Thomas M. Kennedy (TK-0993)
Susan Jennik (SJ-4607)
Larry Magarik (LM-3748)
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place
New York, NY  10003
(212) 358-1500

*- and -*

Hanan B. Kolko (HBK-1307)
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
1350 Broadway, Suite 501
New York, NY  10018
(212) 239-4999

Attorneys for International Union of Electronic,
Electrical, Salaried, Machine and Furniture Workers,
Communications Workers of America (IUE-CWA)

Return Date:
May 9, 2006
10:00 a.m.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

| | |
|---|---|
| In re: | ) |
| | ) |
| In re DELPHI CORPORATION, et al., | ) |
| | ) |
| Debtors. | ) |
| | ) |

Chapter 11

05-44481 (RDD)
(Jointly Administered)

-------------------------------------------------------------

### OBJECTION AND MEMORANDUM OF LAW IN SUPPORT OF OBJECTION OF IUE-CWA TO MOTION FOR ORDER UNDER §§ 1113 AND 1114 AUTHORIZING THE DEBTORS TO REJECT THE IUE-CWA'S COLLECTIVE BARGAINING AGREEMENT AND TERMINATE POST RETIREMENT BENEFITS

## TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF RELEVANT FACTS

    I.    THE IUE-CWA FACILITIES ARE SEPARATE AND UNIQUE . . . . . . . . . . . . 3

    II.    THE IUE-CWA HAS MADE EVERY EFFORT TO MAKE
        DELPHI COMPETITIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    III.    DELPHI HAS NOT PROVIDED IUE-CWA WITH THE MOST
        COMPLETE AND RELIABLE INFORMATION AVAILABLE
        AND HAS WITHHELD RELEVANT INFORMATION WHICH
        IS NECESSARY TO EVALUATE ITS PROPOSALS . . . . . . . . . . . . . . . . . . . . 9

    IV.    DELPHI HAS NOT BARGAINED WITH IUE-CWA IN
        GOOD FAITH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    V.    DELPHI'S PROPOSALS DO NOT REPRESENT GOOD FAITH
        BARGAINING BECAUSE THEY ARE NOT DEFINITE BUT
        ARE CONTINGENT ON THIRD PARTY CONDUCT . . . . . . . . . . . . . . . . . . . 17

    VI.    DELPHI'S PROPOSAL ARE NOT FAIR AND EQUITABLE
        SINCE THEY REQUIRE IUE-CWA MEMBERS TO ABSORB
        A DISPROPORTIONATE SHARE OF THE COSTS OF
        REORGANIZATION AND UNFAIRLY REWARD OTHER
        CONSTITUENCIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    VII.    IUE-CWA HAS MADE A COUNTER-PROPOSAL ON THE
        ATTRITION PROGRAM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT

    I.    DELPHI HAS FAILED TO CARRY ITS BURDEN OF
        SHOWING IT IS NECESSARY TO REJECT THE IUE-CWA
        LABOR AGREEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    II.    THE IUE-CWA HAD GOOD CAUSE TO REJECT THE
        COMPANY'S PROPOSAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    III.    DELPHI'S PROPOSALS ARE NOT FAIR AND EQUITABLE . . . . . . . . . . . 30

IV.   THE BALANCE OF THE EQUITIES DOES NOT CLEARLY
      FAVOR REJECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      A.   The likelihood and consequences of liquidation if
           rejection is not permitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      B.   The likely reduction in the value of creditors' claims
           if the bargaining agreement remains in force . . . . . . . . . . . . . . . . . . . . . 36

      C.   The likelihood and consequences of a strike if the
           bargaining agreement is voided . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      D.   The possibility and likely effect of any employee claims
           for breach of contract if rejection is approved . . . . . . . . . . . . . . . . . . . . 36

      E.   The cost-spreading abilities of the various parties, taking
           into account the number of employees covered by the
           bargaining agreement and how various employees' wages
           and benefits compare to those of others in the industry . . . . . . . . . . . . . 37

      F.   The good or bad faith of the parties in dealing with the
           debtor's financial dilemma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

V.    DELPHI HAS FAILED TO BARGAIN IN GOOD FAITH AND
      AT REASONABLE TIMES WITH THE IUE-CWA . . . . . . . . . . . . . . . . . . . . 39

VI.   DELPHI HAS FAILED TO DEMONSTRATE THAT ITS
      PROPOSALS TO REJECT THE IUE-CWA AGREEMENTS
      ARE NECESSARY FOR REORGANIZATION . . . . . . . . . . . . . . . . . . . . . . . 42

VII.  DELPHI'S PROPOSAL TO TERMINATE POST-RETIREMENT
      MEDICAL AND LIFE INSURANCE BENEFITS FOR
      CURRENT IUE-CWA RETIREES VIOLATES 11 U.S.C. §1114 . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## TABLE OF AUTHORITIES

Cases                                                                                              Page

Cobble Hill Nursing Home v. Henry & Warren Corp., 74 N.Y.2d 475,
    548 N.Y.S.2d 920, 548 N.E.2d 203 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Concilla v. May, 214 A.D.2d 848, 625 N.Y.S.2d 346 (3d Dept. 1995),
    leave denied, 86 N.Y.2d 705 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Danyluk v. Glashow, 2 Misc.3d 1005(A), 784 N.Y.S.2d 919,
    2004 WL 556582 (Civil Court, City of New York,
    New York County, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Ferreira v. Plaza 400 Owners Corp., 125 Misc.2d 296, 479 N.Y.S.2d
    678 (Supreme Court, New York County, New York, 1984) . . . . . . . . . . . . . . . . . . . . . . 42

In re Allied Delivery Sys. Co., 49 B.R. 700 (Bankr. N.D. Ohio 1985) . . . . . . . . . . . . . . . . . . . 29

In re Century Brass Prods., Inc., 795 F.2d 265 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . 33, 35, 44

In re Cook United, 50 B.R. 561 (Bankr. N.D. Ohio 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

In re Express Freight Lines, Inc., 119 B.R. 1006 (Bankr. E.D. Wis. 1990) . . . . . . . . . . . . . 29, 45

In re Family Snacks, Inc., 257 B.R. 884 (B.A.P. 8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 24

In re Farmland, Indus. Inc., 294 B.R. 903 (Bankr W.D. MO. 2003) . . . . . . . . . . . . . . . . . . . . . 46

In re GCI, Inc., 131 B.R. 685 (Bankr. N.D. Ind. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

In re Horseheads Industries, Inc., 300 B.R. 573 (Bankr. S.D.N.Y. 2003) . . . . . . . . . . . . . . 25, 46

In re Indiana Grocery Co., 136 B.R. 182 (Bankr. S.D. Ind. 1990) . . . . . . . . . . . . . . . . . . . . 35, 45

In re Ionosphere Corp., Inc., 134 B.R. 515 (Bankr. S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . 46

In re Jefley, Inc., 219 B.R. 88 (Bankr. E.D. Pa. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

In re K&B Mounting, Inc., 50 B.R. 460 (Bankr. N.D. Ind. 1985) . . . . . . . . . . . . . . . . . . . . 38, 40

In re Lady H. Coal Co., 193 B.R. 233 (Bankr. S.D. W.Va. 1996) . . . . . . . . . . . . . . . . . . . . 29, 34

In re Liberty Cab & Limousine Co., Inc., 194 B.R. 770
        (Bankr. E.D. Penn. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 39, 47

In re Maxwell Newspapers, Inc., 981 F.2d 85 (CA 1992) . . . . . . . . . . . . . . . . . . . . . . . 25, 41, 44

In re Mile Hi Metal Sys., Inc., 899 F.2d 887 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 25

In re Nat'l Forge Co., 279 B.R. 493 (Bankr. W.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 34

In re Pesce Baking Co., Inc., 43 B.R. 949 (Bankr. N.D. Ohio 1984) . . . . . . . . . . . . . . . . . . . . 38

In re Pierce Terminal Warehouse, Inc., 133 B.R. 639 (Bankr. N.D. Iowa 1991) . . . . . . . . 41, 42

In re Royal Composing Room, 62 B.R. 403 (S.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 29

In re Valley Kitchens, Inc., 52 B.R. 493 (Bankr. S.D. Ohio 1985) . . . . . . . . . . . . . . . . . . . . . 43

In re Walway Co., 69 B.R. 967 (Bankr. E.D. Mich. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 29, 35

In re William P. Brogna and Co., 64 B.R. 390 (Bankr. E.D. Pa. 1986) . . . . . . . . . . . . . . . . . . 43

International Bhd. of Teamsters v. IML Freight, Inc., 789 F.2d
        1460 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Martin Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 436
        N.Y.S.2d 247, 417 N.E.2d 541 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Michaels Development Group Inc. v. Greene, 267 A.D.2d 760,
        700 N.Y.S.2d 275 (3d Dept. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

NLRB v. Bildisco, 465 U.S. 513 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 43

Pleasantview Nursing Home, Inc. v. National Labor Relations Board,
        351 F.3d 747 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Seattle-First National Bank v. National Labor Relations Board,
        638 F.2d 1221 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Truck Drivers Local 807 v. Carey Transp., Inc., 816 F.2d 82
        (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 33, 35, 38, 42

Wheeling-Pittsburgh Steel v. United Steel Workers of America,
        791 F.2d 1074 (3d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 42, 45

Statutes

11 U.S.C. § 1113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

11 U.S.C. § 1114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

11 U.S.C. § 1129 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40


Other Authorities

130 Cong. Rec. H7495 (daily ed. June 29, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

130 Cong. Rec. H7496 (daily ed. June 29, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

130 Cong. Rec. S6193 (daily ed. May 22, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

130 Cong. Rec. S8898 (daily ed. June 29, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 44, 45

130 Cong. Rec. S8899 (daily ed. June 29, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

130 Cong. Rec. S8900 (daily ed. June 29, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

Stanley B. Bernstein, Bankruptcy Practice After the Amendments
    Act of 1984 (PEC 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Douglas Bordewick & Vem Countryman, "The Rejection of Collective
    Bargaining Agreements by Chapter 11 Debtors,"
    57 Am. Bankr. L.J. at 319 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

7 Collier, Bankruptcy, ¶ 1113.06[1][b] (15th ed. rev. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

The International Union of Electronic, Electrical, Salaried, Machine and Furniture

Workers-Communications Workers of America ("IUE-CWA"), the labor union representing

8,500 active hourly and 3,000 retired employees of Delphi Corporation, et al. ("Debtor" or

"Delphi"), hereby objects and submits this Memorandum of Law in Support of its Objection to

Debtor's Motion for an Order under 11 U.S.C. § 1113(c) Authorizing Rejection of Collective

Bargaining Agreements and under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree

Welfare Benefits (the "Motion").


## INTRODUCTION

Delphi has presented the IUE-CWA with "take it or leave it," "one size fits all" proposals

that have little or no relevance to the actual contractual standards prevailing at IUE-CWA

represented facilities. Ignoring the differences in prevailing wages at its facilities, Delphi has

made identical proposals to each of its unions without regard to the economic circumstances

applicable to each facility.  Delphi has lumped together 29 different manufacturing facilities that

in most cases have labor costs far in excess of the labor and benefit rates at IUE-CWA

represented facilities to generate "averages" and 'total costs" that ignore the specific conditions

at IUE-CWA plants.  Worse, Delphi has refused to tell the IUE-CWA  the actual savings that it is

attempting to generate at IUE-CWA facilities by the proposals it has made.

Delphi essentially rests its contention that it is fair and equitable to brutally slash the

hourly rates and benefits at these facilities because it has arranged "soft landings" for the affected

employees.  But, as Delphi well knows, most of those proposed "soft landings" do not apply to

the IUE-CWA membership which cannot flow back to OEM-rate General Motors Corporation

-1-

("GM") jobs. The IUE-CWA membership has already cooperated with Delphi in many ways, including by agreeing to prior buy out and retirement incentive programs that leave more than one half of the membership unable to participate in either subsidized retirement or flow back opportunities.

Delphi has not met its obligation to bargain in good faith with the IUE-CWA before the hearing on the Motion. The evidence will show that Delphi did not bargain with the IUE-CWA from November, 2005 through March 24, 2006. More importantly, the March 24, 2006 offer, made just seven days before the filing of the Motion, is not a firm offer under labor law but a set of contingent indefinite proposals conditional on the conduct of a third party. Even if the IUE-CWA was provided the necessary information to evaluate these contingencies (which it was not), it is impossible to bargain over such indefinite proposals.

Finally, Delphi's stark failure to supply crucial information necessary to evaluate its proposals sharply differentiates this proceeding from other so called labor transformation cases.

Delphi's Motion must be denied because:

1.  Delphi has failed to meet its obligation to bargain in good faith with IUE-CWA and its Local Unions prior to the hearing on this motion.

2.  Delphi has offered so called alternative proposals that fail to meet the definite offer standards of 11 U.S.C. § 1113(c) and federal labor law.

3.  Delphi has failed to provide sufficient information about how its proposals impact on the specific manufacturing facilities that the IUE-CWA represents as it is required to do under 11 U.S.C. § 1113(c).

4.    The IUE-CWA had good cause to not accept the proposals for many reasons, including their inapplicability to IUE-CWA plants, Delphi's failure to provide critical information necessary to evaluate these proposals, and Delphi's ability to restore IUE-CWA facilities to profitability without undergoing the enormous disruption caused by these proposals.

5.    Delphi's proposal to the IUE-CWA is neither fair nor equitable and in fact requires IUE-CWA its members to assume a highly disproportionate share of the sacrifices necessary to restore this company to profitability.

6.    Delphi's proposal concerning retiree health and life insurance does not provide for any continuing Delphi responsibility in the event General Motors Corporation substantially reduces or fails to continue such coverage.

## SUMMARY OF RELEVANT FACTS

## I.    THE IUE-CWA FACILITIES ARE SEPARATE AND UNIQUE

The IUE-CWA is a separate and distinct labor union from any other union that bargains with Delphi. The IUE-CWA has represented employees of Delphi and its predecessor, GM, continuously since its founding in 1949. The IUE-CWA and its local unions bargain through the IUE-CWA Automotive Conference Board (the "Conference Board") to achieve agreements that establish the terms and conditions of employment at IUE-CWA represented facilities. No other union has any right to bargain for the IUE-CWA, its local unions or members. Declaration of Henry Reichard, dated April 21, 2006, ¶ 2. (" Reichard Dec.").

These IUE-CWA Local unions are the sole and exclusive representatives at the Delphi facilities noted:

| Local | Facility | Number of actives 12/31/05 |
|-------|----------|---------------------------|
| Local 416 | New Brunswick, N J | 382 |
| Local 755 | Kettering, Ohio | 1,419 |
| Local 698 | Clinton, Mississippi | 816 |
| Local 711 | Gadsden, Alabama | 172 |
| Local 717 | Warren, Ohio | 3,808 |
| Local 718 | Brookhaven, Mississippi | 496 |
| Local 801 | Moraine, Ohio | 1,255 |
| Local 1111 | Anaheim, California | 166 |

The Conference Board negotiates a single national collective bargaining agreement between Delphi and the IUE-CWA (the "National Agreement") which broadly sets the terms and conditions of employment for all IUE-CWA-represented Delphi employees. This National Agreement has been extensively modified at each of the IUE-CWA represented facilities by the entry into local supplements that can and do substantially modify the terms of the National Agreement. Reichard Dec., ¶¶ 3-4.

A recognition of the special problems facing IUE-CWA members is completely missing from Delphi's submission. A careful comparison of the Declarations of Darryl Kidd ("Kidd") and Bernard Quick ("Quick") are extremely telling. The Declaration of Kidd, dated March 31, 2006 ("Kidd Dec.") (who was not describing IUE-CWA benefits) was very general in his depiction of the costs to Delphi of various wages and employment benefits, such as overtime

-4-

costs of $325 million (Kidd Dec., ¶ 25), shift premiums of $65 million (Kidd Dec., ¶ 26), JOBS

bank costs of $346 million and staffing requirements, etc. (Kidd Dec., ¶ 36)  The parallel

Declaration of Quick, dated March 31, 2006 ("Quick Dec."), describing the reasons for rejecting

the IUE-CWA agreements, has much of the same language but is remarkably silent on the cost to

Delphi of these employment practices at the IUE-CWA represented plants.[1]  The fact is that

Delphi has not shown any specific reasons for needing to reject the IUE-CWA agreements and it

cannot because of the agreements that already put 1,910 IUE-CWA represented employees in

competitive  agreements  offering lower wages and benefits than those available to traditional

employees, Quick Dec., ¶ 28.


## II.    THE IUE-CWA HAS MADE EVERY EFFORT TO MAKE DELPHI COMPETITIVE

Each Delphi location faces a different set of circumstances, reflecting various factors

including the product produced by the location, the customers supplied by the location,

competitive pressures facing Delphi with regard to the product produced by the location, the

history of the location, operational issues unique to the location, and the history, demographics,

and experiences of the employees there.  The entry and average rates at many IUE-CWA plants

are below the general proposal made by Delphi. Reichard Dec., ¶ 7.

---

[1]  The paragraphs relating to Overtime, ¶ 29, Shift Premium, ¶ 30, Vacation, ¶ 31, Holidays, ¶ 33, and Jobs Bank, ¶ 37, Quick Dec., detailing the IUE-CWA contract provisions are essentially identical to the paragraphs relating to Overtime, ¶ 25, Shift Premiums, ¶ 26, Vacation, ¶ 27, Holidays, ¶ 28, and Jobs Bank, ¶ 34, Kidd Dec., except that the Quick Dec. contains no statements concerning the costs of the IUE-CWA contractual provisions that Delphi seeks to change through the Motion.

The local supplements are the product of bargaining which reflects and addresses these factors. Each of the IUE-CWA Local Unions have made extraordinary efforts to maintain Delphi's competitiveness by entering into local competitive agreements that substantially reduce the average cost per hour of IUE-CWA represented employees.

### Local 755, Kettering, Ohio -

In 1998, there was emergency bargaining, to prevent the sale of the Delphi Kettering Operations and to secure management's commitment to growing the Delphi Kettering business, Local 755 members agreed to the following concessions:

* A four year wage freeze, all years.
* A four year cost of living freeze.
* Overtime would not be paid until employees had worked 40 hours in a week.
* The attrition of 50 skilled tradespeople. In exchange management agreed to full utilization language allowing skilled trades to work 12 hours per day, 7 days per week it they wanted to work it.
* Management could forgo adding 24 apprentices.
* Established a new "Competitive Hire Plan", that created a third tier within the K-1 plant. Competitive New Hires ("CNH") would come in at $8.00 per hour and grow only to $10.00 after ten years. They had reduced benefits, including no vision or dental, no sickness and accident coverage for one year, no bereavement for three years, no vacation for the first year and only one week paid in the second year. All CNH employees would have gainsharing, instead of profitsharing and no post-employment health care or defined pension plan. There was a one year waiting period for health benefits. They had an Income Security plan, a layoff benefit, which the Company paid for with $0.25 per hour. There was a 401(k) plan instead of a pension.

Declaration of Keith Bailey, dated April 21, 2006, ¶ 11.

### Local 717, Warren, Ohio

In 1993, as a result of management's failure to follow the terms of the 1984 hiring agreement, Local 717 presented to management a proposal to negotiate a new reduced wage hiring plan to spur hiring and growth in the Warren operations. After intensive negotiations the parties agreed to a third tier of wages and benefits. The third tier would be paid a rate equal to 55% of the tier-one wages. This 55% rate would not increase

-6-

yearly but would remain at 55%. These employees would also have a modified 80-20% health care plan. Management agreed to place into Warren the Bussed Electrical Center ("BEC") job package with an employment level of 1,250 employees as a result of the third tier agreement. ...

In 1995, after Local 717 had agreed to the Competitive Hiring Plan, Dave Meyers, the Director of Ohio Operations for Delphi told an assembled group of union leaders that Local 717 was the greatest local union in the Delphi chain and that because of the labor saving concessions we had accepted he promised that Local 717 would have 10,000 members by the year 2000. Delphi even gave out buttons to Local 717 members promising "10,000 in 2000". The fact is that Delphi never kept this promise to Local 717 and we were down to 5000 members by 2001.

Declaration of Donald O. Arbogast, dated April 21, 2006, ¶¶ 10 and 11.


**Local 801, Moraine, Ohio**

In 1996, Local 801 entered into an agreement with management that would greatly increase our competitive position. Many employees had been hired in 1968 and 1969 and would be reaching retirement. As a *quid pro quo* for these concessions, the Company promised to bring in new work and new technology: the V7 compressor, as well as a scroll compressor, and a variable compressor. Subsequent to the ratification of this agreement, the Company reneged on their promise and the V7 compressor was sourced to Hungary and Korea. Furthermore, the Company failed to develop the scroll compressor.

Under the terms of this unprecedented agreement it would now take 17 years for newly hired employees to reach full wage "parity". Employees were hired at $9.11 per hour, which was 50% of the top rate and got a 3% wage increase each year. The biggest concession for the union, under the terms of this agreement called for a waiver of the traditional pension benefits plan. Under this agreement General Motors ("GM") would contribute 7% of the hourly base rate into a Personal Savings Plan ("PSP"). Traditional layoff benefits were also waived, and instead the Company made contributions to the Income Security Plan ("ISP") to provide layoff benefits.

Declaration of Michael Palmer, dated April 21, 2006, ¶¶ 4 and 5.


**Local 711, Gadsden, Alabama**

Our top wage is now $12.67 with only about 25 people at that level; the new hire rate is $7.77. The average rate is about $10 per hour. Delphi proposes to set a wage of $22 per hour for most plants. Our wages are far behind that proposed rate. But Delphi is not

rewarding us for our years of sacrifice. Instead, the Company is proposing to cut our earnings even further by requiring us to pay $180 per month, or $1.04 per hour, for family medical benefits. On top of this required contribution for medical benefits, Delphi proposes new out of pocket costs of up to $3,000 per year, or $1.44 per hour. With those proposals, workers could see a cut in pay of $2.48 per hour from their $10 per hour rate. Delphi wants to sell the plant which could be profitable if it were managed properly.

Declaration of Brian Gilson, dated April 21, 2006, ¶ 11.


**Local 718, Brookhaven, Mississippi**

The next contract changes came in 1994. The Union agreed to Concept 2000: 52.5% of base pay of traditional workers as a new hire rate for full time workers, 401k retirement, limited benefits and no parity. The maximum rate was $18. They only got wage increases when the traditional worker rate went up. Cost of living payments were paid at 52.5% also. Workers began to be hired on these terms in 1998, after all of the PHP commitment workers were hired. Concept 2000 continues today. Their wage rates are now approximately $14 per hour. The Union also agreed to allow Delphi to hire Scheduled Sensitive Employees ("SSEs") who are hired part-time at the rate of $7.50 per hour and receive no benefits. There are now 18 of those employees on lay off. The Union agreed to these changes to make the plant profitable and competitive.

Declaration of Henry Newman, dated April 21, 2006, ¶ 8.


**Local 698, Clinton, Mississippi**

In 1999, the Local agreed to an "all in" package of $13.44 per hour for new hires, called the Competitive Challenge Agreement ("CCA"). ... Workers are paid $8.88 per hour in wages and the rest in benefits, or all in wages. There is a provision that those employees would move in to the third tier based on attrition on a one for one basis. All of those CCA people are now in the third tier. The third tier was modified to get to 70% of the top rate over 4 years and then stay at 70% permanently. The reduced health benefit package is also permanent.

Declaration of Ted Williams, dated April 21, 2006, ¶ 8.


**Local 416, New Brunswick, NJ**

In 1999, after the Delphi spin-off, there was another Agreement -- ESCOP 2000. ... This Agreement added a third tier of competitive employees. The new hires came in at a

-8-

competitive wage of 52.5% of the traditional rate and never get to parity. They get cost of living increases and annual wage increases when the traditional rate goes up. They pay for their health benefits. The only pension is the Income Security Plan which is a defined contribution plan. Employees can also participate in and make their own contributions to the Delphi-IUE Personal Savings Plan ("PSP") but there is no employer match of contributions. There are now 105 employees working with a competitive rate under this agreement.

Declaration of Frank Allen, dated April 21, 2006, ¶ 4.

**Local 1111, Anaheim, California**

In 1998, Local 1111 entered into an agreement with General Motors that called for the hiring of new employees called the Build for Tomorrow Agreement. ... New hires came in at 52.5% of the traditional wage, with a seniority date, health care they paid for and no steps to parity for production workers. There was also an agreement made for competitive skilled trades workers hired at 52.5% of the traditional wage but they had 10 steps to parity for wages only, not benefits. The health benefits provided were choices of different HMO's at different costs. There was no vision coverage and reduced dental coverage.
...

All of the concessions by the Union were made to make the Company more competitive. In 2003, the Company promised to find a viable product replacement for Delphi Anaheim. They have not fulfilled this promise while we have kept our part of the bargain. We have worked for less in exchange for promises of job security. Now the Company wants to eliminate the Jobs Bank which we have paid for by the many concessions we have made. We will be left with no way to support our families.

Declaration of Rochone Ruffin, dated April 21, 2006, ¶ 4, 8.

**III.   DELPHI HAS NOT PROVIDED IUE-CWA WITH THE MOST COMPLETE AND RELIABLE INFORMATION AVAILABLE AND HAS WITHHELD RELEVANT INFORMATION WHICH IS NECESSARY TO EVALUATE ITS PROPOSALS**

The IUE-CWA has sought basic information regarding the actual costs of the benefits that

Delphi seeks to change at IUE-CWA facilities. For example, on March 31, 2006 the IUE-CWA

asked that Delphi detail the actual impact on each IUE-CWA plant of the March 24, 2006

proposal for several different periods of time.  The IUE-CWA specified that each answer should

set forth how much will be saved at each IUE-CWA facility for:

> each cut in wages, elimination of cost of living adjustments, modification of overtime
> provisions, reduction of shift premiums, reduction of holidays, elimination of company
> paid Independence week, reduction of vacation, change in profit sharing, health care
> (separately showing the savings in health benefit costs and the impact of the requested
> premium payments), reduced dental plan, reductions in the life and disability plan,
> elimination of protected status, elimination of restrictions on outsourcing, use of indirect
> employees, elimination of SUB payments, elimination of Guaranteed Income Stream
> Benefits, change in attendance policy, elimination of subsidized discount programs,
> elimination of Joint Activity Center ("JAC") funding and sale of JAC building,
> elimination of legal services benefits, reduction in the number of union representatives,
> expansion of the no strike provisions, freezing of the Hourly Rate Employees Pension
> Plan, establishment of a Retiree Medical Account and the elimination of retiree life
> insurance. Reichard Dec., ¶ 28.

This critically important information has not been provided to the IUE-CWA. In labor

negotiations, it is impossible to craft intelligent counter-proposals unless the party seeking a

change is able to tell the other side how much of a savings they are seeking to achieve.  When the

dominant negotiations have occurred on a facility by facility basis, that information has to be

provided for each facility. Reichard Dec., ¶¶ 29-30.

Delphi has acknowledged that it has not identified any cost savings goals at any IUE-

CWA represented facility.  Reichard Dec., ¶ 16.  In response to an IUE-CWA demand that

Delphi state its overall savings/cost goal and how such goal is being apportioned among the

various labor unions, Delphi admitted that its proposals are not designed to produce a specific

cost reduction goal:

> As explained in Kevin Butler's letter of October 20, 2005, Delphi's proposals are not
> constructed to achieve a specific cost reduction goal.  This is because any cost reduction
> goal is a constantly shifting target depending on assumptions about future revenue, costs,
> volume and lines of business.  Rather, Delphi constructed its proposals to produce an
> hourly labor cost that will allow it to retain existing business and compete successfully

for new business. For the same reason, Delphi has not sought to allocate any cost reduction goal among its different unions but instead seeks to bring all unions into competitive cost levels.

Reichard Dec., Ex. A.

Delphi similarly acknowledged that it cannot predict " the overall savings/returns" it would

achieve by closing particular plants. *Id.*

That lack of information is particularly critical for the IUE-CWA facilities in Moraine

and Kettering, Ohio which are almost entirely used to produce products for GM. Delphi has filed

a self-described "GM Contract Rejection Motion No.1" that identifies Moraine and Kettering as

two of the 21 impacted plants. See, GM Contract Rejection Motion No. 1, ¶ 30, p. 15 ("GM

Motion"). Delphi contends that "rejecting the GM Loss Contracts will provide the Debtors the

opportunity to negotiate reasonable terms that will stem losses, fairly allocate risks, and position

the Debtors to become a viable business in the auto-component supply industry." GM Motion, ¶

6. Paragraph 6 goes on: "Together this Motion and the Section 1113 Motion address an

intolerable situation: the Debtors have been forced to subsidize GM's manufacturing operations

by supplying GM at a loss due to operations obligations and restrictions inherited from GM

itself."

The GM Motion shows that this unprofitable GM business represents 83.6% of the sales

by Kettering and 77% of the sales by Moraine. GM Motion at 24. The alleged losses at those

facilities that require renegotiation of their labor agreements are plainly due in large part from

product pricing that Delphi expects to improve as a result of the GM Motion. But Delphi is now

demanding that IUE-CWA agree to its "one size fits all" contract proposals without knowing the

extent to which better GM product pricing will alleviate the need for labor concessions.

-11-

Appropriate labor costs should be measured against the actual income that the plant will generate. This demonstrates that Delphi has moved prematurely for Section 1113/1114 relief and should defer this Motion until this critical part of the profitability equation is determined.

Chanin Capital Partners ("Chanin"), the IUE-CWA's financial advisors have also been denied critical information necessary for them to analyze and evaluate Delphi's proposals. The chart below summarizes the information that has been requested by Chanin and has not been provided by Delphi:

| Date and Description of Information Request | Comments Regarding Debtors' Response |
|---|---|
| January 10, 2006 – Historical budgets for all IUE-CWA facilities since FY 2003 | On April 20, 2006, the day prior to the 1113 / 1114 objection deadline, Debtors provided 2006 budget information by plant after previously failing to provide such information. |
| January 10, 2006 – Weekly (or the next nearest frequency) management / operating / financial / accounting financial summaries and / or reports regarding IUE-CWA facilities since FY 2003 | Not provided. |
| January 10, 2006 – Summary of lost work at IUE-CWA plants (i.e. lost contracts, customer assignments, etc.). Please include detail on division, model type, manufacturing site, annual volume, annual revenue, customer's rationale for moving business elsewhere, etc. | Debtors did not provide commentary on customer's rationale for moving business elsewhere or providing the contract to another competitor. |
| January 10, 2006 – Hourly employee data by IUE-CWA plant, including classification, tier, age, seniority date, etc. | Debtors did not provide a precise division of "skilled" vs. "high production" vs. "low production" status per employee, which prevented Chanin from being able to precisely analyze the wage proposals (which were made as 3 proposed blended wages classified by the three categories. "skilled" vs. "high production" vs. "low production"). |

| | |
|---|---|
| January 10, 2006 – History of prior IUE-CWA wage and benefit reductions with Delphi as referenced in November 23, 2005 letter from IUE-CWA to Delphi | Not provided. |
| February 10, 2006 – Revenue, volume and cost detail breakdowns by plant. Please provide quarterly and annual detail since FY 2003 and annual detail since FY 2000. For cost detail, please include raw material costs, wages, benefits, overhead (plant specific and corporate), pension and OPEB expense for each of the specified periods.  For revenue, volume and cost detail please break out between GM and non-GM customers | Certain plant by plant historical information was provided by Debtors at a February 14, 2006 meeting in Troy.  Packard financials provided only revenue and operating income by plant, but did not provide any cost detail beyond total operating income. Debtors provided data for Kettering, Moraine, Anaheim and New Brunswick; however, the data was illegible throughout most line items. During a March 21, 2006 conference call between the Debtors, the Debtors' advisors, Packard officials and Chanin, Packard officials said that they would provide an analysis of Packard plant cost breakdowns.  Packard cost breakdowns were not provided until April 20, 2006. |

| | |
|---|---|
| February 10, 2006 – Revenue, volume and cost detail breakdowns by product line. Please provide quarterly and annual detail since FY 2003 and annual detail since FY 2000. For cost detail, please include raw material costs, wages, benefits, overhead (plant specific and corporate), pension and OPEB expense for each of the specified periods.  For revenue, volume and cost detail please break out between GM and non-GM customers | Product line information provided by Debtors was not separated between domestic and international segments, rendering the information meaningless towards any analysis of North American product line profitability and the impact of labor costs on that profitability. |
| February 10, 2006 – Capex maintenance requirements by product line / plant | Not provided. |
| February 10, 2006 – Corporate overhead detail annually for FY 2000 – present, including amounts allocated to each IUE-CWA plant | Not provided. |
| March 14, 2006 – Corporate and divisional overhead for total Delphi | Not provided. |
| April 6, 2006 – March 24 proposal pennysheet for the IUE-CWA | Not provided.  Proposal pennysheets provided only for total hourly labor costs. |

-13-

| | |
|---|---|
| April 6, 2006 – Detail (including annual sales and losses) on GM contracts being rejected at IUE-CWA plants | Profitability at the contract level not provided.<br><br>On April, 20, 2006 the Debtors provided actual profit and loss detail for each plant for 2005 and projected detail for 2006 (the later presumably factoring in the GM rejection motion). However, since projection detail was never provided before, as the Debtors consistently remarked projections were not available at the plant level, the projected impact of the rejection on profitability remains unknown. |

The lack of this information has derailed any ability of IUE-CWA to effectively negotiate concerning Delphi's "one size fits all" proposals. Delphi never provided Chanin with a precise division of "skilled" vs. "high production" vs. "low production" status per employee, which prevented Chanin from being able to precisely analyze the wage proposals (which were made as 3 proposed blended wages classified by the three categories, "skilled" vs. "high production" vs. "low production"). Despite a request on February 10, 2006, Delphi has failed to provide Chanin with annual detail on the corporate and divisional overhead amounts allocated to each IUE plant. Delphi has even failed to provide Chanin with a "penny sheet" for the March 24, 2006 proposal to IUE-CWA, which is traditionally used in the auto and automotive parts industry to indicate the cost (or savings) generated from each element of a collective bargaining proposal for the units impacted by the proposal.

These examples reflect the critical nature of the missing information. The IUE-CWA is aware that Delphi has periodic financial operating reports for each of the IUE-CWA facilities. But Delphi has refused to produce this information. This detailed information would enable the IUE-CWA to pierce the inappropriate corporate wide average costs and gross costs that Delphi is

-14-

using to justify this motion for IUE-CWA facilities and drill down to the actual costs at each of

the IUE-CWA facilities. Reichard Dec., ¶¶ 31-32. The same analysis is true with respect to the

universally utilized penny sheet that Delphi is claiming it cannot provide for the March 24, 2006

proposal. This is information which Delphi has and must produce to the IUE-CWA to enable it

to analyze how Delphi's "one size fits all" proposals actually apply to its members at each of

their facilities.


## IV.    DELPHI HAS NOT BARGAINED WITH IUE-CWA IN GOOD FAITH

Henry Reichard's letter to Delphi executive Kevin Butler of  March 31, 2006, details

Delphi's manifest failure to bargain in good faith with the IUE-CWA before bringing this

motion:

> Your letter of March 29, 2006 erroneously asserts that Delphi and the IUE-CWA have been conducting good faith negotiations since July, 2005. The only meeting that occurred in July, 2005 between the IUE-CWA and Delphi was the initial meeting at which you provided an update on the financial condition of Delphi and a description of the plants you would want to close. We did not receive an actual bargaining proposal describing wages and hours for our plants until October, 2005. We had no negotiations on those proposals and Delphi replaced them with a superceding proposal on November 15, 2005. Delphi withdrew its November 15, 2005 bargaining proposals  on December 19, 2005 before we had any meetings to discuss this proposal with the IUE-CWA bargaining committee. We did not get another proposal until the evening of March 24, 2006. Delphi did not meet with the IUE-CWA to negotiate any changes in our collective bargaining agreement from October 20, 2005 until March 29, 2006.

> Your proposal of March 24 is in fact fundamentally different from the one we received on November 15, 2005. The wages are different, the benefits are different and the contractual language proposals are different. But even if there are areas of duplication between the withdrawn proposal and what we got on March 24, the IUE-CWA is not clairvoyant. We could hardly anticipate which areas of the proposal you would change and which you would again propose.

> Your statement that the IUE-CWA did not make a counter proposal after November 23, 2005 ignores the fact that after December 19, 2005 the IUE-CWA did not

have a proposal to counter. The idea that the IUE-CWA would propose a counter to a withdrawn proposal is ridiculous.

Delphi chose to limit its negotiations for months to the UAW. Our members have their own contracts and their own priorities with Delphi. Your need to negotiate with IUE-CWA is not met by meeting with any other union. That was your choice but you cannot now pretend that at the same time you were negotiating with the IUE-CWA because you were not. The few informal discussions you and I may have had during this period were not a substitute for our traditional negotiations which as you well know require the presence and involvement of our Conference Board leadership.

Your representatives at the March 29, 2006 meeting at Dayton told our negotiators at least 40 times in answer to questions that they would get back to us with answers. They were unable to explain basic aspects of the Delphi proposal. While we expect answers next week in our meetings, the fundamental reality is that Delphi did not engage in any meaningful negotiations with the IUE-CWA before filing your Section 1113/1114 motions today in Bankruptcy Court. Whether that meets your legal obligations remains to be seen.

It certainly is no way to reach a consensual agreement as you purport to want. Let me reiterate: the only way to reach a consensual agreement with the IUE-CWA is to bargain directly with us and to recognize that the different circumstances applicable to our facilities requires a unique response. For example, the attrition plan entered into by the UAW is heavily dependent on flowbacks to existing UAW represented GM plants. We do not have that option for our members and any attrition plan for them needs to include the value of these flowbacks in another form. That is the only way to ensure that any attrition plan is fair and equitable for our members.

We will meet our obligations to fairly consider Delphi's proposals. But there will be no agreement unless and until Delphi puts on the table a proposal that meets our needs and allows our members the income and benefits they need to protect themselves and their families.

Reichard Dec., ¶ 23.

Delphi cannot seriously contend that it bargained with the IUE-CWA over its proposals

prior to the March 31, 2006 motion to reject our labor agreements. Since that date, any

bargaining has been hampered by Delphi's refusal to provide detailed information concerning its

proposals as set forth above and by the continued contingent character to those proposals such

that IUE-CWA has never had a definite proposal to respond to. Reichard Dec., ¶¶ 24-37.

While the IUE-CWA and Delphi representatives have met since March 31, 2006 through the date of this Objection, the discussions have focused almost exclusively on how to adjust the "soft landings" package that the Court has approved to be applicable to the different circumstances of the IUE-CWA. Nor should that be surprising. It took months for GM, Delphi and UAW bargainers to craft the elaborate package of soft landings that have been approved by the Court. Since the IUE-CWA members cannot take advantage of flow backs and are largely unable to enter into subsidized retirements, it will be difficult to fashion an appropriate package that has a similar value for IUE-CWA members. While the parties are trying, they have made no headway in solving the enormous collective bargaining challenge represented by Delphi's March 24, 2006 proposal. Delphi's decision to ignore the IUE-CWA for months and its effort to squeeze bargaining into a short time frame conducted after the parties are already devoting time and resources to the Section 1113 motion has doomed this effort to failure.

## V.    DELPHI'S PROPOSALS DO NOT REPRESENT GOOD FAITH BARGAINING BECAUSE THEY ARE NOT DEFINITE BUT ARE CONTINGENT ON THIRD PARTY CONDUCT

In its March 24, 2006 Proposal to the IUE-CWA, Delphi did not make a definite proposal to the IUE-CWA in what Delphi acknowledges are "several critical areas". Butler Dec., ¶ 59. These "critical areas" are:

- Wage rates for current employees
- Buy outs for employees who choose to leave Delphi
- Buydowns for employees who choose to stay at Delphi
- Supplemental unemployment benefits
- Certain retirement benefits for employees not protected by the GM guarantee, and
- Dental benefits

-17-

*Id.*; See also March 24, 2006 Proposal, Butler Dec., Ex. H. As to these terms of employment,

Delphi's offer depends on how much "Financial Support" it obtains from GM. Butler Dec., ¶59.

At this point, Delphi has not revealed to IUE-CWA how much GM financial support it needs for

the proposal, whether it has started negotiations with GM over how much financial support GM

will provide for the proposal, or when it might finally know how much financial support GM will

provide in connection with its proposal to IUE-CWA. Reichard Dec., ¶ 24. Delphi defines "GM

financial support" as enough money to "fund the incremental cost to Delphi compared to the

Competitive Benchmark Proposals." Butler Dec., ¶59.

It has been impossible to bargain with Delphi over its proposals because they have

been presented in an "alternative format" in which conditions will substantially differ depending

on the level of funding support Delphi receives from GM. Reichard Dec., ¶¶ 24-25. The

differences in proposed wages are significant depending on GM's level of participation. With

GM support the proposed first year wages for production workers are $22 per hour; without the

support the wages are proposed at $12.50 per hour. Worse than that is the provision that in the

event GM gives some support but not all that Delphi seeks, the wages being proposed will be

somewhere between $12.50 and $22.00. The March 24, 2006 proposal to the IUE-CWA Delphi

states:

> In the event that GM does not agree to provide financial support the non-contingent terms
> set forth in or appended to this Term Sheet shall govern.  In the event that GM agrees to
> provide financial support, but that support is insufficient to fund all of the contingent
> proposals set forth herein, or if GM is unable to meet its commitments, Delphi and the
> IUE-CWA agree to discuss which contingent proposals will be implemented and/or
> maintained.

Butler Dec., Ex. H at 4.

-18-

This is an extraordinary proposal. Putting aside the obvious and unsurmountable difficulties entailed in conducting labor negotiations on simultaneous and drastically different wage proposals, Delphi's proposal makes any agreement conditioned upon GM fulfilling any commitments it makes. It is in effect a "snap down" proposal in which any IUE-CWA agreement is subject to reopening (and an implied unilateral roll back by Delphi) if GM does not fulfill its commitments to Delphi. Since the newspapers are full of speculation about a potential GM bankruptcy, this is not idle speculation. Delphi has failed to make definite proposals to the IUE-CWA.

Delphi may regard itself as between a rock and a hard place. But to the extent Delphi has uncertainties in financial support from GM, it was incumbent upon Delphi to get a final determination of where it was going with GM before making this motion. Delphi had to act first to get an agreement with GM to enable it to provide a good faith specific offer to IUE-CWA.

This problem cannot be solved by simply saying to the Union: close your eyes to the contingent offer we have made and bargain as though only the GM non-assisted offer is on the table. The IUE-CWA cannot offer a counter proposal to a proposed $12.50 hourly wage (or ask its bargaining committee to consider making one) when Delphi has on the table a $22.00 hour contingent alternative. The IUE-CWA would not ask its members to ratify an agreement that called for wages $10 an hour below the "real" but contingent offer and they would reject it if it did. Reichard Dec., ¶ 27.

**VI.    DELPHI'S PROPOSALS ARE NOT FAIR AND EQUITABLE SINCE THEY
REQUIRE IUE-CWA MEMBERS TO ABSORB A DISPROPORTIONATE
SHARE OF THE COSTS OF REORGANIZATION AND UNFAIRLY REWARD
OTHER CONSTITUENCIES**

It is critical to note that the IUE-CWA members are not eligible in many instances to take part in the so called "soft landings" that Delphi has been bragging about. First, very few, if any, IUE-CWA members will be able to "flow back" into GM jobs that offer a continuation of OEM type wages and benefits. The IUE-CWA represents only one GM plant that is located in Dayton, Ohio and GM is reducing and not increasing the jobs at that facility. A major underpinning of the asserted fairness underlying this proceeding is not applicable to IUE-CWA members. Reichard Dec., ¶ 11.

Second, the early retirement opportunities that Delphi has stated apply to 14,000 (or 60%) of the UAW members, apply to only 36% of the IUE-CWA represented employees. This difference arises because the IUE-CWA has cooperated with Delphi in the past on a number of early retirement inducements in its plants in order to open up employment opportunities at the competitive level. Many of the employees who might have been motivated into accepting an early buyout have already taken earlier buyouts. They have been replaced by employees on competitive wage agreements. The consequence is that the second major underpinning of the so called soft landing is also not available to more than one-half of the IUE-CWA workforce. Reichard Dec., ¶ 12.

Finally, the last option, the buyout of these jobs at $140,000 for an employee with more than 10 years is fool's gold. IUE-CWA's Moraine employees, for example, have a specific agreement with GM that predates the Delphi spinoff that protected employees would remain

-20-

employed through 2011.[2] Assuming Delphi was right that the employees' wages and benefits earns Delphi $68 an hour, their jobs are worth $140,000 a year for 5 years, or $700,000. The proposed buy-out equals 20% of their potential earnings. In the UAW context, in which the buyout is the third option likely to be taken by very few employees due to the presence of flowbacks and early retirements, it may be an adequate bargain. But it is plainly inadequate when it is expected to be the only alternative available to a majority of our bargaining unit and this offer does not account for the value of the flow backs and incentivized early retirements that the IUE-CWA unit will not be able to obtain. Reichard Dec., ¶ 13.

Delphi's executive bonus program is similar evidence that this reorganization is being carried out on the backs of the IUE-CWA membership. It is now clear that the KECP plan for the first six months of 2006 set easily achievable targets, which are being achieved. The IUE-CWA lacked the data to analyze the rigor of those targets when the Court asked at oral argument on the KECP motion whether the performance targets were a lay-up or a reach. It now appears that Delphi's self set performance targets have been reached in every month so far and it appears will be easily reached by June, 2006. Delphi has thus built a scenario in which it will be simultaneously driving down hourly wages while it distributes checks to its executive work force to dramatically increase their salaries.

It is also now clear that this unfair result is not restricted to key company executives. While this grab was sold as a necessary tool to motivate key company executives, Delphi has, without any authorization from this Court, extended this salary supplement program throughout

---

[2] Moraine employees obtained their agreement by agreeing to reduced wages and benefits, reflected by the fact that their "all in" cost is $10 less than other traditional employees.

-21-

the salaried ranks of Delphi. It would be impossible to frame the contrast any more starkly. The entirety of the salaried workforce will be granted extra compensation just as these hourly wages are being cut under the Company's proposal. Reichard Dec., p. 34. This is unfair, will be perceived as unfair and will trigger a strike.

But the compensation bonuses are not the only fundamentally unfair aspect of this motion. From the beginning of this case, Delphi's executives have demanded an extraordinary compensation package in which they end up with 10% of the equity in Delphi upon its emergence from Chapter 11. See Delphi Human Capital First Day Motion. Since Delphi has repeatedly characterized this case as a "labor transformation" case, Delphi's executives are seeking what they estimate as four hundred million dollars in equity directly as an award for driving down labor wages and benefits for its hourly work force. IUE-CWA members are well aware that their sacrifices will be used to generate an enormous windfall for Delphi's corporate executives that will be not be brought about by increased sales, better products, design creativity, more efficient purchasing or better financial arrangements. This windfall will be gained by the stroke of a judicial pen on an order rejecting Delphi's labor agreements. This too is unfair, will be perceived as unfair and will trigger a strike.

Under the December 12, 2005 "Supplier Agreement Assumption Order," Delphi is permitted to assume supplier agreements and pay those suppliers up to 75% of their pre-petition liabilities. This order authorizes Delphi to pay up to $100 million to cure such pre-petition liabilities, and grants those suppliers an allowed unsecured claim for the remaining pre-petition amounts due. In addition, the suppliers whose contracts are assumed will be able to maintain profitable contracts with Delphi, and will be able to continue a profitable working relationship

-22-

into the future with Delphi.  In contrast, the IUE-CWA members who, as discussed previously, have made pre-petition sacrifices worth millions of dollars to Delphi, will recover none of these pre-petition sacrifices.  In addition, unlike those suppliers who will be able to maintain a profitable, ongoing relationship with Delphi, those IUE-CWA represented employees who will ultimately lose their livelihoods as a result of the bankruptcy will have no continuing relationship with Delphi.  Those IUE-CWA represented employees remain employed by Delphi after the conclusion of the §1113 process will be working for significantly lower wages and benefits, in contrast to the suppliers, whose contracts will remain at existing levels.  Finally, in contrast to suppliers, who do not rely on Delphi for most of their revenues, most IUE-CWA represented Delphi employees' primary source of income and benefits is Delphi.  Thus, the losses suffered by the IUE-CWA represented employees will have a far greater impact on them than any losses suffered by any suppliers.

## VII.    IUE-CWA HAS MADE A COUNTER-PROPOSAL ON THE ATTRITION PROGRAM

On April 5, 2006 the IUE-CWA made a counter-proposal on the portion of the March 24, 2006 Delphi proposal describing an attrition program for IUE-CWA members . See Butler Dec., Ex. H, p. 13-14 and Reichard Dec. Ex. G.  The IUE-CWA counter-proposal seeks increased severance since most IUE-CWA members will be unable to take advantage of flow backs and early retirements.  Ibid. The IUE-CWA was able to draft a counter-proposal to the attrition program proposed by Delphi because it was a definite proposal and because the IUE-CWA could compute the impact of the proposal on each of its facilities.  On April 17, 2006, Delphi rejected this counterproposal. *Id.*

-23-

## ARGUMENT

**I.    DELPHI HAS FAILED TO CARRY ITS BURDEN OF SHOWING IT IS
NECESSARY TO REJECT THE IUE-CWA LABOR AGREEMENTS**

In <u>Truck Drivers Local 807 v. Carey Transp., Inc.</u>, 816 F.2d 82, 88 (2d Cir. 1987) the

Second Circuit described Section 1113 as requiring three substantive requirements:

> 1.    The proposal is "limit[ed]" to "those necessary modifications in the
> employees benefits and protections that are necessary to permit the reorganization of the
> debtor " and that insures that "all creditors, the debtor and affected parties are treated
> fairly and equitably," (11 U.S.C. §1113(b)(1)(A)),

> 2.    The union has rejected the proposal "without good cause," (11 U.S.C.
> §1113(c)(2)), and

> 3.    The balance of equities clearly favors rejection. (11 U.S.C. § 1113(c)(3)).

In addition, the debtor must demonstrate that it has made a proposal based on the "most

complete and reliable information available at the time of such proposal" (11 U.S.C. §1113

(b)(1)(A)), provided the union with "such relevant information as is necessary to evaluate the

proposal" (11 U.S.C. § 1113(b)(1)(B)), and met "at reasonable times, with the authorized

representative to confer in good faith in attempting to reach mutually satisfactory modifications

of such agreement." 11 U.S.C. § 1113(b)(2).

Courts have uniformly held that on each of these elements the debtor bears the burden of

proof by a preponderance of the evidence. See, <em>e.g.</em>, <u>In re Family Snacks, Inc.</u>, 257 B.R. 884, 892

(B.A.P. 8th Cir. 2001). While it is traditional to analyze these factors in a Section 1113 motion

in the order discussed by the statute, it is unnecessary to do so since each of the factors are

equally determinative. Since it is apparent that the IUE-CWA had ample cause to reject the

-24-

Delphi offer, both as initially made and as later modified, and that the balance of the equities

does not clearly favor rejection, we will address those criteria first.


## II.    THE IUE-CWA HAD GOOD CAUSE TO NOT ACCEPT DELPHI'S PROPOSAL

The Second Circuit has held that "the entire thrust of § 1113 is to ensure that

well-informed and good faith  negotiations occur in the market place, not as part of the judicial

process." In re Maxwell Newspapers, Inc., 981 F.2d 85, 90-91 (CA 1992).  In Section 1113

negotiations, where the union does not accept a proposal that is necessary, fair and equitable,[3] it

must explain the reasons for its opposition.  In re Mile Hi Metal Sys., Inc., 899 F.2d 887, 892

(10th Cir. 1990); Carey Transp. Inc., 816 F.2d at 92.  The IUE-CWA had good cause to not accept

the March 24, 2006 Delphi proposal because Delphi's offer ignores the vital differences that

differentiate IUE-CWA contracts.  In re Horsehead Industries, Inc., 300 B.R. 573, 588 recognized

that the price of a Debtor's bargaining strategy to effectively ignore a particular bargaining unit is

a denial of the motion to reject that collective bargaining agreement.  A debtor must meet the

statute's requirements as to each collective bargaining agreement and bargaining unit, and a

failure to meet with a union with regard to one of many collective bargaining agreements

precludes rejection of it.

Delphi's proposals do not recognize the significant differences between IUE and other

unions.  First, IUE-CWA has authorized its local unions to enter into local competitive

agreements and every single one has done so.  The IUE agreements already offer opportunities

_____

[3]  IUE-CWA does not concede that Delphi's March 24, 2006 proposal was necessary, fair
or equitable as applied to its members and Local Unions.

-25-

for Delphi to reduce its average labor costs within the context of the existing contracts. There is no need to reject these labor agreements but to fully implement them. As but one example, the Kettering, Ohio local agreement allows Delphi to bring in new hires at an initial wage of $8.00 per hour. Delphi has failed to demonstrate that it is unable to reduce the average rates at Kettering to the levels it is seeking by diverting work from more expensive facilities into Kettering at the lower rates. The Kettering competitive agreement also accepts a reduced cost health plan and eliminates the defined benefit pension plan in favor of a defined contribution program similar to what Delphi is now demanding.

At Gadsden, Alabama, the local agreement hires employees at $7.77 per hour. These workers also receive a limited health benefit and are participants in a defined contribution pension plan. The Delphi proposal ignores the sacrifice these workers have made to help maintain these jobs and instead demands that in addition to freezing them into their low wages, they must now also pay for health care in the amount of $180 per month. That is a reduction in their pay to an effective rate of $6.67 per hour or $13,873.60, which is absurdly low and indeed below the poverty rate in Alabama, which in 2005 was $15,720 for a family of three with one child. See www.census.gov/hhes/wwwpoverty/thrshld/thresh05.html. The fact is that Delphi has simply not taken the trouble to craft a proposal that is responsive to the particular circumstances represented by IUE-CWA facilities. This one size fits all approach does not satisfy their obligations under Section 1113.

Delphi's decision to make its March 24, 2006 proposals contingent upon the action of General Motors is a further reason justifying the IUE-CWA's non acceptance of the March 24, 2006 proposal. Delphi acknowledges that its proposals are "contingent on GM action in "critical

-26-

areas" such as wage rates for current employees and the proposed buy outs for employees who

choose to leave Delphi and buydowns for employees who choose to stay at Delphi. As we show

below, a contingent proposal that offers a moving wage target does not satisfy Delphi's

obligations under Section 1113 to make a proposal to the IUE-CWA which provides for those

necessary modifications in the employees benefits and protections that are necessary to permit

the Delphi's reorganization.

Finally, Delphi's absolute failure to engage in any negotiations with the IUE-CWA for

months from November, 2005 through March 29, 2006 is cause to not accept this offer. Delphi

first made a proposal to the IUE-CWA leadership for changes in its collective bargaining

agreements on October 20, 2005. Delphi modified the October 20, 2005 proposal on November

15, 2005. Those proposals were not accompanied by sufficient information to evaluate the

extraordinary changes demanded by Delphi.

After the IUE-CWA requested information, Delphi withdrew its proposals on December

19, 2005. After withdrawing this proposal, Delphi did not make another proposal to the IUE-

CWA for the next 95 days. The next proposal for a change in the IUE-CWA collective

bargaining agreement was not made until the eve of this proceeding when Delphi finally sent a

proposed set of contractual changes to the IUE-CWA at 10:00 pm on March 24, 2006. That

extraordinary delay is a unique circumstance that requires that this motion be evaluated

separately for the IUE-CWA from any other union in this proceeding. The IUE-CWA has not

had a serious opportunity to bargain with Delphi over the terms of its proposed contract.

The IUE-CWA was also entitled to not accept Delphi's proposal because the proposal

does not restrict itself to items which are necessary to reorganize Delphi but constitutes a wish

list that sweeps in many irrelevant items. These unnecessary proposals include restricting overtime after 40 hours, eliminating Sunday and Holiday double time pay, forcing sale of a jointly owned training center, reduction of union representatives, broadening of no strike provisions and institution of a zipper clause. There is no cogent argument that these provisions are necessary for Delphi to successfully reorganize but they were a portion of Delphi's proposals at the time of the filing of this motion and they remain in the Company's proposals as this brief is being written. The IUE had no choice but to reject this poorly drafted and in many cases inapplicable proposal. At a minimum, Delphi has not shown that the IUE-CWA lacked good cause to not accept its March 24, 2006 offer.

Section 1113(c) and Section 1114(g) (2) require Delphi to prove that the IUE-CWA refused to accept its proposal without "good cause": "The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that - . . . (2) the authorized representative of the employees has refused to accept such proposal without good cause." 11 U.S.C. § 1113(c) (emphasis added). The legislative history of the "good cause" requirement indicates that a bankruptcy court should give serious consideration and considerable weight to a union's reasons for rejecting the debtor's proposals. Representatives Hughes and Morrison stated that the good cause language was intended to embody the same standard suggested in Douglas Bordewick & Vern Countryman, "The Rejection of Collective Bargaining Agreements by Chapter 11 Debtors," 57 Am. Bankr. L.J. at 319 (1983), that accords a union a presumption of reasonableness to its grounds for rejecting the debtor's proposal. See 130 Cong. Rec. S8899 (daily ed. June 29, 1984) (statement of Senator Kennedy citing statement of Representatives Morrison and Hughes).

-28-

The plain language of Section 1113 mandates that the existence of a union's "good cause" provides a separate and independent statutory reason for denial of the debtor's application. In particular, Section 1113(c)(1) provides that the court shall approve an application for rejection only if the trustee has "made a proposal that fulfills the requirements of subsection (b)(1)." Section 1113(c)(2) then provides that the court can approve the application to reject only if the union has rejected the proposal without good cause. Section 1113(c)(2) provides an additional requirement for the debtor. Thus, even though a proposal might satisfy the requirements of Section 1113(a)(1), the debtor still must prove to the court's satisfaction that the union does not have good cause for not accepting the debtor's proposal. See also Royal Composing Room, 62 B.R. 403, 406 (S.D.N.Y. 1986) (the good cause requirement was "intended to ensure that a continuing process of good faith negotiations will take place before court involvement") (internal citation omitted). If the "debtor's proposal is not necessary to its reorganization and is not fair to all concerned, it follows that the union rejected the proposal with good cause." In re Express Freight Lines, Inc., 119 B.R. 1006, 1017 (Bankr. E.D. Wis. 1990); cf. In re Allied Delivery Sys. Co., 49 B.R. 700, 704 (Bankr. N.D. Ohio 1985); Walway, 69 B.R. at 974; In re GCI, Inc., 131 B.R. 685, 696 (Bankr. N.D. Ind. 1991) (same).

Finally, unions have good cause to not accept a Debtor's proposal when meaningful negotiations could continue between the parties. See In re Liberty Cab & Limousine Co., 194 B.R. 770, 777 (Bankr. E.D. Pa. 1996); Lady H. Coal, 193 B.R. at 242. That is most certainly the case here.

The current Delphi proposal is poorly thought out and inapplicable in many instances to the IUE workforce which has already provided substantial relief to Delphi. Delphi should withdraw this proposal until:

- Delphi is certain of the level of financial support it will receive from GM and can structure its proposals accordingly,

- Delphi has analyzed the impact on each of its proposals upon IUE-CWA represented facilities and provided that information to the IUE-CWA,

- Delphi has accomplished the repricing it is attempting with GM with respect to the Morraine and Kettering facilities, and

- Delphi has given the IUE-CWA an opportunity to respond to a proposal that is not contingent on the actions of a third party, is specific to the IUE-CWA facilities, is adequately supported by information disclosure to enable the IUE-CWA to make counter proposals where appropriate and is fair and equitable to all concerned.


## III.    DELPHI'S PROPOSALS ARE NOT FAIR AND EQUITABLE

Section 1113's substantive provisions were enacted to ensure that "covered employees do not bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden, but only their fair and equitable share of the necessary sacrifices." 130 Cong. Rec. H7496 (daily ed. June 29, 1984) (statement of Rep. Morrison) (emphasis added). It would be difficult to craft a bargaining proposal that is less fair and equitable to the IUE-CWA and its members than the proposal by Delphi. A fair and equitable

-30-

proposal would require all constituents in the Delphi universe to suffer roughly proportional dislocation. Instead this proposal is squarely crushed onto the backs of Delphi's unionized work force.

Delphi executives are getting pay raises not cuts. The Court approved an executive pay plan that provided a bonus opportunity in excess of $38 million dollars to the top 467 executives for the first six months of 2006. Delphi did not stop there. Delphi extended the bonus largess down to all layers of salaried workers. The current plan will reward the executive work force with millions of dollars in bonuses in addition to the $38 million dollars of bonuses already approved by the Court.

Delphi claims that it will reduce its global salaried work force by 8,500 employees, that it will realize savings of approximately $450 million a year in global SG & A expenses and that there will be a restructuring of health care plans for salaried employees. It is apparent that these minor steps for salaried personnel were taken with Section 1113 in mind. But they are not equivalent to the enormous losses the IUE-CWA hourly workforce that remains after the so called transformation is being asked to accept.

The annual prospective wage loss to a 45 year old IUE-CWA traditional wage member at Warren, Ohio who is not eligible for a flow back to GM or to an early retirement is over $27,000 in wages plus the termination of his pension and retiree health benefits, which represents thousands more in reduced compensation each year. If he remains employed by Delphi for ten years until he reaches age 55, he will have lost hundreds of thousands of dollars. This is an enormous economic dislocation for workers who bought and paid for the economic insurance that Delphi is now taking away. It is not an exaggeration to point out that an income reduction of

-31-

more than 40% will result in home mortgage foreclosures, personal bankruptcies, car

repossessions, failed marriages, children being pulled from college and a host of personnel

tragedies inevitably following from this huge economic loss not only to these individuals but also

to their communities such as Dayton, Ohio and Warren, Ohio where thousands of IUE-CWA

Delphi employees that will be affected by this motion reside.  Reichard Dec., ¶ 33.

Frank Allan states in his  Declaration dated April 21, 2006, ¶ 11:

> If Delphi's proposals were adopted and applied to New Jersey most people would
> have to quit.  Property taxes and the standard of living here is too high for the
> wages proposed by Delphi.  Workers have mortgage payments to make and a
> further reduction in their wages would make it impossible for them to survive in
> the State of New Jersey.  The only choice workers would have would be to move
> out of the area and hope to find a job.  Maybe the Government wants to support
> our children because if they don't step in soon this country is going to a record
> poverty rate, turning us into the Third World Countries where Delphi is sending
> our jobs.

Donald O. Arbogast states in his Declaration dated April 21, 2006, ¶ 19 that:

> To impose the proposals currently proposed by Delphi would create an economic disaster
> in the Mahoning Valley area of Ohio. A huge percentage of the families in the area are
> dependent on GM and Delphi for their survival.  If wages are cut as Delphi proposes,
> workers would lose their homes and cars and could not meet their financial
> responsibilities and support their families.

The contrast with the lack of reductions in income and benefits to the remaining salaried

work force is startling.  No salaried worker is losing a dime of compensation in this proposal.  In

fact the reverse is true and they are being given enhanced compensation plans with easily

obtainable performance targets.  The global reach of the supposed $450 million in SG & A

savings dilutes its impact in the North American operations by a substantial and unknown factor.

It is not responsive to Section 1113 to cut salaried workers in India or Mexico which may well be

where these cuts will be made if they are made at all.

-32-

But it is not only Delphi Executives who have prospered in this case.  Delphi has rewarded the trade vendor community through special programs that have paid off millions of dollars in pre-petition debt.

A proposal that satisfies Section 1113(b)(1)(A) must "assure[ ] that all creditors, the debtor and all of the affected parties are treated fairly and equitably."  11 U.S.C. § 1113(b)(1)(A) (emphasis added).  The purpose of this provision is to "spread the burdens of saving the company to every constituency while ensuring that all sacrifice to a similar degree."  Century Brass, 795 F.2d at 273 (emphasis added).  See also 29 U.S.C. § 1114 (f)(1)(A).  While a debtor is not required to prove, in all instances, that managers and non-union employees will have their salaries and benefits cut to the same degree that union workers' benefits are to be reduced, "such a showing would assure the court that these affected parties are being asked to shoulder a proportionate share of the burden."  Carey Transp., 816 F.2d 82 at 90.  This fact pattern stands the idea of cutting non-union employees salaries and benefits "to the same degree" on its head.  Here, these non-union salaries and benefits are increasing while the union members are seeing their wages and benefits drastically reduced.

As noted above, the legislative history makes clear that the "fair and equitable" requirement of Section 1113 ensures that employees are not forced to "bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden."  130 Cong. Rec. H7496 (daily ed. June 29, 1984) (statement of Rep. Morrison). The "fair and equitable" standard thus "guarantees that the focus for cost cutting must not be directed exclusively at unionized workers ... [but that] the burden of sacrifices in the reorganization

-33-

process will be spread among all affected parties." 130 Cong. Rec. S8898 (daily ed. June 29,

1984) (statement of Sen. Packwood).

The Debtors may not seek to place a disproportionate share of the financial burden of

avoiding liquidation upon labor unions. See In re Nat'l Forge Co., 279 B.R. 493, 501 (Bankr.

W.D. Pa. 2002). The burden must be spread fairly and equitably among all affected parties. See

Wheeling-Pittsburgh Steel v. United Steelworkers of America, 791 F.2d 1074, 1091 (3d Cir.

1986). The focus of the inquiry is whether the proposed sacrifices will be borne exclusively and

disproportionately by members of the bargaining unit or will be spread among all affected

parties. Id. Moreover, the concessions sought from various parties "must be examined from a

realistic standpoint." Id. at 1093.

Congress recognized when enacting the "fair and equitable" standard that a negotiated,

rather than an imposed, settlement would be preferable, and that a debtor will be able to obtain

crucial worker support only if proposed modifications are necessary and employees know that the

burden is being fairly shared. As Senator Packwood explained, the fair and equitable requirement

"is desirable since experience shows that when workers know that they alone are not bearing the

sole brunt of the sacrifices, they will agree to shoulder their fair share and in some instances

without the necessity for a formal contract rejection." Id.

The failure to meet this requirement is fatal to Delphi's motion, regardless of whether it

meets all other standards. See In re Lady H. Coal Co., 193 B.R. 233, 242 (Bankr. S.D. W.Va.

1996) (denying Section 1113 motion because of inequities between officers' compensation and

treatment of employees, even in face of possible shut down of facility ); In re Jefley. Inc., 219

B.R. 88, 93-94 (Bankr. E.D. Pa. 1998) (continued receipt by debtor's principals of high salaries

-34-

prevented court from concluding that proposal was fair and equitable to union employees); In re

Indiana Grocery Co., 136 B.R. 182, 195-96 (Bankr. S.D. Ind. 1990) (denying rejection motion

because top management took no reduction in salaries and received bonuses while at the same

time sought to reject CBA); see also In re Walway Co., 69 B.R. 967, 973 n.15 (Bankr. E.D.

Mich. 1987) ("In most cases, a financially troubled company should consider rejection of a labor

contract a last resort to help the company survive. The history of the collective bargaining

agreement and its special treatment and protection lends support to this conclusion").

## IV.    THE BALANCE OF THE EQUITIES DOES NOT CLEARLY FAVOR REJECTION

Under the standards prevailing in the Second Circuit under Sections 1113 and 1114,

Delphi cannot show that the "balance of the equities clearly favors rejection" of the CBA. 11

U.S.C. §1113(c)(3). The Second Circuit has held that the requirement that "the balance of the

equities clearly favors rejection of such agreement" (section 1113(6)(3)) is a "codification of the

Bildisco standard." Carey, 816 F.2d at 92; Century Brass, 795 F.2d at 273. The Carey court

"glean[ed] at least six permissible equitable considerations," which may also "factor into" other

requirements of the statute. Applying these factors to Delphi's motion demonstrates that the

balance of the equities requires denial of this Section 1113/1114 motion:

### A.    The likelihood and consequences of liquidation if rejection is not permitted:

There is no need to reject the IUE agreements to prevent liquidation of Delphi. Each of

the IUE-CWA agreements provide for a competitive hiring agreement that allows Delphi to hire

into IUE-CWA plants enough lower wage workers to bring about a competitive average wage

rate. Especially when combined with the effect of the anticipated buyouts that will allow more

-35-

employees to be hired under the competitive wage agreements and the anticipated price increases for Delphi from GM products, it is clear that Delphi can generate substantial savings to prevent liquidation without rejecting the IUE agreements.

**B.      The likely reduction in the value of creditors' claims if the bargaining agreement remains in force:**

The value of the creditor's claims will be reduced further if the IUE agreements are rejected.  The IUE-CWA claims under the Life Time Job Security Agreements in effect at most of the IUE-CWA plants will be in excess of $1 billion dollars.  The existing creditors claims could be swamped if this court unnecessarily forces a rejection of the IUE lifetime income and security agreements.

**C.      The likelihood and consequences of a strike if the bargaining agreement is voided:**

A strike at the IUE facilities is inevitable if these agreements are voided and the IUE-CWA membership is left with little opportunity for participation in the flowbacks or early retirements and no prospect of continuing employment.  It is a strike that no one wants but will be forced on the IUE-CWA and on Delphi if it takes the reckless step of terminating these agreements.

**D.      The possibility and likely effect of any employee claims for breach of contract if rejection is approved:**

There is a certainty that the IUE-CWA will advance large claims for breach of its contracts if rejection is approved.

-36-

E.    **The cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry:**

Delphi constituents that have not agreed over the years to take various reductions in wages and benefits sought by Delphi are far better able to absorb the cost of any further necessary reductions in wages and benefits. In Kettering, for instance, the employees agreed to a four year freeze in wages and benefits. So called traditional wage IUE members at Kettering earn substantially less than traditional wage employees at other Delphi facilities. The blended average wage rates at Kettering is $18.32, well below the rates at other Delphi facilities because of the sacrifices already made in that facility. Kettering employees should not be required to absorb further cuts on a misconceived one size fits all basis that ignores the reality of what they have given before.

F.    **The good or bad faith of the parties in dealing with the debtor's financial dilemma:**

The IUE-CWA has acted in good faith throughout its recent decades of bargaining with first GM and then Delphi. Starting in the 1980's, the IUE-CWA freed up its local unions to negotiate local competitive agreements to encourage placing additional work into our facilities. Delphi, in contrast, has failed and refused to fulfill the commitments that it made to award our facilities with additional work in response to these concessions. Delphi should not be rewarded with lower wages through this motion when it has not made serious use of the opportunities it already has to reduce its aggregate operating costs.

-37-

Delphi's manifest failure to bargain before the filing of this motion with the IUE-CWA

also demonstrates its relative bad faith. Carey, 816 F.2d at 93. Delphi's burden of proof on the

balance of the equities test is heavier than the preponderance of the evidence test. As the court

explained in In re K & B Mounting, Inc., 50 B.R. 460, 467 (Bankr. N.D. Ind. 1985), "[t]he

debtor's counsel has the burden of proving that the balance of the equities clearly favors rejection.

The modifying adverb suggests that a preponderance of the evidence will not be sufficient." Id.

(emphasis in original) (quoting Stanley B. Bernstein, Bankruptcy Practice After the Amendments

Act of 1984 (PEC 1984)). In this respect, International Bhd. of Teamsters v. IML Freight, Inc.,

789 F.2d 1460 (10th Cir. 1986), is particularly instructive. There, the court reversed a bankruptcy

court's decision permitting the debtor to reject its collective bargaining agreement because the

bankruptcy court failed to consider the impact of rejection. The court specifically noted that the

antagonistic labor relations atmosphere made it likely that a damaging strike could result from

rejection:

> The bankruptcy judge concluded that without rejection the employees would lose their
> jobs. But there is little discussion of the effect on employees from rejection. While there
> is an indication that both the bankruptcy judge and district judge were aware that the
> employees would probably strike after rejection, the reality of the union's strongly stated
> opposition was dismissed with an expression of hope that the debtor would reach an
> accommodation with its employees. Such optimism would scarcely seem warranted in
> view of the pre-bankruptcy history, including unfair labor practice charges following
> unilateral wage cuts.

Id. at 1463; see also In re Pesce Baking Co., Inc., 43 B.R. 949, 961 (Bankr. N.D. Ohio 1984)

(denying debtor's motion to reject agreement because "[c]onsidering the risk of a strike or

decreased productivity, [the debtor's] projected savings is highly speculative)

-38-

## V.  DELPHI HAS FAILED TO BARGAIN IN GOOD FAITH AND AT REASONABLE TIMES WITH THE IUE-CWA

Delphi has made the barest of efforts to secure an agreement with the IUE-CWA to avoid making this motion.  The IUE-CWA did not receive an actual bargaining proposal from Delphi describing wages and hours for our plants until October, 2005.  There were  no negotiations on those proposals and Delphi replaced them with a superceding proposal on November 15, 2005. Delphi withdrew its November 15, 2005 bargaining proposals  on December 19, 2005 before had any meetings were held to discuss this proposal with the IUE-CWA bargaining committee. The IUE-CWA did not get another proposal until the late evening of March 24, 2006.  The undeniable fact is that Delphi did not meet with the IUE-CWA to negotiate any changes in our collective bargaining agreement from October 20, 2005 until March 29, 2006.

Delphi chose to limit its negotiations for months to the UAW.  IUE-CWA  members have their own contracts and their own priorities with Delphi.  Delphi's need to negotiate with IUE-CWA is not met by meeting with any other union.

An abbreviated "take it or leave it" presentation, no matter how well documented, cannot suffice for the good faith bargaining envisioned by the Supreme Court.  *Id.* at 132, *see also* In re Liberty Cab & Limousine Co., Inc., 194 B.R. 770 (Bankr. E.D. Penn. 1996) (recognizing general principle that "take it or leave it" approach is not indicative of good faith bargaining).  These bankruptcy court holdings echo the well-established labor law principle that a "take it or leave it" approach constitutes unlawful bad faith.  *See, e.g.*, Pleasantview Nursing Home, Inc. v. National Labor Relations Board, 351 F.3d 747, 758 (6th Cir. 2003) ("If a party is so adamant concerning its own initial positions on a number of significant mandatory subjects, we may properly find bad faith evinced by its 'take it or leave it' approach to bargaining."); Seattle-First National Bank v.

-39-

National Labor Relations Board, 638 F.2d 1221, 1227 (9th Cir. 1981) ("good faith presupposes a

desire to reach ultimate agreement, thus management and labor cannot maintain an inflexible

attitude").

 Abuse of the time frame in submitting the motion for rejection may affect the requirement

that bargaining be in "good faith." The submission of a motion for rejection at the inception of a

case creates obvious problems. It should be noted that although the statute requires that at the

time it is made, the proposal must be based on the most complete and reliable information

available, a court considering whether this test has been met will ordinarily be making such a

determination based on the information that is available at the time of the hearing on the motion

for rejection. If a court is required to adjudicate a motion to reject a collective bargaining

agreement in the early stages of a case, there may be relatively little credible evidence concerning

the dollar amount of claims against the debtor, the likely treatment of claims and equity interest

under a plan or the ultimate probability that a plan will be filed which will satisfy the

confirmation requirements of section 1129. The "most complete and reliable information" at such

a time may neither be complete nor very reliable in the true sense of those terms. Collier On

Bankruptcy, ¶ 1113.06[1][b] (15th ed. revised 2005). Courts have followed this reasoning and

indicated that the requirement that the parties undergo good faith negotiations may be hindered

by a debtor's premature resort to the bankruptcy court in an effort to rid itself of previously

agreed upon collective bargaining agreements. In re K&B Mounting, Inc., 50 B.R. 460, 465

(Bankr. N.D. Ind. 1985) ("Although the application for rejection may be filed at any time after

the proposal is made, there must be evidence of good faith negotiations with the union before the

-40-

debtor turns to the court. It must be kept in mind that one of the main purposes of the new Code section is to encourage solution of the employer's labor problems through collective bargaining rather than by means of the debtor's unilateral action and recourse to the bankruptcy court.").

Delphi's resort to the 1113 process from the first day of this case is inherently in derogation of its bargaining obligation under the statute and is contrary to its central objective. See In re Maxwell Newspapers, Inc., 981 F.2d 85, 90 (2d Cir. 1992) ("the entire thrust of § 1113 is to ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process."); In re Pierce Terminal Warehouse, Inc., 133 B.R. 639, 647 (Bankr. N.D. Iowa 1991) ("The statute puts the onus on the parties to continue bargaining in order that the union and the employer resolve their dispute without court intervention.").

Delphi's failure to make firm and definite contractual offers to the IUE-CWA also demonstrate its lack of good faith bargaining. "In order to be capable of being accepted, an offer must be certain and definite with respect to all of its material terms. See 1 Corbin, Contracts Sec. 95 at 394. This doctrine of definiteness states that if an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." Cobble Hill Nursing Home v. Henry & Warren Corp., 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989). Further, a mere agreement to agree in which a material term is left for future negotiations is unenforceable. Martin Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981)." Danyluk v. Glashow, 2 Misc.3d 1005(A), 784 N.Y.S.2d 919, 2004 WL 556582,***4(Civil Court, City of New York, New York County, 2004); Michaels Development Group Inc. v. Greene, 267 A.D.2d 760, 700 N.Y.S.2d 275 (3d Dept. 1999).

-41-

It is basic contract law that an offer must be definite and certain in order that the offeree

can know what performance is required of him. 1 Williston §§ 38-48; 1 Corbin § 95-100,

Ferreira v. Plaza 400 Owners Corp., 125 Misc.2d 296, 301, 479 N.Y.S.2d 678, 681 (Supreme

Court, New York County, New York, 1984). Rather than a definite and certain offer, it must be

viewed not as an offer but a suggestion of the terms of a future bargain when and if a party

obtains something it did not have, and may not be the basis of a contract, Concilla v. May, 214

A.D.2d 848, 850, 625 N.Y.S.2d 346, 348 (3d Dept. 1995), leave denied, 86 N.Y.2d 705 (1995).


## VI.    DELPHI HAS FAILED TO DEMONSTRATE THAT ITS PROPOSALS TO REJECT THE IUE-CWA AGREEMENTS ARE NECESSARY FOR REORGANIZATION

Section 1113 requires that the Debtors' proposals to its unions for modifying its collective

bargaining agreements must be "necessary" to permit its reorganization. The Second Circuit has

concluded that the necessity requirement "places on the debtor the burden of proving that its

proposal is made in good faith, and that it contains necessary, but not absolutely minimal,

changes that will enable the debtor to complete the reorganization process successfully." Carey

Transp., 816 F.2d at 90. However, even under this standard, "necessary" means something more

than "desired by the debtor's management." Id. If it is more probable than not that a debtor can

successfully reorganize without the requested modifications to the collective bargaining

agreements, then the debtor has not met its burden for rejection of those agreements, even if the

requested changes would in some sense improve the debtor's business. Therefore, a debtor's

proposal under section 1113 may include only those items absolutely necessary for the debtor's

reorganization. See Wheeling-Pittsburgh Steel, 791 F.2d at 1088; In re Pierce Terminal

-42-

Warehouse, Inc., 133 B.R. 639, 646-47 (Bankr. N.D. Iowa 1991); In re William P. Brogna and

Co., 64 B.R. 390, 392 (Bankr. E.D. Pa. 1986); In re Valley Kitchens, Inc., 52 B.R. 493, 497

(Bankr. S.D. Ohio 1985); In re Cook United, 50 B.R. 561 (Bankr. N.D. Ohio 1985) (denying

rejection because the debtor failed to establish that wage concessions were essential to a positive

cash flow). While Carey is binding on this Court, the IUE-CWA respectfully submits that Carey

case was wrongly decided and reserves the right to argue that it should be reconsidered in any

subsequent appellate proceedings.

The issue before this Court is whether Delphi has demonstrated that it is burdened with

unsustainable labor rates at the IUE-CWA facilities not elsewhere. Delphi's motion rests on

overdramatized examples of comparisons between its competitors and its North American labor

rates in general. There has been no attempt to demonstrate that the "all in" labor rates in effect at

its IUE-CWA represented facilities are so burdensome that Delphi will be unable to successfully

reorganize under the existing agreements. There has been no exploration of the ways available to

Delphi to reorganize within the context of the existing labor agreements which each enable

Delphi to hire workers at much less than the average labor rate of $22 that Delphi is attempting

to secure at these facilities. These rates show that under the existing IUE-CWA contracts Delphi

can achieve the savings it needs to become competitive. Moreover, the impact of the buyouts

that Delphi will be offering will increase the percentage of lower wage employees in these plants

and further drive down the average labor costs in each plant.

Congress incorporated Section 1113 into the Bankruptcy Code in direct response to the

Supreme Court's decision in NLRB v. Bildisco, 465 U.S. 513 (1984), and to address concerns

that employers exploiting Chapter 11 to wrest concessions from unions or to unilaterally rid

-43-

themselves of union contracts. See 130 Cong. Rec. H7495 (daily ed. June 29, 1984) (statement

of Rep. Morrison) (Section 1113 was enacted to "move[] us in the direction of a negotiation

process rather than a litigation process to save companies that are in trouble without permitting

any abuse of chapter 11"). As Senator Packwood, the sponsor of the language that was later

enacted as Section 1113, explained:

> The amendments also prohibit the trustee from unilaterally altering or terminating
> the labor agreement prior to compliance with the provisions of the section. This provision
> encourages the collective bargaining process, so basic to federal labor policy. The
> provision overrules the [procedural holding] of the Supreme Court's Bildisco decision and
> means that the labor contract is enforceable and binding on both parties until a court
> approved rejection or modification.

130 Cong. Rec. S8898 (daily ed. June 29, 1984) (emphasis added). See also 130 Cong. Rec.

58900 (daily ed. June 29, 1984) (comments of Sen. Moynihan) ("This [good faith] provision. . .

embodies the basic principles of collective bargaining established by Congress in the National

Labor Relations Act"); 130 Cong. Rec. S8898 (daily ed. June 29, 1984).

The Second Circuit has stated that Section 1113 "encourages the collective bargaining

process as a means of solving a debtor's financial problems insofar as they affect its union

employees." In re Century Brass Prods., Inc., 795 F.2d 265, 273 (2d Cir. 1986) (emphasis

added). The requirements of Section 1113 prevent debtors "from using bankruptcy as a judicial

hammer to break the union," and the statute's "entire thrust" is to "ensure that well-informed and

good faith negotiations occur in the market place, not as part of the judicial process." In re

Maxwell Newspapers, Inc., 981 F.2d 85, 89-90 (2d Cir. 1992) (emphasis added).

. As Senator Moynihan stated:

> [A debtor's] proposal must provide for the necessary modifications in employee benefits
> and protections to enable the employer to continue operating.

-44-

> Mr. President, this provision is a most important one, worthy of this body's support, for it
> ensures that a company's workers will not have to bear an undue burden to keep the
> company solvent. The union would have to make the necessary concessions. Nothing
> more. Nothing less.

130 Cong. Rec. S8900 (daily ed. June 29, 1984) (emphasis added); see also 130 Cong. Rec.

S6193 (daily ed. May 22, 1984) (statement of Sen. DeConcini) ("No party should be made to

take it all on the chin.... [Union employees] should not be made to unfairly bear the burden of

cost reductions ......) (emphasis added); 130 Cong. Rec. S8898 (daily ed. June 29, 1984)

(statement of Sen. Packwood) (explaining that to make proposed modifications more palatable to

union employees, the burden of sacrifices must be spread among all affected parties.  In short,

Congress imposed "several safeguards" on a debtor seeking rejection "to insure that employers

[did] not use Chapter 11 as medicine to rid themselves of corporate indigestion."  Century Brass,

795 F.2d at 272.

    Further undermining its fairness, Delphi's proposal does not include any "snap back"

provision for restoring wages and benefits in the event the Debtors perform better than

anticipated.  Courts favor snap-back provisions in modification proposals "because they ensure

that once a company is profitable enough for successful reorganization, further profits not

'necessary' for reorganization are returned to the employees who made the concessions." See In

re Ind. Grocery Co., Inc., 136 B.R. 182, 192 (Bankr. S.D.Ind. 1990); see also Wheeling-

Pittsburgh Steel, 791 F.2d at 1090- 91 (proposed modification of collective bargaining agreement

which did not include a "snap back" provision was not necessary to permit the debtor's

reorganization); cf. In re Express Freight Lines, Inc., 119 B.R. 1006, 1017 (Bankr. E.D. Wis.

1990) (holding that snap-back provision was not necessary but was an element to be considered

when determining whether the modification proposal in issue is fair).

-45-

VII.   **DELPHI'S PROPOSAL TO TERMINATE POST RETIREMENT MEDICAL AND LIFE INSURANCE BENEFITS FOR CURRENT IUE-CWA RETIREES VIOLATES 11 U.S.C. §1114**

Congress created §1114 to protect retirees because it "recognized that retirees as a class are unique in a bankruptcy proceeding and that they are deserving of special protection. In Re: Farmland, Indus. Inc., 294 B.R. 903, 918 (Bankr W.D. MO. 2003). To comply with §1114, a Debtor must meet the strict substantive and procedural requirements imposed by §1113. In Re: Ionosphere Corp., Inc., 134 B.R. 515, 519-520 (Bankr. S.D.N.Y. 1991).

To comply with §1114, Debtor must prove that it met at "reasonable times . . . to confer in good faith to . . . reach mutually satisfactory modifications" of retiree benefits. 11 U.S.C. §1114(f)(2). The IUE is the authorized representative of its retirees, pursuant to §1114(c)(1). As detailed earlier in this brief, Debtor did not negotiate with the IUE at all between November 2005 and March 29, 2006. During this entire period, it has also failed to bargain with the IUE concerning retirement benefits for current retirees. While it has bargained with other unions, this has no bearing on its obligation to negotiate with the IUE concerning retiree benefits. See Horseheads Industries, Inc., 300 B.R. 573, 588 (Bankr. S.D.N.Y. 2003). (Although Debtor bargained with unions representing some of its bargaining units, its failure to bargain with union representing one bargaining unit resulted in the courts denial of its motion to reject that union's collective bargaining agreement.) Debtor's pattern of ignoring IUE retirees is illustrated by the Declaration of Kevin Williams, its chief outside actuary. While he provides a detailed analysis of total OPEB costs, he makes no IUE specific analysis. Indeed, even though Debtor has now started to bargain with the IUE, these recent negotiations have not touched on post retirement benefits for current retirees. Because Debtor must establish that it has met each of the §1114

-46-

requirements, its failure to negotiate with the IUE concerning post retirement benefits for current retirees dooms its §1114 motion.

Delphi's proposal to eliminate post retirement benefits presumes that General Motors will accept and discharge its obligations under the GM Benefit Guarantee. Butler Dec. pp. 26-29. But General Motors is only obligated under the Benefit Guarantee to provide covered employees with the same scope and level of post retirement medical and life insurance benefits provided by GM to its own retirees. Id. Delphi's proposal does not contain any provision for aiding its current retirees - including 3,000 IUE-CWA represented retirees – in the event General Motors substantially reduces or eliminates these benefits for its own retirees in the future.

Delphi's consistent position concerning post retirement benefits for current retirees has been consistent and unyielding - each of its proposals has sought complete elimination of post retirement benefits for current retirees. An unyielding "take it or leave it" approach to bargaining is inconsistent with Debtor's §1114(f)(2) obligation to bargain in "good faith." Liberty Cab, 194 B.R. at 777. Also, because the retirees would receive nothing from Delphi in exchange for accepting this proposal, the IUE had good cause to not accept Delphi's proposal to eliminate all post retirement benefits for current IUE retirees.

## CONCLUSION

For the foregoing reasons Debtors' motion under Sections 1113 and 1114 should be

denied.

Dated: New York, New York          Respectfully submitted,
      April 21, 2006

Thomas M. Kennedy (TK-0993)
Susan M. Jennik (SJ-4607)
Larry Magarik
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place
New York, NY 10003
(212) 358-1500

*- and -*

Hanan B. Kolko (HBK-1307)
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
1350 Broadway, Suite 501
New York, NY 10018

Thomas M. Kennedy (TK-0993)
Susan M. Jennik (SJ-4607)
Larry Magarik (LM-3748)
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place
New York, NY 10003
(212) 358-1500

Return Date:
May 9, 2006
10:00 a.m.

*- and -*

Hanan B. Kolko (HBK-1307)
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
1350 Broadway, Suite 501
New York, NY 10018
(212) 239-4999

Attorneys for International Union of Electronic,
Electrical, Salaried, Machine and Furniture Workers,
Communications Workers of America (IUE-CWA)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------

In re:

In re DELPHI CORPORATION, et al.,

Debtors.

)
)
)
)
)
)
)
)

Chapter 11

05-44481 (RDD)
(Jointly Administered)

-------------------------------------------------------

## OBJECTION OF IUE-CWA TO MOTION FOR ORDER
## UNDER 11 U.S.C. § 1113(c) AUTHORIZING REJECTION OF COLLECTIVE
## BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(g)
## AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS

IUE-CWA objects to the motion of Delphi Corporation ("Delphi") for an Order under 11

U.S.C.§§ 1113(c) and 1114(g) authorizing it to reject the IUE-CWA's collective bargaining

agreements and to terminate post retirement benefits for the reasons set forth in the

accompanying Memorandum of Law and respectfully states as follows:

1.   Delphi has failed to meet its obligation to bargain in good faith with IUE-CWA and its Local Unions prior to the hearing on this motion.

2.   Delphi has offered so-called alternative proposals that fail to meet the definite offer standards of 11 U.S.C. § 1113(c) and federal labor law.

3.   Delphi has failed to provide sufficient information about how its proposals impact on the specific manufacturing facilities that the IUE-CWA represents as it is required to do under 11 U.S.C. § 1113(c).

4.   The IUE-CWA had good cause to not accept Delphi's proposals for many reasons, including their inapplicability to IUE-CWA plants, Delphi's failure to provide critical information necessary to evaluate these proposals, and Delphi's ability to restore IUE-CWA facilities to profitability without undergoing the enormous disruption caused by these proposals.

5.   Delphi's proposal to the IUE-CWA is neither fair nor equitable and in fact requires IUE-CWA members to assume a highly disproportionate share of the sacrifices necessary to restore this company to profitability.

6.   Delphi's proposal concerning retiree health and life insurance does not provide for any continuing Delphi responsibility in the event General Motors Corporation substantially reduces or fails to continue such coverage.

Dated: New York, New York
      April 21, 2006

Respectfully submitted,

Thomas M. Kennedy (TK-0993)
Susan M. Jennik (SJ-4607)
Larry Magarik (LM-3748)
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place
New York, NY  10003
(212) 358-1500

### AFFIDAVIT OF SERVICE

State of New York )
        ) ss.:
County of New York )

   Alexandra Miller, being duly sworn, deposes and says that:  I am not a party to the action,

am over 18 years of age, and reside in Kings County, New York.  On April 21, 2006, I served the

within Objection and Memorandum of Law in Support of Objection of IUE-CWA to Motion for

Order under §§ 1113 and 1114, and Declarations of H. Reichard , K. Bailey, D.O. Arbogast,

M. Palmer, B. Gilson, H. Newman, T. Williams, F. Allen, and R. Ruffin in Opposition to

Delphi's Motion for Authority to Reject Collective Bargaining Agreements under 11 U.S.C.

§ 113(c) and Modify Retiree Welfare Benefits under 11 U.S.C. § 1114(g),  by delivering a copy

of each by hand to the following:

       Robert J. Rosenberg, Esq.
       Latham & Watkins LLP
       885 Third Avenue, Suite 1000
       New York, New York 10022-4834


       Alicia Leonhard, Esq.
       U.S. Department of Justice
       Office of the United States Trustee
       33 Whitehall Street, 21st Floor
       New York, New York 10004-2111

       Kayalan A. Marafioti, Esq.
       Thomas J. Matz, Esq.
       Skadden, Arps, Slate, Meagher & Flom, LLP
       4 Times Square
       New York, New York 10036

and by mailing a copy of each via overnight mail to the following:

       Delphi Corporation
       c/o Sean Corcoran and Karen Craft
       5725 Delphi Drive
       Troy, MI 48098-2815

John W. Butler, Jr.
John K. Lyons
Ron E. Meisler
Skadden, Arps, Slate, Meagher & Flom, LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

_____
ALEXANDRA MILLER

Sworn to before me this
21st day of April, 2006.


_____
Notary Public

LARRY MAGARIK
NOTARY PUBLIC, State of New York
No. 02MA5082506
Qualified in Kings County
Certificate Filed in Kings County
Commission Expires July 28, 2009