Thomas M. Kennedy (TK-0993)
Susan Jennik (SJ-4607)
Larry Magarik (LM-3748)
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place
New York, NY 10003
(212) 358-1500

Return Date:
May 9, 2006
10:00 a.m.

- and -

Hanan B. Kolko (HBK-1307)
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
1350 Broadway, Suite 501
New York, NY 10018
(212) 239-4999

Attorneys for International Union of Electronic,
Electrical, Salaried, Machine and Furniture Workers,
Communications Workers of America (IUE-CWA)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------
In re:                                    )
                                          )
                                          )   Chapter 11
In re DELPHI CORPORATION, et al.,         )
                                          )   05-44481 (RDD)
                Debtors.                  )   (Jointly Administered)
                                          )
------------------------------------------------------------

**DECLARATION OF HENRY REICHARD
IN OPPOSITION TO DELPHI'S MOTION FOR AUTHORITY TO REJECT
COLLECTIVE BARGAINING AGREEMENTS UNDER 11 U.S.C. § 1113(c) AND
MODIFY RETIREE WELFARE BENEFITS UNDER 11 U.S.C. § 1114(g)**

I, Henry Reichard, declare and state as follows:

1. I am the Chairman of the Automotive Conference Board of the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America ("IUE-CWA"). I make this Declaration to express my strong opposition to the Motion of Delphi Corporation ("Delphi") for Authority to Reject Collective Bargaining Agreements under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits under 11 U.S.C. § 1114(g) ("the Motion"). Prior to and after the filing of the Motion, Delphi has ignored the special needs and circumstances applicable to IUE-CWA members and has instead insisted upon a one size fits all set of contractual concessions. The Motion must be denied because:

   A. Delphi has failed to meet its obligation to bargain in good faith with IUE-CWA and its Local Unions prior to the hearing on the Motion.

   B. Delphi has offered so-called alternative proposals that fail to meet the definite offer standards of Section 1113 and federal labor law.

   C. Delphi has failed to provide sufficient information about how its proposals impact on the specific manufacturing facilities that the IUE-CWA represents as it is required to do under Section 1113.

   D. The IUE-CWA had good cause to reject the proposals for many reasons, including their inapplicability to IUE-CWA plants, Delphi's failure to provide critical information necessary to evaluate these proposals, and Delphi's ability to restore IUE-CWA facilities to profitability without undergoing the enormous disruption caused by these proposals.

1

E.  Delphi's proposal to the IUE-CWA is neither fair nor equitable and in fact requires our members to assume a highly disproportionate share of the sacrifices necessary to restore this company to profitability.

2.  The IUE-CWA represents 8,500 active employees and 3,000 Delphi retirees. The IUE-CWA is a separate and distinct labor union from any other union that bargains with Delphi. The IUE-CWA has represented employees of Delphi and its predecessor General Motors ("GM") continuously since its founding in 1949. The IUE-CWA and its Local Unions bargain through the IUE-CWA Automotive Conference Board ("Conference Board") to achieve agreements that establish the terms and conditions of employment at IUE-CWA represented facilities. No other union has any right to bargain for the IUE-CWA, its Local Unions or our members.

3.  These IUE-CWA Local Unions are the sole and exclusive representatives of the employees at the Delphi facilities noted:

| Local | Facility | Number of employees, 12/31/05 |
| --- | --- | --- |
| Local 416 | New Brunswick, NJ | 382 |
| Local 755 | Kettering, Ohio | 1,419 |
| Local 698 | Clinton, Mississippi | 816 |
| Local 711 | Gadsden, Alabama | 172 |
| Local 717 | Warren, Ohio | 3,808 |
| Local 718 | Brookhaven, Mississippi | 496 |
| Local 801 | Moraine, Ohio | 1,255 |
| Local 1111 | Anaheim, California. | 166 |

2

4.  I have a great deal of experience in dealing with Delphi and its predecessors. I was employed by Delphi and prior to that GM from 1969 until 2001. I have been Chair of the Conference Board since May, 2005. Between 2001 and May, 2005, I was a full-time staff member of the Conference Board specializing in safety and ergonomics issues. Between January, 1997 and October, 2000, I worked as a full-time safety representative for IUE Local 755, which represents the production and maintenance employees in the Delphi Chassis Plant in Kettering, Ohio. Between 1982 and 1994, I was a representative for Local 755. Between 1983 and 2000, I also served as an Executive Board Member of Local 755, and, between 1998 and 2000, as the Vice President of Local 755. Between 1969 and 1982, and again between 1994 and the end of 1996, I worked as a skilled trades hourly employee at the Kettering facility.

5.  I was involved in national and local bargaining with GM, and later Delphi, in 1987, 1990, and 1993. Since 2001, when I started working for the Conference Board, I have been involved in national bargaining with Delphi, Visteon, GM and D-MAX Limited, a joint venture between GM and Isuzu. In addition, since I have been on the Conference Board, I have also been involved in local bargaining.

## THE STRUCTURE OF THE CONFERENCE BOARD

6.  The Conference Board negotiates a single national collective bargaining agreement between Delphi and the IUE-CWA which broadly sets the terms and conditions of employment for all Delphi employees represented by IUE-CWA. Our current agreement is Exhibit A to the Declaration by Bernard Quick, dated March 31, 2006 ("Quick Dec."). This national agreement has been extensively modified by local supplemental agreements at each of the IUE-CWA represented facilities that can and do substantially modify the terms of the

3

national agreement. These local agreements are attached to the Declarations submitted in opposition to this motion from IUE-CWA local leaders at our various local unions.

7.   Each Delphi location faces a different set of circumstances, reflecting various factors including the product produced by the location, the customers supplied by the location, competitive pressures facing Delphi with regard to the product produced by the location, the history of the location, operational issues unique to the location, and the history, demographics, and experiences of the employees there. The local supplements are very often the product of bargaining which reflects and addresses these factors. As the Court can see from the Declarations from IUE-CWA Local Union leaders at all of our facilities, each of our IUE-CWA Local Unions have made extraordinary efforts to maintain Delphi's competitiveness by entering into local competitive agreements that substantially reduce the average cost per hour of IUE-CWA represented employees.

8.   Delphi has repeatedly stated that the Motion is necessary because "all in" labor rates at its facilities are $78 per hour. You need only look at the starting wage rates that are prevalent in the IUE-CWA represented facilities to show that the Motion is unnecessary at IUE-CWA facilities:

| Plant Location | IUE-CWA Local | Starting Rate |
|---|---|---|
| Brookhaven, MS | 718 | 12.71 |
| Clinton, MS | 698 | 8.88 |
| Gadsden, AL | 711 | 7.77 |
| Kettering, OH | 755 | 8.00 |
| Morraine, OH | 801 | 14.27 |
| New Brunswick, NJ | 416 | 13.41 |

4

| Warren, OH | 717 | 14.00 |

8. Delphi acknowledged in its moving papers that 1,908 of the 8,500 IUE-CWA represented are employed at competitive wage and benefit levels under local agreements that feature far different terms of employment than the terms applicable to traditional wage Delphi employees. Quick Dec., ¶ 28. Many IUE-CWA employees are already employed at wages and benefits below the amounts that Delphi is now asking the IUE-CWA to accept throughout its workforce. Delphi failed to acknowledge that thousands more IUE-CWA represented employees who are formally classified as traditional employees are also employed at wages below the traditional rate because they have agreed to repeatedly forego wage increases that were available to traditional Delphi employees. At my own Local Union, Local 755, for example, all employees agreed to forego wage increases for four years in a row from 1998 to 2002. Local 755 members agreed to the following concessions to prevent the sale of the Kettering Operations and to secure management's commitment to growing the Kettering business:

* A four year wage freeze, all years.

* A four year cost of living freeze

* Established a new "Competitive Hire Plan", that created a third tier within the K-I plant. Competitive New Hires ("CNH") would come in at $8.00 per hour and grow only to $10.00 after ten years. They had reduced benefits, including no vision or dental, no sickness and accident coverage or life insurance for two years, no bereavement for three years, no vacation for the first year and only one week paid in the second year. All CNH employees would have gainsharing, instead of profitsharing and no post-employment health care or defined pension plan. There was a one year waiting period for health

5

benefits. They had an Income Security plan, a layoff benefit, which the Company paid for with $0.25 per hour. There was a 401(k) plan instead of a pension.

9. The average blended wage rate at the Kettering facility is only $18.32. The chart attached as Exhibit A was prepared by Delphi to demonstrate the benchmark comparison of Kettering's new hire competitive cost structure. Using the costs we have agreed to make applicable to all new hires at Kettering, there would be an "all in" labor cost of $18.79, placing it well below 6 of the 8 benchmark companies chosen by Delphi as appropriate comparisons. A well designed and adequately funded buy out program that encouraged the highest paid employees to leave Kettering and allowed backfilling under the new hire rates would meet Delphi's needs.

10. The four year wage freeze and elimination of cost of living protection cost each of our members many thousands of dollars since 1998. In fact, I estimate that our average production worker who would have otherwise been eligible for these raises would have earned an extra $40,000 to $45,000 since 1998 if these concessions had not been made. This lost money represents insurance premiums paid in exchange for employment security to work out the remainder of their working career at Delphi. But the consideration promised for those contributions is being ripped away by Delphi which now tells us that Kettering employees will have further reductions of their terms and conditions of employment and then the facility will be closed and its employees tossed aside.

## THE SO-CALLED "SOFT LANDING" PROVISIONS DO NOT HELP US

11. It is critical to note that the IUE-CWA members are not eligible in many instances to take part in the so-called "soft landings" that Delphi has been bragging about. First, very few, if any, IUE-CWA members will be able to "flow back" into GM jobs that offer a

6

continuation of OEM-type wages and benefits. The IUE-CWA represents workers at only one GM plant located in Dayton, Ohio and GM is reducing, and not increasing, the jobs at that facility. A major underpinning of the asserted fairness underlying this proceeding is not applicable to IUE-CWA members.

12. Second, the early retirement opportunities that Delphi has stated apply to 14,000 (or 60%) of the UAW members, apply to far fewer IUE-CWA represented employees. Only 36% of the IUE-CWA represented employees are over 50 with 10 years of service or have at least 28 years of service. The difference is that the IUE-CWA has cooperated in the past on a number of early retirement inducements in its plants in order to open up employment opportunities at the competitive level. Many of the employees who might have been motivated into accepting an early buyout have already taken earlier buyouts. They have been replaced by employees under competitive wage agreements. The consequence is that the second major underpinning of the so-called "soft landing" is also not available to even half of the IUE-CWA workforce.

13. Finally, the last option, the buyout of these jobs at $140,000 for an employee with more than 10 years is fools' gold because it requires an employee to surrender valuable rights to continuing insurance and pension accumulation as well as terminate employment. Our Moraine members, for instance, currently are protected by an agreement made with General Motors that guarantees them employment through 2011. If you credit Delphi's analysis that the hourly wage and benefit package at Moraine is worth $68 an hour, a single year's income is equivalent to $140,000. Over five years, the value of this buyout is only 20% of the wages and benefits sacrificed. In a context in which many employees have flowback opportunities and early retirement options, the buyouts offered may be an adequate bargain. But for IUE-CWA

7

employees, the buyout proposal is plainly inadequate since it is expected to be the only available alternative available to a majority of our bargaining unit.

**DELPHI HAS NOT CRAFTED ITS PROPOSALS TO REFLECT THE SPECIAL CIRCUMSTANCES APPLICABLE TO IUE-CWA REPRESENTED FACILITIES**

14. A recognition of the special problems facing IUE-CWA members is completely missing from Delphi's submission. A careful comparison of the Declarations submitted by Delphi are extremely telling. Compare, Declaration of Darryl Kidd, dated March 31, 2006 ("Kidd Dec.") with Quick Dec. The Court will note that the Kidd Dec. (which does not describe IUE-CWA benefits) is very general in the depiction of the costs to Delphi of various wages and employment benefits, such as overtime costs of $325 million, Kidd Dec., ¶ 25, shift premiums of $65 million, id., ¶ 26, JOBS bank costs of $346 million and staffing requirements, id. ¶ 34. The parallel Quick Dec. describing the reasons for rejecting the IUE-CWA agreements has much of the same language but is remarkably silent on the cost to Delphi of these employment practices at the IUE-CWA represented plants[1] The fact is that Delphi has not shown any specific reasons for needing to reject the IUE-CWA agreements and it cannot because of the agreements that already put almost 2,000 IUE-CWA represented employees at lower wages and benefits than those available to traditional employees under local competitive agreements. In fact, the Declaration of Kevin Butler, dated March 31, 2006 ("Butler Dec."), ¶ 83, confirms that the IUE-

---

[1] The paragraphs relating to Overtime, ¶ 29, Shift Premium, ¶ 30, Vacation, ¶ 31, Holidays, ¶ 33, and Jobs Bank, ¶ 37, Quick Dec., detailing the IUE-CWA contract provisions are essentially identical to the paragraphs relating to Overtime, ¶ 25, Shift Premiums, ¶ 26, Vacation, ¶ 27, Holidays, ¶ 28, and Jobs Bank, ¶ 34, Kidd Dec., except that the Quick Dec. contains no statements concerning the costs of the IUE-CWA contractual provisions that Delphi seeks to change through the Motion.

8

CWA competitive rate agreements with starting rates between $7.77 and $8.00 per hour result in an "all in" labor rate of under $20.00 per hour.

15.  In addition to the attempt to imply a competitive disadvantage at IUE-CWA represented plants through the use of "average" costs or of corporate-wide numbers, Delphi has ignored the cruel impact its proposals will have on IUE-CWA members who are already working under competitive agreements. The workers at the Delphi facility in Gadsden, Alabama voted to be represented by IUE in 1995. The average rate in this plant is now $9.85. The present top wage is $11.47. All new employees start at $7.77. There is no defined benefit pension plan and no provision for retiree health care. The health insurance plan provides for coverage with the employees paying 20% of the costs of medical benefits. Their health insurance plan deductibles are substantially higher for per person and per family. They have no vision or hearing coverage. Notwithstanding this poor level of benefits, Delphi is proposing that these employees pay more than $180 per month as a premium co-share to maintain this plan. In other words, at the entry level hourly rate of $7.77, over 17% of the likely take home pay each week is going to go towards the health plan in effect at Gadsden - - this is unfair and outrageous. It is a product of a "one size fits all" attitude by Delphi that ignores the special circumstances applicable to IUE-CWA represented plants. It would reduce their effective compensation to well below the federal poverty rate for a family.

16.  Delphi has acknowledged that it has not identified any cost savings goals at any IUE-CWA represented facility. On March 16, 2006, in response to an IUE-CWA demand that Delphi state its overall savings/cost goal and how such goal is being apportioned among the various labor unions, Delphi admitted that its proposals are not designed to produce a specific cost reduction goal:

9

As explained in Kevin Butler's letter of October 20, 2005, Delphi's proposals are not constructed to achieve a specific cost reduction goal. This is because any cost reduction goal is a constantly shifting target depending on assumptions about future revenue, costs, volume and lines of business. Rather, Delphi constructed its proposals to produce an hourly labor cost that will allow it to retain existing business and compete successfully for new business. For the same reason, Delphi has not sought to allocate any cost reduction goal among its different unions but instead seeks to bring all unions into competitive cost levels.

A copy of this reply is attached as Exhibit B.

17. Delphi similarly acknowledged that it cannot predict "the overall savings/returns" it would achieve by closing particular plants. *Id.* Delphi has given IUE-CWA no information that we could use to prepare a counter proposal that could attempt to achieve the same cost savings that they have in mind for any of our facilities.

18. Delphi has not met its obligation to bargain in good faith with the IUE-CWA before proceeding with the Motion to reject our collective bargaining agreements and terminate our retiree health and life insurance benefits. The sequence of events shows that IUE-CWA has not been a partner in the process thus far and has only gotten lip service. Delphi first made a proposal to the IUE-CWA to change its labor agreements on October 20, 2005. Butler Dec., Ex. D. Before any meetings were held between the Conference Board and Delphi to discuss and review this proposal, Delphi announced that this proposal was being superceded by a new proposal on November 15, 2005.

19. Delphi executives have stated that the IUE-CWA failed to make a counterproposal to the November 15, 2005 offer despite a letter from me saying that we would do so. Butler Dec., Ex. F. Butler ignores the fact that for its own reasons, and not on the basis of any discussions with the IUE-CWA, Delphi withdrew the November 15, 2005 proposal on

10

December 19, 2005. <u>It is absurd to expect or argue that IUE-CWA had an obligation to bargain over or present an alternative to a withdrawn proposal.</u>

20. The indisputable fact is that after Delphi withdrew its November 15, 2005 proposal, the IUE-CWA did not get another proposal for contract changes until the evening of Friday, March 24, 2006 – only 7 days before Delphi filed this motion. Butler Dec. Ex. H. Butler states that "between December, 2005 and March 2006, Delphi met with the UAW and GM to discuss a potential consensual resolution and contract modifications and GM financial support that would allow Delphi to successfully restructure". Butler Dec., ¶ 56. I applaud their meetings with a fellow union but there is no mention by Delphi of meetings with the IUE-CWA.

21. Delphi held no meetings with the IUE-CWA at any time between December 19, 2005 when Delphi withdrew its proposals and March 28, 2006 – only three days before the Motion was filed. At that meeting, the Delphi representatives were unable to answer basic questions about the content of their own proposals. By one count, on more than 40 occasions on March 28, 2006, the Delphi representatives were unable to answer how this "one size fits all" contract proposal – which is apparently identical to the proposals made to other unions – actually applies to IUE-CWA represented facilities that have a very different labor cost structure.

22. Delphi did not meet once with the IUE-CWA in developing the tripartite GM-UAW-Delphi agreement that is intended to provide "soft landings" to UAW Delphi employees. Delphi did not meet once with the IUE-CWA in creating its "one size fits all" contract proposals that we finally received late on Friday evening, March 24, 2006. It simply cannot be creditably maintained that Delphi bargained in good faith with the IUE-CWA prior to filing the Motion.

23. On March 28, 2005 I sent Kevin Butler a letter pointing out that the IUE-CWA did not have adequate financial information necessary to evaluate the GM consensus proposals.

11

See attached Exhibit C. He replied on March 29, 2006 arguing that the reams of information given to the IUE-CWA satisfied Delphi's obligations. See attached Exhibit D. I responded on March 31, 2006 by detailing Delphi's manifest failure to bargain in good faith with the IUE-CWA before bringing the Motion, as follows:

> Your letter of March 29, 2006 erroneously asserts that Delphi and the IUE-CWA have been conducting good faith negotiations since July, 2005. The only meeting that occurred in July, 2005 between the IUE-CWA and Delphi was the initial meeting at which you provided an update on the financial condition of Delphi and a description of the plants you would want to close. We did not receive an actual bargaining proposal describing wages and hours for our plants until October, 2005. We had no negotiations on those proposals and Delphi replaced them with a superceding proposal on November 15, 2005. Delphi withdrew its November 15, 2005 bargaining proposals on December 19, 2005 before we had any meetings to discuss this proposal with the IUE-CWA bargaining committee. We did not get another proposal until the evening of March 24, 2006. Delphi did not meet with the IUE-CWA to negotiate any changes in our collective bargaining agreement from October 20, 2005 until March 29, 2006.
>
> Your proposal of March 24 is in fact fundamentally different from the one we received on November 15, 2005. The wages are different, the benefits are different and the contractual language proposals are different. But even if there are areas of duplication between the withdrawn proposal and what we got on March 24, the IUE-CWA is not clairvoyant. We could hardly anticipate which areas of the proposal you would change and which you would again propose.
>
> Your statement that the IUE-CWA did not make a counter proposal after November 23, 2005 ignores the fact that after December 19, 2005 the IUE-CWA did not have a proposal to counter. The idea that the IUE-CWA would propose a counter to a withdrawn proposal is ridiculous.
>
> Delphi chose to limit its negotiations for months to the UAW. Our members have their own contracts and their own priorities with Delphi. Your need to negotiate with IUE-CWA is not met by meeting with any other union. That was your choice but you cannot now pretend that at the same time you were negotiating with the IUE-CWA because you were not. The few informal discussions you and I may have had during this period were not a substitute for our traditional negotiations which as you well know require the presence and involvement of our Conference Board leadership.
>
> Your representatives at the March 29, 2006 meeting at Dayton told our negotiators at least 40 times in answer to questions that they would get back to us with answers. They were unable to explain basic aspects of the Delphi proposal. While we expect answers next week in our meetings, the fundamental reality is that Delphi did not engage in any

12

meaningful negotiations with the IUE-CWA before filing your Section 1113/1114 motions today in Bankruptcy Court. Whether that meets your legal obligations remains to be seen. It certainly is no way to reach a consensual agreement as you purport to want.

Let me reiterate: the only way to reach a consensual agreement with the IUE-CWA is to bargain directly with us and to recognize that the different circumstances applicable to our facilities requires a unique response. For example, the attrition plan entered into by the UAW is heavily dependent on flowbacks to existing UAW represented GM plants. We do not have that option for our members and any attrition plan for them needs to include the value of these flowbacks in another form. That is the only way to ensure that any attrition plan is fair and equitable for our members.

We will meet our obligations to fairly consider Delphi's proposals. But there will be no agreement unless and until Delphi puts on the table a proposal that meets our needs and allows our members the income and benefits they need to protect themselves and their families.

A copy of the letter is attached as Exhibit E.

24. It has also been impossible to bargain with Delphi over its proposals because they have been presented in an "alternative format" in which conditions will substantially differ depending on the level of funding support Delphi receives from GM. The differences in proposed wages are significant depending on GM's level of participation. With GM support the proposed first year wages for production workers are $22 per hour; without the support the wages are proposed at $12.50 per hour. Worse than that is the provision that in the event GM gives some support but not all Delphi seeks, the wages they expect us to agree to will be somewhere between $12.50 and $22.00. Butler Dec., Ex I, ¶ 56. That is an impossible position to bargain over. GM is not a party to these negotiations. We are being asked to accept a package that varies enormously depending on the conduct of a party not at the table. That cannot be consistent with the Section 1113 to bargain in good faith.

25. I am not brushing aside the problem that Delphi has in requiring better price supports from GM. But it was incumbent upon Delphi to get a final determination of where it

13

was going with GM before making the Motion. Delphi had to act sooner to get an agreement with GM if it wanted to provide a good faith specific offer to our Union. I cannot control or even bargain over the relationships between Delphi and its customers. I can insist that before Delphi comes to us for concessions, it gets its ducks in a row over what it can afford and what savings it will need to survive.

26. The problem is particularly acute at our Moraine and Kettering facilities where Delphi has now brought a motion before this Court to reject and reprice the vast majority of the product contracts under which Moraine and Kettering produce parts for GM. If Delphi is successful in substantially increasing the sales income into those facilities, that can and should have an impact on the extent of the concessions that Delphi asks of workers in those facilities.

27. This problem cannot be solved by simply saying to the Union: close your eyes to the contingent offer we have made and bargain as though only the GM non-assisted offer is on the table. How can I offer a counter proposal to a proposed $12.50 hourly wage, or ask the negotiating committee to consider making one, when the company has on the table a $22.00 hour alternative? I would not ask my members to ratify an agreement that called for wages $10 an hour below the "real" but contingent offer and they would reject it if I did. That is an approach that will inevitably result in a strike that shuts down Delphi and ultimately GM. It is simply impossible to bargain without firm offers, clearly based on specific information.

28. We have sought basic information that obtains the actual costs of the benefits that Delphi seeks to change at our IUE-CWA facilities. For example, on March 31, 2006 I asked that Delphi tell us for each separate element of its proposal to change existing conditions of employment for IUE-CWA members dated March 24, 2006, for each facility represented by the IUE-CWA the savings that will be generated in the following time periods: the balance of 2006;

14

2007 through the termination of the existing IUE-CWA National agreement; and calendar 2007. I specified that each answer should set forth how much will be saved at each IUE-CWA facility for each of the following proposals made by Delphi: cut in wages, elimination of cost of living adjustments, modification of overtime provisions, reduction of shift premiums, reduction of holidays, elimination of company paid Independence week, reduction of vacation, change in profit sharing, health care (separately showing the savings in health benefit costs and the impact of the requested premium payments), reduced dental plan, reductions in the life and disability plan, elimination of protected status, elimination of restrictions on outsourcing, use of indirect employees, elimination of SUB payments, elimination of Guaranteed Income Stream Benefits, change in attendance policy, elimination of subsidized discount programs, elimination of Joint Activity Center ("JAC") funding and sale of JAC building, elimination of legal services benefits, reduction in the number of union representatives, expansion of the no strike provisions, freezing of the Hourly Rate Employees Pension Plan, establishment of a Retiree Medical Account and the elimination of retiree life insurance. A copy of this e-mail is attached as Exhibit F.

29.    This critically important information has not been provided to us. Instead, Delphi contends that it has not computed and is not required to tell us the over all savings its proposals will generate, the savings its proposals will generate in any particular plant or the amount of savings that any particular union will need to generate to restore the company to profitability.

30.    In labor negotiations, it is impossible to craft intelligent counterproposals unless the party seeking a change is able to tell us how much of a savings they are seeking to achieve. When the dominant negotiations have occurred on a facility by facility basis, that information has to be provided for each facility. I have not yet received this information which is critical to enable the IUE-CWA to bargain over the proposed changes.

15

31. The IUE-CWA financial advisors have also been denied critical plant-specific information necessary for them to analyze and evaluate Delphi's proposals. As a Local Union officer I attended a meeting with local management almost every month for many years at which I was given an update on the profitability of our facility and the costs we were experiencing in various areas including the areas in which Delphi has now asked for concessions. I am aware as a Conference Board representative that Delphi has given the same information periodically to our other Local Unions. In response to the requests of our financial advisors, however, Delphi has said that there is no plant-specific costing or profitability information that would allow them to answer the questions we have asked. To my knowledge, that is an incorrect statement.

32. Since the local agreements would have to be modified to achieve the concessions Delphi is proposing, each of the IUE-CWA Local Unions is entitled to know the savings projected by Delphi for each of the proposed concessions to be put into effect at each plant. That is especially true since we have facilities such as the Gadsden plant in which elements of this proposal would actually represent a compensation increase. We should not be forced to speculate what Delphi is expecting to accomplish at each facility. Since Delphi has failed to achieve the minimally necessary step of analyzing the impact of its own proposals at each IUE-CWA facility, the Motion must be denied.

33. The human cost of the proposed wage and benefit changes for the few employees who remain will be terrible. The annual prospective wage loss to a traditional wage 45 year old IUE-CWA member at Warren, Ohio who is not eligible for a flow back to GM or to an early retirement is over $27,000 in wages plus the termination of his pension and retiree health benefits which represents thousands more in reduced compensation each year. If he remains employed by Delphi for ten years until he reaches age 55, he will have lost hundreds of

16

thousands of dollars. This is an enormous economic dislocation for workers who bought and paid for the economic insurance that Delphi is now taking away. It is not an exaggeration to point out that an income reduction of more than 40% will result in home mortgage foreclosures, personal bankruptcies, car repossessions, failed marriages, children being pulled from college and a host of personnel tragedies inevitably following from such a huge economic loss not only to these individuals, but also to their communities such as Dayton, Ohio and Warren, Ohio where thousands of IUE-CWA Delphi employees that will be affected by the Motion reside.

34.    The inequality of sacrifice is also deeply troubling. In February, 2006, after this Court approved a KECP Plan that will add millions of dollars in executive bonuses, Delphi extended the program to thousands of other Delphi salaried personnel. As far as I can tell every Delphi salaried worker is going to get a bonus in or shortly after June, 2006 which is exactly when they hope to impose these sharp wage reductions on to my members. I understand that for the first quarter of 2006, Delphi's performance was in excess of the targets set for the performance bonuses.

35.    In addition to its executives and supervisors, Delphi has taken steps to ensure its vendors are not impacted by this bankruptcy. Under the December 12, 2005 "Supplier Agreement Assumption Order," Delphi is permitted to assume supplier agreements and pay those suppliers up to 75% of their pre-petition liabilities. This order authorizes Delphi to pay up to $100 million to cure such pre-petition liabilities, and grants those suppliers an allowed unsecured claim for the remaining amounts due. In addition, the suppliers whose contracts are assumed will be able to maintain profitable contracts with Delphi, and will be able to continue a profitable working relationship into the future with Delphi.

17

36. The meetings I have had with Delphi representatives since March 29, 2006 have been completely unproductive. Delphi has not provided the information we would need to prepare a counter proposal. On April 5, 2006 we counter-proposed that Delphi increase the buy out offers to IUE-CWA employees to $210,000 for employees with more than 10 years of service and $105,000 for employees with less than 10 years of service because so of our members of them are not eligible for a flow back or early retirement. Darrell Kidd told me on April 5, 2006 that they knew the attrition program needs of the IUE-CWA were different from other unions. See attached Exhibit G. On April 17, 2006, however, Darrell Kidd and Kevin Butler told me that we could rearrange the package but any changes costing more money in the attrition program were up to GM. GM refused to alter the buy out program to increase its value to make up for the missing flow backs and early retirements. As a consequence, IUE-CWA members are bearing a disproportionate share of the cost of this reorganization.

37. Where we had sufficient information and a definite proposal to work with such as the attrition program, we have made a counterproposal. In areas such as wages and benefits, where Delphi has yet to provide adequate plant specific information and has not made definite proposals, we have not.

37. While Delphi representatives have met with our Conference Board since March 29, 2006, they have shown no willingness to vary from their "one size fits all" set of bargaining proposals. As long as Delphi is convinced that it will obtain from this Court what it could not obtain across the bargaining table they will never roll up their sleeves and really focus on what they need to survive at IUE-CWA facilities. We remain committed to the long term survival of Delphi as our actions in the past have shown. But we are entitled to a fair process and sufficient

18

information to make negotiations meaningful. Until Delphi meets this standard, the Motion should be denied.

_Henry Reichard_ (signature)    4-20-06

Henry Reichard    Date