UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re:                                          Chapter 11

    DELPHI CORPORATION, *et al.*         Case No. 05-44481 (RDD)

        Debtors.                          Jointly Administered

----------------------------------------X

## DECLARATION OF DONALD O. ARBOGAST
## IN OPPOSITION TO DELPHI'S MOTION FOR AUTHORITY TO REJECT
## COLLECTIVE BARGAINING AGREEMENTS UNDER 11 U.S.C. § 1113(c) AND
## MODIFY RETIREE WELFARE BENEFITS UNDER 11 U.S.C. § 1114(g)

I, Donald O. Arbogast, declare and state as follows:

1. I have been the Shop Chairman for Local 717, IUE-CWA ("Local 717" or "the Union") in Warren, Ohio since October, 2001. As Shop Chairman, I am responsible for negotiations and enforcement of the collective bargaining agreement between Local 717 and the Delphi Corporation in Warren, Ohio ("Delphi Warren"). I have been an employee of Delphi and its predecessor, General Motors Corporation ("GM") for 41 years. I have been a member of the Union during this entire time. Local 717 represents approximately 3,850 bargaining unit workers at Delphi Warren.

2. Packard Electric was founded in Warren, Ohio in 1890 by brothers William and James Ward Packard. These same brothers would later form the Packard Motor Car Company, also in Warren, Ohio. Packard Electric operated as an independent company producing electrical wiring and light bulbs until GM purchased the operation in 1933 and it became Packard Electric Division of GM. The bargaining unit at Packard Electric Division, GM became IUE Local 717 in November 1949 when the IUE was founded.

3. IUE Local 717 continued to represent the hourly workforce at Packard Electric Division of GM through the spin off of GM's Automotive Components Group in 1999 until today, a period of over 50 years.

4. Employment at Packard Electric Division GM remained relatively constant throughout the 1950's and into the 1960's. Starting with the mid-1960's the demand for electrically controlled options expanded so rapidly that Packard Electric began to hire new employees first by hundreds a year and by the early 1970's by thousands a year. Hourly employment peaked at Packard Electric Warren, Ohio at 13,500 employees in

-1-

1973. In the very early 1970's Packard Electric management concluded that the Warren, Ohio operations had grown too large, too fast and decided to place future expansion in areas outside of Warren, Ohio. In 1972 Packard Electric began building a manufacturing facility in Clinton, Mississippi, which is now represented by IUE-CWA Local 698. A second plant opened in Brookhaven, Mississippi in 1976 which is now represented by IUE-CWA Local 718.

5. In 1977 a group of union activists and elected representatives came together for the purpose of developing a new labor approach with local management. This approach was to be a mutual problem solving approach and was a full 180-degree reversal from what was then open warfare between Local 717 and Packard Electric management.

6. In response to the Union's desire for a change in atmosphere and approach to issue resolution, a committee of eight senior management representatives, plant managers and above, were selected by the Divisional Manager to meet with their eight counterparts from the Union to develop a new chapter in Packard Electric Warren, Ohio Union-Management relationships. This group of 16 people became known as the "Jobs Committee". Starting slowly, they worked their way through non-controversial Joint Programs, such as United Way participation and Suggestion Program involvement. This Jobs Committee built credibility with both the membership and with floor level management who were accustomed to constant conflict

7. By 1979 the Jobs Committee was involved in the expansion of available floor space with the acquisition of three available manufacturing facilities, two purchased and one rented. These actions reversed a "No-More-Bricks-and Mortar"

-2-

directive for Warren, Ohio that was first put in place in 1971. The Jobs Committee also tackled outdated work rule issues. As an inducement to the membership to participate in these programs, management agreed to hire one new employee for each work rule resolution that resulted in a "one-man" savings. This led to new employees being hired in 1980. This was the first new hiring since 1973. As the time frame moved into 1981 and 1982 the American automobile industry went into a slump. Packard management, not wanting to lose the momentum of the proceeding four years, but unable to hire because of the downturn, proposed to continue with the work-rule cost reduction program and placed into a bank all earned jobs to be hired when the economy picked up. As we headed into 1982 National IUE bargaining early there were approximately 300 owed jobs in the bank. Management never hired any of those owed jobs. Prior to 1982 there was no job security language.

8. Simultaneously, with our local cost reduction programs, Packard management began to explore the utilization of the vast Mexican workforce available just across the border from El Paso, Texas in Juarez, Mexico. Packard Electric opened its first Mexican plant there in approximately 1979 and by the 1982 National IUE bargaining had three plants up and running in Mexico. Management informed Local 717 that, while they acknowledged that we had earned the jobs that were owed us, they (management) could not justify paying American wages now that they had opened manufacturing plants in Mexico. The Union recognized that low wages in Mexico was now a threat to every job in Warren, Ohio.

9. In 1984, during the Local contract bargaining process, the parties discussed this growing threat in Mexico and explored ways to deal with this issue. An

-3-

agreement was ultimately reached which provided management with the ability to move work to low cost options such as Mexico.[1] Management agreed to provide all current employees then employed at Packard Electric Warren, Ohio with "Lifetime Job and Income Security." This meant that no covered employee could be placed on permanent lay-off or be eliminated because of job transfer or technology. The agreement further provided that the Company would be required to hire one new employee for every three employees who attrited out of the workforce by death, quit, or retirement. Management would be free to place two-out-of-three attritions in other locations. In order to maximize the hiring opportunities the Union agreed to a hiring rate for these newly hired employees of 55% of a full wage employee with a progression to full wage over a 10 calendar year period. In addition, these employees would have a basic 80-20% health care plan for their first 10 years. This was an enormous opportunity for management. Two-thirds of all attrition openings could be placed in Mexico while the final one third would be hired in the United States at wage rates comparable to all second and third tier O.E.M. suppliers. At the time this agreement was made Packard Electric had four operating plants in Mexico. Over the next nine years Packard Electric hired approximately seven hundred second tier employees into the Warren operation. During the same time frame, the Mexican operations went from four plants to seventeen plants and from approximately four thousand employees in Mexico to over thirty thousand. Management had only met their commitment to hire into the Warren operations in two

---

[1] The 2003 Local Agreement, a copy of which is attached as Exhibit A, contains all of the relevant earlier agreements to which I refer in this Declaration.

of the nine years that followed the historic 1984 agreement, the Lifetime Job and Income Security Agreement.

10. In 1993, as a result of management's failure to follow the terms of the 1984 hiring agreement, Local 717 presented to management a proposal to negotiate a new reduced wage hiring plan to spur hiring and growth in the Warren operations. After intensive negotiations the parties agreed to a third tier of wages and benefits. The third tier would be paid a rate equal to 55% of the tier-one wages. This 55% rate would not increase yearly but would remain at 55%. These employees would also have a modified 80-20% health care plan. Management agreed to place into Warren the Bussed Electrical Center ("BEC") job package with an employment level of 1,250 employees as a result of the third tier agreement. Management hired in years 1993, 1994 and 1995 into the third-tier but did not hire to the 1,250 employee level. Finally, after two separate sets of contract bargaining in which the BEC hiring was an issue, the remaining employees were hired in 1999 and 2000. These employees have been either on permanent lay-off or in our Jobs Bank since 2003. Management never took advantage of the reduced costs of hiring into the CHP Plan.

11. In 1995, after Local 717 had agreed to the Competitive Hiring Plan, Dave Meyers, the Director of Ohio Operations for Delphi told an assembled group of union leaders that Local 717 was the greatest local union in the Delphi chain and that because of the labor saving concessions we had accepted he promised that Local 717 would have 10,000 members by the year 2000. Delphi even gave out buttons to Local 717 members promising "10,000 in 2000". The fact is that Delphi never kept this promise to Local 717 and we were down to 5000 members by 2001.

-5-

12. In the 1998 Molding Agreement Local 717 agreed to substantial cost savings for Delphi without touching wages and benefits by quality and productivity improvements. The Union agreed to productivity improvements in connection with investment in a new facility in the Warren area that increased the number of molding machines tended by each worker from 10 to 15 on each shift. Since the new machines triple the output of the old machines the net improvement per worker is 450%. Delphi representatives have told me this is now the most efficient plastic extrusion facility in the world.

13. In October, 2001, I was talking with Rob Gerling, Personnel Director of Warren Delphi and offered to develop a wage rate based on competition from the Mexican suppliers. The Union proposal was for a second tier that worked for the company, would not grow to parity, and had rates low enough to be competitive. The Company said the rate would have to be so low, that the Union would not accept it. The Union proposed to eliminate tier 2 and 3, to negotiate a new second tier that worked and to provide that this tier would not grow to parity. This proposal was another opportunity for management to lower the cost of operating the plant in Warren but management refused to take advantage of the opportunity. Had management taken advantage of the opportunity given to them with the third-tier, together with the attrition that occurred from the full wage employees, they would have had a per employee hourly rate well below twenty dollars per hour by 2003. Additionally, benefit costs would have been drastically reduced.

14. During the time of the 2003 negotiations, I spoke with Mark Cashdollar, then the Personnel Director, and John Sefcik about developing a rate that would be

competitive with the Mexican operations. I made the same kind of proposal as I had made in 2001. Sefcik stated that Delphi could not bring jobs to Warren because of the U.S. operations high legacy costs.

15. Local 717 entered into special agreements for certain products. In 2002, the Union agreed to the Plant 11 Metal Stamping Agreement which folded certain production duties into skilled trades jobs. A copy is attached as Exhibit B. In 2003 the parties negotiated an Ignition Products Agreement which provided for combining job classifications for greater efficiency. In the Ignition Department, we maintained output while eliminating 60 positions by combining classifications. For example, the material handlers were broad banded so that they were productive throughout their work day instead of being idle when there was no work to be done in their classification. A copy is attached as Exhibit C. In 2003, the Union agreed to the Machine Repair/Fab and Repair Re-Alignment Agreement which created new job classification assignments and reduced duplication of services. A copy is attached as Exhibit D.

16. On April 1, 2004, a buyout was offered of $40,000 for those eligible to retire with a normal pension and $20,000 for those eligible to retire with a mutual pension. The Union agreed to this buyout in the hope that 214 people would be returned to work since the Company had an obligation to rehire them. The Company thought 700 people would leave and moved 700 jobs to Mexico. Only 340 employees took the buyouts. Because too many jobs had been moved, the Company had to recall employees to the Jobs Bank, instead of to productive work.

-7-

17. There are now 503 employees in the Jobs Bank. Beginning in January, 2005, the Company put another 212 people in the Jobs Bank and continued to build it up throughout 2005 until the filing for bankruptcy. In May, 2005, Local 717 offered to let those in the Jobs Bank work for other companies. Management first agreed and then later changed their mind.

18. Delphi Warren has always had an amazingly high percentage of salaried employees in comparison to hourly employees. Currently there are 3,850 hourly employees on the payroll. Of this number, approximately four hundred are employed as Non-Traditional Bargaining Unit ("NTBU") employees. These NTBU employees do work that would normally be done by salaried employees. This leaves 3,450 employees doing traditional hourly work. Currently, Delphi Warren has approximately 1,500 salaried employees employed in Warren and when the 400 NTBU positions are added to the total, there are 1,900 salaried positions in Delphi Warren compared to 3,450 hourly. This percentage is so far out of normal for our industry that it has driven a major share of the uncompetitive cost factor.

19. To impose the proposals currently proposed by Delphi would create an economic disaster in the Mahoning Valley area of Ohio. A huge percentage of the families in the area are dependent on GM and Delphi for their survival. If wages are cut as Delphi proposes, workers would lose their homes and cars and could not meet their financial responsibilities and support their families.

Dated: April 21, 2006

*[signature: Donald O. Arbogast]*

DONALD O. ARBOGAST

-9-