**Hearing Date and Time: May 12, 2006 at 10:00 a.m.**
**Objection Deadline: May 5, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
        In re                          :   Chapter 11
                                                          :
DELPHI CORPORATION, et al.,            :   Case No. 05-44481 (RDD)
                                                          :
                                                          :   (Jointly Administered)
            Debtors.                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER FED. R. BANKR. P. 9019 AUTHORIZING AND
APPROVING SETTLEMENT AGREEMENT WITH XM SATELLITE RADIO INC.

("XM SETTLEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion (the "Motion") For Order Under Fed. R. Bankr. P. 9019 Authorizing And Approving Settlement Agreement With XM Satellite Radio Inc. In support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicate for the relief requested herein is Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

D.      The Debtors' Transformation Plan

11.      On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

12.      In connection with the first two elements of the Company's transformation

plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those

discussions, Delphi has consistently communicated a clear message to both its hourly workforce

and GM: Delphi is committed to finding a consensual resolution to its issues and intends to

continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S.

operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a

tripartite agreement providing for a special hourly attrition program for Delphi's UAW-

represented employees.  This special hourly attrition program could provide as many as 18,000

of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings"

through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement

on similar hourly attrition programs with its other unions, which could provide as many as 4,500

additional hourly employees with retirement programs or incentives.

13.      These hourly attrition programs constitute an important first step in

implementing the Debtors' transformation plan, but will not resolve all of the issues related to

Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive

agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under

sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements

and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors also moved to reject

unprofitable supply contracts with GM.[4]  Among the reasons for the GM contract rejection

motion was the Debtors' belief that GM must cover a greater portion of the costs of

manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This

initial motion covers approximately half of the Debtors' North American annual purchase

volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the

filing of these motions was a necessary procedural step, the Debtors remain focused on reaching

a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is

necessary.

14.      To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which the

Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.   To that end, the Company will concentrate the organization

around the following core strategic product lines: (a) Controls & Security (Body Security,

---

[3]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And
       Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035)

[4]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
       Executory Contracts With General Motors Corporation (Docket No. 3033)

6

Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture
(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)
Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel
and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics),
and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.    In contrast, the Company similarly identified certain non-core product
lines that do not fit into its future strategic framework, including Brake & Chassis Systems,
Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering,
and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines
(which will include approximately one-third of its global manufacturing sites) and will consult
with its customers, unions, and other stakeholders to carefully manage the transition of such
affected product lines.  The Company intends to sell or wind down the non-core product lines
and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the
Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as
many as 8,500 employees as a result of portfolio and product rationalizations and initiatives
adopted following an analysis of the Company's selling, general, and administration ("SG&A")
cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented,
the Company should realize savings of approximately $450 million per year in addition to
savings realized from competitive measures planned for its core businesses and the disposition of
non-core assets.

---

[5]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket
or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial
vehicles, or other adjacent-market businesses and product lines.

17.     As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding contributions over a long-term period.  The Company intends to replace the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

19.     By this Motion, the Debtors seek entry of an order under Bankruptcy Rule 9019 authorizing and approving a settlement agreement (the "Settlement Agreement") entered into by the Debtor Delphi Automotive Systems LLC and XM Satellite Radio Inc. ("XM").

<u>Basis For Relief</u>

A.      <u>Background To The Proposed Settlement Agreement</u>

20.      The Debtors and XM have been bringing digital direct satellite radio products and service to vehicles and to the consumer electronics market for a number of years.[6] Together, the Debtors and XM have cooperated in the design, development, manufacture, distribution, and marketing of numerous in-vehicle and portable satellite radio products and accessories.  In the course of their relationship, however, certain disputes have arisen and the parties have become involved in protracted negotiations concerning the calculation and payment by XM to the Debtors of hardware subsidies (the "Subsidies") in connection with the Debtors' purchase of the Roady2, SKYFi2, and MyFi satellite radio products (the "Products"). Specifically, the parties dispute the impact of certain finance and extended warranty fees or charges imposed by Flextronics International USA Inc. ("Flextronics"), a third party manufacturer and supplier of various products to the Debtors, on the calculation of the Subsidies (the "Dispute").

B.      <u>The Proposed Settlement Agreement</u>

21.      In an effort to resolve the Dispute, to clarify the manner in which the Subsidies will be calculated in the future regarding the Products, and to solidify the terms under which XM will support Delphi's manufacture, distribution, and marketing of a new satellite radio product, XM and the Debtors entered into the Settlement Agreement, dated April 11, 2006, a copy of which is annexed hereto as <u>Exhibit A</u>.  The salient terms of the Settlement Agreement are as follows:

---

[6]    XM is a leading satellite radio service company that provides music, news, talk, information, entertainment, and sports programming for reception by vehicle, home, and portable radios nationwide and over the Internet to millions of subscribers.

1) XM and the Debtors will waive and release all claims against each other directly related to the Dispute.

2) In lieu of agreeing to increased Subsidies for the Products to cover fees or charges that are the subject of the Dispute, XM will make three quarterly payments to the Debtors in the amount of $100,000 each, commencing on June 30, 2006.  XM will continue to pay and the Debtors will accept the Subsidies for the Products in accordance with the terms of applicable agreements and excluding any fees or charges imposed by Flextronics.

3) Delphi will use good faith efforts to resolve with Flextronics any open issues related to certain non-manufacturing fees and charges with respect to the Products manufactured by Flextronics by no later than May 31, 2006.

4) XM will waive all past and future minimum Marketing Development Fund ("MDF") spending requirements imposed upon the Debtors under the various product agreements, including the agreements related to the Products.  XM will not be required to reimburse the Debtors for any MDF already expended or committed by the Debtors.

5) XM and the Debtors will use commercially reasonable steps to fulfill certain obligations, as specified in the Settlement Agreement, regarding the SKYFi3 product, which has not yet been introduced at retail.

6) The Debtors will invoice XM in an amount equal to $1,000,000 to support the Debtors' current 2006 engineering and supplier non-restructuring engineering costs for the SKYFi3 product.  XM will pay this invoice in full no later than June 30, 2006.

<u>Applicable Authority</u>

22.    By this Motion, the Debtors respectfully request the entry of an order under Rule 9019(a) of the Bankruptcy Rules approving the Settlement Agreement.  Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Bankruptcy Rule 9019(a). Settlements and compromises are "a normal part of the process of reorganization."  <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968) (quoting <u>Case v. L.A. Lumber Prods. Co.</u>, 308 U.S. 106, 130 (1939)); <u>see also</u> <u>In re Adelphia Communications Corp.</u>, 327 B.R. 143, 159 (decision to accept or reject settlement lies within

10

sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

23.     Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of the debtor's estate.  See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it.").  In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

24.     The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors.  TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

25.     Courts in this district have further elaborated on these factors to consider: (a)  the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex

and protracted litigation if the settlement is not approved, (c) the proportion of the class members

who do not object or who affirmatively support the proposed settlement, (d) the competency and

experience of counsel who support the settlement, (e) the relative benefits to be received by

individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the

directors and officers as a result of the settlement, and (g) the extent to which the settlement is

truly the product of arms-length bargaining, and not of fraud or collusion. Adelphia, 327 B.R. at

159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

26.    The bankruptcy court need not determine that all of the foregoing criteria

favor approval of a compromise, and the proposed compromise need not be the best agreement

that the debtor could have achieved under the circumstances. See Adelphia, 327 B.R. at 159-60;

see also Penn Centr., 596 F.2d at 1114. Instead, the court's proper "role is to determine whether

the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890

(Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'" In re

Telesphere Communications, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citation omitted).

To that end, courts should not substitute their own judgment for that of the debtor, but rather

should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point

in the range of reasonableness.'" Adelphia, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d

at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs,

Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust

Co., 17 F.3d 600 (2d Cir. 1994).

27.    The Settlement Agreement between the Debtors and XM should be

approved under Bankruptcy Rule 9019(a) because its terms are fair and equitable, fall well

within the range of reasonableness, and are in the best interests of the Debtors and their estates.

Most significantly, the Settlement Agreement solidifies the terms under which XM will support

12

Delphi's manufacture, distribution, and marketing of the SKYFi3 product.  XM has significant

expertise and proprietary knowledge in the design and development of portable satellite radio

products and has expended considerable time and resources towards the development of the

SKYFi3 product.  Pursuant to the terms of the Settlement Agreement, XM has agreed to provide

certain designs and schematics to the Debtors, as well as certain technical information and

technical consulting to assist the Debtors in the completion of the SKYFi3 product design and

development.  XM will waive all costs associated with the product development for the SKYFi3

product as well as the costs associated with factory support provided and to be provided to the

Debtors.  XM will provide additional monetary support by making an immediate payment of

$1,000,000 to support the Debtors' current 2006 engineering and supplier costs for the SKYFi3

product.  The Debtors believe that the technical expertise and monetary support XM will provide

to the Debtors pursuant to the Settlement Agreement is critical for the Debtors to successfully

launch the SKYFi3 product.

28.    With respect to the Dispute specifically, in lieu of agreeing to increased

Subsidies for the Products to cover fees or charges that are the subject of the Dispute, XM will

make three quarterly payments to the Debtors in the amount of $100,000 each, commencing on

June 30, 2006.  XM will continue to make Subsidy payments to Delphi in connection with the

Products, which will give the Debtors access to additional working capital to fund their satellite

radio products business.

29.    Finally, the Debtors believe that the Settlement Agreement is a reasonable

compromise under the circumstances because it avoids the potentially burdensome costs and

uncertainties of litigation while generating goodwill and preserving the positive working

relationships between the Debtors and XM and between the Debtors and Flextronics.  Those

positive working relationships and the expertise and technical assistance XM has provided, and

has agreed to continue to provide under the Settlement Agreement, has contributed and will

continue to contribute to the Debtors' success in their growing consumer electronics business.

The Debtors do not believe that this level of ongoing support by XM could be obtained through

the difficult and protracted litigation that would result if this Settlement Agreement is not

approved, and that the loss of such support would eventually result in significant harm to the

Debtors' consumer electronic business.

    30.  Accordingly, in the exercise of their business judgment, the Debtors

believe that the terms of the Settlement Agreement are reasonable based upon the significant

benefits the Debtors will receive, as summarized above.  Therefore, based on the significant

benefits to be realized by the Debtors from entering into the Settlement Agreement, together with

the potential harm to the estates if the relief requested herein is not granted, the Debtors

respectfully request that the motion be granted.

Notice Of Motion

    31.  Notice of this Motion has been provided in accordance with the Third

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered by this Court on April 20, 2006 (Docket No. 3293).  In

light of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

Memorandum Of Law

    32.  Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

14

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

        33.        WHEREFORE the Debtors respectfully request that this Court enter an order (a) authorizing and approving the Settlement Agreement and (b) granting them such other and further relief as is just.

Dated:  New York, New York
       April 21, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

15

# EXHIBIT A

## SETTLEMENT AGREEMENT



**SATELLITE
RADIO**

April 12, 2006

*Settlement Proposal Not Admissible For Any Purpose*

Mr. Frank Ordoñez
President
Delphi Product & Service Solutions
Delphi Automotive Systems LLC
1441 West Long Lake Road
Troy, Michigan  48098

<u>Settlement Letter Agreement Regarding Delphi / Manufacturer Finance Charge
Issue — Certain Additional Issues</u>

Dear Frank:

This Letter Agreement (this "Letter Agreement") is made in reference to that certain letter (the
"Settlement Agreement") by and between Delphi Automotive Systems LLC ("Delphi") and XM
Satellite Radio Inc. ("XM") concerning the calculation and payment by XM to Delphi of
hardware subsidies (the "Subsidies") in connection with Delphi's purchase of the Roady2,
SKYFi2 and MyFi products (the "Products"), specifically pertaining to finance and extended
warranty fees or charges imposed by Flextronics ("Dispute").  In accordance with Fed. R. Evid.
408 and all other applicable laws and rules, neither this Letter Agreement nor the Settlement
Agreement nor any discussions or negotiations involving the contents or terms of this Settlement
Agreement may be used in any action or proceeding which may be commenced hereafter.

Delphi hereby agrees that the motion to be submitted to the Bankruptcy Court with respect to
approval of the Settlement Agreement shall be provided to XM at least one business day prior to
it being filed with the Bankruptcy Court so as to permit XM to review the motion for the purpose
of determining whether there are any potential breaches of any confidentiality provisions
pertaining to any agreements between XM and Delphi.

Mr. Frank Ordoñez
April 12, 2006
Page 2

If you are in agreement with the provisions of this Letter Agreement, please countersign below
and return one fully-executed original to XM within three (3) business days after the date of this
Letter Agreement.

Sincerely,

XM SATELLITE RADIO INC.

*Joseph J. Euteneuer*

Joseph J. Euteneuer
Chief Financial Officer

Acknowledged and Agreed,

DELPHI AUTOMOTIVE SYSTEMS LLC

*Francisco A. Ordoñez*

Mr. Francisco A. Ordoñez
President
Delphi Product & Service Solutions Division

cc: Joe Damato
     Joe Papelian

XM / Delphi Confidential



**SATELLITE
RADIO**

April 12, 2006

*Settlement Proposal Not Admissible For Any Purpose*

Mr. Frank Ordoñez
President
Delphi Product & Service Solutions
Delphi Automotive Systems LLC
1441 West Long Lake Road
Troy, Michigan 48098

<u>Settlement Letter Agreement Regarding Delphi / Manufacturer Finance Charge
Issue</u>

Dear Frank:

This letter ("Settlement Agreement") is submitted as part of negotiations between Delphi
Automotive Systems LLC ("Delphi") and XM Satellite Radio Inc. ("XM") concerning the
calculation and payment by XM to Delphi of hardware subsidies (the "Subsidies") in connection
with Delphi's purchase of the Roady2, SKYFi2 and MyFi products (the "Products"), specifically
pertaining to finance and extended warranty fees or charges imposed by Flextronics ("Dispute").
In accordance with Fed. R. Evid. 408 and all other applicable laws and rules, neither this
Settlement Agreement nor any discussions or negotiations involving the contents or terms of this
Settlement Agreement may be used in any action or proceeding which may be commenced
hereafter.

XM and Delphi hereby agree to the settlement terms below, to be submitted for approval to the
U.S. Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") no later than
April 21, 2006.

Subject to both parties' compliance with their respective obligations under this Settlement
Agreement:

1.   XM and Delphi will waive and release all claims against each other directly related to the
     Dispute.   This waiver and release includes any and all claims, damages, injuries,
     demands, actions, causes of action of whatever kind or nature, at law or in equity, known
     or unknown, asserted or unasserted, suspected or unsuspected, foreseeable or
     unforeseeable, that each party may have had or may now have or may hereafter have
     against the other party, for any cause existing at any time before or after the date hereof
     relating directly to the Dispute.

2.   Delphi will promptly invoice XM an amount equal to $1,000,000 to support Delphi's
     current 2006 engineering and supplier NRE (Non Recurring Engineering) costs for the
     SKYFi3 product. XM will pay this invoice in full no later than June 30, 2006.

Mr. Frank Ordoñez
April 12, 2006
Page 2

3. In lieu of agreeing to increased subsidies for the Products to cover fees or charges that are the subject of the Dispute, XM will make three (3) quarterly payments to Delphi in the amount of One Hundred Thousand Dollars ($100,000) each, with each such payment due on the last day of each calendar quarter commencing with June 30, 2006. XM will continue to pay (and Delphi will accept) the Subsidies for the Products in accordance with the terms of the applicable agreements between XM and Delphi with respect to the Products, provided, however, that Delphi agrees such Subsidies will be calculated in a manner that excludes any fees or charges imposed by Flextronics and related to: (i) payment terms longer than forty-five (45) days; (ii) late payments; (iii) an extended warranty period (i.e., a warranty period greater than nine (9) months from date of shipment from the factory); (iv) delivery other than ex factory; (v) delays or changes to or cancellations of firm orders; (vi) breach by Delphi of the terms of Delphi's agreement with Flextronics with respect to the Products; (vii) changes to the design, manufacturing process, the raw materials or sub-components used for the Products made at the direction of Delphi without XM's written consent; or (viii) actions or inactions of Delphi that result in a financial benefit to Delphi that are not contemplated by the applicable agreements between XM and Delphi with respect to the Products ("Non-MCPU Charges").

4. XM will waive all past and future minimum Marketing Development Fund ("MDF") spend requirements imposed upon Delphi under the SKYFi, SKYFi2 and MyFi product agreements. For the avoidance of doubt, nothing in this Settlement Agreement, including without limitation in paragraph 9, shall require XM to reimburse Delphi for any MDF already expended or committed by Delphi.

5. SKYFi3 Matters.

   a. XM has spent significant time and effort, towards the development of the SKYFi3 product. Specifically XM has provided Delphi with the overall electrical design including schematic diagram and PCB layout for two electrical design passes P1 and P2. XM also provided Delphi with factory support in Malaysia from XM's resident manufacturing support team. XM will waive all NRE costs for the SKYFi3 product development, including the P1 and P2 effort and other required XM technologies, including Napster/XM Desktop Client in forms useable with the SKYFi3 product (Certicom firmware upgrade is required at Delphi's expense).

   b. Delphi and XM will use commercially reasonable efforts to enter into a definitive agreement for the SKYFi3 product no later than April 19, 2006, which shall include a $20 hardware subsidy upon first-time activation (i.e., subsidy only payable with respect to the first activation of each SKYFi3 unit). XM will offer Delphi a hardware subsidy opportunity upon first-time activation for a future variant of the SKYFi3 platform based on the H90 chipset targeted for launch in

XM / Delphi Confidential

Apr-12-08 01:49pm From-XM Satellite Radio 05-44481-rdd Doc 3337 Filed 04/21/06 Entered 04/21/06 15:09:31 Main Document T-885 P.022/023 F-541

Pg 21 of 23

Mr. Frank Ordoñez
April 12, 2006
Page 3

spring of 2007. The exact subsidy amount will be based on the specific features of the product and whether it can be supported in the XM budget for 2007.

c. Delphi shall be responsible for all third party royalties applicable to the SKYFi3 product.

d. Subject to the terms of the "Sensitive Information MOU" between the parties, XM shall promptly provide Delphi with the following: layout, electrical design, "BunA" software and Nexus software (provided that Delphi shall be responsible for entering into a license agreement with and paying any required royalties to PacketVideo Corporation). XM shall provide reasonably necessary technical consulting to assist Delphi in completing the SKYFi3 product design and development.

e. As previously agreed between Delphi and XM, Delphi shall assume all responsibility for the remaining design and development effort related to the SKYFi3 product, and shall be solely responsible for all future prototype builds, commencement of mass production, and timing of introduction at retail, which timing shall be established by Delphi. Delphi will be solely responsible to set all pricing, margin and MDF opportunities for its retailers and distributors. XM agrees to continue to provide reasonable factory support in Malaysia from XM's resident manufacturing support team through the date of the initial SKYFi3 product launch.

f. XM will use reasonable efforts to market and promote the SKYFi3 product in accordance with retail demand and XM's overall marketing plans.

6. Delphi will use good faith efforts to resolve with Flextronics any open issues related to Non-MCPU Charges with respect to the Products manufactured by Flextronics, in no event later than May 31, 2006.

7. No later than April 21, 2006, Delphi will make a motion before the Bankruptcy Court for approval of the settlement terms set forth in this Settlement Agreement. Delphi agrees that the proposed order submitted to the Bankruptcy Court with respect to approval of the settlement terms set forth in this Settlement Agreement shall be acceptable to XM, in its reasonable discretion. XM shall review and approve the proposed order within three (3) days after receipt.

8. XM agrees to provide Delphi with details of XM's monthly activations on all Delphi aftermarket hardware. Details to be provided include, but are not limited to (to the extent known by XM): reported Delphi radios manufactured, radio ID number and activation

XM / Delphi Confidential

Mr. Frank Ordoñez
April 12, 2006
Page 4

date.  This information will be made available to Delphi no later than June 30, 2006 and will provide a historical view back to the beginning of the Delphi-XM relationship.

9.  Apart from the Dispute, XM claims that they overpaid Delphi on product subsidies arising from a previously undiscovered error in the database query used to generate the periodic first time activation reports provided by XM to Delphi ("XM Other Claim"). While Delphi disputes the XM Other Claim, it agrees to cooperate with XM to determine the validity of the XM Other Claim through an audit process or a process otherwise agreed to by the parties.  In addition, Delphi claims that they under-billed certain premium freight (air-only portion), retail price protection and/or retail price credits (e.g., related to temporary price reductions authorized by XM) ("Delphi Other Claim" and together with the XM Other Claim, the "Other Claims").  While XM disputes the Delphi Other Claim, it agrees to cooperate with Delphi to determine the validity of the Delphi Other Claim through an audit process or a process otherwise agreed to by the parties. While the parties acknowledge that this provision does not constitute a settlement or an admission of the Other Claims, both XM and Delphi agree that they will work in good faith to resolve these Other Claims (and net them against each other).  For the avoidance of doubt, the Other Claims exclude all issues covered by this Settlement Agreement.  In the event that XM's claimed overpayment with respect to the XM Other Claim exceeds Delphi's claimed under-billing with respect to the Delphi Other Claim, XM agrees to waive its right to collect the first One Million Dollars ($1,000,000) of such difference from Delphi.  Similarly, in the event that Delphi's claimed under-billing with respect to the Delphi Other Claim exceeds XM's claimed overpayment with respect to the XM Other Claim, Delphi agrees to waive its right to collect the first One Million Dollars ($1,000,000) of such difference from XM.  In both cases, the difference for purposes of its definition as a pre-petition claim (arose prior to October 8, 2005) or a post-petition claim (arose on or after October 8, 2005) will be allocated pro-rata in accordance with the underlying liability and the time period during which such underlying liability arose.

10. This Settlement Agreement constitutes the entire agreement between the parties with respect to the subject matter and supersedes all prior written and oral and all contemporaneous oral agreements and understandings with respect to the subject matter, and changes or modifications shall be in writing and executed by both parties.

11. This Settlement Agreement shall be construed and enforced under the law of the State of New York without reference to any choice of law or conflict of law provisions or rules, and both Parties consent to the jurisdiction of the American Arbitration Association for the resolution of any dispute arising out of this Settlement Agreement.

12. This Settlement Agreement has been prepared mutually by both Parties.

XM / Delphi Confidential

Mr. Frank Ordoñez
April 12, 2006
Page 5

The effectiveness of this Settlement Agreement (including all obligations and agreements referenced herein) shall all be contingent upon the Bankruptcy Court entering an order approving Delphi's motion to approve the settlement terms set forth in this Settlement Agreement and such order not being subject to an appeal filed within ten (10) days of entry of the order by the Bankruptcy Court (a "Final Order"). Without limiting the generality of the foregoing, in no event shall XM be required to make any payment otherwise required by this Settlement Agreement unless and until the Bankruptcy Court has entered the order approving Delphi's motion to approve the settlement terms set forth in this Settlement Agreement and such order becoming a Final Order.

If you are in agreement with the provisions of this Settlement Agreement, please countersign below and return one fully-executed original to XM within three (3) business days after the date of this Settlement Agreement.

Sincerely,

XM SATELLITE RADIO INC.

*Joseph J. Euteneuer*

Joseph J. Euteneuer
Chief Financial Officer

Acknowledged and Agreed,

DELPHI AUTOMOTIVE SYSTEMS LLC

Mr. Francisco A. Ordoñez
President
Delphi Product & Service Solutions Division

cc: Joe Damato
    Joe Papelian

XM / Delphi Confidential