Bruce H. Simon (BS 2597)
Peter Herman (PH 6324)
Babette A. Ceccotti (BC 2690)
Bruce S. Levine (BL 2309)
Elizabeth O'Leary (EO 9323)
David R. Hock (DH 8599)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036
(212) 563-4100

-and -

Niraj R. Ganatra
International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214
(313) 926-5216

Attorneys for International Union, United
Automobile, Aerospace and Agricultural
Implement Workers of America (UAW)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                                           :   Chapter 11
                                                                 :
DELPHI CORPORATION, et al.,                                      :   Case No. 05-44481 (RDD)
                                                                 :   (Jointly Administered)
                                            Debtors.             :
                                                                 :
-----------------------------------------------------------------x

### DECLARATION OF RICHARD A. RUPPERT IN SUPPORT OF THE OBJECTION OF INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW) TO DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. § 1113(c) AUTHORIZING REJECTION OF COLLECTIVE BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(g) AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS

00089682.DOC.1

I, Richard A. Ruppert, under penalty of perjury and in lieu of affidavit as permitted under 28 U.S.C. § 1746, declare and state as follows:

1. I am currently employed by International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW" or the "Union"). I have worked at the UAW since November 1992. In that time period, I have held various positions, including Servicing Representative and Assistant Director in the UAW General Motors Department and as an Administrative Assistant in the UAW Aerospace and Agricultural Implement Department. I am currently employed as Administrative Assistant in the UAW General Motors Department. The UAW General Motors Department coordinates bargaining and administers collective bargaining agreements at General Motors ("GM") and Delphi. My responsibilities in this position include collective bargaining at GM and Delphi, as well as oversight of all activities within the UAW General Motors Department.

2. I submit this declaration in support of the UAW's objection to Delphi Corporation's Motion For Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify Retiree Benefits Under 11 U.S.C. § 1114(g) (the "Motion"). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinions, my experience with and knowledge of the UAW, or are based upon knowledge obtained from UAW employees reporting to me that are derived in the course of their duties. If I were called on to testify, I could and would testify truthfully to the facts set forth herein.

### UAW History and UAW Representation at Delphi

3. The UAW was founded in 1935. Since then, its members have struggled -- through organizing battles, collective bargaining, strikes and lockouts -- to achieve many of the key contract benefits that Delphi Corporation ("Delphi") now seeks to dismantle. Gains from

2

negotiations and strikes led to one of the first victories for equal pay by guaranteeing the same minimum wage for both men and women, the first employer-paid pension plan for industrial workers, the first cost-of-living allowances, landmark job and income security provisions, comprehensive training and educational programs, and supplemental unemployment benefit programs. The UAW has been actively involved in every civil rights legislative battle since the 1950s, including the campaigns to enact the Civil Rights Act of 1964, the Voting Rights Act of 1965, the Fair Housing Act, the Civil Rights Restoration Act of 1988 and legislation to prohibit discrimination against women, the elderly and people with disabilities. The UAW has also been instrumental in passing Medicare and Medicaid, the Occupational Safety and Health Act, the Employee Retirement Income Security Act of 1974 and the Family and Medical Leave Act.

        4.      The UAW is the exclusive collective bargaining representative of approximately 24,000 production and maintenance employees and mechanical employees of Delphi, nearly half of Delphi's total domestic workforce. These employees work in 21 different Delphi facilities located in ten states (Alabama, Georgia, Indiana, Kansas, Michigan, Mississippi, New York, Ohio, Texas, and Wisconsin). These facilities manufacture and produce products ranging from automotive steering components, fuel systems, climate control systems, instrument panels, batteries and related battery components, valvetrains, and electronic devices such as audio systems and ignition and steering electronics. The terms and conditions of UAW-represented employees at Delphi are covered by a number of different collective bargaining agreements: (1) the National Agreements between the UAW and Delphi, (2) a Supplemental New Hire Agreement between Delphi and the UAW that sets wage and benefit levels for new hires, and (3) 22 various local agreements between Delphi and individual UAW locals that address local issues and are plant-specific in their application. The National Agreement became

effective on October 6, 2003, and is effective until September 14, 2007. The Supplemental New Hire Agreement became effective in April 2004, and is a seven-year agreement. The UAW is also the "authorized representative" under 11 U.S.C. § 1114(e) of approximately 9,800 retirees receiving collectively bargained retiree health and life insurance benefits.

### The Spin-off of Delphi from GM, and the UAW's Efforts to Improve Delphi

5. The UAW was opposed to the 1999 spin-off of Delphi from GM. Although both companies were confident that the proposed divestiture and separation would allow Delphi to be competitive in bidding for auto parts supply work from other Original Equipment Manufacturers ("OEMs"), the Union had concerns about the long-term future of UAW-represented workers at Delphi locations, and the security of Delphi retirees' health care and pension benefits.

6. Based on the UAW's reservations about the spin-off, we secured the GM Benefit Guarantee to obtain a level of protection for Delphi retirees and current active employees. In addition, the UAW also obtained commitments from Delphi that the 1999 and 2003 National Agreements would "mirror" the UAW-GM National Agreements.

7. The UAW believes that Delphi took GM business for granted, and that this has contributed to its present situation. For example, while seeking to diversify its product and customer portfolio, Delphi did not undertake the required steps to secure the extant and future or replacement business from GM. Delphi's own financial statements demonstrate the significant erosion of Delphi's consolidated GM revenues from 1999 through 2005.

8. The UAW spent considerable time and effort trying to retain and secure GM work for Delphi. For example, during the 2003 contract negotiations, as a result of the UAW's request that GM "look to Delphi first" in its sourcing needs, GM agreed to award approximately $1 billion in new business to UAW-represented Delphi operations. In addition,

4

GM developed the "Growth and Opportunity" ("GO") process to identify and address new business opportunities. Under this structure, representatives from the UAW, GM and Delphi were to work collaboratively to identify new GM supply programs which Delphi could be competitive in bidding for.

9. Also as part of the 2003 contract negotiations, the UAW and Delphi had discussions concerning the Company's long term viability. As a result of these discussions and as a part of a tri-partite understanding between the UAW, Delphi and GM (including the above-mentioned GM support and Delphi commitments to invest in plants to make them competitive and operationally efficient), the Union and Delphi agreed to a Supplemental Agreement for new employees hired at Delphi. The Union and Delphi felt that negotiation and implementation of the Supplemental Agreement, which provided for lower all-in labor costs as compared to all-in labor costs available to incumbent hourly UAW-represented employees, would address the issues confronting Delphi.

10. In addition, the UAW has provided assistance to Delphi to enhance its competitive position in numerous other ways. By way of example, the UAW agreed to Delphi's proposed sale of its battery business, with the resulting closure of the Olathe, Kansas and Tuscaloosa, Alabama facilities. The UAW also agreed to the closure of Delphi's Flint-West (Michigan) facility and the consolidation of the Flint-West JOBS bank and the Livonia (Michigan) Delco Chassis JOBS bank into the Flint-East JOBS bank, which resulted in significant cost savings for Delphi.

11. Delphi and the Union have also worked, at the local or plant level, to address operational issues. Delphi approached the Union about certain facilities identified as "troubled" and sought to negotiate operational changes. Typically, the union and management

5

officials at the affected facilities negotiated operational changes concerning consolidation of job classifications, subcontracting of certain maintenance jobs and the consolidation of operations into a single facility. Such initiatives, which involve the active participation of the Union at the International level, and which have contributed economic savings to Delphi, were undertaken at several UAW-represented facilities, including Anderson, Indiana, Columbus, Ohio, and Adrian, Michigan.

        12.    The UAW's efforts to improve Delphi's competitiveness are consistent with its long-standing record of stepping up to the plate to protect the competitiveness of the industry's employers. For example, the UAW and GM reached agreement in October 2005 to provide financial relief in connection with GM's health care costs. Prior to that, in May 2004, the UAW reached a seven-year supplemental agreement with Visteon Corp. ("Visteon"), the financially troubled automotive parts company spun off from the Ford Motor Company ("Ford"). That agreement put in place reduced wages and benefits for new hire employees. This agreement is similar to the supplemental agreement reached with Delphi. Thereafter, in June 2005, in response to continued financial distress, the UAW, Visteon and Ford entered into the Visteon Restructuring Memorandum of Agreement that provides for more than a dozen facilities to be spun-off to or absorbed by Ford.

### The Events Between October 2005 and March 2006

        13.    On October 21, 2005, Delphi sent proposals to the UAW which it refers to in its motion as the Competitive Benchmark Proposals. We received revised proposals in mid-November 2005. Delphi's proposals, which sought to eliminate two-thirds of the workforce and ravage the wages, benefits and working conditions of those workers who remained, did not provide a framework for agreement.

14. By the time of Delphi's bankruptcy filing in October, 2005, Delphi's Chairman and Chief Executive Officer, Robert S. Miller, by directing confrontational attacks aimed at the hourly workforce and the collective bargaining agreements, provoked anger, bitterness and mistrust throughout the UAW-represented workforce at Delphi. Miller's repeated public threats to slash wages and close plants created a toxic atmosphere that only aggravated the distress and anxiety created by the bankruptcy itself. Since the time of the filing, Mr. Miller's rhetoric has tempered somewhat, but the effects of his pronouncements in the early days of this proceeding have lingered.

15. In mid-January 2006, the UAW, Delphi and GM agreed to tri-partite discussions to begin work on many issues regarding Delphi's restructuring. Earlier in the process, the parties decided to focus primary attention on the Special Attrition Program discussions, which began in early February 2006 and concluded with an agreement on March 22, 2006. The parties agreed that this was the first step of a two-step process for resolving Delphi's restructuring issues.

16. In addition, from January through March, the UAW held a series of meetings with Delphi, and Delphi and GM collectively to discuss Delphi's proposed "manufacturing footprint," and the timing or manner in which Delphi would effect plant wind-downs, sales and consolidations.

17. On March 24, 2006, Delphi presented the UAW with the proposals that Delphi now calls the "GM Consensual Proposals" and the "Competitive Benchmark Proposals." The baseline aspect of the proposals is identical to the November 2005 proposals, which were viewed by the UAW as failing to provide a framework for agreement and instead, a path to confrontation.

7

18. The UAW's position is that the March 24th proposals, like those which preceded them, are not a good faith effort to bargain to resolution. Among other deficiencies, the proposals are vague and broad in scope, there is no identification of line-item savings attributable to each proposed modification, nor is there an overall savings "ask." And, it is apparent that these proposals go far beyond the modifications that are necessary to permit Delphi to reorganize.

19. The parties have an agreement. UAW is prepared to discuss modifications to that agreement necessary for Delphi's survival. The collective bargaining process is the place for resolution of these issues.

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 21st day of April, 2006

_____
Richard A. Ruppert