Hearing Date and Time:  May 9, 2006 at 10:00 a.m.

Bruce H. Simon (BS 2597)
Peter Herman (PH 6324)
Babette A. Ceccotti (BC 2690)
Bruce S. Levine (BL 2309)
Elizabeth O'Leary (EO 9323)
David R. Hock (DH 8599)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York  10036
(212) 563-4100

    -and -

Niraj R. Ganatra
International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan  48214
(313) 926-5216

Attorneys for International Union, United
Automobile, Aerospace and Agricultural
Implement Workers of America (UAW)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                                 :
In re:                                                           :    Chapter 11
                                                                 :
DELPHI CORPORATION, *et al.*,                                    :
                                                                 :    Case No. 05-44481 (RDD)
                              Debtors.                           :    (Jointly Administered)
                                                                 :
------------------------------------------------------------------x

**MEMORANDUM OF LAW OF INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW) IN SUPPORT OF UAW'S OBJECTION TO DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. § 1113(c) AUTHORIZING REJECTION OF COLLECTIVE BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(g) <u>AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ................................................................................ 6

    A.    UAW History and UAW Representation at Delphi .................................. 6

    B.    The Spin-off of Delphi from GM, and the UAW's Efforts to Improve
        Delphi ....................................................................................................... 7

    C.    The Events Between October 2005 and March 2006 ............................. 9

    D.    Delphi's Proposals ................................................................................ 11

    E.    Delphi's Spinoff From GM and Subsequent Bargaining with the UAW ............ 12

    F.    The UAW-GM-Delphi Special Attrition Program ............................... 13

ARGUMENT ................................................................................................... 15

    Summary of Argument ................................................................................ 15

I.    DELPHI'S MOTION VIOLATES FUNDAMENTAL STATUTORY
    REQUIREMENTS AND IS NOT RIPE FOR JUDICIAL CONSIDERATION ............. 15

    A.    Sections 1113 Was Enacted to Safeguard Collective Bargaining ........................ 15

    B.    Section 1114 Requires Debtors To Meet Equally Stringent Procedural and
        Substantive Requirements as a Condition Precedent for Modifying Retiree
        Health Benefits ...................................................................................... 20

    C.    The Rejection Application Is Premature .............................................. 22

        1.    The Amount of GM Support and The Results of the Special
             Attrition Program Materially Affect the Process ...................................... 22

        2.    The Lack of a Definitive Set of Section 1113/1114 Proposals
             Confirms that the Motion is Premature ...................................................... 23

        3.    The Rejection Motion is Especially Inappropriate Given the
             Parties' Recent Success in Negotiating the Special Attrition
             Program ................................................................................................... 24

    D.    The Application Fails to Meet the "Case or Controversy" and Ripeness
        Requirements for Federal Court Actions .............................................. 25

E.    Delphi Cannot Obtain a Rejection Order to Use at Its Discretion ........................ 27

II.    DELPHI CANNOT MEET THE REQUIREMENTS OF SECTIONS 1113 AND
       1114 IN ANY EVENT .................................................................................................. 30

    A.    Delphi Has Not Provided a "Proposal" as Required by the Statute ...................... 30

    B.    Delphi Cannot Show That Its Proposals are "Necessary" ................................... 32

        1.    Delphi Has Failed to Establish Necessity as a Matter of Law ................. 32

        2.    Delphi has Failed to Demonstrate Facts that Establish the
              Necessity of Its Proposals. ......................................................................... 37

    C.    Delphi Has Failed to Provide The UAW with the Relevant Information
          Necessary to Evaluate Its Proposals .................................................................... 39

        1.    Delphi's Litigation Posture Directly Contradicts Its Prior
              Representation to this Court that the UAW Would Need to
              Conduct Due Diligence in Order to Properly Evaluate Delphi's
              Proposals .................................................................................................... 39

        2.    The UAW's Efforts to Obtain Information Have Been Stymied By
              Delphi's Lack of Good Faith Disclosure. ................................................... 41

    D.    DELPHI'S PROPOSALS ARE NOT "FAIR AND EQUITABLE" ................... 44

    E.    Delphi Wrongly Portrays The UAW As Failing to Negotiate and Rejecting
          Its Proposals ......................................................................................................... 47

    F.    The Balance of the Equities Does Not Clearly Favor Rejection ......................... 48

        1.    The Impact of a Strike in the Event of Rejection Would be
              Devastating for All Constituencies ........................................................... 49

        2.    The Other Relevant Factors Decidedly Counsel Against Granting
              Delphi's Rejection Motion ......................................................................... 52

CONCLUSION ............................................................................................................................. 55

## TABLE OF AUTHORITIES

## CASES

Page

*Adventure Resources, Inc. v. Holland*,
137 F.3d 786 (4th Cir. 1998) ..........................................................................17

*Brotherhood of Railway Airline Clerks v. REA Express, Inc.*,
523 F.2d 164 (2d Cir. 1975)............................................................................16

*Briggs Transport Co. v. International Brotherhood of Teamsters*,
739 F.2d 341 (8th Cir. 1984) ..........................................................................49

*Dow Jones & Co., Inc. v. Harrods, Ltd.*,
237 F. Supp. 2d 394 (S.D.N.Y. 2002)..............................................................26

*In re Adelphia Commc''ns Corp.*,
307 B.R. 432 (Bankr. S.D.N.Y. 2004) .............................................................26

*In re Blue Diamond Coal Co.*,
131 B.R. 633 (Bankr.E.D. Tenn. 1991) ...........................................................35

*In re Brada Miller Freight System, Inc.*,
702 F.2d 890 (11th Cir. 1983) ........................................................................16

*In re Carey Transport, Inc.*,
50 B.R. 203 (Bankr. S.D.N.Y. 1985)..........................................................33, 49

*In re Century Brass Products, Inc.*,
795 F.2d 265 (2d Cir. 1986)................................................................... *passim*

*In re Chateaugay Corp.*,
140 B.R. 64 (Bankr. S.D.N.Y. 1992), *vacated as moot*, 153 B.R. 409 (Bankr.
S.D.N.Y. 1993) ...............................................................................................21

*In re Drexel Burnham Lambert Group Inc.*,
995 F.2d 1138 (2d Cir. 1993)..........................................................................26

*In re Electric Contracting Services Co.*,
305 B.R. 22 (Bankr. D. Col. 2003) ..................................................................48

*In re Evans Products Co.*,
55 B.R. 231 (Bankr. S.D. Fla. 1985)................................................................49

*In re Express Freight Lines, Inc.*,
119 B.R. 1006 (Bankr. E.D. Wis. 1990) ..........................................................53

*In re Family Snacks, Inc.*,
    257 B.R. 884 (B.A.P. 8th Cir. 2001)...................................................................20

*In re Fulton Bellows & Components, Inc.*,
    301 B.R. 723 (Bankr. E.D. Tenn. 2003) ...........................................................27

*In re G-1 Holdings, Inc.*,
    318 B.R. 66 (Bankr. D. N.J. 2004) ...................................................................26

*In re Garofalo's Finer Foods, Inc.*,
    117 B.R. 363 (Bankr. N.D. Ill. 1990) ...............................................................52

*In re George Cindrich General Contracting, Inc.*,
    130 B.R. 20 (Bankr. W.D. Pa. 1991) ...............................................................53

*In re Indiana Grocery Co.*,
    138 B.R. 40 (Bankr. S.D. Ind. 1990) ...............................................................52

*In re Ionosphere Clubs, Inc.*,
    134 B.R. 515 (Bankr. S.D.N.Y. 1991)........................................................21, 22

*In re Ionosphere Clubs, Inc.*,
    922 F.2d 984 (2d Cir. 1990).............................................................................18

*In re K & B Mounting, Inc.*,
    50 B.R. 460 (Bankr. N.D. Ind. 1988)...............................................................49

*In re Kentucky Truck Sales, Inc.*,
    52 B.R. 797 (Bankr. W.D. Ky. 1985) ..............................................................49

*In re Maxwell Newspapers, Inc.*,
    981 F.2d 85 (2d Cir. 1992)....................................................................... *passim*

*In re Moline Corp.*,
    144 B.R. 75 (Bankr. N.D. Ill. 1992) ................................................................52

*In re New York Trap Rock Corp.*,
    126 B.R. 19 (Bankr. S.D.N.Y. 1991)...............................................................21

*In re Pesce Baking Co.*,
    43 B.R. 949 (Bankr. N.D. Ohio 1984)..............................................................50

*In re Pierce Terminal Warehouse, Inc.*,
    133 B.R. 639 (Bankr. N.D. Iowa 1991) ...........................................................33

*In re Roth American, Inc.*,
 975 F.2d 949 (3d Cir. 1992).................................................................17

*In re Royal Composing Room, Inc.*,
 62 B.R. 403 (Bankr. S.D.N.Y. 1986) ..................................... passim

*In re Royal Composing Room, Inc.*,
 848 F.2d 345 (2d Cir. 1988).................................................32, 34, 35

*In re Sol-Sieff Produce Co.*,
 82 B.R. 787, 794 (W.D. Pa. 1988) ................................................48

*In re Sunglow Coal Co.*,
 144 B.R. 58 (Bankr. E.D. Ky. 1992).......................................36, 52

*In re Texas Sheet Metals, Inc.*,
 90 B.R. 260 (S.D. Tex. 1988) ......................................................35

*In re The Lady H Coal Co.mpany, Inc.*,
 193 B.R. 233 (Bankr. S. D. W. Va. 1996) ..................................53

*In re Trans. World Airlines, Inc.*,
 169 B.R. 91 (Bankr. D. Del. 1994) ..............................................26

*In re UAL Corp.*,
 No. 02 B 48191 (Bankr. N.D. Ill. May 20, 2005) ..........................29

*In re U.S. Truck Co. Holdings, Inc.*,
 165 L.R.R.M. (BNA) 2521 (Bankr. E.D. Mich. 2000)....................53

*In re Unimet Corp.*,
 842 F.2d 879 (6th Cir. 1988) .......................................................18

*In re Walway Co.*,
 69 B.R. 967 (Bankr. E.D. Mich. 1987) ...................................25, 45

*In re William P. Brogna and Co.*,
 64 B.R. 390 (Bankr. E.D. Pa. 1986) .....................................45, 46, 53

*Mertens v. Hewitt Associates*,
 508 U.S. 248 (1993).....................................................................36

*NLRB v. Bildisco and Bildisco*,
 465 U.S. 513 (1984)................................................................15, 16

*Teamsters v. IML Freight, Inc.*,
   789 F.2d 1460 (10th Cir. 1986) ..............................................................49, 50

*Truck Drivers Local 807, IBT v. Carey Transport, Inc.*,
   816 F.2d 82 (2d Cir. 1987)...................................................... *passim*

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*,
   484 U.S. 365 (1988)................................................................................36

*Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of America.*,
   791 F.2d 1074 (3d Cir. 1986)..............................................................17, 18, 32

## STATUTES

11 U.S.C. §365.......................................................................................16

11 U.S.C. §1113.............................................................................. *passim*

11 U.S.C. §1114.............................................................................. *passim*

## LEGISLATIVE HISTORY

130 Cong. Rec. H809...............................................................................17

130 Cong. Rec. H1831.............................................................................17

130 Cong. Rec. H7495.............................................................................18

130 Cong. Rec. H7496.........................................................................19, 44

130 Cong. Rec. S6182.............................................................................25

130 Cong. Rec. S6193.............................................................................19

130 Cong. Rec. S8898...................................................................... *passim*

130 Cong. Rec. S8900.............................................................................19

134 Cong. Rec. S6823.............................................................................21

134 Cong. Rec. S6940.............................................................................21

## LAW REVIEW ARTICLES AND OTHER SOURCES

M. Baxter, *Is There a Claim for Damages From the Rejection of a Collective Bargaining Agreement Under Section 1113 of the Bankruptcy Code?*, 12 Bankr. Dev. J. 703 (1996) .................................................................................................................52

*Rosenberg, Bankruptcy and the Collective Bargaining Agreement - A Brief Lesson in the Use of the Constitutional System of Checks and Balances,* 58 Am. Bankr. L.J. 293, 306-308 (Fall, 1984) ................................................................................16

*In re U.S. Airways*, No. 04-13879 ................................................................................35

International Union, United Automobile, Aerospace & Agricultural Implement

Workers of America (the "UAW" or the "Union") submits this memorandum of law in support

of its objection to the Motion of Delphi Corporation ("Delphi" or the "Debtor") for an Order

Under 11 U.S.C. § 1113(c) Authorizing Rejection of Collective Bargaining Agreements and

Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (the

"Rejection Motion").

## PRELIMINARY STATEMENT

Delphi's Rejection Motion is a bold attempt to enlist the Bankruptcy Court in

Delphi's confrontational drive to eliminate nearly three-quarters of its UAW-represented hourly

workforce, extract deep concessions from the rest, and turn Delphi into a low-cost, foreign-based

producer of auto parts by force.[1]  Delphi filed its Rejection Motion only nine days after reaching

an unprecedented agreement with the UAW and General Motors Corporation ("GM") on an

incentive buy-out program (the "Special Attrition Program") that could provide as many as

13,000 UAW-represented hourly employees with exit opportunities, and a minimum 5,000

UAW-represented hourly employees with employment at GM.  Nevertheless, without even

waiting for the results of the buy-out program, Delphi has provoked further conflict with the

UAW and a simultaneous showdown with GM through the Rejection Motion and its separate

motion seeking rejection of over 5,000 GM agreements.  Delphi's reckless tactics should give

every constituency in this case serious cause for concern.

The Rejection Motion should be denied outright.  First, Delphi does not actually

seek an order rejecting the labor agreements.  Instead, Delphi requests an order "authorizing" it

to reject the agreements upon 10 days' notice, expressing an intention to continue bargaining

---

[1] See David Welch, *Go Bankrupt, Then Go Overseas*, Business Week, Apr. 24, 2006.  Copies of all magazine articles, newspaper articles, and press releases cited herein are attached hereto as Exhibit A.

even after the parties – and the Court – have concluded litigation.  (Delphi's Mem. of Law in

Supp. of Mot. for Order Under 11 U.S.C. §1113(c) Authorizing Rejection of Collective

Bargaining Agreements and Under 11 U.S.C. §1114(g) Authorizing Modification of Retiree

Health Benefits ("Delphi Br.") at 1, 75.)  Such relief cannot be granted under Section 1113 or

Section 1114 and turns the statutory processes upside down, essentially enlisting the Court as

Delphi's ally in bargaining.[2]  Either Delphi is serious about being "singularly focused on

reaching a consensual resolution" (Delphi Br. at 1), in which case the Rejection Motion is

premature, or it is not, in which case the motion is entirely improper.  Invoking Section 1113 and

Section 1114 solely to gain leverage in bargaining with the Union is patently at odds with the

workings of the statute and warrants dismissal of the Rejection Motion on grounds of bad faith.

The Rejection Motion is fundamentally flawed in other respects as well.  First,

Delphi has violated the most basic requirement of a Section 1113 case, which is that it be

premised upon "a proposal."  Delphi attempts to support its Rejection Motion on two

conditional, alternative proposals, one called its "definitive written proposals" which Delphi

itself will only agree to pursue further if GM provides significant financial support.  Many of the

provisions in this set of proposals – dubbed the GM Consensual Proposals – require GM funding,

even though, to date, there has been no commitment by GM to provide the financial support. The

other proposals, which Delphi calls the Competitive Benchmark Proposals, are remarkable for,

among other things, drastic cuts in compensation, increases in health care and other benefit costs,

---

[2] Delphi's Chief Executive Officer, Robert S. Miller, was so confident of this strategy that he has called the motion a "slam-dunk."  Micheline Maynard, *Delphi Chief Fights Battle of Detroit,* N.Y. Times, Nov. 23, 2005, at C1.  CEO Miller also reportedly told the Delphi Board of Directors that "he views the request to break labor contracts as an 'insurance policy that we need to have but hope we won't have to use,'" and also said that "[i]f the union won't go far enough in wage-and-benefit concessions and GM won't make up the difference for Delphi, [he] wants the authority to take unilateral action."  Monica Langley and Jeffrey McCracken, *Showdown on Auto-Labor Costs Looms as Delphi Goes to Court,* Wall St. J., Mar. 31, 2006, at A1.

a freeze of pension accruals, and the abrupt termination of retiree health benefits.[3]  Thus,

Delphi's effort to have the Court determine whether Delphi has met its burden under Sections

1113(c) and 1114(g) is in essence an invitation for this Court to issue an advisory opinion

regarding hypothetical proposals. Premised as it is on these starkly different alternative

proposals, the effectiveness of which are wholly dependent upon a third-party commitment

which is unknown at this time, the Rejection Motion raises a significant threshold issue

regarding the Court's constitutional jurisdiction to consider the motion at all.  Even if this

considerable infirmity could be overcome, nothing in Section 1113 or Section 1114 permits the

Court to consider these radically different hypothetical "proposals" as the foundation for meeting

the statutory requirements under Section 1113 and Section 1114.

Second, the Rejection Motion disregards the effect of the recently approved

Special Attrition Program which will provide Delphi with a significant amount of cost savings.

While the precise extent of the savings to be realized by Delphi depends on the number of

workers who elect to retire or flow back to GM under this program, Delphi already has working

estimates of the effect of the program. Yet Delphi's Rejection Motion is premised upon financial

projections that do not take these estimates into consideration.  Moreover, the actual results of

the Special Attrition Program will be known relatively soon. There is no compelling reason why

Delphi must proceed now with the Rejection Motion when key estimates of potential savings are

available now and a clearer picture will be available within a short period of time.  These two

critical uncertainties – the level (if any) of GM support in any consensual settlement agreement

---

[3] The severity of the Competitive Benchmark Proposals and the pain that these proposals would inflict on Delphi's workers caused two prominent academics to ask whether Delphi is actually seeking to be competitive not with the automotive supply industry but with the fast food industry.  Harley Shaiken and David Bonior, *Is Globalization Destroying Consumer Market*, The Sacramento Bee, Oct. 23, 2005, at E1 (noting that Delphi's proposed wage rates trail Burger King's hourly wage in Saginaw, Michigan, thereby "turning fast food into a promotional opportunity for autoworkers.").

and the savings achieved through the Special Attrition Program – clearly show that Delphi

cannot obtain relief under either Section 1113 and Section 1114 now.[4]

Delphi is the second largest automotive supply company in the world, one of at

least ten automotive parts companies in the United States to seek chapter 11 relief in the last

three years.[5]  Delphi's October 8, 2005 bankruptcy filing marked the largest-ever filing in the

U.S. auto industry.  No doubt these cases reflect an industry undergoing serious change, plagued

by rising commodity prices, shifting vehicle production by American auto makers, unfavorable

supplier contracts, unfair trade practices, overcapacity, and the rise of low-cost manufacturers in

China and other countries.  The Rejection Motion, therefore, must be viewed in the context of an

industry-wide realignment affecting hundreds of thousands of employees and retirees as the

industry absorbs the shock of lowered vehicle production by its domestic standard bearers, the

Big Three, and the drive to secure business among competitors engaged in their own

restructuring efforts.

Delphi's insistence on going forward with the Rejection Motion to address the

complex and difficult problems inherent in industry-wide conditions, rather than proceeding with

the kind of discussions that led to the Special Attrition Program is troubling and perplexing.

Delphi itself has created the deadlines for filing its motion and seeking a hearing. Delphi's

misleading contention that the UAW "rejected" its hypothetical proposals does not entitle it to

_____

[4] GM's willingness to continue seeking a consensual resolution with Delphi and the UAW is reflected in the statement released on March 31, 2006, the date of Delphi's filing of the instant motion, in which its chairman and chief executive officer Rick Wagoner pledges to "continue to work with Delphi, its unions and the court to achieve a consensual agreement that makes sense and is financially viable for all of the parties" and states that the recently approved Special Attrition Program "is indicative of GM's commitment to reaching such an agreement."  Press Release, General Motors Corp., GM Statement on Delphi Court Motions (Mar. 31, 2006).

[5] Other auto suppliers to file for bankruptcy include Dana Corp. (Case No.: 06-10354, Bankr. S.D.N.Y.), Tower Automotive, Inc. (Case No.: 05-10578 Bankr. S.D.N.Y.), Collins & Aikman Corp. (Case No.: 05-55927, Bankr. E.D. Mich.), Meridian Automotive Systems, Inc. (Case No.: 05-11168, Bankr. D. Del.), EaglePicher, Inc. (Case No.: 05-12601, Bankr. S.D. Ohio), Trim Trends Co., LLC (Case No.: 05-56108, Bankr. E.D. Mich.), Metalforming Technologies, Inc. (Case No.: 05-11697, Bankr. D. Del.), and Intermet Corp., (Case No.: 04-67597, Bankr. E.D. Mich.).

bypass the statutory procedural requirements designed to further collectively bargained solutions under Sections 1113 and 1114 and, if any set of circumstances merits discussion unpressured by artificial, self-imposed deadlines, it is this one.  Indeed Delphi's CEO captured the scope of the problem – if not the solution – describing Delphi as "a flashpoint, a test case, for all the economic trends and social trends that are on a collision course in our country and around the globe."[6]

Finally, beyond the serious threshold problems present here, and assuming that the Court could proceed with the Rejection Motion, Delphi fails to carry its burden under the statute.  Delphi has not made the case that the draconian rollbacks presented in the proposals are necessary within the meaning of Section 1113 or Section 1114.  Despite the number of documents Delphi has produced, material information necessary to evaluate the proposals has been sorely lacking.  Because the proposals target workers and retirees for radical financial disruption and prejudge their contribution to Delphi's reorganization, the proposals are not fair and equitable.  Delphi's depiction of the UAW as failing to negotiate or having "rejected" its hypothetical proposals is superficial and inaccurate, as negotiation of the Special Attrition Program demonstrates.  Indeed, the parties had agreed that this was the first step of a two-step process for resolving for resolving Delphi's issues.  Finally, the balance of the equities tips decidedly against rejection, particularly given the overwhelming hardship that would be created by the proposals.  Delphi's use of the Rejection Motion as a bargaining tool and the clear likelihood of a strike at Delphi (and perhaps GM) if the collective bargaining agreement is rejected requires denial of Delphi's Rejection Motion.

---

[6] Jeffrey McCracken, *A Middle Class Made by Detroit is Now Threatened by its Slump*, Wall St. J., Nov. 14, 2005, at A1.  Miller has also stated that Delphi and the Union "'each have ways we can harm each other if we so choose.'"  *See* David Welch, *Time and Patience Run Out at Delphi*, Business Week, Oct. 8, 2005.

## STATEMENT OF FACTS

### A.    UAW History and UAW Representation at Delphi

The UAW was founded in 1935.  Since then, its members have struggled --
through organizing battles, collective bargaining, strikes and lockouts -- to achieve many of the
key contract benefits that Delphi now seeks to dismantle.  Gains from negotiations and strikes
led to one of the first victories for equal pay by guaranteeing the same minimum wage for both
men and women, the first employer-paid pension plan for industrial workers, the first cost-of-
living allowances, landmark job and income security provisions, comprehensive training and
educational programs, and supplemental unemployment benefit programs.  The UAW has been
actively involved in every civil rights legislative battle since the 1950s, including the campaigns
to enact the Civil Rights Act of 1964, the Voting Rights Act of 1965, the Fair Housing Act, the
Civil Rights Restoration Act of 1988 and legislation to prohibit discrimination against women,
the elderly and people with disabilities.  The UAW has also been instrumental in passing
Medicare and Medicaid, the Occupational Safety and Health Act, the Employee Retirement
Income Security Act of 1974 and the Family and Medical Leave Act.  (Decl. of Richard A.
Ruppert ["Ruppert Decl."] ¶ 3.)

The UAW is the exclusive collective bargaining representative of approximately
24,000 production and maintenance employees and mechanical employees of Delphi, nearly half
of Delphi's total domestic workforce.  These employees work in 21 different Delphi facilities
located in ten states (Alabama, Georgia, Indiana, Kansas, Michigan, Mississippi, New York,
Ohio, Texas, and Wisconsin).  These facilities manufacture and produce products ranging from
automotive steering components, fuel systems, climate control systems, instrument panels,
batteries and related battery components, valvetrains, and electronic devices such as audio
systems and ignition and steering electronics.  The terms and conditions of UAW-represented

-6-

employees at Delphi are covered by a number of different collective bargaining agreements: (1)

the National Agreements between the UAW and Delphi, (2) a Supplemental New Hire

Agreement between Delphi and the UAW that sets wage and benefit levels for new hires, and (3)

22 various local agreements between Delphi and individual UAW locals that address local issues

and are plant-specific in their application.  The National Agreement became effective on October

6, 2003, and is effective until September 14, 2007.  The Supplemental New Hire Agreement

became effective in April 2004, and is a seven-year agreement.  The UAW is also the

"authorized representative" under 11 U.S.C. § 1114(e) of approximately 9,800 retirees receiving

collectively bargained retiree health and life insurance benefits.  (Ruppert Decl. ¶ 4.)

      **B.**      **The Spin-off of Delphi from GM, and the UAW's Efforts to Improve Delphi**

      The UAW was opposed to the 1999 spin-off of Delphi from GM.  Although both

companies were confident that the proposed divestiture and separation would allow Delphi to be

competitive in bidding for auto parts supply work from other Original Equipment Manufacturers

("OEMs"), the Union had concerns about the long-term future of UAW-represented workers at

Delphi locations, and the security of Delphi retirees' health care and pension benefits.  (Ruppert

Decl. ¶ 5.)  Based on the UAW's reservations about the spin-off, the Union secured the GM

Benefit Guarantee to obtain a level of protection for Delphi retirees and current active

employees.  In addition, the UAW also obtained commitments from Delphi that the 1999 and

2003 National Agreements would "mirror" the UAW-GM National Agreements.  (Ruppert Decl.

¶ 6.)

      The UAW believes that Delphi took GM business for granted, and that this has

contributed to its present situation.  For example, while seeking to diversify its product and

customer portfolio, Delphi did not undertake the required steps to secure the extant and future or

replacement business from GM.  Delphi's own financial statements demonstrate the significant

-7-

erosion of Delphi's consolidated GM revenues from 1999 through 2005.  (Ruppert Decl. ¶ 7.)

The UAW spent considerable time and effort trying to retain and secure GM work for Delphi.

For example, during the 2003 contract negotiations, as a result of the UAW's request that GM

"look to Delphi first" in its sourcing needs, GM agreed to award approximately $1 billion in new

business to UAW-represented Delphi operations.  In addition, GM developed the "Growth and

Opportunity" ("GO") process to identify and address new business opportunities.  Under this

structure, representatives from the UAW, GM and Delphi were to work collaboratively to

identify new GM supply programs which Delphi could be competitive in bidding for.  (Ruppert

Decl. ¶ 8.)

          Also as part of the 2003 contract negotiations, the UAW and Delphi had

discussions concerning the Company's long term viability.  As a result of these discussions and

as a part of a tri-partite understanding between the UAW, Delphi and GM (including the above-

mentioned GM support and Delphi commitments to invest in plants to make them competitive

and operationally efficient), the Union and Delphi agreed to a Supplemental Agreement for new

employees hired at Delphi.  The Union and Delphi felt that negotiation and implementation of

the Supplemental Agreement, which provided for lower all-in labor costs as compared to all-in

labor costs available to incumbent hourly UAW-represented employees, would address the issues

confronting Delphi.  (Ruppert Decl. ¶ 9.)

          In addition, the UAW has provided assistance to Delphi to enhance its

competitive position in numerous other ways.  By way of example, the UAW agreed to Delphi's

proposed sale of its battery business, with the resulting closure of the Olathe, Kansas and

Tuscaloosa facilities.  The UAW also agreed to the closure of Delphi's Flint-West (Michigan)

facility and the consolidation of the Flint West JOBS bank and the Livonia Delco (Michigan)

Chassis JOBS bank into the Flint East JOBS bank, which resulted in significant cost savings for

Delphi.  (Ruppert Decl. ¶ 10.)  Delphi and the Union have also worked, at the local or plant level,

to address operational issues.  Delphi approached the Union about certain facilities identified as

"troubled" and sought to negotiate operational changes.  Typically, the union and management

officials at the affected facilities negotiated operational changes concerning consolidation of job

classifications, subcontracting of certain maintenance jobs and the consolidation of operations

into a single facility.  Such initiatives, which involve the active participation of the Union at the

International level and have contributed economic savings to Delphi, were undertaken at several

UAW-represented facilities, including Anderson, Indiana, Columbus, Ohio, and Adrian,

Michigan.  (Ruppert Decl. ¶ 11.)

Ruppert Decl. The UAW's efforts to improve Delphi's competitiveness is consistent with its

long-standing record of stepping up to the plate to protect the competitiveness of the industry's

employers.  For example, the UAW and GM reached agreement in October 2005 to provide

financial relief in connection with GM's health care costs.  Prior to that, in May 2004, the UAW

reached a seven-year supplemental agreement with Visteon Corp. ("Visteon"), the financially

troubled automotive parts company spun off from the Ford Motor Company ("Ford").  That

agreement put in place reduced wages and benefits for new hire employees.  This agreement is

similar to the supplemental agreement reached with Delphi.  Thereafter, in June 2005, in

response to continued financial distress, the UAW, Visteon and Ford entered into the Visteon

Restructuring Memorandum of Agreement that provides for more than a dozen facilities to be

spun-off to or absorbed by Ford.  (Ruppert Decl. ¶ 12.)

### C.    The Events Between October 2005 and March 2006

On October 21, 2005, Delphi sent proposals to the UAW which it refers to in its

motion as the Competitive Benchmark Proposals.  The Union received revised proposals in mid-

November 2005.   Delphi's proposals, which sought to eliminate two-thirds of the workforce and

ravage the wages, benefits and working conditions of those workers who remained, did not

provide a framework for agreement.  (Ruppert Decl. ¶ 13.)

By the time of Delphi's bankruptcy filing in October, 2005, Delphi's Chairman

and Chief Executive Officer, Robert S. Miller, by directing confrontational attacks aimed at the

hourly workforce and the collective bargaining agreements, provoked anger, bitterness and

mistrust throughout the UAW-represented workforce at Delphi.  Miller's repeated public threats

to slash wages and close plants created a toxic atmosphere that only aggravated the distress and

anxiety created by the bankruptcy itself.  Since the time of the filing, Mr. Miller's rhetoric has

tempered somewhat, but the effects of his pronouncements in the early days of this proceeding

have lingered.  (Ruppert Decl. ¶ 14.)

In mid-January 2006, the UAW, Delphi and GM agreed to tri-partite discussions

to begin work on many issues regarding Delphi's restructuring.  Earlier in the process, the parties

decided to focus primary attention on the Special Attrition Program discussions, which began in

early February 2006 and concluded with an agreement on March 22, 2006.  (Ruppert Decl. ¶ 15.)

The parties agreed that this was the first step of a two-step process to resolve Delphi's

restructuring issues.  In addition, from January through March, 2006, the UAW held a series of

meetings with Delphi, and Delphi and GM collectively to discuss Delphi's proposed

"manufacturing footprint," and the timing or manner in which Delphi would effect plant wind-

downs, sales and consolidations.  (Ruppert Decl. ¶ 16.)

On March 24, 2006, Delphi presented the UAW Competitive Benchmark

Proposals.  The baseline aspect of the proposals is identical to the November 2005 proposals,

which were viewed by the UAW as failing to provide a framework for agreement and instead, a

-10-

path to confrontation.  (Ruppert Decl. ¶ 17.)  The UAW's position is that the March 24th

proposals, like those which preceded them, are not a good faith effort to bargain to resolution.

Among other deficiencies, the proposals are vague and broad in scope, there is no identification

of line item savings attributable to each proposed modification nor is there an overall savings

"ask."  (Ruppert Decl. ¶ 18.)  It is apparent that these proposals go far beyond the modifications

necessary to permit Delphi to reorganize.  *Id.*

      **D.**      <u>**Delphi's Proposals**</u>

      Since October, 2005, Delphi has made, then superseded or withdrawn, and now

again made, deeply concessionary proposals to the UAW.  Most recently, on March 24, 2006,

Delphi submitted two alternative proposals, each dependent upon significant unresolved

contingencies.  While both are deeply concessionary, one proposal, called the GM Consensual

Proposals, is contingent upon financial support from GM in many respects.  To date GM has not

committed to offer any such support.  Even if the aspirational GM support were obtained, it does

not follow that UAW would otherwise deem the proposal acceptable or a reasonable starting

point for discussions.  The other, the Competitive Benchmark Proposals, are themselves

contingent upon a resolution of significant "legacy cost" issues, identified by Delphi, including

pension and retiree health costs.  In the manner that Delphi has conducted this process so far, the

Union cannot meaningfully respond to such a far-reaching set of offers that eviscerates gains

achieved by the UAW over 70 years.  *See* Ruppert Dec. ¶ 18.  For example, the Competitive

Benchmark Proposals include the following pay and benefit reductions:

> ➢ drastic reductions in wage rates for production employees to $12.50 per hour, and to
>   $21.50 per hour for skilled trades;
> ➢ the abrupt and complete elimination of retiree health care and life insurance;
> ➢ the freezing of the pension plan, potentially followed by a termination at a subsequent
>   date;
> ➢ job cuts eliminating approximately two-thirds of Delphi's UAW-represented hourly
>   workforce;

-11-

➢ the elimination of dental and vision benefits;

➢ requiring employee contributions for health care, increased out-of-pocket maximums, co-payments, and deductibles;

➢ the complete elimination of cost of living allowance ("COLA") payments for all employees;

➢ a reduction in overtime and shift premiums;

➢ the elimination of voluntary overtime provisions;

➢ a reduction in vacation time;

➢ the elimination of job security provisions, including hiring and lay off restrictions and the JOBS Bank;

➢ the elimination of restrictions on subcontracting and outsourcing;

➢ the outsourcing of all non-production work, such as janitorial, truck repair and building maintenance;

➢ the elimination of supplemental unemployment ("SUB") benefits; and

➢ reduction of training benefits.

*See, e.g.,* Delphi Br. at 35-46.

**E.     Delphi's Spinoff From GM and
        Subsequent Bargaining with the UAW**

When Delphi became a fully independent corporate identity in May 1999 with the last transfer of Delphi stock to GM stockholders, the plan from the beginning was that Delphi and the UAW would have a "separate but identical contract" to the contract negotiated between GM and the UAW in both 1999 and 2003.  However, it was also contemplated by the UAW, GM and Delphi that "over time" Delphi and the UAW would negotiate independently of GM and that such negotiations would result in agreements with local work rules and practices and other terms more consistent with those prevailing in the automotive parts industry.  And, indeed, the process that was contemplated is well underway.  And one cannot help but think the instant motion is an effort to accelerate the process of modifications to the Delphi-UAW contract that has already begun to take place.

The collective bargaining agreement negotiated in 2003 between Delphi and the UAW is the last agreement in which Delphi is contractually bound to mirror the agreement between GM and the UAW.  Although that agreement largely mirrors the GM-UAW agreement,

-12-

it does respond to Delphi's professed needs by, among other things, providing for additional flowback opportunities to GM. Indeed, at the time the 2003 agreement was negotiated between Delphi and the UAW, Delphi described it as providing Delphi "with a platform to take important steps to boost Delphi's competitiveness in the short term."[7]

More significantly, in April 2004, the UAW agreed to a seven-year supplemental agreement to the 2003 UAW-Delphi National Agreement that set markedly lower wage and benefit levels for new hires. For example, the supplemental agreement provides a $14.00 starting rate for all new hires in three wage groupings, with final grow-in to end rates of $14.50, $16.50, and $18.50. These rates are significantly lower than the average $28.00 rate for current UAW-represented employees. The supplemental agreement also provides for a cash balance pension plan in lieu of the traditional defined benefit program and greater cost-sharing for health care. Delphi described these new provisions as "an important step in improving Delphi's ability to secure current U.S. manufacturing work and more aggressively pursue new work for UAW-Delphi facilities in the United States."[8]

F.    **The UAW-GM-Delphi Special Attrition Program**

On March 22, 2006, the UAW, GM and Delphi completed complex negotiations culminating in the UAW-GM-Delphi Special Attrition Program (the "Special Attrition Program"), and the program was approved by this Court only two weeks ago on April 7, 2006. Under the program Delphi workers who have at least 30 years' service may retire and receive full retirement benefits and a $35,000 cash payment, and Delphi workers with 27 but fewer than 30 years' service may opt into a "pre-retirement" program, receiving $2,800 to $2,900 a month

---

[7] Press Release, Delphi Corp., Delphi Intensified Action to Improve Competitiveness (Oct. 16, 2003).

[8] Press Release, Delphi Corp., Delphi and UAW Finalize New Hire Wage and Benefit Supplement (April 29, 2004).

with their agreement to retire upon obtaining 30 years of service with the company.

Approximately 13,000 hourly UAW-represented employees may be eligible to participate in the

plan, and a minimum 5,000 additional employees will have the opportunity to flow back to GM.

The parties agreed that this was the first step in a two-step process to resolve Delphi's

restructuring issues.  (Ruppert Decl. ¶ 15.)

Delphi has acknowledged the significance of this program to its reorganization

efforts, describing it as "a critical milestone in its restructuring."[9]  Delphi's President and Chief

Operating Officer Rodney O'Neal stated that "[a]n accelerated attrition plan will help enable the

transformation of our U.S. manufacturing and support operations into a much more competitive

cost base."  *Id.*  Indeed, the Wall Street Journal has described the Special Attrition Program as

"one of the largest in U.S. corporate history."  Jeffrey McCracken and Lee Hawkins, Jr., *GM*

*Makes Sweeping Buyout Offer*, Wall St. J., Mar. 23, 2006, at A1.

The incentivized opportunities provided to eligible UAW-represented employees

to take voluntary retirements from Delphi, and the new employment opportunities created for a

minimum 5,000 UAW-represented Delphi employees to flow back to jobs at GM will improve

Delphi's financial results on a current and future basis.  UAW's financial advisors, who will

provide both factual and expert testimony at trial, have estimated the savings as $2 billion per

year, assuming a high level of participation.  (Decl. of Andrew Yearley ["Yearly Decl."] ¶¶ 35,

36.)  The program, which is already being offered to employees, gives employees 45 days to

decide whether to participate in the program, and seven days to change their minds.  Thus, the

impact of the attrition plan should be known sometime in June 2006.  The attrition program will

significantly affect Delphi's current financial projections.  For example, if 18,000 eligible

---

[9] Press Release, Delphi Corp., Delphi, UAW and GM Agree on Hourly Special Attrition Plan (Mar. 22, 2006).

employees accept early retirement or flow back to GM, the JOBS Bank disappears and any new

employees hired would be subject to the lower, second-tier rates in the existing supplemental

agreement, thereby significantly reducing the average hourly wage without requiring any

modification to the contract.  (Yearly Decl. ¶¶ 35-38.)

## ARGUMENT

### Summary of Argument

The Rejection Motion should be denied because significant unknown factors

create too much uncertainty for any rational consideration of the issues raised by Delphi's

proposals.  Two alternative proposals, each contingent on substantial unknown conditions,

cannot form the basis of Section 1113 and Section 1114 litigation.  The premature nature of the

Rejection Motion compels its denial.  Indeed, the Court would be necessarily drawn into

rendering an advisory ruling in a matter not yet ripe for adjudication.  In addition, Delphi

improperly seeks an order "authorizing" rejection but granting it unilateral power to implement

the rejection order as it sees fit.  The discretionary relief Delphi seeks flouts the terms of Section

1113 and Section 1114 and only serves to further Delphi's bargaining agenda.  Thus, the

Rejection Motion is improper and should be denied on this basis as well.  Even if Delphi

lawfully could proceed with the Rejection Motion at this time, that Delphi cannot meet the

prerequisites for relief under either Section 1113 or Section 1114.

## I.    DELPHI'S MOTION VIOLATES FUNDAMENTAL STATUTORY REQUIREMENTS AND IS NOT RIPE FOR JUDICIAL CONSIDERATION

### A.    Sections 1113 Was Enacted to Safeguard Collective Bargaining

Congress enacted Section 1113 in direct response to the 1984 Supreme Court

decision in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513 (1984).  *Bildisco* was one of several

decisions addressing the treatment of collective bargaining agreements under bankruptcy law

provisions permitting the rejection of executory contacts.[10]  In *Bildisco*, the debtor obtained an

order, pursuant to 11 U.S.C. §365(a), rejecting the collective bargaining agreement after refusing

to implement a wage increase and make other contractually required payments.  The National

Labor Relations Board (the "NLRB") – the specialized agency established by Congress to

administer the National Labor Relations Act (the "NLRA"), 29 U.S.C. §§151-169 – found that

Bildisco's unilateral conduct violated the duty to bargain in good faith with the representative of

its employees as required by Sections 8(a)(1) and (5) of the NLRA, 29 U.S.C. §§158(a)(1) and

(5).  *See id.* at 518-19.[11]

　　　　The Supreme Court ultimately held that a collective bargaining agreement could

be rejected under Section 365 of the Bankruptcy Code, although under a stricter standard than

that applicable to non-labor contracts in deference to the policies embodied in federal labor law.

In addition, in a controversial and divided opinion, the Court ruled that a debtor did not violate

labor law by unilaterally modifying collectively bargained terms and conditions of employment

before seeking or obtaining court approved rejection of the agreement.  The Court held that, like

other executory contracts, a collective bargaining agreement was "no longer immediately

enforceable" once an employer filed a bankruptcy case.  *Bildisco,* 465 U.S. at 532.

　　　　The *Bildisco* decision inflamed an already volatile atmosphere created by several

prominent bankruptcy filings that openly targeted labor agreements and unionized workforces.[12]

*Bildisco* confirmed fears that companies were "using the bankruptcy law as an offensive weapon

---

[10] *E.g., In re Brada Miller Freight Sys., Inc.,* 702 F.2d 890 (11th Cir. 1983); *Bhd. of Ry. Airline Clerks v. REA Express, Inc.,* 523 F.2d 164 (2d Cir. 1975).

[11] The Board has long held that an employer's unilateral modification of collectively bargained terms and conditions of employment violates the NLRA's duty to bargain in good faith.  *Bildisco,* 465 U.S. at 519.

[12] Continental Airlines filed its first Chapter 11 petition in 1983, immediately affecting its labor agreements. Continental laid off all 12,000 employees and started operations with a reduced workforce at half of their regular pay rates.  Eastern Air Lines openly threatened its workers with bankruptcy as leverage in collective bargaining negotiations.  *See* Rosenberg, Bankruptcy and the Collective Bargaining Agreement – A Brief Lesson in the Use of the Constitutional System of Checks and Balances, 58 Am. Bankr. L.J. 293, 306-308 (Fall, 1984).

in labor relations." *Adventure Res., Inc. v. Holland*, 137 F.3d 786, 797-98 (4th Cir. 1998)

(quoting *In re Roth American*, *Inc.*, 975 F.2d 949, 956 (3d Cir. 1992)).  *See generally Wheeling-*

*Pittsburgh Steel Corp. v. United Steelworkers of Am.*, 791 F.2d 1074, 1081-82 (3d Cir. 1986)

(detailing legislative history).

Agreeing that *Bildisco* created a "new and dangerous imbalance in the collective

bargaining process," 130 Cong. Rec. H1831 (daily ed. Mar. 21, 1984) (comments of Rep.

Vento), Congress moved swiftly to enact Section 1113, which "replace[d] the *Bildisco* standard

with one that was more sensitive to the national policy favoring collective bargaining

agreements." *Wheeling-Pittsburgh*, 791 F.2d at 1089; *see also* 130 Cong. Rec. H809 (daily ed.

Feb. 22, 1984) (statement of Rep. Rodino) ("The purpose of Section 1113 was to require that

more weight be given to the concerns of the National Labor Relations Act (NLRA) than *Bildisco*

did").

Congress accomplished its objective of restoring the balance in collective

bargaining in bankruptcy by (1) providing that collective bargaining agreements were

enforceable and could not be modified absent court approval,[13] (2) imposing procedural

requirements that must be satisfied prior to seeking rejection of a collective bargaining

agreement, and (3) creating substantive protections, including requirements that a debtor prove

that its proposal is limited to "those necessary modifications in . . . employee benefits and

protections that are necessary to permit the reorganization of the debtor" and that its proposal

"assures that all creditors, the debtor and all of the affected parties are treated fairly and

equitably."  11 U.S.C. §1113(b)(1)(A).

---

[13] Under Section 1113(f), 11 U.S.C. §1113(f), a trustee is not "permit[ted] to unilaterally terminate or alter any
provisions of a collective bargaining agreement prior to compliance with the provisions of this section."

The statute's procedural requirements were intended to eliminate a debtor's ability to unilaterally terminate a labor contract and to promote collective bargaining by encouraging the parties to reach agreement through a process that mirrored the NLRA.[14]  As Senator Packwood, the sponsor of the language that was later enacted as Section 1113,[15] explained:

> The amendments also prohibit the trustee from unilaterally altering or terminating the labor agreement prior to compliance with the provisions of the section. *This provision encourages the collective bargaining process, so basic to federal labor policy.*  The provision overrules the [procedural holding] of the Supreme Court's *Bildisco* decision and means that the labor contract is enforceable and binding on both parties until a court approved rejection or modification.

130 Cong. Rec. S8898 (daily ed. June 29, 1984) (emphasis added).[16]  *See also* 130 Cong. Rec. S8900 (daily ed. June 29, 1984) (comments of Sen. Moynihan) ("This [good faith] provision . . . embodies the basic principles of collective bargaining established by Congress in the National Labor Relations Act"); 130 Cong. Rec. S8898 (daily ed. June 29, 1984) (comments of Sen. Kennedy) (the intent of the law is "to overturn the *Bildisco* decision which had given the trustee all but unlimited discretionary power to repudiate labor contracts and to substitute a rule of law that encourages the parties to solve their mutual problems through the collective bargaining process").  *See also* 130 Cong. Rec. H7495 (daily ed. June 29, 1984) (statement of Rep. Morrison) (Section 1113 was enacted to "move[] us in the direction of a negotiation process rather than a litigation process to save companies that are in trouble without permitting any abuse

---

[14] Since there were no committee reports associated with Section 1113, courts look to other legislative history, including legislators' statements, for Congressional intent.  *See In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 990 (2d Cir. 1990); *In re Unimet Corp.*, 842 F.2d 879, 883 n.3 (6th Cir. 1988); *Wheeling-Pittsburgh*, 791 F.2d at 1081-83 (examining legislative history).

[15] The contemporaneous remarks of the conferees make it clear that Section 1113 was based on the substance of Senator Packwood's proposal.  *Wheeling-Pittsburgh,* 791 F.2d at 1087.

[16] The legislative history of Section 1113 is reprinted in E-1 Lawrence P. King, *et al., Collier on Bankruptcy* App. Pt. 6(c) (15th ed. 2005).

-18-

of chapter 11"); *see also* 130 Cong. Rec. S8898 (daily ed. June 29, 1984) (statement of Sen.

Packwood) ("the language serves to prohibit any bad faith conduct by [employers]").

   The Second Circuit has recognized this central purpose of the statute to promote

collective bargaining in bankruptcy, and to permit unilateral changes through litigation only as a

last resort. *E.g.*, *In re Century Brass Prods., Inc.*, 795 F.2d 265, 273 (2d Cir. 1986) (Section

1113 "*encourages the collective bargaining process* as a means of solving a debtor's financial

problems insofar as they affect its union employees." [emphasis added]). The requirements of

Section 1113 prevent debtors "from using bankruptcy as a judicial hammer to break the union,"

and the statute's "entire thrust" is to "ensure that *well-informed and good faith negotiations*

*occur in the market place*, not as part of the judicial process." *See In re Maxwell Newspapers,*

*Inc.* 981 F.2d 85, 89-90 (2d Cir. 1992) (emphasis added).

   In addition, in order to protect collectively-bargained gains and prevent the

strategic filing of a Chapter 11 case as a weapon to destroy labor agreements, the statute was

designed to ensure that "covered employees do not bear either the *entire* financial burden of

making the reorganization work or a *disproportionate* share of that burden, but only their fair and

equitable share of the *necessary* sacrifices." 130 Cong. Rec. H7496 (daily ed. June 29, 1984)

(statement of Rep. Morrison) (emphasis added). As Senator Moynihan stated:

> [A debtor's] proposal must provide for the necessary modifications
> in employee benefits and protections to enable the employer to
> continue operating.
>
> Mr. President, this provision is a most important one, worthy of
> this body's support, *for it ensures that a company's workers will*
> *not have to bear an undue burden to keep the company solvent.*
> The union would have to make the necessary concessions.
> Nothing more. Nothing less.

130 Cong. Rec. S8900 (daily ed. June 29, 1984) (emphasis added); *see also* 130 Cong. Rec.

S6193 (daily ed. May 22, 1984) (statement of Sen. DeConcini) ("No party should be made to

-19-

take it all on the chin. . . . [Union employees] *should not be made to unfairly bear the burden of cost reductions . . . .*") (emphasis added); 130 Cong. Rec. S8898 (daily ed. June 29, 1984) (statement of Sen. Packwood) (explaining that to make proposed modifications more palatable to union employees, the burden of sacrifices must be spread among all affected parties). *See also Century Brass*, 795 F.2d at 272. (Congress imposed "several safeguards" on a debtor seeking rejection "to insure that employers did not use Chapter 11 as medicine to rid themselves of corporate indigestion.").

Thus, under the statute, the debtor must demonstrate that it has made a proposal limited to "those necessary modifications in the employees' benefits and protections that are necessary to permit the reorganization of the debtor" and based on the "most complete and reliable information available at the time of such proposal" (11 U.S.C. §1113(b)(1)(A)), that the debtor has provided the union with "such relevant information as is necessary to evaluate the proposal" (11 U.S.C. §1113(b)(1)(B)), and has conferred in good faith with the union in attempting to reach "mutually satisfactory modifications." 11 U.S.C. §1113(b)(2). The debtor's rejection motion must be denied unless the debtor has demonstrated compliance with the requirements of Section 1113(b), that the union has rejected the proposal "without good cause," and that the balance of equities clearly favors rejection. 11 U.S.C. §1113(c). Courts have uniformly held that the debtor bears the burden of proof by a preponderance of the evidence on each of the elements. *See, e.g., In re Family Snacks, Inc.,* 257 B.R. 884, 892 (B.A.P. 8th Cir. 2001).

**B.**    **Section 1114 Requires Debtors To Meet Equally Stringent Procedural and Substantive Requirements as a Condition Precedent for Modifying Retiree Health Benefits**

Section 1114 also arose in an environment that threatened hard-fought collective bargaining achievements. In 1986, on the day it filed its first Chapter 11 case, LTV Steel

-20-

notified some 78,000 retirees that the company was terminating health and life insurance benefits

for its retirees under the theory that, upon the filing of the bankruptcy case, these obligations

become merely pre-petition general unsecured claims that could not be paid without court

approval.  *See In re New York Trap Rock Corp.,* 126 B.R. 19, 21 (Bankr. S.D.N.Y. 1991).  LTV's

action triggered widely-noted work stoppages and demonstrations by Steelworker-represented

employees and retirees.  *See In re Chateaugay Corp.,* 140 B.R. 64, 67 (S.D.N.Y. 1992), *vacated

as moot*, 153 B.R. 409 (S.D.N.Y. 1993).  Shortly thereafter, Congress enacted stop-gap

legislation to prevent the unilateral termination or modification of retiree health benefits.  In

1988, Congress enacted permanent relief by adding Section 1114 to the Bankruptcy Code.

Like Section 1113, Section 1114 is intended to strictly limit the use of bankruptcy

as a means of eliminating protected benefits so that "the burden of turning a company around

should not rest on the backs of retirees."  *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 522 (Bankr.

S.D.N.Y. 1991) (quoting 134 Cong. Rec. S6823, S6825 (daily ed. May 26, 1988) (statement of

Sen. Metzenbaum)).  Congress determined the need to provide such stringent protection for

retirees because of the devastating effect of a loss of health insurance on retirees:

> [c]ancellation of health insurance is a serious matter for anyone.  It
> is especially serious for a retiree who is too young for Medicare
> but too old to buy affordable health coverage.  While healthy
> retirees may find a replacement policy for a hefty monthly
> premium, sick retirees may be unable to find one at any price.  The
> thought that a company could enter bankruptcy and renege on the
> promise of health and life insurance without a moment's hesitation
> or so much as a word to the retirees was troubling to the Congress.

134 Cong. Rec. S6940, 1988 WL 1091280 (daily ed. May 27, 1988) (statement of Sen. Heinz).

Like Section 1113, Section 1114 prohibits any modification of retiree benefits

unless the debtor fulfills certain statutory criteria.  *See Chateaugay*, 140 B.R. at 71.  Thus, the

debtor may not unilaterally terminate or modify retiree benefits absent compliance with the Section 1114 statutory procedures.

The statutory requirements for court-approved modifications of a retiree health plan parallel the requirements of Section 1113. *Compare* 11 U.S.C. §§1113(b) and (c) *with* 11 U.S.C. §1114(f); *see also Ionosphere,* 134 B.R. at 519-20 ("[C]ompliance with §1114 is substantively and procedurally the same as compliance with §1113").

### C.    The Rejection Application Is Premature

Rather than point to any compelling reason for filing the Rejection Motion at this time, Delphi characterizes its filing as "a necessary procedural step to *enable action* that *may* become necessary at some point in the future . . . ."  (Delphi Br. at 1 [emphasis added].) Delphi's admission that the Debtor might not even impose changes, while at the same time declaring them to be necessary, highlights the arbitrary manner in which Delphi has filed the Rejection Motion mere days after concluding the negotiations of Special Attrition Program with the UAW and GM.  The premature nature of the filing is underscored by its failure to address at least two pivotal contingencies – whether and to what extent GM will provide financial support and the effects of the Special Attrition Program.  The speculative nature of Delphi's proposals and the abrupt cessation of a process that produced the Special Attrition Program as a "first step," further demonstrates that Delphi should not be permitted to proceed with the reckless strategy revealed by the Rejection Motion.

1.    The Amount of GM Support and The Results of the Special Attrition
Program Materially Affect the Process

At least two significant unknowns that would materially affect the process demonstrate that proceeding with the Rejection Motion now flies in the face of the statutory procedures and common sense.  First, whether and to what extent financial support is to be

-22-

provided by GM is obviously determinative. GM support allowed the parties to develop the Special Attrition Program. One set of Delphi's proposals is entirely dependent on GM funding. Delphi's rush to file the Rejection Motion before knowing whether GM support will be available leaves the parties (and the Court) to attempt to address a purely hypothetical scenario.

In addition, information about the results of the offers under the Special Attrition Program is also unknown, although it may be available by June. (Yearley Decl. ¶ 38.) The anticipated savings significantly affect the nature and impact of the concessions sought by Delphi. For example, as determined by UAW's financial advisors, based upon information provided by Delphi, if 75% of the eligible hourly employees across the workforce accept a buy-out and 5,000 Delphi employees flow back to GM, the savings to Delphi would be $2 billion per year on a pro forma basis. (Yearley Decl. ¶¶ 35-36.)

2.      The Lack of a Definitive Set of Section 1113/1114
        Proposals Confirms that the Motion is Premature

Delphi's failure to make firm proposals to the UAW is further evidence that the Rejection Motion is premature. Although Delphi has dubbed the GM Consensual Proposals its "definitive" Section 1113/1114 proposals (Delphi Br. at 34), calling them so does not make them so. Indeed Delphi's "definitive" proposals rely entirely upon GM support for which there has been no commitment. Delphi acknowledges that the proposals will be withdrawn in the absence of such support. The alternative proposals are themselves contingent on "finding ways to address all of the legacy costs [pension, retiree health and workers' compensation] in the bankruptcy process." (Decl. of Kevin M. Butler ["Butler Decl."], Ex. G.)

Section 1113(b)(1) requires a debtor to first make "a proposal" to the union, and under Section 1113(c)(2) the court must determine whether the union "has refused to accept such proposal without good cause." Delphi initially presented the UAW with a version of its

-23-

Competitive Benchmark Proposals in October, 2005, and superseded the October proposals with

its November, 2005 proposals.  In December 2005, Delphi conditionally withdrew those

proposals.  (Butler Decl. ¶¶ 48, 52, 55.)  Then, on March 24, 2005, Delphi presented both the

GM Consensual Proposals, which Delphi will only consider effective as a proposal with GM

financial commitment, and the Competitive Benchmark Proposals, which were the same as the

proposals the UAW had previously advised did not provide a viable framework for an

agreement.[17]  (Butler Decl. ¶¶ 51, 59.)  Until GM commits to financing the GM Consensual

Proposals, thereby taking these proposals out of the realm of speculation, they are not viable as

proposals.  The alternative proposals are also highly contingent, because they are dependent

upon "solutions" to complex matters such as workers' compensation (which is not subject to

collective bargaining in any event), pension issues and retiree health costs.[18]  Without even a

firm proposal, the Rejection Motion is simply premature.

> 3.    The Rejection Motion is Especially Inappropriate Given the
> Parties' Recent Success in Negotiating the Special Attrition Program

Delphi's motion violates the most basic principle of Section 1113, that is, that

collective bargaining should be favored over litigation; court intervention should be a last resort.

*See Century Brass*, 795 F.2d at 272-73; *Maxwell Newspapers*, 981 F.2d at 89-90.  Here, by

pressing forward with litigation merely a week after submitting its proposals and reaching

agreement on the Special Attrition Program, Delphi has achieved the precise opposite of the

statute's intent.  Indeed, Delphi should not have filed a rejection motion unless there was reason

---

[17] Thus, there were no active proposals from December 19, 2005 until March 24, 2006, seven days before the filing of the Rejection Motion.

[18] The pension proposals in each scenario cannot be considered firm proposals for other reasons.  Delphi states that the GM Consensual Scenario "assumes that Delphi is able to achieve a legislative solution stretching out its pension contributions beyond currently allowed levels."  (Decl. of John D. Sheehan ["Sheehan Decl."] ¶ 81.)  While, as part of a consensual agreement, UAW might consider supporting legislative initiatives in this regard, the uncertainty of obtaining such a legislative outcome and the positive outcome it would have on the Debtors' cash flow, cannot be ignored in this atmosphere of concessionary bargaining.

-24-

to believe that a consensual agreement was not likely.  *See In re Walway Co.*, 69 B.R. 967, 973 n.15 (Bankr. E.D. Mich. 1987) ("In most cases, a financially troubled company should consider rejection of a labor contract a last resort to help the company survive.  The history of the collective bargaining agreement and its special treatment and protection lends support to this conclusion.").[19]

The efforts of the UAW, GM, and Delphi in reaching agreement on the Special Attrition Program refutes any notion that further efforts to reach a consensual agreement would be futile, and Delphi has not made that argument.  During the three-way discussions which began in January 2006, the parties decided that they would first focus their efforts on the Special Attrition Program – a logical place to start.  (Ruppert Decl. ¶ 15.)  That effort proved to be successful.  Delphi's petulant insistence on rushing ahead to obtain a ruling now is improper as a bargaining strategy and needlessly risks further confrontation.  Nor is the Rejection Motion compelled by any current liquidity crisis.  (Yearley Decl. ¶ 34.)  While it may be true that there is no set time that must elapse between making a proposal and filing the Motion (Delphi Br. at 50), the statute requires a process that is far more advanced than this before Delphi may seek court adjudication.

**D.      The Application Fails to Meet the "Case or Controversy"
and Ripeness Requirements for Federal Court Actions**

Because the Rejection Motion is based on hypothetical proposals, the Debtor is essentially asking the Court to engage in an advisory exercise – that is, to evaluate whether the speculative GM Consensual Proposals meet the statutory requirements, and whether the Union

---

[19] In explaining the process, Senator Packwood stated the employer should be in a position to say to the bankruptcy court, "I have bargained with the union in good faith, and we have reached an impasse; we cannot agree. I ask you for the right to discharge the contract."  130 Cong. Rec. S6182 (daily ed. May 22, 1984) (statement of Sen. Packwood).  *See also In re Royal Composing Room, Inc.*, 62 B.R. 403, 406 (Bankr. S.D.N.Y. 1986) (the good cause requirement was "'intended to ensure that a continuing process of good faith negotiations will take place *before* court involvement'" [emphasis added] [internal citation omitted]).

had good cause to reject them – because the GM financial support underlying the proposals may

never materialize or it may materialize in a different amount than assumed in the proposals.

Similarly, Delphi invites the Court to engage in an advisory exercise for the Competitive

Benchmark Proposals because they, too, critically depend on factors that cannot be evaluated at

this time.  As a result, Delphi's motion fails to satisfy fundamental "case or controversy" and

ripeness requirements.

The United States Constitution limits federal court jurisdiction to actual "cases"

or "controversies."  U.S. Const. art. III, § 2, c1. 1.  "Although bankruptcy courts are not Article

III courts, they are subject to the jurisdictional constraints of Article III to the extent that they

exercise the judicial power of the United States."  *In re Adelphia Commc'ns Corp.*, 307 B.R.

432, 437 n.5 (Bankr. S.D.N.Y. 2004) (citing *In re Trans. World Airlines, Inc.*, 169 B.R. 91, 93-

94 (Bankr. D. Del. 1994)).  In order to satisfy the case or controversy requirement, "the

controversy must be sufficiently real and immediate, allowing specific and conclusive relief, but

[] it must also be ripe for adjudication."  *Adelphia*, 307 B.R. at 437 (internal quotation omitted)

(quoting *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F.Supp.2d 394, 406 (S.D.N.Y. 2002)).

The case or controversy requirement "has engendered the ripeness doctrine, an aspect of

justiciability, which determines when an action may be brought."  *In re G-1 Holdings, Inc.*, 318

B.R. 66, 74 (D. N.J. 2004).  The ripeness doctrine seeks to prevent courts "from entangling

themselves in abstract" matters.  *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148

(1967)).  An important factor in determining whether a matter is ripe for review is whether "the

claim involves uncertain and contingent events that may not occur as anticipated or at all."  *G-I*

*Holdings*, 318 B.R. at 75.  *See also In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138,

1146 (2d Cir. 1993) (describing ripeness doctrine as "turn[ing] on whether there are nebulous

future events so contingent in nature that there is no certainty they will ever occur." [internal citation omitted]).

Here, the controversy is too contingent and speculative to meet Article III requirements. The GM Consensual Proposals may never acquire the GM financial support assumed by those proposals, or GM may agree to a different level, or kind, of financial support than that posited by Delphi. To ask this Court to determine whether Delphi satisfies the statutory requirements of Sections 1113 and 1114 by presenting proposals based entirely on an assumed future financial contribution by GM that may not occur is fatally premature for purposes of Article III. Similarly, the uncertainties surrounding the Competitive Benchmark Proposals, which are contingent separate and prospective solutions to pension and other significant obligations, cast serious doubt about the firmness, or ultimate viability of these proposals.

In seeking relief through the Rejection Motion, Delphi essentially asks the Court for an advisory opinion, in derogation of basic Constitutional principles. *See In re Fulton Bellows & Components, Inc.*, 301 B.R. 723, 725-26 (Bankr. E.D. Tenn. 2003) (denying debtor's second rejection motion and warning that the debtor may not return to court repeatedly with proposals; otherwise its prior ruling would be merely an "advisory opinion" that would improperly allow the debtor to use the court's findings in future negotiations with the Unions.)

E.    **Delphi Cannot Obtain a Rejection Order to Use at Its Discretion**

Openly revealing its intent, Delphi asks for an order giving the Debtor "authority" to reject the labor agreements, but not an order granting rejection. Clearly Delphi intends to use the order as part of a bargaining strategy, but does not explain why such efforts must occur *after* the Court has approved its motion. Indeed, Delphi's ploy is not authorized by the statute and thwarts its basic purposes.

-27-

Under Section 1113, a debtor may apply "*for rejection*" of a labor agreement. *See* 11 U.S.C. § 1113(d). *See also* 11 U.S.C. § 1113(c) (setting forth the circumstances under which a court may approve "an application *for rejection* of a collective bargaining agreement") (emphasis added). The statute does not permit Delphi to seek a court order giving Delphi *the option* to reject its collective bargaining agreements. (Delphi Br. at 1 ["Delphi will seek an order authorizing the Debtors to reject, upon ten calendar days' notice, their existing agreements. . . ."]; *id.* at 75 [noting Delphi's intent to obtain the order and keep bargaining for an unspecified time rather than implement its proposals].) By its terms, the statute does not permit Delphi to obtain a rejection order to use at its discretion. Indeed, the purpose of permitting the debtor to seek court relief is that negotiations have failed and the debtor has determined that rejection is "necessary."

At least one other debtor has recently attempted this strategy. United Airlines asked for a rejection order to keep in its "hip pocket" for use as bargaining leverage during final oral argument on United's Section 1113(c) motion. The court flatly rejected the request, citing the statutory language.

> THE COURT: Well, just to make it clear, Mr. Dimitrief, I believe that the only order that 1113 allows the court to enter in this connection is an order granting an application for rejection of a collective bargaining agreement. Now, it may be possible to delay the effective date of that order, but I don't believe it would be possible to delay the effective date of that order beyond the 30-day period from the commencement of the hearing on rejection.

> MR. DIMITRIEF [Debtor's Counsel]: I understand that, sir. And I guess what I would say is that what we intended to do was make our application one that would give us the authority to reject, and I'll reiterate to the court today, within a reasonable period of time after a ruling.

> THE COURT: Okay. Well, I just don't agree that that's a potential outcome under 1113.

-28-

MR. DIMITRIEF:  And I guess that what's important for us for the court to understand is that we ask for this not as negotiating leverage, but as one final opportunity before the order become effective to try to reach a consensual resolution, that's all.

THE COURT:  Well, I think one of the important limitations of 1113 is that a debtor in seeking rejection of a collective bargaining agreement has to be willing to live with the consequences of a rejection if that rejection is ordered.  And so if the debtor is not certain about whether it really wants to have the collective bargaining agreement rejected, it ought not to make the application.  And so merely giving the debtor an option of rejecting it or not rejecting does not exists under 1113 as I read it.

. . . .

THE COURT:  Certainly up until the time the order goes into effect, there is the potential for entering into a consensual arrangement that will make the matter moot.  But once the order goes into effect, then there is rejection of the agreement, not an option to reject or not reject.

*In re UAL Corp.,* No. 02 B 48191 (Bankr. N.D. Ill. May 20, 2005), Tr. of Record at 50-51.

(copies of the pertinent pages of the transcript is attached hereto as Exhibit B.)

Delphi's attempt to obtain an order it can impose at its discretion is plainly at odds with the statute, which requires that the debtor first exhaust the prospects for a consensual modification of the agreement and then apply to the court for a rejection order.  *See Century Brass*, 795 F.2d at 272 ("Only if the expedited bargaining fails does § 1113 permit a debtor to apply *for rejection.*") (emphasis added).  If the debtor were permitted to short circuit the negotiation process, initiate litigation and then use a rejection order as leverage in further bargaining, the statutory provisions would be rendered meaningless and the principal statutory purpose to promote collective bargaining would be nullified.  Delphi's request improperly attempts to enlist the Court in Delphi's bargaining strategy.  Like United, Delphi should "be

-29-

prepared to live with the consequences" of its choice to proceed with this motion, or withdraw it.[20]  (UAL. Tr. at 51.)

## II.    DELPHI CANNOT MEET THE REQUIREMENTS OF SECTIONS 1113 AND 1114 IN ANY EVENT

As demonstrated above, Delphi's motion is premature and constitutionally infirm. In addition, by seeking a court order to implement at its discretion, the Rejection Motion abuses the Sections 1113/1114 process.  Oblivious to the serious infirmities of its motion, Delphi proceeds through a novel and self-serving, seven-part "checklist" of prerequisites for rejection under Section 1113.  (Delphi Br. at 47, 49-78.)  Using its "checklist" approach, Delphi presents an illusion of compliance with the statute.  In reality, Delphi has distorted the statutory requirements, ignoring their meaning by reducing the requirements to a simplistic set of steps.

Because the statute is designed to promote bargaining first and litigation as a last resort, rejection cannot be authorized unless the debtor first demonstrates compliance with a prescribed collective bargaining process, including the requirements for making a proposal that meets the statutory standards of Section 1113(b)(1)(A) and then bargaining over its proposal. *See Maxwell Newspapers*, 981 F.2d at 89 (citing Section 1113(c)(1)-(3)) (rejection is permitted only if the debtor fulfills the requirements of §1113(b)(1)).  The debtor must also prove that the union rejected the proposal without good cause, and that the balance of the equities clearly favors rejection.  *See Truck Drivers Local 807, IBT v. Carey Transp., Inc.,* 816 F.2d 82, 88 (2d Cir. 1987); *Century Brass*, 795 F.2d at 273.  Delphi does not meet any of these requirements.

### A.    Delphi Has Not Provided a "Proposal" as Required by the Statute

Delphi has not provided a "proposal" within the meaning of Section 1113(b)(1)(A) or Section 1114(f)(1).  Instead, Delphi has based its motion on conditional,

---

[20] As discussed below, the Union is entitled to strike upon rejection of a labor agreement.

-30-

hypothetical alternatives.  It is unclear which, if either, of the proposals is even before the Court.

The obvious infirmity of the GM Consensual Proposals is that there is no commitment from GM

either to these or any other proposals.  If at some unspecified future point it is determined that

GM will not commit to the proposals, then the Debtor would switch to the Competitive

Benchmark Proposals, which are themselves highly contingent and speculative.  While this

situation might be a starting place for discussions with GM, it does not form the basis for a

motion against the Union under Sections 1113 and 1114.

        The GM Consensual Proposals are obviously contingent; however, as noted

above, even the alternative Competitive Benchmark Proposals, are subject to major

contingencies, as Delphi concedes.  The Competitive Benchmark Proposals are contingent upon

resolving Delphi's "legacy" costs as part of the bankruptcy in an unspecified solution which

would treat its pension, workers' compensation, and retiree health care obligations in the same

manner as other pre-petition obligations.  As Delphi stated in its cover letter to the UAW

transmitting the November 15, 2005 proposals, "[w]e intend to address these legacy liabilities in

the bankruptcy process along with other historical financial obligations that are subject to

compromise. . . ."  Delphi described its proposals as "subject to our finding ways to address all of

the legacy benefit costs in the bankruptcy process."  (Butler Decl., Ex. G.)

        Thus, both sets of proposals are entirely contingent upon broader solutions

involving complex issues (issues impacting upon collectively bargained retirement benefits for

over 10,000 UAW retirees and pensioners) that have not yet been addressed.  The uncertainty

regarding the proposals, and whether and under what conditions they might be operative is stark

evidence that there is no definitive proposal with which to seriously proceed with litigation under

Sections 1113 and 1114.

B.    **Delphi Cannot Show That Its Proposals are "Necessary"**

      1.    Delphi Has Failed to Establish Necessity as a Matter of Law

Section 1113 requires that any modifications allowed by the court must be

necessary.  *See* 11 U.S.C. §1113(b)(1)(A), 11 U.S.C. §1114(f)(1).  Although the Second Circuit

has held that a debtor need not first present the "absolutely minimal" modifications necessary for

reorganization as a prelude to §1113 relief, *see Carey,* 816 F.2d at 88; *In re Royal Composing*

*Room, Inc.,* 848 F.2d 345, 348 (2d Cir. 1988), the debtor must nonetheless prove that the

proposed changes are necessary "to complete the reorganization process successfully."  *Carey*,

816 F.2d at 90.  As the Second Circuit has noted, Congress imposed a heavy burden of proof on

the debtor seeking rejection "to insure that employers did not use Chapter 11 as medicine to rid

themselves of corporate indigestion."  *Century Brass,* 795 F.2d at 272.

      Delphi mistakenly contends that it can meet the "necessary" requirement under

Section 1113(b)(1)(A) and Section 1114(f) by asserting generally that "modifications to the

existing agreements are necessary for Delphi to reorganize."  (Delphi Br. at 57.)  The statutory

test, however, is whether Delphi's *proposal* is "necessary."  The fact that Delphi's financial

future is subject to uncertainties as a result of factors related to GM, and that Delphi intends to

seek additional, non-GM work does not prove that Delphi's Sections 1113 and 1114 proposals

are "necessary" under the statute.

      Delphi has misapplied judicial interpretations of the "necessary" requirement in a

manner that effectively eliminates any protection for labor agreements or retiree health benefits.

The courts' differing views of the "necessary" standard do not lead to the conclusion that the

interpretive choice lies only between avoiding liquidation on the one hand, *see Wheeling-*

*Pittsburgh*, 791 F.2d at 1074, and, as Delphi argues, authorizing anything that may arguably

foster open-ended, long-range global "competitiveness" on the other hand.  Indeed, the Second

Circuit's interpretation that "necessary" does not mean "absolutely minimal" occurred in a case

involving a local transportation company and the union's effort to defeat a rejection motion with

a proposal that it claimed would yield "break even" financial results.  *Carey*, 816 F.2d at 88-90.

[21]

In *Carey*, the Second Circuit rejected the equation of "necessary" with "essential"

or "bare minimum" with respect to the debtor's "initial" proposal in light of the statute's

requirement that the debtor negotiate *beyond* its initial proposal.  The *Carey* court viewed the

legislative history as inconsistent with "language suggesting that a debtor must prove that its

*initial* post-petition proposal contained only bare-minimum changes" and further noted that since

a debtor must negotiate in good faith bargaining over its Section 1113 proposal, the *initial*

proposal could not be limited to minimal changes.  *Id.* at 89.  Moreover, the *Carey* court rejected

a more strict construction of the term "necessary" in the context of a company needing more than

"break even" finances in a reorganization far less complex than Delphi's.  Thus, *Carey* does not

support Delphi's view that its proposed modifications would meet the "necessary" requirement

simply if they increase the likelihood of a successful reorganization.  (Delphi Br. at 56.)[22]

---

[21] The debtor in *Carey* was a privately held company whose operations solely consisted of providing bus service between New York City and two area airports.  The collective bargaining agreements sought to be rejected in *Carey* covered only 115 workers represented by one local union.  *In re Carey Transp., Inc.*, 50 B.R. 203, 204-05 (Bankr. S.D.N.Y. 1985).  The differences between a debtor like Delphi versus the type of small local company at issue in *Carey* or *Royal Composing* must be considered when those cases are cited by Delphi.  *See, e.g., Royal Composing*, 62 B.R. at 412 (specifically noting that debtor was "not a Fortune 500 company" in applying the requirements of Section 1113 to that facts of that case).  *Royal Composing*, also relied upon by Delphi, involved a collective bargaining agreement between a single union local and one advertising typography shop that employed 71 workers, 31 of whom were covered by the labor contract sought to be rejected.  *Id.* at 405.

[22] To the extent that the Second Circuit can be considered to have adopted an interpretation of the term "necessary" that is less stringent than that of the Third Circuit's *Wheeling-Pittsburgh* interpretation, then in a case of this magnitude, a standard closer to the *Wheeling-Pittsburgh* standard is plainly more consistent with Section 1113's language, structure and legislative history.  *See In re Pierce Terminal Warehouse, Inc.*, 133 B.R. 639, 646-47 (Bankr. N.D. Iowa 1991) (accepting Third Circuit's strict interpretation of the "necessary" standard and pointing out flaws in Second Circuit's position).  Otherwise, interpreting "necessary" in terms of an open ended, long-range time frame, far beyond emerging from bankruptcy, particularly in the context of unpredictable industry-wide stress, would render the standard no more stringent than that used to evaluate any other transaction promoted by the debtor.  Sections 1113 and 1114 obviously were designed to avoid precisely that result.

Delphi contends that its proposals are necessary not because the changes will save a specific amount necessary for reorganization, as in *Carey* or *Royal Composing*, but because they would produce a "competitive wage and benefit package" that would "allow Delphi to compete on a level playing field." (Delphi Br. at 58.) Such abstractions and generalities do not meet the standard for relief under Sections 1113 and 1114.[23]

Although Delphi claims that "[i]n analogous circumstances, the federal courts have had no reluctance to conclude that a debtor's proposed modifications were 'necessary' for reorganization," the cases Delphi cites are inapposite. (Delphi Br. at 57.) For example, Delphi argues that it needs flexibility to sell or close facilities and cites *Royal Composing*, 848 F.2d at 345, as support for its argument, as if laying off workers out of seniority order for "maximum flexibility" in that case were analogous. In *Royal Composing*, the debtor, a small printing firm, faced a discrete problem where senior workers earning higher wages were trained and qualified to work on an outdated machine and less senior workers were trained on more modern equipment. *Id*. at 346. In that case, the court found that it was necessary to alter seniority rules for a practical and real reason, as opposed to the abstract managerial "flexibility" sought by Delphi in this case. *Royal Composing* hardly establishes that a vague pronouncement of the desire for "flexibility" is an established element of the "necessary" requirement of Section 1113(b)(1)(A).[24]

---

[23] Delphi's proposals are particularly problematic because the company has failed to provide the UAW or its advisors with the information required to evaluate what savings would be necessary for Delphi to emerge from bankruptcy as a viable entity. The bullet points Delphi uses to demonstrate that its proposals are necessary illustrate this problem. Delphi alleges that it will have substantial losses, that its wage rate is higher than its competitors, that it is required to maintain employment levels in excess of its available work, that it is prevented from unilaterally closing or selling plants, and that it has large OPEB liability. (Delphi Br. at 57.) Even if true, these statements do not prove that Delphi's proposals are necessary within the statutory meaning.

[24] Even so, the *Royal Composing* decision was not unanimous. In a dissenting opinion, Judge Feinberg strongly criticized the majority for giving too little weight to the labor policies reflected in Section 1113. *Royal Composing*, 848 F.2d at 351 (Feinberg, J., dissenting).

*In re U.S. Airways*, No. 04-13879 (Bankr. E.D. Va. Jan. 6, 2005), is likewise

inapposite.  There, the debtor had presented a proposal with a series of line items with

corresponding values, but was open to any proposal that reached the overall amount of the "ask."

(U.S. Airways Tr. of Record at 26 [attached as App. A to Delphi Br.].)  Here, there is no

identifiable "ask."  (Ruppert Decl. ¶ 18.)  Instead, the UAW has been presented with starkly

different proposals and Delphi's assertions that the proposals reflect "competitive" wages and

benefits.  The proposals are broad, vague, contain no identification of specific savings or an

overall "ask."  (Ruppert Decl. ¶ 18.)[25]

    In addition, Delphi incorrectly contends that it need not demonstrate that each

proposed modification is "necessary."  (Delphi Br. at 56 [citing *Royal Composing*, 848 F.2d at

350 and *Carey*, 816 F.2d at 82].)  In *Royal Composing,* the court held only that a debtor may not

need to demonstrate the necessity of an element of a proposal where the union does not bargain

over changing that proposal.  *See Royal Composing,* 848 F.2d at 348-51 (noting that, at least

where the union has refused to bargain over particular elements of the proposal, the union cannot

attack any specific element in seeking to show the proposal is not necessary).  *Royal Composing*

does not excuse Delphi from having to prove the necessity of each line item in its alternative

proposals, but instead may prohibit a union from belatedly attempting to raise a "necessity"

argument over which elements of the proposal the union failed to bargain.

    In the instant case, the process is far too premature, and Delphi's proposals too

vague and broad in scope, for Delphi to be able to skate past the statute's "necessary

---

[25] Delphi's reliance on *In re Texas Sheet Metals, Inc.*, 90 B.R. 260 (S.D. Tex. 1988), for the proposition that it need not identify the value of its proposals ignores the difference between a bankruptcy at a company the size of Delphi and a family business bankruptcy.  The level of sophistication in proving the value of a proposal regarding a multi-billion dollar global business versus a proposal for a family business is not at all comparable.  Nor does *In re Blue Diamond Coal Co.*, 131 B.R. 633, 644 (Bankr.E.D. Tenn. 1991), also cited by Delphi, support Delphi's effort to dilute the standards.  There, a subcontracting proposal was deemed "necessary" because the company could no longer obtain workers' compensation insurance to operate with its own employees.

-35-

modifications" requirement simply by citing *Royal Composing*.  Delphi must demonstrate that each of its proposed changes is "necessary."  *See Maxwell Newspapers*, 981 F.2d at 90 ("the employer has the burden of proving its proposals are necessary"); in order to be "necessary," the proposal must "contain[] *only* those modifications essential for the debtor's reorganization." *Maxwell Newspapers*, 981 F.2d at 91 (emphasis in original).  *See also In re Sunglo Coal Co.*, 144 B.R. 58, 63 (Bankr. E.D. Ky. 1992) (court determined that proposals were not necessary where debtor was unable to quantify the value of each of its proposals and instead made "vague assertions" of increased productivity).

Moreover, Delphi's construction of "necessary" is contrary to the Supreme Court's construction of parallel language in Section 362(d) of the Bankruptcy Code.  *See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988). There the Court construed a "necessary to an effective reorganization" standard to require that the debtor show (in the context of relief from the automatic stay) "not merely . . . that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is *essential* for an effective reorganization that is in prospect."  *Id.* (emphasis added). Since the same language in one "portion of a statute . . . should be deemed to have the same meaning as the same language used elsewhere," *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 260 (1993), Delphi's notion that it can satisfy Sections 1113's and 1114's "necessity" requirements merely by arguing that its demands would be helpful to a reorganization aimed generally at "competitiveness" must be rejected.

2.      Delphi has Failed to Demonstrate Facts that Establish the Necessity of Its
        Proposals.

Delphi has not presented a factual basis for the necessity of its proposals.  First, as

set forth below, Delphi has failed to provide financial information that would permit the UAW

and this Court to evaluate appropriately Delphi's asserted need for the scope of relief it requests.

Second, the initial information provided by Delphi shows that it is in

demonstrably better financial condition than is portrayed in its motion papers.  Delphi's latest

cash flow shows that the Debtors had approximately $1.4 billion of cash as of April 7, 2006 and

an additional estimated $1.7 billion of available liquidity under its Debtor-in-Possession facility.

Also, UAW's financial advisors understand, Delphi's non-debtor operations have significant

cash and are profitable.  .  All told, Delphi appears to have significant cash and available credit

lines and does not appear to be in any imminent danger of a liquidity crisis.  (Yearley Decl.

¶ 34.)[26]

Third, Delphi disregards the potential impact of the recently-approved Special

Attrition Program, even though UAW's financial advisors estimate that, based on information

provided by Delphi, the program could yield labor cost savings in the amount of approximately

$2 billion per year on a pro forma basis.  (Yearley Decl. ¶¶ 35-36.)  Delphi states that, with no

change in labor costs, it will have an operating income loss of $6.1 billion over the next five

years even if 100 percent of eligible workers elect to participate in the Special Attrition Program.

This assertion is misleading at best.  First, Delphi fails to take into account Delphi's intentions to

reduce its overall workforce through intended plant shut-downs.  Second, the $6.1 billion figure

---

[26] Thus, proceeding with the Rejection Motion is not compelled by any urgent need for a decision based on
near-term liquidity concerns.

includes nearly $5 billion of one-time charges related to accounting for pension and OPEB write-offs.  (Yearly Decl. ¶ 37.)

Fourth, Delphi has failed to establish the necessity of the dramatic wage and benefit cuts it seeks.  Delphi claims that its proposals are necessary to allow it to successfully bid for work against its competitors.  But Delphi fails to even attempt to show the necessity of the labor cost savings it seeks in light of the large number of facilities it proposes to close and the purportedly non-profitable product lines it intends to eliminate.  (Yearly Decl. ¶ 37.)  Nor does Delphi present evidence that achieving pay comparability with Delphi's actual competitors will solve any of Delphi's problems.  The UAW will present expert testimony responding to Delphi's comparability analysis in the event that this matter proceeds to hearing.  In any event, even if it is assumed that a comparability analysis is relevant to this proceeding, Delphi's comparability analysis is fundamentally flawed because it is based on selective and non-weighted use of national wage data, and vague and overbroad characterization of its competitors, fails to account for the differences between capital-intensive and labor-intensive facilities both inside and outside of the automotive industry, and disregards the significance of firm size, productivity and other relevant comparability factors.

Finally, the UAW is prepared to present expert testimony that will establish the inherent flaw in Delphi's assumption that its business will succeed if the Court permits it to reduce its labor costs.  The UAW testimony will establish that this assumption is dangerously flawed, and that a collectively bargained solution is the only route through which Delphi will emerge from bankruptcy as a viable entity.  Even if Delphi could prevail in this proceeding, and even discounting the potential impact of a crippling strike, expert testimony will establish the

futility of any attempt by Delphi to succeed without the support of its workforce and their elected
union representatives.

### C. Delphi Has Failed to Provide The UAW with the Relevant Information Necessary to Evaluate Its Proposals

Section 1113(b)(1)(A) and Section 1114(f)(1) required Delphi to make a proposal
to the UAW "based on the most complete and reliable information available at the time of such
proposal . . . ."  Delphi was also required by Section 1113(b)(1)(B) to provide the UAW with
"such relevant information necessary to evaluate the proposal."  Delphi has failed to comply with
these requirements.

The UAW has sought to conduct a due diligence analysis of Delphi's financial
condition that Delphi agreed – at least until it filed the Rejection Motion – was necessary for
appropriate evaluation of the proposals.  Delphi now claims that it has satisfied its obligation to
supply the UAW with relevant information and seeks to minimize and render trivial its legal
obligation to provide such information.  Delphi ignores that the UAW and its financial advisors
have been unable to engage in the necessary due diligence and have been burdened by
incomplete and untimely responses to their relevant requests for information.  Notably, Delphi
does not contend that any of the information requested by the UAW was unreasonable or not
relevant to the UAW's considerations of Delphi's proposed labor costs.

### 1. Delphi's Litigation Posture Directly Contradicts Its Prior Representation to this Court that the UAW Would Need to Conduct Due Diligence in Order to Properly Evaluate Delphi's Proposals

Delphi's contention that it has complied with its obligation to provide the UAW
with the relevant information necessary to evaluate its proposals disregards Delphi's prior
representations to this Court that the UAW would need to engage in due diligence in order to
effectively negotiate with Delphi.  On January 30, 2006, Delphi applied to the Court for

authorization to compensate the UAW and the IUE-CWA for their use of financial advisors to

assist in collective bargaining.  (Mot. For Order Under 11 U.S.C. Sections 105(a) And 363(b)

Authorizing Debtors To Pay Certain Financial Advisor Fees And Expenses Incurred By The

UAW And The IUE-CWA (Docket Entry No. 1930) (the "Retention Application").)  Delphi

stated that the UAW would be engaging the services of Lazard Freres & Co. LLC ("Lazard") for

this purpose.  Delphi represented that the unions' retention of financial advisors to conduct due

diligence was justified by "the importance of full participation of the Unions in these

negotiations and belief that the Financial Advisors' assistance to the Unions would be in the best

interests of the Debtors, their estates, their creditors, and other parties-in-interest," and that there

was "substantial business justification" for the request to compensate Lazard and other union

advisors because "[b]ased on the extent of the liabilities to employees through collective

bargaining agreements, the Debtors must obtain significant participation from the Unions in their

restructuring efforts in order to achieve economic viability and successfully emerge from chapter

11 protection."  (Retention Application ¶ 26.)  Finally, Delphi expressly acknowledged that the

unions would be conducting due diligence as a necessary component of collective bargaining:

> In light of the extensive nature of the due diligence the Unions
> have undertaken *and will have to continue to undertake*, the
> Debtors believe it is in the best interest of all parties to reimburse
> the Unions' Advisors' Fees in connection with these negotiations.
> The Debtors hope that the relief sought herein will foster good
> faith negotiations that will allow the Debtors to achieve a
> successful financial and operational restructuring and provide
> meaningful employment opportunities for the Debtors' employees.

(Retention Application ¶ 27 [emphasis added].)

Delphi now flatly contradicts its prior position and contends that, as a matter of

law, it had no duty to provide the UAW with the opportunity to engage in due diligence.  In a

letter to the UAW's counsel, Delphi's counsel stated: "[t]he obligations imposed by the courts

-40-

and contemplated by the statute are vastly different than the 'due diligence' that the UAW has asked Lazard to conduct in this case."  (Yearley Decl., Ex. C.)

Delphi justifies its wholesale reversal of position by citing cases that stand for the unremarkable proposition that the nature and scope of relevant information required in any particular Section 1113 proceeding will vary based on the individual circumstances in each particular case.  Indeed, in one of the cases cited by Delphi, this Court specifically noted in finding that the debtor had provided adequate information that the debtor was "not a Fortune 500 company."  *Royal Composing*, 62 B.R. at 412.

Delphi's prior representations to this Court confirm that the extraordinary relief sought by Delphi in the instant motion required that the UAW conduct due diligence in order to evaluate the necessity of Delphi's proposals.  Delphi's reversal of position less than three months later is a meritless litigation ploy.

>    2.    The UAW's Efforts to Obtain Information Have Been
>           Stymied By Delphi's Lack of Good Faith Disclosure.

As set forth more fully in the declaration and accompanying exhibits of Lazard Managing Director Andrew Yearley, Lazard's attempts to obtain necessary information have been systematically stymied by Delphi's failure to cooperate in providing information.  Yearley details the facts underlying Lazard's frustrated attempts, since submitting its initial due diligence request on November 1, 2005 to obtain relevant and necessary financial information from Delphi.

Delphi claims that it has provided the UAW with information beyond that to which the UAW is lawfully entitled, and supports this claim by reference to the number of documents it has produced, claiming that it has fulfilled ninety percent of Lazard's requests, that it has had meetings with Lazard representatives, and that it has placed documents in a virtual

-41-

data room.  (Yearley Decl., Attach. B.)  As detailed by Yearley, myriad requests for information,

none of which Delphi contends is irrelevant, have either yet to be fulfilled or have been provided

only in the last few weeks.  (Yearley Decl. ¶¶ 18-19, Attach. A.)  Much of the information that

Lazard has received was provided by Delphi only in the few days before Delphi filed the

Rejection Motion, or was seen by Lazard for the first time as part of Delphi's filings in support

of the Rejection Motion, or was provided after the motion was filed.  (Yearley Decl. ¶¶ 6, 17.)

Indeed, in an apparent burst of momentum prompted by this litigation, Delphi has just this week

provided hundreds of pages of critical information that Lazard has been requesting for months.

(Yearley Decl. ¶ 32.)

        Notably, it was not until a few days before Delphi filed the instant motion that

Delphi furnished financial models relating to the potential impact of its Competitive Benchmark

Proposals made nearly five months earlier, and the GM Consensual Proposals that were

presented in the week preceding the filing of this motion.  (Yearley Decl. ¶ 29.)  However,

Delphi still has not provided Lazard with the information it needs to evaluate the assumptions

underlying each model.  Each of these models is driven by so-called "hard-coded" operating

assumptions made by Delphi on such matters as sales levels, operating margins, and the level or

mix of continuing versus non-continuing businesses.  Lazard has been unable to independently

sensitize these assumptions or evaluate alternative operating scenarios without consultation with

Delphi's representatives.  As a result, Lazard has not been able to assess the validity of these

financial models in any reasonable detail.  (Yearley Decl. ¶¶ 30-31.)

        Delphi's failure to provide relevant information on a timely basis is highlighted

by Lazard's frustrated attempts to obtain profit, loss and other basic financial information on a

plant-level basis. Such information is obviously relevant to the parties' negotiations principally

-42-

because Delphi's restructuring plans call for the sale or closure of more than two-thirds of its

domestic plants.  In response to Lazard's ongoing attempts to obtain this information over a four-

month period, Delphi claimed that plant-level income statements did not exist on either an actual

or projected basis.  (Yearly Decl. ¶ 31.)

       Now Lazard has recently learned that Delphi does, of course, possess the plant-

level financial information that it claimed did not exist.  Lazard learned of the existence of this

information only because Delphi represented as part of its motion to reject certain GM contracts

that such plant-level income statements would be made available.  Delphi supplied this data to

Lazard on April 18, 2006, just three days ago and nearly three weeks after the Motion was filed.

In addition to the relationship between plant-level information and Delphi's stated intention to

close plants, plant-level financial information is necessary to evaluate what has driven Delphi's

overall profit and loss experience, to assess any significant profit and loss trends on a plant-level

and ultimately on a company-wide basis, and to determine whether there are alternative future

strategies that should be considered by Delphi in connection with its restructuring activities.

(Yearley Decl. ¶¶ 31-32.)

       Finally, not until April 13, 2006, almost two weeks after Delphi filed the

Rejection Motion, Delphi first provided Lazard with projections relating to the impact of the

Special Attrition Program on future performance under the Competitive Benchmark and GM

Consensual Proposals.  Even when provided, the analysis was presented through a high-level

bridge analysis to the financial models related to the Competitive Benchmark and GM

Consensual Proposals.  To date, Delphi has not modified its financial models related to the

Competitive Benchmark and GM Consensual Proposals to take into account the significant

impact of the Special Attrition Program.  This information is a crucial component of any genuine

evaluation of Delphi's proposals.  As stated below, Lazard estimates, based on information

furnished by Delphi, that under the Special Attrition Program it can reduce its annual pro forma

annual labor costs by approximately $2 billion if 75 percent of eligible hourly employees across

the workforce accept early retirement or flow back to GM.  The number of employees electing to

participate in the Special Attrition Program is an issue directly tied to Delphi's asserted need for

the labor cost reductions reflected in its proposals.  (Yearley Decl. ¶¶ 35-36.)

        In addition, the number of employees electing to participate in the Special

Attrition Program will not be known until the middle of June at the earliest.  Delphi's decision to

commence this proceeding before knowing the extent to which its workforce will be reduced is

but one of many reasons that Delphi's Rejection Motion is premature.  In any event, it is patently

unreasonable to assume that the UAW can properly review Delphi's proposals without knowing

the impact of the Special Attrition Program.  (Yearley Decl. ¶ 38.)

        Delphi's motion should be denied because Delphi has failed to provide the

relevant information as required by Section 1113(b)(1)(A) and (B) and Section 1114(f).

### D.      DELPHI'S PROPOSALS ARE NOT "FAIR AND EQUITABLE"

        Section 1113(b)(1)(A) and Section 1114(f) require that a debtor demonstrate that

"all creditors, the debtor and all of the affected parties are treated fairly and equitably."  In

keeping with the basic premises of Section 1113, the purpose of this provision is to ensure that

employees are not forced to "bear either the entire financial burden of making the reorganization

work or a disproportionate share of that burden."  130 Cong. Rec. H7496 (daily ed. June 29,

1984) (statement of Rep. Morrison).  The "fair and equitable" standard thus "guarantees that the

focus for cost cutting must not be directed exclusively at unionized workers . . . [but that] the

burden of sacrifices in the reorganization process will be spread among all affected parties."  130

Cong. Rec. S8898 (daily ed. June 29, 1984) (statement of Sen. Packwood).  *See also Century*

*Brass,* 795 F.2d at 273; *Walway Co.*, 69 B.R. at 973 n.15 ("In most cases, a financially troubled

company should consider rejection of a labor contract a last resort to help the company survive.

The history of the collective bargaining agreement and its special treatment and protection lends

support to this conclusion.").

The Debtor presents a litany of sacrifices that other parties may make during the

course of Delphi's bankruptcy, including the potential loss of equity, GM's guarantee of retiree

liabilities, loss in value to bondholders, non-payment of pre-petition amounts to suppliers, non-

payment of pre-petition unsecured debt, and the effect of the bankruptcy on non-union

employees.  (Delphi Br. at 62-65.)  The size and complexity of this case and the industry-wide

conditions causing multiple supplier bankruptcies leave no doubt that its effects will be felt by

many constituencies.

However, Delphi's general recitation of the changes proposed, as well as

concessions already made and likely to be made by creditors, stockholders, and non-union

employees does not establish that Delphi satisfies the "fair and equitable" requirement.  (Delphi

Br. at 61.)  The only specifics Delphi points to are proposed changes affecting management and

salaried employees.  *Compare* Delphi Br. at 62-64 (listing other constituencies' claims) *with*

Delphi Br. at 65-70 (listing specific programs and changes for non-union employees).

Consistent with Delphi's repeated characterization of this case as a "labor transformation" case,

it is abundantly clear that the labor constituencies are unfairly targeted for harsh, life-altering

changes not comparable to the loss of investment value that general creditors and stockholders

may experience.

Delphi thus cannot demonstrate that the proposed modifications to the UAW

contracts will be even remotely similar to the losses of other constituencies. *See In re William P.*

*Brogna and Co.*, 64 B.R. 390, 392-93 (Bankr. E.D. Pa. 1986) (noting that debtor's proof of other

parties' burden was not "in precise enough terms to meet the 'fair and equitable test.'").

Moreover, Delphi has unfairly and inequitably singled out its union workers to

start the process of reorganization.  The early timing of the Rejection Motion treats the union

workers unfairly because Delphi is required to ask for modifications "necessary" for it to proceed

with any reorganization plan that it may propose.  *See Carey*, 816 F.2d at 86 (discussing cost

reductions required to save $1.8 million annually).  Here, however, the future scope of Delphi's

business remains an open question, likely subject to GM's decision on how much support it will

provide Delphi and other unpredictable industry-wide conditions.

Thus, the determination of the burden imposed on other creditor constituencies

will not be determined until prospects for successful reorganization are better understood.  Both

equity holders and unsecured creditors will likely negotiate their returns under a plan of

reorganization based upon reliable information relating to the value of Delphi's business

operations *after* it has determined its future business.  Delphi's strategy of seeking Sections 1113

/1114 relief early in the case, however, locks the union workers and retirees into negotiating

concessions before the business prospects of a reorganized Delphi are known and unfairly

permits the other constituencies to recoup their losses out of the workers' and retirees'

concessions.[27] *See Brogna*, 64 B.R. at 392-93.

---

[27] Suppliers were able to reach "consensual extensions for more than 99 percent of all expiring contracts for
which the Debtors' business plans necessitated an extension."  (Delphi Br. at 64 [noting consensual renewal of
nearly 11,000 supply contracts].)  Thus, unlike UAW-represented workers and retirees, the suppliers were allowed
to determine the terms on which they will continue to supply Delphi, including negotiating core payments.
Additionally, because their contracts expired by their own terms, renewal, even at a lower rate, was voluntary.

E.    **Delphi Wrongly Portrays The UAW As Failing to Negotiate and Rejecting Its Proposals**

In an effort to demonstrate compliance with the requirement in Section 1113(b)(2) that a debtor "meet, at reasonable times, with the [union] to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement," and its parallel obligation under Section 1114(f)(2), Delphi points to its willingness to meet with the UAW "at any time, or any place," and then suggests that the UAW has somehow failed in its obligations under the statute because it has neither agreed to the Competitive Benchmark Proposals nor provided a counter-proposal.  (Delphi Br. at 70.)  Neither Delphi's invocation of its asserted willingness to meet nor its charge that the UAW should have either accepted hypothetical proposals or offered counter-proposals establishes Delphi's compliance with Section 1113(b)(2), or shows that the UAW rejected a proposal without good cause.  In fact, Delphi presented the UAW with its March 24 alternative proposals mere days before it filed the Rejection Motion, notwithstanding Delphi's lack of a pressing need for a rejection order.[28]

Given the circumstances surrounding Delphi's offer – *i.e.*, the highly speculative nature of the two alternative proposals, exacerbated by the serious deficiencies in the information provided to the UAW that would permit the UAW to evaluate the proposals – Delphi's assertion of its continued availability to meet rings hollow as a measure of its willingness to confer in good faith and represents instead a superficial stab at establishing a paper record of compliance. Mere availability for meetings does not prove a good faith effort to reach a mutual agreement as required by the statute.  Indeed Delphi's position, in addition to underscoring the motion's prematurity and ripeness defects, suggests that it is attempting to establish a record  through a

---

[28] Delphi's tactics have been punctuated by the confrontational posture of Delphi's CEO from the outset of the Chapter 11 case.  (Ruppert Decl. ¶ 14.)

-47-

wooden application of the Section 1113 factors and that it is not committed to reaching a consensual resolution.

The cases relied upon by Delphi in support of its apparent belief that a debtor's mere availability to meet satisfies Section 1113(b)(2) are easily distinguishable. (Delphi Br. at 70-71.) *See, e.g.*, *In re Elec. Contracting Servs. Co.*, 305 BR 22 (Bankr. D. Col. 2003) (rejection motion granted where (1) debtor first exhausted *all* other means of cost savings before seeking union concessions, (2) union admitted that it had been provided with all relevant information it had requested, (3) union only had one objection to proposed modifications, and (4) no suggestions were made that the debtor's proposals rested on speculation; *In re Sol-Sieff Produce Co.*, 82 B.R. 787, 794 (W.D. Pa. 1988) (rejection motion granted where (1) union was granted all financial information needed to evaluate debtor's proposal, (2) union rejected proposals "absolutely and without reservation," and advised that "no modifications whatsoever would be considered," and (3) no evidence or allegation that the debtor's proposals rested on speculation).

Similarly, Delphi's criticism of the UAW for not accepting or making a counteroffer in response to the GM Consensual Proposals is entirely misplaced given the deficiencies of the proposals.  *See* Ruppert Decl. ¶ 18.  Delphi's argument also ignores its inadequate response to the UAW's efforts to obtain relevant information, and the parties' success in negotiating the Special Attrition Program.

**F.**    **The Balance of the Equities Does Not Clearly Favor Rejection**

Delphi cannot show that the "balance of the equities clearly favors rejection" of the UAW collective bargaining agreement.  The Second Circuit has "glean(ed) at least six permissible [relevant] equitable considerations:"

> (1) the likelihood and consequences of liquidation if rejection is not permitted; (2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force; (3) the

> likelihood and consequences of a strike if the bargaining
> agreement is voided; (4) the possibility and likely effect of any
> employee claims for breach of contract if rejection is approved; (5)
> the cost-spreading abilities of the various parties, taking into
> account the number of employees covered by the bargaining
> agreement and how various employees' wages and benefits
> compare to those of others in the industry; and (6) the good or bad
> faith of the parties in dealing with the debtor's financial dilemma.

*Carey*, 816 F.2d at 93.

Delphi's burden of proof on the balance of the equities test is heavier than a

preponderance of the evidence. As one court explained, "the debtor's counsel has the burden of

proving that the balance of the equities *clearly favors* rejection. The modifying adverb suggests

that a preponderance of the evidence will not be sufficient." *In re K & B Mounting, Inc.*, 50 B.R.

460, 467 (Bankr. N.D. Ind. 1988) (emphasis in original) (quoting S.B. Bernstein, *Bankruptcy*

*Practice After the Amendments Act of 1984* (1984)).

1.    The Impact of a Strike in the Event of Rejection Would be Devastating for
      All Constituencies

High-level UAW officials have warned that a strike at Delphi would be the likely

result of any rejection of the collective bargaining agreement, and rank-and-file membership

have publicly supported a Delphi strike if Delphi does not improve its offer significantly.[29]

Delphi concedes that the prospect of a strike must be addressed as part of its

burden of demonstrating that a balance of the equities favors rejection of the collective

bargaining agreement.[30] (Delphi Br. at 73-76.) In this respect, *Teamsters v. IML Freight, Inc.*,

---

[29] *See, e.g.*, Press Release, UAW, UAW Statement on Delphi filing 1113/1114 Motions (Mar. 31, 2006). ("In the event the court rejects the UAW-Delphi contract and Delphi imposes the terms of its last proposal, it appears that it will be impossible to avoid a long strike.") (statement of UAW President Ron Gettelfinger and Vice President Richard Shoemaker).

[30] A union's right to strike after a bankruptcy court approves rejection of a collective bargaining agreement is clear. *See Briggs Transp. Co. v. Int'l Bhd. of Teamsters*, 739 F.2d 341, 344 (8th Cir. 1984) (rejecting employer's request for injunctive relief against union picketing after rejection); *Royal Composing,* 62 B.R. at 405 (noting that if the changes the debtor imposes after rejection are unacceptable, the employees are free to strike); *In re Evans Prods. Co.*, 55 B.R. 231, 234 (Bankr. S.D. Fla. 1985); *In re Kentucky Truck Sales, Inc.*, 52 B.R. 797, 806 (Bankr. W.D. Ky.

789 F.2d 1460 (10th Cir. 1986), is particularly instructive.  There, the court reversed a

bankruptcy court's decision permitting rejection because the bankruptcy court failed to consider

the impact of rejection.  The court specifically noted that antagonistic labor relations made it

likely that a damaging strike could result from rejection:

> The bankruptcy judge concluded that without rejection the
> employees would lose their jobs.  But there is little discussion on
> the effect on employees from rejection.  While there is an
> indication that both the bankruptcy judge and district judge were
> aware that the employees would probably strike after rejection, the
> reality of the union's strongly stated opposition was dismissed with
> an expression of hope that the debtor would reach an
> accommodation with its employees.  Such optimism would
> scarcely seem warranted in view of the pre-bankruptcy history,
> including unfair labor practice charges following unilateral wage
> cuts.

*Id.* at 1463; *see also In re Pesce Baking Co.*, 43 B.R. 949, 961 (Bankr. N.D. Ohio 1984) (denying

rejection motion because "[c]onsidering the risk of a strike or decreased productivity, [the

debtor's] projected savings is highly speculative").[31]

A strike would, of course, hurt Delphi, but the consequences of a Delphi strike for

GM would be monumental.[32]  GM buys nearly a quarter of its parts from Delphi, and GM plants

rely on Delphi parts for everything from steering systems to XM Satellite radios.  Indeed a

Delphi strike might shut down most, if not all, GM assembly plants in the United States, Mexico

and Canada.  Analysts have predicted that GM could lose $8 billion in the first 60 days of a

---

1985) ("[f]ollowing the rejection of a collective bargaining agreement . . . the employees retain the right to strike as their ultimate bargaining tool").

[31] Both *Pesce* and *IML Freight* are directly applicable even though they were both decided pre-1113.  The Section 1113 balancing of the equities test is derived from *Bildisco* and pre-1113 case law.  *See Carey*, 816 F.2d at 92; *Century Brass*, 795 F.2d at 273.

[32] Delphi is apparently well aware of the consequences that a strike at Delphi would have on GM.  *See* Monica Langley and Jeffrey McCracken, *Showdown on Auto-Labor Costs as Delphi Goes to Court*, Wall St. J., Mar. 31, 2006, at A1 reporting that Miller told GM CEO Rick Wagoner that while a strike is "bad" for Delphi, a strike "will kill [GM].").

Delphi strike.[33]  A Delphi strike would likely force the world's largest car maker into

bankruptcy.  *See* Langley and McCracken, *Showdown, supra* n.28.  ("A strike at GM's biggest

supplier could shut down auto maker's assembly lines within days, costing it as much as $130

million a day in the first two months, by some analyst's estimates.  Delphi supplies about $15

billion in parts to GM and about $13 billion to other customers, including Toyota Motor Corp

and Ford Motor Co.  A prolonged strike would affect them, too, as well as their other parts

suppliers – potentially doing harm to a wide swath of the U.S. manufacturing sector.").

        The sweeping implications of a shut down of operations at GM cannot be

overstated.

> GM's payroll pumps $8.7 billion a year into its assembly workers'
> pockets.  Directly or indirectly, it supports nearly 900,000 jobs –
> everyone from auto-parts workers to advertising writers, car
> salespeople, and office-supply vendors.  When GM shut down for
> 54 days during a 1998 labor action, it knocked a full percentage
> point off the U.S. economic growth rate that quarter.  So what's
> bad for General Motors is still, undeniably, bad for America.

David Welsh and Dan Beucke, *Why GM's Plan Won't Work*, Business Week, May 9, 2005

(noting that a GM bankruptcy "would bring to a judge four times the assets of the largest case

filed so far, by WorldCom Inc. in 2002.")

        In short, it is beyond dispute that the consequences of a strike at Delphi would be

devastating to all constituent interests in this case, and could have ramifications for the national

economy as well.  The UAW is acutely aware of the consequences of any decision it might make

to strike Delphi and does not make such decisions lightly.  If Delphi succeeds in its premature

rush to obtain relief through the Rejection Motion, the parties should expect UAW and its

members to exercise their right to strike.

---

[33] *See*, *e.g.*, Jeffrey McCracken, *Delphi Delays Effort to Cancel Union Contracts*, Wall St. J., Feb. 18, 2006.

Although the heightened prospect of a strike does not require the Court to deny

Delphi's motion, the potential for a strike sharply shifts the balance of the equities away from

granting Delphi the relief it requests.  This is particularly true in this case, where the alternative

to a strike is continued negotiations between the parties as part of the ongoing and overall

restructuring process.  Simply put, it makes no sense to grant Delphi's motion because of the

likelihood of a crippling strike.

2.    The Other Relevant Factors Decidedly Counsel Against Granting Delphi's Rejection Motion

As further evidence that the balance of the equities does not clearly favor

rejection here, the Court must also take into account the respective cost-spreading abilities of the

parties.  *See Carey*, 816 F.2d at 93.  Whereas other creditors, such as vendors and banks, have

alternative sources of income and recovery, the UAW-represented employees depend on current

compensation and/or benefits from Delphi as their primary and often sole source of income and

benefits.  There can be little doubt that this factor weighs heavily against rejection.

In addition, the Court must consider the possibility and likely effect of any

employee claims for breach of contract if rejection is approved.  Rejection will indeed permit the

UAW to file damage claims for substantial sums.  *See In re Moline Corp.*, 144 B.R. 75, 78

(Bankr. N.D. Ill. 1992) (as labor agreements are executory contracts, "§365 must apply to fill the

gap left by §1113"); *In re Indiana Grocery Co.*, 138 B.R. 40, 50 (Bankr. S.D. Ind. 1990); *In re

Garofalo's Finer Foods, Inc.*, 117 B.R. 363, 371 (Bankr. N.D. Ill. 1990); M. Baxter, *Is There a

Claim for Damages From the Rejection of a Collective Bargaining Agreement Under Section

1113 of the Bankruptcy Code?*, 12 Bankr. Dev. J. 703 (1996).  In this case, the UAW, one of

Delphi's largest unsecured creditors, would have claims estimated at over $4.6 billion in

damages associated with rejection of the labor agreements. This factor also militates against rejection.

        The Court must also consider Delphi's strategic use of the Rejection Motion as a bargaining tool, clearly evidenced by Delphi's request for a rejection order to use at its own discretion.

        Thus, Delphi cannot meet any of the requirements of Sections 1113 or 1114. Absent compliance with any of the requirements of Section 1113(b), the Rejection Motion must be denied. *See. e.g., In re U.S. Truck Co. Holdings, Inc.*, 165 L.R.R.M. (BNA) 2521, 2530 (Bankr. E.D. Mich. 2000) (rejection denied where debtor's proposal failed the "necessary" and "fair and equitable" requirements and where the debtor failed to meet and confer in good faith); *In re The Lady H Coal Co., Inc.*, 193 B.R. 233 (Bankr. S.D. W. Va. 1996) (rejection denied where debtor's proposal did not meet the "fair and equitable" requirement); *In re George Cindrich Gen. Contracting, Inc.*, 130 B.R. 20, 23-24 (Bankr. W.D. Pa. 1991) (rejection denied where debtor did not meet the statutory requirement to provide adequate information); *In re Express Freight Lines, Inc.*, 119 B.R. 1006, 1011 (Bankr. E.D. Wis. 1990) (rejection denied where proposal did not meet the "necessary" requirement); *In re William P. Brogna & Co.*, 64 B.R. 390, 391 (Bankr. E.D. Pa. 1986) (rejection denied where proposal did not meet "necessary" requirement).

        Delphi is attempting to bring the Section 1113/1114 process back to the *Bildisco* era, using the very statutes enacted to prevent such tactics. Its effort to short-circuit the process through  litigation that would, if successful, distort the statutory requirements beyond recognition, should not be countenanced. For a case that Delphi's CEO considers to be "a flashpoint, a test case, for all the economic and social trends that are on a collision course in our

country and around the globe," there should be no short cuts.[34]  UAW is prepared to discuss modifications that are necessary for Delphi's survival.[35]  But the place to do that is through the bargaining process and not through a misguided, litigation-driven strategy.

---

[34] Jeffrey McCracken, "*A Middle Class Made by Detroit is Now Threatened by its Slump*," Wall St. J., Nov. 14, 2005.

[35] *See* Ruppert Decl. ¶ 19.

## **CONCLUSION**

For the foregoing reasons, Delphi's Rejection Motion should be denied.


Dated: April 21, 2006
      New York, New York

                              Respectfully submitted,


                              /s/ Babette Ceccotti
                              Bruce H. Simon (BS 2597)
                              Peter Herman (PH 6324)
                              Babette A. Ceccotti (BC 2690)
                              Bruce S. Levine (BL 2309)
                              Elizabeth O'Leary (EO 9323)
                              David R. Hock (DH 8599)
                              COHEN, WEISS and SIMON LLP
                              330 West 42nd Street
                              New York, New York  10036
                              (212) 563-4100

                                    -and-


                              /s/ Niraj Ganatra
                              Niraj R. Ganatra
                              International Union, UAW
                              8000 East Jefferson Avenue
                              Detroit, Michigan  48214
                              (313) 926-5216


                              Attorneys for UAW