Hearing Date and Time: May 12, 2006 at 10:00 a.m.
Objection Deadline: May 5, 2006 at 4:00 p.m.

TOGUT, SEGAL & SEGAL LLP
Conflicts Counsel for Delphi Corporation, et al.,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                               :
In re:                                                         :
                                                               :      Chapter 11
DELPHI CORPORATION, et al.,                                    :      Case No. 05-44481 [RDD]
                                                               :
                   Debtors.                                    :      Jointly Administered
                                                               :
---------------------------------------------------------------x

**MOTION FOR APPROVAL OF SETTLEMENT**
**AGREEMENT WITH FURUKAWA ELECTRIC NORTH AMERICA APD, INC.**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), by their undersigned counsel, as and for their motion (the "Motion") for approval, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), of the settlement agreement annexed hereto as Exhibit "1" (the "Settlement Agreement") by and among the Debtors and Furukawa Electric North America APD, Inc. ("Furukawa"), respectfully show this Honorable Court that:

## BACKGROUND

A.  <u>The Chapter 11 Filings</u>

    1.  On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code.  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") also sought reorganization relief.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Dockets Nos. 28 and 404).

    2.  On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee"), which retained Latham & Watkins LLP as its counsel.  No trustee or examiner has been appointed in the Debtors' cases.

    3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    4.  The statutory predicate for the relief requested herein is Bankruptcy Rule 9019.

B.  <u>Current Business Operations Of The Debtors</u>

    5.  As of the Initial Filing Date, Delphi had global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1

billion.[1] Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.      Delphi has become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and the Company (as defined below) is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation ("GM"), equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  As of the Initial Filing Date, the Debtors employed approximately 180,000 employees.  The Debtors' 50,600 U.S. employees work in approximately 44 manufacturing sites, 13 technical centers, and in Delphi's Troy, Michigan headquarters.  As of the Initial Filing Date, the Debtors employed approximately 34,750 hourly employees in the United States, 96% of whom are union-represented.  Outside the United States, the Company's foreign entities employed more than 134,000 people on the Initial Filing Date,

---

[1]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

8. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates (collectively, the "Company") in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base. The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of the Company's U.S. collective bargaining agreements in the fall of 2007.

4

## RELIEF REQUESTED

10.     The Debtors seek approval of the Settlement Agreement with Furukawa pursuant to Bankruptcy Rule 9019.  Pursuant to the Settlement Agreement, the Debtors will: recover $2,261,205.46, representing 80% of the pre-petition Payment (defined below) that was (a) made to Furukawa;  and (b) avoid the cost, expense and delay of litigation.  For the reasons set forth below, the Debtors believe that the settlement and compromise of claims embodied in the Settlement Agreement is fair and equitable, falls well within the range of reasonableness, is in the best interest of the Debtors' estates, and should be approved.

## BASIS FOR RELIEF

A.    Background To The Proposed Settlement Agreement

11.     Furukawa supplies the Debtors with SIR coils and connection systems pursuant to various purchase orders and supply contracts.

12.     In response to demands by Furukawa, on or about September 14, 2005, the Debtors made a wire payment of $2,832,045.42 to Furukawa, noting in the Wire Request Form: "Vendor refusing to ship due to press release" (the "September 14 Payment").

13.     The September 14 Payment represented a gross payment of $2,860,651.94, less a 1% early payment discount, and it satisfied invoices for goods that were just previously shipped to the Debtors (the "Invoices").

14.     As a result of an oversight, on or about October 4, 2005, the Debtors made an electronic funds transfer payment to Furukawa in the amount of $2,826,506.66 (the "Payment").  The Payment was remitted by the Debtors against the same Invoices that had already been satisfied by the September 14 Payment.

15.     The September 14 Payment and the Payment were in slightly different amounts because one invoice for approximately $34,000 was not included in the Payment, and

5

the Payment did not take credit for a prompt-payment discount.  Furukawa placed the Payment into a "suspension account", and the Debtors never provided any instructions to Furukawa regarding application of the Payment.

16. Four days later, on October 8, the Debtors filed their petitions in this Court.  As of the Initial Filing Date, Furukawa had not applied the Payment to invoices due and owing from the Debtors to Furukawa.

17. On December 15, 2005, Furukawa moved for an Order pursuant to Bankruptcy Code section 362(d) modifying the automatic stay to permit it to apply the Payment to an equivalent amount of pre-petition invoices that are unrelated to the Payment (the "Stay Motion").  The Debtors filed an Objection to the Stay Motion on February 2, 2006 (the "Objection"), and Furukawa filed a Reply thereto on February 8, 2006.  The Stay Motion, the Objection and Furukawa's Reply were considered by the Court at a hearing on February 9, 2006, at the conclusion of which, the Court denied the Stay Motion.  An Order denying the Stay Motion was entered on March 3, 2006 (the "March 3 Order").  However, avoidance of the Payment was not before the Court and, consequently, the March 3 Order did not direct Furukawa to return the Payment to the Debtors.

18. The Debtors have asserted that the Payment is avoidable and recoverable as, among other things, a preferential transfer pursuant to Bankruptcy Code sections 547 and 550, and the Debtors have demanded the return of the Payment.

19. Furukawa has asserted that the Payment is not avoidable or recoverable and that, among other things, Furukawa provided subsequent new value to the Debtors totaling approximately $799,000.  Delphi disputed the amount of the subsequent new value provided by Furukawa prior to the Initial Filing Date, and asserted that it totaled no more than approximately

6

$500,000.  The precise amount of Furukawa's subsequent new value would require additional, time-consuming discovery.  Moreover, Furukawa has asserted that it would actively litigate any avoidance proceeding by the Debtors to recover the Payment.

B.  The Proposed Settlement Agreement

20. Diligence and arms-length negotiations between the Debtors and Furukawa have produced an agreement, subject to Bankruptcy Court approval, to settle and compromise the Debtors' demand for return of the Payment:

(a) Furukawa will return $2,261,205.46 to the Debtors (the "Settlement Amount");

(b) Furukawa will retain $565,301.20 of the Payment (the "Retention") which will be applied to satisfy pre-petition Furukawa invoices that have been identified by the Debtors;

(c) Furukawa may amend its proof of claim in Debtors' case to reflect the financial terms of the proposed settlement;[2] and

(d) The Debtors and Furukawa will exchange releases of claims pertaining to the Payment.

21. The Debtors have determined that the proposed Settlement Agreement is in the best interests of the Debtors' estates and, in reaching that conclusion, have considered, among other things, the defenses asserted and potentially assertable by Furukawa and the cost, expense and delay associated with litigation regarding the avoidability of the Payment.

APPLICABLE AUTHORITY

22. Bankruptcy Rule 9019(a) provides, in relevant part, that:  "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise and settlement."  Fed. R. Bankr. P. 9019(a).  Indeed, settlements and compromises are "a normal part of the process of reorganization."  Protective Comm. for Indep. Stockholders of TMT

7

Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939));  see also In re Adelphia Commc'ns Corp., 327 B.R. 143, 159, adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

23.    To approve a compromise and settlement under Bankruptcy Rule 9019(a), courts have held that the proposed compromise and settlement should be found to be fair and equitable, reasonable and in the best interests of the debtor's estate.  See In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994);  Adelphia Commc'ns, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979).  Additionally, the decision to approve a particular settlement lies within the sound discretion of the Bankruptcy Court.  See Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994).

24.    In exercising its discretion, the Bankruptcy Court must make an independent determination that the settlement is fair and reasonable.  Id. at 122.  The Court, however, may consider the opinions of the debtor in possession and its counsel that the settlement is fair and reasonable.  See In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993).  In addition, the Bankruptcy Court should exercise its discretion "in light of the general public policy favoring settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998);  see also Shugrue, 165 B.R. at 123 ("the general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above").

25.    In determining whether to approve a proposed settlement, a Bankruptcy Court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the

---

²     This summary represents the significant provisions of the Settlement Agreement, and it is not intended to

range of reasonableness.'" In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983); accord Purofied Down Prods., 150 B.R. at 522 ("the court need not conduct a 'mini-trial' to determine the merits of the underlying litigation").

26.     Bankruptcy Courts have applied the following factors in determining whether a settlement should be approved:  (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law;  (b) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay;  (c) the proportion of creditors who do not object to, or who affirmatively support the proposed settlement;  and (d) the extent to which the settlement is truly the product of arm's length bargaining and not the product of fraud or collusion.  See In re Ashford Hotels, Ltd., 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998);  In re Best Prods. Co., 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994).  See also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002) (also incorporating as a factor the "likely difficulties in collection").

27.     The relevant factors set forth above support a finding that the compromise that is embodied in the Settlement Agreement is fair and equitable, in the best interests of the Debtors and should be approved.  The Debtors and Furukawa propose to resolve all claims relating to the Payment consensually, without further litigation.  If these matters are not resolved through the proposed settlement, future litigation before this Court will result in additional expense for the Debtors and their estates with no certainty that the Debtors would recover more than the Settlement Agreement after a trial.

28.     The benefits flowing from the settlement and compromise embodied in the Settlement Agreement -- including:  (a) the elimination of a material risk of an unfavorable litigation outcome;  (b) the avoidance of the significant costs, uncertainties and delays likely

---

modify or amend any of the provisions of the Settlement Agreement.

attendant to any litigation and possible resulting judgment; (c) the waiver of any and all claims that Furukawa may possess against the Debtors with respect to the Payment, except for the Amended Claim; and (d) the payment of the Settlement Amount -- all clearly demonstrate that approval of the Settlement Agreement is in the best interests of the Debtors and the Debtors' estates.

29. Additionally, the Settlement Agreement is the product of arm's length bargaining and negotiations between the Debtors and Furukawa. Accordingly, the Debtors submit that the parties' proposed settlement and compromise is appropriate in light of the relevant factors and should be approved.

NOTICE OF MOTION

30. Notice of this Motion is being given in accordance with the Second Supplemental Order under 11 U.S.C. §§ 102 (1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures, entered by this Court on March 28, 2006 (the "Case Management Order") (Docket No. 2995). The Debtors submit that no other notice need be given.

MEMORANDUM OF LAW

31. This Motion does not present any novel issues of law. Consequently, the Debtors respectfully request that the Court waive the requirement that they file a memorandum of law in support of this Motion pursuant to Local Bankruptcy Rule 9013-1(b). The Debtors reserve the right, however, to file a separate memorandum of law in support hereof or in response to any objection to this Motion.

32. No previous motion for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court approve the settlement and compromise by and among the Debtors and Furukawa by "So Ordering" the annexed Settlement Agreement, and grant such other and further relief as the Court deems just and appropriate.

Dated:  New York, New York
        April 21, 2006

DELPHI CORPORATION, et al.
By their attorneys,
TOGUT, SEGAL & SEGAL LLP
By:

/s/ Neil Berger
ALBERT TOGUT (AT-9759)
NEIL BERGER (NB-3599)
Members of the Firm
One Penn Plaza
New York, New York 10119
(212) 594-5000

11