**Hearing Date and Time: May 12, 2006 at 10:00 a.m.**
**Objection Deadline: May 5, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

MOTION TO APPROVE STIPULATION AND AGREED ORDER BETWEEN DELPHI
CORPORATION, ET AL. AND FLEXTRONICS INTERNATIONAL ASIA-PACIFIC LTD., ET
AL. REGARDING ADEQUATE PROTECTION OF PREPETITION SETOFF RIGHTS

("FLEXTRONICS STIPULATION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion (the "Motion") To Approve Stipulation And Agreed Order Between Delphi Corporation, Et Al. And Flextronics International Asia-Pacific Ltd., Et Al. Regarding Adequate Protection Of Prepetition Setoff Rights (the "Stipulation"). In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

2.    On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicate for the relief requested herein is Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.  Current Business Operations Of The Debtors

5.  Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[1]  The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

C.   Events Leading To The Chapter 11 Filing

8.   In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.   The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.   In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

---

[2]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

D.      The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.     In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-represented employees.  This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement

5

on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

13.    These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors also moved to reject unprofitable supply contracts with GM.[4]  Among the reasons for the GM contract rejection motion was the Debtors' belief that GM must cover a greater portion of the costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This initial motion covers approximately half of the Debtors' North American annual purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the filing of these motions was a necessary procedural step, the Debtors remain focused on reaching a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is necessary.

14.    To implement the third element of the Debtors' transformation plan, the Company announced plans to focus its product portfolio on those core technologies for which the Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth.  To that end, the Company will concentrate the organization around the following core strategic product lines: (a) Controls & Security (Body Security,

---

[3]  Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035)

[4]  Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033)

Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.    In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines.  The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented, the Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

---

[5]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

7

17. As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation. The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce. To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007. Despite the freeze, because of the size of the funding deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding contributions over a long-term period. The Company intends to replace the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

19. By this Motion, the Debtors seek entry of an order under Bankruptcy Rule 9019 authorizing and approving the Stipulation.

## Basis For Relief

A. <u>The Proposed Stipulation And Agreed Order</u>

20. The Debtors and Flextronics International Asia-Pacific Ltd. and certain of its affiliates (collectively, "Flextronics") are parties to numerous purchase orders and/or

8

agreements (collectively, the "Agreements") pursuant to which Flextronics manufactures and supplies various products to the Debtors.

21. Prior to the Petition Date (as defined in the Stipulation), one or more of the Debtors owed Flextronics $6,713,037 on account of products delivered to the Debtors prior to the Petition Date (the "Flextronics Prepetition Receivable") and Flextronics owed one or more of the Debtors $5,884,967 on account of prepetition overpayments and price reductions (the "Flextronics Prepetition Payable"). Flextronics received payment under a guaranty provided by a foreign non-Debtor affiliate of the Debtors for pre-Petition Date amounts due to Flextronics under the Agreements (the "Guaranty Payments"), including of the Flextronics Prepetition Receivable.

22. Flextronics has agreed to pay the Flextronics Prepetition Payable to the Debtors pursuant to the Stipulation provided that, the respective setoff rights and defenses of Flextronics and the Debtors as they existed immediately prior to the Petition Date are preserved. The principal terms of the Stipulation are as follows:[6]

> a. Flextronics will pay the Flextronics Prepetition Payable to the Debtors within five business days of the Effective Date (as defined in the Stipulation).
>
> b. As adequate protection for any setoff rights Flextronics may have with respect to the Flextronics Prepetition Payable in the event that Flextronics must return any portion of the Guaranty Payments, Flextronics will be entitled to exercise its prepetition setoff rights, if any, against any postpetition payables owing to the Debtors and Flextronics will be entitled to the adequate protection as provided at paragraph 18 of the Final DIP Financing Order, dated October 28, 2005, which sets forth procedures for parties seeking to exercise and/or preserve their setoff rights. Such exercise, if any, by Flextronics shall for all purposes be treated as if Flextronics had not made any payments to the Debtors with respect to the Flextronics Prepetition Payables. Further, in the event that Flextronics has no postpetition payables owing to, or to be owing to, the Debtors against which to exercise any unresolved setoff rights, the Debtors shall pay Flextronics an amount equal to its setoff right up to the Flextronics Prepetition Payable within ten

---

[6] The following summary is included for convenience and is subject in all respects to the terms of the Stipulation.

9

business days of the effective date of a plan of reorganization in the Debtors' chapter 11 cases.

c.    If Flextronics disgorges any portion of the Guaranty Payments, Flextronics will have a claim against the Debtors in the amount of such disgorged amount and Flextronics' setoff rights with respect to such disgorged amount will be preserved and will in no way be prejudiced as a result of Flextronics payment of the Flextronics Prepetition Payable to the Debtors.

### Applicable Authority

23.    By this Motion, the Debtors respectfully request the entry of an order under Rule 9019(a) of the Bankruptcy Rules approving the Settlement Agreement. Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a). Settlements and compromises are "a normal part of the process of reorganization," Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Communications Corp., 327 B.R. 143, 159 (decision to accept or reject a settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

24.    Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of a debtor's estate. See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained. Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it."). In general, compromises in the bankruptcy

context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

25. The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate: (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

26. Courts in this district have further elaborated on these factors to consider: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the proportion of the class members who do not object or who affirmatively support the proposed settlement, (d) the competency and experience of counsel who support the settlement, (e) the relative benefits to be received by individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the directors and officers as a result of the settlement, and (g) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion. Adelphia, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

27. The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement

11

that the debtor could have achieved under the circumstances. See Adelphia, 327 B.R. at 159-60; see also Penn Centr., 596 F.2d at 1114. Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'" In re Telesphere Communications, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citation omitted). To that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'" Adelphia, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994).

    28.  The Stipulation between the Debtors and Flextronics should be approved under Bankruptcy Rule 9019(a) because its terms are fair and equitable, fall well within the range of reasonableness, and are in the best interests of the Debtors and their estates. Most significantly, the Stipulation provides for the payment by Flextronics of the Flextronics Prepetition Payable in the amount of $5,884,967, which will give the Debtors access to additional working capital to fund their operations. In addition, the Debtors believe that the Stipulation is a reasonable compromise under the circumstances because it avoids the costs and uncertainties of litigation while preserving the positive working relationship between the Debtors and Flextronics. Finally, the Debtors note that the Creditors' Committee has approved the terms of the Stipulation.

    29.  In the exercise of their business judgment, the Debtors therefore believe that the terms of the Stipulation are reasonable based upon the funds and other important benefits that the Debtors will receive. Based on the benefits to be realized from entering into the

12

Stipulation, together with the potential harm to the estates if the relief requested herein is not granted, the Debtors respectfully request that the Motion be granted.

### Notice Of Motion

30. Notice of this Motion has been provided in accordance with the Third Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on April 20, 2006 (Docket No. 3293). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

31. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) authorizing and approving the Stipulation and (b) granting them such other and further relief as is just.

Dated:  New York, New York
April 21, 2006

        SKADDEN, ARPS, SLATE, MEAGHER
         & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession