Bruce H. Simon (BS 2597)
Peter Herman (PH 6324)
Babette A. Ceccotti (BC 2690)
Bruce S. Levine (BL 2309)
Elizabeth O'Leary (EO 9323)
David R. Hock (DH 8599)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York  10036
(212) 563-4100

   -and -

Niraj R. Ganatra
International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan  48214
(313) 926-5216

Attorneys for International Union, United
Automobile, Aerospace and Agricultural
Implement Workers of America (UAW)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                               :
In re:                                                         :    Chapter 11
                                                               :
DELPHI CORPORATION, *et al.,*                                  :    Case No. 05-44481 (RDD)
                                                               :    (Jointly Administered)
                         Debtors.                              :
                                                               :
---------------------------------------------------------------x

**DECLARATION OF ANDREW YEARLEY IN SUPPORT OF THE OBJECTION OF
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW) TO DEBTORS'
MOTION FOR ORDER UNDER 11 U.S.C. § 1113(C) AUTHORIZING REJECTION OF
COLLECTIVE BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(G)
<u>AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS</u>**

I, Andrew Yearley, under penalty of perjury and in lieu of affidavit as permitted

under 28 U.S.C. § 1746, declare and state as follows:

00089720.DOC.1

1. I am a Managing Director of Lazard Freres & Co. LLC ("Lazard"), which maintains offices at 30 Rockefeller Plaza, New York, NY 10020.

2. Lazard serves as financial advisor to the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") in the above-captioned proceeding.

3. Lazard has been working with the UAW since the commencement of this proceeding in October of 2005. On January 31, 2006, Debtors (collectively "Delphi") filed a motion to authorize the estate to compensate Lazard for the due diligence and other work it was and would continue to be performing for the UAW in connection with any collective bargaining between the parties. I have read Delphi's application in which Delphi represented to this Court that the due diligence to be performed by Lazard would be a critical component of collective bargaining. By order dated February 9, 2006, the Court granted Delphi's application.

4. Lazard has been retained by the UAW to conduct due diligence of Delphi's financial condition and to evaluate the impact and necessity of the various proposals made by Delphi for labor cost relief. Such work, among other things, requires Lazard to review Delphi's actual financial performance and projections, analyze Delphi's various financial models and analyses, and assess the necessity of Delphi's various proposals for labor cost relief.

5. As set forth below, prior to the filing of Delphi's Motion for Relief under Sections 1113 and 1114 of the Bankruptcy Code (the "Motion"), Lazard has been unable to adequately complete the due diligence and other financial analysis that, by agreement of all parties (including Delphi), was to be a condition precedent for collective bargaining.

6. Most of the relevant information that Lazard has received was either (i) not provided by Delphi until the few days immediately preceding the filing of the Motion, (ii) made

available for the first time by being filed with the Court in support of the Motion, or (iii) not provided by Delphi until after the filing of the Motion.

### The Information Flow Process

7.    Delphi has required Lazard to channel all of its information requests through Delphi financial advisor Rothschild Inc. ("Rothschild"). We understand through our communications with Rothschild that each of our information requests in turn is subject to review and approval by Delphi's labor team before finance, treasury, and other Delphi professionals consider such requests. Rothschild has advised us on numerous occasions that the information flow has been delayed by this "filtering process," which we understand to be related to Delphi's litigation concerns as distinguished from the collective bargaining process.

### Lazard's Information Requests

8.    Lazard has actively sought to obtain information from Delphi since its involvement in these matters beginning in October of 2005. On November 1, 2005, Lazard submitted its first written due diligence request to Delphi. Lazard organized its request list by category and prioritized such list by relative importance. In an effort to be constructive, Lazard twice prioritized the request list in an attempt to focus Delphi on the most critical items.

9.    On November 22, 2005, Lazard met with Rothschild in connection with Delphi's initial post-petition proposal for wage cuts, which was made on November 15, 2005 (which was later defined by Delphi as the "Competitive Benchmark Proposals"). During that meeting, additional information requests were made pertaining to labor related information.

10.    In mid-December 2005, Delphi and its advisors provided Lazard a high-level, one-page financial summary that purported to show the income statement and cash flow impact of the November labor proposal on the Steady State Scenario (which is Delphi's financial model

- 3 -

that assumes no changes to its labor structure or operating footprint).  This analysis was comprised of three lines summarizing the potential income statement savings as a result of the November labor proposal including "total labor savings excluding pension and OPEB," "pension savings," and "OPEB savings."  The high level analysis included only one line summarizing the total cash flow impact of the November labor proposal. At the time, Delphi advised Lazard that such analysis was preliminary and subject to material revision and, as such, Delphi was not in a position to provide supporting analyses or explanation of the summary calculations.

11. After further requests for more detailed financial information related to the potential impact of the November labor proposal on Delphi's Steady State Scenario were not met, Lazard was surprised to discover that Delphi's February 2, 2006 presentation to the Official Committee of Unsecured Creditors (of which the UAW and its advisors are ex-officio participants) contained a revised financial analysis relating to the impact of the November labor proposal on the Steady State Scenario.  This analysis contained different numbers and was somewhat more detailed than the mid-December 2005 one-page analysis provided to Lazard. This financial analysis was information that Lazard had requested of Delphi directly but Lazard only became aware of in reviewing the Debtors' presentation to the Official Committee of Unsecured Creditors dated February 2, 2006.  On February 8, 2006, Lazard submitted key information requests to Rothschild relating to this "newly available" summary financial analysis.

12. Lazard, based on the representation of Rothschild and Delphi, expected to receive more detailed financial information about the Competitive Benchmark Proposals and their impact on Delphi's Steady State projections in early February 2006.  However, after waiting without response for nearly three weeks for such information, Lazard turned its attention back to

- 4 -

the Steady State Scenario and, on February 23, 2006, submitted additional information requests to Rothschild relative to the Steady State Scenario.

13. On March 10, 2006, Lazard received additional information related to the Competitive Benchmark Proposals (Delphi called this the "Modified Steady State" model which assumed labor modifications consistent with the Competitive Benchmark Proposals and the wind-down of the vast majority of Delphi's U.S. facilities). That same day, Lazard submitted an information request to Rothschild in relation to these materials.

14. Between April 7 and 13, 2006, Lazard submitted requests to Rothschild pertaining to: (i) Delphi's new labor proposal known as the "GM Consensual Proposals," which was provided to the UAW in the days preceding the filing of the Motion, (ii) requests pertaining to the Special Attrition Program agreed by the UAW, GM and Delphi in March 2006, and (iii) requests pertaining to Delphi's recent financial performance.

15. On April 19, 2006, Lazard received more detailed historical plant level financial information for the first time. On April 20, 2006, Lazard received projected plant level financials for 2006. As this information is voluminous, Lazard plans to review and provide Rothschild with information requests as will be required.

16. On April 20, 2006, Rothschild provided Lazard an analysis that reflects updates to Delphi's Steady State Scenario based on actual results to date for 2006 and "refreshed" assumptions for the balance of 2006. The Steady State Scenario is the forecast that underlies the Competitive Benchmark and GM Consensual Proposals. Lazard plans to review this analysis and provide Rothschild with information requests as will be required.

**Delphi's Response to Lazard's Information Requests**

17.   To the best of my knowledge, at no time prior to the filing of the Motion did Delphi ever advise Lazard that any of its information requests were unreasonable or not relevant or necessary with respect to the evaluation of Delphi's labor cost proposals.  Nevertheless, Delphi failed to provide Lazard with relevant information on a timely and responsive basis or with the requisite level of detail.  This has prevented Lazard from completing due diligence and evaluating the necessity of Delphi's proposals for labor cost relief.

18.   Annexed hereto as Exhibit A is a summary chart prepared by professionals at Lazard at my direction.  Exhibit A sets forth the particular information requested from Delphi, the dates that each such request was made, the date of response, if any, from Delphi, and the number of days between each request and corresponding response, if any, from Delphi.

19.   Exhibit A reflects that Delphi has frequently taken weeks and often months to respond to Lazard's information requests, and further reflects that Delphi still has not responded to information requests.  Exhibit A also reflects that much of the most relevant information obtained by Lazard was not provided by Delphi until immediately prior to the filing of the Motion, or was derived from the materials filed by Delphi in support of the Motion, or was only obtained by Lazard after Delphi filed the Motion.

20.   Annexed hereto as Exhibit B is a letter dated March 30, 2006 from UAW attorney Bruce H. Simon detailing Lazard's information requests.  The letter is an accurate reflection of the inadequate and flawed information flow process that preceded Delphi's filing of the Motion on March 31, 2006.

21.   Annexed hereto as Exhibit C (excluding attachments) is a letter dated April 14, 2006 from Delphi attorney Tom A. Jerman, responding to Bruce Simon's March 30 letter.  Mr.

Jerman fails to acknowledge the ongoing failure of Delphi to provide relevant and necessary information in connection with its proposals, as specifically addressed below.

22. While Exhibits A and B provide a reasonable summary of the inadequate and flawed due diligence process to date, the history of Lazard's efforts to analyze the financial impact of the Competitive Benchmark Proposals first proposed by Delphi in November 2005 provides an even clearer picture of this process.

23. As summarized in this declaration, on November 22, 2005, Lazard met with Rothschild in connection with Delphi's Competitive Benchmark Proposals. Shortly thereafter, Lazard submitted information requests related to this proposal focusing on labor related information.

24. Based on requests for more detailed financial analysis, Delphi and its advisors provided Lazard in mid-December 2005, a high level, one-page financial summary that purported to show the income statement and cash flow impact of the November labor proposal on the Steady State Scenario. This analysis was comprised of three lines summarizing the potential income statement savings as a result of the November labor proposal including "total labor savings excluding pension and OPEB," "pension savings," and "OPEB savings." The high-level analysis included only one line summarizing the total cash flow impact of the November labor proposal. At the time, Delphi advised Lazard that such analysis was preliminary and subject to material revision and, as such, Delphi was not in a position to provide supporting analysis or explanation of the summary calculations.

25. As reviewed earlier in this declaration, Delphi did not provide additional financial analysis in support of its proposed November labor modifications until February 2, 2006. Lazard only became aware of the availability of this information through its participation in the February

2, 2006 meeting of the Official Unsecured Creditors Committee with Delphi. Lazard promptly provided Rothschild additional information requests based on this analysis. Rothschild assured Lazard that, within a week or so, Delphi would be able to provide more detailed analysis in relation to the impact of the proposed November labor modifications on the Steady State Scenario.

26. On March 10, 2006, Lazard finally received some additional financial analysis (but not a financial model) related to the impact of the proposed November labor modifications on the Steady State Scenario, but was told that such information was all subject to change.

27. Approximately three weeks later, Delphi filed its Motion and provided financial models in support of its Competitive Benchmark and newly submitted GM Consensual Proposals. This represented the first time Lazard received a financial model that reflected the impact of the proposed November labor modifications despite requesting such information beginning in November 2005. The GM Consensual Proposals reflected an entirely new labor proposal based on new assumptions.

### Outstanding Information Issues

28. Delphi has only recently provided Lazard with much of the information that was requested beginning in November 2005. The untimely responses to Lazard's requests, particularly in light of the timing of Delphi's Motion, have made it impossible for Lazard to properly evaluate the information provided by Delphi for the purpose of collective bargaining. Significant due diligence is required on recently received information – information that has been requested for months by Lazard – in order to evaluate Delphi's labor proposals.

29. Lazard only received Delphi's financial models relating to the potential impact of the Competitive Benchmark Proposals and the newly proposed GM Consensual Proposals a few

days prior to the filing of the Motion.  Subsequent to the filing of the Motion, Lazard has attended one meeting with Delphi and its financial advisors to review the "mechanics" of these financial models.

30.   As a result of this meeting, Lazard learned that the financial models provided by Delphi are largely based on "hard coded" assumptions developed outside of the financial models. Such assumptions cannot be tested without consultation with Delphi's representatives concerning the bases upon which these assumptions were made.  In addition, Delphi and its advisors have advised Lazard that the financial models do not permit the user to change any operating assumptions such as sales, operating margins, or the level or mix of continuing versus non-continuing businesses, and this makes it impossible to use such models to sensitize key assumptions or evaluate alternative operating scenarios.   Under such circumstances, Lazard has been unable to assess these financial models in any reasonable detail

31.   Further, Lazard has attempted for months to obtain actual and projected plant-level profit and loss information from Delphi.  This information is critical for any number of reasons, not the least of which is Delphi's stated intention to shut down the vast majority of its domestic facilities.  Such plant-level information is required to evaluate what has driven Delphi's overall profit and loss experience, to assess any significant profit and loss trends on a plant-level and ultimately on a company-wide basis, and to determine whether, from analysis of plant-level data, alternative future strategies exist that should be considered by Delphi in connection with its restructuring objectives.  Such plant-level data is a necessary indicator of what has worked at Delphi and where and why certain problems exist.

32.   To our surprise, despite being told for months by Delphi that such plant-level data did not exist except for historical sales and operating income figures, Lazard recently learned,

and only through its review of court papers filed by Delphi in connection with its motion to reject certain agreements with GM, that detailed plant-level data does in fact exist. On April 19, 2006, Lazard received more detailed historical plant level financial information for the first time. On April 20, 2006, Lazard received plant-level projections for 2006 for the first time.

33. Lazard appreciates that Delphi's financial condition is not static and that as a result the due diligence process is dynamic and subject to new assumptions and analyses. Having said that, as a result of Delphi's approach to due diligence, Lazard is left in the untenable position of having to scramble to analyze Delphi's latest labor proposal based on newly provided models and analyses that Lazard has been seeking since November 2005.

34. Delphi's rush to file the Motion, which has forced Lazard to meet unrealistic deadlines in light of the complexity of the issues, is particularly curious in light of Delphi's financial position. First, it has become apparent that, at the present time, Delphi has significant liquidity. Delphi's latest cash flow shows that the Debtors had approximately $1.4 billion of cash as of April 7, 2006 and an additional estimated $1.7 billion of available liquidity under its Debtor-in-Possession facility. Also, to the best of our knowledge, Delphi's non-debtor operations have significant cash and are profitable. In short, Delphi has significant cash and available credit lines and does not appear to be in any imminent danger of running out of liquidity.

35. Additionally, Delphi, GM, and the UAW just completed their agreement on the Special Attrition Program in the middle of March. Based on information provided by Delphi, if 75% of eligible hourly employees accept early retirement and an additional 5,000 hourly employees flow back to GM as permitted under the Special Attrition Program, Delphi's pro forma labor costs would be reduced by approximately $2 billion per year.

36. The $2 billion in annual labor savings has been calculated by Lazard based on a scenario presented by Delphi where 75% of eligible hourly employees across the workforce accept the Special Attrition Program and 5,000 Delphi employees flow back to GM. This analysis also assumes that retiring Delphi employees "check the box" as GM retirees. Consistent with Delphi's Competitive Benchmark and GM Consensual Proposals, this labor savings estimate assumes that the hourly employees that retire from Delphi exit the Delphi workforce permanently.

37. Delphi Vice President John D. Sheehan states in paragraph 51 of his declaration submitted in support of the Motion that the Special Attrition Program will "reduce the impact of Delphi's restructuring on its employees but it does not alleviate the need for modifications that Delphi seeks in its labor agreements." Sheehan backs up this contention by stating that, even assuming 100 percent participation in the Special Attrition Program by eligible hourly workers, Delphi will still have operating income losses of $6.1 billion over the next five years. Sheehan's assertion is misleading. A closer look reveals that Sheehan assumes that Delphi will be operating under its Steady State Scenario and will not be shutting down the vast majority of its alleged unprofitable domestic operations as contemplated in Delphi's labor proposals. Instead, Sheehan assumes that Delphi will be hiring back employees and operating "business as usual." As such, Sheehan assumes that Delphi will hire back permanently over 10,500 employees at lower wages and hire an additional estimated 3,500 employees on a temporary basis rather than permanently reducing its hourly workforce. In addition, the $6.1 billion operating loss over five years that Sheehan refers to includes nearly $5 billion of *one-time* charges related to pension and OPEB adjustments.

38.    Notably, the number of employees electing to participate in the Special Attrition Program will not be known, at the earliest, until the middle of June 2006.  For reasons unknown to Lazard, Delphi has chosen to file the Motion even though the effect of the Special Attrition Program on Delphi's labor structure, which Delphi expects to be extraordinary and dramatic, will not be known for approximately two months.

39.    Moreover, it was not until April 13, 2006 that Delphi first provided Lazard with Delphi's projections relating to the impact of the Special Attrition Program on future performance under the Competitive Benchmark and GM Consensual Proposals, respectively.  Even when provided, the analysis was presented through a high-level bridge analysis to the financial models related to the Competitive Benchmark and GM Consensual Proposals.  To date, Delphi has not modified its financial models related to the Competitive Benchmark and GM Consensual Proposals to take into account the significant impact of the Special Attrition Program.

33.    In short, because of the flawed and inadequate due diligence process, Lazard cannot at this time, even after Delphi has filed the Motion, complete its tasks that all parties, including Delphi, agreed would be required in order for collective bargaining to be genuine and productive.

I hereby declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: New York, New York
       April 21, 2006

    /s/ Andrew Yearly
ANDREW YEARLEY