Hearing Date and Time:  May 9, 2006 at 10:00 a.m.
Objection Deadline: April 21, 2006

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Glenn M. Kurtz (GK-6272)
Gerard Uzzi (GU-2297)
Douglas P. Baumstein (DB-1948)

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria (Admitted *Pro Hac Vice*)
Frank L. Eaton (FE-1522)
Ileana A. Cruz

ATTORNEYS FOR APPALOOSA
MANAGEMENT L.P. AND WEXFORD
CAPITAL LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Delphi Corporation, <u>et al.</u> | ) | Case No. 05-44481 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**SUPPLEMENTAL OBJECTION OF APPALOOSA MANAGEMENT L.P. AND**
**WEXFORD CAPITAL LLC TO THE DEBTORS' MOTION FOR ORDER**
**UNDER 11 U.S.C. § 1113(c) AUTHORIZING REJECTION OF COLLECTIVE**
**BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(g)**
**<u>AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS</u>**

TO:    THE HONORABLE JUDGE ROBERT D. DRAIN
       UNITED STATES BANKRUPTCY JUDGE

        Appaloosa Management L.P., collectively with and through certain of its affiliates

("Appaloosa"), and Wexford Capital LLC,  through certain of its affiliates ("Wexford," together

with Appaloosa, the "Shareholders"),[1] by and through their undersigned counsel, hereby submit

this supplemental objection (the "Objection") to the Motion for an Order under 11 U.S.C. §

1113(c) Authorizing Rejection of Collective Bargaining Agreements and under 11 U.S.C. §

1114(g) Authorizing Modification of Retiree Welfare Benefits [Docket No. 3035] (the

"Motion"), together with its accompanying memorandum of law in support thereof [Docket No.

3036] (the "Memorandum"),[2] filed by Delphi Corporation ("Delphi") and certain of its

subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors").  In

support of this Objection, the Shareholders respectfully state as follows:

## PRELIMINARY STATEMENT

1.    While the Shareholders recognize that this is a labor transformation case

and applaud the Debtors' efforts to bring their wage structure in line with the market, the

Debtors' rush to reject their collective bargaining agreements ("CBAs"), which terminate in late

2007, and to modify retiree benefits at this early stage in these highly complex cases fails to

protect the interests of the Debtors' stakeholders.  Indeed, the Debtors readily admit that they

have not determined to reject the CBAs, but are looking to obtain authority to reject the CBAs at

some undisclosed later time if their negotiations with the Unions (defined below) fail.  See

Motion, ¶ 2 (indicating that the relief requested, while unnecessary now, "may become necessary

at some point in the future").  Sections 1113 and 1114 of title 11 of the United States Code, 11

U.S.C. §§ 101, et seq. (the "Bankruptcy Code") do not, however, permit the Debtors to obtain

the right to reject the CBAs and modify retiree benefits, so they can hold that right in their back

---

[1]    Appaloosa beneficially owns approximately 9.3% of Delphi's issued and outstanding shares; Wexford beneficially owns approximately 3.2% of Delphi's issued and outstanding shares.

[2]    All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the accompanying Memorandum, as appropriate.

pocket, to be used at some unknown time in the future when the Debtors determine it is necessary.

2.       In seeking the right to reject, but not rejection itself, the Debtors are seeking relief not permitted under section 1113 of the Bankruptcy Code.  In effect, the Debtors are seeking an advisory opinion based on unknowable facts, such as whether the equities will clearly favor rejection at the time the Debtors choose to exercise such right.  Significantly, the Debtors have not identified any prejudice in delaying consideration of this Motion until the time it is ripe, i.e., after negotiations with the Unions have failed.  To the contrary, by stating that they will not reject now even if the Motion is granted, the Debtors effectively admit that they do not need (and are not entitled to) the relief sought at this time.

3.       Additionally, on their face, the Motion and supporting declarations fail to present sufficient evidence to establish a prima facie case favoring rejection of the CBAs and modification of retiree benefits pursuant to sections 1113 and 1114 of the Bankruptcy Code.  The Debtors have yet to engage any of the Unions in a meaningful dialogue concerning a rational and meaningful resolution of labor issues.  Nor, in the absence of a business plan or proposed reorganized capital structure, analysis of alternative approaches, and an opportunity for stakeholders to consider rejection in light of its consequences to the enterprise, can the Debtors meet their statutory burden of showing that (a) their proposals treat all affected parties fairly and equitably and are necessary to permit the reorganization of the Debtors, or (b) the balance of the equities clearly favor rejection.

4.       By rejecting the CBAs and modifying retiree benefits, the Debtors may be locking in claims for other post-employment benefit ("OPEB") liabilities at current out-of-market levels through the potential triggering of the GM Benefit Guarantee (defined below) and

the Delphi Indemnification Agreement (defined below), which obligations would otherwise terminate in late 2007.[3]  The Debtors do not identify any quantifiable benefits to be gained by obtaining the requested relief now, as opposed to merely waiting until the expiration of the CBAs and obtaining the same relief later, without potentially triggering massive, and unquantified, liabilities under its agreements with General Motors Corporation ("GM").  Because of the enormous ramifications that rejection of the CBAs and modification of retiree benefits will have on these Cases (defined below), the relief should be denied at this time so as to permit a real opportunity for all parties in interest to assess and have meaningful input in the resolution of the Debtors' labor issues, whether through negotiation or rejection, in a fashion that will avoid unnecessary dilution of the Debtors' estates with massive claims that may swallow any benefit obtained.

5.      Given the undeniable impact the rejection of the CBAs and modification of retiree benefits will have on the Debtors' workforce, the Debtors' U.S. assets and operations, the value of the Debtors' business and the claims against the Debtors' estates, it is questionable whether this is the type of relief that can be granted without the due process protections of a chapter 11 plan process.  Indeed, in the Motion, the Debtors, even in the absence of a business plan for emergence from chapter 11, have already telegraphed their view of distributions under a chapter 11 plan: (i) shareholders "will likely lose their entire investments;" (ii) holders of $2 billion in Delphi's unsecured securities are projected "to receive between one-quarter to one-half of the face value of their securities under a restructuring plan;" (iii) holders of $412 million in subordinated notes "can reasonably expect to receive, at best, only a minimal percentage of the face value of these notes under a restructuring plan;" and (iv) "unsecured creditors holding non-

---

[3]      In the event GM raises the argument that granting the relief requested by the Motion triggers the GM Benefit Guarantee liabilities and, in turn, creates indemnity claims against the Debtors' estate, the Shareholders reserve all rights to object to the extent, validity and/or allowability of such claims.

priority claims will likely receive less than 100 cents on the dollar." Motion, ¶ 51. Thus, the

rejection of the CBAs at this point, especially in conjunction with the implementation of the

Hourly Attrition Program, may impermissibly effect a creeping reorganization of the Debtors'

estate without undergoing the scrutiny of the chapter 11 plan process.

6.      For all of the foregoing reasons and as set forth in more detail below, the

Debtors' Motion should be denied without prejudice.

## BACKGROUND

7.      On October 8, 2005, the Debtors filed voluntary petitions for relief under

chapter 11 of the Bankruptcy Code, with the United States Bankruptcy Court for the Southern

District of New York (the "Court"), thereby commencing the above-captioned jointly

administered chapter 11 cases (collectively, the "Cases"). The Debtors continue to operate their

business as debtors and debtors-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.

8.      On December 22, 2005, Appaloosa filed its motion pursuant to section

1102(a)(2) of the Bankruptcy Code for an order directing the United States Trustee (the "U.S.

Trustee") to appoint an equity committee in these Cases. By order dated March 30, 2006, the

Court directed the U.S. Trustee to appoint an official committee of equity security holders (the

"Equity Committee"). On March 30, 2006, the U.S. Trustee filed with the Court a letter (the

"Equity Committee Solicitation Letter") that has been distributed to each of Delphi's over

300,000 shareholders to solicit interest in serving on the Equity Committee. The Equity

Committee Solicitation Letter requires that any shareholders expressing interest in serving on the

Equity Committee respond to the U.S. Trustee by no later than April 24, 2006 at 12:00 p.m. The

Shareholders believe it is unlikely that the Equity Committee will be formed and organized before the first week of May.

9.      On March 31, 2006, the Debtors filed the Motion, seeking an order (a) authorizing the Debtors to reject, pursuant to section 1113(c) of the Bankruptcy Code, their CBAs with the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America ("IUE-CWA"), the United Steelworkers of America ("USW"), the International Association of Machinists and Aerospace Workers ("IAM"), the International Brotherhood of Electrical Workers ("IBEW"), and the International Union of Operating Engineers ("IUOE"), and their local affiliates (collectively, the "Unions"), upon ten calendar days' notice to the Court and the Unions and (b) modifying, pursuant to section 1114(g) of the Bankruptcy Code,  the Debtors' obligations to provide medical and life insurance benefits for hourly retirees, whether arising under their CBAs or otherwise, effective October 1, 2006.  For those retirees who are eligible for retiree medical and life insurance under a retirement benefit guarantee negotiated between GM and the UAW, IUE-CWA, and USW in 1999 (the "GM Benefit Guarantee"), the Debtors seek to eliminate Delphi's obligations entirely. Motion, ¶ 3.  For those retirees and future eligible retirees who do not have the benefit of the GM Benefit Guarantee, the Debtors seek to substitute individual retirement medical accounts in lieu of Delphi's existing obligations.  Id.

10.     In the Motion, the Debtors discuss "Competitive Benchmark Proposals" that provide for (a) modification of base hourly wage rates to include separate starting and base wages competitive with average wages in the industry, (b) elimination of cost of living allowances, (c) reduction of overtime and shift premiums, (d) reduction of the number of paid

holidays, (e) reduction of vacation eligibility, (f) modification of profit sharing plans, (g)

modification of health care provisions, (h) modification of life and disability provisions, (i)

elimination of restrictions on Delphi's ability to close, sell, consolidate, or otherwise dispose of

plants, assets and business units, and (j) elimination of the JOBS Bank and other commercially

unsound programs and requirements.  Motion, ¶ 14.  The Competitive Benchmark Proposals

were based on the assumption that GM would not provide financial support to Delphi.

       11.     According to the Motion, on March 24 and 25, 2006, after GM indicated

its commitment to provide support to Delphi, the Debtors provided the Unions with the "GM

Consensual Proposals," which provide for an average base wage of $22 per hour for current

employees (compared to $12.50 in the Competitive Benchmark Proposals) until September 3,

2007.  Motion, ¶ 14.  Thereafter, wages would be reduced to an average base wage of $16.50 per

hour for existing employees who would also receive a $50,000 buydown.  Id.  In addition, the

proposal would provide for a modified dental plan, a defined contribution pension plan, and a

retiree medical plan.  Id.  Collectively, the Competitive Benchmark Proposals and the GM

Consensual Proposals are hereinafter referred to as the "Proposals."

       12.     In support of the Motion, the Debtors submitted eight separate

declarations by various officers and consultants, including:  (i)  John D. Sheehan, Delphi's Vice

President, Chief Restructuring Officer, Chief Accounting Officer and Controller (the "Sheehan

Declaration"); (ii) Kevin M. Butler, Delphi's Vice President, Human Resource Management; (iii)

Darrell Kidd, Delphi's Divisional Director of Labor Relations; (iv) Bernard J. Quick, Delphi's

Director of Labor Relations (the "Quick Declaration"); (v) Steven Gebbia, Delphi's Executive

Director, Benefits & Policy; (vi) Mark R. Weber, Delphi's Executive Vice President, Operations,

Human Resource Management, and Corporate Affairs; (vii) Keith Williams, the enrolled actuary

for the Delphi Hourly-Rate Employees Pension Plan and the Delphi Corporation Retirement

Program for Salaried Employees, who is employed by Watson Wyatt Worldwide; and (viii)

Michael L. Wachter, a professor of law and economics at the University of Pennsylvania.

13.    Contemporaneously with the filing of the Motion, on March 31, 2006, the

Debtors filed with the Court their Motion for Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P.

6006 Authorizing Rejection of Certain Executory Contracts with General Motors Corporation.

14.    On March 31, 2006, Delphi announced a massive proposed restructuring

of its U.S. operations, including the closing of 21 of its 29 U.S. plants.  See Delphi Corp.,

Current Report (Form 8-K) (March 31, 2006).

15.    On April 7, 2006, this Court made a ruling from the bench granting the

Debtors' expedited Motion For Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004

Approving the Debtor's Human Capital Hourly Attrition Programs (the "Hourly Attrition

Programs").  Even though the Hourly Attrition Program was presented to the Court on an

expedited basis, as of the filing of this Objection (2 weeks after the hearing), no order has been

circulated or entered.

16.    Because the Debtors refused to provide discovery under the Federal Rules

of Bankruptcy Procedure to parties unless they have objected to the Motion, on April 17, 2006,

Appaloosa filed its Preliminary Objection to the Motion [Docket No. 3244] (the "Preliminary

Objection").  As set forth in the Preliminary Objection, the Motion fails to identify quantifiable

benefits flowing from the relief requested, especially in light of the fact that rejection of the

CBAs at this time may expose the Delphi estate to potentially massive claims that materially

exceed Delphi's existing liability.

## **OBJECTION**

**I.    DEBTORS ARE NOT ENTITLED TO AN ADVISORY OPINION
ON THEIR ABILITY TO REJECT THE CBAs AND MODIFY THE
RETIREE BENEFITS**

17.    The Debtors are impermissibly seeking an advisory opinion from this Court.  It is hornbook law that the exercise of a federal court's power depends on the existence of a genuine case or controversy and, thus, federal courts lack the power to render advisory opinions.  U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 446, 113 S.Ct. 2173, 2178 (1993); Penguin Books USA Inc. v. Walsh, 929 F.2d 69 (2d Cir. 1991); see also In re Richardson, 97 B.R. 161, 163 (Bankr. W.D.N.Y. 1989) ("In the absence of a genuine purpose for the valuation currently requested, a valuation of the judgment creditors' claims at this time would result in no more than an advisory opinion.").

18.    By their Motion, the Debtors are not asking this Court to reject the CBAs; rather, they are seeking authority to reject the CBAs later—maybe.  See Motion, ¶ 2 (stating that "this Motion is a necessary procedural step to enable action that may become necessary at some point in the future") (emphasis added).

19.    Section 1113 of the Bankruptcy Code does not work that way.  It does not permit a debtor to obtain an order authorizing rejection and then allow the debtor to carry it around in its back pocket until rejection actually becomes necessary—depending on how negotiations later turn out.  Instead, the debtor is required to negotiate to the point where the debtor determines that rejection is appropriate and then seek rejection.  Only after that, based on the facts and circumstances existing at that point in time, should it be determined whether the statutory requirements for rejection have been met.

20.    The Debtors acknowledge, however, that they are not yet there—they still intend to try to achieve a negotiated resolution after the rejection order is obtained.  See Motion,

¶ 4 (stating that "Even if Delphi obtains the order requested in this Motion, . . . Delphi will not immediately impose all of the relief sought.  Instead, Delphi intends to continue working with its Unions to be competitive in the global marketplace, and hopes that the parties can resolve all of their issues consensually.").

21.    Given that it is impossible to know (i) what circumstances will exist at some unknown point in time in the future when the Debtors actually decide to reject the CBAs, or (ii) whether the equities at that time will "clearly favor rejection," the Debtors should be required to come back when they are done negotiating and really need the CBAs rejected and retiree benefits modified.  Only then will the Court be able to make the findings required for rejection and modifications under sections 1113 and 1114 of the Bankruptcy Code, respectively.

22.    Furthermore, the Debtors have not demonstrated any prejudice from delaying the determination of their Motion.  Indeed, to the contrary, by indicating their intent to actually reject later, the Debtors have admitted that they do not actually need the relief now.  It is clear that the only purpose for this Motion is as a negotiating tactic, and the Court should not grant what is in effect an advisory opinion.

## II.    THE DEBTORS HAVE NOT SATISFIED THE REQUIREMENTS OF SECTION 1113 OF THE BANKRUPTCY CODE

### A.    The Standard for Rejecting a Collective Bargaining Agreement

23.    Although rejection of collective bargaining agreements was historically permitted under the lesser "business judgment" standard, pursuant to section 365 of the Bankruptcy Code, Congress recognized, in response to the U.S. Supreme Court's decision in N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 104 S.Ct. 1188 (1984), that rejection of collective bargaining agreements required a heightened standard.  Thus, in 1984 Congress enacted section 1113 of the Bankruptcy Code, which sets forth a series of procedural and

substantive requirements that the debtor-employer must satisfy before rejection will be permitted.

24.     This heightened scrutiny inherent in section 1113 of the Bankruptcy Code is further magnified when the reorganization's primary goal is to transform its labor structure. The Debtors have touted these Cases as labor transformation cases, where rejection of its CBAs and modification of its legacy liabilities were the driving forces that motivated them to seek chapter 11 relief.  Because rejection of the CBAs and modification of the retiree benefits will have wide-ranging outcome-determinative effects going to the heart of the Debtors' reorganization effort, it must be scrutinized at the highest standard available.  See In re Public Service Co. of New Hampshire, 90 B.R. 575, 582 (Bankr. D.N.H. 1988) ("The degree of scrutiny necessarily must be elastic—becoming more strict and searching the nearer the transaction gets to the heart of the reorganization plan process in terms of channeling that process toward any particular option.").

25.     The Motion should be denied because the Debtors have not satisfied the requirements of section 1113 of the Bankruptcy Code.  The Motion's only purported evidentiary support is limited to broad and conclusory statements about the Debtors' ability to meet the statutory requirements and self-serving declarations of Delphi officers and consultants.

### A.    Debtors Fail to Establish The Urgency in Rejecting the CBAs and Modifying the Retiree Benefits

26.     Despite the Debtors' admission that the relief sought is currently unnecessary, they are, nonetheless, rushing the matter to the courthouse.  On March 24 and 25, 2006, a mere week before filing the Motion, the Debtors submitted the GM Consensual Proposals to the Unions.  As a threshold matter, the Debtors have offered no evidence or justification for their subsequent "rush to the courthouse" to seek authority to reject the CBAs

and modify retiree benefits.  Without doubt, the filing of the Motion is nothing more than a

negotiating tactic.  While the Shareholders support bringing the Unions to the negotiating table

in a timely manner, the "drop dead" message contained in the Motion is the wrong approach

given the high stakes involved.

27.     The Debtors rely on In re Century Brass Products, Inc., 55 B.R. 712 (D.

Conn. 1985), rev'd and remanded on other grounds, 795 F.2d 265 (2d Cir.), cert. denied, 479

U.S. 949 (1986), to argue that no particular amount of time need elapse between delivery of the

Proposals to the Unions and the filing of the Motion to reject the CBAs.  Memorandum, at p. 50.

In Century Brass, the court found that the four-day interval between submitting the proposal to

the unions and granting the rejection did not bar rejection because "[t]here is no indication in the

record that the union was prejudiced in any manner by [the] . . . [']rush to the courthouse,'" and

"the union has not established any other bad faith by [the debtor] sufficient to reverse the

decision of the Bankruptcy Court."  55 B.R. at 716.

28.     By contrast, in Wheeling-Pittsburgh Steel Corp. v. United Steelworkers,

791 F.2d 1074 (3d Cir. 1986), the Third Circuit overturned the bankruptcy court's approval of

the debtor's rejection of its collective bargaining agreement where the application was made only

three weeks after submitting the proposal to the debtor's unions.  The court noted that the

bankruptcy court was unduly concerned with haste.  Similarly, in Pub. Serv. Co., the court

refused to approve the transaction to restructure the management and operational control of a

nuclear power plant, questioning the urgency.  90 B.R. at 582.

29.     Indeed, the Debtors have failed to provide any reason for seeking to reject

the CBAs at this point in time.  See In re Jefly, 219 B.R. 88 (Bankr. E.D. Pa. 1998) (court

deferred ruling on debtor's motion in anticipation of additional negotiation between the parties

where expiration of the collective bargaining agreement was imminent).  Unlike the facts in

Century Brass, the parties here will be prejudiced by the expedited time frame imposed by the

Debtors.

30.     The Debtors' timing is even more troubling given the fact that the Equity

Committee has not yet been formed, so the Court does not have any input from a committee

representing Delphi's shareholders, which, according to the Motion, "will likely lose their entire

investment."  The Debtors have stated that resolving their employee and retiree liabilities is the

key to their reorganization.  However, the Debtors are rushing to a conclusion on such issues

without reliable and credible information on how such conclusions will impact the Debtors'

reorganization, and without any input from a shareholder committee that this Court has ordered

be given the opportunity to participate.

31.     At the very least, the Proposals are of sufficient magnitude and import to

the Debtors and their constituents that they should not be considered under a 21-day objection

period and with limited discovery.  Accordingly, it is in the best interests of all parties that the

Motion be denied without prejudice.

## III.     THE DEBTORS HAVE FAILED TO COMPLY
## WITH SECTIONS 1113(b)-(c) OF THE BANKRUPTCY CODE

32.     The Proposals relied upon by the Motion are not qualifying proposals

under section 1113(b) of the Bankruptcy Code, as they do not meet the procedural requirements

set forth therein.  Under section 1113(b) of the Bankruptcy Code, a court may authorize a debtor

to reject its collective bargaining agreements only if, prior thereto, the debtor complies with the

following procedures:

> (A) make a proposal to the authorized representative of the
> employees covered by such agreement, based on the most
> complete and reliable information available at the time of such
> proposal, which provides for those necessary modifications in the

employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtors and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

11 U.S.C. § 1113(b).

33.    Courts in this District routinely examine seven elements to establish whether sections 1113(b)-(c) of the Bankruptcy Code have been satisfied: (a) the debtor made a proposal to modify the collective bargaining agreement based on the most complete and reliable information available at the time of the proposal and provided all relevant information to the union, (b) the proposed modifications were necessary to permit reorganization of the debtor, (c) the proposed modifications assured that all creditors, the debtor, and all other affected parties were treated fairly and equitably, (d) the debtor met at reasonable times with the authorized representative between the time of the proposal and the time of the hearing on the proposal, (e) the debtor conferred with the union in good faith at these meetings in an attempt to reach mutually satisfactory modifications, (f) the union refused to accept the debtor's proposal without good cause, and (g) the balance of the equities clearly favors rejection of the agreement.  In re Carey Transp., Inc., 50 B.R. 203, 207-12 (Bankr. S.D.N.Y. 1985) ("Carey Transp. I."), aff'd sub nom. Truck Drivers Local 807 v. Carey Transp., 816 F.2d 82 (2d Cir. 1987) ("Carey Transp. II.").  It is the Debtors' burden to establish by the preponderance of the evidence that it has satisfied each of the elements under sections 1113(b)-(c) of the Bankruptcy Code.  Carey Transp.

II., 816 F.2d at 89 (requiring the debtors to bear the burden of proving by a preponderance of the evidence each of the seven elements).

34.    The Shareholders recognize that a number of these factors involve matters that are more appropriately handled between the Debtors and the Unions, and thus, do not take a position on them.  Specifically, the Shareholders are not in a position to know whether the Debtors satisfied their burden to: (a) make a proposal based on the most complete and reliable information available and provide all relevant information to the Unions, (e) confer with the Unions in good faith at these meetings in an attempt to reach mutually satisfactory modifications, or (f) prove that the Unions refused to accept the Debtors' Proposals without good cause.

35.    It is clear, however, that the Proposals relied upon for purposes of the Motion are not qualifying proposals under section 1113(b)(1)(A) of the Bankruptcy Code because they are not "necessary" to permit the reorganization of the Debtors and they do not assure that all affected parties are treated fairly and equitably.

### A.    The Debtors Have Not Proven that the Modifications Proposed Are Necessary to Permit the Debtors' Reorganization

36.    The Debtors have not demonstrated (and cannot at this time demonstrate) that their Proposals are necessary to permit reorganization.  While the Shareholders agree that modifications to the Debtors' labor agreements play a necessary—and perhaps decisive—role in Delphi's reorganization, the Debtors have failed to demonstrate that the extent of modifications proposed in the Competitive Benchmark Proposals or the GM Consensual Proposals are "necessary" at this time as contemplated by section 1113(b)(1)(A) of the Bankruptcy Code. Indeed, the Debtors defeat their own purpose by admitting that rejection is actually unnecessary at this time:  "this Motion is a necessary procedural step to enable action that may become necessary at some point in the future."  Motion, ¶ 2 (emphasis added).

37.     To demonstrate necessity at this time, the Debtors must first explain how they intend to reorganize in more than just conclusory fashion; for example, they need to put forth a well-developed business plan, a proposed capital structure, an analysis of the consequences, including valuation analyses, and an assessment of possible alternative approaches.  Importantly, given the expiry of the CBAs in September and October 2007, the Debtors have offered no evidence or analysis to indicate that rejection prior to such expiry is in the best interests of the estate.  Moreover, to establish "necessity," the Debtors' strategy should be properly vetted with all constituencies, who should be afforded a reasonable opportunity to assess the Debtors' strategy against reasonable alternative approaches.  Without such information, it is impossible for the parties or the Court to determine that the Proposals are necessary to the Debtors' reorganization.

**B.     The Debtors Have Not Proven that the Modifications
Proposed Assure that All Affected Parties Are Treated Fairly and Equitably**

38.     In the absence of the foregoing information, the Debtors cannot demonstrate that the Proposals treat all parties "fairly and equitably."  Indeed, a review of the Motion and supporting declarations currently demonstrates that the Proposals fail to even address fair and equitable treatment of all affected parties, as section 1113(b)(1)(A) of the Bankruptcy Code requires.

39.     The Debtors cite <u>Carey Transp. I.</u>, 50 B.R. at 210, for the proposition that for approval of rejection under section 1113 of the Bankruptcy Code, "equivalent sacrifice" does not require that the debtor have already proposed a plan of reorganization or that the debtor be able to identify at the time of the rejection hearing the ultimate sacrifice each constituency may be required to make.  Memorandum, at p. 61.  Nowhere, however, does the court in <u>Carey Transp. I.</u> specifically make or support this statement.

40.    In fact, the court states that, in determining if a debtor's proposal is fair

and equitable to all parties, courts consider "'whether all of the 'affected parties' [are]

shouldering a [*proportionate*] burden of the debtor's cost-cutting efforts.'"  <u>Carey Transp. I.</u>, 50

B.R. at 210 (quoting <u>In re Salt Creek Freightways</u>, 47 B.R. 835, 839 (Bankr. D. Wyo.

1985)(italics in original)).  It is impossible to gauge at this time, however, whether the Proposals

are fair and equitable to all parties.  As at least one court has noted, it is

> impossible to gauge whether the debtor in possession's proposed
> modification 'assures that all creditors, the debtor and all of the
> affected parties are treated fairly and equitably.'  The court . . . has
> been told little concerning what the debtor proposes to pay other
> creditors.  Without knowing how other creditors . . . are to be
> treated by the debtor, the court simply cannot make a
> determination regarding fair and equitable treatment.

<u>In re Speco Corp.</u>, 195 B.R. 674, 679 (Bankr. S.D. Ohio 1996) (citation omitted).  In <u>Speco</u>, the

court determined under section 1114 of the Bankruptcy Code, which applies an almost identical

analysis as that under section 1113 of the Bankruptcy Code, that the debtor was not entitled to

terminate retiree benefits because, without knowing the debtor's future plans, it was impossible

for the court to find that the proposed termination of benefits was either necessary or fair and

equitable to all parties.  <u>Id.</u>

41.    Although the Debtors purport to have determined that equity is out of the

money and unsecured creditors will receive only a fraction of their claims, it cannot be

determined at this early juncture whether all parties are shouldering a proportionate burden of the

Debtors' cost-cutting efforts.  This is especially true given that the amount and validity of the

claims GM may hold, or become entitled to assert, against the Debtors as a result of these "cost-

cutting" efforts has not been determined.  Nor have the Debtors performed an analysis

identifying the amount of claims they expect GM to assert.

42.    Simply put, without this information or any idea of how the Debtors intend to treat other creditors, it would be impossible to gauge whether all creditors, the debtors and all affected parties are being treated fairly and equitably.  Thus, the Debtors' Motion is premature.

43.    Furthermore, even in the event Carey Transp. I. could be interpreted to support the assertion that "equivalent sacrifice" can be determined prior to the proposal of a plan of reorganization or formulation of a business plan, the facts of Carey Transp. I. are easily distinguishable from the present matter.  Carey Transp. I. was a single-debtor case involving a local New York bus service with collective bargaining agreements covering only approximately 115 employees.  See 50 B.R. at 204.  Carey Transp. I. also considered proposals that discussed amounts at stake in terms of thousands of dollars.  In stark contrast, however, the case at bar involves over 40 debtors, with numerous international affiliates, CBAs with numerous Unions covering over 33,000 employees, and amounts at stake discussed in terms of billions of dollars. The present Cases are far too complex and still in their early stages to be deciding such critical issues without a substantially more informed understanding of the impact these issues will have on these Cases as a whole.

44.    The Debtors also rely on the Sheehan Declaration to show that the Proposals are fair and equitable.  Memorandum, at pp. 62-64.  The Sheehan Declaration does not support this proposition. The Debtors "expect" that they are "hopelessly insolvent," and that "shareholders will not receive any property on account of their existing equity interests under a restructuring plan."  Sheehan Dec., ¶ 94.  The Debtors believe "in all likelihood" that bondholders "will receive only a percentage of their face value under a restructuring plan."  Id., ¶ 96.  Again, because the Debtors allege they are "hopelessly insolvent," the subordinated

noteholders also "will receive, at best, only a minimal percentage of their face value under a restructuring plan." Id., ¶ 97. Other unsecured creditors "will likely receive less than 100 cents on the dollar." Id., ¶ 101. Suppliers are making "concessions" as well. Id., ¶ 99. Notably, the Debtors provide no basis for such assertion. However, given the Debtors' unsubstantiated expectation regarding the distribution to be recovered by its creditors, the Debtors cannot seriously argue the Proposals are fair and equitable to all stakeholders.

**C.     The Debtors Have Not Proven that They Met
         With the Unions After Submitting the Proposals**

45.     The Debtors fail to offer any proof whatsoever in support of their contention that they have met the requirements of section 1113(b)(2) of the Bankruptcy Code. Section 1113(b)(2) requires:

> (2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

11 U.S.C. § 1113(b)(2) (emphasis added).

46.     Despite the statute's unambiguous requirement that a meeting "shall" occur, the Debtors, nevertheless, contend that their mere "willingness" to meet with the Unions in these Cases is sufficient to satisfy this requirement. Memorandum, at p. 71. However, the word "shall" makes clear the Debtors must meet with the Unions before seeking rejection. See Lamie v. U.S. Trustee, 540 U.S. 526, 534, 124 S. Ct. 1023, 1030 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'") (citations omitted).

47.    Notably, although Bernard J. Quick is employed by Delphi as a Director
of Labor Relations and negotiates and oversees negotiation of Delphi's various national and local
agreements, the Quick Declaration offers <u>no</u> evidence that Delphi met with authorized
representatives of any of its Unions, or tried to negotiate in good faith to reach mutually
satisfying modifications.[4]

48.    Indeed, upon information and belief, GM, and not the Debtors, has been
conducting the labor negotiations.  This disqualifies the Proposals for at least two reasons: (i)
GM is in no position to make the determinations required by the statute and (ii) GM is not among
the parties permitted by the statute to make such proposal.  As such, by definition, the Proposals
cannot be qualifying proposals under section 1113(b)(1)(A) of the Bankruptcy Code.

**D.    The Debtors Have Not Proven that the
Balance of the Equities Clearly Favors Rejection of the Agreements**

49.    Based on all the foregoing issues and shortcomings, it is impossible for
the Court to determine that the balance of the equities clearly favors rejection as required by
section 1113(c)(3) of the Bankruptcy Code.  The Debtors, nonetheless, argue the opposite,
offering nothing more than a number of self-serving assumptions in support of their claim.

50.    Given the complexities of these Cases, which have been pending for a
little over five months, it is premature to make a fact-intensive balancing of the equities
determination absent a thorough vetting of a business plan and consultation with the Debtors'
various stakeholders.  While it is clear that Delphi eventually must modify its labor agreements,
it is not clear that rejection <u>at this time</u> is the most efficient method to reach that goal.  It is clear,
however, that the rejection of the CBAs at this time may trigger liability to GM under the GM
Benefit Guarantee, thus exposing the Delphi estate to potentially massive claims (<u>i.e.</u>, billions of

---

[4]    The Shareholders do agree that if the passage of time proves that the Unions are unreasonably stonewalling,
then the Debtors may be entitled to rely on the lesser standard advocated in their papers.

dollars of claims) by GM under the Delphi Indemnity Agreement and the Employee Matters

Agreement, which are based on the Debtors' current out-of-market retiree benefits and which

would otherwise expire in September and October 2007.

51.     Given the potentially devastating effect such GM claims, if allowed, could

have on creditor and shareholder recoveries, this relief should not be granted unless and until it is

truly necessary and other reasonable alternative resolutions have been fully vetted and

determined to be less desirable.

**IV.     THE DEBTORS HAVE NOT SATISFIED THE REQUIREMENTS OF
SECTION 1114 OF THE BANKRUPTCY CODE**

52.     In addition to seeking authorization to reject labor agreements, the Debtors

also seek authority to modify – in fact, eliminate – Delphi's obligations to provide hourly retiree

welfare benefits.  In support of the latter request, the Debtors argue that (a) Delphi has satisfied

the procedural requirements of section 1114(f) of the Bankruptcy Code, (b) authorized

representatives have failed to accept the proposed modifications to the labor agreements without

good cause, and (c) the balance of equities "clearly" favors modifications to retiree benefits.

Memorandum, at pp. 79-81.

**A.     The Debtors Fail to Comply with the Requirements of Section 1114
as They *Mirror* Those of Section 1113**

53.     The Debtors conclude that "in the same fashion as it complied with section

1113(b) of the Bankruptcy Code, Delphi has satisfied the procedural requirements under Section

1114(f)."  Memorandum, at p. 80.  Likewise, the Shareholders reiterate and incorporate their

objections to each of the arguments raised by the Debtors with respect to their purported

satisfaction of each of the elements of section 1113(b) of the Bankruptcy Code.

54.     The Proposals relied upon by the Motion are not qualifying proposals

under section 1114(f)(1)(A) of the Bankruptcy Code.  <u>See</u> 11 U.S.C. § 1114(f)(1)(A) (a

qualifying proposal "provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all [parties] are treated fairly and equitably"). The Debtors have not demonstrated (and cannot at this time demonstrate) that their Proposals are necessary to permit reorganization. As noted, the Debtors must first explain how they intend to reorganize in more than just conclusory fashion (i.e., they need to put forth a well-developed business plan, a proposed capital structure and some analysis of the consequences, including valuation), and then present alternative approaches to demonstrate that their labor proposal is "necessary" to their reorganization; the Debtors' strategy also must be properly vetted (i.e., the constituencies must be afforded a reasonable opportunity to assess the Debtors' strategy against reasonable alternative approaches). Without such information, it is impossible for the parties or the Court to determine that the proposal is necessary to the Debtors' reorganization. Furthermore, in the absence of the foregoing information and procedural protections, the Debtors also cannot demonstrate that the Proposals treat all parties "fairly and equitably." See In re Speco Corp., 195 B.R. 674, 679 (Bankr. S.D. Ohio 1996).

55.    The Proposals relied upon by the Motion also do not qualify under section 1114(f)(2) of the Bankruptcy Code. See 11 U.S.C. § 1114(f)(2) (requiring that "the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits" (emphasis added)). It bears repeating that, upon information and belief, GM (not the Debtors) has been conducting the labor negotiations. As such, by definition, the Proposals cannot be qualifying proposals under section 1114(f)(2) of the Bankruptcy Code, which requires the Debtors specifically, in their role as trustee, to meet with the authorized representative. See id. GM is in no position to make the

determinations required by the statute, and is not among the parties permitted by the statute either to make or negotiate the proposal.  See 11 U.S.C. § 1114(f)(1)(A), (2).

56.    Based on all the Motion's infirmities, it is impossible for the Court to determine that the balance of the equities clearly favors modification as required by section 1114(g)(3) of the Bankruptcy Code.  This is clearly not a determination that contemplates deferral to the Debtors' business judgment.

**B.    Debtors Fail to Comply with the Requirements of Section 1114
as They _Differ from_ Those of Section 1113**

57.    The Debtors have failed to address certain key differences between sections 1114 and 1113 of the Bankruptcy Code.  For example, "unlike Section 1113, Section 1114 does expressly address the availability of a damage claim following modification, by providing that under section 502(b)(7) of the Bankruptcy Code, the one-year limitation on a claim for damages arising from the rejection of an employment contract does not apply to retiree benefits."  Memorandum, at p. 82; 11 U.S.C. §§ 502(b)(7), 1114(j).

58.    Significantly, the Debtors have not quantified such potential damage claims at all, let alone how they compare to the OPEB payments the Debtors have left to make before the benefits expire under the current CBAs.  The Debtors estimate their future OPEB obligations, but they do so through 2010.  See Memorandum, at p. 81.  The Debtors' OPEB obligations, however, are set to expire in 2007; the Debtors, therefore, should quantify the forecasted OPEB payments that are truly for "obligations," and compare those against the potential damage claims.  See Sheehan Dec., ¶ 53 (further exemplifying the Debtors' lack of disclosure regarding the quantification of OPEB obligations:  "The difference between the two ranges of OPEB expense and cost projections are not material to the Motion because, even at the low end, the projected OPEB costs and expenses are simply unaffordable and must be eliminated

under Delphi's 'Competitive Benchmark Scenario.'").  Without such quantification, the Debtors

cannot be said to have based their Proposals on complete information or that such Proposals are

fair and equitable to all affected parties.

59.    Simply put, the Debtors fail to identify any quantifiable benefit to

modification of the retiree benefits now, considering that to do so would likely lock in GM

claims for lifetime OPEB expenses at a rate that everyone agrees will decrease or be eliminated

if Delphi simply were to wait until the expiration of the CBAs.

60.    The Debtors' assertion that "damages are expected to be lessened due to

the GM Benefit Guarantee, which is intended to insure those benefits for most Union-represented

employees" is incorrect.  Memorandum, at p. 82.  Rather than providing relief, such statement

highlights the possibility that Delphi may face greater OPEB-related claims by GM than it

currently would owe directly to retirees.  Modification of retiree benefits at this time would

appear to trigger GM's liability under the GM Benefit Guarantee, thus, potentially exposing the

Delphi estate to billions of dollars of claims by GM based on the Debtors' current out-of-market

OPEB.

61.    Just as the Debtors should not be authorized to reject the CBAs at this

time, the Debtors should also not be authorized to modify the retiree benefits at this time.  They

have not satisfied their burden of proving that modification of retiree benefits under section 1114

of the Bankruptcy Code is appropriate.

## V.    THE REJECTION OF THE CBAs AND THE MODIFICATION OF THE HEALTH AND LIFE INSURANCE BENEFITS FOR HOURLY RETIREES SHOULD BE CONSIDERED IN THE PLAN CONFIRMATION PROCESS

62.    In essence, the relief sought by the Motion, combined with the authority

granted to implement the Hourly Attrition Programs, will have such an enormous impact on the

outcome of the Cases as to constitute a creeping reorganization of the Debtors, which should be

rejected as an impermissible sub rosa plan.   In considering whether a transaction amounts to a

sub rosa plan, the bankruptcy court should ask "whether the proposed transaction might

improperly and indirectly lock the estate into any particular plan mode prematurely, and without

the protection afforded by the procedures surrounding a disclosure statement and confirmation

hearing, in a plan of reorganization."  Pub. Serv. Co., 90 B.R. at 581; see also, Pension Benefit

Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir.

1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements

of Chapter 11 for confirmation of a reorganization plan by establishing the terms of [a] plan *sub*

*rosa*…").  Indeed, the more central an issue is to the reorganization of the debtor, the more

protections should be in place to assure appropriate scrutiny of it.  See Public. Serv. Co., 90 B.R.

at 582 ("The degree of scrutiny necessarily must be elastic—becoming more strict and searching

the nearer the transaction gets to the heart of the reorganization plan process in terms of

channeling that process toward any particular plan option.").

        63.    In Braniff, the Fifth Circuit held that a transaction approved by the lower

court was too significant to be approved under section 363 of the Bankruptcy Code, and

effectively constituted a sub rosa plan.  See 700 F.2d at 940.  The primary aspects of the suspect

transaction that the Fifth Circuit analyzed in Braniff were: (i) the transaction "had the practical

effect of dictating some of the terms of any future reorganization plan," id.; (ii) the transaction

had the effect of thwarting "the Code's carefully crafted scheme for creditor enfranchisement

where plans of reorganization are concerned," id.; and (iii) the transaction provided for the

release of claims by all parties against Braniff, its secured creditors and its officers and directors.

Id.  Based upon the foregoing, the Fifth Circuit held:

> In any future attempts to specify the terms whereby a
> reorganization plan is to be adopted, the parties and the district

> court must scale the hurdles erected in Chapter 11.  See e.g. 11
> U.S.C. § 1125 (disclosure requirements); id. § 1126 (voting); id. §
> 1129(a)(7) (best interest of creditors test); id. § 1129(b)(2)(B)
> (absolute priority rule).

Id.; see also In re CGE Shattuck, LLC, 254 B.R. 5, 12 (Bankr. D.N.H. 2000) (refusing to approve

requested disclosure which was being offered "as a proxy for a competing plan of reorganization

without the need to comply with the requirements of Chapter 11").

        64.     The salient factors that existed in Braniff exist here.  If the relief requested

in the Motion is granted, it will likely have the practical effect of dictating substantially all of the

terms of any future reorganization plan by the creation of potentially billions of dollars of claims

against the Debtors' estate.  Indeed, in the Motion, the Debtors have already outlined anticipated

distributions under a chapter 11 plan:  (i) shareholders "will likely lose their entire investments;"

(ii) holders of $2 billion in Delphi's unsecured securities are projected "to receive between one-

quarter to one-half of the face value of their securities under a restructuring plan;" (iii) holders of

$412 million in subordinated notes "can reasonably expect to receive, at best, only a minimal

percentage of the face value of these notes under a restructuring plan;" and (iv) "unsecured

creditors holding non-priority claims will likely receive less than 100 cents on the dollar."

Motion, ¶ 51.

        65.     Given the tremendous impact the relief requested may have on

distributions in these Cases, proceeding by motion as a contested matter effectively

disenfranchises the Debtors' stakeholders.  Business decisions that are integral to the future

operations of the Debtors and stakeholder recoveries should not be blessed in the context of a

contested matter, but rather as part of a plan of reorganization that is properly proposed and

accompanied by an approved disclosure statement.  See Pub. Serv. Co., 90 B.R. at 581.  It is only

in that context that stakeholders can make a truly informed decision as to whether or not the

26

transaction should be approved.  In stark contrast, the Debtors are effectively restructuring their business by means of a single contested matter before the Court-ordered Equity Committee can meaningfully participate.

66.    The Court should not permit the Debtors at this time to dictate plan recoveries without requiring the Debtors to provide adequate information (which would be required under section 1125 of the Bankruptcy Code in the context of a reorganization plan) regarding the likely outcome of the Debtors' rejection of the CBAs and modification of retiree benefits, and the concomitant impact on all stakeholders.  It is simply too premature to grant the relief requested under the circumstances without adequate information for stakeholders to evaluate the impact of the proposed transaction.

67.    In addition, while the claims that may arise through rejection of the CBAs or modification of retiree benefits could significantly diminish stakeholder recoveries, the Motion lacks any meaningful disclosure or quantification of any rejection damage claims, including those related claims that could be asserted by GM under the GM Benefit Guarantee. Because the Motion may subject the Debtors to massive claims that they would not otherwise incur and which ultimately may dictate recoveries, it is more appropriately treated as part of a plan confirmation process and should be denied.

68.    Finally, it is worth noting that, notwithstanding the centrality of this Motion to the Cases, in response to discovery requests, Debtors have taken the position (just mere hours before objections were to be filed) that "only parties to the collective bargaining agreement, and guarantors under the agreement, may participate" in the hearing on this Motion and that "Debtors do not believe that Appaloosa has standing to object." See e-mail from Jack Butler, Jr. to Douglas Baumstein, dated April 19, 2006, a copy of which is annexed hereto as

Exhibit A.  Thus, the Debtors are attempting to stifle all inquiry into the central issue in these

Cases. The prejudice to the Shareholders resulting from Debtors' position and the likely resulting

delay in discovery mandates denial of the Motion at this time.

### CONCLUSION

For the reasons set forth herein and in the Preliminary Objection, the Shareholders

respectfully request that the Motion be denied without prejudice.

Dated:    April 21, 2006
          Miami, Florida

                                    WHITE & CASE LLP
                                    Glenn M. Kurtz (GK-6272)
                                    Gerard Uzzi (GU-2297)
                                    Douglas P. Baumstein (DB-1948)
                                    1155 Avenue of the Americas
                                    New York, New York 10036-2787
                                    (212) 819-8200

                                    Thomas E Lauria (Admitted *Pro Hac Vice*)
                                    Frank L. Eaton (FE-1522)
                                    Ileana A. Cruz
                                    Wachovia Financial Center
                                    200 South Biscayne Boulevard
                                    Miami, Florida 33131
                                    (305) 371-2700

                                    By:   /s/  Frank L. Eaton
                                          Frank L. Eaton

                                    COUNSEL TO APPALOOSA
                                    MANAGEMENT L.P. AND WEXFORD
                                    CAPITAL LLC