**Hearing Date and Time: May 12, 2006 at 10:00 a.m.**
**Objection Deadline: May 5, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

MOTION FOR ORDER UNDER FED. R. BANKR. P. 9019 AUTHORIZING
AND APPROVING STIPULATIONS AND SETTLEMENT AGREEMENTS
WITH CERTAIN DEFENDANTS IN IN RE ELECTRICAL CARBON
PRODUCTS ANTITRUST LITIGATION, MDL 1514

("ELECTRICAL CARBON SETTLEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion (the "Motion") For Order Under Fed. R. Bankr. P. 9019 Authorizing And Approving Stipulations And Settlement Agreements With Certain Defendants In <u>In re Electrical Carbon Products Antitrust Litigation</u>, MDL 1514. In particular, the Motion seeks the authority and approval for entering into settlement agreements with three sets of defendants: (a) The Morgan Crucible Company plc, Morganite Industries, Inc., Morganite, Inc., Morgan Advanced Materials and Technology, Inc., Morganite Electrical Carbon Ltd., and National Electrical Carbon Products, Inc. (collectively, the "Morgan Defendants"), (b) Ludwig Schunk Stiftung e.V., Schunk GmBH, Schunk Kohlenstoff-Technik GmbH, Schunk of North America, Inc., Schunk Graphite Technology LLC, Hoffmann & Co. Elektrokohle AG, and Hoffmann Carbon, Inc. (collectively, the "Schunk Defendants"), and (c) SGL Carbon AG and SGL Carbon, LLC (together, the "SGL Defendants," and together with the Morgan Defendants and the Schunk Defendants, the "Settling Defendants"). In support of this Motion, the Debtors respectfully represent as follows:

Background

A.  <u>The Chapter 11 Filings</u>

1.  On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2. On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in the Debtors' cases.

3. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicate for the relief requested herein is Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B. Current Business Operations Of The Debtors

5. Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

7. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C. Events Leading To The Chapter 11 Filing

8. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9. The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

---

[2] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11. On March 31, 2006, the Company outlined the key tenets of its transformation plan. The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007. To complete their restructuring process, the Debtors must focus on five key areas. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint. Finally, the Debtors must devise a workable solution to their current pension situation.

12. In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM. Throughout those

5

discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-represented employees.  This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

    13. These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors also moved to reject unprofitable supply contracts with GM.[4]  Among the reasons for the GM contract rejection motion was the Debtors' belief that GM must cover a greater portion of the costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This initial motion covers approximately half of the Debtors' North American annual purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the

---

[3] Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035)

[4] Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033)

6

filing of these motions was a necessary procedural step, the Debtors remain focused on reaching a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is necessary.

14.  To implement the third element of the Debtors' transformation plan, the Company announced plans to focus its product portfolio on those core technologies for which the Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth. To that end, the Company will concentrate the organization around the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.  In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings. The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines. The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

---

[5] The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses. Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

7

16.     As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities. The Company believes that once its SG&A plan is fully implemented, the Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17.     As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation. The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce. To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007. Despite the freeze, because of the size of the funding deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding contributions over a long-term period. The Company intends to replace the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

19.    By this Motion, the Debtors seek entry of an order under Bankruptcy Rule 9019 authorizing and approving various separate stipulations and settlement agreements with the Settling Defendants.

Basis For Relief

A.    Background To The Proposed Stipulations And Settlement Agreements

20.    On November 4, 2002, the U.S. Department of Justice filed Informations[6] against The Morgan Crucible Company plc ("Morgan Crucible") and its United States affiliate, Morganite, Inc., in the U.S. District Court for the Eastern District of Pennsylvania alleging illegal behavior in furtherance of a global conspiracy to suppress and eliminate competition by fixing the prices of Electrical Carbon Products.[7]  Both companies pled guilty to the charges and paid fines of $1 million and $10 million, respectively.  Four Morgan executives – Ian P. Norris, Robin D. Emerson, Jacobus Johan Anton Kroef, and F. Scott Brown (collectively, the "Individual Defendants") – were also charged in connection with their role in the conspiracy. With the exception of Mr. Norris, who currently faces extradition from the United Kingdom, each of the Individual Defendants pled guilty, paid a fine, and served time in federal prison.

---

[6]    An "information," as defined in Fed. R. Crim. Proc. 7, is a criminal charging document.

[7]    "Electrical Carbon Products" includes, but is not limited to, carbon brushes, commutators, brush holders, and current collectors used in the manufacture of direct current electric motors, automotive applications, and other transit applications as well as consumer products; mechanical carbon products used in pump and compressor industries; and the blocks of carbon from which these products are made.  Carbon brushes are used to transfer electrical current in direct current motors by acting as the rubbing contacts for electrical connectors in motors. Direct current motors are used in a variety of products including computers, consumer products, automobiles, battery operated electric vehicles, and public transit vehicles.  Carbon collectors are used to transfer electrical current from wires or rails for use in transit vehicles that are not independently powered.  Mechanical carbon products are sold primarily to pump seal manufacturers and are used in fluid handling markets for containing liquids in wear situations.  The types of electrical and mechanical carbon products at issue include, but are not limited to, carbon current collectors, carbon brushes sold to original equipment manufacturers for automotive applications, traction transit carbon brushes, industrial carbon brushes for use in battery operated vehicles, carbon brushes sold to original equipment manufacturers for use in consumer products and industrial applications, and mechanical carbon products for use in pump and compressor industries.

Subsequently, on December 3, 2003, the European Commission adopted a decision and assessed fines totaling €101,440,000 against the Settling Defendants and others for their participation in the international Electrical Carbon Products price-fixing conspiracy. Finally, on July 16, 2004, Morgan Crucible and its Canadian affiliate, Morganite Canada Corporation, pled guilty and paid fines of Cdn $550,000 and Cdn $450,000, respectively, for their roles in implementing the Electrical Carbon Products price-fixing conspiracy in Canada.

21. Following announcement of the Electrical Carbon Products price-fixing investigations in the United States, the European Union, and Canada, a number of private antitrust class actions were filed in courts throughout the United States against the Settling Defendants; Le Carbone Lorraine S.A., Carbone Lorraine North America Corporation, and Carbone of America Industries Corporation (collectively, the "Carbone Defendants"); and C. Conradty Nuernberg GmbH ("Conradty," and together with the Settling Defendants and the Carbone Defendants, the "MDL Defendants"). The Debtors were not plaintiffs in any of these actions. Certain of these actions – the federal direct purchaser actions – were ultimately consolidated before the Honorable Jerome B. Simandle of the U.S. District Court for the District of New Jersey (the "MDL Court") in <u>In re Electrical Carbon Products Antitrust Litigation</u>, MDL No. 1514, Master Docket No. 03-CV-2182 (JBS) (the "MDL Proceeding").

22. Between August 11, 2004 and February 25, 2005, the class plaintiffs in the MDL Proceeding entered into settlement agreements with each of the MDL Defendants (the "MDL Settlements"). On May 11, 2005, the MDL Court entered an Order Granting Preliminary Approval of Proposed Settlements Between Class Plaintiffs and Settling Defendants. Shortly thereafter, notice of the MDL Settlements was forwarded to all class members. Delphi was a member of the settlement class.

10

23. On August 19, 2005, Delphi and thirteen other similarly situated companies (collectively, the "Plaintiffs"), believing that they might be able to obtain a greater recovery than as a member of the class by filing a separate lawsuit, requested exclusion from the settlement class in the MDL Proceeding. On September 23, 2005, the Plaintiffs, including Delphi, filed a complaint (the "Complaint") against the MDL Defendants thereby initiating an action in the U.S. District Court for the Eastern District of Michigan, Case No. 05-CV-73655 (the "Action"). The Complaint alleges that, during the time period of October 1988 through September 2001, the MDL Defendants engaged in a worldwide conspiracy, the purpose and effect of which was to fix, raise, maintain, and/or stabilize prices and to allocate markets and customers for Electrical Carbon Products sold in the United States, Europe, and elsewhere, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Sections 445.772 and 445.778 of the Michigan Antitrust Reform Act. Subsequently, on December 6, 2005, the Action was transferred to the MDL Court and consolidated in the MDL Proceeding.

24. Prior to the filing of the Action, Delphi settled and released its claims against the Morgan Defendants. Moreover, unlike the other Plaintiffs, Delphi elected not to bring suit against the Schunk Defendants. Thus, of the Settling Defendants, only the SGL Defendants were named as defendants by Delphi in the Action. Delphi did not make any purchases of Electrical Carbon Products from the SGL Defendants, but brought the action against the SGL Defendants on the basis of joint and several liability.

25. Shortly after the Action was transferred to the MDL Court, the Plaintiffs agreed to a request from the parties in the MDL Proceeding to participate in settlement negotiations with the MDL Defendants. After months of extensive arms' length negotiations under court supervision, the Plaintiffs entered into separate stipulations and settlement

11

agreements with each of the Settling Defendants. No such agreement was reached with the Carbone Defendants and Plaintiffs intend to pursue their claims against the Carbone Defendants.

B.  The Proposed Stipulations And Settlement Agreements

26.  The Plaintiffs entered into a stipulation and settlement agreement with the Morgan Defendants on February 11, 2006 (the "Morgan Settlement,"); with the Schunk Defendants on February 28, 2006 (the "Schunk Settlement"); and with the SGL Defendants on March 10, 2006 (the "SGL Settlement," and together with the Morgan Settlement and the Schunk Settlement, the "Settlements").

27.  In general, the Settlements provide that the Plaintiffs will: (a) dismiss the Action against the Settling Defendants and the Individual Defendants with prejudice and without costs, (b) withdraw their requests to exclude themselves from the Morgan, Schunk, and SGL MDL Settlements, and (c) release and discharge the Settling Defendants from all non-Foreign Claims arising from the Electrical Carbon Products price-fixing conspiracy.[8] In return, the Schunk Defendants have agreed to pay the Plaintiffs an additional aggregate sum; the Schunk and SGL Defendants have agreed to cooperate with the Plaintiffs in prosecuting the Action against the Carbone Defendants; and the Morgan and Schunk Defendants have agreed to toll, for a period of twelve months, the relevant statutes of limitation relating to the Plaintiffs' Foreign Claims. Additionally, as an inducement to Delphi and the other Plaintiffs to rejoin some of the

---

[8] The Morgan Settlement defines "Foreign Claims" as "claims (i) based on allegations of an agreement among competitors with respect to the prices charged for Electrical Carbon Products manufactured and sold to the Plaintiffs by the Morgan Defendants outside of the United States of America during the period between October of 1988 and December of 1999; (ii) arising and asserted exclusively under the laws of jurisdiction(s) located outside of the territorial boundaries of the United States of America; and (iii) asserted exclusively in the courts of such non-U.S. jurisdictions(s)." The Schunk Settlement defines "Foreign Claims" as "any claim that relates to any purchase of Electrical Carbon Products by the Releasing Parties from any of the Released Parties, from a facility located outside of North America and the end delivery of which occurred outside of North America." The SGL Settlement defines "Foreign Claims" as "any claim that relates to any purchase of Electrical Carbon Products by the Releasing Parties from any of the Released Parties, from a facility located outside of the United States and the end delivery of which occurred outside of the United States."

12

class settlements, class counsel in the MDL Proceeding agreed to reduce their requested fees from the settlement funds by approximately $900,000.

28.     The Debtors' anticipated recovery from the Settlements will likely exceed $1.1 million.[9]  Prior to filing the Action, the Debtors' last settlement demand to the Schunk Defendants was valued at approximately $380,000.  Thus, the Debtors' anticipated recovery as a result of the Settlements is nearly three times their last settlement demand.  Moreover, the Debtors made no purchases from the SGL Defendants, but will share in the SGL Settlement.

Applicable Authority

29.     By this Motion, the Debtors respectfully request the entry of an order under Rule 9019(a) of the Bankruptcy Rules approving the Stipulations and Settlement Agreements.  Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Bankruptcy Rule 9019(a).  Settlements and compromises are "a normal part of the process of reorganization."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Communications Corp., 327 B.R. 143, 159 (decision to accept or reject a settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

30.     Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of a debtor's estate.  See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia, 327 B.R. at 159 ("The settlement need not be

---

[9]  This amount is based on counsel's best estimate of Delphi's anticipated recovery and does not include costs or attorneys' fees.  The actual amount of Delphi's recovery will not be finalized until all claims are processed by the claims administrator.

13

the best that the debtor could have obtained. Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it."). In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

    31.  The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate: (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

    32.  Courts in this district have further elaborated on these factors to consider: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the proportion of the class members who do not object or who affirmatively support the proposed settlement, (d) the competency and experience of counsel who support the settlement, (e) the relative benefits to be received by individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the directors and officers as a result of the settlement, and (g) the extent to which the settlement

14

truly the product of arms-length bargaining, and not of fraud or collusion. <u>Adelphia</u>, 327 B.R. at 159-60; <u>accord</u> <u>In re Texaco Inc.</u>, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

33.     The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances. <u>See</u> <u>Adelphia</u>, 327 B.R. at 159-60; <u>see also</u> <u>Penn Centr.</u>, 596 F.2d at 1114. Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," <u>In re Lee Way Holding Co.</u>, 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'" <u>In re Telesphere Communications, Inc.</u>, 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citation omitted). To that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'" <u>Adelphia</u>, 327 B.R. at 159 (quoting <u>W.T. Grant Co.</u>, 699 F.2d at 608); <u>accord</u> <u>Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)</u>, 156 B.R. 414, 426 (S.D.N.Y. 1993), <u>aff'd sub nom.</u> <u>Sobchack v. Am. Nat'l Bank & Trust Co.</u>, 17 F.3d 600 (2d Cir. 1994).

34.     Antitrust litigation, like the Action, frequently involves "voluminous documentary and testimonial evidence, extensive discovery, complicated legal, factual, and technical (particularly economic) questions, numerous parties and attorneys, and substantial sums of money." <u>Manual for Complex Litigation</u> (Fourth) § 30 (2004); <u>see also</u> <u>In re Shopping Carts Antitrust Litigation</u>, MDL No. 451, 1983 WL 1950, at *7 (S.D.N.Y. 1983) ("antitrust price fixing actions are generally complex, expensive and lengthy") (citing <u>City of Detroit v. Grinnell Corp.</u>, 495 F. 2d 448, 467-68 (2d Cir. 1974)). The Electrical Carbon Products antitrust litigation, which involves allegations of a decade-long international price-fixing conspiracy, is even more complex than typical antitrust litigation. In the MDL Proceeding, several foreign defendants

15

raised subject matter jurisdiction challenges that have not finally been resolved. The MDL Defendants also raised a statute of limitations defense for a portion of the damages period. Although the MDL Court denied these challenges, it held that fraudulent concealment remains an element that must be proven at trial to finally defeat the statute of limitations defense. The Settling Defendants would likely also challenge federal antitrust jurisdiction over certain of the foreign purchases made by Delphi and the other Plaintiffs. Other contentious issues in the Action would likely include market definition, the Plaintiffs' theory on liability, and the Plaintiffs' ability to prove damages.

35. The Settlements will provide the Debtors with a substantial recovery for a portion of their claims and will decrease the complexity, length, and cost of the continuing litigation relating to the Electrical Carbon Products price-fixing conspiracy, while at the same time increasing the Debtors' probability of success against the non-settling Carbone Defendants in such litigation. First, as a result of the Settlements, the Debtors will only have to litigate against the Carbone Defendants in federal court, rather than conduct a multiple-front litigation against all of the MDL Defendants. Second, the Settlements require the Schunk and SGL Defendants to take affirmative steps to assist the Debtors in their suit against the Carbone Defendants. In addition, the Debtors, benefiting from arguments and theories bolstered by evidence and expertise provided by the Schunk and SGL Defendants, will be able to focus their attention on rebutting the defenses asserted by the Carbon Defendants and on proving the Debtors' claims against the Carbone Defendants.

36. Absent the Settlement, the Debtors would likely face a number of difficulties with collection if the litigation moved forward against the Settling Defendants. As explained above, the Debtors previously released their claims against the Morgan Defendants and elected not to sue the Schunk Defendants. In any event, the Debtors would be prevented

16

from seeking treble damages or joint and several liability against the Schunk Defendants because the Schunk Defendants received amnesty from the Department of Justice. Moreover, as is discussed above, the foreign parents of the Settling Defendants will likely resist jurisdiction in the courts of the United States and challenge collection efforts. Any one of these factors could jeopardize the Debtors' ability to recover their damages.

        37.      The creditors of the Debtors will also benefit from the Settlements. First, as a result of negotiations between class counsel and antitrust counsel for the Debtors, class counsel agreed to reduce their requested attorneys' fees by approximately $900,000. This amount will instead be included in the settlement fund that will now be used to compensate all class members, including the Debtors, for the damages they incurred. Second, the Debtors' recovery under the Settlements from the three Settling Defendants is substantial. The Debtors previously settled with the Morgan Defendants and made no purchases from the SGL Defendants. The Debtors' purchases from the Schunk Defendants (the third Settling Defendant) amounted to approximately $2.3 million. Pursuant to the Settlements, the Debtors stand to recover approximately $1.1 million from the Settling Defendants which represents a recovery of approximately 48% of their purchases from the Schunk Defendants. If the Debtors had remained in the settlement class in the MDL Proceedings, their recovery would have been approximately 4% of the aggregate amount of any purchases. Third, the Settlements allow for the potential of additional recovery from other parties. Under the federal antitrust laws, the Carbone Defendants, who are not settling defendants, remain jointly and severally liable for three times the Debtors' damages. The Debtors intend to pursue their claims against the Carbone Defendants in the Action. The Settlements have also been drafted in a manner that preserves the Debtors' right to bring a foreign action to seek additional damages from the Settling Defendants for purchases made outside the United States.

17

38.     Accordingly, the Stipulations and Settlement Agreements are fair and equitable, fall well within the range of reasonableness, and represent a benefit to the Debtors' creditors and other parties-in-interest.  For the reasons set forth above, the Court should approve the Stipulations and Settlement Agreements pursuant to Bankruptcy Rule 9019.

Notice Of Motion

39.     Notice of this Motion has been provided in accordance with the Third Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on April 20, 2006 (Docket No. 3293). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

40.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) authorizing and approving the Stipulations and Settlement Agreements and (b) granting them such other and further relief as is just.

Dated:  New York, New York
       April 21, 2006

                                SKADDEN, ARPS, SLATE, MEAGHER
                                                    & FLOM LLP

                               By: /s/ John Wm. Butler, Jr.
                                   John Wm. Butler, Jr. (JB 4711)
                                   John K. Lyons (JL 4951)
                                   Ron E. Meisler (RM 3026)
                               333 West Wacker Drive, Suite 2100
                               Chicago, Illinois  60606
                               (312) 407-0700

                                          - and -

                               By: /s/ Kayalyn A. Marafioti
                                   Kayalyn A. Marafioti (KM 9632)
                                   Thomas J. Matz (TM 5986)
                               Four Times Square
                               New York, New York 10036
                               (212) 735-3000

                               Attorneys for Delphi Corporation, et al.,
                                 Debtors and Debtors-in-Possession