Hearing Date and Time: May 12, 2006 at 10:00 a.m.
Objection Deadline: May 5, 2006 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
        In re                             :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                                          :    (Jointly Administered)
        Debtors.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER FED. R. BANKR. P. 9019 AUTHORIZING AND
APPROVING LICENSE AGREEMENT WITH DENSO CORPORATION IN
SETTLEMENT OF PATENT INFRINGEMENT LITIGATION

("DENSO SETTLEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under Fed. R. Bankr. P. 9019 authorizing and approving the Debtors' entry into that certain License Agreement entered into by and among Delphi, Delphi Automotive Systems LLC ("DAS LLC"), Delphi Technologies, Inc. ("Delphi Technologies"), and Denso Corporation ("Denso"), which settles a patent infringement lawsuit between Denso and Delphi and DAS LLC.  In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

2

4.      The statutory predicates for the relief requested herein is Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers

---

[1]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

and applications.  Although GM is still the Company's single largest customer, today more than
half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

        8.        In the first two years following Delphi's separation from GM, the
Company generated approximately $2 billion in net income.  Every year thereafter, however,
with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the
Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]
Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of
approximately $2.8 billion on net sales of $26.9 billion.

        9.        The Debtors believe that the Company's financial performance has
deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational
restrictions driven by collectively bargained agreements, including restrictions preventing the
Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating
largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic
OEMs resulting in the reduced number of motor vehicles that GM produces annually in the
United States and related pricing pressures, and (c) increasing commodity prices.

        10.        In light of these factors, the Company determined that it would be
imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product
portfolio, operational issues, and forward-looking revenue requirements.  Because discussions
with its major unions and GM had not progressed sufficiently by the end of the third quarter of

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

4

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its

transformation plan. The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007. To complete their restructuring process, the Debtors must focus on five

key areas. First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company. Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint. Finally, the Debtors must devise

a workable solution to their current pension situation.

12.    In connection with the first two elements of the Company's transformation

plan, Delphi continues to participate in discussions with its unions and GM. Throughout those

discussions, Delphi has consistently communicated a clear message to both its hourly workforce

and GM: Delphi is committed to finding a consensual resolution to its issues and intends to

continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S.

operations. To that end, Delphi, GM and the UAW recently received this Court's approval of a

tripartite agreement providing for a special hourly attrition program for Delphi's UAW-

represented employees. This special hourly attrition program could provide as many as 18,000

5

of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings"

through retirement attrition programs and GM flowbacks. Delphi also hopes to reach agreement

on similar hourly attrition programs with its other unions, which could provide as many as 4,500

additional hourly employees with retirement programs or incentives.

13.    These hourly attrition programs constitute an important first step in

implementing the Debtors' transformation plan, but will not resolve all of the issues related to

Delphi's uncompetitive labor agreements. Moreover, Delphi has not yet reached comprehensive

agreements with its unions and GM. Therefore, on March 31, 2006, Delphi moved under

sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements

and to modify retiree benefits.[3] Contemporaneously therewith, the Debtors also moved to reject

unprofitable supply contracts with GM.[4] Among the reasons for the GM contract rejection

motion was the Debtors' belief that GM must cover a greater portion of the costs of

manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs. This

initial motion covers approximately half of the Debtors' North American annual purchase

volume revenue from GM but only 10% of the Debtors' total contracts with GM. Although the

filing of these motions was a necessary procedural step, the Debtors remain focused on reaching

a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is

necessary.

14.    To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which the

Company has significant competitive and technological advantages and expects the greatest

---

[3]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And
Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035)

[4]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033)

opportunities for increased growth.  To that end, the Company will concentrate the organization

around the following core strategic product lines: (a) Controls & Security (Body Security,

Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture

(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)

Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics),

and (f) Thermal (Climate Control & Powertrain Cooling).[5]

    15.    In contrast, the Company similarly identified certain non-core product

lines that do not fit into its future strategic framework, including Brake & Chassis Systems,

Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering,

and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines

(which will include approximately one-third of its global manufacturing sites) and will consult

with its customers, unions, and other stakeholders to carefully manage the transition of such

affected product lines.  The Company intends to sell or wind down the non-core product lines

and manufacturing sites by January 1, 2008.

    16.    As part of its organizational restructuring, the fourth element of the

Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as

many as 8,500 employees as a result of portfolio and product rationalizations and initiatives

adopted following an analysis of the Company's selling, general, and administration ("SG&A")

cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented,

the Company should realize savings of approximately $450 million per year in addition to

---

[5]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket
or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial
vehicles, or other adjacent-market businesses and product lines.

savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17.    As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation. The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce. To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007. Despite the freeze, because of the size of the funding deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding contributions over a long-term period. The Company intends to replace the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

19.    By this Motion, the Debtors seek entry of an order under Bankruptcy Rule 9019 authorizing and approving the Debtors' entry into that certain License Agreement entered into by and among Delphi, DAS LLC, Delphi Technologies, and Denso, which settles a patent infringement lawsuit between Denso and Delphi and DAS LLC.

Basis For Relief

A.    Background To Proposed Settlement

20.    In March 2002, Denso, a Japanese corporation, alleged that Delphi was infringing several of Denso's patents relating to gasoline engine management system ("Gasoline EMS"), the systems and technologies used to control engines that operate on gasoline, based on Delphi's manufacture and sale of certain gasoline engine control units.

21.    Delphi and Denso have conducted negotiations over the past four years to resolve this dispute. On July 11, 2005, Denso filed a complaint against Delphi and DAS LLC in the U.S. District Court for the District of Delaware alleging infringement of three of Denso's thermostat diagnostic patents relating to Gasoline EMS. This litigation, entitled Denso Corporation v. Delphi Corporation and Delphi Automotive Systems LLC, Civil Action No. 05-481 (SLR) (D. Del.) (the "Denso Action"), has been stayed as a result of the filing of these chapter 11 cases.

B.    Proposed License Agreement

22.    Delphi and Denso continued to engage in negotiations following the filing of the Denso Action and during the last several months they have negotiated the terms of the License Agreement to resolve this dispute. In the exercise of their business judgment and to avoid the costs, delay, and uncertainty of litigation, the Debtors have agreed to settle the Denso Action under the terms of the License Agreement.

23.    Under the License Agreement, substantially in the form attached hereto under seal,[6] the parties each obtain valuable rights from and provide valuable releases to each other. Denso will release Delphi from Denso's claims as set forth in the Denso Action and

---

[6]    The terms of the License Agreement are highly confidential and were filed under seal with the Court.

9

Delphi will release Denso from Delphi's claims arising from any affirmative defenses or

counterclaims directly related to Denso's claims in the Denso Action; Delphi obtains a license

under 21 Denso Gasoline EMS U.S. patents (including all related U.S. and foreign patents) as

well as an option to designate two additional existing Denso Gasoline EMS patents for inclusion

under the License Agreement, for Delphi's use in its future pursuit of business (these patents

would be valuable to Delphi); Denso obtains a license for up to seven existing Delphi Gasoline

EMS patents; and, in addition, Delphi will pay Denso the sum of $          (the "Settlement

Payment").  Due to the substantial cost of patent litigation, if Denso were to pursue the Denso

Action, Delphi's litigation costs alone could approach the amount of the Settlement Payment.

Moreover, both Delphi and Denso have agreed to a five-year moratorium on any future charges

of infringement of existing Gasoline EMS patents that are not the subject of this settlement.

                24.     The value of this settlement to the Debtors is substantial in light of the cost

and uncertainty of litigation, the benefit of the additional patents option, and the fact that the

Debtors will no longer be distracted by this costly litigation and the threat of further patent

litigation and disputes with Denso during the moratorium with respect to existing Denso

Gasoline EMS patents.  The Debtors are in the midst of implementing their comprehensive

transformation plan announced March 31, 2006.  The Debtors' management is consumed with

this process at this time and will be throughout the reorganization process.  The Debtors are in no

position to devote resources unnecessarily to matters, such as the Denso Action, that are not

related to their core mission at this stage in the reorganization process:  implementing the

transformation plan and continuing to deliver high-quality products to customers globally.  Thus,

Delphi believes it would be prudent to make the Settlement Payment and to end the long-

10

standing dispute with Denso, which, if allowed to continue, could further impede the Debtors'
reorganization efforts.

## Applicable Authority

25.     By this Motion, the Debtors respectfully request the entry of an order
under Rule 9019(a) of the Bankruptcy Rules approving the License Agreement and the
settlement terms contained therein.  Bankruptcy Rule 9019 provides, in relevant part, that "[o]n
motion by the trustee and after notice and a hearing, the court may approve a compromise or
settlement."  Bankruptcy Rule 9019(a).  Settlements and compromises are "a normal part of the
process of reorganization," Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.
v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106,
130 (1939)); see also In re Adelphia Comm'ns Corp., 327 B.R. 143, 159 (decision to accept or
reject a settlement lies within sound discretion of bankruptcy court), adhered to on
reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

26.     Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate
when the compromise is fair and equitable and is in the best interests of a debtor's estate.  See,
e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Comm'ns, 327 B.R. at 159 ("The settlement
need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within
the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr.
Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121
(S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is
in the best interest of an estate before approving it.").  In general, compromises in the bankruptcy
context should be approved unless they "'fall below the lowest point in the range of

reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

27.    The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate: (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

28.    Courts in this district have further elaborated on these factors to consider: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the proportion of the class members who do not object or who affirmatively support the proposed settlement, (d) the competency and experience of counsel who support the settlement, (e) the relative benefits to be received by individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the directors and officers as a result of the settlement, and (g) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion. Adelphia Comm'ns, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

29.    The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances. See Adelphia Comm'ns, 327 B.R.

at 159-60; see also Penn Centr., 596 F.2d at 1114. Instead, the court's proper "role is to

determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co.,

120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation

possibilities.'" In re Telesphere Comm'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994)

(citation omitted). To that end, courts should not substitute their own judgment for that of the

debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above

"'the lowest point in the range of reasonableness.'" Adelphia Comm'ns, 327 B.R. at 159 (quoting

W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust

Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack

v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994).

        30.     The License Agreement, as it sets forth the terms of the settlement

between the Debtors and Denso, should be approved under Bankruptcy Rule 9019(a) because its

terms are fair and equitable, fall well within the range of reasonableness, and are in the best

interests of the Debtors and their estates. Most significantly, the License Agreement provides for

the immediate resolution of the Denso Action. The proposed settlement falls within the

reasonable range of litigation possibilities. As is the case with any litigation, the outcome of

Denso's patent infringement lawsuit is uncertain, and a trial on the merits would involve

significant time and expense, as well as an administrative burden. Given the significant expense

associated with patent litigation, Delphi's litigation costs to defend the Denso Action could

approach the Settlement Payment being paid to Denso under the License Agreement. Thus, the

Debtors believe that resolving Denso's lawsuit against Delphi pursuant to the terms of the

License Agreement is a fair resolution of this matter, and in the best interest of the Debtors and

their creditors.

31.    Furthermore, Denso will grant to Delphi licenses for 21 Denso Gasoline EMS U.S. patents (including all related U.S. and foreign patents), with the option to designate two additional existing Denso Gasoline EMS patents for inclusion under the License Agreement. The Debtors believe that the terms of the settlement set forth in the License Agreement are a reasonable compromise under the circumstances because it avoids the costs and uncertainties of litigation while allowing the Debtors to license certain Denso Gasoline EMS patents.

32.    In the exercise of their business judgment, the Debtors therefore believe that the terms of the License Agreement are reasonable based upon important benefits that the Debtors will receive. Based on the benefits to be realized from entering into the License Agreement, together with the potential harm to the estates if the relief requested herein is not granted, the Debtors respectfully request that the motion be granted.

### Notice Of Motion

33.    Notice of this Motion has been provided in accordance with the Second Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on March 28, 2006 (Docket No. 2995). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

34.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

14

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

authorizing and approving the License Agreement and (b) granting them such other and further

relief as is just.

Dated:  New York, New York
       April 21, 2006


               SKADDEN, ARPS, SLATE, MEAGHER
                 & FLOM LLP

               By: /s/ John Wm. Butler, Jr.
                  John Wm. Butler, Jr. (JB 4711)
                  John K. Lyons (JL 4951)
                  Ron E. Meisler (RM 3026)
               333 West Wacker Drive, Suite 2100
               Chicago, Illinois  60606
               (312) 407-0700

                      - and -

               By: /s/ Kayalyn A. Marafioti
                  Kayalyn A. Marafioti (KM 9632)
                  Thomas J. Matz (TM 5986)
                Four Times Square
               New York, New York 10036
               (212) 735-3000

               Attorneys for Delphi Corporation, et al.,
                 Debtors and Debtors-in-Possession