Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
     In re                              :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                                              :    (Jointly Administered)
     Debtors.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328
AND FED. R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND
RETENTION OF PAGEMILL PARTNERS, LLC AS FINANCIAL
<u>ADVISOR TO DEBTORS NUNC PRO TUNC TO MARCH 14, 2006</u>

("PAGEMILL RETENTION APPLICATION")

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this application (the "Application") for an order under 11 U.S.C. §§ 327(a) and

328 and Fed. R. Bankr. P. 2014 authorizing the employment and retention of Pagemill Partners,

LLC ("Pagemill") as a financial advisor to the Debtors, <u>nunc</u> <u>pro</u> <u>tunc</u> to March 14, 2006.  In

support of this Application, the Debtors submit the Declaration of Milledge A. Hart executed on

March 30, 2006 (the "Hart Declaration").  In further support of this Application, the Debtors

respectfully represent as follows:

<u>Background</u>

A.      The Chapter 11 Filings

        1.      On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

        2.      On October 17, 2005, the Office of the Unites States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  No trustee or examiner has been appointed in the Debtors' cases.

        3.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

        4.      The statutory predicates for the relief requested herein are section 363(b) of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

        5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company

reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

12.    In connection with the first two elements of the Company's transformation

plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those

discussions, Delphi has consistently communicated a clear message to both its hourly workforce

and GM: Delphi is committed to finding a consensual resolution to its issues and intends to

continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S.

operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a

tripartite agreement providing for a special hourly attrition program for Delphi's UAW-

represented employees.  This special hourly attrition program could provide as many as 18,000

of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings"

through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement

on similar hourly attrition programs with its other unions, which could provide as many as 4,500

additional hourly employees with retirement programs or incentives.

13.    These hourly attrition programs constitute an important first step in

implementing the Debtors' transformation plan, but will not resolve all of the issues related to

Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors also moved to reject unprofitable supply contracts with GM.[4]  Among the reasons for the GM contract rejection motion was the Debtors' belief that GM must cover a greater portion of the costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This initial motion covers approximately half of the Debtors' North American annual purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the filing of these motions was a necessary procedural step, the Debtors remain focused on reaching a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is necessary.

14.    To implement the third element of the Debtors' transformation plan, the Company announced plans to focus its product portfolio on those core technologies for which the Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth.   To that end, the Company will concentrate the organization around the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

---

[3]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035)

[4]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033)

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.    In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines.  The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented, the Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17.    As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors'

---

[5]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current

hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension

plan as of January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will

also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation,

the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize

funding contributions over a long-term period.  The Company intends to replace the hourly plan

(for certain employees) and the salaried plan with defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

## Relief Requested

19.    By this Application, the Debtors seek to employ and retain Pagemill as a

financial advisor to the Debtors, effective as of March 14, 2006.  Accordingly, the Debtors

respectfully request the entry of an order under sections 327(a) and 328 of the Bankruptcy Code

and Fed. R. Bankr. P 2014 authorizing the employment and retention of Pagemill as a financial

advisor to the Debtors in accordance with the terms set forth in the letter agreement attached

hereto as Exhibit 1 (the "Engagement Letter").

## Services To Be Rendered

20.    As set forth in further detail in the Engagement Letter and in the Hart

Declaration, subject to the approval of this Court, Pagemill has agreed to provide the following

services:

(a)     Collaborate with MobileAria, Inc. ("MobileAria"), one of the Debtors, to
prepare descriptive materials, presentations, and develop a strategy for
marketing MobileAria to potential acquirors;

(b)     Identify and evaluate strategic partners in cooperation with MobileAria;

(c)     Assist MobileAria in coordinating the material and information to be made
available to prospective partners and the due diligence investigations;

(d)     Contact prospective partners approved in advance by MobileAria to
determine their level of interest in a potential Transaction (as such term is
defined in the Engagement Letter);

(e)     Evaluate the proposed terms and conditions of a potential Transaction, and
make such other analyses and investigations as may be appropriate;

(f)     Advise MobileAria in the negotiation of all aspects of a proposed
Transaction;

(g)     Present summaries to MobileAria's senior management and board of
directors as requested by MobileAria; and

(h)     Provide declarations and live testimony to this Court as requested by
MobileAria.

21.     Subject to this Court's approval of the Application, Pagemill is willing to

perform the services described in the Engagement Letter on the terms set forth therein.

22.     Pagemill is aware that the Debtors have retained additional professionals in

connection with these chapter 11 cases, including FTI Consulting, Inc. and Rothschild, Inc.  The

services to be provided by Pagemill under the Engagement Letter are not intended to duplicate

the services of these or any other professionals retained by  the Debtors in these chapter 11 cases,

and Pagemill will make every effort to avoid duplicating the work performed by such other

professionals.

<u>Qualifications Of Pagemill</u>

23.     Pagemill, a technology-focused investment bank located in Silicon Valley in

California, is a member of the National Association of Securities Dealers and the Securities

Investor Protection Corporation.  Pagemill provides financial advisory services in connection

with mergers and acquisitions, divestitures, private placements, and specialized financial services.  The firm services both public and private companies, focusing on emerging and middle market transactions.

24.    Pagemill and its professionals have extensive transaction experience with over 200 transactions successfully completed by its managing directors.  Pagemill leverages its strong relationships with top tier venture capital, private equity, and law firms to maintain its strong deal flow.

### Disinterestedness Of Professionals

25.    The Hart Declaration contains information available to date on Pagemill's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).  Based on the information in the Hart Declaration, the Debtors submit that Pagemill and the professionals in the Pagemill firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

### Professional Compensation[6]

26.    Subject to this Court's approval and pursuant to the terms and conditions of the Engagement Letter, the Debtor's have agreed to Pagemill's professional compensation as follows:

(a)    <u>Engagement Fee</u>: A non-refundable engagement fee of $40,000 due upon approval of this Application;

(b)    <u>Success Fee</u>: In the case of the Transaction, a Success Fee equal to the sum of $300,000 plus 1.5% of the Aggregate Value of the Transaction; and

---

[6]    Capitalized terms used this section but not defined herein shall have the meanings assigned to them in the Engagement Letter.

(c)    <u>Expenses</u>: Reimbursement of Pagemill for all reasonable out-of-pocket, out of Bay Area travel expenses incurred by Pagemill in connection with the engagement.

27.    The Debtors and Pagemill acknowledge and agree that (a) the hours worked, (b) the results achieved, and (c) the ultimate benefit to the Debtors of the work performed, in each case, in connection with the engagement, may be variable, and the Debtors and Pagemill have taken such factors into account in setting the fees under the Engagement Letter; <u>provided</u>, <u>however</u>, that with respect to the hours worked, Pagemill will devote whatever resources are required to fulfill the purposes of the engagement on a timely basis.

28.    Pagemill intends to apply to this Court for allowance of compensation and reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), the guidelines established by the Office of the United States Trustee, the Order Under 11 U.S.C. § 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals, the Third Supplemental Order Under 11 U.S.C. Sections 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures entered by this Court on 4/20/06 (Docket No. 3293), and any other applicable orders of this Court.  Consistent with its ordinary practice and the practice of financial advisors in other chapter 11 cases whose fee arrangements are typically not hours-based, Pagemill ordinarily does not maintain contemporaneous time records or conform to or provide a schedule of hourly rates for its professionals.  Therefore, Pagemill requests that it be excused from compliance with such requirements.

11

29.    The Debtors believe that Pagemill's fees are fair and reasonable in light of

industry practice, market rates both inside and outside of chapter 11 cases, Pagemill's experience

in reorganizations, and Pagemill's importance to these cases.

Indemnification

30.    As more fully described in the Engagement Letter, if the Application is

granted, the Debtors have agreed to indemnify and hold Pagemill harmless from liabilities

arising out of or in connection with its retention by the Debtors except for any such liability for

losses, claims, damages, or liabilities incurred by the Debtors that are finally judicially

determined by a court of competent jurisdiction to have resulted primarily from have resulted

from the bad faith, negligence, willful misconduct, or breach of fiduciary duty of Pagemill.

31.    The Debtors request that the indemnification provisions contained in the

Engagement Letter (the "Indemnification Provisions") be approved.  The Indemnification

Provisions are as follows:

(a)    In the event that Pagemill or any of its affiliates, their respective directors, officers, partners, agents, or employees, or any other person controlling Pagemill or any of its affiliates (collectively, "Indemnified Persons") becomes involved in any capacity in any action, claim, suit, investigation, or proceeding, actual or threatened, brought by or against any person, including stockholders of MobileAria, in connection with or as a result of the Engagement Letter or any matter referred to in the engagement, MobileAria will reimburse such Indemnified Person for its reasonable legal and other expenses (including without limitation the reasonable costs and expenses incurred in connection with investigation and preparation or enforcement of the engagement) incurred in connection therewith as such expenses are incurred (subject to disgorgement by the Indemnified Person to the extent any losses (defined below) are finally determined by a court or arbitral tribunal to have resulted from the bad faith, negligence, willful misconduct, or breach of fiduciary duty of Pagemill or any Indemnified Person in performing the engagement);

(b)    If indemnification is to be sought thereunder by an Indemnified Person, then such Indemnified Person will notify MobileAria of the commencement of any litigation, proceeding, or other action in respect thereof.  Following such notification, MobileAria may elect in writing to

assume the defense of such litigation, proceeding, or other action (and costs related thereto) and, upon such election, MobileAria will not be liable for any legal costs subsequently incurred by such Indemnified Person unless (i) MobileAria has failed to provide legal counsel to such Indemnified Party in a timely manner or (ii) such Indemnified Person and MobileAria have concluded that (A) the representation of such Indemnified Person by legal counsel selected by MobileAria would be inappropriate due to actual or potential conflicts of interest or (B) there may be legal defenses available to such Indemnified Person that are different from or in addition to those available to MobileAria or any other Indemnified Person who is represented by such legal counsel.  Nothing set forth herein will preclude any Indemnified Person from retaining its own counsel at its own expense.

(c)     No Indemnified Person seeking indemnification, reimbursement, or contribution under the Engagement Letter will, without MobileAria's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation, or proceeding referred to herein.

(d)     The reimbursement, indemnity, and contribution obligations of MobileAria under the terms of the Engagement Letter will be in addition to any liability which MobileAria may otherwise have, will extend upon the same terms and conditions to any affiliate of Pagemill and the partners, directors, agents, employees and controlling persons (if any), as the case may be, of Pagemill and any such affiliate, and will be binding on and inure to the benefit of any successors, assigns, heirs, and personal representatives of the MobileAria, Pagemill, any such affiliate, and any such person.

32.     The Debtors and Pagemill believe that the Indemnification Provisions are customary and reasonable for financial advisory and investment banking engagements, both out-of-court and in chapter 11 cases.  See United Artists Theater Co. v. Walton, 315 F.3d 217 (3d Cir. 2003); In re Acterna Corp., Case No. 03-12837 (Bankr. S.D.N.Y. Jun. 24, 2003); In re Joan & David Halpern, Inc., 248 B.R. 43 (Bankr. S.D.N.Y. 2000), aff'd, 2000 WL 1800690 (S.D.N.Y. 2000).

<u>Termination</u>

33.     Pagemill's engagement will expire six months from the date of the Engagement Letter unless extended by mutual agreement in writing.  Additionally, Pagemill's

engagement may be terminated at any time by written notice to the other party by either Pagemill
or the Debtor; provided, however, that in the event of any termination of Pagemill's engagement
thereunder by Pagemill, Pagemill will not be entitled to any Success Fee.  In the event of any
termination of Pagemill's engagement by the Debtor, Pagemill will continue to be entitled to the
full amount of the Success Fee described above if at any time prior to the expiration of six
months after any such termination, MobileAria consummates a Transaction (as such term is
defined in the Engagement Letter), or enters into an agreement to consummate a Transaction
(which Transaction is subsequently consummated) with a prospective acquirer.  Within 30 days
after any notice of termination of its engagement, Pagemill will (a) deliver to MobileAria a
confirming list of all parties which have contacted or been contacted by Pagemill or which were
contacted by or had contact with MobileAria and with whom direct discussions regarding a
potential Transaction were held and (b) destroy certain materials as described in section 4 of the
Engagement Letter.  Additionally, the provisions of Section 2 through 8 of the Engagement
Letter will survive any termination of the engagement.

## Conclusion

34.    For the foregoing reasons, the Debtors submit that the relief requested
herein is in the best interest of the Debtors and their estates and creditors and should be
approved.

## Notice

35.    Notice of this Application has been provided in accordance with the Third
Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,
9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,
And Administrative Procedures, entered by this Court on April 20, 2006 (Docket No. 3293 ).  In

light of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

Memorandum Of Law

36.    Because the legal points and authorities upon which this Application relies

are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a)

authorizing the Debtors to employ and retain Pagemill as a financial advisor to perform the

services set forth herein and (b) granting the Debtors such other and further relief as is just.


Dated: New York, New York
       April 21, 2006


                              DELPHI CORPORATION, on behalf of itself and
                              certain of its subsidiaries and affiliates, as Debtors
                              and Debtors-in-Possession


                              By:  /s/ Dr. Richard Lind
                                     Name:  Dr. Richard Lind
                                     Title:  MobileAria President

<u>Exhibit 1</u>

March 14, 2006

**Personal & Confidential**

Dr. Richard C. Lind
President
MobileAria, Inc.
800 W. El Camino Real, Suite 240
Mountain View, CA 94040

Re:    **Engagement of Pagemill Partners, LLC**

Dear Richard:

This will confirm our understanding that MobileAria, Inc. as debtor in possession (the "Company") in that certain case under chapter 11 of title 11 of the United States Code designated as case no. 05-47474 consolidated for administrative purposes only with case no. 05-44481 (the "Case") pending before the United States Bankruptcy Court for the Southern District of New York (the "Court") has engaged Pagemill Partners, LLC, a California limited liability company ("Pagemill"), subject to obtaining the requisite Court approvals, to act as a financial advisor to the Company on the terms and conditions set forth in this letter (this "Engagement Letter").

Section 1.    **Services to be Rendered.**    In connection with this engagement, Pagemill shall, as appropriate.

- Collaborate with the Company to prepare descriptive materials, presentations, and develop a strategy for marketing the Company to potential acquirers.
- Identify and evaluate strategic partners in cooperation with the Company.
- Assist the Company in coordinating the materials and information to be made available to prospective partners and with due diligence investigations.
- Contact prospective partners approved in advanced by the Company to determine their level of interest in a potential Transaction.
- Evaluate the proposed terms and conditions of a potential Transaction, and make such other analyses and investigations as may be appropriate.
- Advise the Company in the negotiation of all aspects of a proposed Transaction.
- Present summaries to the Company's Senior Management and Board of Directors as requested by the Company.
- Provide declarations and live testimony to the Court as requested by the Company.

Section 2.  **Compensation**.

(a) **Engagement Fee:** Company shall pay Pagemill an engagement fee of $40,000
due upon approval of the Pagemill retention application and which shall be
separate from the Success Fee (as defined below).

(b) **Success Fee:** Upon consummation of a Transaction with a Prospect, Pagemill will
be due a Success Fee equal to the sum of $300,000 plus 1.5 % of the Aggregate
Value of the Transaction.  The Success Fee shall be paid to Pagemill in cash via
wire transfer on the day of the closing of the Transaction.  No fees or expenses
payable to any other party, including a financial advisor, either by the Company
or by any other entity shall reduce or otherwise affect the fees payable to
Pagemill.

(c) **Expenses:** The Company shall reimburse Pagemill for all reasonable out-of-
pocket, out of Bay Area travel expenses incurred by Pagemill in connection with
this engagement.  Invoices are due and payable upon receipt; provided however,
that the Company shall not be obligated to reimburse Pagemill for legal or out of
Bay Area travel expenses under this paragraph without the prior written consent
of the Company.

(d) **Fee Procedures:**  Pagemill will request payment of its fees in accordance with
the local bankruptcy rules for the Southern District of New York and the relevant
administrative orders governing payment of professionals entered into by the
Court in the case.

Section 3.  **Definitions**.

(a) The "Transaction" shall include, without limitation, (i) any transaction (whether
in one or a series of transactions with one or more Prospects) whereby, directly or
indirectly, a fifty percent or more equity interest in either the Company or all or
substantially all the assets of the Company are acquired by one or more Prospects,
or (ii) any merger with a Prospect; provided, however, that any transaction
resulting in the liquidation of the Company or substantially all the assets of the
Company under chapter 7 or chapter 11 of the United States Bankruptcy Code
shall not be included within this definition.

(b) "Aggregate Value" shall mean the sum of (i) the total amount received or
receivable by the Company and/or its stockholders, other than normal
employment terms and allowances for staff entitlements (severance payments)
typically offered by the acquirer to employees and (ii) the assumption or payment
of debt by the acquiring party, other than normal trade debt; both measured on the
date of the signing of the definitive agreements related to the Transaction.  In the
event Aggregate Value includes securities without an established public trading
market, the value of such securities for purposes of calculating the fee shall be

their fair market value, as the parties shall mutually agree prior to closing, using standard valuation methodologies. In the event Aggregate Value includes securities with an established public trading market, the value of such securities for purposes of calculating the fee shall be the average closing price of such securities over the ten (10) consecutive trading days up to and including the second trading day immediately preceding the date of the signing of the definitive agreements related to the Transaction.

In the event the Aggregate Value involved in the Transaction includes deferred or contingent payments (other than amounts withheld or held in escrow) or acquisition of additional stock or assets after the initial closing, the Company and Pagemill shall use their best efforts to mutually agree on their present value which shall be used for purposes of calculating the fee to be paid at closing; alternatively if the Company and Pagemill do not mutually agree on the present value, Pagemill shall receive its fee as the Company or its stockholders receive such deferred or contingent payments.

(c)     A "Prospect" is any prospective acquirer (other than Delphi Corporation or any of its affiliates) which, during the term of this engagement, contacts or is contacted by Pagemill or contacts or is contacted by the Company independently of Pagemill, and with which Pagemill or the Company holds direct, substantive discussions concerning a potential Transaction.

Section 4.  **Confidentiality.**  No advice rendered by Pagemill, whether formal or informal, may be disclosed, in whole or in part, or summarized, excerpted from or otherwise referred to without Pagemill's prior written consent, provided, however, Pagemill's advice may be disclosed to the Company's stockholders, the Court and any Court-appointed committee.  In addition, neither Pagemill nor the terms of this engagement may be otherwise referred to without Pagemill's prior written consent. The obligations of the Company pursuant to this paragraph shall survive any expiration or termination of this Engagement Letter or Pagemill's engagement hereunder.

In connection with Pagemill's engagement, the Company shall cooperate fully with Pagemill in connection with its financial review and analysis and shall furnish Pagemill with all information concerning the Company which Pagemill reasonably deems appropriate and shall provide Pagemill with access to the Company's officers, directors, employees, accountants, counsel and other representatives (collectively, the "Representatives"), it being understood that Pagemill shall rely solely upon such information supplied by the Company and the Representatives without assuming any responsibility for independent investigation or verification thereof and that such Representatives agree to be bound by the terms of this Section 4.  All non-public information concerning the Company, including the fact of a possible Transaction, which is given to Pagemill in connection with this engagement shall be used solely in the course of the performance of Pagemill's services hereunder and shall be treated confidentially by Pagemill for so long as it remains non-public. Except as otherwise required by law or

regulatory authority, Pagemill shall not disclose this information to a third party without the consent of the Company and confirmation that such third party has executed a confidentiality agreement.

Section 5. **Termination**. Pagemill's engagement shall commence on the date hereof and expire six months from the date hereof, unless extended by mutual agreement in writing. Pagemill's engagement hereunder may be terminated at any time by written notice to the other party by either Pagemill or the Company; provided, however, that in the event of any termination of Pagemill's engagement hereunder by Pagemill, Pagemill will not be entitled to any Success Fee under this Agreement. In the event of any termination of Pagemill's engagement hereunder by the Company, Pagemill shall continue to be entitled to the full amount of the Success Fee provided for herein if at any time prior to the expiration of three (3) months after any such termination by the Company, the Company consummates a Transaction, or enters into an agreement to consummate a Transaction (which Transaction is subsequently consummated) with a Prospect. Within thirty days after any notice of termination of this engagement, Pagemill shall (i) deliver to the Company a confirming list of all parties which have contacted or been contacted by Pagemill or which were contacted by or had contact with the Company and with whom direct discussion regarding a potential Transaction were held and (ii) destroy certain materials as described in Section 4 ~~of that certain Confidentiality~~ hereof ~~Agreement between the Company and Pagemill dated March 6, 2006 (the "Confidentiality Agreement")~~. Additionally, the provisions of Sections 2 through 8 of this Engagement Letter shall survive any termination.

Section 6. **Indemnity**. In the event Pagemill or any of its affiliates, their respective directors, officers, partners, agents or employees, or any other person controlling Pagemill or any of its affiliates (collectively, "Indemnified Persons") becomes involved in any capacity in any action, claim, suit, investigation or proceeding, actual or threatened, brought by or against any person (other than an action between the Company and Pagemill), including stockholders of the Company, in any matter referred to in the engagement, the Company shall reimburse such Indemnified Person for its reasonable legal and other expenses (including without limitation the reasonable costs and expenses incurred in connection with investigation and preparation or enforcement of the engagement) incurred in connection therewith as such expenses are incurred (subject to disgorgement by the Indemnified Person to the extent any losses (defined below) are finally determined by a court or arbitral tribunal to have resulted from the bad faith, negligence, willful misconduct or breach of fiduciary duty of Pagemill or any Indemnified Person in performing the engagement).

If indemnification is to be sought hereunder by an Indemnified Person, then such Indemnified Person shall notify the Company of the commencement of any litigation, proceeding or other action in respect thereof. Following such notification, the Company may elect in writing to assume the defense of such litigation, proceeding or other action (and costs related thereto) and, upon such election, the Company shall not be liable for any legal costs subsequently incurred by such Indemnified Person unless (i) the Company

has failed to provide legal counsel to such Indemnified Party in a timely manner or (ii) such Indemnified Person and the Company shall have concluded that (A) the representation of such Indemnified Person by legal counsel selected by the Company would be inappropriate due to actual or potential conflicts of interest or (B) there may be legal defenses available to such Indemnified Person that are different from or addition to those available to the Company or any other Indemnified Person that are represented by such legal counsel. Nothing set forth hereon shall preclude any Indemnified Person from retaining its own counsel at its own expense.

No Indemnified Person seeking indemnification, reimbursement or contribution under this Engagement Letter shall, without the Company's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to herein.

The reimbursement, indemnity and contribution obligations of the Company hereunder shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any affiliate of Pagemill and the partners, directors, agents, employees and controlling persons (if any), as the case may be, of Pagemill and any such affiliate, and shall be binding on and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, Pagemill, any such affiliate and any such person.

Section 7.   **Miscellaneous**.   The benefits of, and the obligations and liabilities assumed in, this Engagement Letter shall inure to the benefit of, and be binding upon, any successors and assigns of the Company and Pagemill.   Except as provided in the Confidentality Agreement, this Engagement Letter constitutes the entire agreement between Pagemill and the Company and supersedes any prior agreements or understandings with respect to the matters set forth herein. This Engagement Letter may not be amended, waived, modified or assigned, in whole or in part, including by operation of law, without the prior written consent of the Company and Pagemill. In connection with this engagement, Pagemill is acting as an independent contractor with duties owing solely to the Company and not in any other capacity. All aspects of the relationship created by this Engagement Letter shall be governed by and construed in accordance with the laws of the State of California, applicable to contracts made and to be performed therein.

Section 8.   **Bankruptcy Court Jurisdiction**.   The Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Company's engagement of Pagemill.

\*                    \*                    \*

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us an executed copy of this Engagement Letter, which shall then constitute a binding agreement.

Respectfully,
**Pagemill Partners, LLC**

Signed: _____

By:  Milledge Hart
Its:  Managing Director

Accepted and agreed to as of the date first written above:

**MobileAria, Inc.**

Signed: _____

By:  Dr. Richard C. Lind
Its:  President