Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
    In re                          :    Chapter 11
                                                      :
DELPHI CORPORATION, et al.,                           :    Case No. 05-44481 (RDD)
                                                      :
        Debtors.    :    (Jointly Administered)
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(e) AND 1107(b)
AND FED. R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND
RETENTION OF MAYER, BROWN, ROWE & MAW LLP AS SPECIAL INFORMATION
TECHNOLOGY OUTSOURCING COUNSEL TO DEBTORS
NUNC PRO TUNC TO FEBRUARY 1, 2006

("MAYER BROWN RETENTION APPLICATION")

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this application (the "Application") for an order under 11 U.S.C. §§ 327(e) and 1107(b) and Fed. R. Bankr. P. 2014 authorizing the employment and retention of Mayer, Brown, Rowe & Maw LLP ("Mayer, Brown") as special information technology ("IT") outsourcing counsel to the Debtors, nunc pro tunc to February 1, 2006.  In support of this Application, the Debtors submit the Declaration And Disclosure of Paul J.N. Roy In Support Of Application For Order Under 11 U.S.C. §§ 327(e) And 1107(b) And Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of Mayer, Brown, Rowe & Maw LLP As Special Information Technology Outsourcing Counsel To Debtors Nunc Pro Tunc To

February 1, 2006, dated April 21, 2005 (the "Roy Declaration").  In further support of this

Application, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

       1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and

affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title

11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

The Debtors continue to operate their businesses and manage their properties as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered

orders directing the joint administration of the Debtor's chapter 11 cases.

       2.    On October 17, 2005, the Office of the Unites States Trustee appointed an

official committee of unsecured creditors (the "Creditors' Committee").  No trustee or examiner

has been appointed in the Debtors' cases.

       3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

       4.    The statutory predicates for the relief requested herein are sections 327(e)

and 1107(b) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

       5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") had

global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues, and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from the

Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through

various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these

divisions and subsidiaries were transferred to the Company in accordance with the terms of a

Master Separation Agreement between Delphi and GM.  In connection with these transactions,

Delphi accelerated its evolution from a North American-based, captive automotive supplier to a

global supplier of components, integrated systems, and modules for a wide range of customers

and applications.  Although GM is still the Company's single largest customer, today more than

half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

---

[1]      The aggregated financial data used in this Application generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.      The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of its transformation plan. The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

---

[2]      Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

the first half of 2007. To complete their restructuring process, the Debtors must focus on five key areas. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint. Finally, the Debtors must devise a workable solution to their current pension situation.

12.    In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM. Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations. To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-represented employees. This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks. Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

13.     These hourly attrition programs constitute an important first step in
implementing the Debtors' transformation plan, but will not resolve all of the issues related to
Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive
agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under
sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements
and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors also moved to reject
unprofitable supply contracts with GM.[4]  Among the reasons for the GM contract rejection
motion was the Debtors' belief that GM must cover a greater portion of the costs of
manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This
initial motion covers approximately half of the Debtors' North American annual purchase
volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the
filing of these motions was a necessary procedural step, the Debtors remain focused on reaching
a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is
necessary.

14.     To implement the third element of the Debtors' transformation plan, the
Company announced plans to focus its product portfolio on those core technologies for which the
Company has significant competitive and technological advantages and expects the greatest
opportunities for increased growth.   To that end, the Company will concentrate the organization
around the following core strategic product lines: (a) Controls & Security (Body Security,
Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture
(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)

---

[3]     Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements
And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035)

[4]     Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033)

Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics),

and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.     In contrast, the Company similarly identified certain non-core product

lines that do not fit into its future strategic framework, including Brake & Chassis Systems,

Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering,

and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines

(which will include approximately one-third of its global manufacturing sites) and will consult

with its customers, unions, and other stakeholders to carefully manage the transition of such

affected product lines.  The Company intends to sell or wind down the non-core product lines

and manufacturing sites by January 1, 2008.

16.     As part of its organizational restructuring, the fourth element of the

Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as

many as 8,500 employees as a result of portfolio and product rationalizations and initiatives

adopted following an analysis of the Company's selling, general, and administration ("SG&A")

cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented,

the Company should realize savings of approximately $450 million per year in addition to

savings realized from competitive measures planned for its core businesses and the disposition of

non-core assets.

17.     As noted above, the final key tenet of the transformation plan is to devise

a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the

---

[5]     The Company does not expect the portfolio changes to have a significant impact on its independent
aftermarket or consumer electronics businesses.  Similarly, the Company does not expect an impact on
medical, commercial vehicles, or other adjacent-market businesses and product lines.

benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding contributions over a long-term period.  The Company intends to replace the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

19.    By this Application, the Debtors request authorization to employ and retain Mayer, Brown as special IT outsourcing counsel, effective as of February 1, 2006.  Accordingly, the Debtors respectfully request the entry of an order under sections 327(e) and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014 authorizing the employment and retention of Mayer, Brown in accordance with the terms set forth in the letter agreement attached hereto as Exhibit 1 (the "Engagement Letter").

## Basis For Relief

20.    The Debtors submit that Mayer, Brown's proposed retention meets all the prerequisites for retention of special counsel under section 327(e) of the Bankruptcy Code, which

permits a debtor-in-possession, with court approval, to employ counsel for a "specified special purpose" if such employment is in the best interest of the Debtors.

The Debtors' Employment Of Mayer, Brown<br>Is In The Best Interests Of The Estates

21.     The Debtors had retained Mayer, Brown as an ordinary course professional according to the Order Under 11 U.S.C §§ 327, 330, And 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business ("Ordinary Course Professionals Order") (Docket No. 883).  It is apparent, however, that Mayer, Brown will exceed the fee cap established in the Ordinary Course Professionals Order.  Therefore, the Debtors request that Mayer, Brown be formally retained as special IT outsourcing counsel to the Debtors in these chapter 11 cases.

22.     Mayer, Brown is especially attuned to the unique IT outsourcing issues that arise in the Debtors' industry.  Mayer, Brown is a full-service, international law firm, with offices in 13 cities across the United States and Europe, as well as representative offices in China and affiliated offices in Italy and Mexico.  With more than 1,300 lawyers, Mayer, Brown provides legal services in virtually every major practice area, including finance, corporate, business restructuring, trial and appellate litigation, intellectual property, real estate, environmental, tax, employee benefits, and international trade, and, in particular, Mayer, Brown has cultivated a national and international reputation for providing the highest quality legal advice to its clients in all phases of sourcing, from outsourcing through re-sourcing to in-sourcing, in a wide variety of complex transactions.  Most importantly for purposes of this Application, several members of Mayer, Brown have extensive experience in legal services relating to IT, telecommunications, and business process outsourcing.  Accordingly, the Debtors believe that Mayer, Brown is well

qualified to serve as special IT outsourcing counsel in these chapter 11 cases in an efficient and effective manner.

23.     The Debtors believe that the employment of Mayer, Brown will enhance and will not duplicate the employment of Skadden, Arps, Slate, Meagher, & Flom LLP ("Skadden, Arps"), the Debtors' general bankruptcy counsel, Shearman & Sterling LLP, the Debtors' special counsel, Togut, Segal & Segal LLP, the Debtors' conflicts counsel, or any of the other professionals retained by the Debtors to perform specific tasks that are unrelated to the work to be performed by Mayer, Brown as special IT outsourcing counsel to the Debtors.  The Debtors understand that Mayer, Brown will work with the other professionals retained by the Debtors to avoid any such duplication.

<u>Services To Be Rendered By Mayer, Brown</u>

24.     As set forth in the Engagement Letter, the Debtors wish to retain Mayer, Brown to provide services to the Debtors in connection with IT outsourcing matters.  The Debtors anticipate that such services will include the following:

(a)     reviewing documents, including Delphi's form IT outsourcing agreements;

(b)     drafting, revising, and editing a new form IT outsourcing agreement for the IT outsourcing services;

(c)     negotiating specific IT outsourcing agreements with third-party bidders; and

(d)     miscellaneous information technology advice and counsel related to IT outsourcing matters.

25.     Mayer, Brown has indicated its desire and willingness to represent the Debtors as set forth herein and to render the necessary professional services as special IT outsourcing counsel to the Debtors.

26.     The Debtors may request that Mayer, Brown undertake specific matters

beyond the scope of the responsibilities set forth above.  Should Mayer, Brown agree in its

discretion to undertake any such matter, the Debtors will seek further order of this Court.

<u>Disinterestedness Of Professionals</u>

27.     Section 327(e) does not require that Mayer, Brown and its attorneys be

"disinterested persons" as defined in section 101(14) of the Bankruptcy Code.  Rather, section

327(e) of the Bankruptcy Code requires that Mayer, Brown not represent or hold any interest

adverse to the estates or the Debtors with respect to the matters on which Mayer, Brown is to be

employed.  As discussed above, the employment of Mayer, Brown as special IT outsourcing

counsel to the Debtors is in the best interests of the Debtors.

28.     The Roy Declaration filed in support of this Application contains

information available to date on Mayer, Brown's connections with other parties-in-interest, as

required by Bankruptcy Rule 2014(a).  According to the Roy Declaration, Mayer, Brown, its

partners, counsel, and associates do not hold or represent any interest adverse to the Debtors,

their creditors, any other party-in-interest in these chapter 11 cases, their respective attorneys and

investment advisors, the Office of the United States Trustee (the "U.S. Trustee"), or any person

employed therein, with respect to the matters on which Mayer, Brown is to be employed.

29.     Mayer, Brown has disclosed to the Debtors that Mayer, Brown has in the

past represented, currently represents, and will likely in the future represent, certain of the

Debtors' creditors and other parties-in-interest in matters unrelated to the Debtors or their chapter

11 cases, and in certain matters related to these chapter 11 cases, but unrelated to the matters on

which Mayer, Brown is to be employed.  Mayer, Brown does not believe that the foregoing

raises any actual or potential conflict of interest for Mayer, Brown relating to the representation

of the Debtors as their special IT outsourcing counsel in these chapter 11 cases, but such

11

relationships are disclosed out of an abundance of caution.  The Debtors understand that, in order

to vitiate any actual or potential conflicts of interest, Mayer, Brown will not assist the Debtors in

connection with their analysis, negotiations, and litigation, if any, with parties with whom

Mayer, Brown has existing client relationships, and that Skadden, Arps (or other counsel if

Skadden, Arps has a conflict), instead, will handle any such tasks.

<u>Professional Compensation</u>

30.    Mayer, Brown intends to apply to this Court for compensation and

reimbursement of expenses in accordance with section 330(a) of the Bankruptcy Code, the

Bankruptcy Rules, applicable guidelines established by the U.S. Trustee, and orders of this

Court.  Mayer, Brown acknowledges that all compensation will be subject to this Court's review

and approval, after notice and a hearing.

31.    Under the applicable provisions of the Bankruptcy Code, and subject to the

approval of this Court, the Debtors propose to pay Mayer, Brown its rates as disclosed in the

Engagement Letter.  Mayer, Brown will discount its rates by 5% for the first $500,000 of fees,

and by 10% for the portion of its fees that exceed $500,000.  Mayer, Brown will not charge for

travel time, though it will charge for time spent working while traveling.  Mayer, Brown's hourly

billable rates include its general overhead and internal charges associated with its practice.

32.    No arrangement is proposed between the Debtors and Mayer, Brown for

compensation to be paid in these chapter 11 cases other than as set forth above, in the

Engagement Letter, and in the Roy Declaration.

33.    At the Debtors' request, Mayer, Brown has assisted the Debtors in

connection with their IT outsourcing issues since February 1, 2006 and hence the Debtors

request Mayer, Brown's retention to be effective <u>nunc</u> <u>pro</u> <u>tunc</u> to February 1, 2006.

Conclusion

34.    For the foregoing reasons, the Debtors submit that the employment of

Mayer, Brown as the Debtors' special IT outsourcing counsel on the terms set forth herein is in

the best interests of the estates.

Notice

35.    Notice of this Motion has been provided in accordance with the Third

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered by this Court on April 20, 2006 (Docket No. 3293).  In

light of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

Memorandum Of Law

36.    Because the legal points and authorities upon which this Application relies

are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a)

authorizing the Debtors to employ and retain Mayer, Brown as their special IT outsourcing

counsel to perform the services set forth herein, nunc pro tunc to February 1, 2006 and (b)

granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          April 21, 2006

                              DELPHI CORPORATION, on behalf of itself and
                              certain of its subsidiaries and affiliates, as Debtors and
                              Debtors-in-Possession

                              By:   /s/ John D. Sheehan_____
                                    Name:  John D. Sheehan
                                    Title:   Vice President, Chief Restructuring
                                             Officer, and Controller

Exhibit 1

**M A Y E R**
**B R O W N**
**R O W E**
**& M A W**

February 3, 2006

Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrownrowe.com

**Paul J.N. Roy**
Direct Tel (312) 701-7370
Direct Fax (312) 706-8196
proy@mayerbrownrowe.com

Marjorie Harris Loeb, Esq.
Assistant General Counsel
 Corporate and Securities
Delphi Corporation
MC 483.400.603
5725 Delphi Place
Troy, Michigan 48098

Dear Ms. Loeb:

This letter confirms our agreement for the provision of legal services by this Firm to Delphi Corporation in connection with the negotiation of an IT outsourcing services contract (the "**ITO Project**"), subject to the attainment of waiver letters, if necessary. You may limit or expand the scope of our representation at any time, provided that any expansion must be by mutual consent. We are very pleased that you have retained us and will, of course, answer any questions you may have about these arrangements.

<u>PAYMENT PROVISIONS</u>

We recognize that in choosing us to provide these services, you are choosing specific individuals at the Firm, including myself, Paul Chandler, Greg Manter and Kristina Herrmann. I will be your primary interface on this engagement and will supervise the other professionals involved. As per our discussion, I will keep you informed of staffing needs and work with you in coordinating with Delphi's internal legal staff so that together we can insure the most cost-efficient and effective delivery of services. Others from the Firm may be necessary to assist us on this engagement, but we have agreed to obtain your written permission before engaging them. No fees will be paid for work performed by others before we have obtained your written permission. The Firm endeavors, to the maximum extent compatible with the quality of our work product, to assign our personnel in a way designed to produce timely and economical handling of matters. If at any time you have questions, concerns or suggestions, please contact me promptly.

Our fees for services are based on time (at quarter hour increments) spent on specific projects, computed at our hourly rates for those persons performing the services required. I will be the principal attorney for this engagement. My hourly rate is $580. The hourly rates for other professionals you have approved for this engagement are as follows:

Berlin Brussels Charlotte Chicago Cologne Frankfurt Houston London Los Angeles New York Palo Alto Paris Washington, D.C.
Independent Mexico City Correspondent: Jauregui, Navarrete, Nader y Rojas, S.C.

Mayer, Brown, Rowe & Maw LLP operates in combination with our associated English limited liability partnership in the offices listed above.

Mayer, Brown, Rowe & Maw LLP

Marjorie Harris Loeb, Esq.
February 3, 2006
Page 2

| | |
|---|---|
| Paul Chandler | $475 |
| Greg Manter | $300 |
| Kristina Herrmann | $260 |

We agree these hourly rates will remain in effect until the earlier of the completion of the ITO Project and January 1, 2007. We will discount our rates for the ITO Project by 5% for the first $500,000 of fees, and at 10% for portion of our fees that exceed $500,000. We will not charge for travel time, though we will charge for time we are working on your matters while traveling.

Our hourly billable rates include our general overhead and internal charges associated with our practice. A copy of the Delphi billing instructions and limitations is enclosed and incorporated into this engagement agreement by this reference, together with a copy of our current schedule of charges, which will apply only to the extent permitted by the Delphi billing instructions and limitations.

We anticipate submitting to you monthly invoices for the professional (lawyer and paralegal) services rendered and other charges and expenses incurred. Payment is due upon receipt of our statement and in no event later than 30 days thereafter. We will provide you with billing details specifying the individuals involved, their positions here, the hours and work performed and an itemization of other charges.

Mayer, Brown, Rowe & Maw LLP

Marjorie Harris Loeb, Esq.
February 3, 2006
Page 3

## CONFLICT PROVISIONS

You agree that our Firm may represent the persons or entities listed in Attachment A where their interests are adverse (in litigation, transactions or otherwise) to you or your affiliates in matters not related to our engagement by you. In addition, you agree that our Firm may represent other persons or entities (i.e., not listed in Attachment A) whose interests are adverse to you or your affiliates in matters not related to our engagement by you, provided that so long as you remain a continuing client of our Firm, we will not represent such other persons or entities in any litigation or arbitration adverse to Delphi without having obtained a separate waiver from you for that representation.

We agree, however, that your prospective consent to adverse representation shall not apply in any instance where, as the result of our representation of you, we have obtained sensitive, proprietary or other confidential information of a nonpublic nature that, if known to any such other client of ours, could be used in a matter in which we are retained by our other client to your material disadvantage unless we have screened our lawyers and paralegals who have such information from any involvement in the adverse representation. In addition, no lawyer of our Firm who is representing Delphi will participate in the representation of another person or entity adverse to Delphi. The attorneys in our Firm working on matters for Delphi and persons or entities adverse to Delphi will, of course, keep segregated and separate any work product and information concerning the matters for Delphi from any work product and information concerning the matters for any person or entity adverse to Delphi.

For the purpose of determining whether a conflict of interest exists, it is only you and your subsidiaries which we will represent and not your stockholders or other related companies (collectively "Other Related Persons"). You agree not to give us confidential information regarding your Other Related Persons. While we recognize that to act adversely to any Other Related Persons could jeopardize a long term relationship with you, which we would naturally be reluctant to do, for conflict of interest purposes we reserve the right to represent another client with interests adverse to any Other Related Person without obtaining any consent from you or such Other Related Person.

## TERMINATION OF ENGAGEMENT

Following termination of our engagement, any otherwise nonpublic information you have supplied to us which is retained by us will be kept confidential in accordance with applicable rules of professional conduct. At your request, your papers and property will be returned to you; our own files, including lawyer work product, pertaining to the matter will be retained by us. For various reasons, including the minimization of unnecessary storage expenses, we reserve the right to destroy or otherwise dispose of any such items retained by us within a reasonable time after the termination of the engagement.

9056727 42007437

Mayer, Brown, Rowe & Maw LLP

Marjorie Harris Loeb, Esq.
February 3, 2006
Page 4

Our attorney-client relationship will be considered terminated if more than 12 months have elapsed from the last time you requested and we furnished any billable services to you. If you later retain us to perform further or additional services, our attorney-client relationship will be revived, subject to these and any supplemental terms of engagement. The fact that we may inform you from time to time of developments in the law which may be of interest to you, by newsletter or otherwise, should not be understood as a revival of an attorney-client relationship. Moreover, we have no obligation to inform you of such developments in the law unless we are engaged in writing to do so.

<u>ACCEPTANCE</u>

This letter constitutes the entire understanding between you and Mayer, Brown, Rowe & Maw LLP and supersedes all prior understandings, written or oral, relating to its subject matter. Any change must be made or confirmed in writing. If this letter correctly reflects your understanding of the terms and conditions of our engagement, please indicate your acceptance by signing the enclosed copy of this letter in the space provided below and returning it to our office, to my attention.

On behalf of Mayer, Brown, Rowe & Maw LLP, I thank you for the opportunity to be of service.

Sincerely,

Paul J.N. Roy

We agree to the foregoing terms:

DELPHI CORPORATION

By:_____

Date:_____

9056727 42007437

Delphi Billing Instructions and Limitations

**Payment Terms**

Delphi payment terms are MSN-2 (second day of the second month, after the date of the invoice).

**Permitted Reimbursables**

Delphi **will** reimburse a law firm for reasonable and actual out-of-pocket payments made to third-party vendors (i.e., Delphi **will not** pay for markups or surcharges added by the law firm) for the following items:

- Air freight/express mail deliveries
- Bond fees and premiums
- Coach-class air fare (lowest available rate/class)
- Computerized legal research (e.g., Lexis, Westlaw)
- Court reporter fees
- Expert witness fees
- Filing fees
- Inside photocopy (up to 10 cents per page)
- Local business transportation (e.g., taxi fares)
- Long distance telephone charges (for voice, fax or data)
- Outside messenger services
- Outside photocopy, binding, and printing services
- Postage
- Travel (airfare, hotel, rental car)

Delphi **will not** pay for:

- Books/subscriptions
- Fax communications (except long distance telephone charges)
- Hourly fees while traveling
- Inside photocopy (more than 10 cents per page)
- Local meals
- Local personal transportation (taxi/limousine to/from home)
- Local telephone charges
- Membership fees
- Office supplies
- Overtime charges
- Secretarial/clerical charges
- Storage charges

9056727 42007437

- Word processing

Mayer, Brown, Rowe & Maw LLP
U. S. Offices

Schedule of Non-fee Charges to Clients

(which will apply only to the extent permitted by the Delphi Billing Instructions and Limitations)

July 1, 2005

I.      Long Distance Telephone.

We purchase our long-distance telephone service from telecommunications providers at discounted rates. We charge clients at rates calculated to recover our cost.

II.     Automated Research.

We purchase services from Lexis and Westlaw at fixed monthly rates which are substantially below their published rates. We charge clients for the Lexis and Westlaw connections at rates calculated to recover our cost.

III.    Telefax Service.

We charge clients $1.00 per page, plus applicable long distance telephone charges regardless of length at our discounted rates. There is no charge for incoming telefaxes.

IV.     Document Reproduction.

We charge clients for standard-size internal black and white copies at the rate of $.15 per page. We charge clients for standard-size internal color document reproduction (if specifically requested by clients) at the rate of $1.00 per page. We currently reproduce documents using photocopiers, laser printers, and digital copiers, and may in the future use other means of reproduction. Outside copying is charged at actual out-of-pocket cost.

V.      Postage.

We charge clients at cost for postage when the cost of mailing is $1.00 or more.

VI.   <u>Out-of-pocket Disbursements.</u>

The following types of disbursements when related to a client matter are charged at the firm's

cost:

> Advances on behalf of clients (*e.g.*, tax payments, filing fees, title charges)
> Consultants' and expert witnesses' fees and expenses
> Courier and messenger services
> Court reporters
> Equipment when purchased solely for a client matter
> Meals
> Outside services (including cost of litigation support services purchased from outside vendors)
> Service of process
> Records searches
> Supplies (when amounts are large or type of supply item is special)
> Tax return processing charges
> Taxis, mileage, parking (local)
> Travel (airfares, hotels, meals, car rentals, fees of travel agencies and professionals, taxis and incidentals)*
> Trial exhibits
> Witness fees and costs
> Other items not covered above that are directly attributable to a client matter

> *We use commissions paid to our travel agents by hotels and auto rental companies to reduce the costs to us of our Travel Department.

VII.   <u>Items Not Charged to Clients.</u>

> Administrative overhead
> Air conditioning and electricity for overtime work
> Client entertainment
> Local and suburban telephone calls
> Rent for conference rooms

Attachment A

Gail O'Brien
Login Robinson
Oppenheimer Senior Floating Rate Fund

TRW Automotive Inc. and its subsidiaries
Ispat Inland/Mittal Steel USA Inc. and its subsidiaries
United Stars, Inc. and its subsidiaries
Hub Group and its subsidiaries
Micronas Semi-Conductors and its subsidiaries
Bank of America N.A. and its subsidiaries