Hearing Date and Time: May 9, 2006 at 10:00 a.m.

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman (TJ 1129)
Rachel S. Janger
Jessica Kastin (JK 2288)

GROOM LAW GROUP, CHTD
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620
Lonie A. Hassel (LH 8805)

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
    In re                               :     Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :     Case No. 05-44481 (RDD)
                                                          :
        Debtors.            :     (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF DAVID L. RESNICK
IN SUPPORT OF DELPHI'S MOTION FOR AUTHORITY TO REJECT
COLLECTIVE BARGAINING AGREEMENTS UNDER 11 U.S.C. § 1113(c) AND
MODIFY RETIREE WELFARE BENEFITS UNDER 11 U.S.C. § 1114(g)

I, David L. Resnick, declare and state as follows:

1.      I submit this declaration in support of Delphi's Motion For Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g), dated March 31, 2006 (the "Motion").  Any capitalized terms not expressly defined herein have the meanings ascribed to them in the Motion or accompanying Memorandum Of Law, and references to Delphi herein include the Debtors, as appropriate.  The conclusions and analysis set forth below are based on my direct experience in the Debtors' chapter 11 cases, and on my expertise in complex restructuring cases more generally.  I have also relied on a number of publicly-available sources in creating this report, including press releases, rating agency reports and downgrade/upgrade issuances, industry reports, and SEC filings.  If I were called on to testify, I could and would testify to the facts set forth herein.

I.   Background And Prior Expert Testimony

2.      I am a Managing Director at Rothschild Inc. ("Rothschild"), which maintains an office at 1251 Avenue of the Americas, 51st Floor, New York, New York  10020.

3.      Rothschild is a member of one of the world's leading independent investment banking groups, with expertise in domestic and cross-border mergers, acquisitions, restructurings, privatization advice, and other financial advisory services, and with particular experience in providing high-quality investment banking and financial advisory services to financially-troubled companies.  Rothschild has significant experience in a variety of industries, including the automobile industry.  Our restructuring clients include debtors, bondholders, creditors' committees, single creditor classes, and secured creditors.  I have more than 20 years of experience in investment banking, specializing in restructuring.  In the course of my corporate restructuring engagements, I have been responsible for advising many large companies in all

2

**Declaration of David L. Resnick**

aspects of the chapter 11 process.  In particular, I have advised the following companies or creditors' committees on restructuring issues in and outside of chapter 11:  Delphi, PG&E, TWA, Ad-hoc Creditors' Committee of Eurotunnel, Thermadyne, Service Merchandise, NTL (advised France Telecom), Next Wave (advised FCC), Orbimage, Crown Vantage, Bradley Pharmaceuticals, James River Coal, Superior Telecom, Guilford Mills, and Outsourcing Solutions.  In addition, I have advised companies in the automobile sector, including Key Plastics and Guilford Mills.

4.      I received a B.A. with high honors from Wesleyan University in 1981 and my M.B.A. and J.D. degrees from the University of Chicago in 1985.  From 1985 to 1990, I worked at Merrill Lynch & Co. in the investment banking division specializing in merchant banking/restructuring and M&A.  From 1990 to 1996, I worked at Lazard Frères & Co., handling restructuring and M&A assignments for clients in broad range of industries.  From 1996 to 2000, I worked at the Peter J. Solomon Co., where I founded and headed the firm's restructuring group. From 2000 to the present, I have been a Managing Director of Rothschild, with responsibility for leading the firm's global restructuring practice.

5.      I have provided expert testimony in the following cases:  Barney's Inc. (by affidavit), Bedford Fair Industries, Crown Vantage Corporation, Delphi Corporation, Edison Brothers Stores, Inc., Key Plastics, Outsourcing Solutions, Inc., Service Merchandise Company, Inc., Thermadyne Holdings Corporation, Thorn Apple Valley, Inc., Today's Man, Inc., and TransWorld Airlines.  I have no publications authored within the preceding ten years.  I am not being compensated for my testimony in these Delphi's chapter 11 cases, but Rothschild, Inc. is being compensated in accordance with the Bankruptcy Court's Rothschild Retention Final Order, dated November 30, 2005.

3

**Declaration of David L. Resnick**

6.      Rothschild is directly involved in all aspects of the Debtors' restructuring.  Delphi retained Rothschild on May 1, 2005 as financial advisors and investment bankers.  As part of this engagement, Rothschild has been retained to, among other things:  (a) to the extent Rothschild deems necessary, appropriate and feasible, or as the Company may request, review and analyze the Company's assets and the operating and financial strategies of the Company; (b) assist the Company in developing and evaluating a range of strategic alternatives to restructure the Company's legacy liabilities, including without limitation the Company's current labor costs, liabilities for pension and other post-employment benefits; (c) review and analyze the business plans and financial projections prepared by the Company including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends; (d) evaluate the Company's debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for the Company; (e) assist or participate in negotiations with the parties in interest, including, without limitation, any current or prospective creditors of, holders of equity in, or claimants against the Company and/or their respective representatives in connection with a transaction; (f) advise and attend meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as the Company determines to be necessary or desirable; and (g) render such other financial advisory and investment banking services as may be reasonably requested by the Company.

II.  Overview Of The Automotive Industry

7.      Only two decades ago, the "Big Three" U.S. automakers – GM, Ford and Chrysler – had more than 70 percent of the total U.S. light vehicle sales market.  Today, the Big Three constitute nearly 60 percent of the market, while Toyota, Honda, and Nissan combined take nearly 30 percent of the market – largely at the expense of the Big Three.

4

**Declaration of David L. Resnick**

8.      Toyota, Honda, and Nissan, as well as other foreign automakers, have successfully established a considerable North American assembly and manufacturing base, and are known in the industry as "Transplant" automakers.

9.      The Big Three's loss of market share and volume to the Transplants has created substantial excess capacity and over-employment, particularly at GM and Ford.  As a result of pattern labor agreement restrictions on the Big Three's ability to lay off employees and requirements that laid off employees continue receiving wages and benefits, and restrictions on plant closings, GM and Ford generally have been unable to close plants or lay-off employees in an effort to reduce labor costs.  Labor therefore is not a variable cost that changes based on the needs of the market, but is rather a fixed cost.  Because the work force cannot be reduced without continuing to incur fixed labor costs, the Big Three have been left with excess capacity, and as a result, excess production relative to demand.  To handle the excess production, the Big Three has had to offer sales incentives through sometimes drastic price reductions, leading to reduced profitability.  The combination of lower volumes, lower prices, and the general inability to reduce capacity or employee headcount in any meaningful way has resulted in worsening financial conditions at both GM and Ford, with each of their credit ratings having been downgraded to non-investment grade.

10.      These conditions have been critical factors underlying recent GM and Ford announcements of comprehensive North American restructuring plans.  In November 2005, GM announced its North American turnaround plan, which includes reducing assembly capacity by approximately one million units by the end of 2008, closing operations at nine assembly, stamping, and powertrain facilities, and eliminating a total of 30,000 manufacturing positions from 2005 through 2008.  Similarly, in January 2006, Ford announced its "Way Forward" plan

5

**Declaration of David L. Resnick**

for turning around its North American business by 2008.  This plan includes reducing assembly

capacity by 1.2 million units, or 26 percent, by the end of 2008, closing operations at 14

manufacturing facilities, including seven vehicle assembly plants by 2012, and eliminating a

total of 25,000 to 30,000 manufacturing positions from 2006 through 2012.

11.    Although the Big Three historically competed among themselves on a relatively

level playing field due, in large part, to their pattern labor agreements providing them with nearly

identical levels of fixed labor costs and work rules, the Transplants are not burdened by these

pattern labor agreements.  As a result, the Transplants have lower (and, in contrast to the Big

Three, not fixed) labor costs and more flexibility to respond to market forces by modifying their

operations, adjusting their employment base, and reallocating work among employees.

12.    The decline in the Big Three's market share and profitability has had a direct

effect on U.S. suppliers such as Delphi.  First, supply agreements between U.S. automakers and

their suppliers generally do not guarantee volume.  Thus, any decline in production by

automakers directly reduces revenue for their U.S.-based suppliers.  In addition, because

suppliers must make substantial capital investments in the new products they agree to produce,

suppliers are unable to recover the cost of their capital investments if volumes produced are less

than expected.  Suppliers may also have dedicated capacity and employees, based upon expected

volume, that cannot be reallocated to other projects.  Additionally, over the last decade, the

largest and most profitable vehicles for U.S. automakers were SUVs and pick-up trucks.

Because of increasing foreign competition and high gasoline prices, SUV and vehicle sales

declined as compared to the sales of smaller vehicles.

13.    As foreign competition has increased and profitability has declined, U.S.

automakers have pressured suppliers to reduce prices.  The Big Three automakers demand year-

6

**Declaration of David L. Resnick**

over-year price reductions under long-term supply contracts.  Such price reductions are thought

to be justified on the basis that suppliers' costs decline over the life of the contract, as the

suppliers achieve yearly costs savings or absorb the reductions into their profits.  These price

reductions are required even though suppliers' costs may, in fact, be going up due to decreases in

volumes and increases in material and labor costs.  For example, raw material costs including

steel, resins, and plastics, which are major components of an auto suppliers' manufacturing

expense, have considerably increased in recent years.  In general, the Big Three's current supply

agreements do not permit parts suppliers to recover material price increases.  A parts supplier is

thus required to absorb increased raw material costs.

14.    Further accelerating pricing pressure and competitiveness among U.S. automotive

suppliers is the move by automakers to "globally source" parts for their vehicles.  As the auto

industry continues to become more globally competitive, the Big Three automakers are focusing

on reducing their costs by sourcing more of their parts from oversees.  Low labor costs in Asia

and Mexico provide foreign suppliers with significant cost advantages when bidding for new

business, which is particularly true for products that are labor intensive and easily shipped.  As a

result, U.S. automotive suppliers are increasingly having to compete with oversees suppliers on

products where they have a significant cost disadvantage.

15.    As a result of the downturn in the Big Three's market share and profitability,

numerous U.S. suppliers have suffered credit downgrades.  Since the beginning of 2004,

Moody's Investor Services and Standard and Poor's ("S&P"), two of the largest and leading

rating agencies, have downgraded 20 and 34 auto suppliers, respectively, while upgrading only

seven and 14 auto suppliers, respectively.  The agencies have stated numerous reasons for the

downgrades, including decreased operating performance attributable to higher raw material

7

**Declaration of David L. Resnick**

prices, lower volumes, unfavorable product mix, exposure to the Big Three automakers, and cost increases due to increased health care and pension expense.  Further, the rating agencies' outlook for 2006 remains pessimistic.  S&P cites key concerns such as:

- the probability of success of several new vehicle launches, including high volume SUVs and pick-ups that are being introduced by GM;

- high gasoline prices;

- raw materials prices remaining at historically high levels, and the ability to recover little or none of these costs from domestic auto manufacturers;

- decreasing market share for Ford and GM, two manufacturers that many domestic auto suppliers rely upon for business/revenues; and

- decreased consumer demand because auto sales tend to be cyclical; with the relatively high number of vehicles sold in the past few years, there could be negative pressure on volumes.

16.     As shown in the chart below, these industry conditions outlined above, have caused numerous U.S. suppliers other than Delphi to declare bankruptcy in recent years.

| Recent Chapter 11 Filings in the Automotive Supplier Industry | | |
|---|---|---|
| Allied Holdings | Amcast Industrial | Collins & Aikman |
| Dana Corporation | Eagle Picher | Hastings Manufacturing |
| Intermet | J.L. French Automotive Castings | Meridian Automotive |
| Oxford Automotive | Tower Automotive | |

## III. Rothschild's Work On Behalf Of Delphi

### A.     Rothschild Was Retained To Address The Financial Challenges Facing Delphi

17.     As noted above, Delphi retained Rothschild on May 1, 2005, as financial advisors and investment bankers.  Rothschild was charged at that time with assisting Delphi in determining and exploring the options available to Delphi to deal with the financial challenges it had faced since its 1999 Spin-Off from GM.  These financial challenges are discussed in detail in the declaration of John D. Sheehan, so I will address them only briefly here.

8

**Declaration of David L. Resnick**

18.    Although at the time of the Spin-Off, more than three-fourths of Delphi's sales were to GM – principally to GM's North American operations – by the end of 2005, and largely as a result of the trends I discussed in Section II, above, Delphi's total revenue from GM had declined from $22.3 billion in 1999 to approximately $12.8 billion, while Delphi's non-GM revenue had increased from $6.9 billion in 1999 to approximately $14.1 billion.

19.    In addition, Delphi was burdened by the pattern labor agreements it adopted as a result of the Spin-Off and the Mirror Agreement.  Although Delphi may have been able to sustain these high fixed – and increasing – labor costs had it maintained the GM revenues envisioned at the time of the Spin-Off, those costs were simply not sustainable in light of GM volumes that were significantly below the Spin-Off expectations.

20.    Delphi has also been unable to pass on under its agreements with its customers, increased commodity prices that have occurred in recent years.  As a result, Delphi was forced to absorb tens of millions of dollars in increased costs, without increasing revenue or decreasing other fixed costs, such as labor.

B.    Rothschild Worked With Delphi To Develop Four Potential Scenarios For Addressing Delphi's Financial Challenges Based On Downside Case Projections

21.    When Rothschild was retained in May 2005, the Company had just completed a refinancing which had involved developing financial projections that the Company relied on as its "base case" for purposes of the refinancing.  Rothschild advised Delphi, following its review of these projections, that the Company should develop a "downside case," relying on more conservative assumptions, as the basis of its ongoing financial analysis of its strategic alternatives.  Reliance on such conservative downside cases is typical in similar restructuring cases, and was prudent and appropriate in Delphi's circumstances, where the industry was in a

**Declaration of David L. Resnick**

state of turmoil and the future was uncertain, at best.  Consequently, Delphi developed a downside case that became the basis for our analysis.

22.     Rothschild was charged with assisting Delphi's management and the Board of Directors to assess various restructuring alternatives for the Company.  We immediately undertook that project and developed and evaluated a broad range of potential illustrative restructuring scenarios, entitled Scenarios A, B, C, and D, each of which sought to transition Delphi's most significant causes of its financial difficulties:  collectively-bargained active wages and benefits, OPEB, pension, and loss-generating GM contracts.

23.     Scenario A involved an immediate chapter 11 filing, seeking rejection of Delphi's collective bargaining agreements, elimination of pension and OPEB, and rejection of GM loss-generating contracts.  Under Scenario D, Delphi would have attempted to work over the long-term within its existing framework and seek a gradual transition with its key stakeholders to a restructured state.  Scenarios B and C were between Scenarios A and D on the continuum.

24.     Scenario C, which Rothschild recommended, provided for an attempt at a completely out-of court restructuring through negotiations with GM and the Unions.  Rothschild believed that Scenario C was an appropriate consensual resolution that addressed the continued operating and cash flow losses that Delphi was experiencing, which would not have been adequately addressed under the more gradual implementation contemplated by Scenario D.

25.     Delphi's Board of Directors supported Rothschild's recommendation to move forward under the Scenario C approach and directed management, with its advisors, to commence negotiations with GM and the Unions.  Based on the financial projections available at the time, successful negotiations under Scenario C would have enabled Delphi management to implement a sustainable business strategy over time by (a) allowing management to sell, close,

**Declaration of David L. Resnick**

or restructure businesses and plants that are unprofitable, (b) eliminating the JOBS Bank, (c)

allowing for an immediate competitive wage and benefits structure, (d) providing some relief

from OPEB liability, (e) extending the timing of minimum pension funding payments, and (f)

negotiating with GM to resolve loss-generating contracts.

       C.     <u>Delphi And Rothschild Pursued Scenario C</u>

       26.     Over the next several months, Delphi pursued a Scenario C resolution with the

Unions and GM.  After several meetings and sessions with its Unions, and separately with GM,

the Unions and GM both effectively rejected Scenario C.  Each made it clear that it would not be

able to provide concessions approaching the level sought by Delphi.  In addition, both GM and

the Unions indicated that if they were to make concessions, other stakeholders (such as

unsecured bondholders and similar pari passu creditors) should also contribute to a Delphi

restructuring.  Based on this feedback, Delphi and Rothschild explored alternatives of possible

out-of-court solutions that would involve other stakeholders.  These alternatives were reviewed

with the Delphi's Board of Directors, who directed the Company to continue to pursue out-of-

court alternatives and in parallel, prepare for a potential chapter 11 filing if an out-of-court

consensual resolution could not be achieved.  No further progress occurred in discussions with

the Unions and GM, however, and Delphi was unable to reach a consensual out-of-court

resolution.

       D.     <u>In The Fall Of 2005, Delphi Developed Its Base Case Projections That Modeled
Delphi's Steady State Scenario</u>

       27.     Following the analysis and discussions that occurred over the summer of 2005,

Delphi's business outlook continued to deteriorate, and the former downside case had become, in

reality, the base case.  Rothschild understands that Delphi concluded that it was in the best

interests of its stakeholders to seek reorganization relief in October 2005 due to three principal

**Declaration of David L. Resnick**

reasons:  (a) the increased labor and benefit costs and limitations on Delphi's ability to sell or

close facilities, or lay off excess employees, under Delphi's labor agreements, (b) the effect of the

competitive conditions in the U.S. automotive market, which have greatly reduced GM's sales

and profitability, resulting in reduced business and greater pricing pressure for Delphi, and (c)

rapidly rising commodity costs which Delphi was unable to pass along to its automaker

customers.

28.    During the fall of 2005, Delphi prepared its 2006 to 2010 business plan.  Through

Delphi's business planning process, Delphi first developed what has become known as the

Steady State Scenario, which assumes no modification to Delphi's existing cost structure or

manufacturing footprint.  The Steady State Scenario projections, in light of Delphi's deteriorating

financial conditions, forecasted operating losses greater than the downside case that had been

developed over the summer of 2005.

29.    The Steady State Scenario represented Delphi's best estimate of costs and revenue

in each of its divisions based on (a) the assumption that Delphi's existing labor agreements

continued in effect, (b) the assumption that Delphi retained all of its existing lines of business,

and (c) Delphi's best estimate of business volumes, pricing, and material costs based on the then-

existing economic trends.  In creating the Steady State Scenario, Delphi conducted an in-depth

evaluation of each of its businesses, taking into account revenue and costs forecasts in light of

changed economic conditions, including the chapter 11 filings.  Delphi concluded that most of

the economic trends leading to Delphi's current financial crisis – GM's loss of market share,

reduced GM revenues, pressure for price-downs, higher material costs, and the like – will

continue for the foreseeable future.

**Declaration of David L. Resnick**

30.     Under Delphi's Steady State Scenario, Delphi projected an operating loss of $8.1 billion, and a net loss of $12.9 billion over the five-year period from 2006-2010.  As with its historical financial results, these losses are in large part attributable to Delphi's U.S. operations.

31.     Rothschild has reviewed and analyzed the Steady State Scenario prepared and provided by Delphi, and believes that the scenario is based on conservative assumptions that are prudent and appropriate as the starting point to develop a restructuring plan.  Because the Steady State Scenario, as Delphi determined and as Rothschild agreed, is an unsustainable operating model, it was imperative that Delphi take the next step to develop a restructuring plan that incorporated significant modifications to its cost structure and manufacturing footprint to achieve a competitive and sustainable business model.

E.     The Competitive Benchmark Scenario

32.     Because GM had rejected a consensual resolution of Delphi's financial challenges over the summer of 2005 during discussions of Scenario C, and had given no indication that GM would change direction, Rothschild agreed with Delphi that Delphi's restructuring scenarios should be based on the assumption that GM would not provide Delphi with any financial support in Delphi's restructuring.  Delphi therefore developed the "Competitive Benchmark Scenario," which represents Delphi's financial projections following implementation of (a) Delphi's Competitive Benchmark Proposals to the Unions pursuant to Sections 1113 and 1114, (b) other planned efforts to reduce costs including an effort to reduce SG&A costs by $450 million per year by 2009, (c) the sale, wind-down, or consolidation of a certain number of its product lines and associated manufacturing sites, and (d) Delphi's best estimate of GM revenue and pricing if Delphi implemented the other proposed changes.

33.     Rothschild believes that Delphi has used its reasonable business judgment in developing its product portfolio realignment plan and that achieving a competitive cost structure,

including U.S. labor costs, as developed by Delphi in its Competitive Benchmark Scenario is appropriate, reasonable, and necessary, particularly given the difficult dynamics and conditions of the automotive industry, as outlined in Section II, above.

F.  The GM Consensual Scenario

34.  On November 28, 2005, Delphi announced that GM agreed temporarily to forego previously agreed-to 2006 price reductions on components provided by Delphi, as a form of interim financial support to Delphi.  At that time, GM also began preliminary discussions with Delphi and Rothschild to explore potential financial participation in a Delphi restructuring. Delphi thereafter conditionally withdrew the Competitive Benchmark Proposals to the Unions in an effort to facilitate discussions with GM and the UAW regarding a consensual resolution to Delphi's request for contract modifications that would include GM financial support.  The GM Consensual Scenario also included assumptions regarding SG&A and product and portfolio realignment that were also addressed in the Competitive Benchmark Scenario.

35.  The GM Consensual Scenario that Delphi has developed is Delphi's attempt to provide Union employees with "soft landings," with funding from GM, in an attempt to achieve a consensual resolution among the parties.  The GM Consensual Scenario represents Delphi's financial projections following (a) obtaining modified labor agreements consistent with Delphi's GM Consensual Proposals, (b) negotiating a mutually-agreeable level of financial support from GM, or, if that is not possible, dealing with the thousands of GM supply contracts under which Delphi consistently loses money, and (c) a pension solution.

36.  Rothschild believes that Delphi's GM Consensual Scenario is an appropriate approach that addresses a competitive cost structure and manufacturing footprint for Delphi, helps to maximize value to the estates, as well as provides "soft landings" for many of Delphi's U.S. Union employees with funding from GM, Delphi's former parent and largest customer.

14

**Declaration of David L. Resnick**

G.    Delphi's First Quarter 2006 Results Do Not Materially Impact The Scenarios

37.    In the ordinary course of business, Delphi updates its financial outlook quarterly for the remainder of that calendar year.  On April 20, 2006, Delphi's management reviewed with its Board of Directors its first quarter actual performance versus forecast and the impact on Delphi's financial outlook.  Based on higher than projected performance in the first quarter of 2006, Delphi projects a $516 million improvement in its 2006 operating income and a $252 million improvement in its 2006 cash flow over the Steady State Scenario projections.  These improvements are due in large part to either one-time events or items that do not impact the Competitive Benchmark or GM Consensual Scenarios.  As such, Delphi concluded, and Rothschild agrees, these improvements do not materially impact the outlook under the various restructuring scenarios, nor do they alleviate Delphi's need for the restructuring outlined in its Competitive Benchmark and GM Consensual Scenarios.

IV. Conclusions

38.    In sum, in the year that Rothschild has worked with Delphi to find resolutions to its financial challenges, I believe that Delphi has engaged in a comprehensive analysis of its businesses that has resulted in the creation of a series of restructuring scenarios which, if implemented, would allow Delphi to restructure successfully.  Delphi's pursuit of Scenario C in the summer of 2005, which Rothschild recommended, was based on a reasonable set of assumptions at the time and, I believe, had it been successful, would have provided Delphi with the means to engage in a successful out-of-court restructuring.  Delphi's Steady State, Competitive Benchmark, and GM Consensual Scenarios, which have since been developed by Delphi, are based on appropriate and reasonable approaches to Delphi's restructuring in chapter 11.  These three Scenarios conclusively demonstrate that Delphi cannot reorganize without either

15

**Declaration of David L. Resnick**

being granted the relief requested in its Motion or achieving a consensual agreement with GM and the Unions.

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 25th day of April, 2006

/s/ David L. Resnick
DAVID L. RESNICK

**Declaration of David L. Resnick**