TOGUT, SEGAL & SEGAL LLP
Conflicts Counsel for
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, NY 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)

HEARING DATE:    June 20, 2006
HEARING TIME:    10:00 a.m.
OBJECTION DEADLINE:    June 13, 2006 at 4:00 PM

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                          :

In re                          :        Chapter 11
                          :

    DELPHI CORPORATION, et al.,    :        Case No. 05-44481 (RDD)
                          :

                 Debtors.    :        (Jointly Administered)
                          :

-------------------------------------------------------------X

## FIRST APPLICATION OF TOGUT, SEGAL & SEGAL LLP FOR AN ALLOWANCE OF INTERIM COMPENSATION FOR SERVICES RENDERED AS CONFLICTS COUNSEL FOR THE DEBTORS FOR THE PERIOD OCTOBER 8, 2005 THROUGH JANUARY 31, 2006 AND FOR REIMBURSEMENT OF EXPENSES

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

        Togut, Segal & Segal LLP ("TS&S"), as conflicts counsel for Delphi

Corporation ("Delphi") and the other above-captioned debtors and debtors in

possession (collectively, the "Debtors"), respectfully makes this application (the

"Application") for an allowance of interim compensation for professional services

rendered for the period October 8, 2005 through and including January 31, 2006 (the

"First Interim Period"), and for reimbursement of expenses incurred in connection with

such services.  In support of this Application, TS&S states:

1

I.    <u>**FEES AND EXPENSES FOR WHICH ALLOWANCE IS SOUGHT**</u>

1.    This Application is made pursuant to sections 330 and 331 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016(a) of the Federal Rules of Bankruptcy Procedure and the November 4, 2005 Order of the Court establishing procedures for compensation and reimbursement of professionals (the "Administrative Fee Order"), for an allowance of interim compensation for services rendered to the Debtors in the amount of $789,874, and for reimbursement of expenses in the amount of $14,531.15, which were incurred during the First Interim Period.

2.    TS&S attorneys and paraprofessionals expended a total of 1,748.8 hours representing the Debtors during the First Interim Period for which the firm requests compensation.  A schedule setting forth the number of hours expended by the firm's partners, counsel, associates and paraprofessionals during the First Interim Period, their respective hourly rates, and the year in which each attorney was admitted to practice is attached as Exhibit "1."  A schedule specifying the type of expenses for which TS&S is seeking reimbursement during the First Interim Period and the total amount of each category is attached as Exhibit "2."  To the extent that time or disbursement charges for services rendered or disbursements incurred relate to the First Interim Period, but are not processed until after the date of this Application, TS&S reserves the right to request additional compensation and reimbursement in a future application.

3.    TS&S maintains computerized records of the daily time slips completed by all attorneys and paraprofessionals.  Preceding the time entries is a chart listing the names, billing rates and time spent by each of the attorneys and paraprofessionals rendering services on behalf of the Debtors.  In support of this Application, copies of these computerized records, together with a computer generated

2

detailed itemization of the expenses incurred, have been filed electronically with the Bankruptcy Court for the Southern District of New York (the "Court") as a supplement to this Application and furnished to the Debtors, the United States Trustee, the Debtors' secured lenders, and counsel for the official statutory committee of unsecured creditors appointed in these cases (the "Committee").

4.      Pursuant to the Administrative Fee Order, TS&S submitted three monthly invoices during the First Interim Period:  (i) for October 8, 2005 through November 30, 2005 in the amounts of $332,253.50 for fees and $6,929.33 for expenses; (ii) for December 1, 2005 through December 31, 2005 in the amounts of $206,957.50 for fees and $3,982.79 for expenses;  and (iii) for January 1, 2006 through January 31, 2006 in the amounts of $246,331 for fees and $3,619.03 for expenses.

5.      In accordance with the Administrative Fee Order, TS&S has received payment of 80% of its fees and 100% of its expenses for the period October 8, 2005 through January 31, 2006.

6.      As confirmed by the Certification of Neil Berger, a member of TS&S, attached as Exhibit "3," all of the services rendered by TS&S during the case for which compensation is sought were rendered for and on behalf of the Debtors in connection with their chapter 11 cases.

## II.      <u>BACKGROUND</u>

### A.      <u>Current Business Operations Of The Debtors</u>

7.      With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion,[1] the Debtors' chapter 11 cases rank as the fifth largest public company business reorganization measured by revenues, and the thirteenth largest public company business reorganization measured by assets.   Delphi's non-U.S. subsidiaries are not chapter 11 debtors.

8.    Over the past century, the operations that are now owned by the Debtors have developed leading global technology innovations with significant engineering resources and technical competencies in a variety of disciplines.  Today, Delphi is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Debtors' technologies and products are present in more than 75 million vehicles on the road worldwide.  The Debtors supply products to nearly every major global automotive original equipment manufacturer, with 2004 sales to its former parent, General Motors Corporation ("GM"), equaling approximately $15.4 billion, and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

9.    As part of its growth strategy, the Debtors have established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the United States, the Debtors employ approximately 50,600 people.  These employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in the Debtors' worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

Outside of the United States, Delphi's foreign entities employ more than 134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

10.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted Delphi's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Debtors in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Debtors' single largest customer, today more than half of the Debtors' revenue is generated from non-GM sources.

### B.     Events Leading To Chapter 11 Filing

11.     In the first two years following Delphi's separation from GM, Delphi generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, Delphi suffered losses.  In calendar year 2004, Delphi reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005.  Delphi experienced net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9

billion, approximately $1 billion less in sales than during the same time period in calendar year 2004.[2]

12.    The Debtors believe that three significant issues largely contributed to the deterioration of their financial performance:  (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating a largely fixed labor cost;  (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures;  and (c) increasing commodity prices.

13.    In light of these factors, the Debtors determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Having concluded that pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Debtors determined to commence these chapter 11 cases for its U.S. businesses to complete their transformation plan and preserve value.

14.    Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve Delphi's core businesses.  The Debtors have begun negotiations

---

[2]    The Debtors' reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

with key stakeholders over their respective contributions to the restructuring plan; absent consensual participation, the Debtor intends to utilize the chapter 11 process to achieve the necessary cost savings and operational effectiveness envisioned in Delphi's transformation plan.  The Debtors believe that a substantial segment of its U.S. business operations must be divested, consolidated, or wound-down through the chapter 11 process.

15.    Upon the conclusion of this process, the Debtors expect to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, the Debtors are attempting to marshal all of their resources to continue to deliver value and high-quality products to their customers globally.   Additionally, Delphi continues in its efforts to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

C.    **The Debtors' Chapter 11 Cases**

16.    It is against this extraordinarily complex and challenging business and legal backdrop that on October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries filed with this Court voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code.  On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this Court for reorganization relief. On the Initial Filing Date and October 19, 2005, this Court entered Orders directing the joint administration of the Debtors' chapter 11 cases (Docket Nos. 28 and 404).

17.    The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18.    No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee has retained Latham & Watkins LLP as its counsel and Mesirow Financial Advisors as its financial advisors.

III.    **RETENTION OF TS&S**

19.    TS&S was retained by the Debtors just prior to the Initial Filing Date in October 2005 to serve as conflicts counsel and to work with the Debtors' lead bankruptcy counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  TS&S is responsible for handling all bankruptcy-related matters where Skadden has an actual or perceived conflict, and discrete tasks assigned by Skadden that can be more efficiently handled by TS&S.  TS&S has not received a retainer.

20.    The speed with which the Debtors commenced their Chapter 11 cases and the retention of TS&S just prior to the Initial Filing Date did not allow TS&S to benefit from any pre-filing planning.  Since the Debtors faced many legal and operating challenges during the first days of this case, there was a tremendous amount to do after the Initial Filing Date and TS&S had to work hard to get up to speed quickly.

21.    TS&S attorneys met with Skadden and the Debtors so that TS&S could do its part to assist the Debtors in the transition from traditional operations to working in a Chapter 11 case.  TS&S professionals reviewed and analyzed first-day motions and orders to become familiar with the Debtors' operations and conferred with Skadden and representatives of the Debtor to become familiar with tasks for which

8

TS&S was to be responsible.  TS&S traveled to the Debtors' headquarters in Troy,

Michigan to meet with the Debtors concerning various vendor issues and to begin to

develop strategies and protocols for the resolution of various vendor issues.  The

volume and magnitude of the issues confronting the Debtors necessitated assignment of

priorities to projects based upon the Debtors' needs and where resources could best be

used.  TS&S was able to assume responsibility for various tasks that have been timely

resolved for the benefit of the Debtors and their estates.

22.    By Order dated November 4, 2005, the Debtors were authorized to

retain TS&S on a final basis (the "Retention Order";  Docket No. 1034).

23.    Since its retention, TS&S and Skadden have carefully coordinated

their efforts and their work is complementary.

24.    TS&S is a highly specialized "boutique."  For more than 25 years,

the firm's practice has been limited, almost exclusively, to insolvency and bankruptcy

matters pending in this Court.  TS&S has considerable experience in representing high-

profile chapter 11 debtors, and has acted in a professional capacity in hundreds of cases

representing the interests of debtors, creditors' committees, secured creditors and

trustees.

25.    For example, TS&S served as conflicts and co-counsel for the

debtors in the chapter 11 cases of Enron Corp. and certain of its affiliates.  The Enron

debtors, which were primarily engaged in energy trading and operating gas

transmission systems, filed the second largest chapter 11 cases in U.S. history.  TS&S has

been, and continues to be, responsible for a number of significant projects in the Enron

chapter 11 cases including, without limitation:  (i) the commencement of more than

1,000 adversary proceedings which have sought the avoidance and recovery of

preferential transfers, fraudulent conveyances, commercial paper and equity transfers,

9

and other avoidable transfers made by the Enron debtors (to date, TS&S has recovered more than $250 million in value on behalf of the debtors in those adversary proceedings); (ii) the development and execution of a novel, streamlined process that was utilized by the Enron debtors, with Applicant's assistance, to reject more than 45,000 burdensome contracts; (iii) the development and implementation of a Court-approved *de minimus* sale procedure which was used, with Applicant's assistance, to conduct more than 80 sales which realized more than $6 million; (iv) the negotiation and implementation of an auction procedure, and coordination with the retained auctioneer, to consummate sales which realized more than $12 million; (v) negotiation and recovery of accounts receivable; (vi) objections to demands by utility service providers that requested cash deposits (deposit demands exceeded $3.5 million, and Applicant settled all of those demands so that deposits totaled only $250,000); (vii) counseling the debtors concerning various employee issues and claims, including acting as liaison among debtors, the United States Trustee, the unsecured creditors committee and several counsel seeking to form an employees committee; (viii) litigation to enforce the debtors' rights regarding the prosecution and/or stay of various actions against the debtors that were pending throughout the United States; (ix) litigation and settlement of an adequate protection motion made by a lender asserting a claim of more than $20 million; (x) negotiations for the release of millions of dollars of goods which had been stopped in transit by reclaiming vendors; (xi) negotiation of capital recovery in connection with complex energy alliance agreements, resulting in recoveries of more than $10 million; (xii) obtaining Court approval for the sale of real and personal property including, without limitation, energy assets, intellectual property, telecommunications assets and contract rights; (xiii) assistance with asset recovery including, inter alia, motion practice to compel the turnover of assets improperly held

10

by third parties; and (iv) coordination and the preparation of more than 100 schedules

of assets and liabilities and statements of financial affairs for all of the Enron debtors.

      26.    The effective and efficient counsel provided to the Enron debtors

was recognized in the recently published *Recommendation and Advisory Report of the Fee*

*Committee on the Final Compensation of Togut, Segal & Segal LLP* in the Enron cases:

> "As co-counsel, the Togut Firm served in a supporting role to Weil Gotshal, the Debtors' principal bankruptcy counsel. The Togut Firm was asked to handle work for which Weil Gotshal had conflicts. The Togut Firm also handled numerous other bankruptcy matters on which its size and concentrated bankruptcy expertise were an advantage.
>
> "Weil Gotshal handled all of the main work in the case; the Togut Firm, as co-counsel, was assigned discrete subsets of work either because Weil Gotshal had conflicts or because the Togut Firm, being smaller, could handle the work more efficiently. The Togut Firm coordinated its efforts with Weil Gotshal to avoid duplication of effort. Over the course of the case, Togut Firm timekeepers billed for only 10 meetings with Weil Gotshal, most of which were general status meetings. There was virtually no overlap and no duplication of effort.
>
> "The Togut Firm managed its work well and staffed it tightly with timekeepers with appropriate experience and billing rates. It handled every type of bankruptcy matter very efficiently as attested by the timely filing of the Schedules with a single extension of time and by the Togut Firm's favorable dollars-recovered-to-fees-billed ratio.
>
> "When a Weil Gotshal conflict arose in the middle of a matter, the Togut Firm as conflicts counsel took the matter over instantly and seamlessly. The two firms handled transitions so effectively that the Committee found no indication in the time records of how a transition had occurred. Weil Gotshal timekeepers were working on the matter one minute; Togut Firm timekeepers the next."

27.    Some of the other chapter 11 debtors that TS&S has represented include:  (i) *Tower Automotive, Inc.* and its related debtor entities, one of the largest automotive parts suppliers in the country (conflicts counsel for the debtors);  (ii) *Saint Vincents Catholic Medical Centers* and its related debtor entities, one of the New York Metropolitan area's most comprehensive health care systems (conflicts counsel for the debtors);  (iii) *Allegiance Telecom, Inc.* and its related debtor entities, which was a facilities-based national local exchange carrier that provided integrated telecommunications products and services (co-counsel for the debtors);  (iv) *Ames Department Stores, Inc.*, which at the time of the commencement of its case was the largest regional discount retailer in the United States (co-counsel for the debtors); (v) the operating subsidiaries of *Loews Cineplex Entertainment Corp.*, which involved the restructuring of the second largest movie theatre exhibitors in the U.S. with over $1.5 billion of debt (co-counsel for the debtors);  (vi) *Daewoo International (America) Corp.*, an international trading company (sole bankruptcy counsel for the debtors);  (vii) *ContiMortgage Corporation* and certain of its affiliates, which were engaged in the consumer finance business and which filed chapter 11 cases to restructure more than 1 billion of debt (sole bankruptcy counsel for ContiMortgage Corp.);  (viii) *OnSite Access, Inc.* and certain of its subsidiaries, which provided voice and data communication services to tenants in commercial buildings located throughout the United States and which filed chapter 11 cases to restructure more than $100 million in debt (sole bankruptcy counsel for the debtors);  (ix) *Rockefeller Center*, which involved the restructuring of more than $1.3 billion of debt and 12 historic landmarked buildings in the heart of Manhattan (sole bankruptcy counsel to the debtors);  (x) the *Olympia & York Tower B Company's World Financial Center*, which concerned the restructuring of more than $1 billion of debt (sole bankruptcy counsel to the debtor);  and (xi) *Guilford*

12

*Mills, Inc.* and its subsidiaries, one of the largest automotive textile producers in the country, which restructured over $300 million of secured debt and paid all creditors in full under a confirmed plan (sole bankruptcy counsel to the debtor).

28.    TS&S was also sole counsel for the creditors' committee in *Finley, Kumble, et al.*, which concerned the liquidation of the then fourth largest law firm in the United States (having assets of more than $75 million).  A chapter 11 plan was confirmed and Albert Togut, the senior member of TS&S, served as the Trustee of the liquidating trust established under the Finely Kumble plan.  TS&S similarly served as sole counsel to the creditors' committee in the law firm liquidation case of *Bower & Gardner*, and is presently counsel to Mr. Togut as the chapter 11 plan administrator. Likewise, TS&S served as sole counsel to the creditors' committee in the chapter 11 law firm liquidation case of *Shea & Gould*, was also counsel to Mr. Togut as the chapter 11 plan administrator in that case.

29.    The work encompassed by this Application and for which TS&S seeks interim compensation was performed efficiently and at the lowest cost to the estates.  The manner in which staffing has been done has enabled TS&S to bill fewer hours than would have otherwise been possible.

30.    All of the work summarized in this Application was performed in a manner to ensure minimal duplication of services in an effort to keep the administration expenses to a minimum.

## IV.    SERVICES RENDERED BY TS&S
## DURING THE FIRST INTERIM PERIOD

31.    All of the professional services provided by TS&S are set forth in TS&S' computerized time records, and the Court is respectfully referred to those records for the details of all of the work performed.

13

32.    It was determined prior to the filing of the Debtors' chapter 11 cases that a clear division of litigation-related duties was appropriate to avoid potential conflicts that might have arisen had Skadden had been responsible for the resolution of all such matters.

33.    Specifically, Skadden and the Debtors requested that TS&S take primary responsibility for representing the Debtors in the following matters, among others, that would not therefore be addressed by Skadden:

    (a)    motions or demands made by certain creditors asserting setoff and/or recoupment rights pursuant to section 553 of the Bankruptcy Code and Paragraph "18" of this Court's Final DIP Financing Order, dated October 28, 2005 (the "DIP Order");

    (b)    motions by certain parties-in-interest for relief from the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Automatic Stay");

    (c)    issues related to the Essential Supplier Motion (as defined below), including filing Notices of Waiver and proposed Orders to Show Cause addressing payments made to non-conforming suppliers;

    (d)    issues concerning potential injunction litigation with various suppliers to prevent cessation of shipment of products necessary for uninterrupted manufacturing activities of the Debtors;  and

    (e)    issues concerning the collection of accounts receivable from the Debtors' suppliers.

14

A.    __Setoff Issues__:

34.    As part of the negotiations regarding post-petition financing, the Debtors included a detailed mechanism in the DIP Order which enables the Debtors' suppliers to exercise setoff claims and/or recoupment rights regarding their pre-petition payables, subject to certain conditions.  Following the procedures contained in Paragraph 18 of the DIP Order, a supplier may exercise a valid setoff right that arose during the Debtors' ordinary course of business without it being subject to section 362 of the Bankruptcy Code, except for setoffs that arose as a result of the filing of the Debtors' chapter 11 cases.[3]  Thus, setoffs that are subject to paragraph 18 of the DIP Order include claims arising out of, for example, pre-petition warranty and/or product recall, customer adjustments, customer rebates and allowances, overpricing, short shipments and credits for damaged goods.

35.    Any claimant that seeks to exercise setoff rights must submit a written request with supporting documentation to the Debtors and the Committee (with a copy to JPMorgan Chase Bank as Administrative Agent for the Debtors).  If within ten business days after sending such request, unless the parties extend that time, the Debtors and any particular claimant have failed to agree on the allowed amount of a requested setoff, they may seek resolution of the matter through an agreed-upon mediator or the Court.  If the mediator cannot resolve the dispute within thirty days, the parties may submit the matter to binding arbitration, with the arbitrator having an additional sixty days to rule.

---

[3]    Nothing contained herein is meant to modify the provisions of the DIP Order or any right or obligation of any party thereunder.

36.    During the First Interim Period, the Debtors received thirty-seven setoff requests.  Nine of the requests were made by motion seeking relief from the Automatic Stay to exercise setoff and/or recoupment rights;  the balance were made by informal written requests pursuant to the DIP Order, typically by letters to the Debtors. TS&S has been primarily responsible for handling the contested setoff/recoupment demands that have been made:  nineteen requests, including five motions.

37.    To effectively resolve these demands, TS&S has:  (i) regularly communicated with the Debtors' personnel to facilitate their ability to obtain and analyze data needed to reconcile the amounts of the receivables owed to the Debtors with amounts of the payables owed by the Debtors;  (ii) developed strategies for responding to setoff motions and prepared for possible litigation if settlement negotiations fail;  (iii) engaged in negotiations with counsel for the setoff claimants;  and (iv) conducted necessary legal and factual research regarding issues raised in the motions and letter demands.

38.    TS&S has worked with the Debtors to ensure that mutuality exists among the parties involved in the setoff demands.  In instances where the amounts to be setoff have involved a pre-petition overpayment by the Debtors, TS&S has conducted necessary forensic/factual and legal research.

39.    As a result of the high number of setoff demands, it was incumbent upon the Debtors, TS&S and Skadden to ensure very early in the process that they were each apprised of the status of the demands.  Throughout the First Interim Period, the Debtors, TS&S and Skadden participated in weekly status calls to review pending setoff demands and to help coordinate the participants' efforts.  During these calls, among other things, the parties:  (i) discussed new demands that the Debtors had received (including an analysis of the merits of each new demand);  (ii) discussed the status of

16

the Debtors' and setoff claimant's exchange of information to reconcile the accounts;
(iii) analyzed the factual and legal issues implicated by the demands;  and
(iv) developed uniform strategies on behalf of the Debtors regarding each of the
demands.  These calls have proven helpful in safeguarding the Debtors' interests in
these matters because they have permitted each of the parties – the Debtors, TS&S and
Skadden – to efficiently address the setoff demands without TS&S and Skadden
duplicating each others' efforts.

40.    TS&S has devoted substantial time in assisting the Debtors to
resolve setoff requests made pursuant to the DIP Order or by motions.  When a
negotiated settlement was not possible, TS&S has assisted the Debtors in contesting
certain of these demands.  To date, all of the setoff demands were able to be
consensually resolved except for the setoff motion filed by Furukawa Electric North
America APD ("Furukawa").

41.    Furukawa supplies the Debtors with SIR coils and connection
systems pursuant to various purchase orders and supply contracts.  On December 15,
2005, Furukawa filed its *Motion for Relief from Automatic Stay to Permit Setoff of Claims*
(the "Furukawa Motion"), and sought authority to reduce the unpaid pre-petition debt
owed by Delphi to Furukawa by applying an overpayment of approximately $2.8
million that Debtors mistakenly made to Furukawa four days before the Initial Filing
Date (the "Overpayment").

42.    On February 2, 2006, after the parties' business and legal
representatives were unable to resolve the Furukawa Motion despite extensive
negotiations, TS&S filed a response on behalf of the Debtors (the "Response").  In the
Response, TS&S asserted that Furukawa did not establish cause for relief from the
automatic stay because:  (i) the Overpayment constituted an avoidable fraudulent

17

transfer or, alternatively, an avoidable preferential transfer, and that until the Overpayment was returned to the estate, Furukawa had no allowable claim with which to exercise a setoff; and (ii) the mutuality of obligations requirement of section 553 of the Bankruptcy Code could not be satisfied because Furukawa was the recipient of an avoidable transfer. On February 8, 2006, Furukawa filed a reply brief.

43.     The Furukawa Motion, the Response and Furukawa's reply were considered by the Court at a hearing held on February 9, 2006. At the conclusion of the hearing, the Court denied the Furukawa Motion on the basis that, as the Debtors had contended, the $2.8 million sought to be setoff by Furukawa could be subject to recovery by the Debtors through an avoidance action. Cause did not exist for the stay relief sought by Furukawa.

44.     Other vendors seek to effectuate setoffs against double and overpayments. TS&S continues to assist the Debtors as they resist those setoff demands and seek recovery of those payments.

**B.      Essential Supplier Issues/Orders to Show Cause**

45.     During the First Interim Period, the Debtors and Skadden requested that TS&S handle the preparation and resolution of Orders to Show Cause against certain vendors.

46.     The Debtors' manufacturing facilities use a "just-in-time" supply method for processing their products. Consequently, the Debtors do not maintain a significant inventory (and in many cases, less than 24 hours worth) of components supplied by their most important suppliers (the "Essential Suppliers"). Moreover, the Debtors rely on the "sole source" supply method, whereby they purchase all of their requirements for a particular (and necessary) part from one supplier. Accordingly, the

Debtors depend upon frequent and, in many cases, daily shipments of components from the Essential Suppliers to keep their manufacturing facilities operating.

47.    The Debtors were concerned that the Essential Suppliers would exploit the Debtors' need for shipments by, among other things, demanding post-petition payment of pre-petition invoices.  Consequently, on the Initial Filing Date, the Debtors filed their *Motion for an Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, and 1008 and Fed. R. Bankr. P. 6004 and 9019 Authorizing Continuation of Vendor Rescue Program and Payment of Pre-petition Claims of Financially-Distressed Sole Source Suppliers and Vendors Without Contracts* (the "Essential Supplier Motion").  Pursuant to the Essential Supplier Motion, the Debtors sought permission to conditionally pay[4] pre-petition claims (the "Essential Supplier Claims") owing to certain of its suppliers that were "essential" to the uninterrupted function of the Debtors' business operations.

48.    In the Essential Supplier Motion, the Debtors argued that the relief sought was immediate and critically necessary because the failure to pay the Essential Supplier Claims would cause the Essential Suppliers to withhold goods and/or services from the Debtors.  Without "sole source" supplies, the Debtors would suffer substantial delays and disruptions and be unable to conduct business. Consequently, on October 13, 2005, the Court entered an Order approving the Essential Supplier Motion (the "Essential Supplier Order").

49.    Pursuant to the Essential Supplier Order, the Debtors were also authorized, but not directed, to waive (the "Waiver") the conditions outlined in the Essential Supplier Motion (*e.g.,* the execution of a Trade Agreement) to conditionally

---

[4]    The Debtors explain in the Essential Supplier Motion that they would cause parties to enter into letter agreements (the "Trade Agreements") as a condition for payment of an Essential Supplier Claim.

pay the claim of a threatening supplier (the "Non-Conforming Supplier") subject to the

following procedures[5]:

> i.    in the event that the Debtors grant a Waiver to a Non-Conforming Supplier, the Debtors file a Notice of Waiver and a proposed Order to Show Cause with the Court within three business days of the payment pursuant to the Waiver, and serve the Notice of Waiver and Order to Show Cause on: (i) the Non-Conforming Supplier; (ii) the Office of the United State Trustee; (iii) counsel for the Committee; and (iv) counsel for the agent under the Debtors' proposed post-petition credit facility <u>provided however</u>, that the Debtors are not required to file a Notice of Waiver and an Order to Show Cause if, within three (3) business days following the grant of the Waiver, the Committee ratifies the Waiver in writing to the Debtors;

> ii.    at the first regularly-scheduled hearing occurring at least five business days following entry of the Order to Show Cause by the Court, the Non-Conforming Supplier is required to appear before the Court to determine whether such Non-Conforming Supplier should not be held in violation of the Automatic Stay; and

> iii.    if the Court determines that, by its conduct, the Non-Conforming Supplier has violated the Automatic Stay, the Non-Conforming Supplier may be required to disgorge the amount of the payment made by the Debtors pursuant to the Waiver, plus attorneys' fees and interest accrued on such amount at the rate specified under the relevant agreements governing the Debtors' DIP credit facility or such other higher rate as the Court specified, within three business days of entry of the order holding the Non-Conforming Supplier in violation of the Automatic Stay.

50.    During the First Interim Period, TS&S filed eight Notices of Waiver

and obtained corresponding Orders to Show Cause for the Debtors against Non-

---

[5]    Nothing contained herein is meant to modify the provisions of the Essential Supplier Motion or Order or any right or obligation of any party thereunder.

Conforming Suppliers for aggregate conditional payments of $3,512,006.76.  TS&S
subsequently attempted to negotiate amicable resolutions with counsel for each Non-
Conforming Supplier prior to the scheduled hearings for each of the corresponding
Orders to Show Cause.

51.    To achieve settlements in these matters, TS&S:  (i) conducted
lengthy negotiations with counsel to the Non-Conforming Suppliers regarding the
merits of the payment and any legal issues implicated by their demands for payment;
(ii) participated in numerous telephone conferences and meetings with the Debtors'
personnel to discuss background and strategy pertaining to each Non-Conforming
Supplier;  (iii) reviewed documents provided by the Debtors regarding each Non-
Conforming Supplier's corporate structure and historical relationship with the Debtors;
and (iv) in certain cases, performed legal and non-legal research regarding service of the
Notices of Waiver and Orders to Show Cause on foreign Non-Conforming Suppliers in
accordance with the Hague Convention and to determine if those suppliers had the
necessary "minimum contacts" with the United States to be subject to the jurisdiction of
the Court.

52.    As of the date of this Application, TS&S had resolved five of the
eight Non-Conforming Suppliers matters.  Each of those settlements has been
memorialized by a Consent Order that has been entered by the Court.  In three of the
matters, the Debtors' Non-Conforming Suppliers agreed to apply the previously paid
amounts to post-petition or cure obligations of the Debtors.  In another matter, a Non-
Conforming Supplier returned the difference between the payment and the post-
petition amount owed to it by the Debtors (and received an allowed pre-petition claim
for the difference).

53.     In a noteworthy matter involving one of the first Orders to Show Cause that TS&S obtained for the Debtors, the Debtors sought relief regarding a payment made to Macauto USA, Inc. ("Macauto").  After extensive negotiations, TS&S reached a settlement with Macauto pursuant to which Macauto agreed to immediately return the $966,486 that the Debtors conditionally wired to it on October 27, 2005 as a Non-Conforming Supplier.  An Order approving this settlement was entered by the Court on November 29, 2005.  TS&S' efforts helped prevent the cessation of shipping by Macauto, a key supplier of the Debtors, and also enabled the Debtors to achieve a substantial benefit for their estates.

54.     Resolutions of the Non Conforming Supplier matters that TS&S has obtained on behalf of the Debtors so far have already resulted in approximately $1.4 million of cash and post-petition credit being obtained for the Debtors' estates.

C.     **Automatic Stay Issues**

55.     During the First Interim Period, TS&S shared responsibility with Skadden in addressing contested motions filed by parties-in-interest for relief from the Automatic Stay.   To resolve these requests, TS&S:  (i) had frequent conversations with the Debtors' in-house attorneys and business representatives to discuss strategy for settlement and/or potential responses to the motions;  (ii) communicated with counsel for the movants to discuss the legal issues that were implicated by the motions and attempted to negotiate consensual resolutions;  (iii) reviewed documents concerning these matters provided by the Debtors and counsel to the movants (*e.g.,* term sheets, contracts, related pleadings, etc.);  and (iv) performed legal research, when necessary. In particular, TS&S handled (and eventually resolved) two motions filed by such parties:  (i) Bank of America, N.A.;  and (ii) Pepco Energy Services, Inc.;  Orders approving both of those resolutions have been entered by the Court.

22

56.    _Bank of America N.A. ("BofA")_:  The Debtors maintain manufacturing and business facilities throughout the United States, and many of those facilities are located in remote areas that are not serviced by major or regional air carriers.  As part of their continuing efforts to achieve maximum profitability and to eliminate unnecessary cost and delay, the Debtors have historically used two corporate aircraft (the "Aircraft") to transport personnel.  The Aircraft are leased from BofA, as successor to Fleet National Bank, which maintains title to both of the Aircraft and has asserted first priority liens against the Aircraft, aircraft engines, parts accessories, replacements and substitutions (the "Collateral"), and all charter revenue (the "Cash Collateral") that the Debtors derive from certain charter agreements with third parties.

57.    Early in these cases, BofA objected to the entry of the DIP Order because it sought replacement liens and delivery of the Cash Collateral as a form of adequate protection.  The Court overruled BofA's objection because, _inter alia_, the Debtors had modified the DIP Order to include a provision which confirmed that the liens that the DIP Order created in favor of the Debtors' post-petition lenders did not affect BofA's Collateral or Cash Collateral.

58.    Despite these newly added provisions in the DIP Order, on November 11, 2005, BofA filed its _Motion for (i) Adequate Protection of Security Interests in Collateral;  and (ii) Termination of the Automatic Stay Regarding Cash Collateral_ (the "BofA Motion"), pursuant to which it again requested the relief that it had unsuccessfully sought in its objection to the DIP Order.  BofA requested:  (a) adequate protection in the form of replacement liens in after-acquired property similar in nature to the Collateral that is subject to the Agreements;  (b) periodic accountings of all Cash Collateral;  and (c) termination of the Automatic Stay and a requirement that the Debtors deliver to BofA all Cash Collateral related to the Aircraft upon receipt.

59.     TS&S attempted to negotiate a settlement with BofA by proposing, among other things, additional forms of adequate protection that the Debtors believed would protect BofA including, without limitation, establishing a segregated bank account where charter revenue from the Aircraft could be deposited and maintained. Despite these efforts, on November 25, 2005, TS&S was required to file an objection to the BofA Motion, and asserted that BofA was not entitled to relief because: (i) the BofA Motion was an improper request for the Court to revisit an objection that had already been overruled; (ii) BofA had not submitted any evidence that the value of the Collateral was diminishing; (iii) BofA was not entitled to retroactive adequate protection payments; and (iv) BofA was adequately protected (as contemplated by section 361 of the Bankruptcy Code) by the forms of protection pursuant to its agreements with the Debtors as well as by the additional forms of protection that the Debtors had proposed, but that BofA rejected.

60.     Shortly before the November 29, 2005 hearing on the BofA Motion, during discussions with BofA's counsel, TS&S learned that Pentastar Aviation, LLC ("Pentastar"), the company that maintains and operates the Aircraft, was holding more than $253,000 of charter revenue that Pentastar's affiliate had collected on behalf of the Debtors. Pentastar asserted a setoff interest in those funds. The Debtors and BofA believed that those funds constituted a portion of the Cash Collateral, and the Debtors made demands upon Pentastar for the turnover of those funds as Cash Collateral[6].

61.     The Debtors' attempts to recover the funds held by Pentastar, together with the forms of adequate protection negotiated by the parties, enabled the Debtors and BofA to reach a resolution of the BofA Motion and negotiate a term sheet

to memorialize the basic terms of their agreement.  At the November 29, 2005 hearing to consider the BofA Motion, the parties advised the Court that a settlement had been reached, subject to final documentation.  The parties, together with counsel for the Committee, subsequently negotiated the terms of a Consent Order that was approved by the Court.  BofA and the Debtors also agreed to preserve their rights and interests to the funds that Pentastar is holding.

62.   Pepco Energy Services, Inc. ("Pepco"):  Pepco is the supplier of electricity to the Debtors' New Brunswick, New Jersey facility (the "Facility"), which employs approximately 425 people and manufactures batteries under a manufacturing agreement with automotive supplier Johnson Controls.  Pepco provides electricity for the Facility pursuant to a Master Electric Sales Agreement, dated July 8, 2003 (the "Sales Agreement").

63.   On November 21, 2005, Pepco filed its *Motion for an Order for Relief from the Automatic Stay to Provide Notice of Default and Terminate the Sales Agreement Between Pepco and the Debtors, or in the Alternative, to Compel the Debtors' Assumption or Rejection of the Sales Agreement* (the "Pepco Motion").  In the Pepco Motion, Pepco requested that:  (a) the Automatic Stay be modified so that Pepco could provide notice to terminate the Sales Agreement based upon an alleged untimely post-petition payment by the Debtors that was outstanding as of the filing of the Pepco Motion (and which payment was made the day after the Pepco Motion was filed);  (b) in the event that the Debtors paid the sums owed to Pepco for post-petition services later than the exact date that such payments were due, the Automatic Stay could be modified without

---

[6]      Since the receipt of Pentastar's setoff demand, TS&S has begun negotiations with Pentastar regarding the issues raised by its setoff demand.  Those discussions are continuing.

further Order of the Court to permit the termination of the Sales Agreement;  and (c) the Debtors be compelled to assume or reject the Sales Agreement.

64.      Without access to energy to run the Facility, either because Pepco was permitted to terminate the Sales Agreement or because the Debtors were compelled to prematurely reject the Sales Agreement, the Debtors would have been unable to manufacture batteries and meet their commitments to customers.  Moreover, under the terms of the contracts with their customers, the Debtors were responsible for damages caused by missing a production commitment.  The Debtors' customers informed the Debtors that damages could have been as much as $10 million per facility, per day.

65.      Pepco premised the relief that it requested upon its concerns that the Debtors would fail to timely pay Pepco in the future and that Pepco would, as a result, become liable to the local utility through which it supplies electricity to the Debtors.   However, those concerns had not yet materialized.  The Pepco Motion was also filed a mere six days after Pepco had failed to receive Delphi's prepayment for electricity for the December 1-December 31, 2005 period (which was made to Pepco the day after the Pepco Motion was filed).  Recognizing the significant issues presented by the Pepco Motion, TS&S immediately contacted counsel for Pepco and sought a negotiated resolution.

66.      After initial settlement negotiations failed, on December 29, 2005, TS&S filed a response on behalf of the Debtors, and asserted that, *inter alia*:  (i) the Debtors were current on all of their post-petition obligations to Pepco;  (ii) Pepco had failed to demonstrate that it was entitled to relief from the Automatic Stay without further Order of this Court in the event of a single future untimely payment;  (iii) Pepco had not asserted or provided any basis to conclude that the Debtors ought to be compelled to assume or reject the Sales Agreement at such an early stage in their

26

bankruptcy proceedings;  and (iv) the Pepco Motion was contrary to the spirit of the

Court's Utilities Order, dated October 28, 2005, which enjoined utility companies

(including Pepco), from discontinuing service to, or discriminating against, the Debtors

due to the commencement of its chapter 11 cases.

   67. Shortly thereafter, the Debtors and Pepco resolved the Pepco

Motion, and the parties' agreement was memorialized in a stipulation that TS&S

negotiated on behalf of the Debtors (the "Pepco Stipulation").  The material terms of the

Pepco Stipulation are that:  (i) the terms of the Sales Agreement would remain in full

force and effect;  (ii) Pepco agreed to transmit (via e-mail) monthly prepay invoices to

the Debtors no later than the fifth day of the month in which payment of the invoice is

due;  (iii) the Debtors have until ten days after receipt of each monthly prepay invoice to

pay each invoice;  (iv) in the event that the Debtors defaulted in the timely payment of

any post-petition prepay invoice owing under the Sales Agreement, the Debtors would

have a cure period of two business days following the notification of payment default

by Pepco to cure such default (the "Cure Period");  and (v) in the event that the Debtors

failed to cure any payment default regarding a post-petition prepay invoice within the

Cure Period, Pepco could file with the Clerk of the Court and serve, upon three

business days' notice, a notice of presentment of proposed Order modifying the

Automatic Stay to allow Pepco to serve upon the Debtors a *Notice of Nonpayment and*

*Termination in Accordance with the Sales Agreement*.  The Pepco Stipulation was "So

Ordered" by the Court on February 21, 2006, and it operates to, among other things,

protect significant and important property interests of the Debtors.

**D.** **Injunction Issues:**

   68. The Debtors rely on the "just-in-time" supply method for their

manufacturing facilities, and often have "sole source" requirements contracts with their

27

suppliers.  During the First Interim Period, the Debtors and Skadden asked TS&S to prepare pleadings to enjoin suppliers that had threatened to stop shipping parts despite enforceable contracts with the Debtors, and notwithstanding that the Debtors continued to pay for the goods ordered and otherwise comply with the terms of those agreements.

69.    Generally, the Debtors contract with their suppliers to purchase parts for a specific period of time, which is often tied directly to the production run of a particular Original Equipment Manufacturer ("OEM") vehicle.  These requirements contracts generally take the form of purchase orders, which constitute the Debtors' requirements for a particular product over a specified period of time.  The Debtors' standard General Terms and Conditions (the "Terms and Conditions") are incorporated into these contracts.  The Terms and Conditions provide that if a supplier "commences any of the work or services which are the subject of this Contract, [supplier] will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification."  The Terms and Conditions also contain the supplier's acknowledgment that in the event of an actual, anticipatory or threatened breach of the contract, the Debtors are entitled to specific performance and injunctive or other equitable relief.

70.    During the First Interim Period, several suppliers threatened to stop shipping parts to the Debtors.  These suppliers asserted as a basis to stop shipping, among other things, price increases in raw materials that made it unprofitable to continue to meet the Debtors' requirements.  The consequences of a supplier unilaterally stopping shipment of parts for the Debtors to manufacture components for its OEM customers would have been catastrophic.  The Debtors' manufacturing facilities which utilized those products would be forced to shut down within a matter of days after the missed shipment.  Within one to two days after a shutdown of one of the

28

Debtors' facilities, the Debtors' customers would likely be forced to halt production of their products on one or more of their assembly lines. A shutdown of even one assembly line of an OEM could cause the manufacturer to assert millions of dollars of damages against the Debtors.

71.    Accordingly, TS&S immediately prepared comprehensive pleadings against several suppliers that had threatened to stop shipments. These pleadings sought temporary, preliminary and permanent injunctive relief to: (i) enjoin the suppliers from breaching, terminating, or attempting to terminate the pre-petition requirements contracts between the suppliers and the Debtors; and (ii) direct the suppliers to continue to perform under those contracts. For each supplier, TS&S drafted complaints, motions for Temporary Restraining Orders, memoranda of law, and proposed Orders (*e.g.*, Orders to Show Cause, Temporary Restraining Orders and Preliminary Injunction Orders). TS&S intended to file each of these documents with the Court in the event that the Debtors were not able to negotiate acceptable business solutions with their suppliers and in that regard, litigation support to the Debtors was required.

72.    To date, the Debtors' negotiations with suppliers who threatened to stop shipments, with assistance from TS&S, have been successful and no injunction pleadings have had to be filed.

**E.    Accounts Receivable Issues:**

73.    During the First Interim Period, the Debtors and Skadden requested that TS&S assist in the recovery of certain open accounts receivable (the "Accounts Receivable") that are due and payable to the Debtors. Consequently, TS&S prepared and recently mailed demand letters (the "Demand Letters" or individually, a

"Demand Letter") on behalf of the Debtors to seek the payment of approximately $42.5 million.

74.    TS&S anticipates that it will have to commence "turnover" actions pursuant to section 542 of the Bankruptcy Code against any entity that receives a Demand Letter but which refuses to return the funds that it owes to the Debtors.  Any claims (or potential claims) of these entities will be disallowed pursuant to section 502(d) of the Bankruptcy Code until that entity pays all sums due and payable to the Debtors (including any accrued interest).  TS&S anticipates that certain account debtors will assert setoff and/or recoupment defenses, and those defenses will be analyzed by the Debtor, and TS&S as part of the ongoing setoff analysis [See Section IV.A. above].

**F.    Miscellaneous Matters Addressed by TS&S**

75.    In addition to the matters discussed above, TS&S has rendered services for, or on behalf of the Debtors in connection with other miscellaneous matters, such as:

(a)    reviewing various first-day motions and related pleadings to become familiar with the Debtors' chapter 11 cases and strategy;

(b)    reviewing the Debtors' DIP Financing Motion (including corresponding exhibits) and objections to same to prepare for October 27, 2005 omnibus hearing regarding the Final Order approving the motion;

(c)    reviewing the Debtors' (a) Schedules of Assets and Liabilities;  and (b) Statement of Financial Affairs that were filed with the Court on January 20, 2006;

(d)    participating in numerous status and strategy meetings with the Debtors, the Debtors' professionals, and the Committee (in New York and Michigan);

(e)    attending omnibus hearings and addressing various matters at such hearings;

     (f)     conferring with Skadden regarding the delegation of responsibilities of certain matters to TS&S to prevent duplication of effort between the two firms;  and

     (g)     frequently communicating with various third parties, including the Court, the United States Trustee, the Committee and individual creditors and other parties-in-interest concerning the status, conduct and administration of the Debtors' chapter 11 cases.

## V.    THE COMPENSATION REQUESTED

76.    There are numerous factors to be considered by the Court in determining allowances of compensation.  *See, e.g., In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904 (1977);  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991).  *See also In re Nine Associates, Inc.*, 76 B.R. 943 (S.D.N.Y. 1987);  *In re Cuisine Magazine, Inc.*, 61 B.R. 210 (Bankr. S.D.N.Y. 1986).

77.    The perspective from which an application for an allowance of compensation should be viewed in a reorganization case was aptly stated by Congressman Edwards on the floor of the House of Representatives on September 28, 1978, when he made the following statement in relation to section 330 of the Bankruptcy Code:

> [B]ankruptcy legal services are entitled to command the same competency of counsel as other cases.  In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11.  Contrary language in the Senate report accompanying S.2266 is rejected, and *Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir. 1968) is overruled.  Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.

31

124 Cong. Rec. H11,092 (daily ed. Sept. 28, 1978) (emphasis added).  *See also In re McCombs*, 751 F.2d 286 (8th Cir. 1984);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991);  *In re Carter*, 101 B.R. 170 (Bankr. D.S.D. 1989);  *In re Public Service Co. of New Hampshire*, 93 B.R. 823, 830 (Bankr. D.N.H. 1988);  *In re White Motor Credit Corp.*, 50 B.R. 885 (Bankr. N.D. Ohio 1985).

78.    In awarding compensation pursuant to section 330 of the Bankruptcy Code to professional persons employed under section 327, the Court must take into account, among other factors, the cost of comparable non-bankruptcy services. Section 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

- reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional persons employed by such person; and

- reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

79.    As the court in *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991), stated:

> With due recognition of the historical position of Bankruptcy Courts in compensation matters, we recognize that creditors have agreed to pay rates for retained counsel of their choice because of the needs of the particular case.  One could posit other situations or cases where a presumption of prior informed judgment might not be as strong.  Here, however, we have a multi-debtor, multi-committee case involving sophisticated creditors who have determined that the rates charged and tasks undertaken by attorneys are appropriate. We should not, and will not, second guess the determination of those parties, who are directed by Congress, under the Bankruptcy Code, to shape and resolve the case, and who are in fact bearing the cost.  To do so, of course, would be to continue what Congress specifically intended to stop in 1978: Courts, instead of markets, setting rates, with the inevitable consequence that all the legal specialists required

by the debtor or official committees would demur to participate.

*Drexel*, 133 B.R. at 20-21.

80.     The professional services rendered by TS&S have required expenditure of substantial time and effort.   During the First Interim Period, TS&S professionals and paraprofessionals recorded 1,748.8[7] hours in providing the required professional services for which TS&S seeks compensation.

81.     Time and labor devoted is only one of many factors to be considered in awarding attorney compensation.  The number of hours expended must be considered in light of (i) the amount involved and the results achieved to date, (ii) the novelty and difficulty of the questions presented, (iii) the skill requisite to perform properly the legal services, (iv) the preclusion of other employment on behalf of other clients, (v) the customary fee charged to a private client for the services rendered, (vi) awards in similar cases, (vii) time constraints required by the exigencies of the case, including the frequency and amount of time required to be devoted other than during regular business hours, (viii) the experience, reputation and ability of the attorneys rendering services, and (ix) the nature and length of the professional relationship with the client (the "Johnson Factors").  *See Johnson v. Georgia Highway Express*, 488 F.2d at 717-19 (enumerating factors to be considered in awarding attorneys' fees in equal employment opportunities cases under Title VII);  *In re First Colonial Corp. of America*, 544 F.2d at 1294 (applying the Johnson Factors in bankruptcy cases).

---

[7]     In preparation of this Application, Applicant reviewed its prior monthly fee statements to Delphi and deemed it appropriate to:  (i) eliminate certain time entries;  (ii) include time entries that were inadvertently excluded from prior monthly fee statements;  and (iii) reassign certain time entries to appropriate billing matter codes. These corrections account for the slight variance in the total hours billed and fees sought in Applicant's monthly fee statements and this Application.

82.    The majority of the Johnson Factors are codified in section 330(a) of the Bankruptcy Code, and have been applied by various courts in making determinations that requested attorneys' fees constitute reasonable compensation.  It is well settled that the "lodestar method,"[8] as opposed to an application solely of the Johnson Factors, is the best means of determining attorney fees in bankruptcy cases.[9] The Supreme Court, however, has clearly articulated that the "lodestar method" is presumed to subsume the Johnson Factors, as does section 330(a) of the Bankruptcy Code.  *Delaware Valley I*, 478 U.S. at 563;  *Cena's Fine Furniture*, 109 B.R. at 581.

83.    TS&S respectfully submits that application of the foregoing criteria more than justifies the compensation requested in this Application.  The professional services rendered in these chapter 11 cases have been performed by attorneys with broad expertise and high levels of skill in their practice areas or specialty.

84.    At all times throughout the First Interim Period, TS&S successfully avoided expensive litigation by brokering reasonable settlements among the parties. TS&S' efforts have therefore been of significant value to the Debtors and the creditors of these estates.

---

[8]    Application of the "lodestar method" involves multiplying the number of hours reasonably expended on the case by the reasonable hourly rate of compensation for each attorney.  *See Shaw v. Travelers Indemnity Co. (In re Grant Assocs.)*, 154 B.R. 836, 843 (S.D.N.Y. 1993).  This method of calculating attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which serves as a starting point, permitting bankruptcy courts, in their own discretion, to consider other factors, such as the novelty and difficulty of the issues, the special skills of counsel, and their results obtained.  *See In re Copeland*, 154 B.R. 693, 698 (Bankr. W.D. Mich. 1993).

[9]    *See, e.g., Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 483 U.S. 711 ("*Delaware Valley II*"), on remand, 826 F.2d 238 (3rd Cir. 1987); *Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 478 U.S. 546 (1986) ("*Delaware Valley I*"); *United States Football League v. National Football League*, 887 F.2d 408, 413 (2nd Cir. 1989), *cert. denied*, 493 U.S. 1071  (1990); *Lindy Bros. Builders Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973), *vacated on other grounds*, 540 F.2d 102 (3rd Cir. 1976); *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990); *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

85.     TS&S has not sought to burden this Court by setting forth all of the services rendered to the Debtors and for the benefit of creditors.  TS&S has reviewed all of its office files which indicate numerous legal situations and problems resolved over and above those detailed in this Application, and which are more fully summarized in the time sheet entries annexed hereto and made a part hereof which were contemporaneously prepared when the services were rendered.

86.     TS&S has devoted 1,748.8 hours of actual recorded time during the First Interim Period resulting in time charges of $789,874 as reflected in Exhibit "1," and remains unpaid as of the date of this Application.

87.     Throughout the First Interim Period, TS&S sought to assign projects in this case to associates, law clerks, and paraprofessionals who could most efficiently and expeditiously handle them.  TS&S respectfully submits that the legal services reflected in the annexed time slip entries are fair and reasonable and are commensurate with the quality of services provided herein.

88.     In addition to the fees sought for legal services, TS&S has incurred $14,531.15 in out-of-pocket expenses during the First Interim Period directly attributable to the representation of the Debtors.

89.     No part of the compensation to be received pursuant to this Application will be shared with any other person or firm, and no other agreements, either express or implied, to share any compensation received as attorneys for the Debtors has been, or will be, made by TS&S.

90.     Copies of this Application have been given to:  (i) the Debtors; (ii) counsel for the Debtors;  (iii) counsel for the Committee;  (iv) the United States Trustee;  (v) counsel for the agent under the Debtors' pre-petition credit facility;  and (vi) counsel for the agent under the Debtors' post-petition credit facility.

35

## VI.    <u>CONCLUSION</u>

**WHEREFORE**, TS&S respectfully requests that this Application be granted and that it be awarded an allowance of $789,874 for legal services rendered to the Debtors during the First Interim Period, and $14,531.15 for reimbursement of expenses, and that the Debtors be authorized and directed to pay such amounts to the extent not previously paid, together with such other and further relief be granted as may be just and proper.

Dated:    New York, New York
          April 26, 2006

TOGUT, SEGAL & SEGAL LLP,
Conflicts Counsel for the Debtors
and Debtors in Possession


____/s/ Albert Togut_____
ALBERT TOGUT (AT-9759)
NEIL BERGER (NB-3599)
Members of the Firm
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000