**Hearing Date and Time:  June 20, 2006 at 10:00 a.m. (E.S.T.)**
**Objection Deadline:  June 13, 2006 at 4:00 p.m. (E.S.T.)**

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman (TJ 1129)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
  In re                                                     :    Chapter 11
                                                            :
DELPHI CORPORATION, et al.,                                 :    Case No. 05-44481 (RDD)
                                                            :
                                 Debtors.                   :    (Jointly Administered)
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**FIRST INTERIM APPLICATION OF O'MELVENY & MYERS LLP
FOR ORDER AUTHORIZING AND APPROVING COMPENSATION AND
<u>REIMBURSEMENT OF EXPENSES</u>**

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

      O'Melveny & Myers LLP ("O'Melveny"), special labor counsel for Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors, and debtors-in-possession in the

above-captioned case (collectively, the "Debtors"), hereby submits its first interim application for the interim allowance of compensation and reimbursement of expenses (the "First Interim Application"), pursuant to sections 330(a)(1) and 331 of Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the proposed form of which is attached hereto as Exhibit "A". O'Melveny submits this First Interim Application for (a) allowances of compensation for professional services rendered by O'Melveny to the Debtors, and (b) reimbursement of actual and necessary disbursements incurred by O'Melveny in rendition of required professional services on behalf of the Debtors. In support of the First Interim Application, O'Melveny respectfully represents as follows:

## I.
## PRELIMINARY STATEMENT

1.  As hereinafter set forth in detail, the activities performed by O'Melveny, in conjunction with the Debtors and the Debtors' other retained professionals, were extensive during the period from October 8, 2005[1] through January 31, 2006 (the "First Interim Period"), and yielded significant benefits to the estates and their creditors.

2.  O'Melveny requests that this Court authorize total compensation to O'Melveny in the amount of $1,412,915.73, which includes reimbursement of fees in the amount

---

[1] Attorney fees incurred on October 8, 2005, totaling $4,816.00, have been omitted from this First Interim Application. This includes: (1) 6.2 hours billed by T.A. Jerman for drafting Section 1113 and 1114 proposals, as well as associated communications, and travel to Washington, D.C., totaling $4,216.00; (2) 0.4 hours billed by J. Kastin for communications regarding Section 1113 and 1114 proposals, totaling $186.00; and (3) 0.9 hours billed by R. Janger for communications regarding Section 1113 and 1114 proposals, totaling $414.00. O'Melveny treated such fees as prepetition expenses and included the fees in prepetition invoices to the Debtors. To the extent the Court believes court approval of these fees is required, O'Melveny respectfully requests this Court approve the payment of $4,4816.00 on the understanding that O'Melveny will make appropriate adjustments with the Debtors.

- 2 -

of $1,322,746.50, including the 20 percent holdback, and expenses in the amount of $90,169.23 for the First Interim Period.[2]

## II.
## BACKGROUND

A.  The Chapter 11 Filings

3. On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code.  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") also sought reorganization relief.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 8, 2005 and October 19, 2005, this Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Docket Nos. 28 and 404 respectively).

4. On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  No trustee or examiner has been appointed in the Debtors' cases.

5. The Debtors have not yet filed a plan of reorganization or disclosure statement.

6. This Court has jurisdiction over this First Interim Application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[2] O'Melveny is voluntarily adjusting the total amount of compensation requested by $108.75.  These voluntary write-downs include a reduction of $3.75, to correct an inadvertent charge for outgoing facsimiles, and a reduction of $105.00 in fees mistakenly charged for secretarial assistance.

- 3 -

      7.      The statutory predicates for relief requested herein are §§ 330 and 331 of the Bankruptcy Code and Rule 2016 of the Bankruptcy Rules.

B.      <u>Current Business Operations Of The Debtors</u>

      8.      Delphi had global 2004 revenues of approximately $28.6 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[3]  Delphi ranks as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

      9.      Delphi has become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and Delphi is today arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  Delphi's technologies and products are present in more than 75 million vehicles on the road worldwide.  Delphi supplies products to nearly every major global automotive original equipment manufacturer ("OEM"), with 2004 sales to its former parent, General Motors Corporation ("General Motors" or "GM"), equaling approximately $15.4 billion, and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

      10.      As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  As of the Initial Filing Date, the Debtors

---

[3]    The aggregated financial data used in this First Interim Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

- 4 -

employed approximately 180,000 employees worldwide. The Debtors' 50,600 U.S. employees worked in approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters. Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Initial Filing Date, and 96 percent of these were represented by approximately 49 different international and local unions. Outside the United States, Delphi's foreign entities employed more than 134,000 people on the Initial Filing Date, supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

11. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted Delphi's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still Delphi's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

12. Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. When awarding new business, which is the foundation for Delphi's forward revenue base, customers are increasingly concerned with the financial stability of their supply base. The Debtors believe that they will maximize stakeholder value and Delphi's future prospects if they stabilize their businesses and continue to diversify their customer base. The

Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions representing most of its U.S. hourly employees which coincides with the expiration of Delphi's U.S. collective bargaining agreements in the fall of 2007.

C.      Events Leading to Chapter 11 Filing

13.     In the first two years following Delphi's separation from GM, Delphi generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, Delphi has suffered losses. In calendar year 2004, Delphi reported a net operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the marketplace, Delphi's financial condition deteriorated further in the first six months of 2005, with net operating losses of $608 million for the first six months of calendar year 2005 on six-month net sales of $13.9 billion, approximately $1 billion less than the same time period a year earlier.[4]

14.     The Debtors believe that Delphi's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs; (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures; and (c) increasing commodity prices.

15.     In light of these factors, Delphi determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio,

---

[4]     Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

- 6 -

operational issues, and forward looking revenue requirements.  Because discussions with its unions and GM were not progressing sufficiently, Delphi commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

16. Through the reorganization process, the Debtors intend to achieve competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive legacy liabilities and burdensome restrictions under current labor agreements and realigning Delphi's global product portfolio and manufacturing footprint to preserve Delphi's core businesses.  This will require negotiation with key stakeholders over their respective contributions to the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process to achieve the necessary cost savings and operational effectiveness.  The Debtors believe that a substantial segment of Delphi's U.S. business operations must be divested, consolidated, or wound-down during these cases.

17. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver value and high-quality products to its customers globally.  Additionally, Delphi will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### III.
### RETENTION OF O'MELVENY

18. The Debtors filed their application to employ O'Melveny with the Court on October 8, 2005.  O'Melveny charges legal fees on an hourly basis at its attorneys' individual hourly rates, which are based on the attorney's seniority and experience, and which are adjusted

from time to time. O'Melveny also charges the Debtors for actual out-of-pocket expenses incurred, such as court services, computerized research, delivery services, photocopies, long distance phone calls, fee associated with ongoing litigation, travel and other costs necessarily incurred in connection with its representation of the Debtors.[5] O'Melveny's fee structure and reimbursement policies were disclosed in the Debtors' application to employ O'Melveny, to which no party objected and this Court approved by order entered on November 4, 2005, a copy of which is attached hereto as Exhibit "B".

### IV.
### FEE PROCEDURES AND MONTHLY FEE STATEMENTS

19.     On November 4, 2005, this Court entered an Order Under 11 U.S.C. § 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals (Docket No. 869) (the "Interim Compensation Order"). O'Melveny certifies that the Debtors have received a copy of this First Interim Application but have not yet completed this review. In addition, pursuant to paragraph 7 of the Interim Compensation Order and paragraph 15 of the Order Under 11 U.S.C. §§ 102(a) and 15 Fed. R. Bankr. P. 2002(m), 90006, 9007, And 9014 Establishing (1) Omnibus Hearing Dates, (II) Certain Notice, Case Management, and Administrative Procedures, And (III) Scheduling An Initial Case Conference In Accordance With Local Bankr. R. 1007-2(e) (Docket No. 245) ("Case Management Order"), O'Melveny certifies that a copy of this First Interim Application is being served via overnight mail upon (i) the Debtors, (ii) co-counsel for the Debtors, (iii) the United States Trustee for the Southern District of New York, (iv) counsel for the official committee of unsecured creditors, (v) counsel for the agent under the Debtors' prepetition credit facility, and (vi) counsel for the agent

---

[5]     As discussed more fully below, O'Melveny provides discounts to the Debtors, as regards certain expenses. Specifically, O'Melveny does not charge the Debtors for outgoing facsimiles and charges the Debtors for only one-half of total travel time.

- 8 -

under the Debtors' postpetition credit facility. O'Melveny is also serving concurrently with this filing notice of the filing (including all exhibits) of and the hearing on the First Interim Application on parties as required by paragraph 8 of the Interim Compensation Order. O'Melveny submits that no other or further notice need be given.

20. In compliance with the Interim Compensation Order, on or before the last day of the month following each calendar month for which compensation was sought, O'Melveny served by hand or overnight delivery to (i) the Debtors, (ii) co-counsel for the Debtors, (iii) the United States Trustee for the Southern District of New York, (iv) counsel for the official committee of unsecured creditors, (v) counsel for the agent under the Debtors' prepetition credit facility, and (vi) counsel for the agent under the Debtors' postpetition credit facility, a monthly statement of all professional fees and disbursements incurred during the preceding calendar month. The parties had at least 15 days after receipt to review any such statement. In the event any party had an objection to the compensation or reimbursement sought in a particular statement, such person was required to serve the objection no later than the 45th day following the month for which compensation was sought. If there were no objections, at the expiration of the 45 day period, the Debtors were ordered to promptly pay 80 percent of the fees and 100 percent of the expenses identified in each monthly statement. O'Melveny submitted monthly statements for each month during the First Interim Period and no objections were received.

21. O'Melveny received from Debtors a retainer of $300,000 prepetition. Pursuant to the terms of its Engagement Letter, a copy of which is attached hereto as Exhibit "C," O'Melveny has applied $190,886.56 of that retainer to satisfy expenses.

22.     To the best of O'Melveny's knowledge, information and belief, the Debtors have paid postpetition expenses in the ordinary course, and there are currently no unpaid, undisputed ordinary course, postpetition operating expenses in these cases.

23.     To the best of O'Melveny's knowledge, information and belief, the Debtors have sufficient funds on hand to pay the compensation and reimbursement of expenses requested herein.

24.     To the best of O'Melveny's knowledge, information and belief, the Debtors have filed with the United States Trustee all monthly operating reports presently due, and have paid all quarterly fees to the United States Trustee which are presently due.

25.     O'Melveny is providing in this First Interim Application a general description of services rendered during the First Interim Period. Moreover, the actual time records of each professional are appended as Exhibit "D" to the First Interim Application, thereby providing a detailed accounting of the services provided for consideration by the United States Trustee and this Court.

## V.
## SUMMARY OF COMPENSATION REQUESTED AND SERVICES RENDERED TO THE ESTATES DURING THIS PERIOD[6]

26.     O'Melveny seeks approval of professional fees in the amount of $1,322,746.50 and reimbursement of expenses in the amount of $90,169.23 for the First Interim Period. In accordance with the UST Guidelines, O'Melveny has classified all services performed for which compensation is sought for this period. Exhibit "E" is a table listing the names of all attorneys and paraprofessionals who have worked for the Delphi during the First Interim Period, and their respective hourly rates and amounts billed, in addition to other

summary information required by the UST Guidelines. Exhibit "F" to this First Interim Application sets forth with particularity each category of expenses incurred by O'Melveny on behalf of Delphi.

27. During the First Interim Period, O'Melveny handled special labor matters relating to the Debtors' need for relief from their collective bargaining agreements with their unions, including providing regular advice to the Debtors regarding the restructuring of their labor costs and drafting and preparing for filing a potential motion for relief from the collective bargaining agreements pursuant to 11 U.S.C. § 1113(c) and for modification to hourly retiree benefits pursuant to 11 U.S.C. § 1114(g).

28. Because O'Melveny was retained as special labor counsel to the Debtors as relates only to 11 U.S.C. §§ 1113 and 1114 ("Sections 1113 and 1114") advice, and related labor law advice, the activities of O'Melveny are recorded under only one internal matter number, which therefore does not correspond to the UST Guidelines suggestions. All O'Melveny professionals keep a record of the time spent rendering such services in billing increments of one-tenth of an hour.[7] As noted above, Exhibit "D" contains O'Melveny's detailed invoices for this matter number.

29. The tasks to which O'Melveny gave attention during the First Interim Period are summarized more fully below. Although recitation of every item of professional services that O'Melveny performed would unduly burden the Court, the following summary

---

[6]   O'Melveny has taken every effort to ensure that this First Interim Application is prepared in accordance with the Guidelines for Reviewing Applications For Compensation & Reimbursement of Expenses filed under 11 U.S.C. § 330 (the "UST Guidelines") to the extent applicable.

[7]   Although all professionals record time in increments of one-tenth of an hour, due to O'Melveny's voluntary write-off of one-half of travel time as discussed below, the total hours billed for certain professionals are expressed in one-hundredths of an hour.

- 11 -

highlights the major tasks to which O'Melveny devoted substantial time and attention during the First Interim Period.

30. <u>Section 1113/1114 Advice – Labor (-0001)</u>.  During the First Interim Period, O'Melveny researched and advised the Debtors regarding the legal requirements of Sections 1113 and 1114 of the Bankruptcy Code, and related legal issues.  Specifically, after the Initial Filing Date, O'Melveny worked with the Debtors in all aspects of the Debtors' attempts to negotiate significant labor cost and employee benefit savings with unions representing its hourly employees.  O'Melveny took the lead in the preparation of Sections 1113 and 1114 proposals for modifications to the unions' collective bargaining agreements and for modifications of hourly retiree benefits.  As discussions with the unions and GM continued during the First Interim Period, O'Melveny worked closely with numerous financial, operational and labor relations personnel of the client to assist in negotiations strategy, information sharing, and to develop a plan should it be necessary to file for relief from the various bargaining agreements under Sections 1113 and 1114.  O'Melveny, as a part of these preparations, provided significant advice and counseling on labor and benefit cost analyses, strategic labor planning, and labor aspects of the Debtors' restructuring and transformation plans.  O'Melveny attorneys also communicated with counsel to the unions regarding Debtors' information sharing with the unions.

31. At the request of the client, the bulk of O'Melveny's efforts were geared toward the drafting of a potential motion pursuant to Sections 1113 and 1114 for relief from collective bargaining agreements and hourly retiree benefits, as well as supporting papers, including a memorandum of points and authorities in support of the motion and multiple declarations.  These papers were significantly modified numerous times at the request of the client to reflect, among other things, changes in the union negotiations, negotiations for financial

support from GM, and the Debtors' financial condition. Additionally, subsequent to each of two continuances extending the Section 1113 and 1114 filing date, O'Melveny extensively revised these papers to incorporate updated negotiations and changes in the Debtors' financial circumstances. O'Melveny also researched potential experts regarding matters related to the potential Section 1113 and 1114 filing and advised the Debtors on selection of possible expert witnesses.

32.  During the First Interim Period, attorneys and paraprofessionals at O'Melveny billed an aggregate of 3,000.65 hours working on Section 1113 and 1114 matters.[8] As noted above, "E" sets forth the name, hourly rate, hours billed, and total fees incurred by each O'Melveny attorney and paraprofessional during this time.

## VI.
## PREPARATION OF FEE APPLICATION

**33.**  During the First Interim Period, O'Melveny did not expend any hours or incur any fees in preparation of this First Interim Application.

## VII.
## LIST OF EXPENSES

34.  In connection with its representation of the Debtors during the First Interim Period, O'Melveny advanced necessary expenses totaling $90,169.23. A detailed description of expenses incurred during the case is attached hereto as Exhibit "F".

35.  O'Melveny requests reimbursement for expenses including costs advanced for computerized research, delivery services, photocopies, long distance phone calls, fees associated with ongoing litigation, travel and other costs necessarily incurred in connection with

---

[8]  O'Melveny does not charge the Debtors for secretarial assistance. The aggregate number of hours billed has therefore been adjusted to reflect O'Melveny's voluntary write-off of $105.00 in fees mistakenly billed for secretarial assistance.

its representation of the Debtors. O'Melveny made every effort to limit expenditures and to use the most economical means available for accomplishing the tasks requiring such expenditures.

36. Of the expenses, copying charges total $10,608.15. O'Melveny's standard in-house charge for photocopying is $0.15 per page, which is also the charge for non-bankruptcy clients.

37. O'Melveny also incurred costs for sending correspondence regarding the case. O'Melveny charges $1.25 per page for outgoing facsimiles plus long distance phone charges, if applicable, but does not charge for incoming facsimiles. Delphi, however, has not been charged for facsimiles other than for long distance charges associated with the transmissions.[9] O'Melveny attempted to avoid overnight delivery expenses whenever possible.

38. In addition to the above expenses, O'Melveny incurred expenses in connection with the travel of its attorneys to meetings and hearings before this Court in New York City and in connection with travel from its offices in Washington, D.C., New York City, and Los Angeles to Michigan for meetings with the client and others at the client's request. These airfare and travel-related expenses totaled $59,116.25.[10] In addition, O'Melveny's standard practice is to charge for 100 percent of travel time, which is also the charge for non-bankruptcy clients generally. Delphi, however, is charged for only 50 percent of travel time.[11]

---

[9] As noted above, the total expenses requested by O'Melveny has been adjusted to reflect a reduction of $3.75, to correct a mistaken charge for outgoing facsimiles

[10] As shown in Exhibit "F", this figure includes $26,944.54 for travel expenses, $4,170.32 for meals while on travel, $1081.61 in local travel costs, and $26,919.78 in direct bill airfare.

[11] This 50 percent discount is taken into account up-front, with O'Melveny's invoices to the client reflecting only one-half of total travel time.

- 14 -

## VII.
## HOURLY RATES

39. The hourly rates[12] of all professionals and legal assistants rendering services in this case for the First Interim Period are set forth in Exhibit "E". O'Melveny submits that these rates are reasonable and within the range of customary rates in the Southern District of New York for professionals of similar experience and expertise in cases other than those under title 11. Exhibit "E" also sets forth the year of admittance to each attorney's bar, the number of hours billed during the First Interim Period, and the total fees attributable to each professional and paraprofessional, as well as other summary information required by the UST Guidelines.

40. O'Melveny sought to control its fees by administering the case efficiently and coordinating the efficient prosecution of matters. Staffing of matters within the case was done with the intent to provide the optimal level of representation given the importance and complexity of a particular matter, and to avoid duplication of other professional efforts, including those of bankruptcy counsel Skadden, Arps, Slate, Meagher & Flom (Illinois).

## IX.
## LEGAL ARGUMENT

A.   The Legal Standard

41. Section 331 of the Bankruptcy Code provides for interim compensation of professionals and incorporates the substantive standards of section 330, as applies to final allowances, to govern the Court's award of such compensation. 11 U.S.C. § 331. Section 330 provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual necessary services rendered . . . and reimbursement

---

[12] As disclosed in its Engagement Letter, the hourly rates of all O'Melveny professionals and legal assistants change from time to time based on, among other variables, changes in attorney seniority or status and changes in our rates generally. These adjustments, where applicable, are noted in Exhibit "E".

- 15 -

for actual, necessary expenses." 11 U.S.C. § 330(a)(1). Section 330 also sets forth the criteria for the award of such compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded, the court should consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A)  the time spent on such services;
>
> (B)  the rates charged for such services;
>
> (C)  whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D)  whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
>
> (E)  whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

42.  To grant a request for compensation, this Court must find that such request is reasonable. The Second Circuit, in evaluating the reasonableness of a requested fee, has adopted the twelve-factor test of <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974), which includes such factors as the time and labor involved; the novelty and difficulty of the questions; the skill requisite to perform the legal service properly; customary fee; the amount involved and the results obtained; experience, reputation, and ability of the attorneys; and awards in similar cases. See <u>United States Football League v. Nat'l Football League</u>, 887 F.2d 408, 425 (2d Cir. 1989) (awarding plaintiffs-appellees attorney's fees against defendants-appellants for work done in connection with an antitrust suit). The reasonableness of a compensation request is determined by taking into account the nature, extent and value of the

services provided by the professional and the cost of comparable services.  See Colbert v. Furumoto Realty, Inc., 144 F. Supp. 2d 251, 260 (S.D.N.Y. 2001); see also Zolfo,Cooper & Co. v. Sunbeam-Oster Co., 50 F.3d 253 (3d Cir. 1995); In re Busy Beaver Bldg. Ctr., Inc., 19 F.3d 833, 849 (3d Cir. 1994).[13]

B.    O'Melveny's Fees Are Reasonable

43.    The professional services rendered by O'Melveny during the First Interim Period required a high degree of professional competence and expertise.  The provision of such services, therefore, has required the expenditure of substantial time and effort.  O'Melveny submits that the services rendered were performed efficiently, effectively and economically and that the results obtained thus far have provided a significant benefit to the estates of Delphi and their creditors.

44.    In accordance with its practice in other matters, O'Melveny has utilized the lodestar method for calculating its compensation requested in this First Interim Application.  There is a strong presumption that the lodestar product is reasonable.  See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991).

45.    O'Melveny's fees during the First Interim Period were reasonable under the prevailing legal standard and should be allowed.  The amount of these fees is not unusual given the size of the Debtors' business and the capacity in which O'Melveny served as special counsel.

---

[13]    In the "market-driven approach" to compensation requests, the primary focus of the inquiry is the cost of comparable services in non-bankruptcy contexts.  See Zolfo, Cooper, 50 F.3d at 258; see also Busy Beaver, 19 F.3d at 849-50; In re Fine Paper Antitrust Litig., 751 F.2d 562, 583 (3d Cir. 1984) ("[t]he value of an attorney's time generally is reflected in his normal billing rate").  This market-based approach permits flexibility in billing arrangements.  The "lodestar" method (hourly rate multiplied by hours worked) is currently the most widely utilized method for compensation arrangements, but regardless of the manner in which compensation is calculated, "the baseline rule is for firms to receive their customary rates."  Zolfo, Cooper, 50 F.3d at 259.

- 17 -

These fees are commensurate with fees that O'Melveny and other attorneys of comparable experience and expertise have charged for similar services.

C.     O'Melveny's Expenses Were Actual And Necessary

46.     Section 330(a)(1)(B) of the Bankruptcy Code permits reimbursement for actual, necessary expenses.  Moreover, reimbursement for actual, necessary expenses is permitted in the Second Circuit.  Accordingly, attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.  See United States Football League v. Nat'l Football League, 887 F.2d at 416; see also Kuzma v. IRS, 821 F.2d 930, 933-34 (2d Cir. 1987) see also Zolfo, Cooper, 50 F.3d at 258.  As noted above, O'Melveny has conducted a review to ensure compliance of expenses with the UST Guidelines.  Accordingly, those expenses for which reimbursement is sought in this Application satisfy the standards set forth in section 330(a)(1)(B) of the Bankruptcy Code as well as in United States Football League and Kuzma, and should therefore be allowed.

## X.
## DESCRIPTION OF PROFESSIONAL EDUCATION AND EXPERIENCE

47.     The biographies of the primary attorneys[14] employed by O'Melveny who rendered services in this case are attached as Exhibit "G".

## XI.
## NO SHARING OF COMPENSATION

48.     No agreement has been made, directly or indirectly, and no understanding exists, for a division of compensation herein between O'Melveny and any other person or persons, contrary to any applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the local rules or state law.

---

[14]     As noted in Exhibit "G", biographies are provided for only those primary attorneys employed by O'Melveny who billed more than $10,000 in fees to the Debtors during the First Interim Period.

- 18 -

## XII.
## COMPLIANCE WITH THE UNITED STATES TRUSTEE GUIDELINES, THE LOCAL GUIDELINES, AND THE INTERIM COMPENSATION ORDER

49. As set forth in the Certification of Tom A. Jerman With Respect To The First Interim Application of O'Melveny & Myers LLP For Order Authorizing And Approving Compensation And Reimbursement Of Expenses (attached hereto as Exhibit "H"), O'Melveny has complied fully with the UST Guidelines, the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases adopted by the Court on April 19, 2005 (the "Local Guidelines"), and the Interim Compensation Order, to the extent applicable.

## XIII.
## NOTICE OF THIS FIRST INTERIM APPLICATION

50. Notice of the First Interim Application has been given to (i) the Debtors, (ii) co-counsel for the Debtors, (iii) the United States Trustee for the Southern District of New York, (iv) counsel for the official committee of unsecured creditors, (v) counsel for the agent under the Debtors' prepetition credit facility, and (v) counsel for the agent under the Debtors' postpetition credit facility pursuant to the Case Management Order. Complete copies of this First Interim Application were also served upon the parties required by the Interim Compensation Order. Complete copies of this First Interim Application also will be promptly furnished to any other party upon specific request. A copy of the notice given in connection with this First Interim Application is being filed with the Court.

## XIV.
## CONCLUSION

**WHEREFORE**, O'Melveny requests that this Court authorize and approve the compensation in the amount of $1,322,746.50, including the 20 percent Holdback, and reimbursement of expenses in the amount of $90,169.23 for the First Interim Period. O'Melveny also requests that this Court grant such further relief as may be deemed just and proper.

DATED:  April 28, 2006

                                      ROBERT A. SIEGEL (RS 0922)
                                      TOM A. JERMAN (TJ 1129)
                                      O'MELVENY & MYERS LLP

                                      By    /s/ Tom A. Jerman
                                            Tom A. Jerman
                                            Attorney for Delphi Corporation,
                                            et al., Debtors and Debtors-in-
                                            Possession