Hearing Date and Time: May 9, 2006 at 10:00 a.m.

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman (TJ 1129)
Rachel S. Janger
Jessica Kastin (JK 2288)

GROOM LAW GROUP, CHTD
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620
Lonie A. Hassel (LH 8805)

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

In re                      :    Chapter 11
                            :

DELPHI CORPORATION, et al.,  :    Case No. 05-44481 (RDD)
                            :

             Debtors.  :    (Jointly Administered)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OMNIBUS REPLY MEMORANDUM OF DEBTORS IN SUPPORT OF MOTION FOR
ORDER UNDER 11 U.S.C. § 1113(c) AUTHORIZING REJECTION OF COLLECTIVE
BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(g)
<u>AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS</u>

("SECTION 1113/1114 OMNIBUS REPLY MEMORANDUM")

Preliminary Statement

The various Objections filed by the Unions[1] and other entities[2] to the Debtors' motion for

relief under Sections 1113 and 1114 of the Bankruptcy Code only reinforce that the Debtors have

met their burden of proof, and that this Court should authorize Delphi to reject its collective

bargaining agreements and modify Delphi's obligation to provide retiree health and insurance

benefits.

First, on the relief requested, Delphi submits that the Court has discretion under Sections

1113 and 1114 to authorize debtors to reject the agreements upon notice, rather than rejecting the

agreements immediately. Delphi requested this relief because it believed that it was in all parties'

best interests to achieve a consensual agreement rather than immediately face the possibility of a

---

[1]      Any capitalized terms not expressly defined herein are intended to have the meanings ascribed to them in
Delphi's Motion seeking an order for authority to reject collective bargaining agreements under 11 U.S.C. § 1113(c)
("Section 1113") and modify retiree welfare benefits under 11 U.S.C. § 1114(g) ("Section 1114") or its
accompanying memorandum of law.

[2]      Delphi received the following objections:  (1) Objection Of International Union, United Automobile,
Aerospace And Agricultural Implement Workers of America (UAW) To Debtors' Motion For Order Under 11 U.S.C.
§ 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing
Modification Of Retiree Health Benefits, and supporting memorandum of law (the "UAW Objection")(Docket Nos.
3342 and 3346); (2) Objection And Memorandum Of Law In Support Of Objection Of IUE-CWA To Motion For
Order Under §§ 1113 and 1114 Authorizing The Debtors To Reject The IUE-CWA's Collective Bargaining
Agreement And Terminate Post Retirement Benefits (the "IUE-CWA Objection")(Docket No. 3332); (3) Objections
Of USW To Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining
Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits (the "USW
Objection")(Docket No. 3322); (4) IBEW Local 663 And IAMAW District 10's Objection To Debtors' Motion To
Reject Their Collective Bargaining Agreements Pursuant To 11 U.S.C. § 1113(c) And To Modify Their Retiree
Benefits Pursuant To 11 U.S.C. Section 1114(g)(the "IBEW-IAM Objection")(Docket No. 3330); (5) Opposition Of
International Union Of Operating Engineers Locals 18, 832, And 101 To Debtors' Motion For Authority To Reject
Collective Bargaining Agreements And To Modify Retiree Benefits And Memorandum Of Law In Support Of
Opposition (the "IUOE Objection")(Docket No. 3314) (together with UAW Objection, IUE-CWA Objection, USW
Objection, and IBEW-IAM Objection, the "Unions' Objections"); (6) Supplemental Objection Of Appaloosa
Management L.P. And Wexford Capital LLC To The Debtors' Motion For Order Under 11 U.S.C. § 1113(c)
Authorizing Modification Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing
Modification Of Retiree Welfare Benefits (the "Appaloosa Objection")(Docket No. 3356); and (7) Limited
Objection Of Wilmington Trust Company, As Indenture Trustee, To Motion For Order Under 11 U.S.C. § 1113(c)
Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing
Modification Of Retiree Welfare Benefits (the "Wilmington Objection")(Docket No. 3353) (together with
Appaloosa Objection, the "Third Party Objections") (collectively, the "Objections").  In addition, General Motors
Corporation ("GM") filed a Preliminary Response Of General Motors Corporation To Debtors' Motion For Order
Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. §
1114(g) Authorizing Modification Of Retiree Welfare Benefits (the "GM Response")(Docket No. 3317).

strike. If the Court doubts its discretion to issue this remedy, however, then it should simply

modify the order Delphi submitted and reject the agreements immediately upon ruling.

Second, on the most critical issue before the Court, none of the Unions asserts that

modifications to the collective bargaining agreements and retiree welfare benefits are

unnecessary for Delphi to reorganize. To the contrary, the Unions – and the expert reports they

have filed – explicitly or implicitly concede that some modifications to the existing agreements

are necessary for Delphi to reorganize. This concession is fatal to the Objections. The case law

is clear that if some modification is necessary to reorganize and the union has not agreed to that

modification, rejection is appropriate.

Third, while conceding Delphi's need for modifications, the Unions nevertheless argue

that there has not been enough time, information, or bargaining to justify rejection, and that

Delphi has sufficient liquidity to wait a few more months.

- There has been more than enough time. Delphi has sought since the summer of 2005[3] to negotiate modifications on a consensual basis, but the Unions have effectively rejected those efforts. More than five months since Delphi served its initial proposals to the Unions for modifications to Delphi's collective bargaining agreements and retiree welfare benefits, and after this Court has granted two continuances of its Section 1113/1114 Scheduling Order since it was first entered on October 13, 2005[4] – allowing the parties more time to reach a consensual

---

[3]      In the summer of 2005, as described in detail in the Declaration of David Resnick, Delphi pursued an out of court restructuring through negotiations with GM and the Unions. Based on the financial projections available at the time, successful negotiations under Scenario C would have enabled Delphi management to implement a sustainable business strategy over time. After several meetings and sessions between Delphi and its Unions, and separately with GM, the Unions and GM both effectively rejected Scenario C. Each made it clear that it would not be able to provide concessions approaching the level sought by Delphi. In addition, both GM and the Unions indicated that if they were to make concessions, other stakeholders (such as unsecured bondholders and similar pari passu creditors) should also contribute to a Delphi restructuring. Based on this feedback, Delphi and Rothschild explored alternatives of possible out-of-court solutions that would involve other stakeholders. These alternatives were reviewed with the Delphi's Board of Directors, who directed the Company to continue to pursue out-of-court alternatives and in parallel, prepare for a potential chapter 11 filing if an out-of-court consensual resolution could not be achieved. No further progress occurred in discussions with the Unions and GM, however, and Delphi was unable to reach a consensual out-of-court resolution. See Declaration of Devid Resnick ("Resnick Dec.") ¶¶ 24-26.

[4]      See Scheduling Order On Debtors' Motions To (I) Reject Collective Bargaining Agreements Under Section 1113(c) And (II) Eliminate Retiree Medical And Life Insurance Benefits For Union-Represented Retirees Under Section 1114(g) (the "Section 1113 And 1114 Scheduling Order") (Docket No. 232) (dated October 13, 2005); First Amended Scheduling Order On Debtors' Motions To (I) Reject Collective Bargaining Agreements Under Section

resolution -- neither the UAW, IUE-CWA, USW, nor the IUOE have made a single, concrete counterproposal.[5]

- There has been more than enough information. Since October 2005, Delphi has provided the Unions and their financial advisers with all of Delphi's business plans and financial projections, and with complete, interactive financial models; has met numerous times with the Unions' financial advisers to explain the information; has responded to hundreds of information requests; and has created a virtual data room to make the information provided to every union available to the other unions. As demonstrated further below, Delphi has met, and far exceeded, its burden.

- While there has not been enough bargaining, that is through no fault of Delphi. On numerous occasions, Delphi has asked, in person and in writing, that the Unions come to the table to bargain over its Section 1113 and 1114 proposals. Rather than bargaining, the Unions have flatly rejected Delphi's proposals and have threatened strikes if Delphi seeks to reject the agreements.

- The principal financial argument made by the Unions and their financial experts – that Delphi has sufficient liquidity to wait a few months to see how many employees accept the attrition programs, or whether Delphi can reprice its GM contracts – ignores that Delphi will lose approximately $2 billion this year alone. The attrition programs, for example, are intended to provide a "soft landing" for employees who will not be needed anyway, and do not affect the level of wages and benefits that Delphi needs for those employees who remain. The bottom line is that every day that resolution of labor contract issues is delayed, the value of the estate is diminished – meaning that other constituencies are effectively being required to fund the Unions' uncompetitive collective bargaining agreements.

Finally, despite the Unions' arguments to the contrary, Delphi's proposals treat all

constituencies fairly and equitably. As demonstrated in Delphi's Motion, every constituency will

---

1113(c) And (II) Eliminate Retiree Medical And Life Insurance Benefits For Union-Represented Retirees Under Section 1114(g) (the "First Amended Sections 1113 And 1114 Scheduling Order")(Docket No. 2225) (dated February 9, 2006); Second Amended Scheduling Order On Debtors' Motions To (I) Reject Collective Bargaining Agreements Under Section 1113(c) And (II) Eliminate Retiree Medical And Life Insurance Benefits For Union-Represented Retirees Under Section 1114(g) (the "First Amended Sections 1113 And 1114 Scheduling Order")(Docket No. 2425) (dated February 17, 2006).

[5]     The IAM and IBEW provided their counterproposal on April 20, 2006 – the day before filing their joint objections to Delphi's Motion. See Declaration of Robert J. Gerling ("Gerling Dec."), dated May 1, 2006, ¶ 25. Delphi has also recently received an IUE-CWA Attrition Plan Proposal, which is not a counter to the Section 1113 and 1114 proposal. See Supplemental Declaration of Bernard J. Quick ("Supp. Quick Dec."), dated May 1, 2006, ¶ 5.

suffer a share of the pain in these chapter 11 cases.  It is now incumbent upon the hourly

employees and retirees to do the same, in order for Delphi to successfully reorganize.[6]

Supplemental Statement Of Facts

A.    Delphi's Negotiations With Its Unions Since March 31, 2006

As detailed in the supplemental declarations of Kevin M. Butler, Robert Gerling, and

Bernard J. Quick, Delphi has been meeting with all of its Unions in the weeks since the motion

for relief under Sections 1113 and 1114 was filed.  As demonstrated by the supplemental

declarations of Jim Guglielmo, Darrell Kidd, and William Shaw, Delphi has provided the Unions

with sufficient information to permit them to evaluate Delphi's proposals, and continues to

diligently respond to the Unions' information requests.  Despite these efforts, to date, Delphi has

been unable to reach a consensual agreement with any of its Unions.  Supplemental Declaration

of Kevin M. Butler ("Supp. Butler Dec."), dated May 1, 2006, ¶ 11; Gerling Dec. ¶¶ 12, 17, 26;

Supp. Quick Dec. ¶ 8.

B.    Delphi's Updated Financial Reports And Forecasts

In the ordinary course of business, Delphi updates its financial outlook quarterly for the

remainder of that calendar year.  On April 20, 2006, Delphi shared with its Board of Directors,

and later with its Unions as Sections 1113 and 1114 information, Delphi's First Quarter financial

results, which showed that Delphi's projected operating loss for 2006 would be approximately

$500 million lower than expected, meaning that Delphi will now lose approximately $2.0 billion,

rather than the previously projected $2.5 billion.  Supplemental Declaration of John D. Sheehan

("Supp. Sheehan Dec."), dated May 1, 2006, ¶¶ 2-14.

---

[6]    Delphi recognizes how difficult this is for Delphi's employees, retirees, and communities   These are
difficult and emotional issues for any company that must compete to survive.

As explained in the declaration of David Resnick and the supplemental declaration of

John D. Sheehan, the first quarter improvements over previous projections, however, do not

require changes in Delphi's forecasts for 2007 and beyond. These improvements are due in large

part either to one-time events or items that do not impact the Competitive Benchmark or GM

Consensual Scenarios. See Supp. Sheehan Dec. ¶¶ 7-14; Resnick Dec. ¶ 37.

C.    Reductions In Salaried Pension

On March 31, 2006, Delphi announced that as part of its transformation plan, Delphi

would freeze the current U.S. salaried pension plan as of January 1, 2007. The salaried plan will

be replaced with defined contribution plans that include flexibility for both direct company

contributions and company matching of employee contributions. Additionally, in an effort to

bring it in line with other more cost-competitive companies, Delphi announced it will restructure

the current active salaried health care plan to implement increased employee cost sharing, and

that adjustments to other benefits to create a more competitive plan and meet employee needs

will continue to be evaluated. See Supp. Butler Dec. ¶ 12.

Argument

I.    The Court Has Discretion To Grant Delphi's Request For "Authority" To Reject

Although not explicitly an attack on the labor proposals as such, the UAW argues that

Delphi's request for "authority to reject" the collective bargaining agreements upon ten days'

notice is outside the statutory scheme and makes the proposals unreasonably vague. See UAW

Mem. at 22, 27-30; see also Appaloosa Mem. at 2-3, 9. As discussed below, it is appropriate for

the Court to issue relief in the manner Delphi originally requested. If the Court has any doubt

about its authority to grant Delphi's proposed order for authority to reject its labor agreements,

however, Delphi requests that the Court reject the labor agreements immediately upon making its

ruling.

Delphi respectfully submits that it is appropriate for the Court to issue relief in the form of an order giving Delphi authority to reject the collective bargaining agreements and to modify retiree welfare benefits. First, there is nothing in Section 1113 or 1114 that expressly requires that a Section 1113 or 1114 order must, by its terms, immediately reject or modify the agreements, or prohibits the court from granting the debtor the authority to do so upon delayed notice. Second, although Delphi is unaware of any case law on this issue, courts have noted, at least in dicta, that Section 1113 allows the courts to "authorize" rejection. United Food & Commercial Workers Union, Local 770 v. Official Unsecured Creditors Comm. (In re Hoffman Bros. Packing Co.), 173 B.R. 177, 183 (B.A.P. 9th Cir. 1994) ("It is apparent that § 1113 authorizes a bankruptcy court to authorize rejection of a CBA provided that a good faith bargaining effort takes place.") (emphasis added); In re Energy Insulation, Inc., 143 B.R. 490, 495 (N.D. Ill. 1992) ("Section 1113 sets forth the procedure whereby a debtor can obtain authorization to reject or modify the terms of a collective bargaining agreement.") (emphasis added).[7]

Moreover, there are numerous instances when bankruptcy courts are asked to, and do, give debtors authority to take some action, including rejection or assumption of executory contracts, without requiring that the debtor actually do so. See, e.g., In re Refco Inc., No. 05-60006 (Bankr. S.D.N.Y. Oct. 21, 2005) (authorizing, but not directing, debtors to pay prepetition wages and salaries to employees); In re 360networks (USA) inc., No. 01-13721 (Bankr. S.D.NY. June 29, 2001) (authorizing, but not directing, debtors to pay compensation to all employees in

---

[7]    For "legal" support of its argument, the UAW cites to the conversation between the court and counsel in the UAL bankruptcy case. UAW Mem. at 28-29 (citing In re UAL Corp., No. 02-28191 (Bankr. N.D. Ill. May 20, 2005), Tr. Record at 50-51). While the court and counsel engaged in an oral discussion regarding the court's authority to grant debtors the authority to reject, it was done without any prior briefing and the colloquy never resulted in any written decision. As such, the UAW citation is of little value.

the ordinary course). In fact, this Court has previously given Delphi such authority to take a

certain action without directing Delphi actually to do so. See Order Under 11 U.S.C. §§ 365(a)

and 554 and Fed. R. Bankr. P. 6006 Approving Procedures for Rejecting Unexpired Real

Property Leases and Authorizing Debtors to Abandon Certain Furniture, Fixture, and Equipment,

dated Jan. 9, 2006 (Docket No. 1776) (authorizing, but not directing, debtors to reject unexpired

real property leases without further court order); Order Under 11 U.S.C. §§ 363(b) and 365(a)

and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended Restated Sole

Source Supplier Agreements, dated Dec. 12, 2005 (Docket No. 1494) (authorizing, but not

directing, debtors to assume certain agreements by which debtors receive goods necessary to

their on-going operations, without further court order); Order Under 11 U.S.C. §§ 105, 363(b),

365(a), 1107, and 1108 Authorizing Payment of Contractors and Service Providers in

Satisfaction of Liens, dated Oct. 13, 2005 (Docket No. 199) (authorizing, but not directing,

debtors to pay claims of contractors and service providers). There is no reason – and certainly no

case law – usurping judicial discretion in Section 1113 and 1114 proceedings. If the Court has

any doubt about its authority to grant Delphi's proposed order for authority to reject its labor

agreements and modify retiree welfare benefits, however, Delphi requests that the Court reject

the labor agreements and order modification of retiree welfare benefits as of the date of the

order.

II.    Delphi's Proposed Modifications Are Necessary To Successfully Reorganize

Sections 1113(b)(1) and 1114(f)(1) provide that the proposed modifications must be

"necessary to permit the reorganization of the debtor." There is no question that the Debtors

have satisfied this factor as the Unions concede that some level of labor and retiree modifications

is necessary for Delphi to restructure. See UAW Mem. at 32; IUE-CWA Mem. at 42-45; see

generally USW Mem. at 1-3; IAM/IBEW Mem. at 29-32; IUOE Mem. at 1. Despite conceding

7

the overall need for modifications, the Unions nevertheless make "side" arguments in an attempt

to challenge Delphi's affirmative evidence on necessity.

- The UAW and IUE-CWA argue that "necessary" means that Delphi must show that each individual element of its proposals is necessary to the reorganization. See UAW Mem. at 32-36; IUE-CWA Mem. at 42-43.

- The UAW goes further and argues that each element of Delphi's proposals must be essential to the reorganization. See UAW Mem. at 35-36.

- Others argue that not all items are necessary, that Delphi does not need as much savings as it seeks, and/or that Delphi is not in immediate danger of liquidation. See UAW Mem. at 32-38; IUE-CWA Mem. at 42-45.

None of these arguments, however, overcomes the conceded fact that labor and retiree

welfare benefit modifications are necessary for Delphi's reorganization.

A.    None Of The Unions Disputes That Some Measure Of Labor Modifications Is
       Necessary For Reorganization

What the Unions say in their Objections is less important than what they do not say.

None of the Unions disputes that some level of labor modifications is necessary for Delphi to

restructure.  Instead, as further explained below, they argue only that there has not been enough

time, information, or bargaining to justify rejection.  See UAW Mem. at 32 (acknowledging that

"Delphi's financial future is subject to certain uncertainties" and citing, but not contesting,

Delphi's assertion that modifications are necessary); IUE-CWA Mem. at 42-45 (not disputing the

need for overall labor modifications – only the need for labor modifications at IUE-CWA

plants); see generally USW Mem. at 1-3 (no discussion of necessity factor); IAM/IBEW Mem. at

29-32 (challenging only the necessity of a few non-monetary items, but not disputing Delphi's

economic need to modify the labor agreements to achieve the cost savings that would "aid the

ultimate goal of rehabilitation"); IUOE Mem. at 1 (no discussion of necessity factor).  All agree,

however, that modifications to the collective bargaining agreements and retiree welfare benefits

are necessary for Delphi's reorganization to succeed.[8]

B.      The Unions' Legal Arguments On The "Necessity" Standard Contradict
Established Second Circuit Caselaw

Despite conceding that Delphi needs modifications to its labor agreements and retiree

welfare benefit obligations, the Unions attack statutory interpretation of "necessity."

Specifically, the UAW and IUE-CWA argue that "necessary" in Sections 1113 and 1114 means

that the debtors' proposals must be "essential" to continuation of the company's business, and that

the standard set forth in Truck Drivers Local 807, International Brotherhood of Teamsters,

Chauffeurs, Warehousemen, & Helpers of America v. Carey Transportation, Inc., 816 F.2d 82,

---

[8]      Two non-labor parties, Appaloosa and Wilmington Trust, argue that Delphi's proposed changes are not necessary for reorganization, and would harm their recovery in the bankruptcy. As an initial matter, neither Appaloosa nor Wilmington Trust has standing to participate in this matter. The phrase "interested party" in Section 1113 has been interpreted to mean parties to the agreements, or guarantors under the agreements. See In re UAL Corp., 408 F.3d 847 (7th Cir. 2005); United Retired Pilots Benefits Prot. Ass'n v. United Airlines, Inc. (In re UAL Corp.), No. 05-3121, 2006 WL 827307 at *5 (7th Cir. Mar. 31, 2006). Appaloosa and Wilmington Trust are neither. Even if the Court were to consider these third-party objections, their arguments are without merit.

Appaloosa argues that Delphi can simply wait until September 2007, when the agreements generally expire, and terminate OPEB without creating any claim against the estate. See Appaloosa Mem. at 3-4, 16, 23-24. Appaloosa's theory, however, ignores the following fundamental legal issues, which make its position untenable: First, Delphi is obligated to maintain the OPEB benefits, as to certain participants at least, until the parties have reached impasse, despite the expiration of the agreements themselves. See Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198 (1991). Even if Delphi reached impasse, it could well have to endure a strike upon elimination of OPEB, the cost of which could easily exceed the savings that Appaloosa estimates. See Supp. Butler Dec. ¶ 13. Moreover, whether the benefits would be vested would plainly be disputed, with at least some courts inferring that such benefits are vested. UAW Local 134 v. Yard-Man, Inc., 716 F.2d 1476, 1479-80 (6th Cir. 1983). The cost of such a ruling would easily exceed the savings that Appaloosa estimates. Finally, if Delphi were to implement this change while still in bankruptcy, it can be argued that Section 1114 is still the exclusive means to modify retiree benefits even if not vested. Compare In re Farmland Indus., 294 B.R. 903 (Bankr. W.D. Mo. 2003) with In re N. Am. Royalties, Inc., 276 B.R. 860 (Bankr. E.D. Tenn. 2002).

While acknowledging "the Debtors' need to implement fundamental changes to their respective businesses," Wilmington Trust argues that because the Debtors have failed to show that Delphi Corporation and its creditors, as opposed to Delphi's U.S. operating subsidiaries, will receive an overall positive economic benefit from the rejection of its labor agreements and modification of its retiree benefits obligations, Delphi's Section 1113 Motion must be denied. See Wilmington Mem. at 5-6. This argument fails on several grounds: (1) it is speculative as to the existence or amount of any claim arising out of rejection, because as discussed further below, courts are split on the question of whether any or to what extent damages arising out of a Section 1113 rejection are allowed; (2) Wilmington Trust ignores the cost to the entire corporation of not reaching an agreement, particularly the cost of a potential strike; (3) it considers only the interest of creditors, and not all constituencies as Sections 1113 and 1114 requires; and (4) it ignores the possible equitable subordination arguments that Wilmington Trust and others will undoubtedly make.

88-90 (2d Cir. 1987) ("Carey") – i.e., that the proposals "increase the likelihood of successful

reorganization" – should be ignored. See UAW Mem. at 32-36; IUE-CWA Mem. at 42-43. As

the UAW and IUE-CWA themselves concede, however, Carey is binding on this Court. See

IUE-CWA Mem. at 43; UAW Mem. at 32, 33 n.22. In Carey, the Second Circuit held that "the

necessity requirement places on the debtor the burden of proving that its proposal is made in

good faith, and that it contains necessary, but not absolutely minimal, changes that will enable

the debtor to complete the reorganization process successfully." 816 F.2d at 90. The Second

Circuit reiterated the Carey standard in In re Royal Composing Room, Inc., 848 F.2d 345, 350

(2d Cir. 1988) (the "debtor's proposal need not be limited to the bare bones relief that will keep it

going").[9]  Whether the Unions like it or not, there is no question that Carey's standard of

necessity is the law of this Circuit.

---

[9]       Under Carey and Royal Composing Room, the argument made by the UAW that Delphi is not in
immediate danger of liquidation is plainly insufficient to preclude Section 1113 or Section 1114 relief. See UAW
Mem. at 37; see also Appaloosa Mem. at 15 (contending that modification not necessary "at this time").

        Additionally, the UAW's argument that legislative history and the United Savings Ass'n of Texas v.
Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365 (1988) dictates a different reading of Carey's standard is
without merit.  First, United Savings solely addressed whether Section 362(d)(1) of the Bankruptcy Code requires
unsecured creditors to be paid interest on the value of their collateral and did not even mention Section 1113 or 1114.
Moreover, it is simply incorrect that there is some universal rule that language used in one portion of a statute should
"be deemed to have the same meaning as the same language used elsewhere." See UAW Mem. at 36. See Gen.
Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 595-96 (2004) (holding that the word "age" has different meanings
in different places of the Age Discrimination in Employment Act); United States v. Cleveland Indians Baseball Co.,
532 U.S. 200, 213 (2001) (phrase "wages paid" has different meanings in different parts of Title 26 of the United
States Code).  Second, the UAW's argument urging this Court to look to legislative history is also unavailing.  The
controlling case law of this Circuit takes precedence over legislative history.

        Finally, the UAW's reading of Carey – that the Second Circuit allowed a less stringent standard for the
initial proposal only – is without merit.  Carey does not draw any distinction between "initial" and subsequent
proposals.  In fact, nothing in Carey, or any other case, supports the view that the necessity requirement becomes
more onerous for the debtor as negotiations proceed.  This Court has recently reaffirmed its commitment to the
Carey standard in In re Delta Air Lines, Inc., Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 26, 2006).  Moreover, the
UAW's interpretation of Carey contradicts the very purpose of Section 1113 which was engaged to encourage the
process of negotiation and consensual agreement.  See, e.g., In re Maxwell Newspapers, Inc., 981 F.2d 85, 90 (2d
Cir. 1992) ("the entire thrust of § 1113 is to ensure that well-informed and good faith negotiations occur in the
market place").  Application of a higher standard of "necessity" to subsequent proposals would obviously chill any
negotiation beyond the first proposal.

1.    Delphi's Decision To Propose Its "Ask" As A Per Capita Rate Does Not
Render Its Proposals Unnecessary

Despite the UAW and IUE-CWA's arguments, the Carey standard does not mean that

Delphi must demonstrate the exact dollar value of the proposals. See UAW Mem. at 11, 34;

IUE-CWA Mem. at 9-11:

To the contrary, courts have held that a debtor need not quantify

the savings for its proposals to meet the necessity factor. In United Food & Commercial

Workers of Local Union Nos. 455, 408, 540 & 1000 v. Appletree Mkts, Inc. (In re Appletree

Mkts), 155 B.R. 431 (S.D. Tex. 1993), for example, the court rejected the union's argument that

the debtor did not meet the necessity standard because it failed to quantify the savings for many

of its proposals. Id. at 441-42. The court explained that the debtor met the necessity standard

because "AppleTree presented evidence that it would lose millions of dollars a year under its

existing CBAs . . . [and e]ven under AppleTree's proposed modifications, cash available from

operations would not be sufficient to pay its labor costs until the 1995 fiscal year." The failure to

quantify the savings for each of the proposed items did not negate this evidence. Id. at 441-42;

see also In re Valley Steel Prods. Co., Inc., 142 B.R. 337, 340 (Bankr. E.D. Mo. 1992)

(approving motion to reject despite fact that debtors "were careful to point out that it was

difficult to provide an exact dollar amount in savings" and dollar figure provided was "simply

their best estimate").

In any event, Delphi has provided a dollar value for its proposals. As it did with its

opening proposal in October 2005, Delphi provided the Unions with "penny sheets" for its

---

Competitive Benchmark Proposals.[11]  Butler Dec. ¶ 97.  Delphi has also, when requested,

provided penny sheets on a Union-specific and site-specific basis.  Supplemental Declaration of

Darrell Kidd ("Supp. Kidd Dec."), dated May 1, 2006, ¶ 24; Declaration of Jim Guglielmo

("Guglielmo Dec."), dated May 1, 2006, ¶ 24.  Delphi's long-standing past practice in labor

negotiations is to measure the expense or savings attributable to labor modifications in the form

of a "penny sheet.'

                                                                        .  All of its Unions

are intimately familiar with these forms (as demonstrated by the various requests for penny

sheets on a Union or plant-specific basis).  See Supp. Kidd Dec.  ¶ 24; Shaw Declaration ("Shaw

Dec."), dated May 1, 2006, ¶¶ 13, 14; UAW Mem., Ex. A.  The penny sheets take Delphi's total

labor costs for each element of compensation, and convert that to an hourly cost – with each

component of that hourly cost specifically identified.  See Butler Dec., Ex. L; Supp. Kidd Dec.

¶ 22.  Anyone who wants to convert these numbers into a "total ask" or a "plant by plant ask" can

easily do so depending on the assumptions he wishes to use on employment levels.  See Supp.

Kidd Dec. ¶ 23; Shaw Dec. ¶ 22.  Moreover, on a company-wide basis Delphi has already done

the math and provided it to the Unions.  In other words, with each of its proposals, Delphi has

identified the "total cost savings" attributable to the proposed modifications assuming the "base

line" of the Steady State Scenario compared to the Competitive Benchmark and GM Consensual

Scenarios.  See Supp. Kidd Dec. ¶ 23.  Thus, while Delphi has not provided a "total ask" in the

traditional sense, Delphi has identified the "total cost savings" that are necessary from its hourly

employees and retirees.

---

[11]       Because Delphi's costs under the GM Consensual Proposal are the same as under the Competitive
Benchmark Proposal, there is no separate GM Consensual Proposal penny sheet.  See Supp. Kidd Dec. ¶ 24.

Although the Unions wrongly insist on a "total ask" in the traditional sense, Delphi believes that the penny sheet format is a more sensible way to determine the cost of its labor proposals, because the total cost may increase or decrease based on the number of employees and the number of hours worked. For example, if Delphi had 15,000 employees in 2008, the "total ask" would be twice as high as if Delphi had 7,500 employees working the same number of hours. The cost per hour worked for each employee, however, and, thus, the wages and benefits for those employees, would be the same. Supp. Kidd Dec. ¶ 23.

In fact, the recent decision in In re Delta Air Lines, Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 26, 2006), decided only days ago by Judge Hardin, demonstrates the wisdom of the penny sheet approach. In that case, the Court denied the debtor's Section 1113 motion principally because the debtor presented a hard total savings target. The Court explained that such a non-negotiable "ask" is problematic because the factual assumptions underlying the debtor's financial model (i.e., the number of represented employees) will continue to evolve, and therefore, the target "total ask" would have to be adjusted constantly as headcount assumptions change. Id. at 21-22. The fact that the Court in the Delta case denied the debtor's motion because the debtor insisted on a particular total ask that was based on a false premise demonstrates that Delphi's approach – seeking to obtain competitive per capita rates – is plainly the better approach under Sections 1113 and 1114.

2.    The Necessity Of Delphi's Proposals Must Be Considered As A Whole, And Not In Relation To Individual Unions And Proposals

The Unions argue that even if some modifications to Delphi's labor agreements are necessary, Delphi has not shown that all of its proposals are necessary. See UAW Mem. at 32; IUE-CWA Mem. at 27-28; IAM/IBEW Mem. at 29-32; IUOE Mem. at 4. The UAW also argues that the level of wage and benefit cuts Delphi seeks is not necessary because Delphi fails to take

13

into account other savings such as those from facility closings and the UAW Special Attrition

Program. See UAW Mem. at 38. Finally, most Unions argue that Delphi has provided only a

"wish list," improperly including unnecessary items not relevant to reorganization such as the

revised attendance policy and a no-picketing rule. See UAW Mem. at 38; IUE-CWA Mem. at

27-28; IAM/IBEW Mem. at 30-31; IUOE Mem. at 4 & n.1.

Courts have consistently rejected attempts to parse a debtor's Sections 1113 and 1114

proposal to determine the value of individual items, concluding that the question is whether the

employer's proposal, taken as a whole, is financially necessary. In re Royal Composing Room,

848 F.2d at 348 (in determining necessity, "the focus should be on the proposal as a whole"); In

re Appletree Mkts, 155 B.R. at 441 ("[t]o determine whether a debtor's proposed modifications to

a CBA are necessary, a court must focus on the total impact of the changes in the debtors' ability

to reorganize, not on whether any single proposed change will achieve that result").

Any contrary rule would allow a union to avoid rejection, even when demonstrably

necessary for the debtor's survival, by identifying a single item in the proposal that was not

"necessary." In re Royal Composing Room, 848 F.2d at 348 (recognizing that requiring each

element of proposal to be necessary would enable a union to "play 'hit-and-run': refusing to

negotiate toward a compromise, safe in the knowledge that it will almost certainly be able to

defeat a rejection application by attacking some vital modification by saying that it cannot be

'necessary' if reasonable substitutes could have been offered."). The principle applies with

particular force when, as here, the Unions have rejected Delphi's proposals in their entirety, and

not simply the portions of the proposal that they deem unnecessary. In re Royal Composing

Room, 848 F.2d at 349 ("where a union refuses to negotiate in order to obtain a different

combination of modifications, it may not challenge the particular combination, or any vital element, contained in the debtor's proposal.").

Moreover, as explained in Delphi's opening memorandum of law, courts have consistently held in similar circumstances that "non-economic" modifications to labor agreements are necessary to allow a debtor flexibility to restructure its business to meet the "necessity" factor of Sections 1113 of 1114.  See, e.g., In re Royal Composing Room, 848 F.2d at 348-50 (non-economic "modifications [that] were intended to have a direct economic effect on [the debtor's] ability to reorganize successfully by lowering its labor costs and improving its level of customer service" necessary to ensure debtor has "maximum flexibility . . . to mold and adapt" in an "industry where rapid change has been the rule"); In re GCI, Inc., 131 B.R. 685, 688, 691 (Bankr. N.D. Ind. 1991) (elimination of seniority provisions and subcontracting requirements necessary because "[i]mplementing them will allow the debtor to retain a more productive, cost effective, versatile and efficient labor force"); In re Blue Diamond Coal Co., 131 B.R. 633, 644-45 (Bankr. E.D. Tenn. 1991) (finding modifications permitting unlimited use of independent contractors necessary to debtor's reorganization efforts, which centered on debtor's need to shift focus of operations from producing coal to purchasing coal); In re Elec. Contracting Serv. Co., 305 B.R. 22, 27 (Bankr. D. Colo. 2003) (finding that debtor's proposed modifications to work scheduling and overtime provisions were necessary to give  debtor "the added flexibility to compete in its newly chosen marketplace"); In re Maxwell Newspapers, Inc., 146 B.R. 920, 929 (Bankr. S.D.N.Y. 1992) (holding that elimination of lifetime job guarantees is necessary to debtor's ability to attract prospective purchasers and to ensure "that the business can be sold and thrive"); UAW v. Gatke Corp., 151 B.R. 211, 214 (N.D. Ind. 1991) ("Because productivity was a problem in addition to cash flow . . . non-monetary changes such as transfer policies" were

15

necessary); In re Valley Steel Prods. Co., 142 B.R. at 340-41 (modifications that increased

flexibility in layoffs, improved dispatch procedures, and relaxed rules were necessary).[12]

Accordingly, the Unions' argument that each and every element of the Delphi's proposals must

be necessary should be rejected.

3.    Under Sections 1113 And 1114, The Court Should Reject The Agreements
       If Any One Of The Proposed Modifications Is Independently Necessary

When a debtor has proposed a package of modifications – some of which the union

concedes (or the court concludes) are necessary for reorganization, and some of which the union

contends are not – the court should authorize rejection if the union fails to accept the "necessary"

proposals.  Here, for example, the Unions' own experts have not contested, and in some cases

have even admitted, that elimination of the JOBS Bank, elimination of hiring restrictions, and the

elimination of the no-closure/no-sale provisions of the agreements are necessary for

reorganization.  See, e.g., IUE-CWA Declaration of Mark Rubin ("Rubin Dec.") at ¶ 39; UAW

Declaration of Thomas Kochan ("Kochan Dec.") at 5.  Nonetheless, the Unions have rejected

those proposals.

In fact, Judge Hardin recently recognized that "[o]f course, there may be circumstances

where some aspect of the debtors' Section 1113 proposal must indeed be non-negotiable if

reorganization is to be possible." In re Delta Air Lines, No. 05-17923, at 14 .  The Court further

noted that when there is a "truly 'necessary modification'" in the debtor's proposal, and the union

refuses to negotiate that modification, the court should grant the debtor's Section 1113 motion.

Id. The JOBS Bank and the no-closure/no-sale provisions, among others, constitute "truly

necessary" modifications required for Delphi to successfully reorganize.  The fact that none of

---

[12]    Although the UAW attempts to argue that these cases are not applicable here because they involved smaller
companies, UAW Mem. at 34-35, such arguments are unavailing.  Indeed, Delphi's size, and the magnitude of its

the Unions has accepted these modifications, or <u>any</u> of Delphi's proposals, militates in favor of granting Delphi's Motion.

C.    <u>Delphi's Proposals Are Necessary For Reorganization</u>

Although none of the Unions ultimately disputes the need for labor modifications, the Unions have raised two basic attacks on the "necessity" of Delphi's proposals for some portion of the work-force.

The IUE-CWA disputes that labor modifications are necessary for the IUE-CWA-represented facilities because those facilities have already negotiated "competitive operating agreements" with wages and benefits at or below the level proposed by Delphi.  <u>See</u> IUE-CWA Mem. at 5, 43.  In its Objection, the IUE-CWA argues at great length that Delphi's "one size fits all" proposals are unnecessary at IUE-CWA-represented facilities because the IUE-CWA, unlike the UAW, has already agreed to competitive wages and benefits, and that the IUE-CWA-represented employees, therefore, are being asked to bear more than their proportionate share of the savings.  IUE-CWA Mem. at 5, 15, 25-26.  Delphi readily acknowledges that the IUE-CWA has demonstrated great responsibility in negotiating competitive terms, and the IUE-CWA deserves credit for that fact.  The IUE-CWA, however, mischaracterizes Delphi's proposals insofar as it implies that the IUE-CWA, having already given substantial concessions, is being asked to give more than its fair share.  To the contrary, where the IUE-CWA has negotiated terms that are at competitive levels, Delphi does not propose to change those terms.  The IUE-CWA, therefore, is not being asked for more than its fair share.

In addition, the UAW asserts that Delphi's Special Attrition Program with the UAW, and as extended to other groups, would diminish substantially the need for the modifications that

_____

operational and competitive concerns, weigh in favor of a determination that it must eliminate certain restrictions that limit its ability to respond to market forces, regardless of whether they are economically quantifiable.

Delphi seeks. See UAW Mem. at 14-15, 23. The Unions are correct that the precise effect of the
attrition programs will not be known until Delphi knows the "take rate" under those programs.
Even if Delphi could negotiate such agreements with all of the Unions – and GM has, to date, not
committed to provide the funding to do so – and even if 100 percent of eligible employees elect
to participate in the GM Special Attrition Program, the programs do not eliminate the need for
labor modifications. See Sheehan Dec. ¶ 51; Supp. Sheehan Dec. ¶ 15; Supp. Kidd Dec. ¶ 26.
What the attrition programs would actually accomplish is to minimize the impact on employees
who would be separated as a result of Delphi's restructuring.

This is because Delphi's financial projections already assumed that 75 percent of the
retirement-eligible employees would retire following implementation of new terms of
employment. The retirement incentives simply make it more advantageous to do so for those
with 30 or more years of employment, and allow another group – those with 27 to 30 years of
employment – to continue to earn credited service toward retirement. The attrition program does
not address the need for Delphi to realign its product and plant portfolio and implement
competitive terms for those employees who remain. See Supp. Sheehan Dec. ¶ 15. The UAW's
arguments that the attrition programs would solve Delphi's problems, UAW Mem. at 37-38, also
assume away a number of contract terms that the Unions have never offered to modify. For
example, under the terms of the existing agreements, Delphi could be required to hire tens of
thousands of new employees to replace those who leave – and to place those employees in a
JOBS Bank because the attrition programs do not eliminate the basic job security provisions of
the existing agreements. See Kidd Dec. ¶¶ 31-36; Supp. Kidd Dec. ¶ 26.

The IUE-CWA argues that losses at some of its facilities stem largely from product
pricing, which Delphi expects to improve as a result of the GM Contract Rejection Motion, and

18

Delphi should therefore wait until the first GM Loss Contract Motion is resolved before seeking

to reject the IUE-CWA's agreements.  See IUE-CWA Mem. at 11-12.  IUE-CWA

misunderstands the effect such rejections would have.  Any potential effect of Delphi's motion to

reject certain GM contracts will not alleviate Delphi's need for the fundamental restructuring

outlined in its Competitive Benchmark and GM Consensual Scenarios.  The successful rejection

of GM contracts would help to stem the Debtors' operating losses in the short term but does not

obviate the need for a realignment of labor costs that alone can permit the Debtors to compete at

competitive pricing in the long term.  Supp. Sheehan Dec. ¶ 16.

      In sum, the undisputed facts are that Delphi cannot compete under restrictive terms and

the extraordinarily high wages and benefits that the Unions' employees currently enjoy.  As the

Delta court recognized, "it is incumbent on a debtor in bankruptcy to examine every line item in

its budget and seek all economies permissible under the Bankruptcy Code.  That is particularly

true respecting cost elements which are clearly above market, such as the [union's employees']

compensation."  In re Delta Air Lines, No. 05-17923 at 10.  In fact, "[a]s a matter of law, the

Second Circuit has held that pay scales which materially exceed competitive industry standards

were among the factors that justified rejection of the collective bargaining agreement."  Id. at 23-

24 (citing Carey (emphasis added)).

III.    Delphi's Proposals Are Sufficiently "Definite"

      The Unions all argue that Delphi did not comply with Sections 1113 and 1114 because

Delphi did not provide them with a proposal, as contemplated by Sections 1113 and 1114.[13]

Specifically, they argue that:

_____

[13]      Although most of the Unions spend little or no time addressing Section 1114, all acknowledge that
requirements for Section 1114 relief parallel the requirements for Section 1113 relief.  See UAW Mem. at 22; IUE-
CWA Mem. at 46; USW Mem. at 15; IUOE Mem. at 12.  Thus, all parties essentially agree that Delphi's affirmative
evidence presented under Section 1113 applies equally to Delphi's Motion under Section 1114.  This should be

- Delphi did not submit one "definite" proposal, but instead submitted two "conditional," "contingent", "alternative," or "hypothetical" proposals depending on whether GM was willing to provide financial support. See UAW Mem. at 2, 30-31; IUE-CWA Mem. at 17-19; USW Mem. at 8-9; IAM/IBEW Mem. at 1, 15-18; Appaloosa Mem. at 15.

- The failure to resolve legacy costs renders the Competitive Benchmark Proposals hypothetical and not a firm proposal. See UAW Mem. at 31.

- The case is not "ripe" because Delphi's proposals are dependent either on GM support or resolution of legacy costs. See UAW Mem. at 25-26.

These arguments fail upon even a basic reading of Delphi's proposals.

First, Delphi has provided the Unions with a definite proposal for wages at a specific rate. To date, as stated in GM's "Response" to the Motion, GM has not offered financial support to allow Delphi to provide the Unions with the higher wages and benefits presented in the GM Consensual Proposals. Unless and until that changes, and as stated in the term sheets and cover letters provided to the Unions as early as October, 2005, Delphi's proposals are the definite terms set forth in the Competitive Benchmark Proposals, and which are also explicitly contained in the GM Consensual Proposals. See Supp. Butler Dec. ¶ 7. The GM Consensual Proposals themselves state, in no uncertain terms, that "[i]n the event that GM does not agree to provide financial support, the non-contingent terms set forth in or appended to this term sheet shall govern." See Butler Dec. ¶ 59, Exs. H-I.

This is, analytically, no different from a proposal for profit-sharing or a wage snap-back if certain financial goals are achieved. A union cannot know whether such proposals will ever result in any payments, but the employer has definitively promised to make the payments if the

---

especially true because most Unions fail to address Delphi's request to modify retiree welfare benefits altogether. Those that do address it, do so in a cursory manner. See UAW Mem. at 20-22 (explaining the legal standard for modification of retiree benefits under Section 1114 without any analysis to the facts of this case); IUE-CWA Mem. at 46-47; USW Mem. at 15 (addressing Section 1114 in four short paragraphs; see generally IAM/IBEW Mem. (failing to discuss Section 1114 separately); IUOE Mem. at 12-13. Appaloosa raises its own objections to modification of retiree welfare benefits. See Appaloosa Mem. at 23-24.

contingent events occur. Far from prohibiting such "contingent" proposals, courts have explicitly encouraged them, finding that profit-sharing or snap-back proposals may be an important element of a Section 1113 or 1114 proposal. In re Indiana Grocery Co., 136 B.R. 182, 193 (Bankr. S.D. Ind. 1990) ("Snap-back provisions in modification [of collective bargaining agreement] proposals are favored because they ensure that once a company is profitable enough for successful reorganization, further profits not "necessary" for reorganization are returned to the employees who made the concessions").[14]

In fact, if Delphi had not included provisions based on GM support, however, the Unions undoubtedly would have argued that Delphi's proposals are unnecessary because they did not consider the prospect of GM financial support. See Supp. Butler Dec. at ¶ 7. In fact, at least one Union representative acknowledged that including GM support in Delphi's proposals was "a step in the right direction."                       . To hold that including elements in Delphi's proposal that are dependent on GM support means that Delphi cannot obtain relief under Section 1113 or 1114 would put Delphi in an untenable position – unable to force GM to provide support, and unable to seek a contract rejection because GM has not yet done so.

Second, while the UAW also argues that the Competitive Benchmark Proposals were improperly conditional because they were contingent on resolving legacy costs, see UAW Mem. at 31, this argument misconstrues Delphi's proposals. Delphi definitively proposes freezing the Unions' pension plan, and does not propose terminating the plan. Rather, Delphi's proposals

---

[14]    As the UAW acknowledges, there has been a consistent practice to involve GM in negotiations between Delphi and its Unions, including: the 1999 initial Mirror Agreement which diffused UAW objections to the Spin-Off, the GM Benefit Guarantee and Flow-Back Agreements of the same period, the 2003 "GO agreement" described in the UAW's papers, and the recent UAW Special Attrition Program. See UAW Mem. at 7-8, 12-15. Far from objecting to GM financial support, all of the Unions plainly want GM financial support. Indeed, the UAW's papers make it crystal clear that the UAW views its leverage in these negotiations as a strike that would shut down GM. See UAW Mem. at. 50-51.

21

simply preserve the right to seek such relief should it become necessary. If the Unions were to agree to Delphi's proposals, and Delphi subsequently determined that it could not find a way to maintain the plan, it would have to seek further judicial relief under the ERISA provisions governing termination of such plans, and, if necessary Section 1113.[15]

In sum, the Unions' assertion that Delphi did not provide a proposal as required under Sections 1113 and 1114 is without basis and must be rejected.

IV.    Delphi Provided All Relevant Information Necessary To Evaluate The Proposals

   A.    The Unions' Contention That It Did Not Receive Adequate Information Is Not Supported By The Facts

All of the Unions argue that the information provided by Delphi was inadequate to evaluate Delphi's proposals. See UAW Mem. at 39-44; IUE-CWA Mem. at 9-15; USW Mem. at 3, 6-7, IUOE Mem. at 9-10; IAM/IBEW Mem. at 11, 18-20. The UAW, IUE-CWA, IAM, and IBEW argue that Delphi failed to provide the actual dollar cost savings attributable to the items contained in the proposals,[16] and that their advisors were not provided with requested information until the eve of or after the Motion was filed. See UAW Mem. at 11 (citing Delphi's failure to identify line items savings attributable to each modification or an overall savings goal); IUE-CWA Mem. at 10-15; IAM/IBEW Mem. at 18-20.

As is explained in great detail in the Supplemental Declarations of Jim Guglielmo, Darrell Kidd, and William Shaw, the Unions' claims are not borne out by the evidence. Rather, it is abundantly clear that Delphi met, and exceeded, its obligations under Sections 1113 and 1114. The Unions and their financial advisors have:

---

[15]    If the Unions were not to agree to a consensual resolution, then Delphi would be required to seek relief under both Section 1113 and ERISA. If, however, the Court grants the Section 1113 relief Delphi seeks in its Motion, Delphi would only be required to seek relief under ERISA.
[16]    As discussed above, having provided the dollar cost savings in the penny sheet format, Delphi has satisfied its obligations under Section 1113.

- obtained significant information through the bankruptcy process,

- received volumes of material provided at or around the time of the proposals, including dynamic electronic interactive financial models that can be used to test various assumptions, and numerous additional updates to the models as Delphi developed them,

- been given access to a Virtual Data Room containing documents,

- been provided with responses to information requests as the information becomes available, and

- been given access to Delphi personnel and/or financial advisors to respond to questions or explain materials provided.

See Guglielmo Dec. ¶¶ 6, 12-15; Shaw Dec. ¶¶ 8-22; Supp. Kidd Dec. ¶¶ 18-20. In sum, Delphi has shared more than 835 electronic and manual files of documents with its Unions and their professional advisors. See Supp. Kidd Dec. ¶ 21.

> B.    The Unions' Arguments That Inadequate Information Has Been Provided Should Be Viewed Skeptically

Failure to provide relevant information has become the "argument of first resort" to a union seeking to defend against a Section 1113 motion. The common strategy has become to make numerous, detailed information requests early and often so as to create a "record" that a debtor has not complied with every request, just as here, where the Unions and their financial advisors, collectively, have served more than 300 information requests on Delphi. Supp. Kidd Dec. ¶ 21.

On March 24-26, 2006, after serving the GM Consensual Proposals, Kevin Butler sent letters to all of the Unions asking them to confirm Delphi's understanding that it had provided all of the information they sought as of that date. Supp. Kidd Dec. ¶ 2; Kidd Dec. Ex. H. The Unions' responses, and Delphi's responses thereto, demonstrate that the Unions have all of the relevant information necessary to evaluate Delphi's proposals, and the complaints set forth in their Objections are without merit. See Supp. Kidd Dec. ¶¶ 4-17; Exs. A-E.

23

C.    Courts Have Narrowly Construed The Obligation To Provide Information

In recognition of the statutory scheme – and the potential for mischief if a union were
able to avoid the merits by interposing time-consuming, burdensome information requests –
courts have construed the information sharing obligations under Sections 1113 and 1114 quite
narrowly. E.g., In re Appletree Mkts, 155 B.R. at 437-38 (debtor provided union with access to
financial books and current financial statements); In re Valley Steel Prods. Co., 142 B.R. at 337
(debtor provided yearly operating statements and monthly bankruptcy operating report); In re
Amherst Sparkle Mkt, Inc., 75 B.R. 847, 850, 852 (Bankr. N.D. Ohio 1987) (information
sufficient even though its original provision consisted solely of unaudited financial data which
contained errors); In re Royal Composing Room, Inc., 62 B.R. 403, 412-13 (Bankr. S.D.N.Y.
1986), aff'd, 78 B.R. 671 (2d Cir. 1988) (bankruptcy court stated that single sheet of paper which
listed union costs was "reliable and relevant information and complete enough to form a basis for
reasoned consideration of [the debtor's] proposal"). Here, as explained above, Delphi has
provided far more than the information deemed adequate by the courts.

The UAW, nonetheless, expresses discontent at the information provided, suggesting that
Delphi has taken inconsistent positions on the scope of a debtor's legal obligation. Specifically,
the UAW asserts that Delphi has taken the position that Section 1113 does not require the type of
corporate "due diligence" requested by the UAW's financial advisor, Lazard Frères & Co. LLC
("Lazard"), after seeking court permission to reimburse Lazard for such diligence. See UAW
Mem. at 39-41. In doing so, the UAW has mischaracterized Delphi's position. In the letter upon
which the UAW relies for this assertion, Delphi made clear its position:

> Delphi disagrees with your characterization both of the legal requirements
> under Section 1113 of the Bankruptcy Code, and of the scope and quality
> of information that Delphi has provided to Lazard and the UAW. At the
> outset, however, we want to emphasize that our disagreement on these
> matters should in no way be construed as a reluctance on the part of

24

Delphi to provide Lazard and the UAW with all of the information they believe is necessary to evaluate Delphi's proposals. To the contrary, Delphi agreed last year to reimburse your client's fees to Lazard to help ensure that the UAW had all of the resources required to analyze the voluminous information that has been provided to the UAW and its financial and legal advisors over the last nine months. If Delphi's goal had been to impede UAW's access to information, it would not have agreed to do this.

See UAW Declaration of Andrew Yearley ("Yearley Dec."), Ex. C.

In fact, the UAW that has taken inconsistent positions.

- When Delphi provided a summary of financial projections, the UAW complained that the information was provided in "summary format." When Delphi provided a complete financial model, the UAW complained that the model was provided "without explanation or assumptions."

- When Delphi did not provide the level of detail that Lazard wanted, the UAW complained that Delphi was "unwilling to provide calculations and exhibits." When Delphi did provide the detail, the UAW complained that it provided "boxes of data."

- When Delphi delayed providing preliminary projections pending further review, the UAW complained that Delphi unnecessarily delayed production, or required "layers of review and approval." When Delphi provided preliminary information, the UAW complained there were "frequent adjustments to its financial plans."

See Yearley Dec., Ex. C.[17]

The clearest evidence that the Unions' arguments about information sharing are nothing more than a post hoc rationalization for the Unions' rejection of Delphi's contract proposals is that the Unions rejected Delphi's proposals out of hand the day after they were made.[18] If the

---

[17]    To the extent that Lazard has not received responses, it is largely because the information requests called for (1) privileged information, (2) information Delphi did not maintain in the form sought, (3) information that was not yet available, but which will be provided if it does become available, or (4) information that does not exist at Delphi. Guglielmo Dec. ¶ 26.

[18]    See Press Release, The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW Leaders Comment on Delphi Proposal (Oct. 21, 2005), available at http://www.uaw.org/news/newsarticle.cfm?ArtId=360 (asserting that "Delphi's proposal is designed to hasten the dismantling of America's middle class by importing Third World wages to the United States. In short, the proposal faithfully reflects a vision of an America in which an elite few live in luxury while everyone else struggles to make ends meet. Maybe some believe the American Dream is over; the UAW rejects that dismal idea and will continue the struggle to fulfill that dream."); see also Press Release, The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Unions Form Mobilizing@Delphi Coalition (Nov. 7, 2005),

Unions had sufficient "relevant information" available to allow them to reject Delphi's proposals

outright, they cannot now seriously contend that they lacked the information necessary to

evaluate the proposals.

> D.    The Unions' Complaints About Specific Pieces Of Information Do Not
>        Demonstrate That Delphi Failed To Comply With Sections 1113 And 1114

The Unions complain that they did not receive all information requested, but in fact there

is no question that Delphi has met its obligations to provide the <u>relevant</u> information necessary to

evaluate its proposals.

In many cases, the Unions or their financial advisers have requested documents or

information that the union already has in its possession. <u>See</u> Yearley Dec., Ex. A; IUE-CWA

Mem. at 12-13 (complaining that it did not receive "hourly employee data by IUE-CWA plant,

including classification, tier, age, seniority, date, etc."); USW Declaration of Lowell Peterson

("Peterson Dec."), Ex. A.  In considering such requests, courts have noted that the "union must

be assumed to understand the economics of its own [collective bargaining agreement]." <u>In re</u>

<u>Royal Composing Room</u>, 62 B.R. at 413.

In other cases, the Unions have requested information of no relevance whatsoever (<u>e.g.</u>,

the actual salary, by name, of every management employee of Delphi) or which could not

possibly be known at the time (<u>e.g.</u>, the recovery of each equity-holder or creditor under a plan of

reorganization that does not yet exist).  <u>See</u> IUE-CWA Mem. at 12-13; Yearley Dec., Ex. A

---

<u>available at</u> http://www.uaw.org/news/newsarticle.cfm?ArtId=364 (joint statement of the six unions, UAW, IUE-
CWA, USW, IAM, IBEW, and IUOE stating "Delphi's contract proposals to our unions, together with CEO Steve
Miller's public statements, clearly reveal senior management's contempt and disdain for the hard-working people
who have played a vital role in making Delphi the world's leading automotive parts manufacturer"); Press Release,
The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW
Statement on Delphi Postponing Motion (Nov. 28, 2005), <u>available at</u> http://www.uaw.org/news/newsarticle.cfm?
ArtId=369 ("As we have said before, Delphi's second contract proposal, which would slash hourly wages by nearly
62 percent, is not a framework for an agreement, but a road map for confrontation. If Delphi is serious about
restarting discussions, taking that insulting proposal off the table would be a good place to start.").

(seeking "Personnel census summary by location (age, tenure, etc.") and breakdown of employees by general geographic regions). Courts have not required a debtor to provide information that is irrelevant to evaluating the necessity of the debtor's proposal, or constructing the union's own proposals. In re Ormet Corp., 316 B.R. 665, 670 (Bankr. S.D. Ohio 2004) (finding no obligation to produce information that was not needed to evaluate the Debtors' proposals, but instead was needed to prepare counter-offer).

Likewise, courts have explicitly rejected the contention that a debtor must provide details of a plan of reorganization that does not yet exist. See Carey, 816 F.2d at 91 ("[A] section 1113 application will almost always be filed before an overall reorganization plan can be prepared, the debtor cannot be expected to identify future alterations in its debt structure."); In re Kentucky Truck Sales, Inc., 52 B.R. 797, 802 (Bankr. W.D. Ky. 1985) (debtor not required to propose plan of reorganization prior to seeking rejection of collective bargaining agreements); 7 Collier, Bankruptcy ¶ 1113.06[1][b] (15th ed. rev. 2005) ("Congress must have intended that the court make its finding based on the best, albeit fragmentary information available at the time of the hearing on rejection").

Two of the Unions, the IBEW and the IAM also argue that Delphi did not provide necessary information about the "concessions" made by non-union employees or other constituencies. See IAM/IBEW Mem. at 4, 8, 18, 20, 21, 23-24. With regard to salaried and management employees, Delphi has provided the Unions with information on a corporate-wide basis. See Supp. Kidd Dec. ¶ 25. For instance, Delphi provided pension and OPEB data, details on incentive compensation, and census data by function, region, and plant. See Supp. Kidd Dec. ¶ 25. The only thing that Delphi refused to provide was individual employee salaries, which would have violated employees' rights of privacy. The information sought regarding the effect

27

of the bankruptcy on other groups simply cannot be precisely known at this time.[19]  A debtor

cannot be expected to provide information which is unknown, and unknowable.

V.    Delphi's Proposals Treat All Parties Fairly And Equitably

    A.    The Standard For Determining Whether A Debtor's Proposal Treats All Parties
        Fairly and Equitably Is Similar Sacrifice – Not Mathematical Equivalence

Each of the Unions argues that the proposals are not fair and equitable because that

Union's members will suffer more than others.  See, e.g., UAW Mem. at 45-46; IUE-CWA

Mem. at 20-23; USW Mem. at 7-8; IUOE Mem. at 4-7, 12-13; IBEW/IAM Mem. at 24-25.  As

explained in the memorandum of law supporting Delphi's motion for relief under Sections 1113

and 1114, the requirement of "fair and equitable" treatment does not require identical treatment.

As the Delta Court recently explained, "[t]he rule in this Circuit is that the debtor's proposal must

'spread the burden of saving the Company to every constituency while ensuring that all sacrifice

to a similar degree.'  The key phrase here is 'to a similar degree.'  'Similar' cannot mean identical

– indeed there are too many subjective variables at play to determine what an identical sacrifice

would be for flight attendants as compared to, say, pilots, mechanics, or executives.  In the end,

the Court must fall back on the subjective statutory standard of fair and equitable."  In re Delta

Air Lines, No. 05-17923 at 18 (citing In re Century Brass Prods. Inc., 795 F.2d 265 (2d Cir.

1986), Carey, 816 F.2d at 82, and In re Royal Composing Room, 848 F.2d at 345).

    B.    All Of Delphi's Constituencies Will Be Required To Sacrifice

As noted above, all of the Unions argue that the proposals are not fair and equitable

because that Union's members will suffer more than others. E.g., UAW Mem. at 45-46.

Many of these arguments are "inter-union" disputes.  For instance, the IUE-CWA, USW,

IAM, IBEW, and IUOE argue that they will suffer more than UAW-represented employees

---

[19]    Delphi refers the Court to further discussions in Sections V. B., and VI., infra, of this Reply.

28

because Delphi cannot, or has not, offered them the same attrition program as the UAW. See
IUE-CWA Mem. at 20-21; USW Mem. at 7-8; IUOE Mem. at 4-7, 12-13. The IAM further
argues that a pension freeze will unfairly burden its members because it does not have the same
GM Benefit Guarantee as the UAW, IUE-CWA, and USW. IBEW/IAM Mem. at 24-25. Certain
of the Unions' Objections also assert that the Unions, or their members, will suffer more than
other constituencies such as creditors or suppliers. See UAW Mem. at 45-46; IUE-CWA Mem.
at 22-23

As Delphi demonstrated in its motion for relief under Sections 1113 and 1114, everyone
will lose something in this bankruptcy. It is extremely unlikely that the equity holders will
recover any portion of their claims against Delphi. See Sheehan Dec. ¶ 93. GM, Delphi's former
parent and largest customer, will bear significant loss once the Court authorizes rejection of
certain of Delphi's GM contracts, and once the GM Benefit Guarantee is triggered as a result of
reductions in Delphi's hourly retiree health coverage and pension freeze in bankruptcy. Sheehan
Dec. ¶ 95. Holders of Delphi's debt securities will likely receive significantly less than such
securities' face value under a restructuring plan. Sheehan Dec. ¶ 96. Despite their own financial
difficulties, suppliers have made major concessions in giving necessary extensions for expiring
contracts and accepting significantly less than the face amount of their outstanding prepetition
payables for defaulted assumed contracts. See Sheehan Dec. ¶¶ 98, 99. Other unsecured
creditors will likely receive less than 100 cents on the dollar. See Sheehan Dec. ¶ 101. Finally,
the wage and benefit packages for salaried and management employees are already at or below
"market" levels, having already suffered a greater than 15 percent decrease in the value of their
wage and benefit package for the last several years since the Spin-Off. See Gebbia Dec. ¶ 59.
Delphi has also announced that it will freeze the existing salaried employees' pension plan and

increase salaried employees' contributions to health care. See Supp. Butler Dec. ¶ 12.

Moreover, approximately 5,250 of the 14,300 salaried and management positions in the United

States – or more than 35 percent – will be eliminated in this restructuring.[20] See Weber Dec. ¶¶

25, 26. Delphi's incentive compensation for its salaried and management employees will bring

those salaried and management employees to market wages necessary to achieve global

competitiveness.

     In fact, the courts have consistently held that similar contributions by such parties to a

debtor's reorganization were sufficient to meet the "fair and equitable" standard. See, e.g.,

Bowen Enters. v. United Food & Commercial Workers Int'l Union, Local 23 (In re Bowen

Enters.), 196 B.R. 734, 744 (Bankr. W.D. Pa. 1996) (finding it "highly significant" that debtor's

supplier made "significant concessions to help debtor get back on its feet once again" by

---

[20]    The UAW, and two other objectors, Appaloosa and Wilmington Trust, also argue that Delphi cannot meet its burden of proof that the relief requested is fair or equitable because Delphi has not provided specifics on the extent to which other constituencies (in other words, "me") will experience a reduction of their recovery under a plan of reorganization. See UAW Mem. at 45-46; Appaloosa Mem. at 17-18; Wilmington Mem. at 6-7. These objections should be dismissed for two reasons.

    First, as mentioned above, Appaloosa and Wilmington Trust simply have no standing in these proceedings. The "fair and equitable" requirement of Section 1113 was intended to prevent the debtor's employees from bearing a disproportionate share of the sacrifice relative to other parties – not to allow creditors or investors to block contract rejection because rejection could decrease the level of their recovery. See, e.g., Wheeling-Pittsburgh Steel Corp. v. United Steel Workers of Am., AFL-CIO-CLC, 791 F.2d 1074, 1091 (3d Cir. 1986) ("Congressional intent with regard to the meaning of 'fair and equitable' [was to] ensure that . . . the covered employees do not bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden") (internal citations and quotations omitted); In re Nat'l Forge Co., 289 B.R. 803, 811 (Bankr. W.D. Pa. 2003) ("The focus of inquiry [of the fair and equitable factor] is upon whether the proposed sacrifices will be borne exclusively by members of the bargaining unit or will be spread among all affected parties.").

    Second, the case law is clear that the inability of a debtor to predict exact recoveries at an relatively early stage of the proceedings is no bar to Section 1113 relief. The courts have also expressly rejected the argument, made by the Unions here, that the "fair and equitable" requirement under Section 1113 requires the debtor to know precisely how equity holders, creditors, and other parties will be treated under a plan of reorganization. Carey, 816 F.2d at 91 ("[A] section 1113 application will almost always be filed before an overall reorganization plan can be prepared, the debtor cannot be expected to identify future alterations in its debt structure."); In re Blue Diamond Coal Co., 131 B.R. at 645 ("Congress . . . could not have intended that the court make findings with respect to the likely treatment of creditors and equity holders under a plan of reorganization" (quoting 5 Collier, Bankruptcy at ¶1113.01[4][d][ii][C])); In re Royal Composing Room, Inc., 62 B.R. at 415 (while some parties' claims could not be ascertained because no plan of reorganization had been filed, court held that this was no barrier to finding of "fair and equitable" treatment); In re Kentucky Truck Sales, Inc., 52 B.R. at 802 (debtor is not required to propose plan of reorganization prior to seeking rejection of its collective bargaining agreements).

foregoing interest, reducing an "upcharge," and charging the debtor a low rent); In re Appletree

Mkts, 155 B.R. at 439 (proposal fair and equitable when management made sacrifices in benefits

and job cuts).

In other words, all constituents have made and continue to make sacrifices and shoulder

the burden of reorganizing Delphi so that it can emerge as a viable entity. All that is being asked

of the Unions is that they make similar contributions to Delphi's reorganization. That they do is

only fair and equitable.

C.    Delphi's Salaried And Management Employees Will Sacrifice Greatly

Most of the Unions' vitriol is aimed at Delphi's salaried and management employees.

Specifically, the IUE-CWA and USW argue that salaried and management employees are being

rewarded through bonuses and programs such as the Key Employee Compensation Program

("KECP"). See IUE-CWA Mem. at 21-22, 31; USW Mem. at 12-14. The IAM and IBEW also

argue that the Delphi's proposals are not fair and equitable compared to benefits received by

salaried employees. See IAM/IBEW Mem. at 1-2, 24-25 (arguing that salaried employees hired

before 1993 would continue to receive retiree health care benefits and the "30 and out"

retirement option would continue to be available to salaried employees hired before 1988).

Without diminishing the requested sacrifices of Delphi's Union-represented employees,

its salaried and management employees have fared much worse than Union-represented

employees since the Spin-Off. As outlined in its Motion, Delphi has consistently reduced the

relative wage and benefits of its salaried and management employees, in line with market-

competitive pay and benefits, while, at the same time, Union-represented employees, already

above market norms, experienced an approximate 81 percent increase in their all-in labor value

for a traditional Delphi employee, including wages, benefits, fixed costs, and retirement

obligations, in the six years since the Spin-Off, from $43 to $78 per hour. The U.S. salaried and

31

management workforce are expected to be reduced by approximately 35 percent as a result of

Delphi's restructuring. See Gebbia Dec. ¶ 57-60; Weber Dec. ¶ 25-26. In addition, Delphi

recently announced a freeze of the salaried employees' pension plan and increased employee cost

sharing for active salaried health care. See Supp. Sheehan Dec. ¶ 11.

The Unions dispute the fairness and equity of these contributions, but the Second Circuit

has held salaried concessions even without postpetition pay or benefit reductions to be fair and

equitable:

> a debtor can rely on proof that managers and non-union employees are
> assuming increased responsibilities as a result of staff reductions without
> receiving commensurate salary increases; this is surely a sacrifice for these
> individuals. Particularly where, as here, the court finds that only the
> employees covered by the pertinent bargaining agreements are receiving
> pay and benefits above industry standards, it is not unfair or inequitable to
> exempt the other employees from pay and benefit reductions.

Carey, 816 F.2d at 90-91; see also In re Appletree Mkts, 155 B.R. at 439 (proposal was fair and

equitable even when no reductions in compensation for management, where union salaries were

above market rates while management salaries were at or below prevailing wage levels,

management had made other sacrifices in benefits and job cuts, and company could not reduce

management salaries while retaining valued employees). Similarly, the headcount reductions are

fair and equitable sacrifices on the part of Delphi's salaried and management employees when

their wages and benefits are already at or below market.

The fact that the some management employees may benefit from the KECP does not

render Delphi's proposals unfair and inequitable. As the Court found in approving the Revised

Annual Incentive Program, these programs are "in the best interests of the Debtors, their estates,

their creditors, and other parties-in-interest." (Order Under 11 U.S.C. §§ 105 and 365

Authorizing The Debtors To Implement A Short-Term Annual Incentive Program, Docket No.

2441.) These programs improve Delphi's financial performance by incentivizing management to

hit and exceed financial goals.

This type of program is common among chapter 11 debtors, and it does not result in any unfairness or inequity. See, e.g., In re Tower Automotive, No. 05-10578 (Bankr. S.D. N.Y. March 30, 2005); see also In re Friedman's, Inc., 336 B.R. 880, 891 (Bankr. S.D. Ga. 2005) (finding that KECP plan was proper exercise of Debtors' business judgment and was fair and equitable); In re Georgetown Steel Co. LLC, 306 B.R. 549, 558 (Bankr. D.S.C. 2004) (approving debtors' employee retention plan, stating that debtors exercised proper business judgment). Moreover, courts have found proposals under Sections 1113 and 1114 to be fair and equitable, despite noting similar programs. Cf. In re Ormet Corp., 324 B.R. 665, 661 (Bankr. S.D. Ohio 2005) (modification under Section 1114 fair and equitable despite "the existence of a limited stock bonus for certain senior executives"); In re Nat'l Forge Co., 289 B.R. at 811 (finding severance payment to two top executives did not violate "fair and equitable" provision because "[t]he contracts of these two executives were approved by the Court early in the case to ensure that the executives would remain with the Debtor during the bankruptcy to guide it through the process").

As the Court noted in Delta Air Lines, "The statute does not contemplate that any single group of employees . . . will be subsidized by the sacrifice of others." In re Delta Air Lines, No. 05-17923 at 12. Delphi's salaried and management employees should not be asked to subsidize the Union employees' above-market wages and benefits, especially when the salaried and management employees' wages and benefits are already at or below market.[21]

---

[21]    The UAW and USW also argue that Delphi's analysis of comparable wages for employees in equivalent positions is flawed. Specifically, the UAW argues that even if "a comparability analysis is relevant . . ., Delphi's

33

VI.    Sections 1113 And 1114 Contemplates That Proposals Will Be Provided Early In The
       Bankruptcy Case Based On The Best Information Available At The Time

None of the Unions attacks this factor of the Sections 1113 and 1114 test.  Accordingly, it

is undisputed that this factor – that Delphi's proposals were based on the best available

information at the time of the proposals – has been met.

Some of the Unions claim, however, that Delphi has either adjusted its financial forecasts

too frequently, Yearley Dec. Ex. B at 2 (complaining that "Delphi has made this dysfunctional

due diligence process even more challenging by making frequent adjustments to its financial

plans . . . compelling Lazard to restart its due diligence leading to a prolonged and inefficient

process"), or that it has not adequately responded to changing circumstances – in particular, its

First Quarter financial results and the UAW Special Attrition Program.  See UAW Mem. at 37

(asserting that Delphi has failed to take into account both updated cash flow projections and the

impact of the Special Attrition program); IUOE Mem. at 9-10 (failure to receive information

regarding attrition program prevented IUOE for evaluating the necessity or equity of the

proposals).  These arguments are without merit.

Bankruptcy is a dynamic process.  Except in the rare occasion of a "pre-packaged"

chapter 11 case, most corporations enter bankruptcy under difficult circumstances, and the facts

necessarily evolve on a day-to-day basis.  Accordingly, the "most complete and reliable

information available" will necessarily be information that is subject to change throughout the

course of the bankruptcy.  See 7 Collier, Bankruptcy at ¶ 1113.06[1][b] (15th rev. ed. 2005)

---

comparability analysis is fundamentally flawed because it is based on selective and non-weighted use of national
wage data, and vague and overbroad characterization of its competitors, fails to account for the differences between
capital-intensive and labor-intensive facilities both inside and outside of the automotive industry, and disregards the
significance of firm size, productivity and other relevant comparability factors."  See UAW Mem. at 38.  The USW
argues that Debtors' expert, in past cases, has not taken into account "regional wage variations and fail[ed] to
account for increased skill levels," and so do not apply in unionized industrial work places.  See USW Mem. at 9-12.
These claims are addressed in the Supplemental Declarations of Kevin M. Butler and of Michael L. Wachter.

34

("Congress must have intended that the court make its finding based on the best, albeit

fragmentary information available at the time of the hearing on rejection").  As discussed below,

Delphi acted reasonably, and in good faith, in light of changed circumstances, including

providing the Unions with updated information as it became available.  As conceded by all

parties, there is no question Delphi's proposals were based on the best information available at

the time.

VII.    Delphi Has Made Itself Available For Meetings And Has Acted In Good Faith To Reach
        Mutually Satisfactory Modifications

        Section 1113(b)(2) requires that after serving its proposal, the debtor must be available to

meet at reasonable times with the union to confer in good faith in attempting to reach mutually

satisfactory modifications of such agreement.  When, as here, a debtor demonstrates that it

attempted to meet and bargain with the union, it falls to the union to produce evidence that the

debtor did not confer in good faith.  In re Texas Sheet Metals, Inc., 90 B.R. 260, 263-64; In re

Am. Provision Co., 44 B.R. 907, 910 (Bankr. D. Minn. 1984).  This the Unions cannot do.

        The Unions have attacked Delphi's good faith on a number of bases.  One Union has

complained that Delphi withdrew its Competitive Benchmark Proposals in December 2005, and

did not reinstate the proposals until March 2006 – thus leaving it with nothing to counter.  See

IUE-CWA Mem. at 15, 16, 39.  Almost all of the Unions have complained that Delphi filed its

Motion too soon after providing them with the GM Consensual Proposal.  Others have

complained that an attrition program was "critical" to successful negotiations but that Delphi did

not offer an attrition program to them – either at all, or on a timely basis.  See IUOE Mem. at 4-

8; USW Mem. at 7-8; IAM/IBEW Mem. at 24; UAW Mem. at 23-24, 30-31; IUE-CWA Mem. at

16-18, 41-42.  Several of the Unions have argued that Delphi's proposal was too vague to counter

because it did not seek a specific dollar value of concessions.  See UAW Mem. at 11; IUE-CWA

35

Mem. at 9-11, 41-42; IAM/IBEW Mem. at 18, 20.  None of these arguments can overcome

Delphi's affirmative evidence that it has acted in good faith to reach a consensual resolution.

A.    Delphi Has Made Itself Available For Negotiations 24/7 Since The Summer of
       2005

The facts speak volumes.  Delphi has attempted to negotiate in good faith from the start,

while the Unions refused to engage in any serious discussion over the proposals for months.

Delphi began negotiating with its Unions in the summer of 2005 – at the time seeking to

avoid a bankruptcy filing.  See Resnick Dec. ¶¶ 26, 27.  Delphi served its initial Section 1113

and 1114 proposals in October 2005, and despite the absence of a Union counter, served two

additional proposals, and withdrew one because the Unions deemed it an obstacle to successful

negotiations.                                    Moreover, Kevin Butler's cover letters to the

proposals each contained his explicit request that the Unions contact him to discuss Delphi's

proposals.  In response, the UAW and IUE-CWA concede that they have not made a single

comprehensive counter-offer to Delphi's Section 1113 and 1114 proposals to date.  See UAW

Mem. at 48; IUE-CWA Mem. at 15-16.[22]  Neither the USW nor the IUOE has made a written

comprehensive counter either.  See Supp. Quick Dec. ¶ 12; Gerling Dec. ¶¶ 12, 17.

Nevertheless, Delphi made, and continues to make, further efforts to solicit written

counterproposals.

---

[22]    The IAM and IBEW made a counteroffer on April 20, 2006.  See IAM/IBEW Mem. at 32.  They assert that
their proposal "is a comprehensive response to each of the provisions the Company has proposed to modify or
eliminate, and identifies the Union's rationale for each and every proposal it has rejected.  Moreover, [they assert
that] the Union's proposal provides the Company with substantial savings toward the ultimate goal of reorganizing
while also meeting the minimum needs of the Unions' members and retirees."  Id. at 32-33.  Delphi has reviewed
this counterproposal, and believes it is not a good faith effort to reach an agreement.  Not only was it sent six months
after Delphi delivered its proposals, and only a few days before this Reply was to be filed, IAM/IBEW's
counterproposal rejects out of hand virtually all of Delphi's proposals.  Delphi respectfully refers the Court to the
Declaration of Robert Gerling for further discussion of the IAM/IBEW's counterproposal.  Delphi intends to seek
further negotiations with these Unions in an attempt to reach a consensual agreement.  See Gerling Dec. ¶¶ 25, 26.

Although the Unions claim that serving the proposals, and offering to meet, does not satisfy Delphi's obligations under Sections 1113 or 1114, UAW Mem. at 47; IUE-CWA Mem. at 2; see also Appaloosa Mem. at 19-20, that is not what happened here. Rather, Delphi's labor relations representatives conducted a number of formal meetings with the Unions, and conferred by telephone with the Unions' officers on a regular basis, and often daily, during the period from October 2005 to the present. The Unions, however, simply refused to agree to or counter Delphi's proposals.

For instance, in addition to sometimes daily telephone calls, Delphi has met with the UAW 22 times since October, not including additional daily meetings throughout the month of March regarding the UAW Special Attrition Program, with the IUE-CWA 19 times, and with the USW, IAM, IBEW, and IUOE every time proposals were presented, or when those Unions requested a meeting in response to Delphi's offers to meet. See Supp. Butler Dec. ¶¶ 5-8; Supp. Quick Dec. ¶¶ 9, 12; ¶¶ 4-5, 10, 18-21, 24-25.

In addition, Delphi and its financial advisors have been in regular contact with the Unions' financial advisors to provide them with information regarding the proposals. See Shaw Dec. ¶¶ 5, 11, 14-15, 17, 19; Guglielmo Dec. ¶ 6, 15.

Courts have held that debtors whose efforts fell far short of those that Delphi has made, nonetheless negotiated in good faith. See In re Alabama Symphony Ass'n, 155 B.R. 556, 576 (Bankr. N.D. Ala. 1993) (holding that the debtor met good faith standard because it was not

responsible for union's refusal to meet); In re Sierra Steel Corp., 88 B.R. 337, 341 (Bankr. D. Colo. 1988) (despite lack of negotiations, debtor met good faith standard when it supplied all relevant financial data at its disposal, offered to provide union with any additional financial data necessary for evaluation of its proposal, and repeatedly requested to meet with union). Delphi has reached out to its Unions regularly since these cases began in an effort to negotiate a consensual resolution, and the Unions have responded on occasion (and more regularly as of late). The Unions' failure to respond in a more meaningful fashion to Delphi's attempts is not a basis for finding that Delphi has acted in bad faith.

B.    Delphi "Withdrew" Its Proposals To Facilitate Bargaining And Has Allowed For Sufficient Time To Bargain Over Its Proposals

While at least one Union argues that its failure to respond to Delphi's proposals was reasonable because Delphi "withdrew" those proposals in December 2005 and did not serve any substitute proposal until March 24, 2006, IUE-CWA Mem. at 15-16, 39, others argue that there was inadequate time to bargain. See UAW Mem. at 23-24, 30-31; IUE-CWA Mem. at 16-18, 41-42. These arguments are disingenuous at best.

The Unions fail to take note of the following important facts:

• Delphi has twice asked this Court to continue the Section 1113 and 1114 Scheduling Order in these cases in an effort to ensure that adequate time was available to bargain over its proposals. While Delphi was originally ordered to file its Motion in December 2005, Delphi requested, and obtained, extensions until February, and later March 31, 2006, in which to file.

• Delphi "withdrew" its Competitive Benchmark proposal in mid-December in response to the Unions' public opposition to that proposal, so that the parties could pursue discussions with GM and with the understanding from the Unions that doing so would facilitate, not hinder, negotiations.

38

- In January, 2006, Delphi began exploring with the Unions and GM the concept of a gradual reduction in wages for existing employees, a combination of buyouts and buydowns for those employees, and other modifications that Delphi might be able to implement if GM were to provide financial support to pay the incremental cost of the proposal relative to Delphi's Competitive Benchmark Proposals.

- From January to March, 2006, Delphi continued to discuss these concepts in the GM Consensual Proposals with the Unions. <u>See</u> Supp. Quick Dec. ¶¶ 6-7.

- While Delphi, GM and the UAW were able to reach agreement on the UAW Special Attrition Program, the parties were unable to reach agreement on necessary modifications to Delphi's collective bargaining agreements, with or without GM financial support. Accordingly, and consistent with Delphi's December 19, 2005 announcement, Delphi served the Unions with the GM Consensual Proposals, the definitive written proposals pursuant to Sections 1113 and 1114 of the modifications that Delphi had proposed informally in January 2006. Butler Dec. ¶¶ 56-61.

Given these facts, the Unions' (other than the UAW) expressed surprise that Delphi was still pursuing contract modifications during the December 19 to March 24 period is nonsense. First, the parties have a long-standing past practice of "pattern bargaining" under which Delphi first seeks an agreement with the UAW, and then extends that agreement to the other Unions. Butler Dec. ¶ 8. Until filing their Objections, none of the Unions, other than, arguably, the IUE objected to Delphi's pursuit of negotiations primarily with the UAW. Second, their factual assertions notwithstanding, all of the Unions informed Delphi – expressly or implicitly – that they understood that Delphi's negotiations would proceed first with the UAW. <u>See</u> Gerling Dec. ¶¶ 9, 21;

Despite this history of pattern bargaining, the Unions plainly understood that they had the ability to pursue separate negotiations with Delphi. It is not surprising, then, that in none of the Objections do the Unions even attempt to explain their failure to provide a comprehensive

written counterproposal since Delphi's first proposal was presented in mid-October, or, in the case of the IAM/IBEW, to wait to provide a counterproposal in late April, 2006.

Likewise, the Unions' argument that the GM Consensual Proposals were served on March 24, 2006, with too little time to negotiate over those proposals prior to Delphi's Motion, ignores these facts. Since Delphi first discussed the elements of its GM Consensual Proposals with the Unions in January 2006, and continued to do so until March, the proposal was not a surprise to the Unions. This is especially true since the differences between the Competitive Benchmark Proposals and the GM Consensual Proposals, while extremely important, are limited to six economic issues, leaving the majority of the proposals unchanged from the October 2005 proposals. See Butler Dec. ¶¶ 52, 59-60, Exs. D-I. These economic issues were the provision of higher wages, potential buyouts and buydowns, and improved terms for health care, pension and OPEB benefits in the event of GM financial support. Because the cost of additional terms would be borne by GM, the financial effect of the GM Consensual Proposals for Delphi would be the same as the Competitive Benchmark Scenario.[23] Delphi's GM Consensual Proposals contained no changes whatsoever to some of the most important modifications sought – elimination of the JOBS Bank, elimination of hiring requirements, and the elimination of restrictions on Delphi's right to sell, close or consolidate facilities. Thus, the Unions had seen the vast majority of Delphi's proposals in October 2005.

In any event, even if the Unions had only a week to consider the GM Consensual Proposals, which ignores the fact that the Unions received prepetition proposals in the summer of 2005, the Unions have had nearly identical proposals since October 2005, and have had the

---

[23]    The GM Consensual Proposals continue to be the most accurate presentation of the labor modifications Delphi requires to successfully exit Chapter 11.

benefit of two extensions of the Section 1113 and 1114 Scheduling Order, courts have held that much shorter periods of time were reasonable under Sections 1113 and 1114. See In re Maxwell Newspapers, Inc., 981 F.2d at 85 (although last proposal was delivered the day before the hearing, court held that ten hours is ample time to consider and respond to proposal); In re Royal Composing Room, 62 B.R. at 409 (granting rejection when last proposal provided the day before filing of application for rejection of collective bargaining agreements but debtor was continuously available and sought meetings with unions); In re Century Brass Prods. Inc., 55 B.R. 712, 716 (Bankr. D. Conn. 1985) (four days between proposal and filing of application held not unreasonable given absence of time requirement in § 1113), rev'd and remanded on other grounds, 795 F.2d 265 (2d Cir. 1986).

Most importantly, neither Delphi's decision to first withdraw the Competitive Benchmark Proposals nor its decision to serve the GM Consensual Proposals on March 24, 2006 – rather than simply reverting to the Competitive Benchmark Proposals as it had reserved the right to do in December 2005 – was an attempt to surprise the Unions. Rather, both decisions were made in an attempt to facilitate a consensual agreement: Delphi withdrew the Competitive Benchmark Proposals at the Unions' express request and Delphi offered the GM Consensual Proposals because it wanted to make the commitment – implicit but not express in the discussions between January and March 2006 – that it would provide a higher level of wages if it obtained GM support.

41

C.    Delphi Has Reacted Reasonably, And In Good Faith, In Light Of Changed
Circumstances

The Unions complain that Delphi has not responded appropriately to changed

circumstances.  In particular, they attack the fact that Delphi did not adjust its proposals after the

parties were able to agree to the UAW Special Attrition Program and that Delphi has made

evaluation of the proposals more challenging by making frequent adjustments to its financial

plans.  Although the Unions are correct that a debtor must respond reasonably, and in good faith,

to changed circumstances, Delphi has done so.  See National Forge Co. v. Indep. Union of Nat'l

Forge Employees (In re Nat'l Forge Co.), 279 B.R. 493 (Bankr. W.D. Pa. 2002) (finding

proposal, which was changed throughout negotiations to reflect updated information, was based

on the most complete and reliable information); In re Amherst Sparkle Mkt, Inc., 75 B.R. at 852

(noting with approval debtor's provision of "additional and corrective data on a continuing

basis"); In re Royal Composing Room, 62 B.R. at 414 (rejecting union's complaints that debtor's

responses differed at various times because "[p]rojections are necessarily approximations and

will differ depending on the different assumptions made . . .the Debtor's projections developed

and changed over a period of time based on refinements and new information").

First, as explained above, Delphi has acted in good faith in attempting to secure GM

support for the benefit of its hourly employees and retirees.

Since December 2005, when GM indicated for the first time since discussions in

August 2005, that it may be willing to provide financial support to facilitate a consensual

42

agreement between Delphi and the Unions, Delphi not only withdrew its initial proposals to facilitate these negotiations, Delphi was able to secure an agreement with the UAW and GM on a UAW Special Attrition Program, providing retirement incentives for a large number of Delphi employees.[24] The Unions now try to use these efforts against Delphi in arguing that the Attrition Program obviates the need for relief under Sections 1113 and 1114. As explained above in Section II. C., however, the UAW Special Attrition Program, while an important step, does not change the need to modify Delphi's labor agreements and retiree welfare benefits. Despite this fact – that the estimated savings from the UAW Special Attrition Program does not allow Delphi to adjust its proposals – Delphi's efforts to negotiate at least one consensual agreement should demonstrate its good faith.

Likewise, Delphi's projected half-billion improvement in the first quarter of 2006 over projections, which results in a full year 2006 projected operating loss of approximately $2 billion, demonstrates that Delphi, even with better-than-expected performance, still requires the relief sought from its Unions. See Supp. Sheehan Dec. ¶ 2-14.

The UAW complains that "Delphi has made this dysfunctional due diligence process even more challenging by making frequent adjustments to its financial plans." Yearley Dec., Ex. B at 2. What the UAW fails to recognize, however, is that the proposals must be based on the most complete and reliable information available "at the time of the proposal." 11 U.S.C. § 1113(b)(1)(A) (2006); 11 U.S.C. § 1114 (2006). Implicitly, therefore, Sections 1113 and 1114 contemplate that a debtor in bankruptcy will be subject to changing financial situations,

---

[24]    Nonetheless, to date, the parties have been unable to reach comprehensive agreements on either modifications to the existing collective bargaining agreements or GM financial support for such agreements.

strategies and projections.[25]  Delphi should not be faulted for making its best effort to update its

financial plans to ensure their accuracy.

VIII.    The Unions Have Failed To Accept The Proposals Without Good Cause

        To approve rejection of a collective bargaining agreement, the court must be presented

with evidence that the authorized union representative refused to accept the proposal without

good cause.  11 U.S.C. § 1113(c).  Once the debtor produces prima facie evidence that the union

lacked good cause to reject the proposal, the union must prove that it had good cause to reject the

proposal.  Carey, 816 F.2d at 92;  In re Mile Hi Metal Sys., Inc., 899 F.2d 887, 892 (10th Cir.

1990) (the union has an "obligation . . . to explain its reasons for opposing the proposal").  Here,

the Unions have argued that they had good cause to reject Delphi's proposals for the following

reasons:

- The UAW appears to argue that it was justified in refusing Delphi's offer because Delphi's CEO set a "toxic atmosphere" at the beginning of the bankruptcy.  See UAW Mem. at 10.

- The UAW, IUE-CWA, and USW argue that the proposals did not allow for "good faith" bargaining because they are contingent on GM support.  See UAW Mem. at 10-11, 23-24; IUE-CWA Mem. at 18-19, 41; USW Mem. at 8-9.

- The UAW, IUE-CWA, USW, and IUOE argue that they had good cause to reject the proposals because Delphi did not set a specific "ask."  See UAW Mem. at 11; IUE-CWA Mem. at 15-16; USW Mem. at 8-9; IUOE Memo at 11.  IUE-CWA further implies that Delphi's proposals were a "take it or leave it" proposal.  IUE-CWA Mem. at 39.

- All Unions, other than the UAW, also argue (directly or at least implicitly) that because Delphi failed to meet and negotiate with them (only bargaining with the UAW), they had good cause to reject the Delphi's proposals.  See IUE Mem at 27, 39; IAM/IBEW Mem. at 26-27, 33; IUOE Mem. at 10-11; but see USW Mem. at 9 (recognizing that "the template for any new labor agreement will be established by the unions that represent greater numbers of the Debtors' employees" and therefore

---

[25]      As noted above, courts have held that debtors should continue to provide updated information to the unions. In re Amherst Sparkle Mkt., Inc., 75 B.R. at 852; In re Royal Composing Room, 62 B.R. at 414.

asserting that the USW had good cause to reject because Delphi had not
yet concluded negotiations with the UAW).

- The IAM/IBEW belatedly asserts they have good cause to reject because
they have prepared a counterproposal.[26] See IAM/IBEW Mem. at 32-33.

None of these arguments, however, as discussed above and further below, demonstrates good

cause for rejection of Delphi's proposals which are necessary for its survival.

A.    The Unions' Assertions That They Could Not Bargain Because An Agreement
      Required GM Support Is Without Merit

The Unions' contention that they could not bargain with Delphi because its proposals

were contingent on GM financial support is a lawyer's argument that has nothing to do with the

reality of the negotiations.

Delphi has consistently taken the position that the Competitive Benchmark Proposals

were the best terms it could offer without GM financial support.  See Butler Dec. ¶ 52.  At the

same time, Delphi has consistently taken the position that it could offer better terms with GM

financial support, and the GM Consensual Proposals simply memorialized that offer in explicit

terms that allowed the Unions to accept – or reject – a definitive contract proposal under Sections

1113 and 1114.  Butler Dec. ¶ 52.

As described above, Delphi has offered a definitive proposal with a concrete wage rate.

The Unions' refusal to discuss this proposal with Delphi was not justified.

B.    Delphi Has Not Made A "Take It Or Leave It" Proposal

The IUE-CWA, without explaining how Delphi's proposals here are a "take it or leave it"

proposal, makes a conclusory statement that such "take it or leave it" proposals do not suffice for

good faith bargaining and give the union good cause to reject the proposal.  IUE-CWA Mem. at

---

[26]    Delphi respectfully refers the Court to discussions in Section VII. A. n.17, supra.

39. This contention could not be further from the truth.

Delphi has made it clear when offering all of its proposals that the Unions were free to

offer – indeed, encouraged to offer – any alternative terms that they thought were reasonable.

The clearest evidence of this is that Delphi has, on three occasions, "bid against itself" by

improving its offer without any counter-offer by the Unions. See UAW Mem. at 48 (conceding

that the UAW has not made a counter-offer); IUE-CWA Mem. at 15-16 (conceding that the IUE-

CWA has not made a counter-offer).

C.    The Fact That The Unions Have Not Provided Any Written Counterproposal
      Weighs Heavily Toward Finding Lack Of Good Cause

None of the Unions, other than the IAM and IBEW in their belated post-Motion written

counterproposal, have made a counter-offer to any of Delphi's proposals.

Courts have consistently held that a union's failure to provide a counterproposal or

engage in serious negotiations weighs towards a finding that such union lacked "good cause" to

reject a debtor's proposals. In re Maxwell Newspapers, Inc., 981 F.2d at 89-90 (holding that

when union makes demands that employer cannot meet and offers no alternatives focusing on

needs of employer's reorganization, it does not have "good cause" for rejecting proposal); Carey,

816 F.2d at 91 (union's tactic of "stonewalling" company's Section 1113 negotiations violated

good cause requirement); In re Mile Hi Metal Sys. Inc., 899 F.2d at 892 (union's failure to confer

in good faith weighs toward finding lack of good cause); In re Horsehead Indus. Inc., 300 B.R.

573, 589 (S.D.N.Y. 2003) (holding that, by virtue of its "unilateral refusal to negotiate, leading to

the de facto rejection of the Debtors' opening proposal," union "lacked good cause" to reject

Section 1113 and 1114 proposals); In re Sierra Steel Corp., 88 B.R. at 341 (holding that union

acted without good cause by having "refrained from responding to the Debtor's proposal, ignored

Debtor's requests for cooperation, refused to enter into negotiations, and effectively 'stonewalled' Debtor's efforts to achieve necessary modifications of the Bargaining Agreement"); In re Royal Composing Room, Inc., 62 B.R. at 409 (noting union's failure to make a counterproposal, comment item by item on debtor's proposal or debtor's financial situation, or state any reasons why it found debtor's request to be unfair or inequitable, in finding lack of good cause); In re US Airways Group, Inc., Case No. 04-139, Trans of Record at 27-28 (Bankr. E.D. Va. Jan. 6, 2005) (noting that union's failure "to accept some proposal or to come up with some proposal of its own that would achieve the costs being sought, was not objectively reasonable.").

At no time prior to the filing of the Debtors' Motion, did the Unions make a written counterproposal, comment item by item on Delphi's proposals or financial situation, or state any reasons why they found the Debtors' request to be unfair or inequitable.[27] These facts are undisputed. See UAW Mem. at 48; IUE-CWA Mem. at 15-16; see generally USW Mem; IUOE Mem, IAM/IBEW Mem. Clearly, such behavior constitutes lack of good cause.

IX.    The Balance Of The Equities Clearly Favors Rejection

Section 1113(c)(3) requires the court to find that the balance of the equities clearly favors rejection of the collective bargaining agreements before approving a Section 1113 motion. As explained in the Debtors' opening memorandum and further below, Delphi has presented evidence that satisfied the Second Circuit's six-factor test that the balance of the equities clearly favors rejection of the CBAs.[28]

---

[27]    As mentioned above, Section VIII. C., supra, the IUE-CWA provided a counter to the attrition plan proposal, and the IAM/IBEW sent their counterproposal after the Motion was filed on April 20, 2006. See Supp. Quick Dec. ¶ 5; Gerling Dec. ¶¶ 25, 26.

[28]    While the UAW asserts that the burden of proof on the balance of equities test is heavier than a preponderance of the evidence, see UAW Mem. at 49, courts have consistently stated and applied the preponderance of the evidence standard to all nine elements of the Sections 1113 and 1114 test. See, e.g., In re Amerhest Sparkle Market, Inc., 75 B.R. 847, 849 (Bankr. N.D. Ohio 1987) (stating the debtor's burden respecting each of the nine elements is to be satisfied by a preponderance of the evidence.) (emphasis added); see also In re American Provision

A.    The Likelihood Of Liquidation

Delphi's affirmative evidence demonstrates that it cannot survive without modifications

to its labor agreements and retiree welfare benefit obligations.  Nevertheless, the IUE-CWA

argues that there is no likelihood of liquidation because IUE-CWA contracts are not too costly.

See IUE-CWA Mem. at 35-36.  The UAW argues that there is no immediate danger of

liquidation because Delphi now appears to have significant cash and available credit lines.  See

UAW Mem. at 37.

Delphi's projections show, however, that even with its projected half-billion dollar

improvement in the first quarter of 2006, Delphi will still lose approximately $2.0 billion in

operating income this year, and $5.0 billion through 2010.  Under these projections, Delphi

simply will not be able to continue to operate unless it can achieve significant modifications to

its business, including required changes to its labor agreements.

B.    The Likelihood Of A Strike

The UAW, IUE-CWA, and USW continue to argue that the impact of a strike, which

would not only affect Delphi, but also GM and the national economy, should weigh against

rejection.  See UAW Mem. at 49-52; IUE-CWA Mem. at 36; USW Mem. at 14.

This argument, if accepted, would give a union the unrestricted ability to avoid necessary

contract modifications by threatening a strike that would destroy the company (and, in this case,

substantially harm its primary customer as well) in every situation.  The Unions may have that

right but it is not a factor that should allow them to avoid a contract rejection.  See In re Delta

Air Lines, Inc. Case No. 05-17923, at 25 (determining that case would be decided without regard

to threats, including flight attendants' strike threats); In re Horsehead Indus., Inc., 300 B.R. at

---

Co., 44 B.R. 907, 909 (Bankr. D. Minn. 1984) (stating that the debtor bears the burden of persuasion by the
preponderance of the evidence on all nine elements) (emphasis added ).

587; see also In re Maxwell Newspapers, Inc., 146 B.R. at 933-34 (although strike would be

"highly regrettable . . . the risk must be borne."); In re Garofalo's Finer Foods, Inc., 117 B.R.

363, 373 (Bankr. N.D. Ill. 1990) ("Although the employees affected may possibly strike in

protest to a decline in wages and benefits, it is clear they will have no jobs to strike about in the

event the Debtor ceases operations and is forced to liquidate its assets within the next few

weeks."). Further, if the disastrous effects of a strike predicted by the Unions are true, then a

strike is clearly not an practical option for the Unions or the hourly employees.

C.    The Cost-Spreading Abilities Of The Parties

All of the Unions have argued to some extent the cost-spreading abilities of the parties.

- The UAW argues that the relative cost-spreading abilities (such as banks and vendors with alternative sources of income) weighs against rejection. See UAW Mem. at 52.

- The IUE-CWA argues that its members have taken numerous cuts in previous years, and should not be required to absorb more. See IUE-CWA Mem. at 37.

- Several of the Unions challenge Delphi's showing that the proposed wages are comparable to employees at other companies. See USW Mem. at 6-7; see also UAW Mem. at 3, n.3. The UAW states that the only true comparator is Visteon. However, Visteon has returned all of its master agreement sites to Ford for divestiture or winddown.

The fact that two other parties – Appaloosa and Wilmington Trust – make just the opposite

argument demonstrates that equity is in the eye of the beholder. In re Delta Air Lines, Case No.

05-17923 at 8 ("We all know in a general or abstract sense the meaning of fairness, good faith,

and equity, but when it comes down to hard cases reasonable minds will differ over what is just

and fair, and the impetus of small or subtle changes in the circumstances may alter one's

perspective and conclusions.")

As noted above, there is no way to mathematically determine equivalent sacrifice. What should be clear, however, is that all of the relevant constituencies will take considerable sacrifice in this bankruptcy.[29]

### D.    The Potential For Damage Claims

The UAW, IUE-CWA, and Appaloosa argue that the Unions will have substantial damage claims – claims that they estimate at $4.6 billion if Delphi rejects what they describe as lifetime job security agreements. See UAW Mem. at 52-53; IUE-CWA Mem. at 36; Appaloosa Mem. at 3-4, 20-21, 23-24. Appaloosa further argues that GM will have "huge" claims for OPEB and pension liability. See Appaloosa Mem. at 23-24. Wilmington Trust also argues that the possibility of damage claims weighs against rejection. See Wilmington Mem. at 2-3, 4-6.

Which claims, if any, may exist as the result of contract rejection is an issue that will only be decided if and when the court authorizes rejection.[30] What is clear is that the amount of any such claims would be capped by what Delphi would otherwise pay as wages or benefits. The issue, therefore, is whether paying the amounts in "real dollars" or "bankruptcy dollars" is better for the estate. There is no question on that point.

---

[29]    Delphi respectfully refers the Court to more detailed discussion in the Preliminary Statement n.2, supra, and Section VII. A. n.17, supra, of this Reply.

[30]    The courts are split as to the treatment of any damages claim arising from rejection of a labor agreement. See, e.g., In re Blue Diamond Coal Co., 147 B.R. 720, 728-32 (Bankr. E.D. Tenn. 1992) (holding that "the Bankruptcy Code, as presently enacted, does not provide or recognize a remedy for damages resulting from rejection of a collective bargaining agreement under § 1113"), aff'd, 160 B.R. 574 (E.D. Tenn. 1993). Some courts, while allowing employees raise a viable claim for damages following rejection, those claims would be recoverable only to the extent that work would have been available had the agreements not been rejected. See e.g., In re Continental Airlines Corp., 901 F.2d 1259, 1265 (5th Cir. 1990) (remanding case for determination of when debtor would have had to cease operations absent rejection). In any event, any claims for damages that the collective bargaining unit employees would have from a Section 1113 or 1114 rejection would most likely be general unsecured claims, except to the extent a specific priority applies. See In re Horsehead Indus. Inc., 300 B.R. 573, 587 (S.D.N.Y. 2003).

E.     The Good Faith Of The Parties

All of the Unions challenge Delphi's good faith. The UAW, for example, argues that Delphi created a "toxic atmosphere" for negotiations, and that it is using 1113 as a bargaining tool which should weigh against rejection. See UAW Mem. at 53. The IUE-CWA asserts that it demonstrated good faith through decades, and Delphi has acted in bad faith by failing to negotiate before filing this Motion. See IUE-CWA Mem. at 37-38.

The relative good or bad faith of the parties is clearly a factor. See In re Royal Composing Room, Inc., 62 B.R. at 408 (balance of equities favors rejection when union stonewalls debtors by not responding to proposal for months and ultimately rejects debtor's proposal). Delphi has made several proposals, and obtained several extensions of the deadline for filing the Motion with this Court, since October 2005, which the Unions have failed to address the necessary need for modifications of their collective bargaining agreements and modification of retiree welfare benefits. This factor, therefore, must weigh in favor of Delphi.

Conclusion

Accordingly, for all of the foregoing reasons, to enable Delphi to reorganize successfully, the Debtors request that the Court (a) grant the Motion, (b) authorize the Debtors to reject, pursuant to Section 1113, their collective bargaining agreements with each of their Unions, upon ten calendar days' notice to the Court and Unions, (c) authorize the Debtors to modify, pursuant to Section 1114, the Debtors' obligations to provide health and life insurance benefits for hourly

51

retirees, whether arising under their collective bargaining agreements or otherwise, effective

October 1, 2006, and (d) grant the Debtors such other and further relief as is just.

Dated: New York, New York
       May 1, 2006

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

By:/s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

O'MELVENY & MYERS LLP

By:/s/ Tom A. Jerman
    Robert A. Siegel (RS 0922)
    Tom A. Jerman (TJ 1129)
    Rachel S. Janger
    Jessica Kastin (JK 2288)
1625 Eye Street, NW
Washington, DC  20006
(202) 383-5300

GROOM LAW GROUP, CHARTERED

By:/s/ Lonie A. Hassel
    Lonie A. Hassel (LH 8805)
1701 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 857-0620

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Exhibit A

**Exhibit A**

*Chart Of Objections To The Section 1113 And 1114 Motion (the "Motion")*
*Organized By Objection[1]*

| | OBJECTION ASSERTED | OBJECTOR(S) | RESPONSE |
|---|---|---|---|
| 1. | Objection to request for authority to reject because Section 1113 does not allow Court to authorize rejection, but only to reject of collective bargaining agreements. | UAW, Appaloosa | There are numerous instances where bankruptcy courts give debtors authority to take some action, including rejection or assumption of agreements, without requiring the debtor to actually do so. There is no reason, and no case law, why this judicial discretion would not apply under Sections 1113 and 1114. If the Court doubts its ability to do so, Debtors request the Court to reject the labor agreements and modify retiree benefits as of the date of its order. |
| 2. | Objection to the Motion on the basis that Competitive Benchmark and GM Consensual Proposals are contingent, hypothetical, and/or based upon events unknown. | UAW, IUE-CWA, IAM/IBEW, USW, Appaloosa | Delphi has provided the Unions with a definite proposal for wages at a specific rate. As the proposals themselves state, until GM commits financial support, Delphi's proposals are the definite terms set forth in the Competitive Benchmark Proposals. In addition, the Competitive Benchmark Proposals are not contingent on resolving legacy costs. These proposals definitively propose freezing the Unions' pension plan, but preserve the right to terminate the plan should it become necessary. |

---

[1]   This chart reflects all objections entered on the docket as of 9:00 a.m. (Eastern Standard Time) on May 1, 2006.

1

| | OBJECTION ASSERTED | OBJECTOR(S) | RESPONSE |
|---|---|---|---|
| 3. | Objection to the Motion on the basis that Delphi's proposals were not based on the most complete and reliable information available because Delphi has either adjusted its financial forecasts too frequently or that it has not adequately responded to changing circumstances | UAW | None of the Unions directly attacks the conclusion that Delphi's proposals were based on the best available information at the time of the proposals; therefore it is undisputed. One Union's indirect attack that Delphi's proposals were not based on the most complete and reliable information available because the information changed too frequently is without merit. The Sections 1113 and 1114 process contemplates that the "most complete and reliable information available" will necessarily be information that is subject to change throughout the course of the bankruptcy. |
| 4. | Objection to the Motion on the basis that Delphi did not provide relevant information necessary to evaluate the proposals. | UAW, IUE-CWA, IAM/IBEW | The Unions and their financial advisors have obtained significant information through the bankruptcy process and received volumes of material provided at or around the time of the proposals. As is its obligation under Section 1113, Delphi continued to update the information provided. Additionally, Delphi provided responses to information requests as the information became available.

In addition, Delphi has provided the cost savings associated with its proposals in the form of penny sheets. When requested, Delphi provided penny sheets on a Union-specific and site-specific basis. In any event, the case law does not require that Delphi quantify savings by line item under Sections 1113 and 1114. |

2

| | OBJECTION ASSERTED | OBJECTOR(S) | RESPONSE |
|---|---|---|---|
| 5. | Objection to the Motion on the basis that Delphi has not satisfied the "necessary" standard under Section 1113. | UAW, IUE-CWA, IAM/IBEW, IUOE, Appaloosa | The Second Circuit "necessary" standard as articulated in Truck Drivers Local 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, & Helpers of America v. Carey Transportation, Inc., 816 F.2d 82, 88-90 (2d Cir. 1987) (Carey) is binding on this Court. The case law is clear that for the proposals to be necessary under Sections 1113 and 1114, the proposals as a whole must increase the likelihood of a successful reorganization. Under Carey, the Second Circuit does not require that Delphi's proposals are necessary in order to avoid liquidation. Moreover, there is nothing in Carey, or any other case, that supports the view that the "necessary" standard becomes more onerous for the debtor as negotiations proceed. |
| | | | The Unions concede that some level of concessions are required for Delphi to reorganize and the only question is how much. Delphi has demonstrated the need for a competitive wage and benefit structure and has provided the cost savings associated with its proposals in the form of penny sheets traditionally used to evaluate a proposal (to the extent particular Unions' agreements have negotiated terms that are at competitive levels, Delphi does not propose to change those terms). Courts have consistently rejected attempts to parse a debtor's Sections 1113 and 1114 proposal to determine the value of individual items, concluding that the question is whether the employer's proposal, taken as a whole, is financially necessary. Courts have also consistently held in similar circumstances that "non-economic" modifications to labor agreements are necessary to allow a debtor flexibility to restructure its business to meet the "necessary" standard of Section 1113. |

| | OBJECTION ASSERTED | OBJECTOR(S) | RESPONSE |
|---|---|---|---|
| 6. | Objection to the Motion on the basis that the Proposals do not treat all parties fairly and equitably | UAW, IUE-CWA, Appaloosa, Wilmington Trust, USW, | Delphi has demonstrated that the all significant stakeholders in this case will bear some burden associated with the reorganization. The case law is clear that the inability of a debtor to predict exact recoveries at an relatively early stage of the proceedings is no bar to Sections 1113 and 1114 relief. The courts have also expressly rejected the argument, made by the Unions here, that the "fair and equitable" requirement under Sections 1113 and 1114 requires the debtor to know precisely how equity holders, creditors, and other parties will be treated under a plan of reorganization. The fact that the some management employees may benefit from the KECP does not render Delphi's proposals unfair and inequitable. Courts have found proposals under Section 1113 to be fair and equitable, despite noting similar programs. These programs are in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest, and are common among chapter 11 debtors. |
| 7. | Objection to the Motion on the basis that Delphi does not meet good faith standard | UAW, IUE-CWA, USW, IAM/IBEW, IUOE, Appaloosa | Delphi has made clear when offering all its proposals that the Unions were free to, and encouraged to, offer any alternative terms that they thought were reasonable. The parties have a long-standing past practice of "pattern bargaining" under which Delphi first seeks an agreement with the UAW and then extends that agreement to the other Unions. Until filing their objections, none of the Unions objected to Delphi's negotiations with the UAW. Moreover, none of the Unions requested separate negotiations with Delphi. As noted above, Delphi has provided the Unions with a definite proposal for wages at a specific rate. As the UAW acknowledges, there has been a consistent practice to involve GM in negotiations between Delphi and its Unions. In fact, at least one Union representative acknowledged that including GM support in Delphi's proposals was "a step in the right direction." |
| 8. | Objection to the Motion on the basis that the Union had good cause to reject | UAW, IUE-CWA, IAM/IBEW | The Unions have not set forth any legitimate basis for rejecting a proposal based on a competitive wage and benefit structure. |

4

| | OBJECTION ASSERTED | OBJECTOR(S) | RESPONSE |
|---|---|---|---|
| 9. | Objection to the Motion on the basis that the burden of proof is greater than a preponderance of the evidence because the balance of equities must clearly favor rejection | UAW, IUE-CWA, USW, Appaloosa, Wilmington Trust | Courts have consistently stated and applied the preponderance of the evidence standard to all nine elements of the Sections 1113 and 1114 test. See, e.g., In re Amherst Sparkle Market, Inc., 75 B.R. 847, 849 (Bankr. N.D. Ohio 1987); see also In re American Provision Co., 44 B.R. 907, 909 (Bankr. D. Minn. 1984).

Delphi's projections show that even with its projected half-billion dollar improvement in the first quarter of 2006, Delphi will still lose approximately $2.0 billion in operating income this year, which demonstrates that it cannot survive without modifications to its labor agreements and retiree welfare benefit obligations.

Although the Unions may have that right to strike, that is not a factor that should allow them to avoid a contract rejection. See In re Delta Air Lines, Case No. 05-17923, at 25 (Bankr. S.D.N.Y. Apr. 26, 2006); In re Horsehead Indus., Inc., 300 B.R. 573, 587 (S.D.N.Y. 2003); see also In re Maxwell Newspapers, 146 B.R. 920, 933-34 (Bankr. S.D.N.Y. 1992); In re Garofalo's Finer Foods, 117 B.R. 363, 373 (Bankr. N.D. Ill. 1990).

Moreover, as stated above, although there is no way to mathematically determine equivalent sacrifice, all of the relevant constituencies will take considerable sacrifice in this bankruptcy.

Which claims, if any, may exist as the result of contract rejection is an issue that will only be decided if and when the Court authorizes rejection. What is clear is that the amount of any such claims would be capped by what Delphi would otherwise pay as wages or benefits. Obviously, paying the amounts in "bankruptcy dollars" is better for the estate.

Delphi has made several proposals, and obtained several extensions of the deadline for filing the Motion with this Court since October 2005, but the Unions have failed to agree to the necessary need for modifications of their collective bargaining agreements and modification of retiree welfare benefits. |

5

**Docket Entries Of Objections To Motion For Relief Under Sections 1113 And 1114**

| DOCKET # | OBJECTING PARTY |
| --- | --- |
| 3314 | International Union of Operating Engineers |
| 3317 | General Motors |
| 3322 | United Steelworkers of America |
| 3330 | International Brotherhood of Electrical Workers-International Association of Machinists and Aerospace Workers |
| 3332 | International Union of Electric, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America |
| 3342 | United Auto Workers |
| 3353 | Wilmington Trust Company, as Indenture Trustee |
| 3356 | Appaloosa Management L.P. and Wexford Capital LLC |

6

Exhibit B

# Highly Confidential - Not Filed

Exhibit C

# Highly Confidential - Not Filed

Exhibit D

# Highly Confidential - Not Filed

Exhibit E

# Highly Confidential - Not Filed

Exhibit F

# Highly Confidential - Not Filed