Hearing Date and Time: May 9, 2006 at 10:00 a.m.

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC  20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman (TJ 1129)
Rachel S. Janger
Jessica Kastin (JK 2288)

GROOM LAW GROUP, CHTD
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620
Lonie A. Hassel (LH 8805)

Attorneys for Delphi Corporation, et al.,
    Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                            :
        In re                                               :    Chapter 11
                                                            :
DELPHI CORPORATION, et al.,                                 :    Case No. 05-44481 (RDD)
                                                            :
                              Debtors.                       :    (Jointly Administered)
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SUPPLEMENTAL DECLARATION OF DARRELL KIDD
IN SUPPORT OF DELPHI'S MOTION FOR AUTHORITY TO REJECT
COLLECTIVE BARGAINING AGREEMENTS UNDER 11 U.S.C. § 1113(c) AND
MODIFY RETIREE WELFARE BENEFITS UNDER 11 U.S.C. § 1114(g)

I, Darrell Kidd, declare and state as follows:

1.      I submit this supplemental declaration in support of Delphi's Motion For

Authority To Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify

Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) (the "Motion").  Capitalized terms not

otherwise defined in this supplemental declaration shall have the meanings ascribed to them in

my original declaration, filed March 31, 2006 (the "March 31, 2006 Declaration").  Except as

otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge,

my review of relevant documents, my opinion, my experience with and knowledge of Delphi's

labor relations, or are based upon knowledge obtained from Delphi employees reporting to me in

the course of their duties.  If I were called upon to testify, I could and would testify to the facts

set forth herein.

I.      <u>The Unions' Responses To Kevin Butler's March 29, 2006 Letter Regarding Information
        Sharing</u>

2.      As described in my March 31, 2006 declaration, on March 28, 2006, Delphi's

Vice President of Human Resource Management, Kevin M. Butler, sent a letter by e-mail or

Federal Express to each Union that included, among other things, the following statement:

> At this time, we believe that Delphi has provided, directly or through information
> provided in the presentations and meetings or in the litigation process, all of the available,
> relevant information that the [name of the Union] and its financial advisors have sought
> to date regarding the Corporation's proposals, financial condition and restructuring plans.
> If you believe that there are still outstanding requests, please let us know the specifics of
> those requests so that we can ensure that you have all of the relevant information needed
> to evaluate our proposals.

The full letter was attached as Exhibit H to my March 31, 2006 Declaration.

3.      The Unions have responded in some fashion to Kevin Butler's March 28, 2006

letter.

2                    **Supplemental Declaration Of Darrell Kidd**

A.      Communications With The IUE-CWA Regarding Information Sharing.

4.      As I stated in my March 31, 2006 Declaration, the IUE-CWA responded to Kevin Butler's letter on March 28, 2006, asserting incorrectly that Delphi's GM Consensual Proposals differed significantly from the Competitive Benchmark Proposals and that the IUE-CWA did not have adequate financial forecasts necessary to evaluate the GM Consensual Proposals.  The IUE-CWA also informed Delphi through its March 28 letter that it intended to oppose the Motion based on allegations of bad-faith bargaining and failure to provide adequate information.

5.      Kevin Butler responded to the IUE-CWA by letter dated March 29, 2006.  In his letter, Kevin Butler recounted the considerable amount of information given to the IUE-CWA and its financial advisors, as well as the numerous meetings and other correspondence that have occurred between the IUE-CWA and Delphi since before Delphi's October 2005 bankruptcy filing regarding Delphi's deteriorating financial condition and its need for relief from its collective bargaining agreements.  A true and correct copy of this letter is attached hereto as Exhibit A.

6.      On March 31, 2006, the IUE-CWA responded to Kevin Butler's March 29, 2006 letter.  In this IUE-CWA letter, the IUE-CWA again erroneously argued that the March 24, 2006 GM Consensual Proposals greatly differed from the Competitive Benchmark Proposals.  In addition, the IUE-CWA asserted that it had not provided a counter proposal because Delphi had withdrawn the Competitive Benchmark Proposals.  The letter also maintained that Delphi had not bargained in good faith because it had limited negotiations only with the UAW.  A true and correct copy of the March 31, 2006 letter from the IUE-CWA to Kevin Butler is attached hereto as Exhibit B.

**Supplemental Declaration Of Darrell Kidd**

B.    Communications With The UAW Regarding Information Sharing

7.    On March 30, 2006, counsel for the UAW sent a letter to Kevin Butler regarding

information sharing with the UAW and its financial advisors, Lazard Frères & Co ("Lazard").  A

true and correct copy of the March 30, 2006 letter is attached hereto as Exhibit C.  The letter

attached as Exhibit B to the Declaration of Andrew Yearley, submitted In Support of the

Objection of International Union, United Automobile, Aerospace And Agricultural Implement

Workers Of America (UAW) To Debtors' Motion For Order Under 11 U.S.C. § 1113(c)

Authorizing Rejection of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g)

Authorizing Modification of Retiree Welfare Benefits (the "Yearley Declaration"), identified as

the March 30, 2006 letter, is incorrectly dated April 12, 2006.

8.    The UAW expressed discontent at the information provided, suggesting that

Delphi has taken inconsistent positions on the scope of a debtors' legal obligation under section

1113.  The letter also included a number of complaints regarding Delphi's alleged failure to

provide the UAW with the requested information or the inadequacy of the information provided.

Delphi promptly responded on April 14, 2006 in a letter which chronicled the vast amount of

information provided to the UAW and Lazard.  A copy of the April 14, 2006 letter (excluding

attachments) is attached as Exhibit C to the Yearley Declaration.

9.    Delphi had fulfilled nearly 90 percent of the 116 information requests that Lazard

had sent to Delphi prior to its March 30, 2006 letter.  Delphi detailed the status of these

information requests by attaching (a) a chart of the nature and date of Lazard's requests, and

which Delphi department had fulfilled each request; (b) a list of all documents provided to

Lazard, including the date the responsive material was provided, the name and page count of the

document, and the document ID number; (c) a list of all the information requests it received from

the UAW or Lazard as of April 11, 2006; (d) a list of information or updated information Delphi

**Supplemental Declaration Of Darrell Kidd**

provided to all of its Unions with the proposals between October 2005 and the present; and (e) a list of two sets of materials posted on the Virtual Data Room, the electronic database of material made available to the Unions and other interested parties.

10.     Delphi further explained that in the few instances in which the request had not been fulfilled, the reason was that the information request had called for (a) privileged information, (b) information that Delphi did not maintain in the form sought, or (c) information that was not yet available, but would be provided when it became available.

C.     <u>Communications With The USW Regarding Information Sharing</u>

11.     On March 31, 2006, counsel for the USW sent a letter to Kevin Butler regarding information sharing with the USW and its financial advisors, Potok & Co. ("Potok").  A true and correct copy of the USW's March 31, 2006, letter is attached as Exhibit A to the Declaration of Lowell Peterson, Esq. in support of Objections Of USW To Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits.

12.     On a productive note, the USW requested a meeting for its financial advisors to discuss the financial information it had recently received.  Delphi responded with contact information for Delphi's financial advisors.

13.     The USW also enclosed a chart regarding the status of Potok's information requests to Delphi.  Delphi responded with a chart that explained the current status of each of the information requests.  Delphi's detailed line-by-line responses generally indicated:  (a) for which requests responsive information had been provided; (b) for which requests responsive documents were not available; (c) Delphi would review new requests contained in the chart and provide responses to Potok; (d) Delphi would attempt to re-analyze data provided to divide it among the two USW-represented facilities; or (e) in some instances, Delphi did not interpret a request to ask

for certain types of information.  A true and correct copy of Delphi counsel's letter to the USW,

dated April 20, 2006, along with the attached chart, is attached hereto as Exhibit D.

      D.     <u>Communications With The IAM/IBEW Regarding Information Sharing</u>

      14.     On April 5, 2006, counsel representing the IBEW and the IAM sent an e-mail to

Delphi's counsel regarding information requests.  A true and correct copy of the e-mail is

attached as Exhibit E to the Declaration of Randal A. Middleton and Exhibit D to the

Declaration of Donald L. Griffin submitted in support of IBEW Local 663 and IAMAW District

10's Objection to Debtors' Motion to Reject Collective Bargaining Agreements and to Modify

Retiree Benefits.  The e-mail contained a number of inquiries and complaints about the

information sharing and bargaining process, including access to the Virtual Data room, access to

expert reports, the status of an attrition plan for the IAM and IBEW, the scheduling of bargaining

dates, and the status of information sharing and pending information requests.  Counsel for

Delphi promptly responded by letter dated April 12, 2006.  A true and correct copy of the letter

is attached hereto as Exhibit E.

      15.     Delphi's April 12th letter responded to all issues presented in the IAM/IBEW e-

mail.  Delphi confirmed that relevant information had been provided to the Unions and, in

response to inquiries about the virtual data room, Delphi either confirmed that the IAM/IBEW

representatives had full access, restored the individual's access, or noted that individuals had not

taken the minimal effort necessary to gain access, despite Delphi's attempts to provide such

access.  Delphi also confirmed that it had no responsive expert reports to turn over.  Delphi also

explained the current status of Delphi's proposals for Hourly Attrition Programs to the Unions,

and, in response to a query about the collective bargaining process, stated that Delphi and the

Unions should continue to interact directly, without the interference of their respective lawyers,

      **Supplemental Declaration Of Darrell Kidd**

with respect to scheduling bargaining sessions, and that Delphi would process IBEW information requests.

      E.      <u>Communications With The IUOE Regarding Information Sharing</u>

16.      To my knowledge, the IUOE has not responded to Kevin Butler's March 28, 2006 letter addressing information sharing.

II.      <u>Delphi Has Provided The Unions With Volumes Of Information To Enable Them To Evaluate Delphi's Proposals</u>

17.      With each proposal Delphi has provided relevant financial data including dynamic financial models as further described in the Declarations of William Shaw and Jim Guglielmo.

18.      In addition, Delphi has responded to the Unions' voluminous information requests. Delphi has developed and honed a system through which all Union requests for data undergo a review process by relevant departments to ensure that all information requests are responded to in a thorough, accurate, and responsive fashion. Although this process of review takes time, the benefits to the Unions and their advisors are clear – they are provided with the best available information that Delphi has to respond to the request. If Delphi does not maintain information responsive to the request, Delphi evaluates whether it is possible to develop or obtain that information from other sources.

19.      Generally, Delphi has been able to respond to all information requests, except when the requests have sought (a) privileged information, (b) information that was not yet available, but which will be provided if it does become available, or (c) information that Delphi did not maintain in the form sought. To the extent that information was not maintained in the form sought, Delphi attempted to provide the Unions and their advisors with reasonable substitutes. As information is passed on to the Union that made the request, it is also posted on

      **Supplemental Declaration Of Darrell Kidd**

the "virtual data room."  The Unions and their financial advisers have also been given access to

Delphi personnel and financial advisors to answer questions and explain the materials provided.

20.      Collectively, the Unions and their financial advisers have served over 300

information requests on Delphi and Delphi has shared more than 835 electronic and manual files

of documents with its Unions and their advisors.

A.      Delphi's Response To Requests For The "Total" Savings Sought

21.      Delphi has responded to requests for Delphi's total savings goal, or savings goals

on a Union or individual site basis, by providing "penny sheets," a form which Delphi has

traditionally used to measure the expense or savings attributable to labor modifications.  A penny

sheet takes Delphi's total labor costs for each element of compensation, and converts that to an

hourly cost – with each component of that hourly cost specifically identified.

22.      Delphi believes that the penny sheet format is a more sensible way to determine

the cost of its labor proposals than simply asserting a total "ask," because the total cost may

increase or decrease based on the number of employees and the number of hours worked.

Calculating the total cost savings can easily be done with assumptions about the employment

levels and hours worked.  On a company-wide basis Delphi has done the math and provided it to

the Unions.  In other words, with each of its proposals, Delphi has identified the "total cost

savings" attributable to the proposed modifications assuming the "base line" of the Steady State

Scenario compared to the Competitive Benchmark and GM Consensual Scenarios.

23.      The Unions are familiar with Delphi's use of the penny sheet format for

measuring labor costs and savings and several unions have requested penny sheets on a

individual Union or site basis.  Delphi has, when requested, provided penny sheets on a Union-

specific and site-specific basis.  Because Delphi's costs under the GM Consensual Proposal are

the same as under the Competitive Benchmark Proposals, there is no separate GM Consensual

Proposals penny sheet.

      B.      <u>Delphi's Response To Requests For Information Regarding Salaried And
Management Employees</u>

      24.      With regard to salaried and management employees, Delphi has provided the

Unions with information on a corporate-wide basis.  For instance, Delphi provided pension and

OPEB data, details on incentive compensation, and census data by function, region, and plant.

Delphi refused, however, to provide individual employee salaries, because doing so would have

violated employees' rights of privacy.

III.      <u>The Attrition Plans Will Not Eliminate Delphi's Need For Labor Cost Modifications</u>

      25.      The UAW's arguments that the attrition programs would solve Delphi's problems,

UAW Mem. at 37-38, assume away a number of contract terms that the Unions have never

offered to modify.  In particular, as described in my Declaration of March 31, 2005, in

paragraphs 30-36, due to terms in its collective bargaining agreements, Delphi is constrained in

the number of people it must employ and how those employees can be used, severely limiting its

ability to respond to market forces.  Among these are secured employment levels and other

provisions that dictate hiring requirements, including when employees flow back to GM, as well

as provisions that limit Delphi's ability to lay workers off (e.g., JOBS Bank).

      26.      As a result, under the terms of the existing agreements, Delphi could be required

to hire tens of thousands of new employees to replace those who leave under the attrition plan –

and to place those employees in a JOBS Bank because the attrition programs do not eliminate the

basic job security provisions of the existing agreements.

      **Supplemental Declaration Of Darrell Kidd**

27.     In addition, provisions in many of its agreements prevent Delphi from selling or closing operations, which severely constrain Delphi's ability to compete and are also not affected by the attrition plan.

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 1st day of May, 2006

/s/ Darrell Kidd
DARRELL KIDD

**Supplemental Declaration Of Darrell Kidd**

Exhibit A



**Kevin M. Butler**
Vice President
Human Resource Management

March 29, 2006

Mr. Henry Reichard
Chairman
IUE-CWA Automotive Conference Board
2360 Dorothy Lane, Suite 201
Dayton, OH  45439

Dear Mr. Reichard:

Delphi and the IUE-CWA have a bargaining relationship that spans decades and is characterized by good faith bargaining.  Our current bargaining likewise has been conducted in good faith since July, 2005 and will continue to be conducted in good faith.  Since July, we have met with you personally and via telephone many times, before and after each of our three formal proposals, and have provided hundreds of pages of information to you and to your financial and legal advisors over the past nine months.  We twice postponed filing an 1113/1114 motion in the hope of reaching agreement and avoiding court proceedings.

We withdrew our November 15 proposal in response to positive engagement by GM and the major unions, including IUE-CWA, and proceeded with discussions aimed at consensus.  Our current proposal memorializes discussions we had with you personally over the past two months, particularly regarding increased wages phased-in over time, benefit improvements and attrition and wage buydown incentives.  You have been made aware of our need to sell or wind down specific IUE-CWA-represented sites.  We nonetheless have received no counter-proposal from the IUE-CWA, despite your indications, including in a letter dated November 23, 2005, that one would be forthcoming.

We remain committed to reaching agreement with the IUE-CWA.  Our March 24 proposal essentially duplicates our November 15 proposal except for the wage and benefit improvements and incentives, which are contingent upon GM support and do not change the fundamental Delphi financials.  Consequently, it cannot be said that we delivered a proposal one week before our 1113/1114 filing deadline that is radically different from our position over the past many months.

We continue to hope to reach a comprehensive agreement with our unions and GM as soon as possible and are available to meet and confer at your request, as we are doing today in Dayton at our meeting with you and the entire IUE-CWA Automotive Conference Board.

Sincerely,

*Kevin M. Butler*

cc:    James Clark, President, International Union IUE-CWA

World Headquarters and Customer Center  5725 Delphi Drive  Troy, MI  48098-2815  USA
Tel: [1] 248.813.2463  Fax: [1] 248.813.2523

Exhibit B



March 31, 2006

Mr. Kevin Butler
Delphi Corporation
M/C 483-400-606
5725 Delphi Drive
Troy, MI 48098-2815

Robert L. Sutton
Conf. Bd. Sec'y
Arbitration Director
Contract Administration

Dear Mr. Butler:

Your letter of March 29, 2006 erroneously asserts that Delphi and the IUE-CWA have been conducting good faith negotiations since July, 2005. The only meeting that occurred in July, 2005 between the IUE-CWA and Delphi was the initial meeting at which you provided an update on the financial condition of Delphi and a description of the plants you would want to close. We did not receive an actual bargaining proposal describing wages and hours for our plants until October, 2005. We had no negotiations on those proposals and Delphi replaced them with a superceding proposal on November 15, 2005. Delphi withdrew its November 15, 2005 bargaining proposals on December 19, 2005 before we had any meetings to discuss this proposal with the IUE-CWA bargaining committee. We did not get another proposal until the evening of March 24, 2006. Delphi did not meet with the IUE-CWA to negotiate any changes in our collective bargaining agreement from October 20, 2005 until March 29, 2006.

Nick Border
Benefit & Growth &
Opportunity Director

Steve Lykins
Skilled Trades Director

Your proposal of March 24 is in fact fundamentally different from the one we received on November 15, 2005. The wages are different, the benefits are different and the contractual language proposals are different. But even if there are areas of duplication between the withdrawn proposal and what we got on March 24, the IUE-CWA is not clairvoyant. We could hardly anticipate which areas of the proposal you would change and which you would again propose.

Isa Shabazz
Health & Safety Director

Your statement that the IUE-CWA did not make a counter proposal after November 23, 2005 ignores the fact that after December 19, 2005 the IUE-CWA did not have a proposal to counter. The idea that the IUE-CWA would propose a counter to a withdrawn proposal is ridiculous.

Delphi chose to limit its negotiations for months to the UAW. Our members have their own contracts and their own priorities with Delphi. Your need to negotiate with IUE-CWA is not met by meeting with any other union. That was your choice but you cannot now pretend that at the same time you were negotiating with the IUE-CWA because you were not. The few informal discussions you and I may have had during this period were not a substitute for our traditional negotiations which as you well know require the presence and involvement of our Conference Board leadership.

Steve Trent
Training Director

Todd Viars
Quality Network
Director

Your representatives at the March 29, 2006 meeting at Dayton told our negotiators at least 40 times in answer to questions that they would get back to us with answers. They were unable to explain basic aspects of the Delphi proposal. While we expect answers next week in our meetings, the fundamental reality is that Delphi did not engage in any meaningful negotiations with the IUE-CWA before filing your Section 1113/1114 motions today in Bankruptcy Court. Whether that meets your legal obligations remains to be seen. It certainly is no way to reach a consensual agreement as you purport to want.

Let me reiterate: the only way to reach a consensual agreement with the IUE-CWA is to bargain directly with us and to recognize that the different circumstances applicable to our facilities requires a unique response. For example, the attrition plan entered into by the UAW is heavily dependent on flowbacks to existing UAW represented GM plants. We do not have that option for our members and any attrition plan for them needs to include the value of these flowbacks in another form. That is the only way to ensure that any attrition plan is fair and equitable for our members. We will meet our obligations to fairly consider Delphi's proposals. But there will be no agreement unless and until Delphi puts on the table a proposal that meets our needs and allows our members the income and benefits they need to protect themselves and their families.

Sincerely,

Henry Reichard
Chairman IUE-CWA Automotive
Conference Board

Exhibit C

# COHEN, WEISS AND SIMON LLP

SAMUEL J. COHEN (1908-1991)
HENRY WEISS (1910-2004)

BRUCE H. SIMON
ROBERT S. SAVELSON
STEPHEN B. MOLDOF
MICHAEL E. ABRAM
KEITH E. SECULAR
PETER HERMAN
RICHARD M. SELTZER
JAMES L. LINSEY*
JANI K. RACHELSON
BABETTE CECCOTTI*
SUSAN DAVIS*
MICHAEL L. WINSTON
THOMAS N. CIANTRA
JOSEPH J. VITALE*
PETER D. DeCHIARA
LISA M. GOMEZ*
BRUCE S. LEVINE
JAMES R. GRISI*
ELIZABETH O'LEARY

COUNSELLORS AT LAW
330 WEST 42ᴺᴰ STREET
NEW YORK, N.Y. 10036-6976

(212) 563-4100
TELECOPIER (212) 695-5436

COUNSEL
STANLEY M. BERMAN
MANLIO DIPRETA

EYAD ASAD
ROBIN H. GISE
TRAVIS M. MASTRODDI
ORIANA VIGLIOTTI
DAVID R. HOCK*
AVI BERNSTEIN*
ZACHARY N. LEEDS
MOLLY BROOKS
SUZANNE E. D'AMATO**

NEW JERSEY OFFICE
206 CLAREMONT AVENUE
MONTCLAIR, N.J. 07042
(973) 509-0011
* ALSO ADMITTED IN NJ
** ADMITTED IN CT ONLY

March 30, 2006

Via Federal Express
Mr. Kevin M. Butler
Vice President
Human Resource Management
Delphi Corporation
5725 Delphi Drive mc: 483-400-606
Troy, MI 48098

Re: Information Regarding Proposed Modification to UAW-Delphi Agreements

Dear Mr. Butler:

Richard Shoemaker has forwarded to us a copy of your March 28, 2006 letter and has asked us to respond to those portions of the letter describing the information provided to the UAW and its financial advisors.

Please be advised that UAW does not agree with your assertion that "Delphi has provided, directly or through information provided in the presentations and meetings or in the litigation process, all of the available, relevant information that the UAW and its financial advisors have sought to date. . ."

Furthermore, since your letter appears intended to be an exhibit in a Section 1113/1114 filing, let me add that UAW does not believe that Delphi has provided the UAW and its financial advisors with such relevant information as is necessary to evaluate the Section 1113 and Section 1114 proposals".

As you know, Lazard Freres & Co., LLC has been engaged by the UAW to, among other things, independently review and analyze the business, operations, financial condition and prospects of Delphi, and projections related thereto.

00088757.DOC.1

COHEN, WEISS AND SIMON LLP

Kevin M. Butler
March 30, 2006
Page 2

In an effort to properly inform the UAW relative to Delphi, Lazard pursued its due diligence by requesting information in three primary subject areas: (i) background and overview of Delphi's business, operations, and manufacturing footprint, (ii) review of basic labor and benefit related information including staffing levels and "penny sheet" costing information, and iii) review of current and projected financial information including business plans such as the "Steady State" and "Transformation" plans presented by Delphi.

Lazard pursued its due diligence by providing Delphi and its advisors written information request lists organized by category and prioritized by relative importance. Lazard twice narrowed and prioritized its due diligence request list in an effort to better focus the Debtors on the most important items. Lazard also developed follow-up question lists in response to incomplete or inadequate materials provided in response to specific requests. Lazard also frequently followed-up with Delphi or its advisors to check on outstanding and often dated requests.

Despite all of Lazard's efforts, Delphi has not afforded Lazard the required access or information to enable it to properly conduct due diligence and fully assist the UAW in evaluating Delphi's financial and strategic situation. Delphi has subjected each and every request to layers of review and approvals. The information provided to Delphi has been in summary format without explanation. This has prompted further questions and follow-ups. Arbitrary rules have been established restricting access to information. Boxes of "data" as distinguished from relevant information have been provided in a transparent attempt to create an evidentiary track record of compliance with the standards of 1113/1114. This has resulted in a disjointed, unorganized, and uninformative due diligence process. Delphi has made this dysfunctional due diligence process even more challenging by making frequent adjustments to its financial plans and being unwilling to provide the calculations and exhibits supporting its proposed complex labor modifications. As a result of this dynamic, just as Lazard finally receives overdue information to begin to understand the then current business plan or transformation overlay, Delphi releases a new plan with equally limited supporting information, thereby compelling Lazard to restart its due diligence leading to a prolonged and inefficient process.

The most recent labor modification proposal dated March 24, 2006 presents yet another example of Delphi's flawed approach to due diligence. Delphi states in its letter outlining that proposal that it "will also be providing under separate cover a financial analysis of the current proposals and other information relevant to your consideration of these proposals." Delphi's letter ignores that Lazard has been waiting for nearly a month for supporting information and schedules underlying Delphi's *last* proposed transformation plan. After waiting for information sufficient to evaluate Delphi's financial condition and labor modification proposals for nearly 5 months, on the eve of the threatened filing of an 1113/1114 motion, Delphi provides to the UAW a new proposal. The accompanying financial information for this new proposal (which was just received) is comprised of a financial model without explanation or

COHEN, WEISS AND SIMON LLP

Kevin M. Butler
March 30, 2006
Page 3

assumptions. Finally, the latest financial model does not even factor in the impact of potential
early retirements as a result of the recently announced attrition program - a critical component of
any restructuring plan at Delphi.

The following examples illustrate Delphi's fundamental failure to provide relevant
and necessary information to UAW:

1. Lazard submitted an initial due diligence request list to the Debtors on November
1, 2005. This list contained approximately 58 data requests. To accommodate the request of
Delphi's advisors, Lazard twice revised its list, on November 2, 2005 and again on November 7,
2005, and ultimately narrowed the list to 22 prioritized items. By the end of 2005, the Debtors
had responded to 7 of Lazard's 22 prioritized requests.

2. On November 22, 2005, immediately following a labor-related presentation by the
Debtors, Lazard delivered a brief due diligence list (consisting of 13 items) requesting backup
information and raising questions stemming from the presentation. To date, more than half of
the requests have been left unanswered.

3. On February 8, 2006, Lazard provided Delphi with eight priority requests
relating to certain high-level Modified Steady State Plan information presented to the Unsecured
Creditors Committee on February 2, 2006. To date, Lazard has received a response to only three
of these priority requests, two on March $14^{th}/15^{th}$ (five weeks later) and the other on March 24th
(more than six weeks later).

4. By letter dated February 23, 2006, Lazard submitted a list of seven priority items
to Delphi's financial advisors regarding the last Steady State Plan; only one of these requests has
been answered to date, and that response occurred on March 24th.

5. Lazard received Delphi's Steady State Plan in mid-January 2006 but, for some
unexplained reason, the materials were marked for "professional eyes only" and Lazard was not
given permission by Delphi to share the data with the UAW until more than one month later.
Moreover, while the Steady State Plan materials finally provided basic financial information --
income/balance sheet/cash flow statements and high-level financial information by business
division -- the materials still lacked sufficient detail to adequately analyze Delphi's business.
For example, the materials did not provide financial information at the plant-level or product-
level, nor did the information give light to the different cost structures for U.S. and foreign
operations. Having performed analysis on the Steady State Plan, it is Lazard's understanding
that this plan will now be replaced by another steady state plan to be provided some time in April
2006.

COHEN, WEISS AND SIMON LLP

Kevin M. Butler
March 30, 2006
Page 4

## Summary of Data Requests Surrounding Labor Modifications Savings

The issue of labor modifications at Delphi is exceedingly complex and of utmost importance to the unions. Delphi's labor proposals impact tens of thousands of current and retired union employees, and consist of extraordinarily drastic wage cuts and changes concerning, among others, job security programs, work rules, benefit programs, retiree healthcare, and pension benefits. The modeling of the financial impact of Delphi's proposed labor modifications is equally complex and involves both GAAP and actuarial calculations. Yet, despite the inherent complexity and the detail necessary to properly analyze this issue, Delphi has repeatedly provided one or two-page high-level summaries of the potential impact of its proposed labor modifications on the Company's financial position.

For example, Delphi first provided a high-level, one-page summary of the potential impact of its proposed labor modifications on the Company's financial position (with no supporting documentation or context) on December 16, 2005. Lazard requested backup materials and calculations to such savings. To date, only one material request item has been provided, and that was only provided in late March 2006. Examples of requests include critical items such as the individual components of savings involved (reductions in wage/benefit/JOBSbank/headcount), pension and OPEB calculations, and a detailed headcount walk by relevant category (retirements/severance/attrition/flowback, etc.). In January 2006, more than one month after its initial request, Lazard again requested backup and, except for the item delivered in late March, Delphi has still failed to respond.

On February 2, 2006, in a presentation to the Unsecured Creditors Committee, Delphi presented another version of this high-level summary of potential labor savings, again with no further detail provided. As the labor savings in question were specific and exact amounts in the billions of dollars, the data clearly represented summary output from a financial model, suggesting that the requested backup materials existed yet were not made available to Lazard.

In short, with respect to labor cost modifications, Delphi has failed to provide sufficient information, and the information that has been provided has been, for the most part, untimely, insufficiently detailed, and has made it impossible for Lazard to assist the UAW in evaluating Delphi's proposals.

## Summary Process Surrounding Delphi's Transformation Plan

Finally, one of the critical components of Lazard's evaluation of Delphi's future viability is derived from the analysis of Delphi's Transformation Plan. The Transformation Plan, as characterized by Delphi, represents a restructuring plan designed to return Delphi to "market level" profitability and positive operating cash flow. The Transformation Plan is derived from the layering of six "transformation overlays" to its current Steady State (i.e. status quo) Plan.



COHEN, WEISS AND SIMON LLP

Kevin M. Butler
March 30, 2006
Page 5

Two of the transformation overlays consist of labor modifications and a portfolio sale/wind down of much of the Debtors' U.S. operations.

Since the first Transformation Plan was presented (and immediately discredited) in November 2005, Lazard has repeatedly inquired as to when the revised Transformation Plan would be available. Finally, on February 22, 2006, Rothschild suggested that a draft of the Transformation Plan and supporting materials were ready for review, conditioned on the execution of a letter agreement by UAW stating that such information would not be used against Delphi in the 1113/1114 context. Yet, despite stating that the letter was immediately available for execution, Delphi did not send it to UAW counsel for review and execution until March 8th.

On March 10th, Lazard finally received initial data on the February 2, 2006 Transformation Plan; however, such data was limited to four financial output pages. Delphi stated that more detailed information was still being prepared (e.g. labor costing), and asked Lazard to submit a prioritized request list. A list of nine items was provided to the Debtors' advisors on the same day, March 10th. While limited information began to trickle in six days later, the more critical information such as labor costing and headcount walk was not made available until March 24th. To date, the limited nine-item request list, including several follow-on Lazard questions stemming from the limited responses provided by the Debtor, has not been adequately fulfilled. Now, the February 2006 Transformation Plan has been replaced by the labor proposal delivered on March 24, 2006.

Based on the foregoing, UAW believes that Delphi's filing of the Section 1113/1114 proceeding is inappropriate and will impede future progress in the complex negotiations necessary to resolve the difficult issues confronting all parties. Delphi's failure to provide the statutorily required relevant information is only one manifestation of Delphi's process failure.

Sincerely,

Bruce H. Simon

BHS: sjh

cc:    John W. Butler, Jr.



Exhibit D

# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
LOS ANGELES

1625 Eye Street, NW
Washington, D.C. 20006-4001

TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
www.omm.com

NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO

April 20, 2006

OUR FILE NUMBER
207998-0001

**VIA E-MAIL AND OVERNIGHT COURIER**

WRITER'S DIRECT DIAL
(202) 383-5233

WRITER'S E-MAIL ADDRESS
tjerman@omm.com

David R. Jury
Assistant General Counsel
United Steelworkers
Five Gateway Center
Pittsburgh, PA 15222

Re:    *__Information Provided Regarding Section 1113/1114 Proposals__*

Dear Mr. Jury:

Kevin Butler has asked that I respond on behalf of Delphi Corporation ("Delphi") to your March 31, 2006 letter regarding information provided by Delphi to the United Steelworkers ("USW") and Potok and Co., Inc. ("Potok"), the USW's financial advisor. We request that all future correspondence involving Delphi's Section 1113/1114 Motion be addressed directly to me, as counsel of record in this matter.

First, Delphi's financial advisors, Rothschild, Inc. are available to speak directly with Potok regarding questions about Delphi's financial model and the underlying assumptions used in the model. Please have Potok contact William Shaw, Director, Rothschild - New York, at (212) 403-5221 or william.shaw@us.rothschild.com.

Second, I have enclosed a self-explanatory chart that is responsive to Potok's chart regarding the status of the USW's January 9, 2006 information requests. As you can see, Delphi has provided the USW and Potok with all of the responsive information that is available and maintained by Delphi. To the extent information has been provided jointly for Vandalia and Home Avenue, Delphi has not maintained that information separately but, in response to your request, will attempt to break down the information between the two facilities and will provide such information directly to Potok. We do not know for sure, however, whether it will be possible to do so.

O'MELVENY & MYERS LLP
David R. Jury, April 20, 2006 - Page 2


      Finally, Delphi will review each of Potok's new requests for additional information and provide any responses directly to Potok, as you requested in your letter.

                         Sincerely,

                         Tom A. Jerman
                         Of O'Melveny & Myers LLP

Enclosure

**Delphi Responses to January 9, 2006 USW Information Request and
March 31, 2006 Potok Follow-Up Requests**

| Item(s) | Summary of Potok Comments | Delphi Response to Potok Comments |
|---|---|---|
| | | |
| 1(a) – 1(c) | Complete. | N/A. |
| 1(d) | No response. | Delphi provided 25 pages of organizational charts showing Delphi's corporate structure and relationships, in addition to a copy of a First-Day Hearing presentation detailing Delphi's corporate structure. |
| 2(a)-(c) | No response. | Delphi has been unable to locate any documents describing the decision to move Home Avenue/Vandalia to the Automotive Holdings Group. |
| 2(d) | • Describes responsive materials regarding Vandalia provided by Delphi; no documents regarding Home Avenue.<br>• In chart, Potok requests for the first time further explanation and follow-up based on these materials. | • Delphi provided all responsive documents in it possession. No such documents exist for Home Avenue.<br>• Delphi will review requests for additional information and provide any responses directly to Potok, as requested. |
| 3(a) | No response. | The current "guiding tenets" are set forth in the August 12, 2005 Rothschild materials USW has received. Delphi also provided the USW with a document entitled: "DPH Portfolio Impact – USW, " which shows the analysis/application of those tenets to the USW operations. |
| (4)(a)(i) – (4)(a)(ii) | • Although responsive data was received, it was not broken down between Home Avenue and Vandalia plants.<br>• No information provided regarding other facilities in product segments.<br>• In chart, Potok requests for the first time clarification of data provided. | • Delphi provided the USW with data in the format that was available. This data did not regularly break down data between Home Avenue and Vandalia. Delphi is seeking to determine whether further breakdown of any of the data is possible.<br>• Data was not provided regarding other facilities because there are no other facilities that manufacture similar products.<br>• Delphi will review requests for additional information and provide any responses directly to Potok, as requested. |
| (4)(a)(iii) – (4) (a)(v) | • No response to request regarding inter-company transactions and cost allocation methodologies where available.<br>• No description of how SG&A expenses are allocated. | • Delphi provided the USW with data regarding inter-company transactions, and SG&A expenses.<br>• Delphi did not provide a description of allocation methodology regarding SG&A expenses because it did not construe the question to require this information. Delphi will attempt to provide allocation methodology information to Potok as soon as it is available. |

| Item(s) | Summary of Potok Comments | Delphi Response to Potok Comments |
|---|---|---|
| (4)(a)(vi)-(vii) | • Although responsive data was received, it was not broken down between Home Avenue and Vandalia plants.<br>• Although salaried employee data provided, Potok also seeks historical data for salaried employees. | • Delphi provided the USW with multiple files of employment and penny sheet data but separate penny sheets for Home Avenue and Vandalia were not available. In response to your request, Delphi will attempt to prepare this analysis, and provide it directly to Potok.<br>• Delphi provided the USW with a salaried employee snapshot as of October 31, 2005. Historical salaried employee data is not maintained by plant and is not available. |
| (4)(a)(viii) | No response to request for breakdown of salaried labor costs. | Salary ranges by level are posted and available in the Virtual Data Room. |
| (5) & (5)(a) & (5)(b) | • Internal management report information provided for Home Avenue only.<br>• In chart, Potok requests for the first time clarification of data provided. | • Delphi provided the USW with all available data. In most cases the operating data was maintained as a combined Home Ave/Vandalia Operation.<br>• Delphi will review requests for additional information and provide any responses directly to Potok, as requested. |
| (6) | Data received appears to be for Home Avenue only. | Delphi will confirm whether the Vandalia data is contained within the data provided for "Home Avenue" and provide the response to Potok, as requested. |
| (6)(a) & (6)(b) | • Refer to comment on (2)(d).<br>• No information received regarding Home Avenue. | • Delphi provided all responsive documents in it possession. No such documents exist for Home Avenue.<br>• Delphi will review requests for additional information and provide any responses directly to Potok, as requested. |
| (7)(a)-(7)(c) | While responsive data was provided, Potok requests data separately for each facility. | Data was provided in the format in which it exists and was not previously requested separately by facility. Delphi is seeking to determine whether further breakdown of any of the data is possible. |
| (7)(d) | No response *[Please note that Potok's list erroneously shows (7)(d) as identical to (7)(c). In USW's January 9, 2006 request, (7)(d) requests a breakdown of salaried compensation & labor costs, same as the hourly.]* | Salary ranges by level are posted and available in the Virtual Data Room. |
| (8) | Seeks confirmation that the Virtual Data Room contains all documents presented to or shared with the Unsecured Creditors Committee or any other stakeholders and/or their financial advisors. | The Virtual Data Room was created by Delphi to provide a single repository of information requested by its unions, and does necessarily not include all information provided to the UCC  We suggest that you ask either counsel to the UCC, or the IUE-CWA, as a member of the UCC, for such information. If there is a problem in obtaining it from these sources, please let us know. |

| Item(s) | Summary of Potok Comments | Delphi Response to Potok Comments |
|---|---|---|
| New Requests | | Delphi will review Potok's new requests for additional information and provide any responses directly to Potok, as requested. |

Exhibit E

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1625 Eye Street, NW | NEWPORT BEACH |
| BRUSSELS | Washington, D.C. 20006-4001 | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE (202) 383-5300 | SHANGHAI |
| LONDON | FACSIMILE (202) 383-5414 | SILICON VALLEY |
| LOS ANGELES | www.omm.com | TOKYO |

April 12, 2006

OUR FILE NUMBER
207998-0001

**VIA E-MAIL AND FEDERAL EXPRESS**

WRITER'S DIRECT DIAL
(202) 383-5233

Jill Hartley, Esq.
Previant, Goldberg, Uelmen, Gratz, Miller
   & Brueggeman, S.C.
1555 N. River Center Drive, Suite 202
P.O. Box 12993
Milwaukee, WI 53212

WRITER'S E-MAIL ADDRESS
tjerman@omm.com

Re:   ***Delphi 1113/1114 Proposals***

Dear Ms. Hartley:

This is in response to your April 5, 2006 e-mail to Tom Matz of Skadden, Arps, Slate, Meagher & Flom LLP, regarding Delphi's Section 1113 and 1114 proposals to the IBEW and the IAM.

We have investigated your statement that neither the IBEW nor the IAM has received the information referenced in Kevin Butler's March 25, 2006 letter to your clients. Our records show that on Tuesday, March 28, 2006, Delphi sent a package containing the material by Federal Express to Edwin Hill of the IBEW in Washington, DC, which was delivered and signed for on March 29, 2006 (Fed Ex Tracking Number 791899348357). Delphi sent a Federal Express package to Robert Thayer of the IAM in Upper Marlboro, MD on the same day, which was delivered and left pursuant to a Federal Express signature release, on March 29, 2006 (Fed Ex Tracking Number 792697744361). These packages contained a cover letter from Kevin Butler, a CD of the financial model, and hard copies of additional financial material to back-up the proposals. Nonetheless, I have included additional copies of these materials with this letter.

Second, with regard to access to the Delphi virtual data room, Delphi's records show the following:

- You were given access to the data room in December 2005, but your access was inadvertently suspended following the completion of the KECP hearing in early March, 2006, when the company discontinued access to the KECP data room. Delphi asked FTI Consulting ("FTI") to restore your access immediately, and FTI has done so.

O'MELVENY & MYERS LLP
Jill Hartley, Esq., April 12, 2006 - Page 2

- Mr. Curry has full access to the data room.

- FTI attempted to contact Mr. Griffin by telephone to provide him with his data room identification and password, but Mr. Griffin did not respond.

- Delphi has provided Mr. Middleton with several copies of the data room application form, the latest of which was sent to him on March 30, 2006. Mr. Middleton has never submitted the completed form necessary to obtain access to the data room.

Third, Delphi has not been provided copies of any expert reports prepared by experts retained by the UAW or USW, or any other union.

Fourth, as you are aware, Delphi moved the bankruptcy court for approval of the UAW Special Attrition Program and the Hourly Attrition Programs that Delphi hopes to enter into with other unions, including the IAM and IBEW. Delphi therefore did not provide any of the other unions with attrition program proposals pending a bankruptcy court decision. As you know, the court ruled on April 7, 2006, that it would not approve any attrition programs with other unions until agreements on such programs are reached with those unions. As a result of this ruling, Delphi expects to negotiate an attrition program with the IAM and IBEW.

Fifth, we believe that Delphi and the unions should continue to interact directly, without the interference of their respective lawyers, with respect to scheduling bargaining sessions. We therefore have informed Mr. Gerling of your letter and he will contact your clients immediately and directly to schedule dates for bargaining.

Finally, Delphi has received the IBEW's written information requests and is working to process them and provide the information as expeditiously as possible. Delphi will continue to provide the responsive information to clients and we will assume that they will provide you with copies of that information.

Sincerely,

Tom A. Jerman
of O'MELVENY & MYERS LLP

Enclosures