**LATHAM & WATKINS LLP**

885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Email: robert.rosenberg@lw.com
      mitchell.seider@lw.com
      mark.broude@lw.com

Counsel for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Delphi Corporation, <u>et al.</u>, | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS IN SUPPORT OF THE DEBTORS' MOTION FOR ORDER UNDER
11 U.S.C. § 1113(C) AUTHORIZING REJECTION OF COLLECTIVE
BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(G)
AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases of Delphi Corporation ("Delphi") and certain of its affiliates (collectively, the

"Debtors"), by and through its undersigned counsel, hereby submits this Response (the

"Response") in support of the Debtors' Motion for Order Under 11 U.S.C. § 1113(c) Authorizing

Rejection of Collective Bargaining Agreements and Under 11 U.S.C. § 1114(g) Authorizing

Modification of Retiree Welfare Benefits (the "Motion").[1]  In support of this Response,[2] the

Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors assert it is their business judgment that their successful

reorganization requires reductions of their labor and legacy costs.  Based on the information

available to it, the Committee agrees with the Debtors' assertion.  It should be noted that in these

cases, the Debtors have indicated they are cutting more than just labor and legacy costs, as the

Motion makes plain the Debtors cannot honor their agreements with their unsecured creditors

either.

2.      It is beyond doubt that the Debtors currently are facing financial difficulties.  The

Debtors' historical financial data and future projections demonstrate that the status quo simply is

not sustainable.  For example, the Debtors' "Steady State Scenario" currently projects an

operating loss of $8.1 billion, and a net loss of $12.9 billion, during the five-year period from

2006 to 2010.  These losses are in most part attributable to the Debtors' U.S. operations.  While

the recent hourly attrition program with the UAW improves the Debtors' financial outlook by

reducing the projected losses, the program does not alleviate the need for further relief from their

extremely high costs.  First, the precise effect of these programs will depend on how many

employees elect the retirement and flow-back options.  Furthermore, even if there is 100%

acceptance by eligible employees, the Debtors still estimate that they will lose over $6 billion

over the next five years.

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

[2]      By its Motion To Limit Participation in The Hearing on Delphi's Section 1113 and Section 1114 Motion (the "UAW Motion") of April 26, the UAW seeks to prohibit the Committee from participating in the hearing on the Motion.  The Committee's objection to the UAW Motion is due May 5.

3.    The Motion directly relates to one vital part of a five-pronged "transformation plan" that the Debtors recently unveiled.  It is nearly certain that this transformation plan will fail without a significant reduction in the Debtors' labor costs.  The Committee believes that the best way for a debtor to achieve reductions in its labor costs is by consensual agreement resulting from the collective bargaining process.  Where, as here, bargaining has occurred but has not been successful, the debtor should be authorized at the appropriate time to exercise its rights and powers under the Bankruptcy Code.  The Debtors have demonstrated that the time for the Court to authorize rejection is now.  Therefore, the Committee supports the Debtors' business judgment that receiving authority now to reject their collective bargaining agreements, if and when further bargaining becomes futile, is a necessary and appropriate step toward their reorganization.

4.    The Committee believes that it is entirely possible that following the hearing on the Motion, but before the Debtors reject the collective bargaining agreements, the Debtors and some or all of the unions will reach a settlement agreement.  The Committee further believes it is entirely possible such an agreement will provide for General Motors Corporation's ("GM") participation in the settlement in exchange for very significant consideration to GM.[3]  The Committee anticipates such consideration could include releases for GM from its own substantial liability to the estates and significant claims against the Debtors' estates and that the Court will be asked to approve the consideration as a part of a settlement "package" on relatively short notice.[4]  Though a settlement of the Debtors' hourly employee issues is highly desirable,

---

[3]    As of the date of this Response, GM has kept silent regarding the GM Consensual Proposals, presumably at least in part because it is waiting to see what it is offered in exchange for its financial support of such proposals.

[4]    The relief sought in the UAW Motion underscores the risk of GM and the UAW using ultimate resolution of the Motion as leverage for compromise of GM's liability to the estates, as discussed in Section II of this Response.

NY\1136395.7

settlement with GM is far from essential to Delphi's reorganization. Financial support from GM

of a settlement with the Debtors' unions should be viewed simply as a fulfillment of some of

GM's present obligations to the Debtors' employees, not as an event that gives rise to claims in

favor of GM that are immune from challenge by any party in interest.[5]  Indeed, because it seems

likely that a potential settlement will seek to provide potentially improper consideration to GM,

the Committee's participation in any settlement discussions among the Debtors, UAW and GM

is imperative because such participation will permit the parties to reach a true consensus and

avoid time-consuming and costly litigation.

## **BACKGROUND**

5.      On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this

Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  On October 14, 2005, the three remaining Debtors similarly filed

voluntary petitions.  The Committee was appointed nine days after the Petition Date, on October

17, 2005.[6]

6.      Delphi is a party to collective bargaining agreements with the United Automobile,

Aerospace and Agricultural Implement Workers of America ("UAW"), the International Union

of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of

---

[5]       For example, prior to the commencement of these chapter 11 cases, GM contractually obligated itself to the UAW, the IUE and the USW to pay, among other things, the OPEB of the Debtors' employees in the event the Debtors' financial distress caused them to reduce or eliminate OPEB.  If the Court grants the Motion, GM will be obligated to pay the OPEB to the Debtors' UAW, IUE and USW-represented employees.  GM most likely will assert claims against the Debtors for these obligations.  GM's claims relating to these benefit guarantees are subject to numerous defenses, including lack of consideration and defenses under sections 502 and 509 of the Bankruptcy Code.

[6]       The following members originally were appointed to the Committee: (a) Capital Research and Management Company; (b) Electronic Data Systems Corp.; (c) Flextronics International Asia-Pacific, Ltd.; (d) Freescale Semiconductor, Inc.; (e) General Electric Company; (f) IUE-CWA and (g) Wilmington Trust Company, as Indenture Trustee.  Flextronics International Asia-Pacific, Ltd., has resigned from the Committee, and Tyco Electronics Corporation has since been appointed to the Committee.  The Pension Benefit Guaranty Corporation and the UAW have been added as *ex officio* members of the Committee.

NY\1136395.7

America ("IUE-CWA"), the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,

Allied Industrial and Service Workers, International Union ("USW"), the International

Association of Machinists and Aerospace Workers ("IAM"), the International Brotherhood of

Electrical Workers ("IBEW"), and the International Union of Operating Engineers ("IUOE"),

and their local affiliates (collectively, the "Unions").  Delphi also has an obligation to provide

medical and life insurance benefits for hourly active employees and retirees represented by the

Unions.

7.      In connection with their reorganization efforts, the Debtors formulated a plan

pursuant to which they seek to significantly reduce their labor costs and retiree obligations by

bringing such costs in line with market levels.  Accordingly, on October 20 and 21, 2005, the

Debtors delivered section 1113 and 1114 proposals to the Unions, which the Debtors later

amended on November 15-17, 2005 (the "Competitive Benchmark Proposals").  Under those

proposals, the Debtors would immediately implement the wage rates, benefits, and other terms

needed to create the competitive labor cost structure that they assert they need to survive.  The

Motion states that the Unions rejected these proposals, essentially refusing to even discuss the

proposals or provide any counterproposals.  *See* Motion, at ¶ 14.

8.      On March 24 and 25, 2006, the Debtors delivered to the Unions a second set of

proposals (the "GM Consensual Proposals"), which would provide a gradual reduction in wages

for existing Delphi employees, provide buyouts for employees who elect to leave Delphi, and

provide buydowns for employees who continue working for the Debtors under the lower wage

scale, contingent upon GM's commitment to pay the incremental cost created by these terms.

9.      The Debtors and the Unions did not reach an agreement regarding the proposed

modifications, and on March 31, 2006, the Debtors filed the Motion and a supporting

NY\1136395.7

memorandum of law.[7]  By the Motion, the Debtors request an order authorizing them to reject their collective bargaining agreements with the Unions upon ten calendar days notice to this Court and the Unions.  By the Motion, the Debtors also seek an order modifying their obligations to provide retiree medical and life insurance benefits to hourly retirees under section 1114 of the Bankruptcy Code (whether arising under collective bargaining agreements or otherwise), effective October 1, 2006.[8]

10.    Each of the Unions, as well as Delphi shareholders Appaloosa Management, L.P. and Wexford Capital LLC, have objected to the Motion on various grounds.  In addition, Wilmington Trust Company as Indenture Trustee filed a limited objection to the Motion.  GM filed a response, not for the purpose of supporting or opposing the relief sought in the Motion, but rather to "clarify certain points" in the Motion.

## RESPONSE

## I.    THE DEBTORS APPEAR TO HAVE SATISFIED THE REQUIREMENTS UNDER SECTIONS 1113 AND 1114 OF THE BANKRUPTCY CODE

11.    Sections 1113 and 1114 of the Bankruptcy Code set forth the procedural requirements that must be met before relief can be granted.  Section 1113(c) of the Bankruptcy Code provides that:

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that -

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

---

[7]    In support of the Motion, the Debtors also filed Declarations of John D. Sheehan, Kevin M. Butler, Darrell Kidd, Bernard J. Quick, Steven Gebbia, Mark R. Weber, Keith Williams and Michael L. Wachter (collectively, the "Declarations").

[8]    For those retirees who are eligible for retiree medical and life insurance under a retirement benefit guarantee negotiated between GM and the UAW, IUE-CWA, and USW in 1999 (the "GM Benefit Guarantee"), the Debtors seek to eliminate their obligations entirely.  For those retirees and future eligible retirees who do not have the benefit of the GM Benefit Guarantee, the Debtors seek to substitute individual retirement medical accounts in lieu of their existing obligations.

NY\1136395.7

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(c).

12.    Section 1113(b) of the Bankruptcy Code, in turn, provides as follows:

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section ''trustee'' shall include a debtor in possession), shall -

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

11 U.S.C. § 1113(b)(1).

13.    Section 1114(g) of the Bankruptcy Code provides in pertinent part as follows:

(g) The court shall enter an order providing for modification in the payment of retiree benefits if the court finds that -

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);

(2) the authorized representative of the retirees has refused to accept such proposal without good cause; and

>    (3) such modification is necessary to permit the
>    reorganization of the debtor and assures that all creditors, the
>    debtor, and all of the affected parties are treated fairly and
>    equitably, and is clearly favored by the balance of the equities…

11 U.S.C. § 1114(g).  Section 1114(f) of the Bankruptcy Code contains provisions

substantially similar to the provisions of section 1113(b)(1).

14.    Based on the language in sections 1113 and 1114 of the Bankruptcy Code, courts

have identified nine requirements that must be satisfied for a bankruptcy court to authorize

rejection of a collective bargaining agreement or modification of retiree benefits:[9] (a) the debtor

must have made a proposal to the union; (b) the proposal must be based on the most complete

and reliable information available to the debtor at the time of the proposal; (c) the modification

must be necessary to permit reorganization; (d) the modification must provide that all affected

parties are treated fairly and equitably; (e) the debtor must provide the union with relevant

information as is necessary to evaluate the proposal; (f) the debtor must have met with the

collective bargaining representative at reasonable times subsequent to making the proposal; (g)

the debtor must have negotiated with the union in good faith concerning the proposal; (h) the

union must have refused to accept the proposal without good cause; and (i) the balance of the

equities must clearly favor rejection of the collective bargaining agreement.  *See Truck Drivers*

*Local 807, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v.*

*Carey Transp., Inc.*, 816 F.2d 82 (2d Cir. 1987), *aff'g In re Carey Transp.*, 50 B.R. 203 (Bankr.

S.D.N.Y. 1985); *Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of America, AFL-CIO-*

*CLC*, 791 F.2d 1074 (3d Cir. 1986).

---

[9]    While the Debtors only list seven factors, relying on *In re Carey Transportation*, 50 B.R. 203 (Bankr. S.D.N.Y. 1985), that court did not hold that the nine factor test set forth in *In re American Provision Co.*, 44 B.R. 907 (Bankr. D. Minn. 1984) should be conflated into seven factors in all cases, but rather noted that, for purposes of its analysis, and "where appropriate, certain of *American Provision*'s elements are dealt with in tandem." *In re Carey Transp.*, 50 B.R. at 207.  Accordingly, the Committee analyzes the section 1113 requirements using the nine factor test.

NY\1136395.7

15.     If a debtor demonstrates that it has satisfied the provisions of section 1113, the

bankruptcy court is authorized to approve rejection of the collective bargaining agreement.  *See*

*New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing*

*Room, Inc.)*, 848 F.2d 345, 346 (2d Cir. 1988), *cert. denied*, 489 U.S. 1078 (1989) (affirming

"the judgment of the district court, which upheld the bankruptcy court's determination that the

debtor … had met the requirements of § 1113 and granted [the debtor's] application to reject its

agreement with [the union]"); *see also Carey Transp.*, 816 F.2d at 86-87 (upholding lower

court's conclusion that the debtor "had met its burden of proving compliance with the procedural

and substantive standards set forth in [section 1113]").  Compliance with such requirements also

warrants the granting of relief under section 1114 of the Bankruptcy Code.  *See In re Horsehead*

*Indus., Inc.*, 300 B.R. 573, 583 (Bankr. S.D.N.Y. 2003) ("[C]ompliance with § 1114 is

substantively and procedurally the same as compliance with § 1113") (quoting *In re Ionosphere*

*Clubs, Inc.*, 134 B.R. 515, 520 (Bankr. S.D.N.Y. 1991)).

16.     The Committee, through its counsel and financial advisors, spent a significant

amount of time reviewing the Motion, the supporting memorandum of law, the Declarations and

the exhibits attached thereto, and the financial and labor-related documents contained in the

"virtual data room" that the Debtors established for the Unions.  As a result of its review of such

documents and of applicable authority, the Committee believes that the Debtors can credibly

state that they have satisfied each of the requirements outlined by the Second Circuit.

Furthermore, the Committee concurs with the Debtors' business judgment that the relief sought

in the Motion is necessary for them to become competitive and profitable, and thus that such

relief is a necessary and appropriate step towards the Debtors' reorganization.  Thus, this Court

should grant the Motion if, among other factors, the Court determines that (a) the proposed

NY\1136395.7

modifications are necessary to permit a successful reorganization of the Debtors, (b) the

proposed modifications provide that all affected parties are treated fairly and equitably, (c) the

Unions rejected the Debtors' proposals without good cause and (d) the balancing of the equities

favors rejection of the collective bargaining agreements.

### A.    Whether the Debtors Provided Postpetition Proposals to the Unions

17.    Subsequent to filing a chapter 11 petition and prior to filing a motion under

section 1113 or 1114 of the Bankruptcy Code, the debtor must make a proposal to the union.  *See*

11 U.S.C. §§ 1113(b)(1); 1114(f)(1).  In this case, the Debtors provided the Unions with two sets

of proposals (the Competitive Benchmark Proposals and the GM Consensual Proposals) between

October 2005 and March 2006.  Thus, the Committee believes this requirement has been

satisfied.[10]

### B.    Whether the Debtors' Proposals Were Based on the Most Reliable
and Adequate Information Available at the Time of the Proposals

18.    Sections 1113(b)(1)(A) and 1114(f)(1)(A) require that a debtor's proposal be

based on the most reliable and adequate information available to the debtor at the time of the

proposal.  Some courts have held that a debtor's reliance on its most recent business plan and

financial forecasts satisfies its obligation to base its proposals on the most complete and reliable

information available.  *See, e.g.*, *In re Amherst Sparkle Mkt., Inc.*, 75 B.R. 847, 850-51 (Bankr.

N.D. Ohio 1987) (debtor relied on its profit and loss report and balance sheet for the previous

fiscal year, cash disbursement data, its general ledger and payroll registers).  The information on

which the debtor's proposals are based does not need to be error-free.  "This is particularly so

---

[10]    In their objections, certain Unions have argued that the Debtors have not met this requirement because the
GM Consensual Proposals are contingent upon sufficient financial support from GM.  None of the Unions have
cited authority for this proposition.  Moreover, the Competitive Benchmark Proposals are not contingent upon GM
financial support.

where errors, if any, were made inadvertently and relevant corrective data was seasonably

provided to the Union." *See id.* at 850 (stating that, although the financial data provided to the

union was unaudited, a debtor that provides the union supportive documentation for its current

and projected financial posture satisfies the requirement that its section 1113 proposal be based

on the most reliable and adequate information).

19.     The Debtors assert that the Competitive Benchmark Proposals and the GM

Consensual Proposals were based on the most complete and reliable information available to

them at the time the proposals were made.  The Debtors further assert that they provided such

information to the Unions contemporaneously with the proposals and subsequently provided

updated financial information.  The Committee reviewed the Debtors' most recent business plan

and financial projections on which the proposals were based.  Specifically, the Committee

reviewed, among other things, (a) the financial and other documents that form the basis of the

Debtors' proposals and describe some of the assumptions and forecasts underlying such

proposals, (b) several presentations that describe the Debtors' current financial situation and

historical financial data and (c) information regarding the Delphi Preliminary 2006-2010

Business Plan and the Steady State Scenario projections on which the proposals were based.

20.     Collectively, this information illustrates the Debtors' financial outlook both with

and without the proposed modifications and appears to be the most reliable and adequate

information available to the Debtors at the time they made the proposals.  Accordingly, the

Committee believes that the Debtors have met this requirement.

C.     **Whether the Modifications Are Necessary
       to Permit the Reorganization of the Debtors**

21.     Section 1113(b)(1) of the Bankruptcy Code provides that the proposal made by

the debtor must contain only those modifications to the collective bargaining agreements that are

11

"necessary to permit the reorganization of the debtor." *See* 11 U.S.C. § 1113(b)(1). The Second

Circuit's standard for determining whether a proposed modification is "necessary" under section

1113(b)(1)(A) of the Bankruptcy Code takes into account two subsidiary questions: "(1) how

necessary must the proposed modifications be, and (2) to what goal must those alterations be

necessary." *Carey Transp.*, 816 F.2d at 88.

22.      Moreover, in the Second Circuit, the term "necessary" is not equated with

"essential" or "bare minimum," and it is not the debtor's short-term survival but rather its longer-

term successful reorganization that is the goal of the proposed modifications. *See id.* at 89; *In re*

*Delta Air Lines, Inc.*, Case No. 05-17923 (Bankr. S.D.N.Y. Apr. 26, 2006) (Docket No. 2467, at

13). Thus, courts focus on the long-term reorganization of the debtor rather than the immediate

need to avoid liquidation. *See, e.g.*, *Royal Composing Room*, 848 F.2d at 350 (stating that "[a]

debtor's proposal need not be limited to the bare bones relief that will keep it going"). The

Second Circuit has also held that the court must examine whether the entire package of requested

changes is necessary, not whether each element taken alone would be necessary. *See id.* at 348;

*see also Horsehead Indus.*, 300 B.R. at 584 (stating that "[i]n determining 'necessity,' the

proposal must be viewed as a whole, and not by its specific elements").

23.      Proposed modifications have been found "necessary" under section 1113 where

the debtor's proposal seeks to reduce non-competitive wages and benefits or where the

modifications are essential to the debtor's future economic survival. For example, the Second

Circuit in *Carey Transportation* concluded that the debtor's proposal to reduce above-industry-

average wages and benefits satisfied the section 1113 requirement of being necessary to permit

the debtor's reorganization. *See Carey Transp.*, 816 F.2d at 90. Similarly, in *Royal Composing*

*Room*, the court described the debtor's financial woes in great detail and concluded that the

NY\1136395.7

debtor had established that "its need for relief on the order of magnitude requested was necessary to [its] economic survival." *In re Royal Composing Room, Inc.*, 62 B.R. 403, 418 (Bankr. S.D.N.Y. 1986); *order aff'd by*, 78 B.R. 671 (S.D.N.Y. 1987); *judgment aff'd by*, 848 F.2d 345 (2d Cir. 1988); *cert. denied*, 489 U.S. 1078 (1989).  The court relied on the opinions of the debtor's expert witnesses that the debtor's "proposal was essential to its future survival" and concluded

> This court is satisfied that this Debtor has done the best that can be expected of it under all the circumstances and that no greater showing of necessity can be expected before rejection of the collective bargaining agreement should be permitted.

*Id.*

24.    Here, the Debtors assert that their reorganization prospects and long-term viability depend on (a) the reduction of their wage and benefit costs to competitive levels, (b) their obtaining the flexibility to respond to changed market conditions by laying off unneeded employees and selling or closing unprofitable facilities and (c) the elimination or substantial reduction of their legacy benefit costs.  The Committee reviewed, among other things, the Steady State Scenario, which estimates that the Debtors will suffer a total operating loss of approximately $8 billion and a total net loss of approximately $13 billion over the next five years without cost reductions.  The Committee also reviewed the collective bargaining agreements, some of which contain (a) requirements that the Debtors maintain specified employment levels at all times (*i.e.*, the JOBS Bank and temporary layoff programs) and (b) provisions prohibiting the Debtors from selling, closing, or consolidating manufacturing sites, and information describing the impact this has had on the Debtors' product portfolio and strategic decisions.  Moreover, the Committee reviewed information regarding the Debtors' mounting obligations with respect to OPEB and underfunded pension liabilities.

NY\1136395.7

25.    As noted above, in determining whether proposed modifications are necessary, courts in the Second Circuit do not focus on the Debtors' short-term survival, but rather on their long-term reorganization prospects.  The Unions have argued that the modifications sought by the Debtors are not necessary to permit their reorganization.  However, as noted herein, the Debtors are projected to suffer an operating loss of $8.1 billion and a net loss of $12.9 billion during the five-year period from 2006 to 2010.  Even if there is 100% acceptance by eligible employees under the hourly attrition program, the Debtors still estimate that they will lose over $6 billion over the next five years.  Based on these projections and the other information provided by the Debtors, the Committee believes that substantial reductions in labor costs and OPEB are necessary for the Debtors to reorganize successfully and emerge as a viable entity.

D.    **Whether the Proposed Modifications Treat All Parties Fairly and Equitably**

26.    Sections 1113(b)(1)(A) and 1114(f)(1)(A) of the Bankruptcy Code require that the proposal be fair and equitable to the debtor, its creditors and all affected parties.  The purpose of this requirement "is to spread the burdens of saving the company to every constituency while ensuring that all sacrifice to a similar degree."  *Century Brass Prods., Inc. v. Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America (In re Century Brass Prods., Inc.)*, 795 F.2d 265, 273 (2d Cir. 1986); *cert. denied*, 479 U.S. 949 (1986); *see also In re Delta Air Lines, Inc.*, Case No. 05-17923 (Docket No. 2467, at 18).  In other words, this requirement ensures that labor will not have to shoulder a disproportionate share of the burden.

27.    The fair and equitable requirement does not require in every case that "managers and non-union employees will have their salaries and benefits cut to the same degree that union workers' benefits are to be reduced."  *Carey Transp.*, 816 F.2d at 90; *see also In the Matter of Walway Co.*, 69 B.R. 967, 974 (Bankr. E.D. Mich. 1987) (that the debtor's other cost-cutting

measures were not equal to the concessions made by the union workers was not fatal because
"[e]quity … under § 1113 means fairness under the circumstances, not a comparative dollar-for-
dollar concession").  Instead, courts will take into consideration matters such as whether
managers and non-union employees will be making sacrifices by "assuming increased
responsibilities as a result of staff reductions without receiving commensurate salary increases"
and whether the existing salary and benefit structures for the various categories of employees are
above or below industry standards.  *See Carey Transp.*, 816 F.2d at 90.

28.    Courts in the Second Circuit have found that proposals to modify collective
bargaining agreements to reduce wages and benefits were fair and equitable in the following
circumstances:

- Where (a) the union employees' hourly wages and benefits exceeded
  industry averages by several dollars per hour, (b) managerial and
  nonunion supervisory employees, who were not asked to make
  concessions, had "barely competitive" compensation packages and
  underwent prepetition staff reductions that resulted in increasing their
  responsibilities, (c) another union and two of the debtor's principal
  creditors had also made prepetition concessions and (d) the debtor's
  owner, which was also a creditor, charged no interest on its loans to the
  debtor.  *See Carey Transp.*, 816 F.2d at 91.

- Where the debtor cut costs in many ways before seeking concessions from
  the union, including a decrease in executive compensation, the rescinding
  of raises and freezing of salaries of salesmen and middle level
  management and the moving of its premises to smaller quarters.  *Royal
  Composing Room*, 62 B.R. at 415-16.

- Where the number of full-time-equivalent unionized typesetters had been
  reduced by only 13% prepetition, whereas all other work groups had
  endured a greater percentage reduction in the same time frame.  *See New
  York Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re
  Maxwell Newspapers, Inc.)*, 981 F.2d 85, 90 (2d Cir. 1992).

29.    The Committee reviewed information regarding the effect on the various
stakeholders of the Debtors' cost-cutting efforts.  Specifically, the Committee notes the sacrifices

NY\1136395.7

being made by the Debtors' salaried employees, suppliers, bondholders, other unsecured

creditors and other parties.  Based on the Committee's review, it believes that the Unions are not

being asked to bear a disproportionate share of the burden of the Debtors' restructuring efforts.

Rather, the Debtors appear to have undertaken a sincere effort to increase its profitability and

viability.  Other stakeholders should not be expected to bear the entire burden of the Debtors'

cost-cutting efforts while a large number of the Debtors' hourly employees continue to enjoy

considerable wage and benefit premiums.  Accordingly, the Committee believes that the Debtors

have satisfied the requirement that their proposals treat all parties fairly and equitably.

> **E.**     **Whether the Debtors Have Provided Relevant
> Information to the Unions so That They May Evaluate the Proposals**

30.     A debtor must also provide the union with all relevant information to evaluate its

proposals.  *See* 11 U.S.C. §§ 1113(b)(1)(B); 1114(f)(1)(B).  This requires that a debtor "make an

honest effort to compile all data relevant to making its proposal."  *U.S. Truck Co. Holdings, Inc.*,

Case No. 99-59972, 2000 Bankr. Lexis 1376, at *39 (Bankr. E.D. Mich. Sept. 29, 2000).  Courts

have not identified a fixed body of information that must be provided to unions in every case.

However, in practical terms, a debtor must provide the union with relevant financial information,

including information about its costs.  *See, e.g.*, *United Food & Commercial Workers v.

Appletree Mkts., Inc. (In re Appletree Mkts., Inc.)*, 155 B.R. 431, 438 (S.D. Tex. 1993) (holding

that the debtor satisfied this requirement where it opened its books to the union for examination

and made information available to the union during the bargaining process that followed).

31.     Through the Declarations of Kevin Butler and Darrell Kidd, the Debtors

represented that their records reflected that they had provided the Unions with all of the

information they requested as of March 27, 2006.  The Debtors further represented that they will

continue to provide information to the Unions upon request.  The Debtors also have agreed to

pay the fees of the Unions' financial advisors in connection with their review of the Debtors' proposals.  Moreover, the virtual data room contains a host of information relating to the Debtors' financial condition and the proposals.  Based on the foregoing, the Committee believes that the Debtors have satisfied the requirement that they provide the Unions with all relevant information to evaluate their proposals.

**F.    Whether the Debtors Have Met at Reasonable Times with the Unions**

32.    Sections 1113(b)(2) and 1114(f)(2) of the Bankruptcy Code provide that between the making of the proposal and the hearing on the motion, a debtor must meet at reasonable times with the union.  *See, e.g.*, *Amherst Sparkle Mkt., Inc.*, 75 B.R. at 852 (finding that the debtor met its obligation to meet at reasonable times where it and the union met on only two occasions prior to the hearing on the motion to reject the collective bargaining agreement, and where written communications were exchanged by the parties).

33.    Through the Declaration of Kevin Butler, the Debtors represented that they sought to negotiate with the Unions after providing them the proposals and that they regularly reiterated their desire to negotiate with each Union.  According to the Debtors, the Unions categorically rejected the Competitive Benchmark Proposals, and as of the date of the Motion, none of the Unions had expressed a willingness to accept the GM Consensual Proposals.  Aside from the Debtors' negotiations with the UAW and the IUE regarding voluntary attrition programs, there is scant evidence that the Unions came to the bargaining table or provided counterproposals or proposed strategies to deal with the Debtors' financial problems.

34.    Based on the Declaration of Kevin Butler and the letters from the Debtors to the Unions that are in the virtual data room, it appears that the Debtors have made some effort to meet with the Unions regarding the labor modification proposals and to solicit counterproposals.

NY\1136395.7

The IBEW and IAM assert in their joint objection that they communicated their willingness to meet with the Debtors, but that the Debtors' rebuffed their entreaties.  *See* IBEW & IAM Objection at 26-27.  In contrast, through the Declarations filed in support of the Motion, the Debtors represented that they (a) were willing to meet with all of the Unions at any time and (b) communicated their desire to meet with each Union.  If it is true that the Debtors indeed made themselves available to meet with all Unions (including the IBEW and IAM) and it is true that the Unions made little or no effort to meet with the Debtors, then the Debtors would have satisfied this requirement, even though few (if any) meetings to discuss the proposals actually took place.[11]

###    G.    Whether the Debtors Have Conferred with the Unions in Good Faith

35.    The Bankruptcy Code also provides that a debtor must meet with the union in a good faith attempt to reach mutually satisfactory modifications to the collective bargaining agreements and retiree benefits.  *See* 11 U.S.C. §§ 1113(b)(2); 1114(f)(2).  As one court has noted in this context:

> "Good faith" is defined as "conduct indicating an honest purpose to arrive at an agreement as the result of the bargaining process." The requirement is satisfied if debtor seriously attempts to negotiate . . . reasonable modifications of an existing collective bargaining agreement prior to its motion to reject it.

---

[11]    In their objection, the IBEW and IAM assert that the failure to have actual meetings on the Debtors' proposal is "fatal to the application."  In support of their contention, the IBEW and IAM cite *In re K&B Mounting, Inc.*, 50 B.R. 460 (Bankr. N.D. Ind. 1985).  In that case, the court noted that no meetings took place between the debtor and the union, which would indicate that the debtor had not met the requirement of meeting at reasonable times to confer over the modifications.  *Id.* at 468.  However, the court noted the union's improper stance in the negotiations in that case, and stated that "the union's refusal to recognize or to meet with the attorney for the debtor reflected its lack of good faith in these proceedings."  *Id.*  In the other case cited by the IBEW and IAM, the debtor actually declined a request to meet with the representatives of a local union.  *See Horsehead Indus.*, 300 B.R. at 588. Neither case stands for the proposition that a debtor fails to satisfy the requirement to meet at reasonable times with the union if it is willing to meet with the union, but the union refuses to meet.

NY\1136395.7

*Bowen Enters., Inc. v. United Food & Commercial Workers Int'l Union (In re Bowen Enters., Inc.)*, 196 B.R. 734, 744 (Bankr. W.D. Pa. 1996) (internal citations omitted); *see also In re Kentucky Truck Sales, Inc.*, 52 B.R. 797, 801 (Bankr. W.D. Ky. 1985); *In re Texas Sheet Metals, Inc.*, 90 B.R. 260, 270 (Bankr. S.D. Tex. 1988) (finding that the good faith requirement was satisfied where "the debtor made every attempt to meet with both unions, and any reluctance to meet was on their part and not on the part of the debtor"). One court noted that a debtor's continued willingness to meet with the unions is evidence of the debtor's good faith. *See In re Sol-Sieff Produce Co.*, 82 B.R. 787, 795 (Bankr. W.D. Pa. 1988) (stating that "[t]his Court does not question the Debtor's good faith in these negotiations. Debtor has at all times been ready, willing, and able to negotiate these issues.").

36.     Courts will consider the amount of time that the parties have had to negotiate in determining whether the debtor engaged in good faith negotiations. *See Wheeling-Pittsburgh Steel*, 791 F.2d at 1093; *Colorado Iron Workers Pension Fund v. Sierra Steel Corp. (In re Sierra Steel Corp.)*, 88 B.R. 314, 315 (D. Colo. 1987). There is no rigid rule, however, establishing the amount of time the debtor must engage in pre-motion bargaining with the union to be considered to have bargained in good faith.

37.     As noted herein, the Debtors served each of the Unions with proposals in October and November 2005, and again in March 2006. The Committee reviewed the correspondence sent by the Debtors to each of the Unions summarizing the proposed modifications and attaching term sheets describing the proposed modifications to each collective bargaining agreement. Based on the Debtors' representations in the Declarations and the letters from the Debtors to the Unions that are in the virtual data room, it appears to the Committee that the Debtors made some

19

effort to meet with the Unions regarding the proposals and to solicit counterproposals. Thus, it appears that the Debtors have met this requirement.

### H.    Whether the Unions Have Refused to Accept the Proposals Without Good Cause

38.    The requirement that a union must have rejected the debtor's proposals without good cause is "intended to ensure that a continuing process of good faith negotiations will take place before court involvement." *Royal Composing Room*, 62 B.R. at 406. In evaluating whether a union has rejected a debtor's proposals without good cause, courts look at what bargaining occurred in connection with the debtor's proposals and the union's reasons for rejecting those proposals.

39.    The Second Circuit has noted that "[w]hat 'good cause' means is difficult to answer in the abstract apart from the moorings of a given case." *Maxwell Newspapers*, 981 F.2d at 90. Specifically, the Second Circuit stated that

> a union will not have good cause to reject an employer's proposal that contains *only* those modifications essential for the debtor's reorganization, that is, the union's refusal to accept it will be held to be without good cause. On the other hand, as we have noted, where the union makes compromise proposals during the negotiating process that meet its needs while preserving the debtor's savings, its rejection of the debtor's proposal would be with good cause.

*Id.* (citing *Royal Composing Room*, 848 F.2d at 349). Another court noted that

> in order to approve an application for rejection, it is not necessary to find that a Union has rejected the debtor's proposal in "bad faith" or for some contrary motive. In fact, the Union may often have a principled reason for deciding to reject the debtor's proposal and which may, when viewed subjectively and from the standpoint of its self-interest, be a perfectly good reason. However, the court must review the Union's rejection utilizing an objective standard which narrowly construes the phrase "without good cause" in light of the main purpose of Chapter 11, namely reorganization of financially distressed businesses.

NY\1136395.7

*In re Salt Creek Freightways*, 47 B.R. 835, 840-41 (Bankr. D. Wyo. 1985) (stating that "the

Union rejected the debtor's proposal in its entirety due to a policy determination that the Union

could not negotiate away the pension benefits or its affiliation with the National Master Freight

Agreement.  Although this is certainly not an unreasoned basis for rejection of the debtor's

proposal, it does not constitute 'good cause' within the meaning of § 1113(c)(2)").

40.     If the union fails to negotiate in good faith with the debtor, the bankruptcy court

will hold that the union has rejected the debtor's proposals without good cause.  *See Carey*

*Transp.*, 816 F.2d at 92.  The union also will be found not to have good cause to reject the

debtor's proposals if the union refuses to meet with the debtor or meets for a few hours only.  *Id.*;

*see also Sheet Metal Workers' Int'l Ass'n v. Mile Hi Metal Sys., Inc. (In re Mile Hi Metal Sys.,*

*Inc.)*, 899 F.2d 887, 892 n.6 (10th Cir. 1990) (stating that "[a]t the very least, a union's lack of

participation [in negotiations] should be considered when the court decides whether the union

had good cause to reject the proposal") (citing *Carey Transp.*, 816 F.2d at 92).  Thus, although a

debtor bears the ultimate burden of persuading the bankruptcy court that the union lacked good

cause for refusing the proposed modifications, the union must come forward with evidence of

> its reasons for declining to accept the debtor's proposal in whole or
> part.  If prehearing, a union has assigned no reason for its refusal to
> accept a debtor's proposal, it has perforce refused to accept the
> proposal without good cause under Code §1113(c)(2).

*Royal Composing Room*, 62 B.R. at 407.

41.     In their objections, the Unions have argued that they rejected the Debtors'

proposals with good cause.  It is uncontroverted that the Unions have rejected the Debtors'

proposals categorically and have not provided any counteroffers.  Moreover, it appears that

(other than negotiations relating to voluntary attrition programs) the Unions did not participate in

any significant negotiations with the Debtors.  This Court may take these facts into account in determining whether the Unions rejected the proposals without good cause.

I.       **Whether the Balance of the Equities Favors Rejection of the Collective Bargaining Agreements**

42.       This Court must consider the balance of the equities and determine if it weighs in favor of rejection of the collective bargaining agreements.  The Second Circuit has articulated six factors that a bankruptcy court should consider in balancing the equities: (a) the likelihood and consequences of liquidation if rejection is not permitted; (b) the likely reduction in the value of the creditors' claims if the bargaining agreement remains in force; (c) the likelihood and consequences of a strike if the bargaining agreement is voided; (d) the possibility and likely effect of any employee claims for breach of contract if rejection is approved; (e) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry and (f) the good or bad faith of the parties in dealing with the debtor's financial dilemma.  *Carey Transp.*, 816 F.2d at 93.

43.       Courts in the Second Circuit have found that the balance of the equities clearly favored rejection of collective bargaining agreements in the following cases:

- Where "unionized labor costs were approximately 60% above the industry average, . . . 66% of [the debtor's] employees are unionized, . . . managers, supervisors, and non-union workers were receiving less than average compensation while taking on increased workloads, . . . projected losses . . . made liquidation a very real threat," and the unrefuted evidence indicated that the unsecured creditors and shareholders of the debtor would receive little or nothing if the debtor could not reorganize and was forced into liquidation.  *Carey Transp.*, 816 F.2d at 93.

- Where, because of the tremendous costs of assuming the lifetime job guarantees and because none of the prospective purchasers was willing to assume them, the court was "left with the conclusion that no one would fund the Daily News absent a rejection."  The court was "also convinced

that no one would agree to purchase it, even for a drastically reduced price, before it has to cease operations.  In short, without the relief sought, the Debtor is doomed and chapter 7 looms large.  Although the loss of jobs will be painful, the equities tip decidedly in favor of the rejection." *In re Maxwell Newspapers, Inc.*, 146 B.R. 920, 934 (Bankr. S.D.N.Y. 1992), *aff'd in part and rev'd in part on other grounds*, 149 B.R. 334 (S.D.N.Y. 1992), *aff'd in part and rev'd in part on other grounds*, 981 F.2d 85 (2d Cir. 1992).

- Where "it is apparent that a debtor is in need of substantial relief under a union contract and the bargaining process has failed to produce any results and is unlikely to produce results in the foreseeable future.  Bluntly stated, a stonewall by the union favors the grant of the debtor's motion for rejection. . . . In this case, the court finds the Union's posture was essentially a stonewall." *Royal Composing Room*, 62 B.R. at 408.

- Where: (a) the debtors had to cut their labor costs to avoid immediate shut-down and liquidation; (b) shut-down was likely to occur absent rejection; (c) the debtors' proposals reflected the last means of reducing costs significantly and called for equal sacrifices from each of the unions; (d) though the union threatened to strike if the collective bargaining agreements were rejected, a strike was an inherent risk in every motion to reject a collective bargaining agreement and (e) any employee damage claims resulting from rejection would be relegated to the status of unsecured debt. *Horsehead Indus.*, 300 B.R. at 587-88.

44.     The court in *Royal Composing Room* further noted that the balance of equities

> nearly always will tip in favor of the party that seeks to reach a compromise and to that end negotiates in good faith.  This is particularly true where, as here, the debtor not only seeks to negotiate in good faith, but also has adopted numerous cost-saving measures to try to improve the situation before declaring bankruptcy and seeking concessions from the union.

*Royal Composing Room*, 848 F.2d at 349.  If a union refuses to participate in negotiations, such

refusal would be considered when the court determines whether the balance of equities favors

rejection of the collective bargaining agreement.  *See Mile Hi Metal Sys.*, 899 F.2d at 892.

45.     On balance, the Committee believes that the balance of the equities supports the

relief sought by the Debtors.  First, without the modifications sought in the proposals, the

Debtors face significant losses over the next five years and might be in danger of liquidating.

Second, without these additional cost reductions (in addition to the cost reductions the Debtors are obtaining from other sources), the Debtors will not have a competitive cost structure and their ability to reorganize would be impaired.  Without the labor cost savings, therefore, the Debtors' net income and cash flow will be further reduced, which will in turn reduce potential recoveries to unsecured creditors.

46.     Third, the Committee believes, as no doubt most parties in interest believe, that a strike would deal a devastating blow to the Debtors' ability to survive and remain a viable entity. The Committee sincerely hopes that a strike never materializes.  However, at least one court has stated that the possibility of a strike should not control the decision of whether to approve a motion under section 1113 of the Bankruptcy Code.  *See, e.g.*, *Horsehead Indus.*, 300 B.R. at 587 (stating that "[a] strike is an inherent risk in every § 1113 motion, and in the end, it makes little difference if the Debtors are forced out of business because of a union strike or the continuing obligation to pay union benefits to avoid one").

47.     Fourth, any claims of employees that may result from the rejection of the collective bargaining agreements are preferable to the risk that the Debtors will not be able to successfully reorganize.  Such claims, moreover, would constitute unsecured claims that would not receive a 100% recovery.  *See id.* at 587-88.  Any claims for reduced wages would be relatively modest, because the current collective bargaining agreements expire late next year. Moreover, UAW, IUE or USW-represented employees would most likely not assert claims against the Debtors relating to reduced OPEB because GM is obligated to pay for such OPEB under the benefit guarantees.  In addition, any claims by employees represented by other unions relating to reduced OPEB would only be calculated to the expiration date of the current collective bargaining agreements between Delphi and those unions.  *See, e.g.*, *Century Brass*

NY\1136395.7

*Prods. v. UAW (In re Century Brass Prods.)*, 795 F.2d 265, 269 n.2 (2d Cir. 1986) ("Whether retirees' insurance benefits extend beyond the term of a [CBA] is determined by reference to the terms of the contract and the parties' intent.") (citing *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983)); *cert. denied*, 479 U.S. 949 (1986).  Finally, if rejection of the collective bargaining agreements results in claims by employees for damages, section 502(b)(7) of the Bankruptcy Code may cap the amount of certain components of that claim.

48.     Fifth, as noted herein, the Debtors' cost-cutting measures have been spread among various constituencies, including salaried employees, whose benefit packages and salaries have been reduced to more competitive levels and who will be subject to further reductions in the future.  Furthermore, information provided by the Debtors indicates that their hourly employees currently are receiving wages and benefits significantly in excess of competitive industry levels.

49.     Finally, the Debtors note that they have dealt with their poor financial condition in good faith.  For example, the Debtors have undertaken a substantial project designed to reduce their SG&A costs by nearly half a billion dollars per year, which, when combined with other cost-saving efforts, will result in the elimination of approximately 44% of their salaried and management workforce.  Moreover, the Debtors represent that they attempted in good faith to negotiate collective bargaining agreement modifications with the Unions and diligently responded to the Unions' information requests.

## II.     Any Participation by GM in a Settlement of the Motion in the Future Should Not Create Allowed Claims in its Favor or Immunize it From Claims That May Be Asserted Against it

50.     GM has made it clear that, other than the UAW-GM-Delphi attrition program, it has not agreed to provide any financial support to the Debtors in connection with their labor obligations.  *See* GM's Preliminary Response, docket no. 3317.  The Committee wishes to

NY\1136395.7

emphasize that even if GM experiences a "change of heart" and decides to participate in an amicable settlement of the Motion, whether by providing direct financial support to the Debtors or otherwise, such participation should not create any allowed new prepetition or postpetition claims against the Debtors. Such participation also should not insulate GM's existing claims from future challenge by any party in interest on any ground, nor should it immunize GM from any claims that the Debtors or the Committee may affirmatively assert against it.

51.     Since Delphi was spun off from GM in 1999, GM has exercised a large degree of control over the Debtors for the benefit of itself and its stakeholders, to the detriment of the Debtors' creditors. The Debtors' above-market labor agreements are one example of this. As the declarations filed in support of the Motion indicate, shortly after the spinoff, GM and the UAW required Delphi to enter into an agreement, known as the Mirror Agreement, pursuant to which Delphi committed to enter into a collective bargaining agreement in 2003 that "mirrored" the terms of the GM/UAW collective bargaining agreement, even though Delphi could not afford to do so.

52.     The Declarations that the Debtors filed in support of the Motion are replete with evidence that GM's actions both during and after the spinoff caused the Debtors' current financial situation and their unfortunate, but very real, need for relief under sections 1113 and 1114 of the Bankruptcy Code. In the Motion and various Declarations, the Debtors recount how the terms of their collective bargaining agreements were forced on them by GM for its own benefit and how these above-market agreements contributed to the Debtors' failure to achieve their major business post-spinoff goals. Outside the labor context, the Committee has learned that GM has engaged in a continuing course of conduct that has significantly harmed the Debtors. The Committee believes that the Debtors' estates have substantial affirmative claims

NY\1136395.7

against GM and have strong defenses to GM's claims based on this conduct.[12]  For these and other reasons, the Committee believes that GM is a substantial cause of why the Debtors are now left in a financial situation in which they have no choice but to drastically reduce labor costs.

53.      The Court does not need to rule on the merits of the Committee's position on the issue of GM's culpability now, but the Committee respectfully asserts that all affirmative claims and defenses of the Debtors' estates against GM should be preserved.  Any future financial support by GM with respect to the Debtors' labor obligations must not form the basis of an allowed prepetition or postpetition claim in favor of GM.  Any financial support should be viewed as GM fulfilling some of its present obligations to the Debtors and their employees, and should not be the basis of any reward.

## **CONCLUSION**

54.      The Committee prefers a consensual resolution of these difficult issues.  Absent such a consensual resolution, however, the Committee believes the Debtors have demonstrated entitlement to authorization to reject their collective bargaining agreements and Section 1114 obligations.  Accordingly, the Committee supports the Motion.  However, as noted above, if GM does decide to participate in a settlement of this Motion, whether by providing financial support to the Debtors or by some other way, such participation should not (a) entitle GM to claims against the Debtors that are immune from challenge by any party in interest for any reason or (b) entitle GM to immunity from any claims the Debtors or the Committee may assert against it.

---

[12]      In addition to GM, the UAW benefited significantly from the "Mirror Agreement." As noted in footnote 2, *supra*, the UAW now seeks to silence the Committee with respect to the Motion, and presumably, any settlement of it. Tellingly, the UAW Motion specifically states that even though the Committee should be silenced, GM should be heard on the Motion.  A scenario in which GM and the UAW can reach an agreement regarding the Motion that will affect GM's obligations to the estates without unsecured creditors first having a meaningful opportunity to receive full value for the estates' rights against GM must be avoided.

NY\1136395.7

**WHEREFORE,** for all the foregoing reasons, the Committee respectfully requests that this Court (a) grant the Motion and (b) grant the Committee such other relief as is just and proper.

Dated: May 1, 2006
        New York, New York

**LATHAM & WATKINS LLP**

By: /s/ Robert J. Rosenberg
    Robert J. Rosenberg (RR-9585)
    Mitchell A. Seider (MS-4321)
    Mark A. Broude (MB-1902)
    885 Third Avenue, Suite 1000
    New York, New York 10022
    Telephone:  (212) 906-1200

Attorneys for the Official Committee
of Unsecured Creditors

NY\1136395.7