**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

In re                                          :    **Chapter 11**
                                               :
**DELPHI CORPORATION.,**                       :    **Case No. 05-44481 (RDD)**
        <u>et al.</u>,                         :
                                               :    **Jointly Administered**
                            **Debtors.**        :
---------------------------------------------------------- x

## FIRST INTERIM APPLICATION OF ROTHSCHILD INC. FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

Name of Applicant:                             Rothschild Inc.

Authorized to Provide Professional Services to:    DELPHI CORPORATION, et al.

Date of Retention:                             As of October 8, 2005

Period for which compensation and reimbursement are sought:    October 8, 2005 – January 31, 2006

Amount of compensation sought as actual, reasonable, and necessary:    $943,548.39

Amount of expense reimbursement sought as actual, reasonable, and necessary:    $88,346.27

This is a(n):    _____ Monthly    _X_ Interim    _____ Final Application

If this is not the first application filed, disclose the following for prior application:

| Date Filed | Period Covered | Requested Fees | Requested Expenses | Approved Fees | Approved Expenses |
|------------|----------------|----------------|--------------------|---------------|-------------------|
| NA | NA | NA | NA | NA | NA |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **DELPHI CORPORATION,** | : | **Case No. 05-44481 (RDD)** |
| <u>et al.</u>, | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |

------------------------------------------------------------ x

## FIRST INTERIM APPLICATION OF ROTHSCHILD INC. FOR <u>COMPENSATION AND REIMBURSEMENT OF EXPENSES</u>

Rothschild Inc. ("<u>Rothschild</u>"), financial advisor and investment banker for Delphi

Corporation ("<u>Delphi</u>" or the "<u>Company</u>"), together its affiliated debtors and debtors-in-

possession (collectively, the "<u>Debtors</u>" or the "<u>Company</u>"), makes this first interim application

for compensation and reimbursement of expenses, and in support thereof respectfully represents:

1. This application is made pursuant to (<u>i</u>) Sections 330 and 331 of Title 11 of the

United States Code (the "<u>Bankruptcy Code</u>"), (<u>ii</u>) Rules 2014 and 2016 of the Federal Rules of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), (<u>iii</u>) Administrative Order M-150, Amended

Guidelines for Fees and Disbursements for Professionals in Southern District of New York

Bankruptcy Cases (the "<u>Amended Guidelines</u>"), (<u>iv</u>) the Order of this Court, dated November 4,

2005 (the "<u>Fee Order</u>"), Establishing Procedures for Monthly Compensation and

Reimbursement of Expenses of Chapter 11 Professionals, (<u>v</u>) the Order of this Court, dated

October 14, 2005 (the "<u>Interim Retention Order</u>"), Authorizing Retention of Rothschild Inc. as

Investment Banker and Financial Advisor for the Debtors, <u>nunc</u> <u>pro</u> <u>tunc</u> to October 8, 2005, the

commencement of the Debtors' cases, and (<u>vi</u>) the Order of this Court, dated November 30 ,

2005 (the "<u>Final Retention Order</u>, and together with the Interim Retention Order, the <u>Retention</u>

Orders"), Authorizing Retention of Rothschild Inc. as Investment Banker and Financial Advisor

for the Debtors.  Copies of the Retention Orders are attached hereto as Exhibit A.

## BACKGROUND

2.  On October 8, 2005 (the "Filing Date"), 39 of 42 Debtors, and on October 14, 2005,

the remaining Debtors, filed voluntary petitions in this Court under Chapter 11 of the

Bankruptcy Code.  The Debtors are authorized to operate their business and manage their

properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

3.  With more than 180,000 employees worldwide, global 2004 revenues of

approximately $28.6 billion, and global assets as of August 31, 2005 of approximately

$17.1billion,[1] Delphi ranks as the fifth largest public company business reorganization in terms

of revenues, and the thirteenth largest public company business reorganization in terms of

assets. Delphi's non-U.S. subsidiaries are not Chapter 11 debtors, will continue their business

operations without supervision from the Bankruptcy Court, and will not be subject to the

Chapter 11 requirements of the U.S. Bankruptcy Code.

4.  Over the past century, the operations which are now owned by Delphi have become a

leading global technology innovator with significant engineering resources and technical

competencies in a variety of disciplines. Today, the Company is arguably the single largest

global supplier of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology. The Company's technologies and products are present

in more than 75 million vehicles on the road worldwide. The Company supplies products to

---

[1] The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

nearly every major global automotive original equipment manufacturer ("OEM") with 2004

sales to its former parent, General Motors Corporation ("GM"), equaling approximately $15.4

billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan

Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

5.  As part of its growth strategy, Delphi has established an expansive global presence

with a network of manufacturing sites, technical centers, sales offices, and joint ventures located

in every major region of the world. In the U.S., the Debtors employ approximately 50,600

people. Those employees work in approximately 44 manufacturing sites and 13 technical centers

across the country, and in Delphi's worldwide headquarters and customer center located in Troy,

Michigan. Approximately 34,750 of these individuals are hourly employees, 96% of whom are

represented by approximately 49 different international and local unions. Outside the United

States, the Company's foreign entities employ more than 134,000 people, supporting 120

manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

6.  In the first two years following Delphi's separation from GM, the Company

generated more than $2 billion in net income. Every year thereafter, however, with the exception

of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net

operating loss of $482 million on $28.6 billion in net sales. Reflective of a downturn in the

marketplace, Delphi's financial condition has deteriorated further in the first six months of 2005.

The Company experienced net operating losses of $608 million for the first six months of

calendar year 2005 on six-month net sales of $13.9 billion, which is approximately $1 billion

less in sales than during the same time period in calendar year 2004.[2]

---

[2] Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related
to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

7. The Debtors believe that three significant issues have largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

8. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Having concluded that pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these Chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

## RETENTION OF ROTHSCHILD

9. By letter agreement dated May 1, 2005 and amended as of October 8, 2005 (and as may be further amended, modified or supplemented from time to time, including by the Retention Orders, the "Engagement Letter"), the Debtors retained Rothschild to assist the Debtors with a possible restructuring. A copy of the Engagement Letter is attached hereto as Exhibit B.

10. Rothschild understands the Debtors chose to retain Rothschild due to Rothschild's reputation as a leading investment banking firm and financial advisor and its substantial

experience advising debtors, creditors' committees and other parties in interest in connection

with all aspects of the financial restructuring and Chapter 11 cases, including financial advice

regarding mergers, acquisitions, divestitures, public and private financings and spin-offs and

evaluation of assets and liabilities, formulation and negotiation of plans of reorganization and

the restructuring of indebtedness.

11. Rothschild respectfully refers this Court to the Engagement Letter for a full

recitation of its terms. In summary, Rothschild was retained by the Debtors to:

(a) to the extent deemed desirable by the Debtors, identify and/or initiate
potential Transactions (as defined in the Engagement Letter) or other transactions;

(b) to the extent Rothschild deems necessary, appropriate and feasible, or as the
Debtors may request, review and analyze the Debtors' assets and the operating and
financial strategies of the Debtors;

(c) assist the Company in developing and evaluating strategic alternatives with
respect to the Company's legacy liabilities;

(d) review and analyze the business plans and financial projections prepared by
the Debtors including, but not limited to, testing assumptions and comparing those
assumptions to historical Company and industry trends;

(e) evaluate the Debtors' debt capacity in light of their projected cash flows and
assist in the determination of an appropriate capital structure for the Debtors;

(f) assist the Debtors and their other professionals in reviewing the terms of any
proposed Transaction or other transaction, in responding thereto and, if directed, in
evaluating alternative proposals for a Transaction or other transaction, whether in
connection with a Plan (as defined in the Engagement Letter) or otherwise;

(g) determine a range of values for the Debtors and any securities that the Debtors
offer or propose to offer in connection with a Transaction or other transaction;

(h) advise the Debtors on the risks and benefits of considering a Transaction or
other transaction with respect to the Debtors' intermediate and long-term business
prospects and strategic alternatives to maximize the business enterprise value of the
Debtors, whether pursuant to a Plan or otherwise;

(i) review and analyze any proposals the Debtors receive from third parties in
connection with a Transaction or other transaction, including, without limitation, any

proposals for debtor-in-possession financing, as appropriate;

(j) assist or participate in negotiations with the parties in interest, including, without limitation, any current or prospective creditors of, holders of equity in, or claimants against the Debtors and/or their respective representatives in connection with a Transaction or other transaction;

(k) advise and attend meetings of the Debtors' Board of Directors, creditor groups, official constituencies and other interested parties, as necessary;

(l) participate in hearings before the Bankruptcy Court (the "Bankruptcy Court") and provide relevant testimony with respect to the matters described in the Engagement Letter and issues arising in connection with any proposed Plan;

(m) assist the Debtors' internal and external counsel to enable such counsel to provide legal advice to the Debtors; and

(n) render such other financial advisory and investment banking services as may be agreed upon by Rothschild and the Debtors in connection with any of the foregoing.

## COMPENSATION

12. Pursuant to the Engagement Letter, as amended by and as more fully set forth in the Final Retention Order, in consideration for the services provided to the Debtors, the Debtors have agreed to pay Rothschild the following amounts, pursuant to Section 328 of the Bankruptcy Code, and subject to the final approval of the Bankruptcy Court:

(a) A retainer (the "Retainer") in an amount equal to the Monthly Fee (as defined below), to be applied against the fees and expenses of Rothschild under the Rothschild Agreement.

(b) Commencing as of the date of the Engagement Letter, and whether or not a Transaction is proposed or consummated, a cash advisory fee (the "Monthly Fee") of $250,000 per month. The Monthly Fee shall be payable by the Company in advance on the first day of each month.

(c) a fee (the "Completion Fee") of $15,000,000, due and payable in cash upon the earlier of (i) the confirmation and effectiveness of a Plan or (ii) the closing of another Transaction; provided, that Rothschild shall credit against the Completion Fee: (X) 50% of the M&A Fee (as defined below); (Y) 50% of the New Capital Fees (as defined below) and (Z) to the extent not otherwise applied against the fees and expenses of Rothschild under the terms of the Rothschild Agreement, the Retainer; provided that the sum of such credits shall not exceed the Completion Fee.

(d) In the case of any M&A Transaction for which Rothschild is designated by the Company as the Company's primary advisor and investment banker, and which does not arise out of a Transaction for which a Completion Fee is due, a fee (the "M&A Fee") (as defined in the Engagement Letter).

(e) A new capital fee (the "New Capital Fee") equal to (i) 1.0% of any senior secured debt raised; (ii) 3.0% of the face amount of any junior secured or senior or subordinated unsecured debt (including any convertible debt) raised and (iii) 5.0% of any equity or hybrid capital raised (each a "New Capital Raise"), in each case, in which Rothschild is designated by the Company as the Company's primary advisor and investment banker. The New Capital Fee shall be due and payable in cash at the closing of any New Capital Raise; provided, that no New Capital Fee shall become payable in respect of any new capital raised (x) with respect to any debtor-in-possession financing arrangements; (y) from an entity not otherwise participating in or having expressed an interest in participating in a Transaction; or (z) from an Acquirer or an entity having expressed an interest in becoming an Acquirer in connection with the consummation of a Transaction which is intended to occur simultaneously with or within a reasonable period after the closing of such New Capital Raise.

(f) To the extent the Company requests Rothschild to perform additional services not contemplated by the Rothschild Agreement, such additional fees as shall be mutually agreed upon by Rothschild and the Company, in writing, in advance.

13. Pursuant to the Engagement Letter and the Final Retention Order, the Debtors will reimburse Rothschild for reasonable out-of-pocket expenses incurred in connection with the provision of services under the Engagement Letter, including without limitation the reasonable fees, disbursements and other charges of Rothschild's outside counsel. Out-of-pocket expenses shall also include, but not be limited to, reasonable expenses incurred in connection with travel and lodging, data processing and communication charges, research and courier services.[3]

14. Pursuant to the terms of the Final Retention Order and the Fee Order, Rothschild has submitted monthly statements of fees and disbursements to (i) the Debtors, (ii) counsel to the Debtors, (iii) counsel for the official committee of unsecured creditors, (iv) the Office of the United States Trustee, (v) counsel for the agent under the Debtors' prepetition credit facility,

---

[3] As of the Petition Date, Rothschild had accrued unpaid expenses of $40,307.56 which was offset against the Retainer

(vi) counsel for the agent under the Debtors' post-petition credit facility and (vii) the members

of any Committee appointed in these cases for the purpose of reviewing fees and expenses.

Pursuant to the Fee Order, Rothschild has been paid, or anticipates that it will be paid, 80% of

the fees and 100% of the expenses identified in each monthly statement to which no objection

has been served. The monthly fee statements delivered by Rothschild, and amounts received in

respect thereof, are summarized in the following table:

| Statement Period | Statement Amount | | Payments Received | |
|---|---|---|---|---|
| | Fees | Expenses[4] | Fees | Expenses |
| Oct. 2005 | $193,548.39 | $13,888.45 | $154,838.71 | $13,888.45 |
| Nov. 2005 | $250,000.00 | $13,888.45 | $200,000.00 | $13,888.45 |
| Dec. 2005 | $250,000.00 | $20,261.81 | $200,000.00 | $20,261.81 |
| Jan. 2006 | $250,000.00 | $40,307.56 | $200,000.00 | $40,307.56 |

### RELIEF REQUESTED

15.  By this Application, Rothschild seeks an Order (i) granting interim allowance and

approval of compensation for services rendered during the period October 8, 2005 through and

including January 31, 2006 (the "Relevant Period"), consisting of $943,548.39 of fees plus the

reimbursement of reasonable and necessary expenses incurred by Rothschild during the

Relevant Period in the amount of $88,346.27, for a total of $1,031,894.66, (ii) authorizing and

directing the Debtors to make payment in respect of 100% of such fees, to the extent not yet

received by Rothschild for the Relevant Period, including, without limitation, the 20% holdback

---

[4] October and November monthly fee statements were filed together pursuant to the Fee Order, thus for illustrative purposes in this table expenses were evenly distributed

amount withheld pursuant to the terms of the Fee Order[5]; and (iii) authorizing and directing the

Debtors to pay 100% of such expenses, to the extent not yet received by Rothschild for the

Relevant Period.

16. All services for which compensation is sought were performed for and on behalf of

the Debtors.  Rothschild has not entered into any agreement, express or implied, with any party

in interest for the purpose of fixing or sharing fees or other compensation to be paid for

professional services rendered in these cases

17. Annexed hereto as Exhibit C are invoices for the total compensation and expenses

sought by Rothschild for the Relevant Period and a breakdown of Rothschild's expenses

incurred during the Relevant Period.  Attached hereto as Exhibit D are daily time logs detailing

the activities and services performed by Rothschild on behalf of the Debtors during the Relevant

Period.  The resumes of key professionals of Rothschild providing services to the Debtors are

attached as Exhibit E.

## LEGAL BASIS FOR REQUESTED COMPENSATION

18. Rothschild is entitled to receive the fees it has requested in accordance with the

express terms of the Engagement Letter and the provisions of Section 328(a) of the Bankruptcy

Code.  Section 330 of the Bankruptcy Code provides for the award of compensation to

professionals.  *See* 11 U.S.C. § 330.  Section 330, by its terms, is "subject to" the provisions of

Section 328 of the Bankruptcy Code.  *Id.*  Section 328(a) permits a debtor, with the Court's

approval, to employ a professional person "on any reasonable terms and conditions of

---

[5] Pursuant to the Fee Order, 20% of the accrued fees have been held back from each monthly statement. In light of the fact that a substantial portion of Rothschild's fees consists of a completion fee and therefore by its very nature is substantially "back-ended" even without a holdback, Rothschild requests relief from the holdback in its monthly and interim fee statements. The Debtors support, and the Official Committee of Unsecured Creditors does not oppose Rothschild's request for this relief.

employment, including on a retainer, on an hourly basis, or on a contingent fee basis."
*See* 11 U.S.C. § 328(a).

19. Section 328 represents a departure from the practice that prevailed prior to the
enactment of the Bankruptcy Code in 1978. The purpose of Section 328 was to permit the pre-
approval of compensation arrangements as a method of insuring that the most competent
professionals would be available to provide services in bankruptcy cases. *See In re Westbrooks*,
202 B.R. 520, 521 (Bankr. N.D. Ala. 1996) (percentage fee arrangements "comport with the
Bankruptcy Code's goal of attracting highly qualified professionals to the bankruptcy forum");
*In re Olympia Holding Corp.*, 176 B.R. 962, 964 (Bankr. M.D. Fla. 1994).

20. Once the terms of a professional's retention have been approved under Section
328(a), the agreed-upon compensation cannot be altered unless the agreed terms "prove to have
been improvident in light of developments not capable of being anticipated at the time of the
fixing of such terms and conditions." 11 U.S.C. § 328(a); *see also In re Reimers*, 972 F.2d 1127,
1128 (9th Cir. 1992) (compensation agreement approved under Section 328(a) must be enforced
in the absence of unforeseeable circumstances, and is not subject to a "reasonableness" review
under Section 330); *In the Matter of National Gypsum Company*, 123 F.3d 861 (5th Cir. 1997)
(same); *In re Olympia Holding Corp.*, 176 B.R. at 964 (same). As the Court explained in
*National Gypsum*:

> If the most competent professionals are to be available for
> complicated capital restructuring and the development of
> successful corporate reorganization, they must know what they will
> receive for their expertise and commitment. Courts must protect
> those agreements and expectations, once found to be acceptable.

21. Pursuant to the Final Retention Order, this Court approved the retention of Rothschild under the terms of the Engagement Letter, subject to the standard of review provided under Section 328(a). *See* Final Retention Order at pages 2-3.

22. The compensation for services rendered during the Relevant Period has been earned and is due and payable in full under the terms of the Engagement Letter. Rothschild submits that there have been no developments since the entry of the Final Retention Order that were "not capable of being anticipated" and that would justify any modification to the terms of Rothschild's retention. Accordingly, Rothschild submits that the fees and expense reimbursements sought herein should be allowed and approved by this Court pursuant to Sections 328(a) and 330 of the Bankruptcy Code.

23. Senior level professionals with extensive experience in the area of investment banking and bankruptcy services have directed Rothschild's team. The investment banking services set forth above were performed primarily by David L. Resnick, Managing Director; William R. Shaw, Director; Nicole Torraco, Associate; Eric Irion, Analyst; and Michael Stein Analyst, as well as other professionals and paraprofessionals, as needed. Rothschild's general staffing policy is to assign senior bankers, experienced junior bankers and financial analysts to each restructuring assignment. The senior banker, in this case David L. Resnick, has overall responsibility for the case. He is primarily responsible for developing strategy with respect to the case, directing negotiations and interfacing with the other senior professionals involved with the case. The additional senior banker, in this case William Shaw, is responsible for day-to-day coordination of the case and the review of all financial analyses. The experienced junior banker, in this case Nicole Torraco, assists in the day-to-day coordination of the case and performs with the financial analysts, Eric Irion and Michael Stein, extensive financial analyses. The senior

11

bankers, the experienced junior banker and the financial analysts coordinate their actions so as to not duplicate efforts. Given that the senior bankers, the experienced junior banker and the financial analysts have different roles in the case but have overlapping responsibilities, there are frequent times where it is appropriate for two or more bankers to be present at a meeting.

24. The amount of fees and expenses sought in this application and Rothschild's billing processes are consistent with market practices for investment banking firms both in and out of a bankruptcy context. Rothschild's policy for all engagements, in or out of bankruptcy, is to dedicate the appropriate number of professionals to the assignment to complete the work as efficiently as possible.

25. Rothschild does not bill its clients based on the number of hours expended by its professionals. It bills clients on a retainer basis (generally monthly), plus a transaction fee or fees based upon completion. Accordingly, Rothschild does not have hourly rates for its professionals and Rothschild's professionals generally do not maintain time records for the work performed for its clients. Consistent with the terms of the Final Retention Order, however, Rothschild has maintained a daily time log detailing the activities and services performed by Rothschild on behalf of the Debtors, in half-hour increments, during the Relevant Period. A copy of these records is attached hereto as Exhibit D.

26. Given the size and complexity of this case, the complicated corporate and financial structure of the Debtors, the degree of activity during the Relevant Period and the high level of services rendered by Rothschild to the Debtors, Rothschild believes that the compensation sought is fair and reasonable.

## SUMMARY OF SERVICES RENDERED

27.  All services rendered by Rothschild during the Relevant Period were performed at the request or direction of the Debtors or legal professionals of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") or O'Melveny & Myers LLP ("O'Melveny"). Rothschild has provided a broad range of necessary financial advisory services. Major areas of effort performed during the Relevant Period can be summarized into the following general categories:

A.    Debtor-In-Possession Financing ("DIP Facility")

28.  Rothschild assisted the Company in obtaining the DIP Facility, including, but not limited to evaluating proposals received from several potential lead banks, assisting in the lender negotiations and reviewing draft credit agreements. Rothschild worked with the Company and FTI, an advisor to the Company, to monitor the Company's ability to satisfy the conditions and covenants of the DIP Facility.

B.    Preliminary Financial Analysis and Due Diligence Process

29.  Rothschild's initial due diligence involved numerous meetings and telephone calls with officers of the Debtors. The subjects reviewed included the reasonableness of the assumptions underlying the projections, the operating structure and historical financial results of the Debtors, financial reporting structure, legal and tax structure of the Debtors and their subsidiaries, both international and domestic, and numerous other matters.

30.  Rothschild reviewed detailed quarterly and annual operating data and forecasts as part of its continuing due diligence regarding the Debtors' long-term business prospects. Rothschild helped challenge and vet the assumptions underlying these projections, which required daily interaction with Company management and finance team.

252087v1

13

C.        Development of the "Steady State" Business Plan

31. Rothschild worked extensively with the Company's management and FTI to develop and review the Company's detailed and comprehensive operating and financial projections for years 2006 through 2010 (the "Steady State"). As part of the Steady State review, Rothschild assisted the Debtors in assessing different rationalization strategies for certain of the Company's product lines. Throughout the development of the Steady State, Rothschild's team members traveled on several occasions to Troy, Michigan to meet with various employees, including Finance, Treasury and Corporate M&A personnel. Rothschild also participated in each division's business review meetings with corporate management. The assumptions underlying the Steady State were developed to take into consideration the various external factors impacting the Company, its industry and its customers, and Rothschild assisted in vetting these assumptions and assessing them in light of industry competitors.

32. Rothschild worked with the Debtors and FTI to assess historical and projected financial information and assumptions from the divisions as the Debtors developed a consolidated financial model based on the Steady State (the "Steady State Model"). Rothschild performed due diligence on the Steady State and reviewed the Steady State under various sensitivities with the Company.

33. Rothschild assisted Company management in presenting the Steady State to the Debtors' various creditor constituencies, including the Unsecured Creditors Committee (the "UCC") (collectively, the "Creditors"). Copies of the Steady State and the Steady State Model back-up were provided to the Creditors and their advisors.

D.    Transformation Model

34. Rothschild developed a model (the "Transformation Model") that allowed the Company to analyze the impact of various transformation scenarios (i.e., product line winddowns, headcount changes, labor modifications, and other operational sensitivities) on the Company's underlying Steady State. The Transformation Model has been utilized to sensitize numerous variables including, but not limited to, revenue assumptions, SG&A savings initiatives, labor cost savings, and transformation costs. Rothschild used the Transformation Model to help Delphi assess labor modification scenarios, which resulted in the October labor proposal to the unions. The Transformation Model has subsequently been used by the Debtors and FTI to develop the revised business plan projections and transformation scenarios. Rothschild has assisted in analyzing and vetting various labor and transformation scenarios and working with the Company and FTI to develop and prepare presentations on such scenarios.

E.    Recapitalization Model

35. Rothschild developed a consolidated detailed recapitalization model (the "Recap Model") to analyze the projected financial results of the Steady State and the transformation scenarios under various capital structures. With this model, Rothschild analyzed numerous scenarios in conjunction with the ongoing negotiations among Delphi, General Motors ("GM"), and the unions, including assessment of GM and Delphi proposals regarding potential GM support. Major variables include, but are not limited to, the timing and amount of subsidies from GM, treatment of Delphi's legacy liabilities including OPEB and pension, emergence capital structures, and labor cost savings. Rothschild has updated its Recap Model and analysis for revised projections from the Debtors.

F.    Preliminary Valuation and Debt Capacity Analysis

36.  Rothschild has performed preliminary research and detailed analysis on valuation and operating metrics of selected automotive suppliers.  Rothschild has utilized these metrics to benchmark Delphi's operating performance against that of selected competitors.  Rothschild has also developed an analysis of historical precedent industry transactions to assess the associated valuation multiple statistics.  Rothschild continues to update and refine these analyses.

37.  Rothschild has also done preliminary work for use in developing a comprehensive debt capacity analysis by examining the credit statistics (both historical and current) of selected automotive suppliers and credit rating agency standards ("Debt Capacity Analysis") for assessing possible recapitalization alternatives on a preliminary basis.

G.    Creditor Due Diligence Process

38.  Rothschild assisted the Company in coordinating the extensive due diligence process ("Creditor Diligence Process") of Jefferies and Co. ("Jefferies"), as advisor to the Official Committee of Unsecured Creditors and Lazard Ltd. ("Lazard") as advisor to the UAW. The Creditor Diligence Process included sessions with each party to review, among other topics, the Debtors' operations, historical performance, work performed prior to filing for Chapter 11, the Steady State, including the various underlying sales, costs, balance sheet and cash flow assumptions, and preliminary transformation projections.  Rothschild also held sessions separately with each party to review the Transformation Model published in October 2005. Rothschild answered each of their follow-up questions regarding the model and its functionality, and coordinated and attended teleconference calls with the Debtors on the subject.

39. Rothschild coordinated and facilitated Company responses to numerous due diligence requests of each Jefferies and Lazard regarding operations, financial results, projections, labor cost structure, court motions and other topics. Throughout the period, Rothschild has had numerous discussions to answer questions, clarify requests and coordinate the process. Additionally, Rothschild professionals coordinated and participated with the Debtors in due diligence conference calls requested separately by Jefferies or Lazard throughout the Creditor Diligence Process.

## H.   Board Meetings & Discussions

40. Rothschild, along with Company management and Skadden, has met regularly with the Board to keep its members informed of all relevant developments in the Company's bankruptcy proceedings. Rothschild has participated in frequent conference calls and meetings with the Board and sought its members' input, direction and approval on all relevant matters.

## I.   Creditor Meetings & Discussions

41. Rothschild participated in meetings/calls with the Official Committee of Unsecured Creditors and its advisors to report on and respond to questions concerning the financial implications of current operating results, current liquidity, the Debtors' strategic business plan, the due diligence process and other matters concerning the Chapter 11 cases. Rothschild assisted in preparing detailed presentations and discussion materials.

## J.   Labor Analysis / Negotiations

42. Rothschild supported the Debtors' in their labor discussions with the unions. Specifically, Rothschild utilized the Transformation and Recap models to assess the impact of various labor proposals on the Company's projections, reviewed and helped prepare

presentations on these labor proposals. Rothschild participated in numerous regularly scheduled calls and meetings with Company management to review alternatives and assess next steps.

43. Rothschild worked with the Company as well as its labor counsel, O'Melveny, to review and comment on draft section 1113/ 1114 motions and to provide charts and other financial / industry data as needed.

44. Rothschild has also participated in discussions with Lazard regarding the current status and next steps of discussions between the Debtors and UAW.

K.    GM Analysis / Negotiations

45. Rothschild has worked extensively with the Company in its ongoing negotiations with General Motors ("GM") over potential consensual resolution and financial support. This work has encompassed numerous conference calls and in-person meetings in Detroit and New York on these matters. Rothschild has interfaced regularly with GM senior management as well as GM's financial advisors, Greenhill & Co., Inc. ("Greenhill"), and prepared a number of presentations on various alternatives for GM participation in Delphi's reorganization.

46. Rothschild has utilized its Recap Model to assess the financial impact of various scenarios involving potential support from GM. Rothschild has also participated in numerous calls with the Debtors, GM, and Greenhill to review topics such as Delphi's projections and assumptions, GM revenue contracts, Delphi's portfolio footprint and matters relating to these Chapter 11 cases.

L.    Miscellaneous

47. During the Relevant Period, Rothschild has advised the Debtors on a number of miscellaneous matters. Rothschild participates in regular conference calls and meetings with the

Debtors at the Company's headquarters to discuss the Debtors' Chapter 11 cases, financial

situation and various related issues.

48.  Rothschild coordinated and participated in weekly conference calls with officers of

the Debtors and other advisors to the Debtors to discuss current strategic and other issues

relating to the Chapter 11 process.

49.  Rothschild respectfully submits that the compensation requested for the Relevant

Period for services rendered by Rothschild to the Debtors is fully justified and reasonable based

on the following: (a) the degree of activity during the Relevant Period and the high level of

services rendered by Rothschild to the Debtors, (b) the complexity of the issues presented, (c)

the skills necessary to perform the investment banking services properly, (d) the preclusion of

other employment, (e) customary fees charged in non-bankruptcy situations for similar services

rendered, (f) time constraints required by the exigencies of the case and (g) the experience,

reputation and ability of the professionals rendering services.

50.  Rothschild respectfully submits that the services it has rendered to the Debtors have

been necessary and in the best interest of the Debtors and their estates and have furthered the

goals of all parties in interest.  Such services were substantial, highly professional and

instrumental to the Debtors' reorganization.  They were reasonable and necessary to the

Debtors' performance of their duties.

## EXPENSES INCURRED DURING THE RELEVANT PERIOD

51.  Rothschild incurred reasonable and necessary out-of-pocket expenses aggregating

$88,346.27 during the Relevant Period.  Details of the expenses incurred during the Relevant

Period are also provided in Exhibit C.  Rothschild submits that all such expenses were

necessarily incurred, are reasonable in amount and represent only the actual costs incurred.

52. Rothschild's charges for expenses to the Debtors are determined in the same manner as for clients in non-bankruptcy matters. Out-of-pocket expenses incurred by Rothschild are charged to a client if the expenses are incurred for the client or are otherwise necessary in connection with services rendered for such particular client. Rothschild does not factor general overhead expenses into disbursements charged to clients in connection with Chapter 11 cases. Rothschild has followed its general internal policies with respect to out-of-pocket expenses billed to the Debtors as set forth below, with any exceptions fully explained:

(a) Rothschild's general policy permits its employees to bill lunch or dinner meals to a client if the employee is required to provide services to the client during such mealtime due to extreme time constraints. Rothschild's employees are permitted to order meals in the office if Rothschild's employee is required to work after 8:00 p.m. on weekdays or more than five (5) consecutive hours on weekends or holidays. Meal expenses incurred during meetings which employees and other meeting participants are required to attend are billed at cost.

(b) Messengers and couriers are used by Rothschild to deliver hard copy documents relating to a client matter, which require receipt on an expedited basis; otherwise, Rothschild uses the regular postal system. Any charges for either messengers or couriers are billed to the client at cost.

(c) All airfare and other transportation charges incurred by Rothschild's employees directly in connection with services to the client are billed to client at cost.

(d) The research/database category consists of the cost of using databases (e.g., Securities Data Corporation, Thomson Financial, Factiva, etc.) to which Rothschild subscribes to search for and obtain information used in Rothschild's financial analyses. Rothschild pays the vendor's standard rate for such database services. In certain instances, Rothschild has determined that paying a flat annual or monthly fee for such services is less costly than contracting for such services on a per use basis. Such annual or monthly services are allocated to clients based on such clients' use of each service. The research category also consists of charges from outside services, which supply, for a fee, financial documents from regulatory agencies, which cannot be obtained from databases subscribed to by Rothschild.

(e) Rothschild bills photocopying charges at the rate of $.10 per page for black and white copies and $1.00 per page for color copies.

(f) With respect to local travel, Rothschild's general policy enables employees to travel by taxi or, in certain circumstances, by private car service, to and from meetings

while rendering services to a client on a client related matter, for which the client is charged. This policy is based on Rothschild's determination that travel by taxi or private car service is the most efficient use of a professional's time. Rothschild's employees are not permitted to charge personal commuting expenses to a client unless the employee is traveling after 8:00 p.m. and has been required to work late as a result of the time exigencies of that client's matters.

(g) Telephone expenses are charged based on Rothschild's actual cost of telephone charges with respect to client matters. Cellular phone charges are based on vendor's actual invoices.

(h) Word processing charges represent actual costs incurred by Rothschild's in-house vendor and actual cost of overtime secretarial support in connection with client matters

## CONCLUSION

53. The services summarized by this application and rendered by Rothschild to the Debtors during the Relevant Period were substantial, highly professional and instrumental to Debtors in furtherance of their restructuring efforts. Rothschild respectfully submits that the compensation requested by this application is reasonable in light of the nature and value of such services.

* * *

WHEREFORE, Rothschild respectfully requests that this Court enter an order (i) granting interim allowance and approval of compensation for services rendered during the Relevant Period, consisting of $943,548.39 of fees plus the reimbursement of reasonable and necessary expenses incurred by Rothschild during the Relevant Period in the amount of $88,346.27, for a total of $1,031,894.66, (ii) authorizing and directing the Debtors to make payment in respect of 100% of such fees, to the extent not yet received by Rothschild for the Relevant Period, including, without limitation, the 20% holdback amount withheld pursuant to the terms of the Fee Order; and (iii) authorizing and directing the Debtors to pay 100% of such expenses, to the extent not yet received by Rothschild for the Relevant Period, and (iv) granting such other and further relief as this court deems just and proper.

Dated: New York, New York
     April 28, 2006

               ROTHSCHILD INC.

               By: _____
                    William R. Shaw, Director

## CERTIFICATION

WILLIAM R. SHAW, under penalty of perjury, certifies and says:

1. I am a Director with the applicant firm, Rothschild Inc. ("Rothschild"), which firm maintains offices for providing financial advisory and investment banking services at 1251 Avenue of the Americas, New York, NY 10020. Rothschild has acted as financial advisor and investment banker to and rendered professional services on behalf of Delphi Corporation and its affiliated debtors and debtors in possession (the "Debtors").

2. This certification is submitted in support of Rothschild's First Interim Application for Compensation and Reimbursement of Expenses (the "Application"), pursuant to Rule 2016 of the Federal Rules of Bankruptcy Procedure and Administrative Order M-150, Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases (the "Amended Guidelines").

3. I hereby certify that:

(a) I have read the Application.

(b) To the best of my knowledge, information and belief formed after a reasonable inquiry, and except as specifically noted in this Certification and in the Application, the fees and disbursements sought in the Application fall within the Amended Guidelines and the guidelines promulgated by the Office of the United States Trustee applicable to the Application (the "UST Guidelines"), as modified by the order authorizing the retention of Rothschild in these cases and any other applicable administrative orders entered herein.

(c) The fees and disbursements sought are billed at rates and in accordance with practices customarily employed by Rothschild and generally accepted by Rothschild's clients.

(d) In providing a reimbursable service, Rothschild does not make a profit on that service, whether the service is performed by Rothschild in-house or through a third party.

4. Subject to the terms of applicable procedural orders of this Court and any order or orders of this Court approving the retention of Rothschild, this Application is being served upon this Court, the U.S. Trustee, the Debtor and counsel to the Creditors' Committee appointed in the Debtor's Chapter 11 case.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      April 28, 2006

                                  William R. Shaw

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------  x
In re                                                   :    Chapter 11
                                                        :
DELPHI CORPORATION,                                     :    Case No. 05-44481 (RDD)
         et al.,                                        :
                                                        :    Jointly Administered
                          Debtors.                      :
------------------------------------------------------  x
```

### ORDER GRANTING FIRST INTERIM APPLICATION OF ROTHSCHILD INC. AS FINANCIAL ADVISOR AND INVESTMENT BANKER FOR THE DEBTORS FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

Upon consideration of the First Interim Application (the "Application") of Rothschild

Inc. for Compensation and Reimbursement of Expenses, for the period from October 8, 2005

through and including January 31, 2006, filed by Rothschild Inc. ("Rothschild"); and due and

adequate notice of the Application having been given under the circumstances; and capitalized

terms used but not defined herein being used with their defined meanings as set forth in the

Application; and after due deliberation, and good and sufficient cause appearing therefore, it is

hereby

ORDERED, that the Application be, and it hereby is, granted in its entirety; and it is

further

ORDERED, that there shall be allowed to Rothschild, on an interim basis, (i)

compensation for its professional services rendered during the Relevant Period as investment

banker and financial advisor to the Debtors in the amount of $943,548.39 and (ii) reimbursement

of actual, reasonable and necessary expenses incurred during the Relevant Period in the amount

of $88,346.27; and it is further

ORDERED that any and all payments heretofore made to Rothschild pursuant to the

procedures set forth in the Fee Order in respect of Rothschild's fees and expense reimbursements

accrued during the Relevant Period are hereby ratified and confirmed on an interim basis; and it is further

ORDERED that the Debtors are authorized and directed to pay to Rothschild fees in the amount of $188,709.68, representing the fees held back pursuant to the terms of the Fee Order, and expense reimbursements in the amount of $0.00, representing the amount of fees and expenses allowed under this Order and not yet paid to Rothschild; and it is further

ORDERED, that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: New York, New York
       _____, 2006

                                             _____
                                             Hon. Robert D. Drain
                                             United States Bankruptcy Judge

21605023v2