UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| DELPHI CORPORATION, *et al.*, Debtors. | Case No. 05-44481 (RDD) (Jointly Administered) |

**DECLARATION AND EXPERT REPORT OF RAY MARSHALL IN SUPPORT OF THE OBJECTION OF INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKS OF AMERICA (UAW) TO DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. § 1113(c) AUTHORIZING REJECTION OF COLLECTIVE BARGAINING AGREEMENTS AND UNDER 11 U.S.C. § 1114(g) AUTHORIZING MODIFICATION OF RETIREE WELFARE BENEFITS**

I, F. Ray Marshall, under penalty of perjury and in lieu of affidavit as permitted under 28 U.S.C. § 1746, do declare and state as follows:

Qualifications

1. I hold the Audre and Bernard Rapoport Centennial Chair in Economics and Public Affairs at the University of Texas at Austin. From 1977 to 1981, I was Secretary of Labor of the United States and in that capacity was the President's chief advisor on labor matters, including responsibility for appointments to and oversight of the National Labor Relations Board, the National Mediation Board, the Federal Labor Relations Authority, and the Federal Mediation and Conciliation Service. My other duties included chairing the Collective Bargaining Committee and the Pension Benefit Guarantee Corporation; co-chair of the tripartite steel, automobile, and airline committees; the President's Pay Agent for federal employees; member of the Chrysler Loan Guarantee Board; trustee of the Social Security System; and member of the Economic Policy Group, the International Trade Committee, and the Domestic Policy Group.

2. I have done considerable research and writing on labor, industrial relations, economic policy, and competitive issues, and have served as a mediator and arbitrator in a variety of labor disputes (see resume, Attachment A).

3. After serving as Secretary of Labor I devoted considerable attention to economic competitiveness and globalization issues, including membership on the President's Committee on Labor Diplomacy; the Committee on the Future of Labor-Management Relations; the Competitiveness Policy Council's employment and training subcommittee; the National Center on Education and the Economy (chair); the Economic

Policy Council of the United Nations Association; the Institute for the Future (chair); the Bretton Woods Committee; and the National Skills Standard Board.

4. I have, in addition, served as a director of corporations that were undergoing or had undergone reorganization, including USX (US Steel and Marathon Oil); Republic Engineered Steel; and the Executive Life Insurance Company, now Aurora Life Insurance Company.

Assignment

5. I have been asked to discuss U.S. collective bargaining policy, with special emphasis on the government's role in collective bargaining and my personal experience with government efforts to strengthen collective bargaining. In addition to the citations included in this report, I have reviewed the principal court filings of Delphi and the UAW in connection with my preparation of this report.

Role of Government in Collective Bargaining

6. For several reasons, the United States and other advanced democratic countries have policies to promote collective bargaining. The equity reason is to provide employees the means to balance employers' power in the work place and the polity. In the National Labor Relations Act, Congress reasoned that it was unfair for the government to give employers significant power through corporate and other forms of business enterprise while preventing workers from organizing. A macroeconomic reason to promote collective bargaining is to enable workers to have the purchasing power to support themselves and their families and promote economic growth and stability. There are, however, also important political reasons to promote collective bargaining. Free and democratic workers' organizations are absolutely essential to free and democratic

societies. This is the reason that the promotion of free labor movements has been a fundamental part of U.S. foreign and domestic policy since World War II.

7. It also is well established that collective bargaining has important advantages as a rulemaking process. Collectively bargained rules balance the interests of employers and workers and therefore create a sense of ownership and commitment to the resulting agreements by both sides. Collectively bargained rules are more flexible than government regulations because they can be shaped to fit the realities in each work place and can be more easily changed by agreement between the parties. Government regulations, by contrast, ordinarily must be fairly uniform and therefore often are incompatible with work place realities. The regulatory process is therefore often ineffective unless adapted by collective bargaining to conditions in each work place. For example, occupational safety and health laws rely on regulations which often are incompatible with the specifics in each work place and rely too heavily on inspections which will never be as effective as continuous monitoring by workplace-specific labor-management safety and health committees. The regulatory process is therefore often greatly improved through collective bargaining.

8. Union involvement also can contribute significantly to the transformation of companies from noncompetitive to competitive enterprises. This is so because unions can overcome workers' resistance to change and protect their interests in the process. Worker participation also is important because employees have the workplace-specific knowledge and skills required to facilitate the process of change as well as the operation of transformed work places. Indeed, the presence of labor organizations encourages companies to compete mainly through improving value added (productivity and quality)

and not mainly by cutting wages. A high-value-added strategy is the only way companies can succeed in a high-wage country like the United States. Since high-value-added strategies are better for workers, communities, and countries, workers' organizations perform a useful public service by resisting low-wage competitiveness strategies.

9. Within the enterprise, the union role is most effective where the relationships between the parties are based on trust and cooperation. In general, however, productivity is higher in union than in non-union work places.[1]

10. The relationships between unions and management inherently combine cooperation to achieve common objectives and conflict over divergent interests. It clearly is in the interests of the parties and the public to encourage cooperation and minimize conflict. This is particularly true of companies undergoing reconstruction, where long work stoppages can be disastrous to all sides. A case in point is U.S. Steel (where I served as a director), where degenerating relations led to a six-month strike in 1986 which, according to US Steel chairman Tom Usher, nobody won. After the strike, however, union-management cooperation enabled the parties to make US Steel "the lowest-cost steel in the world..."[2]

11. In a current example, American Airlines and AMR Corporation's chief executive, Gerard Arpey, has made American Airlines competitive by cooperating with the union and avoiding bankruptcy. According to Arpey, "'Bankruptcy, by definition

---

[1] See Sandra Black and Lisa Lynch, "Human Capital Investments and Productivity," *American Economic Review* 86:2 (1996): 263-67; Richard Freeman and James Medoff, *What Do Unions Do?* (New York: Basic Books, 1984).
[2] Thomas J. Usher, "Restoring Broadly Shared Prosperity: A Business Perspective," in Ray Marshall (ed.), *Back to Shared Prosperity* (Armonk: NY: ME Sharpe, 2000), p. 355.

really puts the problem in the hands of somebody else.'"[3] Arpey's intent is to "'ingrain into the fabric of this company that to be successful we have to work together (with unions) or we will fail ultimately.'"[4] Arpey believes bankruptcy would damage employee relations and make eventual success unlikely. "Bankruptcy court wrecked other airlines' labor relations by forcing concessions down workers' throats."[5] At American, managers and employees have worked closely together to reduce costs and improve productivity. Moreover, union leaders "sit in on monthly meetings with management to review company financials and brainstorm."[6] In three years under Arpey's leadership, "...productivity has risen about 20%, expenses per seat-mile excluding fuel have dropped by about the same amount, and the airline has raised its cash reserves substantially to $4.3 billion at the end of [2005]...Investors have applauded. AMR's share price has risen seven-fold, far more than any other major carrier...."[7]

12. The USS, AMR and many other examples demonstrate the value of encouraging collective bargaining and union-management cooperation as ways to make companies competitive in the United States through value added instead of through wage cutting alone—which is a losing strategy in a high-wage country. Wage-cutting strategies might help companies on their way to low-wage countries, but they are not in the best interest of workers or communities in high-wage countries like the United States.

13. The value of collective bargaining in free market democratic countries causes governments to be extremely reluctant to interfere with the collective bargaining process.

---

[3] Quoted by Melanie Trottman, "Airline CEO's Novel Strategy: No Bankruptcy," *Wall Street Journal*, April 17, 2006, p. B-1.
[4] Ibid.
[5] Ibid. B-1-4.
[6] Ibid.
[7] Ibid.

It is well established that government interference will cause bargaining to break down if either party believes it can gain more from the government or the courts than from the other party.

14. There are various ways the government can intervene to strengthen collective bargaining while protecting the public interest, including:

1. Mediation and alternative dispute resolution, especially in work stoppages that inflict unacceptable damage on the public. In all of these interventions mediators attempt to get the parties to resolve their problems through clarifying the issues or providing better information to all sides. Mediation tends to focus the parties' attention on their common interests instead of those that divide them. But effective mediators are careful not to substitute their judgment for the parties'.
2. Sometimes governments can facilitate the collective bargaining process by using their regulatory processes to help overcome divisive issues that cannot be solved very effectively by the parties alone. An example in my experience was the 1977-78 national coal strike, which I mediated. The government became involved in this strike only because faulty analyses suggested that the continuation of the strike would cause unacceptable damage to the public interest. It turned out that the damage to the national economy was greatly exaggerated because of assumptions based on coal's importance to the economy in the 1950s and 1960s. As we expected, the government's intervention caused the parties to be less willing to resolve their own differences, prolonging the strike.

There was, however, a legitimate governmental interest in this conflict because an important issue in the strike was mine safety, which had led to a series of wildcat strikes during the 1970s. Since this issue could not be resolved entirely by collective bargaining, we helped the parties settle the strike by promising to strengthen the Mine Safety and Health Administration, which was transferred to the Labor Department from the Department of the Interior. We also created the President's Commission on Coal, chaired by then-West Virginia governor (later U.S. senator) Jay Rockefeller, to take a strategic look at the coal industry.[8] The coal experience also led us to create a group within my office to do strike impact studies in advance of important negotiations. These assessments helped prevent future precipitous government involvement in collective bargaining.

3. The government also can strengthen collective bargaining by helping industries better understand their competitive situations through tripartite (government, business, labor) industry committees, which were most active in the steel, automobile, and airline industries. These committees, which I co-chaired with other relevant cabinet officers, started by tripartite international fact-gathering exercises to determine what was required to make industries competitive in the global economy. In addition, the government can adjust trade, regulatory, tax, and other policies to help improve the competitive position of American industries. We were very

[8] See the Commission's 1980 report, *The American Coal Miner*.

careful, however, to encourage cooperative labor-management relations and motivate the parties to negotiate their own agreements

15. Our most extensive involvement with a particular company was the restructuring of the Chrysler Corporation, which was in trouble partly because of intensified global competition. We determined that Chrysler was a degenerating system that could become competitive mainly through a federal loan guarantee to stop the degeneration. The Chrysler Loan Guarantee Board, on which I served, worked with the company to turn it around. This was done at no financial expense to the federal government—which actually earned $311 million.[9]

16. Thus, while the federal government can and has done other things to strengthen the competitiveness of companies operating in the United States, it is very good public policy not to interfere with the collective bargaining process. Indeed, the value of the institution of collective bargaining helps explain why Congress and the industrial relations community were so shocked by the Bildisco decision, discussed below.

The Bildisco Decision Threatens Collective Bargaining

17. The 1984 Supreme Court Bildisco decision (NLRB v. Bildisco and Bildisco, 465 US 513) was such a threat to deeply established collective bargaining principles that it elicited immediate bipartisan corrective action from the Congress. In this case, Bildisco, the debtor, unilaterally rejected its collective bargaining agreement (CBA), an action later approved by an order pursuant to 11 USC §365a. The National Labor Relations Board (NLRB), the specialized agency created by the Congress to administer

[9] See Robert Reich and John Donahue, *New Deals: The Chrysler Revival and the American System* (New York: Times Books, 1985), p. 267.

the NLRA, found that Bildisco's unilateral action violated its duty to bargain in good faith with representatives of its employees as required by Sections 8(a)(1) and (5) of the NLRA.

18. In Bildisco the Supreme Court ruled that a CBA could be rejected under §365 of the Bankruptcy Code although, in deference to labor law policies, under a stricter standard than applied to non-labor agreements. The Court also decided that a debtor did not violate the NLRA by modifying the terms and conditions of the CBA before seeking or obtaining court approval to reject the agreement. According to the Bildisco decision, a CBA was "no longer immediately enforceable" once an employer filed for bankruptcy.

19. This decision sent shock waves through the industrial relations community because it clearly enabled employers to use bankruptcy proceedings to rid themselves of contractual obligations and defeat unions. At a minimum, Bildisco would have weakened unions' ability to protect their members in components of a firm considered by the employer to be noncompetitive. This decision not only weakened unions' bargaining power, but diminished employers' motive to negotiate with the representatives of their employees. This caused the threat of bankruptcy to combine with the threat of shifting the work to lower wage places as a tactic to weaken workers' bargaining power.[10]

The Congress Overturns Bildisco

20. Congress, agreeing that Bildisco created a "dangerous imbalance in the collective bargaining process,"[11] moved with unusual speed to enact Section 1113 to replace Bildisco with a standard more compatible with national labor policy. Section

[10] See Rosalind Rosenberg, "Bankruptcy and the Collective Bargaining Agreement: A Brief Lesson in the Use of the Constitutional System of Checks and Balances," *American Bankruptcy Law Journal* 58, Fall 1984: 306-08.
[11] 130 Cong. Rec. H1831 (daily ed. March 21, 1984, comments of Rep. Vento).

1113 restored balance in collective bargaining in bankruptcy cases by providing that (1) CBAs were enforceable and could not be modified without approval (11 USC Section 1113(f)); (2) imposing procedural safeguards that had to be satisfied before a debtor could reject a CBA; and (3) requiring that a debtor prove that its proposed CBA modifications are limited to those that are "necessary to permit the reorganization of the debtor" and "assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably."[12]

21. These procedural requirements were intended to preserve collective bargaining by preventing employers from unilaterally modifying CBAs, encouraging the parties to reach agreement through negotiations.[13]

22. In 1986, the Second Circuit noted that Section 1113's central purpose was to promote collective bargaining during bankruptcy and to allow unilateral changes through litigation only as a last resort. According to the Court, Section 1113's requirements prevent debtors "from using bankruptcy as a judicial hammer to break the union" and the statute's "entire thrust" is to "ensure that well-enforced and good faith negotiations occur in the market place, not as part of the judicial process."[14]

23. Section 1113 also is designed to ensure that employers do not use strategic bankruptcy filings as a weapon in collective bargaining and to ensure that "covered employees do not bear either the entire financial burden of making the reorganization

---

[12] 11 USC, sect. 1113(b) (1) (A).

[13] See Memorandum of Law of International Union, Automobile, Aerospace and Agricultural Implement Workers of America (UAW) in Support of UAW's Objection to Debtors' Motion for Order Under 11 USC Sect. 1113(c) Authorizing Rejection of Collective Bargaining Agreements and Under 11 USC Sect. 1114(2) Authorizing Modification of Retiree Welfare Benefits, (UAW Memorandum of Law Brief), pp. 18-20.

[14] In re Maxwell Newspaper, Inc. 981 F. 2d 85, 89-90 (2d Cir. 1992; cited in UAW Mem. of Law, p. 19).

work or a disproportionate share of that burden, but only their fair share of the necessary sacrifice."[15]

24. Section 1114 imposes equally stringent procedural and substantive requirements on debtors as a condition precedent for modifying retiree health benefits: companies cannot unilaterally terminate or modify retiree health benefits absent compliance with Section 1114's statutory procedures, which parallel those of Section 1113.

Conclusions

25. America's collective bargaining policies have served the country well by balancing the interests of employees and employers in the work place. The central requirement for effective collective bargaining is to encourage the parties to solve their own problems. Where the parties bargain in good faith they can achieve much more than either party acting alone. The government—including the courts—should facilitate this process by intervening only in those rare cases where intervention is required to protect the public interest.

26. Sections 1113 and 1114 corrected threats to the institution of collective bargaining and the American economy posed by the Bildisco decision. Employers cannot be allowed to substitute bankruptcy proceedings for good faith negotiations. Debtors should not be allowed to rid themselves of CBA obligations that are not absolutely necessary to their reorganization. And it certainly is not in the national interest to permit otherwise viable companies to use bankruptcy proceedings to avoid their obligations to American workers and shift their operations to low-wage countries.

---

[15] 130 Cong. Rec. H7496 (daily ed. June 29, 1984, statement of Rep. Morrison, cited in UAW Mem. of Law, p. 19).

Companies that wish to continue to operate in the United States will not solve their problems either by forcing concessions on American workers through bankruptcy or forcing workers into long and bitter strikes that no one will win.

27. Although it will not be easy, the solution most compatible with the public interest is to encourage the parties to bargain to impasse, which they have not done in this case. Both parties have declared their preference for a negotiated settlement. Indeed, the parties had successfully bargained the Special Attrition Program nine days before Delphi filed this motion, and the UAW has taken numerous other measures to help Delphi become more competitive.[16] It would therefore be much better policy to deny Delphi's motion, which apparently is designed to enlist the court's help in its bargaining with the UAW. Neither a settlement forced on UAW's members by the court or a long and bitter strike forced on them by the company's unacceptable demands will be in the best interest of its employees or the long-run competitiveness of whatever operations Delphi decides to continue in the United States.

I hereby declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Austin, Texas
April 26, 2006

F. Ray Marshall

[16] Declaration of Richard Ruppert in Support of UAW's Objection to Debtors' Motion for Order Under 11 USC Sect. 1113(c Authorizing Rejection of Collective Bargaining Agreements and Under 11 USC Sect. 1114(2) Authorizing Modification of Retiree Welfare Benefits.

**ATTACHMENT A**

**RAY MARSHALL**
University of Texas at Austin
LBJ School of Public Affairs
Box Y
Austin, Texas 78713-8925
512/471-6242
FAX: 512/471-0986

## EDUCATION

B.A., Millsaps College - 1949
M.A., Louisiana State University - 1950
Ph.D., University of California, Berkeley - 1954

## EMPLOYMENT

January 1981 to present: holder of the Audre and Bernard Rapoport Centennial Chair in Economics and Public Affairs, University of Texas at Austin.

### *Previous Positions*

January 1977 to January 1981: Secretary of Labor, Washington, D.C. As President Carter's chief advisor on labor matters, was responsible for carrying out the Department of Labor's mission "to foster, promote and develop the welfare of the wage earners of the United States, to improve their working conditions, and to advance their opportunities for profitable employment." In carrying out these duties, administered laws and programs in such areas as employment and training, labor statistics, labor-management relations, occupational safety and health, pension benefits security, and other matters affecting the nation's expanding work force. Administered Cabinet-level agency with over 24,000 employees and an annual budget in excess of $29 billion. Served on numerous boards, committees, and official organizations, including:

—Board of Trustees of the Federal Old-Age and Survivors Insurance Trust Fund and the Federal Disability Insurance Trust Fund
—Cabinet-level Committee on the International Labor Organization (ILO), Chair
—Chrysler Loan Guarantee and Restructuring Committee
—Collective Bargaining Group, Chair
—Domestic Policy Council
—Economic Policy Group, Executive Committee
—Pension Benefit Guaranty Corporation, Chairman
—Select Commission on Immigration and Refugee Policy
—Steel Tripartite Advisory Committee, Co-Chair
—Trade Policy Committee

1969 to 1976: Director, Center for the Study of Human Resources and Professor of Economics, University of Texas at Austin (chairman of Economics Department 1970-1972).
1967 to 1969: Alumni Professor of Economics and Chairman of Economics Department, University of Kentucky
1962 to 1967: Professor of Economics, University of Texas at Austin
1957 to 1962: Associate Professor (1957-58) and Professor (1959-62) of Economics, Louisiana State University

1953 to 1957: Assistant Professor (1953-54) and Associate Professor (1955-57) of Economics, University of Mississippi
1952 to 1953: Instructor in Economics, San Francisco State University
1949 to 1951: Teaching Assistant (1949-50) and Instructor (1950-51) of Economics, Louisiana State University

## OTHER ACTIVITIES

### *Current Activities*

Chair, board of trustees, National Center on Education and the Economy. Chair, Council on Families for Children. Board member, Economic Policy Institute. Board Member, Dyslexia Research Foundation. Member, U.S. State Department's Advisory Committee on Labor Diplomacy. Member, Bretton Woods Committee. Member, Council on Foreign Relations. Fellow, $IC^2$, University of Texas-Austin.

### *Previous Activities*

—Trustee, German Marshall Fund
—Member, National Skills Standards Board
—Chair, City of Austin's Social Equity Commission
—Trustee, Spelman College
—Board Member, Winthrop Rockefeller Foundation
—Director, USX Corporation
—Director, American Income Life Insurance Company
—Director, Aurora Life Insurance Company
—Director, Advanced Photovoltaic Systems
—Director, Republic Engineered Steel
—Member, Commission on the Future of Worker/Management Relations (chair, Int'l Working Group)
—Co-chair, Commission on the Skills of the American Workforce
—Board Member, Carnegie Corporation of New York (Chair of Committee on South Africa and member, Finance and Administration Committee)
—Member, Carnegie Council on Adolescent Development and Carnegie Task Force on Meeting the Needs of Young Children
—Chair, Action Committee on Minority Education, Carnegie Corporation of New York
—Board Chair, Institute for the Future
—Member, Overseas Development Council's Foreign Policy Project
—Chair, Federal Committee on Apprenticeship (1969-76)
—Consultant, Kamber Group. Developed Jurisdictional Dispute Settlement Process

## FELLOWSHIPS, SCHOLARSHIPS AND HONORS

—Fellow, General Education Board, Rockefeller Foundation, 1951-1953
—Fulbright Research Scholar to Finland, 1955-56
—Wertheim Fellow in Industrial Relations, Harvard University, 1960-1961
—Ford Foundation Faculty Fellowship, 1964-1965
—Beta Gamma Sigma (National Honor Society, Business)
—Omicron Delta Kappa (National Leadership)
—Phi Kappa Phi (National Honor Society, Scholastic)
—Omicron Delta Epsilon (National Honor Society, Economics)
—Order of Achievement, Lambda Chi Alpha fraternity, 1982
—Alumni Hall of Distinction, Louisiana State University, 1985

—Phi Beta Kappa Visiting Scholar, 1988-1989
—Outstanding Economist Award, Kentucky Economic Association, 1992
—Outstanding Alumni Award, Hinds Community College, 1992
—Sydney Hillman Book Award (for *Thinking for a Living*), 1993
—Veblin-Commons Award from Association for Evolutionary Economics, 1993
—American Association of Community Colleges Outstanding Alumnus, 1995
—Lifetime Achievement Award, Industrial Relations Research Association (IRRA), 2001

Honorary Degrees: Rutgers University; Millsaps College; St. Edwards University; Bryant College; University of Maryland; Cleveland State University, Tulane University, Utah State University

## PROFESSIONAL ASSOCIATIONS, COMMISSIONS, SCHOLARLY COUNCILS, AND FOUNDATIONS

—President, Southern Economic Association, 1973-74; member, Executive Committee of SEA, 1969-71 and 1975-76
—Chair, Committee on Political Discrimination, American Economics Association (AEA)
—Chairman, Committee on Labor Market Studies, AEA, 1973-1974
—Chairman, Committee on Hiring Practices, AEA, 1969-1976; Chairman, 1969-1972
—President, Industrial Relations Research Association, 1976-77
—Member, Committee on the Administration of Training Programs, U.S. Dept. of Labor and U.S. Dept. of Health, Education and Welfare, 1967-1968
—President, National Rural Center
—Board of Trustees, Joint Council on Economic Education
—Member, National Manpower Policy Task Force
—Member, Advisory Council, Texas Employment Commission
—Member, National Advisory Committee, Rural Practices Project, Robert Wood Johnson Foundation
—Member, National Advisory Committee, Poverty Institute, University of Wisconsin
—Member, Binational Committee to Study the Border Region Between the United States and Mexico
—Member, National Council on Employment Policy
—Member, Manpower Study Committee, National Academy of Sciences, 1974-1976
—Member, National Manpower Policy Task Force, 1969-1976
—Director, Task Force on Southern Rural Development
—Member, Board of Directors, Southern Regional Council
—Member, National Council on Science and Technology Education (Project 2061)
—Member, National Commission on American State and Local Public Service
—Member, Strategic Industries Task Force of the Defense Manufacturing Board
—Member, Panel on National Perspective of the Committee on Defense Manufacturing Strategy
—Member, Council on Foreign Relations' Commission on the Future International Financial Architecture

## Selected Publications

### *Books and Monographs*

*The Future of Unions: Organized Labor in the 21st Century*, ed. (with Julius J. Getman) (Austin, Tex.: University of Texas, LBJ School of Public Affairs, Ray Marshall Center for the Study of Human Resources, 2004).

*High Performance Schools and Teacher Unions*, Working Paper (Eugene, OR: University of Oregon, Labor Education and Research Center, 2001).

*Back to Shared Prosperity: The Growing Inequality of Wealth and Income in America*, ed. (Armonk, NY: M.E. Sharpe, 2000).

*Thinking for a Living: Education and the Wealth of Nations* (with Marc Tucker) (New York: Basic Books, 1992). Paperbound edition, 1993.

"Characteristics of High Performance Organizations (HPOs) in the Public and Private Sectors," in Ray Marshall et al., *Restructuring the American Workplace: Implications for the Public Sector*, Labor Education and Research Center Monograph Series No. 11 (Eugene, Oregon: University of Oregon LERC, 1992), pp. 1-36.

*Labour Markets and Employment: A Global Perspective*. Monograph for ILO/OECD-CCEET meeting on "Labor Market and Social Policy Implications of Structural Change in Central and Eastern Europe," September 11-13, 1991, Paris, France.

*How to Expand World Trade and Protect Workers' Rights*, Geneva: International Metalworkers Federation, 1988. Also published in French, Spanish, Swedish, German, and Italian.

*Unheard Voices: Labor and Economic Policy in a Competitive World* (New York: Basic Books Inc., 1987). Paperbound edition, 1988.

*Labor Economics: Wages, Employment and Trade Unionism* (with Allan M. Cartter) (Homewood, Illinois: Richard D. Irwin, 1967; revised, 1972; revised (with Allan G. King), 1976; revised (with Vernon M. Briggs, Jr.), 1980; revised (with Allan G. King and Vernon M. Briggs, Jr.), 1984; Spanish edition, 1987).

*The Role of Unions in the American Economy* (with Brian Rungeling) (New York: Joint Council on Economic Education, 1976; Japanese edition, 1978; Portugese, Spanish and French editions, 1979; Chinese edition, 1980. Revised 1985).

*Human Resources and Labor Markets* (with Sar Levitan and Garth Mangum) (New York: Harper and Row, 1972; revised 1975, 1977, 1981).

*Labor in the South* (Cambridge, MA: Harvard University Press, 1967).

### *Articles and Chapters*

"Before Labor Day, A Look at the Choice Facing U.S. Workers," op-ed, *Austin American Statesman*, September 5, 2004, p. E-3.

"Labor Standards, Human Capital, and Economic Development," Working Paper No. 271 (WDC: Economic Policy Institute, February 2004).

"The Link Between Labor Standards and Human Capital," in Monica Ulewicz, ed., *Monitoring International Labor Standards: Human Capital Investment*, Summary of a Workshop (WDC: National Academies Press, 2003), pp. 4-6.

"Democracy and Unions Go Together" (with Julius Getman), *Los Angeles Times*, "Opinion," July 6, 2003, p. M-5.

"The Economics of Discrimination as Applied to Business Development," in Irving Louis Horowitz, ed., *Eli Ginzberg: The Economist as a Public Intellectual* (New Brunswick, NJ: Transaction Publishers, 2002), p. 67-106

"Industrial Relations and Inmate Labor," *Perspectives on Work* 5:1 (2001): 47-8.

"The Continuing Assault on the Right to Strike," (with Julius Getman) in *Texas Law Review* 79:3 (2001): 703-35.

"Rural Policy in the New Century," in *International Regional Science Review* 24:1 (2001): 59-83. Also in Center for the Study of Rural America, *Beyond Agriculture: New Policies for Rural America* (Kansas City: Federal Reserve Bank of Kansas City, 2000), pp. 25-45.

"New Skills for an Information Economy," in Stuart A. Rosenfeld (ed.), *learning.now: Skills for an Information Economy* (WDC: Community College Press, 2000), pp. 37-52.

"Restoring Broadly Shared Prosperity," *USA Today* 128:2660 (2000): 18-20.

"Changing Employment Relationships in the Open Economy: A Microeconomic Perspective," in Commission for Labor Cooperation, *Incomes and Productivity in North America* (Lanham, MD: Bernan Press, 1997), pp. 133-39.

"The Role of Management and Competitiveness Strategies in Occupational Safety and Health Standards," in Bruce Kaufman, ed., *Government Regulation of the Employment Relationship: IRRA 50th Anniversary Volume* (Madison, Wisconsin: IRRA, 1997), pp. 499-511.

"A Sustainable High Value Added Development Strategy for the 1990s and Beyond," in Antonio R. Magalhalães, ed., *Sustainable Development: Implications for World Peace* (Austin, Texas: Lyndon B. Johnson School of Public Affairs, University of Texas-Austin, 1997), pp. 181-190.

"Improving School-to-Work Transition of American Adolescents," (with Robert W. Glover), in Albert J. Pautler, Jr., and Deborah M. Buffamanti, eds., *Winning Ways: Best Practices in Work-Based Learning* (Ann Arbor, MI: Prakken Publications, Inc., 1997), pp. 131-147.

"School-to-Work Processes in the United States," in Ruby Takanishi and David Hamburg, eds., *Preparing Adolescents for the Twenty-First Century: Challenges Facing Europe and the United States* (NY: Cambridge University Press, 1997), pp. 195-226.

"Restoring Rural Prosperity," *Rural Cooperatives* 63:3 (1996): 26-30.

"Human Resources, Labor Markets and Economic Performance," in Charles J. Whalen, ed., *Political Economy for the 21st Century: Contemporary Views on the Trends of Economics* (Armonk, NY: M.E. Sharpe, 1996), pp. 103-24.

"Work Organization: The Promise of High-Performance Production Systems," in Todd Schafer and Jeff Faux, eds., *Reclaiming Prosperity: A Blueprint for Progressive Economic Reform* (Armonk, NY: M.E. Sharpe, 1995).

"Education, the Economy, and Tomorrow's Workforce" (with Robert W. Glover), in Laura I. Rendón and Richard Hope, eds., *Educating a New Majority: Transforming America's Educational System for Diversity* (San Francisco: Jossey-Bass Publishers, 1995), pp. 35-50.

"Internationalization: Implications for Workers," *Journal of International Affairs* 48:1 (1994): 59-94.

"Industrial Relations in Transition: The Paper Industry Example," *Yale Law Journal* 102:8 (1993): 1803-95.

"High-Performance Production Systems in a More Competitive, Knowledge-Intensive World Economy," in Bertram Silverman, Robert Vogt, and Murray Yanowitch, eds., *Double Shift: Transforming Work and Postindustrial Societies* (Armonk, NY: M.E. Sharpe, 1993), pp. 159-86.

"The Future Role of Government in Industrial Relations," in Mario F. Bognanno and Morris M. Kleiner, eds., *Labor Market Institutions and the Role of Unions* (Cambridge, Mass.: Blackwell Publishers, 1992), pp. 31-49.

"Work Organization, Unions, and Economic Competitiveness," in Lawrence Mishel and Paula B. Voos, eds., *Unions and Economic Competitiveness* (Armonk, NY: M.E. Sharpe, Inc., 1992), pp. 287-315.

"The Future Role of Government in Industrial Relations," *Industrial Relations* 31:1 (1992): 31-49.

"Industrial Policy and Competitiveness in the United States," in M. Donald Hancock, John Logue, and Bernt Schiller, eds., *Managing Modern Capitalism* (Westport, Conn.: Greenwood Press, 1991), pp. 265-81.

"Labor in a Global Economy," in *Labor in a Global Economy: Perspectives from the U.S. and Canada* (Eugene, OR: University of Oregon Books, 1991), pp. 10-24. Proceedings from conference held at University of Oregon, September 1990.

"Industrial Relations and Competitiveness: Japanese and American Cases," in Industrial Union Department, AFL-CIO and Japan Federation of Employers' Associations (NIKKEIREN), *Cooperation is Better: Case Studies on Labor-Management Relations in Japanese Affiliated Companies in the United States* (Tokyo: NIKKEIREN, 1991), pp. 21-25.

"Industrial Relations in a Competitive Global Economy," in *Conference on Labor and Economic Development*, Chung-Hua Institution for Economic Research Conference Series no. 11. Papers published from conference held in Taipei, Taiwan December 21-23, 1988.

"The Act's [National Labor Relations Act] Impact on Employment, Society, and the National Economy," in Charles J. Morris, ed., *American Labor Policy* (WDC: Bureau of National Affairs, 1987).

"America and Japan: Industrial Relations in a Time of Change," in Seymour M. Lipset, ed., *Unions in Transition* (San Francisco: Institute for Contemporary Studies Press, 1986).

"The American Industrial Relations System in a Time of Change," *Journal of Economic Education* 16:2 (1985): 85-97.

# Memorandum

**To:** Robert Simon

**From:** Ray Marshall

**Date:** April 25, 2006

**Re:** Expert Witness Activities—2002-2006

---

The cases I have worked on in the past four years are:

1. Gross Seed v. NDOR. (US District Court, District of Georgia, Sixth Division—Court File No. 4:00-CV-3073). Prepared expert report for the U.S. Department of Justice, Civil Rights Division and testified in court.
2. Sherbrooke et al. v. MnDOT. (U.S. District Court, District of Minnesota-- Court File No.: 00-CV-1026 JMR/RLE). Prepared expert report for the U.S. Department of Justice, Civil Rights Division and was deposed.
3. IAMAW District Lodge 70 and IAM LL 733 v. Raytheon. (U.S. District Court for the District of Kansas—Civil Action No. 03-1470-MLB). Gave deposition on behalf of IAMAW; case settled.
4. Baker et al. v Buffenbarger et al. (No. 03-C-5443). Gave deposition, scheduled for trial May 2006.