1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
2

3                                       .
       IN RE:                           .    Case No. 05-44481
4                                       .
       DELPHI CORPORATION, et al,       .    New York, New York
5                                       .    Wednesday, March 22, 2006
                            Debtors.    .    2:18 p.m.
6       . . . . . . . . . . . . . . .

7
             TRANSCRIPT OF SECTION 1102(a)(2) EVIDENTIARY HEARING
8                  BEFORE THE HONORABLE ROBERT D. DRAIN
                      UNITED STATES BANKRUPTCY JUDGE
9
       APPEARANCES:
10
       For the Debtors:            John Wm. Butler, Jr., Esq.
11                                 David E. Springer, Esq.
                                   Dhananjai Shivakumar, Esq.
12                                 SKADDEN, ARPS, SLATE, MEAGHER
                                    & FLOM, LLP
13                                 333 West Wacker Drive, Suite 2100
                                   Chicago, Illinois 60606
14
                                   Kayalyn A. Marafioti, Esq.
15                                 SKADDEN, ARPS, SLATE, MEAGHER
                                    & FLOM, LLP
16                                 Four Times Square
                                   New York, New York 10036
17
       (Appearances continued)
18
       Audio Operator:            Electronically Recorded
19                                 by Greg White, ECRO

20     Transcription Company:     Rand Transcript Service, Inc.
                                   311 Cheyenne Road
21                                 Lafayette, New Jersey  07848
                                   (973) 383-6977
22

23
       Proceedings recorded by electronic sound recording,
24     transcript produced by transcription service.

25

```
 1   A P P E A R A N C E S:  (Continued)

 2   For Appaloosa
     Management, LP:                  Thomas E. Lauria, Esq.
 3                                    Rudolph F. Aragon, Esq.
                                      Frank L. Eaton, Esq.
 4                                    WHITE & CASE, LLP
                                      Wachovia Financial Center
 5                                    200 South Biscayne Boulevard
                                      Suite 4900
 6                                    Miami, Florida 33131

 7                                    Glenn M. Kurtz, Esq.
                                      Douglas P. Baumstein, Esq.
 8                                    WHITE & CASE, LLP
                                      1155 Avenue of the Americas
 9                                    New York, New York 10036

10
     For the U.S. Trustee:           Alicia M. Leonhard, Esq.
11                                    U.S. DEPARTMENT OF JUSTICE
                                      Office of the U.S. Trustee
12                                    33 Whitehall Street, Suite 2100
                                      New York, New York 10004
13
     For the Official Committee
14   of Unsecured Creditors:         Robert J. Rosenberg, Esq.
                                      John W. Weiss, Esq.
15                                    LATHAM & WATKINS, LLP
                                      53rd at Third, 885 Third Avenue
16                                    New York, New York 10022

17
     For JPMorgan, et al:            Kenneth S. Ziman, Esq.
18                                    Robert Trust, Esq.
                                      SIMPSON, THACHER & BARTLETT, LLP
19                                    425 Lexington Avenue
                                      New York, New York 10017
20
     For Brandes Investment
21   Partners, LP:                   Daniel A. Lowenthal, Esq.
                                      THELEN, REID & PRIEST, LLP
22                                    875 Third Avenue
                                      New York, New York 10022
23

24

25
```

1                          <u>I N D E X</u>

2                                                    <u>Page</u>
<u>MOTION TO STRIKE REPORT/OPINION</u>
3  (Re:  Kenneth S. Williams)
        Argument by Mr. Baumstein                     4
4       Argument by Mr. Butler                         8
        <u>Court Decision</u>                             10
5

6                    <u>DIRECT</u>  <u>CROSS</u>  <u>REDIRECT</u>  <u>RECROSS</u>

7  <u>WITNESSES FOR THE DEBTORS</u>
   KEITH S. WILLIAMS
8       By Mr. Kurtz          12                   71
        By Mr. Butler                   60
9
   DAVID L. RESNICK
10      By Mr. Aragon         86

11

12 <u>MOTION TO STRIKE REPORT/OPINION</u>                  <u>Page</u>
   (Re:  David L. Resnick)
13      Argument by Mr. Aragon                       74
        Argument by Mr. Butler                       82
14      <u>Court Decision</u>                             85

15
   <u>CLOSING ARGUMENTS</u>
16      By Mr. Lauria                               120
        By Mr. Lowenthal                            138
17      By Mr. Butler                               140
        By Mr. Rosenberg                            152
18      By Mr. Ziman                                154
        By Ms. Leonhard                             156
19

20
   <u>COURT DECISION</u>                                 156
21

22

23

24

25

Argument - Baumstein                                    4

1    (Proceedings commence at 2:19 p.m.)

2         THE COURT:  Please be seated.

3         Okay.  We're back on the record from yesterday in

4    Delphi Corporation.

5         Mr. Butler, you have your next witness on rebuttal?

6         MR. BUTLER:  Thank you, Your Honor, and good

7    afternoon.

8         Your Honor at this time we'd like to present the --

9    for cross-examination Keith S. Williams, whose expert report

10   and declaration have been admitted as Exhibit Number 12.

11        MR. KURTZ:  Your Honor, we filed a motion with

12   respect to the witness.  Would now be a good time to present

13   it?

14        THE COURT:  Yes.  You're looking to strike his

15   report?

16        MR. KURTZ:  Correct.  It's going to be argued by Mr.

17   Baumstein?

18        MR. BAUMSTEIN:  Good afternoon, Your Honor.  Doug

19   Baumstein here.

20        The motion is basically about a very simple

21   prospect.  During examinations of both Mr. Williams and Mr.

22   Sheehan, a number of questions were asked about the current

23   status of the negotiations at -- I guess at that point

24   ongoing negotiations between Delphi and the unions, which, as

25   everyone recognizes in this bankruptcy, would largely affect

1    the likelihood of a successful reorganization and the

2    possibility of equity being in the money.

3            During those question-and-answers, debtors on a

4    number of occasions cut off all questioning and gave

5    instructions not to answer.  In their opposition papers to

6    our motion to strike, they don't make any justification for

7    such instructions not to answer, nor is any available under

8    the federal rules.

9            This relates to Mr. Williams in a number of aspects

10   because both his testimony and his conclusions are based, in

11   part, on what happened or what his understanding was of those

12   negotiations.  Specifically, Mr. Williams states as part of

13   his conclusions that:

14           "The Hay Group's alternative forecast are based on

15   assumptions that result in significantly optimistic

16   alternative outcomes for Delphi's reorganization."

17           He also opines more specifically about the potential

18   demands in negotiation that, for example, the conclusions

19   that certain transitional benefits may be required to, quote:

20           "-- maintain a productive work force and to satisfy

21   the various unions that represent most of Delphi's hourly

22   paid work force."

23           Now Mr. Williams is not an independent expert.  He

24   is, in fact --

25           THE COURT:  Where is he, though, in either of those

Argument - Baumstein                                    6

1   statements or elsewhere in his report, actually referring to

2   specific negotiations, as opposed to noting, as Mr. Sheehan

3   did yesterday, that if you take something away, you have to

4   give something in return, often?

5        MR. BAUMSTEIN:  Well, Your Honor, it actually goes

6   to the fact of what he lists -- what he identifies as part of

7   the basis of his conclusions.

8        THE COURT:  All right.  What are those?

9        MR. BAUMSTEIN:  And specifically what he says is,

10  during the deposition, he says the deposition -- his opinion

11  reflects:

12       "-- everything that I know about Delphi and Delphi's

13  plans from the work that I've done for them."

14       He also testified that the work he's done for them

15  includes receiving information and running models based on

16  the ongoing negotiations.

17       On the one -- it's just fundamentally unfair for

18  them to have a testimony from a witness, as both an expert,

19  who's also as a fact witness, who's not willing to disclose

20  the basis for his understandings about potential outcomes

21  from the ongoing negotiations at that point.

22       Clearly, the issue here is what gets done with the

23  unions is going to affect the recovery, if any, for equity.

24  That's just -- that's unquestioned here.  The fact that this

25  witness had some knowledge, and the fact that Mr. Sheehan had

Argument - Butler                                      7

1   some knowledge and we were prohibited from making inquiries,

2   notwithstanding the existence of protective orders in this

3   case is just simply unfair; and, as a result, I think the

4   appropriate remedy should be to strike Mr. Williams's expert

5   report.

6          THE COURT:  Well, I'm still -- if the debtors are

7   not relying upon any knowledge that Mr. Williams may have as

8   to the specific status of negotiations with the unions, but

9   instead are relying upon his knowledge generally of the

10  company and the issues that one would anticipate would arise

11  in negotiations with unions, how are you prejudiced?

12         MR. BAUMSTEIN:  Well, we're prejudiced because their

13  main attack of the Hay report is that it is -- it basically

14  is painting overly optimistic scenarios.

15         THE COURT:  Well, you can make that attack without

16  focusing on -- I mean, you could have made that -- let's

17  assume the Hay report came out on October 16th, after the

18  petition date, before at least post-petition negotiations

19  with the unions began.  Couldn't you make the same statement

20  then; i.e., "overly optimistic"?

21         MR. BAUMSTEIN:  Well, they could make the same

22  statements, but when -- if Mr. Williams were, quote/unquote,

23  "relying on everything I know about Delphi and Delphi's

24  plans," which is what he said during his testimony, then I --

25  then there might be an issue if he knew what those plans

Argument - Butler                                    8

1   included.

2           THE COURT:  Okay.

3           MR. BAUMSTEIN:  Thank you, Your Honor.

4           MR. BUTLER:  Your Honor, the sole basis by which

5   Appaloosa tries to strike Mr. Williams's testimony is because

6   they were unhappy that the debtors enforced Your Honor's

7   protective order and the pretrial scheduling order, which

8   defined the scope of discovery.  We had a specific chambers

9   conference with Your Honor and a specific meet-and-confer,

10  and resolution of what the scope of discovery was, and it did

11  not include the transformation model and the assumptions

12  underlying that and, you know, beyond the steady-state model

13  that was part of discovery.

14          If Your Honor reviewed the transcript, you'll find

15  that in each instance in which -- and the only instances in

16  which Mr. Williams was directed not to answer a question was

17  when we invoked in answering, relying on Federal Rule Civil

18  Procedure 30(d)(1), in which we are entitled to instruct a

19  deponent not to answer a question to enforce a limitation

20  directed by the Court.  And they were using Mr. Williams's

21  deposition, which was about his rebuttal testimony and his

22  rebuttal report to the Hay report, that's it.  That was the

23  scope of the testimony instead as a further discovery

24  opportunity, to try to engage in discovery not permitted

25  under the pretrial scheduling order.  And that was the issue

Argument - Butler                                    9

1    and the dispute that arose.

2          They were -- there was throughout the deposition Mr.

3    Williams fully disclosed the basis for his opinions and

4    conclusions, and he was never instructed not to answer a

5    legitimate inquiry going to the bases of his opinions.  And I

6    think, Your Honor, that if -- you know, one only needs to

7    look at the deposition transcript and look at Mr. Williams's

8    report, which is directed -- and I should point out, Mr.

9    Williams obviously is recognized and Appaloosa has conceded

10   he's an expert on these matters and a qualified actuary; Mr.

11   Reese acknowledged that in his cross-examination.  And so

12   there was a very -- you know, there was a very specific

13   purpose for that, and it was to protect the issues that were

14   intended to be outside the scope of these proceedings.

15         THE COURT:  And as I remember the discovery

16   conference that we had, the debtors stated that they were not

17   going to rely on Mr. Williams as a fact witness as to what

18   was actually going on in the negotiations, correct?

19         MR. BUTLER:  That's correct, Your Honor, and we are

20   not.

21         THE COURT:  And so when he says in his expert report

22   or in his deposition, my conclusions are based on everything

23   I know about Delphi, is it fair for me to assume that he was

24   not including in that answer specific responses, proposals,

25   counter-proposals by the unions in response to proposals made

Court Decision                    10

1   by the debtors during the post-petition negotiations?

2           MR. BUTLER:  Yes, I believe you can rely on that

3   Your Honor.  And I can tell Your Honor that I have been

4   directly involved in those negotiations personally, and I can

5   represent to the Court that Mr. Williams has not been

6   involved.  I'd be surprised if Mr. Williams was even aware of

7   those matters in any kind of a comprehensive way.

8           THE COURT:  Okay.  All right.

9           MR. BUTLER:  Thank you.

10          THE COURT:  All right.  With regard to Appaloosa's

11  motion to strike Mr. Williams's expert report and testimony,

12  I will deny that motion on two grounds:

13          First, as I directed at the discovery conference

14  that we had now several weeks ago in connection with

15  Appaloosa's motion for the appointment of an equity

16  committee, I made it clear that this motion is a summary

17  proceeding and should not take over all of the issues in this

18  case; and, consequently, we were not going to litigate in

19  effectively real time the status of the debtors' negotiations

20  with its various constituents, including the union, the PBGC,

21  and others.

22          And, consequently, while the Appaloosa lawyers were

23  going to be entitled to get information available to the

24  debtors informing the debtors' proposals, they were -- we

25  were not going to get into responses or developments

Williams - Cross/Kurtz                                    11

1   thereafter.  Instead, the parties were free to make their own

2   inferences in light of that information and try to persuade

3   me that those inferences were correct.  And it appears to me

4   that the expert report and the directions not to answer

5   various questions related to the expert report in Mr.

6   Williams's deposition are both consistent with that

7   instruction by me.

8           Secondly, again, in light of my conclusion that, in

9   fact, the debtor has acted in compliance with that

10  determination by me and have -- the debtors have not offered

11  up Mr. Williams as a fact witness about the status of

12  negotiations, the unions' responses to various proposals and

13  the like as a basis of their rebuttal case; that they have

14  not taken advantage of my directive improperly, and that

15  they're not offering up a new issue that Appaloosa has been

16  precluded from taking discovery on, I do not see any

17  prejudice to Appaloosa in having Mr. Williams testify or with

18  regard to the introduction of his report.  I will read the

19  report and listen to his testimony with the assumption that

20  the report is not based on anything that he may know about

21  the back-and-forth with the union, which I had excluded from

22  discovery.  So, Mr. Butler, you can submit an order to that

23  effect.

24          Okay.  Do you want to call Mr. Williams?

25          MR. BUTLER:  As indicated, Your Honor, we were

1  calling, as I indicated, Keith S. Williams for cross-

2  examination with connection with his expert report and

3  declaration filed as Trial Exhibit No. 12.

4            THE COURT:  Okay.

5            MR. KURTZ:  Your Honor, may I approach?

6            THE COURT:  Yes.

7            MR. KURTZ:  I have compiled here the exhibits I may

8  use during cross-examination.

9            THE COURT:  Well, yeah.  Sure.  That's

10           MR. KURTZ:  I have one for counsel, and one to

11 provide to you.

12           THE COURT:  As long as they have the same numbers as

13 what are in the five binders, that's fine.

14           Okay.  Mr. Williams?

15           Would you raise your right hand, please?

16       **KEITH S. WILLIAMS, WITNESS FOR THE DEBTOR, SWORN.**

17           THE COURT:  You can be seated.

18                        **CROSS-EXAMINATION**

19 **BY MR. KURTZ:**

20 Q   Good afternoon, Mr. Williams.

21 A   Good afternoon.

22 Q   I want to start today by talking about OPEB expenses,

23 which Mr. Reese testified were overstated by $2.6 billion.

24           Your firm, Watson Wyatt, has been the actuaries for

25 Delphi since Delphi was formed, correct?

Williams - Cross/Kurtz                          13

1   A    That's correct.

2   Q    And you have been the lead actuary for that entire

3   tenure, correct?

4   A    That's correct.

5   Q    And one of your jobs for Delphi is to forecast medical

6   expenses, correct?

7   A    That's correct.

8   Q    And you do so in accordance with FAS-106, the governing

9   accounting standard, correct?

10  A    That's correct.

11  Q    And pursuant to FAS-106, you're required to give your

12  best estimate as to the OPEB expenses, correct?

13  A    That's correct.

14  Q    And you include your projections and calculations in a

15  FAS-106 valuation report, correct?

16  A    That's correct.

17  Q    And then you discuss your valuation assumptions with the

18  company, correct?

19  A    That's correct.

20  Q    And then, ultimately, it is the responsibility of Delphi

21  to determine the assumptions, correct?

22  A    That's correct.

23  Q    And the FAS-106 valuation report then contains Delphi's

24  best estimate as to its OPEB liabilities, correct?

25  A    As of the date of the report, that's correct.

Williams - Cross/Kurtz                                    14

1   Q    Okay.  And when it's done, the valuation report is

2   delivered to the company's auditors, correct?

3   A    That's correct.

4   Q    And the company includes the OPEB liabilities in its

5   financial statements, correct?

6   A    That's correct.

7   Q    And those financial statements are filed with the SEC,

8   correct?

9   A    I believe so.

10  Q    And then they're publicly disclosed, correct?

11  A    I believe so.

12  Q    And so it's important that the best estimate be accurate,

13  right?

14  A    Yep.

15  Q    All right.  Can I ask you to turn to what I hope to be

16  the first exhibit in your binder.

17  A    Which --

18  Q    Exhibit 70, which is the FAS-106 report for year-ended

19  2005?

20  A    I'm sorry.  Which binder?  There are many up here.

21  Q    Yeah.  We gave you --

22          MR. KURTZ:  May I approach the witness, Your Honor?

23          THE COURT:  Yes.

24      (Witness and counsel review exhibits.)

25          THE WITNESS:  Okay.  Thank you.

1  BY MR. KURTZ:

2  Q    Is that the FAS-106 report for year-end 2005?

3  A    Yes, it is.

4  Q    And that was completed on March 3rd, 2006, correct?

5  A    That's the date on it, yes.

6  Q    Which was just about two weeks ago, correct?

7  A    That's correct.

8  Q    So, obviously, it was prepared well after the steady-

9  state projections, correct?

10  A    That's correct

11  Q    And the driver of projected OPEB expenses is medical

12  trend rates, correct?

13  A    That's one of the drivers.

14  Q    And medical trend rates are the expected increase in

15  medical costs or the medical inflation?

16  A    The expected annual increases in future years, that's

17  correct.

18  Q    And this FAS-106 report from some two weeks ago sets

19  forth Delphi's best estimate of medical trend rates, correct?

20  A    As of the valuation date, that's correct.

21  Q    All right.  Can you turn to Page 35?

22  A    (Witness reviews exhibit.)

23      Okay.

24  Q    Okay.  Delphi's best estimate for the medical trend rates

25  in 2005/2006 is eight percent, correct?

Williams - Cross/Kurtz                    16

1  A    Those are the rates shown here for -- that we used to

2  develop the year-end liabilities as of 12/31/2005, that's

3  correct.

4  Q    Okay.  Then it goes down to six percent in 2006/2007,

5  correct?

6  A    That's correct.

7  Q    Then down the next year to five and a half percent?

8  A    Yes.

9  Q    The year after that to five and a quarter percent?

10 A    Yes.

11 Q    And five percent thereafter, correct?

12 A    Yes.

13 Q    All right.  And it was these medical trend projections

14 that Mr. Reese adopted in his report, correct?

15 A    I believe that that's correct, yes.

16 Q    Okay.  Now the company, on the other hand, did not use

17 these projections in its steady-state projections, correct?

18 A    They used these assumptions in developing -- I believe

19 they used these assumptions developing the disclosure and

20 expense in the first year of the projections.

21 Q    Am I correct that the steady-state projections do not, in

22 fact, assume the medical trend rates that we just read into

23 the record as reflected in FAS-106 report?

24 A    The first year, the steady-state projections do, in fact,

25 as I understand it, reflect these assumptions.

Williams - Cross/Kurtz                          17

1    Q    But not in 2007, 2008, 2009, 2010, or thereafter,

2    correct?

3    A    That's correct.

4    Q    All right.  And, rather, the company substantially

5    increased the medical trend rate, correct?

6    A    That's true.

7    Q    In fact, it nearly doubled it, right?

8    A    I don't recall the rate of increase, what they --

9    Q    Okay.  Can you turn to the next exhibit in your binder,

10   which is part of Exhibit 242.

11   A    (Witness reviews exhibits.)

12         UNIDENTIFIED:  I'm sorry.  What's the next exhibit?

13      (Counsel confer.)

14         MR. KURTZ:  It's part of -- I think it's part of

15   242.  However it is designated -- for people's binders is the

16   next exhibit, and it's a one-page spreadsheet.

17         THE COURT:  I'm sorry.  Is this in the binder you

18   gave me?

19         MR. KURTZ:  It is.  It's the next -- its entitled

20   "Assumption Input for Model to Variance Off Base."

21         UNIDENTIFIED:  Your Honor, can we have just a moment

22   because the exhibit -- the book that he was handed says has a

23   Tab 53.  We just want to verify this is really 242.

24         THE COURT:  Okay.

25         UNIDENTIFIED:  It's a little confusing.

Williams - Cross/Kurtz                        18

1          THE COURT:  Right.

2      (Counsel confer.)

3          MR. KURTZ:  Your Honor, if I can explain, and I

4  think Mr. Shivakumar may be -- we had identified a larger

5  exhibit under 53 when we were submitting our joint exhibit

6  list.  But in the -- just -- but it had -- although we

7  identified the Bates number and the deposition exhibit

8  number, the actual Exhibit 53 had a mislabel in its name and

9  now it's only part of this same document.  So I've spoken to

10 Mr. Shivakumar this morning and we were just --

11         MR. SHIVAKUMAR:  (Not identified) The short answer

12 is that Exhibit 53 should be one in the same as Sheehan

13 Deposition Exhibit 28.  So Sheehan Exhibit -- Deposition

14 Exhibit 28 is also part of the joint binder, no problem.

15         THE COURT:  Where?

16     (Counsel confer.)

17         UNIDENTIFIED:  It's right here, Judge.

18         MR. KURTZ:  It's under 242.

19         THE COURT:  All right.

20     (Counsel confer.)

21         MR. KURTZ:  Everybody okay?

22         COUNSEL:  Yep.  Yes.  Yes.

23         UNIDENTIFIED:  It's 242 Delphi, Bates number 17259.

24         MR. KURTZ:  Uh-huh.  Okay.

25 BY MR. KURTZ:

Williams - Cross/Kurtz                    19

1  Q   Mr. Williams, is it in front of you?

2  A   Yes, it is.

3  Q   And you can see that, for instance, the assumption for

4  2008 was five and a half percent in the FAS-106 report.  But

5  for purposes of the steady-state projections, it's twelve and

6  a half percent, which is more than twice the inflation,

7  correct?

8  A   I'm sorry.  Which are you referring to?

9  Q   2008.

10 A   And which -- there's -- 2008 appears in a column heading

11 and a column row.  Can you --

12 Q   Well, do you understand how -- well, you saw this during

13 your deposition.  Do you understand how this chart works?

14 A   Well, I do, and I'd like to -- I'm happy to talk about

15 it.  But can you tell me which number you're referring to?

16 Q   All right.  Tell us what you think the steady-state

17 projection assumption is for medical trends for the year

18 2007.

19 A   In which projection year would you like me to tell you

20 that?

21 Q   2007.

22 A   So the -- just to be sure I'm answering the question

23 properly, you're asking me what is the assumed rate of

24 medical increase in 2007 for the 2007 projection in a steady-

25 state projection?

Williams - Cross/Kurtz                              20

1   Q    Let me approach it this way.

2        Do you see the shaded box -- I'm sorry -- the shaded

3   columns in the box on the bottom?

4   A    Yes, I do.

5   Q    You agree that the company's steady-state projections

6   adopts the top line of the box, the shaded box, for each

7   year?

8   A    The top line is one component of the steady-state

9   projection, that's correct.

10  Q    That's right.

11       And in each instance it's close to twice what is shown in

12  the FAS-106 report, correct?

13  A    Yes, it is.

14  Q    Okay.

15  A    It appears to be.

16  Q    Okay.  And in your opinion as an actuary, the company's

17  steady-state projections for OPEB expenses are not

18  reasonable, correct?

19  A    I believe that the projections that the company made for

20  their business plan were reasonable for that purpose.

21  Q    Mr. Williams, please, yes or no.

22       Do you think that the company's steady-state projections

23  for medical trend rates are reasonable or not reasonable?

24  A    They are reasonable for the purpose that they're used.

25  Q    Are they reasonable for purposes of a FAS-106 valuation

Williams - Cross/Kurtz                                      21

1    report?

2    A    They are reasonable projections of what FAS-106

3    assumptions might be in the future.

4    Q    Well, wait a second.  You just passed on the FAS-106

5    assumptions not two weeks ago, and they're about half the

6    inflation that's contained in the steady-state projections,

7    correct?

8    A    The assumptions as of 12/31/2005, that's correct.

9    Q    Has anything -- are you prepared to adopt the steady-

10   state projections in a valuation report if you were to put

11   one in today?

12   A    I don't believe I would, no.

13   Q    Right?  There's been no changes between year-end 2005 and

14   now, material changes with respect to medical trend rates,

15   correct?

16   A    I don't believe so, no.

17   Q    You agree with me, correct?

18   A    I agree that there's been no material changes in medical

19   trend rates since two weeks ago to today, I agree.

20   Q    And FAS-106 is intended to capture the best estimate of

21   the company's future projected expenses, correct?

22   A    As of the snapshot date, yes, that's correct.

23   Q    Yeah.  And you believe that the valuation should capture

24   the best assessment or projection of future expenses, right?

25   A    I believe as of the snapshot date it does, yes.

Williams - Cross/Kurtz                              22

1   Q   All right.  And the company's steady-state projections

2   are not the best estimate of future OPEB expenses, correct?

3   A   They are not the best estimate based on the current

4   snapshot, but I do agree that they are a reasonable

5   projection for the company --

6   Q   Well --

7   A   -- to make on for their business plan.

8   Q   Are the company's steady-state projections a reasonable

9   estimate of future OPEB expenses, sitting here today while

10  you're on the stand and under oath?

11  A   The steady --

12  Q   Yes or no.  Yes or no.

13  A   I can't answer the question.

14  Q   From -- you --

15  A   There is not an answer to that question, sir.

16  Q   Well, are you trying to draw a distinction between -- let

17  me ask you this.

18      Are the steady -- are the company's steady-state

19  projections a reasonable forecast of OPEB expenses from a

20  FAS-106 standpoint?

21  A   As I think I said earlier, I believe that they are --

22  Q   Yes or no.

23  A   It's not a yes-or-no question, sir.

24  Q   So you think that the company's steady-state projections

25  are a reasonable FAS estimate?

Williams - Cross/Kurtz                           23

1   A   They are reasonable projections for company business

2   planning purposes.

3          THE COURT:  No, but that wasn't his question.  His

4   question was:  If you were doing a FAS estimate, would they

5   be reasonable?

6          THE WITNESS:  The FAS estimate -- the FAS valuation

7   that I developed generates liabilities at the end of the year

8   and expenses for the next year.  My report doesn't project

9   expenses out into the future, and so that's why I can't

10  answer the question, because my report doesn't cover future

11  years' potential expense.  It covers the current year

12  snapshot best-estimate liability and the expense in the next

13  current year based on those at best-estimate assumptions.

14         THE COURT:  So you -- well, so what -- I guess I'm

15  trying to understand that last answer.  You're saying your

16  report only covers the year in which the steady-state

17  projections and the FAS estimates are basically the same?

18         THE WITNESS:  That's correct.

19         THE COURT:  That is, the current year?

20         THE WITNESS:  That's correct.  My report generates

21  liabilities as of 12/31/2005 in this case, and it generates

22  the expense for fiscal year 2006.

23         THE COURT:  You haven't annualized back any

24  projections thereafter.

25         THE WITNESS:  That's correct.

Williams - Cross/Kurtz                          24

1          THE COURT:  So you're saying that, even though for

2    year 2008 there's a projection of, you know, twelve and a

3    half percent, that didn't affect your calculation of the cost

4    --

5          THE WITNESS:  That's correct.

6          THE COURT:  -- for the current year?

7          THE WITNESS:  That's correct.

8          THE COURT:  Okay.  Go ahead.

9    BY MR. KURTZ

10   Q    FAS-106 requires you to project future medical trend

11   rates, correct?

12   A    Yes, it does.

13   Q    And you have projected future medical trend rates in the

14   FAS-106 report, correct?

15   A    As of my snapshot valuation date I have.

16   Q    And if you were to reissue a report today, it would set

17   forth the very same trend rate projections, correct?

18   A    If my report was meant to be a snapshot valuation, it

19   would.

20   Q    And you -- can you point us to any authority that would

21   suggest that different forecasts of medical trend liabilities

22   can be used for some purpose other than FAS-106?

23   A    I'm not aware of any authority that deals with the kinds

24   of projections that one would develop for company business

25   plans.

                              Williams - Cross/Kurtz                    25

1   Q   So the answer is you cannot cite me to any authority that

2   would suggest your FAS-106 projections can be changed for

3   purposes of, quote, "business planning," correct?

4   A   I'm not aware of anything.

5   Q   And you are aware that, by utilizing the steady-state

6   projections, the debtors have estimated liabilities that are

7   far in excess of what the liabilities would be if, in fact,

8   your FAS-106 projections were adopted, correct?

9   A   The projected liabilities developed by the debtor, these

10  assumptions would be larger than the projected liabilities

11  developed by my snapshot-current (sic), your assumptions.

12        THE COURT:  Well, I'm sorry.  I don't understand

13  that.  I thought I heard you say that you used the same

14  percentage for your snapshot as where FAS -- the FAS

15  projections agree.

16        THE WITNESS:  In the current year, my liabilities,

17  and I believe the liabilities underlying the first-year

18  projections, I believe they would agree.

19        THE COURT:  Well, but as far as your valuation of

20  the liabilities are concerned, you go beyond the current

21  year.

22        THE WITNESS:  Well, my liabilities are -- what I do

23  is I project out all of the future expected benefit payments

24  that I expect to occur under the plan, and then I discount

25  them back to develop a value as of the current year.

Williams - Cross/Kurtz                          26

1          THE COURT:  But -- okay.  But when you do that, are

2  you using the eight percent assumption, or are you projecting

3  a growth as per the -- in terms of the trends, as per the

4  steady-state projections?

5          THE WITNESS:  I'm using the assumptions that were

6  shown in our report, the ones that we discussed earlier.

7          THE COURT:  Which includes the growth.

8          THE WITNESS:  It includes growth, but it includes

9  growth at a declining rate over the next five or six years.

10          THE COURT:  Well, but it -- when you say "growth at

11  a declining rate," the growth declines, but it's still

12  growing.

13          THE WITNESS:  That's right.  That's right.

14          THE COURT:  As opposed to the decline in the FAS.

15          THE WITNESS:  Yeah.  The assumptions that I used in

16  my report, I believe, would line up with the assumptions

17  shown at the top column of this page that doesn't have any

18  shading.  So those, I believe, are the assumptions -- they're

19  a little bit different, I believe, in my report.  We changed

20  the ultimate assumptions from 4.9 percent for each future

21  year to five percent, so we made a modest change.

22          THE COURT:  Are those the FAS assumptions?

23          THE WITNESS:  Those are, in fact, the FAS-106

24  assumptions.

25          THE COURT:  And you say you used those in your

Williams - Cross/Kurtz                              27

1   report?

2              THE WITNESS:  I did.

3              THE COURT:  All right.  Okay.

4   BY MR. KURTZ:

5   Q   You used the assumptions that are reflected on the top of

6   the page, which work down to approximately five percent,

7   correct?

8   A   I believe that's right.

9   Q   You did not use the steady-state projections, which

10  worked out to something like ten and a half percent, correct?

11  A   When you say "ten and a half percent," can you point me

12  to what you're referring to.

13  Q   All right.  Rather than continue to fence with this, you

14  did not use the steady-state projections, which were

15  materially higher than your own, correct?

16  A   That's correct.

17  Q   And if the steady-state projections, in fact, utilized

18  the FAS-106 forecast for medical trends rates, then

19  liabilities would be substantially decreased from what the

20  debtor is showing, correct?

21  A   Liabilities in the projection years would be lower if the

22  FAS-106 assumptions were used, instead of the assumptions

23  that were, in fact, used for the steady-state projections.

24  Q   So the answer is yes.

25  A   I restated it just to be sure I was saying yes to

Williams - Cross/Kurtz                    28

1   something I agreed with.

2   Q   Okay.  And, in fact, the decrease in liabilities would be

3   $2.6 billion, correct?

4   A   I don't know the order of magnitude.

5   Q   Okay.  Can you turn to the next exhibit, which is a

6   demonstrative that has not previously been marked.

7           MR. KURTZ:  I would identify it as 247.

8           THE COURT:  Wait, I'm sorry.

9           MR. BUTLER:  I'd object, Your Honor.  All exhibits

10  were to have been marked and presented.  We haven't seen it.

11  They can't be introducing new exhibits at trial.  That

12  violates the pretrial order.

13     (Counsel confer.)

14          MR. KURTZ:  Your Honor, we went through this math

15  exercise this morning.  What I could do is write it all out

16  on a white board.  But it seems a little more expeditious to

17  walk through a mathematical equation with this witness in

18  this fashion.  If people want me to labor through writing on

19  the board all the same numbers, I can do so.

20          MR. BUTLER:  Counsel --

21          MR. KURTZ:  Which would be permissible under any

22  trial procedures.

23          MR. BUTLER:  Counsel, it would have been nice had

24  you given the objectors to your motion the work product prior

25  to trial.  If you prepared it this morning, you should have

Williams - Cross/Kurtz                                29

1   delivered it this morning.

2          MR. KURTZ:  It was delivered to me at about 2:05,

3   which is why I was happy there was a chambers conference

4   today.

5      (Counsel confer.)

6          THE COURT:  Before I deal with this exhibit, I just

7   have a question.

8          I want to make -- you're not questioning Mr.

9   Williams on his report, right?  You're asking him to critique

10  the company's number -- the company's claim number and this

11  balance sheet, is that what you're doing?

12         MR. KURTZ:  No.  Your Honor, this witness's report

13  opines that Mr. Reese has been overly optimistic in his

14  calculations with respect to OPEB, and that it's

15  unreasonable.  And so I'm going through with this witness the

16  fact that it is the company's assumptions and the company's

17  calculation of OPEB liabilities that is unreasonable, and

18  that it is overstated in accordance with his own work product

19  and the company's own work product by $2.6 billion.

20         THE COURT:  Well, let me ask you.  Do you disagree

21  with Mr. Reese's use of the FAS-106 estimates?

22         THE WITNESS:  No, I believe his results appear to be

23  reasonable based on the starting assumptions that he used,

24  and that those assumptions appear to match the assumptions

25  from our most recent report that he, in fact, had access to.

Williams - Cross/Kurtz                          30

1   So I guess the short answer is:  No, they -- I think I even

2   said in my deposition that I considered them reasonable for

3   the purposes that I thought that they were being used for.

4        THE COURT:  So your criticism of his report is based

5   on other factors, besides the use of the FAS-106.

6        THE WITNESS:  Yes.

7        THE COURT:  All right.  I mean, we can go through

8   this, but it doesn't -- he's agreeing with you on this point.

9        MR. KURTZ:  Okay.  I was just trying to quantify it

10  at $2.6 billion.  In fact, I will stop.

11       What I will say for the record, in case Your Honor

12  wants to be back in the record, looking for exhibits, that

13  the steady-state projection OPEB liabilities are reflected on

14  Exhibit 46; that the Hay Group baseline, which utilizes the

15  FAS-106 projections, is set forth in Exhibit 6, at Appendix

16  B-1.  From there, anybody can do the subtraction and then the

17  addition.

18       THE COURT:  Okay.  All right.

19    (Counsel confer.)

20       THE COURT:  Okay.  So I don't think we need to deal

21  with this demonstrative exhibit because his areas of

22  disagreement with the Reese report are different than after

23  this issue.

24       MR. KURTZ:  Well, I'm about to go into the area.

25  What I was trying to establish, Your Honor, is that Reese

Williams - Cross/Kurtz                                    31

1   properly demonstrated that the steady-state projections

2   overstates OPEB liabilities by 2.6 billion.  I will now go

3   into the rebuttal points --

4           THE COURT:  Okay.  All right.

5           MR. KURTZ:  -- none of which go to that issue.

6           THE COURT:  Okay.

7   BY MR. KURTZ:

8   Q   Okay.  Before -- well, before I get into some of the very

9   specific challenges I have, one other area, which is the

10  pension contribution date, which Mr. Reese thinks was

11  substantially overstated by some $345 million, or caused that

12  kind of a substantial overstatement.

13      I would like you to start by turning to page -- I'm

14  sorry, to Exhibit 53 in your binder.

15  A   (Witness reviews exhibits.)

16      I'm sorry.  There's two Exhibits 53.  53B?

17  Q   Let me come and take a look at it.

18  A   53.

19  Q   Yeah, it's just 53, and that's it.

20  A   Thank you.

21  Q   Okay.  Exhibit 53 is an email that you co-authored on or

22  about October 20th, 2005, correct?

23  A   Correct.

24  Q   And this email sets forth Watson Wyatt's estimated

25  minimum required hourly pension plan contributions under some

1   set of assumptions, correct?

2   A    Correct.

3   Q    And those are the assumptions that were used by Delphi in

4   calculating pension contributions in its steady-state

5   projections, correct?

6   A    Correct.

7   Q    All right.  Now the steady-state projections assume that

8   the company emerges on June 30, 2007, correct?

9   A    I believe that's right.

10  Q    And the company assumes that the pension payment is made

11  that same day, correct?

12  A    I believe that that's right, yes.

13  Q    Okay.  But you had originally run a scenario in which the

14  company emerged on May 30, 2007, one month earlier, correct?

15  A    I do recall that.

16  Q    And under that scenario, the pension costs were much

17  lower, correct?

18  A    Please define what you mean when you say "pension costs."

19  Q    The pension contribution that would be required in 2007

20  would be much lower, correct?

21  A    It was lower, yes.

22  Q    Much lower, correct?

23  A    That depends on what you mean by "much."  Can you define

24  that term?

25  Q    Let's look at what you wrote in your email.  In the first

Williams - Cross/Kurtz                                    33

1   bullet point on the last sentence you write:

2       "Note that these 2007/2008 contributions are much higher

3   than those shown in our August email, which assumed emergence

4   in May 2007."

5       That's what you wrote, correct?

6   A    Correct.

7   Q    So you were certainly comfortable in the ordinary course

8   saying that the pension contribution requirements would be

9   much higher if the company delayed emergence by one month,

10  correct?

11  A    Well, that was --

12  Q    Is that a yes or no?  You were comfortable writing that

13  or no?

14  A    I wrote that for one of the two scenarios that are in

15  here.

16  Q    Okay.  Now both scenarios, though, include emergence on

17  June 30th, correct?

18  A    They do.

19  Q    And, in fact, the second alternative, which we haven't

20  even looked at yet, makes the pension contribution even

21  higher, correct?

22  A    Even higher.

23  Q    Than it would be under alternative one.

24  A    I'd have to look at it to remind myself.

25  Q    All right.  I'll get back to that in a minute.  Let me

Williams - Cross/Kurtz                                    34

1   just at least explain how this works.

2       The company has a plan year-ending of September 30 on, I

3   give a year, correct?

4   A   That's correct.

5   Q   And plan funding may be made within an eight-and-a-half-

6   month period of that time, correct?

7   A   Under the rules of ERISA, that's correct.

8   Q   And that would reduce future pension contributions,

9   correct?

10  A   Correct.

11  Q   And so, in order to achieve that savings on future

12  pension contributions, one would need to make a funding by

13  June 15th of any particular year, correct?

14  A   All contributions count, whether they go in on June 15th

15  or June 30th.

16  Q   But if the go in on June 15th, then they count towards

17  the current year, correct?

18  A   That's correct.

19  Q   And that saves the amount -- that decreases the amount of

20  future pension contributions, correct?

21  A   It decreases the contribution in that current year.

22  Q   Okay.  And in this case, in order to obtain that decrease

23  in required pension contribution for 2007, the funding would

24  have to be by June 15th, correct?

25  A   That's correct.

Williams - Cross/Kurtz                                    35

1   Q    Just two weeks before the June 30th date, correct?

2   A    That's correct.

3   Q    And there's no way that responsible management is going

4   to delay funding for two weeks at a cost of some hundreds of

5   millions of dollars in requirements for 2007, correct?

6   A    If the only effect was to cause the 2007 contribution to

7   increase, I would agree with that statement.

8   Q    Well, can you give us a reason why the company would want

9   to delay two weeks in making that pension contribution at a

10  cost of hundreds of millions of dollars; can you give us that

11  reason?

12  A    Well, in fact, the alternate projection that we did here

13  picked June 30 as a date -- not -- I don't believe that that

14  was the date we were told was the expected emergence from

15  bankruptcy, but rather it was a date that we selected in

16  order to illustrate the difference between making a

17  contribution on June 15th and making a contribution any time

18  after that date.  So, in fact, this projection would be the

19  same whether they emerge from bankruptcy on June 30th or July

20  30th or September 30th.

21       Furthermore, as I've been hinting, the effect on

22  contributions is not just to cause the 2007 contribution to

23  go up by --

24  Q    Hundreds of millions.

25  A    -- a couple of hundred million dollars, but it also

Williams - Cross/Kurtz                                    36

1   caused -- in fact, if you accelerate the contribution before

2   June 15th, while it did cause the 2007 contribution to drop

3   by a couple hundred million dollars, it caused the

4   contribution for the next year to increase by a hundred and

5   fifty some-odd million, and the third year to increase again;

6   so that, over those three years, the contributions were, in

7   fact, the same --

8   Q   Well, let --

9   A   -- so it was simply a timing issue that we were

10  illustrating.

11  Q   Well, let me ask you.  I'm going to go back and ask my

12  same question.

13      Do you identify any legitimate reason that the debtor

14  would want to pay more money in 2007 than it was required to

15  pay in order to comply with ERISA requirements of funding?

16  A   I can't answer that because I don't know enough about

17  their business plan.

18  Q   Well, you've been their actuary since their inception,

19  and you've been doing this for years and years.  Can you

20  think of any reason why the debtor would want to increase its

21  pension contribution requirements in 2007?

22  A   It's a cash flow issue.  I can't tell you what kind of

23  things that they consider when they're deciding what kind of

24  cash flow -- what kind of pension contributions and the

25  timing of those contributions should be.

Williams - Cross/Kurtz                    37

1   Q    Well, it's a cash flow issue, meaning that if they make

2   the payment on June 30th instead of June 15th, they have to

3   pay more money, correct?

4   A    If that was the only decision, that would be correct.

5   Q    Can you identify a reason that Delphi would want to have

6   to pay more money for cash flow purposes?

7   A    Again, I said the June 30 wasn't the date that I

8   understood that they were planning to emerge from bankruptcy;

9   that was simply an illustrative date, that the same exact

10  pattern would occur if they emerged from bankruptcy on

11  September 30th or October 30th.

12  Q    Well, you can make the pension payment at any time,

13  correct?

14         THE COURT:  Counsel, this is the fifth time you've

15  asked this question.

16         MR. KURTZ:  Okay.  Well, no, I'm just trying to

17  point out, Your Honor, you don't have to emerge --

18         THE COURT:  And you well know that in bankruptcy

19  cases, the emergence from bankruptcy is subject to a lot of

20  factors.

21  BY MR. KURTZ:

22  Q    Well, let me put it this way.  You, in fact, ran a

23  scenario where emergence was May 30th, correct?

24  A    That's correct.

25  Q    And it was the company that then asked you to delay it by

1  a mere month, correct?

2  A   I don't recall whether the company asked me to delay it

3  by a mere month, or whether the company asked me to

4  illustrate the impact if the emergence was after June 15th.

5  Q   Okay.  Assuming that the company asked you to assess the

6  impact, you advised the company in Exhibit 53 that the impact

7  was that their contributions would be much higher, correct?

8  A   I said that the contributions would be increased for that

9  year, but they would decrease for the subsequent two years.

10  Q   By the way, do you understand that 2007 is an important

11  year because the company analysis is based in part on 2007

12  earnings?

13         MR. BUTLER:  Objection.  Where does that go into his

14  actuary report?

15         MR. KURTZ:  Your Honor, I understand where this

16  witness -- he keeps suggesting 2007 doesn't mean a lot, but

17  of course it means --

18         THE COURT:  Was this request tied, to your

19  knowledge, to the company's response to the request for the

20  formation of an equity committee and preparation of financial

21  projections related thereto?

22         THE WITNESS:  Not to -- no, I would have had no idea

23  why they were asking me this projection.

24  BY MR. KURTZ:

25  Q   After you assessed the impact of delaying a payment by

Williams - Cross/Kurtz                                    39

1  two weeks, and then advised the company that the impact was a

2  much higher cash contribution requirement, that's what the

3  company included in their steady-state projections, right?

4  A   I believe that's right.

5  Q   All right.  Now one other point on this.  Delphi had you

6  assume that they would not be able to obtain a waiver of the

7  requirement that missed contribution be paid immediately upon

8  emergence from bankruptcy, correct?

9  A   For this particular scenario, that's correct.

10 Q   And you agree that a significantly better result would

11 emerge if Delphi gets IRS approval for funding waivers for

12 2006 and 2007, correct?

13 A   I think I agree with that generally, yes.

14 Q   And you explain that's because, quote:

15     "The approvals would eliminate the funding spike upon

16 emergence from bankruptcy, and would provide more flexibility

17 through the end of 2007, since the waiver would presumably

18 survive such emergence."

19     Correct?

20 A   I believe that's what I said, yes.

21 Q   And it is possible that Delphi will, in fact, obtain a

22 waiver of their minimum funding rules, correct?

23 A   It certainly might be possible, yes.

24 Q   And Delphi did not ask you to model that scenario,

25 correct?

1   A    No, I don't think that's correct.

2   Q    Did they ask you to model that scenario?

3   A    I believe that might have been one of the scenarios we

4   modeled -- we modeled, yes.

5   Q    Well, do you know that?  Because it hasn't been produced

6   to us.

7   A    I believe that that would have been one of the scenarios

8   that we modeled, yes.

9   Q    Okay.  Do you know why it wasn't produced?

10  A    No, I don't.

11  Q    And if you ran the scenario, what it would have

12  demonstrated to the debtors was a significantly -- well, what

13  it would have shown to the debtors is no contribution

14  obligation in 2007 or 2006, correct?

15  A    It would show no contribution requirement for the year of

16  the waiver, that's correct.

17  Q    Which, according to you, is 2006 and 2007, correct?

18  A    That would be one possible scenario, that's correct.

19  Q    All right.  Let me move to the specific challenges you

20  raise in your report.

21       Initially, can you confirm that your report and

22  declaration was drafted by Skadden Arps?

23  A    Yes.

24  Q    And I want to start by making clear that you have not

25  prepared your own calculation of OPEB and pension expenses

Williams - Cross/Kurtz                                          41

1    and liabilities for this motion, correct?

2    A    That's correct.

3    Q    Instead, you have reviewed Mr. Reese's work, correct?

4    A    That's correct.

5    Q    And you know Mr. Reese?

6    A    I do.

7    Q    You worked with him at Watson Wyatt?

8    A    I did.

9    Q    Mr. Reese worked on GM matters when Delphi was still a

10   part of GM, correct?

11   A    That's correct.

12   Q    And he is, in your opinion, a very able actuary, correct?

13   A    He is.

14   Q    All right.  And you agree that Mr. Reese's baseline

15   calculations here are reasonable, correct?

16   A    I agreed that they were reasonable for the purpose I was

17   assessing them for.

18   Q    Okay.  And Mr. Reese's baseline forecasts are based on

19   reasonable actuarial assumptions, correct?

20   A    They're reasonable for the purpose that I assessed them

21   for, that's correct.

22   Q    And they are based on reasonable actuarial assumptions,

23   correct?

24   A    They're reasonable for the purpose that I expected they

25   were to be used for.

Williams - Cross/Kurtz                                    42

1   Q   Yes or no.  Are they based on reasonable actuarial

2   assumptions?  If the answer is no, you're going to have to

3   identify those.

4   A   They're based on reasonable assumptions for the purpose

5   that I expected they were to be used for.

6           THE COURT:  No.  But I mean, you're going to have to

7   explain why that's an important distinction.

8           THE WITNESS:  All right.  When I reviewed Adam

9   Reese's report, there was nothing in the report that

10  indicated to me that it was going to be used to develop any

11  kind of a baseline valuation of Delphi; rather, Adam Reese's

12  report focused most of its attention on the possible -- the

13  impact of possible changes to the plans, impact of possible

14  changes in assumptions.  And, thus, my review of the report

15  was to the notion that I was reviewing it to see whether the

16  ultimate conclusions that he was drawing on the effective

17  changes was reasonable.

18      And so the baseline starting point for that particular

19  review would certainly be different than the baseline that I

20  might think is more appropriate if I thought it was going to

21  be used in determining the value of Delphi.

22      As a for instance, if I can just expound on that, Mr.

23  Reese's report did not include any kind of calculation of

24  contributions based on bankruptcy assumptions.  He, instead,

25  started with he assumed that the company was going to make

Williams - Cross/Kurtz                              43

1   ERISA minimum contributions throughout the period.  And of

2   course, I knew that that was incorrect.  But for purposes of

3   measuring the impact of changes in the plan, changes in

4   assumptions, I concluded that that difference probably

5   wouldn't affect my views regarding his measurement of these

6   changes.

7   Q   Your concern is that, in making actuarial determinations

8   as to future expenses and liabilities in compliance with the

9   governing accounting standard, somehow it should not be used

10  in connection with a valuation exercise.  Is that correct?

11  A   His numbers are based on accounting standards and funding

12  rules, and he based them on funding rules that -- I think as

13  I mentioned in my deposition in a couple of areas -- I don't

14  think are appropriate to use for the purpose of valuing

15  Delphi right now.

16  Q   Are you a valuation expert?

17  A   I'm not.

18  Q   Have you ever valued a company?

19  A   I haven't.

20  Q   Have you ever run a DCF analysis?

21  A   I have not.

22  Q   Have you ever run a comparable company analysis?

23  A   I have not.

24  Q   Okay.  So you don't have a basis for testifying as to

25  whether or not compliance with FAS-106 is sufficient for

Williams - Cross/Kurtz                    44

1  purposes of valuing a company, correct?  Correct?

2  A    That's correct.

3  Q    And one would hope that, in making calculations under

4  strict accounting standards, filing them with the SEC and

5  publicly disclosing them, so that shareholders can make

6  decisions about the value of a company, that, in fact, those

7  would be a good basis for valuation, correct?

8              MR. BUTLER:  Objection.  Objection.

9              MR. KURTZ:  Did you get the head nod?

10             THE COURT:  No, I didn't.

11             THE WITNESS:  I was reaching for my water.

12             THE COURT:  What's the objection?

13             MR. BUTLER:  Your Honor, he just established that

14 this witness isn't to be used for valuation purposes, then he

15 asked him a valuation question.  He can't have it both ways.

16             THE COURT:  Well, let me ask you the question a

17 little differently.  If I think I understand your answer --

18 if I understand your answer, you're saying that the baseline

19 actuarial assumptions that Mr. Reese used -- which are right

20 out of the FAS-106, right?

21             THE WITNESS:  Well, his assumptions for expense and

22 funding.  So the expense assumptions are out of FAS-87 and

23 FAS-106.

24             THE COURT:  So as far as base --

25             THE WITNESS:  But the funding are out of our funding

Williams - Cross/Kurtz                                45

1   reports.

2          THE COURT:  As far as baseline assumptions are

3   concerned, there's nothing wrong with his use of those,

4   right?

5          THE WITNESS:  "Those," the demographic and economic

6   assumptions, I think I'd agree with, yes.

7          THE COURT:  Okay.  Is there some other baseline

8   assumption that he uses in addition to those that you have an

9   issue with?

10         THE WITNESS:  Yes, two areas:

11         One, again, is the assumption of timing of

12  contributions for pension funding purposes.  Because, again,

13  he assumed that the pension funding contributions would be

14  made in accordance with ERISA, which is -- would accelerate

15  the contributions in comparison to the actual contribution

16  scenario that we developed, based on our understanding of the

17  bankruptcy scenario.

18         THE COURT:  And are either of those out of FAS?

19         THE WITNESS:  No, those aren't governed by FAS-87;

20  those are governed by -- in the first case, by ERISA, and in

21  the second -- the government funding rules, and in the second

22  case, they're governed by a combination of the government

23  funding rules and the rules that are being applied during

24  bankruptcy as to how much money Delphi can contribute to its

25  pension plans.

Williams - Cross/Kurtz                              46

1          THE COURT:  Okay.  And is there any other baseline

2    assumption that you take issue with?

3          THE WITNESS:  Yes.  In developing the contributions

4    for the pension plan for the projection period, Mr. Reese

5    assumed that the pension funding law was going to be changed

6    in accordance with one of the bills that is currently being

7    debated in Congress.  And, in fact, in our forecast, we've

8    assumed that the current funding law would remain in place

9    because, in my estimation, there is too much uncertainty

10   associated with trying to predict what possible changes might

11   occur because the funding laws that are being debated in

12   Congress are quite different.  The President has indicated

13   that if the laws aren't -- if they pass a law that he's not

14   happy with, he may veto it.

15          And in the past, when Congress has debated changes

16   in funding rules, it's taken them a long time to get to

17   someplace, and very often they get to a set of rules that are

18   very different than what they start with.

19          THE COURT:  Okay.  Those are the two areas where you

20   disagree with him?

21          THE WITNESS:  Those are the two areas.

22          THE COURT:  Okay.

23          MR. KURTZ:  Thank you.

24   BY MR. KURTZ:

25   Q   On that first area, the assumption concerning the timing

Williams - Cross/Kurtz                              47

1  of contributions.  What's the financial impact on Mr. Reese's

2  calculations associated with that challenge by you?

3  A  I haven't done a direct comparison to try and figure that

4  out.

5  Q  Ah, I see.

6      On your second challenge, you talked about the funding

7  law.  You understand that the law might be passed, and the

8  law might not be passed, correct?

9  A  Correct.

10 Q  And you noted that the President might veto, but that was

11 with respect to the bill that had special treatment for the

12 airlines, correct?

13 A  I don't know that that's necessarily why he would veto

14 it.

15 Q  If the law is passed, then all your assumptions would be

16 wrong that are impacted by the law, correct?

17 A  If the law is passed as written, that's correct.

18 Q  And since we don't know whether it will or will not be

19 passed, would you agree that Mr. Reese's assumption is

20 reasonable?

21 A  No, I don't think it's reasonable to assume that a law is

22 going to change.

23 Q  Okay.  Even though it's passed -- a similar bill has

24 passed both the Senate and the House.  Is that right?

25 A  They differ in some important respects.

Williams - Cross/Kurtz                              48

1   Q   Okay.  So then let's assume that you're right in the way

2   you speculated about the introductions of law (sic).  Then

3   what would the financial impact be on Mr. Reese's

4   calculation?

5   A   Well, certainly Mr. Reese's contributions would be --

6   would be very much delayed, and they would look much more

7   like the contributions that we were just discussing in my

8   report.

9   Q   Your FAS-106 --

10  A   Well, I'm sorry.  In my -- I'm sorry.

11  Q   I'm sorry.

12  A   In the email we were discussing earlier.

13  Q   Okay.  I'm just asking for a number.  What's the number?

14  I'm trying to understand this.  What's the number?

15  A   Well, if we look at one of the years in question, Mr.

16  Reese assumed that the contribution in 2007 would be, I

17  think, on the order of $800 million.  And I believe that my

18  projection was on the order of $2 billion.

19  Q   Can you show me where your math is on that?  I don't

20  recall you doing this in any reports or declarations.

21  A   That's not math.  That's just recalling a number from his

22  report.

23  Q   You haven't actually analyzed and tried to calculate what

24  Mr. Reese's number would be if he changed his assumption

25  about the enaction of a law, have you?

Williams - Cross/Kurtz                                49

1    A   I didn't -- no, I did not do that.

2    Q   Okay.  Let me move to the five specific challenges that

3    you raise in your report, and I'll go through this stuff

4    pretty quickly.

5        The first challenge you raise is with respect to the

6    assumption that Mr. -- by Mr. Reese under some scenarios that

7    the pension discount rate could increase by .25 percent

8    annually, from five and a half to six and a half percent,

9    correct?

10   A   That's correct.

11   Q   Do you agree that it is reasonable to assume that

12   interest rates may so increase?

13   A   They certainly might.

14   Q   All right.  And in fact, the current discount rate used

15   for Delphi's pension and OPEB expense is the lowest it's ever

16   been in Delphi's existence, correct?

17   A   That's correct.

18   Q   And interest rates haven't been this low since the 1940s

19   and '50s, correct?

20   A   I believe that's generally correct.

21   Q   So it's certainly reasonable to project that discount

22   rates may rise from the lowest historical rate, correct?

23   A   That's certainly one assumption one can make, yes.

24   That's --

25   Q   All right.  And then you offer that it is possible that,

Williams - Cross/Kurtz                                    50

1   if interest rates increase, there will be a resulting decline

2   in invested asset value, which may offset, at least in part,

3   some of those savings, correct?

4   A    That's correct.

5   Q    But an increase in discount rates does not necessarily

6   correspond to a decrease in asset value, correct?

7   A    It doesn't always, that's correct.

8   Q    There have been periods of time when discount rates have

9   decreased and asset values have, in fact, increased, correct?

10  A    I'm sorry.  There's been periods when discount rates have

11  decreased?

12  Q    Yeah.  And asset values have increased, correct?

13  A    That certainly is true.

14  Q    All right.  And you certainly haven't quantified or

15  modeled the effect that a decrease in discount rate could

16  have on assets, correct?

17  A    No.

18  Q    Am I right or wrong?

19  A    That's correct.

20  Q    All right.  Your second challenge is to Mr. Reese's

21  assumption that the retirement medical benefit discount rate

22  will be higher than the pension discount rate, correct?

23  A    That's correct.

24  Q    You understand that in the supplemental declaration Mr.

25  Reese provides no such differential, correct?

Williams - Cross/Kurtz                    51

1  A    I did notice that, yes.

2  Q    And you understand that Mr. Reese utilized your FAS-106

3  assumption in setting the discount rates, correct?

4  A    I did notice that.

5  Q    And when he had the twenty-five-basis-point differential

6  that was also based on your FAS-106 report, correct?

7  A    Well, which report was that based on?

8  Q    Well, did -- first the debtor produced a year-end 2004

9  FAS-106 report, correct?

10  A    Correct.

11  Q    And in there was the twenty-five-basis-point

12  differential, correct?

13  A    I believe it was.

14  Q    Which was then used by Mr. Reese, correct?

15  A    I believe that's -- well, it --

16  Q    Then after Mr. Reese submitted a report, the debtors

17  produced the 2005 FAS-106 report, correct?

18  A    That's correct.

19  Q    And in that report, you had extinguished the

20  differential, correct?

21  A    I didn't extinguish it.

22  Q    The company had extinguished it.

23  A    The marketplace extinguished it.

24  Q    Okay.  You reflect no more differential, correct?

25  A    That's correct.

Williams - Cross/Kurtz                          52

1   Q    And Mr. Reese adopts your assumptions again, correct?

2   A    I believe that that's correct

3   Q    Okay.  Your third challenge is your assertion that the

4   elimination of a jobs bank will cause an increase in

5   retirements and that Mr. Reese has failed to account for the

6   costs of such accelerated retirements, correct?

7   A    I believe I said that it could cause an increase in

8   retirements, that's correct.

9   Q    You certainly don't know that will happen, right?

10  A    I don't.

11  Q    And you certainly haven't attempted to quantify the

12  impact of any perspective acceleration or retirements,

13  correct?

14  A    I have not.

15  Q    In fact, you've performed no study of that issue at all,

16  right?

17  A    That's correct.

18  Q    And just to see how this works, some of the employees in

19  the job bank are retirement eligible, correct?

20  A    I believe that they would be, yeah.

21  Q    And some of the employees in the job banks are not

22  retirement eligible, correct?

23  A    I don't know.  I don't know the exact composition of the

24  jobs bank.

25  Q    Okay.  Actually, you just have no idea what the

Williams - Cross/Kurtz                                    53

1   composition of the jobs bank is, correct?

2   A   I think that that's correct, yes.

3   Q   But you know -- or at least you could know if you looked

4   at the right documents what the work force population is,

5   correct, inclusive of job banks?

6   A   Yes.

7   Q   And you know that Delphi accrues an OPEB liability for

8   all employees regardless of whether they're retirement

9   eligible or not retirement eligible, correct?

10  A   Yes.

11  Q   And if Delphi terminates the job bank, then it will

12  eliminate its actuarial liability with respect to each

13  employee that is not retirement eligible, correct?

14  A   That would generally be correct, yes.

15  Q   So there might be an increase in retirement costs with

16  respect to retirement eligible employees, correct?

17  A   Correct.

18  Q   And a decrease in actuarial liability with respect to

19  those employees that are not retirement eligible, correct?

20  A   That's correct.

21  Q   And you understand that approximately seventy-five

22  percent of Delphi's work force is not retirement eligible?

23  A   I don't know that off the top of my head, no.

24  Q   I'll tell you what.  Why don't we look through -- let's

25  go back to your FAS-106 report and ask you to turn to Page 9

Williams - Cross/Kurtz                           54

1   and tell us whether that reflects the number of employees at

2   large and those that are retirement eligible.

3   A   Okay.  I have Page 9.  What was the question?

4   Q   Well, can you first confirm that according to your FAS-

5   106 report there is 32,017 employees that work at Delphi?

6   A   There are 32,000 hourly employees covered by this plan.

7   Q   Okay.  And can you further confirm that the shaded box

8   are those that are retirement eligible?

9   A   With the inclusion of some portion of the people in the -

10  -

11  Q   In the box.

12  A   -- in the box around the two oh eight two.  I believe

13  that's correct.

14  Q   Let's go one step at a time.

15      Everyone in the shaded area is retirement eligible,

16  correct?

17  A   I believe that that's right.

18  Q   And then the box, it contains people that might be

19  retirement eligible and might not be retirement eligible,

20  depending how old they are and how long they've been there?

21  A   That's correct.

22  Q   And eye-balling this, or otherwise accepting my

23  representation subject to somebody doing some math later,

24  about seventy-five percent of the work force is not

25  retirement eligible, correct?

Williams - Cross/Kurtz                          55

1   A    Seventy-five percent of the people covered by this plan -

2   -

3   Q    Yeah.

4   A    -- I would -- without doing the math myself, if you say

5   you've done the math, I accept that that certainly looks like

6   it could be a reasonable conclusion.

7   Q    All right.  And the savings associated with the estimated

8   seventy-five percent of the work force that would result in a

9   decrease in actuarial liability more than offsets any

10  increase associated with the remaining twenty-five percent,

11  correct?

12  A    Not necessarily.

13  Q    You can't say that's incorrect, can you?

14  A    I can't say it either way.

15  Q    Okay.  Your fourth challenge, you claim that Delphi will

16  be required to provide transitional benefits for current

17  retirees or employees that are retirement eligible or close

18  to being retirement eligible, correct?

19  A    I said that they -- that Delphi certainly might be

20  required.

21  Q    Okay.  You're not an expert in labor negotiations,

22  correct?

23  A    I'm not sure what that term means.

24  Q    Then you must not be an expert, right?

25  A    I can't answer that question.

Williams - Cross/Kurtz                          56

1  Q   Okay.  And you don't know whether Delphi would have to

2  provide transitional benefits, right?

3  A   I don't.

4  Q   But you do know that in 1995 -- I'm sorry, in 2005,

5  Delphi, in fact, changed the medical retirement benefits for

6  salaried employees, correct?

7  A   Correct.

8  Q   And that resulted in a fifty percent savings, correct?

9  A   Thereabouts.  That's correct.

10 Q   And that was inclusive of transition benefits, correct?

11 A   Inclusive of the transition benefits that they provided

12 voluntarily to salaried employees.  That's correct.

13 Q   And that's precisely the assumption that's been adopted

14 by Mr. Reese, correct?

15 A   I believe that that's correct.

16 Q   All right.  Last point.  Your fifth challenge is that Mr.

17 Reese should have assumed a mass reduction in work force,

18 correct?  Or maybe should have assumed that, correct?

19 A   I -- yeah.  I think what I said was that his projection

20 was flawed because he didn't take into account the

21 possibility that any change in the plan, particularly a plan

22 freeze or any other change, might result in a large number of

23 people retiring.

24 Q   But your exact words were, quote, "a mass reduction in

25 the workforce," correct?

Williams - Cross/Kurtz                    57

1    A    I'm sorry.  What's the -- can you read the full sentence

2    so I understand the context of what --

3    Q    Well, I'll adapt to any way you want to talk about it.

4    I'm just saying you talk about a mass reduction in the

5    workforce, correct?

6    A    I need to know the context of what I said --

7    Q    Sure.  Look at your report, which is Exhibit 12 in your

8    binder.

9    A    Okay.

10    Q    And turn to Page -- turn to Page 6, Subsection E, first

11    bullet point.  What you say is, just so we have it right on

12    the record, is:

13        "Considering that Delphi has stated that its ability to

14    reorganize depends largely on its ability to successfully

15    transform its labor structure and costs --"

16    A    I'm sorry.  Could you tell me exactly where you are?  I'm

17    on Page 6.  I want to be sure I'm at the right place.

18    Q    Sure.  It's your fifth challenge, so it's under "E" and

19    it's the first bullet point.  It's the last paragraph on the

20    page.

21    A    Okay.

22    Q    Should I start from the beginning or are we comfortable

23    picking up where I left off?

24    A    No, that's fine.

25    Q    "-- Hay Group should have considered a mass reduction in

Williams - Cross/Kurtz                              58

1  workforce arising out of Delphi's potential decision to cease

2  certain operations."

3  A    Yes.

4  Q    That's what you said, right?

5  A    Yes.

6  Q    Now if there was a mass reduction in the workforce, then

7  Delphi's expenses would be dramatically decreased, correct?

8  A    Not necessarily.

9  Q    You mean if Delphi didn't have to pay its employees

10 salaries and benefits and other compensation but for

11 pensions, that wouldn't result in a savings to the company?

12 A    I can't conclude that.

13 Q    You can't conclude that there is a savings associated

14 with not paying employees?

15           MR. BUTLER:  Judge, objection.  Asked and answered.

16           THE COURT:  Well, why would you not conclude that?

17           THE WITNESS:  Because the -- if the mass reduction

18 in the workforce resulted in significant early retirement,

19 particularly if it resulted in the triggering of the special

20 early retirement benefits that are provided to people when

21 plants are shut down, the increase in liabilities and

22 contributions in the near term could be quite substantial.

23 And I haven't looked at that increase compared to the

24 decrease in near-term savings due to the elimination of

25 salaries to know whether there is -- what the relationship

Williams - Redirect/Butler                          59

1    might be.

2              Certainly over the long term, I'd expect that there

3    would be savings.  But because of the rules of ERISA which

4    requires a very rapid pay-down of unemployment liabilities,

5    it could be in the near term there might not be any savings.

6              THE COURT:  Okay.

7    BY MR. KURTZ:

8    Q    Let me take that in pieces.

9         You certainly recognize that a reduction in payroll

10   constitutes a savings, correct?

11   A    Yes, it does.

12   Q    And under general circumstances wouldn't you also assume

13   that it costs more to pay a current employee than it would

14   cost to retire him?  Under normal circumstances.

15   A    I can't conclude that because of the way that ERISA

16   funding rules work.

17   Q    You can't conclude that I'm wrong either, right?

18   A    Without running numbers, no, I can't.

19   Q    And you haven't run any numbers, right?

20   A    That's correct.

21   Q    You've had an opportunity to do that, but you haven't

22   done that, right?

23   A    That's correct.

24   Q    And you do understand that Eureka and Mr. Reese both

25   assume that the workforce will remain static, and so did not

Williams - Redirect/Butler                          60

1  account for the reduction in payroll expenses?

2  A   Yes.

3  Q   Okay.  And, notwithstanding your objection that Mr. Reese

4  failed to assume a mass reduction in workforce, your pension

5  calculations also assume that the workforce will remain

6  static, correct?

7  A   That's correct.

8        MR. KURTZ:  No further questions.

9        THE COURT:  Okay.  I hope, sir, you've turned your

10 cell phone off?

11       UNIDENTIFIED:  Yes.

12       THE COURT:  If that happens again you'll be excluded

13 from the court.  And anyone else whose cell phone goes off

14 will be excluded from the court.  All right.

15                    **REDIRECT EXAMINATION**

16 **BY MR. BUTLER:**

17 Q   Mr. Williams, let's turn back your attention, if you

18 will, to I think what was marked Exhibit 70.  That would be

19 in the book -- the first book that you received.

20     And that's the FAS report dated March 3, 2006.  Is that

21 correct?

22 A   That's correct.

23 Q   And you prepared that report.  Is that correct?

24 A   We did.

25 Q   Can you explain to the Court what relationship, if any,

Williams - Redirect/Butler                                    61

1   that report has to do with the establishment of liabilities

2   in the balance sheet for OPEB?

3   A   Yes.  This report includes in it not just the liabilities

4   we've calculated, the present value future benefits, but also

5   it includes the accumulated liabilities that the company has

6   actually booked, which is the excess of expense books by the

7   company on their balance sheet, or on their income statement,

8   through the end of 2005 over cash benefit payments actually

9   paid by the company through that period.

10  Q   I'm showing you an exhibit, Trial Exhibit 206, Mr.

11  Williams.  On that exhibit there is a part of the pie that

12  says there's $7.399 billion worth of post-retirement

13  obligations other than pensions.  Are you familiar with that

14  number, sir?

15  A   I believe I am.

16  Q   Is that number consistent or inconsistent with your

17  report?

18  A   I believe it to be consistent with my report.

19  Q   So notwithstanding all of the cross-examination, Mr.

20  Williams, you believe that -- do you believe that this number

21  is properly stated?

22       THE COURT:  I'm sorry.  When you say "your report,"

23  which report are you referring to?  The FAS?

24       THE WITNESS:  Yes.

25       MR. BUTLER:  I was talking about Exhibit No. 70,

1   Your Honor.

2            THE COURT:  Okay.  All right.  Let me -- I'm sorry.

3   You had an objection?

4            MR. KURTZ:  Your Honor, this witness does not

5   include anywhere in his report or declaration some sort of

6   balance sheet analysis, which is what we're now looking at.

7   He looks at the actuarial accruals, and we've addressed them.

8            That has nothing to do with balance sheet, nor does

9   it -- we even established a basis that he knows the balance

10  sheet, has looked at the numbers, other than his willingness

11  to sort of just agree with his counsel.  I don't see where

12  he's got a basis for saying he knows what makes up the 7.4

13  million and -- or billion -- and that he studied it and has a

14  basis for responding beyond the scope of what his -- and I

15  didn't ask him about balance sheet questions, either.

16           So it's outside the scope of the cross and it's not

17  within his report and there's no foundation that he even

18  knows the answer.

19           MR. BUTLER:  He examined him about Exhibit 70, Your

20  Honor.  And that -- and, you know, asked a lot of questions

21  about the obligations the company was carrying in its

22  projections and about its financials.  This is one of the

23  core aspects of this case.

24           THE COURT:  Well, but he only asked him about the

25  FAS report insofar as he's talking about the baseline

Williams - Redirect/Butler                        63

1   objections for the medical projections.

2         MR. BUTLER:  This is the starting point of those

3   projections, Your Honor.  That's my --

4         THE COURT:  Well, you can ask him about the baseline

5   -- about the medical projections, but, I mean -- and how they

6   might relate to, you know, the company's financial statement.

7   But I don't see how he can give expert testimony on something

8   he hasn't written a report on or -- and I don't think he's

9   written a report on the claim.

10        MR. BUTLER:  Your Honor, he was examined about the

11  FAS-106 report.

12        THE COURT:  No, no.  You can ask him -- you can ask

13  him about what he -- the specific things he was examined on,

14  which wasn't the whole report.  It was just the baseline

15  medical costs -- medical trend projections and how they

16  relate to the difference between the projected OPEB claim

17  that Mr. Reese has and whether that projected claim of Mr.

18  Reese's is inaccurate.

19        So I think you have to get there in a little -- in

20  baby steps and you may not be able to get all the way there,

21  in other words.

22        MR. BUTLER:  All right.  Your Honor, let me then

23  move to the second line of redirect relating to this because

24  there was a great deal of cross-examination on this point.

25  BY MR. BUTLER:

Williams - Redirect/Butler                         64

1   Q   Mr. Williams, are you aware of whether there were

2   different assumptions used in the steady-state projections

3   than in the Watson Wyatt Report, Exhibit 70, with respect to

4   baseline trends?

5   A   Yes.

6   Q   Are you aware of what those differences are?

7            MR. KURTZ:  Objection.  Your Honor, if this has to

8   do with medical rate trends, terrific; if it doesn't, it's

9   beyond the scope of his report, it's beyond my cross-

10  examination.

11           THE COURT:  Well, except you asked him about the

12  basis for the difference between this number, the 7.33-

13  billion-dollar number, and Mr. Reese's overall number.

14           MR. KURTZ:  No.  No, I --

15           THE COURT:  Well, wasn't that what your

16  demonstrative exhibit was all about?

17           MR. KURTZ:  No.  But let me explain.

18           What I asked him about was the difference -- and I

19  have no problem with redirect on it -- between Mr. Reese's

20  baseline OPEB liability forecast, and that's contained in the

21  steady-state projections, I don't think anybody has connected

22  that to the blue claim on that sheet.

23           Absolutely, I went into the OPEB liabilities.  But I

24  don't believe anyone has connected that to the 7.3  I don't

25  think that's what it adds up to, although I could go through

Williams - Redirect/Butler                                    65

1    the --

2           THE COURT:  So, I'm sorry.  Your comparison in your

3    demonstrative was between what and what?

4           MR. KURTZ:  Between OPEB liabilities for 2006

5    through 2010, as calculated by Mr. Reese and as calculated in

6    the steady-state projections.

7           THE COURT:  Okay.  Well, don't the steady-state

8    projections lead to this -- I mean, that's the question Mr.

9    Butler was asking.  Do the steady-state projections lead to

10   this number or not?

11          MR. KURTZ:  Well, if he says do they lead to the

12   OPEB liability number reflected in the steady-state

13   projections, I have no problem.  I'm not --

14          THE COURT:  Okay.

15          MR. KURTZ:  -- convinced that that's the same number

16   as what's in --

17          THE COURT:  Well, let's ask him that.

18          MR. BUTLER:  Your Honor, I was actually -- I told

19   you I'd go on to my second line of questioning.  I was

20   dealing with -- and just so the record can be clear here,

21   there is a difference between the liabilities on the balance

22   sheet at any given period of time and the OPEB expense that's

23   expensed against the income statement at any period of time.

24   All right?  One is a balance sheet; one is an expense.  One

25   is an income; one is an income item.

1          And the line of questioning which I was moving into

2    which I believe was the line of questioning counsel was

3    involved in was what was being expensed based on actuarial

4    projections and the company's business projections what was

5    being expensed.

6          THE COURT:  Okay.  So it doesn't relate to the --

7          MR. BUTLER:  No.

8          THE COURT:  Fine.  Then you can answer that

9    question.

10         MR. BUTLER:  Okay.

11   BY MR. BUTLER:

12   Q   So I believe the question I was asking you before the

13   objection was:  Are you aware of whether there was a

14   difference between the assumptions used in the steady state

15   with respect to annual OPEB expense expensed against the

16   income statement and that that would be derived by applying

17   forward-looking trend line in the Watson Wyatt Exhibit 70?

18   A   Yes, I am aware of the difference.

19   Q   Okay.  Do you know why there is a difference?

20   A   Yes, I do.

21   Q   Can you explain to the Court what that difference is?

22   A   Yes, I can.

23        The main part of it -- the main difference, the main

24   driver is the fact that in the company's business plan

25   projections, the company elected to assume that in each year

Williams - Redirect/Butler                              67

1   during the business planning period the company would need to

2   move forward the period over which the medical trend is

3   assumed to decrease essentially to push out trend one year in

4   each year of the projection.  And I believe that they did

5   that because of what they saw had, in fact, happened in the

6   past with respect to comparing experience with -- that

7   actually occurred with the assumptions in our various

8   valuation reports in the past.

9   Q    And what, Mr. Williams, had happened in the past?

10  A    In fact, in each year in the past five years medical

11  trend was higher than that we had assumed in our report.  And

12  so, in fact, in each year in the past -- in each year since

13  Delphi spun off from GM, we, in fact, changed the medical

14  trend assumptions at the end of the year to push out trend

15  another year or so in much the same fashion that the company

16  has, in fact, included in their steady-state business plan.

17  Q    So in prior year,  had the company, for budgeting

18  purposes, adopted your trend rates that were in your prior

19  FAS-106 reports, how would the company have ended up at the

20  end of the year compared to budget?

21  A    They would have been -- they would have found themselves

22  surprised.  They would have found that they had not budgeted

23  enough expense for the subsequent year.

24  Q    And how did they remedy that?

25  A    I believe that their business planning process has always

                          Williams - Redirect/Butler                    68

1   included this assumption that the medical trend rates would

2   have to be pushed off in each future year during the

3   budgeting period.

4   Q   Let's now move to Exhibit I believe it was -- I think

5   it's 242.

6   A   I'm sorry.  Can you direct me to which binder that's in?

7   Q   I will in just one moment.

8   A   Okay.

9   Q   I want to make sure I get the right document reference.

10  A   Sure.

11      (Counsel confer.)

12          THE COURT:  It's Exhibit 53A in the book that

13  Appaloosa's lawyer gave you.

14          THE WITNESS:  Oh, the same --

15          THE COURT:  Yeah.

16          THE WITNESS:  That binder?  Okay.

17          MR. BUTLER:  Just one moment.

18      (Counsel confer.)

19  BY MR. BUTLER:

20  Q   It is part of Exhibit 242.  In the short book you've got

21  it says "53" on it, but it's Exhibit 242.  And I'm referring

22  to the email that is dated October 20, 2005.

23  A   Okay.

24  Q   Do you have that document in front of you, sir?

25  A   I have that.

1        MR. KURTZ:  For the record, it's in both places.

2   BY MR. BUTLER:

3   Q    Mr. Williams, did you prepare this email?

4   A    I did.

5   Q    And, again, on what date was this transmitted to the

6   company?

7   A    I believe that we sent it to them on the date of the

8   email, which is October 20th.

9   Q    Had you had prior discussions with the company about the

10  contents of the email before preparing it?

11  A    I'm sure that we did, yes.

12  Q    Do you have any recollection as to when the first time

13  Appaloosa made a demand on the United States Trustee for an

14  equity committee in this case?

15  A    No, I have no idea.

16  Q    Would it refresh your recollection if I told you it was

17  in November of 2005?

18  A    I wouldn't know that.  No one -- it wasn't anything that

19  I needed to know to do my work.

20  Q    Did you ever have any discussions with the company --

21  prior to the filing of this contested hearing, did you have

22  any discussions with the company regarding the trustee motion

23  -- or the motion -- excuse me, the equity committee motion?

24  A    Not that I can recall, no.

25  Q    Now I'd like you to, if you would, Mr. Williams, in your

1    own words to explain to the Court without my interruption

2    what this email and its attachments were purported to --

3    intended to do.

4    A   This email was intended to provide the company with an

5    alternative forecast of contributions based on a scenario

6    posed to me, which is that they -- that the company would

7    emerge from bankruptcy after June 15th instead of before June

8    15th.  And I picked the date of June 30th as a simplifying

9    assumption.  I could have picked a date any time in the

10   second half of the year and come up with the same projections

11   as I did here.

12       And the intention of this was to show the company, in

13   fact, what would happen, which is that by delaying

14   contributions after June 15th, that would increase the

15   contribution requirement during 2007, but decrease

16   contributions in 2008 and 2009 and, in fact, over that three-

17   year period the total contributions end up being virtually

18   the same.

19   Q   I'd like you to look at Trial Exhibit 10.  It's in that

20   same binder.  It's the supplemental of direct testimony and

21   declaration of Mr. Reese.  I'd like you to look at Paragraph

22   12 of that declaration.

23       Mr. Williams, in that paragraph Mr. Reese testified that

24   if Delphi emerged from bankruptcy on June 15, 2007 instead of

25   the June 30th date currently being suggested, the company

1   would have, quote, "saved more than $340 million."

2        Do you agree with Mr. Reese's testimony?

3   A    I do not.

4   Q    And can you tell the Court why you disagree with the

5   testimony?

6   A    I disagree because this implies that the reduction in

7   contribution in 2007 would never have to be made up in the

8   future.  And, in fact, as I found in my prior work, any

9   reduction of contributions in 2007 would be offset by an

10  increase in contributions in 2008 and 2009.

11            MR. BUTLER:  No further questions, Your Honor.

12            THE COURT:  Okay.

13            MR. KURTZ:  I'll be very brief, Your Honor.

14                    **RECROSS-EXAMINATION**

15  **BY MR. KURTZ:**

16  Q    You were asked about the reason that the company's

17  steady-state projections were nearly twice what the FAS-106

18  report reflected.  And you talked about past performance.

19       You were well aware of how your past projections tracked

20  against actual performance at the time that you participated

21  in the completion of the FAS-106 report, correct?

22  A    That's correct.

23  Q    And the company was -- and let me stop there.

24       And the FAS-106 report sets forth your best estimate of

25  the future OPEB liability, correct?

1  A    They set forth our best estimate as of that date --

2  Q    Yes.

3  A    -- of the OPEB liability.

4  Q    And the company was well aware of how your projections

5  had tracked against actual performance at the time that it

6  completed the FAS-106 report, correct?

7  A    I believe that they were.

8  Q    Okay.  And that was the company's best -- what's set

9  forth in FAS-106 report, which is about half of the inflation

10 set forth in the steady-state projections, was the company's

11 best estimate of future OPEB liabilities, correct?

12 A    Their best estimate as of the snapshot date, that's

13 correct.

14 Q    All right.  And the only other thing I want to talk to

15 you about is you just mentioned something about your role in

16 selecting a June 30th emergence date and what it was all

17 about and it could have been any date.  And I just want to

18 read you the following question and answer from Mr. Sheehan's

19 deposition and you can tell me whether this is accurate.

20     "Question --"

21     And this is on Page 20, Lines 7 through 15.

22     "Question:  Who decided to make the June 30, 2007

23 emergence date?

24     "Answer:  The management of the company, together with

25 its legal advisors.  We believe that that is a reasonable

Williams - Recross/Kurtz                                73

1   assumption based upon the timing that we have considered for

2   being able to deal with the issues that need to be dealt with

3   in this reorganization process."

4        Does that sound right to you?

5             MR. BUTLER:  Objection.  How can this witness

6   testify as to Mr. Sheehan's deposition?

7             MR. KURTZ:  I'm asking about the content.  Does that

8   sound right to this witness?

9             THE COURT:  Was there any discussion with you with

10  regard to the company's choice of an emergence date?

11            THE WITNESS:  No, there wasn't.

12            THE COURT:  Okay.

13  BY MR. KURTZ:

14  Q   Do you have any reason to think you better know why the

15  June 30th emergence date was selected than Mr. Sheehan?

16  A   No.

17  Q   In fact, would you agree Mr. Sheehan would be much closer

18  to that kind of information?

19  A   Yes.

20  Q   And so we are back to having a pension contribution made

21  on a mere two-week delay, correct?

22  A   That would be correct.

23  Q   Causing an expense in 2007 of several hundred million

24  dollars, correct?

25  A   That's correct.

1   Q    That could otherwise be avoided, correct?

2   A    That's correct.

3            MR. KURTZ:  No further questions.

4            THE COURT:  Okay.  You can step down, sir.

5            THE WITNESS:  Thank you.

6        (Witness excused.)

7            MR. BUTLER:  Your Honor, the debtors would like to

8   present their final rebuttal witness for cross-examination.

9   That would be Mr. David L. Resnick, who -- from the

10  Rothschild firm, who is the debtors' principal investment

11  banker and financial advisor in these Chapter 11 cases with

12  respect to the documents that have been admitted in evidence,

13  Exhibits -- or, excuse me, that have been presented for

14  admission to evidence subject to the Daubert motion.  This

15  would be Exhibits 13, the declaration of Mr. Resnick, and

16  Exhibit 14, the Rothschild report.

17           THE COURT:  Okay.

18           MR. ARAGON:  Your Honor, of course we'd like to

19  argue our motion if we could.

20           THE COURT:  All right.

21           MR. ARAGON:  May it please the Court, Rudy Aragon

22  from White & Case.

23           Your Honor, we have filed this motion to exclude the

24  expert rebuttal report and declaration of Mr. Resnick based

25  on the teachings of Federal Rule of Evidence 702 as

1   articulated by the <u>Daubert</u> decision.  Under the rule and

2   <u>Daubert</u>:

3            "An expert opinion that is not the product of

4            reliable principles and methodologies ought to be

5            stricken."

6            Now in our case we have presented reliable

7   methodologies and applied them to come up with an enterprise

8   value of the restructured debtor.  We came up at the end of

9   the day with equity value of between 2.9 billion and 6.6

10  billion for the end of 2006 and between 2.4 and 6.2 billion

11  at the end of 2007.

12           By contrast, debtors' expert Mr. Resnick has

13  admitted that he has done no such analysis, even though he

14  very well knows the traditional methods that are used to do

15  this.  He has done it before, but he didn't do it now.

16  Instead, he used two utterly unreliable methodologies that

17  have nothing to do with whether or not in the future, whether

18  it's 2006 or 2007, there is going to be recovery for equity

19  when the debtors emerge from bankruptcy.

20           First, what Mr. Resnick did is he used a current

21  market trading as a methodology.  But it's totally improper

22  in our view and unreliable to determine if the company when

23  it emerges from bankruptcy, at the time of emergence, whether

24  or not that equity will be in the money using that

25  methodology.

Argument - Aragon                                    76

1          In the first place, post-filing trading of debtors'

2     securities are neither accepted nor reliable methods for

3     valuing a company upon reorganization.  We asked Mr. Resnick

4     that question in his deposition:

5          "Question:  This is with respect to the current

6     market trading.  Do you know --"

7          This is on Page 217.  It's in our motion.  Well,

8     maybe it isn't.  217, Lines 6 through 14.

9          "Question:  Do you know of any learned treatises or

10    publications on valuation that use or refer to security

11    market trading as an appropriate method for determining the

12    value of an ongoing enterprise?"

13         And the answer was:

14         "We weren't using these methodologies to determine

15    the value of an ongoing enterprise.  We were using them to

16    assess the company's insolvency."

17         And these methods he's referring to are the current

18    market trading and the insolvency test that I'll speak about

19    in a minute.

20         So not only are they not reliable, Your Honor, but

21    they don't measure the future.  The test is not what the

22    circumstance of the company is today.  We've already seen

23    there are going to be lots of changes to the company over the

24    next few months.

25         THE COURT:  Do you have any case law authority in

1   the context of a motion for appointment of an equity

2   committee that stands for the proposition you just stated?

3          MR. ARAGON:  Excuse me, Your Honor?

4          THE COURT:  Do you have any case law authority in

5   connection with the motion under 1102(a)(2) for the

6   proposition you just stated, that I have to do a projected

7   insolvency analysis as opposed to, among one of the many

8   factors to consider, determine whether the debtor appears to

9   be insolvent, in Judge Lifland's phraseology?

10         MR. ARAGON:  Our view, Judge -- you're talking about

11  the Williams decision, Your Honor?

12         The Williams decision --

13         THE COURT:  I'm not asking about the Williams

14  decision.  I'm asking if you have any authority to the

15  contrary.

16         MR. ARAGON:  I don't have any authority to the

17  contrary --

18         THE COURT:  All right.  Okay.

19         MR. ARAGON:  -- although we've distinguished we

20  believe the Williams decision in our reply brief.

21         THE COURT:  All right.

22         MR. ARAGON:  And our position on Williams, Your

23  Honor, of course, is that there is a circumstance where

24  equity was clearly out of the money under any analysis.  So -

25  -

Argument - Aragon                                    78

1       THE COURT:  That wasn't -- I'm just asking you --

2  this is about the fifth time you've said that I have to do an

3  emergence valuation now, not just today, but yesterday, as

4  well.  I just want to know whether there's any authority for

5  that.

6       MR. ARAGON:  Your Honor, I don't have any specific

7  case that tells me that that's the case.  But I do have the

8  notion that when, at the end of the day, we conclude whether

9  or not equity is going to be in the money, we have to make

10  that assessment and that evaluation.  Is there going to be a

11  likelihood that equity will be in the money?

12       And it's clear that with respect to market trading,

13  and it's typical and indicative -- it's clear what's

14  happening in market trading, that this is typical for Chapter

15  11 filings.  Regardless of ultimate recovery for

16  shareholders, it is very typical that equity and securities

17  trade at a discount.

18       And we've pointed out in our motion various other

19  cases where -- which underscores the fickle nature of the

20  market as the basis for solvency certainly at the end of the

21  case.  And the Mirant case is the perfect example.  And I

22  think the Mirant case I suppose would be one --

23       THE COURT:  I read your brief.

24       MR. ARAGON:  All right.  Now the debtors in their

25  motion, Your Honor, refer to the Loral decision (phonetic),

Argument - Aragon                                              79

1    and I looked at the opinion on that.  And they basically

2    state that the Court considered the book value of the debtor

3    there and its public securities trading.  And the implication

4    they seem to want to draw is that the Court bless this as a

5    way to determine if equity was in the money.

6          But I have the transcript where Your Honor said the

7    following on Page 131, starting at Line 19:

8          "Based on both the book value of the debtors from

9    their publicly filed SEC reporting as well as the agreed-upon

10   range of trading prices which were the only evidence of value

11   offered by the movants, the common shareholders are

12   substantially under water from anywhere between $230 million

13   on a high end to six hundred and twenty or more on a low end"

14   -- "620 million or more on a low end.  As I noted at the

15   hearing in September, both book valuations and trading

16   valuations, that is securities trading valuations, have their

17   weak elements.  And it's been my experience that book

18   valuation in a company like this has often been overstated,

19   whereas we all recognize that the trading valuations are far

20   from accurate."

21         So, in effect, it's really the opposite of what

22   they're saying.  In this case, in the _Loral_ case, it was

23   actually the movant that came in with this attempt to have

24   insolvency and market trading as the basis for the conclusion

25   that somehow equity is in the money.

Argument - Aragon                              80

1          We have done an evaluation, Your Honor, which is

2   based on the ongoing business of the company and we do think

3   at the end of the day it is the future of the company that is

4   critical.

5          The second faulty methodology used in Mr. Resnick's

6   report is called accounting insolvency.  In our view, it's

7   even more unreliable and inappropriate under Daubert.

8          Mr. Resnick basically performs a simple balance

9   sheet test.  But he offers no authoritative support for this

10  method.  We asked him the question, this is from Page 222,

11  Line 20, going into Page 223 question:

12          "Identify any authority that supports this kind of

13  evaluation for post-structuring entity.  This is the balance

14  sheet test."

15          Mr. Stringer objected.

16          "Question:  You can answer.

17          "Answer:  It doesn't really make sense for a post-

18  restructured company.  The question is for a company in

19  Chapter 11, is it solvent.  And one of the standard tests to

20  look at, the balance sheet, it's not determinative.  But it's

21  a test:  Do the liabilities exceed the assets?"

22          And it's not surprising that he would say that, Your

23  Honor.  Such a method does not take into account the earning

24  potential of the company which is the key, in our view, to

25  the future value of a restructured company.

Argument - Butler                            81

1          And Mr. Resnick himself actually admitted that.   In

2     his deposition he said -- I asked the question:

3          "Do you know if this test of accounting insolvency,

4     which is really just a balance sheet test, has ever been

5     accepted by the Court as an indicator of value for a

6     restructured company?"

7          And Mr. Resnick answered:

8          "It's irrelevant with respect to a restructured

9     company."

10          In short, to be reliable, Your Honor, a methodology

11     for determining the restructured value of a company to assess

12     whether equity is in the money must take the future into

13     consideration.  I understand your question.  I believe _Mirant_

14     is one answer.  There are probably others.

15          But, as the Court stated in _Mirant_, quote:

16          "The Court has found in numerous opinions support

17          for valuation of a Chapter 11 debtor through the use

18          of the DCF method and the comparable method.  The

19          Court finds these methods of valuation the most

20          likely to ensure that Mirant Group is valued based

21          on the worth of its future ability to produce

22          income."

23          This type of analysis that was done by the debtors,

24     Your Honor, doesn't take into account the company's ability

25     in the future to produce income.  That's what the Appaloosa

Argument - Butler                                    82

1    experts did.  That's what should have been done.  The two

2    methodologies, which is the solvency test and the market

3    trading test, are utterly unreliable for purposes of

4    determining whether or not equity will be in the money in

5    this case and under Daubert they should be stricken.

6              THE COURT:  Okay.

7              MR. BUTLER:  Your Honor, what Mr. Aragon chooses to

8    ignore are the two seminal cases in this district for the

9    purpose of 1102.  I'm not talking -- this isn't a

10   reorganization hearing.  This isn't a confirmation hearing.

11   But for 1102 what are factors that have been accepted in this

12   district as factors that a Court will consider?

13             We can argue later on what's dispositive and

14   everything else.  What are both factors?

15             Both Judge Lifland and Williams and Your Honor in

16   Loral recognized that the market test and balance sheet tests

17   were factors.  What weight we should put on them in this case

18   I'm prepared to argue at closing argument.  But they -- but

19   to suggest that Daubert -- that the Daubert rule would cause

20   these not to come in to the evidentiary record, there is no

21   case law, and Mr. Aragon cited no case law, to support that

22   view.

23             He wants this Court instead to make a novel ruling,

24   a ruling of first -- of, really, first instance in this

25   district that, quite to the contrary, he wants you to in some

Argument - Butler                                      83

1   respects overrule <u>Loral</u> and overrule <u>Williams</u> and say that as

2   a matter of law, that these tests and these factors are so

3   unreliable as they can't be evaluated by Your Honor in the

4   context of 1102.

5         There is no basis in their motion for that.  There

6   is no basis in the law of this district or the law of this

7   circuit for that proposition.

8         And Your Honor has already acknowledged, and our

9   papers already go into, there is absolutely no obligation for

10  a rebuttal witness at this stage in defending against a -- in

11  rebutting an 1102 motion for us to do a reorganization

12  enterprise valuation.  There is no case law to that support

13  and there's no rules.  So we, Your Honor, would ask you to

14  deny the motion and permit the testimony to go forward.

15        THE COURT:  Well, as far as Mr. Resnick's

16  declaration is concerned, in respect to the trading prices, I

17  mean, he basically just reports that he got them off of

18  reliable sources for trading prices, correct?

19        MR. BUTLER:  Yes.  He is the one who's provided --

20  he's the one who went and did the research and reported on

21  that, and then was deposed as to those matters.

22        THE COURT:  I mean, basically, anyone with access to

23  those market reporting devices could have done that, right?

24        MR. BUTLER:  Right.  And we chose to use our

25  investment banker.  That would be the typical source of that

Court Decision                                                  84

1   in a case would be to have your investment banker go forward

2   and provide that information to the Court.

3            THE COURT:  Okay.  And, similarly, with regard to

4   the company's balance sheet, that's actually reflective of

5   the operating statements on file with the --

6            MR. BUTLER:  It's reflective of the operating

7   statements, Your Honor.  It's also -- Mr. Resnick addressed

8   the -- in his report, I think provided a perspective as to

9   both of those tests.

10           And I would also point out that Mr. Green, on cross-

11  examination yesterday on behalf of Appaloosa, acknowledged

12  that Appaloosa has no quarrel with the GAAP nature or the

13  accuracy of these financial statements.

14           THE COURT:  Okay.

15           MR. BUTLER:  And so, I mean, Your Honor, I think it

16  comes in as evidence.  All we're trying to do here is argue

17  should he be allowed to testify and should this be -- and

18  should this evidence come into the record.

19           And I -- you know, I can't imagine, given <u>Williams</u>

20  and <u>Loral</u> who recognized both of these as factors, why we

21  wouldn't be permitted to use this as rebuttal evidence.

22           THE COURT:  Okay.  Are you saying that, Mr. Aragon,

23  that this is not evidence, admissible evidence?

24           MR. ARAGON:  Your Honor, we're saying that the

25  methodologies are wrong and, therefore, it's an opinion.

1    We're saying the opinion should be excluded.  It may be

2    evidence, but it's opinion evidence.  And under 702 you've

3    got to have more than just --

4              THE COURT:  What opinion?

5              MR. ARAGON:  The opinion of the expert that this is

6    the appropriate method -- that these methodologies speak to

7    whether or not equity is going to be in the money at the end

8    of the day upon a restructured company.

9              They just don't speak to that point.  They speak to

10   today.  They're looking at a snapshot in time now.

11             THE COURT:  Okay.  All right.  I have in front of me

12   a motion relying on the Supreme Court's Daubert opinion

13   seeking the exclusion of Mr. Resnick's declaration and

14   related report and his testimony on the grounds that it's not

15   sufficiently reliable for purposes of this motion.

16             I find that the motion should be denied and that it,

17   frankly, to me willfully reflects -- it reflects the willful

18   shutting of the eyes by Appaloosa to the appropriate standard

19   by which the Court reviews a motion for the appointment of an

20   equity committee and I suppose was done as a matter of

21   rhetoric, but it is not appreciated in any respect by the

22   Court.

23             The use of balance sheet information and trading

24   values is well-established in this Court and elsewhere.  The

25   extent to which it is used and the extent to which it is not

Resnick - Cross/Aragon                                        86

1    probative is well-established in this Court and elsewhere.

2    And to effectively say that it should be excluded is in

3    essence to rewrite the legal precedents in a motion in which

4    the movant acknowledges that there is no contrary legal

5    precedent.

6           The use of this information is one factor in the

7    Court's consideration.  The law is very clear, and I have

8    been very clear since the start of my involvement in this

9    matter several weeks ago in connection with discovery, what

10   type of evidentiary hearing this would be.  And I suppose

11   Appaloosa thought there was some value in this in some way.

12   I fail to see it.  So it's denied.

13          MR. BUTLER:  Your Honor, we would then call Mr.

14   Resnick for cross-examination with respect to Trial Exhibits

15   13 and 14.

16          **DAVID L. RESNICK, WITNESS FOR THE DEBTORS, SWORN**

17          THE COURT:  Would you spell your name for the

18   record, please?

19          THE WITNESS:  Yes, Your Honor.  David Resnick, R-e-

20   s-n-i-c-k.

21                        **CROSS-EXAMINATION**

22   **BY MR. ARAGON:**

23   Q    Good afternoon, Mr. Resnick.

24   A    Good afternoon.

25   Q    You're not a licensed CPA, are you?

Resnick - Cross/Aragon                    87

1  A    No, sir.

2  Q    You're employed by Rothschild, Inc., correct?

3  A    Correct.

4  Q    What is Rothschild, Inc., sir?

5  A    Rothschild, Inc. is an investment banking firm.

6  Q    And you're a managing director of that firm?

7  A    Yes.

8  Q    And a managing director at Rothschild is similar to a

9  partner at a law firm.  Isn't that correct?

10 A    Correct.

11 Q    And on May the 1st, 2005, Delphi engaged Rothschild, in

12 particular you, as financial advisor and investment banker,

13 right?

14 A    Yes.

15 Q    And you're compensated with a salary and a bonus from

16 Rothschild, correct?

17 A    Yes.

18 Q    So if Rothschild makes a profit in this engagement with

19 Delphi, you'll share in that profit.  Is that correct?

20 A    I will receive a bonus, hopefully, that will be

21 reflective of the firm's profits for the year.

22 Q    And in its work for Delphi since May the 1st of this past

23 year, Rothschild is billing at a rate of $250,000 per month,

24 correct?

25 A    Correct.

Resnick - Cross/Aragon                              88

1    Q    And Rothschild also receives a fifteen-million-dollar

2    completion fee.  Isn't that correct also?

3    A    If so awarded by the Court.

4    Q    And you get this fifteen-million-dollar completion fee if

5    so ordered by the Court if there is a successful

6    restructuring, reorganization or some other transaction as

7    defined in your engagement letter with Delphi.  Is that

8    correct?

9    A    Yes.  Rothschild receives it, not me.

10   Q    Okay.  The company which you're a partner?

11   A    Correct.

12   Q    And Rothschild gets that fifteen-million-dollar

13   completion fee regardless of whether or not there's any

14   recovery for equity in this case.  Isn't that right?

15   A    "Successful reorganization" is defined, in my view, as

16   maximizing value for all stakeholders.

17   Q    Now even before your engagement with Delphi, members of

18   Rothschild had worked with Delphi's CEO Steve Miller, right?

19   A    Correct.

20   Q    And since this engagement, you yourself have worked

21   approximately two-thirds to seventy-five percent of your time

22   on the Delphi engagement.  That is since May the 1st, 2005,

23   right?

24   A    Approximately, yes.

25   Q    And you've been working very closely with management from

Resnick - Cross/Aragon                                    89

1   Delphi, right?

2   A    Yes.

3   Q    You've formed friendships with some of those senior

4   managers at Delphi working with them, right?

5   A    We spend a lot of time together.

6   Q    So you formed friendships with them.  You enjoy their

7   company?

8   A    For the most part.

9   Q    I won't ask you which -- I won't ask you which ones.

10       But you've developed friendships with these people?

11  A    Yes.

12  Q    And, of course, these are the very people that are

13  opposing this motion, right?

14  A    The company is opposing the motion along with I think

15  every other stakeholder in this matter, yes.

16  Q    There are other shareholders who have come forward and

17  support this motion besides Appaloosa.  Isn't that right?

18  A    I don't know.

19  Q    So even though you've been financial advisor and

20  investment banker for Delphi since May the 1st, 2005, even

21  though you've spent the majority of your time working with

22  Delphi and its people since that time, even though your firm

23  will get a fifteen-million-dollar completion fee at the end

24  of the day, even though your firm is making $250,000 a month

25  working with Delphi, and even though you've become friends

Resnick - Cross/Aragon                                        90

1   with some of the members of Delphi's senior team, you think

2   you can sit on that stand and provide unbiased independent

3   opinions to oppose this motion?

4   A    I do.  I've done so for twenty years to date in other

5   matters.

6   Q    You're not influenced by this bankruptcy, or by the fact

7   that at the end of this bankruptcy Rothschild stands to make

8   a lot of money?

9   A    I don't think I'd continue to be retained if people did

10  not find that I was an objective credible investment banker

11  in the restructuring field.

12  Q    Now, sir, in reaching your conclusions and opinions as

13  reflected in your declaration and expert report, it's

14  correct, is it not, that neither you nor anybody else in

15  Rothschild has performed an enterprise valuation of Delphi?

16  A    That's correct.

17  Q    Now it's true, is it not, that there are traditional

18  investment banking methodologies used to determine the value

19  of a company?

20  A    Yes.

21  Q    And they are the discounted cash flow analysis, the

22  comparable public companies analysis, and a transaction

23  comparable analysis, correct?

24  A    Correct.

25  Q    In fact, those are the three methodologies that you

Resnick - Cross/Aragon                                                91

1   identified in your deposition when I asked you that question.

2   You remember that?

3   A   Yes, I do.

4   Q   Now have you or Rothschild, or anybody at Rothschild,

5   performed any discounted cash flow analysis of Delphi?

6   A   Not at this time.

7   Q   And you haven't performed a comparable public companies

8   analysis either, have you?

9   A   Not at this time.

10  Q   And nor have you or Rothschild performed a transaction

11  comparable analysis.  Isn't that correct?

12  A   Not at this time.

13  Q   So, in coming to your conclusions and opinions, neither

14  you nor Rothschild have performed any of the traditional --

15  what you call traditional investment banking methodologies to

16  determine the value of the debtors, right?

17  A   I believe it would not be appropriate to do that at this

18  time.  That's correct.

19  Q   You've done in the past for other companies a number of

20  business valuations in your career, have you not?

21  A   I have.

22  Q   But none for Delphi?

23  A   Not at this time.

24  Q   Okay.  Well, let's discuss what you have done starting

25  with your solvency analysis.

Resnick - Cross/Aragon                                              92

1       According to Section 3 of your report, you reviewed

2    Delphi's September 30, 2005 10-Q and the January 31, 2005

3    monthly operating report that was filed with the Court to

4    determine that Delphi was insolvent.  And that's what you

5    call your "test of accounting insolvency," correct?

6    A    Correct.

7    Q    Now you know, sir, do you not, that Delphi declared a

8    dividend on June 22nd, 2005?

9    A    I do.

10   Q    In fact, you were at the meeting of the board of

11   directors on that date, June 22, 2005, when the board of

12   directors of Delphi voted in favor of that dividend, right?

13   A    Correct.

14   Q    And you know, do you not, sir, that that dividend was

15   actually paid on August the 2nd, 2005?

16   A    Yes.

17   Q    Was Delphi solvent at that time, that is when the

18   dividend was paid on August the 2nd, 2005?

19   A    I don't know.  I wasn't asked to assess solvency on that

20   date.

21   Q    In fact, you weren't asked to assess solvency until

22   December of 2005.  Isn't that right?

23   A    That's correct.

24   Q    And prior to that time, you had not formed a view as to

25   whether or not Delphi was solvent, right?

Resnick - Cross/Aragon                                    93

1    A    That's correct.

2    Q    And when you finally did do an analysis of whether or not

3    Delphi was solvent, you basically looked at the balance sheet

4    current as of that time when you made the determination in

5    December of 2005, right?

6    A    No.  I looked primarily at the trading prices of other

7    Delphi securities in the market, principally the unsecured

8    debt and the trade claims, in addition to considering the

9    balance sheet.

10   Q    So you looked at both those?

11   A    Correct.

12   Q    But you looked at the balance sheet?

13   A    I did.

14   Q    We'll get to the market trading in a bit.  Okay.

15        And now in connection with your report you're looking at

16   Delphi's balance sheet, of course, and also market trading to

17   conclude that Delphi -- that, excuse me, the shareholders

18   will be out of the money, correct?

19   A    Correct.

20   Q    Now isn't it true, sir, that your test of solvency, which

21   is really just a balance sheet test, is irrelevant with

22   respect to a restructured company?

23   A    For the purposes of determining reorganization value at

24   the end of the case, that's correct.

25   Q    And it's true, sir, is it not, that you cannot identify

Resnick - Cross/Aragon                                    94

1   any authority that supports your balance sheet test to

2   evaluate a restructured company?

3   A   I think I mentioned in my deposition that for purposes of

4   looking at insolvency, considering the balance sheet and

5   whether or not the company is insolvent for accounting

6   purposes as well as the market trading prices is in my

7   experience very typical and they are factors that Courts have

8   looked to in the past for determining solvency.

9   Q   I asked you about any written treatises and you couldn't

10  identify any of those, could you, sir?

11  A   You asked if I could remember a statement and a treatise

12  and I said I could not at the time, that's correct.

13  Q   And in your expert report, you identified just one

14  treatise.  That was McKinsey (phonetic), right?

15  A   Correct.

16  Q   And that didn't have anything about looking at the

17  insolvency or market trading at the time as a measure of a

18  restructured company.  Isn't that true?

19  A   We weren't referring to the text for that purpose.  We

20  were referring to the text with respect to use of a

21  discounted cash flow analysis which the Eureka report failed

22  to use.

23  Q   Now isn't a balance sheet by its nature really a snapshot

24  in time at the very time that the balance sheet is prepared?

25  A   Yes.

Resnick - Cross/Aragon                                95

1  Q   So, at most, what a balance sheet shows, assuming that it

2  shows insolvency, is that the company is insolvent at that

3  very point in time, right?

4  A   Yes.

5  Q   And often balance sheets, when you look at them, are

6  really based upon dated information, that is accounting

7  information that has come in from a previous period, right?

8  A   In some cases, yes.

9  Q   Now a balance sheet doesn't show insolvency at the time

10 of reorganization, does it?

11 A   At the time a reorganization plan is confirmed?  I'm not

12 sure of the context of your question.

13 Q   Well, let me ask a different question because this goes

14 right to it.

15     To determine whether equity will be in the money, we have

16 to look to the future, don't we?

17 A   Not necessarily.  I think we have to, for the purposes

18 today, make an assessment and considered judgment based on

19 the facts and circumstances available today.

20 Q   Well, let me refer to your deposition, Page 168 starting

21 at Line 14:

22     "Question:  Let me ask this question because you didn't

23 answer it.  What does the financial condition of the company

24 today have to do with the financial condition of the company

25 will be when it emerges from bankruptcy without analyzing

1    whether or not old equity will be in the money?

2        "Answer:  It's a data point in my view, a very

3    significant one.  The current financial situation of the

4    company today, current projections of how the company is

5    likely to perform, the obligations it needs to settle to

6    emerge from Chapter 11, looking at all that data, my view is

7    that I don't believe equity will be in the money in this

8    case.

9        "Question:  But in order to come to that assessment, you

10   have to look in the future as to when the company emerges

11   from bankruptcy, correct?"

12       And you answered, "Yes."

13       Do you recall that?

14   A   I do.

15   Q   Now, in particular, we have to look at a point in time

16   when Delphi emerges from bankruptcy to assess that.  Isn't

17   that true?

18   A   Yes.

19   Q   Okay.  And looking into the future involves making

20   predictions about how Delphi is going to be doing over the

21   next few months going forward.  Isn't that correct?

22   A   That's what traders in the public market do all the time.

23   Q   Well, traders in the public market just yesterday are

24   paying twice as -- or today are paying twice as --

25              THE COURT:  Oh, please, sir.  Give me a break.  What

Resnick - Cross/Aragon                              97

1   were we talking about in there?

2           MR. ARAGON:  I'm sorry, sir -- Your Honor.

3           THE COURT:  I want the parties to come back in here.

4       (Recess taken at 4:19 p.m.)

5       (Proceedings resume at 4:21 p.m.)

6       (Witness resumes stand.)

7           THE COURT:  Please be seated.

8           MR. ARAGON:  Your Honor, I apologize to the Court

9   for any problem caused by that.

10          THE COURT:  You may continue.

11  BY MR. ARAGON:

12  Q   Mr. Resnick, now to make a reasonable prediction of how

13  Delphi will look as a company at the time it emerges from

14  bankruptcy, you'd have to estimate what the terms would be of

15  any negotiations between Delphi and its unions, right?

16  A   That would be a factor, yes.

17  Q   And you haven't done that as you sit here today, have

18  you?

19  A   Those negotiations are ongoing so we have not.

20  Q   And to make a reasonable prediction of how Delphi will

21  look at the time it emerges from bankruptcy, you would also

22  have to estimate what the terms would be of any negotiations

23  with General Motors, correct?

24  A   Yes.

25  Q   And you haven't done that prediction, have you?

Resnick - Cross/Aragon                              98

1   A    For the same reason.  Those negotiations are ongoing.

2   Q    And to make a reasonable prediction of how Delphi will

3   look at the time it emerges from bankruptcy, you further

4   would have to look at the structure of the reorganized

5   company to make a reasonable prediction, correct?

6   A    What do you mean by "the structure?"

7   Q    Well, I asked you a question, sir, in your deposition on

8   Page 172:

9        "Question:  And for that path, along with all others, you

10  would need to look at the structure of the reorganized

11  company as well, right?"

12       And your answer was, "Yes."

13       You seemed to understand what I meant, then.  The

14  restructured company when it emerges from bankruptcy.

15  A    The structure, capital structure, operational structure,

16  certainly whatever changes would result from the

17  reorganization plan.

18  Q    You have not done an analysis of the reorganized capital

19  structure of the company when it emerges from bankruptcy,

20  have you, sir?

21  A    No, because we don't have a reorganization plan yet

22  around which to base a capital structure.

23  Q    Okay.  And to make a reasonable prediction as to how

24  Delphi will look at the time it emerges from bankruptcy, you

25  would also have to look at the automotive industry, not just

Resnick - Cross/Aragon                                    99

1    in the U.S. really, but other places in the world where

2    Delphi does its business, correct?

3    A    Yes.

4    Q    And you haven't done that yet, either?

5    A    Not completely.  We monitor that.  We look at it

6    regularly as part of our work.  But we haven't done the

7    assessment in the context of a reorganization plan yet.

8    Q    Okay.  To make a reasonable prediction of how Delphi will

9    look at the time it emerges from bankruptcy, you'd have to

10   estimate what Delphi's ultimate pension and OPEB liabilities

11   would be, correct?

12   A    Yes.

13   Q    Okay.  When doing your balance sheet test, you're

14   assuming that Delphi is obligated to pay all pension

15   obligations.  Isn't that correct?

16   A    For that test, the amounts which are reflected on the

17   company's balance sheet, yes.

18   Q    Okay.  And you're assuming also when doing your balance

19   sheet analysis that Delphi will pay for all OPEB obligations,

20   correct?

21   A    For which it is currently contractually liable, correct.

22   Q    Right.  However, it's true, is it not, that different

23   assumptions about pensions and OPEB liabilities could swing

24   Delphi's final situation when it emerges from bankruptcy

25   literally billions of dollars?

Resnick - Cross/Aragon                    100

1   A    Theoretically possible, yes.

2   Q    Okay.  So if you change those assumptions about the

3   future, about OPEB obligations, about pensions, about the

4   relationships with General Motors, about the situation of the

5   international automobile industry, if you look at all of

6   those, old equity might actually be in the money at the end

7   of the day, correct?

8   A    Theoretically.  And if you change a couple of players in

9   the Yankee's lineup they'll beat the Red Sox next year.

10  Q    They might beat the Red Sox next year.

11  A    They might.

12  Q    And old equity might be in the money next year too,

13  correct?

14  A    If you change all of those assumptions in a certain way,

15  theoretically possible.

16  Q    Now all of those assumptions are changeable and will be

17  changeable going forward.  Isn't that true?

18  A    Not necessarily, no.

19  Q    Now isn't it true your balance sheet test only looks at

20  whether or not the company is solvent or insolvent today?

21  A    That test does, yes.

22  Q    Okay.  Now it's true we need to look at Delphi at the

23  time it emerges from bankruptcy because the company's

24  obligations may be restructured in such a way that equity is

25  in the money.  Isn't that correct?

Resnick - Cross/Aragon                                    101

1   A   Can you repeat that question, please?

2   Q   Sure.  We need to look at Delphi at the time it emerges

3   from bankruptcy because the company's obligations may be

4   restructured in such a way that equity is in the money,

5   right?

6   A   It depends for what purpose.  Not for the purpose, in my

7   view, for which we're here today for determining whether

8   there should be an equity committee and whether or not the

9   company is insolvent.  I think there are legitimate ways to

10  analyze that question and make that determination today

11  without waiting until the end of the case.

12  Q   Well, on Page 223 I asked the following questions and

13  received the following answers, starting on Line 8:

14      "Question:  Isn't the test of whether or not equity is in

15  the money not on what the balance sheet is today, but what

16  the balance sheet is at the time that the company emerges

17  from bankruptcy?"

18      You said, "No."

19      Mr. Springer objected to form.

20      "Answer:  At the time the company emerges from bankruptcy

21  its obligations are restructured.

22      "Question:  And the obligations may be restructured in

23  such a way that equity is in the money?

24      "Answer:  It may be restructured that all the value is

25  given to other creditors and equity is rendered worthless

Resnick - Cross/Aragon                                    102

1  which is generally the case in most bankruptcies in my

2  experience."

3      And then I -- and then I will ask you this:

4      In a Chapter 11 case you don't know for certain whether

5  or not equity will be in the money until the plan, the

6  reorganization plan, is confirmed, correct?

7  A   You do not know with complete certainty until the end of

8  the case what the recovery would be for any stakeholder.

9  Q   And it's true you have not been asked in formulating your

10 opinions and conclusions to determine whether or not equity

11 will be in the money as of the date of the reorganization,

12 right?

13 A   Correct.

14 Q   Because you think that's irrelevant?

15 A   We have not been asked that question.

16 Q   And you have not done an analysis as to whether Delphi

17 will be insolvent throughout its entire progress through this

18 Chapter 11 proceeding, have you?

19 A   No, we have not.

20 Q   Okay.  Well, let's talk about stock trading.  In Section

21 2 of your report, you opine, and I quote:

22      "The trading price of Delphi securities is the clearest

23 indication of the company's value."

24      That's your opinion, correct?

25 A   For this particular purpose, yes.

Resnick - Cross/Aragon                                        103

1   Q    It's the clearest indication to you of the company's

2   value?

3   A    For the purposes of determining solvency today, yes.

4   Q    Okay.  And that's very important, what you just said.

5   It's only with respect to determining solvency today, right?

6   A    It is an important factor, yes.  Not for determining

7   reorganization value at the end of the case.

8   Q    In fact, I asked you to identify any authority that

9   supports the use of this kind of methodology to determine

10  whether or not the equity of the company will be in the money

11  when it emerges from bankruptcy and you couldn't give me any

12  authority to that effect, correct?

13  A    At that time I could not recall an academic authority.  I

14  mentioned my experience as a banker in using market prices

15  for determining a company's solvency during the pendency of a

16  Chapter 11 case.

17  Q    Now it's true, sir, is it not, to your own knowledge,

18  that there are cases, bankruptcy cases, where a company's

19  debt was trading for less than full value and ended up at the

20  end of the day receiving the full amount of the value of the

21  stock or the value of the debt securities that were being

22  traded when the company emerged from bankruptcy?

23  A    Yes.  There are some cases.

24  Q    Now at the end of the day, market trading cannot tell the

25  full story, isn't it true, because until you confirm the

Resnick - Cross/Aragon                                        104

1   reorganization plan as with respect to the market trading,

2   you're not going to know for sure whether equity is in the

3   money, correct?

4   A   The market will give you a good sense, in my view, of

5   what likely recoveries are.  I think it's the best way to

6   ascertain the answer to that question.

7       As I said, until confirmation, no one knows what actual

8   recoveries the stakeholders will be.

9   Q   Okay.  Now if you were to try to do an evaluation right

10  now of Delphi and you wanted to do it on a reorganized basis,

11  you would need a definitive business plan.  Isn't that true?

12  A   Yes.

13  Q   As you sit here today, sir, you're aware, are you not,

14  that Delphi does not have a definitive business plan?

15  A   Because it has not addressed the key factors that would

16  be required to produce such a business plan, such as the

17  labor costs, the benefit obligations, its relationship with

18  General Motors which are --

19  Q   The company has not come to a conclusion as to what

20  that's going to look like six months or a year or a year and

21  a half from now, correct?

22  A   Has not addressed those issues at this time.

23  Q   And you would also need, would you not, sir, a definitive

24  capital structure analysis to perform a full valuation of

25  Delphi on a reorganized basis?

Resnick - Cross/Aragon                                   105

1  A    The cash flows from the business plan would allow us to

2  work with the company to develop a capital structure, and

3  that would be part of what we would use for our enterprise

4  valuation at that point in the case.

5  Q    But as you sit here today, Mr. Resnick, you have not done

6  that analysis of a definitive capital structure, have you?

7  A    No.  I would not expect to at this point in the case.  It

8  wouldn't make sense.

9  Q    And the company hasn't finally resolved all of its labor

10  obligations, has it?

11  A    No.

12  Q    And the company doesn't have a resolution of all of the

13  various claims back and forth between it and General Motors.

14  Isn't that the case?

15  A    That's correct, as well as other claims in the case.

16  Q    Mr. Resnick, I'd like you to look, if you'd be so kind,

17  at Exhibit 46.  That's the steady-state scenario.

18  A    (Witness reviews exhibit.)

19  Q    Do you recognize that document, sir?

20  A    Yes.

21  Q    What is that document?

22  A    This is the company's steady-state scenario dated

23  December 7th, 2005.

24  Q    All right.  And what was the purpose of that steady-state

25  scenario, sir?

Resnick - Cross/Aragon                                    106

1    A    The purpose of the steady-state scenario was for the

2    company to prepare for its board a set of projections of what

3    the business would look like for the next several years if

4    there were no changes to its business principally with

5    respect to the footprint of the business, that is the number

6    of businesses in which it operates, the labor cost structure

7    wages, the benefit obligations and also its relationship with

8    General Motors.

9    Q    In effect, this assumes that the company will stay on the

10   same path that it was heading on before it entered into

11   bankruptcy, correct?

12   A    Correct.  And then in this presentation the company set

13   forth several I think the term was "overlays" of how it would

14   in the future begin to analyze the business as it addressed

15   each of the key issues critical to the company's

16   restructuring.

17   Q    And senior management of the debtors presented this

18   steady-state scenario to the board, right?

19   A    Correct.

20   Q    And that was on December the 7th, 2005, right?

21   A    Yes.

22   Q    And you were present at that board meeting?

23   A    I was.

24   Q    And so this steady-state scenario is the company's best

25   estimate of what the company would look like, as I said, if

Resnick - Cross/Aragon                                    107

1   it just continued on this path that it was on before

2   bankruptcy?

3   A   Yes.

4   Q   And you didn't calculate the numbers in the steady-state

5   scenario.  They were done by senior management of the

6   company, right?

7   A   Correct.  We were involved in terms of reviewing the

8   numbers and participating with the finance team as the

9   materials came together.  But the numbers were prepared, I

10  think as Mr. Sheehan testified, bottoms-up from the operating

11  business units.

12  Q   And you won't know whether or not the predictions and

13  estimates in this steady-state scenario are actually accurate

14  until, in fact, the events transpire during 2006 and 2007,

15  right?

16  A   That's true with any set of projections.

17  Q   Right.  I mean, these are just projections.  Isn't that

18  correct?

19  A   That's exactly what they say they are.

20  Q   Right.  They assume no changes.  These are projections,

21  right?

22  A   Yes.

23  Q   But the basis for the steady-state scenario is past

24  performance of the company and some estimates, right?

25  A   The basis is past performance and the heads of the

Resnick - Cross/Aragon                                        108

1   operating businesses and then project it going forward, the

2   key elements.  So it's not its past, but they looked at in

3   this industry a good deal of the business is already booked

4   because you have contracts that are negotiated several years

5   in advance for the new model, so they have a fairly good

6   sense of what products are produced, so they make

7   determinations on material costs and manufacturing around

8   them, so they develop their projections.

9   Q    And that's based on past performance, the history of the

10  company vis-a-vis these various contracts and the things that

11  they sell and how much they sell over a period of time,

12  right?

13  A    Not completely past.  It's also their view of the future

14  because part of --

15  Q    Right.

16  A    In '06, '07, '08, '09, business unit heads are making

17  determinations of how much new business they will obtain --

18  Q    I don't --

19  A    And where the market will be, and what other -- what the

20  competitive situation is like, pricing, many factors.

21  Q    Mr. Resnick, I don't quarrel with you that the steady-

22  state scenario is bottomed in part on predictions.  But it's

23  also bottomed, as you just recognized, in part on what

24  actually has happened over the past few years with the

25  company, right?

1    A    Yes.

2    Q    Okay.  Now as far as what has happened in the past, the

3    basis in part for the steady-state scenario, it's true, is it

4    not, that the steady-state scenario is based on information

5    that is, at best, current as of the date it was presented to

6    the board:  December the 22nd -- or seventh, rather, 2005,

7    right?

8    A    Yes.

9    Q    Now just to make it clear, if the company were to

10   continue on with the steady-state scenario path, this would

11   be untenable.  The company would basically go out of

12   business, wouldn't it?

13   A    Yes.

14   Q    And the debtors recognize that the business cannot

15   continue in the steady-state scenario because, among other

16   things, there would be downward -- they would need downward

17   adjustments of Delphi's labor costs, both OPEB and pension,

18   right?

19   A    Among other factors.

20   Q    Now you utilized the steady-state scenario when you

21   addressed the expert reports of Appaloosa's.  Isn't that

22   correct?

23   A    Yes, because they had referred to the steady state.

24   Q    Uh-huh.  I mean, this was the basis for your challenge to

25   some of their numbers, right?

Resnick - Cross/Aragon                                    110

1    A    Well, my recollection is their report utilized the steady

2    state and made changes to it, so we compared their changes to

3    the steady-state projections.

4    Q    Now you looked at steady-state projections, but they

5    looked at real numbers, for example, in GM's production for

6    the first couple of months of 2006, didn't they?

7    A    Yeah.

8    Q    Now you don't even know if the steady-state plan

9    correctly calculates the GM production in 2005, much less the

10   first two months in 2006.  Isn't that right?

11   A    In my deposition, I said I did not recall what GM

12   production was for 2005.

13   Q    You don't even know if the steady-state plan correctly

14   calculates the decline in the production.  That's what my

15   question was.

16   A    I don't recall.

17   Q    And you don't know if the steady-state plan correctly

18   calculates the volume change for General Motors North

19   America, correct?

20   A    The steady-state plan has projections for GMNA volume

21   during the projection period.

22   Q    And do you know if the steady-state plan correctly

23   calculates the projected volumes of sales for General Motors?

24   A    Well, it's projections, so they rely on DRI, an outside,

25   independent firm, for their projections of General Motors

Resnick - Cross/Aragon                                                    111

1   North America and volumes.

2   Q   Now, sir, isn't it true that, while you rely on the

3   steady-state plan, wouldn't more current information on what

4   things look like since December 7th, 2005 affect your

5   assumptions going forward, as to whether or not the steady-

6   state plan actually is accurate?

7   A   Current information is always going to be additive to

8   what had been done in the past.  But when, in my experience,

9   you put a set of projections together, you use your best

10  judgment at the time for assessing the future, and companies

11  can't change their projections every moment.

12  Q   But it's true, sir, is it not, that there are other

13  projections besides the steady-state plan with respect to the

14  restructuring transaction and what it might look like at

15  Delphi?

16  A   I don't know if I'd used the word "projections."  The

17  company has used the steady-state plan, as I think it

18  indicates in these materials, as a starting point for various

19  analyses, scenarios, and sensitivities it would look at as it

20  begins to assess its reorganization options.

21  Q   Well, there are projections --

22  A   I think they're set forth in --

23  Q   I'm sorry, sir.

24  A   -- in one of the pages here, Page 16, where we set forth

25  the basis of the steady-state plan, and then we set out what

Resnick - Cross/Aragon                                    112

1   the key, we call them "overlays" on Page 16 are, based on key

2   elements in the case:  The footprint, the business of the

3   company, portfolio sale wind-down, any SG&A changes, the GM

4   issues in the case, the labor modifications, what would

5   happen to revenues, and that will lead ultimately to a plan

6   on which we will base an enterprise value.

7   Q   Sir, it's true, is it not, that there are projections

8   besides the steady-state projections that exist at the

9   present time that the company is pursuing?

10  A   The company has performed various, I would call them

11  "sensitivities" off the steady state for use in its

12  negotiations with the parties.

13  Q   And these other projections had been discussed with

14  Delphi's board, correct?

15  A   These sensitivities have been discussed with Delphi's

16  board.

17  Q   And those projections, different from the steady-state

18  scenario projections, have not been shared with the movants

19  here, have they?

20        MR. BUTLER:  Objection.  Your Honor, we've been over

21  this ground with other witnesses.  This is exactly what the

22  pretrial scheduling order, your chambers conference, and the

23  meet-and-confer conferences were about.  This is outside the

24  scope of the summary proceeding.

25        MR. LAURIA:  Your Honor, may I respond?

Resnick - Cross/Aragon                                    113

1          We had a meet-and-confer -- actually, before we had

2     the meet-and-confer, we agreed that we were going to get the

3     business plan that was submitted to the board on December

4     7th.  When we reached that agreement with the debtor, we had

5     no idea, not an inkling, that there was a more recent plan

6     prepared that reflected the debtors' view on the changes that

7     were going to happen to its financial performance over time

8     as a consequence of its opinions regarding a labor

9     transition, which is fundamental to this reorganization.

10         And if we had known such a plan existed, we

11    certainly would have insisted on seeing it because it would

12    be a lot more helpful to us and the Court in assessing the

13    prospects of this company.  And I just really think it's not

14    right for counsel to keep shoving in our mouth the fact that

15    we made an agreement when we didn't know this other plan

16    existed.

17         THE COURT:  Were you on the call that we had, the

18    discovery conference call?

19         MR. LAURIA:  Yes, I was, Your Honor.

20         THE COURT:  Do you remember that call?

21         MR. LAURIA:  I do.  At that time, we did not know

22    this other plan existed.  I'm sorry, Your Honor, but we

23    didn't know.  And had we, I can assure you we would have

24    insisted on seeing it.

25         THE COURT:  Didn't I say that you would not be able

Resnick - Cross/Aragon                                    114

1    to get other plans, that you could run your own sensitivity

2    analyses on the plan that they were going to rely on?

3            MR. LAURIA:  Your Honor, we did not know that a

4    better plan --

5            THE COURT:  Answer my question.  Did I just waste an

6    hour and a half, after you people couldn't get your act

7    together to work out your own discovery schedule?

8            MR. LAURIA:  Your Honor, if --

9            THE COURT:  Did I waste an hour and a half a month

10   ago on this --

11           MR. LAURIA:  Your Honor, if that's what you said, I

12   didn't --

13           THE COURT:  -- and did you raise any of these issues

14   in the month and a half since then?

15           MR. LAURIA:  Your Honor, if that's what you said, I

16   apologize because I didn't understand --

17           THE COURT:  It is what I said, and you know it's

18   what I said.

19           MR. LAURIA:  No, Your Honor, I'm sorry.  I don't

20   recall it that way.

21           But I want to say that we only learned of this other

22   plan Friday, when Mr. Resnick was getting deposed.  This past

23   Friday is the first we heard of the existence of this other

24   plan.  And we are very troubled that we didn't know it even

25   existed because we would have argued about our entitlement to

Resnick - Cross/Aragon                                    115

1   see it at an earlier time, I assure you of that, Your Honor.

2           THE COURT:  You did argue about the right to see any

3   projections --

4           MR. LAURIA:  Your Honor --

5           THE COURT:  -- that went off of this.  Of course a

6   debtor is going to do sensitivity runs on its projections.

7           MR. LAURIA:  Your Honor --

8           THE COURT:  The debtor is not supposed to stay still

9   while one argues a motion for the formation of an equity

10  committee.

11          MR. LAURIA:  Of course not, Your Honor.  What we --

12          THE COURT:  So why are you raising this point if you

13  know the law?

14          MR. LAURIA:  What law am I supposed to know, Your

15  Honor?  I'm sorry.

16          THE COURT:  That a debtor is not supposed to stay

17  still while it waits for the movants for an equity committee

18  to conduct discovery and have a hearing.  Of course the

19  debtor is going to run sensitivities on its projections.

20          MR. LAURIA:  Well --

21          THE COURT:  You can, too, and that was the authority

22  I gave you, and that's what your experts have done.  They're

23  not relying upon the --

24          MR. LAURIA:  What --

25          THE COURT:  Let me finish.  All right?

1           MR. LAURIA:  I'm sorry.

2           THE COURT:  Maybe if you let me finish, you'd listen

3    better, as you apparently did not listen at the hour-and-a-

4    half call that we had a month and a half ago.

5           They are not relying on those projections.  As I

6    said a month and a half ago, that's their risk.  Instead,

7    they're projecting the steady-state projections.  And Mr.

8    Aragon has spent a lot of time; in fact, in my view, too

9    much, since he's gone over it three or four times, that those

10   were just that: they're steady-state projections.  They don't

11   reflect changes that might happen in the future.

12          As a movant for an equity committee, that is to your

13   benefit, as I made it clear to you on that call.  Do I have

14   to repeat why?  No, because we said it then.

15          I also said, because of that, they don't have to

16   produce updates.  You can do the sensitivities on that; they

17   can critique them, as long as they're not relying on the

18   updates, but instead upon simple logic and the knowledge of

19   their business, and that's what is happening.

20          And now we have wasted another half-hour.  And

21   frankly, you have tried to turn this on its head.  I don't

22   appreciate it.  It's about the fourth time it's happened, in

23   a suggestion that the debtor is, quote, "withholding

24   documents," as it is clear, as I said yesterday, I am the one

25   withholding the documents.  And I believe I did it correctly,

Resnick - Cross/Aragon                                          117

1    and I believe the parties have operated under that constraint

2    since then.

3          So I will not require the production of any further

4    sensitivity runs that the debtor is doing, and that's my

5    ruling.

6          MR. LAURIA:  Your Honor, we're not asking for them

7    to be produced, and I --

8          THE COURT:  No.  You're just complaining about it

9    needlessly.  Now please sit down, sir.

10         MR. LAURIA:  Well, I apologize.

11         THE COURT:  All right.

12         MR. ARAGON:  Your Honor, upon that admonition, I'm

13   going to be very brief, I promise.  I just have a few more

14   questions of Mr. Resnick.

15   BY MR. ARAGON:

16   Q   Now even though Appaloosa's experts were working with, in

17   our view, limited information, still you didn't challenge,

18   did you, the key aspects of -- certain key aspects of the

19   report; such as, you didn't challenge the EBITDA multiplier

20   of the 5.2 to 5.9, did you?

21   A   No, I did not.

22   Q   And you didn't challenge the current run rate, either,

23   did you?

24   A   No.

25   Q   In fact, if you look at Page 57 of Delphi Corporation's

Resnick - Cross/Aragon                                    118

1    expert report, it's Exhibit 4 --

2    A    I'm sorry.  Which volume is that?

3    Q    It's Exhibit 4, sir.  It would be the first one in the

4    confidential.

5    A    In the confidential?

6    Q    Yes, sir.

7    A    Exhibit 4 is the Eureka report?

8    Q    Yes, sir.  If you look at page --

9    A    At which page?

10   q    57.  This is entitled "Estimated Adjustment EBITDA Post-

11   Petition."  The first period on that page is the month of

12   January of 2006.  You don't challenge the adjusted EBITDA for

13   that period of $18 million that was calculated by Eureka, do

14   you?

15   A    No.  For all the reasons we mentioned in our rebuttal, we

16   just thought the other comments we made were much more

17   relevant and didn't address this point.

18   Q    And it's true, too, is it not, sir, that you did not

19   challenge the adjusted EBITDA for the period of October the

20   8th, 2005, the date of the petition, to the end of January

21   2006, which is $59 million?

22   A    Not specifically, no.

23        MR. ARAGON:  I have no further questions, sir.

24   Thank you.

25        THE COURT:  Okay.

Colloquy                                119

1          MR. BUTLER:  Your Honor, the debtors have no

2   redirect.

3          THE COURT:  Okay.  You can step down, Mr. Resnick.

4          THE WITNESS:  Thank you, Your Honor.

5      (Witness excused.)

6          MR. BUTLER:  Your Honor, may it please the Court,

7   and so the record is clear at this point, with the rulings on

8   the Daubert motions having been denied, I'd like to confirm

9   that all of the 244 exhibits -- actually 246, but all of the

10  exhibits have been admitted.

11         THE COURT:  Okay.

12         MR. LAURIA:  Yeah, confirmed, Your Honor.

13         THE COURT:  Okay.  They're all admitted as per the

14  numbers in the binders.

15         MR. BUTLER:  Your Honor, that would conclude the

16  debtors' rebuttal case.  We'd like to get some guidance from

17  the Court on how you'd like to entertain, if you want to

18  entertain closing arguments, if the Court is so inclined.

19  Seeing as there are a total I think of four objectors, as

20  well as the movant, perhaps some guidelines from the Court on

21  time limits or however you might want to consider it.

22         THE COURT:  Well, again, the parties have provided a

23  pretty thorough briefing on this, including in respect of the

24  movant's papers, a lengthy response; not only to the briefs,

25  but also commenting on the discovery at that point.  So what

1    I'm looking for is really fairly concise closing argument,

2    focusing in on the trial evidence.

3            And my thought is that we'll start at 5 on that, and

4    I would say a half-hour for Appaloosa, and roughly a half-

5    hour for the objectors.  I know there are a couple who have

6    been sitting through the trial and have been dying to say

7    their piece and haven't gotten to open their mouths, so it

8    might be a little longer for you all, just to hear their

9    perspective, but I don't expect the other objectors to repeat

10   what the debtors are going to say, so ...

11           MR. BUTLER:  We'll coordinate during the recess,

12   Your Honor.

13           THE COURT:  If they have a -- you know, if they have

14   an extra point that hasn't been made or that's specific to

15   their constituency, then that's worth making.  So I assume

16   we'll go until about six, 6:15.

17           MR. BUTLER:  Thank you, Your Honor.

18           THE COURT:  Okay.  So I'll be back in five minutes.

19       (Recess taken at 4:52 p.m.)

20       (Proceedings resume at 5:04 p.m.)

21           THE COURT:  Please be seated.

22           Okay.  Mr. Lauria?

23       **CLOSING ARGUMENT FOR APPALOOSA MANAGEMENT, LP**

24           MR. LAURIA:  Thank you, Your Honor.

25           The debtors' Chief Restructuring Officer Mr. Sheehan

Closing Argument - Lauria                          121

1    said two things on the record yesterday that I think are

2    critical to the determination the Court is being asked to

3    make:

4              Number one, looking at the balance sheet, after

5    acknowledging that the liability numbers had been adjusted,

6    on inquiry from the Court, Mr. Sheehan testified that the

7    assets had not been and that, in quotes, "the assets were not

8    worth less than book."

9              The second thing he said was that the debtors had

10   looked at alternative labor deal scenarios that reflect

11   annual savings that are the same and, in some cases, greater

12   than those put forth by our experts.  But Mr. Sheehan still

13   couldn't or wouldn't concede that there might be value for

14   equity.

15             Now, as to the first statement, that the assets are

16   not worth less than book.  If we're trying to get a sense of

17   economic reality and management believes that the assets are

18   not worth less than book -- by that I mean that they're worth

19   more than book -- why wouldn't they show that to the board on

20   December 7th and to the Court now?  It feels a little like

21   we're being gamed.  It feels a little like it is the debtors

22   against the shareholders.  It doesn't feel like shareholder

23   interests are being protected adequately.  It doesn't feel

24   like they're being represented at all.  It feels like the

25   opposite.

Closing Argument - Lauria                           122

1          As to the second statement by Mr. Sheehan, that the

2   company had developed scenarios showing savings that are

3   comparable to or greater than those prepared by our experts,

4   but still, no acknowledgement of value for equity, I think

5   that statement really speaks for itself.  You get the sense

6   that no matter how much savings Delphi could experience from

7   the labor transition, that Mr. Sheehan still wouldn't

8   acknowledge that there's value for equity.  Is this really to

9   be the sole fiduciary representative for the 300,000

10  shareholders in this case?

11         The company's approaches to determining whether or

12  not equity is hopelessly out of the money we believe are

13  fatally flawed and skewed to the detriment of old equity.

14  Both the balance-sheet approach and the market-value-of-the-

15  debt approach fail to answer the bell because they do not

16  capture the forward-looking nature of the inquiry.  The test

17  is widely recognized as being an appearance of being

18  hopelessly insolvent.  We don't dispute that.  I want to be

19  clear on that point, Your Honor.

20         The debtors understand that test, best evidenced by

21  their letter to the United States Trustee not to appoint a

22  committee, which specifically states the standard and that

23  they've concluded it has not been met.  But everyone,

24  including Mr. Resnick today in his testimony, knows that a

25  balance sheet has no forward-looking component to it.  It is

Closing Argument - Lauria                        123

1   as of a point in time that, by definition, has to have

2   already occurred, unless it's a projected balance sheet, and

3   that clearly has not been presented.

4         Anecdotally, Your Honor, in twenty years of

5   practicing in this area, I have never been able to observe a

6   correlation between a debtor's balance sheet at the time it

7   files its Chapter 11 case and ultimate recoveries under a

8   Chapter 11 plan.

9         THE COURT:  It usually shows greater value for

10  assets, though, doesn't it, than what actually transpires?

11        MR. LAURIA:  That's true, Your Honor.

12        THE COURT:  Notwithstanding Mr. Sheehan's statement,

13  which I understand why you went first with that one.

14        MR. LAURIA:  That's certainly true, Your Honor.

15        THE COURT:  Okay.

16        MR. LAURIA:  Everyone, including those who believe

17  that the market and securities of a distressed company is

18  efficient -- and there are those who disagree, including both

19  scholars and courts -- also know that a transaction in an

20  efficient market is evidence of price at the time of the

21  transaction and not at any other time.  Mr. Resnick admitted

22  this today in his testimony.  Were it otherwise, Your Honor,

23  the pricing graph of Mr. Butler would have a straight line on

24  it, rather than one that shows changes over time as new

25  information gets into the market.

Closing Argument - Lauria                                    124

1          Moreover, as with balance sheet tests, I have never

2     seen a correlation between the trading price in a debtor's

3     securities at the beginning of a case and ultimate recoveries

4     under a plan at the end.

5          For that matter, the same is also true of research

6     reports, and we've all looked at lots of them over the years.

7     Generally, they get it wrong.

8          There's another aspect of the trading price of the

9     company's debt, though, that I think is relevant for the

10    Court to consider, and that is the fact that a distressed

11    investor who is today buying the company's debt at sixty

12    cents is looking for a return.  In fact, hedge funds are

13    looking for twenty to twenty-five percent returns.  And if

14    you assume a two-year time line for this Chapter 11 case, in

15    fact, an investor who buys debt today at sixty cents is

16    looking for a par-plus recovery to get that annualized

17    return.

18         As to the balance sheet, as I previously mentioned,

19    Mr. Sheehan has admitted that liabilities have been worked

20    on, but the assets have not, and there is an upside in the

21    assets.  In fact, it's noteworthy that the pension and OPEB

22    liabilities of the debtors are apparently quite volatile at

23    this point, even in the debtors' view.

24         At the recent Creditors' 341 Meeting, which was held

25    on February 3rd this year, the debtors presented information

Closing Argument - Lauria                              125

1   to the creditors indicating that the aggregate pension and

2   OPEB liabilities were $13.95 billion; yet, in Mr. Butler's

3   pie chart, the number is presented as being $10.729 billion.

4   That's a swing of over $3 billion in a month.  How much more?

5   In fact, with that kind of volatility and knowing that

6   there's upside in the assets, it's not even a stretch to get

7   to solvency in the debtors' way of looking at things.

8          It's even easier, Your Honor, if the company would

9   properly reflect its liabilities.  By definition, a liability

10  is an enforceable obligation to pay; and, yet, despite

11  recognizing that OPEB is not vested and that there is no

12  obligation beyond October 2007, the debtors reflect on their

13  balance sheet a number that expresses the present value of

14  the current benefit level into infinity.  Mr. Butler's

15  insinuation that the plans continue to exist after the expiry

16  of the CBAs and is somehow enforceable is just plain wrong.

17  The plans expressly reserve the company's right to amend,

18  modify, or terminate them.

19         Under existing precedent in the Second Circuit, I

20  would cite the Court to American Federation of Grain Millers

21  v. International Multifoods, 116 F.3d 976 (2d Cir. 1977),

22  specifically held that:

23             "When the right to amend, modify, or terminate is

24             retained in the plan, upon termination of the CBA,

25             the obligation under the plan also goes away unless

Closing Argument - Lauria                    126

1          the obligation is vested."

2          We don't have that here.

3          Now we're not suggesting that the number should be

4   taken to zero.  That's impractical.  What we are suggesting,

5   though, is that the number should be reduced to reflect what

6   everyone knows is going to happen.  The obligation is going

7   to be materially reduced.  I probably don't need to remind

8   the Court, but I will, that the company is currently paying

9   over $64 an hour for its laborers.  Market is half that or

10  less.  It's got to come down.

11         It's a simple point, Your Honor.  The debtors'

12  analyses are not predictors and don't pretend to be

13  predictors of reorganized value in the future.  To that

14  extent, if the Court agrees that the term "hopeless" means

15  not only not now, but it means not ever, then those analyses

16  don't answer the question.

17         Now our position on that is not novel.  The fact

18  that the debtors would try to use them to declare equity out

19  of the money now and forever is extraordinarily problematic

20  for the company's shareholders.

21         THE COURT:  Well, they're not saying you're out of

22  the money forever.

23         MR. LAURIA:  Well, Your Honor --

24         THE COURT:  They're not looking -- this is not -- my

25  ruling today, however I rule, is not *res judicata* or

Closing Argument - Lauria                          127

1   collateral estoppel on valuation.

2          MR. LAURIA:  I understand that, Your Honor.  But the

3   debtors' position as to why there should not be an equity

4   committee is that the company is hopelessly insolvent and

5   hopeless -- if they mean what they say, "hopelessly

6   insolvent" means no chance.  That's the debtors' position.

7          I'm not suggesting that your ruling, either way, is

8   binding on us, the debtors, or anybody else.  I'm just saying

9   that the debtors' position in its papers is that we're

10  hopelessly insolvent --

11         THE COURT:  Okay.

12         MR. LAURIA:  -- and that's got to mean not now, not

13  ever, or the word "hopelessly" has been redefined in the

14  English language.

15         THE COURT:  Okay.

16         MR. LAURIA:  Now, knowing the sophistication of

17  management and the professionals who are advising them, this

18  strategy is not one taken out of ignorance.  So it raises

19  concerns regarding the motives of the people whose motive is

20  at issue here; and, to that extent, I do want to try to

21  respond to the Court's concern.

22         This is not about Mr. Tepper or Appaloosa or White &

23  Case.  The fact that the debtors believe that Mr. Tepper or

24  Appaloosa or White & Case are good people or bad people

25  should not color the Court's ruling here.  The issue is:

Closing Argument - Lauria                                    128

1   Under the facts and circumstances, are the shareholders of

2   this company entitled to representation by a formal

3   committee?  And I just hope that the Court will not hold any

4   perceived misconduct on the part of my firm or Mr. Tepper

5   against the shareholders on that issue.

6          Now the company's pension and OPEB liability, like

7   all other obligations of the company, should not be double-

8   counted in valuing the company.  And I want to just use two

9   quick examples.

10         Let's consider how a true lease is dealt with in

11  valuing a company.  The current year's rent is included in

12  the costs that are subtracted from revenues to get to EBITDA.

13  The EBITDA is then multiplied by whatever multiplier the

14  professional determines is appropriate and then, in going

15  from enterprise value to equity value, you don't turn around

16  and subtract the present value of the remaining lease

17  obligation.  That would be a double-count of the lease.

18         Now let's talk about how you deal with debt for a

19  minute.  Debt you treat the other way.  In calculating

20  EBITDA, the current year's interest and amortization

21  obligations are not subtracted from revenues.  They're added

22  back.  Then, after enterprise value is calculated, the

23  present value of the debt obligation is subtracted to get

24  from enterprise value to equity value.  In both cases, the

25  obligation only gets counted once.

Closing Argument - Lauria                                    129

1          Now I'd like to go back to Mr. Springer's

2    questioning of Mr. Greene yesterday.  He asked a series of

3    questions about why the costs of a labor transition had not

4    been subtracted from Delphi's EBITDA, implying that Eureka

5    had overstated the EBITDA in its valuation.  The fact is that

6    the total cost, over $2.6 billion in Eureka's estimate, had

7    already been subtracted in going from enterprise value to

8    equity.  If it were also subtracted from EBITDA, you would

9    have a double-count.

10         It would be inappropriate, moreover, to subtract the

11   buy-out from revenues in calculating EBITDA because this is

12   not a recurring expense.  Application of a multiple would

13   have the effect of treating that as a recurring expense and

14   it's a one-time item.

15         Now the flip side of this is that if the annual

16   costs of the pension plan and OPEB are subtracted from

17   revenues to get to EBITDA, and they have been, then it would

18   be inappropriate to turn around and subtract the present

19   value of these obligations from enterprise value to derive

20   equity value.  That would be a double-count.

21         This is all said to demonstrate the fact that Mr.

22   Butler's pie chart is not just a sloppy surrogate for a

23   proper, forward-looking valuation; it gives the wrong answer.

24   It suggests that you just subtract the pension and OPEB

25   liability from the value of the assets to determine if

Closing Argument - Lauria                                    130

1    there's a deficit.  Your Honor, it's not that simple.

2          I'd like to walk through the sequence of events

3    going from Eureka's March 6 report to its March 10 report,

4    and finally to its March 17 report, to demonstrate the

5    propriety of what was done and that, contrary to Mr. Butler's

6    argument, our valuation has not been refuted.

7          As clearly testified to by Mr. Hyman yesterday,

8    their driving principle in developing a base case on which to

9    add adjustments from a labor transition was from the

10   beginning, in the middle, at the end, and yesterday, when he

11   was on the stand, to make sure that the base case reflects

12   the most recent full-year results and the current-year run

13   rates of the company, absent some explanation of why the

14   numbers should be different.  Applying this principle, Mr.

15   Hyman believed that the base case EBITDA assumption should

16   produce a number somewhere between negative 154 million and

17   positive 200 million.

18         By the way, Your Honor, the top-end number is

19   actually $185.3 million.  That's $59 million which is the

20   EBITDA from the first four months.  It's not actually four

21   months.  It's actually from October 9th to January 31st, so

22   it's 115 days.  So the multiplier on that fifty-nine is 3.14

23   instead of three; 3.14 being the fraction you get when you

24   divide 115 into 365.  So the top of that number is 185.3, not

25   200.  I wanted to make sure we were clear on that.

Closing Argument - Lauria                                    131

1        In preparing the March 6 report, Eureka used the

2   company's 2005 EBITDA as its starting point.  That was the

3   negative one-hundred-and-fifty-four-million-dollar number.

4   And the reason for that was that they got the steady-state

5   projections the Sunday before they were preparing -- the

6   report had to be filed, which was on Monday.  They didn't

7   have time to digest it, to understand it, and to analyze it,

8   to work with it, and they weren't comfortable including it in

9   the report, so they just took 2005.

10       Now, in moving to the March 10 report, which they

11  had to file four days later, they tried to work with the

12  company's steady-state numbers in order to avoid controversy.

13  The closer their case was to what the debtor put on the

14  table, the less there would be to argue about, presumably.

15  They made comparatively minor changes.  Not realizing that

16  the depreciation and amortization had already been accounted

17  for, they added it back to get an EBITDA number that happened

18  to be $180 million.

19       Mr. Hyman testified that, because that number was in

20  his acceptable range, negative one fifty-four to positive two

21  hundred; one eighty, he thought that was an acceptable number

22  to work from, so he did it.  He thought that it would less

23  controversial, easier to digest, easier to contend with in a

24  dispute.

25       When the debtors pointed out the error, however,

1   that the D&A had already been backed out, then he had to

2   revise his numbers based on that and taking the $1.2 billion

3   out, moved the number out of a range that he thought was

4   appropriate to use for a starting point.  He was now at a

5   negative-over-a-billion-dollar number and his bracket was

6   negative one fifty-four to positive one-eighty.  He didn't

7   have an explanation for the negative number, so he thought

8   the best thing to do was to dig into the steady-state numbers

9   and adjust them to reflect the 2005 results and the four

10  months we had while in Chapter 11.  The adjustments he

11  applied brought him to a positive one-hundred-million-dollar

12  EBITDA number for his base case; that is, before addressing

13  the savings of the labor transition.

14        The point is that Eureka's approach was the same

15  throughout the process.  This was no back-looking adjustment.

16  They were looking to conform the base case to recent results,

17  absent explanation, and trying to avoid controversy.

18        I think it's important to mention, by the way, Your

19  Honor, that wherever you fall in that range, between the

20  negative one fifty-four and the positive one eighty, the

21  impact on valuation is slight.  Ultimately, the valuation

22  range stays pretty much the same.

23        Now the debtors have not challenged the two-and-a-

24  half-to-three-billion-dollar savings from the labor

25  transition.  Indeed, the debtors' own materials that were

1  discussed on the record yesterday reflect numbers that are

2  substantially higher than that.  Nor has there been any

3  challenge to the 5.1 to 5.9 "X range" of multiples.

4        So if you accept something close to the Eureka base

5  case, you have a value range of approximately $12.7 billion

6  to just over $16 billion.  Then, if you take out the

7  deductions as set forth in Page 41 of the March 10 report,

8  which had a range of nine to $9.8 billion.  After paying down

9  those deductions with the company's cash, you have a

10 valuation range for equity of 3 billion to approximately $6

11 billion.

12       Now, in those deductions, most of them are hard to

13 quarrel with.  The only one that the debtors have gone on

14 record fighting about is the 2.6-billion-dollar buy-out on

15 the labor.  However, the debtors have not offered a better

16 number.  So, we're left with a 2.6-billion-dollar subtraction

17 getting us to $3 billion of equity at the bottom end.  That

18 number would have to be more than double just to get the

19 bottom-end number of Eureka's range to zero, and it would

20 have to be double, going to triple, to get to a point where

21 most of the range doesn't have equity getting a recovery.

22       But the bottom line -- there are really two issues

23 here:

24       Is there a bona fide interest to be protected and is

25 that interest being protected?  We believe the answers *in*

Closing Argument - Lauria                          134

1    *seriatim* are yes and no.

2         As to the bona fides of old equities' interest, we

3    presented a reasonable, not a pie-in-the-sky case, showing

4    that there can be value for old equity.  Far from an

5    appearance of a hopeless insolvency case, there is a real

6    opportunity to preserve value for Delphi's 300,000

7    shareholders.

8         Notably, our analysis was prepared under

9    extraordinarily difficult circumstances.  Not only was the

10   information consistently late in coming from the debtors, but

11   oftentimes it was jumbled and confused and took time just to

12   sort out, so that it could be digested.  Against our

13   analysis, the debtors have failed to come forward with

14   anything that addresses the forward-looking issue of

15   hopelessness.  They've chosen to proceed on the basis of now

16   or the recent past they have to live with.

17        As to whether or not the interests of the

18   shareholders are being protected, the case couldn't be

19   clearer.  Every variable that the company controls they have

20   adjusted in a way that is unfavorable to old equity.

21        As to the valuation of OPEB, various adjustments

22   have been made that we believe show that the OPEB is clearly

23   overstated by $2.6 billion.

24        As to the timing of the pension payment in 2007, the

25   steady state assumes that the payment is going to be made on

Closing Argument - Lauria                           135

1   June 30th, but if it were made two weeks earlier, on or

2   before June 15th, you could save another $350 million.

3           THE COURT:  On a snapshot basis?

4           MR. LAURIA:  On a snapshot basis, Your Honor.

5           Rather than adjusting projections to reflect the

6   most recent results in the run rate, they've left that to us

7   to try to figure out.  Playing with the balance sheet,

8   they're reflected liabilities that are not legally

9   enforceable and on the asset side, they've admitted that

10  there's upside, but they don't reflect it.

11          Taking the public position of hopeless insolvency,

12  given the absence of an appropriate evaluation of the

13  prospects for value in the future was irresponsible at best.

14  The problem of the company's track record is militated by the

15  positional conflicts that now exist between management and

16  old equity.

17          As we talked about in the opening, the proposed KERP

18  puts management in competition with old equity for a share of

19  the value of the reorganized company.  The competition, I

20  might add, it is most easily won if equity doesn't have a

21  seat in the room.

22          To the extent that appearance is important -- and I

23  think it is, Your Honor, under these circumstances -- what

24  are the moms and pops out there who own stock in this company

25  likely to think if this process results in them getting wiped

Closing Argument - Lauria                    136

1    out without an equity committee and management taking home

2    ten percent?

3          THE COURT:  Is there any motion actually scheduled

4    on that original KECP?

5          MR. LAURIA:  I think debtors' counsel is better --

6          MR. BUTLER:  Your Honor, that motion is currently

7    carried to the July omnibus hearing.  There are negotiations

8    between the Creditors' Committee and the company on that,

9    which will be dealt with this summer.

10         THE COURT:  Okay.

11         MR. BUTLER:  That's the current status.

12         THE COURT:  Okay.

13         MR. LAURIA:  There's a second positional conflict

14   that may even be more important, however.  The debtor is

15   currently engaged in what are no doubt difficult negotiations

16   regarding the transition of its labor costs.  These

17   negotiations involve the UAW and GM, two pretty big guys, who

18   we understand from the debtors know how to negotiate tough.

19   Management's job in those negotiations is clearly made easier

20   if they don't have to worry about old equity and structuring

21   the deal.  In that regard we have to ask, is there anything

22   in this record that should make shareholders comfortable,

23   that if it comes down to structuring the deal, so as, for

24   example, not triggering GM's indemnity or fighting GM's

25   indemnity claim, that management will hold the deal up to

Closing Argument - Lauria                          137

1   preserve value for equity.  For a management that doesn't

2   even want to engage on the topic of what reorganization value

3   is going to be, but will nevertheless swear that the company

4   is hopelessly insolvent, we think the answer can't be

5   anything but no.

6        A final point I'd like to make Your Honor, I think

7   as we all learned a little while ago, there apparently is a

8   partial labor deal in place.  We don't know what the terms

9   are.  We don't know what the implications are.  We don't know

10  what commitments have been made and what rights are proposed

11  to be surrendered.  That motion is going to be filed today,

12  and it's going to be heard on April 7.  If a committee, not

13  just Appaloosa, is going to respond on behalf of

14  shareholders, we need that committee appointment right away.

15       Thank you, Your Honor.

16       THE COURT:  Okay.

17       MR. LAURIA:  Oh, Your Honor, I apologize.  I believe

18  there's counsel for another substantial shareholder of the

19  company who is in the court, who just wanted to announce

20  their joinder in our --

21       THE COURT:  Were these the folks that filed the

22  pleading the other day?

23       MR. LOWENTHAL:  A brief, Your Honor.

24       THE COURT:  I forget the name of your client.  Or

25  did you file a pleading the other day?

Closing Argument - Lowenthal                    138

1          MR. LOWENTHAL:  Pardon me?

2          THE COURT:  Did your client file the pleading in

3    support the other day?

4          MR. LOWENTHAL:  Yes, Your Honor, we did.  Several

5    days ago.

6          THE COURT:  I have that.

7          MR. LOWENTHAL:  Okay.  Can I address the Court for

8    just a moment?

9          THE COURT:  I don't want you to repeat anything.

10          MR. LOWENTHAL:  Fine.  Thank you.

11          THE COURT:  So why don't you do that?

12    **CLOSING ARGUMENT FOR BRANDES INVESTMENT PARTNERS, LP**

13          MR. LOWENTHAL:  Your Honor, the only thing that is

14    important is that this shareholder was a holder of over five

15    percent of the company's stock from before the bankruptcy was

16    filed.  I think it's important --

17          THE COURT:  Well, no.  I'm saying why don't you go

18    ahead?

19          MR. LOWENTHAL:  Thank you, Your Honor.  Good

20    afternoon.  Daniel Lowenthal of Thelen, Reid & Priest.  We

21    represent Brandes Investment Partners, and we did file a

22    pleading several days ago.  I just wanted to expand on one or

23    two points.

24          Brandes, just so Your Honor understands, is an

25    investment advisory firm; and it has, pursuant to its

Closing Argument - Lowenthal                              139

1    clients' authority, the right to vote shares, as well as to

2    buy and to sell them.  It has over a $100 billion under

3    management right now, and it was just remarked, prior to the

4    petition date here, Brandes had a --

5              THE COURT:  I'm sorry.  Did you say a hundred

6    billion or million?

7              MR. LOWENTHAL:  A hundred billion, Your Honor.

8              THE COURT:  Okay.

9              Mr. LOWENTHAL:  6.7 percent of Delphi's equity.  It

10   currently has about 5.3 percent.

11             Brandes has been monitoring the motion and we've

12   been in contact with counsel for Appaloosa.  We support the

13   relief here, Your Honor, and if Your Honor grants the motion

14   and a committee is appointed, Brandes, as mentioned in our

15   pleading, would certainly be willing to serve on the

16   committee and they've served on other equity committees in

17   the past and present, including Interstate Bakeries and Winn-

18   Dixie.  That's essentially it.

19             The key point being, from their perspective, Your

20   Honor, is that from the outset, prior to the petition date,

21   we're a serious equity-holder and continue to monitor and be

22   involved and support the relief being sought here.

23             THE COURT:  Okay.

24             MR. LOWENTHAL:  I don't want to take up any more of

25   the Court's time.  Thank you.

Closing Argument - Butler                    140

1          THE COURT:  Thank you.

2              **CLOSING ARGUMENT FOR THE DEBTORS**

3          MR. BUTLER:  Your Honor asked us in these closing

4    arguments to address how the evidence applies to Appaloosa's

5    burden of proof to establish that there is a substantial

6    likelihood that they will receive a meaningful distribution

7    in the case under a strict application of the absolute

8    priority rule, and that they will be unable to represent

9    their interest in the bankruptcy case without an official

10   committee.  Those are, after all, the standards in <u>Williams</u>

11   <u>Communications</u>, similar standards addressed in Your Honor's

12   priority rulings in <u>Loral</u>.

13         And, as the Court knows, the burden is theirs and

14   not ours.  And when the Court evaluates the evidence, I think

15   there are three or four pieces of key evidence here.

16         The first, going back to the matters we talked about

17   in the opening, I'm just referring to the exhibits that are

18   now in evidence, on a balance-sheet test, Exhibit 204, makes

19   it clear that as of January 31st, 2006, that the debtors were

20   insolvent on the balance-sheet test to the tune of almost or

21   in excess of $6.3 billion.  Mr. Greene testified that he did

22   not quibble in any respect with the financial statements or

23   the fact that they are in a GAAP balance.

24     (Counsel confer.)

25         MR. BUTLER:  And similarly, as we walk through

Closing Argument - Butler                              141

1   there, the next --

2        (Counsel confer.)

3        MR. BUTLER:  The next exhibit, Your Honor, I want to

4   hold it up, is Exhibit 205 now in evidence.  It makes clear

5   that of the 20 billion or so, seventeen and a half billion

6   dollars are a liability, subject to compromise and when you

7   drill down into the seventeen and a half billion, Your Honor,

8   you find that there's about $7.4 billion worth of OPEB on the

9   balance sheet.  Again, Mr. Greene, in his testimony, did not

10  quibble with that at all and, Your Honor, I point out that

11  when Mr. Lauria, in his close, criticized me for my other

12  chart that simply said, gee, where did the $7 billion go,

13  because that's what they basically said is the math, that I

14  was doing something wrong in this analysis.  I point Your

15  Honor to Page 8 and Page 48 of their reply, when they -- this

16  is their analysis, they say and Mr. Aragon, you may recall,

17  in cross-examination did this same math with Mr. Sheehan and

18  said, well, don't you -- you just simply take this away,

19  don't you, in trying to put it down.  And, in fact, that's

20  not what the balance-sheet test or the insolvency test states

21  and Mr. Resnick's expert report, their expert report of

22  Rothschild Exhibit 14 summarizes that first factor and we

23  acknowledge it's a factor.

24       THE COURT:  Well, I think -- although I think he was

25  shifting gears, but I guess the possible implication of what

Closing Argument - Butler                    142

1   Mr. Lauria was saying is that the debtors were double

2   counting the OPEB, since they had it in somewhere else.  Do

3   you agree that the OPEB is reflected somewhere else in the

4   balance sheet?

5        MR. BUTLER:  I don't agree that there's any double

6   counting on the balance sheet.  There's no.  I mean, I think

7   what Mr. Lauria was trying to do was combine their financial

8   valuation analysis with the balance sheet.  Obviously, when

9   you look at a balance sheet, you look at liabilities in one

10  respect.  If you're looking at a income statement, you look

11  at expense items, income and expense items and they're in

12  another area.

13       THE COURT:  Okay.

14       MR. BUTLER:  But on the -- what I found remarkable

15  in their papers and in their argument is that you simply

16  ignore a third -- almost a third -- more than third of the

17  pie and then we have, in their words, in their reply brief,

18  that's the math you do to get positive EBITDA and that -- or

19  rather not positive EBITDA, rather -- excuse me.  Strike

20  that.  Positive value because then the assets exceed the

21  liabilities.

22       Second data point, Your Honor, also recognized in

23  this district, recent trading prices of securities, captured

24  on Exhibit 208, Trial Exhibit 208, also discussed in the

25  Rothschild report in Exhibit 13 and 14.  And again, Your

Closing Argument - Butler                              143

1    Honor, the big -- the bright orange line is the sixty percent

2    ceiling and at least prior to the trading over the last

3    twenty-four hours, at no time from during the last 120 days

4    or so has there been any trading above sixty cents

5    appreciably here.  There may be something right around the

6    orange line of any -- of the securities of this debtor during

7    that period of time and no -- and no, in the evidence, this

8    is uncontroverted.  No argument that these numbers are wrong,

9    that this is not, in fact, the evidence.

10          While we're on this, because it has a time line

11   here, Your Honor, and you can follow the trading prices on

12   this, obviously, we go all the way back.  At least initially,

13   Appaloosa made a big deal about dividends.  Again, I would

14   ask Your Honor to evaluate the evidence because this is what

15   -- the evidence it's in.  Mr. Sheehan, in his redirect

16   examination, took Your Honor through each of the events, some

17   of the major events reported publicly, that occurred from and

18   after the date of August 2nd, when the second-quarter

19   dividend was paid, through the time the third-quarter

20   dividend was canceled or no -- the decision was made not to

21   pay a third-quarter dividend through the debtors' Chapter 11

22   case and Exhibits 18 through 22 highlight each of those major

23   events that occurred.  None of them, in Appaloosa's papers,

24   they talk about date line this and date line that.  They

25   happened to skip, conveniently, five or six date lines that

Closing Argument - Butler                                    144

1    were in the SEC record that were material and if Your Honor

2    actually overlaid them on this trading history, the market

3    thought it was material long before the Chapter 11 case

4    because you can see, if you actually track the announcements,

5    starting with the 10-Q, Exhibit No. 18, you can see the drop

6    in market price starting right there and you can track in the

7    announcements, as each of these events occur and they were

8    rolled out in the periods -- in the post-petition or rather

9    the pre-petition period, what occurred.  So second data

10   point.

11        All right.  Third data point, Your Honor.  And we

12   are very mindful of Your Honor's discovery rulings and what

13   you conceded and what we needed to be able to prove and rebut

14   and how we should approach it.  And, Your Honor, also it's

15   important to recall Your Honor's pretrial order and discovery

16   order and the declarations signed and I hope Your Honor will

17   examine the declarations that were signed by Mr. Greene at

18   Trial Exhibit 3 and Mr. Hyman at Trial Exhibit 5, as well as

19   the expert report at Trial Exhibit 4, that were all dated

20   March 10th, 2006.  They have an obligation under Your Honor's

21   scheduling order, under the pretrial order, to submit their

22   evidence on March 10th.  That was the time and that was the

23   last time, under the terms of the scheduling order that they

24   were supposed to put forward their report and it was that

25   report that was subject to discovery, deposition, cross-

1   examination and preparation for this hearing.

2          And what happened, Your Honor?  Mr. Resnick and his

3   colleagues at Rothschild analyzed that report that was

4   received on the 10th, which I think was a Friday.  Over the

5   course of the weekend they analyzed that report and prepared

6   their expert report and guess what?  If you look at Exhibit

7   14, the Rothschild report, they found a fundamental and fatal

8   error with respect to that report and that was a 1.2-billion-

9   dollar error, which Mr. Hyman conceded on the record, in the

10  examination, was a mistake.  And that number caused their

11  valuation to be negative.  Mr. Lauria acknowledged that and

12  said, well, gee, if it was negative, that was outside of Mr.

13  Hyman's bracketed, acceptable results.  It's not clear to me

14  how Mr. Hyman gets this sort of bracket order, acceptable and

15  unacceptable, but on or inside of his bracket, acceptable

16  results.

17         And so, they scurried around and seven days later,

18  long after they were entitled to do under the pretrial order,

19  they submit supplemental declarations, not subject to cross -

20  - to discovery because depositions had already been taken in

21  which they said, well, never mind, we'll adjust five other

22  items.

23         And you heard, and I thought it was interesting, Mr.

24  Hyman conceded a second mistake on the record.  He said in

25  his testimony, it was a mistake for me to have material costs

Closing Argument - Butler                          146

1   at fourteen -- I always get the math wrong here, $14 billion,

2   14.3.  It really should have been 13.9.  He said, I picked

3   the midpoint of a range between the debtors and where we were

4   and I shouldn't have.  It was a mistake.  All right.  Well,

5   how many mistakes do experts get to make in the only expert

6   report they're supposed to present in a proceeding and, you

7   know, without going to the direct credibility of their

8   reports?

9        And so what happened is, when he wasn't happy with

10  the 1.2 billion, he said, you know what, I made a mistake.

11  His testimony.  A mistake on these others, so I'll change

12  these.  The net result is no surprise.  After he changes the

13  numbers, five of them, he gets back into his bracketed

14  acceptable range and that becomes the revised report.

15       Your Honor, our view is that the -- Your Honor

16  obviously is the trier of fact and determines the credibility

17  of the evidence, but as we said in our opening, we believe

18  the evidence, as it relates to anything after the March 10th

19  reports, are incredible and should not be considered by the

20  Court.

21       I talked a bit about the market evidence, Your

22  Honor.  The market evidence wasn't just what was in Exhibit

23  208.  The market evidence is also reflected in a host -- a

24  host of analyst reports, designated by Appaloosa, not

25  designated by the debtors, but they came in under the joint

Closing Argument - Butler                    147

1   exhibit and there are a huge number of them in the evidence

2   now that have been admitted and what those reports -- and it

3   was conceded by Mr. Greene in his testimony, I believe, it

4   was either Mr. Greene or Mr. Hyman, it certainly went by

5   Eureka, that when you went through all of the reports they

6   designated, equity was zero.

7        That was -- the analysts determined equity was not

8   going to have a recovery, but you heard Mr. Greene make an

9   impassioned speech from the stand that basically said they

10  all -- all the rest of the street got it wrong and he's the

11  only one who understands the treatment of how the treatment

12  of claims ought to be here and all the other reports are

13  wrong and I think Your Honor, in evaluating market evidence,

14  needs to or would want to consider the credibility of Eureka,

15  putting it in light of the mistakes of their own reports,

16  being the only one who gets it right.

17       Your Honor, I also would point out Trial Exhibits

18  189 and 190, the Lehman reports, the Lehman report from

19  Appaloosa's own files.  This is the report that Appaloosa

20  received the week they purchased their only set of interests

21  in this case, which occurred after the Chapter 11 was filed

22  and that was the report where Lehman Brothers told Mr. Tepper

23  that the trade claims in this case, the unsecured claims,

24  would get forty to seventy cents on the dollar, clearly

25  meaning that there was no value for equity here at that

Closing Argument - Butler                                148

1   point.

2        Your Honor, I also think the testimony of Mr.

3   Sheehan and Mr. Williams in the redirect examination was

4   quite helpful in addressing a number of presumptions that

5   were made and I just want to briefly touch on those.

6   Appaloosa criticized the fact that certain of the OPEB

7   assumptions in the steady-state projections differed from

8   what would be in the FAS-106 report.  Mr. Williams offered

9   credible and uncontroverted evidence about the reasons behind

10  that, stating specifically that well look, our FAS report

11  doesn't always line up with what the actual experience people

12  have the last five years, Mr. Williams said.  Our report had

13  ended up -- they thought our report, they would have been off

14  budget significantly because the actual experience was higher

15  than our assumptions and thought and then testified that it

16  was reasonable for them to do what they did.

17       The second thing that -- the other big criticism

18  that they had was of Mr. Williams's projections as it related

19  to pension exhibit, Trial Exhibit 242.  Again, I thought,

20  Your Honor, if you read the entire trial exhibit and consider

21  Mr. Williams's testimony, again, a very credible rebuttal

22  from Mr. Williams in which he said look, you know,

23  effectively, there is no silver bullet in coming out of

24  Chapter 11 on June 15th or June 30th or September 15th of

25  2007, that his scenario has demonstrated simply what would be

Closing Argument - Butler                                149

1   paid and while there would be some amounts -- that minimum

2   amounts would be smaller in the early part of the year and

3   greater in the later part of the year, that wouldn't change

4   the overall payments that would have to be made.  They would

5   simply be made the next year and the year after.  And

6   Appaloosa turned that into a savings.  Your Honor, I

7   understand that's common on a snapshot basis, but the reality

8   is, from the actuarial experts, the testimony clearly, I

9   thought, Your Honor, would argue that it was extremely

10  credible on explaining that what was suggested in the trial -

11  - in the reply brief, again, was simply wrong.

12          Your Honor, I also would ask that Your Honor recall

13  the evidence.  Again, I thought Mr. Sheehan's presentation

14  and his evidence was extremely credible on his redirect

15  examination.  He walked Your Honor through -- and using the

16  steady-state projections, those we agreed were to be the

17  baseline that the debtors would be held to here in terms of

18  what we would be presenting here at trial, that the steady-

19  state projections he walked through and I think gave Your

20  Honor very credible explanations about GM volume, about

21  materials, about the run rate, the EBITDA, the seasonality

22  and the cyclicality of that.

23          Dealing with the GM negotiations and UAW

24  negotiations and why they failed pre-petition, dealing with

25  impairment concerns raised by those creditors as it related

Closing Argument - Butler                                    150

1   to the balance of the capital structure.  Again, very

2   detailed examination and testimony from Mr. Sheehan on each

3   of those items, among other things, pointing out the, again,

4   error in Mr. Aragon's assumptions that gee, the difference

5   between the website, and I guess it was the testimony, I

6   think, of Mr. Hyman, one of the two of them, went to a

7   website and looked at the -- the GM website and looked at

8   North American production, assumed that that North American

9   production number applied to Delphi, and didn't understand

10  that there's another program, the NUMMI/CAMMI program, a

11  dealing between GM and Toyota, in which Delphi has no

12  content; and, therefore, there's a difference of the numbers

13  and our projections and theirs because we don't build those

14  cars and we don't build the parts for those cars.  And,

15  consequently, the variance was explainable.  And Mr. Sheehan,

16  I believe, in his examination made it clear that he was --

17  that he had a very credible explanation for that.

18          In summary, Your Honor, you know, without the

19  evidentiary support for it, under Appaloosa's theory espoused

20  here today, you would always appoint an equity committee in a

21  Chapter 11 case because under their theory, the balance sheet

22  never matters, market evidence never matters.  Valuation is

23  always hypothetical, since it can't take into account future

24  events and you have to rely on their view on an emergency

25  valuation with no support in the case law for that and, oh,

Closing Argument - Butler                          151

1   by the way, any time a board of directors determines the

2   debtors appear hopelessly insolvent, a determination these --

3   this board of directors made only in response to the United

4   States Trustee's request that we respond to Appaloosa's

5   letter, then that board of directors automatically

6   disqualifies themselves from being adequately able to

7   represent equity.

8            The comment here, and the only -- and I'll close on

9   this, Your Honor.  One of the statements Mr. Lauria made was

10  to those of us working in this reorganization, and I know to

11  my board is extremely offensive, and that is the suggestion

12  that the debtors and the -- where their officers and

13  directors, the debtors and their advisors, quote, "don't have

14  to worry about old equity."

15           The plain testimony from Mr. Sheehan, and I think

16  the Court knows from the conduct of this case, is these

17  debtors are all about maximizing business enterprise value.

18  If, at the end of the day, the pie is big enough for lots of

19  people when we carve it up, that will be the optimal result.

20  But sitting here today -- sitting here today, under the case

21  law that applies to a request for the appointment of an

22  equity committee and in response to the inquiries of the

23  United States Trustee, the fact of the matter is, these

24  debtors appear to be hopelessly insolvent, based on the facts

25  that are before this Court, the trial record that exists in

Closing Argument - Rosenberg                    152

1   this Court and under any -- we believe under any analysis,

2   Appaloosa has utterly failed to carry their burden.

3           Thank you, Your Honor.

4           THE COURT:  Okay.

5   **CLOSING ARGUMENT FOR THE CREDITORS' COMMITTEE**

6           MR. ROSENBERG:  Your Honor, I'll be extremely brief.

7           Everybody who plays in this space knows about

8   Appaloosa, and I don't have to belabor their size,

9   sophistication, strength in this sector, et cetera, et

10  cetera.

11          I will also tell the Court that I can vouch

12  personally for the size and sophistication of Brandes.  Until

13  about five years ago, they were my personal money manager and

14  they did very well, indeed.

15      (Laughter.)

16          MR. ROSENBERG:  Having said that, notwithstanding

17  all of the publicity that this motion has gotten over the

18  last month; and, in particular, over the last week in the

19  national press across the board, I find it fascinating that

20  not one human being, one shareholder who actually is in need

21  of the protection of a fiduciary, has come forward and said,

22  yes, Appaloosa is right, we need a fiduciary.

23          Furthermore, the fact that Brandes is here today

24  demonstrates that Appaloosa, Brandes, and a few other

25  sophisticated holders, if they care to do so, can get

Closing Argument - Rosenberg                    153

1  together, function as an informal committee and create or

2  attempt to create the value for equity that doesn't exist

3  today.  And needless to say, Your Honor, on one level I'm

4  really rooting for them because if they create value for

5  equity, that means that my constituency gets par-plus-

6  accrued-interest compounded at the default rate, and I will

7  be very happy to have had that happen.

8          And indeed, we have gotten a very good taste over

9  the last month or so of the skill and aggressiveness and

10 resources that Appaloosa, in its own interest and, therefore,

11 necessarily in the interest of all equity-holders, can bring

12 to the table in this regard.  But, Your Honor, the question

13 is:  On whose nickel, in the context of present hopeless

14 insolvency, present hopeless insolvency?

15         I shudder to think ahead to some time in May, when I

16 examine the bills, the cost of this litigation getting here

17 today, to the estate and unfortunately, that's inevitable,

18 even under the argument I'm presently making to you because

19 as Appaloosa goes forward, spending its own resources, as it

20 should, to create value for itself and other shareholders in

21 the process, the estate is going to bear the burden of it, no

22 matter what.  But the estate should not be asked, under the

23 present circumstances, to bear the burden of Appaloosa's side

24 of their aggressive litigation tactics, designed to create

25 value for them and again, in the process for me, so that's

Closing Argument - Ziman                                    154

1    okay.

2              The last point that I'd like to make is simply this.

3    Mr. Butler chose to take offense on behalf of his client by

4    something that Appaloosa said.  I choose to do the same, and

5    that is the constant harping on the -- two of the major

6    issues in this case at the moment, the debtors' motion for

7    ten percent of the reorganized equity for management and the

8    ongoing issues involving the unions and GM.

9              I think Your Honor has already seen a track record

10   of aggressive protection of the interests of stakeholders by

11   the creditors' committee on these issues.  I assure you that

12   will continue in this hopelessly insolvent situation that

13   presently exists.

14             With due respect, we do not need the help of an

15   equity committee to protect, on our nickel, and that's whose

16   nickel it is at the moment, the interests of the stakeholders

17   of those issues.  Thank you.

18             **CLOSING ARGUMENT FOR JPMORGAN, ET AL**

19             MR. ZIMAN:  Your Honor, I too will try to be brief,

20   especially because I'm following such luminaries.  I couldn't

21   resist.

22             Your Honor, JPMorgan, as an agent for the pre-

23   petition lenders, joins the debtors and the U.S. Trustee in

24   opposing the motion.  I think the record is clear.  It is

25   ineluctably clear that Appaloosa hasn't met its burden on

Closing Argument - Ziman                               155

1   showing that there's a substantial likelihood of meaningful

2   distribution on today's facts and circumstances to equity.

3        Mr. Lauria alluded to several times in his closing

4   somehow that the standard was, you know -- that there might

5   be value and that is not the standard of this Circuit and

6   it's not the standard that should be applied by the Court

7   today.

8        I think there's four things that operate here and it

9   really just points out the fact that if nothing else, this

10  motion is way premature, if it ever should be brought again

11  at all.  That enterprise values is contingent on a labor deal

12  happening, that the recovery all constituents depends on that

13  labor deal and the claims that arise out of it, because if

14  nothing else, we've heard that there was a lot of speculation

15  over what the claims would be.  The debtor hasn't offered a

16  number.  I think that's probably smart, given that it's an

17  unknown.  Appaloosa is putting a pin in it and saying it's

18  $2.6 billion, but that's based on nothing but pure

19  speculation.

20       Third, that an equity committee would not have a

21  meaningful role in the terms of the renegotiated labor deal,

22  I think that is something Your Honor focused on in the

23  opening remarks.  I think it was, you know, a pressing

24  observation.  I think that this negotiation is a delicate one

25  that's taking place between the three constituents at issue.

Closing Argument - Leonhard and Court Decision        156

1   I think others involved in this matter will have an

2   opportunity to weigh in after the fact and Appaloosa, as Mr.

3   Rosenberg pointed out, will have that opportunity, too, as

4   would Brandes, given its substantial resources.

5        I think with that, Your Honor, I'll step down and

6   let Ms. Leonhard make her remarks.  Again, I would propose

7   granting the motion.

8        THE COURT:  Okay.

9        **CLOSING ARGUMENT FOR THE U.S. TRUSTEE**

10       MS. LEONHARD:  Good evening, Your Honor.  Alicia

11  Leonhard for the United States Trustee.

12       Last, but not least, Your Honor, the United States

13  Trustee joins in the comments and the arguments of the

14  objectors and requests that the Court deny the motion.  Thank

15  you very much.

16       THE COURT:  Okay.  All right.  I'll take a five-

17  minute break and then I'll be back.  Well, I'll be back at

18  6:15.

19    (Recess taken at 6:01 p.m.)

20       THE COURT:  Please be seated.

21       I have in front of me a motion by Appaloosa

22  Management, LP, a substantial shareholder of the parent

23  Delphi entity, for the appointment of an official committee

24  of equity security-holders under Section 1102(a)(2) of the

25  Bankruptcy Code.

Court Decision                                                    157

1          The motion is opposed by the debtors, the Official

2     Unsecured Creditors' Committee, the agent for the pre-

3     petition lenders, and the United States Trustee.

4          It has been joined in by another large and

5     sophisticated management company, Brandes, which unlike

6     Appaloosa, was a pre-petition holder of the debtor's equity

7     interests and represents to the Court that it has, under

8     management with authority to vote, again, a substantial stake

9     in the debtor's equity interests.  I believe, if you add the

10    two of them together, they own or control approximately

11    fifteen or sixteen percent of the outstanding shares.

12         Those shares are widely held.  There was no

13    testimony on this point, but I believe the record is clear

14    that there are approximately 300,000 shareholders of the

15    publicly traded equity interests.  In light of that fact, I

16    believe that it is relevant that the SEC has not taken a

17    position on this motion.  There were perhaps contrary

18    representations made to the Court as to why the SEC had not

19    done that, made by counsel to the U.S. Trustee on the one

20    hand, saying that the SEC did not support the motion; and by

21    counsel for Appaloosa, saying the SEC did not support the

22    motion, absent a showing, which it was not taking a position

23    on -- that is, that the SEC was not taking a position on,

24    with regard to whether the debtors at this point are

25    insolvent.

Court Decision                                                    158

1          This is an important motion because it affects the

2     cost of this case, both directly--that is, the cost of an

3     equity committee and its professionals if I grant the motion-

4     -as well as indirectly, in connection with both the cost of

5     the estate and other estate-compensated professionals,

6     including the Creditors' Committee, in dealing with

7     litigation and other matters raised by an equity committee;

8     and then, in addition, also indirectly, in respect of

9     potential delay that the existence of an equity committee

10    might cause at various stages in the case.

11         Because of its importance, and because of the desire

12    by all parties, at least as initially expressed by all

13    parties, including Appaloosa, to have this matter heard and

14    decided by me quickly, so that if I rule in favor of an

15    equity committee, an equity committee could be appointed

16    quickly before passage of much more time in this case, I have

17    decided to rule from the bench.

18         As I often do with long bench rulings, however,

19    particularly where I cite extensive case law, I reserve the

20    right to correct the ruling based on my review of the

21    transcript.

22         This is a core proceeding under the Bankruptcy Code,

23    as it deals with a committee's appointment under the Code.

24    And one begins, as one must, with the statute, which provides

25    at Section 1102(a)(2) that:

Court Decision                                          159

1              "On request of a party in interest, the Court may

2         order the appointment of additional committees of

3         creditors or of equity security-holders, if

4         necessary to assure adequate representation of

5         creditors or of equity security-holders.  The United

6         States Trustee shall appoint any such committee once

7         the Court has ordered the appointment."

8              It's well recognized that there is no statutory test

9    for "adequacy of representation," as used in Section

10   1102(a)(2).  See, for example, In Re:  Johns Manville

11   Corporation, 68 B.R. 155 (SDNY 1986), appeal dismissed 824

12   F.2d 176 (2d Cir. 1987).

13             In light of the absence of a statutory definition of

14   "adequacy of representation," and in light further of the

15   fact that the statute says the Court "may" order the

16   appointment of an additional committee besides the Official

17   Creditors' Committee, the courts have made such

18   determinations on a case-by-case basis in the exercise of the

19   Bankruptcy Court's discretion.  See, again, In Re:  Johns

20   Manville, 68 B.R. 155, as well as In Re:  Becker Industries

21   Corporation, 55 B.R. 945, 948, (Bankruptcy, SDNY 1985), for

22   lists of the factors that the courts have employed in

23   exercising their discretion on a case-by-case basis.

24             I should further note that the case law is clear

25   that the burden of showing a lack of adequacy of

Court Decision                                              160

1   representation is upon the movant.  Again, see <u>In Re:  Johns</u>

2   <u>Manville Corporation</u>, 68 B.R. 155.

3           The factors that the Court is to consider on a case-

4   by-case basis are, by this time, fairly well established,

5   although I should say first and foremost, again, they are

6   merely factors informing the Court's discretion.  It is not a

7   litmus test, and no particular factor's absence precludes the

8   appointment of a committee; and, conversely, although if all

9   the factors were present, one would assume a committee would

10  be appointment, the Court still has discretion under the

11  statute, in light of other factors that might be present and

12  relevant, not to appoint a committee.  The case law has in

13  large measure developed out of cases decided in the Southern

14  District of New York, but the factors are employed throughout

15  the country.  They are laid out in the <u>Becker Industries</u>

16  case, and in the <u>Johns Manville</u> case that I have cited.

17  They're also discussed in, for example, <u>In Re:  Kalvar</u>

18  <u>Microfilm, Inc.</u>, 195 B.R. 599 (Bankruptcy, District Court of

19  Delaware 1996), and numerous other cases throughout the

20  country.  They include:

21          Whether the shares are widely held and publicly

22  traded.

23          The size and complexity of the Chapter 11 case.

24          The delay and additional cost that would result if

25  the Court grants the motion.

Court Decision                                                161

1              The likelihood of whether the debtors are insolvent.

2              The timing of the motion relative to the status of

3      the Chapter 11 case.

4              And other factors relevant to the issue of adequate

5      representation, including:

6              The role of the board and management acting on

7      behalf of shareholders.

8              The role of other estate-compensated parties,

9      including the Official Creditors' Committee, and whether they

10     can be said in large measure to be acting on behalf of

11     shareholders, at least insofar as maximizing the value of the

12     estate.

13             And according to some courts, the sophistication of

14     the shareholders, particularly those who have made the

15     motion, and their ability to retain counsel and other

16     advisors.

17             And according to some courts, the right of such

18     parties, if they do make a substantial contribution in the

19     case, to be compensated under Section 503(b) of the

20     Bankruptcy Code.

21             Before discussing those factors in more detail,

22     however, and particularly focusing upon the factor dealing

23     with the debtors' financial condition, which has occupied a

24     great deal of the hearing in front of me, I believe it's

25     relevant and significant also to quote the legislative

1    history of Section 1102(a)(2), because, given the lack of a

2    statutory definition of "adequacy of representation," I

3    believe congressional intent is relevant.

4           The relevant legislative history on the section is

5    not only quoted, but astutely critiqued in <u>Johns Manville</u> at

6    68 B.R. 155 at 160.  As noted in that case, one of the

7    purposes of the legislation was, quote:

8               "-- to counteract the natural tendency of a debtor

9               in distress to pacify large creditors with whom the

10              debtor would expect to do business at the expense of

11              small and scattered public investors."

12          That's from S. Rep. No. 989, 95th Congress, Second

13   Session at 10 (1978).

14          The Congressional Report went on to state:

15              "The committee believes that it should be emphasized

16              that investor protection is most critical when the

17              company in which the public invested is in financial

18              difficulties and is forced to seek relief under the

19              bankruptcy laws.  A fair and equitable

20              reorganization as provided in the bill is literally

21              the last clear chance to conserve for them values

22              that corporate financial stress or insolvency have

23              placed in jeopardy.  As public investors are likely

24              to be junior or subordinated creditors or debt-

25              holders, it is essential for them to have

Court Decision                                              163

1        legislative assurance that their interests will be

2        protected.  Such assurance should not be left to a

3        plan negotiated by a debtor in distress and senior

4        or institutional debtors who will have their own

5        best interests to look after." Id.

6        The Court in Manville noted, however, that because

7   Congress made the appointment discretionary in the Bankruptcy

8   Court, finding that the Court "may" appoint a committee if

9   necessary to assure adequate representation, it obviously did

10  not take this principle beyond the meaning of the statute.

11       I believe there has been a development in the case

12  law since the Congressional Report was issued, and, frankly,

13  since the Becker Industries case, which was one of the first

14  cases to deal with the appointment of a committee under

15  1102(a)(2), although starting, frankly, with an earlier case,

16  Judge Beatty's case in Emons Industries.

17       The Courts have recognized that even where a Chapter

18  11 case involves a substantial number of public shareholders

19  and is large and complex, the Court should not appoint an

20  equity committee if the debtor appears to be clearly

21  insolvent.  That is because, in the words of Judge Beatty in

22  Emons, which appears at 50 B.R. 692 (Bankruptcy SDNY 1985):

23  to do so would, in effect, give the equity committee and the

24  shareholders a gift.  And that is because the cost of the

25  committee is borne by the estate.

Court Decision                                              164

1          And if it appears, in the words of <u>Emons</u>, that

2     the debtor is hopelessly insolvent, that cost should not be

3     borne.

4          Courts, I believe, because of their experience of

5     cases where equity committees were formed, where equity

6     committees were inordinately litigious and active in such

7     cases and ultimately obtained for their constituents what

8     might charitably be described as a gift, that is, an

9     inducement to go away through a plan, have come to emphasize

10    the point.  It's discussed in some detail and with some

11    candor in the <u>Wang Laboratories</u> decision by Judge Hillman at

12    149 B.R. 1 (Bankruptcy, District of Massachusetts 1992), in

13    which Judge Hillman recognized the need not to legitimize

14    what he called the, quote, "blackmail factor" inherent in the

15    presence of an equity committee where, in fact, it appears

16    that the debtor is hopelessly insolvent.

17         The Bankruptcy Code gives parties in interest

18    considerable access to the Court and considerable issues to

19    raise, if they choose, in front of the Court, which obviously

20    has the effect potentially of delaying the prosecution of a

21    Chapter 11 case and causing other parties to incur

22    substantial costs.  The benefit to a litigant of controlling

23    an equity committee, or any other official committee, is

24    that, subject of course to Court review, the cost of such

25    litigation is borne by the estate, which raises the stakes

Court Decision                                                        165

1    and makes it tempting to implement the "blackmail factor"

2    strategy.

3          I believe these are legitimate concerns in this area

4    and they have been recognized by numerous courts, and

5    specifically, in what I believe today to be the leading

6    decision in this area, they were recognized by Judge Lifland

7    in <u>In Re:  Williams Communications Group, Inc.</u>, 281 B.R. 216

8    (Bankruptcy SDNY 2002), in which he repeated Judge Beatty's

9    concern that an equity committee where the debtor appears to

10   be hopelessly insolvent should not be warranted because, this

11   is a quote:

12         "-- because neither the debtor nor the creditor

13          should have to bear the expense of negotiating over

14          the terms of what is in essence a gift."

15         Judge Lifland used in that quote Judge Beatty's

16   phrase, "appears to be hopelessly insolvent."  He also used

17   it at Page 222 -- I'm sorry, at 221 of his opinion.

18         Interestingly, in his conclusion, however, he

19   provides for a somewhat different test than "hopelessly

20   insolvent."  He states:

21         "The appointment of official equity committees

22          should be the rare exception.  Such committees

23          should not be appointed unless equityholders

24          establish that (i) there is a substantial likelihood

25          that they will receive a meaningful distribution in

Court Decision                                          166

1           the case under a strict application of the absolute

2           priority rule, and (ii) they are unable to represent

3           their interests in the bankruptcy case without an

4           official committee."  Id. at 223.

5        That is, as to the first prong of his test, it

6    requires more of the movant for an official equity committee

7    to establish than that there are signs of hope of solvency,

8    at least in the general run of such applications.

9        That formulation has since been picked up by another

10   court.  Judge Case, whom I certainly respect as a very astute

11   scholar of bankruptcy law, applied the same test in In Re:

12   Northwestern Corporation, 2004 Westlaw 1077913 (Bankruptcy,

13   District of Delaware, May 13, 2004).

14       Now I say that without necessarily accepting it as

15   an ironclad test myself because I believe that all of the

16   courts that look at these issues, including Judge Lifland and

17   Judge Case, would say first and foremost that the various

18   factors enunciated by the Courts are to be applied on a case-

19   by-case basis, in light of the statute and the congressional

20   policy.  And that's what I have done in my balancing analysis

21   of all of the factors; that is, I have not imposed upon the

22   movant here the burden of showing "a substantial likelihood

23   that it will receive a meaningful distribution in the case."

24       I do that because this motion is filed early in the

25   case, as opposed to at the time a plan is to be negotiated

Court Decision                                                    167

1    and/or litigated at confirmation.  And I believe that it is,

2    as a result, important for me to give the benefit of the

3    doubt to the movants here.

4          As the debtors have acknowledged candidly, it is too

5    early to formulate a business plan.  It is, consequently, too

6    early to formulate a going concern valuation with any

7    credibility; and, finally, it is too early to negotiate a

8    chapter 11 plan.  Consequently, all of the analysis of

9    solvency or insolvency here has around it a substantial

10   amount of speculation and doubt.  And I believe it would be

11   unfair to impose upon a movant in that context the burden of

12   doing a full-scale going-concern valuation to show a

13   "substantial likelihood of a meaningful distribution."

14         Moreover, I believe that such a full-blown valuation

15   at this time is not what is called for in connection with a

16   motion for the appointment of an equity committee.  As Judge

17   Lifland made quite clear in Williams, this is a summary

18   proceeding.  The valuation that the Court performs in

19   connection with the proceeding is not binding in any respect

20   on any party with respect to any future valuation of the

21   debtor or its assets, including, most importantly of course,

22   a valuation for chapter 11 plan confirmation purposes.

23         There's an obvious reason for that.  It's tied into

24   both the strengths of Congressional policy in permitting

25   equity committees to be appointed under the proper

1    circumstances as well as the potential for abuse of that

2    right; that is, on the one hand, it's unfair to impose the

3    burden of a full-scale valuation on public shareholders in

4    all circumstances, although the burden may be increased in

5    certain circumstances.  It is also unfair to the debtor and

6    the other parties whose money is very clearly at risk in the

7    bankruptcy case, namely the creditors, and in this case the

8    workers, of, in essence, causing the motion for the

9    appointment of an equity committee to take over the entire

10   case so that under the rubric of "valuation" the movant for an

11   equity committee can use all of the cost and delay leverage

12   that an equity committee might have even before the equity

13   committee is appointed, to engage the parties in litigation

14   on the merits of the key issues in the case.

15        That would be an absurd result.  I believe, frankly,

16   that's why I was so angry at Appaloosa's attempt repeatedly

17   to turn this matter into such a proceeding and why the case

18   law is crystal-clear that that is not what the Court is to

19   consider.

20        Now let me -- before that, let me note that although

21   Judge Lifland makes that crystal-clear in his opinion, he's

22   not the only judge to have done so.  In fact, Judge Case in

23   Northwestern didn't have an evidentiary hearing at all.  He

24   did not believe it was appropriate.  The Court in Leap

25   Wireless, 295 B.R. 135 (Bankr. S.D. Cal. 2003) was frustrated

1   as to the lack of substance behind the debtors' schedules,

2   but, again, only treated the matter as a summary proceeding

3   and took whatever evidence she had and weighed that into her

4   analysis with respect to whether a committee should be

5   appointed.

6          So I believe, both logically and under the case law,

7   there is no basis to expand the inquiry that I need to

8   undertake here to force parties to conduct full-blown

9   valuations on either side of the solvency issue.

10          Now, to apply the various factors.  As I noted

11  before, this is a large public company.  There's over 500

12  million of issued and outstanding common shares and over

13  300,000 public shareholders.  This is obviously also a large

14  and complex bankruptcy case.  The docket is already

15  substantial, and it is clear to me that far more than is

16  reflected in the docket is being done by the debtor and other

17  parties behind the scenes in respect to resolving the key

18  issues in this case.

19          Those issues are complex, both in terms of the

20  negotiating and human dynamics, as well as the qualitative

21  and quantitative analysis in regard to the underlying

22  documentation, the parties' rights under the Bankruptcy Code

23  and other law, including labor law and ERISA; and they

24  ultimately involve numerous important judgment calls that in

25  the first instance the debtor must make in consultation with

Court Decision                                                    170

1   key constituencies in the case, and that ultimately I must

2   make when the debtor goes to seek approval of what it has

3   negotiated.  So those factors clearly call for the

4   appointment of an equity committee.

5           It is also argued that the debtors' management and

6   board is not actually representing the interests of the

7   shareholders as well as those of all of the other

8   constituencies for which they are fiduciaries; and, to some

9   extent, it is argued that they cannot represent those

10  interests.

11          As to the latter point, to the extent it's made, I

12  do not accept that analysis.  Clearly, the board of a public

13  company and its management owes a duty in a bankruptcy case

14  not only to the creditors, assuming that the debtor is

15  insolvent, but also to the shareholders.  And there is no

16  built-in bias there against shareholders.  As noted by Judge

17  Robinson in Edison Brothers Stores, 1996 Westlaw 534, 853

18  (District Court of Delaware, 1996), a movant needs to show

19  more than simply speculation as to such a conflict.

20          It's additionally argued that the very fact of the

21  complexity of this case and the debtors' natural desire to

22  resolve the case may lead the debtor to give short shrift to

23  shareholders' views.  That, I believe, has some merit to it;

24  and, frankly, the argument is, I believe, consistent with the

25  legislative history that I quoted earlier.

Court Decision                                        171

1          That's particularly the case here where there truly

2      are extremely difficult negotiations that the debtors must go

3      through.  And I believe that it is important for the debtors

4      to be fortified in those negotiations by the views of key

5      constituencies.  I believe that has occurred with regard to

6      the Creditors' Committee, as is reflected, I believe, by the

7      constructive relationship between the Creditors' Committee

8      and the debtors that I've viewed in this case.  I say

9      "constructive," rather than "hand-in-glove" because it is very

10     clear to me that the Creditors' Committee is nobody's patsy

11     by any means and makes its views known to the debtor very

12     clearly and forcefully, even if those views are unwelcome.

13         It's not particularly clear to me that that same

14     voice has been expressed by the shareholders.  Partly, that

15     is the fault of the shareholders, at least the sophisticated

16     ones.  For example, I am shocked that Appaloosa made this

17     motion and sent the threatening letter to the board that it

18     sent asserting the allegations that it made without once

19     communicating with the debtor.  And I'll return to that

20     later.

21         But Appaloosa, as Mr. Lauria stated, should not

22     really be the focus of a motion to appoint an official equity

23     committee, although Appaloosa's problems may be the focus of

24     who the U.S. Trustee appoints to a committee.

25         Now Appaloosa also alleges that there are actual

Court Decision                                                    172

1   conflicts over and above the debtor's tendency in a very

2   large and difficult case not to reach out to a constituency

3   that has not reached out to it.  Again, I have a hard time

4   seeing that.  I certainly do not see a level of actual

5   conflict at the level alleged by Appaloosa in what I again

6   believe was irresponsibly loose language.

7           There are really two bases for Appaloosa's

8   allegation.

9           The first is that because at the start of these

10  cases the debtors proposed what I feel free in calling a

11  generous KECP package that included an allocation of post-

12  reorganization equity to post-reorganization management,the

13  debtors' management--and to the extent the board approved the

14  KECP, the board--believes that management's interests are

15  different than shareholder interests.  I note, however, and

16  this, frankly, was obvious to Appaloosa, or at least should

17  have been, that that motion has been repeatedly adjourned and

18  tabled pending further negotiations with the creditors

19  committee, which as I said is nobody's patsy, and secondly,

20  is subject ultimately to my approval.

21          I also note that, traditionally, provisions for

22  allocation of post-reorganization equity for management are

23  dealt with in a plan that is voted upon by those entitled to

24  vote, and, generally, that is done because those entitled to

25  vote then see how they're being diluted.  Generally,

1   notwithstanding some cases where shareholders recover

2   something in respect of their old equity, the major issuance

3   of post-reorganization equity in chapter 11 cases goes to the

4   creditors, and they are the ones who are usually most diluted

5   by such management incentive plans in respect of post-

6   reorganization equity.  In other words, I believe Appaloosa's

7   argument on this point is miscast and at best irrelevant and

8   I believe, again, almost willfully so.

9          Secondly, Appaloosa argues that the debtors' very

10  opposition to this motion shows that the debtors' management

11  and board have an actual conflict in representing the

12  interests of the shareholders, primarily because the debtors

13  have stated that for purposes of this motion, at this time,

14  they are clearly or hopelessly insolvent.  The debtors'

15  objection to the motion, to the contrary, is clearly in good

16  faith.  As Mr. Sheehan and Mr. Resnick testifed, the

17  debtors' goal is to maximize value for all constituencies.  I

18  might understand why an unsophisticated shareholder who did

19  not understand the limited issues and inquiries relevant to a

20  motion under section 1102(a)(2) might make the argument, but,

21  knowing Appaloosa's sophistication, I find this "actual

22  conflict" argument to be rhetoric.

23         As to the timing factor, because of the very serious

24  issues that the debtors are dealing with in these cases,

25  going to the heart of their business, this is to me obviously

Court Decision                                          174

1    not a simple balance sheet restructuring where the capital

2    structure simply needs to be adjusted because there's too

3    much funded debt on the books.

4             There are serious -- to use the debtors' phrase

5    "transformational issues" that have to be resolved here.

6    Because of that, I believe that this is the appropriate time

7    to move for an equity committee, and not to wait until later

8    in the day when a plan is actually being negotiated.

9             I also believe as a corollary to that, the function

10   of the equity committee and the makeup of its professional

11   advisors should be reflected by this timing.  As I'll say

12   later, again, I think this leads to the conclusion that

13   although it's not before me, except in my need to weigh the

14   cost of an equity committee's appointment, that it's unlikely

15   that I would approve the retention of investment bankers and

16   accountants or even actuaries at this time for an equity

17   committee, since those functions are not really the functions

18   that need to be performed at this time by an equity

19   committee.

20            So that in contrast, while in the Loral case I

21   believe that it was incumbent to have an equity committee, if

22   at all, towards the end of the case, here, I believe if it is

23   incumbent on there being an equity committee, this is the

24   time to have one formed.

25            It is even conceivable to me that if I did form an

Court Decision                          175

1    equity committee now and it turned out that ultimately I

2    approved interim transformational solutions --

3    transformational solutions to the labor and related pension

4    and GM problems that the debtors face--it might be

5    appropriate to disband the equity committee because, in light

6    of those solutions, it might appear clearly at that time that

7    the debtor was hopelessly insolvent or at least that it was

8    likely that there would be no distribution to shareholders.

9          But because of the importance of those pending

10   issues, one could at least see a rationale for having an

11   equity committee with counsel in the near future to deal at

12   least with those transformational issues on behalf of the

13   shareholders.

14         Now, as far as whether the debtor is insolvent or

15   hopelessly insolvent or there is a likelihood of a meaningful

16   distribution to shareholders, I am at this time on this

17   record frankly skeptical that there will be a meaningful

18   distribution, but I'm not prepared to rule it out.  I say

19   that for a number of reasons.

20         First of all, it's undisputed that on a balance-

21   sheet basis, and it is correct that the movants' experts did

22   not disagree that on a balance sheet basis, the debtors'

23   operating -- most recent operating numbers comply with GAAP,

24   there is roughly a 6.3-billion-dollar hole, or insolvency.

25         The question, obviously, is how does one fill that

Court Decision                                          176

1   hole or bridge that gap?

2        Although Appaloosa's experts made some effort to do

3   it on the asset side, my review of their analysis is that

4   they have not in any meaningful respect convinced me on the

5   asset side of the balance sheet or in their going-concern

6   value, their enterprise value before deductions, that they

7   have -- they have established a credible case to do so.

8        When you really boil it down, giving the benefit of

9   the doubt to why and how the admitted one-billion-two-dollar

10  -- two-hundred-million-dollar error was corrected by Eureka,

11  what Eureka did was essentially look at the debtors' 2005

12  actual performance and annualize the debtors' actual

13  performance for the first 115 days of 2006 for an EBITDA

14  figure that they then multiplied by two different multiples.

15       I believe Mr. Sheehan's testimony as to why,

16  particularly in respect of the annualization of the first

17  quarter of 2006, Eureka's process was materially if not

18  perhaps fatally flawed, in respect of the Eureka expert's

19  analysis of why the debtors did better in the first quarter

20  of 2006 and what the debtors' properly projected earnings

21  should be.

22       Clearly, to me, Mr. Sheehan's explanation of the

23  debtors' analysis of their projected business with GM and the

24  reason for the potential front-loading of income in 2006 was

25  credible and accounted for the difference between the

Court Decision                                                                           177

1    bottoms-up projections that the debtors did and the

2    effectively back-of-the-envelope calculation that Eureka did

3    in respect of EBITDA, and I say "back of the envelope"

4    because,  frankly, given the billion-two error on its March

5    10th report, that's all Eureka was really left with: applying

6    a multiple to 2005 and the first quarter actual numbers of

7    2006 without proper analysis of why those figures can be

8    relied upon as the basis for projected EBITDA.

9              I do recognize, however, that Mr. Sheehan

10   acknowledged that it is possible that the debtor's balance-

11   sheet numbers on the asset side might be higher.  It's my

12   experience, and I think most people's experience who've dealt

13   with Chapter 11 debtors for a lengthy period, that that's

14   hardly ever the case.  Almost invariably, the balance sheet

15   overstates the assets, but that's Mr. Sheehan's belief, and

16   he has clearly been through an intensive analysis of the

17   business on a bottoms-up basis and I accept his statement.

18             Now, on the balance sheet liability side, which is

19   most -- where most of the dispute arises, I've considered the

20   testimony of Messrs. Reese and Williams.  And, frankly, I

21   believe that it's very hard on the record to find any exact

22   number as far as what would be the appropriate net savings in

23   respect of OPEB liabilities after the debtors resolve their

24   transformational issues.

25             Clearly, Appaloosa's argument that the OPEB

Court Decision                                                    178

1  liabilities go away because the collective bargaining

2  agreements go away in 2007 is -- well, it's almost laughable.

3  The unions aren't going away, and the employees aren't going

4  away without being paid for giving up those rights or having

5  them reinstated in some form.

6        So all the parties recognize that there is a price

7  to resolve those liabilities, including Appaloosa.  The issue

8  is how much of a price has to be paid and how much of a

9  savings can the debtors generate.  I find it hard to believe

10 that despite all of their efforts and all of an equity

11 committee's efforts, there will be a material recovery for

12 shareholders in light of those OPEB negotiations, but the

13 company doesn't preclude it as a possibility.  There are

14 scenarios in which it could occur.  That's agreed to by both

15 sides in this proceeding.

16       And, therefore, while Eureka's March 10th report, as

17 corrected for the billion-two error, still shows on even the

18 most optimistic basis a two-hundred-and-thirty-four-million-

19 dollar insolvency hole, given the huge amounts at stake here

20 in respect of the labor negotiations--and we're talking about

21 potential savings of billions of dollars, I know it's hard to

22 believe it, but $234 million may not be that big of a gap, at

23 least on today's record.

24       I also looked, of course, as Judge Lifland did and

25 Judge Hillman did and other courts have done in connection

Court Decision                                        179

1    with motions under 1102(a)(2), at the trading prices of the

2    debtors' securities when evaluating the debtors' solvency.

3           It's common knowledge that the market in distressed

4    debt and to some extent distressed stock, but more -- more

5    the case of distressed debt, is large, indeed, huge, and

6    active, particularly with respect to public companies such as

7    Delphi.  That is reflected among other things by the numerous

8    Wall Street analysts' reports covering the debt introduced

9    here.

10          There's uncontroverted evidence that Delphi's public

11   debt has consistently traded since the petition date at or

12   below sixty cents on the dollar.  The courts at times have,

13   although not accepting as controlling the trading prices of

14   debt securities, consistently looked at trading prices in the

15   debtors' securities as a indication in this type of summary

16   proceeding of value.

17          Courts obviously know, at least this Court knows,

18   that people engage in a market because they're making various

19   bets on the value of securities.  Some are betting that it's

20   a good idea to sell, and some are betting it's a good idea to

21   buy.  Generally, it's an active market; and, generally,

22   active markets are a good indication of value because there

23   are both buyers and sellers at reasonably arm's length

24   bargaining positions.

25          However, of course, those markets are not guarantees

Court Decision                                          180

1    of value.   That's why some analysts get fired and some get

2    promoted.   Market security trading price indicators are most

3    telling where they're quite low, where they're in my

4    experience below or well below fifty cents on the dollar,

5    particularly in respect of cases that are in all likelihood

6    going to be resolved one way or another in a fairly short

7    term, and, in the life of a chapter 11 case of a large

8    company, fairly short term is around a year.

9         It's clear to me and it's been clear from the start

10   of these cases that although the debtors are pushing these

11   cases, appropriately so, as fast as they can, this is a

12   longer term process.   They project emergence from bankruptcy

13   in 2007, although they are doing everything they can to

14   emerge sooner than that.

15        Given that, I am not particularly moved either way

16   by the trading ratios or prices.   Mr. Lauria is correct that

17   anyone buying distressed debt is looking for a large return

18   to make up for the risk, particularly where the debt is

19   unsecured, and so it's conceivable that a sixty-percent-on-

20   the-dollar level, while obviously not suggesting solvency,

21   may indicate at least a hope of solvency.

22        This is, for example, different than the trading

23   levels in <u>Loral</u>, which were considerably lower, or in

24   <u>Williams</u>, which were at 15% to 6% of face value.

25        So, all things considered, in respect of the

Court Decision                                                    181

1  solvency analysis, at this point in the case, I cannot find

2  that appointing an equity committee would be a gift.  On the

3  other hand, I am very mindful of the cost to these estates of

4  an equity committee.

5        Some cost clearly is legitimate.  The whole reason

6  you have an equity committee is that the estate bears the

7  cost.  On the other hand, the way that this litigation has

8  been conducted, I mean this litigation in front of me right

9  now, by Appaloosa, gives me very serious pause as to whether

10  the cost ultimately will be appropriate in this case.

11        Now, Appaloosa says I can regulate that by looking

12  at fee applications and the like, but, to some extent, once

13  an equity committee is appointed the cat is out of the bag,

14  and so I have thought very long and hard about whether the

15  cost factor here should lead me not to appoint a committee.

16        I can say this, that I will look very carefully at

17  fee applications of any counsel that is chosen to represent a

18  committee.  I also will look very carefully at whether the

19  continued incurrence of fees is appropriate at various stages

20  in the case where the picture on valuation becomes clearer.

21        But, ultimately, standing alone, as I do believe

22  that I can perhaps with the help of the United States Trustee

23  control costs, the costs alone are not in my mind

24  dispositive, although they are a major factor here calling --

25  arguing that I should not appoint a committee.

Court Decision                                    182

1          The last point which is raised by some courts, it's

2    specifically raised by Judge Case in the <u>Northwestern</u>

3    opinion, is that at least Appaloosa went into this bankruptcy

4    case with its eyes wide open.  Judge Case thought that was a

5    clear factor calling for denial of the motion.  And of course

6    the ability of certain shareholders to fund their own

7    professionals also is clearly a factor arguing against a

8    committee.  See <u>Williams</u>, 281 B.R. at 223.

9          If this were a relatively small pool of

10   shareholders, I would -- I would obviously do the same.  I

11   don't think the fact that Brandes has joined in the motion

12   particularly helps Appaloosa's cause, because Brandes is

13   obviously very well-heeled, very sophisticated and is well

14   represented by another large national firm with a bankruptcy

15   practice.

16         However, I go back to the first point I made.  There

17   are over 300,000 shareholders here.  Given the rapid change

18   in their fortunes from June of 2005 to today, it's fair for

19   me, I think, to assume that some of them may be in the

20   investor equivalent of a state of shock or disbelief and that

21   that's why they're not showing up here today.

22         It seems to me, again, that given the important

23   transformative events that will be taking place in this

24   company through this bankruptcy case over the next few

25   months, it's important to give those people representation,

Court Decision                                            183

1    and if a committee is formed that adequately represents them,

2    then I think that they're entitled to it within the

3    parameters that I've already described.

4            Now, in discussing or mentioning the abrupt changes

5    that have taken place in the fortunes of this company, I do

6    not want to suggest, as Appaloosa, I think, has, that the

7    company has done something over the last several months

8    between June of 2005 and today or even between June of 2005

9    and October when it filed for bankruptcy that is somehow

10   nefarious or improper in respect of its business or its

11   shareholders.

12           I think it's irresponsible to suggest that.

13   Clearly, this company has extremely difficult problems to

14   resolve.  To suggest that it should have spent all of its

15   cash on hand before filing to resolve those problems, to

16   suggest that it should continue with the steady-state

17   projections, which even Appaloosa recognized would lead to

18   the destruction of the debtors' business is absurd and was

19   truly a waste of this Court's time, and, frankly, for those

20   who are not particularly sophisticated and read such

21   allegations in the press, again, Appaloosa's argument or

22   insinuation in this regard was a truly irresponsible attack

23   on the company.

24           So I will order the appointment of an official

25   equity committee.  I'm going to be very clear as to the -- my

Court Decision                                                        184

1    expectation as to at least the -- my initial reaction to a

2    request by that committee for retention of professionals.

3            I do not believe that the proper functioning of a

4    committee of equityholders at this time calls for the

5    appointment and retention of investment bankers, accountants

6    or actuaries, and a premise -- a fundamental premise of my

7    ruling is that I would not appoint such parties,

8    professionals at this time.

9            What an equity committee needs to do is to

10   understand through its own members' expertise, and I trust

11   that there will be sophisticated parties like Brandes on the

12   committee, and through the assistance of its counsel, the

13   pressing issues of this case in respect of labor, pension,

14   other benefits and GM.

15           It needs to be informed, it needs to give the debtor

16   its views so that they can be taken into account as the

17   debtor proceeds.

18           To the extent that it feels it needs to do due

19   diligence on actuarial assumptions, I believe an appropriate

20   arrangement can be worked out with regard to using the

21   creditors committee's actuaries.

22           I do not expect an equity committee or its

23   professionals to try to inject themselves into the extremely

24   sensitive negotiations that are ongoing between the debtors,

25   the unions, GM and other parties in the labor transformation

Court Decision                                                    185

1   issue process.

2              They should be able, however, again, to communicate

3   their views to the debtor and be able to be reasonably

4   informed as to the process so that they can make a

5   determination as to whether to oppose or support it whenever

6   an agreement is brought to the Court.

7              It's very clear that one function of a committee may

8   require the committee at times to take an adversarial role in

9   a case.  However, I believe that consistent with all the case

10  law that I've just cited, it is not proper for an equity

11  committee to view its job as one to create leverage by being

12  a thorn in everyone's side.

13             If the equity committee is not engaged in a two-way

14  dialogue with the debtor, I will believe, and I will act on a

15  motion that contends that, the committee is dysfunctional and

16  disband it.

17             I will also look very closely, and I know that the

18  United States Trustee will look very closely, at any

19  suggestion that the equity committee is taking action in

20  court or otherwise not to maximize recoveries for all

21  committee constituents, but instead to artificially pump up

22  the value of the current stock on a trading basis.

23             I am very concerned about the potential that that

24  has already happened in this case--not by an official

25  committee and obviously not by an equity committee, because

Court Decision                                                      186

1   one has not been appointed, but by parties involved in this

2   litigation, and I will look at the facts closely, and I've

3   already looked closely at the facts of the apparent release

4   of confidential information.

5          And, having looked at those facts, I continue to

6   have serious questions about that apparent release, and if,

7   in fact, Appaloosa applies to be a member of this committee,

8   I direct the U.S. Trustee to investigate those facts.

9          In short, the equity committee needs to be

10  responsible in looking after the interests of the equity-

11  holders as a group, and I trust it will do so.

12         So, Mr. Lauria, you can submit an order to that

13  effect.

14         COUNSEL:  Thank you, Your Honor.  Thank you, Your

15  Honor.

16         THE COURT:  Thank you.

17     (Proceedings concluded at 7:17 p.m.)

18                        CERTIFICATION

19         We certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter to the best of our

22  knowledge and ability, except where, as indicated, the Court

23  has modified its bench ruling.

24  _____                March 23, 2006
    Coleen Rand
25  Certified Court Transcriptionist/Agency Director
    Rand Transcript Service, Inc.

Court Decision                                              187

1   _____          March 23, 2006
    Jennifer Linnartz
2   Certified Court Transcriptionist
    For Rand Transcript Service, Inc.

3
    _____          March 23, 2006
4   Cathryn Lynch
    Certified Court Transcriptionist
5   For Rand Transcript Service, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25