ORIGINAL

1           UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF NEW YORK
2

3    ------------------------------

     IN THE MATTER OF THE          :   Case No. 05-44481
4
     BANKRUPTCY OF                 :   May 12, 2006
5
     DELPHI CORPORATION, et al.    :
6
                                   :
7    ------------------------------
8              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE ROBERT D. DRAIN, J.S.C.
9              UNITED STATES BANKRUPTCY COURT
10
     TRANSCRIPT REQUESTED BY:
11
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP,
12        33 West Wacker Drive, Suite 2100,
          Chicago, Illinois 60606
13
     APPEARANCES:
14
          BARBARA S. MEHLSACK, ESQ.
15        Attorney for Operating Engineers.
16        DOUGLAS BAUMSTEIN, ESQ.,
          Attorney for ad hoc Committee of Equity Holders.
17
          THOMAS M. KENNEDY, ESQ.,
18        (KENNEDY, JENNIK & MURRAY, PC),
          Attorney for IUE-CWA.
19
          BRUCE S. LEVINE, ESQ.,
20        (COHEN, WEISS & SIMON, LLP).,
          Attorney for UAW.
21

22

23
                  Regency Reporting, Inc.
24            575 Madison Avenue, Suite 1006
                  New York, NY 10022
25                  (212) 364-0492

```
 1   APPEARANCES: (Continued)

 2        JOHN WILLIAM BUTLER, JR., ESQ.,
          (SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP),
 3        Attorney for Delphi Corporation.

 4        JAY S. BERKE, ESQ.
          (SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP),
 5        Attorney for Delphi Corporation.

 6        TOM JERMAN, ESQ.,
          (SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP),
 7        Attorney for Delphi Corporation.

 8        LOWELL PATERSON, ESQ.
          Attorney for the Steel Workers.
 9
          MARIANNE GOLDSTEIN-ROBBINS, ESQ.
10
          BRUCE H. SIMON, ESQ.
11        (COHEN, WEISS & SIMON, LLP),

12        GLENN M. KURTZ, ESQ.

13

14

15

16

17

18

19              Diana Pawlikowski, AD/T 393

20            Charlene P. Scognamiglio, AD/T 473

21              Cathy E. Betz, AOC 540

22              Regency Reporting, Inc.

23          575 Madison Avenue, Suite 1006

24              New York, NY 10022

25                (212) 364-0492
```

```
1                     I N D E X

2   WITNESS

3   FOR THE DEBTOR                       CROSS

4   MICHAEL L. WACHTER

5        By Mr. Dechiara                    5
         By Mr. Kennedy                    21
6        By Mr. Peterson                   42
         By Ms. Robbins                    57
7        By Ms. Mehlsack                   61
         By Mr. Kurtz                      83
8        By The Court                      84
         By Ms. Mehlsack                   92
9
    STEVEN L. GEBBIA
10
         By Mr. Kennedy                   111
11       By Mr. Levine                    125
         By Mr. Peterson                  134
12       By Ms. Robbins                   140
         By Ms. Mehlsack                  152
13
    KEITH WILLIAMS
14
         By Mr. Kennedy                   166
15       By Ms. Robbins                   174
         By Mr. Simon                     184
16       By Mr. Kurtz                     198

17

18  MOTION TO PRECLUDE WITNESS FROM TESTIFYING    Page

19       By Mr. Baumstein                        99

20       COURT DECISION                          100

21

22

23

24

25
```

REGENCY REPORTING, INC.      (866) 268-7866
www.regencyreporting.net

```
1              THE COURT: Please be seated.

2              Okay.

3              We're back on the record in Delphi.

4              MR. BUTLER: Your Honor, good morning.  Jack Butler

5    from the law firm of Skadden, Arps, Slate, Meagher and Flom,

6    LLP.  Here for the continuation of the Debtor's Section 11, 13-

7    11-14 Hearing

8              When we broke on Wednesday, we were in the middle of

9    the cross examination of Dr. Michael L. Wachter in connection

10   with his declarations, that are Exhibits 16 and 17.  So, with

11   Your Honor's permission we'd like to recall Dr. Wachter for the

12   continuation of that examination.

13             THE COURT: Okay.

14             That's fine.

15             (Whereupon, Dr. Michael L. Wachter was recalled to

16   the stand.  He is still under oath.)

17   D R.   M I C H A E L   L.   W A C H T E R, having been

18   previously sworn, testifies as follows:

19             THE COURT: Okay.

20             Dr. Wachter, you're still under oath.

21             THE WITNESS: Yes.

22             THE COURT: Okay.

23             You can continue.

24             MR. DECHIARA: Good morning, Your Honor, Peter

25   Dechiara, from the law firm of Cohen, Weiss and Simon,
```

1    representing the UAW.

2    CROSS EXAMINATION

3    BY MR. DECHIARA:

4        Q    Good morning, Mr. Wachter.

5    A    Good morning.

6        Q    Mr. Wachter, when we finished on Wednesday, there was

7    one piece of uncompleted business, which I'd like to try to

8    wrap up this morning.

9            We were discussing legacy costs.  And by legacy costs

10    I refer to costs such as and including pension, accrued pension

11    liabilities for employees who have already retired or including

12    retiree health insurance for employees who are already retired.

13            And, I believe you testified and you correct me if I

14    got this wrong, that a proper comparability analysis of a

15    company's current labor costs should include such legacy costs;

16    is that correct?

17    A    That's correct.

18        Q    And I asked you whether or not, in your expert

19    reports in the Delta and the United and the Tower cases, you

20    had, in your analysis of the current labor costs of those

21    employers included legacy costs.  And I showed you the reports

22    and then we decided that you would have the time, during the

23    break between Wednesday and today, to review those reports.

24            Have you had a chance to review those reports?

25    A    Yes/

```
 1        Q    Okay.

 2             And, let me just ask you, did you  - in preparing to

 3   answer this question that I'm asking you now; did you refer to

 4   any other documents apart from the reports themselves?

 5   A    I looked through my notes on United, Tower and Delta.

 6        Q    Okay.

 7             And did you speak to anyone about this particular

 8   issue?

 9   A    I spoke to my colleague, Jim Gillula (phonetic).

10        Q    And what did you speak to him about?

11   A    Um, whether he had other documents, I did not have, in his

12   file.

13        Q    And did he?

14   A    Um, he wasn't sure 'cause he was up here.  And he stayed.

15        Q    Okay.

16             Apart from that did you have any other substantive

17   conversations about this issue with your colleague?

18   A    No.

19        Q    Okay.

20             So, now, let me ask you, why don't we take them one

21   by one.  Let's start with the Delta report.

22             Did you, in your analysis, in the Delta report,

23   include legacy costs, such as accrued pension liabilities for

24   retirees or retiree health insurance?

25   A    Yes.
```

1        Q    Okay.

2            Could you point out to me where, in that report, you

3    do so.  And, just for ease of reference, let me note that these

4    reports have now been included in the exhibits.  It's - the

5    Delta report is Exhibit 246.

6            MR. DECHIARA: And, Your Honor, before we go any -

7    any further, let me further note that in the United expert

8    report that I presented to the Court and to Dr. Wachter on

9    Wednesday, I inadvertently gave a version that did not include

10   certain exhibits.  I've subsequently given copies of those to

11    - to Counsel for Delphi.  And let me now give copies of the  -

12   of those obtained reports to the Court and to the Witness.

13           And I would just ask that at the appropriate time

14   that this complete report be substituted in the Exhibit Books

15   for the  - for the incomplete one.

16           THE COURT: What would that be; 247?

17           MR. DECHIARA: 240  - the United is 247, yes.

18   CONTINUED CROSS EXAMINATION

19   BY MR. DECHIARA:

20       Q    Referring your attention to Exhibit 246; where does

21   show that your report included legacy costs?

22   A    It would appear in any of the tables, um, where we had

23   benefits.

24       Q    Okay.

25           Let me, refer you to Page 36, Table 10.

1          Would it appear in there?

2    A    Yes, it would.

3          Q    And this is a table comparing the monthly wages and

4    benefits of the Delta pilots to the monthly wages and benefits

5    of workers in the private sector; is that correct?

6    A    Yes.

7          Q    Okay.

8               And, where, in particular, do the legacy costs

9    appear?

10   A    Um, well, the retirement costs would appear on the

11   retirement line.

12         Q    Okay.

13              And the retiree health insurance?

14   A    Retiree health insurance, um, I'm not sure exactly how it

15   happened, but it was inadvertently not included.

16         Q    Okay.

17              So you did not include retiree health insurance in

18   your analysis?

19   A    Yes.   Inadvertently so.

20         Q    Okay.

21              But, there  - the retired Delta pilots do have, or at

22   this time, did have retiree health insurance; correct?

23   A    Yes.

24         Q    Okay.

25              Now, this analysis where you compare the wages and

1    benefits of the Delta pilots to the private sector average is

2    identical in format to the analysis you provide in this case,

3    in your Delphi report, on Page 20 of your Declaration, which is

4    Exhibit 16; where you compare Delphi wages and benefits to the

5    average of the  - the private sector average; correct?

6    A    Excuse me.  Which page?

7        Q    20, Table Roman five, Arabic two.

8    A    Sorry.  Your question?

9        Q    This - your analysis, Table 5.2; do you see that?

10   A    Yes, I do.

11       Q    That's the same format as your Exhibit 10 in  - in

12   the Delta report; correct?

13   A    If you refer to similar format and similar lines that's

14   correct.  Obviously there are a lot of other differences.

15       Q    Right.

16           But, in - in terms of  - I'm looking at the  - the

17   wages and then the cat  - the different categories of benefits,

18   including insurance and retirement, and then comparing them

19   against the BLS data for the private sector average.  That

20   format is the same; correct?

21   A    The (inaudible) are the same.

22       Q    Okay.

23           And we know that Table 5.2, where you have an item

24   for retirement and another item for insurance does not include

25   legacy costs; correct?

10

1    A    In 5.2?

2         Q    In 5.2 on Page 20, under the Delt  - the  - the

3    column, the first column on the left for the Delphi workers,

4    you have a retirement benefits line and an insurance line.

5    Those don't  - do not include legacy costs; correct?

6    A    They're not included in that tape holder (sic).  They're

7    included in a different tape holder, which shows the same

8    results.

9         Q    They're not included here; correct?

10   A    Yes.

11        Q    Okay.

12             But your telling us that in Exhibit 10, in Delta,

13   which has the exact same format you did there, at least for

14   pension, include re  - retirees' pension liability?

15   A    Yes.

16        Q    Okay.

17             And, the data  - the data that you include on Exhibit

18   10, for the Delta pilots, you obtain that from Delta Airlines?

19   A    Yes.

20        Q    And, did they tell you that it included pension

21   liabilities for retirees?

22   A    Um  -

23             MR. BUTLER: Objection.

24             Your Honor, I don't know what the relevance of what

25   Delta told Dr. Wachter in the Delta report is to these

1    proceedings.

2            MR. DECHIARA: Your Honor, I  -

3            MR. BUTLER: That's what the question was, what Delta

4    said.

5            THE COURT: Well, no, I'll  - I'll overrule that.

6            THE WITNESS: What I asked Delta to do, what I ask

7    anyone that I'm working for, in terms of providing the

8    benefits, is to provide the benefits, um, in accordance with

9    the ECEC format.

10    CONTINUED CROSS EXAMINATION

11    BY MR. DECHIARA:

12        Q    That's what you said to Delta?

13    A    Yes.

14        Q    Who at Delta did you  - did you say you wanted in

15    accordance with the ECEC format?

16    A    By now I've forgotten.

17            THE COURT: Let's  -

18            THE WITNESS: By now I would have forgotten the

19    person's name.

20    CONTINUED CROSS EXAMINATION

21    BY MR. DECHIARA:

22        Q    Was it a management person at Delta?

23    A    It would certainly have been somebody  - en employer  -

24    employee that managed it at Delta.

25        Q    And when you say ECEB format; what do you mean?

1    A    Employer cost of employee benefits.

2        Q    And the E  - and EC, I'm sorry.  Can you give me

3    those abbreviations again.

4    A    Employer cost of employee benefits.

5        Q    Okay.

6        And the ECEB data is where you got the private sec -

7    the right-hand column in both  - in both the  - the tables

8    we're talking about.  The  - the column that includes the

9    private sector numbers; correct?

10   A    You mean, the middle columns?

11       Q    The columns that  - okay.  On Table 542, would be the

12   middle column.

13   A    Yes.

14       Q    Okay.

15       Now, when the E  - in the ECEB; and just so we all

16   know what we're talking about, that's  - that's the Bureau of

17   Labor Statistics Data?

18   A    Yeah, I  - I missed the initials you were using.

19       Q    ECEB.  Did I get that wrong?

20   A    Employer  - yes, you did.

21       Q    Can you give it to me correctly?

22   A    Yes.  Employer Cost of Employee Benefits.

23       Q    Right.

24       So, that's ECEB?

25   A    Yes.

1          Q     That's what I said.

2     A     But it's called the ECEC.

3               (Laughter)

4          Q     I'm just going to call it the BLS Data, okay.

5     A     If you wanna call it the EECEB go ahead.  Then you'll

6     understand what  -

7          Q     Thank you.

8               Okay.

9               Just a  - just a indulge me.

10              When the Bureau of Labor Statistics in its ECEB

11    figures include  - includes a line for retirement for workers

12    in the private sector economy.  Is it including retiree health

13     - pension liabilities for retired employees?

14    A     It may.

15         Q     What do you mean by that?

16    A     The  - this  - this is data said  - collected by the

17    Government.  It's obviously, um, sort of data intensive

18    exercise.  And what they do is they allow the firm to report

19    the data best they can in accordance with their own method of

20    dealing with it.

21         As a consequence of that, some firms, like the Postal

22    Service, report those items, the employ  - the  - the person

23    employment benefits, below  - what's called the line.  And

24    other employers counted above the line.  And, you can do either

25    as far as the reporting requirements are concerned.

1          Q    So, you're saying there are no guidelines from the

2    Government in reporting on this data as to whether, on the

3    retirement line, you need to  - you should include or not

4    include pension liabilities for retirees; is that what you just

5    said?

6    A    No.

7          Q    Well, let me ask you that.

8          Are there guidelines from the Government, on

9    reporting this data, on whether an employer should include

10   pension liabilities for retired employees?

11   A    Yes.

12         Q    There are guidelines?

13   A    There are guidelines.

14         Q    And what do the guidelines say?

15   A    The guidelines say that you can report it, um, in  - they

16    - they would prefer that you would report it below the line.

17   But if you don't have the data available below the line you can

18   report it above the line.

19         Q    Okay.

20         I'm not sure I understand what you're talking about,

21   above or below the line?

22         When you report the data to the Government, that gets

23   factored into this ECEB database, does the Government direct a

24   company to include that retiree pension liabilities or not?

25   A    Um, ah, yes they do.  I believe they  - they do.

1        Q    Okay.

2    A    I haven't  - the last time I read that particular item was

3    awhile ago.  But, we  - we generally collect it in all the

4    situations in which we work.

5        Q    Okay.

6             So, you believe that the ECEB data, from the

7    Government, does include the  - the legacy costs?  The

8    retirement legacy costs?

9    A    Yes.

10       Q    Okay.

11            So, going back to your Table 502  -

12   A    Let  - let me correct an earlier comment that I made.

13       Q    I didn't hear what you said.

14   A    Can I correct an earlier statement that I made on ECEC or

15   ECEB?

16       Q    Yes.

17   A    It's the employer cost of employee compensation.

18       Q    Oh.

19   A    Hence the name, ECEC.

20       Q    Okay.

21            That's what  - that's what the problem was.

22            So, let me refer you back to Page 20, on your Delphi

23   report.

24   A    Yes.

25       Q    On Table 20, on the retirement line, you're not

```
 1    including for  - on the left column, for Delphi, you're not

 2    including legacy costs; correct?

 3    A    Correct.

 4        Q    But in the  - in the BLS data, in the comparison

 5    column, in the middle, you're including data that does include

 6    legacy costs; correct?

 7    A    Um, yes.  We  - so again, you  -

 8        Q    Is that correct?

 9    A    Yes.

10        Q    Thank you.

11            Let me go back to when you were  - you told Delta

12    Airlines that when you wanted this data from Delta Airlines,

13    you wanted it in accordance with the ECEC format; and you say

14    you don't recall who you said that to?

15    A    That's correct.

16        Q    Was  - was there a trained laborer economist on staff

17    at Delta that you said that to?

18    A    I wouldn't have asked anyone that I spoke to what they

19    were qualifications were.

20        Q    Okay.

21            So  -

22    A    To their educational background.

23        Q    Okay.

24            So you don't know whether the person who you said

25    that to was familiar with the ECEC format, do you?
```

```
 1   A    Do I know for certain?  It was somebody who would have
 2   been in the benefits area who would normally collect that data
 3   for Delta and report it to the Government.
 4        Q    So, I'll take your answer to be no, you don't know
 5   whether they were familiar with the ECEC guidelines?
 6   A    Yes.
 7        Q    Okay.
 8             Let's turn now to - well, let me - let me - let me
 9   move on to United.  And maybe we can make this a little faster.
10             If I ask - if I asked you the same question in
11   United whether you included, in your analysis, legacy
12   retirement costs, when you looked at the United employees
13   benefits, what would your answer be?
14   A    The same thing.  In whatever - whatever the benefits -
15   whatever the retiree benefits may have been, in the different
16   situations we're dealing with.  We would have asked for them.
17        Q    Okay.
18             Although, in the case of Delta, you said you did not
19   include retiree health.
20             Did you include a retiree health in the case of
21   United?
22   A    No.  It turns out we did not there as well.
23        Q    Okay.
24             And that was also inadvertent?
25   A    Correct.
```

1       Q    Okay.

2            Now let's talk  – and if I asked you where, in the

3   United case, did you include retirement legacy costs when you

4   looked at the current costs for the United employees, you would

5   point me to a chart with the similar format as Exhibit 10 in

6   the Delta Exhibit; correct?

7   A    Yes.

8       Q    And there would be a line that says, retirement, and

9   I would ask you, how do you know that?  I would ask you, where

10  did that come from?  And you would tell me, from United

11  Airlines?

12  A    Yes.

13      Q    Okay.

14           Let's go through the same exercise.

15           Had  – when you  – did you ask for that data from

16  United Airlines?

17  A    Yes.

18      Q    Okay.

19           And do you recall who you asked it from?

20  A    No.

21      Q    Okay.

22           And do you know whether the per  – and when you asked

23  for it, did you say you wanted it in the format of the ECEC

24  guidelines?

25  A    Yes.

1      Q      And do you know whether the person you asked that of

2  was a trained laborer economist?

3  A      Again, I would not have asked for the person's

4  qualifications.

5      Q      And  - and that means, no; correct?

6  A      Correct.

7      Q      And you don't know whether that person knew what the

8  ECEC guidelines meant?

9  A      I would assume the person did, (inaudible) since, if the

10  person  -

11     Q      I don't want you to speculate or guess.

12         Do you know what  - if the person know what meant?

13  A      I do not test the person.

14     Q      Okay.

15         And did you do any independent analysis, when you

16  received this data, both in the case of Delta and United, to

17  determine whether or not the retirement  - the current

18  retirement costs included pension liabilities for retirees?

19  A      Yes.

20     Q      And how did you do that?

21  A      We would have looked at the data and asked for the

22  breakdown.

23     Q      And was such a breakdown given?

24  A      I believe so.

25     Q      Do you recall that for certain?

1    A    For certain, I - since you don't want me to speculate,

2    and, you know, that's - this is one of the very detailed facts

3    in a complicated case; I don't - do not remember for certain.

4         Q    Okay.

5             Did you, in your analysis of Tower, the - the - the

6    pay of the, or the compensation of the Tower employees, did you

7    include in your analysis retiree pension liabilities and

8    retiree health insurance benefits when you looked at your

9    analysis of the Tower employees compensation?

10   A    We were not asked to analyze employee benefits.

11        Q    But you did render a judgment, did you not - or, let

12   me not say a judgment.  You did render an expert opinion on the

13   reasonableness of Power's wage proposals; did you not?

14   A    Yes, I did.

15        Q    And, I believe, you testified about this on

16   Wednesday, but correct me if you didn't.  Or - strike that.

17        Isn't it - isn't it the case that in evaluating a

18   Wade Proposal, one must evaluate it in the context of total

19   compensation; correct?

20   A    Absolutely.

21        Q    And, in your view, total compensation includes legacy

22   costs; correct?

23   A    Correct.

24        Q    And, so, did you do any analysis for your Tower

25   report when you rendered that expert opinion, that their Wade

1    Proposal was reasonable to look at the legacy costs?

2    A    I did a brief analysis, yes.

3         Q    And you did not include that in your report, did you?

4    A    Um, I did not include the report on that in the report.

5              MR. DECHIARA: I have no further questions on cross.

6              A VOICE: (Inaudible.)

7              THE WITNESS: G-I-L-L-U-L-A.

8    CROSS EXAMINATION

9    BY MR. KENNEDY:

10        Q    Good morning, Dr. Wachter.  I'm Tom Kennedy of

11   Kennedy, Jennik and Murray.  I represent the IUECWA.

12   A    Good morning.

13        Q    In reading your report, Doctor, it's pretty apparent

14   that you've used the comparability principal to establish the

15   - what you believe to be the appropriate wage rates at Delphi;

16   is that correct?

17   A    That's correct.

18        Q    And is it also correct that you believe that an

19   employer need pay no more than the wage called for by the

20   comparability principal for any job?

21   A    In a competitive market, that's correct.

22        Q    And you determine the comparability principal, as it

23   applies to Delphi, by first comparing Delphi workers to

24   comparably skilled workers, economy wide?

25   A    Yes.

1    Q    And, as I understood it, the comparable group you've

2    selected, is a national average wage of, quote, machine

3    operators, assemblers and inspectors, close quotes; and, quote

4    handlers, equipment cleaners, helpers and laborers, close

5    quotes, as appropriate comparison?

6    A    We had three comparison groups.  That is one of them.

7    Q    Isn't that the  - two groups that were used to

8    compute the applicable national average wage rate?

9    A    It was one of the three that was used for that purpose.

10    Q    Was that the group that was used to compute the wage

11    rate that was applicable, or should be applicable to Delta's  -

12    yeah, Delta.

13         Thank you.

14         (Laughter.)

15    Q    To Delphi's production workers?

16    A    It was one of three.

17    Q    All right.

18         What were the other two?

19    A    The other two were the Competitor Data.

20    Q    Um-mm.

21    A    And with somewhat less emphasis, the  - the Hiring In

22    Plans where they were hiring wages below the traditional

23    scales.

24    Q    Now, for the Competitor Data that you utilized to

25    make the expert opinion on Delphi's production rates.  That was

1   given to you by Delphi; correct  - correct?

2   A    Correct.

3        Q    And you concluded that the average wages of full time

4   workers in comparable occupations, economy wide is $13.34?

5   A    Could you refer me to what number you're using?

6        Q    Okay.

7             It's in Exhibit 16, oops.  I'm referring to Page 15,

8   Paragraph 40 of your opinion, which is in Evidence as Exhibit

9   16, Doctor.

10  A    Yes.

11       Q    Now, that national average, like any average, I take

12  it, has firms that pay both below that number and above that

13  number?

14  A    Yes.

15       Q    And what would the range of payments be within those

16  economy wide classifications that you've selected?

17  A    Um, I don't know what the range is.  The range is not

18  public  - published data.

19       Q    Wouldn't  - wouldn't it be fair to say, Doctor, that

20  the range would be in between the federal minimum rate and

21  about $30 an hour?

22  A    Ah, the unionized firms would cer  - could certainly have

23  high bene  - high costs, whether they're wages or benefits.  I

24  do not know about whether anyone's being paid the minimum wage

25  for doing the jobs that we're talking about.

1       Q    Well, the jobs that you're talking about would

2    include, as I believe you indicated in the last cross

3    examination, selling machine operator jobs in the garment

4    industry; correct.

5    A    That's correct.  There's a range of jobs.

6       Q    And, about a mile north of here is New York City's

7    China Town.  I represent the Union in China Town.

8            Do you have any idea what the applicable wage rates

9    are for machine operators?  In those jobs.

10   A    For machine operators?

11      Q    In those jobs.  In the sewing machine jobs in China

12   Town.

13   A    No.  Obviously not.

14      Q    You don't know if those are minimum rate or just

15   above minimum rate jobs?

16   A    No.

17      Q    If you assumed, Doctor, a hypothetical in which a

18   union free environment in which employers able to implement,

19   under the comparability principal, in all manufacturing shops,

20   the average wage, it would, in your view, be $13.34 per hour?

21   A    It  - the comparable  - the comparable wage, the market

22   wage is approximately that.

23      Q    But, if in a union free environment, all of the

24   employers implemented the 13.34, in a sense, a number of those

25   employer would have been paying above that; wouldn't that have

REGENCY REPORTING, INC.     (866) 268-7866
www.regencyreporting.net

1    the effect of driving down the average rate below $13?

2    A    No.

3        Q    I'm trying to understand that.  Because, in a range

4    environment, in which some employers are paying less and some

5    are paying more, if the employer's paying more went to what

6    was, at any given point the average, wouldn't mathematically by

7    definition, the comparable rate fall?

8    A    I'm  - I don't  - didn't understand your statement.

9        Q    Okay.

10           Let me try to repeat it.

11           The comparability principal is simply an averaging,

12    nationwide, of applicable wage rates in manufacturing

13    facilities; correct?

14    Q    Yes.

15        Q    And since that average has a range, including

16    employers paying above.  If all the employers paying above, in

17    a union free environment, adopted your comparability principal,

18    the wages in those shops would all drop to 13.39, as we sit

19    here today; correct?

20    A    No.

21        Q    Why not?

22    A    The firms can adopt whatever wages they wanna to adopt.

23        Q    I'm just asking, Doctor, in a hypothetical, if your

24    comparability principal were adopted by all employers of

25    manufacturing locations in the United States, and imposed the

1    wage that you've concluded as the average; wouldn't the effect

2    be to immediately reduce the average because higher paying

3    employers would have dropped down to the 13.39 figure?

4    A    No.

5        Q    Why not?

6    A    Because employer can set wages at the points that they

7    wanna set it.  Because this is not  - this is not a regulated

8    wage that every employer has to pay.

9        Q    Well, what are the circumstances under which it makes

10   good business judgment to pay above the comparability

11   established rate?

12   A    There is  - you know, too many to  - to count, including

13   that the employer may not know exactly which one it is.

14       Q    Well, let's assume that there is a perfectly free of

15   universe of information out there.  And, employers are aware of

16   the average.  But, nonetheless, deciding to pay in excess of

17   it.  What would be the factors in which good busi  - business

18   judgment would call for an employer paying in excess of the

19   comparability wage?

20   A    Well, if you had an older workforce, you might wanna pay

21   14 rather than 13 and a half.

22       Q    And why would that be true?

23   A    Um, you might, just as a matter of rewarding workers, even

24   if they're not more skilled.

25       Q    Would productivity be a reason for paying workers

1    above the rate otherwise determined by the comparability

2    principal?

3    A    The use of the term, productivity, in this context doesn't

4    have a direct meaning that I can use and explain.

5        Q    Have you ever been in a factory and watched people

6    work, Doctor?

7    A    Yes, I have.

8        Q    You know, some people can make eight parts an hour,

9    and some people can make 18.  Are you aware of that?

10   A    Yes.

11       Q    And the people making 18 parts an hour, wouldn't it

12   be common sense that they would make more than whatever an

13   average rate would be, of production?

14   A    So, you're talking about workers who were working harder

15   and faster?

16       Q    Yeah.

17   A    Okay.  Yes.

18       Q    I'd like to direct your attention to the report by

19   Susan Halper, that appears as Exhibit 41, Doctor.

20            H-A-L-P-E-R.

21            Referring you, specifically, to Paragraph 23 of that

22   report, sir.

23            Now, in Mr. Dechiara's cross examination, in looking

24   at that paragraph, you gave an opinion that it was, quote,

25   exaggerated, close quote.  So is that correct?

1    A    Um, I - if you could read back the context in which I

2    said it.  I said that as part of a context of answers.

3        Q    Okay.

4            Now, you'll note that Paragraph 23 has a long string

5    of letter, which I take to be an internet address that refers

6    to publications that discuss this particular enterprise,

7    Delphi's Portland, Ohio plant.  In the break, did you make any

8    effort to review that citation?

9    A    No, I didn't.

10       Q    Are you familiar with the Shingo (phonetic) Prize,

11   Doctor?

12   A    Excuse me.

13       Q    Shingo Prize, S-H-I-N-G-O  -

14   A    No, I'm not.

15       Q     - Prize?

16           Do you know if the particular facility that is

17   mentioned in Paragraph 23 has received prizes for excellence in

18   manufacturing?

19   A    No.

20       Q    Do you know if Delphi has issued public statements

21   praising IUECWA Local 717 for its efforts to cooperate with the

22   company in producing greater productivity at that plant?

23   A    No.

24       Q    If you imagine, as a hypothetical, that that is a

25   plant producing a billion plastic parts per year with an

1    effective defect rate of zero parts per million, would you

2    agree with me that, that is an instance in which it would be

3    sound business judgment to pay wages in excess of the

4    comparability principal?

5    A    No.

6        Q    And why not, Doctor?

7    A    It's not my judgment.  It would be the firm's judgment as

8    to the wage policy they want to adopt.  Um, in a regime where

9    you could freely assign worker, promote workers based on merit,

10   one way of rewarding a worker who performs above the average,

11   would be to promote them.

12       The other thing would be to give that particular worker,

13   because you  - you wouldn't want to give, necessarily,

14   everyone, unless you assumed everyone was working harder, the

15   higher wage.  And you could also do that as a bonus.

16       But, the most likely thing you'd wanna do is promote those

17   people who are working harder.

18       However, if  - you would also wanna look at the quick

19   rate, and see if the quick rate were such at the plant that,

20   perhaps, in that plant the market wage  - the local wages are

21   lower, giving you some leeway.

22       And, I'm saying, there are so many factors that I can't

23   answer your question, yes.

24       Q    Okay.

25       I wanna look at one of those factors you just

 1    mentioned.  Promotion.

 2         So, your notion about the way to reward high

 3    productivity machine operators, is to promote them out of the

 4    machine operator position?

 5    A    I said, as a hypothetical, you could promote people.  And

 6    there is, at Delphi, a certain amount of job title creep.

 7         A VOICE: Job title what?

 8         THE WITNESS: Creep.

 9    CONTINUED CROSS EXAMINATION

10    BY MR. KENNEDY:

11    Q    So you think the Delphi's proper approach to dealing

12    with its financial troubles should be to take its high

13    producing industrial workers and give them job titles so that

14    they're no longer running the machines that have made them so

15    productive?

16    A    In  - in a Delphi context, since you  - you're  - you have

17    a collective bargaining contract, you can't do anything more

18    than you can, um, bargain for with the Union, which tends to be

19    a pretty much, a flat wage, regardless of skill.  And, even to

20    an extent, regardless of job title.

21    Q    Even in the context of a flat wage, Doctor, isn't it

22    possible for a Union to negotiate productivity and flexibility

23    rules that, for a group of people, as, for example, at this

24    particular Portland, Ohio facility, the next productivity per

25    labor hour is sufficiently high, but it's good business

1   judgment to pay in excess of the comparability principal?

2   A    Well, this big good business judgment, I'm not sure that

3   you need to do that through collective bargaining.  The

4   employer might be willing to do it on its own.

5        Q    Do you think Delphi has the option of not proceeding

6   through collective bargaining and setting the wages and

7   benefits at the Local 717 facilities in Portland, Ohio?

8   A    Certainly not.  I was just using your term, good business

9   judgment.

10       Q    Doctor, in your statement you refer to the fact that

11  there are employees at Delphi who receive less than  - let me

12  - let me withdraw that.

13            You refer to the fact, in your statement, that there

14  are employees who receive, quote, non-traditional wages, close

15  quote?

16  A    Correct.

17       Q    Which Delphi unionized plants did you determine had

18  employees that were being paid at or below what you determined

19  for competitive market level?

20  A    I had a  - was given a sheet, which I do not have with me,

21  that had the, um, ah, the plants, that were traditional plants

22  and the plants that were nontraditional plants.  Without

23  looking at that, I can't determine exactly what was on that

24  sheet.

25       Q    Do you recall that there were seven such plants?

1    A    I do not want to speculate as to whether there were ten,

2    seven, 12.

3        Q    You're aware, that starting in the mid-1980s, IUECWA

4    negotiated agreements with lower than traditional starting wage

5    rates with Delphi; correct?

6    A    I don't know when that - exactly when that occurred.  But

7    I certainly know it did occur.

8        Q    Well, would you look at Paragraph 38 of your

9    statement, which is in Evidence, as Paragraph, excuse me, as

10   Exhibit 16, Doctor.

11       You may want to keep that one open in front of you,

12   if possible.  I have other questions I would  - I'm referring

13   to Paragraph 38, Doctor.

14       Isn't it true, that in Paragraph 38 of your statement

15   you indicated that the IUE started negotiating lower than

16   traditional starting wage rates with Delphi, in the mid-1980s?

17   A    That's correct.  I was, you know, on the stand, I just

18   wasn't sure, exactly in 1980s or exactly when that occurred.

19       Q    Well, now you're sure; correct?

20   A    Correct.

21       Q    Okay.

22       And, how many employees were hired in by Delphi in

23   the last year, at those lower than traditional starting wage

24   rates; do you know?

25   A    In the last year?

1       Q     Yeah.

2   A     I do not know.

3       Q     Did you determine if there were any Union imposed

4   restrictions on hiring at IUECWA plants at these less than

5   traditional wage rates?

6   A     Ah, I did not  - do not inquire as to that.

7       Q     Now, in Paragraph 10 of your initial declaration,

8   Doctor, you make the statement that the base wages of some of

9   Delphi's production workers, covered by nontraditional

10  agreements, approximate market wages levels; correct?

11  A     Yes.

12      Q     Which Delphi production workers were you referring to

13  as approximating market wage levels?

14  A     Ah, in my analysis I was dealing with averages and was not

15  looking at plants specific numbers.  Other than looking them in

16  creating the averages.

17      Q     Well, I noticed that in bullet one and bullet two, of

18  Paragraph 10, you identify the percentage by which, in your

19  view, traditional Delphi workers are above skilled workers

20  economy wide.  Correct?

21  A     Yes.

22      Q     And in the third bullet, discussing the extent to

23  which Delphi's production workers, approximate market wage

24  levels, you did not include any percentage analysis by which

25  employees might be below what you've included or determined to

1    be market wage levels; correct?

2    A    I think the  - the bullets stands for itself.

3        Q    All right.

4            Now, referring to Paragraph 41 of your declaration,

5    Doctor, I believe you state, quote, the average base wage of

6    production workers, across seven plants, where nontraditional

7    wage agreements have been reached with the IUE and the

8    steelworkers is $12.41.  Correct?

9    A    Yes.

10       Q    And that $12.41 is that what you meant when you were

11   referring, in Paragraph 10, to nontraditional agreements

12   approximating market wage levels?

13   A    Well, the 12.41 would  - would approximate market levels.

14       Q    Okay.

15            Isn't it a fact that the 12.41 is nine percent below

16   the market level that you determined is appropriate of $13 and

17   some odd cents?

18   A    Yes.  Which is why when  - when I was making my general

19   conclusion it was based on the averages.

20       Q    But you didn't include a reference to how much below

21   market they were, in your Paragraph 10; did you, Doctor?

22   A    As you could easily do, calculating a percentage

23   difference is not difficult.

24       Q    Well, isn't it also the fact that that was a number

25   which didn't help Delphi?  Isn't that really why you didn't put

1    it in your report, Doctor?

2    A    Certainly not.

3        Q    Oh.

4            In Paragraph 11 you indicate in your second bullet,

5    that the non-wage benefits of Delphi's production workers are

6    four times higher than those of similarly skilled workers,

7    economy wide; correct?

8    A    I'm sorry.  I was turning to the page about the  -

9        Q    All right.

10           Let me  - let me  - I'll just  - I  - I don't need to

11   repeat it again for the record.

12           If you look at the second bullet in 11, Doctor.

13   A    Yes.

14       Q    You're referring to the four times hire.  Do you see

15   that?

16   A    Yes.

17       Q    Now, did you analyze the non-wage benefits of Delphi

18   workers hired under the Competitive Wage programs that we were

19   discussing a minute ago?

20   A    I did have some discussion, um, with Delphi management

21   about nontraditional benefits.

22       Q    And did that discussion result in your forming a

23   judgment as to the extent to  - or as to how those non-wage

24   benefits for non-traditionally paid workers compared to what

25   you're using as the market level for manufacturing workers?

1    A    Ah, I didn't have precise data.  My, um, assumption was

2    that on average  - was that on average they would be close

3    enough to the market, whether they be above or below the

4    market.  So, that if you added them, and the wage rate, they

5    would still be, um, ah, roughly comparable.

6        Q    They'd be roughly equivalent with the market?

7    A    Correct.

8        Q    Because in your second bullet, in Paragraph 11, you

9    state that the non-wage benefits of Delphi's production workers

10   are four times higher.

11   A    Well, I'm - I'm sorry.  I - all right, I misstated.  I

12   thought you were still  - I misstated the last comment was

13   still about nontraditional.  I -

14       Q    Okay.

15           I understood that.  No, I understood that, Doctor.

16   A    Okay.

17       Q    My question is this; since the nontraditional workers

18    -

19   A    Yes.

20       Q     - have benefits that approximate market wages  -

21   A    Yes.

22       Q     - why was that not included in your Paragraph 11?

23   A    I don't recall why I didn't include it.

24       Q    Isn't it because that wasn't a factoid that helped

25   Delphi, in terms of this proceeding; isn't that why you didn't

1    put it in there?

2    A    I mean, certainly not.  All  - since all these numbers are

3    in the report, it's easy enough to  -

4        Q    Okay.

5    A    - do the calculations.

6        Q    I wanna ask you a couple of questions about the quick

7    rate that you've discussed at Paragraph 14 of your report,

8    Doctor.

9        The quick rate you're indicating that's applicable in

10    manufacturing economy wide, is 19 to 21 percent?

11    A    Ah, you're gonna give me the paragraph number again?

12        Q    Yes.  Paragraph 14, Doctor.  Second bullet.

13    A    Yes.

14        Q    Is that just a blue collar quick rate?  Or is that

15    for everyone involved at a plant, a manufacturing facility?

16    A    Ah, those are collected as average plant, um, numbers.

17        Q    So, would that apply, for instance to salary, to

18    management at manufacturing plants?

19    A    Um, actually that, I'm not  - not entirely sure of  - of

20     - without checking the sources more specifically.  But I  - I

21    think they are, but I would need to check the reference.

22        Q    Okay.

23        Sitting here today, do you have any information on

24    what the salaried or managerial quick rate is economy wide?

25    A    No.

1          Q    You think, though, it's included in the 19 to 21

2    percent average, which is identified at Paragraph 14?

3    A    Ah, I think so.  But, again, I don't want to speculate.

4    And I would need to read the reference, um, related to the

5    collection of quick rates.

6          Q    Well, let's look at the first bullet in Paragraph 14,

7    where you refer to Delphi's annual quick rate.  That one

8    percent figure; is that corporate or at least North American-

9    wide?

10   A    Excuse me?

11         Q    Is that North American-wide, that one percent?

12   A    Yes.

13         Q    It's not limited just to hourly workers; correct?

14   A    I believe those are plant-wide numbers.

15         Q    When you say, plant, you mean North American

16   operations-wide numbers?

17   A    It would be an average of  - of plant quick rates.

18         Q    Okay.

19              I just wanna make sure that whether the term, plant,

20   is referring to just man  - just to hourly workers or to

21   everyone in Delphi's North American operations?

22   A    Um, I bel  - I believe what was given to us was the plant-

23   wide number, which, I presume, would include, ah, all

24   employees.

25         Q    Manaserial (phonetic)  - serial  - excuse me.

```
1    Salaried and managerial; correct?

2    A    And nontraditional.

3         Q    And nontraditional as well.  All right.

4              Now, your final conclusion on the total compensation

5    for Delphi's workers is that it should be $20.79 per hour.  Is

6    that correct, Doctor?

7    A    Excuse me?  Now, are you referring to  -

8         Q    Yes.

9    A     - specifically?

10        Q    I'm referring to your conclusion that the  - all in

11   manufacturing employees labor costs, as I understand it, at

12   Delphi, should be  - let me to withdraw that  - will be $20.79,

13   under the Company's proposals?

14   A    Again, could you give me the paragraph reference.

15        Q    I certainly will find it, Doctor.  Excuse me.

16             Okay.

17             My colleague reminds me that it's Paragraph 74, Table

18   Roman 7.2.

19   A    Yes.

20        Q    And you've concluded that the compensation, all in,

21   for Del  - for Delphi's hourly workers, under the Company's

22   competitive scenario proposal, will be $20.79?

23   A    Um, well, it depends up on the inclusion or exclusion of

24   some of the other post employment  - post employment benefits

25   at the time  -
```

40

1          Q     Well, let's assume they're  – these  – these exclude

2    them, I think, as we've  –

3    A     This  – this number does  –

4          Q     – made clearly  –

5    A     – I refer to it  – I refer to that number in the report.

6    We would, obviously, get different inclusions, depending upon

7    which number you chose to use.

8          Q     But if we put aside the legacy costs, you've

9    concluded that the $20.79 is what the compensation, the all in

10   figure would be for Delphi's hourly laborers, after the, or

11   under the November 15th, competitive wage scenario; correct?

12   A     Correct.

13         Q     And, you've also concluded that the comparable

14   workers, economy wide, under, what I assume is an apple  –

15   apples comparison, would be paid $21.33; correct?

16   A     Yes.

17         Q     Now, that  – that difference would yield more than a

18   $1,000 on an annual basis of 20,080 hours  – excuse me, 2,080

19   hours to the average Delphi worker; correct?

20   A     I didn't do the multiplication.

21         Q     Well, I don't know how hard it is, Doctor.  It's

22   about a 55 cent difference between $21.33 and $20.79?

23   A     I was answering your question literally.  I hadn't done

24   the  –

25         Q     Okay.

1    A    - (inaudible).

2         Q    Well, you - you have a PhD from Harvard, Doctor?

3    A    Yes, I do.

4         Q    Well, see if you can follow me on this.

5    A    Okay.

6         Q    Take $21.33 -

7              (Laughter.)

8         Q    - and subtract $20.79.  I'll give you a calculator

9    if you need it.

10    A    No, I usually don't do things with computers, so  -

11         Q    All right, so.  I can see why, Doctor, but, possibly

12    you can help me here.  It's about 50 cents?

13    A    Yeah, that  -

14         Q    Don't you think you might take a chance on that,

15    about  50 cents?

16    A    I'll  - I'll do that.

17         Q    Okay.

18              And, you know the average working hour is 2,080

19    hours.  Your working year, rather, is 2,080 hours?

20    A    Correct.

21         Q    So, at a 50-cent rate, that's a little more than

22    $1,000 below what you've determined the comparable worker's

23    economy wide is what the Delphi offer was made on November 15th

24    to the Unions; correct?

25    A    Excluding the legacy costs  -

42

```
1          Q     Yeah.
2     A     - that is correct.
3          Q     All right.
4                Thank you.
5                I have no further other questions, Doctor.
6     CROSS EXAMINATION
7     BY MR. PETERSON:
8          Q     Good morning, Dr. Wachter.  Lowell Peterson
9     representing the Steel Workers.
10    A     Good morning.
11         Q     Dr. Wachter, you've been testifying about wage
12    comparability for a number of years; is that a fair statement?
13    A     Yes.
14         Q     And you've been certified as an expert about wage
15    comparability in a number of cases; is that correct?
16    A     Correct.
17         Q     And in all of those cases you have testified on
18    behalf of employers; was that correct?
19    A     Yes.
20         Q     And, in all of those cases you have testified that
21    the wage rates, either earned or proposed by the Unions, were
22    too high; correct?
23    A     No.
24         Q     Would you say that, that's true of 90 percent of time
25    - of the wage rates you've testified about?
```

```
 1   A    Um, to cut to the chase, I never use the term too high.

 2        Q    All right.

 3             Above what you consider to be the market rate?

 4   A    Correct.

 5        Q    So, in all cases you've testified that the wages

 6   earned or proposed by Unions are above the market rate?

 7   A    Correct.  And, no  - and, in fact, none of these cases

 8   were they close.

 9        Q    They've never been close?

10   A    They've ranged over a distance.  But when you're talking

11   about the premiums that we're seeing here, at Delphi, I've

12   never seen anything like this in any of the other work I've

13   done.

14        Q    All right.

15             When's the last time you toured a  - an automotive

16   parts manufacturing facility?

17   A    I don't recall whether they  - when I did that when I was

18   in the ILR School or not, but it would have gone back awhile.

19        Q    1960s?  '50s?

20   A    That  - that was uncalled for.

21             (Laughter)

22        Q    '80s?

23   A    19  -

24             (Laughter)

25   A    It was either 1964 or 1984.
```

1       Q    All right.  Fair enough.

2            And that's - you haven't toured an aut  - any plant

3   in the automobile industry since  -

4   A    I don't  -

5       Q     - then?

6   A    Correct.

7       Q    All right.

8            You haven't toured any manufacturing facilities, in

9   fact, since the ILR School; is that correct?

10  A    Um, correct.

11      Q    All right.

12           So, you haven't actually seen  - it goes without

13  saying  - any Delphi employers at work or what they do; is that

14  a fair statement?

15  A    Correct.

16      Q    All right.

17           And you did not, yourself, select which Delphi job

18  classifications to use to compare with the BLS classifications;

19  correct?

20  A    Yes.  I was using their study as the starting point.

21      Q    All right.

22           But you assume that the machine operator

23  classification that the BLS uses, which uses the  - which

24  includes the pants pressure at the dry cleaners; is, in fact,

25  the appropriate comparable classification to those of Delphi

1    production workers?

2    A    The BLS classification is a very broad one.  Um, and that

3    would be at the bottom and others would be at the top.

4        Q    Well, there are other BLS classifications that are

5    narrower; correct?

6    A    That  - that may or may not be true.  I just wouldn't want

7    to speculate on that.

8        Q    All right.

9            But you use the  - the broad one?

10    A    Oh, we  - you  - yes, you can get narrower within the BLS.

11        Q    All right.

12            But you didn't do so in order to do your

13    comparability analysis?

14    A    No.  I, as I said, I relied on what management had done

15    and I thought it was a very high quality study.

16        Q    Management selected the BLS machine operator

17    classification and not you?

18    A    Management had done the original study where they told us

19    how they  - that they were classifying their workers into four

20    categories.  We, then, subsequently, ah, decided to use two

21    categories that were little broader than their four categories.

22        Q    Why did you use broader categories than the ones

23    selected by Delphi?

24    A    Um, first it didn't make much of a difference.  And we

25    checked both ways.  And the other main factor is that with the

1    four categories, it's my understanding that not all the Delphi

2    production workers could be cat  - could be put in those four

3    groups.  But, in my two groups, um, they could have been

4    classified.

5         Q    So these were the  - the broadest possible categories

6    to catch for everybody who works at a Delphi plant?

7    A    Yes.  It  - but this  - these really entirely appropriate

8    for the purposes of our study.

9         Q    If I understand it correctly, the  - the  - the

10   premise of the labor comparability analysis, as you

11   articulated, is that, it will identify wages that a  - an

12   employer needs to or should pay to attract workers from the

13   labor market.  Broadly defined.  Is that right?

14   A    Again, if we strike the word, should, and relied on need,

15   in terms of attracting and main  - and retaining a qualified

16   work force, that would have calculated in the market wage.

17        Q    All right.

18             Need and not should, because you  - you're not making

19   a value judgment, you're just saying that's all you have to pay

20   to get people to come in and work?

21   A    Ah, that  - that's the market wage.  That's what I'm

22   saying.

23        If you're in a market wage setting, ah, if you're in a co

24    - once a firm is in a competitive setting, it can also fine

25   tune exactly what it's offering based on the quick rate.

1       So, if the quick rate, let's say, goes higher than the

2   national average, the firm might want to increase its wage rate

3   a bit, um, but you'd wanna rely on your quick rate data to say

4   whether or not you are, um, facing any marks  - market

5   eccentricities.

6       Q    Okay.

7            The focus, though, is on what you have to pay,

8   actually pay Joe Worker to come an operate your equipment;

9   correct?

10  A    That's the con  - that's the market wage concept, yes.

11      Q    Yes.

12           So, as far as Joe Worker is concerned, it's really

13  irrelevant that the employer has some legacy costs that are  -

14  that are related to past employment by current employees or  -

15  or to retirees; correct?

16  A    No.

17      Q    Well, how is that relevant?  Because, if  - if Joe

18  Worker can go operate the pants press at the dry cleaners for

19  12.41 an hour or 13.34 an hour, and that  - that is the wage

20  that needs to be paid by Delphi; correct?

21  A    Well, I would assume, in terms of a  - an employee, the

22  employee would look at all the benefits, including the legacy

23  clause.

24      Q    Well  -

25  A    That  - that person might graduate into.

1      Q     All right.

2            Perhaps I need to be more clear than on what I'm

3      referring to when I say legacy costs.

4            I don't have to call it legacy costs.  We'll call it

5      the  - the cost that the employer pays for benefits that this

6      employee does not him  - himself or herself earn.

7            For example, OPEB (phonetic) for retirees.  Accrued

8      liabilities in the pension that  - that don't affect Joe

9      Worker.  Just  - Joe Worker doesn't care about those costs.

10     Correct?

11     A    The employee would care about those benefits that generate

12     the costs.

13     Q    But only as it applies  - affects that particular

14     employee; correct?

15     A    I don't understand the question.

16     Q    Well, um  -

17           THE COURT: Well, let me ask you a little differently.

18           Employers have other costs too.  They are capital

19     costs; right?

20           THE WITNESS: Yes.

21           THE COURT: Those don't directly benefit the employer,

22     although, the employee may have a better work environment.  And

23     the employer may be generally more successful or not; right?

24           THE WITNESS: Yes.

25           THE COURT: But they don't directly affect the

```
 1    decision to come and work; do they?
 2             THE WITNESS: Ah, no.
 3             THE COURT: What is different  -
 4             THE WITNESS: The capital cost do not.
 5             THE COURT: What is different about a legacy cost than
 6    those costs, if anything?
 7             THE WITNESS: Ah, well, two pieces.  One piece is that
 8    it's part of a program, ah, that the employee might view as
 9    attractive if it were retained.  And, so, if an employee were,
10    for example, works for the Postal Service, that employee will
11    count on what we count as below the line benefits.
12             THE COURT: Let me make sure I understand that.
13             Does that only come into play if the employee feels
14    that those particular legacy costs may jeopardize his own
15    pension because the del  - the  - the  - the company won't be
16    able to continue to maintain the pension with those legacy
17    costs?
18             THE WITNESS: Well, I was dealing the hypo  - the
19    hypothetical as  -
20             THE COURT: Well, no.  I'm just focusing on this  - on
21    this issue.  I'm  - I'm trying to figure out is that  - is that
22    the extent of it?
23             THE WITNESS: I'm sorry.  Excuse me  -
24             THE COURT: I  - I think what I heard you say is that,
25    um, because the employee also benefits from a pension.
```

1          THE WITNESS: Yes.

2          THE COURT: The fact that there are high legacy costs

3   may affect his decision or her decision to come and work

4   because those legacy costs may affect the employer's ability to

5   continue to maintain the pension; if they're high enough and  -

6   and not  - and not the  - the  - the  - there's a real risk

7   that the employer can't pay them?  It jeopardizes the pension?

8          THE WITNESS: It  - I think that's   that is one of

9   the two elements.  The other element, of course, is that since

10  the legacy costs have to be paid, the employee may find him or

11  herself out of the job because the firm has to go bankrupt and

12  therefore  -

13         THE COURT: But isn't that  - isn't that the same as

14  having a pier (phonetic)capital cost too?

15         THE WITNESS: Well  -

16         THE COURT:  I mean, if you can't parry the cost to

17  build or update plants, the plant may shut down and you may be

18  out of a job too; right?

19         THE WITNESS: Well, the capital costs are costs that

20  accrue to, um, capital.  The legacy costs are continuing

21  payments, ah, to employees.

22         So, for example, the two  -

23         THE COURT: But not to this employee.

24         THE WITNESS: Not to this  -

25         THE COURT: But to retired employees.

```
 1              THE WITNESS:   - not to the new employ  -

 2              THE WITNESS: Okay.

 3              THE WITNESS:   - not to the entry level employee.

 4              THE COURT: All right.  Okay.

 5              MR. PETERSON: Right.  Thank you.

 6   CONTINUED CROSS EXAMINATION

 7   BY MR. PETERSON:

 8        Q    Sir, so, as between the dry cleaner or the pants

 9   press machine, 13.34 an hour is the  - is the cost?  At Delphi

10   13.34 an hour is the  - is the wage  - I  - I meant to say wage

11   not cost  - and whether Delphi also has some old liabilities

12   for former retirees, is irrelevant to Joe Worker, except in

13   this indirect sense; correct?

14   A    Um, except it affects the ability of the firm to stay in

15   business  -

16        Q    Right.

17   A    - because the costs have to be paid.

18        Q    I understand.

19   A    But only  -

20        Q    And this  -

21   A    - only to the entry level worker.

22        Q    Well, to the worker hired by the firm, at  - at

23   whatever skill level; correct?

24   A    To  - the firm is currently hiring employees, they would,

25   presumably, take them into account and think about whether that
```

1    is a benefit that will continue and could, in the future, if

2    the firm is able to right itself and is that - maintain those

3    programs, re-establish those programs, they would be benefits

4    to the employees -

5         Q    Oh -

6    A    - through a first command.

7         Q    Correct.

8              If the Union is successful in renegotiating those

9    benefits, presumably, that's a benefit to the employee.

10   A    If the firm can be stabilized and get out of bankruptcy

11   and be competitive, then, the firm - the employee would be

12   able to consider, ah, those benefits more seriously.

13        Q    So, whether an employer might be able to negotiate

14   higher retiree benefits in the future might affect that

15   employee's decision about which firm to go to?

16   A    The firm would look at all the - what - what - I'm

17   sorry.  The employee would look at, and I'm assu - assuming a

18   super rational employee, but a person looking at a job would

19   look at what are the wages and benefits of this job?  What's

20   the history of the wage and benefits?  Is this a good employer?

21   Is this likely - is this a busi - a firm that's likely to

22   stay in business?

23        Q    And, if it is, is this a permanent - likely to offer

24   bene - better benefits in the future as opposed to not

25   offering better benefits in the future; correct?

1     A    I think I understood what you said, I'm not sure, but I'm

2     - I'll answer, yes.

3          Q    All right.

4               Let's - you - you mentioned attrition rates also,

5     and, I think you - your declaration suggests a range of 19 to

6     21 percent.  In 2005, as I understand it, you identify an

7     economy wide attrition rate of 23.7 percent.

8     A    You wanna, again, refer me to the paragraph number.

9          Q    Yeah.  Paragraph 64.

10    A    Those are quick rates, not attrition rates.

11         Q    Fair enough.

12              Quick rates.

13              So, that means that on average, it takes a firm a

14    little over four years to have 100 percent turnover; is that a

15    fair statement?

16    A    I guess that would be true.

17         Q    And, do you think that sustainable for a

18    manufacturing enterprise such as Delphi?

19    A    Turn - to turn over - most of the - most of the

20    turnover does include - occur among the younger, um,

21    employees.

22         Q    Do you think that a  - that a turnover rate that  -

23    along the lines that we've just discussed, is sustainable for a

24    manufacturer entity such as Delphi?

25    A    Um, it seems to work for most of the manufacturing firms,

1    you know, whether it's IBM or any of the others.  They seem to

2    be able to handle those kind of quick rates without duress.

3         Q     IBM is a manufacturing firm?

4               Is it  - is IBM a manufacturing firm?

5    A    I thought so.  I thought equipment.  Makes all the

6    equipment and I think that's classified as manufacturing firm.

7         Q    Now, if a firm pays below the market rate, according

8    to this  - to your analysis, then its quick rates would be

9    higher than the national average; correct?

10   A    Correct.

11        Q    All right.

12             And would it be a fair statement that quick rates

13   that are higher than the national average would not be good for

14   that employer?

15   A    Correct.

16        Q    So, you would expect, for example, if an employer

17   pays $8 an hour to new hires, as opposed to the 13.34, that

18   you've identified, that that  - that employer would experience

19   quick rates that are significantly higher than the national

20   average?

21   A    I  - I  - you  - the number that I'm giving is not an

22   entry level rate.  It's an average.

23        Q    All right.

24             But, I'm not talking about an entry level rate.  If

25   the average rate is $8 an hour, the quick rate  -

```
1   A     If the average rate is $8 an hour.

2   Q     All right.

3         And if the average rate is $10 an hour it's also,

4   likewise, would be a higher quick rate; correct?

5   A     You would expect it to be a quick rate.

6         Now, these are national data, so that if the firm were in

7   the south the market wage would be very different.    Ah, if you

8   were looking at regional wages and the pressures, the immediate

9   pressures is this thing from, what I was referring to before,

10  is the longer term pressures, might allow the employer to

11  continue to hire people.

12  Q     Well, I thought you said that we shouldn't look at

13  the regional wages?

14  A     Um.

15  Q     Isn't that your  - the gist of your testimony, about

16  we had  - we had to focus on economy wide and not regional?

17  A     I - I certainly think you have to focus on economy wide.

18  And, the reason for that, is that in a case where  - an

19  particularly in a case where an employer is shedding  - is

20  closing plants and workers are laid off, where those workers

21  are likely to find a job may not be in the auto town in

22  Michigan, that they grew up in.    It may have to be  - go to

23  another firm, another establishment, another industry, another

24  locality.

25        If you're hiring, um, locally, in a competitive market,
```

1    like the south is, it can be that you can get away with a lower

2    wage rate, if you're hiring, than the national average.  Which

3    is why you have this migration of jobs and people to the south.

4        Q    I'm just trying to compare apples with apples,

5    Doctor.

6            Your  - your testimony is  - is  - is that a com  -

7    that for purposes of establishing wage rates this employer; in

8    this case, should use national average wage rate; correct?

9    A    From looking at the market wage rate  -

10       Q    Yes.

11   A    - because what the market wage rate will tell you is what

12   a production worker at Delphi, who loses his or her job, is

13   likely, on average, to receive, in the private sector, because

14   with unionization rates now below 10 percent, that employee is

15   not likely to find another auto parts job.  Is much more likely

16   to migrate to another part of the country even.  And, there

17   they will much more likely be hiring into a market environment

18   as distinct from a union environment, where costs and benefits

19   are driven by the market.

20       Q    All right.

21           Just so  - a $27 an hour, or a union worker is likely

22   to move to Alabama for an $8 an hour job; that's what you're

23   testifying?

24   A    I'm testifying that if the plant closed that might be the

25   worker's alternative.

1      Q    Or, they could take the pants pressing job for 13.34

2    an hour; correct?

3    A    Which pants pressing job are you  -

4      Q    That's the national average machine operator's.

5    A    They will  - he  - they will  - what I'm testifying to is

6    that, on average, there are lots of jobs covered by that.  They

7    may well move out of, um, ah, the motor vehicle parts business.

8    They mo  - may well take a job at, um, at IBM.

9      Q    Fair enough.

10          Thank you.

11   CROSS EXAMINATION

12   BY MS. GOLDSTEIN ROBBINS:

13     Q    Good morning, Dr. Wachter.  Marianne Robbins

14   representing the IAM and the IBEW.

15   A    Good morning.

16     Q    Good morning.

17          In your report you reference using 12 categories for

18   skilled workers.  But, you don't, in the report, identify those

19   12 categories.  Can you identify those categories for us here

20   today?

21   A    Um, I don't have the list up here with me.

22     Q    I don't either, since it was not in your report.

23          So, um, as your test  - as you're sitting here today,

24   you cannot identify for us those 12 categories; is that right?

25   A    Um, I cannot.  They were the range of categories that

1    comported with the Delphi skilled jobs.

2       Q    But, what I'm asking you is whether you can, today,

3    testify to what those categories are?

4    A    Precisely, I cannot.  I just can tell you how we chose

5    them.

6       Q    Do you agree that not all skilled categories have the

7    same comparative wage rate?

8    A    Yes.

9       Q    And, so when we use an overall comparative average,

10   that average is going to be inaccurate for some of the skilled

11   wage categories?

12   A    If - if we're dealing with a market wage, um, that's

13   correct.  We're using an average, so it would be an average of

14   skilled workers.

15      Q    And you did not do a comparison of comparative wage

16   rates for maintenance, electricians in Milwaukee, Wisconsin;

17   did you?

18   A    Ah, from - answering the question literally, no.

19      Q    Well, you didn't do a - a - a study of comparative

20   wage rates for maintenance, electricians in Wisconsin, or

21   Southeast Wisconsin; did you?

22   A    I - I did a national average.  Used national averages,

23   which I believe is a relevant market comparison overall for

24   Delphi.

25      Q    Okay.

59

1          And, we've already discussed the fact that you did

2     not do that by skill  -  by individual skill categories?

3     A     Correct.

4          Q     And, the market for skilled trades is going to be

5     specific to a given skill trade; would you agree?

6     A     From the market; that's correct.

7          Q     And, you also did not do a comparative study in  - in

8     the upper mil  - Midwest for machine  - machine repairmen or

9     tool and dye makers; is that right?

10    A     Correct.  No, I did no regional analysis.

11         Q     And you did no specific skill analysis?

12    A     As I  -

13         Q     Specific to a given skill.

14    A     As you  -

15         Q     Category.

16    A     If you're asking the same question as before, the answer

17    is yes.

18         Q     I think I asked a negative and you answered.  So, I'm

19     - I'm just  - bear with me.

20    A     Okay.

21         Q     You did not do a comparative study by any specific

22    skill category; is that right?

23    A     Ah, correct.  For this report I did not.

24         Q     Now, there was an earlier reference to your quick

25    rates study that was economy wide.  And, I don't know that I

1    wrote down the exact paragraph, but what I wanted to ask you is

2    whether your figures for economy wide quick rates includes

3    salaried and hourly?  I would  - I would have assumed so,

4    because economy wide sounds like that kind  - it would include

5    everyone.  But, I'm just trying to verify that.

6    A    You know, again, as I answered it, I would have to check

7    to be sure.  Um, I be  - I believe they are economy wide.

8        Q    And, it's your testimony that if you have a lower

9    quick rate than that average, you would not need to increase a

10   compensation; is that your testimony?

11   A    If you have a low quit rate, um, based on market  - market

12   conditions, you certainly would not need to pay more.

13       Q    So, if your quick rate was, I think for  - for 2005

14   you have a  - economy wide quit rate of 23.7?  Is it your

15   testimony that if you had a lower than 23.7 quit rate you would

16   not need to increase benefits?

17   A    Well, again, this is on average.  Ah, employees  - em  -

18   employers can use lots of different market indicators that will

19   give them pressure  - give them information on when they should

20   or should not increase wages.  So, that if it's a market wage

21   and a market condition, there are lots of indicators that tell

22   the employer when to increase wages, the quit rate would be one

23   of those.

24       MS. GOLDSTEIN ROBBINS: No further questions, Your

25   Honor.

1           THE COURT: Okay.

2     CROSS EXAMINATION

3     BY MS. MEHLSACK:

4          Q    Good morning, Dr. Wachter.  Barbara Mehlsack.  I

5     represent the Operating Engineers Locals.  And those locals

6     employ workers in the category of stationary engineer.

7          Are you familiar with what stationary engineers do?

8     A    Yes.

9          Q    And  - and what is your understanding of what they do

10    at Delphi?

11    A    Um, well, precisely at Delphi, I'm not sure exactly what

12    they do.  The stationary engineers are typically the  - the

13    people who are running, um, you know, the compot  - the  - the

14    equipment, ah, the complex machinery equipment.

15         Q    Complex.  Very complex machinery.  Is that not the

16    case in  - like compressors, bowlers (phonetic), the equipment

17    upon which the entire plant depends when it's  - when it's

18    running.

19    A    Yeah.  Yeah.  It's certainly the case that operating

20    engineers are high up in the skill category.

21         Q    So, when  - when you  - well, what  - what was the

22    major occupational grouping, that you utilized in analyzing the

23    skilled trades?  Including the  - the  - the ma  - the  - the

24    rates of  - for the skilled trades at Delphi?  Including the

25    operating engineer  - the stationary engineers?

1   A    Um, what I  - what I said is, if we matched the, ah, the

2   major categories, um, best we could with the DLS categories, in

3   terms of similar names, for the major categories.

4        Q    And  - and  - and do you recall what that major

5   occupational grouping is for the skilled trades?  Do you recall

6   the name?

7   A    There were a number of them.  I do not re  - remember if

8   any of them were operating engineers.

9        Q    Well, I believe, Mr. Wachter, that there's only  -

10  there is  - there is a one major occupational grouping that has

11  12 subcategories and 90 job titles that you utilized for the

12  skilled workers comparison.  Is that a fair statement?

13  A    Ah  -

14       Q    Is that an accurate statement?

15  A    Well, if I were to recall off hand, I certainly would not

16  be surprised.

17       Q    You don't recall at all?  Maybe  -

18  A    I  - but I'm  - I think I'm testifying and you ask me

19  numbers.  I should not be speculating when I don't know the

20  exact  -

21       Q    Well  - well, let me  - let me refer you to Page 11

22  of your declaration and report.

23            And, where you say, at the bottom of the page,

24  Delphi's workers are compared to comparably skilled workers

25  using the Bureau of the Census Categoriza  - Categorization

1    Structure for occupations.  The Census categorization reflects

2    their, I - I want you to make note of that word, their

3    determination of what a worker is likely to view as an

4    alternative job or career path since these occupations would

5    require roughly similar training and possess roughly similar

6    job characteristics and working conditions.

7            First of all, Mr. Wachter, could you tell me, who the

8    their refers to in that sentence?  Their determination.

9    A     The Census.

10       Q     And  - and do you have a cite for  - in support of

11   this statement?

12   A     I  - I (inaudible).

13       Q     And  - and you make this statement and you're relying

14   on this Census.  But, I don't find any citation to anything in

15   a Census publication in this report, that would support this

16   statement.

17           Can you  - can you, and perhaps, you can, if you

18   would like, I can reserve, perhaps, to this afternoon or before

19   the next hearing date, you could provide a citation for that

20   statement?

21   A     Um, if you go to any of the BLS, ah, books, where they

22   have the occupations and if it's one of the books that provides

23   the  - the notes on how they do it, the BLS does categorize

24   jobs in terms of the near alternatives that are available to

25   it.

1      Q    Mr. Wachter, I will, again, request that you provide

2   me with the cite for that statement.

3        Would Counsel?

4        Let me - let me - let me, before - let - let me

5   ask you; is it - is it your contention that your use of the,

6   what you call, the Census Categorization Structure, is

7   justifiable because the workers in what these - this major

8   occupational grouping view all of the jobs, or the Census'

9   determine they view all of these jobs as alternative career

10  paths.  And, all of these occupations require roughly similar

11  training and possess roughly similar job characteristics?

12  A    That's not what I said.

13     Q    Well, what - this - that's what the - you - you

14  say here, the Census characterization reflects their

15  determination whether - of whether workers likely to view as

16  an alternative job or career path, since these occupations -

17  Mr. Wachter, what - what occupations are these occupations?

18  A    Ah, the Census has a categorization across all occupations

19  that it provides, and across all the US occupations it

20  categorizes them into narrow groups or broad groups based on

21  their assessment of which of these jobs are more closely

22  related to each other.  It's not mine, it's the Bureau of the

23  Census, in the occupational categorization.

24      And the purpose of the occupational categorization is to

25  provide the Government's - the BLS' - or the Census

1    assessment as to which jobs are more closely related.

2    Q    But, by closely related, in this sentence, what you

3    are saying, closely related means, is that a worker is likely

4    to look at occupations within either one of these narrow

5    characterizations or broad characterizations.  You're saying it

6    doesn't matter whether it's the narrow ca  - you said they

7    categorized them either narrowly or broadly and so, I gather

8    what you're saying is, whether narrowly or broadly, it's what a

9    worker is likely to look at as an alternative job or career

10   path?

11   A    It's  - it's  -

12   Q    In other words, Mr. Wachter, let me ask you  -

13        THE COURT: Well, we gotta let  - let  - let  - let

14   him  -

15        MS. MEHLSACK: Okay.

16        THE COURT: Let him answer that question.

17        MS. MEHLSACK: Okay.

18        THE WITNESS: Ah, it's a gen  - well, I don't  - the

19   statement I'm making here is a general statement which is true

20   about the Bureau of the Census categorization.  If you want to

21   go into, ah, narrow  - narrower category, um, this statement

22   would then be modified by the extent to which  - and if you  -

23   an employee would be moving to a different occupational

24   category.

25   CONTINUED CROSS EXAMINATION

BY MS. MEHLSACK:

Q    You pleaded unclear terms.  Are you saying that a worker looking at the 90 different occupations within the precision production major occupational grouping, which contains the 12 sub-groups that you utilized for analyzing the skilled trades, that that worker is going to view any one of those 90 jobs as an alternative career path, and that those 90 jobs require roughly similar training and possess roughly similar job characteristics?

A    That's what  - that's what I said.  Yes.

Q    Okay.

Do you  - you  - you stated earlier that you  - instead of using Delphi's four categories, you used the two broad categories because, while not all of the Delphi worker  - there are more Delphi workers who fell into the two broad categories than the four categories.

When you looked at the major occupational grouping of precision production workers; did you look at each of the 12 categories?

A    I  - I looked at the 12 categories.  I'm not sure what you mean by looking at that?

Q    Did you determine whether or not, in each one of those 12 categories  - each one of those 12 categories included jobs that were present at Delphi?

A    As I believe I said, not all the jobs, not all the skilled

1    jobs, in Delphi, were able to be categorized into the 12 we

2    chose.

3        Q    That's not what I'm asking you, Mr. Wachter.  I'm

4    asking you of  - whether or not, if you look at the 12

5    categories in the major occupational grouping, precision

6    production and repair that you utilized for the skill trades.

7    Whether there are any one of those categories that have no jobs

8    that are present at the Delphi facility, and, therefore, it

9    would inappropriate to include that category in your analysis?

10   A    Ah, we were using broad averages.  And, the averages that

11   we using were largely insensitive to any, ah, adjustments that

12   you would make, as long as you're talking about, ah, dropping

13   jobs at the top as well as at the bottom.

14       Q    So, you would  - they  - they  -

15   A    (Inaudible.)

16       Q    - they  - they  - your analysis was insensitive to

17   the skill level and complexity level of  - of the jobs?

18   A    I didn't say that.

19       Q    Your analysis was insensitive, I believe you said, to

20   whether  - in dropping down to the occupational level.

21   A    I was  -

22           THE COURT: I don't think he said that.

23           MS. MEHLSACK: Well  - perhaps you wanna  - we'll

24   have  - if you could read back the answer.

25           THE COURT: Could you  - yeah.  Why don't  - why don't

1    you read back what he said.

2             (Whereupon, the Court Reporter read back the previous

3    answer.)

4    CONTINUED CROSS EXAMINATION

5    BY MS. MEHLSACK:

6        Q    Well, what do you mean by jobs at the top?  There's

7    this jobs at the bottom?

8    A    Ah, if you're trying to do a categorization across

9    occupational categories, and I will say this is more relevant

10   to the production line than it may be to the skilled line.  But

11   - because you could also have that come in the production

12   line.  What we did, was to drop a number of the jobs that were

13   largely, ah, ah, from the  - from the full list of  - within

14   the Bureau of the Census of related jobs.

15       If there were no jobs at Delphi, that fit within those

16   jobs, we would fit an analysis where we dropped those jobs out,

17   for the production line, to see if it made a difference in the

18   average wage that we calculated and for the production, um, the

19   - the people who run the equipment as well as the handlers, it

20   did not make a difference.

21       Q    But you did not do that for the skilled trades?

22   A    That's correct.

23       Q    So, for example, there is a category in the pre-

24   production precision  - in the  - in the precision production

25   jobs, called Precision Textile, Apparel and Finishings Machine

1    Workers, including dressmaker, tailors, upholsterers and shoe

2    repairers.  And, do you know what the average wage is of the

3    employees in that category?

4    A    Ah, no, I do not.

5        Q    Okay.

6            It, in fact, is about $11, and I will, if you bear

7    with me for a moment.  The tailors and upholsterers, I'm sorry.

8    But  - make  - their new hourly earnings, and this is from the

9    November 2004 National Compensation Survey, which I'm  - I'm

10   correct that  - that you used the NCS from November 2004, and

11   then extrapolated from there to 2005 wage rights; is that

12   correct?

13   A    Yes.

14       Q    Well, the  - the tailors and the upholsterers make

15   $13 and made  - $13.94, and $14.65 respectively, as their main

16   hourly earnings in 2004.

17           So, you did not, for the skill trades exclude that

18   group at  - what you call the bottom from the  - and your  -

19   your calculation of the  - of comparability from the skill

20   trades?

21   A    Um, I don't recall sitting here now, whether that was one

22   of the broader categories that we included.  But it is the case

23   that for the categories that we included, we did not drop jobs

24   at the bottom and the top.  We did it for the production, for

25   the machine operators and the handlers.

1          MS. MEHLSACK: May  - may I have that answer read

2    back to him, please.  I apologize.

3          (Whereupon, the previous answer was read back by the

4    Court Reporter.)

5          THE WITNESS: Yes.

6    CONTINUED CROSS EXAMINATION

7    BY MS. MEHLSACK:

8          Q    And  - I'll refer you to Page 15 of your decla  -

9    declaration, Paragraph 39.

10          Do you not state, at Paragraph 39, that you used all

11    12 occupational categories in which the BLF classifies skilled

12    workers?

13    A    Well, what I said there  - I'll just read back so it's  -

14    it's somewhat different from what you said.

15          We calculated the average wage of workers economy wide,

16    did a comparable to Delphi's skilled workers based on data on

17    the average hourly earnings of full time workers, a  - across

18    the 12 occupational categories where the BLS classifies most

19    Delphi skilled employees.

20          Q    So, you used the 12 occupational categories that are

21    apart of the major occupational grouping pre  - precision

22    production, craft and repair.  You used all 12 occupational

23    categories?

24    A    No.  That  - I mean  - that's not correct.

25          Q    Well, isn't that what you say here?  You used the 12

1   occupational categories where the BLS classifies most Delphi

2   skilled employees.

3   A    Well, un - unless I'm wrong and that's the title of the

4   overall categories.  If it's the title of the overall category,

5   then you're right.  If that's a narrower category, then it

6   wouldn't be right.

7       Q    So, you don't know, sitting here today, Mr, Wachter,

8   what the major occupational grouping is?  What the 12

9   occupational categories are, that you included in your analysis

10  of the skilled trades?

11  A    I certainly knew it in detail when I was doing this study.

12  Since I didn't (inaudible), ah, that page into the report.  I

13  don't have it here and I cannot testify without speculating on

14  your titles.

15      Q    Okay.

16          We - we will - did - did you put any part of the

17  NCS into your report?

18  A    I (inaudible).

19      Q    The National Computation Survey?

20  A    We didn't publish number - we didn't take numbers out of

21  the NCS and put those numbers in  -

22      Q    But, sitting here today, you can't say whether you

23  utilized all 12 occupational categories in the major

24  occupational grouping, production precision or you didn't use

25  all 12?

1       And, I didn't (inaudible) from your report, would I,

2   since you don't -

3       THE COURT: Well, let him - let him answer that for

4   now - question first.

5       MS. MEHLSACK: I'm sorry.  I withdraw the question.

6       THE COURT: But - but, answer the other one.  Did you

7   use all 12?

8       THE WITNESS: Um, the 12 we - the - the 12 that I

9   used were the categories that apply to most of Delphi's skilled

10  workers.  So that in the study we did of overall skilled

11  workers, we had most of the skilled workers in these categories

12  and there were 12 of them.  They are broad occupational

13  categories.  So it would include, for example, electricians as

14  one of those categories.

15      Um, we then took an average of those categories, ah,

16  for - from the private sector to get the market wage.

17      I think in terms of the particular category that

18  you're referring to, I simply do not recall if that is one of

19  the 12.  I don't know if its even - I don't think it sounds

20  like the broader category.  But, without having the page in

21  front of me, it would be hard to answer that question

22  precisely.

23      THE COURT: Well, if you pro -

24      MS. MEHLSACK: Your Honor -

25      THE COURT:  - if you provided the list of the 12

1    categories that you used?

2            THE WITNESS: Um, I think we did.  But  -

3            THE COURT: Okay.

4            Well, if you  - if you haven't, can you provide that?

5            THE WITNESS: Cer  - certainly.

6            THE COURT: Okay.

7            MS. MEHLSACK: I  - I might be able to, Your Honor.

8    See if this  - up, if I may.

9            May I have this marked  - and I'm not sure how you're

10    marking (inaudible).

11            MR. BUTLER: We aren't.  We aren't.  You can show it

12    to him and it'll be marked later for Court.

13    CONTINUED CROSS EXAMINATION

14    BY MS. MEHLSACK:

15        Q    Mr. Wachter, is the National Compensation Survey,

16    July 2004, that you utilized  -

17    A    Yes.

18        Q     - in your report?

19            Would you turn to Page 5 and the heading, Blue Collar

20    Occupations.

21    A    Yes.

22        Q    And would you  - and  - and I don't normally do this,

23    but I'd ask you to read the first two paragraphs.

24            THE COURT: What?  I'm sorry.  I thought  - I thought

25    what you were going to do is, you had the list of what he

REGENCY REPORTING, INC.      (866) 268-7866
www.regencyreporting.net

1    identified?

2    MS. MEHLSACK: Well, I have a list and I'm trying to

3    make sure that that is the -

4    THE COURT: No, let's just get the list that he used.

5    MS. MEHLSACK: Will you - will you turn -

6    THE COURT: I mean, I think that's what - why don't

7    we just get the list he used.

8    This is - I don't - unless this is going to help -

9    refresh your recollection - is this - will this reading this

10   refresh your recollection?

11   THE WITNESS: No.

12   THE COURT: All right.

13   I think we just have to get the list he used.  And if

14   -

15   MR. BUTLER: Your Honor, we will  - we will obtain a

16   list from the expert and file it as a supplemental  -

17   THE COURT: And you can  - and you can question him on

18   that.

19   MS. MEHLSACK: That's fine.  If we  - that's  -

20   THE COURT: Once you see it.

21   MS. MEHLSACK: If that  - I'm  - I will do it that

22   way.  You provide us with the list.

23   CONTINUED CROSS EXAMINATION

24   BY MS. MEHLSACK:

25   Q    Do you know, Mr, Wachter, what is the range of wages

1    in the precision production group, major occupational group

2    that you utilized in arriving at a mean out wage for skilled

3    traders at Delphi?

4    A    Ah, no, at this point I, again, I concentrated on the

5    average.  And that's what I reported.  I did not memorize the

6    range numbers nor did we report them.

7        Q    Okay.

8            Are  - are you

9    A    Nor did we report them.

10       Q    Are you aware that the range starts at $11 and some

11   cents, and includes bakers and food batch workers?

12   A    Ah, keep in mind, again, that we did a match with seven of

13   those categories that included Delphi's skilled workers.

14       Q    I thought you said 12 categories, Mr. Wachter?

15   A    That's the 12 categories.  Didn't I just say 12?

16       Q    No, you just said seven.

17   A    I'm sorry.  12.  I missed  -

18       Q    And  - and I am asking you, are you aware that those

19   12 categories have a range that starts at  -

20           THE COURT: He doesn't know what the 12 are.  He

21   doesn't know what they are.  Speaking today.

22       Q    So you don't know what the range is now?  Are you  -

23   and  - and you  - you  - you don't know what the 12 are?

24           MS. MEHLSACK: Well, Your Honor, the nine  - I'm

25   going to have to because  - I'm  - I'm  - unless we can  -

1          THE COURT: No.  You're  - I  - you'll have an

2    opportunity  -

3          MS. MEHLSACK: Fine.  Then, I  - I  - I will  -

4          THE COURT:   - once you see the list of the 12 then

5    you can ask him these types of questions  -

6          MS. MEHLSACK: Okay.

7          THE COURT:   - as to, you know, what was in the 12

8    and then go on.

9          MS. MEHLSACK: I will reserve on that issue.  Let me

10   ask you  -

11         THE COURT:  You may not need to, I mean, if  - if

12   your chart shows what the range is, you can let me know

13   separately.

14   CONTINUED CROSS EXAMINATION

15   BY MS. MEHLSACK:

16      Q    I will  - I will  - I will ask you on  - you  - you

17   stated that you did not consider specific skills.  You've

18   acknowledged these  - these  - the specific skills of various

19   groups of Delphi employees, in doing your analysis?

20   A    What I used was the broad categories needed to do the

21   comparability study.

22      Q    Okay.

23         Now, if  -

24   A    `I did not  - I did not  - and I think I was clear on

25   this.  I did not do a specific study of individual skilled

```
 1   categories.
 2        Q    Okay.
 3             And where did you consider if a  - at particular
 4   branch, in which Delphi had identified  - withdraw the
 5   question.
 6             Did Delphi identify, for you, the plants and the
 7   regions in which Delphi was going to con  - where  - where
 8   Delphi considered it had core businesses and Delphi was going
 9   to continue in operation as opposed to the plants that it was
10   closing?
11   A    Um, I was provided very, very general information.  That
12   it was not an important part of my report.
13        Q    And was that because you did not consider what
14   factors, in a particular geograph  - geographic region, at a
15   particular plant, for a particular skill, and a  - for a
16   particular occupation with particular skills, what it would be
17   necessary to pay the employees who performed that occupation in
18   order to attract qualified employees for that plant in that
19   particular region?
20   A    That was a long question.  I'm  - I hate to ask  -
21        Q    I'm sure with  - with your degrees and your  - that
22   you be  - what I'm asking you is, and  - and would you repeat
23   the question, please.
24             (Whereupon, the question was read back by the Court
25   Reporter.)
```

1      Q      You did not, in doing your analysis, consider, for

2    any particular plant or region where Delphi had identified a

3    core business, it was  - it was going to continue in business,

4    and therefore, would need to maintain its workforce.  What wage

5    Delphi would have to pay for a particular group of employees

6    who performed a particular occupation with particular skills

7    and particular requirements?

8    A      Thank you.

9         We did not do a specific skill study.  We did not do a

10   specific plant study.

11      Q      More  - did you do a specific regional study to

12   determine what a market rate would for a particular plan in a

13   particular region, for a particular occupation; is that

14   correct?

15   A      The market rate  - the market rate cannot be a regional

16   rate.  It has to be a national rate.

17      Q      But you're saying that, Mr. Wachter, because you

18   believe that there's a national pool of employees for all of

19   Delphi's jobs?

20   A      Um, over time, we have a national labor market.  If the

21   plants  - if Delphi's plants were to close, and the employees

22   had to find new jobs, it is unlikely that they would find those

23   jobs elsewhere at Delphi.  They might not find in the auto

24   parts business, in the auto parts industry.  They might have to

25   go to a different locality.  That is the migration that takes

1    place, over time, in the United States economy.  And that has

2    made it, um, whether you want to view vibrant as a good term or

3    not, it's a very mobile society.  A very mobile economy where

4    jobs move and employers move.

5         Q    Well, would that  - would that analysis apply to jobs

6    where there are specific local requirements, including

7    residency requirements, the licensing?

8    A    If you had to relocate, it would be more costly,

9    obviously.

10        Q    And there are more restrictions on this free flowing

11   movement that you're describing?

12   A    It certainly could be done.  It would be more difficult.

13        Q    Now, are you familiar with the fact that the

14   stationary engineers, for example, have  - require to be

15   licensed?  And those licensing requirements are at both State

16   and Local levels?

17   A    I believe that to be true, but now we're going back to my

18   days at the IRL School.

19        Q    That was '64 or '84?

20   A    That was, maybe '74.

21        Q    Are you  - are you  -

22   A    (Inaudible.)

23        Q    And  - and let me  -

24   A    (Inaudible), I  - I actually believe it was in graduate

25   school, in which case it would have been 1968.

1    Q    Are you aware  - and  - now, you talked about this

2    national labor market, in terms of closed plants.  Did those

3    plants that Delphi determines to keep open, assuming that there

4    is a attrition program and that some member of employees leave,

5    and Delphi has to attract replacements.  Is it your contention

6    that the na  - that the local market and is irrelevant to

7    Delphi's ability to attract replacements in any particular

8    plant, in any particular region?

9    A    Do you say that the national market is relevant  -

10    Q    Is  - is  - that the local market is irrelevant.

11    That is that local rates paid for a particular occupation or a

12    particular skill are  - are not relevant to Delphi's ability to

13    attract replacements for a particular job category?

14    A    Ah, the hypothetical is difficult.  I would assume if

15    they're both displacing and hiring, um, I don't know if they're

16    bumping rights or not, ah, but if there aren't, um, over time,

17    the national market kicks in.

18        If you need somebody next week you may want to hire

19    somebody, in which case, a local rate might be important to

20    you.  However, if the rates at Delphi is playing  - paying

21    overall, in terms of wages and benefits, um, you wouldn't find

22     - in all my years of studying, um, ah, wage premiums; and this

23    may not refer to your workers, the people you're representing,

24    at all, but Delphi has an incredible wage and compensation

25    premium.  You just don't find this  -

1    Q    Are you aware of how Delphi's wage rate compares to

2  the wage rate of stationary engineers in the auto parts

3  industry nationwide?

4  A    No.

5    Q    Are you aware of the fact that the  - let me  - are

6  you aware of the fact that BLS does analysis?  There  - there

7  are two  - two  - two levels of  - of analysis, broadly, that

8  BLS does.  One is the National Compensation Survey.  The

9  other's called the Occupational Employment Statistics?

10  A    Yes.

11    Q    And you're aware that the Occupational Employment

12  Statistics get down to the particular occupation, regional

13  levels, industry levels?

14  A    Yes.

15    Q    Are you aware that the BLS has  - has published a

16  study that shows that back in 2004 the new wage for stationary

17  engineers at auto parts manufacturers, nationwide, was $28.58

18  an hour?

19  A    Well, as I said, I did note  - I do not know  - did not do

20  any direct study of the stationary engineers.

21    Q    Are you  - you did no direct study of nationwide

22  rates, either of any particular occupational category, within

23  the skilled trades?  Neither electricians or stationary

24  engineers or anyone else who performs what you described as com

25   - who  - who handles complex machinery?

1    A    No.  Ah, I forgot how you expressed that question  -

2         Q    I  -

3    A     - as to yes or no.  We did a study  -

4         Q    Mr Wachter, you answered the question.

5              THE COURT: No, he didn't.

6              What  - what confused you about it?

7              THE WITNESS: I  - I wasn't sure if it was stated in a

8    negative or the positive.   As I've stated a number of times,

9    we did a study of the 12 occupations, in terms of the averages.

10   I did not do a specific study of stationary engineers.

11             MR. BUTLER: Your Honor, Mr. Wachter's colleague did

12   provide me the 12 categories.  I could read them into the

13   record and provide them to Counsel, and maybe after a break she

14   could have an opportunity to review them.

15             THE COURT: Okay.

16             All right.

17             MR. BUTLER: May I read in the record so the Court's

18   aware of what they are?

19             THE COURT: Sure.

20             MR. BUTLER: I'm advised that the methodology for the

21   skilled workers comparison of simple average wage among 7200

22   skilled Delphi workers was the unweighted average, NCS wage

23   across 12 national occupations in which approximately 85

24   percent of Delphi's skilled workers belong.

25             They are:

1              One, carpenters.

2              Two, electricians.

3              Three, industrial machinery repairers.

4              Four, inspectors, testers and graders.

5              Five, machinery maintenance.

6              Six, machinists.

7              Seven, millwrights.

8              Eight, pattern makers and model makers, metal.

9              Nine, plumbers, pipe fitters and steam fitters.

10             Ten, precision inspectors, testers and related

11   workers, NEC.

12             Eleven, tool and dye makers.

13             And, 12, welders and cutters.

14             And I'll give Counsel the list.

15             MS. MEHLSACK: Your Honor, if I may have some time

16   during the break to review this list?

17             THE COURT: Yeah, that's fine.  That's fine.

18             MS. MEHLSACK: Thank you.

19             I have no further questions.

20             THE COURT: Okay.

21             MR. KURTZ: Your Honor, Glenn Kurtz, for the et al

22   Committee of Equity Holders.

23   CROSS EXAMINATION

24   BY MR. KURTZ:

25        Q    Dr. Wachter, Delphi skill workers are provided total

1    compensation premiums relative to comparable workers, economy

2    wide of 95 to 150 percent; correct?

3    A    Could you refer me to  - since we did a number of

4    calculations where you  - where you are?

5        Q    I refer you to Paragraph 11 of your declaration.

6    A    Okay.

7        Here  - I'm sorry, can you repeat the question?

8        Q    The Delphi skilled workers are provided total

9    compensation premium relative to comparable workers, economy

10   wide in between 95 percent and 150 percent; correct?

11   A    One second.  Page  - Page 11.

12       Q    It is  - I'm sorry.  It is Page 6, it is Paragraph

13   12.  It is the first bullet point of your declaration.

14   A    Pa  - say that one more time.

15           THE COURT: Page 6, Paragraph 11.

16           MR. KURTZ: Paragraph 12  - Paragraph 12.

17           THE WITNESS: Can you read me the first bullet?

18   CONTINUED CROSS EXAMINATION

19   BY MR. KURTZ:

20       Q    Yeah, I'm  - I'm asking you whether it was your

21   conclusion that Delphi skilled workers were provided total

22   compensation premium relative to comparable workers, economy

23   wide of 95 to 150 percent?

24   A    Yes.

25       Q    And the 150 percent premium was where OPEB benefits

1    were included; correct?

2    A    Yes.

3        Q    And, Delphi's production workers are provided total

4    compensation.   That is 2.6 to 3.5 times greater than comparable

5    workers, economy wide; correct?

6    A    Correct.

7        Q    And, the 3.5 times is when including OPEB benefits;

8    correct?

9    A    Yes.

10       Q    And, non-wage benefits of Delphi's skilled workers

11   are about three times greater than those of similarly skilled

12   workers economy wide; correct?

13   A    I'm sorry.  You were going a little fast at that point.

14       Q    Pa  - Paragraph 11, first bullet point.

15           Non  - the non-wage benefits of Delphi skilled

16   workers are about three times greater than those of similarly

17   skilled workers economy wide; correct?

18   A    Yes.  And  - yes.

19       Q    And  - and the non-wage benefits of Delphi's

20   production workers are four times higher than those of

21   similarly skilled workers economy wide; correct?

22   A    Correct.  Yes.

23       Q    Okay.

24           THE COURT: OPEB.

25           MR. KURTZ: OPEB.

1          Q     And non-wage benefits include OPEB benefits; correct?

2     A    Ah, correct.

3          Q     And the elimination of OPEB benefits is reflecting

4     the Debtor's proposal  - is consistent with market place

5     benefit levels; correct?

6     A    Correct.

7          Q     And the reduction of non-wage benefits, in total, as

8     reflected in the Debtor's proposal, is consistent with non-wage

9     benefit market levels; correct?

10    A    Correct.

11         Q     And the same is true for total compensation; correct?

12    A    Yes.

13              MR. KURTZ: No further questions.

14              MR. SIMON: Your Honor, is there permission for a

15    recross of the redirect?

16              THE COURT: Well, there hasn't been redirect yet.

17    There hasn't been redirect yet, right?

18              We'll see.

19              Well, but before  - before we adjourn, I have a

20    couple of questions, which, probably are appropriate to have

21    now.

22              Um, you  - you mentioned, Dr. Wachter, that you chose

23    two of those categories that were broader than the four that

24    Delphi had used.  And you said you did that because it covered

25    all the production workers and they're all (inaudible) Delphi

1    did  -

2                THE WITNESS: Yes.

3                THE COURT:  - with production.

4            Do you know what the (inaudible) rate would have been

5    for the four that Delphi was using?

6                THE WITNESS: I think it was about a dollar a hire.

7    I'm  - Judge, I'm sorry, a dollar lower, our number was higher

8    than their number.

9                THE COURT: Your's was higher?

10               THE WITNESS: Higher than their number.

11               THE COURT: Oh.

12           You know what, I think Mr. Kennedy asked you, to do

13   some, in your head math, about the effect of the difference

14   between the national average that you've (inaudible) the

15   production records.  And, the number in your report, the hourly

16    - hourly number, Roman number in your report.  And I think

17   there's a separate chart in your report, that's its Roman five

18   three, comparing, again, the Delphi number with the three other

19   surveys, the competitor survey that cars survey?

20               THE WITNESS: Yes.

21               THE COURT: And, num  - there wasn't an average of

22   those three, so you  - I couldn't really tell whether the

23   Delphi number was higher or lower than those three.  I get  -

24   what was the reason for not doing an average of those three?

25   Or that this  - that they were different populations in each

1    three?

2              THE WITNESS: Yes.

3              THE COURT: Okay.

4              THE WITNESS: All right.  And I think I testified to,

5    our conclusion with respect to, um, market compensation rates,

6    ah, is pretty much in the middle of these three.

7              THE COURT: Well, I guess, that  - that goes to my

8    next question, which is, given the national average, and the

9    fact that it's  - it's somewhat higher.  In over a year it may

10   be materially higher per worker, I'm  - I'm not sure what the

11   affect on Delphi would be, because that's not come out, but per

12   worker it's  - it's a significant difference.  That  - that 30

13   to 50 cents difference per hour.

14             Why  - why the lower number in the proposal?

15             THE WITNESS: I have not consulted with Delphi

16   management at any point  -

17             THE COURT: Okay.

18             THE WITNESS:  - in terms of that calculation.

19             THE COURT: So, let me just  - you're  - you're not  -

20   you're just saying that their number is reasonably close to the

21   national averages?

22             THE WITNESS: Yes.

23             And in terms of the context of trying to keep the

24   company afloat, and workers who wanna retain their jobs as

25   distinct from having to move to other jobs, their proposal

89

1    would be, um, roughly a market rate.

2              THE COURT: All right.

3              Well, actually, that was the other question I wanted

4    to ask you, related to that point.   Your - your study,

5    generally, is about comparability of wages and non-wage

6    elements of compensation; right?

7              THE WITNESS: Yes.

8              THE COURT: And it's not generally a study of whether

9    Delphi, generally, competes effectively with those out there in

10   the market place competing against it; right?

11             THE WITNESS: Ah, not generally.  Although the

12   competitor data, um, is extremely important data on labor

13   costs.  And it would be, from an economics perspective, very

14   unusual for a firm to be able to compete effectively with the

15   kinds of costs that Delphi has currently, compared to the

16   market.

17             THE COURT: But there are other ways that they can

18   compete than labor costs; correct?   And you really haven't

19   gotten into that one way or the other?

20             THE WITNESS: That's true.  Although the size of these

21   premiums are  - are, as I said, larger than any I've seen

22   before.  It would take a huge amount of other factors to put

23   them back close to the market.

24             THE COURT: Okay.

25             Is  - is there  - I  - I'm assuming, as having seen

 1    the papers.  I'm not seeing any indication that there is.  Is

 2    there any similar econometric measure, of sort, of general

 3    competitiveness as opposed to comparability on wages?

 4              THE WITNESS: I  -

 5              THE COURT: Other than just the fact that a company is

 6    losing money?

 7              THE WITNESS: Um, I do not believe so.  I mean, one

 8    can go through sort of a  - a  - you know, sort of a logical

 9    rendition of what it means to have these high costs.  And what

10    impact it would have on the firm's competitiveness if the costs

11    were lower.  But, that's a lot different than, as you say, in

12    econometric study, which does not exist, in my understanding.

13              THE COURT: Okay.

14              All right.  Thank you.

15              How long do you think your redirect will be?

16              MR. BUTLER: Do you finish the cross, Your Honor.

17              THE COURT: Oh, I thought we were done.

18              MR. BUTLER: No, there's  - there's one cross that was

19    reserved, I think.

20              THE COURT: There was?

21              MR. BUTLER: (Inaudible) It's the one dealing with the

22    quality  -

23              A VOICE: The charts.

24              THE COURT: Oh.  I  - I've

25              MS. MEHLSACK: Well, I'm looking at what's been  -

1          THE COURT: Well  -

2          MS. MEHLSACK:  -  provided to me, Your Honor.

3          THE COURT: Do you wanna take like a 15 minute break

4    or  -

5          MS. MEHLSACK: Yeah.

6          THE COURT: Or I can take an hour's break.  We have

7    lunch now.

8          MS. MEHLSACK: I  - I actually  - that might make

9    more sense, Your Honor.

10         THE COURT: All right.

11         We'll do that.

12         MS. MEHLSACK: I'm sure  -

13         THE COURT: Okay.

14         I'll be at  - at one o'clock

15         (Whereupon, the proceedings broke for lunch at this

16   time.)

17

18

19

20

21

22

23

24

25

1          THE COURT:  All right.  We're back on the

2     record in Delphi.  Mr. Wachter, you're still under

3     oath.

4     M I C H A E L   L.   W A C H T E R, WITNESS, PREVIOUSLY

5     SWORN.

6     DIRECT EXAMINATION BY MS. MEHLSACK:

7          Q    Good afternoon, Mr. Wachter, Barbara

8     MEHLSACK, the operating engineers, and I have just two

9     questions on a document that counsel handed me before

10    the lunch break, which I believe you had a chance to

11    review, and this -- the document headed "Skilled

12    Workers."  It is -- is it your contention that the 12

13    occupations that are listed here are the wage rates to

14    be found in the BLS National Compensation Survey for, I

15    guess, July of 2004 are the wage rates that you

16    utilized to make your analysis of the comparability of

17    Delphi's skilled worker wage rates?

18    A    Well.

19         Q    Do you want me to give you the --

20         MS. MEHLSACK:  Mr. Gant (phonetic), I didn't

21    think it was there.

22    A    All right.  This is the group that we use to match

23    with wage raise.  Correct.

24         Q    TO match with wage rates.  Now what I'm

25    asking you -- I asked you, was it wage rates of skilled

1   trades, Delphi's skilled trades?

2   A     There was -- like you have it on your sheet?

3         Q     Yeah.

4   A     They were a skilled trade.

5         Q     And you used those to determine the

6   comparability of Delphi's skilled trade wage rates.

7   A     Again, all we did was an average across the

8   skilled groups.  We did not do a specific analysis of

9   operating engineers.

10        Q     I understand, Mr. Wachter, and this is not a

11  trick question.  It was just that you answered my

12  question by saying "wage rates," and I just want to

13  clarify that when you said "wage rates," you mean just

14  the skilled trades wage rates.

15  A     I think we were saying the same thing, yes.

16        Q     Well, you did an analysis of the production

17  worker wage rates, and I want to -- I want to make sure

18  that I understand that these 12 categories, these 12,

19  what you call national occupations, were utilized for

20  -- we're talking about the skilled trades analysis now.

21  A     Yes.

22        Q     Only.

23  A     Right.

24        Q     Now your -- this torn piece of paper says

25  that --

1          MR. BUTLER:  Objection, Your Honor.  We were

2    asked to produce the list of the 12, not a document or

3    anything else to read into the record.  We read it into

4    the record.  It happens to be on a piece of paper.

5          THE COURT:  All right.  She's just

6    identifying it.

7          MR. BUTLER:  Okay.  We're not offering that

8    that piece of paper is an exhibit, Your Honor.

9          THE COURT:  Okay.

10          MS. MEHLSACK:  Oh.  You're not Counselor?

11          MR. BUTLER:  No.  We read into the record and

12    the client or the --

13          MS. MEHLSACK:  All right.  All right.

14          MR. BUTLER:  -- expert has confirmed that

15    these are the 12.

16          MS. MEHLSACK:  And will you produce --

17    because I asked the question in the break whether this

18    document was in the -- included in the Reliance

19    materials that you produced, and you said you weren't

20    sure, and it's my understanding now from an answer you

21    got from somebody else that these are -- were working

22    notes that were not included in the Reliance materials.

23          MR. BUTLER:  Counsel, you know, I'm not used

24    to having a colloquy on the record about off-the-record

25    conversations, but we have answered all of your

1    discovery requests.   There are no discovery requests

2    outstanding, and we presented the witness at trial.

3           MS. MEHLSACK:   I'm actually not talking about

4    a discovery request, Mr. Butler.   I'm talking about

5    your submission of what you denominated as Reliance

6    materials to Mr. Wachter's report, and all I'm trying

7    to establish is -- because I did not see any lists

8    comparable to this in the Reliance materials, and I

9    confess that with the ton of papers here, I could have

10   missed it.   Was this -- was the piece of paper of which

11   this represents a torn piece of included in the

12   Reliance material?

13          MR. BUTLER:   And the answer, Counsel, as I

14   told you off the record, was no.   Reliance materials

15   are those third-party documents that he relied on, the

16   client documents and so forth.   These are his internal

17   working notes.

18   BY MS. MEHLSACK:

19      Q    Mr. Wachter, I refer you to Page 15 of your

20   declaration.

21   A    Yes.

22      Q    Okay.   Now this document that you utilized

23   that's not being offered as an exhibit, that states

24   that unrelated average NCS wage across 12 national

25   occupations in which approximately 85 percent of Delphi

1    skilled workers belong.  Now I'm correct that

2    stationary engineers are not listed amongst the 12

3    occupations on this document.

4    A    That's correct.

5        Q    Now I'd like to refer you to Page 15 where

6    you state that the average wages of Delphi's skilled

7    workers are 46 percent higher than the average wages of

8    full-time workers in comparable occupations economy-

9    wide.  Am I correct that the reference -- the

10   comparable -- the phrase comparable occupations refers

11   to the 12 occupations listed on this piece of paper?

12   A    Yes.

13       Q    Now is it the case that when you calculated

14   the average wages of Delphi's skilled workers that you

15   included the wages of the stationary engineers?

16   A    For . . .

17       Q    Right.  For your conclusion that the average

18   wages --

19   A    Oh.  For the -- oh, for Delphi.

20       Q    For Delphi.  For your conclusion that the

21   average wages of Delphi's skilled workers are 46

22   percent higher than the average wage that you -- that

23   you resulted -- that resulted in your calculation --

24   from your calculations using these 12 occupational

25   groups.

1          THE COURT:  Well, look at the first part of

2    Paragraph 39.  It says the average wage of Delphi's

3    skilled workers is $31.30, base pay -- base pay plus

4    COBRA.  Were the stationary engineers included in the

5    calculation to come up with that $31.30 average?

6          THE WITNESS:  I do not believe so.

7          THE COURT:  Okay.

8          MS. MEHLSACK:  Your Honor, I have one more

9    question that's not on this issue, but it's a follow-up

10   in which -- and I was reserving.  I understood perhaps

11   mistakenly, and I apologize, that I could ask this one

12   question, and it goes to Mr. Wachter's statement that

13   there is a -- and it relates to the question I asked

14   him about whether or not if there is a local need in a

15   Delphi plant for a worker of a particular skill,

16   whether the local rate is the rate that Delphi has to

17   look at for purposes of attracting a worker of that

18   particular skill, and I believe Mr. Wachter answered

19   that ultimately in the long run the national rate is

20   what matters.

21        Q    Am I rephrasing you correctly, Mr. Wachter?

22   A    Yes.

23        Q    What is the long run?  What is the time frame

24   that is the long run, in your view?

25   A    It differs, but it could certainly be a couple of

1    years.

2        Q    A couple of years.  So that if the Rochester

3    or Columbus plants need to replace a stationary

4    engineer, it will be two years before the national rate

5    would become the rate which the Delphi would be looking

6    at to consider what they need to pay to attract a

7    stationary engineer.

8    A    On the current wage rates certainly Delphi would

9    have no problem recruiting a stationary engineer.

10       Q    And if the current wage rates were cut, as

11   Delphi proposes to cut them, and an attrition program

12   were put in place, and the Rochester plant needed to

13   replace one of the stationary engineers, what wage

14   rate, is it your recommendation, Mr. Wachter, that

15   Delphi would look at to attract a qualified stationary

16   engineer to run the power plant?

17   A    I'm not making any recommendations as to what wage

18   rates they should offer.

19       Q    And what wage rate would be the competitive

20   wage rate?  Would it be the national wage rate or the

21   local wage rate, if they needed to replace an engineer

22   immediately?

23   A    Well, given the specificity of the question, I

24   think the specificity of the answer would be that they

25   would obviously contact the union and nearby unions to

1    see if another stationary engineer were available and

2    to recruit that person to the job.

3            MS. MEHLSACK:  I have no further questions,

4    Your Honor.

5            THE COURT:  Okay.

6            MR. BUTLER:  Your Honor, the debtors have no

7    redirect.

8            THE COURT:  All right.  You can sit down,

9    sir.

10           (Witness excused)

11           MR. BUTLER:  Your Honor, continuing the

12    debtor's direct case.  Calling now our fourth witness,

13    Steven Gebbia.  We're presenting Mr. Gebbia in

14    connection with his declaration, which is  Exhibit 13,

15    and move its admission subject to cross-examination.

16    G-e-b-b-I-a.

17           MR. BAUMSTEIN:  Your Honor, Doug Baumstein on

18    behalf of the ad hoc committee of equity holders.

19           I'm rising to re-raise our application to

20    preclude the testimony of Mr. Gebbia on the grounds

21    that the equity holders were not to permitted to cross-

22    examine.  Mr. Gebbia specifically testified to the

23    current benefits that were offered -- are currently

24    offered tot he unions, the proposed modifications, as

25    well as a comparison with respect to what salaried

1    employees get.  It seems that a lot of what this goes

2    to is to the fair and equitable standard in Section 11-

3    13. It is the Equity Committee's -- ad hoc Equity

4    Committee's position that they are affected parties

5    under the statute, and as a result, would be entitled

6    to discovery of that, and, accordingly, we, therefore,

7    move to preclude the testimony on the grounds that we

8    were not given an opportunity to examine Mr. Gebbia.

9          THE COURT:  Okay.  Well, this is a similar

10   objection to the earlier ones, and had similarly been

11   the subject of the discovery conference about two weeks

12   ago, and for (indiscernible) reasons, I'll deny and

13   overrule the objection.

14         Mr. Gebbia's affidavit -- affidavit I think

15   is accurately in large picture form summarized by you.

16   But as I previously ruled, I don't believe that the

17   show of this objection goes to the specific test

18   Section 11-13C, but, ratter, the debtor's overall

19   business judgment.  And seeking rejection at this time

20   pursuant to a proposal that would trigger the claims or

21   potential claims that the shareholders have identified

22   and I believe that the prejudice to the main parties of

23   interest here, that is, the unions and the debtor, in

24   having additional deposition over and above what they

25   had previously agreed to between themselves outweighs

1    the shareholders' interest inquiring into the subject

2    matter of Mr. Gebbia's declaration.  Okay.

3             MR. BAUMSTEIN:  Thank you, Your Honor.

4             THE COURT:  Okay.

5             MR. BUTLER:  Your Honor, one other matter in

6    response to the argument by the Whiten Case (phonetic).

7    I'm confused about the record.  I'm concerned about the

8    record here.  Whiten Case is now standing up saying

9    that they represent a committee, an equity committee.

10   (Indiscernible) in this case are representing Appalusa

11   (phonetic) and Wexler (phonetic) and a couple of

12   additional shareholders.  I don't know if they filed a

13   20-19 statement.  They asked -- they prosecuted a

14   motion for the appointment of an equity committee.

15   There is an equity committee here.

16           THE COURT:  Well, I think counsel was careful

17   to say it was an ad hoc group.  Obviously you do need

18   to supplement whatever you previously filed, if you

19   filed anything, and you should have -- I think you have

20   -- to reflect all of your clients.

21           MR. BUTLER:  Thank you, Your Honor.

22           THE COURT:  Okay.  Would you raise your right

23   hand, please?

24   S T E V E N   G E B B I A, DEBTOR'S WITNESS, SWORN.

25           THE COURT:  And, again, could you state and

1    spell your name for the record?

2           THE WITNESS:   My name is Steven L. Gebbia,

3    G-e-b-b-i-a.   Two B's.   S-t-e-v-e-n.   Yes.

4           MR. KENNEDY:   Tom Kennedy, IUE-CWA, Your

5    Honor.   The order of cross-examination will be myself

6    and then attorneys for the UAW Steelworkers, the IDEW

7    and the operating engineers.

8    CROSS-EXAMINATION BY MR. KENNEDY:

9           Q    Good afternoon, Mr. Gebbia.

10   A    Good afternoon.

11          Q    I'd like to direct your attention to Exhibit

12   13, which I believe is your declaration, Mr. Gebbia.

13   Do you have that in front of you?

14   A    I do.

15          Q    All right.   At Paragraph 5 yo indicate that

16   the average cost of supplying health benefits for

17   traditional Delphi hourly employees is $11,273 per

18   month?

19   A    Yes.

20          Q    Is that correct?

21   A    Yes.

22          Q    Now you note in Paragraph 11 of your

23   statement, sir, that under supplemental new-hire

24   agreements, new hires are provided with a reduced level

25   of healthcare, dental, vision, and prescription drug

1    coverage, correct?

2    A    Yes.

3        Q    Your declaration, at least as I read it, does

4    not contain a statement of the average cost to Delphi

5    for providing healthcare to employees who are under the

6    supplemental hew-hire agreements that receive reduced

7    levels of healthcare.    What is that cost?

8    A    As I think about it right now, I don't know the

9    specific number.

10        Q    Well, if you look at Paragraph 11, sir --

11    well, let me ask this.    Is it less than $11,273 per

12    month?

13    A    I would say yes.

14        Q    And how much less?

15    A    In the neighborhood of maybe 10, 20 percent less,

16    but I don't know specifically.

17        Q    Well, you gave an example in Paragraph 11 of

18    a reduced level of healthcare plan that one of the

19    unions had accepted, correct?

20    A    Yes.

21        Q    And that example is the IUE-CWA medical value

22    plan?

23    A    Correct.

24        Q    What is the cost to Delphi per month per

25    employee of providing the IUE-CWA medical value plan?

1    A     Again, I don't have a specific answer.

2         Q    I'd like to direct your attention to

3    Paragraph 13, Mr. Gebbia.  You state:

4              "Given Delphi's inability to employee many

5    new hires since the implementation of supplemental new-

6    ire agreements" --

7              And then you go on.  Do you know of any

8    union-imposed restriction on Delphi's ability to hire

9    new hires into the supplemental reduced wage and

10   benefits new-hire agreements?

11   A     (No verbal response).

12        Q    Do you want me to repeat that?  You look a

13   little puzzled.

14   A     Yes.

15        Q    Okay.

16   A     I'm clear about the unions imposed.

17        Q    I'm looking at this notion that Delphi was

18   unable to employ many new hires.  Is there anything the

19   unions are doing that is preventing Delphi from hiring

20   new people into its reduced wage, new-hire agreements?

21   A     Well, in a very general sense, I would say that,

22   yes, I think there are some things in it.  In a very

23   general sense, there are.

24        Q    Okay.  Well, in a very particular sense,

25   let's look at Kettering, Ohio.  Kettering, Ohio permits

1    Delphi to hire people in at $8 an hour, correct?

2    A    I believe so.  Something like that.

3        Q    And that's IUE Local 755?

4    A    Yes.

5        Q    Has Local 755 done anything which prevents or

6    impedes Delphi from hiring new people into the

7    Kettering plant at that wage rate?

8    A    Well, again, in a very general sense, to the

9    extent that the union will not agree with management to

10   all the provisions and things that need to make that

11   plant competitive and the plant cannot hire people

12   because they can't attract work, new work, at a

13   competitive level; you know, at a level that we can

14   actually be profitable or keep the operation viable.

15   So in a very general sense, I'd say yes.

16       Q    Well, isn't it true that in a very particular

17   sense in response to precisely that argument, the IUE

18   agreed that new hires into that plant would be paid

19   substantially less and have reduced benefits?

20   A    Yes.

21       Q    Do you know what the Kettering plant makes?

22   A    Shocks and suspension-type items, things like

23   that.

24       Q    Does Delphi make shocks and suspension-type

25   items at any of its overseas plants?

106

1    A    I believe it does.

2         Q    And that's work that Delphi chooses to place

3    overseas at its plants instead of at the Kettering

4    facility, correct?

5    A    Yes.  Delphi chooses.

6         Q    Do you know which IUE organized plants offer

7    the IUE-CWA medical value plan as an alternative plan?

8    A    Generally speaking --

9         Q    You might need to speak up a little, sir.  I

10   think you're too far from the --

11   A    I'm sorry.  Maybe I should move this over.  Is

12   that better?

13        Q    Yes, it is.

14   A    Generally speaking, plants, IUE-represented plants

15   outside of our -- like Dayton, Ohio, where there -- for

16   example, in Alabama or Mississippi or states like that

17   where we don't have a large concentration of operations

18   offer a medical value plan.

19        Q    So of the seven IUE plants that are

20   operating, the three in the south, Gadsdin (phonetic),

21   Brookhaven, and Clinton all offer the medical value

22   plan?

23   A    I can't say that specifically, but as I recall, I

24   believe that's true.

25        Q    Now is it also true that employees under the

1    supplemental new-hire agreements receive a reduced life

2    insurance program from the traditional model?

3    A    I believe that's true, yes.

4        Q    And would you also agree with me that

5    employees under the supplemental new-hire agreements in

6    the IUE plants are not covered under the defined

7    benefit hourly retirement plan?

8    A    Yes, that's true.

9        Q    They in fact receive a defined contribution

10   plan, correct?

11   A    Correct.

12       Q    Under that defined contribution plan, there

13   is no legacy cost to Delphi for their employment,

14   correct?

15   A    That is true.

16       Q    And isn't it also true that there is no OPEB

17   (phonetic) arising from their employment?

18   A    Yes, that's true, for those specific employees who

19   are covered under those competitive hire agreements.

20       Q    Okay.  Now your declaration at Paragraph 33

21   addresses supplemental unemployment benefits?  And

22   you're aware of how that program works in IUE plants?

23   A    I am.

24       Q    Isn't it a fact that IUE contracts permit, if

25   Delphi's volume of work declines, for employees to be

108

1    laid off for up to 90 weeks?

2    A    That's correct.

3         Q    Now Delphi has raised issues about the jobs

4    bank program before.  Isn't it correct to state that if

5    IUE members were laid off by Delphi now, it would be,

6    if we do the arithmetic on the 90 weeks, past the

7    expiration of the current collective bargaining

8    agreement before anyone went on the jobs bank?

9    A    If we someday you were going to be laid off for 90

10   weeks, yes.  That goes past September of 2007, yes.

11        Q    Now I'd like to direct your attention to

12   Paragraph 48.  Now I believe Paragraph 48, just to set

13   the context, is discussing the terms of the proposals

14   that have been made to the various unions, including

15   the IUE-CWA, correct?

16   A    Paragraph 48 speaks to Delphi's proposal in the

17   pension area?

18        Q    Yeah.

19   A    Yes.

20        Q    And your -- or Delphi's proposal in the

21   pension area is contingent upon sufficient GM financial

22   support.  We all know that, correct?

23   A    Paragraph 48 speaks to both the contingency of GM

24   financial support and also the absence of GM financial

25   support.

1    Q    Okay.  So absent GM financial support, Delphi

2    proposes a company contribution of three percent for

3    new hires only.

4    A    Correct.

5    Q    And I'm assuming, though, it doesn't

6    precisely say that, but you're referring to a three-

7    percent contribution to a 401(k) type plan of some

8    sort.

9    A    Yes.  Three percent of pay.

10    Q    Okay.  And that would only be for new hires.

11    A    That is correct.

12    Q    And you'd be defining new hires a people

13    hired presumably after the implementation of this

14    competitive wage scenario.

15    A    After the agreement, yes.  After the acceptance of

16    the proposal and an agreement, yes.

17    Q    Well, let's put it this way.  After the new

18    terms would be put in place, however they got there,

19    this would be the deal for people hired after that

20    date, right?

21    A    That's correct, yes.

22    Q    Okay.  So of the 8,500 IUE employees working

23    now, even the competitive benchmark scenario assumes

24    that most of them will continue working through most of

25    '07, correct?

1    A    I don't know that specifically.

2        Q    Well, assume it's --

3    A    But directionally I would agree with it.

4        Q    Okay.  And so the company's proposal without

5    GM support is that they would have no pension benefit

6    accrual during that period of time.

7    A    That is our proposal.

8        Q    Okay.  But new people hired would be getting

9    three percent while everyone who had been there prior

10   to this new system would be getting nothing for

11   pension.

12   A    Assuming there were any new people hires, yes,

13   that's true.

14       Q    Well, I assume you've made a proposal for a

15   contribution rate because you assumed some new people

16   might be hired.  Is that correct?

17   A    At some point in the future.

18       Q    Okay.  Now the proposal with GM support

19   provides that for our brothers in the UAW, they would

20   receive 7.5 percent, seven and a half percent,

21   contribution into a defined benefit plan, correct?

22           UNIDENTIFIED MALE SPEAKER:  Defined

23   contribution plan.

24       Q    I mean defined contribution plan.

25           MR. KENNEDY:  Thank you.

111

```
 1    A    With GM support.

 2         Q    Yeah.   With GM support.

 3    A    Yes.

 4         Q    I want to focus on something, though.   The

 5    proposal for the IUE-CWA with GM support is that "an

 6    amount to be negotiated locally"?  Is that the

 7    proposal?

 8    A    It is.

 9         Q    Is there any minimum or maximum to the amount

10    that the company is proposing to negotiate locally for

11    a pension benefit with the IUE?

12    A    Not specifically stated.

13         Q    And is the same analysis true with respect to

14    the personal savings plan, which we have identified --

15    or you have identified, rather, at Paragraph 50?

16         MR. BERKE:  Object to form.  When you say

17    "the same analysis."

18         MR. KENNEDY:  Well, I'll straight --

19         MR. BERKE:  Are you asking is it part of the

20    GM consensual or is it part of the competitive

21    benchmark, and --

22         MR. KENNEDY:  It was a bad question.

23         MR. BERKE:  Thank you.

24         MR. KENNEDY:  I'll try to do better.

25    BY MR. KENNEDY:
```

1       Q    With respect to Paragraph 50 on the personal

2  savings plan.  Is it also Delphi's proposal to the IUE

3  that the personal savings plan contribution would be

4  "in an amount to be negotiated locally in IUE-CWA

5  plants"?

6  A    Paragraph 50 is one and the same with the

7  Paragraph 48.  The defined contribution pension plan

8  would be within the framework of our personal savings

9  plan, so it's the same thing.  They're one and the

10 same.

11      Q    All right.  And directing your attention to

12 Paragraph 54.  Under the competitive benchmark

13 scenario, Delphi proposes to eliminate sub-benefits

14 entire, correct?

15 A    Correct.

16      Q    And under the GM support scenario, the

17 proposal is to "discuss a potential supplemental layoff

18 payment during the transformation periods."  That's a

19 proposal?

20 A    That is our proposal, yes.

21      Q    And is there a minimum or a maximum amount

22 attached to this proposed sub-benefit in the GM

23 consensual scenario?

24 A    I'm not sure what you mean by minimum and maximum

25 amount.  A sub-benefit is a defined benefit that --

1    there's currently a definition for the amount of a sub-

2    benefit.

3        Q    That's the current scenario, correct?    Under

4    the company's proposal with GM support, what would the

5    sub-benefit be if it were agreed to by the IUE-CWA?

6    A    I think what we're referring to here in terms of

7    discussing a potential supplemental payment would be

8    the length of time those payments were made, not the

9    amount of the payment.

10        Q    You feel the amount of the payment is a fixed

11    amount known to everyone?

12    A    I believe it's defined in our current agreements

13    and it's well understood by Delphi and all of its

14    unions that had sub-benefits.

15        Q    So that it's news to me, others may know,

16    that the proposal for sub-payments that Delphi is

17    making is to continue the current amount, but to

18    discuss the length of time for which that amount would

19    be paid?

20    A    That is correct.

21        Q    At Paragraph 58, you state that salaried and

22    management employees currently pay 27 percent of their

23    healthcare costs.    Do you recall that statement?

24    A    I do.

25        Q    You've identified the traditional wage and

1    benefit employees as costing for health benefits

2    approximately $11,200 per month.

3             UNIDENTIFIED MALE ATTORNEY:  Not a month.

4             MR. KENNEDY:  A year.  Yeah, you're right.

5    Thank you.

6        Q    What is the similar yearly cost for health

7    benefits for salaried and management employees?

8    A    That cost, the 11,000 per year is it for a family

9    rate?

10       Q    Yeah.

11   A    And on a comparable basis on the salaried side

12   would be somewhere in the neighborhood of eight to

13   $9,000, cost to the company.

14       Q    Okay.  The 27 percent of their healthcare

15   costs, my understanding of how that would normally be

16   figured is not as against th eight or 9,000, but as

17   against the whole universe of costs that the employee

18   had absorbed.  But why don't you tell me.  What is that

19   27 percent figured against?  27 percent of what

20   represents their healthcare costs?

21   A    Their total healthcare cost.  The total bill for

22   healthcare.

23       Q    Not the amount paid by the company?

24   A    It would be the entire amount.  In other words, if

25   healthcare cost 100, the employee would pay 27 and

1    Delphi would -- or Delphi would pay 73.

2        Q    Okay.  And on average per year, what does the

3    100 in the scenario you gave us a moment ago amount to?

4    How much money?

5    A    I'm not sure.  For whom are we speaking now?

6        Q    Well, you made a statement that management

7    and salaried employees pay 27 percent of their

8    healthcare costs.  Let me ask it this way.  How much

9    money does that 27 percent represent?

10   A    Roughly, $2,000.  And, again, this is, --

11       Q    Okay.

12   A    -- you know, directional.

13       Q    We're talking about order of magnitude and

14   not exact numbers here, Mr. Gebbia.

15   A    Yeah.  Yes.  2,000, maybe 3,000.  Yes.

16       Q    Two or 3,000.

17   A    Yes.

18       Q    And that's because the total healthcare cost

19   for salaried and management employees are somewhere

20   between eight and 12,000 a year?

21   A    Yeah.  Something in that range.

22       Q    Or (indiscernible).

23   A    Something in that range, yes.

24       Q    Okay.  Now what percent -- assuming it's

25   $2,000 or $3,000, what percent of the overall average

116

1    compensation for salaried and management employees does

2    that money represent?

3    A    Well, I would hesitate to give an answer on that

4    because there's a wide range of salaries, from, you

5    know, entry level salaried employee on up.  So it would

6    depend on the salary much more than the healthcare

7    because the healthcare cost is rather fixed.

8        Q    Well, we know that there are approximately

9    14,200 salaried and managerial employees of Delphi in

10   the United States operations, correct?

11   A    Yes.

12       Q    What is the average salary for those 14,200

13   people?

14   A    I don't know the answer to that.

15       Q    Is it more than $60,000?

16   A    It could be, but I don't know that.

17       Q    Do you know if it's less than 60,000?

18   A    I don't know.

19       Q    So do you have any way to tell us what

20   percentage of compensation that two or $3,000 that they

21   would be paying for healthcare represents?

22   A    No.  We don't typically calculate healthcare costs

23   as a percent of total compensation.

24       Q    Well, would you turn to Paragraph 60, sir, of

25   your report?  Now this chart purports to demonstrate

1    the differences between the current compensation and

2    benefits for traditional hourly employees on the chart

3    on the left and salaried and management employees on

4    the chart on the right, correct?

5    A    Yes.

6        Q    Now does this chart include reference to the

7    1,910 IUE members that are working under non-

8    traditional agreements?

9    A    I would say no.

10       Q    Okay.  Now the first bullet refers to

11   healthcare.  Currently hourly employees pay no monthly

12   contributions, correct?

13   A    That's what this first (indiscernible) says, yes.

14       Q    And monthly and management employees have

15   paid contributions since 1993.

16   A    That is correct.

17       Q    Now we know that the contributions that

18   Delphi has proposed to be effective with the new terms

19   and conditions of the employment are $180 a month for

20   hourly employee, correct?

21   A    For a family.

22       Q    Family coverage, yeah.

23   A    Correct.

24       Q    All right.  Have you computed what percent of

25   total -- I won't say total -- of employee hourly wages,

118

1    assuming the $12.50 is implemented that would

2    represent?

3    A    I have not.

4        Q    Have you made any effort -- well, let me

5    withdraw that.  Am I right in presuming that this chart

6    in Paragraph 60 is in your declaration in an effort to

7    show that the changes Delphi is proposing are somehow

8    fair and equitable?

9    A    Yes.

10        Q    In making that fair and equitable

11   determination, have you compared the amount of employee

12   compensation for hourly employees that will be required

13   for healthcare if your proposals are implemented versus

14   the amount of managerial compensation required to pay

15   for healthcare?

16   A    I'm not sure I understood that question.

17        Q    All right.  Let me try to say it more

18   understandably and without going through our prior

19   questions and answers.  We don't know, you haven't

20   computed the amount of compensation managerial people

21   pay for their healthcare, correct?

22   A    Correct.

23        Q    Have you done any comparison -- even though

24   you haven't analyzed the salary, have you done any

25   comparison between how much higher a percentage hourly

1    employees will be paying for their healthcare under

2    your proposal?

3    A    We have not.

4        Q    Let's look at the sickness and accident

5    benefit for a minute.  The current policy pays 60

6    percent of base wage for 52 weeks, correct?

7    A    Correct.

8        Q    And the company proposal is to take that down

9    to 26 weeks, correct?

10    A    That is correct.

11        Q    And salaried and management employees, I see

12    that it is reduced to 26 weeks for employees hired

13    after 2000.  Is that right?

14    A    That is correct.

15        Q    As we stand here today, what about employees

16    in the salaried and managerial ranks who were hired

17    before 2000?  What benefit do they have?

18    A    They have a -- essentially, what's comparable to

19    the hourly 52 weeks, essentially.

20        Q    Okay.  So when and if the company proposals

21    are implemented, all of the salaried employees will

22    have 52 weeks of sickness and accident coverage, but

23    hourly employees would have 26 weeks, correct?

24    A    That's not necessarily true.  We are currently

25    evaluating the salary benefit package.

1      Q    Okay.  As we sit here today, based on the

2  public pronouncements that Delphi has made, isn't it

3  true that if your proposals were to be implemented, all

4  of the salaried and management employees hired before

5  2000 would have twice as much sickness and accident

6  coverage as the hourly employees?

7  A    As we sit here today, that is true.

8      Q    Okay.  Let's look at the extended disability

9  benefits.  The current hourly benefit is 55 percent of

10  base wage until retirement if you have ten years or

11  more of service, correct?

12  A    Correct.

13      Q    And the Delphi proposal is to eliminate that

14  benefit or to permit an employee to self pay for it.

15  A    Correct.

16      Q    And is it also correct that management --

17  managerial and salaried employees that were hired

18  before 2000 still have the 55 percent of base wage

19  coverage?

20  A    That's not technically true.  That's not

21  technically true.

22      Q    Well, is it actually true then?  What do you

23  mean by "not technically true"?

24  A    The 55 management doesn't have the direct

25  translation of a 55-percent benefit.

1        Q    What does it have?

2    A    I believe management has 60-percent replacement.

3        Q    Thank you.  And I'm sure they deserve every

4    bit of it.  The 60-percent benefit.  The company has

5    not announced any plans to end that for the managerial

6    and salaried employees hired before 2000, have they?

7    A    We have not announced any plans, but it is under

8    consideration, as is S and A?

9    A    Okay.  Now let's look at life insurance.  You can

10   read in the chart the current benefit.  And, frankly, I

11   don't know.  If I did I would tell you.  But I don't

12   know what the company proposal is for hourly employees

13   with respect to life insurance.  What is it?

14   A    $40,000.

15       Q    40,000?

16   A    Yes.

17       Q    Okay.  That's without regard to what money

18   they're making, correct?

19   A    It's a broad amount, correct.

20       Q    It's a broad amount.  And what is the

21   salaried and managerial benefit for employees hired

22   before 2000 in the area of life insurance?

23   A    It's two times annual base pay.

24            UNIDENTIFIED MALE ATTORNEY:  Annual?

25            THE WITNESS:  Annual base pay.

122

1      Q      And does your knowledge of that program, by

2    the way, help you back into what the average base pay

3    might be for manager and salaried employees?  You must

4    know what the pay outs have been, typically.

5    A    I'm not sure I understand your question, but I can

6    --

7      Q      Well, do you know -- never mind.  Withdrawn.

8         Is there any cap on that managerial life

9    insurance policy?

10   A    There is.

11     Q      And what is that?

12   A    I believe it's the legal limit of $200,000.

13     Q      All right.  So that if your proposals were to

14   be implemented, hourly employees would have life

15   insurance of 30,000 and salaried and managerial

16   employee who made at least $100,000 would have coverage

17   up to 200,000.  Is that correct?

18   A    Well, I guess I would correct that.  Whatever the

19   legal limit is.  It may not be 200,000.  It was at one

20   time.  It may be higher than that now.  But there is a

21   cap.

22     Q      Okay.  And that cap is at least as great as

23   200,000 and maybe more?

24   A    Yes.

25     Q      Okay.  With respect to retiree healthcare.

1   The company proposal is to eliminate retiree healthcare

2   except for folks not eligible for the GM guarantee and

3   they would get a medial savings account if GM came up

4   with the money, right?

5   A    Correct.

6        Q    What is the policy -- or I should -- yeah,

7   the policy, I guess -- for salaried and management

8   employees who were hired before 1993?

9   A    The policy with respect to healthcare and

10  retirement?

11       Q    Yes.  I'm sorry.  Yes.

12  A    Our policy is while they would car sharing, as do

13  active employees, monthly contributions and co-pays and

14  deductibles. that, again, are stated 27 percent, and

15  we're looking at increasing those rates along with the

16  rest of our benefit package, and the coverages would

17  continue until age 65 when they reach Medicare

18  eligibility, and effective on January of 2007 we will

19  eliminate those coverages and they will receive a

20  retiree medical account.

21       Q    Okay.  The salaried and managerial workforce

22  has a 30 and out provision in the salaried retirement

23  plan, correct?

24  A    It does.

25       Q    And --

1   A      It does for the employees hired prior to 1988.

2          Q      Okay.   So is it fair to say until the year

3   2018 there will be supervisors who are eligible to

4   exercise the 30-year retirement -- the 30-year-ad-out

5   retirement?

6   A      In the context of a frozen pension plan, which we

7   have announced.

8          Q      Okay.   But for purposes of healthcare, they

9   would be retiring those people who still have the 30

10  and out through the year 2018?

11  A      Presumably.

12         Q      Yes.   And those employees, according to the

13  company's plans, will still have retiree healthcare

14  form the point at which they retire until age 65,

15  correct?

16  A      Under existing provisions, at the time they

17  retire, whatever those may be.

18         Q      Okay.   But there's no -- the only

19  announcement the company has made to date takes away

20  retiree healthcare at age 65, right?

21  A      Correct.

22         Q      So that the group of people who retire at age

23  55 would still have ten years of healthcare coverage

24  paid both by the company and by them through the point

25  they turn 65.

1    A    Yes.

2          MR. KENNEDY:   I would have no further

3    questions, Your Honor.

4          MR. LEVINE:   Your Honor, Bruce Levine from

5    Cohen, Weiss & Simon for UAW.

6    CROSS-EXAMINATION BY MR. LEVINE:

7          Q    Mr. Gebbia, I refer you, sir, please, to

8    Paragraph 40 of your declaration.   Are you there, sir?

9    A    I am.

10         Q    The first sentence of that paragraph reads

11   that Delphi seeks to provide an industry standard

12   employee cost-sharing program with monthly employee

13   contributions and increased out-of-pocket maximums, co-

14   payments, and deductibles.   What do you mean by

15   industry standard in your declaration?

16   A    I think we mean very generally that employees

17   would share in the neighborhood of 30 percent or even

18   more of the total cost of healthcare and it would be

19   typically through monthly contributions as well as a

20   deducible and coo-payments for benefits.

21         Q    Did Delphi prior to tendering any of its

22   proposals to UAW or to any of the unions, for that

23   matter, make any analysis of what the industry standard

24   is, as you refer to it in Paragraph 40 of your

25   declaration?

1    A    I'm not sure what you mean by "make any analysis."

2        Q    Was there any attempt to determine what is

3    the industry standard?

4    A    Yes.

5        Q    And what, if anything, was done to make that

6    determination?

7    A    Well, a large part of the work we do is benchmark

8    studying.  We have direct interaction with other

9    companies, including our competitors.  The people who

10   work in the employee benefits activities of their

11   companies.  We work very closely with consultants who

12   keep us apprized of industry practices, and this is how

13   we typically arrive at what is competitive.

14       Q    And did you use that information, you being

15   Delphi -- did Delphi use that information in coming up

16   with its competitive benchmark proposal that was

17   tendered to the unions first in October of 2005?

18   A    We used information that we have collected over

19   time and information that we collected specifically for

20   this purpose, yes.

21       Q    And would -- withdrawn.  With respect to the

22   information compiled for figuring out what the industry

23   standard is and then for figuring out what the proposal

24   to the unions would be, was that information, to your

25   knowledge, provided to the unions -- to the UAW or to

1    any of the other unions at the time the competitive

2    benchmark proposal was first tendered in October of

3    2005?

4    A    It was provided through responses to, I would say,

5    hundreds of questions that were asked by the unions and

6    their advisors.

7        Q    My question, sir, was whether it was provided

8    at the time that the proposal was first tendered to the

9    UAW or to any of the unions, for that matter.

10   A    I don't specifically recall.

11       Q    Now, Mr. Gebbia, would you please turn to

12   Paragraph 5 of your declaration?  Are you -- excuse me

13   -- are you there, sir?

14   A    I believe I am, yes.

15       Q    Okay.  And Mr. Kennedy had asked you some

16   questions about Paragraph 5 and I'm going to try not to

17   repeat those questions.  But you do say in your

18   declaration in Paragraph 5 that the total cost to the

19   company for healthcare for hourly active employees is

20   approximately 384 million dollars per year?

21   A    That is correct.

22       Q    That's correct.  And in the event that Delphi

23   were to -- Delphi's proposal to reduce healthcare

24   benefits was accepted by UAW, how much savings would

25   Delphi obtain as a result of the union -- of the UAW

1    accepting that proposal for reduction?

2    A    I have not made that calculation and cannot

3    answer.

4        Q    And why is it that you cannot answer that

5    question, sir?

6    A    Because the way we developed our proposal was on

7    the basis of competitiveness.  We talked about industry

8    standard and we are looking to what other companies

9    provide in the way of benefits to their employees in

10    terms of what we can provide to be competitive.

11        Q    In order to obtain that 384-million-dollar

12    figure, did you multiply $11,273, as I understand it,

13    that's the cost of healthcare to traditional employees,

14    traditional hourly employees, by the number of

15    traditional hourly employees?

16    A    To arrive at . . .

17        Q    384 million dollars per year?

18    A    I believe that was the calculation, although I

19    didn't do it personally.

20        Q    Okay.  But to your understanding, that's the

21    way you would come up with that number.

22    A    Well, yes.  It appears to me that from an

23    employee's specific basis to a monthly basis, which

24    would imply that the individual cost was multiplied by

25    the workforce and then multiplied by 12 to get the

1    annual cost.

2        Q    Is it correct that in order for UAW or any of

3    the other unions to compute how much Delphi would save

4    in the event that the proposed healthcare reductions

5    were accepted, the -- one would have to calculate the

6    per cost, the -- withdrawn.  In the event that the UAW

7    would want to compute the savings that Delphi would

8    obtain by accepting the proposed reductions in

9    healthcare, would the UAW have to multiply the

10   healthcare cost per employee by the number of

11   employees?

12   A    I would say, yes generally.  If I understand your

13   question correctly, you're asking if the cost per

14   employee times the number of employees equals total

15   cost; generally speaking, yes.

16       Q    And isn't it correct that you can't tell us

17   how many UAW employees there will be as of, say,

18   November of 2006?

19   A    Could you repeat the question, please?

20       Q    Isn't it correct that, sitting here today,

21   you can't tell the Court how many UAW employees at

22   Delphi there will be as of, say, November of 2006?

23   A    I could not predict that accurately.  That's

24   correct.

25   UAW traditional hourly employees there will be as of,