1    1
UNITED STATES BANKRUPTCY COURT

2
SOUTHERN DISTRICT OF NEW YORK

3
Case No. 05-44481

4
- - - - - - - - - - - - - - - - - - - -x

5
In the Matter of:

6

7
DELPHI CORPORATION,

8

9
Debtor.

10

11
- - - - - - - - - - - - - - - - - - - -x

12

13
U.S. Bankruptcy Court

14
One Bowling Green

15
New York, New York

16

17
April 7, 2006

18
10:16 a.m.

19

20
B E F O R E:

21

22
HON. ROBERT D. DRAIN

23
U.S. BANKRUPTCY JUDGE

24

25

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 1            DELPHI CORPORATION              2

 2   MOTION for Relief from Stay filed by Victor J.

 3   Mastromarco Jr. on behalf of H.E. Services

 4   Company, Robert Backie.

 5

 6   MOTION for Relief from Stay filed by Victor J.

 7   Mastromarco Jr. on behalf of Cindie Palmer.

 8

 9   MOTION for Relief from Stay filed by Gene T.

10   Moore on behalf of Gene T. Moore.

11

12   OBJECTION to Motion For the Appointment of A

13   Fee Committee Contained in the Motion For

14   Administrative Order Under 11 U.S.C. Section

15   331 (i) Establishing Procedures For Interim

16   Compensation and Reimbursement of Expenses of

17   Professionals and (ii) Setting A final Hearing

18   Thereon filed by Tracy Hope Davis on behalf of

19   United States Trustee.

20

21   MOTION for Relief from Stay The Offshore

22   Group's Motion Pursuant to Bankruptcy Code
```

```
23    Sections 362(d)(1) and 553 for Order Lifting

24    the Automatic Stay to Permit the Offshore

25    Group to Exercise Right of Setoff filed by
```

```
1              DELPHI CORPORATION                    3

2    Kasey C. Nye on behalf of Offshore

3    International, Inc.

4

5    MOTION to Approve Motion For Order Under 11

6    U.S.C. Sections 107(b), 501, 502, And 1111(a)

7    And Fed. R. Bankr. P. 1009, 2002(a)(7),

8    3003(c)(3), And 5005(a) Establishing Bar Dates

9    For Filing Proofs Of Claim And Approving Form

10   And Manner Of Notice Thereof filed by John Wm.

11   Butler Jr. on behalf of Delphi Corporation.

12

13   MOTION for Relief from Stay To Proceed With

14   Appeals Of Patent Litigation filed by Alan D.

15   Halperin on behalf of Automotive Technologies

16   International, Inc.

17

18   MOTION to Approve Motion For Order Under 11

19   U.S.C. Section 363(b) And Fed. R. Bankr. P.

20   6004 Approving Debtors' Human Capital Hourly
```

21    Attrition Programs filed by John Wm. Butler

22    Jr. on behalf of Delphi Corporation.

23

24    APPLICATION for FRBP 2004 Examination - Motion

25    of the Official Committee of Unsecured


1         DELPHI CORPORATION                    4

2    Creditors for an Order Compelling the

3    Production of Documents by General Motors

4    Corporation Pursuant to Rule 2004 of the

5    Federal Rules of Bankruptcy Procedure filed by

6    Robert J. Rosenberg on behalf of The Official

7    Committee Of Unsecured Creditors.

8

9    MOTION to Approve Motion For Approval Of Joint

10   Interest Agreement Between Debtors And

11   Official Committee Of Unsecured Creditors,

12   Implementation Of Protective Order, And

13   Approval Of Procedures To Protect Information

14   In Fee Statements filed by John Wm. Butler Jr.

15   on behalf of Delphi Corporation.

16

17   RESPONSE /Reply In Support Of Motion For Order

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
18   Under 11 U.S.C. Section 362(D)(2) Directing

19   Debtor Delphi Automotive Systems, LLC To

20   Determine Within 150 Days Whether To Assume Or

21   Reject Its Nonresidential Real Property Lease

22   With Cherokee North Kansas City, LLC Filed By

23   Jill Mazer-Marino On Behalf Of Cherokee North

24   Kansas City, LLC.

25
```

```
1           DELPHI CORPORATION                5

2   OBJECTION to Motion Debtors' Objection To

3   Motion For Order Under 11 U.S.C. Section

4   365(d)(2) Directing Debtor Delphi Automotive

5   Systems, LLC To Determine Within 150 Days

6   Whether To Assume Or Reject Its Nonresidential

7   Real Property Lease With Cherokee North Kansas

8   City, LLC (related document(s)[1834]) filed by

9   John Wm. Butler Jr. on behalf of Delphi

10   Corporation.

11

12   OBJECTION to Motion Appaloosa Management

13   L.P.'s Preliminary Objection to Motion for

14   Order Under 11 U.S.C. Section 363(b) and Fed.

15   R. Bankr. P. 6004 Approving the Debtors' Human
```

16   Capital Hourly Attrition Programs (related

17   document(s)[2933]) filed by Frank L. Eaton on

18   behalf of Appaloosa Management L.P.

19

20   STATEMENT Joinder of Appaloosa Management L.P.

21   in the Motion of the Official Committee of

22   Unsecured Creditors for an Order Compelling

23   the Production of Documents by General Motors

24   Corporation Pursuant to Rule 2004 of the

25   Federal Rules of Bankruptcy Procedure (related

1          DELPHI CORPORATION                    6

2   document(s)[2961]) filed by Frank L. Eaton on

3   behalf of Appaloosa Management L.P..

4

5   RESPONSE / Limited Response of General Motors

6   Corporation to Debtors' Motion for Approval of

7   Joint Interest Agreement between Debtors and

8   Official Committee of Unsecured Creditors,

9   Implementation of Protective Order and

10   Approval of Procedures to Protect Information

11   in Fee Statements (related document(s)[3000])

12   filed by Michael P. Kessler on behalf of

13    General Motors Corporation.

14

15

16

17

18

19

20

21

22

23

24    Transcribed By:  Esther Accardi

25

1              DELPHI CORPORATION                    7

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4          Attorneys for Delphi Corporation

5          Four Times Square

6          New York, New York 10036

7

8    BY:   JOHN WM. BUTLER, JR., ESQ.

9          KAYALYN A. MARAFIOTI, ESQ.

10         DAVID SPRINGER, ESQ.

11

12    TOGUT, SEGAL & SEGAL, LLP

13          Attorneys for the Debtors

14          One Penn Plaza

15          New York, New York 10119

16

17    BY:   ALBERT TOGUT, ESQ.

18          NEIL BERGER, ESQ.

19

20    LATHAM & WATKINS, LLP

21          Attorneys for the Creditors' Committee

22          885 Third Avenue

23          New York, New York 10022

24

25    BY:   ROBERT J. ROSENBERG, ESQ.


1          DELPHI CORPORATION                    8

2    MASTROMARCO & JAHN

3          Attorneys for H.E. Services and

4             The Estate of Michael Palmer

5          1024 N. Michigan Avenue

6          Saginaw, Michigan 48602

7

8   BY:   VICTOR J. MASTROMARCO, ESQ.

9

10   UNITED STATES TRUSTEE

11        33 Whitehall Street

12        New York, NY 10004

13

14   BY:   ALICIA LEONHARD, ESQ.

15

16   BROWNSTEIN HYATT & FARBER, P.C.

17        Attorneys for Cherokee North

18          Kansas City LLP

19        410 Seventeenth Street

20        Denver, Colorado 80202

21

22   BY:   DANIEL GARFIELD, ESQ.

23

24

25

1            DELPHI CORPORATION                    9

2   MENAKER & HERRMANN LLP

3        Attorneys for O'Neill

4        10 East 40th Street

5        New York, New York 10016

6

7    BY:   RICHARD MENAKER, ESQ.

8

9

10    QUARLES & BRADY STREICH LANG LLP

11          Attorneys for Offshore Group

12          One South Church Avenue

13          Tucson, Arizona 85701

14

15    BY:   KASEY C. NYE, ESQ.

16

17    WEIL GOTSHAL & MANGES, LLP

18          Attorneys for General Motors

19          767 Fifth Avenue

20          New York, New York 10153

21

22    BY:   MICHAEL P. KESSLER, ESQ.

23

24

25

1          DELPHI CORPORATION                    10

2    WHITE & CASE

```
 3          Attorneys for Appaloosa Management

 4          200 South Biscayne Blvd.

 5          Miami, Florida 33131

 6

 7   BY:   FRANK L. EATON, ESQ.

 8

 9   HALPERIN BATTAGLIA RAICHT, LLP

10          Attorneys for ATI

11          555 Madison Avenue

12          New York, New York 10022

13

14   BY:   CHRISTOPHER BATTAGLIA, ESQ.

15

16   KENNEDY, JENNIK & MURRAY, P.C.

17          Attorneys for IUE

18          113 University Place

19          New York, New York 10003

20

21   BY:   THOMAS KENNEDY, ESQ.

22

23

24

25
```

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 1          DELPHI CORPORATION                      11

 2                    P R O C E E D I N G S

 3          THE COURT:  Please be seated.

 4     Okay.  This is a Delphi omnibus day.  So,

 5     Mr. Butler.

 6          MR. BUTLER:  Your Honor, good

 7     morning.  Jack Butler from Skadden Arps

 8     Slate Meagher & Flom, LLP.  With my

 9     partners David Springer and Kayalyn

10     Marafioti.  Here on behalf of the debtors

11     in connection with their sixth omnibus

12     hearing.  Your Honor, we have filed and

13     served in accordance with the case

14     management order a proposed sixth omnibus

15     hearing agenda and would ask Your Honor's

16     permission to follow the order of the

17     agenda.

18          THE COURT:  Okay.  That's fine.

19          MR. BUTLER:  Your Honor, the first

20     three matters on the agenda all are

21     orders to show cause.  Behr Industries,

22     JST Mfg. and Deutsche Dagan and they're

23     to be represented by Mr. Berger.

24          MR. BERGER:  Good morning, Judge.

25     Neil Berger, Togut Segal & Segal, for the
```

```
 1          DELPHI CORPORATION                    12

 2          debtors.  First matter is Behr

 3          Industries.  Your Honor may recall that

 4          this was an order to show cause

 5          concerning a payment post-petition on

 6          account of pre-petition obligations

 7          totaling approximately 1.1 million

 8          dollars.  And that the center of this

 9          dispute was the financial ability of Behr

10          to respond and their qualification under

11          the central vendor or rescue program.

12          We've had a lot of discovery, a lot of

13          financial production.  This matter's been

14          settled.  We hoped that a settlement

15          agreement could have been signed this

16          morning, there's one or two sentences

17          that need to be corrected.  We're

18          confident that we'll be able to submit an

19          order to Your Honor next week.

20              THE COURT:  Okay.

21              MR. BERGER:  The next is JST

22          Manufacturing.  I know JST's counsel is

23          here.  This matter is also settled.
```

24          There's a framework for a settlement much

25          like what we had approved by Your Honor

1           DELPHI CORPORATION                          13

2           in the Schmidt matter.  There are a

3           series of separate purchase orders.  A

4           number of them are essential for the

5           debtor's continued operations and the

6           framework for the JST settlement

7           contemplates a non-conforming assumption

8           of certain of those purchase orders, the

9           retention of funds on those purchase

10          orders as cure costs, and a return of

11          funds to the debtor.  So that also is a

12          framework of a settlement that's

13          favorable to the debtors and, again, our

14          hope is that that matter will also be

15          resolved and an order submitted before we

16          see Your Honor again next time.

17              THE COURT:  Okay.

18              MR. BERGER:  Deutsche Dagan, this

19          is the foreign vendor issue.  Hague

20          process still has not been completed, but

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
21        we also have begun to negotiate a

22        settlement also contemplating a non-

23        conforming assumption of certain of the

24        purchase orders, likely some cash coming

25        back to the estate, so I'm staying with
```

```
1         DELPHI CORPORATION                14

2         Deutsche Dagan as a cure.  This framework

3         is also favorable to the debtors and

4         we'll try our best to settle it before we

5         come back to see you.

6             THE COURT:  Okay.  But in any event

7         it's being adjourned to the 12th of May?

8             MR. BERGER:  Yes, Your Honor.

9             THE COURT:  Okay.

10            MR. BERGER:  For purposes of

11        carrying it on the agenda, all three

12        matters ought to be carried, but our hope

13        is certainly as to JST and Behr that they

14        won't appear on the next agenda because

15        we'll have had orders entered by Your

16        Honor.

17            THE COURT:  Okay.

18            MR. BUTLER:  Your Honor, the next
```

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

19          two matters, matters 4 and 5, we take

20          together, is H.E. Services Company, lift

21          stay motion at docket number 2705 and

22          Cindie Palmer, lift stay motion at docket

23          number 2708.  The agenda indicates by

24          agreement of the parties these matters be

25          adjourned to the May 12th, 2006 hearing.

1          DELPHI CORPORATION                    15

2          I understand counsel for the movant filed

3          an objection last night indicating that

4          they did not agree to the adjournment.  I

5          have e-mail correspondence to confirm it

6          on three different occasions.  I can go

7          through the litany, Your Honor, but the

8          bottom line here is as of March 24th, we

9          had e-mail confirmation from the movant's

10          law firms that the matters were to be

11          adjourned.  We did not file objections.

12          These motions and the forms of order are

13          highly objectionable.  If Your Honor

14          looks at the forms of order, they propose

15          that the claims be allowed with respect

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

16          to these motions in a setoff motion.  But

17          we didn't go through and prepare for this

18          hearing.  In our view, under the case

19          management, order should be heard at the

20          May 12th omnibus hearing.  And depending

21          how much Your Honor wants to hear, I can

22          go through the litany of e-mail

23          correspondence and other traffic.

24              THE COURT:  All right.

25              MR. MASTROMARCO:  Your Honor, may I


1           DELPHI CORPORATION                    16

2           address the Court?

3               THE COURT:  Yes.

4               MR. MASTROMARCO:  Victor

5           Mastromarco on behalf of H.E. Services,

6           under 2705 and also the estate of Michael

7           Palmer under 2708.  I want to indicate to

8           the Court that there was no agreement

9           that was reached.  And Mr. Butler had no

10          personal involvement in these issues.

11          And let me indicate that we made it clear

12          before they ever filed their proposed

13          agenda today that we were coming out here

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
14        and they knew that on the 31st of March

15        which was the date at 9 o'clock in the

16        morning when they had all day to file

17        their response.  They chose not to.

18             THE COURT:  Well, this is probably

19        easily explainable.  I mean, do you have

20        a copy of the e-mails that Mr. Butler's

21        referring to?

22             MR. MASTROMARCO:  Yes, I do.  The

23        e-mail that I am going to --

24             THE COURT:  Well, can you give me a

25        copy?
```

```
1        DELPHI CORPORATION                    17

2             MR. MASTROMARCO:  Yes, I will.

3             MR. BUTLER:  I did the entire

4        chain, Your Honor.

5             THE COURT:  Okay.  All right, why

6        don't you give me that, Mr. Butler?

7             MR. BUTLER:  May I approach, Your

8        Honor?

9             THE COURT:  Yes.

10            MR. MASTROMARCO:  Your Honor, may I
```

```
11      --

12           THE COURT:  Let me just take some

13      time to read it.

14           MR. MASTROMARCO:  Sure.

15           THE COURT:  Okay.

16           MR. MASTROMARCO:  Your Honor, may I

17      address the Court?

18           THE COURT:  I've read them, yeah.

19           MR. MASTROMARCO:  Thank you.  We

20      were first contacted on March 21 of 2006

21      by a Matt McKelly, an associate with the

22      Butler office and Skadden Arps.  Is there

23      something funny?  I'm sorry?

24           THE COURT:  I know Mr. Butler's a

25      prominent lawyer, but I don't think
```

```
1            DELPHI CORPORATION                    18

2       they'd refer to it as the Butler office.

3            MR. MASTROMARCO:  Okay.  Well, I'm

4       sure his partners might object to that.

5            THE COURT:  All right.  The name

6       may be somewhere, on a door somewhere but

7       --

8            MR. MASTROMARCO:  Well, it is on
```

file://C:/Documents%20and%20Settings/slank/Desktop/Delphi%200...

9        the top of the pleadings, so --

10            THE COURT:  Okay.

11            MR. MASTROMARCO:  Let me indicate

12       that, at that time, the associate talked

13       to one of the associates of my office,

14       asked for an adjournment of the hearing

15       today and indicated that they would reset

16       the motion for the next hearing date.  On

17       March 24th, my associate agreed to the

18       continuance --

19            THE COURT:  Actually, are you

20       referring to the e-mail?  The e-mail

21       doesn't say that.

22            MR. MASTROMARCO:  No, I'm talking

23       about their discussions on the phone.

24            THE COURT:  Oh, I see.  As opposed

25       to the e-mail.


1        DELPHI CORPORATION                    19

2            MR. MASTROMARCO:  Well, exactly.

3            THE COURT:  All right.

4            MR. MASTROMARCO:  I mean what

5        they're saying and what they're doing

6       are, like, two different things, I'm

7       finding out.

8            THE COURT:  Okay.

9            MR. MASTROMARCO:  March 24th, 2006,

10      we talked to them, agreed to and that it

11      would be heard the next hearing date.  On

12      March 26th -- the 28th, I'm sorry, we

13      received an e-mail saying they're just

14      going to continue the motion off

15      calendar.  So on March 31, there's an e-

16      mail at 8:27 a.m. from us indicating I do

17      not agreed to the hearing unless it is

18      renoticed for the next hearing date.  And

19      they write back an hour later and they

20      say, your e-mail agreeing to the

21      continuance and it is not contingent on

22      continuing the matter to the next

23      hearing.  It was at that point I got on

24      the phone with Mr. Meisler and indicated

25      that we were going forward with the

1            DELPHI CORPORATION                 20

2       motion and I followed that up with a

3       letter of April 3rd, specifically

file://C:/Documents%20and%20Settings/siark/Desktop/Delphi%200...

```
 4        indicating, and I have that which I don't

 5        believe you've been supplied, the

 6        situation.  The fact that we would agree

 7        if they wanted to file a late objection,

 8        we would stipulate to that.  They chose

 9        not to do that.  And instead, filed this

10        proposed agenda indicating that we agreed

11        to something that they knew we were

12        objecting to.  So they filed with this

13        Court something they knew we were

14        objecting to at the time they filed it.

15        I'm here; I'm ready to argue the motion.

16            THE COURT:  Well, there's one thing

17        that's clear, I'm not going to have

18        arguments on the motion today.  Just

19        reading the e-mail, it says from Mr.

20        McKelly, March 21st, "that as I

21        described", which I assume means that

22        refers to their conversation, "Delphi and

23        your clients would each be permitted,

24        seek to restore the motions to a future

25        omnibus hearing agenda by giving each
```

```
 1        DELPHI CORPORATION                21

 2        other not less than 14 days prior written

 3        notice, e-mail is sufficient.  Such

 4        notice would not have to be given to any

 5        party other than Delphi or H.E. Services

 6        Company, Robert Backie or Cindie Palmer.

 7        Please let me know if a continuance under

 8        these terms is acceptable to you."  Then

 9        he has a follow-up e-mail on the 24th.

10        "I'm writing to follow up on the e-mail

11        below", which is the one I just read.

12        "Have you had a chance to review the

13        proposal and make a decision as to the

14        continuance?"  And there's an e-mail back

15        18 minutes later.  "I can agree to the

16        continuance."  That appears to me to be

17        crystal clear.  Moreover, if you wanted

18        to get it back on the calendar for the

19        next hearing date, you could have done so

20        at any time thereafter and been in

21        perfect compliance with what you want and

22        what they agreed, which is to have it on

23        the next hearing date.  So I don't know

24        why this is --

25             MR. MASTROMARCO:  Your Honor, if I
```

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 1        DELPHI CORPORATION                    22

 2        may.  It's the March 28th.

 3               THE COURT:  Well, when is the next

 4        hearing date?

 5               MR. BUTLER:  May 12th, Your Honor.

 6               MR. MASTROMARCO:  It's May 12th.

 7               THE COURT:  So you can get it on

 8        for May 12th, which is the next hearing

 9        date.  And you did that by your March

10        31st letter, saying I want it on the next

11        hearing date.  So, pursuant to the

12        proposal that your associate agreed to on

13        March 24th, you can put it on and it's on

14        for the next hearing date.

15               MR. MASTROMARCO:  All right.  Thank

16        you, Your Honor.

17               THE COURT:  Okay.  Nothing

18        mysterious about that at all, or

19        underhanded.  All right.

20               MR. BUTLER:  Your Honor, the next

21        matter on the agenda, matter number 6, is

22        the creditors' committee application for

23        the Jefferies & Co., docket number 1948.
```

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

24          Mr. Rosenberg is handling that for the

25          committee and Mr. Togut's handling for


1              DELPHI CORPORATION                    23

2          the debtors.

3                  THE COURT:  Okay.

4                  MR. ROSENBERG:   Good morning, Your

5          Honor, Robert Rosenberg, Latham &

6          Watkins, for the creditors' committee.

7          We have reached an agreement with the

8          debtor to make a minor change in the

9          Jefferies retention letter and order

10         approving that letter.  And we have

11         submitted an order to the Court which we

12         found a typo in and therefore will

13         resubmit a new order that would approve

14         the retention of Jefferies as and on an

15         interim basis pursuant to the terms of

16         the retention agreement as we negotiated.

17         It would then be served on a 45-day

18         notice pursuant to the requirements of

19         the U.S. Trustee for a final hearing.

20         The difference, Your Honor, between what

21         was previously submitted to you and the

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
22        settled version involves a single point.

23        As Your Honor may recall, the Jefferies

24        retention provided for a 328 retention

25        for monthly fees and a bonus based upon a
```

```
1         DELPHI CORPORATION                    24

2         formula based upon return to unsecured

3         creditors.  It also, however, had a

4         proviso that said that Jefferies retain

5         the right to apply to this Court for

6         additional compensation on a, you know,

7         whatever basis they chose to do so.  Not

8         as a 328 matter.  The negotiated

9         solution, Your Honor, is to limit

10        Jefferies's right to come back to this

11        Court to a two million dollar cap.  It is

12        no longer open-ended.  It would be

13        limited to two million dollars.  Mr.

14        Togut has asked me to put on the record

15        that nobody has agreed to any additional

16        compensation.  I would have thought that

17        was clear because nobody has asked for

18        any additional compensation.  It is
```

19          merely the reservation of right to ask

20          for an additional two million dollars.

21               THE COURT:  And the reservation's

22          still asking for it under something other

23          than Section 328's standard?

24               MR. ROSENBERG:  That's correct,

25          Your Honor.  It's in the discretion of


1          DELPHI CORPORATION                    25

2          the Court.  And, of course, all parties

3          reserve their right to object if asked

4          for.

5               THE COURT:  Right.  Okay.  All

6          right.

7               MR. TOGUT:  Good morning, Your

8          Honor.  Albert Togut, Togut Segal &

9          Segal.  I only rise because Mr. Rosenberg

10          stated something that I think -- well,

11          that I know is different from the

12          debtor's understanding.  He used the word

13          cap.  The retention -- the engagement

14          letter with Jefferies provides for a

15          transaction fee of not less than two and

16          not more than ten million dollars.  Which

file:///C:/Documents%20and%20Settings/slank/Desktop/Delphi%200...

```
17        is defined to be the cap, the ten million

18        dollars.  Our view is, a cap is a cap is

19        a cap.  After describing the cap, the

20        engagement letter went on to say, "but

21        Jefferies reserves the right to apply for

22        more."  We didn't want to get into a big

23        fight now about Jefferies's entitlement

24        to any more.  We didn't think it made any

25        sense and it may be under the formula
```

```
1         DELPHI CORPORATION                26

2         contained in that engagement letter.

3         They'll never even reach the ten million

4         dollar cap.  So to waste court time over

5         their entitlement to anything beyond the

6         cap, at this point, we didn't view to be

7         a productive use of the Court's time.

8         What we did, though, is we put a limit on

9         what they might ask for above the cap.

10        We don't agree that they're entitled to

11        any more, we're not conceding that

12        they're entitled to any more, we just

13        limited the extent of that fight, if it
```

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

14        ever happens, at the end of the case when

15        Jefferies applies for compensation.

16            THE COURT:  Okay.  I thought that's

17        what Mr. Rosenberg said, that -- are you

18        just saying that the two million is sort

19        of a like a Cat in the Hat cap, it's an

20        extra cap on top of the cap?

21            MR. TOGUT:  I think that's a pretty

22        good way to describe it.

23            THE COURT:  Okay.

24            MR. TOGUT:  Thank you, Your Honor.

25            THE COURT:  Okay.  Thanks.


1        DELPHI CORPORATION                    27

2            MS. LEONHARD:  Good morning, Your

3        Honor.  Alicia Leonhard, for the United

4        States Trustee, Your Honor.  The U.S.

5        Trustee engaged in significant

6        negotiations with Jefferies and the

7        committee and I have signed off on the

8        interim order.

9            THE COURT:  Okay.

10            MS. LEONARD:  Thank you.

11            THE COURT:  All right.  And, of

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

12      course, this is -- because it's seeking,

13      except for the part we just spent talking

14      about, approval under Section 328(a),

15      it's going to go out on wide notice as is

16      the practice in this district?

17           MS. LEONHARD:  That's correct, Your

18      Honor.  It'll go out on notice -- 45-days

19      notice to all creditors.

20           THE COURT:  Okay.

21           MS. LEONHARD:  Thank you.

22           THE COURT:  You have your

23      reservation, in any event, under 330?

24           MS. LEONHARD:  That's correct.

25           THE COURT:   Okay.  All right.


1       DELPHI CORPORATION                28

2       Well, I'll approve the retention on an

3       interim basis.

4            MR. TOGUT:  Thank you, Your Honor.

5            THE COURT:  Okay.

6            MR. BUTLER:  Your Honor, the next

7       matter on the agenda is the bar date

8       motion, it's at docket number 2866.  No

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

9    objections have been filed to this.

10   We've come, Your Honor, to the point in

11   the case where the debtors think it is

12   desirable and reasonable to ask the Court

13   to begin the process of claims

14   administration in these cases.  By

15   establishing a general bar date which the

16   debtors propose be July 31st, 2006 at

17   5:00 p.m. prevailing Eastern time.  And

18   it also has several other aspects to the

19   relief requested.  It indicates, with

20   respect to an amended schedule bar date,

21   that to the extent we amend our schedules

22   and if someone is affected by that

23   amendment they would have the later of

24   the general bar date or 30 days after

25   they've given notice of the change that

1    DELPHI CORPORATION                29

2    pertains to them.  We ask for a separate

3    rejection bar date which would be the

4    later of the general bar date or 30 days

5    after the effective date of an order

6    authorizing the rejection of an executory

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
7        contract or unexpired lease.  In this

8        case the governmental unit bar date, is

9        the same as the general bar date because

10       it complies with statute on that basis.

11       The proposed date, being more than 180

12       days after the petition date.  We also,

13       Your Honor, have set out, in the motion

14       and in the proposed order, extensive

15       procedures for noticing this out, to whom

16       the notice would go and to whom it would

17       apply or not apply.  We propose to -- if

18       Your Honor approves this today, to notice

19       this out no later than April 20th.  That

20       will give creditors slightly more than a

21       hundred days notice of the bar dates.

22       That's about five times what Bankruptcy

23       Rule 200287 requires.  But this is a

24       larger case and we thought it was

25       important to give a more extended notice
```

```
1        DELPHI CORPORATION                    30

2        period.  We also proposed, Your Honor, to

3        give notice of the bar date by
```

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

4        publication in almost 40 separate

5        international, national and local

6        editions.  That would occur on or about

7        April 21st, 2006, and we've listed the

8        publications that would -- in which those

9        notice would be filed.  Your Honor, I'm

10        not going to go through, particularly in

11        light of the lack of objection from any

12        party, I'm not going to go through who

13        the bar date would apply to and who would

14        be excluded.  Those are outlined clearly

15        in the procedures.  We do provide,

16        however, that this bar date arrangement

17        as to the parties that it applies to, for

18        the general bar date, would have

19        preclusive effect.  That the failure to

20        file a proof of claim would, in fact,

21        cause someone who's not otherwise listed

22        as undisputed and otherwise allowable

23        under the schedules, would preclude them

24        from being forever able to assert a claim

25        against the debtors as -- and other

1        DELPHI CORPORATION              31

2        parties; we've indicated in the specifics

3        of the bar date notice and order.  Your

4        Honor, this is -- because of the size and

5        complexity of this case, it's a fairly

6        large undertaking to -- in terms of the

7        number of the scope of the particular

8        notice.  But we've tried to lay it out in

9        detail.  A couple of other things I would

10       note, Your Honor.  The proposed order we

11       have is slightly different than the order

12       that we had submitted.  I have a black-

13       line to present to the Court, if that

14       would be acceptable, just to make sure

15       the Court sees it.

16            THE COURT:  Okay.  That's fine.

17            MR. BUTLER:  May I approach?

18            THE COURT:  Yes.

19            MR. BUTLER:  Your Honor, the

20       primary change's here are in Paragraph 10

21       and this just has to do with the filing

22       of master proofs of claim -- it's a

23       master proof of claim provision for the

24       pre-petition lenders which the pre-

25       petition lenders asked to have inserted.

```
 1          DELPHI CORPORATION              32

 2          I should indicate to you, we've also had

 3          discussions with the Pension Benefit

 4          Guaranty Corporation about the filing of

 5          their claims and they've indicated to us

 6          that they intend to bring a separate

 7          motion on to get authority from the Court

 8          in how they would file their claims,

 9          which they assert would be against each

10          and all of the debtors.  And they have a

11          number of different claims they'd file as

12          to each and they will bring that on by

13          separate motion.  We've spoken about

14          that.

15               THE COURT:  Okay.

16               MR. BUTLER:  Your Honor, I don't

17          have anything else for the Court unless

18          the Court has questions or comments.

19               THE COURT:  Well, I guess, as you

20          did with the indenture trustees and the

21          bank agent, I was wondering had you had

22          any discussion with the unions?  I had

23          some concern that individual employees

24          might feel that -- not relating to any
```

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

25          personal claims they may have, but just

1          DELPHI CORPORATION                    33

2          because of the issues that have been

3          percolating involving the unions, that

4          they might feel that they would have to

5          file a proof of claim for that purpose.

6          Is there any concept of, you know,

7          telling people in the notice, or the

8          unions telling their own people, so that

9          they wouldn't inundate us with, you know,

10         20,000 claims just on that basis?

11              MR. BUTLER:  Your Honor, we've had

12         some discussions about that.  There's a

13         specific carve-out with respect to any

14         claims relating to post-retirement health

15         benefits, OPEB and pension benefits.

16              THE COURT:  I was more focused on

17         the notice than the order.  And if the

18         union is going to be giving people that

19         type of notice, that's fine.  I just

20         don't want people to feel like they're

21         doing something when they don't have to.

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

22          MR. BUTLER:  Our concern, Your

23      Honor, is that if an employee has some

24      other claim they want to provide --

25          THE COURT:  I know.

1       DELPHI CORPORATION                    34

2           MR. BUTLER:  -- we don't want to

3       find out about that or let that ride

4       through the case.

5           THE COURT:  No.

6           MR. BUTLER:  So we have provided

7       for specific exclusions that we think go

8       to the heart of the issues in the case.

9       But we're unwilling to sort of allow any

10      set of claims.  And we have one

11      employee's claim on file already, that,

12      you know, for seventy million or a

13      hundred million dollars, or some theory.

14          THE COURT:  Right.

15          MR. BUTLER:  And we need to be able

16      to understand those claims.

17          THE COURT:  Well, the order's fine.

18      Again, I just -- maybe this lies with the

19      unions in terms of informing their

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

20        members that -- to the extent they're no asserting

21        their own individualized claims, the

22        union will be filing a claim on their

23        behalf, or something like that.

24            UNIDENTIFIED ATTORNEY:  Thank you,

25        Your Honor.  Very much appreciate your


1         DELPHI CORPORATION                    35

2         comments.  And it was really comments

3         along those lines that we did discuss

4         with Mr. Butler's office.  We do face a

5         sort of administrative issue, you know,

6         frequently in cases.  And, I believe, I

7         haven't discussed it yet with the UAW,

8         but typically a notice or the word gets

9         out that for collectively bargained

10        matters the union files a claims on

11        behalf of the bargaining unit members or,

12        in our case, UAW represented persons, but

13        that there would be a difference for

14        specific non-collectively bargained

15        claims.

16            THE COURT:  Right.

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

17          UNIDENTIFIED ATTORNEY:  But I very

18     much appreciate the observation.

19          THE COURT:  All right.  Well, I'm

20     not going to impose that burden on the

21     union or the unions, but I think it would

22     be useful for the them to consider

23     sending out a notice like that somehow,

24     however they communicate with their

25     members, so that they wouldn't feel like


1      DELPHI CORPORATION                    36

2      they have to file claims for collectively

3      bargained claims.

4          UNIDENTIFIED ATTORNEY:  Your Honor,

5      I'll see how they've done it in the past.

6      I'm sure there's a communication

7      apparatus that we can take advantage of.

8          THE COURT:  Okay.

9          MR. KENNEDY:  Your Honor, I just

10     wanted to note for the IUE, Tom Kennedy

11     for the IUE.  To the extent there's an

12     unresolved 1113 issue pending at time of

13     the bar date, I would hope the Court

14     would consider extending that bar date

15      for the purpose of both enabling any

16      claims that have to be made, whether

17      they're individual or on behalf of our

18      unions.

19          THE COURT:  Well, that would be

20      down the road.

21          MR. ROSENBERG:  Your Honor, the

22      changes in this document had not been

23      discussed with the committee, nor had I

24      seen this proposed order before.  So I

25      would simply ask the Court's indulgence

1       DELPHI CORPORATION                    37

2       before you sign it to give us a

3       reasonable opportunity to review it.

4           THE COURT:  Okay.

5           MR. ROSENBERG:  Thank you.

6           THE COURT:  All right.  That's

7       fine.  Again, the changes -- as I

8       understand it, they go just to letting

9       the bank agent file a master proof of

10      claim.

11          MR. BUTLER:  Right.

12          THE COURT:  And picking up

13     subordinated indenture trustees as well

14     as regular ones.

15          MR. BUTLER:  Correct, Your Honor.

16     I don't know why --

17          THE COURT:  I think, knowing the

18     abilities of the two counselors who spoke

19     up, it won't take too long to review it.

20     Probably, we'll get it on Monday.

21     Otherwise, it appears to me to conform to

22     the guidelines here for bar date orders

23     and notices.  So with that caveat, unless

24     I hear something by Monday, it will get

25     entered.


1          DELPHI CORPORATION                    38

2          MR. BUTLER:  Thank you, Your Honor.

3     Your Honor, before we move to the

4     contested docket, can we take about a ten

5     minute recess, please?

6          THE COURT:  Okay.  All right.

7          MR. BUTLER:  Thank you.

8          (Recess at 10:42 a.m.)

9          THE COURT:  Please be seated.  All

10      right, we're back on the record in

11      Delphi.

12          MR. BUTLER:  Thank you, Your Honor.

13      And thank you for the recess.  Your

14      Honor, I wanted to address the balance of

15      the hearing, and get some guidance from

16      the Court.  We have under contested

17      matters, just to run through them with

18      Your Honor, so Your Honor's aware of how

19      to proceed today.  The interim

20      compensation matter I have brief

21      presentation but there is an agreement in

22      principle between the United States

23      Trustee, the creditors' committee and the

24      debtors about the form of order and the

25      protocol.


1       DELPHI CORPORATION                    39

2           THE COURT:  Okay.

3           MR. BUTLER:  I'll describe that to

4       you in a few minutes.  Number 9,

5       Cherokee, is the first of two evidentiary

6       hearings.  I expect it to be the shorter

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
7          of the two hearings.  And this goes to

8          whether or not Cherokee can demonstrate

9          cause under 365(d)(2) to change or to get

10         carved out of the prior 365(d)(4)

11         extension.  We have then three lift stay

12         motions, O'Neill, Offshore Group and

13         Automotive Technologies which are not

14         evidentiary hearings but they are final

15         hearings.  But there is no testimony

16         planned in those three hearings.  Matter

17         number 13, is the Human Capital Hourly

18         Attrition Program motion.  It is an

19         evidentiary hearing.  It is contested and

20         I expect that to take the balance of the

21         time that we'll have for the hearing

22         today.  And then 14 and 15, the motion to

23         compel production of GM documents in the

24         joint interest agreement I think are very

25         limited, are not evidentiary in nature.
```

```
1          DELPHI CORPORATION                    40

2          And one may, in fact, may be resolved.

3          But there's some statements that need to

4          be made on the record.  And the number
```

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 5      16, the Bank of America summons matter

 6      has been adjourned to the May 12th

 7      hearing, with Your Honor's permission.

 8              THE COURT:  Okay.

 9              MR. BUTLER:  So, what I was going

10      to try to suggest, and so people can give

11      some preparation, Your Honor, and be able

12      to know what's going to happen today, I

13      was going to suggest that we try to get

14      through all the agenda matters but for

15      the Hourly or the Human Capital Hourly

16      Attrition Program before the lunch break.

17              THE COURT:  Okay.

18              MR. BUTLER:  And then come back at

19      whatever time Your Honor sets.  I was

20      thinking we can get done by 12:30 with

21      everything else and then come back, if it

22      makes sense to the Court, around 1:30 and

23      begin that hearing.  For the people who

24      are in the courtroom who are here only

25      for that purpose, don't necessarily have
```

```
 1      DELPHI CORPORATION                    41
```

2       to sit through 90 minutes of other

3       matters.

4               THE COURT:  All right.  That sounds

5       fine to me.

6               MR. BUTLER:  Okay.  So, if there's

7       anybody -- just before we move forward

8       into the docket, if there's anybody in

9       the courtroom who is here only on item

10      number 13, agenda item number 13, that

11      matter will not be brought up before 1:30

12      this afternoon.  So if anybody wants to

13      excuse themselves at this point, I'll

14      just take a minute before we do that.

15      And then, Your Honor, we would move on

16      beginning with the interim compensation

17      matter.

18              THE COURT:  Okay.

19              MR. BUTLER:  Your Honor, the next

20      matter on the agenda is the interim

21      compensation matter.  This goes back to

22      docket number 11, one of our first day

23      orders.  It's been carried on a number of

24      months as the U.S. Trustee, the

25      creditors' committee, the debtors have

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
1        DELPHI CORPORATION                    42

2        been trying to navigate through the

3        debtor's proposal for the formation of a

4        committee.  Your Honor on March 8th

5        entered an order that basically directed

6        that today would be a final hearing on

7        this matter, absent an agreed order

8        between those three parties.  I can

9        report to Your Honor that we have an

10       agreement in principle as to the form of

11       order and the fee committee and fee

12       procedures protocol.  I just want to

13       outline the material deviations from the

14       protocol that was submitted to Your

15       Honor.  We're going to finish drafting it

16       up over the weekend and, with Your

17       Honor's permission, submit it to chambers

18       on Monday.  But that would be for

19       settlement purposes only.  We're not --

20       we want to get the words right, but

21       understand we want to present to Your

22       Honor for Your Honor's review.

23            THE COURT:  Okay.

24            MR. BUTLER:  The fee committee
```

25          would add -- I'm paying attention now to

1           DELPHI CORPORATION                    43

2           the black-lined protocol -- but the fee

3           committee that would be established here

4           would be three voting members instead of

5           five.  Which is the request of the United

6           States Trustee, that's what it was in

7           Adelphia and they believe that will

8           function appropriately.  But they have

9           made it clear that's three voting members

10          and have acknowledged for the debtors we

11          can have multiple attendees among our

12          officers.  So our general counselor,

13          chief restructuring officer, chief

14          financial officer are going to

15          participate in the process, but the

16          debtors would have one vote.  And the

17          U.S. Trustee would be the second -- or

18          its designator would be the second and

19          the creditors' committee designee would

20          be the third.  So that's the first major

21          change.  Second change is the portion of

22          the protocol which had been in Adelphia

23          but which, at the request of the

24          creditors' committee, we have removed, is

25          one that -- is a paragraph that deals

 

1               DELPHI CORPORATION                44

2          with -- again, in composition how

3          attorneys who are retained professionals

4          might interact with this committee.  And

5          we believe, and we've all agreed -- the

6          U.S. Trustee has agreed to deviate from

7          the Adelphia protocol to make it clear

8          that retained professionals' interaction

9          with the committee will solely be in

10         connection with the official business of

11         the committee.  None of the retained

12         professionals are going to advise or

13         represent anybody on the committee with

14         respect to fee committee matters.

15              THE COURT:  Okay.

16              MR. BUTLER:  That's the second

17         change of principle.  Third, because this

18         is picking up in midstream and we'll

19         start for the third fee application

20        period that's starting in June, there is

21        a provision that would require everyone

22        in their first budgets, there's a

23        budgeting process here which the debtors

24        believe is among the most important

25        aspects of this protocol.  There is a


 1        DELPHI CORPORATION                    45

 2        requirement that everybody provide the

 3        fee committee with historical monthly

 4        information.  It had been suggested here

 5        that the people should try to allocate

 6        that historical information based on the

 7        billing task codes affirmed by the fee

 8        committee.  And it was concluded that

 9        would simply be too cumbersome.  So

10        people would give their historicals, or

11        however they billed them in their fee

12        applications in monthly comps, will

13        provide that historical information.  It

14        was also agreed, Your Honor, that a

15        deviation from a budget cannot be the

16        basis for a fee committee objection.  And

17        the fee committee can object based on,

18          you know, any number of things relating

19          to reasonableness and guidelines in the

20          statute.  But they can't use the

21          budgeting process itself for purposes of

22          using that as a basis to object.  And

23          that was -- we had earlier said that

24          shouldn't be the sole basis, but the

25          agreement with the committee and U.S.

1           DELPHI CORPORATION                    46

2           Trustee is that would not be an

3           independent basis to object.  And in the

4           last material change in the protocol --

5           actually, I think that is -- those are

6           the three material changes in the

7           protocol.  We all have reserved the right

8           to wordsmith over the weekend for

9           clarification purposes, but none of those

10          changes would be material from that which

11          is in the protocol submitted to Your

12          Honor and as I have placed on the record.

13          But we'll otherwise submit an agreed

14          order, Your Honor, on Monday, if this

15        approach is acceptable to the Court.

16             THE COURT:  Okay.  All right.  The

17        approach is definitely acceptable to me.

18        I agree with you that the budgeting

19        process is by far the most important

20        aspect of this committee.  Although, I

21        also think it's valuable to have a

22        committee like this to be given the specific

23        task of dealing with fees before the fee

24        application process.  That's why I've

25        encouraged it, and the two non-

1        DELPHI CORPORATION                    47

2        governmental members are clearly

3        providing a real service to the estate

4        and they're doing so really just in

5        return for getting their expenses paid,

6        so it's very valuable.  I note, that

7        there's simply a reservation with regard

8        to a possible future retention of a fee

9        examiner.  As I've said before, I think

10        that, at best, those sorts of examiners

11        are somewhat valuable because they have

12        computer programs to scan fee

```
13        applications.  But it's my hope that at

14        some point Congress will appropriate

15        money to the U.S. Trustee's office so

16        they can develop their own computer

17        program that they can apply to all cases

18        and get around this expense which, I

19        think, may be warranted in some cases.

20        But the government should come up with

21        the money so that they could do it

22        themselves.

23            MR. BUTLER:  Thank you, Your Honor.

24        So --

25            THE COURT:  So, I'll look for that
```

```
1         DELPHI CORPORATION                    48

2         order and obviously everyone's rights are

3         reserved.

4             MR. BUTLER:  Thank you, Your Honor.

5             THE COURT:  As to the wording, as

6         opposed to the concepts.

7             MS. LEONHARD:  Good morning, Your

8         Honor.  Alicia Leonhard, appearing for

9         the United States Trustee.  I just wanted
```

10          to echo what Mr. Butler said and thank

11          Mr. Butler and Mr. Rosenberg for working

12          very hard to come up with an agreement.

13          I also wanted to ask if I can be excused,

14          Your Honor, I have pressing business in

15          the office.

16              THE COURT:  Yes, that's fine.

17              MS. LEONHARD:  Thank you very much.

18              THE COURT:  Okay.

19              MR. BUTLER:  Your Honor, the next

20          matter on the agenda is the Cherokee

21          motion directing assumption or rejection.

22          As I indicated, this is a request by

23          Cherokee North Kansas City, LLC, at

24          docket number 1834, to seek an order

25          under 365(d)(2) to shorten the time that

1               DELPHI CORPORATION                 49

2           the debtors have to assume or reject a

3           particular on residential or property

4           lease.  And since the movant has the

5           burden of proof, we'll cede the podium to

6           counsel representing Cherokee.

7               THE COURT:  Okay.

8           MR. GARFIELD:  Good morning, Your

9      Honor, Daniel Garfield appearing on

10     behalf of Cherokee North Kansas City,

11     LLC.  Your Honor, the parties have, I

12     believe, submitted to the Court a joint

13     binder with exhibits and joint exhibit

14     binder listing the various court papers

15     and exhibits that are relevant to the

16     motion.

17           THE COURT:  Okay.

18           MR. BUTLER:  And, Your Honor,

19     there's an agreement that Exhibits 1

20     through 27 would be admitted into

21     evidence.

22           THE COURT:  Okay.

23           (Exhibits 1 through 27 hereby

24     received into evidence)

25           MR. GARFIELD:  That's correct, Your


1      DELPHI CORPORATION                50

2      Honor.  Your Honor, Cherokee's arguments

3      are set forth in total in papers we

4      submitted to the Court.  I go ahead and

5        waive opening statement unless the Court

6        would like to hear anything.  I know

7        there are other matters that need to be

8        heard.

9            THE COURT:  Well, I guess -- I read

10       the reply and from the reply I guess I've

11       been brought up to some extent on the

12       facts.  As I understand it from the

13       reply, there's been a new bank loan

14       entered into by Cherokee.  Correct?

15            MR. GARFIELD:  That's right, Your

16       Honor.

17            THE COURT:  And is there any

18       dispute between Cherokee and the debtors

19       as to the terms of that loan?

20            MR. GARFIELD:  The terms of the

21       loan, no.

22            THE COURT:  Okay.  So, am I right

23       that the only remaining issue, as to

24       prejudice, is the potential cloud over

25       Cherokee's ability to sell the premises

1        DELPHI CORPORATION           51

2        of the -- raised by the uncertainty as to

3       whether the debtor will assume or reject

4       the lease?

5            MR. GARFIELD:  I would not say that

6       that's the only issue.  I think the new

7       loan clarifies things to a certain

8       extent.  Although, as mentioned in the

9       reply, Cherokee did incur costs that it

10      would not have otherwise have incurred.

11           THE COURT:  But those are paid,

12      right?  I mean, that's done?

13           MR. GARFIELD:  That's correct.

14           THE COURT:  Okay.

15           MR. GARFIELD:  Well, some of those

16      costs will be incurred in the next two

17      years or so as that --

18           THE COURT:  Well, is there a

19      provision that says the bank gives back

20      the security deposit or anything like

21      that?

22           MR. GARFIELD:  The bank would give

23      back the security deposit upon payment of

24      the loan, in full, presumably upon sale

25      of the building or if Delphi goes ahead

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 1        DELPHI CORPORATION                    52

 2        and assumes the lease.

 3              THE COURT:  Okay.  So they'll give

 4        back the security deposit if Delphi

 5        assumes the lease?

 6              MR. GARFIELD:  That's correct.

 7              THE COURT:  All right.  Is there

 8        any other benefit, under the bank loan,

 9        that would happen if Delphi assumes the

10        lease?

11              MR. GARFIELD:  Any other benefit?

12        Under the loan itself, no.

13              THE COURT:  Okay.  All right.  And

14        -- okay, that's fine.

15              MR. GARFIELD:  We've made available

16        -- I tender -- we have available in the

17        courtroom today Kenneth Ho and Whitney

18        Kerr, who we submitted their declarations

19        to the Court in the binder, make them

20        available for cross examination unless

21        Mr. Springer, I believe, who has --

22              THE COURT:  Those were the

23        declarations submitted in connection with

24        the motion papers themselves?

25              MR. GARFIELD:  Yes, Your Honor.
```

```
1        DELPHI CORPORATION                    53

2              THE COURT:  Okay.  And I've read

3        those.

4              MR. GARFIELD:  Okay.

5              THE COURT:  Does anyone want to

6        cross-examine either Mr. Ho or Mr. Kerr

7        on that?

8              MR. SPRINGER:  Yes, Your Honor,

9        very briefly.  David Springer for the

10       debtors.

11             THE COURT:  Okay.  So who do you

12       want to cross-examine first, Mr. Ho or

13       Mr. Kerr?

14             MR. SPRINGER:  Mr. Ho, Your Honor.

15             THE COURT:  Okay.  Would you have a

16       seat up here, sir.

17             (The Witness Is Sworn)

18             THE COURT:  Just for the record

19       could you spell your name?

20             THE WITNESS:  Kenneth Ho.  K-E-N-N-

21       E-T-H, last name H-O.

22             THE COURT:  Okay, thanks.
```

23          MR. SPRINGER:  Yes.  Your Honor, if

24     the Court pleases, we'll hand up to Mr.

25     Ho a copy of the exhibit binder.



1          DELPHI CORPORATION                    54

2          THE COURT:  Okay.

3     CROSS EXAMINATION BY

4     MR. SPRINGER:

5          Q.    Now Mr. Ho, as I understand it,

6     you're the asset manager for the owner of the

7     facility in North Kansas City.  Is that right?

8          A.    Yes.

9          Q.    And in March of 2005, the lease

10     between your company and Delphi was extended.

11     Is that correct?

12          A.    Yes.

13          Q.    And you and your colleagues at your

14     company decided, at that point, that you

15     wanted to sell the building?

16          A.    Yes.

17          Q.    And then you hired -- or you worked

18     with Mr. Kerr, who's also here in the

19     courtroom today and he's a real estate broker

20     with respect to the sale.  Is that correct?

21      A.      He's the broker with respect to the

22   leasing of the property and the sale of the

23   property.

24      Q.      And you retained him and his

25   company to help sell the property sometime in


1           DELPHI CORPORATION                55

2   the summer of 2005?

3      A.      Actually, we had retained them

4   previous to that for leasing and potential

5   sale.  And, I believe, as I mentioned in my

6   deposition that as a find of our type, we have

7   considered selling the property.

8      Q.      In the late summer of 2005 did you

9   ask Mr. Kerr and his company to put together

10   an offering memorandum with regard to the sale

11   of the property?

12      A.      Yes.

13      Q.      And you figured -- or that memo of

14   understanding -- or the offering memo, rather,

15   was completed sometime around the end of

16   September, early October 2005?  Is that right?

17      A.      That's correct.

18        Q.     But the offering memo was actually

19   not sent out to prospective purchasers,

20   correct?

21        A.     That's correct.

22        Q.     And then you figured that it would

23   take several months, probably, after the

24   offering memo went out to actually sell the

25   property?


1             DELPHI CORPORATION                56

2        A.     We speculated that it would take

3   approximately two and a half to three months,

4   yes.

5        Q.     And your financing that you then

6   had in place was due to expire on December

7   31st, 2005.  Is that correct?

8        A.     Yes.

9        Q.     And then you learned about Delphi's

10   bankruptcy filing shortly after it happened by

11   reading about it on the internet?

12        A.     The official filing, yes, on

13   October 9th or thereabouts.  We read the

14   articles on the internet about the impending

15   or the chances of that.

16          Q.      And then you also learned about the

17    motion that the debtors had filed to extend

18    the times within which they would have to

19    assume or reject the lease.  Correct?

20          A.      Yes.

21          Q.      And you learned about that sometime

22    in early November of 2005?

23          A.      That's correct.

24          Q.      You reviewed the motion and you

25    understood that you had an opportunity to


1                   DELPHI CORPORATION                    57

2    respond and object to the motion if you wanted

3    to, right?

4          A.      Yes.

5          Q.      And you decided, under your advice

6    of counsel, not to object to the motion at the

7    time.  Isn't that true?

8          A.      Yes.

9          Q.      After the bankruptcy was filed, but

10    sometime before November 29th, 2005, you

11    decided not to sell the property.  Is that

12    correct, sir?

File://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

13        A.    Yes.

14        Q.    And you went ahead then and

15   refinanced the loan.  Correct?

16        A.    We refinanced the loans by January

17   30th.

18        Q.    And the interest rate on the loan

19   is the same as it was -- on the new loan is

20   the same as it was on the old loan, right?

21        A.    Yes.

22        Q.    There was also some closing costs,

23   right?

24        A.    Yep.

25        Q.    And you would have incurred those


1            DELPHI CORPORATION              58

2    closing costs whenever you had to refinance,

3    right?

4         A.    If we had to refinance the loan, we

5    would have most likely incurred those closing

6    costs, yes.

7         Q.    Now with regard to the valuation of

8    the property, do you have that subject matter

9    in mind, sir?

10        A.    Yes.

11          Q.     Is it true that you never did any

12    analysis taking into account the valuation of

13    the property if the debtors rejected the

14    lease?  Isn't that true?

15          A.     Yes.

16          Q.     And it's also true that you never

17    did a valuation of the property taking into

18    account whether the debtors assume the lease.

19    Isn't that also true?

20          A.     Well, no, that's not completely

21    true.

22          Q.     Well, is it true that you did not

23    do a comprehensive analysis taking into

24    account the debtor's assumption of the lease?

25    Is that true?



1             DELPHI CORPORATION                59

2          A.     I guess it depends on what you

3    would say is a comprehensive analysis.  We did

4    consider how that would be interpreted by the

5    market.  But did not specifically know what

6    that valuation would be to a specific number,

7    no.

8    Q.    Were you asked these questions and

9    did you give these answers at your deposition

10    at page 67, line 19?  "Did you do an analysis

11    related to or taking into account whether, if

12    the debtors rejected the lease?"  Answer:

13    "No."  Question: "Did you do analysis taking

14    into account if the debtors assumed the

15    lease?"  Answer:  "We -- no.  We did not do a

16    comprehensive analysis based on that, no.  We

17    did -- we did think about what the income

18    would be, you know, based on that and for that

19    time period.  The difficulty is what

20    conditions would be around in terms of what

21    that acceptance would be, so we didn't.  We

22    never had a full answer as to what that would

23    be from, from Delphi's side.  So it's

24    impossible to underwrite it."  Was that your

25    testimony under oath at your deposition?


1        DELPHI CORPORATION                    60

2    A.    Yes.

3        MR. SPRINGER:  No further

4    questions, Your Honor.

5        THE COURT:  Okay.  Any redirect?

6    REDIRECT EXAMINATION BY

7    MR. GARFIELD:

8        Q.    Mr. Ho, why did Cherokee not do a

9    -- what Mr. Springer called a comprehensive

10   valuation of the property if the Delphi lease

11   were rejected?

12       A.    I think that we were planning on

13   doing that once we had indication as to

14   whether or not they were going to accept or

15   reject the lease and because there we would

16   have had to incur a considerable amount of

17   cost in order to perform that kind of

18   analysis.

19       Q.    Well, did Cherokee have any sort of

20   understanding as to what rejection of the

21   Delphi lease would have upon the valuation of

22   the property?

23       A.    Yes.  It would significantly

24   decrease the value of the property such that

25   we would incur losses that would not be


1        DELPHI CORPORATION                    61

2    acceptable to our investors.

3          Q.     How significant of a drop in

4     valuation?

5          A.     Most likely 30 to 40 percent.

6          Q.     No further questions, Your Honor.

7               THE COURT:  Okay.  All right.  You

8          can step down, sir.  We might as well

9          leave it there.  They may want it

10         available for the next witness.  Do you

11         want to cross-examine Mr. Kerr?

12              MR. SPRINGER:  Yes please, Your

13         Honor, very briefly.

14              THE COURT:  Okay.

15              (The Witness Is Sworn)

16              THE COURT:  And again, would you

17         please spell your name for the record?

18              THE WITNESS:  W-H-I-T-N-E-Y,

19         K-E-R-R.

20    CROSS EXAMINATION BY

21    MR. SPRINGER:

22         Q.     Mr. Kerr, is it true that in the

23    summer of 2005 you were retained by the owner

24    of the facility in North Kansas City to help

25    out with trying to find a prospective buyer?

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 1        DELPHI CORPORATION              62

 2        A.    Yes.

 3        Q.    And in that connection, turn to

 4   Exhibit No. 11.  Exhibit No. 11 is a

 5   spreadsheet that your company prepared to help

 6   in connection with figuring out what a

 7   prospective buyer might be expected to achieve

 8   on the resale of the property, right?

 9        A.    Yes.

10        Q.    And turn to page 4 of Exhibit 11.

11   Do you have that in front of you, sir?

12        A.    I don't see the page numbers marked

13   on here.

14        Q.    It should be copied on --

15        A.    Oh, here, I see it.

16        Q.    Okay.  And the line that says gross

17   proceeds from sale.  That's your estimates of

18   what would be obtained from the sale of the

19   property at those various times.  Is that

20   true?

21        A.    Yes.

22              MR. SPRINGER:  I have nothing

23        further, Your Honor.

24              THE COURT:  Okay.  Any redirect?

25              MR. GARFIELD:  I have no questions,
```

```
 1        DELPHI CORPORATION                    63

 2     Your Honor.

 3          THE COURT:  All right.  You can

 4     step down, Mr. Kerr.

 5          MR. BUTLER:  Your Honor.  Do you

 6     have anything else in your -- any other

 7     evidence?

 8          MR. GARFIELD:  I don't know if -- I

 9     was planning on cross-examining Mr.

10     Sheehan.  But I --

11          THE COURT:  No.  But I mean on your

12     case.

13          MR. GARFIELD:  Oh no.  That's all

14     the evidence we have, Your Honor.

15          MR. BUTLER:  Your Honor, we would

16     present John D. Sheehan, the company's

17     chief restructuring officer for cross

18     examination in connection with his

19     declaration in support of the debtor's

20     objection that's filed at docket number

21     3131.

22          THE COURT:  Okay.  All right.  And

23     you want to cross-examine Mr. Sheehan,
```

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

24       right?

25              MR. GARFIELD:  Yes, please, Your

1           DELPHI CORPORATION                64

2       Honor.

3              THE COURT:  Okay.

4              (The Witness Is Sworn)

5              THE COURT:  And for the record,

6       would you spell your last name?

7              THE WITNESS:  Sheehan.

8       S-H-E-E-H-A-N.

9    CROSS EXAMINATION BY

10   MR. GARFIELD:

11       Q.     Mr. Sheehan, the transformation

12   plan that the debtors announced last week, the

13   debtors announced that they plan to retain

14   eight core businesses.  Isn't that correct?

15       A.     We disclosed that we intended to

16   retain eight manufacturing facilities in the

17   United States, yes.

18       Q.     And there's -- the debtors also

19   intend to retain certain core -- what they're

20   calling core businesses, right?

21          A.      Business lines, yes.

22          Q.      And the manufacturer of what you

23    call cockpits is not one of those core

24    businesses?

25          A.      That is correct.


1               DELPHI CORPORATION                    65

2           Q.      Now, it's the debtor's intention to

3     sell their cockpit business.  Isn't that

4     right?

5           A.      It is our intention to dispose of

6     our cockpit business line, yes.

7           Q.      But the first -- the debtors are

8     first going to attempt to sell it rather than

9     wind it down or liquidate it?

10          A.      Yes, sir.

11          Q.      Okay.  And the debtors expect that

12    they will, in fact, sell those businesses?

13          A.      It would be our fervent hope, yes.

14          Q.      And there are a number of matters

15    that the debtors need to go through or resolve

16    before they can go ahead and sell those

17    businesses, such as negotiations with General

18    Motors?

19          A.    There are a number of matters that

20    are yet to be decided in our transformation

21    plan and we are working through those matters.

22    We have indicated -- the announcement from

23    Friday was what our transformation plan was

24    and we hope to resolve all of those matters as

25    expeditiously as possible.


1               DELPHI CORPORATION               66

2          Q.    Well, a significant part of the

3    debtor's cockpit business is with General

4    Motors, correct?

5          A.    That is correct.

6          Q.    So you'll need to negotiate with GM

7    with respect to the cockpit business.

8    Whatever those negotiations are, you'll need

9    to have some negotiations with General Motors

10   in order to sell that business?

11         A.    Certainly a prospective buyer of

12   the cockpit business is going to want to

13   understand what their ongoing business

14   relationship in the future would be with

15   General Motors, yes.

16          Q.     All right, now the debtors have not

17    started any sale process of any kind with

18    respect to the cockpit business?

19          A.     That is correct.  We are readying

20    for sale at the current time.

21          Q.     I'm sorry.  You're readying it for

22    sale?

23          A.     We are beginning the process, as we

24    announced on Friday, we would be disposing of

25    that business line and we are preparing to

1              DELPHI CORPORATION                    67

2    start that process, yes.

3          Q.     And that process would take at

4    least six to nine months?

5          A.     At least.

6          Q.     All right.  Now, it's Delphi's hope

7    that they would be able to sell the cockpit

8    business before the plan of reorganization is

9    confirmed, if in fact that happens.  Would

10    that be fair to say?

11          A.     That would be our hope.  I think we

12    hope to dispose of the business and receive

13    proceeds to maximize the value of the estate

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

14    as quickly as we can.

15         Q.    The transformation plan that the

16    debtors announced says that the debtors are

17    willing to go as far as January of 2008 to try

18    and dispose of the various businesses that

19    they're disposing, correct?

20         A.    I think it says the end of 2007,

21    January 2008, yeah.

22         Q.    And the cockpit business would be

23    included in those businesses?

24         A.    That's correct.

25         Q.    The cockpit business, at the

1              DELPHI CORPORATION                    68

2    moment, is generating a net operating loss for

3    Delphi.  Is that correct?

4         A.    The business line as a whole?

5         Q.    Yes.

6         A.    Yes, it is.

7         Q.    But it is generating cash flow?

8         A.    I'm not sure I know that

9    specifically.

10         Q.    But -- well, it is a valuable asset

11    of the debtor's various bankruptcy estates?

12        A.    It is an asset of the estate and

13    it's one that we view as saleable as to its

14    value that will be determined in the future.

15        Q.    Well, the business generates

16    hundreds of millions of dollars in revenues.

17        A.    And hundreds of million dollars of

18    costs.

19        Q.    It does generate hundreds of

20    millions of dollars in revenues, correct?

21        A.    Yes, sir.

22        Q.    The North Kansas City plant that's

23    at issue in this motion, the cockpits that are

24    produced there are shipped to a nearby General

25    Motors plant, isn't that correct?

1            DELPHI CORPORATION                    69

2        A.    That's my understanding.

3            MR. GARFIELD:  I have no further

4    questions, Your Honor.

5            THE COURT:  Okay.

6            MR. SPRINGER:  No redirect, Your

7    Honor.

8            THE COURT:  All right.  You can

9        step down, sir.

10           MR. BUTLER:  Your Honor, the

11       debtors will rest on the declaration and

12       the evidence.  The other 27 exhibits have

13       been admitted, the papers.

14           THE COURT:  All right.  Well, is

15       there -- I want to make sure that the

16       exhibits that you've given to me, are

17       those -- those were attachments to the

18       various motion papers?  Is there

19       something that you want to point out to

20       me that wasn't attached to the motion

21       papers just so I --

22           MR. BUTLER:  Your Honor, I believe

23       that there have been the construction --

24       I'm not sure that all the loan agreements

25       and so forth were included here.  Mr.


1        DELPHI CORPORATION                    70

2        Springer, do you want to --

3            MR. SPRINGER:  Yeah, there are a

4        couple other matters, Your Honor, that

5        are not attached to the papers.

6            THE COURT:  Just tell me what

7       numbers they are.

8            MR. SPRINGER:  12 and 13.

9            MR. GARFIELD:  and 14, 15, 10.

10           THE COURT:  Okay.

11           MR. GARFIELD:  and everything else

12      -- under court documents, these have all

13      either been filed with respect to the

14      motions in this matter or have been filed

15      with the Court otherwise.

16           THE COURT:  Okay.

17           MR. SPRINGER:  So 10, 11, 12, 14

18      and 15.

19           THE COURT:  Okay.  And 13.

20           MR. SPRINGER:  13, excuse me.

21           THE COURT:  Okay.  So, do you have

22      any closing argument?  Or do just want to

23      rest on the papers?

24           MR. GARFIELD:  Well, I just want to

25      just point out, emphasize that the

1            DELPHI CORPORATION              71

2       passage of some time in this case since

3       the motion was originally filed, has made

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 4        it apparent what the debtors's intent is

 5        with respect to its cockpit business,

 6        including the business that it operates

 7        at the North Kansas City plant and that

 8        is that it's going to have to assume the

 9        lease in one way or another.

10            If the debtors are unable to sell

11        it prior to planned confirmation, they're

12        going to still assume it because it's a

13        valuable asset of the estate that they're

14        going to want to sell post-confirmation.

15        And if it's assumed -- rather, if it's

16        sold pre-confirmation, there's no real

17        way for it to -- it's not going to reject

18        the lease right off the bat because the

19        cockpit business is something that's not

20        easily transferable to some other

21        location.  The cockpits are produced for

22        a nearby General Motors plant.  A buyer

23        is not going to just want to shut that

24        thing down on the first day that it buys

25        the plant.
```

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

1    DELPHI CORPORATION                    72

2         THE COURT:  Isn't it quite

3    possible, though, that a buyer who would

4    take an assignment of the lease would

5    potentially want changes to it and

6    perhaps Delphi would also want to have

7    changes to it if it was going to assume

8    it before a sale was done?  Just to give

9    more flexibility?  I mean, I took away

10   from Mr. Ho's testimony that one of the

11   reasons they didn't do an evaluation is

12   because they didn't know what terms would

13   be placed upon the assumption.

14        Why should they be forced to do

15   those types of calculations now as

16   opposed to when there actually is a

17   buyer?

18        MR. GARFIELD:  Well, I guess there

19   is some likelihood that the lease would

20   be changed, but at the moment, one, we

21   don't know if that's going to happen and

22   number two, they're still going to have

23   to assume and assign the lease even

24   though they might want to have certain

25   changes.  They can't just go ahead and

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 1          DELPHI CORPORATION                    73

 2      unilaterally do that.

 3              THE COURT:  Well, no.  But what I'm

 4      saying is they may decide, depending on

 5      what a buyer wants to pay, that it's not

 6      worth doing it if it involves assuming a

 7      lease that runs to -- you know, a long

 8      term lease, unless it's substantially

 9      modified, so they put it to your client,

10      well, we'll assume it, but with these

11      changes.  And they might be material.

12              MR. GARFIELD:  Well, I think ---

13              THE COURT:  Or otherwise, we'll

14      reject it.

15              MR. GARFIELD:  I think given the

16      size of the cockpit business and the fact

17      that they want to sell the business as a

18      whole, a lease amount of one and a half

19      to two million dollars for an operation

20      that goes into hundreds of millions of

21      dollars, I don't think that's going to be

22      material to a buyer of the debtors.  It

23      will be material to Cherokee.
```

24          THE COURT:  Well, it's not hundreds

25      of millions of dollar of profit, right?

1          DELPHI CORPORATION                    74

2      So two million dollars might be a good

3      price for this -- I'm not saying that,

4      but you know, a net gain in addition to

5      assuming liabilities may not be that

6      high, at least on the record today.

7          MR. GARFIELD:  I understand that.

8      But I think, given the size of the

9      debtor's estate versus the size of

10      Cherokee's business, I think that any

11      effect on the debtor's estate -- it's

12      essentially a rounding error on the

13      debtor's financial statements.

14          THE COURT:  Okay.  Let me just ask

15      you one more question which is, the reply

16      says in paragraphs 3 and 4, and, I think,

17      you're saying today that it's obvious

18      that the debtor's going to assume this

19      lease.  If that's the case, why can't you

20      sell the building now?

21          MR. GARFIELD:  Because the market

22        is not going to be able to recognize that

23        one way or the other at this point.

24            THE COURT:  Well, if it's obvious

25        --

1        DELPHI CORPORATION                    75

2            MR. GARFIELD:  Well, because I

3        think, as a general matter, any buyer

4        who's going to see that on the market is

5        going to see a company that's in

6        bankruptcy and that makes it difficult to

7        sell.

8            THE COURT:  Okay.

9            MR. GARFIELD:  I don't think I have

10       anything further to add at this point,

11       Your Honor.  Thank you.

12           THE COURT:  All right.

13           MR. BUTLER:  Your Honor, the

14       debtors just have a couple of points of

15       emphasis.  First, as I think is apparent

16       on this record, the debtors are, in fact,

17       making progress towards a transformation

18       and a plan of reorganization.  They've

19          been moving forward in good faith and the

20          landlord acknowledges that the debtors

21          have made statements as recently as last

22          Friday about what are core and non-core

23          assets.

24              Having said that, the record's

25          clear and the examination of Mr. Sheehan


1           DELPHI CORPORATION                    76

2           makes clear that the debtors have -- and

3           the exhibits that are now in evidence

4           make clear, that the projected window for

5           the disposition of non-core businesses in

6           a way that maximizes value for the estate

7           may take up through the beginning of

8           2008, through this year and the balance

9           of next.

10              Having said that, the debtors have

11          also said in that release, which is a

12          matter in evidence now, that the debtors

13          hope to emerge from Chapter 11 by the end

14          of the second quarter of next year.  That

15          happens to be the same period of time

16          that the 365(d)(4) deadline currently

17        exists, which is June of next year.

18              And the question, I think, before

19        the Court is whether under the Second

20        Circuit precedent that has Cherokee

21        carried their burden to establish cause

22        of something new, since they declined to

23        object to the original 365(d)(4)

24        deadline, which is applicable to them.

25        The order that it was entered there

1         DELPHI CORPORATION                  77

2         allowed them to come back to court if

3         they could establish cause.

4               And the only two things that have

5         happened on this record since then, or

6         three things, are they have conceded they

7         have not marketed the property for sale,

8         number one.  Number two, they have gotten

9         new financing in place.  The record is

10        clear that the reserve account that

11        they're funding, they're being paid

12        interest on and it's a negotiated term

13        they negotiated in connection with that

14          financing.  And they're being compensated

15          for the reserve.  And the balance of

16          their argument goes to valuation issues

17          and their own broker's testimony and the

18          evidence that's before the records.  His

19          testimony says that the value they would

20          get towards the middle of next year would

21          fully compensate them and that they're

22          not prejudiced at all if they sold at

23          that period of time.

24              So, I don't understand, Your Honor,

25          how there's any demonstration of cause

1          DELPHI CORPORATION                    78

2          here as to why this ought to be

3          shortened.  It will be, I think, a

4          challenge for the debtors along with this

5          and the other 90 leases that the debtors

6          have.  Because these are not just small

7          stores, these are large plants, for the

8          most part, that the debtors will have a

9          challenge on sorting out the assumption

10          rejection formula for these -- as they're

11          marketing these businesses over the next

File://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
12        18 months.

13              And we basically said we're going

14        to try to get it all done by next June,

15        no later than next June in terms of this

16        reorganization, even though the actual

17        marketing may continue beyond emergence

18        for some of the business lines.

19              THE COURT:  Okay.  All right.

20              MR. ROSENBERG:  Your Honor, very

21        briefly.  The debtor just announced this

22        transformation plan and Mr. Sheehan just

23        testified that the process of marketing

24        is just beginning, just starting, hardly

25        begun at all.  Your Honor in his
```

```
1         DELPHI CORPORATION                 79

2         questions, focused on a successful sale

3         and the need, perhaps, to amend the lease

4         as a negotiation with the landlord for an

5         assumption in the context of a particular

6         deal.

7               But my job, Your Honor, is to look

8         at the down side at worst case.  And
```

9        while we certainly hope and expect that

10       any marketing program will be successful

11       and will result in the generation of

12       benefits for the estate, sitting here now

13       with a process that hasn't even begun,

14       there is no way, whatsoever, of knowing

15       that that will be the case.  No way,

16       whatsoever, of knowing that at the end of

17       the day, the process that may be better

18       for the estate is in fact a rejection of

19       this lease.

20              And therefore, Your Honor, to

21       cause the debtor to make a decision

22       today, simply is not in the best interest

23       of the estate.  And as Mr. Butler just

24       summarized, we heard nothing from the

25       landlord to suggest that the balance of

1        DELPHI CORPORATION                80

2        hurt lies otherwise.

3          THE COURT:  Okay.  All right.  I

4        have in front of me a motion by one of

5        Delphi Automotive Systems, LLC's

6        landlords, Cherokee North Kansas City,

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 7         LLC, to shorten the time under Section

 8         365 of the Bankruptcy Code for the debtor

 9         to determine whether to assume or reject

10         its lease.

11              As the Second Circuit laid out in

12         In re Burger Boys, Inc., 94 F.3d 755,

13   761 (2d Cir. 1996), in

14         connection with requests to determine

15         "cause" under Section 365, although there,

16         as an aside, the Court was determining

17         cause for an extension as opposed to

18         cause for termination of the time to

19         assume or reject,

20         the Second Circuit set forth

21         various factors that the bankruptcy court

22         should consider when determining whether

23         cause exists or not, although cautioning

24         that those factors should not be applied

25         in a mechanical or formulaic manner.
```

```
 1         DELPHI CORPORATION                    81

 2              Cherokee has the burden here to show cause

 3         to require a shortening of the time to assume or
```

```
 4        reject the lease because that is what my order,

 5        previously extending the assume or reject period,

 6        Provided.  That order was dated November 29, 2005.

 7            Now, I don't agree with the debtor

 8        that Cherokee is estopped from seeking to

 9        shorten the assume or reject period

10        provided in that order, because the order

11        did recognize the right of a landlord to

12        come in and seek a shorter period for

13        cause.  But obviously, under the order,

14        Cherokee does have the burden.

15            In going through the factors made

16        out by Burger Boys and subsequent cases,

17        I conclude that it has not carried that

18        burden.  The first factor is whether the

19        debtor is paying for its use of the

20        property.  And it is undisputed that the

21        debtor is paying for use here.

22            I should note that Burger Boys

23        reversed the lower courts for directing

24        the end of the assume-or-reject period

25        simply because the debtor was not paying
```

```
 1        DELPHI CORPORATION                    82
```

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

2        and said, that even if the debtor was not

3        paying, there might be other reasons to

4        continue the assume-or-reject period.

5              But here, of course, the debtor is

6        paying and that's a strong factor for

7        continuing the debtor's ability to decide

8        whether to assume or reject to a later

9        date.

10             Secondly, I need to inquire whether

11       the debtor's continued occupation of the

12       premises damages the landlord beyond

13       compensation available under the

14       Bankruptcy Code.  As far as this record

15       provides, I believe that to the extent

16       there is any damage whatsoever that would

17       not be compensable under Section 502 of

18       the Bankruptcy Code or alternatively, if

19       for some reason the debtor stop paying

20       under section 507, it is negligible.

21             The debtor has pointed out that the

22       landlord did, in fact, successfully

23       refinance its loan, which it knew it

24       would have to do in the fall of 2005,

25       since the loan expired at the end of that

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 1      DELPHI CORPORATION                    83

 2      year and that the finance charge was a

 3      charge that would have been incurred in

 4      any event and that the interest rate did

 5      not change.

 6            The only added burden on the

 7      landlord, in connection with that

 8      refinancing, was the requirement to put

 9      up an additional amount of cash that

10      eventually will aggregate 200 thousand

11      dollars, which is being held at interest

12      as security for breach of the lease.

13      Because it's being held as interest, the

14      only real damage there, is the

15      difference between that interest rate and

16      the amount that Cherokee could earn over

17      and above that interest rate, separately.

18            Cherokee says it's also damaged

19      because it's not able to sell the

20      property, given the debtor's bankruptcy

21      case and the uncertainty over the lease.

22      I believe, however, this factor was not

23      contemplated when the Second Circuit laid

24      out the consideration of whether the
```

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

25          lessor would be damaged beyond the

1          DELPHI CORPORATION                    84

2          compensation available under the Bankruptcy Code.

3              The relationship between Cherokee

4          and the debtor is a landlord tenant

5          relationship.  In that relationship, the

6          debtor is not obligated to enhance the

7          landlord's ability to sell the property

8          and it's clearly recognized that merely

9          the fact of a debtor being a debtor under

10         the Bankruptcy Code is not a reason to

11         terminate a lease or to compel assumption

12         or rejection of it simply because that fact

13         would somehow make it harder for a landlord to

14         sell its property.  If that were the case, debtors'

15         time to assume or reject the lease would almost as a

16         matter of course be terminated.

17             Moreover, as the landlord points out, given

18         Delphi's current statement that it intends to sell

19         its cockpit manufacturig line, and consequently

20         that the likelihood that eventually the line will

21         be sold and consequently the facility in

22          Kansas City will go along with that sale,

23          Cherokee's ability to sell the premises

24          premises should significantly improve,

25          provides better clarification for

1          DELPHI CORPORATION                    85

2          prospective buyers.

3               In addition, Exhibit 10 suggests

4          that, ultimately, such a sale is

5          achievable for a price to the landlord that is not

6          materially worse than what it could be

7          sold at today, after you back out the

8          amount of rent that the debtor will be

9          paying until its decision to assume or

10          reject.

11               The lease is not the debtor's

12          primary asset, but it's a significant

13          facility and it is a piece in the very

14          complicated puzzle that the debtor is

15          still putting together, with the help of

16          its various constituencies including the

17          creditors' committee, and I believe that

18          it has not had sufficient time to

19          formulate a plan, given the complexity of

20        that puzzle.

21            So, in evaluating those last two

22        factors laid out by Burger Boys, it again

23        appears to me that those factors also

24        argue for not shortening the time to

25        assume or reject.

1        DELPHI CORPORATION                86

2            I should note, finally, that the

3        Second Circuit cautioned in the Klein

4        Sleep, 78 F.3d 18, 29 (2d Cir. 1996), that

5        assumption of a lease should be avoided,

6        if possible, given the fact that if the lease

7        is subsequently breached because a debtor

8        changes its business plan or its

9        forecasted revenues, upon which the

10       business plan was based proved to be less

11       than the forecast, the claim is an

12       administrative claim, a hundred cent

13       dollar claim as opposed to a lease

14       rejection claim.  Consequently, given the

15       uncertainty as to the ultimate sale and

16       the terms of the ultimate sale, including

17        the terms by which the lease might be

18        assumed, all of which will not become

19        completely clear, it appears on this

20        record, until the last quarter of 2007,

21        at my best estimate, it would appear to

22        me to be premature to force the debtor to

23        get into a negotiation regarding

24        assumption or rejection with the landlord

25        at this time.


1        DELPHI CORPORATION                    87

2            The prospect of a sale, I'd agree,

3        is quite strong.  But that should be

4        additional protection for the landlord,

5        since that should lead, ultimately, to

6        assumption of the lease and, if not full

7        payment, because the lease may be

8        renegotiated to some extent, at least a

9        much better result than rejection.

10           But given the uncertainties here

11       and the fact that the debtor's paying

12       currently, the debtor should not be

13       forced to get into those negotiation and

14       decision making process at this time.

15          So, Mr. Butler, you can submit an

16     order denying the motion for the reasons

17     stated.

18          MR. BUTLER:  Thank you, Your Honor.

19     Your Honor, the next matter on the agenda

20     is matter number 10.  It's the O'Neil

21     lift stay motion.  And this was filed by

22     Mary O'Neil and Liam O'Neil at docket

23     number 2748.  We filed a response at

24     docket number 3051.  I understand there

25     was a reply filed last evening and this


1          DELPHI CORPORATION                88

2     is the movant's burden and I will cede

3     the podium to them.

4          MR. GARFIELD:  Your Honor, if I may

5     be excused, I have to --

6          THE COURT:  Yes, that's fine.  I

7     guess my first question is, are you

8     proceeding with this or did you want

9     discovery?  As I read the response, you

10     said you wanted some discovery on the

11     insurance policies?

```
12              MR. MENAKER:  Yes, good morning

13        Your Honor.  Richard Menaker,

14        representing the O'Neils.

15              THE COURT:  Okay.

16              MR. MENAKER:  The answer on that

17        is, we don't see in the debtor's papers,

18        they haven't submitted a declaration or

19        any supporting material, but they do

20        refer to docket 1559 which refers to

21        insurer's arrangements that the Court is

22        undoubtedly more aware of than we were.

23        We have studied those documents; don't

24        understand how they support their

25        position.
```

```
1         DELPHI CORPORATION                89

2              But if, in fact, there is an issue

3         as to whether a recovery here somehow

4         truly comes out of the pocket of the

5         debtors and if that is the contention,

6         then I think we aren't able really to

7         respond to that unless we have answers to

8         some very narrow discovery that we've

9         submitted.  And we're happy to put this
```

10    over, pending an opportunity to look at

11    the documentation.

12    THE COURT:  Okay.  I mean, the

13    other question I was going to ask you is

14    -- and if you haven't thought about this,

15    you don't have to give me an immediate

16    answer, is are the O'Neils prepared to

17    condition relief from the stay here upon

18    there being no liability to the debtors?

19    But that either directly, which I

20    understand they're doing right now,

21    they're waiving their recovery from the

22    debtors, but then also indirectly so that

23    if the debtors are right and the claim

24    just circles back to them, they would

25    waive that type of -- then they would

1    DELPHI CORPORATION          90

2    waive or at least reconsider their basis

3    for seeking relief from the stay.

4    It seems to me that -- I'm not

5    asking you that -- it's unfair for me to

6    ask you to answer that right now.  But if

7          you're going to adjourn it anyway, maybe

8          that's something to consider during the

9          few weeks when you're looking at the

10         insurance policy.

11             MR. MENAKER:  Yes.  The short

12         answer is exactly as Your Honor stated.

13         I don't have a basis to know and we

14         haven't directed the question to the

15         petitioners.  A slightly longer answer

16         is, if the documentation that were to be

17         produced and the answers to the

18         interrogatories were to reinforce what we

19         think we see in the materials already on

20         file in docket 1559, I think they would

21         probably say yes because we don't see the

22         circle.

23             THE COURT:  Okay.  All right.

24             MR. BUTLER:  Your Honor, one just

25         aspect of this in terms of the time for

1          DELPHI CORPORATION                    91

2          scheduling, Counsel, is just one of the

3          other things we were going to raise in

4          the record today.  And, Your Honor, we've

```
 5        seen some of these lift stay matters come

 6        into the Court.  We've been able to get a

 7        lot of them taken off calendar because

 8        we've been talking about putting in some

 9        kind -- at least for the tort lift stays

10        --

11            THE COURT:  Right.

12            MR. BUTLER:  -- some type of

13        procedures which we are trying to work

14        out with the creditors' committee this

15        summer as we approach the bar date, the

16        June 5 member's bar date.  And our

17        intention was to come to the Court this

18        summer with some type of a protocol to

19        address this.  Obviously, Your Honor's

20        not going to liquidate tort claims.  And

21        at some point we need to, sort of, as

22        moving to the next phase of the case

23        claim's administration.  We need to sort

24        of understand how we're going to do that.

25        And one of the things we were going to
```

```
 1        DELPHI CORPORATION                92
```

2       ask you to do, had this gone forward

3       today, would be, at a minimum, to adjourn

4       this matter until the summer docket when

5       we're going to deal with this issue

6       generally, because -- but I just say that

7       for benefit of counsel because I don't

8       want to move this to May 12th and then

9       come back --

10       THE COURT:  Well, I think the

11       O'Neils moved, so I need to -- I mean,

12       they moved for relief from the stay, so I do need to

13       determine this matter.  But I think,

14       leaving aside how to liquidate claims and

15       that's something you may want to talk

16       with them about and maybe you'll have somewhat

17       of an ad hoc agreement with them, it

18       seems to me that if it's only insurance

19       that's being sought and it doesn't come

20       back to bite the debtors some other way,

21       then it's kind of an easy issue for me

22       and I'd grant stay relief.

23       The objection says that it does

24       come back to bite you, not really in the

25       sense of you having to pay attention to it,

```
1          DELPHI CORPORATION                    93

2          but monetarily it bites you and I think

3          it's fair for you all to spend a little

4          more time going through the documents on

5          that since I don't -- they're not in

6          front of me today and I don't think

7          counsel's prepared to go through them

8          today.  So I'm going to adjourn this to

9          the 12th.

10             I understand that you want to do

11         these things generally in an organized

12         fashion, but I do have an obligation

13         under 362(e) and I'll stick to that by

14         adjourning it to the 12th and treating

15         this as the preliminary hearing and

16         hoping that the parties may reach

17         agreement so they don't actually have to

18         come back here on the 12th.

19             If it comes down to just how to

20         liquidate the claim, even though you

21         haven't reached a comprehensive program

22         and this won't serve as a basis for a

23         comprehensive program, I think you can

24         probably reach some basis to deal with
```

25        that issue.

1        DELPHI CORPORATION                    94

2              MR. BUTLER:  Thank you, Your Honor.

3              MR. MENAKER:  One further question,

4        Your Honor.  Did the Court give any

5        consideration to the narrow requests we'd

6        made and so that we don't have a later

7        issue about this, that we tried to be

8        very limited and unburdensome in the

9        request that we're proposing.  And does

10       the Court have any views on that?

11             MR. BUTLER:  We'll be happy to work

12       out discovery --

13             THE COURT:  Yeah, well, as far as

14       discovery's concerned?

15             MR. MENAKER:  Yes.

16             THE COURT:  It seemed to be

17       reasonable to me.  I mean, the debtors

18       raised an issue as to how the insurance

19       coverage comes back to actually cause

20       them to in fact pay the damages here,

21       which means that they would have to pay

22       attention to the trial and they could be

23       liable at the end of the day.  So as long

24       as it relates to that contention, there's

25       no problem with that.


1        DELPHI CORPORATION                    95

2             MR. MENAKER:  Thank you very much,

3        Your Honor.

4             THE COURT:  Okay.

5             MR. BUTLER:  Your Honor, the next

6        matter on the agenda is the Offshore

7        Group's lift stay motion filed at docket

8        number 2811 and there was an objection

9        filed at docket number 3025 and Mr.

10       Berger's handling this matter.

11            MR. NYE:  Good morning, Your Honor.

12            THE COURT:  Good morning.

13            MR. NYE:  For the record, I'm Kasey

14       Nye from Quarles & Brady Streich Lang,

15       appearing on behalf of Offshore.  As you

16       know, Offshore has filed a lift stay

17       motion asking the Court for authority to

18       exercise a setoff trade.  The debtors

19       objected and the objection -- we

20      fundamentally agree on most of the law in

21      relation to this.  That is, we agree that

22      the two debts must be mutual and that

23      mutuality must be between the same

24      parties standing in the same right and

25      that both debts must be pre-petition.

1      DELPHI CORPORATION                    96

2      That much we agree on.

3            The debtors attacked our motion --

4      our request for setoff in three primary

5      ways.  On the one hand, they say we're

6      not -- the setoff we seek to achieve is

7      not between the same parties in the same

8      right.  They assert that Maquilas Teta

9      Kawi, which is an affiliate of our

10      client, is the true owner of the debt to

11      the debtors.  We believe that's a

12      contract interpretation issue and I would

13      like to walk the Court through how we

14      interpret the contract to resolve that.

15            Second, the debtors also attack

16      whether or not the obligations are both

17      pre-petition.  I think we would benefit

18          from some clarification from the Court

19          about how the parties or how the Court

20          would determine that on a legal basis and

21          then the third issue that they raise,

22          primarily, are a few minor, relatively

23          speaking, factual issues regarding

24          whether or not certain individual claims

25          in both directions are pre-petition or

1          DELPHI CORPORATION                    97

2          post-petition.

3               THE COURT:  Okay.

4               MR. NYE:  So what I would propose

5          today, Your Honor, is that we attempt to

6          resolve the contract interpretation and

7          the legal issue and then take it from

8          there.

9               THE COURT:  Okay.

10               MR. NYE:  Is that acceptable?

11               THE COURT:  Well, we'll see.  I

12          don't know what the -- the third point is

13          an accounting point and I don't know

14          whether the debtors have finished the

15          accounting or not.  But I guess we'll

16          hear from them.  It may not matter,

17          depending on the first two answers.

18                  MR. NYE:  That's correct, Your

19          Honor.  And we've exchanged only initial

20          discovery with the debtors in relation to

21          that.  It's my understanding that --

22                  THE COURT:  That their last point.

23                  MR. NYE:  -- still need to be

24          provided on the last point.

25                  THE COURT:  All right.  So is the


1           DELPHI CORPORATION                    98

2           debt that is asserted to be owing to the

3           debtor here the obligation to refund the

4           VAT?

5                   MR. NYE:  Yes, Your Honor.

6                   THE COURT:  Okay.  So why don't you

7           walk me through why that's, according to

8           the movant, owed by Offshore?

9                   MR. NYE:  The first place in the

10          contract I'd like to direct the Court's

11          attention to is on page 17.  It is

12          paragraph -- page 17, article 13,

13        referring to subcontract.  That provision

14        provides that -- and I'll read it,

15        without in any way relieving it of any

16        obligation or duty otherwise undertaken

17        hereunder, Offshore will have the right

18        to enter into a subcontract with Maquilas

19        Teta Kawi to provide services hereunder

20        in Mexico.  And as the debtors correctly

21        point out, Maquilas is not a party to

22        this contract although they are

23        significant to it.

24             Next, I would like to turn the

25        Court's attention to page 8, article 5


1        DELPHI CORPORATION                    99

2        which is fees and costs.  We're in

3        subsection a single, little i.  And about

4        halfway through that paragraph, this

5        refers to the facilities fees.  What

6        Offshore provides to the debtors is a off

7        shore manufacturing operation in Guaymas

8        and Empalme and Sonora, Mexico and as

9        part of that there is use of certain

10    facilities in Mexico that actually belong

11    to Maquilas.  There's a facility fee for

12    the use of the space in Mexico in

13    relation to that.

14        The sentence starting in addition,

15    Offshore shall include in this billing an

16    amount equal to 15 percent of facilities

17    fee.  This amount shall cover Offshore's

18    obligation to Maquilas Teta Kawi to

19    advance Mexico's Value Added Tax.  Then

20    the next sentence reads, Offshore shall

21    credit client, client being the debtor

22    here, for the IVA paid on the Mexican

23    facility within Maquilas Teta Kawi being

24    able to utilize the IVA or otherwise

25    resolving -- receiving a refund of IVA

1    DELPHI CORPORATION                100

2    from the Mexican government.  And then it

3    describes how the credit is calculated,

4    which is based on the peso dollar rate at

5    the date Maquilas receives the refund.

6        Again, I would emphasize that the

7    clear obligation under the contract is

8       between Offshore and the debtor and it's

9       an obligation to provide a credit to the

10      debtor when Maquilas has use of the

11      refund.

12          Next, I would direct the Court's

13      attention to page 13, paragraph e, and

14      that is in article 6 of the agreement.

15      This is a --

16          THE COURT:  I'm sorry.  Let me just

17      hold you up for a second.  Okay.

18          MR. NYE:  This is -- among the

19      services provided by Offshore are the --

20      at the Mexican manufacturing operation,

21      the debtors have, or any client of

22      Offshore's has no legal presence in

23      Mexico.  All the liability on the taxes

24      or on employee severance and the like

25      actually belong to Maquilas.  And the

1       DELPHI CORPORATION                101

2       obligations of the -- and then Maquilas

3       and Offshore, in turn, build that

4       upstream to the client and reimbursements

5      flow back and forth which it ends up

6      resulting in some fairly complex kind of

7      accounting and detailed facts that we

8      may, at a later date, need to be working

9      out.  But in this paragraph -- and one of

10     the things that they do is that when a

11     client requires a purchase of goods in

12     Mexico and the client's representative in

13     Mexico seeks that purpose, Maquilas goes

14     and purchases it and then charges it.

15     The Value Added Tax is generally charged

16     on all such purchases in Mexico.  As a

17     Maquiladora under a battery of Mexican

18     laws, meaning that all the manufacturing

19     is going to go back to the United States.

20     Under the shelter, Maquilas has a zero

21     percent Value Added Tax rate and

22     therefore the right to a refund.

23     Paragraph E has a parallel paragraph to

24     the one we just looked at.

25          THE COURT:  I'm sorry.  And what

1      DELPHI CORPORATION                    102

2      page is this on?

3            MR. NYE:  On page 13, Your Honor.

4            THE COURT:  Okay.

5            MR. NYE:  And the last sentence of

6       this paragraph.  Well, this paragraph

7       deals with the billing for costs incurred

8       under contract at the direction of the

9       client.  And the last sentence of that

10      paragraph states that any Value Added Tax

11      -- oh, it deals with sales, with other

12      tax issues, I'm sorry -- any Value Added

13      Tax, sales tax, or other similar taxes

14      related to fees and expenses incurred

15      under this agreement will be refunded to

16      the client within 15 days of Maquilas

17      Teta Kawi/Offshore being able to utilize

18      IVA or similar tax.  Again, referring

19      back to the first paragraph we spoke

20      about on page 17, the article 13, the

21      obligation of the contractor, Offshore's,

22      and to the extent they're Maquilas's,

23      they're as a subcontractor.  So I would

24      submit to the Court that under the clear

25      and unambiguous terms of this contract,

```
 1        DELPHI CORPORATION                103

 2        the contractual relationship is between

 3        Offshore and the debtor -- one of the

 4        debtors, Delphi Automotive, LLC and that

 5        the charges that are -- that the debt

 6        that Offshore has is as a result of the

 7        tax credit in Mexico.  However, it is an

 8        obligation and a mutual obligation under

 9        the contract.

10            THE COURT:  Because of the refund

11        or credit provisions.

12            MR. NYE:  Correct.  And so that,

13        from our perspective, resolves the same

14        parties standing in the same rights and

15        interests.  The next question, and to my

16        mind the more complicated question,

17        perhaps more factually than legally, Your

18        Honor, is the timing issue.  Are these

19        going to be pre-petition or post-petition

20        obligations?  If you have additional

21        questions in relation to the parties, I'd

22        be happy to --

23            THE COURT:  No, that's okay.

24            MR. NYE:  -- address those.  Catch

25        up with my rehearsed stuff here.  It has
```

```
1        DELPHI CORPORATION                    104

2        long been the law and since this Court's

3        Judge Lifland's decision in the matter of

4        Hecht in 1984, and the cite that -- the

5        definitions of debt and claim under the

6        code apply to setoffs and that it is

7        possible to set off a claim that was

8        contingent, unmatured, unliquidated on a

9        petition date.  The cite for Hecht is 701

10       Bankruptcy Reporter page -- 41 Bankruptcy

11       Reporter page 701 at page 705.  Other key

12       cases on this are the Fifth Circuit Court

13       of Appeals decision in Braniff Airways at

14       814 F.2d, 1030 at page 1036.  I'd be

15       happy to repeat any of these, Your Honor,

16       which held that that when the

17       transactions that gave rise to the debt

18       occurred pre-petition, the debt is --

19       remains pre-petition even if the actual

20       payment or refund obligation is triggered

21       post-petition.  And I'll -- there's an

22       additional Court of Appeals case from the
```

23    Eighth Circuit called -- well, Gerth was

24    one of the parties and the cite is 991

25    F.2d 428.


1    DELPHI CORPORATION                    105

2         THE COURT:  Is that a setoff case

3    or a --

4         MR. NEY:  That is a setoff case.

5         THE COURT:  And what's the cite?

6         MR. NEY:  991 F.2d 1428 and the

7    reference page is at 1433.  And that,

8    again, held that debt in claim or co-

9    extensive for setoff purposes and

10    therefore, a debt arises for setoff

11    purposes when all transactions necessary

12    for liability to occur, regardless of

13    whether the claim is unmatured and

14    liquidated or contingent on a petition

15    date is filed.  And this squares a black-

16    letter bankruptcy law going back to post-

17    petition claims -- not rendered post-

18    petition simply because of the fact that

19    time for payment occurs post-petition.

20    There's legion authority, in that regard,

21        from this -- this very Court.  There's a

22        2000 case from In re Nextway  --

23           THE COURT:  Well, the issue is when

24        is the VAT refund earned?

25        MR. NEY:  Correct, Your Honor.


1        DELPHI CORPORATION                    106

2           THE COURT:  I mean, when does

3        Maquilas get the right to get the VAT

4        refund?

5           MR. NEY:  And to respond to the VAT

6        question, I would again, ask the Court to

7        look at the contract.  At page 12,

8        article 6, paragraph C.  No -- no I'm

9        sorry.  Let's start with -- and this is -

10        - the part of the contract that deals

11        with invoices and payments.  Now, again,

12        this intersects with Mexican law and if

13        the Court desires additional briefing and

14        cites to the Mexican law, part of it you

15        need to --

16           THE COURT:  Why didn't you raise

17        any of these issues in your motion?  And

18          just asserted that this was, basically, one

19          whole entity?

20               MR. NEY:  Well, they are separate

21          legal entities.

22               THE COURT:  No.  I know.  But you

23          didn't raise any of these issues.  I feel

24          a bit blind-sided by this and really am

25          inclined to have it be adjourned so that


1          DELPHI CORPORATION                107

2          the parties can brief the issue of when

3          does the VAT arise under Mexican law.

4               MR. NEY:  I would be happy to do

5          that, Your Honor.

6               THE COURT:  Okay.

7               MR. NEY:  I apologize.

8               THE COURT:  Okay.  But I think

9          that's -- unless Mr. Berger wants to

10          submit anything supplemental to what

11          you've just laid out to me, that's all

12          I'm going to need.  Or if there are other

13          provisions of the contract that refute

14          these provisions that were just quoted to

15          me.

16          MR. BERGER:  Your Honor, we think

17     that there's some issues from the first

18     time to the Court as well.  Certainly

19     Offshore has the burden to establish

20     cause here in their motion papers and

21     exhibits; simply do not establish cause.

22     There's no mutuality here.  I don't know

23     that we need to get into the accounting

24     issues of discovery.  I think that the

25     statements that we've heard today clearly

1          DELPHI CORPORATION                    108

2     assert -- establish, rather, that this is

3     a triangulated setoff.

4          THE COURT:  Well, is there

5     anything, I mean, the two provisions,

6     article 5(1) and article 6(e), both, to

7     my mind, seem to make Offshore liable and

8     give it direct liability for a refund

9     or a credit.

10          MR. BERGER:  It does have a direct

11     contractual obligation to us.  And what

12     they're trying to do is fund that

13          contractual obligation by pointing to

14          property of the estate in the hands of

15          others.

16                    THE COURT:  But don't they have to

17          -- don't they just have to -- whether

18          it's in a -- you don't have to get this

19          refund under these provisions, it's just

20          that Maquilas has to get it.  Does

21          Maquilas have some independent obligation

22          to give it over to you?

23                    MR. BERGER:  Under 542 they would,

24          it's property that estate.

25                    THE COURT:  So, isn't that the


1          DELPHI CORPORATION                    109

2          estate's remedy?  That you did -- that

3          the credit is asserted by way of setoff

4          but then you can get the full VAT back?

5                    MR. BERGER:  Well, I don't think

6          that -- no, Your Honor, I don't think so.

7          I don't think -- I think that's taking it

8          in reverse order.  I think that in that

9          instance Offshore is, in essence, taking

10          our property and giving the debtor the

11        burden of chasing a --

12              THE COURT:  Well, that's why I'm

13        asking you.  Is there some other

14        provision of this contract that sets up a

15        separate duty to get the refund back?

16              MR. BERGER:  No, none that I see.

17              THE COURT:  Okay.

18              MR. BERGER:  And the other -- the

19        other point I would raise, Your Honor, is

20        that counsel refers to pre versus post as

21        to when the transactions are completed in

22        a transaction.  You can't point to the

23        shelter agreement because Maquilas simply

24        isn't a party to it.  The transaction, I

25        think, that Your Honor appropriately asks

1         DELPHI CORPORATION                 110

2         questions about, is the transaction of

3         obtaining the VAT refund.

4               THE COURT:  Well, I -- that's the

5         issue that I don't know we can handle

6         today.  My preliminary view on the

7         mutuality point is that Offshore wins on

8      that one.  You can go through the

9      contract and look more closely, since

10     these provisions weren't alluded to in

11     the original motion.  But, just based on

12     these two provisions, it appears to me

13     that there is a separate debt in terms of

14     a creditor refund obligation that

15     Offshore owes the debtor.  But, as far as

16     the mutuality as to pre and post, I could

17     see two possibilities.  The first is

18     that, as you say, it arises when Maquilas

19     actually receives the refund, which would

20     certainly tie in to this language.

21     Alternatively, based on the authorities

22     that counsel cited, I could see it

23     arising when the right to the refund

24     accrued.  That is, when the -- when the

25     Mexican government owed the refund.  And


1      DELPHI CORPORATION                    111

2      I don't know whether that makes a

3      difference or not.

4           MR. BERGER:  Well, we'll take up

5      those issues.  I would say --

6            THE COURT:  I would think it would

7        be a stretch to say that it would arise

8        at the very minute that the transaction

9        that gave rise to the VAT occurred.  But,

10        I guess that's the third option.

11            MR. BERGER:  I'd agree with that,

12        Your Honor.  I would say, though, that in

13        the motion papers they do admit that

14        these VAT refunds weren't received.

15            THE COURT:  No, I know.  You win if

16        that's the case.  But, I think that the

17        argument that counsel was making, and

18        there may be some substance to it, I

19        don't know, is that the right to the

20        refund itself that the debtor -- that

21        Maquilas has -- arises, you know, at an

22        earlier date that happened to be before

23        the debtors filed. Then arguably it's

24        mutual.

25            MR. BERGER:  That is a new issue


1            DELPHI CORPORATION                112

2        raised here.

file:///C:/Documents%20and%20Settings/slank/Desktop/Delphi%200...

3           THE COURT:  And I think that

4      involves interpretation of Mexican law

5      and Mexican tax law, at that, which is --

6      I'm sure you'll have fun with.

7           MR. BERGER:  I'm sure we will.

8      Thank you, Judge.

9           THE COURT:  But I'm going to

10     adjourn it as to that issue until May

11     12th.  And again, if there's something

12     else you want to alert me to as to the

13     contract and on the mutuality of the

14     debtors --and that is Offshore and

15     Automotive Systems LLC-- you can do that

16     too.  I think, to do this efficiently,

17     I'll probably want submissions by May

18     3rd.

19          MR. BERGER:  Very good, Judge.

20          THE COURT:  Okay.  Thanks.

21          MR. BERGER:  Thank you.  May I be

22     excused Your Honor?

23          THE COURT:  Yes.

24          MR. BERGER:  Thank you.

25          THE COURT:  And you're certainly

05/11/2006 4:21 PM

1       DELPHI CORPORATION                  113

2       free to resolve it, in the meantime too,

3       by doing your accounting.

4              MR. BUTLER:  Your Honor, the next

5       matter on the agenda is the Automotive

6       Technologies lift stay motion at docket

7       number 2928.  And we've filed our

8       objection at docket number 3114.  But I'd

9       like to, for a moment, and I know that

10      movant has an opportunity to go forward

11      on this, but try to shortcut this.  I

12      would like to describe to Your Honor,

13      briefly, the stay relief that we're

14      prepared to consent to.

15             THE COURT:  Which is to the one --

16             MR. BUTLER:  Actually, it's to both

17      --

18             THE COURT:  Oh, both.

19             MR. BUTLER:  -- of them on a

20      limited basis.

21             THE COURT:  Okay.

22             MR. BUTLER:  Just so, by way of

23      background, Your Honor, in 2001 and 2003,

24      Automotive Technologies International and

25      ATI commenced two separate actions in the

```
 1         DELPHI CORPORATION                    114

 2         United States Issue Court for the Eastern

 3         District of Michigan. They alleged patent

 4         infringement with respect to two patents,

 5         one involving side-impact sensors and one

 6         involving weight sensors by Delphi, among

 7         other claims.  The District Court, in

 8         both cases, granted summary judgment and

 9         dismissed ATI's claims.  And the -- and

10         both -- and there are appeals taken by

11         ATI from both the 2001 action and the

12         2003 action.  Now the 2003 action, Your

13         Honor, is in the appellate courts and

14         fully briefed.  And we're prepared to

15         consent that the oral argument -- to lift

16         the stay for the purposes of oral

17         argument, so that the appellate courts

18         can come to conclusion on that currently

19         brief -- fully briefed appeal.  But, if

20         there's anything else that needs to be

21         done after that, the -- that Court

22         renders its decision, it would be stayed

23         and we'd have to come back to sort that
```

24      out.

25          THE COURT:  So I'm -- let me make

1      DELPHI CORPORATION                    115

2      sure I understand -- so you're prepared

3      to lift the automatic -- have the

4      automatic stay be lifted with regard to

5      the 2003 action in which the debtor's the

6      only defendant?

7          MR. BUTLER:  Right.

8          THE COURT:  Through a ruling on the

9      appeal?

10          MR. BUTLER:  Through a ruling on

11      the appeal.

12          THE COURT:  But not enforcement or

13      anything else?

14          MR. BUTLER:  Not enforcement and

15      not a further appeal.

16          THE COURT:  Right.  Okay.

17          MR. BUTLER:  It's fully briefed.

18      The only thing we're -- we think makes

19      sense is, modify the automatic stay to

20      allow oral argument to go forward and the

```
21        Court to rule.  And then we're back in

22        the automatic stay land until -- and

23        people -- we can see where we go from

24        there.

25             THE COURT:  All right.
```

```
1             DELPHI CORPORATION                116

2                  MR. BUTLER:  With respect to the

3        2001 appeal, it's a little counter-

4        intuitive because it's the earlier

5        action.  The 2001 action, Your Honor, is

6        about to be involved in mediation if it's

7        not already being mediated.  And we

8        believe it would be appropriate to

9        acknowledge that the stay can be modified

10       for that mediation to go forward, but

11       nothing further.  And the reason for that

12       is with respect to the 2001 action.  That

13       matter has not been briefed.  There is --

14       there are multiple defendants.  General

15       Motors is involved in that and they may

16       contend that Delphi owes us a contractual

17       -- owes them a contractual

18       indemnification to defend them in that
```

19        action.  There are a lot more unresolved

20        issues.  And, we believe, in addition to

21        management time, we'll spend several

22        hundred thousands of dollars in preparing

23        that case for decision.  So for 2001,

24        what we're offering is mediation -- to

25        modify the stay for mediation, but

1        DELPHI CORPORATION                    117

2        nothing more than that.

3            THE COURT:  Okay.  Well, I pose

4        the same question to both of you, which

5        is, is this -- is the request in respect

6        to the 2001 action, at this point, in any

7        event academic because it's going to be

8        in mediation anyway, or are there some --

9        is there some right to opt out of the

10        mediation with regard to certain

11        defendants?

12            MR. BUTLER:  I believe there's

13        always the ability to have a mediation

14        come to a conclusion, Your Honor.

15            THE COURT:  Well, I don't know but,

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

16          I mean, courts of appeal don't generally

17          like to hear things piecemeal.  If

18          everyone's mediating I would assume that

19          they're not going to hear it as to one

20          party --

21               MR. BUTLER:  Your Honor, our papers

22          suggested the 2001 is premature at this

23          time.  But I'm just simply saying, to

24          make it clear --

25               THE COURT:  In any event, you're


1          DELPHI CORPORATION                  118

2          prepared to do the mediation?

3               MR. BUTLER:  Absolutely, Your

4          Honor.

5               THE COURT:  Okay.  All right.

6               MR. BATTAGLIA:  Good afternoon,

7          Your Honor, Christopher Battaglia,

8          Halperin Battaglia Raicht, on behalf of

9          ATI.  Your Honor, my understanding is

10          that the mediation is already in process.

11          I think that there was an initial meeting

12          earlier this week or the end of last week

13          that the debtor's was participating in.

14        I will confirm for the record that what

15        we are looking for, and I think I

16        confirmed that earlier on to an associate

17        in Mr. Butler's office and in the papers,

18        that we are only seeking to move forward

19        with these appeals.  We just want to get

20        a decision in these appeals.  We're

21        tickled pink that they'll, you know,

22        agree to the entry of an order lifting

23        the stay in the 2003 appeal.  But we do

24        want to move forward with briefing in the

25        2001 appeal.  I think that both sides

1         DELPHI CORPORATION                119

2         agree on the law that needs to be applied

3         and the Sonnex Industries issues --

4              THE COURT:  But there's no stay of

5         -- there's no separate stay of briefing

6         given that the other 25 defendants are

7         engaged in mediation?

8              MR. BATTAGLIA:  Well, the stay is

9         for all the parties, Your Honor.  And

10        that's our problem.  I mean, the whole  -

11          -

12              THE COURT:  But given the -- I

13          mean, so, I guess that the appellate

14          court hasn't had to deal with this issue

15          because the bankruptcy stay is in place.

16              MR. BATTAGLIA:  And they are

17          looking for guidance from this Court to

18          say specifically --

19              THE COURT:  I mean, if everyone's

20          mediating anyway, why force people to

21          write briefs and have it be argued by the

22          appellate court?

23              MR. BATTAGLIA:  I can't speak for

24          the Federal Circuit, Your Honor.  It's,

25          you know, I understand the position but,


1           DELPHI CORPORATION                  120

2           you know, my client's unduly prejudiced

3           by this.  It's -- and I have to imagine

4           that the estate --

5               THE COURT:  But they're mediating.

6           Why are they unduly prejudiced?  They're

7           mediating.

8               MR. BATTAGLIA:  Well, I don't know

9     how far the mediation is going to go,

10    Your Honor.  I don't know how long  --

11        THE COURT:  Well, then you could

12    come back.

13        MR. BATTAGLIA:  -- it's going to

14    take.

15        THE COURT:  But you can come back.

16        MR. BATTAGLIA:  If that's, you

17    know, your decision, Your Honor, that's

18    it.  But I, you know, listen, I'd like to

19    proceed.  I think that we should start

20    briefing this issue and I don't think

21    that its a burden to the estate.  I

22    mean, to say that it's going to cost the

23    estate 200,000 dollars, you know.  I -- a

24    quick review of the operating reports

25    through February, shows that, you know,

1     DELPHI CORPORATION          121

2    that this estate has burned over 50

3    million dollars worth of fees.  200,000

4    dollars in the context of those numbers,

5    Your Honor --

```
6              THE COURT:  Well, they add up.

7              MR. BATTAGLIA:  Oh, sure they do.

8         Oh, they certainly do.  They certainly

9         do.  And, you know, Skadden Arps or the

10        Butler Law firm as it was AKA.  Listen,

11        they're arguably the largest, the most

12        prestigious firm in the world.  I'm quite

13        sure they have all the horses they need

14        to get this thing accomplished.  I can't

15        imagine that this is going to be a major

16        imposition on the debtor to move forward

17        on this matter.  If, again, if you look

18        at the Sonnex factors, overwhelming, we

19        have all the issues weighing in our

20        favor.  It's already been --

21             THE COURT:  All right.

22             MR. BATTAGLIA:  I mean, you've got

23        to admit also --

24             THE COURT:  If it weren't in

25        mediation, I might agree with you.  But
```

```
1              DELPHI CORPORATION                122

2         that, I think, changes everything.

3         Because the Sonnex factors compare
```

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 4        litigation in one court versus litigation

 5        in the bankruptcy court.

 6           MR. BATTAGLIA:  Sure.

 7           THE COURT:  And if there's one

 8        thing that all courts agree on is, it's

 9        better to have a consensual resolution of

10        disputes that are otherwise teed up for

11        litigation.  And I think that's the

12        distinguishing factor here.  I think

13        that's why the debtors agreed to the 2003

14        and not to this one.  I'm inclined --

15        I'll deny this.  You can always renew it

16        if the mediation -- I mean, I'll deny it

17        on the terms that the debtor's agreed to.

18        And if the mediation falls apart, then

19        you could come back and convince me that,

20        at that point, the Federal Circuit should

21        deal with it as an, you know, an expert

22        court and dispose of it.  But I think

23        that, of course I can't predict what an

24        appellate judge on the Federal Circuit

25        would say, but I think they'd be pretty
```

```
 1        DELPHI CORPORATION                123

 2        puzzled if I lifted the stay here to -- I

 3        mean, they'd say why is this judge

 4        encouraging these parties to file briefs

 5        in front of me, so, while they're all

 6        mediating.  So, I'll grant the motion

 7        insofar as it seeks relief from the

 8        automatic stay through the pending appeal

 9        in the 2003 action.  And insofar as the

10        automatic stay would apply to the

11        mediation, although I'm not sure it does

12        apply, but to the extent it does apply,

13        I'll lift the stay, and the record will

14        reflect that if the mediation is

15        unsuccessful, you can certainly come

16        back.

17            MR. BATTAGLIA:  Thank you, Your

18        Honor.  I'll submit an order later on

19        today.

20            THE COURT:  Okay.  Okay.  All

21        right.  So then we go to --

22            MR. BUTLER:  We move to matter 14,

23        Your Honor.

24            THE COURT:  Right.

25            MR. BUTLER:  And matter 14 is the
```

```
1          DELPHI CORPORATION                124

2      committee's motion to compel production

3      of GM documents where I think there's

4      been an agreement among the principal

5      parties.  Docket number 2961.

6              THE COURT:  Okay.

7              MR. ROSENBERG:  Yes, Your Honor.  A

8      stipulation which we are asking you to so

9      order was submitted jointly by General

10     Motors and the committee to your chambers

11     yesterday.  Essentially, it grants the

12     right of the committee to take 2004

13     examinations of GM but completely leaves,

14     beyond that, to the parties for

15     negotiation the sculp extent timing of

16     production, etcetera, etcetera.  So that

17     the Court will be burdened only if the

18     parties cannot agree, we'll come back to

19     Your Honor for rulings.

20             THE COURT:  Okay.

21             MR. ROSENBERG:  Thank you.

22             MR. BUTLER:  Your Honor, on that

23     aspect of this matter.  The debtors had
```

```
24         requested that the Court in its -- our

25         papers that we filed -- that the Court




 1         DELPHI CORPORATION                 125

 2         conditions approval of the stipulation

 3         filed by GM and the creditors' committee

 4         on the provision of the debtors that the

 5         product of such discovery, as well as the

 6         notice of and the pre-revision of the

 7         party to further discovery requests, if

 8         any -- we've had that conversation with

 9         the committee and General Motors.

10         They've agreed to do that.  It doesn't

11         need to be in the order and the intention

12         was to make sure that -- and we're not

13         seeking, and I'll say again to the record

14         what I've said to both of them privately.

15         The debtor's not seeking to interject

16         ourselves into the private negotiations

17         they're going to have over the scope.

18         But as the debtors-in-possession and the

19         fiduciary in this case, we do want the

20         product of what that resolves.

21              THE COURT:  So, whatever comes out
```

22        you'll get.

23             MR. BUTLER:  Whatever comes out we

24        get.  If there is anything other than --

25        if there's any discovery beyond just

1        DELPHI CORPORATION                126

2        document discovery, we get to participate

3        in that.  But what we're not doing is

4        negotiating what that is.  That is

5        between the committee and General Motors

6        as to their issues.  If we have separate

7        issues between us and General Motors, in

8        terms of information requests that we

9        can't otherwise resolve, we can -- either

10        of us can always come to the Court.

11        That's not what we're doing.  We've --

12        there is a pretty good track record in

13        this case between the company and General

14        Motors and between the company and the

15        committee on our information request.

16        So, we're not before the Court in that

17        matter.

18             THE COURT:  Okay.  All right.

19          MR. KESSLER:  Michael Kessler from

20     Weil, Gotshal & Manges for General

21     Motors.  And just to clarify what Mr.

22     Butler said, if there happens to be a

23     dispute as to the scope or timing of

24     documents between the committee and

25     General Motors, we -- our understanding

1     DELPHI CORPORATION                    127

2     of the agreement to turn over documents

3     to the debtors is that the debtors do not

4     inject themselves into that dispute --

5          THE COURT:  Right.

6          MR. KESSLER:  -- before this Court.

7          THE COURT:  Right.  Right.

8          MR. KESSLER:  And so whatever comes

9     out between the committee and the debtors

10     -- excuse me, and General Motors, we will

11     furnish to the debtors.

12          THE COURT:  Okay.

13          MR. EATON:  Your Honor, Frank Eaton

14     of White & Case on behalf of Appaloosa

15     Management.  As the Court may be aware,

16     we filed a joinder into the committee's

```
17        motion seeking to compel 2004 examination

18        of General Motors.  We had requested,

19        separately, to get a copy of the

20        stipulation and order prior to being

21        served to the Court.  And we were not

22        granted that request.  By way of

23        background, Your Honor, on March 21st

24        this Court entered an order approving the

25        -- or directing the U.S. Trustee to form
```

```
 1        DELPHI CORPORATION              128

 2        an equity committee.  Recognizing that

 3        time was of the essence, the Court issued

 4        its bench ruling on the same date and

 5        entered an order granting the motion on

 6        March 30th.  Paragraph 5 of the order,

 7        Your Honor, is germane to our request to

 8        join into the relief.  Paragraph 5

 9        states, the equity committee, once

10        appointed, needs to be informed of and to

11        relate to the debtors and other parties

12        in interest in these cases, the equities

13        committee's view with respect to, among
```

14          other things, issues involving labor,

15          pension, OPEB and GM, need to be informed

16          in respect of agreements that the debtors

17          may reach with the unions or GM.  The

18          equity committee should not inject itself

19          into negotiations between or among the

20          debtors, the unions or GM.  Thereafter,

21          Your Honor, on March 30th, the U.S.

22          Trustee submitted, or filed a letter with

23          this Court, which we understand is to be

24          distributed, or is being distributed to

25          all of Delphi's over 300,000

1           DELPHI CORPORATION                    129

2           shareholders, to solicit interest in

3           serving on the committee.  Responses to

4           that request are due on March 24th, 2006.

5           Accordingly, we believe that it is highly

6           unlikely that an equity committee will be

7           formed and organized before the first of

8           May.

9               With respect to the scope of what

10          the creditors' committee is seeking from

11          General Motors, we believe all those

12        documents are germane and relevant to

13        both Appaloosa and the equity committee,

14        when it is formed.  For example, they

15        seek --

16            THE COURT:  Well, let me stop you.

17            MR. EATON:  Sure.

18            THE COURT:  What is the authority

19        to join in a 2004 motion?

20            MR. EATON:  I'm sorry, Your Honor?

21            THE COURT:  What is the authority

22        to join in and make it your motion?

23            MR. EATON:  Your Honor, because we

24        are a party in interest.

25            THE COURT:  No, no.  What is the

1        DELPHI CORPORATION                130

2        authority under the Bankruptcy Rules?  I

3        understand people often file things where

4        they say they we join in this motion.

5        And generally what that means is, we

6        agree with what they say, and we want you

7        to hear about it, Judge.  Like, a couple

8        of the -- and in fact, Appaloosa may have

9        done this, in respect of the responses on

10       the matter that I'll be hearing this

11       afternoon said, we have the following

12       objections and also we join in the

13       objections that so and so is making.  And

14       when I receive those types of things, I

15       say to myself, okay, they just didn't

16       want to write it again so they said, "us

17       too."  But that doesn't mean they're

18       making a motion and it doesn't prevent

19       the person who makes the motion from

20       settling the motion.  So what -- if

21       you're merely looking to piggy-back on

22       the committee's motion, where's the

23       authority for that?

24            MR. EATON:  Your Honor, I

25       understand that question and most likely

1        DELPHI CORPORATION                    131

2        we should have, independently, filed a

3        motion.  But given the expedience nature

4        of these Chapter 11 cases and the fact

5        that the equity committee is not yet

6        appointed, our belief was that we should

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

7        certainly be in a position, at least the

8        equity committee, to begin receiving

9        documents on a real-time basis once that

10       production is made.  And I understand

11       both --

12           THE COURT:  In my view the equity

13       committee can, in all likelihood, obtain

14       those documents when it is formed, just

15       as the debtor's getting them.

16           MR. EATON:  Well, Your Honor, that

17       is why we're here today.  We would like

18       to have that understanding.

19           THE COURT:  But they're not formed

20       yet.  So, I think -- I don't think

21       there's any order I can really enter

22       today.  But I would be pretty surprised

23       if the debtor and the committee and GM

24       said that, you know, as far as obtaining

25       the production that was received, subject

1        DELPHI CORPORATION                    132

2        to if there are confidentiality

3        agreements entered into as part of the

```
4          production committee professional --

5          committee lawyers signing on to those

6          agreements, that they'd get the same

7          stuff.

8               MR. EATON:  Your Honor --

9               THE COURT:  But, I think to, you

10         know, provide it to someone other than

11         the committee before then is not

12         appropriate.

13              MR. EATON:  Your Honor, I

14         appreciate the message that you have sent

15         to the parties in interest and once the

16         committee is formed, whoever represents

17         them will, I'm sure, communicate with the

18         parties in interest and come up with an

19         appropriate resolution.

20              THE COURT:  Okay.

21              MR. EATON:  Okay. Thank you, sir.

22              THE COURT:  Okay.  All right.  So

23         that stipulation will get entered.

24              MR. ROSENBERG:  Thank you, Your

25         Honor.
```

```
1          DELPHI CORPORATION              133
```

```
 2          MR. BUTLER:  Your Honor, the last

 3     matter before the lunch -- scheduled

 4     before the lunch recess is matter number

 5     15 on the agenda.  It's our motion.  The

 6     joint interest agreement motion in which

 7     we're seeking approval of a joint

 8     interest agreement between the creditors'

 9     committee and the debtors.  It's found at

10     docket number 3000.  There was a limited

11     response which really constitutes an

12     objection filed by General Motors at

13     docket number 3096.  Your Honor, this

14     joint review or joint interest motion,

15     which is something that we have had

16     entered in other districts and in this

17     district in other complex Chapter 11

18     cases, is designed to provide an

19     extension of the privilege and to make

20     clear that we can share with our co-

21     fiduciary a wide variety of information

22     relating to a particularized subject

23     matter.  And in this case, and I'll

24     confirm on the record what I confirmed to

25     General Motors earlier, is this --  this
```

```
 1        DELPHI CORPORATION              134

 2        motion deals with only the matters that

 3        are described in and defined as the

 4        investigations.  And the intention here

 5        is to provide this information in a

 6        manner, to the committee, and share this

 7        information with the committee on a joint

 8        basis so as the co-fiduciaries in the

 9        case, we can devise a strategy on how to

10        manage these issues and ultimately how to

11        develop a plan of reorganization, which

12        will surely address most of the matters

13        that are the subject of these

14        investigations.

15             As a -- I think it goes without

16        saying, but I will say it nonetheless,

17        working with the committee as a co-

18        fiduciary, we have some burdens to

19        convince the committee on issues raised

20        in the investigative arena here, that the

21        debtors have done the right thing.

22        You've heard me stand up before, Your

23        Honor, in the course of this case and

24        say, you know, Judge, the debtors here
```

25          are doing the right thing.  We are taking

1           DELPHI CORPORATION                    135

2           these matters seriously.  And you've

3           heard, you know, objectors like Appaloosa

4           say, well, how do you know?  Well, one of

5           the ways that we do this is we've been

6           working closely with the committee on

7           these issues and there is an obvious

8           issue that comes up.  And one of them is

9           that when we talk about certain, very

10          sensitive issues, you know, Mr. Rosenberg

11          and his colleagues say, well, hey, we'd

12          like to know a little more.  And we say,

13          well, we'd like to tell you a little more

14          but if we go too far here, were not --

15          what we're not trying to do is compromise

16          the estate vis-a-vis non-fiduciaries.

17          And therefore, the device that we've

18          used, it's been entered here by Judge

19          Lifland in several cases that I've been

20          involved in and other folks in this

21          district and other judges in other

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

22          districts is a joint review approach that

23          allows us to share information on this

24          particularized subject on the basis

25          described in the order.  And it has, I


1          DELPHI CORPORATION                    136

2          think, obvious benefits to the estate.

3          It allows us to give a deep dive for the

4          creditors' committee so that they can

5          understand and be comforted that, for

6          example, with respect to the

7          investigations, the company has separated

8          wrong-doers from the reorganized

9          businesses so that that's not a concern

10          to the creditors' committee.  To also

11          assure them that we've developed

12          appropriate plans for the implementation

13          of internal controls that are reasonably

14          designed to protect the recurrence of

15          some of the issues that have been raised.

16          And that we have provided adequate

17          information to the committee so that it

18          can make informed understandings as we

19          negotiate, candidly as currency in a

20          plan, how to the estate's claims against

21          third parties ought to be both measured

22          and dealt with.  And who ought to do

23          that.  And for whose benefit in terms of

24          the estate.  And typically, without

25          allowing the creditors' committee's

1           DELPHI CORPORATION                    137

2           professionals the ability to make those

3           assessments.  It's very difficult to work

4           yourself through those issues.

5                THE COURT:  And in each of those

6           issues, it's conceivable, certainly, that

7           either by agreement or otherwise, the

8           committee could actually step into the

9           debtor's shoes, so --

10               MR. BUTLER:  Absolutely, Your

11          Honor.  In fact, one could imagine, I

12          mean, you know, we will -- one of the

13          subject matters of our negotiation will

14          be under what circumstances that ought to

15          happen.  I mean, we clearly are aiming

16          towards an emergence in 2007, which we

17          hope to have the support of our major

18          stakeholders, led by the creditors'

19          committee in connection with a plan.

20          That plan will clearly address the claims

21          related to these investigative matters.

22          And how and whom and for whose benefit

23          those claims are dealt with and pursued

24          will be an aspect of that plan.

25               THE COURT:  Okay.




1          DELPHI CORPORATION                    138

2               MR. BUTLER:  And, Your Honor, we

3          think it's fundamental to our ability to,

4          sort of, work through this as Your Honor

5          has described, very complex puzzle.  It's

6          our -- we think it's important to have

7          the ability to do this.  And we also

8          believe that it is important.  And

9          frankly, in some respects -- we've done

10          this before in other cases when we've

11          concluded that, as a strategic matter,

12          it's important to have a demonstration of

13          faith with the committee.  Okay.  You

14          want, you know -- you want to understand

15          just how complex this is, here is what

16          we've been thinking about.  Well, you

17          can't do that without this Court entering

18          an order that protects the privilege on

19          those issues.

20              THE COURT:  Okay.

21              MR. BUTLER:  Thank you, Your Honor.

22              THE COURT:  Okay.

23              MR. KESSLER:  Your Honor, Michael

24          Kessler again, for General Motors.  Your

25          Honor, we filed a limit -- filed a


1          DELPHI CORPORATION                139

2          limited objection to this motion which we

3          thought would be non-controversial and

4          merely ask that the debtors and the

5          committee include some language in their

6          order to insure that the so-called joint

7          interest, or common interest that they

8          describe in their motion, would not be

9          expanded beyond what it was.  And we got

10          some objection to our proposal which

11          makes me feel like we hit a nerve and

12        maybe there is something to be more

13        suspicious about than we had originally

14        anticipated.  Let me start by saying that

15        there is no case law in this circuit that

16        provides for a joint interest, or common

17        interest at large between creditors'

18        committees and debtors.  The joint

19        interest or common  --

20            THE COURT:  But they're not seeking

21        that -- any ruling on that here.

22            MR. KESSLER:  No, I understand.

23        And the joint interest and common

24        interest doctrine in this circuit in

25        bankruptcy cases between a creditors'


1            DELPHI CORPORATION                140

2        committee and a debtor is no better or no

3        worse than it is generally in litigation

4        in this circuit.  Which is to say that

5        the cases outside of bankruptcy that

6        govern whether there is or is not a joint

7        interest, would govern whether there is

8        one between a creditors' committee and

9        debtor in this case.  And what the cases

10          say is that the joint interest privilege

11          is exacting and clear.  The parties

12          asserting that common interest must show

13          an identical, not merely a similar, legal

14          interest and cooperation directed towards

15          an identical legal strategy based on that

16          interest.  Now, we've -- we're prepared

17          to concede, although I would tell the

18          Court that I don't agree that they have

19          demonstrated a joint interest for

20          purposes of the SEC investigation,

21          restatement, etcetera.  We're prepared to

22          concede on that issue.  And the whole

23          purpose, of course, for the joint

24          interest is to protect the attorney

25          client privilege with respect to

1           DELPHI CORPORATION                    141

2           documents that may be exchanged between

3           the parties on that.  What we want to

4           insure is that the order is very clear

5           that the common interest, or joint

6           interest, approved by the Court is

7        narrowly limited to that investigation as

8        they set it out and cannot be expanded by

9        the committee and the debtor to other

10       matters in this case.  It may be, later

11       on in this case, that General Motors and

12       the debtors have the joint interest

13       against the committee.

14            THE COURT:  Well, I think their --

15       I think their opposition was to the

16       placement of the phrase "narrowly limited."

17       I think that they don't object to saying

18       that this agreement pertains to the -- to

19       the investigation.  And that nothing

20       otherwise, in the order -- I'm sorry,

21       leave out "otherwise."  Nothing in the

22       order expands the scope of any common

23       interest privilege and I don't -- I think

24       those two things are fine.  And I was

25       going to ask them whether, given the


1        DELPHI CORPORATION                    142

2        possibility for someone else down the

3        road arguing what the "investigation"

4        really means, how burdensome is it to

```
 5        keep a basic privilege log here so that

 6        you have a record of what was shared so

 7        that you can substantiate that, in fact,

 8        the privilege wasn't waived.  Those are

 9        the -- I thought those were basically

10        three fair additions to the order, but I

11        wanted to hear --

12             MR. KESSLER:  Well, I wanted to add

13        --

14             THE COURT:  -- one or two parties

15        on the privilege log issue.

16             MR. KESSLER:  I would like to add

17        the following, Your Honor.  That they

18        can't unilaterally expand that joint

19        interest between themselves.

20             THE COURT:  Well, he said he wasn't

21        going to do that.

22             MR. KESSLER:  But these are the

23        provisions that we proposed putting in

24        the order to make clear.

25             THE COURT:  Well, I know, but he
```

 1        DELPHI CORPORATION                    143

2     said he wasn't going to do that.  And I

3     don't think he's -- I mean, he says, you

4     say, "it's limited."  To my mind that means

5     they're not going to expand it because

6     it's limited.  This order is limited to

7     the investigation.

8          MR. KESSLER:  And, of course, the

9     other thing that we asked to put in the

10    order is that the sharing of privileged

11    documents does not preclude General

12    Motors from seeking discovery of factual

13    matters relating to this case.

14         THE COURT:  Well, I don't think

15    there's any implication as to that either

16    way.  I don't want to -- I mean, that's,

17    like, people reserving rights.  I don't

18    think you need to have that in an order.

19         MR. KESSLER:  So, if I'm hearing

20    correctly, you would provide that they

21    add to the order that they keep a

22    privilege log.

23         THE COURT:  Well, I want to hear

24    them on that.  I want to see how

25    burdensome that is.  I mean, I don't want

```
 1      DELPHI CORPORATION                    144

 2      to restrict the sharing of information.

 3      But it seems to me, most of this infor --

 4      this material is -- has already been

 5      pored through and it is probably pretty

 6      well organized.  And I would think it

 7      would be fairly easy to keep a record of

 8      it.  And probably a good idea, because if

 9      it's not GM, then it may well be -- it

10      may well not be GM, other parties in

11      interest who want to assert the

12      privilege has been waived may well assert

13      that you gave more information than was

14      covered by the common interest privilege

15      dealing with the investigation. And so

16      this way you can show them, this is the

17      log.  Or show me, and then --

18          MR. KESSLER:  Of course the

19      sensitivity to this for us, Your Honor,

20      is that they will show the committee

21      privileged documents which the committee

22      will then have the benefit of.  And the

23      committee can then use whatever

24      information is in those privileged
```

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

25          documents against General Motors.  And we


1          DELPHI CORPORATION                    145

2          wouldn't have access to the same

3          documents.  That's why we're particularly

4          concerned about narrowing the joint

5          interest.

6               THE COURT:  Well, okay.

7               MR. BUTLER:  Your Honor, and I

8          think that fairly describes what the real

9          dispute here is.  And, you know, reality

10         is, and Your Honor has seen this for

11         months now and will see it in spades this

12         afternoon, go forward.  All of us, the

13         major stakeholders in this case, are

14         walking along doing a very delicate

15         balancing act, trying to jointly get

16         through to a common resolution which we

17         hope we can eventually achieve.  But in

18         the meantime, everybody does try to react

19         to their best interest and General

20         Motors's position, with which the debtors

21         have respectfully but vehemently

22         disagreed, is that General Motors ought

23        to get all the information the committee

24        gets about everything.  And General

25        Motors has not been happy with the


1         DELPHI CORPORATION                146

2         debtors because we've declined to do

3         that.  And so, what we're trying to --

4         and again here, what we -- we believe

5         there are things that we should talk to

6         the committee about.  And some of those

7         things, insofar as General Motors has

8         implicated many of the investigations,

9         may include General Motors; may not.  I'm

10        not making a statement about that.  It is

11        whatever the subject matter is defined by

12        the investigations.  We're not going to

13        expand it.  But I also don't want to

14        agree here.  Your Honor, I think, wisely

15        said, you know, you're not ruling on

16        whether the committee and the company

17        have a, you know, more than -- something

18        better than or worse than third parties.

19        And General Motors wants you to conclude

20        that today.  We think that's

21        inappropriate.  I mean, we happen to

22        believe, and we think that the -- a

23        practice in this district and we actually

24        think the case law would support the fact

25        that there is a symmetry and respect

1        DELPHI CORPORATION        147

2        accorded by the Courts to the two co-

3        fiduciaries in the Chapter 11 case.  It

4        is different than just third parties, but

5        we're not asking a Court, that Your Honor

6        issue a ruling in great detail on that

7        today.  But we're also not trying to

8        limit it.  Now, as to the privilege log,

9        the concern we have here is General

10        Motors's proposal was that they be able

11        to look at the log.

12        THE COURT:  Oh no, that's not why

13        you --

14        MR. BUTLER:  That was the proposal.

15        THE COURT:  That's left for another

16        day to determine what's appropriate.

17        MR. BUTLER:  And the whole point

18          here was to give anyone, including

19          General Motors, the ability to discover

20          exactly what we're talking about with the

21          committee, is counter-intuitive.

22               THE COURT:  All right. There's a

23          whole body of law on how you deal with

24          privilege logs and -- what I'm suggesting

25          is this.  That you keep one at this point

1          DELPHI CORPORATION                    148

2          and then, how it's dealt with down the

3          road is another issue.

4               MR. BUTLER:  Right.  We track --

5          Your Honor, it is not burdensome for the

6          company to track the information we give

7          to third parties.  We track it now.

8               THE COURT:  Okay.

9               MR. BUTLER:  And so we would be

10          tracking it in the ordinary course going

11          forward.  We track.  We get literally

12          hundreds, if not thousands, of

13          information requests from the major

14          stakeholders in this case and we have a

15      computer system how that's all dealt

16      with.

17          THE COURT:  Okay.  So it seems to

18      me that I should grant this.  Well, I

19      have to stop before I say that.  I have

20      another question.  Paragraph 7 of the

21      order says that no discovery in respect

22      of the matters where they are subject to

23      the investigation shall be permitted

24      unless X, Y and Z.  Is that -- who's that

25      supposed to apply to?

1           DELPHI CORPORATION                149

2           MR. BUTLER:  You Honor, it's

3       supposed to apply to, essentially, to the

4       committee.  It's not out to third

5       parties.

6           THE COURT:  All right.  It's not

7       implying to all third parties?

8           MR. BUTLER:  No.  What's intended -

9       - what's intended here --

10          THE COURT:  All right.  That's all

11      I wanted to know.

12          MR. BUTLER:  Okay.

13          THE COURT:  Okay.  I just wanted to

14      make sure of that.

15          MR. BUTLER:  And we've -- Mr.

16      Rosenberg and I have an understanding on

17      how that would apply.

18          THE COURT:  Okay.  All right.

19          MR. ROSENBERG:  We've discussed it

20      ad nauseam.

21          THE COURT:  All right.  So, it

22      seems to me, then, that I should approve

23      this with -- in the appropriate place in

24      the order the following additions.  One

25      is that this order applies to the


1       DELPHI CORPORATION                150

2       investigation, as you stated on the

3       record.  Two, that the debtors will

4       maintain a privilege log identifying the

5       privileged material provided to the

6       committee.  And you all know how to keep

7       a privilege log, so I don't think you

8       need to spell out anything more than

9       that.  And then third, that nothing in

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
10        this order shall expand the scope of any

11        common interest privilege.  You know, it

12        is what it is.

13              MR. BUTLER:  Your Honor, can we

14        say, shall expand or narrow?  I mean, I

15        just don't want the --

16              THE COURT:  Oh, yeah.  That's fine.

17        Yes.

18              MR. BUTLER:  Okay. Thank you, Your

19        Honor.

20              THE COURT:  Or shall alter.

21              MR. BUTLER:  Or alter.  Thank you,

22        Your Honor.

23              THE COURT:  Okay.  But with those

24        changes in, you probably want to show it

25        to Mr. Kessler as well as Mr. Rosenberg.
```

```
1         DELPHI CORPORATION                151

2               MR. BUTLER:  I will show it to Mr.

3         Kessler.

4               THE COURT:  Okay.

5               MR. BUTLER:  And to Mr. Rosenberg.

6               THE COURT:  Okay.  So, how long do

7         you anticipate this -- did the last
```

8     hearing to last?

9          MR. BUTLER:  I need some help from

10    Appaloosa on that.  I think the -- I

11    think the -- my understanding is as --

12    vis-a-vis Wilmington Trust and the

13    committee, it is more in the way of

14    argument than evidence.

15          THE COURT:  All right.  Well, I

16    have a very strong desire to leave here

17    by 5:00 today.  I have a commitment with

18    some ten-year-olds, unless it starts

19    raining.  So, I think you should sort of

20    plan your time accordingly.

21          MR. BUTLER:  I think we can live

22    within that, Your Honor.

23          THE COURT:  I'm happy to come back

24    here at a quarter to two.  That gives

25    enough people to get in and out of the

1     DELPHI CORPORATION          152

2    building at least, but they'll probably

3    get a little bit of lunch.

4          MR. BUTLER:  Thanks, Judge.

file:///C:/Documents%20and%20Settings/slank/Desktop/Delphi%200...

5            THE COURT:  Okay.

6            (Whereupon this hearing was

7      completed.)

8            (Time Noted:  12:53 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      DELPHI CORPORATION                    153

2           C E R T I F I C A T I O N

3        I, Esther Accardi, hereby certify that

4    the foregoing is a true and correct

5    transcription, except where, as indicated, the

6    Court has modified its bench ruling, to the best

7    of my ability of the sound recorded proceedings

8    submitted for transcription in the matter of:

9    Delphi Corporation.

10

11        I further certify that I am not employed

12    by nor related to any party to this action.

13

14        In witness whereof, I hereby sign this

15    date:

16    April 11, 2006

17

18    _____

19    Esther Accardi

20

21

22

23

24

25

file:///C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...

```
 1                                                        154

 2                          I N D E X

 3    Cross Examination by        Page      Line

 4    Mr. Springer of Mr. Hoe     54        3-4

 5    Mr. Springer of Mr. Kerr    61        20-21

 6    Mr. Garfield of Mr.

 7       Sheehan                  64        9-10

 8

 9    Redirect Examination by     Page      Line

10    Mr. Garfield of Mr. Hoe     60        6-7

11

12                      E X H I B I T S

13    Description                 Page      Line

14    11 - Spreadsheet            62        10

15

16                  INDEX TO INSERTS

17                                Page      Line

18    (NONE)

19

20                  INDEX TO RULINGS

21                                Page      Line

22    Retention Approved on an    28        2

23    Interim Basis

24

25
```

file://C:/Documents%20and%20Settings/slark/Desktop/Delphi%200...