1                                                            1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    DELPHI CORPORATION,

8

9            Debtor.

10

11   - - - - - - - - - - - - - - - - - - - -x

12

13                   U.S. Bankruptcy Court

14                   One Bowling Green

15                   New York, New York

16

17                   April 7, 2006

18                   1:49 p.m.

19

20   B E F O R E:

21

22   HON. ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25

2

3    MOTION for Relief from Stay filed by Victor J.

4    Mastromarco Jr. on behalf of H.E. Services

5    Company, Robert Backie.

6

7    MOTION for Relief from Stay filed by Victor J.

8    Mastromarco Jr. on behalf of Cindie Palmer.

9

10   MOTION for Relief from Stay filed by Gene T.

11   Moore on behalf of Gene T. Moore.

12

13   OBJECTION to Motion For the Appointment of A

14   Fee Committee Contained in the Motion For

15   Administrative Order Under 11 U.S.C. Section

16   331 (i) Establishing Procedures For Interim

17   Compensation and Reimbursement of Expenses of

18   Professionals and (ii) Setting A final Hearing

19   Thereon filed by Tracy Hope Davis on behalf of

20   United States Trustee.

21

22   MOTION for Relief from Stay The Offshore

23   Group's Motion Pursuant to Bankruptcy Code

24   Sections 362(d)(1) and 553 for Order Lifting

25   the Automatic Stay to Permit the Offshore

1           DELPHI CORPORATION                    3

2    Group to Exercise Right of Setoff filed by

3    Kasey C. Nye on behalf of Offshore

4    International, Inc.

5

6    MOTION to Approve Motion For Order Under 11

7    U.S.C. Sections 107(b), 501, 502, And 1111(a)

8    And Fed. R. Bankr. P. 1009, 2002(a)(7),

9    3003(c)(3), And 5005(a) Establishing Bar Dates

10   For Filing Proofs Of Claim And Approving Form

11   And Manner Of Notice Thereof filed by John Wm.

12   Butler Jr. on behalf of Delphi Corporation.

13

14   MOTION for Relief from Stay To Proceed With

15   Appeals Of Patent Litigation filed by Alan D.

16   Halperin on behalf of Automotive Technologies

17   International, Inc.

18

19   MOTION to Approve Motion For Order Under 11

20   U.S.C. Section 363(b) And Fed. R. Bankr. P.

21   6004 Approving Debtors' Human Capital Hourly

22   Attrition Programs filed by John Wm. Butler

23   Jr. on behalf of Delphi Corporation.

24

25   APPLICATION for FRBP 2004 Examination - Motion



1         DELPHI CORPORATION              4

2    of the Official Committee of Unsecured

3    Creditors for an Order Compelling the

4    Production of Documents by General Motors

5    Corporation Pursuant to Rule 2004 of the

6    Federal Rules of Bankruptcy Procedure filed by

7    Robert J. Rosenberg on behalf of The Official

8    Committee Of Unsecured Creditors.

9

10    MOTION to Approve Motion For Approval Of Joint

11    Interest Agreement Between Debtors And

12    Official Committee Of Unsecured Creditors,

13    Implementation Of Protective Order, And

14    Approval Of Procedures To Protect Information

15    In Fee Statements filed by John Wm. Butler Jr.

16    on behalf of Delphi Corporation.

17

18    RESPONSE /Reply In Support Of Motion For Order

19    Under 11 U.S.C. Section 362(D)(2) Directing

20    Debtor Delphi Automotive Systems, LLC To

21    Determine Within 150 Days Whether To Assume Or

22    Reject Its Nonresidential Real Property Lease

23    With Cherokee North Kansas City, LLC Filed By

24    Jill Mazer-Marino On Behalf Of Cherokee North

25    Kansas City, LLC.

1          DELPHI CORPORATION                5

2

3    OBJECTION to Motion Debtors' Objection To

4    Motion For Order Under 11 U.S.C. Section

5       365(d)(2) Directing Debtor Delphi Automotive

6       Systems, LLC To Determine Within 150 Days

7       Whether To Assume Or Reject Its Nonresidential

8       Real Property Lease With Cherokee North Kansas

9       City, LLC (related document(s)[1834]) filed by

10      John Wm. Butler Jr. on behalf of Delphi

11      Corporation.

12

13      OBJECTION to Motion Appaloosa Management

14      L.P.'s Preliminary Objection to Motion for

15      Order Under 11 U.S.C. Section 363(b) and Fed.

16      R. Bankr. P. 6004 Approving the Debtors' Human

17      Capital Hourly Attrition Programs (related

18      document(s)[2933]) filed by Frank L. Eaton on

19      behalf of Appaloosa Management L.P.

20

21      STATEMENT Joinder of Appaloosa Management L.P.

22      in the Motion of the Official Committee of

23      Unsecured Creditors for an Order Compelling

24      the Production of Documents by General Motors

25      Corporation Pursuant to Rule 2004 of the



1           DELPHI CORPORATION                 6

2       Federal Rules of Bankruptcy Procedure (related

3       document(s)[2961]) filed by Frank L. Eaton on

4       behalf of Appaloosa Management L.P..

5

```
 6   RESPONSE / Limited Response of General Motors

 7   Corporation to Debtors' Motion for Approval of

 8   Joint Interest Agreement between Debtors and

 9   Official Committee of Unsecured Creditors,

10   Implementation of Protective Order and

11   Approval of Procedures to Protect Information

12   in Fee Statements (related document(s)[3000])

13   filed by Michael P. Kessler on behalf of

14   General Motors Corporation.

15

16

17

18

19

20

21

22

23

24   Transcribed By:  Esther Accardi

25
```

```
 1          DELPHI CORPORATION               7

 2   A P P E A R A N C E S :

 3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

 4        Attorneys for Delphi Corporation

 5        Four Times Square

 6        New York, New York 10036
```

```
 7

 8   BY:   JOHN WM. BUTLER, JR., ESQ.

 9         KAYALYN A. MARAFIOTI, ESQ.

10         DAVID SPRINGER, ESQ.

11

12   TOGUT, SEGAL & SEGAL, LLP

13         Attorneys for the Debtors

14         One Penn Plaza

15         New York, New York 10119

16

17   BY:   ALBERT TOGUT, ESQ.

18         NEIL BERGER, ESQ.

19

20

21

22

23

24

25
```

```
 1         DELPHI CORPORATION                    8

 2   LATHAM & WATKINS, LLP

 3         Attorneys for the Creditors' Committee

 4         885 Third Avenue

 5         New York, New York 10022

 6

 7   BY:   ROBERT J. ROSENBERG, ESQ.
```

8          MITCHELL SEIDER, ESQ.

9

10   MASTROMARCO & JAHN

11          Attorneys for H.E. Services and

12              The Estate of Michael Palmer

13          1024 N. Michigan Avenue

14          Saginaw, Michigan 48602

15

16   BY:   VICTOR J. MASTROMARCO, ESQ.

17

18   UNITED STATES TRUSTEE

19          33 Whitehall Street

20          New York, NY 10004

21

22   BY:   ALICIA LEONHARD, ESQ.

23

24

25

1          DELPHI CORPORATION                    9

2   BROWNSTEIN HYATT & FARBER, P.C.

3          Attorneys for Cherokee North

4              Kansas City LLP

5          410 Seventeenth Street

6          Denver, Colorado 80202

7

8   BY:   DANIEL GARFIELD, ESQ.

```
 9

10    MENAKER & HERRMANN LLP

11         Attorneys for O'Neill

12         10 East 40th Street

13         New York, New York 10016

14

15    BY:   RICHARD MENAKER, ESQ.

16

17    QUARLES & BRADY STREICH LANG LLP

18         Attorneys for Offshore Group

19         One South Church Avenue

20         Tucson, Arizona 85701

21

22    BY:   KASEY C. NYE, ESQ.

23

24

25
```

```
 1          DELPHI CORPORATION              10

 2    WEIL GOTSHAL & MANGES, LLP

 3         Attorneys for General Motors

 4         767 Fifth Avenue

 5         New York, New York 10153

 6

 7    BY:   MICHAEL P. KESSLER, ESQ.

 8         MARTIN BIENENSTOCK, ESQ.

 9
```

```
10   WHITE & CASE

11        Attorneys for Appaloosa Management

12        200 South Biscayne Blvd.

13        Miami, Florida 33131

14

15   BY:   FRANK L. EATON, ESQ.

16        GLENN KURTZ, ESQ.

17

18   HALPERIN BATTAGLIA RAICHT, LLP

19        Attorneys for ATI

20        555 Madison Avenue

21        New York, New York 10022

22

23   BY:   CHRISTOPHER BATTAGLIA, ESQ.

24

25
```

```
1          DELPHI CORPORATION              11

2   KENNEDY, JENNIK & MURRAY, P.C.

3        Attorneys for IUE

4        113 University Place

5        New York, New York 10003

6

7   BY:   THOMAS KENNEDY, ESQ.

8

9   KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP

10        Attorneys for the Wilmington
```

```
11          Trust Company

12          599 Lexington Avenue

13          New York, New York 10022

14

15   BY:   EDWARD M. FOX, ESQ.

16

17   COHEN WEISS AND SIMON LLP

18          Attorneys for UAW

19          330 West 42nd Street

20          New York, New York 10036

21

22   BY:   BABETTE CECCOTTI, ESQ.

23

24

25
```

```
 1          DELPHI CORPORATION                12

 2   BURR & FORMAN LLP

 3          Attorneys for Mercedes Benz

 4             U.S. International Inc.

 5          420 North 20th Street

 6          Birmingham, Alabama 35203

 7

 8   BY:   SHANNON E. HOFF, ESQ.

 9

10   SIMPSON THACHER & BARTLETT LLP

11          425 Lexington Avenue
```

```
12          New York, New York 10017

13

14    BY:   KENNETH ZIMAN, ESQ.

15

16    KLESTADT & WINTERS, LLP

17          292 Madison Avenue

18          New York, New York 10017

19

20    BY:   TRACY KLESTADT, ESQ.

21

22

23

24

25
```

```
 1          DELPHI CORPORATION                  13

 2    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

 3          1350 Broadway

 4          New York, New York 10018

 5

 6    BY:   LOWELL PETERSON, ESQ.

 7

 8    BROWN RUDNICK BERLACK ISRAELS LLP

 9          One Financial Center

10          Boston, Massachusetts 02111

11

12    BY:   PETER J. ANTOSZYK, ESQ.
```

13

14

15

16

17

18

19

20

21

22

23

24

25

1      DELPHI CORPORATION                    14

2            P R O C E E D I N G S

3            THE COURT:  Please be seated.

4      Okay.  We're back on the record in

5      Delphi.

6            MR. BUTLER:  Your Honor, good

7      afternoon.  Jack Butler, again, for the

8      debtors.  The only remaining item on the

9      omnibus agenda for April is Item No. 13.

10      This is the debtors, Human Capital Hourly

11      Attrition Programs motion, filed at

12      docket no. 2933.  Essentially, Your

13      Honor, there are three objectors to the

14          motion and two parties that have filed

15          statements in support.  That is the UAW

16          has filed a statement in support at

17          docket no. 2958, and General Motors has

18          filed a statement in support as well in

19          connection with the motion.  The three

20          objectors are Appaloosa, who has filed a

21          preliminary objection at docket no. 3021

22          and another objection at docket no. 3098.

23          The creditors' committee, which filed a

24          docket -- a more limited objection, and

25          is styled a limited objection at docket


1          DELPHI CORPORATION                15

2          no. 3092, and they amended that at docket

3          no. 3108.  And Wilmington Trust on behalf

4          -- as indentured trustee, also filed what

5          they styled a limited objection at docket

6          no. 3097.  In addition, Your Honor, I'm

7          advised, although, I haven't seen it,

8          that Law Debenture Trust Company filed a

9          limited objection as well, which was

10          docketed at 3130.  But the Law Debenture

11          objection is essentially a joinder in the

12          objection to the creditors' committee,

13          and we'll need to trust, and we don't

14          believe -- I'm advised, at least, that if

15        it doesn't raise new objections to the

16        relief sought in the motion.  So you have

17        General Motors at docket no. 3090, the

18        UAW at docket no. 2958 in support and the

19        others as I've described in opposition.

20            THE COURT:  All right.

21            MR. BUTLER:  Your Honor, in light

22        of the Court's comments from the bench

23        just before the lunch recess, of a desire

24        to conclude this hearing by 5 o'clock,

25        we've spent some time over the lunch hour

1        DELPHI CORPORATION                16

2        talking with several of the objectors to

3        understand how we would proceed here and

4        I'm going to attempt to outline, and I'm

5        sure I'll be corrected if I get it wrong,

6        but I'm going to attempt to outline an

7        approach to this afternoon's hearing.

8        First, Your Honor, there are exhibit

9        books that I believe have been provided

10        to the Court, previously.  And, if not,

11        we have another set right here.

12            THE COURT:  You should hand those

13        up.

14            MR. BUTLER:  Thank you, Your Honor.

15        As is the custom, they are a joint

16          exhibit book.  They are numbered exhibits

17          1 through 31.  And those that are

18          protected under the protective order are,

19          you know, retain their numerical docket

20          number -- I mean their exhibit number,

21          but are in a separate binder.  In

22          addition, Your Honor, I have two other

23          exhibits, exhibits which we marked

24          Exhibits 32 and 33.  Exhibit 32 is the

25          deposition of Kevin Butler and Exhibit 33

1          DELPHI CORPORATION                    17

2          is the deposition of John Sheehan.  And

3          they have contained designations from

4          Appaloosa and the creditors' committee.

5          And Mr. Sheehan's deposition also

6          contains a designation, which I have

7          penciled in from this morning, by

8          Wilmington Trust at pages 133 through a

9          portion of 136, which are noted in black

10          ink on the exhibit.  And, Your Honor, we

11          also submit with this the debtor's

12          fairness designations as well.  So

13          Appaloosa's are marked in yellow, the

14          committees's in pink or rose, the

15          debtors's Fairness in blue, and the

16          Wilmington Trust in black.  I'd like to,

17        if I could, present Exhibits 32 and 33 to

18        the Court.

19             THE COURT:  Okay.  Thank you.

20             MR. BUTLER:  Your Honor, I'm

21        advised that no parties have any

22        objections to Exhibit's 1 through 33 and

23        that they should be admitted into

24        evidence.

25             THE COURT:  All right.  Everyone


 1        DELPHI CORPORATION                    18

 2        nodding, I'll admit them into evidence.

 3             (Exhibit's 1 through 33 hereby

 4        received into evidence)

 5             MR. BUTLER:  Your Honor, I am also,

 6        going to waive opening argument on behalf

 7        of the debtors, taking Your Honor's

 8        suggestion that we try to expedite this

 9        summary proceeding during the course of

10        the afternoon.  And, we'll try to address

11        things enclosed.  Before I talk about --

12        go into the order of evidence, I would

13        ask, I suppose, with Your Honor's

14        permission if anyone else chooses to make

15        an opening.

16             THE COURT:  Okay.

17             MR. KURTZ:  Glenn Kurtz, White &

18        Case, on behalf of Appaloosa, Your Honor.

19        We'll save our remarks for closing.

20             THE COURT:  Okay.

21             UNIDENTIFIED ATTORNEY:  Your Honor,

22        UAW will do so, as well.

23             MR. SEIDER:  The committee will, as

24        well.

25             MR. PETERSON:  Your Honor, steel

 1        DELPHI CORPORATION                   19

 2        workers, as well.

 3             THE COURT:  Okay.

 4             MR. BUTLER:  Your Honor, that being

 5        the case, then we have only, I believe,

 6        two witnesses that are subject to -- the

 7        only party presenting witnesses today,

 8        are the debtors, in that we're presenting

 9        Mr. Butler and Mr. Sheehan.  I'm advised

10        that Wilmington Trust may choose to call

11        them as part of its direct case, as well.

12        But other than that, my understanding is

13        as follows.  That based on the

14        designations that have been presented to

15        Your Honor, and our discussions that

16        already meet and confers that you had the

17        opportunity to designate but not do

18        cross-exam, do both.  And while no one is

19          admitting that was an agreement, I'm

20          still advised that based on the

21          designations that have been submitted

22          into Exhibit's 32 and 33, that neither

23          the committee nor Appaloosa intend to

24          cross-examine either of the witnesses.

25          Is that correct, gentlemen.


 1          DELPHI CORPORATION                20

 2              MR. KURTZ:  Glenn Kurtz.  That is

 3          correct, subject to the witness actually

 4          taking the stand on someone else's behalf

 5          and making comments that we think it

 6          would be appropriate to cross on.

 7              THE COURT:  Okay.

 8              MR. BUTLER:  So, I think the only

 9          person who is choosing to object -- who

10          is choosing the cross-examine or take

11          direct testimony is Mr. Fox on behalf of

12          Wilmington Trust.

13              THE COURT:  Okay.

14              MR. BUTLER:  With that in mind,

15          Your Honor, I'd first like then to

16          present Kevin M. Butler and his

17          declaration as marked as Exhibit and

18          admitted into evidence as Exhibit 17, and

19          ask Mr. Butler to take the stand and be

20          available for cross-examination.

21               THE COURT:  Okay.

22               (The Witness Is Sworn)

23               THE COURT:  Okay.  Mr. Fox.

24    CROSS EXAMINATION BY

25    MR. FOX:


 1          DELPHI CORPORATION                21

 2          Q.    Good afternoon, Mr. Butler.  My

 3    name is Edward Fox.  I'm from Kirkpatrick &

 4    Lockhart Nicholson Graham.  I represent

 5    Wilmington Trust Companies, Indentured

 6    Trustee.

 7          A.    Good afternoon.

 8          Q.    Mr. Butler, in your declaration you

 9    referred to Delphi's employees.  And the

10    define term Delphi, means Delphi Corporation.

11    Correct?

12          A.    That's true.

13          Q.    Okay.  Does the defined term

14    Delphi, in your declaration, include any of

15    the debtor's subsidiaries which are debtors in

16    this case, or is it just limited to Delphi

17    Corporation?

18          A.    It's my understanding that it

19    included the debtors, as well.

20          Q.    It included all the debtors?

21          A.    All the debtors.

22          Q.    Could you take a look at your

23     declaration, if you would, on page 2?  You

24     have that in front of you?  Exhibit 17.

25          A.    I'm sorry, page?


 1          DELPHI CORPORATION                22

 2          Q.    If you look at page 2, paragraph 1?

 3          A.    Yes.

 4          Q.    Could you just read that first

 5     sentence for me, if you would?

 6          A.    "Delphi Corporation, Delphi, and

 7     certain of its subsidiaries and affiliates are

 8     debtors and debtors-in-possession in these

 9     Chapter 11 cases, collectively the debtors."

10          Q.    So, when you refer in your

11     declaration to Delphi -- let me ask that

12     question again.  Are you limiting yourself to

13     Delphi Corporation or did you mean all of the

14     debtors in these consolidated Chapter 11

15     cases?

16          A.    It's my understanding that the

17     language -- and my understanding is that it's

18     collectively the debtors, all debtors subject

19     to the proceedings.

20          Q.    And, that the term Delphi, means

21     all debtors, as well?

22          A.    That's my understanding.

23          Q.    Okay.  In the attrition agreement,

24    I believe its paragraph 7(b) -- you're

25    familiar with the attrition agreement?


 1          DELPHI CORPORATION                23

 2          A.    I am.

 3          Q.    You were involved in negotiating

 4    that agreement?

 5          A.    I was.

 6          Q.    In, I believe its paragraph 7(b),

 7    refers to the fact that General Motors may

 8    assert a claim against the estate of Delphi

 9    Corporation, do you recall that?

10          A.    I believe so.

11          Q.    Okay.  Now is it your understanding

12    that when the term Delphi Corporation is used

13    in paragraph 7(b) in the attrition agreement,

14    that it's referring to all of the debtors or

15    just to the specific legal entity Delphi

16    Corporation?

17          A.    It's my understanding, and I would

18    subject to the technicalities, it's the

19    debtors.

20          Q.    All of the debtors?

21          A.    It's my understanding.

22          Q.    Okay.  Do you know whether the

23   debtor has a different understanding about

24   that?

25       A.   I would have to rely on expert


 1       DELPHI CORPORATION               24

 2   counsel on that.

 3       Q.   Well, were you involved in

 4   negotiating the terms of that paragraph 7 of

 5   the attrition agreement?

 6           MR. BIENENSTOCK:  Objection to this

 7       line of questioning, Your Honor.  Unless

 8       there's an ambiguity in the agreement,

 9       there's no basis for going into one of

10       the negotiators intent, and the agreement

11       is very clear.  It says Delphi

12       Corporation.

13           MR. FOX:  Your Honor, at this point

14       there is no agreement because it hasn't

15       been approved by the Court yet.  So the

16       parole evidence will --

17           THE COURT:  Well, I mean -- the

18       proposed agreement speaks for itself,

19       doesn't it?  I mean, he --

20           MR. FOX:  Well, I thought Mr.

21       Butler's declaration spoke for itself and

22       I quickly found out that wasn't the case

23       either.

24          THE COURT:  Well, it was his

25     declaration, it's not his agreement.  Why

1      DELPHI CORPORATION              25

2      don't we talk to the people who actually

3      -- well first of all, we could read it.

4      But, I guess its GM, ultimately, that

5      would be asserting the claim.  What is

6      GM's position on this?  It's what Mr.

7      Bienenstock said, right, that it's just

8      Delphi Corporation?

9          MR. FOX:  Well, I don't know what

10     Delphi's position is on that point.  And,

11     it's important given the structure of

12     this case.

13          THE COURT:  Well --

14          MR. BUTLER:   Your Honor, I didn't

15     know that was an issue but I'm sure that

16     all of -- certainly GM and debtors can

17     stipulate that this claim that is

18     provided in paragraph 7 is a claim

19     against the Estate of Delphi Corporation,

20     the parent company.

21          THE COURT:  And no other debtor?

22          MR BUTLER:  And no other debtors.

23          THE COURT:  Okay.  All right.

24  BY MR. FOX:

25          Q.    Mr. Butler, to your knowledge, is

1          DELPHI CORPORATION               26

2      there any reason why paragraph 7 limited the

3      claim from GM to Delphi Corporation as opposed

4      to the debtors, collectively?

5          A.    Not that I'm aware of.

6          Q.    Okay.  Do you know if that was done

7      at the instance of the debtors or of General

8      Motors?

9               MR. BIENENSTOCK:  Objection.

10              Irrelevant to whether this should be a

11              proof.

12              THE COURT:  I'll overrule that

13              objection.  You can answer that.

14              THE WITNESS:  My understanding is

15              that what we were attempting to do was

16              craft an agreement that would balance

17              right factors and benefit the estate and

18              yet not buy us any situations on claims

19              brought, like my understanding.

20     BY MR. FOX:

21         Q.    Okay.  And that's your

22     understanding as to why it specifically refers

23     to Delphi Corporation in 7(b)?

24         A.    That would be my understanding.

25         Q.    Okay.  I'm going to get the UAW's

```
 1          DELPHI CORPORATION                    27

 2    name wrong, because it's long.  You probably

 3    know it, I don't.  I'm going to refer to them

 4    as the UAW or the United Auto Workers.  Do you

 5    know who I'm referring to?

 6          A.    I do.

 7          Q.    And, they're the union that's the

 8    party to the attrition agreement?

 9          A.    Yes.

10          Q.    Okay.  Does either Delphi

11    Corporation or the debtors, collectively, have

12    a Collective Bargaining  Agreement with the

13    UAW?

14          A.    It does.

15          Q.    Do you know which entity -- which

16    debtor entity or entities or parties to that

17    Collective Bargaining  Agreement?

18          A.    I believe its Delphi Corporation.

19          Q.    The single entity Delphi

20    Corporation.

21          A.    It's my understanding.

22          Q.    Okay.  Now, do you know by whom --

23    by which debtor entity or entities, the UAW

24    members are employed, by Delphi or its

25    subsidiaries?
```

```
 1          DELPHI CORPORATION                 28

 2          A.    I believe they are employees of

 3    Delphi Corporation.

 4          Q.    So, is that the case even if --

 5    well let me lay a foundation.  Do some of

 6    these employees perform services for any of

 7    the subsidiaries of Delphi Corporation who are

 8    debtors in this case?

 9          A.    They may.

10          Q.    Do you know for sure?

11          A.    As I sit here, I don't think I

12    could stipulate as to that.

13          Q.    What's your understanding?

14          A.    That, we have subsidiaries in

15    different legal entities in the company and

16    that we also have a corporate structure.  And

17    the actual employment relationship through

18    that, as I sit here, I wouldn't be able to

19    stipulate.

20          Q.    Why don't you take a look, if you

21    would, at Exhibit 16 for a moment?  There are

22    two structure charts, if you look at the one

23    with the green and red boxes?

24          A.    Mine is in grey tones.

25          Q.    Yeah, page 32.
```

```
 1          DELPHI CORPORATION                    29

 2     A.     Okay.

 3     Q.     This is the organizational

 4   structure of the debtor and non-debtor

 5   entities -- I have it in color if it would

 6   make it easier for you to take a look.  But,

 7   looking at this organizational chart, does

 8   that help you or know or answer the question

 9   as to which of the debtor entities, the UAW

10   members perform services for?

11     A.     No, it does not.

12     Q.     To the extent that UAW members

13   perform services for debtor subsidiaries, as

14   opposed to Delphi Corporation, do you know how

15   they're paid or by whom?

16     A.     I believe that we have different --

17   well, when you say how they're paid or whom,

18   can you clarify?

19     Q.     By whom?

20     A.     You mean through what payroll

21   system?

22     Q.     By what entity they're paid?

23     A.     I believe we have some employment

24   structures and we have a payroll system that

25   actually processes a check.  And when I say,
```

```
 1            DELPHI CORPORATION                30

 2    employment structures, other legal entities

 3    for employees, I believe, outside the state of

 4    Michigan.

 5         Q.    Do you know what the name of the

 6    legal entity is then, that's paying the

 7    employees?

 8         A.    As I sit here, no, I don't.

 9         Q.    Is it Delphi Corporation?

10         A.    I'm uncertain.

11         Q.    To the extent that employees are

12    paid by this legal entity that you referred

13    to, are intercompany claims then asserted by

14    that entity against the specific legal

15    entities for whom the UAW employees are

16    providing services?

17         A.    I'm sorry; could you repeat the

18    question again?

19         Q.    To the extent that this legal

20    entity referred to, is making payments to UAW

21    members for services performed for various

22    debtor entities, is there then a system of

23    intercompany liabilities created to charge

24    those payroll costs for these UAW employees to

25    the legal entities for whom they are
```

2    performing services?

3         A.    I don't know.

4         Q.    Do you know who would know that?

5         A.    It may be someone in our finance

6    organization.

7         Q.    Do you think Mr. Sheehan would know

8    that?

9         A.    I don't know.

10        Q.    Okay.  The subsidiary entities, as

11   I understand it, are not parties to the

12   Collective Bargaining  Agreement with the UAW,

13   is the correct?

14        A.    I believe its Delphi Corporation.

15        Q.    Okay.  Are the subsidiary entities

16   free to go out and hire -- well, let me ask it

17   this way.  Are the subsidiary entities bound

18   by the terms of the Collective Bargaining

19   Agreement between Delphi and the UAW?

20        A.    I believe that all our management

21   structure that associates under the Collective

22   Bargaining  Agreement is bound.

23        Q.    I'm not sure I understand your

24   answer?

25        A.    I'm --

1         DELPHI CORPORATION              32

2              MR. BIENENSTOCK:  Objection.  He's

3      given.

4           THE COURT:  Well, you could

5      certainly ask him the question.

6  BY MR. FOX:

7      Q.    What did you mean by your

8  management structure being bound?

9      A.    I mean, the management of Delphi

10 Corporation and the way we diffuse our

11 responsibilities and interact with the unions

12 are bound.  As you ask me a question about

13 legal entities -- not being aware, I'm not

14 sure exactly what that means.

15     Q.    But, when you said the management

16 structure, you talking about individual

17 managers or are you talking about entities?

18     A.    I'm talking about Delphi

19 Corporation and the management that carries

20 out acts, or performs under the contract with

21 the union.

22     Q.    Well, is it your understanding --

23 do you know, or do you have a view as to

24 whether Delphi Automotive Systems, LLC is

25 bound by the provision of the Collective

1        DELPHI CORPORATION                    33

2  Bargaining  Agreement between Delphi

3  Corporation and the UAW?

```
4                MR. BIENENSTOCK:  Objection.

5         That's a legal conclusion, legal

6         conclusion.  The contract speak for

7         themselves.

8                MR. FOX:  We could put the contract

9         into evidence.

10               MR. BIENENSTOCK:  Well, I --

11               THE COURT:  He's already testified

12        that he doesn't know, except for Delphi,

13        as an entity bound by the Collective

14        Bargaining  Agreement.

15               MR. FOX:  Then, that's all I'm

16        going to have for this witness, Your

17        Honor.

18               THE COURT:  Okay.  Any re-direct?

19               MR. BIENENSTOCK:  I have no re-

20        direct, Your Honor.

21               THE COURT:  You can step down, sir.

22               THE WITNESS:  Thank you, Your

23        Honor.

24               MR. BUTLER:  Your Honor, I'd like

25        to present now, Mr. John Sheehan, the
```

```
1         DELPHI CORPORATION              34

2         company's corporate restructuring

3         officer, in connection with cross-

4         examination with respect to his
```

```
 5          declaration which has been admitted into

 6          evidence as Exhibit Number 18.

 7               THE COURT:  Okay.

 8               MR. BUTLER:  Mr. Sheehan.

 9               (The Witness Is Sworn)

10     CROSS-EXAMINATION BY

11     MR. FOX:

12          Q.   Good afternoon, Mr. Sheehan.  My

13     name is Edward Fox on behalf of Wilmington

14     Trust Co.  Mr. Sheehan, do you know whether --

15     you just heard Mr. Butler's testimony, is that

16     correct?

17          A.   I did, sir.

18          Q.   Okay.  I'm going to again, refer to

19     the union members -- members of the UAW and

20     the United Auto Workers if that's okay with

21     you?

22          A.   Yes, sir.

23          Q.   Okay.  Do you know whether -- are

24     you familiar with the corporate structure of

25     Delphi Corporation and its debtor
```

```
 1          DELPHI CORPORATION              35

 2     subsidiaries?

 3          A.   Generally, yes.

 4          Q.   Okay.  And, can you tell me whether

 5     there are UAW members that perform services
```

6      for debtor subsidiaries in Delphi Corporation?

7          A.    It would be my understanding that

8      the significant portion of our U.S. operations

9      are conducted within the legal entity, Delphi

10     Automotive Systems LLC.

11         Q.    And, do the UAW members perform

12     services for Delphi Automotive Systems LLC?

13         A.    The UAW members perform services

14     for the operation in which they're operating.

15     So, they are performing services in a

16     particular manufacturing facility.  That

17     manufacturing facility is owned by, in most

18     instances, Delphi Automotive Systems LLC.

19         Q.    Does that mean that there on

20     facilities owned by Delphi Automotive Systems

21     LLC in which UAW members perform services?

22         A.    Can you ask your question again,

23     please?

24         Q.    Does your previous answer mean that

25     there are plants owned by Delphi Automotive



1          DELPHI CORPORATION                36

2      Systems LLC, in which UAW members perform

3      services?

4          A.    Yes, sir.

5          Q.    Okay.  And, Delphi Automotive

6      Systems LLC is a subsidiary of Delphi

```
 7   Corporation?

 8        A.    That is my understanding.

 9        Q.    Okay.  Now, to the extent that

10   those UAW members perform services for Delphi

11   Automotive Systems LLC, do you know who

12   they're -- are they technically, in your view,

13   employed by Delphi Automotive Systems LLC?

14        A.    It is my understanding that a

15   significant portion of the UAW employees that

16   are -- that we have in the United States are

17   employed by a subsidiary other than Delphi

18   Automotive Systems LLC.

19        Q.    Do you know which subsidiaries that

20   might be?

21        A.    I would want to consult with

22   Exhibit -- see Exhibit 16 before answering

23   that.

24        Q.    Feel free to take a look, if that

25   will help you answer the question.
```

```
 1        DELPHI CORPORATION              37

 2        A.    I believe that for a significant

 3   number of employees that they are employees of

 4   Delphi Automotive Systems Human Resources LLC.

 5        Q.    Now, to the extent -- how are the

 6   UAW employees paid by -- or let me ask it this

 7   way.  By whom, are the UAW employees paid that
```

8      work for, I guess, Delphi Automotive Systems

9      Human Resources LLC?

10          A.     Delphi operates a cash pooling

11     system with respect to its U.S. Operations.

12     That cash pooling system is run by Delphi

13     Automotive Systems LLC.  Therefore, the

14     payroll expenditures or payments, the checks,

15     I believe, are issued out of Delphi Automotive

16     Systems LLC.

17          Q.     Now, is there a system of

18     intercompany accounts that allocates among the

19     subsidiaries that receive the services of the

20     UAW members to charge those entities for the

21     cost of paying them for their services?

22          A.     I'm not aware.

23          Q.     What's your position with the

24     debtor, sir?

25          A.     I'm the vice president, chief


1          DELPHI CORPORATION                    38

2      restructuring officer, chief accounting

3      officer and comptroller.

4          Q.     And, you were for a time, also the

5      chief financial officer?

6          A.     I was the acting chief financial

7      officer, that's correct?

8          Q.     Okay.  But you don't know whether

9   there's a systems of inter -- does the company

10  generally -- does the debtor generally have a

11  system of intercompany accounts to deal with

12  cash that comes in through various entities?

13       A.    The company does have intercompany

14  accounts, yet it does.

15       Q.    Does the company maintain books and

16  records to keep track of the cash flow between

17  various debtor entities?

18       A.    The U.S. operations are highly

19  integrated, and as a result, the individual --

20  the individual legal entities in the United

21  States, we are not charging back and forth

22  cash transactions among those entities.

23       Q.    Do you keep track at all, among

24  these legal entities?

25       A.    We do, generally, keep track among


1        DELPHI CORPORATION                    39

2   the legal entities, yes.

3        Q.    But, you're not keeping track of

4   the payments to the employees?

5        A.    As I sit here today, at the top of

6   my head, I do not know.

7        Q.    As the chief accounting officer of

8   the company, you don't know?

9        A.    That's correct, sir.

10        Q.    Okay.  To your knowledge, can a

11   debtor subsidiary such as Delphi Automotive

12   Systems LLC, if it needs to, just go out and

13   hire an employee.  Or do they have to use a

14   union employee, for the types of services

15   covered by the Collective Bargaining

16   Agreement?

17        A.    I'm sorry.  Can you ask that

18   question again, please?  I'm sorry.

19        Q.    As an example, Delphi Automotive

20   Systems LLC needed to hire an hourly employee

21   to perform the types of services that the UAW

22   members typically perform, could Delphi

23   Automotive Systems, to your knowledge, go out

24   and just hire somebody or do they have to hire

25   somebody who's in the union?

 1             DELPHI CORPORATION                40

 2             MS. CECCOTTI:  I'm going to object

 3        at a minimum to the form, and also to

 4        relevance.

 5             THE COURT:  Do you have any

 6        response?

 7             MR. FOX:  I'll withdraw it.

 8             THE COURT:  Okay.

 9             THE WITNESS:  Thank you.

10   BY MR. FOX:

11        Q.    You're aware, Mr. Sheehan, that

12    pursuant to the terms of the attrition

13    agreement, that General Motors at a minimum

14    may assert certain claims against Delphi

15    Corporation.  Do you understand that to be the

16    case?

17        A.    I understand that to be the case,

18    that they may assert claims.

19        Q.    Okay.  Now, to the extent that

20    General Motors asserts claims against Delphi

21    Corporation, pursuant to the terms of Section

22    7(b) of the attrition agreement, do you know

23    whether Delphi Corporation, at that point,

24    would have seeked to assert claims against

25    debtor subsidiary entities to recover all or a

 1        DELPHI CORPORATION                41

 2    portion of what Delphi Corporation has to pay

 3    to General Motors in respect of its claim?

 4        A.    As I sit here today, I don't know.

 5        MR. FOX:  That's all I have, Your

 6    Honor, thank you.

 7        THE COURT:  Okay.  Any re-direct?

 8        MR. BUTLER:  No re-direct, Your

 9    Honor.

10        THE COURT:  Okay.  You can step

11    down.

12          MR. BUTLER:  Your Honor, in terms

13     of the evidentiary record, the debtors

14     will rest on Exhibit's 1 through 33,

15     including the declarations of Mr. Sheehan

16     and Mr. Butler as they have been admitted

17     into evidence.

18          THE COURT:  Okay.  All right.

19          MR. BUTLER:  Anyone else have

20     anything they want to put in the record?

21          MR. SEIDER:  Your Honor, the

22     committee is satisfied with Exhibit's 1

23     through 33.

24          MR. FOX:  Nothing to add.

25          THE COURT:  Okay.


1     DELPHI CORPORATION                    42

2          MR. BUTLER:  Your Honor, I move to

3     close the evidentiary record.

4          THE COURT:  All right.  It's

5     closed.

6          MR. BUTLER:  Your Honor, we have

7     addressed the Human Capital motion in

8     detail in our pleadings.  With Your

9     Honor's permission, I'd like to defer my

10     argument until I've heard the objections

11     presented by the two objectors.  In my

12     light of the Court's schedule this

```
13        afternoon I don't know it's a useful of
14        the Court's time to walk through the
15        Human Capital motion in great detail.
16        I'm happy to do it if the Court would
17        like me to, but I think it might be
18        useful to sum up after --
19             THE COURT:  All right.  I'm looking
20        through my notes if it makes sense for me
21        to hear people too, or request some
22        questions first, but I'll hear the
23        objectors first.
24             MR. BUTLER:  Thank you, Your Honor.
25             MR. SEIDER:  Good afternoon, Your
```

```
 1        DELPHI CORPORATION                  43
 2        Honor.  Mitchell Seider of Latham &
 3        Watkins on behalf of the creditor'
 4        committee.  Your Honor, before getting to
 5        the fisher, if you will, between the
 6        committee and the debtors on the debtor's
 7        motion, I would like to go over what we
 8        think is some common ground.  The
 9        committee is in general, supportive of
10        the debtor trying to reach an
11        accommodation with its hourly work force
12        in order to provide the hourly workers
13        with a soft landing as the debtor seems
```

14          to transform itself and shrink the size

15          of its U.S. labor force, particularly its

16          hourly force.  Additionally, Your Honor,

17          the committee doesn't quibble with GM's

18          interest in reserving rights to assert

19          claims after the implementation of the

20          program.  However, Your Honor, the

21          committee is quite concerned that the

22          consideration that's being provided to GM

23          in this particular program is neither

24          appropriate nor allowable.  Your Honor,

25          if the motion is granted the total claims


1          DELPHI CORPORATION                44

2          of GM arising from the program back

3          against the debtors would be in excess of

4          3 million dollars.  This was Mr.

5          Sheehan's testimony in his deposition two

6          days ago, that's Exhibit 33, Your Honor,

7          page 47, lines 4 through 23.  Mr.

8          Sheehan, Your Honor, of course is the

9          debtor's chief restructuring officer.

10          Mr. Kevin Butler addressed the same issue

11          in his deposition on Wednesday, as well.

12          Mr. Butler is of course, the director's

13          vice president for labor relations.  He

14          came to the same conclusion as Mr.

15          Sheehan, essentially, at Exhibit 32, page

16          92, lines 24 through page 93, line 21.

17          Under the program, Your Honor, GM is

18          authorized to assert this 3 billion

19          dollars in claims under the U.S. Employee

20          Matters Agreement, which is Debtor's

21          Exhibit 3.  GM's right to do so is

22          acknowledged by the debtors in paragraph

23          25 of their omnibus reply, which was

24          filed yesterday afternoon.  For purposes

25          of the program, Your Honor, and the


1          DELPHI CORPORATION                    45

2          debtor's motion, the U.S. Employee

3          Matters Agreement includes certain other

4          agreements that the debtors have admitted

5          into evidence as Exhibits 4 and 5.  In

6          his deposition on Wednesday, Your Honor,

7          Mr. Butler, the debtor's vice president

8          for labor relations, indicated that GM,

9          will have under the programs -- what GM

10          would get under the programs and what the

11          U.S. Employees Matters Agreement actually

12          provides.  This was discussed in some

13          detail by the committee in its amended

14          objection.  I'm not going to go into it

15          in great detail right now unless that

16          would be useful; unless it would useful

17          for Your Honor.  However, I would like to

18          point out, Your Honor, that Mr. Butler's

19          testimony on Wednesday, did confirm

20          several of the assertions we made in our

21          amended objection.  First, Your Honor,

22          Mr. Butler acknowledged that the

23          provision in Section 4 of the attrition

24          program, allowing GM to consider those

25          Delphi employees who checked the box to


1          DELPHI CORPORATION                    46

2          be flow back employees under the Employee

3          Matters Agreement, that this provides GM

4          with rights that it would be allowed, by

5          virtue of the program, to assert in these

6          bankruptcy cases that are not found in

7          the Employee Matters Agreement.  That was

8          page 29 of Mr. Butler's deposition.  Your

9          Honor, that's Exhibit 32.  The debtor's

10          have essentially admitted this is well,

11          to be the case on the face, Your Honor,

12          that the Employees Matters Agreement

13          would not allow for GM to assert claims

14          based upon the, check-the-box portion of

15          the program.  I think in paragraphs 2 and

16          8 of GM's reply that was filed yesterday,

17          GM did not dispute this either.  Simply

18          put, Your Honor, in our view, the program

19          is a rewriting of the Employees Matters

20          Agreement.  The impact of allowing GM to

21          have the benefit of a rewriting of this

22          agreement for the check-the-box employees

23          is very significant for the committee in

24          this case.  I think as Mr. Butler

25          testified on Wednesday, page 105, line 7


1          DELPHI CORPORATION                    47

2          through 16, he thinks the liability of a

3          100 percent acceptance from the check-

4          the-box program would be for GM to have a

5          claim for approximately 2.8 billion

6          dollars.  Beyond that, in categories of

7          claims, Your Honor, to the Employee

8          Matters Agreement, the program would also

9          extend what is a key termination date in

10          the Employee Matters agreement.  As

11          Exhibit's 3, 4 and 5 demonstrate, your

12          Honor, the Employee Matters Agreement,

13          after December 31st, 2006, cuts off the

14          time in which GM can charge Delphi for

15          employees who flow back to GM after that

16          date.  So that is a termination date that

17          is in those agreements.  Under the

18      program, however, Your honor, GM will be

19      able to charge Delphi, under the Employee

20      Matters Agreement, for employees who flow

21      back after December 31st, 2006 and at

22      least through September 2007 and possibly

23      beyond.  That rewriting of the deadline

24      is also significant.  As Mr. Butler

25      testified, at page 128 of his deposition,

1      DELPHI CORPORATION        48

2      lines 9 through 20, the approximate

3      estimated cost per employee for the OPEB

4      is approximately $200,000.  What this

5      means, Your Honor, is that GM's

6      consideration for the program, if the

7      program remains as is, will be that GM

8      gets to assert claims under the Employee

9      Matters Agreement, that the debtors

10      expect will be in the vicinity of 3

11      billion dollars.  Now put this --

12      THE COURT:  Can I -- I'm sorry.  As

13      far as the last two matters, I'm still

14      grappling with what the cost is of the

15      change as opposed to the overall costs of

16      the flow back.  Is there anything in the

17      record, with respect to the cost to the

18      estates in the form of -- just even the

19        amount of a claim, for the nine month

20        extension?

21             MR. SEIDER:  No, Your Honor.  I

22        don't know that that's necessarily

23        knowable, because it depends on how many

24        employees flow back between December

25        31st, the deadline of the program, as it

1        DELPHI CORPORATION                49

2        existed to pre-petition 2006 and the

3        extended deadline that would be provided

4        for GM's benefit under the program.

5             THE COURT:  Okay.  So the parties

6        have not really dealt with that extra

7        nine month cost as an estimate?

8             MR. SEIDER:  If I understand Your

9        Honor's question, I don't think that a

10        projected cost for that additional stub

11        period of time has been projected by the

12        company.  If it has been, I don't think

13        that it's been shared with the committee.

14             THE COURT:  Okay.  And, with regard

15        to the first point you made, the impact

16        of a 100 percent acceptance on the check-

17        the-box flow back is estimated to be 2.8

18        billion?

19             MR. SEIDER:  That was Mr. Butler's

20      testimony.

21          THE COURT:  But, he testified that

22      it gives -- by conceding, or providing,

23      that GM can assert claims under the U.S.

24      Employee Matters Agreement, GM has rights

25      in excess of what they have now under

1       DELPHI CORPORATION                    50

2       that agreement.  I'm assuming, but

3       correct me if I'm wrong, that not all of

4       that 2.8 billion is in excess of what

5       they would have now.  That some portion

6       of that they could charge under the

7       existing agreements?

8           MR. SEIDER:  Your Honor, I don't

9       know the answer to whether they could use

10      the Employee Matters Agreement, absent

11      this program.

12          THE COURT:  Well, even leaving

13      aside that agreement, other agreements?

14          MR. SEIDER:  Other agreements, yes.

15      And that's a very important point, Your

16      Honor.  Because those --

17          THE COURT:  Well, I know there are

18      timing issues in terms of the valuation

19      of the claim.  I'm really trying to get

20      to the quantification of the tradeoff

21          here.  I understand that in return for

22          agreeing to what it agreed to, GM got

23          something new; I think agreed to by the

24          debtor.  And, I understand generally from

25          your response, or your limited objection,


1          DELPHI CORPORATION                    51

2          thematically what those new things are.

3          But I'm looking in the record for some

4          basis of quantifying what it was that GM

5          got; to see whether it balances out or is

6          less than what it gave.

7               MR. SEIDER:  If I understand your

8          question, let me see if I can try and

9          answer it, Your Honor.  If you start from

10          the proposition that it is uncertain and

11          perhaps even dubious, the Employee

12          Matters Agreement could be used, absent

13          this program, to assert claims on flow

14          back at this point in time.  Making that

15          agreement applicable here, I think based

16          upon the testimony of Mr. Sheehan and Mr.

17          Butler, adds up to, potentially, a claim

18          of, in excess, of 3 billion dollars.  I

19          don't think that a fine point can be put

20          on it yet, because nobody knows how many

21          employees are actually going to check-

22        the-box, for instance, in flow back.

23              THE COURT:  But -- and you tell me,

24        if that provision were not in the

25        agreement that is up for approval today,


 1        DELPHI CORPORATION                    52

 2        wouldn't there be other agreements that

 3        GM and the debtors are a party to, that

 4        GM could assert claims under?

 5              MR. SEIDER:  Yes, there are.

 6              THE COURT:  In return for taking

 7        back their flow back employees.

 8              MR. SEIDER:  Yes, Your Honor.  And,

 9        in fact, I think that those agreements

10        that actually comprehend, in the scheme

11        of the relationship between Delphi and

12        GM, from the time of the spinoff this

13        type of development.  And I'm afraid, of

14        course, to the Benefit Guaranty and the

15        Indemnity Contract approximately a year

16        later given by the debtors to GM.

17              THE COURT:  So is the issue here,

18        and I'm not talking about now, the parent

19        versus the subs issue that Mr. Fox was

20        focusing a lot on during his cross.  But

21        with regard to the U.S. Employee Matters

22        Agreement, is the issue here one

23         primarily of an improved ability of GM to

24         fix its claim as opposed to getting a

25         whole new claim, ie, if it's under the


 1         DELPHI CORPORATION                53

 2         old agreements there are indemnification

 3         claims that may get fixed over time

 4         versus under the U.S. Employee Matters

 5         Agreement, you have claims that get

 6         fixed.  Once the actuaries are done and

 7         the parties are finished arguing about

 8         what the actuarial projections are?

 9              MR. SEIDER:  I think that's it,

10         Your Honor.  And, at the risk of a bad

11         analogy, I think from the committee's

12         prospective there is a very distinct

13         difference in the taste that's in your

14         mouth depending on which plate it comes

15         from.

16              THE COURT:  Well, I'm just trying

17         to figure out the cash impact of it,

18         though.  I mean, it's about 2.8 billion

19         dollars, its present value of some

20         difference plus maybe legal arguments

21         about 502(e) and the like, right?

22              MR. SEIDER:  I think it may be more

23         than a billion, Your Honor, but those

```
24        502(e) arguments are certainly very
25        valuable to the estate.
```

```
 1    DELPHI CORPORATION                54
 2          THE COURT:  All right.  But I'm
 3    just trying to quantify the dollar
 4    impact.  It's not 2.8 billion, because
 5    there are other agreements that they
 6    could assert claims under.  Or 3 billion
 7    depending on, you know, the nine months
 8    and --
 9          MR. SEIDER:  Your Honor, if you
10    start from the proposition that we need
11    to sort of know what the outside boundary
12    may be in the event that the program is
13    approved, then I think Mr. Butler and Mr.
14    Sheehan have told us, that its north of 3
15    billion dollars.  What it actually will
16    be, of course, depends upon the rate of
17    which people flow back.
18          THE COURT:  Right.
19          MR. SEIDER:  Now if we say, well,
20    is that the same impact under these other
21    agreements, subject of course, to the
22    502(e) rights, I think the answer to that
23    is actually no.  And the reason for that
24    is, the Employee Matters Agreement has
```

25          the effect of accelerating -- and putting

1          DELPHI CORPORATION                    55

2          aside 502(e), has the impact of

3          accelerating OPEB liability as people

4          live out their lives following the

5          expiration of the current GM and Delphi

6          CBAs in 2007.  It's our view, Your Honor,

7          that when GM and Delphi redo their CBAs,

8          regardless of whether its through an 1113

9          process, in Delphi's case, or through a

10          negotiation in GM's place prior to the

11          expiration, it's likely that the level of

12          OPEB provided in the new agreements, if

13          you will, Your Honor, is going to be less

14          than what's in the current plan.  By

15          using the Employee Matters Agreement, GM

16          will be able to capture for itself all of

17          the value, if you will, on the OPEB fully

18          loaded under the current Collective

19          Bargaining  Agreement.  But as it makes

20          modifications under its own agreement and

21          as Delphi's obligations come down either

22          through a restructuring of its current

23          CBA or through its 1114 motion, GM will

24          be paying out to the beneficiaries at a

25          lower rate.  And as a result, we believe,

```
 1          DELPHI CORPORATION                56
 2          will be capturing for itself the
 3          differential between the higher number
 4          under the Employee Matters Agreement and
 5          the lower number that it would pay out
 6          under the modified CBAs or the 1114 order
 7          that Your Honor may enter.  We think
 8          that's an important distinction.
 9              THE COURT:  Okay.  Besides the
10          502(e) point, are there other
11          distinctions?
12              MR. SEIDER:  Between the Benefit
13          Guaranty Indemnity on the one hand and
14          the employer's agreement on the other?
15              THE COURT:  Right.
16              MR. SEIDER:  Yes.  Mr. Rosenberg
17          has reminded me of an important point.
18          There are issues that surround, Your
19          Honor, the granting of the indemnity, or
20          the entry by the debtors into the
21          indemnity contract, approximately a year
22          after the spinoff.  And the
23          enforceability of the indemnity based
24          upon the lapse of time and perhaps other
25          factors that the committee is looking
```

```
 1        DELPHI CORPORATION              57

 2        into now that I don't think we need to

 3        get into at this point.  But, that timing

 4        sequence and these other factors could

 5        have a very significant impact on the

 6        vitality of that agreement as a basis for

 7        claims over time.  And, I do want to

 8        point out, Your Honor, that whatever

 9        infirmities there may be with the

10        indemnity, based upon the circumstances

11        of its being granted, that should not

12        really inform a decision today, that's in

13        the past and it's now to some extent, at

14        least, set in stone.  And, it will be

15        developed and it will be looked into as

16        we progress further in the case.  I think

17        the point here though, today, is that the

18        program will allow GM to use its Employee

19        Matters Agreement to shield itself, not

20        only from that investigation but from the

21        outcome of it as well as get the leg up

22        that Your Honor, I think, was indicating

23        a few moments ago in your questions.

24             THE COURT:  So, it's the parties

25        view that that type of issue is not
```

```
 1      DELPHI CORPORATION                    58

 2      preserved by the reservations of rights

 3      about the right to object?

 4          MR. SEIDER:  I don't think it is,

 5      Your Honor, because the way in which I

 6      think the language works in 7(d), I think

 7      it says that the claim that arises under

 8      the Employee Matters Agreement becomes a

 9      general pre-petition unsecured claim.

10      And --

11          THE COURT:  You read the language

12      that the debtors put into their reply to

13      amend the proposed order, and it goes on

14      for several lines.  But, I think you're

15      probably right, but I just want to make

16      sure.  It says, "the avoidance of doubt,

17      nothing in the motion, the UAW Special

18      Attrition Program Agreement or any other

19      documents, shall prejudice the right of

20      any interested party, including the

21      debtors and the creditors' committee, to

22      challenge the allowability amount or

23      priority of any claims asserted by GM,

24      except that."  Up to that point

25      everything is fine, that's what you want
```

```
 1          DELPHI CORPORATION                    59
 2     period.
 3          MR. SEIDER:  Yes, Your Honor.
 4          THE COURT:  Then it says, "Except
 5     that GM's claims, if any, with respect to
 6     OPEB under paragraph 4 of the UAW Special
 7     Attrition Program Agreement or Active
 8     Healthcare and Life Insurance under
 9     paragraph 7(d) of the agreement, shall
10     not be subject to objection on the basis
11     the claims were not assertible under the
12     U.S. Employee Matters Agreement."  So, I
13     guess you're saying that, that confirms
14     that it's assertible under this agreement
15     and I guess the step that's not stated in
16     that proviso is that they're assertible
17     under that agreement as of today.  So,
18     you can't look back at the circumstances
19     when the indemnification agreement was
20     entered into and assert whatever legal
21     theories you want to assert, to say that
22     they shouldn't have a claim back under
23     the indemnification agreement.  Is that
24     the issue?
25          MR. SEIDER:  That is a fair
```

```
 1          DELPHI CORPORATION                    60
```

```
2        statement, Your Honor.  And, I think it's

3        --

4             THE COURT:  I mean, that's implying

5        something that's not necessarily stated

6        in the order.

7             MR. SEIDER:  Well, we think that

8        "except" is a powerful word, Your Honor,

9        and we think also, Your Honor, that it

10        goes beyond that as well.  If you start

11        from the proposition that the Employee

12        Matters Agreement would not be

13        enforceable on a post-petition basis,

14        either because perhaps it gets rejected

15        as an executory contract, or because it's

16        a pre-petition agreement that's not

17        executory and it ends up being the

18        subject of some sort of claim objection.

19        GM would then be left in the ordinary

20        process with whatever rights it may have

21        under the Benefit Guaranty and the

22        indemnity.  Our concern is that this

23        order will shield from that process the

24        claims under the Employee Matters

25        Agreement by taking away, if you will --
```

```
1             DELPHI CORPORATION              61

2        in addition to the leg up that we've
```

3      talked about, will take away from the

4      committee, Your Honor, an ability to have

5      that agreement set aside.

6          THE COURT:  But if you reject it,

7      GM would still have a damages claim,

8      wouldn't they?

9          MR. SEIDER:  Conceivably you do,

10     and then you get into the question of

11     allowability.  Which I don't think is

12     necessarily here, but our concern is that

13     if we do this today, even if we do reject

14     it, we're going to be a leg down on the

15     allowability defense.  May I continue,

16     Your Honor.

17         THE COURT:  Yeah.  I'm just trying

18     to think that through.  Well, GM asserts

19     that these may be covered under the

20     employee agreement, right, already?  Or

21     do they not?

22         MR. SEIDER:  I don't know, Your

23     Honor.

24         THE COURT:  Okay.

25         MR. SEIDER:  I haven't seen an

1      DELPHI CORPORATION                    62

2      assertion in that regard, they may have

3      made it.  I may have missed it.

```
 4            THE COURT:  Okay.  All right.  Just

 5       going on, for a moment.  The point about

 6       the acceleration, if you will, of the

 7       claim, I understand the argument about

 8       the fact that in the future GM may

 9       succeed in revising those OPEB

10       liabilities as part of other negotiations

11       it will have with the union.  And/or the

12       debtor will have negotiations with the

13       union about those liabilities.  It seemed

14       to me you were making another argument

15       too, which was that by going through the

16       mathematical calculation that the U.S.

17       Employee Matters Agreement requires, that

18       the debtors were giving something on top

19       of that also to GM because it was a

20       mathematical calculation, as opposed to

21       being tied to actual experience.  Is that

22       --

23            MR. SEIDER:  That's right, Your

24       Honor.  You know, in the ordinary course

25       we keep coming back to it, but 502(e)
```

```
 1       DELPHI CORPORATION                    63

 2       says you get back what you pay out.

 3       Under the Employee Matters Agreement,

 4       that Your Honor now recognizes, there's
```

```
 5        the opportunity to get more than you pay

 6        out.

 7            THE COURT:  But because it is an

 8        actuarial calculation, and people do seem

 9        to keep living longer, is it just as

10        likely that there might be a benefit

11        there for Delphi?

12            MR. SEIDER:  Well, Your Honor, I'm

13        not a --

14            THE COURT:  Or maybe just a wash?

15        I don't know?

16            MR. SEIDER:  I'm not an actuary and

17        the committee's proposed actuary has not

18        had an opportunity to scrub the

19        assumptions, the what's and why it uses

20        in making the actuarial calculation of

21        the claim for GM.  So, yes I --

22            THE COURT:  Is that conclusive?  Is

23        there a mechanism under the Employee

24        Matters Agreement for dueling actuaries and

25        then a third actuary to come in or do you
```

```
 1        DELPHI CORPORATION                64

 2        just rely on GM's actuary?

 3            MR. SEIDER:  Well, Your Honor, I

 4        think that's in essence where you end up

 5        because GM's actuary and Delphi's actuary
```

```
 6        are the same firm.
 7             THE COURT:  Well, that's a good
 8        deal.  Well, no, Appaloosa didn't like
 9        them, but generally they're pretty --
10        actually they liked each other, the two
11        actuaries, quite respectful of each other
12        at the last hearing.
13             MR. SEIDER:  Sort of like law
14        students marrying one another.
15             THE COURTROOM:  All right.  Okay.
16        So you can continue.
17             MR. SEIDER:  Thank you, Your Honor.
18        We've talked about the Employee Matters
19        Agreement, there's another requirement
20        that's related to it that I'd like to
21        make -- it has to do with the Benefit
22        Guaranty.  Your Honor, as you know, the
23        Benefit Guaranty expires in September of
24        2007.  And, of course, the indemnity
25        obligation to the extent that it's
```

```
 1        DELPHI CORPORATION                65
 2        enforceable with one at that time as
 3        well.  I think when we talk about the
 4        Employee Matters Agreement as the vehicle
 5        for the claim, on the one hand, and the
 6        Benefit Guaranty/indemnity as the vehicle
```

```
 7          on the other, at bottom we're talking

 8          about is who's going to bear the cost of

 9          the employees flowing back to GM from

10          Delphi.  Because if this comes in under

11          the Employee Matters Agreement, the great

12          likelihood is that it's going to be borne

13          by the estate or unsecured creditors.  If

14          it goes to the Benefit Guaranty and it

15          goes to the indemnity, then at least

16          there's an open question as to who bears

17          it.  And, we think at this juncture in

18          the case, Your Honor, it is certainly

19          premature to make that decision in a way

20          that we'll have repercussions for the

21          rest of the case.  We're asking, in

22          essence, that the matter remain open

23          until such time there's been an

24          opportunity for parties to more develop

25          the facts and have a full say on this.
```

```
 1          DELPHI CORPORATION                 66

 2          Mr. Butler was, I think, was very

 3          forthcoming about this program coming

 4          down the pike and trying to give us

 5          information.  But nevertheless, this is

 6          something of significant magnitude that

 7          we're here on with respect to the
```

8       pleadings that was done on 16 days

9       notice.  We've done what we can to get up

10      to speed on it, but that is certainly one

11      of our observations that there is a

12      shifting here, if you will, by virtue of

13      this program of the risk on who's going

14      to bear the cost of the flow back.

15          THE COURT:  And, again, that's

16      because it's contemplated that there will

17      be future negotiations on the flow back,

18      separate and apart from this.

19          MR. SEIDER:  Yes, Your Honor, I

20      would expect that there will be.  I have

21      not -- I don't think that we have

22      anything concrete, but I think the

23      expectation is that --

24          THE COURT:  Not on the flow back,

25      I'm sorry, but on the underlying OPEB


1       DELPHI CORPORATION                    67

2       liabilities?

3           MR. SEIDER:  Well, they're

4       certainly related and I'll get to that in

5       a moment to the relationship between

6       today's program and the recently filed

7       motions with respect to the Collective

8       Bargaining  Agreements and the employee

```
 9        welfare obligations.  Excuse me, retiree

10        welfare obligations.  Your Honor, I'd

11        like to spend a moment, if I could,

12        talking about the (indiscernible),

13        because we just got the reply from the

14        debtors yesterday and just got the reply

15        from GM as well.  And, I don't want to

16        spend a whole lot of time on this, but I

17        think there are a couple of points that

18        are important to make.  As I understand

19        the debtor's position and I think it's

20        GM's position as well.  Let me split the

21        two, actually.  As I understand GM's

22        position, its put value on the table and

23        it's entitled to consideration in

24        exchange for that value and the details

25        are just going have to sort of cow tow,
```

```
 1        DELPHI CORPORATION                68

 2        if you will, to that fact that

 3        consideration is owed, period.  As I

 4        understand the debtors position, Your

 5        Honor, this rewriting, if you will, of a

 6        pre-petition agreement can be justified

 7        under 363(b) as an exercise of the

 8        debtors business judgment.  Respectfully,

 9        Your Honor, we think that they're both
```

10          wrong.  I'd like to tell you why.

11          There's nothing in 363(b), of course on

12          its face, that provides a right for a

13          party to go back in time and re-write its

14          pre-petition agreements.  We found a

15          couple of cases that we think may be

16          useful to Your Honor, in this regard.  On

17          is Farmor v. Strauss Building Associates,

18          it's at 204 Bankruptcy Reporter 948.  In

19          that case, a debtor sought to amend the

20          partnership agreement with the requisite

21          consent -- a pre-petition partnership

22          agreement, with the requisite consent of

23          its limited partners under Section

24          363(b).  The Bankruptcy Court denied the

25          motion and it relied on what it described


1          DELPHI CORPORATION                    69

2          as 6th Circuit precedent.  That

3          bankruptcy courts should not rewrite pre-

4          petition contracts to add provisions.

5          The district court then affirmed the

6          bankruptcy court.  That is in essence

7          what we're doing here; we're rewriting

8          the Employee Matters Agreement, to add

9          new provisions to it, to accommodate the

10          check-the-box flow backs.  Your Honor, I

11          think it's been said numerous times in

12          numerous bankruptcy courts, but however

13          expansive the bankruptcy court's power

14          may be, to protect the property interests

15          of the debtor-in-possession it does not

16          extend to enlarging its rights under a

17          pre-petition contract or rewriting the

18          terms of a pre-petition contract that was

19          said by the Court in EES Lambert

20          Associates which is 62 BR 328.  Your

21          Honor, I'd like to spend also, if I

22          could, a moment talking about --

23              THE COURT:  I'm sorry, I don't

24          quite follow the logic of that.  I mean,

25          certainly it applies in certain

1       DELPHI CORPORATION                    70

2          situations where the other party to the

3          contract doesn't agree, but the debtor is

4          using these agreements as a starting

5          point for how its relationship with GM

6          and the union, on these issues, is going

7          to be dealt with.  How is this different

8          than Delphi agreeing to pay X dollars and

9          the union agreeing to accept X dollars

10         and GM saying we'll pick up X dollars of

11         that but you have to agree to give us a

12          little bit -- or a lot according to you,

13          of X dollars in this respect.  I mean,

14          why would one be prohibited and the other

15          wouldn't be?

16              MR. SEIDER:  Your Honor, I think

17          what you're describing would be a post-

18          petition amendment of a pre-petition

19          agreement that could come up in the

20          context, or would come up in the context

21          of an assumption and a modification of

22          the 365, or more importantly, or perhaps

23          more accurately in these circumstances, a

24          new agreement.  And, if that new

25          agreement, were put before the creditor

1          DELPHI CORPORATION                71

2          body, I presume that we would have what

3          we haven't had from the debtors.  We

4          would have some evidence from the debtors

5          about what the debtors actually project

6          the number of flow backs will be, what

7          the cost of that is going to be in dollar

8          terms, and we have --

9              THE COURT:  But it is the same

10          analysis under 365, except for the rights

11          of cure, as under 363(b)?

12              MR. SEIDER:  Well, Your Honor --

13                THE COURT:  I mean, don't accept

14        that I blindly agree with the debtor's

15        business judgment --

16                MR. SEIDER:  Yes.

17                THE COURT:  -- in that argument,

18        but, I mean, I don't see where else

19        there's a distinction between 363 --

20                MR. SEIDER:  Your Honor --

21                THE COURT:  -- if we can accept

22        that the estate is burdened with

23        additional administrative costs --

24                MR. SEIDER:  Yes.

25                THE COURT: -- if it's an


 1        DELPHI CORPORATION                  72

 2        assumption.

 3                MR. SEIDER:  Yes.  Well, first Your

 4        Honor, there's been no showing the 365 is

 5        applicable here that this is an executory

 6        contract.  It would certainly strike --

 7                THE COURT:  I know, but that's why

 8        they're not doing it under 365.  They're

 9        going under 363(b).

10                MR. SEIDER:  I'm sorry, Your Honor,

11        I was looking at a note.  If Your Honor's

12        question was they're not going under 365

13        because 365 isn't appropriate here, so

14          they're going to 363, that in it of

15          itself, doesn't make 363 available for

16          this relief.  We haven't -- we don't have

17          a -- and I think the debtors cases sort

18          of points this out, we don't have a new

19          transaction with a new set -- with new

20          consideration being provided to and from

21          the parties like in the Montgomery Ward

22          case, the debtors cited who were a KERP

23          program was approved under Section 363

24          above the objection of some parties based

25          upon the debtors business judgment.  I


 1          DELPHI CORPORATION                    73

 2          think if there were cases out there in

 3          which Courts had authorized the debtor to

 4          go back and redo its pre-petition

 5          agreements outside of a planned context

 6          under 363, the debtors would have found

 7          them and they would have been in the

 8          debtor's papers, but they're not.  And I

 9          think that that's rather telling.  We

10          looked from the time we got the debtors

11          papers yesterday --

12              THE COURT:  Well no one cited me

13          anything to the contrary other than

14          Braniff.  And, I don't find Braniff

15        particularly moving here.

16            MR. SEIDER:  I think that the case

17        I just mentioned to Your Honor, the

18        Farmor case in which the debtor,

19        notwithstanding the consent of the

20        limited partners, was not allowed to use

21        363 to rewrite its pre-petition

22        partnership agreement.  I think that's

23        probably more in point than what we've

24        seen from the debtors on this point.

25            THE COURT:  Okay.


 1        DELPHI CORPORATION                    74

 2            MR. SEIDER:  Your Honor, I would

 3        also if I could, like to talk for a

 4        moment about the other line of authority

 5        that the debtors have relied on.  The

 6        class action settlement principal that,

 7        as a general matter when a class action

 8        is settled under Rule 23, the Court

 9        should not insert itself in the deal that

10        the parties have made.  I think, Your

11        Honor, there's a huge distinction between

12        a Rule 23 class action settlement, on the

13        one hand, and a Chapter 11 case on the

14        other.  In the Rule 23 context of course,

15        if the class has been adequately formed,

16          adequately drawn, all of the parties with

17          an economic stake in the settlement or

18          have been represented or are represented

19          at the bargaining table.  In this

20          situation the committee and other parties

21          in interest were not at the bargaining

22          table when this deal was done.  I don't

23          now if we were intentionally excluded or

24          somebody just forgot to put our

25          invitation in the mail, but we weren't



1          DELPHI CORPORATION                    75

2          there.  And, I think that distinguishes

3          this case from --

4               THE COURT:  But I thought all they

5          were saying there that my alternatives

6          here are either to approve their

7          performance under this agreement or to

8          disapprove it.  And not to impose upon

9          the other parties terms that the other

10          parties wouldn't agree to.  Well I'm

11          certainly free to tell everyone that I

12          would approve it under certain

13          conditions.  But aren't they right; I

14          can't tell GM and the UAW that they must

15          perform this agreement with the following

16          additional terms to it?

```
17              MR. SEIDER:  No.  We certainly

18         agree with that, Your Honor.  And the UAW

19         is not really on the table here.  We have

20         no quibble with the benefits for their

21         workers.

22              THE COURT:  No.  I understand that.

23         I was just --

24              MR. SEIDER:  It's a GM issue.

25              THE COURT:  Right.
```

```
 1         DELPHI CORPORATION                  76

 2              MR. SEIDER:  Yes, Your Honor,

 3         that's right.  And I think you've

 4         actually sort of hit upon the next case I

 5         wanted to talk about.  It's a Second

 6         Circuit decision in the class action

 7         context, actually.  Plummer v. Chemical

 8         Bank, 668 Fed. 2d, 654.  The Court there

 9         said in a foot note and I think it's

10         probably dicta but I think it's

11         interesting nevertheless.  That a

12         dissatisified with a class action

13         settlement with circumspection may edge

14         the parties in which, what he believes,

15         to be the right direction.  So I think

16         that sort of covers what Your Honor was

17         hinting at a moment ago.
```

18          THE COURT:  Okay.

19          MR. SEIDER:  Now, Your Honor, we're

20      told today that this agreement must be

21      approved on these terms now as the first

22      step in a comprehensive labor deal.  We

23      actually, Your Honor, disagree with that.

24      The stakes from our perspective are so

25      high for GM and for Delphi that it's


1       DELPHI CORPORATION                77

2       illogical to think that if this deal is

3       not approved today on these terms,

4       somehow that would preclude the

5       possibility of an overall settlement of

6       the labor issues that face GM and the

7       labor issues, more importantly from our

8       perspective that face Delphi.  And I

9       think, Your Honor, the fact that we have

10      the filing of the motion to approve this

11      Attrition Program followed by the filing

12      of the Section 1113 or 1114 motions

13      underscores and demonstrates that point

14      quite effectively.  Furthermore, Your

15      Honor, if the Court were to approve the

16      motion today on the terms that are set

17      forth, and then the 1113 and the 1114

18      process go forward, and something

```
19         intervenes, some factor gets in the way

20         and there is not a global final

21         resolution of the labor situation,

22         unsecured creditors of this case are

23         going to be saddled with about 3 billion

24         dollars of claims on the promise that by

25         approving this agreement today, we were
```

```
 1         DELPHI CORPORATION                78

 2         going to get to a final labor resolution.

 3         Lastly, Your Honor, I do want to make one

 4         other point.  We've been down this path

 5         in this case before.  Right before

 6         Thanksgiving, the creditors' committee

 7         was told that if we did not immediately

 8         agree to allow pre-petition vendors to

 9         receive hundreds of millions of dollars

10         in payments on their pre-petition claims,

11         that when their supply contracts expire

12         at the end of December and then in the

13         early part of this year, that the company

14         would no longer receive shipments from

15         those vendors and the company would fall

16         into a tailspin, and the case would

17         crater.  Obviously that's not what

18         happened here.  Excuse me, that's not

19         what happened.  And, Your Honor, the
```

20          answer at that time, when the debtors

21          came forward on that program, the answer

22          from the committee and with some guidance

23          from the Court, the answer was no.  The

24          debtor's problems need to be solved --

25                  THE COURT:  Well, I don't think it

1      DELPHI CORPORATION                    79

2      was implied -- no, I think that there was

3      a modification of the program.

4              MR. SEIDER:  Precisely, Your Honor.

5      But -- that's exactly the point.  There

6      was a no from the committee, let's sit

7      down, let's talk, and let's work out a

8      sensible solution to the real problem.

9      But to come and say it must be done

10     today, and it must be done in a way that

11     the bankruptcy code doesn't necessarily

12     countenance.  And, by the way, if we're

13     wrong, you unsecured creditors; you're

14     the ones who are going to shoulder the

15     full burden of our mistake.  That's what

16     we said no to at Thanksgiving, Your

17     Honor, or around Thanksgiving.  And

18     ultimately, we were able to work it out.

19     I think we're in the same position now

20     and I think that the same result ought to

21        be what obtains.

22            THE COURT:  Well, all right.  I

23        guess -- I'm coming back, though, to the

24        notion of what it really means even on

25        the down side.  And I agree with Mr.


1        DELPHI CORPORATION                80

2        Rosenberg that the committee needs to

3        focus on the down side as well as the up

4        side.  If in fact, the good efforts of

5        all the parties involved don't result in

6        a consensual labor agreement, it's not --

7        again, I keep coming back to the fact

8        that it appears to me that GM still has

9        -- well, that the workers still have the

10        ability to flow back and assert other

11        rights against the debtors.  And that,

12        although arguably, or maybe not even

13        arguably, that they would be under a

14        different agreement, GM would have claims

15        that it could assert as a result of that.

16        And, so, it doesn't seem to me that it's

17        a, you know, 3 billion dollars versus

18        zero dollars calculation.  If it would,

19        it would be a pretty easy -- you know,

20        pretty easy motion to deal with.  It

21        doesn't seem to me that that's the right

22        calculation.

23             MR. SEIDER:  Your Honor, it may be

24        something between zero and three billion,

25        but I think that the bottom line is, if

1         DELPHI CORPORATION                    81

2         they get the leg up on the Employee

3         Matters Agreement, it's going to be a

4         much larger number than it will be if

5         they don't.

6              THE COURT:  But, how much?  Because

7         there are clearly benefits to the debtor

8         to do this too.  Including GM's agreement

9         to take on liabilities that it would not

10        have to take on, and not to assert an

11        administrative claim, and a lot of other

12        things, the timing of it.

13             MR. SEIDER:  I'm not so sure that

14        GM wouldn't have to take on those

15        liabilities because of the existence of

16        and the language in the Benefit Guaranty.

17        Those are agreements that GM made with

18        the --

19             THE COURT:  Well, but what about

20        the lump sum instead of payment?  The

21        lump sum payments?

22             MR. SEIDER:  No.  The lump sum, I

23        don't think is necessarily contemplated

24        by the Benefit Guaranty.  That's correct.

25        That is a much smaller number.


1        DELPHI CORPORATION                    82

2            THE COURT:  Well, what is that

3        number?

4            MR. SEIDER:  Thirty-five thousand

5        dollars per employee.  Three hundred

6        million and a hundred percent.

7            MR. ROSENBERG:  If everybody

8        accepts that.

9            THE COURT:  Okay.  Well, I mean,

10        again, to me, if the difference between

11        doing this under the employee agreement,

12        as opposed to the indemnity agreement is

13        around 300 million, it's one calculation.

14        If it's around a billion or two billion

15        it's another calculation.  And, I still

16        don't -- I don't know the answer to that

17        question.  But I --

18            MR. SEIDER:  I think to know the

19        answer to that question, we'd have to

20        know a couple of things.  We'd have to

21        know what is the level of OPEB going to

22        be in the debtors next CBA?  And what is

23        it going to be in GM's.  And, Your Honor,

24          will GM be successful in asserting

25          elsewhere what it asserted in litigation



1           DELPHI CORPORATION                    83

2           that it recently compromised in the

3           Eastern District of Michigan regarding

4           its unilateral right to modify OPEB.

5           Because, Your Honor, if there is a

6           modification, as we discussed earlier,

7           the difference between the fully loaded

8           OPEB under the debtors current CBA and

9           the modified amount will be value that's

10          captured by GM if the Employee Matters

11          Agreement is used.  I don't think that

12          that would be the case under the Benefit

13          Guaranty.

14              THE COURT:  Okay.  Before you sit

15          down, there was one other point I didn't

16          fully understand in the objection.  In

17          paragraph 28, it says "finally the

18          program would provide an entirely new

19          claim, in favor of GM, for the healthcare

20          and life insurance benefits it provides

21          to active employees that flow back to

22          GM."  Why is that entirely new?

23              MR. SEIDER:  May I have a moment,

24          Your Honor?

25          THE COURT:  Yeah.  It emphasized

1     DELPHI CORPORATION                    84

2     the word active and that's why I didn't

3     follow.  I thought the flow back right

4     belonged to active employees.  But --

5          MR. SEIDER:  Yes, Your Honor.  The

6     right to flow back does belong to active

7     employees.  Allowing the claim to GM for

8     the active employees who flow back for

9     health care and life insurance benefits

10    is outside the scope of the Benefit

11    Guaranty and hence the indemnity and

12    there has been no conclusion as far as we

13    are aware that the U.S. Employee Matters

14    Agreement necessarily can be applied on a

15    post-petition basis to cover that.

16          THE COURT:  Why is that?

17          MR. SEIDER:  Well, as to the

18    Benefit Guaranty, Your Honor, I don't

19    think it addr --

20          THE COURT:  No.  It's the second

21    point about why the U.S. Employee Matters

22    Agreement wouldn't cover it?

23          MR. SEIDER:  Well first to this

24    threshold question, Your Honor, whether

25    that agreement is enforceable on a post-

```
 1        DELPHI CORPORATION                    85

 2        petition basis.  And then there is a

 3        question as to whether --

 4             THE COURT:  Because it's arguably

 5        executory and can be rejected?

 6             MR. SEIDER:  Or arguably, not

 7        executory, and then it's just a simple

 8        claim on the petition date.  That hasn't

 9        been explored.  Additionally, Your Honor,

10        I believe that there is nothing

11        necessarily in the Employee Matters

12        Agreement that speaks to the benefits

13        that are described in the first part of

14        that paragraph 27, for active employees.

15             MR. BIENENSTOCK:  May I help bun

16        this, Your Honor.

17             THE COURT:  Okay.

18             MR. BIENENSTOCK:  Not wanting to

19        figure out of order, but I think the

20        short answer to this question is that the

21        flow back that we're talking about here,

22        are not flow backs that GM would have to

23        allow other than under the Special

24        Attrition Program.  So we're agreeing to

25        take flow backs that we wouldn't
```

```
 1      DELPHI CORPORATION                    86

 2      otherwise have to take.

 3              THE COURT:  Okay.

 4              MR BIENENSTOCK:  And instead of

 5      getting it admin claim, we agree to take

 6      a general unsecured pre-petition claim.

 7              THE COURT:  Okay.  I guess that's

 8      right.  If the agreement wouldn't apply

 9      in the first place, then you wouldn't

10      have to take them back.  Okay.  All

11      right.  That makes sense to me, do you

12      agree with that?

13              MR. SEIDER:  I'm sorry, I didn't

14      hear quite everything that's been said.

15              THE COURT:  What Mr. Bienenstock

16      said, is you were right in one respect

17      which is that the agreement really

18      doesn't require them to take these

19      employees back.  But, that you were wrong

20      in the sense that because it doesn't

21      require to take them back, now that they

22      are taking them back and paying for them,

23      they should get recompense for that and

24      they agree to do that on an unsecured

25      pre-petition claim basis as opposed to --
```

```
 1        DELPHI CORPORATION                    87

 2             MR. SEIDER:  We would say, Your

 3        Honor, that there are existing vehicles

 4        under which that claim could come in and

 5        it doesn't necessarily have to be the

 6        Employee Matters Agreement protected by a

 7        defense established under the program

 8        that one can't say that that agreement is

 9        not applicable to what's happening here.

10             THE COURT:  So you say that they

11        might be able to be forced to take back

12        active employees under the

13        indemnification agreement?

14             MR. SEIDER:  No, Your Honor.  What

15        I'm saying is if employees have their

16        benefits reduced by something that Delphi

17        does as a result of financial distress,

18        they have claims under the Benefit

19        Guaranty against GM, GM we believe will

20        assert rights under the indemnity

21        agreement back for what it pays under the

22        Benefit Guaranty.

23             THE COURT:  Leaving aside the flow

24        back issue?

25             MR. SEIDER:  Yes, Your Honor,
```

```
 1          DELPHI CORPORATION                88

 2      leaving aside the flow back issue.  And

 3      just to make sure that the point was

 4      clear, the check-the-box program, in the

 5      attrition program is something entirely

 6      new.  It's not something that's in the

 7      Employee Matters Agreement.

 8              THE COURT:  Okay.

 9              MR. SEIDER:  Thank you very much,

10      Your Honor.

11              THE COURT:  Okay.

12              MR. FOX:  Good afternoon, Your

13      Honor.  Edward Fox from Kirkpatrick &

14      Lockhart Nicholson Graham on behalf of

15      Wilmington Trust Company's indenture

16      trustee.

17              Your Honor, I think -- my head is

18      still spinning from looking at these

19      agreements and trying to figure out what

20      the attrition agreement really means, but

21      I've certainly been helped to at least

22      understand what some of the parties think

23      it means based on some of the additional

24      pleadings and the discovery that we've

25      had since the motion was filed.
```

```
 1          DELPHI CORPORATION                89
```

```
 2                At a minimum, though, it seems to

 3           me that there is not a meeting of the

 4           minds here as to what this attrition

 5           agreement means at least with respect to

 6           paragraph 7.  And I'd also add, I think

 7           at the outset, that, at a minimum, Your

 8           Honor needs to understand what the

 9           agreement means and everybody needs to be

10           clear as to what Your Honor's

11           understanding is when you approve it

12           because that's the basis on which you're

13           going to make your determination, based

14           on your understanding of what the

15           agreement means as to whether it's an

16           appropriate agreement or not.

17                It seems to me, though, that, based

18           on some of the pleadings and the

19           deposition testimony, that I don't even

20           think that there is an agreement to the

21           extent that there is a meeting of the

22           minds with respect to paragraph 7.  If

23           you look at GM's reply, which is helpful,

24           quite frankly, in paragraph 2, the last

25           sentence on page 3, they say "GM is
```

```
 1           DELPHI CORPORATION                    90

 2           making new voluntary contributions not
```

3       required by the liability documents or

4       related documents or by any other

5       agreements for the benefit of the debtors

6       for which it is entitled to

7       consideration.  GM's right to assert

8       general unsecured claims under any of the

9       liability documents is simply the

10      consideration negotiated by GM and Delphi

11      for such contributions."

12          On the other hand, if you look at

13      the deposition testimony, for instance,

14      of John Sheehan, and he indicated that he

15      was one of the people who presented this

16      agreement to the board for the board's

17      approval, as I recall from the testimony,

18      that he has a different view.  When he

19      was asked about this, and I'm looking at

20      page -- we'll start on page 135, line 19

21      just to keep it short.  The question, I

22      believe is from Mr. Brant, was "You

23      participated in the presentation of these

24      proposals to the board.  We heard

25      conversation about that earlier and

1       DELPHI CORPORATION                    91

2       referring here to the language in

3       paragraph" -- it says "9.  Do you have

```
 4        any idea what is being" -- and I believe

 5        it should be 7 based on the rest of the

 6        question.  It says "Do you have any idea

 7        what is being conclusively deemed to be

 8        comprehended by your constituting your

 9        pre-petition general unsecured claim?"

10        The answer:  "I can only explain to you

11        what I understand is meant by those

12        words."  Question:  "What is meant by

13        those words?"  Answer:  "What I just

14        said.  That GM is neither advantaged by

15        or disadvantaged by this agreement in its

16        ability to assert claims for obligations

17        that it has assumed as a result.  As it

18        relates to OPEB or anything else under

19        paragraphs 4 or 7 under this agreement."

20             Now, GM is saying, as consideration

21        for what we're doing here, we're getting

22        something we didn't already have.  And

23        Mr. Sheehan is saying, they're not

24        getting that they didn't have.  They're

25        not any worse off; they're not any better
```

```
 1        DELPHI CORPORATION                92

 2        off.  So, the question is, which is it?

 3        And it makes -- and if they don't agree

 4        on that as to whether they're getting
```

5         something additional or not, then there's

6         no meeting of the minds here to have an

7         agreement.

8             THE COURT:  But GM just said we're

9         giving something so we should get

10        something back.

11            MR. FOX:  Well, I understand.  And

12        there's nothing wrong with that argument.

13            THE COURT:  But how is that

14        different from what Mr. Sheehan is

15        saying, which is that --

16            MR. FOX:  Mr. Sheehan is saying

17        they're not getting anything by this

18        agreement in their ability to assert

19        claims.

20            THE COURT:  No.  Well, at least I

21        read it to say that what they're getting

22        back is fair.  That's what I read it to

23        say.  That they're not -- you know, that

24        it's a fair trade.

25            MR. FOX:  No.  Well, he --


1         DELPHI CORPORATION                    93

2             THE COURT:  People may disagree

3         with whether it's a fair trade or not,

4         but -- I don't know that this is that

5         productive anyway.  I mean, I don't

```
 6        understand where you're going with this.
 7            MR. FOX:  If the parties are not in
 8        agreement as to what this agreement is --
 9            THE COURT:  No, but that's not -- I
10        don't think that's -- when you say that,
11        are you talking about what the agreement
12        means or what its underpinnings are?
13            MR. FOX:  No, what it means.
14            THE COURT:  Well, I don't think
15        that's -- I think it's not very
16        productive to look at Mr. Sheehan's
17        testimony on that point.  At least not
18        that section.  I mean, I understand that
19        the agreement's language as to the claim
20        that GM can assert is not a model of
21        clarity, and that's why I spent some time
22        with committee counsel on it, but I think
23        the order as revised as proposed at least
24        makes it more clear.  Although, I think
25        there's still some doubt, at least in my
```

```
 1        DELPHI CORPORATION                94
 2        mind, as to what it means to say it can
 3        assert a claim under the U.S. Employee
 4        Services Agreement.  Whether that claim
 5        is still subject to all of the arguments
 6        that -- as to, I guess, avoidance or
```

```
 7        subordination that the committee would

 8        make in respect of the indemnity

 9        agreement.  But, other than that, it

10        seems to be pretty clear to me that

11        everyone's rights are preserved to object

12        and GM is saying this is an unsecured

13        claim.

14             MR. FOX:  Well, except, again, when

15        you --

16             THE COURT:  And not a priority

17        claim.

18             MR. FOX:  No.  That, I think, is

19        clear.  But the question in the new

20        language that's being proposed, again, is

21        with the exception that's at the end that

22        Mr. Seider would have not preferred to be

23        in there, either.

24             THE COURT:  Right.

25             MR. FOX:  'Cause there are really
```

```
 1        DELPHI CORPORATION                95

 2        two issues as I see it at this point.  On

 3        that point.  One is are GM's rights

 4        enhanced to assert the claim with respect

 5        to these agreements?  Secondly, what are

 6        the other parties able to do in terms of

 7        objecting?  If you can object -- if you
```

8           can show up later and object to the claim

9           and say, look, the underlying agreements,

10          laying aside the attrition agreement,

11          don't provide for this, that's one thing.

12          GM's not saying this.

13                THE COURT:  Well, it's clear to me

14          that that's not what the agreement is.

15                MR. FOX:  Okay.

16                THE COURT:  It's clear to me that

17          what they bargained for is to say that

18          these various payments would be

19          assertable under this agreement and that

20          -- the only area that's not clear to me

21          is if by that language it's intended that

22          any issues as to the avoidability or

23          infirmities of the other agreements, not

24          based on their language not applying but

25          based on the circumstances under which

1           DELPHI CORPORATION                    96

2           they were entered into, is somehow

3           preserved.

4                MR. FOX:  Well, I understand Your

5           Honor's view and I'll move on based on

6           that.

7                THE COURT:  Well, I mean -- no.

8           It's a basis -- you're certainly free to

9      object on the basis that that's not a

10     good deal, but I think that's what it

11     means at least.  I mean, what else could

12     it mean?

13         MR. FOX:  Well, it is, I think, and

14     certainly until we got various statements

15     from various parties, was extremely

16     obtuse as to --

17         THE COURT:  Okay.

18         MR. FOX:  what it was supposed to

19     mean.

20         THE COURT:  All right.

21         MR. FOX:  Let me just stay on a

22     related point and, if I could for a

23     moment, it was a point you raised with

24     Mr. Seider about the Court's ability to

25     change the underlying pre-petition


1      DELPHI CORPORATION                    97

2      agreements.  And I would take a different

3      tack than Mr. Seider, although I think

4      we'd get to the same result.

5          The question ultimately, I think,

6      that's going to have to be answered, and

7      I think in whatever your ruling is today

8      may fix that right, so it's not something

9      that could be raised down the road but

```
10          has to be raised now.  Is whether not

11          whether GM gets a claim but whether GM

12          can be considered a creditor.  If you

13          look at the definitions in the Code, a

14          claim's right to payment.  And it doesn't

15          distinguish when that right arose.  On

16          the other hand, a creditor is one who

17          holds a claim that's based on a pre-

18          petition obligation.  Here, what's

19          happening is that we're changing the

20          rights of GM under these agreements and,

21          in effect, trying to turn them into a

22          pre-petition creditor which they are not

23          and, under the definitions of the Code,

24          can never be.  Moreover --

25              THE COURT:  But isn't that to the
```

```
 1          DELPHI CORPORATION                98

 2          estate's benefit?  Would you rather have

 3          them be an administrative creditor?

 4              MR. FOX:  Well, the debtor

 5          apparently is not prepared to give them

 6          that.  So --

 7              THE COURT:  I know, but that didn't

 8          really answer my question.  You wouldn't

 9          give that to them, either, would you?

10              MR. FOX:  No, I would not.  But
```

11      that doesn't mean that we can rewrite the

12      language of the statutes to provide

13      what's being provided here.  And under

14      5.01, only --

15          THE COURT:  Well, wait.  An

16      administrative creditor can always agree

17      to take their claim at a lower priority.

18          MR. FOX:  Perhaps.

19          THE COURT:  Well --

20          MR. FOX:  If that's what they -- I

21      mean, if that's where the negotiation led

22      and that's what they want to get to then

23      I suppose they could --

24          THE COURT:  Isn't that what

25      happened here?

 1          DELPHI CORPORATION              99

 2          MR. FOX:  I suppose they could

 3      agree to that.

 4          THE COURT:  Okay.

 5          MR. FOX:  That's not what this

 6      agreement provides, though, in the way

 7      it's written.

 8          THE COURT:  Well, it says they

 9      won't assert administrative -- where is

10      it?

11          MR. FOX:  Yes, it does, quite

```
12        clearly.

13             THE COURT:  Okay.

14             MR. FOX:  That's right.  It says

15        that they can assert a pre-petition

16        unsecured claim.

17             THE COURT:  Right.  And the

18        proposed order is even clearer on that

19        point.

20             MR. FOX:  I understand that.  And

21        that's why I'm raising the point now

22        because I don't want to wait until later

23        and lose the point.

24             THE COURT:  Okay.

25             MR. FOX:  But just to finish it
```

```
1         DELPHI CORPORATION              100

2         briefly.  Under Section 5.01, you have to

3         be a creditor.  Which means, you have a

4         pre-petition -- a claim that arose pre-

5         petition in order to file a proof of

6         claim and you can't be scheduled unless

7         you're a creditor, as well, with a pre-

8         petition obligation.  So, I'm not sure

9         that by what we're doing here to get to

10        sort of roll back the clock to change the

11        agreement in the way that it's being

12        proposed in order to allow GM to do what
```

13        they're proposing to do.

14            THE COURT:  I'm dismissing that.

15        They can file a contingent unliquidated

16        claim in respect of their existing

17        agreements.

18            MR. FOX:  Yes, absolutely.

19            THE COURT:  And they can assert on

20        administrative expense claim immediately

21        when they provide post-petition

22        services, benefit, consideration,

23        whatever.

24            MR. FOX:  If the agreement had not

25        provided otherwise, I suppose they could.

1         DELPHI CORPORATION                 101

2             THE COURT:  Okay.  All right.  I

3         think I understand.

4             MR. FOX:  In Section -- I don't

5         know if it's 7(b) or 7(c) -- is very

6         specific.  And you understood that I was

7         getting to this issue in the cross-

8         examination.  That the claim by GM will

9         be filed against the estate of Delphi

10        Corporation.  Not against the debtors

11        generally, but very specifically against

12        Delphi Corporation.  That creates a

13        problem for the senior notes and

14          debentures as a creditor of Delphi

15          Corporation.  What end up happening here

16          is that the subsidiaries benefit 'cause

17          they're the ones that are employing these

18          -- they're actually using the services

19          and paying for the services, apparently,

20          of the union members, but the claim is

21          not being asserted against them.  So,

22          they get the benefit of the flowbacks or

23          the lower wage rates or whatever the

24          benefits are of this agreement and, in

25          essence, Delphi Corp. gets stuck with the



1          DELPHI CORPORATION                102

2          bill.  And, in addition to that, what's

3          likely to happen, I suspect, and

4          certainly has been indicated in the 11.13

5          motion, is that GM has continually, over

6          the course of its relationship with

7          Delphi, and presumably will continue to

8          ask for price reductions.  And to the

9          extent that the subsidiaries now have

10          lower wage rates and have a better cost

11          structure, then going forward GM will try

12          to attempt to take advantage of that for

13          its own benefit while at the same time

14          keeping its claims that it's going to

15          have against Delphi Corporation.

16              Now, if you look at the structure

17          chart, you can see that Delphi

18          Corporation indirectly owns 87 percent of

19          the offshore entities which are,

20          according to Mr. Sheehan's testimony,

21          profitable and not debtors in these

22          cases.  On the other hand, through Delphi

23          Automotive Systems, LLC, it is the

24          indirect parent of the U.S. entities

25          which are, according to Mr. Sheehan's


1       DELPHI CORPORATION                103

2          testimony, decidedly unprofitable and

3          they're going to remain unprofitable,

4          although perhaps less so if this

5          agreement takes effect.

6              If GM were to assert -- so two

7          things happen by where this claim is

8          placed.  Number one, GM has a better

9          claim because it's at the parent which

10          owns a significant portion of the

11          offshore entities which are profitable.

12          Which is better than having a claim at

13          the U.S. subsidiaries which are in

14          bankruptcy.  And secondly, if GM were to

15          file these claims as unsecured claims

16        against the U.S. entities, it probably,

17        given the magnitude of the claims, the

18        likelihood is they'd wind up owning these

19        plants which is the last thing they want

20        'cause then they'd end up paying UAW

21        wages under their agreements to these

22        employees that they're trying to get the

23        benefit of reduced wages by.

24            But from the perspective of this

25        particular group of creditors, the

1        DELPHI CORPORATION                104

2        creditors at Delphi Corp., there's a real

3        question here as to the fairness of this

4        arrangement and certainly, from Mr.

5        Sheehan's testimony, we don't when, if

6        ever, Delphi Corp. will assert any kind

7        of a claim against the subsidiaries to

8        try to recover some of the benefit from

9        this.

10           THE COURT:  All right.  Let me make

11       sure I understand a little more about

12       this.  The agreements between GM and

13       Delphi that are involved here, the pre-

14       petition agreements, who are they

15       actually between on the Delphi side?

16           MR. FOX:  The named party in the

17        agreement, apparently, is only Delphi

18        Corporation.

19             THE COURT:  Okay.  So, except in

20        respect of the new rights that Mr. Seider

21        talked about, that's where the claim

22        would be anyway, right?  Of GM?

23             MR. FOX:  I'm sorry.  Which

24        agreements were you referring to?

25             THE COURT:  The indemnification


1        DELPHI CORPORATION               105

2        agreements.

3             MR. FOX:  Well, the Employee

4        Matters Agreement and, I believe, the

5        indemnification of the Delphi

6        Corporation, the Master Separation

7        Agreement, is with Delphi Corporation, as

8        well as certain other subsidiaries.  So,

9        yeah.  I guess, if you assume that but

10        for this program, the same claims will

11        arise and GM will then assert them back

12        --

13             THE COURT:  But, did --

14             MR. FOX:  -- then I guess you would

15        say, if they assert them under a couple

16        of those agreements that are just against

17        Delphi Corp. that you'd have the same

```
18       result.  I think --
19            THE COURT:  Well, except -- I don't
20       know.  Because you said -- are those --
21       which subsidiaries are also parties to
22       those agreements?
23            MR. FOX:  The one that has parties
24       that are subsidiaries is the Master
25       Separation Agreement.
```

```
 1       DELPHI CORPORATION                106
 2            THE COURT:  All right.  So there,
 3       there would be, I guess, contribution
 4       claims.
 5            MR. FOX:  Well, they're all --
 6            THE COURT:  Against the
 7       subsidiaries.
 8            MR. FOX:  I think there are four
 9       different entities would be jointly and
10       severally liable presumably.
11            THE COURT:  All right.  So, in
12       terms of the argument that Delphi
13       Corporation is saddled with more under
14       this arrangement?
15            MR. FOX:  It's saddled with all of
16       them.
17            THE COURT:  Well, but -- that's
18       right.  Saddled with all.  Isn't it only
```

19            they had saddled with more because it

20            would be saddled with a lot anyway?  Or

21            am I missing something?

22                 MR. FOX:  Potentially, if you make

23            certain assumptions.  If you assume that

24            the only solution to Delphi's problem is

25            to reduce the wage rates and assume that

1            DELPHI CORPORATION                107

2            the union employees are paid too much as

3            opposed to, for instance, assuming that

4            GM pays too little for the product that

5            it receives.  But if you take the view

6            that the only solution to the problem is

7            to reduce the wages and benefits to the

8            employees and as a result of that,

9            depending on what happens, could

10           potentially trigger some of these

11           agreements, then yes, under those

12           circumstances and those assumptions,

13           those obligations potentially would flow

14           back.  Because the UAW, I guess, would

15           claim on its benefit guarantee against

16           GM.  GM would then claim back against

17           Delphi Corporation on its benefit

18           guarantee.

19                 THE COURT:  And is there anything

20          in the agreement that prevents Delphi

21          Corporation from asserting some form of

22          inter-company claim against the

23          subsidiaries that employ these people and

24          received the first benefit?  I understand

25          the argument that it owns the equity in


1          DELPHI CORPORATION                    108

2          the corporation.  But the point Mr. Fox

3          is making is that that's all well and

4          good but the offshore entities is where

5          most of the value is and not in these

6          subsidiaries.

7               MR. FOX:  I don't think we know

8          whether the equity in the U.S. entities

9          has any value whatsoever.

10               THE COURT:  Right.  So, I guess --

11          but, ultimately, is there any issue of

12          having an inter-company claim?

13               MR. BUTLER:  Your Honor --

14               THE COURT:  Maybe it's not --

15          according to Mr. Fox, maybe it's not

16          worth that much, but --

17               MR. BUTLER:  First of all, Your

18          Honor, there's no preclusion.  Your

19          question was is there anything that

20          precludes it.  The answer is no.  But, I

21          just realized the answer to the factual

22          question you asked.  The operative

23          agreements here, the UAW collectively-

24          bargained agreements, the material legacy

25          agreements with General Motors are all at



1           DELPHI CORPORATION                109

2           Delphi Corporation.  The same party that

3           entered into this agreement before the

4           Court.  The Master Separation Agreement

5           which is admitted into evidence Exhibit 2

6           is the only one that has other parties in

7           addition to Delphi Corporation.  It has

8           Delphi Automotive Systems, LLC, Delphi

9           Technologies, Inc. and Delphi Automotive

10          Systems Holding, Inc.  But the U.S.

11          Matter -- Employ Matters Agreement,

12          admitted into evidence Exhibit #3, is

13          only with Delphi and the UAW Delphi

14          Memorandum of Understanding for the

15          Benefit Plan Treatment, admitted into

16          evidence Exhibit #4 is only with Delphi

17          Corporation, as well.  And the UAW -- the

18          collective bargaining agreements are at

19          Delphi Corporation.  All those

20          liabilities, all the issues we're dealing

21          with are at the Delphi Corporation level.

22      And I think the arguments for another day

23      is to whether anyone below that ought to

24      be making contributions or not there's a

25      very cohesive and cogent argument that

1      DELPHI CORPORATION                    110

2      can be made, frankly, that all the rest

3      of the wholly-owned subsidiaries are

4      doing nothing but carrying out the

5      obligations and performing the

6      obligations that the parent company is

7      primarily liable for.  And does it for

8      the benefit of the parent company.  And

9      we can deal about it another day but

10      that's not what's before the Court today,

11      Your Honor.  Ultimately, what's before

12      the Court is all these matters are a

13      parent company obligation.  This

14      agreement is a parent company obligation.

15          MR. KESSLER:  Your Honor, may I

16      make a statement to make sure that

17      there's no confusion in the record?  You

18      heard the name Delphi Automotive Systems,

19      LLC.  If Your Honor goes back to look at

20      some of the agreements that Mr. Butler

21      referred to, you will see the name on the

22      agreement as Delphi Automotive Systems

23          Corporation.  They are not the same

24          company.  Delphi Automotive Systems

25          Corporation is the predecessor name of

 1          DELPHI CORPORATION                    111

 2          Delphi Corporation.

 3               THE COURT:  Okay.

 4               MR. KESSLER:  So it's a different

 5          company from what you've heard as Delphi

 6          Automotive Systems, LLC.

 7               THE COURT:  Okay.

 8               MR. FOX:  I'm not mis -- I

 9          understand the distinction between the

10          entities.

11               THE COURT:  Right.  But, Mr. Fox,

12          let me just ask you.  Is your position

13          then different than the committee's in

14          that you're suggesting that there

15          shouldn't be an agreement involving a

16          soft landing at this point?

17               MR. FOX:  Except -- no, no.  The

18          idea of coming up with a way to provide a

19          soft landing for the employees is not

20          something that we take issue with.  We

21          understand that.

22               THE COURT:  Okay.

23               MR. FOX:  Assuming you go down this

```
24          particular path.  Which is to reduce the

25          level of employees significantly and cut
```

```
 1      DELPHI CORPORATION                 112

 2          the wages of the rest.

 3              THE COURT:  Well, that's what I'm

 4          saying.  But, I mean, that is one aspect

 5          of this motion is going down that path.

 6              MR. FOX:  Well, that's right.  And

 7          I'm -- but I'm not sure that -- and part

 8          of the problem, though, and, really,

 9          that's part of the argument, is that if

10          you go down this path, you're taking on

11          these liabilities on the assumption that

12          you're going to be able to finish going

13          down this path and, therefore, get the

14          rest of the benefit that this is heading

15          towards.  If it turns out that you can't

16          do that for whatever reason, maybe the

17          union is intransigent and says, you know

18          what?  We're never coming back, then --

19          and we're going to go on strike forever.

20          At that point, Delphi may have to turn

21          back to GM and say, we have to go another

22          route.  Now, at that point --

23              THE COURT:  Well, I guess, if

24          that's the case, I guess GM is not going
```

25          to negotiate a date down the OPEB,

 1          DELPHI CORPORATION                  113

 2      either.

 3          MR. FOX:  Well --

 4          THE COURT:  I'm not being entirely

 5      facetious.  I mean, it seemed to me that

 6      the strongest argument that the committee

 7      had is that the debtor is locking itself

 8      in, at least as far as the GM claim on

 9      OPEB for the people who migrate now --

10          MR. FOX:  No, I absolutely agree

11      with them.

12          THE COURT:  But if this thing falls

13      apart, I have to assume that -- no one

14      can predict what would happen, but it's

15      probably falling apart because people

16      aren't willing to move on anything.

17          MR. FOX:  That's certainly

18      possible.  There are different parties

19      and they have different tolerance levels

20      for bait, presumably.  And in all these

21      negotiations that -- you know, you get to

22      that point of deciding who is willing to

23      bear what burden.

24          THE COURT:  On the provision of the

25      agreement that says that the claim will

```
 1          DELPHI CORPORATION                114

 2      be asserted against Delphi Corp.

 3          MR. FOX:  Yes.

 4          THE COURT:  What is your solution

 5      to your problem.  Saying it's asserted

 6      against the U.S. subsidiaries?

 7          MR. FOX:  Well, it would certainly

 8      --

 9          THE COURT:  Who use the services of

10      UAW employees?

11          MR. FOX:  I would certainly feel

12      better if there was some allocation of

13      that and I would certainly feel better if

14      counsel to Delphi Corp. took the view

15      that the subsidiaries are receiving

16      benefit, not doing a favor to Delphi

17      Corp. by employing these people, but have

18      an obligation to pony up to Delphi Corp.

19      And I'm not hearing that.  And it makes

20      me very uncomfortable.

21          THE COURT:  Well, he's reserving

22      that issue.

23          MR. FOX:  Well, he's wearing

24      several hats and I understand he's got

25      some difficulties in that regard, but --
```

```
 1    DELPHI CORPORATION                115

 2         THE COURT:  But nothing in this

 3    settlement prevents anyone from arguing

 4    that down the road.

 5         MR. FOX:  We could certainly, I

 6    guess, make some argument vis-a-vis the

 7    debtor Delphi Corp. that it has some

 8    obligation to assert these claims against

 9    the subsidiaries.

10         I would make one other point.  I

11    think Mr. Butler's argument is a little

12    too facile, as well though, when he says

13    that the subsidiaries are merely doing a

14    benefit to Delphi Corp. by carrying out

15    the terms of Delphi Corp.'s agreement.

16    If they're not bound by this or parties

17    to this, then I don't why they're using

18    these, you know, union employees at too

19    high a price and why they're not just

20    going out and doing something different.

21    I mean, then it's a little disingenuous,

22    I think, to say they're not parties to

23    the agreement, they're not bound by it,

24    yet, they can't just go out and do what

25    they want.
```

```
 1     DELPHI CORPORATION                116
 2          THE COURT:  Well, that's a good
 3     question, but I, well, have to assume
 4     that in all of the turmoil that
 5     surrounded the labor issues, someone has
 6     an answer to that that says they can't go
 7     out and hire --
 8          MR. FOX:  I'm sure that's the case.
 9     I'm sure that --
10          THE COURT:  Ms. Ceccotti is
11     standing up to tell me why.
12          MR. FOX:  And I think that Ms.
13     Ceccotti is going to jump up to say that.
14          MS. CECCOTTI:  Well, I feel that
15     we're burdened today because nobody
16     apparently has in the courtroom a copy of
17     the collective bargaining agreement --
18          MR. FOX:  No, we do.  We do have
19     it.  There is a copy.
20          MS. CECCOTTI:  -- because if you
21     look in it you would see that the
22     agreement probably provides for certain
23     classes and class of employees wherever
24     they are in the system.  I mean, this is
25     how agreements are set up.  I've been
```

```
 1          DELPHI CORPORATION              117
 2     listening to this description and it's
 3     extremely foreign to me because I know
 4     how CBAs are set up.  So, I don't think
 5     that this is really a productive plan at
 6     all.
 7          MR. FOX:  At my request the
 8     agreement is here.  And I don't
 9     understand these things very well.
10          THE COURT:  Well, at the minimum,
11     if the agreement said that GM was going
12     to assert its claim against the
13     subsidiaries that use UAW employees,
14     wouldn't the subsidiaries go right back
15     and assert that that's -- they should be
16     reimbursed for that by Delphi since
17     Delphi is the party on the collective
18     bargaining agreement and on the contracts
19     with GM?
20          MR. FOX:  Yes.  I'd be happy to be
21     involved in that discussion.  But that
22     doesn't, I don't think, answer the point
23     today.
24          THE COURT:  I guess that my
25     question is it doesn't seem to be a magic
```

2        fix.  It's not an either or issue to me

3        to just say that we're going to shift it

4        to be asserted against the subsidiaries.

5        I don't see how that fixes it.

6            MR. FOX:  Well, that, I think, from

7        the perspective of the significant

8        creditor of Delphi Corporation, that

9        certainly would help someone.

10           THE COURT:  But leaving aside

11       whether anyone would agree to it since

12       Delphi Corporation is the party on the

13       agreements, even if someone did agree to

14       it doesn't Delphi Corporation have to

15       assume that it's going to get a claim

16       back from the subsidiaries?

17           MR. FOX:  I'm not sure about that.

18       Particularly, if what Ms. Ceccotti

19       described is correct.  I mean, as I

20       understand it, each subsidiary is paying

21       --

22           THE COURT:  But it's liable, too.

23       It's a question of being liable.  I just

24       --

25           MR. FOX:  Well, if they're getting

1        DELPHI CORPORATION              119

2        the benefit of the reduced wages and the

```
3        flowbacks and all the benefits that this

4        agreement -- the attrition agreement

5        presumably provides then I don't know

6        what they'd have to complain about in

7        being part of --

8              THE COURT:  Because Delphi's being

9        relieved of an enormous liability under

10       your formulation.

11             MR. FOX:  But so, presumably, are

12       the subsidiaries.  You can't separate

13       them.  I mean, as Ms. Ceccotti said --

14             THE COURT:  Well, but if that's the

15       case then it doesn't matter either way.

16             MR. FOX:  No, it does.  Because

17       you're putting all of GM's claim in one

18       particular entity.

19             THE COURT:  But if the subsidiaries

20       are benefiting, too, --

21             MR. FOX:  Yes.

22             THE COURT:  -- and, therefore,

23       wouldn't have a basis of asserting the

24       claim against Delphi then Delphi, through

25       its equity interest in the subsidiaries,
```

```
1          DELPHI CORPORATION                120

2        is benefiting.

3              MR. FOX:  If it has one.
```

4            THE COURT:  But you just said that

5      they're benefiting.

6            MR. FOX:  But they may be benefited

7      but still be insolvent.  There are

8      creditors at every level.  There are

9      schedules and statements that list

10      hundreds and hundreds of pages for some

11      of these entities of creditors and of

12      contracts, for instance, at particular

13      debtor entities, not Delphi Corp.  And

14      they're presumably entering into

15      contracts, producing products, paying

16      these employees, --

17            THE COURT:  All right.  No, I

18      understand that point.

19            MR. FOX:  And they have their own

20      creditors.  And we have a structure.

21            THE COURT:  They may benefit but

22      still not have any equity.

23            MR. FOX:  That's right.

24            THE COURT:  Okay.

25            MR. FOX:  I think for this purpose,

1          DELPHI CORPORATION                    121

2      Your Honor, that, really, the last point

3      I would make is simply the point that --

4      this notion that the debtor, without

```
5       coming back to the Court or only by

6       giving notice to the creditors'

7       committee, should be able to enter into

8       similar agreements with other unions.

9       Certainly, I have no objection to them

10      entering into pattern agreements, if you

11      will.  But given the nature of this, the

12      difficulty in understanding this

13      particular and the affect it has on

14      various parties, I think it's only fair

15      that it be noticed to everybody and that

16      everybody have an opportunity to come

17      back and be heard before Your Honor as

18      each of these are approved.

19              THE COURT:  Okay.

20              MR. FOX:  If, in fact, at that

21      point -- you know, it may be perfunctory

22      even.

23              THE COURT:  Well, it depends.

24              MR. FOX:  Well, that's right.

25              THE COURT:  I mean, it's hard for
```

```
1           DELPHI CORPORATION                122

2       me to imagine that each union has the

3       same relationship with GM and --

4               MR. FOX:  Exactly, Your Honor.

5       Thank you, Your Honor.
```

6             THE COURT:  It would be hard for me

7       to imagine that GM would have a problem

8       being able to assert a claim against more

9       debtors.  Is that a problem for GM?

10            MR. KESSLER:  We don't have a

11      problem asserting a claim against more

12      debtors.

13            THE COURT:  Okay.

14            MR. KESSLER:  We want to assert the

15      claim against Delphi Corporation.

16            THE COURT:  All right.

17            MR. KESSLER:  As the company

18      (indiscernible)

19            THE COURT:  All right.  But the

20      debtors must have a problem with that

21      being -- having an asserted claim against

22      more debtors, or not?  I don't know.

23            MR. BUTLER:  We do.  We do, Your

24      Honor.  I mean, we all understand when

25      anyone has a right to assert the same


1       DELPHI CORPORATION                    123

2       claim against multiple debtors what that

3       does in a reorganization plan.  It

4       creates more opportunity for them.  If,

5       in fact, at the end of the day, and Mr.

6       Fox should presume that the people who

```
 7          are responsible for Delphi Corporation or

 8          fiduciary duties will do their duty.  And

 9          if, in fact, there is a legitimate inter-

10          company claim to be asserted in this

11          Chapter 11 case in connection with this,

12          it will be sorted out in connection with

13          the plan of reorganization.  The plan's

14          not going to ignore those issues.  I

15          don't think Mr. Fox would permit us to.

16          So, that issue will be sorted out in

17          connection with the plan in the claim's

18          administration process.  However, I agree

19          with Your Honor.  It is not so clear that

20          Mr. Fox's view is the correct view here.

21          And we'll sort it out at the end of the

22          day.

23              MR. FOX:  Thank you, Your Honor.

24              THE COURT:  Okay.

25              MR. KURTZ:  Good afternoon, Your
```

```
 1          DELPHI CORPORATION              124

 2      Honor.  Glenn Kurtz of White & Case on

 3      behalf of Appalousa.  Let me start with

 4      some context here, Your Honor.  This is a

 5      very big deal.  This attrition program

 6      directly affects the rights and claims of

 7      thousands of employees.  It impacts all
```

8          of Delphi's U.S. operations and assets.

9          And it exposes Delphi to new claims by

10          its former parent GM for billions of

11          dollars potentially.  This motion,

12          together with the 11.13 motions, may, in

13          fact, dictate the disposition of this

14          entire case.  And even those motions are

15          not directly linked.  So, rather than

16          addressing the matters critical of the

17          debtors reorganization in a comprehensive

18          fashion and after a careful, deliberate

19          review, this motion was made on an

20          expedited basis and has been a mere 16

21          days since the filing to this hearing.

22               THE COURT:  Well, let me ask you a

23          question about that.  It seems to me

24          that, as much as everyone wants to avoid

25          the fact, the workers here are facing

1          DELPHI CORPORATION                    125

2          very painful choices.  And what this

3          motion does by coming now is give them

4          more choices, whereas if it was done in

5          the context of an 1113, it may not mean

6          that much.  I mean, I'm not so sure it

7          doesn't make sense actually to keep it

8          separate from the 1113.

9           MR. KURTZ:  The problem that we

10      have in addition to how incredibly

11      expedited this is in light of the impact

12      it has is I think it sets the table and

13      it can't be changed on what the

14      reorganization will be.  You are

15      committing under the attrition program to

16      take drastic steps which will, if

17      successful, effectively eliminate the

18      work force before you even know, for

19      instance, what will happen on those 1113

20      motions.  Ask yourself what happens if

21      they are successful as projected in some

22      high rate and they don't have enough

23      employees to operate in the plants and

24      the plants aren't closed.  And then where

25      are they?  And we have just a number of

1           DELPHI CORPORATION                126

2      fundamental --

3           THE COURT:  Well, doesn't the 1113

4      motion assume a level of attrition --

5           MR. KURTZ:  The 1113 --

6           THE COURT:  -- flowing from the

7      motion in front of me today?

8           MR. KURTZ:  Well, it does.  But it

9      hasn't been adjudicated and so, if it

```
10          turns out --

11               THE COURT:  Well, no, I understand.

12          But they're not -- I don't think what

13          they're asking for assumes that -- in

14          fact, just the opposite.  They're

15          assuming the majority of the plants close

16          and the like.  They're not assuming full

17          employment.

18               MR. KURTZ:  No, they're not, Your

19          Honor.  But what they are purporting to

20          do is put together a program that they

21          hope and expect to resolve the employment

22          issues, at least with respect to numbers,

23          for the vast majority of the work force

24          coupled with an 1113 motion which they

25          hope will resolve most of their plant
```

```
1          DELPHI CORPORATION                127

2          issues and most of their flexibility

3          issues for their rules.  And there will

4          be precious little to do in the case

5          which is why we think this should be

6          subject to a more comprehensive process

7          with more Chapter 11 protections than an

8          expedited motion.

9               And I'd note that the debtors have

10          never provided a reason, and nor are we
```

11          aware of any, for expedited treatment of

12          this motion given this significance.  We

13          think it's a -- we understand, of course,

14          that it's a complicated matter but we

15          don't think it's appropriate for the

16          debtors to basically say trust us on

17          this.  We are concerned that this is

18          affecting a creeping reorganization and

19          we are concerned, with the sort of

20          dominating role of GM in all of this,

21          especially given GM's historic

22          performance which led to the badly out-

23          of-market contracts in the first

24          instance, both in '99 and in 2003.  And

25          we believe that GM has an awful lot of


1          DELPHI CORPORATION                128

2          control of the debtor in the process and

3          that by reason of the significance of the

4          attrition, coupled with the 11.13s, and

5          the role of GM and the significance that

6          GM is playing that is subject to a

7          heightened review.  And that's under a

8          number of cases that we've cited

9          including, Your Honor, the -- I'm sorry -

10          - the CGE Shattock case, which is 254

11          B.R. 5.  It's including under the New

12          Hampshire Electrical Cooperative, which

13          is 131 B.R. 249.

14              With that background, we basically

15          have five objections.  I think two of

16          them are subsidive and three of them may

17          in fact be to the form of the agreement

18          or the form of the order, although I'm

19          not entirely clear about that for reasons

20          that I'm going to address.

21              The first issue that I'd like to

22          speak to is the decision to lock in

23          approximately three billion dollars in

24          OPEB liabilities.  And this, obviously,

25          is one of the subsidive concerns that we

1           DELPHI CORPORATION              129

2           have.  We view this as absolutely

3           critical to the program and the

4           fundamental problem that we have with it.

5           And I hope that this discussion sheds

6           some light on some of the questions that

7           you're asking of other counsel.  As you

8           know, the collective bargaining agreement

9           will expire on October 2007 and there

10          will be no outstanding obligations to

11          provide OPEB benefits.  And in the reply

12          papers, the debtors chide Appalousa for

13      raising the prospect that OPEB

14      liabilities may be eliminated in the next

15      collective bargaining agreement.  Well,

16      what the debtors don't mention was that

17      their own 30(b)(6) witnesses have both

18      testified that they have an expectation.

19      That they will be successful in

20      eliminating or to bear minimum

21      substantially decreasing OPEB benefits in

22      the next collective bargaining agreements

23      and, Your Honor, that's Sheehan, page 66,

24      line 9 to 22; page 68, line 22 to page

25      69, line two.  And then the Butler


1           DELPHI CORPORATION              130

2       deposition, page 132, lines 14 to 20.

3       The debtors further admit that the

4       industry trend is towards eliminating or

5       to bear minimum substantially reducing

6       OPEB benefits.  Sheehan so testified,

7       page 55, line 14 to page 56, line 8.

8       Consequently, Delphi's competitors either

9       are not providing any OPEB benefits

10      whatsoever or providing substantially

11      less generous OPEB benefits.  That's the

12      background.

13          Now comes the attrition program

14          which provides for the flow of 5,000

15          employees back to GM.  And Your Honor

16          earlier had some questions about what the

17          differences would be and why isn't there

18          already a claim for that flowback under

19          the existing agreements.  And we're

20          approaching this a little differently,

21          although we believe that some of the same

22          fundamental concerns that are being

23          expressed by creditors and the creditors'

24          committee arise really not out of the

25          language but out of the actual decision

1           DELPHI CORPORATION                131

2           to go forward on this basis.

3                Once those 5,000 employees flow

4           back and there is no right for them to

5           flow back other than under the attrition

6           program, the OPEB benefits will be

7           effectively vested forever as concerns

8           the debtors.  At that time, GM will

9           actuarially determine the present value

10          of the future OPEB benefits and this

11          premium state which they exist right now

12          and charge the estate for those amounts.

13          So, what we have here is as the debtors

14          set out with an expectation to eliminate

15          their OPEB benefits in their entirety,

16          they enter into an attrition program that

17          effectively cements those benefits and

18          perpetuity with respect to what they hope

19          to be the vast majority of their work

20          force.  In addition to vesting that three

21          billion dollar liability which should be

22          going away, there is the potential for a

23          great windfall to GM to the detriment of

24          Delphi's creditors and equity holders.

25          GM is not obligated to provide OPEB

1           DELPHI CORPORATION                    132

2           benefits to the Delphi employees going

3           forward.  That will be subject to the

4           next collective bargaining agreement.

5           We're getting a present actuarially

6           determined OPEB liability and,

7           incidentally, the debtors call it three

8           billion.  The spreadsheet which is, I

9           think, Exhibit 14, page 24, reflects

10          something like 2.9 but it only goes

11          through 2010, so unless those OPEB

12          liabilities don't go beyond 2010, and

13          that's not reasonable, the number is

14          actually bigger.  GM, though, can

15          eliminate or substantially reduce those

16          OPEB liabilities, yet give no relief back

17          to the debtors for having made those

18          payments on a present value basis based

19          on the flowbacks that will occur during

20          the short run in this bankruptcy.  And

21          those amounts are substantial.  We can

22          see no basis for choosing to trigger

23          those substantial liabilities at this

24          time.  Liabilities that do not presently

25          exist and which may never exist.



1          DELPHI CORPORATION                    133

2               And so the question that we think

3          the Court must ask is what is it that the

4          debtors are receiving in exchange for

5          that additional three billion dollars in

6          liability or at least up to three billion

7          dollars.  And we think the answer is

8          very, very little.  And if Your Honor

9          looks at Exhibit 14, page 24, which sets

10          forth the spreadsheet of the impact of

11          the attrition program as against the

12          steady state, you'll see two things.  One

13          you will see is that the attrition

14          program will precipitate an additional

15          underfunded pension liability of up to

16          2.2 billion dollars.  The other matter

17      that you will observe in the cash flow

18      comparison is that the attrition program

19      does not improve the financial condition

20      but, in fact, at least slightly impairs

21      it.  You go from a steady state of

22      negative 8.9 billion, as calculated by

23      the debtors, to something slightly more

24      of 8.9 billion when you're using the

25      assumption that there's a hundred percent

1       DELPHI CORPORATION                134

2       acceptance of the program.  The debtors

3       say that the way you demonstrated value

4       notwithstanding the fact that the

5       program, in fact, does not improve the

6       condition is that you add back the line

7       "GM OPEB Flowback for Check-the-box

8       Retirees" because GM is making those

9       payments in the first instance.  And the

10      first instance is, in fact, the word that

11      Mr. Sheehan used at his deposition.

12      Consequently, it's a wash because GM will

13      make a claim back for those very same

14      amounts.

15          When I asked the company's 30(b)(6)

16      witness, Mr. Sheehan, about that, he

17      confirmed that it was a wash except he

18          said the type of consideration that would

19          be provided to GM in a reorganization

20          would be something different than cash.

21          It would be some other form of currency.

22          That testimony, Your Honor, is at pages

23          96, line 7 to page 97, line 3.

24              And we have three issues with that.

25          One is that does little or nothing for


1          DELPHI CORPORATION                135

2          the estate; trading one liability for

3          another doesn't help.  Two, the debtors

4          certainly don't know what a plan of

5          reorganization will look like or the

6          currency that will paid.  This Court

7          itself has acknowledged that it's too

8          soon to determine for certain what anyone

9          will receive.  And, consequently,

10          contrary to the implication by the

11          debtors that they need not concern

12          themselves with the size of the claim

13          because creditors will be impaired.  For

14          all we know, GM will, in fact, receive a

15          full recovery on this new inflated claim

16          to the detriment of equity holders and

17          perhaps creditors.

18              The third concern we have, Your

```
19          Honor, is that we believe, given the

20          significance of the attrition program and

21          the attended 1113 motions and the fact

22          that that's core to the case and given

23          that the debtors' interest seems to be

24          driven, at least in part, if not

25          primarily, with the notion that the
```

```
 1          DELPHI CORPORATION                136

 2          consideration to be paid to GM in the

 3          context of a reorganization will differ

 4          from cash that this would constitute an

 5          impermissible sub rosa plan or at least

 6          would deny all the constituencies of the

 7          benefits of a Chapter 11 plan process.

 8                  THE COURT:  I don't follow that

 9          one.

10                  MR. KURTZ:  Our concern, Your

11          Honor, in the case is like Lionel for the

12          2nd Circuit -- and the cases that have

13          come from that have sort of intermixed a

14          notion of having a heightened review of

15          363 applications and sub rosa plans.  And

16          there is a whole host of issues that one

17          looks to --

18                  THE COURT:  How is this a sub rosa

19          plan?
```

20          MR. KURTZ:  Our concern --

21          THE COURT:  Because the debtor is

22    thinking that GM might get on account of

23    its unsecured claim here instruments that

24    are worth less than the cash that it's

25    getting up front?

1     DELPHI CORPORATION                137

2          MR. KURTZ:  That's right.  And we

3     think that --

4          THE COURT:  All right.  And that's

5     a plan why?

6          MR. KURTZ:  Well, we believe that

7     whether you call it a sub rosa or just

8     has heightened scrutiny under the

9     applicable --

10          THE COURT:  No, I want to know why

11    you said it was a plan.

12          MR. KURTZ:  Because it's

13    effectively setting the table on a

14    reorganization.  I view this as a

15    creeping reorganization.

16          THE COURT:  How?

17          MR. KURTZ:  Because this is a

18    heavily labor-intensive, been coined --

19    don't know if the term existed before

20    this case -- labor transformation case.

```
21          And the issues that are going to be

22          addressed in the attrition program and in

23          the 1113s will resolve by locking in the

24          liabilities nearly all of the labor

25          benefits as of today.  You will lose most
```

```
 1          DELPHI CORPORATION              138

 2          of the work force from 30,000 down to six

 3          to eight, if they're successful.  You

 4          will lose most of the plans, 21 out of

 5          the 29 plans.  And what you will have

 6          left is the go forward collective

 7          bargaining agreement.  Those seem to me

 8          to be primary assets and liabilities in

 9          connection with this that are being

10          determined at the first instance in the

11          case without the protections of a

12          confirmation process.  They are so core

13          in our view to the reorganization efforts

14          --

15              THE COURT:  So, your view is that

16          any decision by the debtor that

17          fundamentally affects its business needs

18          to be voted on pursuant to a plan

19          process?

20              MR. KURTZ:  No.  We believe that

21          the case as Lionel included -- say -- and
```

22          the New Hampshire cases that I cited say

23          that the more fundamental the step is

24          towards a reorganization or towards the

25          assets and liabilities the more scrutiny

 1          DELPHI CORPORATION                    139

 2          it deserves.  And if you, Your Honor,

 3          determine that this will effectively

 4          resolve the lion's share of the

 5          bankruptcy issues and set the table for

 6          what the recoveries are likely to be

 7          because we now know that the liabilities

 8          are being locked in at what we view is an

 9          elevated rate that that should not be

10          determined in a summary fashion.

11               THE COURT:  Okay.

12               MR. KURTZ:  In any event, we don't

13          see whether you consider it a sub rosa

14          plan or not how the ability to change the

15          currency on GM's claim can justify an

16          additional 5.2 billion dollars in

17          liabilities.  And those new liabilities,

18          of course, will absorb what otherwise

19          might be available to equity holders and

20          --

21               THE COURT:  I'm sorry.  How did it

22          get to be 5.2 billion?

23          MR. KURTZ:  I am also noting, Your

24     Honor, the 2.2 billion dollar additional

25     pension liability which is also reflected

1     DELPHI CORPORATION                140

2     on Exhibit 14, page 24.  Or, I should say

3     up to 2.2 billion.  It's less if the

4     acceptance rate on the attrition program,

5     if approved, is less than 100 percent.

6          And we appreciate the complexity of

7     the negotiation, but, Your Honor, this

8     new liability seems to us to be without

9     any concomitant assurances with respect

10    to the rest of the debtors' problems.

11    There is no new collective bargaining

12    agreement.  There is no agreement on

13    plant closings.  There is no guarantee

14    from GM to provide more work or maintain

15    a current level of work.  There really is

16    only at this juncture a stand alone

17    attrition plan with the new liabilities.

18    And we're concerned about a piecemeal

19    approach to what is a global problem.  I

20    asked before what happens if the

21    employees leave and the motion is denied.

22    I ask now why is the debtor assuming the

23    considerable liabilities at the parent

24          level.  And I won't go into this because

25          Mr. Fox did an adequate job with it.  But



1          DELPHI CORPORATION                    141

2          instead of pushing them down to the

3          subsidiaries, which may be insolvent,

4          which enjoy the benefit of the employee

5          services.  The debtors have no business

6          plan.  So, we can't analyze how the

7          attrition program fits or doesn't fit

8          with the new business plan.  The debtors

9          haven't analyzed the impact of the

10          program in connection with any later and

11          necessary steps of transformation so we

12          have no idea how it fits or doesn't fit

13          with the later steps of transformation.

14               Most significantly, and I really

15          think this is the most fundamental

16          economic part of this argument, Your

17          Honor, is we think the debtors are not

18          trying to affect any net restructuring

19          savings.  Now, we know that Delphi's

20          wages and benefits are badly out of

21          market.  The debtors themselves have

22          submitted declarations concluding that

23          the wages and benefits are some 300 to

24          400 percent above market.  We also know,

25          because there's no dispute, that these

1          DELPHI CORPORATION                    142

2          badly out of market CBAs are going to

3          expire in October in 2007.  So we see

4          ample opportunity for restructuring

5          savings.  The debtors' plan does not

6          affect any net savings.  The debtors'

7          analysis shows, and we just looked, that

8          the liabilities are effectively

9          identical, in fact slightly higher, when

10         you implement the human hourly attrition

11         program at a hundred percent.  All the

12         debtors are doing is they're moving the

13         liabilities from the unions -- their

14         liabilities, too -- from the unions to

15         GM.  They are not advantaging themselves

16         of any ability to simply negotiate down

17         badly out of market contracts.   Instead,

18         they're locking them in and simply

19         substituting the claim of union -- the

20         unions for GM.  And we don't think that's

21         reasonable.  And we think it's too early

22         to determine to do nothing to decrease

23         the wages and benefits structure in light

24         of what should be a fairly reasonable

25         position in a negotiation.

```
 1        DELPHI CORPORATION              143

 2              I'd also note, as a timing matter,

 3        that the program may be case dispositive

 4        and there's not even an equity committee

 5        yet.  And the debtors are effectively

 6        proceeding on the basis that they are

 7        hopelessly insolvent and, therefore, they

 8        don't really care about the claims that

 9        go to GM.  So long as they're addressed

10        with plan currency, they will be free to

11        avail themselves of a lower labor

12        structure, wage structure, when they

13        emerge.  But we think that's premature,

14        particularly, in light of Your Honor's

15        determination on our equity committee

16        motion and we think more significantly

17        that it's going to be a self-fulfilling

18        prophesy.  If you simply lock in

19        liabilities that we think should go away

20        or be reduced substantially that you will

21        realize your proclamations about

22        solvency.

23              THE COURT:  Whose proclamations

24        about solvency?

25              MR. KURTZ:  The debtors'
```

```
 1      DELPHI CORPORATION                144
 2      proclamations about solvency where they
 3      had said --
 4           THE COURT:  'Cause you said 'your.'
 5      I just want to make sure who you were
 6      talking about.
 7           MR. KURTZ:  No, no, no.  No, Your
 8      Honor.  I'm sorry.  I meant taking it
 9      from the standpoint of the debtors if
10      they take this action, they will self-
11      fulfill their prophesies.
12           That is the sum and substance of
13      the first and most primary objection and
14      I'm sure you'd be happy to know --
15           THE COURT:  That was just the first
16      objection?
17           MR. KURTZ:  But you'll be happy to
18      know --
19           THE COURT:  You have ten minutes.
20           MR. KURTZ:  -- that the remaining
21      objections are fairly quick.  That was
22      the one --
23           THE COURT:  They will be.
24           MR. KURTZ:  -- that I thought --
25      yeah.  They may be even quicker.
```

```
 1        DELPHI CORPORATION                    145

 2            THE COURT:  Yeah.  Ten minutes.

 3            MR. KURTZ:  Your Honor, the second

 4        issue we have, very quickly, is when I

 5        deposed the debtors' 30(b)(6) witnesses

 6        they seemed to believe that the 35,000

 7        dollar lump sum payments under what I

 8        think was paragraph 1(a) of the attrition

 9        program would give rise to a claim by GM.

10        GM put it in reply papers in which they

11        said in page 4, paragraph 4 that, quote,

12        GM will receive no claim on account of

13        the 35,000 dollar lump sum payment.  That

14        ought to be made clear.  It didn't appear

15        to be clear in the document and it didn't

16        appear to be clear from the deposition

17        testimony.

18            THE COURT:  Okay.

19            MR. KURTZ:  The next sort of

20        procedural issue, Your Honor, is with

21        respect to paragraph of 1(e) of the

22        attrition program which provides for a

23        buyout by GM of 140,000 dollars for

24        workers with more than ten years of

25        tenure and 70,000 thousand dollars for
```

```
 1          DELPHI CORPORATION              146
 2     workers with less than ten years of
 3     tenure.  Our concern, again, may simply
 4     be one of form.  Am I revealing anything
 5     I shouldn't be revealing?
 6          MR. BUTLER:  No, I just wanted to
 7     get up and say that agreement 1(a),
 8     paragraph 1 is in its entirety an
 9     agreement between GM and the UAW on GM's
10     attrition program.
11          MR. KURTZ:  Okay.  I'm getting to
12     that.  This is my confusion.  Both Mr.
13     Sheehan and Mr. Butler, the 30(b)(6)
14     witnesses testified that GM will have no
15     claim based on the amounts under
16     paragraph 1(e).  I take it that Mr.
17     Butler's rising here is confirming that
18     we could not be certain from review of
19     the attrition program why somebody
20     couldn't flow back under paragraph 4 or
21     under paragraph 2 and then retire under
22     this incentive retirement program with
23     1(e).  So, all we ask is that if that's
24     right, that Your Honor make clear that GM
25     has no claim at all arising out of any
```

```
 1          DELPHI CORPORATION              147
```

2      payments it makes under paragraph 1(e) of

3      the attrition program.  If for some

4      reason GM feels otherwise, I would like

5      to be heard on that because I don't think

6      the debtors otherwise consider what would

7      otherwise be I think a very large claim.

8           The next objection, Your Honor,

9      very, very quick, paragraph 7 -- I won't

10     beat what I hope to be a dead horse.  It

11     started its life with language

12     "conclusively deemed to be comprehended

13     by."  We were not sure if that meant it

14     was an allowed claim or an allowable

15     claim.  There has been some effort to fix

16     that language.  I think Your Honor

17     expressed some concerns to whether there

18     was an ambiguity as to whether there were

19     defenses including to allow ability like

20     subordination and any other available

21     defense.  Both of Delhi's 30(b)(6)

22     witnesses have confirmed that the claim

23     was not to be allowed.  It was simply

24     something they could assert.  Both

25     witnesses confirmed that all


1      DELPHI CORPORATION                148

2      constituencies, including equity holders,

3      would be able to raise and fully preserve

4      all defenses, objections, setoffs and

5      claims they had with respect to that.

6      That's at Sheehan, page 93, line 7

7      through 12 and then Butler --

8          THE COURT:  That's fine.  You're

9      right.  This is a dead horse.

10          MR. KURTZ:  Okay.  And then our

11      last point, Your Honor, is with respect

12      to the idea of entering into future

13      agreements without getting on noticing

14      without approval.

15          THE COURT:  Right.  I understand

16      that point.

17          MR. KURTZ:  Okay.  Thank you very

18      much.

19          THE COURT:  Okay.

20          MR. ENKELS:  Afternoon, Your Honor.

21      John Enkels from Brown Rudnick Berlack

22      Israels for Law Debenture Trust Company

23      in about two minutes.  We filed our

24      limited objection two days late.

25      However, we note that because it

1      DELPHI CORPORATION                149

2      presented no new issues that it caused no

3      prejudice to any parties and we hope that

4        the Court will accept it as such.

5             THE COURT:  Okay.

6             MR. ENKELS:  Our limited objection

7        joined in the --

8             THE COURT:  I got it.

9             MR. ENKELS:  Okay.

10            THE COURT:  You're saying me, too.

11            MR. ENKELS:  Me, too.  We joined in

12       the -- fine.  The arguments of the

13       Wilmington Trust, put this in today and

14       then their papers.

15            THE COURT:  You're still saying me,

16       too.  I know you are.  Okay.

17            MR. BUTLER:  Your Honor, I just

18       want to be sure I put on the record that

19       I join the committee's objections.

20            THE COURT:  Everyone joins -- no,

21       I'm kidding.

22            MR. BUTLER:  Your Honor, we've been

23       at this for a couple hours.  Could we

24       take five minutes at this point, or do

25       you want to keep going?

1        DELPHI CORPORATION                150

2             THE COURT:  Well, I wanted to make

3        sure that you focus on whatever you can

4        in respect to quantifiable upfront

```
5        benefits in return for the concessions

6        that you're giving here.  So, that's

7        really what I want to hear about.

8        Particularly, in respect of why the

9        debtors have decided that it makes sense

10       to lock in the OPEB when it's clearly a

11       fruitful area at least for negotiation in

12       the future.  So, that's probably what

13       you're going to address anyway, but I'll

14       come back in five minutes.

15            MR. BUTLER:  Thanks, Your Honor.

16            (Recess at 4:01 P.M.)

17            THE COURT:  Please be seated.

18            MR. BUTLER:  Thank you.  I'm

19       mindful of the points of emphasis that

20       the Court has and I will address those.

21            THE COURT:  Okay.

22            MR. BUTLER:  I would also like --

23       just a couple of things I had promised

24       some stakeholders to mention on the

25       record and --
```

```
1        DELPHI CORPORATION                151

2             THE COURT:  Oh sure.  And you're

3        free to say anything.  I just wanted

4        you to focus on this point.

5             MR. BUTLER:  I will not miss that,
```

6         Your Honor.

7              THE COURT:  All right.

8              MR. BUTLER:  Your Honor, and it's

9         understandable, and so I don't say this

10        by way of criticism but by way of

11        observation because parties tend to focus

12        on the things that they're self-

13        interested about.  But I sat here for

14        almost two and a half hours waiting for

15        someone to argue, even if they were

16        arguing against us, about business

17        judgment and about the agreement that is

18        before us and what the balancing of

19        issues ought to be.  Because from the

20        debtors' perspective, Your Honor, this

21        agreement, while far from case

22        dispositive and why it is a baby step in

23        what is many steps we have to take down

24        the road, was and is to the debtors as

25        fiduciaries of this estate incredibly

1         DELPHI CORPORATION                 152

2         important.  This is a labor

3         transformation case.  We've talked about

4         that before.  It's at the fundamental

5         part of the core of this case.

6              But when I sat here before Your

7          Honor on the first day of this case and

8          we had the charts up and we talked about

9          North American, talked about the debtors

10         and the non-debtors and described the

11         challenges that faced us last October and

12         that would face us over the sort of 18

13         month trek that we envisioned would occur

14         going into next year.  We talked about

15         the people.  And you can't be at this

16         business very long and not understand

17         that if you're going to transform a

18         business and labor is at the center of

19         that transformation that you can't

20         address the needs of the people.

21              Now, the reality is how ever Delphi

22         approaches these matters, and I'm going

23         to be very circumspect in what I say

24         today because depending on the

25         constituency and stakeholder, nothing I

1          DELPHI CORPORATION                153

2          say here can be perfectly acceptable, but

3          the reality is Delphi had a business

4          judgment to make, Your Honor.  And that

5          business judgment was in light of this

6          transformation path that we're on, which

7          the debtors believe is our only road to a

8        reorganization here, the question is do

9        you tell the people that they have

10       options and alternatives and exit

11       strategies and possibilities for what is

12       euphemistically called a soft landing.

13       Or, do you simply tell them we have

14       nothing for you until the end of the

15       process.  And while GM has expressed

16       publicly that they're disappointed in our

17       filings last week and the UAW has

18       chastised us for those filings, the

19       debtors have nevertheless embarked on a

20       dual path that they believe is necessary

21       to complete this reorganization and

22       maximize value.  And we believed that

23       before we began that process, it was

24       important if we could to talk to the

25       people and to tell them that we cared

1        DELPHI CORPORATION              154

2        about the soft landings and that we would

3        provide them for that.  The UAW thought

4        that was important and GM, not because

5        they're altruistic but because as this

6        agreement says and it's a tri-party

7        agreement, GM got something from the

8        union, too, and it's disclosed to this

```
 9        Court.  There are no secrets here.  This
10        is a transparent agreement.  GM got a
11        separate program, as well, that they
12        wanted.
13            But I think it is important and I
14        hope the Court won't dismiss lightly the
15        fact that this represents a collectively
16        bargained agreement, a consensual
17        agreement, between the UAW, General
18        Motors and Delphi on the first step of
19        transformation.
20            In terms of process, and I simply
21        want to talk about that one aspect of
22        business judgment is the process that you
23        use.  I do want to point just out
24        briefly, Your Honor, a couple of exhibits
25        that have been admitted into evidence.
```

```
 1        DELPHI CORPORATION              155
 2        Exhibit #9, I think, is important
 3        because, and I won't go through it in
 4        great detail, but Exhibit #9, which is
 5        dated March 13, is a presentation that
 6        was made to the official committee of
 7        unsecured creditors that convened a
 8        special teleconference with the debtors
 9        for the entire committee to get a
```

```
10          presentation by Mr. Butler, Mr. Kevin

11          Butler, about what was being considered.

12          The discussions on soft landing, the hard

13          bargaining discussions, began the weekend

14          prior to March 13th, continued 24/7 until

15          the morning of March 22nd at which time

16          the tri-party agreement was announced.

17          And before we got through the last ten

18          days of that, and while people were

19          working 24/7, we took time out on March

20          13th to make this presentation to the

21          creditors' committee.  The same day this

22          presentation was made internally to

23          management.  The same information, the

24          same day.  And when you walk through

25          this, Your Honor, you'll note that the
```

```
1           DELPHI CORPORATION                156

2           company evaluated many, many terms and

3           issues in terms of financial issues,

4           possible take rates, retirement

5           assumptions, how this would compare

6           against the models the company is

7           considering both in terms of its steady

8           state run rate and in terms of a possible

9           transformation plan.  And a payback

10          analysis from the company's perspective
```

11          on how these things would be dealt with

12          and various conclusions to the committee

13          on March 13th.

14              The same thing was then discussed

15          on a preliminary basis and we talked to

16          the committee before we talked to our own

17          board.  And Exhibits 10 gives you a sense

18          of the preliminary presentation that was

19          made to the board of directors on March

20          14th, still more than a week before the

21          agreement was actually completed.  And

22          then you have at Exhibits 11, 12 and 13

23          the analysis of what was presented to the

24          board and the creditors' committee in

25          connection with the ultimate agreement.


1          DELPHI CORPORATION                157

2              In addition, I shared aspects, the

3          predecessor of the drafts of what

4          originally was paragraph 5 but paragraph

5          7 of the agreement, with counsel to the

6          committee and got their input in the

7          middle of the negotiations to understand

8          what their concerns were.  I'm not

9          suggesting we addressed every concern of

10          the committee.  Obviously, we have not.

11          But from a process perspective, Your

12          Honor, we conducted the appropriate

13          process, we consulted, we made

14          presentations to the full committee well

15          in advance of agreeing to anything.  And

16          we got feedback which we considered and

17          evaluated and which guided, but did not

18          direct, our action and our conduct.

19              The next point.  We indicated, and

20          I do need to say this on the record, we

21          indicated in our pleadings that the

22          agreement that we entered into, including

23          the segregated account would require the

24          support of our DIP lenders.  And I simply

25          want to report to Your Honor that we have

1          DELPHI CORPORATION                    158

2          reached agreement with the administrative

3          agent with respect to an amendment that

4          was already being worked on for a

5          covenant relief because we're going to be

6          filing our 10Ks we publicly disclosed

7          later than had been originally planned.

8          We got some covenant waivers from the DIP

9          lenders and we did pay them an overall

10          amendment fee of a million dollars for

11          that but they added to that a waiver for

12          this program.  So, we're appreciative of

13          that, appreciative of the steps they took

14          to support us and so there's no issue

15          here with a DIP agreement.  We did point

16          that out in the motion and I wanted Your

17          Honor to be aware of it.

18                In terms of quantifiable benefits

19          and in terms of why one would do this,

20          I'd like to actually walk through this

21          agreement with Your Honor very briefly.

22          It's only five pages long and it's

23          Exhibit 1.  And just sort of talk about

24          the construction of this agreement and

25          what was important to the company.

1          DELPHI CORPORATION                159

2                First of all, paragraphs 1 and 2

3          are agreements between General Motors and

4          UAW and I'm not going to talk about

5          those.

6                THE COURT:  Well, can we confirm in

7          the order that GM will not assert a claim

8          under those two paragraphs?

9                MR. BUTLER:  I'll leave that to --

10          those are GM agreements.  I assume GM has

11          no problem with that.

12                THE COURT:  A claim against the

13          debtors, obviously.  Okay.

14          MR. BUTLER:  Your Honor, with

15    respect to paragraph 3 in terms of the

16    attrition program, the 35,000 dollars for

17    normal early retirements and for the

18    mutually satisfactory retirements, that

19    incentive which is quantified as

20    approximately more or less 300 million

21    dollars is an undertaking that we're

22    paying but General Motors has agreed to

23    fund.  And there is no provision in this

24    agreement for General Motors to get a

25    nickel back from the debtors or to be

 1          DELPHI CORPORATION              160

 2    able to assert a claim.  Now, having said

 3    that, Your Honor, I will tell you that

 4    General Motors is going to put that on

 5    the score card for the final negotiation

 6    and they're going to expect our final

 7    agreements with them will comprehend

 8    that.  But they don't have -- if we never

 9    get to a final agreement and how that's

10    ultimately sorted out in the final

11    agreement is for another day, but if we

12    never get there, they're on the hook for

13    the 300 million dollars and that is a

14    entirely new undertaking that they have

```
15        done on our behalf.

16            The next section of paragraph 3

17        talks about what happens, and this was

18        important to every party, but,

19        particularly, to the union, in dealing

20        with what happened with people who were

21        close to retirement but not quite there.

22        And the 27 to 30 provisions -- we created

23        a special voluntary placement program and

24        a pre-retirement program under the terms

25        described, and I'm not going to go
```

```
 1        DELPHI CORPORATION              161

 2        through each of them, but it essentially

 3        provides that people can grow into

 4        retirement.  All right?  Now, the comment

 5        was made, and I'll just point out to you

 6        at the bottom of page 3 on 3(c), that the

 7        program we're talking about here is going

 8        to be offered on a nationwide basis

 9        immediately, but I do point out to you

10        the important sentence that this

11        addresses Appalousa's concerns, I think,

12        "the application period timing of

13        retirements release dates and number of

14        sign-up dates will be determined jointly

15        by Delphi and the UAW and those dates may
```

16          vary by location."

17              This is rolled out, Your Honor, a

18          plant by plant basis and you roll it out

19          trying to assess the take rates and

20          trying to make sure that you have the

21          necessary workers to be able to operate

22          your businesses and there are provisions

23          in this agreement in which there is an

24          agreement between the parties to

25          cooperate with each other with respect to


1          DELPHI CORPORATION                    162

2          temporary workers.  And that's in another

3          provision of the agreement.

4              All right?  And the payment of this

5          obligation, paying the monthly wages for

6          the special retirement program, that's on

7          the account of the debtors.  The debtors

8          are paying that.  That's where the 75

9          million dollar segregated account came

10          into play, which the DIP lenders have now

11          agreed to, and which we wanted to be able

12          to demonstrate was not subject to 11.13

13          attack.

14              THE COURT:  Okay.  I just have a

15          small point on that.  In the order, it

16          appears that even if that 75 million is

17          not spent, it has to stay in that

18          account?  You may just want to look at

19          the order to see if -- I'm assuming that

20          if it's not spent for the purposes

21          provided in this agreement, it can come

22          out and be used in general funds.

23               MR. BUTLER:  Yes, Your Honor.  It

24          can be.  In fact, under this agreement,

25          there's an adjustment, once we know what


1          DELPHI CORPORATION                163

2          the take rate is, there's an adjustment

3          that we get to do this.  And we talked

4          about whether we would -- how that

5          adjustment would occur and we've agreed

6          the 75 million dollars goes in initially

7          and then it's adjusted back after we know

8          exactly what the amounts are.  And we, in

9          fact, are able to reimburse ourselves

10          from that account as we make payments.

11               THE COURT:  Okay.

12               MR. BUTLER:  So that account, that

13          75 million is not going to hang out there

14          for a long period of time.  It will hang

15          out there until we are able to assess the

16          program, understand the take rate, make

17          sure people signed up, then we get to

```
18        adjust it, then we get to draw it down as

19        we make the payments to people over the

20        period of the pre-retirement program.

21        All right.  And that, particularly, is

22        for our account.

23              Paragraph 4 is in our view, and

24        I'll talk about a couple of others, but I

25        want to paragraph 4 briefly.  Paragraph 4
```

```
 1        DELPHI CORPORATION              164

 2        is the sort of check-the-box arrangement.

 3        And the check-the-box arrangement which

 4        allows an employee to go back and flow

 5        back to GM and retire under the U.S.

 6        Employee Matters Agreement with respect

 7        to this act is another opportunity that

 8        did not exist.  And this is a new

 9        opportunity to encourage -- give people a

10        menu of options.  Because, candidly,

11        these workers who make their wages that

12        they make and without characterizing

13        those wages, they make these wages, if

14        they retire early, they have the

15        opportunity now to retire on either

16        Delphi's balance sheet or General Motor's

17        balance sheet, in terms of what they

18        want, how they want to evaluate what
```

19        their retirement would be.  That was an

20        option.  That was a collectively

21        bargained opportunity for the work force.

22        And that is -- I should also point out

23        and I didn't talk about it in detail, is

24        I should go back to paragraph 2, because

25        paragraph 2 is an agreement between GM

1        DELPHI CORPORATION                    165

2        and UAW, but the direct beneficiary of

3        that is Delphi.  And this is in the

4        context as I understand it, and I've come

5        to learn a little about this in recent

6        months, is, I believe, is appropriately

7        characterized as a sort of historic

8        commitment by General Motors as it

9        relates to flowbacks.  Because here they

10        commit to 5,000 Delphi flowbacks.  That's

11        not what the pre-petition flowback

12        agreement talks about.  It talks about

13        opportunities.  It has a rigid formula

14        for how people can be considered.  This

15        was an arrangement where there was a

16        commitment that by September 1, 2007, GM

17        would do what's necessary in their work

18        force to create 5,000 spots for our

19        employees so people could flow back and

20        go back to work for General Motors.  And

21        that's a commitment.  And it can only be

22        extended -- the target date for

23        implementing that can only be extended

24        beyond the end of next year with Delphi's

25        consent.  Again, collectively bargained a

1         DELPHI CORPORATION                    166

2         hard driven bargain.  And that is a very

3         important, another very important option,

4         and that's going to cost -- General

5         Motors tells us nearly 300 million

6         dollars for them to create the space at

7         General Motors because they've got to

8         clear people out to take these Delphi

9         employees.  It's for our benefit, it

10        reduces our work force and, remember,

11        this entire program, Your Honor, is

12        voluntary.  That's another important

13        element of this people have to

14        understand.  No Delphi employee can be

15        forced to do any of this but this creates

16        a menu of options and opportunities for a

17        work force going through transformation.

18        And this gives at least a number of

19        employees, a group of employees, the

20        ability to go back and continue to work

21          for General Motors and a commitment that

22          General Motors will make the space

23          available to them.

24              That flowback obligation, the 300

25          million dollars at a hundred percent take

1          DELPHI CORPORATION                    167

2          rate more or less with respect to the

3          early retirement -- or, the retirement

4          incentives.  And the paragraph 4 check-

5          the-box opportunity for people to go back

6          and retire on General Motor's balance

7          sheet, if they chose to, are all

8          obligations that General Motors did not

9          have prior to signing their name to this

10          agreement.  Each of them provides

11          extraordinarily important incentives and

12          opportunities for the debtors' employees.

13              And for that, what does General

14          Motors get?  Do they get an

15          administrative claim which is what they

16          first demanded?  The answer is no.  They

17          get zero administrative claim.  Do they

18          get any kind of claim for the 300 million

19          dollars that they're going to spend on

20          the retirement incentives?  The answer is

21          no.  Do they get any claim for clearing

22          their own house out in order to take

23          5,000 flowbacks?  The answer is no.  But

24          for the paragraph 4 check-the-box and for

25          the funding of active health care --

 1          DELPHI CORPORATION                168

 2          where that's necessary is described, I

 3          think, somewhere in paragraph 7 -- for

 4          those obligations, do they get an

 5          administrative claim which is new?  The

 6          answer is no.  Do they get a priority

 7          claim?  The answer is no.  Do they get an

 8          allowed pre-petition claim which they

 9          insisted on?  The answer is no.  What do

10          they get?  They get the right to assert a

11          claim subject to just a few people in

12          this room objecting to it.

13               And why are there different

14          channels?  The creditors' committee's

15          major argument here is the debtors could

16          not possibly have exercised reasonable

17          business judgment in providing the soft

18          landing opportunities for their employees

19          in this labor transformation case because

20          we agreed that General Motors could have

21          the right to assert claims in various

22          channels.  It's what I call the sort of

23          the channel argument.  There are three

24          channels here.  You can do it under the

25          Master Separation Agreement, you can do

 1          DELPHI CORPORATION                169

 2          it under the U.S. Employee Matters

 3          Agreement, you can do it under what we

 4          call the covenant agreement which is

 5          really the indemnity agreements tied with

 6          the benefit guarantee.

 7              General Motors said they wanted the

 8          opportunity to assert those claims under

 9          all those channels.  That was, by the

10          way, after we refused to give General

11          Motors a much simpler way of doing this.

12          We could have simply said, GM, for these

13          new obligations, you get an

14          administrative claim knocked down to a

15          pre-petition claim which we won't allow

16          but it will just be a pre-petition claim

17          under a separate agreement, under this

18          agreement, pre-petition claim.  Which

19          would have given them a clean sailing

20          towards getting the claim allowed.  And

21          we said no.  We said, if you're going to

22          assert a claim for all these things,

23          you're going to agree that you're going

24          to use one of the pre-existing channels.

25          And, by the way, as you know, everybody

1    DELPHI CORPORATION                 170

2          thinks they have, including the debtors,

3          think they may have defenses, both

4          affirmative and otherwise in each of

5          these channels.  And General Motors said

6          to us, we got it, we understand that.

7          And, oh, by the way, if that's the case,

8          then we want the ability, because at one

9          point we were talking about having them

10         elect how to -- which channel to pick.

11         They basically said, we want the ability

12         to argue these channels in the

13         alternative because we understand from a

14         leverage perspective that creditors and

15         equity holders of the estate, and perhaps

16         even Delphi itself, is going to assert

17         that we can't get paid for these things

18         under these various agreements.

19              And the only thing we agreed to was

20         that they had the right to assert.  Not

21         to receive, not to have an allowed claim

22         -- the right to assert, and that we could

23         not and the order would provide that

24         nobody could argue about the fact that

25          these claims could be asserted under

1          DELPHI CORPORATION                    171

2          those.  All the other things, equitable

3          subordination which was raised earlier,

4          other kinds of defenses, other kinds of -

5          - all of those exist.  All of those can

6          be asserted.

7              THE COURT:  Do the debtors

8          acknowledge that the U.S. Employee

9          Matters Agreement might have applied here

10         in any event?  Or, is that -- do they

11         agree with the creditors' committee that

12         that's a stretch?

13             MR. BUTLER:  Your Honor, it could

14         apply only if General Motors would have

15         agreed to take people under it pursuant

16         to the terms of that agreement.  That

17         agreement doesn't include a commitment to

18         take 5,000 people between now and the end

19         of the next -- or, the third quarter of

20         next year.  Okay?  And so that is a new

21         commitment but they want to govern it and

22         I would just point out --

23             THE COURT:  Would there be

24         indemnification agreement applied to that

25         new commitment either?  Or, is there the

```
1        DELPHI CORPORATION              172

2        same problem with that, too?  You need

3        some new agreement, in essence, to apply

4        to the new commitment?

5            MR. BUTLER:  Well, that's, I think,

6        a theoretical position, Your Honor,

7        because I believe that you can take what

8        would otherwise be an administrative -- I

9        agree with the Court.  You can take what

10       would otherwise be an administrative

11       claim and knock it down however you want

12       to.  And I view -- the difference between

13       the committee and us -- and the debtors

14       is that we view forcing this pre-petition

15       assertable claim through existing

16       channels is limiting on General Motors,

17       not expanding General Motors' views.

18       Because it requires them to run the

19       wickets and the defenses of all the pre-

20       existing documents.  They have to run, if

21       you will, the obstacle course with

22       respect to each of those channels.  And

23       they simply said to us, we're not sure

24       which obstacles are higher in which

25       channels and so we want to run all the
```

```
 1      DELPHI CORPORATION              173
 2      channels.  That was the consideration
 3      that was given.  We said, all right.  No
 4      administrative claim, no party claim, no
 5      allowed pre-petition claim but you can
 6      run the obstacle course however you want,
 7      so long as you agree and the order is
 8      clear that people can attack you on any
 9      basis except they can't say the agreement
10      didn't comprehend it.
11          THE COURT:  So, in your view,
12      because the flowback in 2 and the
13      flowback in 4 and the funding of health
14      costs in 7 are all new, there would be no
15      pre-existing agreement that would apply
16      absent your and GM's agreement that it
17      would apply.
18          MR. BUTLER:  Right.  And the
19      agreements we were talking about happened
20      to be just, importantly, agreements
21      between GM and Delphi.
22          THE COURT:  That have their own
23      history and --
24          MR. BUTLER:  Right.
25          THE COURT:  Okay.
```

```
 1      DELPHI CORPORATION                    174

 2          MR. BUTLER:  And what we have said

 3      is that you can assert it under those

 4      agreements but you assert it -- and I

 5      want to answer one question Your Honor

 6      said is, do they have run the obstacle

 7      course, as I call it.  And the answer is

 8      yes.  They assert it subject to all of

 9      the claims, defenses, anything people can

10      say -- they want to say under those

11      different channels except they can't say,

12      gee, this wasn't comprehended under the

13      pre-petition agreement.  They can't say

14      that.  Because otherwise if you did that,

15      then they'd have no claim -- that's the

16      same as saying they got nothing from the

17      outset.  So, we're saying you can run the

18      obstacle course.  We're making no

19      guarantees you get through it.

20          And why did the debtors do that,

21      Your Honor?  We believe that we listened

22      very carefully to the concerns expressed

23      by the creditors' committee as our co-

24      fiduciary of the estate and they were

25      very concerned about claims allowance in
```

```
1        DELPHI CORPORATION              175
2        this case.  They were very concerned
3        about claims, generally.  And I
4        understand that Mr. Rosen -- these are my
5        words, not his -- may think we got 80
6        percent of the way there and for that,
7        congratulations, but he can help us get
8        the other 20 percent of the way there
9        because he can somehow talk you into
10       rewriting this agreement, but I don't
11       think it just works that way, Your Honor,
12       under the statute.  And, by the way, just
13       because we got three-quarters of where we
14       wanted us to be doesn't mean that we
15       didn't, as an estate matter, exercise
16       reasonable business judgment as a legal
17       principle in determining that this was
18       appropriate under all the circumstances.
19            THE COURT:  Okay.  But what about
20       the argument that primarily Mr. Fox and
21       Mr. Kurtz made that one can see the
22       benefits to the employees of doing it
23       this way and because the debtor wants to
24       have reasonably happy employees --
25       although this is not a happy situation,
```

```
1        DELPHI CORPORATION              176
```

```
 2        there's a benefit to the debtor of having

 3        that extend to the employees, but that

 4        ultimately in return for shedding

 5        employees by giving employees the right

 6        to opt out, you're getting costs in

 7        return in the form of a GM claim that's

 8        fixed at current OPEB levels?

 9            MR. BUTLER:  I have a couple of

10        responses to that, Your Honor.  One,

11        you're right.  The debtors would like to

12        have reasonably happy employees.  This

13        agreement is not going to make our

14        employees happy.  This agreement is

15        intended to try to help our employees

16        understand and make personal decisions

17        about their lives in a hopefully helpful

18        fashion that will, if we can, bring the

19        temperature down a little bit as we go

20        through this labor transformation.

21            THE COURT:  Well, put it this way.

22        It's better for them certainly than what

23        Appalousa is suggesting, which is that

24        you do it all at once and completely and

25        prevail on every point.
```

```
 1        DELPHI CORPORATION                177

 2            MR. BUTLER:  Well, Your Honor, I
```

3        happen to think Appalousa's argument is

4        one that simply says, let's just go

5        liquidate the company now because we'll

6        have no business.  I mean, this concept,

7        and this just has to be said, this

8        concept -- we heard it again today --

9        that we magically, next September, all

10       OPEB responsibilities disappear.

11            THE COURT:  No, I understand that.

12       But at the same time, in your

13       negotiations and in GM's separate

14       negotiations they are going to -- you and

15       they are going to be bargaining to reduce

16       OPEB obligations.  I mean, I'm sure you

17       will.

18            MR. BUTLER:  Well, Your Honor,

19       there's no question that we're going to

20       be involved in -- but understand from the

21       debtors' perspective what we think the

22       backdrop of that is.  All right?  We

23       believe the backdrop of that is a GM

24       benefits guarantee and they believe the

25       backdrop of that is an indemnity

1        DELPHI CORPORATION                178

2        agreement.  And the reason that some of

3        the testimony you heard repeated to you

```
 4        in the deposition transcripts is that the

 5        company believes some of this is a wash

 6        is because absent somebody being able to

 7        -- whether it's the debtors or the

 8        creditors' committee or someone else --

 9        being able to establish equitable

10        subordination or some other fraudulent

11        transfer for some other theory which

12        everybody argues about in these cases and

13        very few cases actually result in a

14        judgment for.

15            THE COURT:  'Cause people often

16        settle those issues.

17            MR. BUTLER:  Because people

18        generally settle.  All I'm saying is

19        absent that, Your Honor --

20            THE COURT:  The point is that you

21        and GM are stuck with each other absent

22        that.

23            MR. BUTLER:  No, not just us.  The

24        estate is.

25            THE COURT:  Well, that's what I
```

```
 1        DELPHI CORPORATION                 179

 2        mean.

 3            MR. BUTLER:  These claims exist.

 4        Okay?  If we terminate OPEB -- if we win
```

5      1114 and terminate OPEB, I don't think

6      the UAW intends, no matter who

7      subordinates anyone's mouth right now,

8      but I don't think the UAW intends to tell

9      their members that they aren't going to

10     get any OPEB benefits.  That they're out

11     of luck.  I think they're going to say,

12     we're going to get our benefits from

13     General Motors.  And General Motors is

14     going to say, we may have to write this

15     check now, but guess what, Delphi?  We're

16     going to assert the claim against you.

17          THE COURT:  But what about the fact

18     of the expiry date of the agreements?

19          MR. BUTLER:  That's right, Your

20     Honor.  It's absolutely true in a year

21     and three months from now, or whatever it

22     is, five months from now, these

23     agreements expire on their terms.  And to

24     that I have to tell you in the context of

25     a sophisticated labor case, really, I

1      DELPHI CORPORATION                180

2      have to say, so what?  What does that

3      mean?  That means, the next day that the

4      obligations disappear?  It means the work

5      force vaporizes?  It means that, again,

6        I'm speaking hypothetically now, but the

7        labor unions in this country are going to

8        allow General Motors and Delphi to

9        operate the next day without

10       comprehending these liabilities or that

11       have not been collectively bargained away

12       or dealt with under 1114 or some other

13       way?  I mean, the reality of this is that

14       these obligations exist in this

15       particular situation.  Some of the

16       obligations round trip, so that even if

17       we use 11.14 they come back to us.  All

18       right?  Under the pre-existing agreements

19       here unless those agreements can be set

20       aside or subordinated or attacked.  All

21       right?  And ultimately, I believe -- I

22       think everybody in this room believes,

23       Your Honor.  Ultimately, that will be

24       settled out and I understand, everybody

25       has to look at the worse case and the


1        DELPHI CORPORATION              181

2        downside.  And I would argue that an

3        underpinning of the debtors' business

4        judgment here, which I think the Court

5        needs to evaluate, is what happens if

6        this agreement's turned down?  What

7        happened if this agreement was never

8        entered into or Your Honor tells us we

9        can't implement it?  And I'm not going to

10       talk about, as everyone has, about these

11       parade of horribles that -- and talk

12       about the worse case, but let's talk

13       about downside for just a minute.

14           Downside #1 is I couldn't disagree

15       more with the creditors' committee on the

16       concept that is, hey, Judge, don't worry

17       about it.  Just reject it, turn it away

18       and no worries here.  The UAW and General

19       Motors and Delphi, they'll go down the

20       hallway -- this is so important, they'll

21       figure out another solution.  That

22       doesn't happen in labor transformation

23       cases very often.  There are a lot of

24       factors that coalesce that give you the

25       opportunity at certain windows in time to

1        DELPHI CORPORATION                182

2        reach certain agreements.  And I am not

3        at all confident, Your Honor, that this

4        same agreement could be struck again.  Or

5        that the creditors' committee desire to

6        rewrite the agreement which is not

7        permitted under the law.

8            THE COURT:  When you entered into

9       this, obviously subject to Bankruptcy

10      Court approval, did GM know that you were

11      going to plan to reject their supply

12      agreements?

13           MR. BUTLER:  They had a sense that

14      we might.  They didn't know it for sure.

15      We certainly had talked to them as we

16      talked to the committee about the

17      possibility of seeking to deal with their

18      issues because the reason we filed a

19      motion, along with 1113/1114, Your

20      Honor, is there is a parity here and a

21      symmetry of issues that we have to

22      address to solve the problems.

23           THE COURT:  Okay.

24           MR. BUTLER:  It's not just about

25      labor.  So, Your Honor --

1       DELPHI CORPORATION                    183

2            THE COURT:  Is it fair to say that

3       if I sent you down the hall, people might

4       start talking about those motions in

5       connection with this motion?

6            MR. BUTLER:  I don't know what

7       people will talk about, Your Honor.

8       Right now, there are people that are

9          talking and people that are not talking.

10         And I'm not going to characterize anybody

11         on anything.  I will tell you this is a

12         difficult but necessary moment in the

13         life of this reorganization and I really

14         do believe under 363(b) and I hope the

15         Court appreciates that it is -- this is

16         an overall business judgment level.  And

17         I don't agree here -- and the reason that

18         there's nothing in the record that -- and

19         people weren't, I think, able to sort of

20         push to this point is, I hear people say

21         the words but I don't think anybody has

22         been able to dispute our assessment that

23         we don't believe that there is a material

24         increase in liabilities here by entering

25         into this agreement.

1          DELPHI CORPORATION                184

2              THE COURT:  Well, I mean, what the

3          committee has said, and others have

4          echoed it, is that by locking in the OPEB

5          and related paragraph 7 costs under the

6          Employee Agreement, you are increasing

7          the liabilities because basically people

8          assume, in one way or another, those

9          costs as a practical matter will go down.

10          But for terms of determining GM's claim

11          albeit it's an unsecured pre-petition

12          claim, if allowed, they'll be at the

13          higher levels, the current levels.

14              MR. BUTLER:  But, Your Honor, there

15          are about four assumptions in that

16          conclusion which haven't been proven and

17          are not in the record.  All right?  I

18          mean, the reality is that under the

19          Employee Matters Agreement there is

20          nothing locked in.  There is an algorithm

21          in that agreement, which depending upon

22          what health care trends are either works

23          in Delphi's benefit or GM's benefit.

24              THE COURT:  But it's based on

25          current OPEB levels, right?  It's not

1           DELPHI CORPORATION                185

2           based on what's renegotiated or

3           negotiated for the 2007 contract.

4               MR. BUTLER:  But, Your Honor, we

5           can't sit here and try negotiating on

6           what's going to happen a year and a half

7           or two years from now.

8               THE COURT:  Well, I understand

9           that.

10              MR. BUTLER:  And, in fact, the

11      claims that round trip under the various

12      agreements aren't based on what happens

13      two years from now either.  And, I mean,

14      to suggest that this reorganization is

15      not going to simply --

16          THE COURT:  But they wouldn't -- as

17      I understand it, these are new claims

18      that people have the right to assert so

19      newly.  So, those claims wouldn't exist

20      either.  You'd be just stuck with the

21      people.

22          MR. BUTLER:  Right.  We'd be stuck

23      with where we are today.  Paying the

24      rates we are now.

25          THE COURT:  Right.  Not that you're

1       DELPHI CORPORATION                186

2       stuck with them.  They're valuable

3       workers but it's in the company's interest

4       to have a smaller work force.

5           MR. BUTLER:  Right.  And, Your

6       Honor, this agreement --

7           THE COURT:  So you have different

8       claims if you -- as opposed to these

9       particular claims.

10          MR. BUTLER:  Well, I happen to

11      think OPEB claims in some respects are

12          refundable if we -- if people actually

13          check the box and go back to General

14          Motors here, that is a lesser OPEB claim

15          from the people who stay here and if

16          we're successful on 1114 or otherwise

17          collectively bargain it, go back to

18          General Motors under the benefit

19          guarantee.  It's not like -- it's a

20          reduction of that claim.

21               And, I think, Your Honor, one thing

22          I just wanted to mention, as well, here

23          in terms of benefits here.  You've heard

24          a lot of the jobs bank and a lot about

25          the fact that we pay people to simply

1     DELPHI CORPORATION                187

2          come to work and not do anything because

3          we have nothing for them to do and we pay

4          them their regular wages.  This program,

5          when implemented, the debtors believe

6          will, in this calendar year, have the

7          opportunity of eliminating the jobs bank.

8          Because people will pick, make a choice.

9               THE COURT:  I imagine those people

10          would assume they're most at risk, so I

11          understand that.

12               MR. BUTLER:  But that also saves

13          the estate a tremendous amount of money.

14          And that's another benefit here of this

15          program.

16               THE COURT:  Okay.

17               MR. BUTLER:  Your Honor, I think

18          that --

19               THE COURT:  Well, can I ask you --

20          this is a smaller question but I forgot

21          to raise it with the objectors.  The last

22          paragraph of this talks about the basic

23          benefits in prorating, and yet as I

24          understood one of the committee's

25          objections, prorating for the years of

1          DELPHI CORPORATION                188

2          service and the different entities.

3          Yeah, this is on the pension plan, 7(f).

4          They say that the debtors would be liable

5          for a hundred percent of the pension if -

6          - well, let me just read it.  "Paragraph

7          7(f) of the program provides that an

8          employee retiring from GM under paragraph

9          1(b) with credited service under the

10          Delphi pension plan would be considered

11          eligible to retire under the Delphi plan

12          with eligibility for prorated pension

13          benefits.  The extent of the debtors'

14    obligations arising from this provision

15    is unclear."  I didn't understand why it

16    was unclear.  I thought it was just

17    prorated.

18        MR. BUTLER:  It is prorated as I

19    understand it, Your Honor.  The point is

20    that -- and this is -- somebody talked

21    about -- I should make the point you

22    mentioned pension -- let me just address

23    pension.  The amount of incremental

24    pension liability is measured by

25    termination value that are occurring here


1    DELPHI CORPORATION                189

2    that are not otherwise a timing issue

3    really have nothing to do with most of

4    the retirements here.  They have to do

5    with the MSRs, the mutually satisfactory

6    retirements, which actually may increase,

7    depending on how many people take it,

8    could increase the termination by

9    something in the range of 100 to 150

10    million dollars, depending on take rates

11    it may be less than that.  This 2.2

12    billion dollar number that Appalousa

13    referred to is a timing issue.  These

14    people all have vested benefits.  And the

15    reality is that they're going to have the

16    opportunity ultimately at some point

17    under the steady state, they're going to

18    retire, too, at some point.  This isn't a

19    new liability that's created out of full

20    cloth.

21        THE COURT:  Okay.  But I didn't --

22    so you disagree with this paragraph 33 of

23    the objection?  I don't know if you have

24    it in front of you.

25        MR. BUTLER:  I haven't looked at


1    DELPHI CORPORATION                    190

2    that particular paragraph.

3        THE COURT:  It suggests that -- you

4    could read this agreement.  It's

5    suggesting that instead of being

6    prorated, Delphi would be responsible for

7    a hundred percent?

8        MR. BUTLER:  I believe it's

9    prorated unless somebody tells me

10    differently.  Okay.  My understanding is

11    and I think the agreement says it's

12    prorated.  The reality is we're

13    responsible for their use of service and

14    GM is responsible for GM's.

15        THE COURT:  Okay.

16          MR. ROSENBERG:  Your Honor, I will

17     accept Mr. Butler's statement that it's

18     prorated but when we asked the question

19     in writing and the response that we got

20     back was as stated in that brief and I

21     believe Mr. Sheehan's testimony in his

22     deposition --

23          THE COURT:  But this -- I guess,

24     the record would supersede that.

25          MR. ROSENBERG:  Okay.


 1     DELPHI CORPORATION                    191

 2          THE COURT:  Okay.  I sort of

 3     interrupted you but I think you were

 4     winding up.

 5          MR. BUTLER:  Can I have one minute,

 6     please, Your Honor?

 7          THE COURT:  Yeah.

 8          MR. ROSENBERG:  Apparently, it's

 9     not so simple, Your Honor.

10          THE COURT:  Okay.

11          MR. BUTLER:  I mean, I think that

12     part's obvious.  I'll say it.  Your

13     Honor, if somebody is retiring today and

14     they check the box and flow back to GM

15     today and they retire today, all their

16     service was with Delphi.  But if somebody

```
17        goes back and flows back under the 5,000

18        flowbacks and they have GM's service --

19             THE COURT:  And then they retire

20        later --

21             MR. BUTLER:  -- and then they

22        retire, it's prorated.

23             THE COURT:  Okay.

24             MR. BUTLER:  I mean, you wouldn't

25        -- obviously, if all their service is
```

```
 1        DELPHI CORPORATION              192

 2        with us, when they check the box, they

 3        would be -- okay.

 4             Your Honor, I want to address one

 5        other point that -- just in closing here

 6        and I think some of the other parties

 7        want to speak and I know Your Honor

 8        wanted to be done shortly.  And that is,

 9        the comment about the pattern agreements

10        with the other unions.

11             One of the things that was very

12        important to the debtors here and to the

13        unions is that while we negotiated this

14        agreement with UAW and that covers a

15        significant number of our workers, it

16        does not cover the workers with several

17        other unions.  There's, depending on how
```

18        you count it, 8,000 plus workers this

19        does not cover.  And we are in

20        discussions to deal with that issue now.

21        And we have a lot of workers who are

22        saying how come, why don't I have these

23        options, as well, and it was important in

24        our motion to make it very clear we

25        intend to provide this, as soon as we can

1         DELPHI CORPORATION                193

2         collectively bargain it, with everybody.

3         It is going to be a pattern agreement and

4         our view is just like we set up other

5         procedures with this Court, if it is --

6         as long as it is reasonably similar to

7         this, and we've agreed with the

8         creditors' committee they can review it,

9         to go through this same process again

10        over 30 days from now or at some other

11        point, we would argue, Your Honor, is --

12        shouldn't be necessary.

13            THE COURT:  But let me ask you

14        about -- with the other unions, do you

15        have the same issues as regards to the

16        relationship with GM and the agreements

17        with GM?  You don't, do you?

18            MR. BUTLER:  We actually have

19          similar issues with them.  They're not

20          the same.  For example -- but there are

21          some things that are different.  There

22          are no flowback opportunities for certain

23          of our unions.  Okay?  So that will be a

24          different issue.

25               THE COURT:  It just seems to me,

                DELPHI CORPORATION              194

 1

 2          though, that while the general notion, if

 3          I approve this as far as the level of

 4          buyouts is concerned, should give comfort

 5          to both the debtor and the other unions

 6          that the same logic will apply to them

 7          given the significance of the issues with

 8          GM.  To the extent the agreements and the

 9          relationships are different, it would

10          seem to me that you'd have to come back

11          because that's -- it's really a three-way

12          analysis as opposed to a two-way

13          analysis.  And I don't see how you could

14          get around that.

15               MR. BUTLER:  Well, that's the

16          Court's view.  We certainly have to

17          respect it.  Our point in this --

18               THE COURT:  I mean, my hope is that

19          people would realize that unless

20          something is different, the same result

21          should pertain.  Or, if it's clearer, in

22          respect to those agreements than it is

23          with this one, again, the same results

24          should obtain which is approval.  But I

25          think it's -- without knowing the three

1           DELPHI CORPORATION                195

2           elements of the issues at stake, it's

3           hard for me to give sort of an advanced -

4           - I don't even know what "comparable

5           arrangements" would be because there may

6           be material differences, not in terms of

7           the arrangements but in terms of the

8           parties' rights before the arrangements

9           started.

10               MR. BUTLER:  Well, Your Honor, if

11          that's the Court's view, could we bring

12          that on for -- get a hearing date from

13          Your Honor and bring it on for expedited

14          outside of an omnibus date?  So the

15          unions can get some comfort out of that?

16               THE COURT:  I assume you can.  Just

17          go -- the case management order spells

18          that out on how to do that.

19               MR. BUTLER:  Okay.  Thank you, Your

20          Honor.

21          MR. PETERSON:  Your Honor, Lowell

22     Peterson for the Steel Workers, one of

23     the other unions.  I certainly don't want

24     to belabor the positions that have

25     already been articulated.  We support the


1     DELPHI CORPORATION                196

2     motion.  Some of the sort of labor law

3     arguments that have been made by the

4     objectors are from the other side of the

5     looking glass, but that's not really my

6     role here today.  I would hope that Your

7     Honor would think again perhaps about

8     having a full board hearing with notice

9     and so forth with respect to a similar

10     attrition program with the other unions,

11     particularly, the Steel Workers.  We

12     really have a me-too kind of agreement

13     that's very similar and, of course, we

14     are also much smaller.  The dollar values

15     would be a lot smaller.

16          THE COURT:  Well, see, I don't know

17     whether it's -- the record before me

18     doesn't show whether someone has a

19     literally a me-too agreement or whether

20     there are wrinkles in it.  So, that's why

21     I have a hard time approving something in

22      advance.  On the other hand, if I've

23      approved this in some form, and yours

24      follows it and you have a me-too

25      agreement, I don't think it's going to be


 1          DELPHI CORPORATION                197

 2      this long a hearing.

 3          MR. PETERSON:  That would certainly

 4      be a relief and I'm certain that none of

 5      the objectors have -- will come up with

 6      new arguments.  But I think if you take a

 7      look a the record, in the 11.13

 8      proceedings that everybody seems to be

 9      referring to, you'll see that our

10      agreements are pretty similar.

11          THE COURT:  Okay.

12          MR. PETERSON:  But it certainly

13      would help to get an expedited process

14      and proceed from there.  Thank you, Your

15      Honor.

16          MS. CECCOTTI:  Your Honor, Babette

17      Ceccotti for the UAW.  I will also be

18      brief.  First, I do want to just state so

19      that the record is absolutely clear that

20      approval of the special attrition program

21      today is vitally important to the UAW and

22      in the circumstances of this case in

23        which we find ourselves and our

24        membership finds itself.  The incentives

25        that are provided, the job opportunities

1        DELPHI CORPORATION                198

2        with GM and the other protections that

3        were able to be negotiated here represent

4        meaningful concrete options for people in

5        an atmosphere of enormous uncertainty.

6        We've had lots of discussion or

7        references to the 11.13 motion and I am

8        certainly not here to get into the

9        substance of any of that today.  If it

10       sadly becomes necessary for us to do so,

11       we'll address it at the appropriate time.

12            But the point is that the picture

13       that is painted there is just horrible.

14       And in terms of what it could mean for

15       the workers, here we have an agreement

16       that was able to be reached to provide

17       people with an option and an opportunity

18       and should very much be considered by the

19       Court in that light.

20            We think that the agreement, the

21       fact that it's an agreement represents a

22       very constructive step in the parties'

23       efforts to address extremely challenging

24        and difficult issues and, again, I think

25        the fact that it is an agreement should


1        DELPHI CORPORATION                199

2        be viewed as a productive step here

3        considering really the fact that this is

4        the debtors -- the debtors call this a

5        labor transformation case.  They get to

6        call it, they filed it that way, they've

7        been talking about it for months.  We

8        didn't ask to be part of a labor

9        transformation case, frankly.  We didn't

10       ask to go first.  Right?  The debtors

11       have said this is the case we have.  You

12       guys are going first.  We're targeting

13       these costs.  Here's our timetable,

14       here's the motion.  It's not time yet to

15       negotiate with the creditors' committee.

16       This is a -- I don't want to say -- I

17       don't mean to say understandable because

18       I think a lot of their arguments really

19       are, frankly, simplistic in doing a case

20       like this, but it's not time to deal with

21       their issues yet.  When you have a case

22       like this, and I've -- this is just about

23       the most difficult I've seen easily in 20

24       years of doing this, and the debtor says,

25          labor is going first, you hope for an


1           DELPHI CORPORATION                    200

2           agreement.  You think an agreement is a

3           good thing.  An agreement, I agree with

4           Mr. Butler, you take the time and the

5           place and what's available to you and if

6           you have a window you take the window.

7           It is, and I totally agree with Mr.

8           Butler's observation, as well, that to

9           simply say we can go down the hall or

10          wait or just allow the passage of time

11          and we'll have a different result that

12          perhaps maybe other stakeholders would

13          like simply isn't realistic.  And isn't,

14          again -- given the context we find

15          ourselves in which is that the debtors

16          have said this is the way our case is

17          going to proceed.  It is up to the

18          unions, it's incumbent on the unions to

19          deal with that and to deal with it

20          responsibly and we believe that the

21          agreement should be viewed as a

22          productive step in that effort.

23              I would also like to confirm Mr.

24          Butler's observation regarding the notion

25          that the OPEBs would simply disappear

```
 1        DELPHI CORPORATION                201
 2        that, yes, the UAW would certainly assert
 3        the indemnity.  They have a long and very
 4        successful history in vigorously
 5        defending OPEB retiree health obligations
 6        so there shouldn't be any misapprehension
 7        here that whether it's in an 11.14
 8        context or in some other context that the
 9        UAW would not be as vigorous and
10        defensive of those obligations as it has
11        in the past.
12             In closing, I'd just like to say
13        that it is our very strong view that the
14        agreement represents both a process, the
15        fact that it is an agreement and a result
16        in terms of the program that it offers to
17        the employees that are very good results
18        for this case and absolutely,
19        unquestionably in the best interest of
20        the estate.
21             THE COURT:  Okay.  Let me just hear
22        from --
23             MR. ROSENBERG:  Oh, sorry.
24             MR. BIENENSTOCK:  Good afternoon,
25        Your Honor.  Martin Bienenstock from
```

```
 1      DELPHI CORPORATION                202

 2      Weil, Gotshal & Manges for General Motors

 3      Corporation.  I've tried to limit my

 4      comments to two minutes.  Number one, I

 5      want to do this by example.  Under the

 6      benefit guarantee, General Motors has

 7      guaranteed OPEB and pension.  To trigger

 8      the benefit guarantee, a couple of things

 9      have to happen, one of which has not yet

10      happened, namely Delphi has not stopped

11      paying OPEB to its employees.

12          Therefore, under this current

13      agreement, General Motors has no

14      obligation to start paying OPEB to Delphi

15      employees.  If they stopped paying OPEB

16      to all of them or reduced it to all of

17      them, then our benefit guarantee would be

18      triggered and then we would have an

19      indemnity claim against the estate for

20      whatever we become obligated to pay.

21          The reason I start with that is

22      very simple.  We do have a claim, if they

23      wiped out OPEB or reduced it to everyone,

24      we do have a claim back against the

25      estate for everything we pick up.
```

```
 1        DELPHI CORPORATION                    203

 2        Because of the way this is coming up

 3        procedurally, we have to have a mechanism

 4        for asserting that claim.  Mr. Butler did

 5        explain that we could have just been

 6        given it under this agreement.  Instead

 7        the negotiated solution was we'll assert

 8        it under the benefit guarantee and the

 9        indemnity agreement among others, as if

10        the triggers had occurred.

11             There are many other examples, Your

12        Honor.  But it's that simple.  We have

13        the claims.  Just the triggering events

14        necessary to assert them haven't all

15        occurred currently and there are

16        variations of that in the other

17        agreements.

18             Number two, from a sheerly economic

19        viewpoint, Your Honor, it's clear that if

20        there's a choice given between the debtor

21        having an administrative obligation for

22        all this program's obligations or a

23        general unsecured or no obligation, the

24        debtor and the committee would both

25        prefer no obligation.  It's always nice
```

```
1           DELPHI CORPORATION                   204

2           to get something for nothing.  We

3           understand that.

4                But the debtor satisfied everything

5           it could possibly want by eliminating all

6           administrative expenses back to General

7           Motors under this program and the

8           committee, which theoretically is

9           supposed to represent all general

10          unsecured claim holders, has basically,

11          and as Your Honor has seen, GM is not

12          part of that and the committee believes

13          one way to up the return to some

14          unsecured pre-petition claim holders is

15          to eliminate others such as General

16          Motors.

17               We're not here now to argue that

18          but I only raise it to make one point.

19          That agenda of the committee, whether

20          it's right, wrong or indifferent, is not

21          a reason not to approve this agreement.

22               This agreement makes the debtor's

23          estate better off by hundreds of millions

24          if not billions of dollars because it has

25          a jobs bank.  It has to pay people
```

2       whether they work or not.  The union has

3       1113 and 1114, which obligate the debtor

4       to go on making these payments until the

5       Court says otherwise.  That could go on

6       for months or longer and that's hundreds

7       of millions of dollars.  For every

8       employee, however, who opts into this

9       program, the debtor gets off the hook.

10          And finally, Your Honor, it would

11      be very unusual, and this case should not

12      be decided based on the hypothetical the

13      equity committee or the equity owner and

14      the committee are positing, that the

15      result of the 1113/14 litigation will be

16      that the union will not even get a claim

17      for the OPEB it's giving up.

18          Again, it doesn't effect the

19      reorganized debtor's ability to go

20      forward if the union gets a claim for

21      what it's taking less in the future for.

22      That's a lot more logical than assuming

23      it's going to give up for nothing and we

24      know that's not the case.

25          One party, one objector, did say

1       DELPHI CORPORATION                206

2       that they think that the three billion

```
 3        estimate is low.  I want to confirm that

 4        if everyone opts into the program, the

 5        three billion estimate of the debtor

 6        probably is low.  General Motors will

 7        probably have a general unsecured claim

 8        more in the neighborhood of four billion

 9        plus.  But again, that doesn't affect the

10        viability, it doesn't affect the costs of

11        this program because we're only getting a

12        claim for things the debtors are

13        otherwise obligated to pay and it's a

14        pre-petition claim.

15             THE COURT:  I guess someone looking

16        at this from afar might say why is GM

17        agreeing to accelerate, in terms of real

18        cash dollars, a claim that it might have

19        in a lesser amount.  And I guess one spin

20        that the creditors' committee has put on

21        that is that GM's improving its position

22        in this case because of that, both by

23        fixing the OPEB at a higher number

24        perhaps and also by locking in the claim

25        against the parent company.  What is your
```

```
 1        DELPHI CORPORATION                    207

 2        response to that?

 3             MR. BIENENSTOCK:  The claim against
```

```
4          the parent company could have, at the end

5          of the day, a very low value.  I think to

6          the extent one can speak simply for an

7          organization as large as General Motors,

8          it's fair to say the dominant reason why

9          we are agreeing to this program is that

10         it's a significant step forward in the

11         resolution of a critical supplier's labor

12         problems and for as long as it is a

13         critical supplier of General Motors,

14         solving so much of its labor problem in

15         one agreement makes us believe that it's

16         more likelihood we'll get to a final

17         agreement that will be good for everyone.

18             THE COURT:  Okay.  Thank you.

19             MR. BIENENSTOCK:  Thank you.

20             MR. ZIMAN:  Your Honor, I'm Ken

21         Ziman, on behalf of J.P. Morgan's pre-

22         petition agent.  Very briefly, Your

23         Honor, we're to file papers on this but I

24         just want to let, for the record, state

25         that the pre-petition agent supports the
```

```
1          DELPHI CORPORATION                208

2          relief sought here.  I mean, we are very

3          concerned about the global resolution

4          being obtained here and this step, which
```

```
 5          we view as a reasonable step, can allow a

 6          global resolution without a work

 7          stoppage, you know, should be embraced by

 8          the Court and the parties.  For that,

 9          I'll not take up any more of the Court's

10          time.

11              THE COURT:  Okay.  Okay.  Mr.

12          Rosenberg.  You were --

13              MR. ROSENBERG:  Yeah, Your Honor,

14          just three or four sentences --

15              THE COURT:  Okay.

16              MR. ROSENBERG:  -- to crystallize

17          the committee's position because I think

18          it's been somewhat misrepresented here.

19          Ms. Ceccotti may be surprised to hear

20          that I completely agree with what she

21          said about (a) the importance of this

22          agreement and more importantly that today

23          is not the day to sort through the

24          committee's ultimate problems or issues.

25          And nobody ever suggested that they were.
```

```
 1          DELPHI CORPORATION                209

 2          And of course, Mr. Bienenstock is also

 3          correct, I hardly think it's a surprise

 4          that at this juncture in the case it is

 5          the committee's belief that we are in
```

6          this situation because of what GM did

7          starting in 1999 and in one fashion or

8          another continuing to the present day.

9               And where that takes me, Your

10         Honor, is simply to make the following

11         point.  Your Honor several times focused

12         upon the fact that this agreement

13         provides for new consideration for GM in

14         a number of respects.  And of course that

15         is true and undisputed.  But it is the

16         committee's position that it is indeed

17         GM's obligation to fix the problem which

18         it created for its own benefit way back

19         when.

20              Now that position either will or

21         won't ultimately prevail.  That position

22         either will or won't get settled out over

23         time.  All we're asking for today is that

24         that position not be prejudiced in an

25         unfair and unfortunate way.  That's it.


1          DELPHI CORPORATION                    210

2               THE COURT:  But it sounds to me,

3          given Mr. Butler's remarks about going

4          through the channels of the existing

5          agreements, that those rights are pretty

6          well protected.

```
 7              MR. ROSENBERG:  Well, Your Honor,

 8         if we became truly comfortable with that

 9         we would agree and go home happy today.

10         As Your Honor pointed out, the language

11         of the various orders and provisions do

12         not necessarily support Mr. Butler's

13         statements.  And of course, our real

14         problem is the terms of the employee

15         matters at hand.

16              THE COURT:  But he made his

17         statements in open court and I didn't

18         hear anyone standing up and saying no,

19         no, no that's wrong.  So --

20              MR. ROSENBERG:  Well, perhaps Your

21         Honor then, could help fashion an order

22         that's consistent with what Mr. Butler

23         said in court and we will go away happy.

24              THE COURT:  Okay.  All right.  I

25         have before me a motion for an order
```

```
 1         DELPHI CORPORATION                211

 2         under Section 363(b) of the Bankruptcy

 3         Code to approve the debtor's entry into

 4         and performance of what has been referred

 5         to as the human capital hourly attrition

 6         program.

 7              They were set out in an agreement
```

8          attached to the motion which is a

9          tripartite agreement between the UAW, GM

10         and Delphi, labeled special attrition

11         program.  The terms of that agreement, as

12         they pertain to the relationship between

13         GM and Delphi, have been somewhat further

14         clarified on the record of this hearing

15         as well as in earlier pleadings in

16         response to the four objections that were

17         raised to the motion, and I think the

18         record reflects those clarifications and

19         acknowledgements and perhaps the order

20         should as well.

21              I will approve the motion and

22         authorize the debtors to enter into and

23         perform the agreement as clarified on the

24         record under Section 363(b).

25              It is argued that the debtor does

1          DELPHI CORPORATION                    212

2          not have the ability to seek approval of

3          the agreement under Section 363(b) for a

4          couple of reasons, and I guess I should

5          address that argument first before going

6          on to my reasons for approving the

7          motion.

8               It's contended, first, that because

9       this agreement would modify existing

10     agreements between the debtor and GM and

11     the UAW, that I cannot approve such

12     modifications under Section 363(b).  I

13     believe that's not a valid argument.  The

14     agreement, in large part, actually uses

15     old agreements to govern new arrangements

16     going forward, that were not required

17     under the old agreements between the

18     debtor and GM.  And in any event, I

19     believe that the terms of the attrition

20     agreement are appropriate.

21         It's conceded by the creditors'

22     committee that they could be entered into

23     as a post-petition agreement with a post-

24     petition administrative claim priority

25     for obligations thereunder of the

1        DELPHI CORPORATION          213

2     debtors.  The only difference here is

3     that GM has agreed, to the extent that it

4     is preserving the ability to assert a

5     claim here, that that claim will not have

6     the level of priority that would

7     otherwise apply under Bankruptcy Code sections

8     503 and 507, but would, rather, be a pre-petition

9     unsecured claim.

10          That type of voluntary

11    subordination is (a) permissible and (b)

12    in the interests of the estate.  I've

13    read the Phar-Mor v. Strouss building

14    associates case cited by the Creditors' Committee

15    to me at oral argument, at 204 BR 948 from

16    the District Court, Northern District of Ohio,

17    1997; and I find that case inapposite.

18          That was a case in which one party

19    to an executory contract sought to amend

20    the provisions of the contract but the

21    other party refused tp agree to the amendment.

22    Consequently, it asserted hornbook law which

23    is that a debtor cannot unilaterally amend an

24    executory contract without the consent --

25    well cannot unilaterally amend it, but

1     DELPHI CORPORATION                214

2     must either assume it in full or reject

3     it.

4           It's also argued that this motion

5     and this agreement should be incorporated

6     into a Chapter 11 plan, or I guess more

7     appropriately, into a disclosure

8     statement for a Chapter 11 plan, because

9     of the importance of this agreement to

10    the debtor's overall business and

11          ultimately because this is a

12          reorganization case, as opposed to a

13          liquidation case, to the debtor's

14          reorganization.

15               Now, again, I disagree with that

16          premise.  First, this agreement does not

17          spell out the terms of a Chapter 11 plan--

18          that is, the distributions that will be

19          made to creditors.  If anything, it

20          reduces the ability of one potential

21          administrative creditor to assert an

22          administrative claim.  And that's a far

23          cry from a disguised Chapter 11 plan as

24          analyzing the Fifth Circuit's Braniff case.

25               Moreover, the Second Circuit has

 1          DELPHI CORPORATION                215

 2          been clear since the Lionel decision that

 3          a debtor may take an action out of the

 4          ordinary course, indeed may go so far as

 5          to sell its entire business out of the

 6          ordinary course, without having to take

 7          that step through a Chapter 11 plan,

 8          provided that the debtor has not bent

 9          inappropriately to the pressure of a

10          constituent or constituencies but rather

11          has exercised good business judgment in

12          making its decision to take the action out

13          of the ordinary course.

14              The debtor correctly quotes the

15          Orion Pictures case for the proposition

16          that in connection with an action under

17          Section 363(b), the bankruptcy court

18          needs to review the debtor's exercise of

19          its business judgment, in the first

20          instance, applying its own business

21          judgment to the action proposed by the

22          debtor and generally to defer to applying

23          the business judgment standard to the

24          debtor's business judgment if the debtor has

25          pursued proper procedures and the like in


1          DELPHI CORPORATION                    216

2          analyzing its decision.

3              Obviously when significant

4          constituencies have objected to the

5          proposed action out of the ordinary

6          course, the Court reviews their analysis

7          closely, as well; and it is my practice to

8          give less deference to the debtor's

9          business judgment in those situations and

10          to exercise more of my own in light of

11          the arguments raised by the objectors.

12              It is also argued here that because

13          of the importance of GM to the debtor's

14          business, GM being the debtor's largest

15          customer, that I should impose a strict

16          scrutiny standard here, likening GM to an

17          "insider."  I have not done so because I

18          believe that while GM obviously has important

19          bargaining leverage here, that leverage is far

20          from one sided.  Delphi and the union have

21          leveraged with GM, too.  Moreover, it is clear

22          to me that, although obviously GM is a very

23          important customer to these debtors, it does

24          not control these debtors, as evidenced by

25          the Debtors' recent motion to reject various



1          DELPHI CORPORATION              217

2          agreements that they have with GM, and by the fact

3          that the debtors are actively engaged in

4          a process of analyzing their rights vis-

5          a-vis GM to ensure that GM, in the

6          debtors' Chapter 11 cases, does not get

7          any sort of inappropriate leg up or

8          inappropriate treatment.

9               So, in sum, I do not accept either

10          of those two objections to this motion.

11          In addition, I believe that while in any

12          large Chapter 11 case, all parties would

13          prefer more time to analyze a transaction

14          out of the ordinary course, that there

15          was appropriate notice of this

16          transaction.

17              First, the negotiations between the

18          three parties, I believe, were actively

19          contemplated and understood by the other

20          main constituencies in this case.  I also

21          believe that there was an appropriate

22          level of information sharing both before

23          the agreement was entered into and

24          afterwards by the debtor with its various

25          constituencies and that there was a


 1          DELPHI CORPORATION                  218

 2          sufficient basis to analyze the agreement

 3          in light of the debtor's present

 4          circumstances.

 5              I'll address separately, the

 6          objection that it is premature to enter

 7          into this agreement, but as far as notice

 8          is concerned, I believe that the parties

 9          in interest had adequate notice to

10          analyze whether the agreement should be

11          entered into now or not.

12              I note specifically, that when I

13          approved the formation of an equity

14          committee, I did not contemplate that

15          this case would come to a halt while the

16          committee was formed and came up to speed,

17          and I reiterate that ruling now.

18              As far as the merits of this

19          agreement and the objections raised in

20          response to it, the agreement is, in my

21          view, an important step in the debtor's

22          Chapter 11 case but not by any means the

23          transformative event that the objection

24          by Appaloosa suggests that it is.

25              So I have reviewed it on its own in

 1          DELPHI CORPORATION                    219

 2          light of the parties' best

 3          predictions about what will happen in the

 4          future but also what's appropriate to be

 5          done at this point.  The agreement

 6          essentially provides benefits to all

 7          three of the signatories, and that perhaps

 8          should go without saying, or else they

 9          wouldn't have entered into it.  But it's

10          unfair to assume that because conceivably

11          the debtor is giving up something in

12          return for the benefits it's receiving,

13          that I should not approve the agreement.

14              Essentially, the agreement provides

15          an important option for the debtor's UAW

16          work force to exercise a right, in

17          essence, either to be bought out as part

18          of leaving the company or to migrate from

19          the company to GM.  This right is

20          significant in that as both the debtor

21          and the Union have acknowledged, there is

22          tremendous uncertainty with regard to the

23          future of the debtor's operations in the

24          United States and the future of the debtors'

25          collective bargaining agreement.

1    DELPHI CORPORATION                 220

2          It is, however, clear to me that

3          the debtors fully believe --and no one has

4          disputed this-- that it is very much in the

5          debtors' interest to have a substantially

6          reduced work force.  It's also clear to

7          me that substantial claims would flow

8          from such a reduction under almost any

9          scenario.

10          What the debtors have done here is

11          facilitate that reduction in a way that's

12          acceptable to the union and also to GM, and

13          that will fix the amount of those claims

14          and allocate them in large measure in a

15          way that is not so detrimental to the

16          estate as to outweigh the benefits of

17          having a reduced work force.  And in so doing

18          this gives a level of choice to the debtor's

19          workers, which I believe is not only good

20          business, but also fundamentally right.

21          The committee does not oppose that level

22          of choice being given to the workers.

23          Its objection fundamentally is with the

24          rights that GM would receive under the

25          agreement.  As a result of the hearing, I

1          DELPHI CORPORATION                221

2          believe certain of the committee's fears

3          have proven not to be supported by the

4          agreement in that the agreement has been

5          clarified on the record in a number of

6          respects as regards to GM's rights upon

7          the debtor's performance of the

8          agreement.

9              Fundamentally, the committee

10          contends that the agreement gives GM an

11          undue benefit by enabling GM to assert

12          its claims in respect of paragraphs 4 and

13          7 under the U.S. Employee Matters

14          Agreement.  I believe, however, that Mr.

15          Butler is correct in this respect.  The

16          Employee Matters Agreement is an

17          agreement that in all likelihood would

18          not otherwise apply to the agreements that

19          GM is entering into here -- or the costs

20          that GU is agreeing to pick up.  Nor would, in

21          all likelihood, the other agreements referred

22          to at this hearing.

23              Consequently, by limiting GM's

24          assertion of the claim to that agreement,

25          the debtor is actually reducing GM's

 1          DELPHI CORPORATION                    222

 2          rights, which GM, I believe, could have

 3          otherwise contended successfully would

 4          have constituted a new post-petition

 5          agreement that would have had to have

 6          been not only renegotiated but also

 7           would have given GM a post-

 8          petition priority claim.

 9              In addition, it is alleged that by

10          using the U.S. Employee Matters Agreement

11          as the basis for asserting a claim in

12          respect of the obligations that GM is

13          picking up here under paragraph 4 and 7,

14          GM will have a larger claim against the

15          estate then it would otherwise have if

16          matters just continued in the normal

17          course and at some point, either before

18          the collective bargaining agreement

19          expired, or thereafter, while the parties

20          McFetters were negotiating a new one,

21          obligations arose under the existing GM

22          agreements because of employees leaving,

23          benefits being curtailed or eliminated

24          and the like.

25              There's some strength to that


1          DELPHI CORPORATION              223

2          argument based on what's been represented

3          to me as the way that the claim would be

4          calculated under the U.S. Employee

5          Matters Agreement.  However, I believe

6          that because it is based on -- that

7          calculation is based on actuarial

8          assumptions, the leg up, if you will,

9          that it is asserted GM would get, based

10          on those calculations, is very hard to

11          calculate and in my mind would not

12          outweigh the benefits of this agreement.

13              It's also alleged, with more

14          validity, that ultimately the OPEB

15          obligations would be negotiated down in

16          any event and therefore GM is going to

17          have the benefit of that downward

18          negotiation while at the same time being

19          able to assert a larger claim based on

20          current OPEB agreements here.

21              On that score I guess I have the

22          following points to say.  It is not clear

23          to me, ultimately of course, what the

24          negotiation of OPEB will result in.  I

25          assume there would be some reduction of

1           DELPHI CORPORATION                224

2           OPEB, but I certainly cannot assume that it

3           would completely go away, or anything

4           close to that.

5               Secondly I note that the debtor has the

6           benefit right now of the attrition of its

7           employees under the proposed agreement.  Third,

8           I note that this agreement I believe, is a necessary

9           or an important step in enabling the debtor to

10          then move on to negotiating its own

11          collective bargaining agreement issues.

12          Clearly, if the debtor can offer up a

13          meaningful choice to its employees that

14          leads to significant attrition, the

15          negotiation of a new collective bargaining

16          agreement becomes, I hesitate to say

17          easier because I know it will be

18          difficult, but I believe it does become

19          easier and materially easier.

20              Ultimately, I go back to the

```
21        question I asked GM's counsel, Mr.

22        Bienenstock, which is why is GM agreeing

23        up front to shoulder out-of-pocket costs

24        now, in hundred cent dollars now, in this

25        agreement in return for receiving an
```

```
 1        DELPHI CORPORATION                225

 2        unsecured claim in Delphi's bankruptcy

 3        case.

 4            If one were attributing

 5        Machiavellian motives to GM, one might

 6        argue that the reason it is doing so is

 7        to get a leg up in respect of that claim.

 8        Ultimately, particularly since there's no

 9        evidence as to how much of a leg up GM

10        would get, I don't accept that

11        Machiavellian view.

12            It seems to me, instead, that it's never

13        better to pay hundred cent dollars out in

14        return for an unsecured claim, and that

15        Mr. Bienenstock's explanation, which is

16        that GM is looking, fundamentally or first

17        and foremost, to assist a critical

18        supplier to it and secondly -- and he

19        didn't say this but I'll say it -- to

20        assist itself in regard to its labor

21        negotiations, is more apt.  I believe that's
```

22          why GM is ultimately doing this.

23                So I believe that except as far as

24          the clarifications on the record are

25          concerned, the committee's objection

1          DELPHI CORPORATION                    226

2          should be denied.  The objection by

3          Wilmington Trust Company largely

4          overlapped the committee's objection,

5          except with regard to its concern that by

6          providing in the agreement that GM's

7          claim would be assertable against Delphi

8          Corporation, the parent, that GM was

9          again getting an inappropriate leg up on

10          other creditors.  When this topic was

11          explored at the hearing, however, it was

12          clear to me that GM would be happy to

13          have a claim against all the debtors, as

14          is logical and that it is the debtors

15          themselves that have endeavored to limit

16          the claim to the parent company.

17                At the same time, the record is

18          clear that all of the rights of the operating

19          subsidiaries -- especially those that use UAW

20          workers who provide obviously services to

21          them in manufacturing car parts and working in

22          their plants -- are preserved vis-

23    a-vis any sort of claim that Delphi would

24    have against them and vice versa so that

25    if it appears that Delphi Corporation is

1    DELPHI CORPORATION                    227

2    inappropriately shouldering the burden of

3    a GM claim in respect of workers who

4    perform services to benefit the operating

5    debtors, the record's clear that Delphi

6    Corporation is free to assert a claim

7    against those subsidaries.

8         In my view, that's an intercompany

9    issue that need not require me to

10   disapprove this agreement, because it's

11   not spelled out to the contrary in an agreement

12   between GM, the UAW and Delphi.

13        And I trust that that issue will be

14   one of many issues that the parent

15   company creditors and the subsidiary

16   companies creditors will discuss in the

17   future.  That does leave open, of course, the

18   concern that Wilmington Trust Company and

19   Appaloosa had that there should not be any claim

20   against Delphi Corporation.  Their

21   argument, which I understand, is that

22   Delphi Corporation has the benefit of

23   numerous subsidiaries that are not

24        subject to collective bargaining

25        agreements and that are quite valuable

1        DELPHI CORPORATION                    228

2        and that by having a claim against Delphi

3        Corporation, GM has the ability to assert a right

4        To share in that equity value in the non-unionized

5        subsidiaries.

6            On the other hand, Delphi Corporation is

7        the party to the existing agreements with GM and.

8        more importantly, to the collective bargaining

9        agreements, all of which creat potential claims

10        that this proposed agreement addresses.

11            It's almost inconceivable to me to

12        assume that Delphi Corporation could

13        receive the benefit of these payments and

14        the benefit of the attrition of the

15        employees and not ultimately be

16        responsible in some measure, either on

17        its own or shared with other

18        subsidiaries, for having received that

19        benefit.  So I don't believe that that

20        objection should be sustained either.

21            Finally, Appaloosa, as has WTC,

22        raises the objection that I should not

23        give general authority to the debtors to

24        enter into similar agreements with their

25          other unions.  I think the colloquy on

1          DELPHI CORPORATION              229

2          the record reflects my position on this.  I

3          believe that because they would be, in

4          large measure, tripartite agreements,

5          and I don't have the existing agreements

6          involving GM or the other unions in front of me,

7          that I can give such blanket authority.  On

8          the other hand, it's my view that having

9          approved this agreement, it is quite

10          likely, unless there really are different

11          material considerations involving the

12          debtor's rights against GM and/or the

13          other unions, that I would promptly approve

14          comparable agreements with the other

15          unions.

16              But as far as this motion is

17          concerned, I would not approve those

18          provisions.  I guess it's paragraph 3 and

19          paragraph 6 of the proposed order that

20          would pertain to "reasonably comparable"

21          hourly attrition programs, although, as I

22          said, if they are in fact reasonably

23          comparable and don't raise different

24          issues than the issues raised by this

25          motion, I contemplate that they would be

```
1          DELPHI CORPORATION                    230

2     approved promptly.

3          Finally, Appaloosa contends that it

4     is premature to approve this agreement

5     but that, rather, the agreement should

6     await the negotiation or litigation of

7     the debtor's recently filed motion under

8     Section 1113 of the Bankruptcy Code.

9          It is often facially appealing to

10    want to resolve all issues in a Chapter

11    11 case in one fell swoop.  However, I

12    believe that the ability of the debtors

13    to resolve their remaining labor issues

14    is in fact greatly enhanced by their

15    entry into this agreement now and their

16    performance of this agreement now for the

17    reasons that I stated earlier.

18         In addition, I cannot predict the

19    result of those negotiations or the

20    result of a contested 1113 motion.  It

21    does not appear to me on this record that

22    the benefits of this agreement would be

23    outweighed, however, by waiting to

24    determine the outcome of the Section 1113

25    motion, which to my understanding already
```

```
 1      DELPHI CORPORATION                  231

 2      assumes significant attrition pursuant to

 3      this program.

 4           I also believe that the likelihood

 5      of the debtors walking away without a

 6      concomitant claim against their estates

 7      in connection with either rejection or

 8      determination over the course of time of the

 9      OPEB liabilities is highly unlikely.

10           As far as the pension obligations

11      are concerned, as Mr. Butler says, those

12      are accrued in any event.  So what

13      Appaloosa has asked me to do, in essence, is

14      to defer or to take the risk that this

15      agreement will go by the wayside pending

16      a result on a litigated basis, because I

17      don't believe on a negotiated basis that

18      result would pertain, whereby there would

19      be no claim asserted against the estate

20      comparable to the claim that GM would be

21      asserting here under this agreement in

22      respect of OPEB liabilities.

23           I do not believe that the record

24      reflects that there is such a likelihood

25      of that claim going away if I don't
```

```
 1        DELPHI CORPORATION                232

 2        approve this agreement that I would

 3        question the debtors' or question my own

 4        business judgment in approving this

 5        agreement, which provides the distinct

 6        benefits to the estate now that I've already

 7        outlined.

 8             It is certainly conceivable that

 9        the debtors will, in the ensuing

10        negotiations, persuade the unions that in

11        the context of a comprehensive package

12        that enables the debtors to merge from

13        bankruptcy in a healthy condition to

14        reduce OPEB liabilities and the like.

15        But I don't see the analysis of that

16        process playing out in the way that Appaloosa

17        does, with no large surviving claims, and

18        consequently I believe that it's appropriate for

19        the debtors to enter into this agreement now.

20             Finally, I don't believe that one

21        can assume that this agreement would

22        simply be here waiting for those

23        negotiations to continue.  Those future

24        negotiations -- and they're not just

25        negotiations with the unions but also
```

```
 1          DELPHI CORPORATION                233

 2      they are with GM, as hilighted by the

 3      debtor's motion to reject various GM

 4      agreements -- are going to be difficult.

 5      And it's quite clear to me that if this

 6      agreement were not approved today, the

 7      issues raised in this agreement would be

 8      right back in the pot in the mix of those

 9      negotiations in a way that I don't see

10      would be beneficial to the estate.

11          So, for all of those reasons I'll

12      approve the motion, as modified.  I think

13      what would be appropriate is for the

14      debtors to revise their order, circulate

15      it to the objectors, to the UAW and to the other

16      unions and I guess to the others who spoke

17      briefly today and conform it to the

18      transcript, obviously.

19          I don't think that it needs to be

20      meticulously worded.  I don't think the

21      order should become an agreement but

22      should reflect the reservations made on

23      the record and the clarifications as to

24      the paragraphs of the agreement in which

25      GM is not going to be asserting a claim
```

```
 1          DELPHI CORPORATION                234
```

2       and the like.

3           You can use the draft transcript

4       for that purpose.  However, as far as my

5       ruling is concerned, again as I often do

6       when I cite cases or I give a long ruling,

7       I'll go over it and the revised version

8       will be my final ruling.

9           But certainly I understand the need

10      to proceed with this matter promptly so

11      you can use the draft version of the

12      transcript to work on the order.

13          MR. ROSENBERG:  Your Honor, thank

14      you.  I think it's probably obvious that

15      we will then be able to contact the court

16      reporter and obtain that draft

17      transcript?

18          THE COURT:  Yes.

19          MR. BUTLER:  Your Honor, I

20      appreciate -- this is the last matter on

21      the agenda for today.  We appreciate your

22      Court's time.

23          THE COURT:  Okay.  Thank you.

24          (Whereupon this proceeding was

25      concluded.)  (Time Noted:  4:42 a.m.)

1       DELPHI CORPORATION          235

2       C E R T I F I C A T I O N

```
 3        I, Esther Accardi, hereby certify that

 4    the foregoing is a true and correct

 5    transcription, to the best of my ability, of

 6    the sound recorded proceedings submitted for

 7    transcription in the matter of:

 8    Delphi Corporation.

 9

10        I further certify that I am not employed

11    by nor related to any party to this action.

12

13        In witness whereof, I hereby sign this

14    date:

15    April 13, 2006

16

17    _____

18    Esther Accardi

19

20

21

22

23

24

25


 1        DELPHI CORPORATION                236

 2

 3
```

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                                                    237

2                       I N D E X

3    Cross Examination by        Page     Line

4    Mr. Fox of Mr. Butler        20       25

```
 5   Mr.  Fox of Mr. Sheehan   34      11

 6

 7                     E X H I B I T S

 8   Description               Page    Line

 9   16 Structure Charts       28      25

10

11                  INDEX TO INSERTS

12                             Page    Line

13   (NONE)

14

15                  INDEX TO RULINGS

16                             Page    Line

17   Motion Approved           233     12

18

19

20

21

22

23

24

25
```