**Hearing Date and Time: June 16, 2006 at 10:00 a.m.**
**Objection Deadline: June 9, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
      Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                  :
          In re                                   :     Chapter 11
                                                  :
DELPHI CORPORATION, et al.,                       :     Case No. 05-44481 (RDD)
                                                  :
                                                  :     (Jointly Administered)
                   Debtors.                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 2002 AND 6004
AUTHORIZING AND APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH
JOHNSON CONTROLS, INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES (B) CONTINUATION AND TRANSITION
OF SUPPLY TO JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD
FACILITY AND (C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW
<u>BRUNSWICK FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM</u>

("NEW BRUNSWICK TRANSFER MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to

11 U.S.C. § 363(b) and Fed. R. Bankr. P. 2002 and 6004 authorizing and approving the

Debtors' entry into the postpetition Transfer Agreement dated May 26, 2006 by and between

Delphi Automotive Systems LLC, a Debtor in these cases, and Johnson Controls, Inc. ("JCI"),

a copy of which is attached hereto as <u>Exhibit A</u> (together, with the exhibits and schedules

attached thereto, the "Transfer Agreement"), providing for (a) sale of certain assets of the

Debtors' battery manufacturing facility in New Brunswick, New Jersey (the "New Brunswick

Facility") free and clear of liens, claims, and encumbrances, (b) the continuation and transition

of supply of battery products to Johnson Controls, Inc. of battery products from the Debtors'

battery manufacturing facility in Fitzgerald, Georgia (the "Fitzgerald Facility"), and (c)

implementation of an attrition plan with respect to the New Brunswick facility.  In support of

this Motion, the Debtors respectfully represent as follows:

Background

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries

and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy

2

Code").  The Debtors continue to operate their businesses and manage their properties as

debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This

Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    On October 17, 2005, the Office of the United States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

On April 28, 2006, the U.S. Trustee appointed an official committee of equity security holders

(the "Equity Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C.

§§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a

core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 363 of

the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

B.    <u>Current Business Operations Of The Debtors</u>

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company")

had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31,

2005 of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the

fifth largest public company business reorganization in terms of revenues, and the thirteenth

largest public company business reorganization in terms of assets.  Delphi's non-U.S.

subsidiaries are not chapter 11 debtors and continue their business operations without

supervision from the Bankruptcy Court.

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates.

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

4

9.      The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.      In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

11.      On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the

5

necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform

their salaried workforce to ensure that the Company's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the

Debtors must devise a workable solution to their current pension situation.

      12.     In connection with the first two elements of the Company's

transformation  plan, Delphi continues to participate in discussions with its unions and GM.

Throughout those discussions, Delphi has consistently communicated a clear message to both

its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its

issues and intends to continue to discuss with its unions and GM ways to become competitive

in the Debtors' U.S. operations.  To that end, Delphi, GM and the UAW recently received this

Court's approval of a tripartite agreement providing for a special hourly attrition program for

Delphi's UAW-represented employees (the "UAW Special Attrition Program").  This special

hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-

represented long-term hourly employees with "soft landings" through retirement attrition

programs and GM flowbacks.  Delphi also hopes to reach agreement on similar hourly attrition

programs with its other unions, which could provide as many as 4,500 additional hourly

employees with retirement programs or incentives.

      13.     These hourly attrition programs constitute an important first step in

implementing the Debtors' transformation plan, but will not resolve all of the issues related to

Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached

comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi

moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S.

labor agreements and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors

also moved to reject unprofitable supply contracts with GM.[4]  Among the reasons for the GM

contract rejection motion was the Debtors' belief that GM must cover a greater portion of the

costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy

costs.  This initial motion covers approximately half of the Debtors' North American annual

purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.

Although the filing of these motions was a necessary procedural step, the Debtors remain

focused on reaching a consensual resolution with all of Delphi's unions and GM before a

hearing on the motions is necessary.

14.     To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which

the Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.   To that end, the Company will concentrate the

organization around the following core strategic product lines: (a) Controls & Security (Body

Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture

(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)

Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

---

[3]     Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

[4]     Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033).

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety

Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.     In contrast, the Company similarly identified certain non-core product

lines that do not fit into its future strategic framework, including Brake & Chassis Systems,

Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics,

Steering, and Wheel Bearings.  The Company will seek to sell or wind-down these non-core

product lines (which will include approximately one-third of its global manufacturing sites)

and will consult with its customers, unions, and other stakeholders to carefully manage the

transition of such affected product lines.  The Company intends to sell or wind-down the non-

core product lines and manufacturing sites by January 1, 2008.

16.     As part of its organizational restructuring, the fourth element of the

Debtors' transformation plan, the Company expects to reduce its global salaried workforce by

as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives

adopted following an analysis of the Company's selling, general, and administration ("SG&A")

cost saving opportunities.  The Company believes that once its SG&A plan is fully

implemented, the Company should realize savings of approximately $450 million per year in

addition to savings realized from competitive measures planned for its core businesses and the

disposition of non-core assets.

17.     As noted above, the final key tenet of the transformation plan is to

devise a workable solution to the Debtors' current pension situation.  The Debtors' goal is to

retain the benefits accrued under the existing defined benefit U.S. pension plans for both the

---

[5]     The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket
or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial
vehicles, or other adjacent-market businesses and product lines.

Debtors' hourly and salaried workforce.  To do so, however, it will be necessary to freeze the

current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S.

pension plan as of January 1, 2007.  Despite the freeze, because of the size of the funding

deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit

Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially

Congress, to amortize funding contributions over a long-term period.  The Company intends to

replace the hourly plan (for certain employees) and the salaried plan with defined contribution

plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal

all of its resources to continue to deliver high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

19.    By this Motion, the Debtors seek the entry of an order under section 363

of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 authorizing and approving the

Debtors' entry into the Transfer Agreement providing for (a) the sale of certain assets of the

New Brunswick Facility free and clear of liens, claims, and encumbrances, (b) continuation

and transition of supply of battery products to Johnson Controls, Inc. from the Debtors'

Fitzgerald Facility and (c) implementation of an attrition plan with respect to the New

Brunswick Facility.

20.    Approval of the Motion would allow the Debtors to sell their money-

losing New Brunswick Facility to a buyer which has already purchased the Debtors' worldwide

9

battery business and, thus, is in a unique position to acquire that facility.  The Debtors would also be able to transition production from the Fitzgerald Facility, another money-losing battery operation for the Debtors, in an orderly manner that is consistent with the UAW Special Attrition Program while meeting JCI's production requirements.  Finally, approval of the Motion would (i) minimize the Debtors' human capital liabilities with respect to both facilities that might otherwise be entitled to administrative priority treatment, (ii) allocate risks and prospective obligations with respect to both facilities in a manner most advantageous to the Debtors, (iii) provide a means to manage the environmental liabilities at the New Brunswick Facility, and (iv) afford the Debtors certain Bankruptcy Code protections for sellers of assets.

Basis For Relief

A.    Background

21.    On June 30, 2005, as part of its efforts to dispose of non-core assets, Delphi sold its wholly owned lead acid battery business to JCI, a global manufacturer of automotive systems and building controls, for $202.5 million, with post-closing adjustments of at least $12.5 million.[6]  At the time of closing, however, Delphi was not able to transfer its U.S. battery manufacturing facilities to JCI, in particular the New Brunswick Facility, because of certain provisions in the Debtors' agreements with the International Union, IUE-CWA and IUE-CWA Local 416 (collectively, the "IUE-CWA"), the unions representing the Debtors' employees at the New Brunswick Facility.  In particular, the existence of a "no-sale" clause

---

[6]    Pursuant to the 2005 sale, JCI purchased Delphi's battery operations in France, Brazil, and Mexico and Delphi's interest in battery manufacturing joint ventures in China, South Korea, Belgium, and Saudi Arabia.

(the "No-Sale Clause") in the agreements restricts the Debtors' ability to sell certain U.S.

manufacturing sites, including the New Brunswick Facility, without the IUE-CWA's consent.[7]

22.    Because of this restriction and Delphi's inability to obtain the IUE-

CWA's consent, Delphi retained ownership of the New Brunswick Facility following the sale.

Because of union considerations and because JCI could not fill existing customer needs with its

own manufacturing facilities, however Delphi agreed to keep operating the Fitzgerald and New

Brunswick Facilities to sell batteries exclusively to JCI under the Component Supply

Agreement[8], thus meeting JCI's requirements for the term of the Component Supply

Agreement.  As of the date of this Motion, the Debtors produce approximately three million

batteries per year at the Fitzgerald Facility and approximately 1.8 million batteries per year at

the New Brunswick Facility.

B.    Transfer Agreement

23.    To eliminate the operating losses associated with the continued

operation of the New Brunswick Facility and the Fitzgerald Facility, minimize the

administrative liabilities associated with the transfer of the New Brunswick Facility, provide a

---

[7]    The 2005 sale was effectuated pursuant to that certain Master Sale and Purchase Agreement (the "MSA") dated June 30, 2005 between Delphi and JCI.  The MSA attached a number of ancillary agreements concerning the continuing supply of batteries to JCI, the eventual transfer of the New Brunswick Facility to JCI, and the continuation and transition of the Fitzgerald Facility.  These prepetition ancillary agreements also addressed employee, labor, environmental, and other issues related to the sale of Delphi's battery business.  These ancillary agreements include, but are not limited to: (i) the New Brunswick Put and Call Agreement (the "Put and Call Agreement"), providing for, among other things, a put option for the Debtors to sell the New Brunswick Facility to JCI for $1 and the transfer of New Brunswick Facility employees to JCI following such a sale, with Delphi obligated to subsidize JCI with respect to traditional wage employees for the difference between their wages and benefits and those of a Tier III competitive wage employee – i.e., an employee whose competitive wages will not "grow into" traditional wages, (ii) the Tier 2 Component Supply Agreement (the "Component Supply Agreement"), providing for, among other things, the Debtors' commitment to continue supplying batteries to JCI from the New Brunswick and Fitzgerald Facilities, and (iii) the Environmental Matters Agreement (the "Environmental Matters Agreement"), which provides for the division of responsibilities between the parties for environmental liabilities, if any, at the Debtors' battery manufacturing plants around the globe.

[8]    A copy of the Component Supply Agreement is available upon request, subject to entering into an appropriate confidentiality agreement or protection order.

"soft landing" for affected employees, and complete the smooth transition of the battery business to JCI, the Debtors decided to explore a consensual transfer of the New Brunswick Facility to JCI.

24.    To that end, over the past few months, the Debtors and JCI have been negotiating in earnest regarding the transfer of the New Brunswick Facility to JCI, including whether to consummate this transaction through an exercise of the put option or through other means.  In connection with these negotiations, the parties have been in discussions regarding the number of employees who would be employed at the New Brunswick Facility following its transfer to JCI.  Pursuant to the put option provided for in the Put and Call Agreement, it was contemplated that substantially all of the current hourly employees would be employed by JCI following the transfer.  Since the Put and Call Agreement was signed, however, JCI no longer requires the full production capacity of both the New Brunswick Facility and Fitzgerald Facility and, accordingly, now only requires approximately one-third of the hourly employees currently working at the New Brunswick Facility.

25.    To effectuate a consensual transfer to JCI, the Debtors and the IUE-CWA have been concurrently negotiating over the IUE-CWA's waiver of the No-Sale Clause relating to the New Brunswick Facility, a waiver of the requirement that JCI assume any contractual neutrality obligations collectively bargained by Delphi and the IUE-CWA (the "Neutrality Obligations"),[9] and an attrition plan with respect to Delphi hourly employees at the New Brunswick Facility such that approximately 100 competitive wage hourly employees would transfer to JCI.

---

[9]    Pursuant to such Neutrality Obligations, Delphi has agreed to remain neutral during any IUE-CWA employee organizing campaign at Delphi's facilities.

12

26.    The Debtors and JCI have reached an agreement regarding the disposition of the New Brunswick Facility and the continuation and transition[10] of supply from the Fitzgerald Facility.  Instead of resolving these matters pursuant to the prepetition ancillary agreements described above, the parties seek authority for the Debtors to enter into the Transfer Agreement.[11]  The Transfer Agreement and proposed order submitted herewith would effectuate the sale of the New Brunswick Facility and the Acquired Assets (as such term is defined in the Transfer Agreement) to JCI free and clear of liens, claims, and encumbrances in exchange for JCI's payment to the Debtors of $1.00 plus the value of certain inventory estimated at approximately $1.7 million.

27.    As more fully described below, the Transfer Agreement also provides for the continued supply of batteries as well as the orderly transition of production to JCI from the Fitzgerald Facility, the implementation of an attrition plan between Delphi and the IUE-CWA (the "IUE-CWA New Brunswick Attrition Plan") with respect to the New Brunswick Facility, and the IUE-CWA's waiver of the No-Sale Clause and the Neutrality Obligations (the "IUE-CWA Consent") with respect to the New Brunswick Facility.  Further, JCI has agreed to pay the Debtors at closing $12.5 million to reimburse the Debtors for a significant portion of the amounts to be spent under the IUE-CWA New Brunswick Attrition Plan.  Finally, the Transfer Agreement provides for allocation of risks and prospective obligations with respect to the New Brunswick and Fitzgerald Facilities and requires, as a condition of its completion, the

---

[10]   While a general framework for the transition has been established and is set forth in the Component Supply Agreement, the schedule and volume of production related to the transition will be completed before closing and will be consistent with the UAW Special Attrition Program and JCI's needs.

[11]   As noted above, the term "Transfer Agreement" includes the exhibits and schedule attached thereto.  The material exhibits and schedules attached to the Transfer Agreement include, without limitation:  Exhibit 1.13 (the Memorandum of Agreement between Delphi and the IUE-CWA, which sets forth both the IUE-CWA Consent, as defined below, and the IUE-CWA New Brunswick Attrition Plan, as defined below), Exhibit 3.6H (Environmental Matters), and Exhibit 4.1 (Employee Matters).

entry by this Court of the proposed order submitted herewith, which affords the Debtors certain

Bankruptcy Code protections for sellers of assets.

28.    Terms Of The Transfer Agreement. Other salient terms[12] of the Transfer

Agreement between the Debtors and JCI are as follows:

(a)    Completion. The completion of the sale of the Acquired
Assets (the "Completion") would take place on the later date of August 1, 2006 (12:01
a.m. EST) and the date that is ten days after the date of the order approving this Motion,
unless otherwise agreed to by the parties. At the Completion, (i) the Debtors would be
required to deliver, among other things, a bill of sale for the Acquired Assets, including
certain personal property and inventory, substantially in the form of Exhibit 2.2A to the
Transfer Agreement, duly executed with an invoice relating to the Acquired Assets
transferred, a covenant deed for the Real Property (as defined in the Transfer
Agreement), a certificate of representations and performance, and an officer's certificate
stating that at least $12.5 million has been incurred by Delphi in furtherance of the IUE-
CWA New Brunswick Attrition Plan (as defined below) and (ii) JCI would be required to
deliver a certificate of representations and performance and pay to the Debtors the
purchase price plus reimbursement by wire transfer in accordance with wiring
instructions to be provided by the Debtors before Completion.

(b)    Conditions To Completion. Pursuant to section 2.1 of the
Transfer Agreement, the Transfer Agreement is subject to approval by the Bankruptcy
Court, the Debtors' implementation of the IUE-CWA New Brunswick Attrition Plan,
each party's compliance with its agreements with respect to certain employee matters, and
the continued operation of the Fitzgerald Facility as a battery manufacturing facility in
accordance with the Component Supply Agreement. In addition, the Debtors must not
have negotiated any other collective bargaining agreement which purports to be
applicable to the New Brunswick Facility. Finally, each party must not be in material
default with respect to, or have rejected, the Component Supply Agreement and be in
material compliance with the Environmental Matters Agreement with respect to the New
Brunswick Facility as of completion date.

(c)    Representations And Warranties. The representations and
warranties relate to the power and authority to enter into the Transfer Agreement,
enforceability of the Transfer Agreement, the accuracy and completeness of information
provided by the parties to each other, environmental matters, and product liability and
warranty matters.

---

[12]    To the extent this summary differs in any way with the Transfer Agreement, the provisions of the Transfer
Agreement control.

(d)      Pursuant to section 2.8 of the Transfer Agreement, Delphi will continue to supply batteries to JCI from the Fitzgerald Facility in accordance with the terms of the Component Supply Agreement, as amended.

C.    Sale Of Acquired Assets

29.      By this Motion, the Debtors respectfully request entry of an order, pursuant to section 363(b) and (f) of the Bankruptcy Code, authorizing the Debtors to transfer the Acquired Assets[13] to JCI free and clear of all liens, claims, and encumbrances.  Certain liabilities and obligations of the Debtors are being undertaken by JCI, including, without limitation, those liabilities set forth on Exhibits 3.6H and 4.1 to the Transfer Agreement relating to environmental and employee matters, respectively.

30.      The Debtors have concluded that the transfer of the Acquired Assets pursuant to the Transfer Agreement is the best opportunity available to the Debtors under unique circumstances surrounding the New Brunswick and Fitzgerald Facilities and the resolution of post-closing matters in connection with Delphi's 2005 sale of its battery business to JCI and that the consideration for such transfer provides maximum value for the Debtors, their estates, and their creditors.

31.      The Debtors, in the exercise of their business judgment and in consultation with their advisors, have concluded that the practices often followed for the sale of a chapter 11 debtor's assets, namely the establishment of bidding procedures and the making of a market, would not maximize value in light of the previous sale of the battery business to JCI

---

[13]    As set forth in section 1.1 of the Transfer Agreement, the term "Acquired Assets" means the real property in connection with the New Brunswick Facility and all of the following assets to the extent that such assets are owned by the Debtors and used or held for use primarily or exclusively in the battery manufacturing business at the New Brunswick facility:  administrative assets; permits; personal property owned by the Debtors that is located at the New Brunswick Facility and used for manufacturing battery products for JCI under the Component Supply Agreement; and certain inventory of the battery manufacturing business.  This description of the Acquired Assets is only a summary of that term as it is defined in the Transfer Agreement.  To the extent this summary differs in any way with the definition of "Acquired Assets" in section 1.1 of the Transfer Agreement, the provisions of the Transfer Agreement control.

and the practical inability of any party other than JCI to use the New Brunswick Facility.[14]

Moreover, upon the sale of the New Brunswick Facility, the Debtors are due to receive

significant economic support from GM pursuant to a separate agreement between Delphi and

GM, which was executed in connection with the sale of Delphi's global battery business, under

the terms of which GM agreed to provide financial support for Delphi to transform its U.S.

battery plant operations to be more efficient and competitive.[15]

        32.      The sale of the Acquired Assets, in particular the New Brunswick

Facility, completes the 2005 sale of Delphi's battery business to JCI.  Only JCI is in a position

to maximize the use of the New Brunswick Facility, because JCI can integrate that facility into

its global manufacturing capabilities.  There are no other parties with the same unique need for

the New Brunswick Facility as a battery manufacturing facility.  Moreover, the costs of

converting the New Brunswick Facility to other uses and resolving the human capital and

environmental issues arising from such conversion would likely preclude another party from

offering greater value for the New Brunswick Facility, let alone match JCI's offer to pay $12.5

million to mitigate the costs of the IUE-CWA New Brunswick Attrition Plan.  In addition, JCI

is the only entity which will be able to operate the New Brunswick Facility, and thus employ

New Brunswick employees, because it is obligated to provide a certain level of battery supply

to its own customers.  The Debtors have concluded that no other party is similarly motivated or

able to purchase the Acquired Assets and take on the risks and obligations that are part of such

an acquisition.

---

[14]    Moreover, the presence of non-competition provisions in the MSA may limit the Debtor's ability to sell the New Brunswick Facility to another party for more consideration.  See, e.g., In re Nyren, 187 B.R. 424, 425 (Bankr. D. Conn. 1995) (creditor with non-monetary claim arising from non-compete covenant is entitled to relief from automatic stay).

[15]    Because the terms of this agreement are confidential, the Debtors have not attached a copy of the agreement as an exhibit to this Motion, nor can they disclose the terms of such agreement.

33.    The Debtors evaluated all possible scenarios with respect to the transfer of the Acquired Assets to JCI and the continuation of supply and transition of production out of the Fitzgerald Facility (which would accompany any sale of the Acquired Assets), including but not limited to the assumption or rejection of the prepetition ancillary agreements with respect to Delphi's 2005 sale of its battery business to JCI, the acceleration of the transition of production out of the Fitzgerald Facility, and the costs of environmental remediation of the New Brunswick Facility with or without selling the facility to a third party.  After analyzing these scenarios and the estimated outcomes, the Debtors have determined that the sale of the Acquired Assets to JCI pursuant to the Transfer Agreement provides maximum value to the Debtors and their stakeholders and best minimizes potential administrative liability for the estates.

D.    Indemnification Obligations

34.    Pursuant to the Transfer Agreement, the Debtors are committing on a postpetition basis to honor certain employee and environmental indemnification obligations to the extent that the proposed order granting this Motion, if entered by this Court, would not discharge liability with respect to any claim bought by a third party against JCI. These indemnification obligations are subject generally to a $100,000 deductible[16] and a $20 million cap.  The Debtors have determined that these indemnification obligations are fair and reasonable under the circumstances.  Without these indemnification obligations, JCI would not have agreed to enter into the Transfer Agreement and would have been part of any transactions with JCI consummated in connection with the put option.  The Debtors have analyzed the terms of these indemnification obligations and have determined that, because a sale of the

---

[16]    Indemnification obligations for certain environmental matters are subject to a $500,000 deductible.

Acquired Assets as proposed herein would be free and clear of liens, claims, and

encumbrances, including successor liability claims, the Debtors do not believe that the

indemnification commitments will unduly expose the estates to administrative liability.

Accordingly, the Debtors have concluded, in the exercise of their business judgment, that the

proposed transactions, including the indemnification commitments, are in the best interests of

the estates, their creditors, and other stakeholders.

E.    Continuation and Transition of Supply of Battery Products Out of Fitzgerald Facility

35.    By this Motion, the Debtors also seek approval, pursuant to section

363(b) of the Bankruptcy Code, for the Debtors continuation and transition of supply of battery

production out of the Fitzgerald Facility in accordance with the terms of the Transfer

Agreement.  In connection with the transaction contemplated by the Transfer Agreement, the

Debtors, while not assuming the Component Supply Agreement under section 365 of the

Bankruptcy Code, would continue on a postpetition basis to supply battery products to JCI

from the Fitzgerald Facility in accordance with the terms of the Component Supply

Agreement, as amended pursuant to a transition plan to be completed by the parties.

36.    As a result of this transition plan, the Debtors hope to operate the

Fitzgerald Facility in a manner that allows Delphi to use its available resources consistent with

the UAW Special Attrition Program[17] and production requirements, while still satisfying the

needs of an important customer of the Debtors.  Throughout their reorganization efforts, the

Debtors have worked diligently to continue to meet the production needs of their customers

and as the Debtors have committed to do with all of their customers, this transition plan will be

---

[17]    The Debtors' employees at the Fitzgerald Facility belong to the UAW and (subject to the outcome of the notice
of appeal recently filed by Wilmington Trust Company) will be eligible for the UAW Special Attrition Program
approved by this Court pursuant to the Amended Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004
Authorizing Debtors to Enter Into The UAW Special Attrition Program (Docket No. 3754) entered on May 12,
2006.

completed in consultation with JCI.  Because the Fitzgerald Facility is a money-losing

operation, losing approximately $2 million per month, transitioning production will benefit all

of the Debtors' stakeholders.[18]

F.    IUE-CWA Consent And The IUE-CWA New Brunswick Attrition Plan

37.    As stated above, to transfer the New Brunswick Facility to JCI, the IUE-

CWA must consent to the transfer by waiving the No-Sale Clause and the Neutrality

Obligations.  As part of the negotiations over this IUE-CWA Consent, the Debtors and the

IUE-CWA have also negotiated the terms of the IUE-CWA New Brunswick Attrition Plan,

discussed below.  The parties have memorialized such undertakings in the IUE-CWA

Memorandum, which is attached as Exhibit 1.13 to the Transfer Agreement.  By this Motion,

the Debtors request authority to enter into and implement the IUE-CWA Consent and the IUE-

CWA New Brunswick Attrition Plan, both of which are set forth in the IUE-CWA

Memorandum.

38.    Entry into and implementation of the IUE-CWA Consent and the IUE-

CWA New Brunswick Attrition Plan is in the Debtors' best interests for the reasons set forth

below.  As of the date of this Motion, the New Brunswick Facility is operating at full

manufacturing capacity with an approximately 300-employee workforce.  JCI, however, does

not wish to operate the facility at full manufacturing capacity but rather as a "form and finish

facility"[19] only with a reduced workforce of approximately 100 hourly employees.  To

encourage the consensual separation of more than 200 employees, the Debtors negotiated the

---

[18]    Moreover, upon the re-sourcing of manufacturing of all of the Fitzgerald Facility's battery volume to JCI, the
Debtors are due to receive further significant economic support from GM pursuant to the separate agreement
between Delphi and GM referenced above.

[19]    In JCI's battery manufacturing process, a "form and finish" facility is a facility that receives almost completed
batteries from JCI's other battery manufacturing facilities, and at which production of those batteries is finalized
for distribution to customers.

IUE-CWA New Brunswick Attrition Plan, pursuant to which certain eligible employees of the

Debtors working at the New Brunswick Facility can retire with financial incentives through

early retirement through a pre-retirement program, or by selecting certain buyout or buy down

options.

      39.     The Debtors estimate that implementation of the IUE-CWA New

Brunswick Attrition Plan will cost $18 to 22.8 million, with $12.5 million of that cost to be

mitigated by JCI's reimbursement to be paid to the Debtors at the closing of the transaction.

      40.     Among the significant terms of the IUE-CWA New Brunswick Attrition

Plan, which is meant to attrit all but approximately 100 of the current employees of the New

Brunswick Facility, are the following options that eligible employees may select:[20]

      (a)     Employees who are eligible to retire under the normal or early voluntary provisions of the Delphi Hourly-Rate Employees Pension Plan (the "HRP") as of August 1, 2006 would be eligible for a one-time, lump-sum incentive payment in the amount of $35,000 in exchange for their agreement to retire.

      (b)     Employees age 50 and above with ten or more years of credited service who are eligible, as of August 1, 2006, to retire under the MSR[21] (i.e., mutually satisfactory retirement) provisions of the HRP could do so.

      (c)     Employees with at least 27 and fewer than 30 years of credited service (regardless of age) would be eligible for special voluntary placement in a pre-retirement program under which they would (i) retire without additional incentives (i.e., such employees would not be eligible to receive the $35,000 incentive payment described in paragraph (a) above) when they first accrue 30 years of credited service under the provisions of the HRP and (ii) receive gross monthly wages of $2,800 to $2,900 depending on their years of credited service.

      (d)     Employees who are participants in the Delphi HRP may elect to (i) receive a buyout of $140,000 (with ten or more years of seniority) or a buy out

---

[20]   The terms contained herein are provided solely as a summary and are qualified in all respects by the terms of the IUE-CWA New Brunswick Attrition Plan. To the extent that this summary differs in any way from the terms of the IUE-CWA New Brunswick Attrition Plan, the provisions of the IUE-CWA New Brunswick Attrition Plan will control. Additionally, the IUE-CWA New Brunswick Attrition Plan would be implemented consistent with the Debtors' other attrition programs, including release of claims by the employee participants.

[21]   The MSR provisions of the HRP are provisions to facilitate early retirement by employees at least 50 years old with ten or more years of credited service.

of $70,000 (with fewer than ten years of seniority), less applicable withholdings, to sever all ties with Delphi except vested pension benefits or (ii) remain on the active roll for one year and receive one year of health care (at a total cost to Delphi of up to $15,000), and a weekly payment of up to $2,403.84, less withholdings, for one year (with ten or more years of seniority) or a weekly payment of $1,057.69, less withholdings, for one year (with fewer than ten years of seniority) and sever all ties with Delphi, except vested pension benefits, if any, at the conclusion of the year.  Employees electing either of these options also would also be eligible for up to $2,100 per year pursuant to the terms of the Individual Upward Educational Plan for an additional two years beginning August 1, 2006, and ending July 31, 2008.

(e)    Competitive rate employees who are not participants in the Delphi HRP may elect to receive a percentage buyout prorated against $140,000 (with ten or more years of seniority), or against $70,000 (with fewer than ten years of seniority but more than one year of seniority) less applicable withholdings, to sever all ties with Delphi.  In each case, the buyout would be calculated based upon the participant's competitive wage rate as a percentage of the maximum traditional wage rate for the participant's classification.

(f)    All participants choosing the options set forth in sub-paragraphs (a)-(e) above would be required to sign a release of all claims, except workers compensation claims.

(g)    Employees at the New Brunswick Facility, except those on a leave of absence, who have not selected, or who are not eligible to participate in one of the options identified above, would be eligible for transfer, with seniority, to JCI effective August 1, 2006, at the established New Brunswick Tier III rate and with JCI Benefit Plans coverages. The offer of employment with JCI would sever all ties to Delphi, except for current vested benefits, if any.  Traditional wage rate employees accepting such transfer would receive a $50,000 buy down (intended to represent an offset to a timed wage and benefit reduction) to the Tier III wage and the existing JCI benefit levels. Such employees transferred to JCI will be required to sign a release of all claims, except workers compensation, as a condition for receiving the $50,000 buy down amount. Employees on a leave of absence, who do not participate in the IUE-CWA Attrition Plan, would be eligible for transfer to JCI upon the conclusion of their leave.

(h)    If during the remaining course of Delphi's bankruptcy, materially different Special Attrition Program financial incentives are negotiated between Delphi and the IUE-CWA for the option selected by the employee, it is understood that the employee will not be advantaged or disadvantaged (the "MFN clause").[22]

---

[22]    The Debtors note that the MFN clause could increase or decrease the cost of the IUE-CWA New Brunswick Attrition Plan.  This change, however, would be caused by a nation-wide attrition plan agreed to between Delphi and the IUE-CWA, which would be subject to Bankruptcy Court approval.

41.     The transfer of the New Brunswick Facility pursuant to the IUE-CWA

New Brunswick Attrition Plan would provide one other significant benefit to the Debtors

relative to any transaction that would have been consummated pursuant to the Put and Call

Agreement. Indeed, the Put and Call Agreement, the prepetition ancillary agreement providing

for the transfer of the New Brunswick Facility to JCI pursuant to the exercise of a put option,

requires the Debtors to pay a labor subsidy to JCI to cover the "labor differential," if any,

between traditional wages paid to the Debtors' senior hourly employees transferring to JCI

following the sale of the New Brunswick Facility and wages paid to the Debtors' Tier III

competitive wage employees.[23]  Paying this labor differential without a buy down mechanism

would have been costly.  The Debtors expect that, following the implementation of the IUE-

CWA New Brunswick Attrition Plan, the approximately 100 employees who would be

transferred to JCI would be either employees who are currently Tier III competitive wage

employees or traditional wage employees who received the $50,000 buy down to become Tier

III competitive wage employees immediately before transfer.  Accordingly, pursuant to the

instant transaction, the Debtors will not be obligated to provide JCI with a labor differential.

G.     Contemplated Settlement With New Jersey
       Department of Environmental Protection

42.     In addition to the transactions and agreements described above, the

Transfer Agreement provides that the Debtors are responsible for complying with New Jersey's

statutory environmental remediation obligations in connection with a transfer of the New

Brunswick Facility.  In particular, the Transfer Agreement requires, as a condition to the

closing of the sale of the Acquired Assets, that the Debtors conduct such investigation and

---

[23]   "Tier III" competitive wage employees are those employees who are covered by competitive operating
       agreements but who do not "grow in" to traditional wages.  In contrast, "Tier II" competitive wage employees
       are those employees who do grow in to traditional wages over time.

remediation as required by the New Jersey Department of Environmental Protection to satisfy the requirements of New Jersey's Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq. ("ISRA") and that the Debtors are responsible for undertaking the activities and submitting the required documentation to the NJDEP necessary to complete their responsibilities under ISRA with respect to the sale of the New Brunswick Facility.  If the Debtors were not satisfying these obligations under ISRA, New Jersey law would prohibit the sale of the New Brunswick Facility.

43.     Subsequent to the filing of this Motion, the Debtors will submit to the NJDEP the documentation required under ISRA and endeavor to enter into a remediation agreement with the NJDEP prior to the closing of the sale of the Acquired Assets to JCI.  The Debtors intend to file for the June 16, 2006 omnibus hearing on shortened notice (and the Creditors' Committee has already consented to such shortened notice) the Motion For Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval, pursuant to which the Debtors would seek entry of an order authorizing them to compromise or settle, certain matters.  Provided that this Court enters an order approving the settlement procedures proposed in the aforementioned motion, the Debtors will provide appropriate notice of the proposed settlement agreement with the NJDEP which will hopefully be approved without need for an order from this Court or, in the alternative the Debtors will file a motion to be heard at the July 19, 2006 omnibus hearing seeking approval of such settlement agreement.  Once the Debtors receive appropriate approval of such a settlement agreement with the NJDEP, they will be able to close on the sale of the Acquired Assets by the scheduled closing date of August 1, 2006.

H.    <u>Notice Of Sale Hearing</u>

44.    On May 26, 2006 the Debtors will provide notice of the proposed sale of the New Brunswick Facility to JCI by serving this Motion and the Transfer Agreement by overnight delivery upon (i) the Office of the United States Trustee for the Southern District of New York, (ii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Acquired Assets, including but not limited to environmental, employee, and product liability claims, (iii) all federal, state and local regulatory or taxing authorities or recording offices, including but not limited environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (iv) all entities known to have an interest in a transaction with respect to the Acquired Assets during the past six months, (v) the United States Attorney's office, (vi) the United States Department of Justice, (vii) the Securities and Exchange Commission, (viii) the Internal Revenue Service, (ix) all entities on the Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management Order") and such other entities as are required to be served with notices under the Supplemental Case Management Order, (x) counsel for JCI, (xi) counsel for the Creditors' Committee, and (xii) counsel for the Equity Committee.  To the extent that the Debtors identify and serve notice on entities after May 26, 2006 – in particular, entities described in clause (ii) above should such a party be discovered after the date hereof – the Debtors will provide such party with an appropriate objection deadline as required by the Supplemental Case Management Order.

I.    The Relief Requested Is In The Best Interests Of
      The Debtors, Their Estates, And Their Creditors

45.    The Debtors, in the exercise of their business judgment, have concluded that the sale of the New Brunswick Facility and the Acquired Assets, the continuation and ultimate transition of supply out of the Fitzgerald Facility, the implementation of the IUE-CWA New Brunswick Attrition Plan pursuant to the Transfer Agreement are in the best interests of the Debtors' estates, their creditors, and parties-in-interest.  First, the New Brunswick Facility currently loses approximately $3 million per month and the Fitzgerald Facility loses approximately $2 million per month.  Thus, the expeditious disposition of these facilities would eliminate these losses.  Second, the IUE-CWA New Brunswick Attrition Plan would allow the Debtors to sell the New Brunswick Facility to JCI without having to pay the labor differential subsidy to JCI contemplated under the Put and Call Agreement, minimize administrative liabilities arising from human capital obligations in connection with the transfer of the New Brunswick Facility.  The attrition plan would also provide a "soft landing" for employees of the New Brunswick Facility.  Third, resolution of environmental remediation issues with respect to the New Brunswick Facility, pursuant to the settlement agreement with the NJDEP that is contemplated by the Transfer Agreement, reduces the risk of future liability, further minimizing the Debtors' administrative expenses.  Furthermore, in the Debtors' judgment, JCI's willingness to subsidize $12.5 million of the Debtor's IUE-CWA New Brunswick Attrition Plan benefits the Debtors.  JCI is the only party which can employ nearly one-third of the Debtors' hourly workforce at the plant plus certain of the salaried personnel.  Indeed, it is believed that JCI currently needs the production capacity of the New Brunswick and Fitzgerald Facilities to satisfy its customers' needs.  And, finally the transfer of the New

Brunswick Facility and the transition of supply from the Fitzgerald Facility will trigger GM economic support.

46.    In addition, on March 31, 2006, the Debtors announced a broad transformation plan that outlined core and non-core business lines.  In connection with their transformation plan, the Debtors identified non-core product lines that do not fit into the Company's future strategic framework.  Consistent with that strategy, the Debtors plan to sell the New Brunswick Facility and transition supply of battery products out of the Fitzgerald Facilities.  Finally, because ISRA requires, among other things environmental remediation in connection with the sale of the New Brunswick Facility, the Debtors can not sell the New Brunswick Facility to any third party purchaser without conducting the environmental remediation themselves.

47.    The Debtors believe, in their sound business judgment, that the resolution of post-closing matters relating to the sale of the battery business to JCI and the New Brunswick and Fitzgerald Facilities would benefit the Debtors by reducing operating losses, shifting responsibility for certain employees to JCI, minimizing the estates' administrative liabilities, and allowing the Debtors to begin aligning their North American businesses in connection with their transformation plan.  In addition, the Debtors would receive $12.5 million from JCI and relatively significant economic benefits from GM upon the transfer of this facility to JCI.  The Debtors have determined that the sale of the New Brunswick Facility to JCI and the continuation and transition of supply out of the Fitzgerald Facility pursuant to the Transfer Agreement will maximize value for all stakeholders and thus is a sound exercise of their business judgment.

<u>Applicable Authority</u>

A.    Sale, Continuation and Transition of Supply, And Implementation Of
        <u>Attrition Plan Pursuant To 11 U.S.C. § 363(b)(1)</u>

48.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  <u>See In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).  This "business judgment" test is premised on the debtor's business judgment that the proposed use of property of the estate would be beneficial to the estate.  <u>Cf. Orion Pictures Corp. v. Showtime Networks, Inc.</u> (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993) (analyzing business judgment standard under section 365 of the Bankruptcy Code).  To a bankruptcy court, "'business judgment' … is just that – a judgment of the sort a businessman would make."  <u>Id.</u>

49.    Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992).  As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'"  <u>In re Aerovox, Inc.</u>, 269 B.R. 74, 81 (Bankr. D. Del. 2001)(quoting <u>In re Interco, Inc.</u>, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

27

50.     For the reasons stated herein, the Debtors submit that entering into the

Transfer Agreement with JCI, and, in particular, selling the Acquired Assets, transitioning

supply out of the Fitzgerald Facility, and implementing the IUE-CWA New Brunswick

Attrition Plan, reflects a sound exercise of the Debtors' business judgment.

B.     Sale Free And Clear Pursuant To 11 U.S.C. § 363(f)

51.     Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section
> free and clear of any interest in such property of an entity other than the
> estate, only if —

> (1)     applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;

> (2)     such entity consents;

> (3)     such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens
> on such property;

> (4)     such interest is in bona fide dispute; or

> (5)     such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

52.     Therefore, pursuant to section 363(f) of the Bankruptcy Code, the

Debtors may sell the Acquired Assets to JCI free and clear of all liens, claims, and

encumbrances, except the liabilities specifically assumed by JCI.  Each lien, claim, or

encumbrance which is not the result of such a liability being assumed by JCI satisfies at least

one of the five conditions of section 363(f), and the Debtors submit that any such lien, claim,

or encumbrance will be adequately protected by the attachment of such lien, claim, or

encumbrance to the proceeds of the sale of the Acquired Assets in the order of its priority, with

the same validity, force and effect that it now has as against the Acquired Assets, subject to any

claims and defenses the Debtors may possess with respect thereto.  Accordingly, the Debtors

request that the Acquired Assets be transferred to JCI free and clear of all liens, claims, and

encumbrances, except for the liens resulting from liabilities assumed by JCI.[24]

C.    Good Faith Pursuant To 11 U.S.C. § 363(m)

>       53.       Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or
> (c) of this section of a sale or lease of property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Third Circuit

in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of
> his conduct in the course of the sale proceedings.  Typically, the misconduct that
> would destroy a purchaser's good faith status at a judicial sale involves fraud,
> collusion between the purchaser and other bidders or the trustee, or an attempt to
> take grossly unfair advantage of other bidders.

---

[24]    In addition, JCI should not be liable under any successor liability doctrines, except as otherwise provided in the
Transfer Agreement.  Courts have consistently held that the purchaser of a debtor's assets under section 363 of
the Bankruptcy Code takes such assets free and clear of successor liability resulting or arising from pre-existing
claims.  Such successor liability claims would frustrate the purpose of an order authorizing the sale of estate
assets free and clear of all "interests."  Accordingly, JCI should not be subject to further claims related to the
Debtors' pre-sale conduct.  See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d
89, 94 (2d Cir. 1988) ("when a debtor's assets are disposed of free and clear of third-party interests, the third
party is adequately protected if his interest is assertable against the proceeds of the disposition"); see also Ninth
Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that
bankruptcy court has power to sell assets free and clear of any interest that could be brought against the
bankruptcy estate during bankruptcy); Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.),
19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property pursuant to Bankruptcy Code section 363(f)
was made free and clear of Title VII employment discrimination and civil rights claims of debtors' employees);
In re Hoffman, 53 B.R. 874, 876 (Bankr. D. R.I. 1985) (transfer of liquor license pursuant to Bankruptcy Code
section 363(f) was made free and clear of any interest permissible even though estate had unpaid tax liability);
American Living Sys. Bonapfel (In re All American of Ashburn, Inc.), 56 B.R. 186, 189-90 (Bankr. N.D. Ga.
1986) (product liability claims precluded on successor liability doctrine when assets ere sold free and clear
pursuant to Bankruptcy Code section 363(f)), aff'd sub. nom. Griffen v. Bonapfel, 805 F.2d 1515 (11th Cir.
1986).

788 F.2d at 147 (citations omitted).  The Debtors submit that the Transfer Agreement is the

product of an intensely negotiated, arm's-length transaction, in which JCI has at all times acted in

good faith.  The Debtors and JCI have negotiated the terms of the Transfer Agreement for

several months, as they worked to resolve all issues relating to the disposition of the New

Brunswick Facility, the continuation and transition of supply out of the Fitzgerald Facility, the

resolution of human capital, production supply, and environmental matters, and the allocation of

risks and prospective obligations between the parties.  The Debtors and JCI began this process by

exploring how to resolve these issues pursuant to the ancillary agreements to the MSA executed

pursuant to the 2005 sale of Delphi's battery business to JCI, and concluded by agreeing on the

terms of the postpetition Transfer Agreement, which resolves these issues while taking into

consideration the manner in which both parties' circumstances have changed over the past ten

months.  The Debtors, therefore, request that the Court make a finding that JCI has purchased the

Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

Notice Of Motion

54.    Notice of this Motion shall be provided in accordance with the Seventh

Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006,

9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management,

and Administrative Procedures, entered by this Court on May 19, 2006.  In light of the nature

of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

55.    Because the legal points and authorities upon which this Motion relies

are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

30

Rules for the United States Bankruptcy Court for the Southern District of New York be

deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an

order (a) authorizing and approving the Debtors' entry into the Transfer Agreement and (b)

granting the Debtors such other and further relief as is just.

Dated:        New York, New York
              May 26, 2006

                              SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP

                              By:    /s/ John Wm. Butler, Jr.
                                     John Wm. Butler, Jr. (JB 4711)
                                     John K. Lyons (JL 4951)
                                     Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                          - and -

                              By:    /s/ Kayalyn A. Marafioti
                                     Kayalyn A. Marafioti (KM 9632)
                                     Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                 Debtors and Debtors-in-Possession