1

```
1
2    UNITED STATES BANKRUPTCY COURT
3    SOUTHERN DISTRICT OF NEW YORK
4    Case No. 05-44481pm
5    - - - - - - - - - - - - - - - - - - -x
6    In the Matter of:
7
8    DELPHI CORPORATION, et al.
9
10            Debtors.
11
12   - - - - - - - - - - - - - - - - - - -x
13
14               United States Bankruptcy Court
15               One Bowling Green
16               New York, New York
17
18               May 9, 2006
19               3:07 P.M.
20
21   B E F O R E:
22   HON. ROBERT D. DRAIN
23   U.S. BANKRUPTCY JUDGE
24
25
```

```
 1

 2    Hearing re Motion to Authorize Motion for

 3    Order Under 11 U.S.C. Section 1113(c)

 4    Authorizing Rejection of Collective Bargaining

 5    Agreements and Under 11 U.S.C. Section 1114(g)

 6    Authorizing Modification of Retiree Welfare

 7    Benefits

 8

 9    Hearing re Statement/Expert Report of Thomas

10    A. Kochan in Opposition to Debtors' Motion for

11    Order Under 11 U.S.C. Section 1113(c)

12    Authorizing Rejection of Collective Bargaining

13    Agreements and Under 11 U.S.C. Section 1114(g)

14    Authorizing Modification of Retiree Welfare

15    Benefits

16

17    Hearing re Motion to Authorize Motion for

18    Order Under 11 U.S.C. Section 1113(c)

19    Authorizing Rejection of Collective Bargaining

20    Agreements and Under 11 U.S.C. Section 1114(g)

21    Authorizing Modification of Retiree Welfare

22    Benefits

23

24

25
```

1    Hearing re Motion to Dismiss Party/Limit

2    Participation in the Hearing on Delphi's

3    Section 1113 and Section 1114 Motion

4

5    Reply to Motion Omnibus Reply of UAW in

6    Support of Motion to Limit Participation in

7    the Hearing on Delphi's Section 1113 and

8    Section 1114 Motion

9

10   Notice of Hearing/Proposed 1113/1114 Hearing

11   Agenda

12

13   Hearing re Motion to Authorize Motion for

14   Order Under 11 U.S.C. Section 1113(c)

15   Authorizing Rejection of Collective Bargaining

16   Agreements and Under 11 U.S.C. Section 1114(g)

17   Authorizing Modification of Retiree Welfare

18   Benefits

19

20   Declaration of Kevin M. Butler in Support of

21   Delphi's Motion for Authority to Reject

22   Collective Bargaining Agreements Under 11

23   U.S.C. Section 1113(c) and Modify Retiree

24   Welfare Benefits Under 11 U.S.C. Section

25   1114(g)

```
1

2    Declaration of Randal A. Middleton

3

4    Objection to Motion

5

6    Declaration of Donald L. Griffin

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib
```

```
 1
 2    A P P E A R A N C E S :
 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 4          Attorneys for Debtor and
 5          Debtors-in-Possession
 6          333 West Wacker Drive
 7          Chicago, IL 60606
 8
 9    BY:   JOHN WM. BUTLER, JR., ESQ.
10          JOHN K. LYONS, ESQ.
11          RON E. MEISLER, ESQ.
12
13    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
14          Attorneys for Debtor and
15          Debtors-in-Possession
16          Four Times Square
17          New York, NY 10036
18
19    BY:   KAYALYN A. MARAFIOTI, ESQ.
20          THOMAS J. MATZ, ESQ.
21          JAY S. BERKE, ESQ.
22
23
24
25
```

```
 1    O'MELVENY & MYERS, LLP
```

```
 2          Attorneys for Debtors

 3          7 Times Square

 4          New York, NY 10036

 5

 6   BY:   JEFFREY I. KOHN, ESQ.

 7

 8   O'MELVENY & MYERS, LLP

 9          Attorneys for Debtors

10          1625 Eye Street

11          Washington, D.C. 20006

12

13   BY:   TOM JERMAN, ESQ.

14

15   O'MELVENY & MYERS, LLP

16          Attorneys for Debtors

17          400 South Hope Street

18          Los Angeles, CA 90071

19

20   BY:   ROBERT A. SIEGEL, ESQ.

21

22

23

24

25
```

7

```
 1   COHEN, WEISS AND SIMON, LLP
```

```
 2        Attorneys for UAW

 3        330 West 42nd Street

 4        New York, NY 10036

 5

 6   BY:  BABETTE CECCOTTI, ESQ.

 7        BRUCE S. LEVINE, ESQ.

 8        BRUCE H. SIMON, ESQ.

 9        PETER D. DECHIARA, ESQ.

10        DAVID R. HOCK, ESQ.

11

12   LATHAM & WATKINS, LLP

13        Attorneys for Statutory Creditors'

14        Committee

15        885 Third Avenue

16        New York, NY 10022

17

18   BY:  ROBERT J. ROSENBERG, ESQ.

19        MITCHELL E. SEIDER, ESQ.

20

21

22

23

24

25
```

8

```
 1   LATHAM & WATKINS, LLP

 2        Attorneys for Statutory Creditors'
```

```
3          Committee

4          633 West Fifth Street

5          Suite 4000

6          Los Angeles, CA 90071

7

8    BY:   JOEL E. KRISCHER, ESQ.

9

10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

11          Attorneys for the Equity Committee

12          One New York Plaza

13          New York, NY 10004

14

15   BY:   BONNIE STEINGART, ESQ.

16

17   KIRKPATRICK & LOCKHART NICHOLSON GRAHAM, LLP

18          Attorneys for Wilmington Trust Company

19          599 Lexington Avenue

20          New York, NY 10022

21

22   BY:   EDWARD M. FOX, ESQ.

23

24

25
```

9

```
1    WHITE & CASE, LLP

2          Attorneys for Appaloosa Management
```

```
 3         1155 Avenue of the Americas

 4         New York, NY 10036

 5

 6  BY:   THOMAS E. LAURIA, ESQ.

 7         GLENN M. KURTZ, ESQ.

 8         DOUGLAS P. BAUMSTEIN, ESQ.

 9

10  BURR & FORMAN, LLP

11         Attorneys for Mercedes Benz

12         420 North 20th Street

13         Birmingham, AL 35203

14

15  BY:   MICHAEL L. HALL, ESQ.

16

17  ORRICK, HERRINGTON & SUTCLIFFE, LLP

18         Attorneys for Ad Hoc Trade Committee

19         666 Fifth Avenue

20         New York, NY 10103

21

22  BY:   ALYSSA D. ENGLUND, ESQ.

23

24

25
```

                                                        10

```
 1  KENNEDY, JENNIK & MURRAY, P.C.

 2         Attorneys for IUE-CWA

 3         113 University Place
```

```
 4          New York, NY  10003

 5

 6   BY:   THOMAS M. KENNEDY, ESQ.

 7          SUSAN M. JENNIK, ESQ.

 8

 9   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

10          Attorneys for Steelworkers Union

11          1350 Broadway

12          Suite 501

13          New York, NY 10018

14

15   BY:   LOWELL PETERSON, ESQ.

16

17   PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER &

18   BRUEGGEMAN, S.C.

19          Attorneys for IBEW and IAM

20          1555 North River Center Drive

21          Suite 202

22          Milwaukee, WI 53212

23

24   BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

25
```

                                                          11

```
 1   GORLICK, KRAVITZ & LISTHAUS, P.C.

 2          Attorneys for Operating Engineers

 3          Locals 18-S, 101-S, 832-S
```

```
 4          17 State Street

 5          4th Floor

 6          New York, NY 10004

 7

 8    BY:   BARBARA S. MEHLSACK, ESQ.

 9

10    WEIL, GOTSHAL & MANGES, LLP

11          Attorneys for General Motors

12          767 Fifth Avenue

13          New York, NY 10153

14

15    BY:   JEFFREY L. TANENBAUM, ESQ.

16          MICHAEL P. KESSLER, ESQ.

17

18    UAW/ASSOCIATE GENERAL COUNSEL

19          8000 East Jefferson

20          Detroit, MI 48214

21

22    BY:   NIRAJ R. GANATRA, ESQ.

23

24

25
```

```
 1    OFFICE OF THE UNITED STATES TRUSTEE

 2          33 Whitehall Street

 3          21st Floor

 4          New York, NY 10004
```

5

6    BY:   ALICIA M. LEONARD

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                        13

1                P R O C E E D I N G S

2                THE COURT:   Please be seated.   Okay.

3    We're back on the record on Delphi.   We have

4    some -- a creditor or some shareholders to

5   hear from?

6        MR. LAURIA:  Good afternoon, Your

7   Honor.  Tom Lauria with White & Case.  As I

8   previously indicated, we represent an ad hoc

9   committee of equity security holders that, in

10   the aggregate, hold just under 20 percent of

11   the company's issued in outstanding common

12   stock.  They are Appaloosa Management, Wexford

13   Capital, Partas Capital Management and Lampy

14   Conway.

15        Thoughtful review of the relief

16   requested and the relevant facts and

17   circumstances in these cases, reveals that the

18   debtor's 1113/1114 motions fail on multiple

19   levels.  If granted, the motion would defeat

20   bedrock bankruptcy policy.  In particular, the

21   right of stakeholders to be heard and to vote

22   before; not after the debtors lock in a

23   particular reorganization strategy.

24        The relief sought, like check

25   rejection power, is not available under the

14

1   statute, as I believe the Court agrees.  And

2   importantly belies the fact that no relief is

3   needed or proper at this time.

4        Finally, the stringent tests of

5   section 1113 and 14, imposed to protect the

6      multiple interests that may be impacted by the

7      revision of a debtor's labor obligations, have

8      not been satisfied.

9              Fundamentally, the debtors seek to

10     implement the main act of this Chapter 11 case

11     without the protections afforded stakeholders

12     with respect to such matters.  Inexplicably,

13     this, the debtor's attempt to do without any

14     showing as to why the relief is needed now,

15     without any showing as to why less intrusive

16     interim relief would be inadequate, and

17     without any analysis of or sensitivity to the

18     potentially devastating impact on the debtor's

19     stakeholders of the multi-billion dollar

20     claims in favor of GM to which this relief

21     unnecessarily exposes the Delphi estate.

22             In short, there is no legitimate

23     business justification proffered for this

24     relief at this time.  As such, the motion

25     should be denied at this time without

15

1      prejudice to the debtor's right to seek

2      statutorily provided interim relief or to re-

3      file once a plan has been negotiated and is on

4      the table.

5              One of the fundamental principals

6    upon which Chapter 11 is built is stakeholder

7    democracy.  When the debtor wants to

8    reorganize, its plan is subjected to a vote of

9    the impaired stakeholders.  This is a key

10   component of the balance struck by the code

11   between fostering the rehabilitation of a

12   distressed business on the one hand and

13   protecting stakeholder rights on the other.

14          As we all know, the debtor's

15   direction under the code is to maximize value

16   for the benefit of its stakeholders.  While it

17   is given substantial liberty to work toward

18   that goal during dependency of a case, when it

19   comes to the matter of the debtor's

20   reorganization, which is to be expressed in a

21   plan, the parties for whose benefit the debtor

22   labors are afforded the right to vote.

23          The unstated expectation, of course,

24   is that as a consequence of going through the

25   hoops of the planned process, the

16

1    reorganization well had been largely

2    negotiated and that the majority of

3    stakeholders, both by class and in toto, will

4    accept the plan.

5          Recognizing that such hoped-for

6    stakeholder unanimity cannot always be

```
 7   achieved. The code permits non-consensual

 8   confirmation on both a creditor-by-creditor

 9   basis and a class basis.  But if the --

10           THE COURT:  How do you reconcile

11   this with the timing requirements of 1113(d)

12   and the Second Circuit's opinion in Carey?

13           MR. LAURIA:  Your Honor, I think

14   that these case -- first of all, I think that

15   the fact that relief can be obtained under

16   1113 doesn't undo the fact that you still have

17   to look at the facts and circumstances of each

18   case and the Court has to determine the impact

19   of the relief requested on the overall

20   reorganization.  And I think it would be

21   turning the process upside down to allow one

22   statutory provision to undo the whole scheme

23   of Chapter 11 which is directed to a plan of

24   reorganization and the process that that

25   contemplates.
```

                                                                17

```
 1           THE COURT:  All right.  I think you

 2   better move on off of this point.

 3           MR. LAURIA:  Pardon me?

 4           THE COURT:  I think you better move

 5   on off of this point.  But let me ask you

 6   also, you said that the debtor can seek
```

```
 7    interim relief?

 8           MR. LAURIA:  Pardon me?

 9           THE COURT:  You said the debtor

10    could seek interim relief?

11           MR. LAURIA:  Yes, Your Honor.

12           THE COURT:  Under 1113(e)?

13           MR. LAURIA:  Correct.

14           THE COURT:  And you would view that

15    that interim relief would go to changes

16    essential to the continuation of the business?

17           MR. LAURIA:  Correct.

18           THE COURT:  Okay.

19           MR. LAURIA:  In fact, Your Honor, I

20    think it's telling that Mr. Butler, in his

21    opening, no less than three times made the

22    point of saying that the debtors are not

23    seeking relief under 1113(e), the only

24    statute, in Mr. Butler's words, that requires

25    any showing of necessity.  I think what this
```

                                                    18

```
 1    tells us is that the debtors want the relief

 2    but don't want to have to show that they need

 3    it.

 4           THE COURT:  No.  They're not seeking

 5    relief under 1113(e).

 6           MR. LAURIA:  Correct.  They want to

 7    -- they want permanent relief.  But they don't
```

8    want to have to meet the shelling of the

9    statute in 1113(e) that says they have -- it

10    has to be necessary to the business.

11            THE COURT:  Well, 1113 doesn't say

12    that.  It says, essential to the continuation

13    of the business or in order to avoid

14    irreparable damage to the estate.

15            MR. LAURIA:  Yes.  Agreed.

16            THE COURT:  Okay.

17            MR. LAURIA:  And the point is that

18    the debtors don't want to shift -- although

19    the debtor's evidence is going to be that

20    because the cash burn is so great between now

21    and October 2007, when the contracts expire,

22    they need the relief now.  That sounds like

23    evidence to support interim relief, not

24    permanent relief.  And when we get to that

25    part in the statute --


                                                    19


1            THE COURT:  No, I understand your

2    point now.

3            MR. LAURIA:  Okay.

4            THE COURT:  Okay.

5            MR. LAURIA:  Thank you.  Your Honor,

6    the simple point I'm trying to make is that in

7    the plan process, even when you get that

8    nonconsensual confirmation, the stakeholders

9    are given protections, whether individually or

10   by class.  This process strips them away.  The

11   debtors have, publicly, in their papers filed

12   before this Court and in statements made on

13   the record here and in every conversation we

14   have had with debtor's counsel, that this is a

15   labor transformation case.

16            By this, we are told that they mean

17   that the sine qua non of their reorganization

18   will be their ability to materially adjust

19   their labor costs, which by the debtor's

20   admission are currently three to four times

21   market.  And yet, they now purport to take

22   that critical step, which is the admitted

23   centerpiece of their reorganization, without

24   first putting the rest of the reorganization

25   on the table.

20

1            Without putting forth the

2    information that the constituencies would

3    ordinarily expect to have and indeed, by code

4    be required to have, to assess the

5    consequences of the proposed labor

6    transformation, the value created thereby, the

7    resulting treatment to stakeholder claims and

8    interests, the alternatives --

```
 9              THE COURT:  What -- I'm sorry --
10   what provision of the code are you referring
11   to?
12              MR. LAURIA:  1125, Your Honor.
13              THE COURT:  How is this a plan under
14   Chapter 11?
15              MR. LAURIA:  Well, Your Honor, I
16   think you can look at the debtor's motion for
17   that indication.  I think the debtors know
18   that, in effect, they are establishing a plan
19   --
20              THE COURT:  You know, Mr. Lauria, I
21   understand you made this argument in your
22   papers but it just doesn't hold water.  This
23   is not a Chapter 11 plan.  Even under
24   Brandoff, it's not a Chapter 11 plan.  You
25   could preserve this argument, if you wish, for
```

                                                  21

```
 1   whatever appeal you may want to take but
 2   you're not going to persuade me.  And I don't
 3   think you'd persuade any bankruptcy lawyer in
 4   the country.
 5              MR. LAURIA:  Well, Your Honor, in
 6   paragraph 51 of the debtor's motion, they tell
 7   us all exactly what everybody's going to get
 8   in this case.  And I think it's less than
```

```
9    coincidence that when the debtors filed this

10   motion, they also issued a press release which

11   they filed with the SEC, under Form 8-K,

12   detailing the labor transition strategy.  How

13   they intend to reorganize their business and

14   how the debtor's labor strategy dovetails with

15   implementation of their overall reorganization

16   strategy.

17           Based on the foregoing, there can be

18   little doubt that the debtors, with this

19   motion, know exactly how they intend to

20   reorganize their business, what they believe

21   the implications are and that the relief

22   sought in this motion is the engine that

23   drives all of it.

24           THE COURT:  Have you talked to your

25   friend who represents Wilmington Trust on that
```

                                                              22

```
1    point?

2            MR. LAURIA:  No, Your Honor.

3            THE COURT:  Okay.  Listen, you're

4    trying my patience.  I know you think this is

5    a great argument.  I've read your papers.

6    I've considered it.  I've read the cases.  And

7    there are too many people here to go over this

8    again.

9            MR. LAURIA:  Well, Your Honor, I
```

10    don't mean to be disrespectful --

11         THE COURT:  Well, I know you don't.

12    But I'm telling you, stop it.

13         MR. LAURIA:  Can I --

14         THE COURT:  You can tell me that

15    it's important.  Just don't tell me it's a

16    Chapter 11 plan.

17         MR. LAURIA:  Well, it is important,

18    Your Honor.  In fact, I think the Ormat case,

19    which is relied on by the debtors in their

20    papers, is actually instructive.  In Ormat,

21    what the debtor's did was they sought

22    rejection in connection with consummation of

23    their plan.  And indeed, we were first alarmed

24    because that was the only case we could find

25    when we read the decision that talked about

                                                        23

1    the concept of conditional rejection.

2         So we pulled the motion that the

3    debtors filed.  And in fact the motion -- the

4    conditionalness of the relief sought was just

5    on the hearing on the rejection of request

6    commencing without having a signed deal with

7    the unions.  And that's the farthest anybody

8    ever got with the concept of a conditional

9    rejection in all of the cases that we read.

10    And we think we read them all.

11          But I think what's important is, in

12    Ormat, the rejection was part of the plan

13    process and the question that we are asking

14    the Court to consider is why disaggregate

15    something as important to this case from the

16    plan process when interim relief is provided

17    by the statute if it's essential to the

18    continuation of the business or to avoid

19    irreparable harm.  That's the question.

20          And, Your Honor, I think that the

21    issue of necessity, whether you view it as a

22    question of heightened scrutiny arising under

23    the business judgment test in the cases that

24    suggest the bigger the issue is the higher the

25    scrutiny is or if you view it as checking


                                                    24


1    necessity under 1113, the question still comes

2    down to not only is it necessary for

3    reorganization but why is it necessary now?

4          There must be a time component to

5    that question and the debtors, in their

6    papers, in all of the declarations, have only

7    attempted to come up with one answer.  Which

8    is we're burning cash.  We can't make it.

9    That question needs to be plumbed to see if

10    that's an appropriate  -- whether the Court

11    wants to view that as an appropriate business

12    justification under 363 or under the necessity

13    test under 1113.  That's the question that we

14    have to answer --

15           THE COURT:  Okay.

16           MR. LAURIA:  Because certainly it

17    would be better.  I don't think that the Court

18    could debate that it would be better for all

19    constituencies if this magnitude of relief

20    were incorporated in a plan process because of

21    all the due process that the plan process

22    includes, all of the opportunities for

23    stakeholder input and the ability to hopefully

24    get to consensus before we walk into the

25    courtroom.  Or if not consensus in toto, at

                                                              25

 1    least as much as possible.

 2           Now, Your Honor, we also think that

 3    it's important that the debtors asked for

 4    blank check rejection authority.  I understand

 5    that that request may have been rendered moot

 6    by the Court's earlier ruling that -- at your

 7    ruling on this motion; it's either rejected or

 8    not.

 9           But I think the fact that the

10    debtors asked for the relief the way they did

11    is important because it indicates a view that

12    the debtors maybe really don't need relief

13    now.  Because what the debtors have

14    represented is their intention, is to maintain

15    the status quo and keep negotiating in hopes

16    of a deal taking shape later.  And our

17    question is which way is it? Do they need the

18    relief or don't they?  It's got to be one or

19    the other.  They can't have both.

20         THE COURT:  Well, we'll see what the

21    evidence shows on that.  I think Mr. Simon may

22    have gotten the other reason why they were

23    moving as they moved.

24         MR. LAURIA:  Your Honor, to the

25    point of -- just responding briefly to the

26

1     Court's comment regarding the effect of

2     rejection.  In particular, I noted that in the

3     Court's view the distinction is semantic and

4     that the debtor is permitted to continue

5     performing after the Court enters an order of

6     rejection.

7          We think this is problematical in

8     two respects.  Number one, the debtor's

9     continued performance, at levels that are

10    above the amount that the debtor's purport to

11    have determined to be reasonable, is

12    gratuitous.  It's not the performance of a

13    legal obligation at that point.  It is, in

14    effect, a gift.  And it's very hard for us to

15    get comfortable with the idea that a debtor

16    can provide such a gift at a time when it is

17    also saying it can't pay its creditors in full

18    and it's going to wipe out its shareholders.

19          THE COURT:  Well, obviously they

20    have their fiduciary duties.  They would only

21    do it if there was a good reason to do it.

22          MR. LAURIA:  Well, Your Honor, we

23    think that the distinction is actually maybe

24    not semantical but that rejection means

25    rejection.  And that at that point in time, if

27

1    the debtor wants to continue performing, they

2    need to get some relief from the Court to be

3    able to do so.

4          The second concern we have with that

5    notion is that rejection is a --

6          THE COURT:  What would they pay

7    people in the meantime?

8          MR. LAURIA:  Pardon me?

9          THE COURT:  What would they pay

10    people in the meantime?

11          MR. LAURIA:  They would presumably

12    implement their proposal which they have put

13    on a great deal of evidence -- or purport to

14    offer a great deal of evidence, saying they've

15    determined, in all respects, that that's

16    reasonable and appropriate.

17              THE COURT:  Okay.

18              MR. LAURIA:  The second concern that

19    we have about this potential continued

20    performance in the face of rejection is that,

21    as a matter of law, rejection does equate to

22    breach of the agreement.  And it could be

23    argued by GM that that breach triggers not

24    only its guarantee obligations, but also its

25    indemnity rights which would put the other

28

1    stakeholders in the worst of all worlds.  The

2    debtor would be continuing to spend money at

3    the high levels under the existing agreements

4    and incurring the multibillion-dollar claim

5    under the Employee Matters Agreement to GM.

6    So it would be a lose-lose.  So we're very

7    troubled by the potential scenario that

8    rejection could permit continued performance

9    under the contract.

10              And, in fact, we think, Your Honor,

11    for all the reasons that a debtor should not

12    have back-pocket rejection authority delegated

13    to it by the Court, the debtor should not be

14    able to continue performance after the court

15    order's rejection.

16         Now, finally, I want to talk briefly

17    about the direct statutory issues.  Unlike

18    section 365, sections 1113 and 1114 impose

19    rigorous hurdles a debtor must clear in order

20    to reject a collective bargaining agreement or

21    to modify retiree benefits.  Recognizing that

22    these matters call into play important

23    nonbankruptcy policies and interests, Congress

24    decided to make it harder for a debtor to get

25    relief than with respect to a run-of-the-mill

29

1    executory contract.

2         In fact, whereas under 365 the

3    determination of whether or not the contract

4    is burdensome is commended to the debtor's

5    sound business judgment, the determinations as

6    to whether or not the debtor has satisfied the

7    hurdles set forth in 1113 for rejection of a

8    collective bargaining agreement are entrusted

9    to the Court.  It is the Court's decision, not

10    the debtor's.

11         Now, the breadth and equitable

12    nature of the statutory inquiries imposed by

13    these two statutory provisions suggest a fact-

14    intensive analysis that must be customized to

15    the facts and circumstances of each particular

16    case.  Based on the relevant facts and

17    circumstances here, as we believe they'll be

18    established, the debtors are not entitled to

19    the relief sought at this time.

20         Our focus is on three elements of

21    the debtor's evidentiary burden that apply

22    more or less equally with respect to the

23    request to respect the CBAs and also to modify

24    retiree benefits.

25         Number one, the debtors must prove

30

1    that they have made a modification proposal

2    that is necessary to permit reorganization.

3    Number two, they must establish that their

4    proposal assures that all affected parties

5    will be treated fairly and equitably and

6    number three, the debtors must establish that

7    the balance of the equities clearly favors

8    granting the requested relief.

9         As to the issue of necessity, I find

10    it hard to believe, but some courts have

11    attempted to draw a distinction between relief

12    that is necessary to a plan as compared to

13    relief that would be essential to a plan.

14          But all cases that have addressed

15     the issue, including Carey and its progeny in

16     the Second Circuit, seem to agree that the

17     focus is to be on the big picture, not the

18     short term.

19          In an attempt to address the big

20     picture issue, the debtor's proffered evidence

21     focuses on anticipated losses over a five-year

22     period under their so-called steady-state

23     projections which assume that wages and

24     benefits are paid at the current levels

25     throughout the period.

31

1          This evidence falls flat for two

2     reasons.  One, it ignores the fact that the

3     debtor's existing labor obligations expire in

4     September and October of 2007.  As such,

5     assuming that at some point in the next 16

6     months negotiations reach what under the labor

7     law is called impasse, at the agreement's

8     expiry the debtors will be free to impose the

9     exact changes they now seek with the same

10    attendant risk, a labor strike.

11          Two, the debtors ignore the fact

12    that they are well ahead of plan so far this

13    year and in fact are 500 million dollars

14    positive cash to plan since the beginning of

15    the year, calling into question the

16    reliability of the debtor's predictions of

17    massive losses.

18          But in an effort to retort, the

19    debtors in their supplemental declarations

20    have come back to assert that the positive

21    results of the first quarter should be

22    disregarded and that they cannot survive until

23    the expiry of the CBAs.  This short-term

24    focus, however, while perhaps a basis for

25    relief under 1113(e) and 1114(h), if correct

32

1    and valid, a fact that has been vigorously

2    challenged by the UAW's financial advisor,

3    nevertheless does not establish that permanent

4    relief is necessary for reorganization.

5          The fact is, without a complete plan

6    on the table, given the primacy of labor

7    issues in this case and the fact that the CBAs

8    expire in little over a year, it is

9    effectively impossible for the debtors to

10    clear this hurdle.

11          Surely, the concept of necessity or

12    business judgment carries with it a timing

13    component.  Why do the debtors need permanent

14    relief now, not later?  Why isn't interim

15    relief adequate so that permanent relief can

16    be considered in the context of a plan?

17            The failure to answer these

18    questions should doom the motion.  The courts

19    have suggested that fair and equitable to all

20    affected parties requires a showing that the

21    burdens of the reorganization are being

22    similarly borne by every constituency.

23            Unfortunately, none of the cases

24    provide any real guidance regarding the

25    application of this wily concept.  It could be

                                                          33

1    argued that from a strictly statutory

2    construction perspective, as is arguably

3    required by the Supreme Court in Laney, that

4    fair and equitable means the absolute priority

5    rule must not be defeated by the proposal.

6    Under this approach, the debtor's proposal

7    would clearly fall.  It provides a gift to GM

8    in the form of a multi-billion dollar

9    indemnity claim, for paying OPEB in perpetuity

10   even though the debtors are only obligated for

11   a little more than a year, at the expense of

12   creditors, whose recovery is materially

13   diluted and shareholders whose interests are

14   at risk of being wiped out.

15          However, even taking a looser

16    approach to the test, does the proposal fairly

17    allocate the cost of reorganization?  The

18    presence of a multi-billion dollar gift to GM

19    would still seem to suggest a negative answer.

20          One point I want to make sure to

21    address, in the fact that I call this a gift

22    to GM, the Court should go back to the spin

23    documents and realize that the debtors

24    received no benefit in exchange for agreeing

25    to indemnify GM for the price it had to pay to

                                                        34

1     the union for the benefit it saw for itself of

2     accomplishing the spin-off in terms of paying

3     OPEB into perpetuity, even though Delphi was

4     only legally obligated to pay it for a limited

5     term.

6          Now, that fact, the absence of

7     consideration to Delphi, combined with

8     statements of the time, contemporaneous

9     statements contained in the S(1)(a), filed by

10    Delphi at the time, suggesting that Delphi's

11    capital may well have been inadequate to meet

12    its legacy labor costs and its other capital

13    requirements, sounds like prima facie evidence

14    of the avoidablity of those obligations.  And

15    yet, it is those obligations that rejection

16    now puts squarely on equal footing with the

17    other creditors and ahead of the company's

18    shareholders.

19           THE COURT:  Why would that be the

20    case if the original -- according to your

21    logic, if the original transaction was

22    referable to a transfer, why would the

23    resulting claim not also be tainted with the

24    same --

25           MR. LAURIA:  Your Honor, it may well

35

1    be and I suspect there will be litigation over

2    these issues as some point.  The problem is

3    we're all being kind of forced to put the cart

4    before the horse.  You know, the debtor's

5    making the move and now we're going to have to

6    go do the litigation after the fact and see,

7    you know, how the dice come up.

8           This is particularly problematical

9    when you take into account the fact that if

10    the debtors sought this relief in the fall of

11    2007 while the strike risk would be the same

12    as it is today, the GM claim would go away

13    because the exposure to the GM claim falls

14    away 30 days after the expiry of the existing

15    CBAs.

16              THE COURT:  As would the guarantee,

17    right?

18              MR. LAURIA:  Correct, Your Honor.

19              THE COURT:  So, the employees would

20    not have the benefit of the guarantee?

21              MR. LAURIA:  Correct.

22              THE COURT:  Okay.

23              MR. LAURIA:  If the relief doesn't

24    fail because of these problems, then it

25    should, nevertheless, fail under 1113(c)(3)

                                                    36

 1    and 1114(g)(3).  The balance of the equities

 2    does not clearly favor relief.

 3              Indeed, Your Honor, we believe the

 4    exposure of the estate to the multi-billion

 5    dollar gift to GM, combined with the potential

 6    massive delusion of creditors in the

 7    elimination of old equity, would on its face,

 8    suggest that the equities clearly weight

 9    against relief.

10              Add to that the notion that the

11    labor transformation in a labor transformation

12    case should at least arguably be implemented

13    as part of a plan.

14              Add to that the fact that the CBAs

15    terminate in just over a year, clearing the

16    way for the implementation of the debtor's

17    proposal without the GM gift.

18            Add to that the fact that according

19    to the debtor's old benefits expert, Mr.

20    Williams, the cost from a benefit's

21    perspective, of waiting would only be about

22    300 million dollars.

23            And add to that the fact that the

24    debtors have offered no explanation as to why

25    permanent relief is required now even though

37

1    interim relief is available.  The answer

2    should be manifest.  Permanent relief is not

3    now appropriate.

4            THE COURT:  Just before you sit

5    down, I didn't see it in the papers on

6    standing, particularly, but do you have any

7    cases where a court, in applying

8    1113(b)(1)(A), the fair and equitable

9    standard, applied it other than in respect --

10    in the perspective of how the union is being

11    treated?

12            MR. LAURIA:  No -- well, Your Honor,

13    I think that they all address the need to

14    determine that the cost of the reorganization

15    is being fairly spread among all

16    constituencies, not just the union.

17          THE COURT:  Right.

18          MR. LAURIA:  I think all the cases

19    say that.  There's one case that actually

20    criticizes the suggestion that fair and

21    equitable means fair and equitable in the

22    traditional sense.  Noting that that would

23    suggest you can't do an 1113 motion outside of

24    the plan process.  But I know of no authority

25    for the narrow proposition that the Court

                                                    38

1    asked about.

2          THE COURT:  Okay.

3          MR. LAURIA:  Thank you.

4          MR. FOX:  Good afternoon, Your

5    Honor.  Edward Fox from Kirkpatrick & Lockhart

6    Nicholson Graham, on behalf of Wilmington

7    Trust Company.  Your Honor, I'll be very

8    brief.  As we explained in our limited

9    objection, our concern is that the cost of the

10   debtor's proposal to the unions of what it is

11   doing will be

12   borne by Delphi Corporation, parent

13   corporation for our bonds, our claims, while

14   the benefits will redown to the subsidiary

15   entities, the operating entities in the U.S.

16   through the lower wage rates and other

17   benefits that the debtors at those levels

18    would hope to receive.

19              As a result of that, our view is

20    that the Court, on an entity-by-entity basis,

21    needs to look at whether or not the proposal

22    is fair and equitable.

23              In response to that, the debtor

24    states, in its reply, in a footnote on page 9

25    and I quote, Wilmington Trust ignores the cost

39

1              Delphi Corporation, et al.

2    to the entire corporation -- and I emphasize

3    the words entire corporation -- of not

4    reaching an agreement, particularly the cost

5    of a potential strike.

6              The problem is here, there isn't one

7    single entire corporation.  There are 43

8    separate legal entities, each of which is a

9    debtor in its own case, although they're

10    administratively consolidated, they're not

11    substantively consolidated.  And Mr. Sheehan's

12    declaration indicates that even at the

13    subsidiary levels, the creditors of those

14    entities will not be paid 100 cents on the

15    dollar, which means that Delphi Corporation

16    has no equity in these underlying entities and

17    therefore it will not benefit as a result of

18    increased valuations at the subsidiary level.

19            Accordingly, in reviewing this and

20    in looking at the evidence as is presented to

21    you, we'd simply ask you to bear in mind the

22    fact that there are separate legal entities

23    involved here and each of those rights must be

24    respected and the debtor has to show that its

25    business judgment is appropriate with respect

40

1            Delphi Corporation, et al.

2            THE COURT:  Okay.

3            MS. STEINGART:  Good afternoon, Your

4    Honor.  I have very brief opening remarks

5    because I am not as -- Bonnie Steingart from

6    Fried, Frank on behalf of the official

7    committee of equity holders.  My remarks will

8    be brief because we are not yet up to speed,

9    Your Honor.

10            We had requested of Counsel whether

11    an adjournment would be appropriate.  We were

12    informed it would not be appropriate and we

13    certainly do not want to make these

14    proceedings more complicated and difficult

15    logistically than they are.

16            So we are prepared to go forward.

17    We will play catch-up as best we can and we'll

18    address ourselves to the issue that the Court

19    has highlighted for the committees this

20    morning and that is the exercise of the

21    debtor's business judgment.

22          I wanted to introduce to the Court

23    my partner, Debra Torres, who will be here on

24    behalf of the equity committee as well, and

25    make one small request to the extent that it

                                                              41

1           Delphi Corporation, et al.

2     we will be proceeding today and we came on

3     board about 8:00 P.M. last night, I would ask

4     that, to the extent that we believe that there

5     is material cross-examination that we're not

6     able to do of witnesses presented this week,

7     that we have the opportunity to consult with

8     debtors and counsel for the unions and the

9     Court to see if anyone -- if it is absolutely

10    necessary, Your Honor, to be brought back on a

11    very, very limited basis.  And we would,

12    hopefully, try not to have this happen at all

13    but just in terms of being able to protect the

14    committee and to have an opportunity, if there

15    are witnesses here that are key to the issue

16    of business judgment.  We'd like that small

17    opportunity.  Thank you.

18          THE COURT:  All right.  Before we go

19    further, I see there's still some people

20    standing.  If you do want to sit down and rest

21    your feet, you can go down the hall to the

22    other courtroom.  I'm told that the sound and

23    the temperature are both better there than

24    here.  So, you might want to consider doing

25    that.  Okay, Mr. Butler.

                                                                    42

1             Delphi Corporation, et al.

2    to the debtor's evidentiary case.  Before

3    doing that, I thought it might be appropriate

4    Your Honor, to get some guidance from the

5    Court on a couple of issues.  Does the Court

6    have a view as to when the Court's going to

7    end tonight?

8             THE COURT:  Well, I can go pretty

9    late tonight.  I can go till 7:00.  I would

10   prefer ending tomorrow earlier and I'm happier

11   to begin earlier too.  I can begin at 9:00

12   promptly and go till about 5:00 tomorrow.

13            MR. BUTLER:  So, unless the Court

14   otherwise directs us, we'll presume we'll go

15   till 7:00 tonight, start at 9:00 in the

16   morning, continue until 5:00 tomorrow night

17   and then I think our next day is Friday the

18   12th.

19            THE COURT:  That's right.

20          MR. BUTLER:  And when does the Court

21    want to start then?

22          THE COURT:  Well, I had it down for

23    10:00 -- do we have anything else on Friday?

24    I thought that -- no it was Thursday.  We'll

25    see how it goes on Wednesday.  I may be free

                                                        43

1           Delphi Corporation, et al.

2           MR. BUTLER:  Your Honor, the other

3     point that was made in the report we submitted

4     to chambers, that all the parties had asked me

5     to bring up was a recognition that it is

6     unlikely that the debtors and the unions and

7     the other objectors will finish the case and

8     submit it to Your Honor by the end of the

9     week.  And that there will be a need for

10    additional trial dates.

11          THE COURT:  Well, given all the

12    witnesses that just you detailed, I think

13    that's right.  And I know the unions have

14    their witnesses too.

15          MR. BUTLER:  All right.  The -- I

16    think, Your Honor, I may -- I think I have

17    this right.  There are, I think, 34 witnesses

18    that have been identified by the parties.  Of

19    those, 13 belong to the company and 21 belong

20    to the objectors.  And at least, for the

21    planning of schedules, Counsel wanted to find

22    out if there's any guidance the Court can give

23    to us as to future dates for the balance of

24    the month.

25            THE COURT:  That's what I thought,

                                                          44

1            Delphi Corporation, et al.

2    because it's Memorial Day, that's why.  Well,

3    I actually have Monday the 15th free and then

4    it gets pretty backed up.  We have a Delphi on

5    this day on the 24th and there's nothing else

6    on the calendar that day.  But you probably

7    have other motions on for then.  And the 26th

8    is free but that's the Friday before Memorial

9    Day weekend.  Similarly, May 30th is free.

10    That's the Tuesday after Memorial Day weekend.

11    And then we have your GM motion on Friday the

12    2nd of June.  I do have all day, also, June

13    the 5th.

14            MR. BUTLER:  Which I think was

15    reserved for GM.  I think GM is June 2nd and

16    June 3rd.

17            THE COURT:  Right.  Now, I think

18    there is some benefit, particularly given Mr.

19    Simon's remarks about the UAW's desire to

20    negotiate, that we not rush through the entire

21    hearing.  So, you've heard those days.  Maybe

22    you can work them out between yourselves but I

23    myself might, if you came back to me saying

24    that you'd end this before the last week of

25    May, say well, no you're not because I think

                                                              45

1              Delphi Corporation, et al.

2    only meet, as I'm going to suggest, this

3    Thursday, but also meet and go over requests

4    and concepts and the like for a longer period.

5              MR. BUTLER:  Your Honor, we will

6    take that up with the parties and try and

7    report back tomorrow on that.  I hear the

8    Court's guidance and I think that may make

9    some sense not to do the 15th as a result of

10   that but we'll talk to the Counsel and report

11   back tomorrow.

12             THE COURT:  Okay.

13             MR. BUTLER:  And with that, and

14   while it's quiet in the courtroom, if I could

15   just ask Counsel who are representing actual

16   participants in the hearings to please wait

17   for about five minutes at the end of the day

18   so that we can have that meeting and confer so

19   I can report back.  That would be helpful.  So

20   when we're done, let's just spend five minutes

21    together.

22              Your Honor, moving now to the

23    debtor's direct case.  The first witness is

24    David L. Resnick.  His declarations, which I

25    move into evidence, subject to cross-


                                                    46


1              Delphi Corporation, et al.

2    Exhibits 18 and 19 of the joint trial book.

3              MR. BAUMSTEIN:  Your Honor, just

4    before we get there, if I may, Doug Baumstein

5    from White & Case, on behalf of Appaloosa,

6    Wexford, Partas and Lampe Conway.  We have

7    signalled to the debtors that we intended to

8    make this objection but we do have an

9    objection to both Mr. Resnick's declaration

10   coming in as well as to the declarations of

11   all witnesses other than Mr. Williams who we

12   were permitted to take the deposition of, on

13   the grounds that debtor did not permit us to

14   participate in the depositions with respect to

15   some of these witnesses -- with respect to all

16   of these witnesses, other than Mr. Williams.

17              In some cases we were permitted to

18   be in the room.  In other cases no depositions

19   were taken.  Additionally, debtors did not

20   produce to us a 30b6 witness on several topics

21   that were directly related to the order of

22    proof here is -- including on issues that

23    focus on the business judgment aspects of the

24    case, that the Court has already highlighted

25    and perhaps in -- and those include topics

47

1              Delphi Corporation, et al.

2    the CBAs now, as opposed to after the

3    expiration of the GM indemnity and the current

4    bargaining agreements, the calculation of

5    potential claims that may result from the

6    rejection, the economic analysis of the affect

7    the proposals would have, whether they were

8    implemented as of October 1, 2006, or after

9    the expiration of the CBAs and indemnity

10   obligations and the economic analysis

11   performed with respect to the competitive

12   benchmark proposals and GM consensual

13   analysis.

14             It is our position that it is

15   prejudicial to go forward without having an

16   opportunity to have taken depositions of these

17   individuals.  Additionally, I would note, for

18   example, for Mr. Resnick, he first -- the

19   objection deadline in this case was April

20   19th.  His objection -- his declaration came

21   in on May 25th supp -- I'm sorry, April 25th

22    with a supplement on May 2nd and just by way

23    of example, Mr. Eisenberg, who did not put in

24    any declaration initially at March 31st, when

25    debtors first moved, first put in a

                                                              48

1          Delphi Corporation, et al.

2    of the issues we have here.  It was our

3    position that a 30b6 witness was more

4    appropriate because it would give debtors the

5    opportunity to identify one witness to speak

6    on behalf of the company so that we avoid

7    being whipsawed by having one witness say one

8    thing and another say another.  But we were

9    never permitted to have these depositions.  We

10   think that it is prejudicial to go forward

11   without giving us an opportunity to take these

12   depositions.

13          THE COURT:  Well, let's address the

14   Resnick one first because that's the one in

15   front of me.  This, of course, was all the

16   subject of a chambers conference that we had -

17   - when was it?  Two weeks ago?

18          MR. BAUMSTEIN:  Yeah, I believe the

19   date was Tuesday May 2nd.

20          THE COURT:  Okay.  And it was my

21   view then, and continues to be, that

22   particularly given the primary focus of this

23   litigation, which was with the unions and

24   their agreements with the debtors in respect

25   of how to deal with, in this case, expert

49

1              Delphi Corporation, et al.

2    depositions that I did let you take, which

3    addressed the claim issue and the OPEB/GM

4    claim issue, that to manage the case properly

5    and not to prejudice either the unions or the

6    debtors in their discovery, that the

7    shareholder group's request for additional

8    depositions had to give way, particularly

9    given the issues they had raised and the level

10   of information that they had received.  So on

11   that basis I'll deny the -- or overrule the

12   objection to the admissibility of the two

13   Resnick affidavits.

14              MR. BAUMSTEIN:  Okay.  And just to

15   clarify, because one issue -- just Mr.

16   Williams was not actually familiar with the

17   working of the GM indemnity obligation

18   although he was familiar with the calculation

19   of what we believe a claim might be, he was

20   able to testify.  And just for case management

21   purposes, as I first made --

22              THE COURT:  Well, when you say the

23    working of the GM obligation, what do you mean

24    by that?

25              MR. BAUMSTEIN:  What I'm talking

                                                                    50

 1              Delphi Corporation, et al.

 2    indemnity agreement.  He had never really --

 3    he had never analyzed it.  He has looked,

 4    obviously --

 5              THE COURT:  Isn't it -- it's a

 6    contract, right?

 7              MR. BAUMSTEIN:  That's right.  But

 8    he had never been asked to look at anything

 9    with respect to the claims that would be

10    generated as a result of this -- we had asked

11    for Mr. Williams that there are certain

12    issues, obviously with OPEB that are a concern

13    of the shareholders.

14              THE COURT:  Well, I haven't looked

15    at it for a while but does Mr. Resnick deal

16    with that issue?

17              MR. BAUMSTEIN:  Well, Mr. Resnick

18    touches somewhat on issues of what is the

19    appropriate timing to have made this motion.

20    It looks like he has some understanding of

21    what claims may come up there, based on some

22    of the very few documents that we got in

23    response to Your Honor's order at the chambers

24    conference.

25            THE COURT:  I don't see him

                                                        51

1            Delphi Corporation, et al.

2    all in these two declarations.

3            MR. BAUMSTEIN:  I don't think he

4    discusses the indemnity obligations.  I think

5    he discusses issues such as the timing of the

6    motion and the necessity for moving now which

7    is one of the issues that we'd identified.

8            THE COURT:  All right.  Again, my

9    ruling stands.

10           MR. BAUMSTEIN:  Okay.  And just in

11   terms of case administration for the record,

12   obviously I had raised this objection with

13   respect to each declaration.  Do you want me -

14   - should it be re-raised with each one or --

15           THE COURT:  Yes.

16           MR. BAUMSTEIN:  Okay.  Thank you,

17   Your Honor.

18           MR. BUTLER:  Your Honor, now

19   proceeding with the debtor's case-in-chief, I

20   would call for cross-examination, David L.

21   Resnick to the stand and with the admission of

22   his declarations, Exhibits 18 and 19, subject

23   to cross-examination.

24          THE COURT:  Okay.  All right.

25   You've already agreed with the union that

52

1          MR. KENNEDY:  Yes.

2          THE COURT:  Haven't you agreed to

3   the admissibility of all the documents in the

4   binders?

5          UNIDENTIFIED SPEAKER:  No, Your

6   Honor.

7          MR. KENNEDY:  Not all the documents.

8   The declarations are all --

9          THE COURT:  I'm sorry, the

10   declarations, excuse me.

11          MR. KENNEDY:  Yes.  The declarations

12   are acknowledged to be --

13   (The Declaration of witness Mr. Resnick was

14   hereby admitted as Exhibit 19 for

15   identification, as of this date.)

16   (The Declaration of witness Mr. Resnick was

17   hereby admitted as Exhibit 18 for

18   identification, as of this date.)

19          THE COURT:  So those two

20   declarations, Exhibits 18 and 19 will be

21   admitted.

22          THE COURT:  Right.

23          MR. BUTLER:  And the order of cross-

24   examination, Your Honor will be, the IUE is

25    the initial cross-examination party and the

                                                            53

1    UAW, the steel workers, then the IBEW and then

2    the operating engineer.

3              (Witness duly sworn.)

4              THE COURT:  Could you just spell out

5    your name for the record?

6              THE WITNESS:  Yes, Your Honor.

7    David L. Resnick, R-E-S-N-I-C-K.

8    CROSS EXAMINATION BY

9    MR. KENNEDY:

10       Q.   Mr. Resnick, when was Rothschild

11   retained as an advisor by Delphi?

12       A.   Rothschild was retained on May 1st

13   of 2005.

14       Q.   And you began working on the Delphi

15   account at that point?

16       A.   Yes.

17       Q.   Isn't it a fact that at the time

18   Rothschild became an advisor for Delphi,

19   Delphi had already developed a financial

20   projection called a "base case"?

21       A.   Yes.

22       Q.   And Delphi had created that base

23   case financial projection before Rothschild

24   became involved with Delphi, correct?

25          A.    Delphi created that in the context

                                                                54

1    of its bank financing.  It was --

2           Q.    I asked you if they had created it

3    before Rothschild became involved with Delphi.

4           A.    Yes.

5           Q.    How many years did that base case

6    financial projection go out from the year

7    2005?

8           A.    I believe it went out several years.

9           Q.    Did it go out to 2010?

10          A.    I don't recall.

11          Q.    When you say several years, did it

12   go out to at least 2008?

13          A.    That would be my recollection.

14          Q.    And I take it that when Rothschild

15   became engaged in May of 2005, you advised

16   Delphi to develop a downside case for

17   financial projections.  Is that correct?

18          A.    I don't think we described it,

19   necessarily as a downside case, although that

20   was ultimately how the case became referred to

21   internally.  What we advised Delphi was in the

22   context of the analysis that we were going to

23   be doing with them, given Delphi's performance

24   versus the base case, it would be appropriate

25   to take another look at the base case and

55

1    develop an alternative case, a more

2    conservative case, which the company referred

3    to internally as a downside case.

4        Q.    Did you read your initial

5    declaration in this case before it was

6    submitted to court, the declaration dated

7    April 25th?

8        A.    Yes.

9        Q.    Isn't it a fact that in paragraph 21

10   it states, "Rothschild advised Delphi,

11   following its review of these projections,

12   that the company should develop a quote

13   downside case"?

14       A.    Yes.  That's what it says.

15       Q.    Okay.  I assume that's true.  That's

16   why you signed it, correct?

17       A.    That's correct.

18       Q.    And isn't it a fact that the

19   downside case scenario that you recommended is

20   what has now become known as the steady state

21   scenario?

22       A.    No.  That's not correct.

23       Q.    Did the downside case scenario that

24   you projected; did it identify a particular

25   amount of financial loss that Delphi would

1    experience through the year 2010?

2         A.   Well, first the company developed

3    the downside case, not Rothschild.  And

4    secondly the -- what became known as the

5    downside case was a current reflection of the

6    company's performance used for the analyses we

7    performed in looking at the various

8    alternatives for the company.  And that was

9    the basis for the development of what became

10   known as the steady state case in the fourth

11   quarter of 2005.

12        Q.   All right.  So I'm trying to get the

13   sequence in order.  When Rothschild came on to

14   the scene at Delphi, there was a financial

15   projection called the base case, correct?

16        A.   Correct.

17        Q.   And you -- Delphi suggested that a

18   downside case be developed and -- excuse me,

19   Rothschild suggested a downside case be

20   developed and Delphi went ahead and did that,

21   correct?

22        A.   Correct.

23        Q.   And the next -- using that downside

24   scenario, they created the steady state

25   projection.  Isn't that also correct?

57

1          A.    Well, I think there's some

2     intervening events from the development of the

3     downside case to the steady state case, the

4     most important of which was that the company

5     filed for Chapter 11 protection in October and

6     as a basis of that filing the company decided,

7     as most companies do when they file for

8     Chapter 11, to review their business plan and

9     come up with a business plan -- to come up

10    with a set of projections for five years that

11    reflected current performance from the time of

12    filing.  And that became known as the steady

13    state case.

14          Q.    When you first started advising

15    Delphi in May of 2005, isn't it a fact that

16    Delphi was internally discussing filing a

17    bankruptcy proceeding at that point?

18          A.    No.

19          Q.    No.  How did the base case scenario

20    differ from a downside case?

21          A.    The difference between the base case

22    and the downside case was that the downside

23    case reflected current performance.  The base

24    case had been developed at the beginning of

25    '05, early '05 and the downside case was

58

```
1    developed roughly the middle of '05.  The

2    company had suffered deterioration in its

3    earnings from GM's significantly declining

4    volume and from increased material costs and

5    those two critical items were reflected in the

6    revision that became known as the downside

7    case.

8         Q.   And is it your understanding that

9    reliance on such downside cases is typical in

10   restructuring cases, such as we have here with

11   Delphi?

12        A.   What we told the company when we

13   began work was that if you're analyzing

14   alternatives for their business, to reflect

15   the challenges the company faced, particularly

16   deterioration in GM's volumes, increased

17   material costs and the challenges the company

18   faced, based on its wage and legacy

19   obligations and was going to think about

20   transforming alternatives for its business, it

21   should come up with a set of projections that

22   were conservative and prudent because the

23   business would be undergoing significant

24   change.  And that is typical for a company

25   going through some form of restructure.
```

59

1          Q.    So it's your understanding that the

2    base case projections that they had made were

3    neither conservative nor prudent?   Is that

4    your understanding?

5          A.    We were not involved in the base

6    case projections.

7          Q.    You did review them though, correct?

8          A.    We did review them when we were

9    retained.

10         Q.    And you reviewed the assumptions

11   that underlie that base case projection.

12         A.    Generally.

13         Q.    And your advice to Delphi was to

14   make those assumptions more conservative?

15         A.    No.   Our advice was we noted the

16   difference in actual performance of the

17   company from the base case and we suggested if

18   we were being asked to work with them on

19   strategic alternatives for its business, they

20   should reflect the deterioration in its

21   business in another case that was more

22   realistic with the current operating

23   environment that they faced.   And that was the

24   genesis of the downside case.

25         Q.    When was the steady state analysis

1    published or discussed publicly by Delphi?

2        A.    Work on the steady state analy --

3    the steady state case began in the fourth

4    quarter of 2005.

5        Q.    And when was it finished?

6        A.    Roughly January of '06.

7        Q.    Is it fair to say that it was rolled

8    out to the --

9        A.    Oh, I'm sorry.  It was presented in

10   January '06, but internally, it was finished

11   in probably the winter of '05.

12       Q.    Do you know when it was presented to

13   the Delphi board of directors?

14       A.    I believe in the November/December

15   timeframe.

16       Q.    And the first quarter against which

17   we can measure the accuracy of the steady

18   state scenario was the first quarter of 2006,

19   correct?

20       A.    Correct.

21       Q.    And as has been mentioned, in the

22   first quarter in which that steady state

23   scenario has been put to the test of actual

24   performance, Delphi is running more than half

25   a billion dollars ahead of that steady state

1    scenario, correct?

2        A.    Operating income is a half a

3    billion.

4        Q.    Operating income, yeah.

5        A.    Yes.  Not cash.

6        Q.    Okay.  Do you know if the operating

7    income in the base case scenario, if applied

8    to the first quarter of 2006 would have been

9    accurate, under-performed or over-performed?

10       A.    I don't know.

11       Q.    Well I take it that when your firm

12    began working with Delphi you generated four

13    different strategic alternatives the company

14    considered.  Is that correct?

15       A.    Yeah.  That's correct.

16       Q.    And I assume, since you were

17    presenting all four you regarded each of the

18    four as a feasible alternative for the company

19    to consider to cure its long-term and current

20    financial difficulty?

21       A.    A possible alternative, yes.

22       Q.    And those scenarios were listed, A,

23    B, C, and D, is that correct?

24       A.    Correct.

25       Q.    And isn't it a fact that under the

62

```
 1    scenario D that your firm developed, Delphi

 2    would have attempted to work, over the long

 3    term, within its existing framework and seek a

 4    gradual transitions with its key unions to a

 5    restructured state?

 6         A.    Scenario D was essentially what we

 7    would call a business as usual case so the

 8    company would continue to operate as it

 9    currently exists within the framework of the

10    current Collective Bargaining Agreement which

11    expires in September/October of '07 and any

12    changes would be made at that time, as

13    business-as-usual.

14         Q.    All right.  And did scenario D

15    contemplate that the -- Delphi would go to its

16    existing unions before the expiration of the

17    current collective bargaining agreements and

18    seek early negotiations?

19         A.    I believe if assumed that there

20    could be discussions prior to the expiration

21    of the agreement.

22         Q.    Did scenario D contemplate an 1113

23    motion?

24         A.    No.

25         Q.    Was scenario D ever presented, or
```

1    that approach taken with respect to the IUE-

2    CWA, my client, on how to solve Delphi's

3    problems?

4        A.    I believe the four alternatives may

5    have been presented but I --

6        Q.    You don't know, in other words.

7        A.    No, I don't know.

8        Q.    Okay.  What was the time frame over

9    which scenario D would have Delphi working out

10    its financial problems within the context of

11    the existing collective bargaining agreements?

12        A.    Through and including the period

13    during which the current collective bargaining

14    agreements had to be renegotiated.  So through

15    the fall of 2007.

16        Q.    All right.  Thank you.

17    CROSS-EXAMINATION BY

18    MR. SIMON:

19        Q.    Did Delphi use its base case as the

20    source for discussions to refinance its debts?

21        A.    I believe it did.  We were not

22    involved in the debt refinancing.

23        Q.    And did it produce a debt

24    refinancing?

25        A.    The company --

1        Q.    Those discussions?

2        A.   The company did refinance its debt

3   in June of 2005.

4        Q.   And that was after you had been

5   retained?

6        A.   Correct.

7        Q.   And what was the nature of the debt

8   refinancing?

9        A.   The company had some upcoming

10  maturities and covenant issues in its existing

11  bank agreement, it is my recollection, and

12  negotiated with its lenders, JP Morgan and

13  Citibank, a refinancing of the existing debt,

14  which required significantly the company

15  moving from unsecured financing to secured

16  financing.

17       Q.   And what was the amount of that

18  refinancing?

19       A.   I believe it was approximately two

20  billion dollars.

21       Q.   And was that the refinancing in

22  place until the debtor-in-possession financing

23  exercise?

24       A.   Yes.

25       Q.   And the company was also able to

                                                    65

1   achieve debtor-in-possession financing, was it

```
 2   not?

 3        A.   Correct.

 4        Q.   And is it also correct that it has

 5   not drawn upon that debtor-in-possession

 6   finance capacity?

 7        A.   It's drawn on a portion, a term

 8   piece of the --

 9        Q.   How much has it drawn now?

10        A.   I believe 250 million dollars.

11        Q.   And what is the total facility?

12        A.   Approximately two billion dollars.

13        Q.   Did your review of the base case

14   produce a conclusion that it had been

15   developed on a plant-by-plant, product-by-

16   product basis?

17        A.   My recollection is that when we

18   looked at the base case, it was not done on a

19   plant-by-plant, product-by-product basis.

20        Q.   Do you know whether the lenders in

21   the refinancing exercise, based upon the base

22   case, performed a due diligence with regard to

23   those projections?

24        A.   I don't know.

25        Q.   What did your review of the base
```

66

```
 1   case consist of?

 2        A.   When a client retains us, what we
```

3    ask for is all copies of financial projections

4    that they're currently working with so we can

5    understand how management is looking at its

6    business in the future and the base case was

7    the most current version of the company's

8    projections.  And we talked with the company

9    about that case, looked at how the company was

10    performing against that case and that's how we

11    began our work in May.

12        Q.    And did you perform what you would

13    consider to be an in-depth review of the base

14    case?

15        A.    I would not call it an in-depth

16    review because, as I mentioned earlier, we

17    looked at the performance of the company

18    versus the base case.  It was below what was

19    projected and that led to discussions with the

20    company, that for the purposes for which we

21    were retained, which was to look at an array

22    of strategic options for its business, it

23    would be helpful to develop a set of

24    projections that reflected current

25    performance, particularly taking into account

67

1    a transformation which were the strategic

2    alternatives we were looking at.  So our

3      attention focused on working with the Delphi

4      financial team on developing this alternative

5      set of projections for us to use for our

6      analysis, which we refer to as the downside

7      case.

8          Q.   Did you conclude, on the basis of

9      your review, that the base case was

10     unattainable?

11         A.   We concluded that current

12     performance was below that of the base case.

13         Q.   And did you conclude that it was

14     unattainable?

15         A.   We concluded that performance was

16     not in line with the base case and for the

17     purposes of our work we should work with the

18     company -- the company should work on another

19     set of projections.

20         Q.   The base case included more than a

21     projection of the first quarter or the first

22     two quarters of '05.  It produced a set of

23     projections going out, you believe, to 2008.

24     My question to you is --

25              THE COURT:  Excuse me.  Could you  -

68

1      - just stop whispering to each other.  Okay.

2      Sorry.

3      BY MR. SIMON:

4        Q.    My question to you is whether or not

5    you concluded that the base case which went

6    out to, you believe 2008, was unattainable?

7        A.    We concluded that the company should

8    develop another set of projections that

9    reflected current performance.

10        Q.    Surely you're capable of --

11            THE COURT:  Could I ask you -- did

12    you consider whether it was attainable?

13            THE WITNESS:  We did consider

14    whether it was attainable and we felt that the

15    base case was too aggressive for the purposes

16    for which we needed for our analysis.

17    BY MR. SIMON:

18        Q.    Please.  The Judge tried.  I tried.

19    Surely you're capable of answering --

20            THE COURT:  We know you felt it was

21    aggressive.  Was it attainable?

22            THE WITNESS:  It did not appear

23    attainable.

24            MR. SIMON:  Thank you, Judge.

25    BY MR. SIMON:

69

1        Q.    As an investment banker, you

2    maintain an ongoing relationship with major

3    lenders such as Delphi's lenders, do you not?

4        A.    Yes.  We work with them.

5        Q.    And you consider Rothschild's

6    credibility with those lenders to be a matter

7    of some significance to Rothschild as an

8    institution, do you not?

9        A.    Yes.

10       Q.    Did you inform Delphi's lenders upon

11   reaching the conclusion that the base case

12   projections were unattainable, of that fact?

13       A.    These lenders were not making a cash

14   flow loan.  They were making a secured loan

15   and the value that they were focused on was

16   the underlying collateral for their loan.

17   They look at projections in the ordinary

18   course, to get a sense of how the company is

19   projecting, but the basis of the loan they

20   were making was secured.  It was based on the

21   value of the assets, not the objective cash

22   flow.  So that's why they were moving from

23   unsecured to secured, because of the turmoil

24   that Delphi was undergoing and the changes

25   that were occurring in the automotive industry

                                              70

1    at the time.

2        Q.    Thank you for that observation.  I

3    move that the response be stricken and ask

4    that the witness be directed to answer the

```
 5    question as whether he had informed the

 6    lending banks that Rothschild had concluded

 7    the projections were unattainable.

 8              THE COURT:  Well, I'll deny the

 9    first part of the motion, but you should

10    answer that question.

11              THE WITNESS:  No, we did not.

12    BY MR. SIMON:

13         Q.   Now, during the fall of '05, you

14    prepared the '06 to 2010 business plan,

15    correct?

16         A.   No, we did not.

17         Q.   When did that occur?

18         A.   We did not prepare a business plan.

19         Q.   The company prepared the plan,

20    correct?

21         A.   Correct.

22         Q.   And you reviewed the plan.

23         A.   That's correct.

24         Q.   And did you agree that the plan was

25    an appropriate basis for the company to go
```

                                                    71

```
 1    forward?

 2         A.   And can you just tell me which

 3    specific plan you're referring to?

 4         Q.   Pardon?
```

5        A.    Which plan -- I lost the beginning

6   of the question.   Which plan are you referring

7   to?

8        Q.    Tell me what plan was developed by

9   Delphi and reviewed by Rothschild in the fall

10  of '05.

11       A.    The fall of '05, post filing for

12  Chapter 11 was what we referred to as the

13  steady state plan.

14       Q.    Now, in developing the steady state

15  scenario, did Delphi conduct an in-depth

16  evaluation of each of its business on a plant-

17  by-plant basis?

18       A.    I don't believe so.

19       Q.    What was the nature of the plan that

20  was developed if it was not done on a plant-

21  by-plant basis?

22       A.    Delphi develops its business plans

23  on a business unit or a product basis so the

24  financial team that's responsible for the

25  filing of rejections went back to the

72

1   operating management of each of the businesses

2   and asked them to develop a set of projections

3   for their businesses, which they would

4   typically do, on a business-by-business basis.

5   And then the financial team compiled that on a

6    consolidated basis.

7         Q.   And did Delphi conclude, and did you

8    agree that General Motors' loss of market

9    share reduced General Motor revenue, pressure

10   for price-downs, higher material costs and the

11   like will continue for the foreseeable future?

12        A.   That's a complicated question.

13   Maybe, can you repeat that again?

14        Q.   It was a complicated restatement of

15   your complicated paragraph 29 of your

16   declaration.

17        A.   Okay.

18             THE COURT:  Well, for my benefit, if

19   you could repeat it, because there were a

20   number of elements to it.

21             MR. SIMON:  Okay.

22   BY MR. SIMON:

23        Q.   Did Delphi conclude that the

24   economic trends leading to Delphi's current

25   crisis, described as first, General Motor's

73

1    loss of market share.  Did you conclude that

2    was likely to continue for the foreseeable

3    future?

4         A.   Yes, we did.

5         Q.   Reduce General Motor's revenues,

6    same question.

7         A.   Yes.

8         Q.   Pressure for price-downs, perhaps

9    you should explain what a price-down is,

10   unless the Court has already gathered that

11   from the material before.

12             THE COURT:  Go ahead.

13             MR. SIMON:  Would you like a

14   description?

15   BY MR. SIMON:

16        Q.   Would you describe what a price-down

17   is, please?

18        A.   Yes, a price-down is a requirement

19   of a customer to have the automotive part

20   supplier reduce prices on a product on an

21   ongoing basis over the length of the contract.

22   And we did conclude that those pressures, from

23   the OEM customers for price-downs would

24   continue during that period.

25        Q.   And higher material costs as well?

                                                    74

1         A.   Correct.

2         Q.   Material costs are a very

3    significant aspect of the costs to Delphi of

4    doing business, is it not?

5         A.   They are a significant cost, yes.

6         Q.   And under the steady state scenario

```
 7    which Delphi prepared and you reviewed, Delphi

 8    projected an operating loss of 8 billion

 9    dollars and a net loss of 13 -- 12.9 billion

10    dollars over the 5 years from '06 to 2010?

11        A.   Yes.

12        Q.   And when did Delphi make that

13    projection?

14        A.   As I mentioned earlier, those

15    projections were begun after the company filed

16    for Chapter 11, the fall of '05,

17    October/November period.

18        Q.   And when were they concl -- when did

19    Delphi conclude its process?

20        A.   My recollection, as I said earlier,

21    was some time November or early December when

22    they were presented to the Delphi board.

23        Q.   And when did Rothschild perform its

24    review and analysis?

25        A.   Contemporaneous with the time that
```

                                                           75

```
 1    Delphi was preparing the steady state

 2    projections.

 3        Q.   Now, in much the same way as in '05

 4    when you were retained, you looked at the base

 5    case and at actual performance to see how

 6    actual performance was measuring up against
```

7    base case projections and concluded that it

8    was not, that actual performance was below the

9    base case projection, correct?

10        A.    I'm sorry.  You're talking about

11    what time frame?

12        Q.    Now I'm in '05 and now I'm going to

13    take you forward to '06.  But I just want to

14    establish the base -- that's what you said you

15    did with respect to the '05 base case

16    differentiation from actual results, correct?

17        A.    When we were retained in May?

18        Q.    Yes.

19        A.    Correct.

20        Q.    Okay.  Have you made a similar

21    analysis of actual performance under the

22    steady state scenario with actual -- I'm sorry

23    projected performance under the steady state

24    scenario developed in November and December of

25    '05 and actual performance in the first

76

1    quarter of '06?

2        A.    Yes, we've reviewed Delphi's

3    assessment of actual performance in the first

4    quarter, versus the steady state plan.

5        Q.    And unlike the conclusion you drew

6    in '05, where actual performance was

7    significantly below projections, in the first

8    quarter of '05 actual -- I'm sorry of '06,

9    actual performance was significantly better

10   than the steady state projection, correct?

11        A.   The first quarter of '06 was --

12   actual performance was better than the steady

13   state projection, yes.

14        Q.   And one of the key elements of that

15   was that the material cost projection for the

16   first quarter of '06, made in the winter of

17   '05, was off by a significant amount, correct?

18        A.   Made in the fall of '05, presented

19   in the winter of '05 to the board was off,

20   correct.

21        Q.   Well, when you distinguish between

22   its development in the fall and its

23   presentation to the board in November, you're

24   not suggesting that before it's presented to

25   the board it's not looked at again, are you?


                                                    77


1         A.   No.  I just wanted to be accurate

2    that it was developed at one time and then it

3    took some time to actually present it.  It

4    didn't change but my point was those decisions

5    -- it was set, probably some time late

6    October, early November and then it was

7    subsequently presented.  But it didn't change

8    in the end.

9        Q.    In order of magnitude, the

10    difference in material cost for the first

11    quarter of '06 between that which was

12    developed in the fall and presented in

13    November of '05 and the actual first quarter

14    of '06 was what?  50, 100 million dollars?

15        A.    I could look.  There's -- one of the

16    exhibits goes through my --

17        Q.    Does that strike you as being as in

18    the range --

19        A.    My recollection was it was 90 some

20    million dollars.

21        Q.    90 some million dollars, thank you.

22    Now, there came a point when Delphi determined

23    and Rothschild agreed that steady state was

24    not a sustainable model and it was necessary

25    for Delphi to develop a different

                                                            78

1    restructuring plan, correct?

2        A.    Correct.

3        Q.    And when did that occur?

4        A.    That occurred around the time the

5    steady state model was projected to the Board

6    of Directors.  It was clear, if you look at

7    the steady state projections, that that is not

8    a -- does not produce a viable business and it

9    supported the point that Delphi had to

10   transform its business in a meaningful way to

11   be profitable and it was -- the purpose of the

12   steady state was a building block for the

13   company to develop its transformation plan

14   that was announced in March.  It took current

15   performance and projected that out several

16   years and a conclusion was the losses were

17   significant and dramatic and that the company

18   would have to make major changes in its labor

19   and benefits structure, in its overhead, in

20   pricing with its customers, to transform its

21   business.  And at the time that the steady

22   state was presented, the company had begun

23   working on those changes and that led to the

24   other two projections that have been

25   discussed, what we refer to as the competitive

                                                    79

1    benchmark and the GM consensual fund.

2        Q.   And those were presented to the

3    unions in the end of March, correct?

4        A.   They were formally presented to the

5    unions at the end of March, though elements of

6    each of those plans was discussed informally

7    with them sometime after January.

8        Q.   Now, on November 28th of '05, Delphi

```
 9    announced General Motors's agreement to

10    provide interim financial support to Delphi,

11    correct?

12        A.   Correct.

13        Q.   And Delphi began preliminary

14    discussions with GM and Rothschild to explore

15    potential financial participation in Delphi

16    restructuring, correct?

17        A.   That's correct.

18        Q.   And you, thereafter, conditionally

19    withdrew the competitive benchmark proposals

20    that had been presented to the unions,

21    correct?

22        A.   Correct.

23        Q.   And those -- that withdrawal was on

24    December 19th of '05, correct?

25        A.   I believe that was the date, yes.
```

                                                    80

```
 1        Q.   And between the withdrawal of those

 2    proposals and March 24th of '06, there were no

 3    proposals on the table from Delphi to the

 4    unions, correct?

 5        A.   No.  I disagree with that.  I think

 6    from the time GM -- we began our discussions

 7    with GM, we had discussed alternative

 8    proposals and those were shared in discussions

 9    Mr. But -- Kevin Butler had with the unions
```

10    and they had various names to them, the zip

11    code plan, the step-down plan, that we were

12    trying to use our engagement with GM to help

13    develop alternatives for other proposals that

14    could result in a better result of a

15    reorganization on soft landings that were

16    better than the competitive benchmark proposal

17    that we had put on the table in November and

18    subsequently decided to withdraw.

19         Q.    Are you suggesting that there were

20    actual proposals made by Delphi to the unions

21    during the interim between the withdrawal on

22    December 19th,'05 and the submission of

23    proposals on March 24th?

24         A.    I'm using the word proposal, not in

25    a formal proposal but in discussions of other

                                                                    81

1    ideas that would involve GM support from the

2    time that the competitive benchmark was

3    withdrawn.

4         Q.    I think you'll find that all parties

5    will have tried gingerly to stay away from

6    informal discussions and this is a statute

7    that deals with proposals.  So you'll forgive

8    me if I ask you the question in a legal sense.

9    And that is whether between the withdrawal of

10      the proposals on December 19th, '05 and the

11      submission of formal proposals on March 24th

12      of '06, there were any proposals made by

13      Delphi to the unions.

14          A.   The way you phrase the question, I

15      believe that's correct.

16          Q.   Thank you.  Now, is it a fact that

17      Delphi's withdrawal of its proposals on

18      December 19th was Delphi's effort to

19      facilitate discussions between General Motors

20      and the UAW for a consensual agreement that

21      would include GM financial support?

22          A.   Yes.

23          Q.   And those discussions, which did in

24      fact take place, produced the attrition

25      program announced on March 22 of '06, correct?

                                                         82

1           A.   The attrition plan was one element

2       that resulted from those discussions, yes.

3           Q.   Delphi does intend to market its

4       non-continuing businesses, does it not?

5           A.   Some of the non-continuing

6       businesses, it does plan to try to sell.

7           Q.   What does it intend to do with those

8       it doesn't intend to try to sell?

9           A.   They're -- of the businesses that

10      are considered non-core in the transformation

11    announcement, there are some Delphi said that

12    it will try to sell, it believes they're

13    saleable.  There are some it believes are not

14    saleable and it will wind those businesses

15    down.

16        Q.   But the ability to sell those

17    businesses that it intends to sell and the

18    ultimate amount of the proceeds it receives

19    from those sales, will be greatly affected by

20    the future labor cost structure achieved

21    either by agreement or through this court's

22    process, correct?

23        A.   Correct.  As well as the pricing it

24    will receive --

25        Q.   I was going to -- that was going to

                                                                83

1    be my next question.

2        A.   All right.  Okay.

3        Q.   That is, the labor cost resulting

4    either from negotiations or this court order,

5    will affect in a dramatic way, what the

6    proceeds from a sale of the non-core

7    businesses will be, correct?

8        A.   Correct.

9        Q.   And another significant element of

10    the value of those businesses and the proceeds

11    to be received from its sale will be the

12    viability of executory contracts with General

13    Motors and the pricing mechanism under those

14    contracts, correct?

15         A.   Yes.  But principally the pricing

16    because General Motors is generally the

17    largest or the only customer for many of the

18    non-core businesses.

19         Q.   Now, has Delphi or Rothschild

20    prepared any projection of the range of

21    proceeds that might be received from such

22    sales, projections, worst-case, best-case,

23    likely-case of what the sale proceeds of the

24    non-core facilities would be?

25         A.   No, it has not.

                                                                84

1         Q.   Can you give us order of magnitude

2    range?  Are we talking about tens of millions

3    of dollars, hundreds of millions of dollars?

4         A.   The approach that we've taken is

5    because the two key variables, in terms of

6    what the labor structure would be and the GM

7    pricing would be, would be a significant

8    component of the sale proceeds so we've gone

9    forth on the businesses that we're planning to

10    sell and putting together a set of

11    projections.  They have not been completed

12    yet, but the thought processes we explained to

13    the creditors' committee meeting, on the basis

14    of the company's current labor proposals,

15    competitive benchmark and GM consensual, in

16    developing a sense of what GM pricing would be

17    to the extent the company was able to achieve

18    either of those two alternatives.  That would

19    produce a set of cash flows and then that

20    would allow us to come up with some

21    preliminary views on value but we haven't

22    completed that yet.

23        Q.   Again, without probing it too

24    deeply, but just to get a sense of an order of

25    magnitude, so assuming Delphi achieves, one

85

1    way or another, the labor costs it's pursuing.

2    And assume it receives, one way or another,

3    from General Motors, the business relationship

4    it's pursuing, what do you anticipate, order

5    of magnitude, the range of the proceeds from

6    those sales would be.

7        A.   I'm sorry.  We just -- we did not

8    look --

9        Q.   Again, not even in the sense of tens

10    of millions as opposed to hundreds of millions

11    of dollars?

```
12        A.   The businesses that we're looking at

13   vary in size.   There -- the steering

14   businesses, one of those non-core businesses.

15   That's a much larger -- I'm sorry.

16        Q.   The steering business?

17        A.   The steering business.   It's roughly

18   --

19        Q.   Almost like hearing businesses.

20        A.   -- roughly two billion in sales, a

21   little bit more.   There are some that are

22   smaller, instrument panels and cockpits which

23   are 400 some million in sales.   And then there

24   are some that we're not involved in because

25   they're very small, the company's handling
```

```
1   internally, like brake hoses and a business

2   called Mobilary.   So --

3        Q.   Well, let's take steering.   Let's

4   just take -- is steering the largest of the

5   non-core businesses?

6        A.   Steering --

7        Q.   So you've got a two billion dollar

8   volume business, we've got in place the wage

9   rates that Delphi seeks.   You've got the GM

10  commercial arrangements that GM seeks.   What's

11  the multiple you'd apply to that volume

12  figure?
```

13          A.    The problem that we have right now,

14    and I'd like to try to give you an answer on

15    this, is that those businesses are losing

16    money today because of the current wage and

17    benefits structure and the GM pricing

18    structure that currently exists.  That's why

19    we moved to reject many of the contracts with

20    GM.  So, until we can do that pro forma

21    analysis and produce a positive EBIDA that we

22    can use to value, it's hard to apply a

23    multiple to it.  My point is that it's a large

24    business.  There will be, we expect, some

25    value for that business, but right now it's a

                                                        87

1    negative EBIDA business.

2          Q.    Well, but it's a negative EBIDA

3    business.  That presumably is why you are

4    seeking to shed it, but you're also seeking to

5    shed it in the context of achieving major

6    changes in the cost structure of that post-

7    sale business.  We could obviously make it a

8    more attractive business proposition from your

9    analysis then it is today, correct?

10          A.    Yes.  But one other point -- that

11    Delphi's also seeking to shed it because it's

12    non-core to the product line it would like to

13    focus -- Delphi would like to focus on, going

14    forward.

15         Q.    But none of your projections to date

16    then, take into account any level of proceeds

17    from the sales of these non-core businesses?

18         A.    Correct.  We say any proceeds would

19    be used to reduce the cost of transformation.

20         Q.    Now you'll accept, I take it,

21    Delphi's conclusion that it needs to find a

22    pension solution, even if it achieves its

23    competitive proposal?

24         A.    Yes.

25         Q.    And I take it you would agree with

88

1    Mr. Sheehan's conclusion that Delphi would not

2    have the cash to make the required pension

3    contributions in '07 and '08 and in its

4    cumulative obligations from '07 to 2010, would

5    exhaust all Delphi's available cash?

6         A.    If it did not find a solution,

7    correct.

8         Q.    Assuming no change in existing law

9    and regulations, are you aware of any source

10    of funds for Delphi to meet its required

11    pension obligations from '07 to 2010?

12         A.    I believe we said that to address

13    the pension issue in the competitive benchmark

14    scenario, we would need to negotiate with the

15    PBGC, whether it's a waiver or some change

16    that would give us the flexibility to stretch

17    out those payments so we could be able to

18    service the pension obligations.

19         Q.    And my question was whether,

20    assuming no change in existing law and

21    regulations and assuming that Pension Benefit

22    Guaranty, Pension Benefit Corporation doesn't

23    give you what you're seeking, are you aware of

24    any other source of funds for Delphi to meet

25    its required pension obligations?

89

 1         A.    Delphi could consider, depending on

 2    the result achieved, finding an outside party

 3    to provide financing, to help them meet those

 4    obligations.

 5         Q.    Are you aware of any such source?

 6         A.    Not at this time.

 7         Q.    Is it not your opinion that there is

 8    no such source?

 9         A.    It depends on the ultimate

10    transformation achieved and how someone -- if

11    Delphi's able to develop cash flow in the

12    future, significant to repay a loan that

13    someone might make them so it could pay the

14    pension funding requirement when they emerge,

15    that could be a possibility.

16        Q.    Has Delphi pursued with the PBGC,

17    the waivers that it needs?

18        A.    Delphi has begun to have preliminary

19    discussions with the PBGC.

20        Q.    Has it received PBGC's approval?

21        A.    Not at this time.

22        Q.    Has Delphi or have you explored

23    alternate sources of financing under the

24    conditions you described in your penultimate

25    answer?

                                                          90


 1        A.    Other than identifying that as a

 2    possibility, we have not gone out and explored

 3    that.

 4        Q.    And is it not your professional

 5    belief that such funding sources do not exist?

 6    This is Rothschild I'm asking, not Delphi.

 7        A.    I think if Delphi is able to achieve

 8    the competitive benchmark transformation that

 9    we set forth, I think it would be possible

10    that there could be investors who would

11    consider looking at making some form of

12    investment to help Delphi make the pension

13    payments.

14        Q.    There might be someone who would

15    consider looking.  Is there anyone, in your

16    professional judgment that would lend money

17    for the proposition of making those pension

18    contributions?

19        A.    I think if Delphi is able to do what

20    it tries to achieve in a competitive benchmark

21    projection, which is to bring its costs, its

22    labor and benefit costs, its overhead SGNA

23    costs in line with the market, so it can be a

24    viable business going forward.  And the one

25    remaining piece of its reorganization plan is

                                                            91

1    how to fund the pension obligations that are

2    due upon emergence.

3        There may be an investor that would look

4    at Delphi's business plan now that it's a

5    competitive, viable business.  It has focused

6    on the core businesses going forward that it

7    believes can grow that might be willing to

8    work with them on helping them meet those

9    obligations.

10        Q.    What is the amount of those -- I'm

11    sorry.

12        A.    I don't think that's unrealistic.

13        Q.    What is the amount of those

14    obligations, the pension obligations?

15          A.   My recollection is roughly two

16     billion dollars around the time of emergence.

17     It's the under funded amounts that it has not

18     been paying since it filed for Chapter 11.

19          Q.   And you believe that there's someone

20     out there who's going to lend two billion

21     dollars to Delphi to pay its pension

22     obligations?

23          A.   Well, it may be --

24          Q.   You'll let us know as soon as you

25     find somebody?

                                                          92

1          A.   It may be an equity investment.  And

2     they may take equity.

3          Q.   Appaloosa.  Where's Appaloosa?  You

4     guys ready?  Mr. Resnick, I would hope that

5     your desire to maintain credibility with this

6     court is as strong as your desire to maintain

7     credibility with the JP Morgans and Chases of

8     the world.  And you may want to reconsider

9     your answer to that.

10          MR. BUTLER:  Objection, Your Honor.

11     Move to strike the comment.

12          MR. SIMON:  Withdrawn.

13          THE COURT:  You know he's a lawyer

14     too.  He's a lawyer too.

15          MR. SIMON:  I know.

16          THE COURT:  The point is I don't

17   think really works.  The point is I don't that

18   type of stuff really works.

19   BY MR. SIMON:

20       Q.   Has Delphi or Rothschild performed a

21   risk analysis of the possibility of a UAW

22   strike if the court grants the rejection

23   motion?

24       A.   Rothschild has not performed an

25   analysis.


                                                        93


1        Q.   Are you aware of whether or not

2    Delphi has?

3        A.   I know Delphi has had some

4    discussions internally about the risks of a

5    strike.

6        Q.   And have you discussed that

7    possibility with those in Delphi who've been

8    discussing that possibility?

9        A.   I've participated in meetings when

10   that subject has been discussed, yes.

11       Q.   And would you tell us what the

12   assessment is of the impact on Delphi if UAW

13   were to strike?

14       A.   The impact would be very significant

15   to Delphi.

16        Q.   Can you help us understand what the

17   phrase very significant means in that answer?

18        A.   Well, if the UAW would strike,

19   Delphi would not be able to supply parts to

20   its customers and Delphi would not be able to

21   get paid as it would so it would begin to lose

22   even more money than it's currently losing

23   operating under the existing wage and benefit

24   structure.

25        Q.   Would Delphi be able to reorganize

94

1   in the event of a strike?

2        A.   I think it would be very difficult.

3        Q.   Does Delphi have a plan to try to

4   operate the struck plans with scabs in the

5   event of a strike?

6        A.   I'm not aware if it does.

7        Q.   And did -- were you party to any

8   discussions in which that was discussed?

9             MR. BUTLER:  Objection.  Asked and

10   answered.  You asked him whether --

11             THE COURT:  Well, when you say

12   you're not aware --

13             THE WITNESS:  I was not part of any

14   discussions where that subject arose.

15             MR. SIMON:  No further questions.

16             THE COURT:  Okay.

17            UNIDENTIFIED SPEAKER:  My questions

18    have been answered, Your Honor.

19            THE COURT:  All right.  Anyone else?

20    Mr. Resnick, I think you said, when you were -

21    - and I don't mean to cut you off, Ma'am.  You

22    can go ahead after I ask this question -- but

23    that to the extent there are sale proceeds

24    from the non-core assets, they haven't been

25    taken into account in the projections upon

95

1    which the proposals are based, correct?

2            THE WITNESS:  Correct.  Because we

3    hadn't done the analysis that I was describing

4    to Mr. Simon.

5            THE COURT:  But then, I think I

6    heard you say that the intention would be that

7    they would be used, to the extent they're

8    generated, to reduce the cost of

9    transformation?

10            THE WITNESS:  Correct.  That's

11    right.

12            THE COURT:  Can you elaborate on

13    that?

14            THE WITNESS:  Yes, Your Honor.  That

15    of the non-core businesses, some of those

16    businesses could be sold but some Delphi

17    believes are not saleable because you just

18    can't produce those products in the United

19    States anymore on a cost-effective basis,

20    products, spark plugs or wheel bearings, GM is

21    the principal customer.

22            They have informed Delphi that they

23    can source those products, for significantly

24    less money, outside the United States.  So

25    since they're the principal customer, they

96

1    won't buy from Delphi, you can't sell the

2    business because there wouldn't be a contract

3    for it.  So we have to wind down the facility.

4    That's costly.  That takes some time.  So the

5    thinking in our plan was that any sale

6    proceeds would go to help pay for those wind-

7    down costs.

8            THE COURT:  Okay.  Thank you.

9    BY MS. ROBBINS:

10        Q.   Good afternoon, Mr. Resnick.

11    Marianne Robbins.  Is there any relationship

12    between scenario C in your declaration and the

13    consensual proposals that were submitted n

14    March?

15        A.   Not directly.  There -- it was

16    probably the genesis -- scenario C was the

17    genesis of the consensual proposals because

18    when we were retained one of our primary

19    objectives, at the direction of Delphi, was to

20    work with them to try to achieve some form of

21    out-of-court resolution of these issues and

22    scenario C was the basis of that.  And that

23    ultimately was evolved into some of the other

24    scenarios.

25         Q.    What does OPEB stand for?

                                                          97

1          A.    Other Post Employment Benefits.

2          Q.    And that would include health

3    insurance and life insurance?

4          A.    Yes, Ma'am.

5          Q.    And under scenario C, there would be

6    OPEB that would continue, is that right?

7    There'd be health and life -- retiree health

8    and life benefits that would continue but in a

9    modified form?

10         A.    In a modified form.

11         Q.    Do you recall what that was?

12         A.    I don't recall.

13         Q.    Do you have your declaration, your

14    initial declaration, Exhibit 18, in front of

15    you?

16         A.    Yes.

17         Q.    In paragraph 26, you mention

18    pursuing scenario C with unions.  Do you have

19    any direct knowledge of unions, other than the

20    UAW, that were involved in those discussions?

21        A.    I don't have any direct knowledge.

22        Q.    So you have no direct knowledge as

23    to the IBEW or IAM being involved in that?

24        A.    My recollection is that the Delphi

25    labor group may have shared scenario C with

                                                        98

1    some of the other unions but --

2        Q.    But you don't know about it?

3        A.    No, Ma'am.

4        Q.    And in paragraph 24, you also

5    reference GM in the unions and would it also

6    be true that in that respect you have no

7    direct knowledge of any involvement by the IAM

8    or the IBEW?

9        A.    That's correct.

10        Q.    And the same with respect to the

11    discussions you referred to in January of

12    2006.  You have no knowledge of any

13    involvement of the IAM or IBEW in those

14    discussions, is that right?

15        A.    That's correct.

16            MS. ROBBINS:  No further questions,

17    Your Honor.

18            MS. MEHLSACK:  Your Honor.

19    BY MS. MEHLSACK:

20        Q.   Good afternoon, Mr. Resnick.

21    Barbara Mehlsack, attorney for the Operating

22    Engineers.  I can make this quick.  If I asked

23    you the same questions that you were asked by

24    Ms. Robbins.  Do you have any knowledge of the

25    involvement of the Operating Engineers Locals

99

1    in the meetings that are listed in your

2    declarations?  I assume you would answer the

3    same way, that you have no such knowledge.

4        A.   Yes, that's correct.

5             MS. MEHLSACK:  No further questions,

6    Your Honor.

7             THE COURT:  Okay.  Any redirect?

8    Okay.

9    REDIRECT EXAMINATION BY

10    MR. BUTLER:

11        Q.   Mr. Resnick, Mr. Simon asked you

12    about the pre-petition financing that was

13    completed in the base case projections.  Do

14    you recall those questions?

15        A.   Yeah.

16        Q.   Do you recall, Mr. Resnick, when

17    that loan was closed?

18        A.   My recollection was June of '05.  It

19    was shortly after Rothschild was retained.

20        Q.   Do you have a recollection of

21    whether the downside case that you testified

22    to was completed before or after the financing

23    was completed?

24        A.   After.

25             UNIDENTIFIED SPEAKER:   Before or

100

1    after?

2    BY MR. BUTLER

3        Q.   Before or after the financing was

4    completed?

5        A.   After.

6        Q.   And did you participate, in any way,

7    in connection with the closing of that

8    financing?

9        A.   No, I did not.

10        Q.   In your own words, Mr. Resnick,

11    would you please tell the Court why you

12    recommended that the downside case be

13    developed in June of 2005?

14        A.   Yes.  When Delphi retained us, the

15    first task they asked us to focus on was to

16    work with them in developing several strategic

17    alternatives for its business.  When Delphi

18    retained Rothschild, management had begun to

19    focus and indeed had focused on looking at its

20    business to understand how it was going to

21    address the continued deterioration in its

22    operating profitability resulting from the

23    significant loss of GM market share that was

24    its largest customer.  Although GM -- although

25    Delphi had successfully replaced GM business

101

1    with other customers, GM was still roughly 50

2    percent of its business, declining content in

3    GM vehicles, so Delphi's profitability was

4    suffering because of GM market share losses.

5        Delphi was also under pressure from its

6    existing wage and benefit agreements with it

7    unions which had its wage and benefit costs

8    significantly higher, dramatically higher than

9    other automotive part suppliers, which it had

10    to compete with every day in the market for

11    new business.  And at the same time, it was

12    experiencing dramatic increases in material

13    prices.

14        So Rothschild was asked to work with

15    Delphi to look at a spectrum of alternatives

16    of how Delphi could address that problem

17    before it found itself in a position of being

18    forced to file to for Chapter 11 or running

19    out of cash, to do this in a thoughtful way

20    without its back against the wall.

21        We looked at the base case projections

22    and our view was because the company was not

23    performing in line with the base case and in

24    deference to Mr. Simon, because those

25    projections were probably not attainable, that

                                                    102

1    it would be prudent for the company to develop

2    another set of projections for us to use for

3    our analysis.  And we worked with the

4    financial staff to develop what became known

5    as the downside case and that's what we used

6    when we came up with scenarios A,B,C and D.

7        Q.    Speaking of scenarios A,B,C, and D,

8    did Rothschild ever make a recommendation to

9    the Board of Directors of Delphi about which

10    scenario the board might consider pursuing?

11        A.    Yes.

12        Q.    What scenario did you recommend?

13        A.    We recommended scenario C.

14        Q.    In your own words, can you please

15    tell the Court why you recommended scenario C?

16        A.    Yes.  Because we believed that

17    Delphi could work with its two major

18    stakeholders, GM and the unions, principally

19    the UAW but the IUE and the other unions, on a

20    plan that on an out-of-court basis could

21    address the three major challenges that Delphi

22    faced, that I just mentioned.  And that it

23    would be better for the company, and we felt

24    for all the stakeholders, to do that outside

25    of a Chapter 11 proceeding and avoid having to


103


1    use the process that we're going through

2    today, the 1113 process, which is a very

3    difficult process on many fronts.

4         So our view was that we should develop a

5    proposal, which was scenario C, present that

6    to both GM and the UAW, which was done in the,

7    I believe, June/July timeframe, and worked

8    very hard by trying to develop an out-of-court

9    solution.

10        Q.   Can you briefly describe to the

11   Court the other three scenarios and why you

12   did not recommend those?

13        A.   Yes.  Scenario D, as I discussed

14   earlier, was essentially a business-as-usual

15   scenario and I think we and, particularly the

16   Delphi management team, recognized that

17   scenario D was not working.  That's why they

18   retained us to help them look at other

19   alternatives.  The company was losing

20   considerable money at the time.

21          Scenario A, at the other end of the

22    spectrum, was the Chapter 11 filing and use of

23    1113 and scenario B was in between scenario A

24    and C.

25          Q.    And briefly, why did you not

                                                        104

1    recommend any of those scenarios?

2          A.    Because we felt that the company

3    should work hard on developing a consensual

4    out-of-court solution before having to bring

5    an 1113 motion, before having to consider

6    alternatives -- for example, scenario A went

7    so far, it's kind of the extreme Chapter 11

8    case, termination of pensions, termination of

9    OPEB.   It was a fairly drastic response to the

10    company's financial problems and we felt

11    consensual negotiations among the parties with

12    equal sacrifice among them would be a better

13    way to try to achieve a result.

14          Q.    Mr. Resnick, Mr. Kennedy and Mr.

15    Simon asked you about various of the other

16    scenarios, the steady state scenario, the

17    competitive benchmark scenario, and the GM

18    consensual scenario.   Do you recall that --

19    those questions in your testimony?

20          A.    Yes.

21          Q.    Will you please tell the Court, in

22    your own words, the chronology of those

23    scenarios?  Which was developed first and

24    distributed? Second? Third? The relationship

25    between those scenarios over the last nine

105

1    months?

2        A.   Yes.  The business planning approach

3    the company took was what I'd consider a

4    fairly logical, methodical one.  It started

5    with the steady state, which was business-as-

6    usual and that was the initial building block.

7    And then  overlaid on that was the

8    transformation alternative that would allow

9    Delphi to become competitive.

10       So what the company did, was it looked at

11   the competitive elements on labor and it went

12   out and through, you know, Mr. Butler's

13   office, developed competitive benchmarking for

14   wages and benefits for labor.  It went out

15   through Mr. Sheehan and me, the CFO, Mr.

16   Dellinger, and looked at overhead

17   benchmarking, SGNA, of what would be

18   appropriate.  It looked at its pricing for its

19   customers.

20       And that was the basis of what we called

21   the competitive benchmarking proposal.  It

22   assumed that we had no support from General

23   Motors.  It would be a result that the company

24   would achieve on its own to become a

25   competitive, viable business.

106

1       It also looked at the products that it

2   produced, what we refer to as the core and

3   non-core business.  And the operating

4   management looked at the businesses that it

5   felt Delphi had critical mass and market

6   position and most importantly, technology,

7   which is critical for a successful automotive

8   supplier today to be competitive in the

9   future.

10      And those were the businesses around

11   which Delphi decided to reorganize.  And the

12   other businesses were the non-core businesses.

13   And that was the basis of the competitive

14   benchmarking proposal that evolved after the

15   steady state.  It was what we called the first

16   overlay onto the steady state projections.

17      From that point, and particularly driven

18   as I mentioned I believe with Mr. Simon, by

19   the discussions that we had with General

20   Motors around the Thanksgiving period when

21   General Motors offered some support for Delphi

22   and we were able to engage General Motors in

23    our discussions, we developed a framework

24    where GM participation could improve the

25    competitive benchmark proposal, that would

107

1    essentially provide the soft landings that

2    Delphi felt would be very important for a

3    consensual restructuring proposal,

4    particularly the buy-downs.  Here were some of

5    the differences between the competitive and

6    the consensual.  Employee buy-downs, roughly

7    50,000 dollars.  A revenue plan from GM that

8    would provide additional pricing on certain

9    products to provide Delphi with additional

10   cash to help wind down its businesses and some

11   of the payments that we considered would be

12   the difference between the competitive

13   benchmark wages and 60 dollars in the GM

14   consensual proposal.  That was significant,

15   several billion dollars from General Motors

16   and that was the basis of the GM consensual

17   plan.

18        Q.   Thank you.  Mr. Simon asked you a

19   series of questions about the first quarter

20   performance of 2006.  Do you recall those

21   questions and your answers?

22        A.   Yes.

23        Q.   Mr. Resnick, I'd like you to turn to

24   Exhibit 96A, which is in the confidential

25   book.

                                                          108

1        A.   Okay.

2        Q.   Ready?

3        A.   Yeah.

4        Q.   Mr. Resnick, again keeping in mind

5   that this is confidential information, will

6   you generally describe to the Court what

7   Exhibit 96A represents?

8        A.   Yes.  This is a portion, several

9   pages, from a presentation Delphi made at the

10   May 3, 2006 meeting of the official committee

11   of unsecured creditors.

12            MR. SIMON:  Your Honor, just so that

13   we don't waive any rights, we have not

14   acknowledged and do not intend to acknowledge

15   that exhibits marked confidential by the

16   debtor should necessarily retain that quality.

17   So Mr. Butler's description of it, I take it,

18   will not foreclose us, at an appropriate time,

19   from making an appropriate objection if

20   necessary.

21            MR. BUTLER:  I'm not sure what the

22   appropriate objection part was.  It is a

23   confidential document, protected by the

24    protective order.  It's contemplated under

25    Section 1113.  As I said at the outset of

109

1    these cases -- of this hearing, I'd expect all

2    the parties to use their best efforts to

3    maintain the confidentiality.  If the debtors

4    feel we need to move for a closed term, we

5    will.

6                THE COURT:  Well, the protected --

7                MR. SIMON:  I was simply retaining

8    rights.  I wasn't making the objection now,

9    but I didn't want it to be waived based upon

10   Mr. Butler's un-responded --

11               THE COURT:  All right.  But as I

12   remember the protective order, the burden is

13   on the party challenging confidentiality to

14   raise it, so you were reserving the right to

15   raise that at some appropriate point.

16               MR. SIMON:  Yes.  Thank you, Judge.

17               THE COURT:  Okay.

18   BY MR. BUTLER:

19       Q.   Again, Mr. Resnick, can you -- as a

20   general matter, can you describe what this

21   presentation was to the creditors' committee?

22       A.   Yes.  This presentation, or the

23   pages that excerpted in Exhibit 96A, is an

24    explanation of the first quarter performance

25    of the company versus the steady state

110

1    projections.  It's what the company calls its

2    three plus nine forecast.  It's three plus

3    nine because it now contains three actual

4    months of performance and then nine months of

5    projected.

6         It's very typical with the way Delphi

7    operates.  Each quarter it reviews its

8    performance versus projections and it has

9    actual for the remaining projected period.

10   Actual -- sorry, I'll get a little closer.

11   Actual and the remaining projected period.

12        Q.   Was this presentation made to the

13   Board of Directors at Delphi?

14        A.   Yes, it was.

15        Q.   Do you recall on what date it was

16   presented to the board?

17        A.   I believe it was presented just a

18   few days before it was presented to the

19   creditors' committee meeting, the very end of

20   April.

21        Q.   Can you just, as a general matter,

22   walk the Court through each of the pages of

23   these presentations, and make, as a financial

24   advisor to the debtor, whatever basic points

25    you believe are appropriate with respect to

111

1    the three plus nine update.

2            MR. SIMON:  Your Honor, with all due

3    respect, it seems to me this is the time in

4    which it might be appropriate to make a

5    comment.  We do not believe that in this

6    proceeding, the debtor ought to be able to

7    shield information without the kind of

8    extraordinary showing required both by Supreme

9    Court Second Circuit and the rules as to its

10    necessary confidential basis.

11            This case consists, to a large

12    extent, of historical data which Delphi puts

13    forward showing that the sky is falling, but

14    when it can be pointed out that sky is not

15    necessarily pointing (sic), will claim that

16    the information that establishes it's not

17    falling, is confidential.

18            And while the Court may be capable

19    of taking the material for what it's worth and

20    reading the confidential exhibits, this is a

21    public proceeding.  It is a essentially

22    related collective bargaining matter.

23    Thousands, tens of thousands of workers are

24    going to be looking to this proceeding and its

25    outcome and it doesn't seem to us that

112

1    critical material, unless it can be

2    established to be fully within the narrow

3    exception to a public proceeding, should be

4    able to be relied upon.

5             MR. BUTLER:  Your Honor, I believe

6    the statute of the section 1113 provides --

7    1113(d)(3), for the entry of protective

8    orders.  This Court has entered protective

9    orders and the question really is whether or

10   not the Court, at Mr. Simon's urging now, is

11   going to abrogate those protective orders.

12            THE COURT:  Well, I -- the ultimate

13   issue I guess, under 1113(e) is -- since I

14   think this is broader even than 107, is

15   whether this information, contained in this

16   exhibit -- I'm sorry, not (e), (d)(3), the

17   disclosure of this information would

18   "compromise" the position of the debtor with

19   respect to its competitors in the industry and

20   it's hard for me to discern that from looking

21   at these documents which contain financial

22   information, but it's all fairly generic.

23            MR. BUTLER:  Well, Your Honor,

24   actually on page 36, it describes a breakdown

25   of operating income impact both actual and

113

1    projected over 2006 which is not available in

2    any public arena.

3            It provides information on pages 37

4    with regard to adjustments and assumptions on

5    both its steady state operating income and

6    cash flow.

7            On page 38, it discusses its

8    benchmark, the competitive benchmark and the

9    GM consensual scenarios.  On page 39, it talks

10   about the attrition program and estimates

11   costs of that program.

12           And then there are some conclusions

13   on page 40 that I wanted to ask Mr. Resnick

14   about.  This information, I would argue,

15   particularly, in the future information, would

16   be of interest to Delphi's competitors and I

17   don't know, I'm not quite sure what Mr.

18   Simon's motivation here is because the only

19   try or fact on this is Your Honor and you have

20   all of the relevant information.

21           MR. SIMON:  With due respect, Your

22   Honor, my motivation aside, the company's

23   motivation is to shield from the public what

24   the public and the workers affected by this

25   extension of the collective bargaining process

114

1   are entitled to know.  This isn't a little

2   game between the two of us in which you are an

3   umpire in a sealed room.  This is a court of

4   the United States.

5            THE COURT:  No, but the issue is

6   whether this puts the company at a competitive

7   disadvantage if disclosed, which I'm sure the

8   workers wouldn't want to have either.

9            MR. SIMON:  No.  The question's

10  whether it compromises the position of the

11  debtor with respect to its competitors.

12           THE COURT:  Right.

13           MR. SIMON:  That's the statutory

14  phrase.

15           THE COURT:  Right.  And Mr. Butler's

16  saying that the competitor, not only sees

17  what's in the papers publicly, which is the

18  debtor's losing X billion dollars projected

19  over a period, but sees the specific numbers

20  for specific years.

21           MR. BUTLER:  And specific categories

22  --

23           THE COURT:  And specific categories.

24  It gives them a leg up in their negotiations

25  with customers and with other parties.  That's

115

1    his argument.

2              MR. SIMON:  With due respect, Your

3    Honor, Mr. Butler said the competitors would

4    be interested in it.  I suspect competitors

5    might be interested in it.  That's not the

6    issue.  The issue is whether Delphi's position

7    would be compromised with its competitors.

8    That requires a showing.  The showing hasn't

9    been made and we think there is a very strong

10   presumption.  Supreme Court Second Circuit

11   rules this Court that matters be public and

12   not conducted in Star Chamber proceedings.

13             MR. BUTLER:  Your Honor, my only

14   response to Mr. Simon's comments and I -- Mr.

15   Simon is known for his hyperbole, but to

16   suggest that this is a Star Chamber, I think

17   is a little over the top.  You know, this is a

18   question about whether detailed financial

19   information and projections that have not been

20   made public by the company should be made

21   public in an effort, in a redirect examination

22   of questions that Mr. Simon asked on a cross-

23   examination.

24             THE COURT:  Well, can I -- can you

25   get at this a little more directly, which is

116

1    what is the basis for the 500 million or

2    whatever the actual variance is?

3            MR. BUTLER:  Well, what I was trying

4    to get to -- to demonstrate to Your Honor, and

5    part of the reason we're using this exhibit --

6    this is a creditors' committee exhibit.  Mr.

7    Simon's client is on the creditors' committee.

8    Mr. Kennedy's client is on the creditors'

9    committee.

10           They've received all the

11   presentations that were included in tab 96.

12   There are several of them here.  Mr. Simon

13   raised a whole bunch of questions on cross-

14   examination about the various models and about

15   what assessments were made regarding those

16   models and what Rothschild's participation in

17   the assessment of those models were made.  And

18   the answers to those questions lie in these

19   five pages, pages that were transparently made

20   available to our co-fiduciary.  By the way,

21   the same pages were made available to the

22   equity committee at a meeting on May 3rd,

23   prior to Free Frank having been retained, when

24   they were represented by counsel to the

25   institutional investors of that committee.  So

117

```
 1   that both of our statutory committees had the

 2   same information the Board of Directors had on

 3   May 1st.  And I -- we thought, Your Honor,

 4   that it's useful in terms of redirect

 5   examination, to provide the facts to the Court

 6   and the prism that we thought it made sense to

 7   look through was the actual presentations made

 8   to the statutory committees of which the two

 9   largest unions are members.

10          MR. SIMON:  If I may, Your Honor?

11          UNIDENTIFIED SPEAKER:  I'd like to

12   be heard as well, Your Honor.

13          MR. SIMON:  So what we're being told

14   is that the Board of Directors can see this,

15   the creditors' committee can see it, the

16   equity committee can see it, the Court can see

17   it, but the public can't.

18          THE COURT:  Well, right.  Well let

19   me finish there.  That is true because those

20   parties are all different.  I hope as someone

21   who is on the creditors' committee, your

22   client understands that.

23          MR. SIMON:  There are unions here

24   who are not on the creditors' committee who

25   haven't seen it.  And you know when it was
```

1   presented, Your Honor?  May 3rd.

2            THE COURT:  Actually, has this been

3   provided to the other objectors?

4            MR. BUTLER:  Yes.  They have it in

5   their exhibit books, I believe.  And they had

6   to sign the same protective orders.  They have

7   it in their exhibit books.

8            MR. SIMON:  And when did they get it

9   in their exhibit books?  Friday?

10            MR. BUTLER:  When we had our meeting

11   confirmed, Mr. Simon and put it all the

12   together.  I don't know what your game is in

13   this.

14            MR. SIMON:  You're calling it a

15   game.  This is the lives of tens of thousands

16   of people.  They don't --

17            THE COURT:  No.  No.  Listen, Mr.

18   Simon.  Mr. Simon, with all due respect, I

19   also have some question as to what is going on

20   here with your objection.  It cannot be one

21   based on your inability to evaluate this

22   information 'cause your client has had it.

23            MR. SIMON:  That is correct.  It is

24   not.

25            THE COURT:  So, you simply want to

1    make it public.

2           MR. SIMON:  I simply want to make it

3    public.  Your Honor, this proceeding will

4    affect tens of thousands of people.  This is a

5    court of the United States.  When you affect

6    the interests of tens of thousands of people,

7    I would suggest to you that the institution of

8    this Court and the credibility of this

9    institution is aided --

10          THE COURT:  All right.  Yes.  Yes,

11   and apple pie and motherhood had a good too,

12   and you know what else is good too, making

13   sure that this business doesn't need more

14   money because one of its competitors takes

15   money away from it.  And I don't really hear

16   you addressing that issue.  I hear more of a

17   rhetorical point.  I'm trying to figure out

18   what your real issue is.

19          MR. SIMON:  My single -- well here's

20   the real -- among the real issues is the fact

21   that -- perhaps the objection I should have

22   raised was that this was beyond the scope of

23   direct --

24          THE COURT:  Well, yes.  That's what

25   I was trying to get in Mr. Butler.  Is there

```
 1    some easy way to deal with --

 2              MR. SIMON:  Well, I would object on

 3    the grounds that this is beyond the scope of

 4    direct.

 5              MR. BUTLER:  It's not beyond the

 6    scope of cross-examination because you asked

 7    him about the --.

 8              MR. SIMON:  It's beyond the scope of

 9    cross, I'm sorry.  Beyond the scope of cross.

10              THE COURT:  Beyond the scope of

11    cross for redirect.  I don't know what you're

12    offering this for.  If you're offering it, you

13    know, to ask him how the company does its

14    financial projections and how it measures them

15    and why the projections were off, isn't there

16    some other way you can do that without

17    addressing these actual numbers?

18              MR. BUTLER:  Your Honor, the --

19              THE COURT:  Particularly for the

20    years 2007 through 2010, which I think is the

21    main area that you were concerned about, as

22    opposed to actual.

23              MR. BUTLER:  Let me make a proper

24    rest of where I was trying to go and then --

25              THE COURT:  Okay.
```

1         MR. BUTLER:  Mr. Simon, in his cross

2    examination, said to Mr. Resnick -- in

3    connection with a 2005 base case and then a

4    downside base case -- said, Mr. Resnick, when

5    you found out that the company was not

6    performing according to base case, you

7    recommended a downside base case, correct?

8    Correct.  Then he jumped ahead and talked

9    about the steady state.  All right?  And then

10   he talked about the fact that we'd done better

11   in the steady state and asked what changes

12   were being made within the steady state as a

13   result of that and what Rothschild had

14   recommended along those lines.  That was the

15   line of his questioning.

16        MR. SIMON:  Close, but no cigar.

17   But close.

18        THE COURT:  Right.  That's close.

19        MR. BUTLER:  Close enough for

20   redirect.  I think for redirect, I'm trying to

21   make sure Your Honor understood that and what

22   I believe -- I proffer I believe the witness

23   would testify to, is that as I go through this

24   -- and Mr. Simon knows this because he's seen

25   these pages, sat in the meetings when Mr.

                                                   122

1    Resnick was in the meetings and helped make

2      these presentations.  The fact is the company

3      went through and took three plus nine

4      information, applied it against the steady

5      state, made some adjustments to the steady

6      state which are reflected on page 37, compared

7      what the adjustments would be to the

8      consensual and GM and the benchmark scenarios

9      on page 38 and reached a conclusion, reported

10     on page 40, that says that the first quarter,

11     the company's view and I believe Mr. Resnick's

12     view is that these changes, that was the

13     subject of this cross examination, these

14     changes have no material impact on the models

15     that were presented to the unions.  That was

16     the purpose of trying to present and it seemed

17     to me the most --

18             THE COURT:  The first quarter

19     changes?

20             MR. BUTLER:  The first quarter

21     changes, which is the subject of the cross

22     examination and it seemed to me these five

23     pages were extremely relevant to that.  That's

24     why I tried to use them because it seemed to

25     me the best affectation of that issue.

123

1              MR. SIMON:  You know, I don't

2    dispute that it's relevant.  The question is

3    whether it's within the scope of cross in the

4    first place and B, if it's relevant whether it

5    should be secret.  I don't dispute its

6    relevance.

7            THE COURT:  Well, you did ask --

8            MR. SIMON:  I dispute its accuracy.

9            THE COURT:  You did --

10           MR. SIMON:  I dispute its wisdom.

11           THE COURT:  You did make a point

12   about the company being off on their

13   projections and --

14           MR. BUTLER:  I can ask him.  Your

15   Honor, this is an exhibit.  I can ask him two

16   questions about the last page, without going

17   through every page if that will make it

18   easier.

19           THE COURT:  All right.  Why don't

20   you try that?

21           MR. BUTLER:  Okay.

22   BY MR. BUTLER:

23       Q.   Mr. Resnick, did you participate in

24   the meeting when these pages were presented to

25   the creditors' committee?

                                                    124

1        A.   Yes, I did.

2        Q.   Did you also -- did you form an

3    opinion as to whether or not the three point

4    -- the three plus nine projections required

5    any material updates to either the GM

6    consensual scenario or the GM -- or excuse me

7    or the benchmark, competitive benchmark

8    scenario?

9        A.    Yes, I did.

10       Q.    And what was your opinion?

11       A.    My opinion was that the information

12   presented here with respect to the three plus

13   nine was not material and did not require the

14   company to change either the competitive

15   benchmark or the GM consensual, that most of

16   the performance was in the first quarter, the

17   company did not expect that to continue.  But

18   more importantly, with respect to the

19   competitive benchmark and the GM consensual,

20   that many of the elements that drove the

21   significant differences, particularly in cash,

22   which is the key item, not operating income,

23   in cash, were elements that were reflected

24   already in the competitive benchmark and GM

25   consensual projections because they were

125

1    principally labor related.

2        For example, the SGNA differential, which

3    was a very significant item in terms of the

4    cash differences, resulted from people leaving

5    voluntarily on their own because of the

6    company's Chapter 11 file.  Well, in both the

7    competitive benchmark and the GM consensual,

8    there is an SGNA transformation; an overhead,

9    a salary overhead reduction and these amounts

10   were in compass in those two series of

11   projections.  So it really wasn't material.

12       The same with the jobs bank amount that,

13   because of the transformation, the reduction

14   in the workforce, the left, the right side

15   changes, that we were already contemplating

16   that sort of transformation in our two

17   projections and this was higher than what we

18   were projecting for '06 but it was in compass

19   in the two scenarios.

20       Q.   Were there material changes in the

21   steady state projections?

22       A.   Yes, there were material changes

23   from the steady state.

24       Q.   And in your words, will you explain

25   to the Court why there would be material

126

1    changes in the steady state scenario but not

2    in the benchmark competitive scenario and the

3    GM consensual scenarios that were the subject

4    of the proposals to the unions.

5         A.   Because the steady state did not

6    contemplate a transformation of Delphi, of its

7    workforce, of its SGNA, of its pricing.

8         Q.   So do --

9         A.   It was business-as-usual.  So these

10   improvements did have a significant impact.

11        Q.   Is your testimony the timing of

12   these improvements was already comprehended in

13   these other scenarios?

14        A.   Yes.

15             MR. BUTLER:  No further questions.

16             MR. SIMON:  May we have 60 seconds,

17   Your Honor?

18             THE COURT:  Absolutely.

19             MR. SIMON:  No further questions,

20   Your Honor.

21             THE COURT:  All right.  Let me just

22   -- I have a couple of questions, Mr. Resnick.

23   The presentation was made to the board

24   regarding the competitive benchmark proposal,

25   which I think you described as the first

                                                      127

1    overlay on steady state projection.

2              THE WITNESS:  Yes.

3              THE COURT:  Were there any

4    distinctions made as between the benefits to

5    the operating U.S. companies and Delphi the

6    parent, as a result of that overlay, that

7    plan?

8              THE WITNESS:  No.  It was done on a

9    consolidated basis.

10             THE COURT:  Is there any

11   consideration as -- has there been any

12   consideration by the debtors of whether the

13   parent is to benefit by the proposal that is

14   embodied in the competitive benchmark plan?

15             THE WITNESS:  No, the company

16   doesn't look at it that way.  It looks at its

17   projections consolidated and sometimes will

18   break out North America, where it has its most

19   significant challenges from the rest of the

20   world.  But that's the way it does its

21   financial projections.

22             THE COURT:  Okay.  I'm going to your

23   discussion of scenario D, the business-as-

24   usual scenario and I know you did this fairly

25   early in your engagement.  Does the analysis

                                                        128

1    of scenario D change as the time grows nearer

2    to the date that the collective bargaining

3    agreements start to expire, i.e. does scenario

4    D become more attractive as that time

```
 5   approaches?
 6            THE WITNESS:  The concern the
 7   company had, back in June of '05 was whether
 8   or not it would have significant liquidity,
 9   whether it could continue to gain business
10   from customers if it did not make significant
11   changes to its business.  So everyone knew
12   Delphi was losing significant amounts of
13   money, the problems it had with GM volumes and
14   if Delphi was going to refocus its business,
15   it had to focus on the core businesses to gain
16   new business from those areas.  And customers
17   won't -- weren't going to give Delphi that
18   business if they didn't see that Delphi was
19   going to fix its problems.
20            So that was the conundrum that the
21   company faced.  It was trying to deal with the
22   changed automotive market, a labor and
23   benefits structure that prohibited it from
24   competing in a very competitive industry.
25            You know, in this business, Your
```

                                                      129

```
 1   Honor, price -- Delphi competes for business
 2   and sometimes they win business by pennies in
 3   several hundred million dollars of chunks of
 4   programs that go on for several years.  And
```

5       it's very difficult for Delphi to compete for

6       that business which it may have to do today,

7       for a program that won't start for several

8       years, if it doesn't have a cost structure

9       that appears to the customer that's going to

10      be viable.

11              And the Delphi management felt that

12      prolonging this transformation, and it already

13      felt it was -- it had prolonged it too long

14      already, was going to be a significant

15      impediment to continuing its business and

16      that's why it felt business-as-usual wasn't

17      working.  They were not winning some business

18      because of all the constraints they were

19      operating under, inability to close plants

20      that were losing money, for example.

21              THE COURT:  In your mind, is there

22      any cut off point on that analysis?  For

23      example, if you're six months away from the

24      expiration of the collective bargaining

25      agreements or two months, you know, is there

                                                        130

1       some point where it doesn't really matter?

2               THE WITNESS:  Sure.  I mean if

3       you're just a couple months away, these

4       negotiations could be wrapped up at the time

5       you negotiate.  But that's why we were pushed

```
 6    very hard by the company to come out -- come

 7    up with an out-of-court proposal, which we did

 8    about a month and a half after we were

 9    retained, and get that in front of GM and the

10    UAW.

11              THE COURT:  Okay.  Any other

12    questions you might add?  All right, you can

13    step down, sir.

14              THE WITNESS:  Thank you, Your Honor.

15              MR. BUTLER:  YOUR HONOR, can we take

16    a short, just a short break?

17              THE COURT:  Sure.  Ten minutes.

18              THE COURT:  Please be seated.  Yeah.

19    I noticed some of you taking off your coats,

20    please feel free to do that.  The TSA doesn't

21    believe its summertime until June 21st,

22    although we're trying to convince them

23    otherwise.  No, no.  You can leave them on.

24              MR. SIMON:  Your Honor, if you can

25    wear a robe, I can wear a jacket.
```

131

```
 1              THE COURT:  Well you don't see what

 2    I have on underneath.

 3              MR. SIMON:  I'm not going to touch

 4    that with a 10 foot pole.

 5              THE COURT:  Okay.  Mr. Butler.
```

6          MR. BUTLER:  Your Honor, continue

7     with the debtor's case in chief, I'd like to

8     call Kevin M. Butler for cross examination on

9     -- and move for the admission of his

10    declarations that are Exhibits 7 and 8 in the

11    trial book.

12    (The Admissions of Mr. Kevin Butler's

13    Declarations were hereby received as

14    Defendant's Exhibit 7 and 8 for

15    identification, as of this date.)

16         MR. BAUMSTEIN:  Your Honor, Doug

17    Baumstein on behalf of the ad hoc equity

18    committee.  Re-raising our application to

19    preclude the testimony of Mr. Butler.  And I

20    would specifically note, for example, in his

21    supplemental affidavit, which I happen to have

22    in front of me.  Para -- part -- section 3 is

23    entitled Delphi needs relief from its

24    collective bargaining agreement.  Prior to

25    their September 2007 expiration.  This was

                                                   132

1     specifically an issue that the shareholders

2     identified as something worth examining.  It

3     specifically goes to business judgment and the

4     issues that the Court is concerned with.

5     Accordingly, we think it's prejudicial for Mr.

6     Butler to testify on these subjects without

7    having given the shareholders an opportunity

8    to take a deposition.

9        THE COURT:  Let me take a look at

10    the supplemental.  All right.  Again, this is

11    not a new issue.  This was addressed in a

12    discovery conference about two weeks ago.  And

13    again, based on my knowledge of what the

14    witnesses were being offered for in the

15    agreements worked out between the unions and

16    the company, they being the primary parties to

17    this litigation.  It seemed to me that the

18    prejudice to the company and the unions of

19    permitting additional deposition discovery of

20    Mr. Butler, in light of his declaration, and

21    it was just a declaration, I think, at that

22    time, outweighed the benefits to Appaloosa.

23    I've looked at his supplemental declaration.

24    There is a one paragraph four -- four sentence

25    -- which consists of four sentences, as to why

                                                        133

1    he believes that the debtors should not wait

2    until the expiration of the agreements.  And

3    in respect to those four sentences, I don't

4    think he needs to -- again, I believe that the

5    prejudice to the primary parties to this

6    litigation outweighs the need to take a

7   deposition on these four sentences.  Which I

8   think you can ask him about in cross

9   examination.

10         MR. BAUMSTEIN:  Thank you, Your

11   Honor.

12         MR. KENNEDY:  The union order of

13   cross examination, Your Honor, would be the

14   UAW, the IUE, and the steel workers.  The 580W

15   and then the operating engineer.

16         THE COURT:  All right.

17         (Witness is duly sworn.)

18         THE COURT:  And again, well -- it's

19   B-U-T-L-E-R, right?

20         THE WITNESS:  That's right, Your

21   Honor.

22         THE COURT:  Okay.  All right.  Go

23   ahead Mr. Simon.

24   DIRECT EXAMINATION BY

25   MR. SIMON:

                                            134

1   Q.  Still, good afternoon, Mr. Butler.

2   A.  Good afternoon, counselor.

3   Q.  As director of human resources, how large

4   a staff do you have?

5   A.  Within the corporate staff, roughly about

6   90 people

7   Q.  And when you refer to corporate staff, are

8   there other staff as well for which you are,

9   ultimately, responsible?

10   A.   I have a dotted line relationship to the

11   HR staffs that are in the divisions.

12   Q.   And how many are in those divisions

13   cumulative?

14   A.   If we look at all aspects of HR in the

15   divisions, globally, it would be on the order

16   of about 2000 people.

17   Q.   And the 90 to which you refer is that also

18   global, as opposed to U.S.?

19   A.   No, that would be U.S. corporate staff.

20   Q.   That's U.S.  And if you were to restrict

21   the divisional folks to those involved with

22   U.S. operations out of the 2000, how many

23   would there be?

24   A.   It would be a few hundred.

25   Q.   Two hundred?

                                                    135

1   A.   No, a few hundred.

2   Q.   Few hundred.  And how is your staff

3   organized?  By that I don't mean by the UAW, I

4   mean how is it structured?

5   A.   It is -- it is structured in three main

6   arenas where we have the labor relations and

7   security function.  We have benefits and

8    policy, and the benefits and policy benefits

9    covered both hourly and salary.  The policy

10   function is salaried or white collar policy

11   principally.  And then we have talent and

12   development and executive compensation.  And

13   that is largely the corporate staff

14   organization.

15   Q.  And in addition to the corporate and the

16   divisional levels, are there folks that report

17   to you, either directly or indirectly, in any

18   of the plants?

19   A.  The plant personnel responsible for human

20   resources report up through the divisional

21   structure and then to me on a dotted line

22   basis.

23   Q.  And order of magnitude, how many folks are

24   there out in the plants that would perform HR

25   functions?

136

1    A.  Could I clarify?  Do you mean in the U.S.?

2    Q.  Pardon?  Yes, in the U.S.

3    A.  In the U.S. the plant function would be --

4    let me see, best of my knowledge, several

5    hundred again.

6    Q.  So, how many lawyers of management and

7    supervision, basically, are there between you

8    and a worker on the workroom floor?

9    A.   Could you clarify the question?   HR does

10   not directly supervise hourly employees.   So,

11   I'm trying to understand the --

12   Q.   Well then, let's just take it at the

13   corporate level, operationally, human

14   relations, however you will, between the

15   worker on the floor and the folks up in the

16   executive office, how many different layers of

17   management or supervision is there?   I take

18   it; the workroom floor has a supervisor?

19   A.   Uh-huh.

20   Q.   Okay.   And then up above the supervisor

21   there's a what?

22   A.   Up above the first-line supervisor there

23   may be an area supervisor, general supervisor.

24   Q.   By area, you mean area within the plant?

25   A.   Yes.

                                                  137

1    Q.   And then above the plant -- above the area

2    supervisor, what would be next?

3    A.   It depends on the size of the plant.

4    Q.   Let's take a large plant.

5    A.   In a large plant there would, probably, be

6    a superintendent or an assistant plant

7    manager, and then a plant manager.

8    Q.   And then from the plant level one would go

9    to the divisional level?

10   A.  That's true.

11   Q.  And what would be the hierarchal

12   arrangement at the division level?

13   A.  There would be a divisional director of

14   manufacturing that the collection of plant

15   managers would report to.  And that divisional

16   director of manufacturing would report to a

17   divisional president.

18   Q.  And the divisional president would then,

19   in turn, report to whom?

20   A.  The chief operating officer.

21   Q.  Did you participate in the management

22   decision to file the section 1113 motion?

23   A.  I did.

24   Q.  Who made the decision to file the motion?

25   A.  I believe the board of directors.

                                                        138


1    Q.  And did you recommend the filing of the

2    motion?

3    A.  I did.

4    Q.  Who decided which UAW labor agreements and

5    which parts of UAW labor agreements you would

6    seek authority to reject?

7    A.  That was, basically, within my preview and

8    with my staff, recommended to the senior

9    management of the company and the board.

10    Q.  And would you describe the process that

11    you and your staff went through to determine

12    which UAW agreements, both at the national and

13    local level, and which parts of those

14    agreements to seek authority to reject?

15    A.  Essentially, we did a review and analysis

16    of those agreements, both local and national,

17    that we viewed as an impediment to our

18    competitiveness and our ability to transform

19    the company.  And those that were,

20    essentially, out of line with competitive

21    practice within our industry, such that it

22    would represent an impediment to

23    transformation.  We indicated those -- or

24    those agreements that should be -- we decided

25    those agreements should be terminated if we

                                                      139

1    could not consensually revise them.

2    Q.  So the criteria was whether or not the

3    agreement would be an impediment to --

4    A.  First, whether they were competitive or

5    not within the industry.

6    Q.  Uh-huh.

7    A.  And whether that represented an impediment

8    to our ability to transform.

9    Q.  And how did you conduct the inquiry as to

10    whether or not the various agreements would be

11    competitive?

12    A.  We evaluated various aspects of the

13    agreements in terms of wage and benefits, in

14    terms of work practices and in terms of our

15    ability to respond to customers and the

16    market, or flexibility provisions if you will.

17    Q.  And did you, as a criteria, use whether or

18    not the modifications you had identified as

19    impediments, as you have described it, were

20    necessary to the reorganization of the

21    company?

22    A.  I think that's a fair comment.  We looked

23    at them as if they were not competitive and

24    would prohibit us from transformation, then it

25    was necessary to change them.


                                                    140


1    Q.  And you did that on an agreement by

2    agreement basis.

3    A.  We reviewed all the agreements, that's

4    true, all the agreements.

5    Q.  Do you have before you your March 26th

6    letter and offer -- what exhibit number is

7    that?  March 24th of '06, the offer that's now

8    on the table?  Exhibit 89.

9    A.  I do have this before me.

10   Q.  Turning to the proposed modification

11    chart, which is three pages in.  And if you

12    turn to page 2 of that document.  And if you

13    zip down to the bottom line, carrying over to

14    page 3, you'll see that Delphi is seeking to

15    reject, presumably in addition to everything

16    else that came before it in the two pages, any

17    and all other agreements, supplements,

18    appendices, documents, memoranda, letters,

19    minutes and understandings published and

20    unpublished between Delphi Corporation and the

21    international union UAW, with an exception

22    that I think is not relevant to my question.

23    Can you identify for us what other agreements,

24    supplements, etcetera, you're talking about?

25    A.   Through the course of local bargaining, in

                                                        141

1    particular, there are many local settlements,

2    understandings, memoranda, that may be in

3    place that are not compliant with competitive

4    practice.  So we sought to cancel those as

5    well.

6    Q.   And did you examine those local union

7    agreements that you've just described?

8    A.   We did not examine all of those at the

9    corporate level.

10    Q.   Were they examined at either the district

11    or the plant level?

12    A.  I think they were generally known as

13    matter of local management, but as part of

14    this process we did not do an absolute

15    detailed examination.

16    Q.  As we stand here and sit here now, can you

17    identify for us any such agreements, etcetera,

18    supplements, appendices, etcetera?

19    A.  As I sit here, I cannot bring for the UAW

20    a specific instance to mind, but I know they

21    exist.

22    Q.  All right.  If you turn to page 4 of that

23    attachment, and that comes after the list of

24    UAW local agreements, specifically enumerated

25    that you seek to reject, there is also, on the

142

1    bottom of the page, a comparable catch-all, so

2    that you seek to reject any and all other

3    agreements, supplements, appendices,

4    documents, memoranda, letters, minutes and

5    understandings published and unpublished

6    between Delphi and the UAW local unions.

7    Again, can you identify for us what that

8    phrase refers to?

9    A.  It refers, as I mentioned previously, to

10    basically local understandings, or commitments

11    made or grievance settlements that may

12    represent non-competitive practices.

13    Q.  And can you tell us how the UAW was

14    supposed to understand when receiving and

15    reading this document, to what such

16    agreements, supplements, etcetera, you were

17    referring that you were seeking to reject?

18    A.  I think through the course of bargaining

19    and throughout our history, the local

20    agreements, and the local parties know, with

21    great understanding and great detail their

22    local commitments, their local understandings.

23    Q.  But you did not, at the headquarters

24    level, maintain any log or list or copies of

25    any such agreements?

                                                                  143

1    A.  Certainly not of grievance settlements or

2    local memoranda, we do not keep that at the

3    corporate level.  I can cite one example as I

4    think about it now, that I am aware of, at the

5    Flynt East site, a local understanding where,

6    based on seniority, the local -- the hourly

7    employee would be allowed to select their

8    preferred job within a department, which

9    limits the flexibility of the operation, that

10    kind of thing.

11    Q.  Can you tell us whether, on the bottom of

12     page 2 and on the bottom of page 4, whether

13     the agreements referred to in each instance

14     include only written documents and agreements

15     or does it include within it as the language

16     would suggest, all agreements and

17     understandings as well.

18     A.  It was intended to be broad for any

19     understandings that would inhibit

20     competitiveness.

21     Q.  And your understanding, again, is that the

22     UAW should be able to divine from these

23     references the agreements, oral and written,

24     published and unpublished, of the character

25     described that you seek authority to reject?

                                                        144

1     A.  My experience has been, when we -- when we

2     run or follow any of these understandings,

3     written or unwritten, we are called into

4     account by the local parties.  They tend to

5     know them well.

6     Q.  Doesn't respond to my question, if the

7     reporter would please read the question.

8              THE REPORTER:  And your

9     understanding, again, is that the UAW should

10    be able to divine from these references the

11    agreements, oral and written, published and

12    unpublished, of the character described that

13    you seek authority to reject?

14         THE WITNESS:  It is my belief that

15    the UAW would be knowledgeable of those or be

16    able to be knowledgeable of those.

17    BY MR. SIMON:

18    Q.  If you would turn to pages C1 to C5 at the

19    back of that document you will see Appendix C

20    non-exclusive list of agreements that will be

21    eliminated.  Are you familiar with this list?

22    A.  I am.

23    Q.  And this list was both prepared under your

24    supervision, reviewed by you and determined by

25    you to include only those agreements that

                                                    145

1    would be impediments, as you've described it,

2    and necessary to the corporation's

3    reorganization?

4    A.  I think this represents those that we had

5    identified in our review and the term non-

6    exclusive coincides with any others beyond

7    this.

8    Q.  So that, in effect, this is a partial list

9    of what was described earlier on page 4?

10    A.  The non-exclusive list.

11    Q.  And again, it was determined by you or by

12    your staff, subject to your authority and

13    approval, that this list consists of

14    agreements determined by Delphi to be

15    impediments, as you've described it, and

16    therefore necessary to the reorganization of

17    Delphi, correct?

18    A.   Non-competitive practices or

19    understandings that would impede our ability

20    to transform competitively.

21    Q.   On page C3 you have listed the following,

22    the unpublished memorandum of understanding

23    regarding paid lunches on Christmas and

24    Thanksgiving Day, and any similar

25    understanding from 1999 local negotiations at

                                                        146

1    the Delphi in the Kokomo plant.  Do you know

2    what that unpublished memorandum of

3    understanding is?

4          MR. BUTLER:  Objection.   Your

5    Honor, I tried to be quiet here, but Mr. Simon

6    and I both know that you can only reject a

7    contract in whole or in part.  I'd like him to

8    explain to the Court what this line of

9    questioning is about.  I don't mean trying to

10   seek legal conclusions, but these contracts,

11   you can't reject partial contracts.  I don't

12   know what -- I have a tough time understanding

13   what --

14          MR. SIMON:  We're just trying to

15     understand what the company is trying to

16     reject.  It listed some things, it said

17     anything else anyone can think of.

18          THE COURT:  Well, is it

19          MR. SIMON:  -- and it says that

20     they're impediment and we're going to try and

21     examine and see, (a) when the witness knows

22     what this agreement he seeks to reject

23     actually is.  If he doesn't, I'll help him

24     understand it.  And then we'll try and

25     determine how they determined that this was an

147

1     impediment, because the witness has said they

2     picked and chose between those they thought

3     were impediments and those they weren't.  A

4     perfectly appropriate line of questioning.

5          THE COURT:  Well, let me ask you,

6     because your answer suggested that the reason

7     you picked these agreements is because they

8     were anti-competitive or that they -- is that

9     the only reason you picked these agreements?

10          THE WITNESS:  What I was trying to

11     get to Your Honor, is we do have some sites

12     that are under agreements that have very

13     competitive terms and they were excluded from

14    the 11/13 -- 11/14 motion.

15          THE COURT:  All right.

16          THE WITNESS:  They were not an

17    impediment.

18          THE COURT:  But so Mr. Butler, I

19    don't understand your objection, because it

20    suggests that the company would have to reject

21    those too?

22          MR. BUTLER:  No, Your Honor.  The

23    contracts -- there are separate contracts that

24    the UAW has with us at separate locations.

25    But what Mr. Simon's line of questioning seems

148

1    to be headed towards is trying to explore and

2    trying to get the witness, you know, on a

3    legal issue, to try to deal with the issue of,

4    okay, at a contract or at a specific site did

5    you include or not include certain provisions

6    of that contract when, in fact, the catch-all

7    provisions were designed to catch everything.

8          THE COURT:  Well, I don't know.

9    Based on his answers, it doesn't seem to be

10    that it was the reason for it being on the

11    list.

12          MR. SIMON:  Thank you, Your Honor.

13          THE COURT:  So I -- you could deal

14    with that in rebuttal, unless the witness has

15   different testimony.

16          MR. SIMON:  This won't go on

17   painfully much longer, except for the witness.

18   BY MR. SIMON:

19   Q.  Do you know what the unpublished

20   memorandum of understanding regarding paid

21   lunches on Christmas and Thanksgiving day is?

22   A.  I'm sorry counselor, could you repeat the

23   question?

24   Q.  Do you know what the agreement is?

25   A.  I do not know the specifics of the

149

1    agreement, but I think I understand the

2    general gist of it from this.

3    Q.  Well, what do you understand the gist to

4    be?

5    A.  It is an unpublished memorandum that

6    allows for paid lunch during holidays.

7    Q.  Well, suppose I read to you what the

8    agreement actually is and see whether you're

9    going to stick with your answer.

10   "Arrangements for paid lunch on Christmas day

11   and Thanksgiving day for skilled trade

12   employees, not assigned to support production

13   on those days, will be handled, as discussed

14   by union and management during the 1999 local

15    negotiations."  Do you know how they would

16    discuss and how they're to be handled?

17    A.  I do not know.  I know that, generally

18    speaking, paid lunch is not broadly a

19    competitive practice.

20    Q.  What is the impact upon Delphi of what you

21    believe the paid lunch for Christmas day and

22    Thanksgiving day for skills, trades, employees

23    not assigned to support production on those

24    days would be?

25    A.  I imagine the impact of that would be


                                                        150


1     rather small at one site, but as a general

2     practice is not competitive.

3     Q.  But you only seeking to reject it at this

4     one site.  Can you tell us at this one site --

5     you listed this agreement, I didn't.  You seek

6     to reject  this agreement, I didn't.  At this

7     one site, what does this agreement produce by

8     way of a competitive impact on Delphi

9     Corporation?

10    A.  This one agreement being this specific?

11    Q.  The unpublished memorandum of

12    understanding regarding paid lunches on

13    Christmas and Thanksgiving day and any similar

14    understanding from 1999 local negotiations at

15    the Delphi ENS Kokomo plant?

16    A.  I cannot speak to the specific impact of

17    that one particular point, only that Kokomo is

18    losing money.

19    Q.  Okay.  If we were to go through this list,

20    and I don't propose to unless you give me a

21    ridiculous answer, would your response be,

22    essentially, the same with regard to the

23    couple of pages of listing of non-exclusive

24    agreements at local unions?

25    A.  I think our -- yes.  I think our intent

151

1    was to reject the contracts in whole as they,

2    in whole, represent non-competitive

3    arrangements.

4    Q.  And that includes, as you've listed here,

5    a whole variety of settlements of grievances

6    and other cases between local management and

7    the local union?

8    A.  I believe those settlements that

9    represented then ongoing understandings that

10   affected operations.

11   Q.  And do you know, as we sit here, which of

12   these rejected settlements fit within that

13   category?  Can you tell us what the settlement

14   of management initiative M-11, dated October

15   12, 1999, at the Delphi ENC Milwaukee plant,

16    that's about the sixth or seventh bold line on

17    page C-3, what that -- what that is?

18    A.   I cannot.

19    Q.   Do -- isn't it conceivable that it

20    represents no impact whatsoever on Delphi's

21    competitive position?

22    A.   This list was prepared and reviewed by

23    staff against whether these were impeding our

24    competitiveness at the -- at the operation.

25    So I feel they had a fair review.


                                                    152


1    Q.   And that's basically the same staff that

2    dealt with the Kokomo Thanksgiving and

3    Christmas lunch, special memo?

4    A.   It was the staff of the divisional labor

5    team working with the corporate labor team.

6    Q.   And this is not exclusive?

7    A.   That's correct.

8    Q.   But you seek to reject everything else

9    that fits within the category, in addition to

10    these, what -- three, four, five pages of

11    settlements and side agreements that you can't

12    even describe for us.  So, you want to reject

13    the national contracts, the local contracts,

14    anything else you can think of, including the

15    items on page -- pages C1 through C5.  That's

16    what this company seeks to reject?

17   A.   That's correct.

18   Q.   On page 6 of your proposed modifications

19   --

20   A.   Pardon me counselor, what exhibit number

21   was that again?

22   Q.   It's the one you've just been looking at,

23   89.

24   A. Thank you.

25   Q.   And the last bullet point at the top box,

153

1   paragraph 90 of the UAW Delphi national

2   agreement will be deleted.  And all other

3   references to payment plans in other national

4   and/or local agreement provisions, and/or

5   associated documents or associated

6   supplemental agreements and any related

7   understandings, practices or settlements

8   written or unwritten, will be eliminated.  Can

9   you tell us what that refers to?

10   A.   As I sit here, no I can't.

11   Q.   And in the last box on that page, the same

12   catch-all with regard to the COLA provision.

13   Can you tell us what those relate to?

14   A.   This effectively is eliminating the cost

15   of living allowance.

16   Q.   Yes, but it's also eliminating all other

17    references to COLA and other provisions and/or

18    associated documents, all associated

19    supplemental agreements and any related

20    understandings, practices or settlements

21    written or unwritten.  Can you tell us whether

22    there are any such and if so, what they are.

23    A.  There are a number of various impacts on

24    COLA that may be how grievances are settled.

25    It may be how other provisions of the

                                                                                154

1    agreements are calculated for the impact of

2    COLA.  So --

3    Q.  But you can't -- I'm sorry.

4    A.  So, we were effectively saying, by

5    eliminating COLA, we were pulling it through

6    to all impact.

7    Q.  But you can't tell us, specifically,

8    whether there are any such documents,

9    understandings, practices, settlements written

10    or unwritten, specifically, that you seek to

11    eliminate?

12    A.  Well again, as I mentioned, there are any

13    number of settlements and grievance

14    settlements included, that would specifically

15    call out for a COLA payment to be made.  And

16    we were seeking to broadly eliminate COLA and

17    its impact.

18          MR. SIMON:  If I may just have a

19   quick moment.

20   BY MR. SIMON:

21   Q.  On page 7, relating to overtime, you also

22   have a reference in the middle box to all

23   other associated documents, etcetera.  Can you

24   identify those for us?

25   A.  Can you --

155

1   Q.  Sure.

2   A.  -- you say middle box --

3   Q.  Okay.  It's the paragraph that begins

4   paragraphs 81, 82, 84A, 84B and then there's a

5   laundry list, and then any, all and all other

6   references to computing overtime premium pay

7   in other provisions and/or associated

8   documents, all associated supplemental

9   agreements and any related understandings,

10   practices or settlements written or unwritten,

11   will be eliminated.  Can you identify those

12   for us?

13   A.  That was effectively, again, aimed at

14   bringing overtime understandings or practices

15   in alignment with the bullet above.

16   Q.  My question to you sir, is whether you can

17   identify it?

18    A.   In alignment with the bullet above.

19    Q.   My question to you is whether you can

20    identify any such for us?

21    A.   Specifically, no.

22    Q.   And on page 8 relating to shift premiums.

23    Middle of the page, paragraph 89 of the

24    national agreement and all other references,

25    etcetera, etcetera, etcetera.   Can you

156

1    identify any such for us?

2    A.   I believe at certain locals we do have

3    variant shift practices, particularly on

4    continuous operations shift premium and this

5    was intended to bring those in conformance

6    with the five percent.

7    Q.   Can you identify any four so that the

8    folks in those local unions that you have

9    targeted will know what it is that you're

10    talking about?

11    A.   As I sit here, I cannot specifically

12    identify.

13         MR. SIMON:   Your Honor, this is

14    painful but that phrase runs through a dozen,

15    or perhaps more, of the provisions.   And my

16    questions will be the same.   I suspect the

17    answers will be the same.   I don't want it to

18    get tedious but I do want to make the point

19    with regard to each such area where catch-all

20    provisions of that sort have been identified

21    and sought to be eliminated.  And I can do it

22    page by page, or we can somehow have --

23            THE COURT:  Well, let me ask you,

24    you've seen these provisions, we've been

25    through them already.  Is there any instance,

157

1    that you're aware of in this document, where

2    you have a provision like that, that is

3    serving any purpose other than to impose a

4    specific provision?

5            THE WITNESS:  I don't --

6            THE COURT:  Or to insure that some

7    agreement you're not aware of undoes a

8    specific provision that you're seeking to

9    impose?

10            THE WITNESS:  That, again, Your

11    Honor, our intent was, as we called out these

12    competitive changes we wanted to make, it was

13    to insure that there were no other

14    contravening provisions.

15            THE COURT:  Well, how would -- how

16    did you contemplate the catch-all actually

17    being implemented?

18            THE WITNESS:  What we were moving to

19    reject were both the national and the local

20    agreements and then, effectively saying these

21    national changes would prevail.

22         THE COURT:  So there wouldn't --

23    effectively, with regard to these national

24    changes, there would be no local agreements on

25    those provisions?


                                                      158


1          THE WITNESS:  It would only be those

2    that through the process would be bargained

3    locally.  And a consensual arrangement and

4    then approved by the national parties.

5          THE COURT:  And there was no -- but

6    there was no separate analysis as to whether

7    those local provisions were better for the

8    company than the national agreements or worse?

9          THE WITNESS:  The -- there was not a

10   separate analysis Your Honor, to say that --

11   our experience has been, as it relates to

12   these arrangements, we're virtually always

13   expansionary at the local level, as it relates

14   to the UAW.

15         THE COURT:  Does that mean -- when

16   you say expansionary, does that mean --

17         THE WITNESS:  Less favorable to the

18   company.

19         THE COURT:  Less favorable to the

20    company.

21              THE WITNESS:  That's right.

22              THE COURT:  But there's nothing

23    specific in this agreement that reflects that.

24              THE WITNESS:  We were -- we were

25    wanting to insure because of the broad nature,

159

1    sometimes, of local understandings in local

2    bargaining and grievance settlements that

3    become, as I said, expansionary.  That we were

4    covering all of that as we were trying to

5    bring it to competitive levels.

6              THE COURT:  Does that help?

7              MR. SIMON:  Your Honor, if we can

8    assume that that form of answer and its

9    implications, I believe, from a legal point of

10   view would apply to all of the instances in

11   which that catch-all phrase is set forth,

12   fine.  If we can't I'll just go page by page.

13             THE COURT:  Well --

14             MR. SIMON:  I have no problem doing

15   it, I just -- I didn't want the Court --

16             THE COURT:  I would assume that

17   based --

18             MR. SIMON:  -- to look at me cross-

19   eyed.

20          THE COURT:  I would assume that,

21     based on the witness answer.  And I see

22     counsel nodding to your right so --

23          MR. SIMON:  Thank you.

24          THE COURT:  Okay.

25     BY MR. SIMON:


160


1    Q.  I do have a number of other questions that

2    aren't comprehended by what we've just

3    discussed.  If you would turn to page 5 of

4    your March 6th proposed -- same exhibit

5    number.  The bottom of the top box.  In the

6    event that GM does not agree to provide

7    financial support the non-contingent terms set

8    forth in or appended to this term sheet shall

9    govern.  In the event that GM agrees to

10   provide financial support, but that support is

11   insufficient to fund all of the contingent

12   proposals set forth herein, or if GM is unable

13   to meet the commitments, Delphi and the UAW

14   agree to discuss which contingent proposals

15   will be implemented and/or maintained.  So

16   this is a proposal to meet and discuss what

17   happens if the GM commitment in whole or in

18   part is not fulfilled, correct?

19   A.  That's correct.

20   Q.  And what happens if after the meet and

21   confer agreement is not reached between the

22   UAW and Delphi on the -- on which contingent

23   proposals will be implemented or maintained?

24   A.   The -- this was intended and remains

25   intended to allow for dialogue and negotiation

161

1   between the parties to hammer that out.   The

2   failure mode would be the November 15th

3   underlying proposal.

4   Q.   So then there would be no discussions in

5   that regard?

6   A.   No, I don't believe that's correct.   It

7   was our intent to indicate, through this

8   language, that we have the November 15th

9   proposal.   And to the extent that General

10   Motors can provide additional subsidy and

11   support, clearly at these levels, this would

12   be the proposal.   If it's short of that, then

13   we would discuss it and try to --

14   Q.   And if you -- I'm sorry.

15   A.   And try to come to some sort of consensus

16   or --

17   Q.   And my question to you is, what happens or

18   what would happen if after the discussions you

19   did not come to a consensus?

20   A.   Is this in a consensual discussion basis,

21    or in an imposition basis?

22    Q.  I'm just taking your question to the next

23    step.  The proposal provides for discussions.

24    I'm looking at this proposal, okay.

25    Q.   All of this happens.  GM provides support

162

1    that Delphi deems insufficient to fund the

2    contingent proposals.  Or, I suppose what,

3    General Motors files its Chapter 11.  And it's

4    unable to meet its commitments, Delphi and the

5    union agree to discuss with contingent

6    proposals will be implement and/or maintained.

7    I'm asking you to fill in the following blank

8    in the sentence.  "If such discussions do not

9    result in an agreement, then --

10    A.   We would continue discussing within the

11    available subsidy to try to achieve an

12    acceptable solution, as long as the agreement

13    is otherwise in force, the National Agreement.

14    Q.   Would failure to agree be subject to the

15    dispute resolution provisions of the

16    agreement?

17    A.   I don't believe so, but I haven't thought

18    about that.  I don't know.

19    Q.   Why don't you believe so?

20    A.   I -- I don't believe -- I'm just not --

21    off the top of my head, I have not thought

22    about that as whether it applies.

23    Q.    Okay.  You might have a chance to think

24    about it overnight and can come back and tell

25    us whether your additional thoughts produce


                                                            163


1     anything.  On page 12 of your proposal,

2     Exhibit 89 -- we'll credit where credit is

3     due.  In the top box dealing with health care,

4     you provide other miscellaneous documents; an

5     unpublished letter shall be reviewed to

6     determine if they are essential to providing

7     the health care plan and shall be modified or

8     eliminated as appropriate.  Who conducts that

9     review?

10    A.    That would be handled by the benefit

11    staff of both the UAW and the -- and the

12    company.

13    Q.    And, if they were unable to agree either

14    as to essentiality or to whether something

15    needed modification or elimination as

16    appropriate, what would happen?  And my next

17    question, so you can think about it for a

18    couple of minutes, is whether --

19            MR. BUTLER:  Objection.  One

20    question at a time.

21            MR. SIMON:  I'm trying to be a nice

22    guy.  That's what happens.  No good deed -- no

23    good deed goes unpunished.  I was going to

24    give you a preview of the next question, but I

25    won't.

164

1         THE COURT:  Why don't you just

2    rephrase the first question?  Or do you

3    remember the first question.

4    BY MR. SIMONS:

5    Q.   What happens if you don't agree, or the

6    benefit staff of UAW and Delphi do not agree

7    on either essentiality or on such

8    modifications or eliminations as may be

9    appropriate?

10    A.   I would have to review that.  I don't

11    believe we have a dispute resolution within

12    the healthcare agreement.

13    Q.   There is a dispute resolution mechanism

14    under both the national and local agreements,

15    is there not?

16    A.   I believe there is.

17    Q.   But you do not believe either of them

18    would apply to the questions we just

19    discussed, but you haven't thought about it

20    like you're making it sound like --

21    A.   I need to review.

22    Q.   Got it.  On page 14, under relocation

23    allowance.  You provided that on a case by

24    case basis, Delphi employees relocating to a

25    GM plant outside of the area hire or

165

1    transpiring from the Delphi plant to a Delphi

2    plant may be eligible for a relocation

3    allowance based on actual expenses incurred,

4    up to a maximum of 10,000 dollars.  Who would

5    conduct that case by case analysis?

6    A.    That was intended to be a foundation for

7    negotiation and discussion between the company

8    and union.

9    Q.    And what criteria -- sorry.

10   A.    Yes.  I'm sorry.  That was intended to be

11   a process of -- or a foundation for

12   negotiation and discussion with the union.

13   Q.    And in the event, those discussions did

14   not produce an agreement, what would happen?

15   A.    In that case, where there was no

16   resolution, again, I would have to review the

17   dispute resolution, but it would be our

18   position that we would determine in what cases

19   that applied.

20   Q.    And what criteria would you use?

21   A.    We would take a look at the distance or

22   area, how far, if you were the relocation --

23    out of very hire generally means outside of 50

24    miles.

25    Q.    And who would make that review?


166


1    A.    We would have -- we have a staff that

2    deal with relocation and transfer.

3    Q.    At the local district or headquarters

4    office?

5    A.    At the headquarters level.

6    Q.    And, again, you're not sure whether there

7    would be any recourse to dispute resolution

8    mechanism; it's something you want to think

9    about?

10    A.    It would be, generally speaking, we

11    resolve these issues by operation of the

12    agreement now --

13    Q.    Generally speaking, you don't move to

14    reject contracts?

15    A.    True.

16    Q.    Page 15; buy out payments, middle of the

17    box.  "The application period, timing of buy

18    outs, release dates and number of sign-up

19    dates will be jointly determined by Delphi and

20    the UAW.  These dates may vary by location."

21    Again, failure to agree?

22    A.    Basis for negotiation and I would -- and

23    a failure to agree, have to review.

24    Q.    Failure to agree?

25    A.    I would have to review the process.


167


 1    Q.    Page 23 -- I have the wrong page

 2    reference.  Page 22, personal savings plan,

 3    the top box, Exhibit 89.  "Provision of these

 4    defined contribution benefits is contingent

 5    upon financial support from GM.  In the

 6    absence of such support, the corporation will

 7    implement a defined contribution benefit for a

 8    future benefit accruals where appropriate."

 9    What does the phrase "where appropriate" mean?

10    A.    In the instance where a personal savings

11    plan would be an essential ingredient of a

12    defined contribution plan and a replacement of

13    a frozen pension plan, that's what we were

14    alluding to.

15    Q.    So, when would that be?

16    A.    Our proposal sought to freeze the pension

17    plan.  And many of the membership is covered

18    under the GM Benefit Guarantee and certain

19    portion of population of population is not.

20    So a personal savings plan would be used to

21    handle those folks not covered under the GM

22    Benefit Guarantee.

23    Q.    I see.  So that's only for those not

24    covered by whatever GM is committed and

25    obligated and, in fact, does because you've

                                                                    168

1    recognized earlier, GM may or may not fulfill

2    their commitment.  So this would be a proposal

3    for those for who, for one reason or another,

4    do not receive the GM benefit.  The company

5    would establish for them a defined

6    contribution plan?

7    A.    This was intended for those not covered

8    under the GM Benefit Guarantee.

9    Q.    And what defined contribution benefit

10    would Delphi implement?

11    A.    It would be a subject of negotiation.

12    Q.    And failure to agree?

13    A.    Same as before.

14    Q.    Page 23, middle box.  "Delphi reserves

15    the right, while in Chapter 11 to seek a

16    distress termination of the HRP," which is the

17    defined benefit plan, right?

18    A.    Yes.

19    Q.    In the event it determines that it cannot

20    maintain the HRP under the applicable legal

21    standards for such a termination, does Delphi

22    management have an understanding now whether

23    it would be able to maintain a defined benefit

24    plan?

25    A.    It is our desire to do so.


                                                        169


1    Q.    Does it have an understanding as to

2    whether or not it will be able to do so?

3    A.    It is dependent upon both the changes

4    that we seek to make in our collective

5    bargaining agreements as well as getting a

6    suitable arrangement for funding with the PBGC

7    and, potentially, the IRS.

8    Q.    Based upon Delphi's existing financial

9    forecasts and current law, does management

10    have a position as to whether or not it will

11    have the ability to fund the defined benefit

12    plan?

13    A.    I believe if we remain as we are and do

14    nothing we place our business and our benefit

15    plans in jeopardy.

16    Q.    You're aware of Mr. Sheehan's declaration

17    regarding pension obligation -- pension

18    funding obligations and the corporation's

19    ability to meet them?

20    A.    I am.

21    Q.    You're aware that in his declaration at

22    paragraph 54, he asserts that the pension

23    funding obligations exceed all of the cash and

24    available credit that Delphi anticipates

25    having?

170

1    A.    I believe that to be a true statement.

2    Q.    Has Delphi or its consultants studied

3    what the impact would be on UAW represented

4    employees in the event of a defined benefit

5    plan termination?

6    A.    We have -- we have reviewed that

7    possibility.

8    Q.    And what did your review produce by way

9    of information and conclusions?

10    A.    That in the event of a pension plan

11    termination significant, if not majority of

12    employees, would be covered under the GM

13    Benefit Guarantee and the others would have an

14    impact to their pension plan if picked up by

15    the PBGC.

16    Q.    Have a significant impact?

17    A.    It would.

18    Q.    And, have you made a determination as to

19    General Motor's ability to fulfill the

20    obligations you've described in the event you

21    just described?

22    A.    Not that I'm aware of.

23    Q.    So that, as you noted in one of your

24    earlier proposals, it's really subject to GM's

25    ability to meet its obligations, is it not?

171

```
 1    A.    I'm sorry, could you define it?  It's --

 2    Q.    The ability of your proposal to cover

 3    employees through a General Motors pickup of

 4    obligation, would be subject to GM's ability

 5    to meet its obligations?

 6    A.    Could you rephrase the question, please?

 7    Q.    Do you recall that on page 6 of your

 8    proposal -- we went through this question

 9    earlier, I think.  Sorry, page 5 of your

10    proposal, Exhibit 89, middle of the page.  "In

11    the event GM agrees to provide financial

12    support, but that support is insufficient to

13    fund all the contingent provisions herein.  Or

14    if GM is unable to meet its commitments,

15    etcetera."

16    A.    Yes.

17    Q.    So, much of the same way as you are

18    acknowledging the contingencies attendant upon

19    a GM obligation on page 5, I assume you would

20    acknowledge them with regard to any GM

21    obligations relating to the subject we've just

22    been examining.

23    A.    You mean --

24    Q.    What's good for the goose is good for the

25    gander.
```

172

```
 1   A.    You mean the Benefit Guarantees?

 2   Q.    Yes.

 3   A.    I believe GM's ability to perform under

 4   the Benefit Guarantees, is subject to their

 5   capability to do that.

 6   Q.    What would the impact be on Delphi's

 7   financial projections if it were to terminate

 8   its defined benefit plan?  What savings would

 9   be produced by a termination?

10   A.    There would be a reduction, I believe, in

11   liability.  And there would be a reduction in

12   expense and ongoing cash payments in the plan.

13   Q.    And can you quantify those for me,

14   please?  We talked about three different

15   elements here and we get accounting

16   trickiness.  So let's be careful.

17   A.    I would have to defer to our financial

18   folks.  But the liability would be several

19   billion dollars eliminated and expense and

20   cash contributions would go in the 100's of

21   millions of dollars.

22   Q.    So if Delphi would save billions of

23   dollars, and if your judgment is that a

24   significant number of UAW represented

25   employees would not suffer as a consequence,
```

173

1   why hasn't Delphi simply pursued that option?

2   A.   Our view was, it was responsible and

3   prudent to restructure the company in a

4   fashion that would get us both competitive and

5   the ability to win in bid work, and retain

6   that degree of pension plan -- a frozen plan

7   that we could responsibly fund and carry.

8   Q.   Do you know what controlled group

9   liability is?

10  A.   Yes.

11  Q.   And your decision not to terminate the

12  plan has nothing to do with your desire to

13  protect against controlled group liability

14  being asserted by the PBGC and against your

15  foreign subsidiaries?

16  A.   Not that I'm aware of, no.

17  Q.   That was not a consideration and not

18  discussed within the corporation?

19  A.   That was not a driving factor in our

20  decision.

21  Q.   Are you aware of that reality?

22  A.   I am aware of that potentiality.

23  Q.   And it doesn't occur to Delphi that its

24  foreign subsidiaries were going to be the

25  beneficiary of the lost work opportunities of

174

1    American workers, might fairly bear some of

2    the burden of that decision?

3            MR. BUTLER:  Objection.  Move to

4    strike, argumentative.

5            MR. SIMON:  Withdrawn.

6    BY MR. SIMON:

7    Q.    Page 29 -- sorry, I must have pagination

8    problems or there are two versions of this

9    document.  Page 28, a complete agreement and

10   waiver.  This is, typically, what's described

11   as a zipper clause?

12   A.    Yes.

13   Q.    And, among the things it provides is,

14   "that the corporation and UAW agree that for

15   the life of the agreement, each voluntarily

16   and unqualifiedly waives the right" -- I got

17   some ellipses in here -- "to bargain

18   collectively and that this term sheet

19   represents complete and total agreement in, as

20   to all modifications.  And each party

21   voluntarily and unqualifiedly waives the right

22   to raise claim to the contrary."  Correct?

23   A.    That's correct.

24   Q.    Now at some page in this document -- page

25   27, no assumption, right to re-file 1113 and

175

```
 1    1114 motions.  "Nothing contained herein, in
 2    effect, precludes the company from filing
 3    another 1113 or another 1114 in the even that
 4    the changes in the corporation's financial
 5    condition or other relevant conditions require
 6    it."  Correct?
 7    A.    That's correct.
 8    Q.    Does the zipper clause, on page 28,
 9    supercede the provision on page 27, the no
10    assumption provision?
11    A.    I don't believe so.
12    Q.    So that Delphi has retained the right to
13    a second or third bite at the apple, it's only
14    the UAW that's really bound by the -- that
15    this is an agreement that we mean it clause,
16    correct?
17    A.    I would not characterize it that way, no.
18    Q.    Well, the UAW would be bound by this
19    agreement until May 1, 2010, correct?
20    A.    That's correct.
21    Q.    Delphi could come back say, in September
22    for further relief, in the event of changes in
23    Delphi's financial conditions or other
24    relevant conditions, correct?
25    A.    In the event that we were not financially
```

1    able to perform at the expense of Chapter 11,

2    that would be correct.

3    Q.    I'm not sure what those words mean, but

4    they mean what they mean.    Changes in

5    financial conditions, as you set it forth in

6    your proposal that phrase, from what basis?

7    Which of the various basis and scenarios

8    described earlier in this hearing is the base

9    for the determination as to whether there

10   would be change in financial condition

11   sufficient to move you back into court for a

12   second or third bite at the apple?

13   A.    Change sufficient that we would be able

14   to demonstrate that we are unable to perform

15   and changes are necessary.

16   Q.    And who would make that determination?

17   A.    I believe the company in its judgment

18   would bring that forward.

19   Q.    And what other "relevant conditions"

20   might require a revisit to this courtroom

21   under sections 1113 or 1114?

22   A.    As I review this now, nothing comes to

23   mind.

24   Q.    Who will decide what's relevant?

25   A.    Management, in its review.

1    Q.    And if the UAW disagreed, would that be

2    subject to the dispute resolution mechanism?

3    A.    I don't believe the Chapter 11 is subject

4    to dispute resolution.

5    Q.    What does Delphi plan to do if no

6    agreement is reached between Delphi and the

7    UAW, prior to a decision by this Court and the

8    Court grants your motion?

9    A.    I'm sorry could you repeat the question

10   again?

11   Q.    Sure.  What does Delphi plan to do if no

12   agreement is reached between Delphi and the

13   UAW, prior to a decision by this Court, and

14   the Court grants your motion, what are you

15   going to do?

16   A.    We will seek first to continue

17   negotiating to achieve a consensual solution.

18   Failing to achieve that, we will impose

19   contractual changes.

20   Q.    And what is it that you will impose the

21   March 24th proposal?

22   A.    At this point, I would not speculate.  We

23   would have to see where we are at that time.

24   We would have to be prepared to impose the

25   November 15th proposal.  But I wouldn't

1    speculate where we'd be on that at this point.

2    Q.    So that you're not now prepared to tell

3    the Court what conditions you will impose if

4    the Court grants your motion?

5    A.    If necessary, we will impose the November

6    15th provisions.

7    Q.    What is the word, if necessary, mean?

8    The question to you, sir, is what does Delphi

9    plan to do if the Court grants your motion?

10    A.    To continue to bargain in good faith, and

11    achieve some consensual support form General

12    Motors that allows us to fashion the best

13    transformation agreement that we can fashion.

14    Q.    And in the absence of such an agreement

15    from General Motors, what will the company do?

16    A.    We would be prepared to impose the

17    November 15th --

18    Q.    I'm not asking you what you're going to

19    be prepared to do, sir.  I am asking you what

20    you're going to do.

21            MR. BUTLER:  Objection.  It's about

22    the third time it's been asked.

23            MR. SIMON:  Right.  And it hasn't

24    been answered yet.

25            THE COURT:  What's the basis for the

1    objection?

2            MR. BUTLER:  It's been asked and

3    answered.  He asked the same question in three

4    different ways.  It's been answered three

5    times by the witness, Your Honor.

6            THE COURT:  Is it?

7            MR. SIMON:  It's been asked, and it

8    hasn't been answered.  I agree, guilty, I've

9    asked it three times.

10            THE COURT:  I think it's because

11    you're asking him to speculate.  He thinks

12    he's speculating.  I think his answer is

13    clear.  You can make of it what you want.

14    It's been asked and answered and I sustain the

15    objection.

16    BY MR. SIMON:

17    Q.   Does Delphi's March 6th proposal

18    represent Delphi's last best and final offer

19    as we sit here today?

20    A.   It would be our intent to continue to

21    bargain in good faith after this hearing and

22    after a decision from the Judge.

23    Q.   How many times do I have to ask this

24    question before I'm told to desist?

25            THE COURT:  I think that was the

1    answer.

2            MR. SIMON:  It's non-responsive.  I

3    know --

4            THE COURT:  It was responsive.

5            MR. SIMON:  It was responsive?

6            THE COURT:  He didn't agree, he said

7    it wasn't.

8    BY MR. SIMON:

9    Q.   Does Delphi have a back up set of

10   proposals to propose in the event its March

11   6th proposal does not form the basis for an

12   agreement with the UAW?

13   A.   We are hoping and endeavoring to have

14   counterproposals from the unions, including

15   the UAW.

16   Q.   Do you have a back up proposal to make to

17   the UAW?

18   A.   We do not have a back up at this time,

19   and would invite a counterproposal.

20   Q.   If the Court signs the order you

21   submitted in connection with your 1113 motion,

22   which provided for authority to reject upon

23   days notice, how long would you permit

24   negotiations to go forward before you sent

25   your ten day notice?

181

1    A.   I can't speculate, but broadly, I would

2    say as long as we are making constructive

3    progress toward a resolution.

4    Q.    So, you don't have a drop dead date by

5    which time you would submit that notice?

6    A.    Not that I would speculate on at this

7    point, no.

8    Q.    What does the company plan to do in the

9    event the Court rejects the contract and

10   notwithstanding your willingness to continue

11   to bargain the UAW strikes?

12   A.    In the even that the UAW strikes, we will

13   continue to try to resolve the issue, bargain

14   the issue while on strike, as long as we're

15   financially able.

16   Q.    And how long do you think that would be?

17   A.    I cannot guesstimate that.  Its impact

18   would be significant.

19   Q.    Do you have tucked away in mind that if

20   there has to be a therapeutic strike during

21   the first two weeks of July during the

22   automobile shutdown, you can tolerate that and

23   then you hope for an agreement?  Is that

24   tucked away in the back of your mind.

25   A.    A strike during the first two weeks of

                                                    182

1    July would have a lower impact on the company

2    but an impact nonetheless.

3    Q.    Will you anticipate given our dialogue

4    that if you impose, on the basis we've been

5    discussing that among the agreement you'd be

6    rejecting is the Kokomo Thanksgiving and

7    Christmas day lunch?  Is that your current

8    intention, given our discussion?

9    A.    Given our discussion that we would change

10   all the provisions that are non-competitive.

11   Q.    On December 19, 2005, after General

12   Motors agreed to interim financial pricing

13   support, Delphi conditionally withdrew its

14   November 5th offer, right?

15   A.    November 15th offer, true.

16   Q.    And, on March 22, of '06, agreement was

17   reached on the attrition program, correct?

18   A.    That's correct.

19   Q.    And it had been your hope when you

20   withdrew your proposal in November that there

21   would be tripartied negotiations between

22   General Motors, UAW and Delphi, correct?

23   A.    That is correct.

24   Q.    And there was an agreement, was there

25   not, to approach those negotiations through a

                                                      183

1    three-part framework?  The first of which was

2    to be an attrition program, the second of

3    which was to be footprint discussions and

4    agreement, and the third to be changes and

5    conditions of employment.

6    A.    We did agree after exploring all the

7    topics related to a full transformation.

8    Which included transformation of the work

9    force through attrition meetings, as well as

10   the alignment of the portfolio and site.  So

11   site impact, wages benefits and work rules.

12   We had discussions about all of those.

13   Several aspects which were memorialized in the

14   March 24th proposal.  But we also did talk

15   about how to approach the work, the effort, if

16   you will, to get an agreement and that did

17   include, attrition and then resolving the

18   sites, wages benefits and flexibility issues,

19   including document 13 and jobs.

20   Q.    And two days after you reached the

21   attrition agreement, you re-proposed your

22   contract proposal.  And nine days after you

23   reached attrition agreement, you filed your

24   Section 1113 motion, correct?

25   A.    Starting in January in the three-way

184

1    discussions, the essential elements of the

2    March 24th proposal, the wage step down, the

3    pension freeze, those elements of the March

4    24th proposal were discussed in a three-way

5    discussion with General Motors and the UAW,

6    and that was memorialized on March 23rd.

7    Q.    Did it not occur to you that one reason

8    you were able to reach agreement with the UAW

9    and general motors on the attrition program on

10   March 22nd, was precisely because you did not

11   have a proposal on the table you knew to be

12   unacceptable and you had not filed the 1113?

13   Did that ever occur to you?

14   A.    It occurred to us that withdrawing the

15   proposal of November 15th, conditionally,

16   based on input from the UAW and other unions

17   could create an environment for progress.  And

18   in our hope, would have resulted in

19   comprehensive resolution of the issues in

20   counterproposals.  And what we were able to

21   achieve, in the time frame, was an attrition

22   plan that, while an important first step, did

23   not solve the crux and total of the serious

24   issues we needed to deal with.

25   Q.    And so, two days later, you laid on the

185

1    table the proposal you knew would be

2    unacceptable, and a week after you filed the

3    1113.  And you really consider that to be an

4    action consistent with reaching a consensual

5    agreement?

6    A.    The timing of the March 24th proposal,

7    was, again, a memorialization of a discussion

8    that took place and that had been offered to

9    be put in writing in advance of that date.

10   But the union -- UAW requested that not

11   happen.  And, so our view, and was just

12   advancing the discussions -- memorializing

13   discussions that had occurred.

14          MR. SIMON:  Motion to strike, as

15   non-responsive.

16          THE COURT:  What was the question,

17   again?  What was the question again?

18          MR. SIMON:  Did Delphi really expect

19   that two days after reaching agreement on,

20   what they described as being an extraordinary

21   achievement, the attrition agreement, that by

22   putting on the table a proposal they knew to

23   be unacceptable and a week later filing the

24   section 1113 motion, that they were acting in

25   a manner wholly inconsistent with any effort

186

1    to reach a consensual agreement?

2          THE WITNESS:  I don't believe so.  I

3    believe that our November 23rd -- the March

4    24th proposal, memorialized discussions that

```
 5   had took place and did invite, if it was

 6   unacceptable, counterproposals which did not

 7   materialize.

 8              MR. SIMON:  No further questions.

 9              MR. BUTLER:  Your Honor, at this

10   point I note it's pretty close to the time you

11   had indicated you had wanted to wrap up for

12   the day.  I certainly have a fair amount of

13   cross-examination of Mr. Butler.  What's your

14   preference?

15              THE COURT:  You have more than five

16   minutes, right?

17              MR. BUTLER:  I certainly do, sir.

18              THE COURT:  All right.  I always

19   hate to interrupt a witness in mid-stream, but

20   I think we have to do that here.  Mr. Butler,

21   you should not go over your testimony with

22   counsel, just come back tomorrow and we'll

23   resume then.  So you can step down.

24              MR. BUTLER:  And Your Honor, what

25   time are we starting tomorrow?
```

                                                    187

```
 1              THE COURT:  9 o'clock.  Before

 2   everyone leaves, I have to say two things.

 3   Because I know you're going to talk about

 4   scheduling.
```

```
 5              MR. SIMON:  We have already.

 6              THE COURT:  All right.  You have

 7    already?

 8              MR. BUTLER:  We have a couple of

 9    people we didn't talk to.  We have with the

10    unions but it's not complete yet, Your Honor.

11              THE COURT:  All right.  And does

12    that include wrapping this up, not in the next

13    two weeks, but giving some time for further

14    discussion.

15              MR. BUTLER:  If the proposal the

16    debtors made is accepted, the next -- we would

17    have to move the omnibus, and the next hearing

18    after Friday would be the 24th.

19              THE COURT:  But that's -- the 24th

20    of May, and would that be the last hearing --

21              MR. BUTLER:  No.

22              THE COURT:   Okay.  All right.

23    Well, that's good because, obviously, we're in

24    the middle of a hearing and what I've seen are

25    the declarations, and the briefs and the
```

                                                188

```
 1    statements of the parties.  But, I'll

 2    reiterate something I said earlier, which is

 3    that the hearing, as it plays out, will lead

 4    to a determination by me as to the good faith

 5    of both parties in trying to reach consensus
```

6   here.  And while it's true that some offers

7   may be so outrageous as not to merit a

8   response, a union really proceeds -- you know

9   its plural if it doesn't respond because what

10  is so outrageous that doesn't merit a response

11  is in the eyes of the beholder and ultimately

12  that beholder is me.  And so, I would strongly

13  urge the parties to sit down and ask each

14  other in a non-litigation setting many of the

15  questions that you're asking right now, and

16  see if you can really make progress.  And I

17  think that the parties here are experienced

18  and eager enough to do that in a way that does

19  not -- that keeps the litigation up here in a

20  compartment.  Without getting rhetorical about

21  it, obviously, these are difficult issues.

22  But the code requires me, and you, to review

23  them, not ignore the difficulty of the issues,

24  but in a business like way.  And, that's how I

25  hope you'll do it.  You'd have Thursday, which

189

1   I would hope would be a day for parties to

2   deal with process issues, if you can.

3   Informational issues, process issues, and the

4   like.  And I wouldn't waste that day, and you

5   can move along from there.

```
 6              MR. SIMON:  Unfortunately, Your

 7    Honor, litigation intercedes, depositions are

 8    scheduled.

 9              THE COURT:  Depositions on Thursday?

10              MR. SIMON:  Not by us.

11              MR. BUTLER:  Yes, Your Honor.

12              THE COURT:  I thought discovery was

13    --

14              MR. BUTLER:  Yes, Your Honor, expert

15    witness depositions on Thursday.

16              THE COURT:  All right.  Well -- then

17    you can't use Thursday --

18              MR. SIMON:  Decompartmentalization

19    is a wonderful theory.

20              MR. BUTLER:  Your Honor, that's two

21    lawyers going to deposition and it was because

22    an accommodation was made to the UAW by how

23    they  --

24              THE COURT: Well, you can work that

25    out as you see fit.
```

                                                          190

```
 1              MR. BUTLER:  Right.

 2              THE COURT:  The other point I want

 3    to make is as part of that early analysis, and

 4    again, I'm saying this with the full

 5    understanding that when we're in mid-stream

 6    and this should be taken no more than a
```

7    suggestion.  I would like the company to focus

8    on what I'll refer to as -- I think they refer

9    to themselves as this -- some of the out liar

10   unions to see whether, in fact, it makes sense

11   to proceed with them at this time, given the

12   proposal that's on the table and given their

13   willingness as expressed in oral presentation

14   at the beginning, to focus on their particular

15   situation.  I expect, given the importance of

16   the UAW contracts and perhaps other contracts,

17   their lawyers would still attend every minute

18   of this hearing.  But, I think that's

19   different then potentially putting them to the

20   test about rejection.  And so I hope that's

21   something else that you would talk about over

22   the next day or so.

23          MR. BUTLER:  We will, Your Honor.

24          THE COURT:  Okay.  All right.  So,

25   I'll see you all at 9 tomorrow morning.

191

1          MR. BUTLER:  Your Honor, one

2    question for you.  Can we get some guidance

3    from the Court about -- we're starting at 9

4    o'clock in the morning, there's a lot of paper

5    in this room, can any of it stay?

6          THE COURT:  You can leave it here.

7            MR. BUTLER:  Thank you, Your Honor.

8            THE COURT:    Judge Peck has been

9    kind enough to switch courtrooms with me for

10   the next few days.

11      (Whereupon the afternoon session of these

12   proceedings were concluded at 7:02 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        192

1

2                    I N D E X

3

4                 T E S T I M O N Y

5    EXAMINATION BY        WITNESS        PAGE

6    MR. BUTLER            MR. RESNICK    99

7    MR. SIMON             MR. BUTLER     134

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

193

1

2                C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, hereby certify that the

5    foregoing is a true and correct transcription,

6    to the best of my ability, of the sound

7    recorded proceedings submitted for

8    transcription in the matter of the bankruptcy

9    proceeding of:

10    DELPHI CORPORATION, et al.

11

12        I further certify that I am not employed

13    by nor related to any party to this action.

14

15        In witness whereof, I hereby sign this

16    date:

17    May 11, 2006.

18

19        _____

20                    Lisa Bar-Leib

21

22

23

24

25