IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                         :
In re                              :    Chapter 11
                                   :
DELPHI CORPORATION, et al.,        :    Case No. 05-44481 (RDD)
                                   :
                    Debtors.       :    (Jointly Administered)
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

        I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

        On May 26, 2006, I caused to be served the document listed below (i) upon the parties listed on Exhibit A hereto via overnight delivery, (ii) upon the parties listed on Exhibit B hereto via electronic notification, and (iii) upon the parties listed on Exhibit C hereto via postage pre-paid U.S. mail:

        Motion for Order Under 11 U.S.C § 363(b) and Fed.R.Bankr.P. 2002 and 6004 Authorizing and Approving Debtors' Entry Into Transfer Agreement with Johnson Controls, Inc. Providing for (A) Sale of Acquired Assets Free and Clear of Liens, Claims, and Encumbrances (B) Continuation and Transition of Supply to Johnson Controls, Inc. of Batter Products Out of Fitzgerald Facility and (C) Implementation of Attrition Plan with Respect to New Brunswick Facility in Accordance with IUE-CWA Memorandum; Notice of Motion for Order Under 11 U.S.C § 363(b) and Fed.R.Bankr.P. 2002 and 6004 Authorizing and Approving Debtors' Entry Into Transfer Agreement with Johnson Controls, Inc. Providing for (A) Sale of Acquired Assets Free and Clear of Liens, Claims, and Encumbrances (B) Continuation and Transition of Supply to Johnson Controls, Inc. of Batter Products Out of Fitzgerald Facility and (C) Implementation of Attrition Plan with Respect to New Brunswick Facility in Accordance with IUE-CWA Memorandum; and [Proposed] Order Under 11 U.S.C § 363(b) and Fed.R.Bankr.P. 2002 and 6004 Authorizing and Approving Debtors' Entry Into Transfer Agreement with Johnson Controls, Inc. Providing for (A) Sale of Acquired Assets Free and Clear of Liens, Claims, and Encumbrances (B) Continuation and Transition of Supply to Johnson Controls, Inc. of Batter Products Out of Fitzgerald Facility and (C) Implementation of Attrition Plan with Respect to New Brunswick Facility in Accordance with IUE-CWA Memorandum (Docket No. 3927) [a copy of which is attached hereto as Exhibit D]

On May 30, 2006, I caused to be served the document listed below upon the parties listed on <u>Exhibit E</u> hereto via overnight delivery:

Motion for Order Under 11 U.S.C § 363(b) and Fed.R.Bankr.P. 2002 and 6004 Authorizing and Approving Debtors' Entry Into Transfer Agreement with Johnson Controls, Inc. Providing for (A) Sale of Acquired Assets Free and Clear of Liens, Claims, and Encumbrances (B) Continuation and Transition of Supply to Johnson Controls, Inc. of Batter Products Out of Fitzgerald Facility and (C) Implementation of Attrition Plan with Respect to New Brunswick Facility in Accordance with IUE-CWA Memorandum; Notice of Motion for Order Under 11 U.S.C § 363(b) and Fed.R.Bankr.P. 2002 and 6004 Authorizing and Approving Debtors' Entry Into Transfer Agreement with Johnson Controls, Inc. Providing for (A) Sale of Acquired Assets Free and Clear of Liens, Claims, and Encumbrances (B) Continuation and Transition of Supply to Johnson Controls, Inc. of Batter Products Out of Fitzgerald Facility and (C) Implementation of Attrition Plan with Respect to New Brunswick Facility in Accordance with IUE-CWA Memorandum; and [Proposed] Order Under 11 U.S.C § 363(b) and Fed.R.Bankr.P. 2002 and 6004 Authorizing and Approving Debtors' Entry Into Transfer Agreement with Johnson Controls, Inc. Providing for (A) Sale of Acquired Assets Free and Clear of Liens, Claims, and Encumbrances (B) Continuation and Transition of Supply to Johnson Controls, Inc. of Batter Products Out of Fitzgerald Facility and (C) Implementation of Attrition Plan with Respect to New Brunswick Facility in Accordance with IUE-CWA Memorandum (Docket No. 3927) [a copy of which is attached hereto as Exhibit D]

Dated: May 30, 2006

_/s/ Evan Gershbein_
Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 30th day of May, 2006, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature : _/s/ Amy Lee Huh_

Commission Expires: _3/15/09_

# EXHIBIT A

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brandes Investment Partners LP | Ted Kim | 11988 El Camino Real | Suite 500 | San Diego | CA | 92103 | | | | Equity Security Holders Committee Member |
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel for Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| DC Capital Partners LP | Douglas L Dethy | 800 Third Avenue | 40th Floor | New York | NY | 10022 | | | | Equity Security Holders Committee Member |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2670 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel for Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel for Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com slivir@ffhsj.com | Proposed Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel for Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel for Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| IUE-CWA | Henry Reichard | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | hreichardiuecwa@aol.com | Creditor Committee Member |
| James E Bishop Sr | | 502 Shiloh Dr | No 9 | Laredo | TX | 78045 | | | | Equity Security Holders Committee Member |
| James H Kelly | | PO Box 4426 | | Boulder | CO | 80306 | | | | Equity Security Holders Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

5/30/2006 11:26 AM
Master Service List

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | James Le | 12910 Culver Blvd. | Suite I | Los Angeles | CA | 90066 | 310-751-1511 | 310-751-1561 | jle@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Patrick J. Healy | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Daniel R. Fisher | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Luqman Yacub | | PO Box 1026 | | Hartville | OH | 44632 | | | | Equity Security Holders Committee Member |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel for Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel for Recticel North America, Inc. |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel for Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | ServeAG@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Meyer LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Meyer LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pardus European Special Opportunities Master Fund LP | Joseph R Thornton | Pardus Capital Management LP | 1101 Avenue of the Americas Suite 1100 | New York | NY | 10018 | | | | Equity Security Holders Committee Member |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel for the Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel for Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel for Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

5/30/2006 11:26 AM
Master Service List

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel for Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Trustee of the Koury Family Trust | James N Koury | 410 Reposado Dr | | La Habra Heights | CA | 90631 | | | | Equity Security Holders Committee Member |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel for the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

5/30/2006 11:26 AM
Master Service List

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Crusader Servicing Corporation | | 732 Montgomery Avenue | | Narberth | PA | 19072 |
| Daniel A. Torrisi | New Brunswick City Clerk | 78 Bayard Street | | New Brunswick | NJ | 08901 |
| Dr. Carol O'Cleireacain, Deputy State Treasurer and Acting Director | New Jersey Division of Taxation, | 50 Barrack Street, | | Trenton | NJ | 08695 |
| Ed Reddy | Adler Industrial Services, Inc. | 95-123 Firmenich Way | | Newark | NJ | 07114 |
| Edwin J. Walters, Jr., Darrell J. Papillion | Moore, Walters, Thompson, Thomas, Papillion & Cullens | 6513 Perkins Road | | Baton Rouge | LA | 70808 |
| Elaine M. Flynn | Middlesex County Clerk | County Administration Building | 75 Bayard Street, P.O. Box 1110, County Clerk 4th Floor | New Brunswick | NJ | 08901 |
| Eva Kolb | Northeast Regional Office Securities and Exchange Commission | 3 World Financial Center | Room 4300 | New York | NY | 10281 |
| Geri Margin | North Brunswick Township Public Schools, Administrative Offices | Maple Meade School | Old Georges Road | North Brunswick | NJ | 08902 |
| Hector Canales | Canales & Simonson, P. C. | 2601 Morgan Avenue | | Corpus Christie | TX | 78405 |
| Insolvency | Internal Revenue Service | 290 Broadway | 5th Floor | New York | NY | 10007 |
| Insolvency | Environmental Protection Agency | Ariel Building | 1200 Pennsylvania Ave, N.W. | Washington | DC | 20460 |
| Jacqueline J. Ertl, Vice President and General Counsel | Johnson Controls Inc. | 5757 North Green Bay Avenue | Mail Stop X-18 | Milwaukee | WI | 53209 |
| James T. Phillips | Treasurer of Middlesex County | County Administration Building | 75 Bayard Street, P.O. Box 1110, County Clerk 4th Floor | New Brunswick | NJ | 08901 |
| Jeff C. Spahn | Martin, Pringle, Oliver, Wallace & Bauer, L.L.P. | 100 North Braodway | Suite 500 | Wichita | KS | 67202 |
| John B, Quinn | Quinn, Emanuel, Urquhart & Oliver & Hedges LLP | 865 S. Figueroa Street | 10th Floor | Los Angeles | CA | 90017-2543 |
| John Robertson, Mark Carrigan | Carrigan, McCloskey & Roberson, LLO | 5300 Memorial Drive | Suite 700 | Houston | TX | 77007 |
| John W. Rasmussen, Dale W. Robinson, Jay M. Allen | Johnson, Rasmussen, Robinson & Allen, P.L.C. | 48 North MacDonald Street | | Mesa | AZ | 85201 |
| Jonathan D. Selbin, Rachel Geman | Lieff, Cabaser, Heiman & Bernstein, LLP | 780 Third Avenue | 48th Floor | New York | NY | 10017 |
| Josh Gradwohl | New Jersey Department of Environmental Protection | 401 East State Street, 5th Floor | PO Box 028 | Trenton | NJ | 08625 |
| Lisa J. Leebove | Lieff, Cabraser, Heimann & Bernstein, LLP | Embarcadero Center West | 275 Battery Street, 30th Floor | San Francisco | CA | 94111 |
| Lori J. Gabrielle | | 39 Boomcrang Road 8120 | | Aspen | CO | 81611 |
| Michael J. Garcia | United States Attorney, SDNY | 1 St. Andrews Plaza | | New York City | NY | 10007 |
| New Brunswick Tax Collector's Office | | 78 Bayard Street | | New Brunswick | NJ | 08901 |
| Office of the Tax Collector | City of New Brunswick | City Hall | 78 Bayard St., | New Brunswick | NJ | 08903 |
| Patricia Schrage | Northeast Regional Office Securities and Exchange Commission | 3 World Financial Center | Room 4300 | New York | NY | 10281 |
| Peter Morris | PDM Group Inc. | 1258 South River Road | | Cranbury | NJ | 08512 |
| Regional Administrator | Environmental Protection Agency, Region 2 | 290 Broadway | | New York | NY | 10007-1866 |
| Regional Administrator | Environmental Protection Agency, Region 4 | Atlanta Federal Building | 61 Forsyth Street, SW | Atlanta | GA | 30303 |
| Steve Bobo | Sachnoff & Weaver | 10 South Wacker | | Chicago | IL | 60606 |
| Steve Danneker | AM Sheet Metal | 410 W 2nd Ave | | S. Williamsport | PA | 17702 |

# EXHIBIT B

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel for Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2670 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel for Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel for Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Proposed Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel for Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel for Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| IUE-CWA | Henry Reichard | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | hreichardiuecwa@aol.com | Creditor Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | James Le | 12910 Culver Blvd. | Suite I | Los Angeles | CA | 90066 | 310-751-1511 | 310-751-1561 | jle@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

5/30/2006 11:27 AM
Master Service List

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel for Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel for Recticel North America, Inc. |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel for Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | ServeAG@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Meyer LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Meyer LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel for Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel for the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel for Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel for Movant Retirees and Proposed Counsel for The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel for Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel for the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

5/30/2006 11:27 AM
Master Service List

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

5/30/2006 11:27 AM
Master Service List

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | | 610-230-3064 | 310-687-1052 | david.boyle@airgas.com | Counsel for Airgas, Inc. |
| Ajamie LLP | Thomas A. Ajamie | 711 Louisiana | Suite 2150 | Houston | TX | 77002 | | 713-860-1600 | 713-860-1699 | tajamie@ajamie.com | Counsel for SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel for Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel for Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | 212-922-3891 | craig.freeman@alston.com | Counsel for Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | 404-253-8554 | dconnolly@alston.com dwender@alston.com | Counsel for Cadence Innovation, LLC |
| Ambrake Corporation | Ronald L. Jones | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-765-0208 | 270-234-2395 | rjones@ambrake.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel for ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel for ITW Mortgage Investments IV, Inc. |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | | 212-692-8251 | 212-867-6395 | lwalzer@angelogordon.com | |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel for Stanley Electric Sales of America, Inc. |
| APS Clearing, Inc. | Andy Leinhoff | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | | 512-314-4416 | 512-314-4462 | aleinoff@amph.com | Counsel for APS Clearing, Inc. |
| APS Clearing, Inc. | Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | | 512-314-4416 | 512-314-4462 | mhamilton@ampn.com | Counsel for APS Clearing, Inc. |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel for Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel for Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel for CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Barack, Ferrazzano, Kirschbaum Perlman & Nagelberg LLP | Kimberly J. Robinson | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | kim.robinson@bfkpn.com | Counsel for Motion Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum Perlman & Nagelberg LLP | William J. Barrett | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | william.barrett@bfkpn.com | Counsel for Motion Industries, Inc. |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel for Mays Chemical Company |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | michael.mccrory@btlaw.com | Counsel for Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com | Counsel for Gibbs Die Casting Corporation |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | 617-422-0383 | ffm@bostonbusinesslaw.com | Counsel for Iron Mountain Information Management, Inc. |
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | 765-640-1332 | tom@beemanlawoffice.com | Counsel for Madison County (Indiana) Treasurer |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | 212-554-1444 | wallace@blbglaw.com | Counsel for SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | | 313-496-1200 | 313-496-1300 | murph@berrymoorman.com | Counsel for Kamax L.P.; Optrex America, Inc. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to Veritas Software Corporation |
| Blank Rome LLP | Bonnie Glantz Fatell | Chase Manhattan Centre | 1201 Market Street, Suite 800 | Wilmington | DE | 19801 | | 302-425-6423 | 302-428-5110 | fatell@blankrome.com | Counsel for Special Devices, Inc. |
| Blank Rome LLP | Marc E. Richards | The Chrysler Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel for DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel for Freudenberg-NOK; General Partnership; Freudenberg NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel for Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel for Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel for Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Bose McKinney & Evans LLP | Jeannette Eisan Hinshaw | 135 N. Pennslyvania Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-684-5296 | 317-684-5173 | jhinshaw@boselaw.com | Counsel for Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel for Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel for Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel for SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel for Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc. |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | | 303-295-0202 | | sabelman@cagewilliams.com | Counsel for United Power, Inc. |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@engelhard.com | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel for Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel for Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel for STMicroelectronics, Inc. |
| Clark Hill PLLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel for BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel for ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel for Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel for Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel for Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com | Counsel for International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | | 615-321-0555 | 615-321-9555 | amalone@colwinlaw.com | Counsel for Averitt Express, Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | 203-629-1977 (203) 629-1977 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel for Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel for Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | wachstein@coollaw.com | Counsel for Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Cornell University | Nancy N. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3556 | nhp4@cornell.edu | Paralegal/Counsel for Cornell University |
| Covington & Burling | Susan Power Johnston | 1330 Avenue of the Americas | | New York | NY | 10019 | | 212-841-1005 | 646-441-9005 | sjohnston@cov.com | Special Counsel to the Debtor |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel for SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 17

5/30/2006 11:28 AM
2002 Lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Curtin & Heefner, LLP | Robert Szwajkos | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel for SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | | 212-696-8898 | 917-368-8898 | athau@cm-p.com | Counsel for Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | | 212-696-6065 | 212-697-1559 | dkarp@cm-p.com | Counsel for Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | | 212-696-6065 | 212-697-1559 | sreisman@cm-p.com | Counsel for Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | | 248-576-5741 | | krk4@daimlerchrysler.com | Counsel for DaimlerChrysler Corporation; DaimlerChrylser Motors Company, LLC; DaimlerChrylser Canada, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel for Relco, Inc.; The Durham Companies, Inc. |
| Daniels & Kaplan, P.C. | Jay Selanders | 2405 Grand Boulevard | Suite 900 | Kansas City | MO | 64108-2519 | | 816-221-3086 | 816-221-3006 | selanders@danielsandkaplan.com | Counsel for DaimlerChrysler Corporation; DaimlerChrylser Motors Company, LLC; DaimlerChrylser Canada, Inc. |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Deputy Attorney General | Amina Maddox | R.J. Hughes Justice Complex | P.O. Box 106 | Trenton | NJ | 08625 | | 609-984-0183 | 609-292-6266 | amina.maddox@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | | 212-682-4940 | 212-682-4942 | gdiconza@dlawpc.com | Counsel to Tyz-All Plastics, Inc.; Furukawa Electric North America APD |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel for The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel for Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel for NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; Hosiden America Corporation and Samtech Corporation |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | 302-425-0432 | mbusenkell@eckertseamans.com | Counsel for Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representative for Electronic Data Systems Corporation |
| Entergy Services, Inc. | Alan H. Katz | 7411 Highway 51 North | | Southaven | MS | 38671 | | | | akatz@entergy.com | Company |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel for Doshi Prettl Internatonal, LLC |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel for Jon Ballin |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | ggreen@fagelhaber.com | Counsel for Aluminum International, Inc. |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel for Aluminum International, Inc. |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel for Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel for Kuss Corporation |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel for Southwest Metal Finishing, Inc. |
| Gazes LLC | Ian J. Gazes | 32 Avenue of the Americas | | New York | NY | 10013 | | 212-765-9000 | 212-765-9675 | ian@gazesllc.com | Counsel to Setech, Inc. |
| Gazes LLC | Eric Wainer | 32 Avenue of the Americas | Suite 1800 | New York | NY | 10013 | | 212-765-9000 | 212-765-9675 | office@gazesllc.com | Counsel to Setech, Inc. |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | | 305-349-2300 | 305-349-2310 | crieders@gjb-law.com | Counsel for Ryder Integrated Logistics, Inc. |
| Gibbons, Del Deo, Dolan, Griffinger & Vecchione | David N. Crapo | One Riverfront Plaza | | Newark | NJ | 07102-5497 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel for Epcos, Inc. |
| Goldberg, Stinnett, Meyers & Davis | Merle C. Meyers | 44 Montgomery Street | Suite 2900 | San Francisco | CA | 94104 | | 415-362-5045 | 415-362-2392 | mmeyers@gsmdlaw.com | Counsel for Alps Automotive, Inc. |
| Goodwin Procter LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinproctor.com | Counsel for UGS Corp. |
| Goodwin Procter LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinproctor.com | Counsel for UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2540 | bmehlsack@gkllaw.com | Counsel for International Brotherood of Electrical Workers Local Union Nos. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | gjarvis@gqelaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel for International Brotherocd of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel for International Brotherocd of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbeler@graydon.com | Counsel for Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel for ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel for American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel for Baker Hughes Incorporated; Baker Petrolite Corporation |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel for Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Glen Dumont | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4750 | 908-898-4137 | glen.dumont@hp.com | Counsel for Hewlett-Packard Financial Services Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel for Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel for GW Plastics, Inc. |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | 716-819-4645 | jkreher@hodgsonruss.com | Counsel for Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | amoog@hhlaw.com | Counsel for Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel for Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel for XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel for CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel for Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | Robert B. Weiss, Frank L. Gorman | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | | 313-465-7000 | 313-465-8000 | rweiss@honigman.com fgorman@honigman.com | Counsel for General Motors Corporation |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel for Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | jrhunter@hunterschank.com | Counsel for ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | tomschank@hunterschank.com | Counsel for ZF Group North America Operations, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel for RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel for RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel for Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel for Sumco, Inc. |

In re: Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 17

5/30/2006 11:28 AM
2002 Lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel for International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel for Trutron Corporation |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel for SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC and Tenneco Inc. |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | | 850-763-8421 | 850-763-8425 | gerdekomarek@bellsouth.net | Counsel for Peggy C. Brannon, Bay County Tax Collector |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel for WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel for Solution Recovery Services |
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com erliley@kellerrohrback.com | Counsel for Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel for Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | mbane@kelleydrye.com | Counsel for the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | msomerstein@kelleydrye.com | Counsel for the Pension Benefit Guaranty Corporation |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel for The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel for The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |

In re Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 7 of 17

5/30/2006 11:28 AM
2002 Lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel for The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | George B. South, III | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | gsouth@kslaw.com | Counsel for Martinrea International, Inc. |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | | schnabel@klettrooney.com dbrown@klettrooney.com | Counsel for Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel for Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel for Parlex Corporation |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel for Linamar Corporation |
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | john.weiss@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Latham & Watkins | Robert Rosenberg | 885 Third Avenue | Suite 1000 | New York | NY | 10022-4834 | | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | UCC Professional |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | 1630 McCarthy Blvd. | | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankruptcy@publicans.com | Counsel for Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel for Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel for Industrial Ceramics Corporation |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel for Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel for Methode Electronics, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 | 212-947-1202 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-812-8340 | 212-947-1202 | rcovino@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel for Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel for Cerberus Capital Management, L.P. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 17

5/30/2006 11:28 AM
2002 Lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lowenstein Sandler PC | Michael S. Etikin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel for Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel for AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | egc@lydenlaw.com | Counsel for Metro Fibres, Inc. |
| MacDonald, Illig, Jones & Britton LLP | Richard J. Parks | 100 State Street | Suite 700 | Erie | PA | 16507-1459 | | 814-870-7754 | 814-454-4647 | rparks@mijb.com | Counsel for Ideal Tool Company, Inc. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel for Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | | vmastromar@aol.com | Counsel for H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative to the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel for NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; Hosiden America Corporation and Samtech Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel for Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel for Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel for Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | James M. Sullivan | 50 Rockefeller Plaza | | New York | NY | 10020 | | 212-547-5400 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 50 Rockefeller Plaza | | New York | NY | 10020 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel for National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Jean R. Robertson, Esq. | 600 Superior Avenue, East | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | jrobertson@mcdonaldhopkins.com | Counsel to Brush Engineered materials |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuirewoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1178 | 804-698-2186 | egunn@mcguirewoods.com | Counsel for Siemens Logistics Assembly Systems, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel for The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 17

5/30/2006 11:28 AM
2002 Lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.net | Counsel for Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.net | Counsel for Prince George County, Maryland |
| Miami-Dade County, FL | April Burch | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | | 305-375-5314 | 305-375-1142 | aburch@miamidade.gov | Paralegal Collection Specialist for Miami-Dade County |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | khopkins@milesstockbridge.com | Counsel for Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel for Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 616-831-1726 | 616-988-1748 616-988-1726 | sarbt@millerjohnson.com wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel for Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel for Wells Operating Partnership, LP |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | pjricotta@mintz.com | Counsel for Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Stephanie K. Hoos | The Chrysler Center | 666 Third Avenue | New York | NY | 10017 | | 212-935-3000 | 212-983-3115 | skhoos@mintz.com | Counsel of Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel for Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel for ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel for Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@moritthock.com | Counsel for Standard Microsystems Corporation and its direct and indirect subsidaries Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-intrest to Oasis Silicon Systems, Inc.) |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Morrison Cohen LLP | Joseph T. Moldovan Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8603 212-735-8757 | 917-522-3103 917-522-3157 | jmoldovan@morrisoncohen.com mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel for Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel for Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel for 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Nathan, Neuman & Nathan, P.C. | Susanna C. Brennan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | sbrennan@nathanneuman.com | Counsel for 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel for National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel for Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel for Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Noma Company and General Chemical Performance Products LLC | James Imbriaco | 90 East Halsey Road | | Parsippanny | NJ | 07054 | | 973-884-6952 | 973-515-3244 | jimbriaco@gentek-global.com | |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | | 908-722-0700 | 908-722-0755 | eabdelmasieh@nmmlaw.com | Counsel for Rotor Clip Company, Inc. |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel for WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel for The Texas Comptroller of Public Accounts |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | | 312-849-2020 | 312-849-2021 | mmoody@okmlaw.com | Counsel for Ameritech Credit Corporation d/b/a SBC Capital Services |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Anthony Princi Esq Thomas L Kent Esq | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5000 | 212-506-5151 | aprinci@orrick.com tkent@orrick.com | Counsel to Ad Hoc Committee of Trade Claimants |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel for America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel for Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Matthew C. Wheney | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | mcheney@orrick.com | Counsel for Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel for Westwood Associates, Inc. |
| Otterbourg, Steindler, Houston & Rosen, P.C. | Melissa A. Hager | 230 Park Avenue | | New York | NY | 10169 | | 212-661-9100 | 212-682-6104 | mhager@oshr.com | Counsel for Sharp Electronics Corporation |
| Otterbourg, Steindler, Houston & Rosen, P.C. | Scott L. Hazan | 230 Park Avenue | | New York | NY | 10169 | | 212-661-9100 | 212-682-6104 | shazan@oshr.com | Counsel for Sharp Electronics Corporation |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3157 | 212-373-2053 | cweidler@paulweiss.com | Counsel for Ambrake Corporation; Akebono Corporation |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel for Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel for Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel for Ambrake Corporation |
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K. Street, N.W. | | Washington | DC | 20005-4026 | | 202-326-4020 | 202-326-4112 | landy.ralph@pbgc.gov | Counsel for Pension Benefit Guaranty Corporation |
| Pepe & Hazard LLP | Charles J. Filardi, Jr., Esq. | 30 Jelliff Lane | | Southport | CT | 06890 | | 203-319-4042 | 203-319-4034 | cfilardi@pepehazard.com | Federal Express Corporation |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel for Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel for SKF USA, Inc. |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel for SKF USA, Inc. |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel for Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Phillips Nizer LLP | Sandra D. Riemer, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel for FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel for FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel for Clarion Corporation of America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel for MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | 7th Floor | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel for Clarion Corporation of America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel for MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel for MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pitney Hardin LLP | Ronald S. Beacher | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-682-3485 | rbeacher@pitneyhardin.com | Counsel for IBJTC Business Credit Corporation |
| Pitney Hardin LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@pitneyhardin.com | Counsel for Marshall E. Campbell Company |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | |
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com mgr@previant.com | Counsel for International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Pryor & Mandelup, LLP | A. Scott Mandelup, Kenneth A. Reynolds | 675 Old Country Road | | Westbury | NY | 11590 | | 516-997-0999 | 516-333-7333 | asm@pryormandelup.com kar@pryormandelup.com | Counsel for National Molding Corporation; Security Plastics Division/NMC LLC |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadranglegroup.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegroup.com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel for Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel for Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel for Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel for General Electric Capital Corporation, Stategic Asset Finance. |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | | 330-670-3004 | 330-670-3020 | jlapinsky@republicengineered.com | Counsel for Republic Engineered Products, Inc. |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel for Microsoft Corporation; Microsoft Licensing, GP |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel for ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel for Blue Cross Blue Shield of South Carolina |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | | 213-312-2000 | 213-312-2001 | cnorgaard@ropers.com | Counsel for Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.com | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.com | Attorneys for D-J, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 17

5/30/2006 11:28 AM
2002 Lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel for JAE Electronics, Inc. |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rtrack@msn.com | Counsel for Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman, Arlene N. Gelman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | cschulman@sachnoff.com agelman@sachnoff.com | Counsel for Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.com | Counsel for Dott Industries, Inc. |
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel for Dott Industries, Inc. |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | mnewman@schaferandweiner.com | Counsel for Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel for Dott Industries, Inc. |
| Schiff Hardin LLP | Michael Yetnikoff | 623 Fifth Avenue | 28th Floor | New York | NY | 10022 | | 212-753-5000 | 212-753-5044 | myetnikoff@schiffhardin.com | Counsel for  Means Industries |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | | 312-258-5500 | 312-258-5600 | wkohn@schiffhardin.com | Counsel for  Means Industries |
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.h and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel for Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.h and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel for Panasonic Autommotive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel for Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel for D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk, Esq. | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel for Ie Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Steven E. Boyce | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-2347 | | 603-627-8278 | 603-641-2347 | sboyce@sheehan.com | Counsel for Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel for Milwaukee Investment Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel for Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel for Gulf Coast Bank & Trust Company |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | | 860-251-5811 | 860-251-5218 | bankruptcy@goodwin.com | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co. |
| Sills, Cummis Epstein & Gross, P.C. | Andrew N. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel for Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel for Hewlett-Packard Financial Services Company |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel for Silver Point Capital, L.P. |
| Simpson Thacher & Bartlett LLP | Kenneth S. Ziman, Esq. | 425 Lexington Avenue | | New York | NY | 10017 | | 212-455-2000 | 212-455-2502 | cfox@stblaw.com | Counsel to JPMorgan Chase Bank, N.A. |
| Simpson Thacher & Bartlett LLP | William T. Russell, Jr., Esq. | 425 Lexington Avenue | | New York | NY | 10017 | | 212-455-2000 | 212-455-2502 | cfox@stblaw.com | Counsel to JPMorgan Chase Bank, N.A. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3509 | bellis-monro@sgrlaw.com | Counsel for Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 302652840 | kmiller@skfdelaware.com | Counsel for Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | | Counsel for Molex, Inc. and INA USA, Inc. |
| Sonnenschein Nath & Rosenthal LLP | Jo Christine Reed | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel for Molex, Inc. and INA USA, Inc. |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | jcreed@sonnenschein.com | Counsel for Molex, Inc. and INA USA, Inc. |
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | | 201-930-7483 | | richards@sonnenschein.com | Counsel to Sony Electronics, Inc. |
| Sotiroff & Abramczyk, P.C. | Robert M. Goldi | 30400 Telegraph Road | Suite 444 | Bingham Farms | MI | 48025 | | 248-642-6000 | 248-642-9001 | lloyd.sarakin@am.sony.com | Counsel for  Michigan Heritage Bank; MHB Leasing, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | | 415-393-9887 | rgoldi@sotablaw.com | Counsel for Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Squire, Sanders & Dempsey L.L.P. | Penn Ayers Butler | 600 Hansen Way | | Palo Alto | CA | 94304 | | 650-856-6500 | 650-843-8777 | emarcks@ssd.com | Counsel for Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | 313-456-2201 | pabutler@ssd.com | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | hwangr@michigan.gov | Counsel for Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | jmbaumann@steeltechnologies.com | Counsel for Excel Global Logistics, Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | | 248-352-4700 | 248-352-4488 | rkidd@srcm-law.com | Counsel for Bing Metals Group, Inc.; Central Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-3922100 | 609-392-7956 | shapiro@steinbergshapiro.com | Counsel for Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | jposta@sternslaw.com | Counsel to Tonoli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | cs@stevenslee.com cp@stevenslee.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | mshaiken@stinsonmoheck.com madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 | 502-779-8274 | wbeard@stites.com | Counsel to WAKO Electronics (USA), Inc. and Ambrake Corporation |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | jminias@stroock.com | Counsel for 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |

In re: Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 17

5/30/2006 11:28 AM
2002 Lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel for 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | | 202-424-7500 | 202-424-7645 | rnsteinwurtzel@swidlaw.com | Attorneys for Sanders Lead Co., Inc. |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel for Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | 513-381-0205 | miller@taftlaw.com | Counsel for Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennesse Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel for Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel for TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel for TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | | 100-8322 | Japan | | 81-3-3286-3919 | niizeki.tetsuhiro@furukawa.co.jp | Legal Department of The Furukawa Electric Co., Ltd. |
| The Timpken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706 | | 1-330-438-3000 | 1-330-471-4388 | robert.morris@timken.com | Representative of Timken Corporation |
| Thelen Reid & Priest LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel for American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Thelen Reid & Priest LLP | Daniel A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel for Oki Semiconductor Company |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel for STMicroelectronics, Inc. |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 300 | Dallas | TX | 75201 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel for Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel for Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | | 212-594-5000 | 212-967-4258 | bmcdonough@teamtogut.com | Conflicts counsel to Debtors |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel for Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.com | Counsel for McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel for Union Pacific Railroad Company |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center | Suite 807 | Pittsburgh | PA | 15222 | | 412-562-2549 | 412-562-2429 | djury@steelworkers-usw.org | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Varnum, Riddering, Schmidt & Howlett LLp | Michael S. McElwee | Bridgewater Place | P.O. Box 353 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Counsel for Furukawa Electric North America APD |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | | 614-464-6422 | 614-719-8676 | rjsidman@vssp.com | |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | | 614-464-8322 | 614-719-4663 | tscobb@vssp.com | Counsel for America Online, Inc. and its Subsidiaries and Affiliates |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel for Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel for Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel for Nissan North America, Inc. |
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel for Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel for Behr Industries Corp. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel for Robert Bosch Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 16 of 17

5/30/2006 11:28 AM
2002 Lists

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | | 817-810-5250 | 817-810-5255 | bankruptcy@warnerstevens.com | Counsel for Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel for Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel for Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | John K. Cunningham | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | jcunningham@whitecase.com | Counsel for Appaloosa Management, LP |
| White & Case LLP | Margarita Mesones-Mori | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | mmesonesmori@whitecase.com | Counsel for Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel for Schunk Graphite Technology |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | | 512-370-2800 | 512-370-2850 | bspears@winstead.com | Counsel for National Instruments Corporation |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel for National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.com | Counsel for Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel for Metal Surfaces, Inc. |
| WL Ross & Co., LLC | Oscar Iglesias | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | | 212-826-1100 | 212-317-4893 | oiglesias@wlross.com | Counsel for WL. Ross & Co., LLC |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel for Armacell |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel for Toyota Tsusho America, Inc. |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel for Toyota Tsusho America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 17 of 17

5/30/2006 11:28 AM
2002 Lists

# EXHIBIT C

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|------------------|
| Akebono Corporation (North America) | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | 866-609-0888 | Vice President of Administration for Akebono Corporation |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | 317-236-1313 | 317-231-7433 | Counsel for Clarion Corporation of America |
| Clark Hill PLC | Seth A. Drucker | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | 313-965-8300 | 313-965-8252 | Counsel for BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| King & Spalding, LLP | Alexandra B. Feldman | 1185 Avenue of the Americas | | New York | NY | 10036 | 212-556-2100 | 212-556-2222 | Counsel for Martinrea International, Inc. |
| Kirkland & Ellis LLP | Geoffrey A. Richards | 200 East Randolph Drive | | Chicago | IL | 60601 | 312-861-2000 | 312-861-2200 | Counsel for Lunt Mannufacturing Company |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | 216-579-0212 | Counsel for WL. Ross & Co., LLC |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | 989-754-7690 | Corporate Secretary for Professional Technologies Services |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

5/30/2006 11:28 AM
2002 Lists

# EXHIBIT D

**Hearing Date and Time: June 16, 2006 at 10:00 a.m.**
**Objection Deadline: June 9, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -   x
                                                  :
        In re                                     :        Chapter 11
                                                  :
DELPHI CORPORATION, et al.,                       :        Case No. 05-44481 (RDD)
                                                  :
                                                  :        (Jointly Administered)
            Debtors.                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 2002 AND 6004
AUTHORIZING AND APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH
JOHNSON CONTROLS, INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES (B) CONTINUATION AND TRANSITION
OF SUPPLY TO JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD
FACILITY AND (C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW
<u>BRUNSWICK FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM</u>

("NEW BRUNSWICK TRANSFER MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to

11 U.S.C. § 363(b) and Fed. R. Bankr. P. 2002 and 6004 authorizing and approving the

Debtors' entry into the postpetition Transfer Agreement dated May 26, 2006 by and between

Delphi Automotive Systems LLC, a Debtor in these cases, and Johnson Controls, Inc. ("JCI"),

a copy of which is attached hereto as <u>Exhibit A</u> (together, with the exhibits and schedules

attached thereto, the "Transfer Agreement"), providing for (a) sale of certain assets of the

Debtors' battery manufacturing facility in New Brunswick, New Jersey (the "New Brunswick

Facility") free and clear of liens, claims, and encumbrances, (b) the continuation and transition

of supply of battery products to Johnson Controls, Inc. of battery products from the Debtors'

battery manufacturing facility in Fitzgerald, Georgia (the "Fitzgerald Facility"), and (c)

implementation of an attrition plan with respect to the New Brunswick facility.  In support of

this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries

and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy

2

Code").  The Debtors continue to operate their businesses and manage their properties as

debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This

Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.      On October 17, 2005, the Office of the United States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

On April 28, 2006, the U.S. Trustee appointed an official committee of equity security holders

(the "Equity Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.      This Court has jurisdiction over this motion pursuant to 28 U.S.C.

§§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a

core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are section 363 of

the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company")

had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31,

2005 of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the

fifth largest public company business reorganization in terms of revenues, and the thirteenth

largest public company business reorganization in terms of assets.  Delphi's non-U.S.

subsidiaries are not chapter 11 debtors and continue their business operations without

supervision from the Bankruptcy Court.

---

[1]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates.

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

---

[2]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

4

9.      The Debtors believe that the Company's financial performance has

deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of

creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for

domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually

in the United States and related pricing pressures, and (c) increasing commodity prices.

10.      In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward-looking revenue requirements.  Because

discussions with its major unions and GM had not progressed sufficiently by the end of the

third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses

to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

11.      On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in

which to conduct business.  Second, the Debtors must conclude their negotiations with GM to

finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's

business commitment to the Company.  Third, the Debtors must streamline their product

portfolio to capitalize on their world-class technology and market strengths and make the

5

necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform

their salaried workforce to ensure that the Company's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint. Finally, the

Debtors must devise a workable solution to their current pension situation.

12.     In connection with the first two elements of the Company's

transformation  plan, Delphi continues to participate in discussions with its unions and GM.

Throughout those discussions, Delphi has consistently communicated a clear message to both

its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its

issues and intends to continue to discuss with its unions and GM ways to become competitive

in the Debtors' U.S. operations. To that end, Delphi, GM and the UAW recently received this

Court's approval of a tripartite agreement providing for a special hourly attrition program for

Delphi's UAW-represented employees (the "UAW Special Attrition Program"). This special

hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-

represented long-term hourly employees with "soft landings" through retirement attrition

programs and GM flowbacks. Delphi also hopes to reach agreement on similar hourly attrition

programs with its other unions, which could provide as many as 4,500 additional hourly

employees with retirement programs or incentives.

13.     These hourly attrition programs constitute an important first step in

implementing the Debtors' transformation plan, but will not resolve all of the issues related to

Delphi's uncompetitive labor agreements. Moreover, Delphi has not yet reached

comprehensive agreements with its unions and GM. Therefore, on March 31, 2006, Delphi

moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S.

labor agreements and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors

also moved to reject unprofitable supply contracts with GM.[4]  Among the reasons for the GM

contract rejection motion was the Debtors' belief that GM must cover a greater portion of the

costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy

costs.  This initial motion covers approximately half of the Debtors' North American annual

purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.

Although the filing of these motions was a necessary procedural step, the Debtors remain

focused on reaching a consensual resolution with all of Delphi's unions and GM before a

hearing on the motions is necessary.

            14.     To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which

the Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.   To that end, the Company will concentrate the

organization around the following core strategic product lines: (a) Controls & Security (Body

Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture

(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)

Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

---

[3]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And
       Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits (Docket No. 3035).

[4]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
       Executory Contracts With General Motors Corporation (Docket No. 3033).

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety

Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.    In contrast, the Company similarly identified certain non-core product

lines that do not fit into its future strategic framework, including Brake & Chassis Systems,

Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics,

Steering, and Wheel Bearings.  The Company will seek to sell or wind-down these non-core

product lines (which will include approximately one-third of its global manufacturing sites)

and will consult with its customers, unions, and other stakeholders to carefully manage the

transition of such affected product lines.  The Company intends to sell or wind-down the non-

core product lines and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the

Debtors' transformation plan, the Company expects to reduce its global salaried workforce by

as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives

adopted following an analysis of the Company's selling, general, and administration ("SG&A")

cost saving opportunities.  The Company believes that once its SG&A plan is fully

implemented, the Company should realize savings of approximately $450 million per year in

addition to savings realized from competitive measures planned for its core businesses and the

disposition of non-core assets.

17.    As noted above, the final key tenet of the transformation plan is to

devise a workable solution to the Debtors' current pension situation.  The Debtors' goal is to

retain the benefits accrued under the existing defined benefit U.S. pension plans for both the

---

[5]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket
or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial
vehicles, or other adjacent-market businesses and product lines.

Debtors' hourly and salaried workforce.  To do so, however, it will be necessary to freeze the

current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S.

pension plan as of January 1, 2007.  Despite the freeze, because of the size of the funding

deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit

Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially

Congress, to amortize funding contributions over a long-term period.  The Company intends to

replace the hourly plan (for certain employees) and the salaried plan with defined contribution

plans.

        18.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal

all of its resources to continue to deliver high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

        19.    By this Motion, the Debtors seek the entry of an order under section 363

of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 authorizing and approving the

Debtors' entry into the Transfer Agreement providing for (a) the sale of certain assets of the

New Brunswick Facility free and clear of liens, claims, and encumbrances, (b) continuation

and transition of supply of battery products to Johnson Controls, Inc. from the Debtors'

Fitzgerald Facility and (c) implementation of an attrition plan with respect to the New

Brunswick Facility.

        20.    Approval of the Motion would allow the Debtors to sell their money-

losing New Brunswick Facility to a buyer which has already purchased the Debtors' worldwide

9

battery business and, thus, is in a unique position to acquire that facility.  The Debtors would also be able to transition production from the Fitzgerald Facility, another money-losing battery operation for the Debtors, in an orderly manner that is consistent with the UAW Special Attrition Program while meeting JCI's production requirements.  Finally, approval of the Motion would (i) minimize the Debtors' human capital liabilities with respect to both facilities that might otherwise be entitled to administrative priority treatment, (ii) allocate risks and prospective obligations with respect to both facilities in a manner most advantageous to the Debtors, (iii) provide a means to manage the environmental liabilities at the New Brunswick Facility, and (iv) afford the Debtors certain Bankruptcy Code protections for sellers of assets.

Basis For Relief

A.    Background

21.    On June 30, 2005, as part of its efforts to dispose of non-core assets, Delphi sold its wholly owned lead acid battery business to JCI, a global manufacturer of automotive systems and building controls, for $202.5 million, with post-closing adjustments of at least $12.5 million.[6]  At the time of closing, however, Delphi was not able to transfer its U.S. battery manufacturing facilities to JCI, in particular the New Brunswick Facility, because of certain provisions in the Debtors' agreements with the International Union, IUE-CWA and IUE-CWA Local 416 (collectively, the "IUE-CWA"), the unions representing the Debtors' employees at the New Brunswick Facility.  In particular, the existence of a "no-sale" clause

---

[6]    Pursuant to the 2005 sale, JCI purchased Delphi's battery operations in France, Brazil, and Mexico and Delphi's interest in battery manufacturing joint ventures in China, South Korea, Belgium, and Saudi Arabia.

(the "No-Sale Clause") in the agreements restricts the Debtors' ability to sell certain U.S.

manufacturing sites, including the New Brunswick Facility, without the IUE-CWA's consent.[7]

22.    Because of this restriction and Delphi's inability to obtain the IUE-

CWA's consent, Delphi retained ownership of the New Brunswick Facility following the sale.

Because of union considerations and because JCI could not fill existing customer needs with its

own manufacturing facilities, however Delphi agreed to keep operating the Fitzgerald and New

Brunswick Facilities to sell batteries exclusively to JCI under the Component Supply

Agreement[8], thus meeting JCI's requirements for the term of the Component Supply

Agreement.  As of the date of this Motion, the Debtors produce approximately three million

batteries per year at the Fitzgerald Facility and approximately 1.8 million batteries per year at

the New Brunswick Facility.

B.    Transfer Agreement

23.    To eliminate the operating losses associated with the continued

operation of the New Brunswick Facility and the Fitzgerald Facility, minimize the

administrative liabilities associated with the transfer of the New Brunswick Facility, provide a

---

[7]    The 2005 sale was effectuated pursuant to that certain Master Sale and Purchase Agreement (the "MSA") dated June 30, 2005 between Delphi and JCI.  The MSA attached a number of ancillary agreements concerning the continuing supply of batteries to JCI, the eventual transfer of the New Brunswick Facility to JCI, and the continuation and transition of the Fitzgerald Facility.  These prepetition ancillary agreements also addressed employee, labor, environmental, and other issues related to the sale of Delphi's battery business.  These ancillary agreements include, but are not limited to: (i) the New Brunswick Put and Call Agreement (the "Put and Call Agreement"), providing for, among other things, a put option for the Debtors to sell the New Brunswick Facility to JCI for $1 and the transfer of New Brunswick Facility employees to JCI following such a sale, with Delphi obligated to subsidize JCI with respect to traditional wage employees for the difference between their wages and benefits and those of a Tier III competitive wage employee – i.e., an employee whose competitive wages will not "grow into" traditional wages, (ii) the Tier 2 Component Supply Agreement (the "Component Supply Agreement"), providing for, among other things, the Debtors' commitment to continue supplying batteries to JCI from the New Brunswick and Fitzgerald Facilities, and (iii) the Environmental Matters Agreement (the "Environmental Matters Agreement"), which provides for the division of responsibilities between the parties for environmental liabilities, if any, at the Debtors' battery manufacturing plants around the globe.

[8]    A copy of the Component Supply Agreement is available upon request, subject to entering into an appropriate confidentiality agreement or protection order.

"soft landing" for affected employees, and complete the smooth transition of the battery business to JCI, the Debtors decided to explore a consensual transfer of the New Brunswick Facility to JCI.

24.    To that end, over the past few months, the Debtors and JCI have been negotiating in earnest regarding the transfer of the New Brunswick Facility to JCI, including whether to consummate this transaction through an exercise of the put option or through other means.  In connection with these negotiations, the parties have been in discussions regarding the number of employees who would be employed at the New Brunswick Facility following its transfer to JCI.  Pursuant to the put option provided for in the Put and Call Agreement, it was contemplated that substantially all of the current hourly employees would be employed by JCI following the transfer.  Since the Put and Call Agreement was signed, however, JCI no longer requires the full production capacity of both the New Brunswick Facility and Fitzgerald Facility and, accordingly, now only requires approximately one-third of the hourly employees currently working at the New Brunswick Facility.

25.    To effectuate a consensual transfer to JCI, the Debtors and the IUE-CWA have been concurrently negotiating over the IUE-CWA's waiver of the No-Sale Clause relating to the New Brunswick Facility, a waiver of the requirement that JCI assume any contractual neutrality obligations collectively bargained by Delphi and the IUE-CWA (the "Neutrality Obligations"),[9] and an attrition plan with respect to Delphi hourly employees at the New Brunswick Facility such that approximately 100 competitive wage hourly employees would transfer to JCI.

---

[9]    Pursuant to such Neutrality Obligations, Delphi has agreed to remain neutral during any IUE-CWA employee organizing campaign at Delphi's facilities.

12

26.    The Debtors and JCI have reached an agreement regarding the disposition of the New Brunswick Facility and the continuation and transition[10] of supply from the Fitzgerald Facility.  Instead of resolving these matters pursuant to the prepetition ancillary agreements described above, the parties seek authority for the Debtors to enter into the Transfer Agreement.[11]  The Transfer Agreement and proposed order submitted herewith would effectuate the sale of the New Brunswick Facility and the Acquired Assets (as such term is defined in the Transfer Agreement) to JCI free and clear of liens, claims, and encumbrances in exchange for JCI's payment to the Debtors of $1.00 plus the value of certain inventory estimated at approximately $1.7 million.

27.    As more fully described below, the Transfer Agreement also provides for the continued supply of batteries as well as the orderly transition of production to JCI from the Fitzgerald Facility, the implementation of an attrition plan between Delphi and the IUE-CWA (the "IUE-CWA New Brunswick Attrition Plan") with respect to the New Brunswick Facility, and the IUE-CWA's waiver of the No-Sale Clause and the Neutrality Obligations (the "IUE-CWA Consent") with respect to the New Brunswick Facility.  Further, JCI has agreed to pay the Debtors at closing $12.5 million to reimburse the Debtors for a significant portion of the amounts to be spent under the IUE-CWA New Brunswick Attrition Plan.  Finally, the Transfer Agreement provides for allocation of risks and prospective obligations with respect to the New Brunswick and Fitzgerald Facilities and requires, as a condition of its completion, the

---

[10]    While a general framework for the transition has been established and is set forth in the Component Supply Agreement, the schedule and volume of production related to the transition will be completed before closing and will be consistent with the UAW Special Attrition Program and JCI's needs.

[11]    As noted above, the term "Transfer Agreement" includes the exhibits and schedule attached thereto.  The material exhibits and schedules attached to the Transfer Agreement include, without limitation:  Exhibit 1.13 (the Memorandum of Agreement between Delphi and the IUE-CWA, which sets forth both the IUE-CWA Consent, as defined below, and the IUE-CWA New Brunswick Attrition Plan, as defined below), Exhibit 3.6H (Environmental Matters), and Exhibit 4.1 (Employee Matters).

entry by this Court of the proposed order submitted herewith, which affords the Debtors certain

Bankruptcy Code protections for sellers of assets.

28.    <u>Terms Of The Transfer Agreement</u>.  Other salient terms[12] of the Transfer

Agreement between the Debtors and JCI are as follows:

(a)    <u>Completion</u>.  The completion of the sale of the Acquired
Assets (the "Completion") would take place on the later date of August 1, 2006 (12:01
a.m. EST) and the date that is ten days after the date of the order approving this Motion,
unless otherwise agreed to by the parties.  At the Completion, (i) the Debtors would be
required to deliver, among other things, a bill of sale for the Acquired Assets, including
certain personal property and inventory, substantially in the form of Exhibit 2.2A to the
Transfer Agreement, duly executed with an invoice relating to the Acquired Assets
transferred, a covenant deed for the Real Property (as defined in the Transfer
Agreement), a certificate of representations and performance, and an officer's certificate
stating that at least $12.5 million has been incurred by Delphi in furtherance of the IUE-
CWA New Brunswick Attrition Plan (as defined below) and (ii) JCI would be required to
deliver a certificate of representations and performance and pay to the Debtors the
purchase price plus reimbursement by wire transfer in accordance with wiring
instructions to be provided by the Debtors before Completion.

(b)    <u>Conditions To Completion</u>.  Pursuant to section 2.1 of the
Transfer Agreement, the Transfer Agreement is subject to approval by the Bankruptcy
Court, the Debtors' implementation of the IUE-CWA New Brunswick Attrition Plan,
each party's compliance with its agreements with respect to certain employee matters, and
the continued operation of the Fitzgerald Facility as a battery manufacturing facility in
accordance with the Component Supply Agreement.  In addition, the Debtors must not
have negotiated any other collective bargaining agreement which purports to be
applicable to the New Brunswick Facility.  Finally, each party must not be in material
default with respect to, or have rejected, the Component Supply Agreement and be in
material compliance with the Environmental Matters Agreement with respect to the New
Brunswick Facility as of completion date.

(c)    <u>Representations And Warranties</u>.  The representations and
warranties relate to the power and authority to enter into the Transfer Agreement,
enforceability of the Transfer Agreement, the accuracy and completeness of information
provided by the parties to each other, environmental matters, and product liability and
warranty matters.

---

[12]    To the extent this summary differs in any way with the Transfer Agreement, the provisions of the Transfer
Agreement control.

(d)    Pursuant to section 2.8 of the Transfer Agreement, Delphi will continue to supply batteries to JCI from the Fitzgerald Facility in accordance with the terms of the Component Supply Agreement, as amended.

C.    Sale Of Acquired Assets

29.    By this Motion, the Debtors respectfully request entry of an order, pursuant to section 363(b) and (f) of the Bankruptcy Code, authorizing the Debtors to transfer the Acquired Assets[13] to JCI free and clear of all liens, claims, and encumbrances.  Certain liabilities and obligations of the Debtors are being undertaken by JCI, including, without limitation, those liabilities set forth on Exhibits 3.6H and 4.1 to the Transfer Agreement relating to environmental and employee matters, respectively.

30.    The Debtors have concluded that the transfer of the Acquired Assets pursuant to the Transfer Agreement is the best opportunity available to the Debtors under unique circumstances surrounding the New Brunswick and Fitzgerald Facilities and the resolution of post-closing matters in connection with Delphi's 2005 sale of its battery business to JCI and that the consideration for such transfer provides maximum value for the Debtors, their estates, and their creditors.

31.    The Debtors, in the exercise of their business judgment and in consultation with their advisors, have concluded that the practices often followed for the sale of a chapter 11 debtor's assets, namely the establishment of bidding procedures and the making of a market, would not maximize value in light of the previous sale of the battery business to JCI

---

[13]    As set forth in section 1.1 of the Transfer Agreement, the term "Acquired Assets" means the real property in connection with the New Brunswick Facility and all of the following assets to the extent that such assets are owned by the Debtors and used or held for use primarily or exclusively in the battery manufacturing business at the New Brunswick facility:  administrative assets; permits; personal property owned by the Debtors that is located at the New Brunswick Facility and used for manufacturing battery products for JCI under the Component Supply Agreement; and certain inventory of the battery manufacturing business.  This description of the Acquired Assets is only a summary of that term as it is defined in the Transfer Agreement.  To the extent this summary differs in any way with the definition of "Acquired Assets" in section 1.1 of the Transfer Agreement, the provisions of the Transfer Agreement control.

and the practical inability of any party other than JCI to use the New Brunswick Facility.[14]

Moreover, upon the sale of the New Brunswick Facility, the Debtors are due to receive

significant economic support from GM pursuant to a separate agreement between Delphi and

GM, which was executed in connection with the sale of Delphi's global battery business, under

the terms of which GM agreed to provide financial support for Delphi to transform its U.S.

battery plant operations to be more efficient and competitive.[15]

        32.      The sale of the Acquired Assets, in particular the New Brunswick

Facility, completes the 2005 sale of Delphi's battery business to JCI.  Only JCI is in a position

to maximize the use of the New Brunswick Facility, because JCI can integrate that facility into

its global manufacturing capabilities.  There are no other parties with the same unique need for

the New Brunswick Facility as a battery manufacturing facility.  Moreover, the costs of

converting the New Brunswick Facility to other uses and resolving the human capital and

environmental issues arising from such conversion would likely preclude another party from

offering greater value for the New Brunswick Facility, let alone match JCI's offer to pay $12.5

million to mitigate the costs of the IUE-CWA New Brunswick Attrition Plan.  In addition, JCI

is the only entity which will be able to operate the New Brunswick Facility, and thus employ

New Brunswick employees, because it is obligated to provide a certain level of battery supply

to its own customers.  The Debtors have concluded that no other party is similarly motivated or

able to purchase the Acquired Assets and take on the risks and obligations that are part of such

an acquisition.

---

[14]   Moreover, the presence of non-competition provisions in the MSA may limit the Debtor's ability to sell the New
Brunswick Facility to another party for more consideration.  See, e.g., In re Nyren, 187 B.R. 424, 425 (Bankr.
D. Conn. 1995) (creditor with non-monetary claim arising from non-compete covenant is entitled to relief from
automatic stay).

[15]   Because the terms of this agreement are confidential, the Debtors have not attached a copy of the agreement as
an exhibit to this Motion, nor can they disclose the terms of such agreement.

33.     The Debtors evaluated all possible scenarios with respect to the transfer of the Acquired Assets to JCI and the continuation of supply and transition of production out of the Fitzgerald Facility (which would accompany any sale of the Acquired Assets), including but not limited to the assumption or rejection of the prepetition ancillary agreements with respect to Delphi's 2005 sale of its battery business to JCI, the acceleration of the transition of production out of the Fitzgerald Facility, and the costs of environmental remediation of the New Brunswick Facility with or without selling the facility to a third party.  After analyzing these scenarios and the estimated outcomes, the Debtors have determined that the sale of the Acquired Assets to JCI pursuant to the Transfer Agreement provides maximum value to the Debtors and their stakeholders and best minimizes potential administrative liability for the estates.

D.    Indemnification Obligations

34.     Pursuant to the Transfer Agreement, the Debtors are committing on a postpetition basis to honor certain employee and environmental indemnification obligations to the extent that the proposed order granting this Motion, if entered by this Court, would not discharge liability with respect to any claim bought by a third party against JCI. These indemnification obligations are subject generally to a $100,000 deductible[16] and a $20 million cap.  The Debtors have determined that these indemnification obligations are fair and reasonable under the circumstances.  Without these indemnification obligations, JCI would not have agreed to enter into the Transfer Agreement and would have been part of any transactions with JCI consummated in connection with the put option.  The Debtors have analyzed the terms of these indemnification obligations and have determined that, because a sale of the

---

[16]    Indemnification obligations for certain environmental matters are subject to a $500,000 deductible.

Acquired Assets as proposed herein would be free and clear of liens, claims, and

encumbrances, including successor liability claims, the Debtors do not believe that the

indemnification commitments will unduly expose the estates to administrative liability.

Accordingly, the Debtors have concluded, in the exercise of their business judgment, that the

proposed transactions, including the indemnification commitments, are in the best interests of

the estates, their creditors, and other stakeholders.

E.    Continuation and Transition of Supply of Battery Products Out of Fitzgerald Facility

35.    By this Motion, the Debtors also seek approval, pursuant to section

363(b) of the Bankruptcy Code, for the Debtors continuation and transition of supply of battery

production out of the Fitzgerald Facility in accordance with the terms of the Transfer

Agreement.  In connection with the transaction contemplated by the Transfer Agreement, the

Debtors, while not assuming the Component Supply Agreement under section 365 of the

Bankruptcy Code, would continue on a postpetition basis to supply battery products to JCI

from the Fitzgerald Facility in accordance with the terms of the Component Supply

Agreement, as amended pursuant to a transition plan to be completed by the parties.

36.    As a result of this transition plan, the Debtors hope to operate the

Fitzgerald Facility in a manner that allows Delphi to use its available resources consistent with

the UAW Special Attrition Program[17] and production requirements, while still satisfying the

needs of an important customer of the Debtors.  Throughout their reorganization efforts, the

Debtors have worked diligently to continue to meet the production needs of their customers

and as the Debtors have committed to do with all of their customers, this transition plan will be

---

[17]    The Debtors' employees at the Fitzgerald Facility belong to the UAW and (subject to the outcome of the notice
of appeal recently filed by Wilmington Trust Company) will be eligible for the UAW Special Attrition Program
approved by this Court pursuant to the Amended Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004
Authorizing Debtors to Enter Into The UAW Special Attrition Program (Docket No. 3754) entered on May 12,
2006.

completed in consultation with JCI. Because the Fitzgerald Facility is a money-losing

operation, losing approximately $2 million per month, transitioning production will benefit all

of the Debtors' stakeholders.[18]

F.    IUE-CWA Consent And The IUE-CWA New Brunswick Attrition Plan

      37.    As stated above, to transfer the New Brunswick Facility to JCI, the IUE-

CWA must consent to the transfer by waiving the No-Sale Clause and the Neutrality

Obligations. As part of the negotiations over this IUE-CWA Consent, the Debtors and the

IUE-CWA have also negotiated the terms of the IUE-CWA New Brunswick Attrition Plan,

discussed below. The parties have memorialized such undertakings in the IUE-CWA

Memorandum, which is attached as Exhibit 1.13 to the Transfer Agreement. By this Motion,

the Debtors request authority to enter into and implement the IUE-CWA Consent and the IUE-

CWA New Brunswick Attrition Plan, both of which are set forth in the IUE-CWA

Memorandum.

      38.    Entry into and implementation of the IUE-CWA Consent and the IUE-

CWA New Brunswick Attrition Plan is in the Debtors' best interests for the reasons set forth

below. As of the date of this Motion, the New Brunswick Facility is operating at full

manufacturing capacity with an approximately 300-employee workforce. JCI, however, does

not wish to operate the facility at full manufacturing capacity but rather as a "form and finish

facility"[19] only with a reduced workforce of approximately 100 hourly employees. To

encourage the consensual separation of more than 200 employees, the Debtors negotiated the

---

[18]    Moreover, upon the re-sourcing of manufacturing of all of the Fitzgerald Facility's battery volume to JCI, the
Debtors are due to receive further significant economic support from GM pursuant to the separate agreement
between Delphi and GM referenced above.

[19]    In JCI's battery manufacturing process, a "form and finish" facility is a facility that receives almost completed
batteries from JCI's other battery manufacturing facilities, and at which production of those batteries is finalized
for distribution to customers.

IUE-CWA New Brunswick Attrition Plan, pursuant to which certain eligible employees of the

Debtors working at the New Brunswick Facility can retire with financial incentives through

early retirement through a pre-retirement program, or by selecting certain buyout or buy down

options.

39.    The Debtors estimate that implementation of the IUE-CWA New

Brunswick Attrition Plan will cost $18 to 22.8 million, with $12.5 million of that cost to be

mitigated by JCI's reimbursement to be paid to the Debtors at the closing of the transaction.

40.    Among the significant terms of the IUE-CWA New Brunswick Attrition

Plan, which is meant to attrit all but approximately 100 of the current employees of the New

Brunswick Facility, are the following options that eligible employees may select:[20]

(a)    Employees who are eligible to retire under the normal or
early voluntary provisions of the Delphi Hourly-Rate Employees Pension Plan (the
"HRP") as of August 1, 2006 would be eligible for a one-time, lump-sum incentive
payment in the amount of $35,000 in exchange for their agreement to retire.

(b)    Employees age 50 and above with ten or more years of
credited service who are eligible, as of August 1, 2006, to retire under the MSR[21] (i.e.,
mutually satisfactory retirement) provisions of the HRP could do so.

(c)    Employees with at least 27 and fewer than 30 years of
credited service (regardless of age) would be eligible for special voluntary placement in a
pre-retirement program under which they would (i) retire without additional incentives
(i.e., such employees would not be eligible to receive the $35,000 incentive payment
described in paragraph (a) above) when they first accrue 30 years of credited service
under the provisions of the HRP and (ii) receive gross monthly wages of $2,800 to
$2,900 depending on their years of credited service.

(d)    Employees who are participants in the Delphi HRP may
elect to (i) receive a buyout of $140,000 (with ten or more years of seniority) or a buy out

---

[20]    The terms contained herein are provided solely as a summary and are qualified in all respects by the terms of
the IUE-CWA New Brunswick Attrition Plan.  To the extent that this summary differs in any way from the
terms of the IUE-CWA New Brunswick Attrition Plan, the provisions of the IUE-CWA New Brunswick
Attrition Plan will control.  Additionally, the IUE-CWA New Brunswick Attrition Plan would be implemented
consistent with the Debtors' other attrition programs, including release of claims by the employee participants.

[21]    The MSR provisions of the HRP are provisions to facilitate early retirement by employees at least 50 years old
with ten or more years of credited service.

of $70,000 (with fewer than ten years of seniority), less applicable withholdings, to sever all ties with Delphi except vested pension benefits or (ii) remain on the active roll for one year and receive one year of health care (at a total cost to Delphi of up to $15,000), and a weekly payment of up to $2,403.84, less withholdings, for one year (with ten or more years of seniority) or a weekly payment of $1,057.69, less withholdings, for one year (with fewer than ten years of seniority) and sever all ties with Delphi, except vested pension benefits, if any, at the conclusion of the year.  Employees electing either of these options also would also be eligible for up to $2,100 per year pursuant to the terms of the Individual Upward Educational Plan for an additional two years beginning August 1, 2006, and ending July 31, 2008.

(e)    Competitive rate employees who are not participants in the Delphi HRP may elect to receive a percentage buyout prorated against $140,000 (with ten or more years of seniority), or against $70,000 (with fewer than ten years of seniority but more than one year of seniority) less applicable withholdings, to sever all ties with Delphi.  In each case, the buyout would be calculated based upon the participant's competitive wage rate as a percentage of the maximum traditional wage rate for the participant's classification.

(f)    All participants choosing the options set forth in sub-paragraphs (a)-(e) above would be required to sign a release of all claims, except workers compensation claims.

(g)    Employees at the New Brunswick Facility, except those on a leave of absence, who have not selected, or who are not eligible to participate in one of the options identified above, would be eligible for transfer, with seniority, to JCI effective August 1, 2006, at the established New Brunswick Tier III rate and with JCI Benefit Plans coverages. The offer of employment with JCI would sever all ties to Delphi, except for current vested benefits, if any.  Traditional wage rate employees accepting such transfer would receive a $50,000 buy down (intended to represent an offset to a timed wage and benefit reduction) to the Tier III wage and the existing JCI benefit levels. Such employees transferred to JCI will be required to sign a release of all claims, except workers compensation, as a condition for receiving the $50,000 buy down amount. Employees on a leave of absence, who do not participate in the IUE-CWA Attrition Plan, would be eligible for transfer to JCI upon the conclusion of their leave.

(h)    If during the remaining course of Delphi's bankruptcy, materially different Special Attrition Program financial incentives are negotiated between Delphi and the IUE-CWA for the option selected by the employee, it is understood that the employee will not be advantaged or disadvantaged (the "MFN clause").[22]

---

[22]    The Debtors note that the MFN clause could increase or decrease the cost of the IUE-CWA New Brunswick Attrition Plan.  This change, however, would be caused by a nation-wide attrition plan agreed to between Delphi and the IUE-CWA, which would be subject to Bankruptcy Court approval.

41.      The transfer of the New Brunswick Facility pursuant to the IUE-CWA New Brunswick Attrition Plan would provide one other significant benefit to the Debtors relative to any transaction that would have been consummated pursuant to the Put and Call Agreement. Indeed, the Put and Call Agreement, the prepetition ancillary agreement providing for the transfer of the New Brunswick Facility to JCI pursuant to the exercise of a put option, requires the Debtors to pay a labor subsidy to JCI to cover the "labor differential," if any, between traditional wages paid to the Debtors' senior hourly employees transferring to JCI following the sale of the New Brunswick Facility and wages paid to the Debtors' Tier III competitive wage employees.[23]  Paying this labor differential without a buy down mechanism would have been costly.  The Debtors expect that, following the implementation of the IUE-CWA New Brunswick Attrition Plan, the approximately 100 employees who would be transferred to JCI would be either employees who are currently Tier III competitive wage employees or traditional wage employees who received the $50,000 buy down to become Tier III competitive wage employees immediately before transfer.  Accordingly, pursuant to the instant transaction, the Debtors will not be obligated to provide JCI with a labor differential.

G.    Contemplated Settlement With New Jersey
      Department of Environmental Protection

42.      In addition to the transactions and agreements described above, the Transfer Agreement provides that the Debtors are responsible for complying with New Jersey's statutory environmental remediation obligations in connection with a transfer of the New Brunswick Facility.  In particular, the Transfer Agreement requires, as a condition to the closing of the sale of the Acquired Assets, that the Debtors conduct such investigation and

---

[23]   "Tier III" competitive wage employees are those employees who are covered by competitive operating agreements but who do not "grow in" to traditional wages.  In contrast, "Tier II" competitive wage employees are those employees who do grow in to traditional wages over time.

remediation as required by the New Jersey Department of Environmental Protection to satisfy the requirements of New Jersey's Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq. ("ISRA") and that the Debtors are responsible for undertaking the activities and submitting the required documentation to the NJDEP necessary to complete their responsibilities under ISRA with respect to the sale of the New Brunswick Facility.  If the Debtors were not satisfying these obligations under ISRA, New Jersey law would prohibit the sale of the New Brunswick Facility.

43.    Subsequent to the filing of this Motion, the Debtors will submit to the NJDEP the documentation required under ISRA and endeavor to enter into a remediation agreement with the NJDEP prior to the closing of the sale of the Acquired Assets to JCI.  The Debtors intend to file for the June 16, 2006 omnibus hearing on shortened notice (and the Creditors' Committee has already consented to such shortened notice) the Motion For Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval, pursuant to which the Debtors would seek entry of an order authorizing them to compromise or settle, certain matters.  Provided that this Court enters an order approving the settlement procedures proposed in the aforementioned motion, the Debtors will provide appropriate notice of the proposed settlement agreement with the NJDEP which will hopefully be approved without need for an order from this Court or, in the alternative the Debtors will file a motion to be heard at the July 19, 2006 omnibus hearing seeking approval of such settlement agreement.  Once the Debtors receive appropriate approval of such a settlement agreement with the NJDEP, they will be able to close on the sale of the Acquired Assets by the scheduled closing date of August 1, 2006.

H.     Notice Of Sale Hearing

44.     On May 26, 2006 the Debtors will provide notice of the proposed sale of

the New Brunswick Facility to JCI by serving this Motion and the Transfer Agreement by

overnight delivery upon (i) the Office of the United States Trustee for the Southern District of

New York, (ii) all entities known to have asserted any lien, claim, interest, or encumbrance in

or upon the Acquired Assets, including but not limited to environmental, employee, and

product liability claims, (iii) all federal, state and local regulatory or taxing authorities or

recording offices, including but not limited environmental regulatory authorities, which have a

reasonably known interest in the relief requested by the Motion, (iv) all entities known to have

an interest in a transaction with respect to the Acquired Assets during the past six months, (v)

the United States Attorney's office, (vi) the United States Department of Justice, (vii) the

Securities and Exchange Commission, (viii) the Internal Revenue Service, (ix) all entities on

the Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And

105 And Fed. R. Bankr. P. 2002(M), 9006, 9007, And 9014 Establishing Omnibus Hearing

Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No.

2883) (the "Supplemental Case Management Order") and such other entities as are required to

be served with notices under the Supplemental Case Management Order, (x) counsel for JCI,

(xi) counsel for the Creditors' Committee, and (xii) counsel for the Equity Committee.  To the

extent that the Debtors identify and serve notice on entities after May 26, 2006 – in particular,

entities described in clause (ii) above should such a party be discovered after the date hereof –

the Debtors will provide such party with an appropriate objection deadline as required by the

Supplemental Case Management Order.

I.    The Relief Requested Is In The Best Interests Of
      The Debtors, Their Estates, And Their Creditors

45.    The Debtors, in the exercise of their business judgment, have concluded that the sale of the New Brunswick Facility and the Acquired Assets, the continuation and ultimate transition of supply out of the Fitzgerald Facility, the implementation of the IUE-CWA New Brunswick Attrition Plan pursuant to the Transfer Agreement are in the best interests of the Debtors' estates, their creditors, and parties-in-interest.  First, the New Brunswick Facility currently loses approximately $3 million per month and the Fitzgerald Facility loses approximately $2 million per month.  Thus, the expeditious disposition of these facilities would eliminate these losses.  Second, the IUE-CWA New Brunswick Attrition Plan would allow the Debtors to sell the New Brunswick Facility to JCI without having to pay the labor differential subsidy to JCI contemplated under the Put and Call Agreement, minimize administrative liabilities arising from human capital obligations in connection with the transfer of the New Brunswick Facility.  The attrition plan would also provide a "soft landing" for employees of the New Brunswick Facility.  Third, resolution of environmental remediation issues with respect to the New Brunswick Facility, pursuant to the settlement agreement with the NJDEP that is contemplated by the Transfer Agreement, reduces the risk of future liability, further minimizing the Debtors' administrative expenses.  Furthermore, in the Debtors' judgment, JCI's willingness to subsidize $12.5 million of the Debtor's IUE-CWA New Brunswick Attrition Plan benefits the Debtors.  JCI is the only party which can employ nearly one-third of the Debtors' hourly workforce at the plant plus certain of the salaried personnel.  Indeed, it is believed that JCI currently needs the production capacity of the New Brunswick and Fitzgerald Facilities to satisfy its customers' needs.  And, finally the transfer of the New

Brunswick Facility and the transition of supply from the Fitzgerald Facility will trigger GM economic support.

46.    In addition, on March 31, 2006, the Debtors announced a broad transformation plan that outlined core and non-core business lines.  In connection with their transformation plan, the Debtors identified non-core product lines that do not fit into the Company's future strategic framework.  Consistent with that strategy, the Debtors plan to sell the New Brunswick Facility and transition supply of battery products out of the Fitzgerald Facilities.  Finally, because ISRA requires, among other things environmental remediation in connection with the sale of the New Brunswick Facility, the Debtors can not sell the New Brunswick Facility to any third party purchaser without conducting the environmental remediation themselves.

47.    The Debtors believe, in their sound business judgment, that the resolution of post-closing matters relating to the sale of the battery business to JCI and the New Brunswick and Fitzgerald Facilities would benefit the Debtors by reducing operating losses, shifting responsibility for certain employees to JCI, minimizing the estates' administrative liabilities, and allowing the Debtors to begin aligning their North American businesses in connection with their transformation plan.  In addition, the Debtors would receive $12.5 million from JCI and relatively significant economic benefits from GM upon the transfer of this facility to JCI.  The Debtors have determined that the sale of the New Brunswick Facility to JCI and the continuation and transition of supply out of the Fitzgerald Facility pursuant to the Transfer Agreement will maximize value for all stakeholders and thus is a sound exercise of their business judgment.

26

<u>Applicable Authority</u>

A.    Sale, Continuation and Transition of Supply, And Implementation Of
       <u>Attrition Plan Pursuant To 11 U.S.C. § 363(b)(1)</u>

48.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  <u>See</u> <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).  This "business judgment" test is premised on the debtor's business judgment that the proposed use of property of the estate would be beneficial to the estate.  <u>Cf.</u> <u>Orion Pictures Corp. v. Showtime Networks, Inc.</u> (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993) (analyzing business judgment standard under section 365 of the Bankruptcy Code).  To a bankruptcy court, "'business judgment' … is just that – a judgment of the sort a businessman would make."  <u>Id.</u>

49.    Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992).  As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'"  <u>In re Aerovox, Inc.</u>, 269 B.R. 74, 81 (Bankr. D. Del. 2001)(quoting <u>In re Interco, Inc.</u>, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

27

50.    For the reasons stated herein, the Debtors submit that entering into the

Transfer Agreement with JCI, and, in particular, selling the Acquired Assets, transitioning

supply out of the Fitzgerald Facility, and implementing the IUE-CWA New Brunswick

Attrition Plan, reflects a sound exercise of the Debtors' business judgment.

B.    Sale Free And Clear Pursuant To 11 U.S.C. § 363(f)

51.    Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section
> free and clear of any interest in such property of an entity other than the
> estate, only if —

> (1)    applicable nonbankruptcy law permits sale of such property
> free and clear of such interest;

> (2)    such entity consents;

> (3)    such interest is a lien and the price at which such property
> is to be sold is greater than the aggregate value of all liens
> on such property;

> (4)    such interest is in bona fide dispute; or

> (5)    such entity could be compelled, in a legal or equitable
> proceeding, to accept a money satisfaction of such interest.

52.    Therefore, pursuant to section 363(f) of the Bankruptcy Code, the

Debtors may sell the Acquired Assets to JCI free and clear of all liens, claims, and

encumbrances, except the liabilities specifically assumed by JCI.  Each lien, claim, or

encumbrance which is not the result of such a liability being assumed by JCI satisfies at least

one of the five conditions of section 363(f), and the Debtors submit that any such lien, claim,

or encumbrance will be adequately protected by the attachment of such lien, claim, or

encumbrance to the proceeds of the sale of the Acquired Assets in the order of its priority, with

the same validity, force and effect that it now has as against the Acquired Assets, subject to any

28

claims and defenses the Debtors may possess with respect thereto.  Accordingly, the Debtors

request that the Acquired Assets be transferred to JCI free and clear of all liens, claims, and

encumbrances, except for the liens resulting from liabilities assumed by JCI.[24]

C.    Good Faith Pursuant To 11 U.S.C. § 363(m)

>    53.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or
> (c) of this section of a sale or lease of property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Third Circuit

in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of
> his conduct in the course of the sale proceedings.  Typically, the misconduct that
> would destroy a purchaser's good faith status at a judicial sale involves fraud,
> collusion between the purchaser and other bidders or the trustee, or an attempt to
> take grossly unfair advantage of other bidders.

---

[24]    In addition, JCI should not be liable under any successor liability doctrines, except as otherwise provided in the
Transfer Agreement.  Courts have consistently held that the purchaser of a debtor's assets under section 363 of
the Bankruptcy Code takes such assets free and clear of successor liability resulting or arising from pre-existing
claims.  Such successor liability claims would frustrate the purpose of an order authorizing the sale of estate
assets free and clear of all "interests."  Accordingly, JCI should not be subject to further claims related to the
Debtors' pre-sale conduct.  See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d
89, 94 (2d Cir. 1988) ("when a debtor's assets are disposed of free and clear of third-party interests, the third
party is adequately protected if his interest is assertable against the proceeds of the disposition"); see also Ninth
Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that
bankruptcy court has power to sell assets free and clear of any interest that could be brought against the
bankruptcy estate during bankruptcy); Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.),
19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property pursuant to Bankruptcy Code section 363(f)
was made free and clear of Title VII employment discrimination and civil rights claims of debtors' employees);
In re Hoffman, 53 B.R. 874, 876 (Bankr. D. R.I. 1985) (transfer of liquor license pursuant to Bankruptcy Code
section 363(f) was made free and clear of any interest permissible even though estate had unpaid tax liability);
American Living Sys. Bonapfel (In re All American of Ashburn, Inc.), 56 B.R. 186, 189-90 (Bankr. N.D. Ga.
1986) (product liability claims precluded on successor liability doctrine when assets ere sold free and clear
pursuant to Bankruptcy Code section 363(f)), aff'd sub. nom. Griffen v. Bonapfel, 805 F.2d 1515 (11th Cir.
1986).

788 F.2d at 147 (citations omitted).  The Debtors submit that the Transfer Agreement is the

product of an intensely negotiated, arm's-length transaction, in which JCI has at all times acted in

good faith.  The Debtors and JCI have negotiated the terms of the Transfer Agreement for

several months, as they worked to resolve all issues relating to the disposition of the New

Brunswick Facility, the continuation and transition of supply out of the Fitzgerald Facility, the

resolution of human capital, production supply, and environmental matters, and the allocation of

risks and prospective obligations between the parties.  The Debtors and JCI began this process by

exploring how to resolve these issues pursuant to the ancillary agreements to the MSA executed

pursuant to the 2005 sale of Delphi's battery business to JCI, and concluded by agreeing on the

terms of the postpetition Transfer Agreement, which resolves these issues while taking into

consideration the manner in which both parties' circumstances have changed over the past ten

months.  The Debtors, therefore, request that the Court make a finding that JCI has purchased the

Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

## Notice Of Motion

54.    Notice of this Motion shall be provided in accordance with the Seventh

Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006,

9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management,

and Administrative Procedures, entered by this Court on May 19, 2006.  In light of the nature

of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

55.    Because the legal points and authorities upon which this Motion relies

are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

30

Rules for the United States Bankruptcy Court for the Southern District of New York be

deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an

order (a) authorizing and approving the Debtors' entry into the Transfer Agreement and (b)

granting the Debtors such other and further relief as is just.

Dated:        New York, New York
              May 26, 2006

                                SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP

                                By:   /s/ John Wm. Butler, Jr.
                                      John Wm. Butler, Jr. (JB 4711)
                                      John K. Lyons (JL 4951)
                                      Ron E. Meisler (RM 3026)
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois 60606
                                (312) 407-0700

                                        - and -

                                By:   /s/ Kayalyn A. Marafioti
                                      Kayalyn A. Marafioti (KM 9632)
                                      Thomas J. Matz (TM 5986)
                                Four Times Square
                                New York, New York 10036
                                (212) 735-3000

                                Attorneys for Delphi Corporation, et al.,
                                  Debtors and Debtors-in-Possession

31

# Exhibit A

EXECUTION COPY

**TRANSFER AGREEMENT RELATING TO**
**TRANSFER OF DELPHI'S NEW BRUNSWICK**
**BATTERY FACILITY TO JCI**

**THIS AGREEMENT,** made and entered into this **26th** day of **May, 2006** by and between **JOHNSON CONTROLS, INC.**, a Wisconsin corporation ("**Buyer**") and **DELPHI AUTOMOTIVE SYSTEMS LLC,** a Delaware limited liability company ("**Seller**").

**R E C I T A L S:**

**WHEREAS**, Seller is engaged in the Business (as hereinafter defined).

**WHEREAS**, on October 8, 2005 (the "**Petition Date**"), Seller and certain of its Affiliates filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, Seller wishes to sell to Buyer, all right, title and interest of Seller in and to the Acquired Assets (as hereinafter defined), and Buyer wishes to make such purchase; subject to the conditions set forth in this Agreement.

**WHEREAS,** Buyer and Seller are parties to a Tier 2 Component Supply Agreement ("**CSA**") under which Seller manufactures SLI batteries, at the Seller's facility in New Brunswick, New Jersey (the "**Facility**").

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained in this Agreement, Buyer and Seller agree as follows:

1. **DEFINITIONS.**    As used in this Agreement, the following words, when capitalized, shall have the respective meanings set forth below:

    **1.1**    "**Acquired Assets**" means the Real Property and all of the following assets to the extent owned by Seller and used or held for use primarily or exclusively in the Business at the Facility: (i) Administrative Assets; (ii) Permits; (iii) Personal Property owned by Seller, located at the Facility and used for manufacturing Products for Buyer under the CSA, including any addition thereto or any replacement, adjustment or modification thereof; and (iv) certain Inventory of the Business.   Exhibit 1.1 to this Agreement contains a list of the Acquired Assets consisting of Personal Property and Real Property as of the date hereof to the best of Seller's Knowledge.  For the avoidance of doubt, it is specified that the term "**Acquired Assets**" does not include: (i) any machinery, equipment and other assets owned by Buyer; (ii) any of Seller's assets within its Laurel, Mississippi or Flint, Michigan operations (which make plastic battery trays, covers and other plastic components of Products) or Fitzgerald, Georgia operations (without affecting JCI's rights to its bailed assets within those facilities); (iii) assets owned by third parties; (iv) except as set forth in Section 7.3 (Indemnity), the benefits of any of Seller's or Seller's Affiliates' insurance policies relating to the operation of the

Business (including any right to proceeds thereunder); (v) all finished goods Inventory and all inventories, products, rights, properties, assets and businesses of the Business which shall have been transferred or disposed of by Seller prior to Completion in the Ordinary Course of Business or not otherwise in breach of this Agreement; (vi)  Any Inventory consisting of work in process (other than green group batteries), or raw materials not listed on Exhibit 1.11 of this Agreement, including the excluded raw materials Inventory set forth on Exhibit 1.1(vi); (vii) any Contracts; and (viii) any document or information the transfer of which is prohibited by law or regulation.

**1.2**    "**Administrative Assets**" means books, records and other administrative assets including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, sale order files, tool routings, labor routings, facility blueprints, service blueprints and plant layouts; provided, however that Administrative Assets does not include Technical Documentation or information and materials protected by attorney-client privilege (the lack of which materials are not material to the operation of the Business under the CSA).

**1.3**    "**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity.  For purposes of this definition, control means ownership of more than fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar functions.

**1.4**    "**Agreement**" means this Transfer Agreement, including Exhibit 4.1 and all other exhibits to this Agreement.

**1.5**    Intentionally omitted.

**1.6**    "**Business**" means the manufacture of starting SLI batteries by Seller at the Facility.

**1.7**    "**Completion**" means completion of the purchase of the Acquired Assets by Buyer resulting from and in accordance with this Agreement.

**1.8**    "**Completion Date**" means the date of Completion of the transfer of the Facility to Purchaser under this Agreement.

**1.9**    "**Contracts**" means purchase orders, service contracts, leases, product warranty or service agreements and other commitments, agreements and undertakings relating to the Business.

**1.10**    "**Improvements**" means buildings, fixtures and other improvements to Real Property, including the Facility.

**1.11**    "**Inventory**" included within the Acquired Assets means finished Products, raw materials set forth on Exhibit 1.11, work-in-process consisting of green group batteries, packaging, stores, stock, supplies, spare parts and other inventory used in making Products located at the Facility.

**1.12** "**Lien**" means any lien, mortgage, charge, pledge, security interest, restriction on transferability, easement, defect of title or other claim, easement, encroachment or other encumbrance of any nature whatsoever on any Acquired Asset.

**1.13** "**IUE Consent**" means the IUE waiver of "no sale" provisions contained in the Delphi-IUE-CWA National Agreement (as defined in Exhibit 4.1) and IUE waiver of the Buyer's assumption of the Unpublished Delphi IUE-CWA Neutrality Letter or any other neutrality agreement, included as part of Exhibit 1.13 of this Agreement.

**1.14** "**Purchase Price**" means the purchase price to be paid for the Acquired Assets, exclusive of any Transaction Taxes, equal to One Dollar ($1.00) plus (i) $20.00 for every green group battery, and (ii) the CSA price for all finished goods Inventory, in each case located at the Facility as of close of business on July 31, 2006, based on a physical inventory to be conducted by the parties.

**1.15** "**Ordinary Course of Business**" means the ordinary course of business of the Business, consistent with past practice and custom, including the CSA.

**1.16** "**Party**" or "**Parties**" means Buyer and/or Seller.

**1.17** "**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to Seller and that relate exclusively to the Facility or the Acquired Assets, to the extent that Seller or any of its Affiliates has the power, authority or right to transfer or assign such Permits.

**1.18** "**Permitted Lien**" means: (i) any Lien for taxes not yet delinquent; (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet delinquent; (iii) purchase money security interests arising in the Ordinary Course of Business; (iv) security interests relating to vendor tooling arising in the Ordinary Course of Business; (v) Liens and encumbrances of record; and (vi) Liens consented to by Buyer (such consent not to be unreasonably withheld).

**1.19** "**Personal Property**" means tangible personal property other than Administrative Assets, Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, business machines, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property used by the Business, whether located at the Facility, at the place of business of a vendor or elsewhere.

**1.20** "**Products**" means SLI batteries.

**1.21** "**Real Property**" means the real property used by the Business and owned by Seller, as described in Exhibit 1.21, and all Improvements located thereon.

**1.22** "**Sale Approval Order**" means an order or orders of the Bankruptcy Court issued pursuant to Sections 363 and 365 of the Bankruptcy Code substantially in the form set forth on Exhibit 1.22 to this Agreement, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets to Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Liens other than Permitted Liens.

**1.23**    "**Seller's Knowledge**" or "**Knowledge of Seller**" means the knowledge of any of the individuals listed on Exhibit 1.23 with respect to their respective functional areas of expertise. For this purpose, an individual will be deemed to have Knowledge of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual would be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonable inquiry of Delphi's files and its employees who, in the ordinary course of their job responsibilities, would reasonably be expected to have actual possession or actual personal Knowledge of such information.

**1.24**    "**SLI Batteries**" means starting, lighting and ignition lead-acid batteries.

**1.25**    "**Technical Documentation**" means: (i) assembly and parts drawings, material specifications and drawings for Products; (ii) information to assemble Products; (iii) labor and tool routing sheets; drawings of special tools, fixtures, dies, jigs, gauges and patterns, and service information; and (iv) operating manuals, instructions and other available, relevant documents relating to the operation of the machinery and equipment located at the Facility.

**1.26**    "**Transaction Taxes**" mean any sales taxes, documentary and stamp taxes, transfer taxes, use taxes, excise taxes, value-added taxes, registration duties, gross receipts or similar charges, all charges for filing and recording documents in connection with the transfer of the Acquired Assets.

**2.**    **COMPLETION OF THE SALE OF THE ACQUIRED ASSETS:**

**2.1**    **Completion.**  Subject to the conditions set forth in this Section 2.1, Completion shall take place on the Completion Date at the offices of Seller in Troy, Michigan or at such other place as Buyer and Seller may jointly determine.   The Completion date will be the later of August 1 (12:01AM EST), 2006 and the date that is ten (10) days after the date of the Sale Approval Order, unless otherwise agreed by the Parties. Each Party's obligation to perform at the Completion Date is subject to:

A.    Bankruptcy Court approval of the Sale Approval Order, including without limitation, approval of Exhibit 1.13.

B.    Completion of the implementation of the attrition plan set forth in Exhibit 1.13 (the "**Attrition Plan**") to reduce the number of U.S. Hourly Employees to approximately one hundred (100) U.S. Hourly Employees, in accordance with the terms of the IUE Consent**;**

C.    Seller must not have negotiated any other Collective Bargaining Agreement which purports to be applicable to the New Brunswick Facility.

D.    The other Party's being in compliance, in all material respects, with its agreements with respect to Employee Matters that are such other Party's responsibility, and to be performed before Completion as described in Exhibit 4.1 hereto, and with such Party's representations and warranties set forth in Section 3 of this Agreement being true and correct in all material respects as of

the Completion Date, except where a failure is due to the acts or omissions of the other Party;

E.      The other Party must not be in default in any material respect under, and must not have rejected, the CSA dated June 30, 2005;

F.      The Facility must be an operational plant producing Products in accordance with the CSA, with such changes as contemplated in Exhibit 1.13; and

G.      The other party shall be in compliance in all material respects with the Environmental Matters Agreement dated June 30, 2005 with respect to the Facility.

H.      Each Party undertakes to pay to the other or to the relevant tax authorities the Transaction Taxes as required by applicable law and in accordance with Section 1.26.

**2.2**    **Seller Deliveries at Completion.**    At Completion Seller shall deliver to Buyer:

A.      A Bill of Sale for the Personal Property and Inventory, substantially in the form of Exhibit 2.2A hereto, duly executed together with an invoice relating to the Acquired Assets transferred;

B.      A covenant deed for the Real Property;

C.      A certificate that all the representations and warranties made in Article 3 by Seller are true and correct in all material respects, and that it has complied with its obligations under this Section 2.2, with the same force and effect, and subject to the same qualifications, as though made at Completion;

D.      Officer's certificate stating that at least $12.5 million USD has been incurred by Delphi in furtherance of the Attrition Plan, as referred to in Section 3.A(xi) of Exhibit 4.1; and

E.      Such other documents as may be necessary to give Buyer good and valid title to and ownership of the Acquired Assets.

**2.3**    **Buyer Deliveries at Completion.**    At Completion Buyer shall:

A.      A certificate that all the representations and warranties made in Section 3 by Buyer are true and correct in all material respects, and that it has complied with its obligations under this Section 2.3, with the same force and effect, and subject to the same qualifications, as though made at Completion; and

B.      Pay to Seller the Purchase Price by wire transfer in accordance with wiring instructions to be provided by Seller before Completion.

**2.4** **Transfer of Acquired Assets.**  Seller and Buyer hereby agree that, as of the Completion Date, title and risk of loss to all Acquired Assets shall pass from Seller to Buyer.

**2.5** **Post Closing Deliveries.**  Buyer will pay for assets, goods or services ordered by Seller on or before Completion for the Business in the Ordinary Course of Business to the extent such assets, goods or services are received by the Business after the Completion Date; other than Inventory items that have been excluded from the Acquired Assets under Section 1.1(vi) of this Agreement.  If any such excluded items are delivered to the facility after Completion, Buyer will promptly contact Seller and segregate such items in a reasonable manner, and Seller and Buyer will cooperate in Seller's removal of such items within 30 days after such notice as set forth in Section 8.15 below.

**2.6** **Prorations, Adjustments of Expenses Following Completion:**

A.  **Prorations:**

(i)  To the extent that Seller makes any payment relating to the Business prior to, on or following the Completion Date with respect to any item listed in clause (ii) below relating to periods following the Completion Date for which Buyer will receive a benefit, Buyer shall reimburse Seller on a per diem basis, unless otherwise provided for; and

(ii)  To the extent Buyer makes any payment relating to the Business following the Completion Date with respect to any item listed below relating to periods on or prior to the Completion Date for which Seller received a benefit, Seller shall reimburse Buyer on a per diem basis, unless otherwise provided for, in each case for the following:

(a)  Personal, real property and other ad valorem Taxes, with real property Taxes allocated pursuant to Section 5.5.

(b)  Water, wastewater treatment, sewer charges and other similar types of charges and/or Taxes thereon and any other assessments payable with respect to the Business.

(c)  Electric, fuel, gas, telephone and other utility charges.

(d)  Reimbursable employee business expenses will be paid by Seller if incurred prior to or on the Completion Date or Buyer if incurred after the Completion Date.

(e)  Rentals and other charges under leases to be transferred to or assumed by the Buyer pursuant to this Agreement.

(f)  Payments and charges due pursuant to any Contract (other than pursuant to collective bargaining agreements,

6

Benefit Plans (as defined in Section 3(3) of ERISA)), employee payroll-related items except as set forth in clause (d), Permit, commitment or other binding arrangement to which Seller is a party or is obligated and which are being assumed by the Buyer pursuant to this Agreement or offered to Buyer by Seller on a transition services basis, as may be agreed by the Parties prior to Completion.

B.    **Further Assurance.**  To the extent that, after the Completion Date, Delphi, on the one hand, or Buyer, on the other hand, receives any bills or invoices for any of the items listed in this Section 2.6 or similar items, relating to both pre-Completion and post-Completion periods, such Party shall, within ten (10) business days, send any such bills or invoices to the other Party.  If necessary to avoid incurring interest, penalties and/or late charges, the Party receiving any such bill or invoice shall pay all amounts shown to be due thereon, and shall invoice the other Party for all amounts owed by such other Party thereunder, and such other Party shall reimburse such amounts in accordance with Section 2.6C.

C.    **Payments.**  Any payments due under this Section 2.6 shall be made within fifteen (15) days after the end of the month in which a  bill or invoice is sent to a Party pursuant to Section 2.6C; provided, however, that the disputed portion of any such item shall be paid within fifteen (15) days after the final determination thereof on an item-by-item basis.  When any Party makes a payment to a third party which is required to be reimbursed to it by another Party, the reimbursement payment shall be considered the repayment of an advance. Such payments shall be made by wire transfer in immediately available funds.

2.7    **Approvals and Consents; Cooperation; Notification.**  Seller shall notify, as required by the Bankruptcy Court, all parties entitled to notice of the proposed sale of the Acquired Assets to Buyer, and Buyer will cooperate with Seller in attempting to obtain the Sale Approval Order.

2.8    **Fitzgerald**.  Regarding Delphi's supply of Products to JCI from Delphi's Fitzgerald, Georgia battery manufacturing facility, Delphi will continue to supply such batteries to JCI in accordance with the terms of the Component Supply Agreement between the parties dated July 1, 2005 ("**CSA**"), as amended. In no event shall the pricing of Products manufactured at Fitzgerald be modified other than the GM discounts and other changes and adjustments contemplated by the existing CSA terms.

3.    **REPRESENTATIONS, WARRANTIES AND INDEMNITIES:**

3.1    **Representations and Warranties made by each Party.**  Each of Seller and Buyer makes the representations and warranties contained in this Article 3 to the other Party except for those in Section 3.6, which are made solely by Seller to Buyer. The representations and warranties contained in this Article 3 are made on the date of this Agreement and are deemed to be repeated on the Completion Date.

3.2    **Power and Authority.**  Subject to Bankruptcy Court approval of the Sale Approval Order, it has the power to execute, deliver and perform this Agreement, and

7

has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

**3.3** **Authorizations.** Subject to Bankruptcy Court approval of the Sale Approval Order, all authorizations required in connection with the execution, delivery, performance, validity and enforceability of, and the transactions contemplated by, this Agreement have been obtained or effected and are in full force and effect, provided, however, that performance of this Agreement is subject to Buyer and Seller taking necessary action as required to meet their respective obligations regarding employee matters, as set forth on Exhibit 4.1 hereto.

**3.4** **Enforceability.** Subject to Bankruptcy Court approval of the Sale Approval Order, this Agreement constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms.

**3.5** **No Breach.** Subject to Bankruptcy Court approval of the Sale Approval Order, entering into this Agreement and performing its undertakings hereunder shall not result in the breach of any provision of, or constitute a default under, any judgment, decree, indenture, mortgage or other agreement or instrument to which it is a party or by which it is bound.

**3.6** **Miscellaneous Matters Relating to Business:**

A. **Ownership of the Acquired Assets.** Seller has good, valid and marketable title to the Acquired Assets, and upon entry by the Bankruptcy Court of the Sale Approval Order, Seller shall transfer and convey the Acquired Assets free and clear of any Lien other than Permitted Liens. Except for this Agreement and the Bankruptcy Court approvals reflected in the Sale Approval Order, the Real Property will be transferred free and clear of any restrictions with respect to the transferability or divisibility thereof. At the Closing, Buyer will receive good and marketable fee title or leasehold title (as applicable) to all of the Real Property owned by Seller, free and clear of all Liens other than the Permitted Liens.

B. **Condition.** The Real Property and Personal Property (other than Inventory) have been maintained as required by the CSA and are in such condition (considering age and purpose for which used) as to enable the Business to be conducted as currently conducted without material disruption.

C. **Inventory.** SELLER MAKES NO WARRANTY OF WHATSOEVER KIND OR NATURE REGARDING INVENTORY, ALL OF WHICH IS BEING SOLD "AS IS" AND "WHERE IS", AND SELLER HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, INCLUDING THE CONDITION OF THE INVENTORY AND EACH PART THEREOF, AND THE ADEQUACY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE INVENTORY OR ANY PART THEREOF.

D. **Real Property.** To Seller's Knowledge, the use of the Real Property as currently used is a permitted use by right in the applicable zoning classification and is not a nonconforming use or a conditioned use, and no variances are needed and none have been granted with respect to the Real

Property.  There are currently in full force and effect duly issued certificates of occupancy permitting the Real Property and the Facility to be legally used and occupied for the purpose of conducting the Business.  The Real Property has rights of access to dedicated public highways.  To Seller's Knowledge, no fact or condition exists that would prohibit or adversely affect the ordinary rights of access to and from the Real Property from and to the existing highways and roads, and there is no pending or, to Seller's Knowledge, threatened restriction or denial, governmental or otherwise, upon such ingress and egress.  Seller has not received notice of: (i) any claim of adverse possession or prescriptive rights involving or affecting any of the Real Property; (ii) any structure located on any Real Property that encroaches on or over the boundaries of neighboring or adjacent properties; or (iii) any structure of any other person or entity that encroaches on or over the boundaries of any Real Property.  None of the Real Property is located in a flood plain, flood hazard area, wetland or lakeshore erosion area within the meaning of any Law or Order.

E.    **No Condemnation, Expropriation or Similar Action.**    To Seller's Knowledge, neither the whole nor any portion of the Real Property is subject to any order to be sold (other than the Sale Approval Order) or is being condemned, expropriated or otherwise taken by any governmental entity with or without payment of compensation therefore, and no such condemnation, expropriation or taking has been planned, scheduled or proposed.

F.    **Compliance.**  The Real Property is, or at the time of Completion will be, in compliance in all material respects with any applicable law, regulation or ordinance, and Seller has not received any notice, written or to the best of Seller's knowledge oral, of any such violation.

G.    **Litigation.**  Except for matters disclosed prior to Completion and for which Seller will retain responsibility if so required under the terms of the CSA, there is no litigation or administrative proceeding and to Seller's Knowledge, threatened litigation or administrative proceeding which affects or could affect the Real Property or Buyer's ability to conduct the Business at the Facility.

H.    **Environmental Matters.**  Seller makes no representations or warranties regarding environmental matters in this Agreement (notwithstanding anything to the contrary herein).  Notwithstanding the aforementioned, to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge liability with respect to any claims brought by a third party against Buyer relating to pre-Completion environmental matters at the Facility, Seller will indemnify Buyer as set forth in Exhibit 3.6.H to this Agreement.

I.    Seller represents and warrants that, except for the unpublished Neutrality Letter and Exhibit 1.13 referenced herein, Seller has no current agreements or understandings with the IUE-CWA which create obligations or liabilities for Buyer at its other plants if Buyer purchases the New Brunswick facility or assumes the terms of the Delphi IUE-CWA National Agreement or the Delphi IUE-CWA Local Agreement.

J.     EXCEPT FOR SPECIFIC REPRESENTATIONS AND WARRAN-
TIES CONTAINED IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE
BEING SOLD ON AN "AS IS," "WHERE IS" BASIS AND SELLER DOES NOT
MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY,
FITNESS OR OTHERWISE WITH RESPECT TO THE ACQUIRED ASSETS
WHICH EXTEND BEYOND THE AFORESAID SPECIFIC REPRESENTATIONS
AND WARRANTIES.

**3.7    Product Warranty/Liability:**

A.     **Buyer Indemnity.**    Buyer will defend, indemnify and hold
harmless Seller and its directors, officers, agents and employees, from and
against any and all claims, suits, causes of action, liabilities, losses, damages,
costs of settlement, and expenses (including reasonable attorney fees) which
may be imposed upon or incurred by Seller from claims, suits or causes of action
(including without limitation those for death, personal injury, or property damage)
by any Person whatsoever at any time against Seller and/or its directors, officers,
agents and employees to the extent arising from, caused or alleged to be caused
by: (a) defective or improper design or manufacture of any Products
manufactured by Seller under the CSA; (b) infringement of any intellectual
property right (including patent, trademark, copyright, moral, industrial design or
other proprietary rights, or misuse or misappropriation of trade secret) in
connection with the design or manufacture of any Products other than
infringement of U.S. Patent No. 4,906,540 or U.S. Patent No. 5,401,278; and/or
(c) the failure of the design of Products to comply with any applicable Laws.

B.     **Seller Indemnity.**    To the extent that the Sale Approval Order or
other applicable provisions of the Bankruptcy Code fails to discharge liability with
respect to any claims for Products manufactured at the Facility brought by a third
party against Buyer relating to pre-Completion Product warranty/liability matters,
Seller will defend, indemnify and hold harmless Buyer  and its directors, officers,
agents and employees, from and against any and all claims, suits, causes of
action, liabilities, losses, damages, costs of settlement, and expenses (including
reasonable attorney fees) which may be imposed upon or incurred by Buyer from
claims, suits or causes of action (including without limitation those for death,
personal injury, or property damage) by any Person whatsoever at any time
against Buyer and/or its directors, officers, agents and employees to the extent
arising from or caused by: (a) infringement of U.S. Patent No. 4,906,540 or U.S.
Patent No. 5,401,278;    (b) infringement of any intellectual property right
(including patent, trademark, copyright, moral, industrial design or other
proprietary rights, or misuse or misappropriation of trade secret) other than in
connection with the design or manufacture of any Products; (c) the failure of the
Products manufactured by Seller at the Facility under the CSA to comply in any
material respect with the applicable specifications as a result of Seller's failure to
comply with the Manufacturing and Quality Procedures set forth in the CSA or
negligent workmanship; and/or (d) any and all claims related to the Facility, its
employees, Products to the extent arising in any manner out of facts or
circumstances in existence prior to July 1, 2005.

**4.**      **EMPLOYEE MATTERS.** The treatment of U.S. Hourly Employees and U.S. Salaried Employees, and the obligations of Seller and Buyer with respect thereto, will be as set forth in Exhibit 4.1.

**5.**      **TAX MATTERS:**

**5.1      Seller Responsibilities.** Seller shall file any Tax Returns and pay any Taxes which may be required by any federal, state, local or foreign tax authorities or governmental agencies by reason of business conducted by Seller on or prior to the Completion Date.

**5.2      Buyer Responsibilities.** Buyer shall file any Tax Returns and pay any Taxes which may be required by any federal, state, local or foreign tax authorities or governmental agencies by reason of business conducted by Buyer after the Completion Date.  All United States or foreign, national, state or local sales taxes, documentary and stamp taxes, transfer taxes, registration taxes, use taxes, gross receipts taxes, registration duties and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees), as well any permit, transfer and filing fees required in order to obtain governmental approvals and consents relating to the transactions contemplated by this Agreement ("**Transfer Taxes**"), shall be borne by Buyer.

**5.3      Mutual Assistance.**   Without affecting the foregoing responsibilities, Seller and Buyer shall provide reasonable assistance during normal business hours to one another to resolve any Tax issues which may relate to their respective business activities utilizing the Acquired Assets and personnel. Such assistance may include, without limitation, access to relevant business records and personnel in connection with: (i) the preparation and filing of Tax Returns, elections, consents, certifications and claims for refunds; (ii) the determination of liability for Taxes; and (iii) the response to tax audits, examinations and other proceedings.  To the extent permitted by applicable law, Buyer and Seller agree to reasonably cooperate with each other to complete any and all exemption certificates or other documents that exempt any portion of the Purchase Price from any of the Transaction Taxes prior to either the Completion Date or the due date for such Transaction Tax.

**5.4      Definitions.**   For purposes of this Agreement, the words "**Taxes**" and "**Tax Return**" are defined as follows:

A.      "**Taxes**" mean any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer, taxes, use, gross receipts, value added, employment, excise, ad valorem, property, withholding, payroll, minimum, windfall profit taxes, transfer fees, customs duties or registration duties), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign governmental or subdivision or agency thereof;

B.      "**Tax Return**" means any return, declaration, report, claim for refund or information return or statement, or any other similar filings related to Taxes, including any schedule or attachment thereto.

**5.5    Real Estate Taxes.** All real estate taxes and assessments assessed on the Real Property for the calendar year in which the Completion occurs shall be prorated between Buyer and Seller. The Seller shall be allocated tax liability for the portion of the year beginning on January 1 and ending on the Completion Date; the Buyer shall be allocated tax liability for the portion of the year beginning on the day following Completion Date and ending on December 31. The percentage for each party will be the number of days in its portion of the year divided by the total number of days in the year. Since the actual determination of tax liability for a given calendar year occurs in June, if the Completion Date occurs before the tax has been determined for the year, the calculation of the prorated taxes will be made as soon as practical after the tax bill has been rendered for the calendar year. If the Completion Date occurs after the tax liability has been determined for the year, the calculation of the prorated taxes will take place at Completion. Each party will be responsible for paying or otherwise discharging any installments due in the year in which the Completion Date occurs based on ownership of the property at the time the installment is due. If the tax allocated to a party exceeds the installments paid or to be paid by that party, that party will make a payment to the other party equal to the excess of the prorated liability over the sum of the installment payments paid or to be paid. The parties agree to cooperate as necessary to accurately and promptly determine the prorated tax liability.

## 6.    GOVERNING LAW; DISPUTE RESOLUTION:

**6.1    Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of New York, without giving effect to rules governing the conflict of laws. Buyer and Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the Bankruptcy Court).

**6.2    Dispute Resolution:**

A.    Buyer and Seller will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each Party. If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either Party to the other, either Party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice of Dispute**") and specify therein in reasonable detail the nature of the dispute. Within ten (10) days after receipt of the Notice of Dispute, the receiving Party (the "**Defending Party**") shall submit to the other a written response. The Notice of Dispute and the response shall include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive to meetings of the parties. Within fifteen (15) days after such written notification, the executives (and other named in the Notice of Dispute or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute (the "**Dispute Resolution Meeting**"). All reasonable requests for information made by one Party to the other will be honored promptly. All negotiations pursuant to this Section 6.2A are confidential and shall be treated as

compromise and settlement negotiations for purposes of applicable rules of evidence.

**B.**     The parties agree that neither of them will initiate legal action in respect of a dispute within the period of fifteen (15) days following the Dispute Resolution Meeting.  In the absence of agreement at the Dispute Resolution Meeting and following that fifteen (15) day period, any party shall be free to pursue its rights and remedies as it may see fit in accordance with this Agreement.

7.     **INDEMNIFICATION:**

**7.1     Indemnification:**

A.     **Indemnification Provisions for Benefit of Buyer.**  If Seller breaches any of its warranties or covenants contained in this Agreement, and Buyer makes a written claim for indemnification against Seller in accordance with the procedures set forth in Section 7.2 below within the applicable survival period, to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge the underlying third party claim,  Seller agrees to indemnify Buyer and its Affiliates and their officers, directors, employees and agents (individually a "**Buyer Indemnitee**" and collectively the "**Buyer Indemnitees**") and to hold each Buyer Indemnitee harmless from and against all damages, losses and expenses (including reasonable expenses of investigation and attorneys' fees) ("**Losses**") to the extent caused by or arising out of: (i) any breach of warranty or inaccurate or erroneous representation of Seller contained in this Agreement or in any certificate delivered pursuant to this Agreement; or (ii) any breach of this Agreement.  Buyer shall be named as an additional insured on Seller's General Liability and Excess Liability policies as related to the Business, but only to the extent of Seller's Indemnification Obligations under this Agreement.   Buyer agrees that all claims for indemnification shall be presented to Seller in advance of its insurers to the extent that Buyer does not invalidate its obligations to ensure coverage of such claims is not jeopardized.

B.     **Indemnification Provisions for Benefit of Seller.**  If Buyer breaches any of its Warranties or covenants contained in this Agreement, and Seller makes a written claim for indemnification against Buyer in accordance with the procedures set forth in Section 7.2 below within the applicable survival period, Buyer agrees to indemnify Seller and its Affiliates and their officers, directors, employees and agents (individually a "**Seller Indemnitee**" and collectively the "**Seller Indemnitees**") and to hold each Seller Indemnitee harmless from and against all Losses to the extent caused by or arising out of: (i) any breach of warranty or inaccurate or erroneous representation of Buyer contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of this Agreement.

C.     **Mitigation.**  Notwithstanding anything to the contrary in this Section B, no Party shall have an obligation to indemnify the other Party with respect to any Losses to the extent such Losses could have reasonably been

avoided by such other Party, or the damage to such other Party from such Losses reasonably could have been mitigated.

D.   **Deductible and Cap.**   No Indemnitor shall be liable to an Indemnitee until the amount of all indemnifiable Losses of such Indemnitee in the aggregate exceeds USD One Hundred Thousand ($100,000.00) ("**Deductible Amount**") threshold, after which point the Indemnitor will be obligated to the Indemnitee from and against indemnifiable Losses in excess of the Deductible Amount until the amount of indemnifiable Losses paid by such indemnifying Party in the aggregate reaches a cap equal to USD Twenty Million ($20 million) (the "**Cap Amount**") after which point the indemnifying Party will have no further obligation with respect to Losses under this Agreement.

**7.2**   **Indemnification Procedure.**   When a Party obtains knowledge of the commencement of any third-party claim, action, suit or proceeding or of the occurrence of any event or the existence of any state of facts which may become the basis of a third-party claim (any such claim, action, suit or proceeding or event or state of facts being hereinafter referred to in this Section as a "**Claim**"), in respect of which such Party (an "**Indemnitee**") is entitled to indemnification under this Agreement, such Indemnitee shall promptly notify the indemnitor under this Agreement (the "**Indemnitor**") of such Claim in writing; provided, however, that any failure to give such notice will not waive any rights of the Indemnitee except to the extent that the rights of the Indemnitor are prejudiced thereby.  With respect to any Claim as to which such notice is given by the Indemnitee to the Indemnitor, the Indemnitor may, subject to the provisions below, assume the defense and settlement of such Claim; provided, however, that: (i) the Indemnitee shall cooperate with the Indemnitor in the defense and settlement of  such Claim  in any  manner reasonably requested by the Indemnitor; the Indemnitee will not, and it will use all reasonable efforts to ensure that its employees will not, make an admission of liability in respect of any Third Party Claim and as soon as it becomes aware of a Third Party Claim it shall issue an instruction to relevant employees requiring them not to make any disclosure or statement to any third party in relation to any Third Party Claim or any product or service to which such Third Party Claim relates (except for notices to governmental authorities as required by applicable Laws) without the prior written consent of the Indemnitor (such consent not to be unreasonably withheld or delayed); (ii) the Indemnitee shall have the right to pay or settle such Claim at any time, in which event the Indemnitee shall be deemed to have waived any right to indemnification therefor by the Indemnitor; (iii) the Indemnitee shall be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; and (iv) the Indemnitor shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitee, provided further, however, that if Indemnitee fails to consent to a written settlement offer and judgment is subsequently entered in an amount exceeding the amount of such offer, then Indemnitor shall have no responsibility for the amount of such excess.

If: (i) the Indemnitor fails to assume the defense of such Claim or, having assumed the defense and settlement of such Claim, fails reasonably to contest such Claim in good faith; and (ii) the remedy sought by the claimant with respect to such Claim is not solely for money damages, the Indemnitee, without waiving its right to indemnification, may assume the defense and settlement of such Claim; provided, however, that: (a) the Indemnitor shall be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; (b) the Indemnitor shall

14

cooperate with the Indemnitee in the defense and settlement of such Claim in any reasonable manner requested by the Indemnitee; and (c) the Indemnitee shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitor.

As used in this section, the term Indemnitee shall be deemed to include the plural thereof where the rights or obligations of more than one Indemnitee may be involved.

**7.3     Sole and Exclusive Remedy.**  Each of Buyer and Seller acknowledge and agree that the indemnification provided in this Article 7 shall be the sole and exclusive remedy of the parties and their Affiliates and their respective successors and assigns in respect of any claim for monetary damages arising out of or under this Agreement.

**8.     GENERAL PROVISIONS:**

**8.1     No Inducement.**  The Parties represent to each other and each agrees that, neither it nor any person acting on its behalf has, in contravention of any applicable law, given or offered to give or will give or offer to give any sum of money or other material consideration to any person, directly or indirectly, as an inducement to obtain business hereunder or to influence the granting of licenses or other governmental permissions to enter into this Agreement or perform obligations hereunder.

**8.2     Governing Approvals.**  Seller and Buyer, respectively, shall be responsible for compliance with and for the obtaining of such approvals and/or permits as may be required under national, state and local laws, ordinances, regulations and rules as may be applicable to the performance of their respective responsibilities and obligations under this Agreement.

**8.3     No Agency.**  This Agreement does not constitute either Party the agent or legal representative of the other Party.  Neither Party is authorized to create any obligation on behalf of the other Party.

**8.4     Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and assigns.  No Party may assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other Party; provided, however, that Seller has the right to assign any of its rights or obligations hereunder to any division, subsidiary or affiliate of Seller or to any successor to any or all of Seller's business; provided that, notwithstanding such assignment Seller shall remain liable for all of its obligations hereunder.

**8.5     No Implied Waiver.**  The failure of either Party at any time to require performance by the other Party of any provision hereof shall in no way affect the full right to require such performance at any time thereafter. The waiver by either Party of a breach of any provision hereof shall not constitute a waiver of the provision itself.  The failure of either Party to exercise its rights provided under this Agreement shall not constitute a waiver of such right.

**8.6**    <u>**Notices**</u>.    Any notice under this Agreement shall be in writing (letter, facsimile or telegram) and shall be effective when received by the addressee at its address indicated below:

Notice sent to Seller shall be addressed as follows:

> **DELPHI AUTOMOTIVE SYSTEMS LLC**
> 5725 Delphi Drive
> Troy, Michigan 48098
> Attn:  President-Delphi Energy & Chassis Systems
> Fax No.:  248-813-4301

with a copy to:

> **DELPHI AUTOMOTIVE SYSTEMS LLC**
> 5725 Delphi Drive
> Troy, MI 48098-2815
> Attention:  Assistant General Counsel
> Commercial & Transactional
> Fax: 248-813-2491

Notice sent to Buyer shall be addressed as follows:

> **JOHNSON CONTROLS, INC.**
> 5757 N. Green Bay Avenue
> PO Box 591
> Milwaukee, Wisconsin  53201-0591
> Attn:  President - Battery
> Fax No.:  414-524-2828

with a copy to:

> **JOHNSON CONTROLS, INC.**
> 5757 N. Green Bay Avenue
> PO Box 591
> Milwaukee, Wisconsin  53201-0591
> Attn:  General Counsel
> Fax No.:  414-524-2077

The parties by notice hereunder may designate other addresses to which notices shall be sent.

**8.7**    <u>**Amendments**</u>.    This Agreement and the Mutual Nondisclosure Agreement dated April 24, 2006 between the Parties, constitutes the entire agreement of the Parties, and supersedes all previous agreements, oral or written, between Buyer and Seller with respect to the subject matter hereof. No amendment or modification to this Agreement shall be binding upon either Party unless it is in writing and is signed by both parties.

**8.8**    <u>**Expenses**</u>.    Whether or not the transactions contemplated by this Agreement are consummated, Buyer and Seller shall each bear its respective

16

accounting, legal, financial, advisory and other expenses incurred in connection with the transactions contemplated by this Agreement.

**8.9    Headings.**    The Article and/or Section headings herein are used for convenience of reference only and shall not be deemed a part of this Agreement for any purpose.

**8.10    Severability.**    If any provision of this Agreement shall be held to be invalid, illegal or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, that provision shall be deemed severed to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the parties shall negotiate in good faith to arrive at an alternative replacement provision approximating the parties' original business objective. The remaining provisions hereof shall remain in effect.

**8.11    Counterparts.**    This Agreement may be executed in more than one counterpart, each of which shall for all purposes be deemed to be an original and all of which shall constitute one and the same agreement.

**8.12    Third Parties.**    Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**8.13    Bulk Sales.**    Buyer hereby waives the requirements, if any, of all applicable bulk sales laws.

**8.14    Force Majeure.**    Each Party shall be temporarily excused from performing its obligations under this Agreement for so long as such performance is prevented or delayed by any event of Force Majeure. The term "**Force Majeure**" shall, for purposes of this Agreement, include: (i) any strike or lockout at the plant of a Party or any of its suppliers; (ii) any act or omission of any government authority; or (iii) any other cause beyond the reasonable control of a Party.  A Party affected by an event of Force Majeure shall promptly notify the other Party and shall use its best efforts to overcome and mitigate such event of Force Majeure.

8.15    **Excluded Inventory**. Within 30 days after Completion, Seller will remove at its sole cost and expense all Inventory not included in the Acquired Assets. Buyer will cooperate with Seller and provide reasonable access to the Facility to facilitate such removal.

**THIS AGREEMENT** was executed as of the day and year first set forth above.

DELPHI AUTOMOTIVE SYSTEMS LLC

By:_____

Name:  **Keith Stipp**

Title:  **Finance Director, Automotive Holdings Group**

JOHNSON CONTROLS, INC.

By:_____

Name: **Gregg M. Sherrill**

Title:    **Vice President, and General Manager Automotive Systems Group Battery Division**

## EXHIBIT 1.1

| Inventory number | Asset | Cap.date | Asset description |
|---|---|---|---|
| DGT004763N01 | 1000654 | 12/1/1946 | GRADING & LANDSCAPING |
| DGT004765N01 | 1000655 | 12/1/1946 | ROADWAY |
| DGT004766N01 | 1000656 | 12/1/1946 | SIDEWALKS |
| DGT004768N01 | 1000657 | 12/1/1946 | SEWERS-STORM |
| DGT004770N01 | 1000658 | 12/1/1946 | SEWERS-SANITARY |
| DGT004771N01 | 1000659 | 4/1/1947 | GRADING & LANDSCAPING |
| DGT004772N02 | 1000660 | 12/1/1946 | RAILROAD TRACKS & SIDINGS |
| DGT004774N | 1000661 | 12/1/1946 | WATER LINES |
| DGT004776N | 1000662 | 12/1/1946 | TUNNELS |
| DGT004888N | 1000663 | 6/1/1946 | LAND-NEW BRUNSWICK |
| DGT004911N | 1000664 | 12/1/1953 | MAIN BUILDING-WEST ADDITION-SEWERS |
| DGT004925N | 1000665 | 8/1/1954 | MAIN BUILDING-WEST ADDITION-PAVEMENT |
| DGT004926N | 1000666 | 8/1/1954 | RETAINING WALL |
| DGT008569N | 1000667 | 12/1/1956 | ROADWAY |
| DGT008607N | 1000668 | 3/1/1958 | FENCE |
| DGT008675N | 1000669 | 12/1/1965 | LAND-NEW BRUNSWICK |
| DGT008680N | 1000670 | 4/1/1966 | LAND IMPROVEMENTS |
| DGT008711N | 1000671 | 10/1/1966 | PARKING AREA |
| DGT008712N | 1000672 | 12/1/1966 | LIGHTING-OUTSIDE |
| DGT008725N | 1000673 | 12/1/1968 | RAILROAD SIDING |
| DGT012029N | 1000674 | 10/1/1974 | LAND-NEW BRUNSWICK |
| DGT012052N | 1000675 | 9/1/1976 | CONCRETE PAD-PVC |
| DGT012053N | 1000676 | 9/1/1976 | CONCRETE PAD-MATERIAL STORAGE |
| DGT012054N | 1000677 | 9/1/1976 | LEAD RECLAIM BUILDING-CONCRETE PAD F/LEAD STORAGE |
| DGT012085N | 1000678 | 10/1/1977 | ACID MIX BUILDING-CONCRETE PAD |
| DGT012086N | 1000679 | 10/1/1977 | ACID MIX BUILDING-CONCRETE PAD |
| DGT012087N | 1000680 | 10/1/1977 | CONCRETE PAD-REAR OF POWER HOUSE |
| DGT012087N01 | 1000681 | 2/1/1978 | CONCRETE PAD-REAR OF POWER HOUSE |
| DGT012088N | 1000682 | 10/1/1977 | RETAINING WALL-WATER TOWER |
| DGT012110N | 1000683 | 7/1/1978 | GRADING & LANDSCAPING |
| DGT012221N | 1000685 | 2/1/1989 | WELLS-MONITORING |
| DGT012232N | 1000686 | 6/1/1995 | STORM WATER COLLECTION/TREATMENT SYSTEM |
| DGT690066 | 1000687 | 11/1/2001 | ELIMINATION OF UNDERGROUND PROCESS SEWER |
| DGT004779N01 | 2001722 | 12/1/1946 | MAIN BUILDING |
| DGT004779N02 | 2001723 | 11/1/2001 | PHASE III VENTILATION REPAIRS |
| DGT004779NO1 | 2001724 | 11/1/2001 | LIGHTING FIXTURES,PLANT WALL,GAS MAIN |
| DGT004781N01 | 2001726 | 12/1/1946 | GATE HOUSE |
| DGT004910N01 | 2001727 | 12/1/1953 | MAIN BUILDING-WEST ADDITION |
| DGT004912N | 2001728 | 12/1/1953 | MAIN BUILDING-FIRE PROOF ROOF |
| DGT004915N | 2001729 | 6/1/1954 | HOSE HOUSE |
| DGT004923N01 | 2001730 | 12/1/1954 | MAIN BUILDING-WEST ADDITION-ACCESS |
| DGT004928N02 | 2001731 | 12/1/1954 | MAIN BUILDING-EAST ADDITION |
| DGT004928N03 | 2001732 | 8/1/1954 | MAIN BUILDING-EAST ADDITION |
| DGT008542N | 2001733 | 5/1/1956 | WATER LINES |
| DGT008570N | 2001734 | 12/1/1956 | MAIN BUILDING-EAST ADDITION |
| DGT008594N | 2001735 | 5/1/1957 | MAIN BUILDING-LOCKER ROOM |
| DGT008649N | 2001736 | 7/1/1962 | OIL BUILDING |
| DGT008650N | 2001737 | 2/1/1963 | MAIN BUILDING-MEZZANINE-CASE |
| DGT008658N | 2001738 | 6/1/1963 | WAREHOUSE |
| DGT008664N | 2001739 | 8/1/1965 | MAIN BUILDING-ADDITION-MEZZANINE |
| DGT008674N | 2001740 | 12/1/1965 | MAIN BUILDING-ADDITION |
| DGT008720N | 2001741 | 12/1/1968 | SEWERS-SANITARY |
| DGT008721N | 2001742 | 12/1/1968 | SEWERS-STORM |
| DGT008738N | 2001743 | 9/1/1970 | MAIN BUILDING-MEZZANINE |
| DGT008744N | 2001744 | 7/1/1971 | ROOF-RAISE |
| DGT012049N | 2001745 | 9/1/1976 | LEAD RECLAIM BUILDING |
| DGT012049N01 | 2001746 | 6/1/1977 | LEAD RECLAIM BUILDING |
| DGT012049N02 | 2001747 | 8/1/1977 | LEAD RECLAIM BUILDING |
| DGT012050N | 2001748 | 9/1/1976 | ACID MIX BUILDING |
| DGT012050N01 | 2001749 | 10/1/1977 | ACID MIX BUILDING |
| DGT012079N | 2001750 | 2/1/1977 | CURE ROOM MODIFICATIONS |
| DGT012092N | 2001751 | 12/1/1977 | WASTE TREATMENT BUILDING |

19

| | | | |
|---|---|---|---|
| DGT012092N01 | 2001752 | 5/1/1978 | WASTE TREATMENT BUILDING |
| DGT012113N | 2001753 | 7/1/1978 | STORAGE SHED-3 SIDED |
| DGT012143N | 2001754 | 3/1/1980 | TRUCK DOCK ANNEX |
| DGT012145N | 2001755 | 6/1/1980 | BATTERY STORAGE BUILDING |
| DGT012165N | 2001756 | 7/1/1971 | MAIN BUILDING-MEZZANINE |
| DGT012175N | 2001757 | 6/1/1983 | FIRE LOOP |
| DGT012175N01 | 2001758 | 9/1/1984 | FIRE LOOP |
| DGT012175N02 | 2001759 | 10/1/1984 | FIRE LOOP |
| DGT012175N03 | 2001760 | 11/1/1984 | FIRE LOOP |
| DGT012183N | 2001761 | 12/1/1984 | MAIN BUILDING-MEZZANINE |
| DGT012191N | 2001762 | 8/1/1986 | MAIN BUILDING-MEZZANINE-PAINT MIXING |
| DGT012231N | 2001765 | 6/1/1995 | OVERHEAD PROCESS SEWER |
| DGT105875 | 2001766 | 1/1/1998 | FRONT ENTRANCE STEPS, RAMPS, RAILS |
| DGT105877 | 2001767 | 11/1/2001 | NON-SLIP GRATING, ISLES BTWN CHARGE TABLES & FILL |
| DGT105909 | 2001768 | 1/1/2002 | SAFETY STEPS AND HANDRAILS |
| DGT105922B | 2001769 | 11/1/2001 | NON-SLIP GRATING FOR FORMATION FLOOR |
| DGT105923B | 2001770 | 11/1/2001 | FOAM ROOF '98 |
| DGT105928 | 2001771 | 1/2/1998 | UPGRADE HEATING SYSTEM |
| DGT690029 | 2001772 | 1/2/1998 | 1996 ROOF REPAIR |
| DGT690037 | 2001773 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690038 | 2001774 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690039 | 2001775 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690061 | 2001776 | 11/1/2001 | TRENCH & FOUNDATION FOR THE X-MET LINE |
| DGT690062 | 2001777 | 11/1/2001 | MEZZANINE FOR THE X-MET LINE |
| DGT690063 | 2001778 | 11/1/2001 | ROOF ENCLOSURE FOR THE X-MET LINE |
| DGT690100 | 2001779 | 11/1/2001 | REPLACE LIGHTING ON CHG FLOOR, REPLACE LIGHTING SE |
| DGT690170 | 2001780 | 11/1/2001 | OUTDOOR SMOKING SHELTER -- NEW BRUNSWICK BATTERY P |
| DGT690171 | 2001781 | 11/1/2001 | OUTDOOR SMOKING SHELTER -- NEW BRUNSWICK BATTERY P |
| DGT690197 | 2001782 | 11/1/2001 | SECURITY/FIRE ALARM UPGRADE |
| DGT72424 | 2001783 | 11/1/2001 | INSTALL SPRINKLER SYSTEM |
| DGTB690064 | 2001784 | 11/1/2001 | INSTALLATION OF MEZZANINE FOR X-MET FROM MUNCIE TO |
| DGT690110 | 2004713 | 9/11/2002 | REPAIR BATTERY FORMATION VENTILATION SYSTEM |
| DGTB690114 | 2004714 | 9/11/2002 | REPLACE FLOOR IN WET HEAT SEALER AREA |
| DGTB690090 | 2004715 | 9/11/2002 | REPAIR WALL OF BUILDING TO NEW CONDITION |
| DGT690175 | 2004716 | 9/11/2002 | GREEN GROUP VENTILATION -- NB |
| DGT690221 | 2004717 | 9/11/2002 | INSTALL NEW DUCTWORK ON CHARGE FLOOR |
| DGT690198 | 2004718 | 9/11/2002 | GUARDING/FIRE PROTECTION TANK FARM |
| DGT690189 | 2004719 | 9/11/2002 | VENTILATION COLLECTOR FOR GREEN GROUP LEAN CELL - |
| DGT690179 | 2004720 | 9/11/2002 | NEW BRUNSWICK STEAM HOOD UPGRADE |
| DGT690223 | 2008539 | 9/23/2003 | DESIGN FOR A NATURAL GAS LINE FOR PLANT |
| DGT690268 | 2008540 | 9/23/2003 | HOT WATER HEATER SYS FOR MENS AND WOMENS SHOWER AR |
| DGT695041 | 2008556 | 10/17/2003 | FORMATION VENTILATION STACK TOP ACID MIST FILTERS |
| DGT004779N03 | 2009360 | 1/31/2004 | PHASE III VENTILATION REPAIRS |
| DGT012142N01 | 2009466 | 1/31/2004 | FORMATION VENT REPAIRS/CHARGE TABLE 2 OF 2 |
| DGT012141N01 | 2009467 | 3/31/2004 | FORMATION VENT REPAIRS/CHARGE TABLE 1 OF 2 |
| DGT004779N04 | 2009513 | 6/29/2004 | ENGINEERING SERVICES TO LICENSE NEW STACK FOR VENT |
| DGT690275 | 2009514 | 1/1/2004 | HEATING UPGRADES FOR PLANT CONVERSION TO NATURAL G |
| DGT690291 | 2010088 | 6/14/2005 | FIRE SPRINKLER PROTECTION ON CHARGE FLOOR |
| DGT004898N | 3025115 | 2/1/1953 | PROPANE TANK |
| DGT008560N | 3025119 | 9/1/1956 | POWER EQUIPMENT-EAST |
| DGT008589N | 3025120 | 3/1/1957 | SCREW CONVEYOR |
| DGT008595N | 3025121 | 5/1/1957 | LINES)ELECTR |
| DGT008599N | 3025123 | 10/1/1957 | DUST CNTR EQ |
| DGT008681N | 3025125 | 9/1/1964 | SUBSTATION |
| DGT008682N | 3025126 | 10/1/1960 | SUBSTATIONEQ |
| DGT008732N | 3025127 | 5/1/1969 | COOLING TOWER |
| DGT008743N | 3025128 | 7/1/1971 | SCREW CONVEYOR |
| DGT008750N | 3025129 | 6/1/1972 | BOILER |
| DGT012003N | 3025130 | 1/1/1973 | SWITCHGEAR |
| DGT012004N | 3025131 | 1/1/1973 | RECTIFIER |
| DGT012004N01 | 3025132 | 2/1/1973 | TRAILING CHARGES TO TAG #012004N |
| DGT012005N | 3025133 | 1/1/1973 | SWITCHGEAR |
| DGT012006N | 3025134 | 1/1/1973 | RECTIFIER |
| DGT012007N | 3025135 | 2/1/1973 | ACID TANK |
| DGT012008N | 3025136 | 2/1/1973 | ACID TANK |
| DGT012010N | 3025137 | 2/1/1973 | ACID TANK |
| DGT012011N | 3025138 | 2/1/1973 | ACID TANK |

| | | | |
|---|---|---|---|
| DGT012016N | 3025139 | 9/1/1973 | CONVEYOR |
| DGT012017N | 3025140 | 9/1/1973 | CONVEYOR |
| DGT012018N | 3025141 | 9/1/1973 | CONVEYOR |
| DGT012020N | 3025143 | 9/1/1973 | CONVEYOR |
| DGT012021N | 3025144 | 12/1/1973 | SUB STATION |
| DGT012022N | 3025145 | 12/1/1973 | CABLE |
| DGT012023N | 3025146 | 12/1/1973 | PLATFORM |
| DGT012024N | 3025147 | 3/1/1974 | VENTILATION |
| DGT012025N | 3025148 | 3/1/1974 | CONVEYOR |
| DGT012026N | 3025149 | 3/1/1974 | VENTILATION |
| DGT012027N | 3025150 | 3/1/1974 | VACUUM SYSTEM |
| DGT012034N | 3025151 | 8/1/1975 | VACUUM TO MOLDING |
| DGT012036N | 3025152 | 3/1/1976 | TRENCHES |
| DGT012038N | 3025153 | 5/1/1976 | VENTILATION |
| DGT012043N | 3025154 | 8/1/1976 | ACID TANK |
| DGT012044N | 3025155 | 8/1/1976 | ACID PUMPING SYSTEM FOR MEZZANINE |
| DGT012046N | 3025156 | 9/1/1976 | VENTILATION FOR LEAD POTS |
| DGT012047N | 3025157 | 9/1/1976 | FINAL ACID FILL |
| DGT012051N | 3025158 | 9/1/1976 | ACID TOP-OFF |
| DGT012055N | 3025159 | 9/1/1976 | SUB-STATION-LEAD STRIP |
| DGT012055N01 | 3025160 | 10/1/1977 | ADDITIONAL CHARGES TO TAG #012055N |
| DGT012057N | 3025161 | 10/1/1976 | LEAD MELT FURNACE |
| DGT012058N | 3025162 | 10/1/1976 | FOUNDATION & SUMPS FOR LEAD CASTER |
| DGT012060N | 3025163 | 12/1/1976 | VENTILATION FOR CHARGING UNITS |
| DGT012060N01 | 3025164 | 6/1/1980 | ADDITIONAL CHARGES TO TAG #012060N |
| DGT012062N | 3025165 | 1/1/1977 | ACID MIXING SYSTEM |
| DGT012064N | 3025167 | 1/1/1977 | ACID PUMPS RECLAIM |
| DGT012065N | 3025168 | 1/1/1977 | VENTILATION PLATE OVENS |
| DGT012066N | 3025169 | 1/1/1977 | ACID STORAGE TANK |
| DGT012067N | 3025170 | 1/1/1977 | ACID STORAGE TANK |
| DGT012068N | 3025171 | 1/1/1977 | ACID STORAGE TANK |
| DGT012069N | 3025172 | 1/1/1977 | ACID STORAGE TANK |
| DGT012070N | 3025173 | 1/1/1977 | ACID STORAGE TANK |
| DGT012071N | 3025174 | 1/1/1977 | ACID STORAGE TANK |
| DGT012072N | 3025175 | 1/1/1977 | ACID STORAGE TANK |
| DGT012073N | 3025176 | 1/1/1977 | ACID STORAGE TANK |
| DGT012074N | 3025177 | 1/1/1977 | ACID STORAGE TANK |
| DGT012075N | 3025178 | 1/1/1977 | ACID STORAGE TANK |
| DGT012076N | 3025179 | 1/1/1977 | ACID STORAGE TANK |
| DGT012077N | 3025180 | 1/1/1977 | ACID STORAGE TANK |
| DGT012080N | 3025181 | 2/1/1977 | COOLING FACILITIES FOR CASTER |
| DGT012083N | 3025182 | 7/1/1977 | SUB STATION LEAD RECLAIM |
| DGT012095N | 3025183 | 2/1/1978 | LINDBURG FURNACE |
| DGT012096N | 3025184 | 2/1/1978 | TRANSFER SYSTEM |
| DGT012097N | 3025185 | 9/1/1976 | STEAMER HOOD |
| DGT012098N | 3025186 | 9/1/1976 | STEAMER HOOD |
| DGT012099N | 3025187 | 1/1/1977 | STEAMER HOOD |
| DGT012100N | 3025188 | 1/1/1977 | STEAMER HOOD |
| DGT012102N | 3025189 | 4/1/1978 | WATER CONTAINMENT |
| DGT012109N | 3025190 | 12/1/1976 | PRIMARY SWITCH GEAR |
| DGT012109N01 | 3025191 | 12/1/1977 | TRAILING CHARGE TO TAG #012109N |
| DGT012109N02 | 3025192 | 3/1/1978 | TRAILING CHARGE TO TAG #012109N |
| DGT012117N | 3025193 | 10/1/1978 | CONVEYOR SYSTEM |
| DGT012118N | 3025194 | 10/1/1978 | ACID FILL STATION |
| DGT012119N | 3025195 | 10/1/1978 | REPAIR STATIONS (2) |
| DGT012120N | 3025196 | 11/1/1978 | EXTEND TRENCH/X-MET LINE |
| DGT012121N | 3025197 | 11/1/1978 | AIR MAKEUP UNIT |
| DGT012122N | 3025198 | 12/1/1978 | AIR MAKE UP SYSTEM |
| DGT012122N01 | 3025199 | 10/1/1979 | ADDITIONAL CHARGES TO TAG #012122N |
| DGT012123N | 3025200 | 12/1/1978 | BATROLIFE MEZZANINE |
| DGT012124N | 3025201 | 1/1/1979 | CONVEYOR FROM SETTLING CHAMBER |
| DGT012125N | 3025202 | 2/1/1979 | VENTILATION TUNNEL-EXTENSION |
| DGT012128N | 3025205 | 3/1/1979 | ROLLER TYPE CONVEYOR |
| DGT012129N | 3025206 | 3/1/1979 | INCLINE BELT CONVEYOR |
| DGT012130N | 3025207 | 4/1/1979 | POWER DROPS/C O S & PREHEAT |
| DGT012131N | 3025208 | 5/1/1979 | CONVEYOR FROM COLLECTOR |
| DGT012132N | 3025209 | 8/1/1979 | VENT FOR ELEMENT ASSEMBLY |

| | | | |
|---|---|---|---|
| DGT012132N01 | 3025210 | 9/1/1979 | TRAILING CHARGE TO TAG #012132N |
| DGT012137N | 3025212 | 9/1/1979 | OVERHEAD CONVEYOR |
| DGT012138N | 3025213 | 9/1/1979 | ELECTRIC CABLE & DROPS |
| DGT012139N | 3025214 | 9/1/1979 | SETTLING CHAMBER |
| DGT012140N | 3025215 | 11/1/1979 | LEAD DROP & CONTROLS FOR BARTON POT |
| DGT012141N | 3025216 | 12/1/1979 | CHARGE TABLES |
| DGT012142N | 3025217 | 12/1/1979 | CHARGE TABLES |
| DGT012146N | 3025218 | 6/1/1980 | LEAD MELT POT |
| DGT012147N | 3025219 | 6/1/1980 | VENTILATION F/POT |
| DGT012148N | 3025220 | 6/1/1980 | ELECTRIC CABLE & BUSWAY |
| DGT012150N | 3025222 | 6/1/1980 | COOLING TOWER |
| DGT012151N | 3025223 | 12/1/1980 | EXTEND TRENCHES FOR CONVEYOR |
| DGT012152N | 3025224 | 12/1/1980 | STORAGE RACKS & SPRINKLER |
| DGT012152N01 | 3025225 | 12/1/1981 | TRAILING CHARGE TO TAG #012152N |
| DGT012154N01 | 3025226 | 1/1/1998 | UPGRADE STORM WATER TREATMENT PLANT |
| DGT012156N | 3025227 | 12/1/1980 | RECEIVING OFFICE |
| DGT012159N | 3025229 | 12/1/1981 | CHARGE TABLES |
| DGT012160N | 3025230 | 12/1/1981 | (14) CHARGE TABLES |
| DGT012161N | 3025231 | 2/1/1982 | VENTILATION SYSTEM |
| DGT012162N | 3025232 | 2/1/1982 | LOAD/UNLOAD CONVEYOR |
| DGT012163N | 3025233 | 6/1/1982 | COLLECTOR |
| DGT012164N | 3025234 | 6/1/1980 | VESTIBULE |
| DGT012166N | 3025235 | 9/1/1982 | OWENS CORNING ACID TANK |
| DGT012167N | 3025236 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR 95995 |
| DGT012168N | 3025237 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95996 |
| DGT012169N | 3025238 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95997 |
| DGT012170N | 3025239 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95998 |
| DGT012171N | 3025240 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95999 |
| DGT012172N | 3025241 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR96000 |
| DGT012173N | 3025242 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR105751 |
| DGT012174N | 3025243 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR105752 |
| DGT012176N | 3025244 | 12/1/1983 | OXIDE ELEVATORS & CONVEYORS |
| DGT012176N01 | 3025245 | 10/1/1983 | MATERIAL HANDLING SYSTEM AT PASTE MIX |
| DGT012181N | 3025246 | 9/1/1984 | POWER ROLLER CONVEYOR |
| DGT012182N | 3025247 | 12/1/1984 | ACID & WATER SYSTEM |
| DGT012184N | 3025248 | 12/1/1984 | VENTILATION F/3 PAINT MIXERS |
| DGT012185N | 3025249 | 4/1/1985 | WOMEN'S REST ROOM-WEST |
| DGT012186N | 3025250 | 5/1/1985 | WOMEN'S LOCKER/SHOWER-EAST |
| DGT012187N | 3025251 | 12/1/1985 | CONVEYOR & VENTILATION FOR 6 TABLES |
| DGT012188N | 3025252 | 1/1/1986 | ROOF EXHAUSTERS |
| DGT012194N | 3025253 | 2/1/1987 | ACID PIT |
| DGT012200N | 3025256 | 5/1/1987 | TRANSFER CONVEYORS(ALL) |
| DGT012202N | 3025257 | 10/1/1987 | #26(82'CHG TABLE CONV) |
| DGT012203N | 3025258 | 10/1/1987 | #27(82'CHG TABLE CONV) |
| DGT012204N | 3025259 | 10/1/1987 | #28(82'CHG TABLE CONV) |
| DGT012205N | 3025260 | 10/1/1987 | #29(82'CHG TABLE CONV) |
| DGT012206N | 3025261 | 10/1/1987 | #30(82'CHG TABLE CONV) |
| DGT012207N | 3025262 | 10/1/1987 | 82 FT. CONVEYOR (#31) |
| DGT012208N | 3025263 | 10/1/1987 | #32(82'CHG TABLE CONV) |
| DGT012209N | 3025264 | 10/1/1987 | #33(82'CHG TABLE CONV) |
| DGT012210N | 3025265 | 12/1/1987 | #1 X-MET LINE(OFFBEAR CONV) |
| DGT012211N | 3025266 | 5/1/1988 | POWERED ROLLER CONV(4) |
| DGT012212N | 3025267 | 5/1/1988 | VENT FOR CAST ON STRAP MACH |
| DGT012215N | 3025268 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012216N | 3025269 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012217N | 3025270 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012218N | 3025271 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012219N | 3025272 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012220N | 3025273 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012222N | 3025274 | 6/30/1989 | CAPITALIZABLE MAINT. |
| DGT012223N | 3025275 | 3/1/1990 | VENTILATION FOR (8) BATTERY CHARGE TABLES |
| DGT012224N | 3025276 | 9/1/1990 | TEMPERATURE CONTROL |
| DGT012225N | 3025277 | 1/1/1991 | COS CONTROL |
| DGT012228N | 3025278 | 7/1/1994 | WASTE WATER TREATMENT SYSTEM |
| DGT012230N | 3025280 | 8/1/1995 | ACID LEVELER |
| DGT012233N | 3025281 | 3/1/1995 | AUTOMATIC LABELING MACHINE |
| DGT012234N | 3025282 | 1/1/1996 | RESERVE CAPACITY TESTERS (12) |

| | | | |
|---|---|---|---|
| DGT012236N | 3025284 | 1/1/1996 | 110 OZ CONVERSION |
| DGT014722N | 3025285 | 6/1/1977 | BAYSTONE PLATE STEAMER |
| DGT014729N | 3025286 | 6/1/1977 | OXIDE SCREW CONVEYOR SYSTEM |
| DGT014737N | 3025287 | 7/1/1977 | SCREW CONVEYOR |
| DGT014738N | 3025288 | 7/1/1977 | SCREW CONVEYOR |
| DGT015201N | 3025289 | 12/1/1979 | INSULATE STEAMER HOODS (6) |
| DGT020031D01 | 3025298 | 2/1/1947 | LATHES-ENGIN |
| DGT020059D01 | 3025300 | 12/1/1946 | DRILL-STANDA |
| DGT020726D01 | 3025301 | 7/1/1947 | MIX CONVEYOR |
| DGT021837D | 3025305 | 2/1/1956 | SETTLING CHR |
| DGT021838D | 3025306 | 2/1/1956 | BARTON POT |
| DGT021840D | 3025307 | 2/1/1956 | 12R}DUSTCOLL |
| DGT022488D | 3025308 | 3/1/1957 | COMPRESSORS} |
| DGT022506D | 3025309 | 4/1/1957 | RECTIFIERS}E |
| DGT022510D | 3025310 | 5/1/1957 | BARTON POT |
| DGT022511D | 3025311 | 5/1/1957 | SETTLING CHR |
| DGT022530D | 3025312 | 10/1/1957 | RECTIFIERS}E |
| DGT028031N | 3025315 | 6/1/1996 | ALLEN BRADLEY CONTROL |
| DGT028785N | 3025316 | 10/31/1989 | ACID DUMP SYSTEM |
| DGT028855N | 3025317 | 11/1/1991 | CENTRIFUGAL BLOWER |
| DGT056948D | 3025318 | 6/1/1956 | GRINDER |
| DGT058830D | 3025319 | 6/1/1957 | BARTON POT |
| DGT060227D | 3025320 | 6/1/1954 | BARTON POT |
| DGT060228D | 3025321 | 6/1/1954 | BARTON POT |
| DGT060229D | 3025322 | 6/1/1954 | BARTON POT |
| DGT060230D | 3025323 | 6/1/1954 | SET}CHAMBER |
| DGT060231D | 3025324 | 6/1/1954 | SET}CHAMBER |
| DGT060232D | 3025325 | 6/1/1954 | SET}CHAMBER |
| DGT060233E | 3025327 | 11/1/2001 | MODIF OF MISC LINE STROKER, PLATFORM, LEFT AND TAB |
| DGT060279D | 3025329 | 11/1/1960 | POWER ROLLER |
| DGT060295D | 3025330 | 7/1/1961 | IMPACT TESTI |
| DGT066940D | 3025331 | 6/1/1946 | LATHE |
| DGT069865D | 3025333 | 2/1/1963 | LATHE |
| DGT070211D | 3025335 | 6/1/1963 | TOLEDO SCALE |
| DGT070253D | 3025336 | 8/1/1963 | MILLING MACHINE |
| DGT070255D | 3025337 | 8/1/1963 | SURFACEGRIND |
| DGT071020D | 3025338 | 5/1/1964 | LATHE |
| DGT071037D | 3025339 | 7/1/1964 | MILLING MCH |
| DGT071058D | 3025340 | 12/1/1964 | BOILER |
| DGT071087D | 3025343 | 12/1/1965 | BOILER |
| DGT072221D | 3025346 | 8/1/1966 | EL AS SECT |
| DGT072222D | 3025347 | 9/1/1969 | DUST COLLECTOR |
| DGT072223D | 3025348 | 9/1/1969 | MATL COLL SYS |
| DGT072239D | 3025352 | 4/1/1967 | LATHE |
| DGT072280D | 3025360 | 10/1/1968 | CONVEYORS |
| DGT072284D01 | 3025361 | 3/1/1970 | STARTER |
| DGT072292D | 3025366 | 6/1/1970 | MOLD TEMP CONTR |
| DGT083874D | 3025367 | 5/1/1966 | RECTIFIER |
| DGT087857D | 3025381 | 7/1/1970 | PLATE SAW |
| DGT087872D | 3025385 | 2/1/1971 | CONVEYOR |
| DGT093030D | 3025386 | 12/1/1973 | PASTE MIXER |
| DGT095313D | 3025390 | 7/1/1971 | PASTE MIXER |
| DGT095328D | 3025392 | 4/1/1972 | HACKSAW |
| DGT095330D | 3025394 | 5/1/1973 | DUST COLLECTOR |
| DGT095351D | 3025416 | 9/1/1973 | CONVEYOR |
| DGT095352D | 3025417 | 9/1/1973 | CONVEYOR |
| DGT095353D | 3025418 | 9/1/1973 | GRANULATOR |
| DGT095354E | 3025420 | 11/1/2001 | M & L FOR MODIF OF MAIN LINE STACKER PLATFORM, L/R |
| DGT095355D | 3025421 | 9/1/1973 | CAST ON STRAP |
| DGT095356D | 3025422 | 9/1/1973 | CAST ON STRAP |
| DGT095357D | 3025423 | 9/1/1973 | CAST ON STRAP |
| DGT095358D | 3025424 | 9/1/1973 | CAST ON STRAP |
| DGT095359D | 3025425 | 9/1/1973 | SPOT FACE CONVEYOR |
| DGT095363D | 3025427 | 9/1/1973 | EXT FUSION CONV |
| DGT095364D | 3025428 | 9/1/1973 | AIR TEST CONVEYOR |
| DGT095365D | 3025429 | 9/1/1973 | LABLER CONV |
| DGT095369D | 3025432 | 9/1/1973 | LEAK TEST |

| | | |
|---|---|---|
| DGT095370D | 3025433 | 9/1/1973 DATE CODE |
| DGT095372D | 3025434 | 9/1/1973 LEAD POT |
| DGT095373D | 3025435 | 9/1/1973 LEAD POT |
| DGT095374D | 3025436 | 9/1/1973 LEAD POT |
| DGT095375D | 3025437 | 9/1/1973 LEAD POT |
| DGT095376D | 3025438 | 9/1/1973 VACUUM SYSTEM STACKER |
| DGT095382D | 3025439 | 9/1/1973 TEMPERATURE CONTROL |
| DGT095383D | 3025440 | 9/1/1973 HEAT SEAL MACHINE |
| DGT095384D | 3025441 | 9/1/1973 HEAT SEAL MACHINE |
| DGT095385D | 3025442 | 9/1/1973 HEAT SEAL MACHINE |
| DGT095387D | 3025443 | 12/1/1973 AIR COMPRESSOR |
| DGT095398D | 3025446 | 3/1/1974 LIFT TRUCK |
| DGT095399D | 3025447 | 3/1/1974 SLITTER |
| DGT095400D | 3025448 | 3/1/1974 SLITTER |
| DGT095603D | 3025450 | 10/1/1974 DUST COLLECTOR |
| DGT095604D | 3025451 | 10/1/1974 DUST COLLECTOR |
| DGT095610D | 3025452 | 1/1/1975 HEAT SEAL MACHINE |
| DGT095612D | 3025453 | 4/1/1975 CONVEYOR SYSTEM |
| DGT095614D | 3025454 | 9/1/1975 SOFTENING TANK |
| DGT095615D | 3025455 | 9/1/1975 SOFTENING TANK |
| DGT095620D | 3025456 | 1/1/1976 EXT-FUSION MACHINE |
| DGT095620D01 | 3025457 | 3/1/1976 ADDITIONAL CHARGES TO TAG #095620D |
| DGT095621D | 3025458 | 2/1/1976 HOIST |
| DGT095622D | 3025459 | 5/1/1976 DIELECTRIC LINE |
| DGT095628D | 3025462 | 5/1/1976 BRIDGE HOIST |
| DGT095638D | 3025472 | 6/1/1976 SKID RACK |
| DGT095639D | 3025473 | 6/1/1976 SKID RACK |
| DGT095640D | 3025474 | 6/1/1976 SKID RACK |
| DGT095641D | 3025475 | 6/1/1976 SKID RACK |
| DGT095646D | 3025476 | 9/1/1976 BUTT WELDER |
| DGT095647D | 3025477 | 9/1/1976 BUTT WELDER |
| DGT095654D | 3025479 | 7/1/1976 HI-RATE TEST |
| DGT095657D | 3025480 | 7/1/1976 SCRAP CONVEYOR SYSTEM |
| DGT095658D | 3025481 | 7/1/1976 CONVEYOR |
| DGT095661D | 3025484 | 9/1/1976 DE-REELER |
| DGT095662D | 3025485 | 9/1/1976 DE-REELER |
| DGT095663D | 3025486 | 9/1/1976 DE-REELER |
| DGT095664D | 3025487 | 9/1/1976 DE-REELER |
| DGT095666D | 3025489 | 9/1/1976 EXPANDING PRESS |
| DGT095670D | 3025491 | 9/1/1976 LUG FORM PRESS |
| DGT095671D | 3025492 | 9/1/1976 LUG FORM PRESS |
| DGT095674D | 3025495 | 9/1/1976 MODICON-PASTE LINE |
| DGT095675D | 3025496 | 9/1/1976 MODICON-PASTE LINE |
| DGT095676D | 3025497 | 8/1/1979 OVEN CONVERSION |
| DGT095677D | 3025498 | 8/1/1979 OVEN CONVERSION |
| DGT095681D | 3025501 | 9/1/1976 PARTS CONVEYOR F/250 TON MOLD MACHINE |
| DGT095682D | 3025502 | 9/1/1976 PARTS CONVEYOR F/250 TON MOLD MACHINE |
| DGT095685D | 3025503 | 9/1/1976 CONVEYOR FOR PASTE MACHINE |
| DGT095688D | 3025504 | 9/1/1976 PILOT HOLE PIERCE |
| DGT095689D | 3025505 | 9/1/1976 PILOT HOLE PIERCE |
| DGT095698D | 3025510 | 10/1/1976 BATTERY CHARGER LAB. FACILITIES |
| DGT095801D | 3025511 | 10/1/1976 COLLECTION SYSTEM FOR OFFBEAR |
| DGT095801D01 | 3025512 | 10/1/1978 COLLECTION SYSTEM FOR OFFBEAR |
| DGT095801D02 | 3025513 | 8/1/1979 VENT & CURE OVEN |
| DGT095803D | 3025515 | 10/1/1976 FOUR-ARM STORAGE TURNSTILE |
| DGT095804D | 3025516 | 10/1/1976 SPECTROGRAPH |
| DGT095807D | 3025518 | 12/1/1976 ROLLING MILL 7 STAND |
| DGT095809D | 3025519 | 12/1/1976 CHARGING UNITS BATTERIES |
| DGT095809D01 | 3025520 | 12/1/1978 TRAILING CHARGE TO TAG #095809D |
| DGT095809D02 | 3025521 | 6/1/1980 ADDITIONAL CHARGES TO TAG #095809D |
| DGT095810D | 3025522 | 12/1/1976 CHARGING UNITS BATTERIES |
| DGT095810D01 | 3025523 | 12/1/1978 TRAILING CHARGE TO TAG #095810D |
| DGT095810D02 | 3025524 | 6/1/1980 TRAILING CHARGE TO TAG #095810D |
| DGT095811D | 3025525 | 12/1/1976 CHARGING UNITS BATTERIES |
| DGT095811D01 | 3025526 | 12/1/1978 TRAILING CHARGE TO TAG #095811D |
| DGT095811D02 | 3025527 | 6/1/1980 TRAILING CHARGE TO TAG #095811D |
| DGT095812D | 3025528 | 12/1/1976 CHARGING UNITS BATTERIES |

| | | | |
|---|---|---|---|
| DGT095812D01 | 3025529 | 12/1/1978 | TRAILING CHARGE TO TAG #095812D |
| DGT095812D02 | 3025530 | 6/1/1980 | TRAILING CHARGE TO TAG #095812D |
| DGT095818D | 3025531 | 1/1/1977 | HEAT SEAL FINAL COVER |
| DGT095821D | 3025532 | 1/1/1977 | TURNSTILE |
| DGT095822D | 3025533 | 1/1/1977 | S O C INSERTER |
| DGT095823D | 3025534 | 1/1/1977 | COIL UP UNIT |
| DGT095826D | 3025535 | 2/1/1977 | WATER CHILLER PASTE MIXING |
| DGT095829D | 3025538 | 4/1/1977 | COIL UP UNIT |
| DGT095830D | 3025539 | 4/1/1977 | COIL UP UNIT |
| DGT095831D | 3025540 | 6/1/1977 | PULL BOX CASTER |
| DGT095832D | 3025541 | 6/1/1977 | PULL BOX CASTER |
| DGT095836D | 3025542 | 10/1/1977 | FRONT END LOADER |
| DGT095837D | 3025543 | 10/1/1977 | CHILLER FOR PULL BOX-20 TON |
| DGT095839D | 3025545 | 10/1/1977 | COIN ROLL |
| DGT095840D | 3025546 | 10/1/1977 | COIN ROLL |
| DGT095842D | 3025547 | 10/1/1977 | ROLLING MILL-7 STAND |
| DGT095843D | 3025548 | 6/1/1976 | SKID RACK |
| DGT095845D | 3025549 | 12/1/1977 | CHARGING UNIT |
| DGT095845D01 | 3025550 | 12/1/1978 | TRAILING CHARGE TO TAG #095845D |
| DGT095846D | 3025551 | 12/1/1977 | CHARGING UNIT |
| DGT095846D01 | 3025552 | 12/1/1978 | TRAILING CHARGE TO TAG #095846D |
| DGT095848D | 3025553 | 12/1/1977 | CHARGING UNIT |
| DGT095848D01 | 3025554 | 12/1/1978 | TRAILING CHARGE TO TAG #095848D |
| DGT095849D | 3025555 | 12/1/1977 | CHARGING UNIT |
| DGT095849D01 | 3025556 | 12/1/1978 | TRAILING CHARGE TO TAG #095849D |
| DGT095850D | 3025557 | 12/1/1977 | CHARGING UNIT |
| DGT095850D01 | 3025558 | 12/1/1978 | TRAILING CHARGE TO TAG #095850D |
| DGT095854D | 3025559 | 12/1/1977 | CHARGING UNIT |
| DGT095854D01 | 3025560 | 12/1/1978 | TRAILING CHARGE TO TAG #095854D |
| DGT095858D | 3025561 | 12/1/1977 | CHARGING UNIT |
| DGT095858D01 | 3025562 | 12/1/1978 | TRAILING CHARGE TO TAG #095858D |
| DGT095859D | 3025563 | 12/1/1977 | CHARGING UNIT |
| DGT095859D01 | 3025564 | 12/1/1978 | TRAILING CHARGE TO TAG #095859D |
| DGT095860D | 3025565 | 12/1/1977 | CHARGING UNIT |
| DGT095860D01 | 3025566 | 12/1/1978 | TRAILING CHARGE TO TAG #095860D |
| DGT095861D | 3025567 | 12/1/1977 | CHARGING UNIT |
| DGT095861D01 | 3025568 | 12/1/1978 | TRAILING CHARGE TO TAG #095861D |
| DGT095862D | 3025569 | 12/1/1977 | CHARGING UNIT |
| DGT095862D01 | 3025570 | 12/1/1978 | TRAILING CHARGE TO TAG #095862D |
| DGT095868D | 3025571 | 3/1/1978 | TEST UNIT AND MODULES |
| DGT095870D | 3025572 | 4/1/1978 | COVER HEAT SEAL |
| DGT095872D | 3025573 | 9/1/1978 | BUTT WELDER |
| DGT095873D | 3025574 | 9/1/1978 | DEREELER |
| DGT095874D | 3025575 | 9/1/1978 | DEREELER |
| DGT095877D | 3025576 | 9/1/1978 | LUG FORM PRESS |
| DGT095878D | 3025577 | 9/1/1978 | ROTARY CUT OFF MACHINE |
| DGT095879D | 3025578 | 9/1/1978 | PILOT HOLE PIERCE PRESS |
| DGT095880D | 3025579 | 9/1/1978 | PLATE DRYING OVEN |
| DGT095882D | 3025581 | 6/1/1976 | SKID RACK |
| DGT095883D | 3025582 | 6/1/1976 | SKID RACK |
| DGT095884D | 3025583 | 7/1/1978 | THERMO CARE WATER CHILLER |
| DGT095885D | 3025584 | 8/1/1978 | FULLER BAG COLLECTOR |
| DGT095885D01 | 3025585 | 9/1/1978 | TRAILING CHARGE TO TAG #095885D |
| DGT095887D | 3025586 | 9/1/1978 | CAMBER SENSOR |
| DGT095888D | 3025587 | 11/1/1978 | LABEL MACHINE |
| DGT095889D | 3025588 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095890D | 3025589 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095891D | 3025590 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095892D | 3025591 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095893D | 3025592 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095894D | 3025593 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095895D | 3025594 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095896D | 3025595 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095897D | 3025596 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095898D | 3025597 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095899D | 3025598 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095900D | 3025599 | 12/1/1978 | BATTERY CHARGING UNIT |

| | | |
|---|---|---|
| DGT095901A | 3025600 | 11/1/2001 REBUILD #4 AIR COMPRESSOR - ORIGINAL TAG REFERENCE |
| DGT095901D | 3025601 | 12/1/1978 AIR COMPRESSOR |
| DGT095901D01 | 3025602 | 7/1/1991 ADDL CHG(STRUCTURE OF COMPRESSOR) |
| DGT095902D | 3025603 | 2/1/1979 BASE FOR STACKER |
| DGT095903D | 3025604 | 2/1/1979 FREEZER |
| DGT095906D | 3025606 | 2/1/1979 FILL IN CONVEYOR |
| DGT095907D | 3025607 | 2/1/1979 FILL IN CONVEYOR |
| DGT095908D | 3025608 | 2/1/1979 FILL IN CONVEYOR |
| DGT095909D | 3025609 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095910D | 3025610 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095911D | 3025611 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095912D | 3025612 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095915D | 3025614 | 4/1/1979 RIB TRIM MACHINE |
| DGT095916D | 3025615 | 4/1/1979 TOP TERM ALIGNMENT MACHINE |
| DGT095919D | 3025618 | 4/1/1979 CHILLER-15 TON |
| DGT095920D | 3025619 | 5/1/1979 TEMPERATURE CONTROLLER |
| DGT095923D | 3025620 | 7/1/1979 HEAT SEAL MACHINE |
| DGT095925D | 3025622 | 7/1/1979 CASE GATHERING CONVEYOR FROM COS |
| DGT095927D | 3025624 | 7/1/1979 CAMBER SENSOR |
| DGT095928D | 3025625 | 7/1/1979 CAMBER SENSOR |
| DGT095932D | 3025628 | 8/1/1979 OSI PLATE DRY OVEN |
| DGT095933D | 3025629 | 8/1/1979 OSI PLATE DRY OVEN |
| DGT095934D | 3025630 | 8/1/1979 5 STATION EXT FUSION MACHINE |
| DGT095935D | 3025631 | 8/1/1979 SLITTER & CHOPPER |
| DGT095936D | 3025632 | 8/1/1979 SLITTER & CHOPPER |
| DGT095937D | 3025633 | 8/1/1979 COOLING CHAMBER |
| DGT095938D | 3025634 | 8/1/1979 GROUP PALLET CONVEYOR |
| DGT095940D | 3025635 | 8/1/1979 WORK PLATFORM FOR (2) CAST ON STRAP |
| DGT095942D | 3025636 | 9/1/1979 SCREW CONVEYOR SYSTEM |
| DGT095943D | 3025637 | 9/1/1979 PASTE RECLAIM SYSTEM |
| DGT095944D | 3025638 | 9/1/1979 TENNENT FLOOR SWEEPER |
| DGT095944D01 | 3025639 | 9/1/1979 ADDITIONAL CHARGES TO TAG #095944D |
| DGT095946D | 3025641 | 10/1/1979 CAST ON STRAP |
| DGT095947D | 3025642 | 10/1/1979 GREEN GROUP SHORT TEST CONVEYOR |
| DGT095948D | 3025643 | 10/1/1979 LEAK TEST CONVEYOR |
| DGT095949D | 3025644 | 10/1/1979 GREEN GROUP SHORT TEST CONVEYOR |
| DGT095950D | 3025645 | 10/1/1979 GREEN SHORT TEST CONVEYOR |
| DGT095953D | 3025646 | 12/1/1979 CONVEYOR TO CHARGING TABLES |
| DGT095955D | 3025649 | 12/1/1979 HOPPER AND CONVEYOR |
| DGT095957D | 3025650 | 12/1/1979 VENTILATION SYSTEM |
| DGT095958D | 3025651 | 12/1/1979 LEAK TEST |
| DGT095961D | 3025652 | 12/1/1979 DROTT DECK CRANE |
| DGT095965D | 3025655 | 2/1/1980 ROCKWELL BAND SAW |
| DGT095971D | 3025657 | 6/1/1980 TIG WELDER |
| DGT095972D | 3025658 | 6/1/1980 TIG WELDER |
| DGT095973D | 3025659 | 6/1/1980 TIG WELDER |
| DGT095975D | 3025660 | 6/1/1980 TIG WELD CONVEYOR SYSTEM |
| DGT095985D | 3025666 | 12/1/1981 PASTE MIXER |
| DGT095985D01 | 3025667 | 12/1/1983 INSTRUMENTS FOR/PASTE MIXER |
| DGT095986D | 3025668 | 12/1/1981 PASTE MIXER |
| DGT095986D01 | 3025669 | 12/1/1983 INSTRUMENTS FOR/PASTE MIXER |
| DGT095987D01 | 3025670 | 7/1/1984 INSTRUMENTS FOR/PASTE MIXER |
| DGT095989D | 3025671 | 12/1/1981 STOCK DEREELER |
| DGT095990D | 3025672 | 12/1/1981 STOCK DEREELER |
| DGT095991D | 3025673 | 12/1/1981 STRETCH WRAP MACHINE |
| DGT095992D | 3025674 | 12/1/1982 SINGLE STAND MILL |
| DGT095993D | 3025675 | 12/1/1982 WATER CHILLER |
| DGT095993D01 | 3025676 | 1/1/1983 WATER CHILLER |
| DGT095994D | 3025677 | 12/1/1982 WATER CHILLER |
| DGT095994D01 | 3025678 | 1/1/1983 WATER CHILLER |
| DGT095995D | 3025679 | 12/1/1980 VENTILATION F/COLLECTION SYSTEM |
| DGT095996D | 3025680 | 12/1/1980 VENTILATION F/COLLECTION SYSTEM |
| DGT095997D | 3025681 | 12/1/1982 VENILATION F/COLLECTION SYSTEM |
| DGT095998D | 3025682 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT095999D | 3025683 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT096000D | 3025684 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT098187D | 3025690 | 12/1/1972 DUST COLLECTOR |

| | | | |
|---|---|---|---|
| DGT098361D01 | 3025691 | 10/31/1989 | REBUILD MOLDING MACHINE |
| DGT098361D02 | 3025692 | 3/1/1992 | ADDL CHG(700 T MOLDING MACH) |
| DGT100287D | 3025696 | 6/1/1977 | EXPAND PRESS |
| DGT100297D | 3025698 | 6/1/1977 | PASTE MIXER |
| DGT100306D | 3025699 | 6/1/1977 | BUTT WELDER |
| DGT100312D | 3025700 | 6/1/1977 | DEREELER |
| DGT100315D | 3025701 | 6/1/1977 | DEREELER |
| DGT100470D | 3025702 | 9/1/1977 | TIG TOP TERM BURN MACHINE |
| DGT102070D | 3025703 | 7/1/1978 | LUG TRIM PRESS |
| DGT102099D | 3025704 | 8/1/1978 | OSI PLATE DRY OVEN |
| DGT102511D | 3025708 | 7/1/1979 | SLITTER & CHOPPER |
| DGT102513D | 3025709 | 7/1/1979 | CAMBER SENSORS |
| DGT104491 | 3025710 | 2/1/1998 | LEVELATOR |
| DGT104492 | 3025711 | 2/1/1998 | LEVELATOR |
| DGT104493 | 3025712 | 2/1/1998 | LEVELATOR |
| DGT104494 | 3025713 | 2/1/1998 | LEVELATOR |
| DGT104495 | 3025714 | 2/1/1998 | LEVELATOR |
| DGT104496 | 3025715 | 2/1/1998 | LEVELATOR |
| DGT104497 | 3025716 | 2/1/1998 | LEVELATOR |
| DGT104498 | 3025717 | 2/1/1998 | LEVELATOR |
| DGT104499 | 3025718 | 2/1/1998 | LEVELATOR |
| DGT104500 | 3025719 | 2/1/1998 | LEVELATOR |
| DGT104501 | 3025720 | 2/1/1998 | LEVELATOR |
| DGT104502 | 3025721 | 2/1/1998 | LEVELATOR |
| DGT105567D | 3025724 | 6/1/1983 | STRETCH WRAP MACHINE |
| DGT105650D | 3025725 | 8/1/1983 | SINGLE STAND MILL |
| DGT105751D | 3025726 | 12/1/1982 | VENTILATION F/COLLECTION SYSTEM |
| DGT105752D | 3025727 | 12/1/1982 | VENTILATION F/COLLECTION SYSTEM |
| DGT105753D | 3025728 | 2/1/1983 | TRABON LUBE SYSTEM |
| DGT105754D | 3025729 | 2/1/1983 | TRABON LUBE SYSTEM |
| DGT105755D | 3025730 | 2/1/1983 | SINGLE STAND MILL |
| DGT105756D | 3025731 | 3/1/1983 | DIESEL FIRE PUMP |
| DGT105757D | 3025732 | 3/1/1983 | ELECTRIC FIRE PUMP |
| DGT105758D | 3025733 | 3/1/1983 | JOCKEY PUMP |
| DGT105761D | 3025734 | 12/1/1983 | HYDRAULIC PASTE BOX |
| DGT105762D | 3025735 | 12/1/1983 | HYDRAULIC PASTE BOX |
| DGT105763D | 3025736 | 12/1/1983 | ROTARY PILOT HOLE MACHINE |
| DGT105764D | 3025737 | 12/1/1983 | ROTARY PILOT HOLE MACHINE |
| DGT105765D | 3025738 | 12/1/1983 | TANK FOR MIXER |
| DGT105766D | 3025739 | 12/1/1983 | TANK FOR MIXER |
| DGT105769D | 3025741 | 6/1/1984 | LABEL MACHINE |
| DGT105770D | 3025742 | 8/1/1984 | TIG WELDER |
| DGT105770D01 | 3025743 | 1/1/1995 | ADDITIONAL CHARGES TO TAG #105770 |
| DGT105771D | 3025744 | 8/1/1984 | TIG WELDER |
| DGT105771D01 | 3025745 | 1/1/1995 | ADDITIONAL CHARGES TO TAG #105771 |
| DGT105772D | 3025746 | 8/1/1984 | TIG WELDER |
| DGT105772D01 | 3025747 | 1/1/1995 | ADDITIONAL CHARGES TO TAG #105772 |
| DGT105773D | 3025748 | 8/1/1984 | TIG WELDER |
| DGT105773D01 | 3025749 | 1/1/1995 | ADDITIONAL CHARGES TO TAG #105773 |
| DGT105774D | 3025750 | 10/1/1984 | PILOT HOLE MACHINE |
| DGT105775D | 3025751 | 12/1/1984 | HEVI DUTY TRANSFORMER-300KVA LIGHTING |
| DGT105776D | 3025752 | 12/1/1984 | TANK FOR MIXER |
| DGT105777D | 3025753 | 1/1/1985 | HYDRAULIC PASTE BOX |
| DGT105781D | 3025754 | 1/1/1985 | BATTERY WASHER |
| DGT105787D | 3025756 | 12/1/1985 | EXPANDER PRESS #2 |
| DGT105789D | 3025757 | 8/1/1986 | HI STACKER TIERING TRUCK |
| DGT105790D | 3025758 | 8/1/1986 | HI STACKER TIERING TRUCK |
| DGT105795D | 3025759 | 9/1/1986 | EPANDER PRESS #1LINE |
| DGT105796D | 3025760 | 10/1/1986 | PASTE MACH LINE#1 |
| DGT105797D | 3025761 | 10/1/1986 | BUTT WELDER LINE#1 |
| DGT105798D | 3025762 | 10/1/1986 | PASTE MIXER LINE #1 |
| DGT105800D | 3025763 | 10/1/1986 | HOT RUNNER CONTROLLER(500T CINN MOLD) |
| DGT105801D | 3025764 | 10/1/1986 | MOLD MONITOR MACH #12(500T MOLD MACH) |
| DGT105802D | 3025765 | 10/1/1986 | PARTS CONV(25T MOLD MACH)15'&7' |
| DGT105805D | 3025766 | 2/1/1987 | EXPANDER PRESS LN#1 |
| DGT105806D | 3025767 | 2/1/1987 | COVER HEAT SEAL |
| DGT105807D | 3025768 | 4/1/1987 | FINAL COVER FILT PLACER |

| | | | |
|---|---|---|---|
| DGT105810D | 3025770 | 9/1/1987 | CONV-HANDLE PLACEMENT |
| DGT105811D | 3025771 | 5/1/1988 | CHARGE PANEL |
| DGT105812D | 3025772 | 5/1/1988 | CHARGE PANEL |
| DGT105817D | 3025773 | 2/1/1988 | S.O.C. PROGRAMMABLE CONTROLLER |
| DGT105818D | 3025774 | 2/1/1988 | S.O.C. PROGRAMMABLE CONTROLLER |
| DGT105820D | 3025775 | 2/1/1988 | 15T WATER CHILLER |
| DGT105822D | 3025776 | 5/1/1988 | CAST ON STRAP MACH |
| DGT105823D | 3025777 | 5/1/1988 | HI-RATE TESTER(5575L&R) |
| DGT105824D | 3025778 | 5/1/1988 | AIR BLAST SYS BLOWER |
| DGT105825D | 3025779 | 5/1/1988 | TOP TERM TIG BURN MACH |
| DGT105826D | 3025780 | 5/1/1988 | HI-RATE CONVEYOR |
| DGT105828D | 3025782 | 11/1/1988 | CHARGE FLOOR PROCESS FAN |
| DGT105830D | 3025784 | 12/1/1988 | LABEL MACHINE |
| DGT105831D | 3025785 | 1/1/1989 | SPOT FACE MACHINE |
| DGT105832D | 3025786 | 1/1/1989 | SPOT FACE MACHINE |
| DGT105834D | 3025787 | 8/31/1989 | AUTO STRETCH WRAP UNIT |
| DGT105837D | 3025788 | 10/31/1989 | LEAD SULFATE RECOVERY SYSTEM |
| DGT105839D | 3025790 | 2/1/1990 | CONVEYOR |
| DGT105840D | 3025791 | 2/1/1990 | 90 DEGREE EXIT CONV(RIGHT SIDE INFEED OHB) |
| DGT105842D | 3025793 | 8/1/1973 | TRUCK POWERED SHOP |
| DGT105843D | 3025794 | 3/1/1980 | TRUCK-POWERED-SHOP |
| DGT105845D | 3025795 | 8/1/1976 | TRUCK-POWERED-SHOP |
| DGT105846D | 3025796 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105847D | 3025797 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105848D | 3025798 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105849D | 3025799 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105854D | 3025802 | 12/1/1991 | PRESTRETCH UNIT |
| DGT105856D | 3025803 | 1/1/1993 | ENCLOSURE F/3 DOORS |
| DGT105865D | 3025804 | 3/1/1994 | SPIROMETER |
| DGT105869D | 3025805 | 2/28/1995 | (9)TOLEDO SCALE WEIGHT CONTROLLERS |
| DGT105870D | 3025807 | 1/1/1996 | AUTOMATIC PALLETIZER |
| DGT105870E | 3025808 | 11/1/2001 | AUTOMATIC PALLETIZER |
| DGT105871 | 3025809 | 2/28/1997 | (B) ULTRASONIC WELDER |
| DGT105871A | 3025810 | 12/1/1998 | TRAILING CHARGE TO DGT105871 |
| DGT105871D | 3025811 | 1/1/1987 | GENIE BOOM ELECTRIC MAN LIFT |
| DGT105872D | 3025813 | 3/1/1983 | CLARK WALKING STYLE ELECTRIC SWEEPER/SCRUBBER |
| DGT105873 | 3025814 | 7/31/1997 | AUTO OFF-BEAR SYS |
| DGT105874 | 3025816 | 7/31/1997 | HEATING SYSTEM (UPGRADE) |
| DGT105876 | 3025817 | 11/1/2001 | LEAD OXIDE VENTALATION ON XMET |
| DGT105878 | 3025818 | 11/1/2001 | SYNTRON BOWL CONVERSION |
| DGT105880 | 3025819 | 11/1/2001 | REBUILD CHANGE TABLE |
| DGT105881 | 3025820 | 11/1/2001 | REBUILD CHARGE TABLES |
| DGT105883 | 3025821 | 11/1/2001 | MANCOOLERS FOR C.O.S. |
| DGT105884 | 3025822 | 11/1/2001 | REPAIR PERSON COOLERS - X-MET |
| DGT105886 | 3025824 | 11/1/2001 | ROLLING MILL DRIVE UNIT |
| DGT105887 | 3025825 | 11/1/2001 | REPLACE MODICON CONTROLLERS |
| DGT105888 | 3025826 | 11/1/1997 | SAND FILTER |
| DGT105890 | 3025828 | 11/1/1997 | POWERED SWEEPER |
| DGT105892 | 3025829 | 11/1/1997 | HOT MELT EQUIPMENT |
| DGT105894 | 3025832 | 11/1/1997 | RETENTION AREA |
| DGT105895 | 3025833 | 11/1/2001 | LASER DATE CODE-CELL #1 |
| DGT105897 | 3025834 | 11/1/2001 | HI RATE MACHINE FOR LEAN CELL #1 |
| DGT105898 | 3025835 | 11/1/2001 | AIRCHECK FOR LEAN CELL #1 |
| DGT105899 | 3025836 | 11/1/2001 | AIRCHECK PANEL FOR LEAN CELL #1 |
| DGT105902 | 3025837 | 11/1/2001 | CARTON PRINTER MACHINE CELL #1 |
| DGT105903 | 3025838 | 11/1/2001 | HANDLE PLACER MACHINE |
| DGT105906 | 3025839 | 11/1/2001 | LOW VOLUME SHRING WRAP MACHINE |
| DGT105907 | 3025840 | 11/1/2001 | HIGH SPEED SHRINK WRAP MACHINE |
| DGT105908 | 3025841 | 11/1/2001 | INKJET PRINTER CELL #1 |
| DGT105911 | 3025842 | 11/1/2001 | DESIGN OF ACID HANDLING SYSTEM |
| DGT105912 | 3025843 | 11/1/2001 | PLANT UPGRADES FOR LEAN CELLS |
| DGT105913 | 3025844 | 11/1/2001 | LABEL JET LABELLER |
| DGT105914 | 3025845 | 11/1/2001 | LABEL JET LABELLER |
| DGT105915 | 3025846 | 11/1/2001 | LABEL JET LABELLER |
| DGT105916 | 3025847 | 11/1/2001 | LABEL JET LABELLER |
| DGT105917 | 3025848 | 11/1/2001 | LABEL JET LABELLER |
| DGT105918 | 3025849 | 11/1/2001 | LABEL JET LABELLER |

| | | | |
|---|---|---|---|
| DGT105920 | 3025850 | 11/1/2001 | HEAT SEAL FOR MISC. LINE |
| DGT105921 | 3025851 | 11/1/2001 | POLY STORAGE ELIMINATTION EQUIPMENT TO MOVE PLASTI |
| DGT105924 | 3025852 | 11/1/2001 | QC LAB BITRODE CYCLER FOR NEW BRUNSWICK |
| DGT106102D | 3025853 | 6/1/1984 | PILOT HOLE MACHINE |
| DGT106164D | 3025854 | 9/1/1984 | BRIDGEPORT TAPE MILL |
| DGT106164D01 | 3025855 | 10/1/1984 | TRAILING CHARGE TO TAG #106164D |
| DGT109106D | 3025858 | 12/1/1988 | PASTE MACH(ROTARY DRUM) |
| DGT111097D | 3025859 | 4/1/1993 | BOILER CONTROL FOR #1 |
| DGT111098D | 3025860 | 4/1/1993 | BOILER CONTROL FOR #2 |
| DGT111099D | 3025861 | 4/1/1993 | BOILER CONTROL FOR #3 |
| DGT111100D | 3025862 | 4/1/1993 | BOILER CONTROL FOR #4 |
| DGT111673D | 3025864 | 7/1/1994 | RED LEAD STORAGE SYSTEM |
| DGT111673D01 | 3025865 | 7/1/1994 | ADDITIONAL CHARGES TO TAG #111673D |
| DGT111673D02 | 3025866 | 1/1/1995 | TRAILING CHARGES TO TAG #111673D |
| DGT111674D | 3025867 | 7/1/1994 | RED LEAD DELIVERY SYSTEM |
| DGT111674D01 | 3025868 | 7/1/1994 | TRAILING CHARGE TO TAG #111674D |
| DGT112844 | 3025870 | 4/28/1999 | INFORMATION BOARD |
| DGT113107 | 3025871 | 7/31/1997 | ROBOT |
| DGT690000 | 3025872 | 1/2/1998 | LEVELATOR |
| DGT690001 | 3025873 | 1/2/1998 | LEVELATOR |
| DGT690002 | 3025874 | 1/2/1998 | LEVELATOR |
| DGT690003 | 3025875 | 1/2/1998 | LEVELATOR |
| DGT690004 | 3025876 | 1/2/1998 | LEVELATOR |
| DGT690005 | 3025877 | 1/2/1998 | LEVELATOR |
| DGT690006 | 3025878 | 1/2/1998 | LEVELATOR |
| DGT690007 | 3025879 | 1/2/1998 | LEVELATOR |
| DGT690008 | 3025880 | 1/2/1998 | LEVELATOR |
| DGT690009 | 3025881 | 1/2/1998 | LEVELATOR |
| DGT690010 | 3025882 | 1/2/1998 | LEVELATOR |
| DGT690011 | 3025883 | 1/2/1998 | LEVELATOR |
| DGT690012 | 3025884 | 1/2/1998 | LEVELATOR |
| DGT690013 | 3025885 | 1/2/1998 | LEVELATOR |
| DGT690014 | 3025886 | 1/2/1998 | LEVELATOR |
| DGT690015 | 3025887 | 1/2/1998 | LEVELATOR |
| DGT690016 | 3025888 | 8/1/1998 | TIG WELDER |
| DGT690017 | 3025889 | 1/2/1998 | DOCK LOCK |
| DGT690018 | 3025890 | 1/2/1998 | DOCK LOCK |
| DGT690019 | 3025891 | 1/2/1998 | DOCK LOCK |
| DGT690021 | 3025893 | 1/2/1998 | DOCK LOCK |
| DGT690022 | 3025894 | 1/2/1998 | DOCK LOCK |
| DGT690023 | 3025895 | 1/2/1998 | DOCK LOCK |
| DGT690024 | 3025896 | 1/2/1998 | DOCK LOCK |
| DGT690025 | 3025897 | 1/2/1998 | DOCK LOCK |
| DGT690027 | 3025899 | 1/2/1998 | SITE SIGN (DELPHI) |
| DGT690028 | 3025900 | 4/1/1998 | PERFORATOR LINE UPC |
| DGT690030 | 3025901 | 11/1/1998 | LIFT TABLE |
| DGT690031 | 3025902 | 11/1/1998 | LIFT TABLE |
| DGT690032 | 3025903 | 11/1/1998 | LIFT TABLE |
| DGT690033 | 3025904 | 11/1/1998 | NON SLIP FLOOR COATING-EXPANDER&PASTE MACH. AREAS |
| DGT690034 | 3025905 | 11/1/1998 | TRANSFORMER |
| DGT690035 | 3025906 | 11/1/1998 | LABEL MACHINE |
| DGT690036 | 3025907 | 11/1/1998 | ALARMED FEEDER TO FIRE PUMP HOSE |
| DGT690040 | 3025908 | 11/1/1998 | AUXILLARY REMOTE FIRE DEPT CONNECTION |
| DGT690041 | 3025909 | 11/1/1998 | AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET1 |
| DGT690042 | 3025910 | 11/1/1998 | AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET2 |
| DGT690043 | 3025911 | 11/1/1998 | AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET3 |
| DGT690044 | 3025912 | 1/2/1998 | ROBOT |
| DGT690045 | 3025913 | 1/2/1998 | ROBOT |
| DGT690046 | 3025914 | 1/2/1998 | ROBOT |
| DGT690047 | 3025915 | 1/2/1998 | ROBOT |
| DGT690048 | 3025916 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690049 | 3025917 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690050 | 3025918 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690051 | 3025919 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690052 | 3025920 | 1/2/1998 | AUTOMATED ORIENTATION ROBOT |
| DGT690053 | 3025921 | 1/2/1998 | TITAN CENTRAL CHILL |
| DGT690054 | 3025922 | 1/2/1998 | AIR DRYER |

| | | | |
|---|---|---|---|
| DGT690055 | 3025923 | 1/2/1998 | AIR DRYER |
| DGT690056 | 3025924 | 11/1/2001 | BRIDGE CRANE |
| DGT690057 | 3025925 | 1/1/1999 | NEW BRUNSWICK STORM WATER TREATMENT |
| DGT690058 | 3025926 | 11/1/2001 | DUST COLLECTION SYSTEM FOR THE X-MET LINE |
| DGT690060 | 3025927 | 11/1/2001 | ELECTRICAL DISTRIBUTION SYSTEM FOR THE X-MET LINE |
| DGT690065 | 3025928 | 11/1/2001 | COULTER COUNTER PER DAVE MCCORD - MEASURES OXIDE P |
| DGT690068 | 3025929 | 11/1/2001 | HEAT SEAL MACHINE #1 |
| DGT690069 | 3025930 | 11/1/2001 | HEAT SEAL MACHINE #2 |
| DGT690070 | 3025931 | 11/1/2001 | HEAT SEAL MACHINE #3 |
| DGT690071 | 3025932 | 11/1/2001 | HEAT SEAL MACHINE #4 |
| DGT690072 | 3025933 | 11/1/2001 | CONVERT BOILERS TO-ONLY MARK GOODWIN AUTHORIZATION |
| DGT690073 | 3025934 | 11/1/2001 | ACID TANK |
| DGT690074 | 3025935 | 11/1/2001 | ACID TANK |
| DGT690075 | 3025936 | 11/1/2001 | ACID TANK |
| DGT690076 | 3025937 | 11/1/2001 | ACID TANK |
| DGT690077 | 3025938 | 11/1/2001 | NEW AIR WASHER FAN - INSTALLED |
| DGT690078 | 3025939 | 11/1/2001 | NEW AIR WASHER FAN - INSTALLED |
| DGT690081 | 3025940 | 11/1/2001 | BLOWER UNIT FOR AIR WASHER |
| DGT690082 | 3025941 | 1/1/2002 | BLOWER UNIT FOR AIR WASHER |
| DGT690111 | 3025942 | 11/1/2001 | FEED WATER PUMP #1 IN POWER PLANT |
| DGT690112 | 3025943 | 11/1/2001 | FEED WATER PUMP #2 IN POWER PLANT |
| DGT690113 | 3025944 | 11/1/2001 | BUSS DUCT UPGRADE |
| DGT690115 | 3025945 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690116 | 3025946 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690117 | 3025947 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690118 | 3025948 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690119 | 3025949 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690120 | 3025950 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690122 | 3025951 | 11/1/2001 | SHEET METAL SHEAR |
| DGT690123 | 3025952 | 11/1/2001 | SONIC WELDER SYSTEM |
| DGT690124 | 3025953 | 11/1/2001 | HIGH VOLTAGE GREEN GRP TEST MACHINE |
| DGT690125 | 3025954 | 11/1/2001 | HIGH VOLTAGE GREEN GRP TEST MACHINE |
| DGT690126 | 3025955 | 11/1/2001 | AERIAL PLATFORM TRUCK - NEW |
| DGT690129 | 3025957 | 1/1/2002 | PHASE II REPAIRS TO FORMATION VENTILATION - PROCES |
| DGT690132 | 3025958 | 11/1/2001 | BATTERY LAB AIR CONDITIONER, UPGRADE |
| DGT690134 | 3025959 | 1/1/2002 | SEPARATE PROPANE SYSTEMS FOR PROD PROC, PLANT BOIL |
| DGT690135 | 3025960 | 11/1/2001 | WALMART J240H T BATTERY, APPLICATOR AND TUBING |
| DGT690136 | 3025961 | 11/1/2001 | WALMART J240H T BATTERY, ELECTRICAL CONTROLS |
| DGT690137 | 3025962 | 11/1/2001 | WALMART J240H T BATTERY, ELECTRICAL CONTROLS |
| DGT690138 | 3025963 | 11/1/2001 | WALMART J240H T BATTERY, ENGINEERING DESIGN |
| DGT690139 | 3025964 | 11/1/2001 | WALMART J240H T BATTERY, HOIST |
| DGT690140 | 3025965 | 11/1/2001 | LEAD STRIP MILL (FROM MUNCIE) |
| DGT690141 | 3025966 | 11/1/2001 | WALMART J240 HT BATTERY, MQ 2 MTL |
| DGT690147 | 3025967 | 11/1/2001 | LIFT & ROTATE TABLE # 1 FOR BATTERY PLATE SKIDS |
| DGT690148 | 3025968 | 11/1/2001 | LIFT & ROTATE TABLE # 2 FOR BATTERY PLATE SKIDS |
| DGT690149 | 3025969 | 11/1/2001 | LIFT & ROTATE TABLE # 3 FOR BATTERY PLATE SKIDS |
| DGT690150 | 3025970 | 11/1/2001 | LIFT & ROTATE TABLE # 4 FOR BATTERY PLATE SKIDS |
| DGT690151 | 3025971 | 11/1/2001 | LIFT & ROTATE TABLE # 5 FOR BATTERY PLATE SKIDS |
| DGT690152 | 3025972 | 11/1/2001 | LIFT & ROTATE TABLE # 6 FOR BATTERY PLATE SKIDS |
| DGT690153 | 3025973 | 11/1/2001 | LIFT & ROTATE TABLE # 7 FOR BATTERY PLATE SKIDS |
| DGT690156 | 3025974 | 11/1/2001 | LIFT & ROTATE TABLE # 8 FOR BATTERY PLATE SKIDS |
| DGT690157 | 3025975 | 11/1/2001 | LIFT & ROTATE TABLE # 9 FOR BATTERY PLATE SKIDS |
| DGT690158 | 3025976 | 11/1/2001 | LIFT & ROTATE TABLE # 10 FOR BATTERY PLATE SKIDS |
| DGT690159 | 3025977 | 11/1/2001 | LIFT & ROTATE TABLE # 11 FOR BATTERY PLATE SKIDS |
| DGT690160 | 3025978 | 11/1/2001 | LIFT & ROTATE TABLE # 12 FOR BATTERY PLATE SKIDS |
| DGT690161 | 3025979 | 11/1/2001 | LIFT & ROTATE TABLE # 13 FOR BATTERY PLATE SKIDS |
| DGT690162 | 3025980 | 11/1/2001 | LIFT & ROTATE TABLE # 14 FOR BATTERY PLATE SKIDS |
| DGT690163 | 3025981 | 11/1/2001 | ACID RECLAIM PUMP # 1 |
| DGT690164 | 3025982 | 11/1/2001 | ACID RECLAIM PUMP # 2 |
| DGT690165 | 3025983 | 11/1/2001 | WALMART J240HT BATTERY, SCRAP COLLECTION SYSTEM |
| DGT690166 | 3025984 | 11/1/2001 | INSTALL EQUIP TRANS FROM TRENTON |
| DGT690168 | 3025985 | 11/1/2001 | HOOD FOR OPERATOR QUALITY TESTING EQUIPMENT |
| DGT690169 | 3025986 | 11/1/2001 | ACID ABSORPTION TESTER |
| DGT690176 | 3025987 | 11/1/2001 | HEAT EXCHANGER FOR WASH TUNNEL - NB |
| DGT690177 | 3025988 | 1/1/2002 | PERSONNEL VACUUM SYS. ON CLEAN AREA DOORWAY (1 OF |
| DGT690178 | 3025989 | 11/1/2001 | INSTALL HIGH SPEED ROLLUP DOOR TO SHIPPING DEPT |
| DGT690181 | 3025990 | 11/1/2001 | REPLACE CHARGE TABLE BLOWER |

| DGT690194 | 3025991 | 11/1/2001 | BOILER CONTROLLER (1 OF 3) |
| DGT690195 | 3025992 | 11/1/2001 | BOILER CONTROLLER (2 OF 3) |
| DGT690196 | 3025993 | 11/1/2001 | BOILER CONTROLLER (3 OF 3) |
| DGT690218 | 3025994 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (2 OF |
| DGT690219 | 3025995 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (3 OF |
| DGT690220 | 3025996 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (4 OF |
| DGT720001 | 3025997 | 4/28/1999 | ACID FILL MACHINE |
| DGT720002 | 3025998 | 4/28/1999 | MOD. TO VR |
| DGT720007 | 3025999 | 4/28/1999 | 50 AMP RECTIFIER |
| DGT720010 | 3026000 | 4/28/1999 | UPDATE STACKER SYSTEM |
| DGT72383 | 3026001 | 11/1/2001 | REBUILD 700 MOLDING MACHINE |
| DGT72395 | 3026002 | 1/1/2002 | CAST ON STRAP CONTROLS |
| DGT72396 | 3026003 | 1/1/2002 | PROPANE BACK UP SYSTEM FOR BOILERS |
| DGT72413 | 3026004 | 1/1/2002 | AUTO PLATE STIELER SYSTEM CONTROLS #4 |
| DGT74405 | 3026005 | 11/1/2001 | ACID FILL/PREWASH MACHINE CELL #1 |
| DGT74406 | 3026006 | 11/1/2001 | ACID MIX SYSTEM CELL #1 |
| DGT74407 | 3026007 | 11/1/2001 | WASHER/DRYER FOR FINISHED BATTERIES CELL #1 |
| DGT74408 | 3026008 | 11/1/2001 | BITROBE HIRATE CELL #1 |
| DGTEX095387D | 3026009 | 11/1/2001 | CAPITALIZABLE MAINTENANCE - RECONDITION I.R. AIR C |
| DGT018263N | 3026024 | 1/1/1979 | CASE GATHERING CONVEYOR |
| DGT018358N | 3026079 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018359N | 3026080 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018360N | 3026081 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018361N | 3026082 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018362N | 3026083 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT081436D | 3026331 | 11/1/1974 | STRAP CAST MACHINE |
| DGT081437D | 3026332 | 11/1/1974 | STRAP CAST MACHINE |
| DGT081438D | 3026333 | 11/1/1974 | STRAP CAST MACHINE |
| DGT091798D | 3026399 | 12/1/1977 | CAST ON STRAP MACHINE |
| DGT101707D | 3026558 | 7/1/1985 | STRETCH WRAP MACHINE |
| DGT101750D | 3026598 | 1/1/1988 | OSI OVEN-ENERGY RECOVERY SYSTEM |
| DGT081611D | 3027025 | 4/1/1977 | VACUUM SYSTEM FOR INCAPTULATORS |
| DGT081622D | 3027033 | 7/1/1977 | PLATE ENCAPSULATOR |
| DGT081623D | 3027035 | 7/1/1977 | PLATE ENCAPSULATOR |
| DGT081648D | 3027064 | 8/1/1977 | SPECTROGRAPH |
| DGT081649D | 3027066 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081650D | 3027067 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081651D | 3027068 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081693D | 3027101 | 10/1/1977 | TEMPERATURE CONTROL FOR TERMINAL |
| DGT081705D | 3027112 | 11/1/1977 | FINAL COVER LEAK TEST |
| DGT081743D | 3027130 | 9/1/1978 | BUTT WELDER |
| DGT095750D | 3027192 | 12/1/1976 | X MAT EXPANDING PRESS |
| DGT095758D | 3027208 | 12/1/1976 | PASTE MIXER |
| DGT096940D | 3027221 | 5/1/1972 | WATER CHILLER |
| DGT100166D | 3027229 | 4/1/1977 | TIG BURN MACHINE |
| DGT100357D | 3027246 | 7/1/1977 | EDGE TRIM & CHOPPER UNIT |
| DGT100485D | 3027251 | 9/1/1977 | ENCAPSULATOR |
| DGT100486D | 3027252 | 9/1/1977 | ENCAPSULATOR |
| DGT103764D | 3027269 | 9/1/1978 | GROUP ALIGN CONVEYOR MACHINE |
| DGT103775D | 3027277 | 12/1/1978 | ENCAPSULATION & COLLATION MACHINE |
| DGT103776D | 3027279 | 12/1/1978 | ENCAPSULATION & COLLATION MACHINE |
| DGT103780D | 3027283 | 1/1/1979 | COVER HEAT SEAL |
| DGT103780D01 | 3027284 | 3/1/1979 | TRAILING CHARGE TO TAG #103780D |
| DGT103794D | 3027288 | 4/1/1979 | GREEN GROUP SHORT TEST CONVEYOR #1 |
| DGT103815D | 3027299 | 7/1/1979 | STRAP CAST STATION |
| DGT103833D | 3027307 | 10/1/1979 | WATER CHILLER-15 TON |
| DGT103848D | 3027313 | 12/1/1979 | DC DC MODULE |
| DGT103849D | 3027314 | 12/1/1979 | DC DC MODULE |
| DGT103850D | 3027315 | 12/1/1979 | DC DC MODULE |
| DGT103851D | 3027316 | 12/1/1979 | DC DC MODULE |
| DGT103852D | 3027317 | 12/1/1979 | DC DC MODULE |
| DGT103853D | 3027318 | 12/1/1979 | DC DC MODULE |
| DGT103854D | 3027319 | 12/1/1979 | DC DC MODULE |
| DGT103856D | 3027321 | 12/1/1979 | DC DC MODULE |
| DGT103857D | 3027322 | 12/1/1979 | DC DC MODULE |
| DGT103907D | 3027345 | 11/1/1982 | WATER CHILLER |
| DGT103933D | 3027353 | 9/1/1983 | HEAT TREAT FURNACE |

| DGT104743D | 3027392 | 6/1/1980 BRANSON WELD UNIT |
| DGT107507D | 3027402 | 1/1/1986 DUST COLLECTOR |
| DGT107566D | 3027438 | 3/1/1990 EKG MACHINE |
| DGT107586D | 3027452 | 1/1/1991 GMF ROBOT FOR C.O.S. LINE |
| DGT107588D | 3027454 | 6/1/1991 JWI LEAD FILTER PRESS |
| DGT107609D | 3027463 | 1/1/1992 LEBLOND MAKINO LATHE |
| DGT107619D | 3027469 | 2/1/1992 DIGITAL READOUT FOR LEBLOND LATHE |
| DGT107621D | 3027470 | 4/1/1992 TEMP CONTROLLER FOR MOLD MACH |
| DGT107636D | 3027479 | 4/1/1994 SATELLITE SPIROMETER |
| DGT107647D | 3027487 | 1/1/1994 CHILLER SYSTEM FOR #2 LEAD STRIP |
| DGT107678D | 3027499 | 7/1/1995 SPRAYMATION HOT MELT EQUIPMENT |
| DGT107698 | 3027515 | 6/30/1997 DIELECTRIC TEST CONTROL |
| DGT107700 | 3027517 | 7/31/1997 AUTO OFF |
| DGT107723B | 3027544 | 6/1/1999 FORMATION TABLE SYSTEM |
| DGT107731 | 3027549 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107732 | 3027550 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107733 | 3027551 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107734 | 3027552 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107735 | 3027553 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107736 | 3027554 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107744 | 3027559 | 4/1/2000 TOP TERMINAL TIG WELDER |
| DGT600015 | 3027596 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600016 | 3027597 | 11/1/2001 44 X 55 4000LB CAPACITY SCISSOR LIFT |
| DGT600017 | 3027598 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600018 | 3027599 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600019 | 3027600 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600020 | 3027601 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600043 | 3027617 | 11/1/2001 SEPERATOR ROLL LIFT, JIB CRANE, AND HOIST |
| DGT600044 | 3027618 | 11/1/2001 SEPERATOR ROLL LIFT, JIB CRANE AND HOIST |
| DGT600045 | 3027619 | 11/1/2001 PROTOTYPE WATER BATH FORMATION SYSTEM |
| DGT600049 | 3027622 | 11/1/2001 FORMATION CHARGING TABLE #3 |
| DGT600056 | 3027625 | 11/1/2001 ROBOT TO LOAD BATTERY GROUPS INTO CAST-ON-STRAP MA |
| DGT600106 | 3027656 | 11/1/2001 WALMART J240HT BATT, SCRAP COLLECTION SYSTEM |
| DGT690101 | 3051124 | 9/11/2002 SEPARATOR LIFTING JIB CRANE AND HOIST |
| DGT690099 | 3051125 | 9/11/2002 DELPHI MACHINE TO TEST BATTERY CELLS FOR SHORTS |
| DGT690097 | 3051126 | 9/11/2002 DELPHI WATER COOLING STATION |
| DGT690095 | 3051127 | 9/11/2002 DELPHI STRETCH/PERFORATE MACHINE |
| DGT690094 | 3051128 | 9/11/2002 DELPHI GROUP LOADING MACHINE STATION |
| DGT690093 | 3051129 | 9/11/2002 DELPHI TOP TERMINAL COVER SPIN MACHINE |
| DGT690092 | 3051130 | 9/11/2002 DELPHI GROUP LOADING MACHINE STATION |
| DGT690102 | 3051131 | 9/11/2002 SEPARATOR LIFTING JIB CRANE AND HOIST |
| DGT690187 | 3051132 | 9/11/2002 (#6) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690186 | 3051133 | 9/11/2002 (#5) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690185 | 3051134 | 9/11/2002 (#4) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690184 | 3051135 | 9/11/2002 (#3) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690183 | 3051136 | 9/11/2002 (2) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690182 | 3051137 | 9/11/2002 (#1) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690103 | 3051138 | 9/11/2002 FILTRATION SYSTEM FOR CHILLED WATER SUPPLY |
| DGT690212 | 3051139 | 9/11/2002 WELDER #8 |
| DGT690211 | 3051140 | 9/11/2002 WELDER #7 |
| DGT690210 | 3051141 | 9/11/2002 WELDER #6 |
| DGT690209 | 3051142 | 9/11/2002 WELDER #5 |
| DGT690208 | 3051143 | 9/11/2002 WELDER #4 |
| DGT690207 | 3051144 | 9/11/2002 WELDER #3 |
| DGT690206 | 3051145 | 9/11/2002 WELDER #2 |
| DGT690213 | 3051146 | 9/11/2002 WELDER #9 |
| DGT690083 | 3051147 | 9/11/2002 BIG JOE LIFT TRUCK (REV. 1) |
| DGT105901 | 3051148 | 9/11/2002 REPLACE HEAT SEALER |
| DGT105900 | 3051149 | 9/11/2002 FIRE PTOTECTION FOR GREEN GROU/ VACUUM EXHAUSTER |
| DGT105896 | 3051150 | 9/11/2002 REPLACE HEAT SEALERS |
| DGT690216 | 3051151 | 9/11/2002 WELDER #12 |
| DGT690215 | 3051152 | 9/11/2002 WELDER #11 |
| DGT690214 | 3051153 | 9/11/2002 WELDER #10 |
| DGT690188 | 3051154 | 9/11/2002 DELPHI MACHINE TO ALIGN TOP TERMINAL POSTS |
| DGT105910 | 3051170 | 9/11/2002 RE ROUTE STORM OUTFALL |
| 72414 | 3051171 | 9/11/2002 VACUUM EXHAUSTER |
| 72393 | 3051172 | 9/11/2002 REBUILD TWO CHANGE TABLE |

| | | | |
|---|---|---|---|
| DGT690202 | 3051173 | 9/11/2002 | WATER CONSERVATION SYSTEM FOR BATTERY WASHER |
| DGT690191 | 3051174 | 9/11/2002 | MISC CONVEYORS FOR LAYOUT CHANGES TO GRN GRP LEAN |
| DGT690190 | 3051175 | 9/11/2002 | VENTILATION COLLECTOR FAN FOR GREEN GROUP LEAN CEL |
| 72370 | 3051176 | 9/11/2002 | FIRE PROTECTION UPGRADE |
| DGT690109 | 3051182 | 9/11/2002 | ROBOT TO LOAD BATTERY GROUPS INTO CAST-ON-STRAP MA |
| DGT690205 | 3051183 | 9/11/2002 | WELDER #1 |
| DGT690130 | 3051209 | 9/11/2002 | LINE INSTALL COSTS FOR MQ 1 VALIDATION |
| DGT690121 | 3051210 | 9/11/2002 | DELPHI LEAN COVER TO CASE HEAT SEAL MACHINE |
| DGT690108 | 3051211 | 9/11/2002 | INTER. COVER AIR CHECK MACHINE |
| DGT690107 | 3051212 | 9/11/2002 | GROUP HOTMELT MACHINE |
| DGT690106 | 3051213 | 9/11/2002 | TOP TERMINAL HOTMELT MACHINE |
| DGT690104 | 3051214 | 9/11/2002 | DELPHI CAST-ON-STRAP MACHINE REBUILD OF DGS0099445 |
| DGT690096 | 3051215 | 9/11/2002 | DELPHI SINGLE HEAD EF WELDER MACHINE |
| DGT690131 | 3051216 | 9/11/2002 | PRODUCTIVE MTL FOR MQ 1 VALIDATION |
| DGT690203 | 3051217 | 9/11/2002 | XMET PASTE MIXER #1 UPGRADE (REPLACES DGT100297D) |
| DGT690174 | 3051218 | 9/11/2002 | #2 DR2-NB ENCAPSULATION/COLLATION MACHINE |
| DGT690173 | 3051219 | 9/11/2002 | #1 DR2-NB ENCAPSULATION/COLLATION MACHINE |
| DGT690144 | 3051220 | 9/11/2002 | UPGRADE BATTERY ACID RETENTION & DIST-TANK & COOLI |
| DGT690143 | 3051221 | 9/11/2002 | UPGRADE BATTERY ACID RETENTION & DIST-CONSTR & INS |
| DGT690142 | 3051222 | 9/11/2002 | UPGRADE BATTERY ACID RETENTION & DIST & ACID HOUSE |
| DGT690133 | 3051223 | 9/11/2002 | NFPA VENTING ON PROPANE REGULATORS |
| DGT690087 | 3051228 | 9/11/2002 | DELPHI LEAN TOP TERMINAL TIG WELDER |
| DGT690086 | 3051229 | 9/11/2002 | DELPHI LEAN SIDE TERMINAL TIG WELDER |
| DGT056948 | 3051230 | 9/11/2002 | OXIDE GRINDER CONTROL PANEL REBUILT |
| DGT72373 | 3051408 | 9/25/2002 | replace sulfuric acid tank |
| DGT72387 | 3051409 | 9/25/2002 | new brunswick security upgrade |
| DGT600175 | 3115835 | 2/10/2003 | #5 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600174 | 3115836 | 2/10/2003 | #4 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600173 | 3115837 | 2/10/2003 | #3 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600172 | 3115838 | 2/10/2003 | #2 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600171 | 3115839 | 2/10/2003 | #1 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600176 | 3115841 | 2/10/2003 | #6 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600178 | 3115842 | 2/10/2003 | LOAD STATION & MAGAZINE FOR ROBOT LOAD |
| DGT600170 | 3115843 | 2/10/2003 | ABB ROBOTS (4 OF 4) |
| DGT600169 | 3115844 | 2/10/2003 | ABB ROBOTS (3 OF 4) |
| DGT600168 | 3115845 | 2/10/2003 | ABB ROBOTS (2 OF 4) |
| DGT600167 | 3115846 | 2/10/2003 | ABB ROBOTS (1 OF 4) |
| DGT600177 | 3115848 | 2/10/2003 | CONVEYORS FOR DR3 |
| DGT600126 | 3115866 | 2/11/2003 | #2 DR2-AN ENCAPSULATION/COLLATION MACHINE |
| DGT600125 | 3115867 | 2/11/2003 | #1 DR2-AN ENCAPSULATION/COLLATION MACHINE |
| DGT600060 | 3115887 | 2/12/2003 | INTERMEDIATE COVER. ASSY. MACHINE FOR MARINE |
| DGT600203 | 3115900 | 2/12/2003 | FORMATION TABLE #2 |
| DGT600193 | 3115907 | 2/12/2003 | OPERATOR ASSIST FOR DR-3 (1 OF 2)GREEN GROUP LEAN |
| DGT600194 | 3115908 | 2/12/2003 | OPERATOR ASSIST FOR DR-3 (2 OF 2)GREEN GROUP LEAN |
| DGT600075 | 3115918 | 2/12/2003 | HI VOLTAGE GREEN GROUP SHORT CHECK- MISC GREEN GRP |
| DGT600229 | 3117571 | 5/22/2003 | LIFT ASSIST FOR DR-3 |
| DGT600230 | 3117572 | 5/22/2003 | LIFT ASSIST FOR DR-3 |
| DGT600231 | 3117573 | 5/22/2003 | LIFT ASSIST FOR DR-3 |
| DGT600204 | 3117578 | 5/22/2003 | CONVEYOR SYSTEM FOR MISC LINE DR-3 |
| DGT600213 | 3117580 | 5/22/2003 | CONVEYER FOR DR-3 #3&4 ON MISC. LINE |
| DGT690276 | 3151172 | 9/23/2003 | BUSS DUCT FOR 1203 |
| DGT690180 | 3151173 | 9/23/2003 | BACKFLOW PREVENTORS ON WATER MAINS |
| DGT690267 | 3151174 | 9/23/2003 | NEW PROCESS BOILER FOR PLATE STEAM HOODS |
| DGT690262 | 3151175 | 9/23/2003 | INSTALL NATURAL GAS LINE IN PLANT |
| DGT690260 | 3151183 | 9/23/2003 | GRAPHITE HEAT EXCHANGER FOR ACID HOUSE |
| DGT690263 | 3151189 | 9/23/2003 | LIFT PUMP #1 |
| DGT690259 | 3151190 | 9/23/2003 | CHARGE TABLE 25 |
| DGT690258 | 3151191 | 9/23/2003 | CHARGE TABLE 24 |
| DGT690236 | 3151192 | 9/23/2003 | NEW CHARGE TABLE |
| DGT690235 | 3151193 | 9/23/2003 | NEW CHARGE TABLE |
| DGT690224 | 3151194 | 9/23/2003 | INSTALLATION OF MAJOR MECHANICAL,VENTILATION,ELECT |
| DGT690222 | 3151195 | 9/23/2003 | DESIGN OF NEW CHARGE TABLE VENTILATION |
| DGT690265 | 3151196 | 9/23/2003 | LIFT PUMP #2 |
| DGT695033 | 3152528 | 10/17/2003 | PASTE MIXER BOWL |
| DGT690230 | 3153273 | 11/22/2003 | LUG FORM PILOTED DIE (XMET LINE 3) |
| DGT690229 | 3153274 | 11/22/2003 | LUG FORM CUT-OFF MACHINE (XMET LINE 2) |
| DGT690204 | 3153275 | 11/22/2003 | BAR CODE ERROR PROOFING PROJECT |

| | | | |
|---|---|---|---|
| DGT690193 | 3153276 | 11/22/2003 | STATION TO REMOVE FORMATION CHARGE SPOOLS |
| DGT690283 | 3153277 | 11/22/2003 | HEAT SEAL MACHINE |
| DGT690234 | 3153278 | 11/22/2003 | REFURBISH SIDE TERMINAL PLACEMENT MACHINE |
| DGT690233 | 3153279 | 11/22/2003 | REFURBISH TOP TERMINAL PLACEMENT MACHINE |
| DGT690231 | 3153280 | 11/22/2003 | NEW SCRAP CONVEYOR (XMET LINE 4) |
| DGT690228 | 3153281 | 11/22/2003 | PASTE BOX & RAILS (XMET LINE 1) |
| DGT690232 | 3153282 | 11/22/2003 | NEW STRIP WIDTH GAGE (XMET LINE 5) |
| DGT695034 | 3153284 | 11/22/2003 | OIL PURIFICATION SYSTEM |
| DGT690261 | 3153285 | 11/22/2003 | BUFFER CONVEYOR FOR MISC LINE |
| DGT690257 | 3153286 | 11/22/2003 | CONTROLS SYS FOR CUTTING ON THE GRID FUNCTIONS |
| DGT690256 | 3153287 | 11/22/2003 | VISION SYS FOR NO SPIN CONDITION AND SPOT FACE QUA |
| DGT690255 | 3153288 | 11/22/2003 | SPARE EQUIPMENT TO CUT ON GRID JUNCTIONS (XMET) |
| DGT690254 | 3153289 | 11/22/2003 | SCRAP SYSTEM FOR PHASE 1 TO CUT ON GRID JUNCTIONS |
| DGT690253 | 3153290 | 11/22/2003 | NEW ACID FILL FOR MAIN LINE (WATERFALL) |
| DGT690226 | 3153291 | 11/22/2003 | NEW WASHER AND DRYER FOR MAIN LINE |
| DGT690155 | 3153301 | 11/22/2003 | POWER TRANSFORMER # 4 FOR LIFT AND ROTATE TABLES |
| DGT690154 | 3153302 | 11/22/2003 | POWER TRANSFORMER # 3 FOR LIFT AND ROTATE TABLES |
| DGT690146 | 3153303 | 11/22/2003 | POWER TRANSFORMER # 2 FOR LIFT AND ROTATE TABLES |
| DGT690145 | 3153304 | 11/22/2003 | POWER TRANSFORMER # 1 FOR LIFT AND ROTATE TABLES |
| DGT690067 | 3153306 | 11/22/2003 | OXIDE EQUIPMENT UPG (REACTOR CONTROLS) |
| DGT105892A | 3153307 | 11/22/2003 | HOT MELT EQUIPMENT (REBUILD) |
| DGT095660E | 3153308 | 11/22/2003 | REFURBISH #2 HEAT SEAL MACHINE |
| DGT095659E | 3153309 | 11/22/2003 | REFURBISH #2 HEAT SEAL MACHINE |
| DGT600124 | 3153354 | 11/25/2003 | CONTROLLER FOR TIG WELDER |
| DGT600123 | 3153355 | 11/25/2003 | CONTROLLER FOR TIG WELDER |
| DGT600046 | 3153358 | 11/25/2003 | GROUP CONVEYOR SYSTEM |
| DGT012095O | 3190741 | 1/31/2004 | CAPITALIZE REBUILT COST (SUBMERSIBLE HEATERS LINDB |
| DGT690227 | 3190742 | 1/31/2004 | SLURRY ROOM EQUIPMENT TO RECLAIM PASTE |
| DGT690278 | 3190743 | 1/31/2004 | HOT MELT MACHINE OVERHAUL |
| DGT690192 | 3190744 | 1/1/2004 | AUTOMATED ASSEMBLY CELL FOR CASES & TERMINAL ASSY' |
| DGT690250 | 3190745 | 1/31/2004 | AIR LEAK TEST MACHINE |
| DGT690273 | 3190750 | 1/31/2004 | OXIDE DELIVERY SYSTEM |
| DGT690277 | 3190751 | 1/31/2004 | INSULATOR DETECTION SYSTEM - MAINLINE |
| DGT690279 | 3190752 | 1/31/2004 | INSULATOR DETECTION SYSTEM - MISC LINE |
| DGT600222 | 3190754 | 2/24/2004 | #9 DR-3 ENCAPSULATION COLOLATION MACHINE |
| DGT690264 | 3190755 | 1/31/2004 | AUTOMATIC INSULATOR INSERTER FOR SATURN BATTERY |
| DGT690266 | 3190756 | 1/31/2004 | MACHINE TO INSTALL INSULATOR UNDER SIDE TERMINAL S |
| DGT690269 | 3190757 | 1/1/2004 | HIGH RATE MACHINE BASE |
| DGT690270 | 3190758 | 1/31/2004 | BITRODE VRL HIGH RATE |
| DGT690271 | 3190759 | 1/31/2004 | BITRODE VRL HIGH RATE LOAD |
| DGT600217 | 3190800 | 2/24/2004 | LOAD STATION & MAGAZINE FOR ROBOT LOAD |
| DGT600239 | 3190808 | 2/24/2004 | CONVEYOR FOR DR-3 |
| DGT600223 | 3191600 | 3/30/2004 | #10 DR-3 ENCAPSULATION COLLATION MACHINE |
| DGT600237 | 3191601 | 3/30/2004 | BATTERY CHARGE TABLE #4 |
| DGT600236 | 3191602 | 3/30/2004 | BATTERY CHARGE TABLE #3 |
| DGT600235 | 3191610 | 3/30/2004 | BATTERY CHARGE TABLE #2 |
| DGT600234 | 3191618 | 3/30/2004 | BATTERY CHARGE TABLE #1 |
| DGT690258A | 3192185 | 4/30/2004 | CHARGE TABLE 24 |
| DGT690259A | 3192186 | 4/30/2004 | CHARGE TABLE 25 |
| DGT004779N05 | 3193545 | 1/1/2004 | GENERAL SPENDING FOR MISC. PURCHASES - DESIGN, OUT |
| DGT012175N04 | 3193546 | 6/29/2004 | UPGRADE FIRE LOOP AT PLANT |
| DGT690272 | 3193547 | 1/1/2004 | HEATING SYSTEM FOR PLANT FOR 350000 CFM |
| DGT000254 | 3195184 | 9/16/2004 | RECTIFIER CABINET |
| DGT000255 | 3195185 | 9/16/2004 | RECTIFIER CABINET |
| DGT000256 | 3195186 | 9/16/2004 | RECTIFIER CABINET |
| DGT000257 | 3195187 | 9/16/2004 | RECTIFIER CABINET |
| DGT098361D03 | 3215010 | 11/30/2004 | ADDL CHG(700 T MOLDING MACH) |
| DGT690104A | 3215013 | 11/30/2004 | 007797 - DELPHI CAST-ON-STRAP M |
| DGT690295 | 3215132 | 12/1/2004 | LASER DATE CODE |
| DGT690296 | 3215133 | 12/1/2004 | TOP TERMINAL VISION SYSTEM 66 CELL |
| DGT690288 | 3220272 | 2/17/2005 | 48 HOUR STAND PROCESS LIFT TABLE EQUIPMENT |
| DGT690289 | 3220273 | 2/17/2005 | 48 HOUR STAND PROCESS SPOTFACE MACHINE |
| DGT690290 | 3220274 | 2/17/2005 | 48 HOUR STAND PROCESS TOPTIER MACHINE |
| DGT690297 | 3220275 | 2/17/2005 | AFTERMARKET LINE AHERN-SOPER LABEL ERROR PROOF |
| DGT690298 | 3220276 | 2/17/2005 | MAIN LINE AHERN-SOPER LABEL ERROR PROOF |
| DGT116709 | 3220311 | 1/1/2005 | VRL #2 |
| DGT1116710 | 3220312 | 1/1/2005 | LASER DATE CODE #2 |

| | | | |
|---|---|---|---|
| DGT690096A | 3220661 | 3/14/2005 | UPGRADE DELPHI SINGLE HEAD EF WELDER MACHINE |
| DGT690108A | 3220663 | 3/2/2005 | INTERMEDIATE COVER AIR CHECK MACHINE |
| DGT690121A | 3220664 | 3/2/2005 | LEAN COVER TO CASE HEAT SEAL MACHINE |
| DGT690301 | 3220665 | 3/2/2005 | DR3 PLATE LIFTS |
| DGT690287 | 3220669 | 2/17/2005 | 48 HR STAND PROCESS STORAGE EQUIP |
| DGT690307 | 3222009 | 1/1/2005 | INSTALL DATRONICS INKJET SYSTEM |
| DGT690043A | 3222460 | 5/9/2005 | PLATE STACKER EQUIPMENT UPGRADE |
| DGT690188A | 3222463 | 5/9/2005 | TOP POST ALIGNMENT EQUIPMENT UPGRADE |
| DGT690173A | 3222466 | 5/9/2005 | #1 DR2 ENCAPSULATOR/COALATOR |
| DGT690299 | 3223037 | 6/14/2005 | New Xmet Underground Scrap Conveyor |
| DGT690285 | 3223038 | 6/14/2005 | SODIUM SULFATE DISPENSING SYSTEM EQUIPMENT |
| DGW690314 | 3223256 | 7/19/2005 | MAIN LINE INCLINED CONVEYOR |
| DGT690293 | 3223278 | 7/20/2005 | AUTO INSOLATOR INSERTION MACH - MAIN LINE |
| DGT690294 | 3223279 | 7/20/2005 | AUTO INSULATOR INSERTION MACH-MISC LINE |
| DGT012161N01 | 3223280 | 7/20/2005 | INSTALL BAFFLES IN FORMATION TABLES |
| DGT690310 | 3223281 | 7/20/2005 | WIRE BRUSH STATION-HONDA/TOYOTA LINE |
| DGT690317 | 3223282 | 7/20/2005 | VRL REJECT PRINTER FOR HONDA/TOYOTA LINE |
| DGT690309 | 3223283 | 7/20/2005 | VCI APPLICATOR FOR HONDA/TOYOTA LINE |
| DGT105868D | 3223831 | 1/30/1995 | ICE MAKER |
| DGT690302 | 3223862 | 8/24/2005 | ROBOTIC LOAD EQUIP FOR COS MACHINE |
| DGT690311 | 3223863 | 8/24/2005 | CONTROLS FOR COS - DR3 PROJECT |
| DGT690286 | 3223958 | 8/26/2005 | OXIDE REACTOR #5 |
| DGT690324 | 3223959 | 8/26/2005 | OXIDE REACTOR #6 |
| DGT690292 | 3224765 | 9/29/2005 | 007651 - FORMATION TEMPERATURE MONITORING SYSTEM |
| DGT690305 | 3224771 | 9/29/2005 | ROBOT GUARDING SYSTEM #1 |
| DGT690325 | 3224775 | 9/29/2005 | ROBOT GUARDING SYSTEM #2 |
| DGT690326 | 3224776 | 9/29/2005 | ROBOT GUARDING SYSTEM #3 |
| DGT690327 | 3224777 | 9/29/2005 | ROBOT GUARDING SYSTEM #4 |
| DGT690328 | 3224778 | 9/29/2005 | ROBOT GUARDING SYSTEM#5 |
| DGT690329 | 3224779 | 9/29/2005 | ROBOT GUARDING SYSTEM#6 |
| DGT690318 | 3225240 | 10/17/2005 | PACKOUT LEVELATOR FOR HONDA/TOYOTA LINE |
| DGT690323 | 3225241 | 10/17/2005 | HONDA/TOYOTA FINISHING LINE MATL |
| DGT690303 | 3225242 | 10/17/2005 | INSTALL FINAL COVER PLACER SYSTEM |
| DGT690315 | 3226228 | 11/29/2005 | MISC LINE TUNNEL STRUCTURE |
| DGT690312 | 3226231 | 11/29/2005 | CONTROLS FOR DR3 CONVEYORS |
| DGT690316 | 3226243 | 11/29/2005 | MISC LINE DR3 CONVEYOR |
| DGT690304 | 3226254 | 11/29/2005 | GROUP CONVEYOR SYSTEM DR3'S TO ROBOTS - MAIN LINE |
| DGT690330 | 3226402 | 11/29/2005 | OSHAWA VRL SCRAP SAW |
| DGT690331 | 3226403 | 11/29/2005 | OSHAWA BITRODE UNIT |
| DGT690332 | 3226404 | 11/29/2005 | OSHAWA HONDA BANDER SYSTEM-SURPLUS |
| DGT690308 | 3226436 | 12/19/2005 | DR#3 CAMCO UNIT 1 OF 3 |
| DGT690334 | 3226437 | 12/19/2005 | DR#3 CAMCO UNIT 2 OF 3 |
| DGT690335 | 3226438 | 12/19/2005 | DR#3 CAMCO UNIT 3 OF 3 |
| DGT690333 | 3227473 | 1/1/2006 | OSHAWA INSPECTION VISION SYSTEM |
| DGT690322 | 3227475 | 1/1/2006 | A BRADLEY CONTROLS FOR XMET LINE #4-MTL |
| DGT105866D | 5000713 | 10/1/1994 | GM TKS INFORMATION CENTER |
| DGT105866D01 | 5000714 | 1/1/1995 | TRAILING CHARGES TO TAG #105866D |

See Exhibit 1.21 for Real Property address

**EXHIBIT 1.1(vi)**
**EXCLUDED RAW MATERIALS**

Excluded raw materials Inventory includes the following parts numbers:

| Raw Materials | Part Number |
|---|---|
| PURE LEAD (red +) | 9599001 |
| ALUMINUM (white +) | 9692001 |
| CALCIUM | 9680001 |
| 3% ANT LEAD | 9595001 |
| 100 % TIN | 9681001 |
| Polypropylene | 9528001 |
| HOT MELT-1213 | 9521001 |
| DR4 EXPANDER | 9672025 |
| DR25 EXPANDER | 19060890 |
| POS GMX T/T BUSHING | 19062042 |
| NEG GMX T/T BUSHING | 19062043 |
| POS T/T BUSHING | 10457694 |
| NEG T/T BUSHING | 10457695 |
| HI-TEMP SIDE TERM | 19057272 |
| LEAD RING | 19057273 |
| CHROMA COLOR | 9515001 |
| RUBBER O-RING SEAL | 19057274 |
| 4.6 CRYSTEX PAPER | 9661046 |
| 3.5 CRYSTEX PAPER | 9661035 |
| 4.1 CRYSTEX PAPER | 9661041 |
| 3.75 CRYSTEX PAPER | 19060891 |
| LEXAN STRIP | 9574002 |
| 660 SEPARATOR | 10457660 |
| 658 SEPARATOR | 10457658 |
| 196 SEPARATOR | 19065196 |
| 889 SEPARATOR | 19060889 |
| DYNEL FIBER | 9502001 |
| SODIUM | 9448001 |
| TERMINAL SHEILDS | 10496263 |
| WAFER INSULATOR | 10454924 |
| INSULATOR ROLL | 19065509 |
| FLAME ARRESTORS | 1892323 |
| 10" Interm Cover - | 10472239 |
| 9" Interm Cvr | 10472230 |
| 9" Interm Cvr | 10472231 |
| 9" Interm Cvr | 10472233 |
| 9" Interm Cvr | 10472235 |

| | |
|---|---|
| 9" Interm Cvr | 10472236 |
| 9" Interm Cvr | 10472229 |
| 10" Interm Cover - | 10472241 |
| 10" Interm Cover - | 10472240 |
| 10" Interm Cover - | 10472243 |
| 10" Interm Cover - | 10472245 |
| 10" Interm Cover - | 10472238 |

## **EXHIBIT 1.11**

Raw Materials (direct materials) included in the Acquired Assets

| Raw Materials | Part Number | STP Qty | UM | Unit | Minimum Inventory |
|---|---|---|---|---|---|
| ACID | 9402001 | 45,000 | LB | 1 Tank | 860,000 |
| HYDROMETERS 1124 | 10491124 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 5478 | 10495478 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 2595 | 10492595 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 8954 | 10498954 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 8957 | 10498957 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 7495 | 19057495 | 1,400 | Pcs | Box | 5 |
| SLIPSHEETS- | 39"X45" | 300 | Pcs | 1 Pallet | 8 |
| SLIPSHEETS- | 42"X48" | 300 | Pcs | 1 Pallet | 5 |
| HONEYCOMB- | 37"x44"x1.5 | 29 | Pcs | 1 Pallet | 16 |
| HONEYCOMB- | 42"x44"x1 | 45 | Pcs | 1 Pallet | 6 |
| 13" SHRINKWRAP | 10457753 | 1,368 | LB | 1 Pallet | 3 |
| 12" SHRINKWRAP | 10453144 | 1,404 | LB | 1 Pallet | 3 |
| 11" SHRINKWRAP | 10457752 | 1,053 | LB | 1 Pallet | 1 |
| 10" HANDLE | 10457298 | 5,640 | Pcs | 1 Pallet | 3 |
| 9" HANDLE | 10457299 | 5,640 | Pcs | 1 Pallet | 3 |
| 8" HANDLE | 10457297 | 5,640 | Pcs | 1 Pallet | 1 |
| NEG SIDE TERMINAL CAP | 10467094 | 4,280 | Pcs | Crate | 10 |
| POS SIDE TERMINAL CAP | 10489952 | 4,280 | Pcs | Crate | 10 |
| TOP TERMINAL CAP | 10471203 | 2,000 | Pcs | Crate | 12 |
| TOP TERMINAL CAP | 10471204 | 2,000 | Pcs | Crate | 12 |
| TERMINAL ADAPTORS | 10469296 | 1,080 | Pcs | Box | 3 |
| HOT MELT-1246 | 9462001 | 31 | LB | Box | 2 |
| 083 FOAM BLOCK | 275083 | 2,310 | Pcs | 1 Pallet | 2 |
| 313 CARTON | 10468313 | 1,000 | Pcs | 1 Pallet | 1 |
| 325 CARTON | 10468325 | 1,200 | Pcs | 1 Pallet | 1 |
| 327 CARTON | 10468327 | 1,000 | Pcs | 1 Pallet | 1 |
| 073 CARTON | 10474073 | 1,000 | Pcs | 1 Pallet | 1 |
| 072 CARTON | 10474072 | 1,000 | Pcs | 1 Pallet | 1 |
| 561 CARTON | 10489561 | 1,000 | Pcs | 1 Pallet | 1 |
| AC DELCO PLACARD | 10457751 | 4,000 | Pcs | Box | 8 |
| BU DELPHI PLACARD | 10450883 | 4,000 | Pcs | Box | 2 |
| GMX Interm Cvr | 19063666 | 1320 | Pcs | Pallet | 6 |
| GMX Final Cvr | 19063668 | 4224 | Pcs | Pallet | 2 |

**EXHIBIT 1.13**

**IUE CONSENT**

**IUE-CWA - DELPHI**
**MEMORANDUM OF AGREEMENT**
**REGARDING THE SALE OF**
**DELPHI NEW BRUNSWICK OPERATIONS AND**
**SPECIAL ATTRITION PROGRAM**

**MEMORANDUM OF AGREEMENT** entered into this **25th day of May, 2006** between **Delphi Corporation ("Delphi")** and the **International Union, IUE-CWA** and **IUE-CWA Local 416** (collectively the **"IUE-CWA"** or the **"Union"**).

**WHEREAS,** effective August 1, 2006, Delphi seeks to sell its New Brunswick, New Jersey Operations to **Johnson Controls, Inc. ("JCI")** as an ongoing business consistent with the terms of this Memorandum of Agreement; and

**WHEREAS,** pursuant to the "Sale of Business" letter attached to the 2003 IUE-CWA-Delphi National Agreement as Document 7, JCI is required to assume the applicable terms of the 2003 IUE-CWA-Delphi National Agreement and to otherwise assume the Local Agreements with respect to New Brunswick; and

**WHEREAS,** it is the intent of the parties and the purpose of this Memorandum to establish a Special Attrition Program for all but 100 employees of the New Brunswick bargaining unit identified in accordance with seniority and plant staffing requirements and to transfer to JCI approximately 100 of the current Delphi bargaining unit members at the established New Brunswick Tier III rate and JCI benefit level.    Therefore, the parties agree as follows:

      1.    The IUE-CWA agrees that:

          A.    Document 63 of the 2003 IUE-CWA-Delphi National Agreement is waived as to the sale of the New Brunswick Operations to JCI pursuant to the "New Brunswick Put and Call Agreement" between Delphi and JCI dated June 30, 2005;

          B.    JCI is not required to assume any contractual neutrality obligations collectively bargained by Delphi and the IUE-CWA; and

          C.    The International Union, IUE-CWA and Local 416 will continue to discuss Local Agreement modifications aimed at obtaining agreement on wage, benefits and work practices comparable to JCI's existing IUE-CWA bargaining agreements at JCI's St. Joseph, Missouri and Geneva, Illinois sites.

      2.    Delphi and the IUE-CWA agree on the following Special Attrition Program for all New Brunswick employees on active or on leave status with more than one year of seniority as of 8/1/06 and those employees in protected status assigned to the New Brunswick Operations who, except as to option 2.E. below, are participants in the Delphi Hourly-Rate Employees Pension Plan (**"Delphi HRP"**). Such employee may select one of the options set forth in clauses A through E below, as applicable to such employee:

          A.    If eligible to retire as of 8/1/06, retire as follows:

             (i)    $35,000, less applicable withholdings, for normal or early voluntary retirement (85 points 30 and out, 60 years old with 10 years or more years of credited service) retroactive to October 1, 2005; or

             (ii)    50 & 10 Mutually Satisfactory Retirement (MSR).

B.    Any employee with at least 27 and less than 30 years of credited service regardless of age will be eligible for special voluntary placement in a pre-retirement program under the following terms:

(i)    Employees electing this pre-retirement program must be eligible no later than August 1, 2006.

(ii)    Employees will retire without additional incentives when they first accrue 30 years of credited service under the provisions of the Delphi HRP.

(iii)    The gross monthly wages while in the program will be:

(a)    29 years credited service    $2,900

(b)    28 years credited service    $2,850

(c)    27 years credited service    $2,800

Wages, without COLA and vacation entitlement, will be paid weekly on an hourly basis (2,080 hours per year) and will remain at that rate until 30 years of credited service is accrued.

(iv)    Within ten (10) business days after the first date on which any employees are eligible to receive wage payments in accordance with Paragraph 2.B(iii) above, Delphi will establish a segregated payment account (the "Account") in an amount sufficient to fund the wage payments (the "Ceiling Amount"). The funds in the Account will be available to reimburse Delphi for the payment of weekly wage payments (which will be paid through Delphi's normal payroll process) under Paragraph 2.B(iii) above or for direct wage payments to employees entitled to receive such payments, as described in this Paragraph.

(a)    Delphi shall not draw funds from the Account for purposes of this Paragraph until a date (the "Permitted Draw Down Date"), which shall be the later of the Final Election Date or the Adequate Funding Date (see definitions below). Prior to the Permitted Draw Down Date, payments to satisfy the obligations to employee participants pursuant to this Paragraph will be drawn from Delphi's available cash.

(b)    If, on the Permitted Draw Down Date, the Anticipated Liability is less than the Ceiling Amount, Delphi shall be permitted to draw such funds out of the Account so that the balance remaining in the Account is equal to the Anticipated Liability.

The Final Election Date shall be the first of the month following the last day on which employees at New Brunswick can make an election to participate in the pre-retirement program described in Paragraph 2.B., or sooner if determined by the IUE-CWA-Delphi National Parties.

2

The Adequate Funding Date shall be the date on which the Ceiling Amount is greater than or equal to the Anticipated Liability.

The Anticipated Liability shall be an amount, calculated after the Final Election Date, sufficient to pay all of the remaining liabilities under Paragraph 2.B(iii) for all employees who have elected to participate in such program for the full remaining duration of such program. The Anticipated Liability shall be calculated based on the number of eligible employees, the remaining duration of the wage payments, and the applicable pay rates.

(c)    The funds in the Account shall be available to satisfy the obligations of this Paragraph and for no other purpose. The Bankruptcy Court order approving this Agreement shall specifically provide that under no circumstances (including but not limited to conversion of Delphi's Chapter 11 cases to Chapter 7 proceedings) shall the assets in the Account be available to satisfy the claims of any party other than the employees. This Agreement is, in its entirety, contingent on entry of an order, which, to the satisfaction of the IUE-CWA and Delphi National Parties provides the protections described in this Paragraph.

C.    For current employees who are participants in the Delphi HRP, a buyout of $140,000 (with ten or more years of seniority) or a buy out of $70,000 (with less than ten years of seniority), less applicable withholdings, to sever all ties with Delphi, except vested pension benefits. Also, the employees electing this option are eligible for up to $2,100 per year pursuant to the terms of the Individual Upward Educational Plan for an additional two years beginning 8/1/06 and ending 7/31/08.

D.    For current employees who are participants in the Delphi HRP, elect to remain on the active roll for one year and receive one year of health care (at a total cost to Delphi of up to $15,000 depending on type of enrollee contract), and a weekly payment of $2,403.84 (assuming $15,000 enrollee contract), less withholdings, for one year (with ten or more years of seniority) or a weekly payment of $1,057.69, less withholdings, for one year (with less than ten years of seniority) and sever all ties with Delphi, except vested pension benefits, if any, at the conclusion of the year. Also, the employees electing this option are eligible for up to $2,100 per year pursuant to the terms of the Individual Upward Educational Plan for an additional two years beginning 8/1/06 and ending 7/31/08.

E.    For competitive rate employees, who are not participants in the Delphi HRP, percentage buyout prorated against $140,000 (with ten or more years of seniority), or against $70,000 (with less than ten years of seniority but more than one year of seniority) less applicable withholdings, to sever all ties with Delphi. In each case, the buyout is calculated based upon the participant's competitive wage rate as a percentage of the maximum traditional wage rate for the participant's classification.

F.    All participants in options A through F will be required to sign a release of all claims, except Workers Compensation claims.

3.    New Brunswick employees, except those on a leave of absence, who have not selected, or who are not eligible to participate in one of the options identified above, are eligible for transfer, with seniority, to JCI effective 8/1/2006, at the

3

established New Brunswick Tier III rate and with JCI Benefit Plans coverages. The offer of employment with JCI will sever all ties to Delphi, except for current vested benefits, if any. Traditional wage rate employees accepting such transfer will receive a $50,000 buy down (intended to represent an offset to a timed wage and benefit reduction) to the Tier III wage and the existing JCI benefit levels. Such employees transferred to JCI will be required to sign a release of all claims, except Workers Compensation, as a condition for receiving the $50,000 buy down amount. Employees on a leave of absence, who do not participate in the Special Attrition Program, will be eligible for transfer to JCI upon the conclusion of their leave.

4.      It is understood by all parties that JCI will employ approximately one hundred employees at the Tier III wage and JCI benefit levels. In the instance of excess employee participation in the Special Attrition Program, the lowest seniority employees will be retained for transfer to JCI and will not be permitted to participate in this Special Attrition Program, even if previously eligible, thereby providing JCI with a workforce of 100 employees. In the instance of insufficient participation in the Special Attrition Program, the 100 highest remaining seniority employees will transfer to JCI with eligibility for the $50,000 buy down, if applicable, with the remaining lower seniority employees being separated from Delphi, thereby providing JCI with a workforce of 100 employees. The terms of the Delphi-IUE-CWA Agreements and the ESCOP 2000 Agreement in effect at the time of this Memorandum will apply to all such Tier III employees, unless specifically modified by this Memorandum, and until an Agreement is reached between the IUE -CWA and JCI. JCI is not assuming Delphi's benefit plans and will provide its own retirement benefits to employees who accept employment at New Brunswick, in accordance with the terms of the ESCOP 2000 Agreement.

5.      Delphi and the IUE-CWA agree to the following:

A.      Delphi will use temporary employees as needed to bridge any difficulties arising from the implementation of the Special Attrition Program;

B.      Delphi and the IUE-CWA may agree to use separated employees as contract personnel on a case by case basis as needed to bridge any difficulties arising from the implementation of the Special Attrition Program; and

C.      If during the remaining course of Delphi's bankruptcy, materially different Special Attrition Program financial incentives are negotiated between Delphi and the IUE -CWA for the option selected by the employee, it is understood that the employee will not be advantaged or disadvantaged.

6.      The parties acknowledge that Delphi's participation in this Agreement is subject to (i) the approval of the U.S. Bankruptcy Court, which approval Delphi will seek at the next scheduled omnibus hearing; and (ii) the Closing of the sale of the New Brunswick Operations to JCI. In the event the Bankruptcy Court does not allow such participation, or the Closing does not occur, Delphi and the IUE-CWA will have no obligations hereunder.

7.      A.      The parties further agree that this Agreement is without prejudice to any party-in-interest in all other aspects of Delphi's Chapter 11 cases, including by illustration, all collective bargaining matters involving the parties, in any proceedings under Sections 1113 and/or 1114 of the Bankruptcy Code with respect to the IUE-CWA, in any pension termination proceeding under ERISA and/or the Bankruptcy Code, and all claims administration and allowance matters.

4

B.       Nothing in this Agreement, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder  shall limit or otherwise modify: (i) Delphi's rights under Section 4041 of ERISA; or (ii) Delphi's rights under Section 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed this Agreement (including pre-existing obligations referenced within this Agreement), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in this Agreement) with levels of healthcare or other benefits as specified in pre-existing labor agreements.

C.       Nothing contained herein, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder shall constitute an assumption of any agreement described herein, including, without limitation any collective bargaining agreement between the IUE-CWA and Delphi, nor shall anything herein, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder, be deemed to create or give rise to an administrative or priority claim or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.


_____
Delphi Corporation

_____
Delphi Corporation

Date: _5/26/06_____


_____
International Union, IUE-CWA

_____
International Union, IUE-CWA

Date: _5-26-06_____

5

**EXHIBIT 1.21**

**REAL PROPERTY**

**U.S:**          760 Jersey Avenue
                New Brunswick, New Jersey  08903
                          United States

**EXHIBIT 1.22**

**SALE APPROVAL ORDER**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
　　　In re                          :        Chapter 11
                                    :
DELPHI CORPORATION, et al.,          :        Case No. 05-44481 (RDD)
                                    :
                       Debtors.      :        (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 2002 AND 6004 AUTHORIZING AND
APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH JOHNSON CONTROLS,
INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES (B) CONTINUATION AND TRANSITION OF SUPPLY TO
JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD FACILITY AND
(C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW BRUNSWICK
FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM

("NEW BRUNSWICK TRANSFER ORDER")

　　　　　　Upon the motion, dated May 26, 2006 (the "Motion"), of Delphi Corporation and

certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned

cases (collectively, the "Debtors"), for an order (the "Order") pursuant to 11 U.S.C. § 363(b) and

Fed. R. Bankr. P. 2002 and 6004 authorizing and approving the Debtors' entry into the Transfer

Agreement dated May 26, 2006 by and between Delphi Automotive Systems LLC, a Debtor in

these cases, and Johnson Controls, Inc. ("JCI"), a copy of which is attached hereto as Exhibit 1

(together, with the exhibits and schedules attached thereto, the "Transfer Agreement"), providing

for (a) sale of certain assets (the "Acquired Assets") of the Debtors' battery manufacturing

facility in New Brunswick, New Jersey (the "New Brunswick Facility") free and clear of liens,

claims, and encumbrances (the "Sale"), (b) the continuation and transition of supply to JCI of

battery products out of the Debtors' manufacturing facility in Fitzgerald, Georgia (the "Fitzgerald

Facility"), and (c) implementation of an attrition plan with respect to the New Brunswick facility;

and upon the record of the hearing held on the Motion; and this Court having determined that the

relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors,

and other parties in interest; and it appearing that proper and adequate notice of the Motion has

been given and that no other or further notice is necessary; and after due deliberation thereon;

and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[1]

      A.      The court has jurisdiction over the Motion and the transactions

contemplated by the Transfer Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

      B.      The statutory predicates for the relief sought in the Motion are sections

363 of 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and Fed. R. Bankr. P. 2002

and 6004.

      C.      As evidenced by the affidavits of service previously filed with the Court,

and based on the representations of counsel at the hearing on the Motion (the "Hearing"), (i)

proper, timely, adequate and sufficient notice of the Motion, the Hearing and the sale of the

Acquired Assets (as defined in the Transfer Agreement) has been provided in accordance with 11

U.S.C. §§ 102(l) and 363 and Fed. R. Bankr. P. 2002 and 6004, (ii) such notice was good and

sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice

of the Motion, the Hearing, or the Sale is or shall be required.

---

[1]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

D.      Each applicable Debtor (i) has full corporate power and authority to execute the Transfer Agreement and all other documents contemplated thereby, and the transfer and conveyance of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Transfer Agreement, and (iii) has taken all corporate action necessary to authorize and approve the Transfer Agreement and the consummation by such Debtor of the transactions contemplated thereby, and no consents or approvals, other than those expressly provided for in the Transfer Agreement, are required for each applicable Debtor to consummate such transactions.

E.      Approval of the Transfer Agreement and consummation of the Sale at this time are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

F.      The Debtors have demonstrated good, sufficient, and sound business purpose and justification in that, among other things, the Debtors and their advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Acquired Assets and determined that the terms and conditions set forth in the Transfer Agreement, and the transfer to JCI of the Acquired Assets pursuant thereto, represent a fair and reasonable purchase price and constitute the highest and best value obtainable for the Acquired Assets.  A sale of the Acquired Assets at this time to JCI pursuant to 11 U.S.C. § 363(b) is the most favorable alternative to minimize the Debtors' losses attributable to the Acquired Assets, and maximizes the Debtors' estates for the benefits of all constituencies.  Delaying approval of the Sale might result in JCI's termination of the Transfer Agreement and may result in an

3

alternative outcome that will achieve less value and cause greater losses for the Debtors, their

estates, and their creditors.

G.     The Debtors have demonstrated good, sufficient, and sound business

purpose and justification regarding the continuation and ultimate transition to JCI of the supply

of battery products out of the Fitzgerald Facility pursuant to the Transfer Agreement.

H.     The Debtors have demonstrated good, sufficient, and sound business

purpose and justification in that, among other things, the Debtors and their advisors diligently

and in good faith analyzed the terms and conditions of the IUE-CWA Memorandum (as defined

below) and determined that the terms and conditions thereof and in particular the terms and

conditions of the IUE-CWA New Brunswick Attrition Plan (as defined below) set forth in the

IUE-CWA Memorandum is an appropriate plan under the circumstances and is in the best

interests of the Debtors, their estates, and their creditors.

I.     A reasonable opportunity to object or be heard with respect to the Motion

and the relief requested therein has been afforded to all interested persons and entities, including:

(i) the Office of the United States Trustee for the Southern District of New York, (ii) all entities

known to have asserted any lien, claim, interest, or encumbrance in or upon the Acquired Assets,

including but not limited to environmental, employee, and product liability claims, (iii) all

federal, state, and local regulatory or taxing authorities or recording offices, including but not

limited environmental regulatory authorities, which have a reasonably known interest in the

relief requested by the Motion, (iv) all entities known to have an interest in a transaction with

respect to the Acquired Assets during the past six months, (v) the United States Attorney's office,

(vi) the United States Department of Justice, (vii) the Securities and Exchange Commission, (viii)

the Internal Revenue Service, (ix) all entities on the Master Service List (as defined by the

4

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management

Order")) and such other entities that are required to be served with notices under the

Supplemental Case Management Order, (x) counsel for JCI, (xi) counsel for the Official

Committee of Unsecured Creditors appointed in these chapter 11 cases, and (xii) counsel for the

Official Committee of Equity Security Holders appointed in these chapter 11 cases.

J.    JCI is not an "insider" of any of the Debtors, as that term is defined in 11

U.S.C. § 101(31).

K.    The Transfer Agreement was negotiated, proposed, and entered into by the

Debtors and JCI without collusion, in good faith, and from arm's-length bargaining positions.

Neither the Debtors nor JCI have engaged in any conduct that would cause or permit the Transfer

Agreement to be avoided under 11 U.S.C. § 363(n).

L.    JCI is a good faith purchaser under 11 U.S.C. § 363(m) and, as such, is

entitled to all of the protections afforded thereby.

M.    The consideration provided by JCI for the Acquired Assets pursuant to the

Transfer Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired

Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by

any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair

consideration under the Bankruptcy Code and under the laws of the United States, any state,

territory, possession, or the District of Columbia.

N.        The transfer of the Acquired Assets to JCI will be a legal, valid, and effective transfer of the Acquired Assets, and, except as expressly permitted or otherwise specifically provided for in the Transfer Agreement or this Order, will vest JCI with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all liens, claims, and encumbrances, including, but not limited to those (A) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors' or JCI's interest in the Acquired Assets, or any similar rights, (B) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' battery business prior to the transfer of the Acquired Assets to JCI, and (C) mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens', and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any Court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, transfer, receipt of income, or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, claims (as that term is defined in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or

unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated,

matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to

or subsequent to the commencement of these bankruptcy cases, and whether imposed by

agreement, understanding, law, equity or otherwise, including claims otherwise arising under

doctrines of successor liability (the items and concepts listed in (A), (B), and (C) above,

collectively, the "Interests or Claims").

        O.      If the Sale of the Acquired Assets were not free and clear of all Interests or

Claims as set forth in the Transfer Agreement and this Order, or if JCI would, or in the future

could, be liable for any of the Interests or Claims as set forth in the Transfer Agreement and this

Order, JCI would not have entered into the Transfer Agreement and would not consummate the

Sale or the transactions contemplated by the Transfer Agreement, thus adversely affecting the

Debtors, their estates, and their creditors.

        P.      The Debtors may sell their interests in the Acquired Assets free and clear

of all Interests or Claims because, in each case, one or more of the standards set forth in 11

U.S.C. § 363(f)(1)-(5) has been satisfied.  All holders of Interests or Claims who did not object,

or withdrew their objections to the Sale, are deemed to have consented to the Sale, pursuant to 11

U.S.C. § 363(f)(2).  Those holders of Interests or Claims who did object fall within one or more

of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their

Interests or Claims, if any, attach to the cash proceeds of the Sale ultimately attributable to the

property against or in which they claim an Interest or Claim.

        Q.      The Debtors are authorized to sell, transfer, convey or assign to JCI, all of

the Debtors' right, title, and interest (including common law rights) to all of their intangible

property included in the Acquired Assets to the broadest extent permitted by law and the terms of
the Transfer Agreement.

R.    Approval of the Transfer Agreement and consummation of the Sale of the
Acquired Assets at this time are in the best interests of the Debtors, their creditors, their estates
and other parties in interest.

S.    The liabilities being assumed by JCI under the Transfer Agreement,
including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters)
and Exhibit 4.1 (Employee Matters) to the Transfer Agreement, are an integral part of the
Acquired Assets being purchased by JCI and, accordingly, such assumption is reasonable,
enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND
DECREED THAT:

General Provisions

1.    The Motion is GRANTED.

Approval Of The Transfer Agreement

2.    Pursuant to 11 U.S.C. § 363(b), the Transfer Agreement, and all of the
terms and conditions thereof, are hereby approved.

3.    Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized to perform
their obligations under the Transfer Agreement and comply with the terms thereof and
consummate the Sale in accordance with and subject to the terms and conditions of the Transfer
Agreement.

8

4.      Each of the signatories to the Transfer Agreement is directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the Sale.

5.      The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the Transfer Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Transfer Agreement, and to take all further actions as may be requested by JCI for the purpose of assigning, transferring, granting, conveying, and conferring to JCI or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Transfer Agreement.

6.      This Order and the Transfer Agreement shall be binding in all respects upon all creditors (whether known or unknown) of any Debtor, JCI, all successors and assigns of JCI, the Debtors and their affiliates and subsidiaries, and any subsequent trustees appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection.  To the extent any provision of this Order is inconsistent with the terms of the Transfer Agreement, this Order shall govern.

7.      The Transfer Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; <u>provided</u> that any such modification, amendment, or supplement is not material.

<u>Sale And Transfer Of The Acquired Assets</u>

8.      Except as expressly permitted or otherwise specifically provided for in the Transfer Agreement or this Order, pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the

consummation of the Transfer Agreement, the Acquired Assets shall be transferred to JCI free

and clear of all Interests or Claims, with all such Interests or Claims to attach to the cash

proceeds of the Sale in the order of their priority, with the same validity, force and effect which

they now have as against the Acquired Assets, subject to any claims and defenses the Debtors

may possess with respect thereto.  Following the date of the completion of the transfer of the

New Brunswick Facility to JCI under the Transfer Agreement (the "Completion Date"), no

holder of any Interests or Claims in the Acquired Assets shall interfere with JCI's use and

enjoyment of the Acquired Assets based on or related to such Interests or Claims, or any actions

that the Debtors may take in their chapter 11 cases and no person shall take any action to prevent,

interfere with or otherwise enjoin consummation of the transactions contemplated in or by the

Transfer Agreement or this Order.

       9.     Except as expressly provided in the Transfer Agreement or this Order,

other than the liabilities assumed under the Transfer Agreement, including but not limited to

those liabilities set forth on Exhibit 3.6H (Environmental Matters) and Exhibit 4.1 (Employee

Matters) to the Transfer Agreement, the sale, transfer, assignment, and delivery of the Acquired

Assets pursuant to the Transfer Agreement shall not be subject to any Interests or Claims, and

Interests or Claims of any kind or nature whatsoever shall attach only to the net proceeds of the

Sale in their order of priority.  All persons and entities, including, but not limited to, all debt

security holders, equity security holders, governmental, tax, and regulatory authorities, lenders,

trade and other creditors, holding Interests or Claims arising in any way in connection with any

acts, or failure to act, of the Debtors or the Debtors' predecessors or affiliates, claims (as that

term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, or guaranties of

any kind and nature against or in the Debtors or the Acquired Assets (whether legal or equitable,

secured or unsecured, matured or unmatured, contingent or noncontingent, senior or

subordinated), arising under or out of, in connection with, or in any way relating to the Debtors,

the Acquired Assets, the operation of the Debtors' battery business prior to the Completion Date,

or the transfer of the Acquired Assets to JCI, hereby are, and will be, forever barred, estopped,

and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests or

Claims of any kind or nature whatsoever against JCI, its successors or assigns, their property, or

any designee, such persons' or entities' Interests or Claims.  Following the Completion Date, no

holder of an Interest or Claim (other than holders of liabilities assumed under the Transfer

Agreement, including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental

Matters) and Exhibit 4.1 (Employee Matters) to the Transfer Agreement, on account of such

liabilities only) against the Debtors shall interfere with JCI's title to or use and enjoyment of the

Acquired Assets based on or related to such Interests or Claims and all such Interests or Claims,

if any, shall be and hereby are channeled, transferred and attached solely and exclusively to the

proceeds of the Sale in their order of priority.

          10.     Except as expressly provided in the Transfer Agreement or this Order, the

transfer of the Acquired Assets to JCI pursuant to the Transfer Agreement does not require any

consents other than as specifically provided for in the Transfer Agreement and constitutes a legal,

valid, and effective transfer of the Acquired Assets, and shall vest JCI with all right, title, and

interest of the Debtors in and to the Acquired Assets free and clear of all Interests or Claims of

any kind or nature whatsoever (except for the liabilities assumed under the Transfer Agreement,

including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters)

and Exhibit 4.1 (Employee Matters) to the Transfer Agreement).

11

11.     If any person or entity that has filed financing statements, mortgages,

mechanic's liens, <u>lis pendens</u>, or other documents or agreements evidencing Interests or Claims

against or in the Acquired Assets shall not have delivered the foregoing to the Debtors prior to

the Completion Date, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfactions, releases of all Interests or Claims that the

person or entity has with respect to the Acquired Assets, or otherwise, then (a) the Debtors are

hereby authorized to execute and file such statements, instruments, releases and other documents

on behalf of the person or entity with respect to the Acquired Assets and (b) JCI is hereby

authorized to file, register or otherwise record a certified copy of this Order, which, once filed,

registered or otherwise recorded, shall constitute conclusive evidence of the release of all

Interests or Claims in the Acquired Assets of any kind or nature whatsoever.

12.     This Order (a) shall be effective as a determination that, on the

Completion Date, all Interests or Claims of any kind or nature whatsoever existing as to the

Debtors or the Acquired Assets prior to the Completion Date have been unconditionally released,

discharged, and terminated (other than any surviving obligations), and that the conveyances

described herein have been effected and (b) shall be binding upon and shall govern the acts of all

entities including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, state, and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Acquired

Assets.

12

13.     Except as otherwise expressly provided in the Transfer Agreement, no person or entity, including, without limitation, any federal, state or local governmental agency, department or instrumentality, shall assert by suit or otherwise against JCI or its successors in interest any claim that they had, have or may have against the Debtors, or any liability, debt, or obligation relating to or arising from the Acquired Assets, or the Debtors' operation of the Business or use of the Acquired Assets, including, without limitation, any liabilities calculable by reference to the Debtors or their assets or operations, and all persons and entities are hereby enjoined from asserting against JCI in any way any such claims, liabilities, debts or obligations.

14.     Except as expressly provided in the Transfer Agreement or this Order, JCI is not assuming nor shall it in any way whatsoever be liable or responsible, as a successor or otherwise, for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) of the Debtors or any liabilities, debts, commitments, or obligations in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operation of their business or use of the Acquired Assets on or prior to the Completion Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Completion Date or are to be observed, paid, discharged, or performed on or prior to the Completion Date (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims), or any liabilities calculable by reference to the Debtor or their assets or operations, or relating to continuing conditions existing on or prior to the Completion Date, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to JCI a release thereof. Without

13

limiting the generality of the foregoing, except as expressly provided in the Transfer Agreement

or this Order, JCI shall not be liable or responsible, as a successor or otherwise, for the Debtors'

liabilities, debts, commitments, or obligations, whether calculable by reference to the Debtors,

arising on or prior to the Completion Date and under or in connection with (i) any employment

or labor agreements (including, without limitation, the payment of wages, bonuses, severance

pay, benefits (including, without limitation, contributions or payments on account of any under-

funding with respect to any and all pension plans) or any other payment to employees of Debtors

while such individuals were employed by the Debtors), consulting agreements, severance

arrangements, change-in-control agreements, or other similar agreement to which any Debtor is a

party, (ii) any pension, welfare, compensation, or other employee benefit plans, agreements,

practices, and programs, including, without limitation, any pension plan of the Debtors

(including, without limitation, retention, benefit and/or incentive plan to which any Debtors are a

party and relating to the battery business (including, without limitation, arising from or related to

the rejection or other termination of any such agreement)), (iii) the cessation of the Debtors'

operations, dismissal of employees, or termination of employment or labor agreements or

pension, welfare, compensation, or other employee benefit plans, agreements, practices, and

programs, obligations that might otherwise arise from or pursuant to the Employee Retirement

Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil

Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal

Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget

Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act,

(iv) workers' compensation, occupational disease, or unemployment or temporary disability

insurance claims, (v) environmental liabilities, debts, claims, or obligations arising from

14

conditions first existing on or prior to Completion Date (including, without limitation, the

presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be

asserted on any basis, including, without limitation, under the Comprehensive Environmental

Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vi) any bulk sales or

similar law, (vii) any liabilities, debts, commitments, or obligations of, or required to be paid by,

the Debtors for any Taxes of any kind for any period, (viii) any liabilities, debts, commitments,

or obligations for any Taxes relating to the business of the Debtors or the Acquired Assets for or

applicable to the period prior to the Completion Date, (ix) any litigation relating to the Acquired

Assets for or applicable to the period prior to the Completion Date, and (x) any products liability

or similar claims, whether pursuant to any state or any federal laws or otherwise, relating to the

Acquired Assets for or applicable to the period prior to the Completion Date.  JCI shall in no

way be deemed a party to or assignee of any such agreement set forth in (i), (ii), and (iii) above,

and no employee of JCI shall be deemed in any way covered by or a party to any such agreement,

and all parties to any such agreement are hereby enjoined from asserting against JCI any and all

claims arising from or relating to such agreement.  Any and all notices, if any, required to be

given to the Debtors' employees pursuant to the Workers Adjustment and Retraining Notification

Act, or any similar federal or state law, shall be the sole responsibility and obligation of the

Debtors and JCI shall have no responsibility or liability therefore.

    15.  Upon the completion of the transactions contemplated by the Transfer

Agreement, JCI shall not be deemed to (i) be the successor of the Debtors, (ii) have, de facto, or

otherwise, merged with or into the Debtors, (iii) be a mere continuation or substantial

continuation of the Debtors or the enterprise(s) of the Debtors, or (iv) be liable for any acts or

omissions of the Debtors in the conduct of the Debtors' business.

Continuation And Transition Of Supply Out Of Fitzgerald

16.     The Debtors are hereby authorized to (a) continue manufacturing and supplying JCI with battery products manufactured at the Fitzgerald Facility in accordance with JCI's diminishing supply requirements and (b) to transition production of battery products manufactured at the Fitzgerald Facility to other JCI facilities.

17.     The Debtors and JCI are each directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the supply and transition of battery products from the Fitzgerald Facility.

IUE-CWA Consent And IUE-CWA New Brunswick Attrition Plan

18.     The Debtors are hereby authorized to enter into the agreement by and among Delphi Corporation, the International Union, IUE-CWA and IUE-CWA Local 416 (collectively the "IUE-CWA") attached to the Transfer Agreement as Exhibit 1.13 thereto (the "IUE-CWA Memorandum") and to implement the terms of such IUE-CWA Memorandum, including without limitation (i) that certain attrition plan between Delphi and the IUE-CWA (the "IUE-CWA New Brunswick Attrition Plan") with respect to the New Brunswick Facility and (ii) that certain consent to the waiver of that certain no-sale clause and neutrality obligations (the "IUE-CWA Consent").

19.     Each of the signatories to the IUE-CWA Memorandum is directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan and the terms of the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan, including, without limitation, any

16

and all actions necessary or appropriate to its implementation of and performance under the IUE-

CWA Consent and the IUE-CWA New Brunswick Attrition Plan.

<u>Additional Provisions</u>

20.    The consideration provided by JCI for the Acquired Assets under the

Transfer Agreement is hereby deemed to constitute reasonably equivalent value and fair

consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform

Fraudulent Transfer Act, and under the laws of the United States, and any state, territory,

possession, or the District of Columbia.

21.    On the Completion Date, this Order shall be construed and shall constitute

for any and all purposes a full and complete general assignment, conveyance, and transfer of all

of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired

Assets to JCI on pursuant to the terms of the Transfer Agreement.

22.    Except as otherwise provided in the Transfer Agreement, on the

Completion Date, each of the Debtors' creditors is authorized and directed to execute such

documents and take all other actions as may be necessary to release their respective Interests or

Claims against the Acquired Assets, if any, as may have been recorded or may otherwise exist.

23.    Each and every federal, state, and governmental agency or department,

and any other person or entity, is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the

Transfer Agreement.

24.    All entities who are currently, or as of the Completion Date may be, in

possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

the Transfer Agreement are hereby directed to surrender possession of the Acquired Assets to

JCI on the Completion Date.

25.    The transactions contemplated by the Transfer Agreement are undertaken

by JCI in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and

accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the sale of the Acquired Assets shall not affect the validity of the Sale to JCI, unless

such authorization is duly stayed pending such appeal.  JCI is a purchaser in good faith of the

Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the

Bankruptcy Code.

26.    The consideration paid by JCI in the Sale for the Acquired Assets under

the Transfer Agreement is fair and reasonable, and may not be avoided or otherwise challenged

under 11 U.S.C. § 363(n).

27.    The Debtors, including but not limited to their respective officers,

employees, and agents, are hereby authorized to execute such documents and do such acts as are

necessary or desirable to carry out the transactions contemplated by the terms and conditions of

the Transfer Agreement and this Order.  The Debtors shall be, and they hereby are, authorized to

take all such actions as may be necessary to effectuate the terms of this Order.

28.    The terms and provisions of the Transfer Agreement and this Order shall

be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and

their creditors, JCI, and its respective affiliates, successors, and assigns, and any affected third

parties, including, but not limited to, all persons asserting an Interest or Claim in the Acquired

Assets to be sold to JCI pursuant to the Transfer Agreement, notwithstanding any subsequent

appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of

18

the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and

provisions likewise shall be binding.

29.    Notwithstanding anything contained herein to the contrary, the term

"Acquired Assets" as defined herein does not include property that is not property of the Debtors'

estates, such as funds that are trust funds under any applicable state lien laws.

30.    To the extent permitted by section 525 of the Bankruptcy Code, no

governmental unit may revoke or suspend any permit or license relating to the operation of the

Acquired Assets sold, transferred, or conveyed to JCI on account of the filing or pendency of

these chapter 11 cases or the consummation of the Sale.

31.    The failure specifically to include or to reference any particular provision

of the Transfer Agreement in this Order shall not diminish or impair the effectiveness of such

provision, it being the intent of the Court that the Transfer Agreement be authorized and

approved in their entirety.

32.    The Transfer Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented by the parties thereto in accordance

with the terms thereof without further order of the Court; provided that any such modification,

amendment, or supplement does not have a material adverse effect on the Debtors' estates.

33.    The provisions of this Order are nonseverable and mutually dependent.

34.    Nothing in this Order shall alter or amend the Transfer Agreement and the

obligations of the Debtors and JCI thereunder.

35.    This Court retains jurisdiction to enforce and implement the terms and

provisions of the Transfer Agreement, all amendments thereto, any waivers and consents

19

thereunder, and of each of the agreements executed in connection therewith in all respects,

including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets

to JCI, (b) compel delivery of the purchase price, reimbursement of costs under the IUE-CWA

New Brunswick Attrition Plan, or performance of other obligations owed to the Debtors pursuant

to the Transfer Agreement, (c) resolve any disputes arising under or related to the Transfer

Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the

provisions of this Order, and (e) protect JCI against any Interests or Claims against the Debtors

or the Acquired Assets, of any kind or nature whatsoever, attaching to the proceeds of the Sale.

36.     Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy

Procedure or any other Bankruptcy Rule, this Order shall take effect immediately upon its entry.

37.     The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
        June ___, 2006

_____
        UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT 1.23**

## **SELLER'S KNOWLEDGE**

**GENERAL:**

    Ron Pogue

**EMPLOYEES:**

    Charu Manocha

**EXHIBIT 2.2A**

**BILL OF SALE**

          **BY THIS BILL OF SALE** made on _____, **200_** by _____, a Delaware _____ ("**Seller**"), for good and valuable consideration paid by _____, a _____ corporation ("**Buyer**"), receipt and sufficiency of which consideration are acknowledged by Seller, pursuant to the terms and provisions of that certain Transfer Agreement dated _____, **2006** between Buyer and Seller (the "**Agreement**"), Seller does bargain, grant, sell, convey, assign, transfer and deliver to Buyer and its successors and assigns, all right, title and interest of Seller in and to the Personal Property and Inventory (as those terms are defined in the Agreement) listed on Attachment A hereto.

Notwithstanding the foregoing, the provisions of this Bill of Sale are subject, in all respects, to the terms and conditions of the Agreement and all the representations and warranties, covenants and agreements contained therein, all of which shall survive the execution and delivery of this Bill of Sale as provided in the Agreement.

_____

By:_____
      Name:
      Title:

**ATTACHMENT A TO BILL OF SALE**

**Exhibit 3.6.H**

**ENVIRONMENTAL MATTERS**

1.    **DEFINITIONS**:

1.1    **"Business"** has the same meaning as given in the Transfer Agreement.

1.2    "**Buyer**" has the same meaning as given in the Transfer Agreement.

1.3    "**Completion Date**" has the same meaning as given in the Transfer Agreement.

1.4    "**Competent Authority**" means a person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

1.5    "**Compliance Matter**" means an event, condition, activity, practice, action or omission at the Real Property which gives rise to a breach or violation of an Environmental Law, but which excludes Environmental Contamination.

1.6    "**Environment**" means any and all organisms (including humans), biota, ecosystems, land, natural resources, property, air, soil gas, water, groundwater, human beings, and buildings, fixtures and installations.

1.7    "**Environmental Claim**" means a notice, claim, demand, action, suit, complaint or proceeding by a Competent Authority or a Third Party alleging liability or potential liability arising out of an Environmental Law.

1.8    "**Environmental Contamination**" means the presence of a Hazardous Material at, in, under, on or about the Environment at the Real Property.

1.9    "**Environmental Damages**" means losses, liabilities, costs, damages fines, penalties and expenses (including reasonable expenses of investigation and attorneys' fees) arising out of an Environmental Law, but in all cases excluding losses, liabilities, costs, damages and expenses deemed consequential or loss of profit, and also excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

1.10    "**Environmental Law**" means, solely for those in force and effect as at the Closing date in the relevant jurisdiction, all applicable civil, criminal, administrative and any other federal, state, county and local (including common law) laws, rules, ordinances, orders, codes, guidance, directives, Environmental Permits (or lack thereof), approvals, decisions, decrees, remediation standards and regulations relating to or having the purpose or effect of the prevention of pollution or harm to the Environment or human health.

45

**1.11** "**Environmental Permits**" means all licenses, consents, permits, registrations, approvals or authorizations made or issued by a Competent Authority under an Environmental Law in connection with the Business or the Real Property.

**1.12** "**Hazardous Material**" means all matter (whether alone or in combination with other matter, and whether solid, liquid, gas or other state) which is a pollutant, contaminant, chemical, material, substance, constituent, or waste including without limitation petroleum, petroleum-based or petroleum-derived products, polychlorinated biphenyls, asbestos and asbestos-containing materials, and noxious, radioactive, flammable, corrosive, caustic materials, all of which are governed or regulated under an Environmental Law.

**1.13** "**New Brunswick Real Property**" means the Real Property as defined in the Transfer Agreement.

**1.14** "**Post-Closing Compliance Matter**" means a Compliance Matter first occurring after the Completion Date.

**1.15** "**Post-Closing Environmental Contamination**" means Environmental Contamination first occurring after the Completion Date.

**1.16** "**Post-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the New Brunswick Real Property and disposed at a disposal site not at the New Brunswick Real Property, after the Completion Date, under an applicable Environmental Law.

**1.17** "**Pre-Closing Compliance Matter**" means a Compliance Matter first occurring at prior to the Completion Date.

**1.18** "**Pre-Closing Environmental Contamination**" means Environmental Contamination first occurring prior to the Completion Date.

**1.19** "**Pre-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the New Brunswick Real Property and disposed at a disposal site not at the New Brunswick Real Property, prior to the Completion Date, under an applicable Environmental Law.

**1.20** "**Remedial Works**" means the works, designs, investigations and activities carried out by a Party in relation to Environmental Contamination, but excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

**1.21** "**Remedy**" has the meaning given to it in Section 4 of this Exhibit.

**1.22** "**Seller**" has the same meaning as given in the Transfer Agreement.

**1.23** "**Third Party**" means any person not a Party or a Competent Authority.

**2.**    <u>**INDEMNIFICATIONS OF SELLER AND PURCHASER**</u>:

**2.1**    Subject to the provisions of this Exhibit, and solely with respect to the New Brunswick Real Property, the Seller shall indemnify the Buyer for Environmental Damages arising from Pre-Closing Environmental Contamination, Pre-Closing Compliance Matters or Pre-Closing Off-Site Liability.

**2.2**    Subject to the provisions of this Exhibit, and solely with respect to the New Brunswick Real Property, the Buyer shall indemnify the Seller for Environmental Damages arising from Post-Closing Environmental Contamination, Post-Closing Off-Site Liability or Post-Closing Compliance Matters.

**2.3**    Subject to the provisions of this Agreement, for those Environmental Damages arising from circumstances that may be considered both (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination, (ii) Pre-Closing Compliance Matters and Post-Closing Compliance Matters, or (iii) Pre-Closing Off-Site Liability and Post-Closing Off-Site Liability, such Environmental Damages shall be allocated between the Parties in proportion to the extent that such Environmental Damages arose pre- or post-Completion Date, and each Party shall indemnify the other for its share as determined by such allocation.

**3.**    <u>**LIMITATIONS ON LIABILITY.**</u>    Neither Party shall be liable under this Agreement for Environmental Damages:

**3.1**    In the case of Environmental Claims arising from Pre-Closing Compliance Matters or Post-Closing Compliance Matters (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before eighteen (18) months following the Completion Date;

**3.2**    In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination, except for Remedial Works pursuant to clause 4.1 of this Exhibit, or Post-Closing Environmental Contamination (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before seven (7) years following the Completion Date.  Remedial Works under clause 4.1 of this Exhibit shall be governed by the applicable statute of limitations under ISRA (as defined in clause 4.1 of this Exhibit).

**3.3**    Except for Remedial Works under clause 4.1 of this Exhibit (for which Seller is solely responsible), subject to clauses 3.1 and 3.2 of this Exhibit, no Party will be liable to the other under this Exhibit unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in this clause 3.3 and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is liable solely for the amounts exceeding $500,000.  For all purposes under this Article 3 and Section 7.1 of the Agreement, the Deductible Amount with respect to environmental claims shall be (i) the $500,000 amount referred to in this clause 3.3, less (ii) any amounts that may have been incurred by the relevant claiming party under environmental matters agreements entered into in connection with the sale of any of Seller's global battery operations to Buyer in 2005. The Cap Amount is as set forth Section 7.1.

**3.4**    In the case of Environmental Damages arising from Pre-Closing Environmental Contamination, unless the claiming Party discovers the facts and circumstances giving rise to such claim solely in connection with an investigation

required by an applicable Environmental Law, an order by a Competent Authority, a final judgment of a claim by a Third Party, or settlement of a claim by a Third Party to which the non-claiming Party has agreed (such agreement not to be unreasonably withheld).

3.5    Where Buyer uses the New Brunswick Real Property for a use other than an industrial use, or seeks to or changes the zoning or land use classification of the New Brunswick Real Property to a classification more sensitive than the industrial classification;

3.6    Where, subject to clause 3.7 below, and insofar as the Parties agree to treat this Agreement and all information gathered, known or obtained as a result of the sale and purchase of the Business or performing any obligation or exercising any right under this Exhibit as confidential, for any Environmental Damages claims to the extent that such claim would not have arisen or was increased or made more costly as a result of the claiming Party or any of its respective employees, agents or contractors volunteering or disclosing information to any Competent Authority or Third Party without the prior written consent of the non-claiming Party;

3.7    The following shall not be deemed to be or to have been volunteering or disclosing of information for the purpose of this clause 3.7:

(i)    Where the disclosure is required by any law (including any Environmental Law),

(ii)    Where the disclosure is specifically and formally required by any securities exchange or regulatory or other Competent Authority to which either Party is subject or submits wherever situated,

(iii)    Where the information is clearly in the public domain through no fault of the claiming Party, or

(iv)    Where the non-claiming Party has given prior written approval to the disclosure;

3.8    To the extent the claiming Party did not take reasonable steps to avoid or mitigate any Environmental Damages, acting in a reasonable and cost-effective manner; in the case of an emergency, where a Party takes any action to avoid or mitigate any Environmental Damages, (a) it shall for the avoidance of doubt not be in breach of this Agreement and shall not be precluded from recovering its Environmental Damages provided that the claiming Party notifies the other Party of such circumstances as soon as reasonably practicable and provided that such actions or steps are the minimum necessary to avert the emergency; and (b) the reasonable costs and expenses of all steps taken pursuant to the duty to mitigate contained in this clause 3.8 shall be deemed to be Environmental Damages.

3.9    Notwithstanding anything to the contrary in Section 7.1 of this Agreement, the Deductible Amount with respect to environmental claims shall be $500,000 less any amounts that may have been incurred by the relevant claiming party under environmental matters agreements entered into in connection with the sale of any of Seller's global battery operations to Buyer in 2005.    The Cap Amount is as set forth Section 7.1.    Subject to clauses 3.1 and 3.2 of this Agreement, set forth in Subject to

clauses 4.1, 4.2 and 4.3 of this Agreement, unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in clause 4.4 of this Agreement and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is liable solely for the amounts exceeding $500,000; provided, however, that with respect to Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination referred to in Paragraph 2.2 for which Seller has warranted that it will effect the Remedy with respect to such Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination, Seller shall pay all amounts necessary to effect the Remedy of such issues, which amounts shall not be included in determining when the aggregate amount of claims exceed $500,000.

## 4.    REMEDIATION OF ENVIRONMENTAL DAMAGE:

**4.1**    Seller shall file such papers, and conduct such investigation and remediation as required by the New Jersey Department of Environmental Protection ("**NJDEP**") to satisfy the requirements of the State of New Jersey's Industrial Site Recovery Act, N.J.S.A. 13.1K-6 *et seq.,* and regulations promulgated thereto, N.J.A.C. Title 7, Chapter 26B (collectively "**ISRA**"), as ISRA is in effect as of the date of the Put Completion Date, as follows:    As soon as the Parties mutually agree that it is substantially certain that the third party consent needed prior to any exercise of the Put Option or Call Option will be obtained, Seller shall, pursuant to the requirements of ISRA, promptly prepare and submit to NJDEP a General Information Notice.  Thereafter, with reasonable diligence, Seller shall, pursuant to ISRA, continue to undertake the activities and to submit the required documentation to NJDEP necessary to complete its responsibilities under ISRA, according to any schedule approved by NJDEP and consistent with NJDEP requirements.  In all cases, Seller shall have the right at its sole discretion to seek reasonable extensions of the schedules approved by NJDEP where site conditions warrant.  Where the State of New Jersey requires any consent agreement into which Seller, the State of New Jersey and Buyer must enter pursuant to ISRA, Buyer shall sign such consent agreement.  Any such consent agreement shall be consistent with a remedial action for industrial property.

**4.2**    Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of a Compliance Matter ("**Remedy**") to no less but no more than the minimum standards or levels of Environmental Laws; such Remedial Works may be determined using risk assessment and related risk evaluation methods.

**4.3**    The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, have conduct of such Remedy.

**4.4**    The conduct of a Remedy shall be as follows:

A.        The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party may elect to

adopt where such comments do not increase any cost or liability of the Remedy;

B.      The non-claiming Party shall, at its sole discretion, either:

(i)      Determine to and obtain approval of the Remedy by the appropriate Competent Authority prior to implementation of the Remedy; when requested, the claiming Party shall cooperate with the non-claiming Party in any communications with the appropriate Competent Authority; after the non-claiming Party has obtained such approval, such Party shall provide notice of such approval to the claiming Party; or

(ii)      Determine to implement the Remedy without first seeking approval from the appropriate Competent Authority; the non-claiming Party shall provide notice to the claiming Party of such determination at the time the non-claiming Party provides the claiming Party with the work plan or scope of work set forth in clause 4.4A of this Exhibit;

C.      Where the Seller is the non-claiming Party, Seller will take all reasonable steps to avoid interfering with Buyer's operation of the Business or use of the Real Property, and Buyer will reasonably cooperate with Seller including providing access to the New Brunswick Real Property and the use of utilities in the conduct of the Remedy;

D.      Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy; and

E.      The conduct of the Remedy shall be deemed complete when, as the case may be:

(i)      The non-claiming Party has received approval regarding the Remedy by an applicable Competent Authority; or

(ii)      Subject to clause 4.2 of this Exhibit, the Remedy meets applicable standards which an applicable Environmental Law allows.

**5.      TRANSFER OF PERMITS AND LICENSES.**      On and after the Closing Date, Seller and Buyer shall cooperate in taking all reasonable steps to effect the transfer or procure the re-issuance of any Environmental Permits necessary to operate the Business.

**EXHIBIT 4.1**

**EMPLOYEE MATTERS**

1.    **Definitions:**

A.    "**Buyer Employee Benefit Plans**" means Buyer's pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute", severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes", collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals and written or binding oral statements of policies, practices or understandings relating to employment.

B.    "**Competitive Package**" means the wages and benefits payable to new hire U.S. Hourly Employees at the New Brunswick Facility under the Delphi-IUE-CWA Local Agreement.

C.    "**Delphi-IUE-CWA Local Agreement**" means the local collectively bargained agreements in effect at the New Brunswick Facility, including but not limited to, the memorandum of understanding ("**MOU**") entitled "ESCOP Hiring Plan – Full and Temporary Part-Time Employees" dated June 3, 1998 ("**ESCOP Hiring Plan**"), the November 13, 2003 Local Seniority Agreement, a collective bargaining agreement between Seller and IUE-CWA Local 416, any letter agreements, MOUs (including the ESCOP Hiring Plan), and all applicable employee benefit plans, in effect between Seller and the IUE-CWA applicable only to the U.S. Hourly Employees.

D.    "**Delphi-IUE-CWA National Agreement**" means the nationally negotiated collective bargaining agreements, including any letter agreements, MOUs, supplemental agreements and all applicable employee benefit plans in effect between Seller and the IUE-CWA.

E.    "**Employment Rights**" means all obligations arising out of, or relating to, the employment relationship between the relevant company and the relevant employees, including, without limitation, payment of wages and salaries, employee benefits, taxes, vacation pay, sick leave and severance pay and any claims under any Laws dealing with employment.

F.    "**IUE-CWA**" means the IUE-CWA, the Industrial Division of the Communication Workers of America, AFL-CIO and CLC.

G.    "**Seller Employee Benefit Plans**" means Seller's pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute", severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes", collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

H.    "**Successor Clause**" means Document 7 appended to the Delphi-IUE-CWA National Agreement.

I.    "**Transferred U.S. Hourly Employees**" means those hourly employees of Seller hired by Buyer pursuant to Section 3.A(ii) below.

J.    "**U.S. Hourly Employees**" means the hourly employees represented by the IUE-CWA who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date and identified on <u>Schedule 3.A(i)</u> to this <u>Exhibit 4.1</u> to be provided to Buyer by Seller concurrently with the Put Exercise Notice or within ten (10) days after Seller's receipt of a Call Exercise Notice, as applicable.

K.    "**U.S. Salaried Employees**" means the salaried employees and hourly non-union employees who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date.

2.    <u>**Pre-Completion Obligations of the Parties**</u>:

A.    Prior to Completion, Seller will:

(i)    Endeavor to obtain Bankruptcy Court approval of the attrition plan set forth in the IUE Consent (attached as <u>Exhibit 1.13</u> of this Agreement) and, upon receipt of necessary approvals, to implement the attrition plan set forth in Exhibit 1.13 (the "**Attrition Plan**") to reduce the number of U.S. Hourly Employees to approximately one hundred (100) U.S. Hourly Employees, in accordance with the terms of the IUE Consent [JCI to confirm the number as soon as possible after the date of this Agreement and no later than 5 days before Delphi commences the Attrition Plan]; and

(ii)    Take the lead in negotiating a plant-specific agreement and waiver of the Successor Clause, with Buyer's involvement as the parties deem appropriate.

B.    If waiver of the Successor Clause is obtained before the Completion Date:

(i)    Buyer will take the lead in negotiating a collective bargaining agreement with the IUE-CWA exclusive to the U.S. Hourly Employees at the New Brunswick, New Jersey plant; and

(ii)    Buyer will endeavor to obtain mutually agreed competitive work practices in a collective bargaining agreement, comparable to Buyer's existing IUE-CWA agreements at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities.

C.    If waiver of the Successor Clause is not obtained before the Completion Date:

(i)    Until the Completion Date, Seller will endeavor to obtain mutually agreed competitive work practices in a collective bargaining agreement with the

IUE-CWA, comparable to Buyer's collective bargaining agreements with the IUE-CWA at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities;

Subparagraphs 2.C(i) and 2.C(v) notwithstanding, to the extent that Buyer has not negotiated its own local agreement prior to Completion, as outlined in Section 2.C(i), Buyer will assume the terms and conditions of the Delphi-IUE-CWA National Agreement and Delphi-IUE-CWA Local Agreement applicable as of the Completion Date as they relate to the U.S. Hourly Employees, except that Seller has secured in the IUE Consent a waiver of the unpublished "Neutrality" letter in the Delphi-IUE-CWA National Agreement.  Seller agrees that it is not Seller's intent to negotiate an agreement with the IUE-CWA after the effective date of this Agreement and prior to Completion that would impose additional material obligations or costs upon Buyer.  To that end, and except as otherwise agreed by Buyer, Buyer will not assume terms and conditions relating to the following specified matters contained in any MOU, collective bargaining agreement or other agreement negotiated after the effective date of this Agreement which:

    a.  Contains terms that would  apply to or affect other facilities of Buyer;

    b.  Contains any additional job security provisions for new hires not set forth in the ESCOP Plan;

    c.  Introduces severance provisions that would make it impracticable to reduce the workforce;

    d.  Requires that Buyer assume any Seller Employee Benefit Plans or participate in any multi-employer plan; or

    e.  Guarantees specific levels of manning or requires that the New Brunswick Plant be operated in any specific way for any specific period of time

(iii)  In connection with the foregoing clause 2.C(ii), Buyer will act in good faith and will not act unreasonably in order to avoid taking the New Brunswick plant.

(iv)   Seller reaffirms its commitment to consult with Buyer's lead bargainer on an ongoing basis in the course of collective bargaining, Buyer's involvement to include option to be present on the premises, participate in specified briefing sessions, provide proposals to Seller, and the like.   If in the course of such bargaining, matters which would significantly adversely impact New Brunswick plant competitiveness (compared year over year) arise, Buyer will not be obligated to assume related commitments without Buyer's consent, not to be unreasonably withheld.

(v)    Buyer will endeavor to obtain waiver of the Successor Clause and obtain competitive work practices in a collective bargaining agreement with the IUE-CWA, comparable to Buyer's existing collective bargaining agreements with the IUE-CWA at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities; and

(vi)   Seller will obtain a waiver of, or otherwise remedy, any other materially significant document related to the Delphi-IUE-CWA National or Local Agreements, if any, that was not made available to Seller prior to July 1, 2005.

D.      If a mutually agreeable collective bargaining agreement between the IUE-CWA and JCI is ratified before completion, then the terms of such agreement would

apply to the Transferred U.S. Hourly Employees rather than the terms of Delphi's agreements referred to in Section 2.C(ii) above.  In the event of any conflict with the above terms of this Article 2 and the terms of the Memorandum of Agreement between Delphi and the IUE-CWA attached as Exhibit 1.13 to this Agreement (the "**Memorandum**"), the terms of the Memorandum will govern.

3.    **Obligations at Completion**:

   A.    **Buyer Obligations – U.S. Hourly Employees**:

   (i)    Within five (5) days prior to Completion, Seller will identify in a Schedule 3.A(i) to this Exhibit 4.1, in accordance with the terms of the Attrition Plan and Section 2.A(i) of this Exhibit 4.1, all U.S. Hourly Employees who are employed as of the Completion Date, by name, social security number, date of hire, job code and current hourly rate.    Seller and Buyer will confirm Schedule 3.A(i) of this Exhibit 4.1 as of the day prior to the Completion Date.

   (ii)    Effective on the Completion Date, Buyer will offer employment to all U.S. Hourly Employees identified on Schedule 3.A(i) to Exhibit 4.1. U.S. Hourly Employees who accept Buyer's offer of employment (by reporting to work or otherwise acknowledging acceptance) will be referred to as Transferred U.S. Hourly Employees:

   a.  U.S. Hourly Employees who are included in Schedule 3.A(i) and are not active as of the Completion Date due to disability, layoff, family medical leave or other approved leave of absence may elect to transfer to Buyer under the terms of the Attrition Plan, and will remain Seller's responsibility until any such U.S. Hourly Employee is ready to return to active employment in accordance with Seller's leave policies.

   b.  Upon such U.S. Hourly Employee's return to active status, Buyer will offer employment in accordance with Section 3.A(ii) above, and, provided such individual accepts Buyer's offer of employment, will be considered a Transferred U.S. Hourly Employee as of such date.  In the event that a U.S. Hourly Employee is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Seller and Buyer provided such does not violate any applicable collective bargaining agreement.

   c.  If Seller and Buyer do not agree as to such individual's fitness for active employment, the issue will be submitted to an independent medical evaluator, whose determination will be final and binding on the parties.  The cost of such independent medical evaluation will be shared equally by the parties.

   (iii)    Consistent with Buyer's obligations under Section 2.C(ii) above, unless Buyer is otherwise able to negotiate a new collective bargaining agreement with the IUE-CWA for the Transferred U.S. Hourly Employees, Buyer will provide the Transferred U.S. Hourly Employees with the same level of wages and benefits as required under the Delphi-IUE-CWA National Agreement and

Delphi-IUE-CWA Local Agreement, as applicable, in effect as of the Completion Date.

(iv)    Buyer will assume and recognize the seniority status for all purposes of continued employment with Buyer.

(v)    Buyer will recognize a Transferred U.S. Hourly Employee's pre-Completion credited service with Seller for eligibility and vesting purposes but not benefit accrual purposes with respect to any Buyer Employee Benefit Plans. However, in no case will credited service be recognized under this provision if such recognition will cause a duplication of compensation or benefits as between Seller and Buyer.

(vi)    Transferred U.S. Hourly Employees' and their Beneficiaries' participation in and eligibility for benefits under the Buyer Employee Benefit Plans will commence as of the Completion Date.

(vii)    To the extent allowed under applicable law, Transferred U.S. Hourly Employees who become eligible for a distribution of their account balances in the Delphi Personal Savings Plan will be permitted, at their discretion, to transfer such account balances to Buyer's defined contribution plan.  The manner of such transfer will be a direct rollover.

(viii)    Seller will retain responsibility to administer and all liability for labor grievances and arbitration proceedings (collectively the "**Grievances**") involving claims incurred prior to the Completion Date.  For a period of ninety (90) days following the Completion Date, Buyer will notify Seller of any Grievances filed after the Completion Date which relate to claims incurred prior to the Completion Date.  Buyer will be responsible to administer and bear all liability for Grievances involving claims incurred after the Completion Date.   To the extent the administration or resolution of any Grievances require both the Buyer's and Seller's participation, the following apply:

a.    Buyer and Seller will cooperate in the defense of the Grievances.

b.    Buyer will not settle any Grievance without Seller's consent if such settlement will result in liability or obligation for Seller.  Such consent will not be unreasonably withheld.

c.    Seller will not settle any Grievance without Buyer's consent if such settlement will result in liability for Buyer.  Such consent will not be unreasonably withheld.

d.    If the seniority of a Transferred U.S. Hourly Employee is reinstated as a result of the disposition of a Grievance or a court or administrative order, Buyer will reinstate the Transferred U.S. Hourly Employee as if the Transferred U.S. Hourly Employee had been a Transferred U.S. Hourly Employee as of the Completion Date.

e.      For Transferred U.S. Hourly Employees who have been continuously employed, back pay liability to the extent relating to an event, occurrence or cause of action arising prior to the Completion Date will be allocated to Seller.  Liability relating to an event, occurrence or cause of action arising subsequent to the Completion Date will be allocated to Buyer, including but not limited to costs or other liability incurred by Seller as a result of loss of employment with Buyer, within one (1) year following Completion, by any Transferred U.S. Hourly Employee for any reason other than good cause relating to misconduct or performance under the applicable discipline procedure.

f.      For U.S. Hourly Employees who become Transferred U.S. Hourly Employees because they are reinstated through the grievance procedure, back pay liability relating to periods prior to the Completion Date will be allocated to Seller.  Liability relating to periods subsequent to the Completion Date will be allocated to Seller.

g.      The parties will discuss treatment of Grievances involving unusual circumstances or events that continue before and after the Completion Date.

h.      If either party withholds consent to a settlement or processing of a Grievance recommended by the other party or elects to continue to defend the Grievance, then such party will be liable for the portion of the back pay or other liability resulting from the ultimate disposition of such Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended and rejected.

(ix)      Subject to Seller's obligations under Section 3.C(iv)a, liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees after the Completion Date, will be the responsibility of Buyer.

(x)      Buyer will not assume any Seller Employee Benefit Plans.

(xi)      At Completion, Buyer will pay Seller $12.5 million USD by wire transfer in accordance with wiring instructions to be provided by Seller before Completion, to reimburse Seller for costs incurred by Seller under the Attrition Plan, which costs would otherwise have been payable by Buyer under a predecessor agreement between the parties.

**B.      Buyer Obligations – U.S. Salaried Employees:**

(i)      Buyer will offer employment to all U.S. Salaried Employees, except as otherwise agreed by the parties prior to the time such offers have been made.  Buyer's employment offers to U.S. Salaried Employees will include salary and benefit packages substantially comparable in the aggregate to those provided by Seller immediately prior to the Completion Date.  Prior to tendering such offers, Buyer will provide Seller with information sufficient to satisfy Seller that such offers meet the "substantially comparable in the aggregate"

requirement.  Seller's satisfaction that Buyer's offer meets this requirement may not be unreasonably withheld.  Buyer will assume all Employment Rights relating to the U.S. Salaried Employees whom Buyer employs incurred on and after the date of hire.  U.S. Salaried Employees whom Buyer hires will be subject to Buyer's policies and procedures, including any requirement that they execute agreements providing for the protection of Buyer's confidential information and adherence to Buyer's business conduct guidelines.

(ii)     Buyer will recognize the length of service date and all credited service at Seller that the U.S. Salaried Employees whom Buyer hires accrued at Seller for purposes of vesting and eligibility (but not benefit accrual) under the Buyer Employee Benefit Plans.

**C.     Seller Obligations – U.S. Hourly Employees:**

(i)     Seller will remain responsible for all Employment Rights of the U.S. Hourly Employees incurred or vesting prior to the date when they become Transferred U.S. Hourly Employees, except as otherwise provided herein.  In accordance with the terms of the Attrition Plan, all Transferred U.S. Hourly Employees will transfer at the established New Brunswick Tier III rate and benefits in accordance with applicable terms of the Delphi-IUE-CWA Local Agreement and the Delphi-IUE-CWA National Agreement in effect at Completion, or such other agreement as may be applicable under Section 2.D of this Exhibit 4.1.

(ii)     Transferred U.S. Hourly Employees' and their Beneficiaries' participation in and eligibility for benefits under the Seller Employee Benefit Plans will cease as of the Completion Date.  Notwithstanding the preceding sentence, the Seller Employee Benefit Plans will retain liability for all claims incurred by the Transferred U.S. Hourly Employees and their Beneficiaries on or prior to the Completion Date, including claims which are not submitted until after the Completion Date.  A claim will be deemed incurred, as applicable:

a.     On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

b.     On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

c.     On the date following a Transferred U.S. Hourly Employee's last day worked on which a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

(iii)     Regardless of the vesting date, Seller will pay to each Transferred U.S. Hourly Employee the amount of all accrued and unutilized vacation pay and any profit sharing due for the calendar year in which the Completion Date occurs on a pro-rata basis using the number of days worked by the Transferred U.S. Hourly Employees for Seller.

(iv)     Seller will retain responsibility for:

a.     All liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees on or prior to the Completion Date and the pro rata portion, based on years of credited service with Seller compared with total years of credited service with Seller and Buyer, of liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to post-Completion Date exacerbation of pre-Completion Date injuries or illnesses; and

b.     Claims of the Transferred U.S. Hourly Employees (or a dependent thereof who becomes a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Internal Revenue Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Internal Revenue Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs on or prior to the Completion Date.

4.     **Allocation of Liability; Indemnification; Cooperation:**

A.     **Buyer's Obligations:**

(i)     In general, subject to other more specific provisions contained in this Agreement, Buyer will be responsible for and will bear all liability incurred after the Completion Date for Employment Rights of the Transferred U.S. Hourly Employees and U.S. Salaried Employees whom Buyer hires.

(ii)     Buyer will defend, indemnify and hold harmless Seller, its past and present employees, agents, representatives, shareholders, officers, directors, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs), relating to:

a.     Any Employment Rights of any of the Transferred U.S. Hourly Employees, any U.S. Salaried Employees whom Buyer hires, and any person employed by Buyer after the Completion Date who is not a Transferred U.S. Hourly Employee or U.S. Salaried Employee, for any claims relating to or arising from events occurring after the Completion Date; and

b.     Buyer's failure to comply with the terms of this Exhibit 4.1.

B.     **Seller's Obligations:**

(i)     In general, subject to other more specific provisions contained in this Agreement, Seller will be responsible for and will bear all liability incurred on or prior to the Completion Date for Employment Rights of the U.S. Hourly Employees and U.S. Salaried Employees.

(ii)    Seller will defend, indemnify and hold harmless Buyer, its past and present employees, agents, representatives, shareholders, officers, directors, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs), relating to:

a.    Any Employment Rights of any of the Transferred U.S. Hourly Employees, or of any person employed by Seller prior to the Completion Date who is not a Transferred U.S. Hourly Employee, for any claims relating to or arising from events occurring on or prior to the transfer to Buyer;

b.    Seller's failure to comply with the terms of this Exhibit 4.1; and

c.    Any Employment Rights of U.S. Salaried Employees who do not accept Buyer's offer of employment; provided, however, that such offer complies with the "substantially comparable in the aggregate" requirement of Section 3.B(i).

**C.    Cooperation:**

Seller and Buyer agree to provide each other with such records and information and otherwise cooperate as may be reasonably necessary or appropriate to carry out their respective obligations under this Exhibit 4.1.

**Hearing Date and Time: June 16, 2006 at 10:00 a.m.**
**Objection Deadline: June 9, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
        In re                                           :    Chapter 11
                                                        :
DELPHI CORPORATION, et al.,                             :    Case No. 05-44481 (RDD)
                                                        :
                                Debtors.                :    (Jointly Administered)
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 2002 AND 6004 AUTHORIZING AND APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH JOHNSON CONTROLS, INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (B) CONTINUATION AND TRANSITION OF SUPPLY TO JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD FACILITY, AND (C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW BRUNSWICK FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM

PLEASE TAKE NOTICE that on May 26, 2006, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed a Motion For Order Under 11 U.S.C. § 363(B) And Fed. R. Bankr. P. 2002 And 6004 Authorizing And Approving Debtors' Entry Into Transfer Agreement With Johnson Controls, Inc. Providing For (A) Sale Of Acquired Assets Free And Clear Of Liens, Claims, And Encumbrances, (B) Continuation And Transition Of Supply To Johnson Controls, Inc. Of Battery Products Out Of Fitzgerald Facility, And (C) Implementation Of Attrition Plan With Respect To New Brunswick Facility In Accordance With IUE-CWA Memorandum (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the Motion will be held on June 16, 2006, at 10:00 a.m. (Prevailing Eastern Time) (the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And

2

Administrative Procedures, entered by this Court on May 19, 2006 (the "Seventh Supplemental

Case Management Order") (Docket No. 3824), (c) be filed with the Bankruptcy Court in

accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's

case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch

disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based

word processing format), (d) be submitted in hard-copy form directly to the chambers of the

Honorable Robert D. Drain, United States Bankruptcy Judge, and (e) be served upon (i) Delphi

Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to

the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100,

Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for the agent under the

Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue,

New York, New York 10017 (Att'n: Kenneth S. Ziman), (iv) counsel for the agent under the

postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New

York 10017 (Att'n: Donald Bernstein and Brian Resnick), (v) counsel for the Official Committee

of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York

10022 (Att'n: Robert J. Rosenberg and Mark A. Broude), (vi) counsel for the Official Committee

of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza,

New York, New York 10004 (Att'n: Bonnie Steingart), (vii) the Office of the United States

Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New

York 10004 (Att'n:  Alicia M. Leonhard), and (viii) counsel to Johnson Controls, Inc., Sachnoff

& Weaver, 10 South Wacker Drive, 40th Floor, Chicago, Illinois 60606 (att'n: Stephan T. Bobo)

in each case so as to be **received** no later than **4:00 p.m. (Prevailing Eastern Time) on June 9,**

**2006** (the "Objection Deadline").

3

PLEASE TAKE FURTHER NOTICE that to the extent that the Debtors identify and serve notice on entities after May 26, 2006, the Objection Deadline for such recipient shall be June 13, 2006.

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth herein and in accordance with the Seventh Supplemental Case Management Order will be considered by the Bankruptcy Court at the Hearing.  If no objections to the Motion are timely filed and served in accordance with the procedures set forth herein and in the Seventh Supplemental Case Management Order, the Bankruptcy Court may enter an order granting the Motion without further notice.

Dated:  New York, New York
          May 26, 2006

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By: _/s/ John Wm. Butler, Jr._____
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons  (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

    - and -

By: _/s/ Kayalyn A. Marafioti_____
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
       In re                          :          Chapter 11
                                          :
DELPHI CORPORATION, <u>et al.</u>,          :          Case No. 05-44481 (RDD)
                                          :
                  Debtors.          :          (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 2002 AND 6004 AUTHORIZING AND
APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH JOHNSON CONTROLS,
INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES (B) CONTINUATION AND TRANSITION OF SUPPLY TO
JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD FACILITY AND
(C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW BRUNSWICK
<u>FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM</u>

("NEW BRUNSWICK TRANSFER ORDER")

           Upon the motion, dated May 26, 2006 (the "Motion"), of Delphi Corporation and

certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned

cases (collectively, the "Debtors"), for an order (the "Order") pursuant to 11 U.S.C. § 363(b) and

Fed. R. Bankr. P. 2002 and 6004 authorizing and approving the Debtors' entry into the Transfer

Agreement dated May 26, 2006 by and between Delphi Automotive Systems LLC, a Debtor in

these cases, and Johnson Controls, Inc. ("JCI"), a copy of which is attached hereto as <u>Exhibit 1</u>

(together, with the exhibits and schedules attached thereto, the "Transfer Agreement"), providing

for (a) sale of certain assets (the "Acquired Assets") of the Debtors' battery manufacturing

facility in New Brunswick, New Jersey (the "New Brunswick Facility") free and clear of liens,

claims, and encumbrances (the "Sale"), (b) the continuation and transition of supply to JCI of

battery products out of the Debtors' manufacturing facility in Fitzgerald, Georgia (the "Fitzgerald

Facility"), and (c) implementation of an attrition plan with respect to the New Brunswick facility;

and upon the record of the hearing held on the Motion; and this Court having determined that the

relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors,

and other parties in interest; and it appearing that proper and adequate notice of the Motion has

been given and that no other or further notice is necessary; and after due deliberation thereon;

and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[1]

A.    The court has jurisdiction over the Motion and the transactions

contemplated by the Transfer Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Motion are sections

363 of 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and Fed. R. Bankr. P. 2002

and 6004.

C.    As evidenced by the affidavits of service previously filed with the Court,

and based on the representations of counsel at the hearing on the Motion (the "Hearing"), (i)

proper, timely, adequate and sufficient notice of the Motion, the Hearing and the sale of the

Acquired Assets (as defined in the Transfer Agreement) has been provided in accordance with 11

U.S.C. §§ 102(l) and 363 and Fed. R. Bankr. P. 2002 and 6004, (ii) such notice was good and

sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice

of the Motion, the Hearing, or the Sale is or shall be required.

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate.  See Fed. R. Bankr. P. 7052.

D.      Each applicable Debtor (i) has full corporate power and authority to execute the Transfer Agreement and all other documents contemplated thereby, and the transfer and conveyance of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Transfer Agreement, and (iii) has taken all corporate action necessary to authorize and approve the Transfer Agreement and the consummation by such Debtor of the transactions contemplated thereby, and no consents or approvals, other than those expressly provided for in the Transfer Agreement, are required for each applicable Debtor to consummate such transactions.

E.      Approval of the Transfer Agreement and consummation of the Sale at this time are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

F.      The Debtors have demonstrated good, sufficient, and sound business purpose and justification in that, among other things, the Debtors and their advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Acquired Assets and determined that the terms and conditions set forth in the Transfer Agreement, and the transfer to JCI of the Acquired Assets pursuant thereto, represent a fair and reasonable purchase price and constitute the highest and best value obtainable for the Acquired Assets. A sale of the Acquired Assets at this time to JCI pursuant to 11 U.S.C. § 363(b) is the most favorable alternative to minimize the Debtors' losses attributable to the Acquired Assets, and maximizes the Debtors' estates for the benefits of all constituencies. Delaying approval of the Sale might result in JCI's termination of the Transfer Agreement and may result in an

alternative outcome that will achieve less value and cause greater losses for the Debtors, their

estates, and their creditors.

G.      The Debtors have demonstrated good, sufficient, and sound business

purpose and justification regarding the continuation and ultimate transition to JCI of the supply

of battery products out of the Fitzgerald Facility pursuant to the Transfer Agreement.

H.      The Debtors have demonstrated good, sufficient, and sound business

purpose and justification in that, among other things, the Debtors and their advisors diligently

and in good faith analyzed the terms and conditions of the IUE-CWA Memorandum (as defined

below) and determined that the terms and conditions thereof and in particular the terms and

conditions of the IUE-CWA New Brunswick Attrition Plan (as defined below) set forth in the

IUE-CWA Memorandum is an appropriate plan under the circumstances and is in the best

interests of the Debtors, their estates, and their creditors.

I.       A reasonable opportunity to object or be heard with respect to the Motion

and the relief requested therein has been afforded to all interested persons and entities, including:

(i) the Office of the United States Trustee for the Southern District of New York, (ii) all entities

known to have asserted any lien, claim, interest, or encumbrance in or upon the Acquired Assets,

including but not limited to environmental, employee, and product liability claims, (iii) all

federal, state, and local regulatory or taxing authorities or recording offices, including but not

limited environmental regulatory authorities, which have a reasonably known interest in the

relief requested by the Motion, (iv) all entities known to have an interest in a transaction with

respect to the Acquired Assets during the past six months, (v) the United States Attorney's office,

(vi) the United States Department of Justice, (vii) the Securities and Exchange Commission, (viii)

the Internal Revenue Service, (ix) all entities on the Master Service List (as defined by the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management

Order")) and such other entities that are required to be served with notices under the

Supplemental Case Management Order, (x) counsel for JCI, (xi) counsel for the Official

Committee of Unsecured Creditors appointed in these chapter 11 cases, and (xii) counsel for the

Official Committee of Equity Security Holders appointed in these chapter 11 cases.

J.    JCI is not an "insider" of any of the Debtors, as that term is defined in 11

U.S.C. § 101(31).

K.    The Transfer Agreement was negotiated, proposed, and entered into by the

Debtors and JCI without collusion, in good faith, and from arm's-length bargaining positions.

Neither the Debtors nor JCI have engaged in any conduct that would cause or permit the Transfer

Agreement to be avoided under 11 U.S.C. § 363(n).

L.    JCI is a good faith purchaser under 11 U.S.C. § 363(m) and, as such, is

entitled to all of the protections afforded thereby.

M.    The consideration provided by JCI for the Acquired Assets pursuant to the

Transfer Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired

Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by

any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair

consideration under the Bankruptcy Code and under the laws of the United States, any state,

territory, possession, or the District of Columbia.

N.    The transfer of the Acquired Assets to JCI will be a legal, valid, and

effective transfer of the Acquired Assets, and, except as expressly permitted or otherwise

specifically provided for in the Transfer Agreement or this Order, will vest JCI with all right,

title, and interest of the Debtors to the Acquired Assets free and clear of all liens, claims, and

encumbrances, including, but not limited to those (A) that purport to give to any party a right or

option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors'

or JCI's interest in the Acquired Assets, or any similar rights, (B) relating to taxes arising under

or out of, in connection with, or in any way relating to the operation of the Debtors' battery

business prior to the transfer of the Acquired Assets to JCI, and (C) mortgages, restrictions,

hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options,

deeds of trust, security interests, conditional sale or other title retention agreements, pledges,

liens (including, without limitation, mechanics', materialmens', and other consensual and non-

consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal,

offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution,

indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any Court

or foreign or domestic governmental entity, or charges of any kind or nature, if any, including,

but not limited to, any restriction on the use, transfer, receipt of income, or other exercise of any

attributes of ownership, debts arising in any way in connection with any agreements, acts, or

failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, claims (as

that term is defined in the Bankruptcy Code), reclamation claims, obligations, liabilities,

demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and

matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled,

scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or

unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated,

matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to

or subsequent to the commencement of these bankruptcy cases, and whether imposed by

agreement, understanding, law, equity or otherwise, including claims otherwise arising under

doctrines of successor liability (the items and concepts listed in (A), (B), and (C) above,

collectively, the "Interests or Claims").

O.       If the Sale of the Acquired Assets were not free and clear of all Interests or

Claims as set forth in the Transfer Agreement and this Order, or if JCI would, or in the future

could, be liable for any of the Interests or Claims as set forth in the Transfer Agreement and this

Order, JCI would not have entered into the Transfer Agreement and would not consummate the

Sale or the transactions contemplated by the Transfer Agreement, thus adversely affecting the

Debtors, their estates, and their creditors.

P.       The Debtors may sell their interests in the Acquired Assets free and clear

of all Interests or Claims because, in each case, one or more of the standards set forth in 11

U.S.C. § 363(f)(1)-(5) has been satisfied.  All holders of Interests or Claims who did not object,

or withdrew their objections to the Sale, are deemed to have consented to the Sale, pursuant to 11

U.S.C. § 363(f)(2).  Those holders of Interests or Claims who did object fall within one or more

of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their

Interests or Claims, if any, attach to the cash proceeds of the Sale ultimately attributable to the

property against or in which they claim an Interest or Claim.

Q.       The Debtors are authorized to sell, transfer, convey or assign to JCI, all of

the Debtors' right, title, and interest (including common law rights) to all of their intangible

7

property included in the Acquired Assets to the broadest extent permitted by law and the terms of the Transfer Agreement.

R.      Approval of the Transfer Agreement and consummation of the Sale of the Acquired Assets at this time are in the best interests of the Debtors, their creditors, their estates and other parties in interest.

S.      The liabilities being assumed by JCI under the Transfer Agreement, including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters) and Exhibit 4.1 (Employee Matters) to the Transfer Agreement, are an integral part of the Acquired Assets being purchased by JCI and, accordingly, such assumption is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

<u>General Provisions</u>

1.      The Motion is GRANTED.

<u>Approval Of The Transfer Agreement</u>

2.      Pursuant to 11 U.S.C. § 363(b), the Transfer Agreement, and all of the terms and conditions thereof, are hereby approved.

3.      Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized to perform their obligations under the Transfer Agreement and comply with the terms thereof and consummate the Sale in accordance with and subject to the terms and conditions of the Transfer Agreement.

4.      Each of the signatories to the Transfer Agreement is directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the Sale.

5.      The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the Transfer Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Transfer Agreement, and to take all further actions as may be requested by JCI for the purpose of assigning, transferring, granting, conveying, and conferring to JCI or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Transfer Agreement.

6.      This Order and the Transfer Agreement shall be binding in all respects upon all creditors (whether known or unknown) of any Debtor, JCI, all successors and assigns of JCI, the Debtors and their affiliates and subsidiaries, and any subsequent trustees appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection.  To the extent any provision of this Order is inconsistent with the terms of the Transfer Agreement, this Order shall govern.

7.      The Transfer Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; <u>provided</u> that any such modification, amendment, or supplement is not material.

<u>Sale And Transfer Of The Acquired Assets</u>

8.      Except as expressly permitted or otherwise specifically provided for in the Transfer Agreement or this Order, pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the

9

consummation of the Transfer Agreement, the Acquired Assets shall be transferred to JCI free

and clear of all Interests or Claims, with all such Interests or Claims to attach to the cash

proceeds of the Sale in the order of their priority, with the same validity, force and effect which

they now have as against the Acquired Assets, subject to any claims and defenses the Debtors

may possess with respect thereto.  Following the date of the completion of the transfer of the

New Brunswick Facility to JCI under the Transfer Agreement (the "Completion Date"), no

holder of any Interests or Claims in the Acquired Assets shall interfere with JCI's use and

enjoyment of the Acquired Assets based on or related to such Interests or Claims, or any actions

that the Debtors may take in their chapter 11 cases and no person shall take any action to prevent,

interfere with or otherwise enjoin consummation of the transactions contemplated in or by the

Transfer Agreement or this Order.

        9.      Except as expressly provided in the Transfer Agreement or this Order,

other than the liabilities assumed under the Transfer Agreement, including but not limited to

those liabilities set forth on Exhibit 3.6H (Environmental Matters) and Exhibit 4.1 (Employee

Matters) to the Transfer Agreement, the sale, transfer, assignment, and delivery of the Acquired

Assets pursuant to the Transfer Agreement shall not be subject to any Interests or Claims, and

Interests or Claims of any kind or nature whatsoever shall attach only to the net proceeds of the

Sale in their order of priority.  All persons and entities, including, but not limited to, all debt

security holders, equity security holders, governmental, tax, and regulatory authorities, lenders,

trade and other creditors, holding Interests or Claims arising in any way in connection with any

acts, or failure to act, of the Debtors or the Debtors' predecessors or affiliates, claims (as that

term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, or guaranties of

any kind and nature against or in the Debtors or the Acquired Assets (whether legal or equitable,

secured or unsecured, matured or unmatured, contingent or noncontingent, senior or

subordinated), arising under or out of, in connection with, or in any way relating to the Debtors,

the Acquired Assets, the operation of the Debtors' battery business prior to the Completion Date,

or the transfer of the Acquired Assets to JCI, hereby are, and will be, forever barred, estopped,

and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests or

Claims of any kind or nature whatsoever against JCI, its successors or assigns, their property, or

any designee, such persons' or entities' Interests or Claims.  Following the Completion Date, no

holder of an Interest or Claim (other than holders of liabilities assumed under the Transfer

Agreement, including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental

Matters) and Exhibit 4.1 (Employee Matters) to the Transfer Agreement, on account of such

liabilities only) against the Debtors shall interfere with JCI's title to or use and enjoyment of the

Acquired Assets based on or related to such Interests or Claims and all such Interests or Claims,

if any, shall be and hereby are channeled, transferred and attached solely and exclusively to the

proceeds of the Sale in their order of priority.

    10.  Except as expressly provided in the Transfer Agreement or this Order, the

transfer of the Acquired Assets to JCI pursuant to the Transfer Agreement does not require any

consents other than as specifically provided for in the Transfer Agreement and constitutes a legal,

valid, and effective transfer of the Acquired Assets, and shall vest JCI with all right, title, and

interest of the Debtors in and to the Acquired Assets free and clear of all Interests or Claims of

any kind or nature whatsoever (except for the liabilities assumed under the Transfer Agreement,

including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters)

and Exhibit 4.1 (Employee Matters) to the Transfer Agreement).

11

11.     If any person or entity that has filed financing statements, mortgages,

mechanic's liens, <u>lis pendens</u>, or other documents or agreements evidencing Interests or Claims

against or in the Acquired Assets shall not have delivered the foregoing to the Debtors prior to

the Completion Date, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfactions, releases of all Interests or Claims that the

person or entity has with respect to the Acquired Assets, or otherwise, then (a) the Debtors are

hereby authorized to execute and file such statements, instruments, releases and other documents

on behalf of the person or entity with respect to the Acquired Assets and (b) JCI is hereby

authorized to file, register or otherwise record a certified copy of this Order, which, once filed,

registered or otherwise recorded, shall constitute conclusive evidence of the release of all

Interests or Claims in the Acquired Assets of any kind or nature whatsoever.

12.     This Order (a) shall be effective as a determination that, on the

Completion Date, all Interests or Claims of any kind or nature whatsoever existing as to the

Debtors or the Acquired Assets prior to the Completion Date have been unconditionally released,

discharged, and terminated (other than any surviving obligations), and that the conveyances

described herein have been effected and (b) shall be binding upon and shall govern the acts of all

entities including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, state, and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Acquired

Assets.

13.     Except as otherwise expressly provided in the Transfer Agreement, no person or entity, including, without limitation, any federal, state or local governmental agency, department or instrumentality, shall assert by suit or otherwise against JCI or its successors in interest any claim that they had, have or may have against the Debtors, or any liability, debt, or obligation relating to or arising from the Acquired Assets, or the Debtors' operation of the Business or use of the Acquired Assets, including, without limitation, any liabilities calculable by reference to the Debtors or their assets or operations, and all persons and entities are hereby enjoined from asserting against JCI in any way any such claims, liabilities, debts or obligations.

14.     Except as expressly provided in the Transfer Agreement or this Order, JCI is not assuming nor shall it in any way whatsoever be liable or responsible, as a successor or otherwise, for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) of the Debtors or any liabilities, debts, commitments, or obligations in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operation of their business or use of the Acquired Assets on or prior to the Completion Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Completion Date or are to be observed, paid, discharged, or performed on or prior to the Completion Date (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims), or any liabilities calculable by reference to the Debtor or their assets or operations, or relating to continuing conditions existing on or prior to the Completion Date, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to JCI a release thereof. Without

13

limiting the generality of the foregoing, except as expressly provided in the Transfer Agreement

or this Order, JCI shall not be liable or responsible, as a successor or otherwise, for the Debtors'

liabilities, debts, commitments, or obligations, whether calculable by reference to the Debtors,

arising on or prior to the Completion Date and under or in connection with (i) any employment

or labor agreements (including, without limitation, the payment of wages, bonuses, severance

pay, benefits (including, without limitation, contributions or payments on account of any under-

funding with respect to any and all pension plans) or any other payment to employees of Debtors

while such individuals were employed by the Debtors), consulting agreements, severance

arrangements, change-in-control agreements, or other similar agreement to which any Debtor is a

party, (ii) any pension, welfare, compensation, or other employee benefit plans, agreements,

practices, and programs, including, without limitation, any pension plan of the Debtors

(including, without limitation, retention, benefit and/or incentive plan to which any Debtors are a

party and relating to the battery business (including, without limitation, arising from or related to

the rejection or other termination of any such agreement)), (iii) the cessation of the Debtors'

operations, dismissal of employees, or termination of employment or labor agreements or

pension, welfare, compensation, or other employee benefit plans, agreements, practices, and

programs, obligations that might otherwise arise from or pursuant to the Employee Retirement

Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil

Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal

Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget

Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act,

(iv) workers' compensation, occupational disease, or unemployment or temporary disability

insurance claims, (v) environmental liabilities, debts, claims, or obligations arising from

14

conditions first existing on or prior to Completion Date (including, without limitation, the

presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be

asserted on any basis, including, without limitation, under the Comprehensive Environmental

Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vi) any bulk sales or

similar law, (vii) any liabilities, debts, commitments, or obligations of, or required to be paid by,

the Debtors for any Taxes of any kind for any period, (viii) any liabilities, debts, commitments,

or obligations for any Taxes relating to the business of the Debtors or the Acquired Assets for or

applicable to the period prior to the Completion Date, (ix) any litigation relating to the Acquired

Assets for or applicable to the period prior to the Completion Date, and (x) any products liability

or similar claims, whether pursuant to any state or any federal laws or otherwise, relating to the

Acquired Assets for or applicable to the period prior to the Completion Date.  JCI shall in no

way be deemed a party to or assignee of any such agreement set forth in (i), (ii), and (iii) above,

and no employee of JCI shall be deemed in any way covered by or a party to any such agreement,

and all parties to any such agreement are hereby enjoined from asserting against JCI any and all

claims arising from or relating to such agreement.  Any and all notices, if any, required to be

given to the Debtors' employees pursuant to the Workers Adjustment and Retraining Notification

Act, or any similar federal or state law, shall be the sole responsibility and obligation of the

Debtors and JCI shall have no responsibility or liability therefore.

15.     Upon the completion of the transactions contemplated by the Transfer

Agreement, JCI shall not be deemed to (i) be the successor of the Debtors, (ii) have, de facto, or

otherwise, merged with or into the Debtors, (iii) be a mere continuation or substantial

continuation of the Debtors or the enterprise(s) of the Debtors, or (iv) be liable for any acts or

omissions of the Debtors in the conduct of the Debtors' business.

<u>Continuation And Transition Of Supply Out Of Fitzgerald</u>

16.    The Debtors are hereby authorized to (a) continue manufacturing and supplying JCI with battery products manufactured at the Fitzgerald Facility in accordance with JCI's diminishing supply requirements and (b) to transition production of battery products manufactured at the Fitzgerald Facility to other JCI facilities.

17.    The Debtors and JCI are each directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the supply and transition of battery products from the Fitzgerald Facility.

<u>IUE-CWA Consent And IUE-CWA New Brunswick Attrition Plan</u>

18.    The Debtors are hereby authorized to enter into the agreement by and among Delphi Corporation, the International Union, IUE-CWA and IUE-CWA Local 416 (collectively the "IUE-CWA") attached to the Transfer Agreement as Exhibit 1.13 thereto (the "IUE-CWA Memorandum") and to implement the terms of such IUE-CWA Memorandum, including without limitation (i) that certain attrition plan between Delphi and the IUE-CWA (the "IUE-CWA New Brunswick Attrition Plan") with respect to the New Brunswick Facility and (ii) that certain consent to the waiver of that certain no-sale clause and neutrality obligations (the "IUE-CWA Consent").

19.    Each of the signatories to the IUE-CWA Memorandum is directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan and the terms of the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan, including, without limitation, any

16

and all actions necessary or appropriate to its implementation of and performance under the IUE-

CWA Consent and the IUE-CWA New Brunswick Attrition Plan.

<u>Additional Provisions</u>

20.     The consideration provided by JCI for the Acquired Assets under the

Transfer Agreement is hereby deemed to constitute reasonably equivalent value and fair

consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform

Fraudulent Transfer Act, and under the laws of the United States, and any state, territory,

possession, or the District of Columbia.

21.     On the Completion Date, this Order shall be construed and shall constitute

for any and all purposes a full and complete general assignment, conveyance, and transfer of all

of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired

Assets to JCI on pursuant to the terms of the Transfer Agreement.

22.     Except as otherwise provided in the Transfer Agreement, on the

Completion Date, each of the Debtors' creditors is authorized and directed to execute such

documents and take all other actions as may be necessary to release their respective Interests or

Claims against the Acquired Assets, if any, as may have been recorded or may otherwise exist.

23.     Each and every federal, state, and governmental agency or department,

and any other person or entity, is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the

Transfer Agreement.

24.     All entities who are currently, or as of the Completion Date may be, in

possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

17

the Transfer Agreement are hereby directed to surrender possession of the Acquired Assets to

JCI on the Completion Date.

26. The transactions contemplated by the Transfer Agreement are undertaken

by JCI in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and

accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the sale of the Acquired Assets shall not affect the validity of the Sale to JCI, unless

such authorization is duly stayed pending such appeal.  JCI is a purchaser in good faith of the

Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the

Bankruptcy Code.

26. The consideration paid by JCI in the Sale for the Acquired Assets under

the Transfer Agreement is fair and reasonable, and may not be avoided or otherwise challenged

under 11 U.S.C. § 363(n).

27. The Debtors, including but not limited to their respective officers,

employees, and agents, are hereby authorized to execute such documents and do such acts as are

necessary or desirable to carry out the transactions contemplated by the terms and conditions of

the Transfer Agreement and this Order.  The Debtors shall be, and they hereby are, authorized to

take all such actions as may be necessary to effectuate the terms of this Order.

28. The terms and provisions of the Transfer Agreement and this Order shall

be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and

their creditors, JCI, and its respective affiliates, successors, and assigns, and any affected third

parties, including, but not limited to, all persons asserting an Interest or Claim in the Acquired

Assets to be sold to JCI pursuant to the Transfer Agreement, notwithstanding any subsequent

appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of

18

the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and

provisions likewise shall be binding.

29.    Notwithstanding anything contained herein to the contrary, the term

"Acquired Assets" as defined herein does not include property that is not property of the Debtors'

estates, such as funds that are trust funds under any applicable state lien laws.

30.    To the extent permitted by section 525 of the Bankruptcy Code, no

governmental unit may revoke or suspend any permit or license relating to the operation of the

Acquired Assets sold, transferred, or conveyed to JCI on account of the filing or pendency of

these chapter 11 cases or the consummation of the Sale.

31.    The failure specifically to include or to reference any particular provision

of the Transfer Agreement in this Order shall not diminish or impair the effectiveness of such

provision, it being the intent of the Court that the Transfer Agreement be authorized and

approved in their entirety.

32.    The Transfer Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented by the parties thereto in accordance

with the terms thereof without further order of the Court; _provided_ that any such modification,

amendment, or supplement does not have a material adverse effect on the Debtors' estates.

33.    The provisions of this Order are nonseverable and mutually dependent.

34.    Nothing in this Order shall alter or amend the Transfer Agreement and the

obligations of the Debtors and JCI thereunder.

35.    This Court retains jurisdiction to enforce and implement the terms and

provisions of the Transfer Agreement, all amendments thereto, any waivers and consents

19

thereunder, and of each of the agreements executed in connection therewith in all respects,

including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets

to JCI, (b) compel delivery of the purchase price, reimbursement of costs under the IUE-CWA

New Brunswick Attrition Plan, or performance of other obligations owed to the Debtors pursuant

to the Transfer Agreement, (c) resolve any disputes arising under or related to the Transfer

Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the

provisions of this Order, and (e) protect JCI against any Interests or Claims against the Debtors

or the Acquired Assets, of any kind or nature whatsoever, attaching to the proceeds of the Sale.

36.    Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy

Procedure or any other Bankruptcy Rule, this Order shall take effect immediately upon its entry.

37.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
       June ___, 2006


_____
UNITED STATES BANKRUPTCY JUDGE

20

# Exhibit 1

EXECUTION COPY

**TRANSFER AGREEMENT RELATING TO
TRANSFER OF DELPHI'S NEW BRUNSWICK
<u>BATTERY FACILITY TO JCI</u>**

**THIS AGREEMENT,** made and entered into this **26th** day of **May, 2006** by and between **JOHNSON CONTROLS, INC.**, a Wisconsin corporation ("**Buyer**") and **DELPHI AUTOMOTIVE SYSTEMS LLC,** a Delaware limited liability company ("**Seller**").

**R E C I T A L S:**

**WHEREAS**, Seller is engaged in the Business (as hereinafter defined).

**WHEREAS**, on October 8, 2005 (the "**Petition Date**"), Seller and certain of its Affiliates filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, Seller wishes to sell to Buyer, all right, title and interest of Seller in and to the Acquired Assets (as hereinafter defined), and Buyer wishes to make such purchase; subject to the conditions set forth in this Agreement.

**WHEREAS,** Buyer and Seller are parties to a Tier 2 Component Supply Agreement ("**CSA**") under which Seller manufactures SLI batteries, at the Seller's facility in New Brunswick, New Jersey (the "**Facility**").

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained in this Agreement, Buyer and Seller agree as follows:

1.    **DEFINITIONS.**    As used in this Agreement, the following words, when capitalized, shall have the respective meanings set forth below:

**1.1**    "**Acquired Assets**" means the Real Property and all of the following assets to the extent owned by Seller and used or held for use primarily or exclusively in the Business at the Facility: (i) Administrative Assets; (ii) Permits; (iii) Personal Property owned by Seller, located at the Facility and used for manufacturing Products for Buyer under the CSA, including any addition thereto or any replacement, adjustment or modification thereof; and (iv) certain Inventory of the Business.  <u>Exhibit 1.1</u> to this Agreement contains a list of the Acquired Assets consisting of Personal Property and Real Property as of the date hereof to the best of Seller's Knowledge.  For the avoidance of doubt, it is specified that the term "**Acquired Assets**" does not include: (i) any machinery, equipment and other assets owned by Buyer; (ii) any of Seller's assets within its Laurel, Mississippi or Flint, Michigan operations (which make plastic battery trays, covers and other plastic components of Products) or Fitzgerald, Georgia operations (without affecting JCI's rights to its bailed assets within those facilities); (iii) assets owned by third parties; (iv) except as set forth in Section 7.3 (Indemnity), the benefits of any of Seller's or Seller's Affiliates' insurance policies relating to the operation of the

Business (including any right to proceeds thereunder); (v) all finished goods Inventory and all inventories, products, rights, properties, assets and businesses of the Business which shall have been transferred or disposed of by Seller prior to Completion in the Ordinary Course of Business or not otherwise in breach of this Agreement; (vi)  Any Inventory consisting of work in process (other than green group batteries), or raw materials not listed on Exhibit 1.11 of this Agreement, including the excluded raw materials Inventory set forth on Exhibit 1.1(vi); (vii) any Contracts; and (viii) any document or information the transfer of which is prohibited by law or regulation.

1.2      "**Administrative Assets**" means books, records and other administrative assets including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, sale order files, tool routings, labor routings, facility blueprints, service blueprints and plant layouts; provided, however that Administrative Assets does not include Technical Documentation or information and materials protected by attorney-client privilege (the lack of which materials are not material to the operation of the Business under the CSA).

1.3      "**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity.  For purposes of this definition, control means ownership of more than fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar functions.

1.4      "**Agreement**" means this Transfer Agreement, including Exhibit 4.1 and all other exhibits to this Agreement.

1.5      Intentionally omitted.

1.6      "**Business**" means the manufacture of starting SLI batteries by Seller at the Facility.

1.7      "**Completion**" means completion of the purchase of the Acquired Assets by Buyer resulting from and in accordance with this Agreement.

1.8      "**Completion Date**" means the date of Completion of the transfer of the Facility to Purchaser under this Agreement.

1.9      "**Contracts**" means purchase orders, service contracts, leases, product warranty or service agreements and other commitments, agreements and undertakings relating to the Business.

1.10      "**Improvements**" means buildings, fixtures and other improvements to Real Property, including the Facility.

1.11      "**Inventory**" included within the Acquired Assets means finished Products, raw materials set forth on Exhibit 1.11, work-in-process consisting of green group batteries, packaging, stores, stock, supplies, spare parts and other inventory used in making Products located at the Facility.

2

**1.12** "**Lien**" means any lien, mortgage, charge, pledge, security interest, restriction on transferability, easement, defect of title or other claim, easement, encroachment or other encumbrance of any nature whatsoever on any Acquired Asset.

**1.13** "**IUE Consent**" means the IUE waiver of "no sale" provisions contained in the Delphi-IUE-CWA National Agreement (as defined in Exhibit 4.1) and IUE waiver of the Buyer's assumption of the Unpublished Delphi IUE-CWA Neutrality Letter or any other neutrality agreement, included as part of Exhibit 1.13 of this Agreement.

**1.14** "**Purchase Price**" means the purchase price to be paid for the Acquired Assets, exclusive of any Transaction Taxes, equal to One Dollar ($1.00) plus (i) $20.00 for every green group battery, and (ii) the CSA price for all finished goods Inventory, in each case located at the Facility as of close of business on July 31, 2006, based on a physical inventory to be conducted by the parties.

**1.15** "**Ordinary Course of Business**" means the ordinary course of business of the Business, consistent with past practice and custom, including the CSA.

**1.16** "**Party**" or "**Parties**" means Buyer and/or Seller.

**1.17** "**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to Seller and that relate exclusively to the Facility or the Acquired Assets, to the extent that Seller or any of its Affiliates has the power, authority or right to transfer or assign such Permits.

**1.18** "**Permitted Lien**" means: (i) any Lien for taxes not yet delinquent; (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet delinquent; (iii) purchase money security interests arising in the Ordinary Course of Business; (iv) security interests relating to vendor tooling arising in the Ordinary Course of Business; (v) Liens and encumbrances of record; and (vi) Liens consented to by Buyer (such consent not to be unreasonably withheld).

**1.19** "**Personal Property**" means tangible personal property other than Administrative Assets, Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, business machines, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property used by the Business, whether located at the Facility, at the place of business of a vendor or elsewhere.

**1.20** "**Products**" means SLI batteries.

**1.21** "**Real Property**" means the real property used by the Business and owned by Seller, as described in Exhibit 1.21, and all Improvements located thereon.

**1.22** "**Sale Approval Order**" means an order or orders of the Bankruptcy Court issued pursuant to Sections 363 and 365 of the Bankruptcy Code substantially in the form set forth on Exhibit 1.22 to this Agreement, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets to Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Liens other than Permitted Liens.

**1.23**    "**Seller's Knowledge**" or "**Knowledge of Seller**" means the knowledge of any of the individuals listed on <u>Exhibit 1.23</u> with respect to their respective functional areas of expertise. For this purpose, an individual will be deemed to have Knowledge of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual would be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonable inquiry of Delphi's files and its employees who, in the ordinary course of their job responsibilities, would reasonably be expected to have actual possession or actual personal Knowledge of such information.

**1.24**    "**SLI Batteries**" means starting, lighting and ignition lead-acid batteries.

**1.25**    "**Technical Documentation**" means: (i) assembly and parts drawings, material specifications and drawings for Products; (ii) information to assemble Products; (iii) labor and tool routing sheets; drawings of special tools, fixtures, dies, jigs, gauges and patterns, and service information; and (iv) operating manuals, instructions and other available, relevant documents relating to the operation of the machinery and equipment located at the Facility.

**1.26**    "**Transaction Taxes**" mean any sales taxes, documentary and stamp taxes, transfer taxes, use taxes, excise taxes, value-added taxes, registration duties, gross receipts or similar charges, all charges for filing and recording documents in connection with the transfer of the Acquired Assets.

**2.**    <u>**COMPLETION OF THE SALE OF THE ACQUIRED ASSETS:**</u>

**2.1**    <u>**Completion.**</u>    Subject to the conditions set forth in this Section 2.1, Completion shall take place on the Completion Date at the offices of Seller in Troy, Michigan or at such other place as Buyer and Seller may jointly determine.    The Completion date will be the later of August 1 (12:01AM EST), 2006 and the date that is ten (10) days after the date of the Sale Approval Order, unless otherwise agreed by the Parties. Each Party's obligation to perform at the Completion Date is subject to:

A.    Bankruptcy Court approval of the Sale Approval Order, including without limitation, approval of <u>Exhibit 1.13.</u>

B.    Completion of the implementation of the attrition plan set forth in Exhibit 1.13 (the "**Attrition Plan**") to reduce the number of U.S. Hourly Employees to approximately one hundred (100) U.S. Hourly Employees, in accordance with the terms of the IUE Consent**;**

C.    Seller must not have negotiated any other Collective Bargaining Agreement which purports to be applicable to the New Brunswick Facility.

D.    The other Party's being in compliance, in all material respects, with its agreements with respect to Employee Matters that are such other Party's responsibility, and to be performed before Completion as described in <u>Exhibit 4.1</u> hereto, and with such Party's representations and warranties set forth in Section 3 of this Agreement being true and correct in all material respects as of

the Completion Date, except where a failure is due to the acts or omissions of the other Party;

E.    The other Party must not be in default in any material respect under, and must not have rejected, the CSA dated June 30, 2005;

F.    The Facility must be an operational plant producing Products in accordance with the CSA, with such changes as contemplated in Exhibit 1.13; and

G.    The other party shall be in compliance in all material respects with the Environmental Matters Agreement dated June 30, 2005 with respect to the Facility.

H.    Each Party undertakes to pay to the other or to the relevant tax authorities the Transaction Taxes as required by applicable law and in accordance with Section 1.26.

**2.2    Seller Deliveries at Completion.**  At Completion Seller shall deliver to Buyer:

A.    A Bill of Sale for the Personal Property and Inventory, substantially in the form of Exhibit 2.2A hereto, duly executed together with an invoice relating to the Acquired Assets transferred;

B.    A covenant deed for the Real Property;

C.    A certificate that all the representations and warranties made in Article 3 by Seller are true and correct in all material respects, and that it has complied with its obligations under this Section 2.2, with the same force and effect, and subject to the same qualifications, as though made at Completion;

D.    Officer's certificate stating that at least $12.5 million USD has been incurred by Delphi in furtherance of the Attrition Plan, as referred to in Section 3.A(xi) of Exhibit 4.1; and

E.    Such other documents as may be necessary to give Buyer good and valid title to and ownership of the Acquired Assets.

**2.3    Buyer Deliveries at Completion.**  At Completion Buyer shall:

A.    A certificate that all the representations and warranties made in Section 3 by Buyer are true and correct in all material respects, and that it has complied with its obligations under this Section 2.3, with the same force and effect, and subject to the same qualifications, as though made at Completion; and

B.    Pay to Seller the Purchase Price by wire transfer in accordance with wiring instructions to be provided by Seller before Completion.

**2.4** **Transfer of Acquired Assets.** Seller and Buyer hereby agree that, as of the Completion Date, title and risk of loss to all Acquired Assets shall pass from Seller to Buyer.

**2.5** **Post Closing Deliveries.** Buyer will pay for assets, goods or services ordered by Seller on or before Completion for the Business in the Ordinary Course of Business to the extent such assets, goods or services are received by the Business after the Completion Date; other than Inventory items that have been excluded from the Acquired Assets under Section 1.1(vi) of this Agreement. If any such excluded items are delivered to the facility after Completion, Buyer will promptly contact Seller and segregate such items in a reasonable manner, and Seller and Buyer will cooperate in Seller's removal of such items within 30 days after such notice as set forth in Section 8.15 below.

**2.6** **Prorations, Adjustments of Expenses Following Completion**:

A. **Prorations:**

(i)    To the extent that Seller makes any payment relating to the Business prior to, on or following the Completion Date with respect to any item listed in clause (ii) below relating to periods following the Completion Date for which Buyer will receive a benefit, Buyer shall reimburse Seller on a per diem basis, unless otherwise provided for; and

(ii)    To the extent Buyer makes any payment relating to the Business following the Completion Date with respect to any item listed below relating to periods on or prior to the Completion Date for which Seller received a benefit, Seller shall reimburse Buyer on a per diem basis, unless otherwise provided for, in each case for the following:

(a)    Personal, real property and other ad valorem Taxes, with real property Taxes allocated pursuant to Section 5.5.

(b)    Water, wastewater treatment, sewer charges and other similar types of charges and/or Taxes thereon and any other assessments payable with respect to the Business.

(c)    Electric, fuel, gas, telephone and other utility charges.

(d)    Reimbursable employee business expenses will be paid by Seller if incurred prior to or on the Completion Date or Buyer if incurred after the Completion Date.

(e)    Rentals and other charges under leases to be transferred to or assumed by the Buyer pursuant to this Agreement.

(f)    Payments and charges due pursuant to any Contract (other than pursuant to collective bargaining agreements,

6

Benefit Plans (as defined in Section 3(3) of ERISA)), employee payroll-related items except as set forth in clause (d), Permit, commitment or other binding arrangement to which Seller is a party or is obligated and which are being assumed by the Buyer pursuant to this Agreement or offered to Buyer by Seller on a transition services basis, as may be agreed by the Parties prior to Completion.

B.   **Further Assurance.**  To the extent that, after the Completion Date, Delphi, on the one hand, or Buyer, on the other hand, receives any bills or invoices for any of the items listed in this Section 2.6 or similar items, relating to both pre-Completion and post-Completion periods, such Party shall, within ten (10) business days, send any such bills or invoices to the other Party.   If necessary to avoid incurring interest, penalties and/or late charges, the Party receiving any such bill or invoice shall pay all amounts shown to be due thereon, and shall invoice the other Party for all amounts owed by such other Party thereunder, and such other Party shall reimburse such amounts in accordance with Section 2.6C.

C.   **Payments.**   Any payments due under this Section 2.6 shall be made within fifteen (15) days after the end of the month in which a  bill or invoice is sent to a Party pursuant to Section 2.6C; provided, however, that the disputed portion of any such item shall be paid within fifteen (15) days after the final determination thereof on an item-by-item basis.   When any Party makes a payment to a third party which is required to be reimbursed to it by another Party, the reimbursement payment shall be considered the repayment of an advance. Such payments shall be made by wire transfer in immediately available funds.

2.7   **Approvals and Consents; Cooperation; Notification.**   Seller shall notify, as required by the Bankruptcy Court, all parties entitled to notice of the proposed sale of the Acquired Assets to Buyer, and Buyer will cooperate with Seller in attempting to obtain the Sale Approval Order.

2.8   **Fitzgerald**.   Regarding Delphi's supply of Products to JCI from Delphi's Fitzgerald, Georgia battery manufacturing facility, Delphi will continue to supply such batteries to JCI in accordance with the terms of the Component Supply Agreement between the parties dated July 1, 2005 ("**CSA**"), as amended. In no event shall the pricing of Products manufactured at Fitzgerald be modified other than the GM discounts and other changes and adjustments contemplated by the existing CSA terms.

3.   **REPRESENTATIONS, WARRANTIES AND INDEMNITIES:**

3.1   **Representations and Warranties made by each Party.**   Each of Seller and Buyer makes the representations and warranties contained in this Article 3 to the other Party except for those in Section 3.6, which are made solely by Seller to Buyer. The representations and warranties contained in this Article 3 are made on the date of this Agreement and are deemed to be repeated on the Completion Date.

3.2   **Power and Authority.**   Subject to Bankruptcy Court approval of the Sale Approval Order, it has the power to execute, deliver and perform this Agreement, and

has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

**3.3    Authorizations.**    Subject to Bankruptcy Court approval of the Sale Approval Order, all authorizations required in connection with the execution, delivery, performance, validity and enforceability of, and the transactions contemplated by, this Agreement have been obtained or effected and are in full force and effect, provided, however, that performance of this Agreement is subject to Buyer and Seller taking necessary action as required to meet their respective obligations regarding employee matters, as set forth on Exhibit 4.1 hereto.

**3.4    Enforceability.**    Subject to Bankruptcy Court approval of the Sale Approval Order, this Agreement constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms.

**3.5    No Breach.**  Subject to Bankruptcy Court approval of the Sale Approval Order, entering into this Agreement and performing its undertakings hereunder shall not result in the breach of any provision of, or constitute a default under, any judgment, decree, indenture, mortgage or other agreement or instrument to which it is a party or by which it is bound.

**3.6    Miscellaneous Matters Relating to Business:**

A.    **Ownership of the Acquired Assets.**  Seller has good, valid and marketable title to the Acquired Assets, and upon entry by the Bankruptcy Court of the Sale Approval Order, Seller shall transfer and convey the Acquired Assets free and clear of any Lien other than Permitted Liens.  Except for this Agreement and the Bankruptcy Court approvals reflected in the Sale Approval Order, the Real Property will be transferred free and clear of any restrictions with respect to the transferability or divisibility thereof.  At the Closing, Buyer will receive good and marketable fee title or leasehold title (as applicable) to all of the Real Property owned by Seller, free and clear of all Liens other than the Permitted Liens.

B.    **Condition.**  The Real Property and Personal Property (other than Inventory) have been maintained as required by the CSA and are in such condition (considering age and purpose for which used) as to enable the Business to be conducted as currently conducted without material disruption.

C.    **Inventory.**    SELLER MAKES NO WARRANTY OF WHATSOEVER KIND OR NATURE REGARDING INVENTORY, ALL OF WHICH IS BEING SOLD "AS IS" AND "WHERE IS", AND SELLER HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, INCLUDING THE CONDITION OF THE INVENTORY AND EACH PART THEREOF, AND THE ADEQUACY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE INVENTORY OR ANY PART THEREOF.

D.    **Real Property.**  To Seller's Knowledge, the use of the Real Property as currently used is a permitted use by right in the applicable zoning classification and is not a nonconforming use or a conditioned use, and no variances are needed and none have been granted with respect to the Real

8

Property.  There are currently in full force and effect duly issued certificates of occupancy permitting the Real Property and the Facility to be legally used and occupied for the purpose of conducting the Business.  The Real Property has rights of access to dedicated public highways.  To Seller's Knowledge, no fact or condition exists that would prohibit or adversely affect the ordinary rights of access to and from the Real Property from and to the existing highways and roads, and there is no pending or, to Seller's Knowledge, threatened restriction or denial, governmental or otherwise, upon such ingress and egress.  Seller has not received notice of: (i) any claim of adverse possession or prescriptive rights involving or affecting any of the Real Property; (ii) any structure located on any Real Property that encroaches on or over the boundaries of neighboring or adjacent properties; or (iii) any structure of any other person or entity that encroaches on or over the boundaries of any Real Property.  None of the Real Property is located in a flood plain, flood hazard area, wetland or lakeshore erosion area within the meaning of any Law or Order.

E.    **No Condemnation, Expropriation or Similar Action.**    To Seller's Knowledge, neither the whole nor any portion of the Real Property is subject to any order to be sold (other than the Sale Approval Order) or is being condemned, expropriated or otherwise taken by any governmental entity with or without payment of compensation therefore, and no such condemnation, expropriation or taking has been planned, scheduled or proposed.

F.    **Compliance.**  The Real Property is, or at the time of Completion will be, in compliance in all material respects with any applicable law, regulation or ordinance, and Seller has not received any notice, written or to the best of Seller's knowledge oral, of any such violation.

G.    **Litigation.**  Except for matters disclosed prior to Completion and for which Seller will retain responsibility if so required under the terms of the CSA, there is no litigation or administrative proceeding and to Seller's Knowledge, threatened litigation or administrative proceeding which affects or could affect the Real Property or Buyer's ability to conduct the Business at the Facility.

H.    **Environmental Matters.**   Seller makes no representations or warranties regarding environmental matters in this Agreement (notwithstanding anything to the contrary herein).   Notwithstanding the aforementioned, to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge liability with respect to any claims brought by a third party against Buyer relating to pre-Completion environmental matters at the Facility, Seller will indemnify Buyer as set forth in Exhibit 3.6.H to this Agreement.

I.    Seller represents and warrants that, except for the unpublished Neutrality Letter and Exhibit 1.13 referenced herein, Seller has no current agreements or understandings with the IUE-CWA which create obligations or liabilities for Buyer at its other plants if Buyer purchases the New Brunswick facility or assumes the terms of the Delphi IUE-CWA National Agreement or the Delphi IUE-CWA Local Agreement.

9

J.      EXCEPT FOR SPECIFIC REPRESENTATIONS AND WARRAN-TIES CONTAINED IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE BEING SOLD ON AN "AS IS," "WHERE IS" BASIS AND SELLER DOES NOT MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS OR OTHERWISE WITH RESPECT TO THE ACQUIRED ASSETS WHICH EXTEND BEYOND THE AFORESAID SPECIFIC REPRESENTATIONS AND WARRANTIES.

**3.7**    **Product Warranty/Liability:**

A.      **Buyer Indemnity.**    Buyer will defend, indemnify and hold harmless Seller and its directors, officers, agents and employees, from and against any and all claims, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including reasonable attorney fees) which may be imposed upon or incurred by Seller from claims, suits or causes of action (including without limitation those for death, personal injury, or property damage) by any Person whatsoever at any time against Seller and/or its directors, officers, agents and employees to the extent arising from, caused or alleged to be caused by: (a) defective or improper design or manufacture of any Products manufactured by Seller under the CSA; (b) infringement of any intellectual property right (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) in connection with the design or manufacture of any Products other than infringement of U.S. Patent No. 4,906,540 or U.S. Patent No. 5,401,278; and/or (c) the failure of the design of Products to comply with any applicable Laws.

B.      **Seller Indemnity.**    To the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge liability with respect to any claims for Products manufactured at the Facility brought by a third party against Buyer relating to pre-Completion Product warranty/liability matters, Seller will defend, indemnify and hold harmless Buyer  and its directors, officers, agents and employees, from and against any and all claims, suits, causes of action, liabilities, losses, damages, costs of settlement, and expenses (including reasonable attorney fees) which may be imposed upon or incurred by Buyer from claims, suits or causes of action (including without limitation those for death, personal injury, or property damage) by any Person whatsoever at any time against Buyer and/or its directors, officers, agents and employees to the extent arising from or caused by: (a) infringement of U.S. Patent No. 4,906,540 or U.S. Patent No. 5,401,278;    (b) infringement of any intellectual property right (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) other than in connection with the design or manufacture of any Products; (c) the failure of the Products manufactured by Seller at the Facility under the CSA to comply in any material respect with the applicable specifications as a result of Seller's failure to comply with the Manufacturing and Quality Procedures set forth in the CSA or negligent workmanship; and/or (d) any and all claims related to the Facility, its employees, Products to the extent arising in any manner out of facts or circumstances in existence prior to July 1, 2005.

**4.**    **EMPLOYEE MATTERS.** The treatment of U.S. Hourly Employees and U.S. Salaried Employees, and the obligations of Seller and Buyer with respect thereto, will be as set forth in Exhibit 4.1.

**5.**    **TAX MATTERS:**

**5.1**    **Seller Responsibilities.**    Seller shall file any Tax Returns and pay any Taxes which may be required by any federal, state, local or foreign tax authorities or governmental agencies by reason of business conducted by Seller on or prior to the Completion Date.

**5.2**    **Buyer Responsibilities.** Buyer shall file any Tax Returns and pay any Taxes which may be required by any federal, state, local or foreign tax authorities or governmental agencies by reason of business conducted by Buyer after the Completion Date.  All United States or foreign, national, state or local sales taxes, documentary and stamp taxes, transfer taxes, registration taxes, use taxes, gross receipts taxes, registration duties and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees), as well any permit, transfer and filing fees required in order to obtain governmental approvals and consents relating to the transactions contemplated by this Agreement ("**Transfer Taxes**"), shall be borne by Buyer.

**5.3**    **Mutual Assistance.**    Without affecting the foregoing responsibilities, Seller and Buyer shall provide reasonable assistance during normal business hours to one another to resolve any Tax issues which may relate to their respective business activities utilizing the Acquired Assets and personnel. Such assistance may include, without limitation, access to relevant business records and personnel in connection with: (i) the preparation and filing of Tax Returns, elections, consents, certifications and claims for refunds; (ii) the determination of liability for Taxes; and (iii) the response to tax audits, examinations and other proceedings.  To the extent permitted by applicable law, Buyer and Seller agree to reasonably cooperate with each other to complete any and all exemption certificates or other documents that exempt any portion of the Purchase Price from any of the Transaction Taxes prior to either the Completion Date or the due date for such Transaction Tax.

**5.4**    **Definitions.**    For purposes of this Agreement, the words "**Taxes**" and "**Tax Return**" are defined as follows:

A.    "**Taxes**" mean any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer, taxes, use, gross receipts, value added, employment, excise, ad valorem, property, withholding, payroll, minimum, windfall profit taxes, transfer fees, customs duties or registration duties), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign governmental or subdivision or agency thereof;

B.    "**Tax Return**" means any return, declaration, report, claim for refund or information return or statement, or any other similar filings related to Taxes, including any schedule or attachment thereto.

**5.5**    **Real Estate Taxes**.  All real estate taxes and assessments assessed on the Real Property for the calendar year in which the Completion occurs shall be prorated between Buyer and Seller.  The Seller shall be allocated tax liability for the portion of the year beginning on January 1 and ending on the Completion Date; the Buyer shall be allocated tax liability for the portion of the year beginning on the day following Completion Date and ending on December 31.  The percentage for each party will be the number of days in its portion of the year divided by the total number of days in the year.  Since the actual determination of tax liability for a given calendar year occurs in June, if the Completion Date occurs before the tax has been determined for the year, the calculation of the prorated taxes will be made as soon as practical after the tax bill has been rendered for the calendar year.  If the Completion Date occurs after the tax liability has been determined for the year, the calculation of the prorated taxes will take place at Completion.  Each party will be responsible for paying or otherwise discharging any installments due in the year in which the Completion Date occurs based on ownership of the property at the time the installment is due.  If the tax allocated to a party exceeds the installments paid or to be paid by that party, that party will make a payment to the other party equal to the excess of the prorated liability over the sum of the installment payments paid or to be paid.  The parties agree to cooperate as necessary to accurately and promptly determine the prorated tax liability.

6.    **GOVERNING LAW; DISPUTE RESOLUTION**:

**6.1**    **Governing Law**.  This Agreement shall be construed and enforced in accordance with the laws of the State of New York, without giving effect to rules governing the conflict of laws.  Buyer and Seller  irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the Bankruptcy Court).

**6.2**    **Dispute Resolution**:

A.    Buyer and Seller will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each Party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either Party to the other, either Party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice of Dispute**") and specify therein in reasonable detail the nature of the dispute.  Within ten (10) days after receipt of the Notice of Dispute, the receiving Party (the "**Defending Party**") shall submit to the other a written response.  The Notice of Dispute and the response shall include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive to meetings of the parties.  Within fifteen (15) days after such written notification, the executives (and other named in the Notice of Dispute or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute (the "**Dispute Resolution Meeting**").  All reasonable requests for information made by one Party to the other will be honored promptly.  All negotiations pursuant to this Section 6.2A are confidential and shall be treated as

compromise and settlement negotiations for purposes of applicable rules of evidence.

**B.**    The parties agree that neither of them will initiate legal action in respect of a dispute within the period of fifteen (15) days following the Dispute Resolution Meeting.  In the absence of agreement at the Dispute Resolution Meeting and following that fifteen (15) day period, any party shall be free to pursue its rights and remedies as it may see fit in accordance with this Agreement.

7.    **INDEMNIFICATION:**

    **7.1    Indemnification:**

    A.    **Indemnification Provisions for Benefit of Buyer.**    If Seller breaches any of its warranties or covenants contained in this Agreement, and Buyer makes a written claim for indemnification against Seller in accordance with the procedures set forth in Section 7.2 below within the applicable survival period, to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge the underlying third party claim,  Seller agrees to indemnify Buyer and its Affiliates and their officers, directors, employees and agents (individually a "**Buyer Indemnitee**" and collectively the "**Buyer Indemnitees**") and to hold each Buyer Indemnitee harmless from and against all damages, losses and expenses (including reasonable expenses of investigation and attorneys' fees) ("**Losses**") to the extent caused by or arising out of: (i) any breach of warranty or inaccurate or erroneous representation of Seller contained in this Agreement or in any certificate delivered pursuant to this Agreement; or (ii) any breach of this Agreement.  Buyer shall be named as an additional insured on Seller's General Liability and Excess Liability policies as related to the Business, but only to the extent of Seller's Indemnification Obligations under this Agreement.   Buyer agrees that all claims for indemnification shall be presented to Seller in advance of its insurers to the extent that Buyer does not invalidate its obligations to ensure coverage of such claims is not jeopardized.

    B.    **Indemnification Provisions for Benefit of Seller.**    If Buyer breaches any of its Warranties or covenants contained in this Agreement, and Seller makes a written claim for indemnification against Buyer in accordance with the procedures set forth in Section 7.2 below within the applicable survival period, Buyer agrees to indemnify Seller and its Affiliates and their officers, directors, employees and agents (individually a "**Seller Indemnitee**" and collectively the "**Seller Indemnitees**") and to hold each Seller Indemnitee harmless from and against all Losses to the extent caused by or arising out of: (i) any breach of warranty or inaccurate or erroneous representation of Buyer contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of this Agreement.

    C.    **Mitigation.**    Notwithstanding anything to the contrary in this Section B, no Party shall have an obligation to indemnify the other Party with respect to any Losses to the extent such Losses could have reasonably been

avoided by such other Party, or the damage to such other Party from such Losses reasonably could have been mitigated.

D.    **Deductible and Cap.**    No Indemnitor shall be liable to an Indemnitee until the amount of all indemnifiable Losses of such Indemnitee in the aggregate exceeds USD One Hundred Thousand ($100,000.00) ("**Deductible Amount**") threshold, after which point the Indemnitor will be obligated to the Indemnitee from and against indemnifiable Losses in excess of the Deductible Amount until the amount of indemnifiable Losses paid by such indemnifying Party in the aggregate reaches a cap equal to USD Twenty Million ($20 million) (the "**Cap Amount**") after which point the indemnifying Party will have no further obligation with respect to Losses under this Agreement.

**7.2    Indemnification Procedure.**    When a Party obtains knowledge of the commencement of any third-party claim, action, suit or proceeding or of the occurrence of any event or the existence of any state of facts which may become the basis of a third-party claim (any such claim, action, suit or proceeding or event or state of facts being hereinafter referred to in this Section as a "**Claim**"), in respect of which such Party (an "**Indemnitee**") is entitled to indemnification under this Agreement, such Indemnitee shall promptly notify the indemnitor under this Agreement (the "**Indemnitor**") of such Claim in writing; provided, however, that any failure to give such notice will not waive any rights of the Indemnitee except to the extent that the rights of the Indemnitor are prejudiced thereby.  With respect to any Claim as to which such notice is given by the Indemnitee to the Indemnitor, the Indemnitor may, subject to the provisions below, assume the defense and settlement of such Claim; provided, however, that: (i) the Indemnitee shall cooperate with the Indemnitor in the defense and settlement of  such Claim  in any  manner reasonably requested by the Indemnitor; the Indemnitee will not, and it will use all reasonable efforts to ensure that its employees will not, make an admission of liability in respect of any Third Party Claim and as soon as it becomes aware of a Third Party Claim it shall issue an instruction to relevant employees requiring them not to make any disclosure or statement to any third party in relation to any Third Party Claim or any product or service to which such Third Party Claim relates (except for notices to governmental authorities as required by applicable Laws) without the prior written consent of the Indemnitor (such consent not to be unreasonably withheld or delayed); (ii) the Indemnitee shall have the right to pay or settle such Claim at any time, in which event the Indemnitee shall be deemed to have waived any right to indemnification therefor by the Indemnitor; (iii) the Indemnitee shall be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; and (iv) the Indemnitor shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitee, provided further, however, that if Indemnitee fails to consent to a written settlement offer and judgment is subsequently entered in an amount exceeding the amount of such offer, then Indemnitor shall have no responsibility for the amount of such excess.

If: (i) the Indemnitor fails to assume the defense of such Claim or, having assumed the defense and settlement of such Claim, fails reasonably to contest such Claim in good faith; and (ii) the remedy sought by the claimant with respect to such Claim is not solely for money damages, the Indemnitee, without waiving its right to indemnification, may assume the defense and settlement of such Claim; provided, however, that: (a) the Indemnitor shall be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; (b) the Indemnitor shall

14

cooperate with the Indemnitee in the defense and settlement of such Claim in any reasonable manner requested by the Indemnitee; and (c) the Indemnitee shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitor.

As used in this section, the term Indemnitee shall be deemed to include the plural thereof where the rights or obligations of more than one Indemnitee may be involved.

**7.3    Sole and Exclusive Remedy.**  Each of Buyer and Seller acknowledge and agree that the indemnification provided in this Article 7 shall be the sole and exclusive remedy of the parties and their Affiliates and their respective successors and assigns in respect of any claim for monetary damages arising out of or under this Agreement.

**8.    GENERAL PROVISIONS:**

**8.1    No Inducement.**  The Parties represent to each other and each agrees that, neither it nor any person acting on its behalf has, in contravention of any applicable law, given or offered to give or will give or offer to give any sum of money or other material consideration to any person, directly or indirectly, as an inducement to obtain business hereunder or to influence the granting of licenses or other governmental permissions to enter into this Agreement or perform obligations hereunder.

**8.2    Governing Approvals.**  Seller and Buyer, respectively, shall be responsible for compliance with and for the obtaining of such approvals and/or permits as may be required under national, state and local laws, ordinances, regulations and rules as may be applicable to the performance of their respective responsibilities and obligations under this Agreement.

**8.3    No Agency.**  This Agreement does not constitute either Party the agent or legal representative of the other Party.  Neither Party is authorized to create any obligation on behalf of the other Party.

**8.4    Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and assigns.  No Party may assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other Party; provided, however, that Seller has the right to assign any of its rights or obligations hereunder to any division, subsidiary or affiliate of Seller or to any successor to any or all of Seller's business; provided that, notwithstanding such assignment Seller shall remain liable for all of its obligations hereunder.

**8.5    No Implied Waiver.**  The failure of either Party at any time to require performance by the other Party of any provision hereof shall in no way affect the full right to require such performance at any time thereafter. The waiver by either Party of a breach of any provision hereof shall not constitute a waiver of the provision itself.  The failure of either Party to exercise its rights provided under this Agreement shall not constitute a waiver of such right.

**8.6    Notices.**    Any notice under this Agreement shall be in writing (letter, facsimile or telegram) and shall be effective when received by the addressee at its address indicated below:

Notice sent to Seller shall be addressed as follows:

> **DELPHI AUTOMOTIVE SYSTEMS LLC**
> 5725 Delphi Drive
> Troy, Michigan 48098
> Attn:  President-Delphi Energy & Chassis Systems
> Fax No.:  248-813-4301

with a copy to:

> **DELPHI AUTOMOTIVE SYSTEMS LLC**
> 5725 Delphi Drive
> Troy, MI 48098-2815
> Attention:  Assistant General Counsel
> Commercial & Transactional
> Fax: 248-813-2491

Notice sent to Buyer shall be addressed as follows:

> **JOHNSON CONTROLS, INC.**
> 5757 N. Green Bay Avenue
> PO Box 591
> Milwaukee, Wisconsin  53201-0591
> Attn:  President - Battery
> Fax No.:  414-524-2828

with a copy to:

> **JOHNSON CONTROLS, INC.**
> 5757 N. Green Bay Avenue
> PO Box 591
> Milwaukee, Wisconsin  53201-0591
> Attn:  General Counsel
> Fax No.:  414-524-2077

The parties by notice hereunder may designate other addresses to which notices shall be sent.

**8.7    Amendments.**    This Agreement and the Mutual Nondisclosure Agreement dated April 24, 2006 between the Parties, constitutes the entire agreement of the Parties, and supersedes all previous agreements, oral or written, between Buyer and Seller with respect to the subject matter hereof. No amendment or modification to this Agreement shall be binding upon either Party unless it is in writing and is signed by both parties.

**8.8    Expenses.**    Whether or not the transactions contemplated by this Agreement are consummated, Buyer and Seller shall each bear its respective

16

accounting, legal, financial, advisory and other expenses incurred in connection with the transactions contemplated by this Agreement.

**8.9**   **Headings.**   The Article and/or Section headings herein are used for convenience of reference only and shall not be deemed a part of this Agreement for any purpose.

**8.10**   **Severability.**   If any provision of this Agreement shall be held to be invalid, illegal or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, that provision shall be deemed severed to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the parties shall negotiate in good faith to arrive at an alternative replacement provision approximating the parties' original business objective. The remaining provisions hereof shall remain in effect.

**8.11**   **Counterparts.**   This Agreement may be executed in more than one counterpart, each of which shall for all purposes be deemed to be an original and all of which shall constitute one and the same agreement.

**8.12**   **Third Parties.**   Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**8.13**   **Bulk Sales.**   Buyer hereby waives the requirements, if any, of all applicable bulk sales laws.

**8.14**   **Force Majeure.**   Each Party shall be temporarily excused from performing its obligations under this Agreement for so long as such performance is prevented or delayed by any event of Force Majeure. The term "**Force Majeure**" shall, for purposes of this Agreement, include: (i) any strike or lockout at the plant of a Party or any of its suppliers; (ii) any act or omission of any government authority; or (iii) any other cause beyond the reasonable control of a Party.  A Party affected by an event of Force Majeure shall promptly notify the other Party and shall use its best efforts to overcome and mitigate such event of Force Majeure.

**8.15    Excluded Inventory**. Within 30 days after Completion, Seller will remove at its sole cost and expense all Inventory not included in the Acquired Assets. Buyer will cooperate with Seller and provide reasonable access to the Facility to facilitate such removal.

**THIS AGREEMENT** was executed as of the day and year first set forth above.

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By:_____

Name:   **Keith Stipp**

Title:  **Finance Director,
Automotive Holdings Group**

**JOHNSON CONTROLS, INC.**

By:_____

Name: **Gregg M. Sherrill**

Title:    **Vice President, and General
Manager
Automotive Systems Group
Battery Division**

## EXHIBIT 1.1

| Inventory number | Asset | Cap.date | Asset description |
|---|---|---|---|
| DGT004763N01 | 1000654 | 12/1/1946 | GRADING & LANDSCAPING |
| DGT004765N01 | 1000655 | 12/1/1946 | ROADWAY |
| DGT004766N01 | 1000656 | 12/1/1946 | SIDEWALKS |
| DGT004768N01 | 1000657 | 12/1/1946 | SEWERS-STORM |
| DGT004770N01 | 1000658 | 12/1/1946 | SEWERS-SANITARY |
| DGT004771N01 | 1000659 | 4/1/1947 | GRADING & LANDSCAPING |
| DGT004772N02 | 1000660 | 12/1/1946 | RAILROAD TRACKS & SIDINGS |
| DGT004774N | 1000661 | 12/1/1946 | WATER LINES |
| DGT004776N | 1000662 | 12/1/1946 | TUNNELS |
| DGT004888N | 1000663 | 6/1/1946 | LAND-NEW BRUNSWICK |
| DGT004911N | 1000664 | 12/1/1953 | MAIN BUILDING-WEST ADDITION-SEWERS |
| DGT004925N | 1000665 | 8/1/1954 | MAIN BUILDING-WEST ADDITION-PAVEMENT |
| DGT004926N | 1000666 | 8/1/1954 | RETAINING WALL |
| DGT008569N | 1000667 | 12/1/1956 | ROADWAY |
| DGT008607N | 1000668 | 3/1/1958 | FENCE |
| DGT008675N | 1000669 | 12/1/1965 | LAND-NEW BRUNSWICK |
| DGT008680N | 1000670 | 4/1/1966 | LAND IMPROVEMENTS |
| DGT008711N | 1000671 | 10/1/1966 | PARKING AREA |
| DGT008712N | 1000672 | 12/1/1966 | LIGHTING-OUTSIDE |
| DGT008725N | 1000673 | 12/1/1968 | RAILROAD SIDING |
| DGT012029N | 1000674 | 10/1/1974 | LAND-NEW BRUNSWICK |
| DGT012052N | 1000675 | 9/1/1976 | CONCRETE PAD-PVC |
| DGT012053N | 1000676 | 9/1/1976 | CONCRETE PAD-MATERIAL STORAGE |
| DGT012054N | 1000677 | 9/1/1976 | LEAD RECLAIM BUILDING-CONCRETE PAD F/LEAD STORAGE |
| DGT012085N | 1000678 | 10/1/1977 | ACID MIX BUILDING-CONCRETE PAD |
| DGT012086N | 1000679 | 10/1/1977 | ACID MIX BUILDING-CONCRETE PAD |
| DGT012087N | 1000680 | 10/1/1977 | CONCRETE PAD-REAR OF POWER HOUSE |
| DGT012087N01 | 1000681 | 2/1/1978 | CONCRETE PAD-REAR OF POWER HOUSE |
| DGT012088N | 1000682 | 10/1/1977 | RETAINING WALL-WATER TOWER |
| DGT012110N | 1000683 | 7/1/1978 | GRADING & LANDSCAPING |
| DGT012221N | 1000685 | 2/1/1989 | WELLS-MONITORING |
| DGT012232N | 1000686 | 6/1/1995 | STORM WATER COLLECTION/TREATMENT SYSTEM |
| DGT690066 | 1000687 | 11/1/2001 | ELIMINATION OF UNDERGROUND PROCESS SEWER |
| DGT004779N01 | 2001722 | 12/1/1946 | MAIN BUILDING |
| DGT004779N02 | 2001723 | 11/1/2001 | PHASE III VENTILATION REPAIRS |
| DGT004779NO1 | 2001724 | 11/1/2001 | LIGHTING FIXTURES,PLANT WALL,GAS MAIN |
| DGT004781N01 | 2001726 | 12/1/1946 | GATE HOUSE |
| DGT004910N01 | 2001727 | 12/1/1953 | MAIN BUILDING-WEST ADDITION |
| DGT004912N | 2001728 | 12/1/1953 | MAIN BUILDING-FIRE PROOF ROOF |
| DGT004915N | 2001729 | 6/1/1954 | HOSE HOUSE |
| DGT004923N01 | 2001730 | 12/1/1954 | MAIN BUILDING-WEST ADDITION-ACCESS |
| DGT004928N02 | 2001731 | 12/1/1954 | MAIN BUILDING-EAST ADDITION |
| DGT004928N03 | 2001732 | 8/1/1954 | MAIN BUILDING-EAST ADDITION |
| DGT008542N | 2001733 | 5/1/1956 | WATER LINES |
| DGT008570N | 2001734 | 12/1/1956 | MAIN BUILDING-EAST ADDITION |
| DGT008594N | 2001735 | 5/1/1957 | MAIN BUILDING-LOCKER ROOM |
| DGT008649N | 2001736 | 7/1/1962 | OIL BUILDING |
| DGT008650N | 2001737 | 2/1/1963 | MAIN BUILDING-MEZZANINE-CASE |
| DGT008658N | 2001738 | 6/1/1963 | WAREHOUSE |
| DGT008664N | 2001739 | 8/1/1965 | MAIN BUILDING-ADDITION-MEZZANINE |
| DGT008674N | 2001740 | 12/1/1965 | MAIN BUILDING-ADDITION |
| DGT008720N | 2001741 | 12/1/1968 | SEWERS-SANITARY |
| DGT008721N | 2001742 | 12/1/1968 | SEWERS-STORM |
| DGT008738N | 2001743 | 9/1/1970 | MAIN BUILDING-MEZZANINE |
| DGT008744N | 2001744 | 7/1/1971 | ROOF-RAISE |
| DGT012049N | 2001745 | 9/1/1976 | LEAD RECLAIM BUILDING |
| DGT012049N01 | 2001746 | 6/1/1977 | LEAD RECLAIM BUILDING |
| DGT012049N02 | 2001747 | 8/1/1977 | LEAD RECLAIM BUILDING |
| DGT012050N | 2001748 | 9/1/1976 | ACID MIX BUILDING |
| DGT012050N01 | 2001749 | 10/1/1977 | ACID MIX BUILDING |
| DGT012079N | 2001750 | 2/1/1977 | CURE ROOM MODIFICATIONS |
| DGT012092N | 2001751 | 12/1/1977 | WASTE TREATMENT BUILDING |

| | | | |
|---|---|---|---|
| DGT012092N01 | 2001752 | 5/1/1978 | WASTE TREATMENT BUILDING |
| DGT012113N | 2001753 | 7/1/1978 | STORAGE SHED-3 SIDED |
| DGT012143N | 2001754 | 3/1/1980 | TRUCK DOCK ANNEX |
| DGT012145N | 2001755 | 6/1/1980 | BATTERY STORAGE BUILDING |
| DGT012165N | 2001756 | 7/1/1971 | MAIN BUILDING-MEZZANINE |
| DGT012175N | 2001757 | 6/1/1983 | FIRE LOOP |
| DGT012175N01 | 2001758 | 9/1/1984 | FIRE LOOP |
| DGT012175N02 | 2001759 | 10/1/1984 | FIRE LOOP |
| DGT012175N03 | 2001760 | 11/1/1984 | FIRE LOOP |
| DGT012183N | 2001761 | 12/1/1984 | MAIN BUILDING-MEZZANINE |
| DGT012191N | 2001762 | 8/1/1986 | MAIN BUILDING-MEZZANINE-PAINT MIXING |
| DGT012231N | 2001765 | 6/1/1995 | OVERHEAD PROCESS SEWER |
| DGT105875 | 2001766 | 1/1/1998 | FRONT ENTRANCE STEPS, RAMPS, RAILS |
| DGT105877 | 2001767 | 11/1/2001 | NON-SLIP GRATING, ISLES BTWN CHARGE TABLES & FILL |
| DGT105909 | 2001768 | 1/1/2002 | SAFETY STEPS AND HANDRAILS |
| DGT105922B | 2001769 | 11/1/2001 | NON-SLIP GRATING FOR FORMATION FLOOR |
| DGT105923B | 2001770 | 11/1/2001 | FOAM ROOF '98 |
| DGT105928 | 2001771 | 1/2/1998 | UPGRADE HEATING SYSTEM |
| DGT690029 | 2001772 | 1/2/1998 | 1996 ROOF REPAIR |
| DGT690037 | 2001773 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690038 | 2001774 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690039 | 2001775 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690061 | 2001776 | 11/1/2001 | TRENCH & FOUNDATION FOR THE X-MET LINE |
| DGT690062 | 2001777 | 11/1/2001 | MEZZANINE FOR THE X-MET LINE |
| DGT690063 | 2001778 | 11/1/2001 | ROOF ENCLOSURE FOR THE X-MET LINE |
| DGT690100 | 2001779 | 11/1/2001 | REPLACE LIGHTING ON CHG FLOOR, REPLACE LIGHTING SE |
| DGT690170 | 2001780 | 11/1/2001 | OUTDOOR SMOKING SHELTER -- NEW BRUNSWICK BATTERY P |
| DGT690171 | 2001781 | 11/1/2001 | OUTDOOR SMOKING SHELTER -- NEW BRUNSWICK BATTERY P |
| DGT690197 | 2001782 | 11/1/2001 | SECURITY/FIRE ALARM UPGRADE |
| DGT72424 | 2001783 | 11/1/2001 | INSTALL SPRINKLER SYSTEM |
| DGTB690064 | 2001784 | 11/1/2001 | INSTALLATION OF MEZZANINE FOR X-MET FROM MUNCIE TO |
| DGT690110 | 2004713 | 9/11/2002 | REPAIR BATTERY FORMATION VENTILATION SYSTEM |
| DGTB690114 | 2004714 | 9/11/2002 | REPLACE FLOOR IN WET HEAT SEALER AREA |
| DGTB690090 | 2004715 | 9/11/2002 | REPAIR WALL OF BUILDING TO NEW CONDITION |
| DGT690175 | 2004716 | 9/11/2002 | GREEN GROUP VENTILATION -- NB |
| DGT690221 | 2004717 | 9/11/2002 | INSTALL NEW DUCTWORK ON CHARGE FLOOR |
| DGT690198 | 2004718 | 9/11/2002 | GUARDING/FIRE PROTECTION TANK FARM |
| DGT690189 | 2004719 | 9/11/2002 | VENTILATION COLLECTOR FOR GREEN GROUP LEAN CELL - |
| DGT690179 | 2004720 | 9/11/2002 | NEW BRUNSWICK STEAM HOOD UPGRADE |
| DGT690223 | 2008539 | 9/23/2003 | DESIGN FOR A NATURAL GAS LINE FOR PLANT |
| DGT690268 | 2008540 | 9/23/2003 | HOT WATER HEATER SYS FOR MENS AND WOMENS SHOWER AR |
| DGT695041 | 2008556 | 10/17/2003 | FORMATION VENTILATION STACK TOP ACID MIST FILTERS |
| DGT004779N03 | 2009360 | 1/31/2004 | PHASE III VENTILATION REPAIRS |
| DGT012142N01 | 2009466 | 1/31/2004 | FORMATION VENT REPAIRS/CHARGE TABLE 2 OF 2 |
| DGT012141N01 | 2009467 | 3/31/2004 | FORMATION VENT REPAIRS/CHARGE TABLE 1 OF 2 |
| DGT004779N04 | 2009513 | 6/29/2004 | ENGINEERING SERVICES TO LICENSE NEW STACK FOR VENT |
| DGT690275 | 2009514 | 1/1/2004 | HEATING UPGRADES FOR PLANT CONVERSION TO NATURAL G |
| DGT690291 | 2010088 | 6/14/2005 | FIRE SPRINKLER PROTECTION ON CHARGE FLOOR |
| DGT004898N | 3025115 | 2/1/1953 | PROPANE TANK |
| DGT008560N | 3025119 | 9/1/1956 | POWER EQUIPMENT-EAST |
| DGT008589N | 3025120 | 3/1/1957 | SCREW CONVEYOR |
| DGT008595N | 3025121 | 5/1/1957 | LINES)ELECTR |
| DGT008599N | 3025123 | 10/1/1957 | DUST CNTR EQ |
| DGT008681N | 3025125 | 9/1/1964 | SUBSTATION |
| DGT008682N | 3025126 | 10/1/1960 | SUBSTATIONEQ |
| DGT008732N | 3025127 | 5/1/1969 | COOLING TOWER |
| DGT008743N | 3025128 | 7/1/1971 | SCREW CONVEYOR |
| DGT008750N | 3025129 | 6/1/1972 | BOILER |
| DGT012003N | 3025130 | 1/1/1973 | SWITCHGEAR |
| DGT012004N | 3025131 | 1/1/1973 | RECTIFIER |
| DGT012004N01 | 3025132 | 2/1/1973 | TRAILING CHARGES TO TAG #012004N |
| DGT012005N | 3025133 | 1/1/1973 | SWITCHGEAR |
| DGT012006N | 3025134 | 1/1/1973 | RECTIFIER |
| DGT012007N | 3025135 | 2/1/1973 | ACID TANK |
| DGT012008N | 3025136 | 2/1/1973 | ACID TANK |
| DGT012010N | 3025137 | 2/1/1973 | ACID TANK |
| DGT012011N | 3025138 | 2/1/1973 | ACID TANK |

| | | | |
|---|---|---|---|
| DGT012016N | 3025139 | 9/1/1973 | CONVEYOR |
| DGT012017N | 3025140 | 9/1/1973 | CONVEYOR |
| DGT012018N | 3025141 | 9/1/1973 | CONVEYOR |
| DGT012020N | 3025143 | 9/1/1973 | CONVEYOR |
| DGT012021N | 3025144 | 12/1/1973 | SUB STATION |
| DGT012022N | 3025145 | 12/1/1973 | CABLE |
| DGT012023N | 3025146 | 12/1/1973 | PLATFORM |
| DGT012024N | 3025147 | 3/1/1974 | VENTILATION |
| DGT012025N | 3025148 | 3/1/1974 | CONVEYOR |
| DGT012026N | 3025149 | 3/1/1974 | VENTILATION |
| DGT012027N | 3025150 | 3/1/1974 | VACUUM SYSTEM |
| DGT012034N | 3025151 | 8/1/1975 | VACUUM TO MOLDING |
| DGT012036N | 3025152 | 3/1/1976 | TRENCHES |
| DGT012038N | 3025153 | 5/1/1976 | VENTILATION |
| DGT012043N | 3025154 | 8/1/1976 | ACID TANK |
| DGT012044N | 3025155 | 8/1/1976 | ACID PUMPING SYSTEM FOR MEZZANINE |
| DGT012046N | 3025156 | 9/1/1976 | VENTILATION FOR LEAD POTS |
| DGT012047N | 3025157 | 9/1/1976 | FINAL ACID FILL |
| DGT012051N | 3025158 | 9/1/1976 | ACID TOP-OFF |
| DGT012055N | 3025159 | 9/1/1976 | SUB-STATION-LEAD STRIP |
| DGT012055N01 | 3025160 | 10/1/1977 | ADDITIONAL CHARGES TO TAG #012055N |
| DGT012057N | 3025161 | 10/1/1976 | LEAD MELT FURNACE |
| DGT012058N | 3025162 | 10/1/1976 | FOUNDATION & SUMPS FOR LEAD CASTER |
| DGT012060N | 3025163 | 12/1/1976 | VENTILATION FOR CHARGING UNITS |
| DGT012060N01 | 3025164 | 6/1/1980 | ADDITIONAL CHARGES TO TAG #012060N |
| DGT012062N | 3025165 | 1/1/1977 | ACID MIXING SYSTEM |
| DGT012064N | 3025167 | 1/1/1977 | ACID PUMPS RECLAIM |
| DGT012065N | 3025168 | 1/1/1977 | VENTILATION PLATE OVENS |
| DGT012066N | 3025169 | 1/1/1977 | ACID STORAGE TANK |
| DGT012067N | 3025170 | 1/1/1977 | ACID STORAGE TANK |
| DGT012068N | 3025171 | 1/1/1977 | ACID STORAGE TANK |
| DGT012069N | 3025172 | 1/1/1977 | ACID STORAGE TANK |
| DGT012070N | 3025173 | 1/1/1977 | ACID STORAGE TANK |
| DGT012071N | 3025174 | 1/1/1977 | ACID STORAGE TANK |
| DGT012072N | 3025175 | 1/1/1977 | ACID STORAGE TANK |
| DGT012073N | 3025176 | 1/1/1977 | ACID STORAGE TANK |
| DGT012074N | 3025177 | 1/1/1977 | ACID STORAGE TANK |
| DGT012075N | 3025178 | 1/1/1977 | ACID STORAGE TANK |
| DGT012076N | 3025179 | 1/1/1977 | ACID STORAGE TANK |
| DGT012077N | 3025180 | 1/1/1977 | ACID STORAGE TANK |
| DGT012080N | 3025181 | 2/1/1977 | COOLING FACILITIES FOR CASTER |
| DGT012083N | 3025182 | 7/1/1977 | SUB STATION LEAD RECLAIM |
| DGT012095N | 3025183 | 2/1/1978 | LINDBURG FURNACE |
| DGT012096N | 3025184 | 2/1/1978 | TRANSFER SYSTEM |
| DGT012097N | 3025185 | 9/1/1976 | STEAMER HOOD |
| DGT012098N | 3025186 | 9/1/1976 | STEAMER HOOD |
| DGT012099N | 3025187 | 1/1/1977 | STEAMER HOOD |
| DGT012100N | 3025188 | 1/1/1977 | STEAMER HOOD |
| DGT012102N | 3025189 | 4/1/1978 | WATER CONTAINMENT |
| DGT012109N | 3025190 | 12/1/1976 | PRIMARY SWITCH GEAR |
| DGT012109N01 | 3025191 | 12/1/1977 | TRAILING CHARGE TO TAG #012109N |
| DGT012109N02 | 3025192 | 3/1/1978 | TRAILING CHARGE TO TAG #012109N |
| DGT012117N | 3025193 | 10/1/1978 | CONVEYOR SYSTEM |
| DGT012118N | 3025194 | 10/1/1978 | ACID FILL STATION |
| DGT012119N | 3025195 | 10/1/1978 | REPAIR STATIONS (2) |
| DGT012120N | 3025196 | 11/1/1978 | EXTEND TRENCH/X-MET LINE |
| DGT012121N | 3025197 | 11/1/1978 | AIR MAKEUP UNIT |
| DGT012122N | 3025198 | 12/1/1978 | AIR MAKE UP SYSTEM |
| DGT012122N01 | 3025199 | 10/1/1979 | ADDITIONAL CHARGES TO TAG #012122N |
| DGT012123N | 3025200 | 12/1/1978 | BATROLIFE MEZZANINE |
| DGT012124N | 3025201 | 1/1/1979 | CONVEYOR FROM SETTLING CHAMBER |
| DGT012125N | 3025202 | 2/1/1979 | VENTILATION TUNNEL-EXTENSION |
| DGT012128N | 3025205 | 3/1/1979 | ROLLER TYPE CONVEYOR |
| DGT012129N | 3025206 | 3/1/1979 | INCLINE BELT CONVEYOR |
| DGT012130N | 3025207 | 4/1/1979 | POWER DROPS/C O S & PREHEAT |
| DGT012131N | 3025208 | 5/1/1979 | CONVEYOR FROM COLLECTOR |
| DGT012132N | 3025209 | 8/1/1979 | VENT FOR ELEMENT ASSEMBLY |

21

| | | | |
|---|---|---|---|
| DGT012132N01 | 3025210 | 9/1/1979 | TRAILING CHARGE TO TAG #012132N |
| DGT012137N | 3025212 | 9/1/1979 | OVERHEAD CONVEYOR |
| DGT012138N | 3025213 | 9/1/1979 | ELECTRIC CABLE & DROPS |
| DGT012139N | 3025214 | 9/1/1979 | SETTLING CHAMBER |
| DGT012140N | 3025215 | 11/1/1979 | LEAD DROP & CONTROLS FOR BARTON POT |
| DGT012141N | 3025216 | 12/1/1979 | CHARGE TABLES |
| DGT012142N | 3025217 | 12/1/1979 | CHARGE TABLES |
| DGT012146N | 3025218 | 6/1/1980 | LEAD MELT POT |
| DGT012147N | 3025219 | 6/1/1980 | VENTILATION F/POT |
| DGT012148N | 3025220 | 6/1/1980 | ELECTRIC CABLE & BUSWAY |
| DGT012150N | 3025222 | 6/1/1980 | COOLING TOWER |
| DGT012151N | 3025223 | 12/1/1980 | EXTEND TRENCHES FOR CONVEYOR |
| DGT012152N | 3025224 | 12/1/1980 | STORAGE RACKS & SPRINKLER |
| DGT012152N01 | 3025225 | 12/1/1981 | TRAILING CHARGE TO TAG #012152N |
| DGT012154N01 | 3025226 | 1/1/1998 | UPGRADE STORM WATER TREATMENT PLANT |
| DGT012156N | 3025227 | 12/1/1980 | RECEIVING OFFICE |
| DGT012159N | 3025229 | 12/1/1981 | CHARGE TABLES |
| DGT012160N | 3025230 | 12/1/1981 | (14) CHARGE TABLES |
| DGT012161N | 3025231 | 2/1/1982 | VENTILATION SYSTEM |
| DGT012162N | 3025232 | 2/1/1982 | LOAD/UNLOAD CONVEYOR |
| DGT012163N | 3025233 | 6/1/1982 | COLLECTOR |
| DGT012164N | 3025234 | 6/1/1980 | VESTIBULE |
| DGT012166N | 3025235 | 9/1/1982 | OWENS CORNING ACID TANK |
| DGT012167N | 3025236 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR 95995 |
| DGT012168N | 3025237 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95996 |
| DGT012169N | 3025238 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95997 |
| DGT012170N | 3025239 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95998 |
| DGT012171N | 3025240 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR95999 |
| DGT012172N | 3025241 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR96000 |
| DGT012173N | 3025242 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR105751 |
| DGT012174N | 3025243 | 1/1/1983 | BACK UP BAG COLLECTION FOR DR105752 |
| DGT012176N | 3025244 | 12/1/1983 | OXIDE ELEVATORS & CONVEYORS |
| DGT012176N01 | 3025245 | 10/1/1983 | MATERIAL HANDLING SYSTEM AT PASTE MIX |
| DGT012181N | 3025246 | 9/1/1984 | POWER ROLLER CONVEYOR |
| DGT012182N | 3025247 | 12/1/1984 | ACID & WATER SYSTEM |
| DGT012184N | 3025248 | 12/1/1984 | VENTILATION F/3 PAINT MIXERS |
| DGT012185N | 3025249 | 4/1/1985 | WOMEN'S REST ROOM-WEST |
| DGT012186N | 3025250 | 5/1/1985 | WOMEN'S LOCKER/SHOWER-EAST |
| DGT012187N | 3025251 | 12/1/1985 | CONVEYOR & VENTILATION FOR 6 TABLES |
| DGT012188N | 3025252 | 1/1/1986 | ROOF EXHAUSTERS |
| DGT012194N | 3025253 | 2/1/1987 | ACID PIT |
| DGT012200N | 3025256 | 5/1/1987 | TRANSFER CONVEYORS(ALL) |
| DGT012202N | 3025257 | 10/1/1987 | #26(82'CHG TABLE CONV) |
| DGT012203N | 3025258 | 10/1/1987 | #27(82'CHG TABLE CONV) |
| DGT012204N | 3025259 | 10/1/1987 | #28(82'CHG TABLE CONV) |
| DGT012205N | 3025260 | 10/1/1987 | #29(82'CHG TABLE CONV) |
| DGT012206N | 3025261 | 10/1/1987 | #30(82'CHG TABLE CONV) |
| DGT012207N | 3025262 | 10/1/1987 | 82 FT. CONVEYOR (#31) |
| DGT012208N | 3025263 | 10/1/1987 | #32(82'CHG TABLE CONV) |
| DGT012209N | 3025264 | 10/1/1987 | #33(82'CHG TABLE CONV) |
| DGT012210N | 3025265 | 12/1/1987 | #1 X-MET LINE(OFFBEAR CONV) |
| DGT012211N | 3025266 | 5/1/1988 | POWERED ROLLER CONV(4) |
| DGT012212N | 3025267 | 5/1/1988 | VENT FOR CAST ON STRAP MACH |
| DGT012215N | 3025268 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012216N | 3025269 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012217N | 3025270 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012218N | 3025271 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012219N | 3025272 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012220N | 3025273 | 1/1/1989 | CHARGE TABLE(CONCRETE WORK) |
| DGT012222N | 3025274 | 6/30/1989 | CAPITALIZABLE MAINT. |
| DGT012223N | 3025275 | 3/1/1990 | VENTILATION FOR (8) BATTERY CHARGE TABLES |
| DGT012224N | 3025276 | 9/1/1990 | TEMPERATURE CONTROL |
| DGT012225N | 3025277 | 1/1/1991 | COS CONTROL |
| DGT012228N | 3025278 | 7/1/1994 | WASTE WATER TREATMENT SYSTEM |
| DGT012230N | 3025280 | 8/1/1995 | ACID LEVELER |
| DGT012233N | 3025281 | 3/1/1995 | AUTOMATIC LABELING MACHINE |
| DGT012234N | 3025282 | 1/1/1996 | RESERVE CAPACITY TESTERS (12) |

| | | | |
|---|---|---|---|
| DGT012236N | 3025284 | 1/1/1996 | 110 OZ CONVERSION |
| DGT014722N | 3025285 | 6/1/1977 | BAYSTONE PLATE STEAMER |
| DGT014729N | 3025286 | 6/1/1977 | OXIDE SCREW CONVEYOR SYSTEM |
| DGT014737N | 3025287 | 7/1/1977 | SCREW CONVEYOR |
| DGT014738N | 3025288 | 7/1/1977 | SCREW CONVEYOR |
| DGT015201N | 3025289 | 12/1/1979 | INSULATE STEAMER HOODS (6) |
| DGT020031D01 | 3025298 | 2/1/1947 | LATHES-ENGIN |
| DGT020059D01 | 3025300 | 12/1/1946 | DRILL-STANDA |
| DGT020726D01 | 3025301 | 7/1/1947 | MIX CONVEYOR |
| DGT021837D | 3025305 | 2/1/1956 | SETTLING CHR |
| DGT021838D | 3025306 | 2/1/1956 | BARTON POT |
| DGT021840D | 3025307 | 2/1/1956 | 12R}DUSTCOLL |
| DGT022488D | 3025308 | 3/1/1957 | COMPRESSORS} |
| DGT022506D | 3025309 | 4/1/1957 | RECTIFIERS}E |
| DGT022510D | 3025310 | 5/1/1957 | BARTON POT |
| DGT022511D | 3025311 | 5/1/1957 | SETTLING CHR |
| DGT022530D | 3025312 | 10/1/1957 | RECTIFIERS}E |
| DGT028031N | 3025315 | 6/1/1996 | ALLEN BRADLEY CONTROL |
| DGT028785N | 3025316 | 10/31/1989 | ACID DUMP SYSTEM |
| DGT028855N | 3025317 | 11/1/1991 | CENTRIFUGAL BLOWER |
| DGT056948D | 3025318 | 6/1/1956 | GRINDER |
| DGT058830D | 3025319 | 6/1/1957 | BARTON POT |
| DGT060227D | 3025320 | 6/1/1954 | BARTON POT |
| DGT060228D | 3025321 | 6/1/1954 | BARTON POT |
| DGT060229D | 3025322 | 6/1/1954 | BARTON POT |
| DGT060230D | 3025323 | 6/1/1954 | SET}CHAMBER |
| DGT060231D | 3025324 | 6/1/1954 | SET}CHAMBER |
| DGT060232D | 3025325 | 6/1/1954 | SET}CHAMBER |
| DGT060233E | 3025327 | 11/1/2001 | MODIF OF MISC LINE STROKER, PLATFORM, LEFT AND TAB |
| DGT060279D | 3025329 | 11/1/1960 | POWER ROLLER |
| DGT060295D | 3025330 | 7/1/1961 | IMPACT TESTI |
| DGT066940D | 3025331 | 6/1/1946 | LATHE |
| DGT069865D | 3025333 | 2/1/1963 | LATHE |
| DGT070211D | 3025335 | 6/1/1963 | TOLEDO SCALE |
| DGT070253D | 3025336 | 8/1/1963 | MILLING MACHINE |
| DGT070255D | 3025337 | 8/1/1963 | SURFACEGRIND |
| DGT071020D | 3025338 | 5/1/1964 | LATHE |
| DGT071037D | 3025339 | 7/1/1964 | MILLING MCH |
| DGT071058D | 3025340 | 12/1/1964 | BOILER |
| DGT071087D | 3025343 | 12/1/1965 | BOILER |
| DGT072221D | 3025346 | 8/1/1966 | EL AS SECT |
| DGT072222D | 3025347 | 9/1/1969 | DUST COLLECTOR |
| DGT072223D | 3025348 | 9/1/1969 | MATL COLL SYS |
| DGT072239D | 3025352 | 4/1/1967 | LATHE |
| DGT072280D | 3025360 | 10/1/1968 | CONVEYORS |
| DGT072284D01 | 3025361 | 3/1/1970 | STARTER |
| DGT072292D | 3025366 | 6/1/1970 | MOLD TEMP CONTR |
| DGT083874D | 3025367 | 5/1/1966 | RECTIFIER |
| DGT087857D | 3025381 | 7/1/1970 | PLATE SAW |
| DGT087872D | 3025385 | 2/1/1971 | CONVEYOR |
| DGT093030D | 3025386 | 12/1/1973 | PASTE MIXER |
| DGT095313D | 3025390 | 7/1/1971 | PASTE MIXER |
| DGT095328D | 3025392 | 4/1/1972 | HACKSAW |
| DGT095330D | 3025394 | 5/1/1973 | DUST COLLECTOR |
| DGT095351D | 3025416 | 9/1/1973 | CONVEYOR |
| DGT095352D | 3025417 | 9/1/1973 | CONVEYOR |
| DGT095353D | 3025418 | 9/1/1973 | GRANULATOR |
| DGT095354E | 3025420 | 11/1/2001 | M & L FOR MODIF OF MAIN LINE STACKER PLATFORM, L/R |
| DGT095355D | 3025421 | 9/1/1973 | CAST ON STRAP |
| DGT095356D | 3025422 | 9/1/1973 | CAST ON STRAP |
| DGT095357D | 3025423 | 9/1/1973 | CAST ON STRAP |
| DGT095358D | 3025424 | 9/1/1973 | CAST ON STRAP |
| DGT095359D | 3025425 | 9/1/1973 | SPOT FACE CONVEYOR |
| DGT095363D | 3025427 | 9/1/1973 | EXT FUSION CONV |
| DGT095364D | 3025428 | 9/1/1973 | AIR TEST CONVEYOR |
| DGT095365D | 3025429 | 9/1/1973 | LABLER CONV |
| DGT095369D | 3025432 | 9/1/1973 | LEAK TEST |

| | | | |
|---|---|---|---|
| DGT095370D | 3025433 | 9/1/1973 | DATE CODE |
| DGT095372D | 3025434 | 9/1/1973 | LEAD POT |
| DGT095373D | 3025435 | 9/1/1973 | LEAD POT |
| DGT095374D | 3025436 | 9/1/1973 | LEAD POT |
| DGT095375D | 3025437 | 9/1/1973 | LEAD POT |
| DGT095376D | 3025438 | 9/1/1973 | VACUUM SYSTEM STACKER |
| DGT095382D | 3025439 | 9/1/1973 | TEMPERATURE CONTROL |
| DGT095383D | 3025440 | 9/1/1973 | HEAT SEAL MACHINE |
| DGT095384D | 3025441 | 9/1/1973 | HEAT SEAL MACHINE |
| DGT095385D | 3025442 | 9/1/1973 | HEAT SEAL MACHINE |
| DGT095387D | 3025443 | 12/1/1973 | AIR COMPRESSOR |
| DGT095398D | 3025446 | 3/1/1974 | LIFT TRUCK |
| DGT095399D | 3025447 | 3/1/1974 | SLITTER |
| DGT095400D | 3025448 | 3/1/1974 | SLITTER |
| DGT095603D | 3025450 | 10/1/1974 | DUST COLLECTOR |
| DGT095604D | 3025451 | 10/1/1974 | DUST COLLECTOR |
| DGT095610D | 3025452 | 1/1/1975 | HEAT SEAL MACHINE |
| DGT095612D | 3025453 | 4/1/1975 | CONVEYOR SYSTEM |
| DGT095614D | 3025454 | 9/1/1975 | SOFTENING TANK |
| DGT095615D | 3025455 | 9/1/1975 | SOFTENING TANK |
| DGT095620D | 3025456 | 1/1/1976 | EXT-FUSION MACHINE |
| DGT095620D01 | 3025457 | 3/1/1976 | ADDITIONAL CHARGES TO TAG #095620D |
| DGT095621D | 3025458 | 2/1/1976 | HOIST |
| DGT095622D | 3025459 | 5/1/1976 | DIELECTRIC LINE |
| DGT095628D | 3025462 | 5/1/1976 | BRIDGE HOIST |
| DGT095638D | 3025472 | 6/1/1976 | SKID RACK |
| DGT095639D | 3025473 | 6/1/1976 | SKID RACK |
| DGT095640D | 3025474 | 6/1/1976 | SKID RACK |
| DGT095641D | 3025475 | 6/1/1976 | SKID RACK |
| DGT095646D | 3025476 | 9/1/1976 | BUTT WELDER |
| DGT095647D | 3025477 | 9/1/1976 | BUTT WELDER |
| DGT095654D | 3025479 | 7/1/1976 | HI-RATE TEST |
| DGT095657D | 3025480 | 7/1/1976 | SCRAP CONVEYOR SYSTEM |
| DGT095658D | 3025481 | 7/1/1976 | CONVEYOR |
| DGT095661D | 3025484 | 9/1/1976 | DE-REELER |
| DGT095662D | 3025485 | 9/1/1976 | DE-REELER |
| DGT095663D | 3025486 | 9/1/1976 | DE-REELER |
| DGT095664D | 3025487 | 9/1/1976 | DE-REELER |
| DGT095666D | 3025489 | 9/1/1976 | EXPANDING PRESS |
| DGT095670D | 3025491 | 9/1/1976 | LUG FORM PRESS |
| DGT095671D | 3025492 | 9/1/1976 | LUG FORM PRESS |
| DGT095674D | 3025495 | 9/1/1976 | MODICON-PASTE LINE |
| DGT095675D | 3025496 | 9/1/1976 | MODICON-PASTE LINE |
| DGT095676D | 3025497 | 8/1/1979 | OVEN CONVERSION |
| DGT095677D | 3025498 | 8/1/1979 | OVEN CONVERSION |
| DGT095681D | 3025501 | 9/1/1976 | PARTS CONVEYOR F/250 TON MOLD MACHINE |
| DGT095682D | 3025502 | 9/1/1976 | PARTS CONVEYOR F/250 TON MOLD MACHINE |
| DGT095685D | 3025503 | 9/1/1976 | CONVEYOR FOR PASTE MACHINE |
| DGT095688D | 3025504 | 9/1/1976 | PILOT HOLE PIERCE |
| DGT095689D | 3025505 | 9/1/1976 | PILOT HOLE PIERCE |
| DGT095698D | 3025510 | 10/1/1976 | BATTERY CHARGER LAB. FACILITIES |
| DGT095801D | 3025511 | 10/1/1976 | COLLECTION SYSTEM FOR OFFBEAR |
| DGT095801D01 | 3025512 | 10/1/1978 | COLLECTION SYSTEM FOR OFFBEAR |
| DGT095801D02 | 3025513 | 8/1/1979 | VENT & CURE OVEN |
| DGT095803D | 3025515 | 10/1/1976 | FOUR-ARM STORAGE TURNSTILE |
| DGT095804D | 3025516 | 10/1/1976 | SPECTROGRAPH |
| DGT095807D | 3025518 | 12/1/1976 | ROLLING MILL 7 STAND |
| DGT095809D | 3025519 | 12/1/1976 | CHARGING UNITS BATTERIES |
| DGT095809D01 | 3025520 | 12/1/1978 | TRAILING CHARGE TO TAG #095809D |
| DGT095809D02 | 3025521 | 6/1/1980 | ADDITIONAL CHARGES TO TAG #095809D |
| DGT095810D | 3025522 | 12/1/1976 | CHARGING UNITS BATTERIES |
| DGT095810D01 | 3025523 | 12/1/1978 | TRAILING CHARGE TO TAG #095810D |
| DGT095810D02 | 3025524 | 6/1/1980 | TRAILING CHARGE TO TAG #095810D |
| DGT095811D | 3025525 | 12/1/1976 | CHARGING UNITS BATTERIES |
| DGT095811D01 | 3025526 | 12/1/1978 | TRAILING CHARGE TO TAG #095811D |
| DGT095811D02 | 3025527 | 6/1/1980 | TRAILING CHARGE TO TAG #095811D |
| DGT095812D | 3025528 | 12/1/1976 | CHARGING UNITS BATTERIES |

| | | | |
|---|---|---|---|
| DGT095812D01 | 3025529 | 12/1/1978 | TRAILING CHARGE TO TAG #095812D |
| DGT095812D02 | 3025530 | 6/1/1980 | TRAILING CHARGE TO TAG #095812D |
| DGT095818D | 3025531 | 1/1/1977 | HEAT SEAL FINAL COVER |
| DGT095821D | 3025532 | 1/1/1977 | TURNSTILE |
| DGT095822D | 3025533 | 1/1/1977 | S O C INSERTER |
| DGT095823D | 3025534 | 1/1/1977 | COIL UP UNIT |
| DGT095826D | 3025535 | 2/1/1977 | WATER CHILLER PASTE MIXING |
| DGT095829D | 3025538 | 4/1/1977 | COIL UP UNIT |
| DGT095830D | 3025539 | 4/1/1977 | COIL UP UNIT |
| DGT095831D | 3025540 | 6/1/1977 | PULL BOX CASTER |
| DGT095832D | 3025541 | 6/1/1977 | PULL BOX CASTER |
| DGT095836D | 3025542 | 10/1/1977 | FRONT END LOADER |
| DGT095837D | 3025543 | 10/1/1977 | CHILLER FOR PULL BOX-20 TON |
| DGT095839D | 3025545 | 10/1/1977 | COIN ROLL |
| DGT095840D | 3025546 | 10/1/1977 | COIN ROLL |
| DGT095842D | 3025547 | 10/1/1977 | ROLLING MILL-7 STAND |
| DGT095843D | 3025548 | 6/1/1976 | SKID RACK |
| DGT095845D | 3025549 | 12/1/1977 | CHARGING UNIT |
| DGT095845D01 | 3025550 | 12/1/1978 | TRAILING CHARGE TO TAG #095845D |
| DGT095846D | 3025551 | 12/1/1977 | CHARGING UNIT |
| DGT095846D01 | 3025552 | 12/1/1978 | TRAILING CHARGE TO TAG #095846D |
| DGT095848D | 3025553 | 12/1/1977 | CHARGING UNIT |
| DGT095848D01 | 3025554 | 12/1/1978 | TRAILING CHARGE TO TAG #095848D |
| DGT095849D | 3025555 | 12/1/1977 | CHARGING UNIT |
| DGT095849D01 | 3025556 | 12/1/1978 | TRAILING CHARGE TO TAG #095849D |
| DGT095850D | 3025557 | 12/1/1977 | CHARGING UNIT |
| DGT095850D01 | 3025558 | 12/1/1978 | TRAILING CHARGE TO TAG #095850D |
| DGT095854D | 3025559 | 12/1/1977 | CHARGING UNIT |
| DGT095854D01 | 3025560 | 12/1/1978 | TRAILING CHARGE TO TAG #095854D |
| DGT095858D | 3025561 | 12/1/1977 | CHARGING UNIT |
| DGT095858D01 | 3025562 | 12/1/1978 | TRAILING CHARGE TO TAG #095858D |
| DGT095859D | 3025563 | 12/1/1977 | CHARGING UNIT |
| DGT095859D01 | 3025564 | 12/1/1978 | TRAILING CHARGE TO TAG #095859D |
| DGT095860D | 3025565 | 12/1/1977 | CHARGING UNIT |
| DGT095860D01 | 3025566 | 12/1/1978 | TRAILING CHARGE TO TAG #095860D |
| DGT095861D | 3025567 | 12/1/1977 | CHARGING UNIT |
| DGT095861D01 | 3025568 | 12/1/1978 | TRAILING CHARGE TO TAG #095861D |
| DGT095862D | 3025569 | 12/1/1977 | CHARGING UNIT |
| DGT095862D01 | 3025570 | 12/1/1978 | TRAILING CHARGE TO TAG #095862D |
| DGT095868D | 3025571 | 3/1/1978 | TEST UNIT AND MODULES |
| DGT095870D | 3025572 | 4/1/1978 | COVER HEAT SEAL |
| DGT095872D | 3025573 | 9/1/1978 | BUTT WELDER |
| DGT095873D | 3025574 | 9/1/1978 | DEREELER |
| DGT095874D | 3025575 | 9/1/1978 | DEREELER |
| DGT095877D | 3025576 | 9/1/1978 | LUG FORM PRESS |
| DGT095878D | 3025577 | 9/1/1978 | ROTARY CUT OFF MACHINE |
| DGT095879D | 3025578 | 9/1/1978 | PILOT HOLE PIERCE PRESS |
| DGT095880D | 3025579 | 9/1/1978 | PLATE DRYING OVEN |
| DGT095882D | 3025581 | 6/1/1976 | SKID RACK |
| DGT095883D | 3025582 | 6/1/1976 | SKID RACK |
| DGT095884D | 3025583 | 7/1/1978 | THERMO CARE WATER CHILLER |
| DGT095885D | 3025584 | 8/1/1978 | FULLER BAG COLLECTOR |
| DGT095885D01 | 3025585 | 9/1/1978 | TRAILING CHARGE TO TAG #095885D |
| DGT095887D | 3025586 | 9/1/1978 | CAMBER SENSOR |
| DGT095888D | 3025587 | 11/1/1978 | LABEL MACHINE |
| DGT095889D | 3025588 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095890D | 3025589 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095891D | 3025590 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095892D | 3025591 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095893D | 3025592 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095894D | 3025593 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095895D | 3025594 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095896D | 3025595 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095897D | 3025596 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095898D | 3025597 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095899D | 3025598 | 12/1/1978 | BATTERY CHARGING UNIT |
| DGT095900D | 3025599 | 12/1/1978 | BATTERY CHARGING UNIT |

| | | |
|---|---|---|
| DGT095901A | 3025600 | 11/1/2001 REBUILD #4 AIR COMPRESSOR - ORIGINAL TAG REFERENCE |
| DGT095901D | 3025601 | 12/1/1978 AIR COMPRESSOR |
| DGT095901D01 | 3025602 | 7/1/1991 ADDL CHG(STRUCTURE OF COMPRESSOR) |
| DGT095902D | 3025603 | 2/1/1979 BASE FOR STACKER |
| DGT095903D | 3025604 | 2/1/1979 FREEZER |
| DGT095906D | 3025606 | 2/1/1979 FILL IN CONVEYOR |
| DGT095907D | 3025607 | 2/1/1979 FILL IN CONVEYOR |
| DGT095908D | 3025608 | 2/1/1979 FILL IN CONVEYOR |
| DGT095909D | 3025609 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095910D | 3025610 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095911D | 3025611 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095912D | 3025612 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095915D | 3025614 | 4/1/1979 RIB TRIM MACHINE |
| DGT095916D | 3025615 | 4/1/1979 TOP TERM ALIGNMENT MACHINE |
| DGT095919D | 3025618 | 4/1/1979 CHILLER-15 TON |
| DGT095920D | 3025619 | 5/1/1979 TEMPERATURE CONTROLLER |
| DGT095923D | 3025620 | 7/1/1979 HEAT SEAL MACHINE |
| DGT095925D | 3025622 | 7/1/1979 CASE GATHERING CONVEYOR FROM COS |
| DGT095927D | 3025624 | 7/1/1979 CAMBER SENSOR |
| DGT095928D | 3025625 | 7/1/1979 CAMBER SENSOR |
| DGT095932D | 3025628 | 8/1/1979 OSI PLATE DRY OVEN |
| DGT095933D | 3025629 | 8/1/1979 OSI PLATE DRY OVEN |
| DGT095934D | 3025630 | 8/1/1979 5 STATION EXT FUSION MACHINE |
| DGT095935D | 3025631 | 8/1/1979 SLITTER & CHOPPER |
| DGT095936D | 3025632 | 8/1/1979 SLITTER & CHOPPER |
| DGT095937D | 3025633 | 8/1/1979 COOLING CHAMBER |
| DGT095938D | 3025634 | 8/1/1979 GROUP PALLET CONVEYOR |
| DGT095940D | 3025635 | 8/1/1979 WORK PLATFORM FOR (2) CAST ON STRAP |
| DGT095942D | 3025636 | 9/1/1979 SCREW CONVEYOR SYSTEM |
| DGT095943D | 3025637 | 9/1/1979 PASTE RECLAIM SYSTEM |
| DGT095944D | 3025638 | 9/1/1979 TENNENT FLOOR SWEEPER |
| DGT095944D01 | 3025639 | 9/1/1979 ADDITIONAL CHARGES TO TAG #095944D |
| DGT095946D | 3025641 | 10/1/1979 CAST ON STRAP |
| DGT095947D | 3025642 | 10/1/1979 GREEN GROUP SHORT TEST CONVEYOR |
| DGT095948D | 3025643 | 10/1/1979 LEAK TEST CONVEYOR |
| DGT095949D | 3025644 | 10/1/1979 GREEN GROUP SHORT TEST CONVEYOR |
| DGT095950D | 3025645 | 10/1/1979 GREEN SHORT TEST CONVEYOR |
| DGT095953D | 3025646 | 12/1/1979 CONVEYOR TO CHARGING TABLES |
| DGT095955D | 3025649 | 12/1/1979 HOPPER AND CONVEYOR |
| DGT095957D | 3025650 | 12/1/1979 VENTILATION SYSTEM |
| DGT095958D | 3025651 | 12/1/1979 LEAK TEST |
| DGT095961D | 3025652 | 12/1/1979 DROTT DECK CRANE |
| DGT095965D | 3025655 | 2/1/1980 ROCKWELL BAND SAW |
| DGT095971D | 3025657 | 6/1/1980 TIG WELDER |
| DGT095972D | 3025658 | 6/1/1980 TIG WELDER |
| DGT095973D | 3025659 | 6/1/1980 TIG WELDER |
| DGT095975D | 3025660 | 6/1/1980 TIG WELD CONVEYOR SYSTEM |
| DGT095985D | 3025666 | 12/1/1981 PASTE MIXER |
| DGT095985D01 | 3025667 | 12/1/1983 INSTRUMENTS FOR/PASTE MIXER |
| DGT095986D | 3025668 | 12/1/1981 PASTE MIXER |
| DGT095986D01 | 3025669 | 12/1/1983 INSTRUMENTS FOR/PASTE MIXER |
| DGT095987D01 | 3025670 | 7/1/1984 INSTRUMENTS FOR/PASTE MIXER |
| DGT095989D | 3025671 | 12/1/1981 STOCK DEREELER |
| DGT095990D | 3025672 | 12/1/1981 STOCK DEREELER |
| DGT095991D | 3025673 | 12/1/1981 STRETCH WRAP MACHINE |
| DGT095992D | 3025674 | 12/1/1982 SINGLE STAND MILL |
| DGT095993D | 3025675 | 12/1/1982 WATER CHILLER |
| DGT095993D01 | 3025676 | 1/1/1983 WATER CHILLER |
| DGT095994D | 3025677 | 12/1/1982 WATER CHILLER |
| DGT095994D01 | 3025678 | 1/1/1983 WATER CHILLER |
| DGT095995D | 3025679 | 12/1/1980 VENTILATION F/COLLECTION SYSTEM |
| DGT095996D | 3025680 | 12/1/1980 VENTILATION F/COLLECTION SYSTEM |
| DGT095997D | 3025681 | 12/1/1982 VENILATION F/COLLECTION SYSTEM |
| DGT095998D | 3025682 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT095999D | 3025683 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT096000D | 3025684 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT098187D | 3025690 | 12/1/1972 DUST COLLECTOR |

| | | |
|---|---|---|
| DGT098361D01 | 3025691 | 10/31/1989 REBUILD MOLDING MACHINE |
| DGT098361D02 | 3025692 | 3/1/1992 ADDL CHG(700 T MOLDING MACH) |
| DGT100287D | 3025696 | 6/1/1977 EXPAND PRESS |
| DGT100297D | 3025698 | 6/1/1977 PASTE MIXER |
| DGT100306D | 3025699 | 6/1/1977 BUTT WELDER |
| DGT100312D | 3025700 | 6/1/1977 DEREELER |
| DGT100315D | 3025701 | 6/1/1977 DEREELER |
| DGT100470D | 3025702 | 9/1/1977 TIG TOP TERM BURN MACHINE |
| DGT102070D | 3025703 | 7/1/1978 LUG TRIM PRESS |
| DGT102099D | 3025704 | 8/1/1978 OSI PLATE DRY OVEN |
| DGT102511D | 3025708 | 7/1/1979 SLITTER & CHOPPER |
| DGT102513D | 3025709 | 7/1/1979 CAMBER SENSORS |
| DGT104491 | 3025710 | 2/1/1998 LEVELATOR |
| DGT104492 | 3025711 | 2/1/1998 LEVELATOR |
| DGT104493 | 3025712 | 2/1/1998 LEVELATOR |
| DGT104494 | 3025713 | 2/1/1998 LEVELATOR |
| DGT104495 | 3025714 | 2/1/1998 LEVELATOR |
| DGT104496 | 3025715 | 2/1/1998 LEVELATOR |
| DGT104497 | 3025716 | 2/1/1998 LEVELATOR |
| DGT104498 | 3025717 | 2/1/1998 LEVELATOR |
| DGT104499 | 3025718 | 2/1/1998 LEVELATOR |
| DGT104500 | 3025719 | 2/1/1998 LEVELATOR |
| DGT104501 | 3025720 | 2/1/1998 LEVELATOR |
| DGT104502 | 3025721 | 2/1/1998 LEVELATOR |
| DGT105567D | 3025724 | 6/1/1983 STRETCH WRAP MACHINE |
| DGT105650D | 3025725 | 8/1/1983 SINGLE STAND MILL |
| DGT105751D | 3025726 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT105752D | 3025727 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT105753D | 3025728 | 2/1/1983 TRABON LUBE SYSTEM |
| DGT105754D | 3025729 | 2/1/1983 TRABON LUBE SYSTEM |
| DGT105755D | 3025730 | 2/1/1983 SINGLE STAND MILL |
| DGT105756D | 3025731 | 3/1/1983 DIESEL FIRE PUMP |
| DGT105757D | 3025732 | 3/1/1983 ELECTRIC FIRE PUMP |
| DGT105758D | 3025733 | 3/1/1983 JOCKEY PUMP |
| DGT105761D | 3025734 | 12/1/1983 HYDRAULIC PASTE BOX |
| DGT105762D | 3025735 | 12/1/1983 HYDRAULIC PASTE BOX |
| DGT105763D | 3025736 | 12/1/1983 ROTARY PILOT HOLE MACHINE |
| DGT105764D | 3025737 | 12/1/1983 ROTARY PILOT HOLE MACHINE |
| DGT105765D | 3025738 | 12/1/1983 TANK FOR MIXER |
| DGT105766D | 3025739 | 12/1/1983 TANK FOR MIXER |
| DGT105769D | 3025741 | 6/1/1984 LABEL MACHINE |
| DGT105770D | 3025742 | 8/1/1984 TIG WELDER |
| DGT105770D01 | 3025743 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105770 |
| DGT105771D | 3025744 | 8/1/1984 TIG WELDER |
| DGT105771D01 | 3025745 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105771 |
| DGT105772D | 3025746 | 8/1/1984 TIG WELDER |
| DGT105772D01 | 3025747 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105772 |
| DGT105773D | 3025748 | 8/1/1984 TIG WELDER |
| DGT105773D01 | 3025749 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105773 |
| DGT105774D | 3025750 | 10/1/1984 PILOT HOLE MACHINE |
| DGT105775D | 3025751 | 12/1/1984 HEVI DUTY TRANSFORMER-300KVA LIGHTING |
| DGT105776D | 3025752 | 12/1/1984 TANK FOR MIXER |
| DGT105777D | 3025753 | 1/1/1985 HYDRAULIC PASTE BOX |
| DGT105781D | 3025754 | 1/1/1985 BATTERY WASHER |
| DGT105787D | 3025756 | 12/1/1985 EXPANDER PRESS #2 |
| DGT105789D | 3025757 | 8/1/1986 HI STACKER TIERING TRUCK |
| DGT105790D | 3025758 | 8/1/1986 HI STACKER TIERING TRUCK |
| DGT105795D | 3025759 | 9/1/1986 EPANDER PRESS #1LINE |
| DGT105796D | 3025760 | 10/1/1986 PASTE MACH LINE#1 |
| DGT105797D | 3025761 | 10/1/1986 BUTT WELDER LINE#1 |
| DGT105798D | 3025762 | 10/1/1986 PASTE MIXER LINE #1 |
| DGT105800D | 3025763 | 10/1/1986 HOT RUNNER CONTROLLER(500T CINN MOLD) |
| DGT105801D | 3025764 | 10/1/1986 MOLD MONITOR MACH #12(500T MOLD MACH) |
| DGT105802D | 3025765 | 10/1/1986 PARTS CONV(25T MOLD MACH)15'&7' |
| DGT105805D | 3025766 | 2/1/1987 EXPANDER PRESS LN#1 |
| DGT105806D | 3025767 | 2/1/1987 COVER HEAT SEAL |
| DGT105807D | 3025768 | 4/1/1987 FINAL COVER FILT PLACER |

| | | | |
|---|---|---|---|
| DGT105810D | 3025770 | 9/1/1987 | CONV-HANDLE PLACEMENT |
| DGT105811D | 3025771 | 5/1/1988 | CHARGE PANEL |
| DGT105812D | 3025772 | 5/1/1988 | CHARGE PANEL |
| DGT105817D | 3025773 | 2/1/1988 | S.O.C. PROGRAMMABLE CONTROLLER |
| DGT105818D | 3025774 | 2/1/1988 | S.O.C. PROGRAMMABLE CONTROLLER |
| DGT105820D | 3025775 | 2/1/1988 | 15T WATER CHILLER |
| DGT105822D | 3025776 | 5/1/1988 | CAST ON STRAP MACH |
| DGT105823D | 3025777 | 5/1/1988 | HI-RATE TESTER(5575L&R) |
| DGT105824D | 3025778 | 5/1/1988 | AIR BLAST SYS BLOWER |
| DGT105825D | 3025779 | 5/1/1988 | TOP TERM TIG BURN MACH |
| DGT105826D | 3025780 | 5/1/1988 | HI-RATE CONVEYOR |
| DGT105828D | 3025782 | 11/1/1988 | CHARGE FLOOR PROCESS FAN |
| DGT105830D | 3025784 | 12/1/1988 | LABEL MACHINE |
| DGT105831D | 3025785 | 1/1/1989 | SPOT FACE MACHINE |
| DGT105832D | 3025786 | 1/1/1989 | SPOT FACE MACHINE |
| DGT105834D | 3025787 | 8/31/1989 | AUTO STRETCH WRAP UNIT |
| DGT105837D | 3025788 | 10/31/1989 | LEAD SULFATE RECOVERY SYSTEM |
| DGT105839D | 3025790 | 2/1/1990 | CONVEYOR |
| DGT105840D | 3025791 | 2/1/1990 | 90 DEGREE EXIT CONV(RIGHT SIDE INFEED OHB) |
| DGT105842D | 3025793 | 8/1/1973 | TRUCK POWERED SHOP |
| DGT105843D | 3025794 | 3/1/1980 | TRUCK-POWERED-SHOP |
| DGT105845D | 3025795 | 8/1/1976 | TRUCK-POWERED-SHOP |
| DGT105846D | 3025796 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105847D | 3025797 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105848D | 3025798 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105849D | 3025799 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105854D | 3025802 | 12/1/1991 | PRESTRETCH UNIT |
| DGT105856D | 3025803 | 1/1/1993 | ENCLOSURE F/3 DOORS |
| DGT105865D | 3025804 | 3/1/1994 | SPIROMETER |
| DGT105869D | 3025806 | 2/28/1995 | (9)TOLEDO SCALE WEIGHT CONTROLLERS |
| DGT105870D | 3025807 | 1/1/1996 | AUTOMATIC PALLETIZER |
| DGT105870E | 3025808 | 11/1/2001 | AUTOMATIC PALLETIZER |
| DGT105871 | 3025809 | 2/28/1997 | (B) ULTRASONIC WELDER |
| DGT105871A | 3025810 | 12/1/1998 | TRAILING CHARGE TO DGT105871 |
| DGT105871D | 3025811 | 1/1/1987 | GENIE BOOM ELECTRIC MAN LIFT |
| DGT105872D | 3025813 | 3/1/1983 | CLARK WALKING STYLE ELECTRIC SWEEPER/SCRUBBER |
| DGT105873 | 3025814 | 7/31/1997 | AUTO OFF-BEAR SYS |
| DGT105874 | 3025816 | 7/31/1997 | HEATING SYSTEM (UPGRADE) |
| DGT105876 | 3025817 | 11/1/2001 | LEAD OXIDE VENTALATION ON XMET |
| DGT105878 | 3025818 | 11/1/2001 | SYNTRON BOWL CONVERSION |
| DGT105880 | 3025819 | 11/1/2001 | REBUILD CHANGE TABLE |
| DGT105881 | 3025820 | 11/1/2001 | REBUILD CHARGE TABLES |
| DGT105883 | 3025821 | 11/1/2001 | MANCOOLERS FOR C.O.S. |
| DGT105884 | 3025822 | 11/1/2001 | REPAIR PERSON COOLERS - X-MET |
| DGT105886 | 3025824 | 11/1/2001 | ROLLING MILL DRIVE UNIT |
| DGT105887 | 3025825 | 11/1/2001 | REPLACE MODICON CONTROLLERS |
| DGT105888 | 3025826 | 11/1/1997 | SAND FILTER |
| DGT105890 | 3025828 | 11/1/1997 | POWERED SWEEPER |
| DGT105892 | 3025829 | 11/1/1997 | HOT MELT EQUIPMENT |
| DGT105894 | 3025832 | 11/1/1997 | RETENTION AREA |
| DGT105895 | 3025833 | 11/1/2001 | LASER DATE CODE-CELL #1 |
| DGT105897 | 3025834 | 11/1/2001 | HI RATE MACHINE FOR LEAN CELL #1 |
| DGT105898 | 3025835 | 11/1/2001 | AIRCHECK FOR LEAN CELL #1 |
| DGT105899 | 3025836 | 11/1/2001 | AIRCHECK PANEL FOR LEAN CELL #1 |
| DGT105902 | 3025837 | 11/1/2001 | CARTON PRINTER MACHINE CELL #1 |
| DGT105903 | 3025838 | 11/1/2001 | HANDLE PLACER MACHINE |
| DGT105906 | 3025839 | 11/1/2001 | LOW VOLUME SHRING WRAP MACHINE |
| DGT105907 | 3025840 | 11/1/2001 | HIGH SPEED SHRINK WRAP MACHINE |
| DGT105908 | 3025841 | 11/1/2001 | INKJET PRINTER CELL #1 |
| DGT105911 | 3025842 | 11/1/2001 | DESIGN OF ACID HANDLING SYSTEM |
| DGT105912 | 3025843 | 11/1/2001 | PLANT UPGRADES FOR LEAN CELLS |
| DGT105913 | 3025844 | 11/1/2001 | LABEL JET LABELLER |
| DGT105914 | 3025845 | 11/1/2001 | LABEL JET LABELLER |
| DGT105915 | 3025846 | 11/1/2001 | LABEL JET LABELLER |
| DGT105916 | 3025847 | 11/1/2001 | LABEL JET LABELLER |
| DGT105917 | 3025848 | 11/1/2001 | LABEL JET LABELLER |
| DGT105918 | 3025849 | 11/1/2001 | LABEL JET LABELLER |

| | | | |
|---|---|---|---|
| DGT105920 | 3025850 | 11/1/2001 | HEAT SEAL FOR MISC. LINE |
| DGT105921 | 3025851 | 11/1/2001 | POLY STORAGE ELIMINATTION EQUIPMENT TO MOVE PLASTI |
| DGT105924 | 3025852 | 11/1/2001 | QC LAB BITRODE CYCLER FOR NEW BRUNSWICK |
| DGT106102D | 3025853 | 6/1/1984 | PILOT HOLE MACHINE |
| DGT106164D | 3025854 | 9/1/1984 | BRIDGEPORT TAPE MILL |
| DGT106164D01 | 3025855 | 10/1/1984 | TRAILING CHARGE TO TAG #106164D |
| DGT109106D | 3025858 | 12/1/1988 | PASTE MACH(ROTARY DRUM) |
| DGT111097D | 3025859 | 4/1/1993 | BOILER CONTROL FOR #1 |
| DGT111098D | 3025860 | 4/1/1993 | BOILER CONTROL FOR #2 |
| DGT111099D | 3025861 | 4/1/1993 | BOILER CONTROL FOR #3 |
| DGT111100D | 3025862 | 4/1/1993 | BOILER CONTROL FOR #4 |
| DGT111673D | 3025864 | 7/1/1994 | RED LEAD STORAGE SYSTEM |
| DGT111673D01 | 3025865 | 7/1/1994 | ADDITIONAL CHARGES TO TAG #111673D |
| DGT111673D02 | 3025866 | 1/1/1995 | TRAILING CHARGES TO TAG #111673D |
| DGT111674D | 3025867 | 7/1/1994 | RED LEAD DELIVERY SYSTEM |
| DGT111674D01 | 3025868 | 7/1/1994 | TRAILING CHARGE TO TAG #111674D |
| DGT112844 | 3025870 | 4/28/1999 | INFORMATION BOARD |
| DGT113107 | 3025871 | 7/31/1997 | ROBOT |
| DGT690000 | 3025872 | 1/2/1998 | LEVELATOR |
| DGT690001 | 3025873 | 1/2/1998 | LEVELATOR |
| DGT690002 | 3025874 | 1/2/1998 | LEVELATOR |
| DGT690003 | 3025875 | 1/2/1998 | LEVELATOR |
| DGT690004 | 3025876 | 1/2/1998 | LEVELATOR |
| DGT690005 | 3025877 | 1/2/1998 | LEVELATOR |
| DGT690006 | 3025878 | 1/2/1998 | LEVELATOR |
| DGT690007 | 3025879 | 1/2/1998 | LEVELATOR |
| DGT690008 | 3025880 | 1/2/1998 | LEVELATOR |
| DGT690009 | 3025881 | 1/2/1998 | LEVELATOR |
| DGT690010 | 3025882 | 1/2/1998 | LEVELATOR |
| DGT690011 | 3025883 | 1/2/1998 | LEVELATOR |
| DGT690012 | 3025884 | 1/2/1998 | LEVELATOR |
| DGT690013 | 3025885 | 1/2/1998 | LEVELATOR |
| DGT690014 | 3025886 | 1/2/1998 | LEVELATOR |
| DGT690015 | 3025887 | 1/2/1998 | LEVELATOR |
| DGT690016 | 3025888 | 8/1/1998 | TIG WELDER |
| DGT690017 | 3025889 | 1/2/1998 | DOCK LOCK |
| DGT690018 | 3025890 | 1/2/1998 | DOCK LOCK |
| DGT690019 | 3025891 | 1/2/1998 | DOCK LOCK |
| DGT690021 | 3025893 | 1/2/1998 | DOCK LOCK |
| DGT690022 | 3025894 | 1/2/1998 | DOCK LOCK |
| DGT690023 | 3025895 | 1/2/1998 | DOCK LOCK |
| DGT690024 | 3025896 | 1/2/1998 | DOCK LOCK |
| DGT690025 | 3025897 | 1/2/1998 | DOCK LOCK |
| DGT690027 | 3025899 | 1/2/1998 | SITE SIGN (DELPHI) |
| DGT690028 | 3025900 | 4/1/1998 | PERFORATOR LINE UPC |
| DGT690030 | 3025901 | 11/1/1998 | LIFT TABLE |
| DGT690031 | 3025902 | 11/1/1998 | LIFT TABLE |
| DGT690032 | 3025903 | 11/1/1998 | LIFT TABLE |
| DGT690033 | 3025904 | 11/1/1998 | NON SLIP FLOOR COATING-EXPANDER&PASTE MACH. AREAS |
| DGT690034 | 3025905 | 11/1/1998 | TRANSFORMER |
| DGT690035 | 3025906 | 11/1/1998 | LABEL MACHINE |
| DGT690036 | 3025907 | 11/1/1998 | ALARMED FEEDER TO FIRE PUMP HOSE |
| DGT690040 | 3025908 | 11/1/1998 | AUXILLARY REMOTE FIRE DEPT CONNECTION |
| DGT690041 | 3025909 | 11/1/1998 | AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET1 |
| DGT690042 | 3025910 | 11/1/1998 | AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET2 |
| DGT690043 | 3025911 | 11/1/1998 | AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET3 |
| DGT690044 | 3025912 | 1/2/1998 | ROBOT |
| DGT690045 | 3025913 | 1/2/1998 | ROBOT |
| DGT690046 | 3025914 | 1/2/1998 | ROBOT |
| DGT690047 | 3025915 | 1/2/1998 | ROBOT |
| DGT690048 | 3025916 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690049 | 3025917 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690050 | 3025918 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690051 | 3025919 | 11/1/1998 | ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690052 | 3025920 | 1/2/1998 | AUTOMATED ORIENTATION ROBOT |
| DGT690053 | 3025921 | 1/2/1998 | TITAN CENTRAL CHILL |
| DGT690054 | 3025922 | 1/2/1998 | AIR DRYER |

| | | | |
|---|---|---|---|
| DGT690055 | 3025923 | 1/2/1998 | AIR DRYER |
| DGT690056 | 3025924 | 11/1/2001 | BRIDGE CRANE |
| DGT690057 | 3025925 | 1/1/1999 | NEW BRUNSWICK STORM WATER TREATMENT |
| DGT690058 | 3025926 | 11/1/2001 | DUST COLLECTION SYSTEM FOR THE X-MET LINE |
| DGT690060 | 3025927 | 11/1/2001 | ELECTRICAL DISTRIBUTION SYSTEM FOR THE X-MET LINE |
| DGT690065 | 3025928 | 11/1/2001 | COULTER COUNTER PER DAVE MCCORD - MEASURES OXIDE P |
| DGT690068 | 3025929 | 11/1/2001 | HEAT SEAL MACHINE #1 |
| DGT690069 | 3025930 | 11/1/2001 | HEAT SEAL MACHINE #2 |
| DGT690070 | 3025931 | 11/1/2001 | HEAT SEAL MACHINE #3 |
| DGT690071 | 3025932 | 11/1/2001 | HEAT SEAL MACHINE #4 |
| DGT690072 | 3025933 | 11/1/2001 | CONVERT BOILERS TO-ONLY MARK GOODWIN AUTHORIZATION |
| DGT690073 | 3025934 | 11/1/2001 | ACID TANK |
| DGT690074 | 3025935 | 11/1/2001 | ACID TANK |
| DGT690075 | 3025936 | 11/1/2001 | ACID TANK |
| DGT690076 | 3025937 | 11/1/2001 | ACID TANK |
| DGT690077 | 3025938 | 11/1/2001 | NEW AIR WASHER FAN - INSTALLED |
| DGT690078 | 3025939 | 11/1/2001 | NEW AIR WASHER FAN - INSTALLED |
| DGT690081 | 3025940 | 11/1/2001 | BLOWER UNIT FOR AIR WASHER |
| DGT690082 | 3025941 | 1/1/2002 | BLOWER UNIT FOR AIR WASHER |
| DGT690111 | 3025942 | 11/1/2001 | FEED WATER PUMP #1 IN POWER PLANT |
| DGT690112 | 3025943 | 11/1/2001 | FEED WATER PUMP #2 IN POWER PLANT |
| DGT690113 | 3025944 | 11/1/2001 | BUSS DUCT UPGRADE |
| DGT690115 | 3025945 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690116 | 3025946 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690117 | 3025947 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690118 | 3025948 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690119 | 3025949 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690120 | 3025950 | 11/1/2001 | FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690122 | 3025951 | 11/1/2001 | SHEET METAL SHEAR |
| DGT690123 | 3025952 | 11/1/2001 | SONIC WELDER SYSTEM |
| DGT690124 | 3025953 | 11/1/2001 | HIGH VOLTAGE GREEN GRP TEST MACHINE |
| DGT690125 | 3025954 | 11/1/2001 | HIGH VOLTAGE GREEN GRP TEST MACHINE |
| DGT690126 | 3025955 | 11/1/2001 | AERIAL PLATFORM TRUCK - NEW |
| DGT690129 | 3025957 | 1/1/2002 | PHASE II REPAIRS TO FORMATION VENTILATION - PROCES |
| DGT690132 | 3025958 | 11/1/2001 | BATTERY LAB AIR CONDITIONER, UPDATE |
| DGT690134 | 3025959 | 1/1/2002 | SEPARATE PROPANE SYSTEMS FOR PROD PROC, PLANT BOIL |
| DGT690135 | 3025960 | 11/1/2001 | WALMART J240H T BATTERY, APPLICATOR AND TUBING |
| DGT690136 | 3025961 | 11/1/2001 | WALMART J240H T BATTERY, ELECTRICAL CONTROLS |
| DGT690137 | 3025962 | 11/1/2001 | WALMART J240H T BATTERY, ELECTRICAL CONTROLS |
| DGT690138 | 3025963 | 11/1/2001 | WALMART J240H T BATTERY, ENGINEERING DESIGN |
| DGT690139 | 3025964 | 11/1/2001 | WALMART J240H T BATTERY, HOIST |
| DGT690140 | 3025965 | 11/1/2001 | LEAD STRIP MILL (FROM MUNCIE) |
| DGT690141 | 3025966 | 11/1/2001 | WALMART J240 HT BATTERY, MQ 2 MTL |
| DGT690147 | 3025967 | 11/1/2001 | LIFT & ROTATE TABLE # 1 FOR BATTERY PLATE SKIDS |
| DGT690148 | 3025968 | 11/1/2001 | LIFT & ROTATE TABLE # 2 FOR BATTERY PLATE SKIDS |
| DGT690149 | 3025969 | 11/1/2001 | LIFT & ROTATE TABLE # 3 FOR BATTERY PLATE SKIDS |
| DGT690150 | 3025970 | 11/1/2001 | LIFT & ROTATE TABLE # 4 FOR BATTERY PLATE SKIDS |
| DGT690151 | 3025971 | 11/1/2001 | LIFT & ROTATE TABLE # 5 FOR BATTERY PLATE SKIDS |
| DGT690152 | 3025972 | 11/1/2001 | LIFT & ROTATE TABLE # 6 FOR BATTERY PLATE SKIDS |
| DGT690153 | 3025973 | 11/1/2001 | LIFT & ROTATE TABLE # 7 FOR BATTERY PLATE SKIDS |
| DGT690156 | 3025974 | 11/1/2001 | LIFT & ROTATE TABLE # 8 FOR BATTERY PLATE SKIDS |
| DGT690157 | 3025975 | 11/1/2001 | LIFT & ROTATE TABLE # 9 FOR BATTERY PLATE SKIDS |
| DGT690158 | 3025976 | 11/1/2001 | LIFT & ROTATE TABLE # 10 FOR BATTERY PLATE SKIDS |
| DGT690159 | 3025977 | 11/1/2001 | LIFT & ROTATE TABLE # 11 FOR BATTERY PLATE SKIDS |
| DGT690160 | 3025978 | 11/1/2001 | LIFT & ROTATE TABLE # 12 FOR BATTERY PLATE SKIDS |
| DGT690161 | 3025979 | 11/1/2001 | LIFT & ROTATE TABLE # 13 FOR BATTERY PLATE SKIDS |
| DGT690162 | 3025980 | 11/1/2001 | LIFT & ROTATE TABLE # 14 FOR BATTERY PLATE SKIDS |
| DGT690163 | 3025981 | 11/1/2001 | ACID RECLAIM PUMP # 1 |
| DGT690164 | 3025982 | 11/1/2001 | ACID RECLAIM PUMP # 2 |
| DGT690165 | 3025983 | 11/1/2001 | WALMART J240HT BATTERY, SCRAP COLLECTION SYSTEM |
| DGT690166 | 3025984 | 11/1/2001 | INSTALL EQUIP TRANS FROM TRENTON |
| DGT690168 | 3025985 | 11/1/2001 | HOOD FOR OPERATOR QUALITY TESTING EQUIPMENT |
| DGT690169 | 3025986 | 11/1/2001 | ACID ABSORPTION TESTER |
| DGT690176 | 3025987 | 11/1/2001 | HEAT EXCHANGER FOR WASH TUNNEL - NB |
| DGT690177 | 3025988 | 1/1/2002 | PERSONNEL VACUUM SYS. ON CLEAN AREA DOORWAY (1 OF |
| DGT690178 | 3025989 | 11/1/2001 | INSTALL HIGH SPEED ROLLUP DOOR TO SHIPPING DEPT |
| DGT690181 | 3025990 | 11/1/2001 | REPLACE CHARGE TABLE BLOWER |

| | | | |
|---|---|---|---|
| DGT690194 | 3025991 | 11/1/2001 | BOILER CONTROLLER (1 OF 3) |
| DGT690195 | 3025992 | 11/1/2001 | BOILER CONTROLLER (2 OF 3) |
| DGT690196 | 3025993 | 11/1/2001 | BOILER CONTROLLER (3 OF 3) |
| DGT690218 | 3025994 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (2 OF |
| DGT690219 | 3025995 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (3 OF |
| DGT690220 | 3025996 | 1/1/2002 | PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (4 OF |
| DGT720001 | 3025997 | 4/28/1999 | ACID FILL MACHINE |
| DGT720002 | 3025998 | 4/28/1999 | MOD. TO VR |
| DGT720007 | 3025999 | 4/28/1999 | 50 AMP RECTIFIER |
| DGT720010 | 3026000 | 4/28/1999 | UPDATE STACKER SYSTEM |
| DGT72383 | 3026001 | 11/1/2001 | REBUILD 700 MOLDING MACHINE |
| DGT72395 | 3026002 | 1/1/2002 | CAST ON STRAP CONTROLS |
| DGT72396 | 3026003 | 1/1/2002 | PROPANE BACK UP SYSTEM FOR BOILERS |
| DGT72413 | 3026004 | 1/1/2002 | AUTO PLATE STIELER SYSTEM CONTROLS #4 |
| DGT74405 | 3026005 | 11/1/2001 | ACID FILL/PREWASH MACHINE CELL #1 |
| DGT74406 | 3026006 | 11/1/2001 | ACID MIX SYSTEM CELL #1 |
| DGT74407 | 3026007 | 11/1/2001 | WASHER/DRYER FOR FINISHED BATTERIES CELL #1 |
| DGT74408 | 3026008 | 11/1/2001 | BITROBE HIRATE CELL #1 |
| DGTEX095387D | 3026009 | 11/1/2001 | CAPITALIZABLE MAINTENANCE - RECONDITION I.R. AIR C |
| DGT018263N | 3026024 | 1/1/1979 | CASE GATHERING CONVEYOR |
| DGT018358N | 3026079 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018359N | 3026080 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018360N | 3026081 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018361N | 3026082 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT018362N | 3026083 | 10/1/1986 | HOT RUNNER CONTROLLER SYSTEM |
| DGT081436D | 3026331 | 11/1/1974 | STRAP CAST MACHINE |
| DGT081437D | 3026332 | 11/1/1974 | STRAP CAST MACHINE |
| DGT081438D | 3026333 | 11/1/1974 | STRAP CAST MACHINE |
| DGT091798D | 3026399 | 12/1/1977 | CAST ON STRAP MACHINE |
| DGT101707D | 3026558 | 7/1/1985 | STRETCH WRAP MACHINE |
| DGT101750D | 3026598 | 1/1/1988 | OSI OVEN-ENERGY RECOVERY SYSTEM |
| DGT081611D | 3027025 | 4/1/1977 | VACUUM SYSTEM FOR INCAPTULATORS |
| DGT081622D | 3027033 | 7/1/1977 | PLATE ENCAPSULATOR |
| DGT081623D | 3027035 | 7/1/1977 | PLATE ENCAPSULATOR |
| DGT081648D | 3027064 | 8/1/1977 | SPECTROGRAPH |
| DGT081649D | 3027066 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081650D | 3027067 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081651D | 3027068 | 8/1/1977 | HEAT SEAL MACHINE FINAL |
| DGT081693D | 3027101 | 10/1/1977 | TEMPERATURE CONTROL FOR TERMINAL |
| DGT081705D | 3027112 | 11/1/1977 | FINAL COVER LEAK TEST |
| DGT081743D | 3027130 | 9/1/1978 | BUTT WELDER |
| DGT095750D | 3027192 | 12/1/1976 | X MAT EXPANDING PRESS |
| DGT095758D | 3027208 | 12/1/1976 | PASTE MIXER |
| DGT096940D | 3027221 | 5/1/1972 | WATER CHILLER |
| DGT100166D | 3027229 | 4/1/1977 | TIG BURN MACHINE |
| DGT100357D | 3027246 | 7/1/1977 | EDGE TRIM & CHOPPER UNIT |
| DGT100485D | 3027251 | 9/1/1977 | ENCAPSULATOR |
| DGT100486D | 3027252 | 9/1/1977 | ENCAPSULATOR |
| DGT103764D | 3027269 | 9/1/1978 | GROUP ALIGN CONVEYOR MACHINE |
| DGT103775D | 3027277 | 12/1/1978 | ENCAPSULATION & COLLATION MACHINE |
| DGT103776D | 3027279 | 12/1/1978 | ENCAPSULATION & COLLATION MACHINE |
| DGT103780D | 3027283 | 1/1/1979 | COVER HEAT SEAL |
| DGT103780D01 | 3027284 | 3/1/1979 | TRAILING CHARGE TO TAG #103780D |
| DGT103794D | 3027288 | 4/1/1979 | GREEN GROUP SHORT TEST CONVEYOR #1 |
| DGT103815D | 3027299 | 7/1/1979 | STRAP CAST STATION |
| DGT103833D | 3027307 | 10/1/1979 | WATER CHILLER-15 TON |
| DGT103848D | 3027313 | 12/1/1979 | DC DC MODULE |
| DGT103849D | 3027314 | 12/1/1979 | DC DC MODULE |
| DGT103850D | 3027315 | 12/1/1979 | DC DC MODULE |
| DGT103851D | 3027316 | 12/1/1979 | DC DC MODULE |
| DGT103852D | 3027317 | 12/1/1979 | DC DC MODULE |
| DGT103853D | 3027318 | 12/1/1979 | DC DC MODULE |
| DGT103854D | 3027319 | 12/1/1979 | DC DC MODULE |
| DGT103856D | 3027321 | 12/1/1979 | DC DC MODULE |
| DGT103857D | 3027322 | 12/1/1979 | DC DC MODULE |
| DGT103907D | 3027345 | 11/1/1982 | WATER CHILLER |
| DGT103933D | 3027353 | 9/1/1983 | HEAT TREAT FURNACE |

| | | |
|---|---|---|
| DGT104743D | 3027392 | 6/1/1980 BRANSON WELD UNIT |
| DGT107507D | 3027402 | 1/1/1986 DUST COLLECTOR |
| DGT107566D | 3027438 | 3/1/1990 EKG MACHINE |
| DGT107586D | 3027452 | 1/1/1991 GMF ROBOT FOR C.O.S. LINE |
| DGT107588D | 3027454 | 6/1/1991 JWI LEAD FILTER PRESS |
| DGT107609D | 3027463 | 1/1/1992 LEBLOND MAKINO LATHE |
| DGT107619D | 3027469 | 2/1/1992 DIGITAL READOUT FOR LEBLOND LATHE |
| DGT107621D | 3027470 | 4/1/1992 TEMP CONTROLLER FOR MOLD MACH |
| DGT107636D | 3027479 | 4/1/1994 SATELLITE SPIROMETER |
| DGT107647D | 3027487 | 1/1/1994 CHILLER SYSTEM FOR #2 LEAD STRIP |
| DGT107678D | 3027499 | 7/1/1995 SPRAYMATION HOT MELT EQUIPMENT |
| DGT107698 | 3027515 | 6/30/1997 DIELECTRIC TEST CONTROL |
| DGT107700 | 3027517 | 7/31/1997 AUTO OFF |
| DGT107723B | 3027544 | 6/1/1999 FORMATION TABLE SYSTEM |
| DGT107731 | 3027549 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107732 | 3027550 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107733 | 3027551 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107734 | 3027552 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107735 | 3027553 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107736 | 3027554 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107744 | 3027559 | 4/1/2000 TOP TERMINAL TIG WELDER |
| DGT600015 | 3027596 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600016 | 3027597 | 11/1/2001 44 X 55 4000LB CAPACITY SCISSOR LIFT |
| DGT600017 | 3027598 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600018 | 3027599 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600019 | 3027600 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600020 | 3027601 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600043 | 3027617 | 11/1/2001 SEPERATOR ROLL LIFT, JIB CRANE, AND HOIST |
| DGT600044 | 3027618 | 11/1/2001 SEPERATOR ROLL LIFT, JIB CRANE AND HOIST |
| DGT600045 | 3027619 | 11/1/2001 PROTOTYPE WATER BATH FORMATION SYSTEM |
| DGT600049 | 3027622 | 11/1/2001 FORMATION CHARGING TABLE #3 |
| DGT600056 | 3027625 | 11/1/2001 ROBOT TO LOAD BATTERY GROUPS INTO CAST-ON-STRAP MA |
| DGT600106 | 3027656 | 11/1/2001 WALMART J240HT BATT, SCRAP COLLECTION SYSTEM |
| DGT690101 | 3051124 | 9/11/2002 SEPARATOR LIFTING JIB CRANE AND HOIST |
| DGT690099 | 3051125 | 9/11/2002 DELPHI MACHINE TO TEST BATTERY CELLS FOR SHORTS |
| DGT690097 | 3051126 | 9/11/2002 DELPHI WATER COOLING STATION |
| DGT690095 | 3051127 | 9/11/2002 DELPHI STRETCH/PERFORATE MACHINE |
| DGT690094 | 3051128 | 9/11/2002 DELPHI GROUP LOADING MACHINE STATION |
| DGT690093 | 3051129 | 9/11/2002 DELPHI TOP TERMINAL COVER SPIN MACHINE |
| DGT690092 | 3051130 | 9/11/2002 DELPHI GROUP LOADING MACHINE STATION |
| DGT690102 | 3051131 | 9/11/2002 SEPARATOR LIFTING JIB CRANE AND HOIST |
| DGT690187 | 3051132 | 9/11/2002 (#6) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690186 | 3051133 | 9/11/2002 (#5) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690185 | 3051134 | 9/11/2002 (#4) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690184 | 3051135 | 9/11/2002 (#3) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690183 | 3051136 | 9/11/2002 (2) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690182 | 3051137 | 9/11/2002 (#1) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690103 | 3051138 | 9/11/2002 FILTRATION SYSTEM FOR CHILLED WATER SUPPLY |
| DGT690212 | 3051139 | 9/11/2002 WELDER #8 |
| DGT690211 | 3051140 | 9/11/2002 WELDER #7 |
| DGT690210 | 3051141 | 9/11/2002 WELDER #6 |
| DGT690209 | 3051142 | 9/11/2002 WELDER #5 |
| DGT690208 | 3051143 | 9/11/2002 WELDER #4 |
| DGT690207 | 3051144 | 9/11/2002 WELDER #3 |
| DGT690206 | 3051145 | 9/11/2002 WELDER #2 |
| DGT690213 | 3051146 | 9/11/2002 WELDER #9 |
| DGT690083 | 3051147 | 9/11/2002 BIG JOE LIFT TRUCK (REV. 1) |
| DGT105901 | 3051148 | 9/11/2002 REPLACE HEAT SEALER |
| DGT105900 | 3051149 | 9/11/2002 FIRE PTOTECTION FOR GREEN GROU/ VACUUM EXHAUSTER |
| DGT105896 | 3051150 | 9/11/2002 REPLACE HEAT SEALERS |
| DGT690216 | 3051151 | 9/11/2002 WELDER #12 |
| DGT690215 | 3051152 | 9/11/2002 WELDER #11 |
| DGT690214 | 3051153 | 9/11/2002 WELDER #10 |
| DGT690188 | 3051154 | 9/11/2002 DELPHI MACHINE TO ALIGN TOP TERMINAL POSTS |
| DGT105910 | 3051170 | 9/11/2002 RE ROUTE STORM OUTFALL |
| 72414 | 3051171 | 9/11/2002 VACUUM EXHAUSTER |
| 72393 | 3051172 | 9/11/2002 REBUILD TWO CHANGE TABLE |

| DGT690202 | 3051173 | 9/11/2002 WATER CONSERVATION SYSTEM FOR BATTERY WASHER |
|---|---|---|
| DGT690191 | 3051174 | 9/11/2002 MISC CONVEYORS FOR LAYOUT CHANGES TO GRN GRP LEAN |
| DGT690190 | 3051175 | 9/11/2002 VENTILATION COLLECTOR FAN FOR GREEN GROUP LEAN CEL |
| 72370 | 3051176 | 9/11/2002 FIRE PROTECTION UPGRADE |
| DGT690109 | 3051182 | 9/11/2002 ROBOT TO LOAD BATTERY GROUPS INTO CAST-ON-STRAP MA |
| DGT690205 | 3051183 | 9/11/2002 WELDER #1 |
| DGT690130 | 3051209 | 9/11/2002 LINE INSTALL COSTS FOR MQ 1 VALIDATION |
| DGT690121 | 3051210 | 9/11/2002 DELPHI LEAN COVER TO CASE HEAT SEAL MACHINE |
| DGT690108 | 3051211 | 9/11/2002 INTER. COVER AIR CHECK MACHINE |
| DGT690107 | 3051212 | 9/11/2002 GROUP HOTMELT MACHINE |
| DGT690106 | 3051213 | 9/11/2002 TOP TERMINAL HOTMELT MACHINE |
| DGT690104 | 3051214 | 9/11/2002 DELPHI CAST-ON-STRAP MACHINE REBUILD OF DGS0099445 |
| DGT690096 | 3051215 | 9/11/2002 DELPHI SINGLE HEAD EF WELDER MACHINE |
| DGT690131 | 3051216 | 9/11/2002 PRODUCTIVE MTL FOR MQ 1 VALIDATION |
| DGT690203 | 3051217 | 9/11/2002 XMET PASTE MIXER #1 UPGRADE (REPLACES DGT100297D) |
| DGT690174 | 3051218 | 9/11/2002 #2 DR2-NB ENCAPSULATION/COLLATION MACHINE |
| DGT690173 | 3051219 | 9/11/2002 #1 DR2-NB ENCAPSULATION/COLLATION MACHINE |
| DGT690144 | 3051220 | 9/11/2002 UPGRADE BATTERY ACID RETENTION & DIST-TANK & COOLI |
| DGT690143 | 3051221 | 9/11/2002 UPGRADE BATTERY ACID RETENTION & DIST-CONSTR & INS |
| DGT690142 | 3051222 | 9/11/2002 UPGRADE BATTERY ACID RETENTION & DIST & ACID HOUSE |
| DGT690133 | 3051223 | 9/11/2002 NFPA VENTING ON PROPANE REGULATORS |
| DGT690087 | 3051228 | 9/11/2002 DELPHI LEAN TOP TERMINAL TIG WELDER |
| DGT690086 | 3051229 | 9/11/2002 DELPHI LEAN SIDE TERMINAL TIG WELDER |
| DGT056948 | 3051230 | 9/11/2002 OXIDE GRINDER CONTROL PANEL REBUILT |
| DGT72373 | 3051408 | 9/25/2002 replace sulfuric acid tank |
| DGT72387 | 3051409 | 9/25/2002 new brunswick security upgrade |
| DGT600175 | 3115835 | 2/10/2003 #5 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600174 | 3115836 | 2/10/2003 #4 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600173 | 3115837 | 2/10/2003 #3 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600172 | 3115838 | 2/10/2003 #2 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600171 | 3115839 | 2/10/2003 #1 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600176 | 3115841 | 2/10/2003 #6 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600178 | 3115842 | 2/10/2003 LOAD STATION & MAGAZINE FOR ROBOT LOAD |
| DGT600170 | 3115843 | 2/10/2003 ABB ROBOTS (4 OF 4) |
| DGT600169 | 3115844 | 2/10/2003 ABB ROBOTS (3 OF 4) |
| DGT600168 | 3115845 | 2/10/2003 ABB ROBOTS (2 OF 4) |
| DGT600167 | 3115846 | 2/10/2003 ABB ROBOTS (1 OF 4) |
| DGT600177 | 3115848 | 2/10/2003 CONVEYORS FOR DR3 |
| DGT600126 | 3115866 | 2/11/2003 #2 DR2-AN ENCAPSULATION/COLLATION MACHINE |
| DGT600125 | 3115867 | 2/11/2003 #1 DR2-AN ENCAPSULATION/COLLATION MACHINE |
| DGT600060 | 3115887 | 2/12/2003 INTERMEDIATE COVER. ASSY. MACHINE FOR MARINE |
| DGT600203 | 3115900 | 2/12/2003 FORMATION TABLE #2 |
| DGT600193 | 3115907 | 2/12/2003 OPERATOR ASSIST FOR DR-3 (1 OF 2)GREEN GROUP LEAN |
| DGT600194 | 3115908 | 2/12/2003 OPERATOR ASSIST FOR DR-3 (2 OF 2)GREEN GROUP LEAN |
| DGT600075 | 3115918 | 2/12/2003 HI VOLTAGE GREEN GROUP SHORT CHECK- MISC GREEN GRP |
| DGT600229 | 3117571 | 5/22/2003 LIFT ASSIST FOR DR-3 |
| DGT600230 | 3117572 | 5/22/2003 LIFT ASSIST FOR DR-3 |
| DGT600231 | 3117573 | 5/22/2003 LIFT ASSIST FOR DR-3 |
| DGT600204 | 3117578 | 5/22/2003 CONVEYOR SYSTEM FOR MISC LINE DR-3 |
| DGT600213 | 3117580 | 5/22/2003 CONVEYER FOR DR-3 #3&4 ON MISC. LINE |
| DGT690276 | 3151172 | 9/23/2003 BUSS DUCT FOR 1203 |
| DGT690180 | 3151173 | 9/23/2003 BACKFLOW PREVENTORS ON WATER MAINS |
| DGT690267 | 3151174 | 9/23/2003 NEW PROCESS BOILER FOR PLATE STEAM HOODS |
| DGT690262 | 3151175 | 9/23/2003 INSTALL NATURAL GAS LINE IN PLANT |
| DGT690260 | 3151183 | 9/23/2003 GRAPHITE HEAT EXCHANGER FOR ACID HOUSE |
| DGT690263 | 3151189 | 9/23/2003 LIFT PUMP #1 |
| DGT690259 | 3151190 | 9/23/2003 CHARGE TABLE 25 |
| DGT690258 | 3151191 | 9/23/2003 CHARGE TABLE 24 |
| DGT690236 | 3151192 | 9/23/2003 NEW CHARGE TABLE |
| DGT690235 | 3151193 | 9/23/2003 NEW CHARGE TABLE |
| DGT690224 | 3151194 | 9/23/2003 INSTALLATION OF MAJOR MECHANICAL,VENTILATION,ELECT |
| DGT690222 | 3151195 | 9/23/2003 DESIGN OF NEW CHARGE TABLE VENTILATION |
| DGT690265 | 3151196 | 9/23/2003 LIFT PUMP #2 |
| DGT695033 | 3152528 | 10/17/2003 PASTE MIXER BOWL |
| DGT690230 | 3153273 | 11/22/2003 LUG FORM PILOTED DIE (XMET LINE 3) |
| DGT690229 | 3153274 | 11/22/2003 LUG FORM CUT-OFF MACHINE (XMET LINE 2) |
| DGT690204 | 3153275 | 11/22/2003 BAR CODE ERROR PROOFING PROJECT |

| DGT690193 | 3153276 | 11/22/2003 STATION TO REMOVE FORMATION CHARGE SPOOLS |
| DGT690283 | 3153277 | 11/22/2003 HEAT SEAL MACHINE |
| DGT690234 | 3153278 | 11/22/2003 REFURBISH SIDE TERMINAL PLACEMENT MACHINE |
| DGT690233 | 3153279 | 11/22/2003 REFURBISH TOP TERMINAL PLACEMENT MACHINE |
| DGT690231 | 3153280 | 11/22/2003 NEW SCRAP CONVEYOR (XMET LINE 4) |
| DGT690228 | 3153281 | 11/22/2003 PASTE BOX & RAILS (XMET LINE 1) |
| DGT690232 | 3153282 | 11/22/2003 NEW STRIP WIDTH GAGE (XMET LINE 5) |
| DGT695034 | 3153284 | 11/22/2003 OIL PURIFICATION SYSTEM |
| DGT690261 | 3153285 | 11/22/2003 BUFFER CONVEYOR FOR MISC LINE |
| DGT690257 | 3153286 | 11/22/2003 CONTROLS SYS FOR CUTTING ON THE GRID FUNCTIONS |
| DGT690256 | 3153287 | 11/22/2003 VISION SYS FOR NO SPIN CONDITION AND SPOT FACE QUA |
| DGT690255 | 3153288 | 11/22/2003 SPARE EQUIPMENT TO CUT ON GRID JUNCTIONS (XMET) |
| DGT690254 | 3153289 | 11/22/2003 SCRAP SYSTEM FOR PHASE 1 TO CUT ON GRID JUNCTIONS |
| DGT690253 | 3153290 | 11/22/2003 NEW ACID FILL FOR MAIN LINE (WATERFALL) |
| DGT690226 | 3153291 | 11/22/2003 NEW WASHER AND DRYER FOR MAIN LINE |
| DGT690155 | 3153301 | 11/22/2003 POWER TRANSFORMER # 4 FOR LIFT AND ROTATE TABLES |
| DGT690154 | 3153302 | 11/22/2003 POWER TRANSFORMER # 3 FOR LIFT AND ROTATE TABLES |
| DGT690146 | 3153303 | 11/22/2003 POWER TRANSFORMER # 2 FOR LIFT AND ROTATE TABLES |
| DGT690145 | 3153304 | 11/22/2003 POWER TRANSFORMER # 1 FOR LIFT AND ROTATE TABLES |
| DGT690067 | 3153306 | 11/22/2003 OXIDE EQUIPMENT UPG (REACTOR CONTROLS) |
| DGT105892A | 3153307 | 11/22/2003 HOT MELT EQUIPMENT (REBUILD) |
| DGT095660E | 3153308 | 11/22/2003 REFURBISH #2 HEAT SEAL MACHINE |
| DGT095659E | 3153309 | 11/22/2003 REFURBISH #2 HEAT SEAL MACHINE |
| DGT600124 | 3153354 | 11/25/2003 CONTROLLER FOR TIG WELDER |
| DGT600123 | 3153355 | 11/25/2003 CONTROLLER FOR TIG WELDER |
| DGT600046 | 3153358 | 11/25/2003 GROUP CONVEYOR SYSTEM |
| DGT012095O | 3190741 | 1/31/2004 CAPITALIZE REBUILT COST (SUBMERSIBLE HEATERS LINDB |
| DGT690227 | 3190742 | 1/31/2004 SLURRY ROOM EQUIPMENT TO RECLAIM PASTE |
| DGT690278 | 3190743 | 1/31/2004 HOT MELT MACHINE OVERHAUL |
| DGT690192 | 3190744 | 1/1/2004 AUTOMATED ASSEMBLY CELL FOR CASES & TERMINAL ASSY' |
| DGT690250 | 3190745 | 1/31/2004 AIR LEAK TEST MACHINE |
| DGT690273 | 3190750 | 1/31/2004 OXIDE DELIVERY SYSTEM |
| DGT690277 | 3190751 | 1/31/2004 INSULATOR DETECTION SYSTEM - MAINLINE |
| DGT690279 | 3190752 | 1/31/2004 INSULATOR DETECTION SYSTEM - MISC LINE |
| DGT600222 | 3190754 | 2/24/2004 #9 DR-3 ENCAPSULATION COLOLATION MACHINE |
| DGT690264 | 3190755 | 1/31/2004 AUTOMATIC INSULATOR INSERTER FOR SATURN BATTERY |
| DGT690266 | 3190756 | 1/31/2004 MACHINE TO INSTALL INSULATOR UNDER SIDE TERMINAL S |
| DGT690269 | 3190757 | 1/1/2004 HIGH RATE MACHINE BASE |
| DGT690270 | 3190758 | 1/31/2004 BITRODE VRL HIGH RATE |
| DGT690271 | 3190759 | 1/31/2004 BITRODE VRL HIGH RATE LOAD |
| DGT600217 | 3190800 | 2/24/2004 LOAD STATION & MAGAZINE FOR ROBOT LOAD |
| DGT600239 | 3190808 | 2/24/2004 CONVEYOR FOR DR-3 |
| DGT600223 | 3191600 | 3/30/2004 #10 DR-3 ENCAPSULATION COLLATION MACHINE |
| DGT600237 | 3191601 | 3/30/2004 BATTERY CHARGE TABLE #4 |
| DGT600236 | 3191602 | 3/30/2004 BATTERY CHARGE TABLE #3 |
| DGT600235 | 3191610 | 3/30/2004 BATTERY CHARGE TABLE #2 |
| DGT600234 | 3191618 | 3/30/2004 BATTERY CHARGE TABLE #1 |
| DGT690258A | 3192185 | 4/30/2004 CHARGE TABLE 24 |
| DGT690259A | 3192186 | 4/30/2004 CHARGE TABLE 25 |
| DGT004779N05 | 3193545 | 1/1/2004 GENERAL SPENDING FOR MISC. PURCHASES - DESIGN, OUT |
| DGT012175N04 | 3193546 | 6/29/2004 UPGRADE FIRE LOOP AT PLANT |
| DGT690272 | 3193547 | 1/1/2004 HEATING SYSTEM FOR PLANT FOR 350000 CFM |
| DGT000254 | 3195184 | 9/16/2004 RECTIFIER CABINET |
| DGT000255 | 3195185 | 9/16/2004 RECTIFIER CABINET |
| DGT000256 | 3195186 | 9/16/2004 RECTIFIER CABINET |
| DGT000257 | 3195187 | 9/16/2004 RECTIFIER CABINET |
| DGT098361D03 | 3215010 | 11/30/2004 ADDL CHG(700 T MOLDING MACH) |
| DGT690104A | 3215013 | 11/30/2004 007797 - DELPHI CAST-ON-STRAP M |
| DGT690295 | 3215132 | 12/1/2004 LASER DATE CODE |
| DGT690296 | 3215133 | 12/1/2004 TOP TERMINAL VISION SYSTEM 66 CELL |
| DGT690288 | 3220272 | 2/17/2005 48 HOUR STAND PROCESS LIFT TABLE EQUIPMENT |
| DGT690289 | 3220273 | 2/17/2005 48 HOUR STAND PROCESS SPOTFACE MACHINE |
| DGT690290 | 3220274 | 2/17/2005 48 HOUR STAND PROCESS TOPTIER MACHINE |
| DGT690297 | 3220275 | 2/17/2005 AFTERMARKET LINE AHERN-SOPER LABEL ERROR PROOF |
| DGT690298 | 3220276 | 2/17/2005 MAIN LINE AHERN-SOPER LABEL ERROR PROOF |
| DGT116709 | 3220311 | 1/1/2005 VRL #2 |
| DGT1116710 | 3220312 | 1/1/2005 LASER DATE CODE #2 |

| | | | |
|---|---|---|---|
| DGT690096A | 3220661 | 3/14/2005 | UPGRADE DELPHI SINGLE HEAD EF WELDER MACHINE |
| DGT690108A | 3220663 | 3/2/2005 | INTERMEDIATE COVER AIR CHECK MACHINE |
| DGT690121A | 3220664 | 3/2/2005 | LEAN COVER TO CASE HEAT SEAL MACHINE |
| DGT690301 | 3220665 | 3/2/2005 | DR3 PLATE LIFTS |
| DGT690287 | 3220669 | 2/17/2005 | 48 HR STAND PROCESS STORAGE EQUIP |
| DGT690307 | 3222009 | 1/1/2005 | INSTALL DATRONICS INKJET SYSTEM |
| DGT690043A | 3222460 | 5/9/2005 | PLATE STACKER EQUIPMENT UPGRADE |
| DGT690188A | 3222463 | 5/9/2005 | TOP POST ALIGNMENT EQUIPMENT UPGRADE |
| DGT690173A | 3222466 | 5/9/2005 | #1 DR2 ENCAPSULATOR/COALATOR |
| DGT690299 | 3223037 | 6/14/2005 | New Xmet Underground Scrap Conveyor |
| DGT690285 | 3223038 | 6/14/2005 | SODIUM SULFATE DISPENSING SYSTEM EQUIPMENT |
| DGW690314 | 3223256 | 7/19/2005 | MAIN LINE INCLINED CONVEYOR |
| DGT690293 | 3223278 | 7/20/2005 | AUTO INSOLATOR INSERTION MACH - MAIN LINE |
| DGT690294 | 3223279 | 7/20/2005 | AUTO INSOLATOR INSERTION MACH-MISC LINE |
| DGT012161N01 | 3223280 | 7/20/2005 | INSTALL BAFFLES IN FORMATION TABLES |
| DGT690310 | 3223281 | 7/20/2005 | WIRE BRUSH STATION-HONDA/TOYOTA LINE |
| DGT690317 | 3223282 | 7/20/2005 | VRL REJECT PRINTER FOR HONDA/TOYOTA LINE |
| DGT690309 | 3223283 | 7/20/2005 | VCI APPLICATOR FOR HONDA/TOYOTA LINE |
| DGT105868D | 3223831 | 1/30/1995 | ICE MAKER |
| DGT690302 | 3223862 | 8/24/2005 | ROBOTIC LOAD EQUIP FOR COS MACHINE |
| DGT690311 | 3223863 | 8/24/2005 | CONTROLS FOR COS - DR3 PROJECT |
| DGT690286 | 3223958 | 8/26/2005 | OXIDE REACTOR #5 |
| DGT690324 | 3223959 | 8/26/2005 | OXIDE REACTOR #6 |
| DGT690292 | 3224765 | 9/29/2005 | 007651 - FORMATION TEMPERATURE MONITORING SYSTEM |
| DGT690305 | 3224771 | 9/29/2005 | ROBOT GUARDING SYSTEM #1 |
| DGT690325 | 3224775 | 9/29/2005 | ROBOT GUARDING SYSTEM #2 |
| DGT690326 | 3224776 | 9/29/2005 | ROBOT GUARDING SYSTEM #3 |
| DGT690327 | 3224777 | 9/29/2005 | ROBOT GUARDING SYSTEM #4 |
| DGT690328 | 3224778 | 9/29/2005 | ROBOT GUARDING SYSTEM#5 |
| DGT690329 | 3224779 | 9/29/2005 | ROBOT GUARDING SYSTEM#6 |
| DGT690318 | 3225240 | 10/17/2005 | PACKOUT LEVELATOR FOR HONDA/TOYOTA LINE |
| DGT690323 | 3225241 | 10/17/2005 | HONDA/TOYOTA FINISHING LINE MATL |
| DGT690303 | 3225242 | 10/17/2005 | INSTALL FINAL COVER PLACER SYSTEM |
| DGT690315 | 3226228 | 11/29/2005 | MISC LINE TUNNEL STRUCTURE |
| DGT690312 | 3226231 | 11/29/2005 | CONTROLS FOR DR3 CONVEYORS |
| DGT690316 | 3226243 | 11/29/2005 | MISC LINE DR3 CONVEYOR |
| DGT690304 | 3226254 | 11/29/2005 | GROUP CONVEYOR SYSTEM DR3'S TO ROBOTS - MAIN LINE |
| DGT690330 | 3226402 | 11/29/2005 | OSHAWA VRL SCRAP SAW |
| DGT690331 | 3226403 | 11/29/2005 | OSHAWA BITRODE UNIT |
| DGT690332 | 3226404 | 11/29/2005 | OSHAWA HONDA BANDER SYSTEM-SURPLUS |
| DGT690308 | 3226436 | 12/19/2005 | DR#3 CAMCO UNIT 1 OF 3 |
| DGT690334 | 3226437 | 12/19/2005 | DR#3 CAMCO UNIT 2 OF 3 |
| DGT690335 | 3226438 | 12/19/2005 | DR#3 CAMCO UNIT 3 OF 3 |
| DGT690333 | 3227473 | 1/1/2006 | OSHAWA INSPECTION VISION SYSTEM |
| DGT690322 | 3227475 | 1/1/2006 | A BRADLEY CONTROLS FOR XMET LINE #4-MTL |
| DGT105866D | 5000713 | 10/1/1994 | GM TKS INFORMATION CENTER |
| DGT105866D01 | 5000714 | 1/1/1995 | TRAILING CHARGES TO TAG #105866D |

See Exhibit 1.21 for Real Property address

**EXHIBIT 1.1(vi)**
**EXCLUDED RAW MATERIALS**

Excluded raw materials Inventory includes the following parts numbers:

| Raw Materials | Part Number |
|---|---|
| PURE LEAD (red +) | 9599001 |
| ALUMINUM (white +) | 9692001 |
| CALCIUM | 9680001 |
| 3% ANT LEAD | 9595001 |
| 100 % TIN | 9681001 |
| Polypropylene | 9528001 |
| HOT MELT-1213 | 9521001 |
| DR4 EXPANDER | 9672025 |
| DR25 EXPANDER | 19060890 |
| POS GMX T/T BUSHING | 19062042 |
| NEG GMX T/T BUSHING | 19062043 |
| POS T/T BUSHING | 10457694 |
| NEG T/T BUSHING | 10457695 |
| HI-TEMP SIDE TERM | 19057272 |
| LEAD RING | 19057273 |
| CHROMA COLOR | 9515001 |
| RUBBER O-RING SEAL | 19057274 |
| 4.6 CRYSTEX PAPER | 9661046 |
| 3.5 CRYSTEX PAPER | 9661035 |
| 4.1 CRYSTEX PAPER | 9661041 |
| 3.75 CRYSTEX PAPER | 19060891 |
| LEXAN STRIP | 9574002 |
| 660 SEPARATOR | 10457660 |
| 658 SEPARATOR | 10457658 |
| 196 SEPARATOR | 19065196 |
| 889 SEPARATOR | 19060889 |
| DYNEL FIBER | 9502001 |
| SODIUM | 9448001 |
| TERMINAL SHEILDS | 10496263 |
| WAFER INSULATOR | 10454924 |
| INSULATOR ROLL | 19065509 |
| FLAME ARRESTORS | 1892323 |
| 10" Interm Cover - | 10472239 |
| 9" Interm Cvr | 10472230 |
| 9" Interm Cvr | 10472231 |
| 9" Interm Cvr | 10472233 |
| 9" Interm Cvr | 10472235 |

| | |
|---|---|
| 9" Interm Cvr | 10472236 |
| 9" Interm Cvr | 10472229 |
| 10" Interm Cover - | 10472241 |
| 10" Interm Cover - | 10472240 |
| 10" Interm Cover - | 10472243 |
| 10" Interm Cover - | 10472245 |
| 10" Interm Cover - | 10472238 |

## EXHIBIT 1.11

Raw Materials (direct materials) included in the Acquired Assets

| Raw Materials | Part Number | STP Qty | UM | Unit | Minimum Inventory |
|---|---|---|---|---|---|
| ACID | 9402001 | 45,000 | LB | 1 Tank | 860,000 |
| HYDROMETERS 1124 | 10491124 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 5478 | 10495478 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 2595 | 10492595 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 8954 | 10498954 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 8957 | 10498957 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 7495 | 19057495 | 1,400 | Pcs | Box | 5 |
| SLIPSHEETS- | 39"X45" | 300 | Pcs | 1 Pallet | 8 |
| SLIPSHEETS- | 42"X48" | 300 | Pcs | 1 Pallet | 5 |
| HONEYCOMB- | 37"x44"x1.5 | 29 | Pcs | 1 Pallet | 16 |
| HONEYCOMB- | 42"x44"x1 | 45 | Pcs | 1 Pallet | 6 |
| 13" SHRINKWRAP | 10457753 | 1,368 | LB | 1 Pallet | 3 |
| 12" SHRINKWRAP | 10453144 | 1,404 | LB | 1 Pallet | 3 |
| 11" SHRINKWRAP | 10457752 | 1,053 | LB | 1 Pallet | 1 |
| 10" HANDLE | 10457298 | 5,640 | Pcs | 1 Pallet | 3 |
| 9" HANDLE | 10457299 | 5,640 | Pcs | 1 Pallet | 3 |
| 8" HANDLE | 10457297 | 5,640 | Pcs | 1 Pallet | 1 |
| NEG SIDE TERMINAL CAP | 10467094 | 4,280 | Pcs | Crate | 10 |
| POS SIDE TERMINAL CAP | 10489952 | 4,280 | Pcs | Crate | 10 |
| TOP TERMINAL CAP | 10471203 | 2,000 | Pcs | Crate | 12 |
| TOP TERMINAL CAP | 10471204 | 2,000 | Pcs | Crate | 12 |
| TERMINAL ADAPTORS | 10469296 | 1,080 | Pcs | Box | 3 |
| HOT MELT-1246 | 9462001 | 31 | LB | Box | 2 |
| 083 FOAM BLOCK | 275083 | 2,310 | Pcs | 1 Pallet | 2 |
| 313 CARTON | 10468313 | 1,000 | Pcs | 1 Pallet | 1 |
| 325 CARTON | 10468325 | 1,200 | Pcs | 1 Pallet | 1 |
| 327 CARTON | 10468327 | 1,000 | Pcs | 1 Pallet | 1 |
| 073 CARTON | 10474073 | 1,000 | Pcs | 1 Pallet | 1 |
| 072 CARTON | 10474072 | 1,000 | Pcs | 1 Pallet | 1 |
| 561 CARTON | 10489561 | 1,000 | Pcs | 1 Pallet | 1 |
| AC DELCO PLACARD | 10457751 | 4,000 | Pcs | Box | 8 |
| BU DELPHI PLACARD | 10450883 | 4,000 | Pcs | Box | 2 |
| GMX Interm Cvr | 19063666 | 1320 | Pcs | Pallet | 6 |
| GMX Final Cvr | 19063668 | 4224 | Pcs | Pallet | 2 |

**EXHIBIT 1.13**

**IUE CONSENT**

### IUE-CWA - DELPHI
### MEMORANDUM OF AGREEMENT
### REGARDING THE SALE OF
### DELPHI NEW BRUNSWICK OPERATIONS AND
### SPECIAL ATTRITION PROGRAM

**MEMORANDUM OF AGREEMENT** entered into this **25th day of May, 2006** between **Delphi Corporation ("Delphi")** and the **International Union, IUE-CWA** and **IUE-CWA Local 416** (collectively the **"IUE-CWA"** or the **"Union")**.

**WHEREAS,** effective August 1, 2006, Delphi seeks to sell its New Brunswick, New Jersey Operations to **Johnson Controls, Inc. ("JCI")** as an ongoing business consistent with the terms of this Memorandum of Agreement; and

**WHEREAS,** pursuant to the "Sale of Business" letter attached to the 2003 IUE-CWA-Delphi National Agreement as Document 7, JCI is required to assume the applicable terms of the 2003 IUE-CWA-Delphi National Agreement and to otherwise assume the Local Agreements with respect to New Brunswick; and

**WHEREAS,** it is the intent of the parties and the purpose of this Memorandum to establish a Special Attrition Program for all but 100 employees of the New Brunswick bargaining unit identified in accordance with seniority and plant staffing requirements and to transfer to JCI approximately 100 of the current Delphi bargaining unit members at the established New Brunswick Tier III rate and JCI benefit level.    Therefore, the parties agree as follows:

      1.    The IUE-CWA agrees that:

          A.    Document 63 of the 2003 IUE-CWA-Delphi National Agreement is waived as to the sale of the New Brunswick Operations to JCI pursuant to the "New Brunswick Put and Call Agreement" between Delphi and JCI dated June 30, 2005;

          B.    JCI is not required to assume any contractual neutrality obligations collectively bargained by Delphi and the IUE-CWA; and

          C.    The International Union, IUE-CWA and Local 416 will continue to discuss Local Agreement modifications aimed at obtaining agreement on wage, benefits and work practices comparable to JCI's existing IUE-CWA bargaining agreements at JCI's St. Joseph, Missouri and Geneva, Illinois sites.

      2.    Delphi and the IUE-CWA agree on the following Special Attrition Program for all New Brunswick employees on active or on leave status with more than one year of seniority as of 8/1/06 and those employees in protected status assigned to the New Brunswick Operations who, except as to option 2.E. below, are participants in the Delphi Hourly-Rate Employees Pension Plan (**"Delphi HRP"**). Such employee may select one of the options set forth in clauses A through E below, as applicable to such employee:

          A.    If eligible to retire as of 8/1/06, retire as follows:

              (i)    $35,000, less applicable withholdings, for normal or early voluntary retirement (85 points 30 and out, 60 years old with 10 years or more years of credited service) retroactive to October 1, 2005; or

              (ii)    50 & 10 Mutually Satisfactory Retirement (MSR).

B.      Any employee with at least 27 and less than 30 years of credited service regardless of age will be eligible for special voluntary placement in a pre-retirement program under the following terms:

(i)      Employees electing this pre-retirement program must be eligible no later than August 1, 2006.

(ii)      Employees will retire without additional incentives when they first accrue 30 years of credited service under the provisions of the Delphi HRP.

(iii)      The gross monthly wages while in the program will be:

(a)      29 years credited service      $2,900

(b)      28 years credited service      $2,850

(c)      27 years credited service      $2,800

Wages, without COLA and vacation entitlement, will be paid weekly on an hourly basis (2,080 hours per year) and will remain at that rate until 30 years of credited service is accrued.

(iv)      Within ten (10) business days after the first date on which any employees are eligible to receive wage payments in accordance with Paragraph 2.B(iii) above, Delphi will establish a segregated payment account (the "Account") in an amount sufficient to fund the wage payments (the "Ceiling Amount"). The funds in the Account will be available to reimburse Delphi for the payment of weekly wage payments (which will be paid through Delphi's normal payroll process) under Paragraph 2.B(iii) above or for direct wage payments to employees entitled to receive such payments, as described in this Paragraph.

(a)      Delphi shall not draw funds from the Account for purposes of this Paragraph until a date (the "Permitted Draw Down Date"), which shall be the later of the Final Election Date or the Adequate Funding Date (see definitions below). Prior to the Permitted Draw Down Date, payments to satisfy the obligations to employee participants pursuant to this Paragraph will be drawn from Delphi's available cash.

(b)      If, on the Permitted Draw Down Date, the Anticipated Liability is less than the Ceiling Amount, Delphi shall be permitted to draw such funds out of the Account so that the balance remaining in the Account is equal to the Anticipated Liability.

The Final Election Date shall be the first of the month following the last day on which employees at New Brunswick can make an election to participate in the pre-retirement program described in Paragraph 2.B., or sooner if determined by the IUE-CWA-Delphi National Parties.

2

The Adequate Funding Date shall be the date on which the Ceiling Amount is greater than or equal to the Anticipated Liability.

The Anticipated Liability shall be an amount, calculated after the Final Election Date, sufficient to pay all of the remaining liabilities under Paragraph 2.B(iii) for all employees who have elected to participate in such program for the full remaining duration of such program. The Anticipated Liability shall be calculated based on the number of eligible employees, the remaining duration of the wage payments, and the applicable pay rates.

(c)    The funds in the Account shall be available to satisfy the obligations of this Paragraph and for no other purpose. The Bankruptcy Court order approving this Agreement shall specifically provide that under no circumstances (including but not limited to conversion of Delphi's Chapter 11 cases to Chapter 7 proceedings) shall the assets in the Account be available to satisfy the claims of any party other than the employees. This Agreement is, in its entirety, contingent on entry of an order, which, to the satisfaction of the IUE-CWA and Delphi National Parties provides the protections described in this Paragraph.

C.    For current employees who are participants in the Delphi HRP, a buyout of $140,000 (with ten or more years of seniority) or a buy out of $70,000 (with less than ten years of seniority), less applicable withholdings, to sever all ties with Delphi, except vested pension benefits. Also, the employees electing this option are eligible for up to $2,100 per year pursuant to the terms of the Individual Upward Educational Plan for an additional two years beginning 8/1/06 and ending 7/31/08.

D.    For current employees who are participants in the Delphi HRP, elect to remain on the active roll for one year and receive one year of health care (at a total cost to Delphi of up to $15,000 depending on type of enrollee contract), and a weekly payment of $2,403.84 (assuming $15,000 enrollee contract), less withholdings, for one year (with ten or more years of seniority) or a weekly payment of $1,057.69, less withholdings, for one year (with less than ten years of seniority) and sever all ties with Delphi, except vested pension benefits, if any, at the conclusion of the year. Also, the employees electing this option are eligible for up to $2,100 per year pursuant to the terms of the Individual Upward Educational Plan for an additional two years beginning 8/1/06 and ending 7/31/08.

E.    For competitive rate employees, who are not participants in the Delphi HRP, percentage buyout prorated against $140,000 (with ten or more years of seniority), or against $70,000 (with less than ten years of seniority but more than one year of seniority) less applicable withholdings, to sever all ties with Delphi. In each case, the buyout is calculated based upon the participant's competitive wage rate as a percentage of the maximum traditional wage rate for the participant's classification.

F.    All participants in options A through F will be required to sign a release of all claims, except Workers Compensation claims.

3.    New Brunswick employees, except those on a leave of absence, who have not selected, or who are not eligible to participate in one of the options identified above, are eligible for transfer, with seniority, to JCI effective 8/1/2006, at the

3

established New Brunswick Tier III rate and with JCI Benefit Plans coverages. The offer of employment with JCI will sever all ties to Delphi, except for current vested benefits, if any. Traditional wage rate employees accepting such transfer will receive a $50,000 buy down (intended to represent an offset to a timed wage and benefit reduction) to the Tier III wage and the existing JCI benefit levels. Such employees transferred to JCI will be required to sign a release of all claims, except Workers Compensation, as a condition for receiving the $50,000 buy down amount. Employees on a leave of absence, who do not participate in the Special Attrition Program, will be eligible for transfer to JCI upon the conclusion of their leave.

4.    It is understood by all parties that JCI will employ approximately one hundred employees at the Tier III wage and JCI benefit levels. In the instance of excess employee participation in the Special Attrition Program, the lowest seniority employees will be retained for transfer to JCI and will not be permitted to participate in this Special Attrition Program, even if previously eligible, thereby providing JCI with a workforce of 100 employees. In the instance of insufficient participation in the Special Attrition Program, the 100 highest remaining seniority employees will transfer to JCI with eligibility for the $50,000 buy down, if applicable, with the remaining lower seniority employees being separated from Delphi, thereby providing JCI with a workforce of 100 employees. The terms of the Delphi-IUE-CWA Agreements and the ESCOP 2000 Agreement in effect at the time of this Memorandum will apply to all such Tier III employees, unless specifically modified by this Memorandum, and until an Agreement is reached between the IUE -CWA and JCI. JCI is not assuming Delphi's benefit plans and will provide its own retirement benefits to employees who accept employment at New Brunswick, in accordance with the terms of the ESCOP 2000 Agreement.

5.    Delphi and the IUE-CWA agree to the following:

A.    Delphi will use temporary employees as needed to bridge any difficulties arising from the implementation of the Special Attrition Program;

B.    Delphi and the IUE-CWA may agree to use separated employees as contract personnel on a case by case basis as needed to bridge any difficulties arising from the implementation of the Special Attrition Program; and

C.    If during the remaining course of Delphi's bankruptcy, materially different Special Attrition Program financial incentives are negotiated between Delphi and the IUE -CWA for the option selected by the employee, it is understood that the employee will not be advantaged or disadvantaged.

6.    The parties acknowledge that Delphi's participation in this Agreement is subject to (i) the approval of the U.S. Bankruptcy Court, which approval Delphi will seek at the next scheduled omnibus hearing; and (ii) the Closing of the sale of the New Brunswick Operations to JCI. In the event the Bankruptcy Court does not allow such participation, or the Closing does not occur, Delphi and the IUE-CWA will have no obligations hereunder.

7.    A.    The parties further agree  that this Agreement is without prejudice to any  party-in-interest in all other aspects of Delphi's Chapter 11 cases, including by illustration, all collective bargaining matters involving the parties, in any proceedings under Sections 1113 and/or 1114 of the Bankruptcy Code with respect to the IUE-CWA, in any pension termination proceeding under ERISA and/or the Bankruptcy Code, and all claims administration and allowance matters.

4

B.        Nothing in this Agreement, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder  shall limit or otherwise modify: (i) Delphi's rights under Section 4041 of ERISA; or (ii) Delphi's rights under Section 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed this Agreement (including pre-existing obligations referenced within this Agreement), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in this Agreement) with levels of healthcare or other benefits as specified in pre-existing labor agreements.

C.        Nothing contained herein, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder shall constitute an assumption of any agreement described herein, including, without limitation any collective bargaining agreement between the IUE-CWA and Delphi, nor shall anything herein, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder, be deemed to create or give rise to an administrative or priority claim or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.

_____
Delphi Corporation

_____
Delphi Corporation

Date: ___5/26/06___

_____
International Union, IUE-CWA

_____
International Union, IUE-CWA

Date: ___5-26-06___

5

## EXHIBIT 1.21

## REAL PROPERTY

**U.S:**        760 Jersey Avenue
New Brunswick, New Jersey  08903
United States

## **EXHIBIT 1.22**

## **SALE APPROVAL ORDER**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
     In re                            :        Chapter 11
                                          :
DELPHI CORPORATION, <u>et al.</u>,        :        Case No. 05-44481 (RDD)
                                          :
                Debtors.              :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 2002 AND 6004 AUTHORIZING AND
APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH JOHNSON CONTROLS,
INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES (B) CONTINUATION AND TRANSITION OF SUPPLY TO
JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD FACILITY AND
(C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW BRUNSWICK
<u>FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM</u>

("NEW BRUNSWICK TRANSFER ORDER")

          Upon the motion, dated May 26, 2006 (the "Motion"), of Delphi Corporation and

certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned

cases (collectively, the "Debtors"), for an order (the "Order") pursuant to 11 U.S.C. § 363(b) and

Fed. R. Bankr. P. 2002 and 6004 authorizing and approving the Debtors' entry into the Transfer

Agreement dated May 26, 2006 by and between Delphi Automotive Systems LLC, a Debtor in

these cases, and Johnson Controls, Inc. ("JCI"), a copy of which is attached hereto as <u>Exhibit 1</u>

(together, with the exhibits and schedules attached thereto, the "Transfer Agreement"), providing

for (a) sale of certain assets (the "Acquired Assets") of the Debtors' battery manufacturing

facility in New Brunswick, New Jersey (the "New Brunswick Facility") free and clear of liens,

claims, and encumbrances (the "Sale"), (b) the continuation and transition of supply to JCI of

battery products out of the Debtors' manufacturing facility in Fitzgerald, Georgia (the "Fitzgerald

Facility"), and (c) implementation of an attrition plan with respect to the New Brunswick facility;

and upon the record of the hearing held on the Motion; and this Court having determined that the

relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors,

and other parties in interest; and it appearing that proper and adequate notice of the Motion has

been given and that no other or further notice is necessary; and after due deliberation thereon;

and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[1]

   A. The court has jurisdiction over the Motion and the transactions

contemplated by the Transfer Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

   B. The statutory predicates for the relief sought in the Motion are sections

363 of 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and Fed. R. Bankr. P. 2002

and 6004.

   C. As evidenced by the affidavits of service previously filed with the Court,

and based on the representations of counsel at the hearing on the Motion (the "Hearing"), (i)

proper, timely, adequate and sufficient notice of the Motion, the Hearing and the sale of the

Acquired Assets (as defined in the Transfer Agreement) has been provided in accordance with 11

U.S.C. §§ 102(l) and 363 and Fed. R. Bankr. P. 2002 and 6004, (ii) such notice was good and

sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice

of the Motion, the Hearing, or the Sale is or shall be required.

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  <u>See</u> Fed. R. Bankr. P. 7052.

D.    Each applicable Debtor (i) has full corporate power and authority to execute the Transfer Agreement and all other documents contemplated thereby, and the transfer and conveyance of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Transfer Agreement, and (iii) has taken all corporate action necessary to authorize and approve the Transfer Agreement and the consummation by such Debtor of the transactions contemplated thereby, and no consents or approvals, other than those expressly provided for in the Transfer Agreement, are required for each applicable Debtor to consummate such transactions.

E.    Approval of the Transfer Agreement and consummation of the Sale at this time are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

F.    The Debtors have demonstrated good, sufficient, and sound business purpose and justification in that, among other things, the Debtors and their advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Acquired Assets and determined that the terms and conditions set forth in the Transfer Agreement, and the transfer to JCI of the Acquired Assets pursuant thereto, represent a fair and reasonable purchase price and constitute the highest and best value obtainable for the Acquired Assets.  A sale of the Acquired Assets at this time to JCI pursuant to 11 U.S.C. § 363(b) is the most favorable alternative to minimize the Debtors' losses attributable to the Acquired Assets, and maximizes the Debtors' estates for the benefits of all constituencies.  Delaying approval of the Sale might result in JCI's termination of the Transfer Agreement and may result in an

3

alternative outcome that will achieve less value and cause greater losses for the Debtors, their

estates, and their creditors.

        G.     The Debtors have demonstrated good, sufficient, and sound business

purpose and justification regarding the continuation and ultimate transition to JCI of the supply

of battery products out of the Fitzgerald Facility pursuant to the Transfer Agreement.

        H.     The Debtors have demonstrated good, sufficient, and sound business

purpose and justification in that, among other things, the Debtors and their advisors diligently

and in good faith analyzed the terms and conditions of the IUE-CWA Memorandum (as defined

below) and determined that the terms and conditions thereof and in particular the terms and

conditions of the IUE-CWA New Brunswick Attrition Plan (as defined below) set forth in the

IUE-CWA Memorandum is an appropriate plan under the circumstances and is in the best

interests of the Debtors, their estates, and their creditors.

        I.     A reasonable opportunity to object or be heard with respect to the Motion

and the relief requested therein has been afforded to all interested persons and entities, including:

(i) the Office of the United States Trustee for the Southern District of New York, (ii) all entities

known to have asserted any lien, claim, interest, or encumbrance in or upon the Acquired Assets,

including but not limited to environmental, employee, and product liability claims, (iii) all

federal, state, and local regulatory or taxing authorities or recording offices, including but not

limited environmental regulatory authorities, which have a reasonably known interest in the

relief requested by the Motion, (iv) all entities known to have an interest in a transaction with

respect to the Acquired Assets during the past six months, (v) the United States Attorney's office,

(vi) the United States Department of Justice, (vii) the Securities and Exchange Commission, (viii)

the Internal Revenue Service, (ix) all entities on the Master Service List (as defined by the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management Order")) and such other entities that are required to be served with notices under the Supplemental Case Management Order, (x) counsel for JCI, (xi) counsel for the Official Committee of Unsecured Creditors appointed in these chapter 11 cases, and (xii) counsel for the Official Committee of Equity Security Holders appointed in these chapter 11 cases.

J.    JCI is not an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101(31).

K.    The Transfer Agreement was negotiated, proposed, and entered into by the Debtors and JCI without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor JCI have engaged in any conduct that would cause or permit the Transfer Agreement to be avoided under 11 U.S.C. § 363(n).

L.    JCI is a good faith purchaser under 11 U.S.C. § 363(m) and, as such, is entitled to all of the protections afforded thereby.

M.    The consideration provided by JCI for the Acquired Assets pursuant to the Transfer Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

5

N.    The transfer of the Acquired Assets to JCI will be a legal, valid, and

effective transfer of the Acquired Assets, and, except as expressly permitted or otherwise

specifically provided for in the Transfer Agreement or this Order, will vest JCI with all right,

title, and interest of the Debtors to the Acquired Assets free and clear of all liens, claims, and

encumbrances, including, but not limited to those (A) that purport to give to any party a right or

option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors'

or JCI's interest in the Acquired Assets, or any similar rights, (B) relating to taxes arising under

or out of, in connection with, or in any way relating to the operation of the Debtors' battery

business prior to the transfer of the Acquired Assets to JCI, and (C) mortgages, restrictions,

hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options,

deeds of trust, security interests, conditional sale or other title retention agreements, pledges,

liens (including, without limitation, mechanics', materialmens', and other consensual and non-

consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal,

offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution,

indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any Court

or foreign or domestic governmental entity, or charges of any kind or nature, if any, including,

but not limited to, any restriction on the use, transfer, receipt of income, or other exercise of any

attributes of ownership, debts arising in any way in connection with any agreements, acts, or

failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, claims (as

that term is defined in the Bankruptcy Code), reclamation claims, obligations, liabilities,

demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and

matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled,

scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or

6

unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated,

matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to

or subsequent to the commencement of these bankruptcy cases, and whether imposed by

agreement, understanding, law, equity or otherwise, including claims otherwise arising under

doctrines of successor liability (the items and concepts listed in (A), (B), and (C) above,

collectively, the "Interests or Claims").

O.    If the Sale of the Acquired Assets were not free and clear of all Interests or

Claims as set forth in the Transfer Agreement and this Order, or if JCI would, or in the future

could, be liable for any of the Interests or Claims as set forth in the Transfer Agreement and this

Order, JCI would not have entered into the Transfer Agreement and would not consummate the

Sale or the transactions contemplated by the Transfer Agreement, thus adversely affecting the

Debtors, their estates, and their creditors.

P.    The Debtors may sell their interests in the Acquired Assets free and clear

of all Interests or Claims because, in each case, one or more of the standards set forth in 11

U.S.C. § 363(f)(1)-(5) has been satisfied.  All holders of Interests or Claims who did not object,

or withdrew their objections to the Sale, are deemed to have consented to the Sale, pursuant to 11

U.S.C. § 363(f)(2).  Those holders of Interests or Claims who did object fall within one or more

of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their

Interests or Claims, if any, attach to the cash proceeds of the Sale ultimately attributable to the

property against or in which they claim an Interest or Claim.

Q.    The Debtors are authorized to sell, transfer, convey or assign to JCI, all of

the Debtors' right, title, and interest (including common law rights) to all of their intangible

7

property included in the Acquired Assets to the broadest extent permitted by law and the terms of
the Transfer Agreement.

R.      Approval of the Transfer Agreement and consummation of the Sale of the
Acquired Assets at this time are in the best interests of the Debtors, their creditors, their estates
and other parties in interest.

S.      The liabilities being assumed by JCI under the Transfer Agreement,
including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters)
and Exhibit 4.1 (Employee Matters) to the Transfer Agreement, are an integral part of the
Acquired Assets being purchased by JCI and, accordingly, such assumption is reasonable,
enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND
DECREED THAT:

<u>General Provisions</u>

1.      The Motion is GRANTED.

<u>Approval Of The Transfer Agreement</u>

2.      Pursuant to 11 U.S.C. § 363(b), the Transfer Agreement, and all of the
terms and conditions thereof, are hereby approved.

3.      Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized to perform
their obligations under the Transfer Agreement and comply with the terms thereof and
consummate the Sale in accordance with and subject to the terms and conditions of the Transfer
Agreement.

8

4.      Each of the signatories to the Transfer Agreement is directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the Sale.

5.      The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the Transfer Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Transfer Agreement, and to take all further actions as may be requested by JCI for the purpose of assigning, transferring, granting, conveying, and conferring to JCI or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Transfer Agreement.

6.      This Order and the Transfer Agreement shall be binding in all respects upon all creditors (whether known or unknown) of any Debtor, JCI, all successors and assigns of JCI, the Debtors and their affiliates and subsidiaries, and any subsequent trustees appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection.  To the extent any provision of this Order is inconsistent with the terms of the Transfer Agreement, this Order shall govern.

7.      The Transfer Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such modification, amendment, or supplement is not material.

Sale And Transfer Of The Acquired Assets

8.      Except as expressly permitted or otherwise specifically provided for in the Transfer Agreement or this Order, pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the

9

consummation of the Transfer Agreement, the Acquired Assets shall be transferred to JCI free

and clear of all Interests or Claims, with all such Interests or Claims to attach to the cash

proceeds of the Sale in the order of their priority, with the same validity, force and effect which

they now have as against the Acquired Assets, subject to any claims and defenses the Debtors

may possess with respect thereto.  Following the date of the completion of the transfer of the

New Brunswick Facility to JCI under the Transfer Agreement (the "Completion Date"), no

holder of any Interests or Claims in the Acquired Assets shall interfere with JCI's use and

enjoyment of the Acquired Assets based on or related to such Interests or Claims, or any actions

that the Debtors may take in their chapter 11 cases and no person shall take any action to prevent,

interfere with or otherwise enjoin consummation of the transactions contemplated in or by the

Transfer Agreement or this Order.

        9.      Except as expressly provided in the Transfer Agreement or this Order,

other than the liabilities assumed under the Transfer Agreement, including but not limited to

those liabilities set forth on Exhibit 3.6H (Environmental Matters) and Exhibit 4.1 (Employee

Matters) to the Transfer Agreement, the sale, transfer, assignment, and delivery of the Acquired

Assets pursuant to the Transfer Agreement shall not be subject to any Interests or Claims, and

Interests or Claims of any kind or nature whatsoever shall attach only to the net proceeds of the

Sale in their order of priority.  All persons and entities, including, but not limited to, all debt

security holders, equity security holders, governmental, tax, and regulatory authorities, lenders,

trade and other creditors, holding Interests or Claims arising in any way in connection with any

acts, or failure to act, of the Debtors or the Debtors' predecessors or affiliates, claims (as that

term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, or guaranties of

any kind and nature against or in the Debtors or the Acquired Assets (whether legal or equitable,

secured or unsecured, matured or unmatured, contingent or noncontingent, senior or

subordinated), arising under or out of, in connection with, or in any way relating to the Debtors,

the Acquired Assets, the operation of the Debtors' battery business prior to the Completion Date,

or the transfer of the Acquired Assets to JCI, hereby are, and will be, forever barred, estopped,

and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests or

Claims of any kind or nature whatsoever against JCI, its successors or assigns, their property, or

any designee, such persons' or entities' Interests or Claims.  Following the Completion Date, no

holder of an Interest or Claim (other than holders of liabilities assumed under the Transfer

Agreement, including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental

Matters) and Exhibit 4.1 (Employee Matters) to the Transfer Agreement, on account of such

liabilities only) against the Debtors shall interfere with JCI's title to or use and enjoyment of the

Acquired Assets based on or related to such Interests or Claims and all such Interests or Claims,

if any, shall be and hereby are channeled, transferred and attached solely and exclusively to the

proceeds of the Sale in their order of priority.

        10.    Except as expressly provided in the Transfer Agreement or this Order, the

transfer of the Acquired Assets to JCI pursuant to the Transfer Agreement does not require any

consents other than as specifically provided for in the Transfer Agreement and constitutes a legal,

valid, and effective transfer of the Acquired Assets, and shall vest JCI with all right, title, and

interest of the Debtors in and to the Acquired Assets free and clear of all Interests or Claims of

any kind or nature whatsoever (except for the liabilities assumed under the Transfer Agreement,

including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters)

and Exhibit 4.1 (Employee Matters) to the Transfer Agreement).

11.     If any person or entity that has filed financing statements, mortgages,

mechanic's liens, <u>lis pendens</u>, or other documents or agreements evidencing Interests or Claims

against or in the Acquired Assets shall not have delivered the foregoing to the Debtors prior to

the Completion Date, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfactions, releases of all Interests or Claims that the

person or entity has with respect to the Acquired Assets, or otherwise, then (a) the Debtors are

hereby authorized to execute and file such statements, instruments, releases and other documents

on behalf of the person or entity with respect to the Acquired Assets and (b) JCI is hereby

authorized to file, register or otherwise record a certified copy of this Order, which, once filed,

registered or otherwise recorded, shall constitute conclusive evidence of the release of all

Interests or Claims in the Acquired Assets of any kind or nature whatsoever.

12.     This Order (a) shall be effective as a determination that, on the

Completion Date, all Interests or Claims of any kind or nature whatsoever existing as to the

Debtors or the Acquired Assets prior to the Completion Date have been unconditionally released,

discharged, and terminated (other than any surviving obligations), and that the conveyances

described herein have been effected and (b) shall be binding upon and shall govern the acts of all

entities including without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, state, and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Acquired

Assets.

12

13.    Except as otherwise expressly provided in the Transfer Agreement, no person or entity, including, without limitation, any federal, state or local governmental agency, department or instrumentality, shall assert by suit or otherwise against JCI or its successors in interest any claim that they had, have or may have against the Debtors, or any liability, debt, or obligation relating to or arising from the Acquired Assets, or the Debtors' operation of the Business or use of the Acquired Assets, including, without limitation, any liabilities calculable by reference to the Debtors or their assets or operations, and all persons and entities are hereby enjoined from asserting against JCI in any way any such claims, liabilities, debts or obligations.

14.    Except as expressly provided in the Transfer Agreement or this Order, JCI is not assuming nor shall it in any way whatsoever be liable or responsible, as a successor or otherwise, for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) of the Debtors or any liabilities, debts, commitments, or obligations in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operation of their business or use of the Acquired Assets on or prior to the Completion Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Completion Date or are to be observed, paid, discharged, or performed on or prior to the Completion Date (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims), or any liabilities calculable by reference to the Debtor or their assets or operations, or relating to continuing conditions existing on or prior to the Completion Date, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to JCI a release thereof. Without

13

limiting the generality of the foregoing, except as expressly provided in the Transfer Agreement

or this Order, JCI shall not be liable or responsible, as a successor or otherwise, for the Debtors'

liabilities, debts, commitments, or obligations, whether calculable by reference to the Debtors,

arising on or prior to the Completion Date and under or in connection with (i) any employment

or labor agreements (including, without limitation, the payment of wages, bonuses, severance

pay, benefits (including, without limitation, contributions or payments on account of any under-

funding with respect to any and all pension plans) or any other payment to employees of Debtors

while such individuals were employed by the Debtors), consulting agreements, severance

arrangements, change-in-control agreements, or other similar agreement to which any Debtor is a

party, (ii) any pension, welfare, compensation, or other employee benefit plans, agreements,

practices, and programs, including, without limitation, any pension plan of the Debtors

(including, without limitation, retention, benefit and/or incentive plan to which any Debtors are a

party and relating to the battery business (including, without limitation, arising from or related to

the rejection or other termination of any such agreement)), (iii) the cessation of the Debtors'

operations, dismissal of employees, or termination of employment or labor agreements or

pension, welfare, compensation, or other employee benefit plans, agreements, practices, and

programs, obligations that might otherwise arise from or pursuant to the Employee Retirement

Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil

Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal

Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget

Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act,

(iv) workers' compensation, occupational disease, or unemployment or temporary disability

insurance claims, (v) environmental liabilities, debts, claims, or obligations arising from

conditions first existing on or prior to Completion Date (including, without limitation, the

presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be

asserted on any basis, including, without limitation, under the Comprehensive Environmental

Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vi) any bulk sales or

similar law, (vii) any liabilities, debts, commitments, or obligations of, or required to be paid by,

the Debtors for any Taxes of any kind for any period, (viii) any liabilities, debts, commitments,

or obligations for any Taxes relating to the business of the Debtors or the Acquired Assets for or

applicable to the period prior to the Completion Date, (ix) any litigation relating to the Acquired

Assets for or applicable to the period prior to the Completion Date, and (x) any products liability

or similar claims, whether pursuant to any state or any federal laws or otherwise, relating to the

Acquired Assets for or applicable to the period prior to the Completion Date.  JCI shall in no

way be deemed a party to or assignee of any such agreement set forth in (i), (ii), and (iii) above,

and no employee of JCI shall be deemed in any way covered by or a party to any such agreement,

and all parties to any such agreement are hereby enjoined from asserting against JCI any and all

claims arising from or relating to such agreement.  Any and all notices, if any, required to be

given to the Debtors' employees pursuant to the Workers Adjustment and Retraining Notification

Act, or any similar federal or state law, shall be the sole responsibility and obligation of the

Debtors and JCI shall have no responsibility or liability therefore.

        15.    Upon the completion of the transactions contemplated by the Transfer

Agreement, JCI shall not be deemed to (i) be the successor of the Debtors, (ii) have, de facto, or

otherwise, merged with or into the Debtors, (iii) be a mere continuation or substantial

continuation of the Debtors or the enterprise(s) of the Debtors, or (iv) be liable for any acts or

omissions of the Debtors in the conduct of the Debtors' business.

<u>Continuation And Transition Of Supply Out Of Fitzgerald</u>

16.     The Debtors are hereby authorized to (a) continue manufacturing and supplying JCI with battery products manufactured at the Fitzgerald Facility in accordance with JCI's diminishing supply requirements and (b) to transition production of battery products manufactured at the Fitzgerald Facility to other JCI facilities.

17.     The Debtors and JCI are each directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the supply and transition of battery products from the Fitzgerald Facility.

<u>IUE-CWA Consent And IUE-CWA New Brunswick Attrition Plan</u>

18.     The Debtors are hereby authorized to enter into the agreement by and among Delphi Corporation, the International Union, IUE-CWA and IUE-CWA Local 416 (collectively the "IUE-CWA") attached to the Transfer Agreement as Exhibit 1.13 thereto (the "IUE-CWA Memorandum") and to implement the terms of such IUE-CWA Memorandum, including without limitation (i) that certain attrition plan between Delphi and the IUE-CWA (the "IUE-CWA New Brunswick Attrition Plan") with respect to the New Brunswick Facility and (ii) that certain consent to the waiver of that certain no-sale clause and neutrality obligations (the "IUE-CWA Consent").

19.     Each of the signatories to the IUE-CWA Memorandum is directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan and the terms of the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan, including, without limitation, any

16

and all actions necessary or appropriate to its implementation of and performance under the IUE-

CWA Consent and the IUE-CWA New Brunswick Attrition Plan.

<u>Additional Provisions</u>

20.    The consideration provided by JCI for the Acquired Assets under the

Transfer Agreement is hereby deemed to constitute reasonably equivalent value and fair

consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform

Fraudulent Transfer Act, and under the laws of the United States, and any state, territory,

possession, or the District of Columbia.

21.    On the Completion Date, this Order shall be construed and shall constitute

for any and all purposes a full and complete general assignment, conveyance, and transfer of all

of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired

Assets to JCI on pursuant to the terms of the Transfer Agreement.

22.    Except as otherwise provided in the Transfer Agreement, on the

Completion Date, each of the Debtors' creditors is authorized and directed to execute such

documents and take all other actions as may be necessary to release their respective Interests or

Claims against the Acquired Assets, if any, as may have been recorded or may otherwise exist.

23.    Each and every federal, state, and governmental agency or department,

and any other person or entity, is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the

Transfer Agreement.

24.    All entities who are currently, or as of the Completion Date may be, in

possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

the Transfer Agreement are hereby directed to surrender possession of the Acquired Assets to

JCI on the Completion Date.

       25.    The transactions contemplated by the Transfer Agreement are undertaken

by JCI in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and

accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the sale of the Acquired Assets shall not affect the validity of the Sale to JCI, unless

such authorization is duly stayed pending such appeal.  JCI is a purchaser in good faith of the

Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the

Bankruptcy Code.

       26.    The consideration paid by JCI in the Sale for the Acquired Assets under

the Transfer Agreement is fair and reasonable, and may not be avoided or otherwise challenged

under 11 U.S.C. § 363(n).

       27.    The Debtors, including but not limited to their respective officers,

employees, and agents, are hereby authorized to execute such documents and do such acts as are

necessary or desirable to carry out the transactions contemplated by the terms and conditions of

the Transfer Agreement and this Order.  The Debtors shall be, and they hereby are, authorized to

take all such actions as may be necessary to effectuate the terms of this Order.

       28.    The terms and provisions of the Transfer Agreement and this Order shall

be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and

their creditors, JCI, and its respective affiliates, successors, and assigns, and any affected third

parties, including, but not limited to, all persons asserting an Interest or Claim in the Acquired

Assets to be sold to JCI pursuant to the Transfer Agreement, notwithstanding any subsequent

appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of

18

the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and

provisions likewise shall be binding.

29.    Notwithstanding anything contained herein to the contrary, the term

"Acquired Assets" as defined herein does not include property that is not property of the Debtors'

estates, such as funds that are trust funds under any applicable state lien laws.

30.    To the extent permitted by section 525 of the Bankruptcy Code, no

governmental unit may revoke or suspend any permit or license relating to the operation of the

Acquired Assets sold, transferred, or conveyed to JCI on account of the filing or pendency of

these chapter 11 cases or the consummation of the Sale.

31.    The failure specifically to include or to reference any particular provision

of the Transfer Agreement in this Order shall not diminish or impair the effectiveness of such

provision, it being the intent of the Court that the Transfer Agreement be authorized and

approved in their entirety.

32.    The Transfer Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented by the parties thereto in accordance

with the terms thereof without further order of the Court; provided that any such modification,

amendment, or supplement does not have a material adverse effect on the Debtors' estates.

33.    The provisions of this Order are nonseverable and mutually dependent.

34.    Nothing in this Order shall alter or amend the Transfer Agreement and the

obligations of the Debtors and JCI thereunder.

35.    This Court retains jurisdiction to enforce and implement the terms and

provisions of the Transfer Agreement, all amendments thereto, any waivers and consents

thereunder, and of each of the agreements executed in connection therewith in all respects,

including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets

to JCI, (b) compel delivery of the purchase price, reimbursement of costs under the IUE-CWA

New Brunswick Attrition Plan, or performance of other obligations owed to the Debtors pursuant

to the Transfer Agreement, (c) resolve any disputes arising under or related to the Transfer

Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the

provisions of this Order, and (e) protect JCI against any Interests or Claims against the Debtors

or the Acquired Assets, of any kind or nature whatsoever, attaching to the proceeds of the Sale.

36.    Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy

Procedure or any other Bankruptcy Rule, this Order shall take effect immediately upon its entry.

37.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
        June ___, 2006

_____
                          UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT 1.23**

## **SELLER'S KNOWLEDGE**

**GENERAL:**

Ron Pogue

**EMPLOYEES:**

Charu Manocha

## EXHIBIT 2.2A

## BILL OF SALE

**BY THIS BILL OF SALE** made on _____, **200**_ by
_____, a Delaware _____ ("**Seller**"), for good and valuable consideration
paid by _____, a _____ corporation ("**Buyer**"), receipt and sufficiency of
which consideration are acknowledged by Seller, pursuant to the terms and provisions of
that certain Transfer Agreement dated _____**, 2006** between Buyer and Seller (the
"**Agreement**"), Seller does bargain, grant, sell, convey, assign, transfer and deliver to
Buyer and its successors and assigns, all right, title and interest of Seller in and to the
Personal Property and Inventory (as those terms are defined in the Agreement) listed on
Attachment A hereto.

Notwithstanding the foregoing, the provisions of this Bill of Sale are subject, in all
respects, to the terms and conditions of the Agreement and all the representations and
warranties, covenants and agreements contained therein, all of which shall survive the
execution and delivery of this Bill of Sale as provided in the Agreement.

_____

By:_____
    Name:
    Title:

## ATTACHMENT A TO BILL OF SALE

## Exhibit 3.6.H

## ENVIRONMENTAL MATTERS

**1.**    **DEFINITIONS**:

**1.1**    **"Business"** has the same meaning as given in the Transfer Agreement.

**1.2**    "**Buyer**" has the same meaning as given in the Transfer Agreement.

**1.3**    "**Completion Date**" has the same meaning as given in the Transfer Agreement.

**1.4**    "**Competent Authority**" means a person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

**1.5**    "**Compliance Matter**" means an event, condition, activity, practice, action or omission at the Real Property which gives rise to a breach or violation of an Environmental Law, but which excludes Environmental Contamination.

**1.6**    "**Environment**" means any and all organisms (including humans), biota, ecosystems, land, natural resources, property, air, soil gas, water, groundwater, human beings, and buildings, fixtures and installations.

**1.7**    "**Environmental Claim**" means a notice, claim, demand, action, suit, complaint or proceeding by a Competent Authority or a Third Party alleging liability or potential liability arising out of an Environmental Law.

**1.8**    "**Environmental Contamination**" means the presence of a Hazardous Material at, in, under, on or about the Environment at the Real Property.

**1.9**    "**Environmental Damages**" means losses, liabilities, costs, damages fines, penalties and expenses (including reasonable expenses of investigation and attorneys' fees) arising out of an Environmental Law, but in all cases excluding losses, liabilities, costs, damages and expenses deemed consequential or loss of profit, and also excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

**1.10**    "**Environmental Law**" means, solely for those in force and effect as at the Closing date in the relevant jurisdiction, all applicable civil, criminal, administrative and any other federal, state, county and local (including common law) laws, rules, ordinances, orders, codes, guidance, directives, Environmental Permits (or lack thereof), approvals, decisions, decrees, remediation standards and regulations relating to or having the purpose or effect of the prevention of pollution or harm to the Environment or human health.

**1.11** "**Environmental Permits**" means all licenses, consents, permits, registrations, approvals or authorizations made or issued by a Competent Authority under an Environmental Law in connection with the Business or the Real Property.

**1.12** "**Hazardous Material**" means all matter (whether alone or in combination with other matter, and whether solid, liquid, gas or other state) which is a pollutant, contaminant, chemical, material, substance, constituent, or waste including without limitation petroleum, petroleum-based or petroleum-derived products, polychlorinated biphenyls, asbestos and asbestos-containing materials, and noxious, radioactive, flammable, corrosive, caustic materials, all of which are governed or regulated under an Environmental Law.

**1.13** "**New Brunswick Real Property**" means the Real Property as defined in the Transfer Agreement.

**1.14** "**Post-Closing Compliance Matter**" means a Compliance Matter first occurring after the Completion Date.

**1.15** "**Post-Closing Environmental Contamination**" means Environmental Contamination first occurring after the Completion Date.

**1.16** "**Post-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the New Brunswick Real Property and disposed at a disposal site not at the New Brunswick Real Property, after the Completion Date, under an applicable Environmental Law.

**1.17** "**Pre-Closing Compliance Matter**" means a Compliance Matter first occurring at prior to the Completion Date.

**1.18** "**Pre-Closing Environmental Contamination**" means Environmental Contamination first occurring prior to the Completion Date.

**1.19** "**Pre-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the New Brunswick Real Property and disposed at a disposal site not at the New Brunswick Real Property, prior to the Completion Date, under an applicable Environmental Law.

**1.20** "**Remedial Works**" means the works, designs, investigations and activities carried out by a Party in relation to Environmental Contamination, but excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

**1.21** "**Remedy**" has the meaning given to it in Section 4 of this Exhibit.

**1.22** "**Seller**" has the same meaning as given in the Transfer Agreement.

**1.23** "**Third Party**" means any person not a Party or a Competent Authority.

**2.**     **INDEMNIFICATIONS OF SELLER AND PURCHASER:**

**2.1**    Subject to the provisions of this Exhibit, and solely with respect to the New Brunswick Real Property, the Seller shall indemnify the Buyer for Environmental Damages arising from Pre-Closing Environmental Contamination, Pre-Closing Compliance Matters or Pre-Closing Off-Site Liability.

**2.2**    Subject to the provisions of this Exhibit, and solely with respect to the New Brunswick Real Property, the Buyer shall indemnify the Seller for Environmental Damages arising from Post-Closing Environmental Contamination, Post-Closing Off-Site Liability or Post-Closing Compliance Matters.

**2.3**    Subject to the provisions of this Agreement, for those Environmental Damages arising from circumstances that may be considered both (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination, (ii) Pre-Closing Compliance Matters and Post-Closing Compliance Matters, or (iii) Pre-Closing Off-Site Liability and Post-Closing Off-Site Liability, such Environmental Damages shall be allocated between the Parties in proportion to the extent that such Environmental Damages arose pre- or post-Completion Date, and each Party shall indemnify the other for its share as determined by such allocation.

**3.**    **LIMITATIONS ON LIABILITY.**    Neither Party shall be liable under this Agreement for Environmental Damages:

**3.1**    In the case of Environmental Claims arising from Pre-Closing Compliance Matters or Post-Closing Compliance Matters (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before eighteen (18) months following the Completion Date;

**3.2**    In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination, except for Remedial Works pursuant to clause 4.1 of this Exhibit, or Post-Closing Environmental Contamination (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before seven (7) years following the Completion Date. Remedial Works under clause 4.1 of this Exhibit shall be governed by the applicable statute of limitations under ISRA (as defined in clause 4.1 of this Exhibit).

**3.3**    Except for Remedial Works under clause 4.1 of this Exhibit (for which Seller is solely responsible), subject to clauses 3.1 and 3.2 of this Exhibit, no Party will be liable to the other under this Exhibit unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in this clause 3.3 and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is liable solely for the amounts exceeding $500,000.  For all purposes under this Article 3 and Section 7.1 of the Agreement, the Deductible Amount with respect to environmental claims shall be (i) the $500,000 amount referred to in this clause 3.3, less (ii) any amounts that may have been incurred by the relevant claiming party under environmental matters agreements entered into in connection with the sale of any of Seller's global battery operations to Buyer in 2005. The Cap Amount is as set forth Section 7.1.

**3.4**    In the case of Environmental Damages arising from Pre-Closing Environmental Contamination, unless the claiming Party discovers the facts and circumstances giving rise to such claim solely in connection with an investigation

required by an applicable Environmental Law, an order by a Competent Authority, a final judgment of a claim by a Third Party, or settlement of a claim by a Third Party to which the non-claiming Party has agreed (such agreement not to be unreasonably withheld).

**3.5**    Where Buyer uses the New Brunswick Real Property for a use other than an industrial use, or seeks to or changes the zoning or land use classification of the New Brunswick Real Property to a classification more sensitive than the industrial classification;

**3.6**    Where, subject to clause 3.7 below, and insofar as the Parties agree to treat this Agreement and all information gathered, known or obtained as a result of the sale and purchase of the Business or performing any obligation or exercising any right under this Exhibit as confidential, for any Environmental Damages claims to the extent that such claim would not have arisen or was increased or made more costly as a result of the claiming Party or any of its respective employees, agents or contractors voluntering or disclosing information to any Competent Authority or Third Party without the prior written consent of the non-claiming Party;

**3.7**    The following shall not be deemed to be or to have been volunteering or disclosing of information for the purpose of this clause 3.7:

>    (i)    Where the disclosure is required by any law (including any Environmental Law),

>    (ii)    Where the disclosure is specifically and formally required by any securities exchange or regulatory or other Competent Authority to which either Party is subject or submits wherever situated,

>    (iii)    Where the information is clearly in the public domain through no fault of the claiming Party, or

>    (iv)    Where the non-claiming Party has given prior written approval to the disclosure;

**3.8**    To the extent the claiming Party did not take reasonable steps to avoid or mitigate any Environmental Damages, acting in a reasonable and cost-effective manner; in the case of an emergency, where a Party takes any action to avoid or mitigate any Environmental Damages, (a) it shall for the avoidance of doubt not be in breach of this Agreement and shall not be precluded from recovering its Environmental Damages provided that the claiming Party notifies the other Party of such circumstances as soon as reasonably practicable and provided that such actions or steps are the minimum necessary to avert the emergency; and (b) the reasonable costs and expenses of all steps taken pursuant to the duty to mitigate contained in this clause 3.8 shall be deemed to be Environmental Damages.

**3.9**    Notwithstanding anything to the contrary in Section 7.1 of this Agreement, the Deductible Amount with respect to environmental claims shall be $500,000 less any amounts that may have been incurred by the relevant claiming party under environmental matters agreements entered into in connection with the sale of any of Seller's global battery operations to Buyer in 2005.   The Cap Amount is as set forth Section 7.1.   Subject to clauses 3.1 and 3.2 of this Agreement, set forth in Subject to

clauses 4.1, 4.2 and 4.3 of this Agreement, unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in clause 4.4 of this Agreement and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is liable solely for the amounts exceeding $500,000; provided, however, that with respect to Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination referred to in Paragraph 2.2 for which Seller has warranted that it will effect the Remedy with respect to such Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination, Seller shall pay all amounts necessary to effect the Remedy of such issues, which amounts shall not be included in determining when the aggregate amount of claims exceed $500,000.

4.      **REMEDIATION OF ENVIRONMENTAL DAMAGE:**

**4.1**    Seller shall file such papers, and conduct such investigation and remediation as required by the New Jersey Department of Environmental Protection ("**NJDEP**") to satisfy the requirements of the State of New Jersey's Industrial Site Recovery Act, N.J.S.A. 13.1K-6 *et seq.,* and regulations promulgated thereto, N.J.A.C. Title 7, Chapter 26B (collectively "**ISRA**"), as ISRA is in effect as of the date of the Put Completion Date, as follows:    As soon as the Parties mutually agree that it is substantially certain that the third party consent needed prior to any exercise of the Put Option or Call Option will be obtained, Seller shall, pursuant to the requirements of ISRA, promptly prepare and submit to NJDEP a General Information Notice.  Thereafter, with reasonable diligence, Seller shall, pursuant to ISRA, continue to undertake the activities and to submit the required documentation to NJDEP necessary to complete its responsibilities under ISRA, according to any schedule approved by NJDEP and consistent with NJDEP requirements.  In all cases, Seller shall have the right at its sole discretion to seek reasonable extensions of the schedules approved by NJDEP where site conditions warrant.  Where the State of New Jersey requires any consent agreement into which Seller, the State of New Jersey and Buyer must enter pursuant to ISRA, Buyer shall sign such consent agreement.  Any such consent agreement shall be consistent with a remedial action for industrial property.

**4.2**    Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of a Compliance Matter ("**Remedy**") to no less but no more than the minimum standards or levels of Environmental Laws; such Remedial Works may be determined using risk assessment and related risk evaluation methods.

**4.3**    The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, have conduct of such Remedy.

**4.4**    The conduct of a Remedy shall be as follows:

A.            The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party may elect to

adopt where such comments do not increase any cost or liability of the Remedy;

B.     The non-claiming Party shall, at its sole discretion, either:

(i)     Determine to and obtain approval of the Remedy by the appropriate Competent Authority prior to implementation of the Remedy; when requested, the claiming Party shall cooperate with the non-claiming Party in any communications with the appropriate Competent Authority; after the non-claiming Party has obtained such approval, such Party shall provide notice of such approval to the claiming Party; or

(ii)     Determine to implement the Remedy without first seeking approval from the appropriate Competent Authority; the non-claiming Party shall provide notice to the claiming Party of such determination at the time the non-claiming Party provides the claiming Party with the work plan or scope of work set forth in clause 4.4A of this Exhibit;

C.     Where the Seller is the non-claiming Party, Seller will take all reasonable steps to avoid interfering with Buyer's operation of the Business or use of the Real Property, and Buyer will reasonably cooperate with Seller including providing access to the New Brunswick Real Property and the use of utilities in the conduct of the Remedy;

D.     Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy; and

E.     The conduct of the Remedy shall be deemed complete when, as the case may be:

(i)     The non-claiming Party has received approval regarding the Remedy by an applicable Competent Authority; or

(ii)     Subject to clause 4.2 of this Exhibit, the Remedy meets applicable standards which an applicable Environmental Law allows.

**5.     TRANSFER OF PERMITS AND LICENSES.**   On and after the Closing Date, Seller and Buyer shall cooperate in taking all reasonable steps to effect the transfer or procure the re-issuance of any Environmental Permits necessary to operate the Business.

## EXHIBIT 4.1

## EMPLOYEE MATTERS

**1.    Definitions:**

A.    "**Buyer Employee Benefit Plans**" means Buyer's pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute", severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes", collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals and written or binding oral statements of policies, practices or understandings relating to employment.

B.    "**Competitive Package**" means the wages and benefits payable to new hire U.S. Hourly Employees at the New Brunswick Facility under the Delphi-IUE-CWA Local Agreement.

C.    "**Delphi-IUE-CWA Local Agreement**" means the local collectively bargained agreements in effect at the New Brunswick Facility, including but not limited to, the memorandum of understanding ("**MOU**") entitled "ESCOP Hiring Plan – Full and Temporary Part-Time Employees" dated June 3, 1998 ("**ESCOP Hiring Plan**"), the November 13, 2003 Local Seniority Agreement, a collective bargaining agreement between Seller and IUE-CWA Local 416, any letter agreements, MOUs (including the ESCOP Hiring Plan), and all applicable employee benefit plans, in effect between Seller and the IUE-CWA applicable only to the U.S. Hourly Employees.

D.    "**Delphi-IUE-CWA National Agreement**" means the nationally negotiated collective bargaining agreements, including any letter agreements, MOUs, supplemental agreements and all applicable employee benefit plans in effect between Seller and the IUE-CWA.

E.    "**Employment Rights**" means all obligations arising out of, or relating to, the employment relationship between the relevant company and the relevant employees, including, without limitation, payment of wages and salaries, employee benefits, taxes, vacation pay, sick leave and severance pay and any claims under any Laws dealing with employment.

F.    "**IUE-CWA**" means the IUE-CWA, the Industrial Division of the Communication Workers of America, AFL-CIO and CLC.

G.    "**Seller Employee Benefit Plans**" means Seller's pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute", severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes", collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

H.    "**Successor Clause**" means Document 7 appended to the Delphi-IUE-CWA National Agreement.

I.    "**Transferred U.S. Hourly Employees**" means those hourly employees of Seller hired by Buyer pursuant to Section 3.A(ii) below.

J.    "**U.S. Hourly Employees**" means the hourly employees represented by the IUE-CWA who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date and identified on Schedule 3.A(i) to this Exhibit 4.1 to be provided to Buyer by Seller concurrently with the Put Exercise Notice or within ten (10) days after Seller's receipt of a Call Exercise Notice, as applicable.

K.    "**U.S. Salaried Employees**" means the salaried employees and hourly non-union employees who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date.

2.    **Pre-Completion Obligations of the Parties**:

A.    Prior to Completion, Seller will:

(i)    Endeavor to obtain Bankruptcy Court approval of the attrition plan set forth in the IUE Consent (attached as Exhibit 1.13 of this Agreement) and, upon receipt of necessary approvals, to implement the attrition plan set forth in Exhibit 1.13 (the "**Attrition Plan**") to reduce the number of U.S. Hourly Employees to approximately one hundred (100) U.S. Hourly Employees, in accordance with the terms of the IUE Consent [JCI to confirm the number as soon as possible after the date of this Agreement and no later than 5 days before Delphi commences the Attrition Plan]; and

(ii)    Take the lead in negotiating a plant-specific agreement and waiver of the Successor Clause, with Buyer's involvement as the parties deem appropriate.

B.    If waiver of the Successor Clause is obtained before the Completion Date:

(i)    Buyer will take the lead in negotiating a collective bargaining agreement with the IUE-CWA exclusive to the U.S. Hourly Employees at the New Brunswick, New Jersey plant; and

(ii)    Buyer will endeavor to obtain mutually agreed competitive work practices in a collective bargaining agreement, comparable to Buyer's existing IUE-CWA agreements at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities.

C.    If waiver of the Successor Clause is not obtained before the Completion Date:

(i)    Until the Completion Date, Seller will endeavor to obtain mutually agreed competitive work practices in a collective bargaining agreement with the

IUE-CWA, comparable to Buyer's collective bargaining agreements with the IUE-CWA at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities;

Subparagraphs 2.C(i) and 2.C(v) notwithstanding, to the extent that Buyer has not negotiated its own local agreement prior to Completion, as outlined in Section 2.C(i), Buyer will assume the terms and conditions of the Delphi-IUE-CWA National Agreement and Delphi-IUE-CWA Local Agreement applicable as of the Completion Date as they relate to the U.S. Hourly Employees, except that Seller has secured in the IUE Consent a waiver of the unpublished "Neutrality" letter in the Delphi-IUE-CWA National Agreement.  Seller agrees that it is not Seller's intent to negotiate an agreement with the IUE-CWA after the effective date of this Agreement and prior to Completion that would impose additional material obligations or costs upon Buyer.  To that end, and except as otherwise agreed by Buyer, Buyer will not assume terms and conditions relating to the following specified matters contained in any MOU, collective bargaining agreement or other agreement negotiated after the effective date of this Agreement which:

    a.  Contains terms that would  apply to or affect other facilities of Buyer;

    b.  Contains any additional job security provisions for new hires not set forth in the ESCOP Plan;

    c.  Introduces severance provisions that would make it impracticable to reduce the workforce;

    d.  Requires that Buyer assume any Seller Employee Benefit Plans or participate in any multi-employer plan; or

    e.  Guarantees specific levels of manning or requires that the New Brunswick Plant be operated in any specific way for any specific period of time

(iii)  In connection with the foregoing clause 2.C(ii), Buyer will act in good faith and will not act unreasonably in order to avoid taking the New Brunswick plant.

(iv)   Seller reaffirms its commitment to consult with Buyer's lead bargainer on an ongoing basis in the course of collective bargaining, Buyer's involvement to include option to be present on the premises, participate in specified briefing sessions, provide proposals to Seller, and the like.   If in the course of such bargaining, matters which would significantly adversely impact New Brunswick plant competitiveness (compared year over year) arise, Buyer will not be obligated to assume related commitments without Buyer's consent, not to be unreasonably withheld.

(v)   Buyer will endeavor to obtain waiver of the Successor Clause and obtain competitive work practices in a collective bargaining agreement with the IUE-CWA, comparable to Buyer's existing collective bargaining agreements with the IUE-CWA at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities; and

(vi)   Seller will obtain a waiver of, or otherwise remedy, any other materially significant document related to the Delphi-IUE-CWA National or Local Agreements, if any, that was not made available to Seller prior to July 1, 2005.

D.    If a mutually agreeable collective bargaining agreement between the IUE-CWA and JCI is ratified before completion, then the terms of such agreement would

apply to the Transferred U.S. Hourly Employees rather than the terms of Delphi's agreements referred to in Section 2.C(ii) above.  In the event of any conflict with the above terms of this Article 2 and the terms of the Memorandum of Agreement between Delphi and the IUE-CWA attached as Exhibit 1.13 to this Agreement (the "**Memorandum**"), the terms of the Memorandum will govern.

3.    **Obligations at Completion**:

A.    **Buyer Obligations – U.S. Hourly Employees**:

(i)    Within five (5) days prior to Completion, Seller will identify in a Schedule 3.A(i) to this Exhibit 4.1, in accordance with the terms of the Attrition Plan and Section 2.A(i) of this Exhibit 4.1, all U.S. Hourly Employees who are employed as of the Completion Date, by name, social security number, date of hire, job code and current hourly rate.   Seller and Buyer will confirm Schedule 3.A(i) of this Exhibit 4.1 as of the day prior to the Completion Date.

(ii)    Effective on the Completion Date, Buyer will offer employment to all U.S. Hourly Employees identified on Schedule 3.A(i) to Exhibit 4.1. U.S. Hourly Employees who accept Buyer's offer of employment (by reporting to work or otherwise acknowledging acceptance) will be referred to as Transferred U.S. Hourly Employees:

a. U.S. Hourly Employees who are included in Schedule 3.A(i) and are not active as of the Completion Date due to disability, layoff, family medical leave or other approved leave of absence may elect to transfer to Buyer under the terms of the Attrition Plan, and will remain Seller's responsibility until any such U.S. Hourly Employee is ready to return to active employment in accordance with Seller's leave policies.

b. Upon such U.S. Hourly Employee's return to active status, Buyer will offer employment in accordance with Section 3.A(ii) above, and, provided such individual accepts Buyer's offer of employment, will be considered a Transferred U.S. Hourly Employee as of such date.  In the event that a U.S. Hourly Employee is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Seller and Buyer provided such does not violate any applicable collective bargaining agreement.

c. If Seller and Buyer do not agree as to such individual's fitness for active employment, the issue will be submitted to an independent medical evaluator, whose determination will be final and binding on the parties.  The cost of such independent medical evaluation will be shared equally by the parties.

(iii)    Consistent with Buyer's obligations under Section 2.C(ii) above, unless Buyer is otherwise able to negotiate a new collective bargaining agreement with the IUE-CWA for the Transferred U.S. Hourly Employees, Buyer will provide the Transferred U.S. Hourly Employees with the same level of wages and benefits as required under the Delphi-IUE-CWA National Agreement and

Delphi-IUE-CWA Local Agreement, as applicable, in effect as of the Completion Date.

(iv)    Buyer will assume and recognize the seniority status for all purposes of continued employment with Buyer.

(v)    Buyer will recognize a Transferred U.S. Hourly Employee's pre-Completion credited service with Seller for eligibility and vesting purposes but not benefit accrual purposes with respect to any Buyer Employee Benefit Plans. However, in no case will credited service be recognized under this provision if such recognition will cause a duplication of compensation or benefits as between Seller and Buyer.

(vi)    Transferred U.S. Hourly Employees' and their Beneficiaries' participation in and eligibility for benefits under the Buyer Employee Benefit Plans will commence as of the Completion Date.

(vii)    To the extent allowed under applicable law, Transferred U.S. Hourly Employees who become eligible for a distribution of their account balances in the Delphi Personal Savings Plan will be permitted, at their discretion, to transfer such account balances to Buyer's defined contribution plan.  The manner of such transfer will be a direct rollover.

(viii)    Seller will retain responsibility to administer and all liability for labor grievances and arbitration proceedings (collectively the "**Grievances**") involving claims incurred prior to the Completion Date.  For a period of ninety (90) days following the Completion Date, Buyer will notify Seller of any Grievances filed after the Completion Date which relate to claims incurred prior to the Completion Date.  Buyer will be responsible to administer and bear all liability for Grievances involving claims incurred after the Completion Date.   To the extent the administration or resolution of any Grievances require both the Buyer's and Seller's participation, the following apply:

a.    Buyer and Seller will cooperate in the defense of the Grievances.

b.    Buyer will not settle any Grievance without Seller's consent if such settlement will result in liability or obligation for Seller.  Such consent will not be unreasonably withheld.

c.    Seller will not settle any Grievance without Buyer's consent if such settlement will result in liability for Buyer.  Such consent will not be unreasonably withheld.

d.    If the seniority of a Transferred U.S. Hourly Employee is reinstated as a result of the disposition of a Grievance or a court or administrative order, Buyer will reinstate the Transferred U.S. Hourly Employee as if the Transferred U.S. Hourly Employee had been a Transferred U.S. Hourly Employee as of the Completion Date.

e.      For Transferred U.S. Hourly Employees who have been continuously employed, back pay liability to the extent relating to an event, occurrence or cause of action arising prior to the Completion Date will be allocated to Seller.  Liability relating to an event, occurrence or cause of action arising subsequent to the Completion Date will be allocated to Buyer, including but not limited to costs or other liability incurred by Seller as a result of loss of employment with Buyer, within one (1) year following Completion, by any Transferred U.S. Hourly Employee for any reason other than good cause relating to misconduct or performance under the applicable discipline procedure.

f.      For U.S. Hourly Employees who become Transferred U.S. Hourly Employees because they are reinstated through the grievance procedure, back pay liability relating to periods prior to the Completion Date will be allocated to Seller.  Liability relating to periods subsequent to the Completion Date will be allocated to Seller.

g.      The parties will discuss treatment of Grievances involving unusual circumstances or events that continue before and after the Completion Date.

h.      If either party withholds consent to a settlement or processing of a Grievance recommended by the other party or elects to continue to defend the Grievance, then such party will be liable for the portion of the back pay or other liability resulting from the ultimate disposition of such Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended and rejected.

(ix)    Subject to Seller's obligations under Section 3.C(iv)a, liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees after the Completion Date, will be the responsibility of Buyer.

(x)     Buyer will not assume any Seller Employee Benefit Plans.

(xi)    At Completion, Buyer will pay Seller $12.5 million USD by wire transfer in accordance with wiring instructions to be provided by Seller before Completion, to reimburse Seller for costs incurred by Seller under the Attrition Plan, which costs would otherwise have been payable by Buyer under a predecessor agreement between the parties.

**B.      Buyer Obligations – U.S. Salaried Employees:**

(i)     Buyer will offer employment to all U.S. Salaried Employees, except as otherwise agreed by the parties prior to the time such offers have been made.  Buyer's employment offers to U.S. Salaried Employees will include salary and benefit packages substantially comparable in the aggregate to those provided by Seller immediately prior to the Completion Date.  Prior to tendering such offers, Buyer will provide Seller with information sufficient to satisfy Seller that such offers meet the "substantially comparable in the aggregate"

requirement. Seller's satisfaction that Buyer's offer meets this requirement may not be unreasonably withheld. Buyer will assume all Employment Rights relating to the U.S. Salaried Employees whom Buyer employs incurred on and after the date of hire. U.S. Salaried Employees whom Buyer hires will be subject to Buyer's policies and procedures, including any requirement that they execute agreements providing for the protection of Buyer's confidential information and adherence to Buyer's business conduct guidelines.

(ii)    Buyer will recognize the length of service date and all credited service at Seller that the U.S. Salaried Employees whom Buyer hires accrued at Seller for purposes of vesting and eligibility (but not benefit accrual) under the Buyer Employee Benefit Plans.

**C.    Seller Obligations – U.S. Hourly Employees:**

(i)    Seller will remain responsible for all Employment Rights of the U.S. Hourly Employees incurred or vesting prior to the date when they become Transferred U.S. Hourly Employees, except as otherwise provided herein. In accordance with the terms of the Attrition Plan, all Transferred U.S. Hourly Employees will transfer at the established New Brunswick Tier III rate and benefits in accordance with applicable terms of the Delphi-IUE-CWA Local Agreement and the Delphi-IUE-CWA National Agreement in effect at Completion, or such other agreement as may be applicable under Section 2.D of this Exhibit 4.1.

(ii)    Transferred U.S. Hourly Employees' and their Beneficiaries' participation in and eligibility for benefits under the Seller Employee Benefit Plans will cease as of the Completion Date. Notwithstanding the preceding sentence, the Seller Employee Benefit Plans will retain liability for all claims incurred by the Transferred U.S. Hourly Employees and their Beneficiaries on or prior to the Completion Date, including claims which are not submitted until after the Completion Date. A claim will be deemed incurred, as applicable:

a.    On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

b.    On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

c.    On the date following a Transferred U.S. Hourly Employee's last day worked on which a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

(iii)    Regardless of the vesting date, Seller will pay to each Transferred U.S. Hourly Employee the amount of all accrued and unutilized vacation pay and any profit sharing due for the calendar year in which the Completion Date occurs on a pro-rata basis using the number of days worked by the Transferred U.S. Hourly Employees for Seller.

(iv)    Seller will retain responsibility for:

a.    All liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees on or prior to the Completion Date and the pro rata portion, based on years of credited service with Seller compared with total years of credited service with Seller and Buyer, of liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to post-Completion Date exacerbation of pre-Completion Date injuries or illnesses; and

b.    Claims of the Transferred U.S. Hourly Employees (or a dependent thereof who becomes a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Internal Revenue Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Internal Revenue Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs on or prior to the Completion Date.

4.    **Allocation of Liability; Indemnification; Cooperation:**

A.    **Buyer's Obligations:**

(i)    In general, subject to other more specific provisions contained in this Agreement, Buyer will be responsible for and will bear all liability incurred after the Completion Date for Employment Rights of the Transferred U.S. Hourly Employees and U.S. Salaried Employees whom Buyer hires.

(ii)    Buyer will defend, indemnify and hold harmless Seller, its past and present employees, agents, representatives, shareholders, officers, directors, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs), relating to:

a.    Any Employment Rights of any of the Transferred U.S. Hourly Employees, any U.S. Salaried Employees whom Buyer hires, and any person employed by Buyer after the Completion Date who is not a Transferred U.S. Hourly Employee or U.S. Salaried Employee, for any claims relating to or arising from events occurring after the Completion Date; and

b.    Buyer's failure to comply with the terms of this Exhibit 4.1.

B.    **Seller's Obligations:**

(i)    In general, subject to other more specific provisions contained in this Agreement, Seller will be responsible for and will bear all liability incurred on or prior to the Completion Date for Employment Rights of the U.S. Hourly Employees and U.S. Salaried Employees.

(ii)      Seller will defend, indemnify and hold harmless Buyer, its past and present employees, agents, representatives, shareholders, officers, directors, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs), relating to:

a.      Any Employment Rights of any of the Transferred U.S. Hourly Employees, or of any person employed by Seller prior to the Completion Date who is not a Transferred U.S. Hourly Employee, for any claims relating to or arising from events occurring on or prior to the transfer to Buyer;

b.      Seller's failure to comply with the terms of this <u>Exhibit 4.1</u>; and

c.      Any Employment Rights of U.S. Salaried Employees who do not accept Buyer's offer of employment; <u>provided, however</u>, that such offer complies with the "substantially comparable in the aggregate" requirement of Section 3.B(i).

**C.**      **<u>Cooperation:</u>**

Seller and Buyer agree to provide each other with such records and information and otherwise cooperate as may be reasonably necessary or appropriate to carry out their respective obligations under this <u>Exhibit 4.1</u>.

# EXHIBIT E

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Hires Automotive Centers | Roger Ake | 5809 Illinois Rd. | | Fort Wayne | IN | 46804 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

5/30/2006 11:30 AM
JCI Special Parties