**Hearing Date: July 19, 2006 at 10:00 a.m.**
**Objection Deadline: July 12, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :
     In re                     :       Chapter 11
                                :
DELPHI CORPORATION, et al.,     :       Case No. 05–44481 (RDD)
                                :
              Debtors.     :       (Jointly Administered)
                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


FIRST INTERIM APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
AND AFFILIATES, COUNSEL TO THE DEBTORS-IN-POSSESSION, SEEKING
ALLOWANCE AND PAYMENT OF INTERIM COMPENSATION AND
REIMBURSEMENT OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("FIRST SKADDEN INTERIM FEE APPLICATION")

| | |
|---|---|
| Name of Applicant: | Skadden, Arps, Slate, Meagher & Flom LLP And Affiliates |
| Authorized to Provide Professional Services to: | Delphi Corporation and the Affiliate Debtors |
| Date of Retention Order: | November 4, 2005 |
| Period for Which Compensation and Reimbursement are Sought: | October 8, 2005 through January 31, 2006 |
| Amount of Compensation Sought as Actual, Reasonable, and Necessary: | $9,200,920 |
| Amount of Expense Reimbursement Sought as Actual, Reasonable, and Necessary: | $622,420 |
| Voluntary Reductions: | |
| Monthly Fee Statements: | $773,649 |
| First Fee Application: | $39,512 |
| Total Reductions: | $813,161 |

This is an/(a):  _____X_____ Interim _____ Final Application.

Aggregate Amounts Paid to Date: $ 7,392,345 (upon payment of the January monthly statement)

TIME SUMMARY TO FIRST INTERIM FEE APPLICATION OF
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES
OCTOBER 8, 2005 - JANUARY 31, 2006

| Name | Year of Admission | Rate[1] | Hours | Amount |
|---|---|---|---|---|
| **PARTNERS** | | | | |
| Butler, Jr., John Wm. | 1980 | $757 | 887.0 | $671,393 |
| Lyons, John K. | 1989 | $645 | 774.5 | $499,778 |
| Marafioti, Kayalyn A | 1980 | $781 | 592.7 | $462,861 |
| Cochran, Eric L. | 1987 | $775 | 393.8 | $305,207 |
| Springer David E. | 1977 | $728 | 419.1 | $305,175 |
| Gross, Cliff | 1989 | $770 | 278.6 | $214,522 |
| Furfaro, John P. | 1981 | $710 | 215.1 | $152,769 |
| Hiestand, N. Lynn | 1981 | $826 | 179.1 | $147,922 |
| Wexler, Marian P. | 1977 | $725 | 189.4 | $137,407 |
| Berlin, Kenneth | 1974 | $739 | 156.7 | $115,847 |
| Frishman, Lawrence D. | 1989 | $755 | 133.6 | $100,869 |
| Leff, Neil M. | 1981 | $785 | 26.3 | $20,646 |
| LeDuc, Andre | 1978 | $770 | 17.0 | $13,090 |
| **Partner Total** | | | **4,262.9** | **$3,147,486** |
| **COUNSEL** | | | | |
| Matz, Thomas J. | 1976 | $557 | 846.3 | $471,016 |
| Sensenbrenner, Eric B. | 1996 | $556 | 383.5 | $213,080 |
| Shivakumar, Dhananjai | 1998 | $547 | 161.0 | $88,060 |
| Amodeo, John A. | 1977 | $580 | 60.7 | $35,206 |
| Ziff, Elaine D. | 1983 | $560 | 20.5 | $11,480 |
| Silverman, Daniel | 1966 | $560 | 17.3 | $9,688 |
| Eisenberg, Henry C. | 1985 | $580 | 14.6 | $8,468 |
| Davies, Linda* | 1994 | $540 | 10.1 | $5,454 |
| **Counsel Total** | | | **1,514.0** | **$842,452** |
| **ASSOCIATES** | | | | |
| Meisler, Ron E. | 1999 | $508 | 1,008.3 | $512,217 |
| Reese, Randall G. | 2001 | $431 | 1,117.2 | $481,655 |
| Ziegler, Venera E. | 2003 | $510 | 848.9 | $432,939 |
| Toussi, Sina | 1995 | $537 | 774.7 | $416,313 |
| Herriott, Allison Verderber | 2004 | $354 | 918.4 | $324,908 |
| Micheli, Matthew J. | 2002 | $428 | 671.0 | $287,034 |
| Phillips, Daniel P. | 1998 | $540 | 497.3 | $268,542 |
| De Elizalde, Dolores | 2003 | $437 | 583.1 | $254,980 |
| Fern, Brian M. | 1996 | $483 | 517.4 | $249,753 |
| MacDonald, F. Neil | 1997 | $537 | 397.4 | $213,327 |
| Zaltzman, Haim | 2006 | $295 | 588.3 | $173,558 |
| Campanario, Nick D. | 2002 | $455 | 318.3 | $144,965 |
| Stuart, Nathan L | 2002 | $433 | 319.4 | $138,270 |

---

[1]    The blended rates set forth for certain professionals reflect the average billing rate for the entire Application Period and incorporate a reduced billing rate for nonworking travel time.

| Name | Year of Admission | Rate[1] | Hours | Amount |
|---|---|---|---|---|
| Pilkington, Christian | Foreign (1999) | $540 | 251.9 | $136,026 |
| Wilson, Louis D. | 2000 | $510 | 220.6 | $112,506 |
| Danz, Catherine E. | 2001 | $452 | 218.9 | $98,885 |
| Lozano, Paola | 2002 | $540 | 137.1 | $74,034 |
| Gibson, Marie L.* | 1997 | $540 | 121.4 | $65,556 |
| Hur, Jamie | 2005 | $375 | 170.2 | $63,827 |
| Guzzardo, John | 2004 | $375 | 143.3 | $53,739 |
| Kohut, Ronald D. | 2004 | $410 | 98.8 | $40,508 |
| Feinberg, Aaron S. | 2002 | $465 | 86.1 | $40,037 |
| Nash, Jr. Patrick J. | 1996 | $470 | 67.1 | $31,544 |
| Heather, Justin L. | 2001 | $465 | 48.9 | $22,739 |
| Ogunsanya, Gregory O. | 2004 | $440 | 51.1 | $22,484 |
| Turman, III, Rossie E | 1999 | $540 | 35.3 | $19,062 |
| Smith-Haley, Kelly | 2004 | $375 | 47.6 | $17,850 |
| Dickerson, Chris L. | 1998 | $540 | 27.8 | $15,012 |
| Rohner, William M. | 2002 | $440 | 25.1 | $11,044 |
| Mullin, Joshua A. | 1997 | $540 | 19.9 | $10,746 |
| Meidan, Lanelle K. | 2000 | $510 | 12.1 | $6,171 |
| Boden, Julie M. | 2005 | $375 | 14.3 | $5,363 |
| Kahn, Melissa T. | 2003 | $327 | 13.6 | $4,449 |
| Olasky, Peter | 2005 | $312 | 8.8 | $3,300 |
| **Associate Total** | | | **10,379.6** | **$4,753,343** |
| **PARAPROFESSIONALS** | | | | |
| Demma, Jeffrey | N/A | $218 | 615.7 | $134,095 |
| Salazar, Adriana | N/A | $175 | 557.7 | $97,601 |
| Zsoldos, Andrew F. | N/A | $145 | 509.1 | $73,824 |
| Chow, Pauline | N/A | $219 | 170.1 | $37,237 |
| Jacobson, Susan | N/A | $230 | 83.6 | $19,228 |
| Negron, Angeline M. | N/A | $75 | 238.9 | $17,919 |
| Rivera, Maira | N/A | $75 | 225.2 | $16,891 |
| Nowicki, John A. | N/A | $230 | 63.6 | $14,628 |
| Worscheck, Toby M. | N/A | $75 | 186.3 | $13,973 |
| Corkran, Christine M. | N/A | $145 | 47.4 | $6,874 |
| Bonachea, Louisa | N/A | $175 | 39.0 | $6,825 |
| Lorenz, Geoffrey | N/A | $145 | 42.8 | $6,207 |
| Fieberg, William | N/A | $230 | 15.0 | $3,450 |
| Shahani, Angelly | N/A | $230 | 11.8 | $2,714 |
| Isaksson, Norman K. | N/A | $175 | 14.2 | $2,485 |
| Donnelly, Neal P. | N/A | $175 | 13.4 | $2,345 |
| Roman, Joseph J. | N/A | $75 | 17.9 | $1,343 |
| **Paraprofessional Total** | | | **2,851.7** | **$457,639** |
| **TOTAL ALL PROFESSIONALS** | | | **19,008.2** | **$9,200,920** |

\* On April 1, 2006, Linda Davies and Marie L. Gibson became partners of Skadden.

SUMMARY OF SERVICES RENDERED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES
OCTOBER 8, 2005 - JANUARY 31, 2006

| Activities | Hours | Fees |
|---|---|---|
| Case Administration | 3,484.0 | $1,136,809 (12.4%) |
| Supplier Matters | 1,904.5 | $1,032,388 (11.2%) |
| Tax Matters | 1,557.8 | $932,086 (10.1%) |
| Employee Matters (General) | 1,750.4 | $879,786 (9.6%) |
| Customer Matters (GM) | 799.7 | $458,182 (5.0%) |
| Creditor Meetings / Statutory Committees | 765.9 | $415,954 (4.5%) |
| Employee Matters (Labor Unions) | 705.4 | $414,991 (4.5%) |
| Retention / Fee Matters / Objections (Others) | 867.2 | $377,176 (4.1%) |
| General Corporate Advice | 590.5 | $340,687 (3.7%) |
| Global Subsidiaries (Non-U.S.) | 534.6 | $330,534 (3.6%) |
| Financing (DIP and Emergence) | 518.5 | $296,608 (3.2%) |
| Utilities | 577.2 | $295,549 (3.2%) |
| Nonworking Travel Time | 984.4 | $290,270 (3.2%) |
| Business Operations / Strategic Planning | 386.4 | $258,753 (2.8%) |
| Secured Claims (Except Vendor Claims) | 491.7 | $236,983 (2.6%) |
| Reports and Schedules | 380.1 | $187,152 (2.0%) |
| Environmental Matters | 233.8 | $163,396 (1.8%) |
| Executory Contracts (Personalty) | 320.1 | $153,055 (1.7%) |
| Leases (Real Property) | 286.8 | $143,190 (1.6%) |
| Claims Admin. (Reclamation/Trust Funds) | 417.2 | $134,926 (1.5%) |
| Asset Dispositions (General) | 210.6 | $117,199 (1.3%) |
| Litigation (Insurance Recovery) | 175.5 | $103,530 (1.1%) |
| Insurance | 166.7 | $83,523 (0.9%) |
| Customer Matters (General) | 119.2 | $72,901 (0.8%) |
| Automatic Stay (Relief Actions) | 143.9 | $64,079 (0.7%) |
| Real Estate (Owned) | 102.0 | $63,413 (0.7%) |

| Activities | Hours | Fees |
|---|---|---|
| Retention / Fee Matters (SASM&F) | 203.8 | $58,023 (0.6%) |
| Asset Dispositions (Real Property) | 63.8 | $36,866 (0.4%) |
| Claims Admin. (General) | 83.5 | $31,974 (0.3%) |
| Intellectual Property | 44.4 | $22,186 (0.2%) |
| Litigation (General) | 47.7 | $21,112 (0.2%) |
| Employee Matters (Retirees/OPEB) | 41.4 | $21,019 (0.2%) |
| Reorganization Plan / Plan Sponsors | 33.6 | $14,195 (0.2%) |
| Regulatory and SEC Matters | 15.9 | $12,425 (0.1%) |
| **Total** | **19,008.2** | **$9,200,920** |

**Hearing Date: July 19, 2006 at 10:00 a.m.**
**Objection Deadline: July 12, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

  - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                :
    In re            :     Chapter 11
                :
DELPHI CORPORATION, et al.,     :     Case No. 05–44481 (RDD)
                :
        Debtors.      :     (Jointly Administered)
                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## FIRST INTERIM APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND ITS AFFILIATES, COUNSEL TO THE DEBTORS-IN-POSSESSION, SEEKING ALLOWANCE AND PAYMENT OF INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

### ("FIRST SKADDEN INTERIM FEE APPLICATION")

Skadden, Arps, Slate, Meagher & Flom LLP and affiliates ("Skadden"), counsel for Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (the "Reorganization Cases"), submits this first interim application (the "Interim Application") seeking interim allowance and payment of compensation and reimbursement of expenses under 11 U.S.C. §§ 330 and 331 for the period from October 8, 2005 through January 31, 2006 (the "Application Period"). Skadden submits this Interim Application for (a) allowance of compensation for professional services rendered by Skadden to the Debtors, and (b) reimbursement of actual and necessary charges and disbursements incurred by Skadden in the rendition of required professional services on behalf of the Debtors.  In support of this Interim Application, Skadden represents as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005 (the "Petition Dates"), Delphi and certain of its U.S. subsidiaries and affiliates (the "Debtors") filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity security holders (the "Equity Committee").  No trustee or examiner has been appointed in the Debtors' cases.

2

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157
and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core
proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 330 and
331 of the Bankruptcy Code, Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Local
Rule 2014-1.  This Interim Application has been prepared in accordance with the Amended
Guidelines for Fees and Disbursements for Professionals in Southern District of New York
Bankruptcy Cases, adopted by the Court on April 19, 1995 (the "Local Guidelines") and the United
States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of
Expenses Filed Under 11 U.S.C. § 330 (Appendix A to 28 C.F.R. § 58), dated May 17, 1996 (the
"UST Guidelines" and, together with the Local Guidelines, the "Guidelines").  Pursuant to the
Local Guidelines, a certification regarding compliance with the Guidelines is attached hereto as
<u>Exhibit A</u>.

<u>Retention Of Skadden</u>

5.      Upon the commencement of the Reorganization Cases, the Debtors applied
to this Court for an order approving the retention of Skadden as their principal restructuring and
bankruptcy counsel (the "Retention Application") to perform legal services under a general
retainer that was necessary to enable the Debtors to faithfully execute their duties as
debtors-in-possession.  On November 4, 2006, this Court entered an order (the "Retention Order")[2]

---

[2]     A copy of the Retention Application, the supporting declaration, and the Retention Order are attached hereto as
<u>Exhibit B</u>.  These materials include factual information regarding the experience and standing at the bar of certain
of Skadden's senior attorneys.

authorizing the Debtors to employ Skadden as their counsel under the terms set forth in the

Retention Application.[3]

6.      In the Retention Application, the Debtors disclosed that Skadden's fees for

professional services are based on its guideline hourly rates, which are periodically adjusted.  The

Debtors also disclosed in the Retention Application that Skadden's charges and disbursements are

invoiced pursuant to Skadden's Policy Statement Concerning Charges and Disbursements, a copy

of which is attached to the Engagement Agreement.  Certain charges and disbursements are not

charged separately under the bundled rate structure as described in the Retention Application.

7.      Other than an arrangement between Skadden and its members, there is no

agreement or understanding between Skadden and any person for the sharing of compensation to

be received for services rendered in this case.

<u>Fee Procedures And Monthly Fee Statements</u>

8.      On November 4, 2005, this Court entered the Order Under 11 U.S.C. § 331

Establishing Procedures for Interim Compensation and Reimbursement of Expenses of

Professionals (Docket No. 869) (the "Initial Interim Compensation Order").  On March 8, 2006,

this Court entered a Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures for

Interim Compensation and Reimbursement of Expenses of Professionals (Docket No. 2747) (the

"Supplemental Interim Compensation Order"), which, among other things, clarified the deadlines

for retained professionals to submit interim and final fee applications.  On March 28, 2006, this

Court entered a Second Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures for

Interim Compensation and Reimbursement of Expenses of Professionals (Docket No. 2986) (the

---

[3]      The Retention Order incorporates the terms of an engagement agreement dated as of July 12, 2005 (the "Engagement Agreement"), between Skadden and the Debtors, a copy of which is attached as Exhibit A to the declaration supporting the Retention Application.

"Second Supplemental Interim Compensation Order") extending the deadline for retained

professionals to (a) file and serve their first interim fee applications and (b) serve monthly fee

statements.  On May 5, 2006, this Court entered its Third Supplemental Order Under 11 U.S.C. §

331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of

Professionals (Docket No. 3630) (the "Third Supplemental Interim Compensation Order,"

together with the Initial Interim Compensation Order, Supplemental Interim Compensation Order,

and Second Supplemental Interim Compensation Order, the "Interim Compensation Order"),

which established a Fee Review Committee (as defined below), approved a protocol for reviewing

fees and reimbursement of expenses sought by retained professionals and further extended the

deadline (a) to file and serve the first interim fee application and (b) to serve monthly fee

statements.  Pursuant to paragraph 2(a) and 2(j) of the Interim Compensation Order, as

supplemented, as well as the Fee Review Protocol (defined below), Skadden is submitting this

Interim Application to the Debtors, as well as to the U.S. Trustee, the counsel to the Creditors'

Committee, the counsel for the agent under the Debtors' prepetition credit facility, the counsel for

the agent under the Debtors' postpetition credit facility, and the members of the Fee Review

Committee (defined below).

        9.      To minimize costs to the Debtors' estates and avoid duplicative efforts in

the review of fee applications filed in these Reorganization Cases, the Debtors, the Creditors'

Committee, and the U.S. Trustee negotiated the formation of a joint fee review committee (the

"Fee Review Committee") to review, comment on, and, if necessary, object to the various fee

applications filed in these Reorganization Cases.  As part of the Third Supplemental Interim

Compensation Order, this Court authorized the establishment of the Fee Review Committee and

approved a protocol regarding the Fee Review Committee, its composition, mandate, and

procedures (the "Fee Review Protocol").  One aspect of the Fee Review Protocol institutes a series

of procedures (the "Budget Procedures") with regard to the submission and review of budgets

(each, a "Budget") for professionals working on these Reorganization Cases.  Pursuant to the

Budget Procedures each professional must prepare and submit to the Fee Review Committee a

Budget for professional fees for each application period, beginning with the third interim fee

application period which commences on June 1, 2006.  The Fee Review Committee held its initial

meeting on May 17, 2006.

<u>Overview Of Delphi Corporation</u>

10.    Delphi and its subsidiaries and affiliates (collectively, the "Company") had

global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion.[4] At the time of its chapter 11 filing, Delphi ranked as the fifth largest

public company business reorganization in terms of revenues, and the thirteenth largest public

company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter

11 debtors and continue their business operations without supervision from the Bankruptcy Court.

11.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every major

global automotive original equipment manufacturer.

12.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of GM.  Prior to January 1, 1999, GM conducted the Company's business through various

divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions

---

[4]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and
its worldwide subsidiaries and affiliates.

and subsidiaries were transferred to the Company in accordance with the terms of a Master

Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi

accelerated its evolution from a North American-based, captive automotive supplier to a global

supplier of components, integrated systems, and modules for a wide range of customers and

applications.  Although GM is still the Company's single largest customer, today more than half of

Delphi's revenue is generated from non-GM sources.

<u>Events Leading To Chapter 11 Filing</u>

13.    In the first two years following Delphi's separation from GM, the Company

generated approximately $2 billion in net income.  Every year thereafter, however, with the

exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported

a net loss of approximately $4.8 billion on $28.6 billion in net sales.[5]  Reflective of a continued

downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on

net sales of $26.9 billion.

14.    The Debtors believe that the Company's financial performance has

deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United

States and related pricing pressures, and (c) increasing commodity prices.

---

[5]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

15.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

<u>The Debtors' Transformation Plan</u>

16.     On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

17.     In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce

and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-represented employees.[6]  This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

18.    These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits.[7]  On May 9, 2006 the hearing under sections 1113 and 1114 of the Bankruptcy Code commenced.  Contemporaneously with the filing of the 1113/1114 motion, the Debtors also moved to reject unprofitable supply contracts with GM.[8]  Among the reasons for the GM contract rejection motion was the Debtors' belief that GM must cover a greater portion of the

---

[6]    On May 8, 2006, the Court entered an order approving the agreement relating to the UAW's special hourly attrition program (Docket No. 3648), and such order was amended by this Court on May 12, 2006 (Docket No. 3754).  On May 18, 2006, Wilmington Trust Company filed a notice of appeal related to both the May 8, 2006 order and the May 12, 2006 amended order approving the agreement related to the UAW's special hourly attrition program (Docket No. 3813).  The basis of Wilmington Trust Company's appeal is not stated on its notice of appeal.

[7]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

[8]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033).

costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs. This initial motion covers approximately half of the Debtors' North American annual purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the filing of these motions was a necessary procedural step, the Debtors remain focused on reaching a consensual resolution with all of Delphi's unions and GM before the merits of the motion are determined by the Bankruptcy Court.

19.    To implement the third element of the Debtors' transformation plan, the Company announced plans to focus its product portfolio on those core technologies for which the Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth.   To that end, the Company will focus the organization around the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[9]

20.    In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its

---

[9]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

customers, unions, and other stakeholders to carefully manage the transition of such affected

product lines.  The Company intends to sell or wind down the non-core product lines and

manufacturing sites by January 1, 2008.

21.    As part of its organizational restructuring, the fourth element of the Debtors'

transformation plan, the Company expects to reduce its global salaried workforce by as many as

8,500 employees as a result of portfolio and product rationalizations and initiatives adopted

following an analysis of the Company's selling, general, and administration ("SG&A") cost saving

opportunities.  The Company believes that once its SG&A plan is fully implemented, the

Company should realize savings of approximately $450 million per year in addition to savings

realized from competitive measures planned for its core businesses and the disposition of non-core

assets.

22.    As noted above, the final key tenet of the transformation plan is to devise a

workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the

benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly

and salaried workforce.  To do so, however, it will be necessary to freeze the current hourly U.S.

pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of

January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will also be

necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the

Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding

contributions over a long-term period.  The Company intends to replace the hourly plan (for

certain employees) and the salaried plan with defined contribution plans.

23.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all

of its resources to continue to deliver high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

<u>Significant Events During The Application Period</u>

24.     Upon commencing the Reorganization Cases, Delphi and the Affiliate

Debtors became one of the largest companies, on a consolidated basis, ever to file chapter 11

petitions in the history of the U.S. bankruptcy system and the largest industrial company ever to

seek chapter 11 relief.  The Debtors' schedules of assets and liabilities and statements of financial

affairs (collectively, the "Schedules and Statements"), filed on January 20, 2006, contain nearly

22,000 pages of information listing over 20,000 scheduled liabilities and nearly 347,000 scheduled

executory contracts.

25.     During the Application Period, nearly 2,000 items have been docketed.

There are approximately 450 parties on the core service lists in these Reorganization Cases.  There

have been more than 100 orders entered during the Application Period in which, following the

"first day" hearings, three omnibus and two off-omnibus hearings were conducted.  Skadden has

logged and responded to over two thousand letters, emails, and telephone messages recorded on its

dedicated Delphi voicemail box.

26.     In undertaking these efforts during the initial launch phase of these

Reorganization Cases, the primary goal of the Debtors and their advisors, including Skadden,[10]

---

[10]  Skadden is one of a team of skilled professionals retained by the Debtors to assist in their reorganization efforts.
Skadden's assistance to the Debtors during the Application Period generally was part of a collaborative effort with the
Debtors' other retained professions, including Rothschild Inc. as financial advisors and investment bankers,
FTI Consulting, Inc. as restructuring and financial advisors, Groom Law Group Chartered as special employee
benefits counsel, Jones Lang LaSalle Americas, Inc. as real estate transaction and services providers, O'Melveny

has been to stabilize the Debtors' operations and finances and continue negotiations with key

constituencies to enable a successful reorganization and to provide a platform for future growth.

To that end, Skadden has worked closely with the Debtors' senior management on a number of

restructuring initiatives including arranging postpetition financing, continuing negotiations with

the Debtors' unions and GM, and restoring and retaining confidence among key constituents in the

Debtors.  These achievements included reaching consensual resolution of numerous issues with

hundreds of suppliers that are critical to the Debtors' supply chain.  This resulted in the

stabilization of the Debtors' supplier base without any material interruption to their customers.

A.      Postpetition Financing

27.      In the days prior to the Petition Dates, Skadden devoted substantial time to

assisting the Debtors' senior management team, finance personnel, and the Debtors' other advisors,

including Rothschild, Inc. and FTI Consulting, Inc. ("FTI"), in evaluating the size of a DIP credit

facility and considering their options in obtaining such facility.  Ultimately, the Debtors obtained

court approval of the Debtors' postpetition financing package, which is comprised of $4.5 billion

in debt facilities, including $2.5 billion borrowed from the Debtors' prepetition revolver and term

loan facilities and $2 billion in senior secured debtor-in-possession (DIP) financing from a group

of lenders led by J.P. Morgan Securities, Inc. and Citigroup Global Markets, Inc.  In addition, the

Debtors also received approval of an adequate protection package to cover the prepetition lenders

that were primed by the DIP financing.

B.      Negotiations With Unions And GM

28.      From the inception of these cases, the Debtors have articulated their need to

transform their labor agreements to provide a competitive labor cost structure and to address

---

& Myers LLP as special labor counsel, Shearman & Sterling LLP as special counsel, and Togut, Segal & Segal
LLP as conflicts counsel.

non-profitable and non-strategic U.S. operations. In particular, the Debtors' existing labor agreements must be modified in three principal respects. First, the Debtors must obtain hourly wage and benefit cost levels that are competitive with other U.S. auto parts suppliers. Second, the Debtors must address those provisions that limit the Debtors' ability to respond to market forces by selling or closing unnecessary or unprofitable operations, or by laying off excess employees. Third, the Debtors must address their substantial liabilities for retirement benefits for hourly employees and their costly retiree health care plans. The Debtors are currently on parallel paths, litigating the 1113/1114 motion to impose necessary modifications to the Debtors' labor agreements while simultaneously negotiating with their unions in an attempt to modify consensually certain terms of their collective bargaining agreements, including, without limitation, operational restrictions, which prevent the Debtors from exiting non-strategic, non-profitable operations and restrict the Debtors' ability to permanently lay off idled workers for whom the Debtors must continue to pay full wages and benefits and provide work space during business hours even though such idled workers have no productive work to do. To restructure the Debtors' businesses and design a feasible plan of reorganization, the Debtors must address these issues.

29.    During the Application Period, Skadden worked closely with the Debtors and other professionals regarding the Debtors' negotiations with their unions. Concurrent with the filing of the "first day" pleadings, the Debtors filed a scheduling motion which set December 16, 2005 as the deadline by which the Debtors would file motions to reject their collective bargaining agreements and modify retiree benefits. On November 28, 2005, the Debtors announced that they were accelerating their discussions with GM regarding the Debtors' restructuring efforts and that GM has agreed to temporarily forego previously agreed-to 2006 price reductions on components

provided by the Debtors, to provide interim financial support.[11]  Consequently, the Debtors stated

that they were continuing to work to achieve consensual agreements with their unions and would

suspend their previously contemplated December 16, 2005 deadline until at least until January 20,

2006.  Subsequently, on December 19, 2005, the Debtors announced that in light of GM's

then-recent engagement and discussions with the United Automobile, Aerospace and Agricultural

Implement Workers of America (the "UAW"), the Debtors would defer such motions until at least

February 17, 2006.[12]

C.    Constituent Relationships

30.    Suppliers.  Since the Petition Dates, the Debtors have worked to maintain

and improve their relationships with their suppliers to ensure an uninterrupted supply of goods to

their customers, primarily OEMs.  This process began with the request for and subsequent

implementation of "first day" relief, which provided for payments to those categories of suppliers

that posed the greatest risk of interruption in the Debtors' supply chain should they have failed to

perform under contracts with the Debtors.  During the first months of these cases, the Debtors also

addressed the problem they faced because over 11,000 supplier contracts were due to expire on or

about December 31, 2005, absent a further extension.  Thus, the Debtors and their advisors worked

diligently to develop and implement procedures to effectively and rapidly address issues relating

to expiring supply agreements, including implementing the relief granted by the Court in its

---

[11]    On April 28, 2006, the Debtors filed a Form 8-K on which Delphi reported that Delphi and GM have terminated
their November 2005 agreement in which GM had temporarily agreed to forego previously agreed-to 2006 price
reductions.  Beginning April 1, 2006, Delphi will reflect the price reductions in its financial results.

[12]    As this Court is aware, on February 17, 2006, the Debtors announced that based upon progress in discussions with
its major unions and GM, Delphi would continue talks in an effort to achieve a comprehensive agreement no later
than March 30, 2006. Absent agreement with all parties, Delphi said it would file no later than March 31, 2006 its
motions under sections 1113 and 1114 of the Bankruptcy Code to initiate the process of seeking court
authorization to reject the collective bargaining agreements and terminate hourly post-retirement health care plans
and life insurance.  On March 31, 2006, Delphi proceeded with such filings concurrent with an announcement
regarding the Debtors' preliminary transformation plan and a motion authorizing the rejection of certain executory
contracts with GM.  The hearing with respect to these issues began on May 9, 2006.

Supplier Agreement Assumption Procedures Order (as defined below), which, as more fully set

forth in section B of the Summary of Services, provides procedures for the Debtors to assume

certain contracts on specific terms and renew or otherwise enter into new supply contracts with

other suppliers.

31.    <u>Employees</u>.  During the Application Period, in an effort to ease the concerns

of employees after the filing of the Reorganization Cases, the Debtors, with the assistance of

Skadden, sought and received employee-related relief from the Court, including the authority to

pay certain human capital obligations of the Debtors, including, without limitation, employees'

prepetition and postpetition wages and salaries, including any commissions and bonuses for which

the employees are eligible; outstanding fees to members of the Debtors' Board of Directors;

vacation, sick leave, personal leave, expense reimbursements, and severance; health, insurance,

retirement, and other employee benefit programs; defined contribution, defined benefit,

tax-qualified, and non-tax-qualified retirement plans; workers' compensation programs; associated

payroll and other taxes on account of prepetition human capital obligations; and other benefits to,

or for the benefit of, the employees.  Further, the Court directed banks to honor the Debtors'

prepetition checks for payments of prepetition human capital obligations.

32.    In addition, the Debtors analyzed and developed a key employee

compensation program (the "KECP"), which was comprised of an annual incentive component

and an equity incentive emergence award.  During the Application Period, the Debtors, with the

assistance and guidance of Skadden and other of its advisors, negotiated with the Creditors'

Committee the terms of a modified, short-term KECP that led to the Court's approval in February

2006, of the annual incentive component of the program covering the period January 1, 2006

through June 30, 2006.  The portion of the KECP Motion relating to annual incentive plans beyond

16

June 30, 2006 and proposed cash and equity incentive emergence awards is currently scheduled to be heard at the July omnibus hearing.

33.    <u>Customers</u>.  Given that a failure of the Debtors' to timely supply parts to their customers could cause the shut down of customers' manufacturing facilities in less than 48 hours, resulting in significant economic damages which would tarnish Delphi's relationship with customers, and because supplier selection and awards of new business in the auto industry are generally finalized several years prior to vehicle production, it was imperative that the reorganization process did not interrupt the flow and quality of supply to or otherwise inconvenience or negatively influence the Debtors' customers.  Indeed, critical to achieving a successful restructuring is the Debtors' ability to maintain the strength of their relationships with their customers.  Thus, in response to these concerns, and as part of the Debtors' "first day" relief, the Debtors, with the assistance of Skadden, sought and received Court authority, but not direction, to perform certain of their prepetition obligations related to customer programs, including without limitation, warranty programs, customer adjustments, and customer rebates and allowances, and to continue, renew, replace, implement new, and/or terminate those customer programs as they see fit, in the ordinary course of business.  Moreover, as stated at the commencement of these Reorganization Cases, the Debtors are committed to providing their customers with leading-edge technology, product development, superior engineering, outstanding quality products and services, and world-class customer support.  To keep their customers apprised, the Debtors invested significant time and resources into their communications, including presentations made to certain customers as well as maintaining and constantly updating www.delphidocket.com, which provides up to date information regarding the Reorganization Cases.  As a result of these and other efforts, the Debtors have continued to win new business from their customers.

34.    <u>Creditors</u>.  From the outset of these cases, the Debtors have sought to establish and maintain open and productive relationships with their creditors, in particular, through their relationship with the Creditors' Committee.  The Debtors prepared for and participated in the formation meeting of the Creditors' Committee and have met with the Creditors' Committee numerous times during the Application Period, including three formal meetings that included presentations and other materials which formed the basis of discussion and review.  Skadden has played an integral role in these efforts, coordinating with the Creditors' Committee counsel with respect to most of the major initiatives detailed in this Interim Application and assisting the Debtors in providing the Creditors' Committee with detailed information and analysis of the Debtors' operations and the progress of these cases.  As a result of these efforts, the Debtors and the Creditors' Committee, including their respective professionals, have been able to achieve a successful launch of these cases and reduce the number of contested matters before the Court.

Requested Fees And Reimbursement Of Expenses

35.    Skadden has played an important role in advising the Debtors with respect to the initial stages of implementing their restructuring strategy.  As a result of its efforts during the Application Period, Skadden now seeks interim allowance of $9,200,920 in fees calculated at the applicable guideline hourly billing rates of the firm's personnel who have worked on the Reorganization Cases, and $622,420 in charges and disbursements actually and necessarily incurred by Skadden while providing services to the Debtors during the Application Period.

36.    This Interim Application reflects (a) a voluntary reduction by Skadden in connection with each monthly statement in the aggregate amount of $701,832 (with respect to fees including the elimination from any matter of any timekeeper who recorded less than one hour and the elimination of any timekeeper who recorded less than $2,500 in the aggregate across matters)

18

and $71,817 (with respect to charges and disbursements) and (b) an additional voluntary reduction

in the amount of $39,512 in connection with this Interim Application to reflect, among other

things, the elimination of all fees related to (i) any timekeeper who billed fewer than ten total hours

during the Application Period, (ii) any timekeeper who billed less than $1,000 during the

Application Period, (iii) any instance in which a timekeeper billed less than $1,000 to a particular

matter during the Application Period, and (iv) the elimination of any matter to which fewer than

ten hours were billed during the Application Period.  Accordingly, including the voluntary client

accommodations in connection with each monthly statement, Skadden is voluntarily reducing its

fees by $741,344, or approximately 7.5%, and its charges and disbursements by approximately

$71,817, or approximately 10.3%, for a total reduction of $813,161 for items Skadden normally

would bill its clients.[13]

37.    In staffing this case, in budgeting and incurring charges and disbursements,

and in preparing and submitting this Interim Application, Skadden has been mindful of the need to

be efficient while providing adequate and vigorous representation to the Debtors.  As described in

detail herein, Skadden believes that the requests made in this Interim Application comply with this

Court's standards in the context of the unique circumstances surrounding these unusually large and

complex cases.

Summary Of Services Rendered By
Skadden During The Application Period

38.    Throughout the Application Period, Skadden has worked closely with the

Debtors and their advisors to administer these estates and maximize the return for estate creditors.

---

[13]    Skadden believes that the amounts requested in this Interim Application are reasonable in relation to the services
rendered.  The amounts requested are already reduced to reflect the client accommodations described herein.  To
the extent that a party objects to this Interim Application, Skadden reserves the right to recapture such client
accommodations and seek up to the full amount of fees actually incurred in connection with this engagement.

These services have been directed towards a myriad of tasks necessary to achieve this result.  To meet the Debtors' needs, Skadden attorneys have provided multi-disciplinary services on a daily basis, often working nights, weekends, and holidays.  Throughout this process, certain of the principal Skadden attorneys working on the Reorganization Cases were required to devote the vast majority of their time to this matter, often to the exclusion of other clients.  As a result of the efforts of the Debtors and Skadden, the Debtors have taken large strides in evaluating their businesses and preparing the Debtors for emergence from chapter 11 as quickly as possible.

39.    At the commencement of the Reorganization Cases, Skadden created 45 different matter numbers or subject-matter categories (the "Matter Categories") to which its professionals assigned the time billed by them, all of which are related to the tasks performed by Skadden on behalf of the Debtors.[14]  All Skadden professionals kept a contemporaneous record of the time spent rendering such services and, consistent with the Guidelines, separated tasks in billing increments of one-tenth of an hour.  All of the services performed by Skadden have been legal in nature and necessary for the proper administration of the Reorganization Cases.

40.    Skadden devoted approximately <u>57.7%</u> of its time to the following seven matters, each of which was responsible for fees <u>in excess of $400,000</u> during the Application Period: Case Administration, Supplier Matters, Tax Matters, Employee Matters (General), Customer Matters (GM), Creditor Meetings / Statutory Committees, and Employee Matters (Labor Unions).

41.    Skadden devoted approximately <u>36.7%</u> of its time in the aggregate to the following 15 matters, billings for each of which were <u>between $100,000 and $400,000</u> in fees during the Application Period: Retention / Fee Matters / Objections (Others), General Corporate

---

[14]    <u>Exhibit C</u> contains a table of all matter numbers used by Skadden in these Reorganization Cases, as well as a description of certain business statistics of Skadden in these Reorganization Cases.

Advice, Global Subsidiaries (Non-US), Financing (DIP and Emergence), Utilities, Nonworking

Travel Time, Business Operations / Strategic Planning, Secured Claims (Except Vendor Claims),

Reports and Schedules, Environmental Matters, Executory Contracts (Personalty), Leases (Real

Property), Claims Admin. (Reclamation/Trust Funds), Asset Dispositions (General), and

Litigation (Insurance Recovery).

42.     The remainder of time (approximately <u>5.6%</u>) billed by Skadden was

devoted to the following 12 matters, each of which was responsible for <u>less than $100,000</u> during

the Application Period: Insurance, Customer Matters (General), Automatic Stay (Relief Actions),

Real Estate (Owned), Retention / Fee Matters (SASM&F), Asset Dispositions (Real Property),

Claims Admin. (General), Intellectual Property, Litigation (General), Employee Matters

(Retirees/OPEB), Reorganization Plan / Plan Sponsors, and Regulatory and SEC Matters.

<u>Matters Greater Than $400,000</u>

A.     <u>Case Administration</u>

43.     This particular category of time is comprised of matters relating to, among

other things, (a) general communications with creditors and other parties in interest, (b) general

case administration, including duties pertaining to service of process and pleading and file

maintenance, (c) general preparation for, and attendance at, court hearings, (d) general advice with

respect to the prosecution of the Reorganization Cases, and (e) general advice with respect to the

rights and duties of debtors-in-possession in the administration of the Reorganization Cases.

44.     Given the size and complexity of these Reorganization Cases – the largest

industrial company to ever seek chapter 11 relief – the Debtors and Skadden were presented with a

unique set of challenges in managing the process, tracking motions filed by others, responding to

inquiries from parties in interest, and maintaining organization and control over a case that could

quickly have become disorganized if attention were not provided to case administration matters on a continual basis.

45.    Thus, for instance, professionals from Skadden worked closely with the Debtors, this Court's Clerk's Office, representatives of this Court's Chambers, the U.S. Trustee's Office, the Debtors' notice and claims agent (Kurtzman Carson Consultants LLC ("KCC")), the Debtors' public relations advisors, and the Debtors' other advisors in coordinating the establishment and maintenance of various procedures and processes to aid in the administration of the Reorganization Cases, including a dedicated website, telephone hotlines, and e-mail information sites to assist in responding to the numerous inquiries that this case has generated.  At the commencement of the Reorganization Cases, the Debtors and Skadden established an "800" telephone "hotline" that provides basic information to callers and allows them to leave messages that Skadden professionals can return.  Since the Petition Dates, approximately 1,400 messages have been submitted to the hotline.  Where necessary, Skadden professionals researched responses to more complicated voicemail messages and otherwise responded to inquiries tendered through the hotline.  A considerable amount of time was devoted to these efforts.

46.    To further assist parties involved in the Reorganization Cases, Skadden also established and maintained an electronic mailbox at delphi@skadden.com.  Since the Petition Dates, nearly 200 e-mail messages have been submitted to this mailbox.  As with the hotline, responses to messages were researched (where appropriate) and responded to by Skadden professionals.  In addition, Skadden paraprofessionals received numerous email inquiries, including document requests and other inquiries.  Skadden also estimates that its professionals received approximately 600 pieces of additional written correspondence during the Application Period, all of which were routed to appropriate professionals within Skadden and responded to

either orally or in writing. Skadden necessarily devoted significant resources responding to these

matters. These efforts assured responsive answers to parties, ensured a relatively smooth

transition into chapter 11, and also assisted the Debtors and their estates by resolving numerous

matters that otherwise may have resulted in pleadings filed with this Court.

47.     In addition to communications matters, Skadden professionals maintained

various files critical to enable Skadden and others to address promptly issues that arose during the

Application Period. Skadden docketed all pleadings and orders filed in the Reorganization Cases

and worked with KCC to ensure that entities entitled to notice were kept informed of significant

events in the Reorganization Cases. The efficient management of administrative matters in a

paper-intensive case of this size is a significant task. Each week, the Debtors and Skadden are

inundated with hundreds of items of correspondence, documents, requests, pleadings and other

papers. As of the end of the Application Period, the pleadings docket contained nearly 2,000

entries, meaning that, on average, at least 17 pleadings were filed and docketed each day

(including weekends and holidays) during the 115 days covered by the Application Period.

48.     Given this volume of activity, Skadden professionals implemented various

procedures to create efficiencies in the management of the Reorganization Cases and to avoid

unnecessary duplication of effort between its own professionals and its advisors. For instance,

Skadden kept detailed calendars of future events in the Reorganization Cases and maintained other

planning tools to ensure that critical deadlines were met in this large and highly complex case. In

addition, Skadden designed notice and case management procedures that limit the notice of certain

matters to those parties with the greatest interest in the day-to-day activities of the Reorganization

Cases and utilize electronic noticing means where appropriate. These notice procedures have

saved the estates hundreds of thousands of dollars in photocopying and delivery charges by

limiting the notice of such matters while still providing appropriate notice to pertinent parties in
interest.

49.     Despite the streamlined notice procedures authorized by this Court,
Skadden professionals are required to devote substantial attention and resources to service and
related matters in these cases.  As of the end of the Application Period, there were approximately
380 parties who had filed a notice of appearance or request for notice in these cases (the "2002 List
Parties") and nearly 60 parties on the Master Service List[15] in these cases.  Skadden
paraprofessionals devote a great deal of time updating and maintaining these lists to ensure proper
notice:  they review each pleading filed and update the entities that firms represent as well as
record relevant addresses, they review all electronic and written correspondence to ensure all lists
are accurate, and they review all notices of appearance to ensure that no party in interest is
inadvertently excluded from a mailing.

50.     Obviously, the great number of parties who have appeared in these
proceedings and the time-sensitive nature of many of the pleadings and replies that must be filed
requires a great deal of coordinated effort among Skadden professionals.  There are many matters
that require special notices of particular items that significantly expand these duties.   Thus,
Skadden maintains and continually updates separate notice lists for various parties including the
DIP lenders, landlords, and unions and their advisors.

51.     In addition to communications and service matters, Skadden professionals
also devote significant time preparing for and attending the omnibus and off-omnibus hearings that

---

[15]    The Master Service List is comprised of (a) the Debtors and their counsel, (b) the Office of the United States
Trustee, (c) the members of and counsel for each Committee, (d) counsel for the agent under the Debtors'
prepetition credit facility, (e) counsel for the agent under the Debtors' postpetition credit facility, and (f) those
parties which may be added to the Master Service List by the Debtors upon written request to the Debtors or as
may be otherwise ordered by the Court for good and sufficient cause pursuant to the Local Rules and as required
in the Debtors' case management order.

this Court has established.  The omnibus hearings have streamlined the administration of these

Reorganization Cases by establishing a schedule known to all parties in interest for Court hearings,

thus eliminating unnecessary time and expenses spent appearing before the Court on numerous

occasions each month.  However, the internal coordination of motions, responses, objections,

witnesses, and other related matters requires close and careful attention by the entire Skadden

team.  Indeed, the monthly omnibus hearing agendas that Skadden prepares require significant

attention by numerous Skadden professionals beginning weeks before each hearing.  In most

instances, a carefully coordinated team of a limited number of Skadden attorneys attend the

hearings to meet with numerous parties in interest that appear and to resolve as many issues as

possible.  Moreover, following the hearings, Skadden professionals must, on some occasions,

modify proposed orders to comply with the Court's rulings and subsequently submit those orders

to this Court for signature and docketing.

      52.    During the Application Period, in addition to the "first day" hearings, there

have been three omnibus and two significant off-omnibus hearings.  Approximately 115 matters

have been scheduled at these hearings.  As this Court is aware, the Debtors, with the assistance of

Skadden and the Debtors' other professionals, have succeeded in presenting the great majority of

these matters as uncontested or resolved.  There have been relatively few contested matters in

these proceedings, and even fewer that actually required contested evidentiary hearings.  But for

the coordinated efforts of Skadden professionals (as well as the Debtors' other retained

professionals) in connection with these hearings, this simply would not be possible.

      53.    Moreover, on almost a daily basis, Skadden professionals advise the

Debtors' management of the Debtors' rights and duties as debtors-in-possession, noting proscribed,

permitted, and required conduct.  Skadden frequently advises the Debtors' management with

respect to specific business questions posed by management and by events occurring in the

Reorganization Cases.  Part of Skadden's advice in this regard involves the participation of

Skadden in periodic planning and strategy conferences with the Debtors' senior management team.

54.    To assist the Debtors in continuing to perform their fiduciary duties,

Skadden works with the Debtors in implementing procedures for the Debtors to operate their

businesses in accordance with the requirements of the Bankruptcy Code.  Skadden reviews certain

of the Debtors' proposed expenditures, contractual relationships, dispositions of property and other

transactions to aid the Debtors in evaluating whether the contemplated transactions are within the

ordinary course of business or are outside the ordinary course of business and require Court

approval.

55.    In connection with the foregoing services, Skadden professionals expended

3,484.0 hours during the Application Period for which Skadden seeks compensation of

$1,136,809.  Detailed time entries of each Skadden professional related to these services are

attached hereto as Exhibit D-1.  A summary of the hours incurred and value of the services

performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Thomas J. Matz | $560 | 255.8 | $143,248 |
| Ron E. Meisler | $540 | 243.0 | $131,220 |
| Kayalyn A. Marafioti | $795 | 142.5 | $113,288 |
| Allison Verderber Herriott | $375 | 247.0 | $92,626 |
| Sina Toussi | $540 | 159.1 | $85,914 |
| Venera E. Ziegler | $510 | 144.4 | $73,644 |
| John (Jack) Wm. Butler, Jr. | $835 | 74.9 | $62,542 |
| Dolores De Elizalde | $440 | 78.3 | $34,452 |
| Matthew J. Micheli | $440 | 77.7 | $34,188 |
| Brian M. Fern | $485 | 45.0 | $21,826 |
| Randall G. Reese | $465 | 31.1 | $14,463 |

| Name | Rate | Time | Value |
|------|------|------|-------|
| Haim Zaltzman | $295 | 48.2 | $14,220 |
| John K. Lyons | $695 | 18.2 | $12,650 |
| Jamie Hur | $375 | 12.5 | $4,688 |
| Nathan L. Stuart | $440 | 10.6 | $4,664 |
| Paraprofessional Total | | 1,895.7 | $293,176 |
| **Total** | | **3,484.0** | **$1,136,809** |

B.    <u>Supplier Matters</u>

56.    As stated above, Delphi is the largest industrial company ever to seek

chapter 11 relief.  The Debtors' manufacturing operations depend upon the timely delivery of

goods and services from thousands of separate suppliers that are party to more than 96,000 distinct

supply agreements.  Management of the Debtors' supply chain issues was further complicated by

the Debtors' reliance, consistent with normal automotive industry practice, on "just-in-time"

inventory management systems and "sole source" supply methods.  As discussed in detail in

motions filed earlier in these cases,[16] use of the just-in-time supply method means that the Debtors

do not maintain a significant inventory of the components supplied by many of their suppliers.

Pursuant to the sole source supply method, the Debtors frequently purchase all their requirements

for a particular part from one supplier, each of which must meet demanding specifications imposed

by both the Debtors and their original equipment manufacturer ("OEM") customers before they

can be used in manufacturing the Debtors' products.

57.    The Debtors' use of just-in-time inventory management and sole source

supply methods results in, among others, the following unique risks to the Debtors' businesses:

---

[16]    <u>See</u>, <u>e.g.</u>, Motion for Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, and 1108 and Fed. R. Bankr. P. 6004 and
9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of
Financially-Distressed Sole Source Suppliers and Vendors Without Contracts, dated October 13, 2005 (Docket
No. 17); Motion for Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving
Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements, dated November 18,
2005 (Docket No. 1098).

(a) a failure by a supplier to timely ship goods may force the Debtors' manufacturing facilities using those parts to shut down less than 24 hours after the missed shipment and the Debtors' OEM customer's manufacturing facilities to shut down less than 48 hours after the missed shipment, and (b) the Debtors are unable to re-source parts to another supplier in the short term.  The Debtors' postfiling supply chain management has been further complicated by the fact that many of the Debtors' suppliers are facing similar financial pressures to those faced by the Debtors and are in a tenuous financial position as well.  The financial instability of some such suppliers was significantly exacerbated by the Debtors' chapter 11 filings and the large prepetition amounts owed to suppliers at the time of the Debtors' filings.

58.    Therefore, one of the most challenging aspects during the early days of these Reorganization Cases was to ensure the continuity of the Debtors' supply chain and to avoid any interruptions of the supply of the Debtors' products to their OEM and other customers.  To address these issues, the Debtors, with the assistance of Skadden professionals, sought and received certain "first day" relief allowing payments to those categories of suppliers that posed the greatest risk of interruption in the Debtors' supply chain.  Through the end of the Application Period, the Debtors had received more than 1,600 requests for payment under those "first day" orders, many of which required the completion of substantial due diligence to evaluate and determine the propriety of such request.  Nevertheless, with the assistance of Skadden professionals, the majority of these requests were resolved during the Application Period.  Indeed, throughout the Application Period, Skadden professionals worked closely with the Debtors and their other professionals to implement the "first day" relief granted by the Court and respond to the numerous requests received with respect thereto.

59.    In addition, the Debtors' Global Supply Management personnel, in close cooperation with Skadden professionals and representatives from the Debtors' financial advisors and other functional groups, organized and staffed a Supplier Support Center to field and respond to inquiries from the Debtors' suppliers.  During the first two months of these Reorganization Cases, the Debtors' Supplier Support Center received and responded to over 12,500 calls from suppliers and other interested parties.  Many of these calls were requests for payment under one or more of the "first day" orders, requests for changes in payment terms, or other requests which required involvement of Skadden professionals in responding to and resolving such requests.

60.    Further complicating the Debtors' attempts to avoid any disruption to their supply chain during the Application Period was the fact that over 11,000 of the Debtors' contracts with their suppliers were due to expire on or about December 31, 2005, absent a further extension. The Debtors' continuing manufacturing operations necessitated the extension of nearly 7,000 of such expiring supply agreements.  Therefore, Skadden professionals worked closely with the Debtors' personnel to address these critical issues, culminating in the filing of the Motion for an Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements (Docket No. 1098) (the "Supplier Agreement Assumption Procedures Motion") on November 18, 2005.  Nearly 70 parties filed objections to the Supplier Agreement Assumption Procedures Motion, requiring Skadden professionals to expend significant efforts to respond to and negotiate resolution of such objections.  Prior to the Court's hearing on the Supplier Agreement Assumption Procedures Motion, the vast majority of the objections to the Motion were resolved and an order granting the relief sought was entered by the Court on December 12, 2005 (the "Supplier Agreement Assumption Procedures Order").

61.    In connection with the Supplier Agreement Assumption Procedures Motion, Skadden worked closely with the Debtors' financial advisors and employees to develop and implement procedures to effectively and rapidly address issues relating to expiring supply agreements and implementation of the relief granted by the Court pursuant to the Supplier Agreement Assumption Procedures Order.  During the Application Period, Skadden also spent a significant amount of time negotiating with suppliers regarding the extension or replacement of expiring supply agreements, including pursuant to the procedures approved by the Court in the Supplier Agreement Assumption Procedures Order.  These efforts have resulted in the Debtors' successful extension of approximately 99.5% of all expiring supply agreements which were necessary to the Debtors' on-going operations.[17]

62.    In connection with the foregoing services, Skadden professionals expended 1,904.5 hours during the Application Period for which Skadden seeks compensation of $1,032,388.  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-2.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| John K. Lyons | $695 | 548.9 | $381,486 |
| Randall G. Reese | $465 | 681.5 | $316,898 |
| John (Jack) Wm. Butler, Jr. | $835 | 68.2 | $56,948 |
| Kayalyn A. Marafioti | $795 | 58.4 | $46,429 |
| Allison Verderber Herriott | $375 | 114.3 | $42,863 |
| David E. Springer | $755 | 52.3 | $39,487 |
| Matthew J. Micheli | $440 | 85.0 | $37,400 |
| Ron E. Meisler | $540 | 62.5 | $33,750 |

---

[17]    The remaining 0.5% represent fewer than 40 contracts.  With the assistance of Skadden and their other outside advisors, the Debtors have successfully managed those situations and have not suffered any supply interruptions as a result of any expiring or expired contracts to date.

| Name | Rate | Time | Value |
|---|---|---|---|
| Thomas J. Matz | $560 | 59.1 | $33,096 |
| Sina Toussi | $540 | 24.4 | $13,176 |
| Haim Zaltzman | $295 | 21.5 | $6,343 |
| N. Lynn Hiestand | $835 | 3.7 | $3,090 |
| Delores De Elizalde | $440 | 5.9 | $2,596 |
| Nathan L. Stuart | $440 | 5.3 | $2,332 |
| Chris L. Dickerson | $540 | 3.2 | $1,728 |
| Paraprofessional Total | | 110.3 | $14,766 |
| **Total** | | **1,904.5** | **$1,032,388** |

C.    <u>Tax Matters</u>

63.    A significant portion of Skadden's work on tax matters during the Application Period related to the drafting and negotiation of the interim and final trading orders that established certain restrictions on the trading of equity in Delphi or claims against the Debtors to preserve substantial tax attributes of the Debtors (each, the "Interim Trading Order" and the "Final Trading Order").  The Debtors have substantial net operating loss carryforwards, amortizable research and experimental expenditures, and other tax attributes that could provide potential future tax savings for the Debtors well in excess of $1 billion.  Unrestricted trading in the equity of the Delphi and claims against the Debtors, however, could jeopardize the Debtors' ability to fully utilize these tax attributes in the future.   Accordingly, to preserve these valuable tax assets, Skadden spent substantial time and effort drafting, and negotiating with various interested parties, the provisions of the Interim Trading Order and Final Trading Order, which place certain limited restrictions on the trading in equity of Delphi and claims against the Debtors.  The Debtors felt that substantial work by Skadden was warranted in light of the significant magnitude of the tax attributes.

64.    Prior to the Application Period, Skadden drafted the motion for the Interim

Trading Order and filed that motion with the "first day" motions.  On October 11, 2005, at the "first

day" hearing, a group of investment banks objected to the Debtors' proposed interim trading order.

After some discussion at the hearing, the Court requested that the parties work to resolve the

objections by the next day.  Skadden worked diligently throughout the night negotiating with the

objectors to address the objectors' concerns regarding the proposed Interim Trading Order and

successfully crafted an agreed Interim Trading Order that temporarily addressed the objectors'

concerns while still protecting the Debtors' ability to fully utilize its substantial tax attributes.  The

Court entered the mutually-acceptable Interim Trading Order on October 12, 2005.  The parties

agreed to negotiate a permanent resolution to the objections and incorporate such resolution into a

Final Trading Order.

65.    After the entry of the Interim Trading Order, Skadden spent substantial time

negotiating with those objectors and other parties who raised formal and informal objections to the

Interim Trading Order to formulate the Final Trading Order.  The Final Trading Order was the

focus of significant attention and input by the Creditors' Committee and various holders of claims

and equity interests.  Numerous parties either formally objected to the Interim Trading Order or

expressed a willingness to formally object if their concerns were not addressed (collectively, the

"Trading Objectors").  Four parties objected to or expressed concerns with the provisions of the

Interim Trading Order that related to trading in the equity of Delphi.  Another four parties objected

to or expressed concerns with the provisions of the Interim Trading Order that related to trading in

the claims against Delphi.  Over a period of months, Skadden professionals focused on responding

to and addressing the various and sometimes conflicting concerns of different groups of Trading

Objectors.  Tax, bankruptcy, and securities law expertise were required to respond to and address

32

the numerous issues raised by the Trading Objectors.  Many of the Trading Objectors' concerns

required Skadden to spend significant time researching and analyzing technical issues in a

complex area of tax law.  The negotiations with the Trading Objectors were further complicated by

the trading orders that were entered in the chapter 11 cases of Northwest Airlines Corporation and

Delta Air Lines, Inc.  See In re Northwest Airlines Corporation, Case No. 05-17930 (ALG)

(Bankr. S.D.N.Y. October 28, 2005); In re Delta Airlines, Inc., Case No. 05-17923 (PCB) (Bankr.

S.D.N.Y. December 19, 2005).  Each order represented a further evolution and refinement in the

"technology" of equity and claims trading orders in Reorganization Cases.  Accordingly, Skadden

had to substantially re-draft and re-negotiate the Debtors' proposed Final Trading Order in

response to the entry of each of the trading orders in the Northwest Airlines and Delta Air Lines

cases and new concerns raised by the Trading Objectors.

       66.    Although Skadden made every effort to accommodate the Trading

Objectors' concerns while still allowing the Debtors to preserve their ability to use their substantial

tax attributes, some Trading Objectors did not indicate a willingness to withdraw their objection

until very late in the process.  In fact, the last Trading Objector did not indicate a willingness to

withdraw its objection until the night before the January 5, 2006 omnibus hearing when the Court

heard the merits of the Final Trading Order.  Consequently, Skadden dedicated substantial time to

preparing for a full evidentiary hearing on the Final Trading Order in the event that not all of the

objections were resolved.  Skadden was required to draft responses to objections, prepare

discovery requests, prepare witnesses, prepare oral arguments, and take other steps necessary to

prepare for a contested, evidentiary hearing on the Final Trading Order before the Court.

Fortunately, just prior to the hearing, all of the Trading Objectors' concerns were ultimately

addressed, and Skadden was able to present to this Court an uncontested and agreed order for entry.

67.    In addition, throughout the Application Period, Skadden devoted substantial time to assisting the Debtors in handling the various tax issues that arose as part of the Reorganization Cases, including analysis regarding the application of the Bankruptcy Code and this Court's Orders to federal, state, and local tax laws and employment tax issues, and reviewing and commenting on tax provisions of the debtor-in-possession financing agreements. Furthermore, Skadden professionals worked closely with the Debtors to respond to various inquiries by taxing authorities concerning matters relating to payments pursuant to the "first day" order authorizing payment of certain sales, use, and trust-fund taxes.

68.    In connection with the foregoing services, Skadden professionals expended 1,557.8 hours during the Application Period for which Skadden seeks compensation of $932,086. Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-3.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
| --- | --- | --- | --- |
| Daniel P. Phillips | $540 | 497.3 | $268,542 |
| Cliff Gross | $770 | 278.6 | $214,522 |
| Eric B. Sensenbrenner | $560 | 377.5 | $211,400 |
| Thomas J. Matz | $560 | 91.2 | $51,072 |
| Kayalyn A. Marafioti | $795 | 64.1 | $50,960 |
| Aaron S. Feinberg | $465 | 86.1 | $40,037 |
| David E. Springer | $755 | 38.3 | $28,917 |
| Justin L. Heather | $465 | 30.2 | $14,043 |
| Chris L. Dickerson | $540 | 24.6 | $13,284 |
| Andre LeDuc | $770 | 17.0 | $13,090 |
| Eric L. Cochran | $795 | 9.1 | $7,235 |

| Name | Rate | Time | Value |
|------|------|------|-------|
| Venera E. Ziegler | $510 | 11.9 | $6,069 |
| John (Jack) Wm. Butler, Jr. | $835 | 4.9 | $4,092 |
| Sina Toussi | $540 | 7.5 | $4,050 |
| Neil M. Leff | $785 | 1.5 | $1,178 |
| Haim Zaltzman | $295 | 3.7 | $1,092 |
| Paraprofessional Total | | 14.3 | $2,503 |
| **Total** | | **1,557.8** | **$932,086** |

D.    Employee Matters (General)

69.    As of the Petition Dates, the Company employed approximately 180,000 employees worldwide, of which 50,600 were employees in the United States at approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters. Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Petition Dates, and 96% of these are union-represented. Outside the United States, as of the same date, the Company's foreign entities employed more than 134,000 people on the Petition Dates, supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

70.    As part of the Debtors' "first day" relief, this Court authorized the Debtors to pay certain prepetition human capital obligations and to continue the related human capital benefit programs in the ordinary course of business to protect the Debtors' employees. During the Application Period, Skadden worked closely with the Debtors to assist them in implementing this relief including responding to internal and external questions. In addition, Skadden attorneys negotiated with third parties to ensure that the Debtors' employees' benefits were not interrupted during the first days of these cases.

71.    During these Reorganization Cases, the Debtors anticipate positioning the compensation programs of all of their employees at market-competitive levels. Skadden, along with other advisors to the Debtors, advised the Debtors in connection with the Debtors'

35

reassessment of the employment proposition that the Company could offer its executive workforce

in light of current U.S. and marketplace economic realities.  The result of this evaluation led to

Skadden's drafting of a motion (the "KECP Motion") to implement a key employee compensation

program based on recommendations made by the Debtors' outside compensation consultant as

adopted by the Compensation Committee of Delphi's Board of Directors.  The KECP Motion was

objected to by 11 parties: the Creditors' Committee, the U.S. Trustee, five unions, the Pension

Benefit Guaranty Corporation, the agent under the Debtors' prepetition credit facility, the

indenture trustee to Delphi's senior unsecured securities, and "the Court-appointed Lead Plaintiffs"

in the consolidated securities class action entitled In re Delphi Corp. Securities Litigation, Master

File No. 1:05-CV-2637 (NRB) (S.D.N.Y. 2005) (the "Lead Plaintiffs") (collectively, the "KECP

Objectors").  During the Application Period, Skadden served discovery on many of the KECP

Objectors, and some KECP Objectors served discovery of their own on the Debtors.  In response to

the parties' various pre-hearing discovery requests, Skadden reviewed and produced over 5,000

pages of documents related to the KECP.  Skadden also produced the declarations of their

supporting witnesses and defended them during depositions.  In addition, Skadden took the

depositions of witnesses from three union objectors.

   72. In addition to preparing for litigation over the KECP Motion, Skadden

worked closely with the Debtors during the course of negotiations with the Creditors' Committee

on the terms of the KECP.  Skadden drafted and negotiated with the Creditors' Committee detailed

and consensual safe harbor or prophylactic measures to escrow any performance-based awards in

the event that the Debtors assert a claim (or the Creditors' Committee notifies the Debtors that they

intend to obtain from the Court within a specified time period authority to file a complaint against

that participant).  Moreover, the agreed upon safe harbor provided that KECP payments would be

forfeited for those participants, if any, against whom it is determined, with respect to conduct or transactions relating to the participant's employment or affiliation with the Debtors, that he/she failed to act in good faith and in a manner the Debtors reasonably believe to be in or not opposed to the best interests of the Debtors. Skadden also assisted in the negotiation to defer until July 2006, all aspects of the KECP other than a revised, performance-based annual incentive program (the "Revised AIP") for the six-month period ending June 30, 2006. The portion of the KECP Motion relating to annual incentive plans beyond June 30, 2006 and proposed cash and equity incentive emergence awards is scheduled to be heard at the July omnibus hearing. Finally, during the Application Period, Skadden drafted an omnibus response to the objections as they pertained to the Revised AIP. The final version was completed and filed outside of the Application Period.

73.    In connection with the foregoing services, Skadden professionals expended 1,750.4 hours during the Application Period for which Skadden seeks compensation of $879,786. Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-4. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Neil MacDonald | $540 | 343.0 | $185,220 |
| David E. Springer | $755 | 207.4 | $156,588 |
| Nick D. Campanario | $465 | 305.2 | $141,919 |
| Brian M. Fern | $485 | 278.5 | $135,073 |
| John (Jack) Wm. Butler, Jr. | $835 | 58.0 | $48,431 |
| John Guzzardo | $375 | 112.6 | $42,226 |
| Allison Verderber Herriott | $375 | 82.1 | $30,788 |
| Ron E. Meisler | $540 | 47.2 | $25,488 |
| Kelly Smith-Haley | $375 | 47.6 | $17,850 |
| Neil M. Leff | $785 | 19.0 | $14,915 |
| Joshua A. Mullin | $540 | 19.9 | $10,746 |

| Name | Rate | Time | Value |
|---|---|---|---|
| Sina Toussi | $540 | 11.8 | $6,372 |
| Thomas J. Matz | $560 | 11.3 | $6,328 |
| Lanelle K. Meidan | $510 | 12.1 | $6,171 |
| Kayalyn A. Marafioti | $795 | 4.3 | $3,419 |
| Matthew J. Micheli | $440 | 6.6 | $2,904 |
| Haim Zaltzman | $295 | 9.6 | $2,832 |
| Dolores De Elizalde | $440 | 4.3 | $1,892 |
| Louis D. Wilson | $510 | 2.9 | $1,479 |
| Eric L. Cochran | $795 | 1.3 | $1,034 |
| Paraprofessional Total | | 165.7 | $38,111 |
| **Total** | | **1,750.4** | **$879,786** |

E.    Customer Matters (GM)

74.    During the Application Period, Skadden assisted the Debtors in negotiating various matters with the GM, the Debtors' largest customer and former parent.  As noted above, GM accounts for more than half of the Debtors' revenues and is party to many material agreements with the Debtors.  As the Debtors' largest customer, and potentially the largest creditor, the Debtors and their advisors negotiated extensively with GM with respect to various first-day motions in the period both before and after the Petition Dates.  This included addressing GM's concerns with respect to the DIP Financing Order, setoff rights, and customer and vendor matters.

75.    During the Application Period, Skadden professionals met with Delphi's Board of Directors and advised senior management on strategic short and long term matters concerning GM, including, without limitation, (a) discussions regarding the Debtors' transformation plan and their efforts to realign the Company's global product portfolio and manufacturing footprint, (b) negotiating with GM for financial support to effectuate a comprehensive restructuring of the Debtors' businesses while minimizing the impact upon the

Debtors' employees, (c) GM contract matters including a motion to reject certain money-losing

GM contracts, and (d) resolving setoff requests made by GM.

76.      Skadden professionals devoted considerable amounts of time throughout

the Application Period addressing each of the GM items discussed above.  Of particular note,

Skadden professionals met with and negotiated interim support payments from GM by postponing

previously agreed-upon price reductions.  Skadden professionals have also met with and discussed

with GM comprehensive solutions with regards to human capital matters relating to collective

bargaining agreements, pension plans, and OPEB liabilities.  To guide these discussions, Skadden

assisted the Debtors in strategizing and otherwise drafting documentation in an attempt to facilitate

GM's support.

77.      In addition, Skadden spent significant time beginning to review certain of

the Debtors' contracts with GM in preparation for the Debtors' motion to reject contracts under

section 365 of the Bankruptcy Code.  Primarily, Skadden, in conjunction with FTI and the Debtors,

reviewed contracts where the Debtors were providing goods to GM at a loss.  To facilitate this

process, during the Application Period, Skadden devoted significant time to conducting legal

research regarding the rejection of executory contracts, developing a diligence list to ensure the

proper review of contracts, and drafting an initial motion to reject certain GM loss contracts in the

event that a consensual resolution could not be reached.  In addition, Skadden assisted the Debtors

in reviewing expired contracts between the Debtors and GM and conducted research regarding the

Debtors' legal options with regards to performance under the expired contracts while negotiating

terms for new supply contracts with GM.

78.      Finally, Skadden professionals also analyzed and negotiated with GM

regarding the multiple setoff requests that GM has made during the Application Period, including

certain requests to effect triangular setoffs.  In conjunction with these discussions, Skadden

worked with the Debtors to evaluate and negotiate certain warranty issues raised by GM's setoff

requests.

79.    In connection with the foregoing services, Skadden professionals expended

799.7 hours during the Application Period for which Skadden seeks compensation of $458,182.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-5.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Dhananjai Shivakumar | $560 | 153.5 | $85,960 |
| Eric L. Cochran | $795 | 93.3 | $74,174 |
| Kayalyn A. Marafioti | $795 | 81.7 | $64,952 |
| Nathan L. Stuart | $440 | 92.6 | $40,744 |
| Sina Toussi | $540 | 64.4 | $34,776 |
| John (Jack) Wm. Butler, Jr. | $835 | 40.9 | $34,152 |
| Venera E. Ziegler | $510 | 56.7 | $28,917 |
| David E. Springer | $755 | 17.2 | $12,986 |
| Haim Zaltzman | $295 | 42.6 | $12,567 |
| William M. Rohner | $440 | 25.1 | $11,044 |
| Thomas J. Matz | $560 | 17.3 | $9,688 |
| Marie L. Gibson | $540 | 16.1 | $8,694 |
| John Guzzardo | $375 | 22.8 | $8,550 |
| Jamie Hur | $375 | 17.3 | $6,488 |
| Ron E. Meisler | $540 | 11.2 | $6,048 |
| Gregory O. Ogunsanya | $440 | 11.2 | $4,928 |
| Melissa T. Kahn | $410 | 8.1 | $3,321 |
| Peter Olasky | $375 | 8.8 | $3,300 |
| John K. Lyons | $695 | 3.5 | $2,433 |
| Kenneth Berlin | $770 | 1.7 | $1,309 |
| Paraprofessional Total | | 13.7 | $3,151 |
| **Total** | | **799.7** | **$458,182** |

40

F.    Creditor Meetings/Statutory Committees

80.    This category of time relates to meetings with various creditor constituencies, and, in particular, the Creditors' Committee and its legal and financial advisors. Thus, on October 17, 2005, shortly after commencement of these Reorganization Cases, Skadden professionals advised the Debtors with respect to, and attended, the organizational meeting conducted by the U.S. Trustee, at which the Creditors' Committee was organized and retained counsel.  In addition, during the Application Period, Skadden assisted the Debtors in its preparations for the section 341 meeting of creditors, which was held on February 3, 2006 – three days after the conclusion of the Application Period.

81.    Shortly after formation of the Creditors' Committee and the appointment of the Creditors' Committee's professionals, Skadden assisted the Debtors and their other advisors in responding to information requests by the Creditors' Committee's professionals pursuant to which the Debtors provided substantial background information to the Creditors' Committee on such matters as the Debtors' history, corporate structure, and financial situation.  Throughout the Application Period, Skadden has assisted the Debtors and their other advisors in working with the Creditors' Committee and its professionals on continuing information and related requests.

82.    In addition, throughout the Application Period, Skadden attorneys have communicated extensively with the Creditors' Committee's representatives regarding the progress and status of the Reorganization Cases.  In addition to almost daily communications, Skadden organized and represented the Debtors at periodic meetings with the Creditors' Committee and its professionals.  These meetings, three of which were held during the Application Period and one of which was held on February 2, 2006 – two days outside the Application Period – have allowed the Debtors to keep the Creditors' Committee members and its professionals informed as to upcoming

41

issues, such as motions to be heard at the monthly omnibus hearings, and to address any concerns that the Creditors' Committee may have with respect to such issues.  Skadden assisted the Debtors in substantial preparation for these meetings, including the coordination of financial information and status reports on implementation of various orders and relevant other matters.

83.    The Debtors believe that these efforts to keep the Creditors' Committee fully informed have created a constructive working relationship.  As a result, many issues are addressed and resolved out of Court thereby avoiding unnecessary litigation between the Debtors and their creditor constituencies.

84.    Furthermore, as the Court is aware, the U.S. Trustee received a number of requests by various parties seeking appointment to the Creditors' Committee, one of which resulted in litigation in this Court during the Application Period.  Skadden worked closely with the Debtors in order to evaluate these requests and respond to the U.S. Trustee's inquiries regarding the Debtors' position on these requests.  Of particular note was the request of Law Debenture Trust Company of New York ("Law Debenture").  Before the U.S. Trustee even responded to the request, Law Debenture filed a motion requesting the Court to intervene and direct its appointment to the Creditors' Committee.  Skadden worked with the Debtors to evaluate the request, drafted and filed an objection to the motion, and then articulated on the record the Debtors' position on the matter.

85.    In addition to evaluating and responding to requests directing appointment to the Creditors' Committee, Skadden has also worked closely with the Debtors to respond to requests to form additional committees in these cases, including a retiree committee and an equity committee.  In that regard, and of particular note, during the Application Period, Appaloosa Management L.P. ("Appaloosa") first submitted a request to the U.S. Trustee for the establishment

of an equity committee.  The Debtors evaluated this request with the assistance of Skadden and in

consultation with the Board of Directors, and determined not to support Appaloosa's request.

Accordingly, Skadden drafted and submitted a letter to the U.S. Trustee communicating the

Debtors' opposition.  Immediately following this correspondence, and prior to a response from the

U.S. Trustee, Appaloosa filed a motion requesting that the Court direct the U.S. Trustee to appoint

an equity committee and served an extensive discovery request on the Debtors.  While the hearing

on this motion was continued until after the Application Period, discovery was ongoing.  As a

result, during the Application Period, Skadden spent considerable time participating in multiple

meet and confers with Appaloosa and assisting the Debtors with assembling and reviewing

thousands of pages of materials in response to Appaloosa's various discovery requests.

      86.     In connection with the foregoing services, Skadden professionals expended

765.9 hours during the Application Period for which Skadden seeks compensation of $415,954.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-6.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| John (Jack) Wm. Butler, Jr. | $835 | 113.8 | $95,023 |
| Ron E. Meisler | $540 | 137.4 | $74,196 |
| Allison Verderber Herriott | $375 | 150.1 | $56,288 |
| Kayalyn A. Marafioti | $795 | 48.5 | $38,558 |
| Sina Toussi | $540 | 56.8 | $30,672 |
| Thomas J. Matz | $560 | 44.4 | $24,864 |
| Nathan L. Stuart | $440 | 51.5 | $22,660 |
| Randall G. Reese | $465 | 38.7 | $17,997 |
| Neil MacDonald | $540 | 25.5 | $13,770 |
| David E. Springer | $755 | 15.8 | $11,929 |
| Dolores De Elizalde | $440 | 17.2 | $7,568 |

| Name | Rate | Time | Value |
|------|------|------|-------|
| Eric L. Cochran | $795 | 8.3 | $6,600 |
| Venera E. Ziegler | $510 | 8.6 | $4,386 |
| John Guzzardo | $375 | 7.9 | $2,963 |
| Jamie Hur | $375 | 4.4 | $1,650 |
| Haim Zaltzman | $295 | 5.5 | $1,623 |
| Paraprofessional Total | | 31.5 | $5,207 |
| **Total** | | **765.9** | **$415,954** |

G.    Employee Matters (Labor Unions)

87.    As of the Petition Dates, nearly all of the Debtors' approximately 34,750 hourly employees in the United States were (and still are) represented by three principal unions – the UAW, which represents approximately 70% of the Debtors' hourly workforce; the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America, (the "IUE-CWA"), which represents approximately 25% of the hourly workforce; and the United Steelworkers of America, Local 87 (the "USWA"), which represents nearly 3% of the hourly workforce.  The Debtors have master collective bargaining agreements with each of these three unions as well as "local agreements" with affiliated local unions covering primarily local issues that are worksite or business specific. The Debtors also have collective bargaining agreements with three other unions representing a smaller segment of the U.S. hourly workforce – the International Association of Machinists and Aerospace Workers (the "IAM"), the International Brotherhood of Electrical Workers (the "IBEW"), and the International Union of Operating Engineers (the "IUOE") (the six foregoing unions (the UAW, IUE-CWA, USWA, IAM, IBEW, and IUOE) being referred to herein collectively as the "Unions").

88.    One of the primary challenges facing the Debtors in achieving a successful reorganization will be to address the unsustainable U.S. legacy liabilities and operational

restrictions created by the Debtors' various labor agreements with the Unions.  Many of the

provisions in these agreements have complicated terms and histories, arising in part from the fact

that they were inherited by the Debtors from GM at the time of the Debtors' spin-off from GM in

1999, and, subsequent to 1999, through certain agreements with the UAW that require the Debtors

to "mirror" GM's labor agreements.  The labor agreements themselves are both voluminous and

intricate in detail.  They contain a broad array of commitments and a number of provisions that

must be eliminated or modified in order for the Debtors to reorganize successfully, including (a)

restrictions preventing the Debtors from exiting non-strategic, non-profitable operations and (b)

obligations requiring the Debtors to maintain wage, benefit, and staffing levels significantly higher

than those provided or maintained by the Debtors' competitors.

      89.    In recognition of the importance that resolution of the Debtors' U.S. labor

issues will play in the reorganization process, during the Application Period, Skadden

professionals worked with special labor and benefits counsel to provide the Debtors with

comprehensive assistance in examining labor issues and formulating an overall labor strategy,

including in reviewing and advising the Debtors of their rights, liabilities and obligations under

their labor-related spin-off agreements with GM and their labor agreements with the Unions,

providing input and guidance in the Debtors' working group meetings on labor issues, reviewing

proposals and presentations to the Unions, assisting the Debtors in making materials available to

the Unions and financial advisors retained by the UAW and the IUE-CWA, and engaging in

negotiations with the UAW and IUE-CWA in response to their request to have the Debtors pay

their respective financial advisors' fees and expenses to ensure the full participation of the Unions

in reorganization discussions.  As mentioned above, throughout the Application Period, Skadden

also worked closely (being mindful not to duplicate efforts) with O'Melveny & Myers, LLP and

Groom Law Group, special labor counsel and special employee benefits counsel, respectively,

retained by the Debtors to advise with respect to the filing of the Debtors' motion under sections

1113 and 1114 of the U.S. Bankruptcy Code to initiate the process of seeking court authorization

to reject their collective bargaining agreements and to modify hourly post-retirement health care

plans and life insurance for hourly retirees.

        90.     In connection with the foregoing services, Skadden professionals expended

705.4 hours during the Application Period for which Skadden seeks compensation of $414,991.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-7.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| John P. Furfaro | $770 | 180.0 | $138,600 |
| Louis D. Wilson | $510 | 217.7 | $111,027 |
| John (Jack) Wm. Butler, Jr. | $835 | 54.7 | $45,675 |
| Ronald D. Kohut | $410 | 98.8 | $40,508 |
| Neil MacDonald | $540 | 24.2 | $13,068 |
| Kayalyn A. Marafioti | $795 | 15.6 | $12,403 |
| John K. Lyons | $695 | 17.4 | $12,093 |
| Thomas J. Matz | $560 | 18.4 | $10,304 |
| Daniel Silverman | $560 | 17.3 | $9,688 |
| Julie R. Boden | $375 | 14.3 | $5,363 |
| Nathan L. Stuart | $440 | 10.0 | $4,400 |
| Haim Zaltzman | $295 | 11.6 | $3,422 |
| Brian M. Fern | $485 | 7.0 | $3,395 |
| Sina Toussi | $540 | 2.7 | $1,458 |
| Ron E. Meisler | $540 | 2.3 | $1,242 |
| Paraprofessional Total | | 13.4 | $2,345 |
| **Total** | | **705.4** | **$414,991** |

Matters Between $100,000 And $400,000

H.    Retention/Fee Matters/Objections (Others)

91.    Reorganization Cases as large and complex as these require the coordinated efforts of a number of restructuring advisors and professionals.  To this end, during the Application Period, Skadden professionals worked with the Debtors and their other professionals in retaining approximately 12 such professionals in these cases, including, among others, Deloitte & Touche LLP ("Deloitte") as auditors and accountants for fiscal year 2005, Ernst & Young LLP as Sarbanes-Oxley, valuation, and tax services providers, FTI Consulting, Inc. as restructuring and financial advisors, Groom Law Group Chartered as special employee benefits counsel, Jones Lang LaSalle Americas, Inc. as real estate transaction and services providers, O'Melveny & Myers LLP as special labor counsel, Rothschild Inc. ("Rothschild") as financial advisors and investment bankers, Shearman & Sterling LLP ("Shearman") as special counsel, Togut, Segal & Segal LLP as conflicts counsel, and Wilmer, Cutler, Pickering, Hale & Dorr LLP as special regulatory counsel. Skadden also assisted the Debtors in drafting an application to retain KCC as claims, noticing, and balloting agent.  Where necessary, Skadden conferred with the Debtors and the professionals and provided assistance with evaluating discrete issues affecting the Debtors' retention of these professionals.

92.    In addition, Skadden advised the Debtors in retaining, pursuant to the Order Under 11 U.S.C. §§ 327, 330, And 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business (the "Ordinary Course Professionals Order"), roughly 100 ordinary course professionals who provide the Debtors with a host of non-restructuring legal, accounting, and other professional services.  As the Ordinary Course Professional Order requires any ordinary course professional to file an affidavit prior to being retained and compensated by the

Debtors, Skadden assisted the Debtors in tracking which professionals had filed such affidavits and when the expiration of the individual objection periods had occurred, permitting the Debtors then to pay such ordinary course professional.

93.    In accordance with the requests of the U.S. Trustee, the Ordinary Course Professionals Order requires that any ordinary course professional whose fees exceed $50,000 per month or $500,000 in the aggregate during the pendency of these Reorganization Cases, must be retained pursuant to a formal retention application to receive future compensation from the Debtors.  Accordingly, during the Application Period, Skadden professionals assisted five of the Debtors' ordinary course professionals in preparing and filing their formal retention applications. In addition, during this period, Skadden professionals began the process of preparing additional retention applications, which were subsequently filed after this Application Period.

94.    One of the matters that required resources during the Application Period pertained to the Debtors' retention of Deloitte.  As this Court is aware, the Lead Plaintiffs objected to Deloitte's retention and moved to compel deposition testimony and production of documents of Robert J. Dellinger, Delphi's Chief Financial Officer, and members of the Audit Committee of Delphi's Board of Directors.  This matter required the preparation and filing of supplementary pleadings and resulted in a contested evidentiary hearing.  During the Application Period, Skadden attorneys assisted attorneys from Shearman in defending the Debtors' right to retain Deloitte for fiscal year 2005 and to limit deposition testimony and document production to issues related to the accounting firm's retention.  In addition, the Creditors' Committee filed a limited objection to particular isolated issues related to the retention application.  Skadden worked with the Debtors to

48

resolve these discrete matters with the Creditors' Committee. Ultimately, pursuant to an order

entered on January 17, 2006, this Court approved Deloitte's retention.[18]

95.    Another matter that required significant resources during the Application

Period pertained to the Debtors' retention of Rothschild. Although this matter was resolved

consensually, the Debtors worked to resolve discrete issues with the Creditors' Committee and the

U.S. Trustee involving the terms of Rothschild's retention in these cases. On November 30, 2005,

this Court entered an order approving Rothschild's retention.

96.    Finally, during the Application Period, Skadden and the Debtors began

working with the U.S. Trustee and the Creditors' Committee to come to a consensus regarding the

formation of a Fee Review Committee and to develop the Fee Review Protocol.

97.    In connection with the foregoing services, Skadden professionals expended

867.2 hours during the Application Period for which Skadden seeks compensation of $377,176.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-8. A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Dolores De Elizalde | $440 | 220.7 | $97,108 |
| Thomas J. Matz | $560 | 118.0 | $66,080 |
| Haim Zaltzman | $295 | 219.4 | $64,724 |
| Venera E. Ziegler | $510 | 58.3 | $29,733 |
| Marian P. Wexler | $770 | 35.7 | $27,489 |
| Catherine E. Danz | $465 | 39.0 | $18,135 |
| Sina Toussi | $540 | 27.8 | $15,012 |
| John (Jack) Wm. Butler, Jr. | $835 | 17.2 | $14,363 |
| Kayalyn A. Marafioti | $795 | 17.9 | $14,231 |

---

[18]    The Lead Plaintiffs appealed this Court's approval of Deloitte's retention and on May 26, 2006, the United States
District Court for the Southern District of New York affirmed this Court's order.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Ron E. Meisler | $540 | 16.2 | $8,748 |
| Allison Verderber Herriott | $375 | 13.2 | $4,951 |
| Randall G. Reese | $465 | 4.4 | $2,047 |
| Brian M. Fern | $485 | 2.1 | $1,019 |
| Paraprofessional Total | | 77.3 | $13,536 |
| **Total** | | **867.2** | **$377,176** |

I.    General Corporate Advice

98.    During the Application Period, Skadden professionals attended meetings of the Delphi's Board of Directors which required, among other things, working with the Debtors' various professionals and the Debtors' senior management to prepare detailed materials for distribution and discussion.  In connection with these meetings and in the course of the Debtors' daily operations, in addition to general restructuring advice, Skadden devoted a significant amount of time advising the Debtors' management and Board of Directors on other general corporate governance matters as it relates to the reorganization.

99.    Also during the Application Period, Skadden professionals advised the Debtors in connection with the preparation of the Debtors' regulatory filings, including the Debtors' Form 10-Q for the quarter ended September 30, 2005 filed with the SEC on November 9, 2005.  Skadden also assisted the Debtors in their other regulatory filings with the SEC, including the Debtors' Form 8-Ks, which are issued in connection with disclosure issues on matters such as material agreements, financial matters, and the Debtors' monthly operating reports.  Skadden also advised the Debtors with respect to other regulatory issues, including with respect to the delisting of its common stock with the New York Stock Exchange and the liquidation of the Debtors' Trust Preferred Securities.

100.    Finally, Skadden worked with the Debtors to draft a non-disclosure agreement with Law Debenture, the indenture trustee for certain of the Debtors' junior subordinated notes, to allow for the sharing of certain confidential information between the Debtors and Law Debenture.

101.    In connection with the foregoing services, Skadden professionals expended 590.5 hours during the Application Period for which Skadden seeks compensation of $340,687. Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-9.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Eric L. Cochran | $795 | 138.3 | $109,949 |
| Paola Lozano | $540 | 99.3 | $53,622 |
| Jamie Hur | $375 | 123.5 | $46,313 |
| John (Jack) Wm. Butler, Jr. | $835 | 48.6 | $40,582 |
| Marie L. Gibson | $540 | 57.5 | $31,050 |
| Kayalyn A. Marafioti | $795 | 16.1 | $12,800 |
| Gregory O. Ogunsanya | $440 | 28.2 | $12,408 |
| Sina Toussi | $540 | 18.0 | $9,720 |
| Ron E. Meisler | $540 | 13.3 | $7,182 |
| Neil M. Leff | $785 | 5.8 | $4,553 |
| Lawrence D. Frishman | $755 | 5.7 | $4,304 |
| Kenneth Berlin | $770 | 3.2 | $2,464 |
| Thomas J. Matz | $560 | 2.3 | $1,288 |
| Paraprofessional Total | | 30.7 | $4,452 |
| **Total** | | **590.5** | **$340,687** |

J.    Global Subsidiaries (Non-U.S.)

102.    During the Application Period, Skadden professionals devoted a significant amount of time advising the Company on matters relating to its non-U.S. global subsidiaries

including divestitures, commercial and corporate transactions, and cash management matters that have arisen in the Company's overseas operations.

103.    For example, Skadden professionals gave detailed advice about the reconstruction and consolidation of the Company's Austrian subsidiaries, which eliminated one of the Austrian holding companies so that both of the Company's Austrian operating companies could be owned by one Austrian holding company.  This was effected to realize considerable tax savings for the Company.  A motion to approve the transaction was filed on November 23, 2005, and an order was granted by the Court on December 20, 2005.  In addition, Skadden professionals assisted and advised the Debtors regarding the sale of Shanghai Delco Electronics & Instrumentation Company Ltd. ("SDE"), a Chinese joint venture, to the joint venture partner.  During the Application Period, Skadden commenced drafting a motion seeking court approval for this sale.[19]  Finally, during the Application Period Skadden professionals advised the Company in relation to proposed strategic arrangements aimed at increasing the Company's market share in certain of its global businesses.

104.    Furthermore, during the Application Period, Skadden and the Debtors engaged in analyses regarding many discrete issues involving their global subsidiaries.  For example, Skadden began evaluating the Debtors' ability to make investments in certain of their subsidiaries which impact the Debtors' global customers.  In addition, Skadden and the Debtors analyzed setoff issues in the global context including setoffs between non-U.S. global subsidiaries and international suppliers.  Finally, Skadden advised the Debtors regarding analyses of supply relationships with certain of its Mexican affiliates.

---

[19]    This matter was heard at the March 9, 2006 omnibus hearing and the Court signed the order on March 17, 2006 (Docket No. 2859).

105.    In connection with the foregoing services, Skadden professionals expended 534.6 hours during the Application Period for which Skadden seeks compensation of $330,534. Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-10.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Christian Pilkington | $540 | 244.5 | $132,030 |
| N. Lynn Hiestand | $835 | 142.5 | $118,988 |
| Sina Toussi | $540 | 42.1 | $22,734 |
| Nathan L. Stuart | $440 | 39.4 | $17,336 |
| Ron E. Meisler | $540 | 15.8 | $8,532 |
| Kayalyn A. Marafioti | $795 | 10.7 | $8,507 |
| Thomas J. Matz | $560 | 10.8 | $6,048 |
| John (Jack) Wm. Butler, Jr. | $835 | 4.1 | $3,424 |
| Rossie E. Turman, III | $540 | 6.1 | $3,294 |
| Allison Verderber Herriott | $375 | 6.8 | $2,550 |
| Paola Lozano | $540 | 4.3 | $2,322 |
| Eric L. Cochran | $795 | 2.7 | $2,147 |
| John K. Lyons | $695 | 2.0 | $1,390 |
| Dolores De Elizalde | $440 | 2.8 | $1,232 |
| **Total** | | **534.6** | **$330,534** |

K.    Financing (DIP And Emergence)

106.    In the days prior to the Petition Dates, Skadden devoted substantial time to assisting the Debtors' senior management team, finance personnel, and the Debtors' other business advisors and special counsel, Shearman, in evaluating the size of the debtor-in-possession credit facility (the "Original DIP Credit Facility") and considering their options in obtaining it.  Skadden and Shearman were well coordinated with respect to tasks to be completed and worked carefully to avoid duplicating efforts.  As a result of these efforts, at the "first day" hearing, the Debtors were

granted approval by this Court, pursuant to an interim order, to use up to $950 million of the

Original DIP Credit Facility.  Because some of the loan documentation was not finalized prior to

the "first day" hearing, the Debtors were involved in negotiations and drafting sessions with their

lenders.  Although Shearman was primarily responsible for the documentation related to the

Original DIP Credit Facility as well as closing the facility, Skadden provided assistance to

Shearman and worked with the Debtors and their lenders in negotiating the terms of the facility

and assisted in preparing certain of the related documents.

107.    The Original DIP Credit Facility was subsequently amended by the First

Amendment to the DIP Credit Facility, dated October 27, 2005 (the "First Amended DIP Credit

Facility").  This credit facility provides the Debtors with the ability to borrow up to $2.0 billion

from a syndicate of lenders arranged by J.P. Morgan Securities Inc. and Citigroup Global Markets,

Inc., for which JPMorgan Chase Bank, N.A. is the administrative agent (the "Administrative

Agent") and Citicorp USA, Inc., is syndication agent (together with the Administrative Agent, the

"Agents").  Specifically, the DIP credit facility consists of a $1.75 billion revolving facility and a

$250 million term loan facility (collectively, the "Amended DIP Loans").  Similar to the Original

DIP Credit Facility, while Shearman had primary responsibility for documenting the amendments,

Skadden assisted the Debtors in negotiating the terms of these amendments and provided some

assistance with respect to reviewing and drafting related documents.

108.    Leading up to the hearing for final approval of the Debtors' DIP credit

facility, Skadden assisted the Debtors and their other professionals, including Shearman, in

resolving more than three dozen objections.  Despite the number and varied nature of objections,

the Debtors, with the assistance of their professionals, including Skadden and Shearman,

succeeded in negotiating resolutions to all these matters and Skadden professionals presented to

54

this Court an agreed final order for entry.  Accordingly, on October 28, 2005, the Court granted, on

a final basis, the Debtors' motion for approval of the DIP financing order, which approved the First

Amended DIP Credit Facility, providing the Debtors' access to $2 billion in DIP financing subject

to the terms and conditions set forth in the DIP financing documents, as amended, and an adequate

protection package for the lenders to the prepetition credit facilities as well as to those parties

asserting rights of setoff against the Debtors (the "DIP Financing Order").

109.    Subsequently and in accordance with the DIP Financing Order, the Debtors

further amended their DIP credit facility by entering into that certain Amended and Restated

Revolving Credit, Term Loan and Guaranty Agreement, dated November 21, 2005 (the "Second

Amended DIP Facility").  The Second Amended DIP Facility, among other things, adds new

lenders to the DIP Credit Facility, increases the interest rate that was provided under the DIP

Credit Facility, and alters the provisions regarding future amendments.  The documents

evidencing the Original DIP Credit Facility, the First Amended DIP Credit Facility, and the

Second Amended DIP Facility, including the final order entered by this Court on October 28,

2005, were especially voluminous and complex, including borrowing base and financial covenant

provisions.  These provisions were the focus of significant attention and input by the Debtors and

other parties in interest and Skadden attorneys assisted the Debtors with their analysis.

110.    Additionally, during the Application Period, Skadden devoted significant

time and effort to matters arising during the negotiation of the Amended DIP Loan's

documentation.  They included (a) negotiating potential financing arrangements to ensure liquidity

for non-Debtor subsidiaries and (b) negotiating arrangements with certain prepetition creditors

(including counter-parties to various ISDA documentation representing hedging arrangements and

the lessors under aircraft leases).

111.    In connection with the foregoing services, Skadden professionals expended

518.5 hours during the Application Period for which Skadden seeks compensation of $296,608.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-11.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Lawrence D. Frishman | $755 | 127.9 | $96,565 |
| John (Jack) Wm. Butler, Jr. | $835 | 36.3 | $30,311 |
| Patrick J. Nash, Jr. | $510 | 56.6 | $28,866 |
| Ron E. Meisler | $540 | 49.3 | $26,622 |
| Kayalyn A. Marafioti | $795 | 31.2 | $24,804 |
| Sina Toussi | $540 | 45.1 | $24,354 |
| Rossie E. Turman, III | $540 | 21.0 | $11,340 |
| Paola Lozano | $540 | 19.7 | $10,638 |
| Eric L. Cochran | $795 | 10.3 | $8,189 |
| Matthew J. Micheli | $440 | 16.9 | $7,436 |
| Jamie Hur | $375 | 12.5 | $4,688 |
| Thomas J. Matz | $560 | 5.3 | $2,968 |
| David E. Springer | $755 | 2.4 | $1,812 |
| Kenneth Berlin | $770 | 1.7 | $1,309 |
| Allison Verderber Herriott | $375 | 2.7 | $1,013 |
| Paraprofessional Total | | 79.6 | $15,693 |
| **Total** | | **518.5** | **$296,608** |

L.    Utilities

112.    As of the Petition Dates, the Debtors obtained utility service from

approximately 162 utilities nationwide.  Together, the utilities provide service to the Debtors under

roughly 850 separate billing accounts.  During the Application Period, Skadden professionals

worked to ensure that the Debtors would have uninterrupted utility service at each of the Debtors'

locations throughout the country in accordance with section 366 of the Bankruptcy Code.  To this

end, Skadden obtained from this Court, on behalf of the Debtors, entry of an interim order (the

"Interim Utilities Order") and a final order (the "Final Utilities Order") prohibiting the utilities

from disconnecting service and establishing global procedures for addressing adequate assurance

demands that, among other things, allowed the Debtors a reasonable period of time to respond to

such demands without the threat that service would be terminated prematurely.

113.    During the Application Period, nine utilities filed objections to the Interim

Utilities Order objecting to the adequate assurance procedures and seeking deposits as adequate

assurance of future performance totaling over $7 million (the "Utilities Objections").  Skadden

attorneys engaged in extensive negotiation with the objecting utilities, prepared responses to the

Utilities Objections, and prepared settlement agreements resolving the utilities' concerns.  In

addition, during the Application Period, 30 other utilities submitted requests for deposits totaling

over $1.5 million.  While some of these requests were timely, complied with the Final Utilities

Order, and thus were consensually and promptly resolved, most of the requests were either late or

otherwise invalid due to the utilities' failure to comply with the Final Utilities Order.  Skadden

attorneys reviewed and responded to every adequate assurance request and, where necessary,

engaged in negotiations with utility companies.

114.    In connection with the foregoing services, Skadden professionals expended

577.2 hours during the Application Period for which Skadden seeks compensation of $295,549.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-12.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Venera E. Ziegler | $510 | 453.6 | $231,336 |
| Thomas J. Matz | $560 | 64.2 | $35,952 |

| Name | Rate | Time | Value |
|---|---|---|---|
| Dolores De Elizalde | $440 | 21.5 | $9,460 |
| Sina Toussi | $540 | 13.7 | $7,398 |
| Ron E. Meisler | $540 | 7.6 | $4,104 |
| Kayalyn A. Marafioti | $795 | 4.8 | $3,817 |
| Haim Zaltzman | $295 | 11.8 | $3,482 |
| **Total** | | **577.2** | **$295,549** |

M.      Nonworking Travel Time

115.      Because of the extensive breadth of services that Skadden is providing the
Debtors in these Reorganization Cases, Skadden draws upon the experience and talent of a number
professionals from its worldwide organization including offices located in Chicago, New York,
Washington, D.C., and London, England.  As this Court is aware, the Debtors are headquartered in
Troy, Michigan, a suburb of Detroit, members of the Creditors' Committee are based in several
states across the U.S., the Debtors postpetition lenders are based in New York and many of the
Debtors' other primary constituencies, including its unions and GM, are based in Michigan.  As a
consequence of these disparate locations, Skadden professionals frequently must travel among
these and other locations as necessary to meet with the Debtors' Board of Directors and senior
management, creditor constituencies, and to attend Court hearings.  Skadden's professionals who
spend time traveling, but not otherwise working, allocate their time to this billing category.

116.      Skadden professionals expended 984.4 hours during the Application
Period devoted to non-working travel time for which Skadden seeks compensation of $290,270.
This amount reflects a fifty percent (50%) reduction from Skadden's guideline hourly rates.
Detailed time entries of each Skadden professional are attached hereto as Exhibit D-13.  A
summary of the hours incurred and value of the travel time for each professional is provided in the
following table:

58

| Name | Rate | Time | Value |
|------|------|------|-------|
| John (Jack) Wm. Butler, Jr. | $418 | 165.9 | $69,264 |
| John K. Lyons | $348 | 110.8 | $38,503 |
| Randall G. Reese | $233 | 162.8 | $37,851 |
| Ron E. Meisler | $270 | 119.5 | $32,265 |
| Allison Verderber Herriott | $188 | 104.0 | $19,500 |
| John P. Furfaro | $385 | 33.4 | $12,860 |
| David E. Springer | $378 | 29.8 | $11,250 |
| Marian P. Wexler | $385 | 21.9 | $8,432 |
| Kayalyn A. Marafioti | $398 | 21.0 | $8,348 |
| Matthew J. Micheli | $220 | 37.3 | $8,206 |
| Eric. L. Cochran | $398 | 19.8 | $7,871 |
| Kenneth Berlin | $385 | 12.5 | $4,813 |
| Nick D. Campanario | $233 | 13.1 | $3,046 |
| Thomas J. Matz | $280 | 10.4 | $2,912 |
| Catherine E. Danz | $232 | 12.5 | $2,906 |
| Patrick J. Nash, Jr. | $255 | 10.5 | $2,678 |
| Nathan L. Stuart | $220 | 10.3 | $2,266 |
| Dhananjai Shivakumar | $280 | 7.5 | $2,100 |
| Sina Toussi | $270 | 7.5 | $2,025 |
| Eric B. Sensenbrenner | $280 | 6.0 | $1,680 |
| N. Lynn Hiestand | $417 | 3.9 | $1,628 |
| Dolores De Elizalde | $220 | 7.2 | $1,584 |
| Neil MacDonald | $270 | 4.7 | $1,269 |
| Brian M. Fern | $242 | 4.9 | $1,188 |
| Melissa T. Kahn | $205 | 5.5 | $1,128 |
| Paraprofessional Total | | 41.7 | $4,697 |
| **Total** | | **984.4** | **$290,270** |

N.    Business Operations / Strategic Planning

117.    This particular matter is comprised of time incurred by Skadden professionals in working with the Debtors' senior management, investment bankers, financial advisors, and other business and legal advisors in considering restructuring strategies and

initiatives.  At the commencement of these cases, Skadden professionals participated in a number

of planning sessions to facilitate the launch of the Reorganization Cases.

118.    Skadden professionals also participated in numerous strategy sessions,

meetings, and calls to consider such major case issues as Delphi's development of a 2006

transformation plan, Delphi's development of a comprehensive, go-forward and a 2006-10

restructuring business plan, and various scenarios, considerations, and ramifications regarding the

Reorganization Cases.  Furthermore, Skadden assisted the Debtors with respect to operational

issues as they related to these Reorganization Cases, including, without limitation, conducting

negotiations with the Creditors' Committee regarding cash management and finalizing the terms of

that order, as well as analyzing certain proposed strategic intercompany transactions.  Finally,

Skadden professionals worked with the Debtors' in-house attorneys and key business personnel to

explain certain common issues that arise in many chapter 11 cases.

119.    In connection with the foregoing services, Skadden professionals expended

386.4 hours during the Application Period for which Skadden seeks compensation of $258,753.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-14.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| John (Jack) Wm. Butler, Jr. | $835 | 114.0 | $95,190 |
| Eric L. Cochran | $795 | 66.2 | $52,629 |
| Ron E. Meisler | $540 | 56.0 | $30,240 |
| Kayalyn A. Marafioti | $795 | 20.7 | $16,458 |
| Thomas J. Matz | $560 | 25.4 | $14,224 |
| Matthew J. Micheli | $440 | 22.5 | $9,900 |
| John K. Lyons | $695 | 13.1 | $9,105 |
| Allison Verderber Herriott | $375 | 21.9 | $8,213 |

60

| Name | Rate | Time | Value |
|------|------|------|-------|
| Randall G. Reese | $465 | 12.5 | $5,814 |
| Sina Toussi | $540 | 9.4 | $5,076 |
| Venera E. Ziegler | $510 | 9.8 | $4,998 |
| Nathan L. Stuart | $440 | 5.1 | $2,244 |
| Haim Zaltzman | $295 | 6.0 | $1,770 |
| David E. Springer | $755 | 2.3 | $1,737 |
| Marian P. Wexler | $770 | 1.5 | $1,155 |
| **Total** | | **386.4** | **$258,753** |

O.    Secured Claims

120.    In the days following the Petition Dates, Skadden devoted substantial time to assisting the Debtors' senior management team and finance personnel and the Debtors' other business advisors in connection with preparing for the October 27, 2005 hearing on the Debtors' DIP credit facility.  Specifically, in connection with the dozens of objections received to the relief requested in the Debtors' DIP financing motion, including an objection by an ad hoc committee of prepetition lenders (the "Ad Hoc Prepetition Lenders"), Skadden attorneys assisted the Debtors in reviewing the issues raised by the objecting parties.  The Debtors, with the assistance of Skadden, devoted a significant amount of resources to working with their advisors as well as their prepetition and postpetition lenders in negotiating and resolving these objections.

121.    In connection with resolving the objection filed by the Ad Hoc Prepetition Lenders, the Debtors and their advisors were involved in extensive discovery, including the taking and defending of numerous depositions.  To resolve the objection filed by the Ad Hoc Prepetition Lenders, Skadden attorneys assisted the Debtors in their negotiation of a mutually acceptable adequate protection package, which was approved by this Court pursuant to the DIP Financing Order entered on October 28, 2005.  Throughout the Application Period (and to this date), the

61

Debtors, with the assistance of Skadden professionals have continued to work and meet with their

prepetition lenders to keep them reasonably informed with respect to these Reorganization Cases.

122.    Furthermore, during the Application Period, Skadden devoted significant

time and effort in working with the Debtors and their other advisors in resolving limited cash

collateral objections that remained outstanding after entry of the final DIP Financing Order.  In

addition to objections related to cash collateral matters, Skadden professionals also devoted

significant amounts of time after entry of the DIP Financing Order on setoff claims.  Paragraph 18

of the DIP Financing Order set forth comprehensive procedures by which customers and suppliers

of the Debtors could exercise and resolve their setoff rights without having to file motions to lift

the automatic stay.  Accordingly, during the Application Period, the Debtors and their advisors

devoted significant amounts of time analyzing and resolving the approximately 75 requests by

customers and suppliers who sought to exercise setoff rights during the Application Period under

the DIP Financing Order.  In seeking to resolve these setoff claims, Skadden professionals devoted

considerable effort to tracking the setoff claims, researching their validity, and ultimately

negotiating resolutions of the claims.

123.    Skadden attorneys also dealt with a number of issues regarding assertion of

liens against the Debtors.  Indeed, the Debtors, with Skadden's assistance, analyzed whether

certain claimants could properly assert tooling liens or other statutory liens against certain of the

Debtors' assets.  As part of this analysis, Skadden worked with the Debtors to evaluate and track

complaints filed by numerous alleged lien claimants.

124.    In connection with the foregoing services, Skadden professionals expended

491.7 hours during the Application Period for which Skadden seeks compensation of $236,983.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-15.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Sina Toussi | $540 | 227.0 | $122,580 |
| Dolores De Elizalde | $440 | 92.4 | $40,656 |
| Ron E. Meisler | $540 | 35.1 | $18,954 |
| Haim Zaltzman | $295 | 55.4 | $16,344 |
| John (Jack) Wm. Butler, Jr. | $835 | 9.3 | $7,766 |
| Thomas J. Matz | $560 | 13.2 | $7,392 |
| Allison Verderber Herriott | $375 | 13.1 | $4,913 |
| Venera E. Ziegler | $510 | 9.5 | $4,845 |
| Rossie E. Turman, III | $540 | 8.2 | $4,428 |
| Randall G. Reese | $465 | 7.8 | $3,627 |
| Matthew J. Micheli | $440 | 7.0 | $3,080 |
| Paraprofessional Total | | 13.7 | $2,398 |
| **Total** | | **491.7** | **$236,983** |

P.    Reports And Schedules

125.    As described in the earlier sections of this Interim Application, there are a total of 42 debtors in these jointly-administered cases.  The Bankruptcy Code requires that separate sets of Schedules and Statements be prepared for each debtor.  The Debtors and their numerous non-debtor affiliates have historically reported their financial information on a consolidated basis.  Given the diverse assets, liabilities and operations of the various Debtors and the need to provide precise information concerning the financial and operational condition of these various entities, Skadden worked closely with the Debtors' financial, legal, operational, tax, and other personnel and the Debtors' financial advisors in preparing separate sets of Schedules and Statements for each of the Debtors.

126.    These efforts were time-consuming, detail-oriented, and laborious.  The Debtors, with the assistance of Skadden and the Debtors' financial advisors, FTI, determined that

this undertaking was necessary given the large number of constituencies and the dollar amounts involved. In the aggregate, the Schedules and Statements for the 42 Debtors include over 20,000 scheduled liabilities and nearly 347,000 scheduled executory contracts and unexpired leases, which collectively comprise roughly 22,000 pages of information. In addition, contemporaneously with the filing of their Schedules and Statements, the Debtors, with the assistance of Skadden and FTI, filed Global Notes and Statements of Limitations, Methodology and Disclaimer Regarding Debtors' Schedules and Statements setting forth the Debtors' assumptions and preparation methodology with respect to the Schedules and Statements.

127.     Skadden also worked closely with the Debtors and their financial advisors following the filing of the Schedules and Statements to resolve certain discrete issues which resulted in the Debtors' filing of certain amendments to the Schedules and Statements on February 1, 2006, one day after the end of the Application Period.

128.     The Debtors are also required to submit Monthly Operating Reports, which provide detailed information regarding the Debtors' assets, liabilities, and operations on a monthly basis. During the Application Period, Skadden professionals worked with the Debtors' finance and accounting personnel, as well as the Debtors' financial advisors and the U.S. Trustee, to prepare and file the Monthly Operating Reports.

129.     In connection with the foregoing services, Skadden professionals expended 380.1 hours during the Application Period for which Skadden seeks compensation of $187,152. Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-16. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Randall G. Reese | $465 | 156.1 | $72,587 |

| Name | Rate | Time | Value |
|------|------|------|-------|
| Allison Verderber Herriott | $375 | 95.7 | $35,888 |
| John K. Lyons | $695 | 34.4 | $23,908 |
| Thomas J. Matz | $560 | 38.6 | $21,616 |
| John (Jack) Wm. Butler, Jr. | $835 | 19.6 | $16,366 |
| Kayalyn A. Marafioti | $795 | 11.7 | $9,302 |
| Ron E. Meisler | $540 | 6.9 | $3,726 |
| Marie L. Gibson | $540 | 2.1 | $1,134 |
| Paraprofessional Total | | 15.0 | $2,625 |
| **Total** | | **380.1** | **$187,152** |

Q.    Environmental Matters

130.    Skadden professionals assisted the Debtors in their efforts to comply with environmental law while also complying with the requirements of the Bankruptcy Code. Concurrently, Skadden professionals assisted the Debtors in developing a comprehensive strategy for minimizing and managing their potential environmental liabilities with respect to properties that they currently own or operate.  This strategy covered many sites, claims, and issues. Developing the resulting strategy required numerous telephone conferences and meetings with Debtors, review and analysis of many documents, including purchase, sale and lease agreements, and analysis of certain environmental claims.  Analysis of Debtors' potential environmental liabilities raise particularly complex factual issues because, among other reasons, a large portion of those liabilities arise from actions or operations that took place before the Debtors' separation from General Motors.  As a result, research of many legal issues was required.

131.    In addition, Skadden professionals assisted the Debtors with preparation of environmental schedules, environmental disclosure language, analysis of contractor claims and the imposition of mechanics lien with respect to potential environmental liabilities, review of notices of violations and orders received from regulatory agencies, review of environmental conditions

associated with Debtors' properties in certain states, and developing provisions for resolving

potential environmental liabilities in connection with potential property sales and lease rejections.

132.    In connection with the foregoing services, Skadden professionals expended

233.8 hours during the Application Period for which Skadden seeks compensation of $163,396.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-17.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Kenneth Berlin | $770 | 135.1 | $104,027 |
| John A. Amodeo | $580 | 60.7 | $35,206 |
| Marian P. Wexler | $770 | 13.3 | $10,241 |
| Henry C. Eisenberg | $580 | 14.6 | $8,468 |
| Linda Davies | $540 | 10.1 | $5,454 |
| **Total** | | **233.8** | **$163,396** |

R.    Executory Contracts (Personalty)

133.    The Debtors estimate that, as of the Petition Dates, they were parties to

hundreds of thousands of executory contracts and leases which collectively involve billions of

dollars of liability.  During the Application Period, Skadden professionals began working closely

with dozens of internal and external representatives and employees of the Debtors to coordinate

the preliminary review of various executory contracts and, together with the Debtors' senior

management and business advisors, to evaluate contracts and leases for assumption or rejection.

To conduct the analysis, Skadden participated in frequent meetings with the Debtors' business

personnel regarding appropriate proration of invoices and postpetition payment obligations.

Moreover, Skadden participated in numerous meetings and teleconferences with contract

counterparties regarding contractual matters, termination notices, and other issues.

134.    In addition, during the Application Period, the Debtors and other parties in interest filed numerous motions concerning various executory contracts.  Specifically, during the Application Period, Skadden professionals consulted with the Debtors regarding the assumption and rejection of certain executory contracts.  These consultations led to, among other things, the drafting and filing of five motions requesting authority to assume various contracts and two motions requesting authority to reject executory contracts.  The Court granted each of the Debtors' motions and as a result, the Debtors enhanced the value of the estates for all creditors.

135.    Also, the Debtors, with the assistance of Skadden professionals, responded to numerous requests from counterparties to compel the assumption or rejection of their contracts.  In addition, four counterparties to various contracts filed motions to compel assumption or rejection of their contracts during this Application Period and many more have threatened to do the same.  Skadden professionals drafted objections to these motions to compel and litigated the merits of such requests to, among other things, protect the Debtors' right to maintain "breathing room" during these Reorganization Cases and to take the time permitted by Congress to evaluate whether to assume or reject an executory contract.  The Court ruled in favor of the Debtors on account of three of the motions.  With respect to the fourth motion, the Court found that circumstances existed to merit granting the relief requested and, following the Court's ruling, on behalf of the Debtors, Skadden drafted and filed a motion to assume that contract.

136.    In connection with the foregoing services, Skadden professionals expended 320.1 hours during the Application Period for which Skadden seeks compensation of $153,055.  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-18.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| Venera E. Ziegler | $510 | 77.9 | $39,729 |
| Matthew J. Micheli | $440 | 70.4 | $30,976 |
| Ron E. Meisler | $540 | 46.1 | $24,894 |
| Thomas J. Matz | $560 | 27.9 | $15,624 |
| Haim Zaltzman | $295 | 50.4 | $14,869 |
| Sina Toussi | $540 | 20.5 | $11,070 |
| Kayalyn A. Marafioti | $795 | 9.9 | $7,871 |
| Dolores De Elizalde | $440 | 10.0 | $4,400 |
| David E. Springer | $755 | 2.1 | $1,586 |
| Randall G. Reese | $465 | 2.2 | $1,023 |
| Allison Verderber Herriott | $375 | 2.7 | $1,013 |
| **Total** | | **320.1** | **$153,055** |

S.    Leases (Real Property)

137.    The Debtors are lessors or lessees with respect to approximately 90 leases of real property.  Skadden worked closely with the Debtors on matters related to such real property leases including (a) reviewing the Debtors' existing leases, (b) reviewing proposed new leases, (c) preserving the Debtors' right to assume, assume and assign, or reject such leases through an extension of the period within which the Debtors must assume or reject such leases under the Bankruptcy Code, and (d) conducting negotiations, drafting pleadings, and appearing for the Debtors at hearings relating to the rejection or renewal of leases (or entry into new leases) and other matters concerning the disposition of the Debtors' nonresidential real property leases.

138.    Specifically, during the Application Period, Skadden professionals spent a considerable amount of time preparing three motions relating to nonresidential real property leases:  (a) a motion to extend the deadline to assume or reject leases to June 7, 2007, without prejudice to the Debtors' right to further extend such deadline, (b) a motion approving procedures for the future rejection of leases or subleases and authorizing the Debtors to abandon certain

68

personal property associated with such leases without further Court approval, and (c) a motion

approving procedures to enter into new or renew existing leases or subleases without further Court

approval.  In addition, Skadden attorneys prepared for and attended court hearings regarding these

motions.

139.    Furthermore, during the Application Period, Skadden attorneys prepared

notices to implement the Debtors' business decisions relating to the disposition of certain leases

pursuant to the order entered by this Court approving procedures for the rejection of leases.  In

addition, the Debtors entered into new leases or renewed expiring leases pursuant to the order

entered by the Court approving procedures to enter into or renew leases.

140.    Finally, Skadden worked with the Debtors to begin to evaluate and respond

to a motion by Cherokee North Kansas City LLC ("Cherokee"), which sought to compel an

assumption or rejection of the Debtors' Kansas City, Missouri lease with Cherokee.[20]

141.    In connection with the foregoing services, Skadden professionals expended

286.8 hours during the Application Period for which Skadden seeks compensation of $143,190.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-19.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Catherine E. Danz | $465 | 77.6 | $36,085 |
| Marian P. Wexler | $770 | 41.0 | $31,570 |
| Dolores De Elizalde | $440 | 66.2 | $29,128 |
| Matthew J. Micheli | $440 | 40.9 | $17,996 |
| Ron E. Meisler | $540 | 21.2 | $11,448 |
| Haim Zaltzman | $295 | 21.7 | $6,402 |

[20]    This motion was denied at the omnibus hearing held on April 7, 2006.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Kayalyn Marafioti | $795 | 3.8 | $3,021 |
| Randall G. Reese | $465 | 5.8 | $2,698 |
| Venera E. Zeigler | $510 | 5.2 | $2,652 |
| Sina Toussi | $540 | 2.2 | $1,188 |
| John (Jack) Wm. Butler, Jr. | $835 | 1.2 | $1,002 |
| **Total** | | **286.8** | **$143,190** |

T.    <u>Claims Admin. (Reclamation/Trust Funds)</u>

142.    Given the exceptionally large number of suppliers and shipments that the Debtors receive on a continuous basis, it was inevitable that the Debtors would receive a substantial number of reclamation demands in the very early stages of these Reorganization Cases. Skadden worked with the Debtors and their business advisors to develop global procedures for receiving, reviewing, responding to, and resolving reclamation demands. Skadden successfully obtained final approval of these procedures on November 4, 2005. Moreover, due to the tremendous volume of reclamation demands received by the Debtors, on January 5, 2006, the Court granted the Debtors, through the assistance of Skadden, a 45-day extension of the deadline for the Debtors to reconcile all reclamation claims.

143.    During the Application Period, the Debtors received thousands of reclamation demands, including duplicate demands. Skadden worked closely with the Debtors and their business advisors in reviewing many of these demands and eliminating scores of duplicate claims. As a result, the Debtors, with the assistance of Skadden, identified roughly 850 non-duplicate reclamation demands containing nearly 100,000 lines of data, with a total face amount of more than $285 million.

144.    To facilitate the review process of these 850 reclamation demands, which required the Debtors to respond to all reclamation demands within 135 days, Skadden worked with

70

the Debtors and their business advisors to develop a comprehensive process for responding to all

such reclamation demands, evaluating any disagreements, and reaching agreed reclamation claim

amounts.  In implementing this process, Skadden reviewed hundreds of reclamation claims and

drafted a significant amount of correspondence, including reclamation response statements and

settlement letters.

145.    These efforts required substantial assistance from Skadden in advising the

Debtors regarding their legal obligations under the reclamation procedures, including, for instance,

evaluating foreign supplier claims and analyzing demands covering various types of inventory.  In

addition, Skadden corresponded with numerous claimants and worked with the Debtors and their

financial advisors to design training materials and process protocols for on-going negotiations

with suppliers.

146.    In connection with the foregoing services, Skadden professionals expended

417.2 hours during the Application Period for which Skadden seeks compensation of $134,926.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-20.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Matthew J. Micheli | $440 | 141.3 | $62,172 |
| Kayalyn A. Marafioti | $795 | 13.3 | $10,574 |
| Ron E. Meisler | $540 | 14.8 | $7,992 |
| Allison Verderber Herriott | $375 | 19.2 | $7,201 |
| Thomas J. Matz | $560 | 11.6 | $6,496 |
| John K. Lyons | $695 | 6.9 | $4,796 |
| Christian Pilkington | $540 | 7.4 | $3,996 |
| John (Jack) Wm. Butler, Jr. | $835 | 3.7 | $3,090 |
| Paraprofessional Total | | 199.0 | $28,609 |
| **Total** | | **417.2** | **$134,926** |

U.      Asset Dispositions (General)

147.    The Debtors have stated that to achieve the necessary cost savings and operational effectiveness envisioned in their transformation plans, a substantial segment of Delphi's U.S. business operations will need to be divested, consolidated, or wound-down through the chapter 11 process.  Thus, during the Application Period, Skadden attorneys provided advice to the Debtors regarding the disposition of assets.

148.    To facilitate the sales of de minimis assets and maximize efficiency related thereto, Skadden prepared a motion to approve procedures for selling assets without further court approval provided that the purchase price is $10 million or less for each transaction or in the aggregate for a related series of transactions.  In preparation for the procedures, Skadden worked with the Debtors to formulate internal approval procedures to track the proposed disposition of assets to provide sufficient time to both comply with closing conditions as well as to satisfy the notice procedures proscribed in the attendant order.

149.    Skadden also advised the Debtors with respect to post-closing items in relation to the Company's 2005 prepetition sale of its battery business.  In particular, Skadden analyzed the sale agreements, conducted research, and worked with the Company to evaluate the means by which the Company can transition certain remaining operations to the purchaser in compliance with the related agreements.

150.    In addition, with regard to dispositions of assets that may arise in the future, Skadden attorneys advised the Debtors regarding the auction process frequently implemented when selling significant assets of a debtor in chapter 11 and assisted the Debtors in preparing a form purchase agreement and other documentation for use in any future sale.  Finally, Skadden worked with the Debtors to research and identify other instances in which the Debtors could

72

effectuate benefits to the estate through the divestiture of certain assets.  Where such opportunities

existed, Skadden reviewed and commented on the terms of the potential divestiture.

151.    In connection with the foregoing services, Skadden professionals expended

210.6 hours during the Application Period for which Skadden seeks compensation of $117,199.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-21.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Eric L. Cochran | $795 | 32.1 | $25,520 |
| Marie L. Gibson | $540 | 41.5 | $22,410 |
| Ron E. Meisler | $540 | 28.1 | $15,174 |
| Nathan L. Stuart | $440 | 26.8 | $11,792 |
| John K. Lyons | $695 | 16.9 | $11,746 |
| Sina Toussi | $540 | 13.3 | $7,182 |
| Venera E. Ziegler | $510 | 9.6 | $4,896 |
| Haim Zaltzman | $295 | 16.0 | $4,721 |
| Thomas J. Matz | $560 | 6.9 | $3,864 |
| Gregory O. Ogunsanya | $440 | 7.5 | $3,300 |
| Dolores De Elizalde | $440 | 5.2 | $2,288 |
| Kenneth Berlin | $770 | 2.5 | $1,925 |
| Kayalyn A. Marafioti | $795 | 1.5 | $1,193 |
| Matthew J. Micheli | $440 | 2.7 | $1,188 |
| **Total** | | **210.6** | **$117,199** |

V.    Litigation (Insurance Recovery)

152.    During the Application Period, Skadden was required to devote resources to

various litigation matters.  Specifically, Skadden assisted the Debtors' special litigation counsel

with regard to multi-district litigation currently pending in the United States District Court for the

Eastern District of Michigan.  The Lead Plaintiffs, participating in the securities class action

73

component of the multi-district litigation, engaged in a three-pronged attack against the Debtors to

obtain securities-related discovery through the Bankruptcy Court. One of Lead Plaintiffs' methods

of seeking securities-related discovery was through their request for a modification of the

automatic stay to pursue discovery relating to their consolidated securities class action case. As a

result of the filing of Lead Plaintiffs' motion, Skadden conducted multiple meet and confers with

Lead Plaintiffs in an attempt to consensually resolve the matter. Ultimately, because the parties

could not consensually resolve the issue, Skadden prosecuted an objection to the Lead Plaintiffs'

motion and as a result of that objection, the motion was granted only to permit the Lead Plaintiffs

to apply to the United States District Court for the Eastern District of Michigan for a modification

of the PSLRA stay and, to the extent the PSLRA stay is lifted, Lead Plaintiffs have the right to

return to this Court to seek modification of the stay for the discovery of documents permitted by

the District Court.

    153. In connection with the foregoing services, Skadden professionals expended

175.5 hours during the Application Period for which Skadden seeks compensation of $103,530.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-22. A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Matthew J. Micheli | $440 | 72.6 | $31,944 |
| David E. Springer | $755 | 42.1 | $31,786 |
| John (Jack) Wm. Butler, Jr. | $835 | 24.2 | $20,208 |
| Ron E. Meisler | $540 | 18.9 | $10,206 |
| Brian M. Fern | $485 | 11.4 | $5,529 |
| Thomas J. Matz | $560 | 4.9 | $2,744 |
| Kayalyn A. Marafioti | $795 | 1.4 | $1,113 |
| **Total** | | **175.5** | **$103,530** |

## Matters Under $100,000

W.    <u>Insurance</u>

154.    Skadden assisted the Debtors during the Application Period in connection

with the extension and renewal of the Debtors' casualty insurance program, which was scheduled

to expire at the end of 2005.  Skadden assisted the Debtors in receiving Court approval for entry

into and renewals of a casualty insurance program to avoid exposing the Debtors and their estates

to significant potential liabilities.  Prior to the Petition Dates, the Debtors' insurance policies were

set to expire.  As a prerequisite to the insurer's willingness to provide the Debtors with insurance

coverage, the insurers required that the Debtors meet a series of conditions, including but not

limited to, assumption of the prepetition agreements between the Debtors and the insurer and an

order approving the renewal of the insurance program.  Skadden assisted the Debtors in analyzing

the conditions requested by the insurer, negotiated terms of the renewal insurance program, and

drafted and filed a motion seeking authority to enter into the new insurance program.

155.    In connection with the foregoing services, Skadden professionals expended

166.7 hours during the Application Period for which Skadden seeks compensation of $83,523.

Detailed time entries of each Skadden professional related to these services are attached hereto as

<u>Exhibit D-23</u>.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Brian M. Fern | $485 | 130.1 | $63,099 |
| Ron E. Meisler | $540 | 27.8 | $15,012 |
| Kayalyn A. Marafioti | $795 | 4.0 | $3,180 |
| Randall G. Reese | $465 | 4.8 | $2,232 |
| **Total** | | **166.7** | **$83,523** |

75

X.    Customer Matters (General)

156.    Although every company which files chapter 11 reorganization cases must work to maintain its customer relationships, this is particularly true in the Debtors' Reorganization Cases.  Because of the nature of the Debtors' businesses, the short time frame in which a break in the supply chain can affect an OEM's production capabilities, and the Debtors' constant process of bidding for and winning new business from OEMs (a process which takes place several years in advance of production), maintaining the communication between the Debtors and their customers and reassuring customers that the Debtors had the resources to continue to operate and meet production deadlines was vital.  As a result, during the Application Period, Skadden professionals assisted the Debtors in their communications efforts by, among other things, responding to questions and working with the Company to draft and periodically revise a presentation for customers explaining the authority the Debtors had received from this Court to continue operations during these Reorganization Cases.  In addition, Skadden assisted the Debtors in responding to various requests and motions filed by customers seeking to lift the automatic stay to effect setoff of prepetition amounts.  By facilitating negotiations with the customers and working with the Debtors as they reconcile their books and records, Skadden has assisted the Debtors in preventing litigation of these matters to date.

157.    In connection with the foregoing services, Skadden professionals expended 119.2 hours during the Application Period for which Skadden seeks compensation of $72,901.  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-24.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| N. Lynn Hiestand | $835 | 29.0 | $24,216 |

76

| Name | Rate | Time | Value |
|---|---|---|---|
| Sina Toussi | $540 | 21.4 | $11,556 |
| Eric L. Cochran | $795 | 12.4 | $9,859 |
| Allison Verderber Herriott | $375 | 22.6 | $8,476 |
| Paola Lozano | $540 | 13.8 | $7,452 |
| Ron E. Meisler | $540 | 7.2 | $3,888 |
| Marie L. Gibson | $540 | 4.2 | $2,268 |
| Gregory O. Ogunsanya | $440 | 4.2 | $1,848 |
| John (Jack) Wm. Butler, Jr. | $835 | 2.0 | $1,670 |
| John K. Lyons | $695 | 2.4 | $1,668 |
| **Total** | | **119.2** | **$72,901** |

Y.    Automatic Stay (Relief Actions)

158.    As of the Petition Dates, the Debtors were parties to a variety of litigation. Although the automatic stay pursuant to section 362 of the Bankruptcy Code prohibits parties from pursuing these types of claims during the Reorganization Cases, the Debtors have received numerous requests, including multiple motions, seeking modification of the stay to allow the claimants to proceed against the Debtors in non-bankruptcy fora.  Skadden professionals worked with the Debtors' legal department and other of the Debtors' employees to reach a consensual resolution in response to many of the modification or relief requests.  In certain cases, however, the Debtors and the movant were unable to resolve their differences and on those occasions, the attorneys for Skadden, on behalf of the Debtors, drafted objections to these lift stay motions.  None of the motions other than that of the Lead Plaintiffs' has resulted in litigation during the Application Period.

159.    In connection with the foregoing services, Skadden professionals expended 143.9 hours during the Application Period for which Skadden seeks compensation of $64,079. Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-25.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Matthew J. Micheli | $440 | 67.0 | $29,480 |
| Nathan L. Stuart | $440 | 65.0 | $28,600 |
| Ron E. Meisler | $540 | 6.0 | $3,240 |
| Allison Verderber Herriott | $375 | 4.6 | $1,725 |
| Kayalyn A. Marafioti | $795 | 1.3 | $1,034 |
| **Total** | | **143.9** | **$64,079** |

Z.    Real Estate (Owned)

160.    Skadden professionals assisted the Debtors in undertaking a comprehensive review of the Debtors' owned real estate.  Indeed, Skadden worked closely with employees of the Debtors in coordinating matters related to Debtors' owned real estate, including (a) resolving claims related to mechanics' liens, (b) selling de minimis real estate parcels,[21] and (c) analyzing tax issues.  These issues required numerous meetings with the Debtors' real estate and facilities personnel.

161.    In connection with the foregoing services, Skadden professionals expended 102.0 hours during the Application Period for which Skadden seeks compensation of $63,413. Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-26.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Marian P. Wexler | $770 | 52.4 | $40,348 |
| Catherine E. Danz | $465 | 49.6 | $23,065 |

---

[21]    Skadden professionals also billed time to the "Asset Dispositions (Real Property)" matter code when providing services related to the sale of de minimis real estate.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Total | | 102.0 | $63,413 |

## AA.    Retention/Fee Matters (SASM&F)

162.    Skadden is one of the largest law firms in the world, with more than 1,700 attorneys located in 22 offices in 11 nations.  Because of the number of the Debtors' business relationships and the number of Skadden's business clients, Skadden has been required to spend time before and after the commencement of the Reorganization Cases with respect to retention and fee issues.  In particular, Skadden conducted an extensive relationship and disclosure search in connection with being retained as Debtors' counsel.  After such retention and during the Application Period, Skadden supplemented its search results through distribution of a questionnaire to the firm's professionals worldwide.  In addition, as new parties have become involved in aspects of these cases, Skadden has conducted supplementary disclosure searches.  Finally, pursuant to the requirements of the Interim Compensation Order, Skadden has prepared detailed monthly compensation packages for distribution in accordance with the procedures established by such orders.

163.    In connection with the foregoing services, Skadden professionals expended 203.8 hours during the Application Period for which Skadden seeks compensation of $58,023.  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-27.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| John (Jack) Wm. Butler, Jr. | $835 | 20.2 | $16,868 |
| Dolores De Elizalde | $440 | 21.1 | $9,284 |
| Haim Zaltzman | $295 | 26.1 | $7,700 |
| Venera E. Ziegler | $510 | 3.4 | $1,734 |

79

| Name | Rate | Time | Value |
|------|------|------|-------|
| Paraprofessional Total | | 133.0 | $22,437 |
| **Total** | | **203.8** | **$58,023** |

BB.    <u>Asset Dispositions (Real Property)</u>

164.    During the Application Period, Skadden attorneys provided advice to the Debtors regarding the sale or potential sale of certain assets including excess real property assets. Asset dispositions were conducted in accordance with this Court's order approving procedures for the sale of <u>de</u> <u>minimis</u> assets. Through the sale of real property located in Foley, Alabama, and in Burton, Michigan, the Debtors realized approximately $5 million for assets that were otherwise non-performing and were cash-flow negative.

165.    In connection with the foregoing services, Skadden professionals expended 63.8 hours during the Application Period for which Skadden seeks compensation of $36,866. Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-28</u>. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Catherine E. Danz | $465 | 40.2 | $18,694 |
| Marian P. Wexler | $770 | 23.6 | $18,172 |
| **Total** | | **63.8** | **$36,866** |

CC.    <u>Claims Admin. (General)</u>

166.    Skadden personnel responded to numerous inquiries from potential claimants regarding the claims filing process. Additionally, throughout the Application Period, Skadden professionals advised the Debtors on responding to such claimants. Furthermore, Skadden and the Debtors began to evaluate how the claims reconciliation process should unfold in

these Reorganization Cases and began preparing pleadings to establish a bar date by which claimants would be required to file proofs of claim.

167.    In connection with the foregoing services, Skadden professionals expended 83.5 hours during the Application Period for which Skadden seeks compensation of $31,974. Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-29.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Matthew J. Micheli | $440 | 15.2 | $6,688 |
| Haim Zaltzman | $295 | 20.2 | $5,959 |
| Thomas J. Matz | $560 | 9.3 | $5,208 |
| Randall G. Reese | $465 | 9.5 | $4,418 |
| Dolores De Elizalde | $440 | 5.4 | $2,376 |
| Ron E. Meisler | $540 | 4.0 | $2,160 |
| Nathan L. Stuart | $440 | 2.8 | $1,232 |
| Paraprofessional Total | | 17.1 | $3,933 |
| **Total** | | **83.5** | **$31,974** |

DD.    Intellectual Property

168.    Throughout the Application Period, Skadden provided legal advice regarding bankruptcy-related issues affecting the Debtors' intellectual property – particularly patents and licenses.  Skadden's professionals spent considerable time in analyzing the Debtors' intellectual property contracts and the law regarding assignability of such contracts in the Second Circuit under section 365 of the Bankruptcy Code.

169.    In connection with the foregoing services, Skadden professionals expended 44.4 hours during the Application Period for which Skadden seeks compensation of $22,186. Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-30.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Elaine D. Ziff | $560 | 20.5 | $11,480 |
| Dolores De Elizalde | $440 | 22.0 | $9,680 |
| Ron E. Meisler | $540 | 1.9 | $1,026 |
| **Total** | | **44.4** | **$22,186** |

EE.    Litigation (General)

170.    During the Application Period, Skadden was required to devote resources to various litigation matters not within the purview of other billing categories.  Much of the activity in this billing category relates to efforts by Skadden to ensure that actions arising out of the everyday operations of the Debtors do not distract the Debtors from their chief goal of successful emergence from chapter 11.  These efforts included, among other things, extension of the Debtors' deadline to remove certain state court actions to this Court, resolution of litigation against the Debtors, and advising the Debtors on the implications of the chapter 11 proceedings on litigation pending in other, non-bankruptcy fora.

171.    In connection with the foregoing services, Skadden professionals expended 47.7 hours during the Application Period for which Skadden seeks compensation of $21,112.  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-31.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Justin L. Heather | $465 | 18.7 | $8,696 |
| Ron E. Meisler | $540 | 7.0 | $3,780 |
| Haim Zaltzman | $295 | 12.1 | $3,570 |
| Matthew J. Micheli | $440 | 7.9 | $3,476 |

| Name | Rate | Time | Value |
|------|------|------|-------|
| Kayalyn Marafioti | $795 | 2.0 | $1,590 |
| **Total** | | **47.7** | **$21,112** |

## FF.    Employee Matters (Retirees/OPEB)

172.    Skadden assisted the Debtors during the Application Period in connection
with matters related to retiree benefits.  Among other things, Skadden reviewed motions filed by
salaried, non-hourly retirees seeking to vacate an order appointing the Unions as authorized
representatives for union-represented retirees and requesting appointment of an official committee
of retirees consisting of former salaried employees receiving retiree benefits independent of a
collective bargaining agreement.  Skadden drafted and filed objections to the motions, and
ultimately, Skadden was successful in consensually resolving this matter and, accordingly, the
movants voluntarily withdrew both motions.

173.    In connection with the foregoing services, Skadden professionals expended
41.4 hours during the Application Period for which Skadden seeks compensation of $21,019.
Detailed time entries of each Skadden professional related to these services are attached hereto as
Exhibit D-32.  A summary of the hours incurred and value of the services performed by each
professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Brian M. Fern | $485 | 38.4 | $18,624 |
| John P. Furfano | $770 | 1.7 | $1,309 |
| John (Jack) Wm. Butler, Jr. | $835 | 1.3 | $1,086 |
| **Total** | | **41.4** | **$21,019** |

## GG.    Reorganization Plan/Plan Sponsors

174.    During the Application Period, the Debtors, with the assistance of Skadden,
filed a motion to extend their exclusive periods for filing a plan of reorganization and soliciting

acceptances thereof.  The Debtors received support for their motion from the Creditors'

Committee, the administrative agent under the Debtors' prepetition credit facility, and the

administrative agent to the Debtors' postpetition lending group.  This Court subsequently granted

the motion and extended the Debtors' exclusivity period to August 5, 2006 and the solicitation

period to October 4, 2006.

175.    In connection with the foregoing services, Skadden professionals expended

33.6 hours during the Application Period for which Skadden seeks compensation of $14,195.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-33.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Allison Verderber Herriott | $375 | 18.4 | $6,900 |
| Kayalyn A. Marafioti | $795 | 3.8 | $3,021 |
| Haim Zaltzman | $295 | 6.5 | $1,918 |
| Dolores De Elizalde | $440 | 2.9 | $1,276 |
| Ron E. Meisler | $540 | 2.0 | $1,080 |
| **Total** | | **33.6** | **$14,195** |

HH.    Regulatory And SEC Matters

176.    During the Application Period, Skadden prepared for and represented the

Debtors in meetings with the Creditors' Committee to discuss matters relating to formal ongoing

investigations by several governmental agencies and various securities actions.

177.    In connection with the foregoing services, Skadden professionals expended

15.9 hours during the Application Period for which Skadden seeks compensation of $12,425.

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-34.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| David E. Springer | $755 | 9.4 | $7,097 |
| John (Jack) Wm. Butler, Jr. | $835 | 4.0 | $3,340 |
| Kayalyn A. Marafioti | $795 | 2.5 | $1,988 |
| **Total** | | **15.9** | **$12,425** |

## Relief Requested

178.    In accordance with the Interim Compensation Order, Skadden has submitted monthly fee statements for the period from October 8, 2005 through January 31, 2006, and now submits this Interim Application covering the Application Period.  Based on the firm's customary billing practices, the Debtors ordinarily would be billed a total of $9,942,264 for fees and $694,237 for charges and disbursements.  However, in keeping with Skadden's commitment to self-policing its fees, charges and disbursements, and based on various accommodations to the Debtors, Skadden voluntarily reduced, as part of its monthly fee statements, its fees by $701,832, or approximately 7.1 percent, and its charges and disbursements by $71,817, or approximately 10.3%.  As a result, the actual amount billed to the Debtors was $9,240,432 for fees and $622,420 for charges and disbursements.

179.    Moreover, as an additional accommodation, Skadden has voluntarily reduced the amount sought in this Interim Application by $39,512 to reflect, among other accommodations, the elimination (i) of fees related to any timekeeper who billed fewer than ten total hours during the Application Period, (ii) of fees related to any timekeeper who billed less than $1,000 during the Application Period, (iii) of fees related to any instance in which a timekeeper billed less than $1,000 to a particular matter during the Application Period, and (iv) of any matter

to which fewer than ten hours were billed during the Application Period. As a result, the actual

amount sought herein is $9,200,920 for fees. This represents a total reduction with respect to fees,

charges and disbursements of $813,161, or approximately 7.6% from those amounts that would

customarily be charged.

180.    The Interim Compensation Order provides that when seeking interim

compensation, professionals must submit monthly fee statements to the Debtors, counsel to the

Debtors, the U.S. Trustee, the counsel for the Creditors' Committee, counsel for the agent under

the Debtors' prepetition credit facility, counsel for the agent under the Debtors' postpetition credit

facility, and members of the Fee Review Committee, when appointed. Each person receiving a

statement has at least 15 days after its receipt to review it. If no objection to a monthly fee

statement is made within 45 days after the end of the applicable billing period, the Debtors are

authorized to pay 80% of the fees requested (with the remaining 20% of the fees requested referred

to herein as the "Holdback") and 100% of the charges and disbursements requested. In accordance

with the Interim Compensation Order, Skadden has submitted monthly fee statements for each of

the months covered by the Application Period.

181.    Excluding the January 2006 monthly fee statement – for which the

objection deadline is still pending – no party has filed an objection to Skadden's monthly fee

statements. Accordingly, with respect to the monthly fee statements covering the Application

Period and upon payment of the January monthly statement, Skadden will have received

$7,392,345 on account of billed fees, $622,420 on account of billed charges and disbursements,

and will have accrued a Holdback in the amount of $1,848,087. After application of an additional

client accommodation of $39,512 for, among other accommodations, the elimination (i) of fees

related to any timekeeper who billed fewer than ten total hours during the Application Period, (ii)

of fees related to any timekeeper who billed less than $1,000 during the Application Period, (iii) of

fees related to any instance in which a timekeeper billed less than $1,000 to a particular matter

during the Application Period, and (iv) of any matter to which fewer than ten hours were billed

during the Application Period, Skadden is requesting $1,904,287, reducing the Holdback accrued

through January 31, 2006 by 50%, leaving $904,288 of the Holdback for this Application Period

outstanding, for which Skadden will later seek payment.  Skadden submits that payment of

approximately half of the Holdback amount for this Application Period upon approval of this

Interim Application is an appropriate balance between the interest of professionals in receiving

prompt payment and the interest of the estates in ensuring reasonable professional compensation

and reimbursement for actual or necessary expenses.

A.    Allowance Of Professional Fees

182.    During the Application Period, professionals at Skadden billed an aggregate

of 19,008.2 hours reflected in this Interim Application working on matters concerning the Debtors'

Reorganization Cases.[22]  Of such time spent, 4,262.9 hours were spent by partners, 1,514.0 hours

were spent by counsel, 10,379.6 hours were spent by associates, and 2,851.7 hours were spent by

legal assistants.  A summary showing the name and position of each such partner, counsel,

associate and legal assistant, together with that person's date of admission to the bar (as

applicable), net hours during the Application Period, and hourly billing rate, is provided in the

Summary of Services found at the beginning of this Interim Application.[23]

---

[22]    Skadden maintains records of the time it expended in the rendition of all professional services, which time records
are made concurrently with the rendition of professional services.

[23]    In addition to the matter list, Exhibit C also sets forth the blended hourly rate and certain other business statistics
associated with the Reorganization Cases.

B.    Reimbursement of Charges and Disbursements

183.    As disclosed in the Retention Application that this Court approved, it is Skadden's standard policy to charge its clients in all areas of practice for certain charges and disbursements incurred in connection with such clients' cases. The charges and disbursements charged to clients include, among others, charges for messenger services, photocopying, court fees, travel expenses, postage, long distance telephone, computerized legal research, investigative searches, and other charges customarily billed by law firms.  Certain charges and disbursements are not separately charged for under the bundled rate structure as described in the Engagement Agreement.

184.    Skadden has attempted to minimize the charges and disbursements associated with the Debtors' Reorganization Cases, particularly for items such as reproduction and delivery, which have been lowered as a result of the restricted service list and the ability to serve the 2002 List Parties electronically, which Skadden proposed and this Court approved.  During the Application Period, Skadden disbursed the following sums for actual and necessary charges and disbursements in the rendition of professional services in the Reorganization Cases, and requests that it be reimbursed therefor:

### Charges And Disbursements Incurred

| | |
|---|---|
| Travel Expenses | $281,230 |
| Reproduction And Document Preparation | $168,722 |
| Computer Legal Research | $120,500 |
| Telecommunications | $14,500 |
| Court Reporting | $14,390 |
| Courier, Express Delivery, And Postage | $11,602 |
| Outside Research | $8,952 |
| Professional Fees | $2,499 |
| Filing/Court Fees | $25 |
| **TOTAL** | **$622,420** |

185.    The above charges and disbursements are reasonable and are consistent with those incurred by other bankruptcy practitioners in other large, complex chapter 11 reorganization cases in this and other districts.  Moreover, Skadden believes that the unique size and complexity of these cases, including the terms of this Court's case management order, as amended, which require, among other things, overnight delivery of most pleadings, warrant reimbursement of the foregoing charges and disbursements.

<u>Reasonableness Of Fees, Charges, And Disbursements</u>

186.    Under section 330 of the Bankruptcy Code, a Bankruptcy Court may award to a professional employed by the estates "reasonable compensation for actual, necessary services" rendered by the professional, plus "reimbursement for actual, necessary expenses."  <u>See</u> 11 U.S.C. § 330(a)(1).  <u>See</u> <u>generally</u> <u>In re Cenargo Int'l</u>, 294 B.R. 571 (Bankr. S.D.N.Y. 2003); <u>In re Childworld, Inc.</u>, 185 B.R. 14 (Bankr. S.D.N.Y. 1995).

187.    In determining the amount of "reasonable compensation," the Court must consider the nature, the extent, and the value of the services, taking into account all the relevant factors, including the time spent on such services, the rates charged for such services, whether the services were necessary and beneficial, whether the services were performed in a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed, and whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.  <u>See</u> 11 U.S.C. § 330(a)(3).

188.    In assessing attorneys' fees, courts use several different approaches.  The Second Circuit and bankruptcy courts in this district frequently utilize the "lodestar" method, which is a determination as to the number of hours of service reasonably devoted to the case

89

multiplied by the attorney's reasonable rates.  See Savoie v. Merchants Bank, 166 F.3d 456, 460

(2d Cir. 1999) (applying the lodestar approach to a non-bankruptcy case); In re Masterwear Corp.,

233 B.R. 266, 277 (Bankr. S.D.N.Y. 1999).  When applying the lodestar approach, courts in this

district incorporate the familiar factors set forth in Johnson v. Georgia Highway Express, 488 F.2d

714 (5th Cir. 1974).[24]  See, e.g., Betancourt v. Giuliani, 325 F. Supp. 2d 330, 332 (S.D.N.Y. 2004)

("In adjusting the lodestar, courts generally consider the . . .  factors set forth in Johnson v. Georgia

Highway Express, Inc."); In re Sucre, 226 B.R. 340, 351-52 (Bankr. S.D.N.Y. 1998) ("To

determine the 'lodestar fee' the Court must make an initial objective determination as to the number

of hours reasonably expended and the reasonable hourly rate . . . . After multiplying the two, the

Court may adjust the product by a consideration of [the Johnson] factors.")

   189. In awarding attorneys' fees, courts will also consider whether the services

rendered were reasonably likely to benefit the debtor's estate.  See, e.g., In re Ames Dep't Stores,

Inc., 76 F.3d 66, 71 (2d Cir. 1996), rev'd on other grounds, Lamie v. United States Trustee, 540

U.S. 526 (2004); In re Granite Partners, L.P., 213 B.R. 440, 447 (Bankr. S.D.N.Y.  1997); In re

Drexel Lambert Group, Inc., 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991).   Thus, the Court should

focus on what a reasonable lawyer would have done at the time and not invoke a hindsight

analysis.

> [I]t is important for a court to maintain a sense of overall proportion and not
> become enmeshed in meticulous analysis of every detailed facet of the professional
> representation.  It is easy to speculate that the work could have been done in less
> time or with fewer attorneys or with an associate rather than a partner.  On the other
> hand, it is also possible that [the debtor] would not have enjoyed the success it did
> had its counsel managed matters differently.

---

[24] The twelve Johnson factors are (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) the time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. Johnson, 488 F.2d at 717-19.

In re Boston & Maine Corp., 776 F.2d 2, 10 (1st Cir. 1985) (citations omitted).

190.    In accordance with the factors enumerated in 11 U.S.C. § 330 and applicable case law, the amount requested herein by Skadden is fair and reasonable, given:  (a) the nature of the Reorganization Cases, (b) the novelty and complexity of the Reorganization Cases, (c) the time and labor required to represent the Debtors effectively, (d) the time limitations imposed by the Reorganization Cases, (e) the nature and extent of the services rendered, (f) Skadden's experience, reputation and ability, (g) the value of Skadden's services, and (h) the cost of comparable services other than in a case under the Bankruptcy Code.

C.    Nature, Complexity, And Duration Of Cases

191.    As should be evident from the summary of Skadden's services as described above in this Interim Application, the Debtors' chapter 11 reorganization presents a particularly unique set of circumstances, and unquestionably is a large and complex case.  The nature and complexity of the Reorganization Cases has required Skadden to develop case management and staffing solutions at every stage of the proceedings.  These tasks have been particularly daunting in light of the Debtors' widespread operations and the relative sophistication of other parties-in-interest in these Reorganization Cases.  Skadden nonetheless has assisted the Debtors by employing a streamlined case management structure that generally consists of relatively small, core teams, and has assigned various attorneys to other discrete tasks to avoid the performance of duplicative or unnecessary work.

192.    Given the size of these Reorganization Cases and the number of matters that continually need to be addressed, there have been occasions when a number of Skadden attorneys must be present and participate in the discussions and negotiations.  This is particularly true of meetings with the Creditors' Committee and also with respect to the monthly omnibus hearings.

Skadden believes that, as evident by the summaries contained in this Interim Application and the time entries attached hereto, it has articulated specific reasons for attendance by multiple attorneys on such occasions.

D.    Experience Of Skadden

193.    The experience of Skadden's attorneys also has benefited the estates. Skadden is among the largest firms and has one of the largest restructuring groups in the world. As more fully set forth in the Retention Application, Skadden's restructuring attorneys and attorneys from other practice areas have extensive knowledge and experience in dealing with the multitude and fast-paced issues that arise in similar chapter 11 cases. Accordingly, Skadden's depth of experience in chapter 11 matters has ensured that a number of pressing matters could be addressed promptly. In addition, Skadden's commitment to monitoring the administrative expenses of the estates, including its own legal fees, has been a constant element of its representation of the Debtors. Indeed, this emphasis has been manifested in Skadden careful review of its fees, charges and disbursements and a voluntary client accommodation of $813,161, including a voluntary aggregate accommodation of $773,649 on Skadden's monthly fee statements and an additional $39,512 voluntary reduction on this Interim Application.

E.    Comparable Services

194.    An award of compensation also must be based on the cost of comparable services other than in a bankruptcy case. Skadden's rates are consistent with rates charged to other clients in non-bankruptcy matters. Moreover, its rate structure was disclosed clearly in its Retention Application, which this Court approved and as to which none of the major constituents objected. The amounts sought by Skadden are consistent with the fees, charges and disbursements incurred by other chapter 11 debtors in cases of similar size, complexity and duration.

92

Accordingly, the cost of comparable services supports the Interim Application, and the services performed during the Application Period more than warrant the allowance of compensation, particularly in view of the results achieved.

F.    <u>Compliance With Guidelines</u>

195.    Skadden believes that this Interim Application, together with the attachments hereto, substantially complies in all material respects with the Guidelines.  To the extent this Application does not comply in every respect with the requirements of such guidelines, Skadden respectfully requests a waiver for any such technical non-compliance.

<u>Notice</u>

196.    In compliance with the Interim Compensation Order, notice of the filing of this Interim Application will be provided to all parties who have filed a notice of appearance with the Clerk of this Court and requested notice of pleadings in these chapter 11 cases.  In addition, the Interim Application in its entirety will be served on the following parties: (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098, Att'n: David Sherbin, Esq., (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004, Att'n: Alicia M. Leonhard, Esq., (iii) counsel for the Creditors' Committee, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4802, Att'n: Robert J. Rosenberg, Esq., (iv) counsel for the agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Att'n: Marissa Wesley, Esq., (v) counsel for the agent under the Debtors' postpetition credit facility, Davis Polk & Wardell, 450 Lexington Avenue, New York, New York 10017, Att'n: Donald Bernstein, Esq. and Brian Resnick, Esq., and (vi) the members of the Fee Review Committee.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

197.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, Skadden respectfully requests that the Court (a) enter an order allowing interim compensation of $9,200,920 to Skadden for professional services rendered as attorneys for the Debtors during the Application Period, plus reimbursement of actual and necessary charges and disbursements incurred in the sum of $622,420, (b) authorize and direct the Debtors to pay to Skadden the amount of $904,287 to reduce the Holdback accrued through January 31, 2006 with the remaining Holdback amount of $904,288 to be held by the Debtors until further order of this Court, and (c) grant it such other and further relief as is just and equitable under the circumstances.

Dated: New York, New York
        May 31, 2006

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP


By: /s/ John Wm. Butler, Jr.
     John Wm. Butler, Jr. (JB 4711)
     John K. Lyons (JL 4951)
     Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

                - and -


By:  /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession