1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 05-44481

5   - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   DELPHI CORPORATION, et al.

9

10          Debtors.

11

12  - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              May 9, 2006

19              10:18 A.M.

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

```
 1

 2    Hearing re Motion to Authorize Motion for

 3    Order Under 11 U.S.C. Section 1113(c)

 4    Authorizing Rejection of Collective Bargaining

 5    Agreements and Under 11 U.S.C. Section 1114(g)

 6    Authorizing Modification of Retiree Welfare

 7    Benefits

 8

 9    Hearing re Statement/Expert Report of Thomas

10    A. Kochan in Opposition to Debtors' Motion for

11    Order Under 11 U.S.C. Section 1113(c)

12    Authorizing Rejection of Collective Bargaining

13    Agreements and Under 11 U.S.C. Section 1114(g)

14    Authorizing Modification of Retiree Welfare

15    Benefits

16

17    Hearing re Motion to Authorize Motion for

18    Order Under 11 U.S.C. Section 1113(c)

19    Authorizing Rejection of Collective Bargaining

20    Agreements and Under 11 U.S.C. Section 1114(g)

21    Authorizing Modification of Retiree Welfare

22    Benefits

23

24

25
```

1    Hearing re Motion to Dismiss Party/Limit

2    Participation in the Hearing on Delphi's

3    Section 1113 and Section 1114 Motion

4

5    Reply to Motion Omnibus Reply of UAW in

6    Support of Motion to Limit Participation in

7    the Hearing on Delphi's Section 1113 and

8    Section 1114 Motion

9

10   Notice of Hearing/Proposed 1113/1114 Hearing

11   Agenda

12

13   Hearing re Motion to Authorize Motion for

14   Order Under 11 U.S.C. Section 1113(c)

15   Authorizing Rejection of Collective Bargaining

16   Agreements and Under 11 U.S.C. Section 1114(g)

17   Authorizing Modification of Retiree Welfare

18   Benefits

19

20   Declaration of Kevin M. Butler in Support of

21   Delphi's Motion for Authority to Reject

22   Collective Bargaining Agreements Under 11

23   U.S.C. Section 1113(c) and Modify Retiree

24   Welfare Benefits Under 11 U.S.C. Section

25   1114(g)

```
 1
 2    Declaration of Randal A. Middleton
 3
 4    Objection to Motion
 5
 6    Declaration of Donald L. Griffin
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    Transcribed by:  Lisa Bar-Leib
```

```
 1
 2    A P P E A R A N C E S :
 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 4          Attorneys for Debtor and
 5          Debtors-in-Possession
 6          333 West Wacker Drive
 7          Chicago, IL 60606
 8
 9    BY:   JOHN WM. BUTLER, JR., ESQ.
10          JOHN K. LYONS, ESQ.
11          RON E. MEISLER, ESQ.
12
13    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
14          Attorneys for Debtor and
15          Debtors-in-Possession
16          Four Times Square
17          New York, NY 10036
18
19    BY:   KAYALYN A. MARAFIOTI, ESQ.
20          THOMAS J. MATZ, ESQ.
21          JAY S. BERKE, ESQ.
22
23
24
25
```

                                                          6

```
 1    O'MELVENY & MYERS, LLP
```

```
 2          Attorneys for Debtors

 3          7 Times Square

 4          New York, NY 10036

 5

 6    BY:   JEFFREY I. KOHN, ESQ.

 7

 8    O'MELVENY & MYERS, LLP

 9          Attorneys for Debtors

10          1625 Eye Street

11          Washington, D.C. 20006

12

13    BY:   TOM JERMAN, ESQ.

14

15    O'MELVENY & MYERS, LLP

16          Attorneys for Debtors

17          400 South Hope Street

18          Los Angeles, CA 90071

19

20    BY:   ROBERT A. SIEGEL, ESQ.

21

22

23

24

25
```

                                                        7

```
 1   COHEN, WEISS AND SIMON, LLP
```

```
 2          Attorneys for UAW

 3          330 West 42nd Street

 4          New York, NY 10036

 5

 6   BY:   BABETTE CECCOTTI, ESQ.

 7          BRUCE S. LEVINE, ESQ.

 8          BRUCE H. SIMON, ESQ.

 9          PETER D. DECHIARA, ESQ.

10          DAVID R. HOCK, ESQ.

11

12   LATHAM & WATKINS, LLP

13          Attorneys for Statutory Creditors'

14          Committee

15          885 Third Avenue

16          New York, NY 10022

17

18   BY:   ROBERT J. ROSENBERG, ESQ.

19          MITCHELL E. SEIDER, ESQ.

20

21

22

23

24

25
```

                                                                        8

```
 1   LATHAM & WATKINS, LLP

 2          Attorneys for Statutory Creditors'
```

```
 3          Committee

 4          633 West Fifth Street

 5          Suite 4000

 6          Los Angeles, CA 90071

 7

 8     BY:   JOEL E. KRISCHER, ESQ.

 9

10     FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

11          Attorneys for the Equity Committee

12          One New York Plaza

13          New York, NY 10004

14

15     BY:   BONNIE STEINGART, ESQ.

16

17     KIRKPATRICK & LOCKHART NICHOLSON GRAHAM, LLP

18          Attorneys for Wilmington Trust Company

19          599 Lexington Avenue

20          New York, NY 10022

21

22     BY:   EDWARD M. FOX, ESQ.

23

24

25
```

9

```
 1     WHITE & CASE, LLP

 2          Attorneys for Appaloosa Management
```

```
 3          1155 Avenue of the Americas

 4          New York, NY 10036

 5

 6   BY:   THOMAS E. LAURIA, ESQ.

 7         GLENN M. KURTZ, ESQ.

 8         DOUGLAS P. BAUMSTEIN, ESQ.

 9

10   BURR & FORMAN, LLP

11          Attorneys for Mercedes Benz

12          420 North 20th Street

13          Birmingham, AL 35203

14

15   BY:   MICHAEL L. HALL, ESQ.

16

17   ORRICK, HERRINGTON & SUTCLIFFE, LLP

18          Attorneys for Ad Hoc Trade Committee

19          666 Fifth Avenue

20          New York, NY 10103

21

22   BY:   ALYSSA D. ENGLUND, ESQ.

23

24

25
```

```
                                                        10



 1   KENNEDY, JENNIK & MURRAY, P.C.

 2          Attorneys for IUE-CWA

 3          113 University Place
```

```
 4        New York, NY  10003

 5

 6   BY:   THOMAS M. KENNEDY, ESQ.

 7         SUSAN M. JENNIK, ESQ.

 8

 9   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

10         Attorneys for Steelworkers Union

11         1350 Broadway

12         Suite 501

13         New York, NY 10018

14

15   BY:   LOWELL PETERSON, ESQ.

16

17   PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER &

18   BRUEGGEMAN, S.C.

19         Attorneys for IBEW and IAM

20         1555 North River Center Drive

21         Suite 202

22         Milwaukee, WI 53212

23

24   BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

25
```

                                                              11

```
 1   GORLICK, KRAVITZ & LISTHAUS, P.C.

 2         Attorneys for Operating Engineers

 3         Locals 18-S, 101-S, 832-S
```

```
 4        17 State Street

 5        4th Floor

 6        New York, NY 10004

 7

 8   BY:   BARBARA S. MEHLSACK, ESQ.

 9

10   WEIL, GOTSHAL & MANGES, LLP

11        Attorneys for General Motors

12        767 Fifth Avenue

13        New York, NY 10153

14

15   BY:   JEFFREY L. TANENBAUM, ESQ.

16        MICHAEL P. KESSLER, ESQ.

17

18   UAW/ASSOCIATE GENERAL COUNSEL

19        8000 East Jefferson

20        Detroit, MI 48214

21

22   BY:   NIRAJ R. GANATRA, ESQ.

23

24

25
```

12

```
 1   OFFICE OF THE UNITED STATES TRUSTEE

 2        33 Whitehall Street

 3        21st Floor

 4        New York, NY 10004
```

```
 5

 6    BY:   ALICIA M. LEONARD

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2              THE COURT:  Please be seated.  All

 3    right.  Delphi Corporation?

 4              MR. BUTLER:  Your Honor, good
```

```
 5   morning.  We have -- my name is Jack Butler.

 6   I'm from the law firm of Skadden, Arps, Slate,

 7   Meagher & Flom, representing the debtors.

 8   Your Honor, with me is trial counsel for these

 9   proceedings and my partners from Skadden,

10   Arps, Kayalyn Marafioti and Jay Burke.  From

11   special labor counsel O'Melveney & Myers,

12   Robert Siegel Tom Jerman, and Jeffrey Kohn.

13   And from the Gruheman law firm, our special

14   counsel, Lonnie Hassel.

15        Your Honor, the debtors have filed

16   and served a proposed 1113, 1114 hearing

17   agenda.  There are two matters on the agenda.

18   And, with Your Honor's permission, we will

19   proceed in order of the agenda.

20        THE COURT:  That's fine.

21        MR. BUTLER:  Your Honor, the first

22   matter on the agenda is the UAW motion to

23   limit participation found at Docket No. 3447

24   and Ms. Marafioti will represent the debtors'

25   interest in that matter, Your Honor.
```

                                              14

```
 1        MS. CECCOTTI:  Good morning, Babette

 2   Ceccotti for the UAW this morning on the

 3   motion to limit participation to interested

 4   parties under Section 1113(d).  Just as a

 5   housekeeping matter, Your Honor, I would like
```

6      to just inform the Court the trial counsel for

7      the UAW will introduce themselves as

8      appropriate to do so in connection with the

9      next matter.  Bruce Simon, Bruce Levine, Peter

10     DeChiara and others from Cohen, Weiss and

11     Simon.

12             THE COURT:  Okay.

13             MS. CECCOTTI:  Your Honor, we served

14     yesterday a reply, an omnibus reply, to the

15     various objectors and I -- we did have one

16     delivered to chambers.  I hope the Court --

17             THE COURT:  Yeah, I know.  I read

18     that.

19             MS. CECCOTTI:  Okay.  That's fine,

20     Your Honor.  In that case, I believe that we

21     could summarize the issues as follows.

22             The proceedings that are up next,

23     the Section 1113 and Section 1114 proceedings,

24     Your Honor, take place under specialized

25     provisions of the Bankruptcy Code and you'll

15

1      hear an awful lot about that in the coming

2      hours.  The point for purposes of this motion

3      is that the case proceeds with a test set

4      forth in those statutes that directly relates

5      to the applicable non-bankruptcy law that

```
 6    Section 1113 and 1114 imports into those

 7    sections, specifically, the collective

 8    bargaining relationship between Delphi and its

 9    unions.

10              Because the statute requires

11    bargaining to take place over particularized

12    proposals and requires the debtor to meet its

13    burden by demonstrating substantive tests

14    about those proposals, substantive tests about

15    the way the parties have addressed those

16    proposals, it is entirely logical that the

17    United Court in the 7th Circuit opinion would

18    limit participation logically, under 1113(d)

19    and read interested parties to be limited to

20    those parties.  Otherwise, the proceeding

21    simply makes no sense.  I think that we can

22    see this most starkly in the response to the

23    1114 -- 1113 and 1114 motion filed by the

24    creditors' committee, which seeks to

25    participate here because of its status under
```

```
                                                16
```

```
 1    1109(b) as a creditors' committee.

 2              What the creditors' committee has

 3    done is simply summarizes the debtors'

 4    position.  That's by and large what they've

 5    done in their papers.  They have a brief

 6    aspect of their response that expresses
```

7  concern about other aspects down the road:

8  recoveries, claims.  They don't want claims,

9  and in that sense, their argument on that

10  discreet point is very similar, in fact,

11  identical to the other objectors' concerns

12  here.  All of the concerns relate to matters

13  that are not part of this particularized 1113,

14  1114 process.

15         So, when the United Court says that

16  affected parties -- interested parties, excuse

17  me -- refers to the parties of the collective

18  bargaining agreement, logically, they are the

19  parties that can present the evidence and make

20  the arguments most directly related to the

21  matters that must be proven up by the debtor

22  and defended against by the unions.

23         Therefore, it is our view that the

24  Caldor decision, which everybody has cited,

25  and which discusses whether -- really, which

17

1  discusses whether 1109(b) is read to permit

2  automatic participation in adversary

3  proceedings.  Of course, that case involved

4  the Second Circuit's discussion of two

5  different positions on that score taken in a

6  number of Circuits and comes down on the side

```
 7    of automatic participation in adversary

 8    proceedings.

 9              But we don't see Caldor as invading

10    1113(d).  It's one thing to say that parties

11    in interest, under 1109(b) have a right to

12    participate generically.  But we don't think

13    Caldor stands for the proposition that 1109(b)

14    means where a statute has its own

15    particularized set of evidence and standards

16    that have to be met under that standard and

17    says the parties are the interested -- the

18    parties to the hearing are the interested

19    parties that 1109(b) automatically chumps --

20    that 1109(b) chumps 1113(d).  There isn't

21    really anything for parties other than the

22    parties to the agreement and the debtors to

23    contribute in the most direct evidentiary way.

24    And therefore, we think that the UAL Corp.

25    decision is correct.
```

```
 1              Now, the issues that the parties --

 2    the objectors have raised -- I'm going to put

 3    MBUSI in its own category for a moment --

 4    again, I think, illustrate the correctness of

 5    the UAL Corp.'s decision.  The interests here

 6    that they have expressed have to do with

 7    ultimate recoveries, have to do with which
```

8   debtors are going to ultimately be responsible

9   for various obligations.  These are not part

10  of the 1113 and 1114 tests.  The Ad Hoc Trade

11  Committee, which submitted an objection as

12  well, is actually taking that issue one step

13  farther attenuated by saying, well, our issue

14  really has to do with the issues that were

15  raised in two of the objections, Wilmington

16  Trust and the shareholders.  So, we could see

17  that when the Seventh Circuit is concerned

18  about the manageability of a proceeding, it's

19  not necessarily just talking about the number

20  of people that are in the courtroom.  And

21  obviously, even without those parties, there

22  are going to be a number of people here.  It's

23  talking about, as well, in substance, the

24  manageability of the issues that the Court

25  should deal with or should be forced to deal

                                                    19

1   with in an already complicated Section 1113

2   and 1114 case.

3        Therefore, we think that the UAL

4   Corp. decision is correct.  We think that it

5   is not contradicted by the Caldor principle at

6   all.  And that, in fact, the parties to the

7   hearing should be the unions and the debtors.

8            Now, there is participation and

9    there is participation.  We have not moved to

10   strike anybody's pleadings here to the extent

11   that other parties wish to apprise the Court

12   of their views.  We believe that they have

13   done so adequately in the papers that they

14   have filed and that that should serve,

15   particularly given the fact that their issues

16   are so remote from the core issues that are at

17   stake here today.  That that should more than

18   serve as an expression of the views of those

19   parties for purposes of the Section 1113 and

20   Section 1114 issues.

21           Your Honor, if you're going to take

22   argument from the objectors, I'd just like to

23   reserve for a couple of minutes for reply, if

24   that's all right.

25           THE COURT:  Okay.  Well, let me ask

                                                        20

1    you a question, though.

2            MS. CECCOTTI:  Sure.

3            THE COURT:  I understand your

4    argument about the specialized standards under

5    Section 1113 that I need to apply to determine

6    whether the agreement or agreements may be

7    rejected or not.  But, isn't there also a

8    fundamental issue which is the one raised by

```
 9    Appaloosa, which is whether there should be

10    rejection at all?  And it seems to me on that

11    point, and I guess perhaps also on the issue

12    of whether the proposal that everything flows

13    from is a proper exercise of business

14    judgment, why shouldn't, on those limited

15    issues, parties have standing to be heard?

16              MS. CECCOTTI:  Your Honor, some of

17    the issues raised by the shareholders candidly

18    were issues that we had raised as well.  And,

19    on that score, again, I would go back to the

20    United Court's observation that the issues

21    that they have raised that overlap the issues

22    we have raised we're here to pursue those

23    issues.  We're certainly not dropping them, we

24    can assure Appaloosa's counsel.  In terms --

25    on that score.
```

```
 1              In terms of the proposal, again, I

 2    know that they've raised an issue about fair

 3    and equitable.  I frankly think that --

 4              THE COURT:  No, I'm not talking

 5    about within the construct of the findings

 6    under 1113, but just generally as to whether

 7    it meets the debtors' business judgment test.

 8              MS. CECCOTTI:  Your Honor, it seems
```

 9   to me that, in the first instance, it is up to

10   the parties most directly involved with those

11   proposals to determine whether or not they

12   suffice for 1113 purposes.  The debtor

13   obviously had its reasons for making the

14   proposals that it did and, frankly, Appaloosa

15   and any other party that really wants to

16   comment on that once again is doing so from a

17   position that is necessarily once removed from

18   that process.  And it seems to me, again,

19   there's a difference between saying that a

20   party can pick and choose from that sort of

21   distant relationship to the process.  Or

22   distant vantage point, if you will, from the

23   process and say, well, we think this or that

24   about this aspect of the proposal or that

25   aspect of the proposal, but really the point

                                                            22

 1   of the 1113 and 1114 hearing, a litigation

 2   process is to determine whether as a whole the

 3   debtor had met its burden.

 4            So, once again, it seems to me if at

 5   the end of the day those parties in the

 6   courtroom listening to everything want to make

 7   views known in a limited way about that, well,

 8   then, that's up to the Court to determine how

 9   the Court wants to manage that.  But I think

10    that's a very different issue from saying that

11    as a matter of the debtor marching through its

12    case, standard by standard by standard, a

13    party that does not have the right to

14    participate in what is the principle function

15    of 1113, which is to make sure that there is a

16    bargaining process that has been exhausted

17    before you go to litigation.  That's really

18    the focus.  Or that's a principle focus of it.

19    I don't see how Appaloosa or any other party

20    can have a credible, and I don't mean that in

21    a pejorative sense, but simply a credible

22    opinion on that from the standpoint of a party

23    that is that far removed from the process.

24            THE COURT:  Okay.

25            MS. CECCOTTI:  Thanks.


                                                    23


1            THE COURT:  Thank you.

2            MS. MARAFIOTI:  Good morning, Your

3    Honor.  Kayalyn Marafioti on behalf of Delphi

4    Corporation.  Your Honor, the debtors'

5    position is that the statutory committees in

6    this case, the creditors' committee and the

7    newly appointed equity security holders'

8    committee do have the right to appear and be

9    heard on Delphi's motion for authority to

10    reject the collective bargaining agreements.

11    Section 1113(d)(1) of the Code simply says

12    that all interested parties may appear and be

13    heard.  And Section 1114(k)(1) has identical

14    language.  And we do believe that the Second

15    Circuit decision in Caldor, which holds that a

16    creditors' committee has the right to be heard

17    on any issue in the case whether it's in an

18    adversary proceeding or a contested matter,

19    does govern here and we think common sense

20    extension of that is the equity committee

21    should be heard as well.  And to the extent

22    that the Seventh Circuit in UAL holds

23    otherwise, we don't think it should govern.

24             But I do want to address one point

25    that was point in the UAL reply that was

                                                                    24

1    served yesterday afternoon.

2             THE COURT:  UAW.

3             MS. MARAFIOTI:  I'm sorry.  UAW.

4    That's right.  In that brief, the UAW suggests

5    that the pecuniary concerns of stakeholders in

6    the case are somehow not at issue on a motion

7    to reject a collective bargaining agreement

8    and a comment was just made to that effect a

9    moment ago.

10            We believe that Second Circuit law

11    directly contradicts that proposition.  For

12    example, in the Kerry Transportation case,

13    which was cited in our opening and reply

14    briefs on the underlying motion.  In

15    discussing the balancing of the equities under

16    Section 1113, the Court expressly identifies

17    "the likely reduction in value of creditor

18    claims if the CBA remains in force as one of

19    the equitable considerations that a Court may

20    take into account in determining whether to

21    grant the relief requested."  So, under that

22    reasoning, we think that 1113 does encompass

23    the pecuniary concerns of the stakeholders and

24    the statutory committees as the

25    representatives of those stakeholders should

25

1     be heard on the subject.

2               Similarly, Kerry Transportation, as

3     well as the Second Circuit decisions in Royal

4     Composing Room and Maxwell, which are

5     governing here, we believe, in interpreting

6     the statutory meaning of "necessary" under

7     Section 1113(b)(1)(a).  In other words, what

8     does the statute mean when it says that "the

9     collective bargaining agreement proposal must

10    be necessary to permit the reorganization of

11    the debtor."  Discusses the question of

12    whether rejection of the collective bargaining

13    agreement would increase the likelihood of a

14    successful reorganization.  And on that topic,

15    by any measure, we think that the creditors'

16    committee certainly has a right to be heard.

17          The committee and its advisors both

18    formally and informally have met with the

19    company and its advisors on many, many

20    occasions over the past seven months since

21    this case was commenced and the committee is

22    certainly in a position to assert its views on

23    what is necessary to achieve a successful

24    reorganization.

25          So, in short, we believe that the

26

1    voices of the statutory committees should be

2    heard on this matter and we request that the

3    Court permit those voices to be heard.

4          THE COURT:  Okay.  Thank you.

5          MR. ROSENBERG:  Good morning, Your

6    Honor.  Robert Rosenberg, Latham & Watkins,

7    for the statutory creditors' committee.  Your

8    Honor, I won't belabor the subject.  I'll

9    simply join in Ms. Marafioti's comments, both

10   in terms of the case law in the Circuit of the

11   right of the creditors' committee to

12    participate and the very obvious points that

13    she made vis-a-vis the financial stake of the

14    creditors' committee constituency in how this

15    issue comes out.  Nonrejection equals

16    immediate costs out of their pocket; rejection

17    equals a pre-petition claim that dilutes their

18    pre-petition claims.  There is obviously a

19    significant and substantial financial stake in

20    the outcome here.

21            Ms. Ceccotti suggested that the

22    creditors' committee pleading Exhibit A as to

23    why we shouldn't participate was nothing more

24    than a parroting of the debtor.  Obviously,

25    she hasn't seen the time records yet or the

                                                          27

1    costs of that work product and the due

2    diligence that went into it.  Consistent with

3    the creditors' committees' fiduciary

4    obligations of those issues were scrubbed and

5    scrubbed very, very carefully, both in terms

6    of whether or not a rejection was in the best

7    interest of the estate, ie., consistent with

8    the business judgment of the debtor.  And

9    whether or not the procedural steps to get

10    there were satisfied under Section 1113.  This

11    is by no means a mirror me-too product.  The

12    mirror is the result of the statutory

13    standards being clear but the result is a

14    product of the committees' due diligence

15    respecting both the debtors' process and the

16    debtors' business judgment.  I dare say had

17    that result come out otherwise, we wouldn't be

18    hearing the argument from Ms. Ceccotti that we

19    shouldn't be permitted to participate.  Thank

20    you.

21           THE COURT:  Okay.

22           MS. STEINGART:  Good morning, Your

23    Honor.  Bonnie Steingart from Fried, Frank on

24    behalf of the equity committee.   I rise to

25    let the Court know that the equity committee

                                                              28

1     has now indeed retained counsel as of last

2     night and that we expect to participate in

3     these proceedings.  We have spoken to counsel

4     for the debtor and we have reviewed the papers

5     filed here.  We certainly echo the views of

6     both the debtor and the creditors' committee

7     and certainly, in light of the questions

8     raised by Your Honor, the equity committee

9     does have a very important view about this

10    proceeding, about whether this collective

11    bargaining agreement is or should be rejected

12    at all.  And we hope to have that opportunity.

13          Indeed, the issues raised by the

14     union are issues that are well within the

15     ability of this Court to deal with to the

16     extent that the participation of the

17     committees raises any issue with respect to

18     manageability.  That is certainly something

19     the Court can deal with and all can

20     participate and make sure the Court is

21     informed of all views with respect to whether

22     indeed this agreement should be rejected as

23     well as other issues.

24          So I would urge the Court to permit

25     the statutory committees and those appointed

29

1     by the U.S. Trustee to participate.  Thank

2     you.

3          THE COURT:  Okay.  Thank you.

4          MR. FOX:  Good morning, Your Honor.

5     Edward Fox from Kirkpatrick & Lockhart

6     Nicholson Grant, LLP on behalf of Wilmington

7     Trust Company.  Your Honor, if you take the

8     debtors' argument in this matter that 1109(b)

9     entitles that the equity committee and the

10    creditors' committee to participate, then you

11    have to take the view, as well, that it allows

12    other parties in interest, including the

13      Indenture Trustee, to participate as well.

14           To come back to it, I want to brief,

15      because I'm sure you've read the papers.  As a

16      matter of statutory construction, I think that

17      the Supreme Court's position on this would be

18      clear that absent a positive repugnance

19      between the language in 1113 and the language

20      in 1109(b), the language of 1113 would not be

21      read to cut back on the standing granted by

22      1109(b).  In fact, it should be viewed either

23      as being co-extensive with or greater than the

24      standing that's otherwise permitted.

25      Certainly Judge Bushman in the Sandhurst

30

1      decision viewed the term "interested parties"

2      to mean something greater than parties in

3      interest in 1109(b) and if you look at

4      Bankruptcy Rule 2018, for instance, it allows

5      interested entities, which is a group which is

6      greater than or beyond parties in interest, to

7      request that they be entitled to participate.

8           So, it seems to me that certainly

9      those two views, both of Judge Bushman's

10      decision and the Rules, would indicate an

11      extension of the group of parties that may

12      participate rather than cutting back on those

13      parties that may participate in the 1113

14    proceedings.

15         We also refer you to the -- in our

16    papers, to the floor statement.  I believe it

17    was from Senator Hatch on this point, which

18    doesn't give any indication that it was an

19    attempt to cut back on the inclusion of

20    parties in interest.  And, in fact, although I

21    did not quote it, if you look at the floor

22    statement from Senator Thurman, he indicates

23    that the term "interested parties" should be

24    read to include nonunion employees would be

25    allowed to come to court and participate in

                                                    31

1    hearings as well.  I think there's, if

2    anything, rather than looking at what the UAL

3    Court called the "natural reading and

4    statute", if you look at ordinary terms of

5    statutory interpretation, the motion by the

6    UAW has to be denied.  Thank you.

7         THE COURT:  Okay.

8         MR. LAURIA:  Good morning, Your

9    Honor.  Tom Lauria with White and Case.  We

10    represent Appaloosa Management as an objector

11    to this motion.  We also represent Wexford

12    Capital, Partas Capital Management and Lappy

13    Conway as an ad hoc committee of equity

14    holders who, in the aggregate, own

15    approximately twenty percent of the issued and

16    outstanding common stock of Delphi.

17         Chapter 11 is premised on the notion

18    of stakeholder participation.  The argument of

19    the UAW is built on a perceived distinction

20    between the term "party in interest" as set

21    forth in Section 1109 of the Bankruptcy Code

22    and "interested party" as set forth in Section

23    1113.  Fundamentally, this view overlooks a

24    basic rule of statutory construction that

25    identical or similar words in different parts

                                                        32

1    of the same statute should be afforded the

2    same or similar meaning.

3         But, more importantly, it overlooks

4    the fact that, in this case, the labor issues

5    have been recognized by all parties, I think

6    including the Court, as the main event, as it

7    were in this case, the thing that will be

8    outcome determinative in terms of the ultimate

9    economic recovery of parties in this case,

10    including shareholders.

11         Moreover, this is not the

12    determination to be made under Section 1113

13    and 1114 is not just about bargaining.  The

14    statute makes specific references, I think as

15    has been noted, to whether or not the relief

16    is necessary to a reorganization, whether or

17    not the proposal is fair and equitable to all

18    affected parties and whether or not the

19    equities clearly favor rejection.  It is

20    inconceivable that those types of issues

21    foreclose the parties affected from being

22    heard on their outcome.

23        The argument made by the UAW this

24    morning that we maybe should be able to

25    express our views but can't participate in the

33

1    development of an evidentiary record sets us

2    up for futile participation.  These issues are

3    fact-intensive, the Courts recognize, and we

4    have to have a fair opportunity to participate

5    fully and to build our record to address the

6    ultimate issues that the Court is required to

7    decide.

8        I also need to point out, I guess,

9    that the shareholder interests are obviously

10    distinguishable from those of the union and

11    the employees in many respects.  The bottom

12    line, the fundamental principle of Chapter 11

13    cannot be undone by trying to strain the

14    difference between "party in interest" and

15    "interested party."

16         We all have a great deal of respect

17    for Judge Easterbrook, the author of the UAL

18    decision, but, in this case, he simply got it

19    wrong.  Even in the Court's discussion of the

20    notion that consensual modification would only

21    require the participation of the parties to

22    the agreement, the Court got it wrong.  In

23    fact, if a debtor wants to modify a collective

24    bargaining agreement during the pendency of a

25    Chapter 11 case, a motion has to be filed,

34

1    notices provided, parties in interest respond

2    and a contested matter may ensue.

3         So, Your Honor, we think it's

4    absolutely clear that for this process to

5    work, particularly in this case, broad

6    participation needs to be permitted.

7              THE COURT:  Okay.  Thank you.

8              MR. HALL:  Mike Hall, Your Honor,

9    Burr & Forman for Mercedes Benz USI.  I'll be

10    brief.  All of the other parties to this case

11    who have asked to speak on this issue, or

12    asked to be heard on this issue, have one

13    thing in common and that is they all think

14    that this is an all or nothing ruling.  All

15    contracts are rejected, no contracts rejected.

16    Our position is the Court should take -- pay

17    careful attention and perhaps reject some and

18    not others and that's why we want to be heard.

19    I'll rely on the legal arguments that we've

20    already written.  Thank you.

21            THE COURT:  Okay.

22            MS. ENGLUND:  Your Honor, Alyssa

23    Englund with Orrick, Herrington & Sutcliffe.

24    We represent the ad hoc committee of trade

25    claimant and I'll be very brief.  Just resting

35

1    on our papers, basically, we believe that the

2    fair and equitable standard does not

3    necessitate a specific determination of claim

4    amounts in this hearing.  But if Your Honor

5    decides to make those specific claim amount

6    determination, then we would like to be heard.

7    Thank you.

8            THE COURT:  Okay.  Ms. Ceccotti?

9            MS. CECCOTTI:  Just briefly in

10    reply, Your Honor, I think I'm not going to

11    repeat my opening but I do think once again

12    the context of the statute is important.  It's

13    not simply about looking at words -- similar

14    words in one part of the statute versus

15    similar words in another part of the statute.

16            In terms of Delphi's argument, and I

17    probably should have addressed this at the

18    outset, we fully expect the debtors to make a

19    case regarding all of the elements in Section

20    1113 and 1114, including the balance of the

21    equities.  The balance of the equities, as you

22    will hear in much more detail later on,

23    consist of a variety of types of factors that

24    the Courts have looked at, including the

25    factors that Ms. Marafioti expressed.  They --

                                                              36

1    the process by which the Court will entertain

2    that consideration is exactly what it says.

3    If they balance of a variety of factors, the

4    Court may balance some more than others, but

5    it is only one piece.  And even if the Court

6    says that it's going to take account of six

7    factors or four factors or what have you,

8    including the factors concerning the effective

9    claims, it is still one factor of many.  It is

10    a subpart of one of the elements that must be

11    demonstrated under Section 1113 and Section

12    1114.

13            Again, because the debtors are going

14    to include that element as part of their

15    presentation, that view will be represented.

16    However they choose to do so by the debtors,

17    it's covered.  By letting parties -- other

18    parties into the case in a full blown way just

19    for that purpose or for that -- to address

20    that sub-element of one of the elements that

21    needs to be proved may have the effect of more

22    or less distorting one element of many that

23    the Court would consider amongst all of the

24    very significant elements in 1113.  So, we

25    would suggest that that in and of itself does

37

1    not -- would not permit, again, full blown

2    participation, development of a record and so

3    forth.  It may tend to simply just distort the

4    case by elevating that factor beyond the point

5    to which the statute either says,

6    particularly, in light of the fact that the

7    factors are discretionary and the balancing

8    that the Court conducts is just that.  It's a

9    balancing.

10         With regard to Mr. Rosenberg, I have

11    no doubt that Mr. Rosenberg and his colleagues

12    spent a lot of time going through the various

13    materials and did their homework.  It appears,

14    fortunately, however, that they did their

15    homework largely with the debtors.  So, once

16    again, I would stick with my original view on

17    this, which is that their position is more

18    than amply covered by the party that's

19    supposed to be making that case and that is

20    the debtors.

21         I believe that the other objectors

22    have simply reiterated points that I made in

23    my opening, particularly, with respect to the

24    final comment by the ad hoc trade committee.

25         Once again, there are very serious

38

1     issues here.  There are core considerations

2     that the Court will have to deal with in an

3     evidentiary matter.  Attenuating this out to

4     recoveries and beyond recoveries is simply not

5     something that the 1113 process is designed to

6     encompass nor should it encompass,

7     particularly, in a case of this magnitude.

8          THE COURT:  Okay.  Thank you.  All

9     right.  I have a motion in front of me by the

10    UAW to limit the standing of various parties

11    to be heard on the debtors' pending motion to

12    reject not only the collective bargaining

13    agreement with the UAW but a number of other

14    unions, as well.

15         Generally speaking, under Section

16    1109(b) of the Bankruptcy Code, a party in

17    interest, which the statute expressly states

18   includes not only the debtor but also an

19   official creditors' committee, an official

20   equity committee, a creditor and an equity

21   security holder and all of the objectors to

22   the UAW's motion fall into those categories or

23   any indenture trustee, which applies to

24   Wilmington Trust, one of the objectors, "may

25   raise and may appear and be heard on any issue

39

1   in a case under Chapter 11."

2            In In Re Calgor Corporation, 303

3   F3d. 161 (2d Cir. 2002), the Second Circuit

4   broadly interpreted Section 1109 and applied

5   it even to adversary proceedings noting, among

6   other things, that it was not particularly

7   moved by the argument that by so reading the

8   statute, it would be rendering adversary

9   proceedings unmanageable.  The Second Circuit

10   stated that, and to the contrary, that a Court

11   should be able to develop procedures to the

12   extent they're necessary to manage the conduct

13   of the case to permit the issues that were

14   actually at issue in the proceeding to be

15   developed in an efficient fashion.

16            The UAW relies upon a different

17   provision of Chapter 11 to limit and, in fact,

18    eliminate the general right to be heard under

19    Section 1109(b).  That provision is Section

20    1113(d)(1) of the Bankruptcy Code, which

21    provides, in relevant part, that all

22    interested parties may appear and be heard at

23    the hearing on a debtor's motion to reject a

24    collective bargaining agreement.

25            Simply, on its face, Section

40

1    1113(d)(1) does not appear to restrict

2    standing.  It merely provides that all

3    interested parties may appear and be heard.

4    And it is argued, I think cogently, by the

5    objectors that to read this provision of the

6    Code to be in conflict with another provision

7    of the Code, Section 1109(b), the Court absent

8    some other reason would need to see more

9    evidence of congressional intent to override

10    Section 1109(b)'s generally broad grant of

11    standing.  That argument also is consistent

12    with Bankruptcy Rule 2018(a), which provides

13    that even with regard to those who are not

14    expressly "parties in interest," the phrase

15    used in 1109(b), "interested entities" may

16    under proper circumstances have standing in

17    respect of particular matters before the

18    Court.  That suggests that the phrase in

19    Section 1113(d)(1) is actually a broader grant

20    of standing than 1109(b), a point that I

21    believe is echoed by Collier at Seven Collier

22    on Bankruptcy 1009.03, which states that

23    although the concept of a party in interest is

24    necessarily broad, it was not intended to

25    include literally every entity that may be

41

1     involved in or affected by Chapter 11

2     proceedings and that Congress has specifically

3     provided in some circumstances, including

4     under Bankruptcy Rules 2018(a) and 2018(b)

5     which pertains to unions to appear even if

6     they were not technically parties in interest

7     on particular matters.

8            Notwithstanding that reading, the

9     Seventh Circuit in In Re UAL Corp., 408 F3d.

10    847 at 851 (7th Cir. 2005), has taken a

11    restrictive reading of Section 1113(d),

12    although I noted did not consider Section

13    1109(b) at all in its opinion and, apparently,

14    relied in large measure, if not entirely, on

15    the argument that a more expansive grant of

16    standing would, in the Seventh Circuit's view,

17    render the hearing under Section 1113

18    unmanageable because of the number of

19    participating entities or potentially

20    participating entities which, as I noted

21    earlier, is a point that the Caldor Court and

22    others have found not to be controlling with

23    regard to issues of standing generally in

24    bankruptcy under Section 1109.  See,

25    generally, 7 Collier on Bankruptcy, paragraph

42

1    1109.04(3)(c).

2            Obviously, I take the views of the

3    Seventh Circuit seriously and I do believe,

4    having studied the opinion closely as well as

5    a related opinion in the United Air Lines

6    case, appearing at 443 F3d. 565 (7th Cir.

7    2006).  And, in light of my reading of those

8    two opinions and other case law and the

9    statutes, believe that in two respects

10    limitation of standing is appropriate in

11    connection with the motion to reject under

12    Section 1113.

13            First is really one that doesn't

14    particularly apply across the board and it

15    pertains to the unusual facts that appeared in

16    the UAL case relied upon by the UAW.  In that

17    case, the Seventh Circuit made it clear that

18    the party who was seeking standing

19    "acknowledged that its capacity as a fiduciary

20    would be administrative only to ensure

21    collection of all sums due and their correct

22    distribution under the Benefit Plan's terms.

23    But not to take any position on whether those

24    terms should be altered."  Given that

25    contractual agreement by Independent Fiduciary

43

1    Services, Inc., the party whose standing was

2    denied in UAL Corporation, I would totally

3    agree with the result in the UAL case, which

4    is that that party had no basis for being

5    heard on an 1113 motion on the merits.  They

6    performed a fully administrative function.

7    Other Courts, where parties have agreed that

8    the union is the sole bargaining unit, also

9    have been appropriately limited in their

10    standing under Section 1113.

11            Secondly, and more importantly, in

12    connection with any issue regarding standing,

13    the Court has to consider first and foremost

14    the context of the matter before it.  Here,

15    the matter before me is a request by the

16    debtors for authority to reject the various

17    collective bargaining agreements under Section

18    1113 of the Code, as well as authority to

19    alter related benefits under Section 1114.

20    Those two statutes are clearly unusual

21    provisions of the Code enacted by Congress to

22    vary the normal rules for rejecting executory

23    contracts under Section 365.  In particular,

24    Section 1113 lays out a construct that

25    expressly encourages in various ways

44

1    collective bargaining, both before the hearing

2    commences and during -- that is, after the

3    hearing and up until the point that the Court

4    rules.  It also provides for an elaborate

5    level of proof to establish that the agreement

6    should be rejected or not.

7            In that context, where Congress has

8    clearly set up a dynamic where the union and

9    the debtor are directed to negotiate or act at

10   their peril, it is not appropriate as found by

11   the second UAL Corporation case to let other

12   parties intrude upon the negotiations which

13   was the specific result in UAL2 at 443 F3d.

14   565.  The one caveat being, I suppose, if the

15   debtor, for some reason, laid down on the job

16   in which case, I believe, some other party

17   might well be authorized to pick up the

18   mantle, which was in fact the holding in In Re

19   Parrot Packaging Company, Inc., 42 BR 323 at

20   330 (ND Ind. 1983).

21          Secondly, I believe that with regard

22     to the various elements that need to be shown

23     to support rejection of a collective

24     bargaining agreement, the focus should be on

25     the debtors' case vis-a-vis the union and vice

45

1     versa.  Some of the objectors have argued that

2     they could make their own case under the

3     various factors required under Section 1113 to

4     be shown before a collective bargaining

5     agreement may be rejected, including,

6     specifically, the tests that the modifications

7     be necessary and that the proposal and the

8     result be fair and equitable.

9          I believe that that aspect of the

10     litigation should first and foremost, and

11     perhaps exclusively, be done by the debtor on

12     one side and the union on the other.  However,

13     having said that, I believe that the objectors

14     each have a standing to be heard on the

15     debtors' motion.  In this respect, ultimately,

16     is a motion to reject and that is a decision

17     that, in most cases and clearly in this case,

18     is one that's out of the ordinary course and

19     affects the rights of all of the parties in

20     this case.  The official committees have

21    fiduciary duties to investigate and consider

22    the debtors' decision to reject and to pursue

23    a specific course in determining rejection --

24    is the proper course of action here.  As Mr.

25    Rosenberg said, the creditors' committee has

46

1    properly conducted extensive due diligence on

2    that decision and on the process and it has a

3    right to be heard as does any party in

4    interest on that decision.  However, I believe

5    that decision is justified vis-a-vis the

6    estate, generally, and parties in interest,

7    generally, on a business judgment standard

8    under the Second Circuit's O'Ryan Pictures

9    case and Lionell.

10         And that is the issue, I believe,

11    that the objectors or those supporting the

12    decision can weigh in on.  It may be that they

13    are entitled on that basis to submit evidence

14    but necessarily it will be more of a limited

15    nature, which is the bonafide basis for a

16    decision at this time to reject the agreement

17    or agreements.

18         That's how I harmonize Section

19    1113(d) and 1109(b) in light of the principles

20    and purposes of Section 1113.  Whether it's an

21    absolute statutory bar or more rather an

22    interest analysis coupled with my inherent

23    power to manage the litigation in front of me,

24    I think that's the proper result.

25        Most of the objectors simply want to

47

1    preserve their right to comment having done

2    their due diligence.  Indeed, one of the

3    objectors, I think, will drop out.  That is,

4    the ad hoc trade committee, now that they

5    realize that their issue is not being

6    determined in this motion, which is, again,

7    simply one to seek permission to reject a

8    collective bargaining agreement.  Otherwise it

9    doesn't establish the validity of their claims

10    or their clients' claims.

11        The objectors who oppose the relief

12    sought by the debtors here will have to decide

13    whether and in what respect they want to

14    present evidence and/or cross-examine

15    witnesses.  But, again, I will let them do so

16    only insofar as it pertains to the debtors'

17    business judgment to reject as opposed to all

18    of the factors laid out in Section 1113.

19        So, Ms. Ceccotti, you can submit an

20    order to that effect.

21        MS. CECCOTTI:  Thank you, Your

22    Honor.

23          THE COURT:  Okay.  Now let me take a

24    break just for a second.  I -- just a moment -

25    - I apologize to all of you who are standing.


                                                                48


1     Believe it or not, this is the largest

2     courtroom we have in this building.  We have

3     arranged and we had believed that you'd be

4     able to go there right away.  For those of you

5     who would rather sit and listen as opposed to

6     stand and listen and watch, to go to another

7     courtroom just down the hall to do that --

8     unfortunately, one of my colleagues had an

9     emergency hearing that he had to take this

10    morning.  That hearing is now over.  So, if

11    you want to rest your feet and listen as

12    opposed to listen and watch, you can go down

13    to Room 623 and follow this hearing from

14    there.  You're free to stand here, too, of

15    course, but --

16          MS. CECCOTTI:  Your Honor, in

17    connection with your ruling and I know the

18    Court will review the transcript with care, so

19    I did want to note, in connection with the IFS

20    case, there is a brief mention of the IFS

21    position with respect to the rejection and

22    they did intend to oppose.  I just wanted to

23    note that.  It is -- the contract issue that

24    you raised is also mentioned in the opinion,

25    but farther it does say that, based on their

49

1    duties vis-a-vis the plan, they intended to

2    oppose the rejection.

3            THE COURT:  Well, I agree.  I just

4    don't think they have any --

5            MS. CECCOTTI:  Okay.  That's fine.

6            THE COURT:  I think they've given up

7    their right to --

8            MS. CECCOTTI:  That's fine.  I just

9    wanted to make sure that the Court understood

10    that.

11            THE COURT:  -- 'cause they were just

12    on their agent.

13            MS. CECCOTTI:  Right.  That's fine.

14    And there is also a very brief mention of

15    1109(b) that I'm sure the Court has observed

16    as well.  Thank you.

17            MR. BUTLER:  Okay.  Your Honor, the

18    remaining matter on the agenda is the

19    principle matter.  It is the debtors' motions

20    under Sections 1113 and 1114 of the Bankruptcy

21    Code authorizing rejection of the collective

22    bargaining agreements and authorizing

23    modification of retiree welfare benefits.

24    It's found at Docket No. 3035.  We have filed

25    an agenda that has all of the pleadings

50

1    summarized, as is the Court's practice here.

2         Your Honor, we're here before the

3    Court seven months after commencing these

4    Chapter 11 cases.

5         I'm sorry.  Did you want to take a

6    break, Your Honor, now?

7         THE COURT:  No.  I just want to take

8    a break to give people a chance to leave if

9    they wanted to go to the other -- down the

10   hallway.  Sorry.

11        MR. BUTLER:  As I was saying, Your

12   Honor, we're hear before the Court seven

13   months after commencing these Chapter 11

14   reorganization cases back on October 8th, 2005

15   to commence a contested hearing on the

16   debtors' motion made pursuant to Sections 1113

17   and 1114 of the Bankruptcy Code.

18        By agreement at a meet and confer

19   conference amongst the parties with timely-

20   filed objections seeking to participate at the

21   hearing, the order of opening statements and

22   suggested time limits are as follows:  the

23   debtors' as movants, 60 minutes; the

24    creditors' committee, 10 minutes; General

25    Motors, 10 minutes; the UAW, 30 minutes; the

51

1    IUE, 25 minutes; the USW, 15 minutes; the

2    IAM/IBEW, those two unions, 15 minutes,

3    represented by the same counsel; the USOE, 15

4    minutes; Appaloosa, 20 minutes; and Wilmington

5    Trust, 10 minutes.  In addition, Your Honor,

6    in light of the equity committee's

7    appointment, we've added 10 minutes for the

8    equity committee at the conclusion of that

9    order and, if it pleases the Court, we'll

10    proceed in accordance with the meet and confer

11    agreement.

12            THE COURT:  Okay.  That's fine.  I

13    may shorten people if they're going over the

14    same ground, but that's fine.

15            MR. BUTLER:  Your Honor, when we

16    were before this Court at our first day

17    hearings, we told the Court that our Chapter

18    11 reorganization was required first, because

19    of our labor agreements, which have caused an

20    enormous increase in Delphi's labor and

21    benefit costs, including the legacy retirement

22    liabilities arising under those agreements,

23    and have limited Delphi's ability to respond

24    economic changes by selling or closing

25    facilities or laying off excess people.   We

52

1    told Your Honor the second reason was because

2    of competitive conditions in the U.S.

3    automotive market.   Those conditions greatly

4    reduced sales and profitability of Delphi's

5    largest customer and former parent, General

6    Motors Corporation, and it resulted in reduced

7    business and greater pricing pressure for

8    Delphi.   And finally, we told Your Honor about

9    rapidly rising commodity costs which Delphi is

10    unable to pass along to its OEM automotive

11    customers.

12           By this motion, the debtors seek

13    authority to reject pursuant to 1113(c)

14    various collective bargaining agreements with

15    the UAW, IUE-CWA, the USW, the IAM, IBEW and

16    the IUOE.   Upon ten days calendar notice to

17    the Court and the unions, or, alternatively,

18    upon entry of the rejection order, and to

19    modify pursuant to 1114(g), the debtors'

20    obligation is to provide medical and life

21    insurance benefits for hourly retirees

22    effective October 1, 2006.

23           Your Honor, a word about pensions.

24    The evidence will demonstrate the Delphi

25   Section 1113 and 1114 proposals provide only

53

1   for the freezing of the accrual of benefits

2   and not determination of Delphi's hourly

3   pension plans.  The same is true for Delphi's

4   salary pension plans.  Assuming that Delphi

5   can devise a workable solution to its current

6   pension situation, whether it is to stretch

7   out pension payments or develop an alternative

8   solution, Delphi is committed to using the

9   earning power of its reorganized global

10   enterprise to fund its pension obligations in

11   toto.  This alone distinguishes Delphi from

12   most other large labor transformation cases

13   which have involved the loss of pensions, as

14   well as material changes to labor agreements

15   and other retiree benefits.

16          As for other retirement benefits,

17   Delphi Section 1114 relief seeks to substitute

18   individual retirement medical accounts in lieu

19   of Delphi's existing obligations for those

20   retirees and future eligible retirees who do

21   not have the benefit of a GM benefit

22   guarantee.  However, for the remainder of

23   Delphi's retirees and future eligible

24   retirees, all of whom are protected by the GM

25    benefit guarantee and should not receive any

54

1    diminution in their benefits but will just

2    receive payments from GM rather than Delphi,

3    Delphi proposes to terminate its continuing

4    obligations altogether.

5              As the Court is aware, Delphi does

6    not seek relief on an interim basis under

7    Section 1113(e) of the Bankruptcy Code.

8    Section 1113(e) is the only provision of the

9    statute that carries with it judicial

10   inquiries relating to whether the relief

11   sought is essential to the continuation of the

12   debtors' businesses --

13             THE COURT:  I'm sorry.  Can I

14   interrupt you because I think you're -- I want

15   to go back to the pension point for a second

16   because I think this is an issue that will

17   come up later.  Your proposal does not seek to

18   do more than freeze the pension.  However,

19   there's a caveat in it, right?  That if, in

20   fact, more relief is necessary, you would seek

21   to terminate the pension.  Is that right?

22             MR. BUTLER:  Your Honor, that caveat

23   was in it but our position has been, and we

24   believe -- we think we've communicated it to

25   the unions, that had they accepted the

1    proposals we presented them, the proposals

2    would provide for freezing, not for a

3    termination.  We'd have to come back to the

4    Court under at least two separate parts of the

5    statutes.  One would be under 1113 and,

6    secondly, we'd have to come back under the

7    ERISA statute and go through distress

8    termination litigation.

9             THE COURT:  See that's -- but that's

10   -- that was where I was leading.  I thought

11   that's how I understood your proposal but

12   there's a footnote in your reply that says,

13   and maybe this is just ambiguous, "if however

14   the Court grants the Section 1113 relief

15   Delphi seeks in its motion, Delphi would only

16   be required to seek relief under ERISA."  That

17   seemed to be contradicted by the sentence that

18   precedes it which says that you'd be seeking

19   relief under both 1113 and ERISA.  But, I just

20   want to make sure.  Are you seeking today

21   authority if, for some reason, it becomes

22   necessary to terminate the pension plan or is

23   that something that would be left for another

24   day?

25             MR. BUTLER:  That would be left for

1    another day, Your Honor.

2              THE COURT:  Okay.  All right.

3              MR. BUTLER:  And that's the position

4    we've communicated.

5              THE COURT:  Okay.

6              MR. BUTLER:  Your Honor, I was

7    talking, I think, about 1113(e).  And, as the

8    Court's aware, Delphi does not seek any

9    interim relief under Section 1113(e).  Section

10   1113(e) is the only provision of the statute

11   that carries with it judicial inquiries

12   relating to whether the relief sought is

13   essential to the continuation of the debtors'

14   businesses and whether irreparable harm,

15   irreparable damage to the estate, would be

16   caused but for the relief sought.  These

17   inquiries are not relevant to today's hearing.

18             We're asking for the relief in the

19   motion because the evidence will demonstrate

20   that Delphi has complied with requirements of

21   Section 1113 and 1114, including the fact that

22   we will prove by a preponderance of the

23   evidence that Delphi's unions have refused to

24   accept the proposals made to them without good

25   cause and Delphi's proposals are necessary to

57

1    Delphi's reorganization.

2            The evidence will demonstrate that

3    without transforming Delphi's North American

4    operations to be competitive in North America,

5    let alone globally, these debtors cannot

6    reorganize and these businesses will fail.  No

7    where in the union objections is this

8    fundamental precept challenged or to the

9    union's claim that Delphi's collective

10   bargaining agreements are competitive in the

11   automotive supply industry.

12           We ask for this relief now because

13   despite the passing of three court deadlines

14   in December 2005, February 2006 and March

15   2006, that were imposed at Delphi's request

16   and more than a billion dollars in losses and

17   hundreds of millions of dollars of cash

18   consumed by losing operations since October

19   8th, there is no consensual labor

20   transformation agreement among the parties and

21   there has not been a single comprehensive

22   proposal or counteroffer to Delphi's multiple

23   proposals from Delphi's major unions,

24   including the UAW, the IUE, CWA or USW.

25           Essentially, we believe our unions

58

1    concede that there is a problem but without a

2    consensual solution, Delphi must be empowered

3    to change the status quo and implement

4    solutions.

5            Indeed, even though Delphi's March

6    31st motion, Your Honor, stated clearly that

7    Delphi continued to be focused in reaching a

8    consensual solution with all of its unions and

9    would proceed with this motion only if the

10   parties could not reach consensual resolution

11   by May 9th, after nearly seven weeks since the

12   filing, there still remains no consensual

13   labor transformation agreement among the

14   parties or comprehensive proposal or

15   counterproposal from Delphi's major unions.

16   Not a single one.

17           That having been said, I want to

18   repeat the assurances that Delphi included in

19   its March 31st motion about what Delphi would

20   do if the company obtains the relief requested

21   in the motion.  Because the company continues

22   to seek a consensual resolution, Delphi would

23   not immediately impose all the relief sought.

24   That, of course, Your Honor, is not fatal to

25   our -- the relief sought in the motion.  It

59

```
 1   simply describes to the Court Delphi's present

 2   intention about how it would impose relief if

 3   it was given the authority to do so.

 4           Instead, Delphi's intention is to

 5   continue working with its unions towards a

 6   consensual resolution that would make Delphi's

 7   continuing North American operations

 8   competitive here in North America and would

 9   contribute to making Delphi competitive in the

10   global marketplace.

11           That being our preference and our

12   preferred path does not change the

13   congressional designs of 1113 and 1114, which

14   may be used on very short notice in the life

15   of a Chapter 11 debtor and well in advance of

16   any plan of reorganization process.  It is

17   simply not the case that Delphi can or should

18   be prevented from pursuing, obtaining, and, if

19   necessary, implementing statutory relief to

20   address the very real barriers to successful

21   reorganization that the debtors believe that

22   the evidence will show are posed by

23   uncompetitive collective bargaining agreements

24   and the roadblocks are rationalizing Delphi's

25   product lines and our plant portfolio.
```

1           Your Honor, without affecting in any

2      way the merits of Delphi's motion, it is

3      fundamentally important to acknowledge in this

4      opening statement the very real impact of

5      Delphi's labor transformation reorganization

6      on many people and on many communities in

7      which Delphi operates.

8           I speak of transformation more

9      generally rather than the motion itself being

10     heard today because one way or another there

11     will be fundamental change.  Whether it is

12     transformation and reorganization, which is

13     the goal of Delphi's Chapter 11 cases and

14     today's motion, or something much less

15     palatable like a sales process and

16     liquidation, depends on whether many of us in

17     this courtroom today can continue to navigate

18     towards a consensual transaction at some point

19     soon.

20          Whatever our course, there will be

21     fundamental change.  Delphi's current

22     uncompetitive labor arrangements, which are

23     basically OEM-based compensation rather than

24     Tier One supplier-based cost structures,

25     ignores the competitive realities within North

1    America, as well as global competition.  And

2    it will not.  Indeed, this structure cannot

3    survive through the next winter.

4            That stark reality has been, and

5    will continue to be, incredibly painful to

6    people and communities across the industrial

7    heartland where there is a concentration of

8    people that will not reap the rewards promised

9    to them a generation ago and communities will

10   have to readjust to the loss of major

11   industry.

12           Though my immediate family now lives

13   in Chicago, I am a native son of Michigan.  My

14   grandparents and parents are buried in

15   Detroit's cemeteries south of Eight Mile.  All

16   of my siblings and their families live in

17   southeast Michigan.  In addition to being

18   neighbors and citizens, my brothers and

19   sisters and their spouses are teachers, real

20   estate brokers and small business operators.

21   They personally experience and tell me about

22   the havoc the current state of the automobile

23   industry is causing to the children in their

24   classrooms, the value of their homes, the

25   profitability of their businesses and their

1    communities.

2            For 50 years, I have spent parts of

3    my summer in northeast Michigan with lake

4    friends from cities including Flint and

5    Saginaw.  As other Michiganders, I have driven

6    by the Saginaw Steering plant near the

7    Zilwaukee Bridge hundreds of times headed

8    north.  What you observe and what are told to

9    you and what you sense and you feel is real

10   and vivid pain across Michigan and across

11   other affected states.

12           During the presentation of the

13   unions' opposition cases, we will all sit in

14   this courtroom together and listen to impact

15   witnesses who will talk about the pain and the

16   suffering and the intolerable choices that

17   confront their friends and their colleagues

18   and themselves.  We should listen and be

19   empathetic to them because, as human beings,

20   it is the right thing to do.

21           But as the evidence will

22   demonstrate, and as I will address in closing

23   arguments, there is no magic balm that makes

24   competition go away.  There is no magic balm

25   that takes us back to a high wage

1    manufacturing environment year long gone by.

2    There is no magic balm that permits a supplier

3    to pay OEM-based compensation.

4           Simply stated, Delphi must become

5    competitive to survive.  However mindful the

6    impact and implementation of its

7    transformation plan will have on some of its

8    stakeholders, including its employees and

9    communities, ultimately, Delphi's

10    transformation actions will result in a

11    stronger company with future global growth

12    opportunities.  In the meantime, Delphi will

13    continue to examine and will continue to

14    incorporate into its transformation plan

15    elements that mitigate some of the pain.  The

16    evidence will demonstrate this effort to date

17    through the company seeking to retain and pay

18    accrued pension obligations, through

19    implementing special attrition programs and

20    even through pursuing the GM consensual

21    scenario which provides a longer

22    transformation period during which subsidized,

23    not fully competitive wages, continue to be

24    paid.

25           With respect to the transformation

64

1    plan, Your Honor, the evidence will

2      demonstrate that during the fourth quarter of

3      2005, Delphi identified to GM, its unions and

4      its creditors' committee five key areas that

5      Delphi would need to focus on to complete its

6      restructuring process.

7               First, Delphi said it needed to

8      modify its labor agreements to create a

9      competitive arena in which to conduct business

10     going forward.

11              Second, Delphi said it needed to

12     conclude its negotiations with General Motors

13     to finalize its financial support for the

14     legacy and labor cost Delphi currently carries

15     and to ascertain GM's business commitment to

16     Delphi going forward.

17              Third, Delphi said it needed to

18     streamline its product portfolio to capitalize

19     on its world-class technology and market

20     strengths and make the necessary manufacturing

21     alignment with its new focus.

22              Fourth, Delphi said it needed to

23     transform its salaried work force to ensure

24     that its organizational cost structure was

25     competitive and aligned with its product

1      portfolio and manufacturing footprint.

2          And finally, as I mentioned earlier,

3     Delphi needed to devise a workable solution to

4     its current pension situation, whether it is

5     to stretch out pension payments or develop an

6     alternative solution.

7          Your Honor, I spoke a few minutes

8     ago about the Court's scheduling orders.

9     These orders were entered from time to time at

10    the debtors' request.  But they importantly

11    bear on many of the objections that have been

12    filed.  As part of its first day hearings,

13    this Court granted relief sought by Delphi and

14    entered a scheduling order regarding Sections

15    1113 and 1114, which set three important

16    deadlines relevant to all parties in interest

17    in these cases back last fall.

18         By October 21st, 2005, Delphi was to

19    serve the international unions with Section

20    1113 labor proposals and relevant information.

21    The evidence that this was accomplished.

22         By November 18th, 2005, Delphi was

23    to serve authorized representatives of

24    retirees with Section 1114 retirement benefit

25    modifications and relevant information.  The

66

1     evidence will demonstrate that this was

2     accomplished and included a modified Section

 3    1113 proposal based on the competitive

 4    benchmark scenario.

 5            By December 19th, 2005, absent a

 6    consensual deal, Delphi was to file its

 7    1113/1114 motion.  This was not accomplished.

 8    Indeed, in response to demands from its major

 9    unions and in order to facilitate discussions

10    with its unions, Delphi publicly withdrew the

11    November 18th competitive benchmark proposal

12    as a formal proposal, and at Delphi's request,

13    this Court twice amended the Section 1113/1114

14    motion filing deadline from December 19th,

15    2005 to February 17th, 2006 and, ultimately,

16    to March 31, 2006 in order to provide an

17    additional three and a half months for the

18    pursuit of a consensual transaction by Delphi

19    and its unions.

20            At around the same time, Delphi's

21    largest customer and its former parent,

22    General Motors, agreed to provide some

23    financial support to the debtors in the form

24    of a waiver of future pricedowns.  The

25    evidence will show that General Motors engaged

 1    Delphi and its largest union, the UAW, in

 2    bilateral and tri-party discussions to try to

3    find a consensual resolution of Delphi's labor

4    transformation requirements which might

5    involve GM's financial participation.

6         These discussions included months of

7    meetings with the UAW and periodic meetings

8    with other unions regarding the framework of a

9    transformation plan that could provide wages

10   that were higher than the competitive

11   benchmark scenario but only to the extent

12   subsidized by GM which, by the way, has not

13   itself agreed to such subsidies.  These

14   frameworks discussions led to Delphi's

15   delivery of the GM consensual scenario and

16   related proposals in March.

17        These discussions also led to a

18   negotiated special attrition program for UAW

19   represented employees which the Court approved

20   on April 7th, 2006.  As important a fist step

21   as the special attrition program is, because

22   it provides additional options to workers who

23   face difficult choices, the program is a

24   voluntary program that involves the payment of

25   additional incentives without any

68

1    transformation of collective bargaining

2    agreements or retiree benefits.  And,

3    unfortunately, that first step has not yet led

4    to a consensual restructuring transaction or

5    even a framework for such a transaction.  Nor

6    have the debtors received as of today a single

7    comprehensive proposal or counteroffer from

8    any of the debtors' major unions.

9              And so, Your Honor, this hearing

10    begins 39 days after Delphi filed its motion

11    pursuant to the last scheduling order.  Your

12    Honor, Delphi's direct case will consist of 13

13    witnesses presented by the debtors over the

14    next several days.  Pursuant to meet and

15    confer agreements with the objectors, the

16    debtors' direct testimony will be presented

17    through declarations and supplemental

18    declarations, as well as documentary exhibits.

19              The objectors have the option of

20    admitting their declarations or proceeding

21    with live testimony.  Live testimony is

22    limited to the material covered in the

23    declarations plus development since the date

24    of the declarations and the parties will have

25    the parties will have the opportunity to make

69

1    those decisions as we go forward.  And we

2    understand most of the unions are going to put

3    on live testimony.

 4         The debtors and the objectors

 5    submitted last week joint trial books

 6    consisting of 188 designated exhibits, which

 7    has subsequently had additional exhibits

 8    designated through, I believe, Exhibit No.

 9    231, as of this morning.  There will continue

10    to be some additional exhibits designated by

11    the parties, pursuant to meet and confer

12    protocol, and we will address the admission of

13    the exhibits into the evidentiary record at

14    the conclusion of the direct opposition and

15    rebuttal cases.

16         Each of Delphi's witnesses is

17    present in the courtroom today and will be

18    available for cross and re-direct

19    examinations.  By agreement of the meet and

20    confer parties, the order of cross-examination

21    will be the union objectors, Appaloosa and

22    Wilmington Trust.  Also by agreement, at the

23    time when the debtors present a witness for

24    cross-examination and prior to the

25    commencement, Mr. Kennedy, counsel to the

                                            70

 1    IUE/CWA, will rise and announce the particular

 2    order of cross-examination by union objectors

 3    of that witness.

 4         With respect to the issue of

```
 5    preserving confidentiality and protective

 6    orders entered in these cases in accordance

 7    with Section 1113(d)(3), as witnesses are

 8    examined, the debtors have asked that counsel

 9    make their best efforts to maintain the

10    confidentiality of confidential information by

11    asking questions of witnesses in a manner that

12    is informative to the witness and to the Court

13    but not necessarily to the general public.

14    Given the issues at stake, and the public's

15    interest in these proceedings, it is the

16    debtors' strong preference that the issue of

17    confidentiality be handled this way rather

18    than through closing portions of the hearing.

19    However, the debtors have reserved the right

20    to request a closed hearing at specific times

21    should that need arise.

22            At this time, Your Honor, I'd like

23    to introduce each of Delphi's witnesses in the

24    plan and the planned order of our direct case,

25    which does remain subject to adjustment, and
```

71

```
 1    briefly on the subject area of their

 2    testimony.

 3            When I call the name, I'd just like

 4    them to stand briefly so the Court can
```

```
 5    identify them:

 6           Mr. Resnick?  David Resnick is a

 7    managing director at Rothschild, Inc.  He has

 8    the responsibility for the firm's global

 9    restructuring practice.  Mr. Resnick will

10    testify to an overview of the automotive

11    industry, to Rothschild's work on behalf of

12    Delphi, to the initial development of four

13    restructuring alternatives last summer, also

14    referred to as Scenarios A, B, C and D, to the

15    development of the steady state scenario as

16    the starting point to develop a restructuring

17    plan, to the competitive benchmark scenario

18    issued in connection with last fall's

19    proposals, to the GM consensual scenario

20    issued in connection with proposals that were

21    delivered in March 2006, and finally, Mr.

22    Resnick will provide a critical appraise and

23    rebuttal of Mr. Millstein's declarations

24    submitted on behalf of the UAW.

25           Our second witness is Mr. Kevin
```

72

```
 1    Butler.  Mr. Butler is the vice-president

 2    human resource management of Delphi

 3    Corporation and is responsible for oversight

 4    of Delphi's worldwide human resources.  Mr.

 5    Butler will testify to Delphi's historical
```

6   pattern bargaining practices with its unions,

7   to meetings held with its major unions in the

8   second, third and fourth quarters of 2005, as

9   well as meetings to date this year.  He will

10  testify to information provided to the unions,

11  to the competitive roadblocks caused by the no

12  sale or closed provisions of Delphi's

13  collective bargaining agreements, to the

14  insufficiency of existing new hire agreements

15  with its major unions and to the anticipated

16  impact of special attrition programs

17  negotiated with the UAW and intended to be

18  negotiated with Delphi's other unions.  Mr.

19  Butler will also testify to Delphi's 1113 and

20  1114 proposals served on October 20th and

21  21st, 2005 and November 17th, 2005 relating to

22  the competitive benchmark scenario and the

23  formal withdrawal of that proposal on December

24  19th, 2005.  He will speak, Your Honor, to

25  Delphi's 1113 and 1114 proposal served in

73

1   March 2006 relating to the GM consensual

2   scenario and, if not agreed to by GM, the

3   competitive benchmark scenario.  Mr. Butler's

4   testimony also includes Delphi's use of

5   supplier-based competitive analyses to

6    determine market wage rate and benefit

7    packages, Delphi's neutral relief prior to

8    September 2007 and, finally, he'll speak to

9    certain matters relating to salaried employees

10   including the pension plan freeze of the

11   salaried employee program as of January 1,

12   2007.

13          Our third witness, Your Honor, is

14   Mr. Michael L. Walkter.  Mr. Walkter is the

15   William B. Johnson professor of law and

16   economics and a co-director of the Institute

17   for Law and Economics at the University of

18   Pennsylvania.  He has presented expert

19   testimony on wage and benefit comparability

20   issues on numerous occasions and he will

21   testify regarding his expert evaluation of the

22   current comparability of Delphi's wage and

23   benefits and his assessment of the wage

24   proposals that the company has made for its

25   unionized employees, including Dr. Walkter's

74

1    reviews on the reasons for the company's --

2    or, excuse me -- the reasons for automotive

3    companies' financial troubles in the industry,

4    the comparability principles and his choice of

5    comparison groups, the characteristics of

6    Delphi's work force and comparably skilled

7   workers and production workers economy-wide in

8   the automotive parts industry, the implication

9   of Delphi's historical quit rates and,

10  finally, Dr. Walkter will testify to the

11  affect of Delphi's wage and benefit proposals

12  and their relationship to market levels.

13          Our fourth witness, Your Honor, will

14  be Stephen Gebiuh.  Mr. Gebiuh is executive

15  director, benefits and policy of Delphi

16  Corporation.  He is responsible for directing

17  all activities regarding Delphi's employee

18  benefit plans and programs, as well as

19  Delphi's U.S. salaried policies, procedures,

20  practices and administrative guidelines.  Mr.

21  Gebiuh will testify to proposed modifications

22  to benefits currently provided in the debtors'

23  collective bargaining agreements.  He will

24  testify to proposed modification to retiree

25  benefits.  He will testify to proposed

                                                    75

1   modification to the hourly pension program.

2   And finally, he will deal with incremental

3   benefits included in the GM consensual

4   proposal, including retiree medical accounts

5   and incremental severance payments which are,

6   in the proposal, 70,000 to 140,000 per person,

7    based on seniority, as well as the prior

8    reduction of salaried personnel benefit

9    packages to competitive norms which have

10   resulted in the value of salaried compensation

11   of benefits being reduced by more than 15

12   percent since 1999.

13          Our fifth witness, Your Honor, is

14   Mr. Keith Williams who will join us this

15   afternoon.  He is employed by Watts & Watt

16   worldwide and is the enrolled actuary for

17   Delphi's defined benefit programs.  Mr.

18   Williams will testify to various matters

19   relating to the hourly rate employee pension

20   plan, including liability measurements,

21   primary reasons for increased unfunded pension

22   obligations, projections of future minimum

23   pension funding obligations and the impact of

24   pension relief, including pension waivers, and

25   various matters relating to hourly and

76

1    salaried retiree health care measurements,

2    primary reasons for the increased and

3    projected benefit obligations and the affect

4    of the elimination of OPEB on October 1, 2006,

5    as well as Delphi's health care trend rate.

6          Our sixth witness is Mr. John

7    Schien.  As Your Honor knows, Mr. Schien is

8    vice-president and chief restructuring officer

9    at Delphi and has responsibility as a chief

10   accounting officer and comptroller as well.

11   He will testify to an overview of Delphi's

12   businesses, including its three business

13   sectors, and historical financial performance,

14   the causes of Delphi's current financial

15   condition, Delphi's inability to successfully

16   reorganize without the changes to its labor

17   agreements, Delphi's restructuring scenarios,

18   which include the steady state baseline from

19   which both the competitive benchmark and GM

20   consensual scenarios were constructed,

21   Delphi's five key elements of its

22   transformation, which I addressed earlier, the

23   downside risks to Delphi's transformation

24   plan, the efficiency of the debtors' responses

25   to union information requests, the fair and

77

1    equitable treatment of stakeholders other than

2    the unions in connection with the Section 1113

3    and 1114 proposals and information regarding

4    Delphi's improved 2006 financial performance,

5    including the factors that have contributed to

6    that performance, as well as the company's

7    assessment that there is no material change in

8   its need for relief under Section 1113/1114.

9   Mr. Schien finally will speak to concessions

10  obtained by the company from its suppliers, as

11  well as the company's assessment of the affect

12  of the UAW special attrition program and the

13  GM contract rejection motion on this process.

14       Delphi's seventh witness will be Mr.

15  Mark Weber.  Mr. Weber is executive vice-

16  president, operations, human resource

17  management and corporate affairs at Delphi

18  Corporation.  As part of the company's

19  transformation plan and SGNA realignment, Mr.

20  Weber will take responsibility for the

21  company's shared services organization.  He

22  will testify to the following:  first, he will

23  testify to the 1999 spin-off from GM,

24  including the rationale for that transaction,

25  the assumptions and risks in the spin-off as

78

1   recognized by GM and Delphi, the mirror

2   agreement with the UAW executed in 1999 that

3   committed Delphi to mirror the GM patterned

4   labor agreements until September 2007 and thus

5   continue OEM-based, and not supplier-based,

6   collective bargaining agreements.  Mr. Weber

7   will speak to the GM benefit guarantee, as

8   well as the level of salaried and management

9    compensation and benefits and the need to

10   achieve market-based compensation for salaried

11   workers.  He will address the planned

12   elimination of about 5,250 of Delphi's 14,300

13   U.S. salaried management positions in

14   connection with the implementation of Delphi's

15   transformation plan, as well as the layered

16   implementation of SGNA cost reduction programs

17   that are designed to achieve approximately 450

18   million dollars per year when fully

19   implemented.

20           Our eighth witness will be Mr.

21   Robert Gerling.  Mr. Gerling is labor director

22   of Thermal & Interior of Delphi Corporation.

23   His responsibilities include labor

24   negotiations with the UAW, IUE and the USW.

25   Since the Chapter 11 filing, Mr. Gerling has

79

1    been primarily responsible for negotiating

2    with Delphi's Local unions of the IAM, about

3    45 employees, the IBEW, about 60 employees,

4    and the IUOE, about 19 employees.  Mr. Gerling

5    will testify to meetings with the IUOE

6    Columbus and Rochester Locals regarding

7    Delphi's three proposals, meetings with the

8    IAM and IBEW regarding Delphi's three

9    proposals, receipt of a counterproposal from

10   the IBEW and the IAM on April 20th and 21st

11   and the status of negotiations regarding

12   potential special attrition programs with

13   those unions.

14          Our ninth witness will be Mr. Darryl

15   Kid.  Mr. Kid is executive director of labor

16   relations of Delphi Corporation and is

17   responsible for negotiating the national

18   agreement with the UAW and overseeing the

19   Local agreements with the IAM, IBEW and IUOE.

20   Mr. Kid will testify to information sharing

21   procedures and processes, including Delphi's

22   virtual data room and the status of Delphi's

23   response to over 600 individual data requests

24   from the unions, as well as provisions of

25   Delphi's collective bargaining agreements that

80

1    relate to wages, vacation and holiday

2    entitlements and job security.  And finally,

3    Mr. Kid will testify regarding Delphi's

4    special attrition program with the UAW.

5          Our tenth witness is Bernard J.

6    Quick.  Mr. Quick is a director of labor

7    relations of Delphi Corporation and is

8    responsible for negotiating and overseeing the

9    National and Local agreements of the IUE/CWA

10    and the USW.  Mr. Quick will testify to

11    meetings, negotiations with the IUE and USW,

12    Delphi's custom of pattern bargaining with the

13    IUE and USW following UAW pattern agreements

14    and the insufficiency of new hire agreements

15    that exist with the IUE and CWA, which provide

16    for competitive new hire rates but require

17    that employees grow traditional wages.

18    Finally, Mr. Quick will testify to provisions

19    of Delphi's collective bargaining agreements

20    that relate to wages, vacation and holiday

21    entitlements, job security, no sale or closure

22    provisions, successorship, outsourcing and

23    subcontracting.

24            Our last three witnesses, Your

25    Honor, are financial advisor witnesses.   The

81

1    eleventh witness is William R. Shaw.  Mr. Shaw

2    is a director at Rothschild, Inc.  During the

3    1113 and 1114 process, Mr. Shaw was primarily

4    responsible for coordinating the debtors'

5    information sharing relationship with Lazard,

6    Ltd., financial advisors to the UAW and will

7    testify to the information sharing process

8    with the UAW and rebuttal allegations made by

9    the UAW.

10          Our twelfth witness is James K.

11   Guleamo.  Mr. Guleamo is a managing director

12   of FTI Consulting, Inc. and during the

13   1113/1114 process, he was primarily

14   responsible for coordinating the debtors'

15   information sharing relationship with Shannon

16   Capital Partners, financial advisors to

17   IUE/CWA and will testify to the information

18   sharing process with that union in rebuttal

19   allegations made by the IUE/CWA.

20          The debtors' final witness, Your

21   Honor, will be Mr. Randall Eisenberg.  Mr.

22   Eisenberg is a senior managing director of FTI

23   Consulting, Inc. and is generally responsible

24   for FTI's overall engagement relationship with

25   the debtors.  Mr. Eisenberg will testify


                                                        82


1   regarding Delphi's transformation plan,

2   including the essential element of labor

3   transformation, the lack of material or

4   sufficient impact of the special attrition

5   plan on Delphi's transformation plan

6   requirements, even if those plans are

7   successfully implemented with all of our

8   unions and the status of the debtors' short-

9   term and long-term liquidity position without

10  successful transformation of its business.

11    Mr. Eisenberg will also testify to the

12    adequacy of information provided at certain of

13    Delphi's unions, to the inadequacy of plant by

14    plant proposals to successfully implementing a

15    reorganization of the debtors' businesses and

16    finally, the inadequacy of other savings

17    measures, be they the pending SGA initiatives

18    or the pending GM contract rejection motion to

19    successfully implementing a plan of

20    reorganization in these cases.

21              In summary, Your Honor, there are

22    four principle areas where Delphi's motions

23    has been challenged by its unions:  good faith

24    bargaining, information sharing, financial

25    projections in need of the company and the

                                                              83

1    legitimacy of the underlying competitive wage

2    comparison study, which is the basis for the

3    labor wage proposals.  As to each of these

4    points, insofar as they relate to the required

5    elements of Section 1113/1114 relief, Delphi's

6    witnesses will carry its burden of proof, as

7    I've just outlined.

8              Your Honor, the evidence will

9    demonstrate that Section 1113/1114 relief is

10   necessary for reorganization and that Delphi

11    cannot wait until 1997 -- excuse me, until

12    2007.  The objectors argue that the motion is

13    premature because we must all step to the

14    sidelines and wait and see what the cost

15    savings from the special attrition programs or

16    the GM contract rejection motion, or whether

17    Delphi's first quarter financial performance

18    will continue.

19          The evidence will demonstrate that

20    regardless of whether Delphi is able to

21    realize maximum savings through any of these

22    mechanisms, the company will still lose

23    billions of dollars.  More importantly, the

24    evidence will demonstrate that Delphi's

25    failure to become competitive in North

84

1    America, as well as globally, will not only

2    jeopardize long-term relationships with GM,

3    but also with the balance of the OEM community

4    worldwide.

5          The unions' fact witnesses

6    declarations do not challenge Delphi's

7    competitive data and their experts do little

8    but ask questions without producing

9    alternative proposal or analysis that would

10    weave rebut Delphi's evidence that Delphi

11    cannot continue to pay a substantial wage

12    premium to its hourly workers in a highly

13    competitive auto parts market.

14          The unions also do not appear to

15    challenge Delphi's need for flexibility to

16    respond to the competitive market by

17    affordably reducing the work force and selling

18    or closing businesses.  Delphi's evidence will

19    demonstrate that the non-wage rate

20    modifications of Delphi's proposals are as or

21    more important than the wage rates and have

22    not been countered by the unions.

23          Similarly, Your Honor, the evidence

24    will demonstrate that the notion that Delphi

25    can wait until September 2007 and simply

85

1     implement its proposals at that time is

2     incorrect.  Putting aside the labor loss

3     statutory scheme that would require Delphi to

4     maintain a status quo throughout the 2007

5     bargaining process, the evidence will

6     demonstrate that waiting until the expiration

7     of collective bargaining agreements is not a

8     solution for this company.

9           Your Honor, Delphi will carry its

10    burden of proof in this contested hearing that

11    the debtors have complied with all relevant

12   legal requirements applicable to these debtors

13   in this Court under Sections 1113 and 1114.

14   The evidence will demonstrate that the

15   debtors' requested relief is necessary for

16   reorganization and that there has been more

17   than sufficient time, information and

18   opportunity for bargaining.  The evidence will

19   demonstrate that the debtors' long-term

20   liquidity profile, which is the only relevant

21   profile under the necessity for reorganization

22   test, especially since Section 1113(e) is not

23   implicated in this motion, will not permit the

24   company to reorganize without the relief

25   requested.  Thank you.


86


1        THE COURT:  Okay.

2        MR. ROSENBERG:  Your Honor, I will

3   not take the Court's time at this juncture.  I

4   know Your Honor has read the papers.  I would

5   simply comment that in response to Ms.

6   Ceccotti's point that evidently we only did

7   due diligence with the debtor, she is correct.

8   The debtor was the party who cooperated with

9   due diligence.

10        MR. SIMON:  Good morning, Your

11   Honor.  Cohen, Weiss & Simon for the United

12   Auto Workers.  Before I get to my formal

13    remarks, I have two preliminary matters that

14    this sort of generated by your ruling on the

15    standing issues and one raised by your

16    colloquy with Mr. Butler regarding the pension

17    footnote.

18            First, to seek guidance from the

19    Court as to when it will be appropriate for

20    parties other than the debtor and the union to

21    either submit evidence or otherwise

22    participate in connection with the business

23    judgment issue, as I understand, and we've

24    argued this extensively and I'll turn to it in

25    my formal remarks, the company seeks in this

87

1    motion authority to reject the contract which

2    they would not exercise until after the

3    Court's order and only upon ten days notice at

4    some point, presumably, to the unions and to

5    the Court.  Is it the Court's view that the

6    debtors' decision to seek authority, the

7    matter before us now, is a matter as to which

8    their business judgment is subject to inquiry

9    by the others or will it be their

10    determination after the Court has ruled,

11    assuming it rules to grant authority to

12    reject, and they've given ten days notice of

```
13    intention to reject?  It seems to me that goes
14    to the heart of what it is and when it is that
15    those parties will be able to say on that
16    issue.
17            THE COURT:  Well, I guess we ought
18    to address this issue now.  As addressed in
19    the papers, it was addressed in the debtors'
20    reply in which they said that to the extent I
21    felt that their approach, although it might
22    make sense as a business matter, is not
23    supportable under the statute their seeking
24    rejection.  And, of course, they prefaced that
25    all by saying they're really seeking a
```

88

```
1    consensual agreement.  But barring that
2    they're seeking rejection under 1113.
3            In my view, the statute has an
4    either/or result.  You either reject and have
5    approval to reject or you don't.  Now that
6    being said, after the agreements are rejected,
7    the debtors' can still, in practice, honor
8    them for as long as they want, subject to
9    other parties putting whatever pressure they
10    can in the case on them to stop doing it.  So,
11    I think what they're seeking and what I
12    believe the law is differ only as a matter of
13    semantics.  Although semantics may be
```

14    important with regard to press releases and

15    internet communications and the like, I think,

16    reading between the lines, the debtors don't

17    want a ruling that says that the agreements

18    are rejected because they're concerned, as any

19    business should be, about the consequences of

20    that, ie., the potential for a strike.

21    However, as I said before, I think that all of

22    Delphi's employees, and certainly their

23    representatives, are smart enough to see that

24    the semantic distinction is not particularly

25    meaningful.


                                                          89


1         So, in my view, what this is about

2    is a motion to reject.  If the debtors decide

3    after I authorize rejection, if I do authorize

4    it, to continue on performing various aspects

5    of those collective bargaining agreements,

6    that's their decision.  But this is a motion

7    to reject as opposed a motion to seek

8    authorization to reject sometime in the

9    future.

10         MR. SIMON:  With all due respect,

11    Your Honor, and I trust that you will await

12    our substantive remarks in that regard, I

13    appreciate --

14          THE COURT:  Well, you asked me the

15   question.  That's why I answered you.

16          MR. SIMON:  I appreciate the advance

17   view of your thinking but I think, and as we

18   will demonstrate, it's not semantics.  The

19   debtors specifically asked not for an order of

20   rejection.

21          THE COURT:  Well, no.  Their reply

22   papers are very clear on that point.

23          MR. SIMON:  No, no.  Their reply

24   papers simply said, Judge, if you disagree

25   with them, then yourself should convert this

                                                        90

1    into a motion to reject and, with all due

2    respect, we don't believe that's a function of

3    this Court.  But I prefer -- I don't believe

4    it's this Court's duty --

5          THE COURT:  Well, I don't view it

6    that way.

7          MR. SIMON:  -- to pull their irons

8    out of the fire.  If they made the mistake of

9    asking for something the statute doesn't

10   authorize them to ask for they cannot cure

11   that problem by saying to you, Judge, if we

12   asked for the wrong thing, help us out and

13   convert it into our asking for something that

14   we didn't ask for and don't have the power to

15    ask for.  But, again, I'd prefer to address

16    that substantively in the context of the

17    balance of my argument.

18            THE COURT:  All right.  But --

19            MR. SIMON:  The second issue --

20            THE COURT:  Let me finish.  Your

21    question of me, and I don't like being turned

22    around when someone asks me a question and

23    then have it thrown back at me, all right?

24    You appreciate that?  Your question of me --

25            MR. SIMON:  Your Honor, I appreciate

91

1    the remarks --

2            THE COURT:  Wait a minute.  Just a

3    minute, sir.

4            MR. SIMON:  You asked me a question.

5    I responded.

6            THE COURT:  All right.  And I asked

7    you to listen to me.  Your answer is, to your

8    question, as far as testimony is concerned, I

9    think it is my view to treat this as a motion

10    to reject and that's how I will hear the

11    testimony, which is the answer to your

12    question.  Now, if you want to argue

13    notwithstanding that sometime in the future

14    that I shouldn't have done that, that's fine.

15    But I gave you the answer as far as how I will

16    hear the testimony.

17            MR. SIMON:  I understand your answer

18    and I will assume that I have the ability to

19    make my opening remarks --

20            THE COURT:  You do.

21            MR. SIMON:  -- as I had planned to

22    and will.

23            THE COURT:  You do.

24            MR. SIMON:  The second issue deals

25    with the colloquy you had with Mr. Butler

92

1    regarding pensions.  And I think there, with

2    all due respect, it's not merely ambiguous,

3    but if we turn to page 22 of the debtors'

4    reply --

5            THE COURT:  I have it.  Footnote 15?

6            MR. SIMON:  Up -- well, but -- up at

7    the top --

8            THE COURT:  All right.

9            MR. SIMON:  -- the matter to which

10    the footnote is appended.  "If the unions were

11    to agree to Delphi's proposals and Delphi

12    subsequently determined that it could not find

13    a way to maintain the plan, it would have to

14    seek further judicial relief under ERISA

15    provisions and, if necessary, Section 1113."

16            THE COURT:  Right.

17            MR. SIMON:  But that's all prefaced

18    with "if the unions were to agree."

19            THE COURT:  Right.

20            MR. SIMON:  Footnote.  "If the

21    unions were not to agree," and that's why

22    we're here, "then Delphi would be required to

23    seek relief under both Section 1113 and ERISA.

24    If, however, the Court grants the 1113 relief

25    Delphi seeks, Delphi would only be required to

93

1    seek relief under ERISA."  As I understand Mr.

2    Butler's response to your question, that is,

3    in effect, a waiver of any claim it might have

4    that it would seek relief only under ERISA and

5    that the requirement to seek it under both

6    1113 and ERISA is no longer optimal.  Which

7    is, as I understand --

8            THE COURT:  Well --

9            MR. SIMON:  -- what Mr. Butler

10    responded to -- he said that's for another

11    day.  Did he mean, and did this Court

12    understand him to mean, and should we

13    understand him to mean, that if this order is

14    granted, there will still be the necessity for

15    a further 1113 proceeding, as well as an ERISA

16    proceeding?

17         THE COURT:  Well, I'll tell you what

18    I understood him to say, and you can correct

19    me if I misunderstood you, Mr. Butler.  They

20    are not seeking, pursuant to this motion, sort

21    of standing authority to terminate the pension

22    plan if it is "necessary" down the road.  If

23    they decide that they need to terminate the

24    pension plan down the road, they'll need to

25    get whatever authority they need to get at

94

1    that time.  And if that includes Section 1113,

2    they recognize that.  They're not getting

3    advance authority today.

4         MR. BUTLER:  Your Honor, just so the

5    record's clear because I don't want there to

6    be any miscommunication.  Your Honor's

7    understanding is correct.  If I indicated that

8    1113 would definitely apply, I may have

9    misspoken.  The reason for that is, as Your

10   Honor just said, this is an all or nothing, an

11   either/or.  And nothing in my comments in

12   trying to preserve the employees' pension

13   should be read by Mr. Simon as an effort to

14   say that we're not seeking all the relief we

15   are in this motion, which is a rejection of

16   the collective bargaining agreements.  But I

17   still am of the view that we have to come back

18   to court on the pension issue.  That's

19   probably under the distress formation --

20          THE COURT:  If you decide to

21   terminate --

22          MR. BUTLER:  Correct, Your Honor.

23   Which is not our plan.

24          THE COURT:  Okay.

25          MR. BUTLER:  At least at present.

95

1          THE COURT:  Okay.

2          MR. SIMON:  Your Honor, in the early

3   1950s, the then CEO of General Motors famously

4   declared that what's good for General Motors

5   is good for America.  Today -- some of us in

6   the room besides myself, I trust, are old

7   enough to have remembered that.  Today we have

8   Delphi spawned by General Motors telling us

9   that closing 21 plants in America, eliminating

10   25,000 middle-class jobs in America, slashing

11   the wages, pensions and benefits of the 5,000

12   or so American workers that will be left in

13   Delphi's seven remaining American plants is

14   good for Delphi.

15          Delphi's turnaround management may

16   think it's good for Delphi but it's not good

17    for America.  It's not good for the American

18    workers.  It's not good for the Bankruptcy

19    Court as an institution and, in fact, it's not

20    good for Delphi as a company.

21            Delphi's plan is to substantially

22    exit its United States operations and transfer

23    its production to low wage foreign facilities,

24    to convert the remaining few Delphi American

25    workers from the middle-class to the financial

96

1    margins somewhere between just getting by and

2    poverty level.  Delphi's ingenious plan is to

3    make everyone else pay for the mess that this

4    so-called transformation will create.  A mess

5    not just to Delphi's workers, but for American

6    taxpayers, General Motors, Delphi's creditors

7    and shareholders, the communities that Delphi

8    will abandon and the families that it will put

9    at risk.

10            And Delphi intends to use this Court

11    as the vehicle for this travesty because what

12    stands in the way of its ghoulish version of a

13    restructured Delphi are a number of annoying

14    union agreements.  And Delphi says that you

15    have the power to free Delphi from the

16    constraints of those agreements and that you

17    should exercise that power.  UAW is here to

18    argue that you don't have that power and, if

19    you do, you shouldn't exercise it.

20         Whether or not this nation should

21    have an industrial policy is not, of course,

22    the question before the Court.  The fact is we

23    do not have an industrial policy.  In Chapter

24    11, in general, Section 1113, in particular,

25    and this Court, as the shepherd of the Chapter

97

1     11 process, are not intended, are not designed

2     to operate as a vehicle for the transformation

3     of an entire American industry and adjustment

4     to globalization.

5          Delphi has misused the processes of

6     Chapter 11 and Sections 1113 and 1114 to get

7     us where we are today, facing the prospect

8     that Delphi will gut its work force and its

9     American operations and inflict unspeakable

10    financial pain on tens of thousands of

11    workers, their families and communities, all

12    based on a couple of days of court testimony,

13    a dure of academics and investment bankers and

14    binders and binders of exhibits, the most

15    interesting and revealing of which the debtor

16    wants to shield from public scrutiny and keep

17    secret.

18          This is wrong.  And the Court should

19    not countenance it.  To be sure, the American

20    automobile industry is undergoing a massive

21    transformation.  The impact of that

22    transformation will be felt by millions of

23    people in very profound in life and community

24    changing ways.  But Section 1113 is too

25    slender a reed to bear the burden of such a

98

1    massive undertaking.  And this Court should

2    resist the effort, the transparent effort, by

3    the debtor to use Section 1113 as the fulcrum

4    to leverage the restructure of the industry in

5    the manner it has chosen and to restructure

6    the extraordinarily complex web of

7    relationships and obligations that exist

8    between the debtor and General Motors and not

9    only those relating to the employees at Delphi

10    who were formerly employees of General Motors,

11    including, of course, the Delphi as supplier

12    contracts.  The pricing mechanism of those

13    contracts.  The guaranteed purchase provisions

14    of those contracts.  All matters that are

15    before you in a companioned motion.

16          That Delphi is using the leverage of

17    this Section 1113 process to pursue its mega-

18    strategy with regard to General Motors is

19   obvious and they've admitted it in their own

20   filings.  So, bad enough that they've misused

21   the Court process to gain leverage in

22   bargaining with the auto workers, what they've

23   really done is to make the employees of Delphi

24   mere pawns in Delphi's broader dispute with

25   General Motors.  And that Delphi

99

1   simultaneously filed motions to reject

2   thousands of commercial contracts with General

3   Motors renders that strategy utterly

4   transparent.

5        Section 1113 purposefully has a

6   narrow focus.  It permits a debtor, under

7   certain circumstances, to reject the labor

8   contract if a labor union has refused without

9   good cause to agree to proposed modifications

10  to the labor contract necessary to

11  reorganization.

12       Where the reorganization plan is

13  clear, or at least discernible, and where the

14  path requires union contract modifications

15  proposed by the debtor, where the shoe fits,

16  where the glove fits, 1113 relief may be the

17  appropriate remedy.

18       But here, there is no discernible

19    path to reorganization.  The debtor candidly

20    admits that.  Even if this motion were granted

21    in full, this debtor has no idea what it will

22    have in the way of a business.  Will the

23    debtor have, in effect, written off 50 percent

24    of its current business, General Motors?  Or,

25    will its transparent strategy of using this

100

1    1113 motion to leverage its bargaining

2    position with General Motors succeed?  And

3    succeed in whole or in part?  In what part?

4    At what price?  With what impact on its

5    financial projections?  And with what impact

6    on its rationalization for seeking the level

7    of 1113 relief it seeks?  How many plants will

8    Delphi sell?  At what price?  If this Court

9    grants the 1113 motion, what impact will the

10    resulting low wages have on the sale price of

11    those plants?  And what will be the impact on

12    the rationalization in this Court for the

13    level of 1113 relief it seeks?

14         There are answers to none of those

15    questions.  The path is not only not

16    discernible, it is not conceivable.

17         Delphi concedes that even if this

18    Court grants the motion in full and obtains

19    the GM relief it seeks independently from this

20    Court in full, it does not have a viable

21    business plan.  Delphi concedes that there

22    still needs to be a solution to its

23    underfunded pension plan.  A solution not

24    available under current law.  A solution

25    Delphi has not set forth and for very good

101

1    reason.  It hasn't a clue.

2            Delphi does have a grams to feed

3    your vision.  Let us cut wages to the bone.

4    Let us get rid of benefits and decent working

5    conditions.  Get rid of our American plants

6    and, one way or another, we'll figure out what

7    to do with the rest of whatever may be left.

8    Will we still have GM?  Who knows?  Will we be

9    able to fund our pension obligations?  Will a

10    unions' strike make all of this academic?  Who

11    knows?  Delphi says, trust us.  Give us the

12    leverage of having union contract rejection in

13    our hip pocket and we'll be able to get

14    everyone to sit down and do the right thing as

15    we, Delphi, see fit.

16            That's what Delphi's motion is

17    really all about but that's not what Section

18    1113 is about.  And we hope to persuade Your

19    Honor that you should not permit yourself or

20    this Court to be Delta's enabler in this mega-

21    strategy.

22            THE COURT:  Well, let me ask you.

23    Do you intend to show that Delphi should not

24    make any proposal?

25            MR. SIMON:  I'm sorry, Your Honor?


                                                            102


 1            THE COURT:  Do you intend to show

 2    that Delphi should not seek to reject the

 3    contracts at all, at this point?

 4            MR. SIMON:  That is correct, Your

 5    Honor.  We believe, as Delphi believes from

 6    time to time over the last six months, that

 7    the only way this matter is going to be

 8    resolved, the only way that Delphi is going to

 9    be able successfully to reorganize, and

10    they've acknowledged this, is in a tripartite,

11    enormously complicated concentral arrangement

12    between General Motors, its offspring Delphi

13    and the unions.  And as the complexity of the

14    special attrition program, submitted and

15    approved by Your Honor, indicates all one has

16    to do it.  That's not an easy process, Your

17    Honor.  That agreement was reached only after

18    tortuous bi-part type and, ultimately,

19    tripartite negotiations.  The UAW understands

20    perfectly well, as does each of the other

21    unions at this table, that the only way this

22    case is going to emerge successfully is if

23    that bargaining can take place as the nation's

24    labor policy dictates, and as common sense

25    dictates, in direct negotiations around the

103

1    table.  Delphi has determined --

2              THE COURT:  Let me interrupt you.

3    Why aren't those happening?

4              MR. SIMON:  Pardon me, Your Honor?

5              THE COURT:   Why aren't those

6    happening?

7              MR. SIMON:  Ah.  Excellent question.

8    They did happen.  And you had, as a result of

9    those negotiations just a couple of weeks ago,

10    this extraordinary agreement providing for

11    attrition.  The parties agreed -- the three

12    parties agreed, the UAW, General Motors and

13    Delphi, that there is a framework within which

14    these negotiations had to take place.  There

15    were basically three parts to that process.

16    They agreed to the three parts.  They agreed

17    to the order in which they would be addressed.

18    And they agreed to a process to address them.

19    You'll get testimony on this.

20              The first was to determine the

21    demographics.  What workers are actually going

22    to be left at Delphi?  What's going to happen

23    to workers who are not at Delphi?  What are

24    the demographics of the Delphi work force

25    going to be?  What will be their skill level?


                                                              104


1    What will be their seniority level?  Who are

2    they going to be?  Once you know what the

3    population is, you can then turn to a

4    determination of what the business is going to

5    be like.  They call it the footprint.

6             The parties agreed that once they

7    resolve attrition, they would move to the

8    footprint.  The footprint was going to say,

9    taking this group of employees, what products

10   are we going to make with those employees?  In

11   what plants?  With what level of General

12   Motors support?  And then, only after they had

13   identified their employees and determined the

14   footprint of what Delphi was going to consist

15   of, they would then turn, finally, to what

16   adjustment and terms and conditions of

17   employment and wage levels were necessary for

18   reorganization of that business that phases 1

19   and 2 would have addressed.

20             And, as I indicated earlier, they

21   had, with difficulty but with great success,

22    addressed the first problem and then days

23    later, rather than continue the process for

24    reasons not described anywhere in their papers

25    or in their declarations, they abandoned the

105

1    negotiation process and moved into Court.

2              And our firm position, Your Honor,

3    is that by so doing, they chose a litigation

4    strategy rather than the negotiation strategy

5    which had succeeded literally up to days

6    before they abandoned the effort.  You might

7    want to ask Mr. Butler why or we'll go through

8    it with witnesses on the witness stand.

9              I was saying that that's what their

10    motion is all about, but it's not what 1113 is

11    all about.  The Bankruptcy Court for the

12    Southern District of New York is a court of

13    the United States.  The role of a court of the

14    United States is to hear and determine cases

15    and controversies.  In response to our

16    objection, and here I'm going into what Your

17    Honor has expressed his views about -- I do it

18    understanding that, but I believe the record

19    should reflect our strong views on the

20    subject.  We would ask Your Honor to

21    reconsider his views.  I understand you

22    haven't ruled but you've certainly given a

23    strong indication as to where you are.

24          But in response to our objection,

25    based on case or controversy issue, the

106

1    advisory nature of the relief requested in the

2    1113 motion, Delphi, in its omnibus reply, at

3    page 2, lively suggests that if the Court

4    doubts that the Court has discretion to do a

5    Delphi's motion very carefully, very

6    explicitly, and incorrectly asks this Court to

7    do, why this Court should then "simply modify

8    the orders Delphi submitted" and do something

9    Delphi's actual motion does not seek.

10          This is not a mere quibble.  It is

11    not mere semantics.  It goes to the heart of

12    the fundamental flaw in Delphi's 1113 motion.

13    Because, in its essence, its 1113 motion is

14    not an 1113 motion.

15          Delphi has not come to this Court as

16    a last resort, as 1113 contemplates.  To the

17    contrary, this is a bald-faced effort by

18    Delphi to ensnare this Court in a complex

19    labor relations and business ploy to engage

20    this Court, not as a decider of a case, but as

21    a player whose services are invoked to set the

22    stage for a final round of negotiations

23    between Delphi, the UAW and General Motors and

24    that's not this Court's proper role.

25            THE COURT:  Doesn't 1113 contemplate


107


1    expressly negotiations during the hearing

2    process?

3            MR. SIMON:  Yes, sir.

4            THE COURT:  So, isn't it a complex

5    forum for negotiations?

6            MR. SIMON:  It is, Your Honor, and

7    if Delphi had sought a rejection motion, or

8    unless the Court stays with its original

9    decision and converts its improper motion into

10    one seeking rejection, that doubtless would

11    have happened.  But what Delphi is looking to

12    do is use this Court and get from you hip

13    pocket authority to use in negotiations after

14    this Court has ruled.

15            Your Honor, you've put your finger

16    precisely on the point.  1113 is designed, and

17    actual experience indicates that design has

18    been fulfilled, to force the parties before,

19    during and right up to the moment of the

20    Court's ruling to reach a compromise.  Because

21    each side then bears the burden of the Court's

22    decision if it chooses not to do so.

23        That's not what Delphi sought.

24    Delphi was being too cute by far.  They said,

25    give us authority, Your Honor.  Let us put it

108

1    in our hip pocket.  We'll use it if and when

2    we decide to use it after you've ruled to give

3    us authority.  Then we'll say, okay, General

4    Motors, okay, Union, let's get together.  Look

5    what I have here.

6        This is like a poker game where they

7    have an ace in the hole given to them by the

8    Court before the rest of the cards are dealt.

9    That's not what 1113 is all about.  You are

10    not sitting in their corner.

11        THE COURT:  Well, I know I'm not

12    sitting in their corner, but let me ask you a

13    related question.  Which is, assume for the

14    moment -- this is so I can understand your

15    argument -- that notwithstanding everyone's

16    efforts to negotiate during the hearing

17    process and before I ruled, that I did rule

18    that the UAW agreement was rejected.  Wouldn't

19    the unions' position then be, so what?  You

20    still have to deal with us?

21        MR. SIMON:  No question about it.

22    They'd still have to deal with us.  But the

23    union would also have at that point the power

24    to strike.  What happens, at that point, is

25    that both sides are empowered.  The company is

109

1    empowered to impose.  The union is empowered

2    to strike.  And that's what labor relations is

3    all about.

4              THE COURT:  All right.  And that

5    goes -- and that is apropos in my remark

6    earlier as to why I think the debtors were

7    seeking what they were seeking.  And I

8    understand your point on that point.  But they

9    appear to be prepared nevertheless to live

10   with the consequences of a strike.

11             MR. SIMON:  If they're prepared to

12   live with the conse --

13             THE COURT:  That's their gist of

14   their reply which says if the Court thinks

15   it's appropriate to treat solely as a motion

16   to reject, and not something in our hip

17   pocket, the consequences -- you know, they're

18   taking that risk.

19             MR. SIMON:  Your Honor, too little

20   too late.  They had every right -- they know

21   how to read the statute.  They know what the

22   statute provides.  They also know what

23   strategy they want to pursue.  They wanted to

24   pursue a strategy that gave them their cake

25   and allowed them to eat it, too.  And for

110

1   months now, we have been preparing and

2   defending against that motion.  They cannot,

3   simply by invoking this Court's assistance,

4   say, okay, try that.  Didn't get away with it.

5   Nice try, no cigar.  Now, let's make believe

6   we asked for something else.  Judge, help us

7   out.

8          With all the liberal pleadings in

9   the world, Your Honor, when something goes to

10   the very heart of the statute, and this goes -

11   - that's why I say this goes to the heart of

12   the statute.  It's not a quibble and it's not

13   semantics.  They just should not be permitted

14   to get away with that.

15          THE COURT:  Well, we'll see what the

16   evidence shows.

17          MR. SIMON:   And I won't repeat,

18   even thought I think it perhaps may have been

19   more elegantly phrased, what I had prepared

20   for this morning.  I think we have said about

21   as much as that issue as would be productive.

22   So let me move on.

23          Delphi's draconian proposal is based

24   upon a business and financial projection,

25    itself long delayed.  That projection

111

1    forecasted very substantial losses by the

2    company going forward.  The cuts in wages,

3    benefits and working conditions, proposed by

4    Delphi, are said to be necessary with those

5    very substantial projected losses. But -- and

6    it's a big, big but -- that business and

7    financial projection is bogus.  I realize

8    that's easy to say.  I know that such a broad-

9    based statement can be dismissed as mere

10    advocate zeal.  But don't listen to my words.

11    Look at the numbers.  Not my numbers.  Not the

12    UAW numbers.  Not Lazard's numbers, but

13    Delphi's own numbers.

14            First, let's all acknowledge that

15    when we deal with projections -- that's all

16    they are -- are projections, subject to

17    enormous contingencies and variables, they're

18    close to chaos theory.  The flapping of a

19    butterfly's wings in China lead to an

20    earthquake in California.  And the further out

21    the projection goes, the more unreliable it

22    is.  2010 is tougher to predict than 2008.

23    2008 is tougher to predict than 2007.

24            Another factor, and you'll hear a

25    good deal about this when you hear from Mr.

112

1    Millstein of Lazard.  Another factor of

2    dealing with the reliability of projections is

3    the track record of the predictor.  And, while

4    I intended to Google it or go to the Oxford

5    English, I didn't.  I suspect a track record,

6    one way or another, is tied into the

7    performance of touts at the racetrack.  And

8    the better the tout's record at the track, the

9    more reliable, the more credible the more

10    people are going to pony up ten bucks or the

11    tout sheet.  And we know that reliability of

12    the tout's efforts are likely to be more

13    credible if he called yesterday's races pretty

14    well.  Better than last week's.  Last week's

15    better than last month's.  The track record

16    and the credibility it supports or erodes is a

17    crucial factor in determining the credibility

18    of a given projection.

19         Now, let's look at the credibility

20    of Delphi's skills at projection.  How did

21    they do for their very first significant day

22    at the track?  The first quarter of 2006.

23    January, February and March of this year.

24    Actual performance during that quarter

25    exceeded their projection for that quarter by

113

1    75 percent.  That amounted to a huge

2    difference, hundreds of millions of dollars.

3    In round terms, a half a billion dollars

4    missed in the first quarter, yesterday at the

5    track.  Even more interesting is that their

6    projection for that quarter was given to the

7    unions two days before the end of the quarter,

8    March 29th.  And that projection was 500

9    million dollars wrong than what turned out to

10   be actual, as of March 31, two days later.

11          There's more, a lot more that you'll

12   hear from Mr. Mercile about the gap between

13   Delphi's projections and performance and I

14   won't detail him and Delphi, like the tout at

15   the racetrack with the poor record, will have

16   excuses.  The rain that muddied the track

17   wasn't predicted; the jockey had a bellyache;

18   the actual winner had a lucky day and

19   outperformed his last dozen outings.  Maybe

20   so.  But be cautious before you fork over the

21   ten-spot.  And please be cautious before you

22   gut a labor contract for tens of thousands of

23   jobs and families.  And trash dozens of

24   communities relying upon a projection so

25   grievously, outrageously, egregiously wrong as

114

1    to be laughable.  Half a billion dollars, in

2    this case, in the first quarter of a four or

3    five-year projection is humongous.

4            Let me turn to the statutory

5    requirements relatively briefly.  Our case

6    will show that Delphi's motion meets none of

7    the statutory requirements and, in fact, so

8    distorts the requirements of the statute as to

9    render them almost meaningless.  I've already

10   gone on at length and, as Your Honor may

11   believe, at excessive length about the

12   advisory opinion aspect in this Court's role.

13   I won't deal with that further here.  But as

14   to the necessity requirement, UAW's argument

15   is that the entire litigation is premature.

16   Delphi, in fact, in its declarations goes back

17   to the summer of 2005, and even earlier, to

18   try to construct a longer history for its pre-

19   motion activity.  Because when a proposal is

20   served on March 24th, as this 1113 proposal

21   was served, and a motion is filed on March 31,

22   a debtor hasn't made a credible case for

23   relief.  By extending the story, or trying to,

24   Delphi tries to minimize the rushed nature of

25   recent events.  We'll address the timeline

115

```
 1    through our witnesses and, as I indicated, we

 2    will show that the process is far from

 3    exhausted.  There's no pressing need -- in

 4    fact, there's no need at all to grant the

 5    sweeping relief sought by the motions at this

 6    time and, by so doing, undermine the

 7    fundamental workings of the statute which

 8    places, as Your Honor has indicated, a high

 9    premium on bargaining as a solution to these

10    problems, with litigation only as a last

11    resort and certainly not as a ploy.

12            As I indicated, the evidence will

13    show that early this year, the parties -- and

14    here, again, I'm talking about the three

15    parties -- with all due respect to our brother

16    and sister unions, they had a role or would

17    have a role in this going forward, that the

18    framework for addressing the issues involve

19    three basic issues.  First, demographics, we

20    discussed it.  Second, the footprint and

21    finally, what labor modifications were

22    necessary.  They agreed to the order in which

23    they would deal with those.  They successfully

24    addressed the special attrition program and

25    then, with the ink barely dry, they filed an
```

116

1    1113, rather than continue with the next step

2    in the framework process.

3           Inevitably, the parties are now

4    consumed by litigation, so that the momentum

5    that started with the attrition program came

6    to a screeching halt.  Your Honor indicated,

7    and history suggests, that even during the

8    course of litigation, bargaining is expected

9    and normally takes place.  Most of the

10   bargaining or most of the small cases would

11   not have Skadden and its mad-dog litigators

12   driving everyone crazy in terms of preparing

13   for litigation.  So that, while inferior, Your

14   Honor -- yes, there are separate teams dealing

15   with negotiations and with litigation and yes,

16   inferior they are to be able to proceed

17   independently and simultaneously.  But in the

18   real world, the parties who are the decision-

19   makers, both in litigation and in

20   negotiations, are the same.  The collegial,

21   collaborative, cooperative effort that is at

22   the heart of any consensual agreement.  That

23   is at the heart of negotiations.  The trust

24   that is at the heart of any negotiation is not

25   nearly frayed by aggressive advocacy in

117

1    litigation, it is torn asunder.  You cannot

2    cooperatively, collegially and collaboratively

3    deal with one another openly, honestly and

4    with trust at the bargaining table while, at

5    the same time, the litigators are knocking

6    your heads off and public statements are made

7    in the press.  Yes, Your Honor, we're

8    certainly ready to negotiate.  We will.  We

9    have no choice to negotiate.  But let there be

10   no mistake, this proceeding was, is and will

11   continue to be a very serious impediment.

12   Impediment, not aid.  Impediment, not pushing

13   towards a negotiated solution.

14        Delphi has before us, before you,

15   two proposals, each contingent.  Neither one

16   of which could be implemented by the company

17   even if you gave the full relief requested on

18   both the UAW and the other unions and the

19   General Motor's motions.  Are these

20   contingent, alternative proposals necessary to

21   permit reorganization as required by

22   1113(b)(1)(a)?  We'll say much about that

23   during our testimony and we'll show the many

24   defects in the proposal.  They're not

25   necessary because they reach too far.  They

1    address unrefined generalities, like

2    competitiveness and flexibility.  They're

3    based on projected profitability that's

4    fraught with problems, as I've indicated

5    earlier in my racetrack tout and as Mr.

6    Millstein, presumably in more elegant terms,

7    will describe as he testifies.

8        The wage proposals rely on academic

9    compensation, comparability constructs that

10   are deeply flawed, both in theory and

11   methodology.  You'll have expert witnesses

12   from us that will tell you about that.  Dr.

13   Watker and I have been playing the

14   comparability game since the 1980s in other

15   contexts.  I'm sure you'll be fascinated by

16   it.  The proposals bear little resemblance to

17   the prototype for labor costs and the types of

18   cases exemplified in the recent Conair

19   decision in this Court.  Not before Your

20   Honor, but in this Court.  Where there's an

21   identifiable and fully transparent ACS, an

22   allocation of cost savings, to particular

23   groups and complete disclosure regarding the

24   financial basis in the proposal, none of those

25   are present here.

```
 1              On the information provision

 2    requirement you will hear, at great length,

 3    about whether the information provided meets

 4    the statutory standard.  To be sure, the

 5    debtors provided a volume of material.  Boxes

 6    and boxes, gigabytes and gigabytes of data,

 7    almost none of it of any use or consequence,

 8    as you will hear from Lazard.  Has the union

 9    rejected a proposal without good cause?

10    Hardly.  It is Delphi that has chosen to

11    commence this litigation at a time when the

12    parties had made such significant progress

13    which Delphi astoundingly diminishes in its

14    statements to the Court now, as compared with

15    how much it trumpeted that agreement when it

16    was reached.  It was -- it's very distressing

17    to sit here and listen to them denigrate what

18    they perceive of as so essential to the task,

19    when it was underway and when it was achieved.

20    And even now, as the options available to the

21    employees are still open and to be selected by

22    them -- the interorom quality of the motion

23    and its desired impact, from Delphi's point of

24    view, in pushing General Motors to the

25    bargaining table.  It's also designed, as I
```

1    said, on an interorum basis.  To have people

2    exercise options that will change their lives.

3    It is a further abuse of the 1113 process.

4            Finally, the evidence will show that

5    the balance of equities does not favor

6    rejection.  Here, the Court must weigh a

7    number of factors:  the potential for strike,

8    large damage claims, the relative ability of

9    the parties to bear the burden of the proposed

10   modification and other factors.  The effect of

11   a strike is self-evident.  As we will show

12   through our fact witnesses, rejection of the

13   contracts will affect Delphi's workers in

14   profound life-changing ways.

15           This case began with very public

16   confrontational posturing by Delphi's CEO,

17   who, I think, had more dotted pictures under

18   him in the Wall Street Journal in the two-

19   month period than anyone else in recent

20   history.  In this highly-charged atmosphere,

21   workers were told they could expect extensive

22   job loss and deep cuts in ranges, literally,

23   to poverty levels.

24           As our witnesses will show, the

25   anxiety, worries and fears, real fears, about

121

1    the future are palpable and extensive.  Single

2    parents, workers who are the sole breadwinners

3    for their families.  Workers with

4    responsibilities to elder parents fear about a

5    job that may be too far away from home to keep

6    kids in their current schools.  The stories

7    are affecting and they are real.  All too

8    often, Your Honor, the witnesses are real

9    people in real life circumstances with

10   personal testimony about the god-awful

11   consequences of what they'll be faced with --

12   are simply tolerated with benign neglect by

13   those of us wearing suits in Manhattan.  You

14   can't make an omelet without breaking eggs.

15   That's collateral damage.  It's a terrible

16   thing -- such a shame.  Part of our reaction,

17   I suggest, is because it's too uncomfortable

18   for us to really acknowledge reality.

19   Abstract, academic and investment banker,

20   battle-of-wills are much easier to deal with.

21   Oh, we get the ritualistic bow in the papers.

22   Oh, we, Delphi, certainly understand and have

23   deep concern for all of those affected.

24          We heard Mr. Butler, this morning,

25   telling us about his days in Michigan, his

122

1    passing the cemetery, his passing the plant,

2    his parents.  Give me a break.  Chances are,

3    the debtor won't even cross-examine these

4    folks, get them on and off the witness stand

5    as soon as you can -- it's simply a

6    distraction.

7            The union and its counsel is playing

8    to the galleries.  This is a Court of equity.

9    Fair and equitable is the standard.  Willy

10   Loman said it, attention must be paid.  Thank

11   you.

12           THE COURT:  Let me go back to

13   something you said earlier because I didn't

14   follow it.  You acknowledged that, from the

15   UAW's point of view, this is a three-way

16   negotiation?

17           MR. SIMON:  Yes, sir.

18           THE COURT:  And yet, I thought I

19   heard you saying that this motion was somehow

20   improper because it was intended to put

21   pressure on GM?

22           MR. SIMON:  Yes, sir.

23           THE COURT:  Could you amplify on

24   that --

25           MR. SIMON:  Surely.

123

1            THE COURT:  -- particularly, given

2      that you view this as a three-way negotiation?

3              MR. SIMON:   Surely.  General Motors

4      is both the ultimate source of business to

5      Delphi and, as the relationship over the years

6      has shown, SGNA is a very active participant

7      in dealing with the consequences of the shift

8      in the industry and the consequences for

9      workers.  And it has demonstrated its

10     willingness to participate in the tripartite

11     negotiations that every party to this

12     proceeding believes is absolutely essential.

13     Delphi, in effect, is coming to this Court and

14     said, give me all the money in the register or

15     I'll pull the trigger.  You don't go to

16     General Motors.  That's not a party to this

17     proceeding -- that's not a party to these

18     collective bargaining agreements -- and get

19     them into a consensual, collaborative,

20     cooperative, positive set of negotiations by

21     putting pressure on the employees of Delphi so

22     that the union would put pressure on General

23     Motors.  Or, General Motors would perceive

24     this Court as putting pressure on it.

25              That's not what 1113 is all about.

124

1      I can conceive of a statute.  I can conceive

2      of a national policy that would establish a

3    procedure and a mechanism to deal with that.

4    Other nations have.  You have industrial

5    commissions.  You have a national economic

6    policy.  You have a mechanism for dealing with

7    industrial policy.  We don't.  Perhaps we

8    should.  You're not it.  This Court is not

9    this nation's substitute for industrial

10   policy.  This Court decides cases and

11   controversies.  It doesn't hang out Lucy's

12   shingle and say, the Court is in, pay your

13   nickel, come and get the advice of the Court

14   as to how to deal in the real world, Charlie

15   Brown.

16            THE COURT:  I think we just shifted

17   topics, from the pressure -- let me finish --

18   the pressure that 1113 very clearly is

19   designed to put on parties of the debtor and

20   unions.  And here, I also think GM, if it's a

21   tripartite negotiation and the advisory

22   opinion forum.  Leaving that aside, why hasn't

23   congress specifically provided, in the

24   construct of 1113, which is not, except under

25   1113(e), a lightning-fast determination as 365

125

1    was, to, you know, face up within the

2    construct of 1113 and negotiate?

3          MR. SIMON:  Because 1113 is, in

4     effect, a parallel to the labor relations

5     policy and system in this country.  Again, I

6     can conceive of a statute that would have

7     someone like General Motors bear some

8     collective bargaining responsibility in the

9     relationship between UAW and Delphi.  But

10    that's not what our labor law says.  Our labor

11    law says that collective bargaining

12    negotiations take place between the

13    representative of the Delphi employees and

14    Delphi.

15         THE COURT:  But that's why I asked

16    you the question in the first place.  You seem

17    to be saying it really is a tripartite

18    negotiation.

19         MR. SIMON:  In the real world it is,

20    Your Honor, but it's not in the statutory

21    realm.  We are not here to sit in judgment and

22    surrendering how the real world approaches

23    this problem in a rational and sane way.  My

24    view, it doesn't.  1113 is what you are here

25    to administer.  And 1113 doesn't contemplate

                                             126

1     this.  This is an effort by this company --.

2          THE COURT:  Well, it seemed to me

3     you were asking me to put off 1113 and its

4    two-party issues, so that the three of you can

5    go off and do what you want to do.

6          MR. SIMON:  You got it.

7          THE COURT:  That seems to me just

8    the opposite of what you were telling me I

9    can't do, which is, I can't impose a three-way

10    negotiation under 1113, and I agree with that.

11    I have what I'm given, which is 1113.

12          MR. SIMON:  And you have to make the

13    decision as to whether or not this company has

14    put on the table the 1113 proposal.  We

15    suggest to you, and we believe the evidence

16    will support that it has not, and whether,

17    even if it has, that proposal meets the

18    statutory tests with regard to Delphi's

19    performance of those tests, and we believe the

20    evidence will indicate and you will or should

21    find that it does not.  Again, in a perfect

22    world, in an abstract world, I could devise --

23    you could devise -- this room could devise a

24    different system.  It's not the system we

25    have.  It's not my fault, it's not the union's

127

1    fault, it's not Delphi's fault, it's not your

2    fault.  But Delphi can take the system that we

3    have and use it for a purpose for which it was

```
 4    not designed.  And that's what they're trying

 5    to do.  And this Court should not count this.

 6              THE COURT:  Well, I guess that's

 7    where I have a -- I understand your advisory

 8    opinion point.  But other than that, I have a

 9    disconnect.  But I guess we've said enough on

10    that.

11              MR. SIMON:  Okay, thank you.

12              THE CLERK:  Tom?  25 --

13              MR KENNEDY:  I'll spend most of it

14    replying to Bruce?

15              THE COURT:  Well, he did acknowledge

16    your existence.

17              MR. KENNEDY:  Yes he did, and I

18    actually stand here very appreciative of

19    Bruce's remarks and I would join in almost all

20    of them.  I think they framed these issues in

21    a remarkably precise and compelling way.

22              But let me state, as I should, that

23    my name is Tom Kennedy, Your Honor, and I am

24    with the firm of Kennedy, Jennik & Murray.  We

25    will be representing and have represented the
```

                                                128

```
 1    IUE-CWA in this matter.  With me is my partner

 2    Susan Jennik, who may, from time to time also

 3    be speaking on behalf of the IUE.

 4              I thought is was interesting that
```

5     Mr. Butler began his remarks this morning by

6     commenting that it's been seven months since

7     the filing of this case.  That's, of course,

8     true.  But we look at it in this way.  It's

9     seven months after the following of what

10    they've repeatedly labeled as a labor

11    transformation case.  We don't know what their

12    proposal is on wages.  We have not gotten

13    critical relevant information, or got it as

14    late as May 2nd, as part of this case, which

15    I'll describe later.  We don't know the impact

16    on this company of the plainly relevant and

17    material GM repricing.  We don't know the

18    impact of the attrition programs that this

19    Court has already approved.  And we do not

20    have a clear financial picture of the steady

21    state that this company will be in, in the

22    event this Court and when this Court rejects

23    their motion to eliminate these collective

24    bargaining agreements.  The fact that seven

25    months into this case we don't know these

                                                              129

1     answers and yet the debtors are still coming

2     forward and saying that, notwithstanding all

3     this uncertainty, the answer to our problems

4     is to reject the collective bargaining

5    agreements, in our view, is simply wrong.

6         But let me describe a little bit who

7    the IUE is and who I have the honor of

8    speaking on behalf of.  We have 8,500 active

9    employees and 3,000 retirees with seven active

10   facilities.  Three of those facilities are in

11   the Packard division.  Warren, Clinton and

12   Brookhaven.  Those facilities together

13   represent 5,200 of the IUE's active members,

14   60 percent.  Another two facilities, Morane

15   and Kettering, that are adjacent facilities in

16   the city of Dayton, Ohio, have another 2,700

17   members between them.  Those two plants, and

18   this, becomes material in this case, are

19   almost entirely servicing General Motors'

20   contracts, that are the subject of the

21   repricing decision that your Court -- this

22   Court will make a little later.  With two

23   other facilities: one in Gadsden, Alabama and

24   another in New Brunswick, New Jersey, together

25   they have about 500 employees.

130

1         The one fact that is absolutely

2    clear and undebated, in this case, is that the

3    IUE, for decades has been responsive, first to

4    General Motors and then to Delphi, in its

5    efforts to become competitive.  And when they

6    say competitive, they mean to abandon

7    traditional wage rates and benefits and accept

8    reduced payments, if necessary, to sustain the

9    existence of jobs that are so critical to our

10   members and to their communities.  Every

11   single facility has a competitive agreement.

12   Even in traditional wage plants, like the

13   Kettering facility I mentioned a while ago,

14   the IUE wages are well below what Delphi has

15   indicated is their standard rate of 27 dollars

16   an hour, because the men and women in that

17   facility took a wage freeze for four years,

18   from 1998 through 2002.  They did that in an

19   effort to assist Delphi in maintaining product

20   and production at that plant.  If you contrast

21   the one-size-fits-all approach of Delphi,

22   continuingly labeling if production workers is

23   making all in all costs of 78 dollars an hour,

24   it is simply false, as applied to the IUE

25   rates.  The Kettering wage rate -- I'm not

131

1    talking about the all-in-all rate, but the

2    wage rate averaged among all employees at

3    Kettering is $18.32.  At Gadsden, Alabama it's

4    $9.85.  It's $21.85 at New Brunswick.

5           The fact is, neither the company's

6    approach nor their proposals are, in any

7    material way, reflective of this extraordinary

8    difference in the IUE circumstances.  And does

9    this mean, by the way, these prior sacrifices,

10   that the IUE is exempt from a need to look

11   again at whether belts have to be tightened

12   because of international competition?  No,

13   that's not our position.  But what we do say,

14   loudly and clearly, is that those prior

15   efforts to work with the company merit a

16   separate, thought-through, costed-out proposal

17   that's unique and specific to the IUE-CWA and

18   not, generically based on their view, we think

19   false, of competitive market economy.

20         THE COURT:  And the IUE is prepared

21   to negotiate that separately?

22         MR. KENNEDY:  We are not only

23   prepared, Your Honor, we have demanded

24   separate negotiations.  We reject the concept

25   of pattern bargaining.  Pattern bargaining is


                                            132


1    utterly foreign to an 1113 proceeding.  And

2    that's been true with a number of cases that

3    have discussed how important it is that each

4    individual union be measured against the 1113

5    requirements.

6          THE COURT:  But, I guess I was going

```
 7    a little bit further, which is, assuming you

 8    reach an agreement on the proposal.  Not

 9    necessarily, if you condition it on other

10    unions getting some other type of treatment?

11            MR. KENNEDY:  Well, you know, Your

12    Honor, were I the president of IUE I'd answer

13    that question.  I'm not.  I'm their attorney.

14            THE COURT:  Now there are a lot of

15    conditions in my -- there are a lot of

16    conditions in my question but, under the right

17    circumstances --

18            MR. KENNEDY:  Under the right

19    circumstances, Your Honor, the IUE will sign

20    an agreement necessary to maintain the jobs

21    and income and lifestyle of its members which

22    are currently under what we regard as utterly

23    unnecessary assault.  If you look at the

24    Delphi proposal, their proposal is the same

25    whether the plant to which they're applying it
```

                                                                133

```
 1    has a positive operating income in 2005 -- is

 2    projected to have a positive operating income

 3    in 2006 or has lost hundreds of millions of

 4    dollars.  They've made the same proposal.  The

 5    March 24th proposal's the same for each union,

 6    despite the reality, that IUE critical items,
```

7    like wages, are negotiated locally and not

8    nationally.  And the March 24th proposal is

9    the same even for plants, as I've said, where

10   the start-rate is already below ten dollars.

11          Your Honor, I want to address five

12   specific statutory elements that are important

13   and critical in the Section 1113 motion.

14   First, did the IUE-CWA have good cause to not

15   accept the March 24, 2006 proposal made by

16   Delphi?  That is the heart and soul of this

17   case, with respect to the IUE.  In the Conair

18   opinion, Judge Hardin pointed out that the

19   question is not whether the union made a

20   reasonable counter-proposal or negotiated in

21   good faith.  It is solely whether it had good

22   cause to reject the employer's offer.  And we

23   had to manifest undeniable reasons why we

24   could not accept, let alone did not have the

25   right to refuse, the March 24th proposal.


                                                    134


1           The statute presumes, Your Honor, at

2    Section 1113(b)(1)(a), that the debtor-in-

3    possession shall "make a proposal" to the

4    unions.  A proposal are words with meaning.  A

5    proposal is a set of working conditions that,

6    if the union thought they were acceptable,

7    could sign.  We could agree to -- they could

8    be implemented, they are for real, they are

9    specific.  That's not what we got.  And in

10   fact, in every other Section 1113 proceeding,

11   we could find the employers did exactly that.

12   They gave the union a specific proposal.  In

13   fact, Delphi did that on two occasions.  We'll

14   talk about it in a minute, but they made a

15   specific proposal on October 20th and then on

16   November 15th.  We didn't like it, but, at

17   least, they were specific.  Not the March 24th

18   proposal.  Their so-called GM consensual

19   scenario is vague and indefinite as to

20   critical terms, such as wages, pensions and

21   other benefits since it depends on General

22   Motors' support that has not been forthcoming.

23   IUE could not have accepted that proposal.  It

24   did not know what the wages were.  That

25   doesn't qualify as a proposal under Section

                                                    135

1    1113 (b)(1)(a) and was, therefore, easily

2    rejected or not accepted by the IUE.  Delphi,

3    in fact, could not reasonably have expected

4    the union to have accepted a proposal that

5    indefinite or its companion, a proposal that

6    suggested a wage of $12.50.  That wage is

7    below a majority of the comparisons, as the

8    evidence will show, Delphi has offered as an

9    explanation for its market wage defense.  The

10   12.50 could not have been accepted, $22 was on

11   the table, even though conditionally.

12          And what's the explanation for that

13   remarkable situation -- that get's back, I

14   believe to a colloquy you had with Mr. Simon.

15   To answer the question you posed to him, from

16   the IUE's position, this is a two-party

17   negotiation.  We're negotiating with Delphi,

18   we're not negotiating with General Motors.

19   It's Delphi's obligation to make a proposal

20   that they have either money on hand or

21   reasonably expect to get, to fund.  Until

22   they've done that, we're not able to present a

23   meaningful counter-offer.  What they're doing

24   instead, is attempting to leverage position,

25   as Mr. Simon explained, and I don't think


                                                    136


1    anybody doubts, to force General Motors to put

2    up more money.  I don't know what the business

3    strategy in that is.  That's above my pay

4    grade.  I know, as a labor union lawyer that

5    I'm negotiating with Delphi.  And until Delphi

6    is very clear about what it is they want from

7    the IUE, there's no possibility of an

8    agreement being made.

9          THE COURT:  But they say that the

10    November proposal is the proposal, unless GM

11    signs on.

12          MR. KENNEDY:  That's correct, they

13    say that.  Which leaves us in the position of,

14    well, it could be the November proposal, it

15    could be the March 24th proposal, it could be

16    somewhere in between.  That's a problem for

17    Delphi, I know that.  But it's also a problem

18    for them in this 1113 proceeding because that

19    is not a basis for reaching an agreement with

20    the union.  Every business, in entering labor

21    negotiations, has to make a judgment on what

22    they're going to get in over the next three

23    years -- that the typical length of a contract

24    -- and what they can afford to give the union

25    during that agreement.  Sometimes it's harder

137

1    to make that estimation; sometimes it's easier

2    that's a business' job.  They're trying, and I

3    understand why they're doing it, but they're

4    trying to have the best of both worlds in that

5    circumstance.  They're saying: we're not going

6    to make a commitment to pay you into the over

7    $20 an hour level we know we need to get to

8    make an agreement.  We're not going to make

9    that offer to you.  We're going to let you

10   take, with the threat of a strike, the wood to

11   General Motors and get them to give us enough

12   money to do that.

13           In our view, under 1113, which is a

14   very particular and pointed and specific

15   statute, Delphi has to exhaust its

16   opportunities to generate revenue from General

17   Motors before coming to the unions and saying,

18   okay, this is the best we can do, here's our

19   offer and then bargaining would proceed at

20   that point.  Recognizing, they don't have to -

21   - sorry.  Recognizing, they don't have to put

22   their best offer on the table.  I'm not saying

23   that.  They have to put an offer on the table

24   that permits negotiation.  This vague,

25   indefinite, could be 12.50 could be 22 doesn't

                                                    138

1    do that.  That is not a formula for

2    negotiations in a labor context because we are

3    not in a three-party negotiation with General

4    Motors.  We are in a negotiation with Delphi.

5    And they have obligations under 1113 that they

6    haven't met.

7           THE COURT:  Then why should I assume

8    that they need to exhaust their leverage with

9    GM first?

10              MR. KENNEDY:  Because of the way

11    that -- because of the --

12              THE COURT:  Is it -- what you're

13    saying they're doing here is exerting leverage

14    on GM?

15              MR. KENNEDY:  Yes. And to follow

16    that up, Your Honor.

17              THE COURT:  And you say they can't

18    do that, they have to exhaust it some other

19    way?

20              MR. KENNEDY:  They can exhaust it

21    any way they want.  But they have to come to

22    the union and make a proposal which we

23    believe, under the statute, is defined as a

24    set of terms and conditions that the union

25    could accept and could be implemented.   In

139

1    other words, specific terms.  A range, a wage

2    range proposal from 12.50 to 22 doesn't

3    satisfy 1113.  That's our position in a

4    nutshell.

5              THE COURT:  Okay, all right.

6              MR. KENNEDY:  Now, the second

7    problem that the union wants to identify here

8    is that Delphi has refused to identify, for

9    months, the savings that it was attempting to

10    generate from the IUE.  That request was first

11    made in the beginning of October of 2005.  It

12    was repeated in November, it was repeated in

13    January it was repeated again in March.  The

14    IUE position was: tell us what you're looking

15    to achieve at our facilities.  They're

16    different in economics than other facilities.

17    Don't give us one-size-fits-all.  Tell us what

18    you need.  And we got what we regard as labor

19    relations nonsense back.  On March 16th, in

20    which the company says, we don't know how much

21    we want in each facility.  We don't know what

22    we're looking for from each union.  In fact,

23    we just want a market-competitive wage.  And

24    you can figure out yourself what that would

25    mean at your facility.


140


1         Now there are several references,

2    Royal Composing is one, in which the Court

3    refers to " as long as the total quantum of

4    savings is necessary under Kerry, the union

5    may not prevent rejection."  And they go on.

6    There's a second reference to the need to

7    achieve comparable savings in the Royal

8    opinion.

9         In Horsehead Industries, the Court

10    refers to "if the union makes counter-

11   proposals that meets its needs while

12   preserving the savings required by the

13   debtor."  It's impossible to read 1113

14   literature and not understand the significance

15   from an in -- a debtor of identifying what it

16   is attempting to achieve for each particular

17   union that is the subject of the 1113

18   proceeding.

19          Now, in fact, the story has a new

20   development.  On May 2nd, just the other day,

21   in response to interrogatories that I served

22   on the debtor as part of the 1113 motion, they

23   finally provided us with information on

24   anticipated savings at IUE facilities.  I

25   couldn't agree more with Mr. Simon, that,

141

1    approaching these labor relations problems as

2    something to be solved in litigation, is

3    ultimately defeating and not within the

4    context of 1113.  To be replying months-sought

5    information in the form of answers to

6    interrogatories demonstrates that this

7    proceeding is premature.  It's unnecessary.

8    We are well short of achieving a level of

9    appropriate bargaining in which they could

10   honestly say the union has not had good cause

11   to accept their proposal.

12        Now, Your Honor, obviously, one of

13   the issues you're going to review is whether

14   the March 24th proposal is clearly fair and

15   equitable.  We have a number of concerns about

16   that.  First, there's a disproportionate

17   treatment of the managerial and salaried

18   workforce.  Now, you'll recall the KECP

19   hearing on February 10th.  I was asked, in

20   oral argument, if the financial goals that

21   were set were a lay-up or a reach.  And I

22   responded that I did not know, I could not

23   make that judgment, but it looked like the

24   company was going to make those proposals, or

25   rather, those earning targets pretty easily.

142

1   Not too long after the hearing, I relearned,

2   in fact, that Delphi is 500 million dollars

3   ahead of its projections for the first quarter

4   of 2006.  It's now clear -- they will meet

5   those projections, although we don't know how

6   much money above the 38 million dollars that

7   was set aside for this purpose or proved is

8   going to be paid.

9        Here's our complaint.  That's water

10   under the bridge, we understand that.  After

11   the KECP determination, Delphi extended,

12    essentially, the same program of managerial

13    bonuses to all 14,000 salaried employees in

14    the United States, including all of the

15    salaried employees that worked at each of the

16    IUE facilities.  Those people will be

17    receiving a bonus as well.  That bonus will be

18    paid in July of 2006, exactly, potentially at

19    the same paycheck as the company is requesting

20    a reduction in IUE wages.  It would be

21    difficult to frame a more inequitable and

22    inappropriate demonstration of a failure to

23    share the pain of this reorganization than to

24    so closely time these utterly opposite

25    results.  Why the debtor chose to do that, I

143

1    don't know, but it would be difficult to

2    convince me -- and you could spend ten minutes

3    or 20 minutes or half an hour talking to any

4    individual IUE member and you would never

5    convince them that there was anything fair or

6    equitable in that procedure.

7         Now the second point.  This proposal

8    -- and there's nothing wrong with this by the

9    way.  We applaud this.  From the company's

10   perspective, it's based on the concept of soft

11   landings.  And we are delighted that our

12    brothers and sisters in the UAW have the

13    options of flowbacks to General Motors, with

14    $25,000 relocation bonuses, which I'm not

15    suggesting suffers or softens the blow of this

16    proceeding in the slightest.  But it's a

17    factor.  And there's 60 percent of them can

18    retire on the attrition program.  That's not

19    true for IUE members.  We don't have

20    flowbacks.  And only 39 percent of our

21    workforce could be eligible for an early

22    retirement.  What's odd about this is that the

23    three Packard plants I identified earlier are

24    going to be kept open via Delphi.  That's

25    great.  We're thrilled that they're keeping

                                                          144

1    the plants open.  But what it means is that if

2    they not only keep the plants open but reject

3    our collective bargaining agreements, we have

4    thousands of people who will suffer wage

5    reductions without any of the soft landings

6    that are contemplated under the proposal,

7    other than one, which is the buy-down, that

8    would be -- I'm assuming, would be applicable

9    to them.

10            But the major steps that the company

11    has pointed to as creating an equitable

12    arrangement are not applicable to the IUE.

13    Now, we understand that's a problem.  We went

14    to the company and we said, okay, we'll talk

15    about an attrition program, but you have to

16    give us an attrition program that includes a

17    value for not having the flow-backs and a

18    value for having so many more members that are

19    unable to retire.  Delphi refused to offer one

20    dollar more than the package they had already

21    negotiated with the UAW.  They will rearrange

22    the deck chairs, but no money above the 140

23    and 70 programs they had already proposed.

24    And, as many Courts have pointed out, most

25    recently in Conair, it does not comply with

                                                    145

1    1113, to steadfastly maintain that an initial

2    proposal under section (b)(1)(a) is non-

3    negotiable, which is essentially what they've

4    done.  We have no soft landings.

5           Third point under this particular

6    element, Your Honor, of the statutory scheme

7    is that this proposal is not reflective.  When

8    I say this proposal, I'm referring to the

9    March 24th proposal of past IUE efforts to

10    make this company competitive.  For example,

11    the March 24th proposal says:  retiree health

12    costs under a reduced plan will now be as a

13    premium paid by the member, $180 per month for

14    family coverage.  They're applying that

15    proposal to Gadsden, Alabama where people hire

16    in at $7.77.  Thirteen percent of their wages

17    would go toward maintaining their family

18    coverage.  That's unfair, it's inequitable.

19    It's a product of a one-size-fits-all

20    philosophy that does not respect the prior

21    steps taken at some of these plants.  And as

22    the Court said in Conair, the union was bound

23    to consider, in figuring out what to do in

24    reaction to a proposal, in that case to the

25    flight attendants, are at or near the bottom

146

1    level of compensation among Conair employees.

2    That's a factor that legitimizes the IUE

3    saying no, we're not going to accept that

4    proposal, and that demonstrates that it's

5    fundamentally unfair.  A third -- in our view,

6    Delphi has not discharged its obligation to

7    provide the IUE with sufficient information to

8    allow it to engage in bargaining over this

9    proposal.  As I've said, they've confused

10    discovery in the legal proceeding with

11    bargaining, and released to us critical

12    information in the form of answers to

13    interrogatories.  And I remind you of the

14    comment in Maxwell Newspapers that the entire

15    thrust of 1113 is to ensure that well-informed

16    and good-faith negotiations occur in the

17    marketplace, not as part of the judicial

18    process.  That hasn't been true here.  This

19    1113 proceeding has truncated any

20    negotiations.  It's been used to exchange

21    information which is critically important to

22    the negotiations.  We're confusing the lawyers

23    for the union leaders and the Delphi labor

24    relations people.  There has not been, as our

25    experts will testify and as our fact witnesses

147

1    will testify, sufficient information exchanged

2    to allow the IUE to engage in bargaining.

3            We also believe that Delphi has not

4    met its obligation to bargain in good faith.

5    As we indicated, this proposal is contingent.

6    And a contingent proposal doesn't meet its

7    requirements.  Judge Hardin, a few weeks ago,

8    pointed out that the structure of 1113 --

9            THE COURT:  Well, again, you're

10    focusing on the GM -- the one that requires

11    GM's acceptance, right?

12            MR. KENNEDY:  That is the proposal,

13    Your Honor.

14          THE COURT:  Well, --

15          MR. KENNEDY:  It's called the GM

16   consensual proposal.

17          THE COURT:  They say that, to the

18   extent GM hasn't agreed, it's the other

19   proposal.

20          MR. KENNEDY:  That's what makes it

21   contingent.

22          THE COURT:  Well, the other proposal

23   isn't contingent, though.

24          MR. KENNEDY:  Well, Your Honor,

25   since there are two proposals simultaneously

                                                    148

1   being made, whether one is contingent or not,

2   the fact is they're offering two different

3   visions of whether people are going to be able

4   to continue to meet their credit card bills,

5   pay their mortgages.  And one of them, they

6   certainly can't; the other one, it's the

7   beginning of a discussion where maybe they

8   might -- that is not a definite proposal under

9   any circumstance.

10          I don't think, whatever you may be

11   able to do in connection with the relief

12   they've requested over the -- in their motion,

13   it would be, I believe, beyond the Court's

14   power in 1113, to direct -- well, they really

15    meant this one of the proposals and not the

16    other.  They are stuck, and there's reasons

17    for it, but they are stuck as they stand here

18    today, with having attempted to go down two

19    tracks at the same time.

20          THE COURT:  Well, let's explore

21    that.  They could have made a proposal that

22    said that if our EBIT/DA increases by 500

23    million or a billion, then the following wages

24    snap back.

25          MR. KENNEDY:  Yes.


                                                            149


1          THE COURT:  But until that happens

2    they will be X.  What is the difference

3    between that and the GM proposal where you

4    just substitute GM's agreement for improvement

5    in the business?

6          MR. KENNEDY:  Well, I think, Your

7    Honor, there's an enormous night and day

8    difference.  In the first, the union's

9    interest is finding out what are the wages

10   going to be on day one of the new contract.

11   If they had said to us they are going to be

12   $12.50, but if we do better in the future we

13   will meet with you and consider that, even

14   retroactively, let's give them the maximum

15    benefit of the hypothetical.  The membership

16    is still voting on $12.50.  There's not a

17    union member in the world that you're going to

18    sit down there and explain, don't worry men,

19    it's $12.50, but there's a good chance it'll

20    double some months later when the company

21    finally finishes its struggle with General

22    Motors.  That is not a conversation that is

23    capable of being had in labor relations.  If

24    they'd wanted to do that, in other words,

25    stand or die on their $12.50 proposal, then

150

1    that's what they should have done.  And they

2    didn't for a reason they know it's south of a

3    strike line, they know what the consequences

4    of that proposal are.  I don't think that's

5    for real, even from them and they're simply

6    trying to have, as they have in other areas of

7    this proceeding, two simultaneous efforts.

8    One to an interorum 12.50 to get everybody to

9    leave and then somewhat higher number they

10    haven't revealed to us yet that will be

11    available when they finish their dance with

12    General Motors.  Again, all that may make

13    sense to them on a business perspective.  And

14    in an 1113 perspective, they haven't met their

15    obligation to provide a proposal, which is the

16    critical beginning of the entire 1113 process.

17          Now, what we heard from Delphi is

18    that they're engaging in pattern bargaining.

19    You will find that they have met with other

20    unions dozens of times more frequently than

21    with the IUE and that the IUE has been given

22    some meetings but brief, preemptory, surface

23    -- there's really been nothing significant

24    going on between Delphi and the IUE-CWA,

25    unfortunately.  And they -- it's obvious from

151

1     their comments that they feel they can do that

2     because of pattern bargaining.

3           Now, we reject the notion that

4     though there has been, as a factual matter,

5     outside the 1113 context, a history that the

6     UAW settles first among the several unions,

7     that's true.  But that doesn't replicate

8     itself in an 1113.  In an 1113, each and every

9     union has to separately meet the 1113

10    criteria.  And they cannot do that, with

11    respect to us.  And this is not something

12    we've suddenly told them about.  On March

13    31st, right after the March 24th proposal,

14    Henry Reichert, the head of our automotive

15    conference board, wrote Delphi and pointed out

16    to them that Delphi has chosen to limit its

17    negotiations for months to the UAW.  Our

18    members have their own contracts and their own

19    priorities with Delphi.  Your need to

20    negotiate with IUE-CWA is not met by meeting

21    with any other person.  The fundamental

22    reality is that Delphi did not engage in any

23    meaningful negotiations with the IUE-CWA

24    before filing your Section 1113 motions today

25    in bankruptcy Court.  Whether or not that

                                                     152

1    meets your legal obligations remains to be

2    seen.  It certainly is no way to reach

3    consensual agreement as you purport to one.

4            We've been on record early and often

5    that we are not prepared to accept pattern

6    negotiations in this 1113 process or this

7    Delphi bankruptcy and yet, that is the

8    approach they've been taking.  It's not

9    permissible under Section 1113.

10            I want to address an issue, as it's

11    obviously important in the Second Circuit, of

12    whether the IUE-CWA has made a counter-offer

13    and second, whether it had an obligation to

14    make more of a counter-offer.  Now, our

15    position and I don't want to repeat this, but

16    again, as a contingent offer that didn't meet

17   the requirements of 1113(b)(1)(a), we did not

18   have an obligation to make a counter-offer.

19   That we did not have sufficient information to

20   even fashion a counter-offer.  And that their

21   practice of pattern bargaining frees us from

22   any obligation to make a counter-offer.  But

23   not responding, rather, notwithstanding that,

24   with respect to the one piece of the puzzle

25   which was definite, which was the attrition

153

1   plan, the IUE did make a counter-offer.  In

2   fact, back in November, after that November

3   15th proposal, which is a terrible proposal --

4   but we wrote them a letter dutifully saying,

5   we'll try to make a counter-proposal.  Give us

6   the information we need.  We'll try.  Before

7   we could make a counter-proposal, they

8   withdrew it, not in speaking to us, I might

9   add.  We found out in a press release.

10   Essentially, there was a brief phone call a

11   few minutes before but, essentially, we get a

12   press release saying they've withdrawn it.

13   Okay.  We're not going make a counter-offer to

14   a withdrawn proposal.

15           The next proposal we get is in

16   March, March 24.  As I've said, we could not

17    counter that and we haven't.  This litigation

18    and this motion and this effort by the company

19    to roll back wages for so many people will

20    have an enormous impact on our communities and

21    our membership.  I'm confident the Court will

22    listen carefully to the IUE witnesses who will

23    be called to testify, both on that topic and

24    on the question of what they have done as

25    locals to try to make Delphi and GM

154

1    competitive in the past.

2            In our view, this motion is

3    premature for the reasons I've identified:

4    lack of critical information, uncertain GM

5    support, there's the repricing motion that is

6    before this Court and the substantial changes

7    to the steady state scenario, which you are

8    going to hear a lot about and heard some

9    already.  And the unknown impact of the

10    attrition programs.  What Delphi is really

11    saying is that, while we've looked at all four

12    of those points, and let's assume we get as

13    much as we could in each one, we're still

14    going to need labor transformation.  That's

15    their position.  And that may be true, I don't

16    know.  And no one knows because we don't know

17    the answers to those four questions.

18             But this much I'll tell you.  If, as

19    we believe any fair person would judge,

20    Delphi's financial state is improved by

21    billions of dollars as a consequence of these

22    four items, the extent of labor

23    transformation, the amount of labor

24    transformation that they would need is clearly

25    going to be less.  And it's unfair and

155

1    unreasonable when we can't even get our arms

2    around what this company is going to look like

3    in six months to ask the unions, on the basis

4    of a gloomy-as-possible steady state scenario,

5    to make the enormous changes they're looking

6    for in wages and benefits.  This is just

7    premature.  An action by this Court denying

8    this motion, as you should, both for the IUE

9    and for the other unions, doesn't give the

10    unions a get-out-of-jail-free card and we know

11    that.  But it will say to the company: get

12    your financial house in order.  Figure out

13    with all of these changes what it is you're

14    going to need.  Make a proposal that's

15    specific to each union on what it is you need.

16    Give them an opportunity to accept it or

17    reject it.  If we don't fairly accept it, then

18    they're back in this Court.  If we do, we've

19    avoided the enormous judicial and lawyerly

20    expense that we're all engaged in.  For that

21    reason, Your Honor, and we will say more about

22    this at the end of the evidence, we ask you to

23    reject this 1113-1114 motion.

24            THE COURT:  Okay.

25            MR. PETERSON:  Good afternoon, Your

156

1    Honor, Lowell Peterson, Meyer, Suozzi, English

2    and Klein for the steelworkers union.  The

3    debtors have presented this case as a labor

4    transformation case and it is certainly a very

5    interesting discussion whether the post World

6    War II social contract should be discarded or

7    modified, whether North American manufacturing

8    can or cannot survive at union wage rates.

9    But the issue before the Court, of course, is

10    whether, in this particular set of

11    circumstances, the debtors have complied with

12    the requirements of the statute.  And

13    certainly in connection with the steelworkers,

14    the debtors have not done so and they have not

15    even come close to doing so.  And frankly, we

16    sort of wonder what we are doing here.

17            Let's talk about the first and most

18    obvious obligation under the statute and case

19    law, which is the requirement that the debtors

20    engage in good-faith negotiations with the

21    union, whose contracts they seem to reject.

22    It hasn't happened with respect to the

23    steelworkers.  There have not been good-faith

24    negotiations.  You'll hear some evidence about

25    that but let me give you an overview.  There

157

1    certainly have been presentations made by the

2    debtors about the debtors' financial

3    condition.  Maybe this can be thought of as

4    sort of aerial bombardment to soften us up.

5    Bu, in any event, they've been talking about

6    how they're losing money and we have to help.

7    We understand.  They've been saying that to us

8    for a long time, they've said it to us a

9    number of times both in the summer of 2005 and

10    also after the petition was filed in this

11    case.  The debtors did send two separate term

12    sheets to the United Steelworkers:  one in

13    October and one in November.  We got,

14    apparently, similar term sheets to those that

15    were sent to the other unions.  Those were

16    withdrawn in December.  Shortly before filing

17    the motion, as with the other unions, we got

18    another term sheet, and I'll address some of

19    the contents of that term sheet in a moment.

20    And in the wake of getting that last set of

21    proposals, finally, there were actually a

22    couple of meetings between the steelworkers

23    and Delphi.  Those meetings, as I'll mention a

24    little bit further on, basically, were

25    information gathering and information sharing

158

1    meetings.  There were no negotiations.  It has

2    been suggested that unions know the score;

3    they know they have to give concessions and,

4    therefore, this motion should be granted.

5    That's an enormous logical leap between that

6    proposition.  I don't think any of the unions

7    have stood before Your Honor, and we certainly

8    don't stand before Your Honor and suggest that

9    nothing at all has to be done, everything is

10    hunky-dory, give us status quo for all of

11    eternity.  But in the real world, what is

12    important is the actual proposals made by the

13    debtors to make actual, specific changes to

14    collect the bargaining agreements and to go

15    through sets of proposals, concrete proposals,

16    talk about how each one of them would work and

17    see if there's a way to reach agreement,

18    either on the proposals as initially written

19    or as modified in the process of discussion.

20          As I mentioned, we had a couple of

21    abbreviated information sessions on the

22    debtors' latest proposals in which that

23    process was begun, barely begun.  Now, the

24    debtors assert, as most debtors do, that

25    really the reason to file an 1113, 1114 motion

159

1    is to motivate the unions to take the

2    bargaining process seriously.  But that really

3    stands the statute on its head.  The whole

4    concept of 1113 is that the negotiations

5    should supersede the litigation and not the

6    other way around.  And the opposite is

7    certainly true here.  From what I understand,

8    it's certainly true with the autoworkers and

9    the IUE-CWA.  I can represent to Your Honor

10    that it's definitely true of the steelworkers.

11    We have been left by the wayside as this

12    litigation has simply resulted in legions of

13    lawyers descending upon Troy, Michigan and

14    Milwaukee, Wisconsin and all over the place in

15    New York and Texas, there just hasn't been any

16    negotiation there hasn't been any time for it

17    and regardless of whether there has been, it

18    hasn't taken place.

19          We do understand in the real world

20    that the focus of Delphi is on General Motors

21    and our brothers and sisters in the UAW.  And

22    we understand that, as a practical matter,

23    those negotiations will, in some important

24    way, set the stage for our own negotiations.

25    Bernie Quick said in his declaration, and Mr.


160


1    Butler has said it here today, that there is a

2    practice of pattern bargaining.  Well, I think

3    that's an overstatement.  I don't think that's

4    exactly what's happened.  Certainly, if you

5    look at the differences between the contracts

6    negotiated by the unions, it's not borne out.

7    But, in any event, it's clear that the core

8    group of workers is the largest group of

9    workers.  And those negotiations clearly have

10    not progressed much at all.  We're not

11    proposing that the debtors engage in a sort of

12    fruitless exercise of the steelworkers -- to

13    pretend to negotiate with us while the real

14    action is someplace else.  We're not asking

15    for that, we're not asking for a litigation

16    exercise.  We're not asking for nice drawings

17    to be put on the wall about a process that's

18    really not inclined to lead to anything.  We

19    understand that the focus has to be where the

20    focus has been, or should be, which is

21    negotiations involving General Motors and

22    largely the autoworkers.  But in the meantime,

23    that can't serve as an excuse to reject the

24    steelworkers' collective bargaining

25    agreements.

161

1         And yet, that is precisely what the

2    debtors seek.  In other words, it might make

3    sense for the negotiations to take place in

4    the order that is actually taking place, but

5    that doesn't mean that our contracts can be

6    thrown out in the meantime.  We still don't

7    even have an attrition proposal.  Now this has

8    been promised to the steelworkers for months.

9    It was represented by the debtors in Court

10    that an attrition proposal would be made and,

11    in fact an attrition program very similar to

12    the UAW attrition program would be offered and

13    negotiated with the other unions, specifically

14    including the steelworkers.  The steelworkers

15    have requested this, repeatedly from the

16    company.  We've requested it from General

17    Motors.  It's been promised by the company and

18    by General Motors, it hasn't happened yet.

19    How can we negotiate a labor transformation

20    package, a key element of which has not even

21    been put on the table?

22         As argued by my colleagues and more

23    extensively, in our objections, there's also a

24    problem with the two sets of proposals that

25    the steelworkers received.  One, assuming

162

1    General Motors' participation to some degree;

2    the other assuming no General Motors

3    participation.  We don't even know the degree

4    of General Motors participation that's been

5    requested, that's been bargained or what those

6    discussions have entailed.  Obviously, that's

7    a variable number, it's not as if there's --

8    if General Motors contributes one dollar extra

9    to this process suddenly our wages jump up to

10    the GM consensual proposal from the bare bones

11    proposal.  This is an unknown variable when

12    the job's out of our control and we simply

13    can't negotiate under those circumstances.

14    This is something that involves the extent of

15    a contribution and it has a direct impact on

16    our wages and our benefits.  And also, unless

17    the debtors are just making up stories,

18    clearly there is some anticipation that

19    General Motors is inclined, at least, to

20    discuss significant participation.

21    Steelworkers know how to negotiate.  We know

22    how to negotiate agreements that address the

23    competitive pressures faced by many

24    manufacturers in general and also Delphi in

25    particular.  The local union has a structure

163

 1    for negotiating; it involves a negotiating

 2    committee, an executive board, membership

 3    ratification.  We've used that with Delphi in

 4    the past and, in fact, have made major

 5    adjustments to the collective bargaining

 6    agreements at both of the steelworkers' plants

 7    which I'll describe in a moment.

 8             In their response to our objections,

 9    the debtors suggest that the steelworkers

10    didn't even bother to address the necessity

11    poll of the 1113 analysis.  We respectfully

12    request that perhaps that they could have read

13    a little bit more than the first three pages

14    of our objections, they would have noted that,

15    in fact, we devoted a lot of attention to

16    necessity.

17             THE REPORTER:  Sorry, could you slow

18    down?

19             MR. PETERSON:  I'll try.  I'm just

20    trying to make my 15 minutes.

21             THE REPORTER:  I know.

22          MR. PETERSON:  Now, as we've

23    mentioned, the draconian changes that have

24    been proposed by the debtors and the

25    competitive benchmark proposals are certainly

                                                              164

1     not necessary if General Motors contributes.

2     And that remains a live possibility.  We have

3     to recognize that in the real world that is a

4     live possibility.

5            Similarly, the changes are not

6     necessary with respect to the steelworkers.

7     Because let me tell you a little bit about our

8     actual wages.  We have two plants.  One is in

9     Home Avenue in Dayton, Ohio the other one is

10    Vendalia.  The Home Avenue plant is on the

11    hit-list.  It is one of the plants that Delphi

12    has all but announced will be closed or

13    auctioned off.  It is part of the AHG

14    division, it's a money loser, it's gone.

15    That's where most of our members work.  Even

16    at Home Avenue there are competitive wage

17    agreements in place.  And here's the breakdown

18    according to the local union's numbers.  There

19    are 348 core employees at Home Avenue, that's

20    the $27 an hour variety.  There are 280

21    competitive workers at Home Avenue, who

22    average $12.59 an hour.  I don't know who

23    makes $73 an hour but it ain't us.  At

24    Vandalia the numbers are even more dramatic.

25    There are seven core employees at Vendalia

165

1    making $27 an hour, 159 employees who average

2    $16 an hour, 53 who make $10 an hour and 52

3    who make eight dollars an hour.

4            THE COURT:  When you giving us

5    figures, are you including all of the other

6    non-hourly costs attributable to those

7    workers?

8            MR. PETERSON:  These are the wage

9    figures, Your Honor.

10            THE COURT:  This is just the wage

11    amount?

12            MR. PETERSON:  Yeah.

13            THE COURT:  Okay.

14            MR. PETERSON:  Now, I will point out

15    that, with respect to over a hundred of the

16    people at Vandalia, the OPED number is

17    illusory because, in fact, we already have

18    medical retirement accounts at which the

19    company's obligations in connection with their

20    retiree medical benefits is defined as 50

21    cents an hour paid into an account.  There is

22    no OPED number there.  And if we were to get

23    an attrition program, of course, it is the

24    higher paid people who would be eligible to

25    take those buyouts so that, in fact, both the


166


1    average hourly wage rate and the OPED and

2    other benefit rates would substantially

3    shrink.  This is something that we pointed out

4    repeatedly to management.  I think they agree.

5    It's just a question of people not having

6    focused sufficiently to have engaged in a

7    conversation with us about an attrition

8    program.  In fact, it's entirely possible that

9    if you combine the closure of the Home Avenue

10    plant and attrition program and so forth, that

11    the wage rate at Vandalia will be

12    significantly below the market rate that's

13    been identified by Delphi and its experts.  We

14    certainly don't have to accept a proposal to

15    cut those wage rates further.

16            THE COURT:  Has there been such a

17    reply?  Is this the first time they're hearing

18    this or has there been a reply like this by

19    the steelworkers to the union?

20            MR. PETERSON:  To the steelworkers

21    to the company, absolutely --

22            THE COURT:  I'm sorry --

23    steelworkers to the company -- excuse me?

24          MR. PETERSON:  Yes, repeatedly.  To

25     the extent there have been meetings, this


167


1     argument, these facts, have been presented to

2     the company repeatedly.  And, of course, the

3     Vandalia agreement, I should mention, was

4     negotiated at the end of 2004.  It's still

5     fresh in the minds of the negotiators of the

6     company.  So the employers' negotiators both

7     know what these facts are, and they know that

8     the steelworkers are capable of negotiating in

9     this manner and have done so very recently.

10          Now, as for the good cause component

11     of 1113, I think the arguments I just made go

12     to the good cause poll.  But I want to amplify

13     a little bit and talk about whether there's

14     been a rejection of proposals.  I think that

15     it's correct to say that it's very difficult

16     to accept or reject these contingent proposals

17     that are on the table.  Let me parenthetically

18     footnote that the GM consensual proposals, as

19     we understand them, are contingent not only on

20     some money flowing from GM but also solutions

21     to the company's pension programs which is a

22     much bigger bear to attack.  In any event, in

23     the real world of bargaining it's not just a

24    question of here, here's our proposal take it

25    or leave it.  At least we don't understand

168

1    that the statute permits that and we certainly

2    hope that the debtors are not making that

3    proposal.  Instead, what has to happen is some

4    sort of give and take and some sort of

5    discussion.  So the question of whether time

6    for a union to actually, "reject a proposal

7    within the meaning of 1113" is not at the

8    beginning.  It's not at the initial phase, but

9    it's after these negotiations have had a

10    chance to play out.  That simply hasn't

11    happened in connection with the steelworkers.

12    Sounds like it hasn't happened with respect to

13    the other unions either.  So, I don't know if

14    we can even answer the question of whether the

15    steelworkers have, I'm sorry, have rejected

16    the debtors' proposals because we're not at

17    that phase in the negotiations.  It's far too

18    soon for that kind of analysis to kick in.

19    And in any event, I think it's important to

20    make two other points about these

21    negotiations.  One is it would be absurd to --

22    for any of the unions -- to agree to the

23    proposals that do not include General Motors'

24    contributions while there is still some

25    possibility of General Motors contributing.


                                                                169


1    Let's just be practical, let's just be

2    pragmatic.  Leaving aside the interesting, I

3    think very interesting, theoretical issues,

4    the reality is, if, in fact, these unions

5    signed off on proposals that did not involve

6    General Motors' contributions General Motors

7    wouldn't contribute.  So, as a matter of

8    bargaining strategy, it's a very simple thing

9    to address.  It doesn't make sense to pretend

10   that the non-GM proposals are serious or that

11   any union would have any realistic real-world

12   reason to simply agree to those proposals.

13   It's just not the way the world works.  Let me

14   say something about the counter-proposal issue

15   as well, although this has also been

16   addressed.  There were no proposals on the

17   table for the steelworkers or the other unions

18   to counter after December of 2005.  There were

19   no proposals on the table from December 2005

20   until the end of March.  So the concept that

21   somehow the unions have been spinning their

22   wheels and wasting time by not putting

23   concrete counter-proposals or proposals on the

24   table during that period is just silly.

25          That's not how bargaining works.


                                                                    170


1   What happened was, the debtors unilaterally

2   withdrew their proposals, unilaterally

3   rescheduled the hearings.  Both moves, we

4   think, are good but the debtors can't now turn

5   around and play gotcha and say oh, by the way,

6   even though we didn't have any proposals on

7   the table you should have divined that

8   sometime down the road when we did file our

9   motions we were going to accuse you of not

10  countering proposals that we had withdrawn.

11  With respect to the balance of equities

12  component.

13          THE COURT:  Before we get to that,

14  do you agree that the GM-related proposal is

15  not a proposal because it's contingent?

16          MR. PETERSON:  I think within the

17  language of 1113 I agree that it is contingent

18  and, therefore, is not a proposal.  Again as a

19  practical matter, it's difficult to in fact,

20  engage in concrete bargaining when it is so

21  contingent.  Regardless of whether it reaches

22  statutory requirements, I don't know how we

23  get our hands around it.

24          THE COURT:  And yet, you seem to be

25  saying what other unions are saying which is

171

1    that we can't bargain on a proposal that

2    doesn't include GM.  So aren't you effectively

3    saying that GM has to agree first?

4              MR. PETERSON:  Well, GM has to be at

5    the table.  That's correct.

6              THE COURT:  More than at the table.

7    They're at the table now.

8              MR. PETERSON:  Well, not with us.

9              THE COURT:  They're at the table in

10   the sense that everyone is saying they're at

11   the table.

12             MR. PETERSON:  Yes.  And they have

13   stepped up to the plate in the attrition

14   program.

15             THE COURT:  But more than that, I

16   think, is what you're saying needs to be that

17   to make it a proposal, to fit into 1113 -- I

18   think what you're saying -- I think what the

19   other counsel, maybe with one exception, is

20   saying, is that it doesn't really count as a

21   proposal and yet at the same time, nothing

22   else counts as a proposal unless it involves

23   GM.

24             MR. PETERSON:  Well, this is a

25   predicament that, frankly, the debtors have

172

1    brought upon themselves.  It's not of our

2    making.  They have indicated to us that

3    they're willing to use us as leverage against

4    General Motors to get General Motors to pony

5    up money and they've even put dollars on the

6    table.  Where those dollars come from, I don't

7    know.  I don't know how the debtors have

8    priced the General Motors participation,

9    perhaps there's some rational basis, perhaps

10   it's as a result of actual conversations

11   they've had with General Motors.  We don't

12   know.  All we know is the end result.  But

13   they have said that this is a realistic

14   possibility.  Under those circumstances we

15   have to take it seriously.  If it's just a

16   smoke screen, if, in fact, they're not being

17   serious and General Motors is not prepared to

18   participate then, that's bad-faith bargaining.

19            THE COURT:  If you have to take it

20   seriously, why isn't it a proposal?

21            MR. PETERSON:  Are the debtors

22   actually saying that we can accept their

23   proposal that involves General Motors'

24   contributions if General Motors has said that

25   we haven't made this commitment?  Again, I

173

```
1    don't think that's the way the world works.
2              THE COURT:  Okay.
3              MR. PETERSON:  I think the problem
4    is --
5              THE COURT:  On the point about
6    rejecting the proposal, doesn't the statute
7    contemplate that since negotiations are
8    supposed to continue after the motion is filed
9    that the unions still have time to respond to
10   and reject or accept or bargain?
11             MR. PETERSON:  Yes, I think that's
12   right.  My point, with respect to rejection,
13   is that is hasn't happened yet, we're not at
14   that phase.  The concept, as we understand it
15   under the statute, is that the analysis should
16   be on what the ultimate -- the proposal that
17   that union ultimately rejected looks like, not
18   the one that was first put on the table.  If,
19   in fact, the analysis, and we think this is
20   not correct, is on the first proposal well,
21   certainly, we haven't accepted it.
22             THE COURT:  Well, the analysis is on
23   the first proposal, but your good faith is
24   measured not -- it doesn't just cut off at the
25   date of the motion.
```

1           MR. PETERSON:  I understand that,

2    Your Honor.

3           THE COURT:  Okay.

4           MR. PETERSON:  Right.  No.  And we

5    would -- we welcome the opportunity to

6    negotiate.  It has not happened, certainly

7    with respect to the steelworkers.  It just has

8    not happened.  And we think there's an

9    explanation for that, which is that the hard

10   work, if you will, is taking place away from

11   the steelworkers' bargaining table.  We're not

12   whining about that, we're not complaining

13   about it, we understand that that's the way

14   the world is working.  But, in the meantime,

15   the debtor should not pretend that they're

16   actually engaging in an 1113 process with us

17   when they're not.

18           THE COURT:  Okay.

19           MR. PETERSON:  Another point made by

20   the debtors in their response to our

21   objections is that the unions, including the

22   steelworkers, somehow complained that

23   proposals were not fair and equitable because

24   the UAW got an attrition program and we

25   didn't.  Well, that's a misapprehension that

175

1    also, perhaps, would have been cleared up by

2    actually reading carefully our objections.

3    We're not saying that at all.  We're saying we

4    have been promised an attrition program, an

5    attrition program is a central component in

6    the precursor to discussing the other changes

7    in wages and benefits and terms and

8    conditions.  And it's impossible to really get

9    involved in discussing those terms until we

10   actually get the attrition program that's been

11   promised to us.  It will have a tremendous

12   impact on the costing of our contracts and it

13   has to come before we continue -- before we

14   end our negotiations.  I think another point

15   that needs to be made in terms of balance and

16   equities and equality of sacrifice is the

17   ultimate sacrifice that the union members are

18   being asked to make, which is loss of jobs.

19   Two thirds of the steelworkers' members are

20   going to be unemployed.  That is an enormous

21   sacrifice far beyond sacrifices being asked of

22   the non-labor constituencies and I think that

23   it is critical to include that in the

24   analysis.

25            At the same time, we hear that the

```
 1    executives are prospering.  Not only have KECP
 2    targets presumably been met and lots of
 3    payments been extended to those executives,
 4    but now we hear that, in fact, this program
 5    has been extended to 14,000 non-union
 6    employees who will also be getting checks of
 7    some magnitude at precisely the time our
 8    members are going to be -- either being laid
 9    off or facing wage cuts.  And the balance of
10    the KECP program, which was deferred until
11    July, is still on the table; it has not been
12    withdrawn by the debtors.  There are
13    substantially more lucrative components to the
14    KECP program which are still teed up for Court
15    approval, just a couple of months from now.  I
16    want to make a point about the information
17    flow issue.  This, we hope, is a work in
18    progress.
19            As of today, the debtors have not
20    provided all of the information that the
21    steelworkers need to evaluate their proposals.
22    This isn't a question of adjusting one wage
23    rate by a dollar or two an hour or increasing
24    a deductible, these are extraordinarily
25    complicated proposals.  They are extensive and
```

1    they are of a piece with a major

2    transformation plan.  It's our hope that we

3    will continue to get information.  In fact,

4    later this week, there are going to be some

5    additional meetings between the consultants to

6    see if we can get additional information.  So

7    we hope this doesn't continue as an issue as a

8    practical matter but, at this point, we simply

9    do not have the information necessary to

10   evaluate the debtors' proposals.  We

11   certainly, contrary to what the debtors

12   suggest in their reply, we certainly have

13   addressed the 1114 issues and the arguments we

14   make with respect to the procedural and

15   substantive problems with the debtors' 1113

16   proposals apply also to the 1114 proposals

17   with the exception of the question of whether

18   our wages are already competitive.  So, in

19   conclusion, the debtors have failed to bargain

20   with the steelworkers in good faith, they have

21   to do so before moving to reject.  They have

22   already moved to reject.  They have certainly

23   have not bargained in good faith since then.

24   They have utterly failed to suggest that the

25   modifications proposed to the steelworkers'

1    contract are necessary for the reasons they

2    have articulated including what, in large

3    measure, the fact that our wages are already

4    quite low.  And they have failed to present an

5    attrition program which would further impact

6    those numbers.  And it is profoundly

7    inequitable to slash the wages of union-

8    represented workers and to throw most of them

9    out of work while simultaneously paying large

10   bonuses to non-union employees, in particular,

11   executives.  We hope that the Court will

12   dismiss this motion.  Regardless, of course we

13   will continue to sit down with the debtors, as

14   we have historically, and address their real

15   needs to compete in the marketplace.  Thank

16   you, Your Honor.

17        THE COURT:  Okay.  All right, are

18   there other union representatives?

19        MS. ROBBINS:  Yes, Your Honor.

20        THE CLERK:  Your Honor, there are

21   two others that would be at least another

22   thirty minutes of our time that haven't been

23   scheduled.

24        THE COURT:  Why don't I hear you?

25        MS. ROBBINS:  Good afternoon, Your

1    Honor, my name is Marianne Goldstein Robbins

2    at law firm of Previanat, Goldberg, Uelmen,

3    Gratz, Miller & Brueggeman.  We represent the

4    IAM and the IBEW.  We agree and will not

5    repeat the many points that have been made by

6    the other unions.  What we would like to do is

7    point out some of the circumstances that are

8    unique to these two unions.

9            The IAM and the IBEW represent

10    skilled trades at the Milwaukee location.

11    Sixty electricians, 45 machine repair and tool

12    and die workers as well as approximately 25

13    retirees between the two groups.  Although the

14    Milwaukee facility is comparatively

15    profitable, we have been informed that it is

16    due to close at the end of 2007.  Which means

17    that, with respect to our small groups, and

18    there's been some reference to salaried maybe

19    taking a 35 percent elimination in jobs, our

20    groups will take a 100 percent elimination of

21    jobs.  Our groups are not on the creditors'

22    committee so we don't have privy to that

23    information.  We don't have estate-funded

24    experts because we're a small group.  And the

25    problems, in addition to all the ones that the

180

1    unions have mentioned thus far, that we have,

2   is that it is apparent that we are simply an

3   afterthought.  Even though there has been no

4   bargaining, no attention, we have been

5   included in the 1113 and we do not believe

6   that the statute permits that.  We were told

7   early on that the company was busy meeting

8   with the larger unions and that there would be

9   no real reason for meeting with us at those

10   points in time.  In terms of their earlier

11   proposals, there were no bargaining sessions

12   concerning them.  There was not even a verbal

13   statement as to the status of those proposals,

14   other than that we're not ready to deal with

15   you yet, and reading -- and the press releases

16   that have been referenced previously.  When it

17   comes to the most recent proposal, we have not

18   received information that would allow us to

19   know what exactly has been proposed or how

20   much it will save.

21           And I just want to make reference to

22   one specific point that was made.  Our group,

23   according to Delphi, does not have a GM

24   guarantee.  GM financial statements have not

25   identified a guarantee of benefits for

1   retirees or pension benefits for our groups.

2    The reference was made that there would be a

3    health savings account in lieu of retiree

4    benefits for our group.  But that's contingent

5    on GM's support which we don't know about.  We

6    also don't know about any kind of attrition

7    package, although it's been promised and we've

8    even been told that it exists but nobody has

9    shared it with us.  When we talk about

10   information that is necessary to evaluate the

11   proposal we don't see how you could get more

12   basic than that and I will not go on to

13   explain other items that we are also missing.

14   I would like to point out to the Court that

15   the requirement to provide necessary

16   information to evaluate a proposal is supposed

17   to be provided prior to the time this motion

18   is filed.  It has not been provided prior to

19   the time that this motion has been filed.

20   We've had references to pattern bargaining.

21   As I mentioned in the case of our group, there

22   was no contact after December 16th until late

23   March when the contingent -- drafts of

24   contingent proposals were provided.  There was

25   no in-person meeting to even discuss that,

                                                        182

1    prior to this motion being filed.  There was a

2    conference call.  We are the one group which

3    has prepared a counter-proposal addressing all

4    of Delphi's proposals.  We did that in spite

5    of the fact that the proposal we received was

6    indefinite, incomplete, imprecise.  We've been

7    criticized for providing it so late.  But it

8    was April 20th when we provided it.  Your

9    Honor, that was the first time that we had an

10   in-person meeting with any representatives

11   from Delphi concerning the March proposal --

12   the very first meeting.  We did not have all

13   the information; we still don't -- on that

14   proposal.  Yet, we made, what we could of a

15   counter-proposal.  That counter-proposal

16   included a two dollar an hour wage reduction,

17   a reduction in holidays a reduction in shift

18   premiums.  We were promised, at that point,

19   that there would be a proposed attrition

20   package, the remainder of our information

21   requests would be provided and there would be

22   additional meetings and there would be a

23   counter-proposal to our counter-proposal.

24   There hasn't been a counter-proposal.  Delphi

25   hasn't been willing to schedule a meeting.

183

1    There hasn't been an attrition package.

2           In other words, Delphi is not ready

3    to bargain with us, even if we make a counter-

4    proposal.  We are demonstrating package --

5    pattern bargaining.  No matter what we do,

6    they will not bargain with us.  They are not

7    ready to bargain with us.  We understand that

8    we're small but if that's the case we do not

9    belong as part of this 1113 and 1114 hearing.

10   We do not belong as part of the motion.

11       THE COURT:  Where was that -- your

12   proposal was not conditioned upon some sort of

13   overall agreement with other unions, right?

14       MS. ROBBINS:  No.  There were holes for

15   things like health insurance because we hadn't

16   been told what the program was -- and several

17   other holes.  It's very hard to deal with job

18   security issues when you've been told there

19   will be an attrition package and it hasn't

20   been provided and your members have to weigh

21   what they have now verses an attrition package

22   that hasn't been proposed.

23       We also want to raise some things,

24   raise some points concerning the criteria of a

25   proposal that is fair and equitable and that

184

1    is necessary.  As I've mentioned, the IBEW and

2    IAM agreed to significant wage cut or at

3    least, made that as a counter-proposal to

```
 4    resolve the matter with other provisions.

 5    They do not have the sub-benefits that the UAW

 6    has; they don't have the same Harding

 7    requirements.  We understand those provisions,

 8    we would like to have them, we just don't.

 9    Delphi seeks to abolish our retiree health

10    insurance, freeze the pension.  The theory is,

11    and it was referenced by Delphi in its opening

12    statement, well, the unions have these

13    guarantees with GM.  Well, Delphi says, we

14    don't know of any guarantee you have with GM

15    but we want you to take the same proposal of

16    no retiree insurance and a frozen pension.

17    Even though you don't have the same guarantees

18    for continuing the pension and continuing

19    retiree health insurance anywhere else.

20         Now, there's another group that doesn't

21    have those guarantees, as far as we know,

22    they're the salaried employees.  Now, Delphi,

23    even though they're a larger group than our

24    group, Delphi has retained retiree health

25    insurance for salaried employees.  Delphi, at
```

185

```
 1    the time our proposals were made, had not

 2    chosen to freeze their pension and even now is

 3    not going to freeze it on the same schedule.
```

4    And there's no showing that it's as

5    vulnerable.  There's no showing that there is

6    the same potential additional loss of pension

7    benefits -- supplemental benefits.

8        In other words, our group, which has

9    worked for Delphi for years on the promise of

10   retirement benefits, could lose everything.

11   More so than any other group.  The splinter

12   unions do not have the GM guarantees and do

13   not have Delphi's recognition that maybe, they

14   should retain their retirement benefits in any

15   part.  We don't have either thing.  We're

16   going to be treated worse than everybody else

17   and no one wants to pay attention.  We're an

18   afterthought.  They'll get around to thinking

19   about us well after the hearing and the

20   decision this Court's being asked to make

21   occurs and this, on the eve of the closure of

22   our plant.  No attrition package.  Plant

23   closed.  No clear answer as to whether or

24   where retiree benefits will come from, in any

25   form.  That is not fairness and equity.  That

186

1    is a misplaced motion that should never have

2    been filed when these issues had not been

3    addressed.  No meetings to talk about this.

4        THE COURT:  Okay, I got that point.

5        MS. ROBBINS:  The last point that I

6    will make, Your Honor, and it's very short is

7    simply that you can't say that it is necessary

8    to treat these splinter groups more poorly

9    than everybody else.  We're small.  We could

10   be provided with comparable benefits.  It

11   wouldn't break anybody.  A hundred employees,

12   25 retirees.  You can do it for salaried

13   groups, it's a lot larger, but you can't do it

14   for us?  It's not necessary and it's not fair

15   and equitable and it doesn't comply with the

16   statute.  We ask that you deny the motion,

17   Your Honor.

18        THE COURT:  Okay, thank you.

19        MS. MEHLSACK:  Good afternoon, Your

20   Honor.  Barbara Mehlsack, Gorlick, Kravitz &

21   Listhaus for the three Operating Engineers

22   Locals 18-S, 101-S and 832-S.  I recognize the

23   late hour, Your Honor, and I've been listening

24   to the growling stomachs, but I have every

25   confidence that Your Honor is not going to let

187

1    us, despite our small size -- we represent a

2    scant 20 employees.  Mr. Butler said 19 and

3    that's an issue I'll discuss further.  And

4    we're covered by three separate collective

5    bargaining agreements.  And I trust that Your

6    Honor, as this Court has done in Horsehead

7    Industries, will recognize that we are

8    entitled to the same rights, under 1113, as

9    our colleagues and that the debtor has to meet

10   the same obligations with respect to 1113 as

11   it does with our colleagues.  Though our three

12   operating engineers' locals, as I said

13   represent a total of 20 employees.  We have

14   one employee at a plant in Olef, Kansas, six

15   employees at the plant in Rochester and 13

16   employees at the plant in Columbus.  Each of

17   these plants is faced with an entirely

18   different factual situation.  The plant in

19   Olef, Kansas was a battery facility that has

20   been shut down and, in fact, demolished.  And

21   our lone employee, who has been the butt of

22   many jokes for the time we have taken in other

23   aspects of this proceeding, is the only hourly

24   employee left at the plant because his

25   presence is necessary as a result of the

                                                    188

1    clean-up requirements for the toxic waste at

2    the facility.  The other two plants, Rochester

3    facility has six employees, we understand that

4    they have identified as one of the sites at

5    which Delphi manufactures has its core

6    products.  In contrast to the Columbus

7    facility, which has 13 employees and has been

8    identified as a site that will be either

9    closed, consolidated or sold, we have no idea

10   which of the three, or maybe all three.

11         While it may seem frivolous to use this

12   Court's time to talk about the one employee in

13   Kansas, I'm going to do that because the

14   debtors' treatment of that employee at a

15   collective bargaining agreement in Kansas is

16   emblematic of its failure to meet the 1113

17   requirements with respect to our three locals.

18   We recognize the practical realities of what

19   the debtor calls pattern bargaining.  We

20   recognize that it may be necessary from a

21   business point of view for the debtor to

22   utilize the strategy it has adopted.  But as

23   this Court said in Horsehead Industries,

24   having made that choice not to provide us with

25   a proposal, not to bargain with us it cannot

                                                    189

1    then sweep our contracts away in this tsunami

2    of papers that it has dumped on all of us.

3    The way the debtor has treated the Olef,

4    Kansas contract and the employee there, is

5    evidence of the fact that the debtor has no

6      intention of negotiating with the operating

7      engineers until it concludes its negotiations

8      with GM, the UAW, possibly the IUE, possibly

9      the steelworkers.

10          I'm not sure at what point the debtor

11     believes it's appropriate to come to us but in

12     the first place, the debtor has never made any

13     proposal directed to the Local 101 contract,

14     even though it lists that contract in its

15     Exhibit A to Mr. Butler's declaration, as a

16     contract subject to the 1113 motion.  You will

17     search through all of the exhibits in those

18     many volumes, Your Honor and you will find no

19     proposal whatsoever directed to the Local 101

20     contract.  That's a separate contract from the

21     Local 18 contract which is a separate contract

22     from the Local 832 contract.  But never mind

23     that, because when Delphi sent the Columbus

24     and Rochester proposals to our general

25     president in Washington, not to our bargaining

190

1      committees and to our locals, but to our

2      general president and he forwarded them to all

3      three locals.  In fact, Local 101 responded

4      with a letter to the debtor saying, we want to

5      negotiate.  We want to negotiate what's going

6      to happen to this plant.  We understand that

7    the clean-up is likely to be concluded before

8    our contract expires and the contract expires

9    there 14 months from now.  And we want to

10   negotiate what's going to happen to our

11   employee, to the plant and to the contract.

12   No response was forthcoming, Your Honor.  The

13   debtor acknowledges and we have a stipulation

14   and it's an exhibit that they received the

15   letter, they acknowledged they never responded

16   to the letter.  We're not surprised, Your

17   Honor.  We're not surprised that they don't

18   want to negotiate with Danny Baird, who is the

19   business agent from Local 101 and represents a

20   single employee in a closed facility.

21       But it is noteworthy that Local 101 and

22   Delphi were able to negotiate the terms of

23   that plant-closing so that a three-employee

24   bargaining unit was reduced to one.  Whatever

25   attrition issues, whatever manning issues had

191

1    to be worked out, were worked out in that

2    collective bargaining agreement when the local

3    union and the Delphi representative actually

4    sat down to negotiate.  Despite all Delphi's

5    posturing about the unions having accepted

6    pattern bargaining and, therefore, we can't

7    complain that we're not being negotiated with,

8    the fact is, under 1113, as my colleagues have

9    said, if the debtor chooses to engage in

10   pattern bargaining and not to negotiate with

11   the splinter unions, it cannot then move to

12   reject our contracts under 1113.  You can't

13   have it both ways.  Not only that, Your Honor,

14   the failure to respond to the plea from Kansas

15   to negotiate is evidence that even if we had

16   said to the debtor, let's negotiate, if we had

17   had something to negotiate, and I'll address

18   that, the debtor had no intention and was not

19   willing to negotiate, having not responded to

20   a specific demand to sit down and negotiate.

21   As my colleagues have said, our obligation is

22   not to make a counter-proposal it's to

23   negotiate.  But it's to negotiate when we have

24   something to negotiate against.  The debtor

25   has not made a proposal -- a concrete proposal

192

1    to us --

2         THE COURT:  You've gone over all of

3    that.

4         MS. ROBBINS:  Okay, let me -- one of

5    the things -- we've not gotten an attrition

6    program.  And I want to remind Your Honor that

7    the debtor has said to us, directly and has

8    said to our clients that an attrition program

9    is essential to negotiating a consensual

10   resolution.  When the debtor transmitted his

11   proposals to the operating engineers the

12   debtor said, and I quote Mr. Butler, we hope

13   the parties can utilize the momentum created

14   this week as we seek the Bankruptcy Court's

15   approval of hourly attrition programs which

16   might be negotiated with the operating

17   engineers.  They've never offered us that

18   program, Your Honor.

19        At the same time, as my colleagues have

20   also have said, they're offering the KECP

21   program to 14,000 salaried employees.  They're

22   telling us, you're going to have to wait to

23   see what money GM comes up with before we can

24   negotiate with you.  But Delphi has apparently

25   been able to reach into its own pockets and

                                                    193

1    come up with money to fund a KECP program for

2    those 14,000 employees.  Not only that, it has

3    said the GM benefit guarantee is the key to

4    our proposals being equitable because that

5    means the hourly employees have retirement

6    benefits, health insurance bene -- and life

7    insurance post retirement.  And so, it's not

8    unfair of us to continue those benefits for

9    our salaried employees.  While somehow they've

10    been able to reach into their pockets to find

11    the money to continue those benefits for their

12    salaried employees, but they can't reach into

13    their pockets, or at least they're not willing

14    to come to us with a proposal that says, you

15    know what?  If GM isn't willing to fund your

16    20 people, we'll find the money to fund your

17    20 people with a severance or an attrition

18    package that is fair and equitable because it

19    puts you on the same level playing field as

20    everybody else.  They haven't been willing to

21    do that and so they're not entitled to claim

22    that their proposal meets the fair and

23    equitable standard of the statute.

24        Finally, what our submissions

25    demonstrate, on a micro level, is what the

                                                194

1    experts demonstrate on a macro level.  That

2    until the attrition program effects are known,

3    the debtor cannot say that its proposals are

4    necessary to a reorganization.  Take the

5    Rochester plant.  We have six employees, our

6    business agent has estimated that four of the

7    six employees would be eligible for a UAW-like

8    attrition program that would leave a

9   bargaining unit of two employees, Your Honor.

10        The debtor have said there may be

11   22,000 people taking the program, but it

12   doesn't know the savings that it can achieve

13   by those 22,000.  Certainly it could calculate

14   the savings it would achieve in the Rochester

15   plant from four out of the six employees

16   taking the program, were it to offer us the

17   program.

18        The same defects apply to the debtors'

19   proposals to do away with post-employment

20   health insurance and post-employment life

21   insurance benefits.  Again, as we said, the

22   debtor claims it's equitable to maintain those

23   benefits for salaried employees because of the

24   GM guarantee.  The guarantee doesn't apply to

25   us.  The debtor hasn't explained how it's


                                                    195


1   going to deal with that problem when it comes

2   time to negotiate with us.  Again, as this

3   Court recognized in Horsehead Industries, when

4   it refused to recognize rejection of the

5   contract of a small bargaining unit under

6   almost identical circumstances, it may make

7   sense to the debtor to pursue this strategy.

8   It does not give the debtor the right under

9      the statute to reject our contract.   Thank

10     you.

11          THE COURT:   Thank you.   All right, I

12     will resume at three.

13          (Whereupon this morning session

14     proceeding was concluded.)

15          (Time noted:   2:00 P.M.)

16

17

18

19

20

21

22

23

24

25

196

1

2                        I N D E X

3

4                     R U L I N G S

5     DESCRIPTION              PAGE     LINE

6     Motion to Limit           46       10

7     Participation in the

8     Hearing granted

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

197

1

2                  C E R T I F I C A T I O N

3

4          I, Lisa Bar-Leib, hereby certify that the

5     foregoing is a true and correct transcription,

6     to the best of my ability, of the sound

7     recorded proceedings submitted for

8     transcription in the matter of the bankruptcy

9     proceeding of:

```
10   DELPHI CORPORATION, et al.

11

12        I further certify that I am not employed

13   by nor related to any party to this action.

14

15        In witness whereof, I hereby sign this

16   date:

17   May 11, 2006.

18

19        _____

20              Lisa Bar-Leib

21

22

23

24

25
```