REDACTED-CONFIDENTIAL/
HIGHLY CONFIDENTIAL

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re                                                   :

                           :       **Chapter 11 Case No.**

                           :

**DELPHI CORPORATION,** *et al.*,     :       **05-44481 (RDD)**

                           :

           **Debtors.**         :       **(Jointly Administered)**

                           :

-------------------------------------------------------------x

                           :

**DELPHI CORPORATION,** *et al.*,     :

                           :

         **Movants,**         :

                           :

     **-against-**           :

                           :

**GENERAL MOTORS CORPORATION,**   :

                           :

        **Respondent.**       :

                           :

-------------------------------------------------------------x

**SUPPLEMENTAL OBJECTION AND MEMORANDUM OF LAW OF**
**GENERAL MOTORS CORPORATION IN OPPOSITION TO DEBTORS'**
**MOTION FOR ORDER UNDER 11 U.S.C. § 365 AND FED. R. BANKR. P. 6006**
**<u>APPROVING REJECTION OF CERTAIN EXECUTORY CONTRACTS</u>**

Martin J. Bienenstock, Esq. (MB 3001)
Richard P. Krasnow, Esq. (RK 5707)
Michael P. Kessler, Esq. (MK 7134)
Jeffrey L. Tanenbaum, Esq. (JT 9797)
Richard A. Rothman, Esq. (RR 0507)
Penny P. Reid, Esq. (PR 5699)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Melanie Gray, Esq. (pro hac vice)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5045
Facsimile: (713) 224-9511

– and –

Robert B. Weiss, Esq.
Frank L. Gorman, Esq.
HONIGMAN MILLER SCHWARTZ AND COHN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226-3506
Telephone: (313) 465-7000
Facsimile: (313) 465-8000

Attorneys for General Motors Corporation

Dated:  June 5, 2006

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE ................................................................................. 2

I.    Summary of Argument ........................................................................ 2

II.   Procedural History ........................................................................... 10

      A.      Delphi Case Commencement ........................................ 10

      B.      Delphi's Initial Motion to Alter Contracts ...................... 10

      C.      Delphi Has Continued Performing its Supply
             Contracts Whose Profit Depends on Labor Costs ........... 11

      D.      Progress Among UAW, GM, and Delphi ........................ 11

      E.      Delphi Halted Consensual Progress ............................... 11

      F.      Delphi Now Requests Authorization to Reject
             Supply Contracts it Selects in the Future ....................... 12

      G.     GM's Preliminary Objection to Rejection Motion ........... 14

III.  Factual Background ........................................................................... 14

      A.      Delphi Requests GM Cover Alleged Losses on GM
             Contracts but Fails to Provide Information as to
             Such Losses .................................................................. 14

      B.      Delphi Filed the Rejection Motion as "Leverage"
             with no Intention to Actually Reject the Supply
             Contracts ...................................................................... 16

      C.      Delphi Failed to Analyze Whether Actual Rejection
             of the Supply Contracts Would Benefit the Estates ......... 18

      D.      GM's Just-in-Time Delivery System .............................. 27

      E.      GM Is Delphi's Largest Customer .................................. 27

      F.      Substitute Goods Are not Available in the Short
             Run .............................................................................. 28

      G.      GM Would Have Enormous Damages Against
             Debtors' Estates as a Result of Rejection ....................... 30

      H.      Shutdown of Production at GM Would Affect
             Delphi, the Automotive Industry and the Public ............. 31

      I.      Certain of the Supply Contracts Operate Under the
             GO Agreement and the Component Supply
             Agreement ................................................................... 32

# TABLE OF CONTENTS
## (continued)

Page

    1.    GO Agreement ...............................................................32

    2.    Component Supply Agreement .......................................33

ARGUMENT .................................................................................................34

I.    The Court Lacks Power to Grant Delphi Options to Reject Supply Contracts...................................................................................34

II.    Delphi Flunks the Business Judgment Test ....................................35

    A.    Delphi Fails to State a Claim for Rejecting the Supply Contracts ..............................................................37

        1.    Delphi fails to show benefits from rejection ..................38

        2.    Delphi pleads no substantial and significant benefit from rejection to unsecured claimholders .......................43

        3.    Delphi fails to plead the amounts of administrative, priority, and secured claims, and whether there are other contracts to reject ..................................................44

    B.    Delphi Fails to Show the Supply Contracts Are Burdensome ..................................................................44

    C.    Rejection of its Supply Contracts Provides GM Rights to Specific Performance Under Michigan Law that Are Nondischargeable Under Bankruptcy Law.................................................................................48

        1.    GM is entitled to specific performance under Michigan law upon breach of the Supply Contracts........50

        2.    GM's right to specific performance is nondischargeable...........................................................53

        3.    GM is entitled to vindicate its right to specific performance ..................................................................64

    D.    If Delphi Rejects Supply Contracts, Delphi Releases GM from Two Master Agreements and GM's Other Supply Agreements .......................................................67

III.    Equity Prohibits Rejection Here ...........................................69

IV.    Even if Rejection of the Supply Contracts Is in the Exercise of Delphi's Business Judgment, the Court Should Apply a Heightened Scrutiny Standard to Deny the Rejection Motion Due to Its Irreparable Harm to GM and the Public Interest............................76

# TABLE OF CONTENTS
## (continued)

Page

V.    If the Court Grants the Rejection Motion, the Court Should Condition the
Approval on Delphi Providing GM an Adequate Transition Period to
Resource the Rejected Supply Contracts .................................................... 79

CONCLUSION ........................................................................................................... 82

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Abboud v. Ground Round, Inc. (In re Ground Round, Inc.),*
    Case No. 05-039, 2005 Bankr. LEXIS 2595 (1st Cir. B.A.P. Dec. 15, 2005)...... 54, 58

*Air Line Pilots Ass'n. v. Continental Airlines (In re Continental Airlines),*
    125 F.3d 120 (3d Cir. 1997)................................................................... 58

*In re Allegheny Int'l, Inc.,*
    118 B.R. 282 (Bankr. W.D. Pa. 1990)..................................................... 80

*In re Alongi,*
    272 B.R. 148 (Bankr. D.Md. 2001)......................................................... 63

*American United Mutual Life Ins. Co. v. City of Avon Park, Fla.,*
    311 U.S. 138................................................................................... 71

*In re Balco Equities Ltd., Inc.,*
    323 B.R. 85 (Bankr. S.D.N.Y. 2005)...................................................... 35

*Barton v. Barbour,*
    104 U.S. 126 (1881) .......................................................................... 66

*Beck v. Fort James Corp. (In re Crown Vantage, Inc.),*
    421 F.3d 963 (9th Cir. 2005)................................................................ 66

*In re Ben Franklin Hotel Assocs.,*
    186 F.3d 301 (3d Cir. 1999)................................................................ 58

*Brotherhood of Ry., Airline and Steamship Clerks v. REA Express, Inc. (In re*
    *REA Express, Inc.),*
    523 F.2d 164 (2d Cir. 1975)................................................................ 69

*In re Bush,*
    273 B.R. 625 (Bankr. S.D. Cal. 2002)..................................................... 63

*Byrd v. Gardinier, Inc. (In re Gardinier, Inc.),*
    831 F.2d 974 (11th Cir. 1987).............................................................. 68

*In re CMC Heartland Partners,*
    966 F.2d 1143 (7th Cir. 1992).............................................................. 59

*Carter v. Rodgers,*
    220 F.3d 1249 (11th Cir. 2000)............................................................ 65

# TABLE OF AUTHORITIES
## (continued)

Page

*In re Chicago, Rock Island & Pac. R.R. Co.*,
   860 F.2d 267 (7th Cir. 1988) .................................................................. 67

*Cohen v. Drexel Burnham Lambert Group Inc. (In re Drexel Burnham Lambert Group, Inc.)*,
   138 B.R. 687 (Bankr. S.D.N.Y. 1992) ........................................................ 53

*Control Data Corp. v. Zelman (In re Minges)*,
   602 F.2d 38 (2d Cir. 1979) ............................................................... passim

*Creator's Way Associated Labels, Inc. v. Mitchell (In re Mitchell)*,
   249 B.R. 55 (Bankr. S.D.N.Y. 2000) ........................................... 53, 61, 62

*Fellerman & Cohen Realty Corp. v. Clinical Plus Inc. (In re Hirschhorn)*,
   156 B.R. 379 (Bankr. E.D.N.Y. 1993) ............................................... 64, 70

*In re G Survivor Corp.*,
   171 B.R. 755 (Bankr. S.D.N.Y. 1994) ........................................................ 36

*General Motors Corp. v. Paramount Metal Prod. Co.*,
   90 F. Supp. 2d 861 (E.D. Mich. 2000) ................................................ passim

*George Gasser & Gassert Chair Co. v. Infanti Int'l Inc.*,
   2004 U.S. Dist. LEXIS 9758 (E.D.N.Y. Apr. 21, 2004) ........................... 65

*In re Good Taste, Inc.*,
   317 B.R. 112 (Bankr. D. Alaska 2004) ...................................................... 75

*In re Growth Dev. Corp.*,
   168 B.R. 1009 (Bankr. N.D. Ga. 1994) ...................................................... 75

*Hurley v. Atchison, T. & S. Fe Ry. Co.*,
   213 U.S. 126 (1909) .................................................................................... 67

*In re Indian River Estates, Inc.*,
   293 B.R. 429 (Bankr. N.D. Ohio 2003) ..................................................... 63

*International Casings Group, Inc. v. Premium Standard Farms, Inc.*,
   358 F. Supp. 2d 863 (W.D. Mo. 2005) ....................................................... 51

*JPM, Inc. v. John Deere Indus. Equip. Co.*,
   934 F. Supp. 1043 (W.D.Wis. 1995) .......................................................... 75

# TABLE OF AUTHORITIES
## (continued)

Page

*Jaytee-Penndel Co. v. Bloor (In re Investors Funding Corp. of N.Y.),*
    547 F.2d 13 (2d Cir. 1976)......................................................................... 66

*Johnson v. Home State Bank,*
    501 U.S. 78 (1991) ...................................................................... 59, 61

*Kennedy v. Medicap Pharmacies, Inc.,*
    267 F.3d 493 (6th Cir. 2001)................................................................... 61

*In re Kopel,*
    232 B.R. 57 (Bankr. E.D.N.Y. 1999) ...................................................... 67

*Laclede Gas Co. v. Amoco Oil Co.,*
    522 F.2d 33 (8th Cir. 1975)..................................................................... 51

*Lebovits v. Scheffel (In re Lehal Realty Assocs.),*
    101 F.3d 272 (2d Cir. 1996)............................................................... 65, 66

*Leslie Fay Cos., Inc. v. Corporate Prop. Assocs. 3 (In re Leslie Fay Cos., Inc.),*
    166 B.R. 802 (Bankr. S.D.N.Y. 1994)..................................................... 67

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci),*
    126 F.3d 380 (2d. Cir. 1997)................................................................... 54

*Long Island Lighting Co. v. Bokum Res. Corp.,*
    40 B.R. 274 (Bankr. D. New Mexico 1983) ........................................... 75

*Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.,*
    756 F.2d 1043 (4th Cir. 1985)................................................................. 58

*Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne),*
    114 F.3d 379 (2d Cir. 1997)................................................................... 53

*Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.,*
    474 U.S. 494 (1986) ............................................................................... 75

*In re Mirant Corp.,*
    318 B.R. 100 (N.D. Tex. 2004)............................................................... 78

*Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.),*
    378 F.3d 511 (5th Cir. 2004)....................................................... 77, 78, 79

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Motel Invs., Inc.*,
172 B.R. 105 (Bankr. M.D. Fla. 1994) ................................................................. 75

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984) ............................................................................... passim

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated
Telecom Express, Inc.)*,
384 F.3d 108 (3d Cir. 2004) ................................................................................ 8

*In re N.P. Mining Co., Inc.*,
963 F.2d 1449 (11th Cir. 1992) ......................................................................... 75

*In re Nickels Midway Pier, LLC*,
332 B.R. 262 (Bankr. D.N.J. 2005) ................................................................... 63

*Nostas Assocs. v. Costich (In re Klein Sleep Prods. Inc.)*,
78 F.3d 18 (2d Cir. 1996) .................................................................................. 35

*Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon
Corp.)*,
200 F.3d 154 (3d Cir. 1999) ................................................................................ 8

*Ohio v. Kovacs*,
469 U.S. 274 (1985) ............................................................................ 55, 56, 58

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
4 F.3d 1095 (2d Cir. 1993) ....................................................................... passim

*In re Penn Central Transp. Co.*,
458 F. Supp. 1346 (E.D. Pa. 1978) ................................................................... 70

*Progressive Rest. Sys., Inc. v. Wendy's Int'l, Inc. (In re Progressive Rest. Sys.,
Inc.)*,
No. 96-CV-0768E(F), 1997 U.S. Dist. LEXIS 6668 (W.D.N.Y. May 8, 1997) ......... 68

*Public Auditorium Authority of Pittsburgh v. HBRM, LLC (In re Pittsburgh
Sports Assocs. Holding Co.)*,
1999 Bankr. LEXIS 1870 (Bankr. W.D. Pa. 1999) ............................................ 63

*Reading v. Brown*,
391 U.S. 471 (1968) .......................................................................................... 75

vii

# TABLE OF AUTHORITIES
## (continued)

Page

*Richmond Leasing Co. v. Capital Bank, N.A.*,
   762 F.2d 1303 (5th Cir. 1985)................................................................ 67

*In re Royster Co.*,
   137 B.R. 530 (Bankr. M.D. Fla. 1992) ................................................. 68

*S.E.C. v. U.S. Realty & Improvement Co.*,
   310 U.S. 434 (1940) ........................................................................... 72

*In re Sharon Steel Corp.*,
   871 F.2d 1217 (3d Cir. 1989) ............................................................. 39

*Sheerin v. Davis (In re Davis)*,
   3 F.3d 113 (5th Cir. 1993) .................................................................. 58

*Shell Oil Co. v. AMPM Enters., Inc.*,
   No. 95-CV-75117-DT, 1996 U.S. Dist. LEXIS 4667 (E.D. Mich. Mar. 18,
   1996)................................................................................................... 51

*Software Customizer, Inc. v. Bullet Jet Charter, Inc. (In re Bullet Jet Charter,
   Inc.)*,
   177 B.R. 593 (Bankr. N.D. Ill. 1995) ............................................ 51, 70

*State of Ohio v. Collins (In re Madeline Marie Nursing Homes)*,
   694 F.2d 433 (6th Cir. 1982).............................................................. 80

*Stone StreetCapital, Inc. v. Granati (In re Granati)*,
   270 B.R. 575 (Bankr. E.D. Va. 2001) ................................................. 63

*In re TSW Stores of Nanuet*,
   34 B.R. 299 (Bankr. S.D.N.Y. 1983)................................................... 67

*In re UAL Corp.*,
   No. 02-48191 (Bankr. N.D. Ill. May 20, 2005) ................................ 3, 35

*In re US Airways Group, Inc.*,
   287 B.R. 643 (Bankr. E.D. Va. 2002) .............................................. 3, 34

*In re Udell*,
   18 F.3d 403 (7th Cir. 1994)....................................................... 58, 59, 60

*United States v. LTV Corp. (In re Chateaugay Corp.)*,
   944 F.2d 997 (2d Cir. 1991)....................................................... 56, 57, 58

# TABLE OF AUTHORITIES
## (continued)

Page

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
  363 U.S. 574 (1960) ................................................................................................. 76

*Valdez Alvino v. MGS Realty and Mgm't Corp.*,
  2000 U.S. Dist. LEXIS 5569 (S.D.N.Y. Apr. 28, 2000) ......................................... 65

*In re Village Rathskeller, Inc.*,
  147 B.R. 665 (Bankr. S.D.N.Y. 1992) ...................................................................... 67

*In re Walnut Assocs.*,
  145 B.R. 489 (Bankr. E.D. Pa. 1992) ................................................................. 63, 64

*In re Willets*,
  262 B.R. 552 (Bankr. N.D. Fla. 2001) ...................................................................... 63

*Wirth v. U.S.*,
  No. 2:91-CV-099, 1991 U.S. Dist. LEXIS 16038 (W.D. Mich. June 26, 1991) ........ 51

*Zurn Constructors, Inc. v. The B.F. Goodrich Co.*,
  685 F. Supp. 1172 (D. Kan. 1988) ..................................................................... 51, 53

## STATE CASES

*Bed v. Fallon*,
  12 N.W.2d 396 (Mich. 1943) ................................................................................... 68

*DaimlerChrysler Corp. v. Lear Corp.*
  No. 05-70865, Mich. Cir. Ct. Dec. 1, 2005 ............................................................. 52

*Edidin v. Detroit Econ. Growth Corp.*,
  352 N.W.2d 288 (Mich. Ct. App. 1984) .................................................................. 51

*Makie v. East Tawas*,
  188 N.W.2d 593 (Mich. 1971) ................................................................................. 75

## FEDERAL STATUTES

11 U.S.C. § 101 ................................................................................................. passim

11 U.S.C. § 105 ............................................................................................ 10, 30, 80

11 U.S.C. § 524 ...................................................................................................... 8, 49

## TABLE OF AUTHORITIES
### (continued)

Page

11 U.S.C. § 1108 ................................................................................................ 10

11 U.S.C. § 1113 ............................................................................................ passim

11 U.S.C. § 1141 ...................................................................................... 8, 49, 54

11 U.S.C. § 362 .................................................................................................. 65

11 U.S.C. § 365 ............................................................................................. passim

28 U.S.C. § 959 ............................................................................................. passim

## STATE STATUTES

Mich. Comp. Laws Serv. § 440.2309 ...................................................... 53, 80

Mich. Comp. Laws Serv. § 440.2711 ............................................................ 50

Mich. Comp. Laws Serv. § 440.2716 ...................................................... 50, 51

## FEDERAL RULES OF BANKRUPTCY PROCEDURE

Fed. R. Bankr. P. 6006 ............................................................................... 14, 30

## LEGISLATIVE HISTORY

H.R. Rep. No. 95-595 at 349 (1977) ............................................................. 58

## MISCELLANEOUS

Am. Jur. 2d *Contracts* § 379 (2006) .............................................................. 68

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding
    Rejection,* 59 U. Colo. L. Rev. 845, 931 (1988) ....................................... 53

U.C.C. § 2-309 ...................................................................................... 7, 53, 80

Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn. L. Rev. 227
    (1989) ........................................................................................................... 63

Martin J. Bienenstock, Esq. (MB 3001)
Richard P. Krasnow, Esq. (RK 5707)
Michael P. Kessler, Esq. (MK 7134)
Jeffrey L. Tanenbaum, Esq. (JT 9797)
Richard A. Rothman, Esq. (RR 0507)
Penny P. Reid, Esq. (PR 5699)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Melanie Gray, Esq. (pro hac vice)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5045
Facsimile: (713) 224-9511

– and –

Robert B. Weiss, Esq.
Frank L. Gorman, Esq.
HONIGMAN MILLER SCHWARTZ AND COHN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226-3506
Telephone: (313) 465-7000
Facsimile: (313) 465-8000

Attorneys for General Motors Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
In re                                  :    Chapter 11 Case No.
                                       :
DELPHI CORPORATION, et al.,            :    05-44481 (RDD)
                                       :
                   Debtors.            :    (Jointly Administered)
                                       :
------------------------------------------------------------x
                                       :
DELPHI CORPORATION, et al.,            :
                                       :
                   Movants,            :
                                       :
      -against-                        :
                                       :
GENERAL MOTORS CORPORATION,            :
                                       :
                   Respondent.         :
                                       :
------------------------------------------------------------x
```

**SUPPLEMENTAL OBJECTION AND MEMORANDUM OF LAW OF
GENERAL MOTORS CORPORATION IN OPPOSITION TO DEBTORS'
MOTION FOR ORDER UNDER 11 U.S.C. § 365 AND FED. R. BANKR. P. 6006
<u>APPROVING REJECTION OF CERTAIN EXECUTORY CONTRACTS</u>**

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

               General Motors Corporation ("<u>GM</u>") respectfully submits this supplemental

objection and memorandum of law (the "<u>Supplemental Objection and Memorandum of

Law</u>") in opposition to the motion, filed March 31, 2006, of Delphi Corporation and/or

certain of its subsidiaries and affiliates, as debtors and debtors in possession in the above-

captioned cases (collectively, "<u>Delphi</u>" or the "<u>Debtors</u>"), for entry of an order authorizing

the Debtors to reject at their discretion 5,472 executory contracts (the "<u>Supply Contracts</u>")

with GM (the "<u>Rejection Motion</u>").

<b>STATEMENT OF THE CASE</b>

**I.      <u>Summary of Argument</u>**

               This Rejection Motion is an attempt by Delphi to use section 365 of the

Bankruptcy Code, and this Court's imprimatur, to obtain an option to reject over 5,000

supply contracts with GM on the unexplained theory that Delphi can parlay that option,

into a suicidal and tortious shutdown threat that will somehow convince GM to pay

billions of extra dollars to Delphi to convince Delphi not to destroy itself.  As

demonstrated below, Delphi's attempt to use section 365 in this fashion is groundless as a

matter of law for many reasons, which fall into four broad categories.

               **FIRST, Delphi's motion should be denied because it requests relief

neither authorized nor permissible under the Bankruptcy Code.**  The Rejection

Motion, as well as Delphi's internal documents, make clear that Delphi intends to continue

to perform its obligations to supply GM with the parts covered by all but a minuscule fraction of the Supply Contracts at issue, and that it has no intention of actually rejecting the overwhelming majority of the Supply Contracts.  Rather, by this motion Delphi seeks an option which, if granted, would enable Delphi to determine on its own, in the future, which of thousands of contracts it would reject on 10 days' notice with no court supervision.  As Delphi well knows, when the same relief was requested elsewhere, the bankruptcy court ruled there was "obviously no way" it could be granted unless the court were to "abdicate the court's essential supervisory role over the reorganization process."[1] This Court articulated a similar ruling at the commencement of the hearing on Delphi's request for authority to reject, at Delphi's election, its collective bargaining agreements (collectively, the "CBAs") (the "Sections 1113/1114 Motion").[2]  Because the relief Delphi seeks is outside the Court's power to grant, the Rejection Motion should be denied.

Unlike Delphi's Sections 1113/1114 Motion, the Rejection Motion can not be treated as a motion to reject the Supply Contracts because, among other things, Delphi's own lead independent director and Rule 30(b)(6) witness, John D. Opie, testified that Delphi has not determined to reject any contracts.  Moreover, he failed to explain how rejection would make it better off, especially before it procures relief from its CBAs.

---

[1] *In re US Airways Group, Inc.,* 287 B.R. 643, 646 (Bankr. E.D. Va. 2002) ("As a conceptual matter, there is obviously no way by which the court can make a meaningful determination whether the debtors in possession have exercised sound business judgment in seeking to abandon a particular encumbered aircraft or to reject a particular unexpired aircraft lease when the debtor has not yet selected which aircraft are to be abandoned and which leases are to be rejected.  Furthermore, to simply give a trustee or debtor in possession carte blanche to make that determination itself would be to abdicate the court's essential supervisory role over the reorganization process."); *see also* Transcript of Record, Hearing on § 1113 Motion, at 123-24, *In re UAL Corp.,* No. 02 B 48191 (Bankr. N.D. Ill. May 20, 2005) (excerpt annexed hereto as Exhibit A).

[2] *See* Transcript of Record, Hearing on Sections 1113/1114 Motion at 88-89, *In re Delphi Corp.,* No. 05-44481 (Bankr. S.D.N.Y. May 9, 2006).

Conversely, if Delphi procures such relief with support from GM of the type Delphi has

already requested, that support will have to resolve any Supply Contract issues.

Otherwise, GM would be subsidizing Delphi's ability to manufacture parts for GM's

competitors without assurances Delphi will manufacture parts for GM.  Finally, if Delphi

suddenly changes its testimony, requests immediate rejection of the Supply Contracts, and

submits a new motion under the guise of supplemental declarations, GM is entitled to

discovery and trial preparation in respect of its new or amended motion.

**SECOND, to the extent Delphi's Rejection Motion is treated as an**

**application to actually reject the Supply Contracts, it must be denied for failure to**

**state a claim.  Delphi has failed completely to satisfy the Second Circuit business**

**judgment test necessary to justify a debtor's decision to reject a contract—and it can**

**not do so.**  Unlike the situation presented by Delphi's Sections 1113/1114 Motion, where

the Court indicated that Delphi's procedural infirmity could be cured by treating Delphi's

application for an option to reject as a motion to actually reject its labor contracts, Delphi

has not even attempted to make the case, required by the Second Circuit's decisions in

*Minges* and *Orion*, that the Debtors' estates would be better off if they were actually to

reject any of the Supply Contracts and discontinue supplying GM with the affected parts.

Nor, for a host of reasons, could it possibly do so.

Thus, Delphi's motion is based entirely on the contention – supported by a

model riddled with gross methodological errors – that some Supply Contracts have

negative operating income and its speculation that the rest do too.  As shown below, even

if Delphi's contention were correct (and it is not), under *Minges* it would be plainly

insufficient to warrant rejection where, as here, Delphi has failed to demonstrate that

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

rejection of the Supply Contracts has a reasonable likelihood of making the Delphi estate

better off. In *Minges*, the trustee proved more than Delphi is alleging and the Second

Circuit overturned the rejection because, as here, the trustee provided no cogent business

judgment showing how rejection would lead to a benefit and, and if it did, whether the

benefit would substantially or significantly improve the returns of general creditors.

Business judgment connotes logic and rationality. Delphi's wish connotes Never

Neverland. Delphi completely ignores the *Minges* requirements and the facts here making

its case impossible or implausible. For instance:

- **Delphi's CBA's require Delphi to pay union employees whether they work or not. Delphi's Rejection Motion contains no computation showing it would be financially better off rejecting the Supply Contracts and not producing parts because it can not be, as it would continue to be saddled with fixed labor costs that amount to approximately [REDACTED] of Delphi's costs under the Supply Contracts. Accordingly, <u>it is undisputable that today Delphi is better off with the Supply Contracts than without them.</u> Conversely, if and when Delphi procures relief from its CBAs, its Supply Contracts will be even more profitable.**

- **As explained in the accompanying declarations of Greg Ruselowski and Kevan B. Parekh, Delphi is a sole-source supplier of many parts that are critical to GM's ability to manufacture vehicles, many of which would take months, and in some instances more than a year, to resource. As Delphi is well aware, an interruption of supply of any of the many essential production parts GM purchases from Delphi could result in the shutdown of GM plants using that part (e.g., without a steering column or brakes, GM cannot make a car). As Delphi is equally aware, the effect of such a shut-down will immediately rebound directly back to Delphi as GM will have no need – or obligation – to continue purchasing other parts from Delphi, including those that even Delphi admits are profitable and important contributors to its reorganization efforts. In short, <u>Delphi has failed to show that it would be better off if it actually rejects the Supply Contracts –and cannot possibly do so – because doing so would immediately lead to the destruction of Delphi itself.</u>**

- **Particularly in light of the horrific consequences of rejecting the Supply Contracts and shutting down production, Delphi has failed to show it could possibly be better off if it pursues this reckless course than if it had**

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

followed the path to consensual resolution that GM had offered.  Delphi chose to file its Rejection Motion and take a litigation path at a time when it was negotiating with GM towards a consensual resolution of these issues, pursuant to which GM was prepared to agree to reasonable contract price adjustments, where justified, in exchange for Delphi's agreement  to provide GM with a reasonable transition period so that GM could resource the parts Delphi no longer wants to produce.

- **Delphi has also made no attempt to, and cannot, show, that the estates will be better off rejecting the Supply Contracts in light of the claims and rights that will accrue to GM upon rejection including, but not limited to, the billions of dollars in cash claims GM would attain from contract rejections that would dilute if not swamp the claims of other creditors. Indeed, any theoretical savings that Delphi's experts might speculate would result from rejection would clearly be swallowed by the enormous loss of business and revenue Delphi would suffer if it succeeds in either paralyzing or holding-up GM.**

- **Beyond Delphi's abject failure to prove that anyone would be better off if it rejects the Supply Contracts, Delphi has failed to demonstrate – as the Second Circuit requires – that anyone other than Delphi's secured creditors would benefit in any substantial way.**

- **Finally, in addition to the fact that Delphi's model attempting to show that it experienced negative operating income on some Supply Contracts is legally insufficient for the foregoing reasons, as explained in the declaration of Jeffrey L. Baliban, the model is hopelessly flawed in fundamental respects.**

In view of the catastrophic consequences for Delphi that undeniably would result from rejection of the Supply Contracts, it is not surprising that Delphi has not made a decision to reject and cease performance under the Supply Contracts at issue – much less justified any such business judgment to do so as required by *Minges* and *Orion*.  On this basis alone, the Rejection Motion should be denied.

**THIRD, Delphi's Rejection Motion should also be denied because, rather than making a genuine business judgment to reject disadvantageous contracts, it is misusing section 365 in bad faith**.  The Rejection Motion itself reveals that Delphi's

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

intention in filing this motion was solely to hold-up GM and use the threat of rejection, coupled with its own suicide, to coerce GM into giving Delphi billions of dollars. Indeed, Delphi's internal documents have now confirmed that Delphi's strategy in making this motion has been driven at every turn <u>not</u> by the need to identify and jettison disadvantageous contracts, but by a single-minded desire to do everything possible to proceed in the ways that would be most harmful to GM so that GM would have no alternative but to succumb to Delphi's unlawful tactics. This has included seeking the power to reject as yet unidentified contracts on only ten days' notice so that GM cannot possibly resource them, and refusing to provide GM with information regarding the parts and contracts that GM would need to resource and mitigate its injury. As the drafters of the Uniform Commercial Code recognized, "<u>principles of good faith and sound commercial practice normally call for [] notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement</u>."[3] These principles are no less compelling in a bankruptcy context.

Moreover, this is a far cry from the situation where a debtor seeks court approval under section 365 to reject a disadvantageous contract which it also seeks to renegotiate – believing <u>and</u> proving, as required by *Minges*, that it will be better off rejecting the contract than continuing to perform it if the contract is not renegotiated. As demonstrated in this brief, here it is undeniable that Delphi has no intention of using section 365 for its intended purpose because rejecting the Supply Contracts would be catastrophic for Delphi. Significantly, *Minges* imposed an equitable requirement on the

---

[3] U.C.C. § 2-309, Official Comment 8 (emphasis added).

use of the rejection power even when the trustee was not engaging in short notice, holdup

tactics.   No logic or reported decision condones use of the rejection power offensively as a

sword to hold up or threaten a nondebtor-counterparty to coerce new contract terms

unattainable legally in the marketplace.  Indeed, entire chapter 11 cases have been

dismissed when brought for offensive purposes.[4]  The notion that Delphi could ask this

Court – sitting as a court of equity – to sanction its abuse of the bankruptcy process is

untenable, and on this basis alone, Delphi's Rejection Motion should be denied.

      **FOURTH, even if Delphi could somehow establish that it would be**

**better off if it rejects the Supply Contracts rather than continuing to perform them,**

**this Court should still deny the Rejection Motion.**  Simply put, Michigan law governs

the supply contracts, and upon Delphi's breach provides GM a right to specific

performance for which money damages are not an adequate substitute.  Moreover, GM's

right to specific performance would be nondischargeable under 11 U.S.C. §§ 101(5)(B),

524, and 1141, because although GM would also have a very substantial claim for

rejection damages, those money damages would not fully compensate GM and would be

an inadequate substitute for GM's equitable remedy of specific performance.

      **FIFTH, to the extent that the Court is inclined to authorize Delphi to**

**reject any of the Supply Contracts at any point, it should do so on terms that are**

**equitable and that will minimize the enormous and irreparable harm – to GM, the**

**industry, and the public – that rejection of any significant Supply Contracts will**

**cause.**  As this Court is well aware, this Rejection Motion – like other chapters of the

---

[4] *See, e.g., Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154
(3d Cir. 1999); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom
Express, Inc.)*, 384 F.3d 108 (3d Cir. 2004), *cert. denied*, 1255 S. Ct. 2542 (2005).

Delphi bankruptcy over which it is presiding – will have far reaching consequences for Delphi, GM, and the entire U.S. automotive industry, as well as the numerous sectors of the economy and millions of people who are dependent upon and affected by it.  It is well-settled that a bankruptcy court sits as a court of equity, and should apply the provisions of the Bankruptcy Code upon terms that are equitable.  Moreover, with respect to motions to reject contracts in particular, *Minges* imposes a requirement that a debtor, in seeking to reject an executory contract, demonstrate that rejection will benefit general unsecured claimholders.

In this case, there can be no question that, in the event the Court is inclined to grant Delphi any authority to reject GM Supply contracts, it can and should only do so subject to clearly defined terms and conditions that will minimize the harm to GM and other constituents who will be negatively impacted by such an order.  Moreover, any contention by Delphi that this Court's hands are tied and that it must unwillingly become the engine for Delphi's reckless attempt to use section 365 and the bankruptcy court process as a coercive hold-up device should be rejected out of hand.

Based on the arguments herein, GM requests that:

1.    The Rejection Motion be denied on the papers on the ground either that the Court lacks the power to grant the unique relief requested or to grant rejection for offensive purposes, and/or Delphi has failed to state a claim for rejection; or

2.    (i)  The record of the Rejection Motion not be closed until the outcome of Delphi's Sections 1113/1114 Motion is known; and

(ii) The Rejection Motion be denied after trial on any or all of the independent grounds set forth herein; or

3.    If the Court authorizes rejection to any extent, then the Court's order should grant GM:

a. Time before rejection is effective to obtain a ruling pursuant to 28 U.S.C. § 959(a) that under Michigan law GM has a right to specific performance for breach of the rejected contracts for which money damages would not be an adequate alternate remedy;

b. Time before rejection is effective to resource its parts elsewhere;

c. Rescission of any contracts related to the rejected contracts, the GO Agreement, and the Component Supply Agreement;

d. A direction to Delphi under 11 U.S.C. § § 105(a) and 1108 and 28 U.S.C. § 959(b) barring Delphi from threatening or causing a shutdown of any GM production or engaging in any other conduct constituting economic duress or unconscionability; and

e. Time before any rejection is effective to request stays pending appeal from any courts empowered to grant it and time for such courts to consider the request.

4.    Finally, if Delphi continues its practice of filing new or revised motions in the guise of supplemental declarations after discovery is closed or on the eve of trial, GM's rights be reserved to move to strike the supplements and/or to obtain reasonable time for discovery and trial preparation in respect of all new Delphi allegations.

## II.    Procedural History

### A.    Delphi Case Commencement

On October 8, 2005 or October 14, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

### B.    Delphi's Initial Motion to Alter Contracts

On October 8, 2005, Delphi filed one motion to establish a schedule for litigating its desired rejection of its CBAs and one motion to provide its nonunion employees with enhanced compensation. Subsequently, Delphi proposed three amendments to the schedule and substantially curtailed its compensation motion.

C.      **Delphi Has Continued Performing its Supply
Contracts Whose Profit Depends on Labor Costs**

Delphi's current CBA with the International Union, United Automobile,

Aerospace and Agricultural Implement Workers of America ("UAW") requires Delphi to

pay union employees whether they work or not.  Delphi has been economically

incentivised to continue operations because GM generally pays Delphi market and above-

market prices and Delphi's financial results would deteriorate if it paid union employees

without obtaining the value of the parts they produce.

D.      **Progress Among UAW, GM, and Delphi**

On or about March 22, 2006, the UAW, GM and Delphi agreed on a special

attrition program constituting a major step towards resolution of Delphi's wages and

benefits problems (the "Special Attrition Program").  On April 7, 2006, the Court

approved the Special Attrition Program.

E.      **Delphi Halted Consensual Progress**

Rather than build on the positive progress and momentum with the UAW

and GM manifested by the UAW's consent to the Special Attrition Program and GM's

funding of a material portion of Delphi's liability under it, on March 31, 2006, Delphi

reignited its adversarial position and filed the Sections 1113/1114 Motion.  Notably, the

Bankruptcy Code expressly fosters a consensual renegotiation between Delphi and labor

by denying Delphi labor relief until it makes an offer the union can not reject with good

cause.[5]  Thus, while Delphi may ultimately be entitled to relief from its CBAs, the

Bankruptcy Code requires it to engage in genuine good faith bargaining (now more

---

[5] 11 U.S.C. § 1113(c)(2).

difficult because Delphi dragged the unions and GM into litigation with its consequential adversarial effects) to get to a proposal that can not be rejected with good cause.

### F.    Delphi now Requests Authorization to Reject Supply Contracts it Selects in the Future

On March 31, 2006, Delphi also stymied negotiations with GM and opted for confrontation and litigation by filing its Rejection Motion for an order authorizing Delphi to reject in its discretion and on its own timing, any or all of up to 5,472 Supply Contracts with GM covering, by Delphi's estimation, 22,043 parts. These parts cost GM at least $4.5 billion annually[6] and are used in essentially all of the 4.5 million vehicles GM manufactures in North America.[7]

All but ten of the Supply Contracts relate to 21 U.S. manufacturing plants, which Delphi alleges "generate[] negative operating income and primarily produce[] parts for GM vehicles."[8] Delphi's Rejection Motion suggests that Delphi employed a rigorous two-phase methodology to select which supply contracts to include in the Rejection Motion: (i) in the first phase ("Phase One"), Delphi analyzed profitability on a part-by-part and contract basis of only four plants, some of which are Delphi's most unprofitable plants; and (ii) in the second phase ("Phase Two"), Delphi pursued a plant-wide financial analysis on all its plants to "isolate the subset of plants that (a) generate more than half of

---

[6] Of the 5,472 Supply Contracts that Delphi lists in its Rejection Motion, GM can identify only 3,143 as not having expired and which are currently being performed. These 3,143 Supply Contracts represent approximately $4.5 billion in annual purchase value. *See* Declaration of Greg Ruselowski ¶¶ 6,7, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. June 5, 2006) (filed contemporaneously herewith) (hereinafter, the "Ruselowski Declaration").

[7] *See id.* ¶ 16.

[8] Rejection Motion ¶ 30.

their revenue by supplying parts intended for GM vehicles to either GM or GM's Tier suppliers and (b) generated negative operating income in 2005."[9]

Through discovery, GM has now learned that Phase One was mere window dressing to create the illusion that the selection of supply contracts for the Rejection Motion based upon a reasonable methodology.  As the main person responsible for identifying which supply contracts to include in the Rejection Motion testified, Phase One [REDACTED – HIGHLY CONFIDENTIAL]              .[10]  Rather, the sole criterion used was simply to list all GM supply contracts related to plants with negative operating income that generate more than half of their revenue from the sale of GM related parts.  This criterion was employed *despite* the fact that the Phase One analysis showed that [REDACTED -  HIGHLY CONFIDENTIAL] [11]  Moreover, the Phase Two criterion was employed *despite* the fact that no one at Delphi or its outside professionals can tell this Court whether 4,957 out of 5,472 Supply Contracts to be rejected are profitable – or what effect their rejection will have on Delphi's estates.  Indeed, we know from Phase One that at least 958 parts covered by Phase One Supply Contracts generate positive operating

---

[9] *Id.* ¶¶ 39-41, 51.

[10] Transcript of Steven Daniels Deposition at 183, lines 4-5, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. May 30, 2006) (hereinafter, the "Daniels Deposition") (relevant excerpts annexed hereto as Exhibit B) (page references and excerpts referred to herein are to the rough draft of the transcript; GM will supplement the Supplemental Objection and Memorandum of Law, as necessary, upon receipt of the final transcript).

[11] Declaration of Jeffrey L. Baliban ¶ 11, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. June 5, 2006) (filed contemporaneously herewith) (hereinafter, the "Baliban Declaration").

income, but because they are from plants that satisfy the superficial Phase Two criteria, they are included in Delphi's Rejection Motion.[12]

### G.    GM's Preliminary Objection to the Rejection Motion

On April 12, 2006, GM filed its preliminary objection (the "Preliminary Objection") to the Rejection Motion reserving the right to file a complete, final objection after discovery and to seek discovery from Delphi as to any and all facts and allegations asserted in the Rejection Motion and any and all defenses GM may have to the Rejection Motion.  GM hereby supplements its Preliminary Objection with this Supplemental Objection and Memorandum of Law.

## II.    Factual Background

### A.    Delphi Requests GM Cover Alleged Losses on GM Contracts but Fails to Provide Information as to Such Losses

Even prior to the Petition Date, Delphi requested cash subsidies from GM to cover alleged losses that Delphi was incurring in connection with parts it manufactures for GM.[13]  In response, GM repeatedly asked Delphi to identify the supply contracts that are unprofitable to Delphi.  GM also asked Delphi to provide the cost allocations for parts, including direct labor, direct material, and general and administrative expenses.[14]  GM also

---

[12] Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Order Under 11 U.S.C. §365 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Certain Executory Contracts with General Motors Corporation ¶¶ 27, 29, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. Mar. 31, 2006) (hereinafter, the "Eisenberg Declaration").

[13] *See* Declaration of Kevan B. Parekh ¶ 17, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. June 5, 2006) (filed contemporaneously herewith) (hereinafter, the "Parekh Declaration").

[14] *See id.*

requested an explanation of Delphi's methodology for allocating these expenses between GM and non-GM business.  Delphi failed to provide any of this information.[15]

Rather than providing GM with any of the information it sought, in its latest request in January 2006, Delphi simply requested payment from GM of $125 million per month for a period of four months (or a total of $500 million).[16]  In addition to the "gift" of $500 million, Delphi also requested that GM fund Delphi's labor transformation expenses and assume a significant portion of its legacy liabilities, which GM estimates could exceed $5.5 billion.[17]  Delphi also insisted that any payment from GM would be without recourse, could not be applied as an advance on supply contracts between Delphi and GM, and would not be deemed as an allowed claim against the Debtors' estates.   And Delphi threatened that if GM refused to make these gift payments, Delphi would seek the authority to reject GM contracts.[18]

[REDACTED – HIGHLY CONFIDENTIAL], GM has indicated to Delphi its willingness to consider, as part of a comprehensive agreement, compensating Delphi for documented cash losses, if any, incurred in the manufacture of parts for GM during an agreed upon transition period.[19]  However, Delphi only provided GM with various ballpark

---

[15] *See id.*

[16] *See id.* ¶ 18.

[17] *See id.*

[18] *See id.*

[19] *See id.* ¶ 19; [REDACTED – HIGHLY CONFIDENTIAL]

.

figures representing its purported overall losses and bearing no identifiable relationship to the production of such parts.[20]

The first time Delphi identified the alleged GM loss contracts was in Exhibit A to the Rejection Motion. However, to this date, Delphi has never provided GM with any of the financial information requested by GM.[21]

**B.     Delphi Filed the Rejection Motion as "Leverage"
with no Intention to Actually Reject the Supply Contracts**

In filing the Rejection Motion, Delphi had no intention to actually reject any of the Supply Contracts, but to use section 365 of the Bankruptcy Code to extort price increases from GM. The depositions of John D. Opie, Delphi's lead independent director, Steven Daniels, the main person at Delphi responsible for identifying which supply contracts to include in the Rejection Motion, and Randall Eisenberg of FTI, Delphi's financial advisor, demonstrate this unequivocally:

[REDACTED – CONFIDENTIAL].[22]

---

[20] *See* Parekh Declaration ¶ 19.

[21] *See id.*

[22] Transcript of John D. Opie Deposition at 19, lines 2-13, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. May 30, 2006) (hereinafter, the "Opie Deposition") (annexed hereto as Exhibit D).

**REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL**

\* \* \*

[REDACTED – HIGHLY CONFIDENTIAL][23]

\* \* \*

[REDACTED – HIGHLY CONFIDENTIAL][24]

\* \* \*

[REDACTED –CONFIDENTIAL][25]

---

[23] Daniels Deposition at 38-40, lines 21-25, 1-5, 25, 1-5.

[24] *Id.* at 139, lines 7-9.

[25] Transcript of Randall Eisenberg Deposition at 40-41, lines 23-35, 2-9, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. May 31, 2006) (hereinafter, the "Eisenberg Deposition") (annexed hereto as Exhibit E).

Moreover, internal Delphi documents show that Delphi

[REDACTED – HIGHLY CONFIDENTIAL]

[26] In explaining why Delphi chose to consider this factor Eisenberg stated in his

deposition that:

[REDACTED – HIGHLY CONFIDENTIAL].[27]

### C.    Delphi Failed to Analyze Whether Actual Rejection of the Supply Contracts Would Benefit the Estates

Not only has Delphi not determined to actually reject any of the Supply

Contracts, Delphi has never analyzed the effect of actual rejection of the Supply Contracts

or whether rejection would benefit the estates.  This is clearly evidenced by the Opie

Deposition and the Daniels Deposition:

- The Board of Directors did not authorize actual rejection of the Supply Contracts.

  [REDACTED – CONFIDENTIAL][28]

- Delphi has not analyzed whether actually rejecting the Supply Contracts is in the best interests of the estates.

  [REDACTED – CONFIDENTIAL]

---

[26] [REDACTED – HIGHLY CONFIDENTIAL]

[27] Eisenberg Deposition at 235, lines 11-15; *see also* Daniels Deposition at 101-02, lines 13-25, 1-3 (admitting same).

[28] Opie Deposition at 22, lines 6-8.

**REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL**

[29]

. . .

[REDACTED – CONFIDENTIAL]

[30]

- Delphi has not determined whether or not actually rejecting the Supply Contracts would burden the Debtors' estates.

[REDACTED – CONFIDENTIAL]

---

[29] *Id.* at 22-23, lines 18-25, 2.

[30] *Id.* at 133-34, lines 13-25, 2-5.

31

- Even though FTI's Phase Two analysis showed that fixed labor costs represent between [REDACTED – HIGHLY CONFIDENTIAL] of aggregate production costs,[32] Delphi has not analyzed the effect of paying fixed labor costs on whether or not Delphi is better off rejecting the Supply Contracts.

     [REDACTED – CONFIDENTIAL].[33]

- Delphi has not analyzed the losses Delphi would incur as a result of rejection of the Supply Contracts.

     [REDACTED – CONFIDENTIAL]

---

[31] *Id.* at 161-62, lines 8-25, 2-10.

[32] *See* Parekh Declaration ¶ 9.

[33] Opie Deposition at 165, lines 3-15.

34

. . .

[REDACTED – CONFIDENTIAL][35]

\* \* \*

[REDACTED – HIGHLY CONFIDENTIAL]

---

[34] *Id.* at 182, lines 3-19.

[35] *Id.* at 183, lines 11-14.

.[36]

- Delphi acknowledges that it may not survive without GM's business.

[REDACTED – CONFIDENTIAL]

---

[36] Daniels Deposition at 131-33, lines 22-25, 1-25, 4-9.

[37]

- The Board of Directors has not been presented with or analyzed the rejection damage claim GM would have.

  [REDACTED – CONFIDENTIAL]

---

[37] Opie Deposition at 167-69, lines 17-25, 2-25, 2-10.

.[38]

- <u>Delphi has not analyzed GM's rejection damage claim or its impact on the unsecured claimholders</u>.

[REDACTED – HIGHLY CONFIDENTIAL].[39]

\* \* \*

---

[38] *Id.* at 150, lines 9-17.

[39] Daniels Deposition at 42, lines 1-6.

[REDACTED – HIGHLY CONFIDENTIAL].[40]

- <u>The Board of Directors has not determined what to do if the Court grants the
  Rejection Motion and GM does not renegotiate the Supply Contracts.</u>

    [REDACTED – CONFIDENTIAL]

    [41]

- <u>The Board of Directors does not know whether GM will renegotiate.</u>

    [REDACTED – CONFIDENTIAL]

    [42]

Moreover, Delphi's financial advisor, FTI, did not analyze the effect of

rejection of the Supply Contracts on Delphi either to see if such rejection would benefit the

Debtors' estates.  As is clear from the Eisenberg Deposition:

---

[40] *Id.* at 108-09, lines 12-25, 1-10.

[41] Opie Deposition at 32-33, lines 24-25, 2-4.

[42] *Id.* at 195-96, lines 21-25, 2.

- <u>FTI did not analyze the effect of labor relief on profitability of the Supply Contracts</u>.

  [REDACTED – CONFIDENTIAL].[43]

- <u>FTI has not analyzed the losses Delphi would incur as a result of rejection of the Supply Contracts</u>.

  [REDACTED – CONFIDENTIAL][44]

- <u>FTI did not analyze the effect of rejection of the Supply Contracts on Delphi's other contracts with GM</u>.

  [REDACTED – CONFIDENTIAL]

  [45]

- <u>FTI did not analyze GM's rejection damage claim</u>.

  [REDACTED – CONFIDENTIAL][46]

---

[43] Eisenberg Deposition at 30, lines 20-25.

[44] *Id.* at 246, lines 18-23.

[45] *Id.* at 126, lines 12-17.

[46] *Id.* at 59, lines 13-16.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

### D.    GM's Just-in-Time Delivery System

GM, consistent with industry practice, operates on a "just-in-time" inventory delivery system.  Component parts from suppliers are typically assembled onto vehicles by the vehicle manufacturer within a few hours of the delivery of the parts to the vehicle assembly facility.[47]  In addition, to achieve the economies of scale required to compete in the automotive industry, GM and the industry operate in most cases utilizing a single supplier for specific parts for each vehicle line.  GM frequently purchases all of its requirements for a particular part from one supplier.[48]  As a result, a sole-source supplier's failure to make scheduled shipments of critical parts can have immediate and drastic consequences on GM, including the shutdown of an entire vehicle production line.

### E.    GM Is Delphi's Largest Customer

Delphi is a sole-source just-in-time supplier of many critical parts to GM and is GM's largest supplier, accounting for approximately 18% of GM's North American purchases and 14% of GM's global purchases.[49]  Pursuant to the terms and conditions of the parties' various purchase contracts, Delphi is obligated to sell to GM, and GM, on a requirements basis, is obligated to purchase from Delphi, component parts for installation into new vehicles manufactured by GM.  Delphi parts are used in essentially every GM North America product line.[50]

---

[47] *See* Ruselowski Declaration ¶ 15.

[48] *See id.* ¶ 16.

[49] *See id.*

[50] *See id.* ¶¶ 16,17.

In turn, GM is by far Delphi's largest customer, generating on an annual basis generally more than 50% of Delphi's revenues. In 2005, Delphi's sales to GM aggregated approximately $12.8 billion, or approximately 48% of Delphi's revenues.[51] Thousands of Delphi's employees work at plants whose production is primarily dedicated to production for GM or GM's Tier suppliers.[52]

### F.   Substitute Goods Are not Available in the Short Run

Because GM operates on a just-in-time inventory delivery system, it generally maintains little or no inventory of parts on site, and relies instead upon frequent and regular shipments of parts from its suppliers, including Delphi.[53] Consequently, if Delphi ceases shipping even a small fraction of production parts to GM, the GM plants relying on such shipments may run out of inventory of such parts and [REDACTED – HIGHLY CONFIDENTIAL].[54] While GM would certainly accelerate efforts to resource Delphi parts in the event of a supply interruption, the sheer magnitude of the parts to be resourced and revalidation required would take at least several months to achieve, at a minimum.[55] The volume of parts that Delphi seeks authority to reject—22,043—are

---

[51] *See* Declaration of John D. Sheehan in Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g), ¶ 9, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. Mar. 31, 2006) (hereinafter, the "Sheehan Declaration").

[52] *See* Ruselowski Declaration ¶ 20.

[53] *See id.* ¶ 15.

[54] *See id.* ¶ 20.

[55] *See id.* ¶ 17.

simply impossible to resource on short notice, and certainly not within the ten days sought by Delphi.[56]

Because of GM's historical relationship with Delphi, most parts that Delphi manufactures for GM are not readily available from an alternate source due, among other things, to capacity issues within the automotive parts supply industry, the length of time it takes to validate and obtain safety regulatory approval of a new supplier's parts, and lead time to develop and build tools for manufacture.[57]  For example, Delphi currently provides over 60% of GM's North American steering columns: almost three million per year.  That volume simply can not be resourced quickly as there is not currently sufficient excess capacity within the entire industry to accommodate GM's needs.  So Delphi's failure to ship would halt GM's production line until GM could find an adequate replacement.[58]

As stated, many of the parts supplied by Delphi are custom built using specially manufactured tooling and dies not currently available from any other supplier.[59] Additionally, the components Delphi uses to manufacture GM parts, with very few exceptions, can not be resourced within a short time period.  As Delphi has acknowledged,

> [i]n the Debtors' businesses, they typically do not buy commodities from their suppliers, but rather buy sophisticated customized components, each of which require extensive and time-consuming testing and validation, including contractual approvals from the Debtors' customers [such as GM].  Therefore, with very few exceptions, re-sourcing the [components] in the short term is impossible.  Further, the failure to timely receive even a very

---

[56] *See id.*

[57] *See id.*

[58] *See id.* ¶ 18.

[59] *See id.* ¶ 17.

> inexpensive part can quickly shut down the Debtors' assembly lines
> and expose [the Debtors'] estates to millions of dollars in potential
> damage claims.[60]

Indeed, due to the unique nature of the goods provided by Delphi's sole-source suppliers and the inability to resource many of these goods within a reasonably short time period, Delphi has sought Court authority to, among other things, assume certain agreements with sole-source suppliers of "goods not readily available from another supplier in quantities sufficient to avoid an interruption in [Delphi's] manufacturing operations and [Delphi's] supply of products to its customers….,"[61] and pay prepetition claims of sole-source suppliers whose provision of goods to Delphi is "vital to [Delphi's] reorganization efforts because [such suppliers] are the sole source from which [Delphi] can procure the goods and services they provide without suffering substantial delays and disruptions in [Delphi's] ability to conduct business and corresponding losses."[62]

## G. GM Would Have Enormous Damages Against Debtors' Estates as a Result of Rejection

The shutdown of GM plants as a result of termination of deliveries of affected parts could idle approximately 173,000 GM workers, and it is estimated that GM's revenues would decrease by as much as $250 million per day, leading to $5 billion loss in revenues in the first 30 days, and as much as $14 billion in lost revenues in the first

---

[60] Debtors' Motion for an Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements ¶ 16, *In re Delphi Corp, et al.*, No. 05-44481 (Bankr. S.D.N.Y. Nov. 18, 2005).

[61] *Id.* ¶ 7.

[62] Debtor's Motion for an Order Under 11 U.S.C. § § 105(a), 363, 364, 1107, and 1108 and Fed. R. Bankr. P. 6004 and 9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of Financially-Distressed Sole Source Suppliers and Vendors Without Contracts ¶ 15, *In re Delphi Corp, et al.*, No. 05-44481 (Bankr. S.D.N.Y. Oct. 8, 2005).

60 days.[63]  In addition, GM would incur additional cash losses in the form of fixed labor

costs,[64] which alone would approximate $1 billion per month.[65]  [REDACTED – HIGHLY

CONFIDENTIAL][66]

GM would also accrue other cash losses not easily quantifiable before the fact.  GM's total

monetary damages could easily exceed $1 billion per month.  All of these cash losses

would constitute general unsecured rejection damage claims against the Debtors' estates.

> **H.    Shutdown of Production at GM Would Affect
> Delphi, the Automotive Industry and the Public**

GM is the world's largest vehicle manufacturer.[67]  As such, it purchases

parts not only from Delphi, but also from many other automotive parts suppliers.  Indeed,

GM is the main customer or one of the main customers for many parts suppliers, including

American Axle, Lear, Magna, Tenneco and JCI.[68]  GM's contracts with these suppliers are

generally requirements contracts, meaning, among other things, that GM is contractually

---

[63] *See* Parekh Declaration ¶ 13.

[64] For example, pursuant to various labor agreements, if production is down due to a work stoppage or contract dispute, GM has an obligation to pay full wages and benefits for its idled employees who are in the JOBS Bank (assuming they exhaust 48 weeks of temporary layoff) and up to 95% of after-tax wages and full benefits for employees on temporary layoff.  *See id.* ¶ 14.

[65] *Id.*

[66] *See id.* ¶ 15.

[67] *See id.* ¶ 11.

[68] *See* Ruselowski Declaration ¶ 26.

obligated to purchase only the volume of parts it needs from time to time.[69]   The GM

plants that rely on delivery of Delphi parts also use parts of other parts suppliers.[70]   In the

event of a shutdown of its North American facilities, GM would have no need for parts

and would be forced to stop purchasing all other parts used in the shut-down facilities,

which include not only the Delphi parts under contracts not rejected, but also parts of over

3,000 other automotive parts suppliers.[71]

I.    **Certain of the Supply Contracts Operate Under the
GO Agreement and the Component Supply Agreement**

1.    GO Agreement

In 2003, Delphi and GM entered into the GM/Delphi Commercial

Agreement, dated November 24, 2003 (the "GO Agreement"), pursuant to which GM has

agreed, subject to certain specified conditions, to offer to Delphi certain purchase

contracts.  Pursuant to the GO Agreement

[REDACTED – HIGHLY CONFIDENTIAL].

---

[69] *See id.* ¶ 27.

[70] *See id.*

[71] *See id.*

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

GM believes it is currently paying an approximate [REDACTED] premium above market price for certain Delphi parts as a result of the GO Agreement.[72]  [REDACTED – HIGHLY CONFIDENTIAL] [73]

[REDACTED – HIGHLY CONFIDENTIAL] [74]

2.    Component Supply Agreement

As part of the spin-off of Delphi from GM in 1999, Delphi and GM entered into an agreement, dated January 1, 1999 (the "Component Supply Agreement"), pursuant to which, *inter alia*, Delphi and GM agreed to:

> continue to honor the terms and conditions of all existing Purchase Orders and other commercial agreements (e.g., Long Term and Lifetime Contracts and other formal and verifiable informal agreements) that are in effect as of the Effective Date ("Existing Agreements") regarding the purchase and supply of motor vehicle related components and systems ("Components"), including all Components that have been awarded to Delphi, regardless of whether production for such program has commenced, as if Delphi and GM were separate legal entities at the time such agreements were made.

Component Supply Agreement, § 1.1.  Among the Existing Agreements, 952 supply contracts are still operative.[75]  Of these, 87 supply contracts are subject to the Rejection Motion and 865 are not.[76]

---

[72] *See id.* ¶ 11.

[73] *See id.* ¶ 10.

[74] *See id.*

[75] *See id.* ¶ 14.

[76] *See id.*

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

# ARGUMENT

## I.    The Court Lacks Power to Grant
## Delphi Options to Reject Supply Contracts

Delphi requests unique relief unauthorized by the Bankruptcy Code.  If granted, Delphi could determine on its own, in the future, which of thousands of contracts it would reject on 10 days' notice with no court supervision.  As Delphi well knows, when the same relief was requested elsewhere, the bankruptcy court ruled there was "obviously no way" it could be granted unless the court were to "abdicate the court's essential supervisory role over the reorganization process."[77]  This Court articulated a similar ruling at commencement of the hearing on Delphi's Sections 1113/1114 Motion.[78]

As Delphi is also aware, when addressing a motion in the context of section 1113, seeking similar relief to what Delphi requests here, the court in *In re UAL Corp.* stated:

> THE COURT:  Well, I think one of the important limitations of 1113 is that a debtor in seeking rejection of a collective bargaining agreement has to be willing to live with the consequences of a rejection if that rejection is ordered.  And so if the debtor is not certain about whether it really wants to have the collective bargaining agreement rejected, it ought not to make the application.  And so merely giving the debtor an option of rejecting it or not

---

[77] *In re US Airways Group, Inc.,* 287 B.R. 643, 646 (Bankr. E.D. Va. 2002) ("As a conceptual matter, there is obviously no way by which the court can make a meaningful determination whether the debtors in possession have exercised sound business judgment in seeking to abandon a particular encumbered aircraft or to reject a particular unexpired aircraft lease when the debtor has not yet selected which aircraft are to be abandoned and which leases are to be rejected.  Furthermore, to simply give a trustee or debtor in possession carte blanche to make that determination itself would be to abdicate the court's essential supervisory role over the reorganization process.").

[78] *See* Transcript of Record, Hearing on Sections 1113/1114 Motion at 88-89, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. May 9, 2006) (emphasis added).

> rejecting does not exist under 1113 as I read it.  Section 365(a)
> expressly requires approval by the court.[79]

Unlike Delphi's Sections 1113/1114 Motion, the Rejection Motion can *not* be treated as a

motion to reject the Supply Contracts because among other things, [REDACTED –

CONFIDENTIAL] Delphi has not actually determined to reject any contract or even

performed any analysis to determine if it would benefit from actual rejection.[80]  If,

nonetheless, the Court determines to treat the Rejection Motion as a motion for approval of

Delphi's current rejection of the Supply Contracts, the Rejection Motion should be

dismissed for failure to state a claim on the grounds set forth below.

## II.    Delphi Flunks the Business Judgment Test

Common ground between Delphi and GM is that Delphi can not obtain

court approval to reject the Supply Contracts without satisfying the business judgment test.

The authorities for that proposition are clear.  Under the business judgment test, <u>absent bad

faith</u> or gross mismanagement, a debtor may reject an executory contract only if it can

establish that doing so is in the exercise of its sound business judgment and will benefit the

estate.[81]  Courts consider a variety of factors in determining whether rejection of an

executory contract is in the sound business judgment of the debtor, including whether: (1)

the contract burdens the debtor's estate financially; (2) the debtor showed real economic

benefit resulting from the rejection; (3) rejection would result in a large claim against the

---

[79] Transcript of Record, Hearing on § 1113 Motion at 123-24, *In re UAL Corp.*, No. 02-48191 (Bankr. N.D. Ill. May 20, 2005) (excerpt of transcript is annexed hereto as Exhibit A).

[80] *See, e.g.*, Opie Deposition at 22-23.

[81] *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994) (adopting *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 43 (2d Cir. 1979)); *Nostas Assocs. v. Costich (In re Klein Sleep Prods. Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *In re Balco Equities Ltd., Inc.*, 323 BR. 85, 99 (Bankr. S.D.N.Y. 2005).

estate; and (4) upon balancing the equities, rejection will do more harm to the other party

to the contract than to the debtor if not rejected.[82]

As an initial matter, the Rejection Motion should be denied in its entirety as

having been filed in bad faith.  [REDACTED –CONFIDENTIAL].[83]

Indeed, because Delphi considers rejection [REDACTED –CONFIDENTIAL],[84]

Delphi has not even bothered to analyze the effects of rejection of the Supply Contracts on

the Debtors' estates to determine whether the estates would be better off not performing

under the Supply Contracts.[85]  Moreover, as discussed in detail below, Delphi's filing of

---

[82] *See In re G Survivor Corp.*, 171 B.R. 755, 758 (Bankr. S.D.N.Y. 1994), *aff'd sub nom. John Forsyth Co., Inc. v. G Licensing, Ltd.*, 187 B.R. 111 (S.D.N.Y. 1995).

[REDACTED – HIGHLY CONFIDENTIAL]

[83] *See, e.g.*, Opie Deposition at 133, lines 18-21; Eisenberg Deposition at 40-41, lines 23-25, 3-9; [REDACTED – HIGHLY CONFIDENTIAL]

[84] *See, e.g.*, Eisenberg Deposition at 128-30; 246-47.

[85] Opie Deposition at 22-23, lines 18-25, 2.  [REDACTED –CONFIDENTIAL]

*Id.* at 133, lines 13-25.

the Rejection Motion solely to gain leverage over GM[86]—in complete disregard to the harm such action will cause Delphi if granted—epitomizes bad faith.

In addition, comparing what *Minges* requires to pass the business judgment test to what Delphi alleges, categorically demonstrates Delphi's Rejection Motion fails to state a claim for rejection.  And when material facts are considered that Delphi ignores, it is also clear Delphi's Rejection Motion can not succeed on the merits even if it were to state a valid claim.

### A.    Delphi Fails to State a Claim for Rejecting the Supply Contracts

In *Minges*, the bankruptcy trustee proved the debtor-lessor had entered into a lease requiring it to provide utilities and janitorial services to its tenant when the services' combined cost was $10,000 to $11,000 per year.  The combined cost at the time of bankruptcy had risen to $34,250 per year.[87]  The trustee asserted the property's market value would increase if the lessor's covenant to provide those services were rejected.[88] The bankruptcy court approved rejection and the district court affirmed.[89]

The United States Court of Appeals for the Second Circuit overturned the rejection on multiple grounds, each of which requires this Court to deny Delphi's

---

[86] *Id.* at 19, lines 2-13 [REDACTED – CONFIDENTIAL]; [REDACTED – HIGHLY CONFIDENTIAL]

[87] *Minges*, 602 F.2d at 40.

[88] *Id.* at 44.

[89] *Id.* at 40.

Rejection Motion for failure to state a claim:[90]

> (1)    There was "no detailed support, by appraisal or otherwise," for the proposition that the property would increase in market value.[91]

> (2)    There was no record showing "whether a sound basis exists for a finding that there is a reasonable likelihood that general creditors will derive substantial or significant benefit from the proposed lease rejection."[92]

> (3)    There was no record of "the amount of the secured debt" and "whether the estate is likely to be adequate to cover administrative expenses and other priority claims, whether there are other properties beside Pro Park in the estate, and if there are the extent of encumbrances on them."[93]

1.    <u>Delphi fails to show benefits from rejection</u>

Delphi flunks the *Minges* test starting with step one—a showing that rejection will create more value for the Delphi estate.  One can read Delphi's pleading and declarations from cover to cover without finding a scintilla of support for the proposition that rejection of the Supply Contracts makes the Delphi estate better off.  This is not surprising because Delphi admits [REDACTED –  CONFIDENTIAL].[94]  Indeed, in his deposition, Eisenberg acknowledged that the decision to reject any Supply Contract could

---

[90] Not only has Delphi failed to allege these factors, but Delphi also failed to analyze any of the other factors courts consider when determining whether rejection is in the debtor's sound business judgment.  *See* Opie Deposition at 149-50, 161-63, 165.

[91] *Minges*, 602 F.2d at 44 ("We find only the most general estimate of increase in market value if the covenants involved here are rejected….").

[92] *Id.*

[93] *Id.*

[94] *See* Opie Deposition at 19, lines 2-14, and 128, lines 2-12.

[REDACTED –CONFIDENTIAL].[95]

Delphi's sole allegation in support of its business judgment is its allegation that it calculated that some Supply Contracts have a negative operating income and inferred the rest do too. Delphi hopes the Court will infer that Delphi would be better off without the Supply Contracts.

The trustee tried that approach in *Minges* and it did not work. The Second Circuit acknowledged the covenant to supply services satisfied the burdensome requirement,[96] but then overturned the rejection because the record did not provide detailed support for the proposition that the rejection would increase the estate's value.[97] The *Minges* trustee provided "only the most general estimate of increase in market value."[98]

Similarly, Delphi asserts its aspiration that upon rejection GM will agree to pay Delphi higher prices. Like the trustee in *Minges*, Delphi fails to provide any plausible roadmap to show how rejection leads to higher prices or higher value.[99] And, there are compelling reasons why Delphi did not and can not do so.

---

[95] *See* Eisenberg Deposition at 41, lines 2-5.

[96] *Minges*, 602 F.2d at 43.

[97] *Id.* at 44.

[98] *Id.*

[99] Notably, postpetition conduct such as a shutdown by Delphi that causes colossal damage to the Delphi estate in both losses and exponential increases in liabilities, may well qualify as gross mismanagement for purposes of 11 U.S.C. section 1104(a)(1). *See, e.g., In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989). Such gross mismanagement both further highlights the absence of business judgment here and the inequity of Delphi's shutdown threat. We submit, a debtor in possession should not threaten that which it can not do without breaching its fiduciary duties.

Under Delphi's current CBAs, as Delphi has acknowledged, it must pay its employees whether they work or not.[100]  GM's Supply Contracts are priced to cover more than the costs of labor and materials and Delphi's documents concede they cover variable costs.  Delphi does not allege GM pays Delphi less than market prices because that is not the case.  Depending on the part, GM pays market or above-market prices.  Therefore, prior to obtaining relief from its CBAs, Delphi is better off honoring the Supply Contracts than not honoring them.  In fact, Delphi would lose a fortune if it stopped manufacturing GM parts while still paying its employees.[101]  Indeed, Delphi has not requested authority to reject supply contracts with other customers, even though other customers do not pay

---

[100] Pursuant to Delphi's CBAs, Delphi is required to pay employees who are on temporary layoff up to 95% of their after-tax wages and 100% of their benefits, and employees who are in the JOBS Bank, 100% of wages and benefits.  *See* Memorandum of Law in Support of Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) at 38-39, *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. Mar. 31, 2006).  In addition, as Delphi has admitted in the Sections 1113/1114 Motion, its CBAs generally prohibit Delphi from shutting down plants.  *See, e.g.*, Sections 1113/1114 Motion ¶ 12.  Accordingly, unless and until Delphi is permitted to eliminate the above provisions, Delphi will incur labor costs and the costs of keeping the plants open regardless of whether or not parts are being manufactured in the plants.  *See also*

[REDACTED –CONFIDENTIAL]

[101] If Delphi is rash enough to shut down GM plants that manufacture vehicles containing parts purchased under the Supply Contracts, GM will have no need for and therefore will stop purchasing other parts manufactured by Delphi for use in the shutdown plants.  *See* Ruselowski Declaration ¶ 20.  Such parts, which are not subject to the Rejection Motion, include wiring, cable terminals, connectors, relays, bus electrical centers, battery cables, floor consoles, injectors, cockpits and instrument panels.  *See id.* ¶ 23.  As set forth above, because the supply contracts between GM and Delphi are requirements contracts, GM will have no obligation to continue purchasing from Delphi parts it no longer needs.  This would lead to an additional significant loss in revenue for Delphi.  For example, more than [REDACTED] of the Supply Contracts Delphi seeks authority to reject touch GM's highest volume product, the GMT-900 truck.  The 2006 annual purchase value of these contracts is greater than [REDACTED].  But Delphi supplies many more parts for GMT-900 truck under other contracts.  Delphi has approximately [REDACTED] of content per vehicle on the GMT-900.  With approximately [REDACTED] vehicles, the annual revenue that Delphi receives on the GMT-900 is approximately [REDACTED].  Failure to supply [REDACTED] of content will force cessation of production at all of GM's GMT-900 facilities, which would have the ripple effect of stopping production for all parts supplied for the GMT-900, including the Delphi facilities that provide [REDACTED] of additional content for GM trucks.  *See id.* ¶ 24. Similar examples exist for all of GM's vehicle platforms produced in North America.  *See id.*  In other words, as a practical matter, the rejection of the 5,472 Supply Contracts would effectively trigger rejection of thousands of other supply contracts with GM, including incontrovertibly profitable contracts.

Delphi above-market prices like GM does.  Delphi's failure to try to reject contracts with lower prices further corroborates the lack of any plausible basis to assume contract rejection leads to higher prices.

How then can Delphi convince GM to pay higher prices when Delphi makes itself worse off if it refuses to produce GM parts?  The Rejection Motion provides no explanation because it is not rational.  Thus, Delphi is asking this Court to approve its strategy either to bluff GM concerning a shutdown or to engage in a reckless shutdown having grave consequences for hundreds of thousands of employees and the domestic auto industry.

Conversely, if Delphi is allowed ultimately to reject its CBAs, Delphi has already admitted in writing that to make new contracts with its unions, Delphi wants GM's financial support.  Is there any reasonable possibility GM will commit to subsidize Delphi's new CBAs while leaving to future negotiations and Delphi's brinksmanship the prices GM must pay for parts?  Clearly, the prices GM pays for Delphi parts will be a function of GM's negotiations with the unions, and not a function of Supply Contract rejection.  For Delphi to assert that its rejection of the Supply Contracts will cause GM to pay higher prices, Delphi's business judgment must be that GM will subsidize Delphi's new CBAs to avoid a strike and to enable Delphi to manufacture parts for GM's competitors, while GM itself is not assured of obtaining the parts it needs at prices satisfactory to GM.

Moreover, Delphi also overlooks the obvious.  If Delphi does obtain lower wages and benefits in new CBAs, Delphi's current allegations that the Supply Contracts are burdensome will be immaterial, and Delphi may be unable to make similar allegations

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

with its new CBAs even if it again deploys its flawed operating income methodology.

Lower wages equate to lower costs and lower costs to higher operating income. Notably,

in *Minges*, the court agreed the lease covenant was burdensome because the building

would be worth more if the owner did not have to pay for utilities and janitorial

services.[102] Here, where there is not even an allegation that GM pays Delphi less than

market prices, Delphi will likely be unable to satisfy *Minges*' "burdensome" requirement if

there are new CBAs because Delphi's revenues will already be at or above market levels

and its expenses will be competitive.

In short, "business judgment" and "wish" are not synonymous. Business

judgment connotes such concepts as logic, sense, and rationality. Delphi's wish to

strongarm GM into paying higher prices is based on none of the above. For present

purposes, however, what is important is the absence from Delphi's pleading and

declarations of any basis supporting its notion that its estate benefits from Supply Contract

rejection. Delphi has failed to state a claim.

In addition to Delphi's having failed to provide any basis for asserting

rejection will benefit the Delphi estate, Delphi ignored three independent, critical factors

making rejection detrimental to Delphi's estate. Rejection of the Supply Contracts would

provide GM with a nondischargeable right to specific performance, making rejection

moot. Rejection of the Supply Contracts will release GM from two master agreements.

And, threatening GM with a shutdown would be a postpetition tort under Michigan law

enforceable under 28 U.S.C. § 959(b). These factors are discussed later herein.

---

[102] *Minges*, 602 F.2d at 43.

2.    Delphi pleads no substantial and significant
benefit from rejection to unsecured claimholders

Delphi premises its entire Rejection Motion on a snippet of a quotation

from *Minges*:  "It is enough, if, as a matter of business judgment, rejection of the

burdensome contract may benefit the estate."[103]  Then, Delphi ignores everything *Minges*

rules is required to establish a contract is burdensome and may benefit the estate.

This circuit does not tolerate rejection for rejection's sake.  After writing

the snippet Delphi quotes, *Minges* made very clear it was overturning rejection because the

rejection power can not be invoked without proof "there is a reasonable likelihood that

general creditors will derive substantial or significant benefit from the proposed lease

rejection."[104]

Delphi's admissions to date about its foreign income and domestic losses,

make it unlikely a price increase from GM in the amounts Delphi put in its own internal

documents[105] would benefit anyone other than Delphi's secured claimholders of which

there are at least three tranches:  the largely or completely undrawn postpetition loan, the

prepetition bank loan, and GM and other vendors' setoffs.  Additionally, the scenario

Delphi would have to posit is implausible.  Delphi would need to assert that the entities

creating new enterprise value for Delphi by making sacrifices and contributions in the

future, will allocate material portions of that value to unsecured claimholders not making

new sacrifices and contributions.

---

[103] Rejection Motion ¶ 61 (citing *Minges*, 602 F.2d at 43).

[104] *Minges*, 602 F.2d at 44.

[105] [REDACTED – HIGHLY CONFIDENTIAL]

For present purposes, however, it was Delphi's burden to plead and to substantiate with declarations how rejection would have a reasonable likelihood of producing substantial or significant benefits to general unsecured claimholders. Delphi failed to do so. It ignored the controlling authority. It failed to state a claim.

3.    Delphi fails to plead the amounts of administrative, priority, and secured claims, and whether there are other contracts to reject

*Minges* makes clear that to decide whether to approve rejection, the court should know the amounts of secured debt, administrative debt, priority claims, and whether there are other similar properties. Delphi has pled none of that. The amount of its secured, administrative, and priority debt could easily show rejection will not benefit general creditors even if there were a price increase. The existence of thousands of other contracts not being rejected could easily show Delphi unfairly chose to try to exercise its rejection power against GM when other customers pay lower prices. For now, however, the point is that Delphi ignored *Minges* and failed to state a claim.

**B.    Delphi Fails to Show the Supply Contracts are Burdensome**

In *Minges*, the court acknowledged the debtor-lessor's covenants to provide utility and janitorial services were burdensome because their costs had risen substantially since the lease was originated and the property whose rental value had almost doubled was "clearly capable of producing more income without them."[106] In contrast, here there is no allegation that GM's prices are lower than market. Indeed, they are equal or greater than market prices. Accordingly, Delphi has attempted to satisfy *Minges*' burdensome

---

[106] *Minges*, 602 F.2d at 43.

requirement by alleging it calculated that some Supply Contracts have negative operating income and it inferred the rest do too.

Above we explained that Delphi is worse off not performing the Supply Contracts than performing them because (i) they cover their variable costs and contribute to overhead, (ii) Delphi must pay labor whether it works or not, thereby creating huge losses if Delphi shuts down, and (iii) GM will not require and not purchase other Delphi parts if supply of some parts is curtailed.  Here, we explain that Delphi also fails the burdensome test because its choice of operating income as the litmus test is a deceptive exercise in arithmetricks and not a valid proxy for whether the Supply Contracts are burdensome.

Based on Delphi's arithmetricks, for example, engineering and selling expenses are allocated to products not needing engineering and not needing selling since the engineering has already been done and the parts already sold for the life of the car that uses the part.

Delphi has failed to show it is losing money on the Supply Contracts and has made no showing that each Supply Contract generates negative operating losses.[107] Delphi's declarations have not satisfied its burden of proving it is losing money because of the Supply Contracts.[108]  Delphi's methodology for selecting which supply contracts to include in the Rejection Motion is flawed.

---

[107] *See* Baliban Declaration ¶¶ 22, 23; *see also* Daniels Deposition at 18, lines 14-16 [REDACTED – HIGHLY CONFIDENTIAL].

[108] [REDACTED – HIGHLY CONFIDENTIAL]  *See* Baliban Declaration ¶ 11.

First, Delphi inappropriately looked at net operating income in determining which Supply Contracts to include in the Rejection Motion.[109]  Even Delphi questioned this approach.  In response to a question from its own advisors regarding Delphi's decision to look at net operating income, Delphi stated:

[REDACTED – HIGHLY CONFIDENTIAL][110]

As used by Delphi, net operating income was calculated roughly as sales price of a GM part less cost of manufacturing such part less allocated overhead costs.[111]  Using net operating income to determine whether rejection will benefit the estate is inappropriate because it fails to take into account the fact that allocated overhead costs are fixed costs, such as costs of the JOBS Bank, temporary layoff program, and OPEB.[112]  Depending on the size of the allocated costs, Delphi's net operating income could be the result of its huge overhead costs, rather than because of the Supply Contracts.  Moreover, often, the costs allocated to a GM part may not even be related to the manufacture of such part.  For example, many of the Supply Contracts that Delphi seeks authority to reject are for manufacture of commodity parts, such as rubber hose, which are not skilled labor intensive and do not use many, if any, engineering staff resources in their design;

---

[109] See id. ¶¶  12, 16.

[110] DPH-1GM054232; see also Daniels Deposition at 141, lines 17-21 [REDACTED – HIGHLY CONFIDENTIAL]

[111] See Baliban Declaration ¶ 12; see also DPH-1GM055582 [REDACTED – CONFIDENTIAL]

[112] See Baliban Declaration ¶ 12.

nonetheless, they are still allocated costs of maintaining an engineering staff.[113]

Accordingly, Delphi has failed to prove the causal link that any net operating losses it may

be incurring (which Delphi has not even shown as to each of the Supply Contracts) are a

result of the Supply Contracts.  As noted above, GM pays the same or more for each part

as other customers.  Yet, Delphi is not trying to reject other customers' contracts.

Second, Delphi selected some of its most unprofitable plants for the Phase

One analysis.[114]  It is no surprise, therefore, that Phase One resulted in a finding of many

GM supply contracts that Delphi alleges to be unprofitable.  Using these results to

extrapolate to all other plants, however, is inaccurate and misleading, and certainly does

not "confirm the continuing and widespread losses generated by the Debtors' contracts

with GM."[115]  Delphi's reasoning that because the Phase One plants were generating

negative operating income and did more than 50% of their business with GM or GM's Tier

suppliers, then all other plants with these same two characteristics must also be losing

money because of Delphi's contracts with GM, is illogical.[116]  It is entirely possible that

Delphi's net operating income at these other plants was caused by losses from Delphi's

non-GM business at those plants.  Delphi has failed to analyze its non-GM contracts at

---

[113] *See id.* ¶ 18.

[114] *See, e.g.,* Rejection Motion ¶ 41. ("Needmore has long been one of Delphi's most unprofitable U.S. plants."); Eisenberg Declaration ¶ 20 ("Within [the Automotive Holdings Group] the Needmore and Home Avenue plants are particularly unprofitable.  Needmore and Home Avenue were selected for Phase One of Delphi's loss contract analysis for this reason.").

[115] Eisenberg Declaration ¶ 29.

[116] *See* Baliban Declaration ¶ 23.

these plants[117] and, accordingly, has no basis to extrapolate from the Phase One results to Phase Two.  In fact, Delphi admitted in the Daniels Deposition that

[REDACTED – HIGHLY CONFIDENTIAL].[118]

Third, not only was Delphi's methodology in selecting which Supply Contracts to include in the Rejection Motion faulty, but Delphi's financial advisor's "testing" of Delphi's analyses was inadequate.  FTI's confirmation that Delphi's review of loss-generating plants is sufficient and that a part-by-part review is not necessary is based on an evaluation of just [REDACTED] GM supply contracts.[119]  Moreover, FTI's analysis was based on [REDACTED – CONFIDENTIAL] of 2005 actual data annualized.[120] Furthermore, FTI provides no breakdown of costs or profitability for GM versus non-GM business either by part number, plant, division or in aggregate; therefore there is no way to determine how much Delphi is earning or losing on GM business.[121]  Accordingly, Delphi has not pled a case that the Supply Contracts are burdensome for purposes of section 365.

C.    **Rejection of its Supply Contracts Provides GM Rights to Specific Performance Under Michigan Law that Are Nondischargeable Under Bankruptcy Law**

Delphi's Rejection Motion ignores the consequences of rejecting the Supply Contracts.  Simply put, Michigan law governs the Supply Contracts, and upon

---

[117] [REDACTED – CONFIDENTIAL] *See* Eisenberg Deposition at 183, lines 9-22.

[118] *See* Daniels Deposition at 53-59, 182-83.

[119] *See id.* at 173, lines 16-23 [REDACTED – HIGHLY CONFIDENTIAL].

[120] [REDACTED – CONFIDENTIAL]; Baliban Declaration ¶¶ 8, 17.

[121] *See* Baliban Declaration ¶ 11.

Delphi's breach provides GM a right to specific performance for which money damages would be an inadequate substitute. Therefore, GM's right to specific performance would be nondischargeable under 11 U.S.C. §§ 101(5)(B), 524, and 1141. In turn, GM's remedy renders rejection moot because Delphi would be obligated to continue performing the rejected contracts in accordance with their terms.

Pursuant to *Orion*, the Court can not determine GM's breach of contract remedies in the rejection hearing and its findings at the rejection hearing do not have collateral estoppel effect.[122] But, the Court is obligated to take into account GM's potential remedies in its oversight of Delphi's business judgment and in its application of equitable principles to Delphi's Rejection Motion.[123] GM's nondischargeable right to specific performance independently undermines Delphi's business judgment to reject GM's contracts.

This section demonstrates: (i) the basis for GM's right to specific performance under state law; (ii) the authorities rendering GM's right nondischargeable under the Bankruptcy Code; and (iii) Delphi's wrongful effort to prevent GM from vindicating its rights to specific performance while Delphi attempts to deploy its wrongful shutdown threat.

---

[122] *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994) ("In no way is [bankruptcy court's decision on motion to assume contract] a formal ruling on the underlying disputed issues, and thus will receive no collateral estoppel effect.").

[123] *Id.* ("In reviewing a trustee's or debtor-in-possession's decision to assume an executory contract, then, a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession . . .").

1.    GM is entitled to specific performance under
      Michigan law upon breach of the Supply Contracts

Delphi's rejection of the Supply Contracts would constitute a prepetition breach of the Supply Contracts.[124]  The Supply Contracts, by their terms, are governed by Michigan law where both Delphi and GM are based and perform the Supply Contracts. Michigan law, therefore, determines GM's rights upon Delphi's breach, while federal bankruptcy law determines whether those rights are dischargeable.

Under the Michigan Uniform Commercial Code, a buyer may be entitled to specific performance where the goods are "*unique or in other proper circumstances,*"[125] and the Official Comment makes crystal clear that GM's supply contracts are the prototypical proper circumstances.  Sections 440.2716(1)-(2) of the Michigan Uniform Commercial Code provide:

(1)    Specific performance may be decreed where the goods are unique or in other proper circumstances.

(2)    The decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just.[126]

Delphi's breach of the Supply Contracts presents the precise commercial scenario contemplated by the Michigan Uniform Commercial Code for the application of the remedy of specific performance.  Official Comment 2 to section 440.2716 provides:

In view of this Article's emphasis on the commercial feasibility of replacement, a new concept of what are 'unique' goods is introduced under this section.  Specific performance is no longer

---

[124] 11 U.S.C. § 365(g).

[125] Mich. Comp. Laws Serv. §§ 440.2711(2) and 440.2716 (emphasis added).

[126] *Id.* § 440.2716(1)-(2).

limited to goods which are already specific or ascertained at the time of contracting. The test of uniqueness under this section must be made in terms of the total situation which characterizes the contract. *Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation,* as contrasted with contracts for the sale of heirlooms or priceless works of art which were usually involved in the older cases. However, *uniqueness is not the sole basis of the remedy under this section for the relief may also be granted "in other proper circumstances" and inability to cover is strong evidence of "other proper circumstances."*[127]

Consistent with the Official Comment, specific performance is granted when the buyer has an inability to cover.[128]

Michigan courts consistently rule specific performance is available to prevent irreparable harm where the remedy at law is inadequate.[129] Courts grant buyers specific performance of purchase contracts when monetary damages are deemed inadequate and the buyers would be irreparably harmed by termination of the purchase contracts.[130]

---

[127] *Id.* § 440.2716 cmt. 2 (emphasis added).

[128] *See International Casings Group, Inc. v. Premium Standard Farms, Inc.*, 358 F. Supp. 2d 863, 876 (W.D. Mo. 2005) (holding that a buyer of hog casings could not find cover goods to replace the casings manufactured by the seller because those casings were not fungible and were not readily available on the spot market); *Software Customizer, Inc. v. Bullet Jet Charter, Inc. (In re Bullet Jet Charter, Inc.)*, 177 B.R. 593, 599 (Bankr. N.D. Ill. 1995) (specific performance granted where buyer of an aircraft was unable to cover, "if at all, without considerable inconvenience, expense, and delay.").

[129] *Edidin v. Detroit Econ. Growth Corp.*, 352 N.W.2d 288, 291 (Mich. Ct. App. 1984); *see also Shell Oil Co. v. AMPM Enters., Inc.,* No. 95-CV-75117-DT, 1996 U.S. Dist. LEXIS 4667, *14 (E.D. Mich. Mar. 18, 1996); *Wirth v. U.S.*, No. 2:91-CV-099, 1991 U.S. Dist. LEXIS 16038, *9 (W.D. Mich. June 26, 1991).

[130] *See, e.g., Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 39 (8th Cir. 1975) (decreeing specific performance of a long-term contract to supply propane gas to a distributor for distribution to a specific subdivision even though propane gas was readily available on the market and the distributor had propane gas immediately available to it under other contracts with other suppliers because the distributor probably would not have been able to enter into a similar *long-term* contract with anyone else and monetary damages for the considerable expense and trouble of rearranging distribution from other sources to the subdivision supplied by the defendant would have been difficult to estimate); *Zurn Constructors, Inc. v. The B.F. Goodrich Co.*, 685 F. Supp. 1172, 1187 (D. Kan. 1988) (granting specific performance to a buyer of polyvinylchloride ("PVC") pipe grade resin, an essential raw material used by buyer to manufacture PVC pipes, because the

*DaimlerChrysler Corp. v. Lear Corp.*[131] is on point.  There, DaimlerChrysler Corporation ("DCC") filed a complaint against Lear Corporation ("Lear"), a sole source supplier of seats and other parts for Chrysler vehicles, on the ground that Lear's threats to cease production of certain parts to DCC unless DCC would agree to Lear's demanded price increases constituted anticipatory reputation by Lear of the supply contract and entitled DCC to specific performance.  The Michigan Circuit Court issued a temporary restraining order restraining Lear from repudiating or threatening to breach its purchase contracts with DCC for a certain term or refusing to fulfill any of its supply obligations to DCC.[132]  The court found DCC would suffer "*irreparable harm [to its] customer goodwill, business reputation, and existence*" if Lear ceased delivery of parts and DCC would not have an adequate remedy at law.[133]

Similarly, if Delphi ceases performance under the Supply Contracts before GM is able to resource the affected parts, GM will be irreparably harmed and will not have an adequate remedy at law because the parts delivered from Delphi are unique and GM can not cover prior to making alternate manufacturing arrangements and attaining all required safety certificates and testing.  As a sole-source supplier, Delphi supplies unique goods to GM pursuant to the Supply Contracts. The parts supplied by Delphi are custom built using specially manufactured tooling and dies not currently available from any other

---

buyer was not able to purchase a sufficient amount of PVC pipe grade resin from other sources due to a shortage, and the buyer would have been irreparably harmed by the termination of the supply contract because the inability to buy the raw material for its products would potentially have put it out of business, and money damages would thus have been inadequate).

[131] No. 05-70865, slip op. (Mich. Cir. Ct. Dec. 1, 2005).

[132] *Id.* at *2.

[133] *Id.* (emphasis added).

supplier. It could take months for GM to secure a new supplier. An interruption of supplies from Delphi would result in [REDACTED – HIGHLY CONFIDENTIAL] GM plants because of the just-in-time delivery system.

[REDACTED – HIGHLY CONFIDENTIAL].[134]  Because of GM's inability to cover virtually immediately, and because GM and the many critical components of its enterprise will be irreparably harmed by a rejection of the Supply Contracts, there is no adequate remedy at law. Under Michigan law, GM therefore has a right of specific performance if Delphi ceases (or threatens to cease) deliveries under the Supply Contracts, at least until GM can procure alternate sources of supply.[135]

   2.    GM's right to specific performance is nondischargeable

       a.    Delphi's rejection would not terminate GM's rights

           Rejection of an executory contract breaches it, but does not terminate it or avoid it.[136]  For example, "[c]onsistent with bankruptcy law's general deference to state-

---

[134] *See Zurn Constructors*, 685 F. Supp. at 1181 ("[n]umerous cases support the conclusion that loss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm.").

[135] If Delphi provides GM an adequate transition period before ceasing deliveries under the Supply Contracts, then monetary damages will be adequate to compensate GM for breach of the Supply Contracts. A counterparty's right to a transition period upon termination of a contract is recognized under Michigan law. *See* Mich. Comp. Laws Serv. § 440.2309(3) ("Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with modification is invalid if its operation would be unconscionable."); *see also* U.C.C. § 2-309, Official Comment 8 ("[P]rinciples of good faith and sound commercial practice normally call for [] notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement.")

[136] *Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386-387 (2d Cir. 1997), *aff'g*, 183 B.R. 65, 72 (Bankr. S.D.N.Y. 1995) ("Rejection . . . does not extinguish all rights under an executory contract. . . . State-law rights embodied within executory contracts survive rejection."); Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding Rejection*, 59 U. Colo. L. Rev. 845, 931 (1988) (quoted approvingly by Second Circuit in *Lavigne* at 114 F.3d at 387); *Creator's Way Associated Labels, Inc. v. Mitchell (In re Mitchell)*, 249 B.R. 55, 58 (Bankr. S.D.N.Y. 2000); *Cohen v. Drexel Burnham Lambert Group Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687, 709 (Bankr. S.D.N.Y. 1992).

law rights in or to specific property, rejection of a contract does not terminate such rights that arise from rejected contracts."[137]  Accordingly, "[b]ecause rejection constitutes only a breach, not a termination, an obligation in a rejected contract continues to bind a debtor unless the obligation is discharged."[138]

        b.      <u>GM's right to specific performance is not a dischargeable claim</u>

        Only liabilities on "claims" are discharged by confirmation of a chapter 11 plan.[139]  Section 101(5) of the Bankruptcy Code defines "claim" as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) *right to an equitable remedy for breach of performance if such breach gives rise to payment*, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.[140]

        Accordingly, a right to an equitable remedy for breach of performance that does not give rise to payment is not a dischargeable claim.  The issue becomes whether GM's equitable remedy for the breach imposed by rejection gives rise to payment for purposes of section 101(5)(B).  As demonstrated below, it does not.

        As the first step in the analysis, it is crystal clear a creditor's right to equitable remedies is not rendered dischargeable simply because the court is empowered to

---

[137] *Drexel Burnham*, 138 B.R. at 709 (quotations omitted); *see also Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 389 (2d. Cir. 1997) (non-debtor party "has a reasonably strong argument that rejection of its licensing contract [pursuant to which the non-debtor party had a right to license the prepetition designs created by the debtor] does not eliminate the transfer of the property right created under it").

[138] *Abboud v. Ground Round, Inc. (In re Ground Round, Inc.)*, Case No. 05-039, 2005 Bankr. LEXIS 2595, *19 (1st Cir. B.A.P. Dec. 15, 2005).

[139] 11 U.S.C. § 1141(d)(1).

[140] *Id.* § 101(5) (emphasis added).

grant equitable and monetary relief for the same breach.  In *Ohio v. Kovacs*,[141] the United

States Supreme Court decided whether a prepetition injunction ordering a debtor "to

remove specified wastes from the property,"[142] was dischargeable when the debtor had

been dispossessed from the site by a receiver and the state conceded "the only performance

sought from Kovacs was the payment of money."[143]

The Supreme Court held the injunction was a dischargeable claim precisely

because "the cleanup order had been converted into an obligation to pay money."[144]  The

court went out of its way to caution it was not addressing "what the legal consequences

would have been had Kovacs taken bankruptcy before a receiver had been appointed and a

trustee had been designated with the usual duties of a bankruptcy trustee."[145]  Given that

cleaning up and paying for cleanup procure the identical result as occurred in *Kovacs*, the

Supreme Court clearly did not see the possibility of a money judgment as automatically

rendering an injunction dischargeable.

Notably, the Supreme Court rejected the argument that its analysis of what

a claim is under section 101(5)(B) should differ according to whether a civil statute is

being enforced or a contract is breached.[146]  The Supreme Court also observed that

---

[141] 469 U.S. 274 (1985).

[142] *Id.* at 275.

[143] *Id.* at 283.

[144] *Id.*

[145] *Id.* at 284.

[146] *Id.* at 278-279.

Congress had considered two versions of section 101(5)(B).[147]  One version only

discharged rights to payment and the other version discharged rights to payment and

equitable remedies.  Congress enacted a compromise version.[148]

Significantly, the key question that the Supreme Court announced it did not

decide in *Kovacs* (i.e., whether the injunction against the debtor in possession to clean up

hazardous waste would have been dischargeable as 'giving rise to a right to payment' if

the debtor had remained in possession and had the ability to remediate) was later decided

in *United States v. LTV Corp. (In re Chateaugay Corp.)*.[149]  There, LTV had deposited

hazardous substances prepetition, which substances continued to contribute to pollution

postpetition.[150]  The United States Environmental Protection Agency ("EPA") had ordered

LTV to clean up the affected sites.  LTV, unlike Kovacs, remained in possession of its

property during its chapter 11 case.

The United States Court of Appeals for the Second Circuit conceded: "It is

true that, if in lieu of such an order, EPA had undertaken the removal itself and sued for

the response costs, its action would have both removed the accumulated waste and

prevented continued pollution."[151]  But, applying the definition of claim in section

101(5)(B), the Second Circuit ruled the cleanup order was nondischargeable for the same

---

[147] *Id.* at 280.

[148] *Id.*

[149] 944 F.2d 997 (2d Cir. 1991).

[150] *Id.* at 999, 1008.

[151] *Id.* at 1008.

reason GM's right to specific performance is nondischargeable here.  Namely, a portion of the cleanup order was not convertible to a right to payment.[152]

Under Michigan law, specific performance is only given when money damages do not suffice as shown above, and the facts here make crystal clear that Delphi's nonperformance would create irreparable harm to GM's enterprise including its employees, its dealer network, its customers, its vendors, and its market share, until GM can resource the affected parts.

Here, just as in *Chateaugay*, there is a right to specific performance and a right to payment.  Once GM has been given sufficient time to resource its parts, GM will have a right to payment from Delphi for the difference between the Delphi contract price and the new price, if higher.  But, until GM can acquire parts from an alternate source, there is no right to payment that substitutes for timely delivery of parts because money can not cure the incalculable and irreparable injuries to GM's business, dealers, vendors, employees, and market share while GM production is shut down.

Significantly, the Second Circuit volunteered it could have decided *Chateaugay* somewhat differently.[153]  The other possibility would have been more in line with the Bankruptcy Code's fresh start policy because it would have relieved the debtor of an ongoing liability to clean up prepetition hazardous releases.  The Court observed it could have placed "on the non-'claim' side only those injunctions ordering a defendant to stop current activities that add to pollution (*e.g.*, depositing new hazardous substances),

---

[152] *Id.* ("Since there is no option to accept payment in lieu of continued pollution, any order that to any extent ends or ameliorates continued pollution is not an order for breach of an obligation that gives rise to a right of payment and is for that reason not a 'claim.'").

[153] *Id.* at 1009.

while leaving on the 'claim' side all other injunctions, including those that direct the

cleanup of sites from which hazardous substances, previously deposited, are currently

contributing to pollution."[154]  Previously, however, the Second Circuit had warned:

> Of course, the comprehensive nature of the bankruptcy statute does not
> relieve us of the obligation to construe its terms, nor may we resolve all
> issues of statutory construction in favor of the "fresh start" objective,
> regardless of the terms Congress has chosen to express its will. . . . But we
> are obliged to apply the bankruptcy laws that Congress enacted, not to
> reformulate it as theorists would prefer to see it.[155]

Then, the Second Circuit rejected its alternate resolution, explaining:

> We think we must endeavor to apply the 'claim' definition as written,
> mindful of the purposes of bankruptcy law but without the prerogative of
> rewriting it to maximize bankruptcy objectives that Congress might not
> have fully achieved.[156]

In sum and substance, the Second Circuit (now joined by other circuits)[157]

logically determined that section 101(5)(B)'s provision that a breach must give rise to

---

[154] *Id.*

[155] *Id.* at 1002, 1003.

[156] *Id.* at 1007.

[157] *See In re Udell*, 18 F.3d 403, 406, 407-8 (7th Cir. 1994) (holding that the ability of a party to obtain injunctive relief and liquidated damages gives rise to non-dischargeable claim if, under state law, such remedies are cumulative, not alternative); *Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines)*, 125 F.3d 120, 135, 136 (3d Cir. 1997), *cert. denied*, 522 U.S. 1114 (1998) (adopting same test for whether an equitable remedy is a dischargeable claim: whether money damages are only "cumulative" or independently will "suffice to remedy the alleged violation"); *In re Ben Franklin Hotel Assocs.*, 186 F.3d 301 (3d Cir. 1999) (defrauded partner not barred from pursuing equitable demand for reinstatement of its partnership interest because such ownership interest was not a claim or debt, and since monetary payment was not a viable remedy, it was not subject to bankruptcy discharge); *Sheerin v. Davis (In re Davis)*, 3 F.3d 113 (5th Cir. 1993) (holding section 101(5)(B) of the Bankruptcy Code does not require creditors entitled to an equitable remedy to select a suboptimal remedy of money damages); *see also Abboud v. Ground Round, Inc. (In re Ground Round, Inc.)*, Case No. 05-039, 2005 Bankr. LEXIS 2595 (1st Cir. B.A.P. Dec 15, 2005) (holding non-debtor lessor entitled to specific performance of a lease rejected under section 365 requiring debtor to transfer liquor license to lessor because liquor license was a unique item and for which money damages would be inadequate). *But see Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1048 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986) (Although the *Lubrizol* court concluded that rejection eliminates specific performance, it reached that result by erroneously drawing an inference from legislative history of a proposed version of the Bankruptcy Code later changed before enactment. *Lubrizol* inferred from House Report No. 95-595, 95th Cong., 2d Sess. (1977) at 349, that section 365(g) provides

payment to be a dischargeable claim, must refer to a payment that is an adequate substitute for specific performance.  Anything less would create an exception that swallows the rule because courts can always order payment for breach of performance.

Demonstrating that the right to payment under section 101(5)(B) must be an adequate substitute for performance, the United States Court of Appeals for the Seventh Circuit held the debtor's contractual covenant not to compete gave rise to a nondischargeable claim in *In re Udell*,[158] even though the contract at issue included a liquidated damages clause.

*Udell* commenced its analysis by stating the issue as "whether § 101(5)(B) requires any connection between the equitable and the legal remedies beyond the fact that both remedies arise from the same breach of performance."[159]  Based on *Kovacs, Johnson v. Home State Bank*,[160] *Chateaugay*, and *In re CMC Heartland Partners*,[161] the Seventh Circuit found it easy to rule out the notion that if a breach gives rise to an equitable remedy

---

"only a damages remedy" for the nondebtor.  *Id.* at 1048.  That legislative history provides: "The purpose [of section 365(g)] is to treat rejection claim [sic] as prepetition claims."  When the House Report was issued in 1977, the House version of the Bankruptcy Code (H.R. 8200) defined "claim" to include all legal and equitable rights including specific performance, by providing "claim" means a "right to payment . . ." or a "right to an equitable remedy for breach of performance *if such breach does not give rise to a right to payment . . .*" (emphasis added).  As finally enacted and as the Supreme Court acknowledged in *Kova*cs, 469 U.S. at 280, "claim" means "right to payment…" or a "right to an equitable remedy for breach of performance <u>if such breach gives rise to a right to payment</u> . . ." (emphasis added).  In short, the legislative history relied on by *Lubrizol* refers to "claims," and the meaning of "claims" changed from including to excluding specific performance after the legislative history was written.  By carving out of the universe of claims, rights to equitable remedies that do not give rise to rights of payment, Congress excluded specific performance from discharge when a right to payment is not an adequate substitute for it, as here.)

[158] 18 F.3d 403 (7th Cir. 1994).

[159] *Id.* at 406.

[160] 501 U.S. 78 (1991).

[161] 966 F.2d 1143 (7th Cir. 1992).

and money damages, the breach automatically creates only a dischargeable claim.[162]

Rather, the court ruled the right to performance and the right to payment must be

substitutes for one another or related in a manner that the debtor is entitled to stop the

performance remedy, such as foreclosure, by paying money:

> [W]e hold that a right to an equitable remedy for breach of performance is a
> "claim" if the same breach also gives rise to a right to payment "with
> respect to" the equitable remedy.  If the right to payment is an "alternative"
> to the right to an equitable remedy, the necessary relationship clearly exists,
> *for the two remedies would be substitutes for one another*. . . . As the
> Supreme Court's decision in *Home State Bank* implies, relationships other
> than outright substitution may also suffice.  For example, the right to
> foreclose on a mortgage, though not strictly an 'alternative' to the right to
> the proceeds from the sale of the debtor's property, nonetheless gives rise to
> a corollary right to payment (and may in fact be considered an alternative to
> money in the sense that the debtor can stop the foreclosure by paying the
> full debt).  The two remedies are sufficiently related that the Supreme Court
> classified the right to foreclose as a "claim."[163]

   *Udell*'s application of its holding to its facts is instructive.  The court ruled

that state law allows an injunction in addition to liquidated damages, and thus, the

remedies are cumulative, unless the parties intended them to be substitutes at the election

of the party by whom the money is to be paid.[164]  Because the remedies were cumulative

and not alternative, the court ruled the right to an injunction was not a dischargeable claim.

Indeed, based on *Kovacs*, the court reasoned: "the fact that both remedies are triggered by

a single act does not mean that the right to an injunction gives rise to a right to liquidated

damages. . . . Lacking is the derivative relationship between the two remedies exemplified

---

[162] *Udell*, 18 F.3d at 407-08.

[163] *Id.* at 408 (emphasis added) (footnote omitted).

[164] *Id.*

by Home State Bank, *supra*, where the equitable remedy of foreclosure was the means for realizing the right to the proceeds from the sale of the debtor's property."[165]

The concurrence in *Udell* utilizes a different, but equally persuasive analysis concluding the covenant not to compete was a nondischargeable claim. Circuit Judge Flaum reasons that any other result would create a patently absurd interpretation of the statute.[166]

Here, GM's right to specific performance would clearly be cumulative with any rights to money damages, but not an alternative to money damages. Delphi's cessation of delivery of parts would not merely affect the cost and number of cars GM can sell. [REDACTED – HIGHLY CONFIDENTIAL]

This Court has adopted the conclusion that an equitable remedy is a dischargeable claim if money damages are an adequate alternative, and has provided guidance as to how to determine whether money damages are adequate. In *Creator's Way Associated Labels, Inc. v. Mitchell (In re Mitchell)*,[167] the individual chapter 7 debtor contended his contract to provide recordings exclusively for Creator's Way was dischargeable. Chief Bankruptcy Judge Bernstein articulated the test as follows:

---

[165] *Id.* at 409, 410; *accord Kennedy v. Medicap Pharmacies, Inc.*, 267 F.3d 493 (6th Cir. 2001) (equitable remedy of an injunction for breach of covenant not to compete was not dischargeable claim because the requested injunction was not an alternative to the right of payment).

[166] *Udell*, 18 F.3d at 412.

[167] 249 B.R. 55 (Bankr. S.D.N.Y. 2000).

> As noted, the determinative question is whether the unperformed
> obligation gives rise to a right to payment under state law, *which right is
> an adequate alternative to equitable relief.*[168]

Judge Bernstein recognized that breach of the recording contract "ordinarily gives rise to a damage claim for lost profits."[169] But, "[t]he availability of the monetary remedy, however, does not automatically mean that damages are an adequate alternative under state law."[170] Judge Bernstein ruled that to prove nondischargeability, there would have to be proof the debtor's services "are extraordinary or unique, or can not be replaced, or that damages are inadequate."[171]

Here, it is undisputable that Delphi's parts are extraordinary and unique. No one else can produce them in the short term because of all the special tooling, testing, and certifications they require. For the same reasons, it is undisputable the parts can not be replaced in the short term. And, for all the reasons listed above, money damages are grossly inadequate to cure all the injuries Delphi's breach will cause to GM's critical components of its enterprise. Indeed, these are the logical and compelling reasons why the states have provided specific performance remedies for supply contracts.

Notably, the equities compelling state courts to grant specific performance must be fairly vindicated and not simply subordinated to other creditors' desire to maximize value no matter what the consequence to the injured contract party. *Public Auditorium Authority of Pittsburgh v. HBRM, LLC (In re Pittsburgh Sports Associates*

---

[168] *Id.* at 60 (emphasis added).

[169] *Id.*

[170] *Id.*

[171] *Id.*

*Holding Co.)*,[172] held an injunction against a debtor based on a lease covenant

nondischargeable, and explained:

> Even if we assume, however, that claim holders and equity interest holders
> would fare less well if a permanent injunction is issued, the irreparable
> harm suffered by [the arena owners], and the community at large in the
> absence of a permanent injunction outweighs that experienced by claim
> holders and interest holders in the presence of one. . . . It is not sufficient
> for purposes of § 101(5)(B) that the equitable remedy and the right to
> money damages are related only to the extent that both happen to be
> disjunctively available in the event of a breach.

Bankruptcy courts across the country adjudicate whether an equitable

remedy is dischargeable by determining whether money damages are an alternative

remedy as opposed to being an additional or cumulative remedy.[173]

As explained in *In re Walnut Assocs.*[174]:

> [U]nless specific performance is available to the nondebtor party under
> applicable state law, the debtor cannot be compelled to render its

---

[172] 1999 Bankr. LEXIS 1870, *23-24, 33 (Bankr. W.D. Pa. 1999).

[173] *See, e.g., In re Indian River Estates, Inc.*, 293 B.R. 429, 434 (Bankr. N.D. Ohio 2003) (the
dischargeability test is: "could a monetary award substitute for the equitable remedy. . . . §101(5)(B) does not
require that a party accept a monetary alternative if it is not in proportion to the equitable remedy." (citations
omitted); (breach of contract remedy to convey 8 lots held nondischargeable); *In re Willets*, 262 B.R. 552,
556 (Bankr. N.D. Fla. 2001) (order to remove pool and concrete deck and to replace wooden deck
nondischargeable because money damages not an alternative); *In re Bush*, 273 B.R. 625, 628-29 (Bankr.
S.D. Cal. 2002) (contract to convey residence nondischargeable because state law provides it can not be
adequately relieved by pecuniary compensation); *cf. In re Nickels Midway Pier, LLC*, 332 B.R. 262, 275-76
(Bankr. D.N.J. 2005) ("An equitable remedy can be a claim in bankruptcy under § 101(5) provided that it
can be reduced to monetary damages.") (when the nondebtor's right to specific performance for breach of
contract is already protected by the Bankruptcy Code's grant of specific performance in sections 365(i) or (j),
the Bankruptcy Code's specific performance provisions control), *aff'd in part and remanded in part on other
grounds Nickels Midway Pier, LLC v. Wild Waves, LLC (In re Nickels Midway Pier, LLC)*, No. 05-5514,
2006 U.S. Dist. LEXIS 22631 (Apr. 24, 2006); *In re Alongi*, 272 B.R. 148, 155-56 (Bankr. D.Md. 2001)
(covenant to employer by individual debtor-doctor not to compete and covenant to pay tail insurance held
nondischargeable because debtor triggered those provisions by postpetition termination of contract); *Stone
StreetCapital, Inc. v. Granati (In re Granati)*, 270 B.R. 575, 586-587 (Bankr. E.D. Va. 2001) (debtor's
specifically enforceable obligation to turn over annuity payments to entity that paid debtor lump sum for
such payments held nondischargeable based on *Chateaugay*), *aff'd*, 307 B.R. 827 (E.D. Va. 2002), *aff'd*, 63
Fed. Appx. 741 (4th Cir. 2003). The foregoing analysis is consistent with commentators as well. *See*
Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn. L. Rev. 227 (1989).

[174] 145 B.R. 489 (Bankr. E.D. Pa. 1992).

performances required under the contract. *However, if state law does authorize specific performance under the rejected executory contract, it means that the non-debtor should be able to enforce the contract against the Debtor, irrespective of his rejection of it.*[175]

In sum, the facts in all the decisions above enforcing a contract party's right to specific performance pale in comparison to the GM-Delphi situation. Nowhere has there been such a clear case of a unique product, with cover unavailable in the short term, and with so much irreparable harm to the contract party and the public interest.

3.     <u>GM is entitled to vindicate its right to specific performance</u>

Manifestly, GM is entitled to a fair opportunity to vindicate its right to specific performance if Delphi is allowed to reject (breach) the Supply Contracts.[176] Additionally, as shown below, under the circumstances, if Delphi threatens to shut down GM's production by withholding delivery of parts unless GM signs whatever contract Delphi demands, under these circumstances Delphi will be committing the postpetition tort of wrongful economic duress. That Delphi's Rejection Motion ignores GM's rights is no basis to vitiate them.

---

[175] *Id.* at 494 (emphasis added); *see also Fellerman & Cohen Realty Corp. v. Clinical Plus Inc. (In re Hirschhorn)*, 156 B.R. 379, 381-82 (Bankr. E.D.N.Y. 1993) ("Section 365(g) is intended to affect only the monetary rights of creditors. . . . Section 365(g) does not disturb the equitable non-monetary rights arising from the breach of contract.").

[176] If GM were to bring an action for specific performance, the court in determining the parameters of the relief to be granted may in the exercise of its equitable powers order Delphi to continue supplying parts to GM for an adequate transition period to enable GM to obtain alternate suppliers and avoid irreparable harm. As noted elsewhere herein, GM has indicated its willingness to compensate Delphi for cash losses, if any, incurred in the manufacture of parts for GM during a transition period. *See* Parekh Declaration ¶ 19.

In the context of a motion to assume a contract, the Second Circuit ruled the hearing on the debtor's business judgment is not a hearing on underlying contract disputes and the court's ruling will have no collateral estoppel effect.[177]

Bankruptcy Code section 362(a) enjoins the commencement of actions against the debtor to collect claims.[178] But, it does not enjoin the commencement and prosecution of actions to declare non-claims (i.e., rights to specific performance for which money damages are not a fair substitute). Thus, GM is not enjoined by the automatic stay from seeking such a declaratory judgment if Delphi is allowed to reject the Supply Contracts.

Moreover, 28 U.S.C. § 959(a) provides GM an independent right to sue Delphi for declaratory judgment without stay relief. It provides:

> Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

Section 959(a) allows parties to sue debtors in possession for their acts or transactions in carrying on business. This right to sue applies both for torts,[179] and contract enforcement.[180]

---

[177] *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

[178] *See* 11 U.S.C. § 362(a)(1)(6).

[179] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 (11th Cir. 2000) (section 959(a) "is intended to 'permit actions redressing torts committed in furtherance of the debtor's business, such as the common situation of a negligence claim in a slip and fall case where a bankruptcy trustee, for example, conducted a retail store.'") (quoting *Lebovits v. Scheffel (In re Lehal Realty Assocs.)*, 101 F.3d 272, 276 (2d Cir. 1996)); *George Gasser & Gassert Chair Co. v. Infanti Int'l Inc.*, 2004 U.S. Dist. LEXIS 9758, at *8 (E.D.N.Y. Apr. 21, 2004);

Section 959(a) is a carveout from the doctrine of *Barton v. Barbour*[181] that does not allow trustees and receivers to be sued outside the court appointing them without that court's leave.  Here, GM's contract and tort actions solely address Delphi's shutdown threat as a means to procure new contracts which is quintessentially the manner in which Delphi is attempting to carry on its business and not the rote administration of an estate. Thus, GM's actions are within the ambit of section 959(a).[182]

Therefore, GM is allowed to sue Delphi for wrongful economic duress and for a declaration that GM has a right to specific performance for which money damages are not an adequate substitute.

This Court, however, is empowered to enjoin actions brought under section 959(a).  Here, Michigan-based GM could ask a Michigan court to decide these questions of Michigan law affecting Delphi, a Michigan-based debtor.  Rather than be embroiled in motion practice over which court GM should be in to vindicate these rights, GM is willing to bring these actions in Michigan state court or this Court in accordance with this Court's preference.

---

*Valdez Alvino v. MGS Realty and Mgm't Corp.*, 2000 U.S. Dist. LEXIS 5569, at *16 (S.D.N.Y. Apr. 28, 2000).

[180] *See Jaytee-Penndel Co. v. Bloor (In re Investors Funding Corp. of N.Y.)*, 547 F.2d 13, 14, 16 (2d Cir. 1976).

[181] 104 U.S. 126 (1881).

[182] *See Lehal Realty Assocs.*, 101 F.3d at 276; *Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963 (9th Cir. 2005).

### D.    If Delphi Rejects Supply Contracts, Delphi Releases GM from Two Master Agreements and GM's Other Supply Agreements

Delphi's Rejection Motion presumes Delphi can reject certain supply agreements while maintaining the benefits of two agreements under which supply agreements are granted to Delphi and all the other supply contracts related to the ones Delphi is attempting to reject.  Delphi's presumption is wrong.  Delphi further flunks the business judgment test because Delphi has obviously not weighed its loss of benefits under two master agreements (the GO Agreement and the Component Supply Agreement) and other supply agreements against the benefits Delphi wishes it could attain from rejecting of the Supply Agreements.

It is well established that if a debtor decides to reject a contract, the debtor must reject the entire contract, with its burdens as well as its benefits.[183]  A debtor is not permitted to reject one part of an executory contract and assume another part.[184]  Where several related documents are construed as one contract, the debtor must assume or reject them together.[185]  As described below, the master agreements and many of the Supply Contracts are integrated with other supply contracts that purportedly are not subject to rejection.

---

[183] *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531 (1984); *Hurley v. Atchison, T. & S. Fe Ry. Co.,* 213 U.S. 126 (1909); *In re TSW Stores of Nanuet,* 34 B.R. 299, 304 (Bankr. S.D.N.Y. 1983) ("An executory contract can not be rejected in part, and assumed in part. . . . The contract must be rejected in its entirety, or not at all."); *see also In re Chicago, Rock Island & Pac. R.R. Co.,* 860 F.2d 267, 272 (7th Cir. 1988) ("A trustee can not accept the benefits of an executory contract without accepting the burdens as well."); *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985) ("The debtor can not choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement.").

[184] *See, e.g., Leslie Fay Cos., Inc. v. Corporate Prop. Assocs. 3 (In re Leslie Fay Cos., Inc.),* 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994); *In re Village Rathskeller, Inc.,* 147 B.R. 665, 671 (Bankr. S.D.N.Y. 1992).

[185] *See In re Kopel,* 232 B.R. 57, 64 n.4 (Bankr. E.D.N.Y. 1999).

Whether multiple agreements are parts of an integrated agreement or are severable into individual contracts is a question of state law and is determined by the intent of the parties as evidenced by the four corners of the instruments.[186]   Michigan state law governs the Supply Contracts, the GO Agreement, and the Component Supply Agreement. "[W]hen two instruments are entered into between the same parties concerning the same subject matter, whether made simultaneously or on different days, they may, under some circumstances, be regarded as one contract and interpreted together."[187]   Manifestly, when Delphi obtains individual supply contracts based on either one of the master agreements or on its obtaining other supply contracts for related parts, it is undisputable that the contracts are integrated.  For instance, Delphi can not seriously contend it can procure a contract for one part of a steering column if it does not satisfy contracts for other parts of the same steering column.[188]   Similarly, there is no rational basis to contend that GM is obligated under a master agreement to provide Delphi supply contracts for multiple parts if Delphi can repudiate contracts for some of the parts.

In addition, all Existing Agreements under the Component Supply Agreement are integrated contracts and must be rejected together.  Yet, out of the 952 Existing Agreements still operative, Delphi's Rejection Motion only seeks authority to

---

[186] *See Byrd v. Gardinier, Inc. (In re Gardinier, Inc.)*, 831 F.2d 974, 975-76 (11th Cir. 1987), *cert. denied*, 488 U.S. 853 (1988); *Progressive Rest. Sys., Inc. v. Wendy's Int'l, Inc. (In re Progressive Rest. Sys., Inc.)*, No. 96-CV-0768E(F), 1997 U.S. Dist. LEXIS 6668, *10 (W.D.N.Y. May 8, 1997); *In re Royster Co.*, 137 B.R. 530, 532 (Bankr. M.D. Fla. 1992).

[187] *Bed v. Fallon*, 12 N.W.2d 396, 398 (Mich. 1943); 17A Am. Jur. 2d *Contracts* § 379 (2006).

[188] Delphi may have selected less than all the parts of a component for rejection, but since GM has not had the ability to identify the parts of such components not subject to the Rejection Motion, it is premature to specify which other contracts Delphi would lose if the Supply Contracts are rejected.

reject 87 and purports to leave the remaining 865 contracts in effect.[189]  Under the

Bankruptcy Code, Delphi must reject the entire agreement and is not permitted to cherry

pick parts of an integrated agreement.  Pursuant to the Component Supply Agreement,

Delphi and GM agreed to perform under the Existing Agreements as if Delphi and GM

were separate legal entities at the time such agreements were made.  Not only were they

entered into on the same date as a result of the Component Supply Agreement, it was the

stated intent of both Delphi and GM that both parties shall continue to honor the terms and

condition of *all* Existing Agreements, regardless of whether a particular Existing

Agreement was profitable or unprofitable.[190]  Delphi does not have the right today to

cherry pick the profitable Existing Agreements, and reject the unprofitable Existing

Agreements (if any), all of which were entered into or reaffirmed pursuant to the

Component Supply Agreement.

## III.    Equity Prohibits Rejection Here

The United States Court of Appeals for the Second Circuit has consistently

overturned contract rejections when the trial court failed to consider the equities.[191]  In

*Minges* the equities were simple because the case was simple.  The issue according to the

majority and concurring decisions was whether the harm of rejection to the nondebtor-

tenant would only benefit secured creditors, or would provide "substantial and significant"

---

[189] *See* Ruselowski Declaration ¶ 14.

[190] *See* Component Supply Agreement, § 1.1 (annexed hereto as Exhibit F).

[191] *See, e.g., Brotherhood of Ry., Airline and Steamship Clerks v. REA Express, Inc. (In re REA Express, Inc.),* 523 F.2d 164 (2d Cir. 1975)*, cert. denied, sub nom. International Ass'n. of Machinists & Aerospace Workers, AFL-CIO v. REA Express, Inc.,* 423 U.S. 1073 (1976); *Control Data Corp. v. Zelman (In re Minges),* 602 F.2d 38, 44 (2d Cir. 1979).

benefit to unsecured creditors.[192]  In *REA Express,* rejection was overturned because the trial court had not "weighed the conflicting equities," among the multiple constituencies and determined the contracts were "sufficiently onerous and burdensome to warrant an authorization to the debtor-in-possession to reject them."[193]

The courts are sensitive to the harms inflicted on the nondebtor contract party.  For instance, in *In re Penn Central Transp. Co.,*[194] the debtor-lessor attempted pursuant to the Bankruptcy Act of 1898, as amended, to reject ground leases for land underlying New York skyscrapers in an effort to hold up the skyscraper owners for more ground rent.  This occurred when the bankruptcy law was less clear about the tenants' rights on rejection, and the debtor was able to threaten the skyscraper owners that they would lose their skyscrapers if they refused to pay more rent.  The same as Delphi boasts it wants to continue supplying parts to GM, Penn Central boasted it would not take away the owner's buildings.  It just wanted more rent.  Penn Central's threat of a holdup led the court to deny its ground lease rejection motion, ruling: "The bankruptcy laws are intended as a shield, not as a sword.  Their purpose is to minimize fiscal chaos and disruption, not to aggravate it."[195]  "It is a well-known axiom that bankruptcy laws are intended to be used as a shield and not as a sword."[196]  To use them otherwise evinces bad faith.

---

[192] *Minges,* 602 F.2d at 44, 45.

[193] *REA Express,* 523 F.2d at 172.

[194] 458 F.Supp. 1346, 1356 (E.D. Pa. 1978).

[195] *Id.*

[196] *Fellerman & Cohen Realty Corp. v. Clinical Plus Inc. (In re Hirschhorn),* 156 B.R. 379, 381-82 (Bankr. E.D.N.Y. 1993) (citations omitted) (denies debtor use of extensions of debtor's right to reject or assume a lease to defeat a non-compete clause in the lease); *see also Software Customizer, Inc. v. Bullet Jet Charter, Inc. (In re Bullet Jet Charter, Inc.),* 177 B.R. 593, 603 (Bankr. N.D. Ill. 1995) (denying debtor's motion to

Delphi's shutdown threat to GM here is no more virtuous than Penn Central's holdup threat. A threatened shutdown before GM can resource is blackmail, no matter how it is cloaked in bankruptcy jargon.

Weighing the equities is particularly easy here because the facts are beyond dispute:

i.    First, GM would suffer irreparable harm from a shutdown, which is self evident when one considers the effect of a shutdown on GM's auto dealers, employees, market share, vendors, and the public.

ii.    Second, Delphi's documents show it intentionally engaged in inequitable conduct by intentionally choosing Supply Contracts for parts GM can not easily resource[197] and intentionally scuttling negotiations, all to be able to threaten GM with a shutdown.

iii.    Third, Delphi's threat of a shutdown is wrongful economic duress and Delphi is barred from violating state law by 28 U.S.C. § 959(b).

iv.    Fourth, Delphi is attempting to have this Court approve, bless, and sponsor its inequitable, tortious conduct.

v.    Fifth, any benefit Delphi could have tried to plead from rejecting GM's Supply Contracts would be inherently speculative and incapable of quantification because the claims, demands, and needs of Delphi's unions and GM are so complex that the imposition of higher prices involuntarily through a shutdown threat does not translate into an overall better outcome for Delphi, only a more contentious one.

The Second Circuit's imposition of an equitable component in the calculus of rejection is well grounded in bankruptcy jurisprudence from our highest court. In *American United Mutual Life Ins. Co. v. City of Avon Park, Fla.*,[198] the Supreme Court ruled:

---

reject a contract for sale of an aircraft, in part, because such motion was "just another device to pressure [the buyer] to pay more money, not an effort to sell [the aircraft] for more to another likely purchaser").

[197] *See* [REDACTED – HIGHLY CONFIDENTIAL]

[198] 311 U.S. 138, 146, *reh'g denied*, 311 U.S. 730 (1940).

> [A bankruptcy court's equitable power] is ample for the exigencies
> of varying situations.  It is not dependent on express statutory
> provisions.  It inheres in the jurisdiction of a court of bankruptcy.

Similarly,

> A court of equity may in its discretion in the exercise of the
> jurisdiction committed to it grant or deny relief upon performance of
> a condition which will safeguard the public interest.  It may in the
> public interest, even withhold relief altogether, and it would seem
> that it is bound to stay its hand in the public interest when it
> reasonably appears that private right will not suffer.[199]

Accordingly, the Court may, and should, take equitable considerations into account in

considering the Rejection Motion, and upon their consideration, deny it.

That Delphi is attempting to use the Rejection Motion as a sword is further

buttressed by the reasoning of the United States District Court for the Eastern District of

Michigan in *General Motors Corp. v. Paramount Metal Prod. Co.*[200]  In that case, the

court ruled that certain price increases under a supply agreement between GM and one of

its sole-source suppliers, Paramount Metal Products Co. ("Paramount"), were potentially

unenforceable on the basis that GM agreed to the price increases under duress.  As

described below, the tactics employed by Paramount in obtaining the subject price

increases from GM are strikingly similar to those deployed here by Delphi.

Paramount and GM were parties to a supply agreement, pursuant to which

Paramount served as GM's sole-source supplier of seat frames, for installation by GM into

certain vehicles.[201]  The seat frames were supplied by Paramount to GM on a just-in-time

---

[199] *S.E.C.  v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 455 (1940).

[200] 90 F. Supp. 2d 861 (E.D. Mich. 2000).

[201] *See id.* at 864.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

basis.[202]  Paramount, experiencing financial distress, threatened an immediate cessation in its production of seat frames to GM, unless GM acquiesced to certain retroactive price increases under the agreement between the parties.[203]  Approximately seven months after the parties agreed to an "Accommodation Agreement" under which, among other things, Paramount received the benefit of significant retroactive and prospective price increases, GM found an alternate seat frame supplier.[204]  GM subsequently sued Paramount to invalidate the Accommodation Agreement on the basis of economic duress, and to enforce the price terms in effect under the parties' prior agreement.[205]

The court denied Paramount's subsequent motion for summary judgment with respect to GM's claim that the Accommodation Agreement be set aside on the basis of economic duress.[206]  After stating that "[t]o avoid a contract on the basis of duress, a party must prove coercion by the other party to the contract" and that "[a] person who claims to have been a victim of economic duress must show that he or she was subjected to a wrongful or unlawful act or threat, and that it deprived the victim of his unfettered will," the court concluded that it "remain[ed] possible for [GM] to demonstrate that Paramount unlawfully coerced the plaintiffs into executing the Accommodation Agreement by threatening to immediately stop producing seat frames without a legal right to do so, and

---

[202] *Id.*

[203] *Id.*

[204] *Id.*

[205] *Id.* at 865.

[206] *Id.* at 876.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

thereby depriving the plaintiffs of the exercise of their free will."[207]  The court explained,

"[a] clear unlawful breach of contract by Paramount under circumstances that would shut

down production of vehicles by [GM] certainly satisfies the 'illegal' conduct requirement

of an economic duress defense."[208]  The court noted, however, that "[e]conomic duress

may be accomplished through a 'wrongful' act as well as an 'illegal' act."[209]

To be sure, Delphi is trying to avoid the illegal or wrongful requirement of

economic duress by procuring this Court's blessing for threatening to shut down GM.  The

question here is not whether, with the Bankruptcy Court's approval of Delphi's Rejection

Motion, Delphi can still be liable for economic duress; although the answer is clearly yes

because the Court's approval only goes to rejection and not to Delphi's subsequent

threatening GM with a shutdown.  The question is whether the Bankruptcy Court should

approve rejection if Delphi plans to use it to threaten GM with a shutdown.

Congress and the Supreme Court have considered and determined that

debtors in possession must operate their property in accordance with valid state laws

without committing torts under state law even when such operation requires monetary

expenditures.

28 U.S.C. § 959(b) provides:

> Except as provided in section 1166 of title 11, a trustee, receiver or
> manager appointed in any cause pending in any court of the Untied States,
> including a debtor in possession, shall manage and operate the property in
> his possession as such trustee, receiver or manager according to the
> requirements of the valid laws of the State in which such property is

---

[207] *Id.* at 875 (quotations omitted).

[208] *Id.* (citing *Mancino v. Friedman*, 429 N.E.2d 1181, 1168 (1980)).

[209] *Id.*

situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

The introductory clause of section 959(b) demonstrates Congress fully realized section 959(b) requires debtors in possession to spend money to comply with state law. Congress carved out one exception, namely that railroads in reorganization do not have to spend money or incur obligations in accordance with orders of Federal, State, or local regulatory bodies, unless the bankruptcy court approves the expense or incurrence. Congress carved out no exception for Delphi.

It is hornbook law that debtors in possession must operate and manage their property in compliance with state law.[210] The United States Supreme Court has decreed that section 959(b) establishes the principle that debtors in possession have liability under state tort and agency law, and that liability is an administrative expense.[211] Economic duress is a tort recognized under Michigan law[212] and several other states.[213]

The upshot is simple. Delphi's threat to shut down GM production unless GM pays whatever price Delphi demands is, by any name, inequitable. Whether it is

---

[210] *See, e.g., In re N.P. Mining Co., Inc.*, 963 F.2d 1449, 1453 (11th Cir. 1992); *In re Good Taste, Inc.*, 317 B.R. 112, 117 (Bankr. D. Alaska 2004); *In re Growth Dev. Corp.*, 168 B.R. 1009, 1020 (Bankr. N.D. Ga. 1994); *In re Motel Invs., Inc.*, 172 B.R. 105, 107 (Bankr. M.D. Fla. 1994).

[211] *Reading v. Brown,* 391 U.S. 471, 478, 485 (1968). The United States Supreme Court has made clear that section 959(b) shows such state laws are not preempted by bankruptcy laws. *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 505 (1986) ("…Even though § 959(b) does not directly apply to an abandonment under § 544(a) of the Bankruptcy Code – and therefore does not delimit the precise conditions on an abandonment – the section nevertheless supports our conclusion that Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers.").

[212] *See Makie v. East Tawas*, 188 N.W.2d 593 (Mich. 1971); *General Motors Corp. v. Paramount Metal Prod. Co.*, 90 F. Supp. 2d 861 (E.D. Mich. 2000).

[213] *JPM, Inc. v. John Deere Indus. Equip. Co.*, 934 F.Supp. 1043, 1046 (W.D.Wis. 1995); *Long Island Lighting Co. v. Bokum Res. Corp.*, 40 B.R. 274, 293 (Bankr. D.N.M. 1983).

wrongful economic duress, barred by specific performance, lacking in good faith required by the Uniform Commercial Code, or otherwise contrary to principles of fairness, one thing is clear.  No bankruptcy court can or should sponsor, approve, and bless such conduct.

IV.    **Even if Rejection of the Supply Contracts Is in the Exercise of Delphi's Business Judgment, the Court Should Apply a Heightened Scrutiny Standard to Deny the Rejection Motion Due to Its Irreparable Harm to GM and the Public Interest**

Courts have long recognized that certain executory contracts require a stricter or heightened standard for rejection because rejection of such executory contracts would dramatically and negatively affect more people than just the parties to the executory contract.  For example, as discussed below, courts have recognized that rejection of CBAs and electric power contracts should be subject to a stricter standard than the business judgment standard.

Prior to the addition of section 1113 to the Bankruptcy Code, the United States Supreme Court, in *National Labor Relations Board v. Bildisco & Bildisco*,[214] agreeing with all the United States Courts of Appeals that had previously ruled on the issue, held that "because of the special nature of a collective-bargaining contract, and the consequent 'law of the shop'[215] which it creates, a somewhat stricter standard [than the business judgment standard] should govern the decision of the Bankruptcy Court to allow

---

[214] 465 U.S. 513, 523-24 (1984).

[215] As the Supreme Court explained in *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 579 (1960), "[t]he collective bargaining agreement covers the whole employment relationship.  It calls into being a new common law – the common law of a particular industry or of a particular plant. . . . 'Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the collective-bargaining process demand a common law of the shop which implements and furnishes the context of the agreement'" (citations omitted).

rejection of a collective-bargaining agreement."  The Supreme Court held a court should

permit rejection of a CBA only if "the debtor can show that the collective-bargaining

agreement burdens the estate, and that after careful scrutiny, the equities balance in favor

of rejecting the labor contract."[216]  The Supreme Court explained:

> Since the policy of Chapter 11 is to permit successful rehabilitation
> of debtors, rejection should not be permitted without a finding that
> that policy would be served by such action.  The Bankruptcy Court
> must make a reasoned finding on the record why it has determined
> that rejection should be permitted.  Determining what would
> constitute a successful rehabilitation involves balancing the interests
> of the affected parties – the debtor, creditors, and employees.  The
> Bankruptcy Court must consider the likelihood and consequences of
> liquidation for the debtor absent rejection, the reduced value of the
> creditors' claims that would follow from affirmance and the
> hardship that would impose on them, and the impact of rejection on
> the employees.  In striking the balance, the Bankruptcy Court must
> consider not only the degree of hardship faced by each party, but
> also any qualitative differences between the types of hardship each
> may face.[217]

Notably, nothing in *Bildisco* limits the application of the heightened scrutiny standard to

collective bargaining agreements.

More recently, in *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant

Corp.)*,[218] the Court of Appeals for the Fifth Circuit analyzed whether a court may

authorize the rejection of an executory contract for the purchase of electricity as part of a

chapter 11 case.  The court stated in dicta that like the CBA in *Bildisco*, "[t]he nature of a

contract for the interstate sale of electricity at wholesale is also unique."[219]  "Use of the

---

[216] *Bildisco*, 465 U.S. at 526.

[217] *Id.* at 527.

[218] 378 F.3d 511 (5th Cir. 2004).

[219] *Id.* at 525.

business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity."[220]  The court directed that upon remand the district court apply a more rigorous standard to the rejection of the power contract, suggesting that the district court apply the standard outlined in *Bildisco*:

> [The district court] might adopt a standard by which it would authorize rejection of an executory power contract only if the debtor can show that it "burdens the estate, [] that, after careful scrutiny, the equities balance in favor of rejecting" that power contract, and that rejection of the contract would further the Chapter 11 goal of permitting the successful rehabilitation of debtors.  *See Bildisco*, 465 U.S. at 526-27.  When considering these issues, the court should carefully scrutinize the impact of rejection upon the public interest and should, *inter alia*, ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers.  *Cf. id.* at 527. (requiring the bankruptcy court to balance the interests of the debtor, the creditors and the employees when determining what constitutes a successful rehabilitation).[221]

On remand, the district court in *In re Mirant Corp.*,[222] adopted in dicta the standard suggested by the Fifth Circuit to the power contract at issue.[223]  Again, and as in *Bildisco*, nothing in *Mirant* limits the application of the heightened scrutiny standard to electricity contracts.

Like the executory contracts in *Bildisco* and *Mirant*, the Supply Contracts are unique.  Unlike the majority of executory contracts rejected pursuant to section 365 of

---

[220] *Id.*

[221] *Id.*

[222] 318 B.R. 100, 108 (N.D. Tex. 2004).

[223] Although the issue of which standard to apply to rejection of the power contract became moot due to the district court's ruling on another issue on remand, the district court nevertheless addressed the standard to be applied to rejection of the power contract in case the issue became important later in the case.  *Id.*

the Bankruptcy Code, rejection of which affect only the parties to the contract, rejection of the Supply Contracts will impact not just Delphi and GM, but also GM's employees and their families, GM dealers, other parts suppliers and automotive manufacturers, as discussed *supra*. Indeed, the entire automotive industry will be affected by the rejection of the Supply Contracts. Consumers will no doubt also feel the effects of the rejection.

Because of the serious harm that rejection of the Supply Contracts will have on the automotive industry and the U.S. economy, the Court should apply a *Bildisco* standard to rejection of the Supply Contracts.[224]

As in *Bildisco* and *Mirant*, the Court should balance the interests of Delphi, GM and all other parties affected by rejection of the Supply Contracts, including the public.[225] The balance of the equities clearly favors denial of authority to reject the Supply Contracts. As discussed above, the costs to Delphi, GM and the public would far exceed any savings to Delphi from rejection. Indeed, Delphi has failed to demonstrate that it will benefit from rejecting the Supply Contracts.

## V.    If the Court Grants the Rejection Motion, the Court Should Condition the Approval on Delphi Providing GM an Adequate Transition Period to Resource the Rejected Supply Contracts

If the Court were inclined to grant the Rejection Motion, it should use its equitable powers to condition rejection on terms that will minimize the harm to GM.

---

[224] By this statement, GM does not advocate adoption of a stricter standard for rejection of just any supply contract, but only those supply contracts, such as the ones in the instant case, rejection of which will cause material detrimental effects throughout the entire industry and U.S. economy.

[225] *Cf. Bildisco*, 465 U.S. at 527 (requiring the bankruptcy court to balance the interests of the debtor, the creditors and the employees when determining what constitutes a successful rehabilitation); *Mirant*, 378 F.3d at 525 ("the court should carefully scrutinize the impact of rejection upon the public interest and should, *inter alia*, ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers").

Specifically, Delphi should be required to provide GM with (i) an adequate transition period and (ii) the necessary cooperation to permit GM to resource the affected parts as quickly and inexpensively as possible.  Based on principles of good faith, Michigan law requires a party to give a counterparty to a contract reasonable time to seek substitute arrangements before terminating a contract.[226]  As a court of equity, the Court should require Delphi to provide GM with similar relief.[227]

Providing GM with an adequate transition period will not only reduce the harm to GM, it will result in a considerably smaller rejection damage claim by GM against Delphi and will stifle the ripple effects that immediate termination of deliveries would cause to the automotive industry as a whole.  In addition, providing an adequate transition period would not cost Delphi much, if anything.  As stated previously, unless the current CBAs are rejected, Delphi will still incur labor costs and other fixed costs of keeping plants open even if they immediately terminate deliveries of parts to GM.  Indeed, because of lost revenues, Delphi will lose even more money in such a circumstance.   On the other hand, if Delphi provides GM an adequate transition period, not only will Delphi continue

---

[226] *See* Mich. Comp. Laws Serv. § 440.2309(3) ("Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with modification is invalid if its operation would be unconscionable."); *see also* U.C.C. § 2-309, Official Comment 8 ("[P]rinciples of good faith and sound commercial practice normally call for [] notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement.")

[227] *See, e.g., State of Ohio v. Collins (In re Madeline Marie Nursing Homes)*, 694 F.2d 433, 436 (6th Cir. 1982) ("As courts of equity, bankruptcy courts 'will look through the form to the substance of any particular transaction and may contrive new remedies where those in law are inadequate.  Where the Bankruptcy Act is silent, equitable principles will govern.'") (citations omitted); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 302 (Bankr. W.D. Pa. 1990) (pursuant to section 105 of the Bankruptcy Code, a "court faced with the unusual situation . . . has 'ample power' to formulate appropriate remedies"); *see also* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a  party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.").

receiving revenues from GM, but GM, would be willing to compensate Delphi for the cash losses it incurs during the agreed transition period.[228]  It is important, however, that Delphi be fully forthcoming in demonstrating its cash losses, if any.  The Court, in the exercise of its equitable powers, can ensure that the process be orderly, fair and reasonable.  Further, if and to the extent the Court authorizes rejection of a Supply Contract, GM also seeks an order restraining Delphi from using such rejection offensively and requiring Delphi to limit its demands for higher prices to the amounts, if any, actually lost on rejected contracts.

---

[228] *See* Parekh Declaration ¶ 19.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

# CONCLUSION

For the foregoing reasons, the Court should deny the Rejection Motion.  If

it does not deny the Rejection Motion, the Court should grant relief to the parties in the

manner specified in the Summary of Argument above, to prevent Delphi from deploying a

holdup strategy with a shutdown threat while enabling GM to vindicate its rights.

Dated:   June 5, 2006
         New York, New York

/s/ Richard P. Krasnow
Martin J. Bienenstock, Esq. (MB 3001)
Richard P. Krasnow, Esq. (RK 5707)
Michael P. Kessler, Esq. (MK 7134)
Jeffrey L. Tanenbaum, Esq. (JT 9797)
Richard A. Rothman, Esq. (RR 0507)
Penny P. Reid, Esq. (PR 5699)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Melanie Gray, Esq. (pro hac vice)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5045
Facsimile: (713) 224-9511

– and –

Robert B. Weiss, Esq.
Frank L. Gorman, Esq.
HONIGMAN MILLER SCHWARTZ
AND COHN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226-3506
Telephone: (313) 465-7000
Facsimile: (313) 465-8000

Attorneys for General Motors Corporation

**EXHIBIT A**

Page 1

1              IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3

4   In re:                    )
                              ) No. 02 B 48191
5   UAL CORPORATION, et al.,  )
                              ) Chicago, Illinois
6                             ) May 20, 2005
              Debtors.        ) 9:30 a.m.

7

8       TRANSCRIPT OF PROCEEDINGS BEFORE THE
           HONORABLE EUGENE R. WEDOFF

9

10  APPEARANCES:

11  MR. JAMES SPRAYREGEN
    MS. LESLIE BAYLES
12  MR. TODD GALE
    MR. DAVID SELIGMAN
13  MR. ERIC CHALUT
    MR. JEFFREY GETTLEMAN
14  MR. ALEX DIMITRIEF
    on behalf of the debtors;

15

    MR. STEPHEN WOLFE
16  on behalf of the United States Trustee, Mr. Ira
    Bodenstein, as a member of the fee review committee;

17

    MR. FRANK CITERA
18  MR. MATT GENSBURG
    on behalf of the city of Chicago;

19

    MR. JOHN MENKE
20  on behalf of the PBGC;

21  MS. BABETTE CECCOTTI
    on behalf of the Air Line Pilots Association;

22

    MR. JACK CARRIGLIO
23  on behalf of the retired pilots;

24  MR. RONALD R. PETERSON
    on behalf of the KBC Bank;

25

Page 2

1    MR. WILLIAM BARRETT
     on behalf of Environmental Resource Management;

2

     MR. DON MACHALINSKI

3    on behalf of USAIG;

4    MR. HILLARD STERLING
     on behalf of OurHouse;

5

     MR. KURT CARLSON

6    on behalf of Ace Hardware;

7    MR. ANDREW ROSENMAN
     on behalf of UAL Loyalty Services;

8

     MR. PAUL SLATER

9    on behalf of the creditors committee;

10   MS. SHARON LEVIN
     on behalf of the IAM;

11

     MR. JAMES SPIOTTO

12   on behalf of the Bank of New York and Wells Fargo as
     trustee;

13

14   ALSO PRESENT:

15   MR. DANIEL THOMAS MILLER.

16

17

18

19

20

21

22

23

24

25

1   an order granting an application for rejection of a

2   collective bargaining agreement.  Now, it may be

3   possible to delay the effective date of that order,

4   but I don't believe it would be possible to delay the

5   effective date of that order beyond the 30-day period

6   from the commencement of the hearing on rejection.

7           MR. DIMITRIEF:  I understand that, sir.

8   And I guess what I would say is that what we intended

9   to do was make our application one that would give us

10  the authority to reject, and I'll reiterate to the

11  court today, within a reasonable period of time after

12  a ruling.

13          THE COURT:  Okay.  Well, I just don't agree

14  that that's a potential outcome under 1113.

15          MR. DIMITRIEF:  And I guess that what's

16  important for us for the court to understand is that

17  we ask for this not as negotiating leverage, but as

18  one final opportunity before the order becomes

19  effective to try to reach a consensual resolution,

20  that's all.

21          THE COURT:  Well, I think one of the

22  important limitations of 1113 is that a debtor in

23  seeking rejection of a collective bargaining

24  agreement has to be willing to live with the

25  consequences of a rejection if that rejection is

1    ordered.  And so if the debtor is not certain about

2    whether it really wants to have the collective

3    bargaining agreement rejected, it ought not to make

4    the application.  And so merely giving the debtor an

5    option of rejecting or not rejecting does not exist

6    under 1113 as I read it.

7            MR. DIMITRIEF:  Well, Your Honor, I

8    apologize for belaboring the point.  But remember

9    that we've said all along that we would prefer a

10    consensual agreement.  So moving for rejection

11    doesn't mean that the defendant wants rejection.

12    It's that the -- that the debtor will --

13            THE COURT:  Will take --

14            MR. DIMITRIEF:  -- utilize --

15            THE COURT:  -- rejection in the event that

16    a consensual agreement is not able to be reached

17    prior to the time that an order goes into effect.

18            MR. DIMITRIEF:  Exactly.

19            THE COURT:  Okay.  And then we don't

20    disagree because I think that's what the consequence

21    of 1113 is.  Certainly up until the time the order

22    goes into effect, there is the potential for entering

23    into a consensual arrangement that will make the

24    matter moot.  But once the order goes into effect,

25    then there is rejection of the agreement, not an

**EXHIBIT B**


**[FILED UNDER SEAL]**

**EXHIBIT C**


**[FILED UNDER SEAL]**

**EXHIBIT D**

**[FILED UNDER SEAL]**

**EXHIBIT E**

**[FILED UNDER SEAL]**

**EXHIBIT F**

Execution Copy

Exhibit K-1

## *Component Supply Agreement*

This Component Supply Agreement ("Agreement") dated as of January 1, 1999 (the "Effective Date") is entered into by and between DELPHI AUTOMOTIVE SYSTEMS CORPORATION ("Delphi"), a corporation organized under the laws of the State of Delaware, and GENERAL MOTORS CORPORATION ("GM"), a corporation organized under the laws of the State of Delaware.

### *Recitals*

A.   GM and its subsidiaries and affiliates worldwide are engaged in, among other things, the design, manufacture, and sale of motor vehicles and motor vehicle related products.  Prior to the Effective Date, the business operations which are owned by Delphi were owned by GM.

B.   Delphi and its subsidiaries and affiliates worldwide are engaged in among other things, the design, manufacture, and sale of motor vehicle related components and systems.

C.   As of the Effective Date, Delphi has separated from GM and become a separate legal entity.

D.   Following the separation of Delphi from GM, Delphi wishes to continue to supply and to assure that its subsidiaries and affiliates have the right, under certain circumstances, to continue to supply GM with motor vehicle related components and systems and GM wishes to continue acquiring such components and systems from Delphi and its subsidiaries and affiliates.

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement and intending to be legally bound, Delphi and GM agree:

1.   **Existing Agreements**

1.1   Delphi and GM shall continue to honor the terms and conditions of all existing Purchase Orders and other contractual agreements (e.g., Long Term and Lifetime Contracts and other formal and verifiable informal agreements) that are in effect as of the Effective Date ("Existing Agreements") regarding the purchase and supply of motor vehicle related components and systems ("Components"), including all Components that have been awarded to Delphi, regardless of whether production for such program has commenced, as if Delphi and GM were separate legal entities at the time such agreements were made.

1

Execution Copy

1.2   The terms and conditions of GM's standard Purchase Order (a copy of which is attached to this Agreement as Attachment-A) are incorporated herein and in the Existing Agreements by this reference; provided, however, that in the event the specific agreed upon terms of an Existing Agreement conflict with the terms of the standard GM Purchase Order or the parties have agreed to omit all or some of the terms of the standard GM purchase order, the specific agreed upon terms (including agreed upon omissions from the standard GM Purchase Order terms, if any), of the Existing Agreement shall control. Additionally, the parties agree that in situations where the parties are silent with respect to the applicability of all of the standard GM Purchase Order terms and conditions, it shall be presumed that such terms and conditions apply.

1.3   The unit prices for all Components produced for each program will be equal to the existing prices already established by Existing Agreements, including any pre-determined price reductions.

1.4   All Existing Agreements will retain their current status (e.g., lifetime, long term or one year purchase order).

1.5   Unless otherwise provided in Existing Agreements, no adjustments will be made for changes in costs, including increases in Delphi's costs for labor, material, or overhead; provided, however, both parties agree to reasonably discuss potential price adjustments associated with hyper-inflationary economies or economies subject to extreme devaluation.

1.6   Delphi and GM will continue to honor all nomination letters currently in place regardless of whether formal purchase orders have been issued.

2.   **Payment Terms**

2.1   The provisions of Section 1.2 above notwithstanding, except as provided below, payment terms on all existing contracts, including those related to General Motors International Operations ("GMIO"), will be modified to MNS2 effective immediately upon the Effective Date. For purposes of this Agreement MNS2 shall mean GM's Multilateral Netting System, which provides, on average, that payment shall be made on the second day of the second month following, in the case of GM's North American facilities, the shipment date of the goods or date of services, and for all of GM's other locations, the receipt date of the goods or date of services.

(a)   Saturn contracts will be modified to MNS2, but shall retain the consumption methodology currently in place between Saturn and Delphi.

2

Execution Copy

(b)     GMIO contracts related to South America will retain existing payment terms.  SPO will follow the same payment terms as OEM (e.g., buy in South America for South America).

(c)     GMIO contracts related to operations in China, India and Indonesia will retain existing payment terms.

2.2    Payment terms on all new business will be MNS2, unless otherwise agreed.

3.    **Right to Resource for Non-Competitiveness during the Term of a Contract**

3.1    GM retains the right to resource any and all Components in the event Delphi fails to remain competitive in terms of quality, service, design and technology.

3.2    For purposes of the above provision, competitiveness is defined by demonstrable product and performance levels available to GM from other suppliers.

3.3    Following notice by GM, Delphi shall be provided a reasonable period of time to cure any such non-competitiveness before the Components will be resourced.  In this regard, the parties agree to utilize the following processes to resolve issues of non-competitiveness:

(a)     With respect to non-competitiveness in quality and service, the parties agree to employ the GM 16 Step Process or the then current process utilized by GM.

(b)     With respect to non-competitiveness in design and technology, the parties agree to work jointly to mutually identify acceptable solutions.  Components will only be resourced if this endeavor is unsuccessful and a mutually acceptable solution cannot be developed within a reasonable period of time.

3.4    Under no circumstances will GM be responsible for any supplemental or compensatory payments to Delphi in the event that Components are resourced because of non-competitiveness.

4.    **New Technology**

4.1    In the event that GM wishes to introduce a technological change to a Component which is covered by a then existing contract with Delphi, Delphi will have a right of last refusal to implement the new technology or equivalent technology (acceptable to GM) and continue production through the balance of the existing contract.  If Delphi cannot provide such new or equivalent technology on a competitive basis, GM shall be free to resource the Component without liability to Delphi.

3

Execution Copy

4.2    Disputes regarding new technology under this process will be resolved by the applicable Vehicle Chief Engineer (GM) and the divisional Director of Engineering for the product involved (Delphi) plus a facilitator mutually acceptable to both sides.

5.    Quality

5.1    To insure a robust quality improvement process, Delphi must participate in all GM quality improvement programs and GM can require Delphi to achieve reasonable increased quality standards.

5.2    All increased quality standards established by GM must be comparable to then current industry standards, but allow GM to maintain its position as a quality leader.

6.    **Right of Last Refusal on Replacement Business**

6.1    For a period of 3 years following the Effective Date, Delphi shall be granted a right of last refusal under competitive purchase order terms for the first replacement cycle of existing product programs (in the United States and Canada) currently provided by Delphi.

6.2    In order to invoke the right of last refusal, Delphi must be competitive in terms of design, quality, price, service and technology.

6.3    The right of last refusal described above, is also intended to include these additional items: (i) production in the United States and Canada of common global platforms to the extent Delphi can provide or execute designs that comply with the required form and function specifications, as reasonably determined by GM; and (ii) product programs in Mexico where the vehicle is assembled in Mexico and shipped to the U.S. or Canadian markets for sale; provided, however, that in all cases covered by this Section 6.3, such programs must also meet all of the other criteria set forth in this Article 6.

6.4    In the event a particular Delphi product/plant is on "New Business Hold", that Delphi product/plant shall not be eligible to invoke the right of last refusal.  For purposes of this Agreement, the term "New Business Hold" shall be applied as set forth in GM's Quality Systems Requirements Manual, specifically GP5 (Jan. '98), and is contained as a performance step of the Level 2 Controlled Shipping Process.  This procedure is common for all suppliers and a requirement included in GM's standard terms and conditions.

6.5    Except as specifically provided above, the right of last refusal does not apply to, (i) GMIO programs and (ii) programs in Mexico.

4

**Execution Copy**

6.6   <u>Mechanics of Right of Last Refusal.</u>

(a)   Upon commencement of a product program covered by the Right of Last Refusal specified in Section 6.1 above (a "ROLR Product"), GM will submit to prospective suppliers, including Delphi, a request for quotation in accordance with its customary procedures including, but not limited to, the bundling of ROLR Products for any Component with ROLR Products for other Components; provided, however, that the bundling of ROLR Products will involve naturally related components, systems and modules, consistent with normal industry practices.

(b)   When such bundled sourcing packages including two or more ROLR Products are offered, Delphi will have the right of last refusal on any such ROLR Product(s) in the bundle. For those products in the bundle not currently provided by Delphi, the right of last refusal contemplated in this Article 6. shall not apply.

(c)   If Delphi wishes to exercise the right of last refusal with regard to a ROLR Product, Delphi must participate in the sourcing process, including developmental work, the advance purchasing/engineering process, and the submission of bids, all on the same basis as other potential suppliers.

(d)   In the event GM determines that a proposal submitted by an entity other than Delphi is the most favorable (the "Favorable Proposal"), GM will notify Delphi in writing of the material terms (including price, other financial considerations (including, without limitation, the economic impact of price reductions on other current and future products) material content, investment, timing non-proprietary technology, and the existence of proprietary technology) of the Favorable Proposal (the "Terms Notice"), and will request that Delphi notify GM in writing whether Delphi wishes to supply such ROLR Product(s) on terms the same as or substantially the same as (as mutually determined by the parties in their reasonable discretion) the terms of the Term Notice.

(e)   Following receipt by Delphi of the Terms Notice from GM, Delphi must notify GM in writing of its willingness and ability to supply such ROLR Products on such terms within seven (7) business days if no new technology is included in the Favorable Proposal, or thirty (30) business days if new technology is included in the Favorable Proposal.

5

Execution Copy

(f)     If Delphi so notifies GM that it is willing and able to supply such ROLR Product(s) on such terms, then subject to Section 6.2 and Section 6.4 above, Delphi will be awarded the sourcing of such ROLR Product(s) for the relevant contract term.

(g)     If Delphi fails to so notify GM or notifies GM that it is unwilling or unable to supply such ROLR Product(s) on such terms, GM may source the ROLR Product(s) on terms no less favorable to GM than those set forth in the Terms Notice.

(h)     If for any reason GM determines to source such ROLR Product(s) on terms less favorable to GM than the terms of the Terms Notice, then Delphi will again have the right of last refusal to supply such ROLR Product(s) in the manner described in this Section 6.6.

(i)     Delphi may, at Delphi's sole option and expense, be an advance development source (on a non-exclusive basis) for ROLR Products.

6.7     Under no circumstances will GM be responsible for any supplemental or compensatory payments to Delphi in the event Delphi fails to exercise its right of last refusal or can not provide the Components on a competitive basis.

## 7.     New Business

7.1     All new business awarded to Delphi will be governed by the specific terms and conditions under which that business is awarded.

7.2     During the term of this Agreement, Delphi will continue to be included on WWP's quotation list, with the exception of Delphi product/plants that are on "New Business Hold."

7.3     Other than business awarded pursuant to Delphi's exercise of its right of last refusal, new business awarded to Delphi, if any, will be at GM's sole discretion.

## 8.     Tooling and Dunnage

8.1     Each of GM and Delphi will own the tooling which is reflected on that party's balance sheet as of the Effective Date.

8.2     Delphi shall not use tooling owned by GM to compete against SPO in the aftermarket.

6

Execution Copy

8.3    Delphi shall not use tooling to produce products for other customers if such tooling is used to produce products for GM; provided, however, that Delphi shall be allowed to continue the use of such tooling to the extent necessary to satisfy already awarded contracts or extensions of such contracts, where Delphi has previously used such tooling to produce such products. Delphi will have the burden of establishing, upon GM's reasonable request, the existence of a binding contract with other customer(s) and prior use of particular tooling for those specific customer(s) prior to the Effective Date. If Delphi is unable to establish such facts with respect to particular tooling, Delphi will not have the right to use the applicable tooling. Moreover, Delphi agrees that it will not expand the use of any tooling described in this Section to new products, new customers or new contracts, other than for or with GM.

8.4    In the event that (i) any Force Majeure Event prevents Delphi from producing or delivering products, or (ii) GM resources products to another supplier as permitted under this Agreement or any underlying agreement, Delphi will permit GM to take possession of all tooling which is used to produce parts for GM; provided, however, that in the event such tooling is being used by Delphi to produce products for other customers (as permitted pursuant to Section 8.3 above, it being understood and agreed that Delphi shall have the burden of proving such eligibility), GM will to the extent practicable, allow the new supplier to use such tooling to produce products for sale to Delphi to permit Delphi to satisfy Delphi's pre-existing contractual commitments to other customers. For purposes of this Article 8, a Force Majeure Event shall be defined as those events specified in Paragraph 8 of GM's standard Purchase Order terms and conditions, a copy of which is attached as Attachment-A.

8.5    In the case of a Force Majeure Event involving tooling which was paid for partially by GM and partially by one or more other customers of Delphi, GM and Delphi will discuss the situation with the other customer(s) and enter into an agreement incorporating a mutually acceptable plan to equally protect each party's respective need to continue to obtain products produced by such tooling.

8.6    GM agrees to return to Delphi all tooling of which GM obtains possession as a result of a Force Majeure Event as promptly as commercially reasonable under the circumstances, following the cessation of that force majeure event; provided, however, that GM shall not be required to return any such tooling to Delphi until after GM has satisfied any contractual commitments that GM may have made to other suppliers regarding products produced from such tooling.

7

Execution Copy

8.7    Ownership of containers and dunnage existing at the time of the split-off shall be determined as follows:

    (a)    Containers and dunnage related to the transportation of products from Delphi to GM facilities or Tier 1 suppliers (other than Delphi) will be owned by GM.

    (b)    Containers and dunnage related to the transportation of products inside Delphi facilities will be owned by Delphi.

    (c)    Containers and dunnage related to the transportation of products between Delphi and its suppliers will be owned by Delphi.

## 9.    Intellectual Property & Technical Information

9.1    The provisions related to Intellectual Property and Technical Information as set forth in GM's standard Purchase Order terms and conditions (which is attached hereto as Attachment-A) shall control existing contracts.

9.2    GM and Delphi will each cooperate with the other to create, maintain, update and share technical information about the products being supplied by Delphi and their manufacture without restriction, as needed, and in compliance with GM's drafting and math data standards.

## 10.    Process for Delphi to Exit Certain Businesses

10.1    Exit of a business through closure:

(a) In the event of an extension of production of an existing product (which is covered by a contract with a fixed term) beyond the term of the original program life, GM shall have the right to require Delphi to continue production and sale of that product for a reasonable extension period, at reasonable commercial terms to be negotiated by the parties.

(b) In the event of a proposed plant closure or elimination of a product line, Delphi will agree to keep GM timely appraised of its decision process, review all plans with GM, in good faith reasonably consider GM's input and concerns, and in good faith reasonably consider modifying its plans to accommodate GM's timing requirements to resource the business.

8

**Execution Copy**

10.2    Exit of a business through sale:

(a)    In the event of a proposed divestiture of a business, Delphi will keep GM timely appraised of its decision process and in good faith reasonably consider GM's input and concerns.

(b)    Delphi will select a qualified buyer.

(c)    Assignment of existing contracts requires GM's prior written consent which will not be unreasonably withheld.

(d)    GM will negotiate a supply agreement with the buyer that will be intended to mirror the then existing agreements between GM and Delphi that relate to the business being sold.  Any changes to existing agreements, including price, will be mutually agreed between Delphi and GM.

10.3    During the term of the assigned contract, Delphi and GM shall dedicate resources and efforts necessary to assure that GM receives a comparable level of quality, service, delivery, price and technology; provided, however, that nothing in this provision shall be deemed a financial guarantee by either party.

**11.    Warranty**

11.1    Existing Contracts:

(a)    Delphi's warranty responsibility for products supplied under Existing Agreements will be governed by the terms and conditions of those Existing Agreements, including Paragraph 9 of GM's standard Purchase Order terms and conditions (a copy of which is attached hereto as Attachment-A).

(b)    Delphi and GM will continue to work together in good faith to reduce warranty costs including participation in the Risk/Reward Warranty Policy and other related programs, where mutually agreed.

11.2    With respect to new business, Delphi's warranty responsibility for products supplied under new contracts will be governed by the terms and conditions of those new contracts, including participation in the Risk/Reward Warranty Policy and related programs, where required.

9

Execution Copy

12.    Raw Materials and Purchased Components

To the extent practical and consistent with all applicable laws and regulations, Delphi and GM shall continue to cooperate and participate in existing programs related to the acquisition of raw materials and purchased components, consistent with GM's normal practices and procedures.

13.    Term and Termination

13.1    The term of this Agreement shall commence on the Effective Date and continue as long as any Existing Agreement is in effect, including any extensions of any Existing Agreement.

13.2    Either GM or Delphi may terminate this Agreement in any of the following events:

(a)    the other party materially breaches this Agreement;

(b)    the other party becomes insolvent or enters bankruptcy, receivership, liquidation, composition of creditors, dissolution or similar proceeding; or

(c)    a significant portion of the assets of the other party necessary for the performance of this Agreement becomes subject to attachment, embargo or expropriation.

In addition, GM may terminate this Agreement in the following events: (i) thirty-five percent ( 35 %) or more of the voting shares of Delphi become owned or controlled, directly or indirectly, by a competitor of GM in the business of manufacturing motor vehicles; or (ii) all of the Existing Agreements become subject to termination or cancellation pursuant to their terms.

13.3    A party intending to terminate this Agreement shall first notify the other party of the grounds for the intended termination. If the other party fails to remedy such grounds for termination within sixty (60) days after such notice (or any longer period of time as mutually agreed by the parties), then the terminating party may terminate this Agreement effective upon notice to the other party without the need for any judicial action.

13.4    The provisions of this Article 13 are without prejudice to any other rights or remedies either party may have by reason of the default of the other party.

13.5    In the event a competitor of GM in the business of manufacturing motor vehicles acquires a significant interest in Delphi (directly or indirectly) Delphi will provide GM

10

Execution Copy

with reasonable assurances that Delphi will utilize its best efforts to preserve the confidentiality of all information related to products produced for GM and GM product programs.

14.   **Service Parts**

14.1   Unless otherwise provided in Existing Agreements, the unit pricing on service parts that currently are not past model will continue at OEM prices, for a minimum of three (3) years after such service parts go past model. Thereafter, unit prices for such service parts will be as agreed between the parties.

14.2   GM and Delphi's respective obligations and responsibilities with regard to Components sold to AC Delco warehouse distributors and other distribution channels are set forth in the Aftermarket Agreement between GM and Delphi dated January 1, 1999.

15.   **General Provisions**

15.1   <u>No Agency.</u> This Agreement does not constitute either party the agent or legal representative of the other party. Neither party is authorized to create any obligation on behalf of the other party.

15.2   <u>Notices.</u>   Any notice under this Agreement must be in writing (letter, facsimile or telegram) and will be effective when received by the addressee at its address indicated below.

(a)   Notice sent to Delphi will be addressed as follows:

Delphi Automotive Systems Corporation:

Treasurer
Delphi Automotive Systems Corporation
5725 Delphi Drive
Troy, Michigan  48098
Facsimile:  248-813-2499

with a copy to:

General Counsel
Delphi Automotive Systems Corporation
5725 Delphi Drive
Troy, Michigan  48098
Facsimile:  248-813-2491

11

**Execution Copy**

(b)                          Notice sent to GM will be addressed as follows:

GM:    Vice President and Group Executive
              Worldwide Purchasing and NAO Production
              Control and Logistics
       NAO Headquarters
       GM Technical Center
       30400 Mound Road
       Warren, MI 48090
       Facsimile: 810-986-6646

with a copy to:

       Christopher F. Dubay
       Group Counsel – Worldwide Purchasing and NAO
              Production Control and Logistics
       NAO Headquarters
       GM Technical Center
       30400 Mound Road
       Warren, MI 48090
       Facsimile: 810-986-6646

(c)  The parties by notice hereunder may designate other addresses to which notices will be sent.

15.3  <u>Subsidiaries and Affiliates.</u>  GM and Delphi each acknowledge and understand that their respective subsidiaries and affiliates are not parties to this Agreement and may not be legally bound by the provisions herein unless and until they agree to be so bound. In this regard, Delphi and GM agree to utilize their reasonable best efforts to recommend and encourage their respective subsidiaries and affiliates to agree to be bound by the provisions of this Agreement. Until such time, both GM and Delphi agree to utilize their reasonable best efforts to cause their respective subsidiaries and affiliates, to the extent appropriate and in compliance with applicable laws, to honor and perform the obligations set forth in this Agreement, as if they were parties hereto.

15.4  <u>Amendments.</u>  No amendment to this Agreement will be binding upon either party unless it is in writing and is signed by a duly authorized representative of each party. This Agreement supersedes any prior agreements between the parties concerning the subject matter herein.

15.5  <u>Assignments.</u>  This Agreement shall be binding upon and inure to the benefit of the parties, and their respective successors and permitted assigns, but no rights, interests

12

**Execution Copy**

or obligations of either party herein may be assigned without the prior written consent of the other, except to Affiliates and as permitted under Section 10.2 of this Agreement.

15.6    <u>Severability.</u>    If any provision of this Agreement, or portion thereof, is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision, or portion thereof, shall be deemed reformed or deleted, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Agreement shall remain in full force and effect.

15.7    <u>Governing Law.</u>    This Agreement will be construed and enforced in accordance with the laws of the State of Michigan, excluding its conflict of laws rules. Each party consents, for purposes of enforcing this Agreement, to personal jurisdiction, service of process and venue in any state or federal court within the State of Michigan having jurisdiction over the subject matter. The parties exclude the application of the 1980 United Nations Convention on Contracts for the International Sale of Goods, if otherwise applicable.

15.8    <u>Dispute Resolution.</u>    The parties acknowledge and agree that all disputes or other matters related to this Agreement shall be exempt from the dispute resolution process established in Section 8.08 of the Master Separation Agreement or in any other agreement related to the transaction(s) contemplated therein.

15.9    <u>Counterparts.</u>    This Agreement may be executed by the parties in separate counterparts, each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.

IN WITNESS WHEREOF, GM and Delphi have caused this Agreement to be executed in multiple counterparts by their duly authorized representatives.

**Delphi Automotive Systems Corporation**            **General Motors Corporation**

By: _____                    By: _____
Name: _Alan S. Dawes_____                    Name: _____
Title: _Chief Financial Officer___                    Title: _____

13

**Execution Copy**

or obligations of either party herein may be assigned without the prior written consent of the other, except to Affiliates and as permitted under Section 10.2 of this Agreement.

15.6    Severability.    If any provision of this Agreement, or portion thereof, is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision, or portion thereof, shall be deemed reformed or deleted, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Agreement shall remain in full force and effect.

15.7    Governing Law.    This Agreement will be construed and enforced in accordance with the laws of the State of Michigan, excluding its conflict of laws rules.  Each party consents, for purposes of enforcing this Agreement, to personal jurisdiction, service of process and venue in any state or federal court within the State of Michigan having jurisdiction over the subject matter.  The parties exclude the application of the 1980 United Nations Convention on Contracts for the International Sale of Goods, if otherwise applicable.

15.8    Dispute Resolution.    The parties acknowledge and agree that all disputes or other matters related to this Agreement shall be exempt from the dispute resolution process established in Section 8.08 of the Master Separation Agreement or in any other agreement related to the transaction(s) contemplated therein.

15.9    Counterparts.    This Agreement may be executed by the parties in separate counterparts, each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.

IN WITNESS WHEREOF, GM and Delphi have caused this Agreement to be executed in multiple counterparts by their duly authorized representatives.

**Delphi Automotive Systems Corporation**          **General Motors Corporation**

By: _____          By: _____ 12/17/98
Name: _____          Name: _____
Title: _____          Title: _____

13

*Attachment - A*

## PURCHASE ORDER TERMS AND CONDITIONS

1.   **ACCEPTANCE:** Seller has read and understands this order and agrees that Seller's written acceptance or commencement of any work or service under this order shall constitute Seller's acceptance of these terms and conditions only.   All terms and conditions proposed by Seller which are different from or in addition to this order are unacceptable to Buyer, are expressly rejected by Buyer, and shall not become a part of this order.  Any modifications to this order shall be made in accordance with Paragraph 31.

2.   **SHIPPING, BILLING AND FLSA CERTIFICATION:** Seller agrees: (a) to properly pack, mark and ship goods in accordance with the requirements of Buyer and involved carriers in a manner to secure lowest transportation cost; (b) to route shipments in accordance with instructions from Buyer's Traffic Department; (c) to make no charge for handling, packaging, storage, transportation or drayage of goods unless otherwise stated in this order; (d) to provide with each shipment packing slips with Buyer's order number marked thereon; (e) to properly mark each package with this order number, the factory, plant and dock number, and where multiple packages comprise a single shipment, to consecutively number each package; and (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyer's instructions. Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyer's instructions and carrier's requirements. The marks on each package and identification of the goods on packing slips, bills of lading and invoices shall be sufficient to enable Buyer to easily identify the goods purchased. Seller further agrees: (a) to promptly render, after delivery of goods or performance of services, correct and complete invoices to Buyer; and (b) to accept payment by check or, at Buyer's discretion, other cash equivalent (including electronic transfer of funds).  Seller's invoice must include a certification that all goods were produced in compliance with the applicable requirements of sections 6, 7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States Department of Labor issued in connection therewith. The payment date is set forth on the face side of this order, or if not stated, shall be on the 25th day of the month following Buyer's receipt of a proper invoice (except as may otherwise be agreed upon by Buyer and Seller in connection with a program providing for electronic funds transfer).  Time for payment shall not begin until correct and complete invoices are received, and Seller's cash discount privileges to Buyer shall be extended until such time as payment is due. Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under this order.

3.   **DELIVERY SCHEDULES:** Deliveries shall be made both in quantities and at times specified in Buyer's schedules. Buyer shall not be required to make payment for goods delivered to Buyer which are in excess of quantities specified in Buyer's delivery schedules. Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this order.  For orders of goods where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

4.   **PREMIUM SHIPMENTS:** If Seller's acts or omissions result in Seller's failure to meet Buyer's delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall, at Buyer's option, (i) promptly reimburse Buyer the difference in cost between the more expeditious method and the original method, (ii) allow Buyer to reduce its payment of Seller's invoices by such difference, or (iii) ship the goods as expeditiously as possible at Seller's expense and invoice Buyer for the amount which Buyer would have paid for normal shipment.

5.   **CHANGES:** Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this order, including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes; any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct. Any changes to this order shall be made in accordance with Paragraph 31.

6.   **INSPECTION:** Seller agrees that Buyer shall have the right to enter Seller's facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this order. Buyer's inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

7.   **NONCONFORMING GOODS:** To the extent Buyer rejects goods as nonconforming, the quantities under this order will automatically be reduced unless Buyer otherwise notifies Seller. Seller will not replace quantities so reduced without a new order or schedule from Buyer. Nonconforming goods will be held by Buyer for disposition in accordance with Seller's instructions at Seller's

risk. Seller's failure to provide written instructions within ten (10) days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyer's option, to charge Seller for storage and handling, or to dispose of the goods, without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance thereof, limit or impair Buyer's right to assert any legal or equitable remedy, or relieve Seller's responsibility for latent defects.

8.    FORCE MAJEURE: Any delay or failure of either party to perform its obligations hereunder shall be excused if, and to the extent that it is caused by an event or occurrence beyond the reasonable control of the party and without its fault or negligence, such as, by way of example and not by way of limitation, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor, equipment or transportation, or court injunction or order; provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party within ten (10) days. During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this order. If requested by the Buyer Seller shall, within ten (10) days of such request, provide adequate assurances that the delay shall not exceed thirty (30) days. If the delay lasts more than thirty (30) days or Seller does not provide adequate assurance that the delay will cease within thirty (30) days, Buyer may immediately cancel the order without liability.

9.    WARRANTY: Seller expressly warrants that all goods or services covered by this order will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect. In addition, Seller acknowledges that Seller knows of Buyer's intended use and expressly warrants that all goods covered by this order which have been selected, designed, manufactured, or assembled by Seller based upon Buyer's stated use, will be fit and sufficient for the particular purposes intended by Buyer.

10.    INGREDIENTS DISCLOSURE AND SPECIAL WARNINGS AND INSTRUCTIONS: If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods purchased hereunder; (b) the amount of one or more ingredients; and (c) information concerning any changes in or additions to such ingredients. Prior to and with the shipment of the goods purchased hereunder, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on goods, containers and packing) of any hazardous material which is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution which will best prevent bodily injury or property damage in the handling, transportation, processing, use, or disposal of the goods, containers and packing shipped to Buyer.

11.    INSOLVENCY: Buyer may immediately cancel this order without liability to Seller in the event of the happening of any of the following or any other comparable event: (a) insolvency of the Seller; (b) filing of a voluntary petition in bankruptcy by Seller; (c) filing of any involuntary petition in bankruptcy against Seller; (d) appointment of a receiver or trustee for Seller; (e) or execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment, or assignment is not vacated or nullified within fifteen (15) days of such event.

12.    CANCELLATION FOR BREACH: Buyer reserves the right to cancel all or any part of this order, without liability to Seller, if Seller: (a) repudiates or breaches any of the terms of this order, including Seller's warranties; (b) fails to perform services or deliver goods as specified by Buyer; or (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods; and does not correct such failure or breach within ten (10) days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.

13.    TERMINATION: In addition to any other rights of Buyer to cancel or terminate this order, Buyer may at its option immediately terminate all or any part of this order, at any time and for any reason, by giving written notice to Seller. Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the order price for all goods or services which have been completed in accordance with this order and not previously paid for; and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this order to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this order, less, however the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's

written consent, and the cost of any damaged or destroyed goods or material. Buyer will make no payments for finished goods, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods which are in Seller's standard stock or which are readily marketable. Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods which would be produced by Seller under delivery or release schedules outstanding at the date of termination. Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, and general and administrative burden charges from termination of this order. Within sixty (60) days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request. Buyer or its agents, shall have the right to audit and examine all books, records, facilities, work, material, inventories, and other items relating to any termination claim of Seller.

14.    **INTELLECTUAL PROPERTY:** Seller agrees: (a) to defend, hold harmless and indemnify Buyer, its successors and customers against all claims, demands, losses, suits, damages, liability and expenses (including reasonable attorney fees) arising out of any suit, claim or action for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark, copyright or mask work right by reason of the manufacture, use or sale of the goods or services ordered, including infringement arising out of compliance with specifications furnished by Buyer, or for actual or alleged misuse or misappropriation of a trade secret resulting directly or indirectly from Seller's actions; (b) to waive any claim against Buyer under the Uniform Commercial Code or otherwise, including any hold harmless or similar claim, in any way related to a claim asserted against Seller or Buyer for patent, trademark, copyright or mask work right infringement or the like, including claims arising out of compliance with specifications furnished by Buyer; and (c) to grant to Buyer a worldwide, nonexclusive, royalty-free, irrevocable license to repair and have repaired, to reconstruct and have reconstructed the goods ordered hereunder. Seller assigns to Buyer all right, title and interest in and to all trademarks, copyrights and mask work rights in any material created for Buyer under this order.

15.    **TECHNICAL INFORMATION DISCLOSED TO BUYER:** Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information which Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this order.

16.    **INDEMNIFICATION:** If Seller performs any work on Buyer's premises or utilizes the property of Buyer, whether on or off Buyer's premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including reasonable attorney fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Seller's performance of work or use of Buyer's property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

17.    **INSURANCE:** Seller shall maintain insurance coverage in amounts not less than the following: (a) Workers' Compensation - Statutory Limits for the state or states in which this order is to be performed (or evidence of authority to self-insure); (b) Employer's Liability- $250,000; (c) Comprehensive General Liability (including Products/Completed Operations and Blanket Contractual Liability) - $1,000,000 per person, $1,000,000 per occurrence Personal Injury, and $1,000,000 per occurrence Property Damage, or $1,000,000 per occurrence Personal Injury and Property Damage combined single limit; and (d) Automobile Liability (including owned, non-owned and hired vehicles) - $1,000,000 per person, $1,000,000 per occurrence Personal Injury and Property Damage combined single $1,000,000 per occurrence Property Damage, or $1,000,000 per occurrence Personal Injury and Property Damage combined single limit. At Buyer's request, Seller shall furnish to Buyer certificates of insurance setting forth the amount(s) of coverage, policy number(s) and date(s) of expiration for insurance maintained by Seller and, if further requested by Buyer, such certificates will provide that Buyer shall receive thirty (30) days' prior written notification from the insurer of any termination or reduction in the amount or scope of coverages. Seller's purchase of appropriate insurance coverage or the furnishing of certificates of insurance shall not release Seller of its obligations or liabilities under this order. In the event of Seller's breach of this provision, Buyer shall have the right to cancel the undelivered portion of any goods or services covered by this order and shall not be required to make further payments except for conforming goods delivered or services rendered prior to cancellation.

18.    **TOOLS:** Unless otherwise agreed to by Buyer, Seller at its own expense shall furnish, keep in good condition, and replace when necessary all tools, jigs, dies, gauges, fixtures, molds and patterns ("Tools") necessary for the production of the goods. The cost of changes to the Tools necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer. Seller shall insure the Tools with full fire and extended coverage insurance for the replacement value thereof. Seller grants Buyer

an irrevocable option to take possession of and title to the Tools that are special for the production of the goods upon payment to Seller of the book value thereof less any amounts which Buyer has previously paid to Seller for the cost of such Tools; provided, however, that this option shall not apply if such Tools are used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

19.  **BAILED PROPERTY:**  All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this order, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer.  Seller shall bear the risk of loss of and damage to Buyer's property.  Buyer's property shall at all times be properly housed and maintained by Seller; shall not be used by Seller for any purpose other than the performance of this order; shall be deemed to be personalty; shall be conspicuously marked "Property of General Motors Corporation" by Seller; shall not be commingled with the property of Seller or with that of a third person; and shall not be moved from Seller's premises without Buyer's prior written approval. Upon the request of Buyer, such property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B. transport equipment at Seller's plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable cost of delivering such property to such location.  Buyer shall have the right to enter onto Seller's premises at all reasonable times to inspect such property and Seller's records with respect thereto.

20.  **REMEDIES:**  The rights and remedies reserved to Buyer in this order shall be cumulative, and additional to all other or further remedies provided in law or equity.

21.  **DUTY DRAWBACK RIGHTS:**  This order includes all related customs duty and import drawback rights, if any, (including rights developed by substitution and rights which may be acquired from Seller's suppliers) which Seller can transfer to Buyer. Seller agrees to inform Buyer of the existence of any such rights and upon request to supply such documents as may be required to obtain such drawback.

22.  **SETOFF:**  In addition to any right of setoff provided by law, all amounts due Seller shall be considered net of indebtedness of Seller to General Motors Corporation and its subsidiaries; and General Motors Corporation may deduct any amounts due or to become due from Seller to General Motors Corporation and its subsidiaries from any sums due or to become due from General Motors Corporation to Seller.

23.  **ADVERTISING:**  Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services herein ordered, or use any trademarks or tradenames of Buyer in Seller's advertising or promotional materials.  In the event of Seller's breach of this provision, Buyer shall have the right to cancel the undelivered portion of any goods or services covered by this order and shall not be required to make further payments except for conforming goods delivered or services rendered prior to cancellation.

24.  **GOVERNMENT COMPLIANCE:**  Seller agrees to comply with all federal, state and local laws, Executive Orders, rules, regulations and ordinances which may be applicable to Seller's performance of its obligations under this order.

25.  **EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION:**  This order incorporates by reference: (a) all provisions of 41 C.F.R. 60-1.4, as amended, pertaining to the equal opportunity clause in government contracts; (b) all provisions of 41 C.F.R. 60-250, as amended, pertaining to affirmative action for disabled veterans of the Vietnam Era; and (c) all provisions of 41 C.F.R. 60-741, as amended, pertaining to affirmative action for handicapped workers.  Seller certifies that it is in compliance with all applicable provisions of 41 C.F.R. 60-1, including but not limited to: (a) developing and presently having in full force and effect a written affirmative action compliance program for each of its establishments as required by 41 C.F.R. 60-1.40, as amended; (b) filing EEO-1 Reports as required by 41 C.F.R. 60-1.7, as amended; and (c) neither maintaining segregated facilities nor permitting its employees to perform services at segregated facilities as prohibited by 41 C.F.R. 60-1.8, as amended.  Buyer requests that Seller adopt and implement a policy to extend employment opportunities to qualified applicants and employees on an equal basis regardless of an individual's age, race, color, sex, religion or national origin.

26.  **NO IMPLIED WAIVER:**  The failure of either party at any time to require performance by the other party of any provision of this order shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this order constitute a waiver of any succeeding breach of the same or any other provision.

27.    **NON-ASSIGNMENT:**  Seller may not assign or delegate its obligations under this order without Buyer's prior written consent.

28.    **RELATIONSHIP OF PARTIES:**  Seller and Buyer are independent contracting parties and nothing in this order shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

29.    **GOVERNING LAW:**  This order is to be construed according to the laws of the state from which this order issues as shown by the address of Buyer on the face side of this order.

30.    **SEVERABILITY:**  If any term of this order is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term shall be deemed reformed or deleted, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this order shall remain in full force and effect.

31.    **ENTIRE AGREEMENT:**  This order, together with the attachments, exhibits, or supplements, specifically referenced in this order, constitutes the entire agreement between Seller and Buyer with respect to the matter contained herein and supersedes all prior oral or written representations and agreements.  This order may only be modified by a purchase order amendment/alteration issued by Buyer.

May 1986

**EXHIBIT G**

LEXSEE 1997 U.S. DIST. LEXIS 6668

**In Re PROGRESSIVE RESTAURANT SYSTEMS, INC., Debtor. PROGRESSIVE RESTAURANT SYSTEMS, INC., Appellant, -vs- WENDY'S INTERNATIONAL, INC., Appellee.**

**96-CV-0768E(F)**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 6668*

**May 8, 1997, Decided**
**May 8, 1997, OPINION FILED**

**NOTICE:** [*1]    FOR ELECTRONIC PUBLICATION ONLY

**PRIOR HISTORY:** BK 95-14370K.

**DISPOSITION:** Affirmed.

**COUNSEL:** ATTORNEYS FOR THE APPELLANT: Camille W. Hill, Esq., c/o Hancock & Estabrook, Syracuse, NY.

ATTORNEYS FOR THE APPELLEE: Raymond L. Fink, Esq., c/o Harter, Secrest & Emery, Buffalo, NY.

**JUDGES:** John T. Elfvin, U.S.D.J.

**OPINIONBY:** John T. Elfvin

**OPINION:**

MEMORANDUM and ORDER

Presently before this Court is the appeal by the Chapter 11 Debtor ("Progressive")

from the Order ("the Severability Order") n1 issued October 18, 1996 by the Honorable Michael J. Kaplan, Chief Judge of the United States Bankruptcy Court for the Western District of New York. Jurisdiction is proper pursuant to *28 U.S.C. § 158*(a)(3). n2

n1 Although so labeled by the parties, such should more properly be characterized as "the Non-severability Order." The parties' designation is adopted.

n2 By Order filed November 26, 1996 the undersigned granted Progressive's motion for leave to appeal from the Severability Order.

Although familiarity with the details of the underlying facts and prior [*2]    proceedings in this action is presumed, a brief statement of the pertinent undisputed background facts will help to frame the matter

which is before this Court. In 1988 Progressive became a franchisee of the Creditor-Appellee Wendy's International, Inc. ("Wendy's") and began operating sixteen restaurants in western New York n3 ("the Buffalo restaurants") and six additional restaurants in central New York ("the Syracuse restaurants"). Progressive and Wendy's entered into separate, individual franchise agreements for each restaurant location ("the Franchise Agreements"). Each such agreement required Progressive to pay (1) a franchise fee and a royalty -- *viz.*, the greater of a minimum fixed royalty amount or four percent of the prior month's gross sales -- and (2) advertising fees to Wendy's National Advertising Program, Inc. ("WNAP") not exceeding three percent n4 of the preceding month's gross revenues. Wendy's also leases to Progressive the real property in connection with four of the restaurant locations ("the Leases").

n3 Progressive claims that it entered into "approximately eighteen" franchise agreements for restaurants in western New York. Brief on Behalf of Appellant Progressive, p. 6. Judge Kaplan indicated that, in 1988, Progressive operated sixteen stores in western New York. Severability Order, p.3. Progressive's brief neither otherwise intimates that such finding in the Severability Order is incorrect nor offers an explanation for such discrepancy.

[*3]

n4 Wendy's Notice of Motion for Relief from the Automatic Stay and to Compel Debtor to Assume or Reject Executory Contract filed January 17, 1996, Exh E PP11.1 & 11.1.A); *see also* Exhs B-D (PP15(g) & 15(h) in each (national advertising fees not to exceed two percent)). Progressive was also obligated to spend between 1% and 2.5% of gross revenues on local and regional advertising.

In 1991 Progressive and Wendy's entered into "the Buffalo Agreement" whereby Wendy's purchased the Syracuse restaurants and which, *inter alia*, incorporated two promissory notes -- one note evidencing approximately $ 900,000 in past due royalties and other non-advertising amounts Progressive owed to Wendy's and another note reflecting approximately $ 300,000 in delinquent national advertising fees Progressive owed to WNAP. Subsection 9.F. of the Buffalo Agreement pertinently states that,

"except as specifically modified herein, the terms and conditions of the Franchise Agreements shall remain in full force and effect. It is further acknowledged and agreed that the terms and conditions of [the Buffalo] [*4] Agreement modify the Franchise Agreements and are hereby incorporated therein; any breach of the terms of conditions of this Agreement shall constitute a material default under [all] the Franchise Agreements." Brief On Behalf of Progressive, Appendix B (Emphasis supplied.)

The Buffalo Agreement was immaterially amended in July and December of 1992. Progressive subsequently entered into additional franchise agreements with Wendy's for two restaurants in western New York; neither franchise agreement references the Buffalo Agreement.

As of June 21, 1995 Progressive was in default in the amount of approximate $ 1.5 million in royalties, rents and other non-advertising debts and in the amount of approximately $ 560,000 owed to WNAP. On such date Wendy's and Progressive entered into an agreement entitled the "Restructure Agreement" which, *inter alia*, incorporated two new promissory notes ("the Promissory Notes") which had been separately executed on May 10, 1995 and attached as exhibits to the Restructure Agreement and which reflected and memorialized the approximately $ 1.5 million in arrears Progressive owed to Wendy's and the approximately $ 560,000 Progressive owed to [*5] WNAP. The Restructure Agreement pertinently states that

"Wendy's and [Progressive] agree that this Agreement is intended to modify not only the Franchise Agreements and Leases, but specifically, the Buffalo Agreement and shall supersede and replace any provision of those agreements which is in conflict with the terms of this Agreement [, that failure] *** to comply with either of the Promissory Notes (regardless of whether or not the Promissory Notes are acceler-

ated) shall constitute a default under [all] the Franchise Agreements and under [all] the Leases *** [and that this] Agreement sets forth the entire understanding between the parties concerning the subject matter hereof and incorporates [the terms and conditions of the Promissory Notes and] all prior negotiations and understandings." Wendy's Notice of Motion for Relief from the Automatic Stay and to Compel Debtor to Assume or Reject Executory Contract filed January 17, 1996, Exh J, PP3.E., 8.A & 8.C.

Paragraph 3.F. of the Restructure Agreement indicates that, if Wendy's were to issue three default notices to Progressive during a twelve-month period with respect to any single Franchise Agreement or [*6] Lease, the payments required by the Promissory Notes would be accelerated. Finally, each of the Promissory Notes appended to and incorporated into the Restructure Agreement states that the principal amount thereof, comprised of franchisee obligations for, *inter alia*, royalties, rents, fees and advertising,

"does not represent payment of [such] obligations owed to Wendy's and/or [to WNAP] *** under the Franchise Agreements or Leases, nor is the principal amount hereunder separate from the obligation to cure arrearages

1997 U.S. Dist. LEXIS 6668, *

under the Franchise Agreements and Leases n5 as set forth under *Section 365 of the U.S. Bankruptcy Code.*\*\*\* In addition, any default [under either Promissory Note] shall constitute a default under the Franchise Agreements and the Leases, and, upon the occurrence of any \*\*\* [default event, Wendy's], in its sole discretion, may elect to issue a Notice of Default under \*\*\*all of the Franchise Agreements and Leases without the necessity of first accelerating the principal or interest balance [due under the Promissory Notes]." *Id.*, Exhs K-L, pp. 2 & 5 in each.

Progressive subsequently defaulted on the Promissory Notes and, on December 15, 1995, [*7] filed a voluntary Chapter 11 petition seeking protection of the Bankruptcy Court. At such time, Progressive owed more than $ 80,000 on the Promissory Notes and had defaulted on the Franchise Agreements as to several stores that are now closed; Progressive has remained current on the post-petition royalties, fees and rents on thirteen remaining restaurants. The Severability Order, p. 5.

n5 The pertinent language in the note entitled "Promissory Note (WNAP)" does not contain the first two references to the Leases. *Id.*, Exh L, p. 2.

Progressive submitted to Judge Kaplan a Disclosure Statement and its Plan of Reorganization ("the Plan") in which it proposed to assume thirteen Franchise Agreements and the Leases, cure only the pre-petition arrears accrued in connection with the Franchise Agreements and the Leases so assumed, reject the balance of the agreements entered into by the parties -- *viz.*, the Restructure Agreement and the Promissory Notes -- and treat the sum accrued in connection with the rejected [*8] agreements as a general unsecured claim. The Severability Order, p. 6; Brief on Behalf of Progressive, p.1. In an Order dated August 7, 1996 Judge Kaplan sustained objections to the Disclosure Statement raised by several creditors including Wendy's and permitted Progressive to amend such in response thereto. On September 6, 1996 Progressive filed an Amended Disclosure Statement which "set forth the identical proposal \*\*\* [set forth] in the prior Disclosure Statement" and did not alter the Plan. Brief on Behalf of Progressive, p. 2. After receiving documentary evidence and several rounds of briefing from all interested parties, n6 Judge Kaplan denied approval of Progressive's Disclosure Statements and found that the Restructure Agreement, the Promissory Notes, the Buffalo Agreement and the leases unambiguously comprised a single contractual relationship with a common overall purpose and objective, that the Restructure Agreement together with the Promissory Notes incorporated therein had integrated all of such agreements and that the Plan was violative of *11 U.S.C. § 365* and not confirmable. The Severability Order, pp. 7-9, 17 & 21. The sole issues on appeal are whether Judge Kaplan [*9] erred in holding that the Restructure Agreement together with the Promissory Notes, the Franchise Agreements and

1997 U.S. Dist. LEXIS 6668, *

Leases constituted an indivisible agreement and whether Progressive may elect to assume only the thirteen Franchise Agreements and four Leases pursuant to *11 U.S.C. § 365*, reject the Restructure Agreement and cure only those pre-petition arrears accrued in connection with the assumed Franchise Agreements and the Leases. Progressive's Motion for Leave to Appeal Interlocutory Order, P14.

> n6 Progressive did not request an evidentiary hearing and Judge Kaplan did not find one necessary. The Severability Order, pp. 1-2.

A Bankruptcy Court's findings of facts -- whether based upon oral evidence or documents or both -- will remain undisturbed unless such are clearly erroneous; the legal effect of such findings and other conclusions of law may be considered *de novo. Rule 8013 of the Federal Rules of Bankruptcy Procedure.* When credibility questions or other extrinsic determinations are absent, the interpretation **[*10]** of a contract, including whether it is ambiguous *vel non*, is a question of law subject to *de novo* review. *Network Pub. Corp. v. Shapiro, 895 F.2d 97, 99 (2nd Cir. 1990); In re Brunswick Hosp. Center, Inc., 156 B.R. 896, 899-900 (E.D.N.Y. 1993).*

The parties do not challenge Judge Kaplan's finding that the issue of severability -- also termed divisibility -- *vel non* is governed by Ohio law. n7 Severability Order, p. 15. Whether an agreement is entire -- *i.e.*, non-divisible -- or severable depends generally upon the intention of the parties which is ascertained via ordinary rules of contract construction. *Material Contrac-*

*tors, Inc. v. Donahue, 14 Ohio St. 2d 19, 235 N.E.2d 525, 528 (Ohio 1968).* Primary consideration is given to the language of the subject contract. *Ibid.* Where the intent of the parties cannot be gleaned from the four corners of the documents, additional consideration may be given to the facts and circumstances surrounding the transaction. *Ibid.; In re Plum Run Service Corp., 159 B.R. 496, 499 (Bankr. S.D. Ohio 1993).* In determining whether the parties intended that a number of separate agreements constitute a single indivisible contract, **[*11]** it is useful to inquire "whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." *U.S. v. Bethlehem Steel Corp., 315 U.S. 289, 298, 86 L. Ed. 855, 62 S. Ct. 581 (1942); In re Ritchey, 84 B.R. 474, 479 (Bankr. N.D. Ohio 1988).*

> n7 The Restructure Agreement, the 1995 Promissory Notes, the Buffalo Agreement and the Franchise Agreements all contain provisions indicating that such are to be interpreted and construed under the law of Ohio; the Leases contain provisions which indicate that such are to be construed under the laws of that state in which the subject property is located.

A study of the pertinent provisions of the Franchise Agreements, the Leases, the Buffalo Agreement, the Promissory Notes and the Restructure Agreement leaves no doubt that all such are inextricably intertwined and interdependent and that the Restructure Agreement integrates them. into one indivisible and non-severable **[*12]**

agreement. Progressive, burdened with delinquencies in excess of two million dollars, entered with Wendy's into the Promissory Notes which expressly state that the non-payment of the obligations due thereunder constitute a default of the Franchise Agreements and of the Leases; the parties also included cross-default provisions whereby a default under any Franchise Agreement or Lease would constitute a default under the Promissory Notes. Furthermore, the Promissory Notes notably manifest the parties' contemporaneous awareness that Progressive might seek bankruptcy protection at a later date and, in contemplation of such, their agreement that the entire principal due under each such note was not to be treated separately from any arrearages to be cured under the Franchise Agreements in the event such were assumed after such a filing. Finally, the Restructure Agreement incorporates all of such and broadly integrates "all prior negotiations and understandings." The pertinent language of the documents and the ambient facts and circumstances clearly demonstrate that, when it entered into the Restructure Agreement and the Promissory Notes incorporated therein, Progressive bargained away a [*13] right that might have been useful to it had it instead filed for bankruptcy protection at

that time -- *viz.*, the right to separately assume (or reject) each Franchise Agreement independently. There is no doubt that, had Wendy's not received such concession, neither the Restructure Agreement nor the Promissory Notes incorporated therein would have been consummated. This Court is firmly convinced that the Restructure Agreement represents a full and complete integration of all the Franchise Agreements, the Leases and the Promissory Notes into a single document representing an interdependent, indivisible agreement. Progressive's Plan to selectively assume certain Franchise Agreements and cure only arrearages pertaining to such ignores the plain provisions in the Restructure Agreement (and the Promissory Notes incorporated therein) pursuant to which the Franchise Agreements and the Leases no longer exist severally.

Accordingly, it is hereby **ORDERED** that the Severability Order is affirmed in its entirety.

DATED: Buffalo, N.Y.

May 8, 1997

John T. Elfvin

U.S.D.J.

LEXSEE 2005 BANKR. LEXIS 2595

**THE GROUND ROUND, INC., et al., Debtors. JOSEPH A. ABBOUD, ELIAS N. DOW, WAZEN J. WYZEW, a Pennsylvania Partnership, and BYBLOS, INC., Plaintiffs-Appellees, v. THE GROUND ROUND, INC., et al., Defendants-Appellants.**

**BAP NO. MB 05-039**

**UNITED STATES BANKRUPTCY APPELLATE PANEL FOR THE FIRST CIRCUIT**

*335 B.R. 253; 2005 Bankr. LEXIS 2595; 45 Bankr. Ct. Dec. 204*

**December 15, 2005, Decided**

**PRIOR HISTORY:** [**1] Appeal from the United States Bankruptcy Court for the District of Massachusetts. Bankruptcy No. 04-11325-WCH, Adversary Proceeding No. 04-01390. (Hon. William C. Hillman, U.S. Bankruptcy Judge). *Abboud v. Ground Round, Inc. (In re Ground Round, Inc.), 326 B.R. 23, 2005 Bankr. LEXIS 1050 (Bankr. D. Mass., 2005)*

**COUNSEL:** Harold B. Murphy, Esq. Andrew G. Lizotte, Esq. and Christian J. Urbano, Esq., on brief for Defendants-Appellants.

Eugene J. Malady, Esq., on brief for Plaintiffs-Appellees.

**JUDGES:** Before Lamoutte, Haines and Deasy, United States Bankruptcy Appellate Panel Judges.

**OPINIONBY:** J. Michael Deasy

**OPINION:**

[*256] **DEASY, U.S. Bankruptcy Appellate Panel Judge.**

This is an appeal from an order of the bankruptcy court granting summary judgment in favor of Joseph A. Abboud, Elias N. Dow, Wazen J. Wyzew, and Byblos, Inc. (collectively, "Landlord"), in their adversary proceeding to determine the interest of the debtor, The Ground Round, Inc. (the "Debtor"), in a Pennsylvania liquor license previously used in its operation of a restaurant at a leased premises in West Chester, Pennsylvania. At issue in this appeal is whether after rejection of a lease under the Bankruptcy Code the Landlord is entitled to enforce a lease provision requiring the Debtor to retransfer to the Landlord upon termination of the lease a liquor license [**2] transferred to the Debtor by the Landlord at the inception of the lease. For the reasons stated below, we hereby affirm the bankruptcy court's decision.

335 B.R. 253, *; 2005 Bankr. LEXIS 2595, **;
45 Bankr. Ct. Dec. 204

## BACKGROUND

In 1977, the Landlord leased certain nonresidential property located in West Chester, Pennsylvania ("Property") to Howard Johnson Company, Inc. The lease [*257] was for a term of ten years plus six five-year extensions. Through a series of assignments, the Debtor subsequently succeeded Howard Johnson Company, Inc.'s rights as lessee and thereafter operated a Ground Round restaurant at the Property. n1

n1 In this opinion the term "Debtor" shall include, where the context requires, the Debtor's predecessors in interest in the Property under the 1977 lease.

In January, 1978, Byblos, Inc. (one of the entities collectively referred to as Landlord), acquired the subject liquor license. An addendum to the lease required the Landlord to transfer the liquor license to the Debtor for $ 1.00 for use during the terms of the lease. The addendum also provided [**3] that "at the termination of this lease" the Debtor was required to "transfer such liquor license to [the Landlord]" for consideration of $ 1.00. The Landlord transferred the liquor license to the Debtor as required by the lease, and the Debtor used the liquor license for 24 years in connection with its operation of a full-service Ground Round restaurant at the Property.

On February 19, 2004, the Debtor and its affiliates filed voluntary petitions under Chapter 11 of the Bankruptcy Code. n2 Although the Debtor continued operations as a debtor-in-possession, it ceased restaurant operations at the Property. Thereafter, the Debtor filed a motion to reject various leases, including the lease of the Property. The motion provided that, notwithstanding rejection, "the Debtors shall retain any interest in the liquor license associated with the Rejected Locations. . . ." The Landlord did not file an objection, and the bankruptcy court entered an endorsement order granting the motion.

n2 All references to the "Bankruptcy Code" or to specific sections are to the Bankruptcy Reform Act of 1978, as amended prior to April 20, 2005, 11 U.S.C. § 101 et seq.

[**4]
In November, 2004, the Landlord commenced an adversary proceeding to determine the Debtor's interest in the liquor license. n3 The Landlord argued that the provisions of the lease which required the Debtor to retransfer the liquor license to the Landlord upon termination of the lease were specifically enforceable against the Debtor notwithstanding its rejection of the lease. The Debtor responded to the complaint, arguing that the liquor license constituted property of the bankruptcy estate, that the Landlord was not entitled to specific performance of the license transfer provisions of the rejected lease, and that any rights that the Landlord had in the liquor license were avoidable by the Debtor pursuant to § 544.

n3 Abboud, Dow and Wyzen were the original plaintiffs on the adversary

335 B.R. 253, *; 2005 Bankr. LEXIS 2595, **;
45 Bankr. Ct. Dec. 204

complaint. Byblos, Inc. was subsequently added as a plaintiff.

The parties filed cross-motions for summary judgment and, after a hearing, the bankruptcy court took the matter under advisement. On June 6, 2005, the bankruptcy court [**5] issued a "Memorandum of Decision on Complaint Seeking Determination of the Interest of Debtors' Estate in Pennsylvania Liquor License," concluding as follows:

> For the stated reasons, I will enter an order granting Landlord's motion for summary judgment and denying Debtor's cross-motion. Landlord shall present a form of order directing Debtor to tender the license to Landlord for transfer to it. All costs of the transfer are to be borne by Landlord.

The bankruptcy court did not issue a separate order or judgment at that time. On June 15, 2005, the Debtors filed a Notice of Appeal with respect to the Memorandum. [*258] In August, 2005, the Panel issued an order remanding the matter to the bankruptcy court for entry of an order conforming to the Memorandum. Thereafter, on August 23, 2005, the bankruptcy court entered two orders: (1) an order granting the Landlord's motion for summary judgment and denying the Debtor's cross-motion for summary judgment, and (2) an order directing the Debtor to return the liquor license to the Landlord. n4

n4 On October 5, 2005, the bankruptcy court entered an endorsement order granting the Debtor's motion to amend the August 23, 2005, order directing turnover of the liquor license to the Landlord. As stated in the motion, the Debtor is no longer in possession of the liquor license, having returned the license to the Pennsylvania Liquor License Control Board in October, 2004, for safekeeping.

[**6]

## JURISDICTION

### I. Final Order

A bankruptcy appellate panel may hear appeals from "final judgments, orders and decrees [pursuant to *28 U.S.C. § 158(a)(1)*] or with leave of the court, from interlocutory orders and decrees [pursuant to *28 U.S.C. § 158(a)(3)*]." *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.), 218 B.R. 643, 645 (B.A.P. 1st Cir. 1998)*. "A decision is final if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Id. at 646* (citations omitted). An interlocutory order "'only decides some intervening matter pertaining to the cause, and requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.'" Id. (quoting *In re American Colonial Broad. Corp., 758 F.2d 794, 801 (1st Cir. 1985))*. A bankruptcy appellate panel is duty-bound to determine its jurisdiction before proceeding to the merits even if not raised by the litigants. See *In re George E. Bumpus, Jr. Constr. Co., 226 B.R. 724 (B.A.P. 1st Cir. 1998)*. A bankruptcy court's [**7] order granting a motion for summary judgment is a final order.

See *Jones v. Svreck (In re Jones), 300 B.R. 133, 137 (1st Cir. 2003)*; *Ragosa v. Canzano (In re Colarusso), 295 B.R. 166, 171 (B.A.P. 1st Cir. 2003)* (recognizing that order denying motion for summary judgment that also grants opposing party's cross-motion for summary judgment is final order because it ends litigation on the merits), aff'd, *382 F.3d 51 (1st Cir. 2004)*.

## II. Timeliness

Timely filing a notice of appeal is mandatory and jurisdictional. See *Johnson v. Teamsters Local 559, 102 F.3d 21, 28 (1st Cir. 1996)* (citing *Acevedo-Villalobos v. Hernandez, 22 F.3d 384, 387 (1st Cir. 1994)*). If a notice of appeal is not timely filed, the bankruptcy appellate panel does not have jurisdiction over the appeal. See *Colomba v. Solomon (In re Colomba), 257 B.R. 368, 369 (B.A.P. 1st Cir. 2001)*. Although the Debtor's Notice of Appeal was filed prior to the entry of the subject orders on August 23, 2005, the appeal is timely. See *Fed. R. Bankr. P. 8002(a)* ("A notice of appeal filed after the announcement of a decision [**8] or order but before the entry of the judgment, order, or decree shall be treated as filed after such entry and on the day thereof").

## STANDARD OF REVIEW

We evaluate the bankruptcy court's findings of fact pursuant to the "clearly erroneous" standard of review and its conclusions of law de novo. *Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994)*; see also *Fed. R. Bankr. P. 8013*; *Palmacci v. Umpierrez, 121 F.3d 781, 785 (1st Cir. 1997)*. A trial court's grant of summary judgment, as well as its [*259] determination that there are no issues of material fact

in dispute, are reviewed de novo. See *Canzano v. Ragosa (In re Colarusso), 382 F.3d 51, 57-58 (1st Cir. 2004)*; *McCrory v. Spigel (In re Spigel), 260 F.3d 27, 31 (1st Cir. 2001)*; *Beatrice v. Braunstein (In re Beatrice), 296 B.R. 576, 577 (B.A.P. 1st Cir. 2003)*.

## DISCUSSION

## I. Debtor's Interest in the Liquor License

The Debtor argues that the bankruptcy court erred in its findings and conclusions regarding the scope of the Debtor's interest in the liquor license. According [**9] to the Debtor, the liquor license is property of the estate which can be marketed and sold for the benefit of its creditors. We disagree.

*Section 541(a)(1) of the Bankruptcy Code* provides that property of a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *11 U.S.C. § 541(a)*; see also *Ostrander v. Lalchandani (In re Lalchandani), 279 B.R. 880, 883 (B.A.P. 1st Cir. 2002)*. *Section 541* is construed broadly to bring any and all of the debtor's property rights within the bankruptcy court's jurisdiction and the umbrella of protections granted by the Bankruptcy Code, and to promote the goal of equality of distribution. See *United States v. Whiting Pools, Inc., 462 U.S. 198, 205 n.9, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983)*. The question of whether an interest claimed by the debtor is "property of the estate" is a federal question to be decided by federal law; however, courts must look to state law to determine whether and to what extent the debtor has any legal or equitable interests in property as of the commencement of the case. See *Butner v. United States, 440 U.S.*

05-44481-rdd   Doc 4019   Filed 06/05/06   Entered 06/05/06 12:25:01   Main Document
Pg 135 of 189

Page 5

335 B.R. 253, *; 2005 Bankr. LEXIS 2595, **;
45 Bankr. Ct. Dec. 204

*48, 54, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979).* **[**10]** Given the fact that the liquor license is titled in the Debtor's name, it is clear that the license constituted one of the "legal or equitable interests" of the Debtor at the commencement of this case, and that interest (whatever it is) is property of the Debtor's estate under *§ 541.* We turn to Pennsylvania law n5 to determine the scope of the Debtor's interest in the liquor license. See *id.*

n5 Although the lease does not contain a choice of law provision, the Landlord contends that Pennsylvania applies and the Debtor has not opposed that assertion.

At the time the lease was executed, *§ 4-468(b.1)* of the Pennsylvania Liquor Code provided: "The license shall continue as a personal privilege granted by the board and nothing herein shall constitute the license as property." *47 P.S. § 4-468(b.1).* Courts interpreting that provision have concluded that a liquor license is not personal property, but constitutes a mere personal privilege to conduct a certain type of business at a specific **[**11]** location. See, e.g., *1412 Spruce, Inc. v. Pa. Liquor Control Bd., 504 Pa. 394, 474 A.2d 280, 283 (Pa. 1984).* Consequently, liquor licenses can not be levied upon or attached, see *id.* (upholding conclusion that liquor license, while in safekeeping with the liquor control board, was not subject to the execution process in Pennsylvania because it constituted a personal privilege rather than personal property), and are not properly subject to a security interest. See *In re Revocation of Liquor License No. R-2193, 72 Pa. Commw. 367,*

*456 A.2d 709 (Pa. Commw. Ct. 1983);* see also *Matter of MJ's, Inc., 49 B.R. 492 (Bankr. W.D. Pa. 1985).* Moreover, the Pennsylvania Supreme Court has concluded that a liquor license transferred as a part of a lease transaction does not constitute an interest in "property," but is **[*260]** merely a temporary right to use the license during the life of the lease. See *O'Neill v. Keegan, 376 Pa. 606, 103 A.2d 909, 910-911 (Pa. 1954).*

The Debtor recognizes that as between it and the Pennsylvania Liquor Control Board the liquor license is a "mere personal privilege." However, the Debtor contends that as between it and the Landlord, or other third **[**12]** parties, the liquor license itself is property of its bankruptcy estate which may be marketed and sold for the benefit of creditors. To support its argument, the Debtor cites several bankruptcy cases from the District of Pennsylvania. See, e.g., *In re Nejberger, 934 F.2d 1300, 1302 (3d Cir. 1991)* (concluding that a Pennsylvania liquor license is appropriately considered property of the estate within the broad definition of *§ 541*); *Johnson v. Kramer (In re Kramer), 71 B.R. 2, 5 (Bankr. E.D. Pa. 1986)* (noting that while a liquor license itself may not be property of the estate, a trustee's rights with regard to a liquor license are estate property under *§ 541(a)*); *Keck v. Schuster's Restaurant, Inc. (In re Miller), 68 B.R. 385, 387 (Bankr. W.D. Pa. 1986)* (stating that a privilege under state law can be property of a debtor's bankruptcy estate); *Miller v. Hodges (In re Hodges), 33 B.R. 51, 54 (Bankr. E.D. Pa. 1983)* (stating that liquor licenses are "legal or equitable interests of the debtor in property as of the commencement of the case" and therefore constitute property of the es-

335 B.R. 253, *; 2005 Bankr. LEXIS 2595, **;
45 Bankr. Ct. Dec. 204

tate notwithstanding state law holding [**13] that a liquor license is a privilege rather than personal property); see also *Penn Center Mgmt. Corp. v. Ultimate Restaurant Group, Inc. (In re Ultimate Restaurant, Inc.), 144 B.R. 291 (Bankr. W.D. Pa. 1992)*. Unfortunately, none of these cases support the Debtor's position.

*Nejberger*, the only circuit court decision cited by the Debtor, is distinguishable because it involved a debtor's efforts to renew an expired liquor license while in bankruptcy, an issue which is not analogous to the one in the present case. The remaining cases cited by the Debtor are distinguishable from this case because in each of those cases the debtor's rights in the liquor license arose from an agreement to sell the liquor license and other assets to the debtor. See *Ultimate Restaurant, 144 B.R. at 291* (involving the lease of real estate and an agreement to sell a liquor license to the debtor for $ 15,000); *Kramer, 71 B.R. at 2* (involving a lease and contract to sell a liquor license to the debtor for $ 30,000, and the seller's request for relief from the automatic stay to recover the license after the debtor's default of lease); *Hodges, 33 B.R. at 51* [**14] (involving the sale of a restaurant, bar and liquor license to the debtor, and the sellers' request for relief from the automatic stay to recover possession of the license after the debtor's default of the purchase agreement).

In this case it is undisputed that the Debtor acquired rights in the liquor license under the terms of the lease of the Property, not a sale of the Property. Moreover, the Debtor's rights in the liquor license were coterminous with its rights in the Property under the lease. Although the Landlord transferred the license to the Debtor for nominal consideration of $ 1.00, there was no related sale of assets, and the Debtor did not acquire any ownership interest in the liquor license separate from the lease. Accordingly, to the extent that the Debtor's interest in the liquor license constitutes property of its bankruptcy estate under federal law, the scope of that interest is limited to a temporary privilege to use the license for the duration of the lease of the Property. No provision of the lease or applicable state law provides the Debtor with rights in the liquor license separate and distinct from its rights under the lease of the Property.

## [*261] II. Specific [**15] Performance

The Debtor argues that the bankruptcy court erred in finding that the Landlord could compel specific performance of the license retransfer provisions of the lease notwithstanding the Debtor's rejection of the lease. According to the Debtor, the Landlord's specific performance rights were subordinated by the Debtor's rejection rights. We disagree. The Debtor's rejection of the lease did not terminate the Landlord's right under state law to specifically enforce the retransfer provisions of the lease.

Pursuant to § 365, a debtor can decide to reject an unexpired lease in the course of its bankruptcy case. Rejection does not constitute a termination of the contract. See *Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp., 80 B.R. 606 (D. Mass. 1987)* (citing cases); see also Michael T. Andrew, Executory Contracts in Bankruptcy: Understanding 'Rejection', 59 U. Colo. L. Rev. 845 (1988) ("Rejection does not cancel, repudiate, or terminate contracts"). It does not cause a contract to magically vanish. See *Sir Speedy, Inc. v. Morse, 256 B.R. 657, 659 (D. Mass. 2000)*.

05-44481-rdd    Doc 4019    Filed 06/05/06    Entered 06/05/06 12:25:01    Main Document
Pg 137 of 189

Page 7

335 B.R. 253, *; 2005 Bankr. LEXIS 2595, **;
45 Bankr. Ct. Dec. 204

Rather, the Debtor's rejection of the [**16] lease of the Property constitutes a breach of the lease as of the petition date. See *11 U.S.C. § 365(g)*. Accordingly, the rights and obligations of the parties remain intact after a rejection because "rejection does not change the substantive rights of the parties to the contract, but merely means the bankruptcy estate itself will not become a party to it." Andrew, supra, at 848-49.

This does not mean that rejection has no effect. Rejection means "that the non-debtor party to the contract subject to rejection is limited in its claims for breach to the treatment accorded to a debtor's general unsecured creditors." *In re Walnut Assocs., 145 B.R. 489, 494 (Bankr. E.D. Pa. 1992)*. Thus, to the extent the breach creates a claim in the non-debtor party, this claim can be processed through the bankruptcy proceeding. Andrew, supra, at 848-49. Rejection also means that the debtor cannot be compelled to render its performances required under the contract, unless specific performance is available to the non-debtor party under applicable state law. See *Walnut Assocs., 145 B.R. at 494*. However, "if state law does authorize specific [**17] performance under the rejected executory contract, it means that the non-debtor should be able to enforce the contract against the Debtor, irrespective of his rejection of it." Id. Thus, a party is entitled to specific performance of a rejected contract if such a remedy is clearly available under applicable state law.

Pennsylvania law conforms to the general rules regarding the availability of specific performance. "Specific performance should only be granted . . . where no adequate remedy at law exists." *Clark v. Pennsylvania State Police, 496 Pa. 310, 436*

*A.2d 1383, 1385 (Pa. 1981)* (citations omitted). With respect to what constitutes an adequate remedy at law, the Pennsylvania Supreme Court has observed that "an action for damages is an inadequate remedy when there is no method by which the amount of damages can be accurately computed or ascertained." Id. (citations omitted). It is well settled that damages cannot be accurately ascertained, and thus specific performance is an appropriate remedy, "where the subject matter of the agreement is an asset that is unique or one such that its equivalent cannot be purchased on the open market." *Tomb v. Lavalle, 298 Pa. Super. 75, 444 A.2d 666, 668 (Pa. Super. 1981)* [**18] (citing *Pichler v. Snavely, 366 Pa. 568, 79 A.2d 227 (1951)*; *Cochrane v. Szpakowski, 355 Pa. 357, 49 A.2d 692 (1946)*; *Simcoe v. Huszar, 10 D. & C.3d* [*262] *298 (1979))*. A liquor license has been recognized as such an asset. See id. It is not necessary for a court to make a specific finding that another liquor license is not available before ordering specific performance. Indeed, the Pennsylvania Supreme Court has taken judicial notice of the fact that liquor licenses are limited in number and hence not readily available. See id. (upholding the conclusion that a liquor license is a unique item, not easily replaceable, and one for which mere monetary compensation would be inadequate); see also *Cochrane, 49 A.2d at 694* (concluding that a liquor license has "a peculiar value depending upon the business ability and the popularity of the owner, which cannot be accurately or adequately measured or compensated for in an action at law"). Accordingly, because the liquor license is an inherently "unique" asset, specific performance is a remedy available under Pennsylvania law.

335 B.R. 253, *; 2005 Bankr. LEXIS 2595, **;
45 Bankr. Ct. Dec. 204

The Debtor argues that even if specific performance is available under state [**19] law, any such right is subordinated by the Debtor's rejection rights in bankruptcy. Although the Debtor cites case law to support its argument that there is no right to specific performance of a contract rejected in bankruptcy, n6 the result is different where there is no available monetary remedy. See generally *Sir Speedy, Inc. v. Morse, 256 B.R. 657 (D. Mass. 2000)*. Because rejection constitutes only a breach, not a termination, an obligation in a rejected contract continues to bind a debtor unless the obligation is discharged. See id. (emphasis added).

n6 See, e.g., *Penn Center Mgmt. Corp., 144 B.R. at 295* (concluding that because of its rejection, a lease was no longer enforceable against the debtor and the landlord could not compel the debtor to retransfer liquor license); *In re Fleishman, 138 B.R. 641, 648 (Bankr. D. Mass. 1992)* ("Specific performance should not be permitted where the remedy would in effect do what *§ 365* meant to avoid, that is, impose burdensome contracts on the debtor."); *In re Waldron, 36 B.R. 633, 642 n.4 (Bankr. S.D. Fla. 1984)*, rev'd on other grounds, *785 F.2d 936 (11th Cir. 1986)* ("The Code does not permit specific performance as a remedy resulting from the rejection of an executory contract under *§ 365*.").

[**20]

In *Sir Speedy,* the District Court for the District of Massachusetts held that a franchisor could enforce a covenant not to compete notwithstanding the debtor's rejection of the franchise agreement. See id. The debtor entered into a franchise agreement with Sir Speedy, a franchisor of printing and copying centers. The agreement provided that in the event of termination of the agreement, the debtor would not operate any business competitive to Sir Speedy within a five-mile radius for one year. One week prior to filing for bankruptcy, the debtor removed all Sir Speedy signs and began operating under a different name. During the bankruptcy proceedings, the bankruptcy court rejected Sir Speedy's efforts to enforce the non-compete clause, concluding that the breach of the agreement constituted a "claim." On appeal, the district court reversed, concluding that the breach of the non-compete clause did not give rise to a right to payment and, therefore, was not a "claim" under *§ 101(5)(B)*. On remand, the bankruptcy court refused to grant injunctive relief, finding that the rejection of the agreement constituted a termination of all obligations under that agreement. On appeal, the [**21] district court noted that although the debtor, in rejecting the agreement, also rejected the covenant not to compete, the very purpose of the covenant was to govern the relationship between the parties after the demise of the underlying contract, and the rejection did not constitute a termination of the agreement. The district court concluded, therefore, that because the breach of the non-compete [*263] clause did not constitute a claim, Sir Speedy was entitled to injunctive relief. n7 *Id. at 658.* Accordingly, in order to be entitled to specific performance, the Landlord must show that its breach of contract remedy is not a claim under *§ 101(5)(B)*.

05-44481-rdd   Doc 4019   Filed 06/05/06   Entered 06/05/06 12:25:01   Main Document
Pg 139 of 189

Page 9

335 B.R. 253, *; 2005 Bankr. LEXIS 2595, **;
45 Bankr. Ct. Dec. 204

n7 The Debtor attempts to distinguish Sir Speedy from the present case because it involved the enforceability of a covenant not to compete after rejection of a franchise agreement. According to the Debtor, the purpose of a covenant not to compete is to govern the relationship between the parties after the demise of the underlying contract, and that there was no such provision in the subject lease. We do not agree that this distinction affects the relevance of this case to the issue of specific performance.

[**22]

The Debtor argues that "the Landlord's specific performance remedy constitutes a dischargeable claim" under *§ 101(5)(B)*, and that the bankruptcy court erred by disregarding the availability of a monetary remedy for the Landlord under the facts of this case. According to the Debtor, the Landlord cannot show that the license has no adequate monetary equivalent as the Debtor intends to sell the license at auction, and the Landlord would be able to bid on the license.

A "claim" is defined, in relevant part, as:

> [the] right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputes, undisputed, secured, or unsecured[.]

*11 U.S.C. § 101(5)(B)*. An equitable remedy will "give rise to a right of payment" and therefore be deemed a "claim," when the payment of monetary damages is an alternative to the equitable remedy. See *In re Ben Franklin Hotel Assocs., 186 F.3d 301, 305 (3d Cir. 1999); Air Line Pilots Assoc. v. Continental Airlines, 125 F.3d 120, 133 (3d Cir. 1997)* [**23] (citing *Matter of Udell, 18 F.3d 403, 407 (7th Cir. 1994)* ("One example of a 'claim' is a right to an equitable remedy that can be satisfied by an 'alternative' right to payment.")). Thus, where an award of monetary damages is a "viable alternative" to the equitable remedy sought by plaintiffs, such as specific performance, the asserted equitable relief should be treated as a "claim." See *Air Line Pilots, 125 F.3d at 132*; see also *Udell, 18 F.3d at 408* (holding that the right to an equitable remedy for breach of performance is a claim if the same breach also gives rise to a right of payment with respect to the equitable remedy or if the right to payment is an alternative to the right to an equitable remedy).

The lease of the Property contains no language that could be construed as creating a right to money damages. Therefore, the rights of the Landlord do not constitute a claim and cannot be discharged.

## III. Avoidance under § 544

The Debtor argues that the bankruptcy court erred in concluding that the Landlord's interest in the liquor license cannot be avoided as a "secret lien" under *§ 544*. We disagree. Under Pennsylvania [**24] law at the time the lease was executed, there could not be a "secret lien," or a lien of any

05-44481-rdd    Doc 4019    Filed 06/05/06    Entered 06/05/06 12:25:01    Main Document
Pg 140 of 189

Page 10

335 B.R. 253, *; 2005 Bankr. LEXIS 2595, **;
45 Bankr. Ct. Dec. 204

kind, relating to the liquor license because the license was a personal privilege, not property, and, therefore, the Landlord did not and could not obtain a lien or a security interest.

To be afforded the secured transaction protection of the Uniform Commercial Code, the subject of a security interest must be personal property. n8 As noted **[*264]** above, at the time the lease was executed, *§ 4-468* of the Pennsylvania Liquor Code provided that a liquor license was a "personal privilege granted by the board and nothing therein shall constitute the license as property." Thus, a liquor license could be neither property nor the subject of a valid security interest under the Uniform Commercial Code. See *In re Kramer, 71 B.R. at 4* (noting that it is not possible under Pennsylvania law to impose a lien upon a "privilege").

N8 A security interest "means an interest in personal property or fixtures." See *13 Pa. Cons. Stat. § 1201.*

**[**25]**

In 1987, *§ 4-468* was amended to include a new subsection *(d)*, which provides that "the license shall constitute a privilege between the board and the licensee. As between the licensee and third parties, the license shall constitute property." Thus, after the 1987 amendment, a liquor license would constitute "property" to which a third party's security interest could attach. See *Pennbank v. GRF, Inc. (In re GRF, Inc.), 119 B.R. 68, 70 (Bankr. W.D. Pa. 1990).* This section was not in effect, however, at the time the lease was executed. The Debtor argues that even if the Landlord was not able to obtain an enforceable security interest in the license at the inception of the lease, it could have perfected a security interest after the 1987 amendment. However, the amendment to *§ 4-468* was not meant to have retroactive effect, and the Landlord was not required to perfect a security interest after the 1987 amendment. See *In re J.B. Winchells, Inc., 106 B.R. 384 (Bankr. E.D. Pa. 1989)* (citing *Jackson v. Miller (In re Jackson), 93 B.R. 421, 424 (Bankr. W.D. Pa. 1988)).* Therefore, the bankruptcy court did not err in concluding that there could **[**26]** not be a secret lien because the Landlord did not and could not hold a security interest in the license.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the bankruptcy court's order granting summary judgment in favor of the Landlord and denying the Debtor's cross-motion for summary judgment.

LEXSEE 1999 BANKR. LEXIS 1870

**IN RE: PITTSBURGH SPORTS ASSOCIATES HOLDING COMPANY, PITTSBURGH HOCKEY ASSOCIATES, and HBRM LLC, Debtors; PUBLIC AUDITORIUM AUTHORITY OF PITTSBURGH AND ALLEGHENY COUNTY, a body corporate and politic, and SMG PITTSBURGH, INC., d/b/a PITTSBURGH ARENA, INC., a Delaware corporation, General Partner, trading as SMG PITTSBURGH, L.P., d/b/a PITTSBURGH ARENA, L.P., a Delaware limited partnership, Plaintiffs v. HBRM, LLC, a Pennsylvania limited liability company, General Partner of PITTSBURGH HOCKEY ASSOCIATES, a Pennsylvania limited partnership, and ROGER M. MARINO, an individual, Defendants**

**Bankruptcy No. 98-28174-BM, Bankruptcy No. 98-28175-BM, Bankruptcy No. 98-28176-BM, Jointly Administered At Bankruptcy No. 98-28174-BM, Chapter 11, Adversary No. 98-2475-BM**

**UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

*1999 Bankr. LEXIS 1870*

**March 25, 1999, Decided**

**DISPOSITION:** [*1] Motion for a permanent injunction filed by Public Auditorium Authority of Pittsburgh and by SMG Pittsburgh, Inc. GRANTED. Pittsburgh Hockey Associates and HBRM, LLC to dissolve the preliminary injunction issued on November 23, 1998, and again on November 25, 1998 DENIED.

**COUNSEL:** Corrine Ball, Weil, Gotshal & Manges LLP, Fred S. Hodara, Akin, Gump, Strauss, Hauer & Feld, LLP, Jeffrey W. Levitan, Proskauer Rose LLP, Saul E. Burian, Thomas Moers Mayer, KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP, Elliot H. Herstowitz, New York, NY, for 98-28174.

George L. Cass, Buchanan Ingersoll, P.C., Joel Marc Helmrich, Meyer, Unkovic & Scott, LLP, A. Jay Molluso, Office of Attorney General, David A. Murdoch, KIRKPATRICK & LOCKHART LLP, David Armor Murdoch, Kirkpatrick & Lockhart, Gary Philip Nelson, Sherrard,

Germand & Kelly, PC, Thomas Edward Reiber, Reiber & Sobkiewicz, LLC, Russell R. Sanders, May, Long & Sanders, Eric Andrew Schaffer, Reed, Smith Shaw & McClay, Steven T. Shreve, Glosser & Shreve, George Thomas Snyder, Stonecipher, Cunningham, Beard & Schmitt, Kenneth Mark Steinberg, Steidl & Steinberg, Amy M. Tonti, Reed Smith LLP, Marylouise Wagner, Apple & Apple, P.C., C. James Zeszutek, THORP, REED [*2] & ARMSTRONG, Domenic A. Bellisario, Douglas Anthony Campbell, Philip A. Fabiano, Ronald L. Hicks, Jr., George B. Mastovich, James G. McLean, Jacqueline R. Morrow, T. Lawrence Palmer, Philip J. Uher, Kimberly L. Wakim, James L. Weisman, Pittsburgh, PA, for 98-28174.

Timothy R. Casey, Harold L. Kaplan, GARDNER, CARTON & DOUGLAS, John McCambridge, GRIPPO & ELDEN, Chicago, IL, for 98-28174.

James Cirilano, Mc Kees Rocks, PA., for 98-28174.

Jeffrey Citron, Toronto, CANADA, for 98-28174.

Louis Coffey, Marvin Krasney, WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP, Philadelphia, PA, for 98-28174.

Heather Lennox, Cleveland, OH, for 98-28174.

E. Penn Nicholson, POWELL, GOLDSTEIN, FRAZER & MURPHY, LLP, Atlanta, GA, for 98-28174.

Joel Ohlgren, SHEPPARD, MULLIN, RICHTER & HAMPTON, Diana P. Scott, GILCHRIST & RUTTER, Los Angeles, CA, for 98-28174.

Christine Robinette, US BANK TRUST NATIONAL ASSN., St. Paul, MN, for 98-28174.

Paul Scheerer, DORSEY & WHITNEY, LLP, Minneapolis, MN, for 98-28174.

Michelle Shuker, BERK, WHITEHEAD, CASSOL, FELICIANI & KERR, P.C., Greensburg, PA, for 98-28174.

Charles A. Dale, GADSBY & HANNAH LLP, Harry L. Manion, III, Martin [*3] F. Gaynor, III, COOLEY MANION JONES LLP, Boston, MA, for petitioner (98-28174).

Michael L. Tuchin, Klee, Tuchin, Bogdanoff LLP, Los Angeles, CA, for petitioner (98-28174).

Weisman, Goldman, Bowen & Gross, LLP, Pittsburgh, PA, for petitioner (98-28174).

Doepken, Keevican & Weiss, Pittsburgh, PA, for creditors committee (98-28174).

Kathleen Robb, Office of the U.S. Trustee, Pittsburgh, PA, for U.S. Trustee (98-28174).

Robert Gerald Sable, Sable, Pusateri, Rosen, Gordon & Adams, Sable, Pusateri, Rosen, Gordon & Adams, Pittsburgh, PA, for debtor (98-28174).

Spence, Custer, Saylor, Wolfe & Rose, James R. Walsh, Spence Custer Saylor Wolfe & Rose, Johnstown, PA, for debtor (98-28174).

Office of United States Trustee, Pittsburgh, PA.

**JUDGES:** BERNARD MARKOVITZ, Chief Judge, U.S. Bankruptcy Court.

**OPINIONBY:** BERNARD MARKOVITZ

**OPINION:**

### PREFACE

Two matters are before us at this time.

After receiving evidence in court that Roger Marino and his representatives had egregiously breached non-relocation covenants contained in agreements Pittsburgh Hockey Associates ("PHA") had with Public Auditorium Authority of Pittsburgh ("PAA") and SMG Pittsburgh, Inc. (SMG"), we issued **[*4]** orders in November of 1998 preliminarily enjoining PHA, HBRM, and Marino from taking further actions in breach of the covenants. Marino is a principal of PHA and HBRM. The breaches occurred so soon after execution of the agreements that one is left to wonder whether Marino intended to abide by the covenants when the agreements containing them were executed.

Seeking to require debtors and Marino to abide by their promise to keep the Pittsburgh Penguins hockey team playing at the Pittsburgh Civic Arena, PAA and SMG have brought a motion to make permanent the injunction we issued in November of 1998.

Claiming that the value of the Penguins franchise can be accurately determined only if we permit them to solicit offers from potential purchasers who might relocate the team elsewhere, PHA and HBRM have brought a motion to dissolve the preliminary injunction.

We will deny the motion of PHA and HBRM to dissolve the temporary injunction and instead will grant the motion of PAA and SMG for a permanent injunction.

### MEMORANDUM OPINION

### - FACTS -

PAA is a corporation created under the Public Auditorium Authorities Law (53 P.S. § 2384 *et seq.*). Among other things in April of 1958, **[*5]** it leased from Urban Redevelopment Authority tracts of land on which the Civic Arena was constructed.

SMG is in the business of managing and operating various sports, entertainment, and convention complexes throughout the nation. It presently manages and operates the Civic Arena.

Debtor PHA is a limited partnership which owns and operates the Penguins franchise. It plays its home games at the Civic Arena.

Debtor HBRM is a limited liability company and is the sole general partner of PHA.

Defendant Roger Marino is co-chair of HBRM and co-managing director of PHA. He holds himself out as co-owner of the Penguins and has assumed and asserted *de facto* control and ultimate authority over the team.

Pursuant to a sublease dated July 1, 1981, PAA subleased the Civic Arena to

1999 Bankr. LEXIS 1870, *

Civic Arena Corporation ("CAC"), which managed and operated the facility.

On October 31, 1991, CAC assigned its sublease to SMG. In addition to managing and operating the Civic Arena, SMG coordinates and promotes all events held at the facility.

In accordance with an amended and restated lease agreement with PHA, SMG subleased the Civic Arena to PHA on October 31, 1991. The term of the lease will not expire until [*6] September 1, 2012.

Paragraph 304 of the amended and restated lease between SMG and PHA dated July 14, 1993, contained a "non-relocation covenant", whereby PHA covenanted and agreed:

> (1) to play and cause to be played in the Arena, all Penguins Regular Scheduled Games, all Penguins Playoff Series Games in which the Penguins are designated to play in their home rink, and at least two Exhibition Games per Season;

> (2) not to cause or permit the Penguins' status as a Member Club of the National Hockey League for the City of Pittsburgh, Commonwealth of Pennsylvania, to be transferred outside the City of Pittsburgh, Commonwealth of Pennsylvania, unless mutually agreed upon by Tenant and Landlord; and

> (3) not to assign, transfer, let or sublet, mortgage or pledge this Lease without the prior written consent of Landlord.

Among other things, PHA agreed in paragraph 305 of the amended and restated lease agreement dated July 14, 1993, not to "assign, transfer, pledge, or otherwise dispose of the Penguins" and not to "sell, assign, sublet, or otherwise transfer" its rights under the lease without the prior, written consent of SMG.

Paragraph 704 of the amended and restated [*7] lease between SMG and PHA further provides as follows:

> Tenant acknowledges that its obligation hereunder not to relocate during the term of this Lease is necessary to protect the business and goodwill of Landlord and that a breach of such covenant will irreparably and continually damage Landlord, for which money damages may not be adequate or determinable, and that Landlord shall, in addition to any other remedies available at law or in equity, have the right to injunctive relief to enforce the aforesaid covenant and to protect and preserve the rights of Landlord. Tenant agrees that in the event it breaches any of the non-relocation covenant, Landlord shall be entitled to a temporary, preliminary or permanent injunction in order to prevent the continuation of such harm... .

Paragraph 705 of the lease provided that, in addition to the rights and remedies given to it in the agreement, SMG would have all rights and remedies available to it at law or in equity. All such available rights and remedies are "cumulative and concurrent".

Paragraphs 304 and 704 of the amended and restated lease dated July 14, 1993, were amended in June of 1997, in a third amendment to the amended [*8] and restated lease.

Paragraph 304(2) was amended to provide that PHA could not cause the Penguins to be transferred out of Pittsburgh unless mutually agreed upon by SMG **and PAA**.

Paragraph 704 was amended to add paragraphs (B)(1) through (5).

PHA made various "acknowledgments" in paragraph (B)(1). For instance, PHA "acknowledged" that PAA, the City of Pittsburgh, and the County of Allegheny would suffer irreparable harm if PHA relocated the Penguins or entered into an agreement to sell the Penguins that contemplated relocating the team. Such action, PHA acknowledged, would constitute a material breach for which PAA would have no adequate remedy at law. PHA further acknowledged that PAA would be entitled to injunctive relief to prevent continuation of such harm. Lastly, PHA agreed that PAA had the right to recover specified liquidated damages, "if the Authority is unable to obtain an injunction".

Paragraphs 704(B)(2) through (4) provide that, in the event PHA receives a bona fide offer to relocate the Penguins to another venue or to purchase and then relocate the team to another venue, which offer PHA

intends to accept, PHA shall promptly notify PAA, the City, and the County [*9] and shall wait sixty days before accepting the offer. PAA has the option during this sixty-day period to match the offer.

Paragraph 704(B)(5) specifies the liquidated damages to which PAA is entitled. It provides in relevant part that:

> If the Authority is unable to (x) obtain an injunction in accordance with subsection 704(B)(1) above or (y) to find a buyer who exercises the option granted under subsection 704(B)(4) above, or if the Authority, in its sole discretion, chooses not to seek such a buyer, then the Authority shall have the right to recover liquidated damages from PHA in a cumulative amount...

The specified damages identified in paragraph 704(B)(5) include: the outstanding amount borrowed by PAA to renovate the Civic Arena in 1997; the outstanding amount of a bond PAA issued in 1994 to make earlier renovations to the Civic Arena; tax revenues lost in connection with Penguins games played at the Civic Arena; and $ 5,000,000 for additional damages and/or to offset costs incurred to attract another NHL franchise to Pittsburgh.

Beginning late in 1996, PHA approached PAA and SMG and requested certain improvements to the Civic Arena. Its request was in addition [*10] to improvements PAA had made to the Civic Arena in 1994 and 1995 with public funds. Among other things, PHA requested installation of

luxury boxes and reconfiguration of the seating bowl.

PAA and SMG ultimately agreed to undertake the requested improvements. PAA financed the improvements by borrowing the sum of $ 10,500,000, which was to be repaid from public funds through allocations of tax revenue from Allegheny Regional Asset District ("RAD") and from a RAD grant in the approximate amount of $ 2,300,000.

Marino purchased an ownership interest in the Penguins through PHA in May of 1997, thereby becoming an equal partner and co-managing director of the Penguins.

On June 23, 1997, approximately one month after Marino acquired an interest in the Penguins, PHA, SMG, and PAA executed a document entitled "Development and Repayment Agreement". Paragraph (f) of the Recital portion of this agreement made reference to another agreement executed that same day. It states as follows:

> (f) Pursuant to the PHA Agreement, and as consideration in part for the improvement, PHA has agreed that the Pittsburgh Penguins will not be relocated from the Arena during the term of this Agreement. [*11] .. .

The term of this agreement expires on June 30, 2007.

That same day -- i.e., June 23, 1997 --, PAA and PHA executed a document entitled "PHA Agreement", the term of which also expires on June 30, 2007.

PAA agreed in paragraph 1 to provide up to $ 10,500,000 to PHA to make improvements to the Civic Arena in accordance with the Development Agreement.

Paragraph 2.A of this agreement provides in part as follows:

> A. Covenant. Effective immediately, PHA affirmatively covenants to (I) occupy the Civic Arena in accordance with the Penguins Lease; (ii) have its NHL franchise continue to play the home portion of its regular and playoff schedule at the Civic Arena in accordance with the Penguins lease; (iii) not to relocate or attempt to relocate its NHL franchise; and (iv) not to initiate discussions for the sale and relocation of PHA's NHL franchise with any third party.

Paragraph 2.C of the PHA Agreement is identical to paragraph 704(B)(1) of the third amendment to the amended and restated lease agreement between PHA and SMG. It provides as follows:

> C. Injunctive Relief. PHA acknowledges that the Authority, the City, and the County would suffer irreparable [*12] harm if PHA's NHL franchise would, during the term of this Agreement, relocate or enter into any agreement for the sale or assignment of its rights and privileges under its NHL franchise that would constitute a material

breach of this Agreement, that damages incurred as a result of such material breach would not be readily ascertainable, and that money damages would not adequately compensate the Authority, the City, or the County for resulting injuries. PHA acknowledges that its obligations as set forth in this Agreement are unique and that the Authority would not have an adequate remedy at law if PHA's NHL franchise were to relocate. Therefore, PHA agrees that this Agreement may be specifically or mandatorily enforced by the Authority. PHA agrees that, if it breaches this covenant not to relocate, then in addition to any other remedies available at law or in equity (including specific performance), the Authority shall be entitled to a temporary, preliminary, or permanent injunction in order to prevent the continuation of such breach or harm....If the Authority is unable to obtain an injunction, the Authority shall have the right to recover liquidated damages as set forth below.

**[*13]**

Paragraph 2.G of the PHA Agreement is virtually identical to paragraph 704(B)(5) of the third amendment to the amended and restated lease agreement. It sets forth the same liquidated damages which PAA would be entitled to recover in the event PAA was unable to obtain an injunction in accordance with paragraph 1.C.

Starting in May of 1998, less than a full year after PHA had persuaded PAA to make further improvements to the Civic Arena and PHA had executed the so-called "PHA Agreement", Roger Marino, principal of debtors PHA and HBRM, undertook discussions with representatives of various cities concerning relocation of the Penguins. If he ever intended to abide by the non-relocation covenants set forth in the third amendment to the amended and restated lease agreement and the PHA Agreement, we are left to wonder whether the ink on the agreements had fully dried before Marino decided to investigate the possibility of relocating the Penguins to another city. Conduct in violation of the covenants almost certainly occurred well before one year had elapsed. Marino and his representatives did not wake up one morning and decide on the spur of the moment to make overtures to other cities **[*14]** and to travel there that same day to meet with appropriate individuals and to tour their arenas. Arranging such visits requires considerable time and planning before they take place.

Marino secretly traveled to Houston, Texas, in May of 1998 to meet with its representatives to discuss possible relocation of the Penguins to Houston and to tour the Summit to see whether it was a suitable venue for playing hockey.

He secretly traveled to Kansas City, Missouri, in August of 1998 and met with its representatives, including its Mayor, to discuss moving the Penguins to Kansas City. Marino also toured the Kemper Arena to evaluate it as a potential venue for hockey games.

At some unspecified time after August of 1998, Marino or his representatives also

1999 Bankr. LEXIS 1870, *

secretly traveled to Las Vegas, Nevada, and met with representatives of these cities to discuss the possibility of relocating the Penguins there.

Neither PAA, SMG, nor the other co-principal and co-owner of the Penguins was aware of any of these visits and discussions concerning possible relocation of the Penguins until after they had taken place.

On October 7, 1998, after learning about these visits and discussions, PAA and SMG brought [*15] a complaint in equity in the Court of Common Pleas of Allegheny County, Pennsylvania, against PHA, HBRM, and Roger Marino seeking to enforce the non-relocation covenants contained in the third amendment to the amended and restated lease with SMG and the PHA Agreement with PAA. Along with their complaint, PAA and SMG filed a motion requesting a preliminary injunction prohibiting PHA, HBRM, and Marino from violating the aforementioned non-relocation covenants.

Debtors PHA and HBRM responded to the complaint by filing voluntary chapter 11 petitions on October 13, 1998, thereby staying the state court action against them brought only six days before. Roger Marino himself did not file a bankruptcy petition. Three days later, on October 16, 1998, debtors PHA and HBRM had the state court action removed to this court, where it was docketed at Adversary No. 98-2475-BM.

PHA and HBRM brought motions to dismiss or to stay the adversary action against them. PAA and SMG responded by bringing a motion for remand or for relief from the automatic stay. Marino brought his own motion to dismiss shortly thereafter.

A hearing on these motions was conducted on November 13, 1998, at which time we invited [*16] all interested parties to provide whatever support for their motions they deemed appropriate. We issued an oral order at the conclusion of the hearing which, among other things, prohibited PHA, HBRM, and Marino from engaging in discussions with third parties pertaining to relocation of the Penguins and effectively requiring them to comply with the above non-relocation covenants. The order was entered after the parties had an opportunity to offer evidence on the matter. This order was primarily intended to maintain the status quo until the dust generated by debtors' bankruptcy filings had settled and we could decide upon a permanent course of action.

On November 17, 1998, PHA, HBRM, and Marino brought motions for reconsideration of our oral order of November 16, 1998. PHA and SMG stated their opposition to the motions.

We issued a written order on November 25, 1998, which was intended to codify our previous oral order. Among other things, the order enjoined debtors, their managing directors, partners, affiliates, agents, officers, servants, employees, experts, and attorneys from: (1) initiating or engaging in discussions with third parties concerning the sale or relocation of the [*17] Penguins hockey team; (2) relocating or attempting to relocate the Penguins hockey team to a venue other than the Civic Arena; and (3) causing or permitting the Penguins hockey team to play any portion of its regular season and playoff season scheduled for the Civic Arena to be played at any other venue.

1999 Bankr. LEXIS 1870, *

On January 9, 1999, PHA, HBRM, and Marino withdrew their earlier motions for reconsideration and did not appeal the written order of November 25, 1998. As a consequence, said order remains in force to this date.

After experiencing an apparent change of heart concerning the above injunction, PHA brought a motion on February 12, 1999, to dissolve the temporary injunction arising from our orders of November 13, 1998, and November 25, 1998, respectively.

PHA and SMG responded by bringing a motion of their own on February 23, 1999, to make permanent the injunction we had issued.

A hearing on the motion to dissolve the temporary injunction and the motion to make it permanent was held on March 19, 1999, at which time all interested parties were given an opportunity to offer evidence on the issues raised by the motions.

## - DISCUSSION -

Debtors PHA and HBRM and non-debtor Marino [*18] previously had requested reconsideration of the orders of November 13, 1998, and November 25, 1998, which enjoined them from taking action in violation of the above non-relocation covenants. We issued these orders because we were convinced at the time that they were necessary to preserve the status quo until the furor created by debtors' petitions subsided.

For reasons that are known only to debtors and Marino, they subsequently withdrew their motions for reconsideration and agreed to let the order stand. The orders

became binding when they took no appeal of them.

PAA and SMG have responded to debtors' motion by bringing a motion of their own to make the above injunction permanent.

We first will address the motion of PAA and SMG for a permanent injunction. A determination that a permanent injunction is warranted would largely obviate the need to address debtors' motion to dissolve the temporary injunction.

## A.) Motion For Permanent Injunction.

A party seeking a permanent injunction must:

> (1) demonstrate that exercise of the court's equity jurisdiction is warranted;
>
> (2) actually succeed on the merits of its claim; and
>
> (3) establish that the balance of [*19] the equities tips in favor of injunctive relief.

*Roe v. Operation Rescue, 919 F.2d 857, 868 n.8 (3d Cir. 1990).*

The first of these requirements itself consists of three subparts. The moving party must establish that:

> (1) it has no adequate remedy at law;

(2) the threatened injury is real, not imagined; and

(3) no equitable defense exists.

*Roe, 919 F.2d at 868 n.8.*

One has no "adequate remedy at law" if the injury in question is of a repeated or continuing nature or if monetary damages are difficult to ascertain or inadequate. *Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977).*

We are convinced that PAA and SMG would have no adequate remedy at law if debtors PHA, HBRM, and Marino were to continue violating the non-relocation covenants and took steps that resulted in moving the Penguins to another city. PAA is an instrumentality of the City of Pittsburgh and Allegheny County and was created to further the public interest of this community.

Were debtors to violate the non-relocation covenants and the Penguins ultimately moved as a consequence, the resultant injury to this community would be continual [*20] in that the community and surrounding areas would be without a professional NHL franchise. The injury most likely would be permanent in that it would be exceedingly difficult, if not impossible, to attract another NHL franchise to relocate here.

Moreover, any award of monetary damages would be difficult, if not impossible, to determine and would not be adequate. The Penguins are as much a part of the warp and woof of this community as are its other professional sports teams, museums, parks, theaters, and ethnic neighborhoods. Because the team is known as the **Pittsburgh** Penguins, it brings invaluable recognition to this region and greatly enhances its cachet in ways that confer economic benefit in the form of increased business, employment, and tax revenues. All of these would suffer if the Penguins relocated. Having an NHL franchise, we are convinced, can help to entice other individuals and businesses considering moving into this region to do so. Major League franchises contribute greatly to the making of major league cities.

We do not believe that the resultant injury to the self-image, pride, and prestige of this community, could be adequately compensated for solely by an [*21] award of money damages. To the extent that money damages would be adequate, they would be virtually impossible to calculate in a meaningful way.

The second and third subparts of the first of the above requirements for a permanent injunction also are satisfied in this case.

Evidence that the threat is real, not imagined, is found in the actions of Roger Marino and his minions occurring shortly after execution of the PHA Agreement. He made overtures to officials in Houston, Kansas City and Las Vegas, concerning relocation of the Penguins to these cities and even toured some of their arenas to find out whether they would provide a suitable venue for playing hockey. We have little or no doubt that Marino, as debtors' controlling principal, would once again violate the non-relocation covenants in the absence of an injunction prohibiting him and his subordinates from so doing.

Finally, debtors PHA and HBRM have not raised any equitable defenses to the request for a permanent injunction. Although

they seek to have the temporary injunction dissolved because the required elements for a temporary injunction purportedly are not satisfied, debtors have not asserted any credible equity-based [*22] arguments in opposition to the injunction.

Based on the foregoing, we conclude that the first of the above requirements for a permanent injunction is satisfied in this instance.

PHA and SMG also have satisfied the second requirement for a permanent injunction. In other words, they have prevailed on the merits of their claim that debtors and Marino breached the non-relocation covenants.

We previously determined that debtors and Marino, their dominant principal, breached these covenants by making secret overtures to various other cities about relocating the Penguins there and by traveling to those cities to discuss the matter in person with various officials and to tour their facilities to see if they would provide an acceptable venue for hockey. n1

n1 We will undertake later on in this memorandum opinion a more complete discussion of the contention of debtors PHA and HBRM that SMG and PHA **cannot** prevail on the merits in light of the fact that PHA and HBRM are in bankruptcy.

Finally, PAA and SMG have shown [*23] that the balance of the equities in this case favors issuance of a permanent injunction.

We already have determined that PAA, SMG, and the community at large, whose interest PAA is charged with furthering, would suffer substantial, noncompensable injury if PHA, HBRM, and Roger Marino were not enjoined from taking actions in violation of the non-relocation covenants and the Penguins ultimately moved elsewhere.

It is not clear what injury, if any, debtors PHA and HBRM themselves would suffer as debtors-in-possession if we permanently enjoined them from taking action which violates the non-relocation covenants and which resulted in the Penguins moving to another city. Any confirmed plan or reorganization apparently will be funded by a sale of the Penguins to a third party. We anticipate that the net sale proceeds will be applied as far as they go toward paying creditors' claims and will in no way inure to the benefit of PHA and HBRM. In addition, it is questionable at present whether such a sale would result in any funds that make their way to Roger Marino and other interest holders as equity owners.

It is conceivable, however, that claim holders may be harmed by a permanent injunction. [*24] A sale of the hockey franchise to a purchaser who would relocate the Penguins to another city might fetch more than would a sale to a purchaser who is not able to relocate the team. We have no way of knowing at the present time whether any distribution would be made to general unsecured creditors even in the event the team is sold and moved elsewhere. Even if we assume, however, that claim holders and equity interest holders would fare less well if a permanent injunction is issued, the irreparable harm suffered by PAA, SMG, and the community at large in the absence of a permanent injunction outweighs that ex-

perienced by claim holders and interest holders in the presence of one.

We reach this conclusion without intending to derogate the importance of the interests of claim holders in a bankruptcy case. As important as their interests are, they may have to give way when the interest of the community at large so dictates. In this case it so dictates.

Based on the foregoing, we conclude that we should grant the motion by PAA and SMG for a permanent injunction.

**B.) Motion To Dissolve Temporary Injunction.**

It is not necessary in light of the determination that PAA and SMG are [*25] entitled to a permanent injunction to address in detail the arguments offered by PHA and HBRM in support of their motion to dissolve the temporary injunction. We nonetheless shall address two arguments offered in support of their motion because of their importance not only to the decision to issue a permanent injunction but also to the eventual fate of the non-relocation covenants if and when debtors receive a discharge.

We have concluded that PAA and SMG were successful on the merits of their claim that PHA, HBRM, and Marino had breached the above non-relocation covenants. PHA and HBRM apparently concede that PAA and SMG may be entitled to permanent injunctive relief in another forum, but strenuously deny that such injunctive relief is appropriate in the context of a bankruptcy case. They offer two arguments in support of this proposition.

According to PHA and HBRM, any obligation owed to PAA and SMG as a result of the non-relocation covenants qualifies as a "claim" for purposes of § 101(5)(B) of the Bankruptcy Code and therefore is dischargeable. They also assert that, as a hypothetical judicial lien creditor, PHA may invoke the "strong-arm" power accorded by § 544(a)(1) of the [*26] Bankruptcy Code to avoid under state law the obligations owed to PAA and SMG under the non-relocation covenants. As a result, they argue, they could not be prohibited from selling the Penguins to a party who may wish to relocate the team to another city. Neither of these arguments has merit in this case.

"Claim" is defined in the Bankruptcy Code in relevant part as a:

> (B) right to an equitable remedy
> for breach of performance if
> such breach gives rise to a right
> to payment.

The term "claim" is to be construed broadly to permit a debtor to meet all of its legal obligations in bankruptcy and to enable holders of allowed claims to participate in the bankruptcy proceedings. *Ohio v. Kovacs, 469 U.S. 274, 279, 105 S. Ct. 705, 708, 83 L. Ed. 2d 649 (1985).*

The purpose of this provision is to cause the liquidation or estimation of contingent claims for which there may be an alternative equitable remedy with the result that the equitable remedy will be discharged in bankruptcy. For instance, if a judgment for specific performance may be satisfied by an alternative right to payment, the creditor entitled to specific performance has a "claim" in the bankruptcy case. [*27] *Kovacs, 469 U.S. at 280, 105 S. Ct. at 708.*

The United States Court of Appeals for the Third Circuit, whose decisions bind us, recently has spoken to the proper application of § 101(5)(B) in light of Kovacs. *See Torwico Electronics, Inc. v. State of New Jersey, Department of Environmental Protection (In re Torwico Electronics, Inc.), 8 F.3d 146 (3d Cir. 1993), cert. denied, 511 U.S. 1046, 114 S. Ct. 1576, 128 L. Ed. 2d 219 (1994); also Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines), 125 F.3d 120 (3d Cir. 1997), cert denied, 522 U.S. 1114, 118 S. Ct. 1049, 140 L. Ed. 2d 113 (1998).* n2

N2 We are aware of a well-reasoned case which would have us follow a different approach for determining whether a right to equitable relief is a "claim" for purposes of § 101(B)(5). *See Maids International, Inc. v. Ward (In re Ward), 194 B.R. 703 (Bankr. D. Mass. 1997).* Were we to follow its approach, the outcome of this case might well be different. We are, however, precluded from so doing because the United States Court of Appeals for the Third Circuit, which interpretation of the law binds us, has spoken to the issue.

**[*28]**

When determining whether equitable relief such as an injunction qualifies as a "claim" for purposes of § 101(5)(B), we must examine the nature of the remedy sought and determine whether it can give rise to a right to payment. *Continental Airlines, 125 F.3d at 134.* Even if it does not facially require payment of money, it still

may constitute a "claim". *Torwico, 8 F.3d at 150.*

In particular, we must determine whether monetary payment is an **alternative** for the requested equitable relief. If it is such an alternative, the equitable relief constitutes a "claim". *Continental Airlines, 125 F.3d at 133 (citing Matter of Udell, 18 F.3d 403, 407 (7th Cir. 1998)).*

The Third Circuit has analyzed requests for injunctive relief in either of two way to determine whether such relief qualifies as a "claim". These variant formulations, we are told, are "persuasive and consistent". *Torwico, 8 F.3d at 150.*

Under the one formulation, we must determine whether the requested equitable relief is but a "repackaged ....claim for damages". *Torwico, 8 F.3d at 149 (citing In re CMC Heartland Partners, 966 F.2d 1143, 1147 (7th Cir. 1992)).* **[*29]** If the requested equitable relief is so "repackaged", it qualifies as a "claim" for purposes of § 101(5)(B).

Under the other formulation, a request for equitable relief constitutes a "claim" if the party seeking the injunction has the option of taking action on its own and then suing to recover damages. If, however, the other party has no option to accept damages in lieu of equitable relief and instead seeks to end or ameliorate harm, it does not have a "claim". *Torwico, 8 F.3d at 149 (citing In re Chateaugay, 944 F.2d 997, 1008 (2d Cir. 1991)).*

The fact that compliance with an order granting equitable relief will require a debtor to expend money, without more, is not sufficient reason for concluding that the equitable remedy sought is a claim. What

matters is whether a party seeks to force a debtor to pay money to it, in which case that party has a "claim". *Torwico, 8 F.3d at 150.*

Applying the above legal standard to the facts of this case, we conclude that the injunctive relief sought by PAA and SMG is **not** a "claim" for purposed of § 101(5)(B) and therefore survives debtors' anticipated discharges.

We do not view [*30] the permanent injunction PAA and SMG seek as a "repackaged claim for damages" arising out of the breach of the non-relocation covenants by PHA, HBRM, and Marino. PAA and SMG instead seek to prevent PHA, HBRM, and Marino from continuing to engage in conduct that violates the covenants. In short, they want the Penguins to remain where they are and want to avoid having to recover for losses resulting from the breaching of the covenants. n3

n3 Media accounts and statements in court proceedings made public the secret attempts at shopping the Penguins. Immediately thereafter, public support at the box office dipped, all of which inured to the economic detriment of PAA and SMG. In spite thereof, no claim is advanced for money damages.

We also do not view PAA and SMG as having the option **in the requisite sense** of seeking monetary damages as an "alternative" to an injunction prohibiting PHA, HBRM, and Marino from breaching the covenants.

Paragraph 704(B)(1) of the third amendment to the restated and amended lease [*31] between PHA and SMG is identical to paragraph 2.C of the agreement between PHA and PAA executed during that same month. They provide, among other things, that PAA is entitled to an injunction in the event PHA breaches the non-relocation covenants. Only if PAA is unable to obtain an injunction, however, is it entitled to liquidated damages.

Also, paragraph 704(B)(5) of the third amendment to the restated and amended lease between PHA and SMG is identical to paragraph 2.G of the agreement between PHA and PAA. If PHA is unable to obtain an injunction **or** is unable to find a buyer for the Penguins, **or** chooses not to find such a buyer, it has the right to recover certain specified liquidated monetary damages.

As we read paragraphs 704(B)(1) and 2.C, PAA does not have the option in the requisite sense of seeking monetary damages for a breach of the non-relocation covenants as an alternative to injunctive relief. That is to say, PAA does not enjoy the luxury of deciding whether to seek injunctive or monetary relief. It may seek monetary relief **only in the event injunctive relief is not available**. Accordingly, these paragraphs do not justify the conclusion that PAA's right [*32] to injunctive relief is a "claim" for purposes of § 101(5)(B).

PHA, HBRM, and Marino do not seriously contest this conclusion but instead assert that paragraphs 704(B)(5) and 2.G provide that a breach of the non-relocation covenants triggers a right to injunctive relief as well as a right, under certain conditions, to payment of monetary damages. It is this disjunctive provision, they argue,

which qualifies PHA's right to injunctive relief as a dischargeable "claim".

We disagree both with their construal of paragraphs 704(B)(5) and 2.G and with the conclusion they reach.

We have just concluded that the first of the disjuncts set forth in paragraphs 704(B)(5) and 2.G -- i.e., the right to liquidated damages if PHA is unable to obtain an injunction -- does not provide on its own that PHA has the option of pursuing monetary damages in lieu of injunctive relief. It may recover damages only in the event an injunction is not available.

The remaining disjuncts of paragraphs 704(B)(5) and 2.G, we conclude, do not constitute "alternatives" to equitable relief in the sense required for a right to injunctive relief to qualify as a "claim" for purposes of § 101(5)(B). Not just any alternative [*33] right to monetary damages will qualify under the rubric set forth in Torwico and Continental Airlines as an "alternative" remedy in the requisite sense.

A right to injunctive or other equitable relief qualifies as a "claim" for purposes of § 101(5)(B) if the breach that gives rise to equitable relief also gives rise to a **corollary** right to payment of liquidated damages -- i.e., **to a right to payment with respect to the equitable remedy**. *Continental Airlines, 125 F.3d at 133 (citing approvingly to Matter of Udell, 18 F.3d 403, 408 (7th Cir. 1994)).*

We understand this cryptic language to mean that the right to monetary relief must be "derivative of" or a "corollary to" the right to injunctive relief. It is not sufficient for purposes of § 101(5)(B) that the equitable remedy and the right to money damages

are related only to the extent that both happen to be disjunctively available in the event of a breach.

Applying this analysis to our case, we see that the disjunctive remedies available to PAA under paragraphs 704(B)(5) and 2.G in the event of a breach of the non-relocation covenants do not make PHA's right to injunctive [*34] relief a "claim" in the requisite manner. The other remedies set forth in these contractual provisions, while unquestionably alternatives in a generic way, are not "derivative of" PAA's right to injunctive relief.

One final matter remains for our consideration.

*Section 544 of the Bankruptcy Code (11 U.S.C. § 544),* the so-called "strong arm" clause, provides in relevant part as follows:

> (a)       The       trustee....may avoid....any obligation incurred by the debtor that is voidable by--

>> (1) a creditor that extends credit to the debtor at the time of commencement of the case, and that obtains at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or

not such creditor ex-
ists.

PHA and HBRM argue, as an apparent
afterthought and half-heartedly, that we
should not enjoin them and Roger Marino
from violating the non-relocation covenants
because, under § 544(a)(1), a hypothetical
judicial lien holder would be able to sell the
Penguins to a third party without regard to
the non-relocation covenants.

This argument is unpersuasive and mer-
its [*35] the same cursory treatment from
us that PHA and HBRM gave it.

Although these strong arm powers arise
under federal bankruptcy law, their scope
vis-a-vis third parties is governed entirely
by the substantive law of the state in which
the property is located as of the bankruptcy
filing date. *Midatlantic National Bank v.
Bridge (In re Bridge), 18 F.3d 195, 200 (3d
Cir. 1994)*. We conclude from this that
Pennsylvania law controls the determina-
tion whether a judicial lien creditor could,
as PHA and HBRM contend, avoid debtors'
obligations arising under the non-relocation
covenants. Their contention is not persua-
sive.

To begin with, we question whether §
544(a) even applies here. The purpose of §
544(a) is to enable the trustee (or debtor-in-
possession) to set aside preferential or
fraudulent transfers and to preserve estate
assets against unrecorded or "secret" liens.
*In re Teerlink Ranch, Ltd., 886 F.2d 1233,
1235 (9th Cir. 1989)*. There is no indication
that fraud or a secret lien of any kind is at
issue here. To the contrary, what is at issue
is a non-relocation covenant contained in a
lease which was duly filed with the appro-
priate authorities. [*36]

Also, PHA and HBRM have not offered
any case law in support of what they con-
sider to be the "obviously true" premise
that, under Pennsylvania law, a judicial lien
creditor could sell the Penguins without re-
gard to the non-relocation covenants. The
correctness of this proposition is far from
obvious.

According to Pennsylvania law, the pur-
chaser of property sold at a sheriff's sale
assume all risk under the rule of *caveat
emptor* and receives only what right, title,
and interest the judgment debtor had. *CSS
Corporation v. Sheriff of Chester County,
352 Pa. Super. 256, 259, 507 A.2d 870, 872
(1986), appeal denied, 514 Pa. 630, 522
A.2d 559 (1987)*. The same would appear to
apply by parity of reasoning with respect to
limitations on the debtors' interest, such as
non-relocation covenants.

An appropriate order shall issue.

**BERNARD MARKOVITZ**

Chief Judge

U.S. Bankruptcy Court

**ORDER OF COURT**

**AND NOW** at Pittsburgh this 25th day
of **March**, 1999, in accordance with the ac-
companying memorandum opinion, it
hereby is **ORDERED, ADJUDGED,** and
**DECREED** that:

(1) the motion for a permanent
injunction filed by Public [*37]
Auditorium Authority of Pitts-
burgh and by SMG Pittsburgh,
Inc. is **GRANTED**. Debtors
Pittsburgh Hockey Associates
and HBRM, LLC, their manag-
ing directors, partners, affiliates,

agents, officers, servants, employees, experts and attorneys are **PERMANENTLY ENJOINED** from:

> (A) initiating or engaging in discussions with third parties concerning the sale or relocation of the Pittsburgh Penguins hockey team; and

> (B) relocating or attempting to relocate the Penguins hockey team to a venue other than the Pittsburgh Civic Arena; and

> (C) causing or permitting the Penguins hockey team to play any portion of its regular season and playoff season scheduled for the Civic Arena to be played at any other venue.

(2) the motion by Pittsburgh Hockey Associates and HBRM, LLC to dissolve the preliminary injunction issued on November 23, 1998, and again on November 25, 1998, is **DENIED**.

It is **SO ORDERED.**

**BERNARD MARKOVITZ**

Chief Judge

U.S. Bankruptcy Court

LEXSEE 1991 U.S. DIST. LEXIS 16038

**HARRY M. WIRTH, Plaintiff, v. UNITED STATES OF AMERICA, Acting by and through the UNITED STATES COAST GUARD, Defendant**

**File No. 2:91-CV-099**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN, NORTHERN DIVISION**

*1991 U.S. Dist. LEXIS 16038*

**June 25, 1991, Decided**
**June 26, 1991, Filed**

**SUBSEQUENT HISTORY: [*1]**

*Non-Adopting Order of July 31, 1991, Reported at 1991 U.S. Dist. LEXIS 10583.*

**JUDGES:**

Timothy P. Greeley, United States Magistrate.

**OPINIONBY:**

GREELEY

**OPINION:**

REPORT AND RECOMMENDATION

This civil action, filed pursuant to *28 U.S.C. § 1331,* 1346 and 1361, arises out of a contract between the parties involving a parcel of real estate known as the Huron Island Light Station, West Huron Island, in Marquette County, Michigan. There are several buildings on the Island, including one, the lighthouse, which is listed on the National Historic Register. Over the course of time, all of the buildings had fallen into a state of disrepair. Plaintiff, who had significant experience with historic restoration and preservation, agreed to perform maintenance and restoration work on the buildings at his expense in exchange for what he perceived to be an agreement to occupy the 11 acres on the south end of the island for an agreed period of time. n1

n1 The plaintiff has at times referred to the agreement as a lease. A lease gives the possessor a legal interest in the land, and exclusive possession of the premises against all the world, including the owner. See *McCastle v. Scandlon, 337 Mich. 122, 59 N.W.2d 114 (1953); Sweeney v.*

*Bird*, 293 Mich 624, 292 N.W.2d 506 (1940); *Steward v. St. Regis Paper Co.*, 484 F. Supp. 992 (D.C. Ala 1979). Plaintiff's testimony demonstrates his understanding that he did not have exclusive possession of the property or the buildings. The documents themselves use the term "license," which conveys only the right to do some act on the land of another. Id.; see also *Marshall v. Heselschwerdt*, 304 Mich. 664, 8 N.W.2d 871 (1943); *Three D Dep'ts Inc. v. K Mart Corp.*, 670 F. Supp. 1404 (N.D. Ill. 1987) (applying Mich. law); In Re: *Yachthaven Restaurant Inc.*, 103 Bankr. 68 (E.D.N.Y. 1989). At a hearing on this matter, the plaintiff conceded that he was not sure of the proper term for the agreement, nor of the difference between the two types of contracts. Plaintiff used the terms interchangeably. Plaintiff does not appear to dispute that the parties intended a license. Plaintiff's brief in "Support of Motion for Preliminary Injunction After Hearing" states, "We are not contending that Mr. Wirth is a lessee." Brief at 4. However, plaintiff's conduct has at times been inconsistent with a mere license. Plaintiff admitted that he posted "No Trespassing" signs, and believed he had "jurisdiction" over the buildings identified in the agreement, suggesting that he understood his rights to be those more consistent with a lease than a license. The undersigned has proceeded on the understanding that plaintiff was granted a license. While there may remain an underlying dispute as to the nature of the contract, that issue has

not been argued. Furthermore, there is not a substantial likelihood that plaintiff can prove he was operating under anything other than a license.

[*2]

The original contract, executed on November 22, 1983, is entitled, "License for Non-Federal Use of Real Property." The original contract was terminable at any time, without prior notice, but anticipated a one year term beginning on December 1, 1983, and ending on November 30, 1984. (Pl's Exh. 4) The original contract provided that the plaintiff could request renewals for periods of one year. An amendment was executed on July 12, 1984. (Pl's Exh. 3) The amendment establishes a one-year term beginning on January 1, 1984, and ending on December 31, 1984, and also provides that the licensee could request a renewal for four additional periods of one year. After the expiration of the original five year term, the license was renewable, upon request, for four additional periods of five years each. The amendment does not contain the language present in the original contract that allowed the Coast Guard to terminate the agreement at any time. Rather, the amendment gives the Coast Guard the right to terminate the license at any time, without notice, for "national defense or for navigation purposes only." In addition, the amendment provides: "Mr. Wirth has right to renew license agreement. The [*3] Coast Guard shall not unreasonably withhold its approval of Mr. Wirth's renewal request."

According to the plaintiff, he anticipated making a substantial investment in the property in labor and materials. He therefore originally sought a 99-year lease in order to be assured that he would be allowed

1991 U.S. Dist. LEXIS 16038, *

to enjoy the property for a significant period of time. The Coast Guard was unwilling to provide him with a 99-year lease. Under the executed amendment plaintiff anticipated that, in the absence of malfeasance, he would be allowed to occupy the property for 25 years.

The parties proceeded fairly amicably for several years under the agreement. However, in December 1989, the Coast Guard did not renew the agreement. n2 Plaintiff remained on the island, believing their failure to renew the license was a violation of the contract. The Coast Guard issued a formal notice of trespass on July 23, 1990. Apparently, due to the uninhabitability of the island during the winter months, plaintiff physically vacated the property in the fall of 1990. However, plaintiff left personal property on the island, demonstrating an intent to return to the island in the spring. Plaintiff then filed this action on [*4] April 12, 1991.

n2 The five one-year terms under the amended contract were 1984, 1985, 1986, 1987, and 1988. Upon renewing the license in January 1989, the first of four five-year terms began. There is no dispute that the Coast Guard renewed the contract in January 1989, apparently at plaintiff's request for a one-year renewal. The Coast Guard refused however to renew plaintiff's request for a renewal of the license "for the calendar year 1990." (Pl's Exh. 5) The significance of these facts, if any, was not argued. Plaintiff admitted that the renewal he received in 1988 was for one year and

that the renewal he requested in December 1989 was denied.

Plaintiff immediately filed a request for a temporary restraining order and preliminary injunction, alleging that the Government had breached the agreement and was threatening to unlawfully evict him and his personal property from the island. Plaintiff presently seeks protection from this threatened action and maintenance of the status quo pending the resolution of this action. [*5] n3 The Government opposes plaintiff's motion.

n3 In accordance with an agreement between the parties, the status quo includes an agreement by plaintiff not to enter the island, except that he may hire a caretaker to occupy the island for the purpose of protecting plaintiff's property. The government has agreed not to remove, sequester or otherwise interfere with plaintiff's property on the island. See Order, 4/25/91.

The motion was referred to the undersigned pursuant to *28 U.S.C. § 636*(b)(1)(B). On May 29 and 30, 1991, a hearing was held before the undersigned on plaintiff's motion. At the hearing, plaintiff presented his own testimony and that of Mr. Barry Polzin, an architect. The Government called Ms. Ann Thomas, a realty specialist employed by the Coast Guard. Following the hearing, the parties submitted additional briefs. The matter is now ready for decision. I have reviewed plaintiff's request for injunctive relief and conclude that the request lacks merit on the grounds presented.

1991 U.S. Dist. LEXIS 16038, *

Therefore, I recommend **[*6]** that plaintiff's request for a temporary restraining order and preliminary injunction be denied.

The issuance of preliminary injunctive relief is committed to the discretion of the district court. *Planned Parenthood Association v. City of Cincinnati, 822 F.2d 1390, 1393 (6th Cir. 1987)*. In exercising that discretion, the court must consider and balance four factors:

1. Whether the movant has shown a strong or substantial likelihood or probability of success on the merits.

2. Whether the movant has shown irreparable injury.

3. Whether the preliminary injunction could harm third parties.

4. Whether the public interest would be served by issuing a preliminary injunction.

*Wilcox v. United States, 888 F.2d 1111, 1114, n.3 (6th Cir. 1989); Glover v. Johnson, 855 F.2d 277, 282 (6th Cir. 1988)*.

These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Restaurant, Inc. v. Shoney's Inc., 759 F.2d 1261, 1263 (6th Cir. 1985)*. It has also been remarked that a party seeking **[*7]** injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. See *Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2nd Cir. 1969)*, cert. denied, *394 U.S. 999 (1969)*.

Plaintiff's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his action. *NAACP v. City of Mansfield, Ohio, 866 F.2d 162, 167 (6th Cir. 1989); City of Mt. Clemens v. E.P.A., 917 F.2d 908 (6th Cir. 1990)*. A showing of mere possibility of success on the merits is insufficient to justify the extraordinary remedy requested. Id. A review of the materials of record fails to establish a substantial likelihood of success with respect to plaintiff's claim that the government has violated his rights.

Plaintiff alleges that under the 1984 amendment, the government has no authority to refuse renewal of the license, and that plaintiff is therefore lawfully entitled to continued occupancy on the island. However, the enforceability of the amendment is suspect. **[*8]** Without deciding the issue, the undersigned notes that it is rare case where estoppel will be enforced against the government. See for example *Office of Personnel Management v. Richmond, U.S. , 110 S.Ct. 2465, 2472 (1990)*. Generally, where one seeks to estop the government, the interests of the citizenry outweigh the interests of a single individual. *Heckler v. Community Health Services of Crawford Co., Inc., 467 U.S. 51, 60 (1984)*. In this case, the government maintains that the party who represented the government in entering into the license agreement with plaintiff acted ultra vires. The government asserts that even the "Commandant of the Coast Guard (the senior Coast Guard official and a "four star Admiral") lacked the authority to enter into the contract as amended, as it violated agency guidelines, let alone "the Ninth District Commander (typically a "two star" Admiral)." Plaintiff

has not rebutted these facts. While there is no per se rule prohibiting the application of estoppel against the government, the Supreme Court has recently noted its consistent refusal to apply estoppel against the government. Richmond, supra [*9] , at 2472. Recognizing that this policy sometimes works hardship on individuals who rely upon agents of the government, the court reiterated the long-accepted policy that "Anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority." Richmond, supra, at 63, n.17, quoting *Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384 (1947).*

Moreover, the undersigned hesitates to order what amounts to "specific performance" in a case involving a license at this stage of the proceeding. Plaintiff cites *Shell Petroleum Corp v. Ford, 255 Mich. 105, 237 N.W.2d 378 (1931)* for the proposition that "specific performance" is an appropriate remedy. However, Shell Petroleum concerned a lease, which as noted in Footnote 1, is to be distinguished from a license, as a license does not convey an interest in land. Under Michigan law, the remedy of "specific performance" is a "matter of grace, not of right." *Barbers Local 552 v. Sealy, 368 Mich 585, 588, 118 N.W.2d 837 (1962); Holy Cross Baptist Church v. D.V. Construction Co., 368 Mich 80, 83, 117 N.W.2d 159 (1962).* [*10] The remedy is reserved for those cases where the remedy at law is inadequate due to the uniqueness of the subject of the contract. *Kent v. Bell, 374 Mich. 646, 652, 132 N.W.2d 601 (1965).* Land is traditionally presumed to have a peculiar value, and contracts involving in-terests in land are traditionally subject to specific performance. *Id., 374 Mich. at 651; American Electrical Steel Co. v. Scarpace, 399 Mich. 306, 309, 249 N.W.2d 70 (1978).* Thus, on the one hand, plaintiff's interest in entering the land and enjoying it, while not a traditional possessory interest in land, does represent the type of interest which has traditionally been the subject of specific performance. However, in the opinion of the undersigned, the distinction between a possessory interest in land, that is, by lease or by deed, and a mere license is critical to this dispute.

The main distinction between a license and a lease is that 'a license to do an act on land involves occupation of the land by the licensee so far as is necessary to do the act and no further, whereas a lease gives the right of possession of [*11] the land and the exclusive occupation of it for all purposes not prohibited by its terms."

In re: *Yachthaven Restaurant, Inc., 103 Bankr. 68 (E.D.N.Y. 1989),* quoting 49 N.Y. Jur. 2d Licenses in Real Property § 199 (1985).

Unlike the traditional possessory interests in land, plaintiff's "license" technically limited his right to occupy the land for the purpose of preserving, protecting or restoring the buildings. Plaintiff's opportunity to enjoy the land is a natural byproduct of plaintiff's need to be on the island in order to fulfil his part of the bargain. Assuming that the contract states only a license, the right to enjoy the land is plaintiff's compensation for performing a task for the owner. However, plaintiff's enjoyment of the land, in the context of a license, is not a goal of the license in itself. n4

n4 The contract does not state the consideration flowing from the government to the plaintiff. It would however appear to be the right of plaintiff to enter the land. Plaintiff anticipated having the right to enter the land for perhaps as many as 25 years. In essence, plaintiff offered to volunteer his expertise, labor and materials in exchange for the right to enter onto the island for a certain period of time. He was not therefore technically a volunteer. Plaintiff might ultimately be entitled to quantum meruit, but his right to specific performance is not as clear.

[*12]

The undersigned has done an extensive search for analogous case law, and has found none. In the absence of better authority, the undersigned believes it appropriate to deny specific performance in the absence of a more clear showing of plaintiff's right to enforce the contract.

Furthermore, plaintiff has failed to establish that he will suffer irreparable harm absent injunctive relief.

In order to obtain a preliminary injunction, the harm that would result in the absence of the injunction must be irreparable, not merely substantial. *Sampson v. Murray, 415 U.S. 61, 94 S. Ct. 937 (1974).* The notion that irreparable injury must include more than a determinable monetary loss is well established. In Sampson, the Supreme Court stated that 'the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.' *415 U.S. at 90* (citation omitted).

*Hodge Business Computer Systems Inc. v. USA Mobile Communications Inc. II, 910 F.2d 367, 369 (1990).*

In the instant action, plaintiff has [*13] not shown injury which cannot be compensated by money damages. The Coast Guard intends to evict plaintiff and his personal property from the island. In the opinion of the undersigned, no irreparable harm is implicated by this action. If plaintiff is ultimately successful in this action, he may simply return to the island and receive compensation for any inconvenience and expense associated therewith.

Plaintiff's primary concern is that he will be denied the right to protect his past work and investment from vandalism. In the opinion of the undersigned, this interest is not one which is cognizable under this contract. Plaintiff has no legal interest cognizable under the law for any damage to the government's property. Although plaintiff has done the work, he will suffer no legally compensable loss if that work is destroyed or damaged, since the work which he has completed belongs not to him but to the government. Plaintiff is not the possessory interest; he merely has a license to enter the property for the purpose of performing work on it for the government. If the contract herein is ultimately upheld, plaintiff's obligation under it will not be compromised if he has to duplicate [*14] some of the work he has already completed. Plaintiff is under no obligation to complete specific tasks or perform particular work by a date certain. The contract leaves these matters solely to plaintiff's discretion, so long as he

complies with the law concerning historic places. While plaintiff would obviously experience distress if his efforts are needlessly destroyed by vandals or otherwise, the government is free to treat its property as it likes. If the government fails to adequately preserve or protect its property, plaintiff has no right to interfere.

Plaintiff also argues that he will be denied the right to occupy the island. However, this is apparently not his primary concern at this stage. At the hearing, he asked only that he be allowed to maintain the status quo, including "a caretaker" on the island to prevent vandalism. Moreover, the distinction described above between plaintiff's rights as a licensee, as compared to a lessee, has equal application here. n5

> n5 In addition, the relationship of the parties has broken down to the point where allowing the plaintiff to enter onto the island creates the potential for additional controversy and further disintegration of the relationship, pending resolution of this action.

**[*15]**

Plaintiff's efforts to improve the property are admirable, and the quality of his work and that of his contractors is not in dispute. Mr. Wirth appears sincerely proud of the work he has done on the property, and appears to receive considerable joy and satisfaction from his work there. It is the undersigned's understanding that plaintiff is performing the work and providing the materials on a pro bono basis. Plaintiff testified that his investment to date, in time and materials, amounts to approximately $ 200,000. However, the fact remains that the property belongs to the government, and not to plaintiff. Plaintiff has no legal interest in it. He has no legal right to protect the investment he has made in it. Therefore, the undersigned is unable to conclude that plaintiff will suffer any irreparable damage if he is not granted his request for an injunction.

Finally, the interests of identifiable third parties and the public at large weigh against the granting of an injunction. The government's evidence established that the license violates the law. When the government is unable to enforce the law, the interests of the public are undermined. *Heckler, supra, 467 U.S. at 60.* **[*16]** Contracts which violate the law should not be enforced. *Boatland Inc. v. Brunswick Corp., 558 F.2d 818 (6th Cir. 1977).* In addition, plaintiff has taken action at the Island which is not in the best interest of the public. Plaintiff has locked buildings belonging to the United States Forest Service and has attempted to deny access to the buildings on the island to government employees and members of the public. These actions by plaintiff were contrary to the license. The public welfare therefore militates against the issuance of extraordinary relief absent a sufficient showing of a violation of clearly established rights. That showing has not been made here.

Because plaintiff has failed to meet the heavy burden establishing the need for injunctive relief, I recommend that plaintiff's motion for a preliminary injunction be denied, and that the Order of April 25, 1991, be dissolved. n6

> n6 Although this dispute involves a federal contract, the undersigned has

1991 U.S. Dist. LEXIS 16038, *

applied state substantive law to the analysis of this matter. See *28 U.S.C. § 1652* ("Rules of Decisions Act"). Under *Clearfield Trust Co. v. United States, 318 U.S. 363 (1943),* and its progeny, a federal court should not fashion federal common law unless certain circumstances exist. In this preliminary proceeding, the parties both cited Michigan substantive law and have not requested application of federal common law. Preliminarily, and without foreclosing the possibility, it would not appear to the undersigned that circumstances exist here requiring application of federal common law. See generally e.g. *Pennzoil Co. v. F.E.R.C., 645 F.2d 360 (5th Cir. 1981).*

**[*17]**

Objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. *28 U.S.C. § 636*(b)(1)(c). Failure to file objections within the specified time waives the right to appeal the district court's order. *Thomas v. Arn, 474 U.S. 140 (1985).*

LEXSEE 1996 U.S. DIST. LEXIS 4667

## SHELL OIL COMPANY, Plaintiff, vs. AMPM ENTERPRISES, INC., et al., Defendants.

### Civil Action No. 95-CV-75117-DT

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

### *1996 U.S. Dist. LEXIS 4667*

### March 18, 1996, Dated

**DISPOSITION:** [*1] Plaintiff's motion for summary judgment granted in part and denied in part. AmPm and Hakim Fakhoury's motion for summary judgment granted in part and denied in part.

**COUNSEL:** For SHELL OIL COMPANY, plaintiff: William A. Sankbeil, [COR LD NTC ret], Joanne G. Swanson, [COR ret], Kerr, Russell, Detroit, MI. Ann Spiegel, [COR NTC ret], Shell Oil Company, Houston, TX.

For AMPM ENTERPRISES, INCORPORATED, HAKIM FAKHOURY, defendants: Edward A. Schneider, [COR LD NTC ret], Dearborn, MI. Robert E. Forrest, [COR LD NTC ret], Raymond & Prokop, Southfield, MI.

For RAYMOND FAKHOURY, ROSE FAKHOURY, movants: C. William Garratt, [COR LD NTC ret], Garratt Law Firm, Bloomfield Hills, MI.

For AMPM ENTERPRISES, INCORPORATED, HAKIM FAKHOURY, counter-claimants: Edward A. Schneider, [COR LD NTC ret], Dearborn, MI. Robert E. Forrest, [COR LD NTC ret], Raymond & Prokop, Southfield, MI.

For SHELL OIL COMPANY, counter-defendant: William A. Sankbeil, [COR LD NTC ret], Joanne G. Swanson, [COR ret], Kerr, Russell, Detroit, MI. Ann Spiegel, [COR NTC ret], Shell Oil Company, Houston, TX.

**JUDGES:** BERNARD A. FRIEDMAN, UNITED STATES DISTRICT JUDGE

**OPINIONBY:** BERNARD A. FRIEDMAN

**OPINION:**

### MEMORANDUM OPINION AND ORDER

This matter is presently before the court on the cross-motions for summary judgment, both filed December 11, 1996. Pursu-

ant to E.D. Mich. **[\*2]** LR 7.1(e)(2), these motions shall be decided without oral argument.

This case involves a Dealer Agreement between Plaintiff Shell Oil Co. and Defendants AmPm Enterprises, Inc. and its vice-president Hakim Fakhoury. The agreement provides that AmPm will use Shell's identifications and trademarks and sell Shell's petroleum products at AmPm's gasoline service station located at 4407 Fort Street, Trenton, Michigan. Dealer Agreement, Plaintiff's Exhibit A. The agreement requires AmPm to purchase a minimum amount of gasoline per month. The agreement was signed on January 14, 1994, and was to be effective from that date until January 31, 1999.

The land on which the gas station is situated is owned by Ray Fakhoury Enterprises ("RFE"), which is owned by Ray Fakhoury, Hakim Fakhoury's father. RFE leased the property for use as a service station to AmPm, which is also owned by Ray Fakhoury.

In addition to the Dealer Agreement, the parties executed an Amortization Agreement and Promissory Note on November 9, 1993, in which Shell agreed to loan Hakim Fakhoury $ 121,711 for financing improvements at his service station. Plaintiff's Exhibit B. The Amortization Agreement provides that: in lieu **[\*3]** of monthly payments, Shell will reduce the indebtedness by $ 1,014.26 each month for each month that the Dealer Agreement is in effect.

In August, 1995, RFE entered into a supply agreement with Amoco Oil Co., and AmPm cancelled the Dealer Agreement with Shell on September 12, 1995. Shell filed the instant suit against AmPm and

Hakim Fakhoury on October 4, 1995, alleging breach of contract and seeking damages (Count II) and specific performance of the Dealer Agreement (Count I).

On November 7, 1995, Defendants filed a counterclaim, alleging breach of contract (Count II) and innocent misrepresentation (Count III). Defendants claim that the Dealer Agreement included a promise by Shell to finance the construction of a car wash at Defendants' service station and that Shell breached the agreement by failing to provide this funding. Defendants also seek a declaratory judgment (Count I) that they have no continuing obligations to Shell other than repayment of the unamortized balance under the Amortization Agreement and Promissory Note of $ 101,425.80.

The parties filed the instant cross-motions for summary judgment. Responses and replies have been filed.

## DISCUSSION

### **[\*4] I. Summary judgment standard**

Summary judgment is appropriate if

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Fed. R. Civ. P. 56(c)*. Once a properly supported summary judgment motion has been filed, the burden is on the party opposing

summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine dispute as to any material fact." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (emphasis included). Viewing the evidence "in the light most favorable to the opposing party," *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)*, summary judgment should be entered only if the evidence is so one-sided that a reasonable fact-finder [*5] could not find for the opposing party. See, e.g., *Anderson v. Liberty Lobby, Inc., 477 U.S. at 248-50; Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478-80 (6th Cir. 1989)*. In other words, " [a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp., 899 F.2d 533, 534 (6th Cir. 1990)*.

## II. Breach of contract

Each party alleges that the other breached the Dealer Agreement. Shell contends that because the contract does not provide for Defendants' unilateral termination, Defendants breached the agreement by removing Shell identifications from the service station, refusing to maintain the service station under the Shell brand name, and refusing to sell Shell gasoline. Defendants argue that by failing to provide funding for construction of a car wash at the service station, as promised, Shell breached the agreement.

Shell maintains that it never entered into a promise to fund the car wash and that AmPm's termination of the contract amounts to an unlawful breach as a matter of law. Shell contends that because the [*6] Dealer Agreement does not include any provision regarding funding of a car wash, no such obligation is imposed on Shell. Shell relies on the Dealer Agreement itself, which provides:

> This Agreement, along with any related agreement(s) which may be executed contemporaneously herewith, comprises the entire agreement, and merges and supersedes all prior agreements, understandings, representations and warranties (oral or written, expressed or implied), between Shell and Dealer covering the sale and delivery of Shell products. All such prior agreements between Shell and Dealer are hereby terminated as of the effective date hereof; and Shell and Dealer hereby respectively release each other . . . from all claims which each now has against the other . . . arising directly or indirectly out of or in connection with any such prior agreement . . . . Neither this Agreement nor any subsequent agreement amending or supplementing this Agreement shall be binding on Shell unless and until it is signed for Shell by a duly authorized representative.

Dealer Agreement, Part II, P 26, Plaintiff's Exhibit A.

Plaintiff argues that the contract is clear and unambiguous in stating that it constitutes [*7] the entire agreement between the parties and merges and supersedes all prior agreements. Plaintiff explains that if there were an agreement regarding car wash funding, it could have been, but was not, included in the contract. Shell argues that the parol evidence rule bars the admission of any evidence that might vary, add, or contradict the terms of the parties' agreement. *General Aviation, Inc. v. Cessna Aircraft Co., 915 F.2d 1038, 1040-41 (6th Cir. 1990); see also In re Auto Specialties Manufacturing Co., 18 F.3d 358, 361-362 (6th Cir. 1994); Vickers v. American Oil Co., 26 Mich. App. 245, 251-252, 182 N.W.2d 592 (1970); M.C.L. § 440.2202* (providing that a writing intended by the parties as a final expression of their agreement may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement).

In addition to Part II, P 26 of the Dealer Agreement, Shell relies on a few other documents in arguing that it did not agree to fund a car wash. In a letter from Hakim Fakhoury to Rick Thornton, the district manager of Shell's Michigan Retail District, dated January 14, 1994, the same day the Dealer Agreement was signed, Fakhoury referred to [*8] having "hopes of a car wash as soon as the Spring of 1994." Defendants' Exhibit D. Shell argues that this statement reveals that on the day the Dealer Agreement was signed, there was no firm understanding between the parties regarding the funding of a car wash. Moreover, a memo from Shell's Michigan Retail District to the Head Office for Real Estate Services, dated March, 1995, states:

> Mr. Hakim Fakhoury purchased and converted this former Sunoco to Shell in February 1994. . . . Although the addition of a car wash facility was discussed at that time, the determination was made, due to the large up-front cost on Mr. Fakhoury's part, to wait on the car wash addition as well as additional signage till now.

Defendants' Exhibit K. Shell explains that this document proves that at the time the Dealer Agreement was signed, the parties had only engaged in discussions about funding a car wash and had not reached an agreement.

Furthermore, Shell's Thornton testified that although everyone involved in the negotiations hoped that a car wash would eventually be built, as the closure on the Dealer Agreement approached, Fakhoury indicated that he did not have enough money for a car [*9] wash. Deposition of Thornton, pp. 35-36, Defendants' Exhibit B. Consequently, Thornton explained, they decided to talk about the car wash at a later date. Id.

In response, Defendants assert that the integration clause in the Dealer Agreement does not preclude proof of the existence of other agreements not contained in the Dealer Agreement. Defendants stress that Part II, P 26 of the Dealer Agreement provides that the agreement, "along with any

related agreement(s) which may be executed contemporaneously herewith comprises the entire agreement . . . "

Defendants argue that a prerequisite to application of the parole evidence rule is a finding by the court that the parties intended the written instrument to be the complete expression of their agreement. *NAG Enter., Inc. v. All State Indus. Inc., 407 Mich. 407, 410, 285 N.W.2d 770 (1979).* Defendants contend that extrinsic evidence of prior or contemporaneous agreements or negotiations is admissible as it bears on the threshold question of whether the written instrument is in fact an "integrated" agreement. Id. Defendants point to other agreements between the parties, like the Amortization Agreement and Promissory Note and **[*10]** a "side" agreement in which Shell promised AmPm a price rebate on gasoline if it attained sales of certain monthly volumes of gas. Defendants argue that these additional contracts are evidence that the Dealer Agreement was not the complete expression of the parties' agreement.

Defendants additionally argue that a merger clause in a contract does not as a matter of law prove that the instrument is integrated when the agreement is on a pre-printed form drawn by a sophisticated seller, as is the case here. *Eberhardt v. Comerica Bank, 171 Bankr. 239, 243 (E.D. Mich. 1994).*

Defendants rely on a number of documents to support their assertion that Shell did in fact promise to fund construction of a car wash. Defendants point to Hakim Fakhoury's deposition testimony in which he explains that on many occasions prior to and on January 14, 1995, the date the Dealer Agreement was signed, Shell representatives promised him orally that he would receive funding once the service station demonstrated a historical sales volume of gasoline. Fakhoury dep., pp. 78-81, Defendants' Exhibit A. Defendants also rely on Fakhoury's statement that a Shell employee, Gleason, told an unnamed female employee **[*11]** of the service station that "Hakim's request for the car wash will be given." *Id. at 277.* However, the date on which this statement was allegedly made is not provided.

Defendants further argue that both Hakim Fakhoury's January 14, 1994, letter to Thornton (Defendants' Exhibit D) and the memo from Shell's Michigan Retail District to the head office (Defendants' Exhibit K), also relied upon by Shell, evidence that Shell did agree to fund a car wash. They additionally point to a Shell interoffice memo, dated December 22, 1994, which discusses providing Defendants with $ 142,450 for, inter alia, construction of a car wash building. Defendants' Exhibit H.

Defendants argue, in the alternative, that Shell modified the original Dealer Agreement by later agreeing to finance the car wash in exchange for AmPm promising not to enter into a contract with Marathon Oil. Defendants rely on a document prepared by Shell, dated March 23, 1995, which proposes that Shell "meet a competitive offer from Marathon and provide funding for a free standing car wash building." Defendants' Exhibit L.

Plaintiff responds by asserting that any modification of the Dealer Agreement is not binding upon Shell **[*12]** unless it is in writing and signed by an authorized Shell representative. See Dealer Agreement, Part

1996 U.S. Dist. LEXIS 4667, *

II, P 26, Plaintiff's Exhibit A. Shell stresses that there is no such document, signed by Shell, which contains a promise to fund a car wash. Shell argues that the evidence reveals that the parties engaged in negotiations to fund a car wash but never reached an agreement.

After a thorough review of the evidence, the court finds that Shell did not agree to fund a car wash as part of the parties' original agreement. The Dealer Agreement, which is clear in stating that it merges and supersedes all prior agreements between the parties, makes no mention of a car wash. Had Shell agreed to finance a car wash at the site, the parties could and should have included it as part of their written agreement. Moreover, although it is undisputed that the parties entered into a few agreements in addition to the Dealer Agreement, the evidence does not support a finding of a contemporaneous agreement in which the parties agreed on terms regarding the financing of a car wash. Some of the documents upon which Defendants rely [e.g., Shell's interoffice memo of December 22, 1994 (Defendants' Exhibit [*13] H)] reveal that discussions about the car wash were still ongoing between the parties well after the Dealer Agreement was signed on January 14, 1994. Other evidence, such as Fakhoury's January 14, 1994, letter to Thornton (Defendants' Exhibit D) and Shell's internal memo of March, 1995 (Defendants' Exhibit K), show that although the parties discussed car wash funding when they executed the Dealer Agreement, no agreement was reached at that time.

The court also finds that there is no evidence that the Dealer Agreement was subsequently modified to provide for car wash financing. There is no written document signed by the parties, as required by the Dealer Agreement, Part II, P 26, in which Shell agreed to finance a car wash at AmPm's service station.

Based on the foregoing analysis, the court finds that by terminating the parties' contract, Defendants breached the Dealer Agreement. Therefore, the court will grant Plaintiff's summary judgment motion as to Count II of its complaint and deny Defendants' summary judgment motion as to Count II of its counterclaim.

## III. Specific performance

The parties dispute whether or not Shell is entitled to the equitable relief of specific [*14] performance. The grant of specific performance is within the discretion of the court. *Wilhelm v. Denton, 82 Mich. App. 453, 455, 266 N.W.2d 845 (1978).* Under Michigan law, specific performance is an extraordinary remedy granted only in unusual cases to prevent irreparable harm. *Barbers Local 552 v. Sealy, 368 Mich. 585, 588, 118 N.W.2d 837 (1962);* see also *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n, 23 F.3d 1071, 1077 n. 2 (6th Cir. 1994).* "It is a matter of grace and not of right." *Id.* at 588.

The court believes that the circumstances in this case do not warrant the grant of specific performance. The court is aware of plaintiff's argument that money damages will not adequately compensate it for its losses due to the unique and desirable location of the gas station at issue. However, the court believes that an adequate remedy at law does exist and that Plaintiff's damages can in fact be ascertained, as there must be other unique and desirable locations for comparison. The court also believes that

1996 U.S. Dist. LEXIS 4667, *

specific performance would be difficult in this case due to the current strained relations between the parties. See *Giordano v. Markovitz, 209 Mich. App. 676,* [*15] *680, 531 N.W.2d 815 (1995).*

Therefore, the court shall grant Defendants' motion for summary judgment as to Count I of Plaintiff's complaint and deny Plaintiff's motion for summary judgment as to Count I of its complaint.

## IV. Damages

The parties additionally dispute the appropriate damages remedy for Plaintiff. Defendants initially argue that, pursuant to P 3 of the Amortization Agreement, Plaintiff's sole remedy is the unpaid balance of $ 101,425.80. The agreement provides:

> If the Agreement is terminated due to an act or default by Dealer, the then unpaid balance shall, at Shell's option and without demand or notice, become immediately due and payable . . .

Amortization Agreement, P 3, Plaintiff's Exhibit B. Defendants note that the Dealer Agreement itself does not provide for Shell's remedies in case of Defendants' breach. Therefore, Defendants argue, because the Dealer Agreement and the Amortization Agreement constitute one transaction, the only remedy available to Shell in case of Defendants' breach of either agreement is that which is provided in the Amortization Agreement.

Defendants further argue that if Shell disputes that it is entitled only [*16] to the unpaid balance of the Amortization Agreement, any other damages owing Shell are limited to its seller remedies under the Michigan Uniform Commercial Code, *M.C.L. § 440.2708.*

The court believes that Shell is correct in arguing that the acceleration clause of the Amortization Agreement is not its sole remedy. *M.C.L. § 440.2719(1)(a)* provides that a contract between parties may "provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article . . . " Moreover, "resort to a remedy as provided [by contract] is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." *M.C.L. § 440.2719(1) (b)*

Plaintiff is correct in arguing that neither the Dealer Agreement nor the Amortization Agreement state that P 3 of the Amortization Agreement is the exclusive remedy available to Shell in case of Defendants' breach. The court believes that Shell is entitled to monetary damages to compensate it for Defendants' breach of the Dealer Agreement as well as the unpaid balance of the Amortization Agreement of $ 101,425.80.

Lastly, the parties dispute [*17] which measure of damages under *M.C.L. § 440.2708* is appropriate. This factual question shall be resolved by the jury at a trial on the issue of damages.

The court notes that Count III of Defendants' counterclaim for innocent misrepresentation remains, as neither party sought

1996 U.S. Dist. LEXIS 4667, *

dismissal of or summary judgment on this claim.

For the foregoing reasons,

IT IS ORDERED that Shell's motion for summary judgment as to Count II of its complaint and as to Counts I and II of Defendants' counterclaim is granted.

IT IS FURTHER ORDERED that Shell's motion for summary judgment as to Count I of its complaint for specific performance is denied.

IT IS FURTHER ORDERED that the issue of damages will proceed to trial.

IT IS FURTHER ORDERED that AmPm and Hakim Fakhoury's motion for summary judgment as to Count I of the complaint for specific performance is granted.

IT IS FURTHER ORDERED that AmPm and Hakim Fakhoury's motion as to Count II of the complaint is denied.

BERNARD A. FRIEDMAN

UNITED STATES DISTRICT JUDGE

Dated: March 18, 1996

Detroit, Michigan

LEXSEE 2000 US DIST LEXIS 5569

**SANDY VALDEZ and YHANELLY VALDEZ, infants, by their mother and natural guardian, MARIA ALVINO, and MARIA ALVINO, individually, Plaintiffs, -against- MGS REALTY AND MANAGEMENT CORPORATION, BRONX PROPERTIES, L.L.C., JOEL GENDELS, as receiver, J.M.G. MANAGEMENT PLUS, INC., FEDERAL HOME LOAN MORTGAGE CORPORATION and THE CITY OF NEW YORK, Defendants.**

**96 Civ. 5122 (SWK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 5569*

**April 26, 2000, Decided
April 28, 2000, Filed**

**DISPOSITION:** [*1] Gendels' and JMG's motion for summary judgment against Plaintiffs denied; Bronx Properties' motion for summary judgment against Plaintiffs and all cross-claims against it denied; City's motion for summary judgment denied as to Plaintiffs' second cause of action; City's motion for summary judgment granted as to Plaintiffs' first, third, fourth, fifth, sixth, and seventh causes of action; and Plaintiffs' cross-motion for summary judgment against all defendants denied.

**COUNSEL:** For Plaintiffs: Brian J. Farrell, Alberto Casadevall, Fitzgerald & Fitzgerald, P.C., Yonkers, New York.

For Bronx Properties, LLC, Defendant: Stephen A. Aschettino, Hodgson, Russ, Andrews, Woods & Goodyear, LLP, New York, New York.

For Joel Gendels, as Receiver, and JMG Management Plus, Inc., Defendants: Michael E. Gorelick, Kevin J. Spencer, Abrams & Martin, P.C., New York, New York.

For City of New York, Defendant: Michael D. Hess, Thomas G. Merrill, Corporation Counsel of the City of New York, New York, New York.

**JUDGES:** SHIRLEY WOHL KRAM, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** SHIRLEY WOHL KRAM

**OPINION:**

2000 U.S. Dist. LEXIS 5569, *

# MEMORANDUM OPINION AND ORDER

## SHIRLEY WOHL KRAM, U.S.D.J.

In this action seeking judgment and [*2] recovery for various torts, and for violations of federal, state, and local laws, all arising out of infant plaintiffs Sandy Valdez's and Yhanelly Valdez's and their mother Maria Alvino's (collectively, the "Plaintiffs") ingestion of lead-based paint chips and dust while residents of 2835 Bainbridge Avenue, Apartment 2E, Bronx, New York ("the Premises"), n1 the parties make various motions addressed to Plaintiffs' amended complaint. For the reasons set forth below, all motions are denied, except for the City of New York's (the "City") motion for summary judgment, which is granted in part.

n1 The Court will alternately refer to the Premises and the building in which the Premises is located (the "Building").

## BACKGROUND n2

n2 The facts recited below are taken from the amended complaint, unless otherwise indicated.

Plaintiff Maria Alvino [*3] ("Alvino") moved into the Premises in 1991. At that time, and again in 1995, the Premises were painted by the building's owner. See Deposition of Maria Alvino, taken October 16, 1997 ("Alvino Tr.") at 44, 57, attached to Plaintiffs' Notice of Cross-Motion as Exh. "2." Plaintiff Sandy Valdez was born on March 3, 1992, and his sister, plaintiff Yhannelly Valdez, was born on December 3, 1993. With the exception of a two month period in 1996, both children have lived with their mother in the Premises for their entire lives.

Defendant Bronx Properties, LLC ("Bronx Properties") has owned the Premises since November 28, 1995. See Deposition of Robert Baranowski, taken October 29, 1997 ("Baranowski Tr.") at 12, attached to Plaintiffs' Notice of Cross-Motion as Exh. "3." Before Bronx Properties purchased the Building, it was owned by MGS Realty & Management, Corp. ("MGS"). During MGS's ownership, the Federal Home Loan Mortgage Corporation commenced a foreclosure action and on August 16, 1994, Federal District Court Judge John S. Martin ("Judge Martin") appointed defendant Joel Gendels ("Gendels") Receiver of the Building. See Deposition of Joel Gendels, taken November 18, 1997 ("Gendels [*4] Tr.") at 5-6, attached to Plaintiffs' Notice of Cross-Motion as Exh. "1." While Gendels served as Receiver, defendant JMG Management Plus, Inc. ("JMG") managed the Building on his behalf.

Plaintiffs allege that, beginning in November, 1995, they were diagnosed with elevated blood lead levels, or "lead poisoning." Specifically, Plaintiffs allege that on November 15, 1995, Sandy Valdez was diagnosed as having an elevated blood lead level of 27 ug/dL. Subsequent testing, on December 4, 1995, revealed a blood lead level of 23.9 ug/dL. In addition, on January 5, 1996, Yhanelly Valdez was diagnosed as having an elevated blood lead level of 26.9 ug/dL. Plaintiffs allege, inter alia, that "on or before November 15, 1995, defendant owners knew or should have known about

the lead-based paint hazards in plaintiffs' apartment." Amended Complaint, P 23.

On December 4, 1995, after being notified that Sandy Valdez had a blood lead level above 20 ug/dL, the City's Department of Health ("DOH") inspected the Premises. n3 See City's Memo. at 4. DOH inspectors found that thirty surfaces with peeling paint at the Premises contained lead, and an Order to Abate was subsequently sent to Gendels [*5] directing him to correct the violation. See id. Plaintiffs continued to live in their apartment until February 1, 1996, when they temporarily moved into a "safehouse." See id. While plaintiffs were living at the safehouse, the Premises were repaired and its walls were covered with sheetrock. See Baranowski Tr. at 24-25.

n3 New York City Health Code § 173.13(d)(2) requires the DOH to "order the removal of [lead-based] paint" when it is put on notice that lead paint of a certain content is present in an apartment and "the blood-lead level of any person residing in such dwelling is 20 micrograms per deciliter or higher." 24 N.Y. Comp. Codes R. & Regs. § 173.12[d][2]. According to the City, a report of a blood level of 20 ug/dL or above automatically triggers a home inspection by the DOH. See Memorandum of Law in Support of the City of New York's Motion to Dismiss Plaintiff's Complaint ("City's Memo."), at 3, n. 2.

Plaintiffs' brought the instant action in July 1996. Plaintiffs' amended complaint [*6] pleads seven causes of action. The first cause of action alleges that the City is a public housing authority ("PHA") that receives Community Development Block Grant ("CDBG") funds from the United States Department of Housing and Urban Development ("HUD"). Plaintiffs claim that the City, as a CDBG grantee and under the Lead-based Paint Poisoning and Prevention Act, *42 U.S.C. § 4822* ("LPPPA"), was obligated to abate the Premises of lead, and failed to do so. Plaintiffs' second cause of action is against the City for failure to enforce various local laws. Plaintiffs' third cause of action, also against the City, is brought under the Civil Rights Act of 1937, *42 U.S.C. § 1983,* and alleges that the City violated the LPPPA under the color of law. The remaining causes of action are against all defendants, n4 for negligence, breach of the implied warranty of habitability, nuisance, and negligent or intentional infliction of mental distress.

n4 On September 26, 1996, by stipulation and pursuant to *Federal Rule of Civil Procedure 41(a)*, plaintiffs' claims against defendant Federal Home Loan Mortgage Corporation were dismissed.

[*7]

Pending before the Court are (1) the City's motion, pursuant to *Federal Rules of Civil Procedure 12(b)(6)* and *56*, to dismiss the amended complaint; (2) Gendels' and JMG's motion, pursuant to *Federal Rules of Civil Procedure 12(b)(6)* and *56*, for summary judgment and dismissal of the amended complaint; (3) Bronx Properties' motion, pursuant to *Federal Rule of Civil Procedure 56*, for summary judgment and

dismissal of all cross-claims; and (4) Plaintiffs' cross-motion, pursuant to *Federal Rule of Civil Procedure 56*, for summary judgment on the issues of liability against all defendants.

## DISCUSSION

### I. Jurisdiction

As a threshold matter, the Court notes that Plaintiffs have abandoned their federal claims. See Plaintiffs' Memorandum of Law in Opposition to Motions by Defendants Seeking Summary Judgment Dismissal and in Support of Plaintiffs' Motion for Partial Summary Judgment on the Issue of Liability ("Plaintiffs' Memo.") at p. 5. The amended complaint presented federal claims against the City, but Plaintiffs have since "conceded that at trial they will not be able to prove the expenditure of any federal funds at any of the buildings involved herein." Plaintiffs' Memo. **[\*8]** at 29, n. 2. As a result, Plaintiffs state that "the City's motion to dismiss plaintiffs' federal claims should be granted." Id. Accordingly, the City's motion for summary judgment is granted with respect to the first and third causes of action.

Because Plaintiffs have voluntarily withdrawn the federal claims over which this Court had original jurisdiction, the Court may decline to exercise supplemental jurisdiction over the state claims and remand the case to state court. See *28 U.S.C. § 1367*(c)(3) ("Section 1367(c)(3)"). In determining whether to exercise supplemental jurisdiction, the Court must consider four factors: judicial economy, convenience to the parties, fairness, and comity. *In re Porges, 44 F.3d 159, 163 (2d Cir. 1995)* (citing *Carnegie-Mellon Univ. v. Cohill, 484 U.S.*

*343, 350 n.7, 98 L. Ed. 2d 720, 108 S. Ct. 614 (1988)).* In a typical case, a federal court will decline to retain jurisdiction where it already has dismissed all claims over which it had original jurisdiction, especially if this dismissal occurs early in the life of the litigation. See, e.g., *Janneh v. Regency Hotel, Binghamton, 870 F. Supp. 37, 41 (N.D.N.Y. 1994);* **[\*9]** *Hotel Syracuse, Inc. v. Young, 805 F. Supp. 1073, 1086 (N.D.N.Y. 1992).* The instant case, however, presents circumstances warranting a different result.

On balance, the four considerations relevant to the determination of supplemental jurisdiction support retention of jurisdiction. Convenience to the parties is best served in retaining jurisdiction and addressing the parties' various motions. The motions have been fully briefed and will be addressed in this Opinion and Order. Fairness is also best served by retaining jurisdiction. This case has a long history of conferences, motion practice, and negotiations since the first complaint was filed in 1996. Further delay at this point would be unfair to all parties. Likewise, judicial economy is best served by retaining jurisdiction over this case because doing so will avoid unnecessarily duplicative and inefficient state law processes. Comity to state courts is not an issue here. Accordingly, the Court exercises its discretion under Section 1367(c)(3) to retain supplemental jurisdiction over Plaintiffs' remaining claims against the defendants.

### II. Conversion of Rule 12(b)(6) Motions

Where affidavits and exhibits **[\*10]** in addition to the pleadings are presented to and not excluded by the Court, the Court must convert the Rule 12(b)(6) motion into

a motion for summary judgment. See *Fed. R. Civ. P. 12(b)*; *Great American Ins. Co. v. M/V Handy Laker, 1999 U.S. Dist. LEXIS 19215, Nos. 96 Civ. 8737, 97 Civ. 74000, 1999 WL 1206718* at *2 (S.D.N.Y. Dec. 16, 1999) ("Great American Ins. Co."). However, a district court may not convert a motion under Rule 12(b)(6) into a Rule 56 motion without sufficient notice to the opposing party and without giving the nonmovant an opportunity to respond. See *Groden v. Random House, Inc., 61 F.3d 1045, 1052 (2d Cir. 1995); Gronne v. Apple Bank For Savings, 2000 U.S. Dist. LEXIS 3546, No. 98- Cv-6091, 2000 WL 298914* at *1 (E.D.N.Y. Feb. 14, 2000) ("Gronne"). "This is simply an application . . . of the principle that parties are entitled to a reasonable opportunity to present material pertinent to a summary judgment motion." *Great American Ins. Co., 1999 WL 1206718* at *2. Therefore, "the essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken [*11] by surprise and deprived of reasonable opportunity to meet facts outside the pleadings." *In re G. & A. Books, Inc., 770 F.2d 288, 295 (2d Cir. 1985)*, cert. denied sub nom. *M.J.M. Exhibitors, Inc. v Stern, 475 U.S. 1015, 89 L. Ed. 2d 310, 106 S. Ct. 1195 (1986)*.

Here, defendants Gendels and JMG, and the City, moved to dismiss the amended complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, or in the alternative for summary judgment pursuant to *Federal Rule of Civil Procedure 56*. See Gendels' and JMG's Notice of Motion; City's Notice of Motion. Plaintiffs responded by cross-moving for partial summary judgment pursuant to *Federal Rule of Civil Procedure 56*. See Plaintiffs' Notice of Motion. Furthermore, all parties' memoranda of law refer to various exhibits, including affidavits and transcripts of depositions. Therefore, no party can fairly claim surprise by the Court's decision to convert the motions made under Rule 12(b)(6) into motions for summary judgment. Accordingly, the Court shall decide the present motions according to the well-established standard for motions brought pursuant to Rule 56.

## III. Standard of Law [*12]

Under *Rule 56(c) of the Federal Rules of Civil Procedure*, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing to an absence of evidence in support of the nonmoving party's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986)*. The nonmoving party must then come forward with "specific facts showing that there is a genuine issue for trial," *Fed. R. Civ. P. 56(e)*, by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett, 477 U.S. at 322*.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion.

[*13]   " *Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 1609, 26 L. Ed. 2d 142 (1970); Hathaway v. Coughlin, 841 F.2d 48, 50 (2d Cir. 1988); Knight v. United States Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986),* cert. denied, *480 U.S. 932, 94 L. Ed. 2d 762, 107 S. Ct. 1570 (1987).* But the Court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986),* and to grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative, *id. at 249-50; Knight v. United States Fire Ins. Co., 804 F.2d at 12, 15; Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 45 (2d Cir. 1986),* cert. denied, *479 U.S. 1088, 94 L. Ed. 2d 151, 107 S. Ct. 1295 (1987).* To determine whether the nonmoving party has met his or her [*14] burden, the court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.* A dispute over irrelevant or unnecessary facts will not preclude summary judgment, id., but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion. See, e.g., *Knight v. United States Fire Ins. Co., 804 F.2d at 11-12.* In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)* (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 1593, 20 L. Ed. 2d 569 (1969)).*

## IV. Gendels' and JMG's Motion

### A. Plaintiffs' Failure to Obtain Leave of the Court [*15]

Gendels and JMG submit that Plaintiffs did not obtain leave of the Court prior to commencement of the action against them. Gendels and JMG argue that "where, as here, a receiver has been discharged from any and all liability, he or she may not be sued unless the appointing court vacates its Order and grants leave to same." Defendants Gendels' and JMG's Memorandum of Law ("Gendels/JMG Memo.") at 4 (citing *Gadson v. 1340 Hudson Realty Corp., 180 A.D.2d 582, 580 N.Y.S.2d 291 (N.Y. App. Div. 1992)).* New York law does require authorization from the appointing court prior to commencing any suit against a receiver or similar property administrator. See, e.g., *Copeland v. Salomon, 56 N.Y.2d 222, 451 N.Y.S.2d 682, 687, 436 N.E.2d 1284 (N.Y. 1982).* The rule is different, however, where, as here, the receiver was appointed by a Federal District Court. See *Federal Home Loan Mort. Corp. v. 550 Riverside Owners Corp., 1991 U.S. Dist. LEXIS 16979, No. 90 Civ. 7873, 1991 WL 258779,* at *2 (S.D.N.Y. 1991). In that case, "federal, not state, law governs actions against receivers appointed by a federal court." Id.

The applicable federal law is found in *28 U.S.C. § 959* [*16]   ("Section 959").

Congress enacted Section 959 "to remove the requirement of prior authorization in certain circumstances." *Federal Home Loan Mort. Corp. v. 550 Riverside Owners Corp., 1991 U.S. Dist. LEXIS 16979, *4, 1991 WL 258779 at *2*. The statute provides, in relevant part, that:

> Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on the business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to a trial by jury.

*28 U.S.C. § 959*(a). Section 959(a) was intended to permit actions redressing torts committed in furtherance of the receiver's normal business operations. See, e.g., *In re American Assoc. Sys., Inc., 373 F. Supp. 977 (E.D.Ky. 1974)* ("The exception created in *28 U.S.C. 959*(a) is intended to permit actions redressing torts committed in furtherance of the bankrupt's business operations . . . .").

Here, [*17] Plaintiffs allege personal injuries and damages which arise out of the ordinary operation of the receivership property, namely, that defendants knew or should have known of lead-paint hazards, and that defendants did not adequately maintain the property to ensure protection against lead poisoning. See Amended Compaint, PP 54-55. Gendels and JMG have failed to show how the instant case is not encompassed by the plain language of Section 959(a). n5 Therefore, the Court finds that Section 959(a) applies to the instant case, and the action may proceed in this Court without leave of the court that appointed Gendels receiver.

> n5 Indeed, Gendels' and JMG's memorandum of law does not even mention Section 959(a).

## B. Notice of the Hazardous Lead Paint Condition

Gendels and JMG also argue that they could not be found liable for lead poisoning because "defendants Gendels and JMG had no notice that children under the age of seven years were residing in the subject apartment." Gendels/JMG Memo. at 7. To be liable [*18] for injuries caused by a lead hazard, "a landlord must have actual or constructive notice of both the hazardous lead condition and the residency of a child six years of age or younger." *Juarez v. Wavecrest Mgt. Team Ltd., 88 N.Y.2d 628, 646, 649 N.Y.S.2d 115, 672 N.E.2d 135 (N.Y. 1996)* ("Juarez"). However, the lead abatement provision of the Administrative Code of the City of New York, Local Law 1, provides for constructive notice of a hazardous lead condition "where a landlord has notice that a child under the specified age is residing in an apartment." *Juarez, 88 N.Y.2d at 647;* see also Administrative Code of City of New York § 27-2013(h)(1) (Local Laws, 1982, No. 1 of City of New York) ("Local Law 1"). Thus, if defendants

had knowledge that a child under seven resided in the apartment, defendants may be charged with notice of the lead hazard. See *Juarez, 88 N.Y.2d at 648.*

Plaintiffs assert that Alvino told Gendels that there were children residing in the subject apartment. See Plaintiffs' Memo. at 19; Alvino Tr. at 60. Plaintiffs also submit that Gendels was told of the children residing in the apartment during landlord-tenant [*19] housing court proceedings. See Plaintiffs' Memo. at 19; Alvino Tr. at 85. In addition, Plaintiffs argue that Gendels had notice by virtue of the child window guards. See Plaintiffs' Memo. at 20. Finally, according to Plaintiffs, "Defendant Joel Gendels, his agents and repairmen had been in the apartment when the plaintiff children were present." Id. Thus, Plaintiffs have set forth sufficient facts to allow a rational trier of fact to conclude that Gendels and JMG had notice of children under seven years of age living in the Premises.

Gendels and JMG reject Plaintiffs' assertions. They argue, inter alia, that "the gentleman that Ms. Alvino refers to as being Gendels actually was someone else or that she did not speak with Gendels until sometime after he ceased acting as Receiver with respect to the operation of the premises." Defendants Gendels' and JMG's Memorandum of Law in Reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss and In Opposition to Plaintiffs' Cross-Motion ("Gendels/JMG Memo. II"), at 7. Gendels and JMG also state that "plaintiffs do not indicate whether the children were in the same portion of the apartment as Mr. Soto [an agent of Gendels] [*20] is said to have visited or why he would have assumed that they were residents." Id. Finally, Gendels and JMG argue that windowguards

are insufficient for constructive notice, noting that "the New York City Health Code requires that windowguards be installed in all apartments in which children of the age of ten years of age or younger reside." Id. at 11. These arguments, however, fail to rebut the genuine issues of material fact that Plaintiffs have raised as to whether Gendels and JMG had notice of the infants in their building. It is well-settled that the presence of unresolved factual issues precludes summary judgment. See, e.g., *Knight v. United States Fire Ins. Co., 804 F.2d at 11-12.*

## C. Maintenance of the Subject Apartment

As alternative grounds for summary judgment, Gendels and JMG assert that "the evidence submitted in support of this motion amply demonstrates that Gendels and JMG acted both diligently and reasonably with respect to maintenance of the subject apartment." Gendels/JMG Memo. II at 13. Gendels and JMG argue, inter alia, that invoices related to the maintenance of the subject apartment demonstrate that the Premises, as well as [*21] the painted surfaces therein, were adequately maintained. See Gendels/JMG Memo. at 7-8; Schedule of Receipts and Disbursements for the Period August 1, 1994 through December 31, 1995, attached to Aff. of Joel Gendels ("Gendels Aff.") as Exh. "2."

Plaintiffs, however, allege that Gendels and JMG acted negligently, and thus unreasonably, in maintaining the Premises. See Amended Complaint, P 58. Among other things, Plaintiffs indicate that Alvino showed Gendels chipping, peeling, or flaking paint inside the Premises, and that Gendels and JMG "never inspected the sub-

ject apartment to determine if it was contaminated by lead based paint." See Plaintiffs' Memo. at 8; Alvino Tr. at 60. Gendels and JMG dispute that Alvino showed Gendels any type of defective paint, but admit that they never inspected the subject apartment for lead-based paint. See Gendels' and JMG's Local Rule 56.1 Statement Responsive to Plaintiffs' Rule 56.1 Statement at 6, 8. Thus, the issue of whether Gendels and JMG acted reasonably with respect to the maintenance of the apartment is a disputed factual issue. Accordingly, and for the reasons discussed above, Gendels' and JMG's motion for summary judgment [*22] is denied. See *Knight v. United States Fire Ins. Co., 804 F.2d at 11-12.*

## V. Defendant Bronx Properties' Motion

Bronx Properties moves, pursuant to *Federal Rule of Civil Procedure 56*, for summary judgment dismissing the amended complaint and all cross-claims against it. See Memorandum of Law in Support of Motion for Summary Judgment of Bronx Properties ("Bronx Prop.'s Memo."), at 1. Bronx Properties argues that summary judgment is warranted because it had: (1) no notice of a lead paint condition; (2) no reasonable opportunity to respond to the lead paint condition; and (3) a six month grace period to repair the defective condition. See id. at 2, 7.

### A. Notice of the Hazardous Lead Paint Condition

Bronx Properties submits that it "had owned the subject premises for just over two months when it received notice of the lead paint condition by way of the DOH Order to Abate Nuisance," and that "the

Order to Abate arose from an inspection performed less than one week after Defendant took title to the premises." Bronx Prop.'s Memo. at 6-7. Bronx Properties argues that "as a matter of law, this limited notice is insufficient to impose liability against [*23] Bronx Properties for failing to repair the condition." Id. at 7. However, Local Law 1 provides for constructive notice of a hazardous lead condition, regardless of the landlord's length of ownership, "where a landlord has notice that a child under the specified age is residing in an apartment." *Juarez, 88 N.Y.2d at 647.*

Plaintiffs argue that Bronx Properties had immediate notice of children residing in the Premises, by virtue of tenant files that included child window guard notices. See Plaintiffs' Memo. at 24, 28. During his deposition testimony, Gendels stated that window guard notices were "most likely" issued, and that any such notices would have been turned over to Bronx Properties. See Plaintiffs' Memo. at 27-28; Gendels Tr. at 60. Further, in a sworn affidavit, Alvino stated that window guards were "plainly visible" when Bronx Properties purchased the Building. Affidavit of Maria Alvino ("Alvino Aff.") at P 12, attached to Plaintiffs' Notice of Cross-Motion as Exh. "6."

Bronx Properties counters that it "had no indication that children were residing in Apartment 2E," and that it "did not receive window guard forms from the prior owner concerning [*24] this apartment." Reply Memorandum of Law in Further Support of Motion for Summary Judgment of Bronx Properties and in Opposition to Plaintiffs' Cross-Motion ("Bronx Prop.'s Memo. II"), at 4; Supplemental Aff. of Robert Baranowski ("Baranowski Aff.") at P 4, attached to Bronx Prop's Memo. II. A rational

trier of fact could find that the presence of such window guard forms supplied Bronx Properties with notice of children under seven. See, e.g., *Nwaru v. Leeds Management Co., 236 A.D.2d 252, 654 N.Y.S.2d 338, 339 (N.Y. App. Div. 1997)* ("We reject the contention that window guard forms, required for residency by children less than 10 years old, failed to provide notice, since, at the least, defendants thereby knew that the child could have been six or younger."); *Baptiste v. New York City Hous. Auth., 177 Misc. 2d 51, 53, 675 N.Y.S.2d 802 (N.Y. Sup. Ct. 1998)* ("Window guard forms filed by the tenant provided actual notice of the occupancy of children less than seven years of age."). Thus, whether Bronx Properties knew about the window guards and/or received window guard forms are disputed issues of material fact. Accordingly, Bronx Properties is not entitled **[*25]** to summary judgment on the grounds that it did not, as a matter of law, have notice of the lead paint hazard.

### B. Reasonable Opportunity to Repair

"Local Law 1 simply obligates landlords to remedy a specific dangerous defect." *Juarez, 88 N.Y.2d at 644*. Therefore, where "a landlord establishes that it exercised due care, it will not be held liable." Id. Bronx Properties argues that it is entitled to summary judgment because "as a matter of law and as a matter of equity, Bronx Properties abated the lead paint hazards in the newly acquired building within a reasonable time . . . ." Bronx Prop.'s Memo. II at 10. Bronx Properties submits that "to hold Defendant liable under these circumstances would require the imposition of absolute liability under Local Law 1, without any regard to the reasonableness of Defendant's conduct." Id. at 2.

All parties agree that Bronx Properties purchased the Building on November 28, 1995. All parties also agree that from November 28, 1995, until March 6, 1996, Bronx Properties did not abate the lead paint hazard. See Plaintiffs' Memo. at 25; Bronx Prop.'s Memo. II at 10. Thus, more than three months elapsed between Bronx **[*26]** Properties' purchase of the Building and its abatement of the lead paint in the Premises. A reasonable trier of fact could conclude that Bronx Properties did not abate the lead paint hazard in a reasonable amount of time. Bronx Properties has not supplied the Court with any cases that would, as a matter of law, mandate a finding that Bronx Properties acted reasonably given the facts of this case. Accordingly, Bronx Properties is not entitled to summary judgment on the grounds that, as a matter of law, it acted reasonably.

### C. Six Month Grace Period

Bronx Properties also argues that new owners of property have at least six months to remedy any dangerous condition existing at the time of purchase. See Bronx Prop.'s Memo. at 7. In support of this argument, Bronx Properties points to City of New York Administrative Code § 27-2114(h), and *New York Multiple Dwelling Law § 304(6-b)*. Both of these statutes provide that "no civil or criminal liability or penalty shall attach to any person who shall by operation of law become an owner of a multiple dwelling . . . for a period of six months" after the new owner acquires ownership. *New York Multiple Dwelling Law § 304(6-b)* (McKinney **[*27]** 1974) ("Multiple Dwelling Law § 304(6-b)") (emphasis supplied); City of New York Administrative Code § 27-2114(h) ("City Code § 27-2114(h)"). However, Bronx Properties ad-

2000 U.S. Dist. LEXIS 5569, *

mits that it did not take title to the Building by operation of law. See Bronx Prop.'s Memo. II at 10. Rather, Bronx Properties "respectfully requests that this Court apply the same fundamental fairness and equity rationales which underlie" Multiple Dwelling Law § 304(6-b) and City Code § 27-2114(h). See id.

The Court finds that Multiple Dwelling Law § 304(6-b) and City Code § 27-2114(h) do not apply to the instant case, as Bronx Properties did not acquire the Building by operation of law. Therefore, to the extent Bronx Properties' motion for summary judgment relies on a six month grace period to abate the lead paint hazard, the motion is denied.

### D. Implied Warranty of Habitability Claim

Finally, Bronx Properties contends that Plaintiffs' claim for breach of the warranty of habitability seeks improper relief. See Bronx Prop.'s Memo. II at 11. Specifically, Bronx Properties asserts that Plaintiffs are not entitled to damages stemming from any personal injuries, and that Plaintiffs have failed **[*28]** to demand the appropriate damages for a breach of the implied warrant of habitability. See id. Upon further review, the Court finds that this alleged defect in pleading does not warrant summary judgment for defendants.

*New York Real Property Law § 235-b* imbues all residential leases with an implied warranty of habitability. See *N.Y. Real Property Law § 235-b* (McKinney's 1989) ("Section 235-b"); *German v. Federal Home Loan Mortgage Corp., 885 F. Supp. 537, 567 (S.D.N.Y. 1995)* ("German"). It is well-settled that Section 235-b provides tenants with a cause of action sounding in

breach of contract. See *German, 885 F. Supp. at 567.* The most frequently applied measure of damages for this type of breach is rent abatement. See id. ("To the extent that plaintiffs may have been seeking to recover for their alleged personal injuries, their cause of action does not lie in a claim for breach of the implied warranty of habitability.").

Plaintiffs' Amended Complaint does not specifically seek contract damages for the breach of the implied warranty of habitability claim. However, "*Rule 54(c) of the Federal Rules of Civil Procedure* . . . clearly **[*29]** entitles a court to grant a party relief based on the pleaded and proven facts regardless of whether such relief has been demanded in the pleadings or whether such relief is consistent with the party's theory of the case." *McGrath v. Krieger, 502 F. Supp. 103, 104 (S.D.N.Y. 1980).* Moreover, "Bronx Properties does not contend that Plaintiffs' cause of action is invalid," only that "the relief demanded is improper as a matter of law." Bronx Prop.'s Memo. II at 11. Therefore, the Court finds that Bronx Properties has not shown that it is entitled to summary judgment on the breach of the implied warranty of habitability claim.

### VI. City of New York's Motion

As noted above, Plaintiffs have voluntarily withdrawn their federal claims, and the Court grants the City's motion for summary judgment with respect to Plaintiffs' first and third causes of action. The City presently moves for summary judgment on the remaining causes of action.

### A. Failure to Enforce Local Laws

Plaintiffs' second cause of action alleges that the "City has failed to perform duties

enjoined upon it by [local] law, in violation of [local] law." Amended Complaint, P 48. Plaintiffs [*30] allege, inter alia, that the City failed and neglected to (1) correct lead-based paint violations in Plaintiffs' apartment promptly and completely; (2) impose any of the penalties required by law on the landlord; and (3) relocate Plaintiffs and other family members in accordance with City of New York Administrative Code § 26-301. Id., P 49. The City maintains that Plaintiffs do not have a private right of action for such violations. See City's Memo. at 12-14. Plaintiffs respond that "it has already been determined that tenants can sue municipalities for enforcement of these laws" pursuant to New York City Health Code ("N.Y.C. Health Code") § 173.13 ("Section 173.13"). n6 Plaintiffs' Memo. at 33.

n6 Section 173.13(d)(2) provides that the DOH is required to "order the removal of [lead-based] paint" when it is put on notice that lead paint of a certain content is present in an apartment and "the blood-lead level of any person residing in such dwelling is 20 micrograms per deciliter or higher." 24 N.Y. Comp. Codes. R. & Regs. § 173.13[d][2]. If the owner of the apartment fails to comply with the order to abate within five days after service thereof, the DOH "shall request the Department of Housing Preservation and Development to execute such order." Id. Plaintiffs allege, inter alia, that an order to abate "was not issued to the correct party until February 2, 1996, some 60 days after the apartment inspection conducted by the DOH on December 4, 1995 found the lead based paint hazard in the subject apartment." Plaintiffs' Memo. at 31-32.

[*31]

It is well-settled that "absent a special relationship creating a municipal duty to exercise care for the benefit of a particular class of individuals, no liability may be imposed upon a municipality for failure to enforce a statute or regulation." *Valencia v. Lee, 55 F. Supp. 2d 122, 129 (E.D.N.Y. 1999)* ("Valencia") (quoting *Kenavan v. City of New York, 70 N.Y.2d 558, 568, 523 N.Y.S.2d 60, 64, 517 N.E.2d 872 (N.Y. 1987))*. A special relationship exists when a municipality has either: (1) violated a duty commanded by a statute enacted for the special benefit of particular individuals; (2) voluntarily assumed a duty, and the individuals gaining benefit from that duty justifiably relied upon its proper exercise; or (3) assumed positive direction and control over a known, blatant, and dangerous safety violation. See *Garrett v. Holiday Inns, Inc., 58 N.Y.2d 253, 261-62, 460 N.Y.S.2d 774, 778, 447 N.E.2d 717 (N.Y. 1983)*.

In this case, there is no basis for the first of the three types of special relationships that would allow Plaintiffs to sue the City for violation of local laws. Section 173.13(d)(2), cited by Plaintiffs as authority [*32] for such a suit, does not apply to the "special benefit" of a "particular class" of persons, such as children. Rather, Section 173.13(d)(2) "was created for the benefit of all residents of New York City who live in a dwelling and not for the special benefit of children." *Lindsay v. New York City Housing Auth., 1999 U.S. Dist. LEXIS 1893, *24, No. 95- CV-3315, 1999 WL 104599, at *8

2000 U.S. Dist. LEXIS 5569, *

(E.D.N.Y. Feb. 24, 1999) ("Lindsay"); see also *Davis v. Owens, 259 A.D.2d 272, 686 N.Y.S.2d 31 (N.Y. App. Div. 1999).* As a result, Section 173.13(d)(2) does not create a special relationship between the City and Plaintiffs. See *Lindsay, 1999 WL 104599* at *8. Thus, whether a special relationship exists in this case turns upon the two other exceptions to municipal immunity.

The second exception requires that Plaintiffs demonstrate "(1) the municipality's assumption, through promise or actions, of an affirmative duty to act on behalf of the victim, (2) knowledge on the part of the municipality's agents that inaction could lead to harm, (3) some form of direct contact between the municipality's agents and the victim, and (4) justifiable reliance by the victim upon the municipality's affirmative [*33] undertaking . . . ." *Bargy v. Sienkiewicz, 207 A.D.2d 606, 609, 615 N.Y.S.2d 520, 522 (N.Y. App. Div. 1994)* (citations omitted).

Plaintiffs have submitted sufficient evidence to raise triable issues of fact regarding the existence of these four elements. Specifically, Plaintiffs submit evidence that a Public Health Advisor n7 ("PHA") named Allison DeFreitas visited the Premises on several occasions beginning on November 27, 1995 and counseled Plaintiffs on how to protect themselves from lead poisoning. See Plaintiffs' Memo. at 35-36; Reports of Public Health Advisor Visit/Action, dated November 27, 1995, January 17, 1996, and April 22, 1996; and Public Health Advisor Intervention Reports, dated September 4, 1996, and March 26, 1997 (collectively, the "PHA Reports"), attached to Plaintiffs' Notice of Cross-Motion as Exh. "5." During these visits, DeFreitas discussed, inter alia, the environmental hazards of lead poison-

ing, proper nutrition for the children, and follow-up medical care. See PHA Reports, passim. DeFreitas also advised Plaintiffs to mop the Premises with Cascade and Tide. See PHA Report dated November 27, 1995. However, there is no [*34] indication that Plaintiffs were warned that such measures might not protect them from the lead hazard. Alvino asserts that she "was never advised by anyone from the New York City Department of Health to vacate the subject apartment until the lead paint conditions could be abated." Alvino Aff. P 11. Thus, Plaintiffs have submitted evidence that (1) the City, through DeFreitas's contact with the Plaintiffs, (2) assumed a duty to help Plaintiffs reduce the risk of lead poisoning, while (3) simultaneously knowing that a lead paint hazard existed and would continue to exist at the Premises, despite the recommended remedial measures.

n7 Public Health Advisors are employed by the City's Department of Health.

Furthermore, a rational trier of fact could conclude that Plaintiffs relied upon DeFreitas's advice to their detriment. "What shows reliance on the PHA is that plaintiffs took all of the steps that the PHA recommended and remained in the apartment, believing that if they took those steps, infant plaintiff[s] would [*35] be safe." *Valencia, 55 F. Supp. 2d at 131.* Indeed, on at least one occasion, DeFreitas noted that "Mom stated that she has been following the above [nutritional and environmental] regiment." PHA Report dated April 22, 1996. Thus, a rational jury could determine that Plaintiffs relied upon the advice of DeFreitas to con-

clude that as long as the prescribed measures were followed, Plaintiffs would not be in danger of continuing lead poisoning. See *Valencia, 55 F. Supp. 2d at 131* (denying summary judgment on facts similar to the instant case). Therefore, Plaintiffs have submitted sufficient evidence of the existence of a special relationship based upon the City's assumption of an affirmative non-statutory duty to act on behalf of Plaintiffs to create a genuine issue of material fact. See id.

Similarly, Plaintiffs have also submitted sufficient evidence to create a genuine issue of material fact on the third exception to municipal immunity. Given the facts as discussed above, the City appears to have "assumed positive direction and control under circumstances in which a known, blatant and dangerous safety violation," namely, lead paint, existed. **[*36]** *Garret v. Holiday Inns, Inc., 58 N.Y.2d at 262;* see also *Valencia, 55 F. Supp. 2d at 132-33.* The City was aware, at all times during DeFreitas's visits, of the lead paint safety hazard, but apparently failed to take proper steps to safeguard Plaintiffs. And, as discussed above, Plaintiffs appear to have relied on the City's advice and direction, and may have been harmed as a result. Thus, triable issues of fact exist on this third exception as well. Accordingly, the City's motion for summary judgment is denied as to the second cause of action. n8

n8 Plaintiffs' surviving cause of action is not based on the violation of local laws, but rather on the negligent performance of voluntarily assumed duties. See *Valencia, 55 F. Supp. 2d at 133.* Plaintiffs' amended complaint, however, does not currently plead negligent performance of voluntarily assumed duties. Nevertheless, Plaintiffs' memorandum of law and supporting documentation adequately put the City on notice of this alternative legal theory. See, e.g., Plaintiffs' Memo. at 34-39. Accordingly, Plaintiffs will be granted leave to amend their pleadings as to the second cause of action to conform to their proof. See *Valencia, 55 F. Supp. 2d at 130, n. 5.*

**[*37]**

## B. Plaintiffs' Remaining Causes of Action

Plaintiffs' fourth cause of action is for negligence. See Amended Complaint, PP 54-58. Specifically, the amended complaint states that "defendants have not maintained the premises that defendants own, manage or operate, or to which they administer federal funds to ensure that plaintiffs would be protected against lead poisoning." Id., P 55. As against the City, this cause of action does not state a claim upon which relief can be granted, as Plaintiffs have conceded that they cannot prove the expenditure of federal funds on the Premises. See Plaintiffs' Memo. at 29, n. 2. To the extent that this cause of action is not based upon the City's use of federal funds, it is duplicative of Plaintiffs' second cause of action, which pleads a claim for negligent assumption of voluntarily assumed duties. Cf. *Valencia, 55 F. Supp. 2d at 134.* Accordingly, the City's motion for summary judgment on the fourth cause of action is granted.

Plaintiffs' fifth cause of action is for breach of contract and of the implied war-

ranty of habitability. See Amended Complaint, PP 59-61. However, there is no evidence that the City [*38] had any contractual arrangement with Plaintiffs in connection with the Premises. In fact, the evidence before the Court establishes that the City did not own, finance, or provide Plaintiffs with their apartment. Accordingly, the City's motion for summary judgment on the fifth cause of action is granted.

Plaintiffs' sixth cause of action alleges that defendants are liable to Plaintiffs under a nuisance theory, because "the lead contamination in the dwelling provided by defendants creates an unreasonable invasion of the living condition of plaintiffs and is defined as an unlawful nuisance in violation of the New York City Administrative Code and Health Code." Amended Complaint, P 63. There is no cause of action for nuisance under the common law where the condition complained of did not arise from outside the subject premises. See *Graham v. Wisenburn, 39 A.D.2d 334, 336, 334 N.Y.S.2d 81, 83 (N.Y. App. Div. 1972).* Thus, unless a statutory cause of action exists, the City's motion for summary judgment on the nuisance claim must be granted. See *Valencia, 55 F. Supp. 2d at 134.* In the amended complaint, Plaintiffs refer to the New York City Administrative [*39] Code and Health Code, but do not cite to any specific section of either code that would allow an action for nuisance.

In any event, even assuming that Plaintiffs could satisfy the requirements of a distinct statutory nuisance claim against the owner of the Premises, there is no indication that the City owned or provided Plaintiffs with their apartment. As stated above, the evidence establishes that the City did not own, finance, or provide Plaintiffs with

their apartment. Therefore, the nuisance claim appears to be against Plaintiffs' landlords, and not the City. See *Valencia, 55 F. Supp. 2d at 134.* Accordingly, the City's motion for summary judgment on the sixth or nuisance cause of action is granted.

Finally, Plaintiffs also allege claims for negligent and intentional infliction of mental distress. See Amended Complaint, PP 66-69. Under New York law, "it is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity." *Lauer v. City of New York, 240 A.D.2d 543, 544, 659 N.Y.S.2d 57, 58 (N.Y. App. Div. 1997)* (citations omitted). Accordingly, the City's motion for summary judgment [*40] must be granted as against the claim for intentional infliction of emotional distress.

A plaintiff claiming negligent infliction of emotional distress under New York law must establish that she or he: (1) is "one to whom a duty of care is owed," (2) sustained harm "solely as a result of an initial, negligently-caused psychological trauma," and (3) suffered "ensuing psychic harm with residual physical manifestations." *Johnson v. State, 37 N.Y.2d 378, 381, 372 N.Y.S.2d 638, 641, 334 N.E.2d 590 (N.Y. 1975)* (citations omitted). As discussed above, Plaintiffs have submitted evidence that the City voluntarily assumed a duty to Plaintiffs that exceeded the scope of any duty imposed upon the City by statute. However, Plaintiffs have not submitted evidence that the City's negligence caused mental distress or psychic trauma, nor have they indicated how Plaintiffs have exhibited physical manifestations of such psychic trauma. Indeed, Plaintiffs do not address the claim for negligent infliction of emotional distress in their memorandum of law. Accordingly, the

2000 U.S. Dist. LEXIS 5569, *

City's motion for summary judgment on the seventh and final cause of action is also granted.

## VII. Plaintiffs' [*41]  Cross-Motion for Summary Judgment

Plaintiffs move "for an Order granting summary judgment on the issue of liability against all defendants." See Plaintiffs' Notice of Motion. Because disputed factual issues remain as to the liability of each defendant, this motion must be denied. As discussed above, significant issues of material fact remain as to whether Gendels and JMG, and Bronx Properties, had notice of children under seven years of age living in the Premises. Issues of material fact also remain on the issue of whether Gendels and JMG, and Bronx Properties, acted reasonably with respect to maintenance of the Premises. Finally, with respect to the City, Plaintiffs have submitted evidence creating a genuine issue of material fact as to whether the City negligently discharged voluntarily assumed obligations. Accordingly, Plaintiffs' cross-motion for summary judgment against all defendants is denied.

## CONCLUSION

For the reasons set forth above, (1) Gendels' and JMG's motion for summary judgment against Plaintiffs is denied; (2) Bronx Properties' motion for summary judgment against Plaintiffs and all cross-claims against it is denied; (3) the City's motion for summary [*42]  judgment is denied as to Plaintiffs' second cause of action; (4) the City's motion for summary judgment is granted as to Plaintiffs' first, third, fourth, fifth, sixth, and seventh causes of action; and (5) Plaintiffs' cross-motion for summary judgment against all defendants is denied. Trial of this matter shall commence on September 11, 2000 at 10:00 a.m. in Room 906, 40 Centre Street, New York, New York. The joint pre-trial order, all proposed voir dire, jury charges, and motions in limine shall be filed and served on or before August 28, 2000.

SO ORDERED.

SHIRLEY WOHL KRAM

UNITED STATES DISTRICT JUDGE

DATED: New York, New York

April 26, 2000