REDACTED — HIGHLY CONFIDENTIAL

Martin J. Bienenstock, Esq. (MB 3001)
Michael P. Kessler, Esq. (MK 7134)
Richard P. Krasnow, Esq. (RK 5707)
Jeffrey L. Tanenbaum, Esq. (JT 9797)
Richard A. Rothman, Esq. (RR 0507)
Penny P. Reid, Esq. (PR 5699)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Melanie Gray, Esq. (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5045
Facsimile: (713) 224-9511

– and –

Robert B. Weiss, Esq.
Frank L. Gorman, Esq.
HONIGMAN MILLER SCHWARTZ AND COHN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7000
Facsimile: (313) 465-8000

Attorneys for General Motors Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

In re                                                          :
                                                               :   Chapter 11 Case No.
                                                               :
DELPHI CORPORATION, et al.,                                    :   05-44481 (RDD)
                                                               :
                    Debtors.                                   :   (Jointly Administered)
----------------------------------------------------------------x
                                                               :
DELPHI CORPORATION, et al.,                                    :
                                                               :
                    Movants                                    :
                                                               :
         -against-                                             :
                                                               :
GENERAL MOTORS CORPORATION,                                    :
                                                               :
                    Respondent                                 :
----------------------------------------------------------------x

## DECLARATION OF KEVAN B. PAREKH

I, Kevan B. Parekh, declare as follows:

1. I am the Director of Business Development for General Motors Corporation ("GM"). I have personal knowledge of the facts set forth herein or have conducted a reasonable inquiry to determine that such statements are true and correct.

2. I have a bachelors degree in Engineering, received in 1993, from the University of Michigan. After graduating from college, I spent four years working as an engineer at ITT Automotive Corp in Auburn Hills, Michigan. Thereafter I attended the University of Chicago and received an MBA in 1999.

3. I was hired by GM in 1999 and I have been employed continuously since then. During my employment at GM I have held several positions in the New York Treasurer's Office focusing on different aspects of corporate finance. I am currently the Director of Business Development and have held this position since March 2005. As the Director of Business Development, I am responsible for supporting corporate M&A and strategic initiatives, as well as for supporting restructuring activities related to GM's supply base. Over the past ten months, I have spent a majority of my time focusing on the Delphi matter.

4. I have read the motion (the "Motion") of Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, "Delphi" or the "Debtors"), requesting authorization to reject 5,472 executory supply contracts with GM (the "Supply Contracts"), as well as the accompanying declaration of Mr. Eisenberg describing Delphi's so-called "Phase I" and "Phase II" analyses.

2

REDACTED - HIGHLY CONFIDENTIAL

5.  In this Declaration I explain how Delphi can transition out of the manufacture of GM parts without creating severe injuries from a shutdown. In so doing, I describe GM's efforts to avoid such injuries by propounding a cooperative solution with Delphi that would, among other things, provide for the continued manufacture and supply of parts for GM and an orderly plan to resource parts from facilities that Delphi would like to wind-down and close consistent with Delphi's so-called "Transformation Plan." Moreover, I describe why the rejection of the Supply Contracts identified in the Motion followed by a shutdown of parts deliveries to GM by Delphi would cause severe injury to GM, the automotive industry and Delphi. Because, as explained below, Delphi is obligated to pay labor regardless of whether employees work, Delphi's estate would be worse off refusing to honor the Supply Contracts than honoring them. Delphi's Motion, however, implies a threat to shut down and to injure itself and GM unless GM agrees to whatever new prices Delphi demands. The injuries to Delphi would be very substantial, which is why GM believes Delphi's Motion fails to explain how its contract rejection benefits their estates or has a reasonable likelihood of leading to higher prices from GM in a manner that preserves the long term value of the estates. I also describe the information GM needs and has requested, but which Delphi has failed to provide, for GM to assess whether, and in what amount, GM would be willing to provide financial support to Delphi during the transition period. Finally, if the Court were to consider authorizing Delphi to reject the Supply Contracts, I describe the conditions that should be included in any order authorizing rejection that would be necessary to avoid the otherwise devastating consequences that would result from rejection.

### A. GM's Good Faith Attempts to Negotiate With Delphi to Construct a Transition Wind-Down Plan.

6. I have directly participated in the discussions between Delphi and GM related to, among other things, Delphi's continued manufacture and supply of parts for GM. These discussions began before Delphi filed its chapter 11 case and have continued to date.

7. During that time, GM has engaged in extensive discussions with Delphi regarding the terms and conditions under which GM would support Delphi's so-called Transformation Plan (as ultimately disclosed on March 31), including the potential for an orderly transition of GM business currently produced at facilities supporting non-core product lines (as described in the Transformation Plan) that Delphi may close or wind-down. During these discussions, both parties have recognized that the closure of Delphi plants and the transition of GM components now being manufactured at those plants to alternative suppliers will be an extremely complicated and intricate process. Unless handled on an orderly, well-planned and cooperative basis, this process will be extremely damaging to Delphi, GM and other industry constituents. Given the scope and magnitude of the wind-down and transitioning process, we estimate that in most cases it will take through ⁺            to resource all of the components produced at any of the non-core product lines facilities that Delphi may look to close or wind-down and will require the involvement of not only GM and Delphi, but also the unions and alternative suppliers.

4

8.  As described below in more detail, the actual rejection of the Supply Contracts and Delphi's immediate cessation of manufacturing parts under those Supply Contracts would cause severe harm to Delphi, GM, and the automotive industry.

**B.  Rejection Of The Supply Contracts Will Not Benefit Delphi**

9.  Based on our review of the financial information prepared by FTI of the 21 plants in Phase II, it appears that, on average, labor costs (excluding retiree OPEB) approximate ___ of Delphi's manufacturing costs, including material costs. Even if Delphi anticipates selling or closing some of the 21 Plants, it would take Delphi months to finalize the sales and closures—and during that time Delphi would continue to be saddled with the enormous fixed costs relating to those plants, including SG&A and other corporate expenses in addition to its fixed labor costs (as explained below). Accordingly, precipitous rejection of GM Supply Contracts and cessation of delivery of parts to GM will not, in the short term, reduce the Debtors' cash costs of operating its affected plants. Moreover, as explained in Mr. Ruselowski's Declaration, because GM purchases its parts on a requirements basis, if GM production lines are shut down, GM will have no need during that time to continue purchasing other profitable parts from Delphi that were not rejected, which could result in an entire shutdown of Delphi's operations. This would have a materially negative impact on Delphi's cash flow, particularly since Delphi's current labor agreements require that Delphi pay its union employees regardless of whether they are working without the benefit of any offsetting revenue from GM. Moreover, Delphi would be foregoing future GM contracts which would damage the long term value of the Delphi estates. See Ruselowski Declaration ¶ 20.

10. The impact on Delphi of the GM Supply Contracts could change radically based on the outcome of the 1113/1114 motion. If Delphi receives significant labor relief (either through negotiations with its unions or otherwise), Delphi's losses, if any, on the Supply Contracts will be eliminated or reduced very substantially. It is likely that many of the alleged loss contracts would become profitable. In addition, due to the special attrition program agreed upon by GM, Delphi and the International Union, United Automotive, Aerospace and Agricultural Implement Workers of America in March 2006 (the "Special Attrition Program"), Delphi's labor costs will be further reduced. The combined effect of any labor relief achieved through Delphi's 1113/1114 motion and the Special Attrition Program, in all likelihood, would reverse any aggregate cash losses on the Supply Contracts and enable Delphi to generate positive cash flow.

C. **Rejection Of The Supply Contracts And Cessation of Deliveries To GM Will Result in An Enormous Rejection Damage Claim Against The Debtors' Estates As Well As Irreparable Harm To GM**

11. GM is the world's largest vehicle manufacturer. It employs approximately 173,000 employees (hourly & salaried) in North America, supporting the production of approximately 4.5 million annual units of trucks and cars using parts manufactured pursuant to the Supply Contracts.

12. Because of the industry standard just-in-time delivery system, Delphi's rejection of GM Supply Contracts and termination of deliveries of production parts covered by the Supply Contracts would very rapidly require GM to shut down North American production. As explained in Mr. Ruselowski's Declaration, GM's plants may have to remain idle for months because of the time it would take to obtain an alternate supplier for the affected parts. See Ruselowski Declaration ¶ 17.

13. Rejection of the Supply Contracts will result in an enormous damage claim against the Debtors' estates, as well as additional incalculable harm. For example, a shutdown of GM's plants could result in (i) the idling of approximately 173,000 GM workers and (ii) the decrease in GM's revenues by as much as $250 million per day, leading to $5 billion loss in revenues in the first 30 days, and as much as $14 billion in lost revenues in the first 60 days.

14. Under GM's various collective bargaining agreements with its labor union, if production is halted due to Delphi's non-delivery of parts, GM (similar to Delphi) would remain obligated to compensate idled employees either (i) up to 95% of after-tax wages if they are placed on temporary/indefinite layoff or (ii) 100% of wages if they are placed in a JOBS bank. During this period, GM would remain responsible to provide 100% of idled employees' benefits. In aggregate, such costs would approximate $1 billion per month.

15.

16.

7

### D. Delphi Has Failed To Provide Information Related to Alleged Cash Losses for Supply Contracts

17. Even before Delphi filed its chapter 11 case, Delphi began requesting that GM provide Delphi with cash subsidies to cover alleged losses that Delphi was incurring in connection with parts it manufactures for GM. In response, GM repeatedly requested that Delphi identify which supply contracts were unprofitable to Delphi. GM also requested that Delphi provide the cost allocations for parts, including direct labor, direct material and general and administrative expenses, and requested that Delphi explain how allocations are applied to GM versus non-GM business. Delphi has failed to provide any of this information.

18. Rather than providing GM with any of the information it sought, in its latest request in January 2006, Delphi instead requested payment from GM in the amount of $125 million per month for a period of four months (or a total of $500 million). Delphi made clear that the requested payments from GM would be without recourse, could not be applied as an advance on supply contracts between Delphi and GM, and would not be treated as an allowed claim against the Debtors' estates. Delphi further communicated that if GM refused to make these payments, Delphi would seek the authority to reject GM contracts. In addition to the "gift" of $500 million, Delphi also requested that GM fund Delphi's labor transformation expenses and assume a significant portion of its legacy liabilities, which GM estimates could exceed $5.5 billion.

19.     While GM indicated its willingness to consider, as part of a comprehensive agreement, compensating Delphi for cash losses, if any, incurred in the manufacture of parts for GM during an agreed upon transition period, GM has made it clear that such consideration would be contingent upon Delphi demonstrating that it is, in fact, incurring cash losses under the Supply Contracts. As stated above, however, Delphi only provided GM with various ballpark figures representing its supposed overall losses and requested that GM simply convey a monthly lump sum to Delphi. The first information provided to GM with regard to the identification of supply contracts under which Delphi was allegedly suffering losses was in the Debtors' Motion. While Exhibit A to the Motion purports to list the supply contracts that Delphi seeks to reject, Delphi has failed to provide any of the financial information requested by GM as set forth above.

**D.    Conclusion**

20.     GM believes Delphi's motion should be denied for many reasons. But, to the extent, if any, that the Court approves rejection of any of the GM Supply Contracts, GM believes the rejection should be conditioned on a reasonable transition plan that will minimize the enormous harm that rejection and cessation would inflict upon both Delphi and GM.

21.     During their negotiations, the parties have recognized that such an orderly, cooperative plan would benefit both GM and Delphi. It should include, among other things, the following components:

   (i)    sufficient time to ensure an orderly transition;

   (ii)   access to drawings, materials, and other information necessary to resource the manufacture and supply of GM parts;

(iii)    access to Delphi's personnel and its tiered suppliers by GM and its alternative suppliers to facilitate a cooperative transition plan;

(iv)    rights to use Delphi's intellectual property relating to manufacturing of GM parts, subject to agreement on reasonable commercial terms.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of June, 2006

_____
Kevan B. Parekh