Martin J. Bienenstock, Esq. (MB 3001)          Melanie Gray, Esq. (admitted *pro hac vice*)
Richard P. Krasnow, Esq. (RK 5707)             WEIL, GOTSHAL & MANGES LLP
Michael P. Kessler, Esq. (MK 7134)             700 Louisiana, Suite 1600
Jeffrey L. Tanenbaum, Esq. (JT 9797)           Houston, TX 77002
Richard A. Rothman, Esq. (RR 0507)             Telephone: (713) 546-5045
Penny P. Reid, Esq. (PR 5699)                  Facsimile: (713) 224-9511
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

– and –

Robert B. Weiss, Esq.
Frank L. Gorman, Esq.
HONIGMAN MILLER SCHWARTZ AND COHN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI  48226-3506
Telephone: (313) 465-7000
Facsimile: (313) 465-8000

Attorneys for General Motors Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11 Case No.** |
| : | |
| **DELPHI CORPORATION,** *et al.,* : | **05-44481 (RDD)** |
| : | |
| Debtors. : | **(Jointly Administered)** |

------------------------------------------------------------x

| | |
|---|---|
| **DELPHI CORPORATION,** *et al.,* : | |
| : | |
| Movants, : | |
| : | |
| -against- : | |
| : | |
| **GENERAL MOTORS CORPORATION,** : | |
| : | |
| Respondent. : | |

------------------------------------------------------------x

REDACTED – HIGHLY
CONFIDENTIAL

## DECLARATION OF GREG RUSELOWSKI

I, Greg Ruselowski, declare as follows:

1.    I am the Finance Director of Special Suppliers for Purchasing at General Motors Corporation ("GM"). I have personal knowledge of the facts set forth herein or have conducted a reasonable inquiry to determine that such statements are true and correct.

2.    I was hired by GM in June 1983 and have been employed continuously by GM since then. During my employment at GM I have held a variety of finance positions in many areas, including the Comptroller's Staff, Treasurer's Office, Detroit Diesel, Midsize & Luxury Car Group, Advanced Technology Vehicles and Fuel Cell Activities. In my current position as Finance Director for Special Suppliers, I am responsible for providing oversight and financial support for the Delphi relationship within GM's purchasing organization. In addition, I am also responsible for providing financial and analytical support for the Global Indirect, Machinery & Equipment purchasing activity at GM.

3.    I have read the motion (the "Motion") of Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, "Delphi" or the "Debtors"), requesting an option to reject 5,472 executory supply contracts with GM (the "Supply Contracts"), as well as the accompanying declaration describing Delphi's so-called Phase I and Phase II analyses. The Motion does not disclose or analyze the consequences of rejection adverse to Delphi that are listed in this declaration.

REDACTED - HIGHLY
CONFIDENTIAL

4.    In this Declaration, I explain that:

(i)    although GM has not been able to identify all the contracts that Delphi is seeking an option to reject in its Motion, the annual purchase value of the contracts that are identifiable to GM amounts to Delphi seeking authority to reject over $4.5 billion in annual revenue (or over 40% of GM's North American purchases from Delphi);

(ii)    if Delphi rejects the contracts it is seeking authority to reject, that rejection likely will result in the loss to Delphi of otherwise favorable and profitable supply contracts because of the interrelatedness of the GM and Delphi agreements;

(iii)    if Delphi rejects the contracts in its Motion and ceases deliveries of any parts to GM, GM will be forced to shut down certain production lines until it is able to resource parts covered by Delphi's Motion because GM operates on a "sole source" and "just-in-time" system; and

(iv)    if Delphi rejects the contracts in its Motion and ceases deliveries of parts, there will be severe adverse consequences to the public interest.

Delphi Seeks To Reject Contracts Totaling Over $4.5 Billion Of Annual Purchase Value

5.    In the Motion, Delphi states that "in [its] informed business judgment [Delphi] should not continue to subsidize GM's parts under the current terms of the GM Loss Contracts to the detriment of the Debtors' estates and their creditors," and it purports to identify approximately 5,472 Supply Contracts with GM that Delphi seeks authority to reject upon ten days' (10) notice to GM, GM's counsel, and the official committee of unsecured claimholders.

6.    The 5,472 Supply Contracts allegedly cover 22,043 parts. Of the 5,472 Supply Contracts listed for potential rejection, however, GM can identify only 3,143 of the 5,472 contracts that currently are being performed (the "Live Contracts").[1]

---

[1] The remaining 2,329 contracts include contracts that (i) are listed twice or represent a contract GM cannot identify (1,045); (ii) are expired by their terms and are no longer operable (638); or (iii) have no purchase value (i.e. contracts where there are no pending shipments and/or shipment will not begin prior to 2007) (646). In addition, the Live Contracts include a number of non-U.S. contracts (348).

REDACTED – HIGHLY
CONFIDENTIAL

7.      The Live Contracts represent over $4.5 billion in annual revenue to Delphi.

8.      Although GM's contracts typically expire on a date certain, the standard terms of GM's contracts provide for extensions until the parts are not needed for further production or service.  (Attached hereto as Exhibit A is a true and correct copy of GM's Standard Terms and Conditions.)  In its Motion, Delphi claims that it still is producing under some expired contracts.  But, in fact, they have not expired (unlike the contracts identified above in note 1).

**Rejection Of The Supply Contracts Issued Pursuant To The Growth And Opportunities Agreement ("GO Agreement") Is Likely To Result In The Loss Of Profitable Contracts To Delphi**

9.      Thirty three (33) of the Live Contracts subject to rejection were issued to Delphi pursuant to the GM/Delphi Commercial Agreement, dated November 24, 2003 (also referred to as the "GO Agreement").  The GO Agreement provides Delphi with

10.     GM estimates that the benefit of the premium pricing above market to Delphi of all outstanding GO Supply Contracts is

11.     The only contractual obligation GM has to offer any new business to Debtors is pursuant to the GO Agreement.

12.     The sum and substance of the GO Agreement is

**Rejection Of Contracts Governed By The Component Supply Agreement Is Likely To Result In The Loss Of Other Live Contracts Governed By The Same Agreement**

13.     Certain of the Live Contracts that Delphi seeks the authority to reject are contracts performed pursuant to the Component Supply Agreement, dated as of January 1, 1999 (the "CSA Live Contracts"). The Component Supply Agreement provides that Delphi and GM shall continue to honor the terms and conditions of all preexisting purchase orders and other commercial agreements regarding the purchase and supply of motor vehicle related components and systems in effect as of January 1, 1999 (the "Preexisting Agreements").

14.     Currently, 952 Preexisting Agreements are in effect as part of the

Component Supply Agreement.  Of these, 87 Preexisting Agreements are subject to the

Motion and 865 Preexisting Agreements are not.  Consequently, if Delphi is successful in

rejecting the 87 Preexisting Agreements, GM maintains that it will no longer be bound by

any obligation to continue to perform under the remaining 865 Existing Agreements, and

Delphi will lose all of the economic benefit conferred by the Component Supply

Agreement.

**Rejection Of The Supply Contracts Upon 10 Days' Notice Is Likely To Cause Significant
Disruption In GM's Ability To Continue Production And Delphi's Ability To Continue
Servicing Profitable Contracts With GM**

15.     GM, like other automotive vehicle manufacturers, operates on a

"just-in-time" inventory delivery system.  Under just-in-time delivery systems,

component parts from suppliers are typically assembled onto vehicles by the vehicle

manufacturer within a few hours of the delivery of the parts to the vehicle assembly

facility.  Because GM operates on a just-in-time inventory delivery system, it generally

maintains little or no inventory on site, and it relies instead on frequent and regular

shipments of inventory from its suppliers, including Delphi.

16.     In addition, to achieve the economies of scale required to compete

in the automotive industry, GM, like other vehicle manufacturers, utilizes, in most cases,

a single supplier for specific parts for each vehicle line.  Under this sole-source supplier

approach, GM frequently purchases all its requirements for a particular part from one

supplier.  Delphi is a sole-source supplier of many critical parts to GM and is GM's

largest supplier, accounting for approximately 18% of GM's North American purchases

and 14% of GM's global purchases.  GM uses the parts manufactured pursuant to the

Supply Contracts in most North American facilities to manufacture approximately 4.5 million units annually and Delphi's parts are used in essentially every GM North America product line.

17.    Pursuant to the terms and conditions of the parties' various supply contracts, Delphi is obligated to sell to GM, and GM, on a requirements basis, is obligated to purchase from Delphi, component parts for installation into new vehicles manufactured by GM. Because Delphi is a sole-source supplier of critical parts to GM, an interruption of supply of just a small fraction of production parts from Delphi can result in the shutdown of GM plants using those parts. Because of GM's historical and contractual reliance on Delphi, most parts that Delphi manufactures for GM are not readily available from an alternate source due, among other things, to capacity issues within the automotive parts supply industry, the length of time it takes to validate and obtain safety regulatory approval of a new supplier's parts and lead time to develop and build tools for manufacture. In addition, many of the parts supplied by Delphi are application-specific using specially manufactured tooling, not readily available from any other supplier. Moreover, the sheer volume of parts that Delphi seeks authority to reject -- 22,043 -- simply are impossible to resource on short notice, such as ten days sought by Delphi. Although GM would use its best efforts to resource this business in a crisis environment, the sheer magnitude of the parts to be resourced and revalidation required will take at least several months to achieve, at a minimum.

18.    As an example, Delphi currently provides over 60% of GM's North American steering columns: almost three million per year. That volume simply cannot be resourced as currently there is insufficient excess capacity within the entire

20.     If Delphi ceases shipping even a small fraction of production parts to GM, the GM plants relying on such shipments may run out of inventory of such parts As discussed below in more detail, the effect of such a shut-down will reverberate directly back to Delphi as thousands of Delphi's employees work at plants whose production is primarily dedicated to production for GM or GM's Tier suppliers.  Simply stated, if GM production lines are shut down as a result of Delphi's rejection of the Supply Contracts, GM will have no need during that time to continue purchasing other parts from Delphi—parts that even Delphi would admit are profitable and important contributors to its reorganization efforts.  Moreover, given that Delphi's current labor agreements require that Delphi pay its union employees regardless of whether they are working, Delphi will continue to bear the economic burden of its labor force without the benefit of offsetting revenue from GM.  For example, under Delphi's collective bargaining agreements, Delphi is obligated to compensate idled employees either (i) up to 95% of after-tax wages if they are placed on temporary/indefinite layoff or (ii) 100% of wages if they are placed in a JOBS Bank. During this period, Delphi must continue to provide 100% of idled employees' benefits.

21.     Consequently, wholesale rejection of even a small fraction of the Supply Contracts encompassed by the Motion would harm Delphi and GM.  Many of Delphi's plants either produce parts only for GM, or GM purchases the majority of the parts made by that particular plant.  Thousands of Delphi's employees work at plants whose production is primarily dedicated to production for GM or GM's Tier suppliers. In plants such as Warren, Ohio or Coopersville, Michigan, rejecting the Supply Contracts

would close a significant portion or all of these plants and put large numbers of employees out of work, yet the costs will remain.

22.     On average, approximately        of Delphi's manufacturing costs, including material costs, under the Supply Contracts are labor costs (excluding retiree OPEB), based on Delphi's analysis of the 21 plants in Phase II.  Absent labor relief, these costs are fixed costs and would still be incurred even if production of parts for GM and GM's Tier suppliers was halted.

23.     In addition to the parts purchased under the Supply Contracts, GM purchases other parts that are not subject to the Motion, which are manufactured by Delphi for use in the same facilities, such as wiring, cable terminals, connectors, relays, bus electrical centers, battery cables, floor consoles, injectors, cockpits and instrument panels.

24.     For example, more than        of the Supply Contracts Delphi seeks authority to reject are for parts relating to GM's highest volume product, the GMT-900 truck.  The 2006 annual purchase value of these      contracts is greater than . However, Delphi has contracts that total approximately        per GMT-900 vehicle, of which the      contracts are only a small fraction.  With approximately vehicles, the annual revenue that Delphi receives on the GMT-900 is approximately        Obviously, failure to supply        of parts under the 50 contracts will

other automotive parts suppliers find themselves, a cessation of purchases by GM may cause these suppliers serious harm and may endanger their viability.  The consequences of the plant shutdowns on GM's other automotive parts suppliers, which constitute a large percentage of all parts suppliers in the industry, undoubtedly will be felt by the other automotive manufacturers that also purchase parts from these suppliers.  In addition, rejection of the Supply Contracts will affect the parts suppliers that Delphi uses to manufacture parts for GM.  As a result, not only will employees of GM be idled by the shutdown of plants, but employees of other parts suppliers will face serious risk of job losses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of June, 2006

Greg Ruselowski

EXHIBIT A
-FILED UNDER SEAL-

Exhibit B

## GM Delphi
## Documents Considered

### Bates Stamped Materials

| Start | End | Description |
|-------|-----|-------------|
| DPH-1GM000001 | DPH-1GM000294 | Delphi Phase I Loss ContractA nalysis Binder |
| DPH-1GM000449 | DPH-1GM000862 | Delphi Phase II GM Contracts FinancialA nalysis Binder |
| DPH-1GM000863 | DPH-1GM000899 | Delphi Loss ContractF inancial Analysis - Phase I |
| DPH-1GM000900 | DPH-1GM000968 | Delphi GM Contracts Financial Analysis - Phase II |
| DPH-1GM000969 | DPH-1GM001013 | FTI Consulting Loss Contracts Analysis Appendix |
| DPH-1GM001014 | DPH-1GM003569 | KE301 Excel File from CD |
| DPH-1GM005828 | DPH-1GM005913 | FTI Consulting Loss Contracts Analysis Phase II |
| DPH-1GM047715 | DPH-1GM047717 | Email Correspondence |
| DPH-1GM049478 | DPH-1GM049479 | Preliminary Observations re: Profitability Measures |
| DPH-1GM052857 | DPH-1GM052858 | Email Correspondence |
| DPH-1GM052993 | DPH-1GM052996 | Email Correspondence |
| DPH-1GM053005 | DPH-1GM053006 | Email Correspondence |
| DPH-1GM053015 | DPH-1GM053678 | Eisenberg Declaration and Back Up GM Loss Contract Tie Out Binder |
| DPH-1GM054178 | DPH-1GM054180 | Email Correspondence |
| DPH-1GM054196 | DPH-1GM054197 | Email Correspondence |
| DPH-1GM054232 | DPH-1GM054234 | Email Correspondence |
| DPH-1GM054921 | DPH-1GM055026 | Email Correspondence; Allocation summary table; Engineering time and efforts tudy example |
| DPH-1GM055452 | DPH-1GM055452 | Email Correspondence |

### Legal Documents

- Declaration of Randall S. Eisenberg in Support of Debtor's Motion for Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection of Certain Executory Contracts with General Motors Corporation.
- Declaration of John D. Sheehan in supporto f Delphi's Motion for Authority to RejectC ollective Bargaining Agreements under 11 U.S.C. § 1113 (c) and Modify Retiree Welfare Benefits under 11 U.S.C. § 1114 (g).
- Motion for Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection of Certain Executory Contracts with General Motors Corporation.
- Motion for Order under 11 U.S.C. § 1113(c) Authorizing Rejection of Collective Bargaining Agreements and under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits.
- Eisenberg Deposition on May 31, 2006.

### Academic Literature

- Wackerly, Mendenhall, and Scheaffer. "MathematicalS tatistics with Applications," Fifth Edition, 1996, p. 413

### SEC Filings

- Delphi Corporation Form 10-K for years ended December 31, 1999 through 2004.
- Delphi Corporation Form 10-K/A for year ended December 31, 2004.
- Delphi Automotive Systems Corporation Form S-1 filed on November 16, 1998.
- Delphi Automotive Systems Corporation Amendment No. 2 to Form S-1 filed on January 14, 1999.
- Delphi Automotive Systems Corporation Amendment No. 3 to Form S-1 filed on January 20, 1999.
- Delphi Automotive Systems Corporation Amendment No. 4 to Form S-1 filed on January 27, 1999.
- Delphi Automotive Systems Corporation Amendment No. 5 to Form S-1 filed on February 2, 1999.