Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                          :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328 AND FED. R.
BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND RETENTION OF
PRICEWATERHOUSECOOPERS LLP TO PROVIDE CERTAIN SARBANES-OXLEY
COMPLIANCE, TAX AND FINANCIAL PLANNING, AND OTHER GENERAL TAX
CONSULTING SERVICES TO THE DEBTORS NUNC PRO TUNC TO JANUARY 1, 2006

("PRICEWATERHOUSECOOPERS RETENTION APPLICATION")

        Delphi Corporation ("Delphi") and certain of its subsidiaries and

affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors"), hereby submit this application (the "Application") for an order under 11 U.S.C. §

327(a) and 328 And Fed. R. Bankr. P. 2014 authorizing the employment and retention of

PricewaterhouseCoopers LLP ("PwC") to provide certain Sarbanes-Oxley compliance, tax and

financial planning, and other general tax consulting services to the Debtors, nunc pro tunc to

January 1, 2006.  In support of this Application, the Debtors submit the Declaration of Brian D.

Decker, sworn to June 5, 2006, (the "Decker Declaration").  In further support of this

Application, the Debtors respectfully represent as follows:

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

        1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

        2.    On October 17, 2005, the Office of the Unites States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity security holders.  No trustee or examiner has been appointed in the Debtors' cases.

        3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

        4.    The statutory predicates for the relief requested herein are section 362 of the Bankruptcy Code and Rules 7016 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      <u>Current Business Operations Of The Debtors</u>

        5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

2

largest public company business reorganization in terms of revenues, and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from the

Bankruptcy Court.

      6.   The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems

and modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

      7.   Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.     Events Leading To The Chapter 11 Filing

      8.   In the first two years following Delphi's separation from GM, the Company

generated approximately $2 billion in net income.  Every year thereafter, however, with the

exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company

reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]  Reflective of a

continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately

$2.8 billion on net sales of $26.9 billion.

       9.    The Debtors believe that the Company's financial performance has

deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of

creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for

domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually

in the United States and related pricing pressures, and (c) increasing commodity prices.

       10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward-looking revenue requirements.  Because

discussions with its major unions and GM had not progressed sufficiently by the end of the

third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses

to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.      <u>The Debtors' Transformation Plan</u>

       11.    On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.   In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-represented employees (the "Hourly Attrition Program").  This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

13.   These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached

5

comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi

moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S.

labor agreements and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors

also moved to reject unprofitable supply contracts with GM.[4]  Among the reasons for the GM

contract rejection motion was the Debtors' belief that GM must cover a greater portion of the

costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy

costs.  This initial motion covers approximately half of the Debtors' North American annual

purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.

Although the filing of these motions was a necessary procedural step, the Debtors remain

focused on reaching a consensual resolution with all of Delphi's unions and GM.

14.    To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which

the Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.   To that end, the Company will concentrate the

organization around the following core strategic product lines: (a) Controls & Security (Body

Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture

(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)

Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

---

[3]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements
And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

[4]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033).

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.    In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines.  The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented, the Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17.    As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current

---

[5]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension

plan as of January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will

also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty

Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress,

to amortize funding contributions over a long-term period.  The Company intends to replace

the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal

all of its resources to continue to deliver high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

19.    By this Application, the Debtors seek to employ and retain PwC to

provide certain compliance, tax and financial planning, and other general tax consulting

services nunc pro tunc to January 1, 2006, as further described below.  Accordingly, the

Debtors respectfully request the entry of an order under sections 327(a) and 328 of the

Bankruptcy Code authorizing the employment and retention of PwC to provide assistance to

the Company in complying with the provisions of the Sarbanes-Oxley Act of 2002 including,

but not limited to Section 404 of the Sarbanes-Oxley Act, as well as to provide certain

compliance, tax and financial planning, and other general tax consulting services on the terms

and conditions of that certain Master Professional Services Agreement dated as of March 17,

2006 (the "Master Agreement"), and applicable statements of work (individually each as

defined below, and collectively, the "Statements Of Work"), between PwC and the Debtors.  A

8

copy of the Master Agreement is attached as <u>Exhibit 1</u> to the Decker Declaration.  A copy of the Statement Of Work For Sarbanes-Oxley 404 Services (the "Sarbanes-Oxley Statement Of Work") is attached as <u>Exhibit 2</u> to the Decker Declaration.  A copy of the Statement Of Work For Executive Personal Financial Planning Services (the "Financial Planning Statement Of Work") is attached as <u>Exhibit 3</u> to the Decker Declaration.  A copy of the Statement Of Work For Tax Compliance - Foreign Affiliate Reporting (the "Tax Compliance Statement Of Work") is attached as <u>Exhibit 4</u> to the Decker Declaration.  A copy of the Statement Of Work For PwC WNTS Advocacy Services (the "WNTS Advocacy Statement Of Work") is attached as <u>Exhibit 5</u> to the Decker Declaration.  A copy of the Statement Of Work For Miscellaneous General Consulting Not Exceeding $20,000 (the "Consulting Statement Of Work") is attached as <u>Exhibit 6</u> to the Decker Declaration.

Basis For Relief

20.    The Debtors wish to employ PwC to provide assistance and support in connection with the Debtors' compliance with Section 404 of the Sarbanes-Oxley Act, certain financial planning services as well as consulting and advocacy services with respect to tax policy, legislative and IRS administrative matters, foreign affiliates tax reporting, and other general tax consulting services.

21.    To help ensure compliance with Section 404 of the Sarbanes-Oxley Act, the Debtors require the services of various professionals.  In this vein, the Debtors engaged PwC to provide management certification testing and remediation plans necessary for the Debtors to meet the requirements of Section 404 of the Sarbanes-Oxley Act.  The Debtors selected PwC to provide such services because of PwC's national reputation and expertise in these areas.

22.    The Debtors' retention of PwC is evidenced by the Master Agreement as supplemented by the Statements of Work.  In accordance with the terms of the Master Agreement, the respective scopes of the services that PwC conducts are defined in statements of work which are periodic attachments to the Master Agreement.  As more fully described in the applicable Statements of Work, PwC will provide service such as Sarbanes-Oxley compliance assistance, personal financial planning services, tax compliance assistance in connection with the foreign affiliate tax reporting requirements, analysis and computations of U.S. earnings and profits and related creditable income tax pools, consulting and advocacy services with respect to tax policy, legislative, and IRS administrative matters, and other miscellaneous general tax consulting services.

23.    The Debtors had retained PwC as an ordinary course professional under the Order Under 11 U.S.C §§ 327, 330, And 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business ("Ordinary Course Professionals Order") (Docket No. 883).  As a professional retained under the Ordinary Course Professionals Order, PwC has provided tax planning and personal financial planning services such as assistance with income tax projections, modeling the tax impact of company benefits, and cash flow and debt management analysis.   During 2006, the Debtors and PwC discussed expanding the scope of the professional services to include Sarbanes-Oxley compliance and tax advisory consulting services.   The Debtors are concerned that PwC will exceed the fee cap established in the Ordinary Course Professionals Order.  Therefore, the Debtors request that PwC be formally retained to provide Sarbanes-Oxley compliance, tax and financial planning, and other general tax consulting services in these chapter 11 cases.

24.    The Debtors believe that they will continue to require the services provided by PwC.  Accordingly, the Debtors are hereby seeking authority to retain PwC to

10

complete the projects described in the Statements Of Work and to execute additional Statements Of Work as necessary without seeking further Court approval.

Qualifications Of PwC

25.    PwC is a firm of independent public accountants as defined under the code of professional conduct of the American Institute of Certified Public Accountants. PwC is a global market leader for accounting, tax and advisory services that has operated for more than 150 years.  PwC assists businesses, individuals, and organizations with accounting, tax, strategy, planning, and compliance, while also delivering a wide range of business advisory services. PwC is one of the four largest accounting and auditing, tax, and consulting firms in the United States, with 23,000 dedicated professionals in the United States, and with an international practice with 130,000 professionals in more than 148 countries.  PwC has significant experience proving a wide range of accounting and tax services for troubled and restructuring companies.

26.    The Debtors submit that PwC is well-positioned to provide such services. As a result of its previous engagement by the Debtors, PwC has worked closely with the Debtors and has become familiar with the Debtors' businesses.  Accordingly, PwC has the necessary background and capability to deal effectively with potential issues that may arise in the future course of its work with the Debtors in these chapter 11 cases.  Moreover, given its expertise and the institutional knowledge it has acquired regarding the Debtors' businesses, PwC is uniquely qualified to provide the services needed by the Debtors.  Accordingly, the Debtors' retention of PwC on the terms set forth herein and in the Master Agreement as supplemented by the Statements of Work is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest.

27.    The Debtors believe that the employment of PwC to provide services
pertaining to consulting, management certification testing, and remediation planning under
section 404 of the Sarbanes-Oxley Act, personal financial planning, tax compliance, advocacy,
and other miscellaneous general tax consulting services will enhance and will not duplicate the
employment of KPMG LLP, the Debtors' tax and transaction services advisors, Ernst &
Young, the Debtors' independent auditors, accountants, and tax advisors or any of the other
professionals retained by the Debtors to perform specific tasks that are unrelated to the work to
be performed by PwC.  The Debtors and PwC understand that PwC will work closely with
other professionals retained by the Debtors to avoid any such duplication.

<u>Services To Be Rendered</u>

28.    As set forth in the Mater Agreement and the Statements of Work, the
Debtors have engaged PwC to provide the following professional services to the Debtors:

(a)    Pursuant to the Sarbanes-Oxley Statement Of Work, PwC will provide
project assistance under the direction of company accounting executives,
related to the Debtors' overall management certification testing and
remediation plans under section 404 of the Sarbanes-Oxley Act of 2002;

(b)    Pursuant to the Financial Planning Statement Of Work, PwC will
provide (i) tax planning services to Debtors' senior executives, such as
assistance with income tax projections, modeling tax impact of provided
benefits, modeling tax impact of life events, withholding tax analysis,
and estimated tax payment sufficiency analysis and (ii) personal
financial planning services to Debtors' senior executives, such as cash
flow and debt management, stock option analysis, education funding
planning, retirement funding planning, retirement distributions,
investment strategies, estate tax minimization, and wealth distribution;

(c)    Pursuant to the Tax Compliance Statement Of Work, PwC will provide
tax compliance assistance in connection with the foreign affiliate tax
reporting requirements included in the 2005 Delphi consolidated U.S.
tax return, including, but not limited to, analysis and computations of
U.S. earnings and profits and related creditable income tax pools,
analysis of potential subpart F inclusions, analysis of the U.S. tax
implications of dividend distributions and related section 902 credits,

12

and computation of intercompany transaction flow information for use in transfer pricing analysis;

(d)   Pursuant to the WNTS Advocacy Statement Of Work, PwC will provide consulting and advocacy services with respect to tax policy, legislative, and Internal Revenue Service administrative matters, including, but not limited to, analysis of emerging tax issues and discussions and analysis of forums of tax executives focused on international tax policy issues; and

(e)   Pursuant to the Consulting Statement Of Work, PwC will provide miscellaneous general tax consulting services for projects not exceeding $20,000 per project, including consulting with PwC's U.S. and foreign offices and providing subscription and data services for accounting and other miscellaneous needs.

29.   In addition, the Debtors and PwC are in the process of negotiating a statement of work for the provision of bankruptcy tax advisory services.  Under this statement of work, PwC will assist the Debtors with tax advisory and consulting services relating to the impact of the bankruptcy filing, including calculating net operating loss carry forwards, the tax consequences of any proposed plans of reorganization, and assistance in the preparation of any federal, state, local, and foreign ruling requests regarding the future tax consequences of alternative reorganization structures.

30.   Subject to this Court's approval of the Application, PwC is willing to perform the services described in the Master Service Agreement and the Statements of Work on the terms set forth therein.

<u>Disinterestedness Of Professionals</u>

31.   To the best of the Debtors' knowledge, except as set forth in the Decker Declaration, (a) PwC neither holds nor represents any interest adverse to the Debtors' estates, (b) PwC has had no affiliation with the Debtors, their creditors, any party-in-interest, or their respective attorneys and accountants, the United States Trustee, any person employed in the office of the United States Trustee, or the Bankruptcy Judge presiding over these cases, and (c)

13

PwC is a "disinterested person" within the meaning of Sections 101(14) and 327(a) of the

Bankruptcy Code.   The Decker Declaration, executed on behalf of PwC in accordance with

section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014, is filed contemporaneously

herewith and incorporated herein by reference.   The Debtors' knowledge, information, and

belief regarding the matters set forth in this Application are based on, and made in reliance

upon, the Decker Declaration.

32.   In addition to services provided to the Debtors, PwC provides continued

assistance to the law firm of Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Hale"), the

special regulatory counsel to the Audit Committee of the Debtors' Board of Directors (the

"Audit Committee"), in its representation of the Audit Committee in an SEC investigation into

certain accounting transactions and contracts entered into by the Debtors.   PwC will continue

to be compensated for its assistance to Wilmer Hale in accordance with the fee statements and

fee applications submitted by Wilmer Hale in these chapter 11 cases.

33.   The Debtors submit that the appointment of PwC on the terms and

conditions set forth herein is in the best interest of the Debtors, their creditors, and all parties-

in-interest.

Professional Compensation

34.   Consistent with the Master Agreement, the applicable Statements of

Work, and as described in the Decker Declaration, the Debtors have agreed to pay PwC

reasonable sums in accordance with the normal rates charged by PwC for the services provided

and to compensate PwC for reasonable and necessary out of pocket expenses incurred, which

expenses may include travel, report preparation, delivery services, and other necessary costs in

providing services to the Debtors in accordance with PwC's customary reimbursement policies.

PwC's hourly rates for professional services are based upon the individual resources provided from PwC's various lines of business and are currently as follows:[6]

| | |
|---|---|
| Partners | $390 to $975 |
| Directors/Senior Managers | $250 to $690 |
| Managers | $165 to $460 |
| Senior Associates/Associates | $120 to $320 |
| Paraprofessionals/Office Staff | $ 75 to $180 |

These rates are PwC's normal and customary rates for the type of services to be provided. The Debtors are advised that these rates are subject to change but that any changes will remain in line with market rates for comparable services.

35.   During the one-year period preceding the Petition Date, the Debtors paid PwC approximately $431,467 in respect of the types of services to be rendered pursuant to the Master Agreement and the expenses incurred in relation thereto.

36.   In summary, if this Application is approved, as compensation for the services rendered under the existing Statements Of Work, PwC will be entitled to receive the following fees:

(a)   For work performed under the Sarbanes-Oxley Statement Of Work, PwC will receive compensation based on the number of hours of professional time provided at an hourly rate as follows: Partner $250 to $400 per hour, Senior Manager $180 to 300 per hour, Manager $120 to $200 per hour, Senior Associate $60 - $160 per hour, and Associate $50 to $130 per hour;

(b)   For work performed under the Financial Planning Statement Of Work, PwC will receive compensation in accordance with the terms of the Master Agreement, total charges of $6,000 per participant per annum except that the fee for the initial year of services will be approximately $11,000 per participant. The fee for certain specified individuals on the Debtor's strategy board will be $2,000 higher;

---

[6]   These rates are the current U.S. hourly rates by personnel level. The hourly rates for the various PwC's foreign offices are not included in the ranges above, which may be significantly lower or higher for any personnel level. For the Sarbanes-Oxley Statement of Work, the foreign office billing rates, specific for the project, have been disclosed to the Debtors.

(c)    For work performed under the Tax Compliance Statement Of Work, PwC will receive compensation based on the number of hours of professional time provided at a discounted hourly rate as follows: Senior Associate - $155.00 per hour, Associate, Transfer Pricing - $125.00 per hour, Associate - $110.00 per hour;

(d)    For work performed under the WNTS Advocacy Statement Of Work, PwC will receive $60,000 per year, invoiced at $5,000 per month; and

(e)    For work performed under the Consulting Statement Of Work, the Debtors will pay PwC their regular hourly rates.

37.    The Debtors and PwC acknowledge and agree that (a) the hours worked, (b) the results achieved, and (c) the ultimate benefit to the Debtors of the work performed, in each case, in connection with this engagement, may be variable, and the Debtors and PwC have taken such factors into account in setting the fees under the Master Agreement and the Statements of Work; provided, however, that with respect to the hours worked, PwC will devote whatever resources are required to fulfill the purposes of this engagement on a timely basis.

38.    In the event that this Court approves the retention of PwC by the Debtors, (a) PwC's fees and expenses will be subject to (i) the jurisdiction and approval of this Court under section 328(a) of the Bankruptcy Code and any order entered by this Court with regard to PwC's retention, (ii) any applicable fee and expense guideline orders, and (iii) any requirements governing interim and final fee applications, and (b) the Debtors will pay all fees and expenses of PwC under the Master Agreement and the Statements Of Work as promptly as practicable in accordance with the terms thereof and the orders of this Court governing interim and final fee applications, and after obtaining all necessary further approvals from this Court, if any.

39.    PwC will also seek reimbursement for necessary expenses incurred, in accordance with Appendix A of the Master Agreement and guidelines established by the

Unites States Trustee, which will include travel, photocopying, delivery service, postage,
vendor charges, and other out-of-pocket expenses incurred in providing professional services.

<u>Dispute Resolution Procedures</u>

40.   As set forth in <u>Exhibit 7</u> to the Decker Declaration, the Debtors and PwC
have agreed, subject to this Court's approval of the Application, that (a) any controversy or
claim with respect to, in connection with, arising out of, or in any way related to this
Application or the services provided by PwC to the Debtors as outlined in the Application,
including any matter involving a successor in interest or agent of any of the Debtors or of PwC,
shall be brought in this Court or the District Court for the Southern District of New York if
such District Court withdraws the reference, (b) PwC and the Debtors and any and all
successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole
and exclusive forum (unless such court does not have or retain jurisdiction over such claims or
controversies) for the resolution of such claims, causes of actions or lawsuits, (c) PwC and the
Debtors, and any and all successors and assigns thereof, waive trial by jury, such waiver being
informed and freely made, (d) if this Court, or the District Court for the Southern District of
New York if such District Court withdraws the reference, does not have or retain jurisdiction
over the foregoing claims and controversies, PwC and the Debtors, and any and all successors
and assigns thereof, will submit first to non-binding mediation and, if mediation is not
successful, then to binding arbitration, in accordance with the dispute resolution procedures set
forth in <u>Exhibit 7</u> to the Decker Declaration, and (e) judgment on any arbitration award may be
entered in any court having proper jurisdiction.

41.   PwC has agreed, as set forth in the Decker Declaration, not to raise or
assert any defense based upon jurisdiction, venue, abstention, or otherwise to the jurisdiction
and venue of this Court or the District Court for the Southern District of New York if such

District Court withdraws the reference to hear or determine any controversy or claims with

respect to, in connection with, arising out of, or in any way related to, this Application or the

services provided hereunder.

42.    For the foregoing reasons, the Debtors submit that the relief requested

herein is in the best interests of the Debtors and their estates and creditors and should be

approved.

Notice

43.    Notice of this Motion has been provided in accordance with the Seventh

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered by this Court on April 20, 2006 (Docket

No. 3293).  In light of the nature of the relief requested, the Debtors submit that no other or

further notice is necessary.

Memorandum Of Law

44.    Because the legal points and authorities upon which this Application

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Rule 9013-1(b) of the Local

18

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New

York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order

(a) authorizing the Debtors to employ and retain PwC to provide certain Sarbanes-Oxley

compliance, tax and financial planning, and other general tax consulting services to the

Debtors, nunc pro tunc to January 1, 2006 and (b) granting the Debtors such other and further

relief as is just.

Dated: New York, New York
       June 5, 2006

DELPHI CORPORATION, on behalf of itself and
certain of its subsidiaries and affiliates, as Debtors
and Debtors-in-possession


By:   /s/ John D. Sheehan
      Name: John D. Sheehan
      Title:  Vice President, Chief Restructuring
              Officer, and Controller