UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |  |
|---|---|---|
|  | : |  |
| In re | : | Chapter 11 |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF BRIAN D. DECKER IN
SUPPORT OF APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a),
328(a), AND 1107(b) AUTHORIZING EMPLOYMENT AND RETENTION OF
PRICEWATERHOUSECOOPERS LLP TO PROVIDE CERTAIN SARBANES-OXLEY
COMPLIANCE, TAX AND FINANCIAL PLANNING, AND OTHER GENERAL TAX
CONSULTING SERVICES TO DEBTORS NUNC PRO TUNC TO JANUARY 1, 2006

Brian D. Decker, states the follows:

1.       I am a Certified Public Accountant and a partner of PricewaterhouseCoopers

LLP ("PricewaterhouseCoopers"), a professional services firm.  I submit this declaration on

behalf of PricewaterhouseCoopers  in support of the application (the "Application") of Delphi

Corporation, and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in

the above-captioned cases (collectively, the "Debtors"), for entry of an order, pursuant to

sections 327(a), 328(a) and 1107(b) of the United States Bankruptcy Code, 11 U.S.C. 101-

1330, as amended (the "Bankruptcy Code"), authorizing the retention and employment of

PricewaterhouseCoopers LLP to provide Sarbanes-Oxley compliance, tax and financial

planning, and other general tax consulting services to the Debtors, nunc pro tunc to January 1,

2006 [1], pursuant to the terms and conditions set forth in the Master Professional Services

Master Agreement, dated March 17, 2006, attached as Exhibit 1 hereto and the applicable

_____

[1]       PricewaterhouseCoopers was employed and paid as an Ordinary Course Professional during calendar
year 2005. Beginning in February, 2006, it became clear to PricewaterhouseCoopers and the Debtors that our
cumulative fees would exceed the applicable limits set forth as an Ordinary Course Professional.

Statement of Works, attached as Exhibits 2, 3, 4, 5 and 6 hereto, for Sarbanes-Oxley 404

services executed May 11, 2006 (the "Sarbanes-Oxley Statement of Work"), tax planning and

personal financial planning services executed April 25, 2006 (the "Financial Planning

Statement of Work", for tax compliance assistance associated with foreign affiliate

requirements executed April 25, 2006 (the "Tax Compliance Statement of Work"), consulting

and advocacy relative to tax and IRS matters executed April 25, 2006 (the "WNTS Advocacy

Statement of Work"), and for miscellaneous general tax consulting executed April 25, 2006

(the "Consulting Statement of Work", and, together with the Master Professional Services

Master Agreement (the "Master Agreement").  Except as otherwise noted [2], I have personal

knowledge of the matters set forth herein, and, if called as a witness, would testify

competently thereto.

## QUALIFICATIONS OF PROFESSIONALS

2.      PricewaterhouseCoopers is a firm of independent public accountants as

defined under the code of professional conduct of the American Institute of Certified Public

Accountants. PricewaterhouseCoopers is a global market leader for accounting, tax and

advisory services that has operated for over 150 years.  PricewaterhouseCoopers assists

businesses, individuals and organizations with accounting, tax strategy, planning, and

compliance, while also delivering a wide range of business advisory services.

PricewaterhouseCoopers is one of the four largest accounting and auditing, tax and

consulting firms in the United States, with 23,000 dedicated professionals in the United

States, and with an international practice with 130,000 professionals in over 148 countries,

and has significant experience proving a wide range of accounting and tax services for

troubled and restructuring companies.

---

[2]      Certain of the disclosures herein relate to matters within the personal knowledge of other professionals
at PricewaterhouseCoopers and are based on information provided by them.

3.      The Debtors have selected PricewaterhouseCoopers as one of their Sarbanes-Oxley compliance, tax and financial advisors because of the wealth of experience in providing accounting, tax and advisory services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

4.      On the Petition Date, PricewaterhouseCoopers was requested by the Debtors to continue providing tax planning and personal financial planning services such as assistance with income tax projections, modeling the tax impact of company benefits, and cash flow and debt management analysis.  On November 4, 2006, this Court approved PricewaterhouseCoopers' retention as an ordinary course professional.  On December 7, 2005, PricewaterhouseCoopers filed its Declaration of Ordinary Course Professional.

5.      During 2006, PricewaterhouseCoopers and the Debtors continued to discuss the expansion of various requested services, including Sarbanes-Oxley compliance and tax advisory services, as described within this Declaration and the associated Application. By virtue of these additional engagements, PricewaterhouseCoopers anticipates exceeding the aggregate limits established for an Ordinary Course Professional.

6.      PricewaterhouseCoopers is familiar with the books, records, financial information and other data maintained by the Debtors as relevant to the services hereunder and is qualified to continue to provide litigation, tax and financial advisory services to the Debtors.  As such, expanding the services provided by PricewaterhouseCoopers is an efficient and cost effective manner in which the Debtors may obtain the requisite services. PricewaterhouseCoopers and the Debtors continue to believe that PricewaterhouseCoopers is an appropriate professional to advise the Debtors during the course of these chapter 11 cases.

<u>SERVICES TO BE RENDERED</u>

7.     PricewaterhouseCoopers has been providing tax advising services to the

Debtors as an Ordinary Course Professional since the Petition Date.  The Debtors and

PricewaterhouseCoopers respectfully request an expansion of services to include certain

Sarbanes-Oxley compliance, tax and financial planning and other general tax consulting

services pursuant to the Master Agreement and its applicable statement of works.

   (a)     Pursuant to the Sarbanes-Oxley Statement Of Work, PwC will provide project
           assistance under the direction of company accounting executives, related to
           the Debtors' overall management certification testing and remediation plans
           under section 404 of the Sarbanes-Oxley Act of 2002;

   (b)     Pursuant to the Financial Planning Statement Of Work, PwC will provide (i)
           tax planning services to Debtors' senior executives, such as assistance with
           income tax projections, modeling tax impact of provided benefits, modeling
           tax impact of life events, withholding tax analysis, and estimated tax payment
           sufficiency analysis and (ii) personal financial planning services to Debtors'
           senior executives, such as cash flow and debt management, stock option
           analysis, education funding planning, retirement funding planning, retirement
           distributions, investment strategies, estate tax minimization, and wealth
           distribution;

   (c)     Pursuant to the Tax Compliance Statement Of Work, PwC will provide tax
           compliance assistance in connection with the foreign affiliate tax reporting
           requirements included in the 2005 Delphi consolidated U.S. tax return,
           including, but not limited to, analysis and computations of U.S. earnings and
           profits and related creditable income tax pools, analysis of potential subpart F
           inclusions, analysis of the U.S. tax implications of dividend distributions and
           related section 902 credits, and computation of intercompany transaction flow
           information for use in transfer pricing analysis;

   (d)     Pursuant to the WNTS Advocacy Statement Of Work, PwC will provide
           consulting and advocacy services with respect to tax policy, legislative, and
           Internal Revenue Service administrative matters, including, but not limited to,
           analysis of emerging tax issues and discussions and analysis of forums of tax
           executives focused on international tax policy issues; and

   (e)     Pursuant to the Consulting Statement Of Work, PwC will provide
           miscellaneous general tax consulting services for projects not exceeding
           $20,000 per project, including consulting with PwC's U.S. and foreign offices
           and providing subscription and data services for accounting and other
           miscellaneous needs.

8.     In addition, the Debtors and PwC are in the process of negotiating a statement

of work for the provision of bankruptcy tax advisory services.  Under this statement of work,

PwC will assist the Debtors with tax advisory and consulting services relating to the impact of the bankruptcy filing, including calculating net operating loss carry forwards, the tax consequences of any proposed plans of reorganization, and assistance in the preparation of any federal, state, local, and foreign ruling requests regarding the future tax consequences of alternative reorganization structures.

9.      PricewaterhouseCoopers, at the request of the Debtors, also may render additional related professional support deemed appropriate and necessary to the benefits of the Debtors' estates.  The services to be provided by PricewaterhouseCoopers to the Debtors will not be unnecessarily duplicative of those provided by any of the Debtors' other professionals, and PricewaterhouseCoopers will coordinate any services performed at the Debtors' request with such professionals, including financial advisors, accountants and counsel, as appropriate, to avoid duplication of effort.

10.     The PricewaterhouseCoopers professionals providing the Sarbanes-Oxley compliance, tax and financial planning, and other general tax consulting services and will consult with internal PricewaterhouseCoopers bankruptcy advisors to ensure compliance with the requirements of the Bankruptcy Code, as well as to decrease the overall fees associated with the administrative aspects of PricewaterhouseCoopers postpetition engagements. The services provided by these PricewaterhouseCoopers bankruptcy advisors include: assistance with the bankruptcy retention Master Agreements; required disinterestedness disclosures; and compensation requirements including compliance with the Bankruptcy Rules, the Local Rules, orders of this Court and guidelines established by the Untied States Trustee.  Due to the specialized nature of the services, and consistency between bankruptcy venues, specific billing rates have been established for these bankruptcy advisors.[3]

---

[3]      The rate per hour for the PricewaterhouseCoopers bankruptcy advisors by level of experience will be as follows: Partner: $570; Director/Senior Manager: $500; Manager: $360; Senior Associate: $260; Associate: $205 and Paraprofessional: $135. These rates are subject to periodic adjustments.

11.     Subject to this Court's approval of the Application, PricewaterhouseCoopers is
willing to perform the services described in the Master Agreement and the Statement of
Works on the terms set forth therein.

## OTHER TERMS AND CONDITIONS ASSOCIATED WITH THE MASTER
## AGREEMENT

### Dispute Resolution Procedures

12.     The Debtors and PricewaterhouseCoopers have agreed, subject to the Court's
approval of this Application, that  (a) any controversy or claim with respect to, in connection
with, arising out of, or in any way related to this Application or the services provided by
PricewaterhouseCoopers to the Debtors as outlined in this Application, including any matter
involving a successor in interest or agent of any of the Debtors or of PricewaterhouseCoopers,
shall be brought in the Bankruptcy Court or the District Court for the Southern District of
New York if such District Court withdraws the reference, (b) PricewaterhouseCoopers and
the Debtors and any and all successors and assigns thereof, consent to the jurisdiction and
venue of such court as the sole and exclusive forum (unless such court does not have or retain
jurisdiction over such claims or controversies) for the resolution of such claims, causes of
actions or lawsuits, (c) PricewaterhouseCoopers and the Debtors, and any and all successors
and assigns thereof, waive trial by jury, such waiver being informed and freely made, (d) if
the Bankruptcy Court, or the District Court for the Southern District Of New York withdraws
the reference, does not have or retain jurisdiction over the foregoing claims and controversies,
PricewaterhouseCoopers and the Debtors, and any and all successors and assigns thereof, will
submit first to non-binding mediation and, if mediation is not successful, then to binding
arbitration, in accordance with the dispute resolution procedures set forth in Exhibit 7 to this
Declaration, and (e) judgment on any arbitration award may be entered in any court having

proper jurisdiction. By this Application, the Debtors seek approval of this Master Agreement by the Court.

13.     Further, PricewaterhouseCoopers has agreed not to raise or assert any defense based upon jurisdiction, venue, abstention, or otherwise to the jurisdiction and venue of the Bankruptcy Court or the District Court for the Southern District of New York, if such District Court withdraws the reference) to hear or determine any controversy or claims with respect to, in connection with, arising out of, or in any way related to, this Application or the services provided hereunder.

<u>DISINTERESTEDNESS OF PROFESSIONALS</u>

14.     Skadden, Arps has provided a list (the "List") of the Debtors' (A) Affiliates and Non-Debtor Subsidiaries; (B) Former Officers and Directors (for the past three years); (C) All Lenders (including current and former agents under credit facilities and their counsel and financial advisors); (D) Insurers; (E) Professionals (attorneys, accountants, investment bankers, consultants for the past three years, excluding those professionals that charge less than $100,000 in Annual Fees); (F) Parties to Litigation and their Counsel (for claims of at least $500,000); (G) Top 50 Creditors; (H) Holders of 5% or More of any Outstanding Equity Security of the Company; (I) Record Noteholders holding 5% or More of Any Outstanding Issuance of Notes of the Company; (J) Indenture Trustees; (K) Underwriters of Securities Issued by the Company During the Past Three Years; (L) Counterparties to Major Leases; (M) Counterparties to Major Contracts (over $100,000); (N) Secured Financial Creditors; (O) Lienholders and Other Significant Lenders; (P) Major Customers; (Q) Major Suppliers; (R) Letter of Credit Issuers and Beneficiaries; (S) State and Other Governmental Authorities with an Interest in the Company; (T) Unions Representing Company Employees; (U) Other Miscellaneous Interested Parties; (V) Objecting/Adverse Parties/Postpetition Parties; and (W) Master Service List and 2002 Entities List.

15.    Our review, completed under my supervision, consisted of queries of an internal computer database containing names of individuals and entities that are present or recent former clients of PricewaterhouseCoopers in order to identify potential relationships. PricewaterhouseCoopers' review of its relationships with these parties in interest is continuing and PricewaterhouseCoopers will file a supplemental declaration disclosing the results of the remaining entities in an expedient manner.  A summary of potential relationships that PricewaterhouseCoopers has already been able to locate using its reasonable efforts is reflected in Exhibit 8 to this Declaration.

16.    In addition to the services provided by the Debtors, PricewaterhouseCoopers provides continued assistance to the law firm of Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Hale"), the special regulatory counsel to the Audit Committee of the Debtors' Board of Directors (the "Audit Committee"), in its representation of the Audit Committee in an SEC investigation into certain accounting transactions and contracted entered into by the Debtors.  PricewaterhouseCoopers will continue to be compensated for its assistance to Wilmer Hale in accordance with the fee statements and fee applications submitted by Wilmer Hale in these chapter 11 cases.[4]

17.    PricewaterhouseCoopers confirms it is not providing and will not provide services to any of the clients that are listed on Exhibit 8 that are adverse to the Debtors or related to issues connected to the Debtors' bankruptcy.  Further, we are not providing and will not provide services to the Debtors that would be adverse to any of the entities listed on Exhibit 8.  Despite the size or significance of the relationships with the entities listed on Exhibit 8, none of those relationships will compromise in any way PricewaterhouseCoopers'

---

[4]    Subsequent to the Petition Date, PricewaterhouseCoopers have invoiced the Debtors, $442,914 for services rendered through March 31, 2006 and the Debtors have paid PricewaterhouseCoopers, $294,341, associated with the services through January 31, 2006. PricewaterhouseCoopers provides a narrative summary of the services provided to Wilmer Hale and the Debtors.

ability to provide Sarbanes-Oxley compliance, tax and financial planning and other general tax consulting services to the Debtors.

18.    PricewaterhouseCoopers has provided and likely will continue to provide services unrelated to the Debtors' case for the various entities shown on Exhibit 8.  Our assistance to these parties has been primarily related to auditing, tax, and/or other consulting services.  To the best of my knowledge, no services have been provided to these creditors or other parties in interest which could impact their rights in the Debtors' case, nor does PricewaterhouseCoopers' involvement in this case compromise its ability to continue such auditing, tax and/or consulting services.  With respect to those potential parties in interest listed on Exhibit 8 who are PricewaterhouseCoopers clients, only two of those clients accounted for more than 1% of PricewaterhouseCoopers revenues for the fiscal year ended June 30, 2005, and that client did not account for more than 1.5% of PricewaterhouseCoopers' revenues for the fiscal year ended June 30, 2005.

19.    Further, as part of its diverse practice, PricewaterhouseCoopers appears in numerous cases, proceedings and transactions that involve many different professionals, including attorneys, accountants and financial consultants, who may represent claimants and parties-in-interest in the Debtors' chapter 11 cases.  Also, PricewaterhouseCoopers has performed in the past, and may perform in the future, audit, tax and consulting services for various attorneys and law firms in the legal community, and has been represented by several attorneys and law firms in the legal community, some of whom may be involved in these proceedings. In addition, PricewaterhouseCoopers has in the past, may currently and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to the Debtors and these cases.  Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relationships

create interests materially adverse to the Debtors herein in matters upon which PricewaterhouseCoopers is to be employed, and none are in connection with this case.

20.    PricewaterhouseCoopers is not a "Creditor" of any of the Debtors within the meaning of Section 101(10) of the Bankruptcy Code. Further, PricewaterhouseCoopers is not a holder of any shares of the Debtors' stock. Further, neither I nor any other PricewaterhouseCoopers partner or principal, to the best of my knowledge, is a holder of any shares of the Debtors' stock.

21.    Based on the results of the relationship search conducted to date as described above, PricewaterhouseCoopers insofar as I have been able to ascertain has no connection with the above-captioned Debtors, their creditors, equity security holders, other parties-in-interest (as reasonably known to us) or their respective attorneys, except as disclosed or otherwise described herein. Further, to the best of my knowledge, no one involved in this case has any connection to the U.S. Trustee or any person employed in the Office of the U.S. Trustee in the New York Southern District, or the Bankruptcy Judge presiding over these cases.

22.    As such, to the best of my knowledge, PricewaterhouseCoopers is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that PricewaterhouseCoopers:

> (a)    is not a creditor, equity security holder or insider of the Debtors;
>
> (b)    is not and was not an investment banker for any outstanding security of the Debtors;
>
> (c)    has not been, within three years before the date of the filing of the Debtors' chapter 11 petition, (i) an investment banker for a security of the Debtors or (ii) an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the Debtors; and
>
> (d)    was not, within two years before the date of filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors or of any investment banker as specified in subparagraph (b) or (c) of this paragraph.

In addition, to the best of my knowledge and based upon the results of the relationship search described above, PricewaterhouseCoopers neither holds nor represents an interest adverse to the Debtors within the meaning of Section 327(a) of the Bankruptcy Code.

23.    It is PricewaterhouseCoopers' policy and intent to update and expand its ongoing relationship search for additional parties in interest in an expedient manner.  If any new relevant facts or relationships are discovered or arise, PricewaterhouseCoopers will promptly file a Bankruptcy Rule 2014(a) Supplemental Declaration.

PROFESSIONAL COMPENSATION

Subject to this Court's approval and pursuant to the terms and conditions of the Master Agreement, except as otherwise set forth below, PricewaterhouseCoopers' requested compensation for professional services rendered to the Debtors will be based upon the hours actually expended by each assigned staff member at each staff member's hourly billing rate. PricewaterhouseCoopers' hourly rates for professional services are based upon the individual resources provided from PwC's various lines of business and are currently as follows:[5]

| Partners | $390 to $975 |
| Directors/Senior Managers | $250 to $690 |
| Managers | $165 to $460 |
| Senior Associates/Associates | $120 to $320 |
| Paraprofessionals/Office Staff | $75 to $180 |

24.    These rates are PricewaterhouseCoopers' normal and customary rates for the type of services to be provided.  The Debtors are advised that these rates are subject to change but that any changes will remain in line with market rates for comparable services. Except as otherwise set forth below, the Debtors have agreed to compensate PricewaterhouseCoopers for professional services rendered at its normal and customary hourly rates.

---

[5]    These rates are the current U.S. hourly rates by personnel level.  The hourly rates for the various PricewaterhouseCoopers' foreign offices are not included in the ranges above, which may be significantly lower or higher for any personnel level.  For the Sarbanes-Oxley Statement of Work, the foreign office billing rates, specific for the project, have been disclosed to the Debtors.

<u>Statement of Work with Fixed Fee Arrangements</u>

25.    The Debtors and PricewaterhouseCoopers have agreed to a fixed fee for various projects. For these Fixed Fee Services, PricewaterhouseCoopers intends to include as an exhibit to each fee application a summary in reasonable detail of the approximate time spent by professionals on various tasks in lieu of contemporaneous time records in partial hour increments or a qualitative report of the types of services rendered to the Debtors for each monthly services, rather than a specific detailed time descriptions.

26.    <u>Financial Planning Statement of Work</u>: The Debtors and PricewaterhouseCoopers have agreed to a fixed fee of $6,000 per participant per year, except that the initial year of services will be approximately $11,000 per participant. The fee for certain specified individuals on the Strategy Board will be $2,000 higher. To date, $43,000.00 has been paid related to these services during the post-petition period. PricewaterhouseCoopers intends to include as an exhibit to the fee applications a narrative summary of the services provided to the Debtors for these fixed fee services.

27.    <u>WNTS Advocacy Statement of Work</u>: The Debtors and PricewaterhouseCoopers have agreed to a fixed fee of $60,000 per year, invoiced at $5,000 per month, plus reimbursement of out of pocket as invoiced. To date, $0.00 has been paid related to these services. Accordingly, PricewaterhouseCoopers will begin invoicing the Debtors for the post-petition services, along with the out-of-pocket expenses.

<u>Statement of Work with Hourly Rate Arrangements</u>

28.    PricewaterhouseCoopers intends to apply to this Court for the allowance of compensation for professional services rendered and reimbursement of expenses incurred in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), guidelines established by the U.S. Trustee, and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern

District of New York.[6]  PricewaterhouseCoopers will submit time records in a summary

format which shall set forth a description of the services rendered by each professional and

the amount of time spend on each date, in half-hour (x.5) or whole-hour (x.0) increments, by

each such individual in rendering services on behalf of the Debtors. PricewaterhouseCoopers

understands that interim and final fee awards are subject to approval by this Court.  The

approved compensation billing rates for the services rendered under the existing Statement of

Works are described below:

29.    <u>Sarbanes-Oxley Statement of Work</u>: The Debtors and

PricewaterhouseCoopers have agreed to the following ranges of hourly rates by personnel

level.  The specifics for each respective country are detailed within the Exhibit 2, Appendix

A.

| *Personnel Level* | *Range of Hourly Rates* |
|---|---|
| Partner | $250 - $400 |
| Senior Manager | $180 - $300 |
| Manager | $120 - $200 |
| Senior Associate | $  60 - $160 |
| Associate | $  50 - $130 |

30.    <u>Tax Compliance Statement of Work</u>:  The Debtors and

PricewaterhouseCoopers have agreed to discounted hourly rates to be rendered by its

professionals plus reimbursement of out of pocket expenses:

| *Foreign Affiliate Reporting:* | *Discounted Rates:* |
|---|---|
| Senior Associate | $155/hour |
| Associate - Transfer Pricing | $125/hour |
| Associate - Other | $110/hour |

---

[6]    As mentioned previously, PricewaterhouseCoopers professionals will consult with internal PricewaterhouseCoopers bankruptcy specialists regarding the administrative processes of the bankruptcy court. The rate per hour for these professionals, by level of experience, will be as follows: Partner: $570; Director/Senior Manager: $500; Manager: $360; Senior Associate: $260; Associate: $205 and Paraprofessional: $135. These rates are subject to periodic adjustments.

PricewaterhouseCoopers prepared an invoice for services rendered February 20, 2006 through March 15, 2006, totaling $53,380.00. This invoice has not been paid and accordingly, PricewaterhouseCoopers will include these fees in the initial invoice to the Debtors for the post-petition services and intends to include as an exhibit a narrative summary of the services provided to the Debtors through this outsourcing of professionals.

31.    <u>Consulting Statement of Work</u>: The Debtors and PricewaterhouseCoopers have not agreed to hourly rates to be rendered in this category. As soon as the parties determine the hourly billing rates for this category, PricewaterhouseCoopers will file a supplemental Declaration disclosing the hourly rates.

32.    <u>Bankruptcy Tax Advisory Services</u>: The Debtors and PricewaterhouseCoopers have not finalized their hourly rates, but our standard hourly rates for this type of services are provided below:

| Personnel Level | Range of Hourly Rates |
| --- | --- |
| Partner | $530 - $795 |
| Director | $435 - $670 |
| Manager | $370 - $610 |
| Senior Associate | $240 - $435 |
| Associate | $190 - $305 |
| Administrative | $ 85 - $105 |

33.    PricewaterhouseCoopers will also seek reimbursement for necessary expenses incurred, in accordance with the Appendix A of the Master Agreement and guidelines established by the U.S. Trustee, which shall include travel, photocopying, delivery service, postage, vendor charges and other out-of-pocket expenses incurred in providing professional services.

34.    During the one-year period preceding the Petition Date, the Debtors paid PwC approximately $431,467 in respect of types of services to be rendered pursuant to the Master Agreement and expenses incurred in relation thereto.

35.    In accordance with section 504 of the Bankruptcy Code, I hereby state that
there is no Master Agreement or understanding between PricewaterhouseCoopers and any
other entity, other than a member, partner or regular associate of PricewaterhouseCoopers,
for the sharing of compensation received or to be received for services rendered in connection
with these proceedings.

36.    This declaration is provided in accordance with section 327 of the Bankruptcy
Code and Bankruptcy Rule 2014.

37.    I declare under the penalty of perjury, that the foregoing is true and correct.

[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]

Dated:      Detroit, Michigan
June 5, 2006

PRICEWATERHOUSECOOPERS LLP

By:    /s/ Brian D. Decker          
Name: Brian D. Decker
Title:  Partner

PricewaterhouseCoopers LLP
1900 St Antoine Street
Detroit, Michigan 48226-2263
Telephone: (313) 394-6000
Facsimile: (313) 394-6555

Exhibit 1

Master Professional Services Agreement

# MASTER PROFESSIONAL SERVICES AGREEMENT

This is a MASTER PROFESSIONAL SERVICES AGREEMENT, dated as of March 17, 2006 (this "Agreement"), between PricewaterhouseCoopers LLP, a Delaware limited liability partnership ("PwC"), and Delphi Corporation, a Delaware corporation ("Client"), each a Party, and together Parties, to this Agreement.

## Background

PwC and Client desire to establish a contract pursuant to which Client may, from time to time, obtain from PwC, and PwC may provide to Client, certain professional Services (as defined in Section 1(a)), all on the terms and subject to the conditions set forth in this Agreement and in the applicable statement of work ("SOW").

## Terms and Conditions

In consideration of the premises and of the mutual covenants and agreements contained herein, and intending to be legally bound, the Parties hereby agree as follows:

1.    Services.

(a)    This Agreement establishes the standard terms and conditions pursuant to which PwC may provide to Client certain professional services (the "Services"), as may be performed or agreed upon from time to time in writing in an SOW.  Notwithstanding any provision to the contrary contained herein, audit, attest and other assurance services are not within the definition of "Services" and such engagements are not covered by this Agreement.  An executed SOW, attached and incorporated into a Client purchase order, may expressly identify and amend terms and conditions in this Agreement, or list special terms and conditions, effective for that SOW only.  Unless modified by provisions contained in an SOW, the terms and conditions in this Agreement are incorporated into and made part of each SOW.  To the extent of any express conflict or inconsistency between the terms and conditions of an SOW and the terms and conditions of this Agreement, the terms and conditions of the SOW will control.

(b)    An SOW shall contain the following, as applicable:  (i) the term or period of time during which PwC will perform the Services, provide resources or otherwise perform its obligations as specified in the SOW; (ii) a description of the obligations of, and Services to be performed by, PwC; (iii) a description of Client's responsibilities related to the SOW, including any facilities, equipment, personnel and tasks or other support to be provided or performed by Client; (iv) PwC's fees and expenses under the SOW, or, if applicable, the basis on which such fees and expenses will be computed; (v) any provision limiting the liability of either Party other than, or in addition to, those provision set forth herein, and (vi) any other terms and conditions

1

appropriate to the Services to be performed and the obligations of the Parties under that SOW. Forms of Statements of Work are attached hereto as Attachment A.

2.    Term.

The term of this Agreement shall commence as of October 8, 2005, and shall continue until March 31, 2007, whereupon Client and PwC may agree to extend the Agreement for successive one (1) year periods. Each SOW shall become effective as of the date of the commencement of the Services or, if earlier, the date of execution of such SOW. Each SOW executed by the Parties prior to the effective date of a termination (as provided for in Section 7) shall remain in full force and effect in accordance with its terms, including the terms and conditions of this Agreement. If PwC commenced the performance of the Services prior to the execution of this Agreement, this Agreement shall be effective as of the commencement of such Services and shall cover such Services, unless the performance of such Services are governed by an existing executed agreement. The Parties agree that any such existing executed agreements shall be converted to SOWs within ninety (90) days of the execution of this Agreement, unless the services under such existing executed agreements have been completed by such date.

3.    Fees, Expenses and Taxes.

(a)    In addition to professional fees outlined in the applicable SOW, PwC will also bill Client for pre-approved, reasonable out-of-pocket and travel expenses according to the guidelines set forth in Exhibit A: Delphi Travel and Expense Reimbursement Policy for Contractors; provided, however, that instead of submitting all expenses on Delphi expense vouchers, PwC shall account for such expenses within PwC's normal expense reimbursement system. Included in travel expenses shall be PwC internal per ticket charges for booking travel (as agreed from time to time between PwC and Delphi). The internal per ticket charge is an allocation of estimated costs of running PwC's travel department in a manner to maximize cost savings. PwC shall provide Client with a summary of such expenses and Client shall have the right to audit such expenses.

(b)    Client shall pay for all taxes, other than withholding taxes and taxes based on or measured by PwC's or PwC's personnel's net income, including any interest and penalties from any related deficiency if due to an act by Client and not that of PwC, in connection with this Agreement, including any sales, use, excise, value-added, services, consumption, and other taxes and duties assessed on the provision of Services by PwC to Client or on PwC's charges to Client under this Agreement including the reimbursement of expenses, so long as such taxes are listed in the applicable SOW. The parties shall cooperate in good faith to minimize such tax liabilities to the extent legally permissible.

2

4.    Invoices.

Unless otherwise provided in an SOW, PwC will submit an invoice to Client at the end of every month for all hours of service provided to Client by PwC, together with all expenses incurred by PwC, during the preceding month period.  The invoices shall be in the form and contain all information required by the rules and procedures of the United States Bankruptcy Court for the Southern District of New York.  Each such invoice shall be due and payable pursuant to Client's Multilateral Netting System ("**MNS-2**"), which provides, on average, that payment shall be on the second day of the second month following the date of the invoice, recognizing that the rules and procedures of the United States Bankruptcy Court for the Southern District of New York will apply.  In no event shall Client pay Supplier interest or other late charges on any fees due under this Agreement.

5.    Client Responsibilities.

(a)    Client shall provide PwC with all information relevant to the Services and any reasonable assistance as may be required to properly perform the Services.  Unless otherwise indicated, Client represents and warrants to PwC that all such information will be accurate and complete in all material respects, to the best of Client's knowledge.  The overall definition and scope of the work to be performed, and the adequacy of such definition and scope in addressing Client's needs, is Client's responsibility.  Client shall perform all management functions and make all management decisions in connection with the Services, and shall assign competent individuals to oversee the Services.  Client is also responsible for the implementation of actions identified in the course of this engagement and results achieved from using any Services or Deliverables as defined in Section 6(a) below.

(b)    Each Party shall use commercially reasonable procedures to check for the then most commonly known viruses and to check the integrity of data before sending information to the other electronically, but each Party recognizes that such procedures cannot be a guarantee that transmissions will be virus free.  It remains the responsibility of the Party receiving an electronic communication from the other to carry out a virus check on any attachments before launching any documents whether received on disk or otherwise.

(c)    Neither Party shall be responsible for any delay, cost increase or other consequences due to the other Party's failure to perform any of its obligations under this Agreement or an SOW or otherwise due to factors beyond its reasonable control.  Each Party will use commercially reasonable efforts to mitigate such costs or expenses.  Any PwC deadline that is affected by any Client default shall be extended by a reasonable amount of time provided that PwC has provided timely communication to Client.

6.    Deliverables.

(a)    Ownership.  PwC shall own any general skills, know-how, expertise, ideas, concepts, methods, techniques, processes, software, materials or other intellectual property or information which may have been discovered, created, developed or derived by PwC either prior to or as a result of its provision of Services under this Agreement ("PwC Materials").  Subject to the restrictions in this Agreement, Client will own all tangible written material

3

originally prepared expressly for Client and delivered to Client under this Agreement (the "Deliverables"), excluding any PwC Materials contained or embodied therein. PwC's working papers and PwC's Confidential Information (as defined in Section 9(a)) belong exclusively to PwC; provided, however, PwC shall provide a copy of such working papers to Client after consultation and agreement with Client. Client will have a non-exclusive, non-transferable license to use PwC Materials for Client's own internal use and only for the purposes for which they are delivered to the extent that they form part of the Deliverables.

(b)       Use of Deliverables.   Except as otherwise expressly stated in the applicable SOW, all Deliverables are solely for Client's internal use and benefit. Client shall not authorize any third party ("Third Party") to rely upon any of the Deliverables except as set forth in an SOW or, if not set forth in an SOW, without PwC's prior written consent. Except that Deliverables may be disclosed to (i) taxing authorities, (ii) an accounting firm providing attest services to Client (solely to the extent necessary for the performance of such attest services), and (iii) as set forth in this Section 9(b) or (iv) as set forth in an SOW; Client shall not distribute to, discuss with, or otherwise disclose the Deliverables to any Third Party without PwC's prior written consent. Oral or preliminary information, drafts or advice given by PwC may not be relied upon or attributed to PwC unless PwC specifically confirms such information or advice or otherwise reduces such draft to a final writing.

7.   Termination.

(a)       Either Party may terminate this Agreement or any SOW under this Agreement in the event of a material breach of this Agreement that is not cured within thirty (30) days after receipt of written notice of such breach. Unless otherwise provided in the applicable SOW, Client may terminate this Agreement or any SOW for convenience at any time upon thirty (30) days prior written notice. In the event of Client termination for breach by PwC, Client shall be responsible for fees earned and expenses incurred only up to the date of written notice to PwC of the breach. In the event of other termination by Client or termination by PwC for breach by Client, Client will be responsible for fees earned and expenses incurred through the actual date of termination. In the event of termination by mutual agreement, the Parties shall jointly determine the fees due or to be refunded.

(b)       PwC may also resign from performing all or any portion of the Services and terminating this Agreement and/or any Schedule immediately upon written notice in the event that circumstances arise that would make continuation of all or any portion of the Services by PwC in conflict with any independence or other professional regulations, standards or guidelines to which PwC conforms. If Client is or becomes an SEC registrant audit client of PwC and the Services performed and/or Deliverables provided under a particular SOW will be relied upon by the PwC audit team, the limitation of liability and Client's obligation to indemnify under this Agreement will not apply to such Services and/or Deliverables.

8.   Warranty.

PwC warrants that it has the requisite power and authority to enter into and perform its obligations under this Agreement and each SOW. PwC further warrants that the Services will be

4

performed by qualified personnel. PwC warrants that it will provide its non-tax related Services in a manner consistent with the terms and conditions of this Agreement and in accordance with the applicable Standards for Consulting Services established by the American Institute of Certified Public Accountants ("AICPA") as well as any applicable standards (as agreed to between the Parties) of the Public Company Accounting Oversight Board ("PCAOB"). PwC warrants that it will provide its tax services in a manner consistent with the terms and conditions of this Agreement and in accordance with the AICPA Statements on Standards for Tax Services and any applicable standards (as agreed to between the Parties) of the PCAOB. THE WARRANTIES IN THIS SECTION 8 AS WELL AS ANY EXPRESS WARRANTY IN ANY APPLICABLE SOW (BUT ONLY IF EXPRESSLY IDENTIFIED AS A "WARRANTY" IN SUCH SOW) ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, OR WHETHER ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR PROFESSION OR OTHERWISE, INCLUDING BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.    Confidentiality.

(a)    All data relating specifically to a Party's business and any other information which reasonably should be understood to be confidential in nature are confidential information of such Party. PwC's proprietary software, tools, methodologies, techniques, ideas, discoveries, inventions, know-how and any other information which reasonably should be understood to be confidential to PwC are confidential information of PwC. Client confidential information and PwC confidential information are collectively referred to as "Confidential Information." Each Party shall use Confidential Information of the other Party only in furtherance of the purposes of this Agreement and shall not disclose such Confidential Information to any third party without the other Party's prior written consent. Each Party agrees to take reasonable measures to protect the confidentiality of the other Party's Confidential Information and to advise its employees of the confidential nature of the Confidential Information and of the confidentiality provisions and use prohibitions herein.

(b)    Notwithstanding any terms or conditions in this Agreement to the contrary, no conditions of confidentiality within the meaning of Internal Revenue Code §6111(d) or U.S. Treasury regulations §1.6011-4 are intended, and Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction and all materials of any kind (including opinions or other tax analysis) that are provided to the Client relating to such tax treatment and tax structure, subject to the limitations set forth in the following sentence. In the event that a Deliverable includes discussion of such tax treatment or tax structure, disclosure of the Deliverable will be limited solely to the section or sections discussing the tax treatment or tax structure; all other information in the Deliverable unrelated to the tax treatment or tax structure remains subject to the restrictions set forth in Section 9(a) and all references to "PwC" or "PricewaterhouseCoopers" and all branding and other identifiers of PwC shall be redacted from the tax treatment and tax structure portions of such Deliverable, and/or shall otherwise not be distributed to any other third party, except as may be expressly provided for in this Agreement.

5

This Section 9(b)) is effective as of the commencement of any discussions the Parties may have had regarding any transaction related to any Services.

(c)      Notwithstanding anything to the contrary contained in this Agreement, neither Party shall be obligated to treat as confidential any information disclosed by the other Party (the "Disclosing Party") which: (i) is rightfully known to the recipient prior to its disclosure by the Disclosing Party except that which was disclosed under a prior confidentiality agreement between the Parties; (ii) is released by the Disclosing Party to any other person or entity (including governmental agencies) without restriction; (iii) is independently developed by the recipient without any use of or reliance on Confidential Information; or (iv) is or later becomes publicly available without violation of this Agreement or may be lawfully obtained by a Party from any nonparty. Notwithstanding the foregoing, either Party may disclose Confidential Information of the other to a third party as may be required by law, statute, rule or regulation, including any subpoena or other similar form of process, or by the standards of the AICPA or other professional self-regulatory authority, provided that (and without breaching any legal or regulatory requirement) the Party to which the request is made provides the other Party with prompt written notice thereof and, if practicable under the circumstances, allows the other Party to seek a restraining order or other appropriate relief.   Subject to PwC's confidentiality obligations in this Agreement, nothing herein shall preclude or limit PwC from providing services similar to the Services to other PwC clients.

10.    Indemnification.

(a)      Subject to the provisions hereof, each Party shall indemnify, defend and hold harmless the other from and against any and all amounts payable under any judgment, verdict, court order or settlement for death or bodily injury or the damage to or loss or destruction of any real or tangible personal property, but only to the extent the foregoing arise out of the indemnitor's gross negligence or intentional misconduct in the performance of this Agreement.

(b)      PwC agrees to indemnify, defend and hold harmless Client from and against any and all amounts payable under any judgment, verdict, court order or settlement for Third Party claims of infringement or misappropriation of any trade secrets, copyrights, trademarks, trade names or other intellectual property rights alleged to have occurred and arising from the Deliverables. Should Client's use of such Deliverables be determined to have infringed, or if, in PwC's judgment, such use is likely to be infringing, PwC may, at its option: (i) procure for Client the right to continue using such Deliverables provided, or (ii) replace or modify them to make their use non-infringing while yielding substantially equivalent results.  If neither of the above options are or would be available on a basis that PwC finds commercially reasonable, then, PwC may terminate this Agreement, Client shall return such Deliverables provided to PwC and PwC will refund to Client the fees paid for the Deliverables provided.  This infringement indemnity does not cover claims to the extent arising from: (1) the combination of such Deliverables with products or services not provided by PwC; (2) the modification of such Deliverables by any person, other than PwC; (3) Deliverables complying with or based upon: (A) designs provided by or at the direction of Client or (B) specifications or other information provided by or at the direction of the Client; or (4) use of systems, materials or work performed in a manner not permitted or contemplated hereunder or by another obligation of Client to PwC.

6

11.    <u>Limitation of Liability</u>.

(a)    PwC is the US member firm of the global network of PricewaterhouseCoopers
firms (exclusive of PwC, the "PricewaterhouseCoopers Firms"). In the course of providing the
Services and/or Deliverables hereunder, PwC, may, in its discretion, draw on the resources of
and subcontract to other PricewaterhouseCoopers Firms. Client agrees that PwC may provide
any information PwC receives in connection with this engagement to other
PricewaterhouseCoopers Firms for the purpose of providing the Services and/or for internal
administrative and regulatory compliance purposes.    The provision of Services and/or
Deliverables will remain the responsibility of PwC. Client agrees that in relation to the Services
and this Agreement, its relationship is solely with PwC.    Client further agrees that no
PricewaterhouseCoopers Firms, nor the partners, principals or employees of PwC or the
PricewaterhouseCoopers Firms (together the "Beneficiaries"), who perform work in connection
with the Services and/or Deliverables will have any liability to Client in connection with the
Services or this Agreement. Client therefore agrees to bring any claim under this Agreement
against PwC and not to bring a claim of any nature against any such PricewaterhouseCoopers
Firm relating to the Services, Deliverables or this Agreement except where such a claim cannot
be excluded by law.

(b)    The provisions of this Agreement and any SOWs relating to the Beneficiaries,
have been stipulated by PwC expressly for their benefit.    Client agrees that each of the
Beneficiaries shall have the right to rely on said provisions as if they were Parties to this
Agreement. Client likewise agrees on behalf of all of its business operations in which Client has
a direct or indirect controlling interest and that are receiving Services or Benefits of Services
under this Agreement ("Service Recipients"), that they are bound by these provisions as if they
were Parties to this Agreement. Without limiting any other indemnification provision set forth in
this Agreement, Client agrees to indemnify and hold harmless PwC and the Beneficiaries from
and against any claim that is asserted by any Service Recipient other than Client arising out of or
relating to the Services and/or Deliverables provided under this Agreement, and all liabilities,
costs, damages and expenses imposed or incurred in connection therewith, including reasonable
attorneys' fees.

(c)    Each SOW shall include a provision setting forth any applicable limitation of
liability. The parties acknowledge and agree that no SOW shall be valid unless it contains such a
provision.

In addition, neither party will be liable in any event for lost profits or any consequential, indirect,
punitive, exemplary or special damages. Further, PwC shall have no liability to Client arising
from or relating to any third party hardware, software, information or materials supplied by
Client.

(d)    PwC accepts no liability to third parties with respect to the Services and
Deliverables. Client agrees (without limiting any other indemnification provision set forth in this
Agreement) to indemnify and hold PwC and the Beneficiaries (as defined in Section 11(a))
harmless from and against any and all Third Party claims, suits and actions, and all associated
damages, settlements, losses, liabilities, costs, and expenses, including without limitation
reasonable attorneys fees, arising from or relating to the Services and/or Deliverables under this

7

Agreement, except to the extent finally determined to have resulted from the gross negligence or
intentional misconduct of PwC relating to such Services and/or Deliverables.

12.    Changes; Additional Services.

PwC will not be responsible for work that is beyond the scope of Services set forth in this
Agreement or the applicable SOW.  Either Party may request changes to the Services.  Changes
must be agreed between the Parties and may be subject to reasonable adjustments to fees and
schedules.  Changes to an SOW that amount to the provision of additional Services, rather than
adjustments to the Services already agreed, must be in writing and signed by both Parties.

13.    Subcontracts.

PwC may subcontract any of the Services hereunder, with written approval of Client, provided
that PwC shall be responsible for the fulfillment of its obligations hereunder.  For purposes of
this section, PwC firms outside of the US are not considered subcontractors.  Notwithstanding
anything to the contrary in this Agreement, PwC may disclose Client's Confidential Information
to such approved subcontractors involved in the provision of the Services.

14.    Engagement Limitations Applicable to All Services.

       (a)    The Services do not include the provision of legal advice and PwC makes no
representations regarding questions of legal interpretation.   Client should consult with its
attorneys with respect to any legal matters or items that require legal interpretation, under
federal, state or other type of law or regulation.  Changes in the law and/or its interpretation may
take place before PwC's advice is acted upon, or may be retrospective in effect; PwC accepts no
responsibility for changes in the law or its interpretation which may occur after the provision of
the Services. Without limiting the generality of the foregoing, Client acknowledges that tax laws
and regulations are subject to change at any time, and such changes may be retroactive in effect
and may be applicable to advice given or other Services rendered before their effective dates.
PwC does not assume responsibility (and will have no liability) for such changes occurring after
the date it has completed its Services under a particular SOW.

       (b)    PwC will provide no opinion, attestation or other form of assurance with respect
to its work or the information upon which its work is based.  The procedures PwC will be
performing under this Agreement will not constitute an examination or a review in accordance
with generally accepted auditing standards or attestation standards.  PwC will not audit or
otherwise verify the information supplied to it in connection with any engagement under this
Agreement, from whatever source, except as may be specified in the applicable SOW.

       (c)    PwC has not been engaged to, nor will PwC provide any management functions
or make management decisions for Client under this Agreement.  It is Client's responsibility to
establish and maintain its internal controls.  In addition, it is Client's responsibility to determine
the procedures deemed necessary in connection with its compliance with the provisions of the
Sarbanes-Oxley Act of 2002 (the "Act") and related SEC rules, to execute those procedures and
to assess the results of its procedures and the adequacy thereof.  PwC provides no opinion or

8

other form of assurance with respect to Client's compliance with the Act, related SEC rules, or
Client's procedures. PwC makes no representation as to the sufficiency of Client's procedures
for its own purposes. The Services should not be taken to supplant inquiries and procedures that
Client should undertake for purposes of obtaining and using the information necessary in
connection with Client's compliance with the provisions of the Act and related SEC rules.

15.    General.

    (a)    PwC, in furnishing Services to Client, is acting only as an independent contractor
and is not acting as a fiduciary of Client. PwC does not undertake to perform any obligation of
Client, whether regulatory or contractual, or to assume any responsibility for Client's business or
operations. PwC has the sole right and obligation to supervise, manage, contract, direct, procure,
perform or cause to be performed all work to be performed by PwC, except as otherwise
provided in this Agreement or any SOW. PwC accepts full and exclusive liability for the
payment of all employer contributions and taxes measured by the remuneration paid to PwC
employees as required by all applicable United States federal, state and local laws, rules and
regulations.

    (b)    This Agreement may only be amended by written agreement signed by a duly
authorized representative of each Party.

    (c)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED,
INTERPRETED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE
OF MICHIGAN, WITHOUT GIVING EFFECT TO THE PROVISIONS RELATING TO
CONFLICT OF LAWS.

    (d)    No delay or omission by either Party in exercising any right or power shall impair
such right or power or be construed to be a waiver. A waiver by either Party of any of the
covenants to be performed by the other or any breach thereof shall not be construed to be a
waiver of any succeeding breach or of any other covenant. No waiver or discharge shall be valid
unless in writing and signed by an authorized representative of the Party against whom such
waiver or discharge is sought to be enforced.

    (e)    This Agreement shall be binding upon and inure to the benefit of the Parties
hereto and their permitted successors and assigns, and, except as expressly provided herein,
nothing in this Agreement shall confer upon any other person or entity any legal or equitable
right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Neither
Party may, nor shall have the power to, assign or transfer this Agreement or any rights or
obligations hereunder or claims arising hereunder, without the prior written consent of the other
Party. Any attempt to assign or transfer this Agreement in violation of this subsection shall be
void and of no force and effect.

    (f)    This Agreement and the applicable SOW constitutes the entire agreement between
the Parties with respect to the Services and the rights and responsibilities of the Parties with
respect to such applicable SOW.

(g)    Neither Party shall publicize their relationship or the terms of this Agreement or any SOW or use the other Party's name or other trademarks or service marks in any advertisement or publication without the other Party's prior written approval.

(h)    The provisions of this Agreement, which expressly or by implication are intended to survive its termination or expiration, will survive and continue to bind both Parties.

(i)    If any provision of this Agreement is declared or found to be illegal, unenforceable or void, then both Parties shall be relieved of all obligations arising under such provision, but if the remainder of this Agreement shall not be affected by such declaration or finding and is capable of substantial performance, then each provision not so affected shall be enforced to the extent permitted by law.

(j)    Except as expressly provided herein, all remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

(k)    Where agreement, approval, acceptance, consent or similar action by Client or PwC is required, such action shall not be unreasonably delayed or withheld.

(l)    Headings in this Agreement are for convenience only.  The headings shall not be used in interpreting this Agreement or any provision of it.

(m)    Neither Party shall be liable to the other for any delay or failure to perform any of the Services or obligations set forth in this Agreement due to causes beyond its reasonable control.

(n)    The engagement limitations set forth on Addendum A are incorporated by reference herein.

(o)    All of PwC's agents, employees, subcontractors and/or independent contractors furnished by PwC to perform the Services (collectively, "Personnel") are and will remain PwC's employees and/or independent contractors and, under no circumstances, will any Personnel furnished by PwC be deemed to be Client's employees or agents.  PwC is solely responsible, at PwC's sole cost and expense, for (i) the fulfillment of all obligations to Personnel, and (ii) the compliance by PwC and personnel with Agreement and all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

(BALANCE OF THIS PAGE INTENTIONALLY BLANK)

(p)    PwC will assure that all Personnel who are performing Services on behalf of PwC are competent to perform the Services. PwC will require all Personnel who are performing any work on Client's premises to comply with all of Client's reasonable instructions, regulations and policies that have been provided to PwC in writing in a timely manner. Client, in its sole discretion, has the right to: (i) bar any of Personnel from Client's premises for failure to observe Client's regulations or policies, (ii) require that PwC promptly remove from Client's premises any Personnel who violate any of Client's regulations or policies, and (iii) require that PwC cease using any Personnel to perform the Services who are reasonably unacceptable to Client. Client will confer with PwC to discuss Client's concerns prior to requiring removal of any Personnel. PwC will replace any barred or removed Personnel with Personnel reasonably acceptable to Client.

In witness whereof, each of the Parties has caused this Agreement to be executed on its behalf by its duly authorized representative as of the date first above written.

Delphi Corporation                          PricewaterhouseCoopers LLP


By: _Kevin Smith_____              By:_ _Mark Mendola_____
Name: Kevin Smith                     Name: Mark J Mendola
Title: Director, Indirect and M&E      Title: Partner
       Procurement

11

**Exhibit A**

**Delphi Travel and Per Diem Expense Reimbursement Policy for
Contractors**

A.     If Contractor is required by Delphi to travel as an incidental requirement in performing
services for Delphi, then such travel and per diem expenses, subject to prior written approval of
Delphi, will be reimbursable as follows:

|   |   |   |
|---|---|---|
| 1. | Air Travel | Economy/Coach class only.  Business class is permitted only upon prior written consent by Delphi. |
| 2. | Hotel | Contractor will exercise good, sound business judgment and discretion in choosing hotels, such as moderately priced chain hotels or hotels that offer discounted corporate rates.  Where extended travel is involved, reduced rates may be available and should be requested. |
| 3. | Rental Cars | Compact or intermediate class only.  The cost of collision damage waiver and personal accident insurance is the responsibility of Contractor. |
| 4. | Mileage Allowance | Reimbursement will be at the then current IRS rate (currently $0.44 per mile) for the miles which are in excess of his or her normal commute from home to work and back.  When permanently assigned to another location, even if the new location is temporary, Contractor will not be reimbursed for excess miles, additional driving time, etc. |
| 5. | Expense Reports | If requested, Contractor will provide receipts for all reimbursable expenses, including meals and other expenditures, in excess of $25.00 or more. |
| 6. | Meals | Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours.  Reimbursement for meals will be the actual and reasonable expenses paid by Contractor. |

12

| | |
|---|---|
| 7. Extended Travel | Contractor should review the home visit policy prior to a trip. Generally, the following provisions apply: |
| | If the travel expense is less than the living expense in the temporary location, Contractor will be reimbursed for travel to the permanent location every week. |
| | If the travel expense is more than the living expense in the temporary location, Contractor will be reimbursed for travel to the permanent location every two weeks. |
| | Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval. |
| 8. Miscellaneous | When Contractor chooses an alternative method of transportation, *e.g.*, to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours. |
| | The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form. |
| | Contractor is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Contractor will make all travel arrangements through Global Experts in Travel, using a special account set up for such purposes. |
| | Any cash advance by Contractor to its employee is the responsibility of Contractor. |
| 9. Per Diem | In certain instances, a per diem will be paid to Contractor in accordance with Delphi's standard per diem policy. |

B.    All travel and per diem for which Contractor seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

## ADDENDUM A

1.    **Engagement Limitations Applicable to Tax Services.**

(a)    With regard to any tax Services provided pursuant to this Agreement, Client shall bring to PwC's attention any matters that may reasonably be expected to require further consideration to determine the proper treatment of any relevant item and any changes in the information as originally presented as soon as such information becomes available. PwC is not responsible (and shall not be liable) for any penalties assessed against Client as a result of Client's failure to provide PwC with all the relevant information relative to the issue under consultation and Client agrees to reimburse PwC for any penalties imposed on PwC, its partners or staff, as the result of Client's failure to provide such information.

(b)    Some of the tax matters on which PwC may be asked to advise Client may have implications to other persons or entities. However, PwC shall have no responsibility or liability to these persons or entities unless PwC specifically is engaged to address these issues to such persons or entities, and PwC expressly agrees to do so in an SOW.

(c)    Tax jurisdictions may impose penalties for certain failures. Relative to the Services provided under the terms of this Agreement, PwC will discuss with Client any tax positions of which PwC is aware that PwC believes may subject Client to penalties. PwC will also discuss with Client possible courses of action related to the Client's tax return, where applicable, to avoid the imposition of any penalty (e.g., disclosure). PwC will use its judgment in resolving questions where the tax law may be unclear, or where there are conflicts between taxing authorities' interpretations of the law and other supportable positions, and discuss them with Client. PwC is not responsible for any penalties imposed for positions that have been discussed with Client where PwC recommended a course of action to avoid penalties and Client elected not to pursue such course.

(d)    US Treasury regulation §1.6011-4 requires that taxpayers disclose to the IRS their participation in certain "reportable transactions." Client shall advise PwC if it determines that any matter covered by this Agreement is a reportable transaction that is required to be disclosed under §1.6011-4. Similar Treasury regulations issued under Internal Revenue Code §6112 require that PwC maintain lists of certain client engagements where it is a material advisor to clients that have participated in either a reportable transaction or a transaction that is required to be registered with the IRS as a tax shelter. If PwC determines, after consultation with Client, that Client has participated in either a reportable transaction or one required to be registered under Internal Revenue Code §6111, PwC will place Client's name and other required information on a list and will so advise Client. Sometime in the future the IRS may request PwC's lists of reportable or §6011 transactions, and PwC may be compelled to provide the IRS with the contents of its lists, including Client's name. PwC will advise Client if it is ultimately required to provide Client's name to the IRS in connection with any matter covered by this Agreement.

14

**2.    Engagement Limitations Applicable to Transaction Services/Due Diligence Services.**

(a)    Where PwC's work expressly includes consideration of prospective financial information, PwC will comment on the bases and assumptions underlying the prospective financial information adopted as the case may be by Client or by the management of the company who is the subject of a due diligence investigation (the "Target Company"), but PwC's work will not constitute an examination, compilation or agreed-upon procedures in accordance with standards established by the AICPA, and PwC will not express any opinion or provide any assurance (in the sense in which "opinion" and "assurance" are used in the AICPA standards). Where PwC comments on bases and assumptions underlying the prospective financial information, PwC reports may include tables aggregating quantified vulnerabilities and sensitivities in order to illustrate effects of possible alternative assumptions. Those tables should not be regarded as a restatement of the Target's and/or management's prospective financial information, or preparation of revised prospective financial information; they are provided as a means of summarising PwC comments to assist Client in considering Client's implications for the transaction. It is Client's responsibility to consider PwC comments and make Client's own decision based on the information available to the Client. Client must make its own decision about likely future profitability and the cash flows likely to be generated by the Target and Client understands that, with regard to illustrations of sensitivities that may be included in our Deliverables, there may be other, equally valid ways of assessing the sensitivities and possible outcomes. Client understands that our Deliverables are not prepared for the purposes of managing the Target's business and because events and circumstances frequently do not occur as expected, there will usually be differences between predicted and actual results, and those differences may be material. PricewaterhouseCoopers LLP is not responsible for developing the underlying assumptions of the prospective financial information and we take no responsibility and accept no liability for the achievement of predicted results.

(b)    Except to the extent expressly agreed to the contrary in writing, where PwC comments on use of Internet technologies in key business processes, PwC does so as business advisors rather than as information technology specialists.

(c)    Where the work expressly includes consideration of potential operational improvements, PwC will comment on the Client and/or Target Company's view of such improvements. PwC's comments will be provided solely in the light of our business experience of operational matters but will not be based on direct experience of Client's operations or the Target Company's operations, specific industry or commercial sector. PwC's comments may not represent the optimal operational solution and there may be other, equally valid, views. Further, the results which can be achieved will depend upon the detailed circumstances at the time and on the way in which planned operational improvements are implemented. PwC takes no responsibility for the achievement of potential operational improvements.

(d)    PwC assumes no responsibility and makes no representations with respect to the accuracy or completeness of information provided by any Target Company. PwC will not provide assurance that matters of significance to the financial information or to Client's due diligence investigation will be disclosed. We have not been engaged to, nor will we provide any management functions or make management decisions for Client. Further, PwC's work is not

15

designed to and is not likely to reveal fraud or misrepresentation by the management of a Target Company.

(e)     Advice and comments that PwC may provide in the course of a due diligence engagement regarding the accounting and tax treatment of a proposed transaction should not be viewed as a formal accounting or tax opinion of PwC.  If such opinions are desired and PwC determines that such an opinion can be issued, the terms of an engagement to provide such an opinion will be subject to a separate SOW.

(f)     Client acknowledges that PwC may be asked to provide services to other clients who may be in competition with Client or whose interests may conflict with Client's interests, or regarding the possible purchase or sale of a Target Company that may be in competition with Client or whose interests may conflict with Client's interests.  PwC will not be prevented or restricted by virtue of its relationship with Client under this Contract from providing services to other clients.  Except as required by law or professional regulations, PwC will maintain the information obtained during the course of each engagement it performs for Client confidentially in accordance with Section 9 of the Agreement.

**3.     Circular 230: Limitations.**

(a)     <u>For Tax Services:</u>

<u>i.</u>     *Other Written Advice.*  It is anticipated that the written advice PwC provides during the course of this engagement will be Other Written Advice as defined by Treasury Circular 230.  Accordingly, unless otherwise prohibited or PwC agrees to issue a Covered Opinion as defined by Circular 230, PwC written advice may include a disclosure stating that the advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties that may be imposed.  PwC advice will contain any other disclosures required by Circular 230.

ii.     *Covered Opinion.*  If expressly set forth in the applicable Statement of Work, or in the deliverable itself, PwC's final written deliverable will be a Covered Opinion as defined by Circular 230.  All other written advice provided prior to PwC's final deliverable may include a disclosure stating that the advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties that may be imposed on the taxpayer.  In the event Client does not proceed with the transaction that is the subject of PwC's advice or proceeds with the transaction but choose not to receive a final deliverable from PwC, Client may not rely on any of the advice provided by PwC for the purpose of avoiding any penalties that the IRS may impose.  To the extent Client is entitled to rely on PwC's written advice for purposes of penalty protection, Client understands that such reliance will be limited to the issues expressly addressed, therein. PwC's final deliverable may contain certain disclosures required by Circular 230.

(b)     <u>For Transaction Services/Due Diligence:</u>

The Tax advice provided in PwC reports or other forms of written communication relative to PwC's due diligence work may be considered written tax advice subject to the rules of Treasury Circular 230.  Accordingly, unless otherwise prohibited or agreed to with the Client in

advance to the contrary, such tax advice in any written form will constitute "Other Written Advice" as defined by Circular 230. Accordingly, tax information and/or advice provided in the report or other forms of written communication is not intended or written to be used, and it cannot be used, for the purpose of avoiding penalties that may be imposed on the taxpayer. In accordance with these regulations, PwC's written communications will include a disclosure to this effect. Further, PwC reports or other forms of written communication relating to the provision of due diligence services will not be written to support the promotion or marketing of this or any transaction or matters addressed in the report or other forms of written communication and should not be considered a Marketed Opinion under Circular 230.

4.    **Engagement Limitations Applicable to Dispute Analysis/Expert Witness Services.**

(a)    Client acknowledges that PwC is a large firm who is engaged by new clients every day throughout the United States. PwC will undertake a reasonable review of its records to determine its professional relationships with any persons or entities Client identifies in connection with any dispute analysis/expert witness engagement that PwC undertakes for Client. PwC will advise Client of any conflicts of interest of which PwC becomes aware that would preclude PwC from performing such work.

(b)    PwC may be engaged by parties adverse to Client to perform dispute analysis/expert witness services in litigation matters that are unrelated to any dispute analysis/expert witness services that PwC may perform for Client under this Agreement. Client agrees not to use the fact of any current or previous PwC engagement for expert witness services by opposing parties in other matters as a means of enhancing or diminishing PwC's credibility in conjunction with any appearance before a trier of fact.

Master Services Agreement
Dated _____, 200__

**ATTACHMENT A**
**SAMPLE FORM**

**Statement of Work ("SOW")**
**Between Delphi Corporation and PricewaterhouseCoopers LLP**

Project Name: _____

This SOW is governed under the Master Professional Services Agreement (the "Agreement") dated _____, 200____ between _____ ("Client") and PricewaterhouseCoopers LLP, ("PwC") and is fully incorporated therein. All terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.

**I.      PURPOSE AND SCOPE OF THIS SOW:**

This SOW covers _____ [describe project generally]. This SOW confirms the understanding of the objectives, deliverables, timing, staffing and fees for this project/effort.

**II.     PARTIES' RESPONSIBILITIES UNDER THIS SOW**

   **2.1     Services to be provided by PwC:**

   **2.2     Deliverables:**

   **2.3     Client's Responsibilities:**

   **2.4     Timing**

The timing of the services to be provided hereunder is as follows:

| | |
|---|---|
| Project Start Date: | |
| Estimated Project Completion Date: | |

18

**Master Services Agreement**
**Dated _____, 200__**

### III.   RESOURCES ASSIGNED TO THIS SOW

The PricewaterhouseCoopers personnel assigned to provide services and deliverables under this SOW are as follows:

### IV.   PAYMENT; EXPENSES; AND INVOICES

**4.1   Payment Terms**

**4.2   Professional Fees and Expenses [list any taxes applicable]**

### V.   OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW

**5.1   Limitation of Liability:** Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of PwC, PwC's liability to pay damages for any losses incurred by Client as a result of breach of contract, negligence or other tort committed by PwC, regardless of the theory of liability asserted, is limited to no more than [_____( ) times] the total amount of fees paid to PwC for the Services provided under this SOW. Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of Client or in connection with Client's violation of its obligations under Section 6(b) of the Agreement, Client's liability to pay damages for any losses incurred by PwC as a result of breach of contract, negligence or other tort committed by Client, regardless of the theory of liability asserted, is limited to no more than [_____(__) times] the total amount of fees paid to PwC for the services provided under this SOW.

**5.2   [Insert terms specific to Project – [*consult sample SOWs for practice group*]]**

**5.3 For engagements that will take over a year:** Because adverse income tax consequences may result from assignment of personnel at project sites for an engagement for a year or more, such personnel may annually be required by PwC to break from providing services to Client. PwC will monitor its staff on the long-term expense reimbursement policy and will inform Client prior to such break. If Client does not want to release personnel from performing Services for the aforementioned period, Client shall pay to PwC the amount of compensation provided by PwC to its personnel to cover the tax consequences thereof.

**5.4 If applicable:** Client shall provide reasonable workspace, administrative support, computer facilities and other support, which are necessary to perform

19

**Master Services Agreement**
**Dated _____, 200__**

the Services.   Client shall perform the tasks and provide the assistance described in this SOW.   Client shall ensure that it has appropriate back up, security and virus-checking procedures for any computer facilities, information or materials it provides.   Client consents to the use, by staff visiting or working from the Client site, of the Client's resources, including, but not limited to network, Internet and extranet access, for the purpose of accessing similar resources.   Client agrees to perform in a timely fashion those tasks and provide the personnel agreed to by the Parties and set forth herein.

**IN WITNESS WHEREOF,** the Parties to the above referenced Agreement have caused this SOW to be executed by their authorized representatives.

| PricewaterhouseCoopers LLP | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |
| Signature | Printed Name | Title | Date |
| **DELPHI CORPORATION** | | | |
| Authorized Signature | Printed Name | Title | Date |
| Authorized Signature | Printed Name | Title | Date |

20

Exhibit 2

Statement Of Work For Sarbanes-Oxley 404 Services

`

**Statement of Work ("SOW") - Number \_\_\_**
**Between Delphi Corporation and PricewaterhouseCoopers LLP**

**Project Name:** Sarbanes-Oxley 404 ("SOX") Services

This SOW is governed under the Master Professional Services Agreement (the "Agreement")
dated February 15, 2006 between Delphi Corporation ("Delphi" or "Client") and
PricewaterhouseCoopers LLP, ("PwC") and is fully incorporated therein.  All terms used in
this SOW and not otherwise defined will have the same meaning as in the Agreement.

## I.    *PURPOSE AND SCOPE OF THIS SOW:*

This SOW covers the provision of SOX services for the period beginning February 15, 2006.
This SOW confirms the understanding of the objectives, deliverables, timing, staffing and fees
for this project/effort.

## II.    *PARTIES' RESPONSIBILITIES UNDER THIS SOW*

### 2.1    Services to be provided by PwC:

At Client's request PwC will provide project assistance under the direction of Mr. David A.
Bayles, related to Client's requirements under Section 404 of the Sarbanes Oxley Act of 2002
(SOX 404) as set forth herein and as related to the Client's overall SOX 404 management
certification testing and remediation plans, as periodically amended and / or requested.  In
connection with this project, PwC will assist Mr. Bayles by providing all of the services in the
manner, at the locations and within the times as set forth in Delphi's RFQ: RED-001-06 of
January 13, 2006 and as amended by an Addition dated January 23, 2006, Sections 2.2 and 3.1
through 3.15, both of which are attached hereto, incorporated hereby and made a part of this
SOW.

Our SOX 404 services are intended for the benefit of the management of Client and will not be
planned or conducted in contemplation of reliance by any third party, other than Client's
external auditors as outlined in Section 2.3 of this SOW, or with respect to any specific
transaction.  Therefore, items of a possible interest to a third party may not be specifically
addressed, or matters may exist that would be assessed differently by a third party, possibly in
connection with a specific transaction.  PwC acknowledges no responsibility to any such party
except to the extent that such responsibility may exist under law.  Any final report prepared as
a deliverable under this arrangement is for the use of management and cannot be shared with
any third party, other than Client's external auditor as outlined in Section 2.3, without PwC's
prior written consent.  Each party further agrees that it shall not discuss with third parties the

fact or substance of this engagement, or make any reference to the other with respect to this engagement with third parties without the other's prior written consent.

### 2.2    PwC Deliverables:

In addition to the services provided in Section 2.1 and the process improvements provided for in Section 4.2, PwC will perform the following:

(a)    In order to facilitate external audit reliance as contemplated in Section 2.3, at each testing location specifically identified by management and listed in Exhibit B (which will be updated during the project period) PwC will provide a binder or binders that contain the following:

    (i)    A summary report of the test results;

    (ii)    The testing templates and work papers;

    (iii)    Copies of all samples and or items tested;

    (iv)    Any walkthrough diagrams and/or narratives;

    (v)    Any deficiencies found, copies of remediation plans as approved by Client, remediation testing templates, work papers, copies of test samples, and summary results;

    (vi)    Anything else which PwC deems useful in order to assist management to achieve its objectives for compliance with Section 404.

(b)    Entering into or attaching into Certus all relevant and required data.

(c)    Where requested, assist testing location management with identification of possible remediation activities.  In addition, as requested, PwC will provide advice to management's regarding its implementation of the remediation activities.

(d)    Once testing location management believes that any issues have been remediated, perform additional testing to determine if controls have been effectively remediated.  For purposes of this remediation testing, PwC agrees that both time and staff consistency are of the essence and PwC commits to maintaining staff consistency wherever possible.

(e)    PwC staff will use best efforts to return calls from Client within 24 hours.

To facilitate the reliance by Client's external auditors, PwC and Client agree to establish and agree upon the level and quality of documentation to be prepared as part of Section 2.2(a) above.

### 2.3    External Auditor Reliance:

All SOX 404 testing, retesting or validation work contemplated by this SOW will be done by PwC in accordance with AICPA Consulting standards and in such a manner that it may be

2

relied upon by Client's external auditors as contemplated by PCAOB standards. Simultaneous
to executing this SOW, PwC will obtain a release from both Client and Client's external
auditors in the format shown in Exhibit C to enable the sharing of work papers with Client's
external auditors.

### 2.4    Management's Responsibilities:

Client management is responsible for establishing and maintaining effective internal controls.

PwC has not been engaged to, and will not, perform management functions, make
management decisions, or act or appear to act in a capacity equivalent to that of an employee
or otherwise engage in any activity that in the judgment of PwC would be inappropriate in the
capacity for performing the services as set forth in this SOW.

Client is responsible for making available to PwC, upon request, all of the necessary
information and company personnel to whom PwC can direct inquiries to perform its services
as set forth in this SOW.

PwC will make specific inquiries of Client management when performing the services as set
forth in this SOW.  PwC intends to rely upon the results of its SOX audit procedures and the
responses to its inquiries in forming its findings.

Because of the importance of oral and written representations to effectively perform the
services as set forth in this SOW, Client releases PwC from any and all claims, liabilities, costs
and expenses attributable to any knowing misrepresentation by Client.

### 2.5    In addition to the engagement limitations set forth in Section 15 in the Agreement:

PwC's engagement does not constitute an audit, examination or other attestation, the objective
of which is the expression of an opinion on financial statements, on other subject matter or on
Client's assertion.  Accordingly, PwC will not express such an opinion.

PwC is responsible for performing the services set forth in this SOW in accordance with the
terms of the Agreement and this SOW and reporting its findings thereon.  The day-to-day
performance of the services as set forth in this SOW will be directed, reviewed, and supervised
by PwC.

PwC will communicate to Client any illegal act, material errors or evidence that fraud may
exist identified during the course of providing the services as set forth in this SOW.

### 2.6    Timing

The timing of the services to be provided hereunder is as follows:

| Project Start Date: | February 15, 2006 |
|---|---|
| Estimated Project Completion Date: | March 31, 2007 |

## III.  RESOURCES ASSIGNED TO THIS SOW

The PwC leadership team assigned to provide services and deliverables under this SOW are as follows:

Brian Decker, Global Engagement Partner
Mark Mendola, Global Relationship Partner
Stasi Brown, Engagement Director
Shannon Herbst, Engagement Manager
Dave Erickson, Lead IT Partner
Dennis Wojdyla, IT Managing Director
Scott Osterman, SAP Director
Brian Towhill, Territory Leader - Europe
Adolfo Ramirez, Territory Leader - Latin America
Patrick Fitzgerald, Territory Leader - Asia Pacific

This leadership team will assign additional personnel as necessary throughout the course of the project.

## IV.  PAYMENT; EXPENSES; AND INVOICES

### 4.1    Payment Terms

Payment terms are consistent with the terms in Section 4. of the Master Professional Services Agreement.

### 4.2    Professional Fees and Expenses

PwC's fees are based on the time required by the individuals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and experience and skill required.  See attached Appendix A for billing rates by personnel level and country. Expenses will be billed in accordance with the terms in Section 3. of the Master Professional Services Agreement.

### 4.3    Fees at Risk

As part of the engagement as set forth by this SOW, PwC will identify process improvements, both within the SOX 404 process as well as within the underlying financial processes, that if implemented would reduce Client's overall costs by $5 million or more per year.

4

To the extent that PwC does not identify at least that level of savings during calendar 2006, PwC's fees for the services provided under this SOW will be reduced up to $1 million, proportionately on the level of savings identified.

The savings identified by PwC must be agreed to by Client (both in process and total savings amount) before being considered as part of the $5 million commitment and must make reasonable economic sense in the business condition and under the market constraints that Client is in at the time that each process improvement is identified.

All process improvements will be evaluated at a monthly meeting and confirmed in writing by the agreement of both Parties at the monthly meeting following.

Should it be necessary, and to fulfill the terms of this section, Client will withhold payment of the last $1 million (or proportionate share thereof) of fees to PwC prior to 2006 year-end verification of the total amount of process improvements is agreed upon.

### 4.4    Reliance Credit

To the extent that Client's external auditors do not rely upon PwC's SOX 404 testing, retesting or validation work, Client and PwC agree to meet to discuss specific reasons for Client's external auditors' lack of reliance.  To the extent that the lack of reliance is the result of a failure by PwC to comply with Sections 2.2 and 2.3 of this SOW, PwC will provide a credit (or return of fee if no further work is required) to Client in the amount of the fees charged for the work which did not meet the requirements of said Sections.

In the alternative, PwC may fix the deficiency in the SOX 404 work, to the extent that it is able, to gain reliance by Client's external auditors without additional charge in fees or costs to Client.


## V.    *OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW*

### 5.1    Other matters

While Client personnel may have access to and may use PwC proprietary technology and material during the course of the engagement, PwC does not grant a license in the PwC proprietary technology and material that do not form part of the deliverables to Client.

**5.2**    In the event PwC is requested or authorized by Client or required by government regulation, subpoena, or other legal process to produce its working papers or its personnel as witnesses with respect to its engagement for Client, Client will, so long as PwC is not a party to the proceeding in which the information is sought, reimburse PwC for our professional time and expenses, as well as the reasonable fees and expenses of its counsel, incurred in responding to such a request.

**5.3**   Client shall provide reasonable workspace, administrative support, computer facilities and other support, which are necessary to perform the Services. Client shall perform the tasks and provide the assistance described in this SOW. Client and PwC shall ensure that it has appropriate back up, security and virus-checking procedures for any computer facilities, information or materials it provides. Client consents to the use, by staff visiting or working from the Client site, of the Client's resources, including, but not limited to network, Internet and extranet access, for the purpose of accessing similar resources. Client agrees to perform in a timely fashion those tasks and provide the personnel agreed to by the parties and set forth herein.

**5.4**   In providing PwC with access to Client's network, the Internet and Client's extranet, PwC will complying with all of the following:

(a) PwC will comply with the Client's Information Security Policy which will be made available to PwC.

(b) PwC is responsible and accountable for ensuring that all PwC devices attaching to Client's network have the most current version of anti-virus software. The type of anti-virus software and the manner in which updates shall be enabled shall be documented and provided to Client.

(c) PwC is responsible and accountable for ensuring that all PwC devices attaching to Client's network are maintained with current patch levels for all Operating Systems and applications. The manner in which updates shall be enabled shall be documented and provided to Client.

(d) PwC shall encrypt Client information classified as "Delphi SECRET" or "Delphi CONFIDENTIAL" and any personal information stored on a laptop or servers used by PwC. Communications shall be secure (i.e., SSL/VPN, secret/confidential files sent encrypted, etc.). PwC and Client to agree on which PwC personnel should be issued and utilize Client e-mail accounts (PwCConsultant@delphi.com).

(e) PwC shall not store Client information on a laptop for any longer than is necessary to fulfill a specific business need and must delete or transfer laptop data to a secure device as soon as practicable possible.

(f) PwC shall remove from the laptop in an irretrievable fashion all Client information and records at the completion of this SOW unless instructed otherwise by Client.

(g) Client reserves the right to audit anti-virus software or operating system patch levels for laptops being used by PwC personnel and/or to vary the device off-line from Client network at any time throughout PwC's performance of this SOW.

(h) PwC shall report any data spills or loss of a laptop to Delphi IT Security immediately.

(i) PwC shall maintain a listing of all PwC employees who perform services under this SOW and shall provide to Client regular updates to the list.

5.5   Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of Client, and excluding any liabilities associated with Client's obligations under Section 6(b), acknowledging that Deliverables will be provided to

Client's external auditors subject to PwC obtaining the release as set forth in Section 2.3 of this SOW and Section 11(d) of the Agreement, Client's liability to pay damages for any losses incurred by PwC as a result of Client's breach of contract, negligence or other tort committed by client regardless of the theory of liability asserted, is limited to no more than $1,000,000.

5.6    Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of PwC, PwC's liability to pay damages for any losses incurred by Client as a result of PwC's breach of contract, negligence or other tort committed by PwC regardless of the theory of liability asserted, is limited to no more than the total mount of two times the fees paid to PwC under this SOW.

**IN WITNESS WHEREOF,** the parties to the above referenced Agreement have caused this SOW to be executed by their authorized representatives.

| PwC LLP | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |
| *PricewaterhouseCoopers LLP* | Brian Decker | Partner | Feb. 15, 2006 |
| Delphi Corporation | | | |
| Authorized Signature | Printed Name | Title | Date |
| | DAVID A. BAYLES | Director, Sarbanes-Oxley Compliance & Internal Control | May 11, 2006 |
| Authorized Signature | Printed Name | Title | Date |
| *Kevin Smith* | Kevin Smith | Director GSM Indirect | May 11, 2006 |

# PRICEWATERHOUSE COOPERS 🅒

**PricewaterhouseCoopers LLP**
1900 St. Antoine Street
Detroit MI 48226-2263
Telephone (313) 394 6000
Facsimile (313) 394 6555
www.pwc.com

Exhibit C

February 16, 2006

Mr. David A. Bayles
Delphi Corporation

Dear Mr. Bayles:

In connection with the integrated audit of the consolidated financial statements of Delphi Corporation, a Delaware corporation ("Client") for the year ending December 31, 2006 in accordance with generally accepted auditing standards, you have asked PricewaterhouseCoopers LLP to agree to provide Ernst & Young LLP, your financial statement auditors, with copies of the working papers prepared as part of the services performed under Statement of Work (SOW) Number _____ and to discuss with them the work we have carried out in connection with their auditing procedures under Statement on Auditing Standards No. 65 (AU 322), *The Auditor's Consideration of the Internal Audit Function in an Audit of Financial Statements* and Auditing Standard No. 2, *An Audit of Internal Control over Financial Reporting Performed in Connection with an Audit of the Financial Statements.*  It is expected that Ernst & Young LLP will treat materials and information made available to them in their AU 322 review as confidential client information in accordance with Section 301 of the American Institute of Certified Public Accountants Code of Professional Conduct.

We confirm we will provide full cooperation to Ernst & Young LLP, on the understanding our reports were addressed to you and have been prepared on your instructions under the terms of our SOW effective February 15, 2006.

The workpapers prepared as part of performing services in accordance with SOW Number _____ were prepared for the benefit of the management of Delphi Corporation. Our internal audit work and the related internal audit working papers were not intended for the benefit of Ernst & Young LLP and should not be taken to supplant other inquiries and procedures that Ernst & Young LLP should undertake for the purpose of satisfying itself regarding its opinion on the consolidated financial statements of Delphi Corporation and the scope of its audit work.  We accept no responsibilities in this regard except for that which is set forth in SOW #_____.

Client agrees to indemnify and hold harmless PwC and the global network of PricewaterhouseCoopers firms, the partners, principals or employees of PwC or the PricewaterhouseCoopers Firms from and against any claim that is asserted by or on behalf of any of the business operations in which Client has a direct or indirect controlling interest and that are receiving Services or Benefits of Services under the Agreement (collectively "Service Recipients") other than Client arising out of or relating to the Services and/or Deliverables provided under the Agreement, and all liabilities, costs, damages and expenses imposed or incurred in connection therewith, including reasonable attorneys' fees.

# PRICEWATERHOUSECOOPERS 🅿

PwC is the US member firm of the global network of PricewaterhouseCoopers firms (exclusive of PwC, the "PricewaterhouseCoopers Firms"). In the course of providing the Services and/or Deliverables to Client under the Agreement, PwC, may, in its discretion, draw on the resources of and subcontract to other PricewaterhouseCoopers Firms. Client agrees that PwC may provide any information PwC receives in connection with this engagement to other PricewaterhouseCoopers Firms for the purpose of providing the Services and/or for internal administrative and regulatory compliance purposes. The provision of Services and/or Deliverables will remain the responsibility of PwC. Client agrees that in relation to the Services and this Agreement, its relationship is solely with PwC. Client further agrees that no PricewaterhouseCoopers Firms, nor the partners, principals or employees of PwC or the PricewaterhouseCoopers Firms (together the "Beneficiaries"), who perform work in connection with the Services and/or Deliverables will have any liability to Client in connection with the Services or this Agreement. Client therefore agrees to bring any claim under this Agreement against PwC and not to bring a claim of any nature against any such PricewaterhouseCoopers Firm relating to the Services, Deliverables or this Agreement except where such a claim cannot be excluded by law.

We will provide Ernst & Young LLP with a copy of this letter.

Please confirm your agreement with the foregoing by signing and dating a copy of this letter and returning it to PricewaterhouseCoopers LLP.

Very truly yours,

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP

Acknowledged by:

**Delphi Corporation**

By: *Kevin Smith*
(Name of company official)

*Director, GSM Indirect*
(Title)

*5/11/06*
(Date)

(2)

# PRICEWATERHOUSE COOPERS

We acknowledge that we read the foregoing and understand that access to PwC's working papers is provided on the basis stated above.

*Ernst & Young LLP*

_____, PARTNER
**(Signature and title)**

_____5/10/06_____
**(Date)**

(3)

Exhibit 3

Statement Of Work For Executive Personal Financial Planning Services

**Statement of Work ("SOW")**
**Between Delphi Corporation and PricewaterhouseCoopers LLP**


Project Name:  <u>Executive Personal Financial Planning Services</u>


This SOW is governed under the Master Professional Services Agreement (the "Agreement") dated <u>March 17, 2006,</u> between Delphi Corporation ("Client") and PricewaterhouseCoopers LLP, ("PwC") and is fully incorporated therein.  All terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.


I.      **PURPOSE AND SCOPE OF THIS SOW:**

This SOW covers <u>tax planning services and personal financial planning services</u>.  This SOW confirms the understanding of the objectives, deliverables, timing, staffing and fees for this project/effort.


II.     **PARTIES' RESPONSIBILITIES UNDER THIS SOW**


    2.1     **Services to be provided by PwC:**

        Tax Planning Services
        . Assistance with income tax projections
        . Modeling tax impact of company benefits
        . Modeling tax impact of life events
        . Withholding and estimated tax payment sufficiency analyses

        Personal Financial Planning Services
        . Cash flow and debt management
        . Stock options
        . Educational funding
        . Retirement planning
        . Retirement distributions
        . Investment strategies
        . Estate tax minimization
        . Wealth distribution


    2.2     **Deliverables:  Analyses, recommendations and assistance.**


    2.2     **Client's  Responsibilities:**

        . Provide PwC with a list of authorized executives who may receive services in terms of this agreement.

. Provide accurate compensation information for each authorized
executive.
. Provide detailed information regarding company benefits and retirement
plans.

**2.3   Timing:  We are prepared to begin working with your team
immediately.**

The timing of the services to be provided hereunder is as follows:

| Project Start Date: | 1/1/2006 |
|---|---|
| Estimated Project Completion Date: | 3/31/2007 |

## III.   RESOURCES ASSIGNED TO THIS SOW

The PricewaterhouseCoopers personnel assigned to provide services and deliverables
under this SOW are as follows:  Detroit Office Personal Financial Planning Group.

## IV.   PAYMENT; EXPENSES; AND INVOICES

**4.1   Payment Terms:**  No changes from Agreement

**4.2   Professional Fees and Expenses:**

Total charges will be $6,000 per participant per year, except that the initial
year of services will be approximately. $11,000 per participant.  The fee
for certain specified individuals on the Strategy Board will be $2,000
higher.

## V.   OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW

**5.1   Limitation of Liability:**  Except to the extent finally determined to have
resulted from the gross negligence or intentional misconduct of PwC,
PwC's liability to pay damages for any losses incurred by Client as a result
of breach of contract, negligence or other tort committed by PwC,
regardless of the theory of liability asserted, is limited to no more than the
total amount of fees paid to PwC for the services provided under this
SOW. Except to the extent finally determined to have resulted from the
gross negligence or intentional misconduct of client or in connection with
Client's violation of its obligations under section 6(b) of the Agreement,
Client's liability to pay damages for any losses incurred by PwC as a result
of breach of contract, negligence or other tort committed by Client,
regardless of the theory of liability asserted, is limited to no more than the
total amount of fees paid to PwC for the services provided under this
SOW.

**5.2   N/A**

**5.3 For engagements that will take over a year:**  Because adverse income tax
consequences may result from assignment of personnel at project sites for an
engagement for a year or more, such personnel may annually be required by
PwC to break from providing services to Client.  PwC will monitor its staff on
the long-term expense reimbursement policy and will inform Client prior to
such break.   If Client does not want to release personnel from performing
Services for the aforementioned period, Client shall pay to PwC the amount of
compensation provided by PwC to its personnel to cover the tax consequences
thereof.

**5.4 If applicable:**   Client shall provide reasonable workspace, administrative
support, computer facilities and other support, which are necessary to perform
the Services.   Client shall perform the tasks and provide the assistance
described in this SOW.  Client shall ensure that it has appropriate back up,
security   and   virus-checking   procedures   for   any   computer   facilities,
information or materials it provides.   Client consents to the use, by staff
visiting or working from the Client site, of the Client's resources, including,
but not limited to network, Internet and extranet access, for the purpose of
accessing similar resources. Client agrees to perform in a timely fashion those
tasks and provide the personnel agreed to by the Parties and set forth herein.

**IN WITNESS WHEREOF,** the Parties to the above referenced Agreement have caused
this SOW to be executed by their authorized representatives.

| PricewaterhouseCoopers LLP | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |
| *Michael Dast* | *Michael Cenko* | *Partner* | *4/25/06* |
| Signature | Printed Name | Title | Date |
| | | | |
| **DELPHI CORPORATION** | | | |
| Authorized Signature | Printed Name | Title | Date |
| *[signature]* | *Debra S. Alexand* | *Exec Dir Global Corp* | *4-24-06* |
| Authorized Signature | Printed Name | Title | Date |
| | | | |

Exhibit 4

Statement Of Work For Tax Compliance-Foreign Affiliate Reporting

**Statement of Work ("SOW")**
**Between Delphi Corporation and PricewaterhouseCoopers LLP**


**Project Name:  <u>Tax Compliance - Foreign Affiliate Reporting</u>**


This SOW is governed under the Master Professional Services Agreement (the
"Agreement") dated <u>March 17, 2006,</u> between <u>Delphi Corporation</u> ("Client") and
PricewaterhouseCoopers LLP, ("PwC") and is fully incorporated therein.  All terms
used in this SOW and not otherwise defined will have the same meaning as in the
Agreement.


**I.    PURPOSE AND SCOPE OF THIS SOW:**

This SOW covers <u>tax compliance assistance in connection with the foreign affiliate</u>
<u>tax reporting requirements included in the 2005 Delphi consolidated US tax return.</u>
This SOW confirms the understanding of the objectives, deliverables, timing, staffing
and fees for this project/effort.


**II.    PARTIES' RESPONSIBILITIES UNDER THIS SOW**

**2.1 Services to be provided by PwC:**  Preparation of Forms 5471, 8858,
8865, and related forms and schedules.  This assistance will include
analysis and computations of U.S. earnings and profits and related
creditable income tax pools.  This assistance will also include analysis of
potential subpart F inclusions and the U.S. tax implications of dividend
distributions and related Section 902 credits.

Preparation of Form 1118 and related forms and schedules.  This
assistance will include analysis and computations of foreign source
income, the allocation and apportionment of expenses and available direct
and indirect foreign tax credits.

Compilation of intercompany transaction flow information for use in
transfer pricing analyses.  This assistance will include the preparation of a
trade flow summary based on information provided in Delphi's foreign
reporting packages.  The summary will include specific details on tangible
goods transactions, royalty payments and receipts, service charges, and
lending arrangements between Delphi affiliates around the world.  This
assistance may also include testing of pricing results from a U.S. transfer
pricing perspective against Delphi's expected outcomes.


**2.2    Deliverables:**  Requested assistance will be provided under the
direction and supervision of Delphi's tax department, and the final

responsibility for the review and submission of complete and accurate
tax returns and schedules will be with Delphi.

2.3    **Client's Responsibilities:**  Supervision of loan staff[covered in
section 5.4] and requisite financial information to perform the tax
compliance services.

2.4    **Timing:**  We are prepared to begin working with your team
immediately.  We will make the lead Senior Associate and Transfer
Pricing Associate available to you at your earliest convenience, and
will commit to making meeting your needs the priority in their
schedules until your 2005 returns are filed

The timing of the services to be provided hereunder is as follows:

| Project Start Date: | This is a continuation of the engagement under letter of February 14, 2006, accepted February 23, 2006. |
|---|---|
| Estimated Project Completion Date: | 6/15/2006 |

## III.    RESOURCES ASSIGNED TO THIS SOW

The PricewaterhouseCoopers personnel assigned to provide services and deliverables
under this SOW are as follows:   Don VanArsdalen, Curt Lawler, and Michael
Schuler.  Other tax professionals if needed.

## IV.    PAYMENT; EXPENSES; AND INVOICES

4.1    **Payment Terms:**  No changes from Agreement.

4.2    **Professional Fees and Expenses [list any taxes applicable]:**  For this
engagement, our fee is based on the number of hours of professional
time provided at the discounted hourly rate below plus reimbursement
of out-of-pocket expenses:
Senior Associate                          $ 155.00 / hour
Associate – Transfer Pricing        $ 125.00 / hour
Associate – Other                          $ 110.00 / hour
No applicable taxes.

## V.    OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW

5.1 **Limitation of Liability:** Except to the extent finally determined to
have resulted from the gross negligence or intentional misconduct of
PwC, PwC's liability to pay damages for any losses incurred by Client
as a result of breach of contract, negligence or other tort committed by
PwC, regardless of the theory of liability asserted, is limited to no more
than the total amount of fees paid to PwC for the services provided
under this SOW.  Except to the extent finally determined to have
resulted from the gross negligence or intentional misconduct of client
or in connection with Client's violation of its obligations under section
6(b) of the Agreement, Client's liability to pay damages for any losses
incurred by PwC as a result of breach of contract, negligence or other
tort committed by Client, regardless of the theory of liability asserted,
is limited to no more than the total amount of fees paid to PwC for the
services provided under this SOW.

5.2 **N/A**

5.3 **N/A**

5.4 **If applicable:** Client shall provide reasonable workspace, administrative
support, computer facilities and other support, which are necessary to
perform the Services.   Client shall ensure that it has appropriate back up,
security and virus-checking procedures for any computer facilities,
information or materials it provides.  Client consents to the use, by staff
visiting or working from the Client site, of the Client's resources, including,
but not limited to network, Internet and extranet access, for the purpose of
accessing similar resources.

**IN WITNESS WHEREOF,** the Parties to the above referenced Agreement have
caused this SOW to be executed by their authorized representatives.

| PricewaterhouseCoopers LLP | | | |
|---|---|---|---|
| Signature | Printed Name *Michael Cenko* | Title *Partner* | Date *4/25/06* |
| Signature | Printed Name | Title | Date |
| **DELPHI CORPORATION** | | | |
| Authorized Signature | Printed Name *James P. Whitson* | Title *Chief Tax Officer* | Date *19 Apr 2006* |
| Authorized Signature | Printed Name | Title | Date |

Exhibit 5

Statement Of Work For PwC WNTS Advocacy Series

**Statement of Work ("SOW")**
**Between Delphi Corporation and PricewaterhouseCoopers LLP**


**Project Name: PwC WNTS Advocacy Services**


This SOW is governed under the Master Professional Services Agreement (the
"Agreement") dated March 17, 2006, between Delphi Corporation ("Client") and
PricewaterhouseCoopers LLP, ("PwC") and is fully incorporated therein. All terms used
in this SOW and not otherwise defined will have the same meaning as in the Agreement.


**I.    PURPOSE AND SCOPE OF THIS SOW:**

This SOW covers various services relating to consulting and advocacy with respect to tax
policy, legislative and IRS administrative matters. This SOW confirms the understanding
of the objectives, deliverables, timing, staffing and fees for this project/effort.


**II.    PARTIES' RESPONSIBILITIES UNDER THIS SOW**

**2.1    Services to be provided by PwC:** This SOW covers Washington
National Tax Services (WNTS) retainer-based programs including the
Washington Tax Service (providing analysis of emerging tax issues of
importance to Delphi), the Tax Study Group (a discussion and analysis
forum of top tax executives) and the International Tax Policy Forum ( a
discussion and analysis forum of tax executives focused on international
tax policy issues). In addition to the periodic meetings, conference calls
and materials provided by these programs, this SOW also covers as needed
consulting and deliverables on emerging policy issues.


**2.2    Deliverables:** Memos, email correspondence, etc.


**2.3    Client's Responsibilities:** Attending meetings and conference calls on an
as needed basis.


**2.4    Timing:** As needed basis.

The timing of the services to be provided hereunder is as follows:

| Project Start Date: | 1/1/2006 |
|---|---|
| Estimated Project Completion Date: | 3/31/2007 |

## III.    RESOURCES ASSIGNED TO THIS SOW

The PricewaterhouseCoopers personnel assigned to provide services and deliverables
under this SOW are as follows:   Washington Tax Services personnel including Bob
Shapiro, Lindy Paul and Don Longano.

## IV.    PAYMENT; EXPENSES; AND INVOICES

**4.1    Payment Terms:** No changes from Agreement.

**4.2    Professional Fees and Expenses [list any taxes applicable]:**   The fee
for these services is a retained in the amount of $60,000 per year, invoiced
at $5,000 per month.   Reimbursement of out of pocket expenses will be
additionally invoiced.   No applicable taxes.

## V.    OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW

**5.1    Limitation of Liability:**   Except to the extent finally determined to have
resulted from the gross negligence or intentional misconduct of PwC,
PwC's liability to pay damages for any losses incurred by Client as a result
of breach of contract, negligence or other tort committed by PwC,
regardless of the theory of liability asserted, is limited to not more than the
fees paid to PwC for the services provided under this SOW.   Except to the
extent finally determined to have resulted from the gross negligence or
intentional misconduct of client or in connection with Client's violation of
its obligations under section 6(b) of the Agreement, Client's liability to
pay damages for any losses incurred by PwC as a result of breach of
contract, negligence or other tort committed by client, regardless of the
theory of liability asserted, is limited to no more than the total amount of
fees paid to PwC for the services provided under the SOW.

**5.2    Insert terms specific to Project –** Not applicable.

**5.3    If applicable:**   Not applicable.

**5.4    If applicable:**   Not applicable.

**IN WITNESS WHEREOF**, the Parties to the above referenced Agreement have caused
this SOW to be executed by their authorized representatives.

| PricewaterhouseCoopers LLP | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |
|  | Michael Peake | Partner | 4/25/06 |
| Signature | Printed Name | Title | Date |
|  |  |  |  |

| DELPHI CORPORATION | | | |
|---|---|---|---|
| Authorized Signature | Printed Name | Title | Date |
|  | James P. Whitson | Chief Exp Officer | 19 Apr 2006 |
| Authorized Signature | Printed Name | Title | Date |
|  |  |  |  |

Exhibit 6

Statement Of Work For Miscellaneous General Consulting Not Exceeding $20,000

**Statement of Work ("SOW")**
**Between Delphi Corporation and PricewaterhouseCoopers LLP**

**Project Name:  <u>Miscellaneous General Consulting Not Exceeding $20,000</u>**

This SOW is governed under the Master Professional Services Agreement (the
"Agreement") dated <u>March 17, 2006,</u> between <u>Delphi Corporation</u> ("Client") and
PricewaterhouseCoopers LLP, ("PwC") and is fully incorporated therein.  All terms used
in this SOW and not otherwise defined will have the same meaning as in the Agreement.

**I.    PURPOSE AND SCOPE OF THIS SOW:**

This SOW covers <u>miscellaneous general tax consulting including consulting with PwC's
U.S. and foreign offices and subscription/data services for accounting and miscellaneous
needs</u>.  This SOW confirms the understanding of the objectives, deliverables, timing,
staffing and fees for this project/effort.

**II.    PARTIES' RESPONSIBILITIES UNDER THIS SOW**

**2.1**    **Services to be provided by PwC:**  PwC will provide miscellaneous
general tax consulting services for projects not exceeding $20,000 per
project.

**2.2**    **Deliverables:**  Memos or emails, (oral conversations must be followed up
in a written memo or email).

**2.3**    **Client's Responsibilities:**  Providing facts and questions in written or
email form.

**2.4**    **Timing:**  As needed basis.

The timing of the services to be provided hereunder is as follows:

| | |
|---|---|
| Project Start Date: | 3/1/2006 |
| Estimated Project Completion Date: | 3/31/2007 |

**III.    RESOURCES ASSIGNED TO THIS SOW**

The PricewaterhouseCoopers personnel assigned to provide services and deliverables under this SOW are as follows: PwC partners or managers located in cities such as Detroit or Washington DC or foreign office locations.

## IV.    PAYMENT; EXPENSES; AND INVOICES

**4.1    Payment Terms:**  No changes from Agreement.

**4.2    Professional Fees and Expenses [list any taxes applicable]:**  Delphi negotiated hourly rates both within and without the US.  Responsibility for any applicable taxes will be negotiated in conjunction with the hourly rates.

## V.    OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW

**5.1    Limitation of Liability:**  Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of PwC, PwC's liability to pay damages for any losses incurred by Client as a result of breach of contract, negligence or other tort committed by PwC, regardless of the theory of liability asserted, is limited to no more than 10 times the total amount of fees paid to PwC for the services provided under this SOW that give rise to the liability.  Any liability arising in connection with the subscription/data services will be limited to fees paid.  Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of Client or in connection with Client's violation of its obligations under section 6(b) of the Agreement, Client's liability to pay damages for any losses incurred by PwC as a result of breach of contract, negligence or other tort committed by client, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to PwC for the services provided under this SOW.

**5.2    Insert terms specific to Project – N/A**

**5.3    For engagements that will take over a year:**  Because adverse income tax consequences may result from assignment of personnel at project sites for an engagement for a year or more, such personnel may annually be required by PwC to break from providing services to Client.  PwC will monitor its staff on the long-term expense reimbursement policy and will inform Client prior to such break.  If Client does not want to release personnel from performing Services for the aforementioned period, Client shall pay to PwC the amount of compensation provided by PwC to its personnel to cover the tax consequences thereof.

**5.4    If applicable:**  If the parties separately agree, Client shall provide reasonable workspace, administrative support, computer facilities and other support, which are necessary to perform the Services. Client shall ensure that it has appropriate back up, security and virus-checking

procedures for any computer facilities, information or materials it
provides. Client consents to the use, by staff visiting or working from the
Client site, of the Client's resources, including, but not limited to network,
Internet and extranet access, for the purpose of accessing similar resources.

**IN WITNESS WHEREOF**, the Parties to the above referenced Agreement have caused
this SOW to be executed by their authorized representatives.

| PricewaterhouseCoopers LLP | | | |
|---|---|---|---|
| Signature *Richard Peako* | Printed Name *Richard Peako* | Title *Partner* | Date *4/25/06* |
| Signature | Printed Name | Title | Date |
| **DELPHI CORPORATION** | | | |
| Authorized Signature *J.P. Whitson* | Printed Name *James P Whitson* | Title *Chief Tax Officer* | Date *19 APR 2006* |
| Authorized Signature | Printed Name | Title | Date |

Exhibit 7

Dispute Resolution Procedures

<u>Exhibit 7 - DISPUTE RESOLUTION PROCEDURES</u>

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in this Master Agreement.  If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

<u>Mediation</u>

A dispute shall be submitted to mediation by written notice to the other party or parties.  In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.  The mediator will be selected by Master Agreement of the parties.  If the parties cannot agree on a mediator, a mediator will be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party.  Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and agreed upon by the parties.  The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential.  The mediator may not testify for either party in any later proceeding relating to the dispute.  No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation.  The fees and expenses of the mediator will be shared equally by the parties.

<u>Arbitration</u>

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.  The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA ("AAA Rules').

Exhibit 8

PricewaterhouseCoopers Relationships Identified

## EXHIBIT 8 – PWC RELATIONSHIPS IDENTIFIED

This information is being provided in connection with the Affidavit of PricewaterhouseCoopers LLP in Connection with its Employment and Retention as Sarbanes-Oxley Advisors and Tax Advisors for the Debtors (the "Affidavit") (hereinafter, together with its affiliates, for this purpose only, "PricewaterhouseCoopers").  PricewaterhouseCoopers or its affiliates currently perform or have previously performed services as described in the Affidavit and/or in matters unrelated to these Chapter 11 Cases to the following individuals or entities or have other relationships with such entities, such as banking relationships.

### Conflicts Entities for Project Motown

#### Domestic Subsidiaries
| | |
|---|---|
| 7. | CEI Co., Ltd. (Tennessee) |
| 25. | Delphi Diesel Systems Corp. (Delaware) |
| 26. | Delphi Electronics (Holding) LLC (Delaware) |
| 49. | HE Microwave LLC (Delaware) |
| 52. | Packard Hughes Interconnect Company (Delaware) |

#### Foreign Subsidiaries
| | |
|---|---|
| 69. | Bujias Mexicanas, S.A. de C.V. (Mexico) |
| 84. | Daewoo Motor Co., Ltd. (Korea) |
| 140. | Delphi Electronic Suzhou Co. Ltd. (Peoples Republic of China) |
| 189. | KDS Company, Ltd. (Korea) |
| 196. | NSK Ltd. (Japan) |
| 199. | Packard Korea Incorporated (Korea) |
| 202. | PROSTEP AG (Federal Republic of Germany) |

#### Joint Owners of Subsidiaries
| | |
|---|---|
| 227. | Furukawa Electric North America APD, Inc. |
| 233. | Raytheon Company |
| 234. | Royce & Associates |
| 235. | RS Investments Management |

#### Customers
| | |
|---|---|
| 407. | Aftermarket Technology Corp. |
| 410. | AZ Automotive Corp. |
| 412. | BMW |
| 413. | Caterpillar Inc. |
| 414. | Collins & Aikman Corp. |
| 415. | Cummins Inc. |
| 416. | Daewoo Motor |
| 418. | DaimlerChrysler Corp., US |
| 421. | Denso |
| 423. | Ford Motor Co. |
| 424. | Fuji Heavy Industries |

**EXHIBIT 8 - PWC RELATIONSHIPS IDENTIFIED**

| | |
|---|---|
| 425. | General Motors Corp. |
| 426. | GM Powertrain |
| 439. | Mitsubishi Motors of America Credit Co. |
| 441. | Navistar International Corporation |
| 447. | Renault |
| 452. | Toyota Motor Credit Corporation |
| 453. | TRW |
| 454. | Volvo Truck |
| 456. | Yorozu |
| 463. | Applied Biosystems |
| 466. | Cambrex Bio Science |
| 469. | Caterpillar Engine Systems |
| 476. | Hewlett-Packard Co. |
| 479. | Inogen |
| 484. | Johnson Controls Inc. (JCI) |
| 488. | L-3 Communications |
| 493. | Medtronic Navigation |
| 497. | Niton Corporation |
| 506. | StorageTek |

**Insurance Providers**

| | |
|---|---|
| 517. | ACE American Insurance Company |
| 518. | AIG/American International Group, Inc. |
| 519. | Allied World Assurance Company, AWAC |
| 520. | American International Companies |
| 522. | AON Risk Services of Illinois |
| 523. | AON Risk Services, Inc. |
| 525. | CIGNA Behavioral Health |
| 526. | CIGNA Corp. |
| 533. | Hewitt Associates |
| 534. | JLT Services |
| 535. | Lexington Insurance Companies |
| 539. | MetLife |
| 551. | University of Michigan |
| 553. | Zurich American Insurance Company |
| 554. | ACE USA |
| 555. | AIG World Source |
| 557. | American International Specialty Lines Insurance Company |
| 560. | GEP |
| 566. | Lloyds of London |
| 567. | Marsh USA, Inc. (Broker) |
| 568. | Tokio Marine |
| 570. | AIG Excess Casualty North America (Lexington) |
| 573. | AON UK |
| 575. | AXIS |
| 578. | Continental Casualty Co. (C.N.A) |

## EXHIBIT 8 - PWC RELATIONSHIPS IDENTIFIED

| | |
|---|---|
| 579. | Federal Ins. Co. (Chubb) |
| 584. | National Union Fire Ins. Co. (AIG) |
| 585. | Pacific Employers Insurance Co. (ACE USA) |
| 591. | ACE Insurance Co. |
| 592. | AIG WorldSource |
| 595. | ANR Pipeline Company |
| 601. | Panhandle Eastern Pipeline Company |
| 604. | The Hartford |

**Vendors**

| | |
|---|---|
| 608. | 3M Company |
| 637. | Cie Automotive Sa |
| 642. | Dayco Products LLC |
| 644. | Deloitte & Touche |
| 646. | Dhl Danzas Air & Ocean |
| 658. | General Electric Capital Corporation |
| 659. | General Electric Co. Inc. |
| 676. | Kyocera |
| 688. | Metropolitan Life Ins. Co. |
| 689. | Microsoft Services |
| 712. | Qek Global Solutions |
| 717. | Securitas Security |
| 721. | Siemens Automotive Ltd. |
| 722. | Siemens AG |
| 732. | Thyssenkrupp AG |
| 736. | TRW Automotive |
| 737. | TT Electronics PLC |
| 740. | Umicore Sa |
| 742. | US Steel Corporation |
| 748. | Visteon Automotive Systems |
| 753. | Bayer AG |
| 756. | Equistar Chemicals LP |
| 759. | GKN PLC |
| 761. | Henkel KGAA |
| 763. | Intec Group Inc., The |
| 774. | Norandal |
| 780. | PFG |
| 784. | PMP |
| 791. | Shell Oil |
| 795. | Swatch Group |
| 806. | SIRVA Relocation LLC |
| 807. | EI Dupont de Nemours & Co. Inc. |
| 812. | Daihatsu |
| 816. | Wal-Mart Stores CE |
| 821. | Hub Group |
| 838. | ATF |

## EXHIBIT 8 - PWC RELATIONSHIPS IDENTIFIED

| | |
|---|---|
| 844. | Dana Corporation |
| 852. | Exxon Mobile Corp. |
| 871. | Pechiney Rolled Products |
| 878. | TI Group Automotive System |
| 883. | Corus LP |
| 885. | Aisin Seiki Co Ltd |
| 888. | Delta |
| 892. | State of Michigan |
| 905. | Saab Automobile AB |
| 908. | Amphenol Corp |
| 909. | Asahi Glass Co |
| 912. | British Vita PLC |
| 918. | International Rectifier Corp |
| 921. | Mitsubishi Electric |
| 927. | Rohm Co Ltd |
| 933. | Sumitomo Electric Industries Ltd |
| 934. | Taiho Corporation of Europe Kft |
| 936. | TPG Advisors |

**Professionals**

| | |
|---|---|
| 943. | Fidelity Employer Services Company LLC |
| 944. | Fidelity Institutional Retirement Services Company |
| 967. | FTI Consulting, Inc. |
| 973. | KPMG LLC |
| 981. | McCann-Erickson |
| 982. | MIT |
| 989. | Saloman Smith Barney |
| 990. | Sapient |
| 997. | TBM |
| 1000. | TSSC |
| 1003. | Watson Wyatt & Company |
| 1008. | O'Melveny & Meyers, LLP |
| 1025. | Det Norske Veritas |
| 1041. | TPI |
| 1046. | Calwest |
| 1066. | Parsons |
| 1067. | Paul Hastings Janofsky & Walker LLP |

**Indenture Trustees**

| | |
|---|---|
| 1081. | Bank One Trust Company N.A. |
| 1082. | J.P. Morgan Trust Company, N.A. |

**Underwriters of Securities**

| | |
|---|---|
| 1086. | ABN AMRO Incorporated |
| 1088. | Banc of America Securities LLC |
| 1089. | Barclays Capital Inc. |

# EXHIBIT 8 - PWC RELATIONSHIPS IDENTIFIED

| | |
|---|---|
| 1091. | BNP Paribas Securities Corp |
| 1093. | Citigroup Global Markets Inc. |
| 1095. | Credit Suisse First Boston LLC |
| 1097. | Deutsche Bank Securities Inc. |
| 1099. | HSBC Securities Inc. |
| 1100. | J.P. Morgan Securities Inc. |
| 1103. | Merrill Lynch, Pierce, Fenner & Smith Incorporated |
| 1105. | Morgan Stanley & Co. Incorporated |
| 1106. | Oppenheimer & Co. Inc. |
| 1116. | U.S. Bancorp Piper Jaffray Inc. |
| 1117. | UBS Securities LLC |
| 1119. | Wachovia Capital Markets, LLC |
| 1120. | Wells Fargo Van Kasper LLC |

## Unions
| | |
|---|---|
| 1161. | United Steelworkers of America |

## Counterparties to Major Leases
| | |
|---|---|
| 1168. | Ford Motor Land Development Corporation |
| 1178. | Wells Operating Partnership, L.P. |

## Counterparties to Major Contracts
| | |
|---|---|
| 1183. | Alabama Gas Corporation |
| 1185. | Alltel |
| 1186. | Ameritech Information Systems, Inc. |
| 1189. | Applera Corporation |
| 1190. | ARL |
| 1191. | AT&T Corporation |
| 1192. | AT&T Solutions, Inc. |
| 1193. | AT&T Wireless |
| 1203. | Consumers Energy |
| 1215. | El Paso Electric Co. TX |
| 1227. | Honeywell International |
| 1230. | Indiana-American Water Company |
| 1251. | Nextel Communications |
| 1266. | SBC Ameritech |
| 1267. | SBC Global Services, Inc. |
| 1268. | SkyTel |
| 1269. | Southern California Edison |
| 1273. | Tennessee Valley Authority |
| 1274. | Time Warner |
| 1277. | TXU Energy Retail Company LP |
| 1288. | Bell South |
| 1299. | Ericsson AB |
| 1302. | IBM Corporation |
| 1310. | Lucent Technologies Inc. |

**EXHIBIT 8 - PWC RELATIONSHIPS IDENTIFIED**

| | |
|---|---|
| 1314. | MMT SA |
| 1318. | Nokia Corporation |
| 1322. | Satyam |
| 1325. | TCS |

**Lenders**

| | |
|---|---|
| 1333. | Banc One Capital Markets, Inc. |
| 1335. | Jupiter Securitization Corporation |
| 1336. | ABN AMRO Bank N.V. |
| 1340. | JPMorgan Bank, N.A. |
| 1341. | Wachovia Bank, National Association |
| 1344. | Michigan Strategic Fund |
| 1346. | Citicorp Securities, Inc. |
| 1353. | Regions Bank |
| 1355. | A3 Funding LP |
| 1356. | Ableco Finance LLC |
| 1357. | Agricultural Bank of China |
| 1365. | Bank of America, N.A. |
| 1366. | Bank of China Luxembourg SA |
| 1367. | Bank of New York |
| 1368. | Bank of Nova Scotia |
| 1369. | Bank of Toyko Mitsubishi Company |
| 1370. | Barclays Bank PLC |
| 1371. | BNP Paribas |
| 1376. | Citibank N.A. |
| 1377. | Citigroup Financial Products Inc. |
| 1380. | Credit Industriel et Commercial |
| 1381. | Deutshce Bank AG |
| 1382. | Deutsche Bank Trust Company America |
| 1383. | Dymas Funding Company LLC |
| 1385. | Fifth Third Bank, Eastern Michigan |
| 1386. | Goldman Sachs Credit Partners L.P. |
| 1390. | HSBC Bank USA, National Association |
| 1392. | Lehman Commercial Paper, Inc. |
| 1393. | Mizuho Corporate Bank Ltd. fka DKB |
| 1394. | Morgan Stanley Senior Fundings, Inc. |
| 1395. | Protective Life Insurance Company |
| 1396. | Sequils Ing I, Ltd. |
| 1398. | Societe Generale SA New York |
| 1399. | Special Situations Investing Group |
| 1400. | Sumitomo Mitsui Banking Corporation |
| 1405. | UBS AG, Stamford Branch |
| 1406. | UBS Loan Finance LLC |
| 1407. | UFJ Bank Limited |
| 1410. | Sea Pines Funding LLC |
| 1412. | Citicorp Vendor Finance, Inc. |

**EXHIBIT 8 - PWC RELATIONSHIPS IDENTIFIED**

| | |
|---|---|
| 1417. | Whitney Private Debt Fund LP |
| 1418. | Bear Stearns Investment Products |
| 1421. | Access Institutional Loan Fund |
| 1425. | Ahab Partners, L.P. |
| 1426. | Airlie Opportunity Master Fund, Ltd |
| 1428. | AMMC CLO |
| 1433. | Atrium |
| 1437. | BDC Finance LLC |
| 1441. | Boldwater Credit Opportunities |
| 1443. | Boston Income Portfolio |
| 1450. | Castle Garden Funding |
| 1451. | Castle Hill |
| 1458. | Colonial Funding LLC |
| 1472. | Duma Master Fund LP |
| 1473. | Dunes Funding LLC |
| 1481. | Flagship CLO |
| 1484. | Forstress Credit Funding |
| 1486. | Galaxy |
| 1492. | Guggenheim Portfolio Company XII |
| 1494. | Harbour Town Funding LLC |
| 1495. | High Income Portfolio |
| 1496. | Highland Floating Rate |
| 1498. | IDS Life Insurance Company |
| 1522. | Metropolitan West |
| 1525. | Muirfield Trading LLC |
| 1526. | National City Bank |
| 1529. | Oak Hill Securities Fund |
| 1530. | OCM High Yield Plus Fund LP |
| 1531. | Octagon Investment Partners |
| 1532. | Panton Master Fund LP |
| 1534. | PIMCO Floating |
| 1536. | Pioneer Floating Rate Trust |
| 1542. | Prospect Funding I, LLC |
| 1543. | Putnam Investments |
| 1546. | Quattro |
| 1547. | R2 Top Hat, Ltd. |
| 1548. | Race Point |
| 1549. | Red Fox Funding LLC |
| 1551. | Riviera Funding LLC |
| 1554. | Rosemont CLO, Ltd. |
| 1555. | Salomon Brothers Variable Rate |
| 1556. | Sankaty High Yield Partners |
| 1561. | SEI Institutional Managed TST |
| 1570. | Stanfield |
| 1571. | SunTrust Bank Atlanta |
| 1572. | TCW |

## EXHIBIT 8 - PWC RELATIONSHIPS IDENTIFIED

| 1574. | The Foothill Group Incorporated |
| 1581. | Watershed Capital |
| 1582. | Waterville Funding LLC |
| 1585. | Western Asset Floating Rate |

**Litigation Parties**

| 1700. | Opel Hungary/GMPT |
| 1704. | Denso Corporation |
| 1706. | DHB-CA |
| 1708. | DSL Net Inc. |
| 1713. | Energy Conversions Systems (ECS) f/k/a Morganite |
| 1724. | First Technology |
| 1747. | HPI |
| 1752. | ICG |
| 1781. | Lockheed Martin Corp. |
| 1793. | Means Industrial, Inc. |
| 1810. | NGK Spark Plugs USA, Inc. |
| 1820. | Paragon/CJR |
| 1833. | Praxair Surface Technologies |
| 1863. | Siemens VDO Automotive AG (SVDO) |
| 1891. | Grundig Multimedia B.V. |
| 1894. | ESS, Inc. |
| 1899. | Valeo Electrical Systems, Inc. |
| 1900. | Valeo Switches and Detection Systems, Inc. |
| 1923. | Bentley Rolls-Royce |
| 1947. | CWI |
| 1952. | DMS NA |
| 1959. | Epsilon |
| 1982. | Honeywell ACS Sensing & Control |
| 2016. | MCI Telecommunications Corporation |
| 2021. | Opel |
| 2062. | Arnold & Porter |
| 2075. | Eftec North America, LLC |
| 2093. | Invensys |
| 2115. | Krupp-Hoersch |
| 2128. | Mubea, Inc. |

**Holders of 5% or More of Equity Security of Company**

| 2161. | Capital Group International, Inc. |
| 2162. | Capital Research & Management Company |
| 2163. | Dodge & Cox |
| 2164. | State Street Bank and Trust Company |
| 2165. | Brandes Investment Partners, LLC |

**Noteholders Holding 5% or More of Insurance Notes of Company**

| 2168. | Lehman Brothers, Inc. |

**EXHIBIT 8 - PWC RELATIONSHIPS IDENTIFIED**

2169.   Mellon Trust

**Objecting/Adverse Parties/Postpetition Parties**

2174.   A. Schulman, Inc.
2177.   Autocam Corporation
2180.   Concordia Advisors LLC
2185.   DOTT Industries, Inc.
2187.   Elliot & Associates
2189.   Fujikura America, Inc.
2207.   SBC Communications Inc.
2215.   XM Satellite Radio, Inc.
2216.   Alcan Rolled Products-Ravenswood, LLC
2217.   Baker Hughes Incorporated
2219.   BASF Corporation
2220.   Datwyler Inc.
2222.   GKN Sinter Metals, Inc.
2223.   Greer Stop Nut, Inc.
2224.   Hexcel Corporation
2229.   Koyo Corporation
2234.   NSS Technologies, Inc.
2242.   Saturn Electronics
2246.   SPS Technologies Waterford Company
2247.   SPS Technologies, LLC
2249.   Sumitomo Corporation of America
2251.   TRW Canada Limited
2252.   TRW Electronica Ensambles S.A. de C.V.
2253.   TRW Vehicle Safety Systems, Inc.
2254.   Valeo Climate Control Corp.
2259.   Barnes Group Inc.
2262.   Cadillac Rubber & Plastic
2264.   Daewoo International (America) Corp.
2271.   Sojitz Corporation of America
2272.   Sony Electronics, Inc.
2285.   CSX Transporation, Inc.
2287.   Appaloosa Management L.P.
2294.   Law Debenture Trust Company Of New York
2300.   Thermo NITON Analyzers LLC
2303.   Deutsch Dagan Ltd.

**Master Service List and 2002 List**

2310.   APL Co. Pte Ltd.
2318.   Capro, Ltd.
2319.   Cerberus Capital Management, L.P.
2326.   CoorsTek, Inc.
2328.   Daishinku (America) Corp.
2330.   Davis Polk & Wardwell

**EXHIBIT 8 - PWC RELATIONSHIPS IDENTIFIED**

2348.   McDermott Will & Emery LLP
2354.   National City Commercial Capital
2357.   Pacific Gas Turbine Center, LLC
2360.   Priority Health
2364.   Quaker Chemical Corporation
2365.   Rassini, S.A. de C.V.
2368.   SANLUIS Rassini International, Inc.
2370.   Simpson Thatcher & Bartlett LLP
2376.   Teleflex Automotive Manufacturing Corporation
2377.   Teleflex Incorporated
2378.   Teleflex Morse (Capro)
2380.   Thermotech Company
2381.   Thyssenkrupp Stahl Company
2382.   Thyssenkrupp Waupaca, Inc.
2385.   Toyota Tsusho America, Inc.
2402.   AP Racing
2407.   Bibielle S.p.A.
2410.   Brembo S.p.A.
2420.   Doosan Infracore America Corp.
2443.   Kuss Corporation
2452.   MeadWestvaco Corporation
2458.   Moody's Investors Service
2459.   National Instruments Corporation
2462.   Nichicon (America) Corporation
2466.   Oasis SiliconSystems AG
2472.   Orbotech, Inc.
2473.   Parlex Corporation
2476.   Precision Mold and Tool Group
2479.   Reliable Castings
2486.   Siemens Logistics Assembly Systems, Inc.
2487.   Silver Point Capital, L.P.
2490.   SMSC NA Automotive, LLC
2494.   Special Devices, Inc.
2495.   Standard Microsystems Corporation
2496.   Stanley Electric Sales of America, Inc.
2497.   Sumco, Inc.
2498.   Taiho Corporation of America
2502.   The Proctor & Gamble Company
2505.   UGS Corporation
2506.   Umicore Autocat Canada Corporation

**SUPPLEMENTAL LISTS RUN**

**Additional Parties**
2529.   Aramark Services, Inc.
2531.   Paul Hastings Janofsky & Walker LLP

# EXHIBIT 8 - PWC RELATIONSHIPS IDENTIFIED

2535.   Iron Mountain Information Management, Inc.

2539.   AB Automotive, Inc.

2543.   Aman Environmental Construction, Inc.

2544.   Arabian Battery Holding Company

2545.   Corning Incorporated

2549.   Ameritech Credit Corporation

2551.   SBC Capital Services

### Additional 2002 Parties

2556.   Appaloosa Management L.P. (Rerun)

2558.   Interpublic Group of Companies, Inc.

2562.   Union Pacific Railroad Company

### Additional Retained Professionals

2573.   Davis Polk & Wardwell

2587.   Wilmer, Cutler, Pickering, Hale & Dorr LLP