**Hearing Date and Time: June 16, 2006 at 10:00 a.m.**
**Objection Deadline: June 13, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
          In re                               :     Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :     Case No. 05-44481 (RDD)
                                              :
                                              :     (Jointly Administered)
                    Debtors.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 1121(d) EXTENDING
DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE
AND SOLICIT ACCEPTANCES OF REORGANIZATION PLAN

("1121(d) EXCLUSIVITY SECOND EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 1121(d) extending the Debtors' exclusive periods within which to file and solicit acceptances of a plan of reorganization. In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors. No trustee or examiner has been appointed in the Debtors' cases. On April 28, 2006, the Office of the United States Trustee appointed an official committee of equity holders.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

2

4.    The statutory predicates for the relief requested herein are section 365 of the Bankruptcy Code and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.    In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-represented employees.  This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

13.    These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits.[3]  Contemporaneously therewith, the

---

[3]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

Debtors also moved to reject unprofitable supply contracts with GM.[4]  Among the reasons

for the GM contract rejection motion was the Debtors' belief that GM must cover a greater

portion of the costs of manufacturing products for GM at plants that bear the burden of the

Debtors' legacy costs.  This initial motion covers approximately half of the Debtors' North

American annual purchase volume revenue from GM but only 10% of the Debtors' total

contracts with GM.  Although the filing of these motions was a necessary procedural step,

the Debtors remain focused on reaching a consensual resolution with all of Delphi's unions

and GM before a hearing on the motions is necessary.

14.    To implement the third element of the Debtors' transformation plan,

the Company announced plans to focus its product portfolio on those core technologies for

which the Company has significant competitive and technological advantages and expects

the greatest opportunities for increased growth.   To that end, the Company will

concentrate the organization around the following core strategic product lines: (a) Controls

& Security (Body Security, Mechatronics, Power Products, and Displays), (b)

Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection

Systems, and Electrical Centers), (c) Entertainment & Communications (Audio,

Navigation, and Telematics), (d) Powertrain (Diesel and Gas Engine Management

Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal

(Climate Control & Powertrain Cooling).[5]

---

[4]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033).

[5]    The Company does not expect the portfolio changes to have a significant impact on its independent
aftermarket or consumer electronics businesses.  Similarly, the Company does not expect an impact on
medical, commercial vehicles, or other adjacent-market businesses and product lines.

7

15.    In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines.  The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented, the Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17.    As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007.  Despite the freeze, because of the size of

8

the funding deficit, it will also be necessary for the Debtors to obtain relief from the

Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of

Labor, and potentially Congress, to amortize funding contributions over a long-term

period.  The Company intends to replace the hourly plan (for certain employees) and the

salaried plan with defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect

to emerge as a stronger, more financially sound business with viable U.S. operations that

are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will

marshal all of its resources to continue to deliver high-quality products to its customers

globally.  Additionally, the Company will preserve and continue the strategic growth of its

non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

19.    As set forth in the Order Pursuant to 11 U.S.C. § 1121(d) Extending

the Debtors' Exclusive Periods Within Which to File and Solicit Acceptances of a Plan of

Reorganization (Docket No. 1749) entered by this Court on January 6, 2006 (the

"Exclusivity Order"), the Debtors have the exclusive right to file one or more

reorganization plans through and including August 5, 2006 (the "Plan Proposal Period")

and the exclusive right to solicit and obtain acceptances for such plan through and

including October 4, 2006 (the "Solicitation Period," and together with the Plan Proposal

Period, the "Exclusive Periods").

20.    By this Motion, the Debtors seek entry of an order further extending

(i) the Plan Proposal Period through and including February 1, 2007 and (ii) the

Solicitation Period through and including April 2, 2007, without prejudice to the Debtors'

right to seek further extensions of the Exclusive Periods.

<u>Basis For Relief</u>

21.    The Exclusive Periods are intended to afford chapter 11 debtors a full

and fair opportunity to rehabilitate their business and to negotiate and propose a

reorganization plan without the deterioration and disruption of their business that might be

caused by the filing of competing reorganization plans by nondebtor parties.

22.    The sheer size and complexity of the Debtors' cases alone justifies an

extension of the Exclusive Periods.  A review of certain basic statistics make the foregoing

conclusion self-evident:

(a)    As noted above, at the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets;

(b)    the Debtors' global 2004 revenues were approximately $28.62 billion, and its global assets as of May 1, 2006 for the period ending December 31, 2004 were approximately $16.59 billion;

(c)    as of the filing, the Debtors employed approximately 50,600 people in the technical centers.  Ninety-six percent of the Debtors' 34,750 hourly employees were represented by approximately 49 different international and local unions under various collective bargaining agreements.  The Debtors' foreign entities employed more than 134,000 people supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide;

(d)    on January 20, 2006, the Debtors filed their Schedules of Assets and Liabilities (Schedules or SOALs) and Statements of Financial Affairs (Statements or SOFAs). In the aggregate, the Schedules and Statements for the 42 Debtors include more than 20,000 scheduled liabilities and nearly 347,000

10

scheduled executory contracts and unexpired leases, which
collectively comprise roughly 22,000 pages of information;

(e)     on April 20, 2006, the Debtors provided more than 580,000
parties with notice of the order establishing bar dates for
filing proofs of claim; and

(f)     in the eight months since the Debtors' chapter 11 filings
more than 4,100 entries have been filed on the docket, an
average of approximately 25 entries per business day.

23.    The Debtors' cases are further complicated by other factors including
their long history with GM, their former parent and still their largest customer, and the
disadvantageous labor contracts the Debtors inherited from GM upon separation in 1999.
Before the Debtors may propose a plan of reorganization, the Debtors must address
numerous issues including the re-pricing of parts supplied to GM and the current litigation
and negotiations with the various labor unions to reduce the increasingly unsustainable
U.S. legacy liabilities and to eliminate operational restrictions imposed by collectively
bargained agreements that prevent the Debtors from exiting non-strategic, non-profitable
operations.

24.    To ensure that realizing these objectives is possible, the Debtors
require more time than the current Exclusive Periods, to position their businesses to
execute the transformation plan and formulate, promulgate, and build consensus for a plan
of reorganization.  This request should come as no surprise to any party in interest because
the Debtors publicly announced in their October 8, 2005 press release at the
commencement of their chapter 11 cases that the Debtors hoped to emerge from
bankruptcy in early to mid-2007, which telegraphed the Debtors' need to extend the
Exclusive Periods.  Consistent with this statement, the Debtors stated, on the record at the

11

January 5, 2006 hearing in connection with the Debtors' initial request for an exclusivity

extension that a further extension of time would be sought.  The requested extension will

not prejudice other parties, but will allow the Debtors to concentrate their efforts on

systematically working towards a viable business and reorganization plan.  The Debtors

submit that under these circumstances the Debtors' requested extension of the Plan

Proposal Period through February 1, 2007 and the Solicitation Period through April 2,

2007 is justified.

<u>Applicable Authority</u>

25.    Section 1121(d) of the Bankruptcy Code permits the court to extend a

debtor's exclusive periods upon a demonstration of cause:

> On request of a party in interest made within the respective
> periods specified in subsections (b) and (c) of this section
> and after notice and a hearing, the court may for cause
> reduce or increase the 120-day period or the 180-day period
> referred to in this section.

11 U.S.C. § 1121(d).  Although the term "cause" is not defined in the statute, the

legislative history states that it is intended to be a flexible standard to balance the

competing interests of a debtor and its creditors.  <u>See</u> H.R. Rep. No. 95-595 at 232 (1977),

<u>reprinted</u> <u>in</u> 1978 U.S.C.C.A.N. 5963, 6191 (bankruptcy courts are given flexibility to

increase the 120-day period depending on the circumstances of the case).  Moreover,

whether "cause" exists to extend a debtors' exclusive periods to file and solicit acceptances

of a plan is a decision committed to the sound discretion of the bankruptcy court based

upon the facts and circumstances of each particular case.  <u>See</u> <u>In re Texaco, Inc.</u>, 76 B.R.

322, 325 (Bankr. S.D.N.Y. 1987).  In determining whether a debtor has had an adequate

opportunity to negotiate a plan of reorganization and solicit acceptances thereof, a court

should consider a variety of factors to assess the totality of circumstances.  See In re Ames

Dep't Stores, Inc., 1991 WL 259036, at *2 (S.D.N.Y. Nov. 25, 1991); In re McLean Indus.,

Inc., 87 B.R. 830, 833-34 (Bankr. S.D.N.Y. 1987).

26.    The court in McLean Indus. identified the following factors as

relevant to the determination of "cause" to extend a debtor's Exclusive Periods:

> (a)    the size and complexity of the debtor's case;
>
> (b)     the existence of good faith progress towards reorganization;
>
> (c)    a finding that the debtor is not seeking to extend exclusivity to pressure creditors "to accede to [the Debtor's] reorganization demands";
>
> (d)    existence of an unresolved contingency; and
>
> (e)    the fact that the debtor is paying its bills as they come due.

In re McLean Indus., 87 B.R. at 834; accord In re Hoffinger Indus., Inc., 292 B.R. 639, 644

(B.A.P. 8th Cir. 2003) (stating that not all factors "are relevant in every case" and court has

discretion to "decide which factors are relevant and give the appropriate weight to each").

When evaluating these factors, the goal is to determine whether a debtor has had a

reasonable opportunity to negotiate an acceptable plan with various interested parties and

to prepare adequate financial and non-financial information concerning the ramifications of

any proposed plan for disclosure to creditors.  See, e.g., In re McLean, 87 B.R. at 833-34;

In re Texaco, 76 B.R. at 326.

27.    In other cases of similar size and complexity to the Debtors' cases,

courts have extended the debtors' exclusivity rights to propose a plan of reorganization for

periods similar to those requested by the Debtors.  See, e.g., In re Delaco Co., Case No. 04-

13

10899 (PCB) (Bankr. S.D.N.Y. 2004) (granting initial extension of five months and total

extensions of approximately 16 months);  In re Enron, Case. No. 01-16034 (AJG) (Bankr.

S.D.N.Y. 2001) (granting initial extension of six months and total extensions of

approximately 15 months); In re Bethlehem Steel, Case No. 01-15288 (BRL) (Bankr.

S.D.N.Y. 2001) (granting initial extension of five and a half months and total extensions of

more than 17 months); In re Kmart Corporation, Case No. 02-02474 (Bankr. N.D. Ill.

2002) (granting initial extension of nine months and aggregate exclusivity for more than 17

months);  In re Kaiser Aluminum Corp., Case No. 02-10429 (Bankr. D. Del. 2002)

(granting initial extension of six months and total extensions of approximately 43 months).

In this case, based upon the preceding factors and in line with other cases of similar size

and complexity, sufficient cause exists for a six month extension of the Exclusive Periods.

A.      These Cases Are Large And Complex

        28.    The size and complexity of the Debtors' chapter 11 cases alone

constitutes sufficient cause to extend the Exclusive Periods.  See, e.g., In re Texaco Inc., 76

B.R. 322, 326 (Bankr. S.D.N.Y. 1987); see also H.R. Rep. No. 595, 95th Cong., 1st Sess.

231, 232, 406 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6191, 6362 ("[I]f an unusually

large company were to seek reorganization under Chapter 11, the Court would probably

need to extend the time in order to allow the debtor to reach an agreement."); In re Express

One  Int'l, Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) ("The traditional ground for

cause is the large size of the debtor and the concomitant difficulty in formulating a plan of

reorganization").  These and other authorities show that in large, complex chapter 11 cases

courts consistently extend the debtor's exclusive periods to afford the debtor time to

stabilize its business, analyze reliable information to diagnose problems, and formulate a long-term business plan before commencing the plan of reorganization process.

29.    As stated above, the Debtors' cases are certainly large and complex. A debtor's chapter 11 case need not even approach the size of these cases to justify an extension of the exclusive periods based on size and complexity.  See, e.g., In re United Press Int'l, 60 B.R. 265, 270 (Bankr. D.D.C. 1986) ($40 million company granted extension of exclusive periods based on size and complexity of case; "In many much smaller cases, involving far less complications, two or three years go by before the debtor is in a position to file a plan").  Thus, by any measure, the Debtors' chapter 11 cases are sufficiently large and complex to warrant an extension of the Exclusive Periods under the foregoing authorities.  Moreover, in addition to the typical issues that can be anticipated to arise in a large chapter 11 case, the Debtors face numerous significant issues that are unique to the automobile industry (an industry which, as a whole, is in distress) affecting the Debtors' ability to formulate and execute a viable business plan.

B.    The Debtors Have Made Good Faith Progress Toward Reorganization

30.    An extension of a debtor's exclusive periods also is justified by a debtor's progress in resolving issues facing its creditors and estates. In re Amko Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996).  The Debtors' progress in these cases thus far is significant and compels an extension of the Exclusive Periods.

31.    The Debtors have made great strides in reaching its goal of completing the restructuring process.  As announced on March 31, 2006 and described above, the Debtors have focused on the following five key areas and have made significant progress on each front.

15

(a)    **Key area:** Modifications to labor contracts to create a competitive arena in which to conduct business going forward.

**Progress:** Litigation has commenced in connection with the Debtors' motions under sections 1113/1114 of the Bankruptcy Code seeking authority to reject U.S. labor agreements and to modify retiree benefits. On a parallel track, the Debtors continue to negotiate with their unions in an attempt to reach a consensual resolution.

(b)    **Key area:** Attempting to conclude negotiations with GM to finalize GM's financial support and to ascertain GM's business commitment to Delphi going forward.

**Progress:** On March 31, 2006, the Debtors filed their initial motion to reject unprofitable supply contracts with GM. On June 5, 2006, GM filed its supplemental objection to the Debtors' motion. Discussions surrounding the Debtors' motion have been ongoing. In addition, negotiations regarding forward looking revenue commitments are also in process.

(c)    **Key area:** Streamlining Delphi's product portfolio to capitalize on Delphi's world class technology and market strengths, and make the necessary manufacturing alignment with this new focus.

**Progress:** Delphi announced which of its product lines have been deemed "core" and "non-core," which will be sold or wound-down.

(d)    **Key area:** Transforming Delphi's salaried workforce to ensure that Delphi's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.

**Progress:** Delphi announced reductions it will be making in the size of its salaried workforce and benefits provided to these employees.

(e)    **Key area:** Devising a workable solution to Delphi's current pension situation.

**Progress:** Among other things, the Debtors intend to freeze the current hourly U.S. pension plan as of October 1, 2006

16

and the current U.S. salaried pension plan as of January 1, 2007. The Debtors anticipate that both plans will be replaced with defined contribution plans.

32.     As mentioned above, a key area of progress in these chapter 11 cases is the Debtors' efforts to modify their labor agreements. The motion for authority to reject the Debtors' collective bargaining agreements is an essential procedural step to enable the Debtors to take necessary action in the absence of a consensual resolution. On May 9, 2006 the hearing under sections 1113 and 1114 of the Bankruptcy Code commenced. During the weeks leading up to this hearing the Debtors were immersed in negotiations with their unions and preparation for the hearing. The Debtors presented twelve witnesses in support of their motion and the unions intend to present more than a dozen witnesses. Currently, the parties have designated 327 exhibits. Hearings were held on May 9, 10, 12, 24 and 26, 2006, and June 2, 2006. It is anticipated that the court will schedule additional hearing dates.

33.     With respect to the Debtors' current unprofitable supply contracts with GM, Delphi has discussed the necessity of GM covering a greater portion of the costs of manufacturing products for GM at plants that bear the burden of their legacy costs. In an effort to address this need, on March 31, 2006, the Debtors delivered a letter to GM initiating a process to reset the terms and conditions for more than 425 commercial agreements that expired between October 1, 2005, and March 31, 2006. Contemporaneously, the Debtors filed a motion to reject certain executory contracts between Delphi and GM. As a result of this motion the Debtors and GM have been

17

involved in extensive discovery over the last several weeks.  Additionally, the Debtors and

GM continue negotiations related to this matter.

34.    In addition to the foregoing, since the Debtors last sought an extension

of the initial Exclusivity Periods, the Debtors have also:

(a)    reached an agreement with the UAW and GM on a special
hourly attrition plan, which included the opportunity for
UAW-represented Delphi employees to retire from GM;[6]

(b)    continued to manage and preserve the Debtors' relationship
with suppliers pursuant to the authority granted by this Court
under the essential supplier order, foreign vendor order, and
supplier assumption agreement procedures order;

(c)    negotiated with suppliers pursuant to the supplier agreement
assumption procedures order and successfully extended
approximately 99.5% of all expiring supply agreements
which were necessary to the Debtors' on-going operation;
and

(d)    received approval for the annual incentive portion of their
Key Employee Compensation Program (with modifications)
for the period ending June 30, 2006.

35.    Thus, the Debtors are clearly making good faith progress towards their

reorganization.  Nevertheless there is still significant progress to be made.

C.    Unresolved Contingencies Still Exist

36.    Courts have also cited the need to resolve an important contingency as

justification for extending a debtor's exclusivity periods.  In this case, as described in detail

above, in addition to all the other matters that the Debtors are managing in these cases, the

---

[6]    On May 18, 2006 Wilmington Trust Company ("WTC"), as indenture trustee to the Debtors' senior notes
and debentures, filed a notice of appeal regarding the order approving this plan (Docket No. 3813).  In
its statement of issues to be presented on appeal (Docket No. 3961) and on May 30, 2006 WTC filed its
designation of items to be included in the record on appeal and statement of issues.  In addition, on May
31, 2006, Appaloosa Management L.P., Wexford Capital LLC, and Lampe Conway and Company LLC
filed an untimely notice of appeal regarding the Court approved attrition plan (Docket No. 3974).

Debtors' current 1113/1114 litigation, their prosecution of the GM contract rejection, and their execution and implementation of the Transformation Plane alone should all satisfy the existence of an unresolved contingency as described in the multi-factor test set forth in the McLean Industries case.

D.    The Debtors Are Using Exclusivity For A Proper Purpose

37.    Courts have denied extensions of exclusive periods when plan negotiations among parties in interest have broken down and the continuation of exclusivity would but merely give the debtor unfair bargaining leverage over the other parties in interest.  See In re Lake in the Woods, 10 B.R. 338, 345 (Bankr. E.D. Mich. 1981).  Here, the Debtors' request for an extension of the Exclusive Periods is not a negotiation tactic merely a reflection of the fact that these cases still are not yet ripe for the formulation and confirmation of a viable plan of reorganization.  Indeed, as mentioned above, even upon the commencement of these chapter 11 cases, the Debtors announced in a press release on October 8, 2005 that they hoped to emerge in early to mid-2007.   This Motion is entirely consistent with the Debtors' initial projections.

38.    Furthermore, the Debtors and their professionals have consistently conferred with their constituencies on all major substantive and administrative matters in these cases, often incorporating other positions in deference to the views of the official committee of unsecured creditors ("Creditors' Committee"), the prepetition and postpetition lenders, their largest shareholders and the U.S. Trustee.  Moreover, the Debtors have begun to meet with the newly-appointed official committee of equity holders and their counsel in these chapter 11 cases. The Debtors will, of course, continue to meet

19

with each of these constituencies to facilitate constructive and consensual negotiations going forward.

E.       The Debtors Are Paying Their Bills As They Come Due

39.    Courts considering an extension of exclusivity may also assess a debtor's liquidity and solvency.  See In re Ravenna Indus., 20 B.R. 886, 890 (Bankr. N.D. Ohio 1982).  This court has approved for use by the Debtors a $4.5 billion financing package.  In addition, the Debtors are paying their bills as they come due.

40.    As described above, cause exists to extend the Exclusive Periods without prejudice to the Debtors' rights to seek a further extension. There is no harm in granting the requested extensions now because they will be without prejudice to the right of any party to request a termination of exclusivity for cause at any time under section 1121(d) of the Bankruptcy Code.  Accordingly, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, and other parties-in-interest.

Notice

41.    Notice of this Motion has been provided in accordance with the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824) ("Supplemental Case Management Order").  In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of

this Motion and the need for expedited relief. [7]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

42.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[7]    The Debtors have noticed this Motion for hearing at the June 16, 2006 regularly-scheduled omnibus hearing in these cases in compliance with the Supplemental Case Management Order.  Pursuant to the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard at the June omnibus hearing.  Because this Motion is being filed on less than 20 days' notice, parties-in-interest will have until June 13, 2006 to file an objection.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) extending the Debtors' exclusive periods to file and solicit acceptance of a plan of reorganization through and including February 1, 2007 and April 2, 2007, respectively, and (ii) granting the Debtors such other further relief as is just.

Dated: New York, New York
      June 6, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

22