**Hearing Date and Time: June 16, 2006 at 10:00 a.m.**
**Objection Deadline: June 13, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)


   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession


Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698


Delphi Legal Information Website:
http://www.delphidocket.com


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :
         In re                           :     Chapter 11
                                         :
DELPHI CORPORATION, et al.,              :     Case No. 05-44481 (RDD)
                                         :
                                         :     (Jointly Administered)
                 Debtors.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


   MOTION FOR ORDER UNDER 11 U.S.C. §§ 363, 502, AND 503 AND FED. R. BANKR. P.
9019(b) AUTHORIZING DEBTORS TO COMPROMISE OR SETTLE CERTAIN CLASSES
OF CONTROVERSY AND ALLOW CLAIMS WITHOUT FURTHER COURT APPROVAL

("SETTLEMENT PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 363, 502, and 503 and Fed. R. Bankr. P. 9019(b) authorizing the Debtors to compromise or settle certain classes of controversy in these chapter 11 cases, including, but not limited to, the settlement of disputes in certain commercial transactions that are not in the ordinary course of business and the allowance of both prepetition claims and administrative expense claims within those classes, pursuant to guidelines and notice procedures, without further court approval.  In support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity security holders (the "Equity Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 363,

502, and 503 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") had

global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues, and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from the

Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from
       Delphi and its worldwide subsidiaries and affiliates.

3

assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

        8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

        9.      The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

---

[2]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

12.    In connection with the first two elements of the Company's transformation

plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those

discussions, Delphi has consistently communicated a clear message to both its hourly workforce

and GM: Delphi is committed to finding a consensual resolution to its issues and intends to

continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S.

operations. To that end, Delphi, GM and the UAW recently received this Court's approval of a

tripartite agreement providing for a special hourly attrition program for Delphi's UAW-

represented employees (the "Hourly Attrition Program"). This special hourly attrition program

could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly

employees with "soft landings" through retirement attrition programs and GM flowbacks.

Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions,

which could provide as many as 4,500 additional hourly employees with retirement programs or

incentives.

13.    These hourly attrition programs constitute an important first step in

implementing the Debtors' transformation plan, but will not resolve all of the issues related to

Delphi's uncompetitive labor agreements. Moreover, Delphi has not yet reached comprehensive

agreements with its unions and GM. Therefore, on March 31, 2006, Delphi moved under

sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements

and to modify retiree benefits.[3] Contemporaneously therewith, the Debtors also moved to reject

unprofitable supply contracts with GM.[4] Among the reasons for the GM contract rejection

motion was the Debtors' belief that GM must cover a greater portion of the costs of

manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs. This

initial motion covers approximately half of the Debtors' North American annual purchase

volume revenue from GM but only 10% of the Debtors' total contracts with GM. Although the

---

[3]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

[4]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033).

filing of these motions was a necessary procedural step, the Debtors remain focused on reaching

a consensual resolution with all of Delphi's unions and GM.

14.    To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which the

Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.   To that end, the Company will concentrate the organization

around the following core strategic product lines: (a) Controls & Security (Body Security,

Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture

(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)

Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics),

and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.    In contrast, the Company similarly identified certain non-core product

lines that do not fit into its future strategic framework, including Brake & Chassis Systems,

Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering,

and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines

(which will include approximately one-third of its global manufacturing sites) and will consult

with its customers, unions, and other stakeholders to carefully manage the transition of such

affected product lines.  The Company intends to sell or wind down the non-core product lines

and manufacturing sites by January 1, 2008.

---

[5]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket
or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial
vehicles, or other adjacent-market businesses and product lines.

16.     As part of its organizational restructuring, the fourth element of the

Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as

many as 8,500 employees as a result of portfolio and product rationalizations and initiatives

adopted following an analysis of the Company's selling, general, and administration ("SG&A")

cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented,

the Company should realize savings of approximately $450 million per year in addition to

savings realized from competitive measures planned for its core businesses and the disposition of

non-core assets.

17.     As noted above, the final key tenet of the transformation plan is to devise

a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the

benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors'

hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current

hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension

plan as of January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will

also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation,

the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize

funding contributions over a long-term period.  The Company intends to replace the hourly plan

(for certain employees) and the salaried plan with defined contribution plans.

18.     Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

### Relief Requested

19. By this Motion, the Debtors seek authority to compromise or settle certain

classes of controversy in these chapter 11 cases, including, but not limited to, the settlement of

disputes in certain commercial transactions that are not in the ordinary course of business and the

allowance of both prepetition claims and postpetition claims within those classes, pursuant to

guidelines and notice procedures (as set forth below, the "Settlement Procedures"), without

further court approval.

### Basis For Relief

20. In the course of operating a Fortune 100 business, disputes regularly arise

between the Debtors and other parties concerning a host of matters. These disputes include

claims of governmental agencies regarding environmental, health, safety, and other regulations;

terms and conditions of a contract; and disputes regarding accounts receivable and payable

between the Debtors and businesses with which the Debtors interact.

21. Such disputes will inevitably arise in these chapter 11 cases. The Debtors

seek authority from this Court pursuant to Bankruptcy Rule 9019(b) to resolve certain classes of

controversy that are outside the Debtors' ordinary course of business without further hearing and

notice, except as provided by the procedures outlined below. These procedures would not apply

to settlements that (a) resolve any controversy arising or that arose in the ordinary course of

business as the Debtors are already permitted to settle these claims in any event under section

363(c) of the Bankruptcy Code, (b) are already authorized under another order entered by this

Court, or (c) compromise or settle a dispute that arose outside the ordinary course of business

where the final amount of the compromise or settlement is greater than (a) $20 million for

general unsecured prepetition controversies or (b) $10 million for prepetition secured, prepetition

priority, or postpetition controversies.

22.     Given the large number of disputes the Debtors anticipate resolving during

the course of these cases, the costs associated with an individualized approach to obtaining court

approval of those settlements would not be economical.  Indeed, by way of example, five of the

17 matters heard at the May omnibus hearing were motions brought by the Debtors pursuant to

Bankruptcy Rule 9019 seeking authority to enter into various settlements.  This piecemeal

process increases the administrative burden on the Court in these cases.  This Court has already

granted the Debtors authority to settle certain types of disputes, including reclamation claims

and, under the final debtor-in-possession financing order, certain setoff claims.  These settlement

procedures have saved the Debtors considerable time and resources, thereby preserving value for

the benefit of the estates, and the Debtors anticipate that the Settlement Procedures proposed in

this Motion will similarly benefit the Debtors' estates, creditors, and other parties-in-interest by

streamlining the process of settling claims and controversies.

A.     Classes Of Controversies

23.     The Debtors seek authority to resolve both prepetition and postpetition

controversies without further Court approval, provided that the final amount of the compromise

or settlement is a sum that is less than or equal to $20 million for general unsecured prepetition

controversies and $10 million for prepetition secured, prepetition priority, and postpetition

controversies.  Specifically, the Debtors expect that such controversies would include:  (a)

disputes regarding any obligations owed by third parties to the Debtors, or other claims of the

Debtors against third parties, (b) disputes with regulatory or other governmental or quasi-

governmental agencies, and (c) other claims or controversies which, in the Debtors' business

judgment, affect the ability of the Debtors to operate, manage, or otherwise conduct their

businesses.

24.     The Debtors propose that all prepetition controversies resulting in

monetary claims against the Debtors be resolved by the determination and allowance of a claim

that would be treated in accordance with a confirmed plan of reorganization.  The Debtors do not

seek to make payment on any prepetition claims at this time.  Moreover, the Debtors do not, by

this Motion, seek to institute a large-scale prepetition claims reconciliation process of the

thousands of prepetition claims the Debtors anticipate will be filed against these estates.  That

process will be undertaken at a later date.  Instead, the Debtors anticipate that, from time to time,

the best terms for settling certain prepetition claims may arise prior to establishment of the

claims reconciliation process.  In those instances, the Debtors believe that it would be in the best

interests of the Debtors' estates, their creditors, and other parties-in-interest to settle such claims

pursuant to the Settlement Procedures.  All postpetition claims settled in accordance with the

Settlement Procedures would be paid by the Debtors in the ordinary course of business.

25.     Prompt settlement of claims that the Debtors have that are outside the

ordinary course of business is an essential element of preserving and enhancing the Debtors' cash

flow.  A cost-effective resolution of these claims enhances the Debtors' estates.  In the case of the

various regulatory claims, frequent administrative or judicial proceedings and ongoing oversight

by regulatory agencies demand the time and resources of the Debtors' personnel and

professionals, distracting them from the Debtors' restructuring efforts and depleting the estates'

assets.  In many instances, these disputes also involve the relevant agency's police or regulatory

power, and therefore are not stayed by the provisions of section 362 of the Bankruptcy Code.  In

other cases, the agency may allege a continuing violation if no action is taken, making the

dispute one with potentially both prepetition and postpetition elements.

26.    Many of these controversies are ripe for settlement.  The Debtors therefore

seek to establish these Settlement Procedures to facilitate the recovery of money or other assets

of or obligations to the estates, timely resolve pre- or postpetition claims on the most

advantageous terms available to the Debtors, or resolve any regulatory or other operating issues

of the Debtors without the need to return to this Court for approval of each of these settlements.

These Procedures will promote judicial economy and will maximize value for the benefit of the

estates.

A.    Settlement Procedures

27.    Under the proposed procedures, negotiations would be primarily handled

by the employees, agents, and other business persons of the Debtors who would normally handle

such disputes in the absence of these chapter 11 cases.  The Debtors would maintain internal

approval procedures, however, to monitor the dispute resolution process and to provide notice to

specified parties in interest as set forth below.

28.    Subject to the reporting requirements set forth in paragraphs 31 and 32

below, the settlement process would be subject to the following simple parameters:

    (a)    For disputes related to general unsecured prepetition claims with respect to
which the Debtors have determined in the exercise of their business
judgment that a reasonable compromise or settlement of such general
unsecured prepetition claims is the allowance of a general unsecured
prepetition claim in a sum of $1 million or less, the compromise or
settlement could be agreed upon and consummated without the need for
further Court approval or further notice.

    (b)    For disputes related to general unsecured prepetition claims with respect to
which the Debtors have determined in their business judgment that a
reasonable compromise or settlement of such general unsecured
prepetition claims is the allowance of a general unsecured prepetition
claim in a sum greater than $1 million but less than or equal to $20

12

million, the Debtors would give notice of the terms of the proposed settlement (the "Proposed Settlement Notice") to (i) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (ii) counsel for the Creditors' Committee, (iii) counsel for the agent under the Debtors' prepetition credit facility, and (iv) counsel for the agent under the Debtors' postpetition credit facility (collectively, the "Notice Parties"). The Proposed Settlement Notice would be served by e-mail (except the U.S. Trustee), facsimile, overnight delivery, or hand delivery.

(c)     For disputes related to prepetition secured or priority claims, administrative expense priority claims, or other postpetition claims with respect to which the Debtors have determined in the exercise of their business judgment that a reasonable compromise or settlement of such claims is in a sum of $500,000 or less, the compromise or settlement would be agreed upon and consummated without the need for further Court approval or further notice.[6]

(d)     For disputes related to prepetition secured or priority claims, administrative expense priority claims, or other postpetition claims with respect to which the Debtors have determined in their business judgment that a reasonable compromise or settlement of such claims is in a sum greater than $500,000 but less than or equal to $10 million, the Debtors would serve the Proposed Settlement Notice to the Notice Parties.  The Proposed Settlement Notice would be served by e-mail (except the U.S. Trustee), facsimile, overnight delivery, or hand delivery.

(e)     For any disputes referenced in subparagraphs (a) and (c) above with respect to which the Debtors have determined in their business judgment that a reasonable compromise or settlement of such claims affects any claim asserted by the Debtors against a third party in excess of $1 million, the Debtors would serve the Proposed Settlement Notice to the Notice Parties.  The Proposed Settlement Notice would be served by e-mail (except the U.S. Trustee), facsimile, overnight delivery, or hand delivery.

(f)     The Notice Parties would have ten business days following initial receipt of the Proposed Settlement Notice to object to or request additional time to evaluate the proposed settlement. If counsel to the Debtors received no written objection or written request for additional time prior to the expiration of such ten business day period, the Debtors would be authorized to accept and consummate the proposed settlement.

(g)     If a Notice Party objected to the proposed settlement within ten business days after the Proposed Settlement Notice was received, the Debtors and

---

[6]     By this Motion, the Debtors are not opining on the potential distribution for general unsecured claims under any plan of reorganization confirmed in these chapter 11 cases.

13

such objecting Notice Party would meet and confer in an attempt to negotiate a consensual resolution. If either party were to determine that court intervention was necessary, then the Debtors would not be authorized to consummate the proposed settlement without further order of the Bankruptcy Court.

29.    The foregoing procedures for resolving disputes would not apply to settlements which involve an "insider" as defined in section 101(31) of the Bankruptcy Code. Any such settlements would require individual hearings as prescribed by Bankruptcy Rule 9019(a).

30.    The Debtors request that the Settlement Procedures order, if granted, not be deemed in any manner to affect, impair, impede, or otherwise alter the right of the Debtors to resolve any controversy arising in the ordinary course of the Debtors' business or resolve any controversy pursuant to any other order of the Court.

31.    Following entry of the proposed order, the Debtors would provide periodic summary reporting to counsel for the Creditors' Committee of all settlements consummated pursuant to this Order. This periodic reporting would include, with respect to each settlement consummated since the prior report to the Creditors' Committee, (i) the names of parties with whom the Debtors have reached settlement, (ii) the asserted amount of the settling party's claim, (iii) the amounts of and other consideration for such consummated settlement, and (iv) the particulars of each such consummated settlement that were considered by the Debtors in arriving at the decision to enter into such settlement. From and after the last day of the first full month after the date of entry of the proposed order, this periodic reporting would be provided quarterly, until confirmation of a plan of reorganization.

32.    In addition, with respect to claims that the Debtors are in the process of negotiating, where compromise or settlement of such claims would fall within the scope of this Motion, the financial advisors to the Creditors' Committee would be entitled to receive periodic

14

reports containing aggregate summary information without any individual creditor data.  The

periodic reporting described in this paragraph would be in the format currently being shared

between the Debtors and the Creditors' Committee and would take place not less frequently than

monthly until further order of this Court.

33.     The Debtors believe that the proposed Settlement Procedures would

maximize efficiency and value in the Debtors' settlement of disputes and would better enable the

Debtors to administer their estates.  Accordingly, the Debtors submit that the implementation of

the Settlement Procedure is in the best interests of the estate, their creditors, and other parties-in-

interest.

### Applicable Authority

34.     Bankruptcy Rule 9019(b) empowers the Court to approve procedures for

the settlement of classes of controversy by a debtor-in-possession:  "[a]fter a hearing . . . the

court may fix a class or classes of controversies and authorize the trustee to compromise or settle

controversies within such class or classes without further hearing or notice."  Fed. R. Bankr. P.

9019(b).  The only requirement of the rule is that the proposed procedure be reasonable.  In re

Check Reporting Service, Inc., 137 B.R. 653 (Bankr. W.D. Mich. 1992).

35.     The Settlement Procedures are reasonable and appropriate based on the

size of the Debtors' operations and the classes and amounts of disputes the Debtors seek

authority to resolve.  In addition, to ensure the protection of all parties, the Debtors will seek

Court authority, pursuant to Bankruptcy Rule 9019(a), to settle any claim of insiders and to settle

any non-ordinary course claim with respect to which settlement is in a sum greater than $20

million and $10 million for prepetition and postpetition claims, respectively.  "[S]ome

transactions either by their size, nature or both are not within the day-to-day operations of a

business and are therefore extraordinary." In re Dant & Russell, 853 F.2d 700, 705 (9th Cir.

1988) (quoting In re Waterfront Companies, 56 B.R. 31, 35 (Bankr. D. Minn. 1985)).

36.     These streamlined Settlement Procedures will encourage resolution of

these classes of controversy, thereby eliminating unnecessary expenditures of time and money

with respect to these disputes.  Courts in this circuit have recognized the general rule in

bankruptcy cases and other litigation that settlement is the more appropriate method of resolving

claims, because it preserves the resources of the judiciary. In re W.T. Grant Co., 699 F.2d 599,

608 (2d Cir. 1983); In re Purofied Down Products, 150 B.R. 519, 522 (S.D.N.Y. 1993); In re

Drexel Burnham Lambert Group, Inc., 130 B.R. 910, 926 (S.D.N.Y. 1991); see also Thomas v.

Fallon (In re Chicago Rapid Transit Co.), 196 F.2d 484, 490 (7th Cir. 1952) ("We fully realize

the desirability of settling claims without resort to litigation in bankruptcy matters … where any

reasonable basis for compromise settlements appears they should be encouraged.").  Similar

procedures have been approved in this district.  See In re WorldCom, Inc. et al., jointly

administered under Case No. 02-13533 (Bankr. S.D.N.Y. Oct. 8, 2002).

37.     To seek Court approval to resolve numerous discrete disputes that may

arise in these classes of controversy would be unduly burdensome on the Court and an

unnecessary drain on the time and other resources of the Debtors and their counsel.  In a case of

this size and complexity, the expense of seeking Court approval for every settlement might

significantly reduce the benefits otherwise incident to many of these settlements.  Thus, for the

sake of both judicial efficiency and maximizing the Debtors' estates, implementation of the

Settlement Procedures should be permitted.

Notice Of Motion

38.     Notice of this Motion has been provided in accordance with the Seventh

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824)

("Supplemental Case Management Order").  In addition, the Debtors have complied with the

Supplemental Case Management Order with respect to the filing of this Motion and the need for

expedited relief.[7]  In light of the nature of the relief requested, the Debtors submit that no other

or further notice is necessary.

Memorandum Of Law

39.     Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

---

[7]     The Debtors have noticed this Motion for hearing at the June 16, 2006 regularly-scheduled omnibus hearing in
these cases in compliance with the Supplemental Case Management Order.  Pursuant to the terms of the
Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee
regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed
that the Creditors' Committee has consented to this Motion being heard at the June omnibus hearing.  Because
this Motion is being filed on less than 20 days' notice, parties-in-interest will have until June 13, 2006 to file an
objection.

WHEREFORE the Debtors respectfully request that the Court enter an order (i)

authorizing the Debtors to compromise or settle certain classes of controversy and allow certain

claims within those classes pursuant to the Settlement Procedures set forth in this Motion and (ii)

grant the Debtors such other and further relief as is just.

Dated:          New York, New York
                June 6, 2006

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                         & FLOM LLP


                                        By:    /s/ John Wm. Butler, Jr.
                                               John Wm. Butler, Jr. (JB 4711)
                                               John K. Lyons (JL 4951)
                                               Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois 60606
                                        (312) 407-0700


                                                - and -


                                        By:    /s/ Kayalyn A. Marafioti
                                               Kayalyn A. Marafioti (KM 9632)
                                               Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                          Debtors and Debtors-in-Possession