**Hearing Date and Time: June 16, 2006, 10:00 a.m.**
**Objection Deadline: June 13 , 2006, 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　In re　　　　　　　　　　　　　　　:　　Chapter 11
　　　　　　　　　　　　　　　　　　　　　　　　:
DELPHI CORPORATION, et al.,　　　　　　　　:　　Case No. 05-44481 (RDD)
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:　　(Jointly Administered)
　　　　　　　　　　　Debtors.　　　　　　　　:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 362 AND FED. R. BANKR. P.
7016 AND 9019 APPROVING PROCEDURES FOR MODIFYING THE AUTOMATIC
STAY TO ALLOW FOR (I) LIQUIDATING AND SETTLING AND/OR
(II) MEDIATING CERTAIN PREPETITION LITIGATION CLAIMS

("LIFT STAY PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 362 and Fed. R. Bankr. P. 7016 and 9019 establishing procedures for modifying the automatic stay applicable in these cases (the "Lift Stay Procedures"), to the extent necessary, for (i) liquidating and settling and/or (ii) mediating certain prepetition litigation claims.  In support of the Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity security holders. No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.        The statutory predicates for the relief requested herein are section 362 of

the Bankruptcy Code and Rules 7016 and 9019 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

B.        Current Business Operations Of The Debtors

5.        Delphi and its subsidiaries and affiliates (collectively, the "Company") had

global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues, and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from the

Bankruptcy Court.

6.        The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

7.        Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.       Events Leading To The Chapter 11 Filing

8.       In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.8 billion on net sales of $26.9 billion.

9.       The Debtors believe that the Company's financial performance has

deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (c) increasing commodity prices.

10.      In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
       valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
       loss in calendar year 2004 was $482 million.

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

12.    In connection with the first two elements of the Company's transformation

plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those

discussions, Delphi has consistently communicated a clear message to both its hourly workforce

and GM: Delphi is committed to finding a consensual resolution to its issues and intends to

continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S.

operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a

tripartite agreement providing for a special hourly attrition program for Delphi's UAW-

5

represented employees (the "Hourly Attrition Program").  This special hourly attrition program

could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly

employees with "soft landings" through retirement attrition programs and GM flowbacks.

Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions,

which could provide as many as 4,500 additional hourly employees with retirement programs or

incentives.

13.    These hourly attrition programs constitute an important first step in

implementing the Debtors' transformation plan, but will not resolve all of the issues related to

Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive

agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under

sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements

and to modify retiree benefits.[3]  Contemporaneously therewith, the Debtors also moved to reject

unprofitable supply contracts with GM.[4]  Among the reasons for the GM contract rejection

motion was the Debtors' belief that GM must cover a greater portion of the costs of

manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This

initial motion covers approximately half of the Debtors' North American annual purchase

volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the

filing of these motions was a necessary procedural step, the Debtors remain focused on reaching

a consensual resolution with all of Delphi's unions and GM.

14.    To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which the

---

[3]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

[4]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033).

Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth.   To that end, the Company will concentrate the organization around the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[5]

15.      In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines.  The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

16.      As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented,

---

[5]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

the Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17.     As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding contributions over a long-term period.  The Company intends to replace the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

19.     By this Motion, the Debtors seek entry of an order approving certain Lift Stay Procedures.  The Lift Stay Procedures, as set forth below, are intended to promote cost-effective and timely liquidation and settlement of certain prepetition litigation claims.  The

Debtors submit that the Lift Stay Procedures are in the best interests of the certain prepetition

litigation claimants, the Debtors, their estates, and all parties-in-interest.

Basis For Relief

A.      The Claims Under The Insurance Program

20.      Prior to the Petition Date, the Debtors maintained an insurance program

for general liability, product, liability, and automobile liability claims (the "Insurance Program")

with ACE American Insurance Company and its affiliates (collectively, the "Insurers").[6]  As of

the Petition Date, approximately 101 claimants in 76 open files (the "Claimants") had asserted

liability claims against the Debtors that fall within the scope of the Insurance Program (the

"Claims").  The Claims can be broken into four general categories: automobile liability (25%),

general liability (28%), product liability (39%), and emissions (8%).  The Debtors anticipate that

the aggregate amount of the Claims could exceed $6.3 million.  There are only four claims,

however, for which the Debtors have reserved $1 million or more.

21.      Before the Debtors sought reorganization relief, approximately 52 of these

Claimants had already commenced litigation asserting liability for the Claims against the

Debtors.  Upon the commencement of these chapter 11 cases, however, all lawsuits and any

other efforts or actions by the Claimants to collect or recover on the Claims vis-a-vis the Debtors

were stayed under section 362(a) of the Bankruptcy Code.  Thus, dozens of asserted Claims

remain contingent, disputed, and/or unliquidated.  In many cases, the Debtors believe that they

have no liability on these claims or dispute the asserted amounts of such claims.  Consequently,

the Debtors expect to file objections to a majority of the Claims to contest the validity and/or

---

[6]    Although the Insurance Program also covers workers' compensation claims, the Debtors do not seek to apply
the Lift Stay Procedures to workers' compensation claims because the Debtors continue to respond to those
claims in the ordinary course of business and pursuant to the authority granted by this Court in the order
authorizing the Debtors to pay prepetition benefits and continue maintenance of human capital benefit programs
in the ordinary course (Docket No. 198).

amount of such claims.  Additionally, most of the Claimants seek relatively small amounts.  The

Debtors estimate that approximately 91% of all Claims will be allowed in amounts less than

$100,000.

22.    One of the agreements in the Insurance Program is a Multi-Line

Deductible Program Agreement, effective as of October 1, 2000, by and between an Insurer and

Delphi (formerly known as Delphi Automotive Systems Corporation) and all amendments and

addenda thereto (collectively, the " Multi-Line Deductible Program Agreement").  As previously

disclosed in other filings before this Court, Article I of the Multi-Line Deductible Program

Agreement requires the Debtors to pay the Insurers "all amounts the Insured is or may be

obligated to pay to other parties but which are paid by the [Insurers]."  (A copy of the Multi-Line

Deductible Program Agreement is attached hereto as Exhibit A.)  Under the various liability

policies in the Insurance Program, the Debtors have deductible limits, depending on the date and

nature of the claim, ranging from $1 million to $5 million.  Therefore, the Debtors are obligated

to pay any portion of a claim that falls within the applicable deductible limit.

23.    On January 9, 2006, this Court authorized the Debtors to assume the

various insurance agreements under which this obligation arises.  Subsequently, the Debtors

assumed these agreements.  Thus, if the Debtors' Insurers make any payments directly to the

Claimants, the Debtors' Insurers would have administrative expense priority claims for any such

payments that are within the applicable deductible amount.[7]  Accordingly, despite the existence

of insurance coverage, the Claimants' prosecution of the Claims could directly and significantly

affect the Debtors' estate.

---

[7]    It should be noted that even if the Debtors did not assume these insurance agreements, the insurers, after paying
the Claimants amounts within the applicable deductible, would have the right under the insurance agreements to
draw down on the letter of credit that was issued under the Debtors' prepetition security facility.  This would in
turn increase the amount of funded debt owed to prepetition lenders.  Thus, even if the Debtors did not assume
the insurance agreements, any Claim paid by the Debtors' insurers would affect the Debtors' estate.

B.    <u>Third-Party Indemnity</u>

24.    The Debtors do not believe that the relief requested in this Motion violates the terms of any insurance policies under the Insurance Program.  Moreover, the Debtors have given to the Insurers notice of this Motion and an opportunity to comment or object to the procedures requested herein.

25.    In some instances, the Debtors may also be entitled under certain agreements or applicable non-bankruptcy law to be indemnified from other third parties (collectively with the Insurers, the "Third Party Indemnitors").  To the extent that the Debtors are or may be entitled to indemnity for a particular Claim from a Third Party Indemnitor, the Debtors seek authority to invite such Third Party Indemnitor to participate in the liquidation of the Claim.  The Debtors seek confirmation that they have no obligation vis a vis the Claimants to take any such action, however.

C.    <u>Proposed Lift Stay Procedures</u>

26.    The underlying rationale for the Lift Stay Procedures is the practical fact that most Claims are settled prior to trial, but only after each side has had an opportunity to analyze the merits of its and its opponent's case.  Each Claimant which chooses to participate in the Lift Stay Procedures will be permitted to analyze, present, and document the alleged Claim in an informal, inexpensive way that could result in a large percentage of such Claims being resolved without the need of further litigation.

27.    The Lift Stay Procedures may thus lead to cost-effective settlement and liquidation of many Claims, without the administrative expense of multi-forum, full trial litigation.  For those Claimants who still want to present their claims before a jury, this Procedure would not infringe on any right to a trial by jury.

28.    The proposed terms of the Lift Stay Procedures are as follows:

11

(a)    Eligibility.  Only Claimants who file timely proofs of claim by 5:00

p.m. Eastern Time on July 31, 2006 (the "Bar Date"), and in accordance with the order

establishing bar dates for filing proofs of claim (Docket No. 3206) would be eligible to participate

in the Lift Stay Procedures.  Nothing in the Lift Stay Procedures is intended to obviate the need

for any Claimant to file a proof of claim prior to the Bar Date.

(b)    Informal Negotiations.  Following the Bar Date, the Debtors (or an

agent of the Debtors) would begin to contact certain Claimants by telephone in an effort to settle

such Claims informally, in each case after appropriate consultation and consent by the Third Party

Indemnitor, if applicable.  If the Debtors do not have sufficient information to evaluate certain

Claims, the Debtors might informally request additional information from the Claimants.

Although the Claimants would be under no obligation to provide such information, the Debtors

would not seek to resolve claims for which they have insufficient information.  If the Claimants

would like to provide additional information to the Debtors, the Claimants could do so at any

time.  Unless otherwise requested by the Debtors, the Lift Stay Procedures would provide that any

additional information related to a Claimant's Claim should be sent to both:

Delphi Proof of Claim Reconciliations          Delphi Corporation
M/C 480-900-001                                M/C 483-400-161
900 Tower Drive, 9th floor                     5725 Delphi Drive
Troy, Michigan 48098                           Troy, Michigan 48098
Attn: Lift Stay Procedures Manager             Attn: W. Telgen – Risk Manager

(c)    Mediation.  If a settlement were not reached through informal

negotiations, the parties could seek to mediate the Claims.  Neither the Debtors nor any Claimant

would be obligated to mediate the Claims.  The apportionment of cost of the mediations and the

location of any such mediations would be determined by the parties to the mediation on a case-

by-case basis.  The Debtors request that this Court authorize, but not direct, the Debtors to lift the automatic stay to mediate certain Claims.

(d)    <u>Release Of Insurers</u>.  As a condition precedent to settling any Claims, the Debtors would require that the Claimant release the Debtors' Insurers from all amounts the Debtors are or might be obligated to pay to other parties under the Multi-Line Deductible Program Agreement.  By executing such a release, the Claimants would be precluded from seeking payment from the Debtors' Insurers for the portion of their Claims that fall within the applicable deductible.  Instead, if a settlement were reached in accordance with the Lift Stay Procedures, then the Claimant would hold an allowed prepetition general unsecured non-priority claim against the applicable Debtor in an amount equal to the settlement and would receive a distribution in respect thereof in accordance with a confirmed plan of reorganization.

(e)    <u>Insurers</u>.  Nothing in the Lift Stay Procedures would be construed to alter the rights or obligations or any Insurer of the Debtors, except to the extent that a Claimant releases the Insurer from certain liability as described in subparagraph (d) above.  In all instances in which an Insurer has a right to receive notice, participate in the resolution of a Claim, or decide upon or approve the resolution of a Claim, that right would be preserved.  Nothing in the Lift Stay Procedures would be construed to authorize the Debtors to act on behalf of or as an agent for any Insurer of the Debtors.

D.    <u>The Proposed Lift Stay Procedures Are Fair To Claimants</u>

29.    The Lift Stay Procedures will treat the Claimants fairly.  The Lift Stay Procedures are a non-judicial procedure for liquidating Claims more quickly than full trial litigation in state, federal, or bankruptcy court.  The parties will have sufficient opportunity to reach a consensual settlement through direct negotiation and/or alternative dispute resolution.

The implementation of the Lift Stay Procedures does not abridge a Claimant's substantive rights in any way.

30.     Further, there is no requirement that a Claimant settle its Claim pursuant to the Lift Stay Procedures.  From the Debtors' perspective, the Lift Stay Procedures provide the Debtors with an opportunity to reduce the impact that the Claims may have on the Debtors' estate.  Additionally, the Procedures minimize the time and expense that all relevant parties would otherwise take to resolve the Claims in the ordinary course of business.

31.     As for the benefits to the Claimants, the Lift Stay Procedures provide the Claimants the opportunity to monetize their claims promptly.  Because of the impact that the Claims can have on the Debtors' estate, except for rare circumstances, the Debtors intend to vigorously object to any Claimant's request to seek relief from the automatic stay to proceed with litigation in another forum.  Given this posture, and unless this Court rules otherwise, the Claimants may not be permitted to proceed with litigation and liquidate their Claims until after the Debtors have successfully reorganized, which the Debtors currently anticipate occurring in mid-2007.  The Debtors believe that the Lift Stay Procedures are attractive because they allow for the rapid liquidation of a Claimant's Claim.

32.     Finally, the Lift Stay Procedures ultimately provide that the Claimants will retain whatever rights they have to liquidate their Claims through litigation in an alternative forum and tribunal if the parties cannot resolve the Claim by the less expensive and less time-consuming process of direct negotiation and/or alternative dispute resolution.  Thus, the Lift Stay Procedures ultimately protect the Claimants' rights, if any, under section 362(d) of the Bankruptcy Code and 28 U.S.C. § 157(b)(5) to have Claims involving personal injuries heard outside this Court.

E.    Settlement Authority And Court Approval

33.    At any time during the administration of the Lift Stay Procedures, even during litigation, the Debtors (and the Third Party Indemnitor, if applicable) would have the authority to agree to a settlement with an eligible Claimant, subject to the provisions in paragraph 34 below, if the Debtors deem it advisable to do so.

34.    The Debtors  request authority to settle Claims in accordance with the following terms:

(i)    In settlement of a Claim, Bankruptcy Court approval would not be required for the allowance of any Claim as a prepetition general unsecured non-priority claim in an amount equal to or less than $500,000, and the Debtors (and the Third Party Indemnitor, if applicable) could settle and allow any such Claim without notice or hearing;

(ii)    In settlement of a Claim in a sum greater than $500,000 but less than or equal to $20,000,000, the Debtors would give notice of the terms of the proposed settlement (the "Proposed Settlement Notice") to counsel to the Creditors' Committee, the agent for the Debtors' prepetition financing facility (the "Prepetition Lenders' Agent"), the agent for the Debtors' postpetition financing facility (the "DIP Facility Agent"), and the United States Trustee (the "U.S. Trustee") (collectively, the "Notice Parties").  The Proposed Settlement Notice would be served by e-mail (except the U.S. Trustee), facsimile, overnight delivery, or hand delivery.  The Notice Parties would have ten business days following initial receipt of the Proposed Settlement Notice to object to or request additional time to evaluate the proposed settlement.  If counsel to the Debtors received no written objection or written request for additional time prior to the expiration of such ten business day period, the Debtors would be authorized to accept and consummate the proposed settlement.[8]

(iii)    If a Notice Party were to object to the proposed settlement within ten business days after the Proposed Settlement Notice was received, the Debtors and such objecting Notice Party would meet and confer in an attempt to negotiate a consensual resolution.  Should either party determine that court intervention was necessary, then the Debtors would seek authority to approve the proposed settlement pursuant to Bankruptcy Rule 9019(a).

The settling Claimant would be deemed to hold an allowed prepetition general unsecured non-priority claim against the applicable Debtor in the settled amount, to receive a distribution in

---

[8]    The Debtors will seek court approval to settle any Claim for an amount in excess of $20,000,000.

accordance with the confirmed plan(s) of reorganization in these chapter 11 cases.  The authority requested in this paragraph would streamline the Lift Stay Procedures and reduce the administrative burdens on the Debtors' estates as well as the Court when the sums at issue are not great enough to prejudice any parties-in-interest.

35.     The Debtors would provide the Creditors' Committee periodic summary reporting, commencing 120 days after the Bar Date, and quarterly thereafter, until confirmation of a plan of reorganization.  This periodic reporting would include, with respect to each Claim resolved since the prior report, (i) the names of the Claimants with whom the Debtors have reached settlement under the Lift Stay Procedures, (ii) the asserted amount of each Claimant's Claim, (iii) the amounts of and other consideration for such consummated settlement, and (iv) a general description of the particulars underlying the Claimant's Claim.

36.     In addition, with respect to Claims that the Debtors are in the process of negotiating, where compromise or settlement of such Claims would fall within the scope of this Motion, the financial advisors to the Creditors' Committee would be entitled to receive periodic reports containing aggregate summary information without any individual Claimant data.  The periodic reporting described in this paragraph would be in the format currently being shared between the Debtors and the Creditors' Committee and would take place not less frequently than monthly until further order of this Court.

F.     <u>Stay Relief</u>

37.     To implement a meaningful Lift Stay Procedures, the automatic stay of section 362 of the Bankruptcy Code should remain in effect against commencement or continuation of all prepetition Claims asserted against the Debtors, except to the extent that the Claimants are required to comply with the Lift Stay Procedures.  Nothing in the Lift Stay

16

Procedures, however, is intended to alter the showing that a Claimant must establish to seek

relief from the automatic stay for any purpose, including, but not limited to, the continued

prosecution of the Claimant's Claim in an alternative forum.  If a Claimant cannot resolve its

Claim in the Lift Stay Procedures and wishes to proceed with litigation in an alternative forum, it

would be required to move this Court for relief from the automatic stay.[9]  The goal of the Lift

Stay Procedures is to provide Claimants with a cost-effective mechanism for liquidating their

Claims.  The Debtors are hopeful that many Claimants will seek to engage in the Lift Stay

Procedures.

<u>Applicable Authority</u>

38.    Authority for adopting the Lift Stay Procedures can be found in the

Bankruptcy Rules and Federal Rules of Civil Procedure.  Bankruptcy Rule 7016 incorporates

Fed. R. Civ. P. 16 by reference.  Fed. R. Bankr. P. 7016.  Furthermore, pursuant to Bankruptcy

Rule 9014, "[t]he court may at any stage in a particular matter direct that one or more of the

other rules in Part VII shall apply."  Fed. R. Bankr. P. 9014(c).  Accordingly, the court may and

should direct that Bankruptcy Rule 7016 applies to this Motion.

39.    Fed. R. Civ. P. 16(a), among other things, gives the Court discretion to

direct parties and their attorneys to appear at conferences to expedite disposition of the action

and to facilitate settlement.  Fed. R. Civ. P. 16(c)(12) authorizes the use of special procedures

"for managing potentially difficult or protracted actions that may involve complex issues,

multiple parties, difficult legal questions, or unusual proof problems."  Lift Stay Procedures, or

other similar settlement procedures, have been approved in other large, complex chapter 11

cases.  <u>See</u> <u>In re WorldCom, Inc.</u>, <u>et al.</u>, jointly administered under Case No. 02-13533 (Bankr.

---

[9]    The Debtors reserve all rights to object to any motion for relief from the automatic stay filed by any Claimant, regardless of whether the Claimant participates in the Lift Stay Procedures.

S.D.N.Y. Oct. 8, 2002); In re Kmart Corporation, et al., jointly administered under Case No. 02-02474 (Bankr. N.D. Ill. July 16, 2002); In re Harnischfeger Indus., Inc., et al., jointly administered under Case No. 99-2171 (Bankr. D. Del. Aug. 25, 1999); In re FPA Medical Management, Inc., et al., jointly administered under Case No. 98-1596 (PJW) (Bankr. D. Del. 1998).

40.    The settlement authority requested herein is expressly authorized by Bankruptcy Rule 9019(b), which provides in pertinent part:  "the court may fix a class or classes of controversies and authorize the trustee to compromise and settle controversies within such class or classes without further hearing or notice."  The settlement parameters are reasonable and well within the Debtors' business judgment.  The settlement authority requested herein in conjunction with the Lift Stay Procedures is in the best interests of the Debtors' estates and should therefore be approved.  See generally In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983); In re Purofied Down Products, 150 B.R. 519, 522 (S.D.N.Y. 1993); In re Marvel Entertainment Group, Inc., 222 B.R. 243 (D. Del. 1998); In re Energy Coop., Inc., 886 F2d 921, 927-29 (7th Cir. 1989).

41.    Indeed, Bankruptcy Rule 9019(b) precisely contemplates the relief requested herein.  Compromises are tools for expediting the administration of the case and reducing administrative costs and are favored in bankruptcy.  See In re Martin, 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy case, '[c]ompromises are favored in bankruptcy.'") (quoting 9 Colliers, Bankruptcy ¶ 9019.03[1] (15th rev. ed. 1993)).  Various courts have endorsed the use of Bankruptcy Rule 9019(b) in a similar manner.  See, e.g., In re Check Reporting Service, Inc., 137 B.R. 653 (Bankr. W.D. Mich. 1992); Bartel v. Bar Harbour Airways, Inc., 196 B.R. 268 (S.D.N.Y. 1996); In re Foundation for New

18

Era Philanthropy, Case No. 95-13729B, 1996 Bankr. Lexis 1892 (Bankr. E.D. Pa. August 21, 1996).

42.     The standards by which a court should evaluate a settlement are well established.  In addition to considering the proposed terms of the settlement, the Court should consider the following factors:

(a)     the probability of success in litigation;

(b)     the difficulties, if any, in collection matters;

(c)     the complexity of the litigation and the attendant expense, inconvenience, and delay; and

(d)     the paramount interest of the creditors and a proper deference to their reasonable views.

See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-425 (1968).

43.     The decision to approve a settlement is within the discretion of the Court and is warranted when the settlement is found to be reasonable and fair in light of the particular circumstances of the case.  See TMT Trailer Ferry, 390 U.S. at 424-25.  The settlement need not be the best that the debtor could have achieved, but need only fall "within the reasonable range of litigation possibilities."  See id.; see also In re Penn Central Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979).  A proposed settlement will fail the test only if it falls beneath the lowest possible point in the range of reasonableness.  See Energy Coop., 886 F.2d at 929; In re Trism, 286 B.R. 744, 748 (Bankr. W.D. Mo. 2002).

44.     Providing the Debtors with authority to compromise and settle the Claims in accordance with the Lift Stay Procedures is reasonable.  It will allow expedited and cost-efficient determination of the Claims of modest size in the context of this case.  Moreover, the

proposed settlement procedures will eliminate the unnecessary diversion of judicial and administrative resources that would occur were the Debtors required to separately seek approval of each settlement of a Claim.

45.    The Debtors believe that the Lift Stay Procedures will assist them in reducing costs and maximizing the value of the Debtors' estates.  Granting authority to settle Claims as set forth herein without further motion, notice, or order will likely significantly reduce associated administrative expenses and help the Debtors and the Claimants reduce the delay and uncertainty of the more traditional means of seeking relief from the automatic stay.  Moreover, the authority requested provides incentive to the Claimants to work with the Debtors to reconcile, settle, or compromise the Claims.  Accordingly, the proposed procedures are in the best interest of the Debtors' estates and should be approved.

<u>Notice</u>

46.    Notice of this Motion has been provided in accordance with the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824) ("Supplemental Case Management Order").  In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[10]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

---

[10]    The Debtors have noticed this Motion for hearing at the June 16, 2006 regularly-scheduled omnibus hearing in these cases in compliance with the Supplemental Case Management Order.  Pursuant to the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard at the June omnibus hearing.  Because

Memorandum Of Law

47.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

this Motion is being filed on less than 20 days' notice, parties-in-interest will have until June 13, 2006 to file an objection.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) approving the Lift Stay Procedures, (b) granting relief from the automatic stay to the extent necessary to implement and administer the Lift Stay Procedures, and (c) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          June 6, 2006

                                  SKADDEN, ARPS, SLATE, MEAGHER
                                    & FLOM LLP

                                  By:   /s/ John Wm. Butler, Jr.
                                        John Wm. Butler, Jr. (JB 4711)
                                        John K. Lyons (JL 9331)
                                        Ron E. Meisler (RM 3026)
                                  333 West Wacker Drive, Suite 2100
                                  Chicago, Illinois 60606
                                  (312) 407-0700

                                        - and -

                                  By:   /s/ Kayalyn A. Marafioti
                                        Kayalyn A. Marafioti (KM 9632)
                                        Thomas J. Matz (TM 5986)
                                  Four Times Square
                                  New York, New York 10036
                                  (212) 735-3000

                                  Attorneys for Delphi Corporation, et al.,
                                    Debtors and Debtors-in-Possession

22

Exhibit A

## MULTI-LINE DEDUCTIBLE PROGRAM AGREEMENT
(hereinafter "this Agreement")

effective the **1st day of October, 2000**

by and between
**Pacific Employers Insurance Company**

(hereinafter the "Company")

and

# Delphi Automotive Systems Corporation,
(hereinafter the "Insured")

**WHEREAS,** the Insured is the Named Insured under the policy(ies) of General Liability, Automobile Liability, and/or Workers' Compensation insurance listed on the respective Addenda hereto (including Addenda that may be added after the effective date hereof) issued by the Company (which together with all extensions thereof and endorsements thereto, are hereinafter collectively referred to as the "Policies" or as the "General Liability Policies," "Automobile Liability Policies," and "Workers' Compensation Policies," respectively), which Policies each include a Deductible Endorsement; and

**WHEREAS,** the Company is willing to issue such Policies only if the Insured provides collateral security to the Company; and

**WHEREAS,** the Company has entered and may in the future enter into one or more contracts with the Insured's preferred claims administrator (hereinafter, the "Claims Adjusting Service") to provide claims adjusting and related services for claims arising under the Policies;

**NOW, THEREFORE,** in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in accordance with the terms and conditions of the Policies, the Company and the Insured agree as follows:

## ARTICLE I

## INSURED'S PAYMENTS

The Insured agrees to pay or reimburse the Company for:

a) all premiums payable to the Company under the Policies, including audit of the Policies and any recalculation of premium as provided therein, as described in greater detail in the respective Addenda hereto;

b) Paid Loss Deposit Funds as provided in Article III of this Agreement;

c) all other amounts the Insured is or may in the future be required to pay or reimburse to the Company in accordance with the terms and conditions of the Policies or this Agreement, including without limitation the Insured's share of Paid Losses and Allocated Loss Adjustment Expense;

d) Claim Administration Expense as provided in the respective Addenda hereto;

e) all amounts the Insured is or may be obligated to pay to other parties but which are paid by the Company;

and to provide collateral to the Company to secure the Insured's Obligation as provided herein.

The Company will bill the Insured monthly for Company Expenses and any amounts described above in b), c) or d), which are payable or reimbursable to the Company pursuant to the Workers' Compensation Policies. The Company will also bill the Insured for any amounts described above which are payable or reimbursable to the Company pursuant to the General Liability Policies and Automobile Liability Policies if and when such payment obligations arise. Insured's payment of each such bill shall be due and payable no later than the Required Payment Date. If the Insured does not pay an amount billed by the Required Payment Date,

(i) the Company shall have the right to bill the Insured for, and to collect, the Interest Charge applied to any such unpaid amount; and

(ii) the Company shall have the right to increase the amount of any Paid Loss Deposit Fund to an amount determined by the Company, which amount may exceed the required amount as specified in Article III of this Agreement.

All payments made by the Insured under this Agreement and the Policies shall be allocated first to collateral security, then to other amounts owed to the Company other than premiums, then finally to premiums for the Policies, regardless of the designation of the payment.

All terms and conditions of each Addendum hereto are a part of this Agreement and are here incorporated by reference in their entirety.

The Insured and the Company agree that this Agreement is not intended to, and does not, amend or alter any of the terms and conditions of any of the Policies. In the event of any inconsistencies between this Agreement and any Policy, the terms and conditions of the Policy shall control.

## ARTICLE II

## DEFINITIONS

"Allocated Loss Adjustment Expense" shall mean such claim expenses, costs and any interest incurred in connection with the investigation, administration, adjustment, settlement or defense of any claim or lawsuit that the Company, under its accounting practices, directly allocates to a particular claim, whether or not a payment indemnifying the claimant(s) is made. Such expenses include, but are not limited to, subrogation, all court costs, fees and expenses; fees for service of process; fees and expenses to attorneys for legal services; the cost of services of undercover operations and detectives; fees to obtain medical cost containment services; the cost of employing experts for the purpose of preparing maps, photographs, diagrams, and chemical or physical analysis, or for expert advice or opinion; the cost of obtaining copies of any public records; and the cost of depositions and court reporters or recorded statements, provided, however, that Allocated Loss Adjustment Expense shall not include the salaries and traveling expenses of the Company's employees (except for amounts allocated to a specific claim by any of the Company's Field Litigation Offices or Legal Services Offices), or the Company's overhead and adjusters' fees.

"Claim Administration Expense" shall mean the amounts the Company and the Claims Adjusting Service determine are needed to cover expenses of administering claims under the Policies.

"Company Expenses" shall mean that amount the Company determines it needs to cover its expenses to administer the Insured's casualty insurance program pursuant to the Policies, including but not limited to the following:
   a. general and administrative expense;
   b. insurance charges;
   c. premium taxes;
   d. variable expenses, including but not limited to residual market assessments, boards and bureaus, non-subject state surcharges and assessments and other related fees; and
   e. other services provided by the Company.

"Deductible Premium" shall mean the premium after the application of the deductible credit factor, as shown on the Workers' Compensation Deductible Policies.

"Insured's Obligation" shall mean all amounts the Insured is or may in the future be required to pay or to reimburse to the Company pursuant to this Agreement or the Policies. The amount of the Insured's Obligation shall be calculated by the Company based on Ultimate Losses.

"Interest Charge" shall mean the amount of interest for which the Insured is liable to the Company, payable at the monthly rate of one and one-half percent (1.5%) (or, if such rate is impermissible under applicable law, the maximum lawful, non-usurious rate that may be charged) on any amount payable by the Insured to the Company under this Agreement, but not paid by the Insured by the Required Payment Date, said charge to commence on the day next following the Required Payment Date for any such unpaid amount.

"Paid Losses" shall mean all amounts paid for losses (exclusive of Allocated Loss Adjustment Expense) under the Policies; provided, however, that the amount payable or reimbursable by the Insured for each Paid Loss shall be subject to the amount of the deductible as provided in the respective Policies.

"Required Payment Date" shall mean a date not later than ten (10) calendar days after the date of the Company's invoice for any amount billed by the Company to the Insured under this Agreement.

"Ultimate Losses" shall mean losses incurred under the Policies within the respective deductibles plus future loss development and the amount of losses incurred but not reported, as estimated by the Company. Ultimate Losses may include Allocated Loss Adjustment Expense as estimated by the Company.

## ARTICLE III

### PAID LOSS DEPOSIT FUND

As of the effective date of this Agreement, and of each Addendum hereto, the Insured will be required to pay the Company, on or before the Required Payment Date therefor, the amount specified as "Initial Paid Loss Deposit Fund" in each respective Addendum. Such payments will establish and initially fund, for the Policies listed on each of the respective Addenda, a Paid Loss Deposit Fund. Each of such "Initial Paid Loss Deposit Fund" amounts shall represent the Company's estimate of the average amount the Company will pay under the Policies listed on the respective Addenda during a sixty (60) day period for the amount of the Insured's share of (a) Paid Losses (b) Allocated Loss Adjustment Expense, and (c) Claim Administration Expense.

In the event of any single payment of a large Paid Loss and/or Allocated Loss Adjustment Expense under any Policy in an amount equal to or greater than the amount specified as "Single Payment of Paid Loss and/or Allocated Loss Expense" on the Addendum on which such Policy is listed, the Company shall have the right to require the Insured to pay immediately the amount of such single payment into the Paid Loss Deposit Fund.

The Company may from time to time recalculate the required amount of any Paid Loss Deposit Fund, based upon the Company's revised estimate of the average of the amounts it will pay as described above, and require the Insured to adjust the amount of such Paid Loss Deposit Fund accordingly, provided, that the minimum required amount of each Paid Loss Deposit Fund shall be $1,000.

## ARTICLE IV

### SECURITY FOR INSURED'S OBLIGATION

MULTTPA
12/18/98

4

As security for payment of the Insured's Obligation under this Agreement, the Insured will provide to the Company, as beneficiary thereof, a clean irrevocable evergreen letter of credit (hereinafter, the "LOC") issued by a bank or other financial institution, and in an amount and form, acceptable to the Company; and/or such other forms of collateral as the Insured and the Company may agree in writing from time to time.

The Insured will continue to provide the Company with an LOC (and/or other collateral) as security for payment of the Insured's Obligation, until the Company determines that there is no longer any need for security. If there shall be a material deterioration in the financial condition of the bank or other financial institution which has issued the LOC, the Company shall have the right to require the Insured to replace the LOC with a new LOC issued by a bank or other financial institution then acceptable to the Company.

The Company shall have the right to draw against the LOC and/or other collateral in each instance where the Insured's Obligation, or any portion thereof, for any reason is not fulfilled.

Not less than thirty days prior to any termination or expiration of the LOC, the Insured will deliver to the Company a replacement LOC in an amount and form acceptable to the Company, issued by a bank or other financial institution acceptable to the Company.

Annually, the Company shall review and redetermine the amount of the Insured's Obligation and the amount of collateral security required pursuant to this article. At such time, the Insured will provide audited financial statements, interim financial statements, and any other financial information requested by the Company for the purpose of evaluating the financial condition of the Insured. The Insured will provide any needed increases in the amount of the LOC (and/or other collateral if acceptable to the Company) within thirty days of the Company's request for any additional required amount of the LOC. The Company will effect any decreases in the amount of the LOC (and/or other collateral) promptly, provided that the Insured is not in breach of any of its obligations under this Agreement or any of the Policies.

If the Insured fails to provide the Company with a replacement LOC or to provide the Company with any additional required amount of the LOC (and/or other collateral if acceptable to the Company), the Company will have the right to draw the full amount of the existing LOC and/or other collateral. The Insured recognizes that the Company may continue to require collateral as security for the payment of the Insured's Obligation after any cancellation, non-renewal, conversion or replacement of the Policies.

The Insured agrees that the Company shall have no obligation to remit to the Insured or to apply in reduction of the Insured's Obligation any increase or profits (including without limitation any interest or money) received by the Company from the proceeds of any LOC or from any other collateral provided by the Insured.

The Insured and the Company agree that nothing in this Agreement will constitute or be construed as a waiver of any rights the Company may have in each instance in which the Insured's Obligation for any reason is not fulfilled.

## ARTICLE V

## CANCELLATION/TERMINATION OF THE POLICIES

Cancellation of the Policies or any Policy by either the Insured or the Company will not terminate this Agreement. The parties' rights, duties and obligations under this Agreement will continue after any cancellation, non-renewal or replacement of the Policies.

This Agreement shall continue in full force and effect until the Company and the Insured mutually agree that it shall terminate.

## DIVIDEND CONSIDERATION

The Board of Directors for one or more of the companies that are parties to this Agreement may declare dividends in accordance with the provisions for participating companies on some of the policies under this agreement. The applicability of any and all dividends will be described in greater detail in the respective Addendum hereto.

## ARTICLE VI

1.   **Applicable Law.**  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.  No amendments or modification of this Agreement shall have any force or effect unless in writing and signed by the parties hereto.

2.   **Successors and Assigns.**  All the terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns, whether so expressed or not; provided, however, that no party hereto shall assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the other parties hereto.

3.   **Severability.**  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or enforceability without invalidating the remaining provisions and without affecting the validity or enforceability of such provision in any other jurisdiction.

4.   **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute but one and the same instrument.

5.   **Arbitration.** Any controversy, dispute, claim or question arising out of or relating to this Agreement, including without limitation its interpretation, performance or non-performance by any party, or any breach thereof (hereinafter, collectively, "Controversy") shall be referred to and resolved exclusively by three arbitrators through private, confidential arbitration conducted in Philadelphia, PA. Such arbitrators shall be disinterested, neutral individuals who have experience and qualifications in the subject matter of the Controversy. One arbitrator shall be chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of written notice from the other party requesting it to do so, the requesting party may choose a total of two arbitrators who shall choose the third. If the arbitrators fail to select the third arbitrator within ten (10) days after both have been named, each arbitrator shall name three candidates, of whom the other shall decline two, and the decision shall be made by drawing lots. In the event of the death, disability or incapacity of any arbitrator, a replacement shall be named pursuant to the process, which resulted in the selection of the arbitrator to be replaced. The arbitrators may abstain from following the strict rules of law, and shall make their decision with regard to the custom and usage of the insurance business as at the effective date of this Agreement. The majority decision of the panel shall be final and binding upon the parties to this Agreement. Judgment may be entered upon the award of the arbitrators in any court of competent jurisdiction. Except as otherwise specifically provided in this paragraph, the arbitration of any controversy shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

**IN WITNESS WHEREOF,** this Multi-Line Deductible Agreement has been executed by the parties hereto, to be effective on the date first written above.

Delphi Automotive Systems, Inc.                    Pacific Employers Insurance Company
THE INSURED                                        THE COMPANY

Name: _____                    Name: _____
                                                          Ric Pena

Title: __RISK MANAGER_____                    Title: _Senior Vice President_

Date: __06/19/2002_____                      Date: __6 24 07_____

# 2000 ADDENDUM TO
## MULTI-LINE DEDUCTIBLE PROGRAM AGREEMENT
### (the "Addendum")

for **Delphi Automotive Systems Corporation**

Effective <u>October 1, 2000</u>

The terms and conditions stated in this **2000** Addendum apply only to the Policies listed below. All other terms and conditions of the Agreement are here incorporated by reference in their entirety.

**Policy Listing**

**DEDUCTIBLE POLICIES**

| Policy Number | Policy Period | Deductible Limit | Issuing Company |
|---|---|---|---|
| GENERAL LIABILITY HDOG20307043 | 10/01/2000 to 10/01/2001 | $1,000,000 | *Pacific Employers Insurance Company |
| AUTOMOBILE LIABILITY ISAHO7682360 | 10/01/2000 to 10/01/2001 | $1,000,000 | *Pacific Employers Insurance Company |
| WORKERS' COMPENSATION WLRC43013191 WLRC4301299A WLRC43013038 | 10/01/2000 to 10/01/2001 | $2,000,000 Workers' Compensation ($1,240,000 in Minnesota) $1,000,000 Employers Liability | *Pacific Employers Insurance Company |
|  |  |  | * denotes Participating Compan |

## WORKERS' COMPENSATION DEDUCTIBLE POLICIES

**1. Company Expenses:**  Commencing on the effective date of this Addendum and for five months thereafter, the Insured will make a monthly payment to the Company by the Required Payment Date related to the above listed Workers' Compensation Deductible Policies.  The first such payment shall be **$24,213.13**  and the five subsequent payments shall be **$20,095.97**  each.  The total of all payments shall be the initial Company Expenses.

**2. Recalculation of Company Expenses:** At the time of audit, the Company will recalculate and the Insured will pay Company Expenses related to the Workers' Compensation Deductible Policies based on the following components:

    a.    **$80,000** flat charge – not subject to adjustment; plus
    b.    **$30,000** flat charge.

**3. Allocated Loss Adjustment Expense:**  For the Workers' Compensation Policies listed on this Addendum, the Insured will pay or will reimburse the Company for all Allocated Loss Adjustment Expense related to Claims under the Policies.

## GENERAL LIABILITY DEDUCTIBLE POLICIES/ AUTOMOBILE LIABILITY DEDUCTIBLE POLICIES

**1.  General Liability Premium and Automobile Liability Premium:**  Commencing on the effective date of this Addendum and for five months thereafter, the Insured will make a monthly payment to the Company by the Required Payment Date related to the above listed General Liability Policies and Automobile Liability Policies.  The first such] payment shall be **$44,000** and the five subsequent payments shall be **$13,200** each.

**2.  Adjustment of General Liability and Automobile Liability Premium:**   The General Liability and Automobile Liability premiums are flat charges and not subject to adjustment.

**3.  Allocated Loss Adjustment Expense:**  For General Liability and Automobile Liability, the Insured's share of the Allocated Loss Adjustment Expense is stated on the respective Policies listed in this Addendum.

## CLAIM ADMINISTRATION EXPENSE:

The Company will engage **Sedgwick CMS**  (the "Claims Adjusting Service") to investigate, adjust, settle and provide for the defense of claims in all states, except the Designated Adjuster states listed below and Texas, arising under the Policies listed on this Addendum.  The Insured and the Claims Adjusting Service will separately contract to effectuate recovery dollars for any appropriate claim.

MULTTPA                                           9
12/18/98

The Company will provide such claims adjusting services for claims arising in the Designated Adjuster States.

The Insured will pay to the Company the Claim Administration Expense, comprised of:
  (i)   Claim Handling Fee incurred according to actual claims count, at prices set forth in fee schedules, below;
  (ii)  Claim Supervision Fee.

Claim Handling Fees are set forth in the following fee schedules:

(1)   For Designated Adjuster States ( Idaho, Maryland, Oregon and Virginia) and Texas:

| TYPE OF CLAIMS | FEE PER CLAIM |
|---|---|
| Workers' Compensation - Medical Only | $135 |
| Workers' Compensation - Indemnity | $945 – first two years claim is open<br>$900 annual charge thereafter |
| Workers' Compensation - Managed Medical Only | $445 |

(2)   For all states other than Designated Adjuster States listed above: (As outlined in Claim Service Agreement with ~~Crawford~~ – Exhibit A attached)
        Sedgwick   (mwg)   R.P.

As used in this Addendum, the following terms shall be defined as set forth below:

"Indemnity" shall mean any claim for which benefits may be payable under a Policy (I) to repay all or a portion of wages lost due to a compensable injury or disease and/or (ii) to compensate for disfigurement.

"Medical Only" shall mean any claim other than Indemnity, including claims for which the claimant did not receive lost wage payments from the Company.

"Managed Medical Only'" shall mean any claim other than Indemnity, including claims for which the claimant did not receive lost wage payments from the Company, for which the total accumulated amount of medical payments by the Company exceeded $1,000.

**IN WITNESS WHEREOF,** this **2000** Addendum to the Multi-line Deductible Program Agreement dated **October 1, 2000** has been duly executed by the parties hereto, each of which intends by its execution hereof to be legally bound by the terms of this Addendum and of the Agreement.

**Delphi Automotive Systems Corporation**          **Pacific Employers Insurance Company**
THE INSURED                                         THE COMPANY

By ; _____                      By _____
                                                       Ric Pena

Title: _____                    Title: _Senior Vice President_

Date: _____                     Date: _6/24/02_