**Bidding Procedures Hearing Date And Time: June 16, 2006 at 10:00 a.m.**
**Bidding Procedures Objection Deadline: June 13, 2006 at 4:00 p.m.**
**Sale Hearing Date And Time: July 19, 2006 at 10:00 a.m.**
**Sale Hearing Objection Deadline: July 12, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                        :
      In re                       :     Chapter 11
                                          :
DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                                          :
                                          :     (Jointly Administered)
              Debtors.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002,
6004, 6006, AND 9014 (A) APPROVING (I) BIDDING PROCEDURES, (II) CERTAIN BID
PROTECTIONS, (III) FORM AND MANNER OF SALE NOTICES, AND (IV) SALE
HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF CERTAIN
OF THE DEBTORS' ASSETS COMPRISING SUBSTANTIALLY ALL ASSETS OF
MOBILEARIA, INC. FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES,
(II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
<u>AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES</u>

("MOBILEARIA SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for orders under 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 approving (i) the bidding procedures set forth herein and attached hereto as Exhibit A (the "Bidding Procedures"), (ii) the granting of certain bid protections, (iii) the form and manner of sale notices (the "Notice Procedures"), and (iv) the setting of a sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of certain of the Debtors' assets (the "Acquired Assets") comprising substantially all of the assets of MobileAria, Inc. ("MobileAria") for $6.5 million and other consideration, free and clear of liens, claims, and encumbrances to Wireless Matrix USA, Inc. (the "Purchaser") pursuant to the Asset Sale and Purchase Agreement dated June 6, 2006 by and between MobileAria and the Purchaser (the "Agreement")[1] or to the Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid, (ii) the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Contracts") to the Purchaser or the Successful Bidder, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Purchaser or the Successful Bidder.  In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates, including MobileAria, filed voluntary petitions in this Court for reorganization relief

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.       On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the Office of the United States Trustee appointed an official committee of equity security holders (the "Equityholders' Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.       This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.       The statutory predicates for the relief requested herein are sections 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.       Current Business Operations Of The Debtors

5.       Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.[2] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

---

[2]      The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.      The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.      In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

11.      On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

5

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

12.      In connection with the first two elements of the Company's transformation

plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those

discussions, Delphi has consistently communicated a clear message to both its hourly workforce

and GM: Delphi is committed to finding a consensual resolution to its issues and intends to

continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S.

operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a

tripartite agreement providing for a special hourly attrition program for Delphi's UAW-

represented employees.  This special hourly attrition program could provide as many as 18,000

of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings"

through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement

on similar hourly attrition programs with its other unions, which could provide as many as 4,500

additional hourly employees with retirement programs or incentives.

13.      These hourly attrition programs constitute an important first step in

implementing the Debtors' transformation plan, but will not resolve all of the issues related to

Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive

agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under

sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements

and to modify retiree benefits.[4]  Contemporaneously therewith, the Debtors also moved to reject

unprofitable supply contracts with GM.[5]  Among the reasons for the GM contract rejection

motion was the Debtors' belief that GM must cover a greater portion of the costs of

manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This

initial motion covers approximately half of the Debtors' North American annual purchase

volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the

filing of these motions was a necessary procedural step, the Debtors remain focused on reaching

a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is

necessary.

14.    To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which the

Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.   To that end, the Company will concentrate the organization

around the following core strategic product lines: (a) Controls & Security (Body Security,

Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture

(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)

Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

---

[4]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And
Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

[5]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033).

7

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics),

and (f) Thermal (Climate Control & Powertrain Cooling).[6]

15.    In contrast, the Company similarly identified certain non-core product

lines that do not fit into its future strategic framework, including Brake & Chassis Systems,

Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering,

and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines

(which will include approximately one-third of its global manufacturing sites) and will consult

with its customers, unions, and other stakeholders to carefully manage the transition of such

affected product lines.  The Company intends to sell or wind down the non-core product lines

and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the

Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as

many as 8,500 employees as a result of portfolio and product rationalizations and initiatives

adopted following an analysis of the Company's selling, general, and administration ("SG&A")

cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented,

the Company should realize savings of approximately $450 million per year in addition to

savings realized from competitive measures planned for its core businesses and the disposition of

non-core assets.

17.    As noted above, the final key tenet of the transformation plan is to devise

a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the

benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors'

---

[6]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket
or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial
vehicles, or other adjacent-market businesses and product lines.

hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current

hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension

plan as of January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will

also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation,

the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize

funding contributions over a long-term period.  The Company intends to replace the hourly plan

(for certain employees) and the salaried plan with defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

Relief Requested

19.    On June 6, 2006, MobileAria and the Purchaser entered into the

Agreement which provides for the Sale of the Acquired Assets, which comprise substantially all

of the assets of MobileAria, to the Purchaser for $6.5 million and other consideration.  The

proposed Sale is subject to approval by this Court and additional competitive bidding pursuant to

the proposed Bidding Procedures.  By this Motion, the Debtors seek entry of two orders.  First, at

the omnibus hearing scheduled to be held on June 16, 2006, the Debtors request entry of an order

substantially in the form attached hereto as Exhibit B (the "Bidding Procedures Order")

approving the Bidding Procedures, Notice Procedures, and certain bid protections to be provided

to the Purchaser pursuant to the Agreement and as described more fully herein.  Second, subject

to the terms of the Bidding Procedures Order, at the omnibus hearing scheduled to be held on

July 19, 2006, the Debtors request entry of an order substantially in the form attached hereto as

Exhibit C (the "Sale Order") authorizing and approving the Sale, the assumption and assignment

of the Assumed Contracts, and the assumption of the Assumed Liabilities.

20.    As more fully set forth below, after a comprehensive strategic review,

MobileAria believes that the Sale is its best opportunity under the circumstances to maximize the

underlying core value of its business and that, therefore, the sale is in the best interests of its

estate and its creditors.

Basis For Relief

A.    MobileAria's Business

21.    MobileAria is a technology leader in next generation mobile resource

management (MRM) solutions designed to maximize mobile workforce productivity.  By

enabling a high-speed data connection between mobile resources and an enterprise's IT

infrastructure, MobileAria's end-to-end solutions deliver unique dual functionality by (a)

enabling real-time central monitoring and control of mobile assets through intelligent web

applications and (b) providing field workers with real-time wireless access to corporate data

networks and the internet while providing field services, both in and away from a vehicle.

22.    Founded in 2000 to serve the long-haul trucking industry, in 2004

MobileAria identified escalating demand for customized telematics solutions among operators of

the nation's largest fleets.  Soon thereafter, MobileAria refocused its development efforts on

designing a flexible and adaptable technology platform and positioning MobileAria as a provider

of custom MRM and mobile workforce connectivity solutions.  In 2005, MobileAria won a

20,000 unit, five-year service contract from Verizon Services Corp., one of the largest service

fleet operators in the U.S., validating MobileAria's solutions approach and the superiority of its

technology platform.

10

23.     Although the Debtors believe that MobileAria is a fundamentally strong business in a emerging and rapidly growing market, MobileAria's business does not present a strong fit within the Debtors' anticipated product portfolio under their transformation plan.  The Debtors and MobileAria have, therefore, determined that MobileAria's value will be maximized through the divestiture of its assets.

B.     Factors Leading To The Sale

24.     As a result of the Debtors' development of their transformation plan, the Debtors and MobileAria determined that MobileAria's business was not a good strategic fit with the Debtors' restructured product portfolio.  Therefore, in March of this year, MobileAria engaged Pagemill Partners LLC ("Pagemill") to develop, solicit and assist MobileAria in analyzing potential transactions including a sale of MobileAria's assets or a merger with a strategic partner.  Pagemill, as a technology-focused investment bank located in the Silicon Valley region of California (as is MobileAria's headquarters) with extensive transactional experience focusing on emerging and middle-market transactions, was uniquely qualified to provide such services to MobileAria.

25.     In seeking potential acquirers of MobileAria's assets, Pagemill identified approximately 70 potential bidders based upon those companies' strategic fit and financial characteristics ("Potential Bidders").  Beginning in early April, Pagemill contacted each such potential bidders to gauge their interest in acquiring MobileAria's assets or otherwise entering into a strategic transaction with MobileAria.  Of those targeted companies, 16 requested and were provided an information memorandum prepared by MobileAria and Pagemill.

26.     Following receipt of the information memorandum, six of the potential acquirers submitted preliminary indications of interest to MobileAria.  MobileAria, with the

assistance of its retained advisors, assembled an electronic data room and prepared management

presentations to provide for an organized and efficient transmission of significant amounts of

data related to MobileAria's business.  During the week of May 15, five in-person and one

telephonic management presentations were made to the potential bidders.

27.    Following this initial round of diligence, four of the potential bidders

submitted proposals for the acquisition of MobileAria's assets on May 24, 2006.  MobileAria, in

conjunction with Pagemill and its other retained advisors, evaluated the terms and benefits of

each proposal, as well as the benefits of other alternatives.  MobileAria, in its business judgment,

concluded that the proposal from the Purchaser, which formed the basis of the Agreement

attached hereto as Exhibit D,[7] offered the most advantageous terms and the greatest economic

benefit to MobileAria.

C.    The Need For An Expedited Sale Process

28.    Although MobileAria is a technology leader in next generation MRM

solutions and remains poised for significant growth, MobileAria's present growth requires

current cash infusions.  The Debtors' current financial condition has therefore put a strain on

MobileAria's potential future growth.  In light of MobileAria's current cash needs and the other

Debtors' desire to focus their available free cash on investments in those business lines which are

more likely to comprise their restructured product portfolio, there is a risk of value erosion if a

sale is not effectuated promptly.  While the proposed Sale of the Acquired Assets to a solid,

financially-strong party will provide some stability to prevent business deterioration during this

---

[7]    The copy of the Agreement attached hereto as Exhibit D omits the schedules thereto, certain of which contain
information which MobileAria has determined is highly confidential.  Copies of such schedules will be
provided to all Qualified Bidders (as defined below) upon execution of the confidentiality agreement provided
for under the Bidding Procedures.

process, the overall value of MobileAria's assets will be maintained and maximized through an

expedited sale process.

D.    The Agreement

29.    Pursuant to the Agreement, (a) MobileAria will (i) sell the Acquired

Assets for $6.5 million and other consideration, free and clear of all liens, claims, interests and

encumbrances and (ii) assume and assign the Assumed Contracts to the Purchaser and (b) the

Purchaser will assume the Assumed Liabilities of MobileAria.

30.    The significant terms of the Agreement are as follows:[8]

(a)    General Terms.  It is proposed that the Purchaser will acquire the
Acquired Assets, which comprise substantially all of the assets of MobileAria.  The transaction
will be accomplished through an asset sale.  Among others, certain bailed assets, personnel
records, financial assets, contracts, tax refunds, benefits arising under insurance policies, and
MobileAria's rights under chapter 5 of the Bankruptcy Code are excluded from the Acquired
Assets.

(b)    Bankruptcy Approval.  The Sale is subject to approval by the Court and
competitive bidding pursuant to the Bidding Procedures.

(c)    Documentation.  The Sale will be effected pursuant to the Agreement and
related documentation.  At the closing, MobileAria and the Purchaser will enter into, among
others, the following agreements: (i) certain agreements governing the transfer of intellectual
property from MobileAria to the Purchaser, (ii) an escrow agreement by and among MobileAria,
the Purchaser, and JPMorgan Chase Bank, N.A. for the purposes described below, and (iii) a
software license agreement between Delphi Technologies, Inc. ("DTI") and the Purchaser
providing for a license of certain proprietary software belonging to DTI used in conjunction with
MobileAria's vehicle tracking and control unit product.

(d)    Purchase Price.  The purchase price to be paid by the Purchaser is $6.5
million.

(e)    Escrow.  $975,000.00 of the purchase price will be placed into an escrow
account to satisfy MobileAria's indemnification obligations to the Purchaser.  The remaining
available funds from the escrow are to be released on the first anniversary of the date of closing;
provided, however, that if the Purchaser has made an indemnification claim prior to such date,
then the escrow agent will continue to hold in escrow an amount sufficient to satisfy such
indemnification claim until such claim is fully and finally resolved.

---

[8]    In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of
the Agreement are controlling.

(f)      Representations And Warranties.  Pursuant to the Agreement, MobileAria will provide comprehensive representations and warranties relating to the Sale and the Acquired Assets.  The representations and warranties of MobileAria will survive the closing of the Sale and expire on the first anniversary of the date of closing.  Purchaser will also provide standard representations and warranties which will survive the closing of the Sale and expire on the first anniversary of the date of closing.

(g)      Covenants.  Between the date of signing the Agreement and the closing, MobileAria is required to, among other things: (i) carry on its business in substantially the same manner as it has heretofore and perform in all material respects all of its obligations under certain enumerated contracts, (ii) use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, and employees, and (iii) use commercially reasonable efforts to take all actions necessary, proper, or advisable to effectuate the Sale in accordance with the Agreement.  For a period of three years after the closing, MobileAria is required not to take certain actions which would place it in competition with the Purchaser with respect to MobileAria's current business line.

(h)      Indemnification.  MobileAria has agreed to indemnify the Purchaser for damages related to the following items: (i) those liabilities and assets retained by MobileAria at closing, (ii) MobileAria's breach of any representation or warranty in the Agreement, and (iii) a breach of any agreement or covenant of MobileAria in the Agreement.  The sole and exclusive recourse of the Purchaser with respect to breaches of representations and warranties described above is a claim against the $975,000.00 escrow account described above.

(i)      Closing Conditions.  In addition to certain other customary closing conditions relating to bankruptcy court approvals and regulatory matters, the obligation of the Purchaser to close the Sale is subject to the satisfaction of the following conditions: (i) the performance in all respects by MobileAria of its covenants under the Agreement and (ii) the accuracy of MobileAria's representations and warranties in all material respects.

(j)      Termination.  The Agreement may be terminated in the following circumstances (but not by a party that is in breach of the Agreement): (i) upon mutual written consent of MobileAria and the Purchaser, (ii) by either MobileAria or the Purchaser if consummation of the Sale would violate any final non-appealable order of any regulatory governmental entity other than the Court, (iii) by either MobileAria or the Purchaser if MobileAria consummates an alternative transaction, (iv) by either MobileAria or the Purchaser if the closing shall not have occurred by July 31, 2006, (v) by either MobileAria or the Purchaser if the Sale Order is not entered by the Court by July 26, 2006 or if the Sale Order is subject to a stay or injunction, (vi) within ten business days of receiving written notice, by the Purchaser if a material adverse effect has occurred and is continuing, (vii) by the Purchaser if Verizon Services Corp. has terminated, threatened to terminate, or otherwise evidenced an intent to terminate a certain agreement with MobileAria or materially reduce the amount of business conducted pursuant to such agreement, (viii) by the Purchaser if the Purchaser provides MobileAria with written notice by 6:00 p.m. (prevailing Eastern time) on June 9, 2006 (or such later date as the Purchaser and MobileAria may mutually agree) that the results of the Purchaser's further due diligence into certain matters specifically enumerated in the Agreement are not reasonably acceptable to the Purchaser, and MobileAria and the Purchaser are not able to agree

14

upon a mutually-acceptable resolution to such concerns (provided that, in the event of a termination under (viii), the Purchaser's sole remedy will be the immediate return of the Purchaser's deposit and MobileAria will have no other liability to the Purchaser whatsoever, including, without limitation, for payment of the Break-Up Fee or the Expense Reimbursement), or (ix) by MobileAria if MobileAria accepts or is about to accept a qualified bid at the auction other than that of the Purchaser (provided that such termination under (ix) will be of no effect unless MobileAria enters into an agreement with respect to such qualified bid within two business days of termination and subsequently completes the Sale pursuant thereto).

(k)    <u>Break-up Fee</u>.  Subject to Court approval, MobileAria will be required to pay a Break-Up Fee to the Purchaser in the amount of 3.0% of the purchase price if (i) MobileAria sells, transfers, leases, or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, or other similar transaction, all or substantially all or a material portion of the Acquired Assets in a transaction or a series of transactions with one or more parties other than the Purchaser or (ii) (A) MobileAria accepts a Qualified Bid or Qualified Bids at the Auction other than that of the Purchaser, (B) the Purchaser does not submit a subsequent bid at the Auction, and (C) MobileAria does not provide written notice to the Purchaser and its counsel on or before 5:00 p.m. (prevailing Eastern time) on July 26, 2006 that, notwithstanding MobileAria's acceptance of a Qualified Bid or Qualified Bids other than that of the Purchaser at the Auction, it intends to close the transactions contemplated by the Agreement on or before July 31, 2006.  The Purchaser has agreed that, in the event that it is entitled to receive both the break-up fee and the expense reimbursement under the Agreement, the Purchaser shall only be entitled to receive the larger of the two and in no case shall be entitled to receive payment of both.

(l)    <u>Expense Reimbursement</u>.  Subject to Court approval, MobileAria will be required to reimburse the Purchaser's reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement in an amount not to exceed $120,000.00 to the Purchaser upon (i) a termination of the Agreement by reason of the failure of the Closing to occur by July 31, 2006 or (ii) a termination of the Agreement by reason of (A) the failure of the Sale Order to be entered on or before July 26, 2006 or (B) the Sale Order being subject to a stay or injunction, in any case provided that the Purchaser is not then in breach of the Agreement for which MobileAria had previously notified the Purchaser.

E.    <u>Bidding Procedures</u>

31.    The Sale of the Acquired Assets is subject to higher or otherwise better offers pursuant to the Bidding Procedures.  Accordingly, MobileAria seeks approval of the Bidding Procedures for the Sale of the Acquired Assets.  MobileAria has determined that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Acquired Assets for the benefit of MobileAria's estate, creditors, and other interested parties.

32.    The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process").

33.    The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> provide, in relevant part, as follows:[9]

(a)    <u>Assets To Be Sold</u>:  The assets proposed to be sold are the Acquired Assets.

(b)    <u>"As Is, Where Is"</u>:  The Bidding Procedures provide that the sale of the Acquired Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description except as set forth in the Agreement or the purchase agreement of a Successful Bidder.

(c)    <u>Free Of Any And All Claims And Interests</u>: The Acquired Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "Claims and Interests") and the Claims and Interests shall attach to the net proceeds of the sale of such Acquired Assets.

(d)    <u>Participation Requirements</u>:  To ensure that only bidders with a serious interest in the purchase of the Acquired Assets participate in the Bidding Process, the Bidding Procedures provide for certain minimal requirements for a potential bidder to become a "Qualified Bidder."  These requirements include (i) executing a confidentiality agreement substantially in the form attached to the Bidding Procedures, (ii) providing MobileAria with certain financial assurances as to such bidders ability to close a transaction, and (iii) submitting a preliminary proposal reflecting any Acquired Assets expected to be excluded and the purchase price range.

(e)    <u>Due Diligence</u>:  The Bidding Procedures permit all Qualified Bidders an opportunity to participate in the diligence process.  MobileAria will coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.

(f)    <u>Bid Deadline</u>:  The Bidding Procedures provide for a bid deadline of 11:00 a.m. (prevailing Eastern time) on June 29, 2006 (the "Bid Deadline").  As soon as

---

[9]    In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the provisions of the Bidding Procedures shall control.  Capitalized terms used but not otherwise defined in this summary have the meanings ascribed to them in the Bidding Procedures.

reasonably practicable following receipt of each Qualified Bid, MobileAria will deliver to Purchaser and its counsel complete copies of all items and information set forth in section (g) below.

(g)    Bid Requirements:  All bids must include the following documents: (i) a letter stating that the bidder's offer is irrevocable for the period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a good faith deposit of $500,000.00, and (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

(h)    Qualified Bids: To be deemed a "Qualified Bid," a bid must be received by the Bid Deadline and, among other things, (i) must be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to MobileAria than those contained in the Agreement, (ii) must not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) must have a value greater than the purchase price reflected in the Agreement plus the amount of the Break-Up Fee plus $400,000.00, (iv) must not be conditioned on bid protections, other than those contemplated in the Bidding Procedures, (v) must contain acknowledgements and representations as set forth in the Bidding Procedures, and (vi) includes a commitment to consummate the purchase or the Acquired Assets within not more than 15 days after entry of a Bankruptcy Court order approving such purchase.  With certain limited exceptions, MobileAria retains the sole right to deem a bid a Qualified Bid, if such bid does not conform to one or more of the aforementioned requirements, provided however, that such bid must have a value greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus $400,000.00, taking into account all material terms of any such bid. Each Qualified Bid other than that of the Purchaser shall be called a "Subsequent Bid."

(i)    Conduct Of Auction: If MobileAria receives at least one Qualified Bid in addition to the Agreement, MobileAria will conduct an auction (the "Auction") of the Acquired Assets at 10:00 a.m. (prevailing Eastern time) on or before July 10, 2006, in accordance with the procedures outlined in the Bidding Procedures which include: (i) attendance at the Auction will be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two business days prior to the Auction, each Qualified Bidder with a Qualified Bid must inform MobileAria whether it intends to participate in the Auction and at least one business day prior to the Auction, MobileAria will provide such bidders copies of the Qualified Bid which MobileAria believes is the highest or otherwise best offer for the Acquired Assets, (iii) all Qualified Bidders will be entitled to be present for all Subsequent Bids, and (iv) bidding at the Auction will begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $100,000, and conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids.

(j)    Selection of Successful Bid:  As soon as practicable after the conclusion of the Auction, MobileAria will, in consultation with its financial advisors, review each Qualified Bid and identify the highest or otherwise best offer for the Acquired Assets (the "Successful Bid") and the bidder making such bid (the "Successful Bidder").  MobileAria will sell

the Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "Sale Hearing").

        (k)      Sale Hearing: MobileAria requests that the Sale Hearing be scheduled for July 19, 2006 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing may be adjourned or rescheduled by MobileAria without notice other than by an announcement of the adjourned date at the Sale Hearing. If no Qualified Bids other than that of the Purchaser are received, MobileAria will proceed with the sale of the Acquired Assets to the Purchaser following entry of the order approving the Sale. If MobileAria does receive additional Qualified Bids, then, at the Sale Hearing, MobileAria shall seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid" and such bidder, the "Alternate Bidder"). A bid will not be deemed accepted by MobileAria unless and until approved by the Bankruptcy Court. Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid will be deemed to be the Successful Bid and MobileAria will effectuate a sale to the Alternate Bidder without further order of the Bankruptcy Court.

        (l)      Return Of Good Faith Deposits: The Bidding Procedures provide that good faith deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open until two business days following the closing of the Sale (the "Return Date"). Notwithstanding the foregoing, the good faith deposit submitted by the Successful Bidder, together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder. If a Successful Bidder fails to consummate an approved sale, MobileAria will not have any obligation to return such good faith deposit and it shall irrevocably become property of MobileAria. On the Return Date, MobileAria will return the good faith deposits of all other Qualified Bidders, together with the accrued interest thereon.

        (m)      Reservation of Rights: MobileAria, after consultation with the agent for the debtors' prepetition secured lenders and the Creditors' Committee: (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer, and (ii) may reject at any time, any bid (other than the Purchaser's bid) that is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of MobileAria, its estate and creditors as determined by MobileAria in its sole discretion.

F.      Bid Protections

        34.      The Purchaser has expended, and likely will continue to expend,

considerable time, money, and energy pursuing the Sale and has engaged in extended arms'

length and good faith negotiations. The Agreement is the culmination of these efforts.

        35.      In recognition of this expenditure of time, energy, and resources,

MobileAria has agreed to provide certain bid protections to the Purchaser (the "Bid

Protections").  Specifically, the Agreement provides, and MobileAria respectfully requests that

the Bidding Procedures Order approve, a break-up fee payable by MobileAria to the Purchaser in

the amount of 3.0% of the purchase price if (a) MobileAria sells, transfers, leases or otherwise

disposes of, directly or indirectly, including through an asset sale, stock sale, merger, or other

similar transaction, all or substantially all or a material portion of the Acquired Assets in a

transaction or a series of transactions with one or more parties other than the Purchaser, or (b) (i)

MobileAria accepts a Qualified Bid or Qualified Bids at the Auction other than that of the

Purchaser (ii) the Purchaser does not submit a subsequent bid at the Auction, and (iii)

MobileAria does not provide written notice to the Purchaser and its counsel on or before 5:00

p.m. (prevailing Eastern time) on July 26, 2006 that, notwithstanding MobileAria's acceptance of

a Qualified Bid or Qualified Bids other than that of the Purchaser at the Auction, it intends to

close the transactions contemplated by the Agreement on or before July 31, 2006.  MobileAria's

obligation to pay the Bid Protections, as provided by the Agreement, shall survive termination of

the Agreement and, until paid, shall constitute a superpriority administrative expense pursuant to

section 507(b) of the Bankruptcy Code.

   36.  In addition, the Agreement provides, and MobileAria respectfully requests

that the Bidding Procedures Order approve, reimbursement of the Purchaser's reasonable, actual

out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the

Agreement not to exceed $120,000.00 will be payable to the Purchaser, subject to this Court's

approval pursuant to the Bidding Procedures Order, upon (y) a termination of the Agreement by

reason of the failure of the Closing to occur on or before July 31, 2006 or (z) a termination of the

Agreement by reason of (1) the failure of the Sale Order to be entered on or before July 26, 2006

or (2) the Sale Order being subject to a stay or injunction, in any case provided that the Purchaser

is not then in breach of the Agreement for which MobileAria had previously notified the Purchaser.  The Purchaser has agreed that, in the event that it would otherwise be entitled to receive both the break-up fee and the expense reimbursement under the Agreement, the Purchaser shall only be entitled to receive the larger of the two and in no case shall be entitled to receive payment of both.

37.    The Bid Protections were a material inducement for, and a condition of, the Purchaser's entry into the Agreement.  MobileAria believes that the Bid Protections are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Purchaser in connection with the Sale and (b) the fact that the Purchaser's efforts have increased the chances that MobileAria will receive the highest or otherwise best offer for the Acquired Assets, to the benefit of MobileAria, its estate, its creditors, and all other parties in interest.

38.    The Purchaser is unwilling to commit to hold open its offer to purchase the Acquired Assets under the terms of the Agreement unless the Bidding Procedures Order authorized payment of the Bid Protections.  Thus, absent entry of the Bidding Procedures Order and approval of the Bid Protections, MobileAria may lose the opportunity to obtain what it believes to be the highest and best offer for the Acquired Assets.

39.    Payment of the Bid Protections will not diminish MobileAria's estate. MobileAria will not terminate the Agreement so as to incur the obligation to pay either of the Bid Protections unless to accept an alternative Successful Bid, which must exceed the price offered by the Purchaser by an amount sufficient to pay the applicable Bid Protections. MobileAria thus requests that the Court authorize payment of the Bid Protections pursuant to the terms and conditions of the Agreement.

G.    Notice Of Bid Procedures And Sale

40.    Notice Of Sale Hearing.  Within five days after entry of the Bidding Procedures Order (the "Mailing Date"), MobileAria (or its agent) proposes to serve the Motion, the Agreement, the proposed Sale Order, the Bidding Procedures, and a copy of the Bidding Procedures Order by first-class mail, postage prepaid, upon (a) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past six months,[10] (b) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Acquired Assets, (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion, (d) all parties to the Assumed Contracts, (e) all parties to Post-Petition Contracts, (f) the United States Attorney's office, (g) the Securities and Exchange Commission, (h) the Internal Revenue Service, (i) all entities on the 2002 List, and (j) counsel to the Creditors' Committee and the Equityholders' Committee.

41.    Sale Notice.  On or before the Mailing Date, MobileAria (or its agent) proposes to serve by first-class mail, postage prepaid, a notice of the Sale (the "Sale Notice"), substantially in the form annexed hereto as Exhibit E, upon all other known creditors of MobileAria.

H.    Assumption And Assignment Of Contracts

42.    In connection with the proposed Sale, MobileAria seeks authority to assume and assign the Assumed Contracts to the Purchaser or the Successful Bidder.  With respect to the Assumed Contracts, MobileAria no later than ten days after the entry of the Bidding Procedures Order will file with the Court and serve on each party to an Assumed

---

[10]    All such entities will also be served by electronic mail to the extent MobileAria has electronic mail addresses for such parties.

Contract a cure notice substantially in the form attached hereto as <u>Exhibit F</u> (the "Cure Notice").

The Cure Notice will state the cure amount that MobileAria believes is necessary to assume such

contract or lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and notify

each party that such party's lease or contract will be assumed and assigned to the Purchaser or the

Successful Bidder to be identified at the conclusion of the Auction.  In addition, such Cure

Amounts will be listed on a schedule to the Sale Order.

43.    Any objection to the Cure Amount must be filed by within ten days of the

date of the Cure Notice (the "Cure Objection Deadline").  Any objection to the Cure Amount

must state with specificity what cure the party to the Assumed Contract believes is required with

appropriate documentation thereof.  If no objection is timely received, the Cure Amount set forth

in the Cure Notice will be controlling notwithstanding anything to the contrary in any Assumed

Contract or other document and the nondebtor party to the Assumed Contract will be forever

barred from asserting any other claim arising prior to the assignment against MobileAria, the

Debtors, or the Purchaser or the Successful Bidder (as appropriate) as to such Assumed Contract.

44.    Within two business days of the conclusion of the Auction, MobileAria

will send a notice (the "Assumption Notice"), in a form substantially similar to the form attached

hereto as <u>Exhibit G</u>, to each nondebtor party to an Assumed Contract identifying the Successful

Bidder.  Any objection to the assumption and assignment of any Assumed Contract will be filed

no later than two business days prior to the Sale Hearing, unless otherwise ordered by the Court.

<u>Applicable Authority</u>

A.    <u>Bidding Procedures</u>

45.    Section 363 of the Bankruptcy Code provides that the Debtors, "after

notice and a hearing, may use, sell or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b).  To approve the use, sale, or lease of property

22

outside the ordinary course of business, this Court need only determine that the Debtors' decision is supported by "some articulated business justification."  See, e.g., Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.) 722 F.2d 1063, 1070 (2d Cir. 1983); In re Chateaugay Corp., 973 F.2d 141, 143-145 (2d Cir. 1992) (affirming, based in part on Lionel, decision "authoriz[ing] the sale of an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization"); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate outside the ordinary course of business if he has an articulated business justification.") (citations omitted); Stephens Indus. Inc. v. McClung, 789 F.2d 386, 389-90 (6th Cir. 1986) (adopting reasoning in Lionel and concluding "that a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); In re Abbott Dairies of Pa., Inc., 788 F.2d 143, 1447-48 (3d Cir. 1986).

46.     The Court should approve MobileAria's Sale of the Acquired Assets outside the ordinary course of business if MobileAria can demonstrate a sound business justification for the proposed transaction.  See In re Lionel, 722 F.2d at 1070-71; In re Ionosphere Clubs, Inc., 100 B.R. 670, 674-78 (Bankr. S.D.N.Y. 1989) (applying Lionel).  Once MobileAria articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotations omitted).  MobileAria's business judgment "should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or

23

whim or caprice." In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal citations omitted).

47.    The business judgment rule shields a debtor's management from judicial second-guessing. In re Johns-Manville Corp., 60 B.R. 612, 615-616 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

48.    As set forth above, MobileAria has sound business justifications for pursuing a sale process at this time. Although the Debtors believe that MobileAria is a fundamentally strong business in a emerging and rapidly growing market, MobileAria does not present a strong fit within the Debtors' anticipated product portfolio under their transformation plan. Thus, the Debtors and MobileAria have determined that MobileAria's value will be maximized through the divestiture of its assets to an entity that is a better strategic fit and in a financial position to make the necessary cash infusions to support MobileAria's future growth. Moreover, delaying the sale of the Acquired Assets proposed by MobileAria pursuant to these procedures may result in the erosion of MobileAria's value. Accordingly, there is a sound business purpose for pursuing the sale process.

49.    Moreover, a prospective purchaser of assets from a chapter 11 debtor may be reluctant to make an offer, because it knows that even if it reaches agreement with the debtor, its offer is subject to overbid. Pre-approved bidding procedures address these concerns, by assuring initial bidders that any auction procedure will be reasonable. Thus, MobileAria submits that the use of the Bidding Procedures also reflects sound business judgment.

B.    Sale Of The Acquired Assets Free And
      Clear Of Liens, Claims, Encumbrances, And Interests

24

50.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is sold is great that the aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

51.    Therefore, section 363(f) permits MobileAria to sell the Acquired Assets free and clear of all liens, claims, and encumbrances, <u>except</u> the liabilities specifically assumed by a Successful Bidder.  Each lien, claim or encumbrance that is not the result of an assumed liability satisfies at least one of the five conditions of 11 U.S.C. § 363(f), and MobileAria submits that any such lien, claim, or encumbrance will be adequately protected by attachment to the net proceeds of the Sale, subject to any claims and defenses MobileAria may posses with respect thereto.  Accordingly, MobileAria requests that the Acquired Assets be transferred to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances, except for the liens resulting from assumed liabilities, with such liens, claims, and encumbrances to attach to the proceeds of the Sale of the Acquired Assets.

C.    The Purchase Is A Good Faith Purchaser Pursuant To
Section 363(m) Of The Bankruptcy Code And The Transaction
Contemplated By The Agreement Should Be Deemed Not
<u>Avoidable Pursuant To Section 363(n) Of The Bankruptcy Code</u>

52.    Section 363(m) of the Bankruptcy Code provides:

25

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci held that the

> good faith of a purchaser is shown by the integrity of his conduct during
> the course of the sale proceedings; where there is a lack of such integrity,
> a good faith finding may not be made. A purchaser's good faith is lost by
> 'fraud, collusion between the purchaser and other bidders or the trustee, or
> an attempt to take grossly unfair advantage of other bidders.'

126 F.3d at 390 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir.

1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen

Int'l Airlines Inc. v. Pan Am Corp. (In re Pam Am Corp.), Case Nos. 91 Civ. 8319 (LMM) to 91

Civ. 8324 (LMM), 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992); In re Sasson Jeans, Inc., 90

B.R. 608, 610 (S.D.N.Y. 1988).

53.     Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

> The trustee may avoid a sale under this section if the sale price was
> controlled by an agreement among potential bidders at such sale, or may
> recover from a party to such agreement any amount by which the value of
> the property sold exceeds the price at which such sale was consummated,
> and may recover any costs, attorneys' fees, or expenses incurred in
> avoiding such sale or recovering such amount.

54.     MobileAria submits, and will present evidence at the Sale Hearing, that as

set forth above, the Agreement is an intensely negotiated, arm's-length transaction, in which the

Purchaser has at all times acted in good faith. MobileAria, therefore, requests that the Court

make a finding that the Purchaser has purchased the Acquired Assets and assumed the Assumed

Contracts and Assumed Liabilities in good faith within the meaning of section 363(m) of the

Bankruptcy Code.  Further, MobileAria submits that any asset purchase agreement reached as a result of the Bidding Procedures will be an arm's-length, intensely-negotiated transaction entitled to the protections of section 363(m) of the Bankruptcy Code and MobileAria will present evidence of the same at the Sale Hearing.  As a key element of a good faith finding is that the Purchaser's successful bid is not the product of fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders, MobileAria further requests that the Court make a finding that the transactions contemplated by the Agreement are not avoidable under section 363(n) of the Bankruptcy Code.

D.    The Assumption And Assignment Of The Assumed Contracts

55.    Section 365(f)(2) of the Bankruptcy Code provides that:

[t]he trustee may assign an executory contract or unexpired lease of the debtor only if –

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

56.    Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  It provides:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee –

27

>> (A)    cures, or provides adequate assurance that the
trustee will promptly cure, such default;

>> (B)    compensates, or provides adequate assurances that
the trustee will promptly compensate, a party other than the debtor to such
contract or lease, for any actual pecuniary loss to such party resulting from
such default; and

>> (C)    provides adequate assurance of future performance
under such contract or lease.

11 U.S.C. § 365(b)(1).

57.    Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction." See In re Sanshoe Worldwide Corp., 139 B.R. 585, 592 (S.D.N.Y. 1992) (the presence of adequate assurance should be "determined under the facts of each particular case"); see also In re Fifth Avenue Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds). Courts have consistently held that the phrase does not provide total assurances. In re Natco Industries, Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). In fact, adequate assurance has been provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See In re Bygraph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

58.    To the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Acquired

Assets or any portion thereof, MobileAria will cure any such default prior to such assumption and assignment.  Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of any Successful Bidder, its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

59.    The Sale Hearing therefore will provide this Court and other parties in interest ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder(s) to provide adequate assurance of future performance under the contracts to be assumed.  This Court therefore should have a sufficient basis to authorize MobileAria to assume and assign contracts as set forth in the Agreement.

E.    Approval Of The Bid Protections

60.    Bidding incentives encourage potential purchasers to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  See, e.g., In re 995 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule.  In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has seriously argued the inapplicability of the business judgment test, and if any such argument had been made, the Court would be compelled . . . to reject it.");  In re Bethlehem Steel Corp., Case No. 02 Civ. 2854 (MBM), 2003 WL 21738964 at *8 n.13 (S.D.N.Y. July 28, 2003) (the court should approve agreements providing bidding incentives "unless they are unreasonable or appear more likely to chill the bidding process than to enhance it").  One court, explaining the

force of the business judgment rule in this context, stated "the business judgment rule does not

become inapplicable simply because a court decides a break-up fee is too large." In re Integrated

Resources, 147 B.R. at 660.

61.     This district has established a three part test for determining when to

permit bidding incentives. Id. at 657-58. The three factors are: "whether (1) relationship of

parties who negotiated breakup fee is tainted by self-dealing or manipulation; (2) whether fee

hampers, rather than encourages, bidding; and (3) amount of fee is unreasonable relative to

purchase price." Id.

62.     Here, MobileAria seeks authority to utilize the Bidding Process and Bid

Protections in the event that the Purchaser is not ultimately the Successful Bidder or must

increase the Purchaser's bid price to become the Successful Bidder. The Bid Protections are fair

and reasonable in amount, particularly in view of the efforts to be made by the Purchaser and the

risk to the Purchaser of being used as a stalking horse. Indeed, the maximum amount of the

Break-Up Fee – 3.0% of the purchase price – not only constitutes a fair and reasonable

percentage of a proposed purchase price, but also is customary for similar transactions of this

type in the bankruptcy context. In addition, the payment of expenses and the indemnification

and expense reimbursement provisions of the Agreement are reasonable given the significant

investment in time and resources that the Purchaser will have contributed as the stalking horse

bidder. Further, the Purchaser has agreed that the break-up fee and the expense reimbursement

shall be mutually-exclusive -- in the event that it would otherwise be entitled to receive both the

break-up fee and the expense reimbursement under the Agreement, the Purchaser shall only be

entitled to receive the larger of the two and in no case shall be entitled to receive payment of

both. Moreover, the amount of the proposed Break-Up Fee is within the range of breakup fees

typically approved by courts in this district.  See, e.g., In re Allegiance Telecom, Inc., Case No.

03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense

reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-16034 (AJG)

(Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closes on a superior transaction);

In re Loral Space & Communications Ltd., Case Nos. 03-41710 and 03-41709 (RDD) (Bankr.

S.D.N.Y. 2003) (allowing 2% for break-up fee and .8% for expense reimbursement allowed only

if court enters order approving alternative transaction).

        63.     Further, MobileAria submits that the Bidding Procedures and the Bid

Protections have encouraged competitive bidding in that the Purchaser would not have entered

into the Agreement without such provisions.  The Bidding Procedures and the Bid Protections

have thus induced a bid that otherwise would not have been made and without which bidding

would be limited.  Finally, the mere existence of the Bidding Procedures and Bid Protections

permits MobileAria to insist that competing bids be materially higher or otherwise better than the

Agreement, a clear benefit to MobileAria, its estate, its creditors, and all other parties in interest.

G.     Waiver Of The Ten-Day Stays Provided By Bankruptcy Rules 6004 And 6006

        64.     Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides: "An

order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is

stayed until the expiration of 10 days after the entry of the order, unless the court orders

otherwise."

        65.     Courts in this district have waived these ten-day stays upon a showing of

business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005)

("As I find that the required business need for a waiver has been shown, the order may provide

for a waiver of the 10-day waiting period under Fed. R. Bankr.P. 6004(g)."); In re PSINet Inc.,

268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring a demonstration of "a business exigency"

for a waiver of the ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)).  In general,

courts will grant waivers when doing so is important to the Debtor's financial health.  See In re

Second Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004) (affirming decision

waiving ten-day stay because "time was of the essence"); In re Decora Industries, Inc., Case No.

00-4459 (JJF), 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that

an immediate closing is required to remedy Debtors' precarious financial and business position.

Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to

close.").

   66. As described above, MobileAria's growth requires current cash

contributions that the Debtors' current financial position and the Debtors' focus on investments

on its business lines that are more likely to comprise their restructured product portfolio do not

allow the Debtors to make.  By delaying the time in which the Sale may be completed, there is a

risk that MobileAria will suffer business deterioration.  Moreover, a delay in the ability of a

Successful Bidder to close the Sale could chill prospective bidders from entering the sale process

out of a reluctance to keep bids open for an extended period of time and thus could prevent

MobileAria from maximizing the value of its assets.  Finally, the Purchaser has insisted upon the

ability to close the transactions contemplated by the Agreement, assuming that MobileAria does

not receive a higher or otherwise better bid at the auction, quickly following entry of the Sale

Order and has therefore required that the Sale Order include a waiver of the ten-day stays

provided under Bankruptcy Rules 6004(g) and 6006(d) by the terms of the Agreement.

67.    Because MobileAria has demonstrated a business need requiring closing

within ten days, this Court should exercise its authority under Bankruptcy Rules 6004(g) and

6006(d) and waive the ten-day stays.

H.    Conclusion

68.    MobileAria submits that the granting of the Bidding Procedures, Bid

Protections, and Notice Procedures, the setting of the Sale Hearing, and an order approving the

Sale of the Acquired Assets free and clear of liens, claims, and encumbrances to the Purchaser or

to the Successful Bidder, the assumption and assignment of the Assumed Contracts to the

Purchaser or the Successful Bidder, and the assumption of the Assumed Liabilities by the

Purchaser or the Successful Bidder are in the best interests of MobileAria's estate and will

maximize value for all creditors as described above.

## Notice Of Motion

69.    Notice of this Motion has been provided in accordance with the Seventh

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824)

("Supplemental Case Management Order").  In addition, the Debtors have complied with the

Supplemental Case Management Order with respect to the filing of this Motion and the need for

expedited relief. [11]  Notice will be provided in accordance with the Notice Procedures described

---

[11]    The Debtors have noticed this Motion for hearing at the June 16, 2006 regularly-scheduled omnibus hearing in
these cases in compliance with the Supplemental Case Management Order.  Pursuant to the terms of the
Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee
regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed
that the Creditors' Committee has consented to this Motion being heard at the June omnibus hearing.  Because
this Motion is being filed on less than 20 days' notice, parties-in-interest will have until June 13, 2006 to file an
objection.

herein.[12]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

70.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[12]    In addition, notice of this Motion has also been provided by electronic mail to the Potential Bidders.

WHEREFORE the Debtors respectfully request that the Court (a) enter an order approving (i) the Bidding Procedures, (ii) the Bid Protections, (iii) the Notice Procedures, and (iv) the setting of the Sale Hearing; (b) enter an order approving (i) the Sale of the Acquired Assets free and clear of liens, claims, and encumbrances to the Purchaser or to the Successful Bidder, (ii) the assumption and assignment of the Assumed Contracts to the Purchaser or the Successful Bidder, and (iii) the assumption of the Assumed Liabilities by the Purchaser or the Successful Bidder; and (c) grant them such other and further relief as is just.

Dated:  New York, New York
       June 6, 2006

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession