1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-44481

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DELPHI CORPORATION,

9

10         Debtor.

11

12  - - - - - - - - - - - - - - - - - - - -x

13                 (A.M. SESSION)

14                 U.S. Bankruptcy Court

15                 One Bowling Green

16                 New York, New York

17

18                 May 24, 2006

19                 9:04 a.m.

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

2

1

2  MOTION to Authorize Motion For Order Under 11

3  U.S.C. Section 1113(c) Authorizing Rejection

         4    Of Collective Bargaining Agreements And Under

         5    11 U.S.C. Section 1114(g) Authorizing

         6    Modification Of Retiree Welfare Benefits filed

         7    by John Wm. Butler Jr. on behalf of Delphi

         8    Corporation.

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24    Transcribed By:  Esther Accardi

        25

                                                                        3

         1

         2    A P P E A R A N C E S :

         3

         4    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

         5         Attorneys for Delphi Corporation

         6         Four Times Square

         7         New York, New York 10036

         8

```
 9   BY:   JOHN WM. BUTLER, JR., ESQ.

10

11   O'MELVENY & MYERS, LLP

12        Attorneys for Debtors

13        7 Times Square

14        New York, New York 10036

15

16   BY:   JEFFREY I. KOHN, ESQ.

17

18   O'MELVENY & MYERS, LLP

19        Attorneys for Debtors

20        1625 Eye Street

21        Washington, D.C. 20006

22

23   BY:   TOM JERMAN, ESQ.

24

25
```

                                                    4

```
 1   O'MELVENY & MYERS, LLP

 2        Attorneys for Debtors

 3        400 South Hope Street

 4        Los Angeles, CA 90071

 5

 6   BY:   ROBERT A. SIEGEL, ESQ.

 7

 8   WEIL GOTSHAL & MANGES, LLP

 9        Attorneys for General Motors

10        767 Fifth Avenue

11        New York, New York 10153

12

13   BY:   MR. JEFFREY TANENBAUM, ESQ.
```

```
14

15   KENNEDY, JENNIK & MURRAY, P.C.

16        Attorneys for IUE

17        113 University Place

18        New York, New York 10003

19

20   BY:  THOMAS KENNEDY, ESQ.

21

22

23

24

25
```

5

```
 1   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

 2        Attorneys for Steelworkers Union

 3        1350 Broadway

 4        Suite 501

 5        New York, New York 10018

 6

 7   BY:  LOWELL PETERSON, ESQ.

 8

 9   PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER &

10   BRUEGGEMAN, S.C.

11        Attorneys for IBEW and IAM

12        1555 North River Center Drive

13        Suite 202

14        Milwaukee, Wisconsin 53212

15

16   BY:  MARIANNE GOLDSTEIN ROBBINS, ESQ.

17

18   GORLICK, KRAVITZ & LISTHAUS, P.C.
```

```
19        Attorneys for Operating Engineers

20        Locals 18-S, 101-S, 832-S

21        17 State Street

22        4th Floor

23        New York, New York 10004

24

25   BY:   BARBARA S. MEHLSACK, ESQ.
```

6

```
 1

 2   COHEN, WEISS AND SIMON, LLP

 3        Attorneys for UAW

 4        330 West 42nd Street

 5        New York, New York 10036

 6

 7   BY:   BRUCE H. SIMON, ESQ.

 8

 9   WHITE & CASE, LLP

10        Attorneys for Appaloosa Management

11        1155 Avenue of the Americas

12        New York, New York 10036

13

14   BY:   GLENN M. KURTZ, ESQ.

15        DOUGLAS P. BAUMSTEIN, ESQ.

16

17   KIRKPATRICK & LOCKHART NICHOLSON GRAHAM, LLP

18        Attorneys for Wilmington Trust Company

19        599 Lexington Avenue

20        New York, New York 10022

21

22   BY:   EDWARD M. FOX, ESQ.

23
```

24

25

7

1                P R O C E E D I N G S

2              THE COURT:  Please be seated.  Okay

3     we're on the record in Delphi Corporation.

4              MR. BUTLER:  Your Honor, good

5     morning.  Jack Butler from the law firm of

6     Skadden, Arps, Slate, Meagher & Flom LLP, here

7     with my colleagues from O'Melveny & Myers

8     law firm representing the debtors in

9     connection with this continued hearing on the

10    debtor's motion under Section 1113 and 1114 of

11    the Bankruptcy Code.  Your Honor before

12    proceeding with the first of today's witnesses

13    continuing the debtor's direct case.  Mr. John

14    Sheehan, the debtor's chief restructuring

15    officer is the next witness slated.  Counsel

16    for General Motors Corporation asked if they

17    might address the Court.

18             THE COURT:  Okay.  This is about the

19    request they made for an adjournment?

20             MR. TANENBAUM:  Yes, Your Honor.

21             THE COURT:  Okay.  That's fine.  I

22    read the -- obviously that request plus the

23    letters in response by the debtors, the

24    creditor' committee and the equity committee

25    so you should assume that.

8

1           MR. TANENBAUM:  Good morning, Your

2    Honor, Jeffrey Tanenbaum from Weil Gotshal &

3    Manges representing General Motors

4    Corporation.  Yesterday, Your Honor, General

5    Motors sent to the Court, with copies to the

6    parties in this proceeding, a letter urging

7    the adjournment of this 1113, 1114 motion.

8    Having observed the initial phase of these

9    hearings and the attended time and expense

10   related to it, there is no doubt that the

11   focus at this moment and the only focus should

12   be on negotiation, not litigation.  As the

13   Court and all parties will agree, General

14   Motors plays an integral role in these Chapter

15   11 cases and in the debtor's ultimate

16   corporate transformation.  Whether by

17   implications through the now infamous benefit

18   guaranty, the so-called General Motors

19   consensual proposal, or the incredibly

20   intricate negotiations related to the wind-

21   down and closure, sale or continuation of the

22   debtor businesses, as exemplified in part by

23   the special attrition program, General Motors

24   will play a major part in the contemplated

25   success of these Chapter 11 cases.  How we

9

1    achieve that end is what General Motor's

2    request is all about.  It should be clear to

3    the Court for better or worse and the

4    livelihood and financial well being of

5    thousands of employees, both hourly and

6   salary, is at stake.  Tensions and emotions

7   run very high.  One must not, and cannot,

8   ignore the long history of union negotiations

9   that predate these cases.  The wages and

10   benefits achieved by these unions and the

11   necessary modifications that must now be made

12   to the CBA's which will undue many of these

13   achievements.  Nobody, including the debtors,

14   suggest that it's an easy for pill to swallow.

15   However, history and emotion of what we must

16   live with, and the 1113, 1114 process,

17   represents a delicate balance between

18   utilization of the power of contract rejection

19   granted to the debtors in respective

20   collective bargaining agreements, and the

21   clear inducement to negotiate that is an

22   integral part of the statutory framework.

23   General Motors strongly suggests that months

24   of proposals or non-proposals, negotiations or

25   non-negotiations, dozens of depositions of

10

1   expert and non-expert witnesses and three days

2   of hearings have more than adequately set the

3   stage for the ultimate negotiations that must

4   occur and be concluded one way or another.

5   However, rather than agree to a hiatus in

6   these proceedings, to allow the unions,

7   General Motors and itself to attend to the

8   task at hand, which General Motors

9   respectfully submits a twelve-day recess does

10   not qualify for, the debtors have chosen a

11  dual track.  Including the high risk stakes of

12  win or loss in Court.  Which in the end will

13  empower Delphi or the unions or both with

14  weapons that will serve simply to place

15  additional unnecessary pressure on a situation

16  which both the unions and General Motors

17  already recognize is at a critical stage.  The

18  question's been raised, why can't litigation

19  and negotiation occur at the same time?  The

20  answer is simple.  They can, but they

21  shouldn't.  As stated earlier, the global

22  transformation in negotiations including the

23  related 1113, 1114 issues are intricate,

24  extraordinary complex and are requiring daily

25  attention by General Motors.  The results of

11

1  the attrition program are integral to the

2  finalization of the ultimate road map to deal

3  with many of the issues at hand.  The fact is

4  that the overhang of these proceedings is

5  chilling the negotiations.  Particularly from

6  the perspective of the unions who are not

7  dealing with invisible shareholders but real

8  people, with real families and real issues who

9  see and react to the positions taken and

10  statements made by the debtors in these cases.

11  And again, for better or worse, we act

12  emotionally to them.  General Motors has not

13  said the debtor should be required to pursue a

14  single track.  It has requested them to do so

15  for the foregoing reasons.  Mr. Butler's

16    letter states that the Court has rejected the

17    contention that the parties might be better

18    served single-tracking these negotiations.

19    The Court has clearly expressed its desire

20    that the parties negotiate in good faith.

21    General motors assumes the Court will be happy

22    to forego these proceedings with the crowd of

23    high paid lawyers involved in order to force

24    the negotiations with periodic progress

25    reports to the Court.  Hearings could always

12

1    resume immediately in the absence of clear

2    progress.  In light of the statutory deadline

3    for ruling on this motion, General Motors

4    appreciates the Court cannot force the parties

5    to stand down.  We find it unfortunate that

6    the debtors have taken the position they have

7    today.  Nonetheless, General Motors stands

8    prepared to continue to work toward the goal

9    of achieving a negotiated resolution of all

10    issues.  Finally, although general motors, has

11    restrained itself at almost every opportunity

12    to respond to the allegations and innuendos of

13    the creditors' committee in the many pleadings

14    it has filed with this Court, including its

15    response to the 1113, 1114 motion itself, GM

16    is compelled to comment on that letter.

17    First, in its opening paragraph, the committee

18    blatantly misstates that GM was suggesting to

19    the Court a 60-day adjournment of the motion

20    to reject contracts.  GM has made no such

21    requests in its letter and the issue for today

22    relates solely to the 1113, 1114 motion.

23    Second, to suggest that the letter sent on

24    behalf of General Motors to this Court,

25    requesting an adjournment of these proceedings

13

1    on the consent of the parties, is the best

2    evidence of the extraordinarily controlling

3    and dominant role General Motors has played in

4    Delphi's affairs and purports to dictate for

5    Delphi whether the hearing should be allowed

6    to proceed is absolutely ludicrous and

7    disingenuous.  Having attacked General Motors

8    good faith intentions, having committed to

9    object to any claims General Motors may

10    ultimately file, and having gone on record as

11    having valid and substantial claims against

12    General Motors, the committee questions why it

13    should not be invited to the negotiating table

14    to deal with General Motors, Delphi, the UAW

15    and the other unions.  Your Honor, has ruled

16    that it is inappropriate for non-debtor, non-

17    union parties to intrude upon the 1113, 1114

18    negotiations.  GMC's has no further reason to

19    comment on this particular issue.  Your Honor,

20    the debtors have voiced their position on the

21    matter at hand.  General Motors thanks the

22    Court for the opportunity to express its views

23    on the process.  And as I've stated earlier,

24    Your Honor, my clients stands prepared to

25    continue to participate actively in the

14

1    negotiation process to facilitate a resolution

2    of the issues at hand.

3            THE COURT:  Okay.  Well it's

4    normally my practice to grant an adjournment

5    when the parties agree to an adjournment.

6    That's obviously not the case here.  And

7    given, as you eloquently noted, the delicate

8    balance under 1113, I'm going to defer to the

9    sort of the collective judgment of the debtors

10    and creditors' committee and the equity

11    committee in not agreeing to an adjournment.

12    My sense in looking at those letters in

13    response to GM's letter was that under perhaps

14    not dramatically different circumstances, they

15    might agree to an adjournment.  For example,

16    if there was a meaningful or a tangible

17    proposal that set a real framework for

18    negotiations where there could be progress

19    reports, as you noted this morning, to see if

20    that framework was working to structure

21    negotiations, then I think that, at least

22    reading between the lines in the parties

23    response to the adjournment request, they

24    might well agree to an adjournment and I might

25    pressure them, you know, to an adjournment.

15

1    You're also, I think, correct that these

2    issues are intricate.  Even more intricate

3    than the normal Section 1113 issue because of

4    GM's involvement.  And it strikes me that one

5    key perhaps to putting this on a single track

6    approach as opposed to a dual track approach

7    where people are litigating and negotiating at

8    the same time would be to work out, literally,

9    a process framework of issues to be addressed

10   in sequence so that the parties in interest no

11   that this is all leading to an overall

12   approach.  And, perhaps, if that were coupled

13   with some movement on an initial issue, there

14   might be a real basis for an adjournment to

15   see if we could move along a path.  But, I

16   think, people need to be assured that there is

17   some structure to the process to move off of

18   litigation.

19           MR. TANENBAUM:  Your Honor, the

20   request for the adjournment and the letter,

21   albeit very simple, made it clear that within

22   30 days it was the expectation that the

23   parties return to the Court to indicate the

24   status of progress.  I understand Your Honor's

25   argu --

16

1           THE COURT:  No.  No, that's fine.  I

2    just think that before I put off hearings I

3    think we need a little more than that.

4           MR. TANENBAUM:  No, Your Honor, I

5    meant that it was going to continue.  I don't

6    disagree with Your Honor that having a

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

```
 7   stricter framework to the negotiations

 8   certainly should be part of the process, no

 9   doubt about that.  Because we're really

10   testing the good faith intentions of the

11   party.  And General Motors is not suggesting

12   that that doesn't make sense in light of the

13   situation.  What we're dealing with here is a

14   desire to reach an endgame at some point

15   sooner rather than later, which is fine.  I

16   think the problem that we're indicating here

17   is that the overhang of the these proceedings

18   is having a negative effect, whether people

19   want to admit it or not.  And because of the

20   intricacy of the circumstances, that result is

21   not going to prove fruitful or helpful at end.

22   Because it's just going to prove to a load

23   weapons.  But I don't disagree with Your Honor

24   that having a clearer framework and having a

25   guideline as to how the negotiations can and
```

17

```
 1   should continue makes sense.

 2            THE COURT:  Okay.  The parties are

 3   well represented.  Including I think by their

 4   business representatives.  They're not all

 5   here and I would urge them to continue to work

 6   but not wasting any days and see if we can get

 7   to the point where the parties are reasonably

 8   assured that this process can be put on hold

 9   subject to periodic status reports while they

10   bring in extra resources being on the senior

11   people to implement a negotiated solution.
```

12    The only other thing I'd say is that clearly

13    negotiations between the debtor and the unions

14    are just that, between the debtor and the

15    unions.  When GM gets involved though, as is

16    clear from the various positions by third-

17    parties to this motion under 1113 and 1114,

18    most of whose positions are really geared to

19    the implication of the GM claims whether its

20    Appaloosa or others taking that position.  I

21    think, and this is no surprise I'm sure to

22    you, that their views are important to me and

23    I'm sure important to the debtors, and

24    consequently, ultimately important to GM.  And

25    I'm sure GM has been advised of the process in

18

1    bankruptcy court on those types of issues.

2    You either hear about their views now or you

3    hear about them later and it's often better to

4    keep them in the loop.

5         MR. TANENBAUM:  We're hearing about

6    them on a regular basis.

7         THE COURT:  I'm sure you are.  All

8    right.  So, I think enough said on that point.

9         MR. TANENBAUM:  Thank you, Your

10   Honor.

11        THE COURT:  And we'll proceed unless

12   Mr. Simon, you're rising on something?

13        MR. SIMON:  Your Honor, I rise not

14   to -- Bruce Simon, Cohen, Weiss & Simon for

15   the UAW, I rise not to suggest that you change

16   course.  But simply so that some comments that

17    you made which indicate to me perhaps a full

18    appreciation of the nuances and delicacy of

19    the bargaining do not remain uncommented upon.

20    Most specifically, your suggestion that a

21    framework and an ordering of the issues in a

22    logical way would be perhaps of some

23    assistance in arranging for an adjournment of

24    this proceeding.  Please understand that from

25    the UAW's point of view, we believe that there

19

1    is, in fact, an agreement between the parties

2    as to the process to follow.  That was agreed

3    upon, that will be testified to, and that to

4    the extent you've been told to the contrary,

5    we want to make it clear we do not share that

6    view of the world.  We are surprised.  We are

7    disappointed in the denigration of the

8    attrition program, most recently expressed by

9    Delphi, certainly contrasted with the

10    glorification of that result that accompanied

11    its release.  We continue to believe that the

12    process agreed upon by General Motors, Delphi

13    and the UAW to deal with these issues in a

14    step process -- a three-step process was

15    correct, that the attrition program was

16    evidence of its success and that it was the

17    filing of this motion two days later by Delphi

18    that called that momentum and that significant

19    progress to a screeching halt, put it into the

20    courtroom instead of at that process framework

21    agreement where it belonged.  And we continue

22    to believe that the myth of a two-step process

23    while possible in the academic or in the

24    Harvard Business case study view of the world,

25    in the real world, of Section 1113 and the

20

1    real world of restructuring the automobile

2    industry in the country, the notion that we're

3    going to be able to litigate on Wednesday's

4    and Friday's and negotiate on Monday's and

5    Tuesday's is absurd.  Especially when there's

6    a meeting two days ago and the meeting shows

7    up in a declaration by a Delphi witness filed

8    in the Court yesterday.

9            THE COURT:  Well that's part of --

10           MR. SIMON:  That is not going to

11    produce.

12           THE COURT:  That's part of the

13    process I'm afraid.  And if you want to talk

14    about the real world you could look at what

15    happened in Northwest and in Delta and in

16    numerous other cases.  And I'm sure --

17           MR. SIMON:  Your Honor, we were

18    there.

19           THE COURT:  I know.

20           MR. SIMON:  Okay.

21           THE COURT:  I know you were there.

22    And so I know that parties are able to

23    negotiate while they litigate.  It's harder, I

24    appreciate that, there's more pressure.

25    There's more pressure on all the parties

21

1    including GM.  And I just repeat what I said

2    before, I urge the parties to put some

3    detailed process points in place.  If they

4    want to follow the framework that you said

5    they were following.  I encourage them to do

6    that.  I just want them to move forward.

7              MR. SIMON:  Your Honor, I just --

8    sorry.

9              THE COURT:  So I think that's --

10   that's probably enough said on that point.

11             MR. SIMON:  Just a word on Delta and

12   Northwest.  As difficult and complex as those

13   matters were, they involved a sewer company

14   and they involved a similar workforce.

15             THE COURT:  Right.

16             MR. SIMON:  If there's one thing

17   that I believe this case presents that is

18   unique in the annals of Section 1113, it is

19   that General Motors as the absolute sine qua

20   non of any resolution is there.  That makes

21   this enormously complicated.  Well beyond the

22   interesting and difficult cases of Northwest

23   and Delta and a dozen others that I could to

24   Your Honor about.

25             THE COURT:  Well, I agree.

22

1              MR. SIMON:  This is extremely

2    generous.

3              THE COURT:  But on the other hand,

4    one thing that I think we all agree upon -- I

5    hope at least is that the people running GM

6    are guided by logic, reason and economics and

7    not by emotion.  So I think they can see the

8    risks and the rewards and move ahead.

9            MR. SIMON:  Your Honor, so is the

10   UAW.  I did --

11           THE COURT:  I agree.  I agree.

12           MR. SIMON:  I sat there when the

13   notion of emotional response in dealing with

14   issues and I --

15           THE COURT:  No, no.  I just talked

16   about the distinction which is GM.

17           MR. SIMON:  You Honor was clear but

18   Mr. Butler was not.

19           THE COURT:  I agree with you

20   completely.  The unions are very well

21   represented.  Their management are hard-headed

22   business people, that's why they were elected.

23   And so I trust that they'll negotiate too.

24   But the one distinction you made between the

25   other cases where you had the people of GM.

23

1    But I think we can all agree, or at least I

2    hope, that they're not as hard-headed as the

3    people of GM and will understand the

4    exigencies caused by moving ahead with

5    litigation and put something tangible on the

6    table.

7            MR. SIMON:  But I believe its

8    because they are aware of the exigencies of

```
 9   litigation as are we, that the suggestion has
10   been made to Your Honor, made to Delphi,
11   rejected by them, rejected by what I think was
12   an over-the-top response by the unsecured
13   creditors' committee that while they bemoan
14   the fact of litigation as opposed to
15   negotiations they press forward on litigation.
16   Thank you, Your Honor.
17           THE COURT:  Okay.  All right.
18   Should we move ahead with Mr. Sheehan.
19           MR. BUTLER:  Thank you, Your Honor.
20   Your Honor, I'd like to call for cross-
21   examination John D. Sheehan, the company's
22   chief restructuring officer in connection with
23   moving into evidence his declarations which
24   are Exhibit's 5 and 6 to the trial record.
25   (The Sheehan Declaration was hereby received
```

                                              24

```
 1   as Debtor's Exhibit 5 and 6 for
 2   identification, as of this date.)
 3           THE COURT:  Okay.
 4           MR. BAUMSTEIN:  Good morning, Your
 5   Honor.  Doug Baumstein on behalf of the ad-hoc
 6   committee of equity holders.  In Mr. Sheehan's
 7   declarations, he testifies about the financial
 8   condition of Delphi.  He has an entire section
 9   of the declaration entitled "Delphi cannot
10   restructure without modifications to its labor
11   agreements."  The implication of theses
12   sections is clearly that they need to move
13   now.  As you're aware, it is the ad hoc
```

14    committee's belief that moving now may not be

15    in the correct business judgment of debtors.

16    And we think that the fact that we were not

17    allowed to depose Mr. Sheehan on those issues

18    is important.  But perhaps, most importantly,

19    in paragraphs 92 and 93 of Mr. Sheehan's

20    declaration, he states that equity will be

21    wiped out as a result of the, and I quote,

22    "direct and indirect claims against Delphi on

23    account of the non-competitive legacy

24    liabilities and burdensome restrictions under

25    current U.S. labor agreements which are direct

                                                    25

1    claims against the U.S. parent holding

2    company."  As Your Honor is also aware, it is

3    the ad hoc committee's belief that as of now

4    there are no direct claims there and they

5    would be incurring claims as a result.  And

6    both the calculation of those claims and the

7    business judgment, with respect to the

8    incurrence of those claims at this time, we

9    believe are central issues to our objections

10    to this motion right now.  Accordingly, we

11    believe that Mr. Sheehan's declaration should

12    not be admitted into evidence because we were

13    not given an opportunity to examine him in

14    advance of trial.

15            THE COURT:  All right.  Well, again,

16    this is the same issue that has arisen with

17    regard to other witnesses and was the subject

18    of an earlier chambers conference with regard

19    to discovery by Appaloosa over and above the

20    agreements and a discovery schedule reached

21    between the unions and the debtor.  At that

22    time I said that we would not have another

23    deposition of Mr. Sheehan, unlike the expert

24    testimony by the claims analyst that we had

25    during the last session, which I believe was

26

1    not particularly pertinent to Appaloosa's

2    objection.  Here Appaloosa had the opportunity

3    and he wanted extensively to depose Mr.

4    Sheehan in connection with the motion to

5    appoint an equity committee, which is exactly

6    what paragraph 93 addresses.  And, in my view,

7    that deposition which occurred in a matter of

8    weeks before the deposition that you would

9    have taken again, was sufficient.

10    Particularly given the issues involved.  So,

11    I'll deny your request.

12            MR. BAUMSTEIN:  Thank you, Your

13    Honor.

14        (Witness sworn in.)

15            THE COURT:  Just for the record

16    would you spell your name?

17            MR. SHEEHAN:  John J-O-H-N, Sheehan

18    S-H-E-E-H-A-N.

19            MR. KENNEDY:  Good morning, Your

20    Honor.  Tom Kennedy for the IUE-CWA.   First,

21    let me note that the order of union cross

22    examination of Mr. Sheehan will be first the

23    IUE-CWA, then the Steel Workers, the IBEW, the

24    Operating Engineers and then the UAW.

25    CROSS EXAMINATION BY

27

1    MR. KENNEDY:

2    Q.    Good morning, John.

3    A.    Tom.

4    Q.    John, when did you start at Delphi?

5    A.    I began my career at Delphi on July 1,

6    2002.

7    Q.    What was your initial position with

8    them?

9    A.    My initial position was as the chief

10    accounting officer and controller.

11    Q.    And how long did you hold that title?

12    A.    I continue to hold that title today.

13    Q.    And at some point you were also made

14    chief restructuring officer?

15    A.    That's correct.

16    Q.    And when was that?

17    A.    I was named vice president and chief

18    restructuring officer on October 8, 2005.

19    Q.    John, am I correct that Delphi is

20    organized into three sectors?

21    A.    We have organized our operating

22    divisions into three sectors, that's correct.

23    Q.    The first is electrical, electronics and

24    safety.  The second is dynamics propulsion,

25    thermal and interior.  And the third is

28

1    automotive holding groups.  Is that correct?

2    A.    That's correct.

3    Q.    And each of those sectors has one or

4    more operating divisions?

5    A.    That's correct.

6    Q.    Is it also correct that the electrical,

7    electronics and safety sector is Delphi's most

8    profitable and fastest growing business

9    sector?

10   A.    That's correct.

11   Q.    And that electrical, electronics and

12   safety sector itself has three separate

13   divisions?

14   A.    That's correct.

15   Q.    And those divisions are Delphi,

16   Electronics and Safety, Delphi Packard

17   Electrical Systems and Delphi Product and

18   Service Solutions, correct?

19   A.    Yes, sir.

20   Q.    Now the electronics and safety division

21   of the electrical and electronics and safety

22   sector had positive operating income of 222

23   million dollars in 2005, correct?

24   A.    Without looking back at my declaration,

25   I believe that's correct.


                                            29


1    Q.    Well it may be useful, John, if you did

2    take out Exhibit 5, which is your initial

3    declaration in this case.  And I'm referring

4    you to paragraph 14.

5    A.    I agree.

6    Q.    And that operating income of 222 million

7    dollars included a 130 million dollar profit

8    for that division in 2005, correct?

9    A.    That's correct, for North American

10    operations.

11    Q.    I'm sorry?

12    A.    For the North American operations,

13    that's correct.

14    Q.    And under the current labor agreements,

15    without any change used in Delphi's steady

16    state scenario for 2006, that division would

17    still have operating income of 104 million

18    including positive operating income of 56

19    million in its North American operations.  Is

20    that also correct?

21    A.    Yes, sir.

22    Q.    Now, how many North American

23    manufacturing plants are there in the

24    electronics and safety division of the

25    electrical, electronics and safety sector?

30

1    A.    Just ask your question again, if you

2    could, please?  Sorry.

3    Q.    Sure.  Looking at that electronics and

4    safety division that's going to show under the

5    steady state scenario, operating income of 56

6    million dollars in its North American

7    operations, how many manufacturing plants are

8    there in the North American operations in that

9    division?

10    A.    I'm not -- I'm not aware of how many

11    manufacturing facilities the electronics and

12    safety division has in North American total.

13    Q.    Do you know of any of them?

14    A.    Do I know of any of them?

15    Q.    Yes.

16    A.    Yes, I do.

17    Q.    How about Kokomo, for instance?

18    A.    That's in North American, that's

19    correct.

20    Q.    And is it also in the electronics and

21    safety division?

22    A.    Yes, sir.

23    Q.    And that division showing that profit --

24    some of that profit is generated from the

25    Kokomo plant, correct?

31

1    A.    No, I don't believe so.

2    Q.    Okay.  Is it accurate to state that even

3    in this profitable division Delphi has

4    proposed the same reduced labor contract terms

5    that are being proposed for its unprofitable

6    divisions?

7    A.    That is correct.

8    Q.    Have you calculated how much more profit

9    than the 130 million dollars that was made in

10    2005 in the electronics and safety division.

11    Delphi would have made if the wages and

12    benefits being paid in 2005 were equivalent to

13    the competitive wage scenario?

14    A.    How much profit the electronics and

15    safety division --

16    Q.    Yeah.

17    A.    I don't believe that we have calculated

18    the -- or broken down the competitive

19    benchmark scenario by division.  We have done

20    that at the corporation level as a whole.

21    Q.    Would you agree with me that the profit

22    or loss in a particular division was not a

23    factor for Delphi in designing the proposals

24    that you've provided to the unions for changes

25    in their collective bargaining agreements?


32


1    A.    Yes, I would agree with that.

2    Q.    Now, the second division in the

3    electrical -- electronics and safety sector is

4    Delphi Packard.  Are you aware that Delphi

5    Packard operates three manufacturing sites in

6    the United States?  You might look at

7    paragraph 15 of your declaration.

8    A.    Yes, sir.

9    Q.    Those three sites are Brookhaven,

10    Mississippi, Clinton, Mississippi and Warren,

11    Ohio, isn't that correct?

12    A.    That's correct.  They're outlined in

13    paragraph 23.

14    Q.    And all three of those sites are

15    represented, for purposes of collective

16    bargaining, by the IUE CWA, correct?

17    A.    I believe that's correct.

18    Q.    In fact, are you aware of the reality

19    that 60 percent of IUE CWA represented Delphi

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

20    employees work in the Packard division?

21    A.    Well, I was not aware of the specific

22    percentage that -- I am aware that a good

23    portion of our IUE represented workforce is in

24    the Packard division.

25    Q.    Now, in 2005 the Brookhaven, Mississippi

33

1    plant that the IUE CWA represents in the

2    Packard division had positive operating income

3    of 31 million dollars, correct?

4    A.    Yes, sir.

5    Q.    And the proposal Delphi has made to the

6    IUE would be equally applicable to the

7    Brookhaven, Mississippi plant with positive

8    operating income, as it is to any plant with

9    negative operating income, correct?

10    A.    That is correct.

11    Q.    Now, have you calculated how much more

12    operating income, above the 31 million that

13    was earned in 1980 -- excuse me, in 2005,

14    Delphi would have earned if the competitive

15    wage scenario had been in place in 2005 at

16    Brookhaven?

17    A.    For the same reasons I described a few

18    moments ago, no we have not.

19    Q.    Now, I take it that under the steady

20    state scenario the Packard operating division

21    in 2006 is projected as undergoing a 265

22    million dollar operating loss in its North

23    American operations, is that correct?

24    A.    That's corr -- to the North American

25    Operations, that's correct.

34

1    Q.    In that steady state scenario, under

2    which that 265 million dollar operating loss

3    is calculated, assumes an operating loss, for

4    Delphi as a whole, of 8.1 billion dollars

5    through 2010, correct?

6    A.    Yes, sir.

7    Q.    Now, as a chief accountant and

8    comptroller in 2005, for Delphi, did you

9    participate in the refinancing that Delphi

10    underwent in 2005?

11    A.    I did.  I was also, between March 4 of

12    2005 and October 8, 2005, the acting chief

13    financial officer of the company.  And in that

14    capacity was -- or led the refinancing of the

15    company.

16    Q.    Okay.  And in the course of that

17    refinancing, did Delphi prepare a base case to

18    present to lenders?

19    A.    We did.

20    Q.    Am I correct that the amount of

21    refinancing that Delphi underwent in 2005 was

22    approximately 2 billion dollars?

23    A.    Approximately I believe it was 2.5

24    billion dollars -- or 2.8, excuse me, 2.8

25    billion dollars.

35

1    Q.    And the closing on this refinancing was

2    in May of 2005?

3    A.    No, sir.

4    Q.    When was it then?

5    A.    I believe it was in June 2005.

6    Q.    Did the base case that was created for

7    purposes of this refinancing, set forth

8    operating income and net projections for the

9    years 2006 through 2010?

10    A.    No, I do not believe it did.

11    Q.    Did it contain any projections of

12    financial performance for years after 2005?

13    A.    Yes, it did.

14    Q.    And what were those?

15    A.    I believe that it projected the years

16    2006 and 2007.

17    Q.    Did the base case include a projection of

18    operating income for Delphi North American

19    operations for 2006 and 2007?

20    A.    I don't recall.

21    Q.    Did it include operating income for

22    Delphi as a whole for 2006 and 2007?

23    A.    I don't recall.

24    Q.    Well, were the lenders that were

25    obligating themselves for up to 2.8 billion

36

1    dollars in money, interested in what the

2    financial performance of Delphi was likely to

3    be after 2005?

4    A.    Yes, sir.

5    Q.    And what did you tell them it was likely

6    to be?

7    A.    I told them it was likely to be what was

8    included in those projections.  As I sit here

9    today, I just cannot -- it's not included in

10   the declaration that I prepared for this court

11   -- or for this motion, and it's been a year

12   since that process took place.  I don't

13   remember the numbers specifically.

14   Q.    Well, the -- did the refinancing include

15   covenants respecting Delphi's financial

16   performance?

17   A.    Yes, it did.

18   Q.    And what were the covenants in connection

19   with operating income for the year 2006?

20   A.    I don't recall.

21   Q.    I believe you were present in court when

22   your financial advisor testified that sometime

23   in May 2005, Delphi decided to create, in

24   addition to the base case that had been used

25   for refinancing, a downside case financial

37

1    projection.  Do you recall that testimony,

2    sir?

3    A.    I do.

4    Q.    And am I correct that the steady state

5    scenario, under which Packard is projected as

6    losing 265 million dollars in 2006, is this

7    downside case that was developed some time in

8    2005?

9    A.    That is not correct.

10   Q.    Okay.  Which set of financial projections

11   did you understand your financial advisor to

12    be referring to when he indicated that the

13    company was going to be preparing a downside

14    case?

15    A.    In the late second quarter of 2005 our

16    financial advisor that you're referring to,

17    Rozz Child, recommended that the company

18    prepare a downside case based upon the, so-

19    called base case that you've been referring

20    to.  We did prepare that downside case and

21    based upon a topside, or an overall look at

22    how the company was performing, and making

23    certain assumptions with respect to what --

24    how the performance would continue during the

25    second half of 2005.

38

1    Q.    Well, when in 2005 did Delphi begin to

2    work on what became the steady state scenario?

3    A.    We began to work on, what you refer to as

4    the steady state scenario, beginning in the

5    third quarter of 2005.

6    Q.    All right.  Remembering my quarters, that

7    would mean July 1 -- sometime after July 1?

8    A.    Sometime after July 1, that's correct.

9    Q.    And prior to July 1, there had been no

10    steady state -- what we now, I believe not

11    only me but the company refers to as the

12    steady state scenario, had not been developed,

13    correct?

14    A.    Prior to July 1, the steady state

15    scenario had not been developed.  The steady -

16    -

17  Q.   Okay.  When did Mr. Miller begin his

18  tenure as chief operating -- excuse me, chief

19  executive officer of Delphi?

20  A.   July 1st, 2005.

21  Q.   How long after Mr. Miller's installation

22  as chief executive officer was the steady

23  state scenario, projecting all these losses,

24  completed?

25  A.   While the two are completely independent

39

1   of each other, the answer to your question is,

2   approximately five months.

3   Q.   Just a coincidence that Mr. Miller begins

4   working July 1 and that same calendar quarter

5   the company begins working on a financial

6   projection but shows 265 million dollars

7   losses in the Packard division, which is the

8   basis for the request that the IUE CWA slash

9   it's wages and benefits, that's a coincidence?

10  A.   I think it's important to understand that

11  the so-called steady state scenario represents

12  the company's normal business planning process

13  that it undertakes every year.  Every single

14  year since I've been at Delphi, beginning in

15  the third quarter of 2005, we begin the

16  business planning process for the subsequent

17  years.  And we did so exactly in the same time

18  schedule and process as we've done in all

19  previous years in 2005.

20  Q.   When did Delphi first meet with the IUE

21  CWA in 2005 for the purpose of convincing the

22    union that it was time to make changes in

23    their collective bargaining agreement?  Let me

24    help you out here --

25    A.    Ask the question again, Tom, sorry.

40

1    Q.    Let me help you out a little.

2    A.    Mr. Kennedy, sorry.

3    Q.    You made, I think, I believe it was you

4    John, a financial presentation to the unions

5    in -- some time around September 1, I think it

6    was Detroit -- or Chicago actually, it might

7    have been Chicago?

8    A.    I don't believe that I made the

9    presentation that you're referring to.  I

10    believe a member of Delphi's finance staff

11    did.

12    Q.    Okay.

13    A.    I know the presentation you're referring

14    to.  I believe your question was, when we

15    first met with the IUE CWA --

16    Q.    Yeah.

17    A.    -- and I would have placed that first

18    discussion about the need for changes in our

19    US labor agreements, in order to provide for

20    reduced wages and benefits and changes in the

21    operating rules, more in the first to second

22    quarter of 2005, specifically March of 2005.

23    Q.    Do you know if the base case scenario

24    that was utilized in connection with the

25    refinancing projected a greater or smaller

41

1    loss for 2006 in the Packard division than the

2    265 million that appears in the steady states

3    scenario?

4    A.    I don't know.

5    Q.    In constructing the steady states

6    scenario, did you include the likely impact of

7    medical inflation on your obligations to both

8    active and retired Delphi employees?

9    A.    Yes, we did.

10   Q.    In fact, I believe your declaration

11   indicates that Delphi's hourly OPEB health

12   expenses would average, approximately, 1.16

13   billion per year in the 2006 to 2010 period?

14          MR. BULTER:  Your Honor, if Mr.

15   Kennedy's going to refer to specific

16   statements out of the declaration, it would be

17   helpful if he would refer to the paragraph.

18          MR. KENNEDY:  Well, generally, I

19   haven't been doing that.

20          THE COURT:  All right.  He's been

21   doing a pretty good job at that so --

22          MR. KENNEDY:  I'm sorry, Your Honor,

23   you'll have to give me a minute to find

24   that --

25          THE COURT:  Okay.

42

1          MR. KENNEDY:  -- particular

2    reference.

3          THE COURT:  That's fine.

4   BY MR. KENNEDY:

5   Q.   Okay.  I'm told by the peanut gallery

6   that paragraph 52 might be the location of

7   that particular fact.

8   A.   I'm aware that counsel from Appaloosa is

9   well aware of those paragraphs.

10  Q.   Yes, we're great friend, Appaloosa and

11  the unions.  The -- looking at paragraph 52

12  would you indicate if that's correct that the

13  OPEB health expenses are projected under the

14  steady state scenario as, approximately, 1.16

15  billion per year in that '06 to '10 period?

16  A.   Yes, sir.

17  Q.   Does Delphi retain actuaries to advise

18  you on pension and health care projections?

19  A.   We do.

20  Q.   Are you aware that those actuaries made

21  medical cost projections as part of the FASBE

22  106 and FASBE 87 procedures Delphi is required

23  to perform?

24  A.   I'm aware that they prepared a pension --

25  a post-retirement medical valuation report,


                                               43


1   valuating our OPEB obligation at December 31,

2   2005.

3   Q.   Well, isn't it a fact that the actuaries

4   retained by Delphi project an hourly OPEB

5   health expense of only 800 million a year

6   through 2010?

7   A.   I don't know that number specifically,

8    but it is lower than the 1.16 billion, that's

9    correct.

10   Q.    And if you look at paragraph 53 of your

11   declaration, your position is that this 300

12   million dollar difference in OPEB cost is not

13   material, for purposes of this proceeding?

14   A.    Whether -- whether it's 800 million or

15   1.16 billion in either -- in either situation

16   it's on the cost of providing medical care in

17   retirement, it is, unfortunately, unaffordable

18   to the company.

19   Q.    Well, isn't it true that the 300 million

20   dollar difference between those two numbers

21   would cover most of the operating losses at

22   all of the IUE plants in 2005?  Have you ever

23   done that comparison?

24   A.    I haven't done that comparison.

25   Q.    Now, does your steady state scenario also

44

1    presume health care costs increasing for

2    actives from 2006 through 2010?

3    A.    Yes, it does.

4    Q.    What expected health care inflation rate

5    did you use for computing the active health

6    care cost projections for those years?

7    A.    I believe we used 10 percent.

8    Q.    Are you aware that Mr. Williams utilized

9    health care costs declining after 2006 down to

10   5.5 percent for '09 and 5.25 percent for

11   '10 -- 2010?

12   A.    I am.

13    Q.    How much would it reduce operating losses

14    at IUE plants in the years 2006 through 2010,

15    if Delphi had utilized, as a projection for

16    its retiree and actives, the same health care

17    inflation factor utilized by Delphi's

18    actuaries?

19    A.    I'm not aware.

20    Q.    You didn't perform those calculations?

21    A.    No, sir.

22    Q.    Well, specifically, have you calculated

23    the impact on the supposed -- I won't say

24    supposed -- on the projected loss of 265

25    million dollars at Packard in '06, if the

45

1    inflation factor is utilized by Watson Wyatt,

2    had been utilized in that projection?

3    A.    No, sir.

4    Q.    All right.  I think there's been

5    testimony in the past that the steady state

6    scenario does not include any impact of the

7    attrition program that has been negotiated

8    between UAW, General Motors and Delphi and is

9    being discussed by those parties, including

10    the IUE, correct?

11    A.    That is correct.

12    Q.    Would you agree with me that the

13    attrition program is expected to have an

14    impact on the operating income at the plants

15    in which it is proposed?

16    A.    It will have an impact, that's correct.

17    Q.    Do you know what the impact will be if a

18    similar program was implemented at Packard as

19    has been agreed to between UAW and General

20    Motors and Delphi?

21    A.    I do not.

22    Q.    Has the company done the calculation of

23    what the operating income would be at Packard,

24    assuming the implementation of a similar

25    attrition program?

46

1    A.    No, sir.

2    Q.    Now, there's also been testimony that in

3    the first quarter of 2006, Delphi ran ahead of

4    the steady state scenario by about 500 million

5    dollars, correct?

6    A.    That is correct.

7    Q.    And that that is -- as projected forward

8    would reduce the steady state scenario

9    operating income loss through 2010 by billions

10    of dollars, is that also correct?

11    A.    I believe it -- as we set forth, it would

12    reduce the steady state scenario losses by

13    approximately 3 billion dollars, that's

14    correct.

15    Q.    Now, have you computed the impact on the

16    steady state analysis of the operating income

17    at Packard, how that would benefit from a

18    projection forward of the 500 million dollar

19    better performance in the first quarter of

20    2006?

21    A.    No, sir.

22    Q.    We are approaching the ed of the second

23    month of the second quarter, at this point

24    have you performed a projection of how Delphi

25    will perform on an operating income compared

47

1    to where the steady state scenario said you

2    would be at this point in the year?

3    A.    No sir, we only -- we forecast the year

4    on a quarterly basis and we'll do so again in

5    the mid-June timeframe.

6    Q.    If Delphi runs ahead an additional 500

7    million in the second quarter of 2006, what

8    would that impact be on the operating losses

9    expected through 2010?

10    A.    I don't think you can draw any conclusion

11    without knowing where that performance would

12    derive from and whether it would be

13    sustainable into the future.  And then also

14    understanding what the impact of that positive

15    performance is on the transformation plans

16    that the company has developed.  Because, as

17    we know, while we are running positive to the

18    financial performance under the steady state

19    scenario, most of that performance is already

20    comprehended in the programs that are set

21    forth to achieve the GM consensual and the

22    competitive benchmark scenarios.

23    Q.    Have you compared the performance by

24    Delphi in the first quarter to what was

25    projected under the base case scenario that

48

1  was adopted for purposes of the refinancing?

2  A.   No, I have not.

3  Q.   Does the projection of 265 million dollar

4  losses at Packard in 2006 include any impact

5  of the SGNA savings that have been identified

6  in the Booz Allen report?

7  A.   No, sir.

8  Q.   Does that projection of a loss of 265

9  million include any financial gain to Packard

10  from re-pricing any GM contracts?

11  A.   No, sir.

12  Q.   If you recalculated -- or calculated

13  again, the projected operating income

14  performance of Packard in 2006 and included a

15  gain from the running ahead in the first

16  quarter of '06, included or utilized the

17  Watson Wyatt health cost inflation

18  assumptions, included a gain from an attrition

19  program, included a gain from SGNA

20  improvements and looked at re-pricing GM

21  contracts, what would the expected operating

22  income for Packard be in 2006?

23  A.   I do not know, however, I would only

24  point out, I guess, a couple of things from

25  that.  Number one is that the Packard division

49

1  is only one piece of an overall enterprise,

2  Delphi Corporation, and the entire enterprise

3  needs to be viable, not just the Packard

4  division.  While I understand that is the --

5    where the predominance of the IUE labor force

6    is located and then --

7    Q.    That's why we're talking about it.

8    A.    I understand that and I recognize that.

9    And the other point I guess I would make is

10    that it's important to recognize that the

11    health care inflation at 10 percent, that

12    we've used in the steady state scenario for

13    active and retiree health care is consistent

14    with the experience we've achieved, or seen,

15    in health care inflation over the last five

16    years and as we project a future, we don't see

17    a reason why, although I understand from an

18    actuarial perspective -- actuaries -- that the

19    health care inflation in the economy as a

20    whole, cannot exceed the inflation in the

21    economy as a whole over the long term.

22    Whether that'll occur here in the short run,

23    we need to guard against.

24    Q.    Wouldn't it make sense, John, if you're

25    going to sit down and bargain with the union

50

1    over the terms and conditions of employment at

2    Packard, to have developed a financial

3    scenario that, in fact, did include those

4    variables?  Aren't they important from the

5    point of view of both the union and the

6    company, to get a handle on what the actual

7    cost will be in terms of deciding what level

8    of benefits and wages the company can afford

9    at that division?

10    A.    We -- we looked at what a com -- as you

11    know -- as you're aware, we looked at from

12    Kevin Butler's testimony, what a competitive

13    wage and benefit package would be for employee

14    -- for our hourly employees.  And then we also

15    have examined the viability of the company

16    with that competitive wage and benefit

17    package.  As I said a few moments ago, from my

18    perspective the entire corporation needs to be

19    viable, not just the Packard division.

20    Q.    So your sense of how the negotiations

21    with the IUE is going to go, is that we take

22    a, sort of, global approach and ignore the

23    actual economic circumstances applicable to

24    the men and women that we really represent?

25    Is that your vision of how we're going to get

51

1     a contract between Delphi and the IUE?

2     A.    The company needs to have a competitive

3     wage and benefit -- all of the company's

4     costs, and for that matter revenue or pricing,

5     needs to be at competitive levels.  The

6     company needs to be competitive in every area

7     for the corporation as a whole.  And that --

8     recognition would be is that, that has to

9     include both the IUE represented employees, as

10    well as every other employee.  And the

11    viability of the company depends upon that.

12    Q.    The largest production facility at the

13    Packard division is Warren, Ohio, correct?

14    A.    I believe that's correct.

15   Q.   We have about 3,800 IUE members working

16   in Warren, Ohio?

17   A.   It's a substantial number.  I don't know

18   that number specifically, but --

19   Q.   Are you aware that some of those

20   operations under local 717 at Warren have

21   achieved international productivity awards?

22   Are you aware of that?

23   A.   No, sir.

24   Q.   Did it make a difference to the company

25   in structuring its proposals to the unions

52

1   whether the unions, prior to those proposals,

2   has taken steps on work rules and other

3   arrangements to make themselves as productive

4   as possible?

5   A.   We recognize that the IUE has been very -

6   - has worked very hard to help the company to

7   be competitive and to deal with the

8   competitive situation that the company has

9   been operating under.  And we very much

10   appreciate that.  At the end of the day, in

11   our current situation, what we have to be able

12   to recognize is the company needs to be

13   competitive in all aspects of its business.

14   And, therefore, that the focus of the labor

15   proposals, as I understand them, is focused on

16   what is a competitive wage and benefit

17   package.

18   Q.   I'm not looking for appreciation, nor is

19   the union.  The issue is, whether in a place

20    like Warren, where individuals have agreed to

21    work rule changes in which they run many more

22    machines than had previously been the case,

23    does it make sense to give them the same wage

24    proposal that is being made to workers in

25    facilities where there had been no

53

1    productivity improvement?

2    A.    I think it does.

3    Q.    How does that proposal reward union

4    members then, for increased productivity if

5    its in a one size fits all across the board

6    proposal, dictated by external notions of what

7    you think the market for auto part wages is?

8    A.    I believe that we're asking all of our

9    constituencies -- labor constituencies to

10    achieve a level of competitiveness that --

11    both in wage, benefit and work rules.  And the

12    degree to which change is required to achieve

13    that competitiveness will vary depending upon

14    the current wage and benefit package.

15    Q.    Now, John, let's talk about the Gadsden,

16    Alabama plant that's represented by the IUE.

17    I believe that plant is in the Delphi thermal

18    and interior division.  You mentioned it in

19    paragraph 21 of your declaration.

20    A.    That's correct.

21    Q.    Now, are you familiar with the labor

22    conditions prevailing at the Gadsden, Alabama

23    plant?

24    A.    Labor conditions from what perspective?

25    Q.    Well, the average wages, cost and

54

1    benefits and so forth?

2    A.    I believe that the Gadsden, Alabama

3    facility has, other than traditional high wage

4    employees, but I'm not specifically aware of

5    the details?

6    Q.    Well, do you know that the all-in labor

7    cost for IUE members at Gadsden is less than

8    20 dollars an hour?

9    A.    I understand that there is a competitive

10    portion of the workforce there.

11    Q.    In fact, the entire workforce there is

12    what you euphemistically call competitive,

13    correct?

14            MR. BUTLER:  Objection.

15            MR. KENNEDY:  To what?

16            MR. BUTLER:  To characterizations.

17    You're testifying, Mr. Kennedy?

18            MR. KENNEDY:  No, I'm not.

19            THE COURT:  Well, generically called

20    competitive, it's the label he's putting on

21    it.

22    BY MR. KENNEDY:

23    Q.    All right.  Generically called

24    competitive.  They're all competitive

25    employees there as you've termed them,

55

1    correct?

2    A.    Whether they're all or not, I'm not

3    aware.  But I am aware that there is, at

4    least, a portion that is competitive and it

5    could be all.

6    Q.    Do you know if they have a reduced

7    medical value plan at that facility?

8    A.    I do not.

9    Q.    Are you aware that they don't participate

10   in the defined benefit pension plan for hourly

11   employees?

12   A.    If they are competitive -- if they are in

13   a competitive wage agreement, that was not --

14   that would be consistent with my

15   understanding.

16   Q.    And did you know the starting wages are

17   seven dollars and 77 cents an hour at Gadsden?

18   A.    I did not.

19   Q.    The Delphi proposal that is applicable to

20   Gadsden would require those workers to pay 180

21   dollars a month for their medical benefits,

22   correct, for family coverage?

23   A.    I'm not the --

24   Q.    You don't know that detail?

25   A.    I can't get into that detail, that's

56

1    correct.

2    Q.    Did Delphi give any consideration as to

3    whether it was appropriate, in what are

4    already low-wage plants, to make the same

5    proposal that was being made at other plants

6    where the workers were averaging 25 or 26

7    dollars an hour?

8    A.   The health care costs are a fixed cost

9    which -- for which the sharing of those costs

10   between employee and employer is a common

11   practice in the industry.  And, therefore, I

12   believe that our wage proposals recognize a

13   competitive level of wage -- of health care

14   cost infla -- sharing between the two parties.

15   Q.   And you didn't look at the affected

16   percentage of a worker's income that those

17   proposals would be, correct?

18   A.   I believe that's correct.  The focus was

19   on achieving competitiveness with our peers

20   and industry in general.

21   Q.   And in order to become competitive you

22   felt it was necessary to make the same

23   proposal at Gadsden for employees making 7.77

24   an hour as employees making 30 dollars an hour

25   at Warren?

57

1    A.   The -- as I was indicating a few moments

2    ago when we were discussing the work rules,

3    the focus was on achieving competitiveness

4    within all aspects of our business.  The

5    degree of change required to get there will

6    vary, depending upon where individuals are

7    currently located in the spectrum of

8    competitiveness.

9    Q.   John, let's talk about Kettering, Ohio a

10   little bit.  Kettering, Ohio is addressed --

11    or rather is located in the automotive

12    provings group that's mentioned at paragraph

13    22 of your statement.

14    A.    That's correct.

15    Q.    Do you know what the percentage of

16    business at Kettering is, that comes from

17    General Motors?

18    A.    While I'm not aware of the percentage

19    specifically, I believe it is a substantial

20    proportion of all of the manufacturing in the

21    facility.

22    Q.    Over 80 percent is what the union tells

23    me.

24    A.    I wouldn't be surprised.

25    Q.    The Kettering GM contracts are currently

58

1    the subject of the GM re-pricing motion that

2    Delphi has made, isn't that also correct?

3    A.    I believe that's correct.

4    Q.    And I gathered from paragraph 83 of your

5    declaration that you are presuming an

6    additional two billion dollars in GM revenue

7    as part of your GM consensual scenario?

8         MR. BUTLER:  Objection, foundation.

9         THE COURT:  Well --

10        MR. KENNEDY:  All right.  Well, let

11   me just ask the question better.

12   Q.    What is the amount of additional revenue

13   Delphi hopes to achieve by the re-pricing of

14   its General Motors contract?

15   A.    That would be a matter that would be

16    worked out at such time that the company has

17    the authority to be able to reject and/or re-

18    price those contracts.

19    Q.    So, at the moment you're unable to

20    estimate how much additional revenue the

21    Kettering plant would achieve if the GM

22    contracts, under which it's producing a

23    product, were rejected and re-priced?

24    A.    That's correct.

25    Q.    Would you agree with me, it's fair to say

59

1    it's going to be more money rather than less?

2    A.    I think that would be a fair assumption

3    if we had the authority to be able to re-price

4    those contracts and GM accepted that re-

5    pricing.

6    Q.    Does the steady state scenario that

7    projects operating losses at Kettering include

8    the impact of re-pricing those General Motors

9    contracts?

10    A.    No, sir.

11    Q.    And what about the attrition program.

12    Does the steady state scenario for Kettering

13    assume the impact of an attrition program to

14    be implemented at Kettering?

15    A.    No, sir.

16    Q.    Now, are you aware that new employees can

17    be hired under the existing contract at

18    Kettering at eight dollars an hour?

19    A.    Not specifically.

20    Q.    Are you aware that there is a reduced

21   hiring rate in effect at Kettering already,

22   under the existing contract?

23   A.   We have -- we have with many of our

24   unions, the ability to hire new employees at

25   competitive wage and benefit at negot -- lower

60

1   than traditional wage and benefit packages

2   that are much closer to competitive.  And the

3   issue for us has been the ability to have the

4   work in order to be able to hire new

5   employees.  And to get at that lower wage and

6   benefit package.

7   Q.   How much would it improve Kettering's

8   operating income if there were an attrition

9   program implemented which opened spots that

10   allowed the company to hire in at eight

11   dollars an hour?

12   A.   I'm not specifically aware.

13   Q.   Have you factored into the Kettering

14   operating income projections, the recent

15   improvements in the steady state scenario?

16   A.   We have done so for the corporation as a

17   whole, not on an individual manufacturing

18   facility basis.

19   Q.   Can you tell us what the projected

20   performance and operating income for 2006

21   would be at Kettering if we did factor in an

22   attrition program, re-hirings at eight dollars

23   an hour, the recent improvements in the steady

24   state scenario and additional income from

25   General Motors?

61

```
 1          MR. BUTLER:  Your Honor, in a sense

 2   this has been asked and answered.  He's going

 3   to go to each plant.  He's already -- the

 4   witness has already testified that these

 5   factors were not taken into consideration at

 6   that level.

 7          MR. KENNEDY:  We only have seven

 8   plants, Your Honor.

 9          THE COURT:  Well, but he has -- he's

10   not done it on a plant by plant

11          MR. KENEDY:  All right.

12          THE COURT:  -- he hasn't even done

13   it on a division by division, so he's not done

14   it on a plant by plant either.

15   BY MR. KENNEDY:

16   Q.   Well, if I ask you those same questions

17   in connection with the Moraine, Ohio facility,

18   would you give the same answers?

19   A.   I would.

20   Q.   The product that's made at Moraine is

21   compressors, correct?

22   A.   I believe that's correct.

23   Q.   And the -- Delphi has announced that the

24   compressors being made at Moraine will

25   continue to be made but are expected to be
```

62

```
 1   placed into other plants, is that correct?

 2   A.   I believe that's correct.
```

3    Q.    Do you know where those compressors are

4    going to be sent?

5    A.    I believe the -- the relocation would be

6    to Mexico.

7    Q.    Directing your attention to the New

8    Brunswick facility that is represented by the

9    IUE, that's a battery plant, correct?

10    A.    That's correct.

11    Q.    And the company has entered into an

12    arrangement with JCI under which this facility

13    may be sold to JCI, correct?

14    A.    That's correct.

15    Q.    And are you aware that the IUE has

16    indicated it will agree to the proposed sale

17    if the parties can agree upon an attrition

18    program to be applicable to those employees?

19    A.    Generally.

20    Q.    And that's generally correct, right?

21    A.    To my understanding, it is generally

22    correct.  I don't know the specifics --

23    Q.    Okay.

24    A.    -- of the negotiation and the

25    discussions.  But, I am generally aware of

                                                            63

1    that, yes.

2    Q.    And that ability to sell that plant has

3    been achieved under the existing labor

4    agreement, isn't that also correct?

5    A.    Ask the question again, please.

6    Q.    The ability to sell that plant to JCI has

7    been achieved under the existing collective

8    bargaining agreement?

9    A.    Whether it's under the existing

10    collective bargaining agreement or a separate

11    agreement among the parties I'm not positive.

12    But I believe there is agreement between the

13    IUE and the company that, subject to reaching

14    an acceptable operating arrangement in the

15    future, that yes.  That facility would have

16    the ability to be transferred to JCI.

17    Q.    Okay.  Let me be clearer in my question.

18    A.    Yeah.

19    Q.    The -- a complaint I've heard quite a bit

20    from Delphi is that it is unable to sell, fix

21    or close it's existing facilities under it's

22    national labor agreements including the IUE

23    agreement, isn't that correct?

24    A.    I think that the company has, after much

25    discussion and protracted -- I'll say


64


1    negotiations been able in certain situations

2    to be able to achieve the sale or closure of

3    facilities.  But they have been at -- after

4    much, you know, over a protracted time period

5    and discussion, yes.

6    Q.    And it's been hard for the company

7    because you have to get the union's agreement

8    in essence, correct?

9    A.    It has delayed the process over that it

10    would -- the company would otherwise have been

11    able to achieve.

12    Q.    But although it's been delayed, isn't it

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

13    a fact that Delphi has been able to close and

14    sell facilities under the current contracts in

15    negotiations with the unions?

16    A.    In certain situations, yes.

17    Q.    Now, with respect to the Anaheim facility

18    that was represented by the IUE, that facility

19    is now closed, isn't that also correct?

20    A.    I believe that's correct.

21    Q.    And are you aware, in the various

22    negotiations the IUE has said it will agree to

23    an attrition program to be provided to those

24    employees?

25    A.    I believe that's correct.

65

1    Q.    Now, I'd like to direct your attention to

2    paragraph 31 of your declaration, John.  Am I

3    right that the first factor you identify as

4    responsible for the continued deterioration in

5    Delphi's US operations are the existing labor

6    agreements?

7    A.    That is correct.

8    Q.    And I take it you believe that the

9    commitments Delphi made to mirror the 1999 and

10    2003 GM labor contracts were costly to Delphi?

11    A.    I think that's a -- that is a true

12    statement.

13    Q.    So, as we sit here today Delphi has never

14    had an opportunity to negotiate its own

15    national labor agreement with the IUE, is that

16    also correct?

17    A.    I believe that's correct.

18   Q.    And the first opportunity to do so will

19   be in 2007, right?

20   A.    That's correct.

21   Q.    And am I also right that in typical

22   negotiations the parties start some months in

23   advance of the actual expiration date?

24   A.    That's correct.

25   Q.    So is it fair to say that even if this

                                                              66

1    Court denies the motion that is currently

2    pending, by the summer of 2007 the IUE and

3    Delphi will be in negotiations for a new

4    national agreement anyway?

5    A.    Assuming that the company is able to

6    financially survive until that period of time,

7    yes.

8    Q.    Yes, assuming you're able to survive.

9    A.    Yeah.

10   Q.    Is there any -- well, let me withdraw

11   that.  And I take it that one of Delphi's most

12   important business objectives in the spinoff

13   from General Motors, was to become a global

14   supplier to OEMs, is that correct?

15   A.    To all OEMs --

16   Q.    Yes.

17   A.    Including non-GM customers, that's

18   correct.

19   Q.    And Delphi, in fact, has achieved these

20   goals, correct?

21   A.    We are -- we continue to seek to increase

22   our revenue with customers other than General

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

23    Motors.  And to diversify our customer base

24    away from General Motors, in order to be able

25    to insulate ourselves against the impact of

67

1    any one customer.

2    Q.    Now, you state at paragraph 40 of your

3    declaration that labor is a fixed cost under

4    GM UAW labor agreements, do you see that

5    statement?

6    A.    Paragraph 40?

7    Q.    Yeah.

8    A.    It is, in effect, a fixed cost.

9    Q.    And is it your contention that it is a

10    fixed cost under IUE Delphi agreements as

11    well?

12    A.    In certain situations, yes.

13    Q.    In certain situations it's not though, is

14    that correct?

15    A.    In certain situations they -- employees

16    may not have job security and, therefore, not

17    be as fixed as in situations where they do

18    have job security, yes.

19    Q.    Well, even employees that work under IUE

20    contracts that have job security are permitted

21    to be laid off for volume related reasons,

22    correct?

23    A.    I'm not --

24        MR. BUTLER:  Objection.  Your Honor,

25    Mr. Kennedy is talking now about specific

68

```
1    provisions of the effective bargaining
2    agreement.  I don't know that it's in the
3    knowledge of this witness, but if there's a
4    provision of the collective bargaining
5    agreement, he ought to point to it.  I just --
6            MR. KENNEDY:  I think this is a
7    pretty well-known fact.  If the witness
8    doesn't know it he'll say so.
9    A.   I don't know that specifically.
10   Q.   You don't know that?
11   A.   No.
12   Q.   Do you know how long an IUE represented
13   employee under the national agreement can be
14   laid off before there is any opportunity to go
15   into the jobs bank?
16   A.   No, I do not.
17   Q.   Do you know if the next contract -- or I
18   should say the current contract, which expires
19   in October 2007, will expire before any
20   employees laid off now would be eligible for
21   any job bank participation?
22   A.   No.
23   Q.   You don't.  In paragraph 56 of your
24   declaration, John, you refer to a supplemental
25   executive retirement plan.  What is that SERP
```

69

```
1    plan?
2    A.   It is an unfunded supplemental retirement
3    plan for certain executives of the company.
```

4   Q.   How many executives of Delphi participate

5   in this plan?

6   A.   To the best of my knowledge, I believe

7   that every executive in the company

8   participates in the plan.

9   Q.   And, for purposes of, sort of, scale

10  approximately how many people are you defining

11  as executives for that purpose?

12  A.   We have 600 executives globally in the

13  company.  As I sit here, I am not specifically

14  aware of whether the non-US executives

15  participate in this plan or whether it's only

16  US executives. That's not my area of

17  expertise, quite honestly.

18  Q.   It would be a number smaller than 600

19  though?

20  A.   There would be less US executives than

21  the global population, that's correct.

22  Q.   Okay.  Now, has that -- has there been

23  any public announcement that that plan is or

24  is going to be frozen?

25  A.   There has been no public announcement

70

1   about that fact.

2   Q.   Have any plan amendments been adopted to

3   the supplemental executive retirement plan

4   that would freeze it at any point in time?

5   A.   No, sir.

6   Q.   Since October 8, 2005 and the filing of

7   this proceeding, have there been any changes

8   at all in the supplemental executive

9    retirement plan?

10   A.   No, sir.  I'm not aware there's been

11   changes in any of our retirement plans.

12   Q.   Well, as I understand it, the hourly

13   retirement plan announcements have been made

14   that the company, at least, intends to freeze

15   the accumulation of benefits as of December

16   31, 2006, correct?

17   A.   Subject to the negotiations that are

18   going on, yes.

19   Q.   Is there any intention of freezing the

20   accumulation of benefits under the

21   supplemental executive retirement plan?

22   A.   No decision has been made about that, to

23   the best of my knowledge.

24   Q.   The salaried retirement plan is being

25   frozen as of December 31, 2006 as well,


71


1    correct?

2    A.   It is our intention to do so, yes.

3    Q.   Do the executives who participate in the

4    supplemental executive retirement plan also

5    participate in the salaried retirement plan?

6    A.   Yes, they do.  I believe they do.

7    Q.   John, I'd like to direct your attention

8    to paragraph 100 of your declaration.  You're

9    referring there to settlements -- claim

10   settlements for trade creditors.

11   A.   Yes, sir.

12   Q.   What has been the average percentage

13   claim settlement for trade creditors thus far

14    in the proceeding?

15    A.    I believe that's approximately 75 cents

16    on the dollar.

17    Q.    And most of those creditors have also, in

18    the course of that settlement, continued to do

19    business with Delphi, correct?

20    A.    I believe that's correct.

21    Q.    And is that under reduced terms or

22    typically a continuation of the terms that

23    were in place prior to the filing of the

24    bankruptcy?

25    A.    It varies by supplier.  And based upon

72

1    the overall terms and conditions that are

2    negotiated between Delphi and the supplier,

3    you know, that back in November the supplier

4    contract assumption motion was approved by

5    this court and we believe that's been very

6    helpful at being able to allow the company to

7    stabilize the relationships and the terms and

8    conditions in which it operating with it's

9    supply base.

10    Q.    Well, is it fair to say that most of the

11    trade creditors have continued doing business

12    with Delphi on, more or less, the same terms

13    as existed prior to filing the bankruptcy

14    petition?

15    A.    No, I don't think that's fair to say.

16    When you look at the level of performance

17    that -- financial performance that we're

18    achieving in material cost this year, it is

19    reduced from that which we've historically

20    seen.  We've averaged, in the past,

21    approximately four percent and we're not

22    achieving that type of performance in 2006.

23    While I --

24    Q.   Could you explain what you mean by four

25    percent performance?


                                                    73


1    A.   What I guess I'm referring to -- guess,

2    excuse me.  What I'm referring to is, is that

3    when you look at, on a volume adjusted basis,

4    so on a like level of volume what our material

5    cost is year over year, it has, on average,

6    declined by four percent during the last five

7    years.

8    Q.   Okay.

9    A.   In 2006 we are not achieving that same

10   level of financial performance.  Meaning,

11   we're not achieving the same level of cost

12   reduction from -- with our supply base.

13   Second --

14   Q.   As I understand that point, the supply

15   base then is essentially selling to Delphi at

16   the same unit cost as they had been selling

17   prior to the filing of the bankruptcy?

18   A.   Or not as at -- at as low or reduced a

19   price as we may have otherwise been able to

20   have negotiated with that supply base but for

21   the unsettled circumstances the company finds

22   itself in.  Secondly, while we certainly have

23   been able to achieve a level of trade --

24    credit trade -- trade credit terms with our

25    supply base greater than we had assumed we

74

1    would back in October 8th, when we filed for

2    bankruptcy, we are not back to a M and S 2 or

3    second day, second month credit terms that we

4    enjoyed prior to filing for reorganization, or

5    before the whole unsettled circumstances

6    began.

7    Q.    So the trade creditor group is being paid

8    faster by Delphi then it was before the

9    bankruptcy was filed, correct?

10    A.    We are at -- are being obliged to pay

11    that supply base faster, in order to assure a

12    source of supply to be able to meet the

13    commitments from our customers.

14    Q.    And the trade cred -- the trade vendors

15    are also achieving a until cost which is

16    higher than you would have anticipated before

17    the bankruptcy, because they're not accepting

18    the four percent price-down that you would

19    otherwise get?

20    A.    We are experiencing a lower level of

21    price-down than we'd, perhaps, otherwise would

22    have been able to achieve.

23    Q.    Okay.   Thank you.

24          MR. KENNEDY:   I have no further

25    questions, Your Honor.

75

1          THE COURT:  Okay.

2    CROSS EXAMINATION BY

3    MR. PETERSON:

4    Q.   Good morning, Mr. Sheehan.  Lowell

5    Peterson, Meyer, Souzzi, English & Klein for

6    the Steelworkers.  You testified about the

7    SERP, the executive retirement plan.  That is

8    a non-tax qualified plan, correct?

9    A.   I believe that's correct.

10   Q.   And that is because the level of benefits

11   offered under the SERP, particularly when

12   combined with the executive's participation in

13   the salary plan, exceeds the maximum benefit

14   levels under ERISA, correct?

15   A.   I believe that's correct.

16   Q.   Do you know by how much it exceeds those

17   benefit levels?

18   A.   I do not.

19   Q.   I'd like to ask you a couple of questions

20   about the Home Avenue plant, represented by

21   the -- who's workers are represented by the

22   steelworkers.  Now, as I understand your

23   declaration at paragraph 30 and the chart that

24   appears there, these operating income margins

25   reflect an allocation of corporate overhead to

76

1    the particular facilities, correct?

2    A.   That's correct.

3    Q.   And those allocations are not necessarily

4    based on any plant by plant performance,

5    correct?

    6   A.    They're -- it's not based upon plant

    7   performance, no.

    8   Q.    These allocations are done by --

    9   essentially by product line, is that a fair

   10   statement?

   11   A.    I think the allocations are made based

   12   upon the level of service that is provided to

   13   the facility, so based upon the relative size

   14   of the facility, if I use that term as

   15   measured by, whether it be revenue or head

   16   count or some other measure.

   17   Q.    And that -- that allocation is done based

   18   on an absolute calculation of -- I'm repeating

   19   the question, I think, but I just want to make

   20   sure I understand -- that is based on an

   21   allocation on -- of absolute corporate

   22   overhead, not plant by plant performance?

   23   A.    I think that's what I said.

   24   Q.    Yeah.  I think that's right.  I just

   25   wanted to make sure that I didn't mess up my


                                                  77


    1   question earlier.  So if you look at the Home

    2   Avenue plant, for example, which is in the

    3   chart --

    4   A.    Uh-huh.

    5   Q.    The operating income loss reflects plant

    6   performance and a corporate allocation simply

    7   based on the fact that it's a relatively large

    8   facility, correct?

    9   A.    I don't know how much allocation is in

   10   there.  And I don't know the relative size of

11    that facility. But in general, that would be

12    correct.

13    Q.    Home Avenue is scheduled to be sold or

14    closed, correct?  When I say scheduled that's

15    perhaps, too precise a word. The current plans

16    of Delphi is to either close or sell the Home

17    Avenue plant, correct.

18    A.    I believe that's correct.

19    Q.    And as a result that operating loss, net

20    operating income loss would be gone from the

21    corporate books going forward, correct?

22    A.    That is correct.  The revenue would be

23    eliminated and the associated costs would be

24    eliminated.

25    Q.    All right.  In fact, that's one of the


78


1    reasons -- Home Avenue is an AHG facility,

2    correct?

3    A.    I believe that's correct.

4    Q.    Sort of the resting place for the sell,

5    fix or close product lines?

6    A.    We don't use the term resting place,

7    but --

8    Q.    I think it's identified as the division

9    which is -- accumulates the plants that are

10    under-performing and therefore are subject to

11    this kind of treatment?

12    A.    It is our -- it is those facilities that

13    are under-performing and where we seek to be

14    able to fix the situation or if we cannot, to

15    sell or close the facility, that's correct.

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

16  Q.   And what would be the -- have you -- I

17  think I know from your responses to Mr.

18  Kennedy's questions the answer to this, but

19  let me just --

20  A.   Sure.

21  Q.   -- flush it out a bit.

22  A.   Sure.

23  Q.   Do you know the impact on Delphi's going

24  forward performance of losing this net

25  operating income loss at Home Avenue?

79

1   A.   As set forth in paragraph 30, in 2005

2   there's a reported operating loss of 105

3   million dollars on revenue of 216 million

4   dollars.  And so that -- to the extent the

5   facility was closed and the attendant costs

6   were eliminated, the effect on the company's

7   financial results would be to eliminate 216

8   million -- and the numbers were all the same,

9   would be to eliminate 216 million dollars of

10  revenue and 105 million dollars of cost -- of

11  losses.

12  Q.   So all things being equal, this is a 105

13  million dollar net gain, approximately.

14  A.   Assuming all of the costs were able to be

15  eliminated, that's cor -- including the

16  corporate allocations as you point out.

17          THE COURT:  Well does the steady

18  state scenario factor in the elimination of

19  the facility?

20  A.   No.

21          THE COURT:  Okay.

22   A.    I'm sorry if I misunderstood the

23   question, the steady state scenario does not

24   factor in the elimination of any facilities.

25   I had understood if it was able to be

80

1    achieved, what would be the impact on the

2    steady state scenario.

3    Q.    Now, with respect to Vandalia, which is

4    also in the chart, clearly the steady state

5    scenario does not reflect any projections for

6    an attrition program, or any other changes,

7    correct?

8    A.    That is correct.

9    Q.    But does the -- has Delphi factored in

10   savings resulting from an attrition program at

11   Vandalia in any of its projections?

12   Obviously, not in steady state.

13   A.    We have in the -- in our GM -- in our

14   competitive benchmark and GM consensual

15   scenarios, we have factored in the savings

16   associated with implementation of those

17   respective labor proposals that are being

18   discussed here and are incorporated into those

19   proposals.  Including Vandalia.

20   Q.    Do you know how much money is projected

21   to be saved as a result of an attrition

22   program at Vandalia?

23   A.    No, I do not.

24   Q.    Okay.  In fact, that attrition proposal

25   wasn't even made until the middle of last

81

1    week, correct?

2    A.    I'm not aware of exactly that discussion.

3    Q.    All right.  I won't belabor this, because

4    I -- as I said, I think Mr. Kennedy has asked

5    you the questions with respect to projections

6    of -- on a plant by plant level.  But with

7    this could you -- withdrawn.  With respect to

8    Vandalia, in fact the steelworkers negotiated,

9    just in the fall of 2004 with Delphi to reduce

10   a number of the labor costs at that facility,

11   correct?

12   A.    I'm not aware.

13   Q.    You're not aware of the competitive wage

14   schedules at the Vandalia plant?

15   A.    I'm not -- it's not my area of expertise

16   within the company.

17   Q.    All right.  Thank you.

18   CROSS EXAMINATION BY

19   MS. ROBBINS:

20   Q.    Good morning Mr. Sheehan.  Marianne

21   Robbins for the IAM and IBEW.  At the

22   beginning of your declaration, paragraph 4,

23   you mention that, at the present time for 2005

24   you do not have -- you did not at that -- at

25   the time you prepared the declaration, have an

82

1    audited statement.  Do you have an audited

2    statement for 2005 now?

3    A.    No, we do not.

4    Q.    Do you know when you expect it?

5    A.    In the next couple of weeks.

6    Q.    In paragraph 14 of your declaration, you

7    make reference to ENS, I don't know whether

8    it's a division or --

9    A.    We call it sector.

10    Q.    A sector.  And you make reference --

11    A.    I've heard division.  Excuse me, this is

12    the ENS division.

13    Q.    Division, okay.  You make reference to

14    130 million dollar profit in North America.

15    And you identify Milwaukee and Kokomo as the

16    US plants.  Are those the only North American

17    plants in that division?

18    A.    No, Ma'am.  No.

19    Q.    What are the others if you know?

20    A.    We have a number of manufacturing

21    facilities in that division that are located

22    in North America other than those two

23    facilities that are specifically located in

24    the United States.

25    Q.    Can you name them and their location?

83

1    A.    The -- no, I cannot name them.  They are

2    located in Mexico and I cannot name the

3    facilities off the top of my head.

4    Q.    In paragraph 19 you make reference to the

5    ENC division and you indicate a overall loss

6    of 809 million and you identify 428.9 million

7   of that being in North America.    So about

8   half of the loss is outside North America, is

9   that right?

10   A.    That is correct.  That is driven by an

11   impairment charge that was taken for that

12   division, related to good will that was

13   located in Europe.

14   Q.    The impairment charge goes over both --

15   goes over all geographic areas, is that right?

16   A.    The impairment charge relates to the

17   division as a whole, and specifically relates

18   to good will that is sitting on the -- the

19   general ledger or the trial balances of

20   European facilities resulting from an

21   acquisition by that division in Europe.

22   Q.    I don't know that you answered my

23   question.  Was the impairment charge spread

24   over the entire division?

25   A.    The impairment charge was taken at the

84

1   division level and relat -- and was recorded

2   in the European operations.  So, I guess, if I

3   understand your question properly, the 428

4   million dollar loss in the North American

5   operations does not include the impairment

6   charge.

7   Q.    Looking at paragraph 23 of your

8   declaration concerning the products made at

9   the various locations, am I reading that

10   correctly that Milwaukee is the only source in

11   the United States for catalytic converters?

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

12    A.    What I can tell you is that none of the

13    other facilities listed on this page, in

14    paragraph 23, include the words catalytic

15    converters.  I am not specifically aware

16    whether there are any other manufacturing

17    facilities in the United States that produce

18    any catalytic converters.

19    Q.    But as far as you know, paragraph 23 and

20    the chart that goes with it is accurate, is

21    that right?

22    A.    To the best of my knowledge, that's

23    correct.

24    Q.    So the only one that you know that makes

25    catalytic converters, according to your chart,

85

1    is Milwaukee?

2    A.    That's correct.

3    Q.    On paragraph 30 you then go through a

4    chart which has the 2005 OI margin and is that

5    operating income margin?

6    A.    That's correct.

7    Q.    And I notice a lot of negative numbers.

8    In fact, I think, the only positive number

9    shown is for Brookhaven, Mississippi?

10    A.    That's correct.

11    Q.    But if you look at the least of the

12    worst, the lowest -- the highest, from a

13    positive point of view, OI margin next to

14    Brookhaven are the Milwaukee facilities, is

15    that right?  That is they have the lowest

16    negative number?  They're the closest to a

17  positive number, is that right?

18  A.   As it relates to the ENS facility and

19  portion of the facility in Milwaukee, that's

20  correct.  I believe that the Adrian, Michigan

21  facility slightly beats out the Milwaukee ENC

22  facility.

23  Q.   Has there been consideration, given that

24  Milwaukee has ENS which is generally doing

25  well overall, in terms of the Delphi product

86

1   lines, and you can talk --

2         MR. BUTLER:  Objection.  Again it's

3   a characterization of testimony.  She's saying

4   it's, you know, this plant's doing well.

5   Q.   Well, do you think -- do you think that

6   ENS is doing relatively well compared to the

7   divisions in -- the other divisions in Delphi?

8   A.   You know, I guess it's all relative --

9   Q.   That's what I said.  I said relatively.

10  A.   At the end of the day, losing two bill --

11  two and a half billion dollars doesn't make a

12  viable business enterprise, but if you want to

13  look at it from a relativity perspective, I

14  guess I would agree with you.

15  Q.   Okay.  Has there been consi -- to go

16  forward a little bit in your declaration.  The

17  Milwaukee facility as a whole, is scheduled to

18  close at the end of 2007, is that right?

19  A.   I believe that's correct.

20  Q.   That's what your declaration says.

21  A.   I believe that's correct.

22    Q.    Has there been any consideration to

23    leaving it open?

24    A.    Not at the current time.

25    Q.    Have you given any consideration as to

87

1    how applying the attrition program and the re-

2    pricing program would impact the figures for

3    operating income of the Milwaukee facility?

4    A.    No, as I explained to Mr. Kennedy, we

5    haven't overlaid any of those types of

6    proposals at individual facility levels.

7    Q.    In paragraph 17 of your declaration, you

8    make reference to certain collective

9    bargaining agreements which are not subject to

10    the 1113 and 1114 proceedings.  And one of

11    those is in Mountain View, California.   Can

12    you identify for us the parties to the

13    collective bargaining agreement involving the

14    company's facility in Mountain View,

15    California?

16    A.    No, I cannot.

17    Q.    You don't know what union represents

18    employees there?

19    A.    I do not.

20    Q.    Do you know what the compensation level,

21    the wage level is in Mountain View,

22    California?

23    A.    No, I do not.

24    Q.    So, to the best of your knowledge, it may

25    be as comparable as or higher than the wage

88

```
 1   rate in Milwaukee, Wisconsin?
 2           MR. BUTLER:  Objection.  He's
 3   already testified he doesn't know what it is.
 4           THE COURT:  Sustained.  It's
 5   implicit in his answer.
 6           MS. ROBBINS:  I'm trying to test
 7   whether he knows, in terms of the range, he
 8   doesn't know the precise wage level.
 9   Q.   Do you know --
10   A.   I don't know the range either.
11   Q.   Okay.  With respect to Irvine,
12   California, do you know the parties to that
13   collective bargaining agreement?
14   A.   I do not.
15   Q.   Do you know anything about the level of
16   compensation related to the compensation in
17   the contracts that are at issue here?
18   A.   At issue?
19   Q.   In these 1113 proceedings.  In other
20   words do you --
21   A.   I'm sorry I didn't -- I didn't understand
22   your question --
23   Q.   I'll repeat the question.
24   A.   I apologize.
25   Q.   Do you know whether the Irvine,
```

89

```
 1   California wage rates are higher, lower or the
 2   same as contracts in Milwaukee?
 3   A.   No, I do not.
```

4    Q.    And with respect to Landrum, South

5    Carolina, do you know who the parties are to

6    the collective bargaining agreement?

7    A.    I do not.

8    Q.    And do you know anything about the

9    compensation level there?

10    A.    No, I do not.

11    Q.    Do you know who are the declarants -- I

12    mean, the reason I'm asking you those

13    questions is, these contracts are referenced

14    in your declaration.  Do you know which of the

15    company witnesses does have information on

16    these issues?

17    A.    The determination of which contracts --

18    labor agreements would be the subject of this

19    1113 process was made by looking at the

20    question of competitiveness --

21    Q.    I asked who -- who, if you could just

22    tell me who?

23    A.    I was trying to get there, I apologize.

24    And I believe that that focus was made by our

25    labor relations staff together with our legal

90

1    staff.

2    Q.    Can you identify any of the declarants in

3    this case as having that knowledge, sir?

4    A.    Kevin Butler is our chief labor

5    negotiator.

6    Q.    On paragraph 28 of your declaration you

7    mention that, in terms of the evaluation of

8    the financial performance of the United States

9    versus other geographic areas, you used what

10   you call a management study.  Why did you use

11   a management study rather than a financial

12   statement -- or financial statements to make

13   the comparison?

14   A.   The company manages itself by operating

15   division as I discuss in my declaration.  So,

16   we have seven operating divisions and then we

17   also do, on a periodic basis or a monthly

18   basis, accumulate our financial performance by

19   the regions that I describe.

20   Q.   My question to you is, why did you use a

21   management study rather than a financial

22   statement such as income and expense to make

23   the evaluation?

24   A.   Because our financial systems do not

25   accumulate the financial information.


                                              91


1    Q.   So there -- there is no financial

2    statement, like an income and loss statement

3    by these areas?

4    A.   It's not system generated, it's required

5    to be done on a manual or an allocation basis.

6    And that's what I mean when I refer to a

7    management study.  It's not how --

8    Q.   Would it be accurate that you have no

9    knowledge that any of these management studies

10   have been shared with the IAMAW or the IBEW?

11   A.   I have no knowledge one way or the other.

12   Q.   You made reference, in terms of some

13   questions, I believe, that Mr. Kennedy asked

14    you that indicated that in terms of your

15    supplier experience you normally are able to

16    get reductions in costs.  Does that include

17    suppliers of materials?

18    A.    Yes, it does.  It is principally

19    suppliers of materials.

20    Q.    So, if we would look at a chart of a per

21    unit cost to Delphi for suppliers over the

22    last five years, what we would see is that it

23    reduces year to year, is that right?

24    A.    That is correct, for a comparable size

25    and specification of product.

92

1    Q.    An in fact, in 2006 you experienced a

2    reduction in material cost over what you had

3    projected in your studies state of about 99

4    million, isn't that right?

5    A.    We are projecting to experience that

6    level of performance, yes.

7    Q.    In paragraph 55 of your declaration you

8    describe an increase in the per capita OPEB,

9    O-P-E-B, over a period of time.  Do you know

10    what the per capita OPEB is for the hourly

11    plan at the present time?  When you say that

12    there was a large increase, my question is, do

13    you know what the actual -- since apparently

14    there was some look at what it was, do you

15    know what the actual per capita OPEB is?

16    A.    Not off the top of my head, no.

17    Q.    Did you experience similar increases in

18    your salaried pension plan?

19    A.    Salaried post retirement medical plan,

20    OPEB is for medical, yeah.

21    Q.    Yeah, you're right.  Excuse me.

22    A.    That's okay.  Yes, we did.

23    Q.    Thank you for straightening out my

24    question.

25    A.    We have experienced a similar level of

93

1    health care inflation in our hourly plan --

2    excuse me, in our salaried plan that we have

3    experienced in the salary plan. Whether the

4    per capita increase is exactly the same, I'm

5    not testifying to that.  But we have

6    experienced a similar level of increase.

7    Q.    And your plan now is to retain that plan

8    for the salaried employees that have that?

9    A.    In 2005 we amended the salary retire --

10    salaried's OPEB plan to eliminate the benefit

11    of OPEB.  For those individuals have the plan

12    since 1993, we have not been providing health

13    care in retirement for any of our salaried

14    employees --

15    Q.    Thos who have --

16            MR. BUTLER:  Objection.  Can he

17    answer -- finish the question, or the answer,

18    please.

19            THE COURT:  I think you were asking

20    the same thing.  Go ahead with your answer.

21    A.    Since 19 -- sorry, I'll do it a little

22    differently.  Since '93 none of our salaried

23    employees have had OPEB in retirement, post

24    retirement medical.  And those who do only

25    have it until age 65 when medical -- Medicare

94

1    kicks in.  At which point they no longer

2    receive the benefit.

3    Q.    But, in terms of those who have it, those

4    who were hired before 1993, that benefit has

5    been retained for them?

6    A.    On the amended level that I just

7    described.

8    Q.    When did the amendment that the benefit

9    lasts until you're Medicare eligible go into

10    affect if it -- or has it not yet gone into

11    affect?

12    A.    I believe it went into effect on April 1,

13    2005, or during the course of 2005.  Whether

14    it's exactly April 1, it is clearly in affect

15    today, exactly the date, I'm not sure.

16    Q.    Earlier you made reference to the

17    employer's proposal to freeze hourly pension

18    benefits.  The employer's proposal is that

19    that freeze go into effect in what month of

20    2006, if you know?

21    A.    I believe its October 1, 2006.

22    Q.    I just wanted -- your best understanding

23    is, it's October 2006, not December 2006?

24    A.    That would be my understanding.

25    Q.    But the salaried -- an announced but not

95

1  implemented freeze in the salaried plan would

2  not go into effect until the beginning of

3  2008, December 31, 2007, is that right?

4  A.   I'm not sure, off the top of my head,

5  whether it's the end of '07 or the end of '06.

6  Whether it's January 1, '07 or January 1, '08.

7  Q.   Okay.  Let me -- it certainly is not

8  October of '06, it is after?

9  A.   That's correct.

10  Q.   It is no earlier than the end of 2006?

11  A.   I believe that's correct.

12       MR. BUTLER:  Your Honor, if I could

13  just, for the record, be clear on this.  I

14  mean, we'll stipulate to those facts.  The

15  proposal is hourly October 1, '06, salaried

16  January 1, '07.  Just so there's not an

17  ambiguity on the record.

18  Q.   Okay.  And I'm sorry.  I was trying to

19  straighten the record, and I managed to mis-

20  speak enough times that it didn't quite work

21  out that way.

22  A.   That's what I believe, but I just wasn't

23  positive.

24       MR. BUTLER:  The debtor's will

25  stipulate to that.


                                            96


1  Q.   In terms of the supplemental executive

2  retirement plan that you made reference to

3  earlier, do you know how many executives there

4  are in the United States?

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

5   A.   Approximately 450.

6   Q.   On a per capita basis, in terms of the

7   funding that you make reference to, I think

8   it's .3 billion, even if you assume the 600

9   figure, that would be half a million dollars

10  per person?

11  A.   The --

12  Q.   Is that right?

13  A.   The 300 million dollar number is not

14  funding its liability.  It's an unfunded plan

15  and I haven't done the calculation of 300

16  million divided by 450 to know what that

17  calculation is.

18  Q.   Your reference to, and this is paragraph

19  62 of your declaration.  You make a reference

20  to a cumulative shortfall of 4.6 billion

21  dollars.  That does not take into account your

22  financing, is that right?

23  A.   The 4.6 billion dollar number that you

24  refer to is the cumulative cash flow shortage

25  over the '06 through '10 period in the

97

1   competitive benchmark scenario, and it does

2   not contemplate financing it.  It is before

3   financing.

4   Q.   And refresh our recollection as to what

5   financing you have available to Delphi at the

6   present time.

7   A.   All right.  We presently have available

8   to us a debtor-in-possession financing

9   facility that expires upon the emergence from

10    reorganization that has an unused credit

11    facility of 1.7 billion dollars.

12    Q.    And how much is it total, including

13    what's used and unused.

14    A.    Two billion dollars.

15    Q.    Is part of that 4.6 billion claims that

16    would be compromised in the reorganization?

17    A.    No, I do not believe it is.

18    Q.    In any case, as of 2008 you expect to

19    have positive operating income, is that right?

20    Exhibit M of your statement.

21    A.    You're looking under the competitive

22    benchmark scenario.

23          MR. BUTLER:  You're addressing to

24    Exhibit M?

25          MS. ROBBINS:  Yes.


98


1          MR. BUTLER:  Thank you.

2    A.    Under the competitive benchmark scenario

3    in 2008, that's correct.

4    Q.    In your statement you state that the

5    employer, Delphi, will not be able to make its

6    required contribution for the hourly pension

7    plan.  And you talk about a legislative

8    solution.  Have any steps been taken with

9    respect to a legislative solution?

10    A.    We are taking steps to address the

11    initiative to be able to stretch our pension

12    funding, yes.

13    Q.    There are steps that can be taken without

14    legislation, are there not?

15   A.    There are.

16   Q.    And can you, instead of seeking a

17   legislative solution, simply meet your minimum

18   funding requirements for that plan.

19   A.    The --

20   Q.    Is that an alternative?

21             THE COURT:   I'm sorry, do you mean a

22   hypothetical alternative or based upon a set

23   of projections?

24   Q.    Is that an alternative that can be --

25   that you can consider?


99


1    A.    I'm sorry, I don't understand the

2    question.

3    Q.    As an alternate -- let me back up there.

4    A.    I'm not trying to be difficult, I just

5    want to be sure I answer accurately.

6    Q.    As an alternative to a legislative

7    solution --

8    A.    Uh-huh.

9    Q.    -- you could seek a waiver without

10   legislation, could you not?

11   A.    We could.

12   Q.    There are provisions in the regulations

13   now for waivers?

14   A.    We are exploring that, yes.

15   Q.    And as another alternative, you can make

16   a funding payment, and then you don't need any

17   waiver?

18   A.    Assuming we had the cash to do so.

19   Q.    And you are expecting to make your

20    minimum funding requirement to your salaried

21    plan, are you not?

22    A.    No.  The situation is exactly the same as

23    it relates to both plans and we recognize,

24    while this may only discuss the hourly, which

25    is the subject to this -- of this issue, we

100

1    explore an extension of the minimum funding

2    requirements that we would have under ERISA

3    for both our salaried and hourly plans upon

4    emergence from reorganization.

5    Q.    Your reason for thinking about a waiver

6    is that you expect to be able, in the future,

7    to make payments to make up for the funding

8    deficit now?

9    A.    Our reason for --

10    Q.    Is that right?

11    A.    Ask your question again, please.

12    Q.    The purpose or the assumption built in to

13    obtaining a waiver now, for the hourly plan or

14    the hourly and salaried plan is that, in the

15    future you will be able to make up the funding

16    requirements needed?

17    A.    Yes, over time.  Over a longer period of

18    time, we would be able to make those

19    contributions.  The effect of ERISA and the

20    level of under-funding the plan results in

21    significant results in significant

22    contributions being required immediately upon

23    emergence and that level is overwhelming to be

24    able to cover as the company is coming out of

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

25    reorganization.

101

1    Q.    Well, I think the figure you used was two

2    billion dollars?

3    A.    I believe that's correct.

4    Q.    And we're already 500 million better than

5    your planned projections.

6    A.    At the operating income level, I don't

7    believe that's all cash.

8    Q.    Do you have projections as to money or

9    funds that you will realize from selling some

10   of the businesses that you wish to sell?

11   A.    At the current time, we do not.

12   Q.    But you anticipate being able to sell

13   some of those businesses?

14   A.    Given the ability to achieve a

15   competitive laborer situation in those

16   facilities or businesses, and the support of

17   the customer, we would expect to be able to

18   sell   facilities -- sell business, yes.

19   Q.    Are you aware that the company has -- you

20   make reference to information being provided

21   to unions, are you aware that the company has

22   taken the position that it would refuse to

23   provide information on salaried compensation

24   or concessions?

25   A.    Not specifically, no.

102

1    Q.    Would it be accurate to say that you

2    really don't have any information as to what

3    information has or has not been provided to

4    the IAMAW and the IBEW?

5    A.    I know that significant information has

6    been provided to the advisors to our -- this

7    motion, and our union advisors.  And we've

8    fulfilled a substantial number of requests,

9    including, I believe, those that are made of

10   your unions.

11   Q.    Are you aware that the IAM and IBEW do

12   not have financial advisors?

13   A.    I understand that, yes.

14   Q.    And would it be accurate that you do not

15   have any information as to what information

16   was or was not provided to the IAM and IBEW?

17   A.    Not here in front of me, no.

18   Q.    Would you agree that in terms of the

19   impact of the concessions sought from the

20   splinter unions, specifically in this case the

21   IAM and the IBEW, that the savings that you

22   would realize from the concessions would not

23   be enough to make the difference between

24   Delphi making it financially and not making it

25   financially out of reorganization?


                                            103


1    A.    I think that's a true statement.

2    Q.    Do you agree that you are not seeking any

3    wage concessions from salaried employees?

4    A.    I think that at this current time that's

5    a true statement.

6          MS. ROBBINS:  No further questions,

7    Your Honor, at this time.

8         THE COURT:  Okay.

9         THE COURT:  How's everyone doing?

10    Does it make sense to go another half hour or

11    so before we take a break?

12         MS. MEHLSACK:  I shouldn't take more

13    than that.

14         THE COURT:  Okay.

15    CROSS EXAMINATION BY

16    MS. MEHLSACK:

17    Q.    Good -- I think its still morning.  Good

18    morning Mr. Sheehan.  Barbara Mehlsack for the

19    operating engineers.  Are you aware of the --

20    that the operating engineers are -- represent

21    employees at only three facilities, but two

22    that are the subject of this 1113 motion?

23    A.    Yes, I'm aware of that.

24    Q.    And are you aware of the -- which plants

25    they are?

104

1    A.    I believe one is Rochester.  Perhaps one

2    is Grand Rapids.  I don't remember exactly.

3    Q.    If -- I will not engage in game playing.

4    It's actually Rochester and Columbus.

5    A.    Excuse me.

6    Q.    I know you were aware that there was a

7    third facility that is now closed, I'll

8    probably still mispronounce it.

9    A.    Olpe --

10    Q.    Kansas --

11    A.    Yes, Ma'am.

12    Q.    And are you -- Rochester is a plant

13    that's projected to continue in operation with

14    a core business -- and what is that core

15    business at Rochester, do you know?

16    A.    Engine management systems.

17    Q.    And do you know how many operating

18    engineer employees are at that facility?

19    A.    I do not.

20    Q.    Were these projected for the Columbus

21    plant, do you know?  Whether it's going to be

22    closed, consolidated, sold?  If you don't know

23    off the top of your head --

24    A.    I don't remember off the top of my head,

25    specifically.

105

1    Q.    It is -- it is -- are you aware that the

2    labor relations representatives who have been

3    meeting with the operating engineers have told

4    them that the Columbus facility is likely to

5    be closed?  Were you aware of that?

6    A.    That would have been my expectation.  I

7    believe that's correct.  It's on the list of

8    facilities to be closed.  I wanted to make

9    sure I was clear about that.

10    Q.    And the reason for that is?

11    A.    We have gone through an analysis of our

12    business lines and those that would, for which

13    we believe we can be competitive in the

14    future, in which we have the right technology

15    and the right products to be competitive. And

16    then based upon that, we then have looked at

17    our footprint to determine how many

18    manufacturing facilities and where those

19    manufacturing facilities would be located.

20    Q.    But as to the Columbus plant,

21    specifically, you cannot tell me why -- what

22    was the basis for the decision to close that

23    particular facility as opposed to another

24    facility, let's say?

25    A.    No, I -- you know, that the -- it would

106

1    depend upon both the product that was being

2    produced there and whether that was a product

3    that we would remain in.  and then the nature

4    of the product and the ability to profitably

5    manufacture that product in -- within a

6    facility in the United States, even with a

7    competitive US wage benefit package.

8    Q.    I think it was a simple question, Mr.

9    Sheehan.  Right now, today, you can't tell me

10    what the basis is of the decision to close

11    down the Columbus facility?

12    A.    No, Ma'am.

13    Q.    Turning to paragraph 31 of your

14    declaration.  You state that -- you said that

15    the continued deterioration of Delphi is

16    attributable to three principal factors.  And

17    then you talk about the labor agreements and

18    you -- in effect, have three, I guess reasons,

19    and please correct me if I'm mischaracterizing

20    in any way, your statement.  You're saying

21    that it cost an increase in labor and benefit

22    costs, legacy retirement liabilities and have

23    limited Delphi's ability to respond to reduced

24    revenue by selling or closing facilities and

25    laying off access employees.  The first of

107

1    those factors, the increase in Delphi's labor

2    costs.  An increase over what?

3    A.    An increase over the costs in prior

4    periods.

5    Q.    So that in the case of the operating

6    engineers is that -- do you have an analysis

7    of what that increase is?

8    A.    I do not.

9    Q.    Is that an unanticipated increase?

10   A.    The -- I'm not aware.

11   Q.    You don't know whether that was an

12   anticipated increase or an unanticipated

13   increase?

14   A.    I do not.

15   Q.    But the labor costs as set forth in the

16   collective bargaining agreements, is that not

17   correct?

18   A.    That is correct.

19   Q.    And those costs are easily projectable

20   based upon wage rates and numbers of

21   employees.

22   A.    I have not seen an analysis of that for

23   the operating engineers.

24   Q.    Legacy retirement liabilities, have you

25   seen any analysis of legacy retirement

108

1    liabilities for the operating engineers?

2    A.    I have not.

3    Q.    Are you aware of -- as to whether or not

4    there even are any legacy retirement

5    liabilities for the operating engineers?

6    A.    I am not.

7    Q.    The limitation on Delphi's ability to

8    respond to reduced revenue by selling or

9    closing facilities.  Are you aware of the

10   circumstances surrounding the closing the only

11   facility where the operating engineers are

12   represented that has already closed the one in

13   Kansas?

14   A.    Am I aware of the --

15   Q.    The circumstances surrounding the closing

16   of that Kansas facility?

17   A.    Not specifically.

18   Q.    So, as far as you know, the operating

19   engineer's contract posed no obstacle to the

20   closing of that facility?

21            MR. BUTLER:  He already testified he

22   wasn't aware of the circumstances.

23            MS. MEHLSACK:  And I'm --

24            THE COURT:  Can you answer her

25   question?

109

1    A.    Can I repeat the answer, yes.

2            THE COURT:  No, can you answer that

3    question?

4    A.    I am not aware whether the operating

5    engineer's contract posed any obstacles to the

6    closing of the Olathe facility.

7    Q.    And -- question withdrawn.  Laying off

8    access employees, are you aware of what the

9    circumstances are at the Columbus facility in

10    connection with employee needs, manning needs?

11    A.    No, I'm not.

12    Q.    Are you aware of the fact that the labor

13    representatives have advised the OE, the

14    operating engineers, that if it there is an

15    attrition program in place -- put in place,

16    that they want to control how many employees

17    take that program.  Because they want to make

18    sure that there are a sufficient number of

19    skilled engineers available to operate the

20    facility until its shut down.

21    A.    I believe that provision exists with the

22    UAW attrition program that was already

23    approved, that there has to be mutual

24    agreement and the timing of the leaving -- the

25    people leaving under the program insure that

110

1    the facility is able to operate -- continue to

2    operate.

3    Q.    All right.  But the question I asked you

4    is, are you aware specifically that at

5    Columbus, Delphi has told the IUOE that they

6    want to make sure that there are enough

7    employees around?

8   A.    I'm not aware of that specifically, but

9   it would not surprise me given my

10   understanding of the UAW.

11   Q.   Are you aware of what the impact would be

12   in Rochester of the attrition program?

13   A.   I am not.

14   Q.    In terms of whether there would be a need

15   to lay off any employees after an attrition

16   program were offered?

17   A.   I am not.

18   Q.   I take it that your answers to Mr.

19   Kennedy and Ms. Robinson, that you have not

20   considered the impact of an attrition program

21   -- first, you have not considered the impact

22   of an attrition program on the profitability

23   of any of the facilities that will continue to

24   operate, including Rochester?

25   A.   That's correct.


111


1   Q.   Have you considered the impact on --

2   question withdrawn.  Is it the case that if

3   the changes that, to the IUE contract that

4   Delphi has proposed, whether it's consensual,

5   competitive, or anything that's in between,

6   that at the Rochester plant, those changes

7   would have no impact, whatsoever, on the

8   profitability of the Rochester plant.  That

9   is, it would make no difference at all to the

10   profitability of the Rochester plant if the

11   operating engineers -- the proposed changes to

12   the operating engineer's contracts were put in

13    place?

14              MR. BUTLER:  Objection.  I don't

15    know what the question is, Your Honor.  I'm

16    sorry, I can't --

17              THE COURT:  I think you should start

18    over.

19    Q.    Have you made any analysis if the

20    operating -- the changes that Delphi has

21    proposed to the operating engineers contract.

22    Let's take the competitive benchmark

23    proposals, were put in place, whether that

24    would have any impact at all on the Rochester

25    plant's profitability in the future?

112

1    A.    Have I prepared an analysis?

2    Q.    That's the question.

3    A.    Not specifically.  It is part of the

4    overall analysis of the company.

5    Q.    But you've not done a specific analysis

6    as to the impact of the proposed operating

7    engineer's changes on the profitability of the

8    company?

9    A.    As I described to Mr. Kennedy, the entire

10    corporation has to be viable, not just one

11    piece of the company.

12    Q.    And I gather what you mean, amongst the

13    elements of viability, you said is that there

14    be competitive wage -- that there be

15    competitive wages, and you stated that those

16    wages have to be competitive with Delphi's

17    peers, am I correct?

18   A.   Yes, Ma'am.

19   Q.   And by peers do you mean the other auto

20   manufacturing company -- auto parts

21   manufacturing companies in this country?

22   A.   Yes, Ma'am.

23   Q.   Have you done an analysis of whether or

24   not the operating engineer's wages are

25   competitive with the wages for stationary

113

1   engineers at the other auto manufacturing

2   parts companies?

3   A.   I have not.

4   Q.   Do you know -- you have not.  It's my

5   understanding, however, from Mr. Butler's

6   testimony that the competitive wage that --

7   that Delphi's claim that its wage package is

8   competitive is based on Mr. Wachter's

9   comparability study, is that correct?

10   A.   I don't remember Mr. Butler's testimony

11   exactly so I can't say.

12   Q.   Is it your understanding that the wage

13   proposal that Delphi has made to the operating

14   engineers is based on Mr. Wachter's

15   comparability study?

16   A.   I don't know.

17   Q.   The executive -- the supplemental

18   executive retirement plan that you were

19   discussing, that's a non-qualified plan,

20   that's correct?

21        MR. BUTLER:  Objection.  Asked and

22   answered in prior cross-examination.

23    Q.    Are  you aware of any other non-qualified

24    plans that are available to the executives who

25    have the supplemental executive plan?

114

1    A.    Not at the current time.

2    Q.    Not -- you're not aware at the current

3    time, or there aren't any at the current time?

4    A.    To the best of my knowledge, as I sit

5    here, I don't know of any.

6    Q.    Are you aware of any proposals to the

7    executives who are in that supplemental plan,

8    to reduce benefit levels in that plan?

9    A.    I'm not aware of any.

10    Q.    Are you aware of any retiree health

11    insurance that's provided to executives in the

12    company?

13    A.    The executives are in exactly the same

14    plan as I described to Mr. Peterson earlier.

15    So, if they were hired before 1993, they would

16    be eligible to participate in the plan and

17    they would have received the same treatment

18    that all of the other salaried employees

19    received in 2005 when we eliminated post-

20    retirement medical once you're Medicare

21    eligible.

22    Q.    And is that post-retirement medical until

23    Medicare eligibility; is there any plan to

24    eliminate that provision?

25             THE COURT:  That's asked and

115

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

1   answered too.

2          MS. MEHLSACK:  I don't remember this

3   witness had answered that.

4          THE COURT:  He did.

5          MS. MEHLSACK:  Then I apologize,

6   Your Honor.

7   Q.  Are you aware of any individual

8   arrangements, other than a medical plan or a

9   retiree medical plan, individual arrangements

10  with executives, retired executives, to

11  provide them with health insurance?

12  A.  No, Ma'am.

13  Q.  Are you aware of any individual contracts

14  with current executives, to provide them with

15  health insurance when they do retire?

16  A.  No, Ma'am.

17         MS. MEHLSACK:  Okay.  I'm going to

18  ask that -- if counsel could provide us, if

19  any of those contracts exist.

20         MR. BUTLER:  Your Honor, cross

21  examination is not the time for discovery

22  requests.

23         MS. MEHLSACK:  We will make that

24  discovery later on.

25         MR. BUTLER:  The time for discovery

                                                116

1   requests has passed, counsel.

2          MS. MEHLSACK:  I'll have a

3   discussion with counsel about this later.

4   Your --

 5              THE COURT:  Okay.

 6              MS. MEHLSACK:  My client's have been

 7   refused certain data, Mr. Butler.

 8   Q.   Are you aware, in fact, Mr. Sheehan, and

 9   I don't know if you're the individual to whom

10   this question has been addressed but, are you

11   the person who did the analysis of the losses

12   at the various plants?  There's that chart on

13   page 14 of your declaration, was that done by

14   you or members of your staff?

15   A.   Paragraph 14?

16   Q.   No, page 14.

17   A.   Page 14, sorry.

18   Q.   Page 14, paragraph 30.

19   A.   Sorry.  That analysis was prepared by the

20   Delphi finance staff in 2005.

21   Q.   Are you aware that in negotiations, my

22   clients have asked to have a -- to receive a

23   copy of that analysis for the Rochester plant

24   and have been refused that.  And they were

25   told that they would -- that the negotiators

                                          117


 1   would have to ask, I believe, upper

 2   management.  Has that question been addressed

 3   to you?

 4   A.   Not to the best of my knowledge.

 5   Q.   From an overall perspective, in terms of

 6   the overall profitability of Delphi, would the

 7   concessions that have been requested of the

 8   operating engineers make a difference?

 9   A.   Yes, they would make a difference.

10    Q.    And you've done an analysis of that

11    difference?

12    A.    No, Ma'am.  You're question was whether

13    they would make a difference.  They would make

14    a difference.  Each change helps a little bit.

15    Q.    But there's no analysis done of that.  So

16    you couldn't show me the numbers?

17    A.    No, Ma'am.

18          MS. MEHLSACK:  No further questions.

19          THE COURT:  Okay.  Thank you.

20    CROSS EXAMINATION BY

21    MR. SIMON:

22    Q.    Good morning, or is it afternoon?

23    A.    No, still morning.

24    Q.    Still good morning.  Good morning Mr.

25    Sheehan, Bruce Simon from Cohen, Weiss and


                                        118


1    Simon for the auto workers.  As we stand here

2    today, what is Delphi's liquidity position?

3    A.    I'm not aware specifically.

4    Q.    What is the most recent date for which

5    you would be aware of Delphi's liquidity

6    position?

7    A.    I believe that at the end of April that

8    we had, roughly, 1.9 billion dollars of cash

9    and access to a revolving credit facility

10    under the DIP financing arrangement.

11    Q.    And what was the access to the revolver?

12    A.    As I described earlier, 1.7 billion

13    dollars.

14    Q.    So that would be a total of --

15   A.   In excess of three billion dollars.

16   Q.   And in addition to that is there,

17   approximately, another billion dollars in non-

18   debtor Delphi entities?

19   A.   In terms of borrowing capacity, I don't

20   believe that there's capacity but there is

21   outstanding lines, but I don't know it

22   specifically off the top of my head here.

23   Q.   But there's also cash in the non-debtor

24   Delphi facilities, correct?

25   A.   The 1.9 billion dollars that I referred

119

1   to was debtor and non-debtor combined, not

2   just the debtor.

3   Q.   So, order of magnitude, 3.6 billion

4   dollars worth of liquidity at the end of

5   April?

6   A.   Yes, sir.

7   Q.   And that reflected the 500 million better

8   than planned performance for the first

9   quarter?

10   A.   The 500 --

11   Q.   That was included in there?

12   A.   To the extent it was cash.

13   Q.   Yeah.  I want to revisit what you

14   testified to regarding your material costs.

15   A.   Uh-huh.

16   Q.   If I understood your testimony this

17   morning, it was the Delphi had not

18   experienced, in the first quarter of '06, the

19   price downs in material costs that it had

20    experienced over the past number of years,

21    correct?

22    A.    I believe that's correct.

23    Q.    And what had Delphi projected for the

24    first quarter of '06 regarding material costs?

25    A.    I believe that it was approximately half

120

1    a percent decrease year over year.

2    Q.    But, instead the decrease year over year

3    was significantly greater than the half

4    percent projected, correct?

5    A.    That's correct.

6    Q.    So it was closer to the prior year's

7    experience, correct?

8    A.    It was two percent, I believe, as

9    compared to the four percent and compared to

10    the half a percent I just mentioned.

11    Q.    I guess what I'm trying to square is the

12    half a percent lower projection versus your

13    testimony this morning that the material costs

14    came in and did not have the same level of

15    reductions that you had anticipated?

16    A.    I think what I was describing this

17    morning was our historical experience at the

18    four percent level that I was mentioning a few

19    moments ago.  And that the performance that we

20    expect to see in 2006 is below what we had

21    historically been seeing at the four percent

22    level.

23    Q.    So that the actual performance in the

24    first quarter of '06 was much better for

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

25    Delphi than you had projected, correct?

121

1    A.    Versus what we had projected, but less

2    than our historical experience, yes.

3    Q.    Can you tell us what led you to project a

4    much lower level of material cost reductions

5    when you were doing your plan than you had

6    historically recognized?

7    A.    The unsettled circumstances associated

8    with Delphi in the second half of 2005 when

9    the plan was being put together.  Combined

10    with the uncertain situation with respect to

11    commodity costs globally.

12    Q.    Had you considered, at the time you made

13    the half a percent projection that you were

14    making a conservative projection?

15    A.    We believe we were making our best

16    estimate at that point in time, with all the

17    information we had available to us.

18    Q.    Was this another respect in which you

19    were responding to Rothschild's or anyone

20    else's suggestion or directive that you make a

21    worse case assumption?

22    A.    No, sir.

23    Q.    I beg your pardon?

24    A.    No, sir.

25    Q.    Was this another instance where departing

122

1    from your own actuarial experts projection

2    with regard to OPEB expense, you went off on

3    your own and were simply wrong?

4    A.    No, sir.

5              MR. BUTLER:  Objection.  I don't

6    know what the question is on that one?

7              MR. SIMON:  Asked and answered.

8    You're a little late.

9              THE COURT:  Either he didn't know or

10   he disagreed.

11   A.    Sorry.

12             THE COURT:  He didn't under -- I

13   don't think he understood the question either.

14             MR. BUTLER:  Okay.

15   Q.    If you'll turn to paragraph 55 of your

16   declaration.  You state, in paragraph 55 that

17   your US based workforce dropped from,

18   approximately, 63,000 hourly employees in 1999

19   to, approximately, 33,100 hourly employees in

20   2005.  That's a 30,000 employee reduction

21   between '99 and '05, correct?

22   A.    Yes, sir.

23   Q.    And that was during the period of time

24   when your labor contracts that you seek to

25   reject were fully enforced?

123

1    A.    Yes, sir.

2    Q.    So that you were able to reduce your

3    workforce by 30,000 employees under the

4    contracts which you state onerously prevent

5    the company from taking actions necessary to

6    transform itself, correct?

7    A.    The workforce reduction during that

8    period of time is from 63 to 33.

9    Q.    In response to Ms. Mehlsack's questioning

10   this morning, you stated that the company made

11   an analysis of its business lines to determine

12   what products it had that would be

13   competitive, for which it had the right

14   technology.    And that led to an analysis of a

15   footprint of manufacturing facilities that

16   could produce those products, correct?

17   A.    Yes, sir.

18   Q.    When did you do that?

19   A.    It was done over a period of time between

20   2003 and 2005.

21   Q.    So that was done --

22   A.    It evolved over time.

23   Q.    I'm sorry.

24   A.    It evolved over time.    Excuse me.

25   Q.    So that was done before the development

124

1    of the steady state?

2    A.    Yes, sir.

3    Q.    And was that analysis submitted to the

4    board of directors?

5    A.    It was reviewed by the -- with the board

6    of directors, yes.

7    Q.    And adopted by them?

8    A.    I don't recall a specific request for the

9    board of directors to adopt or to agree to

10   that -- that analysis.    It was --

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

11  Q.   And had that analysis been presented to

12  the Court?

13  A.   I'm not aware.

14  Q.   Was that analysis presented to the UAW or

15  to the other unions?

16  A.   I believe that it has been -- I don't

17  know.

18  Q.   What is the relationship between -- is

19  there a name for that one, like everything

20  else has.  We have a steady state, we have a

21  transformation, does that analysis of your

22  core products have a name just so that we

23  could refer to it easily?

24  A.   You know, when we first started off we

25  talked about it as our product pyramid.

125

1  Q.   Product pyramid?

2  A.   Uh-huh.

3  Q.   And is that -- is the product -- what is

4  the relationship between the product pyramid

5  and the transformation plan?

6  A.   The relationship between the two is that

7  the analysis that we performed, as to those

8  product lines in which we believed we had the

9  right technology, the right expertise to and

10  the ability to be successful, that those are

11  the businesses that we wanted to retain and

12  grow and keep as part of our product portfolio

13  for the future.  Those in which we believe

14  that we either do not possess the right

15  technology or the nature of the product is

16    such that we cannot be successful,

17    manufacturing that product are those that,

18    ultimately became part of what is referred to

19    as the non-core product lines.

20    Q.    And contrary-wise, the core product line

21    and the transformation plan is essentially

22    derived from or similar to, if not identical

23    to, the product pyramid, correct?

24    A.    It is the output from it, that analysis

25    and those considerations by management.


126


1    Q.    Now, there's been a good deal of

2    testimony that, by yourself and others, that

3    the driving consideration for Delphi in

4    developing and presenting it's section 1113

5    proposals, has been the perceived need to have

6    competitive wages and benefits, correct?

7    A.    Yes, sir.

8    Q.    With those competitive wages and benefits

9    with relation to the competitors that you

10    would face in your transformed company, or was

11    that a comparison with regard to your steady

12    state analysis?

13    A.    I'm sorry, can you ask that question

14    again, please?

15    Q.    Sure.

16    A.    I apologize.

17    Q.    When Delphi was driven in formulating

18    it's 1113 proposals --

19    A.    Uh-huh.

20    Q.    -- by the desire to achieve competitive

21    wage rates --

22    A.    Yeah.

23    Q.    -- were the competitive wage rates that

24    it was driven to --

25    A.    Uh-huh.

127

1    Q.    -- those in the competitor group that you

2    would face in your transformation plan, or

3    those that you had faced in your steady state

4    plan?

5    A.    It was focused on those that would be --

6    let me start differently.  Certainly as it --

7    as the population of competitors that we have

8    looked at in terms of our transformation plan

9    represent those that we expect -- we have been

10    and expect to continue to compete against in

11    our core product lines.  To the extent -- I'm

12    not aware of specifically, with respect to the

13    way the US labor agreement and thinking about

14    the competitiveness, whether there's a

15    complete overlap it would depend upon whether

16    they had a US footprint or not.

17    Q.    Do you have any idea at all whether the

18    wages and benefits of your competitors in your

19    non-core businesses are greater than, lesser

20    than or more or less the same as those in your

21    core competitors?

22    A.    I do not.  We compete for -- we compete

23    against or we have to have a competitive wage

24    and benefit package with those of the industry

25    in genera.

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

128

1    Q.    Have you identified, for purposes of your

2    competitive analysis, the cohort of companies

3    that you would compete with in your

4    transformation move?

5    A.    Yes, we have.

6    Q.    And are they reflected anywhere?  Do you

7    have them?

8    A.    Sitting here in front of me?

9    Q.    Yes.

10   A.    No, I do not believe it I do.

11   Q.    Is that the same cohort of competitors

12   that you competed with in your steady state

13   scenario?

14   A.    Yes.  For -- some of them are, yes.

15   Q.    Some of them are, but many of them are

16   not, is that not correct?

17   A.    To the extent that they were only -- we

18   were only competing against them in non-core

19   business lines and we exit those business

20   lines, they would not be competitors in the

21   future.

22   Q.    And sitting here today as the chief

23   restructuring officer, you really don't have

24   the faintest idea whether the wages and

25   benefits of those in your core competitor

129

1    cohort are great than, lesser than, or more or

2    less the same than those in your steady state

3   cohort?

4          MR. BUTLER:  Objection.  Asked and

5   answered.  I wish that question was five

6   answers ago.

7          THE COURT:  No.  You can answer

8   that.

9   A.   Perhaps -- could I just ask for a few

10  less adjectives to try to understand the

11  question?

12  Q.   Well, let's describe the businesses.

13  What's your core -- what's the core

14  competitors you're going to be dealing with?

15  Not the names, but the products.

16  A.   Lets just say, generally, technology

17  related products, audio, engine control

18  systems, diesel technology, etc.

19  Q.   High tech, high IT products, correct?

20  A.   Yes, sir, electronic.

21  Q.   Do you have a general understanding as to

22  whether or not the wage level -- wage and

23  benefit levels for employees in those

24  industries are greater or lesser than the more

25  commodity-like industries that you are exiting

130

1   as non-core?

2   A.   It's not my area of expertise.

3   Q.   Do you have any understanding as to

4   whether or not hourly labor costs as a

5   percentage of total cost is greater than,

6   lesser than or more or less the same as

7   between core and non-core competitors?

8   A.   I haven't studied that.

9   Q.   Don't they have a significantly higher

10  investment in -- capital investment

11  technology, therefore driving, almost

12  certainly, a lower level of hourly labor

13  costs?  You know that, don't you?

14  A.   I'm sorry, can you ask the question

15  again, please?

16  Q.   Paragraph 60 of your declaration, please.

17  You state that the wage and benefit changes,

18  including modifications to provide retiree

19  health and life insurance, would provide

20  approximately 9.2 billion in cash savings

21  through 2010, correct?

22  A.   Under the competitive benchmark scenario,

23  that's correct.

24  Q.   And is that the total savings that you

25  have calculated with respect to the

131

1   competitive proposal?

2   A.   No, sir.

3   Q.   Is that all inclusive, a total of 9.2

4   billion in savings?

5   A.   For the wage -- for the wage and benefit

6   changes.

7   Q.   Yeah.  Can you break it down for us as

8   between wages and benefits?

9   A.   Not off the top of my head, I cannot give

10  you the exact numbers, no.

11  Q.   Who is it --

12        MR. BULTER:  I just want to try to

13    get a sense of things.  The witness has been

14    on the stand for almost three hours at this

15    point, approaching that.  I don't know how

16    much longer Mr. Simon has to go, but if we're

17    going to continue this, at some point could we

18    take a break for 10 minutes.  I don't know

19    when -- what's the right time to do it in your

20    questioning is --

21            THE COURT:  How much time do you

22    think you have?

23            MR. SIMON:  I have got, certainly

24    more than 10 minutes.  I have a bit.

25            THE COURT:  Well, more than half an


132


1    hour?

2            MR. SIMON:  Probably.

3            THE COURT:  All right.  Well why

4    don't we -- are you -- let's come to a point

5    where you're going to be changing topics and

6    then we'll take a break.

7            MR. SIMON:  Yeah, that's right.  I

8    am moving into a different --

9            THE COURT:  You're at that point

10    now?

11            MR. SIMON:  Uh-huh.

12            THE COURT:  All right.  Why don't we

13    take a -- you're at that point now where

14    you're going to be changing topics?

15            MR. SIMON:  Yes, it's fine.

16            THE COURT:  All right.  Let's take a

17    10 minute break.  Come back at 12:05.

18          (Recess at 11:45 a.m.)

19          THE COURT:  Please be seated.  Okay.

20     Let's resume, Mr. Sheehan, you're still under

21     oath.

22          THE WITNESS:  Yes, sir.

23     BY MR. SIMON:

24     Q.   We've made it to the afternoon.  Good

25     afternoon.  I think we left and you said you

133

1      could not break down for us the 9.2 billion

2      cash savings reflected in paragraph 60 of your

3      declaration, as between wages and benefits,

4      correct?  You just don't have that information

5      at your tip?

6      A.   That's correct.

7      Q.   Can you break it down as between the

8      various unions?

9      A.   Not as I sit here today?

10     Q.   But that information does exist?  Do you

11     know who has that?

12     A.   My finance staff would have that

13     information and I believe that it's -- its

14     part of our modeling, but I just don't have

15     that information with me.

16     Q.   The 9.2 billion savings is on the basis

17     of a steady state assumption, is that correct?

18     A.   It is the savings, assuming the

19     competitive benchmark scenario was

20     implemented, as compared to the steady state

21     scenario.

22     Q.   But that's after the transformation plan

23    has been implemented?

24    A.    The competitive benchmark transformation

25    plan.

134

1    Q.    Okay.  So that it's after you're now only

2    producing your core products in the plants you

3    have retained with the reduced workforce that

4    you have?

5    A.    Yes, sir, as compared to the steady

6    state.

7    Q.    And so, when you say in paragraph 60, in

8    the last sentence, "under the assumptions in

9    the steady state scenario and adjusted for the

10    revenue pricing assumptions and labor

11    modifications expected to impact the business

12    in the competitive benchmark scenario, Delphi

13    would still have a cash flow shortfall of 3.4

14    billion between '06 and '10," right, that's

15    paragraph 60?

16    A.    Yes, sir.

17    Q.    Okay.  And the phrase within that

18    sentence, labor modifications expected to

19    impact the business in the competitive

20    benchmark scenario are the labor modifications

21    proposed in your section 1113 proposal?

22    A.    Yes, sir.

23    Q.    Now in paragraph 62, you state in the

24    middle of that paragraph -- do you have it?

25    A.    Yes, I do.

1    Q.    Okay.  Assuming that Delphi would

2    implement all of the portfolio changes,

3    including manufacturing site closures and

4    consolidations identified in the restructuring

5    plan and discussed below, and that Delphi were

6    able to implement its proposed labor

7    modifications, Delphi would still have a cash

8    flow shortage of approximately 4.6 billion

9    between '06 and 2010, because of it's pending

10   funding -- pension funding obligations, which

11   account for approximately 3.1 of the 4.6. Can

12   you help us reconcile the 3.4 billion in

13   paragraph 60 with the 4.6 billion in paragraph

14   62?

15   A.    The paragraph 60 is starting with the

16   steady state scenario and only adjusting for

17   the specific changes that are referred to

18   there in paragraph 60, specifically revenue

19   and pricing assumptions and labor

20   modifications.  So it is not adjusting for any

21   of the other initiatives that we have under

22   our overall transformation plan.  Whereas

23   paragraph 62, as it says in the second

24   sentence, assuming that Delphi were able --

25   were to implement all of the portfolio

136

1    changes, including manufacturing site closures

2    and consolidations identified in the

3    restructuring plan and were able to implement

4    its proposed labor modifications.  Delphi

5    would still have a cash flow shortage of 4.6

6    billion.  So it --

7    Q.   So, can you break down for us what the

8    components and relative values would be for

9    the differences between the 3.4 billion in

10   paragraph 60 and the 4.6 in paragraph 62?

11   A.   No, not sitting here off the top of my

12   head, sorry.

13   Q.   Does paragraph 60 reflect the same 3.1

14   billion pension funding obligation between '06

15   and 2010 as paragraph 62 does?

16   A.   I'd have to look at more detail --

17   Q.   I'm sorry?

18   A.   I would have to look at more detail to be

19   able to answer that question.  I would want to

20   look at more detail to answer your question.

21   Q.   So that as we sit here, you can't tell us

22   whether paragraph 60 does or does not account

23   for the pension shortage of 3.1 billion that

24   you referred to in paragraph 62?

25   A.   In order to answer the question

137

1    accurately, I would want to look at more

2    detail.

3    Q.   Well in paragraph 63, you state that

4    Delphi's current financial projections show

5    that it will not have the cash to make its

6    required pension contribution in '07 and '08,

7    and that the cumulative minimum funding

8    obligation between '07 and 2010 would exhaust

9   all of Delphi's available cash during that

10  period, correct?

11  A.    That's correct.

12  Q.    Harking back to the first few words of

13  paragraph 63 when you referred to your current

14  financial projection, which current financial

15  projection?  What plan are we talking about

16  here?

17  A.    That's referring to the competitive

18  benchmark scenario that this section of my

19  declaration is referring to.

20  Q.    Assuming that the transformation plan has

21  been implemented?

22  A.    That's correct, a competitive benchmark

23  transformation plan.

24  Q.    And how much are the required pension

25  contributions in '07 and '08?

138

1   A.    I believe that -- I believe that in 2007

2   using existing, excuse me, using the funding

3   laws that were in effect up until April 15,

4   2005 and that have not yet been renewed by

5   congress, that it was -- they were in excess

6   of two and a half billion dollars in 2007 and

7   approximately a billion dollars in 2008.

8   Q.    Could I have those numbers again, please,

9   I just missed it.

10  A.    I believe it's approximately two and a

11  half billion dollars in 2007, and a billion

12  dollars in 2008 for both the -- I'm referring

13  to both the salaried and hourly plans, I

14    believe.  Not just simply the hourly plans and

15    I'm also -- I want to make sure that I'm clear

16    that it's based upon the law at that time.

17    Q.    And then -- again, just doing some simple

18    math and looking back to paragraph 62, I guess

19    I'm trying to reconcile that two and a half

20    plus one equals 3.5 we just talked about with

21    the 3.1 referred to in the last sentence of

22    paragraph 62?

23    A.    That's the entire period 2006 through

24    2010, and that's only the hourly retirement

25    plan, not the hourly and salaried plans.

139

1    Q.    And can you break down for us as between

2    the salary and hourly?

3    A.    Not off the top of my head.

4              THE COURT:  I'm sorry, so the 4.6

5    figure does include the full pension

6    shortfall, including the salaried plan?  The

7    4.6?

8    A.    Yes, sir.

9              THE COURT:  All right.

10    Q.    Jumping if you would, please, to

11    paragraph 83.  You refer there to cash

12    contributions to the plan of two billion in

13    2007, in order to emerge from bankruptcy.  Did

14    the figures you just gave us for '07 include

15    that two billion?

16    A.    Yes, it does.

17    Q.    That is the two billion, it's the same

18    number there?

19    A.    This is only the hourly plan.

20    Q.    Okay.  So that just to be clear, that two

21    billion is included in the 3.1 billion you

22    referred to in paragraphs 60 and 62?

23    A.    Yes, sir.

24    Q.    In paragraph 85, I think this is clear, I

25    just want to make sure it is, you discussed

140

1    the company's thought process with regard to

2    projections of GM business and with the last

3    two lines on page 35 you say, Delphi's

4    original projections were that it's GM revenue

5    for '06 through 2010 would be, approximately,

6    two billion lower than assumed in the current

7    projection.  Was the two billion included or

8    not included in the steady state scenario?

9    A.    It is included.

10    Q.    So that you assume the higher -- the two

11    billion higher revenue in steady state?

12    A.    That is correct.

13          THE COURT:  And you made the same

14    assumption for the comparative benchmark

15    projections?

16    A.    Yes, sir.  The GM volume assumptions are

17    the same.

18    Q.    Now the -- harking back to paragraph 62

19    where you identified 3.1 billion of the

20    projected cash shortage from 2006 to 2010, as

21    attributable to your pension funding

22    obligations, you have that with me?

23    A.    Yes, sir.

24    Q.    Have you calculated what the result would

25    be if you terminated the hourly pension plan?


141


1    A.    No, I have not.

2    Q.    Has anyone, if you know?

3    A.    It's not our current intention to -- it

4    is not our current intention to terminate our

5    hourly pension plans -- plan.

6    Q.    But you project, forecast and analyze

7    things even when it's not your current

8    intention, do you not as a business planning

9    matter?

10    A.    Yes, we do.

11    Q.    And you have determined that, in the

12    absence of a pension solution, the company is

13    not viable, correct?

14    A.    That is correct.

15    Q.    And you have determined that on the basis

16    of current law that Delphi will not be able to

17    meet its pension obligations, correct?

18    A.    I would say that that issue is still

19    being explored.  We intend to try to take

20    advantage of every opportunity that there is

21    under current law to be able to -- certainly

22    it's true that we would not be able to achieve

23    the ERISA minimum contributions.  There are,

24    as one of the other attorney's here this

25    morning was asking about, there are provisions


142

1    in law for relief, and we intend to seek every

2    opportunity we can to find relief.  Whether

3    that be through legislative action or use of

4    currently existing law.

5    Q.    I'm trying to square that with your

6    statement.

7    A.    Yeah.  I was only -- all I was --

8    Q.    In paragraph 63, if you turn to that.

9    Delphi's current financial projection showed

10    it will not have the cash to make its required

11    pension contributions in 2007 to 2008 and that

12    the cumulative minimum funding obligation

13    between '07 and 2010 would exhaust all of

14    Delphi's available cash during that period?

15    A.    Yeah.  The only distinction I was making

16    for you was the difference between what our

17    minimum funding obligations are and trying to

18    take advantage of existing relief that is in

19    law, that we would be able to potentially

20    receive from the United States government.  Am

21    I clear about what --

22    Q.    Under existing legislation?

23    A.    Under ERISA minimum contribution law.  We

24    are not capable, in our opinion, of funding

25    those amounts as they are otherwise due.  But

143

1    there are provisions in law that provide for,

2    potentially, receiving relief and we will seek

3    to take advantage of every opportunity there

4    is.

5    Q.    No, I'm sorry.  First you say under

6    existing law there isn't then you say under

7    existing law there is.  Is your

8    understanding --

9           MR. BUTLER:  Objection.  That wasn't

10    the testimony.

11           MR. SIMON:  Then can we reread the

12    testimony.  I want the witness to have every

13    opportunity to recon --

14           THE COURT:  He was making a

15    distinction between minimum funding

16    contributions and the potential to get a

17    waiver of them.

18    A.   Thank you.

19           MR. SIMON:  Well, but the

20    possibility of waivers either exists or does

21    not exist under existing law?

22           THE COURT:  But he says he thinks it

23    does exist under existing law, at least he's

24    exploring it.

25    BY MR. SIMON:

144

1    Q.   Has the company explored the availability

2    to it of the waivers that you've described?

3    A.   We are exploring it.

4    Q.   Have you had meetings with the

5    appropriate government officials regarding the

6    availability to you of a waiver?

7    A.   Yes, we have.

8    Q.   And are those conversations continuing?

9    A.   Yes, they are.

10    Q.   And have they outlined to you

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

11  requirements that you would have to fulfill in

12  order to be considered for the waivers?

13  A.   Not -- the discussions have not

14  progressed to that stage yet.

15  Q.   And notwithstanding the uncertainty as we

16  sit here today, of the availability to you of

17  waivers that you believe might give you some

18  relief, the company has made no analysis of

19  the savings it would achieve if it terminated

20  the plan?

21          MR. BUTLER:  Objection.  Asked and

22  answered.

23          THE COURT:  Well, I'd like to hear

24  it again.

25  A.   I think we -- I would say to you is that,

145

1  yes.  We understand    what -- we understand

2  what the pension obligations that we have are

3  and we understand what the pension expense

4  amounts that are included in both the steady

5  state and transformation models are.  And we

6  also recognize that if we terminate the

7  pension plan, or plans, that those costs would

8  not be incurred

9  Q.   And how much costs would not be incurred

10  if you terminated the pension plan?

11  A.   The current under-funding of the pension

12  plan is approx -- pension plans is,

13  approximately, four billion dollars.  Two and

14  a half billion in the hourly and I believe,

15  about a billion and a half on the salaried in

16    those order of magnitude.  And there's,

17    approximately, I believe, six to seven hundred

18    million dollars of expense for both the hourly

19    and salaried plans in the projections of

20    expense in future periods.  If those plans

21    didn't exist because they had been terminated,

22    there would be no -- those obligations

23    wouldn't exist and the expense wouldn't exist.

24    So, you know, we understand what --

25              THE COURT:  But have you calculated

146

1     the termination liability?

2     A.    Yes, but that  wouldn't -- yes, we have.

3               THE COURT:  Okay.

4     Q.    How much of the 3.1 billion of net

5     funding obligations between 2006 and 2010 set

6     forth in paragraph 62 of your declaration,

7     would be dealt with by termination of the

8     pension plan?

9     A.    I'm sorry --

10    Q.    Paragraph 62 --

11    A.    -- start at the beginning -- the question

12    again, please, I'm sorry.

13    Q.    How much of the 3.1 billion --

14    A.    Uh-huh.

15    Q.    -- pension funding obligations that you

16    described in the last sentence of paragraph

17    62, would be erased by pension termination?

18    A.    I believe it all would.

19    Q.    Yeah.  So that instead of a 4.6 billion

20    dollar shortage, you would be left with a 1.5

21    billion dollar shortage, correct?

22    A.    Yes, sir.

23    Q.    And that's as compared with what, the

24    eight billion dollar shortage that you had

25    developed as an analytic tool in connection

147

1    with your steady state analysis?

2    A.    The steady state scenario --

3    Q.    Yes.

4    A.    -- showed an eight billion dollar

5    negative cash flow over the period 2006

6    through 2010.

7    Q.    Now, have you analyzed, or has anyone

8    analyzed for you, the impact on your hourly

9    employees if you were to terminate the hourly

10    pension plans?

11    A.    I think that we have discussed and we

12    understand that what the impacts could be,

13    yes.

14    Q.    And what is your understanding?

15    A.    I think that for a significant percentage

16    of our hourly workforce that, if we were to

17    terminate the pension plan, the plan would be

18    assumed by the pension benefit guarantee

19    corporation.  And in the first instance the

20    employees would collect the -- their pension

21    from the PBGC up to the PBGC's guaranteed

22    amounts over and above the -- that, for a

23    substantial portion of our employee base --

24    hourly employee base, there exists benefit

25    guarantee agreements with General Motors,

148

1    which would, I believe, obligate General

2    Motors for paying additional amounts to them

3    to replicate the benefits they would receive

4    under the GM plan.

5    Q.    So for the very substantial percentage of

6    hourly workers, they would suffer no loss of

7    benefit if you were to terminate the pension

8    plan, correct?

9    A.    Presuming that it operated the way I

10    described.

11    Q.    Yes.  And the company would realize a 3.1

12    billion dollar savings if it were to terminate

13    the plan as compared with funding obligations

14    if it did not terminate the plan, correct?

15    A.    Yes, sir.

16    Q.    Can you help us understand why, in view

17    of the fact it would not impact the very

18    substantial number of your employees and would

19    save you 3.1 billion dollars in funding

20    obligations, you have not pursued that

21    alternative?

22    A.    We have -- I think that we have looked at

23    what is the -- for prospectively for the labor

24    agreement, what is necessary and we've

25    proposed a competitive wage and benefit

149

1    package, prospectively.  And then we have

2    looked at the obligations that currently exist

3    and those that we would be able to retain.

4    And as I described, be able to retime those

5    payments under the pension with the United

6    States government with the PBGC and it's

7    related -- other related agencies of the

8    United States government, such that the

9    company was able to develop a viable business

10    plan to emerge from bankruptcy.  And we

11    believe that we can do that.

12    Q.    My question to you was, why if your

13    employees are not being negative impacted and

14    you can save 3.1 billion dollars over the next

15    five years, you have not chosen to do that.

16    Is it not a fact, Mr. Sheehan, that you've

17    chosen not to do it because you want to avoid

18    control group liability, being imposed by the

19    PBGC for your non-American facilities?

20    A.    No.

21    Q.    That's clearly why you haven't done it,

22    isn't it?

23    A.    No, sir.

24    Q.    Tell us then, why you haven't?

25    A.    Because, I believe that the standard to

150

1    be able to, while I'm not a lawyer, the

2    standard to be met to be able to terminate the

3    pension plan is a higher standard than the one

4    that we are discussing under this motion.  And

5    is a so-called but-for test and we believe

6    that with the plans that we've outlined, that

7    if we were able to achieve the -- those plans,

8    as we've set forth in our transformation plan,

9    we would be able to retain the pension.

10   Q.   But my question to you is, why would you

11   want to?  What do you accomplish by retaining

12   it, since it's not benefiting your employees

13   and it is costing you 3.1 billion dollars?

14   A.   I think that -- I guess what I would say

15   is, that the -- our obligation is to look at a

16   transformation plan that allows the company to

17   emerge from reorganization and deal with the

18   obligations that it has and that -- to the

19   extent that a -- that a plan can be emerged.

20   Just because an agreement exists between

21   the -- certain of the hourly employees in

22   General Motors, that that shouldn't enter into

23   our thinking about how the company itself will

24   deal with its obligations.

25   Q.   So that as between two alternatives.

151

1    One, not impacting your employees and saving

2    3.1 billion on the one hand, and on the other,

3    slashing your employees wages and benefits

4    down to 12.50 and hour, you believe that it's

5    your obligation to do the latter, rather than

6    to pursue the former?

7         MR. BUTLER:  Objection, foundation.

8    That's not the testimony and that's not what

9    the plans say.

10        THE COURT:  Well, let me ask it a

11   little differently because I wasn't sure I

12    understood your answer, Mr. Sheehan.  I think

13    I understood your answer to say that you

14    didn't want to create new obligations, and

15    that's why you wouldn't be seeking to

16    terminate the pension plan, is that right?

17    Triggering obligations, like triggering the GM

18    guarantee and triggering termination

19    liability?

20    A.    No.  I don't think I was trying to say

21    that we didn't want to trigger the benefit

22    guarantee agreement.  I think what I was

23    trying to say was that, as I understand the

24    bankruptcy law, the test to be able to

25    terminate a pension plan is a higher standard

152

1    than the one we discussed here today.  And we

2    believe that, if we were able to implement the

3    transformation plan that we've outlined, that

4    we can successfully emerge from

5    reorganization.  So, I think that our ability

6    to actually terminate -- to be able to

7    successfully terminate the pension plan is not

8    necessarily as clear as we believe this

9    discussion is and, therefore, we have been

10    pursuing, rather than terminating the plan, we

11    have been pursuing an alternative of

12    stretching out of the pension contributions

13    using, either a legislative solution or

14    existing waivers and other provisions of law

15    that may be available to us.  Whether or

16    not -- again, you know, I will not profess to

17    be a lawyer but, whether or not we can, in

18    making our decisions about our transformation

19    plan, whether we can look at agreements to

20    which we're not a party, I'll leave for

21    lawyers to consider.

22            THE COURT:  Okay.  You want to go

23    back to your question then.  Or a similar

24    question?

25            MR. SIMON:  I think the witness's

153

1     answer and non-answer speaks eloquently, just

2     think control group.

3             MR. BUTLER:  Move to strike, Your

4     Honor.

5             THE COURT:  I don't think that's --.

6             MR. SIMON:  Withdrawn.

7             THE COURT:  Okay.

8     Q.   Let's explore.  Are you familiar with

9     control group liability imposed by the PBGC on

10    terminated plans?

11    A.   I'm generally familiar.

12    Q.   And are you familiar with the fact that

13    the PBGC liability extends not only to your

14    American facilities but would also extend to

15    your worldwide facilities?

16    A.   Yes, sir.

17    Q.   And no part of your approach to this

18    problem is reflected by -- is reflective of a

19    corporate desire to protect its non-American

20    subsidiaries from PBGC reek?

21    A.   I -- no, sir.  I explained our rationale.

22   Q.   Addressing --

23        THE COURT:  I'm sorry.  If I

24   understood your answer to my question

25   correctly, well, correct me if I'm wrong, are

154

1    you saying that the decision not to, at this

2    point, actively to seek to terminate the plan

3    is based on an analysis that you might not be

4    successful in terminating the plan, unless you

5    had pursued an interim step which is to modify

6    collective bargaining agreements and benefits

7    and implement a transformation of the

8    business.  Is that what you're saying?  That

9    the PBGC wouldn't approve termination unless

10   you've done that first?

11   A.   I think that in order for the company to

12   be viable in the future it has to modify

13   its and make competitive its wage and benefit

14   labor agreements.  And the -- it would not be

15   -- let's take a reverse situation where we

16   were do not pursue what we're sitting here

17   today discussing but rather just simply pursue

18   termination of the pension plan.  That

19   wouldn't fix the company.  So -- and make it a

20   viable business enterprise.  So we have to

21   pursue this motion in order for the company to

22   be -- labor agreements to be competitive.  The

23   second question of whether just taking  a

24   second step of terminating the pension plans,

25   I think I agree with what you're -- that you

155

1    correctly summarized what I said.  Which was I

2    don't know that we believe we would be

3    successful given that the first step has to

4    take place.

5            THE COURT:  Okay.

6    Q.   Are you aware what other unions in

7    similar circumstances have done in both

8    collective bargaining and Section 1113

9    collective bargaining with regard to pension

10   termination?

11   A.   No, not specifically.

12   Q.   Does it occur to you that the unions

13   might have an interest in pursuing solutions

14   with the company that would save it 3.1

15   billion dollars and perhaps reduce the level

16   of concessions you were otherwise seeking?

17   A.   I think that we can discuss all

18   alternatives to be able -- for this company to

19   be competitive in the future.

20   Q.   What is -- or what was Delphi's U.S.

21   hourly labor expense order magnitude for 2005,

22   something in excess of 3 billion dollars sound

23   about right?

24   A.   In terms of the gross number of hourly

25   labor expense?

156

1    Q.   Yes.

2    A.   I would say that's in the order of

3    magnitude.

4    Q.    And order of magnitude, how much will the

5    company save in its hourly labor expense

6    purely from its reduction of the work force

7    from the 31 or 33 thousand today to the 5700

8    projected in 2010.  Does something order of

9    magnitude of 2.4 billion sound about right?

10   A.    I don't know off the top of my head, it

11   may be accurate.

12            THE COURT:  I'm sorry.  What was

13   your number again, Mr. Simon?

14            MR. SIMON:  2.4.

15            THE COURT:  And was that annually or

16   over the four or five year period?

17            MR. SIMON:  Annual.

18   Q.    Do you have any idea -- does this sound

19   right, order of magnitude again, that the 2010

20   U.S. hourly labor expense under your scenario

21   is less than 500 million dollars?

22   A.    I don't know.  I'd have to see more

23   detail to know.

24            MR. SIMON:  One moment please, Your

25   Honor.  Nothing further, thank you.


157


1            THE COURT:  Okay.

2            MR. KURTZ:  Your Honor, Glenn Kurtz

3    on behalf of the ad hoc committee of equity

4    holders.  Good afternoon.

5    CROSS EXAMINATION BY

6    MR. KURTZ:

7    Q.    Mr. Sheehan.

8    A.    Mr. Kurtz.

9    Q.    As you may have anticipated, I want to

10   talk to you about the ability to fund the OPEB

11   benefits intel expiration the CBA's.

12   A.    We've talked about that before.

13   Q.    Yes.  And to put this discussion in

14   context, there is a trend in the auto parts

15   industry towards eliminating or at least

16   substantially reducing OPEB benefits, correct?

17   A.    That is correct.

18   Q.    And you certainly expect that Delphi will

19   eliminate or at least substantially reduce

20   OPEB benefits in any new agreement with the

21   unions, correct?

22   A.    Yes, sir.

23   Q.    Do you know what it would cost the

24   debtors to fund the OPEB benefits until

25   expiration of the CBA's?

158

1    A.    Our annual funding obligations for

2    OPEB -- we pay OPEB, we pay post-retirement

3    medical expenses as they were incurred, a pay

4    as you go.  So it's not a funding per se as

5    much as it is paying of medical costs as they

6    are incurred by the retiree population.  And

7    that's averaging a little bit over 200 million

8    dollars per year.  So as we sit here with

9    approximately 17 or 18 months to go until

10   expiration of the CBA's it would be

11   approximately 300 million dollars.

12   Q.    Okay.  About a 300 million dollar cost to

13   continue the OPEB benefits until expiration of

14    the CBA's, correct?

15    A.    Yes, sir.

16    Q.    And as you testified in response to

17    questions from Mr. Simon, the debtors

18    presently have cash and available credit of

19    approximately 3.6 billion dollars, correct?

20    A.    In that order of magnitude, yes.

21    Q.    And that is exclusive of any available

22    credit for the following operations, correct.

23    A.    Yeah, there's not that much of actual

24    available credit.  It's mostly drawn from

25    borrowings.

159

1    Q.    Do you know what the available credit is

2    for foreign operations?

3    A.    It's in the hundreds of millions of

4    dollars.

5    Q.    How many hundreds of millions of dollars?

6    A.    It's, I believe, less that 500 million.

7    I don't know the number specifically off the

8    top of my head.

9    Q.    Okay.  So including cash and credit, both

10    for U.S. and foreign operations, in fact, the

11    debtors have some 4.1 billion dollars

12    available at this time, correct?

13    A.    In that order of magnitude.

14    Q.    Okay.  And do the foreign operations have

15    debt capacity in addition to the available

16    credit in place today?

17    A.    I would expect they would, yes.

18    Q.    You would concede that the foreign

19    operations are highly profitable, correct?

20    A.    Yes, sir.

21    Q.    In fact, I think you're projecting some

22    3.5 billion dollars in operating income over

23    the next five years or so from foreign

24    operations alone, correct?

25    A.    Yes, sir.


160


1    Q.    And so the foreign operations have

2    substantial debt capacity, correct?

3    A.    They have debt capacity, yes.

4    Q.    Substantial debt capacity, correct?

5    A.    I don't know.  I'd have to consider -- I

6    don't know what substantial means.  But, yes,

7    they have debt capacity, yes.

8    Q.    Do the foreign operations have debt

9    capacity in the billions of dollars?

10    A.    I don't know.

11    Q.    You understand that the foreign

12    operations are projected to have operating

13    income of some 700 million dollars this year?

14    A.    I do.

15    Q.    So that will also turn out further cash

16    to fund the debtor's U.S. operations if

17    necessary?

18    A.    Yes, sir.

19    Q.    Okay.  So, certainly, the debtors have

20    sufficient cash and access to cash to fund

21    operations including OPEB benefits for some

22    period of time into the future, correct?

23    A.    For some period of time into the future,

24    yes.

25    Q.    I mean, the debtors are in no cash crisis

161

1    today, correct?

2    A.    Not today.

3    Q.    And the debtors, of course, monitor their

4    financial condition and their liquidity on a

5    daily basis, correct?

6    A.    Yes.

7    Q.    So the debtors will have ample notice of

8    any deterioration in their financial condition

9    on a real time basis, correct?

10    A.    Yes, sir.

11    Q.    And will have ample opportunity to come

12    into court and address those needs, correct?

13    A.    I can't really say whether it would be

14    ample or not.  It would depend upon the

15    circumstances at that time.

16    Q.    Are you aware of any contingencies that

17    could materially impact the debtor's financial

18    condition as of today, where it has access to

19    more than four billion dollars prior to the

20    debt -- utilizing debt capacity at the foreign

21    operations?

22    A.    I think that would depend upon the

23    situation at that point in time and whether

24    all --

25    Q.    My question is, are you aware of any such

162

1  contingencies?

2       MR. BUTLER:  Objection.  Can he

3  answer the question.

4       MR. KURTZ:  I don't believe he was

5  being responsive, Your Honor.

6       THE COURT:  Well, what was your last

7  question again?

8       MR. KURTZ:  My question is whether

9  he can identify any contingencies today that

10 would substantially deteriorate the debtor's

11 financial condition.  In light of its 4.1

12 billion dollars of access to cash without

13 including the debt capacity for the foreign

14 entities?

15 A.   I cannot, but I also would recom --

16 Q.   Thank you.  The debtors are more than

17 five hundred million dollars ahead of plan

18 with respect to U.S. operations in the first

19 quarter alone this year, correct?

20 A.   Yes, sir.

21 Q.   By the way, what is the debtor's EBITDA

22 from the filing of the bankruptcy in October

23 2005 through the most current information

24 available to you?

25 A.   I don't know that number.


                                            163


1  Q.   Is it a positive number or a negative

2  number?

3  A.   I really -- I don't know the number.

4  Q.   So you certainly can't say that the

5    debtor's have operated along the last half

6    year with negative earnings, correct?

7    A.    No.    We have absolutely had negative

8    earnings.    We have definitely had operating

9    losses in our U.S. operations and since the

10    time of filing.

11    Q.    On an EBITDA basis?

12    A.    I don't know the number.

13    Q.    You can not say that the company is

14    operating at a negative EBITDA in the last six

15    months or so, correct?

16    A.    I cannot say that.

17    Q.    I just want to make clear for my

18    understanding and for the record a couple of

19    things about your projections.    What document

20    reflects the debtor's best estimate of future

21    material costs?

22    A.    The best estimate of our future material

23    costs at the current time is our three plus

24    nine forecast.    As -- which was with respect

25    to the year 2006, and then was extrapolated

164

1    out through the period '07 through '10.

2    Q.    And are the debtor's confident in the

3    projections reflected in that document?

4    A.    Based upon the current economic

5    conditions.

6    Q.    And you are personally confident in the

7    projections set forth in the nine, three

8    document?

9    A.    Three plus nine.

10    Q.    Three plus nine document, I'll look

11    backwards.

12    A.    They are our best estimate recognizing

13    the unsettled circumstances both with respect

14    to the company and to commodity cost in

15    general.

16    Q.    And including your best estimate, is that

17    correct?

18    A.    They are my best estimate as well as that

19    of the company.

20    Q.    Okay.  Are they also the best estimate of

21    your financial advisors and other consultants?

22    A.    I believe so.

23    Q.    And what document reflects the debtor's

24    best estimate of pension obligations?

25    A.    Again, the three plus nine forecast which

165

1    is an operating forecast but reflects the

2    results of the 2005 actuarial evaluation that

3    was performed by our outside actuaries.

4    Q.    And, again, the debtors are confident of

5    the three plus nine forecast with respect to

6    pension obligations?

7    A.    Yes, sir.

8    Q.    And it represents your best estimate

9    personally as well?

10    A.    Yes, sir.

11    Q.    And it represents the best estimate of

12    the financial advisors and other professional

13    consultants for the debtors, correct?

14    A.    I believe so.

15    Q.    All right.  And what document reflects

16    the debtor's best estimate of future GM market

17    share?

18    A.    The -- our -- the steady state scenario

19    which, quite honestly, hasn't been -- that

20    matter hasn't been readdressed and is still

21    our best estimate.

22    Q.    And the debtors are confident in their

23    projections of GM market share as set forth in

24    steady state projections?

25    A.    As confident as you can be in that type

166

1    of a projection.

2    Q.    And you, personally, are confident of

3    those projections?

4    A.    It is our best estimate.

5    Q.    And it is the best estimate for the

6    debtor's financial advisors and other

7    professionals, correct?

8    A.    I believe so.

9    Q.    What document represents the debtor's

10    best estimate of future Delphi content for GM

11    vehicle numbers?

12    A.    Again, the steady state scenario which,

13    to the best of my knowledge, we have not

14    revised since that time.

15    Q.    And the debtors remain confident in the

16    steady state projection -- steady state

17    projections with respect to Delphi's content

18    for GM vehicle?

19    A.    Yes, sir.

20  Q.   And that's your best estimate as well?

21  A.   Yes, sir.

22  Q.   And the best estimate of the debtor's

23  financial advisors and other professionals,

24  correct?

25  A.   I believe so.


167


1   Q.   And which document represents the

2   debtor's best estimate of future revenues from

3   GM?  And just to make this go quicker, cash

4   flows and sales and EBITDA as well?

5   A.   With respect to revenues from General

6   Motors we projected in the steady state

7   scenario our expectation of General Motors

8   revenue.  As well as in the competitive

9   benchmark and the GM consensual scenarios.

10  There are many factors that go into the

11  estimation of what GM revenue will be, not

12  just simply what product they're selling but

13  also volumes and pricing and product winds and

14  so forth.  And that estimate was updated in

15  the three plus nine forecast for 2006.  It is

16  my best estimate, etcetera.

17  Q.   It's your best estimate, it's the best

18  estimate -- the debtors are confident in it.

19  It's the best estimate of your financial

20  advisors and other consultants, correct?

21  A.   As it relates to the first two, yes.  And

22  as it relates to the financial advisors, I

23  believe so and we'll let that apply to the

24  remaining topics that we're going to discuss

25    next.  So I think your next one was --


168


1    Q.    Cash flows.

2    A.    Cash flows would be the three plus nine

3    forecast that we recently prepared and then

4    projected out through 2007 through 2010.

5    Q.    And sales?

6    A.    Sales in total, including General Motors,

7    would be the steady states scenario as

8    adjusted by the three plus nine forecast.

9    Q.    And EBITDA projections?

10    A.    The three plus nine forecast.

11    Q.    And then in combination the company is

12    still confident of its three plus nine

13    projections with respect to those items,

14    correct?

15    A.    As I explained to one of the other

16    lawyers that is the most up to date forecast

17    we currently have.

18    Q.    And it reflects your personal opinion

19    with respect to those subject matters,

20    correct?

21    A.    Yes, sir.

22    Q.    And the best estimate, as well, of your

23    financial advisors and other consultants,

24    right?

25    A.    I believe so.


169


1    Q.    And then the last question along these

2    lines, what document represents the debtor's

3    best estimate of future health care trend

4    rates?

5    A.    The steady state projections.

6    Q.    Now didn't the company put together a FAZ

7    106 report?

8    A.    The company's actuaries prepared a

9    actuarial evaluation under the provisions of

10   FAZ B 106 as of 12/31/05.

11   Q.    And doesn't the company have to adopt and

12   ultimately make the determination as to the

13   reasonableness of the FAZ 106 report.

14   A.    The FAZ 106 actuarial evaluation is

15   valuing the liability as the OPEB liability as

16   of December 31, 2005.

17   Q.    The FAZ 106 report was filed in something

18   like March 31, 2006, correct?

19   A.    It was prepared.  I don't know what you

20   mean by filed?

21   Q.    Was the FAZ 106 report, in fact, filed

22   with the SEC?

23   A.    No, sir.

24   Q.    Is it your understanding the FAZ 106

25   reports are to be filed with the SEC?


                                        170


1    A.    No, sir.

2    Q.    And were you here during the equity

3    committee proceedings when your actuarial

4    expert, Keith Williams, testified that that is

5    precisely the purpose for filing a FAZ 106

6    report?

7    A.    That's not my recollection of the

8    testimony.

9    Q.    But we have it in the record --

10    A.    Or my understanding of --

11    Q.    We'll go over that.  You understand that

12    a FAZ 106 report, by definition, is the best

13    estimate by the company of its healthcare

14    trend rate projections?

15    A.    It is under the provisions of FAZ 106,

16    yes.  I do.

17    Q.    There's no authority you can cite that

18    would tell you that the company's best

19    estimate of the health trend rates for

20    purposes of FAZ 106, for purposes of public

21    filings and publication would differ based on

22    any other purpose including your steady state

23    projections, are you?

24    A.    I'm sorry, ask that question again?

25    Q.    Can you identify any authority that says

171

1    you tell the SEC and the public what your best

2    estimate of health care trend rates are, but

3    you do something different in connection with,

4    you know, the bankruptcy proceedings or any

5    other purpose?

6    A.    I think that the FAZ 106 actuarial

7    evaluation was prepared by our actuaries and

8    being used in our accounting for the

9    purpose -- for those purpose and it is in

10    accordance with the requirement of GAP.  As it

11    relates to the company's business plan and the

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

12    assumptions underlying its business plan,

13    those assumptions take into consideration

14    actual past experience that we've seen with

15    respect to healthcare inflation.  And take

16    that into consideration in thinking about what

17    the potential expense could be in future

18    periods.

19    Q.    Your actuaries, likewise, were aware of

20    and took into account your actual experience

21    in determining a FAZ 106 liability, correct?

22    A.    They not only --

23    Q.    Is that correct?

24    A.    -- took interest.

25    Q.    They did so, yes.

172

1    A.    I don't know.

2    Q.    You don't know.  And you're confident

3    that it is not the company's FAZ 106 report,

4    it is simply the actuaries report?

5    A.    The actuarial evaluation was prepared by

6    the company's actuary, Watts & Wyatt, based

7    upon demographic data provided to the actuary

8    by the company and using assumptions with

9    respect to future experience.

10    Q.    And then the resulting calculations and

11    the report were adopted by the company,

12    correct?

13    A.    They are used by the company in its

14    actual GAP accounting, yes.

15    Q.    And they were used with respect to

16    whatever filing and publications made of the

17    FAZ 106 report which you are presently

18    disputing, correct?

19          MR. BUTLER:  Objection, foundation.

20    A.   No, I'm not disputing, Mr. Kurtz.

21          MR. BUTLER:  He said disputing, I

22    don't know what that means.

23          MR. KURTZ:  I believe the witness

24    has disputed that the FAZ 106 report is made

25    publicly available and filed with the SEC,

173

1    directly contradicts certain testimony we've

2    submitted in the record from the equity

3    committee --

4          THE COURT:  That wasn't what your

5    question was.

6          MR. KURTZ:  Well that's what I

7    intended it to be.  I'll rephrase, Your Honor.

8          THE COURT:  Okay.

9    Q.   But let me just make sure I'm clear about

10    this.  Do you dispute that the FAZ 106 report,

11    the company's best estimate of health care

12    trends is submitted to the SEC and is made

13    publicly available to the world?

14    A.   My understanding is that the actual

15    actuarial valuation report, prepared by Watson

16    Wyatt, is not filed with the SEC.  What we do

17    with the actuarial evaluation report is we use

18    that for purposes of our GAP accounting and

19    financial statement disclosures.

20    Q.   Okay.  So the FAZ 106 report -- that the

21    conclusions that are reflected in the FAZ 106

22    report, including the cost for healthcare

23    trend rates is included within the company's

24    financial statements, correct?

25    A.    Yes, sir.

174

1    Q.    Okay and those financial statements are

2    filed with the SEC, correct?

3    A.    Yes, sir.

4    Q.    And those financial statements are made

5    publicly available, correct?

6    A.    Yes, sir.

7    Q.    And now I'm asking you to identify

8    authority which would allow the company to

9    create a different estimate of its healthcare

10    costs and the one that's included in the

11    company's financial statements?

12    A.    The company's financial projections are

13    prepared based upon the company's estimates of

14    the future.

15    Q.    Can you just cite any authority for the

16    notion that the company's best estimate of its

17    future health trend rates and its cost and

18    liabilities associated with that will differ.

19    Depending upon whether you're using them to

20    disclose to the public and to the SEC as

21    compared to when you use them here in Court

22    for your own purposes?

23    A.    I'm not aware of an authority that

24    governs financial projections.

25    Q.    All right.  Let me move to the debtor's

175

```
 1   intention with respect to this rejection
 2   motion.  The debtor's are continuing to
 3   negotiate with the unions, correct?
 4   A.   Yes, sir.
 5   Q.   And the debtor's intend to continue to
 6   negotiate with the unions irrespective of
 7   whether this Court grants this application to
 8   reject the CBA's, correct?
 9   A.    It is our desire to reach a consensual
10   solution to these issues.
11   Q.    The debtor's intent to continue to
12   negotiate with the unions irrespective of
13   whether the Court grants this application to
14   reject the CBA's, correct?
15   A.    Yes, sir.
16   Q.    And the debtor's have no present
17   intention of unilaterally imposing new
18   compensation terms on the union members,
19   correct?
20   A.    I believe that's what Kevin Butler
21   testified, yes.
22   Q.    And you agree with Mr. Butler's testimony
23   in that respect, correct?
24   A.    I think that we recognize that --
25   Q.    Yes?
```

176

```
 1   A.   Yes.
 2   Q.   And the debtors, in fact, intend to
```

3      provide the same compensation provided for

4      under the CBA's to the union members pending

5      these further negotiations, correct?

6   A.   Yes, sir.

7   Q.   If no agreement can be reached, do the

8      debtors intend ever to unilaterally impose new

9      compensation terms on union members?

10   A.   I believe that we would not be able to

11      sustain paying the current wage and benefits

12      to the union employees.  And therefore, there

13      has to be a point in time where the world

14      changes.

15   Q.   Well, but my question is whether the

16      debtors ever intend to unilaterally impose new

17      compensation terms on the unions?

18   A.   We would certainly hope that that day

19      never comes.

20   Q.   Okay.  Putting aside your hope, do the

21      debtor's have an intention to ever

22      unilaterally impose new compensation terms on

23      the unions?

24   A.   I can't speculate about that.  There's

25      too many variables involved.


                                              177


1   Q.   You are not aware, as the chief

2      restructuring officer, the acting CFO, and

3      active participant in the negotiations and in

4      the bankruptcy of any intent by the debtors to

5      ever unilaterally impose new compensation

6      terms on the unions, correct?

7   A.   No deadline has been set to do that,

8      that's correct.

9      Q.    Have you considered a deadline for

10     imposing -- strike that.  If you tell me no

11     deadlines been set then you are implying to me

12     that, in fact, the debtors do intend to

13     unilaterally impose new compensation terms at

14     some point, is that right or wrong?

15     A.    We're in a very complicated situation

16     here with more constituencies than just

17     ourselves to be consid -- to consider.  And

18     the estate is losing money and cannot lose

19     money forever.  And, therefore, we don't

20     intend to unilaterally impose.

21     Q.    Okay.  You do not intend to unilaterally

22     impose new compensation on the term -- new

23     compensation terms on the unions at any point

24     in time, correct?

25     A.    I don't know how to better answer the

178

1      question at the current time.

2      Q.    Well, I'll make it easy.  It will be a

3      yes or no question.  Do the debtors intend to

4      ever unilaterally impose new compensation

5      terms on the unions?  Time is elapsing.

6            MR. BUTLER:  Objection.

7      A.    I apologize.  I just don't how to answer

8      that as a yes or no question.  I think that

9      I'd have to elaborate more and so --

10           MR. KURTZ:  Your Honor, can --

11           THE COURT:  It's not really

12     susceptible to a yes or no answer because it

13    uses the word intent.  That's the problem.

14    You've tried to ask it in a way that would

15    have been a yes or no answer and he hasn't

16    answered that one either.  But you can go back

17    -- let me ask you.  Are there scenarios in

18    which you would impose, unilaterally,

19    compensation or other terms on the unions?

20    A.    Your Honor, the company has commitments

21    to its customer base and it has to meet those

22    commitments.  And so, we recognize the risk

23    associated with labor disruption.  And we want

24    to find a consensual solution.  I also

25    recognize that the company's losing money

179

1    every day and that there would be

2    constituencies in our bankruptcy case, such as

3    our creditors that may not accept, and would

4    not accept losing -- continuing to lose that

5    money.  And so, you have to balance between

6    how to impose and still continue to not

7    disrupt the entire automotive industry.  And

8    as a result, destroy more value than you

9    create.  And it's a very complex situation as

10   I know you're fully aware of.  So I don't know

11   how to answer the question, quite honestly.

12   We wake up every morning and evaluate the

13   situation.

14           THE COURT:  Okay.

15   Q.    Let me try it this way.  Irrespective of

16   whether this Court grants the present motion

17   for relief under 1113 and 1114 of the

18    Bankruptcy Code the debtor's have no intention

19    of imposing, unilaterally, the resulting terms

20    on the unions, correct?

21    A.    Haven't I answered that --

22          MR. BUTLER:  Objection.  I think it

23    was asked and answered.  The Court asked the

24    questions.

25          MR. KURTZ:  It's been asked,

180

1    including by Your Honor.  It's not answered.

2    We've heard about complexities, we haven't

3    heard about -- everyone has to --

4          THE COURT:  Well, he agreed with you

5    that they presently don't intend to do that.

6    Having considered over the last five or ten

7    minutes is that still your view that you

8    presently do not intend to unilaterally

9    impose?

10    A.    That's correct.  And I believe that's

11    consistent with what Kevin Butler discussed.

12    Q.    And presently there are no circumstances

13    that the debtor's anticipate pursuant to which

14    they would unilaterally impose new

15    compensation terms irrespective of this

16    Court's ruling, correct?

17    A.    I don't know that I can say that there

18    are no circumstances in which we would do so.

19    Q.    Okay.  Then identify the circumstances

20    for us?

21    A.    If we get to a point in time in the

22    future where the company can find no solution

23    together with its unions and General Motors to

24    the current discussions, where it is -- where

25    its liquidity is evaporating or has been used


181


1    up, we'll have to consider drastic

2    circumstances.  But those days are still in

3    front of us and we hope not to get that to

4    those days and we are a responsible management

5    team that doesn't intend to get there.

6    Q.    Has the board of directors ever discussed

7    the idea of imposing unilaterally the new

8    terms of a collective bargaining agreement on

9    the unions?

10    A.    I would say not in a serious way.

11    Q.    They certainly haven't authorized it,

12    correct?

13    A.    That's for sure.

14    Q.    And have any members of management had

15    discussions about unilaterally imposing the

16    new conditions of employment on the unions?

17    A.    In the context of the ramifications of

18    doing so, yes we have.

19    Q.    But, you've discussed the -- bringing

20    this motion, but has anybody in management

21    discussed the prospect of actually enforcing

22    any order you get in this Court so as to

23    unilaterally impose new terms of employment on

24    the unions?

25    A.    That was a Freudian slip.  We have


182

1    discussed.

2    Q.    And did the discussions result with a

3    decision not do so, not to unilaterally impose

4    new terms?

5    A.    It is our desire to reach a consensual

6    solution to continue to negotiate even if we

7    achieve the authority under this motion.

8    Q.    Is there any one in the debtors that has

9    suggested taking the tack of imposing

10   unilaterally the new terms of employment that

11   may be achieved by reason of this motion?

12            MR. BUTLER:  Objection.  Your Honor,

13   now I'm trying to go with the relevancy of

14   this line of questions.  It's been going on

15   for about 15 minutes now.  He now wants to

16   know whether anyone at Delphi has ever raised

17   the prospect of whether we would impose.  Now,

18   I don't know how that's relevant to his

19   objection or relevant to where we are in

20   this --

21            THE COURT:  I'm sorry, I missed it.

22   How is this question different than the last

23   one?

24            MR. BUTLER:  He asked whether any

25   person at Delphi had ever raised whether there

183

1    should be a unilateral --

2            THE COURT:  Is that what you asked?

3            MR. KURTZ:  Yes, I have Your Honor.

4            THE COURT:  And he purpo -- well --

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

5    Q.    Are anyone at management, to your

6    knowledge -- has anybody -- is there anybody

7    to your knowledge at Delphi that believes

8    there is any possibility of unilaterally

9    imposing the terms of employment that may be

10   granted in connection with this motion?

11        MR. BUTLER:  Objection.  Again, as

12   to relevance.

13        THE COURT:  I'm not sure what you --

14   what terms are you talking about imposing?

15        MR. KURTZ:  The terms that had been

16   requested in connection with this application.

17   Which is to reject the CBA's but to provide

18   certain other benefits in connection with it,

19   including this medical, you know, COBRA

20   supplement.  And the -- obviously, the

21   relevance, Your Honor, is that we don't

22   believe that the debtor's can simply hit

23   pocket their -- any authority to reject.  And

24   we wonder why this is even right to be here in

25   Court.

                                            184

1         THE COURT:  I'm not responding to

2    the objection because I think you modified

3    your question.  I'm just trying to understand

4    the question.  The motion seeks two things.

5    It seeks to reject the contract or contracts

6    and to modify benefits.  I thought your

7    question was addressed to some other point

8    than either of those two alternatives.

9         MR. KURTZ:  No.  I'm just trying to

10    confirm and then I will sit, that there is

11    nobody at management, no one in the position

12    of significance at the debtors that has any

13    intention of enforcing the terms of any order

14    that is obtained in connection with the

15    application for 1113 and 1114 relief.

16        MR. BUTLER:  Again, object.  Look

17    the order -- Your Honor's made it very clear,

18    the order is to reject.

19        THE COURT:  No.  But that's a

20    fair -- that's all right.  That question I

21    understand because it refers to the specific

22    order that is being sought.

23        MR. KURTZ:  Okay.

24    Q.  Mr. Sheehan, is there anybody who intends

25    to enforce the order?

185

1    A.  I think that as I described --

2    Q.  Yes or no.  Is there anyone who intends

3    to enforce the order?

4    A.  Yes.

5    Q.  Who?

6    A.  At a point in time, as I described

7    already several times, there would be a point

8    in time where we would intend to enforce.

9    Q.  Are you authorized to make that

10    determination?

11    A.  I am not, today, authorized to make that

12    determination.

13    Q.  Has anybody with authority ever told you

14    that the debtors would enforce an order

15    obtained in these proceedings unilaterally?

16    A.    No.

17    Q.    So you're giving us pure speculation and

18    conjecture when you tell us under some set of

19    circumstances you -- the debtors would enforce

20    the order?

21    A.    I'll agree with you to move on.

22          MR. KURTZ:  No further questions.

23          THE COURT:  Okay.

24    CROSS EXAMINATION BY

25    MR. FOX:


                                              186


1    Q.    Good afternoon, Mr. Sheehan, my name is

2    Edward Fox from Kirkpatrick and Lockhart,

3    Nicholson Graham on behalf of Wilmington Trust

4    Company, indenture trustee for the company's

5    senior notes.  Mr. Sheehan, in paragraph 3 of

6    your declaration you indicate that references

7    to the defined term "Delphi" which is Delphi

8    Corporation in paragraph 1 include the debtors

9    as appropriate.  And by debtors you mean the

10    42 debtors in these administratively

11    consolidated cases, right?

12    A.    As appropriate, yes.

13    Q.    Okay.  Now, is there any particular way

14    of reading through your declaration to know

15    when its appropriate to indicate which debtor

16    or debtors your talking about?  Whether its

17    Delphi Corporation or some other entity?

18    A.    Not specifically, no.

19    Q.    Okay.  Now can you take a look at Exhibit

20   204?  Do you have Exhibit 204 in front of you,

21   Mr. Sheehan?

22   A.   Yes, I do.

23   Q.   Okay.  Now Exhibit 204 are structure

24   charts which show the domestic U.S. entities

25   and there's a separate chart that shows the

187

1   corporate structure of the U.S./foreign entity

2   relationships, correct?

3   A.   That's correct.

4   Q.   I'm sorry?

5   A.   That's correct.

6   Q.   Okay.  And so looking at the domestic

7   U.S. entities, shows in green on the color

8   chart that you have there, which of the

9   members of the Delphi family, if you will, of

10   corporations and entities are debtors who

11   filed cases before this Court, correct?

12   A.   Yes, that's correct.

13   Q.   Okay.  Now in paragraph 6 you indicate

14   that -- its paragraph 6 of your declaration,

15   you state that Delphi does not report

16   divisional financial results for its U.S.

17   operations.

18   A.   Sorry?

19   Q.   Paragraph 6.  Do you see that?

20   A.   Yes, I do.

21   Q.   When you use the word Delphi there, what

22   Delphi are you talking about?

23   A.   Delphi and its consolidated subsidiaries.

24   Delphi is the -- Delphi is the parent

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

25    corporation and we prepare our financial

188

1    information on a consolidated basis under GAP.

2    Q.    So you're referring to Delphi, here in

3    paragraph 6, you're talking about Delphi on a

4    consolidated basis, that's correct?

5    A.    Yes, sir.

6    Q.    Okay.  Now the U.S. operations though are

7    not run directly by Delphi Corporation,

8    correct?

9    A.    The -- Delphi is the parent company and

10    there are -- and most of the oper -- U.S.

11    operations are included in a subsidiary that's

12    owned by Delphi Corporation.

13    Q.    But Delphi Corporation, itself, does not

14    directly own or operate the U.S. manufacturing

15    operations, correct?

16    A.    Not directly.

17    Q.    Okay.  In fact, they're owned and

18    operated by Delphi Automotive Systems LLC,

19    correct?

20    A.    Largely, that's correct, yeah.

21    Q.    Now, the manufacturing sites that you

22    referred to in your declaration also are not

23    owned directly by Delphi Corporation, correct?

24    A.    That's correct.

25    Q.    Okay.  And, in fact, according to

189

1    schedule A, which you filed for Delphi

2    Corporation with the schedules and statement

3    of affairs -- don't look yet, Delphi

4    Corporation releases, at the time of the

5    filing, owned no real property, correct?

6    A.    Off the top of my head, I believe that's

7    correct.

8    Q.    I have a copy here if you'd like to

9    refresh your recollection?

10    A.    No.  If you tell me I believe you.

11    Q.    Okay.

12    A.    I believe its correct, so I trust your

13    correct.

14    Q.    Would you like to take a look just to be

15    sure?

16    A.    No, sir.

17    Q.    Now, in paragraph 12 of your declaration

18    on page 5 where you say Delphi is organized

19    into three sectors, you see that?

20    A.    Yes.

21    Q.    Again, here you're not talking about

22    Delphi Corporation, correct?

23    A.    I'm talking about the consolidated

24    company.

25    Q.    Okay.  But these are sectors at the

190

1    operating level, correct?

2    A.    That is correct.

3    Q.    Okay.  So that's sectors of DAS -- Delphi

4    Automotive Systems LLC, correct?

5    A.    Not only DAS LLC, but also -- our sectors

6    are global in nature and we're a global

7    corporation with global subsidiaries.  So

8    these operations are more than just DAS LLC,

9    these are operations all over the globe.

10   Q.    Okay.  But within the United States --

11   A.    Uh-huh.

12   Q.    -- Delphi's operations are also in these

13   three sectors, correct?

14   A.    That is correct.

15   Q.    Okay.

16   A.    Largely.

17   Q.    And within the United States the

18   operations that are part of these three

19   sectors are not directly owned or operated by

20   Delphi Corporation, right?

21   A.    That's correct.

22   Q.    Now I just want to talk a minute about

23   paragraph 23 of your declaration.  This

24   paragraph has a chart that lists the active

25   manufacturing sites in the United States,

191

1    correct.

2    A.    That's correct.

3    Q.    And, again, these are manufacturing sites

4    none of which are owned directly by Delphi

5    Corporation, correct?

6    A.    That's correct.

7    Q.    And the employees at each of these -- the

8    unionized employees at each of the plants

9    listed here in paragraph 23, are employed by

10   the entity that owns the particular plant or

11    manufacturing site listed, correct?

12    A.    Say that one more time for me, sorry.

13    Q.    The humanized employees that work at each

14    of the manufacturing sites listed here are

15    employed by the entity that owns the plant,

16    correct?

17    A.    No.  I don't believe that that's accurate

18    in every situation.

19    Q.    Is it accurate in some situations?

20    A.    I believe that it may be in some

21    situations, yes, but not in all.

22    Q.    Okay.  And to the extent that it's not

23    accurate -- well, you know, let's make it

24    easier, why don't we take a look at Exhibit

25    201, if you will?


                                                192


1              THE COURT:  The confidential volumes

2    don't have the exhibit numbers on them, so --

3              MR. FOX:  Would you like a separate

4    copy, Your Honor.

5              THE COURT:  No.  Okay.

6              MR. FOX:  Exhibit 201.

7    Q.    Do you have that in front of you, Mr.

8    Sheehan?

9    A.    Yes, I do.

10    Q.    Now, you're familiar with this chart, are

11    you not?

12    A.    I've seen it before, yes.

13    Q.    Okay.  And this chart sets forth which

14    debtor entities employ unionized employees,

15    correct?

16    A.    That's correct.

17    Q.    Okay.  And with respect to Delphi

18    Corporation under the column headed, Directly

19    Employed Employees, the answer is no, that it

20    has no unionized employees that it directly

21    employees, correct?

22    A.    With the proviso of note 5, yes.

23    Q.    Okay.

24    A.    I'm going to put this exhibit away?

25    Q.    Well, keep the volume out because we're

193

1    going to go back to the chart now for a

2    minute.  In paragraph 25, you referred to

3    Delphi's non U.S. businesses, which you say

4    are generally separate legal entities.  Now,

5    if you look at the structure chart which is

6    Exhibit 204.  Do you have that in front of

7    you?

8    A.    Yes, I do.

9    Q.    Now if you take a look at the corporate

10    structure for the U.S./foreign entity

11    relationships in Exhibit 204?  In color it's

12    the light and blue chart.

13    A.    Yes, sir.

14    Q.    Do you have that?

15    A.    Yes, I do.

16    Q.    Now this indicates how the ownership of

17    the foreign entities flows back to the U.S.

18    entities, correct?

19    A.    Yes, sir.

20    Q.    Okay.  And it illustrates that Delphi

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

21    Corporation, through Delphi New York Holding

22    Corporation owns 87 percent of Delphi

23    Automotive Systems (Holdings) Inc., a Delaware

24    Corporation, correct.  All the way over on the

25    right-hand side of the chart.

194

1    A.    Ask that question again, please, sorry?

2    Q.    The chart indicates that the Delphi

3    Corporation owns a 100 percent of Delphi New

4    York Holding Corporation, correct?

5    A.    Yes, it does.  Sorry.

6    Q.    And Delphi New York Holding Corporation

7    owns 87 percent --

8    A.    Yes, it does.

9    Q.    -- of Delphi Automotive Systems

10    (Holdings) Inc., a Delaware Corporation,

11    correct?

12    A.    That's correct.

13    Q.    Okay.  Now Delphi Automotive Systems LLC

14    owns the other 13 percent of that entity,

15    right?

16    A.    That's correct.

17    Q.    Okay.  Now that entity, Delphi Automotive

18    Systems (Holdings) Inc. owns the overseas

19    operation a 100 percent, correct?

20    A.    That is correct.

21    Q.    Okay.  So through that entity, Delphi

22    Automotive Systems Holding Inc., Delphi

23    Corporation indirectly owns 87 percent of the

24    foreign entities?

25    A.    Yes, sir.

195

1    Q.    Now do you know, off-hand -- let me back

2    up.  The debtor's have indicated that there's

3    certain core -- certain manufacturing

4    facilities which they've indicated are what

5    they called core, correct?

6    A.    I think we really focus more on product

7    lines and then manufacturing facilities

8    derived from that.

9    Q.    Okay.  And you set forth in a press

10   release of March 31, which of the facilities

11   you consider core and intended to keep,

12   correct?

13   A.    As a result of the product line

14   decisions, yes.

15   Q.    Okay.  And the balance of the facilities

16   you're either going to sell or close?

17   A.    That is correct.

18   Q.    I'm sorry?

19   A.    That is correct, sorry.

20   Q.    Now with respect to the core facilities,

21   looking at the chart on paragraph 30, it

22   appears that you'll have roughly 4 billion of

23   revenue from the core facilities remaining

24   after you sell or close the balance of the

25   facilities, correct?  And the U.S. facilities?

196

1    A.    I haven't done the analysis that way,

2    but -- I haven't added them up but I'll trust

3    you.

4    Q.    Do you want to take a minute to -- do you

5    know which of the core facilities off-hand?

6    A.    I would be able to do that analysis, if

7    you say its 4 billion I'll --

8            THE COURT:  I'm sorry, what

9    paragraph are you reading?

10            MR. FOX:  Paragraph 30.

11    Q.    Well the core facility is Vercave and

12    Clinton, Grand Rapids, Kokomo, Lockport,

13    Rochester, Vandalia and Warren, correct?

14    A.    I believe that's correct, yes.

15    Q.    Okay.  And, at least by my lawyers map,

16    the total revenues from those facilities in

17    2005, at least, was about 4 billion dollars.

18    A.    Okay.

19    Q.    Now, can you tell me what you expect your

20    operating margin will be on that 4 billion?

21    A.    Will be?

22    Q.    After you -- if you impose the -- let's

23    see what do we call it -- the competitive

24    benchmark scenario?

25    A.    As I described to the other lawyers in


197


1    this case, we have not analyzed the

2    transformation plan at a facility level.

3    Q.    Well have we done it at a U.S. level?

4    A.    For the overall U.S. operations, we have

5    done that, yes.

6    Q.    I'm sorry, I couldn't hear.

7    A.    For the overall U.S. operations we have

8   done that, yes.

9   Q.   Okay.  Using the competitive benchmark

10  scenario you've done that?

11  A.   We have broken down the transformation

12  plan between U.S. and non U.S. operations,

13  yes.

14  Q.   Is that set forth in your declaration

15  somewhere?

16  A.   No, I do not believe it is.  I'd have to

17  look, but I don't believe it is, no.

18  Q.   But do you  know offhand what you expect

19  your operating margins will be for the U.S.

20  operations if you impose the consolidated --

21  I'm sorry the competitive benchmark scenario?

22  A.   We will get to -- we will be moving

23  towards, you know, margins comparable with our

24  peers by the time we get to 2010.

25  Q.   Well generally what do you expect those

198

1   margins to be?

2   A.   Six to eight percent range.

3   Q.   Six to eight percent, okay.  Well,

4   looking at Exhibit M to your declaration.  You

5   show operating margins on consolidated basis,

6   right?

7   A.   That's correct.

8   Q.   Okay.  And you go all the way out to 2010

9   your operating margin is only 6.6. percent on

10  a consolidated basis?

11  A.   Yes.

12  Q.   Okay.  Do you expect it will be higher

13    than that for the U.S. operations?

14    A.    No.    I think it will be by 2010 largely

15    in the same range.    Because we would be

16    competitive at that point in time.

17    Q.    Okay.    And do you think it would be the

18    same in 2008 by 5.8 percent in the U.S., or do

19    think it will be lower?

20    A.    I think it would be -- it could be lower.

21    Q.    Okay.    So on four billion of operating

22    income with a 5.8 percent operating margin,

23    you're talking about, what, 240 million of

24    operating income from the U.S. core facilities

25    at that point?

199

1    A.    I think -- the 4 billion number you're

2    referencing is what?

3    Q.    That was the --

4    A.    That's a revenue --

5    Q.    Total revenue release in 2005 from the

6    core facilities?

7    A.    Right.    I think, yep.

8    Q.    Did I do the math right?

9    A.    I understand.

10    Q.    I'm sorry?

11    A.    I understand.

12    Q.    Do you think I did the math right?

13    A.    I believe you did.

14    Q.    Okay.

15         MR. FOX:    I'm just trying not to

16    repeat other people's questions, Your Honor,

17    if you can give me a moment?

18    Q.    Now on page 30 in paragraph 68 of your

19    declaration, you say that Delphi's operations

20    are necessary for General Motors to continue

21    operations without interruption.  You see

22    that?  It's on the carry over page, page 30.

23    A.    Yes, I do.

24    Q.    Now, by that you mean that at least in

25    the short term, GM can't operate if it doesn't

                                                        200

1    get the ongoing supply of parts from Delphi

2    that it uses to build its cars and trucks,

3    right?

4    A.    That's correct.

5    Q.    Okay.  And, at least in the short term,

6    GM did not resource those parts and get them

7    from another -- other vendors if Delphi were

8    to stop supplying in the short term, right?

9    A.    That is our belief.

10    Q.    Okay.  Do you have any reason to think

11    your belief might be incorrect?

12    A.    I am not privy to what General Motors

13    operating personnel might be doing.

14    Q.    Okay.  So as far as you know, if Delphi

15    were to either stop supplying parts or have to

16    liquidate the U.S. operations, that would

17    cause severe disruption to General Motors,

18    correct?

19    A.    I believe in the short run that would be

20    a safe assumption, yes.

21    Q.    Okay.  When you say a short run, what

22    period of time are you talking about?

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

23    A.    I believe that, you know, certainly over

24    a six-month period of time, depending upon

25    General Motors ability to resource, that they

201

1    would have difficulty running their U.S.

2    operations.

3    Q.    Do you have any sense of how long it

4    would take them to resource?  Do you think it

5    would be six months or do you think it would

6    be longer?

7    A.    I think it depends upon the particular

8    part that we're discussing.

9    Q.    So, there'd be a range?

10    A.    I think it depends upon the -- it would

11    definitely be a range and it also depends upon

12    GM's -- the status of GM's considering the

13    ability to resource.

14    Q.    Well what do you -- if six months were

15    the short end, what do you think the long end

16    of that range would be?

17    A.    I think there's a lot of factors that

18    would go into that, so I don't know that I can

19    speculate about that.

20    Q.    Okay.  Now in paragraph 81 of your

21    declaration on page 34, you talk about finding

22    a pension solution.  Now, you say that your GM

23    consensual scenario assumes that Delphi is

24    able to achieve a legislative solution

25    stretching out its pension contributions.  Do

202

1   you have any reason to believe that such a

2   legislative solution will be achieved?

3   A.   At the time that we put the scenarios

4   together we had not spent significant time

5   considering a pension solution.  And we

6   therefore, at a very minimum, believed that

7   once the other issues had been addressed that

8   we should be able to use a legislative

9   solution.  Since that time we've spent

10  significant time considering this issue and

11  how we would address it.  And I think I

12  described that we are discussing with the

13  relevant parties how to address this issue

14  through existing legislation.

15  Q.   You talked about --

16  A.   In a manner consistent with what's in the

17  GM consensual solution in terms of stretching

18  out.

19  Q.   But I'm not sure if I heard you

20  correctly.  When you're saying you still

21  believe that a legislative solution is

22  possible or whether you're looking at

23  alternate solutions that do not include

24  legislation?

25  A.   What I think I was trying to relate to

203

1   you is, is that certainly a legislati -- we

2   wouldn't pursue a legislative solution if we

3   were able to utilize existing law and achieve

4    a result which was similar to that which you

5    see under the legislative solution.  So we'd

6    never get to that point in time.

7    Q.   Well, does Delphi believe, at this point,

8    that it is likely to be able to achieve a

9    legislative solution if it had no other

10   alternative?

11   A.   We believe that it would have a chance to

12   be successful there under certain

13   circumstances, yes.

14   Q.   Okay.  And that legislative solution I

15   take it from the time frames you seem to be

16   indicating, would be separate and apart from

17   current legislation that's pending in

18   Congress?

19   A.   I think that's part of our process.  It

20   may be as part of current legislation that's

21   pending in Congress.  It may be a separate

22   action if that legislation was never to move

23   forward.  We explored every avenue available

24   to us at the current time.

25   Q.   Okay.  Now, Mr. Williams of Watts &

204

1    Wyatt, indicated in his declaration that he

2    assumed that if the current pension

3    legislation were to pass, that the debtors

4    would have an investment grade rating and

5    therefore would not be considered at risk

6    under the proposed legislation.  Are you

7    familiar with that?

8    A.   Generally, yes.

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

9    Q.    Okay.  And is it your view that the

10    debtors would be able to come out of

11    bankruptcy and have an investment grade

12    rating?

13    A.    Obviously, yeah, that will depend upon a

14    lot of factors that are contained in our

15    transformation plan.  But assuming for a

16    moment, that we are able to achieve the

17    transformation plan, we believe that we should

18    be able to achieve an investment grade credit

19    rating, yes.

20    Q.    Okay.  The debtors have been booking new

21    business since the bankruptcy filing took

22    place, correct?

23    A.    Yes, sir.

24    Q.    In paragraph 94, on page 39 of your

25    declaration, you discussed the debtor's

205

1    financial condition in effect on a

2    consolidated basis, is that correct?

3    A.    I believe that's on a consolidated basis

4    for the debtors.

5    Q.    Okay.  So when you say "when examined in

6    the aggregate, the debtor's schedules reveal

7    assets of approximately 16.4 billion and

8    liabilities of 24.8 billion as of the petition

9    date."  That's on a consolidated basis among

10    the debtors, correct.

11    A.    Yes, sir.

12    Q.    Okay.  You understand, though, that

13    absent substantive consolidation each debtor

14    entity has its own separate assets and

15    liabilities, correct?

16    A.    Yes, I do.

17    Q.    Okay.  And in order to determine any

18    particular creditor's recovery, one would have

19    to take a look at that -- the particular

20    debtor entity against which it holds its claim

21    in order to determine what the recovery would

22    be for that particular creditor, correct?

23            MR. BUTLER:  Objection.  Calls for

24    legal conclusion.

25    Q.    To the extent you know, Mr. Sheehan?


206


1    A.    I was going to answer somewhat similar

2    that I haven't been through a process like

3    this before, but I generally understand that

4    that's how -- when we get to a subsequent

5    phase I'll be learning about that part.

6    Q.    Now if the debtors, to the extent that

7    they employee unionized employees, are able to

8    reduce their labor costs that will end up

9    benefiting their customers, correct?

10    A.    Their customers?

11    Q.    General Motors, the OEM's --

12    A.    The company's customers.  Well, I think

13    that we need to be competitive in all aspects

14    of our business and -- so that we need to be

15    compe -- in order to win business we need to

16    offer competitive pricing and we need to a

17    valuable business enterprise.

18    Q.    Okay.  So General Motors and the other

19    customers would benefit by getting lower

20    prices for their products.  Or more

21    competitively priced products, correct?

22    A.    From that perspective, if the company

23    wants to win business, yes.

24    Q.    Okay.  Now the trade creditors that you

25    referred to in your declaration, those are

207

1    creditors at the operating entities, correct?

2    In other words, below Delphi Corporation?

3    A.    I think that's -- you know, for the most

4    part that's correct.  I don't know that

5    there's any trade creditors at the Delphi

6    Corporation level.

7    Q.    Okay.  So you talk in paragraph 97 of

8    your declaration about the fact, for instance,

9    the subordinated notes are structurally

10    subordinated -- subordinate to the claims of

11    trade creditors.  Similarly, because of the

12    off-shore entities, trade creditors are

13    structurally subordinate to the senior debt in

14    other creditors of Delphi Corporation with

15    respect to the non-debtor entities, correct?

16            MR. BUTLER:  Objection.  I think

17    that's a legal conclusion.

18            THE COURT:  I don't think it makes

19    any sense either.  They're not creditors of

20    the non-debtor entities, right?

21            MR. FOX:  I'm sorry, Your Honor?

22            THE COURT:  They're not creditors of

23    the non-debtor entities.

24            MR. FOX:  Well, this goes to

25    structural -- to who's got a claim against

208

1    which assets.

2            THE COURT:  Well, maybe you can re-

3    ask that?  You're using the phrase structural

4    subordination.  But you're talking about

5    entities that they don't even have a claim

6    against, right?

7            MR. FOX:  Well, that's in effect

8    always the -- well, okay.  I understand your

9    point.  I'll withdraw that question.

10   Q.   Now the debtor's suppliers, you indicate,

11   had claims of approximately a billion dollars

12   as of the petition date, correct?

13   A.   That's correct.

14   Q.   Okay.  And up until the petition date, if

15   I understand it correctly, the suppliers were

16   being paid on a current basis and asked two

17   terms, right?

18   A.   In the period leading up to

19   reorganization, there was a shortening of

20   trade terms by suppliers given the uncertainty

21   the company was facing.  But if you exclude

22   that short period prior to filing, yes, they

23   were generally on M&S two payment terms.

24   Q.   So you ended up being paid on M&S two

25   terms, so they're being paid more quickly than

209

1   that, right?

2   A.   I'm sorry?

3   Q.   They're either being paid on M&S two

4   terms or being paid more quickly than those

5   terms ordinarily provide for?

6   A.   In the period leading up?

7   Q.   Yes.  That's what's -- in other words

8   nobody was being stretched out and paid

9   farther out, correct?

10  A.   In the period leading up to

11  reorganization, that is absolutely correct.

12  Nobody was getting paid in longer period of

13  time.

14  Q.   Okay.  But some were getting paid more

15  quickly?

16  A.   We were having to shorten payment terms

17  in order to be able to continue to receive

18  products from our suppliers.

19  Q.   And of the one billion of claims to

20  suppliers, I believe under the first day

21  orders, the debtors have paid off about 212

22  million of that amount, correct?

23  A.   It's in that range.  I don't know it

24  exactly.  It might be in something here, but I

25  think it's in that range.


210


1   Q.   Well, if you'd like you can take a look

2   at Exhibit's -- take a look at Exhibit 205.

3   A.   That is correct.

4   Q.   I'm sorry?

5   A.   That is correct.

6   Q.   Okay.  And the debtors also, I believe,

7   prepaid some of their suppliers before they

8   filed for bankruptcy, correct?

9   A.   In order to be able to secure -- supply

10   the company in certain situations, was

11   required to meet demands for advance payment.

12   Q.   Okay.  And then the debtors also asked

13   this Court to approve an order in November

14   which allowed the debtors to assume certain

15   executory contracts which were nearing the end

16   of their term as well, correct?

17   A.   Under certain circumstances we had that

18   authority, yes.

19   Q.   Okay.  And, again, that was to ensure

20   that the debtors would be able to obtain goods

21   and services from these vendors?

22   A.   That's correct.

23   Q.   Okay.  Now there were approximately -- I

24   think there were like six thousand contracts

25   that were outstanding that were expiring as of

211

1   the end of December that had to be renewed,

2   right?  Is that roughly the number?

3   A.   That had to be renewed, yes.

4   Q.   Okay.  And of those six thousand, those

5   were accounted for by, I believe, it was

6   approximately a thousand or so vendors, is

7   that right?

8   A.   I believe so.  I don't know the numbers

9   specifically.

10   Q.   Okay.  And of that thousand or so, only,

11    I believe it's 41, actually, took advantage of

12    the authority that the debtors were granted

13    under that contract assumption order, correct.

14            MR. BUTLER:  Objection.  Relevance,

15    Your Honor.  I have no clue where we're going

16    with this line of testimony.

17            MR. FOX:  It relates directly to

18    what the debtor's talking about in terms of

19    concessions and how the suppliers are helping

20    them out.  It also goes to the debtor's

21    business judgment and the way it's treating

22    different groups of creditors.  And to their

23    business judgment, you know, understanding

24    their own business in the way that they, you

25    know, need to do some of the things that

212

1    they're doing.  I don't plan to spend much

2    time on it, but I'd like to just get an answer

3    for that.

4            THE COURT:  I think I'm going to

5    sustain the objection.  It's too remote.

6            MR. FOX:  Okay.

7    Q.    Now, page 42 in paragraph 101 of your

8    declaration, you indicate that non-creditor

9    claims will likely receive less than 100 cents

10    on the dollar.  You see that?

11    A.    Yes, sir.

12    Q.    Now, you also indicated that you thought

13    the bond claims would recover somewhere

14    between 25 and 50 cents on the dollar?

15    A.    Where are you referring to?

16    Q.    Paragraph 97, the -- on page 41, the last

17    sentence.

18    A.    Yeah, I think I said that the markets

19    interpretation of the publicly disclosed

20    information about Delphi is that the holders

21    of Delphi's debt securities will receive,

22    blah, blah, blah.

23    Q.    All right.  Do you receive the recovery

24    to the bond holders is going to be different

25    than the recovery, you refer to in paragraph

213

1    101, for whatever these non-priority claims

2    are you're referring to?

3    A.    I think that the whole question of

4    recoverability for any class of creditors is a

5    matter that will be dealt with at a later

6    stage in this hearing.

7    Q.    Let me ask in a different way.  Do you

8    believe the creditors, Delphi Automotive

9    Systems, LLC and the subsidiaries in the

10   organizational chart are going to receive less

11   than 100 cents on the dollar as a result of

12   this bankruptcy case?

13   A.    I don't know.

14   Q.    You indicate, here in paragraph 101, that

15   non-priority claims will likely receive less

16   than 100 cents on the dollar?

17   A.    Recognizing the level of liabilities that

18   this pre-petition liabilities that the company

19   has and assets that the company has.  Exactly

20   how all of the claims will be handled within

21    each individual legal entity, I don't believe

22    that we've progressed to a stage in this case,

23    where I can answer that question.

24    Q.    Do you think that there are any creditors

25    of any of the subsidiaries, direct or


214


1     indirect, of Delphi Corporation that will --

2     let me back up?  Do you think there are any

3     creditors of Delphi Automotive Systems LLC,

4     general and secured creditors I mean, which

5     will be paid 100 cents on the dollar as a

6     result of the plan?

7     A.    I haven't tried to analyze that question

8     at the current time.

9     Q.    Okay.  Do you believe, sitting here

10    today, that creditors of Delphi Automotive

11    Systems, LLC will be paid in full?

12    A.    I don't know.

13    Q.    Okay.

14    A.    I haven't analyzed that.

15    Q.    Okay.  Do you have any reason to think

16    they will, though, sitting here today?

17    A.    I hope everybody does.  It's a --

18    Q.    Well, we all hope that.  But the question

19    is do you have any reason to think, sitting

20    here today, that that would be in fact the

21    case?

22    A.    No, I do not.

23    Q.    Okay.  Thank you.

24          MR. FOX:  Thank you.

25          THE COURT:  Okay.  All right.  Why

215

```
1    don't we take a lunch break to 3:15.

2            MR. BUTLER:  3:15.  Thanks.  Thank

3    you, Your Honor.

4        (Proceedings concluded at 2:06 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

216

```
1
```

https://vip21.veritextllc.com/myfiles/283287/117758am.TXT

```
 2                       I N D E X

 3

 4    WITNESS                EXAMINATION BY      PAGE

 5    DELPHI CORPORATION  Mr. Kennedy            26

 6    DELPHI CORPORATION  Mr. Peterson           74

 7    DELPHI CORPORATION  Ms. Robbins            81

 8    DELPHI CORPORATION  Ms. Mehlsack          103

 9    DELPHI CORPORATION  Mr. Simon             117

10    DELPHI CORPORATION  Mr. Kurtz             157

11    DELPHI CORPORATION  Mr. Fox               185

12

13                       E X H I B I T S

14    DEBTOR'S               DESCRIPTION         PAGE

15    5 and 6                Sheehan             26

16                           Declaration

17

18

19

20

21

22

23

24

25
```

```
                                                  217



 1

 2              C E R T I F I C A T I O N

 3        I, Esther Accardi, hereby certify that

 4    the foregoing is a true and correct

 5    transcription, to the best of my ability, of

 6    the sound recorded proceedings submitted for
```

7    transcription in the matter of:

8    Delphi Corporation.

9

10        I further certify that I am not employed

11    by nor related to any party to this action.

12

13        In witness whereof, I hereby sign this

14    date:

15    May 26, 2006.

16

17    _____

18    Esther Accardi

19

20

21

22

23

24

25