1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481AM

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DELPHI CORPORATION, et al.

9

10          Debtors.

11

12   - - - - - - - - - - - - - - - - - - -x

13

14               United States Bankruptcy Court

15               One Bowling Green

16               New York, New York

17

18               May 10, 2006

19               9:05 A.M.

20

21   B E F O R E:

22   HON. ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25

2

1

2    Hearing re Motion to Authorize Motion for

3    Order Under 11 U.S.C. Section 1113(c)

4    Authorizing Rejection of Collective Bargaining

5    Agreements and Under 11 U.S.C. Section 1114(g)

6    Authorizing Modification of Retiree Welfare

7    Benefits

8

9    Hearing re Statement/Expert Report of Thomas

10   A. Kochan in Opposition to Debtors' Motion for

11   Order Under 11 U.S.C. Section 1113(c)

12   Authorizing Rejection of Collective Bargaining

13   Agreements and Under 11 U.S.C. Section 1114(g)

14   Authorizing Modification of Retiree Welfare

15   Benefits

16

17   Hearing re Motion to Authorize Motion for

18   Order Under 11 U.S.C. Section 1113(c)

19   Authorizing Rejection of Collective Bargaining

20   Agreements and Under 11 U.S.C. Section 1114(g)

21   Authorizing Modification of Retiree Welfare

22   Benefits

23

24

25

3

1    Hearing re Motion to Dismiss Party/Limit

2    Participation in the Hearing on Delphi's

3    Section 1113 and Section 1114 Motion

4

5    Reply to Motion Omnibus Reply of UAW in

6    Support of Motion to Limit Participation in

7    the Hearing on Delphi's Section 1113 and

8    Section 1114 Motion

```
 9

10    Notice of Hearing/Proposed 1113/1114 Hearing

11    Agenda

12

13    Hearing re Motion to Authorize Motion for

14    Order Under 11 U.S.C. Section 1113(c)

15    Authorizing Rejection of Collective Bargaining

16    Agreements and Under 11 U.S.C. Section 1114(g)

17    Authorizing Modification of Retiree Welfare

18    Benefits

19

20    Declaration of Kevin M. Butler in Support of

21    Delphi's Motion for Authority to Reject

22    Collective Bargaining Agreements Under 11

23    U.S.C. Section 1113(c) and Modify Retiree

24    Welfare Benefits Under 11 U.S.C. Section

25    1114(g)
```

4

```
 1

 2    Declaration of Randal A. Middleton

 3

 4    Objection to Motion

 5

 6    Declaration of Donald L. Griffin

 7

 8

 9

10

11

12

13
```

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

```
14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib
```

5

```
 1

 2    A P P E A R A N C E S :

 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

 4         Attorneys for Debtor and

 5         Debtors-in-Possession

 6         333 West Wacker Drive

 7         Chicago, IL 60606

 8

 9    BY:   JOHN WM. BUTLER, JR., ESQ.

10          JOHN K. LYONS, ESQ.

11          RON E. MEISLER, ESQ.

12

13    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

14         Attorneys for Debtor and

15         Debtors-in-Possession

16         Four Times Square

17         New York, NY 10036

18
```

19    BY:    KAYALYN A. MARAFIOTI, ESQ.

20           THOMAS J. MATZ, ESQ.

21           JAY S. BERKE, ESQ.

22

23

24

25

                                                        6

1    O'MELVENY & MYERS, LLP

2           Attorneys for Debtors

3           7 Times Square

4           New York, NY 10036

5

6    BY:    JEFFREY I. KOHN, ESQ.

7

8    O'MELVENY & MYERS, LLP

9           Attorneys for Debtors

10          1625 Eye Street

11          Washington, D.C. 20006

12

13   BY:    TOM JERMAN, ESQ.

14

15   O'MELVENY & MYERS, LLP

16          Attorneys for Debtors

17          400 South Hope Street

18          Los Angeles, CA 90071

19

20   BY:    ROBERT A. SIEGEL, ESQ.

21

22

23

24

25

7

1    COHEN, WEISS AND SIMON, LLP

2         Attorneys for UAW

3         330 West 42nd Street

4         New York, NY 10036

5

6    BY:   BABETTE CECCOTTI, ESQ.

7         BRUCE S. LEVINE, ESQ.

8         BRUCE H. SIMON, ESQ.

9         PETER D. DECHIARA, ESQ.

10        DAVID R. HOCK, ESQ.

11

12   LATHAM & WATKINS, LLP

13        Attorneys for Statutory Creditors'

14        Committee

15        885 Third Avenue

16        New York, NY 10022

17

18   BY:   ROBERT J. ROSENBERG, ESQ.

19        MITCHELL E. SEIDER, ESQ.

20

21

22

23

24

25

8

```
 1   LATHAM & WATKINS, LLP

 2        Attorneys for Statutory Creditors'

 3        Committee

 4        633 West Fifth Street

 5        Suite 4000

 6        Los Angeles, CA 90071

 7

 8   BY:   JOEL E. KRISCHER, ESQ.

 9

10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

11        Attorneys for the Equity Committee

12        One New York Plaza

13        New York, NY 10004

14

15   BY:   BONNIE STEINGART, ESQ.

16

17   KIRKPATRICK & LOCKHART NICHOLSON GRAHAM, LLP

18        Attorneys for Wilmington Trust Company

19        599 Lexington Avenue

20        New York, NY 10022

21

22   BY:   EDWARD M. FOX, ESQ.

23

24

25
```

                                                    9

```
 1   WHITE & CASE, LLP

 2        Attorneys for Appaloosa Management

 3        1155 Avenue of the Americas

 4        New York, NY 10036

 5
```

```
 6   BY:   THOMAS E. LAURIA, ESQ.

 7         GLENN M. KURTZ, ESQ.

 8         DOUGLAS P. BAUMSTEIN, ESQ.

 9

10   BURR & FORMAN, LLP

11         Attorneys for Mercedes Benz

12         420 North 20th Street

13         Birmingham, AL 35203

14

15   BY:   MICHAEL L. HALL, ESQ.

16

17   ORRICK, HERRINGTON & SUTCLIFFE, LLP

18         Attorneys for Ad Hoc Trade Committee

19         666 Fifth Avenue

20         New York, NY 10103

21

22   BY:   ALYSSA D. ENGLUND, ESQ.

23

24

25
```

10

```
 1   KENNEDY, JENNIK & MURRAY, P.C.

 2         Attorneys for IUE-CWA

 3         113 University Place

 4         New York, NY  10003

 5

 6   BY:   THOMAS M. KENNEDY, ESQ.

 7         SUSAN M. JENNIK, ESQ.

 8

 9   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

10         Attorneys for Steelworkers Union
```

```
11         1350 Broadway

12         Suite 501

13         New York, NY 10018

14

15   BY:   LOWELL PETERSON, ESQ.

16

17   PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER &

18   BRUEGGEMAN, S.C.

19         Attorneys for IBEW and IAM

20         1555 North River Center Drive

21         Suite 202

22         Milwaukee, WI 53212

23

24   BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

25
```

11

```
 1   GORLICK, KRAVITZ & LISTHAUS, P.C.

 2         Attorneys for Operating Engineers

 3         Locals 18-S, 101-S, 832-S

 4         17 State Street

 5         4th Floor

 6         New York, NY 10004

 7

 8   BY:   BARBARA S. MEHLSACK, ESQ.

 9

10   WEIL, GOTSHAL & MANGES, LLP

11         Attorneys for General Motors

12         767 Fifth Avenue

13         New York, NY 10153

14

15   BY:   JEFFREY L. TANENBAUM, ESQ.
```

```
16          MICHAEL P. KESSLER, ESQ.

17

18    UAW/ASSOCIATE GENERAL COUNSEL

19          8000 East Jefferson

20          Detroit, MI 48214

21

22    BY:  NIRAJ R. GANATRA, ESQ.

23

24

25
```

                                                      12

```
1     OFFICE OF THE UNITED STATES TRUSTEE

2           33 Whitehall Street

3           21st Floor

4           New York, NY 10004

5

6     BY:  ALICIA M. LEONARD

7

8

9

10

11

12

13

14

15

16

17

18

19

20
```

21

22

23

24

25

13

 1                P R O C E E D I N G S

 2                THE COURT:  Please be seated.  Good

 3      morning.  Okay.  Delphi Corporation.

 4                MR. BUTLER:  Your Honor, good

 5      morning.  Jack Butler from the Skadden, Arps,

 6      Slate, Meagher & Flom, LLP firm again on

 7      behalf of the debtors for the second day of

 8      our section 1113, 1114 hearing.  Your Honor,

 9      at the conclusion of yesterday's hearing, or

10      actually during the course of the hearing,

11      Your Honor, from the bench, provided a series

12      of potential dates for continued hearing,

13      asked the parties to meet and confer, which

14      we've done.  With the Court's permission we

15      would like to schedule the fourth and fifth

16      days of the hearing for May 24th and May 26th,

17      a Wednesday and a Friday, several weeks from

18      now. The interim period will give the

19      opportunity for -- and it will facilitate good

20      faith negotiations between the debtor and the

21      unions between the conclusion of this week's

22      hearings and the resumption of hearings on May

23      24th.  In order to be able to keep that

24      schedule, we would move the May 24th omnibus

25      hearing to May 30th, which was the other date

14

```
 1   you had given us.  And we'd ask to start the
 2   omnibus hearing at 11 o'clock.  We also, Your
 3   Honor, with Your Honor's permission we're
 4   going to contact each of the parties that have
 5   scheduled things for that omnibus hearing and
 6   encourage them to roll their matters to June
 7   20th so that we can have a short rather than
 8   extended omnibus hearing.  So we're going to
 9   try to encourage people to, unless they have
10   something that's really pressing for the Court
11   to deal with, to roll to the June 20th omnibus
12   hearing.  Those that will not do we'll take on
13   May 30th.  We'd like to start that -- the
14   omnibus at 11:00 A.M. if that's possible.
15          THE COURT:  Okay. Those dates and
16   those times, they're all fine.
17          MR. BUTLER:  Thank you.  The other
18   matter, Your Honor, is that the equity
19   committee yesterday made some comments about
20   the concept of bringing witnesses back for
21   extended cross-examination at some point in
22   the future.  But also indicated that they
23   wanted to meet and confer with us about that.
24   We are willing to do that.  We're having
25   lunch, scheduled for Thursday, to have a
```

15

```
 1   conversation with the equity committee.  We
```

2    met with the committee last Wednesday,

3    immediately after they got organized.  I just

4    wanted to indicate that, obviously, the

5    debtors reserve their rights on that if we

6    have to argue it with Your Honor.  I don't

7    want to -- I want the record to be clear as to

8    that.

9            THE COURT:  Right.  Everyone's

10    rights are reserved on that issue.

11            MR. BUTLER:  And finally, Your

12    Honor, if -- we'd like to re-call Mr. Butler

13    for the continuation of his cross-examination

14    in support of declarations that are Exhibits 7

15    and 8.  Mr. Kurtz from White and Case has a

16    scheduling issue and has asked to go forward

17    now with his cross-examination and the parties

18    have all consented to that.  And so Mr. Kurtz

19    would go next and then Mr. Kennedy would

20    resume the union cross-examination.

21            THE COURT:  Okay.  That's fine.  All

22    right.  Mr. Butler, you're still under oath.

23            THE WITNESS:  Yes, Your Honor.

24            THE COURT:  Okay.  You can go on Mr.

25    Kurtz.

16

1            MR. KURTZ:  Thank you, Your Honor.

2    CROSS-EXAMINATION BY

3    MR. KURTZ:

4    Q.  Good morning, Mr. Butler.

5    A.  Good morning, counselor.

6    Q.  The debtors have not evaluated the amount

7    of GM's potential claims arising from

8    projection -- it's the CBAs, correct?

9    A.    That's true.

10    Q.    And the debtors have not compared the

11    costs and the benefits of rejecting the CBAs

12    now with the costs and benefits of simply

13    permitting them to expiry at -- in or about

14    October 2007, correct?

15    A.    It's our opinion that it would be damaging

16    to the estate to wait until 2007.

17    Q.    Mr. Butler, my question is whether the

18    debtors have compared the costs and benefits

19    of rejecting the CBAs now with the costs and

20    benefits of simply permitting them to expire

21    in October 2007?

22    A.    I'm not aware of a specific analysis.

23    Q.    And you did attend the meetings of the

24    board of directors at which the determination

25    to file this motion was addressed and decided,

17

1    correct?

2    A.    I did.

3    Q.    And no analysis comparing rejection now

4    with expiration in 2007 was presented to the

5    debtor's board, correct?

6    A.    Not that I'm aware.

7    Q.    And the debtor's board has not otherwise

8    considered that issue, correct?

9    A.    Not that I am aware.

10    Q.    And do you know the amount of GM's claim

11    that debtors potentially will incur by

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

12    rejecting the CBAs now?

13    A.  I do not know the specific amount.

14    Q.  All right.  Can I ask you to open up to

15    Exhibit 209, Joint Exhibit 209?

16    A.  I have it.

17    Q.  Okay.  For some reason Exhibit 209 is a

18    compilation of a number of documents and where

19    I'd like to direct you is to the last

20    document, and, in fact, the last page of the

21    exhibit.  All right.  Is that the -- does that

22    bear the title maximum claims exposure

23    estimates?

24    A.  Can you direct me to where on the page?

25    Yes, I see it.  Maximum claims exposure.

18

1    Q.  If you look at the second box from the

2    bottom, is there a number for the maximum

3    claim exposure for GM's potential --

4             THE COURT:  I'm sorry.  What's the

5    title of this exhibit?  I'm not sure I have

6    the right one.

7             MR. KURTZ:  It is the last three

8    pages of Exhibit 209.  It's called preliminary

9    illustrative analysis of scenario c, and it

10    bears Bates number DPHAPA 9 through 11.

11             THE COURT:  I'm sorry.  My exhibit

12    book has a different exhibit there.

13             MR. KURTZ:  For the very last three

14    pages?

15             THE COURT:  No.  It's just a totally

16    different exhibit.  It's a form AK, is what I

17    have.

18              MR. KURTZ:  What about the very last

19    three pages?

20              THE COURT:  No.

21              MR. KENNEDY:  Your Honor, 209 in our

22    confidential exhibits, which begins with form

23    AK, but there's a compilation of documents

24    past some blue sheets, the last one --

25              THE COURT:  Oh, I see, I see.  It's

19

1     a --

2               MR. KURTZ:  I apologize, Your Honor.

3     I don't know how the compilation of exhibits

4     came to be one exhibit or having separate

5     exhibits came to be compiled.

6               THE COURT:  All right.  Go ahead.

7     BY MR. KURTZ:

8     Q.  Mr. Butler, is the maximum claims exposure

9     estimate reflected in the second box from the

10    bottom 8.598 billion dollars?

11    A.  I believe that refers to the hourly OPEB

12    liability at 75 percent retirement.

13    Q.  Okay.  And it's 8.6 billion dollars,

14    correct?

15    A.  I do see 8.598.

16    Q.  And this was either created or compiled by

17    Rothschild?

18    A.  It appears so.

19    Q.  And Rothschild is the debtor's financial

20    advisor, correct?

21    A.  Yes.

22  Q.  All right.  Now, are you aware of the cost

23  of funding the OPEB benefits through

24  expiration of the CBAs in or about October

25  2007?

20

1   A.  Off the top of my head I don't recall the

2   number.

3   Q.  Are you aware that the debtor's actuaries

4   have calculated that number at only 300

5   million dollars?

6   A.  That would be generally consistent with my

7   understanding of cash costs.

8   Q.  Which would comprise only some three

9   percent of the amount of the potential OPEB

10  claim that will be incurred by Delphi by

11  rejecting the CBAs now, correct?

12  A.  If the math is correct.

13  Q.  And the debtor's board did not consider

14  that fact in deciding to file this motion to

15  reject the CBAs, correct?

16  A.  I don't recall.

17  Q.  All right.  Let me move to the portion of

18  your supplemental declaration that's

19  specifically directed to Appaloosa's

20  objection, which I believe is paragraph 13.

21  That's Exhibit A, paragraph 13.  Tell me when

22  you're there.

23  A.  Paragraph 13?

24  Q.  Correct.

25  A.  Yes.

21

```
 1   Q.  All right.  This is a paragraph in which
 2   you will opine that Appaloosa's position that
 3   Delphi can wait until September 2007 for
 4   expiration of the labor agreements is
 5   untenable, correct?
 6   A.  Correct.
 7   Q.  And you identified two reasons, correct?
 8   A.  That's true.
 9   Q.  Your first reason is your suggestion that
10   Delphi cannot lawfully implement changes to
11   the terms of employment until it reaches an
12   impasse, correct?
13   A.  That's correct.
14   Q.  But Delphi can easily reach that impasse
15   by October 2007 when the CBAs expire, correct?
16   A.  I don't -- I don't know that that's a true
17   statement.
18   Q.  If Delphi chooses to reach an impasse by
19   October 2007 it can do so, correct?
20   A.  We would need to bargain in good faith and
21   I think that's a time dependant issue.
22   Q.  And you can bargain in good faith from now
23   until October 2007 and then reasonably
24   conclude that in over a year's worth of
25   negotiations, with no tangible result, you've
```

22

```
 1   reached an impasse, correct?
 2   A.  That would be correct.
 3   Q.  So that would not cause any additional
```

4    delay, correct?

5    A.  You could -- you could achieve that

6    assumption.

7    Q.  And, in fact, you could easily,

8    potentially, reach an agree -- a consensual

9    resolution with the unions sometime between

10   now and October 2007 if there's no rejection,

11   correct?

12   A.  I'm sorry, could you repeat the question?

13   Q.  You could easily, potentially reach a

14   consensual resolution with the unions some

15   time between now and October 2007, correct?

16   A.  No, I would not characterize it that way.

17   Q.  You don't think you have the potential to

18   reach a resolution with the union any time

19   between now and October 2007?

20   A.  You said easily.

21   Q.  Okay.  I also said potentially.  But how

22   about you could reasonably reach a resolution

23   with the unions sometime between now and

24   October 2007, correct?

25   A.  We are endeavoring to do so.


                                                     23


1    Q.  And now, your second remark is that Delphi

2    is vulnerable to a strike at a cost which

3    would easily exceed any savings, correct?

4    A.  That's correct.

5    Q.  But Delphi is vulnerable to a strike now,

6    based on this motion to reject, correct?

7    A.  There is that possibility.

8    Q.  In fact, unions are asking their members

9    to approve a strike, correct?

10   A.  They are asking their members to approve

11   the ability to authorize strike.

12   Q.  And have the debtors analyzed the

13   likelihood that the unions will strike based

14   on this motion to reject the CBAs?

15   A.  We know that it is a possibility.

16   Q.  You, in fact, in your professional

17   opinion, believe that if the Court permits

18   rejection the unions will strike, correct?

19   A.  I believe that's a possibility.

20   Q.  You believe it's likely, correct?

21   A.  It depends on the outcome of our

22   bargaining.

23   Q.  Do you remember giving a deposition in

24   connection with the human attrition program?

25   A.  I do.

                                            24

1    Q.  I am going to read, I can go through the

2    exercise of handing you the transcript or you

3    can just trust that I read it accurately.

4    A.  I would like a copy of the transcript.

5    Q.  Mr. Baumstein, can you hand Mr. Butler a

6    copy of his sworn testimony?  Why don't you

7    turn to page 107, lines 3 through 11.

8    Question:  "If the unions don't agree and,

9    therefore, you pursue a non-consensual

10   resolution, have you considered whether the

11   individual employees would nonetheless agree

12   to work on the terms that you set forth in the

13   November proposal?"  Answer:  "It's my

14   professional view that we are likely to have a

15   strike and it is likely an extended strike."

16   That was a question you were asked at your

17   deposition and answer that you gave, correct?

18   A.  That is correct.

19   Q.  Have the debtors analyzed the duration of

20   any potential strike that results from this

21   motion to reject the CBAs?

22   A.  It depends upon the outcome of our

23   bargaining and this, of course, was prior to

24   having the attrition plan approved.

25   Q.  Have the debtors reached a determination

25

1   as to the duration of a potential strike

2   precipitated by this motion to reject the

3   CBAs?

4   A.  We do not have a definitive duration.

5   Q.  Do you have some range of duration that

6   the debtors believe is reasonable, if in fact

7   the CBAs are rejected in connection with this

8   motion?

9   A.  No, we do not have for pure rejection of

10   this motion.

11   Q.  And have the debtors determined the cost

12   of such a strike?

13   A.  Cost would be very high.

14   Q.  Would the cost be destructive to the

15   company?

16   A.  Cost would be very harmful to the company.

17   Q.  Potentially irreparable?

18   A.  Depending on duration, could be.

19    Q.  If it was an extended strike, as you

20    opined in your deposition, that could be

21    irreparable damage to the company, correct?

22    A.  Depending on timing and duration it could

23    be.

24    Q.  All right.  Let me go back to your

25    supplemental declaration.  Although you

                                                    26

1    included testimony about its potential, the

2    debtors, in fact, have not analyzed the

3    likelihood of a strike based on expiration of

4    the CBAs in October 2007, correct?

5    A.  I'm sorry, could you repeat the question

6    again?

7    Q.  Yeah.  Although you included testimony

8    about its potential, the debtors have not

9    analyzed the likelihood of the strike based on

10    expiration of the CBAs in October 2007,

11    correct?

12    A.  We've done no specific analysis to that

13    point.

14    Q.  And although you included testimony about

15    the potential impact of such a strike, the

16    debtors have likewise not analyzed the cost of

17    the strike based on expiration, correct?

18    A.  The cost of a strike in any circumstances

19    where -- depending on timing and duration --

20    Q.  My question is whether the debtors have

21    analyzed it in connection with expiration --

22    A.  We have not done the specific --

23    Q.  -- of the CBAs in 2007, yes or no?

24    A.   We have not done a specific analysis.

25    Q.   And you certainly cannot conclude that it

27

1     is more likely that the unions will strike

2     based on the expiration of the CBAs as

3     compared with rejection of the CBAs in this

4     motion, correct?

5     A.   I -- that requires an assumption.  No, I

6     don't -- I don't know how to analyze that.

7     Q.   And you likewise cannot conclude that the

8     cost of any potential strike based on the

9     expiration of the CBAs will exceed the cost of

10    any strike based on the expiration, correct?

11    A.   That depends on timing and duration.

12    Q.   And so, that's cer -- the potential and

13    cost of the strike in 2007 certainly isn't the

14    reason that the debtors are moving now to

15    reject the CBAs, correct?

16    A.   The -- to resolve our issues --

17    Q.   Yes or no?

18    A.   We are trying to resolve our issues as

19    expeditiously as possible.

20    Q.   My question is whether -- that's not my

21    question.  My question is whether the cost and

22    likelihood of a strike in 2007 is the reason

23    you're moving to reject today?

24    A.   No, that is not the reason.

25    Q.   And although you submitted testimony

28

```
 1   identifying the risk and impact of a strike in
 2   October 2007, based on the expiration of CBAs,
 3   you've included no such testimony with respect
 4   to the present risk of a strike and the cost
 5   of a strike based on the rejection of the CBAs
 6   now, correct?
 7   A.  I'm sorry, could you repeat the question?
 8   Q.  Although you did, in your
 9   supplemental declaration, testimony about the
10   potential for a strike and the cost of the
11   strike based on expiration of the CBAs, you've
12   included no such testimony about the risks and
13   costs based on rejection of the CBAs in
14   connection with this motion, correct?
15   A.  That's correct.
16   Q.  And that's true even though you think
17   there will be a strike and even though the
18   unions are looking for a vote authorizing the
19   strike, correct?
20          MR. BUTLER:  Objection.  That wasn't
21   what he testified to, Your Honor.
22          THE COURT:  Why don't you just
23   phrase it as a separate question?
24          MR. KURTZ:  All right.
25   BY MR. KURTZ:
```

29

```
 1   Q.  And that's true even though you've
 2   testified that it is likely that the unions
 3   will strike if there's a non-consensual
 4   resolution, correct?
```

```
 5            MR. BUTLER:  Objection.  That's not

 6   what he testified to.

 7            THE COURT:  I think he's already

 8   given you the answer to this anyway.

 9   BY MR. KURTZ:

10   Q.  And by the way, did you draft your

11   supplemental declaration?

12   A.  It was drafted for me and I edited it.

13   Q.  Okay.  Was it drafted by Skadden Arps?

14   A.  It was.

15   Q.  Okay.  And did you edit that paragraph

16   that we're talking about, paragraph 13?

17   A.  I don't recall.

18   Q.  All right.  And just to put all this

19   concern about some purported strike based on

20   the expiration of the CBAs in context, the

21   debtors intend to eliminate OPEB benefits in

22   any new deal they reach with the unions,

23   correct?

24   A.  I'm sorry, could you repeat the question

25   again?
```

                                                                    30

```
 1   Q.  Sure.  The debtors intend to eliminate

 2   OPEB benefits in any deal they reach with the

 3   unions, correct?

 4   A.  That is our current intent.

 5   Q.  All right.  In fact that's --

 6   A.  For those employees that are covered by

 7   the benefit guarantee.

 8   Q.  Okay.  No further questions.

 9            THE COURT:  Okay.
```

10          MR. KURTZ:  Thanks to the unions for

11    permitting me to go first.

12          MR. KENNEDY:  Tom Kennedy, Your

13    Honor, for IUE-CWA.

14    CROSS-EXAMINATION BY

15    MR. KENNEDY:

16    Q.  Good morning, Kevin.

17    A.  Good morning, Tom.

18    Q.  Do you understand that Delphi has a

19    tradition stemming from its GM days and since

20    the spin-off of engaging in pattern

21    negotiations with its unions?

22    A.  I do.

23    Q.  And is Delphi expecting pattern bargaining

24    to occur in connection with the Section 1113

25    negotiations?

31

1    A.  It is a reality that we deal with and we

2    are attempting to work with the unions to the

3    best of our ability, simultaneously.

4    Q.  So then you're not expecting the pattern

5    negotiations to be the rule in these

6    negotiations, is that correct?

7    A.  I'm expecting that it is, by practice and

8    practicality, it is a factor that will impact

9    these.  But we are trying to bargain as

10    simultaneously as we can.

11    Q.  Isn't it a fact that with respect to the

12    attrition program Delphi's approach was to

13    first reach an agreement with the United Auto

14    Workers?

15    A.   It is true that because the attrition

16    program was a tripartite agreement and General

17    Motors interest was highest in resolving this

18    with the UAW first, we did, in fact, bargain

19    with the UAW first.

20    Q.   Is it your testimony that you were

21    simultaneously engaging in negotiations for an

22    attrition program with the IUE-CWA through

23    March 2006?

24    A.   We were trying to keep the IUE aware of

25    the material developments.   But I would not

32

1    call it active bargaining on the attrition

2    program.   Particularly in light of the fact

3    that again, it required General Motors

4    involvement.

5    Q.   Given the magnitude of the cuts in this

6    proposal that you've made to the IUE-CWA, do

7    you expect it to accept whatever pattern you

8    achieve with another union?

9    A.   I would expect that we would have to

10    tailor the agreement, to some extent, for each

11    of the unions.

12    Q.   And when you say tailor to some extent, do

13    you mean to keep within a basic economic

14    parameter and then to adjust it for particular

15    unions?

16    A.   To generally preserve the critical

17    provisions that allow us to be competitive and

18    then also adjust to deal with the realities of

19    each of the union's conditions.

20    Q.  Did you get a letter from Henry Reichard

21    who, as you know, is the head of the IUE-CWA

22    Automotive Conference Board, on March 31st

23    telling you that IUE-CWA was a separate labor

24    organization, that it had to be dealt with

25    directly by Delphi?

33

1    A.  I do recall that letter.

2    Q.  And did you write back to Mr. Reichard in

3    response to that letter?

4    A.  I'd like to check exhibits on that.  That

5    was a March 31st letter?

6    Q.  Yes.

7    A.  I don't recall.

8    Q.  Prior to 2006, is it your contention that

9    the IUE-CWA has engaged in pattern bargaining

10    with Delphi in 1999 and 2003?

11    A.  I think that's a fair statement.

12    Q.  Isn't it true that the IUE has negotiated

13    separate wages for each of its facilities?

14    A.  There is a variance of wages at each of

15    the facilities.

16    Q.  So that insofar as there is any tradition

17    of pattern bargaining it doesn't extend to

18    wages, isn't that correct?

19    A.  Each of the unions have provisions in

20    their agreements that allow local flexibility

21    in wages and other matters.  And the IUE has

22    taken great advantage of that or has done that

23    to a great extent.

24    Q.  I'm asking you, given the fact that there

25    are provisions for local variation isn't it

34

1    true that to the extent there has been pattern

2    bargaining it has not been true with respect

3    to wages at IUE-CWA facilities?

4    A.   There is variation within the wage -- wage

5    portion of the agreements as it relates to a

6    pattern.

7    Q.   And given that variation, wouldn't you

8    agree with me that there has not been a

9    pattern at IUE-CWA facilities of taking

10   whatever wages have been negotiated with the

11   UAW and simply applying them to our facility?

12   A.   No, I would not say that.

13   Q.   You think there has been a pattern of

14   applying the wages?

15   A.   I think for traditional employees, which

16   constitute the majority of the IUE membership,

17   there has, in fact, been a pattern.

18   Q.   But isn't it also true that at each of the

19   IUE facilities wages differing from the

20   national pattern have been negotiated?

21   A.   They have generally been negotiated for

22   new hires, true.

23   Q.   Isn't it also true that the IUE negotiated

24   a medical value plan at some of its

25   facilities?

35

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

1   A.  That's true.

2   Q.  And that medical value plan is not the

3   same plan as is represented by your contract

4   with the UAW, isn't that true?

5   A.  For those employees who are not covered

6   under the traditional pattern.

7   Q.  Isn't it also true that the IUE has

8   negotiated separate pension arrangements at

9   some of its facilities?

10   A.  That's true.

11   Q.  And the IUE has negotiated work rules and

12   flexibility agreements at its facilities,

13   isn't that also correct?

14   A.  That is correct.

15   Q.  Now, how would you characterize the

16   relationship between the IUE-CWA and Delphi as

17   two bargaining partners?

18   A.  I think it has been constructive and

19   positive through the years.

20   Q.  The term flow-backs has been used in this

21   proceedings.  Can you describe to the Court

22   what a flow-back is?

23   A.  A flow-back is a tri-lateral agreement

24   between General Motors, Delphi and the UAW

25   that allows for employees that were prior GM

36

1   employees to flow to openings at UAW

2   facilities.

3   Q.  And is it accurate to state that between

4   September of 1999 and September of 2003

5   approximately 4,500 Delphi employees flowed

6    back to GM?

7    A.  I believe that's a correct number.

8    Q.  Isn't it true that none of those employees

9    were IUE members?

10    A.  The IUE is not party to that tripartite

11    agreement.

12    Q.  The total flow-backs from Delphi to GM

13    from September '99 until the end of 2005 were,

14    approximately, 7,000 employees?

15    A.  That, I think, is approximately correct.

16    Q.  And again, none of them were IUE members,

17    correct?

18    A.  No.

19    Q.  Isn't it a fact that under the existing

20    agreements some Delphi operations have been

21    consolidated or wound down without union

22    objection, since the spin-off in 1999?

23    A.  There have been a handful.

24    Q.  I'm sorry, could you repeat that?

25    A.  It's true for a handful.

37

1    Q.  And at the time of the spin-off in 1999,

2    Delphi already had agreements in place with

3    IUE-CWA that provided for starting wages and

4    benefits below the traditional pattern for

5    certain employees, correct?

6    A.  For new hires, true.

7    Q.  And was it one of Delphi's goals in 2003

8    -- in the 2003 negotiations with the IUE-CWA,

9    to extend the IUE-CWA competitive hire

10    agreements and eliminate any grow-in ability

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

11    of those employees to achieve a traditional

12    wage?

13    A.    That's true.

14    Q.    And isn't it true that Delphi was able, in

15    fact, to secure an agreement with IUE-CWA in

16    which the grow-in provisions for new hires was

17    eliminated?

18    A.    There was -- there was an agreement made

19    there, true.

20    Q.    Which IUE plants eliminated a grow-in to

21    the traditional wage for new hires?

22    A.    I don't recall specifically, off the top

23    of my head, those that did.

24    Q.    All right.  As I understand it, Delphi has

25    approximately 3,000 employees of its 33,000

                                                    38

1    that work under non-traditional wage

2    agreements, is that correct?

3    A.    I believe that's approximately correct.

4    Q.    And two thirds of those, about 2,000, are

5    IUE members, correct?

6    A.    I believe that's correct.  About 1,900.

7    Q.    Now that figure 1,900, does that include

8    employees of Kettering facility, for instance,

9    that took a four-year wage freeze from 1998 to

10    2002?

11    A.    I don't believe it does, but I'm not

12    certain.

13    Q.    I'm sorry you were going to continue --

14    A.    I don't believe it does, but I'm not

15    certain.

16    Q.  Were there about 500 such employees at

17    Kettering, correct?

18    A.  I believe that's approximately correct.

19    Q.  So that if we were looking at the number

20    of IUE employees that earn wages below any

21    traditional rate, we would have to take the

22    1,910 new hires and add to them the 500 people

23    at Kettering?

24    A.  On that assumption, that's correct.

25    Q.  Would there be additional people that

39

1    would have to be added from the IUE workforce

2    of 8,500 to represent the full number that is

3    working on non-traditional agreement?

4    A.  Not that I'm aware.

5    Q.  In your declaration you state that the

6    all-in cost for a traditional Delphi employee

7    is, approximately, $78.63 per hour?

8    A.  That's true.

9    Q.  That's effective as of the end of 2005?

10   A.  I believe that's correct.

11   Q.  Is that $78.63 per hour, is that

12   reflective of the average all-in labor cost at

13   IUE facilities?

14   A.  I believe the all-in labor cost at IUE

15   facilities would be somewhat lower.

16   Q.  Do you know what the all-in cost is at

17   Gadsden in Alabama IUE facility?

18   A.  I believe it is -- I believe its on the

19   order of 21 dollars.

20   Q.  Well, as a matter of fact, didn't you

21    state at paragraph 82 of your declaration that

22    certain supplemental agreements between Delphi

23    and IUE-CWA have starting wages between $7.77

24    and eight dollars which produces an all-in

25    labor rate under 20 dollars an hour?

40

1    A.  I believe there may be those rims, I

2    believe I stated that.

3    Q.  Okay.

4    A.  Yeah.

5    Q.  So the sense -- that the facility to which

6    that would apply is Gadsden and among others,

7    wouldn't it be accurate to state that the

8    Gadsden all-in labor rate is below 20 dollars

9    an hour?

10    A.  It -- it -- that could be true, I'm not

11    certain, as I sit here, the mix of employees

12    and where they are in the grow-in schedule.

13    Q.  Well, if I told you that the average wage

14    rate at Gadsden was $9.85, if you assume that,

15    what would the all-in labor rate be on your

16    usual calculation of adding 65 percent?

17    A.  About -- about 17, 18 dollars.

18    Q.  In your declaration you stated at times

19    during 2005 there were nearly 4,000 employees

20    on temporary lay-off or in the jobs bank?

21    A.  That's true, that was our peak -- peak

22    number, I believe.

23    Q.  How many IUE members at the highest point

24    in 2005 were on the jobs bank?

25    A.  I believe it's on the order of 600 or 700.

41

1    Q.  And weren't over 100 of them put on the

2    jobs bank after the company filed for

3    bankruptcy, October 1 of 2006 -- of 2005,

4    rather?

5    A.  I don't recall.

6    Q.  The hourly attrition program that Delphi

7    has negotiated with the United Auto Workers,

8    that's intended to provide a soft landing for

9    people affected by this proceeding, is that

10   correct?

11   A.  That's true.

12   Q.  And do you agree with me that the soft

13   landings are important because they allow

14   employees to avoid much of the economic

15   hardship that they would otherwise face?

16   A.  I do.

17   Q.  In fact, that's the comment you made in

18   paragraph 45, correct, of your declaration.

19   Do you remember that?

20   A.  I believe that's a comment I have made.

21   Q.  And what economic hardship were you

22   referring to that they would otherwise face?

23   A.  Either the dislocation, if a plant is

24   wound down or closed, or the impact of an

25   involuntary or reduction in wage and benefits,

42

1    if it were negotiated and ratified.

2    Q.  And your reference to a soft landing had

3   three elements, is that correct?

4   A.  I believe so.

5   Q.  Well, let me lead you through it.  The

6   first was early voluntary retirements,

7   correct?

8           MR. BUTLER:  If you're going to be

9   talking about his declaration, can you point

10  him to it?

11          MR. KENNEDY:  Yeah.  Of course.

12          MR. BUTLER:  What paragraph?

13          MR. KENNEDY:  Paragraph 42.  It's

14  Exhibit 90.

15          THE WITNESS:  And I'm sorry, what

16  paragraph?

17          MR. KENNEDY:  Paragraph 42.

18          THE WITNESS:  I have it.

19  BY MR. KENNEDY:

20  Q.  Now the first two components of the soft

21  landings are early retirement -- early

22  voluntary retirements and pre-retirement

23  placements, correct?

24  A.  That's correct.

25  Q.  Now, with respect to our brothers and

43

1   sisters in the United Auto Workers, do you

2   know what percentage of their 23,000 active

3   employees are able to participate in either

4   the early voluntary or the pre-retirement

5   placements?

6   A.  I believe that's between 55 and 60

7   percent.

8   Q.  In the third leg of the soft landings are

9   the flow-backs that GM has opened up for 5,000

10  additional UAW members, correct?

11  A.  That's correct.

12  Q.  And isn't it also accurate that GM and

13  Delphi have committed to a mutually acceptable

14  resolution to any remaining Delphi employees

15  who wish to leave Delphi if they're -- once

16  the 5,000 flow-back and the 60 percent

17  retirements is completed?

18  A.  I believe the agreement calls for

19  developing a mutually acceptable solution of

20  that with implementation and it's subject to

21  the three parties.

22  Q.  So something will be done.  We don't know

23  what yet, but something will be done with

24  respect to anybody left over from the UAW unit

25  that wants to leave, correct?

44

1   A.  I believe that's correct.

2   Q.  All right.  Let's look how those apply to

3   the IUE unit.  Are you aware that

4   approximately 36 percent of the IUE unit would

5   be eligible for early voluntary retirements or

6   pre-retirement placements?

7   A.  I believe that's generally correct.  I'm

8   not sure if it's exactly 36 but between 36 and

9   40 percent.

10  Q.  Okay.  And it's also accurate to state

11  that IUE employees do not have a flow-back

12  option, correct?

13    A.  They have preferential hiring, but not

14    flow-back.

15    Q.  Preferential hiring by whom?

16    A.  By General Motors.

17    Q.  All right.  So if this is the General

18    Motors that has announced plans to drastically

19    reduce its North American workforce and is

20    agreeing to accept 5,000 flow-backs from the

21    UAW Delphi employees and perhaps more, and

22    your proposal to us is that we have a

23    preferential right to be hired once all of

24    those people are already taken care of?

25    A.  GM is in the process of hiring temporaries

45

1    right now and it will -- time will tell

2    whether all -- after our attrition program or

3    our proposal is worked through, how many

4    people will flow-back.

5    Q.  So the basic position here with respect to

6    IUE employees desiring to leave Delphi is a

7    time will tell, is that the company's

8    position?

9    A.  It's not immediately known what the

10    possibilities will be.

11    Q.  And again, with respect to our brothers in

12    the UAW, and I applaud them for having gotten

13    these benefits, but they're entitled to a

14    25,000 dollar relocation bonus in a situation

15    in which there's a flow-back, correct?

16    A.  That's correct.

17    Q.  Is there any relocation bonus that would

18  be available to IUE employees who would be

19  entitled to get on a list, a preferential

20  hiring list?

21  A.  At the present there is not.

22  Q.  Now, if we look at the Warren facility

23  where approximately 3,800 IUE members are

24  employed, that is a facility that Delphi is

25  planning on keeping open, correct?

46

1  A.  That's correct.

2  Q.  That's a core facility and you want it to

3  continue?

4  A.  That's correct.

5  Q.  To the extent there are layoffs at the

6  Warren facility, will they be by seniority?

7  A.  Yes, that's our -- that has been the

8  agreement and our practice.

9  Q.  So that the remaining employees at Warren

10  will be the senior employees, namely those

11  employees now getting at or close to a

12  traditional wage, correct?

13  A.  That is correct.

14  Q.  And many of those employees will not be

15  able to retire and they will not be able to

16  flow-back, isn't that also correct?

17  A.  That is correct.

18  Q.  And those employees, your proposal would

19  take them from 26 dollars down to $12.50

20  effective July 3rd, 2006, is that correct?

21  A.  I'm sorry, could you repeat the question?

22  Q.  Sure.  For those employees at Warren, your

23    proposal is to take them, assuming there's no

24    GM support, and we'll talk about that, but

25    assuming there isn't, from 26 dollars an hour

47

1    down to 12.50 an hour on July 3rd, 2006 --

2    A.  That's correct.

3    Q.  Is that correct?

4    A.  That is correct.

5    Q.  Now, would you agree that, like most

6    Americans, the folks that have been earning 26

7    dollars at Warren, probably between their

8    credit card debt, their mortgages and tuition

9    for their kids are probably spending most of

10   what they make now?

11   A.  It's -- my belief is people tend to live

12   to their income levels.

13   Q.  And have, generally, debt which reflects

14   that income level, correct?

15   A.  I think that varies on the individual.

16   Q.  Well, wouldn't you guess that that's --

17   you must know what the credit union records

18   are at Warren, do you?  How many people are in

19   debt?

20   A.  No, I don't.

21   Q.  Okay.  You talked about the economic

22   impact that you were concerned about.  What is

23   your understanding of what the economic impact

24   will be for the thousands of employees at

25   Warren that your proposal would suggest would

1    go down from 26 dollars an hour down to 12.50

2    on July 3rd of this year?

3    A.  It would be a significant impact.

4    Q.  A significant impact?

5    A.  Yes.

6    Q.  Do you have any idea how many of them

7    would be forced to file for bankruptcy as a

8    result of that proceeding?

9    A.  No, I don't

10   Q.  Have you looked at that?

11   A.  No, I have not.

12   Q.  Now, did IUE engage in negotiations with

13   Delphi over the proposed attrition plan?

14   A.  Negotiations have gone on regarding the

15   attrition program.

16   Q.  And in those negotiations, isn't it

17   correct that the IUE representatives, Henry

18   Reichard and Steve Lichens and others, said to

19   you that IUE doesn't have flow-backs?

20   A.  That's true.

21   Q.  And didn't they make the point that most

22   of our members can't early retire?

23   A.  That is true.

24   Q.  And didn't they ask for an attrition plan

25   which reflected the values -- the value,

49

1    rather, of those missing benefits, the missing

2    flow-backs and the missing early retirement

3    opportunities?

4    A.  We did receive a bullet sheet proposal

5    regarding that.

6    Q.  And isn't it accurate to state that your

7    response to the IUE-CWA was that you would

8    agree to an attrition plan of 140,000 for

9    people with 10 years or more and 70,000 with

10   people -- for less than 10 years, but no

11   additional value, notwithstanding the

12   difference between the IUE and the other

13   unions?

14   A.  It's my understanding we're actively in

15   talks regarding that topic right now and we

16   had indicated to the IUE we were aware that

17   they were bargaining on this very same topic

18   with General Motors.  And that we were looking

19   at the outcome of that in light of this

20   discussion as well.

21   Q.  Isn't it a fact that the Delphi

22   negotiators told the IUE-CWA that they would

23   rearrange the package but they wouldn't

24   provide any more value in the package than

25   what they had already negotiated with the UAW?

50

1    A.  At some point in the bargaining that may

2    be said, we are not concluded yet.

3    Q.  I'd like to address your proposals that

4    have been made to the IUE-CWA.  And I'm

5    referring specifically to paragraph 47 of your

6    declaration, so that you know where we're

7    pointing to.  You indicate in your declaration

8    "the unions have flatly rejected" the October

9    and November proposals that were made, is that

10    correct?

11    A.  That's true.

12    Q.  At what meeting did IUE-CWA flatly reject

13    the October and November proposals?

14    A.  I believe shortly after our presentation

15    of those proposals we were told they were

16    unacceptable.

17    Q.  Did they refuse to discuss the October and

18    November proposals?

19    A.  No.

20    Q.  Well, look at paragraph 47.  At paragraph

21    47 don't you state that the union "refusing

22    even to discuss the October proposals or the

23    November proposals"?

24    A.  In terms of engaged discussions, it's my

25    view that did not really occur.

51

1    Q.  That's correct.  In fact, there were no

2    meetings at all between the IUE-CWA from

3    October 20 until November 15th, isn't that

4    correct?

5    A.  I'm not aware.

6    Q.  You're not aware if there were any

7    meetings?

8    A.  I am not aware of any specific dates.  I'm

9    not always directly involved in IUE

10    bargaining.

11    Q.  All right.  But you haven't had a report

12    that there was a negotiating session between

13    October 20th and November 15th, have you?

14    A.  Our practice has been to bargain both

15    face-to-face and also through conversations on

16    the phone.  And it's my understanding that the

17    bargaining team was in discussions, but as far

18    as engaged substantive negotiations --

19    regarding these proposals, it is my view they

20    were not occurring.

21    Q.  All right.  We couldn't join with more in

22    that observation, but you're the one who

23    indicated in your declaration that IUE-CWA

24    refused to even discuss the proposals.  Isn't

25    it a fact that neither you nor the unions


52


1    scheduled a meeting between October 20th and

2    November 15th to discuss these proposals?

3    A.  I am not aware.

4    Q.  Okay.  Now, after the November 15

5    proposal, what you called the competitive

6    benchmark proposal, isn't it a fact that the

7    IUE-CWA wrote either you or Mr. Quick and

8    indicated that we were looking to prepare a

9    counterproposal to those November 15th

10    proposals and that we needed information in

11    order to do that?

12    A.  I believe that's true.

13    Q.  And isn't it also a fact that from

14    November 23rd, 2005 through December 18th

15    there were no negotiation sessions between the

16    IUE-CWA and Delphi?

17    A.  I don't recall.

18    Q.  You don't know of any such sessions?

19    A.   None that come to mind.  I don't recall

20    the specifics of the dates.

21    Q.   And then at that point, on December 19th,

22    Delphi withdrew the November 15th proposal,

23    correct?

24    A.   After consultation with the unions, yes.

25    Q.   Well, was there a meeting with the IUE-CWA

53

1    that I don't know about that occurred before

2    the December 19th withdrawal that discussed

3    this proposal?

4    A.   I believe there were telephone

5    conversations with the leadership of the IUE

6    about the prospect of this withdrawal to

7    facilitate discussions.

8    Q.   Isn't it a fact that on the morning of

9    December 19th, about 10 minutes before a press

10    release was issued by Delphi advising that

11    there was going to be a withdrawal of the

12    proposal, Mr. Reichard received a courtesy

13    telephone call advising him of that?

14    A.   I don't believe that's correct.

15    Q.   Did you speak to Mr. Reichard and advise

16    him that the company was going to withdraw its

17    November 15th proposal?

18    A.   I believe that the staff, in the days

19    prior to that -- immediately prior to that,

20    indicated that this topic was under

21    consideration and sought input from Mr.

22    Reichard as to whether this would be a

23    positive event.

24    Q.  Did you?

25    A.  I don't recall.

54

1    Q.  Now, in paragraph 55 of your original

2    declaration you state that Delphi

3    conditionally withdrew the competitive

4    benchmark proposal "in an effort to facilitate

5    discussions with GM and the UAW regarding a

6    consensual resolution to Delphi's request for

7    contract modifications," correct?

8    A.  That's correct.

9    Q.  You didn't mention, in paragraph 55, that

10   you were doing this to facilitate discussions

11   with the IUE-CWA, did you?

12   A.  I did not mention that there.

13   Q.  That's because that wasn't one of the

14   purposes, was it?  The IUE-CWA hadn't been

15   consulted before this withdrawal, had it?

16   A.  No, I don't believe that's true.  I

17   believe we consulted with the IUE.

18   Q.  Did you leave the IUE-CWA out of paragraph

19   55 by accident?

20   A.  The -- there was -- as our largest union,

21   of course, high focus on the UAW, but we did

22   consult with the IUE, as I recall.

23   Q.  And that consultation was a phone call?

24   A.  Yes.

25   Q.  Was it only a phone call that you had with

55

1   the UAW as well, or were there face-to-face

2   meetings in the period of time between

3   November 15th and December 19th?

4   A.  I recall there were both face-to-face and

5   a phone call regarding this topic.

6   Q.  Okay.  But now let's look at why you

7   withdrew the December -- rather the November

8   15th proposal.  In paragraph 55 you indicate

9   that it's to facilitate discussions.  Do you

10   have your supplemental declaration with you,

11   sir?

12   A.  I do.

13   Q.  Could you take a look at paragraph 6?

14   Isn't it a fact that in paragraph 6 the reason

15   for the withdrawal has changed to "Delphi

16   withdrew its competitive benchmark proposals

17   in response to the union's opposition to these

18   proposals and because of their refusal to

19   negotiate with Delphi"?

20   A.  That is a -- that's a correct statement.

21   Q.  All right.  So the -- paragraph 55 of your

22   original declaration is wrong and paragraph 5

23   of your supplemental is right?  Or are you

24   saying they say the same thing?

25   A.  The UAW very publicly indicated that a

56

1   good place to start, if we were serious about

2   negotiating, was withdrawal of this -- the

3   November 15th proposal.  And we took that into

4   consideration and consulted with the other

5   major unions, IUE and the Steelworkers, as I

6    recall.

7    Q.  Well, had the IUE publicly stated that

8    they were insisting that the November 15th

9    proposal be withdrawn before they would

10   negotiate?

11   A.  I don't recall them making that public

12   statement.

13   Q.  Okay.  In fact, IUE-CWA wrote you a letter

14   saying they were going to make a counteroffer,

15   correct?

16   A.  That is correct.

17   Q.  Now, once the November 15th proposal was

18   withdrawn isn't it accurate to state that IUE-

19   CWA would not have had a proposal to counter?

20   A.  I believe the IUE-CWA had the basis,

21   whether it be called a counter or a proposal,

22   the basis to advance a counter or a proposal

23   of whatever they felt was appropriate.

24   Q.  Now, how long have you been doing labor

25   negotiations?

                                                      57

1    A.  Twenty-five years.

2    Q.  Okay.  In those 25 years have you ever

3    made a counterproposal to a proposal that had

4    already been withdrawn?

5    A.  In some cases we have advanced our ideas

6    in the face of the other party withdrawing

7    something we felt was untenable.

8    Q.  So your notion here is that the IUE-CWA

9    would advance some ideas in response to your

10   withdrawal of the proposal?

11   A.  Some -- some constructive engagement to

12   try to solve the problem.  Be it a bullet

13   sheet, a what-if proposal, as is common in our

14   relationship.

15   Q.  The proposals that you've made on October

16   20th, November 15th and, ultimately, March

17   24th of '06 are the same for all your unions,

18   correct?

19   A.  They are largely the same.

20   Q.  And those proposals don't vary depending

21   on whether the particular facilities they

22   would apply to are profitable or not?

23   A.  As applies to, I believe all the

24   facilities, none are profitable.

25   Q.  Well, is the -- you know the Brookhaven

58

1   facility in which the IUE members work?

2   A.  I am generally aware of it.

3   Q.  Are you aware that in '05 it had a

4   positive operating income?

5   A.  I am not aware.

6   Q.  You are not aware of that?

7   A.  I am not.

8   Q.  Would that have made a difference to

9   Delphi in drafting the proposals that were

10   going to be submitted to the IUE and therefore

11   applicable to the Brookhaven plant?

12   A.  Several of the main provisions that we

13   feel are important for restructuring dealt

14   with the no-sell/no-close provision as well as

15   jobs provisions.  And so, the large part of

16    the -- what was consistent among the proposals

17    went beyond wage and benefits.

18    Q.  But you didn't make any effort to sculpt

19    these proposals so that you identified to each

20    union which parts of the contracts each union

21    had needed to be modified, did you?

22    A.  We hoped to engage that through

23    bargaining.

24    Q.  But at least the proposal, as it stands

25    now, is a one-size-fits-all essentially

59

1    uniform proposal to all unions regardless of

2    the economic circumstances under which their

3    members work, isn't that true?

4    A.  The framework of the proposal is to

5    attempt to create industry competitive

6    provisions for all U.S. sites.

7    Q.  Well, industry competitive provisions for

8    all U.S. sites?

9    A.  Yes.

10    Q.  Okay.  So this --

11    A.  Affected by the national agreements.

12    Q.  Affected by the national agreements.  So,

13    the industry competitive wages that you've

14    proposed would be the same whether the

15    individuals were working in Alabama or working

16    in Northern Michigan, is that correct?

17    A.  We basically proposed that for standard

18    starting wage, unless otherwise lower, in the

19    case of the IUE where it has facilitated

20    retention of business.  They would be at a

21  given level, 10 growing to 12.50 on

22  production, as I recall.  Ten dollars growing

23  to 12.50 on production, as I recall.

24  Q.  When you made the October 20th proposal to

25  the IUE did you include with it the

60

1  information necessary for the IUE to evaluate

2  the proposal?

3  A.  I believe we started flowing information

4  available to that -- available to do that

5  assessment shortly thereafter.

6  Q.  The IUE made requests for information from

7  Delphi as early as October 7, correct?

8  A.  I don't -- I can't stipulate the specific

9  date, but they made --

10  Q.  But you, at least, know that in October

11  the IUE started making requests for

12  information?

13  A.  I believe that's true.

14  Q.  And isn't it also true that as late as

15  April 2006 Delphi was still responding to the

16  information requests made in October?

17  A.  I believe that's true.  There were a great

18  number of requests with a great deal of

19  complexity and analysis required.

20  Q.  At what point in this process did the IUE-

21  CWA ask the company to tell it the amount of

22  savings that Delphi was seeking to generate at

23  each IUE plant?

24  A.  I don't recall.

25  Q.  But didn't that begin in October?

61

1    A.  It may have.

2    Q.  And wasn't it repeated again in November?

3    A.  That could be.

4    Q.  Do you know if Chanon made that same

5    request in January?

6    A.  I am uncertain.

7    Q.  Do you know if Mr. Reichard made that

8    request again on March 31st in response to

9    your March 24th proposals?

10   A.  I believe that's the case.  Our, again,

11   our proposals have been created to get to a

12   competitive level rather than a specific level

13   of savings.

14          MR. KENNEDY:  Can I have just a

15   moment, Your Honor?

16          THE COURT:  Yes.

17          MR. BUTLER:  Your Honor, can we have

18   a five minute recess?

19          THE COURT:  Is that okay with you?

20          MR. KENNEDY:  Yes, sir.

21          THE COURT:  Okay.  I'll be back at

22   10:05.

23      (Recess at 10:00 A.M. until 10:07 A.M.)

24          THE COURT:  Please be seated.

25   Okay.  Back on the record in Delphi.  Mr.

62

1    Butler, you're still under oath.

2          THE WITNESS:  Yes, Your Honor.

3     CONTINUED CROSS-EXAMINATION BY

4     MR. KENNEDY:

5     Q.   Mr. Butler, I'd like to direct your

6     attention to Exhibit 189 in the exhibit book.

7     A.   I need to get another exhibit book,

8     counselor.

9     Q.   Someone is about to give that to you.

10    A.   189?

11    Q.   It looks like volume eight.  Kevin,

12    you're going to look at, it's different.  I'm

13    looking at an e-mail which is 189.

14    A.   I'm looking at a wage chart.

15    Q.   Yeah, it's Exhibit A -- it's actually

16    Exhibit B in 189.

17    A.   Yes, I have it.

18    Q.   Do you recognize that as an e-mail?

19    A.   It is an e-mail.

20    Q.   In fact, if you look at the bottom of the

21    first page, the upper stuff being a forward

22    that would not be relevant, this is an e-mail

23    from Chuck McGwee to Henry Reichard, isn't

24    that correct?

25    A.   Yes, it is.

63

1     Q.   Chuck McGwee is the Delphi official that

2     was named as being responsible for the

3     provision of information to the IUE, in

4     response to its request?

5     A.   Chuck coordinated the gathering and

6     disbursement of information to the union.

7   Q.   And Mr. Reichard, of course, was the

8   chief IUE-CWA official engaged in discussion

9   with Delphi?

10   A.   I believe that's true.

11   Q.   But the e-mail indicates that the

12   attached documents respond to questions raised

13   by President Clark in his letter dated October

14   7, 2005, see that?

15   A.   I do.

16   Q.   President Clark is President Jim Clark of

17   the IUE-CWA?

18   A.   That's true.

19   Q.   And what is the date on this e-mail

20   responding to these questions dated October 7,

21   2005?  You see that it's March 16th?

22   A.   I see a whole string of ---

23   Q.   If you look up six lines from the bottom

24   of the page?

25   A.   I see Thursday, March 16, 2006.

64

1   Q.   And that's the date on which Mr. McGwee

2   responded to the information request of

3   October 7th?

4   A.   It appears so.

5   Q.   And the e-mail has three attached

6   questions and answers, is that correct?

7   A.   Yes.

8   Q.   And did you approve these answers or

9   responses to the questions before they were

10   sent out?

11   A.   I was consulted on these answers, yes.

12    Q.    So the answer that the company gave to

13    the question, "What is the company's overall

14    savings/cost goal" is set forth in the first

15    of these attachments to this e-mail?

16    A.    Yes.

17    Q.    And you've indicated, "Delphi's proposals

18    are not constructed to achieve a specific cost

19    reduction goal."

20    A.    That's true.

21    Q.    So that it was impossible for the IUE-CWA

22    to provide a response to your proposals that

23    would meet a specific cost reduction goal,

24    isn't that true?

25    A.    Our proposals, because --

65

1    Q.    Just answer if that's yes or no.

2    A.    Would you repeat the question?

3    Q.    Isn't it a fact that it was impossible

4    for the IUE-CWA to make a counterproposal to

5    the company that would achieve the same cost

6    savings goal that the company might have

7    intended for its proposals?

8    A.    I don't believe that's true.

9    Q.    From the point of view of the IUE-CWA, in

10    March of '06, the company's position is you

11    don't have the cost saving reduction goal.

12    Correct?

13    A.    That's true.

14    Q.    And the IUE also asked, did it not, on

15    October 7th, "specifically how is the overall

16    labor contribution apportioned among the

17    various labor groups?"  And in response to

18    that the answer was "Delphi has not sought to

19    allocate any cost reduction goal among its

20    different unions."  Isn't that also true?

21    A.    That's true.

22    Q.    In a situation in which the company has

23    not identified a cost reduction goal to a

24    union, either overall or for that particular

25    union, how could a union construct a

66

1    counterproposal that would be able to achieve

2    the same results the company was seeking?

3    A.    The company's proposals were built on

4    achieving competitive agreements and those

5    were laid out as it related to, at least,

6    wages and benefits on any sheets, as is our

7    practice, which I recall were provided.  And

8    trying to calculate a total savings goal as a

9    myriad of assumptions that could be modeled,

10    and I believe models were made available that

11    were interactive and so could be projected.

12    So our main objective here is to create

13    comparative agreements that allow us the

14    competitive cost structure necessary to bid

15    and win work in our core products.

16    Q.    Did you, as a bargainer -- I'm not asking

17    you for a legal conclusion, as a bargainer

18    responsible, I take it, for directing the

19    company's negotiations with its various

20    unions, undertake any specific analysis of how

21    collective bargaining might be different under

22    Section 1113 than had been your experience in

23    the prior 25 years?

24    A.    A specific analysis?

25    Q.    Yes.

67

1    A.    I don't recall a specific analysis, other

2    than knowing through advice of counsel there

3    were certain requirements or tests that might

4    with Chapter 11.

5    Q.    At any point before May 2 of 2006, did

6    Delphi identify to the IUE-CWA the cost

7    savings it believed its proposals would

8    achieve at the various IUE facilities?

9    A.    I don't recall.

10    Q.    Do you know of any such disclosure to the

11    IUE of what the impact of the company's

12    proposals would be, at its facilities?

13    A.    I believe through the financial models

14    that could be derived.

15    Q.    So your notion was that the IUE would

16    generate itself what the union thought the

17    company's cost reduction proposals were?

18    A.    I believe that the financial advisors

19    working through the models, along -- and I

20    understand the IUE had a financial advisor,

21    would take and model those impacts.

22    Q.    You didn't feel under 1113 that Delphi

23    had any obligation to specify to IUE-CWA or

24    any of its other unions what cost reduction

25    savings it was hoping to achieve through its

1   proposals?

2           MR. BUTLER:  Objection.  Calls for

3   legal conclusion.

4           THE COURT:  I'm sorry.  You're

5   asking this on what basis?  Just general

6   basis?

7           MR. KENNEDY:  I think rhetorical

8   flourish would be the general basis.

9           THE COURT:  Okay.

10          MR. KENNEDY:  Under that

11  circumstance, I'll withdraw.

12          THE COURT:  Okay.  Now, that's the

13  candor I like in negotiations.

14          MR. KENNEDY:  Candor, we are.

15  BY MR. KENNEDY:

16  Q.   Mr. Butler, in paragraph 52 of your main

17  declaration, you state that in connection with

18  the November 2005 competitive benchmark

19  proposals, but Delphi served all of its unions

20  with new proposals that superseded the October

21  proposals, close up.  You see that?

22  A.   I do.

23  Q.   That's unusual language in collective

24  bargaining that proposals were served on a

25  union.  Isn't it true that there was no face-

1   to-face meeting between IUE-CWA and Delphi at

2   which the November 15th proposals were

3   presented?

4   A.   I believe the proposals were transmitted

5   to the IUE and then a follow-up meeting

6   arranged.

7   Q.   Well, they were transmitted by overnight

8   mail to the various delegates to the IUE-CWA

9   conference court, correct?

10   A.   I believe that's true, as it relates to

11   the locals, yes.

12   Q.   After that November 15th proposal was

13   withdrawn, between December 2005 and March

14   2006, isn't it true that there were no formal

15   negotiation sessions between IUE and CWA and

16   Delphi concerning changes the company was

17   proposing in the collective bargaining

18   agreement?

19   A.   I'm sorry, can you repeat the question?

20   Q.   Sure.  Isn't it true that between

21   December '05 and March '06 there were no

22   formal negotiation sessions between IUE-CWA

23   and Delphi?

24   A.   I don't recall whether there were any

25   full conference board discussions.  I think,

70

1   as is our practice in bargaining, there were

2   several discussions between the international

3   and the corporate staff.

4   Q.   I'd like you to take a look at Exhibit

5   90.  Mr. Butler, do you recognize Exhibit 90

6   as the March 24th cover letter to a proposal

7   provided to IUE-CWA?

8   A.   I do.

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

9    Q.   Now, in your cover letter of March 24th,

10   in the first paragraph, you indicate that this

11   is the proposal that Delphi intends to include

12   in its section 1113 and 1114 motion, to be

13   filed with the bankruptcy court on March 31st,

14   is that correct?

15   A.   That's true.

16   Q.   At the time the March 24th proposal was

17   made the company had already made a firm

18   decision to move forward with the 1113 motion

19   on March 31st, is that correct?

20   A.   I don't believe that's an appropriate

21   characterization, no.

22   Q.   Okay.  Were you leaving open the idea

23   that between March 24th and March 31st a

24   comprehensive agreement could be reached

25   between IUE-CWA and General Motors

71

1    Corporation?

2    A.   Depending on the nature of

3    counterproposals or development in discussions

4    with General Motors it may have created a

5    situation where we would consider the timing

6    of the filing, a 1113 and 1114.

7    Q.   Okay.  Wasn't it your expectation, at the

8    time you wrote the March 24, 2006 letter, that

9    Delphi was going forward with the filing of

10   this motion on March 31st?

11   A.   I considered that a possibility but not

12   an absolute.

13   Q.   It was only a possibility?

14    A.    A possibility.

15    Q.    How many times did Delphi meet with IUE-

16    CWA between March 24th and March 31st?

17    A.    I don't recall.

18    Q.    Was it once on March 29th?

19    A.    It may have been.  I was not involved in

20    those meetings.

21    Q.    Okay.  As of March 24th, is it your

22    understanding that IUE-CWA had enough

23    information that would allow it to accept the

24    March 24th proposal?

25    A.    I believe that the IUE had a considerable

72

1    amount of information at that time.

2    Q.    Well, that's probably true, but that

3    wasn't the question.  Did they have all of

4    their questions answered so that they could

5    make a judgment on whether to accept the March

6    24th proposal before March 31st?

7    A.    It's my view that the IUE had sufficient

8    information to produce a counterproposal, if

9    not accept it.

10    Q.    Okay.  Let's look at the consequences of

11    acceptance.  I take it by acceptance you're

12    referring to the remainder of the pages that

13    constitute Exhibit 90, correct?

14    A.    That's true.

15    Q.    And Exhibit 90 identifies two alternative

16    proposals, doesn't it?

17    A.    It's one proposal with one alternative in

18    it.

19    Q.    Okay, so it's one proposal with an

20    alternative in it.

21    A.    Yes.

22    Q.    And that proposal was to be effective as

23    to what day?

24    A.    July 3rd for most provisions, as I

25    recall.

73

1    Q.    And other provisions April 1st, correct?

2    If you at paragraph -- rather page 4,

3    effective date.

4    A.    Yes.

5    Q.    So this proposal, except in instances

6    where there's a separate date set forth, was

7    intended to be effective April 1st?

8    A.    Yes.

9    Q.    Five days after you made it, or six or

10    seven, whatever it is?

11    A.    That's true.

12    Q.    Okay.  And did the proposal have,

13    incorporated within it, a no strike clause?

14    A.    It did.

15    Q.    And it did because the existing national

16    agreements have a no strike clause and this

17    terms sheet was containing the changes?  Is

18    that correct?

19    A.    It had a no strike clause because we

20    believe that to be a competitively productive

21    provision in the agreement.

22    Q.    Well, do the pages that we identified as

23    Exhibit 90 contain a reference to a no strike

24    clause?

25    A.    I would have to review.


74


1    Q.    Would you, please?  I'd like to be clear

2    on this.  It appears on page 19.

3    A.    Yes.

4    Q.    Okay.  And the proposal also has a zipper

5    clause, correct?

6    A.    What is, as I understand, referred to as

7    a zipper clause.

8    Q.    The no waiver clause?

9    A.    Yes.

10    Q.    And that appears on page 24?  And under

11    the zipper clause on page 24 of Exhibit 90,

12    the union waives its right to bargain over any

13    matter, even matters covered under the

14    agreement?  Am I correct?

15    A.    That's correct.

16    Q.    Okay.  Now at page 3, in the box

17    identified as transformation proposals,

18    there's a list of elements of these proposals

19    that are, in fact, contingent upon General

20    Motors' funding, correct?

21    A.    That's correct.

22    Q.    And they include the wage rates?

23    A.    The higher wage rates, true.

24    Q.    The wage rates above 12.50?

25    A.    Yes.


75

1   Q.   And they include the dental plan?

2   A.   They do.

3   Q.   And payments comparable to unemployment

4   compensation supplement are also contingent

5   upon General Motors?

6   A.   Yes, the higher sub-payments.

7   Q.   And the buyout and buy-down payments are

8   all contingent upon General Motors?

9   A.   That's true.

10   Q.   Retiree medical accounts?

11   A.   As I recall, that's true.

12   Q.   And the defined contribution plan that

13   the company was proposing in March 24th is

14   contingent on General Motors' support,

15   correct?

16   A.   As I recall.

17   Q.   So, let us assume that you and Bernie

18   Quick and John Sheehan are very persuasive

19   fellows and you meet with the IUE-CWA on March

20   28th and the IUE-CWA agrees, even waives

21   ratification it's such obviously a good deal.

22   In that event, what would the wages have been,

23   effective July 3rd, 2006, under this proposal?

24   A.   Absent GM subsidy, they would have a

25   12.50 for production workers that are at

76

1   traditional rates.  And below that if they

2   were below.

3   Q.   Okay.  Now, if the Union had agreed and

4   accepted the March 24th proposal and it was in

5    effect and it had a zipper clause and a no

6    strike clause, why would General Motors

7    provide funding to raise the wages above

8    12.50?

9    A.    It was our expectation that this was a

10   proposal and a framework for discussion and

11   negotiation.  So, I think, we fully

12   contemplated that the IUE would have differing

13   views on all the provisions in here and we

14   would negotiate.

15   Q.    So that if this proposal wasn't actually

16   meant to be accepted by the IUE-CWA, isn't

17   that fair to say?

18   A.    No.  It was -- this is a competitive

19   proposal and of course we would have been

20   delighted if it were accepted. But in the

21   course of bargaining we know there's give and

22   take.

23   Q.    What would the pension provisions have

24   been if this proposal had been accepted for

25   employees who weren't under the General Motors

77

1    pension guarantee?

2    A.    The pensional provision -- I would have

3    to review.

4    Q.    Well, it's on page 19.  Please feel free

5    to review it.

6    A.    Thank you.

7    Q.    It's called personal savings plan, but I

8    believe you would agree with me it's intended

9    to replicate a pension?

10    A.    Yes.  Absent GM's support I believe we

11    would have implemented a defined contribution

12    benefit.

13    Q.    Well, would you agree with me, Mr.

14    Butler, that retirement income benefits is one

15    of the critical areas of the contract?

16    A.    I believe they are.

17    Q.    And once the HRP, the early retirement

18    plan is frozen, how many IUE employees would

19    not be eligible for the GM guarantee?

20    A.    I don't specifically recall off the top

21    of my head.

22    Q.    2,000, in that order of negative?

23    A.    It's a fair number.

24    Q.    Okay.  And under the proposal at page 19,

25    under personal savings plan under the GM

78

1    assisted proposal, "The corporation will

2    provide a base contribution and a match of

3    employee savings."  Correct?

4    A.    Yes.

5    Q.    Now, this March 24th proposal doesn't

6    even identify what the pension contributions

7    will be by Delphi even if Delphi got GM's

8    support, correct?

9    A.    That's true.

10    Q.    And if the IUE accepted the March 24th

11    proposal, what incentive would General Motors

12    have for providing money into Delphi to use to

13    provide contributions to a personal savings

14    plan for the thousands of IUE members who were

15    not under the guarantee?

16    A.    It was our hope and expectation that

17    through the course of bargaining that would be

18    defined.

19    Q.    So you had no expectation, again let me

20    ask you, that the IUE would or could accept

21    what you've identified is the March 24th

22    proposal, isn't that true?

23    A.    I believe that this provided a framework

24    for bargaining.

25    Q.    Well, let's look at the -- page 20, the

79

1    next page, just continuing thought for a

2    moment.  Where it says, "in the absence of

3    such," meaning GM's support, "the corporation

4    will implement a defined contribution benefit

5    for future benefit accruals where

6    appropriate."  That's what it says, correct?

7    A.    That's correct.

8    Q.    So that in the event there was no GM

9    support, the pension offer in the March 24th

10    proposal was to have the corporation implement

11    a plan in the future at an undisclosed amount

12    where the corporation thought it was

13    appropriate, isn't' that correct?

14    A.    Subject to bargaining.

15    Q.    Okay.  Would you also agree with me, Mr.

16    Butler, that post-retirement healthcare is a

17    critical subject for bargaining and has been

18    between IUE-CWA and Delphi?

19    A.    I would agree.

20    Q.    And, am I also accurate that the

21    healthcare proposal for retirees -- let me

22    withdraw that.  Am I accurate that on page 21,

23    the healthcare proposal for actives that would

24    cover them when they retire is a retiree

25    medical account?

80

1    A.    Yes, I believe that's true.

2    Q.    Now, does this proposal, the retiree

3    medical account proposal, it's also contingent

4    upon General Motors' support, correct?

5    A.    That's correct.

6    Q.    But isn't it true that the proposal

7    doesn't even identify how much of a

8    contribution the corporation will make to

9    covered employees into this retiree medical

10    account?

11    A.    True, subject to bargaining.

12    Q.    And if there were no GM support, what

13    would the contribution be?

14    A.    It would be topic of bargaining.

15    Q.    Okay.  Now all of this bargaining, if we

16    had accepted the proposal would take place in

17    a context in which there was an active no

18    strike clause, correct?

19    A.    If the proposal were accepted on its

20    face.

21    Q.    So that the bargaining would essentially

22    consist of the union saying it would really be

23    nice if you guys set up a retiree medical

24    account and Delphi would have right to say

25    well, we'd rather not.  And that would be the

81

1    end of the bargaining, isn't that correct?

2    A.    If the union accepted this proposal

3    without counterproposal, that could occur.

4    Q.    Let's look at the buyout provisions that

5    appear on page 13.  The bottom of page 13.

6    The buyout provisions are also contingent upon

7    General Motors' support, correct?

8    A.    That's true.

9    Q.    And, the language of the offer of March

10   24th provides "in the absence of such support

11   the corporation will discuss implementation of

12   affordable severance pay provisions."

13   Correct?

14   A.    That's correct.

15   Q.    Now, in a context in which the union,

16   IUE-CWA, has accepted your March 24th

17   proposal, what would the union's recourse be

18   in the event those discussions were not

19   satisfactory to the union?

20   A.    In the event that this were accepted

21   without counterproposal negotiation?

22   Q.    Yes.

23   A.    The recourse would be continued

24   discussions.

25   Q.    And, if, at some point, the company said

82

1    there's a zipper clause in the contract,

2    fellows, we're tired of discussions.  What

3    would the union's opportunity to protest that

4    be?

5    A.    Contractually, it would be limited.

6    Q.    Limited to nothing, correct?

7    A.    Without counterproposal in advance.

8    Q.    Now, we've used the phrases sub-benefits

9    a couple of times, there may be people in the

10    room who don't know what that is, why don't

11    you describe it?

12    A.    Sub-benefits are supplemental

13    unemployment benefits which wrap around or

14    supplement worker unemployment benefits.  And

15    as a general proposition for traditional

16    employees, provide approximately 95 percent of

17    take-home pay.  You know, when combined with

18    unemployment benefit.

19    Q.    Now, would you agree with me that that's

20    also an important topic of collective

21    bargaining from the point of view of job

22    security for union members?

23    A.    It's been an important point -- or topic

24    of discussion as it relates to income

25    security.

83

1    Q.    Okay.  Now, I'd like to direct your

2    attention to page 15 of the March 24th

3    proposal.  Do you have that?

4    A.    I do.

5    Q.    The first point in the proposal is to

6    eliminate the existing sub-plan, correct?

7   A.   That's correct.

8   Q.   And isn't it a fact that your proposal

9   indicates that "payments comparable to sub,

10  for certain layoffs during the transformation

11  period, will be discussed by the parties?"

12  A.   That's correct.

13  Q.   So again, in the context in which the

14  union IUE-CWA has accepted your March 24th

15  proposal, those discussions could easily

16  result in a denial to the union of any sub-

17  payments, correct?

18  A.   Sub-payments are not a competitive

19  practice in our industry.  In any event, the

20  IUE accepted this proposal on its face; it

21  could result in that circumstance.

22  Q.   In fact, the proposal includes a maximum

23  on how much such payments can be, at page 15,

24  correct?

25  A.   That's true.

84

1   Q.   And the proposal doesn't have a minimum,

2   does it?

3   A.   No, it does not.

4   Q.   As I understand the position of Delphi

5   and its negotiations with IUE-CWA, you've made

6   a wage proposal of 12.50 an hour on the

7   judgment that that is what you need to be

8   competitive, correct?

9   A.   That's true.

10  Q.   And is it also accurate to state that in

11  your main declaration, beginning in paragraph

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

12    83, you identify the process that Delphi went

13    through to construct, in effect, its 12.50

14    wage offer?

15    A.    That's true.

16    Q.    And you identify the data points, I

17    believe you call them that were used in your

18    construction of the $12.50 offer?

19    A.    That's true.

20    Q.    And the first data point is the fact that

21    certain supplemental agreements between Delphi

22    and the IUE have starting wages -- I'll leave

23    out a few words, which produce an all in labor

24    rate under 20 dollars an hour?

25    A.    That's true.

85

1    Q.    Now, those agreements between IUE and

2    Delphi, did they apply to any existing

3    employees, when they were made between the

4    parties?

5    A.    I'm sorry, could you repeat it again?

6    Q.    Weren't those agreements restricted to

7    new hires?

8    A.    By and large that's true.

9    Q.    Well, is it by and large or is it true?

10    A.    There were, I believe, certain agreements

11    where wage increases and COLA was foregone as

12    in Kettering that applied to existing

13    employees.  The starting wages were for new

14    hires.

15    Q.    The starting wages were for new hires.

16    Those agreements for competitive wages, apart

17   from the Kettering example, did not require

18   anyone to give up any wages they had already

19   earned, correct?

20   A.   That's correct.

21   Q.   Now, the second data point had to do with

22   estimated LIBOR rates of 45 competitors, is

23   that right?

24   A.   That's true.

25   Q.   And the competitive average of those 45

86

1   competitors that Delphi selected, wage was

2   $13.09 ?

3   A.   That's true.

4   Q.   What was the range?  What were the

5   highest rates paid by your competitors?

6   A.   I don't specifically recall.

7   Q.   Well, of the 45 competitors can you tell

8   us what they range from, from low to high?

9   A.   I believe they were as low as the seven

10   to eight dollar range and somewhere in the 14,

11   15 dollar range.

12   Q.   And that was, again, some of your

13   competitors?

14   A.   That's true.

15   Q.   Now, your next data point was as a result

16   of this so-called growth and opportunity

17   program maintained by General Motors?

18   A.   Yes.

19   Q.   And under that program, the lowest

20   competitive rate was 14 dollars an hour?

21   A.   Yes, I believe that's true.

22    Q.    And that was the cheapest of the 13 --

23    meaning lowest hourly rate, growth and

24    opportunity bids?

25    A.    That was the lowest as expressed in

87

1    future years.

2    Q.    Okay.  Now that leaves 12 other

3    competitors that were included with the

4    information you got from General Motors,

5    correct?

6    A.    I'm sorry, can you repeat the question?

7    I was reading.

8    Q.    Under paragraph 87, you're reporting on

9    13 competitors you've learned information

10    about from General Motors?

11    A.    True.

12    Q.    You've indicated that the lowest of those

13    13, the lowest rate was 14 dollars?  Correct?

14    A.    I just re-read the information here in my

15    declaration and I think it said indicated an

16    average base wage of approximately 14.

17    Q.    Yes, that's the lowest of the 13

18    competitors, correct?  Take a minute to read,

19    if you need.

20    A.    I don't believe it says loss, I think it

21    says average.

22    Q.    All right.  Let's look at this sentence

23    and see if we can figure out what it means.

24    "According to this data, the average labor

25    costs included in the most competitive

88

1    supplier bid was slightly more than 23 dollars

2    per hour."  Now I read that to say that your

3    14 dollar calculation was from among the lease

4    expensive of the 13 growth and opportunity

5    bids that Delphi reviewed?

6    A.    I believe what this is saying is we

7    looked at 13 bidders who wanted business from

8    us.

9    Q.    Right.

10   A.    And then averaged that and took what

11   would be the average base wage, not lowest,

12   and therefore 14 dollars.

13   Q.    Okay.  Let's look at the next data point,

14   that's a BLS data, which is Bureau of Labor

15   Services, correct?

16   A.    I think it's Bureau of Labor and

17   Statistics.

18   Q.    Statistics, correct, yes statistics.  Now

19   in paragraph 93, your data indicates that

20   average hourly wages for the most populated

21   job categories among all auto supply industry

22   employers was $15.37, correct?

23   A.    It is correct, and the auto supply does

24   include the big three Delphi and Vestion.

25   Q.    Okay.  That average is 15.37?


89

1   A.    That's correct.

2   Q.    And then your next data point, and I

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

3    believe your second to last was, the study

4    that was conducted by the Center for

5    Automotive Research?

6    A.    Yes.

7    Q.    And that shows that the average for UAW

8    represented employers was $16.23, is that

9    correct?

10   A.    That's true.

11   Q.    Then your final data point has to do with

12   penny sheets you constructed?

13   A.    Yes.

14   Q.    From competitors what you assumed to be

15   competitor rates?

16   A.    Yes.

17   Q.    And the penny sheet comparisons that you

18   constructed was high as $14.38 an hour?

19   A.    That's true.

20   Q.    Let me ask you some questions on a

21   different topic, Mr. Butler.  I believe you

22   testified at the KECP hearing that was

23   conducted in this proceeding?

24   A.    No, I did not.

25   Q.    All right.  You are aware of the KECP

90

1    hearing, correct?

2    A.    I am.

3    Q.    And isn't it true that the KECP plan that

4    was approved by the Court applied to fewer

5    than 500 executives employees by Delphi?

6    A.    It's my understanding that the Court

7    approved, through human capital ,otions, a

8    program of at-risk pay incentive that covered

9    salary to non-executive employees.  And true,

10   the KECP motion, a short-term incentive for

11   at-risk pay for executives.

12   Q.    The short-term incentive through what

13   pay?

14   A.    At-risk.

15   Q.    At-risk pay, I see.  I'm trying to

16   understand what it was that was approved by

17   the Court at the hearing that was held.  As I

18   understood it, the Court had approved the KECP

19   plan for fewer than 500 executives.  Am I

20   wrong about that?

21   A.    At the hearing, I believe that's true.

22   Q.    Okay.  And was there another point at

23   which the Court approved a broader plan for

24   Delphi's salary and managerial work force?

25   A.    I believe that was approved in the human

91

1    capital motion.

2    Q.    That was the motion that was approved as

3    one of the first days here in the --

4    A.    That's my recollection.

5    Q.    Okay.  And that first day -- well, we'll

6    get to that in a minute.  Now the KECP plan

7    for the executives, based on the performance

8    of Delphi to date, isn't it clear that Delphi

9    will meet the financial targets that were

10   included for the first six months of 2006?

11   A.    Putting on the performance for the

12   following three months, the second quarter

13    there could be a pay-out.

14    Q.    Has Delphi adopted a short-term incentive

15    plan for its remaining salaried managerial

16    employees?

17    A.    As approved in the human capital motion

18    we are, in fact, in position to execute that

19    plan.

20    Q.    Well, it's in place as we stand here

21    today, right?

22    A.    Yes, it is.

23    Q.    And that plan applies to all non-

24    executive salaried to managerial employees in

25    the United States?

92

1    A.    It largely does.

2    Q.    It applies to about 14,000 people, isn't

3    that correct?

4    A.    Approximatley.  There are some

5    subsidiaries that do not participate in this.

6    Q.    And that plan has the same OBIDAR UG

7    targets for the corporation and business units

8    as have been applied to the executive KECP

9    plan, correct?

10    A.    The overall target formula is the same --

11    its application on each individual, of course,

12    is variable on the cooperative compensation.

13    Q.    Well, I understood that the KECP plan for

14    the executives, if paid at in full, would pay

15    out approxiamtely 38 million dollars?

16    A.    I believe that's correct.

17    Q.    And how much money will be paid out to

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

18    the 14,000 salaried to managerial employees if

19    their short-term incentive plan also pays out

20    at the end of June, 2006?

21    A.    I don't specifically recall an exact

22    number, I think it target lows it was on the

23    order of, I think, 60 million.

24    Q.    Sixty million.  Now, the corporation got

25    specific approval for the 38 million that is

93

1    in play on the executive KECP, correct?

2    A.    That's true.

3    Q.    At what point did the Court enter an

4    order approving 60 million dollars for a

5    short-term incentive plan on a similar basis

6    for other Delphi salaried to managerial

7    employees?

8    A.    I'm not aware.  I believe the non-

9    executives have been considered normal course

10    compensation.

11    Q.    So the 60 million then is normal course

12    for Delphi?

13    A.    It is normal course for us to have an

14    element of at-risk pay within a competitive

15    structure to have an element of at-risk pay in

16    a complete obstructer for our non-executive

17    employees.

18    Q.    And the -- was there an element of at-

19    risk pay for these 14,000 executives in 2003?

20    A.    Executives?  I'm sorry can you --

21    Q.    Fourteen thousand non-executive in 2003?

22    A.    There was.

23    Q.    And isn't it true that there was no pay-

24    out to them under that plan in 2003?

25    A.    That's true, there was no pay-out.

94

1    Q.    And in 2004, isn't it also true that

2    there was no pay-out on the short-term

3    incentive plan?

4    A.    I believe that's true.

5    Q.    And in fact, in 2005 it's also true that

6    there was no pay-out under the short-term

7    incentive plan?

8    A.    I believe that's correct.

9    Q.    Isn't it true that your belief, looking

10    at the performance to date, that it is likely

11    to generate a pay-out for both executives and

12    the 14,000 non-executive personnel?

13    A.    Could I see the deposition, please?

14    Q.    Sure.

15            MR. KENNEDY:  Your Honor, you mind

16    if I had this up to him?

17            THE COURT:  That's fine.

18    BY MR. KENNEDY:

19    Q.    Referring to page 81, lines 18 through

20    24.

21    A.    It's my belief that if the performance

22    date, if it were to continue for the entire

23    period, as I just mentioned, it is likely

24    there would be payoff if the performance

25    continued.

95

1   Q.   Okay.  As we stand here today, some five

2   months into the first six months of 2006,

3   knowing that the company is 500 million

4   dollars ahead of where they were expecting to

5   be according to their gloomy state scenario,

6   do you have any reason to believe the bonus

7   pay-out will not be made in connection with

8   the first six months of 2006?

9           MR. BUTLER:  Objection to the form

10   of the question, and the characterization

11   gloomy.

12           MR. KENNEDY:  All right, I withdraw

13   gloomy.

14           THE COURT:  Is there a question or

15   not?

16           MR. KENNEDY:  Yes, there is a

17   question.

18   BY MR. KENNEDY:

19   Q.   Do you have any reason to believe,

20   knowing what you know, given where we are,

21   that there won't be a pay-out of both these

22   programs in connection with the first six

23   months of 2006?

24   A.   Because EBITDA ROOG is different than the

25   500 million.  I would not speculate on that.

96

1   Q.   So, do I infer from that that you don't

2   have any particular knowledge which would lead

3   you to believe that it won't be paid out in

4    six months?

5    A.    If the performance continues, I believe,

6    that it is likely there'll be a pay-out.

7    Q.    And would that pay-out be all 60 million

8    for the salaried and managerial employees?

9    A.    I don't know at this point.

10   Q.    The salaried to managerial employees that

11   will receive the pay-outs include, first line

12   supervisors and other individuals working at

13   IUE-CWA represented plants, correct?

14   A.    That's true.

15   Q.    And the pay-out of bonus will occur

16   sometime in July of 2006, isn't that most

17   likely?

18   A.    Normal pay-out would be July or August.

19   Q.    Certainly in July people would know

20   whether there's going to be a pay-out, isn't

21   that fair to say?

22   A.    I believe that's fair to say.

23   Q.    And, if IUE-CWA had accepted the March

24   24th proposal, that payment would be made

25   almost, or the news of the payment would be

97

1    almost simultaneous with the reduction in

2    wages from 26 dollars to 12.50.  Isn't that

3    also correct?

4    A.    The timing would be -- would coincide

5    within perhaps a couple of weeks.

6    Q.    Now, you're aware of IUE-CWA ratification

7    procedures, correct?

8    A.    I am.

9   Q.   And they ultimately call for a membership

10  vote?

11  A.   I believe that's true.

12  Q.   Would you -- I assume you've watched

13  these contract ratification procedures over

14  your career as a company spokesman?

15  A.   I have.

16  Q.   Don't you think that would have an impact

17  on the ability of a labor union to have

18  ratified a collective bargaining agreement if

19  all the supervisors in the plant were, at the

20  same time, getting a bonus that they hadn't

21  gotten in the past four years?

22  A.    I think the ratification votes are

23  largely dependent on what happens for the

24  individual who is voting.  And so, dependent

25  on the arrangement negotiated, particularly if

98

1   it had soft landings, that would be the

2   biggest determinant of the ratification vote.

3   Q.   And how about through the IUE-CWA

4   employees that we know from our prior

5   discussion don't have soft landing, what about

6   them?

7   A.    I think soft landings are a function of

8   the bargaining.

9   Q.   In looking at your declaration, I noticed

10  that there are references to both the hourly

11  represented plan and the SRP.  The SRP, I take

12  it, is a salary retirement plan?

13  A.   That's correct.

14    Q.    And that's the plan that Delphi has

15    indicated is going to be frozen as of January

16    1, 2007?

17    A.    That's true.

18    Q.    It's my understanding that Delphi also

19    maintains another pension plan for its

20    executives.  Is that correct?

21    A.    It has a non-qualified plan for --

22    Q.    Is that part of that plan?

23    A.    It's called a SERP, supplemental

24    executive retirement program.

25    Q.    Okay.  And, I didn't catch the

99

1    announcement that that supplemental executive

2    retirement plan is being frozen on January 1,

3    2007.  Is it?

4    A.    That program remains capped as provided

5    for in the human capital motion.

6    Q.    Capped, meaning what?

7    A.    It has a pay-out limit on it that remains

8    in place.  So it was reduced.

9    Q.    It's reduced, but effective January 1,

10    2007, there will still be a pension plan in

11    place for the executives, isn't that correct?

12    A.    There will be a non-qualified plan that

13    exists.

14            MR. KENNEDY:  Could I have just a

15    minute, Your Honor?

16            THE COURT:  Yes.

17            MR. KENNEDY:  I have no further

18    questions, Your Honor.

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

19          THE COURT:  Okay.

20  CROSS-EXAMINATION BY

21  MR. PETERSON:

22  Q.   Good morning, Mr. Butler.

23  A.   Good morning, counselor.

24  Q.   Lowell Peterson for the Steelworkers.

25  A.   Good morning.

100

1  Q.   Mr. Butler, the Steelworkers represent

2  employees at two Delphi plants, correct?

3  A.   That's true.

4  Q.   That would be the Home Avenue plant in

5  Dayton, Ohio, which has approximately 700

6  hourly employees represented by the

7  Steelworkers.

8  A.   I believe that's approximately correct.

9  Q.   And the Vandalia, Ohio plant which has

10  approximately 300?

11  A.   I believe that's correct.

12  Q.   Now, as I understand it from the

13  pleadings that the company has filed in

14  connection with the motion to reject the GM

15  Executory Contracts, the Home Avenue plant is

16  scheduled to be closed by Delphi, is that

17  accurate?

18  A.   I don't believe that's the case.

19  Q.   What is going to happen to the Home

20  Avenue plant?

21  A.   I believe it is either a sale or wind

22  down.

23  Q.   Have any sale discussions been had with

24    buyers with respect to the Home Avenue plant?

25    A.    I believe there have been discussion with

101

1    General Motors, but I'm not aware of any with

2    buyers.

3    Q.    All right.  This has been identified as a

4    plant that loses somewhere in the vicinity  --

5    it has operating margin losses of nearly 50

6    percent per year, is that accurate?

7    A.    That's true.

8    Q.    All right.  And you still think you might

9    be able to sell that plant?

10    A.    As a restructured facility.  It's my

11    understanding that the motor mount business is

12    believed to have -- that the motor mount

13    business may be a possibility for sale.

14    Q.    All right.  But, under the company's

15    plans Home Avenue will not be part of a

16    reorganized Delphi, correct?

17    A.    It would -- if sold, would not be part of

18    Delphi.

19    Q.    Or closed.

20    A.    Or if closed.

21    Q.    But there are no plans to keep it open as

22    a part of Delphi, correct?

23    A.    Not that I'm aware of.

24    Q.    All right.  So the nearly 700

25    Steelworkers represented employees at Home

102

https://vip21.veritextllc.com/myfiles/116593am.TXT

1    Avenue go off the books in terms of the labor

2    cost equation for Delphi, correct?

3    A.    They would no longer be part of Delphi.

4    Q.    All right.  So that leaves just the

5    Vandalia plant?

6    A.    That's true.

7    Q.    All right.  Now, the Steelworkers

8    represented employees at Delphi do not have

9    the flow back rights that UAW represented

10   employees have, correct?

11   A.    There's no tripartite agreement, that's

12   true.

13   Q.    All right.  And they are not entitled to

14   any relocation payments such as those that UAW

15   represented employees are eligible for,

16   correct?

17   A.    Not at present.

18   Q.    All right.  And Delphi has not even made

19   an attrition program proposal to the

20   Steelworkers, correct?

21   A.    I believe there's been a discussion

22   regarding the attrition program and I believe

23   we are engaged with General Motors around the

24   prospect of extending comparable attrition

25   program or suitable attrition program.  And, I

103

1    believe, that's been discussed with steel

2    worker leadership.

3    Q.    Well, that's right.  Delphi has promised

4    to make an attrition proposal to Steelworkers,

5    correct?

6   A.   We have indicated that's our desire.

7   Q.   All right.  But you haven't done it yet?

8   A.   We have not concluded the discussions

9   with General Motors for the subsidies that

10  exist in the UAW version.

11  Q.   All right.  So you haven't made a

12  proposal to the Steelworkers?

13  A.   We have not provided a formal, written

14  proposal to the Steelworkers.

15  Q.   So, in connection with the transformation

16  of Delphi, at this point, as we sit here in

17  the middle of a trial to reject our contracts

18  and to modify retiree medical benefits, there

19  is no soft landing in place for any

20  steelworker represented employees, isn't that

21  correct?

22  A.   As part of our March 24th proposal, and

23  subject to GM subsidy, we did have the buy

24  outs, I believe, that were included in them.

25  In GM subsidy we had the buy outs that were


104


1   included in that proposal, the 140,000 and

2   70,000, as I recall.

3   Q.   Yeah, I want to highlight that a little

4   sub phrase, subject to GM subsidy.

5   A.   That's true.

6   Q.   And GM has not agreed to pay that

7   subsidy, correct?

8   A.   At this time, no.  They have indicated to

9   -- that they are interested in resolving the

10  issue, and will provide support broadly, but

11    they have not specifically agreed to that.

12    Q.    All right.  So at this point in time,

13    unless GM decides to write some checks or

14    otherwise subsidize Delphi's operations, there

15    is no soft landing for Steelworkers

16    represented employees?

17    A.    There our November 15th proposal would be

18    operative.

19    Q.    And that does not include an attrition

20    program, buyouts, there's no flow-back,

21    correct?

22    A.    That's correct.

23    Q.    All right.  They're just on their own?

24    A.    There are limited elements in the

25    November 15th proposal that are industry

105

1    competitive.

2    Q.    Right.  I would concur with your

3    characterization that it's limited.  Now, one

4    of the features of an attrition program, as I

5    understand it, at least in terms of the broad

6    outlines that have been discussed in court,

7    for example, would be that the higher paid

8    employees -- higher paid hourly employees

9    would be the ones more likely to be eligible

10    to take buyouts under the attrition program,

11    is that a fair statement?

12    A.    Under the retirement provisions that's

13    true, under the buyout provisions, if a buyout

14    is fashioned, that is available to everyone.

15    Q.    All right.  In the buyout, payments, of

16    course, would be greater to people with higher

17    seniority, correct?

18    A.    Greater than 10 years it is different.

19    Q.    All right.  I'll ask you to keep that 10

20    year figure in your mind, I'm going to diverge

21    a little bit from that line of inquiry.  But

22    let me ask you about your experience as a

23    negotiator.  You've been negotiating contracts

24    with unions for, I think you said, 25 years?

25    A.    Approximately.

106

1    Q.    And, have you ever been engaged in

2    collective bargaining in the 1113 contacts

3    before this?

4    A.    No, I have not.

5    Q.    All right.  Have you ever been engaged in

6    bargaining with the union in which wage and

7    benefit cuts and language changes of this

8    magnitude have been placed in on the table

9    before you?

10    A.    I have not.

11    Q.    All right.  So even with -- if you will

12    permit my characterization, even with more

13    modest proposals it takes a certain amount of

14    time to get to yes in the course of collective

15    bargaining with the union, correct?

16    A.    I believe in difficult bargaining it

17    takes not only time, but it also takes

18    deadlines.

19    Q.    Time and deadlines, both.  Now, you've

20    negotiated with the Steelworkers before,

21    correct?

22    A.    At limited level, true.  Yes.

23    Q.    You're familiar with the procedures used

24    by, at least in general terms, you're familiar

25    with the procedures used by Steelworkers,

107

1     Local 87L, it represents the Delphi workers,

2     correct?

3     A.    Generally, yes.

4     Q.    And, the Local appoints a negotiating

5     committee, correct?

6     A.    That's true.

7     Q.    And after the negotiating committee meets

8     extensively with the company's

9     representatives, whatever it tentatively

10    agrees on has to be approved by the Local

11    union's executive board, is that right?

12    A.    That's my understanding.

13    Q.    And then after the executive board

14    approves, if it does approve that, those

15    tentative terms, the full membership of the

16    local has to vote to ratify that, correct?

17    A.    I believe that's true.

18    Q.    Now, in this case -- I'll call your

19    attention to your supplemental declaration.  I

20    think that's Exhibit 8.

21    A.    Yes.

22    Q.    Now you've testified, or in your

23    declaration you make a statement about, in

24    general terms, that there has been all kinds

25    of meetings with the various unions.  But if,

108

1    I'll call your attention to -- I think it's

2    Exhibit A of the declaration which lists the

3    meetings that you, personally, have been

4    involved with.

5    A.    Yes.

6    Q.    You can take a moment to review it, but

7    as I see it, you've only been engaged in one

8    meeting with the Steelworkers post-petition.

9    A.    I'm sorry, can you repeat the question?

10    I was reading.

11    Q.    You've only been engaged -- you,

12    personally, have only been involved in one

13    meeting with the Steelworkers post-petition?

14    By post-petition I mean the filing of the

15    Chapter 11 petition in this Court.

16    A.    Chapter 11, not 1113, 1114?

17    Q.    Chapter 11.

18    A.    Chapter 11.  No, I don't believe that's

19    true.

20    Q.    No, you don't believe that's true.

21    You've had more than one meeting with the

22    Steelworkers?

23    A.    I believe that's true, yes.

24    Q.    On October 21, at the Troy Marriott,

25    there's something called a financial

109

1    presentation, right?

2    A.    That's true.

3    Q.    That's not a negotiating meeting, that's

4    just a presentation of financial condition,

5    correct?

6    A.    That is a review of financial materials.

7    And as I recall, that is where we put our

8    first October proposal on the table.  So, I

9    would call that a negotiating session as well.

10    Q.    But in your declaration which you filed

11    in connection with this motion, you didn't

12    call it a negotiation, you called it a

13    financial presentation?

14    A.    I think this was prepared by my

15    administrative assistant and she just declared

16    the topics.

17    Q.    So it's wrong?

18    A.    I think it's incomplete.

19    Q.    Did you review it before you signed your

20    declaration?

21    A.    I did.

22    Q.    All right.  You didn't correct that?

23    A.    No, I did not.

24    Q.    The other reading that I see here is on

25    January 30, 2006.  Right, you see that?

110

1    A.    Yes, I do.

2    Q.    USWA rubelling up meeting?

3    A.    Yes.

4    Q.    All right.  Rubelling up meetings are

5    discussion about possible layoffs, correct?

6    A.    No, that's not true.

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

7    Q.    On January 30, 2006, there was no actual

8    proposal on the table for modification of the

9    collective bargaining agreements, correct?

10   A.    The rubelling up meeting is -- rubelling

11   up is terms that we used to try to bring each

12   other up to a common state of knowledge, if

13   you will.  And we were beginning, and had

14   entered into three way discussions with

15   General Motors and the UAW and we were

16   briefing the Steelworkers' leadership at that

17   meeting.

18   Q.    Oh, I see.  So what you were -- the

19   rubelling up, as you term it, is not the --

20   what perhaps has been a term that has been

21   used by these parties before to talk about

22   what else or closing of divisions.  It's

23   simply to sort of bring everybody up to the

24   same level of knowledge?

25   A.    That's true.

111

1    Q.    So, you met with the Steelworkers for, it

2    looks like about an hour and a half, just to

3    keep them posted as to discussions that were

4    taking place with the UAW and GM?

5    A.    We shared that as well as some of the

6    elements that we were discussing with GM and

7    the UAW as it relates to what eventually

8    became the March 24th proposal.

9    Q.    And that was the last time you met with

10   the Steelworkers?

11   A.    To the best of my recollection, that's

12    true.

13    Q.    Do you know about how many people

14    attended that meeting?

15    A.    I believe, there were two representatives

16    from the -- I actually, as I sit here, I can't

17    recall specifically.

18    Q.    All right.  Now, you've mentioned the

19    March 24 proposal.

20    A.    Yes.

21    Q.    March 24 is a Friday, isn't that right?

22    A.    I believe that's correct.  I'd have to

23    check the calendar to be sure.

24    Q.    I think it is.  Now, are you aware of the

25    fact that the Steelworkers received the

112

1    proposals?  I think you've testified that

2    there was not a meeting with any of the

3    unions, they were sent out by delivery.  Are

4    you aware that the Local did not receive those

5    proposals until the following Monday, the

6    27th?

7    A.    That may be true, I'm not aware.

8    Q.    All right.  And I gather that the 1113

9    petition was filed later that week?

10    A.    I believe that's -- I believe that's

11    true.

12    Q.    All right.  Now, I don't want to repeat

13    too much of the cross-examination you've been

14    going through with other counsel, but I think

15    it's safe to say that you've identified a

16    number of elements of the March 24 proposal

17    that are contingent on specific commitments by

18    General Motors.  Pension, wage, medical,

19    retiree medical, buy out.  It's a laundry list

20    of fairly detailed provisions, is that a fair

21    statement?

22    A.   That's a fair statement.

23    Q.   All right.  So, did you really think that

24    between Friday, March 24 and Friday, March 31,

25    General Motors was going to sign on the dotted

113

1    line and agree to all of those provisions?

2    A.   In the event that there was substantial

3    discussion or counterproposal, then it would

4    have caused us to evaluate our timeline.

5    Q.   I don't think that answered my question.

6    Did you really think that General Motors was

7    going to agree to the contributions

8    contemplated by your March 24 proposal between

9    Friday, March 24 and Friday, March 31?

10    A.   I couldn't speculate on what they'd do.

11    Q.   So, you thought it was possible that in a

12    week they were going pony up, is that right?

13    A.   We would hope to have that happen,

14    although I don't know that it's likely.

15    Q.   Now, you didn't have any discussions,

16    three-way discussions with the Steelworkers,

17    Delphi and General Motors, correct?

18    A.   Not that I recall.

19    Q.   I'd like to call your attention to

20    Exhibit 91 which by my count is the March 24

21    proposal given to the Steelworkers.

22          MR. KENNEDY:  Could I trouble

23    debtor's counsel for water, please?  Thank

24    you.

25    BY MR. KENNEDY:


114


1    Q.  You there?

2    A.    Yes, I am.

3    Q.    All right.  Again, I don't want to

4    belabor this by going through the provisions

5    that are common between the various proposals,

6    but I do want to ask you some questions about

7    what these proposals mean and how they would

8    work.  We start with a general question.  I

9    know Mr. Simon, yesterday, was asking your

10    thoughts and then you were going to

11    contemplate this overnight about whether the

12    dispute resolution mechanisms in place between

13    the parties and reflect in the proposals would

14    apply in the event that a given union and

15    Delphi were not able to agree.  For example,

16    on the level of a buyout and the level of a

17    pension contribution.  Have you had a chance

18    to think about that further?

19    A.    I did think about that.

20    Q.    And those dispute resolution mechanisms

21    would not apply, correct?

22    A.    My view is, if we were not able to come

23    to terms on those elements, it's likely we

24    would not have an agreement and therefore the

25    dispute resolution would not be involved.

1   It's part of a comprehensive proposal.

2          THE COURT:  Can I interrupt?

3   Because I'm not sure that was the question

4   that Mr. Simon addressed to you.  I think

5   there are two different issues.  One is if the

6   union don't accept this proposal.

7          THE WITNESS:  Yes.

8          THE COURT:  And the other is if they

9   do.  If they do, but these contingencies the

10  open end -- not the GM contingencies, but the

11  points that Mr. Kennedy identified and there's

12  similar provisions for the Steelworkers.

13  You're not able to reach agreement on those

14  open-ended provisions, under that scenario,

15  would the dispute resolution mechanism

16  elsewhere in the collective bargaining

17  agreement apply?

18          THE WITNESS:  I believe, in that

19  case, if they accepted the agreement and then

20  I believe they would apply, subject to all the

21  other provisions.

22  BY MR. KENNEDY:

23  Q.   I'm not certain I understand that.  In

24  other words if the unions were to agree, in

25  Mr. Kennedy's hypothetical, if the unions were

116

1   somehow to sign off on this and get it

2   ratified, even with these many unresolved

3   economic and other issues, and these items

4   that are subject to further discussion between

5   the parties did not result in agreement, would

6   the parties bring those disagreements to

7   arbitration and Delphi would say we think it

8   should be 50 cents an  hour and the union

9   would say 75 cents an hour, is that what

10  you're testifying?

11  A.   I believe, the dispute resolution, our

12  intent was that would be subject to

13  negotiations to achieve whatever the dispute

14  resolution would be.

15  Q.   I still don't understand what you're

16  saying.  The point is I think the Judge has

17  got it exactly right.  If we don't have an

18  agreement between the parties, there's no --

19  the dispute resolution mechanism is a creature

20  of the agreements.

21  A.   That's right.

22  Q.  By definition it would not apply.  But if

23  there is agreement -- I guess by definition it

24  would apply -- but if there is agreement and

25  there are open terms and the parties don't

117

1   reach agreement, isn't it the case,

2   particularly with the zipper clause, that what

3   would happen is Delphi would simply set these

4   contributions in these terms, at whatever it

5   decided to set them at?

6   A.   That could be the outcome, yes.

7         THE COURT:  Can I make sure I

8   understand this?  I understand that the union,

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

9    under your proposal, if they accept it, would

10   be precluded from certain very significant

11   rights.  Such as, no strike and the zipper

12   clause.  Are you saying also they would not

13   have the right to compel arbitration over

14   whether your proposal was, you know, on the

15   open-ended items that were to be negotiated?

16   Would they have the right to invoke the

17   arbitration provisions of the collective

18   bargaining agreement?

19          THE WITNESS:  That we did not

20   stipulate with specificity which provisions

21   would be arbitrable and which would not.  And

22   that's what I referred to a matter of

23   negotiations.

24          THE COURT:  Okay.

25   BY MR. KENNEDY:

118

1    Q.   All right.  But your previous answer is,

2    in fact, that the company's position is the

3    open-ended items would not be subject to

4    arbitration?

5    A.   I said that could be an outcome,

6    depending on which provisions were arbitrable

7    and which not.

8    Q.   Well the arbitration -- you're familiar

9    with -- I don't want to get too arcane, but

10   are you familiar with the distinction between

11   interest arbitration and contract arbitration?

12   A.   No.  As, I -- not in present mind.

13   Q.   All right.

14          MR. SIMON:  Your Honor, I realize

15    that this is unorthodox, but given what I

16    sense is the Court's puzzlement and what I can

17    assure you is mine, might it be appropriate,

18    might I ask leave to try and clarify what I

19    think is a fairly significant issue?  If not,

20    I'll wait.  It just seems to me --

21          THE COURT:  Well, I think his answer

22    speaks for itself.  And there may be questions

23    on redirect and we'll see what happens.

24          MR. SIMON:  Thank you very much.

25          MR. KENNEDY:  I'd be happy to yield

119

1    to the senior senator from New York, but --

2          MR. SIMON:  The unkindness cuttable.

3    BY MR. KENNEDY:

4    Q.    Lets take a look at 91.  I want to make

5    sure I understand how some of these provisions

6    would apply -- Exhibit 91 -- how some of these

7    provisions would apply as proposed by Delphi.

8    Now, I think that you've testified that the

9    wage provisions, if you will, which was

10    appendices A-1 and A-2.

11    A.    Yes.

12    Q.    Those were essentially the same proposals

13    made to all of the unions, correct?

14    A.    They were largely the same, they did make

15    proviso where local new hire rates were lower

16    than the proposed starting rate that would

17    remain in place.

18    Q.    So, for example -- well, let me take that

19    one at a time.  Let's look at Appendix A,

20    that's the sort of competitive benchmark

21    proposal, correct?

22    A.    Let me see.

23    Q.    A-1.

24    A.    Yes.

25    Q.    The concept, as I understand your

120

1    testimony on cross and in your declaration,

2    concept of coming up with the wage rates

3    proposed in Appendix A-1 was to hit a

4    competitive wage rage that would permit the

5    debtors to compete in your market, correct?

6    A.    I'm sorry, I'm looking at Appendix A-1

7    and when I said yes, I meant I had A-1.

8    Q.    I'm sorry.

9    A.    This appears to me to be the --

10    Q.    Yes.

11    A.    Okay.

12    Q.    All right.  So those wages were, at some

13    level of detail, arrived at as a way to hit

14    what could be termed the market rate, a

15    competitive rate that Delphi could pay in its

16    market, correct?

17    A.    I believe that's a fair statement.

18    Q.    All right.  So under this proposal,

19    anyone at the remaining Steelworkers'

20    facility, which would be Vandalia, hired on or

21    after July 1, 2006, would either be hired at

22    this rate or if there's a lower, new hire rate

23    at Vandalia at the lower rate, correct?

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

24    A.    That's correct.

25    Q.    And, in fact, there is a lower rate for

121

1    new hires at Vandalia, correct?

2    A.    That's true.

3    Q.    In fact it's substantially lower, is that

4    not correct?

5    A.    I believe that's true.

6    Q.    It's eight dollars an hour?

7    A.    That's my understanding.

8    Q.    All right.  And that new hire provision

9    at Vandalia does not have a grow-in or parity

10   component, correct?  In other words, people

11   don't grow into the traditional rate, they

12   stay at rate and increase incrementally, wants

13   and never gets to the traditional rate,

14   correct?

15   A.    I believe they grow from eight dollars to

16   a somewhat higher rate, but they do not go to

17   traditional rate.

18   Q.    All right.  They go to ten dollars an

19   hour?

20   A.    That's my understanding.

21   Q.    And then stay there?

22   A.    Absent other increases that are

23   negotiated.

24   Q.    So, in fact, the rate for new hires at

25   Vandalia will be lower than the competitive

122

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

1    rate that Delphi has identified, correct?

2    A.   For new hires, that's correct.

3    Q.   All right.  Well, let's talk about what

4    happens to existing employees under the

5    proposal.  And I believe that is at page 12 of

6    the proposal.  All right?

7    A.   I have page 12.

8    Q.   Down towards the bottom, actually at the

9    bottom, tradition and tiered to employees at

10   the Vandalia site will be converted to tier

11   three wages.  Tier three wages are what, Mr.

12   Butler?

13   A.   Tier three wages, I believe, are the

14   eight dollar an hour wages.

15   Q.   So, someone at Vandalia who's making 27

16   dollars an hour, for example, would go to

17   eight dollars an hour?  Is that the proposal?

18   A.   That appears to be.

19   Q.   All right.  That, as I think you've just

20   testified, is substantially below what Delphi

21   has identified to be the competitive rate it

22   needs?

23   A.   It is below the competitive rate we have

24   identified.

25   Q.   Now, with respect to the nontraditional

                                            123

1    employees at Vandalia currently, that would be

2    the majority of employees at Vandalia,

3    correct?

4    A.   I believe that's true.

5    Q.    And that would include so-called tier

6    twos as well as the full 27 dollar an hour

7    people?

8    A.    The -- I'm sorry, the --

9    Q.    Tier two as you identified them on page

10    12?

11    A.    Yes, there'd be tier two.  I understood

12    you to say that the non-traditional and you

13    included the 27 dollar an hour people in that.

14    I'm confused, I'm sorry.  Could you restate

15    the question?

16    Q.    With respect to the people who are not

17    getting the traditional 27 dollar an hour rate

18    at Vandalia --

19    A.    Yes.

20    Q.    -- they also had different benefit

21    structures, correct?

22    A.    That's true.

23    Q.    All right.  They don't have the same

24    level, same generosity from -- there's one

25    term, they don't have the same amount of

124

1    benefits in the medical arena as the

2    traditional employees, correct?

3    A.    I believe that's the case.

4    Q.    They're not in the defined benefit

5    pension plan, correct?

6    A.    I believe in some instances that's true.

7    I'm not aware of all the details of that.

8    Q.    And with respect to -- between a third

9    and a half of the Vandalia employees, they do

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

10    not currently have a retiree medical benefit

11    guarantees by Delphi, correct?

12    A.    I believe they have a medical spending

13    account.

14    Q.    Now, you're familiar with the concept of

15    OPEB, I think you testified about it, correct?

16    A.    Yes, I am familiar.

17    Q.    And you're familiar with the fact that

18    Delphi has identified a certain accumulative

19    OPEB amount that it carries on its books that

20    it seeks to take off of its books through

21    these proposals, correct?

22    A.    That's true.

23    Q.    With respect to the employees who have

24    these medical spending accounts, there is no

25    such accumulated OPEB amount that needs to be

125

1    taken off the books, correct?

2    A.    I believe that with regard to medical

3    spending accounts, there is some limited OPEB

4    liability.

5    Q.    It is a fraction of what it is for a

6    traditional employee who has actual benefit

7    guarantees from the corporation?

8    A.    I think that's a fair characterization.

9    Q.    Because, in fact, the company's only

10    obligation to these employees is the defined

11    amount per hour that the corporation

12    contributes into these medical spending

13    accounts, correct?

14    A.    That's true.

15    Q.    And that's the cap on the liability,

16    there's no backstop on the part of the

17    corporation, correct?

18    A.    That's correct.

19    Q.    Let me bring you back to the proposal,

20    the March 24 proposal, page 4.  The COLA

21    provision, cost of living allowance.

22    A.    Yes.

23    Q.    Well, isn't it the fact that there is --

24    that the union has already waived the COLA for

25    the balance of the contract at the Vandalia

126

1    plant?

2    A.    I don't recall.

3    Q.    Do you recall that the Steelworkers and

4    Delphi engaged in, what they call, fix-it

5    negotiations in the fall and winter of 2004 at

6    Vandalia?

7    A.    I do recall that.

8    Q.    And that was in response to a statement

9    by management that Vandalia might, in fact,

10    close unless certain adjustments were made to

11    the operations and the labor costs at

12    Vandalia, is that right?

13    A.    The need to improve competitiveness and

14    get viable site, it's true if we were not able

15    to do that.  Site would not be viable.

16    Q.    All right.  And to translate the need to

17    improve competitiveness means lower costs?

18    A.    That's one element.

19    Q.    All right.  Including lower labor costs?

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

20    A.    That's one element, yes.

21    Q.    All right.  And in fact the union agreed

22    to lower labor costs in a number of areas,

23    correct?

24    A.    I believe that's true.

25    Q.    And you recall now at this point where

127

1    that included waiving the COLA?

2    A.    I don't recall as I sit here.  I'm not the

3    principle bargainer with the Steelworkers.

4    Q.    Do you recall that those negotiations also

5    resulted in the Steelworkers agreeing to

6    forego certain other payments that were

7    scheduled to take place over the life of the

8    contract, bonus and other payments?

9    A.    I just recall that there were a number of

10    changes made that improved the competitiveness

11    and reduced the labor cost.

12    Q.    And, in fact, there were certain work-rule

13    changes that were negotiated in the course of

14    those fix-it negotiations, correct?

15    A.    I believe that's true.

16    Q.    All right.  And all of this took place

17    notwithstanding your broad assertion that the

18    no-sell/no-close provisions in the -- all the

19    unions' contracts make it impossible for

20    Delphi to have the flexibility it needs in

21    connection with unprofitable facilities,

22    right?

23    A.    To the extent that we need to realign our

24    product portfolio to focus on businesses we

25    can be successful in.  A no-sell/no-close or a

128

1    jobs bank -- and a jobs bank provision can

2    inhibit restructuring.

3    Q.  Are the new hires -- are the people -- are

4    the non-traditional employees at Vandalia

5    eligible to participate in the jobs bank?

6    A.  I don't believe so.

7          MR. PETERSON:  If I might have a

8    minute, Your Honor?

9          THE COURT:  Okay.

10    BY MR. PETERSON:

11    Q.  I think the answer to this question might

12    have already been clear, but let's make sure.

13    Is it your testimony -- we want to make sure

14    that your testimony is as follows.  If, in

15    fact, there is no consensual resolution, so

16    Delphi and the unions do not enter into new

17    agreements and the existing agreements are

18    rejected by court order, is it your position

19    that there would be no dispute resolution

20    mechanism in place between Delphi and its

21    unions?

22    A.  Not as proposed.

23          MR. PETERSON:  I have nothing

24    further.

25          THE COURT:  Okay.

129

1    CROSS-EXAMINATION BY

2    MS. ROBBINS:

3    Q.  Good morning, Mr. Butler.

4    A.  Good morning, Counselor.

5    Q.  Marianne Robbins.  Marianne, the IAM and

6    the IBEW.  Do you have your declaration --

7    your initial declaration and exhibits in front

8    of you?  I believe it's Exhibit 7.

9    A.  I do.

10   Q.  I'm going to ask you to look at Exhibit A,

11   which is immediately following the declaration

12   itself.  I don't think -- it's not marked as

13   Exhibit A, it's the first exhibit.  There's a

14   list of contracts at that point.  And there is

15   first a list from one to six, do you see that?

16   A.  I do.

17   Q.  And it references international unions.  I

18   just want to clarify, you do not have a

19   separate -- Delphi does not have a separate

20   agreement with the IAM International or the

21   IBEW International, is that right?

22   A.  I believe those are local agreements.

23   Q.  Okay.  So that initial list is not

24   intended to be separate agreements.  The

25   agreements with the IAMAW and IBEW are listed

130

1    below under local agreements.

2    A.  I believe that's correct.

3    Q.  I want to talk a moment about benefit

4    guarantees that you have -- are those

5    tripartite agreements between your Delphi,

6    certain unions and GM?

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

```
 7   A.  No, they are not.

 8   Q.  The agreements that I saw or the documents

 9   I saw attached to Mr. Weber's declaration

10   include reference to obligations of Delphi.

11   Are there agreements between Delphi and GM

12   that reference those benefit guarantees?

13   A.  There are commercial agreements, as I

14   understand it, between Delphi and General

15   Motors.

16   Q.  And have they been made available to the

17   parties, I mean to the unions?

18   A.  I am -- I don't recall.

19   Q.  What do those commercial agreements say

20   about benefit guarantees in terms of which

21   unions are covered, if any?  If you know.

22   A.  I believe the commercial agreements only

23   cover the UAW.

24   Q.  But there are additional agreements,

25   benefit guarantees?
```

131

```
 1   A.  It is my understanding that there are

 2   benefit guarantees between General Motors and

 3   at least three of the unions that we deal

 4   with.

 5   Q.  Do you have any understanding as to when

 6   those agreements were reached?

 7   A.  I believe they were reached sometime in

 8   1999, although I'm uncertain.

 9   Q.  And was that the time of the spin-off?

10   A.  The -- Delphi was spun off in 1999.

11   Q.  And at the time of the spin-off was there
```

12    a discussion with all unions about how they

13    would be treated under the spin-off?

14    A.  I believe there were discussions.

15    Q.  And in those discussions is it -- is it

16    accurate that all union represented employees

17    were told that they would have the same rights

18    as the UAW in terms of the separation from GM?

19    A.  I do not know.

20    Q.  You were not involved?

21    A.  I was not involved.

22    Q.  You are familiar with pattern bargaining?

23    A.  I am.

24    Q.  And when pattern bargaining occurs between

25    Delphi and its unions, the larger unions will

132

1    negotiate first and the splinter unions such

2    as IAMAW will negotiate thereafter?

3    A.  Yes.

4    Q.  And there are assurances that Delphi

5    provides that it will provide the same package

6    changes?

7    A.  As it relates to that which Delphi

8    negotiates?

9    Q.  Have you -- has Delphi done anything to

10    determine what rights the IAM and the IBEW

11    have for benefit guarantees through GM?

12    A.  No, I believe that is -- the benefit

13    guarantees are a bilateral agreement between

14    the unions and General Motors.

15    Q.  But to answer my question, you have done

16    nothing to investigate whether there are

17   agreements, commercial or otherwise,

18   tripartite or otherwise, there are agreements

19   for guarantees that would -- benefit

20   guarantees that would apply to the IAM or the

21   IBEW?

22   A.   It's my understanding that our bargaining

23   representative asked the splinter unions if

24   they, in fact, had an agreement with General

25   Motors to the benefit guarantees and asked for

133

1    copies.

2    Q.   Have you done any calculations as to the

3    cost of providing benefit guarantees to the

4    splinter unions if they do not receive those

5    guarantees from General Motors?

6    A.   Not that I'm aware.

7    Q.   We talked earlier about amounts of 30

8    million and 60 million.  Would you agree that

9    you'd expect the amounts for the splinter

10   unions to be far less than 30 or 60 million?

11   A.   As I sit here without a calculation, I'm

12   uncertain.

13   Q.   At the present time have you made an att

14   -- have you provided an attrition package to

15   the IAM and IBEW for consideration?

16   A.   I believe we've had discussions regarding

17   that and we have had discussions with General

18   Motors about that, but we have not made a

19   formal proposal at this point in time.

20   Q.   Who, if anyone, is negotiating with

21   General Motors concerning an attrition package

22    that would apply to the IAM and the IBEW?

23    A.   I believe that that responsibility would

24    fall to Darrell Kidd, executive director.

25    Q.   The only attrition package that has been

134

1    presented to this court involves the UAW, is

2    that right?

3    A.   The tripartite agreement, that's true.

4    Q.   And that was negotiated, not by a

5    representative of Delphi with GM bilaterally,

6    but it involves the union, isn't that right?

7    A.   That's true.

8    Q.   But you have made no effort to involve the

9    IAM or the IBEW in negotiations with General

10    Motors concerning attrition, isn't that true?

11    A.   At present we have not had a three-way

12    meeting on that topic including General

13    Motors.

14    Q.   Have you done any costing of what it

15    provide -- of the cost that would be provided

16    to provide a parallel attrition package for

17    this small group from Delphi itself?

18    A.   Those calculations may have been done but

19    I am not aware of them.

20    Q.   So the IAM and the IBEW don't have an

21    attrition package.  You know that the plant is

22    scheduled to close at the end of 2007?

23    A.   We have indicated it as non-core.

24    Q.   So you've indicated that it's going to

25    close, have you not?

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

135

```
 1   A.  It would be consolidated or wound down by
 2   the end of '07, yes.
 3   Q.  Bottom line, no work in Milwaukee?
 4   A.  As proposed, that's true.
 5   Q.  But there's no attrition package?
 6   A.  I believe we had a contingent proposal for
 7   buyouts and we have not concluded the
 8   discussions.
 9   Q.  There's nothing specific that the IAM or
10   IBEW could submit to their members and know
11   that they would have the package that was
12   being contingently proposed?
13   A.  I think we're still in the process of
14   discussions.
15   Q.  So the answer to my question is do you
16   agree that there is nothing concrete that the
17   IAM or IBEW could provide to their members on
18   the issue of attrition?
19   A.  There is not a comprehensive attrition
20   proposal before the IBEW -- or the IBEW and
21   the IAM.
22   Q.  There's not a less than comprehensive
23   proposal either, is there?
24   A.  I believe for the buyouts there is a
25   proposal?
```

136

```
 1   Q.  But it is contingent, it is not definite?
 2   A.  That's true.
```

3    Q.  So there is no definite proposal,

4    comprehensive or otherwise, for attrition?

5    A.  There is not an unqualified proposal.

6    Q.  There is also no provision for retiree

7    health insurance that is non-contingent, isn't

8    that right, for this group?

9    A.  I believe the proposal indicated for

10   medical spending accounts for those who were

11   not covered under the benefit guarantee.

12   Q.  And would you -- are those contingent or

13   non-contingent on General Motors financial

14   support?  Can we look at the agree -- the

15   document?

16   A.  I'd have to review it, yeah.

17   Q.  If you look at your exhibit -- we're going

18   to be looking at the EMS which is one of the

19   three documents.

20   A.  Could you give me an exhibit number,

21   please?

22   Q.  It's all in Exhibit 7, I hate to tell you.

23   A.  I'm sorry, thank you.

24   Q.  And if you sort through it's most of the

25   way toward the back.  And I'm afraid there's

137

1    no other identifying -- there's no Bates stamp

2    or anything like that.

3           MR. BUTLER:  Can I have a moment,

4    Your Honor?

5           THE COURT:  Sure.

6           MS. ROBBINS:  Your Honor, I could

7    find it for the witness very quickly, if I can

8    approach the witness.

9              THE COURT:  Did you find it?

10             THE WITNESS:  You say it's a 91?

11             MS. ROBBINS:  Can I approach the

12   witness, Your Honor, and find the exhibit for

13   him?

14             THE COURT:  Sure.

15             THE WITNESS:  Thank you.

16   BY MS. ROBBINS:

17   Q.  There you go.

18   A.  Thank you.

19   Q.  Can you confirm now that it is not a

20   definite, but a contingent proposal that you

21   made?

22             THE COURT:  Are you looking at the

23   box marked health care?

24             MS. ROBBINS:  This is page 18,

25   health care.

138

1    BY MS. ROBBINS:

2    Q.  I think it goes, actually -- there's an

3    indented portion that deals with a health care

4    account, subject to GM financial support, is

5    that what your proposal was?

6    A.  Yes, it is.

7    Q.  Now, in terms of how much would go into

8    that contingent account if it were to exist,

9    and I'm -- it just says that there would be a

10   beginning balance based on their years, it

11   does not determine that amount?

12   A.  As written it does not.  We have a

13    methodology for ascertaining a comparable

14    amount of OPEB based on service and that's how

15    we would credit it.

16    Q.  It's not here?

17    A.  It's not specifically called out, no.

18    Q.  Now, would it be accurate to state that

19    you had no interaction with the IAM or the

20    IBEW about the proposal that was submitted in

21    October of 2005?

22    A.  I did not have direct interaction.

23    Q.  So you do not know what their response was

24    to that proposal?

25    A.  Not directly.

139

1    Q.  And again, in November you were not

2    involved in any discussions with the IAM or

3    IBEW, is that right?

4    A.  That's correct.

5    Q.  And you do not know their response to that

6    proposal?

7    A.  I do not know it directly.

8    Q.  Are you aware that Mr. Gerling was the

9    designated representative to discuss matters

10    with the IAM and the IBEW?

11    A.  I am.

12    Q.  Are you aware that prior to filing this

13    motion Mr. Gerling was unable to meet in

14    person with the IAM and IBEW concerning the

15    March proposal?

16    A.  I don't recall.

17    Q.  In terms of information, you make

18    reference in your declaration to information

19    being provided on December 12th.  Would it be

20    accurate that you're not aware of whether any

21    information was provided to the IAM or IBEW on

22    that date?

23    A.  I do not recall.

24    Q.  And with respect to your reference

25    concerning information being provided on

140

1    January 13th of 2006, are you also unaware of

2    whether any information was provided to the

3    IAM or IBEW on that date?

4    A.  I don't recall.

5    Q.  Are you aware that the IAM and IBEW

6    provided information requests as early as

7    October and November of 2005?

8    A.  I am generally aware.

9    Q.  And are you aware that some of those

10    requests are only being responded to in May of

11    2006?

12    A.  I am aware that, depending on the nature

13    of the request, it has taken time to

14    thoroughly and accurately answer the

15    questions.

16    Q.  You'd have no reason to dispute that

17    information was not provided until May in

18    response to those requests?

19    A.  I am -- I am uncertain as to the specifics

20    there.

21    Q.  In terms of the question about cost

22    savings from proposals that were being made by

23    Delphi, did you provide the same answer that

24    there was no calculation of specific cost

25    savings for the proposals made to the IAM and

141

1    IBEW?

2    A.  It was our intent to develop industry

3    competitive proposals.

4    Q.  But to answer my question, you did not

5    identify any cost savings for any of the

6    proposals made to the IAM or the IBEW?

7    A.  Not that I'm aware.

8    Q.  You make reference, in paragraph 82 of

9    your declaration, to wage surveys that were

10   performed.  Were those wage surveys for

11   production employees?

12   A.  Predominantly production, true.

13   Q.  Is it accurate that you performed no

14   similar survey for skilled trades?

15   A.  That analysis was performed by staff and

16   so I am uncertain.

17   Q.  Are you aware that the IAM and IBEW asked

18   you for wage surveys including skilled trades

19   and salaried employees?

20   A.  I don't recall.

21   Q.  And so I take it then, you also would not

22   recall whether you ever provided any such

23   surveys to the IAM or the IBEW?

24   A.  I am uncertain.

25   Q.  Do you still have the ENS IBEW contract

142

1    that -- in front of you there?  Because I'm

2    going to ask you a few more questions -- it's

3    the one I just opened up --

4    A.  The proposal.

5    Q.  The proposal, excuse me -- the proposal.

6              THE COURT:  Which one is this?  Is

7    this the March one or the November one?

8              MS. ROBBINS:  March.  Yes.  It's

9    March 24th or 25th.  I think its March 25th,

10   Your Honor.

11             THE COURT:  March.  Okay.

12             MS. ROBBINS:  And it's -- the little

13   sub-heading is ENS Term Sheet --

14             THE COURT:  I have it.

15   BY MS. ROBBINS:

16   Q.  I'm going to ask you, Mr. Butler, to turn

17   to page, I believe it's 3 of that -- no, I'm

18   sorry, page 4 of that proposal.  In that

19   proposal you seek to delete a number of

20   provisions from the IBEW ENS contract,

21   including paragraph 45.  Are you aware that

22   paragraph 45 defines the workday?

23   A.  As I sit here, no, I'm not.

24             MS. ROBBINS:  This is part of, Your

25   Honor, is part of Exhibit 76, which is a CD.


                                        143


1    So with counsel's permission, I will hand him

2    a copy of the contract.

3              MR. BUTLER:  No problem.

4    BY MS. ROBBINS:

5   Q.  I am showing you paragraph 45 of the ENS

6   IBEW labor agreement and because we can't all

7   have a copy in front of us, and it's

8   relatively brief, sir.  And it's the only time

9   I will do this, would you read that?

10  A.  It reads, "Employees will be compensated

11  on the basis of the calendar day, midnight to

12  midnight, on which their shift starts working

13  for the regular working hours of that shift.

14  The employee's working week shall be calendar

15  week beginning on Monday at the regular

16  starting time of the shift to which they are

17  assigned."

18  Q.  Your proposal is to abolish that

19  provision.  Would you agree that you have not

20  proposed an alternative?

21  A.  It's unclear to me.

22  Q.  Would you agree that there is likely to be

23  more disputes and more confusion if you do not

24  define what the day is?

25  A.  It's unclear to me if we are explicitly

144

1   leaving the date undefined or if we are

2   effectively dealing with the overtime impact

3   of the day.  It's under the heading of

4   overtime.

5   Q.  So you might just change the day and the

6   week, flexibly, back and forth?

7   A.  No.  I think this had to do when overtime

8   is paid and start -- start times.

9   Q.   Do you agree that deleting this provision

10    might create some confusion?

11    A.    It could.

12    Q.    You also propose to abolish voluntary

13    overtime provisions.  Can you identify for us

14    what voluntary overtime provisions you seek to

15    delete from this contract?

16    A.    I cannot.

17    Q.    Do you agree that whether it is a

18    volunteer or a mandated individual you will

19    pay the same amount for overtime?  For

20    example, time and a half after 40?

21    A.    I believe that's true.

22    Q.    So you can't identify any cost savings by

23    deleting a voluntary overtime provision.

24    Isn't that true?

25    A.    It may depend on the capability of the

                                        145

1    worker, efficiency of operations.

2    Q.    But you haven't identified any cost

3    savings?

4    A.    Not as I sit here, no.

5    Q.    On page 8 of this proposal you propose to

6    delete hiring requirements.  Excuse me, I blew

7    it.  Find it.  Excuse me, it's on page 11.  I

8    can't read my own notes.  My apologies.  Do

9    you know what hiring requirements you are

10    referencing with respect to the IBEW?

11    A.    Specifically, I do not.

12    Q.    Do you agree that if you make reference

13    to provisions that cannot be identified that

14    this will create confusion in terms of the

15    union's ability to address a proposal?

16    A.    My belief is those close to the actual

17    bargaining would have greater knowledge than I

18    on this.

19    Q.    Are you aware that the IBEW and IAM have

20    submitted a counterproposal?

21    A.    I am.

22    Q.    Do you agree that you have not made a

23    response to that counterproposal?

24    A.    It's my understanding that we have

25    engaged in discussions regarding that

146

1    counterproposal, principally through counsel,

2    but are attempting to discuss and work that.

3    Q.    That counterproposal was provided to you

4    on April 20th, is that right?

5    A.    That's my understanding.

6    Q.    And we are now on May -- sorry, 10th?

7    A.    Yes.

8    Q.    And you have not been able yet to respond

9    to the union's counterproposal -- to the

10    union?

11    A.    I believe that in light of proceedings we

12    have responded through counsel.

13    Q.    Would you agree you have not provided a

14    counterproposal?

15    A.    We have not a formal counterproposal at

16    this time.

17    Q.    And would you agree that it takes more

18    than a week to prepare a counterproposal?

19    A.    Depending on the particulars, I think

20    that's a fair statement.

21    Q.    Given the number of issues the company

22    has raised, would you agree that it takes more

23    than a week?

24    A.    I believe that that's a fair statement.

25    Q.    But in this case, you did not provide

147

1    more than a week to the IAM and IBEW before

2    you filed this motion.  Isn't that right?

3    A.    Depending on the nature of discussions

4    that took place, there could have been more

5    time.

6    Q.    But you're not aware of whether Mr.

7    Gerling could even get to Milwaukee in that

8    period of time.  Isn't that right?

9    A.    I am uncertain with regard to his

10    schedule.

11    Q.    If I were to ask you what you intended to

12    delete with the statement of intent

13    representation in the IBEW contract, could you

14    tell me?

15    A.    I do not know the specifics there.

16    Q.    If I were to -- and handing you the

17    contract wouldn't help.  Is that accurate?

18    A.    I would rely on those closer to the

19    bargaining.

20    Q.    The same answer would apply if I were to

21    ask you about local practices that you

22    believed were uncompetitive and whether those

23    could be identified?

24    A.    I would rely on staff.

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

25   Q.   And if I switched from the IBEW contract

148

1    to the ENC contract or the IAM contract your

2    answers would be the same?

3    A.    I believe that would be the case.

4           MS. ROBBINS:  No further questions,

5    Your Honor.

6           THE COURT:  Okay.  Thank you.

7    CROSS-EXAMINATION BY

8    MS. MEHLSACK:

9    Q.   Good morning, Mr. Butler.  Barbara

10   Mehlsack here representing the operating

11   engineers.

12   A.   Good morning, Counselor.

13   Q.    You've testified -- you testified

14   yesterday that, I believe, you were

15   responsible for selecting the collective

16   bargaining agreements on the plants that are

17   the targets of the 1113 motion.   Is that

18   correct?

19   A.    The core staff and working with the labor

20   relations function.

21   Q.    I ask you, please, to answer my question.

22   Are you personally involved in selecting the

23   collective bargaining agreements that are the

24   subject of the 1113?

25   A.    I was involved.

149

https://vip21.veritextllc.com/myfiles/116593am.TXT

1    Q.    Okay.  I ask you to turn to your

2    declaration, Exhibit 7 and it's Exhibit A and

3    next to Exhibit 7.

4    A.    Yes.

5    Q.    Would you look at the list of contracts

6    on the top half -- sorry -- the exhibit is

7    entitled the contract subject to the debtor's

8    1113/1114, motion.  Is that correct?

9    A.    That's correct.

10    Q.    Okay.  And there are international

11    agreements listed at the top of that page.

12    Is that correct?

13    A.    That's correct.

14    Q.    And is it not the case that there is, in

15    fact, no agreement between Delphi and the

16    International Union of Operating Engineers?

17    A.    I believe there are local agreements with

18    the IUOE.

19    Q.    Local agreements exclusively?

20    A.    I am uncertain whether that's exclusive.

21    Q.    So you don't know what agreements there

22    are, in fact, between the operating engineers

23    and Delphi?

24    A.    I believe they are local agreements.

25    Q.    But you're not certain.

150

1    A.    I'm not certain.

2    Q.    Okay.

3    A.    I am certain there are local agreements.

4    Q.    But you're not certain whether there are

5    any other agreements?

6    A.    I am uncertain whether there is a single

7    international agreement.

8    Q.    There is, if I might clarify for the

9    record, no international agreement between the

10   operating engineers and Delphi, despite the

11   list.  Now, turning to the second half of the

12   list, the local agreements that are targeted

13   for a rejection.  How many operating engineers

14   agreements are there on that list?

15   A.    There are -- there are three.

16   Q.    And what Locals are they?

17   A.    They are Local 101s, at Olathe, Local

18   832s at ENC Rochester, and Local 18s at TNI

19   Columbus.

20   Q.    And has Delphi made proposals to modify

21   each and every one of those contracts to the

22   respective operating engineers' Local?

23   A.    I believe that's the case.

24   Q.    Can you show me, in this voluminous list

25   of exhibits, which one of those proposals

151

1    applies to the Local 101s contract?  Can you

2    identify a Local 101s proposal made by Delphi

3    to operating engineers' Local 101s?

4    A.    It's -- I don't believe I can as I sit

5    here.  It's quite a stack.

6    Q.    And in fact is it not the case that you

7    can't because in fact there has been no

8    proposal made to Local 101s, Mr. Butler?

9    A.    I am uncertain.

10   Q.    Do you -- would you turn, please, to the

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

11   -- bear with me a moment, Your Honor, to

12   Exhibit 94.

13   A.   I have it.

14   Q.   And did you write that letter?

15   A.   I did.

16   Q.   And that letter's addressed to the

17   national president of the operating engineers.

18   Is that correct?

19   A.   That's correct.

20   Q.   All right.  And that is -- is it the case

21   that that letter was intended to be a

22   transmittal letter for the proposals to the

23   operating engineers' Locals?

24   A.   Yes, it was.

25   Q.   And you signed that letter.

152

1   A.   I did.

2   Q.   And did you check the enclosures to that

3   letter?

4   A.   I did generally check the enclosures.

5   Q.   And do you know if there was an enclosure

6   to Local 101s?

7   A.   There does not appear to be.

8   Q.   Will you concede today, Mr. Butler, that

9   there in fact has been no proposal made to

10   Local 101s?

11   A.   I have not seen one here.

12   Q.   Will you concede today that there has

13   been no proposal made to Local 101s?  Can you

14   answer the question yes or no please, sir.

15          MR. BUTLER:  Your Honor, if it will

16    help move this along, the debtor -- Mr. Butler

17    may be uncertain.  The debtors will stipulate

18    there was no proposal to 101s.  I think

19    Counsel knew that before she started the line

20    of questioning.

21          THE COURT:  Okay.

22          MR. BUTLER:  We'll stipulate on the

23    Record, there was no proposal.

24          MS. MEHLSACK:  Mr. Butler, you

25    stipulated to no communications.  You haven't

153

1     stipulated to no proposal.  But this goes to

2     the -- a number of other issues as to the

3     witness's representations as to what

4     bargaining between the operating engineers and

5     --

6           THE COURT:  Well you can go on.

7     They answered your question.

8           MS. MEHLSACK:  Okay.  Mr. Butler

9           THE COURT:  Is this the plant where

10    they're said to demolish and there's one

11    going?

12          MS. MEHLSACK:  That's right.

13          THE COURT:  All right.

14    BY MS. MEHLSACK:

15    Q.  Mr. Butler, you've testified that there's

16    been patterned bargaining, historically,

17    between Delphi and its unions.

18    A.  That's true.

19    Q.  Has there ever been a time when the so-

20    called splinter or outlier unions have been

21    able to pursue independent bargaining before

22    you've concluded an agreement with the UAW?

23    A.    Not that I recall.

24    Q.    And how long have you been doing

25    bargaining for Delphi with the various unions

154

1    involved here?

2    A.    With responsibility for splinter units,

3    since 2000.

4    Q.    And, in fact, isn't it the case that

5    Delphi's been pursuing the same pattern

6    bargain strategy in the context of this 1113

7    motion as it has historically?

8    A.    We have been attempting to deal with each

9    of the unions in parallel, recognizing the

10    particulars of our pattern bargaining history.

11    Q.    Mr. Butler, will you turn to Exhibit 188,

12    please?  And what should be the last page of

13    the exhibit is a letter addressed to you, sir.

14    A.    I'm sorry.  We're getting a lot of tabs.

15    Yes.

16    Q.    And do you recall receiving that letter?

17    A.    I believe I do.

18    Q.    Did you ever respond to that letter?

19    A.    I referred this to staff for handling and

20    I don't believe I personally responded.

21    Q.    That letter, in fact, is a request to

22    bargain, is it not, from Local 101s?

23         THE COURT:  Ma'am, you won this one.

24    They don't have a proposal on it, okay?  So we

25    should just move off of 101s.

155

 1          MS. MEHLSACK:  It goes beyond that.

 2    Their claim is that they would pursue parallel

 3    bargaining with the individual Locals.  The

 4    fact is, when a specific Local requested the

 5    opportunity to bargain, they never responded.

 6          THE COURT:  Well, I don't know

 7    whether you were misled on this, but as far as

 8    I see, since there's no proposal to 101s, 101s

 9    is not covered by this motion.

10          MS. MEHLSACK:  Thank you, Your

11    Honor.

12    BY MS. MEHLSACK:

13    Q.   Mr. Butler, turning to the two other

14    Locals that are covered by -- purported to be

15    covered by the proposal.  They are Locals 18s

16    and A32s.  Is that correct?

17    A.   That is my understanding.

18    Q.   And what is the facility that Local 18s -

19    - at which Local 18s represents employees?

20    You don't recall, off the top of your head?

21    A.   I don't recall off the top of the head by

22    Local number.  I understand Columbus and

23    Rochester.

24    Q.   Do you know how many employees are -- you

25    said you don't know which facility is covered

156

 1    by the 18s contract?  Which facility is

 2    covered by the A32s contract?

3    A.    By Local number, as I sit here, I don't

4    recall.  I believe there are thirteen

5    employees at Columbus and six in Rochester.

6    Q.    Have you -- and what functions do the

7    operating engineers perform at these two

8    facilities?

9    A.    I believe that they deal with boilers and

10   waste water treatment and the like.

11   Q.    And is it also true they maintain the

12   heating, HV -- what's called HVAC, heating

13   ventilation and air conditioning systems?

14   A.    I believe that's true.

15   Q.    And turning to your declaration, Exhibit

16   7.

17   A.    I have it.  Thank you.

18   Q.    You've testified that amongst the data

19   that you utilized in determining what a

20   competitive wage rate, is Bureau of Labor and

21   Statistics data.

22   A.    That's correct.

23   Q.    Okay.  And what categories of employees

24   did you utilize in terms of -- when you were

25   determining whether or not the Columbus and

157

1    Rochester contract rates were competitive?

2    A.    The study we cited was aimed principally

3    at production workers and I do not recall the

4    specific skill trades analysis.

5    Q.    And you concede today that the operating

6    engineers are skilled trades?

7    A.    I believe, generally, that's the

8    classification.

9    Q.   And are you -- do you know whether any

10   comparison was made of the heating,

11   ventilation and air conditioning employees who

12   work at various automotive parts suppliers and

13   how those wage rates compared to Delphi's wage

14   rates for the operating engineers?

15   A.   I do not recall the specifics.

16   Q.   And would it surprise you to learn that

17   those wage rates exceed the wage rates in the

18   competitive proposal?

19   A.   I don't know if I would be so -- I would

20   have to review the data.

21   Q.   So you've never reviewed any comparisons

22   of the wage rates of the operating engineers,

23   employees at Columbus and Rochester, to the

24   wage rates received by employees of similar

25   scales at other automotive parts suppliers

158

1    throughout the country?

2    A.   Specifically as it relates to HVAC, no I

3    have not.

4    Q.   Specifically as it relates to the

5    operating engineers?

6    A.   That's true.   I have not.

7    Q.   Would you turn, please, to Exhibit 82?

8    And that is a letter that you wrote, is it

9    not, to the general president of the operating

10   engineers --

11   A.   It is.

12   Q.   -- transmitting the October proposals?

13    A.    Yes.

14    Q.    And is it not the case then, in that

15    letter you state that when you constructed the

16    proposals you did not construct them to meet

17    any specific level of cost reductions?

18    A.    That's true.

19    Q.    And have you constructed any of the

20    proposals that you made to the operating

21    engineers to meet a specific level of cost

22    production or savings?

23    A.    No.  They were constructed to achieve

24    competitive agreements.

25    Q.    Now, you've testified that in

159

1    constructing those proposals to achieve

2    competitive agreements it was necessary to

3    deal with provisions relating to the sale and

4    closure of various facilities.

5    A.    That's true.

6    Q.    All right.  Are there -- I believe the

7    Columbus facility has been identified for

8    sale, closure or consolidation.  Is that

9    correct?

10    A.    That's true.

11    Q.    Which one of those?  Sale, closure or

12    consolidation?

13    A.    At this point we have determined it to be

14    non-core and are ascertaining whether it can

15    be sale or will be wound down.

16    Q.    Have you ever identified to the operating

17    engineers any problems that you have with the

18    provisions in their contract that are

19    preventing you from engaging in negotiations

20    to sell the facility?

21    A.    Not that I am aware.

22    Q.    All right.  Have you been involved in

23    negotiations with the operating engineers

24    before the shutdown of the facility?

25    A.    Not that I recall.  I don't have personal

160

1    knowledge of that.

2    Q.    Were -- do you have any knowledge of the

3    negotiations that took place in the shut down

4    of the Olathe, Kansas facility?

5    A.    I have general knowledge of discussions,

6    principally with the UAW, around the closure

7    of Olathe.

8    Q.    Are you aware that the Olathe contract

9    between the operating engineers and Delphi

10    specifically provides that if the facility

11    should be closed that Delphi has the right to

12    determine what the effects of attrition will

13    be on its obligations to replace employees?

14    A.    I do not have specific knowledge of the

15    Olathe IUOE contract, as I sit here.

16    Q.    So that you are not aware of the fact

17    that when asked, the operating engineers have

18    been willing to come to the table and

19    negotiate what -- specific provisions that

20    Delphi identified as necessary to enable it to

21    shut down a facility economically?

22    A.    I'm sorry.  Can you repeat the question?

23    Q.    So, you have no personal knowledge that -

24    - of negotiations between the operating

25    engineers and Delphi and the willingness of

161

1    the operating engineers to come to the table

2    when Delphi has identified for them specific

3    provisions and specific needs in connection

4    with the shutdown of a facility?

5    A.    I do not have direct detailed knowledge.

6    Q.    Do you have any knowledge at all?

7    A.    I have general knowledge as reported by

8    staff that the IUOE was willing to engage in

9    discussions, particularly around attrition

10    program.

11    Q.    Now you have identified the -- or Delphi

12    has identified, am I correct, both the

13    attrition program as something that Delphi

14    believes is essential to reducing its

15    headcount to enable it to realign its product

16    -- its portfolio, I should call it.  Am I

17    correct?

18    A.    We believe that the attrition program is

19    an important soft landing and an important

20    first step in our total transformation.

21    Q.    Would you turn to Exhibit 94, please?

22    And is that a letter that you wrote to the

23    president of the operating engineers, a

24    transmittal letter, transmitting the March

25    24th proposals?

1    A.    It is a letter prepared and I did sign

2    it, yes.

3    Q.    Okay.  And would you read the -- look at

4    the second page of the letter.

5    A.    Yes.

6    Q.    Where you say that you have stated to the

7    operating engineers that you believe you can

8    utilize the momentum of the Court's approval

9    of the attrition program for the UAW.  Is that

10    correct?  And then you go on to say for an

11    attrition program which might be negotiated

12    with the operating engineers.

13    A.    That's true.

14    Q.    Has any attrition program been negotiated

15    with the operating engineers?

16    A.    I believe there have been discussions but

17    I am not aware that one has negotiated -- it

18    has not been negotiated.

19    Q.    On what do you base your belief that

20    there have been discussions about an attrition

21    program?

22    A.    It's my understanding from Mr. Gerling

23    that there have been discussions with all the

24    splinters regarding an attrition program.

25    Q.    And what do you characterize as a

163

1    discussion about an attrition program?

2    A.    Discussions to the effect that if an

3    attrition program comparable to the UAW's

4    would be available that that would be an

5    acceptable approach or solution to the

6    attrition problem.

7    Q.    Acceptable to whom?

8    A.    To the --

9    Q.    To Delphi?

10    A.    No.  My understanding is to the splinter

11    unions.

12    Q.    It's your understanding that the -- who

13    has said such an attrition program would be

14    acceptable?

15    A.    It's my understanding from Mr. Gerling

16    that that is the feedback he has received from

17    the splinter unions.

18    Q.    But it is not your understanding that any

19    particular attrition program has been offered

20    to the operating engineers?

21    A.    It's my understanding there has been no

22    formal proposal discussions at this point.

23    Q.    Do you understand there to have been any

24    informal proposal?

25    A.    I believe what has been described is the

164

1    UAW program along with our proposal on March

2    24th that affects buyouts and that we have

3    indicated we are endeavoring to receive GM

4    support to advance a formal proposal.

5    Q.    Now, the UAW program includes what's

6    called the GM benefit guarantee and the flow-

7    backs.  Is that correct?

8    A.    The GM program involves flow-backs.  The

9   GM benefit guarantee is a separate bilateral

10   agreement between General Motors and the UAW.

11   Q.   Now that GM benefit guarantee, do you

12   know how it works in connection with Delphi

13   employees?

14   A.   I have a general understanding of it.

15   Q.   And what is your general understanding?

16   A.   My general understanding is that in the

17   event that Delphi, through financial distress,

18   does not meet its contractual commitments

19   prior to October or '07, as relates to

20   pensions, post-employment health care and

21   post-employment life insurance, that General

22   Motors will cover effectively up to the level

23   of benefit that it provides for its current

24   UAW retirees and certain employees, the

25   comparable level of coverage.

165

1   Q.   So that effectively the GM benefit

2   guarantee preserves health insurance for

3   retirees?

4   A.   For retirees and potentially those

5   eligible to retire or within seven years of

6   retirement eligibility.

7   Q.   Okay.  Now, it is part of your proposal

8   to the operating engineers to cut -- to

9   eliminate health insurance for retirees.   Is

10   that correct?

11   A.   Yes.

12   Q.   Okay.  And is it the case that health

13   insurance for salaried employees is being

14    eliminated?

15    A.    I'm sorry, could you repeat the question?

16    Q.    Is it the case that Delphi is eliminating

17    health insurance for salaried employees?

18    A.    No, that's not the case.  Salaried -- are

19    you speaking about retirees or --

20    Q.    Retiree health insurance for its salaried

21    employees.

22    A.    Salaried retiree health coverage has --

23    effective January 1st of 2007, you will see,

24    effectively at age 65.

25    Q.    But anyone who retires from Delphi until

166

1    -- before age 65 will continue it -- before

2    eligibility for Medicare -- will continue to

3    have retiree health insurance?

4    A.    They will have subject to co-pays,

5    deductibles and monthly premiums, yes.

6    Q.    Now, is that true for all Delphi salaried

7    employees?

8    A.    That is.  All U.S. salaried employees --

9    Q.    Is it not the case that --

10            MR. BUTLER:  I'm sorry.  Could you

11    have him finish the question?

12            MS. MEHLSACK:  I'm sorry.  I thought

13    he had.

14    BY MS. MEHLSACK:

15    Q.    Go on.

16    A.    -- all U.S. salaried employees.

17    Q.    Now, is it not the case that pre-1993

18    hires continued to maintain their health

19    insurance -- retiree health insurance

20    coverage?

21    A.    No, that is not true.

22    Q.    Turn to Exhibit 165, please.

23    A.    I have the exhibit.

24    Q.    You will bear with me a moment.  Is it

25    not the case, Mr. Butler, that you've

                                                    167

1    identified the GM benefit guarantee as making

2    the Delphi proposal to cut retiree health

3    insurance essentially fair and equitable when

4    compared to the salaried retirees because it

5    provides coverage for most union represented

6    employees?

7            MR. BUTLER:  Objection in the sense

8    calling for a legal conclusion.  I'm not sure

9    what the --

10    BY MS. MEHLSACK:

11    Q.    But do you agree, Mr. Butler?  Is that --

12    do you agree with Delphi's representation that

13    that is one of the elements that makes the

14    proposal fair and equitable?

15    A.    I believe what we've indicated is that by

16    action of the benefit guarantee it would

17    mitigate or reduce the impact of our proposal

18    to get to competitive wage and benefits

19    structure.

20    Q.    And have you identified whether the

21    operating engineers have a GM benefit

22    guarantee that preserves their retiree health

23    insurance?

24   A.   The operating engineers have produced no

25   such document that I am aware of.

168

1   Q.   And has Delphi done any analysis of what

2   it would cost Delphi, should GM not be willing

3   to fund the attrition program, to provide a

4   similar program for the operating engineers?

5   A.   Not that I'm aware of.

6   Q.   Has Delphi indicated, in any of its

7   discussions that you have described your staff

8   has had, its willingness to provide any

9   funding to equalize the conditions of the

10   operating engineers with the other unions

11   relative to retiree health insurance, buyouts,

12   severance packages?

13   A.   Not that I am aware of at this point.

14   Q.   Has Delphi identified to the operating

15   engineers or indicated its willingness to

16   provide any funds in order to provide what you

17   have described as the contingent elements of

18   the contract proposal should GM not be willing

19   to fund those elements of the proposal for the

20   operating engineers?

21   A.   I'm sorry, Counselor, could you repeat

22   the question?

23   Q.   You've identified, and I won't go through

24   with you the operating engineer contract --

25   you've identified several contingent elements.

169

1    Among those contingent elements are the

2    medical accounts, the -- and you have the

3    buyouts and those are all contingent on GM

4    funding.    Is that correct?

5    A.    I think that's basically true, yes.

6    Q.    Has Delphi indicated in any way to the

7    operating engineers that if GM is unable or

8    unwilling to fund those proposals that Delphi

9    is prepared to fund them?

10   A.    I don't believe that proposal's been

11   made, no.

12   Q.    Yet Delphi continues to fund its retiree

13   health insurance.

14   A.    I'm sorry could you clarify --

15   Q.    Delphi continues to fund its retiree

16   health insurance for salaried employees.

17   A.    Delphi continues to fund its salaried

18   health care coverage until age 65.

19   Q.    Which includes retiree health insurance

20   till age 65.

21   A.    That's true, subject to co-pays and

22   premiums and such.

23   Q.    Now -- you bear with me a moment, sir.

24   Would you turn to Exhibit 94, please?

25   A.    I have Exhibit 94.


                                                      170


1    Q.    Page 2 says that in the event that GM

2    agrees to provide financial support but that

3    support is insufficient to fund all of the

4    contingent proposals set forth herein or if

5    GM's unable to meet its commitment, Delphi and

6    the IUOE agree to discuss which contingent

7    proposals will be implemented and/or

8    maintained.  Now, there's been discussion or

9    you've been asked whether or not in the event

10   that GM support should not be provided, were

11   the unions to accept these proposals, whether

12   any conflict or dispute between the unions and

13   Delphi about the contingent proposals would be

14   subject to the dispute resolution clause of

15   the contract.  Is it your testimony today that

16   were the operating engineers to accept this

17   proposal and GM were to start to fund the

18   contingent aspects of the proposal such as the

19   retiree medical account and GM were to suffer

20   financial reversals that would prevent it from

21   continuing that funding.  What is your

22   position as to what would happen to those

23   contingent aspects of the proposal at that

24   point in time?  And assuming that you were in

25   the middle of a contract term.

171

1    A.   So the proposal is accepted without

2    counterproposal or any other negotiation to

3    change any other provisions, I assume.  Then I

4    believe if it were accepted in its entirety,

5    then the conflict resolution provision would

6    be enacted and we would discuss that.  The

7    specific implications of that, again on

8    certain specifics --

9    Q.   So you believe if, for example, in the

10   middle of the contract term GM were to say we

11    can't afford these retiring medical accounts

12    anymore, we're pulling the plug.  And the

13    unions were to -- and the operating engineers

14    were to go to Delphi and say all right, we

15    want you to start funding these retiree

16    medical accounts, and Delphi were to say no,

17    that that would be subject to the arbitration

18    clause of the contract and an arbitrator would

19    have the right to decide whether or not Delphi

20    should put up the money for the retiree

21    medical accounts?

22    A.   It would be, as I indicated earlier,

23    pursuant to what we stipulated was arbitrable,

24    which is not called out specifically, which

25    provisions are arbitrable is not called out in

172

1    the language as I read it.

2    Q.   Well, are you familiar with the

3    arbitration clause in the operating engineers'

4    contracts?

5    A.   I am not.

6    Q.   So you don't know whether this dispute

7    would be covered by that clause or not covered

8    by that clause?

9    A.   That is correct.

10        MS. MEHLSACK:  I have no further

11    questions.

12        THE COURT:  Okay.

13        MR. FOX:  Your Honor, Edward Fox

14    from Kirkpatrick and Lockhart on behalf of

15    Wilmington Trust Company's indenture trustee.

16    I'll try to be brief.  Before I begin cross-

17    examination, if I could, the one issue about

18    exhibits.  We identified Exhibits 201 through

19    207 that we proposed to offer into evidence.

20    That was circulated last Friday in accordance

21    to the agreement of the parties.  And there

22    has been no objection.  So I would ask, if I

23    could, that at this point that they be

24    admitted into evidence.

25            MR. BUTLER:  Your Honor, I would

173

1    only object under our discussions we were

2    going to deal with the admission of the

3    exhibits at the end of the hearing, which is

4    what I said in my opening statement, not, you

5    know, item by item as we go through.  So

6    that's why there are various objections, we

7    were trying to reconcile them all and then

8    deal with it at the end of the hearing.

9            MR. FOX:  None of those relate to

10    ours.  And the problem I have is that I've got

11    a witness on cross-examination and I don't, in

12    part, know whether, you know, whether I need

13    to raise certain issues with him concerning

14    documents or not, particularly if I don't know

15    whether they're admissible or not.  These are

16    all documents produced to us by the debtors.

17            THE COURT:  Well, are you just

18    looking for identification by this witness?  I

19    mean authentication?  I don't --

20            MR. FOX:  Well, I don't think that

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

21    should be an issue but I don't want to find

22    out later that it is, for instance.

23            THE COURT:  Well, is that an issue?

24    I mean, if it's just authentication --

25            MR. BUTLER:  No, it's not an issue.


                                                    174


1     I'm not sure that anything is an issue.  If

2     Mr. Fox had raised it at any time other than

3     when he starts his cross-examination, if he'd

4     mentioned it this morning, we could have

5     worked it out.

6             THE COURT:  All right.

7             MR. BUTLER:  This is a new piece of

8     information.

9             THE COURT:  Well, do you want to

10    take a few minutes to confirm that the

11    authentication is not an issue?

12            MR. BUTLER:  I don't think there's

13    any authentication problems with any of the

14    documents in these binders, Your Honor.

15            THE COURT:  Okay.

16            MR. FOX:  Thank you, Your Honor.

17    CROSS-EXAMINATION BY

18    MR. FOX:

19    Q.   Mr. Butler, take a look, if you would, at

20    Exhibit 7a.

21    A.   I have it.

22    Q.   And this is your declaration, correct?

23    A.   Yes.  My declaration's contained in --

24    Q.   I'm sorry.  I couldn't hear you.

25    A.   My declaration is contained in 7a.

175

1  Q.   Okay.  In paragraph 1, on page 2 of your
2  Exhibit 7a, you refer -- you say you're vice
3  president of Delphi Corporation.  And that's
4  then defined as Delphi.  Is that correct?
5  A.   That's correct.
6  Q.   Okay.  Now, throughout the declaration
7  you then refer to Delphi, for instance on page
8  3 in paragraph 5, you say Delphi also has
9  sites that have no union representation.  In a
10 case such as paragraph 5, are you always using
11 Delphi, the defined term, to mean Delphi
12 Corporation, or do you mean the collective
13 debtor entities, the 43 debtor entities?
14 A.   I believe that I mean that to be Delphi
15 Corporation.
16 Q.   Okay.  So on page 5, paragraph 11, when
17 you refer to Delphi's employees, you're
18 referring specifically to Delphi Corporation?
19 A.   The employees are assigned to divisions
20 that are part of Delphi Corporation -- plants
21 and divisions assigned to Delphi Corporation
22 that are part of Delphi Corporation.
23 Q.   Are the plants and divisions owned
24 directly by Delphi Corporation?
25 A.   I believe they are part of Delphi

176

1  Automotive Systems which is held by Delphi

2    Corporation.

3    Q.    So the plants are actually owned by

4    Delphi Automotive Systems, LLC.  Is that

5    correct?

6    A.    It's my understanding that we have assets

7    in Delphi Automotive Systems and that Delphi

8    Corporation is the owner of Delphi Automotive

9    Systems.

10    Q.    And it's Delphi Automotive Systems, LLC,

11    correct?

12    A.    That's my understanding.

13    Q.    And the same is true with respect to your

14    statements in paragraph 13 of your declaration

15    concerning Delphi's active manufacturing

16    sites?

17    A.    Yes.

18    Q.    And, in fact, they're owned directly by

19    Delphi Automotive Systems, LLC?  Is that

20    correct?

21    A.    I'm uncertain the specific arrangement,

22    only that Delphi Automotive Systems, LLC

23    exists and has assets assigned to it and

24    Delphi Corporation is the holding company or

25    owner of it.


177


1    Q.    Delphi Corporation does not hold these

2    plants directly.

3    A.    I don't know specifically, but I do not

4    believe so.

5    Q.    Now, with respect to -- sorry, Your

6    Honor, I have to find the confidential binder.

7    Now, with respect to the employees at the

8    plants referred to in paragraph 13 of your

9    declaration.

10    A.    Yes.

11    Q.    When you say that those -- I'm sorry, let

12    me back up.  Those employees referred to in

13    paragraph 13 of your declaration at those

14    plants are performing services for Delphi

15    Automotive Systems, LLC at those plants,

16    correct?

17    A.    I believe so.

18    Q.    Okay.

19            MR. FOX:  Thank you, Your Honor.

20    That's all that I have.

21            THE COURT:  Well, when you -- let me

22    just -- when you say that, when they're

23    performing services at those plants for Delphi

24    Automotive Systems, LLC, is Delphi Automotive

25    Systems, LLC the employer?

178

1            THE WITNESS:  I believe the

2    employer, effectively, I believe, Your Honor,

3    is Delphi Corporation, but the assets are

4    assigned to Delphi Automotive Systems, LLC and

5    we have employment organizations or entities

6    that employees are released back and forth.

7            THE COURT:  Is this reflected in the

8    collective bargaining agreements?

9            THE WITNESS:  I think it's our view

10    the collective bargaining agreements are with

11    the Corporation and, effectively, the

12    Corporation is the holder of the collective

13    bargaining agreements.

14            THE COURT:  And so when you say that

15    Delphi Automotive Systems is the employer you

16    are viewing that simply in the sense of what,

17    that they got the benefit of the work or what?

18            THE WITNESS:  No.  Essentially,

19    that's where the assets and the dollars reside

20    within the structure.

21            THE COURT:  Okay.  All right.

22            MR. FOX:  Your Honor, if I could

23    follow up on that?

24            THE COURT:  Sure.

25    BY MR. FOX:


179


1    Q.   Mr. Butler, take a look, if you would, at

2    Exhibit 201 which is in the confidential

3    binder.

4    A.   Yes, I have it.

5    Q.   Are you familiar with this document?

6    Have you seen this before?

7    A.   I believe I've seen this before.

8    Q.   Okay.  And this Exhibit 201 sets forth

9    how the employees are employed by -- entity by

10    entity by debtor, entity by debtor entity,

11    correct?

12    A.   I believe that's true.

13    Q.   Okay.  And then take a look, if you

14    would, at Exhibits 202 and 203, please.

15    A.   Yes.

16    Q.   Do you have those?

17    A.    I do have them.

18    Q.    Okay.  And those are leasing agreements

19    between, in the case of 202, Delphi Automotive

20    Systems, LLC and Delco Electronics Corporation

21    and Delphi Automotive Systems Services, LLC.

22    And is that correct, in the case of 202?

23    A.    It appears so.

24    Q.    Okay.  And in the case of Exhibit 203,

25    it's again an employee leasing agreement

180

1    between Delphi Automotive Systems, LLC and

2    Delphi Automotive Systems Human Resources,

3    LLC, correct?

4    A.    Yes.

5    Q.    Okay.  And these are the leasing

6    agreements that are referred to in Exhibit 201

7    under debtor names 38, which is Delphi

8    Automotive Systems Human Resources, LLC and

9    39, Delphi Automotive Systems, LLC, correct?

10    A.    I believe so.

11    Q.    Okay.  Thank you.

12          MR. FOX:  Your Honor, that's the

13    road map that --

14          THE COURT:  All right.  Well, I just

15    want to follow up because I want to make sure.

16    I think -- were these agreements the types of

17    arrangements you were referring to as far as

18    the sharing of employees?

19          THE WITNESS:  Yes, Your Honor.  This

20    is the agreement that my understanding on how

21    employees are leased between the entities.

22          THE COURT:  All right.  Now, Delphi

23   Corporation's not a party to this agreement.

24          THE WITNESS:  That's my understand

25   -- my understanding, Your Honor, are these are

181

1   affectively for tax effectiveness.

2          THE COURT:  All right.  But it's

3   your view that Automotive Systems has the

4   power to give over an employee for corporate

5   reporting purposes to one of these other

6   entities?

7          THE WITNESS:  I'm uncertain on that,

8   Your Honor.

9          THE COURT:  All right.  Okay.  Fine.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  Do you have much

12   redirect?

13          MR. BUTLER:  Your Honor, the witness

14   has been on the stand for about three hours

15   and forty-five minutes at this point and I'd

16   like to be able to try and make my redirect as

17   efficient as possible.  There will be some

18   redirect, yes.

19          THE COURT:  Okay.

20          MR. BUTLER:  So if we can take a

21   lunch break now, that would be appreciated

22   then.

23          THE COURT:  All right.  That's fine.

24   Come back at 2 o'clock.  I think my clerk

25   caught you all before you left last night to

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

182

1   tell you I can go later, after all, tonight.

2   Okay.      (Whereupon this proceeding was

3   concluded.)

4        (Time noted:  12:45 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

183

1

2                 I N D E X

3

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT

```
 4              T E S T I M O N Y

 5    WITNESS              EXAMINATION BY      PAGE

 6    Mr. Butler          Mr. Kurtz           16

 7    Mr. Butler          Mr. Kennedy         30

 8    Mr. Butler          Mr. Kennedy         62

 9    Mr. Butler          Mr. Peterson        99

10    Mr. Butler          Ms. Robbins         129

11    Mr. Butler          Mr. Mehlsack        148

12    Mr. Butler          Mr. Fox             174
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

184

```
 1

 2          C E R T I F I C A T I O N

 3

 4       I, Lisa Bar-Leib, hereby certify that the

 5    foregoing is a true and correct transcription,

 6    to the best of my ability, of the sound

 7    recorded proceedings submitted for

 8    transcription in the matter of the bankruptcy
```

```
 9   of:

10   DELPHI CORPORATION, et al.

11

12        I further certify that I am not employed

13   by nor related to any party to this action.

14

15        In witness whereof, I hereby sign this

16   date:

17   May 12, 2006.

18

19        _____

20                    Lisa Bar-Leib

21

22

23

24

25
```

https://vip21.veritextllc.com/myfiles/170408/116593am.TXT