**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Email: robert.rosenberg@lw.com
        mitchell.seider@lw.com
        mark.broude@lw.com

Counsel for The Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, <u>et</u> <u>al.</u>, | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF THE DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. § 365 AND FED. R. BANKR. P. 6006 AUTHORIZING REJECTION OF CERTAIN EXECUTORY <u>CONTRACTS WITH GENERAL MOTORS CORPORATION</u>**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases of Delphi Corporation, *et al.* (collectively, the "Debtors"), by and through its

undersigned counsel, hereby submits this response (the "Response") in support of the Debtors'

Motion (the "Rejection Motion") for Order Under 11 U.S.C. §365 and Fed. R. Bankr. P. 6006

Authorizing Rejection of Certain Executory Contracts With General Motors Corporation

("GM").[1]  In support of its Response, the Committee respectfully states as follows:

---

[1]  Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Rejection Motion.

## PRELIMINARY STATEMENT

1.      The Rejection Motion is one element of the Debtors' "Transformation Plan" to
restructure their United States operations.  The Transformation Plan represents the Debtors'
effort to address the operational costs and disadvantages with which GM saddled the Debtors
when GM spun them off in 1999.  This restructuring effort has two primary and interrelated
elements:  (a) reduction of the onerous labor costs (both wage and benefit) that GM foisted on
the Debtors and (b) rationalization of the unprofitable contractual relationships that the Debtors
have with GM as their single largest customer.  The Debtors' attempts to address these two
elements are inextricably intertwined and cannot be viewed independently.

2.      As part of their Transformation Plan, on March 31, 2006, the Debtors filed two
motions, each directed at one of the two primary elements.  First, to achieve the necessary
reduction in their inherited labor costs, the Debtors filed a motion under sections 1113 and 1114
of the Bankruptcy Code seeking to reject certain collective bargaining agreements and modify
certain retiree benefits.  Second, to fix their burdensome contractual relationships with GM, the
Debtors filed the Rejection Motion.  These two motions must be viewed together as part of a
coordinated effort to create the framework for rationalizing the Debtors' operations and fixing
their primary problems – the unsustainable costs and insufficient revenues that resulted from the
relationships and contracts the Debtors were forced to accept as part of their spin-off from GM.

3.      GM, in its objections to the Rejection Motion, blatantly attempts to distract this
Court from that broader picture.  Instead, GM paints a myopic picture of the relief the Debtors
have sought in the hopes of being able to distort the business rationale (and judgment) for the
Debtors' requested relief.  In trying to convince this Court to take the Rejection Motion out of

2

context, GM looks to hide its responsibility for the problems the Debtors are facing, in the hopes

of forcing others to bear the costs of those problems.

4.      This Court should see through GM's disingenuous attempt to hide the ball.  The

relief sought in the Rejection Motion is a critical part of the Debtors' efforts to obtain, whether

voluntarily or involuntarily, GM's contribution to solve the problems that GM created.  The

Committee supports the Debtors' efforts and respectfully requests that this Court grant the relief

sought in the Rejection Motion.

## PROCEDURAL BACKGROUND

5.      On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this

Court voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, as

amended (the "Bankruptcy Code").  On October 14, 2005, the three remaining Debtors also filed

voluntary petitions.

6.      The Committee was appointed nine days after the Petition Date, on October 17,

2005.[2]  Shortly thereafter, the Committee selected Latham & Watkins LLP as its counsel,

Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. as its

investment banker.

7.      On March 31, 2006, the Debtors filed the Rejection Motion with the Court.

Contemporaneously therewith, the Debtors filed their Motion for Order Under 11 U.S.C.

§1113(c) Authorizing Rejection of Collective Bargaining Agreements and Under 11 U.S.C.

§1114(g) Authorizing Modification of Retiree Welfare Benefits (the "1113 and 1114 Motion").

_____

[2]   The following members originally were appointed to the Committee: (a) Capital Research and Management
Company; (b) Electronic Data Systems Corp.; (c) Flextronics International Asia-Pacific, Ltd.; (d) Freescale
Semiconductor, Inc.; (e) General Electric Company; (f) IUE-CWA and (g) Wilmington Trust Company, as
Indenture Trustee.  Flextronics International Asia-Pacific, Ltd., has resigned from the Committee, and Tyco
Electronics Corporation has since been appointed to the Committee.  The Pension Benefit Guaranty Corporation and
the UAW have been added as ex officio members of the Committee.

3

The hearing on the 1113 and 1114 Motion began on May 9, 2006 and is ongoing.  The Rejection

Motion is scheduled to be heard by the Court immediately following the conclusion of the

hearing on the 1113 and 1114 Motion.

8.      On April 12, 2006, GM filed a preliminary objection to the Rejection Motion for

discovery purposes and, on June 5, 2006, GM filed a substantive supplemental objection to the

Rejection Motion (the "Supplemental Objection").

## FACTUAL BACKGROUND

**A.      The Spin-Off**

9.      The Debtors were a division of, and later a wholly-owned subsidiary of, GM

before their 1999 spin-off from GM (the "Spin-Off").  In connection with the Spin-Off, GM and

Delphi entered into a series of complex agreements, including labor agreements, guarantee and

indemnity agreements, and continuation and supplier agreements.  Notwithstanding the Spin-Off,

as a result of these agreements GM continues to have broad, deep and complex relationships with

all aspects of the Debtors' businesses.  GM is the Debtors' single largest customer and the

Debtors are GM's single largest supplier.

10.     As part of the Spin-Off, GM required the Debtors to assume the terms and

conditions of collective bargaining agreements that were negotiated between GM and its unions

(the "GM Labor Agreements").  The GM Labor Agreements have burdened the Debtors with

unsustainable, inflexible and uncompetitive labor costs and liabilities.  Also, the GM Labor

Agreements restrict the Debtors' ability to sell or close their existing plants or lay off excess or

redundant employees without union consent.  These restrictions have hindered the Debtors'

ability to restructure by selling or closing their unprofitable operations.

4

NY\1138667.8

11.     In addition, and notwithstanding the Spin-Off, GM continued to use its leverage and control over the Debtors to force the Debtors to agree to supply contracts that were effectively guaranteed to be unprofitable from their inception.  For example, GM forced the Debtors to agree to so-called "price-downs" (year-over-year reductions in the price that a purchaser pays for parts from its suppliers) substantially in excess of industry norms.  See Declaration of John D. Sheehan in support of the 1113 and 1114 Motion, ¶ 42.  As a result, the Debtors have a relationship with their single largest customer that causes them to incur tremendous losses each year.  Clearly, this relationship is not one that the Debtors can sustain if they are to become profitable and emerge from bankruptcy.

12.     Thus, GM saddled the Debtors with cost and revenue structures that doomed the Debtors to failure and led to the commencement of the Debtors' bankruptcy cases.

**B.     The Transformation Plan**

13.     On March 31, 2006, the Debtors announced a plan (the "Transformation Plan") to restructure their businesses in a manner the Debtors believe will allow them to achieve stable and profitable business operations by the first half of 2007.  See Delphi Corporation's Press Release dated March 31, 2006.  Under the Transformation Plan, the Debtors are pursuing restructuring initiatives that focus on five areas:  (a) modification of labor agreements, (b) negotiation with GM regarding reduction of legacy costs, as well as GM's future business commitment to the Debtors, (c) reduction of product portfolio and manufacturing footprint, (d) efforts to make their salaried workforce competitive and aligned with their restructuring plan, and (e) reduction of pension obligations.  Id.  In particular, the Debtors identified "two central issues that, if addressed satisfactorily, will enable the Debtors to reorganize successfully:  (a) onerous fixed labor and legacy costs inherited from GM and (b) unprofitable contractual relationships with

5

GM."  See Declaration of Randall S. Eisenberg in Support of the Rejection Motion (the "Eisenberg Declaration"), ¶ 16.

14.    Simultaneous with the announcement of the Transformation Plan, the Debtors filed two motions by which they are seeking to address these "central issues."  To address the labor costs inherited from GM, the Debtors filed the 1113 and 1114 Motion, pursuant to which they are seeking to reject their collective bargaining agreements with their unions and modify their pension liabilities.  To address their unprofitable supply relationships with GM, the Debtors filed the Rejection Motion, pursuant to which they are seeking authority, in their discretion, to reject the GM Loss Contracts.  Thus, these two motions must be viewed as interconnected elements of the broader Transformation Plan, each of which is equally necessary to achieve the ultimate goal of restructuring the Debtors' businesses so that they may become stable and profitable, and so that the Debtors may emerge from bankruptcy.

**C.    The Debtors' Contracts With GM, Analysis of the GM Loss Contracts and the Rejection Motion**

15.    The Debtors are the largest parts supplier to GM and currently supply GM with thousands of parts under tens of thousands of contracts.  See Eisenberg Declaration, ¶ 12. Pursuant to these contracts, the Debtors sell to GM parts necessary for GM to fulfill its current and past model service and replacement parts requirements.  Each contract generally takes the form of a purchase order that specifies the price for the specific part (or parts) and the term of the purchase order.  The Debtors' obligations under the contracts are absolute and unconditional.

6

The contracts also contain or incorporate by reference certain general terms and conditions under which GM deals with the Debtors.[3]

16.     As part of the Transformation Plan, the Debtors and their financial advisors have been analyzing and identifying unprofitable GM contracts that should be rejected. The Debtors' first phase of this process (the "Phase I Analysis") focused on the Debtors' contracts at their unprofitable Needmore, Home Avenue, Sandusky and Saginaw plants. The Debtors conducted an intensive part-by-part and contract-by-contract examination which identified 1,395 parts they supplied to GM, the sale of which resulted in negative operating income. These parts ultimately related to 515 burdensome GM contracts at the four plants. See Eisenberg Declaration, ¶¶ 24-28.

17.     During the Phase I Analysis, the Debtors found that plant-level operating income was a reasonable indicator of unprofitable contracts and, in particular, unprofitable GM contracts, because GM contracts generated most of the losses at those four plants. See Eisenberg Declaration, ¶ 29. Based on this finding, the Debtors determined that their pursuit of a part-by-part and contract-by-contract profitability analysis for the identification of additional GM Loss Contracts would be unduly burdensome to their estates and would provide only negligible added value. Id. In addition, because the Debtors are continuing to supply parts to GM at significant losses, the Debtors determined that they could not wait for the months of intensive work such an analysis would require. See Rejection Motion, ¶ 50.

18.     Accordingly, the second phase of the Debtors' contract analysis (the "Phase II Analysis") focused on plant-level profitability at certain of their plants. The Debtors evaluated plants that generate more than one half of their revenue by supplying parts for GM (and GM Tier

---

[3]  Among other things, these general terms and conditions provide that the contracts are to be construed according to the laws of the country, state or province from which the contracts are issued, as shown by the address of GM thereon.

7

1 Suppliers) and plants that generated negative income in 2005.  See Eisenberg Declaration, ¶¶ 30-32.  Based on the Debtors' evaluation of these two factors, they identified a total of 21 GM Loss Plants with an additional 4,957 burdensome GM Loss Contracts that need to be rejected.

19.    The Debtors have attempted to resolve unprofitable pricing terms with GM, but these negotiations are at a standstill.  See Rejection Motion, ¶ 37.  GM agreed to suspend certain price-downs temporarily, but refused to compensate the Debtors for the financial burdens (i.e., contract and labor costs) imposed by GM in connection with the Spin-Off.  Id.  As a result, and in furtherance of the Transformation Plan, the Debtors filed the Rejection Motion, pursuant to which they are seeking authority to reject the 5,472 GM Loss Contracts relating to the 21 GM Loss Plants.

## RESPONSE

20.    The Committee supports the Rejection Motion as an integral part of the Debtors' overall efforts to implement the Transformation Plan.  In the context of the Debtors' overall reorganization strategy, the Rejection Motion (in tandem with the 1113 and 1114 Motion) is in the best interests of the Debtors and their creditors.  The Rejection Motion will give the Debtors the opportunity to re-negotiate their unprofitable relationships with GM to achieve profitable price levels.

21.    Accordingly, the Rejection Motion is a necessary step in the Debtors' implementation of the Transformation Plan and, as such, should be approved by the Court.  As stated in the Eisenberg Declaration, "[t]he relief requested in the [Rejection] Motion, together with the relief requested in the . . . [s]ection 1113 [and 1114] Motion, will serve as a foundation for the Debtors' successful reorganization."  Eisenberg Declaration, ¶ 17.

8

A.    **The Rejection Motion Represents A Sound Exercise of the Debtors' Business
Judgment**

22.     The Debtors, both in their filings related to the Rejection Motion and those related

to the 1113 and 1114 Motion, amply demonstrate their business judgment in support of the

Rejection Motion.  The Debtors detail the analysis that their Board of Directors undertook in

evaluating both the Transformation Plan and the strategy the Debtors developed for its

implementation.  By doing so, the Debtors satisfy the standards for authorizing their rejection of

the GM Loss Contracts under section 365 of the Bankruptcy Code.

23.     In its Supplemental Objection, GM alleges that the Rejection Motion should be

denied because the Debtors did not demonstrate the validity of their business judgment.

Specifically, GM alleges that the Debtors should have reviewed each and every one of the GM

Loss Contracts to determine if their rejection would benefit the Debtors and their creditors.  GM

then has the audacity to argue that if in fact any contract is unprofitable, that unprofitability is

solely a function of the Debtors' fixed costs (primarily labor costs), and that as a result rejection

of even unprofitable contracts will harm the Debtors' estates.  However, GM's allegations are

without merit and should be overruled.

24.     First, the Debtors are not required to perform a contract-by-contract analysis of

the GM Loss Contracts to satisfy the business judgment test.  Section 365(a) of the Bankruptcy

Code provides that a debtor in possession "subject to the court's approval, may assume or reject

any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  If the debtor

determines, in the exercise of its business judgment, that the rejection of an executory contract or

unexpired lease is in the best interests of its estate, the court should approve the rejection of such

contract or lease.  See, e.g., NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Orion

Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99

9

(2d Cir. 1993); In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994). "Section 365 [of the Bankruptcy Code] does not require any balancing of the equities." In re Riodizio, 204 B.R. 417, 425 n. 9 (Bankr. S.D.N.Y. 1997). Moreover, "[a] court 'should defer to a debtor's decision that rejection of a contract would be advantageous unless the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim.'" In re Balco Equities Ltd., Inc., 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005) (citing In re Sundial Asphalt Co., 147 B.R. 72, 84 (Bankr. E.D.N.Y. 1992)).

25.    As explained by the Second Circuit, the business judgment test is a flexible one:

> We believe that such a flexible test for determining when an executory contract may be rejected, however termed (and business judgment is as good a label as any), is most appropriate. For in bankruptcy proceedings, the trustee, and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor. A rigid test, permitting rejection only where the executory contract will cause a net loss to the debtor's estate if performed, might work a substantial injustice in cases where it can be shown that the non-debtor contracting party will reap substantial benefits under the contract while the debtor's creditors are forced to make substantial compromises of their claims.

Control Data Corp. v. Zelman (In re Minges), 602 F.2d 38, 41 (2d Cir. 1979). A debtor need not prove that its proposed rejection of a particular executory contract certainly will provide a benefit to its estate. Rather, "[i]t is enough if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate . . . [and] there is a reasonable likelihood that general creditors will derive substantial or significant benefit. . . ." Id. at 43-44. Here, the Debtors satisfied this standard by demonstrating that the rejection of the GM Loss Contracts as a whole will benefit their estates and creditors.

26.    Second, GM fails to recognize that the purpose of the Rejection Motion is to enable the Debtors to fix the overall unprofitability of their contractual relationships with GM, and not to address the economics of each individual contract. Any requirement to analyze each

10

of the thousands of contracts among the Debtors and GM to support individualized rejection decisions would miss the forest for the trees, and prevent the Debtors from achieving the necessary fundamental changes to the relationship.

27.     Third, the arguments made by GM deliberately ignore the context within which the Rejection Motion was filed.  GM instead focuses myopically on the Rejection Motion, divorced from the 1113 and 1114 Motion and the Transformation Plan.  Its argument fails to consider that the Rejection Motion will help provide a framework for the Debtors' resolution of contract and labor issues with GM and the Debtors' unions.

28.     The deliberate refusal to view the Rejection Motion in context is highlighted by GM's argument that the Rejection Motion should be denied because the unprofitability of the GM Loss Contracts is a function of the Debtors' labor costs and not of the prices that GM pays for the parts.  That argument completely and intentionally ignores the fact that the Rejection Motion goes hand in hand with the Debtors' efforts to reduce those labor costs, and that both a reduction in labor costs and a rationalization of the supplier relationships between the Debtors and GM are equally necessary to implement the Transformation Plan.[4]

29.     However, GM's audacity does not stop there.  On the one hand, GM argues that the GM Loss Contracts must be maintained regardless of the losses they generate.  Then, GM argues that the Debtors' stated purpose in rejecting those contracts – to obtain higher pricing from GM to rectify the above-market labor costs with which GM has saddled the Debtors – means that the Rejection Motion has been filed in bad faith.  The mere attempt to create

---

[4]  Indeed, it is ironic that at least one of the Debtors' unions has made the exact opposite argument in opposition to the 1113 and 1114 Motion – namely, that the collective bargaining agreements cannot be rejected because the result of the Rejection Motion will be to make the GM Loss Contracts profitable.  See Objection and Memorandum of Law in Support of Objection of IUE-CWA to Motion for Order Under §§ 1113 and 1114 Authorizing the Debtors to Reject the IUE-CWA's Collective Bargaining Agreement and Terminate Post Retirement Benefits, pp. 11-12.

11

leverage, GM would have this Court believe, renders section 365 unavailable.  Such an argument

is patently absurd.  It is not an improper use of section 365 of the Bankruptcy Code for a debtor

to create leverage in an effort to renegotiate a contractual relationship.  See, e.g., In re Arden and

Howe Assocs., Ltd., 152 B.R. 971, 976 (Bankr. E.D. Cal. 1993) (explaining that a debtor may

"use the threat of rejection as leverage to negotiate" changes in restrictive contract terms).[5]

Given that the problem that the Debtors are seeking to rectify is one of GM's creation, GM's

attempt to paint any attempt by the Debtors to address the situation as an act of bad faith is

disingenuous in the extreme.

30.     Accordingly, the Committee believes that the Debtors' decision to seek authority

to reject the GM Loss Contracts is a reasonable exercise of their business judgment.

**B.     Assertions of Outsized Damages from Rejection are Unsupportable and Irrational**

31.     GM also alleges that it will suffer substantial damages if the Debtors reject the

GM Loss Contracts, that this damage outweighs any benefit to the Debtors' estates from

rejection and that this sort of cost benefit analysis is dispositive of the Rejection Motion.  These

allegations, however, cannot be taken seriously.  In the Rejection Motion, the Debtors make clear

that they expect and intend no disruption in their supply to GM of parts essential to its

manufacturing operations.  See Rejection Motion, ¶ 70.  Most importantly, the Debtors stated

that rejection would, at most, result in increases in the prices that the Debtors charge for the parts

supplied to GM, but that those parts will continue to be supplied to GM.  Id., ¶¶ 57, 70.

Therefore, no GM plants face shutdown except as a result of GM's own actions – its refusal out

of spite to continue to purchase from the Debtors any parts not available from another supplier.

---

[5]  Just as one example, it has been a staple of every airline bankruptcy that the debtor uses the threat of a rejection to
get reduced rates under aircraft leases.

GM would have this Court believe that, when faced with the choice between paying more for its

parts or shutting down its production, GM would choose to shut down its production.  It is

simply not credible to believe that GM would choose suicide over survival.

32.      Furthermore, even if GM is suicidal, GM's assertion that it would be entitled to

assert against the Debtors claims arising from a shutdown of its plants is flatly contradicted by

applicable state law.  See In re Urban, 202 B.R. 565, 571 (Bankr. S.D.N.Y. 1994) ("The

appropriate measure of damages for rejection of an executory contract is determined with

reference to state law.").  As noted above, the GM Loss Contracts state that they are governed by

the laws of the state where the GM purchaser is located.  Based on a review of the "Phase One"

GM Loss Contracts, the vast majority are governed by the laws of Michigan or Arizona[6] and,

because the GM Loss Contracts are contracts for the sale of goods, they are governed by Article

2 of each state's adopted version of the Uniform Commercial Code (the "U.C.C.").  See U.C.C. §

2-102 ("Unless the context otherwise requires, this Article applies to transactions in goods . . .

."); Michigan Compiled Laws ("M.C.L.") § 440.2102 (same); Arizona Revised Statutes

("A.R.S.") § 47-2102 (same).  Sections 2-712 and 2-713 of the U.C.C. provide that, where the

seller under a contract for the sale of goods breaches that contract or otherwise fails to deliver the

goods, the non-breaching buyer's damages are measured by its costs to obtain replacement

goods.  See U.C.C. §§ 2-712 (Cover; Buyer's Procurement of Substitute Goods), 2-713 (Buyer's

Damages for Nondelivery or Repudiation); M.C.L. §§ 440.2712 (Cover; Procurement of

Substitute Goods; Buyer's Damages), 440.2713 (Nondelivery or Repudiation; Buyer's

---

[6]  GM asserts that all of the GM Loss Contracts are governed by Michigan law.  See GM's Supplemental Objection,
p. 50.  This is flatly contradicted by the terms of the GM Loss Contracts themselves, which state that they are
governed by the law of the state indicated in GM's address on each such contract, which in certain circumstances is
Arizona, not Michigan (and for a small number of GM Loss Contracts is in fact a foreign country).

13

Damages); A.R.S. §§ 47-2712 (Cover; Buyer's Procurement of Substitute Goods), 47-2713

(Buyer's Damages for Non-delivery or Repudiation). Thus, given that the Debtors will be

offering to continue to supply GM with the same parts, albeit at a higher price, GM's rejection

damages would be limited to the difference between the price of products GM purchased from

the Debtors under pre-rejection contract terms and GM's costs to cover its damages by

purchasing replacement products under new contracts, including new post-rejection contracts

with the Debtors.  See U.C.C. §§ 2-712 ("After a breach . . . the buyer may 'cover' by . . .

purchase of or contract to purchase [substitute] goods . . . [and] [t]he buyer may recover . . . as

damages the difference between the cost of cover and the contract price . . . ."), 2-713 ("[T]he

measure of damages for nondelivery or repudiation by the seller is the difference between the

market price . . . and the contract price . . . ."); M.C.L. §§ 440.2712, 440.2713 (same); A.R.S. §§

47-2712, 47-2713 (same).

      33.     This is true under the U.C.C. even if GM refuses to mitigate its damages and

instead shuts down its plants by refusing to continue to purchase necessary parts from the

Debtors.  See U.C.C. § 2-715 (2) (Buyer's Incidental and Consequential Damages)

("Consequential damages resulting from the seller's breach include (a) any loss . . . which could

not reasonably be prevented by cover or otherwise . . . ."); M.C.L. § 440.2715 (2) (same); A.R.S.

§ 47-2715 (B) (same); see also Robert A. Hillman, Keeping the Deal Together After Material

Breach—Common Law Mitigation Rules, the UCC, and the Restatement (Second) of Contracts,

47 U. COLO. L. REV. 553, 585 (1976) (a buyer's consequential damages are limited to those

which could not reasonably be prevented by cover, and a buyer who chooses not to cover will be

precluded from obtaining consequential damages that could have been avoided).  Also, principles

of mitigation would preclude any effort by GM to assert damage claims that reflect unnecessary

14

enhancement of the loss caused by the Debtors' rejection (or breach) of its contracts.  See, e.g., NY-Coastal Aviation, Inc. v. Commander Aircraft Co., 937 F. Supp. 1051, 1070 (S.D.N.Y. 1996), aff'd, 108 F.3d 1369 (2d Cir. 1997) (finding that buyer wrongfully failed to mitigate damages where it refused to accept seller's offer to sell aircraft in smaller market area, and thus, that buyer could not recover damages it could have so avoided); Lorenz Supply Co. v. American Standard, Inc., 100 Mich. App. 600, 610 (Mich. Ct. App. 1980) ("[A] breach of contract imposes on the plaintiff a duty to mitigate damages."); Toshiba Mach. Co. v. SPM Flow Control, Inc., 180 S.W. 761, 781 (Tex. App. 2005) ("Mitigation of damages is a rule requiring the injured party to use reasonable diligence to minimize his damages.").  The irrationality of GM's refusal to purchase parts from the Debtors would only be compounded by the fact that such refusal would provide GM with no additional claim against the Debtors.

34.     Moreover, GM's argument that the Rejection Motion should be denied simply because rejection will damage the Debtors' relationship with its largest customer is equally unsupportable.  The Committee has no doubt that GM will continue to act in its own best interests – it will not pull future business from the Debtors simply out of spite if that means purchasing parts from a more expensive or less qualified supplier.  In any event, given that the overall goal of the Rejection Motion and the Transformation Plan is to make the Debtors' products more price competitive, in fact it is just as plausible that the long term effect of the Rejection Motion is to make the Debtors' products more attractive to GM.

35.     More importantly, GM's position ignores the origins of and onerous nature of the contractual relationship between GM and the Debtors.  GM is attempting to require the Debtors to maintain a money-losing relationship simply because, unsurprisingly, given its historic relationship with Delphi, GM is the Debtors' largest customer.  That position defies economic

15

logic if the Debtors lose money on each part sold to GM, the response should be to sell fewer parts and thus reduce the losses, not to sell more.

**C.    GM is Not Entitled to Specific Performance of the GM Loss Contracts**

36.    GM's claim that it is entitled to specific performance carries to an absurd extreme its deliberate blindness to the Debtors' willingness to continue supplying the parts covered by the GM Loss Contracts on a post-rejection basis.[7]  According to GM, "if Delphi ceases performance under the [GM Loss Contracts] before GM is able to resource the affected parts, GM will be irreparably harmed and will not have an adequate remedy at law because the parts delivered from Delphi are unique and GM can not [sic] cover prior to making alternative manufacturing arrangements . . . ."  Supplemental Objection, p. 66.  However, nothing could be further from the truth.  GM blatantly ignores the obvious fact that, after rejection, it would be able to immediately obtain its allegedly unique goods from the Debtors.[8]

---

[7]  Also, GM's threat to sue the Debtors for economic duress for their rejection of the GM Loss Contracts is unsupported and cannot be seriously considered.  Under Michigan law, "[d]uress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will . . . [and] fear of economic hardship or financial devastation, alone . . . is insufficient . . . to establish economic duress."  In re National Steel Corp., 316 B.R. 287, 308 (Bankr. N.D. Ill. 2001).  In the Rejection Motion, the Debtors are seeking relief available to them under section 365 of the Bankruptcy Code.  If GM refuses to purchase parts from the Debtors after their rejection of the GM Loss Contracts, this would be irrational and suicidal on GM's part, but it certainly would not be the product of any duress imposed on GM by the Debtors.

Furthermore, notwithstanding GM's unsupported statements to the contrary, any specific performance or duress action would clearly be barred by the automatic stay.  Although 28 U.S.C. § 959 permits the prosecution of claims based on a debtor's postpetition operation of its business, it does not permit a creditor's prosecution of prepetition claims against a debtor.  See, e.g., First Fiscal Fund Corp., 36 B.R. 299, 302 (Bankr. E.D.N.Y. 1984).  Specifically, § 959 does not permit "[a]n action on a claim arising out of the rejection of an executory contract . . . since any damages flowing from such a rejection are deemed to have occurred immediately prior to the filing of the debtor's petition in bankruptcy."  Id.  The statutory exceptions to the automatic stay are found in section 362(b) of the Bankruptcy Code and none of them would apply to the Debtors' rejection of the GM Loss Contracts.  As acknowledged in In re Crown Vantage, Inc., 421 B.R. 963, 972 (9th Cir. 2005) -- a case cited by GM -- "[t]he few examples of suits that have been allowed under § 959(a) include a [postpetition] wrongful death action filed against an operating railroad trustee and suits for wrongful [postpetition] use of another's property."  Accordingly, GM's purported reliance on 28 U.S.C. § 959(a) is completely baseless.

[8]  In addition to arguing that it does not have an adequate remedy at law, GM argues that it is entitled to the affirmative injunction of specific performance because its purported right to this remedy is not a dischargeable "claim."  Supplemental Objection, p. 54.  However, this argument is both premature and incorrect as a matter of law.

16

37.     With respect to post-rejection remedies available to a creditor, "specific

performance will not be granted where under the circumstance an action at law for compensatory

damages . . . would be adequate . . . ."  In re Chick Smith Ford, 46 B.R. 515, 519 (Bankr. M.D.

Fla. 1985); see also In re Waldron, 36 B.R. 633, 642 n.4 (Bankr. S.D. Fla. 1984), rev'd on other

grounds, 785 F.2d 936 (11th Cir. 1986) ("The Code does not permit specific performance as a

remedy resulting from the rejection of an executory contract under § 365.").  Thus, GM will not

have a right to specific performance because, as described above, it would have an adequate

remedy at law in the form of "cover" damages under the U.C.C. (i.e., the difference between the

price of products GM purchased from the Debtors under pre-rejection contract terms and GM's

costs to cover its damages by purchasing replacement products under new contracts, including

new post-rejection contracts with the Debtors).[9]  Moreover, specific performance would be

---

As GM acknowledges, the Court "can not [sic] determine GM's breach of contract remedies in the rejection hearing and its findings at the rejection hearing do not have collateral estoppel effect."  Supplemental Objection, p. 49. Thus, any dischargeability argument is premature because, at the hearing, the Court will only determine whether the Rejection Motion represents a sound exercise of the Debtors' business judgment.  In addition, GM completely ignores the fact that section 101(5) recognizes that an obligation is a dischargeable "claim" if it can be reduced to money.  See, e.g., In re Udell, 18 F.3d 403, 408 (7th Cir. 1994) ("[A] right to an equitable remedy for breach of performance is a 'claim' if the same breach also gives rise to a payment 'with respect to' the equitable remedy.").  This is precisely the case here.  Michigan law permits specific performance under supply contracts but money damages in the form of cover are an alternate remedy.  Moreover, the cases GM discusses in support of its dischargeability argument are distinguishable from the facts surrounding the Debtors' rejection of the GM Loss Contracts.  For example, none of the cases deals with a debtor being forced to specifically perform under supply contracts after rejection.  Also, the three main cases GM discusses (i.e., Kovacs, Chateaugay and Udell) as examples of courts holding affirmative injunctions to be non-dischargeable deal with injunctions against harmful postpetition acts or omissions (i.e., ongoing environmental pollution or violations of non-competition agreements).  Here, the Debtors will not be engaging in any such harmful postpetition conduct.  The Debtor's rejection of the GM Loss Contracts will give rise to prepetition rejection damages claims of GM against the Debtors (in the form of cover damages), and GM's claims for these money damages will be dischargeable in the Debtors' chapter 11 cases.

[9]  Interestingly, in the Supplemental Objection, GM opens with the argument that the Court is without power to approve the Rejection Motion because the discretionary relief requested therein is "neither authorized nor permitted under the Bankruptcy Code."  Supplemental Objection, pp. 34-35.  However, GM completely undermines its position and implicitly concedes that it can "cover" its post-rejection damages in its closing argument, which states "[i]f the Court were inclined to grant the Rejection Motion, it should use its equitable powers to condition rejection on terms that will minimize the harm to GM."  Supplemental Objection, p. 79.  Specifically, GM suggests that the Debtors provide GM with a contract rejection transition period and cooperate to permit GM to resource the affected parts.  Supplemental Objection, p. 80.  This is exactly what the Debtors contemplate doing upon their receipt of authority to reject the GM Loss Contracts.

17

inappropriate under the circumstances because the Debtors' rejection of the GM Loss Contracts

is vital to their Transformation Plan and they would not be able to successfully reorganize if they

were forced to specifically perform under the burdensome GM Loss Contracts. See, e.g., In re

Fleishman, 138 B.R. 641, 648 (Bankr. D. Mass. 1992) ("Specific performance should not be

permitted where the remedy would in effect do what § 365 meant to avoid, that is, impose

burdensome contracts on the debtor.").

**D.     The GM Loss Contracts Are Not Integrated With Other Agreements**

38.     GM adds to its illogical threat of mutually assured destruction by asserting,

without any meaningful analysis, that the rejection of the GM Loss Contracts constitutes a

breach of other supply contracts, and that GM will compound its self-inflicted wounds by

refusing to continue to purchase those parts as well. Not only would such behavior constitute a

failure by GM to mitigate any damages resulting from the Debtors' breach (qua rejection) of the

GM Loss Contracts for the reasons set forth above,[10] but such a threat is simply not supported by

fact or law.

39.     Under section 365 of the Bankruptcy Code, contracts that are part of a single

integrated agreement must be assumed or rejected together. See, e.g., In re Teligent, Inc., 268

B.R. 723, 728 (Bankr. S.D.N.Y. 2001). GM alleges that certain of the GM Loss Contracts

cannot be rejected by the Debtors because they are purportedly integrated with (a) the

Component Supply Agreement into which the Debtors and GM entered as part of the Spin-Off

(the "CSA"), (b) the GM/Delphi Commercial Agreement between the Debtors and GM dated

---

[10]  Because the Debtors are not seeking to reject these other supply contracts and intend to continue to supply these
parts at the contract price, GM would have no damages at all from a refusal to purchase. In fact the Debtors may
have damages arising from GM's willful breach by refusing to perform these supply contracts in the event of the
Debtors' rejection of the GM Loss Contracts.

18

November 24, 2003 (the "GOA") and (c) certain other unidentified supply agreements (the "Other Agreements").  <u>See</u> Supplemental Objection, p. 67.

40.     GM, however, fails to support its assertion that the GM Loss Contracts are integrated with the listed agreements.  With respect to the GOA and the Other Agreements, GM merely concludes that "it is undisputable that the contracts are integrated."  Supplemental Objection, p. 68.  GM provides no support at all for this statement; GM has not even bothered to attach copies of these agreements to allow any parties in interest or this Court to see their terms.  With respect to the CSA, GM's sole support is the statement that certain of the GM Loss Contracts were entered into on the same date as the CSA and that Section 1.1 therein provides that "it was the stated intent of both Delphi and GM that both parties shall continue to honor the terms and condition [sic] of all Existing Agreements, regardless of whether a particular Existing Agreement was profitable or unprofitable."  Supplemental Objection, p. 69.  However, GM incorrectly states that Section 1.1 provides that it was the parties' intent to honor the agreements "regardless of whether a particular Existing Agreement was profitable or unprofitable."  <u>Id</u>.  Indeed, the CSA makes no mention of profitability and this assertion is flatly contradicted by GM's explicit option to resource components to other suppliers if the Debtors fail to remain competitive or GM wishes to introduce technological changes.  <u>See</u> CSA, §§ 3.1, 4.1.  However, even if GM's characterization of the CSA is correct, it does not support its argument that the GM Loss Contracts and the CSA constitute one integrated contract.

41.     To determine if separate agreements constitute a single integrated agreement, courts examine the intent of the parties and look to applicable state law.  <u>See</u>, <u>e.g.</u>, <u>Teligent</u>, 268 B.R. at 728.  GM asserts that the CSA, the GOA and the Other Agreements are all governed by Michigan law, <u>see</u> Supplemental Objection, p. 68.  The Committee cannot confirm this assertion

19

with respect to the GOA or the Other Agreements because the CSA is the only agreement GM

attached to its Supplemental Objection.  Furthermore, as noted above, certain of the GM Loss

Contracts are governed by Arizona law and a few are governed by the laws of foreign countries.

Nevertheless, assuming Michigan law applies to all of these agreements, Michigan courts

consider three principal factors when determining whether agreements were intended by the

parties to be separate or integrated: (a) whether the terms of each agreement modify or alter the

terms of each other, (b) whether the terms of each agreement are definite and certain, and (c)

whether each agreement is supported by independent consideration.  See, e.g., Network

Commc'ns v. Mich. Bell Tel. Co., 703 F. Supp. 1267, 1272 (E.D. Mich. 1989).  In addition, "as a

general rule, a contract is entire when, by its terms, nature and purpose, it contemplates that each

and all of its parts are interdependent and common to one another and to the consideration, and is

severable when, in its nature and purpose, it is susceptible of division or apportionment."  Dumas

v. Auto Club Ins. Ass'n, 473 N.W.2d 652, 659 (Mich. 1991).

      42.     Based on the above factors, each of the GM Loss Contracts is a severable

agreement that can be independently rejected by the Debtors pursuant to section 365 of the

Bankruptcy Code.  First, the CSA provides for the severance of the Debtors' production of parts

under supply contracts in certain events (i.e., if the Debtors fail to remain competitive or GM

wishes to introduce technological changes).  See CSA, §§ 3.1, 4.1.  In this regard, GM cannot

credibly argue that the CSA should be construed as flexible enough to allow for product

discontinuation in certain events while, at the same time, so rigid and integrated that both parties

must "honor the terms and condition of all [GM Loss Contracts], regardless of whether a

particular [GM Loss Contract] was profitable or unprofitable."  See Supplemental Objection, p.

69.  Second, the CSA provides that the price of each component part in each agreement is

20

apportioned and, in particular, each of the GM Loss Contracts provides its own pricing terms for parts covered thereunder.  Indeed, section 14.1 of the CSA explicitly provides for the independent pricing of each part.  See, e.g., Stevenson, 19 N.W.2d at 497 ("When the price is expressly apportioned by the contract, or the apportionment may be implied by law, to each item to be performed, the contract will generally be held to be severable.").  Third, the CSA and the GM Loss Contracts do not contain other provisions typically seen in integrated contracts, such as clauses clearly integrating them as one contract or cross-default provisions.  See, e.g., In re Comdisco, Inc., 270 B.R. 909, 911-12 (Bankr. N.D. Ill. 2001) (finding one set of agreements with cross-default provisions to be integrated, but not a second set of agreements without such provisions).  Finally, the fact that the CSA and certain of the GM Loss Contracts were executed simultaneously at the time of the Spin-Off (together with a long list of agreements) does not necessitate a finding that the parties intended for the contracts to constitute a single integrated agreement.  Specifically, it is not determinative that the contracts were negotiated and executed at the same time and between the same parties.  See, e.g., Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 738-42 (5th Cir. 1996) (finding, in one contract, two severable and separate agreements entered between same parties, at same time, and as part of same transaction).  Indeed this argument, in fact, cuts against GM's position given the fact that many of the GM Loss Contracts were entered into after the CSA was executed.  In short, GM's paltry analysis cannot hide the fact that there is no real basis on which to integrate the GM Loss Contracts with the CSA, the GOA or any Other Agreements.

21

## CONCLUSION

**WHEREFORE,** the Committee respectfully requests that this Court (a) approve the

Rejection Motion, (b) overrule GM's objections and (c) grant such other relief as is just and

proper.

Dated: June 15, 2006
        New York, New York

**LATHAM & WATKINS LLP**

By: /s/ Robert J. Rosenberg
     Robert J. Rosenberg (RR-9585)
     Mitchell A. Seider (MS-4321)
     Mark A. Broude (MB-1902)
     885 Third Avenue, Suite 1000
     New York, New York 10022
     Telephone:  (212) 906-1200

Attorneys for the Official Committee
of Unsecured Creditors

22