SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :
       In re                  :    Chapter 11
                        :
DELPHI CORPORATION, et al.,   :    Case No. 05–44481 (RDD)
                        :
           Debtors.    :    (Jointly Administered)
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO DEBTORS' MOTION
FOR ORDER UNDER 11 U.S.C. § 365 AND FED. R. BANKR. P. 6006
AUTHORIZING REJECTION OF CERTAIN EXECUTORY CONTRACTS
<u>WITH GENERAL MOTORS CORPORATION</u>**

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this omnibus response to the Preliminary And Supplemental Objections Of General Motors Corporation To Debtors' Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts (Docket Nos. 3210, 4019), Appaloosa Management L.P.'s Preliminary Objection To Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3243), the Limited Objection Of SPS Technologies, Inc., SPS Technologies Waterford Company And Greer Stop Nut, Inc. To Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3567), and the Preliminary And Limited Objections Of The Official Committee Of Equity Security Holders To Debtors' Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket Nos. 3926, 4128) (collectively, the "Objections").[1]

## Nature of Objections

General Motors Corporation ("GM") is the only objector to have set forth substantive objections regarding the relief sought by the Debtors, and thus this omnibus response is focused on GM's objections. GM's preliminary and supplemental objections are referred to herein collectively as the "Objection."

---

[1]    General Motors Corporation ("GM") is the only objector to have set forth substantive objections regarding the relief sought by the Debtors, and thus this omnibus response is focused on GM's objections. GM's preliminary and supplemental objections are referred to herein collectively as the "Objection." The Equity Committee's limited objection seeks a modification of the form of notice (i.e., the inclusion of notice to the Equity Committee) with which the Debtors agree.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

The Equity Committee's limited objection seeks a modification of the form of notice (i.e., the inclusion of notice to the Equity Committee) with which the Debtors agree.  While the Debtors have not included the Equity Committee in its notice provisions as a matter of course, in light of the scope of the Court's mandate in appointing an equity committee in these cases, in this instance the Debtors believe that notice is appropriate in light of the nature of the Motion.

Through its Limited Objection, SPS Technologies, Inc. ("SPS") seeks information from the Debtors regarding the contracts at issue on the Motion, and the Debtors will work with SPS to provide reasonable information.

The balance of the preliminary objections were filed simply as a means to participate in discovery and therefore do not call for a response.

In the Pretrial And Scheduling Order relating to the Motion dated June 13, 2006, the Court set a June 26, 2006 deadline for the filing of a supplemental objection by Appaloosa Management L.P., Wexford Capital LLC, Lampe Conway & Co., L.L.C., Harbinger Capital Partners LLC, and Marathon Asset Management LLC (the "Appaloosa Group").  The Debtors reserve all of their rights to respond to any supplemental objection filed by the Appaloosa Group.

In response to the Objections, and in further support of their Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033) (the "Motion"), the Debtors respectfully represent as follows:

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

## Preliminary Statement

As has been the case since early last year, Delphi continues to be principally focused on forging a comprehensive, consensual resolution of the Debtors' unsustainable cost and revenue structure.  GM, however, was not prepared to participate in Delphi's transformation plans prior to the commencement of these chapter 11 cases, in part because GM believed that Delphi's capital structure should be impaired so as to require the participation of all stakeholders in any transformation.  Nor were the Debtors successful in persuading GM to participate in the Debtors' transformation during the first six months of these cases.  Although the pace, tone, tenor, and intensity of discussions since early 2006 have been noticeably different, constructive, and encouraging, in light of GM's historical track record, and in the absence of a comprehensive transformation plan, the Debtors reasonably determined that they owe a fiduciary duty to their creditors and other stakeholders to prepare for the sub-optimal possibility that the Debtors will not reach a comprehensive, consensual resolution in the near future.

This is why the Debtors filed the Motion, and why they continue to seek the authority to reject certain unprofitable supply contracts with GM.  The Debtors have concluded, in good faith, that absent a comprehensive consensual resolution, rejecting unprofitable GM contracts over an interim period will help stem operating losses, position the Debtors to maximize business enterprise value realistically available to them, and address the inequitable transfer of value from the Debtors' estates to GM.  Because the Debtors' current level of GM-related operating losses is unsustainable—a fact that GM cannot challenge—it is incumbent upon the Debtors to take appropriate measures to mitigate these losses until they resolve their GM-inherited labor-cost

4

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

issues. The discovery record on the Motion is entirely consistent with, and fully supports, this reasonable business judgment.

Rather than challenge the Debtors' business judgment that rejection and repricing will benefit their estates, GM in its Objection sets up and knocks down a straw man. GM repeatedly presents the specter of a shutdown of its operations. GM does so despite the fact that it knows that the Debtors' business judgment is <u>not</u> that their estates benefit by canceling these contracts and stopping the shipment of parts to GM. In addition to invoking the catastrophic consequences of a shutdown, GM and its rebuttal expert assert that the Debtors will be committing financial "suicide" by discontinuing the production of parts at issue, in light of the Debtors' "fixed costs." GM's "fixed cost" argument proceeds on the same flawed premise, namely that the Debtors intend by rejecting the GM Loss Contracts to stop supplying GM. Thus, GM's central arguments miss the point and do not address the Debtors' actual business judgment that the Court must evaluate here.

In fact, the declarations submitted by GM emphasize that GM cannot easily re-source the parts at issue in the Motion. This only reinforces the Debtors' judgment that, following rejection of the GM Loss Contracts, GM will have every incentive to accept new terms under which the supply of parts will continue until the Debtors are able to reduce their labor costs and transition in an orderly fashion out of non-core businesses. <u>The only way a calamitous shutdown of GM can happen as a result of this Motion is if GM itself decides to reject equitable re-pricing terms offered by Delphi and chooses to shut itself down.</u> For a myriad of reasons, the Debtors and GM can be expected to act rationally and to seek to avoid a shutdown.

To the extent GM raises legal arguments that could pertain to the Debtors' actual business judgment, they are misplaced. For the reasons set forth fully herein: (i) the Court has discretion

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

to grant the Debtors the authority to reject; (ii) the Debtors have met the flexible, fact-specific business judgment test that applies in this Circuit on a motion under 11 U.S.C. § 365; (iii) the Debtors are acting in good faith; (iv) the equities favor the relief requested; and (v) neither the Bankruptcy Code nor Michigan law permits GM to frustrate the purpose of rejection by locking in current prices through the remedy of specific performance.

In the end, GM's position is not surprising. It wants to continue, for as long as possible, to receive parts from its former parts division at prices that do not compensate the Debtors' estates for GM-inherited production costs. It would be inequitable to allow GM to do so, to the detriment of the Debtors' estates, creditors, and other stakeholders. GM must either voluntarily resolve this historical and continuing inequity, or this Court should give the Debtors access to the tools Congress provided in the Bankruptcy Code, so that the Debtors may unilaterally address and seek to mitigate the present, unsustainable state of affairs.

The Discovery Record

The discovery record confirms and supports the Debtors' business judgment. Although GM's Objection insinuates that discovery has revealed facts inconsistent with the Debtors' Motion and supporting declarations, this is not the case.

A.    The Debtors Do Not Seek To Disrupt The Supply Of Parts To GM

In its Objection and supporting declarations, GM assumes that rejection of the GM Loss Contracts will result in the immediate shutdown of GM plants, with catastrophic economic reverberations throughout North America. Contrary to this doomsday scenario, the Debtors have made it clear that their goal through this Motion they do not seek to disrupt the delivery of parts to GM. In the Motion, the Debtors clearly state: "As an accommodation to GM, the Debtors are prepared to continue to ship the parts associated with the GM Loss Contracts under reasonable

6

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

and equitable price terms." (Mot. ¶ 70.)  The discovery record on this issue is entirely consistent

with the Motion itself:


**REDACTED**


Individuals at GM responsible for sourcing to Delphi and negotiating with Delphi have

testified that


**REDACTED**


\*      \*      \*


**REDACTED**

---

2       Excerpts from the transcript of the deposition of John Opie appear in Exhibit A hereto.

3

**REDACTED**

                                                    )  Excerpts from the transcript of the
deposition of John Sheehan appear in Exhibit B hereto.

4       Excerpts from the transcript of the deposition of Steve Daniels appear in Exhibit C hereto.

5       Excerpts from the transcript of the deposition of Greg Ruselowski appear in Exhibit D hereto.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

**REDACTED**

(Parekh Dep. 31:8-32:2, June 12, 2006.)[6] Nor would the rejection of the contracts result in the immediate discontinuation of GM business, as Steve Daniels, a Director of Mergers & Acquisitions at Delphi and a former GM employee, explained:

**REDACTED**

---

[6]    Excerpts from the transcript of the deposition of Kevan Parekh appear at Exhibit E hereto.

[7]    One of GM's principal Delphi negotiators likewise conceded that it would be irrational for Delphi to cause a shutdown.  (Parekh Dep. 83:3-8, 14-21.)

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

B.   GM Distorts The Discovery Record By Assuming That
      "Rejection" Means Immediately Ceasing Shipment

Delphi's Chief Restructuring Officer, John Sheehan, testified that

**REDACTED**

By ascribing a different meaning to the concept of "rejection"—i.e., by equating "rejection" with the immediate cessation of production and shipments to GM—GM's counsel created a confusing deposition record.  In its Objection, GM takes advantage of that confusion.  GM has selectively quoted snippets from deposition transcripts and documents in order to create the misleading impression that the Debtors have not evaluated the consequences of "rejection," or that the Debtors have no intention to "actually reject" contracts.

For example, quoting Mr. Eisenberg's testimony, GM claims that

**REDACTED**

---

[8]   Other instances in which GM confusingly equates rejection with the immediate cessation of shipment are found in GM's Objection on page 20 (testimony of John Opie, Delphi's lead independent director, on fixed costs) and page 26 (testimony of Mr. Eisenberg on the effect of rejection on the Debtors' other contracts with GM).

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Similarly, GM cites an internal Delphi e-mail in support of the proposition that "Delphi admits it has no intention to actually reject the Supply Contracts." (Objection 36.) What that e-mail actually reflects is that, **REDACTED**

All of GM's assertions regarding the Debtors' supposed failure to assess the impact of "actual rejection" (which it asserts is evidence of "bad faith") amounts to this:  GM refuses to accept that the Debtors have reasonably determined that "rejection" inures to the benefit of the Debtors by placing them in a position to supply GM with parts at higher, yet reasonable, prices, and to stop incurring unsustainable losses solely for the benefit of GM, and to the detriment of every other stakeholder in these chapter 11 cases.

GM also claims that Delphi filed the Motion "solely to gain leverage over GM—in complete disregard to the harm such action will cause Delphi if granted." (Objection 37.)  In reality, the Debtors filed the Motion to address the large operating losses generated by the Debtors' U.S. operations.  As Mr. Eisenberg articulated:

**REDACTED**

An important by-product of filing the Motion is that it may provide GM with additional

---

[9]    See DPH-1GM052967 (attached hereto as Exhibit G).

[10]    (See also Daniels Dep. 89:22-89:25, 90:2-90:3 ("Under the—in the context of the way we have structured the motion, I personally feel that the Estate will be better off because, as I said before, it gives us more options in terms of reaching consensual agreement or ending up a with a mechanism, a tool, to facilitate our restructuring process."); Opie Dep. 18:16-18:25.)

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

motivation to negotiate a consensual resolution.  When questioned on this issue, Mr. Sheehan explained:

**REDACTED**

(Sheehan Dep. 96:18-96:25, 97:2-97:9.)

GM attempts to portray the Debtors as having filed the Motion without assessing whether rejection might benefit the Debtors' estates because the potential economic benefit has not been quantified.  (See Objection 19.)  The Debtors did, however, assess the benefits and risks of filing the Motion, as Mr. Sheehan explained:

**REDACTED**

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

(Sheehan Dep. 223:2-23; see also Daniels Dep. 121:3-6

**REDACTED**

Finally, GM attempts to portray the Debtors' Motion as an attempt to disrupt GM's "just-in-time" delivery system. (Objection 27.) However, the Debtors do not seek through this Motion to cause a shutdown of GM. Indeed, the Debtors have expended well in excess of one billion dollars in estate assets since the commencement of these cases in an effort <u>not</u> to disrupt GM's or any other customer's continuity of supply — and have been spectacularly successful in maintaining the functioning of the automobile industry supply chain in spite of operating within the largest manufacturing reorganization in history. It should not be surprising, therefore, that the Debtors and FTI's workpapers do not evaluate the consequences of an immediate shutdown. As Mr. Eisenberg stated, "We did not analyze something that we thought was wholly and entirely unrealistic." (Eisenberg Dep. 129:25-130:2.)

C.    <u>The Discovery Record Fully Supports The Debtors' Reasonable Business Judgment</u>

The record developed in discovery supports and substantiates the Debtors' reasonable business judgment in seeking authority to reject the GM Loss Contracts. The record is clear that Delphi is losing money at an unsustainable rate. Delphi had an operating loss of $1.5 billion in 2005 and    **REDACTED**    [11] In 2005, the GM Loss Plants generated estimated negative operating income of $1.5 billion on sales revenue or $9.3 billion. (Eisenberg Decl. ¶ 31.) The GM Loss Plants are currently budgeted to generate negative

---

[11]    <u>See</u> Declaration of John D. Sheehan In Support Of Delphi's Motion For Authority To Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g), Exhibit C; Supplemental Declaration of John D. Sheehan In Support Of Delphi's Motion For Authority To Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) ¶ 3.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

operating income of $2.1 billion on sales revenue of $8.2 billion in 2006. (Id.) Delphi's Board of Directors (the "Board") and senior management must address these North American losses, and thus they have been actively pursuing negotiations with GM since last summer.[12] To date, however, the Debtors have been unable to reach a consensual global resolution despite protracted negotiations. Consequently, the Debtors must continue to prosecute this Motion. The Debtors do not disagree with GM that a negotiated resolution would be the optimal outcome. Delphi wants a consensual resolution. But it cannot simply pin its future on the bare hope that the parties will reach an acceptable solution.[13] Although GM's Objection attempts to portray the filing of the Motion as an effort to "stymie" discussions, it is significant that negotiations have progressed following the March 31, 2006 filing date. If GM and the Debtors are unable to come to a resolution, the Debtors will reject and reprice the GM Loss Contracts.[14]

With respect to the precise nature of the Debtors' business judgment, Delphi's Chief Restructuring Officer testified as follows:

---

[12]

[13]

**REDACTED**

[14]

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

**REDACTED**

The Debtors exercised due care in arriving at this business judgment. Support for filing the Motion was developed over the course of several months and consisted of a reasonable examination and testing of the profitability of the Debtors' U.S. operations, including an analysis of part- and plant-level data.[15] Indeed, unlike some other auto suppliers in chapter 11, the Debtors waited six months after filing these cases to commence the prosecution of the Motion. The Debtors arrived at their business judgment after determining that, on a net basis, the GM Loss Plants are generating substantial losses. The Debtors did not conduct a contract-by-contract analysis in Phase Two of the analysis because of the magnitude of the losses and the substantial proportion of U.S. revenues attributable to GM.

**REDACTED**

---

[15] "We thought looking at a plant level was reasonable because of the fact that the costs were more easily identifiable to a plant basis rather than to a contract, and that given the macro amount of losses and the level of understanding and analysis that was done for Phase 1, we thought that was a fair representation of where the problems were." (Daniels Dep. 72:6-72:12.)

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL
REDACTED

The decision to focus on the largest issues facing Delphi logically included focusing on GM customer contracts.

REDACTED

Delphi's Board deliberated carefully regarding the potential impact of filing the Motion. When questioned why the Board approved the filing of the Motion, Delphi's lead independent director candidly stated:

REDACTED

15

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

**REDACTED**

\* \* \*

**REDACTED**

Because GM's counsel questioned Delphi's lead director

**REDACTED**

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Not surprisingly, GM does not agree with the difficult decisions made by Delphi's management and directors. The Debtors have no reasonable choice, however, but to prepare for the possibility of unsuccessful consensual negotiations. As Mr. Sheehan noted:

**REDACTED**

D.    Discovery Has Not Revealed Any "Hidden" Purpose That Is Not Plain On the Face Of The Motion

Far from revealing a secretive, bad-faith rationale inconsistent with the Motion, the Debtors' documents cited by GM in its Objection further confirm what the Debtors set forth candidly in their motion: they seek, through this Motion, to reject contracts identified through the assessment of GM Loss Plants that allows the Debtors to maximize the value to their estates and/or to stop unprofitable operations. That Delphi is projected to lose billions of dollars in the coming years is no secret, least of all to its former parent and largest customer. The purpose of the Motion, as the Debtors have continuously stated, is not to "blackmail" GM (see Objection 16), but to relieve the Debtors from the obligation of manufacturing parts for GM at a

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

considerable loss. And this protection from burdensome contracts is precisely what Congress

afforded restructuring debtors through Section 365(a) of the Bankruptcy Code. The term

"blackmail" cannot fairly be attributed to the Debtors' efforts to seek from GM revenue sufficient

to operate viably as a supplier to GM, under a GM-inherited cost structure, until it can complete

its transformation.

**REDACTED**

That the Debtors ·

hardly surprising or troubling. It is only rational to assume that the ability to reprice contracts

may affect the dynamics of ongoing negotiations. And the Debtors' goals are clear on the face of

the Motion.

The Debtors have been engaged in open discussions with GM regarding the Debtors'

transformation plans for many months. Ideally, the Debtors would accomplish their

transformation plan through a consensual agreement with GM. The Motion is critical to

preserving value of the estates, because it will position the Debtors to stem losses on money-

losing contracts in North America if necessary, and it also may provide additional impetus

toward a consensual deal. At his deposition, Mr. Daniels testified candidly about

**REDACTED**

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

While GM's Objection casts the foregoing testimony in a negative light, the Debtors submit that the Debtors' goals should hardly come as a surprise to GM or the Court. GM's witnesses admitted that.

**REDACTED**

GM's claim to have discovered some hidden truth behind the Debtors' Motion during the course of discovery is thus entitled to a healthy dose of skepticism.

E.    GM's Declarations And Witness Testimony Confirm
      That The Debtors' Business Judgment Is Appropriate

Finally, GM's own declarations and witnesses confirm that the Debtors' business judgment is appropriate. The timing and complexity of re-sourcing ensures that an interim period of adjusted pricing is a reasonable prospect. And during that interim period, the Debtors can execute their transformation plan, in the best long term interests of all involved.

Because Delphi is a sole-source supplier of many parts to GM, GM cannot readily resource many of the parts covered by the Motion.

**REDACTED**

---

[16]    GM-RJ 002762 (attached hereto as Exhibit H).

19

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

**REDACTED**

underlying reality supports the Debtors' business judgment.

In the long term, the Debtors believe that

**REDACTED**

<u>Argument</u>

I.   The Court Has The Power Under Section 365(a) To Grant The Debtors Authority To <u>Reject The GM Loss Contracts</u>

Section 365(a) of the Bankruptcy Code provides that, "subject to the Court's approval," a

debtor-in-possession "<u>may</u> assume or reject any executory contract." 11 U.S.C. § 365(a)

(emphasis added).  This statutory framework designed by Congress, unlike that of section 1113,

does not require a showing that the rejection of the contracts is "necessary to permit the

20

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

reorganization of the debtor." 11 U.S.C. § 1113(b)(1)(A).  In the Motion, as demonstrated by the discovery record, the Debtors decided, in their business judgment, to address their supply contracts with GM because they were losing billions of dollars in their North American operations, and that GM was responsible for over 60 percent of the Debtors' North American business.  The Debtors believe and expect that rejection of the GM Loss Contracts will benefit the Debtors' estates.

By seeking the authority to reject the GM Loss Contracts, the Debtors are leaving open the possibility of a consensual resolution with GM that may obviate the need for rejection.  It is appropriate and reasonable for the Court to grant this authority, which would, in essence, operate as an approval of the Debtors' rejection of the GM Loss Contracts should the parties fail to reach a consensual resolution.  Bankruptcy courts frequently grant debtors the authority to take actions without requiring them to do so, including actions involving the rejection or assumption of executory contracts under section 365(a) of the Bankruptcy Code.  See, e.g., HA-LO Indus., Inc. v. CenterPoint Props. Trust, 342 F.3d 794, 796 (7th Cir. 2003) (describing order that granted debtor "authority to reject [a] lease, at its option, effective upon 30 days' written notice" to non-debtor); In re Victory Mkts., Inc., 221 B.R. 298, 304 (B.A.P. 2d Cir. 1998) (describing order that "served merely to authorize the assumption of a lease," and explaining that debtor was "not obliged to complete that assumption"); In re Kmart Corp., No. 02-B02474, slip op. at 2 (Bankr. N.D. Ill. Jan. 25, 2002) (granting debtor's motion for authority to reject leases on ten days' notice to lessors).[17]

Indeed, this Court has previously granted Delphi precisely the authority sought here.  See Order Under 11 U.S.C. §§ 365(a) And 554 And Fed. R. Bankr. P. 6006 Approving Procedures

---

[17]        A copy of the Kmart order is attached to this response as Exhibit I.

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

For Rejecting Unexpired Real Property Leases And Authorizing Debtors To Abandon Certain Furniture, Fixture, And Equipment, dated Jan. 6, 2006 (Docket No. 1776) (authorizing, but not directing, Debtors to reject unexpired real property leases without further court order); Order Under 11 U.S.C. §§ 363(b) And 365(a) And Fed. R. Bankr. P. 9019 Approving Procedures To Assume Certain Amended And Restated Sole Source Supplier Agreements, dated Dec. 12, 2005 (Docket No. 1494) (authorizing, but not directing, Debtors to assume certain agreements by which debtors receive goods necessary to their on-going operations, without further court order); Order Under 11 U.S.C. §§ 105, 363(b), 564(b), 1107, And 1108 Authorizing Payment Of Contractors And Service Providers In Satisfaction Of Liens, dated Oct. 13, 2005 (Docket No. 199) (authorizing, but not directing, Debtors to pay claims of contractors and service providers).

II.    The Debtors' Decision To Seek Authority To Reject The GM Loss Contracts Was A Sound Exercise Of Business Judgment

GM contends that the Debtors cannot satisfy the legal requirements for rejecting the GM Loss Contracts. Although GM contends that In re Minges, 602 F.2d 38 (2d Cir. 1979), imposes a checklist of requirements on a debtor-in-possession seeking to reject contracts, or that the Court should apply the heightened standard set forth in NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984), it is well-settled that the standard in this Court for deciding a section 365(a) motion is the business judgment test as formulated in In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir. 1993). The Debtors' decision to seek the authority to reject the GM Loss Contracts satisfies that test because (a) rejecting the contracts would benefit the Debtors' estates by enabling the Debtors to maximize value for the estates with its current productive assets, and (b) the contracts are burdensome, as shown by the substantial operating losses at 21 plants that produce the parts covered by the GM Loss Contracts.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

A.    <u>The Applicable Standard Is Orion's Business Judgment Test</u>

GM takes issue with the Debtors' position that the applicable legal standard is the business judgment test set forth in <u>Orion</u>. GM advances two arguments on this point. First, citing <u>Minges</u>, GM asserts that the Motion must be denied unless the Debtors make a showing on a laundry list of items, among them the existence of a benefit to the Debtor's general creditors, increased market value, "the amounts of secured debt, administrative debt, priority claims, and whether there are other similar properties," and if so "the extent of encumbrances on them." (<u>See</u> Objection 37-38, 44.) The particular items addressed in <u>Minges</u> are not requirements that must be satisfied in every case, but rather were tailored to the particular circumstances raised by the debtor's motion. Indeed, several of the factors GM identifies as "requirements" do not make sense in the context of the Debtor's Motion—for example, the existence of similar properties and encumbrances.

Contrary to GM's misreading of the case, <u>Minges</u> established that the business judgment standard is a "flexible test" that is satisfied whenever, "as a matter of business judgment, rejection of [a] burdensome contract may benefit the estate." 602 F.2d at 43. Indeed, the Second Circuit in <u>Minges</u> expressly rejected an argument in favor of a bright-line rule that an executory contract is burdensome "only where [it] will cause a net loss to the debtor's estate if performed." <u>Minges</u>, 602 F.3d at 43. In doing so, the court expressed its distaste for the kind of "rigid" analysis that GM proposes here. <u>Id.</u>

Although the Second Circuit remanded the case for further findings regarding whether general creditors would benefit from rejection, including findings related to the debtor's secured debt, administrative expenses, priority claims, and other properties, <u>id.</u> at 44, it did not hold, as GM asserts, that these issues must be addressed whenever a debtor moves to reject a contract. Rather, the decision was based on the unique facts and circumstances that arise when rejecting

23

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

leases of property subject to security interests (facts and circumstances that are not present here),

as well as specific deficiencies in the bankruptcy court's factual findings.[18]

Section 365(a) cases decided after Minges illustrate that the business judgment test is a

flexible approach that focuses on whether assumption or rejection would benefit the debtor's

estate. See, e.g., Orion, 4 F.3d at 1099 (explaining that "a bankruptcy court reviewing a . . .

decision to assume or reject an executory contract should examine a contract and the surrounding

circumstances and apply its 'business judgment' to determine if it would be beneficial or

---

[18]    The contract at issue in Minges was a real property lease, and the debtor-landlord's debts to certain third parties were secured by multiple mortgages on the property. Id. at 40. The bankruptcy court granted a trustee's motion to reject certain covenants in the lease after finding it was "obvious" that granting the motion would "automatically enhance the value of the premises to the benefit of the ultimate beneficiaries, the creditors in Class 3 (the general creditors)." Id. at 43-44. The Second Circuit was unable to conclude that there was an "adequate" or a "sound basis" for this finding, and therefore remanded the case to allow for the presentation of additional evidence and further findings. Id. at 44.

The Second Circuit's decision was driven by its concern that, while rejecting the lease provisions would benefit the secured creditors by increasing the value of the property, it would not benefit the remaining creditors. The court noted, for example, that the rejection motion was prosecuted by counsel for two of the secured creditors, rather than the trustee's counsel. Id. And Judge Mansfield issued a concurring opinion devoted to the theme that it is inappropriate to use contract rejection to pit the interests of secured creditors against those of general creditors, stating:

> If . . . the rejection would probably result in no benefit to general creditors or in recovery of only a few dollars for distribution to general creditors holding claims of many thousands of dollars and would result in the mortgagees gaining a windfall at the expense of the lessee, the trustee should not have the power to reject. In the latter case he would in effect be acting as a pawn for the mortgagees, benefiting them at the expense of the lessee, even though the mortgagees took their security with notice of the burdens involved . . . , without any substantial resulting benefit to creditors generally.

Id. at 44-45.

Because of the danger that rejecting the lease in Minges would benefit the mortgagees to the detriment of general creditors, and because the bankruptcy court's ruling depended on an unsupported finding that general creditors would benefit from the rejection, it was entirely appropriate for the Second Circuit to remand the matter for additional evidence and findings on this issue. In this case, however, the Debtors' Motion involves supply contracts between certain Debtors and GM, not leases of property encumbered by mortgages or other security interests. And the benefit of rejection and re-pricing in this case would take the form of higher payments from GM, rather than an increase in the value of encumbered property, as in Minges. Accordingly the risk that rejection would benefit the Debtors' secured creditors at the expense of their general creditors is not present here, and there is no reason to require the Debtors to present evidence addressing such a risk.

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

burdensome to the estate to assume it"); In re Footstar, Inc., 323 B.R. 566, 568-69 (Bankr. S.D.N.Y. 2005) ("The standard to be applied by a court . . . is the 'business judgment' test, which is premised upon the debtor's business judgment that assumption would be beneficial to its estate."); In re Bradlees Stores, Inc., 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996) (stating that question is whether assumption or rejection would be beneficial or burdensome to estate); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996) (same); In re G Survivor Corp., 171 B.R. 755, 758 (Bankr. S.D.N.Y. 1994) (quoting Minges's statement that, "[i]t is enough if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate"). Indeed, GM has not cited a single case to support its position that Minges requires specific showings of market value, secured debt, administrative debt, and the like in every case, and there is no basis for reaching such a conclusion here. To hold otherwise would transform Minges's "flexible" business judgment test, 602 F.2d at 43, into a wooden formula that ignores the unique facts presented by each motion.

GM's argument that the Court should apply the Bildisco standard to the GM Loss Contracts is equally unavailing. While GM asserts that "nothing in Bildisco limits the application of the heightened scrutiny standard to collective bargaining agreements" (Objection 77), that is not the case. The question in Bildisco was whether "rejection of collective bargaining agreements should be governed by a standard different from that governing other executory contracts." 465 U.S. at 523. The Court explained that the standard applicable to "other executory contracts"—i.e., executory contracts other than collective bargaining agreements— was the "traditional 'business judgment' standard." Id. There is nothing in the Court's opinion to suggest that it would be appropriate to alter that standard as to any "other executory contracts." Indeed, Bildisco adopted a heightened standard for collective bargaining agreements only

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

"because of the special nature of a collective-bargaining contract, and the consequent 'law of the shop' which it creates," id. at 524—considerations that are not presented by any contracts other than collective-bargaining agreements, let alone the supply contracts at issue here.[19]

GM points to In re Mirant Corp., 378 F.3d 511 (5th Cir. 2004), in support of its argument for a heightened standard. Yet that case, like Bildisco itself, is limited by its reasoning to a specific type of contract that implicated important federal policies enshrined in the United States Code. The debtor-in-possession in Mirant—"one of the largest regulated public utilities in the United States," that generated, bought, and sold electricity "for use by utilities, municipalities, electric-cooperative utilities, and generators across the country"—moved to reject contracts requiring it to purchase electricity at a certain rate. 378 F.3d at 515-16. The contracts were subject to the Federal Power Act, 16 U.S.C. §§ 791a-828c ("FPA"), which governs the interstate sale of electric energy, and the regulatory authority of the Federal Energy Regulatory Commission ("FERC"). Mirant, 378 F.3d at 514-15. At issue was whether, in light of the FPA and the FERC's authority to determine rates, the debtor-in-possession could seek rejection of the

---

[19] In its first encounter with the Bildisco standard, the Second Circuit recognized that the Court's reasoning did not extend beyond collective-bargaining agreements, explaining that "collective bargaining agreements, as cornerstones of labor law, have traditionally been accorded a higher status than the normal executory contract," resulting in a "standard for rejecting a collective bargaining agreement [that] is more stringent." In re Century Brass Prods., Inc., 795 F.2d 265, 271 (2d Cir. 1986) (discussing Bildisco); accord In re Ionosphere Clubs, Inc., 114 B.R. 379, 391 (S.D.N.Y.) (explaining that heightened standard for collective bargaining agreements was "compelled by judicial recognition of the special nature of collective bargaining agreements and the serious consequences of rejection for employees"), aff'd in part & rev'd in part on other grounds, 922 F.2d 984 (2d Cir. 1990). On the other hand, "ordinary executory contracts," the Second Circuit stated, are governed by the "traditional business judgment standard." Century Brass, 795 F.2d at 271; accord In re Banco Nacional de Obras y Servicios Publicos, S.N.C., 91 B.R. 661, 665 (Bankr. S.D.N.Y. 1988) (citing Bildisco for proposition that "a contract to manufacture widgets may be rejected with court approval if the debtor's sound business judgment so dictates"). Courts have rejected efforts to stretch the Bildisco standard beyond collective-bargaining agreements, as in In re Chateaugay Corp., 130 B.R. 162 (S.D.N.Y. 1991), where the court ruled that Bildisco did not apply to a contract for the removal, transport, and disposal of hazardous and non-hazardous waste. Chateaugay, 130 B.R. at 163, 167; accord In re Federal Mogul Global, Inc., 293 B.R. 124, 126 (D. Del. 2003) (rejecting argument that heightened standard applied to lease, and stating it was "clear" based on the Court's reasoning that Bildisco was "limited to collective-bargaining agreements").

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

contracts as part of the bankruptcy case. See id. at 516-22. After concluding in the debtor-in-possession's favor on that point, the Fifth Circuit suggested, but did not rule, that the lower court should apply the Bildisco standard in determining whether to approve rejection.[20] Id. at 524-25.

In explaining its suggestion, the Fifth Circuit noted that, as with collective-bargaining agreements, "[t]he nature of a contract for the interstate sale of electricity at wholesale is also unique. . . . Congress found when it passed the FPA that the pubic has an interest in the transmission and sale of electricity," including an "interest in the continuity of electrical service to the customers of public utilities."[21] Id. at 525. It would be inappropriate to apply the business judgment test to the electricity contracts, Mirant reasoned, because doing so would conflict with the higher public-interest standard that governs the FERC's ability to modify wholesale rates for electricity:

> The FPA and the filed rate doctrine protect the public interest by imposing severe limitations upon a public utility's ability to alter the terms of [electricity] contracts after they are certified by FERC. Under the filed rate doctrine, FERC can only approve a change to a filed rate if the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory. . . . Clearly the business judgment standard normally applicable to rejection motions is more deferential than the public interest standard applicable in FERC proceedings to alter the terms of a contract within its jurisdiction. Use of the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity.

---

[20] As GM noted (Objection 78 n.223), the district court on remand denied the rejection motion on other grounds, without applying the Bildisco standard. In re Mirant Corp., 318 B.R. 100, 107-08 (N.D. Tex. 2004).

[21] The FPA declares, for example, that "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest," and that federal regulation of "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessarily in the public interest." 16 U.S.C. § 824(a). The FPA also charges the FERC with the duty "to insure continuity of service to customers of public utilities." Id. § 824a(g).

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Id. (internal quotation marks and citation omitted). The contracts at issue here are of a different nature than the agreements considered in Mirant. The GM Loss Contracts are governed by the law of contracts, rather than a comprehensive statutory scheme designed to further the public interest.[22]

Unlike the electricity contracts in Mirant (and the collective bargaining agreements in Bildisco), the supply contracts between the Debtors and GM do not implicate any federal statutory policy that would justify a departure from the traditional business judgment standard applied to ordinary executory contracts. As demonstrated in the next section, GM's arguments that the Debtors' decision to seek authority to reject the GM Loss Contracts does not satisfy that standard are easily refuted.

B.    The Debtors Satisfy The Applicable Business Judgment Test

As stated in Orion, section 365(a) of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject." Orion, 4 F.3d at 1098. When presented with a motion under section 365(a), a bankruptcy court "should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." Orion, 4 F.3d at 1099.

In this case, the Debtors' inventory of executory contracts includes thousands of burdensome agreements that require the Debtors to supply parts to GM at prices that result in

---

[22]    Indeed, the recent decision in In re Calpine Corp., 337 B.R. 27 (S.D.N.Y. 2006), underscores the special position occupied by contracts covered by the FPA. In that case, the court declined to adopt Mirant's holding, ruling instead that a debtor-in-possession could not seek to reject a FERC-regulated contract under section 365(a) of the Bankruptcy Code because of the plenary jurisdiction granted to the FERC. Calpine, 337 B.R. at 29-39; accord In re NRG Energy, Inc., No. 03 Civ. 3754 (RCC), 2003 WL 21507685, at *3 (S.D.N.Y. June 30, 2003) (concluding that court lacked jurisdiction over rejection motion because of "the unique regulatory framework for the business of selling electric energy and [a] pending FERC proceeding").

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

significant operating losses. The Debtors, exercising sound business judgment, and after months of negotiating in good faith with GM in an attempt to reach an out-of-court solution, concluded that rejecting the GM Loss Contracts will maximize value to the estates, in the event a consensual resolution is not achieved.

        1.     <u>Rejecting The GM Loss Contracts Would Benefit The Debtors' Estates</u>

GM contests the Debtors' business judgment by positing a doomsday scenario in which rejection of the GM Loss Contracts would trigger a chain reaction of shutdowns and business closures throughout the automotive industry and the United States economy as a whole. This argument is a straw man—the Debtors have been clear from the outset that they do not seek to disrupt the supply of parts to GM if this Motion is granted. Instead, as is evident from the Debtors' Motion and supporting materials, their primary objective is to reprice the GM Loss Contracts such that the Debtors continue to supply parts to GM, albeit under a new arrangement that enables the Debtors to generate operating income (or, at a minimum, to stem operating loss) and provide further protections to the Debtors. (<u>See</u> Motion ¶¶ 2, 6, 30, 48, 54, 57, 69-70 (describing the Debtors' intention to reprice the GM Loss Contracts); Eisenberg Decl. ¶ 15, 32-33 (same).)

If the Motion is granted and GM is presented with a choice between accepting parts at a higher price and a shutdown, it would be obliged to mitigate its damages by covering. This is particularly true given the availability of a middle course—if GM decided it was in its best interest to re-source the parts covered by the GM Loss Contracts, one would expect it to continue to receive parts from the Debtors until it completed the re-sourcing, thereby assuring an uninterrupted flow of automobiles along its assembly lines. The longer the duration of any potential shutdown, the greater the incentive for the parties to come to the table and reach an

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

agreement that keeps business running.  Thus, GM's assertion that

**REDACTED**

GM also maintains that rejection would not benefit the Debtors' estates because it would leave the Debtors with all of their "fixed costs," including labor costs that cannot be eliminated under the Debtors' restrictive collective-bargaining agreements, and less revenue from GM to absorb those "fixed costs."  As with GM's doomsday argument, its fixed-cost argument presumes, without any reasonable foundation, that granting the Debtors' Motion would lead to a cessation of the supply of parts to GM and the corresponding stream of revenue to the Debtors.

In addition, even assuming _arguendo_ that rejection would result in the loss of some existing business from GM, the Debtors could react by eliminating related fixed costs.

**REDACTED**

Finally, GM's point about labor costs, although well taken, does not counsel in favor of denying this Motion.  Rather, it substantiates what the Debtors have been saying all along:  in the absence of a consensual resolution among the Debtors, GM, and the unions representing a large share of the Debtors' employees, the Debtors will continue to generate substantial operating losses unless the Court (a) allows the Debtors to increase their revenues by rejecting and

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

renegotiating the GM Loss Contracts and (b) permits the Debtors to reduce their costs by granting the Debtors' motion to reject its collective-bargaining agreements and modify retiree benefits. GM's argument that the Debtors should proceed in a linear manner ignores the Debtors' fiduciary duty to preserve the value of the estates for the benefit of its general creditors and other stakeholders.

Finally, GM argues that rejection would make the Debtors worse off because rejection would release GM from its obligations under two agreements that GM calls "master agreements": the "GO Agreement" of November 24, 2003 and the Component Supply Agreement dated January 1, 1999 (the "CSA"). To be clear, the Debtors are requesting authority to reject the Purchase Orders listed in Exhibit A to the Motion. The Debtors have not sought authority to reject either the GO Agreement or the CSA. The argument that the Debtors have somehow flunked the business judgment test because a handful of contracts covered by the Motion might be somehow associated with the master agreements is a classic red herring.

First, GM has failed to demonstrate how purchase orders that are allegedly related to the GO Agreement and the CSA are integrated or merged into these so-called "master agreements." GM cites a single case for the proposition that contracts obtained by Delphi "based on either one of the master agreements or on its obtaining other supply contracts for related parts" are somehow integrated. (Objection 68.) In that decision, Bed v. Fallon, 12 N.W.2d 396 (Mich. 1943), the court infers, from the record, that a purchase order and "master" agreement "should be construed together." Id. Notably, the agreements at issue in Fallon did not include integration clauses.

Here, the Court need not make such an inference because the plain language of the terms and conditions made part of the purchase orders covered by the Motion clearly states that each

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

purchase order is the entire agreement between General Motors and Delphi, and supersedes all prior oral or written representations and agreements. (Ruselowski Decl. Ex. A.)

**REDACTED**

Michigan law is clear on this point: when parties include an integration clause in their written contract, it is conclusive. See, e.g., UAW-GM Human Resource Ctr. v. KSL Recreation Corp., 579 N.W. 2d 411, 418 (Mich. 1998).

**REDACTED**

Second, GM has not explained how the Debtors' rejection of contracts that may be associated, but not merged with, the "master agreements" releases GM from its obligations under either the GO Agreement or the CSA. GM argues that "there is no rational basis to contend that GM is obligated under a master agreement to provide Delphi supply contracts for multiple parts if Delphi can repudiate contracts for some parts." (Objection 68.) The Debtors' rational basis for this contention has been discussed throughout this response. The Bankruptcy Code gives a debtor the right to reject executory contracts that are burdensome to the estate. The Bankruptcy Code does not give a non-debtor party the option of discontinuing its performance under an executory contract. See, e.g., In re El Paso Refinery, L.P., 220 B.R. 37, 44 (Bankr. W.D. Tex. 1998) ("pending assumption or rejection by the estate, the non-debtor party to an executory contract is bound by terms of the contract: '[T]he Code places an independent duty on the non-debtor to continue the performance of an executory contract until it is assumed or rejected ·Whether the debtor performs or not, the non-debtor must perform until assumption or

---

[23]

**REDACTED**

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

rejection.' Krafsur v. UOP (In re El Paso Refinery, L.P.), 196 B.R. 58, 72 (Bankr. W.D. Tex.

1996).").  The Debtors are not moving to reject either the CSA or the GO Agreement, and GM

must continue to perform under the terms of those agreements.

**REDACTED**

---

24      See GM-RJ 005549 (attached hereto as Exhibit J).

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

REDACTED

GM's argument concerning the potential impact on the CSA is even more specious. That agreement maintained the status quo with respect to existing purchase orders at the time of Delphi's spin-off from GM. GM cannot articulate any material, negative impact on the Debtors even assuming that, as GM asserts, the rejection of contracts at issue in the Motion were to free GM from any obligations under the CSA.[26]

To conclude, when one sets aside the parade of horribles conjured by GM and focuses instead on what the Debtors actually seek to accomplish by this Motion, the benefit to the estates becomes obvious and irrefutable. In the Debtors' business judgment, the authority to reject the GM Loss Contracts will result in increased value from their relationship with GM. GM makes no attempt to explain how supplying the same parts at a higher price would fail to benefit the Debtors' estates, and there is no logical line of argument that would enable them to offer such an explanation.

## 2.    The GM Loss Contracts Are Burdensome

GM also argues that the Debtors have failed to establish that the GM Loss Contracts are burdensome. In fact, the two-phase analysis performed by the Debtors with the assistance of their restructuring and financial advisor, FTI, demonstrates beyond any reasonable doubt that the

---

[25]    While GM estimates that approximately $ 4.5 billion of annual purchase value ("APV") is at issue in the Motion (Ruselowski Decl. ¶7), the total anticipated APV in 2006 for all contracts associated with the GO process business awards at issue in the Motion is only $60 million. (GM-RJ 002753 (attached hereto as Exhibit K).)

[26]    Q:    Other than the right to cancel a contract that GM would have if the CSA went away, are there any other negative impacts to Delphi of the CSA being terminated?

A:    I don't know, but I don't think so.

(Ruselowski Dep. 144:18-21.)

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

net cost of producing the parts covered by the GM Loss Contracts vastly exceeds the revenue received from GM for those parts, resulting in significant operating losses for the Debtors. Based on this analysis, the GM Loss Contracts easily qualify as burdensome.

Indeed, the United States Supreme Court and the Second Circuit have expressly recognized that a debtor-in-possession may, in its business judgment, conclude that a contract is burdensome even if the contract is profitable. Group of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 549–50 (1943) (rejecting lease under which debtor "received a net financial benefit"); Minges, 602 F.2d at 42–43 (rejecting non-debtor's argument that "an executory contract cannot be deemed 'burdensome' [if] it produces a profit"); accord Frostbaum v. Ochs, 277 B.R. 470, 475 (E.D.N.Y. 2002) (explaining that business judgment rule applies to "trustee's decision to reject an executory contract that potentially would provide some profit to the estate if fulfilled, but would ultimately result in greater profit to creditors if rejected"). There is no need to resort to this principle in this case, however, because GM's criticisms of the Debtors' analysis of the unprofitability of the GM Loss Contracts are unfounded.

In the Objection and supporting declaration of rebuttal expert Jeffery Baliban, GM seeks to cast doubt on whether the Debtors have shown that the GM Loss Contracts are truly burdensome to the Debtors' estates. GM offers two types of arguments in this regard. First, GM argues that the Debtors' "fixed costs" imply that the Debtors are better off performing under the GM Loss Contracts than not performing. (Objection 45.) Second, GM argues that certain methodological issues related to the Debtors' profitability analyses leave doubt as to whether all of the contracts at issue are unprofitable. (Id.) Remarkably, GM goes so far as to contend that "Delphi's declarations have not satisfied its burden of proving it is losing money because of the

Supply Contracts."  Id.[27]  This despite the data cited in the Motion showing that the Debtors suffered actual operating losses of $1.47 billion in 2005 at the 21 GM Loss Plants at issue in the Motion — plants that, on average, have 82 percent of their sales flowing to GM and GM's tier suppliers.  (See Mot. ¶ 24.)

As discussed above, the "fixed cost" argument incorrectly assumes that "rejection" here means the cessation of all production and supply to GM of the parts at issue.

**REDACTED**

The various methodological issues GM identifies also do not raise any realistic doubt as to the burdensomeness of the GM Loss Contracts.  First, GM contends that net operating income is not an appropriate metric to use when deciding which contracts to reject, because fixed costs

---

[27]

**REDACTED**

[28]

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

are included within that calculation.  Again, the basis for this contention is a misunderstanding of the meaning of "rejection" in this context.  Given that the Debtors' goal is repricing and not the cessation of production, negative operating income is clearly a useful metric for identifying which contracts to reject.

**REDACTED**

GM next argues that the Debtors skewed the Phase One analysis by conducting a contract-by-contract analysis of four plants that were known to be particularly unprofitable, that were grouped in the Automotive Holdings Group ("AHG") because they were non-core businesses, and that mainly supplied GM.  Yet similar criteria govern the plants identified in the second, plant-wide phase of the Debtors' profitability analysis:  the 21 plants generated negative operating income on a net basis and primarily produced parts for GM vehicles

**REDACTED**

**REDACTED**

) GM emphasizes that the Phase Two methodology does not definitively establish that each of the GM contracts at issue in the Motion is unprofitable, and the Debtors readily concede this point. There is no requirement under section 365(a), however, that precludes a debtor from basing its reasonable business judgment on a net, plant-wide analysis, particularly where, as here, the debtor is rejecting contracts in order to seek a broader repricing solution. The touchstone is simply whether rejection is likely to benefit the estates, and the Debtors' Phase Two analysis is more than adequate in identifying contracts that a losing a substantial amount of money and that require repricing.

Third, GM contends that FTI's methodology was inadequate because it considered only 11 months of 2005 data and evaluated only 20 contracts in Phase One as a basis for its decision to move away from performing contract-specific profitability analyses. (Objection 48.)

**REDACTED**

Furthermore, the contention that the Debtors considered only 20 contracts before deciding to transition to a plant-wide analysis is demonstrably false.[29] As indicated in the Motion, the contract-specific methodology in Phase One of the analysis identified over 500 unprofitable contracts related to 1395 unprofitable GM parts. At the four Phase One plants alone, these unprofitable GM parts generated $120 million in operating losses in 2005, whereas <u>all</u> GM

---

[29]                                    **REDACTED**

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

parts generated a net of $108 million in operating losses. These results supported the Debtors'

conclusion to proceed on a plant-wide basis, based on the realization that part- or contract-

specific allocation methods were unnecessary in order to identify a universe of significantly

unprofitable GM contracts that merit rejection and repricing. (Mot. ¶¶ 50-51.)

III.    Although Section 365(a) Does Not Require The Court To Balance The Equities, The
        Balance Here Weighs In Favor Of Rejection

        GM argues that, in addition to evaluating the Debtors' business judgment in deciding to

seek the authority to reject the GM Loss Contracts, the Court should also weigh the equities to

determine whether rejection is appropriate. (See Objection 69-72.) However, in contrast to a

motion to reject a collective-bargaining contract under section 1113 of the Bankruptcy Code (or

Bildisco before section 1113 was enacted), a motion to reject an executory contract under section

365(a) of the Bankruptcy Code does not require the Court to balance the equities. See In re

Riodizio, Inc., 204 B.R. 417, 425 n.9 (Bankr. S.D.N.Y. 1997) ("The right to assume or reject an

executory contract is designed to permit the debtor to shed its obligations under burdensome and

uneconomical contracts. Section 365 does not require any balancing of the equities."). Indeed,

many courts have concluded that the balance of equities between the debtor and non-debtor is an

"irrelevant" factor that should not be considered under section 365(a). See, e.g., In re Trans

World Airlines, Inc., 261 B.R. 103, 122-23 & n.7 (Bankr. D. Del. 2001) (stating that inquiry

regarding "the potential burden imposed on a nondebtor party" is "irrelevant and unnecessary,"

and citing cases); In re Prime Motor Inns, 124 B.R. 378, 383 (Bankr. S.D. Fla. 1991) (impact of

rejection on non-debtor "is not proper for consideration"); In re H.M. Bowness, Inc., 89 B.R. 238,

242 (Bankr. M.D. Fla. 1988) ("[T]he effect of the rejection on the innocent third-party . . . is not

an appropriate factor for the Court to consider."); In re Wheeling-Pittsburgh Steel Corp., 72 B.R.

845, 847 (W.D. Pa. 1987) ("Once the debtor establishes that rejection will benefit the estate, the

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

inquiry ends.  The burden that rejection may visit upon other entities is not a material fact to be

considered by the court under the business judgment test."); In re Logical Software, Inc., 66 B.R.

683, 687 (Bankr. D. Mass 1986) (effects of rejection on non-debtor "are simply not relevant").

The rationale for not balancing the equities on a motion to reject an ordinary executory

contract was best expressed in Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc., 756

F.2d 1043 (4th Cir. 1985), a case involving a technology license, in which the court explained:

> It cannot be gainsaid that allowing rejection of such contracts as executory
> imposes serious burdens upon contracting parties such as [the non-debtor].  Nor
> can it be doubted that allowing rejection in this and comparable cases could have
> a general chilling effect upon the willingness of such parties to contract at all with
> businesses in possible financial difficulty.  But under bankruptcy law such
> equitable considerations may be not be indulged by courts in respect of the type of
> contract here in issue.  Congress has plainly provided for the rejection of
> executory contracts, notwithstanding the obvious adverse consequences for
> contracting parties thereby made inevitable.  Awareness by Congress of those
> consequences is indeed specifically reflected in the special treatment accorded to
> union members under collective bargaining contracts [citing Bildisco], and to
> lessees of real property [citing section 365(h) of the Bankruptcy Code].  But no
> comparable special treatment is provided for technology licensees such as [the
> non-debtor].  They share the general hazards created by § 365 for all business
> entities dealing with potential bankrupts in the respects at issue here.

Lubrizol, 756 F.2d at 1048.  Lubrizol's reasoning applies with equal force to GM, as Congress

has provided no special treatment for non-debtors that are parties to the type of supply contracts

at issue here.

That said, the Debtors fully recognize that bankruptcy courts are courts of equity, and that,

in some instances, courts have found it appropriate to balance the equities in deciding whether to

grant a rejection motion under section 365(a).  An examination of the equities in this case reveals

that they weigh in favor of the Debtors and rejection.

First and foremost, the Debtors' request for relief must be viewed in light of their

fiduciary duties.  GM ignores the fact that a debtor-in-possession has a fiduciary duty to reject an

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

executory contract when rejection would benefit the estate. In re 68 West 127 Street, LLC, 285

B.R. 838, 845 (Bankr. S.D.N.Y. 2002). Delphi sustained an operating loss of approximately $1.5

billion in 2005. (See Sheehan Dec. (Docket No. 3037) ¶¶ 24–26.) And, as of May 1, 2006,

Delphi projects that it will suffer an operating loss of approximately $2.0 billion in 2006.

(Sheehan Supplemental Decl. (Docket No. 3552) ¶ 3.) GM is Delphi's largest customer,

accounting for approximately 63 percent of Delphi's North American revenue in 2005. (See Mot.

¶ 25.) Delphi incurs a substantial portion of its operating losses in connection with the Debtors'

provision of parts to GM under the GM Loss Contracts.

These GM Los Contracts are unprofitable for several reasons, among them the fact that

the Debtors inherited from GM burdensome collective-bargaining agreements involving

uncompetitive labor costs and other unsustainable operating restrictions. The GM Loss

Contracts do not provide the Debtors with adequate revenue to cover these high costs, in part

because of GM's practice of aggressively implementing annual price-downs. Since Delphi was

spun off, in 1999, price-downs under its agreements with GM have averaged 2.1 percent of sales

per year, far in excess of the 1.6 percent predicted by Delphi in 1999. (See Weber Decl. ¶ 14;

Sheehan Decl. ¶ 43.) Since the spin-off, GM's year-over-year price reductions have been 50

percent greater than those implemented by the other original-equipment manufacturers supplied

by the Debtors. (See Sheehan Dec.l ¶ 43.) Thus, GM has contributed to the unprofitability of

the GM Loss Contracts on both the cost and revenue sides of the equation. It would be a

dereliction of their fiduciary duties for the Debtors to continue to supply parts to GM at a loss.

GM presents a list of points that it believes show that the balance of equities weigh in

favor of denying the Motion. (Objection 71.) Those points, however, do not withstand scrutiny,

as demonstrated below:

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

- GM claims that rejection would cause it to suffer irreparable harm. But this claim assumes that rejection would result in a shutdown of GM. As discussed at length elsewhere in this response, shutting down GM is an unrealistic scenario that the Debtors will strive to avoid and that GM can easily avoid as well.

- According to GM, documents produced in discovery demonstrate that

REDACTED

- GM also maintains that "Delphi's threat of a shutdown" constitutes economic duress, a tort under Michigan law. (Id.) Yet there is no evidence that Delphi has ever threatened to shut down GM, and in fact Delphi has made no such threats. Moreover, as discussed in detail in Part IV.B of this response, GM's economic-duress theory does not hold water.

- The next point offered by GM is that "Delphi is attempting to have this Court approve, bless, and sponsor its inequitable, tortious conduct." (Id.) Three verbs and two adjectives do not add up to an argument, and GM's conclusory statement that Delphi has engaged in unidentified bad acts contributes nothing to its position that the balance of equities weighs in its favor.

- Finally, GM posits that any benefit the Debtors derived from rejecting the GM Loss Contracts "would be inherently speculative and incapable of quantification because the claims, demands, and needs of Delphi's unions and GM are so complex that the imposition of higher prices involuntarily through a shutdown threat does not translate into an overall better outcome for Delphi, only a more contentious one." Id. The benefit of rejection here is self-evident, not speculative. No amount of complexity or contention can alter the fact that, if the Debtors reject and reprice the GM Loss Contracts, as they expect, they will achieve a benefit for the estates by generating more revenue from the sale of parts to GM. While the precise amount of the increased revenue will not be known until the parties implement a repricing, the business judgment test does not require a debtor-in-

---

[30]    **REDACTED**

[31]    For further details regarding Phase One, see the Motion at ¶¶ 39–48 and the materials cited in those paragraphs.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

possession to establish with mathematical precision the benefits of rejection. Nor does a debtor need to somehow demonstrate that the rejection of burdensome contracts will resolve every conceivable difficulty in its path toward a successful restructuring.

IV.    GM's Accusations Of Bad Faith And Unlawful Conduct Are Meritless

GM's next line of defense is to accuse the Debtors of acting in bad faith in seeking authority to reject the GM Loss Contracts. In addition, GM urges the Court to deny the Motion based on GM's fear that the Debtors might exercise their authority to reject the GM Loss Contracts in a way that constitutes economic duress under Michigan law. Neither of these arguments is persuasive. Courts applying the business judgment test have consistently held that there is nothing untoward about a debtor-in-possession rejecting an executory contract for the purpose of obtaining more attractive terms from the non-debtor party. Accordingly there is no support for a finding of bad faith here. With respect to economic duress, GM's argument fails because the hypothetical set of facts on which it is based do not involve the type of unlawful conduct required under Michigan law.

To put things into broader perspective, GM has alleged bad faith and unlawful conduct by the Debtors despite the fact that the Debtors have been negotiating in good faith with GM regarding its contribution to a comprehensive consensual resolution for a period that stretches back to the summer of 2005, before the Debtors filed their petitions in these cases. As the Court is aware, the Debtors and GM have been heavily involved in negotiations with the Debtors' unions during this period as well. The Debtors have not threatened a shutdown of GM or stopped their shipments of parts to GM at any point during any of these discussions. In numerous instances involving substantial revenue, the Debtors have continued to make shipments to GM even after the applicable supply contract has expired. GM does not dispute any of this. Now, after months of negotiations and accommodations have passed, the Debtors'

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

seek the Court's assistance in obtaining the support it needs by granting it the authority to reject the GM Loss Contracts, something that GM itself predicted would happen in its Form 8-K of October 11, 2005. There is no basis for GM to accuse the Debtors of a holdup under these circumstances.

GM also stresses that the Debtors are GM's sole-source suppliers of many of the parts covered by the GM Loss Contacts, and that GM would feel the negative consequences of a shutdown almost instantaneously because of just-in-time inventory practices. Yet sole-source suppliers and just-in-time inventory are commonplace in the automotive industry. If taken to its logical end, GM's position that the Debtors should not be permitted to reject the GM Loss Contracts because it might result in a shutdown would, in effect, carve out of section 365(a) an exception that forces debtors in the automotive industry to perform burdensome supply contracts so as not to disrupt the operations of their customers and to effectively subsidize these customers at the expense of the debtors' estates and the reorganization process. As a matter of policy, the Court should not allow GM to invoke business practices in the automotive industry to override the Debtors' ability to successfully reorganize under the Bankruptcy Code.

A.    The Debtors' Are Acting In Good Faith In Pursuing The Authority To Reject The GM Loss Contracts

In support of its argument that the Debtors are attempting to use the Bankruptcy Code in bad faith as a "sword," rather than a "shield," GM relies on In re Penn Central Transportation Co., 458 F. Supp. 1346 (E.D. Pa. 1978). (Objection 70-71.) GM's use of Penn Central presents another situation in which it seeks to stretch a case beyond its limited application. Penn Central decided a narrow question of statutory interpretation under the old Bankruptcy Act—namely, whether a debtor-lessor's disaffirmation of leases including rent covenants that established below-market rents would "deprive the lessee[s] of [their] estate[s]," in violation of section 70(b)

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

of the Bankruptcy Act.[32] Penn Central, 458 F. Supp. at 1354. The leases were net leases that "generate[d] very substantial cash flow" for the debtor's estate, but the debtor wanted to disaffirm the leases and generate even more cash flow. Id. The court ruled that such a disaffirmation would violate section 70(b) based on its conclusions that "exact[ing] increased rent payments on pain of eviction would be tantamount to depriving [the lessees] of their estates." Penn Central, 458 F. Supp. at 1355-56. Although Penn Central cited "equitable considerations" in rejecting the debtor's proposed interpretation of section 70(b),[33] Penn Central, 458 F. Supp. at 1356, there is nothing in the decision that suggests a general prohibition on rejecting a contract for the purpose of renegotiating better terms with the non-debtor party.[34]

Indeed, as demonstrated in the Debtors' Motion, it is well-settled that a debtor-in-possession exercises sound business judgment when it rejects an executory contract so that it may enter into a new contract with the same party with more favorable terms. (See Motion ¶ 67 (citing Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989); Bhd. of Ry., Airline & Steamship Clerks v. REA Express, Inc., 523 F.2d 164, 169 (2d Cir. 1975);

---

[32]    Section 70(b) provided that, "Unless a lease of real property shall expressly otherwise provide, a rejection of such lease or of any covenant therein by the trustee of the lessor shall not deprive the lessee of his estate." Bankruptcy Act, former 11 U.S.C. § 110(b) (repealed 1978).

[33]    The debtor argued that the term "estate" in section 70(b) was limited to the right of possession. Penn Central, 458 F. Supp. at 1355.

[34]    The other cases cited by GM—In re Bullet Jet Charter, Inc., 177 B.R. 593 (Bankr. N.D. Ill. 1995) and In re Hirschhorn, 156 B.R. 379 (Bankr. E.D.N.Y. 1993)—are inapposite. Notably, both cases involved contracts that were not "executory," and therefore not covered by section 365(a). See Bullet Jet, 177 B.R. at 601 ("Therefore, the Agreement cannot be treated as 'executory' for bankruptcy purposes."); Hirschhorn, 156 B.R. at 389 ("[T]he non-compete clause is not an executory contract which may be rejected by the Debtor."). While both cases contain dicta observing that the debtor was misusing the bankruptcy process, one case involved a series of bad acts by the debtor, including, among other things, concealing information from the non-debtor and the court, making misrepresentations to the court in seeking an extension of the deadline to assume or reject the contract, and "ignoring the jurisdiction of [the] Court." Hirschhorn, 156 B.R. at 383-85. There are and could be no similar allegations of misconduct here. In the other case, the debtor "grossly abused its business discretion" by seeking to reject a contract to sell at market value an airplane that was depreciating and otherwise draining assets from the estate. Bullet Jet, 177 B.R. at 601. The relatively easy question answered by Bullet Jet—i.e., whether a debtor exercises sound business judgment when it refuses to unload a burdensome asset for a fair price—is not presented here.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

In re Metro Transp. Co., 87 B.R. 338, 344 (Bankr. E.D. Pa. 1988); Wheeling-Pittsburgh Steel, 72 B.R. at 848–49).)

> B.    GM's "Economic Duress" Argument Is Fundamentally Flawed

GM claims that granting this Motion could allow the Debtors to force GM to enter into new agreements by threatening to stop shipments to GM, in violation of Michigan's economic duress doctrine. A party claiming economic duress must establish that it was "illegally compelled or coerced to act by fear of serious injury to [its] person[], reputation[], or fortune." Farm Credit Servs. of Mich.'s Heartland, P.C.A. v. Weldon, 591 N.W.2d 438, 447 (Mich. Ct. App. 1998) (emphasis added); accord Enzymes of Am., Inc. v. Deloitte, Haskins & Sells, 523 N.W.2d 810, 814 (Mich. Ct. App. 1994) (same), rev'd in part on other grounds sub nom. Porta-John Corp. v. Deloitte, Haskins & Sells, 539 N.W.2d 513 (Mich. 1995). As a host of Michigan cases have held, "fear of financial ruin alone is insufficient to establish economic duress." E.g., Farm Credit, 591 N.W.2d at 447; Enzymes, 523 N.W.2d at 814; Apfelblat v. Nat'l Bank Wyandotte-Taylor, 404 N.W.2d 725, 728 (Mich. Ct. App. 1987) (per curiam). As stated in Truform, Inc. v. General Motors Corp., 80 Fed. Appx. 968 (6th Cir. 2003), a party's "concern that it might go out of business [is] insufficient to establish economic duress under Michigan law." Id. at 979. The claimant must establish that the opposing party acted "illegally."[35] E.g.,

---

[35] GM's position that the doctrine also encompasses acts that are merely "wrongful" is mistaken. Although a federal court applying Michigan law stated in Kelsey-Hayes Co. v. Galtaco Redlaw Casting Corp., 749 F. Supp. 794, 796-97 & n.5 (E.D. Mich. 1990), that a wrongful act would suffice, the Michigan Court of Appeals concluded in Enzymes that Kelsey-Hayes had misstated Michigan law on this point. 523 N.W.2d at 814. Since Enzymes was decided, federal courts applying Michigan law have consistently held that economic duress requires an act that is illegal. See, e.g., Flannery v. Tri-State Div., 402 F. Supp. 2d 819, 825 (E.D. Mich. 2005) (stating that economic duress occurs "when one is compelled to submit to an illegal exaction") (internal quotation marks omitted); Myers v. U.S., 943 F. Supp. 815, 819 (W.D. Mich. 1996) (describing Enzymes as "reiterating the requirement of showing illegality to prove duress"), rev'd on other grounds, 145 F.3d 1332 (6th Cir. 1998). GM was a party to one such case. See Truform, 80 Fed. Appx. 968, 978 (6th Cir. 2003) ("To succeed on a claim of economic duress under Michigan law, a plaintiff must show that it was illegally compelled or coerced to act by fear of serious injury to its reputation or fortunes.").

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Farm Credit, 591 N.W.2d at 447 (rejecting economic-duress claim when defendants failed to allege that "plaintiff acted illegally"); Enzymes, 523 N.W.2d at 814 ("Illegality is an element of duress."); Apfelblat, 404 N.W.2d at 728 ("Duress requires compulsion or coercion by which one is illegally forced to act . . . .").

The basic flaw in GM's duress argument is that it fails to allege any illegal (or even "wrongful") conduct by the Debtors. By this Motion, the Debtors seek an order authorizing them to reject the GM Loss Contracts on ten days' notice to GM and others. If the Court issues such an order and the Debtors choose to exercise their authority to reject the contracts, they will be doing so pursuant to the legal authority granted by the Court. Whether or not rejection would lead to a shutdown at GM (and again, the Debtors neither expect nor intend such an outcome), it defies reason to suggest that the Debtors would be acting illegally or wrongfully if they stopped performing under the GM Loss Contracts to protect the value of their estates for the benefit of their creditors and other stakeholders.

In addition, the proponent of an economic duress claim must show that it does "not have an adequate legal remedy available." Hungerman v. McCord Gasket Corp., 473 N.W.2d 720, 721 (Mich Ct. App. 1991); Macene v. County of Wayne, No. 182966, 1997 WL 33352865, at *4 (Mich. Ct. App. Apr. 8, 1997) (per curiam). As described in greater detail in response to GM's specific performance argument, see Part V below, if the Debtors reject the GM Loss Contracts and GM is damaged by agreeing to pay a higher price under new agreements, GM may seek breach-of-contract damages. This avenue of relief makes it impossible for GM to establish the requisite lack of an adequate legal remedy.

GM relies on General Motors Corp. v. Paramount Metal Products Co., 90 F. Supp. 2d 861 (E.D. Mich. 2000), in support of its economic duress argument. That case is inapposite,

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

however, because it involved a supplier's threat to <u>unlawfully</u> breach a contract that had not been rejected under the Bankruptcy Code. The supplier in <u>Paramount</u> threatened to "immediately cease seat frame production" under its supply contracts with GM unless GM either purchased the supplier or granted it a retroactive price increase. <u>Id.</u> at 864. Faced with this ultimatum, GM executed a new agreement with the defendant, but later found an alternate supplier and then filed a lawsuit seeking to invalidate the new agreement on the basis of economic duress under Ohio law.[36] <u>Id.</u> at 864–65, 870. The district court denied the supplier's motion for summary judgment on this claim, ruling that it was possible for GM to demonstrate that the defendant "unlawfully coerced [GM] into executing the [new agreement] by threatening to immediately stop producing seat frames <u>without a legal right to do so</u>, and thereby depriving the plaintiffs of the exercise of their free will." <u>Id.</u> at 875 (emphasis added). "A clear <u>unlawful</u> breach of contract by [the defendant] under circumstances that would shut down production of vehicles by [GM] clearly satisfies the 'illegal' conduct requirement of an economic duress defense." <u>Id.</u> (emphasis added).

In contrast to the supplier in <u>Paramount</u>, which threatened to stop performing a contract it had a legal obligation to perform, the Debtors would cease performance under the GM Loss Contracts only after obtaining the Court's authority to do so under section 365(a) of the Bankruptcy Code. This distinction is critical because, again, once a contract is rejected pursuant to section 365(a), the Debtors will not have a legal obligation to continue performance of the contract. <u>See</u> <u>In re Lavigne</u>, 114 F.3d 379, 398 (2d Cir. 1997) (explaining that rejection under section 365(a) "frees the estate from the obligation to perform" the contract); <u>In re Hooker Invs.</u>, <u>Inc.</u>, 131 B.R. 922, 928 (Bankr. S.D.N.Y. 1991) ("In seeking authorization to reject a contract, a

---

[36]    In <u>dicta</u>, <u>Paramount</u> cited <u>Kelsey-Hayes</u> for the proposition that, under Michigan law, "[e]conomic duress may be accomplished through a 'wrongful' act as well as an 'illegal' act." 90 F. Supp. 2d at 875. As discussed in footnote 78, however, the Michigan Court of Appeals has squarely rejected <u>Kelsey-Hayes</u>'s pronouncement of Michigan law on this point.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

debtor asks . . . for a judicial declaration that it be relieved of future obligations to perform the burdensome contract.").

When a party acts in accordance with its legal rights and duties, those acts cannot be used to satisfy the economic duress doctrine's illegal-conduct requirement. See Apfelblat, 404 N.W.2d at 728 (holding that creditors were "entitled to enforce their contractual rights" and "may properly warn of [their] intentions to pursue collection without being subject to a defense of duress"); Frank v. Henry Ford Health Sys., No. 201419, 1999 WL 33452190, at *2 (Mich. Ct. App. Mar. 26, 1999) (per curiam) (ruling that medical group's expression of "intent to comply with a federal law requiring health care facilities to disclose to a data bank any denial of privileges to a physician" did not constitute economic duress). Accordingly, when a party has no legal duty to conduct business with another, the party's threat to discontinue business with the other is not illegal for purposes of establishing economic duress. For example, in Andersons, Inc. v. Crotser, No. 226095, 2001 WL 1511567 (Mich. Ct. App. Nov. 27, 2001) (per curiam), the defendant claimed that his agent signed confirmations "because plaintiff threatened to cease conducting business with defendant and his family unless someone signed the confirmations." Id. at *2. The court found no economic duress under these circumstances, stating, "Even accepting defendant's characterization of plaintiff's threats, . . . absolutely no indication exists that plaintiff acted illegally in urging defendant's [agent] to sign the confirmations." Id. [37]

---

[37] In arguing that the Debtors have engaged in illegal conduct, or might do so at some point in the future, GM also cites 28 U.S.C. § 959(b). This provision is of no help to GM, however, because it does not create any legal obligations that do not already exist under state law; rather, it merely requires a debtor-in-possession to "manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated." Id.; see also In re Stable Mews Assocs., Inc., 41 B.R. 594, 598 (Bankr. S.D.N.Y. 1984) (explaining that section 959(b) "imposes . . . a broad obligation to comply with state law, without enumerating any specific responsibilities"). Because GM cannot establish an underlying violation of state law, this section does not apply. This conclusion would not change even if the Debtors rejected the GM Loss Contracts and stopped performance. See In re Bradlees Stores, Inc., No. 02 Civ. 0786 (WHP), 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003) ("a simple breach of contract is not

(cont'd)

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

V.    GM Has No Right To Specific Performance If The Debtors Reject The GM Loss
Contracts

The final argument presented by GM is that, upon rejection by the Debtors, GM would
have a right to specific performance of the GM Loss Contracts, and that its right to this equitable
remedy would give rise to a cause of action that is not dischargeable claim under the Bankruptcy
Code. In other words, GM asserts that it would be futile for the Debtors to reject the GM Loss
Contracts because GM could force the Debtors to perform the contracts in any event. This
argument fails on two grounds. First, a debtor-in-possession's rejection of an executory contract
under section 365(a) of the Bankruptcy Code defeats the non-debtor's ability to obtain specific
performance of the contract, even if the non-debtor would otherwise be entitled to specific
performance under applicable state law.[38] Second, even if rejection did not trump a non-debtor's
right to specific performance, GM cannot satisfy the requirements for obtaining that remedy
under Michigan law.

_____

*(cont'd from previous page)*

cognizable under § 959(b) since any damages flowing from such a rejection are deemed to have occurred
immediately prior to the filing of the debtor's petition in bankruptcy, and thus are treated as a pre-petition
claim against the property of the debtor's estate"); In re Caldor, Inc., 240 B.R. 180, 195 (Bankr. S.D.N.Y.
1999) (holding that section 959(b) did not apply when debtor "simply breached a contract" pursuant to a
bankruptcy court's orders regarding the payment of claims), aff'd sub nom. Pearl-Phil GMT (Far East) Ltd.
v. Caldor Corp., 266 B.R. 575 (S.D.N.Y. 2001).

[38]    GM's argument that 28 U.S.C. § 959(a) would allow GM to sue the Debtors for specific performance
without leave of court is incorrect. As discussed in First Fiscal Fund Corp. v. Fishers Big Wheel, Inc., 36
B.R. 299 (E.D.N.Y. 1984), this section:

provides creditors with the automatic authority to commence an action against a
debtor-in-possession for post-petition acts related to the carrying on of the
business of the debtor-in-possession. An action on a claim arising out of the
rejection of an executory contract, however, is not included in this category
since any damages flowing from such a rejection are deemed to have occurred
immediately prior to the filing of the debtor's petition in bankruptcy [pursuant to
section 365(g) of the Bankruptcy Code], and thus must be regarded as a pre-
petition bankruptcy claim against property of the debtor's estate.

Id. at 302. This interpretation places GM's economic duress theory outside the coverage of 28 U.S.C.
§ 959(a) as well, because it is clear that GM's tort theory arises from the Debtors' rejection of the GM Loss
Contracts.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

A.   The Bankruptcy Code Does Not Permit A Non-Debtor To Seek Specific
Performance Of A Rejected Contract

While a considerable portion of GM's brief is devoted to the argument that GM is entitled

to specific performance of the GM Loss Contracts, and that this equitable remedy is not a

"claim" that can be discharged under the Bankruptcy Code (see Objection 48-66), it gives only

token consideration to a critical threshold question—namely, whether a non-debtor has the

ability to seek specific performance of an executory contract that has been rejected pursuant to

section 365(a) of the Bankruptcy Code.

Specific performance should not be available in such circumstances, regardless of

whether the non-debtor would be entitled to specific performance under state law. See, e.g.,

Midway Motor Lodge of Elk Grove v. Innkeepers' Telemanagement & Equip. Corp., 54 F.3d

406, 407-08 (7th Cir. 1995) (stating that "[r]ejection avoids specific performance," and that

"rejection is a device to avoid specific performance"); In re Rega Props., Ltd., 894 F.2d 1136,

1140 (9th Cir. 1990) ("specific performance [is] not an available relief under section 365");

Leasing Serv. Corp. v. First Tenn. Bank Nat'l Ass'n, 826 F.2d 434, 436 (6th Cir. 1987)

("Rejection denies the right of the contracting creditor to require the bankrupt estate to

specifically perform the then executory portions of the contract [and] limits the creditor's claim

to damages for breach of contract."); In re Ducane Gas Grills, Inc., 320 B.R. 341, 350 (D.S.C.

2004) (explaining that non-debtor cannot obtain specific performance of a rejected contract); In

re Executive Tech. Data Sys., 79 B.R. 276, 282 (Bankr. E.D. Mich. 1987) (same); In re Waldron,

36 B.R. 633, 642 n.4 (Bankr. S.D. Fla. 1984) ("The Code does not permit specific performance

as a remedy resulting from the rejection of an executory contract under § 365," despite the fact

that "this remedy may have otherwise been available to [the non-debtor] had the Debtors simply

breached the . . . contract and chosen to litigate th[e] matter in state court.").

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

This was the result, for example, in In re Bradlees Stores, Inc., 194 B.R. 555 (Bankr. S.D.N.Y. 1996). In that case, the non-debtor brought an adversary proceeding against the debtors, seeking, among other things, specific performance of an alleged contract granting the non-debtor the right to purchase certain property. Id. at 557. The debtors moved to dismiss this count for failure to state a claim under Fed. R. Bankr. P. 7012(b), arguing that the non-debtor was not entitled to specific performance "because the Debtors retain the right to reject [the] executory contract under section 365 of the Bankruptcy Code." Bradlees, 194 B.R. at 557. In its decision granting the debtors' motion, the bankruptcy court noted that, at oral argument, the non-debtor had "conceded that it could not sustain" its specific-performance claim "in light of the Debtors' ability to reject executory contracts under section 365." Bradlees, 194 B.R. at 558. The court's discussion of this point cited several cases from foreign jurisdictions, as well as the Second Circuit's decisions in Orion and Minges. See Bradlees, 194 B.R. at 558.

The decision in Barnett v. Blachura, 618 N.W.2d 777 (Mich. Ct. App. 2000) (per curiam), is also particularly instructive, as it reflects the views of a Michigan state court on whether specific performance is an available remedy when a contract has been rejected under section 365(a). Barnett was a state-court action for specific performance of an alleged contract to buy land. 618 N.W.2d at 778. When the debtor-seller rejected the contract pursuant to section 365(a) in a separate bankruptcy case, the state court divested itself of subject-matter jurisdiction over the specific performance action. Barnett, 618 N.W.2d at 779-80. The Michigan Court of Appeals reversed and remanded "for a determination whether an enforceable contract to purchase property exists," and instructed that, "If a contract is found, then plaintiff"—who, again, was seeking specific performance—"has the option to pursue his unsecured claim for prepetition damages through the normal bankruptcy process." Id. at 781. By directing the buyer to pursue

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

prepetition damages in the bankruptcy case, the court foreclosed the possibility that the buyer

could maintain his action for specific performance of the rejected contract. There is no reason to

believe that a Michigan court would reach a different conclusion if presented with a specific-

performance action regarding the GM Loss Contracts.

There are two principal reasons why courts have not allowed non-debtors to pursue

specific performance of rejected contracts. The first is based on 11 U.S.C. § 365(g), which

dictates the consequences that flow from rejection. Under section 365(g), the rejection of an

executory contract that has not been assumed constitutes a breach of the contract as of the date

immediately before the date of the filing of the bankruptcy petition. The non-debtor's remedy in

the event of a breach under section 365(g) is limited to damages, as explained by the Fourth

Circuit in:

> Under 11 U.S.C. § 365(g), [the non-debtor] would be entitled to treat rejection as
> a breach and seek a money damages remedy; however, it could not seek to retain
> its contract rights . . . by specific performance even if that remedy would
> ordinarily be available upon breach of this type of contract. Even though § 365(g)
> treats rejection as a breach, the legislative history of § 365(g) makes clear that the
> purpose of the provision is to provide only a damages remedy for the non-
> bankrupt party.

Id. at 1048 (internal citation omitted).

The second reason for refusing to allow specific performance of a rejected contract is that

requiring the debtor to perform would defeat the fundamental purpose of section 365(a) of the

Bankruptcy Code. As the Second Circuit has stated, the underlying purpose of that section is to

enhance the value of the estate by granting debtors the opportunity to examine their executory

contracts "and decide which ones it would be beneficial to adhere to." See Orion, 4 F.3d at 1098;

accord Lavigne, 114 F.3d at 386. This exercise provides no benefit to the estates if, after

spending the considerable time and resources necessary to evaluate executory contracts and

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

litigate a rejection motion, the debtor is nevertheless forced to perform those contracts based on a

separate action (requiring the expenditure of additional time and resources) for specific

performance that returns the debtor back to square one. Permitting specific performance of a

rejected contract "would in effect do what § 365 meant to avoid, that is, impose burdensome

contracts on the debtor." In re Fleishman, 138 B.R. 641, 648 (Bankr. D. Mass. 1992); accord

Lubrizol, 756 F.2d at 1048 ("Allowing specific performance would obviously undercut the core

purpose of rejection under § 365(a), and that consequence cannot therefore be read into

congressional intent.").

> B.    Even If The Bankruptcy Code Did Not Prohibit Specific Performance Of A
> Rejected Contract, GM Could Not Obtain Specific Performance Of The GM Loss
> Contracts Under Michigan Law

"[S]pecific performance is an "extraordinary remedy under Michigan law." G & V

Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1077 n.2 (6th Cir. 1994); accord

Barbers Local 552, Journeymen Barbers, 118 N.W.2d 837, 839 (Mich. 1962) ("The remedy of

specific performance is an extraordinary one granted only in unusual cases to prevent irreparable

harm."). Accordingly, a party seeking specific performance must clear several hurdles designed

to insure that the remedy is invoked only in rare cases, among them the requirement that there is

no adequate legal remedy. See 8600 Assocs., Ltd. v. Wearguard Corp., 737 F. Supp. 44, 46 (E.D.

Mich. 1990) (denying specific performance when "harm suffered by the plaintiff [was] strictly

economic, making money damages an adequate remedy"); Edidin v. Detroit Econ. Growth Corp.,

352 N.W.2d 288, 291 (Mich. Ct. App. 1984) ("Specific performance will not be decreed . . .

where there is an adequate remedy at law.").

Furthermore, under Michigan law, in the event of a breach of contract, the injured party

must make "every reasonable effort to minimize damages." Bak v. Citizens Ins. Co. of Am., 503

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

N.W.2d 94, 97 (Mich. Ct. App. 1993); <u>accord</u> <u>Lorenz Supply Co. v. Am. Standard, Inc.</u>, 300

N.W.2d 335, 339 (Mich. Ct. App. 1980) (explaining that "a breach of contract imposes on the

plaintiff a duty to mitigate damages").  As explained by the Michigan Supreme Court in <u>Morris v.</u>

<u>Clawson Tank Co.</u>, 587 N.W.2d 253 (Mich. 1998):

> Mitigation of damages is a legal doctrine that seeks to minimize the economic harm arising from wrongdoing.  Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages.  The person wronged cannot recover for any item of damage which could thus have been avoided.

<u>Id.</u> at 263 (internal quotation marks and citations omitted).

In the context of a contract for the sale of goods, the duty to mitigate includes the concept

of "cover."  Under the Michigan Uniform Commercial Code—Sales, Mich. Comp. Laws Ann.

§§ 440.2101–440.2725 ("UCC"), if a seller breaches a sales contract, the buyer must "'cover' by

making in good faith and without reasonable delay any reasonable purchase of or contract to

purchase goods in substitution for those due from the seller."  <u>Id.</u> § 440.2712(1); <u>see</u> <u>also</u>

<u>Lawrence v. Will Darrah & Assocs., Inc.</u>, 516 N.W.2d 43, 49 n.18 (Mich. 1994) (explaining that

"the [UCC] imposes a <u>duty</u> on a plaintiff to mitigate damages") (emphasis added).  A buyer who

covers can sue for damages representing "the difference between the cost of cover and the

contract price together with any incidental or consequential damages . . . less expenses saved in

consequence of the seller's breach."[39]  Mich. Comp. Laws Ann. § 440.2712(2).

---

[39]    Under the UCC, incidental damages are "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."  Mich. Comp. Laws Ann. § 440.2715(1).  Consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise," and "injury to person or property proximately resulting from any breach of warranty."  <u>Id.</u> § 440.2715(2).

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

One of the ways to achieve cover is by buying the same goods from the same seller at a higher price. See Kelsey-Hayes, 749 F. Supp. at 799 n.10 (rejecting the argument that "buying the same goods, from the same seller, on different terms is not 'cover' under" the UCC); Calbag Metals Co. v. Guy F. Atkinson Co., 770 P.2d 600, 603 n.6 (Or. Ct. App. 1989) (assuming that "buying the same goods from the seller at a higher price could qualify as cover" under Oregon's version of the UCC); B.B. Walker Co. v. Ashland Chem. Co., 474 F. Supp. 651, 661 (M.D.N.C. 1979) (explaining that buyer covered by purchasing same goods from same seller who breached contract, and who "controlled both the amount and grade of goods it would supply plaintiff, as well as the price therefor").

These principles, taken together, defeat GM's argument for specific performance of the GM Loss Contracts. GM's specific-performance theory is based on the false premise that granting this Motion would leave GM without the parts it needs from the Debtors, and without the ability to re-source those parts to other suppliers in the near future. As described above, however, the Debtors' business judgment is that rejection will not lead to the dire consequences predicted by GM, but rather will result in a new arrangement that preserves the supply of parts essential to GM under terms and conditions that help the Debtors reverse the operating losses they sustain under the GM Loss Contracts. Indeed, if the Debtors breach the GM Loss Contracts by exercising their authority to reject them, and GM cannot re-source the parts without unreasonable delay, GM would have the obligation to mitigate its damages by continuing to purchase parts from the Debtors at a higher price. Under those circumstances, GM would have a legal remedy in the form of a damages claim for the difference between the price set by the GM

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

Loss Contracts and the new, higher price.  Given the existence of this adequate legal relief, it would be improper to impose the extraordinary remedy of specific performance.[40]

---

[40]  The fact that any rights arising in GM's favor from the Debtors' rejection of the GM Loss Contracts could be vindicated through cover and an award of damages also defeats GM's argument that those rights do not constitute a "claim" within the meaning of section 101(5) of the Bankruptcy Code.  As GM acknowledged in its Objection, a creditor has "a dischargeable claim if money damages are an adequate alternative." (Objection 61.)  In addition, GM's request that the Court provide it with "an adequate transition period" during which it would continue to purchase parts under the GM Loss Contracts until it can re-source (id. 79–81) is nothing more than a disguised call for an order requiring specific performance.  This request fails for the reasons described above.

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

<u>Conclusion</u>

WHEREFORE the Debtors respectfully request that the Court enter an order overruling the Objection, granting the Motion, and granting the Debtors such other and further relief as is just.

Dated: New York, New York
   June 15, 2006

         SKADDEN, ARPS, SLATE, MEAGHER
         & FLOM LLP


         By: _/s/ John Wm. Butler, Jr._
           John Wm. Butler, Jr. (JB 4711)
           David E. Springer (DS 9331)
           John K. Lyons (JL 4951)
           Ron E. Meisler (RM 3026)
         333 West Wacker Drive, Suite 2100
         Chicago, Illinois 60606
         (312) 407-0700

              - and -


         By: _Kayalyn A. Marafioti_
           Kayalyn A. Marafioti (KM 9632)
           Thomas J. Matz (TM 5986)
         Four Times Square
         New York, New York 10036
         (212) 735-3000

         Attorneys for Delphi Corporation, <u>et al.</u>,
         Debtors and Debtors-in-Possession