KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Edward M. Fox, Esq. (EF1619)
599 Lexington Avenue
New York, New York 10022
Telephone (212) 536-3900

Attorneys for Wilmington Trust Company,
as Indenture Trustee

Hearing Date: June 19, 2006
10:00 A.M.

**REDACTED**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                                :
                                                      :
DELPHI CORPORATON, *et al.*,                          :
                                                      :
        Debtors.                                      :
                                                      :
------------------------------------------------------X

Chapter 11
Case No. 05-44481 (RDD)
(Jointly Administered)

**AMENDED OBJECTION OF WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE, TO MOTION FOR ORDER UNDER 11 U.S.C. § 363(B) AND FED. R. BANKR. P. 2002 AND 6004 APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH JOHNSON CONTROLS, INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (B) CONTINUATION AND TRANSITION OF SUPPLY TO JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD FACILITY, AND (C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW BRUNSWICK FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM**

Wilmington Trust Company ("WTC"), in its capacity as indenture trustee with

respect to the senior notes and debentures (the "Senior Debt") in the aggregate principal amount

of $2 billion issued by Delphi Corporation ("Delphi"), by and through its attorneys, Kirkpatrick

& Lockhart Nicholson Graham LLP, hereby files this amended objection to the Motion for Order

Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 2002 and 6004 Authorizing and Approving

Debtors' Entry into Transfer Agreement with Johnson Controls, Inc. Providing for (A) Sale of

Acquired Assets Free and Clear of Liens, Claims and Encumbrances, (B) Continuation and

Transition of Supply to Johnson Controls, Inc. of Battery Products Out of Fitzgerald Facility, and

(C) Implementation of Attrition Plan with Respect to New Brunswick Facility in Accordance

with IUE-CWA Memorandum (the "Motion") filed by Delphi and its debtor subsidiaries and

affiliates (collectively, the "Debtors"), stating as follows:

## INTRODUCTION

1.    WTC takes no position regarding the wisdom of the decision by Delphi

Automotive Systems, LLC ("DAS LLC") to sell its battery business to Johnson Controls, Inc.

("JCI"), nor with respect to DAS LLC's decision to implement an attrition program in

connection with that sale.

2.    WTC strenuously objects, however, to the Debtors' proposal to have

Delphi Corporation fund an attrition program for the benefit of DAS LLC and its employees, at a

cost of up to $22.8 million, without even attempting to show why such an expenditure is in the

best interests of Delphi Corporation and its own creditors.

## BACKGROUND

3.    Pursuant to the terms of a Master Sale and Purchase Agreement between

Johnson Controls, Inc. ("JCI") and Delphi Corporation dated June 30, 2005 (the "MSA"; true

and correct copy annexed hereto as Exhibit A), Delphi agreed to ██████████ ████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████ which is owned by DAS LLC.  MSA Schedule 1.

4.    Simultaneously with the execution and delivery of the MSA, JCI and DAS

LLC entered into the New Brunswick Put and Call Agreement dated June 30, 2005 (the "Put and

Call Agreement"; true and correct copy annexed hereto as Exhibit B).  Under the terms of the Put

and Call Agreement, ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Put and Call

Agreemen ████████████

     5.    Pursuant to Section ████ of the Put and Call Agreement, to the extent that

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████

     6.    The ██████████████ to have been ██████████████ under the

terms of the Put and Call Agreement was expected to ██████████████████████████.

     7.    Because ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ the Put and Call

Agreement has now been abandoned in favor of the Transfer Agreement Relating to Transfer of

Delphi's New Brunswick Facility to JCI dated May 26, 2006 between JCI and DAS LLC (the

"Transfer Agreement"; true and correct copy annexed hereto as Exhibit C).

     8.    Pursuant to the terms of the Transfer Agreement, the sale of the New

Brunswick Facility is subject to implementation of an Attrition Plan (the "Attrition Plan") to be

---

[1]  ██████████████████████████████████████████████████████████
████████████████████████

entered into between Delphi Corporation and the IUE-CWA. As proposed, Delphi Corporation

will pay the entire cost of the Attrition Plan, which is expected to cost between $18 and $22.8

million.

9.    Pursuant to the terms of the Transfer Agreement, JCI is required to

reimburse DAS LLC for up to $12.5 million of the cost of the Attrition Plan. The Debtors have

since agreed to provide in the order approving the Motion that the $12.5 million reimbursement

from JCI will, instead, be paid to Delphi Corporation because Delphi Corporation is paying the

cost of the Attrition Plan.

10.    According to the Debtors ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

11.    Although Delphi Corporation will thus receive ████████ pursuant to

the transaction, it faces costs under the Attrition Plan of up to $22.8 million. In addition to the

████████████ that Delphi did not have under the Put and Call Agreement, Delphi also

effectively loses the benefit of the ████████████ under the ████████████

because Delphi Corporation must now ████████████████ the Attrition Plan.

In contrast, ████████████████████████████████████████████████

████████████████████████. Thus, Delphi Corporation is worse off ████

████████████, and possibly by ████████████████ as a result of the implementation of the

Transfer Agreement rather than the Put and Call Agreement.

12.    In contrast, DAS LLC, which was obligated to ███████████████ ████████████████████████████████████████████████████████████ now pays nothing under the Transfer Agreement in connection with the Attrition program.

## DELPHI CORPORATION'S PARTICIPATION IN THE SALE OF THE NEW BRUNSWICK FACILITY IS NOT A PROPER EXERCISE OF ITS BUSINESS JUDGMENT.

13.    Facilitating the sale of the New Brunswick Facility may well be in the best interests of DAS LLC and its creditors for all of the reasons set forth in the Motion. Delphi Corporation, however, has an independent fiduciary duty to act in the best interests of its creditors without regard to the potentially conflicting interests of its subsidiaries and affiliates, including DAS LLC.

14.    Nevertheless, the Motion makes no effort to explain how the relief requested, which involves a substantial expenditure of funds by Delphi Corporation for the benefit of DAS LLC and its creditors, would or could conceivably advance the interests of Delphi Corporation's own creditors.

15.    In discovery, the Debtors have asserted ███████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████

16.    This putative justification for imposing on Delphi Corporation the cost of providing incentives to DAS LLC employees to retire or otherwise leave their employment is premised on a number of legal errors and factual distortions.

17.    First, Delphi Corporation's status as a signatory to a collective bargaining agreement ("CBA") does not mean that Delphi Corporation actually *employs* any of the workers

covered by the CBA, nor that it necessarily has any obligation to provide such employment for the workers covered by the CBA.

18.    Contrary to the Debtors' suggestion, a CBA is simply not the same thing as an employment contract. As explained by the Supreme Court in J.J. Case Co. v. National Labor Relations Board, 321 U.S. 332 (1944):

> Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to the terms which will govern hiring and work and pay in that unit. **The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone.** The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment.

Id. at 335 (emphasis added); see also Airline Pilots Assoc. Int'l. v. Continental Airlines, Inc. (In re Continental Airlines Corp.), 901 F.2d 1259, 1264 (5th Cir. 1990) ("Unlike a contract of employment, ordinarily a collective bargaining agreement does not create an employer-employee relationship; and its rejection does not terminate an employment relationship. It neither obligates any employee to perform work nor requires the employer to provide work.").

19.    The Debtors have repeatedly stated that the unionized employees at the New Brunswick Facility are either employed directly by DAS LLC or employed by Delphi Automotive Systems Human Resources LLC and leased to DAS LLC. Exhibit 4.1 §1. J. to the Transfer Agreement specifically states that the employees to be covered by the Attrition Plan are employed by DAS LLC. These employees are paid by DAS LLC out of the cash pooling operation maintained by DAS LLC.

20.    Equally misleading is the Debtors' suggestion that DAS LLC is somehow not bound by the CBA that covers its employees – and is thus doing a favor to Delphi

Corporation by abiding by its terms -- simply because DAS LLC is not a signatory to that
agreement.

21.    Under the so-called "joint employer" doctrine of labor law, a non-
signatory to a CBA, like DAS LLC, may nevertheless be bound its terms if "it *share[s]* or co-
determine[s] those matters governing the essential terms and conditions of employment" with a
signatory. See N.L.R.B. v. Browning Ferris Indus. of Pennsylvania, Inc., 691 F.2d 1117 (3d Cir.
1982).

22.    In this case, it is clear that the employees covered by the CBA at issue
here are employees of DAS LLC, perform their services at facilities owned by DAS LLC and are
paid for their services by DAS LLC.

23.    Indeed, Exhibit 4.1 to the Transfer Agreement defined the Delphi-IUE-
CWA National Agreement as:

> the nationally negotiated collective bargaining agreements, including any
> letter agreements, MOUs, supplemental agreements and all applicable
> employee benefit plans in effect between seller and the IUE-CWA.

Transfer Agreement, Exhibit 4.1 §1.D. (emphasis supplied).  Thus, DAS LLC has conceded that
it is bound by the terms of the CBA.

24.    Moreover, if DAS truly believed that it was not bound to observe the
provisions of the CBA, it is inconceivable that it would continue to pay what it considers to be
substantially above market compensation and benefit arrangements for its employees.

25.    Under the circumstances, the Motion appears to be the latest example of
the Debtors' willingness to treat Delphi Corporation as a communal piggybank to be tapped for
the benefit of its operating subsidiaries rather than a separate and distinct legal entity, with
interests and obligations distinct from those of its subsidiaries and a fiduciary duty to advance
the interests of its own creditors and equity holders.

26.    Under the guise of a ███████████████████ the Debtors have taken the opportunity to change the economics of the transaction by ███████████████ ████████████████████████████████████████ and shifting those costs to Delphi Corporation, even though Delphi Corporation receives no benefit from this transaction[2].

27.    The Debtors have failed to demonstrate the existence of any "good business reason" for Delphi Corporation's participation in this transaction, and the Motion must therefore be denied.  In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).

WHEREFORE, WTC respectfully requests that the Court enter an Order denying the Motion insofar as it obligates Delphi Corporation to fund the cost of the Attrition Program and granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
       June 16, 2006

KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP

By:    /s/ Edward M. Fox
       Edward M. Fox (EF1619)
       A Member of the Firm
       Attorneys for Wilmington Trust Company,
       as Indenture Trustee
       599 Lexington Avenue
       New York, NY 10022
       (212) 536-3900

---

[2]    Because DAS LLC is insolvent, Delphi's membership interest in DAS LLC is of no value.  Any funds expended by Delphi for the benefit of DAS LLC simply enhance the recovery to the creditors of DAS LLC at the expense of the creditors of Delphi Corporation.

## EXHIBIT A

**Filed Under Seal Pursuant To**

**Agreed Protective Order Governing Production And
Use Of Confidential And Highly Confidential Information
In Connection With The Within Chapter 11 Cases,
Including Contested Matters And Adversary Proceedings**
dated January 12, 2006

## EXHIBIT B

**Filed Under Seal Pursuant To**

**Agreed Protective Order Governing Production And
Use Of Confidential And Highly Confidential Information
In Connection With The Within Chapter 11 Cases,
Including Contested Matters And Adversary Proceedings**
dated January 12, 2006

Exhibit C

EXECUTION COPY

## TRANSFER AGREEMENT RELATING TO
## TRANSFER OF DELPHI'S NEW BRUNSWICK
## <u>BATTERY FACILITY TO JCI</u>

**THIS AGREEMENT**, made and entered into this **26th** day of **May, 2006** by and between **JOHNSON CONTROLS, INC.**, a Wisconsin corporation ("**Buyer**") and **DELPHI AUTOMOTIVE SYSTEMS LLC**, a Delaware limited liability company ("**Seller**").

## R E C I T A L S:

**WHEREAS**, Seller is engaged in the Business (as hereinafter defined).

**WHEREAS**, on October 8, 2005 (the "**Petition Date**"), Seller and certain of its Affiliates filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, Seller wishes to sell to Buyer, all right, title and interest of Seller in and to the Acquired Assets (as hereinafter defined), and Buyer wishes to make such purchase; subject to the conditions set forth in this Agreement.

**WHEREAS**, Buyer and Seller are parties to a Tier 2 Component Supply Agreement ("**CSA**") under which Seller manufactures SLI batteries, at the Seller's facility in New Brunswick, New Jersey (the "**Facility**").

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained in this Agreement, Buyer and Seller agree as follows:

1.    **DEFINITIONS.**    As used in this Agreement, the following words, when capitalized, shall have the respective meanings set forth below:

1.1    "**Acquired Assets**" means the Real Property and all of the following assets to the extent owned by Seller and used or held for use primarily or exclusively in the Business at the Facility: (i) Administrative Assets; (ii) Permits; (iii) Personal Property owned by Seller, located at the Facility for manufacturing Products for Buyer under the CSA, including any addition thereto or any replacement, adjustment or modification thereof; and (iv) certain Inventory of the Business. <u>Exhibit 1.1</u> to this Agreement contains a list of the Acquired Assets consisting of Personal Property and Real Property as of the date hereof to the best of Seller's Knowledge. For the avoidance of doubt, it is specified that the term "**Acquired Assets**" does not include: (i) any machinery, equipment and other assets owned by Buyer; (ii) any of Seller's assets within its Laurel, Mississippi or Flint, Michigan operations (which make plastic battery trays, covers and other plastic components of Products) or Fitzgerald, Georgia operations (without affecting JCI's rights to its bailed assets within those facilities); (iii) assets owned by third parties; (iv) except as set forth in Section 7.3 (Indemnity), the benefits of any of Seller's or Seller's Affiliates' insurance policies relating to the operation of the



Business (including any right to proceeds thereunder); (v) all finished goods Inventory and all inventories, products, rights, properties, assets and businesses of the Business which shall have been transferred or disposed of by Seller prior to Completion in the Ordinary Course of Business or not otherwise in breach of this Agreement; (vi)  Any Inventory consisting of work in process (other than green group batteries), or raw materials not listed on Exhibit 1.11 of this Agreement, including the excluded raw materials Inventory set forth on Exhibit 1.1(vi); (vii) any Contracts; and (viii) any document or information the transfer of which is prohibited by law or regulation.

      **1.2**    "**Administrative Assets**" means books, records and other administrative assets including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, sale order files, tool routings, labor routings, facility blueprints, service blueprints and plant layouts; provided, however that Administrative Assets does not include Technical Documentation or information and materials protected by attorney-client privilege (the lack of which materials are not material to the operation of the Business under the CSA).

      **1.3**    "**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity.  For purposes of this definition, control means ownership of more than fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar functions.

      **1.4**    "**Agreement**" means this Transfer Agreement, including Exhibit 4.1 and all other exhibits to this Agreement.

      **1.5**    Intentionally omitted.

      **1.6**    "**Business**" means the manufacture of starting SLI batteries by Seller at the Facility.

      **1.7**    "**Completion**" means completion of the purchase of the Acquired Assets by Buyer resulting from and in accordance with this Agreement.

      **1.8**    "**Completion Date**" means the date of Completion of the transfer of the Facility to Purchaser under this Agreement.

      **1.9**    "**Contracts**" means purchase orders, service contracts, leases, product warranty or service agreements and other commitments, agreements and undertakings relating to the Business.

      **1.10**    "**Improvements**" means buildings, fixtures and other improvements to Real Property, including the Facility.

      **1.11**    "**Inventory**" included within the Acquired Assets means finished Products, raw materials set forth on Exhibit 1.11, work-in-process consisting of green group batteries, packaging, stores, stock, supplies, spare parts and other inventory used in making Products located at the Facility.

2

**1.12**   "Lien" means any lien, mortgage, charge, pledge, security interest, restriction on transferability, easement, defect of title or other claim, easement, encroachment or other encumbrance of any nature whatsoever on any Acquired Asset.

**1.13**   "IUE Consent" means the IUE waiver of "no sale" provisions contained in the Delphi-IUE-CWA National Agreement (as defined in Exhibit 4.1) and IUE waiver of the Buyer's assumption of the Unpublished Delphi IUE-CWA Neutrality Letter or any other neutrality agreement, included as part of Exhibit 1.13 of this Agreement.

**1.14**   "Purchase Price" means the purchase price to be paid for the Acquired Assets, exclusive of any Transaction Taxes, equal to One Dollar ($1.00) plus (i) $20.00 for every green group battery, and (ii) the CSA price for all finished goods Inventory, in each case located at the Facility as of close of business on July 31, 2006, based on a physical inventory to be conducted by the parties.

**1.15**   "Ordinary Course of Business" means the ordinary course of business of the Business, consistent with past practice and custom, including the CSA.

**1.16**   "Party" or "Parties" means Buyer and/or Seller.

**1.17**   "Permits" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to Seller and that relate exclusively to the Facility or the Acquired Assets, to the extent that Seller or any of its Affiliates has the power, authority or right to transfer or assign such Permits.

**1.18**   "Permitted Lien" means: (i) any Lien for taxes not yet delinquent; (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet delinquent; (iii) purchase money security interests arising in the Ordinary Course of Business; (iv) security interests relating to vendor tooling arising in the Ordinary Course of Business; (v) Liens and encumbrances of record; and (vi) Liens consented to by Buyer (such consent not to be unreasonably withheld).

**1.19**   "Personal Property" means tangible personal property other than Administrative Assets, Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, business machines, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property used by the Business, whether located at the Facility, at the place of business of a vendor or elsewhere.

**1.20**   "Products" means SLI batteries.

**1.21**   "Real Property" means the real property used by the Business and owned by Seller, as described in Exhibit 1.21, and all Improvements located thereon.

**1.22**   "Sale Approval Order" means an order or orders of the Bankruptcy Court issued pursuant to Sections 363 and 365 of the Bankruptcy Code substantially in the form set forth on Exhibit 1.22 to this Agreement, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets to Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Liens other than Permitted Liens.

3

**1.23** "Seller's Knowledge" or "**Knowledge of Seller**" means the knowledge of any of the individuals listed on Exhibit 1.23 with respect to their respective functional areas of expertise. For this purpose, an individual will be deemed to have Knowledge of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual would be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonable inquiry of Delphi's files and its employees who, in the ordinary course of their job responsibilities, would reasonably be expected to have actual possession or actual personal Knowledge of such information.

**1.24** "SLI Batteries" means starting, lighting and ignition lead-acid batteries.

**1.25** "**Technical Documentation**" means: (i) assembly and parts drawings, material specifications and drawings for Products; (ii) information to assemble Products; (iii) labor and tool routing sheets; drawings of special tools, fixtures, dies, jigs, gauges and patterns, and service information; and (iv) operating manuals, instructions and other available, relevant documents relating to the operation of the machinery and equipment located at the Facility.

**1.26** "Transaction Taxes" mean any sales taxes, documentary and stamp taxes, transfer taxes, use taxes, excise taxes, value-added taxes, registration duties, gross receipts or similar charges, all charges for filing and recording documents in connection with the transfer of the Acquired Assets.

## 2.   COMPLETION OF THE SALE OF THE ACQUIRED ASSETS:

**2.1**   **Completion**. Subject to the conditions set forth in this Section 2.1, Completion shall take place on the Completion Date at the offices of Seller in Troy, Michigan or at such other place as Buyer and Seller may jointly determine.   The Completion date will be the later of August 1 (12:01AM EST), 2006 and the date that is ten (10) days after the date of the Sale Approval Order, unless otherwise agreed by the Parties. Each Party's obligation to perform at the Completion Date is subject to:

A.      Bankruptcy Court approval of the Sale Approval Order, including without limitation, approval of Exhibit 1.13.

B.      Completion of the implementation of the attrition plan set forth in Exhibit 1.13 (the "**Attrition Plan**") to reduce the number of U.S. Hourly Employees to approximately one hundred (100) U.S. Hourly Employees, in accordance with the terms of the IUE Consent;

C.      Seller must not have negotiated any other Collective Bargaining Agreement which purports to be applicable to the New Brunswick Facility.

D.      The other Party's being in compliance, in all material respects, with its agreements with respect to Employee Matters that are such other Party's responsibility, and to be performed before Completion as described in Exhibit 4.1 hereto, and with such Party's representations and warranties set forth in Section 3 of this Agreement being true and correct in all material respects as of

4

the Completion Date, except where a failure is due to the acts or omissions of the other Party;

E.      The other Party must not be in default in any material respect under, and must not have rejected, the CSA dated June 30, 2005;

F.      The Facility must be an operational plant producing Products in accordance with the CSA, with such changes as contemplated in Exhibit 1.13; and

G.      The other party shall be in compliance in all material respects with the Environmental Matters Agreement dated June 30, 2005 with respect to the Facility.

H.      Each Party undertakes to pay to the other or to the relevant tax authorities the Transaction Taxes as required by applicable law and in accordance with Section 1.26.

2.2      <u>Seller Deliveries at Completion</u>.  At Completion Seller shall deliver to Buyer:

A.      A Bill of Sale for the Personal Property and Inventory, substantially in the form of <u>Exhibit 2.2A</u> hereto, duly executed together with an invoice relating to the Acquired Assets transferred;

B.      A covenant deed for the Real Property;

C.      A certificate that all the representations and warranties made in Article 3 by Seller are true and correct in all material respects, and that it has complied with its obligations under this Section 2.2, with the same force and effect, and subject to the same qualifications, as though made at Completion;

D.      Officer's certificate stating that at least $12.5 million USD has been incurred by Delphi in furtherance of the Attrition Plan, as referred to in Section 3.A(xi) of <u>Exhibit 4.1</u>; and

E.      Such other documents as may be necessary to give Buyer good and valid title to and ownership of the Acquired Assets.

2.3      <u>Buyer Deliveries at Completion</u>.  At Completion Buyer shall:

A.      A certificate that all the representations and warranties made in Section 3 by Buyer are true and correct in all material respects, and that it has complied with its obligations under this Section 2.3, with the same force and effect, and subject to the same qualifications, as though made at Completion; and

B.      Pay to Seller the Purchase Price by wire transfer in accordance with wiring instructions to be provided by Seller before Completion.

5

**2.4** **Transfer of Acquired Assets.** Seller and Buyer hereby agree that, as of the Completion Date, title and risk of loss to all Acquired Assets shall pass from Seller to Buyer.

**2.5** **Post Closing Deliveries.** Buyer will pay for assets, goods or services ordered by Seller on or before Completion for the Business in the Ordinary Course of Business to the extent such assets, goods or services are received by the Business after the Completion Date; other than Inventory items that have been excluded from the Acquired Assets under Section 1.1(vi) of this Agreement. If any such excluded items are delivered to the facility after Completion, Buyer will promptly contact Seller and segregate such items in a reasonable manner, and Seller and Buyer will cooperate in Seller's removal of such items within 30 days after such notice as set forth in Section 8.15 below.

**2.6** **Prorations, Adjustments of Expenses Following Completion:**

A.   **Prorations:**

(i)   To the extent that Seller makes any payment relating to the Business prior to, on or following the Completion Date with respect to any item listed in clause (ii) below relating to periods following the Completion Date for which Buyer will receive a benefit, Buyer shall reimburse Seller on a per diem basis, unless otherwise provided for; and

(ii)   To the extent Buyer makes any payment relating to the Business following the Completion Date with respect to any item listed below relating to periods on or prior to the Completion Date for which Seller received a benefit, Seller shall reimburse Buyer on a per diem basis, unless otherwise provided for, in each case for the following:

(a)   Personal, real property and other ad valorem Taxes, with real property Taxes allocated pursuant to Section 5.5.

(b)   Water, wastewater treatment, sewer charges and other similar types of charges and/or Taxes thereon and any other assessments payable with respect to the Business.

(c)   Electric, fuel, gas, telephone and other utility charges.

(d)   Reimbursable employee business expenses will be paid by Seller if incurred prior to or on the Completion Date or Buyer if incurred after the Completion Date.

(e)   Rentals and other charges under leases to be transferred to or assumed by the Buyer pursuant to this Agreement.

(f)   Payments and charges due pursuant to any Contract (other than pursuant to collective bargaining agreements,

6

Benefit Plans (as defined in Section 3(3) of ERISA)), employee payroll-related items except as set forth in clause (d), Permit, commitment or other binding arrangement to which Seller is a party or is obligated and which are being assumed by the Buyer pursuant to this Agreement or offered to Buyer by Seller on a transition services basis, as may be agreed by the Parties prior to Completion.

B.     **Further Assurance.** To the extent that, after the Completion Date, Delphi, on the one hand, or Buyer, on the other hand, receives any bills or invoices for any of the items listed in this Section 2.6 or similar items, relating to both pre-Completion and post-Completion periods, such Party shall, within ten (10) business days, send any such bills or invoices to the other Party. If necessary to avoid incurring interest, penalties and/or late charges, the Party receiving any such bill or invoice shall pay all amounts shown to be due thereon, and shall invoice the other Party for all amounts owed by such other Party thereunder, and such other Party shall reimburse such amounts in accordance with Section 2.6C.

C.     **Payments.** Any payments due under this Section 2.6 shall be made within fifteen (15) days after the end of the month in which a bill or invoice is sent to a Party pursuant to Section 2.6C; provided, however, that the disputed portion of any such item shall be paid within fifteen (15) days after the final determination thereof on an item-by-item basis. When any Party makes a payment to a third party which is required to be reimbursed to it by another Party, the reimbursement payment shall be considered the repayment of an advance. Such payments shall be made by wire transfer in immediately available funds.

2.7     **Approvals and Consents; Cooperation; Notification.** Seller shall notify, as required by the Bankruptcy Court, all parties entitled to notice of the proposed sale of the Acquired Assets to Buyer, and Buyer will cooperate with Seller in attempting to obtain the Sale Approval Order.

2.8     **Fitzgerald.** Regarding Delphi's supply of Products to JCI from Delphi's Fitzgerald, Georgia battery manufacturing facility, Delphi will continue to supply such batteries to JCI in accordance with the terms of the Component Supply Agreement between the parties dated July 1, 2005 ("**CSA**"), as amended. In no event shall the pricing of Products manufactured at Fitzgerald be modified other than the GM discounts and other changes and adjustments contemplated by the existing CSA terms.

3.     **REPRESENTATIONS, WARRANTIES AND INDEMNITIES:**

3.1     **Representations and Warranties made by each Party.** Each of Seller and Buyer makes the representations and warranties contained in this Article 3 to the other Party except for those in Section 3.6, which are made solely by Seller to Buyer. The representations and warranties contained in this Article 3 are made on the date of this Agreement and are deemed to be repeated on the Completion Date.

3.2     **Power and Authority.** Subject to Bankruptcy Court approval of the Sale Approval Order, it has the power to execute, deliver and perform this Agreement, and

7

has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

3.3    **Authorizations.**    Subject to Bankruptcy Court approval of the Sale Approval Order, all authorizations required in connection with the execution, delivery, performance, validity and enforceability of, and the transactions contemplated by, this Agreement have been obtained or effected and are in full force and effect, provided, however, that performance of this Agreement is subject to Buyer and Seller taking necessary action as required to meet their respective obligations regarding employee matters, as set forth on <u>Exhibit 4.1</u> hereto.

3.4    **Enforceability.**    Subject to Bankruptcy Court approval of the Sale Approval Order, this Agreement constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms.

3.5    **No Breach.**    Subject to Bankruptcy Court approval of the Sale Approval Order, entering into this Agreement and performing its undertakings hereunder shall not result in the breach of any provision of, or constitute a default under, any judgment, decree, indenture, mortgage or other agreement or instrument to which it is a party or by which it is bound.

3.6    **Miscellaneous Matters Relating to Business:**

A.    **Ownership of the Acquired Assets.**    Seller has good, valid and marketable title to the Acquired Assets, and upon entry by the Bankruptcy Court of the Sale Approval Order, Seller shall transfer and convey the Acquired Assets free and clear of any Lien other than Permitted Liens. Except for this Agreement and the Bankruptcy Court approvals reflected in the Sale Approval Order, the Real Property will be transferred free and clear of any restrictions with respect to the transferability or divisibility thereof. At the Closing, Buyer will receive good and marketable fee title or leasehold title (as applicable) to all of the Real Property owned by Seller, free and clear of all Liens other than the Permitted Liens.

B.    **Condition.**    The Real Property and Personal Property (other than Inventory) have been maintained as required by the CSA and are in such condition (considering age and purpose for which used) as to enable the Business to be conducted as currently conducted without material disruption.

C.    **Inventory.**    SELLER MAKES NO WARRANTY OF WHATSOEVER KIND OR NATURE REGARDING INVENTORY, ALL OF WHICH IS BEING SOLD "AS IS" AND "WHERE IS", AND SELLER HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, INCLUDING THE CONDITION OF THE INVENTORY AND EACH PART THEREOF, AND THE ADEQUACY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE INVENTORY OR ANY PART THEREOF.

D.    **Real Property.**    To Seller's Knowledge, the use of the Real Property as currently used is a permitted use by right in the applicable zoning classification and is not a nonconforming use or a conditioned use, and no variances are needed and none have been granted with respect to the Real

Property. There are currently in full force and effect duly issued certificates of occupancy permitting the Real Property and the Facility to be legally used and occupied for the purpose of conducting the Business. The Real Property has rights of access to dedicated public highways. To Seller's Knowledge, no fact or condition exists that would prohibit or adversely affect the ordinary rights of access to and from the Real Property from and to the existing highways and roads, and there is no pending or, to Seller's Knowledge, threatened restriction or denial, governmental or otherwise, upon such ingress and egress. Seller has not received notice of: (i) any claim of adverse possession or prescriptive rights involving or affecting any of the Real Property; (ii) any structure located on any Real Property that encroaches on or over the boundaries of neighboring or adjacent properties; or (iii) any structure of any other person or entity that encroaches on or over the boundaries of any Real Property. None of the Real Property is located in a flood plain, flood hazard area, wetland or lakeshore erosion area within the meaning of any Law or Order.

E.    **No Condemnation, Expropriation or Similar Action.**    To Seller's Knowledge, neither the whole nor any portion of the Real Property is subject to any order to be sold (other than the Sale Approval Order) or is being condemned, expropriated or otherwise taken by any governmental entity with or without payment of compensation therefore, and no such condemnation, expropriation or taking has been planned, scheduled or proposed.

F.    **Compliance.**    The Real Property is, or at the time of Completion will be, in compliance in all material respects with any applicable law, regulation or ordinance, and Seller has not received any notice, written or to the best of Seller's knowledge oral, of any such violation.

G.    **Litigation.**    Except for matters disclosed prior to Completion and for which Seller will retain responsibility if so required under the terms of the CSA, there is no litigation or administrative proceeding and to Seller's Knowledge, threatened litigation or administrative proceeding which affects or could affect the Real Property or Buyer's ability to conduct the Business at the Facility.

H.    **Environmental Matters.**    Seller makes no representations or warranties regarding environmental matters in this Agreement (notwithstanding anything to the contrary herein). Notwithstanding the aforementioned, to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge liability with respect to any claims brought by a third party against Buyer relating to pre-Completion environmental matters at the Facility, Seller will indemnify Buyer as set forth in Exhibit 3.6.H to this Agreement.

I.    Seller represents and warrants that, except for the unpublished Neutrality Letter and Exhibit 1.13 referenced herein, Seller has no current agreements or understandings with the IUE-CWA which create obligations or liabilities for Buyer at its other plants if Buyer purchases the New Brunswick facility or assumes the terms of the Delphi IUE-CWA National Agreement or the Delphi IUE-CWA Local Agreement.

9

J.    EXCEPT FOR SPECIFIC REPRESENTATIONS AND WARRAN-
TIES CONTAINED IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE
BEING SOLD ON AN "AS IS," "WHERE IS" BASIS AND SELLER DOES NOT
MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY,
FITNESS OR OTHERWISE WITH RESPECT TO THE ACQUIRED ASSETS
WHICH EXTEND BEYOND THE AFORESAID SPECIFIC REPRESENTATIONS
AND WARRANTIES.

### 3.7    Product Warranty/Liability:

A.    **Buyer Indemnity.**    Buyer will defend, indemnify and hold
harmless Seller and its directors, officers, agents and employees, from and
against any and all claims, suits, causes of action, liabilities, losses, damages,
costs of settlement, and expenses (including reasonable attorney fees) which
may be imposed upon or incurred by Seller from claims, suits or causes of action
(including without limitation those for death, personal injury, or property damage)
by any Person whatsoever at any time against Seller and/or its directors, officers,
agents and employees to the extent arising from, caused or alleged to be caused
by: (a) defective or improper design or manufacture of any Products
manufactured by Seller under the CSA; (b) infringement of any intellectual
property right (including patent, trademark, copyright, moral, industrial design or
other proprietary rights, or misuse or misappropriation of trade secret) in
connection with the design or manufacture of any Products other than
infringement of U.S. Patent No. 4,906,540 or U.S. Patent No. 5,401,278; and/or
(c) the failure of the design of Products to comply with any applicable Laws.

B.    **Seller Indemnity.**    To the extent that the Sale Approval Order or
other applicable provisions of the Bankruptcy Code fails to discharge liability with
respect to any claims for Products manufactured at the Facility brought by a third
party against Buyer relating to pre-Completion Product warranty/liability matters,
Seller will defend, indemnify and hold harmless Buyer and its directors, officers,
agents and employees, from and against any and all claims, suits, causes of
action, liabilities, losses, damages, costs of settlement, and expenses (including
reasonable attorney fees) which may be imposed upon or incurred by Buyer from
claims, suits or causes of action (including without limitation those for death,
personal injury, or property damage) by any Person whatsoever at any time
against Buyer and/or its directors, officers, agents and employees to the extent
arising from or caused by: (a) infringement of U.S. Patent No. 4,906,540 or U.S.
Patent No. 5,401,278;    (b) infringement of any intellectual property right
(including patent, trademark, copyright, moral, industrial design or other
proprietary rights, or misuse or misappropriation of trade secret) other than in
connection with the design or manufacture of any Products; (c) the failure of the
Products manufactured by Seller at the Facility under the CSA to comply in any
material respect with the applicable specifications as a result of Seller's failure to
comply with the Manufacturing and Quality Procedures set forth in the CSA or
negligent workmanship; and/or (d) any and all claims related to the Facility, its
employees, Products to the extent arising in any manner out of facts or
circumstances in existence prior to July 1, 2005.

4.    **EMPLOYEE MATTERS**. The treatment of U.S. Hourly Employees and U.S. Salaried Employees, and the obligations of Seller and Buyer with respect thereto, will be as set forth in Exhibit 4.1.

5.    **TAX MATTERS:**

5.1    **Seller Responsibilities**. Seller shall file any Tax Returns and pay any Taxes which may be required by any federal, state, local or foreign tax authorities or governmental agencies by reason of business conducted by Seller on or prior to the Completion Date.

5.2    **Buyer Responsibilities**. Buyer shall file any Tax Returns and pay any Taxes which may be required by any federal, state, local or foreign tax authorities or governmental agencies by reason of business conducted by Buyer after the Completion Date. All United States or foreign, national, state or local sales taxes, documentary and stamp taxes, transfer taxes, registration taxes, use taxes, gross receipts taxes, registration duties and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees), as well any permit, transfer and filing fees required in order to obtain governmental approvals and consents relating to the transactions contemplated by this Agreement ("**Transfer Taxes**"), shall be borne by Buyer.

5.3    **Mutual Assistance**.  Without affecting the foregoing responsibilities, Seller and Buyer shall provide reasonable assistance during normal business hours to one another to resolve any Tax issues which may relate to their respective business activities utilizing the Acquired Assets and personnel. Such assistance may include, without limitation, access to relevant business records and personnel in connection with: (i) the preparation and filing of Tax Returns, elections, consents, certifications and claims for refunds; (ii) the determination of liability for Taxes; and (iii) the response to tax audits, examinations and other proceedings. To the extent permitted by applicable law, Buyer and Seller agree to reasonably cooperate with each other to complete any and all exemption certificates or other documents that exempt any portion of the Purchase Price from any of the Transaction Taxes prior to either the Completion Date or the due date for such Transaction Tax.

5.4    **Definitions**.  For purposes of this Agreement, the words "**Taxes**" and "**Tax Return**" are defined as follows:

A.    "**Taxes**" mean any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer, taxes, use, gross receipts, value added, employment, excise, ad valorem, property, withholding, payroll, minimum, windfall profit taxes, transfer fees, customs duties or registration duties), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign governmental or subdivision or agency thereof;

B.    "**Tax Return**" means any return, declaration, report, claim for refund or information return or statement, or any other similar filings related to Taxes, including any schedule or attachment thereto.

**5.5**   **Real Estate Taxes.**  All real estate taxes and assessments assessed on the Real Property for the calendar year in which the Completion occurs shall be prorated between Buyer and Seller.  The Seller shall be allocated tax liability for the portion of the year beginning on January 1 and ending on the Completion Date; the Buyer shall be allocated tax liability for the portion of the year beginning on the day following the Completion Date and ending on December 31.  The percentage for each party will be the number of days in its portion of the year divided by the total number of days in the year.  Since the actual determination of tax liability for a given calendar year occurs in June, if the Completion Date occurs before the tax has been determined for the year, the calculation of the prorated taxes will be made as soon as practical after the tax bill has been rendered for the calendar year.  If the Completion Date occurs after the tax liability has been determined for the year, the calculation of the prorated taxes will take place at Completion.  Each party will be responsible for paying or otherwise discharging any installments due in the year in which the Completion Date occurs based on ownership of the property at the time the installment is due.  If the tax allocated to a party exceeds the installments paid or to be paid by that party, that party will make a payment to the other party equal to the excess of the prorated liability over the sum of the installment payments paid or to be paid.  The parties agree to cooperate as necessary to accurately and promptly determine the prorated tax liability.

## 6.    GOVERNING LAW; DISPUTE RESOLUTION:

**6.1**   **Governing Law.**  This Agreement shall be construed and enforced in accordance with the laws of the State of New York, without giving effect to rules governing the conflict of laws.  Buyer and Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto except in the Bankruptcy Court).

**6.2**   **Dispute Resolution:**

A.      Buyer and Seller will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each Party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either Party to the other, either Party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice of Dispute**") and specify therein in reasonable detail the nature of the dispute.  Within ten (10) days after receipt of the Notice of Dispute, the receiving Party (the "**Defending Party**") shall submit to the other a written response.  The Notice of Dispute and the response shall include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive to meetings of the parties.  Within fifteen (15) days after such written notification, the executives (and other named in the Notice of Dispute or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute (the "**Dispute Resolution Meeting**").  All reasonable requests for information made by one Party to the other will be honored promptly.  All negotiations pursuant to this Section 6.2A are confidential and shall be treated as

12

compromise and settlement negotiations for purposes of applicable rules of evidence.

**B.**     The parties agree that neither of them will initiate legal action in respect of a dispute within the period of fifteen (15) days following the Dispute Resolution Meeting.   In the absence of agreement at the Dispute Resolution Meeting and following that fifteen (15) day period, any party shall be free to pursue its rights and remedies as it may see fit in accordance with this Agreement.

7.     **INDEMNIFICATION:**

   7.1   **Indemnification:**

   **A.**     **Indemnification Provisions for Benefit of Buyer.**   If Seller breaches any of its warranties or covenants contained in this Agreement, and Buyer makes a written claim for indemnification against Seller in accordance with the procedures set forth in Section 7.2 below within the applicable survival period, to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge the underlying third party claim,  Seller agrees to indemnify Buyer and its Affiliates and their officers, directors, employees and agents (individually a **"Buyer Indemnitee"** and collectively the **"Buyer Indemnitees"**) and to hold each Buyer Indemnitee harmless from and against all damages, losses and expenses (including reasonable expenses of investigation and attorneys' fees) (**"Losses"**) to the extent caused by or arising out of: (i) any breach of warranty or inaccurate or erroneous representation of Seller contained in this Agreement or in any certificate delivered pursuant to this Agreement; or (ii) any breach of this Agreement.  Buyer shall be named as an additional insured on Seller's General Liability and Excess Liability policies as related to the Business, but only to the extent of Seller's Indemnification Obligations under this Agreement.     Buyer agrees that all  claims for indemnification shall be presented to Seller in advance of its insurers to the extent that Buyer does not invalidate its obligations to ensure coverage of such claims is not jeopardized.

   **B.**     **Indemnification Provisions for Benefit of Seller.**   If Buyer breaches any of its Warranties or covenants contained in this Agreement, and Seller makes a written claim for indemnification against Buyer in accordance with the procedures set forth in Section 7.2 below within the applicable survival period, Buyer agrees to indemnify Seller and its Affiliates and their officers, directors,  employees and agents (individually a **"Seller Indemnitee"** and collectively the **"Seller Indemnitees"**) and to hold each Seller Indemnitee harmless from and against all Losses to the extent caused by or arising out of: (i)  any breach of warranty or inaccurate or erroneous representation of Buyer contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of this Agreement.

   **C.**     **Mitigation.**   Notwithstanding anything to the contrary in this Section B, no Party shall have an obligation to indemnify the other Party with respect to any Losses to the extent such Losses could have reasonably been

13

avoided by such other Party, or the damage to such other Party from such Losses reasonably could have been mitigated.

D.    **Deductible and Cap.**    No Indemnitor shall be liable to an Indemnitee until the amount of all indemnifiable Losses of such Indemnitee in the aggregate exceeds USD One Hundred Thousand ($100,000.00) ("**Deductible Amount**") threshold, after which point the Indemnitor will be obligated to the Indemnitee from and against indemnifiable Losses in excess of the Deductible Amount until the amount of indemnifiable Losses paid by such indemnifying Party in the aggregate reaches a cap equal to USD Twenty Million ($20 million) (the "**Cap Amount**") after which point the indemnifying Party will have no further obligation with respect to Losses under this Agreement.

7.2    **Indemnification Procedure.**    When a Party obtains knowledge of the commencement of any third-party claim, action, suit or proceeding or of the occurrence of any event or the existence of any state of facts which may become the basis of a third-party claim (any such claim, action, suit or proceeding or event or state of facts being hereinafter referred to in this Section as a "**Claim**"), in respect of which such Party (an "**Indemnitee**") is entitled to indemnification under this Agreement, such Indemnitee shall promptly notify the indemnitor under this Agreement (the "**Indemnitor**") of such Claim in writing; provided, however, that any failure to give such notice will not waive any rights of the Indemnitee except to the extent that the rights of the Indemnitor are prejudiced thereby. With respect to any Claim as to which such notice is given by the Indemnitee to the Indemnitor, the Indemnitor may, subject to the provisions below, assume the defense and settlement of such Claim; provided, however, that: (i) the Indemnitee shall cooperate with the Indemnitor in the defense and settlement of such Claim in any manner reasonably requested by the Indemnitor; the Indemnitee will not, and it will use all reasonable efforts to ensure that its employees will not, make an admission of liability in respect of any Third Party Claim and as soon as it becomes aware of a Third Party Claim it shall issue an instruction to relevant employees requiring them not to make any disclosure or statement to any third party in relation to any Third Party Claim or any product or service to which such Third Party Claim relates (except for notices to governmental authorities as required by applicable Laws) without the prior written consent of the Indemnitor (such consent not to be unreasonably withheld or delayed); (ii) the Indemnitee shall have the right to pay or settle such Claim at any time, in which event the Indemnitee shall be deemed to have waived any right to indemnification therefor by the Indemnitor; (iii) the Indemnitee shall be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; and (iv) the Indemnitor shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitee, provided further, however, that if Indemnitee fails to consent to a written settlement offer and judgment is subsequently entered in an amount exceeding the amount of such offer, then Indemnitor shall have no responsibility for the amount of such excess.

If: (i) the Indemnitor fails to assume the defense of such Claim or, having assumed the defense and settlement of such Claim, fails reasonably to contest such Claim in good faith; _and_ (ii) the remedy sought by the claimant with respect to such Claim is not solely for money damages, the Indemnitee, without waiving its right to indemnification, may assume the defense and settlement of such Claim; provided, however, that: (a) the Indemnitor shall be permitted to join in the defense and settlement of such Claim and to employ counsel at its own expense; (b) the Indemnitor shall

14

cooperate with the Indemnitee in the defense and settlement of such Claim in any reasonable manner requested by the Indemnitee; and (c) the Indemnitee shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitor.

As used in this section, the term Indemnitee shall be deemed to include the plural thereof where the rights or obligations of more than one Indemnitee may be involved.

**7.3    Sole and Exclusive Remedy.**  Each of Buyer and Seller acknowledge and agree that the indemnification provided in this Article 7 shall be the sole and exclusive remedy of the parties and their Affiliates and their respective successors and assigns in respect of any claim for monetary damages arising out of or under this Agreement.

**8.    GENERAL PROVISIONS:**

**8.1    No Inducement.**  The Parties represent to each other and each agrees that, neither it nor any person acting on its behalf has, in contravention of any applicable law, given or offered to give or will give or offer to give any sum of money or other material consideration to any person, directly or indirectly, as an inducement to obtain business hereunder or to influence the granting of licenses or other governmental permissions to enter into this Agreement or perform obligations hereunder.

**8.2    Governing Approvals.**  Seller and Buyer, respectively, shall be responsible for compliance with and for the obtaining of such approvals and/or permits as may be required under national, state and local laws, ordinances, regulations and rules as may be applicable to the performance of their respective responsibilities and obligations under this Agreement.

**8.3    No Agency.**  This Agreement does not constitute either Party the agent or legal representative of the other Party.  Neither Party is authorized to create any obligation on behalf of the other Party.

**8.4    Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and assigns.  No Party may assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other Party; provided, however, that Seller has the right to assign any of its rights or obligations hereunder to any division, subsidiary or affiliate of Seller or to any successor to any or all of Seller's business; provided that, notwithstanding such assignment Seller shall remain liable for all of its obligations hereunder.

**8.5    No Implied Waiver.**  The failure of either Party at any time to require performance by the other Party of any provision hereof shall in no way affect the full right to require such performance at any time thereafter. The waiver by either Party of a breach of any provision hereof shall not constitute a waiver of the provision itself.  The failure of either Party to exercise its rights provided under this Agreement shall not constitute a waiver of such right.

**8.6**    __Notices__.  Any notice under this Agreement shall be in writing (letter, facsimile or telegram) and shall be effective when received by the addressee at its address indicated below:

Notice sent to Seller shall be addressed as follows:

**DELPHI AUTOMOTIVE SYSTEMS LLC**
5725 Delphi Drive
Troy, Michigan 48098
Attn:  President-Delphi Energy & Chassis Systems
Fax No.:  248-813-4301

with a copy to:

**DELPHI AUTOMOTIVE SYSTEMS LLC**
5725 Delphi Drive
Troy, MI 48098-2815
Attention:  Assistant General Counsel
Commercial & Transactional
Fax: 248-813-2491

Notice sent to Buyer shall be addressed as follows:

**JOHNSON CONTROLS, INC.**
5757 N. Green Bay Avenue
PO Box 591
Milwaukee, Wisconsin  53201-0591
Attn:  President - Battery
Fax No.:  414-524-2828

with a copy to:

**JOHNSON CONTROLS, INC.**
5757 N. Green Bay Avenue
PO Box 591
Milwaukee, Wisconsin  53201-0591
Attn:  General Counsel
Fax No.:  414-524-2077

The parties by notice hereunder may designate other addresses to which notices shall be sent.

**8.7**    __Amendments__.    This  Agreement  and  the  Mutual  Nondisclosure Agreement dated April 24, 2006 between the Parties, constitutes the entire agreement of the Parties, and supersedes all previous agreements, oral or written, between Buyer and Seller with respect to the subject matter hereof. No amendment or modification to this Agreement shall be binding upon either Party unless it is in writing and is signed by both parties.

**8.8**    __Expenses__.    Whether  or  not  the  transactions  contemplated  by  this Agreement  are  consummated,  Buyer  and  Seller  shall  each  bear  its  respective

accounting, legal, financial, advisory and other expenses incurred in connection with the transactions contemplated by this Agreement.

**8.9    Headings.**    The Article and/or Section headings herein are used for convenience of reference only and shall not be deemed a part of this Agreement for any purpose.

**8.10    Severability.**    If any provision of this Agreement shall be held to be invalid, illegal or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, that provision shall be deemed severed to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the parties shall negotiate in good faith to arrive at an alternative replacement provision approximating the parties' original business objective. The remaining provisions hereof shall remain in effect.

**8.11    Counterparts.**    This Agreement may be executed in more than one counterpart, each of which shall for all purposes be deemed to be an original and all of which shall constitute one and the same agreement.

**8.12    Third Parties.**    Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**8.13    Bulk Sales.**    Buyer hereby waives the requirements, if any, of all applicable bulk sales laws.

**8.14    Force Majeure.**    Each Party shall be temporarily excused from performing its obligations under this Agreement for so long as such performance is prevented or delayed by any event of Force Majeure. The term **"Force Majeure"** shall, for purposes of this Agreement, include: (i) any strike or lockout at the plant of a Party or any of its suppliers; (ii) any act or omission of any government authority; or (iii) any other cause beyond the reasonable control of a Party. A Party affected by an event of Force Majeure shall promptly notify the other Party and shall use its best efforts to overcome and mitigate such event of Force Majeure.

17

**8.15**   **Excluded Inventory**. Within 30 days after Completion, Seller will remove at its sole cost and expense all Inventory not included in the Acquired Assets. Buyer will cooperate with Seller and provide reasonable access to the Facility to facilitate such removal.

**THIS AGREEMENT** was executed as of the day and year first set forth above.

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By:_____

Name:  **Keith Stipp**

Title:  **Finance Director,
Automotive Holdings Group**

**JOHNSON CONTROLS, INC.**

By:_____

Name:  **Gregg M. Sherrill**

Title:  **Vice President, and General
Manager
Automotive Systems Group
Battery Division**

18

## EXHIBIT 1.1

| Inventory number | Asset | Cap.date | Asset description |
|---|---|---|---|
| DGT004763N01 | 1000654 | 12/1/1946 | GRADING & LANDSCAPING |
| DGT004765N01 | 1000655 | 12/1/1946 | ROADWAY |
| DGT004766N01 | 1000656 | 12/1/1946 | SIDEWALKS |
| DGT004768N01 | 1000657 | 12/1/1946 | SEWERS-STORM |
| DGT004770N01 | 1000658 | 12/1/1946 | SEWERS-SANITARY |
| DGT004771N01 | 1000659 | 4/1/1947 | GRADING & LANDSCAPING |
| DGT004772N02 | 1000660 | 12/1/1946 | RAILROAD TRACKS & SIDINGS |
| DGT004774N | 1000661 | 12/1/1946 | WATER LINES |
| DGT004776N | 1000662 | 12/1/1946 | TUNNELS |
| DGT004888N | 1000663 | 6/1/1946 | LAND-NEW BRUNSWICK |
| DGT004911N | 1000664 | 12/1/1953 | MAIN BUILDING-WEST ADDITION-SEWERS |
| DGT004925N | 1000665 | 8/1/1954 | MAIN BUILDING-WEST ADDITION-PAVEMENT |
| DGT004926N | 1000666 | 8/1/1954 | RETAINING WALL |
| DGT008569N | 1000667 | 12/1/1956 | ROADWAY |
| DGT008607N | 1000668 | 3/1/1958 | FENCE |
| DGT008675N | 1000669 | 12/1/1965 | LAND-NEW BRUNSWICK |
| DGT008680N | 1000670 | 4/1/1966 | LAND IMPROVEMENTS |
| DGT008711N | 1000671 | 10/1/1966 | PARKING AREA |
| DGT008712N | 1000672 | 12/1/1966 | LIGHTING-OUTSIDE |
| DGT008725N | 1000673 | 12/1/1968 | RAILROAD SIDING |
| DGT012029N | 1000674 | 10/1/1974 | LAND-NEW BRUNSWICK |
| DGT012052N | 1000675 | 9/1/1976 | CONCRETE PAD-PVC |
| DGT012053N | 1000676 | 9/1/1976 | CONCRETE PAD-MATERIAL STORAGE |
| DGT012054N | 1000677 | 9/1/1976 | LEAD RECLAIM BUILDING-CONCRETE PAD F/LEAD STORAGE |
| DGT012085N | 1000678 | 10/1/1977 | ACID MIX BUILDING-CONCRETE PAD |
| DGT012086N | 1000679 | 10/1/1977 | ACID MIX BUILDING-CONCRETE PAD |
| DGT012087N | 1000680 | 10/1/1977 | CONCRETE PAD-REAR OF POWER HOUSE |
| DGT012087N01 | 1000681 | 2/1/1978 | CONCRETE PAD-REAR OF POWER HOUSE |
| DGT012088N | 1000682 | 10/1/1977 | RETAINING WALL-WATER TOWER |
| DGT012110N | 1000683 | 7/1/1978 | GRADING & LANDSCAPING |
| DGT012221N | 1000685 | 2/1/1989 | WELLS-MONITORING |
| DGT012232N | 1000686 | 6/1/1995 | STORM WATER COLLECTION/TREATMENT SYSTEM |
| DGT690066 | 1000687 | 11/1/2001 | ELIMINATION OF UNDERGROUND PROCESS SEWER |
| DGT004779N01 | 2001722 | 12/1/1946 | MAIN BUILDING |
| DGT004779N02 | 2001723 | 11/1/2001 | PHASE III VENTILATION REPAIRS |
| DGT004779NO1 | 2001724 | 11/1/2001 | LIGHTING FIXTURES,PLANT WALL,GAS MAIN |
| DGT004781N01 | 2001726 | 12/1/1946 | GATE HOUSE |
| DGT004910N01 | 2001727 | 12/1/1953 | MAIN BUILDING-WEST ADDITION |
| DGT004912N | 2001728 | 12/1/1953 | MAIN BUILDING-FIRE PROOF ROOF |
| DGT004915N | 2001729 | 6/1/1954 | HOSE HOUSE |
| DGT004923N01 | 2001730 | 12/1/1954 | MAIN BUILDING-WEST ADDITION-ACCESS |
| DGT004928N02 | 2001731 | 12/1/1954 | MAIN BUILDING-EAST ADDITION |
| DGT004928N03 | 2001732 | 8/1/1954 | MAIN BUILDING-EAST ADDITION |
| DGT008542N | 2001733 | 5/1/1956 | WATER LINES |
| DGT008570N | 2001734 | 12/1/1956 | MAIN BUILDING-EAST ADDITION |
| DGT008594N | 2001735 | 5/1/1957 | MAIN BUILDING-LOCKER ROOM |
| DGT008649N | 2001736 | 7/1/1962 | OIL BUILDING |
| DGT008650N | 2001737 | 2/1/1963 | MAIN BUILDING-MEZZANINE-CASE |
| DGT008658N | 2001738 | 6/1/1963 | WAREHOUSE |
| DGT008664N | 2001739 | 8/1/1965 | MAIN BUILDING-ADDITION-MEZZANINE |
| DGT008674N | 2001740 | 12/1/1965 | MAIN BUILDING-ADDITION |
| DGT008720N | 2001741 | 12/1/1968 | SEWERS-SANITARY |
| DGT008721N | 2001742 | 12/1/1968 | SEWERS-STORM |
| DGT008738N | 2001743 | 9/1/1970 | MAIN BUILDING-MEZZANINE |
| DGT008744N | 2001744 | 7/1/1971 | ROOF-RAISE |
| DGT012049N | 2001745 | 9/1/1976 | LEAD RECLAIM BUILDING |
| DGT012049N01 | 2001746 | 6/1/1977 | LEAD RECLAIM BUILDING |
| DGT012049N02 | 2001747 | 8/1/1977 | LEAD RECLAIM BUILDING |
| DGT012050N | 2001748 | 9/1/1976 | ACID MIX BUILDING |
| DGT012050N01 | 2001749 | 10/1/1977 | ACID MIX BUILDING |
| DGT012079N | 2001750 | 2/1/1977 | CURE ROOM MODIFICATIONS |
| DGT012092N | 2001751 | 12/1/1977 | WASTE TREATMENT BUILDING |

19

| | | | |
|---|---|---|---|
| DGT012092N01 | 2001752 | 5/1/1978 | WASTE TREATMENT BUILDING |
| DGT012113N | 2001753 | 7/1/1978 | STORAGE SHED-3 SIDED |
| DGT012143N | 2001754 | 3/1/1980 | TRUCK DOCK ANNEX |
| DGT012145N | 2001755 | 6/1/1980 | BATTERY STORAGE BUILDING |
| DGT012165N | 2001756 | 7/1/1971 | MAIN BUILDING-MEZZANINE |
| DGT012175N | 2001757 | 6/1/1983 | FIRE LOOP |
| DGT012175N01 | 2001758 | 9/1/1984 | FIRE LOOP |
| DGT012175N02 | 2001759 | 10/1/1984 | FIRE LOOP |
| DGT012175N03 | 2001760 | 11/1/1984 | FIRE LOOP |
| DGT012183N | 2001761 | 12/1/1984 | MAIN BUILDING-MEZZANINE |
| DGT012191N | 2001762 | 8/1/1986 | MAIN BUILDING-MEZZANINE-PAINT MIXING |
| DGT012231N | 2001765 | 6/1/1995 | OVERHEAD PROCESS SEWER |
| DGT105875 | 2001766 | 1/1/1998 | FRONT ENTRANCE STEPS, RAMPS, RAILS |
| DGT105877 | 2001767 | 11/1/2001 | NON-SLIP GRATING, ISLES BTWN CHARGE TABLES & FILL |
| DGT105909 | 2001768 | 1/1/2002 | SAFETY STEPS AND HANDRAILS |
| DGT105922B | 2001769 | 11/1/2001 | NON-SLIP GRATING FOR FORMATION FLOOR |
| DGT105923B | 2001770 | 11/1/2001 | FOAM ROOF '98 |
| DGT105928 | 2001771 | 1/2/1998 | UPGRADE HEATING SYSTEM |
| DGT690029 | 2001772 | 1/2/1998 | 1996 ROOF REPAIR |
| DGT690037 | 2001773 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690038 | 2001774 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690039 | 2001775 | 11/1/1998 | AUTO SIZE CONTAINMENT DOOR |
| DGT690061 | 2001776 | 11/1/2001 | TRENCH & FOUNDATION FOR THE X-MET LINE |
| DGT690062 | 2001777 | 11/1/2001 | MEZZANINE FOR THE X-MET LINE |
| DGT690063 | 2001778 | 11/1/2001 | ROOF ENCLOSURE FOR THE X-MET LINE |
| DGT690100 | 2001779 | 11/1/2001 | REPLACE LIGHTING ON CHG FLOOR, REPLACE LIGHTING SE |
| DGT690170 | 2001780 | 11/1/2001 | OUTDOOR SMOKING SHELTER -- NEW BRUNSWICK BATTERY P |
| DGT690171 | 2001781 | 11/1/2001 | OUTDOOR SMOKING SHELTER -- NEW BRUNSWICK BATTERY P |
| DGT690197 | 2001782 | 11/1/2001 | SECURITY/FIRE ALARM UPGRADE |
| DGT72424 | 2001783 | 11/1/2001 | INSTALL SPRINKLER SYSTEM |
| DGTB690064 | 2001784 | 11/1/2001 | INSTALLATION OF MEZZANINE FOR X-MET FROM MUNCIE TO |
| DGT690110 | 2004713 | 9/11/2002 | REPAIR BATTERY FORMATION VENTILATION SYSTEM |
| DGTB690114 | 2004714 | 9/11/2002 | REPLACE FLOOR IN WET HEAT SEALER AREA |
| DGTB690090 | 2004715 | 9/11/2002 | REPAIR WALL OF BUILDING TO NEW CONDITION |
| DGT690175 | 2004716 | 9/11/2002 | GREEN GROUP VENTILATION -- NB |
| DGT690221 | 2004717 | 9/11/2002 | INSTALL NEW DUCTWORK ON CHARGE FLOOR |
| DGT690198 | 2004718 | 9/11/2002 | GUARDING/FIRE PROTECTION TANK FARM |
| DGT690189 | 2004719 | 9/11/2002 | VENTILATION COLLECTOR FOR GREEN GROUP LEAN CELL - |
| DGT690179 | 2004720 | 9/11/2002 | NEW BRUNSWICK STEAM HOOD UPGRADE |
| DGT690223 | 2008539 | 9/23/2003 | DESIGN FOR A NATURAL GAS LINE FOR PLANT |
| DGT690268 | 2008540 | 9/23/2003 | HOT WATER HEATER SYS FOR MENS AND WOMENS SHOWER AR |
| DGT695041 | 2008556 | 10/17/2003 | FORMATION VENTILATION STACK TOP ACID MIST FILTERS |
| DGT004779N03 | 2009360 | 1/31/2004 | PHASE III VENTILATION REPAIRS |
| DGT012142N01 | 2009466 | 1/31/2004 | FORMATION VENT REPAIRS/CHARGE TABLE 2 OF 2 |
| DGT012141N01 | 2009467 | 3/31/2004 | FORMATION VENT REPAIRS/CHARGE TABLE 1 OF 2 |
| DGT004779N04 | 2009513 | 6/29/2004 | ENGINEERING SERVICES TO LICENSE NEW STACK FOR VENT |
| DGT690275 | 2009514 | 1/1/2004 | HEATING UPGRADES FOR PLANT CONVERSION TO NATURAL G |
| DGT690291 | 2010088 | 6/14/2005 | FIRE SPRINKLER PROTECTION ON CHARGE FLOOR |
| DGT004898N | 3025115 | 2/1/1953 | PROPANE TANK |
| DGT008560N | 3025119 | 9/1/1956 | POWER EQUIPMENT-EAST |
| DGT008589N | 3025120 | 3/1/1957 | SCREW CONVEYOR |
| DGT008595N | 3025121 | 5/1/1957 | LINES)ELECTR |
| DGT008599N | 3025123 | 10/1/1957 | DUST CNTR EQ |
| DGT008681N | 3025125 | 9/1/1964 | SUBSTATION |
| DGT008682N | 3025126 | 10/1/1960 | SUBSTATIONEQ |
| DGT008732N | 3025127 | 5/1/1969 | COOLING TOWER |
| DGT008743N | 3025128 | 7/1/1971 | SCREW CONVEYOR |
| DGT008750N | 3025129 | 6/1/1972 | BOILER |
| DGT012003N | 3025130 | 1/1/1973 | SWITCHGEAR |
| DGT012004N | 3025131 | 1/1/1973 | RECTIFIER |
| DGT012004N01 | 3025132 | 2/1/1973 | TRAILING CHARGES TO TAG #012004N |
| DGT012005N | 3025133 | 1/1/1973 | SWITCHGEAR |
| DGT012006N | 3025134 | 1/1/1973 | RECTIFIER |
| DGT012007N | 3025135 | 2/1/1973 | ACID TANK |
| DGT012008N | 3025136 | 2/1/1973 | ACID TANK |
| DGT012010N | 3025137 | 2/1/1973 | ACID TANK |
| DGT012011N | 3025138 | 2/1/1973 | ACID TANK |

| | | | |
|---|---|---|---|
| DGT012016N | 3025139 | 9/1/1973 | CONVEYOR |
| DGT012017N | 3025140 | 9/1/1973 | CONVEYOR |
| DGT012018N | 3025141 | 9/1/1973 | CONVEYOR |
| DGT012020N | 3025143 | 9/1/1973 | CONVEYOR |
| DGT012021N | 3025144 | 12/1/1973 | SUB STATION |
| DGT012022N | 3025145 | 12/1/1973 | CABLE |
| DGT012023N | 3025146 | 12/1/1973 | PLATFORM |
| DGT012024N | 3025147 | 3/1/1974 | VENTILATION |
| DGT012025N | 3025148 | 3/1/1974 | CONVEYOR |
| DGT012026N | 3025149 | 3/1/1974 | VENTILATION |
| DGT012027N | 3025150 | 3/1/1974 | VACUUM SYSTEM |
| DGT012034N | 3025151 | 8/1/1975 | VACUUM TO MOLDING |
| DGT012036N | 3025152 | 3/1/1976 | TRENCHES |
| DGT012038N | 3025153 | 5/1/1976 | VENTILATION |
| DGT012043N | 3025154 | 8/1/1976 | ACID TANK |
| DGT012044N | 3025155 | 8/1/1976 | ACID PUMPING SYSTEM FOR MEZZANINE |
| DGT012046N | 3025156 | 9/1/1976 | VENTILATION FOR LEAD POTS |
| DGT012047N | 3025157 | 9/1/1976 | FINAL ACID FILL |
| DGT012051N | 3025158 | 9/1/1976 | ACID TOP-OFF |
| DGT012055N | 3025159 | 9/1/1976 | SUB-STATION-LEAD STRIP |
| DGT012055N01 | 3025160 | 10/1/1977 | ADDITIONAL CHARGES TO TAG #012055N |
| DGT012057N | 3025161 | 10/1/1976 | LEAD MELT FURNACE |
| DGT012058N | 3025162 | 10/1/1976 | FOUNDATION & SUMPS FOR LEAD CASTER |
| DGT012060N | 3025163 | 12/1/1976 | VENTILATION FOR CHARGING UNITS |
| DGT012060N01 | 3025164 | 6/1/1980 | ADDITIONAL CHARGES TO TAG #012060N |
| DGT012062N | 3025165 | 1/1/1977 | ACID MIXING SYSTEM |
| DGT012064N | 3025167 | 1/1/1977 | ACID PUMPS RECLAIM |
| DGT012065N | 3025168 | 1/1/1977 | VENTILATION PLATE OVENS |
| DGT012066N | 3025169 | 1/1/1977 | ACID STORAGE TANK |
| DGT012067N | 3025170 | 1/1/1977 | ACID STORAGE TANK |
| DGT012068N | 3025171 | 1/1/1977 | ACID STORAGE TANK |
| DGT012069N | 3025172 | 1/1/1977 | ACID STORAGE TANK |
| DGT012070N | 3025173 | 1/1/1977 | ACID STORAGE TANK |
| DGT012071N | 3025174 | 1/1/1977 | ACID STORAGE TANK |
| DGT012072N | 3025175 | 1/1/1977 | ACID STORAGE TANK |
| DGT012073N | 3025176 | 1/1/1977 | ACID STORAGE TANK |
| DGT012074N | 3025177 | 1/1/1977 | ACID STORAGE TANK |
| DGT012075N | 3025178 | 1/1/1977 | ACID STORAGE TANK |
| DGT012076N | 3025179 | 1/1/1977 | ACID STORAGE TANK |
| DGT012077N | 3025180 | 1/1/1977 | ACID STORAGE TANK |
| DGT012080N | 3025181 | 2/1/1977 | COOLING FACILITIES FOR CASTER |
| DGT012083N | 3025182 | 7/1/1977 | SUB STATION LEAD RECLAIM |
| DGT012095N | 3025183 | 2/1/1978 | LINDBURG FURNACE |
| DGT012096N | 3025184 | 2/1/1978 | TRANSFER SYSTEM |
| DGT012097N | 3025185 | 9/1/1976 | STEAMER HOOD |
| DGT012098N | 3025186 | 9/1/1976 | STEAMER HOOD |
| DGT012099N | 3025187 | 1/1/1977 | STEAMER HOOD |
| DGT012100N | 3025188 | 1/1/1977 | STEAMER HOOD |
| DGT012102N | 3025189 | 4/1/1978 | WATER CONTAINMENT |
| DGT012109N | 3025190 | 12/1/1976 | PRIMARY SWITCH GEAR |
| DGT012109N01 | 3025191 | 12/1/1977 | TRAILING CHARGE TO TAG #012109N |
| DGT012109N02 | 3025192 | 3/1/1978 | TRAILING CHARGE TO TAG #012109N |
| DGT012117N | 3025193 | 10/1/1978 | CONVEYOR SYSTEM |
| DGT012118N | 3025194 | 10/1/1978 | ACID FILL STATION |
| DGT012119N | 3025195 | 10/1/1978 | REPAIR STATIONS (2) |
| DGT012120N | 3025196 | 11/1/1978 | EXTEND TRENCH/X-MET LINE |
| DGT012121N | 3025197 | 11/1/1978 | AIR MAKEUP UNIT |
| DGT012122N | 3025198 | 12/1/1978 | AIR MAKE UP SYSTEM |
| DGT012122N01 | 3025199 | 10/1/1979 | ADDITIONAL CHARGES TO TAG #012122N |
| DGT012123N | 3025200 | 12/1/1978 | BATROLIFE MEZZANINE |
| DGT012124N | 3025201 | 1/1/1979 | CONVEYOR FROM SETTLING CHAMBER |
| DGT012125N | 3025202 | 2/1/1979 | VENTILATION TUNNEL-EXTENSION |
| DGT012128N | 3025205 | 3/1/1979 | ROLLER TYPE CONVEYOR |
| DGT012129N | 3025206 | 3/1/1979 | INCLINE BELT CONVEYOR |
| DGT012130N | 3025207 | 4/1/1979 | POWER DROPS/C O S & PREHEAT |
| DGT012131N | 3025208 | 5/1/1979 | CONVEYOR FROM COLLECTOR |
| DGT012132N | 3025209 | 8/1/1979 | VENT FOR ELEMENT ASSEMBLY |

21

| | | |
|---|---|---|
| DGT012132N01 | 3025210 | 9/1/1979 TRAILING CHARGE TO TAG #012132N |
| DGT012137N | 3025212 | 9/1/1979 OVERHEAD CONVEYOR |
| DGT012138N | 3025213 | 9/1/1979 ELECTRIC CABLE & DROPS |
| DGT012139N | 3025214 | 9/1/1979 SETTLING CHAMBER |
| DGT012140N | 3025215 | 11/1/1979 LEAD DROP & CONTROLS FOR BARTON POT |
| DGT012141N | 3025216 | 12/1/1979 CHARGE TABLES |
| DGT012142N | 3025217 | 12/1/1979 CHARGE TABLES |
| DGT012146N | 3025218 | 6/1/1980 LEAD MELT POT |
| DGT012147N | 3025219 | 6/1/1980 VENTILATION F/POT |
| DGT012148N | 3025220 | 6/1/1980 ELECTRIC CABLE & BUSWAY |
| DGT012150N | 3025222 | 6/1/1980 COOLING TOWER |
| DGT012151N | 3025223 | 12/1/1980 EXTEND TRENCHES FOR CONVEYOR |
| DGT012152N | 3025224 | 12/1/1980 STORAGE RACKS & SPRINKLER |
| DGT012152N01 | 3025225 | 12/1/1981 TRAILING CHARGE TO TAG #012152N |
| DGT012154N01 | 3025226 | 1/1/1998 UPGRADE STORM WATER TREATMENT PLANT |
| DGT012156N | 3025227 | 12/1/1980 RECEIVING OFFICE |
| DGT012159N | 3025229 | 12/1/1981 CHARGE TABLES |
| DGT012160N | 3025230 | 12/1/1981 (14) CHARGE TABLES |
| DGT012161N | 3025231 | 2/1/1982 VENTILATION SYSTEM |
| DGT012162N | 3025232 | 2/1/1982 LOAD/UNLOAD CONVEYOR |
| DGT012163N | 3025233 | 6/1/1982 COLLECTOR |
| DGT012164N | 3025234 | 6/1/1980 VESTIBULE |
| DGT012166N | 3025235 | 9/1/1982 OWENS CORNING ACID TANK |
| DGT012167N | 3025236 | 1/1/1983 BACK UP BAG COLLECTION FOR DR 95995 |
| DGT012168N | 3025237 | 1/1/1983 BACK UP BAG COLLECTION FOR DR95996 |
| DGT012169N | 3025238 | 1/1/1983 BACK UP BAG COLLECTION FOR DR95997 |
| DGT012170N | 3025239 | 1/1/1983 BACK UP BAG COLLECTION FOR DR95998 |
| DGT012171N | 3025240 | 1/1/1983 BACK UP BAG COLLECTION FOR DR95999 |
| DGT012172N | 3025241 | 1/1/1983 BACK UP BAG COLLECTION FOR DR96000 |
| DGT012173N | 3025242 | 1/1/1983 BACK UP BAG COLLECTION FOR DR105751 |
| DGT012174N | 3025243 | 1/1/1983 BACK UP BAG COLLECTION FOR DR105752 |
| DGT012176N | 3025244 | 12/1/1983 OXIDE ELEVATORS & CONVEYORS |
| DGT012176N01 | 3025245 | 10/1/1983 MATERIAL HANDLING SYSTEM AT PASTE MIX |
| DGT012181N | 3025246 | 9/1/1984 POWER ROLLER CONVEYOR |
| DGT012182N | 3025247 | 12/1/1984 ACID & WATER SYSTEM |
| DGT012184N | 3025248 | 12/1/1984 VENTILATION F/3 PAINT MIXERS |
| DGT012185N | 3025249 | 4/1/1985 WOMEN'S REST ROOM-WEST |
| DGT012186N | 3025250 | 5/1/1985 WOMEN'S LOCKER/SHOWER-EAST |
| DGT012187N | 3025251 | 12/1/1985 CONVEYOR & VENTILATION FOR 6 TABLES |
| DGT012188N | 3025252 | 1/1/1986 ROOF EXHAUSTERS |
| DGT012194N | 3025253 | 2/1/1987 ACID PIT |
| DGT012200N | 3025256 | 5/1/1987 TRANSFER CONVEYORS(ALL) |
| DGT012202N | 3025257 | 10/1/1987 #26(82'CHG TABLE CONV) |
| DGT012203N | 3025258 | 10/1/1987 #27(82'CHG TABLE CONV) |
| DGT012204N | 3025259 | 10/1/1987 #28(82'CHG TABLE CONV) |
| DGT012205N | 3025260 | 10/1/1987 #29(82'CHG TABLE CONV) |
| DGT012206N | 3025261 | 10/1/1987 #30(82'CHG TABLE CONV) |
| DGT012207N | 3025262 | 10/1/1987 82 FT. CONVEYOR (#31) |
| DGT012208N | 3025263 | 10/1/1987 #32(82'CHG TABLE CONV) |
| DGT012209N | 3025264 | 10/1/1987 #33(82'CHG TABLE CONV) |
| DGT012210N | 3025265 | 12/1/1987 #1 X-MET LINE(OFFBEAR CONV) |
| DGT012211N | 3025266 | 5/1/1988 POWERED ROLLER CONV(4) |
| DGT012212N | 3025267 | 5/1/1988 VENT FOR CAST ON STRAP MACH |
| DGT012215N | 3025268 | 1/1/1989 CHARGE TABLE(CONCRETE WORK) |
| DGT012216N | 3025269 | 1/1/1989 CHARGE TABLE(CONCRETE WORK) |
| DGT012217N | 3025270 | 1/1/1989 CHARGE TABLE(CONCRETE WORK) |
| DGT012218N | 3025271 | 1/1/1989 CHARGE TABLE(CONCRETE WORK) |
| DGT012219N | 3025272 | 1/1/1989 CHARGE TABLE(CONCRETE WORK) |
| DGT012220N | 3025273 | 1/1/1989 CHARGE TABLE(CONCRETE WORK) |
| DGT012222N | 3025274 | 6/30/1989 CAPITALIZABLE MAINT. |
| DGT012223N | 3025275 | 3/1/1990 VENTILATION FOR (8) BATTERY CHARGE TABLES |
| DGT012224N | 3025276 | 9/1/1990 TEMPERATURE CONTROL |
| DGT012225N | 3025277 | 1/1/1991 COS CONTROL |
| DGT012228N | 3025278 | 7/1/1994 WASTE WATER TREATMENT SYSTEM |
| DGT012230N | 3025280 | 8/1/1995 ACID LEVELER |
| DGT012233N | 3025281 | 3/1/1995 AUTOMATIC LABELING MACHINE |
| DGT012234N | 3025282 | 1/1/1996 RESERVE CAPACITY TESTERS (12) |

| | | | |
|---|---|---|---|
| DGT012236N | 3025284 | 1/1/1996 | 110 OZ CONVERSION |
| DGT014722N | 3025285 | 6/1/1977 | BAYSTONE PLATE STEAMER |
| DGT014729N | 3025286 | 6/1/1977 | OXIDE SCREW CONVEYOR SYSTEM |
| DGT014737N | 3025287 | 7/1/1977 | SCREW CONVEYOR |
| DGT014738N | 3025288 | 7/1/1977 | SCREW CONVEYOR |
| DGT015201N | 3025289 | 12/1/1979 | INSULATE STEAMER HOODS (6) |
| DGT020031D01 | 3025298 | 2/1/1947 | LATHES-ENGIN |
| DGT020059D01 | 3025300 | 12/1/1946 | DRILL-STANDA |
| DGT020726D01 | 3025301 | 7/1/1947 | MIX CONVEYOR |
| DGT021837D | 3025305 | 2/1/1956 | SETTLING CHR |
| DGT021838D | 3025306 | 2/1/1956 | BARTON POT |
| DGT021840D | 3025307 | 2/1/1956 | 12R}DUSTCOLL |
| DGT022488D | 3025308 | 3/1/1957 | COMPRESSORS} |
| DGT022506D | 3025309 | 4/1/1957 | RECTIFIERS}E |
| DGT022510D | 3025310 | 5/1/1957 | BARTON POT |
| DGT022511D | 3025311 | 5/1/1957 | SETTLING CHR |
| DGT022530D | 3025312 | 10/1/1957 | RECTIFIERS}E |
| DGT028031N | 3025315 | 6/1/1996 | ALLEN BRADLEY CONTROL |
| DGT028785N | 3025316 | 10/31/1989 | ACID DUMP SYSTEM |
| DGT028855N | 3025317 | 11/1/1991 | CENTRIFUGAL BLOWER |
| DGT056948D | 3025318 | 6/1/1956 | GRINDER |
| DGT058830D | 3025319 | 6/1/1957 | BARTON POT |
| DGT060227D | 3025320 | 6/1/1954 | BARTON POT |
| DGT060228D | 3025321 | 6/1/1954 | BARTON POT |
| DGT060229D | 3025322 | 6/1/1954 | BARTON POT |
| DGT060230D | 3025323 | 6/1/1954 | SET}CHAMBER |
| DGT060231D | 3025324 | 6/1/1954 | SET}CHAMBER |
| DGT060232D | 3025325 | 6/1/1954 | SET}CHAMBER |
| DGT060233E | 3025327 | 11/1/2001 | MODIF OF MISC LINE STROKER, PLATFORM, LEFT AND TAB |
| DGT060279D | 3025329 | 11/1/1960 | POWER ROLLER |
| DGT060295D | 3025330 | 7/1/1961 | IMPACT TESTI |
| DGT066940D | 3025331 | 6/1/1946 | LATHE |
| DGT069865D | 3025333 | 2/1/1963 | LATHE |
| DGT070211D | 3025335 | 6/1/1963 | TOLEDO SCALE |
| DGT070253D | 3025336 | 8/1/1963 | MILLING MACHINE |
| DGT070255D | 3025337 | 8/1/1963 | SURFACEGRIND |
| DGT071020D | 3025338 | 5/1/1964 | LATHE |
| DGT071037D | 3025339 | 7/1/1964 | MILLING MCH |
| DGT071058D | 3025340 | 12/1/1964 | BOILER |
| DGT071087D | 3025343 | 12/1/1965 | BOILER |
| DGT072221D | 3025346 | 8/1/1966 | EL AS SECT |
| DGT072222D | 3025347 | 9/1/1969 | DUST COLLECTOR |
| DGT072223D | 3025348 | 9/1/1969 | MATL COLL SYS |
| DGT072239D | 3025352 | 4/1/1967 | LATHE |
| DGT072280D | 3025360 | 10/1/1968 | CONVEYORS |
| DGT072284D01 | 3025361 | 3/1/1970 | STARTER |
| DGT072292D | 3025366 | 6/1/1970 | MOLD TEMP CONTR |
| DGT083874D | 3025367 | 5/1/1966 | RECTIFIER |
| DGT087857D | 3025381 | 7/1/1970 | PLATE SAW |
| DGT087872D | 3025385 | 2/1/1971 | CONVEYOR |
| DGT093030D | 3025386 | 12/1/1973 | PASTE MIXER |
| DGT095313D | 3025390 | 7/1/1971 | PASTE MIXER |
| DGT095328D | 3025392 | 4/1/1972 | HACKSAW |
| DGT095330D | 3025394 | 5/1/1973 | DUST COLLECTOR |
| DGT095351D | 3025416 | 9/1/1973 | CONVEYOR |
| DGT095352D | 3025417 | 9/1/1973 | CONVEYOR |
| DGT095353E | 3025418 | 9/1/1973 | GRANULATOR |
| DGT095354E | 3025420 | 11/1/2001 | M & L FOR MODIF OF MAIN LINE STACKER PLATFORM, L/R |
| DGT095355D | 3025421 | 9/1/1973 | CAST ON STRAP |
| DGT095356D | 3025422 | 9/1/1973 | CAST ON STRAP |
| DGT095357D | 3025423 | 9/1/1973 | CAST ON STRAP |
| DGT095358D | 3025424 | 9/1/1973 | CAST ON STRAP |
| DGT095359D | 3025425 | 9/1/1973 | SPOT FACE CONVEYOR |
| DGT095363D | 3025427 | 9/1/1973 | EXT FUSION CONV |
| DGT095364D | 3025428 | 9/1/1973 | AIR TEST CONVEYOR |
| DGT095365D | 3025429 | 9/1/1973 | LABLER CONV |
| DGT095369D | 3025432 | 9/1/1973 | LEAK TEST |

23

| | | |
|---|---|---|
| DGT095370D | 3025433 | 9/1/1973 DATE CODE |
| DGT095372D | 3025434 | 9/1/1973 LEAD POT |
| DGT095373D | 3025435 | 9/1/1973 LEAD POT |
| DGT095374D | 3025436 | 9/1/1973 LEAD POT |
| DGT095375D | 3025437 | 9/1/1973 LEAD POT |
| DGT095376D | 3025438 | 9/1/1973 VACUUM SYSTEM STACKER |
| DGT095382D | 3025439 | 9/1/1973 TEMPERATURE CONTROL |
| DGT095383D | 3025440 | 9/1/1973 HEAT SEAL MACHINE |
| DGT095384D | 3025441 | 9/1/1973 HEAT SEAL MACHINE |
| DGT095385D | 3025442 | 9/1/1973 HEAT SEAL MACHINE |
| DGT095387D | 3025443 | 12/1/1973 AIR COMPRESSOR |
| DGT095398D | 3025446 | 3/1/1974 LIFT TRUCK |
| DGT095399D | 3025447 | 3/1/1974 SLITTER |
| DGT095400D | 3025448 | 3/1/1974 SLITTER |
| DGT095603D | 3025450 | 10/1/1974 DUST COLLECTOR |
| DGT095604D | 3025451 | 10/1/1974 DUST COLLECTOR |
| DGT095610D | 3025452 | 1/1/1975 HEAT SEAL MACHINE |
| DGT095612D | 3025453 | 4/1/1975 CONVEYOR SYSTEM |
| DGT095614D | 3025454 | 9/1/1975 SOFTENING TANK |
| DGT095615D | 3025455 | 9/1/1975 SOFTENING TANK |
| DGT095620D | 3025456 | 1/1/1976 EXT-FUSION MACHINE |
| DGT095620D01 | 3025457 | 3/1/1976 ADDITIONAL CHARGES TO TAG #095620D |
| DGT095621D | 3025458 | 2/1/1976 HOIST |
| DGT095622D | 3025459 | 5/1/1976 DIELECTRIC LINE |
| DGT095628D | 3025462 | 5/1/1976 BRIDGE HOIST |
| DGT095638D | 3025472 | 6/1/1976 SKID RACK |
| DGT095639D | 3025473 | 6/1/1976 SKID RACK |
| DGT095640D | 3025474 | 6/1/1976 SKID RACK |
| DGT095641D | 3025475 | 6/1/1976 SKID RACK |
| DGT095646D | 3025476 | 9/1/1976 BUTT WELDER |
| DGT095647D | 3025477 | 9/1/1976 BUTT WELDER |
| DGT095654D | 3025479 | 7/1/1976 HI-RATE TEST |
| DGT095657D | 3025480 | 7/1/1976 SCRAP CONVEYOR SYSTEM |
| DGT095658D | 3025481 | 7/1/1976 CONVEYOR |
| DGT095661D | 3025484 | 9/1/1976 DE-REELER |
| DGT095662D | 3025485 | 9/1/1976 DE-REELER |
| DGT095663D | 3025486 | 9/1/1976 DE-REELER |
| DGT095664D | 3025487 | 9/1/1976 DE-REELER |
| DGT095666D | 3025489 | 9/1/1976 EXPANDING PRESS |
| DGT095670D | 3025491 | 9/1/1976 LUG FORM PRESS |
| DGT095671D | 3025492 | 9/1/1976 LUG FORM PRESS |
| DGT095674D | 3025495 | 9/1/1976 MODICON-PASTE LINE |
| DGT095675D | 3025496 | 9/1/1976 MODICON-PASTE LINE |
| DGT095676D | 3025497 | 8/1/1979 OVEN CONVERSION |
| DGT095677D | 3025498 | 8/1/1979 OVEN CONVERSION |
| DGT095681D | 3025501 | 9/1/1976 PARTS CONVEYOR F/250 TON MOLD MACHINE |
| DGT095682D | 3025502 | 9/1/1976 PARTS CONVEYOR F/250 TON MOLD MACHINE |
| DGT095685D | 3025503 | 9/1/1976 CONVEYOR FOR PASTE MACHINE |
| DGT095688D | 3025504 | 9/1/1976 PILOT HOLE PIERCE |
| DGT095689D | 3025505 | 9/1/1976 PILOT HOLE PIERCE |
| DGT095698D | 3025510 | 10/1/1976 BATTERY CHARGER LAB. FACILITIES |
| DGT095801D | 3025511 | 10/1/1976 COLLECTION SYSTEM FOR OFFBEAR |
| DGT095801D01 | 3025512 | 10/1/1978 COLLECTION SYSTEM FOR OFFBEAR |
| DGT095801D02 | 3025513 | 8/1/1979 VENT & CURE OVEN |
| DGT095803D | 3025515 | 10/1/1976 FOUR-ARM STORAGE TURNSTILE |
| DGT095804D | 3025516 | 10/1/1976 SPECTROGRAPH |
| DGT095807D | 3025518 | 12/1/1976 ROLLING MILL 7 STAND |
| DGT095809D | 3025519 | 12/1/1976 CHARGING UNITS BATTERIES |
| DGT095809D01 | 3025520 | 12/1/1978 TRAILING CHARGE TO TAG #095809D |
| DGT095809D02 | 3025521 | 6/1/1980 ADDITIONAL CHARGES TO TAG #095809D |
| DGT095810D | 3025522 | 12/1/1976 CHARGING UNITS BATTERIES |
| DGT095810D01 | 3025523 | 12/1/1978 TRAILING CHARGE TO TAG #095810D |
| DGT095810D02 | 3025524 | 6/1/1980 TRAILING CHARGE TO TAG #095810D |
| DGT095811D | 3025525 | 12/1/1976 CHARGING UNITS BATTERIES |
| DGT095811D01 | 3025526 | 12/1/1978 TRAILING CHARGE TO TAG #095811D |
| DGT095811D02 | 3025527 | 6/1/1980 TRAILING CHARGE TO TAG #095811D |
| DGT095812D | 3025528 | 12/1/1976 CHARGING UNITS BATTERIES |

| | | |
|---|---|---|
| DGT095812D01 | 3025529 | 12/1/1978 TRAILING CHARGE TO TAG #095812D |
| DGT095812D02 | 3025530 | 6/1/1980 TRAILING CHARGE TO TAG #095812D |
| DGT095818D | 3025531 | 1/1/1977 HEAT SEAL FINAL COVER |
| DGT095821D | 3025532 | 1/1/1977 TURNSTILE |
| DGT095822D | 3025533 | 1/1/1977 S O C INSERTER |
| DGT095823D | 3025534 | 1/1/1977 COIL UP UNIT |
| DGT095826D | 3025535 | 2/1/1977 WATER CHILLER PASTE MIXING |
| DGT095829D | 3025538 | 4/1/1977 COIL UP UNIT |
| DGT095830D | 3025539 | 4/1/1977 COIL UP UNIT |
| DGT095831D | 3025540 | 6/1/1977 PULL BOX CASTER |
| DGT095832D | 3025541 | 6/1/1977 PULL BOX CASTER |
| DGT095836D | 3025542 | 10/1/1977 FRONT END LOADER |
| DGT095837D | 3025543 | 10/1/1977 CHILLER FOR PULL BOX-20 TON |
| DGT095839D | 3025545 | 10/1/1977 COIN ROLL |
| DGT095840D | 3025546 | 10/1/1977 COIN ROLL |
| DGT095842D | 3025547 | 10/1/1977 ROLLING MILL-7 STAND |
| DGT095843D | 3025548 | 6/1/1976 SKID RACK |
| DGT095845D | 3025549 | 12/1/1977 CHARGING UNIT |
| DGT095845D01 | 3025550 | 12/1/1978 TRAILING CHARGE TO TAG #095845D |
| DGT095846D | 3025551 | 12/1/1977 CHARGING UNIT |
| DGT095846D01 | 3025552 | 12/1/1978 TRAILING CHARGE TO TAG #095846D |
| DGT095848D | 3025553 | 12/1/1977 CHARGING UNIT |
| DGT095848D01 | 3025554 | 12/1/1978 TRAILING CHARGE TO TAG #095848D |
| DGT095849D | 3025555 | 12/1/1977 CHARGING UNIT |
| DGT095849D01 | 3025556 | 12/1/1978 TRAILING CHARGE TO TAG #095849D |
| DGT095850D | 3025557 | 12/1/1977 CHARGING UNIT |
| DGT095850D01 | 3025558 | 12/1/1978 TRAILING CHARGE TO TAG #095850D |
| DGT095854D | 3025559 | 12/1/1977 CHARGING UNIT |
| DGT095854D01 | 3025560 | 12/1/1978 TRAILING CHARGE TO TAG #095854D |
| DGT095858D | 3025561 | 12/1/1977 CHARGING UNIT |
| DGT095858D01 | 3025562 | 12/1/1978 TRAILING CHARGE TO TAG #095858D |
| DGT095859D | 3025563 | 12/1/1977 CHARGING UNIT |
| DGT095859D01 | 3025564 | 12/1/1978 TRAILING CHARGE TO TAG #095859D |
| DGT095860D | 3025565 | 12/1/1977 CHARGING UNIT |
| DGT095860D01 | 3025566 | 12/1/1978 TRAILING CHARGE TO TAG #095860D |
| DGT095861D | 3025567 | 12/1/1977 CHARGING UNIT |
| DGT095861D01 | 3025568 | 12/1/1978 TRAILING CHARGE TO TAG #095861D |
| DGT095862D | 3025569 | 12/1/1977 CHARGING UNIT |
| DGT095862D01 | 3025570 | 12/1/1978 TRAILING CHARGE TO TAG #095862D |
| DGT095868D | 3025571 | 3/1/1978 TEST UNIT AND MODULES |
| DGT095870D | 3025572 | 4/1/1978 COVER HEAT SEAL |
| DGT095872D | 3025573 | 9/1/1978 BUTT WELDER |
| DGT095873D | 3025574 | 9/1/1978 DEREELER |
| DGT095874D | 3025575 | 9/1/1978 DEREELER |
| DGT095877D | 3025576 | 9/1/1978 LUG FORM PRESS |
| DGT095878D | 3025577 | 9/1/1978 ROTARY CUT OFF MACHINE |
| DGT095879D | 3025578 | 9/1/1978 PILOT HOLE PIERCE PRESS |
| DGT095880D | 3025579 | 9/1/1978 PLATE DRYING OVEN |
| DGT095882D | 3025581 | 6/1/1976 SKID RACK |
| DGT095883D | 3025582 | 6/1/1976 SKID RACK |
| DGT095884D | 3025583 | 7/1/1978 THERMO CARE WATER CHILLER |
| DGT095885D | 3025584 | 8/1/1978 FULLER BAG COLLECTOR |
| DGT095885D01 | 3025585 | 9/1/1978 TRAILING CHARGE TO TAG #095885D |
| DGT095887D | 3025586 | 9/1/1978 CAMBER SENSOR |
| DGT095888D | 3025587 | 11/1/1978 LABEL MACHINE |
| DGT095889D | 3025588 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095890D | 3025589 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095891D | 3025590 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095892D | 3025591 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095893D | 3025592 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095894D | 3025593 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095895D | 3025594 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095896D | 3025595 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095897D | 3025596 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095898D | 3025597 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095899D | 3025598 | 12/1/1978 BATTERY CHARGING UNIT |
| DGT095900D | 3025599 | 12/1/1978 BATTERY CHARGING UNIT |

| | | |
|---|---|---|
| DGT095901A | 3025600 | 11/1/2001 REBUILD #4 AIR COMPRESSOR - ORIGINAL TAG REFERENCE |
| DGT095901D | 3025601 | 12/1/1978 AIR COMPRESSOR |
| DGT095901D01 | 3025602 | 7/1/1991 ADDL CHG(STRUCTURE OF COMPRESSOR) |
| DGT095902D | 3025603 | 2/1/1979 BASE FOR STACKER |
| DGT095903D | 3025604 | 2/1/1979 FREEZER |
| DGT095906D | 3025606 | 2/1/1979 FILL IN CONVEYOR |
| DGT095907D | 3025607 | 2/1/1979 FILL IN CONVEYOR |
| DGT095908D | 3025608 | 2/1/1979 FILL IN CONVEYOR |
| DGT095909D | 3025609 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095910D | 3025610 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095911D | 3025611 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095912D | 3025612 | 2/1/1979 CONVEYOR TO STORAGE |
| DGT095915D | 3025614 | 4/1/1979 RIB TRIM MACHINE |
| DGT095916D | 3025615 | 4/1/1979 TOP TERM ALIGNMENT MACHINE |
| DGT095919D | 3025618 | 4/1/1979 CHILLER-15 TON |
| DGT095920D | 3025619 | 5/1/1979 TEMPERATURE CONTROLLER |
| DGT095923D | 3025620 | 7/1/1979 HEAT SEAL MACHINE |
| DGT095925D | 3025622 | 7/1/1979 CASE GATHERING CONVEYOR FROM COS |
| DGT095927D | 3025624 | 7/1/1979 CAMBER SENSOR |
| DGT095928D | 3025625 | 7/1/1979 CAMBER SENSOR |
| DGT095932D | 3025628 | 8/1/1979 OSI PLATE DRY OVEN |
| DGT095933D | 3025629 | 8/1/1979 OSI PLATE DRY OVEN |
| DGT095934D | 3025630 | 8/1/1979 5 STATION EXT FUSION MACHINE |
| DGT095935D | 3025631 | 8/1/1979 SLITTER & CHOPPER |
| DGT095936D | 3025632 | 8/1/1979 SLITTER & CHOPPER |
| DGT095937D | 3025633 | 8/1/1979 COOLING CHAMBER |
| DGT095938D | 3025634 | 8/1/1979 GROUP PALLET CONVEYOR |
| DGT095940D | 3025635 | 8/1/1979 WORK PLATFORM FOR (2) CAST ON STRAP |
| DGT095942D | 3025636 | 9/1/1979 SCREW CONVEYOR SYSTEM |
| DGT095943D | 3025637 | 9/1/1979 PASTE RECLAIM SYSTEM |
| DGT095944D | 3025638 | 9/1/1979 TENNENT FLOOR SWEEPER |
| DGT095944D01 | 3025639 | 9/1/1979 ADDITIONAL CHARGES TO TAG #095944D |
| DGT095946D | 3025641 | 10/1/1979 CAST ON STRAP |
| DGT095947D | 3025642 | 10/1/1979 GREEN GROUP SHORT TEST CONVEYOR |
| DGT095948D | 3025643 | 10/1/1979 LEAK TEST CONVEYOR |
| DGT095949D | 3025644 | 10/1/1979 GREEN GROUP SHORT TEST CONVEYOR |
| DGT095950D | 3025645 | 10/1/1979 GREEN SHORT TEST CONVEYOR |
| DGT095953D | 3025646 | 12/1/1979 CONVEYOR TO CHARGING TABLES |
| DGT095955D | 3025649 | 12/1/1979 HOPPER AND CONVEYOR |
| DGT095957D | 3025650 | 12/1/1979 VENTILATION SYSTEM |
| DGT095958D | 3025651 | 12/1/1979 LEAK TEST |
| DGT095961D | 3025652 | 12/1/1979 DROTT DECK CRANE |
| DGT095965D | 3025655 | 2/1/1980 ROCKWELL BAND SAW |
| DGT095971D | 3025657 | 6/1/1980 TIG WELDER |
| DGT095972D | 3025658 | 6/1/1980 TIG WELDER |
| DGT095973D | 3025659 | 6/1/1980 TIG WELDER |
| DGT095975D | 3025660 | 6/1/1980 TIG WELD CONVEYOR SYSTEM |
| DGT095985D | 3025666 | 12/1/1981 PASTE MIXER |
| DGT095985D01 | 3025667 | 12/1/1983 INSTRUMENTS FOR/PASTE MIXER |
| DGT095986D | 3025668 | 12/1/1981 PASTE MIXER |
| DGT095986D01 | 3025669 | 12/1/1983 INSTRUMENTS FOR/PASTE MIXER |
| DGT095987D01 | 3025670 | 7/1/1984 INSTRUMENTS FOR/PASTE MIXER |
| DGT095989D | 3025671 | 12/1/1981 STOCK DEREELER |
| DGT095990D | 3025672 | 12/1/1981 STOCK DEREELER |
| DGT095991D | 3025673 | 12/1/1981 STRETCH WRAP MACHINE |
| DGT095992D | 3025674 | 12/1/1982 SINGLE STAND MILL |
| DGT095993D | 3025675 | 12/1/1982 WATER CHILLER |
| DGT095993D01 | 3025676 | 1/1/1983 WATER CHILLER |
| DGT095994D | 3025677 | 12/1/1982 WATER CHILLER |
| DGT095994D01 | 3025678 | 1/1/1983 WATER CHILLER |
| DGT095995D | 3025679 | 12/1/1980 VENTILATION F/COLLECTION SYSTEM |
| DGT095996D | 3025680 | 12/1/1980 VENTILATION F/COLLECTION SYSTEM |
| DGT095997D | 3025681 | 12/1/1982 VENILATION F/COLLECTION SYSTEM |
| DGT095998D | 3025682 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT095999D | 3025683 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT096000D | 3025684 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT098187D | 3025690 | 12/1/1972 DUST COLLECTOR |

| | | |
|---|---|---|
| DGT098361D01 | 3025691 | 10/31/1989 REBUILD MOLDING MACHINE |
| DGT098361D02 | 3025692 | 3/1/1992 ADDL CHG(700 T MOLDING MACH) |
| DGT100287D | 3025696 | 6/1/1977 EXPAND PRESS |
| DGT100297D | 3025698 | 6/1/1977 PASTE MIXER |
| DGT100306D | 3025699 | 6/1/1977 BUTT WELDER |
| DGT100312D | 3025700 | 6/1/1977 DEREELER |
| DGT100315D | 3025701 | 6/1/1977 DEREELER |
| DGT100470D | 3025702 | 9/1/1977 TIG TOP TERM BURN MACHINE |
| DGT102070D | 3025703 | 7/1/1978 LUG TRIM PRESS |
| DGT102099D | 3025704 | 8/1/1978 OSI PLATE DRY OVEN |
| DGT102511D | 3025708 | 7/1/1979 SLITTER & CHOPPER |
| DGT102513D | 3025709 | 7/1/1979 CAMBER SENSORS |
| DGT104491 | 3025710 | 2/1/1998 LEVELATOR |
| DGT104492 | 3025711 | 2/1/1998 LEVELATOR |
| DGT104493 | 3025712 | 2/1/1998 LEVELATOR |
| DGT104494 | 3025713 | 2/1/1998 LEVELATOR |
| DGT104495 | 3025714 | 2/1/1998 LEVELATOR |
| DGT104496 | 3025715 | 2/1/1998 LEVELATOR |
| DGT104497 | 3025716 | 2/1/1998 LEVELATOR |
| DGT104498 | 3025717 | 2/1/1998 LEVELATOR |
| DGT104499 | 3025718 | 2/1/1998 LEVELATOR |
| DGT104500 | 3025719 | 2/1/1998 LEVELATOR |
| DGT104501 | 3025720 | 2/1/1998 LEVELATOR |
| DGT104502 | 3025721 | 2/1/1998 LEVELATOR |
| DGT105567D | 3025724 | 6/1/1983 STRETCH WRAP MACHINE |
| DGT105650D | 3025725 | 8/1/1983 SINGLE STAND MILL |
| DGT105751D | 3025726 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT105752D | 3025727 | 12/1/1982 VENTILATION F/COLLECTION SYSTEM |
| DGT105753D | 3025728 | 2/1/1983 TRABON LUBE SYSTEM |
| DGT105754D | 3025729 | 2/1/1983 TRABON LUBE SYSTEM |
| DGT105755D | 3025730 | 2/1/1983 SINGLE STAND MILL |
| DGT105756D | 3025731 | 3/1/1983 DIESEL FIRE PUMP |
| DGT105757D | 3025732 | 3/1/1983 ELECTRIC FIRE PUMP |
| DGT105758D | 3025733 | 3/1/1983 JOCKEY PUMP |
| DGT105761D | 3025734 | 12/1/1983 HYDRAULIC PASTE BOX |
| DGT105762D | 3025735 | 12/1/1983 HYDRAULIC PASTE BOX |
| DGT105763D | 3025736 | 12/1/1983 ROTARY PILOT HOLE MACHINE |
| DGT105764D | 3025737 | 12/1/1983 ROTARY PILOT HOLE MACHINE |
| DGT105765D | 3025738 | 12/1/1983 TANK FOR MIXER |
| DGT105766D | 3025739 | 12/1/1983 TANK FOR MIXER |
| DGT105769D | 3025741 | 6/1/1984 LABEL MACHINE |
| DGT105770D | 3025742 | 8/1/1984 TIG WELDER |
| DGT105770D01 | 3025743 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105770 |
| DGT105771D | 3025744 | 8/1/1984 TIG WELDER |
| DGT105771D01 | 3025745 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105771 |
| DGT105772D | 3025746 | 8/1/1984 TIG WELDER |
| DGT105772D01 | 3025747 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105772 |
| DGT105773D | 3025748 | 8/1/1984 TIG WELDER |
| DGT105773D01 | 3025749 | 1/1/1995 ADDITIONAL CHARGES TO TAG #105773 |
| DGT105774D | 3025750 | 10/1/1984 PILOT HOLE MACHINE |
| DGT105775D | 3025751 | 12/1/1984 HEVI DUTY TRANSFORMER-300KVA LIGHTING |
| DGT105776D | 3025752 | 12/1/1984 TANK FOR MIXER |
| DGT105777D | 3025753 | 1/1/1985 HYDRAULIC PASTE BOX |
| DGT105781D | 3025754 | 1/1/1985 BATTERY WASHER |
| DGT105787D | 3025756 | 12/1/1985 EXPANDER PRESS #2 |
| DGT105789D | 3025757 | 8/1/1986 HI STACKER TIERING TRUCK |
| DGT105790D | 3025758 | 8/1/1986 HI STACKER TIERING TRUCK |
| DGT105795D | 3025759 | 9/1/1986 EPANDER PRESS #1LINE |
| DGT105796D | 3025760 | 10/1/1986 PASTE MACH LINE#1 |
| DGT105797D | 3025761 | 10/1/1986 BUTT WELDER LINE#1 |
| DGT105798D | 3025762 | 10/1/1986 PASTE MIXER LINE #1 |
| DGT105800D | 3025763 | 10/1/1986 HOT RUNNER CONTROLLER(500T CINN MOLD) |
| DGT105801D | 3025764 | 10/1/1986 MOLD MONITOR MACH #12(500T MOLD MACH) |
| DGT105802D | 3025765 | 10/1/1986 PARTS CONV(25T MOLD MACH)15'&7' |
| DGT105805D | 3025766 | 2/1/1987 EXPANDER PRESS LN#1 |
| DGT105806D | 3025767 | 2/1/1987 COVER HEAT SEAL |
| DGT105807D | 3025768 | 4/1/1987 FINAL COVER FILT PLACER |

27

| | | | |
|---|---|---|---|
| DGT105810D | 3025770 | 9/1/1987 | CONV-HANDLE PLACEMENT |
| DGT105811D | 3025771 | 5/1/1988 | CHARGE PANEL |
| DGT105812D | 3025772 | 5/1/1988 | CHARGE PANEL |
| DGT105817D | 3025773 | 2/1/1988 | S.O.C. PROGRAMMABLE CONTROLLER |
| DGT105818D | 3025774 | 2/1/1988 | S.O.C. PROGRAMMABLE CONTROLLER |
| DGT105820D | 3025775 | 2/1/1988 | 1ST WATER CHILLER |
| DGT105822D | 3025776 | 5/1/1988 | CAST ON STRAP MACH |
| DGT105823D | 3025777 | 5/1/1988 | HI-RATE TESTER(5575L&R) |
| DGT105824D | 3025778 | 5/1/1988 | AIR BLAST SYS BLOWER |
| DGT105825D | 3025779 | 5/1/1988 | TOP TERM TIG BURN MACH |
| DGT105826D | 3025780 | 5/1/1988 | HI-RATE CONVEYOR |
| DGT105828D | 3025782 | 11/1/1988 | CHARGE FLOOR PROCESS FAN |
| DGT105830D | 3025784 | 12/1/1988 | LABEL MACHINE |
| DGT105831D | 3025785 | 1/1/1989 | SPOT FACE MACHINE |
| DGT105832D | 3025786 | 1/1/1989 | SPOT FACE MACHINE |
| DGT105834D | 3025787 | 8/31/1989 | AUTO STRETCH WRAP UNIT |
| DGT105837D | 3025788 | 10/31/1989 | LEAD SULFATE RECOVERY SYSTEM |
| DGT105839D | 3025790 | 2/1/1990 | CONVEYOR |
| DGT105840D | 3025791 | 2/1/1990 | 90 DEGREE EXIT CONV(RIGHT SIDE INFEED OHB) |
| DGT105842D | 3025793 | 8/1/1973 | TRUCK POWERED SHOP |
| DGT105843D | 3025794 | 3/1/1980 | TRUCK-POWERED-SHOP |
| DGT105845D | 3025795 | 8/1/1976 | TRUCK-POWERED-SHOP |
| DGT105846D | 3025796 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105847D | 3025797 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105848D | 3025798 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105849D | 3025799 | 5/1/1991 | ROTARY DRUM PASTE MACH |
| DGT105854D | 3025802 | 12/1/1991 | PRESTRETCH UNIT |
| DGT105856D | 3025803 | 1/1/1993 | ENCLOSURE F/3 DOORS |
| DGT105865D | 3025804 | 3/1/1994 | SPIROMETER |
| DGT105869D | 3025805 | 2/28/1995 | (9)TOLEDO SCALE WEIGHT CONTROLLERS |
| DGT105870D | 3025807 | 1/1/1996 | AUTOMATIC PALLETIZER |
| DGT105870E | 3025808 | 11/1/2001 | AUTOMATIC PALLETIZER |
| DGT105871 | 3025809 | 2/28/1997 | (B) ULTRASONIC WELDER |
| DGT105871A | 3025810 | 12/1/1998 | TRAILING CHARGE TO DGT105871 |
| DGT105871D | 3025811 | 1/1/1987 | GENIE BOOM ELECTRIC MAN LIFT |
| DGT105872D | 3025813 | 3/1/1983 | CLARK WALKING STYLE ELECTRIC SWEEPER/SCRUBBER |
| DGT105873 | 3025814 | 7/31/1997 | AUTO OFF-BEAR SYS |
| DGT105874 | 3025816 | 7/31/1997 | HEATING SYSTEM (UPGRADE) |
| DGT105876 | 3025817 | 11/1/2001 | LEAD OXIDE VENTALATION ON XMET |
| DGT105878 | 3025818 | 11/1/2001 | SYNTRON BOWL CONVERSION |
| DGT105880 | 3025819 | 11/1/2001 | REBUILD CHANGE TABLE |
| DGT105881 | 3025820 | 11/1/2001 | REBUILD CHARGE TABLES |
| DGT105883 | 3025821 | 11/1/2001 | MANCOOLERS FOR C.O.S. |
| DGT105884 | 3025822 | 11/1/2001 | REPAIR PERSON COOLERS - X-MET |
| DGT105886 | 3025824 | 11/1/2001 | ROLLING MILL DRIVE UNIT |
| DGT105887 | 3025825 | 11/1/2001 | REPLACE MODICON CONTROLLERS |
| DGT105888 | 3025826 | 11/1/1997 | SAND FILTER |
| DGT105890 | 3025828 | 11/1/1997 | POWERED SWEEPER |
| DGT105892 | 3025829 | 11/1/1997 | HOT MELT EQUIPMENT |
| DGT105894 | 3025832 | 11/1/1997 | RETENTION AREA |
| DGT105895 | 3025833 | 11/1/2001 | LASER DATE CODE-CELL #1 |
| DGT105897 | 3025834 | 11/1/2001 | HI RATE MACHINE FOR LEAN CELL #1 |
| DGT105898 | 3025835 | 11/1/2001 | AIRCHECK FOR LEAN CELL #1 |
| DGT105899 | 3025836 | 11/1/2001 | AIRCHECK PANEL FOR LEAN CELL #1 |
| DGT105902 | 3025837 | 11/1/2001 | CARTON PRINTER MACHINE CELL #1 |
| DGT105903 | 3025838 | 11/1/2001 | HANDLE PLACER MACHINE |
| DGT105906 | 3025839 | 11/1/2001 | LOW VOLUME SHRING WRAP MACHINE |
| DGT105907 | 3025840 | 11/1/2001 | HIGH SPEED SHRINK WRAP MACHINE |
| DGT105908 | 3025841 | 11/1/2001 | INKJET PRINTER CELL #1 |
| DGT105911 | 3025842 | 11/1/2001 | DESIGN OF ACID HANDLING SYSTEM |
| DGT105912 | 3025843 | 11/1/2001 | PLANT UPGRADES FOR LEAN CELLS |
| DGT105913 | 3025844 | 11/1/2001 | LABEL JET LABELLER |
| DGT105914 | 3025845 | 11/1/2001 | LABEL JET LABELLER |
| DGT105915 | 3025846 | 11/1/2001 | LABEL JET LABELLER |
| DGT105916 | 3025847 | 11/1/2001 | LABEL JET LABELLER |
| DGT105917 | 3025848 | 11/1/2001 | LABEL JET LABELLER |
| DGT105918 | 3025849 | 11/1/2001 | LABEL JET LABELLER |

| | | |
|---|---|---|
| DGT105920 | 3025850 | 11/1/2001 HEAT SEAL FOR MISC. LINE |
| DGT105921 | 3025851 | 11/1/2001 POLY STORAGE ELIMINATTION EQUIPMENT TO MOVE PLASTI |
| DGT105924 | 3025852 | 11/1/2001 QC LAB BITRODE CYCLER FOR NEW BRUNSWICK |
| DGT106102D | 3025853 | 6/1/1984 PILOT HOLE MACHINE |
| DGT106164D | 3025854 | 9/1/1984 BRIDGEPORT TAPE MILL |
| DGT106164D01 | 3025855 | 10/1/1984 TRAILING CHARGE TO TAG #106164D |
| DGT109106D | 3025858 | 12/1/1988 PASTE MACH(ROTARY DRUM) |
| DGT111097D | 3025859 | 4/1/1993 BOILER CONTROL FOR #1 |
| DGT111098D | 3025860 | 4/1/1993 BOILER CONTROL FOR #2 |
| DGT111099D | 3025861 | 4/1/1993 BOILER CONTROL FOR #3 |
| DGT111100D | 3025862 | 4/1/1993 BOILER CONTROL FOR #4 |
| DGT111673D | 3025864 | 7/1/1994 RED LEAD STORAGE SYSTEM |
| DGT111673D01 | 3025865 | 7/1/1994 ADDITIONAL CHARGES TO TAG #111673D |
| DGT111673D02 | 3025866 | 1/1/1995 TRAILING CHARGES TO TAG #111673D |
| DGT111674D | 3025867 | 7/1/1994 RED LEAD DELIVERY SYSTEM |
| DGT111674D01 | 3025868 | 7/1/1994 TRAILING CHARGE TO TAG #111674D |
| DGT112844 | 3025870 | 4/28/1999 INFORMATION BOARD |
| DGT113107 | 3025871 | 7/31/1997 ROBOT |
| DGT690000 | 3025872 | 1/2/1998 LEVELATOR |
| DGT690001 | 3025873 | 1/2/1998 LEVELATOR |
| DGT690002 | 3025874 | 1/2/1998 LEVELATOR |
| DGT690003 | 3025875 | 1/2/1998 LEVELATOR |
| DGT690004 | 3025876 | 1/2/1998 LEVELATOR |
| DGT690005 | 3025877 | 1/2/1998 LEVELATOR |
| DGT690006 | 3025878 | 1/2/1998 LEVELATOR |
| DGT690007 | 3025879 | 1/2/1998 LEVELATOR |
| DGT690008 | 3025880 | 1/2/1998 LEVELATOR |
| DGT690009 | 3025881 | 1/2/1998 LEVELATOR |
| DGT690010 | 3025882 | 1/2/1998 LEVELATOR |
| DGT690011 | 3025883 | 1/2/1998 LEVELATOR |
| DGT690012 | 3025884 | 1/2/1998 LEVELATOR |
| DGT690013 | 3025885 | 1/2/1998 LEVELATOR |
| DGT690014 | 3025886 | 1/2/1998 LEVELATOR |
| DGT690015 | 3025887 | 1/2/1998 LEVELATOR |
| DGT690016 | 3025888 | 8/1/1998 TIG WELDER |
| DGT690017 | 3025889 | 1/2/1998 DOCK LOCK |
| DGT690018 | 3025890 | 1/2/1998 DOCK LOCK |
| DGT690019 | 3025891 | 1/2/1998 DOCK LOCK |
| DGT690021 | 3025893 | 1/2/1998 DOCK LOCK |
| DGT690022 | 3025894 | 1/2/1998 DOCK LOCK |
| DGT690023 | 3025895 | 1/2/1998 DOCK LOCK |
| DGT690024 | 3025896 | 1/2/1998 DOCK LOCK |
| DGT690025 | 3025897 | 1/2/1998 DOCK LOCK |
| DGT690027 | 3025899 | 1/2/1998 SITE SIGN (DELPHI) |
| DGT690028 | 3025900 | 4/1/1998 PERFORATOR LINE UPC |
| DGT690030 | 3025901 | 11/1/1998 LIFT TABLE |
| DGT690031 | 3025902 | 11/1/1998 LIFT TABLE |
| DGT690032 | 3025903 | 11/1/1998 LIFT TABLE |
| DGT690033 | 3025904 | 11/1/1998 NON SLIP FLOOR COATING-EXPANDER&PASTE MACH. AREAS |
| DGT690034 | 3025905 | 11/1/1998 TRANSFORMER |
| DGT690035 | 3025906 | 11/1/1998 LABEL MACHINE |
| DGT690036 | 3025907 | 11/1/1998 ALARMED FEEDER TO FIRE PUMP HOSE |
| DGT690040 | 3025908 | 11/1/1998 AUXILLARY REMOTE FIRE DEPT CONNECTION |
| DGT690041 | 3025909 | 11/1/1998 AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET1 |
| DGT690042 | 3025910 | 11/1/1998 AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET2 |
| DGT690043 | 3025911 | 11/1/1998 AUTOMATIC PLATE STACKER SYS W/CONTROLS F/X-MET3 |
| DGT690044 | 3025912 | 1/2/1998 ROBOT |
| DGT690045 | 3025913 | 1/2/1998 ROBOT |
| DGT690046 | 3025914 | 1/2/1998 ROBOT |
| DGT690047 | 3025915 | 1/2/1998 ROBOT |
| DGT690048 | 3025916 | 11/1/1998 ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690049 | 3025917 | 11/1/1998 ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690050 | 3025918 | 11/1/1998 ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690051 | 3025919 | 11/1/1998 ABB-IRB 6400 ROBOT FOR AUTOMATIC PLATE HANDLING |
| DGT690052 | 3025920 | 1/2/1998 AUTOMATED ORIENTATION ROBOT |
| DGT690053 | 3025921 | 1/2/1998 TITAN CENTRAL CHILL |
| DGT690054 | 3025922 | 1/2/1998 AIR DRYER |

| DGT690055 | 3025923 | 1/2/1998 AIR DRYER |
|---|---|---|
| DGT690056 | 3025924 | 11/1/2001 BRIDGE CRANE |
| DGT690057 | 3025925 | 1/1/1999 NEW BRUNSWICK STORM WATER TREATMENT |
| DGT690058 | 3025926 | 11/1/2001 DUST COLLECTION SYSTEM FOR THE X-MET LINE |
| DGT690060 | 3025927 | 11/1/2001 ELECTRICAL DISTRIBUTION SYSTEM FOR THE X-MET LINE |
| DGT690065 | 3025928 | 11/1/2001 COULTER COUNTER PER DAVE MCCORD - MEASURES OXIDE P |
| DGT690068 | 3025929 | 11/1/2001 HEAT SEAL MACHINE #1 |
| DGT690069 | 3025930 | 11/1/2001 HEAT SEAL MACHINE #2 |
| DGT690070 | 3025931 | 11/1/2001 HEAT SEAL MACHINE #3 |
| DGT690071 | 3025932 | 11/1/2001 HEAT SEAL MACHINE #4 |
| DGT690072 | 3025933 | 11/1/2001 CONVERT BOILERS TO-ONLY MARK GOODWIN AUTHORIZATION |
| DGT690073 | 3025934 | 11/1/2001 ACID TANK |
| DGT690074 | 3025935 | 11/1/2001 ACID TANK |
| DGT690075 | 3025936 | 11/1/2001 ACID TANK |
| DGT690076 | 3025937 | 11/1/2001 ACID TANK |
| DGT690077 | 3025938 | 11/1/2001 NEW AIR WASHER FAN - INSTALLED |
| DGT690078 | 3025939 | 11/1/2001 NEW AIR WASHER FAN - INSTALLED |
| DGT690081 | 3025940 | 11/1/2001 BLOWER UNIT FOR AIR WASHER |
| DGT690082 | 3025941 | 1/1/2002 BLOWER UNIT FOR AIR WASHER |
| DGT690111 | 3025942 | 11/1/2001 FEED WATER PUMP #1 IN POWER PLANT |
| DGT690112 | 3025943 | 11/1/2001 FEED WATER PUMP #2 IN POWER PLANT |
| DGT690113 | 3025944 | 11/1/2001 BUSS DUCT UPGRADE |
| DGT690115 | 3025945 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690116 | 3025946 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690117 | 3025947 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690118 | 3025948 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690119 | 3025949 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690120 | 3025950 | 11/1/2001 FORMATION TABLE - PURCHASE & INSTALLATION |
| DGT690122 | 3025951 | 11/1/2001 SHEET METAL SHEAR |
| DGT690123 | 3025952 | 11/1/2001 SONIC WELDER SYSTEM |
| DGT690124 | 3025953 | 11/1/2001 HIGH VOLTAGE GREEN GRP TEST MACHINE |
| DGT690125 | 3025954 | 11/1/2001 HIGH VOLTAGE GREEN GRP TEST MACHINE |
| DGT690126 | 3025955 | 11/1/2001 AERIAL PLATFORM TRUCK - NEW |
| DGT690129 | 3025957 | 1/1/2002 PHASE II REPAIRS TO FORMATION VENTILATION - PROCES |
| DGT690132 | 3025958 | 11/1/2001 BATTERY LAB AIR CONDITIONER, UPGRADE |
| DGT690134 | 3025959 | 1/1/2002 SEPARATE PROPANE SYSTEMS FOR PROD PROC, PLANT BOIL |
| DGT690135 | 3025960 | 11/1/2001 WALMART J240H T BATTERY, APPLICATOR AND TUBING |
| DGT690136 | 3025961 | 11/1/2001 WALMART J240H T BATTERY, ELECTRICAL CONTROLS |
| DGT690137 | 3025962 | 11/1/2001 WALMART J240H T BATTERY, ELECTRICAL CONTROLS |
| DGT690138 | 3025963 | 11/1/2001 WALMART J240H T BATTERY, ENGINEERING DESIGN |
| DGT690139 | 3025964 | 11/1/2001 WALMART J240H T BATTERY, HOIST |
| DGT690140 | 3025965 | 11/1/2001 LEAD STRIP MILL (FROM MUNCIE) |
| DGT690141 | 3025966 | 11/1/2001 WALMART J240 HT BATTERY, MQ 2 MTL |
| DGT690147 | 3025967 | 11/1/2001 LIFT & ROTATE TABLE # 1 FOR BATTERY PLATE SKIDS |
| DGT690148 | 3025968 | 11/1/2001 LIFT & ROTATE TABLE # 2 FOR BATTERY PLATE SKIDS |
| DGT690149 | 3025969 | 11/1/2001 LIFT & ROTATE TABLE # 3 FOR BATTERY PLATE SKIDS |
| DGT690150 | 3025970 | 11/1/2001 LIFT & ROTATE TABLE # 4 FOR BATTERY PLATE SKIDS |
| DGT690151 | 3025971 | 11/1/2001 LIFT & ROTATE TABLE # 5 FOR BATTERY PLATE SKIDS |
| DGT690152 | 3025972 | 11/1/2001 LIFT & ROTATE TABLE # 6 FOR BATTERY PLATE SKIDS |
| DGT690153 | 3025973 | 11/1/2001 LIFT & ROTATE TABLE # 7 FOR BATTERY PLATE SKIDS |
| DGT690156 | 3025974 | 11/1/2001 LIFT & ROTATE TABLE # 8 FOR BATTERY PLATE SKIDS |
| DGT690157 | 3025975 | 11/1/2001 LIFT & ROTATE TABLE # 9 FOR BATTERY PLATE SKIDS |
| DGT690158 | 3025976 | 11/1/2001 LIFT & ROTATE TABLE # 10 FOR BATTERY PLATE SKIDS |
| DGT690159 | 3025977 | 11/1/2001 LIFT & ROTATE TABLE # 11 FOR BATTERY PLATE SKIDS |
| DGT690160 | 3025978 | 11/1/2001 LIFT & ROTATE TABLE # 12 FOR BATTERY PLATE SKIDS |
| DGT690161 | 3025979 | 11/1/2001 LIFT & ROTATE TABLE # 13 FOR BATTERY PLATE SKIDS |
| DGT690162 | 3025980 | 11/1/2001 LIFT & ROTATE TABLE # 14 FOR BATTERY PLATE SKIDS |
| DGT690163 | 3025981 | 11/1/2001 ACID RECLAIM PUMP # 1 |
| DGT690164 | 3025982 | 11/1/2001 ACID RECLAIM PUMP # 2 |
| DGT690165 | 3025983 | 11/1/2001 WALMART J240HT BATTERY, SCRAP COLLECTION SYSTEM |
| DGT690166 | 3025984 | 11/1/2001 INSTALL EQUIP TRANS FROM TRENTON |
| DGT690168 | 3025985 | 11/1/2001 HOOD FOR OPERATOR QUALITY TESTING EQUIPMENT |
| DGT690169 | 3025986 | 11/1/2001 ACID ABSORPTION TESTER |
| DGT690176 | 3025987 | 11/1/2001 HEAT EXCHANGER FOR WASH TUNNEL - NB |
| DGT690177 | 3025988 | 1/1/2002 PERSONNEL VACUUM SYS. ON CLEAN AREA DOORWAY (1 OF |
| DGT690178 | 3025989 | 11/1/2001 INSTALL HIGH SPEED ROLLUP DOOR TO SHIPPING DEPT |
| DGT690181 | 3025990 | 11/1/2001 REPLACE CHARGE TABLE BLOWER |

30

| | | |
|---|---|---|
| DGT690194 | 3025991 | 11/1/2001 BOILER CONTROLLER (1 OF 3) |
| DGT690195 | 3025992 | 11/1/2001 BOILER CONTROLLER (2 OF 3) |
| DGT690196 | 3025993 | 11/1/2001 BOILER CONTROLLER (3 OF 3) |
| DGT690218 | 3025994 | 1/1/2002 PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (2 OF |
| DGT690219 | 3025995 | 1/1/2002 PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (3 OF |
| DGT690220 | 3025996 | 1/1/2002 PERSONNEL VACUUM SYS. IN CLEAN AREA DOORWAY (4 OF |
| DGT720001 | 3025997 | 4/28/1999 ACID FILL MACHINE |
| DGT720002 | 3025998 | 4/28/1999 MOD. TO VR |
| DGT720007 | 3025999 | 4/28/1999 50 AMP RECTIFIER |
| DGT720010 | 3026000 | 4/28/1999 UPDATE STACKER SYSTEM |
| DGT72383 | 3026001 | 11/1/2001 REBUILD 700 MOLDING MACHINE |
| DGT72395 | 3026002 | 1/1/2002 CAST ON STRAP CONTROLS |
| DGT72396 | 3026003 | 1/1/2002 PROPANE BACK UP SYSTEM FOR BOILERS |
| DGT72413 | 3026004 | 1/1/2002 AUTO PLATE STIELER SYSTEM CONTROLS #4 |
| DGT74405 | 3026005 | 11/1/2001 ACID FILL/PREWASH MACHINE CELL #1 |
| DGT74406 | 3026006 | 11/1/2001 ACID MIX SYSTEM CELL #1 |
| DGT74407 | 3026007 | 11/1/2001 WASHER/DRYER FOR FINISHED BATTERIES CELL #1 |
| DGT74408 | 3026008 | 11/1/2001 BITROBE HIRATE CELL #1 |
| DGTEX095387D | 3026009 | 11/1/2001 CAPITALIZABLE MAINTENANCE - RECONDITION I.R. AIR C |
| DGT018263N | 3026024 | 1/1/1979 CASE GATHERING CONVEYOR |
| DGT018358N | 3026079 | 10/1/1986 HOT RUNNER CONTROLLER SYSTEM |
| DGT018359N | 3026080 | 10/1/1986 HOT RUNNER CONTROLLER SYSTEM |
| DGT018360N | 3026081 | 10/1/1986 HOT RUNNER CONTROLLER SYSTEM |
| DGT018361N | 3026082 | 10/1/1986 HOT RUNNER CONTROLLER SYSTEM |
| DGT018362N | 3026083 | 10/1/1986 HOT RUNNER CONTROLLER SYSTEM |
| DGT081436D | 3026331 | 11/1/1974 STRAP CAST MACHINE |
| DGT081437D | 3026332 | 11/1/1974 STRAP CAST MACHINE |
| DGT081438D | 3026333 | 11/1/1974 STRAP CAST MACHINE |
| DGT091798D | 3026399 | 12/1/1977 CAST ON STRAP MACHINE |
| DGT101707D | 3026558 | 7/1/1985 STRETCH WRAP MACHINE |
| DGT101750D | 3026596 | 1/1/1988 OSI OVEN-ENERGY RECOVERY SYSTEM |
| DGT081611D | 3027025 | 4/1/1977 VACUUM SYSTEM FOR INCAPTULATORS |
| DGT081622D | 3027033 | 7/1/1977 PLATE ENCAPSULATOR |
| DGT081623D | 3027035 | 7/1/1977 PLATE ENCAPSULATOR |
| DGT081648D | 3027064 | 8/1/1977 SPECTROGRAPH |
| DGT081649D | 3027066 | 8/1/1977 HEAT SEAL MACHINE FINAL |
| DGT081650D | 3027067 | 8/1/1977 HEAT SEAL MACHINE FINAL |
| DGT081651D | 3027068 | 8/1/1977 HEAT SEAL MACHINE FINAL |
| DGT081693D | 3027101 | 10/1/1977 TEMPERATURE CONTROL FOR TERMINAL |
| DGT081705D | 3027112 | 11/1/1977 FINAL COVER LEAK TEST |
| DGT081743D | 3027130 | 9/1/1978 BUTT WELDER |
| DGT095750D | 3027192 | 12/1/1976 X MAT EXPANDING PRESS |
| DGT095758D | 3027208 | 12/1/1976 PASTE MIXER |
| DGT096940D | 3027221 | 5/1/1972 WATER CHILLER |
| DGT100166D | 3027229 | 4/1/1977 TIG BURN MACHINE |
| DGT100357D | 3027246 | 7/1/1977 EDGE TRIM & CHOPPER UNIT |
| DGT100485D | 3027251 | 9/1/1977 ENCAPSULATOR |
| DGT100486D | 3027252 | 9/1/1977 ENCAPSULATOR |
| DGT103764D | 3027269 | 9/1/1978 GROUP ALIGN CONVEYOR MACHINE |
| DGT103775D | 3027277 | 12/1/1978 ENCAPSULATION & COLLATION MACHINE |
| DGT103776D | 3027279 | 12/1/1978 ENCAPSULATION & COLLATION MACHINE |
| DGT103780D | 3027283 | 1/1/1979 COVER HEAT SEAL |
| DGT103780D01 | 3027284 | 3/1/1979 TRAILING CHARGE TO TAG #103780D |
| DGT103794D | 3027288 | 4/1/1979 GREEN GROUP SHORT TEST CONVEYOR #1 |
| DGT103815D | 3027299 | 7/1/1979 STRAP CAST STATION |
| DGT103833D | 3027307 | 10/1/1979 WATER CHILLER-15 TON |
| DGT103848D | 3027313 | 12/1/1979 DC DC MODULE |
| DGT103849D | 3027314 | 12/1/1979 DC DC MODULE |
| DGT103850D | 3027315 | 12/1/1979 DC DC MODULE |
| DGT103851D | 3027316 | 12/1/1979 DC DC MODULE |
| DGT103852D | 3027317 | 12/1/1979 DC DC MODULE |
| DGT103853D | 3027318 | 12/1/1979 DC DC MODULE |
| DGT103854D | 3027319 | 12/1/1979 DC DC MODULE |
| DGT103856D | 3027321 | 12/1/1979 DC DC MODULE |
| DGT103857D | 3027322 | 12/1/1979 DC DC MODULE |
| DGT103907D | 3027345 | 11/1/1982 WATER CHILLER |
| DGT103933D | 3027353 | 9/1/1983 HEAT TREAT FURNACE |

| | | |
|---|---|---|
| DGT104743D | 3027392 | 6/1/1980 BRANSON WELD UNIT |
| DGT107507D | 3027402 | 1/1/1986 DUST COLLECTOR |
| DGT107566D | 3027438 | 3/1/1990 EKG MACHINE |
| DGT107586D | 3027452 | 1/1/1991 GMF ROBOT FOR C.O.S. LINE |
| DGT107588D | 3027454 | 6/1/1991 JWI LEAD FILTER PRESS |
| DGT107619D | 3027463 | 1/1/1992 LEBLOND MAKINO LATHE |
| DGT107619D | 3027469 | 2/1/1992 DIGITAL READOUT FOR LEBLOND LATHE |
| DGT107621D | 3027470 | 4/1/1992 TEMP CONTROLLER FOR MOLD MACH |
| DGT107636D | 3027479 | 4/1/1994 SATELLITE SPIROMETER |
| DGT107647D | 3027487 | 1/1/1994 CHILLER SYSTEM FOR #2 LEAD STRIP |
| DGT107678D | 3027499 | 7/1/1995 SPRAYMATION HOT MELT EQUIPMENT |
| DGT107698 | 3027515 | 6/30/1997 DIELECTRIC TEST CONTROL |
| DGT107700 | 3027517 | 7/31/1997 AUTO OFF |
| DGT107723B | 3027544 | 6/1/1999 FORMATION TABLE SYSTEM |
| DGT107731 | 3027549 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107732 | 3027550 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107733 | 3027551 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107734 | 3027552 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107735 | 3027553 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107736 | 3027554 | 11/1/2001 LIFT TABLE FOR PLATES |
| DGT107744 | 3027559 | 4/1/2000 TOP TERMINAL TIG WELDER |
| DGT600015 | 3027596 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600016 | 3027597 | 11/1/2001 44 X 55 4000LB CAPACITY SCISSOR LIFT |
| DGT600017 | 3027598 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600018 | 3027599 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600019 | 3027600 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600020 | 3027601 | 11/1/2001 44 X 52 4000LB CAPACITY SCISSOR LIFT |
| DGT600043 | 3027617 | 11/1/2001 SEPERATOR ROLL LIFT, JIB CRANE, AND HOIST |
| DGT600044 | 3027618 | 11/1/2001 SEPERATOR ROLL LIFT, JIB CRANE AND HOIST |
| DGT600045 | 3027619 | 11/1/2001 PROTOTYPE WATER BATH FORMATION SYSTEM |
| DGT600049 | 3027622 | 11/1/2001 FORMATION CHARGING TABLE #3 |
| DGT600056 | 3027625 | 11/1/2001 ROBOT TO LOAD BATTERY GROUPS INTO CAST-ON-STRAP MA |
| DGT600106 | 3027656 | 11/1/2001 WALMART J240HT BATT, SCRAP COLLECTION SYSTEM |
| DGT690101 | 3051124 | 9/11/2002 SEPARATOR LIFTING JIB CRANE AND HOIST |
| DGT690099 | 3051125 | 9/11/2002 DELPHI MACHINE TO TEST BATTERY CELLS FOR SHORTS |
| DGT690097 | 3051126 | 9/11/2002 DELPHI WATER COOLING STATION |
| DGT690095 | 3051127 | 9/11/2002 DELPHI STRETCH/PERFORATE MACHINE |
| DGT690094 | 3051128 | 9/11/2002 DELPHI GROUP LOADING MACHINE STATION |
| DGT690093 | 3051129 | 9/11/2002 DELPHI TOP TERMINAL COVER SPIN MACHINE |
| DGT690092 | 3051130 | 9/11/2002 DELPHI GROUP LOADING MACHINE STATION |
| DGT690102 | 3051131 | 9/11/2002 SEPARATOR LIFTING JIB CRANE AND HOIST |
| DGT690187 | 3051132 | 9/11/2002 (#6) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690186 | 3051133 | 9/11/2002 (#5) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690185 | 3051134 | 9/11/2002 (#4) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690184 | 3051135 | 9/11/2002 (#3) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690183 | 3051136 | 9/11/2002 (2) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690182 | 3051137 | 9/11/2002 (#1) COS HOIST & FRAME PLUS INSTALLATION |
| DGT690103 | 3051138 | 9/11/2002 FILTRATION SYSTEM FOR CHILLED WATER SUPPLY |
| DGT690212 | 3051139 | 9/11/2002 WELDER #8 |
| DGT690211 | 3051140 | 9/11/2002 WELDER #7 |
| DGT690210 | 3051141 | 9/11/2002 WELDER #6 |
| DGT690209 | 3051142 | 9/11/2002 WELDER #5 |
| DGT690208 | 3051143 | 9/11/2002 WELDER #4 |
| DGT690207 | 3051144 | 9/11/2002 WELDER #3 |
| DGT690206 | 3051145 | 9/11/2002 WELDER #2 |
| DGT690213 | 3051146 | 9/11/2002 WELDER #9 |
| DGT690083 | 3051147 | 9/11/2002 BIG JOE LIFT TRUCK (REV. 1) |
| DGT105901 | 3051148 | 9/11/2002 REPLACE HEAT SEALER |
| DGT105900 | 3051149 | 9/11/2002 FIRE PTOTECTION FOR GREEN GROU/ VACUUM EXHAUSTER |
| DGT105896 | 3051150 | 9/11/2002 REPLACE HEAT SEALERS |
| DGT690216 | 3051151 | 9/11/2002 WELDER #12 |
| DGT690215 | 3051152 | 9/11/2002 WELDER #11 |
| DGT690214 | 3051153 | 9/11/2002 WELDER #10 |
| DGT690188 | 3051154 | 9/11/2002 DELPHI MACHINE TO ALIGN TOP TERMINAL POSTS |
| DGT105910 | 3051170 | 9/11/2002 RE ROUTE STORM OUTFALL |
| 72414 | 3051171 | 9/11/2002 VACUUM EXHAUSTER |
| 72393 | 3051172 | 9/11/2002 REBUILD TWO CHANGE TABLE |

| | | | |
|---|---|---|---|
| DGT690202 | 3051173 | 9/11/2002 | WATER CONSERVATION SYSTEM FOR BATTERY WASHER |
| DGT690191 | 3051174 | 9/11/2002 | MISC CONVEYORS FOR LAYOUT CHANGES TO GRN GRP LEAN |
| DGT690190 | 3051175 | 9/11/2002 | VENTILATION COLLECTOR FAN FOR GREEN GROUP LEAN CEL |
| 72370 | 3051176 | 9/11/2002 | FIRE PROTECTION UPGRADE |
| DGT690109 | 3051182 | 9/11/2002 | ROBOT TO LOAD BATTERY GROUPS INTO CAST-ON-STRAP MA |
| DGT690205 | 3051183 | 9/11/2002 | WELDER #1 |
| DGT690130 | 3051209 | 9/11/2002 | LINE INSTALL COSTS FOR MQ 1 VALIDATION |
| DGT690121 | 3051210 | 9/11/2002 | DELPHI LEAN COVER TO CASE HEAT SEAL MACHINE |
| DGT690108 | 3051211 | 9/11/2002 | INTER. COVER AIR CHECK MACHINE |
| DGT690107 | 3051212 | 9/11/2002 | GROUP HOTMELT MACHINE |
| DGT690106 | 3051213 | 9/11/2002 | TOP TERMINAL HOTMELT MACHINE |
| DGT690104 | 3051214 | 9/11/2002 | DELPHI CAST-ON-STRAP MACHINE REBUILD OF DGS0099445 |
| DGT690096 | 3051215 | 9/11/2002 | DELPHI SINGLE HEAD EF WELDER MACHINE |
| DGT690131 | 3051216 | 9/11/2002 | PRODUCTIVE MTL FOR MQ 1 VALIDATION |
| DGT690203 | 3051217 | 9/11/2002 | XMET PASTE MIXER #1 UPGRADE (REPLACES DGT100297D) |
| DGT690174 | 3051218 | 9/11/2002 | #2 DR2-NB ENCAPSULATION/COLLATION MACHINE |
| DGT690173 | 3051219 | 9/11/2002 | #1 DR2-NB ENCAPSULATION/COLLATION MACHINE |
| DGT690144 | 3051220 | 9/11/2002 | UPGRADE BATTERY ACID RETENTION & DIST-TANK & COOLI |
| DGT690143 | 3051221 | 9/11/2002 | UPGRADE BATTERY ACID RETENTION & DIST-CONSTR & INS |
| DGT690142 | 3051222 | 9/11/2002 | UPGRADE BATTERY ACID RETENTION & DIST & ACID HOUSE |
| DGT690133 | 3051223 | 9/11/2002 | NFPA VENTING ON PROPANE REGULATORS |
| DGT690087 | 3051228 | 9/11/2002 | DELPHI LEAN TOP TERMINAL TIG WELDER |
| DGT690086 | 3051229 | 9/11/2002 | DELPHI LEAN SIDE TERMINAL TIG WELDER |
| DGT056948 | 3051230 | 9/11/2002 | OXIDE GRINDER CONTROL PANEL REBUILT |
| DGT72373 | 3051408 | 9/25/2002 | replace sulfuric acid tank |
| DGT72387 | 3051409 | 9/25/2002 | new brunswick security upgrade |
| DGT600175 | 3115835 | 2/10/2003 | #5 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600174 | 3115836 | 2/10/2003 | #4 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600173 | 3115837 | 2/10/2003 | #3 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600172 | 3115838 | 2/10/2003 | #2 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600171 | 3115839 | 2/10/2003 | #1 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600176 | 3115841 | 2/10/2003 | #6 DR3 ENCAPSULATION COLLATION MACHINE |
| DGT600178 | 3115842 | 2/10/2003 | LOAD STATION & MAGAZINE FOR ROBOT LOAD |
| DGT600170 | 3115843 | 2/10/2003 | ABB ROBOTS (4 OF 4) |
| DGT600169 | 3115844 | 2/10/2003 | ABB ROBOTS (3 OF 4) |
| DGT600168 | 3115845 | 2/10/2003 | ABB ROBOTS (2 OF 4) |
| DGT600167 | 3115846 | 2/10/2003 | ABB ROBOTS (1 OF 4) |
| DGT600177 | 3115848 | 2/10/2003 | CONVEYORS FOR DR3 |
| DGT600126 | 3115866 | 2/11/2003 | #2 DR2-AN ENCAPSULATION/COLLATION MACHINE |
| DGT600125 | 3115867 | 2/11/2003 | #1 DR2-AN ENCAPSULATION/COLLATION MACHINE |
| DGT600060 | 3115887 | 2/12/2003 | INTERMEDIATE COVER. ASSY. MACHINE FOR MARINE |
| DGT600203 | 3115900 | 2/12/2003 | FORMATION TABLE #2 |
| DGT600193 | 3115907 | 2/12/2003 | OPERATOR ASSIST FOR DR-3 (1 OF 2)GREEN GROUP LEAN |
| DGT600194 | 3115908 | 2/12/2003 | OPERATOR ASSIST FOR DR-3 (2 OF 2)GREEN GROUP LEAN |
| DGT600075 | 3115918 | 2/12/2003 | HI VOLTAGE GREEN GROUP SHORT CHECK- MISC GREEN GRP |
| DGT600229 | 3117571 | 5/22/2003 | LIFT ASSIST FOR DR-3 |
| DGT600230 | 3117572 | 5/22/2003 | LIFT ASSIST FOR DR-3 |
| DGT600231 | 3117573 | 5/22/2003 | LIFT ASSIST FOR DR-3 |
| DGT600204 | 3117578 | 5/22/2003 | CONVEYOR SYSTEM FOR MISC LINE DR-3 |
| DGT600213 | 3117580 | 5/22/2003 | CONVEYER FOR DR-3 #3&4 ON MISC. LINE |
| DGT690276 | 3151172 | 9/23/2003 | BUSS DUCT FOR 1203 |
| DGT690180 | 3151173 | 9/23/2003 | BACKFLOW PREVENTORS ON WATER MAINS |
| DGT690267 | 3151174 | 9/23/2003 | NEW PROCESS BOILER FOR PLATE STEAM HOODS |
| DGT690262 | 3151175 | 9/23/2003 | INSTALL NATURAL GAS LINE IN PLANT |
| DGT690260 | 3151183 | 9/23/2003 | GRAPHITE HEAT EXCHANGER FOR ACID HOUSE |
| DGT690263 | 3151189 | 9/23/2003 | LIFT PUMP #1 |
| DGT690259 | 3151190 | 9/23/2003 | CHARGE TABLE 25 |
| DGT690258 | 3151191 | 9/23/2003 | CHARGE TABLE 24 |
| DGT690236 | 3151192 | 9/23/2003 | NEW CHARGE TABLE |
| DGT690235 | 3151193 | 9/23/2003 | NEW CHARGE TABLE |
| DGT690224 | 3151194 | 9/23/2003 | INSTALLATION OF MAJOR MECHANICAL,VENTILATION,ELECT |
| DGT690222 | 3151195 | 9/23/2003 | DESIGN OF NEW CHARGE TABLE VENTILATION |
| DGT690265 | 3151196 | 9/23/2003 | LIFT PUMP #2 |
| DGT695033 | 3152528 | 10/17/2003 | PASTE MIXER BOWL |
| DGT690230 | 3153273 | 11/22/2003 | LUG FORM PILOTED DIE (XMET LINE 3) |
| DGT690229 | 3153274 | 11/22/2003 | LUG FORM CUT-OFF MACHINE (XMET LINE 2) |
| DGT690204 | 3153275 | 11/22/2003 | BAR CODE ERROR PROOFING PROJECT |

| | | |
|---|---|---|
| DGT690193 | 3153276 | 11/22/2003 STATION TO REMOVE FORMATION CHARGE SPOOLS |
| DGT690283 | 3153277 | 11/22/2003 HEAT SEAL MACHINE |
| DGT690234 | 3153278 | 11/22/2003 REFURBISH SIDE TERMINAL PLACEMENT MACHINE |
| DGT690233 | 3153279 | 11/22/2003 REFURBISH TOP TERMINAL PLACEMENT MACHINE |
| DGT690231 | 3153280 | 11/22/2003 NEW SCRAP CONVEYOR (XMET LINE 4) |
| DGT690228 | 3153281 | 11/22/2003 PASTE BOX & RAILS (XMET LINE 1) |
| DGT690232 | 3153282 | 11/22/2003 NEW STRIP WIDTH GAGE (XMET LINE 5) |
| DGT695034 | 3153284 | 11/22/2003 OIL PURIFICATION SYSTEM |
| DGT690261 | 3153285 | 11/22/2003 BUFFER CONVEYOR FOR MISC LINE |
| DGT690257 | 3153286 | 11/22/2003 CONTROLS SYS FOR CUTTING ON THE GRID FUNCTIONS |
| DGT690256 | 3153287 | 11/22/2003 VISION SYS FOR NO SPIN CONDITION AND SPOT FACE QUA |
| DGT690255 | 3153288 | 11/22/2003 SPARE EQUIPMENT TO CUT ON GRID JUNCTIONS (XMET) |
| DGT690254 | 3153289 | 11/22/2003 SCRAP SYSTEM FOR PHASE 1 TO CUT ON GRID JUNCTIONS |
| DGT690253 | 3153290 | 11/22/2003 NEW ACID FILL FOR MAIN LINE (WATERFALL) |
| DGT690226 | 3153291 | 11/22/2003 NEW WASHER AND DRYER FOR MAIN LINE |
| DGT690155 | 3153301 | 11/22/2003 POWER TRANSFORMER # 4 FOR LIFT AND ROTATE TABLES |
| DGT690154 | 3153302 | 11/22/2003 POWER TRANSFORMER # 3 FOR LIFT AND ROTATE TABLES |
| DGT690146 | 3153303 | 11/22/2003 POWER TRANSFORMER # 2 FOR LIFT AND ROTATE TABLES |
| DGT690145 | 3153304 | 11/22/2003 POWER TRANSFORMER # 1 FOR LIFT AND ROTATE TABLES |
| DGT690067 | 3153306 | 11/22/2003 OXIDE EQUIPMENT UPG (REACTOR CONTROLS) |
| DGT105892A | 3153307 | 11/22/2003 HOT MELT EQUIPMENT (REBUILD) |
| DGT095660E | 3153308 | 11/22/2003 REFURBISH #2 HEAT SEAL MACHINE |
| DGT095659E | 3153309 | 11/22/2003 REFURBISH #2 HEAT SEAL MACHINE |
| DGT600124 | 3153354 | 11/25/2003 CONTROLLER FOR TIG WELDER |
| DGT600123 | 3153355 | 11/25/2003 CONTROLLER FOR TIG WELDER |
| DGT600046 | 3153358 | 11/25/2003 GROUP CONVEYOR SYSTEM |
| DGT012095O | 3190741 | 1/31/2004 CAPITALIZE REBUILT COST (SUBMERSIBLE HEATERS LINDB |
| DGT690227 | 3190742 | 1/31/2004 SLURRY ROOM EQUIPMENT TO RECLAIM PASTE |
| DGT690278 | 3190743 | 1/31/2004 HOT MELT MACHINE OVERHAUL |
| DGT690192 | 3190744 | 1/1/2004 AUTOMATED ASSEMBLY CELL FOR CASES & TERMINAL ASSY' |
| DGT690250 | 3190745 | 1/31/2004 AIR LEAK TEST MACHINE |
| DGT690273 | 3190750 | 1/31/2004 OXIDE DELIVERY SYSTEM |
| DGT690277 | 3190751 | 1/31/2004 INSULATOR DETECTION SYSTEM - MAINLINE |
| DGT690279 | 3190752 | 1/31/2004 INSULATOR DETECTION SYSTEM - MISC LINE |
| DGT600222 | 3190754 | 2/24/2004 #9 DR-3 ENCAPSULATION COLOLATION MACHINE |
| DGT690264 | 3190755 | 1/31/2004 AUTOMATIC INSULATOR INSERTER FOR SATURN BATTERY |
| DGT690266 | 3190756 | 1/31/2004 MACHINE TO INSTALL INSULATOR UNDER SIDE TERMINAL S |
| DGT690269 | 3190757 | 1/1/2004 HIGH RATE MACHINE BASE |
| DGT690270 | 3190758 | 1/31/2004 BITRODE VRL HIGH RATE |
| DGT690271 | 3190759 | 1/31/2004 BITRODE VRL HIGH RATE LOAD |
| DGT600217 | 3190800 | 2/24/2004 LOAD STATION & MAGAZINE FOR ROBOT LOAD |
| DGT600239 | 3190808 | 2/24/2004 CONVEYOR FOR DR-3 |
| DGT600223 | 3191600 | 3/30/2004 #10 DR-3 ENCAPSULATION COLLATION MACHINE |
| DGT600237 | 3191601 | 3/30/2004 BATTERY CHARGE TABLE #4 |
| DGT600236 | 3191602 | 3/30/2004 BATTERY CHARGE TABLE #3 |
| DGT600235 | 3191610 | 3/30/2004 BATTERY CHARGE TABLE #2 |
| DGT600234 | 3191618 | 3/30/2004 BATTERY CHARGE TABLE #1 |
| DGT690258A | 3192185 | 4/30/2004 CHARGE TABLE 24 |
| DGT690259A | 3192186 | 4/30/2004 CHARGE TABLE 25 |
| DGT004779N05 | 3193545 | 1/1/2004 GENERAL SPENDING FOR MISC. PURCHASES - DESIGN, OUT |
| DGT012175N04 | 3193546 | 6/29/2004 UPGRADE FIRE LOOP AT PLANT |
| DGT690272 | 3193547 | 1/1/2004 HEATING SYSTEM FOR PLANT FOR 350000 CFM |
| DGT000254 | 3195184 | 9/16/2004 RECTIFIER CABINET |
| DGT000255 | 3195185 | 9/16/2004 RECTIFIER CABINET |
| DGT000256 | 3195186 | 9/16/2004 RECTIFIER CABINET |
| DGT000257 | 3195187 | 9/16/2004 RECTIFIER CABINET |
| DGT098361D03 | 3215010 | 11/30/2004 ADDL CHG(700 T MOLDING MACH) |
| DGT690104A | 3215013 | 11/30/2004 007797 - DELPHI CAST-ON-STRAP M |
| DGT690295 | 3215132 | 12/1/2004 LASER DATE CODE |
| DGT690296 | 3215133 | 12/1/2004 TOP TERMINAL VISION SYSTEM 66 CELL |
| DGT690288 | 3220272 | 2/17/2005 48 HOUR STAND PROCESS LIFT TABLE EQUIPMENT |
| DGT690289 | 3220273 | 2/17/2005 48 HOUR STAND PROCESS SPOTFACE MACHINE |
| DGT690290 | 3220274 | 2/17/2005 48 HOUR STAND PROCESS TOPTIER MACHINE |
| DGT690297 | 3220275 | 2/17/2005 AFTERMARKET LINE AHERN-SOPER LABEL ERROR PROOF |
| DGT690298 | 3220276 | 2/17/2005 MAIN LINE AHERN-SOPER LABEL ERROR PROOF |
| DGT116709 | 3220311 | 1/1/2005 VRL #2 |
| DGT1116710 | 3220312 | 1/1/2005 LASER DATE CODE #2 |

| DGT690096A | 3220661 | 3/14/2005 UPGRADE DELPHI SINGLE HEAD EF WELDER MACHINE |
| DGT690108A | 3220663 | 3/2/2005 INTERMEDIATE COVER AIR CHECK MACHINE |
| DGT690121A | 3220664 | 3/2/2005 LEAN COVER TO CASE HEAT SEAL MACHINE |
| DGT690301 | 3220665 | 3/2/2005 DR3 PLATE LIFTS |
| DGT690287 | 3220669 | 2/17/2005 48 HR STAND PROCESS STORAGE EQUIP |
| DGT690307 | 3222009 | 1/1/2005 INSTALL DATRONICS INKJET SYSTEM |
| DGT690043A | 3222460 | 5/9/2005 PLATE STACKER EQUIPMENT UPGRADE |
| DGT690188A | 3222463 | 5/9/2005 TOP POST ALIGNMENT EQUIPMENT UPGRADE |
| DGT690173A | 3222466 | 5/9/2005 #1 DR2 ENCAPSULATOR/COALATOR |
| DGT690299 | 3223037 | 6/14/2005 New Xmet Underground Scrap Conveyor |
| DGT690285 | 3223038 | 6/14/2005 SODIUM SULFATE DISPENSING SYSTEM EQUIPMENT |
| DGW690314 | 3223256 | 7/19/2005 MAIN LINE INCLINED CONVEYOR |
| DGT690293 | 3223278 | 7/20/2005 AUTO INSOLATOR INSERTION MACH - MAIN LINE |
| DGT690294 | 3223279 | 7/20/2005 AUTO INSULATOR INSERTION MACH-MISC LINE |
| DGT012161N01 | 3223280 | 7/20/2005 INSTALL BAFFLES IN FORMATION TABLES |
| DGT690310 | 3223281 | 7/20/2005 WIRE BRUSH STATION-HONDA/TOYOTA LINE |
| DGT690317 | 3223282 | 7/20/2005 VRL REJECT PRINTER FOR HONDA/TOYOTA LINE |
| DGT690309 | 3223283 | 7/20/2005 VCI APPLICATOR FOR HONDA/TOYOTA LINE |
| DGT105868D | 3223831 | 1/30/1995 ICE MAKER |
| DGT690302 | 3223862 | 8/24/2005 ROBOTIC LOAD EQUIP FOR COS MACHINE |
| DGT690311 | 3223863 | 8/24/2005 CONTROLS FOR COS - DR3 PROJECT |
| DGT690286 | 3223958 | 8/26/2005 OXIDE REACTOR #5 |
| DGT690324 | 3223959 | 8/26/2005 OXIDE REACTOR #6 |
| DGT690292 | 3224765 | 9/29/2005 007651 - FORMATION TEMPERATURE MONITORING SYSTEM |
| DGT690305 | 3224771 | 9/29/2005 ROBOT GUARDING SYSTEM #1 |
| DGT690325 | 3224775 | 9/29/2005 ROBOT GUARDING SYSTEM #2 |
| DGT690326 | 3224776 | 9/29/2005 ROBOT GUARDING SYSTEM #3 |
| DGT690327 | 3224777 | 9/29/2005 ROBOT GUARDING SYSTEM #4 |
| DGT690328 | 3224778 | 9/29/2005 ROBOT GUARDING SYSTEM#5 |
| DGT690329 | 3224779 | 9/29/2005 ROBOT GUARDING SYSTEM#6 |
| DGT690318 | 3225240 | 10/17/2005 PACKOUT LEVELATOR FOR HONDA/TOYOTA LINE |
| DGT690323 | 3225241 | 10/17/2005 HONDA/TOYOTA FINISHING LINE MATL |
| DGT690303 | 3225242 | 10/17/2005 INSTALL FINAL COVER PLACER SYSTEM |
| DGT690315 | 3226228 | 11/29/2005 MISC LINE TUNNEL STRUCTURE |
| DGT690312 | 3226231 | 11/29/2005 CONTROLS FOR DR3 CONVEYORS |
| DGT690316 | 3226243 | 11/29/2005 MISC LINE DR3 CONVEYOR |
| DGT690304 | 3226254 | 11/29/2005 GROUP CONVEYOR SYSTEM DR3'S TO ROBOTS - MAIN LINE |
| DGT690330 | 3226402 | 11/29/2005 OSHAWA VRL SCRAP SAW |
| DGT690331 | 3226403 | 11/29/2005 OSHAWA BITRODE UNIT |
| DGT690332 | 3226404 | 11/29/2005 OSHAWA HONDA BANDER SYSTEM-SURPLUS |
| DGT690308 | 3226436 | 12/19/2005 DR#3 CAMCO UNIT 1 OF 3 |
| DGT690334 | 3226437 | 12/19/2005 DR#3 CAMCO UNIT 2 OF 3 |
| DGT690335 | 3226438 | 12/19/2005 DR#3 CAMCO UNIT 3 OF 3 |
| DGT690333 | 3227473 | 1/1/2006 OSHAWA INSPECTION VISION SYSTEM |
| DGT690322 | 3227475 | 1/1/2006 A BRADLEY CONTROLS FOR XMET LINE #4-MTL |
| DGT105866D | 5000713 | 10/1/1994 GM TKS INFORMATION CENTER |
| DGT105866D01 | 5000714 | 1/1/1995 TRAILING CHARGES TO TAG #105866D |

See Exhibit 1.21 for Real Property address

**EXHIBIT 1.1(vi)**
**EXCLUDED RAW MATERIALS**

Excluded raw materials Inventory includes the following parts numbers:

| Raw Materials | Part Number |
|---|---|
| PURE LEAD (red +) | 9599001 |
| ALUMINUM (white +) | 9692001 |
| CALCIUM | 9680001 |
| 3% ANT LEAD | 9595001 |
| 100 % TIN | 9681001 |
| Polypropylene | 9528001 |
| HOT MELT-1213 | 9521001 |
| DR4 EXPANDER | 9672025 |
| DR25 EXPANDER | 19060890 |
| POS GMX T/T BUSHING | 19062042 |
| NEG GMX T/T BUSHING | 19062043 |
| POS T/T BUSHING | 10457694 |
| NEG T/T BUSHING | 10457695 |
| HI-TEMP SIDE TERM | 19057272 |
| LEAD RING | 19057273 |
| CHROMA COLOR | 9515001 |
| RUBBER O-RING SEAL | 19057274 |
| 4.6 CRYSTEX PAPER | 9661046 |
| 3.5 CRYSTEX PAPER | 9661035 |
| 4.1 CRYSTEX PAPER | 9661041 |
| 3.75 CRYSTEX PAPER | 19060891 |
| LEXAN STRIP | 9574002 |
| 660 SEPARATOR | 10457660 |
| 658 SEPARATOR | 10457658 |
| 196 SEPARATOR | 19065196 |
| 889 SEPARATOR | 19060889 |
| DYNEL FIBER | 9502001 |
| SODIUM | 9448001 |
| TERMINAL SHEILDS | 10496263 |
| WAFER INSULATOR | 10454924 |
| INSULATOR ROLL | 19065509 |
| FLAME ARRESTORS | 1892323 |
| 10" Interm Cover - | 10472239 |
| 9" Interm Cvr | 10472230 |
| 9" Interm Cvr | 10472231 |
| 9" Interm Cvr | 10472233 |
| 9" Interm Cvr | 10472235 |

| | |
|---|---|
| 9" Interm Cvr | 10472236 |
| 9" Interm Cvr | 10472229 |
| 10" Interm Cover - | 10472241 |
| 10" Interm Cover - | 10472240 |
| 10" Interm Cover - | 10472243 |
| 10" Interm Cover - | 10472245 |
| 10" Interm Cover - | 10472238 |

## EXHIBIT 1.11

Raw Materials (direct materials) included in the Acquired Assets

| Raw Materials | Part Number | STP Qty | UM | Unit | Minimum Inventory |
|---|---|---|---|---|---|
| ACID | 9402001 | 45,000 | LB | 1 Tank | 860,000 |
| HYDROMETERS 1124 | 10491124 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 5478 | 10495478 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 2595 | 10492595 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 8954 | 10498954 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 8957 | 10498957 | 1,400 | Pcs | Box | 5 |
| HYDROMETERS 7495 | 19057495 | 1,400 | Pcs | Box | 5 |
| SLIPSHEETS- | 39"X45" | 300 | Pcs | 1 Pallet | 8 |
| SLIPSHEETS- | 42"X48" | 300 | Pcs | 1 Pallet | 5 |
| HONEYCOMB- | 37"x44"x1.5 | 29 | Pcs | 1 Pallet | 16 |
| HONEYCOMB- | 42"x44"x1 | 45 | Pcs | 1 Pallet | 6 |
| 13" SHRINKWRAP | 10457753 | 1,368 | LB | 1 Pallet | 3 |
| 12" SHRINKWRAP | 10453144 | 1,404 | LB | 1 Pallet | 3 |
| 11" SHRINKWRAP | 10457752 | 1,053 | LB | 1 Pallet | 1 |
| 10" HANDLE | 10457298 | 5,640 | Pcs | 1 Pallet | 3 |
| 9" HANDLE | 10457299 | 5,640 | Pcs | 1 Pallet | 3 |
| 8" HANDLE | 10457297 | 5,640 | Pcs | 1 Pallet | 1 |
| NEG SIDE TERMINAL CAP | 10467094 | 4,280 | Pcs | Crate | 10 |
| POS SIDE TERMINAL CAP | 10489952 | 4,280 | Pcs | Crate | 10 |
| TOP TERMINAL CAP | 10471203 | 2,000 | Pcs | Crate | 12 |
| TOP TERMINAL CAP | 10471204 | 2,000 | Pcs | Crate | 12 |
| TERMINAL ADAPTORS | 10469296 | 1,080 | Pcs | Box | 3 |
| HOT MELT-1246 | 9462001 | 31 | LB | Box | 2 |
| 083 FOAM BLOCK | 275083 | 2,310 | Pcs | 1 Pallet | 2 |
| 313 CARTON | 10468313 | 1,000 | Pcs | 1 Pallet | 1 |
| 325 CARTON | 10468325 | 1,200 | Pcs | 1 Pallet | 1 |
| 327 CARTON | 10468327 | 1,000 | Pcs | 1 Pallet | 1 |
| 073 CARTON | 10474073 | 1,000 | Pcs | 1 Pallet | 1 |
| 072 CARTON | 10474072 | 1,000 | Pcs | 1 Pallet | 1 |
| 561 CARTON | 10489561 | 1,000 | Pcs | 1 Pallet | 1 |
| AC DELCO PLACARD | 10457751 | 4,000 | Pcs | Box | 8 |
| BU DELPHI PLACARD | 10450883 | 4,000 | Pcs | Box | 2 |
| GMX Interm Cvr | 19063666 | 1320 | Pcs | Pallet | 6 |
| GMX Final Cvr | 19063668 | 4224 | Pcs | Pallet | 2 |

**EXHIBIT 1.13**

**IUE CONSENT**

**IUE-CWA - DELPHI**
**MEMORANDUM OF AGREEMENT**
**REGARDING THE SALE OF**
**DELPHI NEW BRUNSWICK OPERATIONS AND**
**SPECIAL ATTRITION PROGRAM**

**MEMORANDUM OF AGREEMENT** entered into this **25th day of May, 2006** between **Delphi Corporation ("Delphi")** and the **International Union, IUE-CWA and IUE-CWA Local 416** (collectively the "**IUE-CWA**" or the "**Union**").

**WHEREAS,** effective August 1, 2006, Delphi seeks to sell its New Brunswick, New Jersey Operations to Johnson Controls, Inc. ("**JCI**") as an ongoing business consistent with the terms of this Memorandum of Agreement; and

**WHEREAS,** pursuant to the "Sale of Business" letter attached to the 2003 IUE-CWA-Delphi National Agreement as Document 7, JCI is required to assume the applicable terms of the 2003 IUE-CWA-Delphi National Agreement and to otherwise assume the Local Agreements with respect to New Brunswick; and

**WHEREAS,** it is the intent of the parties and the purpose of this Memorandum to establish a Special Attrition Program for all but 100 employees of the New Brunswick bargaining unit identified in accordance with seniority and plant staffing requirements and to transfer to JCI approximately 100 of the current Delphi bargaining unit members at the established New Brunswick Tier III rate and JCI benefit level.    Therefore, the parties agree as follows:

1.    The IUE-CWA agrees that:

A.    Document 63 of the 2003 IUE-CWA-Delphi National Agreement is waived as to the sale of the New Brunswick Operations to JCI pursuant to the "New Brunswick Put and Call Agreement" between Delphi and JCI dated June 30, 2005;

B.    JCI is not required to assume any contractual neutrality obligations collectively bargained by Delphi and the IUE-CWA; and

C.    The International Union, IUE-CWA and Local 416 will continue to discuss Local Agreement modifications aimed at obtaining agreement on wage, benefits and work practices comparable to JCI's existing IUE-CWA bargaining agreements at JCI's St. Joseph, Missouri and Geneva, Illinois sites.

2.    Delphi and the IUE-CWA agree on the following Special Attrition Program for all New Brunswick employees on active or on leave status with more than one year of seniority as of 8/1/06 and those employees in protected status assigned to the New Brunswick Operations who, except as to option 2.E. below, are participants in the Delphi Hourly-Rate Employees Pension Plan ("**Delphi HRP**"). Such employee may select one of the options set forth in clauses A through E below, as applicable to such employee:

A.    If eligible to retire as of 8/1/06, retire as follows:

(i)    $35,000, less applicable withholdings, for normal or early voluntary retirement (85 points 30 and out, 60 years old with 10 years or more years of credited service) retroactive to October 1, 2005; or

(ii)    50 & 10 Mutually Satisfactory Retirement (MSR).

B.      Any employee with at least 27 and less than 30 years of credited service regardless of age will be eligible for special voluntary placement in a pre-retirement program under the following terms:

(i)      Employees electing this pre-retirement program must be eligible no later than August 1, 2006.

(ii)      Employees will retire without additional incentives when they first accrue 30 years of credited service under the provisions of the Delphi HRP.

(iii)      The gross monthly wages while in the program will be:

(a)      29 years credited service      $2,900

(b)      28 years credited service      $2,850

(c)      27 years credited service      $2,800

Wages, without COLA and vacation entitlement, will be paid weekly on an hourly basis (2,080 hours per year) and will remain at that rate until 30 years of credited service is accrued.

(iv)      Within ten (10) business days after the first date on which any employees are eligible to receive wage payments in accordance with Paragraph 2.B(iii) above, Delphi will establish a segregated payment account (the "Account") in an amount sufficient to fund the wage payments (the "Ceiling Amount"). The funds in the Account will be available to reimburse Delphi for the payment of weekly wage payments (which will be paid through Delphi's normal payroll process) under Paragraph 2.B(iii) above or for direct wage payments to employees entitled to receive such payments, as described in this Paragraph.

(a)      Delphi shall not draw funds from the Account for purposes of this Paragraph until a date (the "Permitted Draw Down Date"), which shall be the later of the Final Election Date or the Adequate Funding Date (see definitions below). Prior to the Permitted Draw Down Date, payments to satisfy the obligations to employee participants pursuant to this Paragraph will be drawn from Delphi's available cash.

(b)      If, on the Permitted Draw Down Date, the Anticipated Liability is less than the Ceiling Amount, Delphi shall be permitted to draw such funds out of the Account so that the balance remaining in the Account is equal to the Anticipated Liability.

The Final Election Date shall be the first of the month following the last day on which employees at New Brunswick can make an election to participate in the pre-retirement program described in Paragraph 2.B., or sooner if determined by the IUE-CWA-Delphi National Parties.

2

The Adequate Funding Date shall be the date on which the Ceiling Amount is greater than or equal to the Anticipated Liability.

The Anticipated Liability shall be an amount, calculated after the Final Election Date, sufficient to pay all of the remaining liabilities under Paragraph 2.B(iii) for all employees who have elected to participate in such program for the full remaining duration of such program. The Anticipated Liability shall be calculated based on the number of eligible employees, the remaining duration of the wage payments, and the applicable pay rates.

(c)    The funds in the Account shall be available to satisfy the obligations of this Paragraph and for no other purpose. The Bankruptcy Court order approving this Agreement shall specifically provide that under no circumstances (including but not limited to conversion of Delphi's Chapter 11 cases to Chapter 7 proceedings) shall the assets in the Account be available to satisfy the claims of any party other than the employees.    This Agreement is, in its entirety, contingent on entry of an order, which, to the satisfaction of the IUE-CWA and Delphi National Parties provides the protections described in this Paragraph.

C.    For current employees who are participants in the Delphi HRP, a buyout of $140,000 (with ten or more years of seniority) or a buy out of $70,000 (with less than ten years of seniority), less applicable withholdings, to sever all ties with Delphi, except vested pension benefits.  Also, the employees electing this option are eligible for up to $2,100 per year pursuant to the terms of the Individual Upward Educational Plan for an additional two years beginning 8/1/06 and ending 7/31/08.

D.    For current employees who are participants in the Delphi HRP, elect to remain on the active roll for one year and receive one year of health care (at a total cost to Delphi of up to $15,000 depending on type of enrollee contract), and a weekly payment of $2,403.84 (assuming $15,000 enrollee contract), less withholdings, for one year (with ten or more years of seniority) or a weekly payment of $1,057.69, less withholdings, for one year (with less than ten years of seniority) and sever all ties with Delphi, except vested pension benefits, if any, at the conclusion of the year. Also, the employees electing this option are eligible for up to $2,100 per year pursuant to the terms of the Individual Upward Educational Plan for an additional two years beginning 8/1/06 and ending 7/31/08.

E.    For competitive rate employees, who are not participants in the Delphi HRP, percentage buyout prorated against $140,000(with ten or more years of seniority), or against $70,000 (with less than ten years of seniority but more than one year of seniority) less applicable withholdings, to sever all ties with Delphi. In each case, the buyout is calculated based upon the participant's competitive wage rate as a percentage of the maximum traditional wage rate for the participant's classification.

F.    All participants in options A through F will be required to sign a release of all claims, except Workers Compensation claims.

3.    New Brunswick employees, except those on a leave of absence, who have not selected, or who are not eligible to participate in one of the options identified above, are eligible for transfer, with seniority, to JCI effective 8/1/2006, at the

3

established New Brunswick Tier III rate and with JCI Benefit Plans coverages. The offer of employment with JCI will sever all ties to Delphi, except for current vested benefits, if any. Traditional wage rate employees accepting such transfer will receive a $50,000 buy down (intended to represent an offset to a timed wage and benefit reduction) to the Tier III wage and the existing JCI benefit levels. Such employees transferred to JCI will be required to sign a release of all claims, except Workers Compensation, as a condition for receiving the $50,000 buy down amount. Employees on a leave of absence, who do not participate in the Special Attrition Program, will be eligible for transfer to JCI upon the conclusion of their leave.

4.      It is understood by all parties that JCI will employ approximately one hundred employees at the Tier III wage and JCI benefit levels. In the instance of excess employee participation in the Special Attrition Program, the lowest seniority employees will be retained for transfer to JCI and will not be permitted to participate in this Special Attrition Program, even if previously eligible, thereby providing JCI with a workforce of 100 employees. In the instance of insufficient participation in the Special Attrition Program, the 100 highest remaining seniority employees will transfer to JCI with eligibility for the $50,000 buy down, if applicable, with the remaining lower seniority employees being separated from Delphi, thereby providing JCI with a workforce of 100 employees. The terms of the Delphi-IUE-CWA Agreements and the ESCOP 2000 Agreement in effect at the time of this Memorandum will apply to all such Tier III employees, unless specifically modified by this Memorandum, and until an Agreement is reached between the IUE -CWA and JCI. JCI is not assuming Delphi's benefit plans and will provide its own retirement benefits to employees who accept employment at New Brunswick, in accordance with the terms of the ESCOP 2000 Agreement.

5.      Delphi and the IUE-CWA agree to the following:

A.      Delphi will use temporary employees as needed to bridge any difficulties arising from the implementation of the Special Attrition Program;

B.      Delphi and the IUE-CWA may agree to use separated employees as contract personnel on a case by case basis as needed to bridge any difficulties arising from the implementation of the Special Attrition Program; and

C.      If during the remaining course of Delphi's bankruptcy, materially different Special Attrition Program financial incentives are negotiated between Delphi and the IUE -CWA for the option selected by the employee, it is understood that the employee will not be advantaged or disadvantaged.

6.      The parties acknowledge that Delphi's participation in this Agreement is subject to (i) the approval of the U.S. Bankruptcy Court, which approval Delphi will seek at the next scheduled omnibus hearing; and (ii) the Closing of the sale of the New Brunswick Operations to JCI. In the event the Bankruptcy Court does not allow such participation, or the Closing does not occur, Delphi and the IUE-CWA will have no obligations hereunder.

7.      A.      The parties further agree that this Agreement is without prejudice to any party-in-interest in all other aspects of Delphi's Chapter 11 cases, including by illustration, all collective bargaining matters involving the parties, in any proceedings under Sections 1113 and/or 1114 of the Bankruptcy Code with respect to the IUE-CWA, in any pension termination proceeding under ERISA and/or the Bankruptcy Code, and all claims administration and allowance matters.

4

B.      Nothing in this Agreement, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder   shall limit or otherwise modify: (i) Delphi's rights under Section 4041 of ERISA; or (ii) Delphi's rights under Section 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed this Agreement (including pre-existing obligations referenced within this Agreement), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in this Agreement) with levels of healthcare or other benefits as specified in pre-existing labor agreements.

C.      Nothing contained herein, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder shall constitute an assumption of any agreement described herein, including, without limitation any collective bargaining agreement between the IUE-CWA and Delphi, nor shall anything herein, the Bankruptcy Court's approval of this Agreement, or the performance of any obligations hereunder, be deemed to create or give rise to an administrative or priority claim or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.

_____
Delphi Corporation

_____
Delphi Corporation

Date: _5/26/06_

_____
International Union, IUE-CWA

_____
International Union, IUE-CWA

Date: _5-26-06_

5

## **EXHIBIT 1.21**

## **REAL PROPERTY**

U.S:            760 Jersey Avenue
               New Brunswick, New Jersey  08903
                              United States

## **EXHIBIT 1.22**

## **SALE APPROVAL ORDER**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
      In re                           :        Chapter 11
                                          :
DELPHI CORPORATION, et al.,                :        Case No. 05-44481 (RDD)
                                          :
                  Debtors.         :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 2002 AND 6004 AUTHORIZING AND
APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH JOHNSON CONTROLS,
INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES (B) CONTINUATION AND TRANSITION OF SUPPLY TO
JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD FACILITY AND
(C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW BRUNSWICK
FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM

("NEW BRUNSWICK TRANSFER ORDER")

          Upon the motion, dated May 26, 2006 (the "Motion"), of Delphi Corporation and

certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned

cases (collectively, the "Debtors"), for an order (the "Order") pursuant to 11 U.S.C. § 363(b) and

Fed. R. Bankr. P. 2002 and 6004 authorizing and approving the Debtors' entry into the Transfer

Agreement dated May 26, 2006 by and between Delphi Automotive Systems LLC, a Debtor in

these cases, and Johnson Controls, Inc. ("JCI"), a copy of which is attached hereto as <u>Exhibit 1</u>

(together, with the exhibits and schedules attached thereto, the "Transfer Agreement"), providing

for (a) sale of certain assets (the "Acquired Assets") of the Debtors' battery manufacturing

facility in New Brunswick, New Jersey (the "New Brunswick Facility") free and clear of liens,

claims, and encumbrances (the "Sale"), (b) the continuation and transition of supply to JCI of

battery products out of the Debtors' manufacturing facility in Fitzgerald, Georgia (the "Fitzgerald

Facility"), and (c) implementation of an attrition plan with respect to the New Brunswick facility;

and upon the record of the hearing held on the Motion; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[1]

A.    The court has jurisdiction over the Motion and the transactions contemplated by the Transfer Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Motion are sections 363 of 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and Fed. R. Bankr. P. 2002 and 6004.

C.    As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel at the hearing on the Motion (the "Hearing"), (i) proper, timely, adequate and sufficient notice of the Motion, the Hearing and the sale of the Acquired Assets (as defined in the Transfer Agreement) has been provided in accordance with 11 U.S.C. §§ 102(l) and 363 and Fed. R. Bankr. P. 2002 and 6004, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Hearing, or the Sale is or shall be required.

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

D.    Each applicable Debtor (i) has full corporate power and authority to execute the Transfer Agreement and all other documents contemplated thereby, and the transfer and conveyance of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Transfer Agreement, and (iii) has taken all corporate action necessary to authorize and approve the Transfer Agreement and the consummation by such Debtor of the transactions contemplated thereby, and no consents or approvals, other than those expressly provided for in the Transfer Agreement, are required for each applicable Debtor to consummate such transactions.

E.    Approval of the Transfer Agreement and consummation of the Sale at this time are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

F.    The Debtors have demonstrated good, sufficient, and sound business purpose and justification in that, among other things, the Debtors and their advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Acquired Assets and determined that the terms and conditions set forth in the Transfer Agreement, and the transfer to JCI of the Acquired Assets pursuant thereto, represent a fair and reasonable purchase price and constitute the highest and best value obtainable for the Acquired Assets. A sale of the Acquired Assets at this time to JCI pursuant to 11 U.S.C. § 363(b) is the most favorable alternative to minimize the Debtors' losses attributable to the Acquired Assets, and maximizes the Debtors' estates for the benefits of all constituencies. Delaying approval of the Sale might result in JCI's termination of the Transfer Agreement and may result in an

3

alternative outcome that will achieve less value and cause greater losses for the Debtors, their
estates, and their creditors.

G.    The Debtors have demonstrated good, sufficient, and sound business
purpose and justification regarding the continuation and ultimate transition to JCI of the supply
of battery products out of the Fitzgerald Facility pursuant to the Transfer Agreement.

H.    The Debtors have demonstrated good, sufficient, and sound business
purpose and justification in that, among other things, the Debtors and their advisors diligently
and in good faith analyzed the terms and conditions of the IUE-CWA Memorandum (as defined
below) and determined that the terms and conditions thereof and in particular the terms and
conditions of the IUE-CWA New Brunswick Attrition Plan (as defined below) set forth in the
IUE-CWA Memorandum is an appropriate plan under the circumstances and is in the best
interests of the Debtors, their estates, and their creditors.

I.    A reasonable opportunity to object or be heard with respect to the Motion
and the relief requested therein has been afforded to all interested persons and entities, including:
(i) the Office of the United States Trustee for the Southern District of New York, (ii) all entities
known to have asserted any lien, claim, interest, or encumbrance in or upon the Acquired Assets,
including but not limited to environmental, employee, and product liability claims, (iii) all
federal, state, and local regulatory or taxing authorities or recording offices, including but not
limited environmental regulatory authorities, which have a reasonably known interest in the
relief requested by the Motion, (iv) all entities known to have an interest in a transaction with
respect to the Acquired Assets during the past six months, (v) the United States Attorney's office,
(vi) the United States Department of Justice, (vii) the Securities and Exchange Commission, (viii)
the Internal Revenue Service, (ix) all entities on the Master Service List (as defined by the

4

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management

Order")) and such other entities that are required to be served with notices under the

Supplemental Case Management Order, (x) counsel for JCI, (xi) counsel for the Official

Committee of Unsecured Creditors appointed in these chapter 11 cases, and (xii) counsel for the

Official Committee of Equity Security Holders appointed in these chapter 11 cases.

J.    JCI is not an "insider" of any of the Debtors, as that term is defined in 11

U.S.C. § 101(31).

K.    The Transfer Agreement was negotiated, proposed, and entered into by the

Debtors and JCI without collusion, in good faith, and from arm's-length bargaining positions.

Neither the Debtors nor JCI have engaged in any conduct that would cause or permit the Transfer

Agreement to be avoided under 11 U.S.C. § 363(n).

L.    JCI is a good faith purchaser under 11 U.S.C. § 363(m) and, as such, is

entitled to all of the protections afforded thereby.

M.    The consideration provided by JCI for the Acquired Assets pursuant to the

Transfer Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired

Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by

any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair

consideration under the Bankruptcy Code and under the laws of the United States, any state,

territory, possession, or the District of Columbia.

5

N.    The transfer of the Acquired Assets to JCI will be a legal, valid, and

effective transfer of the Acquired Assets, and, except as expressly permitted or otherwise

specifically provided for in the Transfer Agreement or this Order, will vest JCI with all right,

title, and interest of the Debtors to the Acquired Assets free and clear of all liens, claims, and

encumbrances, including, but not limited to those (A) that purport to give to any party a right or

option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors'

or JCI's interest in the Acquired Assets, or any similar rights, (B) relating to taxes arising under

or out of, in connection with, or in any way relating to the operation of the Debtors' battery

business prior to the transfer of the Acquired Assets to JCI, and (C) mortgages, restrictions,

hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options,

deeds of trust, security interests, conditional sale or other title retention agreements, pledges,

liens (including, without limitation, mechanics', materialmens', and other consensual and non-

consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal,

offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution,

indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any Court

or foreign or domestic governmental entity, or charges of any kind or nature, if any, including,

but not limited to, any restriction on the use, transfer, receipt of income, or other exercise of any

attributes of ownership, debts arising in any way in connection with any agreements, acts, or

failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, claims (as

that term is defined in the Bankruptcy Code), reclamation claims, obligations, liabilities,

demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and

matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled,

scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or

6

unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (the items and concepts listed in (A), (B), and (C) above, collectively, the "Interests or Claims").

O.    If the Sale of the Acquired Assets were not free and clear of all Interests or Claims as set forth in the Transfer Agreement and this Order, or if JCI would, or in the future could, be liable for any of the Interests or Claims as set forth in the Transfer Agreement and this Order, JCI would not have entered into the Transfer Agreement and would not consummate the Sale or the transactions contemplated by the Transfer Agreement, thus adversely affecting the Debtors, their estates, and their creditors.

P.    The Debtors may sell their interests in the Acquired Assets free and clear of all Interests or Claims because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. All holders of Interests or Claims who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale, pursuant to 11 U.S.C. § 363(f)(2). Those holders of Interests or Claims who did object fall within one or more of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their Interests or Claims, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim an Interest or Claim.

Q.    The Debtors are authorized to sell, transfer, convey or assign to JCI, all of the Debtors' right, title, and interest (including common law rights) to all of their intangible

7

property included in the Acquired Assets to the broadest extent permitted by law and the terms of
the Transfer Agreement.

      R.     Approval of the Transfer Agreement and consummation of the Sale of the
Acquired Assets at this time are in the best interests of the Debtors, their creditors, their estates
and other parties in interest.

      S.     The liabilities being assumed by JCI under the Transfer Agreement,
including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters)
and Exhibit 4.1 (Employee Matters) to the Transfer Agreement, are an integral part of the
Acquired Assets being purchased by JCI and, accordingly, such assumption is reasonable,
enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

      NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND
DECREED THAT:

### General Provisions

      1.     The Motion is GRANTED.

### Approval Of The Transfer Agreement

      2.     Pursuant to 11 U.S.C. § 363(b), the Transfer Agreement, and all of the
terms and conditions thereof, are hereby approved.

      3.     Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized to perform
their obligations under the Transfer Agreement and comply with the terms thereof and
consummate the Sale in accordance with and subject to the terms and conditions of the Transfer
Agreement.

8

4.      Each of the signatories to the Transfer Agreement is directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the Sale.

5.      The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the Transfer Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Transfer Agreement, and to take all further actions as may be requested by JCI for the purpose of assigning, transferring, granting, conveying, and conferring to JCI or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Transfer Agreement.

6.      This Order and the Transfer Agreement shall be binding in all respects upon all creditors (whether known or unknown) of any Debtor, JCI, all successors and assigns of JCI, the Debtors and their affiliates and subsidiaries, and any subsequent trustees appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection.  To the extent any provision of this Order is inconsistent with the terms of the Transfer Agreement, this Order shall govern.

7.      The Transfer Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such modification, amendment, or supplement is not material.

### Sale And Transfer Of The Acquired Assets

8.      Except as expressly permitted or otherwise specifically provided for in the Transfer Agreement or this Order, pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the

9

consummation of the Transfer Agreement, the Acquired Assets shall be transferred to JCI free

and clear of all Interests or Claims, with all such Interests or Claims to attach to the cash

proceeds of the Sale in the order of their priority, with the same validity, force and effect which

they now have as against the Acquired Assets, subject to any claims and defenses the Debtors

may possess with respect thereto. Following the date of the completion of the transfer of the

New Brunswick Facility to JCI under the Transfer Agreement (the "Completion Date"), no

holder of any Interests or Claims in the Acquired Assets shall interfere with JCI's use and

enjoyment of the Acquired Assets based on or related to such Interests or Claims, or any actions

that the Debtors may take in their chapter 11 cases and no person shall take any action to prevent,

interfere with or otherwise enjoin consummation of the transactions contemplated in or by the

Transfer Agreement or this Order.

9.      Except as expressly provided in the Transfer Agreement or this Order,

other than the liabilities assumed under the Transfer Agreement, including but not limited to

those liabilities set forth on Exhibit 3.6H (Environmental Matters) and Exhibit 4.1 (Employee

Matters) to the Transfer Agreement, the sale, transfer, assignment, and delivery of the Acquired

Assets pursuant to the Transfer Agreement shall not be subject to any Interests or Claims, and

Interests or Claims of any kind or nature whatsoever shall attach only to the net proceeds of the

Sale in their order of priority. All persons and entities, including, but not limited to, all debt

security holders, equity security holders, governmental, tax, and regulatory authorities, lenders,

trade and other creditors, holding Interests or Claims arising in any way in connection with any

acts, or failure to act, of the Debtors or the Debtors' predecessors or affiliates, claims (as that

term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, or guaranties of

any kind and nature against or in the Debtors or the Acquired Assets (whether legal or equitable,

secured or unsecured, matured or unmatured, contingent or noncontingent, senior or

subordinated), arising under or out of, in connection with, or in any way relating to the Debtors,

the Acquired Assets, the operation of the Debtors' battery business prior to the Completion Date,

or the transfer of the Acquired Assets to JCI, hereby are, and will be, forever barred, estopped,

and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests or

Claims of any kind or nature whatsoever against JCI, its successors or assigns, their property, or

any designee, such persons' or entities' Interests or Claims. Following the Completion Date, no

holder of an Interest or Claim (other than holders of liabilities assumed under the Transfer

Agreement, including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental

Matters) and Exhibit 4.1 (Employee Matters) to the Transfer Agreement, on account of such

liabilities only) against the Debtors shall interfere with JCI's title to or use and enjoyment of the

Acquired Assets based on or related to such Interests or Claims and all such Interests or Claims,

if any, shall be and hereby are channeled, transferred and attached solely and exclusively to the

proceeds of the Sale in their order of priority.

      10.    Except as expressly provided in the Transfer Agreement or this Order, the

transfer of the Acquired Assets to JCI pursuant to the Transfer Agreement does not require any

consents other than as specifically provided for in the Transfer Agreement and constitutes a legal,

valid, and effective transfer of the Acquired Assets, and shall vest JCI with all right, title, and

interest of the Debtors in and to the Acquired Assets free and clear of all Interests or Claims of

any kind or nature whatsoever (except for the liabilities assumed under the Transfer Agreement,

including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters)

and Exhibit 4.1 (Employee Matters) to the Transfer Agreement).

11.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Interests or Claims against or in the Acquired Assets shall not have delivered the foregoing to the Debtors prior to the Completion Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Interests or Claims that the person or entity has with respect to the Acquired Assets, or otherwise, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) JCI is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests or Claims in the Acquired Assets of any kind or nature whatsoever.

12.    This Order (a) shall be effective as a determination that, on the Completion Date, all Interests or Claims of any kind or nature whatsoever existing as to the Debtors or the Acquired Assets prior to the Completion Date have been unconditionally released, discharged, and terminated (other than any surviving obligations), and that the conveyances described herein have been effected and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

12

13.    Except as otherwise expressly provided in the Transfer Agreement, no person or entity, including, without limitation, any federal, state or local governmental agency, department or instrumentality, shall assert by suit or otherwise against JCI or its successors in interest any claim that they had, have or may have against the Debtors, or any liability, debt, or obligation relating to or arising from the Acquired Assets, or the Debtors' operation of the Business or use of the Acquired Assets, including, without limitation, any liabilities calculable by reference to the Debtors or their assets or operations, and all persons and entities are hereby enjoined from asserting against JCI in any way any such claims, liabilities, debts or obligations.

14.    Except as expressly provided in the Transfer Agreement or this Order, JCI is not assuming nor shall it in any way whatsoever be liable or responsible, as a successor or otherwise, for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) of the Debtors or any liabilities, debts, commitments, or obligations in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operation of their business or use of the Acquired Assets on or prior to the Completion Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Completion Date or are to be observed, paid, discharged, or performed on or prior to the Completion Date (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims), or any liabilities calculable by reference to the Debtor or their assets or operations, or relating to continuing conditions existing on or prior to the Completion Date, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to JCI a release thereof. Without

13

limiting the generality of the foregoing, except as expressly provided in the Transfer Agreement

or this Order, JCI shall not be liable or responsible, as a successor or otherwise, for the Debtors'

liabilities, debts, commitments, or obligations, whether calculable by reference to the Debtors,

arising on or prior to the Completion Date and under or in connection with (i) any employment

or labor agreements (including, without limitation, the payment of wages, bonuses, severance

pay, benefits (including, without limitation, contributions or payments on account of any under-

funding with respect to any and all pension plans) or any other payment to employees of Debtors

while such individuals were employed by the Debtors), consulting agreements, severance

arrangements, change-in-control agreements, or other similar agreement to which any Debtor is a

party, (ii) any pension, welfare, compensation, or other employee benefit plans, agreements,

practices, and programs, including, without limitation, any pension plan of the Debtors

(including, without limitation, retention, benefit and/or incentive plan to which any Debtors are a

party and relating to the battery business (including, without limitation, arising from or related to

the rejection or other termination of any such agreement)), (iii) the cessation of the Debtors'

operations, dismissal of employees, or termination of employment or labor agreements or

pension, welfare, compensation, or other employee benefit plans, agreements, practices, and

programs, obligations that might otherwise arise from or pursuant to the Employee Retirement

Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil

Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal

Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget

Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act,

(iv) workers' compensation, occupational disease, or unemployment or temporary disability

insurance claims, (v) environmental liabilities, debts, claims, or obligations arising from

14

conditions first existing on or prior to Completion Date (including, without limitation, the

presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be

asserted on any basis, including, without limitation, under the Comprehensive Environmental

Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vi) any bulk sales or

similar law, (vii) any liabilities, debts, commitments, or obligations of, or required to be paid by,

the Debtors for any Taxes of any kind for any period, (viii) any liabilities, debts, commitments,

or obligations for any Taxes relating to the business of the Debtors or the Acquired Assets for or

applicable to the period prior to the Completion Date, (ix) any litigation relating to the Acquired

Assets for or applicable to the period prior to the Completion Date, and (x) any products liability

or similar claims, whether pursuant to any state or any federal laws or otherwise, relating to the

Acquired Assets for or applicable to the period prior to the Completion Date. JCI shall in no

way be deemed a party to or assignee of any such agreement set forth in (i), (ii), and (iii) above,

and no employee of JCI shall be deemed in any way covered by or a party to any such agreement,

and all parties to any such agreement are hereby enjoined from asserting against JCI any and all

claims arising from or relating to such agreement. Any and all notices, if any, required to be

given to the Debtors' employees pursuant to the Workers Adjustment and Retraining Notification

Act, or any similar federal or state law, shall be the sole responsibility and obligation of the

Debtors and JCI shall have no responsibility or liability therefore.

      15.    Upon the completion of the transactions contemplated by the Transfer

Agreement, JCI shall not be deemed to (i) be the successor of the Debtors, (ii) have, de facto, or

otherwise, merged with or into the Debtors, (iii) be a mere continuation or substantial

continuation of the Debtors or the enterprise(s) of the Debtors, or (iv) be liable for any acts or

omissions of the Debtors in the conduct of the Debtors' business.

15

<u>Continuation And Transition Of Supply Out Of Fitzgerald</u>

16.    The Debtors are hereby authorized to (a) continue manufacturing and supplying JCI with battery products manufactured at the Fitzgerald Facility in accordance with JCI's diminishing supply requirements and (b) to transition production of battery products manufactured at the Fitzgerald Facility to other JCI facilities.

17.    The Debtors and JCI are each directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the supply and transition of battery products from the Fitzgerald Facility.

<u>IUE-CWA Consent And IUE-CWA New Brunswick Attrition Plan</u>

18.    The Debtors are hereby authorized to enter into the agreement by and among Delphi Corporation, the International Union, IUE-CWA and IUE-CWA Local 416 (collectively the "IUE-CWA") attached to the Transfer Agreement as Exhibit 1.13 thereto (the "IUE-CWA Memorandum") and to implement the terms of such IUE-CWA Memorandum, including without limitation (i) that certain attrition plan between Delphi and the IUE-CWA (the "IUE-CWA New Brunswick Attrition Plan") with respect to the New Brunswick Facility and (ii) that certain consent to the waiver of that certain no-sale clause and neutrality obligations (the "IUE-CWA Consent").

19.    Each of the signatories to the IUE-CWA Memorandum is directed to take all actions necessary or appropriate to effectuate the terms of this Order with respect to the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan and the terms of the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan, including, without limitation, any

16

and all actions necessary or appropriate to its implementation of and performance under the IUE-
CWA Consent and the IUE-CWA New Brunswick Attrition Plan.

### Additional Provisions

20.    The consideration provided by JCI for the Acquired Assets under the
Transfer Agreement is hereby deemed to constitute reasonably equivalent value and fair
consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform
Fraudulent Transfer Act, and under the laws of the United States, and any state, territory,
possession, or the District of Columbia.

21.    On the Completion Date, this Order shall be construed and shall constitute
for any and all purposes a full and complete general assignment, conveyance, and transfer of all
of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired
Assets to JCI on pursuant to the terms of the Transfer Agreement.

22.    Except as otherwise provided in the Transfer Agreement, on the
Completion Date, each of the Debtors' creditors is authorized and directed to execute such
documents and take all other actions as may be necessary to release their respective Interests or
Claims against the Acquired Assets, if any, as may have been recorded or may otherwise exist.

23.    Each and every federal, state, and governmental agency or department,
and any other person or entity, is hereby directed to accept any and all documents and
instruments necessary and appropriate to consummate the transactions contemplated by the
Transfer Agreement.

24.    All entities who are currently, or as of the Completion Date may be, in
possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

17

the Transfer Agreement are hereby directed to surrender possession of the Acquired Assets to
JCI on the Completion Date.

25.    The transactions contemplated by the Transfer Agreement are undertaken
by JCI in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and
accordingly, the reversal or modification on appeal of the authorization provided herein to
consummate the sale of the Acquired Assets shall not affect the validity of the Sale to JCI, unless
such authorization is duly stayed pending such appeal. JCI is a purchaser in good faith of the
Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the
Bankruptcy Code.

26.    The consideration paid by JCI in the Sale for the Acquired Assets under
the Transfer Agreement is fair and reasonable, and may not be avoided or otherwise challenged
under 11 U.S.C. § 363(n).

27.    The Debtors, including but not limited to their respective officers,
employees, and agents, are hereby authorized to execute such documents and do such acts as are
necessary or desirable to carry out the transactions contemplated by the terms and conditions of
the Transfer Agreement and this Order. The Debtors shall be, and they hereby are, authorized to
take all such actions as may be necessary to effectuate the terms of this Order.

28.    The terms and provisions of the Transfer Agreement and this Order shall
be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and
their creditors, JCI, and its respective affiliates, successors, and assigns, and any affected third
parties, including, but not limited to, all persons asserting an Interest or Claim in the Acquired
Assets to be sold to JCI pursuant to the Transfer Agreement, notwithstanding any subsequent
appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of

18

the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and

provisions likewise shall be binding.

29.    Notwithstanding anything contained herein to the contrary, the term

"Acquired Assets" as defined herein does not include property that is not property of the Debtors'

estates, such as funds that are trust funds under any applicable state lien laws.

30.    To the extent permitted by section 525 of the Bankruptcy Code, no

governmental unit may revoke or suspend any permit or license relating to the operation of the

Acquired Assets sold, transferred, or conveyed to JCI on account of the filing or pendency of

these chapter 11 cases or the consummation of the Sale.

31.    The failure specifically to include or to reference any particular provision

of the Transfer Agreement in this Order shall not diminish or impair the effectiveness of such

provision, it being the intent of the Court that the Transfer Agreement be authorized and

approved in their entirety.

32.    The Transfer Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented by the parties thereto in accordance

with the terms thereof without further order of the Court; provided that any such modification,

amendment, or supplement does not have a material adverse effect on the Debtors' estates.

33.    The provisions of this Order are nonseverable and mutually dependent.

34.    Nothing in this Order shall alter or amend the Transfer Agreement and the

obligations of the Debtors and JCI thereunder.

35.    This Court retains jurisdiction to enforce and implement the terms and

provisions of the Transfer Agreement, all amendments thereto, any waivers and consents

19

thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to JCI, (b) compel delivery of the purchase price, reimbursement of costs under the IUE-CWA New Brunswick Attrition Plan, or performance of other obligations owed to the Debtors pursuant to the Transfer Agreement, (c) resolve any disputes arising under or related to the Transfer Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect JCI against any Interests or Claims against the Debtors or the Acquired Assets, of any kind or nature whatsoever, attaching to the proceeds of the Sale.

36.    Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure or any other Bankruptcy Rule, this Order shall take effect immediately upon its entry.

37.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
        June ___, 2006

_____
UNITED STATES BANKRUPTCY JUDGE

20

## EXHIBIT 1.23

## SELLER'S KNOWLEDGE

**GENERAL:**

Ron Pogue

**EMPLOYEES:**

Charu Manocha

**EXHIBIT 2.2A**

**BILL OF SALE**

      **BY THIS BILL OF SALE** made on _____, 200_ by _____, a Delaware _____ ("**Seller**"), for good and valuable consideration paid by _____, a _____ corporation ("**Buyer**"), receipt and sufficiency of which consideration are acknowledged by Seller, pursuant to the terms and provisions of that certain Transfer Agreement dated _____, **2006** between Buyer and Seller (the "**Agreement**"), Seller does bargain, grant, sell, convey, assign, transfer and deliver to Buyer and its successors and assigns, all right, title and interest of Seller in and to the Personal Property and Inventory (as those terms are defined in the Agreement) listed on Attachment A hereto.

Notwithstanding the foregoing, the provisions of this Bill of Sale are subject, in all respects, to the terms and conditions of the Agreement and all the representations and warranties, covenants and agreements contained therein, all of which shall survive the execution and delivery of this Bill of Sale as provided in the Agreement.

_____

By:_____
    Name:
    Title:

43

## ATTACHMENT A TO BILL OF SALE

**Exhibit 3.6.H**

**ENVIRONMENTAL MATTERS**

1.    **DEFINITIONS:**

    **1.1**    **"Business"** has the same meaning as given in the Transfer Agreement.

    **1.2**    "**Buyer**" has the same meaning as given in the Transfer Agreement.

    **1.3**    **"Completion Date"** has the same meaning as given in the Transfer Agreement.

    **1.4**    **"Competent Authority"** means a person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

    **1.5**    **"Compliance Matter"** means an event, condition, activity, practice, action or omission at the Real Property which gives rise to a breach or violation of an Environmental Law, but which excludes Environmental Contamination.

    **1.6**    **"Environment"** means any and all organisms (including humans), biota, ecosystems, land, natural resources, property, air, soil gas, water, groundwater, human beings, and buildings, fixtures and installations.

    **1.7**    **"Environmental Claim"** means a notice, claim, demand, action, suit, complaint or proceeding by a Competent Authority or a Third Party alleging liability or potential liability arising out of an Environmental Law.

    **1.8**    "**Environmental Contamination**" means the presence of a Hazardous Material at, in, under, on or about the Environment at the Real Property.

    **1.9**    "**Environmental Damages**" means losses, liabilities, costs, damages fines, penalties and expenses (including reasonable expenses of investigation and attorneys' fees) arising out of an Environmental Law, but in all cases excluding losses, liabilities, costs, damages and expenses deemed consequential or loss of profit, and also excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

    **1.10**    "**Environmental Law**" means, solely for those in force and effect as at the Closing date in the relevant jurisdiction, all applicable civil, criminal, administrative and any other federal, state, county and local (including common law) laws, rules, ordinances, orders, codes, guidance, directives, Environmental Permits (or lack thereof), approvals, decisions, decrees, remediation standards and regulations relating to or having the purpose or effect of the prevention of pollution or harm to the Environment or human health.

1.11    "**Environmental Permits**" means all licenses, consents, permits, registrations, approvals or authorizations made or issued by a Competent Authority under an Environmental Law in connection with the Business or the Real Property.

1.12    "**Hazardous Material**" means all matter (whether alone or in combination with other matter, and whether solid, liquid, gas or other state) which is a pollutant, contaminant, chemical, material, substance, constituent, or waste including without limitation petroleum, petroleum-based or petroleum-derived products, polychlorinated biphenyls, asbestos and asbestos-containing materials, and noxious, radioactive, flammable, corrosive, caustic materials, all of which are governed or regulated under an Environmental Law.

1.13    "**New Brunswick Real Property**" means the Real Property as defined in the Transfer Agreement.

1.14    "**Post-Closing Compliance Matter**" means a Compliance Matter first occurring after the Completion Date.

1.15    "**Post-Closing Environmental Contamination**" means Environmental Contamination first occurring after the Completion Date.

1.16    "**Post-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the New Brunswick Real Property and disposed at a disposal site not at the New Brunswick Real Property, after the Completion Date, under an applicable Environmental Law.

1.17    "**Pre-Closing Compliance Matter**" means a Compliance Matter first occurring at prior to the Completion Date.

1.18    "**Pre-Closing Environmental Contamination**" means Environmental Contamination first occurring prior to the Completion Date.

1.19    "**Pre-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the New Brunswick Real Property and disposed at a disposal site not at the New Brunswick Real Property, prior to the Completion Date, under an applicable Environmental Law.

1.20    "**Remedial Works**" means the works, designs, investigations and activities carried out by a Party in relation to Environmental Contamination, but excluding expenses of investigating information for the purposes of making a claim for indemnification under this Exhibit.

1.21    "**Remedy**" has the meaning given to it in Section 4 of this Exhibit.

1.22    "**Seller**" has the same meaning as given in the Transfer Agreement.

1.23    "**Third Party**" means any person not a Party or a Competent Authority.

2.    **INDEMNIFICATIONS OF SELLER AND PURCHASER:**

46

2.1     Subject to the provisions of this Exhibit, and solely with respect to the New Brunswick Real Property, the Seller shall indemnify the Buyer for Environmental Damages arising from Pre-Closing Environmental Contamination, Pre-Closing Compliance Matters or Pre-Closing Off-Site Liability.

2.2     Subject to the provisions of this Exhibit, and solely with respect to the New Brunswick Real Property, the Buyer shall indemnify the Seller for Environmental Damages arising from Post-Closing Environmental Contamination, Post-Closing Off-Site Liability or Post-Closing Compliance Matters.

2.3     Subject to the provisions of this Agreement, for those Environmental Damages arising from circumstances that may be considered both (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination, (ii) Pre-Closing Compliance Matters and Post-Closing Compliance Matters, or (iii) Pre-Closing Off-Site Liability and Post-Closing Off-Site Liability, such Environmental Damages shall be allocated between the Parties in proportion to the extent that such Environmental Damages arose pre- or post-Completion Date, and each Party shall indemnify the other for its share as determined by such allocation.

3.      **LIMITATIONS ON LIABILITY.**    Neither Party shall be liable under this Agreement for Environmental Damages:

3.1     In the case of Environmental Claims arising from Pre-Closing Compliance Matters or Post-Closing Compliance Matters (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before eighteen (18) months following the Completion Date;

3.2     In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination, except for Remedial Works pursuant to clause 4.1 of this Exhibit, or Post-Closing Environmental Contamination (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before seven (7) years following the Completion Date. Remedial Works under clause 4.1 of this Exhibit shall be governed by the applicable statute of limitations under ISRA (as defined in clause 4.1 of this Exhibit).

3.3     Except for Remedial Works under clause 4.1 of this Exhibit (for which Seller is solely responsible), subject to clauses 3.1 and 3.2 of this Exhibit, no Party will be liable to the other under this Exhibit unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in this clause 3.3 and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is liable solely for the amounts exceeding $500,000. For all purposes under this Article 3 and Section 7.1 of the Agreement, the Deductible Amount with respect to environmental claims shall be (i) the $500,000 amount referred to in this clause 3.3, less (ii) any amounts that may have been incurred by the relevant claiming party under environmental matters agreements entered into in connection with the sale of any of Seller's global battery operations to Buyer in 2005. The Cap Amount is as set forth Section 7.1.

3.4     In the case of Environmental Damages arising from Pre-Closing Environmental Contamination, unless the claiming Party discovers the facts and circumstances giving rise to such claim solely in connection with an investigation

47

required by an applicable Environmental Law, an order by a Competent Authority, a final judgment of a claim by a Third Party, or settlement of a claim by a Third Party to which the non-claiming Party has agreed (such agreement not to be unreasonably withheld).

3.5    Where Buyer uses the New Brunswick Real Property for a use other than an industrial use, or seeks to or changes the zoning or land use classification of the New Brunswick Real Property to a classification more sensitive than the industrial classification;

3.6    Where, subject to clause 3.7 below, and insofar as the Parties agree to treat this Agreement and all information gathered, known or obtained as a result of the sale and purchase of the Business or performing any obligation or exercising any right under this Exhibit as confidential, for any Environmental Damages claims to the extent that such claim would not have arisen or was increased or made more costly as a result of the claiming Party or any of its respective employees, agents or contractors volunteering or disclosing information to any Competent Authority or Third Party without the prior written consent of the non-claiming Party;

3.7    The following shall not be deemed to be or to have been volunteering or disclosing of information for the purpose of this clause 3.7:

(i)    Where the disclosure is required by any law (including any Environmental Law),

(ii)    Where the disclosure is specifically and formally required by any securities exchange or regulatory or other Competent Authority to which either Party is subject or submits wherever situated,

(iii)    Where the information is clearly in the public domain through no fault of the claiming Party, or

(iv)    Where the non-claiming Party has given prior written approval to the disclosure;

3.8    To the extent the claiming Party did not take reasonable steps to avoid or mitigate any Environmental Damages, acting in a reasonable and cost-effective manner; in the case of an emergency, where a Party takes any action to avoid or mitigate any Environmental Damages, (a) it shall for the avoidance of doubt not be in breach of this Agreement and shall not be precluded from recovering its Environmental Damages provided that the claiming Party notifies the other Party of such circumstances as soon as reasonably practicable and provided that such actions or steps are the minimum necessary to avert the emergency; and (b) the reasonable costs and expenses of all steps taken pursuant to the duty to mitigate contained in this clause 3.8 shall be deemed to be Environmental Damages.

3.9    Notwithstanding anything to the contrary in Section 7.1 of this Agreement, the Deductible Amount with respect to environmental claims shall be $500,000 less any amounts that may have been incurred by the relevant claiming party under environmental matters agreements entered into in connection with the sale of any of Seller's global battery operations to Buyer in 2005. The Cap Amount is as set forth Section 7.1. Subject to clauses 3.1 and 3.2 of this Agreement, set forth in Subject to

clauses 4.1, 4.2 and 4.3 of this Agreement, unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in clause 4.4 of this Agreement and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is, liable solely for the amounts exceeding $500,000; provided, however, that with respect to Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination referred to in Paragraph 2.2 for which Seller has warranted that it will effect the Remedy with respect to such Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination, Seller shall pay all amounts necessary to effect the Remedy of such issues, which amounts shall not be included in determining when the aggregate amount of claims exceed $500,000.

4.    **REMEDIATION OF ENVIRONMENTAL DAMAGE:**

    **4.1**    Seller shall file such papers, and conduct such investigation and remediation as required by the New Jersey Department of Environmental Protection ("**NJDEP**") to satisfy the requirements of the State of New Jersey's Industrial Site Recovery Act, N.J.S.A. 13.1K-6 *et seq.*, and regulations promulgated thereto, N.J.A.C. Title 7, Chapter 26B (collectively "**ISRA**"), as ISRA is in effect as of the date of the Put Completion Date, as follows:    As soon as the Parties mutually agree that it is substantially certain that the third party consent needed prior to any exercise of the Put Option or Call Option will be obtained, Seller shall, pursuant to the requirements of ISRA, promptly prepare and submit to NJDEP a General Information Notice. Thereafter, with reasonable diligence, Seller shall, pursuant to ISRA, continue to undertake the activities and to submit the required documentation to NJDEP necessary to complete its responsibilities under ISRA, according to any schedule approved by NJDEP and consistent with NJDEP requirements. In all cases, Seller shall have the right at its sole discretion to seek reasonable extensions of the schedules approved by NJDEP where site conditions warrant. Where the State of New Jersey requires any consent agreement into which Seller, the State of New Jersey and Buyer must enter pursuant to ISRA, Buyer shall sign such consent agreement.    Any such consent agreement shall be consistent with a remedial action for industrial property.

    **4.2**    Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of a Compliance Matter ("**Remedy**") to no less but no more than the minimum standards or levels of Environmental Laws; such Remedial Works may be determined using risk assessment and related risk evaluation methods.

    **4.3**    The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, have conduct of such Remedy.

    **4.4**    The conduct of a Remedy shall be as follows:

A.    The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party may elect to

adopt where such comments do not increase any cost or liability of the Remedy;

B.      The non-claiming Party shall, at its sole discretion, either:

(i)      Determine to and obtain approval of the Remedy by the appropriate Competent Authority prior to implementation of the Remedy; when requested, the claiming Party shall cooperate with the non-claiming Party in any communications with the appropriate Competent Authority; after the non-claiming Party has obtained such approval, such Party shall provide notice of such approval to the claiming Party; or

(ii)      Determine to implement the Remedy without first seeking approval from the appropriate Competent Authority; the non-claiming Party shall provide notice to the claiming Party of such determination at the time the non-claiming Party provides the claiming Party with the work plan or scope of work set forth in clause 4.4A of this Exhibit;

C.      Where the Seller is the non-claiming Party, Seller will take all reasonable steps to avoid interfering with Buyer's operation of the Business or use of the Real Property, and Buyer will reasonably cooperate with Seller including providing access to the New Brunswick Real Property and the use of utilities in the conduct of the Remedy;

D.      Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy; and

E.      The conduct of the Remedy shall be deemed complete when, as the case may be:

(i)      The non-claiming Party has received approval regarding the Remedy by an applicable Competent Authority; or

(ii)      Subject to clause 4.2 of this Exhibit, the Remedy meets applicable standards which an applicable Environmental Law allows.

5.      **TRANSFER OF PERMITS AND LICENSES.**  On and after the Closing Date, Seller and Buyer shall cooperate in taking all reasonable steps to effect the transfer or procure the re-issuance of any Environmental Permits necessary to operate the Business.

## EXHIBIT 4.1

## EMPLOYEE MATTERS

1.    **Definitions**:

A.    "**Buyer Employee Benefit Plans**" means Buyer's pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute", severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes", collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals and written or binding oral statements of policies, practices or understandings relating to employment.

B.    "**Competitive Package**" means the wages and benefits payable to new hire U.S. Hourly Employees at the New Brunswick Facility under the Delphi-IUE-CWA Local Agreement.

C.    "**Delphi-IUE-CWA Local Agreement**" means the local collectively bargained agreements in effect at the New Brunswick Facility, including but not limited to, the memorandum of understanding ("**MOU**") entitled "ESCOP Hiring Plan – Full and Temporary Part-Time Employees" dated June 3, 1998 ("**ESCOP Hiring Plan**"), the November 13, 2003 Local Seniority Agreement, a collective bargaining agreement between Seller and IUE-CWA Local 416, any letter agreements, MOUs (including the ESCOP Hiring Plan), and all applicable employee benefit plans, in effect between Seller and the IUE-CWA applicable only to the U.S. Hourly Employees.

D.    "**Delphi-IUE-CWA National Agreement**" means the nationally negotiated collective bargaining agreements, including any letter agreements, MOUs, supplemental agreements and all applicable employee benefit plans in effect between Seller and the IUE-CWA.

E.    "**Employment Rights**" means all obligations arising out of, or relating to, the employment relationship between the relevant company and the relevant employees, including, without limitation, payment of wages and salaries, employee benefits, taxes, vacation pay, sick leave and severance pay and any claims under any Laws dealing with employment.

F.    "**IUE-CWA**" means the IUE-CWA, the Industrial Division of the Communication Workers of America, AFL-CIO and CLC.

G.    "**Seller Employee Benefit Plans**" means Seller's pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute", severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes", collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

51

H.   "**Successor Clause**" means Document 7 appended to the Delphi-IUE-CWA National Agreement.

I.   "**Transferred U.S. Hourly Employees**" means those hourly employees of Seller hired by Buyer pursuant to Section 3.A(ii) below.

J.   "**U.S. Hourly Employees**" means the hourly employees represented by the IUE-CWA who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date and identified on Schedule 3.A(i) to this Exhibit 4.1 to be provided to Buyer by Seller concurrently with the Put Exercise Notice or within ten (10) days after Seller's receipt of a Call Exercise Notice, as applicable.

K.   "**U.S. Salaried Employees**" means the salaried employees and hourly non-union employees who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date.

2.   **Pre-Completion Obligations of the Parties:**

A.   Prior to Completion, Seller will:

(i)   Endeavor to obtain Bankruptcy Court approval of the attrition plan set forth in the IUE Consent (attached as Exhibit 1.13 of this Agreement) and, upon receipt of necessary approvals, to implement the attrition plan set forth in Exhibit 1.13 (the "**Attrition Plan**") to reduce the number of U.S. Hourly Employees to approximately one hundred (100) U.S. Hourly Employees, in accordance with the terms of the IUE Consent [JCI to confirm the number as soon as possible after the date of this Agreement and no later than 5 days before Delphi commences the Attrition Plan]; and

(ii)   Take the lead in negotiating a plant-specific agreement and waiver of the Successor Clause, with Buyer's involvement as the parties deem appropriate.

B.   If waiver of the Successor Clause is obtained before the Completion Date:

(i)   Buyer will take the lead in negotiating a collective bargaining agreement with the IUE-CWA exclusive to the U.S. Hourly Employees at the New Brunswick, New Jersey plant; and

(ii)   Buyer will endeavor to obtain mutually agreed competitive work practices in a collective bargaining agreement, comparable to Buyer's existing IUE-CWA agreements at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities.

C.   If waiver of the Successor Clause is not obtained before the Completion Date:

(i)   Until the Completion Date, Seller will endeavor to obtain mutually agreed competitive work practices in a collective bargaining agreement with the

IUE-CWA, comparable to Buyer's collective bargaining agreements with the IUE-CWA at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities;

Subparagraphs 2.C(i) and 2.C(v) notwithstanding, to the extent that Buyer has not negotiated its own local agreement prior to Completion, as outlined in Section 2.C(i), Buyer will assume the terms and conditions of the Delphi-IUE-CWA National Agreement and Delphi-IUE-CWA Local Agreement applicable as of the Completion Date as they relate to the U.S. Hourly Employees, except that Seller has secured in the IUE Consent a waiver of the unpublished "Neutrality" letter in the Delphi-IUE-CWA National Agreement. Seller agrees that it is not Seller's intent to negotiate an agreement with the IUE-CWA after the effective date of this Agreement and prior to Completion that would impose additional material obligations or costs upon Buyer. To that end, and except as otherwise agreed by Buyer, Buyer will not assume terms and conditions relating to the following specified matters contained in any MOU, collective bargaining agreement or other agreement negotiated after the effective date of this Agreement which:

    a.  Contains terms that would apply to or affect other facilities of Buyer;

    b.  Contains any additional job security provisions for new hires not set forth in the ESCOP Plan;

    c.  Introduces severance provisions that would make it impracticable to reduce the workforce;

    d.  Requires that Buyer assume any Seller Employee Benefit Plans or participate in any multi-employer plan; or

    e.  Guarantees specific levels of manning or requires that the New Brunswick Plant be operated in any specific way for any specific period of time

(iii)  In connection with the foregoing clause 2.C(ii), Buyer will act in good faith and will not act unreasonably in order to avoid taking the New Brunswick plant.

(iv)  Seller reaffirms its commitment to consult with Buyer's lead bargainer on an ongoing basis in the course of collective bargaining, Buyer's involvement to include option to be present on the premises, participate in specified briefing sessions, provide proposals to Seller, and the like.  If in the course of such bargaining, matters which would significantly adversely impact New Brunswick plant competitiveness (compared year over year) arise, Buyer will not be obligated to assume related commitments without Buyer's consent, not to be unreasonably withheld.

(v)  Buyer will endeavor to obtain waiver of the Successor Clause and obtain competitive work practices in a collective bargaining agreement with the IUE-CWA, comparable to Buyer's existing collective bargaining agreements with the IUE-CWA at Buyer's St. Joseph, Missouri and Geneva, Illinois facilities; and

(vi)  Seller will obtain a waiver of, or otherwise remedy, any other materially significant document related to the Delphi-IUE-CWA National or Local Agreements, if any, that was not made available to Seller prior to July 1, 2005.

D.  If a mutually agreeable collective bargaining agreement between the IUE-CWA and JCI is ratified before completion, then the terms of such agreement would

53

apply to the Transferred U.S. Hourly Employees rather than the terms of Delphi's agreements referred to in Section 2.C(ii) above. In the event of any conflict with the above terms of this Article 2 and the terms of the Memorandum of Agreement between Delphi and the IUE-CWA attached as Exhibit 1.13 to this Agreement (the "**Memorandum**"), the terms of the Memorandum will govern.

3.    **Obligations at Completion:**

A.    **Buyer Obligations – U.S. Hourly Employees:**

(i)    Within five (5) days prior to Completion, Seller will identify in a Schedule 3.A(i) to this Exhibit 4.1, in accordance with the terms of the Attrition Plan and Section 2.A(i) of this Exhibit 4.1, all U.S. Hourly Employees who are employed as of the Completion Date, by name, social security number, date of hire, job code and current hourly rate. Seller and Buyer will confirm Schedule 3.A(i) of this Exhibit 4.1 as of the day prior to the Completion Date.

(ii)    Effective on the Completion Date, Buyer will offer employment to all U.S. Hourly Employees identified on Schedule 3.A(i) to Exhibit 4.1. U.S. Hourly Employees who accept Buyer's offer of employment (by reporting to work or otherwise acknowledging acceptance) will be referred to as Transferred U.S. Hourly Employees:

a. U.S. Hourly Employees who are included in Schedule 3.A(i) and are not active as of the Completion Date due to disability, layoff, family medical leave or other approved leave of absence may elect to transfer to Buyer under the terms of the Attrition Plan, and will remain Seller's responsibility until any such U.S. Hourly Employee is ready to return to active employment in accordance with Seller's leave policies.

b. Upon such U.S. Hourly Employee's return to active status, Buyer will offer employment in accordance with Section 3.A(ii) above, and, provided such individual accepts Buyer's offer of employment, will be considered a Transferred U.S. Hourly Employee as of such date. In the event that a U.S. Hourly Employee is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Seller and Buyer provided such does not violate any applicable collective bargaining agreement.

c. If Seller and Buyer do not agree as to such individual's fitness for active employment, the issue will be submitted to an independent medical evaluator, whose determination will be final and binding on the parties. The cost of such independent medical evaluation will be shared equally by the parties.

(iii)    Consistent with Buyer's obligations under Section 2.C(ii) above, unless Buyer is otherwise able to negotiate a new collective bargaining agreement with the IUE-CWA for the Transferred U.S. Hourly Employees, Buyer will provide the Transferred U.S. Hourly Employees with the same level of wages and benefits as required under the Delphi-IUE-CWA National Agreement and

Delphi-IUE-CWA Local Agreement, as applicable, in effect as of the Completion Date.

(iv)    Buyer will assume and recognize the seniority status for all purposes of continued employment with Buyer.

(v)    Buyer will recognize a Transferred U.S. Hourly Employee's pre-Completion credited service with Seller for eligibility and vesting purposes but not benefit accrual purposes with respect to any Buyer Employee Benefit Plans. However, in no case will credited service be recognized under this provision if such recognition will cause a duplication of compensation or benefits as between Seller and Buyer.

(vi)    Transferred U.S. Hourly Employees' and their Beneficiaries' participation in and eligibility for benefits under the Buyer Employee Benefit Plans will commence as of the Completion Date.

(vii)    To the extent allowed under applicable law, Transferred U.S. Hourly Employees who become eligible for a distribution of their account balances in the Delphi Personal Savings Plan will be permitted, at their discretion, to transfer such account balances to Buyer's defined contribution plan. The manner of such transfer will be a direct rollover.

(viii)    Seller will retain responsibility to administer and all liability for labor grievances and arbitration proceedings (collectively the "**Grievances**") involving claims incurred prior to the Completion Date. For a period of ninety (90) days following the Completion Date, Buyer will notify Seller of any Grievances filed after the Completion Date which relate to claims incurred prior to the Completion Date. Buyer will be responsible to administer and bear all liability for Grievances involving claims incurred after the Completion Date. To the extent the administration or resolution of any Grievances require both the Buyer's and Seller's participation, the following apply:

a.    Buyer and Seller will cooperate in the defense of the Grievances.

b.    Buyer will not settle any Grievance without Seller's consent if such settlement will result in liability or obligation for Seller. Such consent will not be unreasonably withheld.

c.    Seller will not settle any Grievance without Buyer's consent if such settlement will result in liability for Buyer. Such consent will not be unreasonably withheld.

d.    If the seniority of a Transferred U.S. Hourly Employee is reinstated as a result of the disposition of a Grievance or a court or administrative order, Buyer will reinstate the Transferred U.S. Hourly Employee as if the Transferred U.S. Hourly Employee had been a Transferred U.S. Hourly Employee as of the Completion Date.

55

e.    For Transferred U.S. Hourly Employees who have been continuously employed, back pay liability to the extent relating to an event, occurrence or cause of action arising prior to the Completion Date will be allocated to Seller. Liability relating to an event, occurrence or cause of action arising subsequent to the Completion Date will be allocated to Buyer, including but not limited to costs or other liability incurred by Seller as a result of loss of employment with Buyer, within one (1) year following Completion, by any Transferred U.S. Hourly Employee for any reason other than good cause relating to misconduct or performance under the applicable discipline procedure.

f.    For U.S. Hourly Employees who become Transferred U.S. Hourly Employees because they are reinstated through the grievance procedure, back pay liability relating to periods prior to the Completion Date will be allocated to Seller. Liability relating to periods subsequent to the Completion Date will be allocated to Seller.

g.    The parties will discuss treatment of Grievances involving unusual circumstances or events that continue before and after the Completion Date.

h.    If either party withholds consent to a settlement or processing of a Grievance recommended by the other party or elects to continue to defend the Grievance, then such party will be liable for the portion of the back pay or other liability resulting from the ultimate disposition of such Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended and rejected.

(ix)    Subject to Seller's obligations under Section 3.C(iv)a, liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees after the Completion Date, will be the responsibility of Buyer.

(x)    Buyer will not assume any Seller Employee Benefit Plans.

(xi)    At Completion, Buyer will pay Seller $12.5 million USD by wire transfer in accordance with wiring instructions to be provided by Seller before Completion, to reimburse Seller for costs incurred by Seller under the Attrition Plan, which costs would otherwise have been payable by Buyer under a predecessor agreement between the parties.

**B.    Buyer Obligations – U.S. Salaried Employees:**

(i)    Buyer will offer employment to all U.S. Salaried Employees, except as otherwise agreed by the parties prior to the time such offers have been made. Buyer's employment offers to U.S. Salaried Employees will include salary and benefit packages substantially comparable in the aggregate to those provided by Seller immediately prior to the Completion Date. Prior to tendering such offers, Buyer will provide Seller with information sufficient to satisfy Seller that such offers meet the "substantially comparable in the aggregate"

56

requirement. Seller's satisfaction that Buyer's offer meets this requirement may not be unreasonably withheld. Buyer will assume all Employment Rights relating to the U.S. Salaried Employees whom Buyer employs incurred on and after the date of hire. U.S. Salaried Employees whom Buyer hires will be subject to Buyer's policies and procedures, including any requirement that they execute agreements providing for the protection of Buyer's confidential information and adherence to Buyer's business conduct guidelines.

(ii)    Buyer will recognize the length of service date and all credited service at Seller that the U.S. Salaried Employees whom Buyer hires accrued at Seller for purposes of vesting and eligibility (but not benefit accrual) under the Buyer Employee Benefit Plans.

## C.    Seller Obligations – U.S. Hourly Employees:

(i)     Seller will remain responsible for all Employment Rights of the U.S. Hourly Employees incurred or vesting prior to the date when they become Transferred U.S. Hourly Employees, except as otherwise provided herein. In accordance with the terms of the Attrition Plan, all Transferred U.S. Hourly Employees will transfer at the established New Brunswick Tier III rate and benefits in accordance with applicable terms of the Delphi-IUE-CWA Local Agreement and the Delphi-IUE-CWA National Agreement in effect at Completion, or such other agreement as may be applicable under Section 2.D of this Exhibit 4.1.

(ii)    Transferred U.S. Hourly Employees' and their Beneficiaries' participation in and eligibility for benefits under the Seller Employee Benefit Plans will cease as of the Completion Date. Notwithstanding the preceding sentence, the Seller Employee Benefit Plans will retain liability for all claims incurred by the Transferred U.S. Hourly Employees and their Beneficiaries on or prior to the Completion Date, including claims which are not submitted until after the Completion Date. A claim will be deemed incurred, as applicable:

a.      On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

b.      On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

c.      On the date following a Transferred U.S. Hourly Employee's last day worked on which a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

(iii)   Regardless of the vesting date, Seller will pay to each Transferred U.S. Hourly Employee the amount of all accrued and unutilized vacation pay and any profit sharing due for the calendar year in which the Completion Date occurs on a pro-rata basis using the number of days worked by the Transferred U.S. Hourly Employees for Seller.

(iv)    Seller will retain responsibility for:

a.    All liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illnesses incurred by Transferred U.S. Hourly Employees on or prior to the Completion Date and the pro rata portion, based on years of credited service with Seller compared with total years of credited service with Seller and Buyer, of liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to post-Completion Date exacerbation of pre-Completion Date injuries or illnesses; and

b.    Claims of the Transferred U.S. Hourly Employees (or a dependent thereof who becomes a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Internal Revenue Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Internal Revenue Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs on or prior to the Completion Date.

4.    **Allocation of Liability; Indemnification; Cooperation:**

A.    **Buyer's Obligations:**

(i)    In general, subject to other more specific provisions contained in this Agreement, Buyer will be responsible for and will bear all liability incurred after the Completion Date for Employment Rights of the Transferred U.S. Hourly Employees and U.S. Salaried Employees whom Buyer hires.

(ii)    Buyer will defend, indemnify and hold harmless Seller, its past and present employees, agents, representatives, shareholders, officers, directors, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs), relating to:

a.    Any Employment Rights of any of the Transferred U.S. Hourly Employees, any U.S. Salaried Employees whom Buyer hires, and any person employed by Buyer after the Completion Date who is not a Transferred U.S. Hourly Employee or U.S. Salaried Employee, for any claims relating to or arising from events occurring after the Completion Date; and

b.    Buyer's failure to comply with the terms of this Exhibit 4.1.

B.    **Seller's Obligations:**

(i)    In general, subject to other more specific provisions contained in this Agreement, Seller will be responsible for and will bear all liability incurred on or prior to the Completion Date for Employment Rights of the U.S. Hourly Employees and U.S. Salaried Employees.

(ii)     Seller will defend, indemnify and hold harmless Buyer, its past and present employees, agents, representatives, shareholders, officers, directors, affiliates and assigns and successors, from and against all claims, actions, damages, liabilities, causes of action, losses, costs and expenses (including attorney's fees and defense costs), relating to:

a.     Any Employment Rights of any of the Transferred U.S. Hourly Employees, or of any person employed by Seller prior to the Completion Date who is not a Transferred U.S. Hourly Employee, for any claims relating to or arising from events occurring on or prior to the transfer to Buyer;

b.     Seller's failure to comply with the terms of this Exhibit 4.1; and

c.     Any Employment Rights of U.S. Salaried Employees who do not accept Buyer's offer of employment; provided, however, that such offer complies with the "substantially comparable in the aggregate" requirement of Section 3.B(i).

## C.     Cooperation:

Seller and Buyer agree to provide each other with such records and information and otherwise cooperate as may be reasonably necessary or appropriate to carry out their respective obligations under this Exhibit 4.1.