1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481PM

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DELPHI CORPORATION, et al.

9

10          Debtors.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                May 10, 2006

19                2:15 P.M.

20

21    B E F O R E:

22    HON. ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25

2

1

2    Hearing re Motion to Authorize Motion for

3    Order Under 11 U.S.C. Section 1113(c)

```
 4   Authorizing Rejection of Collective Bargaining

 5   Agreements and Under 11 U.S.C. Section 1114(g)

 6   Authorizing Modification of Retiree Welfare

 7   Benefits

 8

 9   Hearing re Statement/Expert Report of Thomas

10   A. Kochan in Opposition to Debtors' Motion for

11   Order Under 11 U.S.C. Section 1113(c)

12   Authorizing Rejection of Collective Bargaining

13   Agreements and Under 11 U.S.C. Section 1114(g)

14   Authorizing Modification of Retiree Welfare

15   Benefits

16

17   Hearing re Motion to Authorize Motion for

18   Order Under 11 U.S.C. Section 1113(c)

19   Authorizing Rejection of Collective Bargaining

20   Agreements and Under 11 U.S.C. Section 1114(g)

21   Authorizing Modification of Retiree Welfare

22   Benefits

23

24

25
```

```
                                              3


 1   Hearing re Motion to Dismiss Party/Limit

 2   Participation in the Hearing on Delphi's

 3   Section 1113 and Section 1114 Motion

 4

 5   Reply to Motion Omnibus Reply of UAW in

 6   Support of Motion to Limit Participation in

 7   the Hearing on Delphi's Section 1113 and

 8   Section 1114 Motion
```

```
 9

10    Notice of Hearing/Proposed 1113/1114 Hearing

11    Agenda

12

13    Hearing re Motion to Authorize Motion for

14    Order Under 11 U.S.C. Section 1113(c)

15    Authorizing Rejection of Collective Bargaining

16    Agreements and Under 11 U.S.C. Section 1114(g)

17    Authorizing Modification of Retiree Welfare

18    Benefits

19

20    Declaration of Kevin M. Butler in Support of

21    Delphi's Motion for Authority to Reject

22    Collective Bargaining Agreements Under 11

23    U.S.C. Section 1113(c) and Modify Retiree

24    Welfare Benefits Under 11 U.S.C. Section

25    1114(g)
```

                                          4

```
 1

 2    Declaration of Randal A. Middleton

 3

 4    Objection to Motion

 5

 6    Declaration of Donald L. Griffin

 7

 8

 9

10

11

12

13
```

```
14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib
```

5

```
 1

 2    A P P E A R A N C E S :

 3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

 4         Attorneys for Debtor and

 5         Debtors-in-Possession

 6         333 West Wacker Drive

 7         Chicago, IL 60606

 8

 9    BY:   JOHN WM. BUTLER, JR., ESQ.

10          JOHN K. LYONS, ESQ.

11          RON E. MEISLER, ESQ.

12

13    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

14         Attorneys for Debtor and

15         Debtors-in-Possession

16         Four Times Square

17         New York, NY 10036

18
```

19   BY:   KAYALYN A. MARAFIOTI, ESQ.

20         THOMAS J. MATZ, ESQ.

21         JAY S. BERKE, ESQ.

22

23

24

25

                                                        6

1   O'MELVENY & MYERS, LLP

2         Attorneys for Debtors

3         7 Times Square

4         New York, NY 10036

5

6   BY:   JEFFREY I. KOHN, ESQ.

7

8   O'MELVENY & MYERS, LLP

9         Attorneys for Debtors

10        1625 Eye Street

11        Washington, D.C. 20006

12

13  BY:   TOM JERMAN, ESQ.

14

15  O'MELVENY & MYERS, LLP

16        Attorneys for Debtors

17        400 South Hope Street

18        Los Angeles, CA 90071

19

20  BY:   ROBERT A. SIEGEL, ESQ.

21

22

23

24

25

7

1    COHEN, WEISS AND SIMON, LLP

2         Attorneys for UAW

3         330 West 42nd Street

4         New York, NY 10036

5

6    BY:   BABETTE CECCOTTI, ESQ.

7         BRUCE S. LEVINE, ESQ.

8         BRUCE H. SIMON, ESQ.

9         PETER D. DECHIARA, ESQ.

10        DAVID R. HOCK, ESQ.

11

12   LATHAM & WATKINS, LLP

13        Attorneys for Statutory Creditors'

14        Committee

15        885 Third Avenue

16        New York, NY 10022

17

18   BY:   ROBERT J. ROSENBERG, ESQ.

19        MITCHELL E. SEIDER, ESQ.

20

21

22

23

24

25

8

```
 1   LATHAM & WATKINS, LLP

 2        Attorneys for Statutory Creditors'

 3        Committee

 4        633 West Fifth Street

 5        Suite 4000

 6        Los Angeles, CA 90071

 7

 8   BY:   JOEL E. KRISCHER, ESQ.

 9

10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

11        Attorneys for the Equity Committee

12        One New York Plaza

13        New York, NY 10004

14

15   BY:   BONNIE STEINGART, ESQ.

16

17   KIRKPATRICK & LOCKHART NICHOLSON GRAHAM, LLP

18        Attorneys for Wilmington Trust Company

19        599 Lexington Avenue

20        New York, NY 10022

21

22   BY:   EDWARD M. FOX, ESQ.

23

24

25
```

                                                        9

```
 1   WHITE & CASE, LLP

 2        Attorneys for Appaloosa Management

 3        1155 Avenue of the Americas

 4        New York, NY 10036

 5
```

```
 6   BY:   THOMAS E. LAURIA, ESQ.

 7         GLENN M. KURTZ, ESQ.

 8         DOUGLAS P. BAUMSTEIN, ESQ.

 9

10   BURR & FORMAN, LLP

11         Attorneys for Mercedes Benz

12         420 North 20th Street

13         Birmingham, AL 35203

14

15   BY:   MICHAEL L. HALL, ESQ.

16

17   ORRICK, HERRINGTON & SUTCLIFFE, LLP

18         Attorneys for Ad Hoc Trade Committee

19         666 Fifth Avenue

20         New York, NY 10103

21

22   BY:   ALYSSA D. ENGLUND, ESQ.

23

24

25
```

                                                              10

```
 1   KENNEDY, JENNIK & MURRAY, P.C.

 2         Attorneys for IUE-CWA

 3         113 University Place

 4         New York, NY  10003

 5

 6   BY:   THOMAS M. KENNEDY, ESQ.

 7         SUSAN M. JENNIK, ESQ.

 8

 9   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

10         Attorneys for Steelworkers Union
```

```
11        1350 Broadway

12        Suite 501

13        New York, NY 10018

14

15   BY:   LOWELL PETERSON, ESQ.

16

17   PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER &

18   BRUEGGEMAN, S.C.

19        Attorneys for IBEW and IAM

20        1555 North River Center Drive

21        Suite 202

22        Milwaukee, WI 53212

23

24   BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

25
```

11

```
 1   GORLICK, KRAVITZ & LISTHAUS, P.C.

 2        Attorneys for Operating Engineers

 3        Locals 18-S, 101-S, 832-S

 4        17 State Street

 5        4th Floor

 6        New York, NY 10004

 7

 8   BY:   BARBARA S. MEHLSACK, ESQ.

 9

10   WEIL, GOTSHAL & MANGES, LLP

11        Attorneys for General Motors

12        767 Fifth Avenue

13        New York, NY 10153

14

15   BY:   JEFFREY L. TANENBAUM, ESQ.
```

```
16          MICHAEL P. KESSLER, ESQ.

17

18   UAW/ASSOCIATE GENERAL COUNSEL

19          8000 East Jefferson

20          Detroit, MI 48214

21

22   BY:   NIRAJ R. GANATRA, ESQ.

23

24

25
```

                                                        12

```
1    OFFICE OF THE UNITED STATES TRUSTEE

2           33 Whitehall Street

3           21st Floor

4           New York, NY 10004

5

6    BY:   ALICIA M. LEONARD

7

8

9

10

11

12

13

14

15

16

17

18

19

20
```

21

22

23

24

25

13

1                P R O C E E D I N G S

2            THE COURT:  Please be seated.  All

3    right.  We're back on the record.  You're

4    still under oath, Mr. Butler.

5            THE WITNESS:  Yes, Your Honor.

6    REDIRECT EXAMINATION BY

7    MR. BUTLER:

8    Q.   Mr. Butler, during your cross-

9    examination, you were questioned by counsel

10   for all the unions about the various proposals

11   that were submitted by Delphi to the unions.

12   Do you recall that examination and your

13   various answers?

14   A.    I do.

15   Q.    How many proposals since the debtors

16   filed Chapter 11 have they provided to the

17   United Auto Workers?

18   A.    Three proposals.

19   Q.    I'd ask you to look at Exhibit 77.  Is

20   that the first of the three proposals?

21   A.    It is.

22   Q.   And we're going to flip back and forth

23   between proposals, so I'd like you to keep

24   that in your mind.  And then the next

25   proposal, would you look at Exhibit No. 83.

14

1    Can you just tell me?  Is that the second

2    proposal?

3    A.    It is.

4    Q.    And Exhibit No. 89, is that the third

5    proposal?

6    A.    Yes.

7    Q.    So the proposals are October 21st, 2005,

8    November 15th, 2005, March 24, 2006, is that

9    correct?

10    A.    That's correct.

11    Q.    Now, is it accurate that the November

12    15th proposal, the Exhibit 83 -- is that

13    blacklined against Exhibit 77 to show the

14    differences?  Flip through and --  I'll point

15    you to page 19.

16    A.    Yes, it is.

17    Q.    And, again, on Exhibit 83, if you go to

18    page A1 and A2, that's blacklined as well,

19    correct?

20    A.    That's correct.

21    Q.    And when you look at Exhibit 89, is that

22    also blacklined against the prior proposal to

23    show changes?  The prior two proposals to show

24    changes?

25    A.    Yes, it is.

15

1    Q.    So, for example, on the October 21st

2   proposal, at page 12, in the provision on

3   severance pay --

4   A.   I'm sorry, counselor.  Can you give me

5   the exhibit number again?

6   Q.   Page 12, Exhibit 77.

7   A.   Thank you.  Yes.

8   Q.   Section on severance pay.  In your own

9   words, will you explain what you meant by that

10  when you sent that proposal regarding

11  severance pay to the unions?

12  A.   That effectively meant that we would

13  discuss with the unions a means of separating

14  or severing employees, affect a type of soft

15  landing or some other remuneration if their

16  services were no longer needed.

17  Q.   And if you look at 12 of the November

18  15th proposal, that's a very identical

19  provision and the identical offer?

20  A.   Yes, it is.

21  Q.   And on Exhibit 89, page 15, is the

22  severance pay offer still the same?

23  A.   It has been blacklined.  It's changed.

24  Q.   So, Mr. Butler, when the Court or we or

25  anyone of us in this room look at Exhibit 89,


16


1   if something hasn't been blacklined, then it

2   was contained in the original October 21st

3   proposal, is that correct?

4   A.   I believe that's correct.

5   Q.   Did United Auto Workers comment publicly

6   on your October 21st proposal after they

7  received it?

8  A.    I believe they did?

9  Q.    Would you look at Exhibit 57, please?   So

10  far as you know, is this the public statement

11  that they made?

12  A.    Yes, I believe it is.

13  Q.    It's short.  Would you just read the

14  first and last sentences?  Just the first and

15  last sentences of that statement into the

16  record?

17  A.    "The UAW received Delphi's contract

18  proposal today."  And the last sentence,

19  "maybe some believe the American dream is

20  over; UAW rejects that dismal idea and will

21  continue the struggle to fulfill that dream."

22  Q.    Did you take this public statement as a

23  rejection of your October 21st contract offer?

24  A.    I did.

25  Q.    Between October 21st and the time you

17

1  made your next offer to the United Auto

2  Workers -- now we're talking about the

3  November 15th proposal, Exhibit 83.  Now, did

4  you withdraw the November -- the October 21st

5  offer at any time between October 21st and

6  November 15th?

7  A.    No, we did not.

8  Q.    During that period of time, did the UAW

9  sit down with and ask you any questions about

10  the proposal?

11  A.    Not that I recall.

12    Q.    Do you know whether they asked you any

13    questions, for example, about the severance

14    provision that said you would discuss matters?

15    A.    Not that I recall.

16    Q.    In fact, in the last seven months, do you

17    recall any discussions where the UAW asked you

18    what that proposal meant?

19    A.    No, not that I recall.

20    Q.    When Delphi filed its Chapter 11, did it

21    establish a timetable for 1113/1114?

22    A.    Could you clarify a timetable?

23    Q.    When Delphi filed Chapter 11, did it come

24    to the Court and ask that a timetable be

25    established for the 1113/1114 process?

18

1    A.    I believe it did.

2    Q.    And the Court approved that timetable,

3    didn't it?

4    A.    That's my understanding.

5    Q.    And that timetable was discussed with the

6    unions, was it not?

7    A.    I believe it was.

8    Q.    Would you look at Exhibit 58, please?

9    This, in fact, is the UAW's statement

10    regarding that timetable, is it not?

11    A.    It is.

12    Q.    And that statement, the UAW statement,

13    recognizes Exhibit 58 -- recognizes that on

14    October 21st, the company would provide its

15    proposal, correct?

16    A.    That's true.

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

17    Q.    And that's the proposal that you referred

18    to the UAW announcement in Exhibit 57, is that

19    correct?

20    A.    That's correct.

21    Q.    This timetable in the UAW document says

22    the next proposal is to come by November

23    18th, is that correct?

24    A.    Yes.

25    Q.    And, in fact, you provided them with

19

1    Exhibit 83, the second proposal, prior to

2    November 18th, didn't you?

3    A.    That's true.

4    Q.    Were there any discussions between the

5    UAW and yourself regarding that proposal after

6    you submitted it?

7    A.    Not that I recall.

8    Q.    There were no conversations between

9    anyone at the UAW and you regarding this --

10    the November 15th proposal?

11    A.    There were some informal discussions

12    regarding the November 15th proposal.

13    Q.    Did Delphi's unions take any coordinated

14    action together between the time of the

15    October 21st proposal and the time of the

16    November 15th proposal, so far as you know?

17    A.    Could you clarify the question,

18    coordinated action?

19    Q.    Do you have any knowledge of whether the

20    unions got together?

21    A.    I am aware of an effort called mobilizing

22    at Delphi.

23    Q.    And, in your own words, can you tell us

24    what you understand that action to be?

25    A.    I understand that action to be a

20

1    coordinated effort to resist the changes that

2    Delphi was advancing.

3    Q.    Would you take a look at Exhibit 59,

4    please?  Is this the mobilizing Delphi

5    coalition action that you were discussing?

6    A.    Yes, it is.

7    Q.    And the date of that announcement?

8    A.    Monday, November 7th.

9    Q.    And are all the unions that are objectors

10    to this motion, this 1113/1114 motion, part of

11    that coalition?

12    A.    Yes, they are.

13    Q.    Now, after the November 15th proposal was

14    delivered, did the UAW or the coalition make

15    any public pronouncements about the second

16    proposal?

17    A.    Yes, they did.

18           MR. SIMON:  Your Honor, objection.

19    I'm tolerant but I fail to see the connection

20    between the redirect and the cross?

21           MR. BUTLER:  Your Honor, the

22    connection is simply there was lots of -- on

23    the cross-examination, there were questions

24    about what statements were made between the

25    parties, whether they rejected the proposals

21

1    or not.  You have public statements of

2    rejection here where they say where they say

3    we reject these proposals.  This next exhibit

4    is going to talk to, quote -- this is by all

5    the unions a joint pronouncement that the

6    contract proposal is not even a framework.

7    And, you know, I think it is -- in part of

8    what Your Honor needs to determine is the good

9    faith of the parties.

10           MR. SIMON:  It stretches -- it's

11    interesting.  It might be relevant.  The

12    problem is it's beyond the scope of cross.

13           THE COURT:  Well, I'm trying to

14    think back.  I don't think -- I think it is

15    beyond the scope of your cross, but other

16    unions did raise the point about responses, so

17    --

18           MR. SIMON:  I thought perhaps by

19    raising the objection, we might shorten the

20    proceeding.  I accept Your Honor's ruling.

21           MR. BUTLER:  I mean, I have to

22    redirect Your Honor to 350 question that were

23    asked over a five and a half hour period.

24           THE COURT:  All right.  So, you can

25    go ahead.


22


1    BY MR. BUTLER:

2    Q.    So, my question to you, Mr. Butler --

3           THE COURT:  If you could do it as briefly

4    as possible, though, 'cause it is in the

5    record.

6        THE WITNESS:  Could you repeat the

7    question?

8    BY MR. BUTLER:

9    Q.   I just wanted to point to your attention

10   page -- to Exhibit 62 and the joint statement

11   by all of these unions at the fifth paragraph.

12   Just that sentence.  Would you read just that

13   sentence into the record, please?

14   A.   "Delphi's contract proposal is not a

15   framework for an agreement but a roadmark for

16   confrontation."

17   Q.   And, as Delphi's chief labor negotiator,

18   did you read that statement when it was issued

19   the next day, the day after your proposal was

20   issued?

21   A.   I did.

22   Q.   And did you reach any conclusions about

23   the unions' position on your proposal?

24   A.   I viewed that as a rejection of our

25   November 15th proposal.


23


1        MR. SIMON:  Yes, Your Honor.  It was

2    objectionable but the answer was preferable.

3    BY MR. BUTLER:

4    Q.   Mr. Butler, in your own words, would you

5    just tell the Court, and, again, focus on the

6    UAW since Mr. Simon asks these questions, how

7    you came about evaluating -- how, as a general

8    matter, a UAW contracts would be evaluated for

9    inclusion in this motion?

10   A.   We had a process of review by the

11   divisions and the plants from a local

12   standpoint and then reviewed by the corporate

13   staff, and at the -- these were contracts that

14   were under the national agreements that

15   included the provisions that were

16   noncompetitive and that would inhibit our

17   ability to restructure.  Said in other words,

18   we have other agreements with some of the

19   unions that are not under the national

20   agreement structure and they are far more

21   competitive and do not have or do not

22   represent an impediment to our ability to

23   restructure.  We excluded those.

24   Q.   Now, if you look at -- and we'll just --

25   let's just focus on Exhibit 89.  That's what

                                                24

1    Mr. Simon used.  You listed a series of

2    national agreements on pages 1, 2 and 3, is

3    that correct?

4    A.   That's true.

5    Q.   As Delphi's chief labor negotiator, do

6    you have one national agreement with the UAW

7    or 50?

8    A.   We have one.

9    Q.   And these all represent different

10   elements of that one agreement, is that

11   correct?

12   A.   That is correct.

13   Q.   Did you make a judgment about -- at any

14    time, about the UAW national agreement and

15    whether it was competitive or not?

16    A.    I did.

17    Q.    And what was your judgment?

18    A.    That it was not competitive.

19    Q.    And once you decided that it was not

20    competitive, what actions did you decide to

21    take?

22    A.    We decided to reject the agreement in

23    whole.

24    Q.    And how is it that all of these

25    agreements got listed on pages 1 through 3 if

25

1    you had one agreement?

2    A.    They are all various components of the

3    agreement and local agreements that emanate

4    from the national agreement.

5    Q.    And Mr. Simon asked you about the catch

6    all at the bottom of page 2, top of page 3.

7    A.    Yes.

8    Q.    Why did you include that in your list?

9    A.    In the event there was something we did

10    not include such that it would -- there would

11    be no question that something was left

12    operable.

13    Q.    And how was the approach taken with

14    respect to local agreements?

15    A.    Again, we had a process of review with

16    the local bargainers working with the

17    corporate staff to identify all the various

18    provisions associated with the local

19   agreements, including local understandings,

20   memoranda, so forth.

21   Q.    These are local agreements regarding a

22   particular plant.  Did you have one agreement

23   at that plant or did you have 75 agreements at

24   that plant?

25   A.    One agreement and within that there would

26

1    be various understandings or commitments.

2    Q.    And when you listed all of these local

3    agreements in this proposal at Exhibit 89, why

4    did you list all of the local agreements, like

5    the Christmas lunch agreement, or whatever it

6    was?

7    A.    It was our intent to reject the local

8    agreements in total.

9    Q.    And why did you put catch-all provisions

10   in the proposal?

11   A.    In the event that we missed something,

12   did not name it, that there be no question it

13   was left operable -- that we did not list it

14   that there be any question it was left

15   operable.

16   Q.    Is it fair to say you didn't want to have

17   a "gotcha?"

18   A.    That's fair to say.

19   Q.    I'd like you to look at paragraph 29 of

20   Exhibit 89.  This -- it's called Complete

21   Agreement and Waiver.  You've testified that's

22   the so-called zipper provision, is that

23   correct?

24    A.    Yes.

25    Q.    And that's not blacklined so that was in

27

1    there since October 21 of 2005, is that

2    correct?

3    A.    That's correct.

4    Q.    And just flip back a couple of pages.

5    Let's look together and find the no-strike

6    provision.  That was on page 21 here.  That's

7    not blacklined, either.  That was in since

8    October 21, too.

9    A.    There is a blackline for OAR picketing.

10    Q.    Okay.  Other than the OAR picketing?

11    A.    That's true.

12    Q.    And the -- page 28 has a paragraph called

13    Dispute Resolution, is that correct?

14    A.    That's correct.

15    Q.    And that's not blacklined, either.  So

16    that was in since October 21st?

17    A.    That's correct.

18    Q.    And there's also, on page 27 -- this

19    hasn't -- the unions didn't ask you questions

20    about this but it's in the agreement -- they

21    went through.  This definitive documentation

22    provision?

23    A.    Yes.

24    Q.    In your own words, will you tell us --

25    tell the Court what that provision means?

28

1    What it meant to you when you put it in the

2    document?

3    A.   This was intended to deal with the fact

4    that this term sheet did not represent final

5    language and all aspects and provided

6    capability for the parties to work through

7    that.

8    Q.   And this isn't blacklined so the same

9    provision existed since October 21st, is that

10   correct?

11   A.   That's correct.

12   Q.   And, Mr. Butler, you will recall the

13   question, and virtually every union lawyer

14   asked you a series of questions about how

15   these provisions work with each other based on

16   things that were in discussion under the

17   various provisions.  Do you recall?

18   A.   I do recall.

19   Q.   All right.  Prior to today's cross-

20   examination, did any union representative ever

21   ask you that same question?

22   A.   No.

23   Q.   So, not one of them?

24   A.   None.

25   Q.   Did you have any questions with the UAW

29

1    before you withdrew the -- made the public

2    announcement of withdrawing formally the

3    November 15th proposal -- that would be

4    Exhibit 83, which you did -- you testified you

5    did on December 19th?

6    A.    Yes, I did.

7    Q.    Will you describe for the Court the

8    substance of those discussions?

9    A.    The substance of the discussions went to

10   trying to create an environment for

11   negotiation dialogue and progress on our

12   issues and the UAW had indicated that the

13   presence of the November 15 proposal was an

14   impediment to such.  And we sought to

15   understand that a conditional withdrawal -- if

16   we were to do that, would that provide a more

17   conducive environment for negotiations.  And

18   it was indicated it would.

19   Q.    Did you have -- based on those

20   discussions, did you form any expectation

21   about what might be anticipated from the UAW

22   if you took the public action of formally

23   withdrawing that proposal?

24   A.    It was our expectation that we would

25   engage in earnest and serious negotiations.

30

1    Q.    And, as to -- did you expect them then to

2    respond to your November 15 proposal even

3    though you had publicly withrawn it?

4    A.    It was certainly our hope that would be

5    the case.

6    Q.    Did they ever give you a response, formal

7    or informal, beyond the public rejections?

8    A.    We did not get a comprehensive proposal,

9    informal or otherwise, to counter that.

10    Q.    Now, you've already pointed to the UAW's

11    timetable exhibit where they let the members

12    of the public understand the timetable for

13    11/13.  When the debtors made adjustments --

14          MR. SIMON:  Objection, Your Honor.

15    That wasn't a UAW timetable.  That was a

16    timetable set by the Court.

17          THE COURT:  You should rephrase that

18    question.

19          MR. BUTLER:  I'll rephrase the

20    question.

21    BY MR. BUTLER:

22    Q.    It's the UAW's announcement of the

23    timetable set by the Court.  Was a UAW

24    document put out to its members and the

25    general public describing the timetable?

31

1     A.    Yes.

2     Q.    And you -- did you understand that the

3     UAW understood the timetable?

4     A.    That's my belief.

5     Q.    Did you make subsequent adjustments to

6     the timetable?

7     A.    We did.

8     Q.    Did you discuss those adjustments with

9     the UAW prior to making those adjustments?

10    A.    Yes, we did.

11    Q.    The last of those adjustments was made on

12    or about the middle of February, was it not?

13    A.    That's correct.

14    Q.    Did you have specific conversations with

15    the UAW regarding the movement of the deadline

16    of February 19th for filing the 1113s to March

17    31st?

18    A.    Yes, we did.

19    Q.    In your discussions with them, did you

20    characterize that extension in any way?

21    A.    We did characterize it as an extension to

22    allow us, in earnest effort, to resolve our

23    issues and we expected March 31st absent

24    significant progress to be a hard and fast

25    deadline, absent significant progress.

32

1    Q.    And, in the interim, between those two

2    dates, you participated in the negotiation of

3    the UAW/GM/Delphi special attrition program,

4    isn't that correct?

5    A.    That's correct.

6    Q.    And that's the document that's at Exhibit

7    72?

8    A.    Yes, it is.

9    Q.    In negotiating Exhibit 72, did you, at

10    any time, have reason to give consideration as

11    to whether you should break out the attrition

12    program from an overall deal or just wait to

13    do an overall deal?

14    A.    We had considerable discussion and

15    consideration of that.

16    Q.    Did those discussions include discussions

17    on that singular topic with the UAW?

18    A.    Yes, it did.

19    Q.    Did you have discussions with GM about

20   that?

21   A.   Yes, we did.

22   Q.   Did you have discussions with your board

23   of directors about that?

24   A.   Yes, we did.

25   Q.   Is that what you referred to as the one-

33

1   step, two-step discussion?

2   A.   Yes.   A two-step versus a one-step.

3   Q.   In your own words, will you just give the

4   Court a brief synopsis of what you believe the

5   risks and benefits were of a one-step versus a

6   two-step approach in these negotiations?

7   A.   The risks, of course, would be to -- if

8   we broke this process into two steps, that

9   (a)we might stall after having provided the

10   attrition program or have whatever changes

11   made through the attrition program used as a

12   basis against an 1113/1114 proceeding.   The

13   benefits of this approach were to act in good

14   faith to try to resolve our issues, make

15   progress and provide soft landing support for

16   employees in any event that changes needed to

17   be made beyond that which, of course, a total

18   solution would require.

19   Q.   You ultimately decided to do the one-step

20   -- rather, two-step, is that correct?

21   A.   We did.

22   Q.   And why -- in your own words, will you

23   explain to the Court why you did the two-step?

24   A.   We believed that, given -- that General

25    Motors and the UAW were both supportive of

34

1    trying to partition this very complicated

2    problem and to provide some progress would be

3    a constructive action to take and action in

4    good faith.

5    A.    In the final weekend of negotiations

6    regarding Exhibit 72, was there time spent by

7    all three parties addressing the potential

8    impact of a two-step on the 1113 process?

9    A.    Yes, there was.

10    Q.    Did you communicate any positions of

11    Delphi Corporation to the UAW regarding that

12    particular subject matter?

13    A.    Yes.  I communicated that we had concerns

14    that this action taken to craft a attrition

15    program not prejudice, if you will, our

16    abilities to proceed, if necessary, on

17    1113/1114.

18    Q.    Had the -- had you communicated at or

19    prior to that weekend the company's intention

20    to file the 1113 on March 31st absent a

21    consensual agreement?

22    A.    We had.

23    Q.    So, on March 22nd, when there was this

24    two-step agreed to, did you believe that the

25    second step could be completed by March 31st?

35

1    A.    It was hope and desire to do that.

2  Q.   Did the -- were there any discussions

3  with the union?  Did the union discuss with

4  you how to get to that second step between

5  March 22nd and March 31st?

6  A.   We had discussion about partitioning the

7  problem, if you will, between attrition sites,

8  disposition of sites, and work rules, wages

9  and benefits.

10         THE COURT:  I'm sorry.  Could you

11  say that again?

12         THE WITNESS:  We had discussions

13  three-way, actually, between the parties on

14  how to attack the problem.  And so, we talked

15  about an attrition plan.  We talked about

16  ascertaining the disposition of the sites.

17  What would be sold, kept, wound down, as well

18  as then dealing with flexibility issues, our

19  ability to sell jobs bank and so forth, Your

20  Honor.  And including wage and benefits.

21  BY MR. BUTLER:

22  Q.   I'd like you to take a look -- and, by

23  the way, two days after you signed the special

24  attrition program, you delivered the March

25  24th proposal, which is Exhibit 89, is that

36

1  correct?

2  A.   That's correct.

3  Q.   Had you discussed any of the blackline

4  changes in Exhibit 89 with the unions, with

5  the UAW, prior to delivering Exhibit 89 to

6  them?

7    A.    Yes, I had.

8    Q.    When did those discussions commence?

9    A.    In January.

10    Q.    In your own words, will you please

11    describe to the Court, generally, the

12    substance of those discussions?

13    A.    Those discussions, again, which took

14    place in a three-party environment -- we

15    described the basic elements of the March 24th

16    proposal that differed from the November 15th,

17    including a wage step-down approach, a buy-

18    down concomitant with the second wage step-

19    down, some potential enhancement in health

20    care and a period of voluntary attrition

21    followed by a mandatory attrition date in

22    September of '07.

23    Q.    I'd like you to look at Exhibit 89.  Take

24    a moment and examine it.  If you can, answer

25    this question.  As you're flipping through the

37

1    underlying provisions, are any of the subjects

2    that are the subject matter, the topics that

3    are the subject of blacklines, topics that you

4    had not described or discussed with the UAW

5    prior to them receiving that proposal on March

6    24th?

7    A.    I don't recall discussing a performance

8    bonus of three percent prior to that.  And as

9    I sit here, I am uncertain whether I mentioned

10    profit-sharing.  I believe I did but I'm

11    uncertain, specifically, as it relates to

12    that.  And I -- I don't believe, to the extant

13    of detail and sub-benefits, that we discussed

14    that in great detail.

15    Q.    Other than those subjects, profit-

16    sharing, performance bonuses, supplemental

17    benefits, any other topic that was blacklined

18    not discussed with them prior to the delivery?

19    A.    To the best of my recollection, I believe

20    they were covered.

21    Q.    Mr. Kennedy, in his cross-examination,

22    asked you very specific questions about formal

23    proposals.  Do you recall that testimony,

24    those questions and your answers?

25    A.    I do.

38

1    Q.    Did you have any discussions with any

2    representative of the IUE from October through

3    today that were not formal?

4    A.    Yes.  In terms of general discussion,

5    yes, I did.  Yes, I've had informal

6    discussions with the IUE.

7    Q.    Have those discussions been just recently

8    or over a period of months?  Can you give the

9    Court some sense of the time frame?

10    A.    There have -- they have occurred on

11    periodic occasions through the months.

12    Q.    Did they begin last fall?

13    A.    Yes, it did.

14    Q.    Did they stop at any time?

15    A.    No, they did not.

16    Q.    You were asked in your cross-examination

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

17    about how often there were meetings with the

18    United -- the Steelworkers and with the

19    IUE/CWA.   Do you recall those questions?

20    A.   I do.

21    Q.   Are you the person at Delphi primarily

22    responsible for conducting those meetings?

23    A.   No, I am not.

24    Q.   Who conducted those meetings?  Who had

25    that responsibility?

39

1    A.   Principally, that would be Mr. Quick.

2    Q.   Okay.  I'd like you to look briefly at

3    Exhibit 12, please.  And, specifically,

4    Exhibits A and C.  Exhibit 12 is Mr. Quick's

5    declaration.  Exhibit A -- I'm not going to

6    ask you about the subject of these meetings

7    because they're Mr. Quick's meetings, but

8    these are the list -- Exhibit A is the list of

9    meetings that Mr. Quick has said he's had with

10    the IUE/CWA, is that correct?

11    A.   I believe that's true.

12    Q.   And does Mr. Quick report to you?

13    A.   He reports to Darryl Kid.

14    Q.   And --

15    A.   Mr. Kid reports to me.

16    Q.   Would you have received summaries of any

17    of these meetings in terms of being updated on

18    the progress of these discussions over the

19    course of the seven months?

20    A.   There would be general feedback to me.

21    Q.   Is the same true with Exhibit C, which is

22    Mr. Quick's list of the listing of the

23    meetings with the United Steelworkers?

24    A.    That's correct.

25    Q.    In your cross-examination, you were asked

40

1    a lot about the so-called one-size-fits-all

2    proposals.

3    A.    Yes.

4    Q.    Do you recall that?

5    A.    I do.

6    Q.    In -- as you evaluated these proposals,

7    Mr. Butler, do these proposals impact every

8    union the same way?

9    A.    No, they do not.

10    Q.    In your own words to the Court, can you

11    explain what you mean by that answer?

12    A.    As one example, the proposals that would

13    call for a modification of wages would have a

14    greater impact on certain unions that have

15    more or a higher proportion of their members

16    at full wage versus competitive wage, as

17    example.

18    Q.    I want to turn now to the testimony that

19    you -- the questions you were asked about

20    negotiating the 2007 collective bargaining

21    agreements with the unions.  Do you recall

22    that testimony?

23    A.    2007?

24    Q.    You were asked by counsel to Appaloosa

25    why not wait and simply negotiate this in

41

1    2007.  Do you recall that?

2    A.    Yes, I do.

3    Q.    And when did these contracts expire?

4    A.    In 2007?

5    Q.    When precisely?

6    A.    They vary from September through, I

7    believe, October.

8    Q.    Okay.  I'm not a labor lawyer, Mr.

9    Butler, so can you tell me, as the lead labor

10   negotiator for Delphi, when would the

11   negotiations regarding the September/October

12   2007 collective bargaining agreements begin to

13   be negotiated?

14   A.    We would generally, formally, kick off

15   negotiations in the mid-summer of 2007 but

16   then the focus within the pattern environment

17   that we're in with all the OEMs, we would tend

18   to be focused on after the conclusion of the

19   OEM bargaining.

20   Q.    Do you have a view, as Delphi's chief

21   labor negotiator, as to whether or not you

22   could complete your negotiations for Delphi

23   prior to the OEM negotiations being completed?

24   A.    Within the pattern that we -- and

25   experience we've had within that pattern, no,

42

1    we would not.

2    Q.    So, when would the unions likely turn to

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

3    you?

4    A.   After completion of the OEMs, which would

5    likely be sometime in September/October where

6    it would commence.

7    Q.   You were asked about impasse bargaining.

8    Can you explain to the Court in your own words

9    what that is?

10   A.   In my words, impasse bargaining is to

11   bargain in good faith, in earnest, until it

12   becomes clear we're hopelessly irreconcilable

13   and no practical prospect for a resolution.

14   Q.   Do you have any sense of -- from a time

15   perspective, when an impasse like that would

16   be achieved?

17   A.   Certainly, it would take, I think,

18   several weeks.

19   Q.   And could that happen this week for

20   October 2007?

21   A.   I don't believe so.

22   Q.   Could it happen this summer?

23   A.   I don't believe so.

24   Q.   Why?

25   A.   Because the natural kinks of bargaining,


43


1    particularly, with difficult issues, is -- you

2    are driven to closure by deadlines.

3    Q.   So do you have a view, as Delphi's chief

4    labor negotiator, as to when impasse on the

5    October or the September/October collective

6    bargaining agreements might occur, if it would

7    occur at all?

8  A.   It would be, in my opinion, at least 30

9  days beyond the end of the OEM cycle, perhaps

10  longer depending on the nature of the issues.

11  Q.   And what happens if you reach impasse at

12  that point in time?

13  A.   At that point in time, if we are at

14  impasse and the agreement is not extended,

15  then we have the -- we have the ability to

16  impose.  And the union, of course, has the

17  ability to strike.

18  Q.   Do you recall you were asked a series of

19  questions that were very specific about

20  economic analyses and other kinds of analyses

21  relating to a strike in or around the third

22  quarter of 2007 versus this summer?

23  A.   I do.

24  Q.   I'd like you, in your own words, to

25  describe for the Court your own evaluation,


44


1  however you have come to it, comparing the

2  risks to Delphi of a strike now or a strike in

3  October 2007?

4  A.   In my opinion, a strike in 2007, given

5  the cadence of bargaining and on the

6  assumption of bargaining impasse, would be far

7  more devastating to Delphi than a strike this

8  summer.  And I base that on both my

9  understanding and belief that the company

10  grows weaker across time without resolution

11  and that it also has significant impact, in

12  that there is an impact as it relates to our

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

13    impact on customers, if there is a strike as

14    they are in new model launch in the fall

15    versus if there were such action here in the

16    new term, depending on the timing and duration

17    and our stronger standing, financially, I'm

18    assuming, at this time versus later without

19    relief.  I think it would be a much more

20    devastating impact later.

21    Q.   When you said in that testimony "grow

22    weaker," what did you mean by that?

23    A.   It's -- it's my understanding that at the

24    operating level of the organization, we are

25    experiencing negative cash flow.  And in our

45

1    business, if we are fundamentally weaker --

2    our business is such that we bid, as I think

3    was mentioned by David Resnick yesterday, in

4    large chunks of bids or large chunks of

5    revenue, if you will -- often several hundred

6    million dollars of revenue at a time for

7    programs that last for multiple years and are

8    placed three to four years out with the

9    customers.  And if it is not clear that we are

10    financially viable, that puts us at risk with

11    customer behavior.  And if we are experiencing

12    negative operating cash flow, we become weaker

13    as an organization, as well.

14    Q.   Mr. Butler, one last question.  With

15    respect to those unions who unilaterally

16    negotiated benefit guarantees with General

17    Motors, in your judgment, would it be easier

18    or more difficult to negotiate a resolution of

19    the issues -- labor issues that are facing the

20    company after the GM benefit guarantee

21    expires?

22    A.    I believe it would be much more

23    difficult.

24    Q.    And why?

25    A.    Because the benefit guarantee, I believe,

46

1    acts as its own form of soft landing, if you

2    will, to mitigate the impact of the changes

3    that are necessary to make Delphi viable.

4          MR. BUTLER:  No further questions,

5    Your Honor.

6          THE COURT:  Okay.

7          MR. SIMON:  Could we have a stay-in-

8    place one minute --

9          THE COURT:  You want to talk to

10   yourselves?  Yeah, that's fine.  This is on

11   the redirect, Mr. Kennedy?

12         MR. KENNEDY:  Yes, Your Honor.  All

13   right.  The order will be I'll be doing a

14   brief redirect.  The other unions have a few

15   questions and then we --

16         THE COURT:  Well, re-cross.

17         MR. KENNEDY:  Re-cross.

18         THE COURT:  On the redirect.

19         MR. KENNEDY:  Pardon?

20         THE COURT:  On the redirect.

21         MR. KENNEDY:  Yes.  Cross on the

22   redirect.

23    RECROSS-EXAMINATION BY

24    MR. KENNEDY:

25    Q.    I want to just clear something up, Mr.

47

1    Butler, that I believe may have been confused,

2    if you'll just follow me a little bit.    On

3    redirect, you indicated -- if you look at page

4    -- or, rather, excuse me, Exhibit 89, which is

5    the March 2004 exhibit, that -- do you want to

6    get it?

7    A.    Yeah.  Yes.

8    Q.    I believe you indicated on redirect that

9    the matters that do not appear to be

10    blacklined or stricken in Exhibit 89 were

11    present in the original offer, which is

12    Exhibit 77, correct?

13    A.    I believe that's true.

14    Q.    All right.  Would you do me a favor and

15    look at Exhibit 83, which is the middle

16    exhibit, the November 15 proposal?

17    A.    I have it.

18    Q.    Now, if you look at Exhibit -- or, I

19    should say, page B2 of Exhibit 83, you'll note

20    that there is a strikeout in replacement of

21    some numbers that reflect monthly

22    contributions for medical and prescription

23    drug coverage?

24    A.    Yes.

25    Q.    Okay.  And then, if you turn to Exhibit

48

1    89 and go to that same B2 -- are you at that

2    page, sir?

3    A.   I am.

4    Q.   You'll note that the strikeout does not

5    appear on that same item, the monthly

6    contributions for medical and prescription

7    drug coverage.

8    A.   Yes, that's true.

9    Q.   So, would you agree with me that, in

10   fact, the strikeouts that appear in the March

11   24th proposal, which we've marked as Exhibit

12   89, only reflect the differences from the

13   November 15th proposal, that we've marked as

14   83, and do not go back to the original

15   proposal?

16   A.   In this instance, I believe that's true.

17   Q.   Well, isn't that true, in general, sir?

18   A.   I would have review the document each --

19   Q.   All right.  So, your testimony would

20   really only be what you observe of the

21   documents.  You don't either way for a fact,

22   is that correct?

23   A.   As a -- I would have to review the

24   documents in detail to give a detailed answer.

25   Q.   Okay.  Now, with respect to Document 89,

49

1    at page 27, your counsel directed your

2    attention to the definitive documentation

3    section in your -- I'm sorry.  It's Exhibit

4    89, page 27.

5    A.    Yes.

6    Q.    All right.  And counsel directed your

7    attention to the definitive documentation

8    section and I note that the last phrase of

9    that indicates that the parties agree that

10   they will "modify any provisions of the

11   current UAW/Delphi agreements" -- and I

12   believe this is repeated in the IUE/CWA

13   language as well -- "that are inconsistent

14   with this term sheet or which would preclude

15   the corporation from obtaining the full

16   savings sought by this proposal."  Now, wasn't

17   it your position at the time you gave this

18   proposal on March 24th that you did not need

19   to identify to the unions the amount of

20   savings that Delphi was expecting to obtain

21   from its proposals?

22   A.    It was not our objective to stipulate a

23   dollar amount but rather a competitive

24   agreement.

25   Q.    So, given the fact that you were not

50

1    asked -- you were not telling even the unions

2    what savings you were looking to achieve, how

3    could you ask them to agree that they would do

4    nothing that would preclude you from obtaining

5    the full savings that you were seeking by the

6    proposal?

7    A.    I believe our intent was -- if,

8    effectively, some provision was in conflict,

9    that would not allow us to be competitive and,

10    therefore, not allow us the full savings.

11    That was not our intent.

12    Q.    So that this was intended as a catch-all

13    provision ensuring that if in your -- in the

14    company's view, any aspect of this proposal --

15    of its contract was uncompetitive, the unions

16    would be required to agree to language which

17    would address that?

18    A.    That we would -- yes.  We would eliminate

19    or modify those provisions that would inhibit

20    that.

21    Q.    You testified in your redirect concerning

22    a press release that was put out by the

23    mobilization at Delphi Group.  I think that's

24    Exhibit 59.

25    A.    Yes.

51

1    Q.    And you -- you read that as a rejection

2    of the proposal that had been provided on

3    October 20th?

4    A.    Yes.

5            MR. BUTLER:  Objection, Your Honor.

6    That's not the right exhibit reference.

7            MR. KENNEDY:  I apologize.  I don't

8    have it in front of me.

9            MR. BUTLER:  He testified to Exhibit

10    62, not Exhibit 59.

11            MR. KENNEDY:  Well, thank you.  I

12    appreciate that.  I meant 62.

13    BY MR. KENNEDY:

14    Q.    I'm referring to the mobilization at

15    Delphi press release.

16    A.    Yes.

17    Q.    Now, you're an experienced bargainer,

18    correct?

19    A.    Yes.

20    Q.    Did it surprise you that the unions were

21    saying negative things about the proposal that

22    had been made on October 20th?

23    A.    Not particularly.

24    Q.    Isn't it true that it's not uncommon for

25    private negotiations to actually proceed

52

1    while, at the same time, on a public level,

2    the parties are quite at opposite ends of the

3    spectrum?

4    A.    It does if there are different signals,

5    if you will, between private and public.

6    Q.    But wouldn't it be fair to say that it

7    was not reasonable, just looking at -- alone

8    at the press release, to interpret a press

9    release as a substantive bargaining response?

10    A.    I think the press release was

11    confirmation of other input that we were

12    receiving directly.

13    Q.    But I was asking that the press release

14    itself, in your view as an experienced

15    bargainer, would be a reasonable place to

16    judge what a union's position was on proposals

17    that had been given to them?

18    A.    I have experience where press releases

19    are different than the other private

20    communication we have.

21    Q.    Now, you were asked about meetings that

22    took place between the company and the UAW in

23    your redirect?

24    A.    Yes.

25    Q.    I'd like to direct your attention to your

53

1    supplemental declaration which, I believe, is

2    Exhibit 8?

3    A.    Yes.

4    Q.    And Exhibit 8 -- I'll wait till you're at

5    it.

6    A.    Yes.

7    Q.    Exhibit 8 has attached to it a chart

8    that's entitled Kevin Butler Meeting With

9    Unions?

10    A.    Yes.

11    Q.    And would you agree with me that from

12    October 21st through March 24th, you met with

13    the UAW 15 or 16 times and with the IUE once?

14    A.    I'm sorry.  Could you give me the dates

15    again?

16    Q.    Sure.  October 21st --

17    A.    Right.

18    Q.    -- through March 24th.

19    A.    I met with the UAW several times and the

20    IUE, from this period -- from the 21st?

21    Q.    Yeah.

22    A.    Three times.

23    Q.    Well, I'm asking, from the 21st -- which

24    is the date of October 21st --

25    A.    Oh, I'm sorry.

54

1    Q.    I'll tell you why I'm doing this.  This

2    isn't calendar manipulation.  From the date of

3    the first proposal that you made through the

4    point of the March 24th proposal --

5    A.    My recollection is we presented a

6    proposal, I believe, on the 20th, at least,

7    the framework review of that with the IUE.

8    And then we had another meeting after that.

9    But I was involved in -- on January 30th.

10    Q.    All right.  So there was one meeting to

11    present the October proposal with the IUE?

12    The next meeting was January 30th?

13    A.    That's my recollection.

14    Q.    And that January 30th meeting, you've

15    entitled a leveling-up meeting?

16    A.    That's true.

17    Q.    And we know that that's for the purpose

18    of explaining to the IUE what's happening with

19    the other unions, right?

20    A.    That's true.

21            MR. KENNEDY:  All right.  No other

22    questions, Your Honor.

23            THE COURT:  Okay.

24            MR. KENNEDY:  Though there are

25    others to follow.

55

1    RECROSS-EXAMINATION BY

2    MR. PETERSON:

3    Q.    Hello, again, Mr. Butler.  I don't want

4    to belabor this bargaining in the press line -

5    -

6    A.    Good afternoon.

7    Q.    -- because I don't know how productive it

8    is.  But if you will take a look at the

9    exhibit you were asked about, Exhibit 59,

10   Unions' Forum Mobilizing at Delphi Coalition?

11   A.    Yes.

12   Q.    Take a look at the last sentence.  Could

13   you read that out loud?

14   A.    "Our unions have demonstrated time and

15   again our willingness and ability to develop

16   innovative, effective and fair approaches to

17   solving problems."

18   Q.    Now, you wouldn't read that as a

19   statement that the unions were not willing to

20   bargain with Delphi, would you?

21   A.    No, I would not.

22   Q.    Has anyone from the Steelworkers ever

23   said, to your knowledge, to anyone at Delphi

24   that the Steelworkers are not willing to

25   negotiate changes to the Steelworkers'

56

1    agreements?

2    A.    Not that I am aware of.

3          MR. PETERSON:  Thank you.

4    RECROSS-EXAMINATION BY

5    MS. ROBBINS:

6    Q.   I'll start out with the same question.

7    Has anyone from the IAM or the IBEW ever said

8    to you that they were unwilling to negotiate?

9    A.   Not that I am aware of.

10   Q.   When counsel asked you a question

11   concerning the status of the employees who are

12   represented by the unions and you mentioned

13   the leasing agreement and a LLC that had some

14   of the relationship of an employer, I wanted

15   to ask you, in terms of your reference to

16   Delphi Corporation, are you familiar that the

17   agreements between the IAM and the IBEW are

18   between Delphi Corporation and those unions?

19   A.   I am.

20   Q.   You made a reference -- your counsel

21   asked you a question as to whether before

22   today -- excuse me -- whether before today

23   anyone had raised the issue of the conflict

24   between your complete agreement and waiver and

25   all of the issues that still needed to be

57

1    discussed.  My question to you is to whether

2    you have reviewed the counterproposal which

3    the IBEW and the IAM submitted on April 20th?

4    A.   I have generally reviewed it.

5    Q.   Would you take a look at Exhibit 198,

6    which is the exhibits to a declaration and,

7    specifically, to the IAM/IBEW counterproposal,

8    page 8 of 9?  I think it's the very last page

9    of Exhibit 198.

10   A.   Page 8 of -- 9 of 9, counsel?

11    Q.    No.  Page 8 of 9.

12    A.    8 of 9.  I'm sorry.

13    Q.    And do you see in the left-hand column of

14    that page a reference to Complete Agreement

15    and Waiver?

16    A.    Yes.

17    Q.    And do you see a rationale that explains

18    the unions' position with respect to that

19    proposal?  Do you see that?

20    A.    I do see that.

21    Q.    Would you read it?

22    A.    Yes.  "Particularly, where the company

23    seeks to remove existing understanding

24    settlements and agreements, there will be

25    necessity of continuing negotiations to


58


1    resolve issues related to any existing

2    agreements and understandings which have been

3    removed.  In the absence of such negotiations,

4    there will be continuous litigation which is

5    expensive, inefficient and time consuming."

6    Q.    So, you did get a response that pointed

7    out the conflict between your indefinite

8    proposals and the waiver of agreement?

9              MR. BUTLER:  Objection to the

10    characterization of the agreements, Your

11    Honor.

12    BY MS. ROBBINS:

13    Q.    Would you agree with me that you did

14    receive a response, before your cross-

15    examination, with respect to the conflict

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

16    between the complete agreement and waiver

17    proposal and other issues left open?

18    A.    I would agree that there is a rejection

19    and rationale regarding the complete agreement

20    and waiver.

21    Q.    And does that point out to you the

22    conflict between that waiver and other

23    provisions of your proposal?

24    A.    That's unclear to me.

25    Q.    Have you gotten back to the IBEW and the

                                                                59

1    IAM in response to this explanation of their

2    problem with your proposal?

3    A.    We have not.  I have not.

4          MS. ROBBINS:  No further questions,

5    Your Honor.

6          THE COURT:  Okay.

7    RECROSS-EXAMINATION BY

8    MS. MEHLSACK:

9    Q.    Mr. Butler, you were asked about meetings

10    with other unions other than the UAW and, I

11    believe, you stated that you have summaries of

12    meetings received from your staff of meetings

13    with the other unions.  Do you have any

14    summaries from your staff of meetings between

15    your staff and the Operating Engineers?

16    A.    I think I indicated that I get general

17    input or recap.  I don't believe I have any

18    written summaries.

19    Q.    Mr. -- I will ask the reporter to read

20    back the answer to the question, if necessary,

21   but you specifically used the word summaries,

22   Mr. Butler.  Are you now retracting that

23   testimony?  You do not have summaries of those

24   meetings?

25   A.   Sorry, counselor.  I took your remark to

60

1   be written summaries and I -- if I used the

2   term summaries, I meant I get verbal input

3   after meetings.

4   Q.   So, it is your statement today you have

5   no written summaries from your staff, no

6   written accounts of any kind.  No memos, no

7   emails, nothing in writing that summarizes

8   accounts -- that gives you a summary account

9   of meetings of your staff with the Operating

10   Engineers.

11   A.   I may have written documents.  I meant to

12   infer that I have no standard regular written

13   summaries.

14   Q.   Mr. Butler, please.  Standard or

15   otherwise, do you have written accounts from

16   your staff of meetings with the Operating

17   Engineers and what occurred during those

18   meetings?

19   A.   Not that comes to mind, no.

20   Q.   So that if I were to request counsel to

21   produce any such summaries, there will be

22   nothing produced, as far as you recall?

23   A.   As I sit here, I do not know.  There may

24   be emails.

25        MR. BUTLER:  Your Honor, I'll just

61

1    -- at this point, I've been waiting -- my

2    question to -- if you go back and look and the

3    record, my question to Mr. Butler had nothing

4    to do with this union.  I asked about specific

5    summaries of meetings that Mr. Quick had with

6    two specific unions.

7            MS. MEHLSACK:  Mr. Butler, you did

8    not ask about summaries.  You asked about

9    meetings and Mr. Butler offered -- volunteered

10   the information that he had summaries of

11   meetings.  I'm going to make a formal request

12   on the record.  Will you provide me, please,

13   with any summaries that exist of meetings

14   between the Operating Engineers and Mr.

15   Butler's staff?

16           MR. BUTLER:  For what purpose?

17           MS. MEHLSACK:  So that I can review

18   them for cross-examination of Mr. Gerling.  So

19   that I can review them for purposes of writing

20   -- of delivering a closing statement.

21           MR. BUTLER:  I'll be happy to meet

22   and confer with you after this.  If you're

23   unhappy with the response, you can to Court.

24           MS. MEHLSACK:  Thank you.

25   RECROSS-EXAMINATION BY

62

1    MR. LAURIA:

2    Q.   My name is Tom LauriA.   Good afternoon,

3    Mr. Butler.  Just a couple of quick questions.

4    What is the total liquidity of Delphi today?

5    A.   That's -- I do not recall.

6    Q.   Isn't it true that it's over three

7    billion dollars?

8    A.   That sounds -- that sounds correct to me,

9    but I do not recall.

10   Q.   Isn't it true that the company has over

11   1.75 billion dollars of availability on its

12   DIP facility?

13   A.   That could me.  That number -- the

14   specific number I don't -- I don't recall.

15   Q.   All right.  Isn't it true that the

16   company monitors its actual and anticipated

17   liquidity on a regular basis?

18   A.   I believe that's true.

19   Q.   You don't of any reason you couldn't seek

20   Court relief, with respect to your CBAs, at

21   any time when the company determines that its

22   liquidity got to or approached a danger zone,

23   do you?

24           MR. BUTLER:  Objection.  Outside of

25   redirect.  I don't know what that was about.


                                                  63


1           THE COURT:  No, I don't think so.

2    He was talking about the company's decreasing

3    resources over the time between now and

4    September of 2007.

5           MR. BUTLER:  I'll withdraw it, Your

6    Honor.

7           THE WITNESS:  I'm sorry, counselor.

8   Could you repeat the question?

9   BY MR. LAURIA:

10   Q.   You don't know of any reason why you

11   couldn't seek Court relief, with respect to

12   your collective bargaining agreements, at any

13   time when the company determined that its

14   liquidity got to or approached a danger zone,

15   do you?

16   A.   I believe that we could seek relief and

17   there would be the risks of -- if we were

18   moving into a danger zone that it would

19   threaten our revenue and our relationship with

20   customers.

21   Q.   But you don't know of any reason you

22   couldn't seek that relief, do you?

23   A.   Not that I'm aware of.

24   Q.   Isn't it true that you're already

25   negotiating work rules, in terms of

64

1   employment, that would be effective the

2   expiree of the current collective bargaining

3   agreements?

4   A.   I'm sorry.  Again?  Could you repeat the

5   question, please?

6   Q.   Isn't it true that you're already

7   negotiating work rules and work terms that

8   would be effective after the expiree of the

9   current collective bargaining agreements?

10   A.   I'm -- I'm uncertain as to --

11   Q.   Could you look at Exhibit 89, please?

12   A.   Yes.

13    Q.    Para -- page 5.  The heading Duration.

14    And maybe you could just read it out loud for

15    the Court?

16    A.    I'm sorry.  Again?  Exhibit?

17    Q.    89.

18    A.    89, thank you.  And if you could give me

19    the specific reference again, counselor?

20    Q.    Page 5.

21    A.    Thank you.

22    Q.    The section entitled Duration?

23    A.    Yes.

24    Q.    Could you just read that out loud for the

25    Court, please?

                                                        65

1    A.    "The UAW/Delphi National/Local Agreements

2    as modified by this term sheet shall continue

3    in effect until 11:59 on May 2010, subject to

4    the modification and termination provisions of

5    Paragraph 223 of the UAW National Agreement --

6    UAW/Delphi National Agreement."

7    Q.    When did the current agreements expire

8    again?

9    A.    The current agreements expire in 2007

10    with the exception of Doc 13 for the --

11    Document 13 for the UAW.

12    Q.    May 1, 2010 is after that date, correct?

13    A.    Yes, it is.

14    Q.    Isn't it true that the current

15    negotiations would be relevant in determining

16    if impasse is reached at the end of the

17    current CBAs?

18    A.    It could be.

19            MR. LAURIA:   Thanks.

20    RECROSS-EXAMINATION BY

21    MR. SIMON:

22    Q.    Good afternoon, Mr. Butler.

23    A.    Good afternoon, counselor.

24    Q.    I understand from your testimony that you

25    understood Delphi's November 15th, '05


66


1    proposal was not acceptable to the UAW as the

2    framework for negotiating a comprehensive

3    agreement, correct?

4    A.    That's correct.

5    Q.    And you say that you were informed by the

6    UAW that the November 15th, '05 proposal was

7    in fact an impediment to such negotiations,

8    correct?

9    A.    That's true.

10    Q.    And that withdrawal of that proposal

11    would provide a more conducive atmosphere for

12    negotiations, correct?

13    A.    That's correct.

14    Q.    And you hoped that the withdrawal of your

15    November 15th proposal would then lead the

16    parties to engage in responsible and serious

17    negotiations, correct?

18    A.    That's correct.

19    Q.    And remove the impediment, correct?

20    A.    That's correct.

21    Q.    And, indeed, there were serious and

22    responsible negotiations, were there not?

23    A.    There were.

24    Q.    And there were, in the context of what

25    you've described as your agreement, that a

67

1    better way to approach those negotiations was

2    through a multi-step process, correct?

3    A.    We agreed that it would be a productive

4    approach, multi-step.

5    Q.    And you shared that judgment?

6    A.    Yes.

7    Q.    So, on December 19th, you then did

8    conditionally withdraw your November 15th

9    proposal, correct?

10    A.    That's true.

11    Q.    Now, you testified that after your

12    withdrawal on December 19th, you did not

13    receive a comprehensive proposal from UAW,

14    correct?

15    A.    That's true.

16    Q.    But you had agreed with the UAW and

17    General Motors in or about that time frame,

18    perhaps a little or few weeks after your

19    December 19th withdrawal, that the way to

20    proceed was not by a comprehensive one-step

21    exercise but rather through a multi-step

22    process identifying three areas in which to

23    approach the problem and prioritizing those

24    areas, correct?

25    A.    As a means to a comprehensive solution.

68

1  Q.   That is correct.  And, in fact then, in

2  connection with those three areas which you

3  identified and agreed upon, specifically,

4  attrition, footprint and then wages and

5  working conditions, you focused on the

6  attrition program, correct?

7  A.   We did.

8  Q.   Was that an easy issue?

9  A.   That was a very challenging issue.

10  Q.   And it was extremely complex, was it not?

11  A.   It was.

12  Q.   And it involved lengthy, serious, complex

13  negotiations, some bi-lateral, some tri-

14  lateral, between UAW, General Motors and

15  Delphi?

16  A.   I think that's a fair representation.

17  Q.   Over what period of time did those

18  negotiations take place?

19  A.   Those negotiations?  Could you please

20  clarify?

21  Q.   The negotiations over (a)the

22  establishment of the three-step process;

23  (b)the prioritizing of the issues; and (c)the

24  resolution of the attrition issue as you've

25  just described.


69

1  A.   Generally, from -- say, mid-January to

2  the attrition program conclusion on March

3  22nd.

4    Q.    And the March 22nd agreement, which the

5    Court approved last week, and is not doubt

6    familiar with its complexity was reached on

7    March 22 and was considered by Delphi to be a

8    significant achievement, was it not?

9    A.    An important step toward a comprehensive

10    solution.

11    Q.    And a significant achievement?

12    A.    In regards to an important first step, it

13    is significant.

14    Q.    And it was the completion of the first

15    step that you had identified as necessary

16    towards the process of reaching a

17    comprehensive agreement?

18    A.    An important first step but not a

19    solution in and of itself.

20    Q.    Understood.  And that important first

21    step took approximately two months to

22    negotiate and conclude, correct?

23    A.    I think the -- that would not be my

24    characterization.  We spent time talking about

25    all the issues involved in a total

70

1    comprehensive solution.  And so, I don't think

2    it's fair to say it was that entire time

3    solely on the attrition program.

4    Q.    But that was the focus of the

5    negotiations?

6    A.    When we began to focus on the specific

7    issue at hand, the focus became the attrition

8    program.

9    Q.    And approximately when, during the mid-

10   January to March 22 period, would that have

11   been?

12   A.    I believe we began focus on that in

13   earnest in late February, early March.

14   Q.    So that it took three to four weeks to

15   conclude negotiations once you began to focus

16   on the attrition program?

17   A.    I believe that's roughly appropriate.

18   Q.    Close enough?

19   A.    Yeah.

20   Q.    Well, you described the benefit of

21   pursuing the multi-step process as being that

22   the parties, acting in good faith, could make

23   progress and produce a soft landing, correct?

24   That was your view of the -- in your

25   risk/reward analysis of single step against


71


1    multi-step, that was your view of the

2    advantage of pursuing the multi-step process?

3    A.    Particularly, in light of the requirement

4    for GM's involvement to bring this to life, I

5    think that's fair.

6    Q.    And was that benefit in your risk/reward

7    analysis as apparent to you on March 22nd as

8    it was when Delphi made the judgment to go

9    along with the multi-step rather than the

10   single step process?

11   A.    I'm sorry.  Could you repeat the

12   question?

13   Q.    Yeah.  You had described the benefit of

14  pursuing the multi-step process that the

15  parties acting in good faith could make

16  progress and produce a soft landing?

17  A.    Yes.

18  Q.    Okay.  And did you still see as a benefit

19  of the multi-step process, which had two more

20  steps to go, right?  The analysis and

21  definition and agreement upon what we call the

22  footprint -- you call it the site solution,

23  and finally, as the last ingredient, agreement

24  on the wages, terms and conditions of

25  employment that would be applicable to the

72

1  remaining employees, correct?

2  A.    I would only qualify that last piece.  It

3  also included what I've called flexibility

4  issues, Document 13, jobs bank and so forth.

5         MR. BUTLER:  Critical --

6  BY MR. SIMON:

7  Q.    I include that in working conditions.

8  We're in agreement on that subject.

9  A.    Thank you.

10  Q.    But, in any event, that's the third

11  bundle of the three-issue bundle?

12  A.    Generally speaking, yes.

13  Q.    So, on March 22, you had completed

14  serious, complex negotiations with regard to

15  critical step number one, the issue you had

16  identified and prioritized as the first issue

17  to be dealt with, and that had, in effect,

18  borne out the wisdom of your December 19th

19    conditional withdrawal to remove the

20    impediment on negotiations and permit those

21    negotiations to go forward, correct?

22    A.    It had created a first step and,

23    arguably, the easiest step of the entire

24    process.

25    Q.    I'm sorry.  And?

73

1    A.    Arguably the easiest step of a total

2    solution.  This was a voluntary program with

3    incentives and the remaining issues were much,

4    much, much more difficult to deal with.

5    Q.    Thank you.  So that having completed the

6    easiest of the three issues that you had

7    identified as necessary for a comprehensive

8    agreement, one which, when you finally focused

9    upon it, took some three to four weeks to

10    conclude.  It was the easiest one.  You now

11    had two more issues to address.  It's now

12    March 22nd.  Did you not understand, Mr.

13    Butler, that if you were to submit again two

14    days later a modestly updated version of your

15    November 15th proposal, which you understood

16    not to be a framework for negotiations toward

17    an agreement and which you understood to be an

18    impediment to negotiations, that you were once

19    again creating an environment that would not

20    produce those negotiations and would again

21    constitute an impediment?  Did that not occur

22    to you?

23    A.    In light of the momentum and the support

24    that had been garnered from General Motors, we

25    felt that the March 24th proposal, that

74

1    included more that could be done with GM

2    assistance and subsidy, to be a constructive

3    step.

4    Q.    Were you not informed, Mr. Butler, by the

5    UAW that the submission of such a proposal and

6    the following of it by an 1113 within days

7    would constitute an impediment to serious

8    negotiations?

9    A.    I recall the UAW indicating that -- to --

10    an 1113 filing would complicate the issues of

11    negotiation.

12    Q.    And wasn't, specifically, the word

13    impediment used in that communication?

14    A.    I don't recall.

15    Q.    Nevertheless, notwithstanding the fact

16    that you were so informed by the UAW, as you

17    had been informed in response to your November

18    15th proposal, by your own admission, you

19    nevertheless on October 24th, two days after

20    your significant achievement, filed virtually

21    the same proposal that you knew was

22    unacceptable back in November, correct?

23    A.    I believe we provided the proposal that

24    memorialized the discussions we'd been having

25    in a three-way -- three-way meetings.

75

1   Q.    And nine days later, nine days after your

2   significant achievement on the easiest of the

3   three elements necessary for a comprehensive

4   agreement, that had taken three to four weeks

5   to negotiate extremely complex, but you say

6   the simplest, you filed the 1113, correct?

7   A.    We did file the 1113.

8   Q.    And you did not understand that would be

9   an impediment to continued negotiations of the

10  good faith character you had sought to achieve

11  by withdrawing the proposal on December 19th,

12  correct?

13  A.    I understood that the union had indicated

14  -- UAW had indicated their view is an 1113

15  filing would be a complication or difficulty

16  with bargaining.

17          MR. SIMON:  No further questions.

18          THE COURT:  Let me follow up on that

19  because I think you said a couple of times

20  that it was the company's hope, both when it

21  adopted the two-step, or even when there's a

22  three-step approach, that notwithstanding the

23  risk that there would be lost momentum after

24  each step, that it would lead to a

25  constructive solution of the whole problem.

76

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  And I think you also

3   said that the company intended and, I believe,

4   also made it clear to the UAW that if it

5   received sufficient indications of interest or

6    signs or the like, after March 22nd and before

7    the March 31st deadline, it would consider

8    extending the deadline?

9              THE WITNESS:  That's correct, Your

10   Honor.

11             THE COURT:  Had there been any

12   communication to the UAW as to what sort of

13   signals you had in mind?

14             THE WITNESS:  We had had discussion

15   -- I would call it informal discussion but

16   discussion where we asked whether we would

17   receive a counterproposal to our proposal out

18   there that would provide a framework to

19   resolve our issues or work our issues

20   comprehensively.

21             THE COURT:  So you were looking for

22   some form of response?

23             THE WITNESS:  Yes.  On a more

24   comprehensive basis.

25             THE COURT:  And what about the


                                                    77


1    notion of doing this in the process where the

2    footprint would be next and then the wages and

3    working conditions?

4              THE WITNESS:  It -- I -- that, in

5    terms of trying to tackle the complexity of

6    this issue, seemed like a manageable way to

7    break the issues down and deal with them but

8    was not a substitute for some kind of more

9    comprehensive framework.  It was open-ended,

10   if you will.

11          THE COURT:  Did you get at least a

12    response in respect of the footprint issue?

13          THE WITNESS:  Not that one that

14    would suggest that we would make significant

15    progress on that issue.

16          THE COURT:  Did you get any sort of

17    indication of a timetable to work both, the

18    footprint and the wages, working conditions,

19    flexibility, jobs bank?

20          THE WITNESS:  No, we did not, Your

21    Honor.

22          THE COURT:  Did you ask for one?

23          THE WITNESS:  We did ask for whether

24    we could use the time to either construct a

25    framework, be it counterproposal or framework,

78

1    prior to the end of the month, the 31st

2    deadline we had out there.  And we did not

3    receive anything specific.

4          THE COURT:  Now by that, do you mean

5    you asked for a proposal as to certain

6    deadlines that the parties would hold

7    themselves to for a process to get to an

8    agreement?

9          THE WITNESS:  We -- I don't recall

10    asking for a specific timetable but rather,

11    would we get a proposal or some kind of

12    indication that we could use to indicate that

13    there was going to be constructive and

14    substantial progress.

15          THE COURT:  And when was that

16    sought?  Was that sought before the 22nd?

17         THE WITNESS:  As I recall, that

18    dialogue took place throughout the process and

19    then was brought it sharper focus after the

20    22nd.  And, as I recall, we did raise the

21    issue that, while it was not a preferred

22    approach, if what was necessary was to bargain

23    exclusively with the UAW and then take the

24    result and resolution cost to General Motors,

25    we were prepared to do that.


79

1          THE COURT:  All right.  And was that

2    -- when you say, you know, up -- before and

3    along the 22nd, were there any indications the

4    company was still looking for that type of

5    approach -- a response even after it put the

6    March 24th proposal on the table?

7          THE WITNESS:  I believe -- I believe

8    that's correct, Your Honor.  I think that's a

9    fair characterization.  We were looking for a

10   response on how to resolve this issue

11   comprehensibly and we continued to seek that.

12         THE COURT:  Did the UAW tell the

13   company, before the company made that March

14   24th proposal, that if it did so, that would

15   preclude it getting in response some form of

16   counterproposal or --

17         THE WITNESS:  Not that I recall.

18         THE COURT:  Okay.  Let me turn

19   briefly to another topic that you discussed

20   because I'm not quite sure I understood this.

21    I think Mr. Kennedy was asking you and a

22    number of other counsel for the different

23    unions asked you also about specific cost

24    savings.

25            THE WITNESS:  Yes, Your Honor.


80


1            THE COURT:  And your response has

2    consistently been that the company's proposals

3    are not based on specific cost savings but

4    more on the ?? (12630) of generic agreements

5    that affect competition adversely.

6            THE WITNESS:  Yes.  That our

7    proposals, Your Honor, were based on what our

8    competitors -- their labor arrangements have

9    as we compete for work.

10            THE COURT:  All right.  But then I

11    think -- at least I had that in my notes, that

12    you said that the unions, at least those that

13    had financial advisors, could model specific

14    savings under various scenarios, based on the

15    information the company had given you?

16            THE WITNESS:  It -- I think -- what

17    I was trying to indicate, Your Honor, is that

18    there were models passed and the unions,

19    through both their bargaining experience and

20    with their advisors, could model the impact

21    which, depending on assumptions could gen up

22    savings.

23            THE COURT:  All right.  Well, my

24    question is when you say models were passed,

25    has the company developed a financial model

81

1    that it has shared with the unions?

2            THE WITNESS:  It's my understanding

3    that the company, and along with Rothschild,

4    has passed models that model the steady state

5    as well as the impact of the competitive

6    benchmark.

7            THE COURT:  And it's your view that

8    if you, in a negotiation with the union,

9    wanted to show the affect of savings, in

10   connection with a particular provision under

11   various scenarios, depending on, for example,

12   the income the company was making in that

13   plant or that ?? (12822) was losing in that

14   plant, that you would be able to go to this

15   model and instruct Rothschild to run that

16   assumption so you could come up with a

17   hypothetical based on a projection and see as

18   particular savings?

19           THE WITNESS:  I don't think the

20   model would operate at the plant level, Your

21   Honor.  I think it's a broader model.  But

22   through assumptions on the penny sheets, on

23   how we model wage and benefits, that it could

24   be ascertained -- the impact, if you will.

25   Depending on the wage rate and benefit loan

82

1    versus how many employees that are assumed, if

2    you will.  That are assumed.

3              THE COURT:  So the modeling is under

4    divisional level?  Or, how does it --

5              THE WITNESS:  I believe the modeling

6    is broadly at a corporate level.

7              THE COURT:  Corporate level.

8              THE WITNESS:  And we have provided

9    now some plant level.  We retained a firm back

10   in December to provide some plant level and

11   that information has just recently been

12   flowing.

13             THE COURT:  Is that in the form of a

14   model also or is that something that they

15   would have to make their own models out of?

16             THE WITNESS:  I am uncertain as I

17   sit here, Your Honor, whether that's an

18   interactive model.

19             THE COURT:  In negotiating other --

20   in past negotiations that you've been involved

21   in where the company is asked for concessions

22   with respect to -- as I gather, at least at

23   the plant level that has occurred with some of

24   the unions.

25             THE WITNESS:  Yes.

83

1              THE COURT:  Had those negotiations

2    turned on specific cost savings or have they

3    been more generic as far as the give and take

4    between the union and the company?

5              THE WITNESS:  They've been -- they

6    have been somewhat more generic but in some

7   instances, for example, we have targeted

8   competitive cost levels to try to win bids.

9   We've interacted with the unions to say this

10   is the labor cost level.  We concurrently see

11   that we'll be required to be competitive and

12   win these bids.  So, we actually have a

13   combination of interactions like that.

14       THE COURT:  Does the company have

15   the data to do that type of negotiation if

16   that's where a particular union wants to go in

17   the study?  At least to show them that it's --

18   that the company's proposal is just --

19   actually, foots out --

20       THE WITNESS:  I think we have, with

21   the plant level analysis that's been done and

22   with penny sheets that we've had against

23   competitive practice, I think the factors are

24   available broadly.

25       THE COURT:  And -- I'm not sure I

84

1   heard you.  Is that -- when was that provided

2   to the unions?

3       THE WITNESS:  I think the plant

4   level data went just recently within the last

5   ten days, I believe.

6       THE COURT:  And the penny sheets?  I

7   think I remember in the affidavits, but --

8       THE WITNESS:  Penny sheets were made

9   available, I think, in November and, again,

10   we've had a history of using penny sheets.

11   Our unions are quite familiar with those.

12          THE COURT:  Okay.  All right.  Does

13    anyone want to ask any questions on those

14    questions that I just asked?

15          MR. PETERSON:  Your Honor, just one

16    thing.

17    FURTHER CROSS-EXAMINATION OF

18    MR. PETERSON:

19    Q.    I think it's clear but this sort of

20    reading of end trails about what sign you

21    needed from the UAW and so forth to avoid

22    filing your 1113, it had nothing to do with

23    the Steelworkers?  You weren't looking for any

24    sign or wiggle or response from the

25    Steelworkers?  This was a UAW-based thing,

85

1    right?

2    A.    The specific discussion I referenced for

3    the UAW.  We were ardently hopeful of

4    counterproposals or some significant

5    indication from any of the unions.

6    Q.    And then you wouldn't have filed it?

7    A.    It would have been a consideration.

8          MS. ROBBINS:  Just a similar

9    question, Your Honor, on ??(13219).

10          THE COURT:  Well, my question just

11    weren't to the UAW.  Were you looking for

12    indications or signs of whatever I was asking

13    you about from anyone other than the UAW at

14    that time?

15          THE WITNESS:  We were hopeful of

16    signs from any union.  We, of course, through

17    the three-way bargaining, had highest focus on

18    the UAW, Your Honor.

19         THE COURT:  Okay.  And you hadn't

20    specifically gone to any of the other unions

21    and said we want --

22         THE WITNESS:  As I recall --

23         THE COURT:  We want a time frame or

24    schedule or, you know, a framework for

25    bargaining or anything like that?


86


1          THE WITNESS:  I believe we had

2     conversation with the IUE who had indicated

3     that a counterproposal asking whether we would

4     receive that.  And beyond that, I don't recall

5     specific discussions with the other unions.

6          THE COURT:  Okay.

7          MR. BUTLER:  I'm sorry.  You have

8     more recross?

9          MR. FOX:  Yeah.

10         THE COURT:  I just don't remember

11    Mr. Butler asking any questions of your issue

12    but go ahead.

13         MR. FOX:  He did.

14         THE COURT:  Okay.  All right.  It

15    obviously had an impact, right?

16         MR. FOX:  Well, on me, at least.

17    FURTHER CROSS-EXAMINATION OF

18    MR. FOX:

19    Q.   Mr. Butler, you indicated in the redirect

20    by your counsel, Mr. Butler, some reasons why

21    you thought it would be beneficial to deal

22    with the labor issues now rather than waiting

23    till the fall of 2007 to do that.  Do you

24    remember that testimony?

25    A.    I do.


87


1    Q.    And one of those reasons was that if you

2    reach agreement or cut back on the benefits

3    now, that the unions, or at least some of the

4    unions, have the benefit of benefit guarantees

5    that they've obtained from General Motors,

6    correct?

7    A.    Some of the unions do, that's true.

8    Q.    Okay.  And the unions that have that, I

9    believe, are the UAW, the Steelworkers and, I

10   think, the IUE, is that right?

11   A.    That's my understanding.

12   Q.    And if you waited until 2007 when those

13   benefit guarantees go away, then there would

14   be, in effect, less of a soft landing once

15   those benefit guarantees are gone than there

16   is today with them in existence, correct?

17   A.    On the assumption that the benefit

18   guarantees would go away.  It's unclear to me

19   whether they do or not.

20   Q.    Well, assuming they -- you're assuming

21   they expire in 2007, as presently drafted,

22   correct?

23   A.    On the assumption that they are not

24   extended through negotiation then I think it's

25   reasonable to say that they would not be there

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

88

1    as a soft landing.

2    Q.    All right.  Well, but as they stand

3    today, they expire in 2007, correct?

4    A.    As do many of our agreements, yes.

5    Q.    Okay.  Now, there is also an agreement

6    between Delphi and General Motors by which

7    Delphi indemnifies General Motors to the

8    extent General Motors pays on the guarantee --

9    the benefits guarantees, correct?

10    A.    It's my understanding there is a

11    commercial agreement or covenant between

12    Delphi and General Motors as relates to the

13    benefit guarantees for the UAW.

14    Q.    Does that mean the answer to my question

15    is yes?

16    A.    I was narrowing it because I am not aware

17    of that commercial arrangement for the IUE and

18    the Steelworkers.

19    Q.    Take a look, if you would, at Exhibit 75,

20    please.

21    A.    Allow me to arrange the books.  I have

22    it.

23    Q.    Okay.  And within Exhibit 75, there are,

24    I guess, the two agreements.  Exhibit -- the

25    agreement that's marked Exhibit 99.1 is the

89

1    indemnification agreement by Delphi

2    Corporation of General Motors in the event

3    General Motors pays on the UAW benefit

4   guarantee, correct?

5   A.    I believe that's true.

6   Q.    Okay.  And although this agreement says

7   that it's -- the Delphi party is Delphi

8   Automotive Systems Corporation, I think we've

9   previously established that that was

10  previously the name of Delphi Corporation.

11  Are you aware of that?

12  A.    I believe that's the case.

13  Q.    Okay.  So, by entering into -- or by

14  having the unions take account or use the

15  benefit -- or take advantage of the benefit

16  guarantees today, the cost of the benefit

17  guarantee, at least with respect to the UAW

18  comes back as a liability against Delphi

19  Corporation.  Whereas, if you waited until

20  these agreements expired in 2007, that

21  liability would not come back to Delphi

22  Corporation, correct?

23  A.    On those assumptions, that could be true.

24  Q.    Could be true or is true?

25  A.    I -- I'm -- I'm not authoritative on the

90

1   operation of this and liabilities and claims,

2   but if the benefit guarantee is assumed to

3   expire, then I believe what you're saying is

4   true.

5           MR. FOX:  Thank you, Mr. Butler.

6           MR. BUTLER:  I have no further

7   direct, Your Honor.

8           THE COURT:  All right.  You can step

9    down, Mr. Butler.

10           THE WITNESS:  Thank you, Your Honor.

11           MR. BUTLER:  Your Honor, before

12   proceeding with the next witness, does it make

13   sense to take the afternoon break or do you

14   want to keep going?

15           THE COURT:  Oh, there's an afternoon

16   break?

17           MR. BUTLER:  I was put up to it by a

18   few people but if not, Your Honor --

19           THE COURT:  You know, I'm going to

20   check on the air conditioning again.  So, a

21   ten minute break would be fine.

22           MR. BUTLER:  Yes, yes.

23       (Recess from 3:55 P.M. to 4:14 P.M.)

24           THE COURT:  Please be seated.  All

25   right, back on the record on Delphi.


                                              91


1            BY MR. DECHIARA:    Your Honor,

2    continuing with the debtors' case in chief,

3    I'd like to ask Dr. Michael L. Wachter to the

4    stand to be cross examined in connection with

5    his declarations which are Exhibits 16 and 17

6    which I move into evidence.

7            BY MR. BUTLER:  And, Your Honor, the

8    order of cross examination will be UAW, IUE,

9    Steelworkers, IBEW and Operating Engineers.

10           THE COURT:  Okay.

11           MR. BAUMSTEIN:  And, Your Honor,

12   very briefly, again Doug Baumstein on behalf

13   of shareholders.  I know this issue had been

14    addressed in the meet and confer specifically

15    with respect to Professor Wachter and his

16    testimony.  It is was our position that Mr.

17    Wachter is purporting to offer expert

18    testimony that goes to their order of proof

19    and goes to issues of comparability.  We

20    believe those issues go to the type of relief

21    that's appropriate here, and whether what is

22    being sought is likely to either be good

23    enough to either satisfy the unions or

24    alternatively push them toward -- even more

25    toward a strike and goes to -- ultimately to

92

1     the business judgment of the debtors.  I would

2     also note that -- I know you have ruled on

3     this issue before, at least at the meet and

4     confer that, with respect to the meet and

5     confer process between the unions and the

6     debtors that, allowing Appaloosa to have this

7     deposition would interfere with that.  I just

8     note for the record that Appaloosa did not

9     participate, was not invited and was not even

10    aware of that meet and confer at the time it

11    happened.  So we re-raise our application with

12    respect to Professor Wachter.

13            THE COURT:  Okay, well first,

14    basically for the same the reasons up, I'll

15    deny it.  Base on my review of Mr. Wachter's

16    declarations.  I think his being offered up by

17    the debtors here really goes to the 1113

18    issues primarily as opposed to business

19    judgment at to whether to, at this time seek

20    to reject if, if there's no agreement.  So,

21    again, given that peripheral tie to the

22    shareholder's issue and the agreements worked

23    out between the main litigants here.  I don't

24    think it's a fair result that you didn't get a

25    separate deposition on him.


93


1              MR.BAUMSTEIN:  Thank you, Your

2    Honor.

3              (The witness is sworn.)

4              THE COURT:  For the record, would

5    you spell you name?

6              THE WITNESS:  Michael Wachter.

7    Michael: M-I-C-H-A-E-L, W-A-C-H-T-E-R.

8              THE COURT:  Do you want to shut

9    this?

10             MR. DECHIARA:  Good afternoon, Your

11   Honor, Peter Dechiara from the law firm of

12   Cohen Weiss and Simon for the UAW.  Good

13   afternoon Mr. Wachter.

14             THE WITNESS:  Good afternoon.

15   CROSS-EXAMINATION BY

16   MR. DECHIARA:

17       Q.   Mr. Wachter, your analysis in this

18   case is based on the principle of

19   comparability, is that correct?

20       A.   Yes, it is.

21       Q.   And comparability is the principle

22   of labor economics in which the economists

23   compares the pan benefits of a group of

24    workers under study to a group of similarly

25    situated workers, is that correct?

94

1        A.   Yes, that's correct.

2        Q.   Okay.  And this is not the first

3    time that you have done a comparability study,

4    correct?

5        A.   That's correct.

6        Q.   Okay.  And in fact, in your

7    declaration in this case which is Joint

8    Exhibit 16, do you have that in front of you?

9        A.   Yes, I do.

10        Q.   In paragraph one you indicate that

11    you have appeared on several occasions in

12    interest arbitrations between the United

13    States' Postal Service or on behalf of the

14    United States' Postal Service is that correct?

15        A.   Yes.

16        Q.   Just so we all understand what an

17    interest arbitration is, tell me if this is a

18    fair description.  An interest arbitration is

19    an arbitration proceeding typically held in,

20    or -- between public sector employers and

21    public sector unions where the parties are

22    unable to reach the terms of a new contract

23    and they choose a neutral party to -- an

24    arbitrator, to determine that the terms,

25    including the wages and benefits of the new

95

1    contract.  Is that a fair description of your

2    understanding of interest arbitration?

3        A.    It's certainly much more used in the

4    public sector than it is in the private

5    sector.

6        Q.    Okay, but my general description of

7    what an interest arbitration was accurate.

8        A.    Roughly, yes.

9        Q.    Okay.  And the reason that the

10   Unites States' Postal Service has interest

11   arbitrations with its unions is because the

12   unions in the public sector, including postal

13   union workers are prohibited from striking and

14   from using self-help, correct?

15       A.    That's one of the reasons.  The

16   other reason is that there's a pay

17   comparability statute, asking the Postal

18   Service to pay comparable wages.

19       Q.    Okay, so in a postal service

20   interest arbitration, use of comparability

21   analysis is mandated by law, correct?

22       A.    I like to think so, yes.

23       Q.    Okay.  Let me show you a provision

24   of the United States' Code, it's 39 U.S.C.

25   Section 1003 and I'll represent to you it's a

96

1    provision from the Postal Reorganization Act

2    which is the statute that governs the postal

3    service.

4              MR. DECHIARA:  Your Honor, if I may

5    approach the witness?

6              THE COURT:  Yes.

7    BY MR. DECHIARA:

8        Q.   Mr. Wachter, let me direct your

9    attention to Section 1003 and in particular

10   let me read to you the second sentence of that

11   provision.  It says: "it shall be the policy

12   of the postal service to maintain compensation

13   and benefits for all officers and employees on

14   a standard of comparability to the

15   compensation and benefits paid for, paid for

16   comparable levels of work in the private

17   sector of the economy."  Are you familiar with

18   that provision?

19       A.   Yes, I am.

20       Q.   And that's what you were referring

21   to when you said that comparability analysis

22   is mandated by statute in such an interest

23   arbitration?

24       A.   Yes.

25       Q.   Okay.  Do you recall an interest

                                          97

1    arbitration between the United States' Postal

2    Service and the National Association of Letter

3    Carriers that you participated in, in the

4    summer of 1999?

5        A.   Yes.

6        Q.   Okay.  And did you present a

7    comparability analysis on behalf of the postal

8    service in that interest arbitration?

9        A.   Yes, I did.

10        Q.   And in your comparability analysis

11   in that case, you -- very similar to what you

12   do here -- made the argument that letter

13   carriers enjoy a pay premium because their

14   wages and benefits are above the pay and

15   benefits of the average similarly skilled

16   worker throughout the private sector economy

17   of the United States.  Do you recall making

18   that presentation?

19        A.   Yes.

20        Q.   Okay.  And you also argued, did you

21   not, that further evidence of the paid premium

22   enjoyed by letter carriers is their low quit-

23   rate, correct?

24        A.   That's correct.

25        Q.   Okay.  And the National Association


                                                  98


1    of Letter Carriers in that arbitration argued

2    that your comparability analysis was flawed,

3    isn't that right?

4         A.   That is what they argued.

5         Q.   And, among other things they argued

6    that one must look at comparably sized firms

7    that comparing the workers in the United

8    States' Postal Service, one should also look

9    at control for other large firms in the

10   economy, correct?

11        A.   Yes, they tried to get arguments

12   that would make the premium smaller or go

13   away.

14        Q.   Do you remember who won that

15    arbitration?

16        A.    Depends on what you mean by won.

17        Q.    Well, may I ask you, did the

18    arbitrator hold that the wages and benefits of

19    the letter carriers, pursuant to the statute,

20    should be reduced to the average wage of

21    similarly skilled workers throughout the

22    United States' economy?

23        A.    The award in that case was geared to

24    the differential between the letter carriers

25    and the clerks and in that case -- and I will

99

1    say in part because the postal service was

2    also having more trouble recruiting and

3    retaining letter carriers at that time -- that

4    the award was simply an adjustment between the

5    letter carriers and the clerks.  I think, as

6    you know, a series of arbitrators, beginning

7    in 1984, held that there were discrepancies in

8    pay comparability in the premium -- wage

9    premiums were at 20 percent and the

10    compensation was about 30-40 percent.

11        Q.    Let me tell you what I mean by who

12    won.  In that arbitration there had

13    historically been a parity between the clerks

14    and the letter carriers.  In that arbitration

15    the letter carriers argued that they should

16    break parity, that they should be paid more

17    than the clerks and they prevailed, did they

18    not?

19        A.    That's correct and the --

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

20    Q.    Okay, and then you answered my

21    question.  And now let me ask you a more

22    particular question.  The arbitrator did not

23    hold that pursuant to your comparability

24    analysis, pursuant to the statute that

25    mandates comparability that that paid premium

100

1    that you said the letter carriers should enjoy

2    should be eliminated, correct.

3        A.    What I said before that --

4        Q.    Could you answer my question?  Did

5    the arbitrator hold that the letter carriers'

6    pay should be reduced to the national average?

7        A.    What the arbitrator held was that

8    there should be a pay differential between the

9    letter carriers and the clerks

10       Q.    Can you answer my question now?

11       A.    That's what he held.

12       Q.    Did he hold -- okay, I take it from

13   your answer that he did not hold that the pay

14   premium for the letter carriers should be

15   reduced to the national average?

16       A.    He did not address that issue.

17       Q.    Okay, and to your knowledge, to this

18   day, no arbitrator has reduced, pursuant to

19   this statute that I've shown you, the pay

20   premium enjoyed by letter carriers, correct?

21       A.    Since then?

22       Q.    Yes, to the U.S. average.  Do you

23   have any knowledge of such an award?

24       A.    When was that arbitration?

25        Q.    1999.

101

1        A.    They reduced the differential

2    between clerks and carriers, correct?

3        Q.    No, no.  That's not my question.

4    Since 1999 you're not aware of any arbitration

5    award that reduced the pay and benefits of

6    letter carriers to the national average in the

7    private sector for similarly-skilled workers.

8        A.    Could you remind me, because I don't

9    recall when the last set of arbitrations were.

10   Have there been arbitrations since --

11       Q.    I'm just asking you if you have any

12   knowledge of any arbitration since 1999 that

13   did that.  If you do, you do, if you don't,

14   you don't.

15       A.    That was the one and only

16   arbitration that the letter carriers or any of

17   the unions prevailed on the issue of pay

18   comparability and then only to the extent of

19   establishing a differential between clerks and

20   carriers.

21       Q.    Can I take it your answer is no?

22       A.    Depends on what your question is.

23           MR. DECHIARA:  Can the court

24   reporter read back my question?

25           THE REPORTER:  "Do you have any

102

1    knowledge of any arbitration since 1999 that

2   did that.  If you do, you do, if you don't,

3   you don't."

4          MR. DECHIARA:  I guess the one

5   before that.

6          THE REPORTER:  "Since 1999 you're

7   not aware of any arbitration award that will

8   reduce the pay and benefits of letter carriers

9   to the national average in the private sector

10  for similarly-skilled workers?"

11         THE WITNESS:  I haven't but I would

12  like to --

13  BY MR. DECHIARA:

14     Q.   You have not?  Thank you.

15     A.   I have not but if I could explain.

16     Q.   You've answered my question.  Let me

17  refer you to your supplemental declaration

18  which is Exhibit 17 and ask if you if you

19  could turn to paragraph 30 of that, it appears

20  on page 11.  Let me read you the second

21  sentence of paragraph 30, you say quote: we

22  agree entirely that the comparability standard

23  has applicability in arbitration, but it also

24  has equal relevance to a Section 1113(c)

25  bankruptcy hearing.  Indeed the comparability

                                      103

1   standard was the basis for my testimony in

2   United Airlines and Tower Automotive

3   bankruptcy hearings, end quote.  Do you see

4   that?

5      A.   Yes, I do.

6      Q.   Okay.  Now that first sentence,

```
 7   where you assert that comparability standard

 8   has equal relevance to a section 1113(c)

 9   bankruptcy hearing.  That's a legal

10   conclusion, is it not?

11        A.   I was giving an economic

12   interpretation.

13        Q.   Okay.  Do you have any expertise in

14   bankruptcy law?

15        A.   I am not a lawyer.

16        Q.   Are you're not appearing here today

17   as a legal expert?

18        A.   That's correct.

19        Q.   Or a bankruptcy law expert?

20        A.   That's correct.

21        Q.   Okay.  You point to your testimony

22   in United Airlines and Tower Automotive and in

23   those cases you presented comparability

24   analyses on behalf of those employers?

25        A.   Correct.
```

104

```
 1        Q.   Okay, in fact, there was never a

 2   decision rendered in either the United case or

 3   the Tower case, correct?

 4        A.   There is very little doubt that in

 5   the United case the parties are agreeing to

 6   reestablish the airline on more competitive

 7   terms.

 8        Q.   That wasn't my question

 9        THE COURT:  You should try to answer

10   his question.

11   BY MR. DECHIARA:
```

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

12      Q.   There was no decision rendered on

13   the employer's 1113 motion in either the

14   United case or the Tower case, correct?

15      A.   I don't know, as a matter of fact.

16      Q.   Okay, so you're not aware of any --

17   then it's safe to say that you're not aware of

18   any court decision finding that your testimony

19   in those cases had any relevance to the

20   Section 1113 standard, correct?

21      A.   I have not followed any of the

22   decisions that have come down after I've

23   testified.

24      Q.   Okay, you also failed to mention

25   that you were hired to perform a comparability

105

1   analysis on behalf of Delta Airlines, for its

2   Section 1113 proceeding.  You were hired to do

3   that for Delta, were you not?

4      A.   Correct.

5      Q.   And are you aware that there was a

6   Section 1113 proceeding in the Delta case?

7      A.   Yes.

8      Q.   And after Delta received your

9   comparability analysis they decided not even

10   to put you on the witness stand, is that

11   correct?

12      A.   I was in the hospital at the time.

13      Q.   They made your colleague, who helped

14   you out on your report available?

15      A.   Excuse me?

16      Q.   You had a colleague who worked with

17    you on the report?

18         A.    Correct.

19         Q.    What was his name?

20         A.    Jim Galula

21         Q.    And Dr. Galula was made available to

22    testify in your stead?

23         A.    I was in the hospital.

24         Q.    You had no idea what was going on?

25         A.    At the time I didn't.

106

1          Q.    Okay.  Do you know that in the

2     spring of this year, in fact, quite recently

3     in the last couple of months there was --that

4     was in the fall of '05 that your were in the

5     hospital?

6          A.    That is correct.

7          Q.    Okay.  Are you aware that Delta

8     originally had a section 1113 hearing in this

9     court which was aborted when the parties

10    reached an interim agreement but then, due to

11    their failure to reach a comprehensive

12    agreement they had a full blown Section 1113

13    hearing that went to completion just within

14    the last couple of months, were you aware of

15    that?

16         A.    I did not follow that, no.

17         Q.    Okay.  No one contacted you to

18    testify at that hearing did they?

19         A.    That's correct.

20         Q.    Okay.  Your central finding here is

21    that most of Delphi's unionized workers

22    receive a premium above the average pay in the

23    United States' economy for workers who work in

24    the same BLS occupational categories, correct?

25        A.   Yes.


                                                    107


1         Q.   And BLS, the Bureau of Labor

2    Statistics?

3         A.   Yes.

4         Q.   Okay.  By the way, Bureau of Labor

5    Statistics -- statistics are generally used by

6    labor economists, are they not?

7         A.   Yes.

8         Q.   They're publicly available?

9         A.   Yes.

10        Q.   They're seen as reliable?

11        A.   Yes.

12        Q.   They're comprehensive?

13        A.   That's a more difficult question.

14        Q.   Okay, but they're generally seen as

15    reliable standard

16        A.   Yes.

17        Q.   And authoritative?

18        A.   Yes.

19        Q.   Now everything else being equal if

20    one company's workers are more productive than

21    average, that company can afford to pay a

22    premium, can it not?

23        A.   Can you tell me more what you mean

24    by productive?

25        Q.   Let's say you have a perfectly

108

```
 1    competitive market in the production of

 2    widgets.  You have two companies.  Everything

 3    about them is identical except one has workers

 4    who can produce ten widgets an hour and one

 5    has workers that can produce two widgets an

 6    hour.  The one that has the workers that can

 7    produce ten widgets an hour can afford to pay

 8    a premium, can it not?

 9         A.    In that differential is driven by

10    differences in the skill of the workers --

11         Q.    What's that?

12         A.    Excuse me.  Is the differential

13    driven entirely by what you're calling the

14    skill of the workers as distinct from --?

15         Q.    Well, we'll get into why there may

16    be differentials in productivity.  But I want

17    to limit my hypothetical just -- all we know

18    is that one has workers that can spit out ten

19    widgets and hour and the other one has workers

20    that can spit out two widgets an hour.  And

21    we'll talk in a minute about why those

22    differences might exist.

23         A.    it's very difficult to answer that

24    question without knowing more about your

25    hypothetical.
```

109

```
 1         Q.    You cannot testify for me that the

 2    company that is producing, that has workers
```

3    that are producing ten widgets an hour, and

4    presumably selling them, because it's a

5    perfectly competitive market, and producing

6    more revenue cannot pay its workers a premium?

7        A.    The hypothetical you've given me is,

8    at this point, incomplete.  So there are

9    different factors depending upon what your

10   hypothetical is that could lead to different

11   answers.

12       Q.    In what way is it incomplete?

13       A.    Lots of ways.  I need to know about

14   the nature of the product market, I need to

15   know about the nature of the capital

16   equipment.

17       Q.    Let's say the product market --

18   unlimited demand for widgets.  They all sell

19   for the same price, you produce them, someone

20   buys them.

21       A.    In a perfectly competitive market?

22       Q.    Right.

23       A.    These people are just working

24   harder?

25       Q.    Excuse me?

110

1        A.    They're working harder?  Can you

2    tell me -- do I know what --

3        Q.    Let's say they work harder, yes,

4    they work harder.

5        A.    They are working sort of, faster?

6        Q.    Okay, well let's move on, we'll come

7    back to this.  There are different reasons why

8    certain workers in the economy are more

9    productive than others, correct?

10       A.   Surely.

11       Q.   And one of those reasons is because

12   they use equipment that allows them to be more

13   productive.  For example they may use bigger

14   machines, more sophisticated machines, more

15   automated machines, correct?

16       A.   That's certainly the case.

17       Q.   Okay.  And another reason workers

18   may be more productive is that they may have

19   more aptitude, they may be better at the job;

20   they may work harder, correct?

21       A.   There are lots of reasons.

22       Q.   Well those are some reasons?

23       A.   That is some of the reasons.

24       Q.   They may be more experienced, they

25   may know how to do it better because of having

111

1    done it before, correct?

2        A.   If there were facts to establish

3    that, it could be recent --

4        Q.   Well, I'm speaking in general terms.

5    Am I correct that those are factors that could

6    lead to greater productivity?

7        A.   Well, I said, yes.

8        Q.   Yes, okay.  They could be better

9    trained?

10       A.   You have to give me more of the

11   hypothetical again.

12       Q.   well, I'm trying to isolate factors

13    that make some workers in the economy more

14    productive than others.  We've established

15    that using machinery or equipment can do that.

16    We've established, I believe, that people can

17    work harder, they can have better aptitude,

18    you said they can have more experience and now

19    I'm asking you about training.  They can be

20    trained to do the job better and that would

21    make them more productive, everything else

22    equal, correct?

23        A.   Yes.  And some of that --

24        Q.   Well, you answered my question.

25        A.   I was trying to.

                                              112

1         Q.   Well, you already did.

2         A.   I had half of a sentence; I don't

3    know how I could have answered the question.

4         Q.   Complete your sentence.

5         A.   If a worker was, you're giving me

6    very incomplete hypotheticals and this is

7    another one.  If workers are trained at a cost

8    to the employer, sometimes at least a part of

9    that gain is recouped by the employer.

10        Q.   Okay.  So now going back to my

11   original question.  The hypothetical with the

12   widgets.  Let's say the workers that can

13   produce ten widgets an hour as opposed to two

14   widgets an hour do so because they have --

15   they're using machines that can shoot out

16   widgets more efficiently.  Everything else

17   equal, that employer can pay a premium.

18         A.   It is as incomplete now as it was

19    before.  I need to know if that is because the

20    workers are working faster, if the machinery

21    is, in itself, more productive and if the

22    workers are working faster then yes, you would

23    be able to pay them more.

24         Q.   Let me refer you to page 13 of your

25    supplemental declaration, paragraph 34.  Are

                                                        113

1    you there?

2         A.   Yes.

3         Q.   Okay.  Let me refer you to the

4    beginning of the third sentence.  I'm not

5    going to complete it I'm just going to read

6    the first few words, but feel free to read as

7    much of it as you want.  It says, quote, wages

8    do rise with respect to experience and

9    productivity.  And the sentence goes on but

10    I'm going to finish the quote there.  That's

11    true, is it not, what I just read?

12         A.   Yes.

13         Q.   Now, is it also a generally observed

14    economic fact that companies that produced

15    high valued products tend to pay their workers

16    more than companies that pay low value

17    products.  For example, companies that produce

18    jet planes tend to pay their workers more than

19    companies that produce broomsticks?

20         A.   Well, in your example is because you

21    deal with Boeing and that is a unionized

22    company.

23        Q.   Well I wasn't going to say with

24   Boeing but --

25        A.   I, what undercuts your argument

114

1   significantly is that the people who are in

2   the computer industry who have worked and

3   produced computers, let's say Hewlett Packard

4   computers.  The value of what they have

5   produced has increased significantly and, you

6   know, made some companies very wealthy.  And

7   as long as the skill of those workers is

8   replaceable in the labor market, what happens

9   is that the price of the product falls and

10   your return does not accrue to the workers.

11        Q.   Mr. Wachter, I asked you a question.

12   If you could try to answer my question.  As an

13   empirical matter, as a labor economist, have

14   you observed or is it generally observed that

15   companies that produce high value products --

16   and I'm not saying that this is always the

17   case and there may be exceptions, but is it a

18   general rule that companies that produce high

19   value products pay their workers more than

20   companies that produce low value products.

21        A.   Well, since my statement was not

22   just an, you know, an idle hypothetical, the

23   answer is no.

24        Q.   Okay.  There are some cases in which

25   an employer would want to pay a wage premium

115

1    to its employees, purely for business reasons,

2    to maximize profits.  Isn't that the case?

3        A.   Yes.

4        Q.   Okay.  And, in fact an example, a

5    famous example, I think you refer to it in

6    your papers was in 1914 Henry Ford doubled the

7    wages of his workers, completely voluntarily.

8    Is that correct, is that your understanding?

9        A.   That's correct.

10       Q.   Okay and at that time the auto

11   industry which was in its nascent stage at the

12   beginning of the 20th Century, was very

13   competitive, there were a lot of start-ups,

14   correct?

15       A.   That's correct.

16       Q.   That proved to be a very shrewd move

17   by Mr. Ford, did it not?

18       A.   Yes, it did.

19       Q.   And Ford went on to be one of the

20   paragons of an industrial company in the 20th

21   Century, correct?

22       A.   Paragons is in the eyes of the

23   beholder.

24       Q.   It became a major industrial

25   company?

116

1        A.   I thought you were talking about

2    Henry Ford.

3        Q.   No, I'm not talking about Henry

4    Ford.  There's plenty of things about Henry

5    Ford's personality that I can take issue with.

6    I'm talking about his company.

7        A.    His company did very well for --

8        Q.    For many years.

9        A.    For many years.

10        Q.    Okay.  Now, do you have any

11    particular expertise in the auto industry or

12    in the auto parts industry?

13        A.    Not more specifically to other

14    industries which I've studied since 1965, so I

15    guess that's 40 years.

16        Q.    Well, have you published any studies

17    particularly in the auto industry?

18        A.    No, but I've published studies where

19    auto industry data were included.

20        Q.    Well, you've published studies where

21    you look at the entire U.S. economy, have you

22    not?

23        A.    Yes, in some manufac -- you sort of

24    have to know what the data mean before you can

25    publish.

117

1        Q.    It would be fair to say that you

2    have no specialty in the auto industry or in

3    the auto parts industry, correct?

4        A.    If you want to interpret -- given my

5    answer, if you want me to say no I'd be

6    pleased to do so.

7        Q.    I don't want you to say no or yes.

8    I want you to answer honestly.  Is it fair to

9    say that you do not have a specialty in the

10    auto industry or in the auto parts industry?

11        A.    A specialty?

12        Q.    Yes.

13        A.    A specialty, no.

14        Q.    Thank you.  In your preparation of

15    your expert report for your testimony here

16    today, did you visit any Delphi facility to

17    see how the workers there actually view their

18    work?

19        A.    No, I did not.

20        Q.    Did you visit the facilities of any

21    of Delphi's competitors to see how the workers

22    there do their work?

23        A.    No.

24        Q.    Did you make any empirical

25    observations at all, as opposed to reviewing

                                            118

1    published -- reviewing data?

2        A.    I've certainly known for a long

3    what's been going on in the automobile

4    industry so, and what's been happening with

5    General Motors and Delphi and Viscion and Ford

6    --

7        Q.    Let me refer you to the expert

8    report of Dr. Susan Halper, which is Exhibit

9    41.  Do you have access to that?

10        A.    Yes.

11        Q.    Let me turn your attention to

12    paragraph 23 on page 8.  Are you there?

13        A.    Yes, I am.

14        Q.    Okay, let me read, starting with the

15    third sentence, Dr. Halper is describing

16    Delphi's Courtland Ohio plant, she says quote,

17    in this plant, each worker oversees 15

18    presses, equipment worth hundreds of thousands

19    of dollars.  Workers all have 20 years of

20    seniority or more and were able to draw on

21    their experience and on training their

22    received in statistical process control to (a)

23    achieve a full year of zero defect production.

24    A remarkable achievement when the plant

25    shipped one billion products and (b) debug the

119

1    process so that all cavities and moles were

2    filled on every run, dramatically increasing

3    the capacity of the plant, end quote.  Do you

4    have any reason to believe that Dr. Halper's

5    description of Delphi's Courtland Ohio plant

6    that I just read is in any way inaccurate?

7         A.   As a general matter it certainly is.

8         Q.   Is her description of this plant

9    inaccurate?

10        A.   I have not been to that plant.

11        Q.   Do you have any basis to believe

12   that her description of this plant is

13   inaccurate?  That's my question.

14        A.   Sounds like an exaggeration but

15   since I haven't been to the plant it's hard to

16   comment further.

17        Q.   Since you haven't been to the plant

18   you don't know, is that correct?

19        A.   You asked me if I'd been to the

20   plant and observed what she observed.  And

21   since I haven't been to the plant and couldn't

22   observe what she has observed, but I find what

23   she says here to be, you know, quite an

24   exaggeration.

25        Q.   And which part of that do you -- do

120

1   you dispute the veracity of any part of that

2   description?

3        A.   Well, there's clearly the case that

4   Delphi is losing money.  And it's clearly the

5   case that their labor costs and their wages

6   and benefits are far in excess of those of

7   their competitors.  Those two statements mean

8   that, as a general matter, what she is saying

9   in paragraph 23 cannot be anything more than a

10   data point at best.

11        Q.   My question was --

12            MR. DECHIARA:  I would, Your Honor,

13   I move to strike Dr. Wachter's responses, non-

14   responsive.

15            THE COURT:  Well, I'm not sure I

16   understood your question.

17            MR. DECHIARA:  Okay.  Let me try one

18   more time.

19            THE COURT:  The question was asked

20   in a particular plant and the workers there as

21   opposed to generalizing from that question to

22   Delphi's position overall.  So given that

23   focus, is there anything to doubt that

24   statement?

25                    THE WITNESS:  I'm not -- I really

121

1    what I said which I guess, you're not, you're

2    -- I haven't been to the plant.  If you want I

3    would say I can't get out the statement in

4    that sense.

5            MR. DECHIARA:  Thank you, I'll

6    accept that.

7    BY MR. DECHIARA:

8        Q.   Let's look at the prior paragraph in

9    Dr. Halper's declaration.  She describes

10   another plant in Ohio.  Read her description

11   on this other plant.  She says quote, in one

12   plant I visited in Cleveland Ohio recently a

13   group of minimum wage workers operating

14   machines that put labels on bottles that were

15   sold to a variety of firms selling liquid

16   products.  The process was very simple and

17   quality requirements were not high or

18   difficult to meet.  In parens, the labels had

19   to look to the naked eye like it was on

20   straight.  Equipment costs were negligible, in

21   parens, much of it had been cobbled together

22   from machines scrapped by other firms, so if

23   there was down time it was not costly.

24   Carrying inventory in parens of empty bottles

25   was cheap and customers were not demanding

122

1   about delivery times.  Workers were merely

2   shown what to do, they did not have to read

3   instructions or perform tests to determine

4   quality.  Do you have any reason to doubt that

5   Dr. Halper actually observed that plant and

6   described it accurately?

7        A.   I believe, well, I haven't visited

8   the plant.  If she observed this and this is

9   her description of what she observed I

10  certainly cannot disagree with it.

11       Q.   Now both the workers in Delphi's

12  Courtland Ohio plant and in the bottling plant

13  which Dr. Halper describes in paragraph 2,

14  both fall within the BLS category of machine

15  operator, is that not correct?

16       A.   Yes.

17       Q.   Okay.  And so in your analysis, in

18  your comparability analysis of comparing the

19  wages and benefits of the Delphi workers,

20  among the workers whose wages and benefits you

21  were comparing them to were the workers in

22  this bottling plant, correct?

23       A.   Yes.

24       Q.   Okay.  Now let me refer you to

25  paragraph 14 and 15 of Dr. Halper's

                                        123

1   declaration.  She says in paragraph 14 that

2   many Delphi plant follow a just-in-time

3   policy, where the plants carry only a few

4   hours of inventory and production is stopped

5   if a single defect is found.  Let me ask you

6    first; are you familiar with just-in-time

7    production?

8        A.   Yes.

9        Q.   Okay.  Do you have any reason to

10   doubt what Dr. Halper here says, that many

11   Delphi plants use the just-in-time production

12   method?

13       A.   I don't know whether they do or not

14   as a matter of fact.

15       Q.   So, do you have any reason to doubt

16   her assertion that they do?

17       A.   No.

18       Q.   Let me refer you to the next

19   paragraph, starting in the third sentence,

20   I'll skip the first word it says, quote: if a

21   worker has produced a defective product and

22   the defect is not caught before it leaves the

23   plant, the consequences may be quite

24   expensive.  Some automakers, such as Toyota,

25   will reject an entire shipment if even one

124

1    defect is found.  Even worse, if a defective

2    product is assembled into a car, warranty

3    costs plus a large fine will be charged back

4    to the supplier, end quote.  Do you have any

5    reason to doubt the accuracy of what Dr.

6    Halper says there?

7        A.   I haven't been to the plant.  And

8    this is just another data point.  These are

9    individual data points that, I don't

10   understand the meaning.

11    Q.    Well, I don't believe she's talking

12    about just one plant.  She says many plants --

13    many Delphi plants use this just-in-time

14    production method and as I read this she is

15    saying -- and she's then generally describing

16    the consequences of the just-in-time

17    production method.  So my question is do you

18    have any reason to doubt what Dr. Halper is

19    saying there?

20    A.    Well, in a sense that what she's

21    saying in this sentence and some of the others

22    -- although, again these are really sort of

23    individual sort of observations.  If these

24    were more generally true you would expect to

25    find that these plants were profitable.

125

1    Q.    So your testimony is that this can't

2    be true because Delphi is in bankruptcy?  Is

3    that your testimony, Dr. Wachter?

4    A.    What I'm saying is that if the

5    workers are highly productive then, what would

6    happen is that Delphi would be able to reduce

7    their prices and they would be more

8    competitive.  These particular observations

9    that she is making I have no reason to quarrel

10    with.

11    Q.    Okay.  Let's stop there.  That's my

12    question.  Do you have any reason to quarrel

13    with her particular observations -- that was

14    my question, you've answered it.  Let's move

15    on.  Now, is it not true that workers who work

16    in an environment where, if they make mistakes

17    and cause defects, it has enormous financial

18    consequences for their employer?  Wouldn't it

19    be fair to say that those workers shoulder a

20    fair amount of responsibility?

21        A.    Yes.

22        Q.    And isn't it a generally-observed

23    fact in the economic world that, everything

24    else being equal, workers with more

25    responsibility get paid more?  That's why we

126

1    pay pilots and flight controllers more than

2    baggage handlers for example, correct -- among

3    other reasons?

4        A.    As long as you put in among other

5    reasons' to your examples, I'm willing to

6    agree.  Examples that may be -- perhaps you

7    could repeat your question, I may have just --

8        Q.    It may be hard to isolate because

9    workers with more responsibility tend to be

10    more highly skilled.  But let me ask you as a

11    general matter; is it not true that workers

12    with more responsibility are paid more?

13        A.    As a general matter, if you're just

14    looking at that factor and so you would be

15    looking at sort of Onet effects, that is not a

16    variable that has a high pay-off in the

17    market.  Because a lot of people have that

18    trait.  So that as long as the supply of

19    workers is adequate for the nature of the job

20    being performed, there is no return to that

21    particular trait.

22        Q.   So it's your testimony that as a

23    general matter someone having more

24    responsibility, whether it being responsible

25    for keeping an airplane in the air or saving a

127

1    patient's life or avoiding hundreds of

2    thousands of dollars in adverse economic

3    consequences to their employer, that just the

4    increased level of responsibility does not

5    generally equate with a higher level of pay,

6    is that your testimony?

7        A.   What I just said is my answer to

8    your question.

9        Q.   I'm not sure I understood, maybe you

10    could try again?

11        THE COURT:  I think he's saying if

12    there are very few plastic surgeons but a lot

13    of surgeons, surgeons will get paid less than

14    plastic surgeons.

15        MR DECHIARA:  Right, but the

16    surgeons will always be paid more than, say

17    the nurses' aid?

18        THE WITNESS:  But that's not so much

19    because of the responsibility it's because of

20    the greater skill.

21    BY MR. DECHIARA:

22        Q.   I understand, obviously, that

23    there's a skill difference.  But is it not

24    also part of the equation that they have

25    greater responsibility?

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

128

1        A.    But that's not clear that they're

2    being paid more because they have greater sk -

3    -

4        Q.    Well that's what I'm asking you.

5    Does it not make common sense?

6        A.    But that's what I already just

7    answered.

8        Q.    Okay.

9        A.    You just didn't like my answer.

10       Q.    Okay.  Does it not make sense that

11   if someone has a greater responsibility, the

12   person paying them to do the job would want to

13   pay them a premium to make sure they do the

14   job well?  Because the consequences of their

15   not -- let me finish -- not doing the job well

16   is greater?

17       A.    Your hypothetical has really taken

18   off now.  You've added four more things to

19   what you had in your last hypothetical.  So if

20   you want to narrow down your hypothetical

21   again, I can try and answer the question.

22   Because you really, truly did add a lot of

23   things -- they want to pay more, you have they

24   want to pay more and are likely to pay more.

25       Q.    I'm asking a new question.

129

1        A.    Ah.

2        Q.    Would not the person paying for the

3      services, if the person they're paying has

4      greater responsibilities and the consequences

5      of their not doing the job well are bigger,

6      wouldn't the person paying for the services

7      have a motive to pay a premium?

8          A.    Not if there is an adequate supply

9      of similarly motivated and competent workers

10     who can be as careful as the one that's on the

11     job.

12         Q.    But there is always a limited

13     supply, is that not true?

14         A.    No, there is not always a limited

15     supply.

16         Q.    So there's always an unlimited

17     supply of surgeons?

18         A.    There's a difference between limited

19     and unlimited.  There is more -- it appears at

20     the market a lot of the traits that you're

21     talking about as being more responsible do not

22     have a payoff because in the market there is

23     enough supply to deal with that demand factor.

24         Q.    What is a compensating differential?

25         A.    A compensating differential is, as

                                                    130

1      one example you work in a coal mine and it's a

2      bad job.  You get paid more.

3          Q.    Okay.

4              THE COURT:  I'm sorry, I didn't hear

5      that.

6              THE WITNESS:  One example of a

7      compensating differential is that you work in

8      a coal mine, it's a lousy, dangerous job and

9      you get paid more because of it.

10           MR. DECHIARA:  So an adverse working

11     condition, everything else being equal, leads

12     to higher pay.  Is that the general theory

13     behind compensating differential?

14           A.   Adverse has to be interpreted in

15     terms of where there's a payoff.  Not all

16     adverse working conditions have a payoff.

17           Q.   some do, some don't is that what

18     you're saying?

19           A.   Yes.  The ones that do, for example

20     are things like heights.  Like if you're

21     working high up, extremes in temperatures,

22     wearing protective equipment, working with

23     contaminants are the ones that have high

24     payoffs.

25           Q.   What about stress?


                                           131


1            A.   Stress I don't think -- I didn't

2      look but I don't think stress has a high

3      payoff.

4            Q.   Well have you ever studied or looked

5      at studies at whether high-stress jobs or

6      whether high stress is a compensating

7      differential?

8            A.   I have no reason to suppose it is, I

9      mean most --

10           Q.   That wasn't my question.  Have you

11     ever looked at studies, or done your own

12     study, of whether high stress is a

13    compensating differential?

14        A.    I haven't looked at any studies

15    specifically on stress other than as appears

16    in the New York Times.

17        Q.    Okay.  And the New York Times is not

18    an academic periodical that you would rely on,

19    is that correct?

20        A.    I often don't rely on the New York

21    Times.

22        Q.    Okay.  Let me refer you to Dr.

23    Halper's description on paragraph 15 of her

24    declaration.  First sentence, she says that

25    just-in-time production increases stress.  Do

132

1    you have any reason to doubt that that's true?

2        A.    I don't know whether it is true or

3    not true.

4        Q.    So I take it, your answer is no, you

5    have no reason to doubt that it's true?

6        A.    Yes.

7        Q.    Okay.  Now in your study you compare

8    the pay of Delphi production workers to the

9    pay of all workers in the BLS classifications

10    of one machine operators, assemblers and

11    inspectors and two, handlers, equipment

12    cleaners, helpers and laborers.  Did I get

13    that right?

14        A.    Yes.

15        Q.    Okay.  And in the category of

16    machine operators we -- two job

17    classifications are sewing-machine operators

18    and dry cleaning machine operators, is that

19    correct?

20        A.    I'm sorry?

21        Q.    Sewing-machine operators and dry

22    cleaning machine operators?

23        A.    I think so, yes.

24        Q.    Okay.  Now someone who is stitching

25    a cuff onto a shirt or pressing a pair of

133

1    pants with a dry cleaning machine is making a

2    product that has less value than the complex

3    electronic systems that Delphi makes, correct?

4        A.    I think Delphi has some of those

5    workers and it pays them the same as it pays

6    the other production workers.

7        Q.    Can you answer my question?

8        A.    That's what I did.

9        Q.    Okay.  The product created by a

10    sewing-machine operator or a dry cleaning

11    machine operator is a lower value product than

12    the complex electronic products that Delphi

13    makes, correct?

14        A.    I guess so, I'm not sure I

15    understand exactly the question, but I'll say

16    I guess so.

17        Q.    Okay.  Well do you have any idea

18    what Delphi does?

19        A.    Yes.

20        Q.    Okay.  And you understand that they

21    make complex electronic products.

22        A.    That is some of the things they do,

23    yes.

24         Q.    Okay.  Let me try it a third time.

25    Those products that he makes, now he makes a


134


1    range of products but I'm talking about those,

2    which is in the core of the products it plans

3    to continue to make, is that your

4    understanding?

5         A.    Yes.

6         Q.    Okay.  Those are higher value

7    products than the shirt or the pressed pair of

8    pants, correct?

9         A.    Higher valued products, yes.

10         Q.    Okay, thank you.  Now Delphi doesn't

11    compete against the corner dry cleaner or the

12    textile factory that makes shirts, correct?

13    It doesn't compete for business?

14         A.    Yes, it does not.

15         Q.    Okay, and in fact, Delphi doesn't

16    compete for business against the vast majority

17    of firms in the private sector of the United

18    States whose workers are in the same BLS

19    occupational categories as the Delphi

20    production workers, correct?

21         A.    No, you're wrong.

22         Q.    It competes for business against the

23    vast majority of those companies?

24         A.    It competes for labor and that's

25    part of its business.

135

1        Q.    No -- competes for work, competes

2    for contracts?

3        A.    Complete for work -- they do compete

4    for workers --

5        Q.    No, no, no, no, no, no.  Not

6    workers. Does it compete for bus -- do you

7    know what I mean by business?  A firm, to make

8    money goes out and tries to make contractual

9    relations with other firms that will pay them

10   money in return for services.  That's what I

11   mean by business.  With that definition of

12   business. For example, the kind of work that

13   Delphi does for GM?  It's true, is it not,

14   that Delphi does not compete for business with

15   the vast majority of firms in the private

16   sector of the United States, whose workers are

17   in the same BLS occupational categories --

18       A.    They're not --

19       Q.    Let me finish as the Delphi

20   production workers?

21       A.    Okay.  Now that we've gotten it

22   narrowed down, they are not in the same

23   product market and, therefore, they do not

24   compete.  In the same -- in the product market

25       Q.    And is that the same way of saying


136

1    for business using the way I was, in my

2    layperson's terms, describing it?

3        A.    I don't know how you're using it.

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

4      Q.   Okay, they don't compete in the same

5  product market.  And a product market is a

6  market in which you try to sell the product

7  you make, right?

8      A.   Yes.

9      Q.   Okay.  I think we're on the same

10  page.  You conclude in your study that the

11  company's section 1113 proposal would reduce

12  the paying benefits of Delphi's skilled and

13  production workers roughly to the level of

14  comparable workers throughout the economy,

15  correct?

16      A.   Yes.

17      Q.   Okay.  And, in fact you have a

18  table, and let me refer you back to your

19  declaration, pages 28 and 29 of your

20  declaration.  Are you there?

21      A.   Yes.

22      Q.   Okay, why don't we focus -- page 29

23  table Roman VII, Arabic 2, and there you

24  identify the wages and salaries of the average

25  worker in the private sector of the U.S.


137


1  economy in those two BLS categories I was

2  talking about as $13.55.  Do you see that?

3      A.   Yes.

4      Q.   Okay.  Have you reviewed Delphi's

5  Section 1113 proposal?

6      A.   I've certainly reviewed; I'm not

7  sure what the terms are.  I have certainly

8  reviewed their proposals.

9      Q.   Okay.  And so you know -- or let me

10   put it this way, is it accurate that -- and

11   I'm putting aside -- there are referred a lot

12   of testimony about multiple and contingent

13   proposals et ceterA.   Your report focuses on

14   the November, 2005 proposal, the one without

15   the GM subsidy, correct?

16      A.   Yes.

17      Q.   Okay.  And that is -- that proposal

18   for the production workers -- well first --

19   Delphi, in its proposal at least, divides the

20   production workers into low production and

21   high production.  Are you aware of that?

22      A.   They have different categories.  I

23   didn't know they use the term high and low.

24      Q.   Let me refer you to Exhibit H to Mr.

25   Butler's declaration, which is Exhibit 7.  Do


138


1   you have that in front of you?

2      A.   There's nothing in here.  Oh, here

3   it is, I'm sorry.  7A?

4      Q.   No, the Butler declaration is

5   Exhibit 7, and I'm referring you to Exhibit H

6   to that declaration.  Now that you're at

7   Exhibit H, let me ask you to flip to Appendix

8   A-2 of that exhibit.

9      A.   A-1-2?

10      Q.   No, A dash 2.  There's an A-1 and

11   there's an A-2.  I'm referring you to A-2.

12      A.   I see page one of --

13      Q.   Just go to the first page of

14      Appendix A dash 2.

15              THE COURT:  What document is it?

16      Was it one of the proposals, right?

17              THE WITNESS:  Wages?

18              MR. DECHIARA:  It's the -- it's one

19      of the proposals, yes.

20              THE COURT:  Which one is it?

21              MR. DECHIARA:  I believe it's the

22      November, 2005 proposal.

23              THE COURT:  All right.  So it should

24      say that down in the lower corner.

25              MR. DECHIARA:  Although --

139

1               THE COURT:  There's a little date in

2       the lower corner.

3       BY MR. DECHIARA:

4           Q.   Oh no, I'm sorry, it's the March 24,

5       '06.

6           A.   Okay.

7           Q.   Are you there?  It says Appendix A-

8       2, Wages at the top?

9           A.   Yes.

10          Q.   Okay.  Is it your understanding that

11      this is the March proposal without GM support

12      for -- yeah?

13          A.   Yes.

14          Q.   Have you seen this document before?

15          A.   I think so, but I don't recall.

16          Q.   Well look in the middle, there's a

17      wage scale.  It says low production, high

18      production, skilled.  Have you ever seen that

19    before?

20         A.    I don't recall the terms low

21    production, high production.  I recall the 12-

22    13 range.

23         Q.    Okay.  So you don't know how Delphi

24    and it's proposal's dividing low production

25    verses high production workers?

140

1         A.    That's correct.

2         Q.    You don't know if it's based on

3    skill or some other factor?

4         A.    That's correct.

5         Q.    Okay.  Do you know how many low

6    production work -- what the ratio is of low

7    production workers to high production workers?

8         A.    Let me step back for a minute.

9    Exactly how the differentiating the two --

10   which workers it precisely applies to, I'm not

11   sure.  But certainly within the production

12   category, there are different categories of

13   workers, some of which like the handlers.

14   That might be what they're calling low

15   production here.  And the high production

16   would be the people on the --

17        Q.    But you don't know?

18        A.    I don't know for certain but what

19   I'm saying is probably true.  I don't know if

20   they're using a --

21        Q.    Well, are you speculating?  Do you

22   know, has anyone ever told you or have you

23   ever inquired and gotten an answer as to how

24    the company divided low production from high

25    production?

141

1        A.    Again, I just don't recall the term,

2    but I know they used the term handlers and the

3    people who run the machines.   And that could

4    very well be what they're saying here and I --

5        Q.    That could very well be.   But do you

6    know?

7        A.    More than I've said, I don't know.

8        Q.    Okay.   Do you know the ratio between

9    low production and high production?   You don't

10    know what the difference is, do you know the

11    ratio of who -- how many fall on one label

12    verses the other label?

13        A.    No, we don't, I don't.

14        Q.    Okay.   Let me refer you back to your

15    table on your declaration, page 29.   I'm going

16    to be referring back to this repeatedly, so

17    you might want to keep this handy.   Your

18    table, Roman VII Arabic 2 on page 29.

19        A.    Yes.

20        Q.    For Delphi, for wages and salaries

21    you come up with 12.50.   Where did you get

22    12/50?

23        A.    I believe it's the average of the 12

24    and the 13.

25        Q.    Okay, but you don't know the ratio.

142

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

1    So you don't know if that's an accurate

2    average, correct?

3        A.    It's certainly an average of 12 and

4    13.

5        Q.    But if one totaled the wages of all

6    the workers who would receive those salaries

7    or those wages under the proposal, you

8    wouldn't necessarily get an average by the

9    number of workers.  You wouldn't necessarily

10   get 12.50, correct?

11       A.    It's not a weighted average.

12       Q.    It's not.  Thank you.

13       A.    And this 12.50 would, on this -- let

14   me refer you back to Appendix A-2.  The $13

15   would be the highest wage that any production

16   worker even the production workers in the high

17   production category, would receive no matter

18   what their level of seniority and experience,

19   correct?

20       A.    Yes.

21       Q.    Okay.  And that is below the 13.55

22   which you identify as the average wage for

23   private sector workers in the production

24   classifications, correct.

25       A.    That is, but it's compensation that

143

1    matters not the individual wage differentials.

2        Q.    Okay, but I'm just focusing on wages

3    here.  I mean, it's indisputable; it's below

4    that wage, correct?

5        A.    Yes.  Whether it has any labor

 6    market impact at that small a differential,

 7    but it is a negative number.

 8        Q.    Okay.  And in fact, when you say

 9    13.55 -- 13.55 is not a median.    So that does

10    not mean half the workers get more and half

11    get less, it's an average I understand that.

12    But that still means a lot of workers get more

13    than that 13.55, correct?

14        A.    A lot get more and a lot get less,

15    yes.

16        Q.    Okay.  Now, in performing a

17    comparability analysis, one should strive to

18    compare workers at issue to workers that work

19    in similar jobs, is that a fair statement?

20        A.    Yes.

21        Q.    Okay.  In general it's best to

22    compare apples to apples, not apples to

23    oranges, correct?

24        A.    Yes.

25        Q.    Okay.  So isn't it, shouldn't one

                                                    144

 1    not control for, or take into account,

 2    differences that may make the comparisons

 3    inappropriate?

 4        A.    Could you say that, state that

 5    again?

 6        Q.    In doing a comparability analysis,

 7    should one not take into account factors that

 8    might make the comparisons inappropriate?

 9    That might result in comparing apples to

10    oranges?

11          A.    Well, there are a lot of negatives

12     there.  I wouldn't take into account things

13     that weren't relative --

14          Q.    Let me take out the negatives, it'll

15     make it easier.  One should, account for --

16          A.    One should use, one should compare

17     comparable jobs.

18          Q.    Let me phrase my question without

19     the negative.  A labor economist, doing his

20     job correctly should take into account factors

21     that would make the comparisons inappropriate,

22     correct?

23          A.    Take into account.  You should not

24     include that would make the comparison

25     inappropriate, yes.


                                                    145


1          Q.    And there's no question, is there,

2     that large firms, everything else equal, pay

3     more than small firms?

4          A.    As an empirical regularity, that is

5     true.

6          Q.    Okay. Let me refer you to Dr. Paula

7     Voos' declaration, which is Exhibit 40.  And

8     let me refer to table 1 on page 5.

9          A.    Wait, I'm not there yet -- 40, yes

10     you're right.  Okay.

11          Q.    And table 1 uses BLS data to show

12     that in the goods-producing industries, total

13     compensation generally rises based on the

14     number of employees a firm employs, correct?

15          A.    Correct.

16        Q.    And you have no reason to doubt the

17    accuracy of this table, do you?

18        A.    It's the interpretation placed on

19    the table that's inaccurate.

20        Q.    And that's not what I'm asking you

21    about.  I asking do you have any reason to

22    doubt that this table accurately depicts the

23    data?

24        A.    I think she probably copied the data

25    correctly.

146

1        Q.    And do you have any reason to doubt

2    that the data reflects reality?

3        A.    You mean, whether BLS got it right?

4        Q.    Yes.

5        A.    I think the BLS probably got it

6    right.

7        Q.    Okay.  And this chart shows that the

8    -- in firms that employ more than 500 or 500

9    or more employees pay substantially more both

10    in wages and in total compensation that the

11    firms that employ fewer employees, correct?

12        A.    That's true but it's -- it has

13    nothing to do with comparability in itself,

14    unless she has some more things to say about

15    the table, which she does not.

16        Q.    Okay.  And Delphi employs tens of

17    thousands of employees, does it not?

18        A.    That's correct.

19        Q.    Now if we go back to your page 29,

20    table Roman VII, Arabic 2.  The chart where

21    you compare where Delphi's production workers

22    pay and benefits would be with workers

23    throughout the U.S. economy?

24         A.   I'm sorry, what table are we on?

25         Q.   Table seven, it's Roman numeral VII


                                                    147


1    point Arabic number 2.

2         A.   Tell me the tab again, I'm sorry.

3         Q.   It's page 29.

4              THE COURT:  He wants the tab of this

5    exhibit.

6              MR. DECHIARA:  Oh, it's 16.

7              THE WITNESS:  Yes.  What page you

8    want?

9    BY MR. DECHIARA:

10        Q.   29.

11        A.   Yes.

12        Q.   Look at your column, comparable

13   workers economy-wide.  And you have a number

14   there for total compensation and below that a

15   number for wages and salaries?

16        A.   Yes.

17        Q.   If you controlled for firm size, and

18   only look at firms that had more than 500

19   workers that number would go up, would it not?

20        A.   It would be inappropriate to do so

21   in a comparability analysis.

22        Q.   Well --

23        A.   If you were asking me to do

24   something --

25             THE COURT:  No, no, just ask him,

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

148

1    just answer his question.

2          MR. DECHIARA:  I'm not asking you

3    for your interpretation.

4    BY MR. DECHIARA:

5          Q.   My question is, would that number go

6    up?

7          A.   Depends on what other controls you

8    have in the equation.

9          Q.   Just one.  You do exactly what you

10   did, you control for one factor, you limit it

11   to firms with over 500 workers.  Would that

12   number go up?

13         A.   Which number?

14         Q.   Well, let's start with the 21.33,

15   the number for total compensation?

16         A.   If you only had that -- if you only

17   thought the only thing that mattered in the

18   world was firm size that would go up.

19         Q.   Okay.  And the number below that,

20   for wages and salaries, that number would go

21   up?

22         A.   That would go up.

23         Q.   Okay.  Now, in your comparability

24   analysis you also fail to control for

25   industry, correct?

149

1          MR. BUTLER:  Objection, to the

2    question.  You used the word failed.

3         THE COURT:  You should rephrase it.

4    BY MR. DECHIARA:

5        Q.   You did not do control for industry,

6    did you?

7        A.   Yeah, I actually like the word

8    failed because what you're doing is failing to

9    correct for other things that you should

10   correct

11        THE COURT:  All right, let's ignore

12   the word fail and just answer his question.

13   BY MR. DECHIARA:

14       Q.   You did not control for industry,

15   did you?

16       A.   I wouldn't want to, so I didn't.

17       Q.   Doctor Wachter --

18        THE COURT:  There isn't a doubt.

19   That was a pretty fast answer.

20   BY MR. DECHIARA:

21       Q.   One can, in doing a comparability

22   analysis control for industry, can one not?

23       A.   If one wants to do the study

24   incorrectly one can, yes.

25        MR. DECHIARA:  I would, Your Honor

150

1    ask to have the portion of that response as

2    non-responsive, stricken as non-responsive.

3         THE COURT:  Let's just go on.

4         MR. DECHIARA:  Okay.

5    BY MR. DECHIARA:

6        Q.   There's no question that firms in

7    the motor vehicle industry pay more that the

8    average in the U.S. economy?

9        A.   Yes, those firms pay a wage premium.

10       Q.   Okay.  So let me ask you the same

11   question.  On table 7.2 that I did when I

12   asked you about firm size.  If you controlled

13   for industry, in other words, if you compared

14   the Delphi workers only to workers in the

15   industry in which they work, the motor vehicle

16   parts industry, the numbers in the column that

17   says comparable workers would -- let's start

18   with the total compensation number.  Do you

19   know whether that number would go up?

20       A.   I'd like to point out the --

21            THE COURT:  No, just yes or no.

22   BY MR. DECHIARA:

23       Q.   Can you please answer my question?

24       A.   Not necessarily given your previous

25   sentence to the predicate you've built up to

151

1    this hypothetical.  I answered the previous

2    question to say that the firms in the motor

3    vehicle industry paid a wage premium.  In that

4    sense, this number would not go up.  Because

5    you would be controlling for the factors you

6    need to control for so that it wouldn't be a

7    wage premium.

8        Q.   Okay.  I'm not sure I understood

9    what you said but let me ask you -- let's back

10   up, let's go back to the Voos declaration

11   which is Exhibit 40.  And I'll ask you to look

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

12   at table 3 on page 7.

13        A.   I'm sorry, where are we going now?

14             THE COURT:  Exhibit 40

15             MR. DECHIARA:  It's Dr. Voos'

16   declaration, which is Exhibit 40, and I will

17   ask you to turn to page 7.

18             THE WITNESS:  Page 7.

19             MR. DECHIARA:  Table 3.

20             THE WITNESS:  This is, we're still

21   in Exhibit H?

22             MR. DECHIARA:  No, no, no, no.

23             THE COURT:  This is Exhibit 40.

24             THE WITNESS:  I'm here.

25   By MR. DECHIARA:

152

1        Q.   You're at the Voos declaration?

2        A.   Yes.

3        Q.   Please turn to page 7.  Do you see

4   table 3 there?

5        A.   Yes.

6        Q.   You've seen this before; you

7   reviewed the Voos declaration, did you not?

8        A.   Yes.

9        Q.   And this shows that according to the

10   BLS data that -- now this is wages. That wages

11   in the motor vehicle parts industry are 32.8

12   percent, or almost a third higher, than wages

13   throughout the private sector economy.

14             MR. BUTLER:  Objection.

15             MR. DECHIARA:  Am I reading that

16   correctly?

17          THE COURT:  I'm sorry?

18          MR. BUTLER:  Objection to the form

19    of the question.  The chart says earnings it

20    does not say wages.

21          MR. DECHIARA:  It does say earnings

22    but it means wages.

23    BY MR. DECHIARA:

24       Q.   Am I correct?

25       A.   No.  Average hourly earnings are not

153

1    the same as wages.

2       Q.   How is it different?

3       A.   Wages usually refer to wage rates

4    average hourly earnings usually refer to the

5    total pay divided by the number of hours.

6       Q.   Okay.  So your earnings are about a

7    third higher, correct?

8       A.   Could you restate the whole

9    question?

10       Q.   Does this table not show that the

11    earnings, the average hourly earnings for

12    workers in the motor vehicle parts industry

13    are approximately one third higher than for

14    the private sector in general?

15       A.   Yes.

16       Q.   And you have no doubt that this

17    chart accurately depicts the BLS data, do you?

18       A.   I think the wage in motor vehicle

19    parts is higher than the wage in the economy

20    overall.

21       Q.   That was not my question.  Do you

22    have any doubt that this chart accurately

23    depicts the BLS data?

24         A.   I don't think -- I would doubt that

25    she made any mistakes.

154

1         Q.   Okay.  And you have no reason to

2    doubt that the BLS data accurately describes

3    reality, do you?

4         A.   Yes.

5         Q.   You don't have any reason to doubt

6    it?

7         A.   I do not doubt that it states

8    reality.

9         Q.   Okay.  So let's now go back and let

10    me go back to your table 7.2.  Now let's focus

11    on the wages -- are you on your table 7.2?

12        A.   Yes.

13        Q.   The middle column.  The column where

14    you compare the wages of the comparable

15    workers?

16        A.   Yes.

17        Q.   Okay now, let me ask you for the

18    wages and salaries number for comparable

19    workers.  There's a number there, do you see

20    that number?

21        A.   Yes.

22        Q.   Okay.  Now if you did the exact same

23    study that you did, the exact same

24    comparability analysis but you controlled for

25    industry in the sense that you limited the

155

1  comparison group to workers in the motor

2  vehicle parts industry would that number go

3  up?

4      A.   I really need to ask that -- if

5  you're saying that this is a comparability

6  study, the number wouldn't go up because you

7  wouldn't do it.  If you put that variable in

8  the equation, then that number that you're

9  referring to would go up, but that has nothing

10  to do with the comparability st --

11      Q.   My question was, would it go up and

12  you answered my question, thank you.

13      A.   You put in the word comparability so

14  I answered appropriately I thought.

15      Q.   Now in doing a comparability

16  analysis, one can control for more than one

17  factor, correct?

18      A.   Correct.

19      Q.   One could, say, control for both

20  firm size and industry, correct?

21      A.   Correct.

22      Q.   And one could even control for

23  experience, and one could control for how many

24  years of experience the workers have on the

25  job, correct?

156

1      A.   Correct.

2      Q.   And you didn't -- I won't use the

3  word fail -- you did not do that in your

4    study, correct?

5         A.   That's correct.

6         Q.   And if one controlled for experience

7    would that number on table 7.2 -- and I'm not

8    going to ask you if, in your view it should be

9    done or should not be done but if mechanically

10   one did it, that number would go up, correct?

11        A.   A little bit.

12        Q.   Okay.  You answered my question.

13        A.   You're adding one at a time?

14        Q.   What's that?

15        A.   You're just adding one variable at a

16   time.

17        Q.   I'm just asking you one question at

18   a time.  You just have to answer my questions.

19   You're doing great.  Did you control for

20   regional variance?

21        A.   I didn't because I didn't think I

22   needed to.

23        Q.   Okay.  And is it not a fact that

24   many of Delphi's plants are located in

25   Michigan, Indiana, Ohio and Wisconsin and that


157


1    the pay rates -- the going pay rates for

2    machine operators in those states is above the

3    national average.

4         A.   That fact at the end of your

5    sentence is true.  Does it have anything to do

6    with comparability?  No.

7         Q.   But if one did control for those

8    particular plants, if one controlled for where

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

9  they were located the comparability number

10  would go up, correct?

11      A.  Which states are you putting in?

12      Q.  The upper middle west.

13      A.  None of the southern states?

14      Q.  No, no.  I think what you refer --

15  the old indust -- what used to be called the

16  industrial belt.  Let me be specific,

17  Michigan, Indiana, Ohio and Wisconsin, that is

18  where the plants are.  The number would go up,

19  correct?

20      A.  Certainly anytime you put in a

21  variable that will have higher wages attached

22  to it; it will make these numbers go up.  The

23  question always is what is the basis for

24  putting it in?

25      Q.  Okay.  And we will have our experts

158

1  explain our position on that.  Now if,

2  controlling for regional variance has the

3  advantage of accounting for any conditions of

4  labor demand or supply that are specific to

5  that location, correct?

6      A.  Was that a question?

7      Q.  Yes.

8      A.  Could you repeat that?

9      Q.  Yes.  Controlling for regional

10  variance, in other words, the region in which

11  the workers are located, has the advantage of

12  accounting for any conditions of labor demand

13  or supply that are specific to that location?

14      A.    If you thought you're dealing with

15  local labor market that would be true.

16      Q.    Okay.  And is it your view that the

17  Delphi workers do not work in a regional labor

18  market?

19      A.    The Delphi workers work in a

20  national labor market.

21      Q.    Well, whether a labor market is

22  national or local depends on what the job is,

23  doesn't it?

24      A.    Not particularly.  The United States

25  labor market is a very much a national market

159

1   in that workers move and firms move.  And I

2   think it's generally recognized that our

3   economy now is much more competitive

4   nationally if not internationally; so that

5   workers don't in a sense, work in a particular

6   state.

7       Q.    If you post an opening for a tenure

8   track position in the economics department of

9   a -- if you post a job opening for a tenure

10  track teaching position in the University of

11  Pennsylvania Economics Department, I assume

12  you get applications from all across the

13  country, is that correct?

14      A.    All over the world.

15      Q.    All over the world.  If the

16  cafeteria service of the University of

17  Pennsylvania posted an opening for a kitchen

18  worker I assume they do not get applications

19   from all across the country, is that true?

20        A.   Probably not.

21        Q.   In fact, the cafeteria service pays

22   the going rate in the Philadelphia area,

23   correct?

24        A.   I actually don't know what -- when I

25   was deputy provost and interim provost I used


160


1    to know what the cafeteria workers got paid,

2    but I don't currently.

3         Q.   Right, but you have no doubt that

4    the rate they pay for kitchen workers is what

5    the going rate is in Philadelphia?

6         A.   I don't know if they pay that going

7    ra --

8              THE COURT:  You know, I'm sorry.  I

9    don't buy the cafeteria example.

10   BY MR. DECHIARA:

11        Q.   Well, let me be more specific.  Do

12   you know, have you done a study of whether,

13   when a Delphi plant in Michigan posts an

14   opening, or in the past has posted openings,

15   whether, from what area, from how broad an

16   area they draw applicants?  Have you done a

17   study?

18        A.   I haven't published a study but we

19   certainly know that the build up --

20             THE COURT:  No, go ahead go ahead.

21   BY MR. CHIARA:

22        Q.   The question is did you do a study?

23        A.   I did not publish a study.

24        Q.    Okay.

25              THE COURT:  Well, I'm sorry.  Have

161

1    you studied that issue?

2              THE WITNESS:  I've studied the issue

3    in terms of what's happened to the -- what led

4    to the development of the automobile industry

5    in this area of the country.

6              MR. DECHIARA:  That's not my

7    question.

8              THE WITNESS:  Okay.

9    BY MR. DECHIARA:

10        Q.    My question is have you looked at

11   any empirical data on when, in the past when

12   Delphi has looked for workers, a particular

13   plant has looked for workers, the breadth of

14   the area from which they received applicants?

15        A.    No.

16        Q.    Thank you.  You note in your papers

17   that sometimes plants move to the South to get

18   cheaper wages, right?

19        A.    And become more competitive, yes.

20        Q.    And the reason wages are cheaper in

21   the south than in the north is because, for

22   certain groups of workers, there is a regional

23   labor market that pays a different wage,

24   correct?

25        A.    By cheaper you mean lower?

162

1       Q.    Yes.

2       A.    That's right.

3       Q.    Thank you.  Now in the Tower case,

4    you submitted a declaration did you not?

5       A.    Yes.

6       Q.    I'd like to show that to you now.

7             (Discussion away from the

8    microphone).

9             MR. DECHIARA:  I'm sorry, Your

10   Honor, did I give you a copy?  The most

11   important person in the room I forgot, I'm

12   sorry.

13            THE COURT:  There you go.  Thank

14   you.

15   BY MR. DECHIARA:

16      Q.    Let me refer you -- is this the

17   report that you submitted on behalf of Tower

18   Automotive for their Section 1113 proceeding?

19      A.    Yes it is, uh-huh.

20      Q.    Let me refer you to pages -- the

21   graphs that appear on pages 13 and 14.  Now

22   Tower Automotive is an auto supply company

23   like Delphi?

24      A.    That's correct.

25      Q.    And it employs industrial production

163

1    workers like Delphi, correct?

2       A.    Yes.

3       Q.    Okay.  Now you have on page 13,

4    Exhibit 3.2 and on page 14, Exhibit 3.3 and

5       one is an analysis of the average hourly wages

6       of Tower Automotive employees in comparable

7       occupations economy-wide for a certain date,

8       and the next exhibit on the next page, Exhibit

9       3.3 is the average wages of Tower's hourly

10      workers at twelve unionized plants and

11      comparable occupations in their local labor

12      markets, as measured by Department of Labor

13      datA.   Do you see that?

14           A.   Yes, I do.

15           Q.   And if you turn to the next page,

16      page 15, paragraph 37, I'll read the second

17      sentence of paragraph 37 you say, use of local

18      market comparison data leads to a market wage

19      estimate of 14.23 verses an estimate of 13.25

20      based on national wage datA.   This difference

21      reflects the fact that the twelve Tower plants

22      tend to be located in areas that have average

23      wages for the ten benchmark occupations that

24      are higher than the national average compiled

25      across all labor markets.  Do you see that?


                                          164


1            A.   Yes.

2            Q.   You chose not to do a similar

3       analysis in this case, is that correct?

4            A.   Can I explain, or not?

5            Q.   Well first if you could answer the

6       question.  Is that correct, you chose not to

7       do a similar analysis in this case.  It's a

8       yes or no question.

9            A.   I chose not to.

10      Q.   Okay.  Now you formed an opinion --

11      A.   So I can't explain?

12      Q.   Your counsel will have a chance to

13   ask you appropriate questions on redirect.

14   You formed an opinion in the Tower Case about

15   whether the company's Section 1113 proposals

16   in that case were reasonable.  Do you remember

17   forming that opinion?

18      A.   Yes.

19      Q.   Okay and you believed that Tower's

20   Section 1113 proposal in that case were highly

21   reasonable.

22      A.   Yes.

23      Q.   Okay.  Let's look at page 21 in the

24   Tower case, your Exhibit 4.2.  This chart

25   shows, does it not, for the non-skilled as


                                          165


 1   opposed to the skilled employees after Tower

 2   implemented its Section 1113 proposal those

 3   employees would have a wage premium measured

 4   nationally, against a national average of 33

 5   percent, correct?

 6      A.   That's correct.

 7      Q.   And that in your view was highly

 8   reasonable.

 9      Q.   That's correct.

10      A.   And in this case if we go back to

11   your table 7.2, Delphi's proposal would leave

12   Delphi's production workers with a deficit,

13   the opposite of a premium, but a deficit below

14   the national average.  Not factoring for any

15    of all the other factors we talked about, firm

16    size et ceterA.   Under the national average

17    of an 8 percent deficit, correct?

18        A.   Correct.

19        Q.   What are legacy costs?

20        A.   Legacy costs are costs inherited

21    from GM in this particular case.

22        Q.   Okay now I'm not talking about this

23    particular case.   In general are legacy costs,

24    costs that are not incurred -- well, let me

25    ask you can you -- what in general -- how

166

1     would you describe legacy costs?

2         A.   It's used differently.   Legacy costs

3     usually refer to a change in regime and it

4     refers to the cost from the old regime that

5     are inherited by the new regime.

6         Q.   Do legacy costs include accrued

7     pension liabilities?

8         A.   Yes, they certainly can.

9         Q.   Well you would consider accrued

10    pension liabilities to be legacy costs,

11    correct?

12        A.   Well in what context are you

13    referring?

14        Q.   In general -- speaking in general

15    terms.   You used the word legacy costs in your

16    analysis, correct?

17        A.   Accrued, depending upon the

18    circumstances either they can or they may not

19    be.

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

20      Q.   Under what circumstances would

21   accrued pension liabilities not be considered

22   legacy costs?

23      A.   Not be considered?

24      Q.   Yes.

25      A.   If a firm is continuing to fund its

167

1   pension plan, the pension plan may be under

2   funded and is putting money in that would be a

3   -- an example of what you're saying.

4      Q.   So if it's not continuing to fund

5   its pension plan the accrued pension

6   liabilities are legacy costs?

7      A.   I'm not sure how to answer your

8   hypothetical.

9      Q.   It's not a hypothetical.  I'm asking

10   you a question.  You made a distinction?

11      A.   Yes.

12      Q.   I asked you what are legacy costs

13   generally?

14      A.   Right.

15      Q.   You said they could be accrued

16   pension liabilities in some cases and not

17   others.  I said what cases.  You said if the

18   company is not funding the pension they are

19   legacy costs.

20      A.   Well if they're not funding it then

21   there are no costs, so they're not legacy

22   costs.

23      Q.   Well if they're not contributing,

24   but the liabilities are still there?

25          A.    The liabilities are still there,

168

1    that would be a legacy cost.

2          Q.    Okay.  And is it your view -- and

3    those pension liabilities could have been

4    accrued and in many cases are accrued by

5    former workers, workers who are now retired,

6    correct?

7          A.    Yes.

8          Q.    Okay.  Now is it your view in

9    analyzing a company's -- I'm not specifically

10   talking about Delphi -- but a company's wages

11   and benefits when doing a comparability study

12   one should include legacy costs?

13         A.    Absolutely.

14         Q.    Okay.  Even though those costs were

15   incurred not by -- or are not being incurred

16   by the present workers but workers who

17   predated the present workers?

18         A.    Absolutely.

19         Q.    Okay.  Now, Delphi management, as

20   opposed to you, their expert, when calculating

21   their labor costs do not include legacy costs,

22   correct?

23         A.    Do not include legacy costs?

24         Q.    Yes.

25         A.    In doing what they don't include

169

1    legacy costs?

2      Q.   In analyzing their own labor costs.

3      A.   I believe they do.

4      Q.   Okay.  Have you read the Butler

5  declaration?

6      A.   I've read parts of it.

7      Q.   Well let's look at it together.  Can

8  you turn to Exhibit 7 which is the Butler

9  declaration?

10     A.   Okay.

11     Q.   Okay, turn to page 32, paragraph 98.

12 Let me refer you to the last sentence of

13 paragraph 98.  It says, quote, in connection

14 with the current restructuring, however,

15 Delphi management made an important policy

16 decision in November 2005 to exclude those

17 legacy costs in analyzing its average U.S.

18 hourly labor costs and in direct bidding for

19 new supply contracts, end quote.  Do you have

20 any reason to doubt that Mr. Butler's

21 statement there is inaccurate?  Is accurate?

22     A.   It is accurate and it is in no

23 contradiction with what I said.

24     Q.   Well you said legacy costs should be

25 included in analyzing the company's wages and


170


1  benefits.  And the company says when it

2  analyzes its average U.S. hourly labor costs

3  it does not include legacy costs.  Am I

4  reading that wrong?

5      A.   Yes, you are.

6      Q.   How am I reading that wrong?

7        A.    Read the rest of the sentence,

8    you'll see.  And in direct bidding for new

9    supply contracts.

10        Q.    And how is my interpretation

11    incorrect based on those last words?

12        A.    There was a -- in bidding for new

13    business you would not include legacy costs

14    because they're fixed costs and not marginal

15    costs.  That's very different from that being

16    an element of costs because whether a firm

17    goes bankrupt and has to liquidate or not,

18    depends on those fixed costs.  So there is a

19    difference between fixed costs as it affects

20    output, which is what's being stated in

21    paragraph 98.  And my statement which says

22    that if you don't -- if you have these fixed

23    and legacy costs, although it doesn't affect

24    your output level, it affects the decision to

25    stay in business or not stay in business.

171

1        Q.    But you agree that in bidding for

2    new work it's appropriate not to account for

3    legacy costs, right?

4        A.    That's what I just said.  It's

5    perfectly legitimate.  There's no

6    contradiction to anything that I've said.

7        Q.    And you read that sentence from Mr.

8    Butler as not being in the conjunctive.  It's

9    not that they exclude legacy costs both (a) in

10    analyzing their average U.S. labor costs and

11    (b) indirect bidding.  But somehow you put

12    those two things together.

13        A.    Can you read that sentence back,

14    that question back to me?

15            MR. DECHIARA:  I -- I won't belabor

16    this further, Your Honor.

17            THE COURT:  Okay.

18            MR. DECHIARA:  Let me move on.

19    BY MR. DECHIARA:

20        Q.    Delta Airlines has, had and has a

21    pension plan for its pilots, which is the only

22    unionized group on the property, correct?

23        A.    Yes.

24        Q.    And it went into bankruptcy and it

25    ceased to contribute to that plan, correct?

172

1        A.    Again, I do not recall -- I did not

2    keep up with the Delta situation.

3        Q.    Well, when you wrote your Section

4    1113 comparability study for Delta Airlines?

5        A.    Yes.

6        Q.    Did you inquire as to whether or not

7    Delta had accrued pension liabilities?

8        A.    I almost certainly would have, yes.

9        Q.    You would have?

10        A.    Yes.

11        Q.    And did you do so?

12        A.    I believe so.

13        Q.    And did you -- what did you find

14    out?

15        A.    I don't recall offhand what we did

16    in the Delta -- what that factoid was from the

17    Delta report.

18         Q.   So you don't know, just from reading

19    newspapers, being an economist or being a

20    hired expert for Delta Airlines in their 1113

21    proposal, you don't know whether Delta

22    Airlines had accrued pension liabilities?

23         A.   No, again, I have not followed the

24    Delta situation so I prefer not to speculate.

25         Q.   Were you following it when you

173

1    prepared your Section 1113 proposal for them?

2         A.   Certainly.

3         Q.   Okay.  At that time did you inquire

4    as to whether or not Delta had accrued pension

5    liabilities?

6              MR. BUTLER:  Objection, form of the

7    question.

8              THE COURT:  Well, I think he

9    answered it differently.  You said yes, right?

10             THE WITNESS:  Yes.

11             THE COURT:  Overruled.

12    BY MR. DECHIARA:

13         Q.   And did you find out that it did?

14         A.   I believe so. As I said before that

15    I don't recall that exact fact from the Delta

16    report.

17         Q.   Okay, when you say that exact fact.

18    You believe that it did.  As you sit here

19    today on the witness stand, under oath, do you

20    believe that Delta had, at the time you served

21    as the expert and wrote your report, accrued

22    pension liabilities?

23         A.    Under oath, if I had my report in

24    front of me and I had the facts in front of

25    me, then I could refer to it.

174

1          Q.    Let me put the report in front of

2     you.  Mr. Wachter, I'm not going to ask you

3     this for the fourth time, let me just ask you.

4     In your report on behalf of Delta Airlines,

5     you do an analysis in the context of your

6     comparability study of the wages and benefits

7     of the Delta pilots, correct?

8          A.    Correct.

9          Q.    You do not, however, in that study,

10    take into account any legacy costs that Delta

11    Airlines may have had, including any legacy

12    costs in connection with accrued pension

13    liabilities, correct?

14         A.    I think that's a different question

15    than you were asking me before.

16         Q.    Right.  Can you answer the question

17    I just asked you?

18         A.    Okay, could you restate that

19    question?

20         MR. DECHIARA:  Could I ask the

21    reporter to please read it back?

22         THE REPORTER:  "You do not however

23    take into account any legacy costs that Delta

24    Airlines may have had, including any legacy

25    costs in connection with accrued pension

175

1   liabilities, correct?"

2           THE COURT:  In your report for

3   Delta.

4           THE WITNESS:  I believe I did take

5   them into account.

6   BY MR. DECHIARA:

7       Q.   Can you show me where?

8       A.   It can take a while before I -- .

9   It's on page 35.

10          MR. DECHIARA:  Your Honor, if I may

11  suggest, it's a long document.  Perhaps Dr.

12  Wachter would like to -- I can continue with

13  the rest of my cross and if Dr. Wachter is

14  still on the witness stand tomorrow he can

15  take the night to review it.

16          THE COURT:  All right.  It seems to

17  me, maybe I'm wrong but it's dealt with in

18  paragraph 77 and paragraph 21, but he may

19  disagree with me.

20          THE WITNESS:  Paragraph 77?

21          THE COURT:  Yeah and paragraph 21,

22  but I think your suggestion's an excellent

23  one.

24          MR. DECHIARA:  Okay.  And Monday,

25  just to cut this short.  Just to shorten this

176

1   line of inquiry, I would have the same

2   question for Dr. Wachter regarding his report

3      in the United Airlines case and in the Tower

4      case.  Let me give him now, his report in the

5      United Airlines case.

6      BY MR. DECHIARA:

7          Q.   Mr Wachter there's no question in

8      your mind, is there, that United Airlines had

9      massive pension liabilities?

10         A.   Yes.

11         Q.   Okay.  So my question to you and, if

12     you can't answer it now please feel free to

13     study your report overnight.  My question is,

14     did you anywhere in your report in United

15     Airlines in analyzing the paying benefits of

16     the United Airlines unionized employees for

17     purposes of your comparability study take into

18     account legacy costs?  And, in particular,

19     accrued pension liabilities?  And I would ask

20     you the same question for Tower Airlines, I

21     mean Tower Automotive.

22         A.   Unless I'm misunderstanding your

23     question, I believe we would have in each

24     case.

25         Q.   Well I want you to show me.  That's

177

1      the question.

2              THE COURT:  He wants you to look at

3      it overnight and tell him tomorrow.

4              THE WITNESS:  Okay.

5      BY MR. DECHIARA:

6          Q.   Because I've read it, and I don't

7      see it.  So if you could please -- I'm asking

8      you to be able to show the Court where, in

9      those reports, you point to legacy costs as

10     something that should be factored into current

11     workers pay and benefits.  Now in your report

12     you did not just rely on Department of Labor

13     or BLS data but you also looked at data that

14     was provided to you by Delphi, correct?

15          A.   Yes.

16          Q.   Okay.  Let me refer you to page 22

17     of your report.

18          A.   Excuse me, which report is this?

19          Q.   Your declaration in this case.  It's

20     Exhibit 16.  And in particular I referring you

21     table 5.3, do you see that?

22          A.   What page are we on again?

23          Q.   Twenty-two.

24          A.   Yes.

25          Q.   Okay.  And there you have certain

178

1      dollar figures for the compensation of

2      Delphi's competitors in the motor vehicle

3      industry, correct?

4           A.   Correct.

5           Q.   And you're just looking at

6      production workers here, correct?

7           A.   Correct.

8           Q.   And you have three figures for the

9      competitors' compensation.  It's the customer

10     data, the business team data and the car non-

11     union plants, do you see those three lines?

12          A.   Correct.

13      Q.   To what extent do any of those

14   include legacy costs?

15      A.   They would if they were there.

16      Q.   How do you know that?

17      A.   I believe that was part of the data

18   collection.

19      Q.   Who told you that?

20      A.   I don't recall.  It could have been

21   Mr. Butler, it could have been someone else

22   who I talked to --

23      Q.   Did you ask that question?

24      A.   Excuse me?

25      Q.   Did you ask that question?


                                        179


1      A.   Yes.

2      Q.   And what were you told?

3      A.   I was told that the CAR study which

4   is a non-union plant would not have certainly

5   legacy costs because non-union plants don't

6   have legacy costs.  That most of the customer

7   data are the low-cost competitors.  And most

8   of them, as I understand it, don't have legacy

9   costs.  The business team data to the extent

10   that it included firms like Viscion, I think

11   it would include their legacy costs.

12      Q.   Do you know that for a fact, or are

13   you just speculating?

14      A.   Well I thought I knew it for a fact

15   until you raised the question.

16      Q.   And now what do you think?

17      A.   I believe, I believe that where

18    legacy costs are there and were known and

19    could be estimated, they were included.

20        Q.    What do you mean that the customer

21    data reflects low-cost competitors?  What do

22    you mean by low-cost?

23        A.    Where the customer data is collected

24    is that -- actually I misspoke, I should have

25    said high-cost competitors.  The way the

180

1    business cost data is collected, and this

2    really is a magnificent data set, that you

3    almost don't find anywhere else, is that the

4    firms that are competing with Delphi would

5    report information to GM and GM would then

6    calculate a premium that they would pass on in

7    pricing, or a discount that they would pass on

8    to Delphi.  If Delphi believed that the

9    premium was inaccurate, then they would go

10    back to GM and GM would then report the data

11    they had available.  So that the customer data

12    by its very nature will include the high-cost

13    firms, because those were the firms that

14    Delphi would have said, we'd like to see the

15    datA.    Because they didn't think they were

16    getting enough of a price cut.

17        Q.    Let me refer you to Mr. Butler's

18    declaration where he provides an explanation

19    of where this business team data comes from.

20        A.    I'm sorry, I thought you were

21    talking about customer datA.    Did I

22    misunderstand?

23    Q.    Yes.  I believe you did.

24          THE COURT:  No, you asked him about

25    customer data.


                                                      181


1           MR. DECHIARA:  Oh yes, yes, yes, I'm

2     sorry.

3     BY MR. DECHIARA:

4           Q.    Let me refer you to Mr. Butler's

5     declaration.  Do you have that in front of

6     you, Exhibit 7?  Okay, all right.  I apologize

7     for any confusion.  Now I'm referring to the

8     business team data and I'd like to refer you

9     to paragraph 84.  Let me know when you're

10    there.

11          A.    Yes.

12          Q.    Okay.  Now Mr. Butler describes in

13    his paragraph where the business team data

14    came from, and I'm going to read the second

15    sentence of paragraph 84 he says, quote,

16    Delphi asked each division to identify its

17    principle competitors and to determine or make

18    their best estimate of the all in labor rates

19    of these competitors, end quote.  So in part,

20    this business team data is based on estimates,

21    correct?

22          A.    Of course.

23          Q.    Okay.  And there is a figure that is

24    derived, the one you have on your table of

25    21.60.  Do you know how that number was


                                                      182

1    derived or calculated?

2        A.    Yes.

3        Q.    How was it derived?

4        A.    It was derived from having the

5    various people who were involved at Delphi

6    with individual products and individual plants

7    identify who they thought their competitors

8    were.  The idea for this was to try to get an

9    accurate estimate of what they were facing in

10   terms of competition.  The idea being that

11   they would look at the information and then

12   they would, in part, ask themselves, can we

13   meet this number?

14       Q.    Did you do any independent

15   investigation of the accuracy of these

16   numbers?

17       A.    The accuracy of these numbers, no, I

18   did not.

19       Q.    You just accepted the numbers the

20   company gave you, and put them in your chart?

21       A.    Yes, I did.

22       Q.    Okay.  And you have a description in

23   your --

24       A.    I did after that obviously with the

25   analysis I put in it.  I did look at the -- I

183

1    did talk with them at some length about the

2    information.

3        Q.    And then you accepted their numbers?

4        A.    And then I, numbers look reasonable

5    and, moreover, they fit, almost to the tee,

6    the estimate that we separately got from the

7    BLS data of the -- of what the Delphi faces

8    with respect to its competitors --

9        Q.    It matches, your saying -- go ahead,

10   I'm sorry.

11       A.    What it captures, what it captures

12   is the competitive market price of production

13   workers in the U.S. economy.  And that number

14   on all end compensation is around $21.

15       Q.    So the number that Delphi said was

16   the average all-in compensation for its

17   competitors matches the total compensation

18   that you found with the BLS data throughout

19   the private sector economy, correct?

20       A.    Yes, in terms of the way we

21   correctly did the comparability study.

22       Q.    Right.  But we know from the BLS

23   data that hourly earnings in the motor vehicle

24   industry are about a third higher that the

25   private sector, do we not?


                                            184


1        A.    As a factoid we do, but it's

2    irrelevant to comparability, as so many of

3    your other questions have been.

4        Q.    But the chart in Dr. Voos'

5    declaration shows that hourly earnings in the

6    motor vehicle industry are about a third

7    higher than the private sector.  And that data

8    is authoritative and reliable, to use your

9    words, correct?

10      A.   If you -- she is calculating means

11   from --

12      Q.   Please answer my questions.  We're

13   not -- this is not an academic seminar.  I ask

14   the questions, I'd ask you to answer them.

15           THE COURT:  We, you know, the chart

16   speaks for itself about hourly earnings.

17   There's a dollar difference.

18           MR. DECHIARA:  I'll move on, Your

19   Honor.

20           THE COURT:  It's a dollar

21   difference.  Which means a lot to some people,

22   I appreciate it.

23   BY MR. DECHIARA:

24      Q.   Now the CAR study, that last figure,

25   the lowest figure, do you know how CAR, the

185

1   Center for Automotive Research did their

2   study?

3      A.   Exactly how they did their study, I

4   don't know.  I think they, as I understand it,

5   what they did was they surveyed a number of

6   unionized firms and non-unionized firms.  CAR

7   is a very respected center in terms of doing

8   automobile research and they reported their

9   findings.

10      Q.   But do you know whether it was a

11   comprehensive study, whether they look at

12   every firm, did they only look at some firms,

13   do you know the answer to that?

14      A.   In detail I don't.

15          Q.   I'm not asking you in detail or not,

16    I'm asking you do you know whether it's 100

17    percent of the firms or less than 100 percent?

18          A.   I would assume it was not 100

19    percent of the firms, but it's an

20    authoritative study.

21          Q.   That's not my question.  So you

22    don't know whether it was a hundred percent or

23    less than a hundred percent, correct?

24          A.   I would very much doubt that they

25    were able to contact a hundred percent of the

186

1     firms in the U.S. economy that are in this

2     industry.

3          Q.   Well, is this the U.S. economy or is

4     this the CAR study just of the motor parts

5     industry?

6          A.   I understood this to be the United

7     States.

8          Q.   So your understanding of this last

9     number, the CAR non-union plants, that's for

10    firms not just in the automotive industry but

11    throughout the United States?

12          A.   Excuse me?

13          THE COURT:  Does this limit it just

14    to automotive companies or does it cover other

15    companies besides.

16          THE WITNESS:  No, it's just

17    automotive, parts.

18          THE COURT:  But it's limited to

19    those companies in the U.S.?

20          THE WITNESS:  Yes.

21          MR. DECHIARA:  Oh okay yeah.

22    Domestic automotive

23    BY MR. DECHIARA:

24      Q.   But it is limited to automotive,

25    correct?


187


1       A.   And your testimony is you believe

2    it's less than all.

3          MR. BUTLER:  Objection, asked and

4    answered for the third time.

5          THE COURT:  Sustained.

6    BY MR. DECHIARA:

7       Q.   Do you know which ones were -- how

8    CAR chose the ones they chose?

9       A.   Like, I don't have a recall on it

10    now, I did read the report.

11      Q.   In fact, the CAR study shows that if

12    you looked at unionized plants, the number

13    would be much higher, correct?

14      A.   Of course.  As I've said they looked

15    at unionized plants and non-unionized plants.

16      Q.   And if you looked at -- according to

17    the CAR study if you just looked at, well

18    according to Mr. Butler's declaration based on

19    the CAR study, if you just looked at unionized

20    plants the number would be 26.78?

21      A.   Yeah but, why would you want to?

22      Q.   That's not my question.

23          THE COURT:  It's a good answer

24    though.  I'm ready to move on.

25          MR.DECHIARA:  Okay.

188

1          THE COURT:  It's not the purpose to

2     suit his report.

3     BY MR. DECHIARA:

4          Q.   Do you know whether either the

5     customer data or the business team data

6     included firms who competed or who compete

7     with Delphi in product lines from which Delphi

8     plans to divest?

9          A.   I would think so.

10          Q.   And do you know whether the business

11     team data and the customer data are weighted

12     averages based on the extent to which the

13     competitors compete with Delphi?

14          A.   I did know at one point.  I don't

15     recall offhand.  I just don't recall.

16          Q.   That would be a relevant fact, would

17     it not?

18          A.   Might be, might not be.

19          Q.   Okay.  You have a discussion of

20     quit-rates in your declaration.

21          A.   Yes.

22          Q.   Do you know what the quit-rates are

23     for Delphi's competitors?

24          A.   No, I don't.

25          MR. DECHIARA:  No further questions.

189

1          THE COURT:  Okay.

2          MR. DECHIARA:  Your Honor, I would

3    just ask that the Witness provide an answer to

4    those outstanding questions when we come back

5    on Friday.

6          THE COURT:  You know, to look at the

7    three reports for the other studies you did.

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  All right, I

10   think this is a good place to take a break.

11   And we'll resume on Friday at 10:00.

12      (Whereupon this proceeding was

13   concluded.)

14      (Time noted:  6:11 P.M.)

15

16

17

18

19

20

21

22

23

24

25

190

1

2               I N D E X

3             T E S T I M O N Y

4    WITNESS            EXAMINATION BY        PAGE

5    Butler            Mr. Butler          13

| 6  | Butler  | Mr. Kennedy   | 46 |
| 7  | Butler  | Mr. Peterson  | 54 |
| 8  | Butler  | Ms. Robbins   | 55 |
| 9  | Butler  | Ms. Mehlsack  | 58 |
| 10 | Butler  | Mr. Lauria    | 61 |
| 11 | Butler  | Mr. Simon     | 65 |
| 12 | Butler  | Mr. Peterson  | 84 |
| 13 | Butler  | Mr. Fox       | 86 |
| 14 | Wachter | Mr.DeChiara   | 93 |

15

16                R E Q U E S T S

| 17 | DESCRIPTION | PAGE | LINE |
| 18 | Written summaries of | 60 | 24 |
| 19 | meetings between Delphi |
| 20 | and the unions |

21

22

23

24

25

191

1

2          C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, hereby certify that the

5   foregoing is a true and correct transcription,

6   to the best of my ability, of the sound

7   recorded proceedings submitted for

8   transcription in the matter of the bankruptcy

9   of:

10  DELPHI CORPORATION, et al.

https://vip21.veritextllc.com/myfiles/170483/116593pm.TXT

```
11

12        I further certify that I am not employed

13   by nor related to any party to this action.

14

15        In witness whereof, I hereby sign this

16   date:

17   May 12, 2006.

18

19        _____

20                  Lisa Bar-Leib

21

22

23

24

25
```