<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3   ----------------------------------X
                                       :
 4   In Re:                            :  Case No. 05-44481
                                       :
 5    DELPHI CORPORATION               :
                                       :  June 2, 2006
 6                                     :
                           Debtor.     :  One Bowling Green
 7   ----------------------------------X  New York, NY

 8           TRANSCRIPT OF CONTINUED MOTION ON
 9            SECTION 1113 AND 1114 MOTION
          BEFORE THE HONORABLE ROBERT D. DRAIN
10             UNITED STATES BANKRUPTCY JUDGE

11
     APPEARANCES:
12
     For the Debtor:              JOHN WILLIAM BUTLER, JR., ESQ.
13                                SKADDEN, ARPS, SLATE, MEAGHER &
                                  FLOM, LLP
14                                333 West Wacker Drive
                                  Chicago, IL  60606-1285
15
     For the IUEW:                THOMAS M. KENNEDY, ESQ.
16                                SUSAN JENNIK, ESQ.
                                  KENNEDY, JENNIK & MURRAY, P.C.
17                                113 University Place
                                  7th Floor
18                                New York, NY  10003

19   For the United Auto          BRUCE LEVINE, ESQ.
       Workers:                   COHEN, WEISS & SIMON, LLP
20                                330 West 42nd Street
                                  New York, NY  10036
21
     For the IAM and IBEW:        MARY ANN ROBBINS, ESQ.
22
     For Operating Engineers:     BARBARA MEHLSACK, ESQ.
23                                GORLIK, KRAVITZ & LITZHAUS, P.C.
                                  17 State Street
24                                4th Floor
                                  New York, NY  10004

25
</pre>

1                         UNITED STATES BANKRUPTCY COURT
                          SOUTHERN DISTRICT OF NEW YORK
2

3
      For the UAW:                    LOWELL PETERSON, ESQ.
4                                     MEYER, SUOZZI, ENGLISH & KLEIN
                                      1350 Broadway, Suite 501
5                                     New York, NY  10018

6
      For the Ad Hoc Committee of  DOUGLAS BAUNSTEIN, ESQ.
7       Equity Holders:

8     For the Official Committee    BONNIE STEINGART, ESQ.
        of Security Holders of       FRIED, FRANK, HARRIS, SHRIVER &
9       Delphi:                      JACOBSON
                                      One New York Plaza
10                                    New York, NY  10004

11    For Ad Hoc Committee of       GLENN KURTZ, ESQ.
        Equity Holders:

12

13

14
      Court Transcriber:            RUTH ANN HAGER
15                                    TypeWrite Word Processing Service
                                      356 Eltingville Boulevard
16                                    Staten Island, New York 10312

17

18

19

20

21

22

23

24

25


      Proceedings recorded by electronic sound recording,transcript
      produced by transcription service

3

1                                    INDEX

2   DEBTOR'S WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS

3   **WILLIAM SHAW**

4     By Mr. Levine                    5

5     By Ms. Robbins                  30

6     By Ms. Mehlsack                 31

7

8   **JAMES GUGLIELMO**

9     By Ms. Jennik                   36

10    By Mr. Peterson                 54, 70

11    By Ms. Robbins                  60

12    By Ms. Mehlsack                 66

13

14                                  EXHIBITS

15  EXHIBITS:                    DESCRIPTION              MARKED

16  ADMITTED

17  324                   Objections, 5-15-06        77        --

18

19

20

21

22

23

24

25

4

1    (Proceedings began at 10:02 a.m.)

2            THE COURT:  Please be seated.  Okay.  <u>Delphi</u>

3    <u>Corporation</u>.

4            MR. BUTLER:  Your Honor, good morning.  Jack

5    Butler from the law firm of Skadden, Arps, Slate, Meagher &

6    Flom, LLP., here with my colleagues from [inaudible] Marrs and

7    the Groom law firm here for the continued hearing on the

8    debtor's Section 1113, 1114 motion.

9            Your Honor, we're continuing with the 11th

10   witness in the debtor's direct case in support of the motion.

11   That witness is William R. Shaw, who is director at Rothschild,

12   Inc.  We would call Mr. Shaw for the purpose of cross-

13   examination in support of his declarations, which have been

14   marked Exhibits 22 and 282, which we move into evidence subject

15   to cross-examination.

16           THE COURT:  Okay.

17           MR. KENNEDY:  Tom Kennedy, Your Honor, IUECWA.

18   The union order of cross-examination will be the UAW, the IBEW,

19   and the Operating Engineers.

20           THE COURT:  Okay.  Would you raise your right

21   hand, please?

22                   WILLIAM SHAW, SWORN

23           THE COURT:  And for the record would you spell

24   your name?

25           THE WITNESS:  William Shaw, W-i-l-l-i-a-m  S-h-a

Shaw – Cross                                              5

1   -w

2               MR. LEVINE:  Good morning, Your Honor.  Bruce

3   Levine, Cohen, Weiss & Simon for the United Auto Workers.  Good

4   morning, Mr. Shaw.

5               THE WITNESS:  Good morning.

6                        CROSS-EXAMINATION

7   BY MR. LEVINE:

8   Q.     Do you have your declaration, Exhibit Number 22, in

9   front of you?

10  A.     Yes, I do.

11  Q.     Mr. Shaw, is this the first time that you've been

12  involved in an 1113 proceeding in any capacity?

13  A.     No, it's not.  I had -- we had represented Special

14  Metals in its Chapter 11 and I was involved in that 1113

15  process.

16  Q.     Okay.  Was your role in that proceeding any different

17  than it is in this proceeding?

18  A.     In -- in what sense?

19  Q.     What -- did you --

20  A.     Oh, we represented the debtor in that case as well.

21  Q.     Okay.  And did you provide the same services to the

22  debtor in that proceeding that you were providing the debtor in

23  this proceeding?

24  A.     Yes, we did.

25  Q.     And in -- excuse me.  In this case am I correct that you

Shaw – Cross                                               6

1   have a principle role on Delphi's behalf in terms of responding

2   to information requests by the UAW through its financial

3   advisor, Lessard?

4   A.      That is correct.

5   Q.      Okay.  And in your declaration, Exhibit 22, paragraph 4,

6   you referred to Delphi's application granted by this court to

7   have Lessard's fees paid by the estate.  Is that correct?  Read

8   the last two sentences of that declaration of paragraph 4.

9   A.      Yes, I see that.

10  Q.      And are you familiar with that application to retain

11  Lessard by Delphi?

12  A.      I'm familiar with it.  I don't know necessarily the

13  specific terms of it as I sit here.

14  Q.      But you understand that in that application it was

15  stated that Lessard would be retained to conduct due diligence

16  on behalf of UAW in connection with collective bargaining with

17  Delphi?

18  A.      That is correct.

19  Q.      And prior to that retention order by the Court, which

20  was in January of this year, had you or FTI -- I'm sorry,

21  Rothschild developed a procedure for responding to Lessard's

22  various due diligence requests?

23  A.      Yes, we had -- Lessard, I believe, first got involved

24  toward the of October and submitted an initial due diligence

25  list.  There was a procedure with respect to Lessard.

Shaw – Cross                                                                            7

1    Actually, there was a procedure for due diligence by all

2    advisors to the various constituencies and all information

3    requests went through that process.

4    Q.      Okay.  And could you briefly summarize that process,

5    that is, beginning with the time that presumably Rothschild

6    received a diligence request and how that worked through

7    Delphi's various departments, if that's what happened, and

8    completing that process with presenting a document or not

9    presenting a document?

10   A.      Certainly.  When we received information requests, we

11   would review it.  There -- the company has tasked several

12   individuals within Delphi that their primary role is to help

13   coordinate all the due diligence requests.  They're kind of the

14   central repository for requests that come in so that specific

15   requests don't, you know, kind of get channeled through an

16   orderly process.  So all requests go in through those parties.

17   They're logged into a main database of requests that come in,

18   and then we review those request lists with them.  And then

19   depending on where that information is to come from, the

20   specific requests are then sent out to the various departments.

21   If they're union related they also go to the labor folks, so

22   that, you know, before any of the advisors' involvement,

23   whether it's Lessard or others, the -- the unions had been

24   interacting with Delphi giving due diligence and there was a

25   team task within the labor group that received specific

Shaw - Cross                                                    8

1    requests.  So there was some coordination to make sure that

2    information that had come in -- already been provided to this

3    union directly, you know, that kind of all gets filtered into

4    the process.

5    Q.      And when you say "the labor folks" or "the labor

6    people," are you talking about people employed by Delphi?

7    A.      People employed by Delphi.

8    Q.      Was there also law firm review by -- of document

9    requests made by UAW?

10   A.      Primarily internal, but it was also -- it was the review

11   of maybe less so the document -- the information requests and

12   more so the actual documents that came back, but that was part

13   of the process for all the advisors.  There was a set group of

14   people that had to review information before it was sent out.

15   Q.      So as I understand it, you would get a request -- "you"

16   being Rothschild --

17   A.      Um-hum.

18   Q.      -- you would discuss that request or forward that

19   request to some internal folks in Delphi corporate.  Is that

20   fair to say?

21   A.      That's correct.

22   Q.      They would then channel a specific request to the

23   pertinent department in Delphi, is that correct?

24   A.      That's correct.

25   Q.      Then it would be reviewed by internal labor folks at

Shaw – Cross                                               9

1    Delphi, is that correct?

2    A.      As well as others, yes.

3    Q.      As well as others.  And then finally would it be

4    reviewed by outside counsel as it was being provided or at any

5    time?  Was that part of the process?

6    A.      In -- in general, I don't believe so.  There may have

7    been specific items that had to be, but I -- I don't -- I don't

8    believe so.

9    Q.      Okay.  Now, you've been working with Lessard in this

10   proceeding since October of 2005, is that correct?

11   A.      That's correct.

12   Q.      Now, during that time there have been a series of

13   financial models developed by Delphi in connection with its

14   restructuring and in connection with their negotiations with

15   the union.  Is that fair to say?

16   A.      There was a model delivered when they first were

17   engaged.  That was in the October proposal time frame.  That

18   was a model.  That was based on the projections.

19   Q.      Yeah, I appreciate that, Mr. Shaw, and I don't mean to

20   be rude, but my question was just whether there have been a

21   series of financial models since that first model in October of

22   2005.

23   A.      There was --

24   Q.      Developed by Delphi.  And that's really a yes or a no.

25   A.      Yes, there was one subsequent model.

Shaw – Cross                                    10

1   Q.      Okay.  Now, would you please turn to paragraph 10 of

2   your declaration, Exhibit 22?

3   A.      I'm there.

4   Q.      Now, you state there that each of Delphi's unions was

5   provided in October of 2005 with an electronic and dynamic,

6   i.e., working Excel copy of the existing financial model.  Is

7   that correct?

8   A.      That is correct.

9   Q.      Okay.  And could you describe what you mean by

10  "electronic" and "dynamic"?

11  A.      Yeah.  Using Excel software and Excel spreadsheets, it

12  was a model similar to the model that was delivered at the end

13  of March where the company's steady -- the kind of continuing

14  projections, called steady status is how they've been termed,

15  are then overlaid with the various transformation assumptions,

16  whether it's the labor transformation, the SG&A savings, the

17  portfolio modifications to then create what would be a set of

18  projections post that transformation.

19  Q.      What can you do in a general sense within electronic and

20  dynamic model that you cannot do with a financial model that is

21  not electronic dynamic and within the Excel framework?

22  A.      I'm not sure I understand the question.

23  Q.      Well --

24  A.      Within the Excel framework, if it's a live working

25  model, they're all dynamic.

Shaw – Cross                                        11

1    Q.      Okay.  If it's not a live working model you're talking

2    about a paper model.  And what can you do with an electronic

3    model that you can't do with a paper financial model?

4    A.      The model has a series of inputs that are either the

5    baseline projections or the modifications that you could change

6    the -- you know, the inputs of the assumptions to.

7    Q.      Okay.  Now, this model, the first -- the model that

8    you're talking about, the one from October of 2005, that was

9    provided to UAW and the other unions so that they could review

10   the original competitive benchmark proposal that was tendered

11   to the unions in October of 2005, is that correct?

12   A.      That was the original purpose, yes.

13   Q.      Okay.  Now, isn't it correct that that model was based

14   on preliminary assumptions about wind-down plans without

15   consultation with General Motors?  Do you know that?

16   A.      I'm actually not -- not aware of Gen -- General Motor's

17   involvement at that time.

18   Q.      Okay.  Are you aware, however -- or you are aware,

19   however, are you not, that the model was based on preliminary

20   assumptions with respect to the company's -- Delphi's wind-down

21   plans?

22   A.      Yes, I was.

23   Q.      And you advised UAW's financial advisors that the model

24   was based on those preliminary assumptions, isn't that correct?

25   A.      We advised them that the model was preliminary.  It was

Shaw – Cross                                    12

1    the company's thinking -- current thinking at that time, and it

2    was the best, you know, that -- newest, most recent thinking at

3    that time.

4    Q.       And, in fact, the assumptions and the projections of

5    that model were subsequently superseded by the steady state --

6    so-called steady state financial model that was rolled out to

7    the unions in or about January of 2006, is that fair to say?

8    A.       The underlying again kind of baseline steady state

9    projections were -- were subsequently updated for the steady

10   state.  That's correct.

11   Q.       Okay.  And the October 2005 competitive benchmark

12   proposal was subsequently superseded by another competitive

13   benchmark proposal rolled out and tendered to the unions in

14   November of 2005, is that correct?

15   A.       Yes.  I think there were a few modifications between the

16   proposals.  I think there was a change in the labor rate by a

17   couple of dollars and maybe some other health care changes,

18   those assumptions and kind of the breakdown of which were

19   provided to the unions in the November time frame.

20   Q.       By the way, I'm held -- I'm sorry, were you finished?  I

21   didn't mean to --

22   A.       Yes.

23   Q.       Yeah.  On health care, I believe Mr. Williams testified

24   that there was a survey of competitors and what they -- what

25   kind of health care they were providing -- health insurance

Shaw – Cross                                    13

1    they were providing to their employees.  And Mr. Williams, I

2    believe, testified that he -- he understands that that

3    information was shared with the UAW and the other unions.  Do

4    you have any knowledge of that?

5    A.      There was a competitive benchmark work that the company

6    had performed, I think.  Some of the summary schedules have --

7    provided in exhibits was provided to the UAW and Lessard in, I

8    believe, the middle of November in conjunction with the review

9    of this November 15th proposal there was actually a meeting

10   held where a representative of Delphi, Rothschild, UAW, Lessard

11   went through kind of the company's -- the -- that analysis and

12   that backup.

13   Q.      And it's your understanding that in that meeting there

14   was a discussion of what other companies considered to be

15   competitors of Delphi were providing to their employees with

16   respect to medical insurance?

17   A.      I actually at this time do not recall the specific

18   details, but I believe that was a talk that was covered.

19   Q.      Okay.  Do you recall any exchange for paper during that

20   meeting or at any time around the time of that meeting that

21   provided information pertaining to Delphi's assertion that the

22   medical care proposal tendered to the UAW was consistent with

23   the kind of medical care provided to similarly-situated

24   employers?

25   A.      The studies that the company had done as well as had

Shaw – Cross                                          14

1    accumulated from other sources and the back of that -- backup

2    to that were provided to the UAW and Lessard.  I -- at this

3    time, I can't remember the level of detail that was in that.

4    Q.      Okay.  Now, in or around November of 2005 am I correct

5    that you also on behalf of Delphi provided Lessard with a --

6    what are known as penny sheets in connection with the second

7    competitive benchmark proposal in the November 2005 proposal?

8    Is that correct?

9    A.      That's correct.  And there was a meeting to review

10   those.

11   Q.      Okay.  And the penny sheets, I believe you state in your

12   declaration, can be used to determine hourly cost savings per

13   employees as a consequence of the proposal --

14   A.      That's --

15   Q.      -- rollout, is that correct?

16   A.      That's correct.

17   Q.      And that's all the penny sheets do, right?

18   A.      I'm not a labor negotiator, but my understanding is

19   that's one of the key kind of analyses that's used in

20   bargaining and discussions.

21   Q.      Well, do you know of any other use for the penny sheets

22   other than determining hourly cost savings or what hourly costs

23   will be for labor per employee?

24   A.      Per employee, that information can then be used to build

25   up to what's the total cost of -- you know, for example, Delphi

Shaw - Cross                                    15

1   and its model, what the total cost of its labor wages,

2   benefits, et cetera, under a kind of transformed scenario, so

3   it can be used for analysis and modelling purposes.

4   Q.      And you would have to assume the number of employees

5   that would be provided both wages and benefits in order to

6   determine a total cost savings, isn't that correct?

7   A.      That's correct.  That was actually one of the topics

8   that was discussed at that meeting as well as going through the

9   head count associated with those penny sheets.

10  Q.      Because the head count was something that wasn't certain

11  at that time, correct?

12  A.      The head count --

13  Q.      Prospective head count.

14  A.      The prospective head count, like any set of projections,

15  was based on assumptions, but there were assumptions as to what

16  the head count would be under those projections.

17  Q.      And that was before an attrition plan had even been

18  agreed to, correct?

19  A.      That's correct, yes.

20  Q.      That's with respect to the UAW, correct?

21  A.      Yes, this was back in the November time frame.

22  Q.      Now, that November proposal was conditionally withdrawn

23  in December, is that correct?

24  A.      That's my understanding.  Correct.

25  Q.      And is it also correct that in or about January you

Shaw – Cross                                    16

1    began providing Lessard with information about the so-called

2    steady state scenario?

3    A.      Actually, I believe in the beginning of December there

4    was a preliminary kind of summary output from the steady state,

5    kind of giving a preliminary view, but that was completed in

6    the middle of January.  The steady state was, as I think others

7    have testified, was the company's 2006 through 2010 business

8    plan that was getting completed toward the end of the fourth

9    quarter and was provided with backup in the middle of January.

10   Q.      Now, was that an electronic and dynamic model similar to

11   the one tendered to the unions or provided to the unions in

12   October of 2005?

13   A.      No, that was a, you know, paper version or hard-coated

14   version, because that -- in the kind of the transformation

15   model, that's the first step upon which then the transformation

16   analyses are done.

17   Q.      And the steady state scenario is an all-things-equal

18   scenario, is that correct?  In other words, assuming no plants

19   close, no product lines disappear, it doesn't assume any

20   changes, is that correct?

21   A.      It assumes the company continues to operate its business

22   as it is today.

23   Q.      Business as usual?

24   A.      Business as usual.

25   Q.      Okay.  Now, there's a refreshed steady state plan at

Shaw – Cross                                    17

1    this point, isn't there, or a modified steady state plan?  Are

2    those the same things?

3                    THE COURT:  I'm sorry.  What are you saying as we

4    speak or --

5                    MR. LEVINE:  Subsequent -- I'm sorry, Your Honor.

6    Let me withdraw that and rephrase it.

7    BY MR. LEVINE:

8    Q.    Subsequent to the rollout of the steady state plan was

9    that plan sub -- was that plan then modified and is -- and that

10   modification is now called the modified steady state scenario

11   or the refreshed steady state scenario?

12   A.    There was what was termed at the time a modified steady

13   state which at that time was the -- consistent to what today is

14   called the competitive benchmark.  Modified steady state was

15   actually taking that steady state from the middle of January

16   and taking a first look at -- a preliminary look at overlaying

17   the transformation.  That at the time was called the modified

18   steady state.  And again subsequently became known once it was

19   finalized as the competitive benchmark scenario.

20   Q.    Okay.  And was an electronic and dynamic model developed

21   with respect to the modified steady state scenario?

22   A.    There was a dynamic model and again it ultimately was

23   provided to the unions on March -- I think it was 24th or 28th

24   as called the competitive benchmark when the modified steady

25   state was provided to Lessard.  I think the first preview of it

Shaw – Cross                                              18

1   was the beginning of February and then sometime more detailed

2   set of analyses were provided beginning of March.  That was

3   a -- in preliminary form not yet finalized, so no electronic

4   model was available at that time for that.

5   Q.      And it's your understanding that the electronic model

6   was provided to Lessard in connection with that modified steady

7   state plan or about March 28, 2006?

8   A.      That model, correct.  However, again, as I mentioned

9   earlier, the --

10  Q.      Mr. Shaw, again, I really don't mean to be rude.

11  A.      Okay.

12  Q.      You answered my question.  Thank you.  Now, that was

13  three days before Delphi filed the 1113 and 1114 motions,

14  correct, March 28, 2006?

15  A.      That's correct.

16  Q.      Now, in paragraph 22 of your declaration, you referred

17  to Lessard's Andrew Yearly's [Ph.] assertion in his declaration

18  that the electronic model provided to Lessard on the eve of

19  Delphi's motion included hard-coated assumptions.  Do you refer

20  to that in paragraph 22?

21  A.      Yes.  I see that.

22  Q.      What is a "hard-coated assumption"?

23  A.      The -- I think what Mr. Yearly was referring to, I

24  believe, was that there were -- as in any model, there has to

25  be a starting point for which the numbers are input.  Inputs

Shaw - Cross                                        19

1    are considered kind of hard-coated numbers.  Assumptions, for

2    example, the labor costs, the head count are hard-coated

3    assumptions.  I think he was making reference to those

4    assumptions being hard-coated in the model.

5    Q.      Let me ask you this.  In that model could you -- if you

6    were using the electronic model could you change the revenue

7    line for North American operations electronically?

8    A.      The model was not built that way.  You could not have

9    done that within the model.

10   Q.      Yes or no.  So you could not do that.  Could you change

11   assumptions on plant closings and have the output accurately

12   reflect the changed assumptions about which plants were going

13   to be closed and the number of plants that would be closed?

14   A.      There are the assumptions in there.  I don't believe --

15   Q.      Let's just say you could change those --

16               MR. BUTLER:  Objection.  Could he finish his

17   answer?

18               THE WITNESS:  I don't believe as I sit here today

19   without having, you know, the model in front of me, I -- I'm

20   not aware of what level of modifications you could make to

21   those wind-down.  I think there are -- there is a level of

22   change that you could make.

23   BY MR. LEVINE:

24   Q.      Do you know that for certain?

25   A.      I don't know that for certain.

Shaw – Cross                                            20

1   Q.      Now, in response to Mr. Yearly's reference, the hard-

2   coated assumptions in that model, you state that -- and I think

3   this is paragraph 22 also, that Delphi and Rothschild have

4   explained the basis for these model assumption inputs to

5   Lessard and have provided with Lessard with sufficient

6   information, including labor penny sheets supporting each

7   proposal and head count walks to allow Lessard to perform

8   sensitivity analyses on the models.  And do you stand by that

9   statement, Mr. Shaw?

10  A.      Yes, I do.

11  Q.      And when, if ever, did you explain the bases for the

12  various model assumptions to Lessard in connection with that

13  financial model provided on March 28, 2006?

14  A.      We -- there were -- I'm sorry, could you repeat the

15  question?

16  Q.      When did you explain the basis for the various

17  assumptions used in that financial model tendered on March 28,

18  2006?

19  A.      Many of the assumptions, including the steady state,

20  were consistent with materials provided to Lessard earlier in

21  the year going back to January and some of the penny sheets

22  that were provided at the end of January.  There were calls to

23  review that.  There were opportunities for Lessard to follow-up

24  with questions.  All questions that were asked or requests for

25  meetings were addressed, so to the extent that Lessard had

Shaw – Cross                                    21

1    questions, the company and Rothschild were -- were making

2    themselves available to address them.

3    Q.      And did you have such meetings -- such follow-up

4    meetings with Lessard?

5    A.      Such follow-up meetings as what?

6    Q.      You spoke about follow-up meetings to -- in connection

7    with discussing the assumptions of the financial model.  Did

8    you have such meetings with Lessard?

9    A.      The --

10   Q.      Conversations or personal meetings?

11   A.      There was a meeting at the end of January to review the

12   penny sheets of the -- what became known as the consensual

13   scenario.  There was a meeting at the beginning of February, I

14   think maybe February 7th, to review the steady state modelling

15   assumptions.  There was a request -- there was -- there was

16   several meetings in the early February time frame.  There was a

17   request by Lessard to have kind of a broader assumption

18   discussion, which the company and Rothschild proposed -- had --

19   you know, responded and accepted to have and Lessard

20   subsequently postponed that session.  So to the extent there

21   are still sessions to be had, you know, the company will --

22   will present itself to have those.

23   Q.      My question, Mr. Shaw, was directed at the -- at any

24   follow-up meetings to discuss the financial model, the

25   electronic model that was provided to UAW on March 28, 2006.

Shaw - Cross                                                22

1   A.      Yes, well, the -- particular to that financial model,

2   there was an in-person session in New York, I believe a week

3   after the model was provided where the model was kind of put up

4   on a screen.  There was walk-through discussions questions, and

5   then I think following that there was, as they mentioned, a

6   couple of subsequent requests for sessions that were had.

7   Q.      And that was after Delphi filed its 1113 and 1114

8   motions, correct?

9   A.      That is correct.

10  Q.      So you're not saying that Lessard could have utilized

11  that model, spoken to Lessard about the assumptions and advised

12  UAW on the merits of Delphi's proposals in light of that model

13  in the four -- in the three days between providing that model

14  and the filing of the motion, are you?

15  A.      But I think as I mentioned earlier there are components

16  of that model, like the actual underlying financial projections

17  that had been provided in January that they could have -- the

18  actual model was provided at the end of March, but was

19  relatively consistent in structure to what was provided in

20  October.  It's not uncommon for advisors in these situations to

21  develop analyses models on their own.  With respect to the

22  actual model at the end of March, you had said yourself there

23  were three days between.  But again, as I'd said, there --

24  there -- a lot of those components had pro -- been provided

25  before then.

Shaw - Cross                                23

1   Q.      Okay.   Trying to defer to my colleague, Mr. Butler, and

2   not interrupt you when I asked -- when you were answering my

3   questions, but all I asked you about was whether those three

4   days gave Lessard time to review -- to use the electronic

5   model, have discussions with Rothschild about the assumptions

6   underlying that model, and make recommendations to the UAW in

7   the three days prior to the filing of the 1113 motion.   They

8   couldn't have done that, correct?

9   A.      Again, as I've just stated --

10  Q.      Could they have done it or not, Mr. Shaw?

11  A.      On that specific model?

12  Q.      Correct.

13  A.      Probably not on that specific model.

14  Q.      Isn't it also correct that on or about March 27th or

15  28th you provided Lessard for the first time with a summary

16  overlay?

17  A.      I'm sorry, what was the date?

18  Q.      March 27th or 28th.   With a summary overlay of the

19  special attrition program on the steady state scenario?

20  A.      That's correct.

21  Q.      And isn't it correct that it was not until April 13,

22  2006, that Delphi provided Lessard with projections relating to

23  the impact of the special attrition program on the forecast for

24  the competitive benchmark and GM consensual proposals?

25  A.      That was about the time frame it was completed.   That's

Shaw – Cross                                                        24

1   correct.

2   Q.      And isn't it correct that both of these overlays, the

3   one provided on or about March 27th or 28th and the one

4   provided on April 13th utilized 75 and 100 percent acceptance

5   rate assumptions?

6   A.      That is correct.

7   Q.      And isn't it also correct that both summary overlays

8   assume that all employees existing Delphi through the special

9   attrition program would be replaced by new hires?

10  A.      Can you repeat that question?

11  Q.      Isn't it also correct that both of those summary

12  overlays assume that all employees exiting Delphi through the

13  special attrition program would be replaced by new hires?

14  A.      Under the competitive and consensual scenarios?

15  Q.      Correct.

16  A.      To the extent they were required through the

17  transformation period, that is correct.

18  Q.      My question to you was whether or not those overlays

19  relating to the special attrition program assumed that every

20  employee who accepted the attrition program early retirement

21  option or who flowed back to General Motors would be replaced

22  by a new hire?

23  A.      The answer to that, I believe, is no.  The consent --

24  competitive and consensual scenarios on their own right assume

25  that 75 percent of people eligible to retire will retire.  Over

Shaw - Cross                                        25

1   the course of 2006 and 2007 as the noncore businesses are being

2   exited, those employees are no longer needed.  It's called a

3   need-to-run head count level.  So to the extent people leave

4   the system and are not needed to continue to run the business,

5   they are not being replaced.

6   Q.      So as I understand it, the first steady state overlay --

7   I'm sorry, withdraw it.  The first overlay with respect to the

8   special attrition program provided to Lessard at the end of

9   March in 2006, that dealt with the effect -- the impact of the

10  program using the steady state assumptions.  Is that correct?

11  A.      That was the first analysis, you know, the company did

12  on each of the three.  That was the first one done, correct.

13  Q.      And that overlay of the special attrition program

14  assumed that every employee who was -- who accepted attrition

15  benefits under the special attrition program would be replaced

16  by a new employee, correct?

17  A.      I'm not entirely certain.  I believe so, but I'm not

18  entirely certain as I sit here.

19  Q.      Okay.  And then it is your understanding, however, that

20  the second overlay, the one provided in April of 2006, that

21  assumed that -- that did not assume that each of the employees

22  accepting attrition benefits under the special attrition

23  program would be replaced by Delphi, is that correct?

24  A.      I think it's consistent to what I answered just a moment

25  ago.  The number of employees who were required post-

Shaw - Cross                                    26

1    transformation to the extent they needed to be rehired, they

2    would be rehired.  That 75 percent attrition plan, those people

3    leaving the system, are consistent with what is assumed in the

4    transformation, the competitive benchmark and the consensual.

5    The attrition plan is essentially a facilitator of that.

6    Q.     So at least as of April 13 of 2006 Delphi understood,

7    did it not, that people accepting attrition benefits would not

8    have be replaced by new employees, is that correct?

9              MR. BUTLER:  Objection.  Objection, Your Honor.

10   I'm not sure how that question has anything to do with the

11   direct examination or the declarations.  Mr. Shaw is being

12   offered for the purpose of information sharing with Lessard,

13   and Mr. Levine has been sort of running far afield with the

14   information --

15             THE COURT:  Well, I think it goes to the

16   differences between the information that was provided, so

17   although this last question I wasn't quite so sure.

18             MR. LEVINE:  Yeah, that's -- yeah, that's --

19   that's all I have for that.

20             THE COURT:  All right.  Fine.  Why don't you

21   repeat the question?

22             MR. LEVINE:  I'm sorry, Your Honor?

23             THE COURT:  So are you withdrawing your question

24   or are you --

25             MR. LEVINE:  I'll withdraw the question.

Shaw – Cross                                                        27

1              THE COURT:  Okay.

2    BY MR. LEVINE:

3    Q.      Now, Mr. Shaw, would -- I'm sorry, would you please

4    refer to paragraph 25 of your declaration?

5    A.      Yes, I'm here.

6              MR. LEVINE:  And I'm almost done, Your Honor.

7    Just a couple more questions.

8    BY MR. LEVINE:

9    Q.      Now, you state that Lessard requested plan specific data

10   on a historical and projected basis?  Is that correct?

11   A.      That's correct.

12   Q.      And you state that Delphi had to compile this data on a

13   "ad hoc basis," is that correct?

14   A.      The Delphi corporate does not on a regular basis receive

15   this so --

16   Q.      Yes or no.

17   A.      -- it had to go out and compile it.

18   Q.      Did they have --

19   A.      Yes, that's correct.

20   Q.      -- to produce -- provide it on an ad hoc basis?

21   A.      That's correct.

22   Q.      Compile it on an ad hoc basis?  And when did Delphi do

23   that?

24   A.      They compiled that on an ad hoc basis -- I believe we

25   were not involved in that process.  I believe it was maybe in

Shaw - Cross                                                28

1   the February time frame.

2   Q.      Isn't it correct that UAW did not receive this plant

3   level financial data until April 19th and 20th of this year?

4   A.      That is correct.  The --

5   Q.      That answers my question.  Have you now provided labor

6   costs by plants data to the UAW and to the other unions?

7   A.      Yes, the company has provided that they had worked with

8   an alternate --

9   Q.      Yes or no.

10  A.      -- firm to -- to do that, yes.

11  Q.      And that was done in May of this year, correct?

12  A.      I believe that's correct.

13  Q.      And so it's fair to say that prior to the filing of the

14  1113 and 1114 motions, UAW and the other unions couldn't have

15  analyzed data that they didn't have, correct?

16  A.      That's correct.  Yes.

17  Q.      Now, finally, Mr. Shaw, isn't it correct that Lessard

18  has requested information pertaining to SG -- excuse me -- SG&A

19  expense from Delphi?

20  A.      We had a conference call last Thursday, I believe.  And

21  on that conference call one of the topics was SG&A and there

22  was, I think, three or four questions that they requested the

23  company is now working with Booze, Allen [Ph.] to compile the

24  answers to.

25  Q.      Is it your understanding that a portion of domestic SG&A

Shaw – Cross                                            29

1   expense is attributable to foreign operations?

2   A.      I'm -- I'm not aware.

3   Q.      Do you know whether Delphi has provided UAW with

4   information that distinguishes between Delphi's SG&A expense

5   for foreign operations and Delphi's SG&A expense for domestic

6   operations?

7   A.      The actual SG&A -- I'm actually not certain as I sit

8   here today.  They may have.

9   Q.      But you don't know that?

10  A.      Not as I sit here today.

11            MR. LEVINE:  Thank you, Mr. Shaw.  No further

12  questions, Your Honor.

13            THE COURT:  Okay.

14            MS. ROBBINS:  Good morning, Mr. Shaw.

15            THE WITNESS:  Good morning.

16            MS. ROBBINS:  Mary Ann Robbins for the IAM and

17  IBEW.

18                    CROSS-EXAMINATION

19  BY MS. ROBBINS:

20  Q.      Would you agree that you yourself had no personal

21  involvement in providing information to the IAM and IBEW?

22  A.      That's correct.  Delphi did not charge Rothschild with

23  that role.

24  Q.      So you have no firsthand knowledge of when and what

25  information those unions received, is that right?

Shaw – Cross                                                    30

1   A.      I have no information on that.

2              MS. ROBBINS:   Thank you.

3              MS. NELSON:   Good morning, Mr. Shaw.  Barbara

4   Mehlsack, the Operating Engineers.

5              THE WITNESS:   Good morning.

6                         CROSS-EXAMINATION

7   BY MS. MEHLSACK:

8   Q.      I take it that Rothschild was charged with providing

9   information at the request of various individuals at Delphi.

10  Is that correct?  You talked about interacting with Delphi

11  labor people.

12  A.      I'm not sure.  Could you repeat?  I'm not sure I

13  understand the question.

14  Q.      Did -- was -- did Rothschild receive information

15  requests directly from Delphi representatives?

16  A.      Information -- well, their information requests came

17  from Lessard, which we would then forward or whatever the

18  constituencies working with.

19  Q.      So the only information requests that Rothschild was

20  dealing with was those that came from Lessard?

21  A.      Lessard as well as Jeffries as the unsecured Creditors'

22  Committee advisor.

23  Q.      Okay.  So then I take it you never received any

24  information requests from Delphi to do any analyses in

25  connection with Delphi's proposals to the Operating Engineers?

```
                          Shaw – Cross                           31
```

1   A.      That's correct.

2   Q.      So that when you -- in paragraph 21 of your declaration,

3   you discussed the fact that you did an analysis of the special

4   attrition program on Delphi's financial projections.

5   A.      I'm sorry.  Where are you?

6   Q.      Paragraph 21.

7   A.      We provided it.  It was an analysis the company had --

8   had performed.

9   Q.      Do you know if the company has done an analysis of any

10  other attrition programs of the effect -- of any other

11  attrition programs on Delphi's financial projections?

12  A.      I'm not aware.

13  Q.      In paragraph 25 you discussed the ad hoc plant specific

14  projection, both historical data and projections that were

15  made.  Did you ever receive a request to do an analysis of --

16  question withdrawn.  I take it that analysis was done by

17  Delphi.

18  A.      That's correct.

19  Q.      Okay.  And Rothschild's involvement in those plant

20  specific analysis was what?

21  A.      We were not -- we were not tasked with being involved

22  with assisting them and doing that analysis.

23  Q.      So the extent --

24  A.      We reviewed it.

25  Q.      -- to your knowledge is that the analyses were done?

Shaw - Cross                                            32

1   A.      The analysis was done.  We re -- we were part of the

2   review process in understanding them, but we were not involved

3   in the -- in the --

4   Q.      But you did review the plant-specific analyses?

5   A.      After they were completed.

6   Q.      All right.  Do you recall if there was a plant-specific

7   analysis done of the Rochester facility?

8   A.      I don't recall specifically, but I -- I believe so.

9   Q.      And do you recall -- you said -- so it's your

10  understanding that there would have been a plant-specific

11  analysis done?

12  A.      It's my understanding there would have been, although I

13  cannot recall specifically seeing one.

14  Q.      But you would have no personal -- Rothschild would have

15  no knowledge of whether that information was -- of what was

16  done with that information.

17  A.      That's correct.

18  Q.      Okay.

19  A.      I would have no knowledge.

20  Q.      And do you know if there was a plant specific analysis

21  done at the Columbus facility?

22  A.      I'm not personally aware.  I -- I believe there was one

23  done on each U.S. plant, but to specific plants, I'm not -- I'm

24  not aware.

25  Q.      And you say -- when you say one was done, can you talk

Shaw - Cross                                              33

1    about what the "one" was -- it would be and is divided into a

2    historical analysis?  And what claim of an historical analysis

3    on a plant-specific basis was conducted?

4    A.       Again, we weren't involved with the process, so it's

5    difficult for me to speak to it.  I'm not personally aware of

6    the analysis of the process that went on behind it.

7    Q.       But I thought you said that you reviewed the analysis.

8    A.       I said, we reviewed the output with the company.  We --

9    your question was to whether we were, you know, specific to the

10   process.  We were not involved in the development of -- of

11   these analyses.

12   Q.       What was the output data in the historical analysis?

13   A.       I believe it was just a summary, income statement of

14   sales, the different cost components, and then operating

15   income.

16   Q.       And what were the -- so that the -- they were summary

17   analyses that would not have gone down to the level of specific

18   bargaining units and specific labor costs?

19   A.       They schedules we had we reviewed.  I'm not certain, but

20   I'm also not certain what analysis there may be behind it and

21   how it was developed and built up.  Can't answer that question.

22   Q.       And would your answer be the same for the projections?

23   Do you know what was being projected?  Was it business plans?

24   Was it assumptions based on the various scenarios on a plant

25   level?  What kinds of projections were done?

Shaw – Cross                                            34

1   A.      I think my answer to your first part of the question,

2   the answer would be similar.  I'm not aware of the specific

3   analysis or how it was built or developed.  We weren't --

4   Q.      But once again, I take it --

5   A.      -- involved in that.

6   Q.      -- none of those analyses were provided prior to May of

7   this year.  Question withdrawn.  Those analyses were not

8   completed prior to -- to May, is that correct?

9   A.      I -- I believe that's correct.

10                  MS. NELSON:  No further questions.  Thank you.

11                  THE COURT:  Mr. Peter --

12                  MR. BUTLER:  No redirect, Your Honor -- oh.

13                  THE COURT:  You're not -- Mr. Peterson, you're

14   not doing it?

15                  MR. PETERSON:  No, I'm not.

16                  THE COURT:  Okay.  No redirect?

17                  MR. BUTLER:  No redirect, Your Honor.

18                  THE COURT:  All right.  You can step down, sir.

19                  THE WITNESS:  Thank you.

20                  MR. BUTLER:  Your Honor, the 12 through the 13

21   witnesses on our direct case in supporting 1113, 1114 motion is

22   James K. Guglielmo.  He is the managing director of FTI

23   Consulting, Inc., and we would call him in support of his

24   declarations, which are at Exhibits 21 and 281, which we would

25   move into evidence on cross-examination.

Guglielmo - Cross                                    35

1          THE COURT:  Would you raise your right hand,

2     please?

3               JAMES GUGLIELMO, SWORN

4          THE COURT:  And for the record would you spell

5     your name?

6          THE WITNESS:  James Guglielmo, J-a-m-e-s,

7     Guglielmo, G-u-g-l-i-e-l-m-o.

8          MR. KENNEDY:  The order of cross-examination,

9     Your Honor, is IUE, Steelworkers, IBEW, and IUOE.

10         THE COURT:  Okay.

11         MS. JENNIK:  Good morning, Your Honor.  Susan

12    Jennik of Kennedy, Jennik & Murray for IUE, CWA.

13                  CROSS-EXAMINATION

14    BY MS. JENNIK:

15    Q.    Mr. Guglielmo, what is your position with FTI?

16    A.    I'm a managing director in the corporate finance

17    practice of FTI.

18         COURT REPORTER:  I'm sorry, can you --

19         THE WITNESS:  I'm a managing director in the

20    corporate finance practice of FTI.

21    BY MS. JENNIK:

22    Q.    And what are your responsibilities regarding this --

23    regarding Delphi?

24    A.    I handle various and numerous responsibilities with

25    Delphi beginning back in August of 2005.  We helped the company

Guglielmo - Cross                                    36

1   with preparation for potential Chapter 11 filing.  And since

2   filing, we have been -- continue our retention as financial

3   restructuring advisor for Delphi.

4   Q.     You are responsible for interfacing with Channon Capital

5   Partners [Ph.], the financial advisors to IUE, CWA, correct?

6   A.     That's correct.

7   Q.     And that responsibility includes coordinating the

8   information sharing with Channon, correct?

9   A.     That's correct.

10  Q.     And when did that responsibility begin?

11  A.     I became first aware of Channon's involvement with the

12  IUE in late December 2005 and began interacting with them

13  shortly thereafter.

14  Q.     Who do you communicate with at Channon?

15  A.     Several of their folks led by Mark Rubin [Ph.] of

16  Channon.

17  Q.     And who do you primarily communicate with at Delphi

18  regarding the information sharing with Channon?

19  A.     As discussed in Bill Shaw's cross, the company has set

20  up an information sharing process.  So to the extent that I get

21  individual requests from Shannon, I take those requests and

22  review them with the company, who log them into their master

23  database and we figure out between FTI and company

24  representatives as to where best to obtain that information in

25  the functional areas of Delphi.

Guglielmo - Cross                                    37

1   Q.      My question is, is there one primary contact person at

2   Delphi that you deal with?

3   A.      One of the leads at Delphi is an individual named Brian

4   Eichenlobe [Ph.] in the investor relation group at Delphi.

5   Q.      And what about Chuck McQuie [Ph.]?  Do you have contact

6   with him?

7   A.      Chuck is also a lead from a labor perspective.  Many of

8   the requests that come in get funneled.  If it has to do with

9   specific labor issues, it goes to Chuck McQuie.  Brian

10  Eichenlobe also sees to it, but Brian is a little bit more in

11  charge of filtering requests to the various finance functional

12  groups at Delphi while Chuck would handle more of the labor-

13  oriented areas.

14  Q.      Do you know how many Delphi employees have been involved

15  with responding to the information requests of Channon and IUE

16  CWA?

17  A.      Not exactly, but I would tell you numerous.

18  Q.      Dozens, would you say?

19  A.      Dozens.

20  Q.      More than a hundred?

21  A.      Probably not more than a hundred.

22  Q.      And there were others at FTI who assisted you in

23  coordinating this information, correct?

24  A.      Yes.

25  Q.      And how many FTI employees have worked with you on

Guglielmo – Cross                                             38

1    coordinating information with Channon?

2    A.      Probably three or four.

3    Q.      I'm sorry?

4    A.      Probably three or four.

5    Q.      Now, you recognized Channon as one of the leading

6    investment banks in the U.S., correct?

7    A.      Yes.

8    Q.      And you and Delphi believed that Channon's involvement

9    as a financial advisor to IUE, CWA would be productive and

10   helpful, correct?

11   A.      Yes.

12   Q.      Prior to December 2005 did FTI play any role in

13   responding to requests for information from IUE, CWA?

14   A.      Not that I'm aware of.

15   Q.      Do you know whether Delphi was responsible for

16   responding to requests for information from IUE, CWA prior to

17   December 2005?

18   A.      I'm sorry, could you repeat that question?

19   Q.      Do you know -- you said you did not play any role

20   regarding the information requests from IUE, CWA prior to

21   December 2005.  Do you know who at Delphi had that

22   responsibility?

23   A.      Or since, though, Counselor.  I handle information

24   requests from Channon who represent the IUE CWA.

25   Q.      Okay.  So before you got involved do you know who at

Guglielmo – Cross                                    39

1   Delphi was responsible for responding to information requests

2   from the IUE, CWA?

3   A.      Correct.  As discussed earlier, one of the leads in

4   handling those types of requests would be Chuck McQuie at

5   Delphi.

6   Q.      When you began the information coordination function in

7   December 2005 were you provided with copies of information

8   requests made by IUE CWA up to that point?

9   A.      No, I wasn't.

10  Q.      Did you at any time become aware of the previous

11  information requests, which had been made by IUE CWA?

12  A.      Not at that time.

13  Q.      At any time, I asked you.

14  A.      Yes.

15  Q.      So you were aware that IUE CWA made requests for

16  information beginning in October 2005?

17  A.      I have read that through the various declarations.

18  Q.      Have you seen those requests?

19  A.      I believe I may have seen them.

20  Q.      Now, as of the date of your declaration -- your first

21  declaration, which was May 1, 2006, Delphi had not responded to

22  all of Channon's request for information, had it?

23  A.      It had not.

24  Q.      Are you aware that each of the IUE CWA plans has a

25  different local competitive agreement, which provides for

Guglielmo - Cross                              40

1  different wage and benefit levels?

2                   MR. BUTLER:  Objection, foundation.

3                   MS. JENNIK:  I am asking if he is aware of that.

4                   THE WITNESS:  I am --

5                   MR. BUTLER:  He described his competitive

6  agreement --

7                   THE COURT:  I'm sorry, just -- are you asking if

8  there's a separate agreement for each plant?

9                   MS. JENNIK:  I am asking if he is aware that

10 there is a separate agreement for each local plant represented

11 by the IUE CWA.

12                  THE COURT:  Okay.  You can answer that question.

13                  THE WITNESS:  I am aware that there are local

14 CBAs as well as a national CBA.

15 BY MS. JENNIK:

16 Q.     And isn't it true that if IUE CWA wanted to analyze the

17 effect of the company's proposals on each plant, it would need

18 economic data on a plant basis?

19 A.     I would agree with that.

20 Q.     And isn't it true that Delphi did not historically

21 maintain plant level information in any consistent manner at

22 its corporate headquarters?

23 A.     Yes.

24 Q.     And isn't it true that Delphi had to gather plant

25 information from divisional and plant facilities?

Guglielmo - Cross                                    41

1    A.       To satisfy the requests of Channon, yes.

2    Q.       And that process took some time, didn't it?

3    A.       Took a little bit of time.

4    Q.       And in responding to the requests by Channon for

5    information Delphi has required that all information be

6    thoroughly reviewed to make certain that it is, in fact, the

7    best information currently available.  Isn't that right?

8    A.       It is reviewed and checked for accuracy and

9    completeness.

10   Q.       And that process took some time also, didn't it?

11   A.       It took some time.

12   Q.       Do you recall that in February 2006 Mark Rubin of

13   Channon requested permission to visit the plants so that he

14   could assist Delphi in gathering the information that was

15   requested?

16   A.       Could you repeat that question?

17   Q.       Do you recall that in February 2006 Mark Rubin of

18   Channon requested permission to visit the plants, the IUE CWA

19   plants, so that he could assist Delphi in gathering the

20   information?

21   A.       I recall the request, but not for that reason.

22   Q.       And do you recall that Delphi refused to allow Mark

23   Rubin to visit those plants?

24   A.       Delphi's decision was, in their opinion, be better for

25   Channon to come to Troy, and we would gather the appropriate

Guglielmo - Cross                                    42

1   personnel that could speak to the IUE facilities from a

2   divisional perspective and Channon could meet with them there

3   and go through their questions and answers.

4   Q.      And Delphi did not allow Mark Rubin to visit the IUE CWA

5   representative plans, correct?

6   A.      They had not.

7   Q.      Isn't it true that on April 20, 2006, Channon was first

8   given the 2006 budget information by plant?

9   A.      That is correct.

10  Q.      Now, if you could look at your initial declaration,

11  Exhibit 21.

12  A.      Yes.

13  Q.      Paragraph 7.

14  A.      I'm there.

15  Q.      Okay.  And that -- in that paragraph you state:

16          "As a member of the unsecured Creditors' Committee, the

17          IUE CWA presumably receives regular reports with

18          substantial information from Delphi and the legal and

19          financial advisors to the UCC."

20  Do you see that?

21  A.      Yes, I do.

22  Q.      Okay.  Now, you are aware that members of the unsecured

23  Creditors' Committee are bound by a confidentiality

24  requirement, aren't you?

25  A.      Not overwhelmingly familiar, but yes.

Guglielmo - Cross                                    43

1    Q.      Are you aware that all of the financial reports made by

2    Delphi to the unsecured Creditors' Committee are disclosed

3    subject to a strict confidentiality requirement?

4    A.      I -- Counselor, I don't know which reports are and which

5    ones are not.

6    Q.      Are you aware that IUE CWA was specifically cautioned

7    that it could not use for contract negotiation purposes

8    information it obtained solely through its role as a member of

9    the unsecured Creditors' Committee?

10   A.      I do not know.

11             THE COURT:  You have to speak up a little.

12             THE WITNESS:  I do not know.

13   BY MS. JENNIK:

14   Q.      And if that were the case, then IUE could not have

15   utilized any information it received from the unsecured

16   Creditors' Committee for contract negotiation purposes,

17   correct?

18   A.      If that were the case.

19   Q.      Now, on paragraph 8 you stated that you provided -- that

20   Delphi provided a number of documents as well as monthly

21   operating reports available to Channon.

22             Now, those reports do -- are on a company-wide

23   basis, not a plant basis, correct?

24   A.      The monthly operating reports are on a debtor basis.

25   Q.      Corporate-wide?

Guglielmo – Cross                                            44

1   A.      Consolidated -- consolidated debtor basis.

2   Q.      And in paragraph 10 of your declaration, if you could

3   look at that, you stated there that the IUE CWA receives

4   financial information at each facility and, therefore, Channon

5   should have access to a substantial amount of financial

6   information through its own client.  Do you see that?

7   A.      Yes, I do.

8   Q.      Okay.  Assuming that IUE CWA had certain financial

9   information from Delphi isn't it true that IUE CWA needed to

10  verify that the information it had was accurate?

11  A.      Could you repeat that question?

12  Q.      Assuming that IUE CWA had certain financial information

13  from each facility, isn't it true that IUE CWA would need to

14  verify that the information it had was accurate?

15  A.      I guess that's up to the IUE CWA to determine.

16  Q.      Well, a prudent financial advisor would recommend that,

17  wouldn't it?  Recommend that it verify that its information is

18  accurate?

19  A.      Maybe to some degree.

20  Q.      Are you aware that in 2006 when local IUE CWA

21  representatives asked plant managers for plant level financial

22  information they were told that all information requests had to

23  go through the corporate level?

24  A.      I am not aware of that conversation.

25  Q.      Now, in addition to the financial model that Mr. Shaw

Guglielmo - Cross                                45

1   was testifying about -- you heard his testimony, didn't you?

2   A.      Yes, I did.

3   Q.      Wasn't there also a model developed for the calculation

4   of labor costs savings?

5   A.      Yes, there was.

6   Q.      And when was that specific labor costing model

7   developed?

8   A.      I believe it was completed in late April 2006.

9   Q.      And when were the unions first informed that a labor

10  costing model was being developed?

11  A.      I am not aware.  I'm not specifically aware.

12  Q.      Wasn't it in May of 2006, this month?

13  A.      I have seen a letter from Omelbany [Ph.] to various

14  unions indicating that -- about such a model.  I don't know if

15  that was the first time it was indicated.

16  Q.      Have you seen any correspondence prior to that letter

17  that --

18  A.      I have not.

19  Q.      -- were to the IUE CWA referring to that model?

20  A.      I have not.

21  Q.      Did you ever talk to Mark Rubin or anyone at Channon

22  about that model?

23  A.      Not that I can recall.

24  Q.      And when was Pay Craft [Ph.], the consulting firm that

25  developed this model, when was Pay Craft hired, do you know?

Guglielmo - Cross                              46

1    A.      Not specifically, but I would think sometime in late

2    2005.

3    Q.      So has the information from the labor costing model been

4    given to Channon?

5    A.      Yes, it has.

6    Q.      And when was that?

7    A.      It was delivered to them on May 2, 2006.

8    Q.      And if you could look at paragraph 15 of

9    yourdeclaration.

10   A.      I'm there.

11   Q.      This paragraph refers to meetings that you had with

12   Channon, correct?

13   A.      Yes, it does.

14   Q.      And the meetings said you had in Troy on March 13th and

15   14th of 2006 -- regarding the plant-specific information that

16   was discussed at that meeting wasn't that basically what's

17   called a "site walk"?

18   A.      I'm sorry, I --

19   Q.      All right.

20   A.      I'm not understanding the question.

21   Q.      Are you familiar with the term "site walk"?

22   A.      Yes, I am.

23   Q.      Okay.  So when you had your meeting March 13th and 14th

24   with Channon and the discussion that you had about

25   plantspecific information wasn't that, in fact, discussing the

Guglielmo - Cross                                47

1   site walk?

2   A.      I don't know if we specifically went over the site walk

3   at those meetings.

4   Q.      Well, was there any other plant-specific information

5   that you discussed at that meeting?

6   A.      We went through all of the IUE sites, except for the

7   Packard sites with Channon at that meeting and had

8   represented -- divisional representatives from Delphi speak to

9   the operations at those facilities and answer questions that

10  Channon had as to those facilities.

11  Q.      And did you discuss also the future of the plans for

12  each facility?

13  A.      We did not.

14  Q.      And isn't it true that at that meeting Channon requested

15  information regarding the overall and plant allocations for

16  overhead?

17  A.      We -- we discussed overhead at that meeting.

18  Q.      And isn't it true that Channon requested the map or

19  methodology used by Delphi to determine the allocations for

20  overhead?

21  A.      We discussed the mapping concept and allocation of

22  overhead to the sites.  We indicated to Channon that the

23  detailed financials by site that were given to them at these

24  meetings showed the allocations into those plants.  They had

25  several other questions related to it.

Guglielmo - Cross                          48

1    Q.      And isn't it true that additional information regarding

2    the overhead methodology was provided to Channon on May 21st of

3    this year?

4    A.      The concept of how that overhead was allocated into the

5    plants was discussed at the meeting.  The company compiled and

6    developed several documents showing how that mapping works and

7    it was just delivered recently.

8    Q.      Okay.  If you could look at paragraph 17 of your

9    declaration.

10   A.      I'm there.

11   Q.      Okay.  And the first bullet point starting on March

12   13th, do you see that?

13   A.      Yes, I do.

14   Q.      Okay.  Now, isn't it true that the information that was

15   provided-- that you referred to on -- that was provided to

16   Channon on March 13th was requested by Channon on January 10,

17   2006?

18   A.      That's correct.

19   Q.      And then the second bullet point refers to information

20   for the Packard division facilities.  Do you see that?

21   A.      It speaks to the Packard division, yes.

22   Q.      And you said that you did not have -- Delphi did not

23   have that information available as of the date of this

24   declaration, correct?

25   A.      Only relative to the corporate overhead and allocations.

Guglielmo - Cross                                    49

1    That's not the manner in which Packard maintains its books and

2    records.

3    Q.      And wasn't this information recently provided to

4    Channon?

5    A.      Relative --

6    Q.      The Packard division facility information.  Wasn't that

7    information provided to Channon on May 21st?

8    A.      They received Packard divisional information sometime in

9    mid-April.

10   Q.      But not the overhead information?

11   A.      The corporate overhead and allocation methodology for

12   all of the U.S. sites was provided to them just recently.

13   Q.      Could you look at paragraph 18 of your declaration?

14   A.      I'm there.

15   Q.      Okay.  Your -- the third bullet point there as Channon

16   acknowledges Delphi provided Channon with plant-by-plant

17   historical information.  Do you see that?

18   A.      Yes, I do.

19   Q.      Okay.  Isn't it true that the historical budgets for IUE

20   plants was not provided until May 19th?

21   A.      That's correct.

22   Q.      And did that information include the budget forecasts

23   for each IUE plant?

24   A.      It was the budget forecast for each IUE, so --

25   Q.      It was the historical budget information and

Guglielmo - Cross                                          50

1    the forecast for one year, correct?

2    A.    It was the historical budget forecast for each facility.

3    Q.    But it did not include any projections going forward,

4    did it?

5    A.    Not in that submission.  Channon had received budgeted

6    2006 steady state site information in April of 2006.

7    Q.    Could you look at paragraph 19 of your declaration?

8    A.    I'm there.

9    Q.    Okay.  And the first bullet point you referred to the

10   request from Channon for information regarding skilled versus

11   high production versus low production, correct?

12   A.    That's correct.

13   Q.    Didn't Delphi make proposals to IUE CWA for wage levels

14   for skilled high production and low production?

15   A.    I believe the proposals were broken into pockets, yes.

16   Q.    But Delphi did not have information available broken

17   down into those categories, even though it made proposals for

18   those categories, is that right?

19   A.    It -- it has this information that I became aware of

20   recently and has been provided to Channon.

21   Q.    Well, the information that was provided to Channon on

22   May 19th was broken down by skills and production, correct?

23   A.    That's correct.

24   Q.    Not high production and low production?

25   A.    That's right.  It does not exist.

Guglielmo - Cross                                    51

1   Q.      And could you look at paragraph 22 of your declaration?

2   A.      22?

3   Q.      22.

4   A.      I'm there.

5   Q.      And that refers to a request by Channon for a breakout

6   between international and North American profitability --

7   product profitability.

8   A.      The paragraph speaks to product line information.

9   Q.      Didn't Channon request the breakout information on -- at

10  a meeting on March 14, 2006?

11  A.      At the meeting on March 14th, Delphi representatives

12  walked Channon through a product line P&L for 2004.  It was

13  prepared on a global basis, which is the manner in which Delphi

14  has the ability to do this.

15  Q.      Wasn't --

16  A.      I do not believe that requests came from that meeting to

17  say, can we have it on -- can Channon have it on an

18  international versus North American view.

19  Q.      Well, do you recall that Channon was told at that

20  meeting that the breakout between international and North

21  American product profitability was not available?

22  A.      I believe they were told it doesn't exist.

23  Q.      Okay.  So is it now available?

24  A.      Not that I'm aware of.

25  Q.      Then do you know how Delphi calculates North American

Guglielmo - Cross                                                52

1   operating income without that breakout?

2   A.      Not specifically.

3   Q.      And could you look at paragraph 26 of your declaration?

4   A.      I'm there.

5   Q.      Okay.  And you referred to information which was not

6   provided for various reasons.  One of them was that the

7   information -- the information requests called for privileged

8   information.  Is that right?

9   A.      That's correct.

10  Q.      Has Delphi ever told Channon that it is not providing

11  requested information because it is privileged?

12  A.      The only thing that I can think of is dialogue that I

13  had with Mark Rubin indicating that we would not -- the company

14  would not provide -- put in a request for all information

15  provided to the UCC advisors.

16  Q.      Isn't it true that all of the information provided to

17  Channon has been identified by Delphi as preliminary and

18  nonrestated?

19  A.      Could you repeat that question?

20  Q.      Isn't it true that all of the information provided to

21  Channon has been identified by Delphi as preliminary and

22  nonrestated?

23  A.      I don't think all information.  Certain financial

24  information has been labeled with that.

25  Q.      And isn't it true that Channon has been cautioned by

Guglielmo - Cross                                    53

1   Delphi that the information it has provided may be unreliable?

2   A.      Not that I'm aware of.

3   Q.      Delphi recently provided additional information to

4   Channon, correct, as late as May 30th, isn't that right?

5   A.      Delphi and FTI continued to satisfy questions and

6   requests from Channon, yes.

7   Q.      So there are still some requests that have -- some

8   requests that Channon has made that have not been satisfied,

9   isn't that right?

10  A.      As I sit here today, all requests provided by Channon

11  have been fulfilled.

12  Q.      Has Delphi provided financial projections for each plant

13  beyond 2006?

14  A.      It is not -- they do not exist.

15          MS. JENNIK:  Thank you.  I have no further

16  questions.

17          MR. PETERSON:  Good morning, Mr. Guglielmo,

18  Lowell Peterson --

19          THE WITNESS:  Good morning.

20          MR. PETERSON:  -- for the Steelworkers.

21                      CROSS-EXAMINATION

22  BY MR. PETERSON:

23  Q.      I'm going to ask you some questions initially based on

24  your supplemental declaration, which I believe is Exhibit 281

25  dated May 23.  Got that one?

Guglielmo - Cross                                          54

1   A.      I do.

2   Q.      Okay.  Is it true that the first time that Delphi asked

3   you to get involved with respect to Steelworkers, USW

4   information requests was March of this year?

5   A.      I would say it was early April and it was related to

6   Potoc [Ph.], the financial advisor to USW's requests.

7   Q.      All right.  So you were not asked by Delphi to do

8   anything with respect to information requests by the USW or

9   Potoc before April of this year.  Is that correct?

10  A.      That's correct.

11  Q.      Now, you state that in your -- paragraph 6 of your

12  supplemental declaration that you understood that Potoc first

13  became involved in Delphi's information sharing in March.

14  A.      That's correct.

15  Q.      Why do you understand that that was Potoc's first

16  involvement?

17  A.      Delphi -- represented some Delphi in earl April showed

18  me a letter from I believe your firm, Counselor, to Kevin

19  Butler [Ph.], indicating that Potoc was the financial advisors

20  and they had several outstanding requests.  So from that

21  letter, I became knowledgeable as to Potoc's involvement.

22  Q.      Well, take a look at Exhibit 26, please, the attachment

23  to it.

24  A.      Exhibit 26?

25  Q.      Yeah.  I don't know if you've got it there.  You might.

Guglielmo - Cross                                              55

1   Should be in the other binder.

2   A.      I have it.

3   Q.      Okay.  You see the letter to Mr. Butler dated -- Kevin

4   Butler dated March 31?

5   A.      Exhibit 26 is a declaration of Lowell Peterson --

6   Q.      Yeah, there's a letter.

7   A.      I have it.

8   Q.      All right.  Our declaration simply introduced this.

9   That's a letter from the USW to Mr. Butler.  Is that the letter

10  you were talking about?

11  A.      It is not.

12  Q.      There was a different letter that alerted your client

13  Delphi that Potoc was a financial advisor?

14  A.      Yes.

15  Q.      All right.  Was it before or after March 31?

16  A.      It was my recollection it was March 31 as well, but it

17  was not this letter.

18  Q.      All right.  I guess we can deal with that issue

19  separately.  But in any event, did you ever see this letter,

20  this March 31 letter from David Jury [Ph.] of the USW to

21  Mr. Butler before today?

22  A.      I may have, Counsel.

23  Q.      Okay.  Take a look at the attachment to the letter,

24  which is a chart prepared by Potoc.  Have you seen -- I'm

25  sorry.

Guglielmo - Cross                                      56

1    A.       That's all right.

2    Q.       Have you seen that chart before?

3    A.       I've seen something similar.  I don't know if it's the

4    exact one.

5    Q.       All right.  Now, according to Mr. Jury's letter, this is

6    a chart prepared by Mr. Potoc giving a status report on

7    information requests submitted by the USW in January of this

8    year.  Do you see that?

9    A.       I do.

10   Q.       Okay.  Do you have any reason to believe that

11   Mr. Potoc's summary of those Jan -- of the responses to the

12   January information request is inaccurate?

13   A.       I don't have any reason to believe it's not.

14   Q.       Okay.  Now, even though the USW submitted information

15   requests prior to March, Delphi never asked you to get involved

16   with that until April, correct?

17   A.       No, the comp -- Delphi would handle that themselves

18   through an individual named Chuck McQuie, who I've indicated

19   before.

20   Q.       Okay.  But they didn't ask FTI to get involved?

21   A.       That's correct.

22   Q.       The first time FDA -- FTI got involved and USW

23   information requests was April of this year?

24   A.       Potoc requests in April of this year.

25   Q.       Potoc is a financial advisor to USW?

Guglielmo - Cross                                        57

1   A.      In this case, Counselor, requests have come in both from

2   the unions and their financial advisors.

3   Q.      All right.  I'm just trying to get it clear.  I think

4   it's clear.  You didn't do anything with respect to USW

5   information requests or requests made on behalf of the USW by

6   Potoc or anyone else before April of this year?

7   A.      That's correct.

8   Q.      Okay.  Now, in paragraph 6 you say that -- well,

9   withdrawn.  Back to paragraph 6.  You say prior to that time it

10  is my understanding that USW provided information requests and

11  Delphi provided USW with a significant amount of information.

12  You have no firsthand knowledge of that, correct?

13  A.      I have some knowledge.  Chuck McQuie shared with me all

14  of the information provided to the USW.

15  Q.      In April?

16  A.      Yes.

17  Q.      All right.  And you -- all right.  Withdrawn.  With

18  respect to the statement you make in paragraph 9 of your

19  supplemental declaration, in that -- in that paragraph you do

20  refer to the January 9, 2006, USW request, correct?

21  A.      I do.

22  Q.      All right.  So you did actually take a look at what -- I

23  gather you spoke with Mr. McQuie about what Delphi's responses

24  were to the USW in response to the January 9th letter?

25  A.      Likely.

Guglielmo - Cross                                     58

1    Q.      Okay.  All right.  You don't know the timing of Delphi's

2    responses to the January 9 requests, correct?  You don't know

3    when particular documents or pieces of information were

4    provided in response, do you?

5    A.      Not specifically as I sit here.

6    Q.      Okay.  You testified a moment ago that Delphi declined

7    to provide information -- certain information that had been

8    provided to the advisors to the unsecured Creditors' Committee.

9    Do you recall that?

10   A.      They -- they declined for -- to provide all information

11   under a blanket request.  If individual requests came in, the

12   company and its advisors would examine each of those individual

13   requests to see if they could find the information responsive.

14   Q.      But the company refused to provide simply a parallel

15   production to the unions that had provided to the advisors to

16   the --

17   A.      Under a general blanket request for all information.

18   Yes, Counsel.

19   Q.      And that information was not posted in the data room?

20   A.      Some information -- relative to what production, sir?

21   Q.      The information that had been provided to the committee.

22   A.      Certain information provided to the committee is loaded

23   out on the virtual data room for the ones which the company

24   feels would be helpful for the various unions and their

25   advisors.

Guglielmo - Cross                                    59

1   Q.      Well, so the company feels that some information that

2   was provided to the committee in connection with this 1113

3   motion might not be helpful to the unions, is that what you're

4   saying?

5   A.      I just think they made a determination that some would

6   be beneficial, so they load it out into the [inaudible].

7   Q.      Do you know what the grounds were for deciding that some

8   information could be provided to the union and other

9   information could not be provide -- should not be provided to

10  the union?

11  A.      I do not.

12              MR. PETERSON:  I've nothing further.  Thank you.

13              MS. ROBBINS:  Good morning.

14              THE WITNESS:  Good morning.

15                          CROSS-EXAMINATION

16  BY MS. ROBBINS:

17  Q.      My name is Mary Ann Robbins.  I represent the IAM and

18  IBEW.  Would it be accurate that you had no personal role in

19  providing information to the IAM and IBEW?

20  A.      Some role, and that being documents that are out on the

21  virtual data room for which your union --

22  Q.      But in terms of you gathering information, looking at

23  requests, gathering information, did you do that with respect

24  to the IAM and the IBEW at all?

25  A.      I did not.

Guglielmo - Cross                                    60

1    Q.      You mentioned in the earlier questioning by some of the

2    other union Counsel certain plant-by-plant information that was

3    provided on or after May 2, 2006.  Were you involved in

4    preparing that information?

5    A.      Not in preparing them, but in -- in reviewing them and

6    providing them to Channon.

7    Q.      Would you look at Exhibit 274?

8    A.      I'm there.

9    Q.      Oh.  Good work.

10   A.      I have lots of binders.

11   Q.      Huh?

12   A.      I have lots of binders.

13   Q.      Is this the type of information that you were referring

14   to that was provided plant by plant?

15   A.      Can you point me to specifically on 274 where you're

16   looking at?  You're referring to every question?

17   Q.      Are you on Exhibit 274?

18   A.      Oh, I'm sorry.

19   Q.      It's a one-page chart.

20   A.      I have a one-page listing that says this document is

21   designated [inaudible].  Is this what you'd like me to refer

22   to?

23   Q.      I thought it was too quick to be true.

24   A.      I'll go to the other 274.

25   Q.      I realize that --

Guglielmo - Cross                                          61

1   A.       I'm there.

2   Q.       Yes.  That there's a bit of eyestrain involved in this

3   document.  I apologize.  This is the only document that we

4   have.  But can you identify this as the kind of information you

5   reviewed with respect to plant-by-plant information?

6   A.       This is -- this is one page of a saving summary model

7   that I -- off of the model that I did review.

8   Q.       Okay.  And this is back -- this was not prepared until

9   May, is that right?

10  A.       It was not completed until May.  Right.

11  Q.       And so unions would have received this sometime after it

12  was completed sometime in May?

13  A.       I believe this information was loaded out onto the

14  virtual data room as soon as it was completed.

15  Q.       And that was sometime in May 2006?

16  A.       Early May 2006, correct.

17  Q.       Okay.  When you look at this document can you identify

18  that this is a page for Milwuakie?

19  A.       Yes.

20  Q.       Would you agree, although it's difficult to read, that

21  this does not assume that Milwaukie shuts down but continues

22  until 2010?

23  A.       My understanding of the manner in which this model and

24  its [inaudible] were prepared were on a prewind-down basis.

25  Q.       So do you understand that Milwaukie is scheduled to shut

Guglielmo – Cross                                        62

1    down at the end of 2007?

2    A.      I'm not intimately familiar, no.

3    Q.      Okay.  But in any case, if you wanted to see the

4    implication for various savings issues, this document would not

5    show what adjustments would be made for a closure in 2000 -- at

6    the end of 2007, would you agree?

7    A.      This document shows the savings summary at the Milwaukie

8    location relative to the company's proposals to the unions.

9    Q.      Would you agree that this projection does not include a

10   closure of Milwaukie at the end of 2007?

11   A.      I would agree.  That's not the manner in which this was

12   prepared.

13   Q.      Okay.  And so if there were adjustments in numbers for

14   that closure, we would not see them here?

15   A.      Not on this page.  Correct.

16   Q.      Can you also confirm that there is nothing on this page

17   that would allow a union to identify bargaining unit savings,

18   rather than plant-wide savings?

19   A.      Could you repeat that question?

20   Q.      There is more than one bar -- I'm going to ask you to

21   assume that there's more than one bargaining unit in Milwaukie.

22   A.      At Milwaukie -- okay.

23   Q.      Okay.  And can you confirm that this document would not

24   allow you to do a bargaining unit analysis?

25   A.      I think this is outside of my expertise, I would say.

Guglielmo – Cross                                     63

1    Q.      You mentioned the virtual data room.  Were you involved

2    in preparation of the virtual data room or was that somebody

3    else's responsibility at FTI?

4    A.      I -- I am somewhat responsible for setting up the room.

5    Q.      If you would look at Exhibit 95.

6    A.      I'm there.

7    Q.      Now I realize I didn't have to ask the question that

8    required it.  I'm sorry, but --

9    A.      Oh.

10   Q.      I shouldn't have said that.  I'm sorry.

11   A.      I enjoyed looking at it anyway.

12   Q.      In any case, just hold it there, because we are going

13   to -- I am going to ask you a few questions --

14   A.      Certainly.

15   Q.      -- about the virtual data room.  Maybe that will help

16   you out anyway.  In terms of the virtual data room are you

17   aware that not everybody who is -- has access to the virtual

18   data room has access to all the information in it?

19   A.      I don't believe that is correct.

20   Q.      Are you aware that there are documents posted in the

21   virtual data room that you cannot print out, that they are set

22   up so that you may be able to review the initial page, but you

23   cannot print out?

24   A.      I believe that not every document can be printed out,

25   but you can do print screens from the documents that you pull

Guglielmo - Cross                                        64

1   up on the [inaudible].

2   Q.      Are you aware that there are documents that you cannot

3   print even screen by screen?

4   A.      No.  I would also suggest that to the extent you can't,

5   I'm sure that Delphi would have no problem in producing a file

6   in another manner.

7   Q.      And so basically what's going on is that when someone

8   wants documents, you have an understanding that people have

9   been requesting hard copies rather than dealing with the data

10  room.  Do you have that understanding?

11  A.      I'm sorry.  Repeat the question.

12  Q.      In order to get an actual hard copy of a multi-page

13  document, are you aware that what has basically happened is

14  people have had to request that information of Delphi, rather

15  than rely on the data room?

16  A.      Well, I would say that many requests come in to Delphi

17  through its advisors directly Delphi and those -- that

18  information is provided to them directly.  To the extent it

19  gets loaded out in the room is for the benefit of the other

20  members that have access to the room to see that information.

21  Q.      But in terms of the -- whether or not Delphi actually

22  provides the hard copy, that is beyond your personal knowledge?

23  A.      No.  I would say that I am aware of many times in which

24  documents are provided directly upon request.

25  Q.      Would you agree that you have no knowledge as to

Guglielmo - Cross                                    65

1    occasions when physical documents have been provided directly

2    by Delphi to the IAM and IBEW?

3    A.      Repeat the question.

4    Q.      Sir, would you agree that you have no personal knowledge

5    of what hard-copy documents have been provided by Delphi to the

6    IAM and IBEW?

7    A.      That would be fair.  I do not.

8              MS. ROBBINS:  No further questions.

9              MS. MEHLSACK:  Good morning, Mr. Guglielmo.  I'm

10   Barbara Mehlsack for the Operating Engineers.

11             THE WITNESS:  Good morning.

12                        CROSS-EXAMINATION

13   BY MS. MEHLSACK:

14   Q.      Do you have any personal involvement in providing

15   information requested either by or on behalf of the Operating

16   Engineers?

17   A.      I do not.

18   Q.      Would you turn to paragraph 24 of your declaration in

19   which you state you -- it's a discussion of the penny sheets.

20   A.      What paragraph, Counsel?

21   Q.      24.

22   A.      I'm there.

23   Q.      And you -- the last sentence where you state that the

24   penny sheets, together with projected head count and hours at

25   each facility which have been provided to Channon form the

Guglielmo – Cross                                    66

1    basis for a simple calculation which Channon can perform to

2    determine the total savings provided by Delphi's ask by site or

3    union.   Is it accurate to say that in order to do a calculation

4    of savings by union, one would have to know the projected head

5    count by union.   Is that correct?

6    A.       I believe that's fair.

7    Q.       Generally speaking, in order to use a penny sheet --

8    A.       So you use the penny sheets, right --

9    Q.       -- to calculate a savings, you need not only the per-

10   employee data on the penny sheet, but you need a projection --

11   a head count projection and an hours projection.

12   A.       I believe you could do it with head count or hours.

13   Q.       But your sentence says projected head count and hours at

14   each facility.

15   A.       That's fair.

16   Q.       So you need both head count and hours, plus the per

17   employee data.

18   A.       Plus the penny sheet data.

19   Q.       Yes, the penny sheet data.

20   A.       You could do the savings in this manner, yes.

21   Q.       Is there another way you can do the savings?

22   A.       Yeah, not -- not that I would speak to here today, but

23   I'm assuming you could look at many different financial

24   analyses or productions of documents to calculate savings in

25   any way you'd like to.

Guglielmo - Cross                                    67

1   Q.      Well, has -- are you aware of Delphi providing any other

2   means of calculating savings by site by union?

3   A.      They have provided savings sheets from a model that they

4   have completed to all the various units.

5   Q.      Savings sheets from a model.  Are those savings sheets

6   by facility?

7   A.      Yes, they are and let me stipulate.  My knowledge is

8   that those are for UAW, IUE, and USW sites.

9   Q.      Thank you.  But as far as you know, those have not been

10  provided with regard to the IUAE?

11  A.      I am not, no.  I --

12  Q.      You're not aware.  Okay.  Now, in order to do a savings

13  ask by union, you would have to know the projected head count

14  by -- for that union.  Is that correct?

15  A.      I agree.

16  Q.      The labor costing models that you talk -- that you were

17  discussing earlier, do those labor costing -- those labor

18  costing models are on a plant basis, is that correct?

19  A.      Yes.

20  Q.      Are those labor costing models on a union basis as well?

21  A.      Yes, they are.

22  Q.      So that -- are you aware of -- question withdrawn.  Do

23  those labor-costing models are those electronic models?

24  A.      Yes, they are.

25  Q.      And one is able to manipulate the assumptions in those

Guglielmo - Cross                                          68

1  models.  By that, I mean, if you change the head count -- is it

2  possible to use those models and overlay different head count

3  assumptions?

4  A.      I'm not that intimately familiar with how those models

5  were built and whether or not you could sensitize them.  My

6  impression is you probably could get there.

7  Q.      But you don't know?

8  A.      No, I don't.

9  Q.      Do you know if Delphi has done any analysis by plant, by

10 union overlaying different head count assumptions on those

11 models?

12 A.      Not that I'm aware of.

13 Q.      Do you know if Delphi has done any analysis overlaying

14 any attrition program assumptions on those models?

15             MR. BUTLER:  Objection.  Your Honor, I've tried

16 to be patient with this line of questioning.  None of this

17 relates to the declaration or to even models that Mr. Guglielmo

18 was responsible for preparing.  She's asking him to comment

19 about models that other people have prepared and what they do

20 and don't do.

21             MS. MEHLSACK:  Your Honor, Mr. Guglielmo offered

22 the information in response to earlier questioning.

23             THE COURT:  Well, that doesn't protect the

24 subsequent question.  You can ask him about what information

25 he's provided to people, but that's really what it's being

Guglielmo - Cross                                         69

1   offered for.

2   BY MS. MEHLSACK:

3   Q.    Have you personally provided any information with regard

4   to these models to any of the unions or their financial

5   advisors?

6   A.    I've provided the output related to the IUE's facilities

7   to Channon and -- excuse me, as well as the USW sites to Potoc.

8           MS. MEHLSACK:  Thank you.  I have no further

9   questions.

10          THE COURT:  Okay.  Any more questions?

11          MR. PETERSON:  Your Honor, if I just could

12  followup.              CROSS-EXAMINATION

13  BY MR. PETERSON:

14  Q.    I apologize, but you just testified about USW.  you

15  provided that information to Potoc in May, right, the site the

16  savings sheets you were just testifying about?

17  A.    Yes, Counsel.

18          MR. PETERSON:  Thank you.

19          THE COURT:  Okay.  Any redirect?

20          MR. BUTLER:  No redirect and no re-redirect

21  either, Your Honor.

22          THE COURT:  Well, it was an ambiguous question,

23  huh?

24          MR. BUTLER:  Yeah, really.

25          THE COURT:  It was -- Ms. Mehlsack's question was

70

1   somewhat ambiguous.  All right, you can step down, sir.

2              MR. BUTLER:  Your Honor, could we take just a

3   five-minute recess before we head to the next one.

4              THE COURT:  That's fine.

5              MR. BUTLER:  Thanks.

6              (Recess at 11:43 a.m. until 12:06 p.m.)

7              THE COURT:  Please be seated.  All right.  We're

8   back on the record in Delphi.

9              MR. BUTLER:  Thank you, Your Honor.  Your Honor,

10  subject to the debtor's reservation of rights to put in a

11  rebuttal case later in the hearing -- requested hearing, our

12  final witness in our direct case is Randall S. Eisenberg,

13  Senior Managing Director at FTI Consulting, Inc., which we

14  would call for the purpose of cross-examination in support of

15  his declaration, which has been marked Joint Exhibit 23, which

16  we move into evidence subject to cross-examination.

17             THE COURT:  Okay.

18             MR. BAUNSTEIN:  Your Honor, Doug Baunstein on

19  behalf of the ad hoc committee of equity holders.

20             We object to the introduction of Mr. Eisenberg's

21  testimony.  Mr. Eisenberg has put in what is essentially an

22  expert rebuttal report mostly responding to some of the

23  information put in by Mark Rubin, one of the union's experts.

24             Nobody was given any opportunity to take the

25  deposition -- the expert deposition of Mr. Eisenberg, and I

71

1    say, by the way, that this is essentially an expert report is

2    that -- is because although it -- the declaration itself is not

3    styled as an expert report nor for that matter are -- does it

4    comport with the requirements of Rule 26.  There's not a --

5    there's no indication of Mr. Eisenberg's publications, his past

6    testimony, or even his compensation.

7              Additionally, the subject matter of

8    Mr. Eisenberg's report while at times not only dealing with

9    Mr. Rubin's report on rebuttal in fact goes certainly far

10   beyond that scope.  For example, Section 1 called placing the

11   Section 1113, 1114 motion into perspective is essentially a

12   regurgitation of Delphi's reasons for seeking the motion that

13   we're here today for.  But it could only be based upon his

14   information he's received from Delphi and, therefore, is

15   inadmissible hearsay contained within his declaration.

16             Additionally, Section 3 entitled rejecting the

17   collective bargaining agreements now is not premature.  It goes

18   directly to the issue of the timing and the business judgment

19   of moving for this relief now.  And although much of it deals

20   with Mr. Rubin, specifically paragraphs 9, 10, 14, 15, and 17

21   contain bald conclusions --

22             THE COURT:  I'm sorry, what document are you

23   referring to --

24             MR. BAUNSTEIN:  I'm talking about the declaration

25   of Mr. Eisenberg.

72

1            THE COURT:  Supplemental or --

2            MR. BAUNSTEIN:  The first one.

3            THE COURT:  Well, you must be talking about a

4   different one than Exhibit 23 -- Exhibit 23, right?  You're

5   referring to paragraphs --

6            MR. BAUNSTEIN:  Yes.

7            THE COURT:  All right.  I see what you're saying.

8   Go ahead.

9            MR. BAUNSTEIN:  Oh, okay.  I'm sorry.  But

10  that -- what I was saying was paragraphs 9, 10, 14, 15, and 17

11  are not styled as either opinions or conclusions, but rather

12  just statements of Delphi's intentions and in Delphi's current

13  economic state without identifying what's being relied upon or

14  that, in fact, it purports to be an expert opinion.

15            And finally, with respect to the Eisenberg

16  declarations, I think that the timing of this very important.

17  This declaration was submitted on May 3, 2006.  At the same

18  time, supplemental declarations were submitted with respect to

19  many of the other witnesses.  Significantly, May 3 was after

20  the meet-and-confer agreement between debtors in the union.  It

21  was after the chambers conference between Appaloosa and the

22  debtors with respect to discovery.  And it was just less than

23  one week before the commencement of this hearing.

24            At that point, it was virtually impossible that

25  anyone would have any chance to depose Mr. Eisenberg on

73

1   whatessentially are expert -- his expert testimony, although

2   not necessarily styled as such.

3            Accordingly, because this is expert testimony

4   without having complied with Rule 26 or with giving the parties

5   an opportunity to depose Mr. Eisenberg, we think that the

6   declaration should not be admitted into evidence.

7            THE COURT:  Okay.  Is it -- well, is it being

8   offered as an expert testimony?

9            MR. BUTLER:  Your Honor, Mr. Eisenberg is both a

10  fact witness and does have use, which will be based on his

11  expertise as a senior managing director at FTI.  This was filed

12  as a -- we believe on a timely basis on May 3rd, because it was

13  filed as a supplemental and rebuttal report, which will be

14  printed and filed at that time.  I don't recall Appaloosa ever

15  actually having asked for a deposition here or having made a

16  notice of deposition.

17           There have been other depositions that have been

18  ongoing during the last 30 days.  I don't believe that

19  Mr. Baunstein is going to be able to represent to the Court

20  that they sought a deposition of Mr. Eisenberg after receiving

21  this or had created discovery dispute or had come to chambers

22  on it.  I think this is a -- I think they decided to lie in

23  wait and make the objection here on June 1st.

24           And with respect to Mr. Eisenberg's statements

25  here, Your Honor, we believe the testimony as the debtors --

74

1    one of their principal financial advisors is appropriate.   It

2    is a response to the Rubin -- much of it is a response, I

3    agree, Mr. Baunstein, to the Rubin report, and it's appropriate

4    rebuttal to that report.   FTI was, in fact, the financial

5    advisor dealing most closely with Channon.

6                    THE COURT:   This just came to your head today?

7                    MR. BAUNSTEIN:   No, Your Honor.   Well, actually

8    as you recall, we initially had served 30(b)(6) notices.

9                    THE COURT:   No, I remember that, but I mean this

10   issue.

11                   MR. BAUNSTEIN:   No, Your Honor, but of course as

12   you know that in -- you know, we -- back when we initially made

13   the motion, one of the declarations I specifically referred to

14   when discussing whether to deal with all the declarations in an

15   omnibus fashion was the Eisenberg declaration.   I don't know.

16   Maybe you don't recall looking at your reaction.

17                   THE COURT:   Well, I don't -- it couldn't have

18   been because it was filed after the conference.

19                   MR. BAUNSTEIN:   No, no, I'm sorry.   Not at the

20   conference.   I'm talking about at the first day of the hearing.

21   This was filed, of course, on May 3rd.   In that time, we had --

22   there was obviously preparation for the hearing.   We were

23   reviewing not just Mr. Eisenberg's declaration, but all the

24   supplemental declarations, and we also --

25                   THE COURT:   All right.   This has obviously taken

75

1   me by surprise and I guess the debtor also, so I'm going to

2   take a half-hour recess and then lunch so I can look at the

3   issue.  Do you have anything more to say on the issue than what

4   you said, Mr. Butler?

5           MR. BUTLER:  No, Your Honor, other than I don't

6   hear Mr. Baunstein contradicting the statement I made that they

7   never sought discovery or a deposition of Mr. Eisenberg.

8           THE COURT:  Well, that's fine.  Does anyone else

9   have anything to say on this issue?  All right.  I'll be back

10  at 2:00.

11          MR. BUTLER:  Thank you, Your Honor.

12          (Recess taken at 12:14 until 2:10 p.m.)

13          THE CLERK:  Please be seated.

14          THE COURT:  Okay.  We're back on the record in

15  Delphi.

16          MR. BUTLER:  Your Honor, just before the break in

17  response to the objections made by Appaloosa, your -- the Court

18  asked if we had anything to add.  I did not at that time,

19  because the objection caught me by surprise.

20          I'd ask the Court's indulgence to explain to the

21  Court why it caught me by surprise and to respond to it now if

22  it would please the Court.

23          THE COURT:  All right.  Actually, I had a

24  question or two for you, too, so that's fine.  Go ahead.

25          MR. BUTLER:  Your Honor, I just briefly want to

76

1   outline a couple of points.  There was a meet-and-confer report

2   in this case that was agreed to by the parties and submitted to

3   Your Honor.  Appaloosa would not participate in the report

4   itself when it was submitted on or about May 4th, but

5   thereafter participated in a meet-and-confer meeting on May 4th

6   in which this report -- and the deadlines in it were adopted as

7   to all parties.

8              Paragraph 12 of that report required that on or

9   prior to May 2, 2006, the debtors would identify any rebuttal

10  expert witnesses, serve any rebuttal expert reports which were

11  to be Rule 26(a)(2) compliant and provide copies of reliance

12  materials used by the debtor's experts.

13             Exhibit Number 23, which is Mr. Eisenberg's

14  declaration was served in accordance to that -- in accordance

15  with that paragraph.  Reliance materials in accordance with

16  Rule 26 were served on the parties on or about May 8th with

17  respect to that, and I have -- and I would present Your

18  Honor -- I've provided to the relevant parties, including

19  Appaloosa, the evidence of that service and the reliance

20  materials, which I've marked Exhibit 325.  I'd like to present

21  it to the Court, if I may.

22             THE COURT:  Okay.

23             MR. BUTLER:  In addition, Your Honor, pursuant to

24  the meet-and-confer arrangements, with respect to all of the

25  exhibits, including all the declarations, the parties had self

77

1    imposed deadlines by which objections had to be filed.  White &

2    Case, on behalf of Appaloosa served several comprehensive sets

3    of objections, the most recent of which are dated May 15, 2006,

4    which are purported to be both their counter designations of

5    deposition testimony and their specific objections as to all of

6    the exhibits.

7            I'd like to present this to the Court and mark it

8    as Exhibit Number 324, if I may.

9            THE COURT:  Okay.

10            MR. BUTLER:  If Your Honor looks at page 4 of

11    that set of objections and counter designations by Appaloosa,

12    which represents its initial and supplemental objections to the

13    exhibits, Your Honor will find that as to Exhibit 23, the sole

14    objection raised by Appaloosa was an objection as to no

15    opportunity to depose.  There were no objections as to hearsay,

16    certainly no objections as to Rule 26 deficiencies, no

17    objections as to the use of the Eisenberg report as an expert.

18    Only the same objection they raised as to all of the debtors

19    and objector's declarations, which was the chambers conference

20    issue regarding no opportunity to depose.

21            In addition, Your Honor, the -- to that, we've

22    checked our records, and we don't find any notice or other

23    requests from Appaloosa subsequent to May 2nd seeking to depose

24    Mr. Eisenberg at any point in time between May 2nd and today.

25            Having said that, Your Honor, and when you look

78

1    at Rule 26(a)(2)(B), there are seven items that should have

2    been dealt with, including the reliance materials.  And from a

3    technical perspective, it is accurate to say that we did not

4    disclose in his affidavit his compensation.  That's a matter

5    the Court could take judicial notice of because Mr. Eisenberg

6    is a retained professional.  FTI's -- they filed their first

7    fee application.  Their engagement letter was approved by this

8    court as a matter of public record in this docket, and

9    Mr. Eisenberg isn't being paid anything extra beyond what the

10   engagement arrangements were.

11           It is also technically accurate that the

12   declaration did not include a listing of prior cases in the

13   last four years in which Mr. Eisenberg has testified.  However,

14   something Appaloosa did not acknowledge here on the record

15   today, Appaloosa participated in a ten-hour deposition of

16   Mr. Eisenberg just two days ago in another contested hearing in

17   this matter dealing with the GM contract rejection motion at

18   which Mr. Eisenberg's credentials, prior case testimony and so

19   forth were a subject of that deposition, and Appaloosa

20   participated in the entire ten-hour deposition which occurred

21   on Wednesday, May 31st.

22           So, Your Honor, I would just indicate to the

23   Court that while there was a technical oversight in not

24   including the compensation reference to the fee applications,

25   and retention agreement, and the listing of the prior cases in

79

1   this particular affidavit, in fact, there was a signed

2   declaration report and otherwise we believe is Rule 26

3   compliant.  And we did as the exhibits would indicate we did

4   provide reliance materials to all parties, including Appaloosa.

5           And whatever deficiencies there were with respect

6   to Appaloosa, who's the only one who raised this objection

7   which we believe is barred by their May 15th objection from an

8   estoppel and waiver perspective because they otherwise would

9   themselves be outside of the meet-and-confer arrangements,

10  whatever we did was not dealt with certainly was cured by

11  Appaloosa's participation in a ten-hour deposition of

12  Mr. Eisenberg two days ago at which the subject matter was

13  covered.

14          THE COURT:  Okay.  And when was he first

15  identified as an expert witness for the debtors?

16          MR. BUTLER:  The identification was -- there was

17  some point in connection with the meet and confer, and I don't

18  have the exact date, Your Honor.  It would have been on -- in

19  the discussions on or around the week or so prior to May 2nd,

20  because it was this use -- remember, Your Honor, he was being

21  offered as a rebuttal expert.

22          THE COURT:  Right.

23          MR. BUTLER:  And so it wasn't until we got the

24  expert reports in and we had a ser -- we had arrangements

25  worked out on the meet-and-confer that we got the -- our

80

1    original experts were filed, and then there was a few days

2    delay, and then the unions' experts were then filed.  And then

3    we had a few-day relay and we filed our rebuttal reports.

4                THE COURT:  Why are you doing him now as opposed

5    to as part of your rebuttal case?  I mean, is there -- you

6    could correct these things if you did it now.  Is it just --

7    you'd just rather have it now and you're all prepared to have

8    it now?

9                MR. BUTLER:  Well, we'll have -- we're prepared

10   to have him now, Your Honor.  We certainly if Your Honor thinks

11   we should not have him as part of the direct case but rather as

12   a separate rebuttal case, we certainly can do that.  I mean,

13   that's the -- it is being offered for that purpose as it

14   relates to those particular matters --

15               THE COURT:  I mean --

16               MR. BUTLER:  -- and as --

17               THE COURT:  He's commenting on the two reports by

18   the UAW's expert and the IUE's expert.  I imagine you want him

19   to comment on their testimony, too.

20               MR. BUTLER:  It's possible, Your Honor, that we

21   could recall him in a rebuttal case.  I wouldn't rule that out.

22               THE COURT:  Okay.  All right.  Well, we'll hear

23   from Appaloosa.

24               MR. BAUNSTEIN:  Thank you, Your Honor.  Just to

25   sort of start with the last point first.  Obviously should the

81

1    debtors decide to reintroduce Mr. Eisenberg on a rebuttal case,

2    we would seek to take his deposition beforehand.

3            As far as whether the objection was preserved, I

4    think there was no doubt that it was.  In both the meet-

5    and-confer process we made clear that we objected and we

6    intended to object to the introduction of all witnesses.  We

7    did again the first day of hearings here, and we've done it

8    subsequently with most witnesses, certainly the ones that we

9    thought were relevant to our case.

10           As far as having noticed a deposition seeking

11   this type of testimony, the 30(b)(6) deposition notice that we

12   sought specifically had as a category "Delphi's determination

13   to seek to reject or modify its labor agreements prior to the

14   expiration of its current agreements with the labor unions."

15           This is an issue that was clearly raised.  We

16   understood both your order, as well as to permit us just the

17   deposition of Mr. Williams subje -- and whatever other

18   information that had already been agreed upon between the

19   debtors and the unions.

20           Likewise, debtors made clear that they were not

21   going to permit all our discovery.  At the meet-and-confer when

22   we raised our objection to the admission of all these

23   evidences, they certainly weren't volunteering additional

24   people.

25           THE COURT:  What meet-and-confer was that?

82

1          MR. BAUNSTEIN:  This was a meet-and-confer, I

2    believe it was on May 5th or so.

3          MR. BUTLER:  May 4th.

4          MR. BAUNSTEIN:  May 4th.

5          MR. BUTLER:  Two days after Mr. Eisenberg was --

6          THE COURT:  But did you raise Eisenberg in

7    particular and say, you know, he's new.  You haven't talked

8    about him before.  Can't we depose him over the next however

9    many days it's going to take before we gets on the stand?

10          MR. BAUNSTEIN:  We did not mention him

11    specifically, but we did followup from our initial conference

12    with the Court with an email -- unfortunately, I don't have it

13    with me -- about certain 30(b)(6) topics that we thought have

14    not been covered in the prior discovery with vis-a-vis the

15    unions and the debtors.

16          The debtors made clear at that point that it was

17    their opinion that they were not obligated to produce any

18    further witness, including on these very topics and include --

19    essentially, the one -- including the one I just mentioned.

20          THE COURT:  Which is what again?

21          MR. BAUNSTEIN:  "Delphi's determination to seek

22    to reject or modify its labor agreements prior to the

23    expiration of its current agreements with labor unions."  We

24    also sought to other topics, which went to the economic

25    analysis with respect to moving now, as opposed to after the

83

1  expiration.

2          Mr. Eisenberg's declaration is very clear in

3  going to the point that it's appropriate to move now.  We were

4  not given this opportunity to depose.  Certainly, the idea that

5  this was not preserved beforehand, I think, is, you know, just

6  far from the facts and circumstances here.

7          THE COURT:  Okay.

8          MR. BAUNSTEIN:  Thank you.

9          THE COURT:  I think there really are two separate

10  objections here.  I think that they should be addressed

11  separately too.  The first is to the debtor's use of

12  Mr. Eisenberg as an expert witness.  And I conclude that they

13  came using an expert witness in rebuttal.  He [inaudible]

14  identified in his report based on [inaudible] expert witness

15  provided within the 30-day time provided under Rule 26(a)(2)(B)

16  and he was identified as a [inaudible] I think under

17  26(a)(2)(A).

18          That leaves the omission of his compensation and

19  somehow [inaudible] his curriculum vitae and -- which is

20  information that's supposed to be disclosed under 26(a)(2)(B)

21  as well.  And then Rule 37(c), the theory to make a disclosure

22  requirement under 26(a) will meet in the normal course to

23  preclusion of the evidence at trial.

24          However, there is an exception where the failure

25  is harmless, and based upon my belief that the [inaudible] was

84

1   harmless, I think that his reporting or testimony should not be

2   preluded as Mr. Butler points out.  He is not separately being

3   compensated in connection with his testimony.  He's a principle

4   of FTI Consulting and FTI Consulting is retained [inaudible]

5   case, its compensation arrangements were disclosed at the time

6   of its retention, and that's a matter of record.

7           As far as his CV is concerned, he does state in

8   his report he's worked and in particular he was deposed

9   recently, I believe that there was ample opportunity to pull

10  that out of there.

11          And then there's a second objection, which is

12  that the Appaloosa should have had the opportunity to depose

13  him under Rule 26(b)(4).  I don't believe it's a mandatory

14  right, because he's being offered in rebuttal.  He didn't have

15  to provide [inaudible] expert testimony, and so I don't believe

16  it's a [inaudible] depose him [inaudible].

17          However, I think there's a [inaudible] because he

18  was designated as a witness after the conference that we had

19  the night before two separate times in these hearings with

20  regard to other requests for depositions by Appaloosa.  And I

21  have some concern that Appaloosa has not complied with the

22  requirement of Rule 26(b), which provides that a party should

23  not seek discovery prior to having -- not being conferred under

24  Rule 26(f).  However, although I think it's a very close call,

25  I accept Counsel for  Appaloosa's representation that they did

85

1    not specifically confer about withdrawals, and they conferred

2    about any generic witness that would cover topics that

3    Mr. Eisenberg does cover in his report, which includes the

4    timing of the rejection motion.

5            I don't really know yet, because I don't believe

6    there has been a full opportunity to meet and confer, and I do

7    somewhat blame Appaloosa for not pressing this before the

8    middle of today's hearing, since they obviously have had time

9    in which Mr. Eisenberg would have been deposed, including

10   [inaudible].  He was deposed on something else yesterday.

11           However, given the fact that he is a rebuttal

12   witness, I expect he'll be -- he will likely be used again, it

13   would seem to me the better pact as less I [inaudible] from

14   someone else is scheduled that whole month around appearing for

15   his cross-examination, but we put him off and reserve him for a

16   rebuttal case [inaudible].

17           In the first instance, the parties have an

18   opportunity to discuss his deposition, i.e., you've got to

19   recover and the like.  I particularly don't want to have him

20   deposed over matters he was just deposed upon for several hours

21   the other day and the like.  And when -- if [inaudible] wants

22   to put him on and [inaudible] introduced, we can have him --

23   put him on at that time.

24           Is there any -- does that raise any hackles with

25   the union's Counsel?

86

1            MR. SIMON:  Could we have just a minute to

2    discuss it, Your Honor?

3            THE COURT:  Sure.  I guess that doesn't raise any

4    hackles with Mr. Eisenberg, but his [inaudible].

5            MR. SIMON:  We have no objections, Your Honor.

6            THE COURT:  All right.  So Mr. Eisenberg, you

7    have a temporary reprieve, then, which is [inaudible] deposed

8    for the next few weeks.

9            MR. EISENBERG:  Thank you.

10           MR. BUTLER:  Your Honor, we're going to take the

11   Court's guidance that we would call Mr. Eisenberg as part of

12   our rebuttal case.  With that in mind, we've completed our

13   testimony in support of our case subject to the rebuttal case.

14   There are -- there's other business to be accomplished in this

15   and we need to prepare for the first witness for the unions.

16           I should tell the Court that there are, as the

17   Court expected there to be on this dual path that we're on,

18   there are dual-path negotiations, and we have conferred with

19   Counsel to certainly of the larger unions, in particular about

20   whose witnesses are scheduled to come first, and we've

21   concluded that it would better serve the parties' purposes and

22   acceptable to the Court to begin with the UAW case on Monday.

23           THE COURT:  Okay.

24           MR. BUTLER:  And not today.

25           THE COURT:  All right.

87

```
 1            MR. BUTLER:  And --

 2            THE COURT:  You gave me some warning of that last

 3  week, so --

 4            MR. BUTLER:  So with Your Honor's permission, we

 5  would adjourn.  I believe based on talking to Counsel, the

 6  start time on Monday just prefer to be 10:00.

 7            THE COURT:  At 9:00 -- 10:00.

 8            MR. BUTLER:  Some of us -- that was also a close

 9  vote, Your Honor.

10            THE COURT:  All right.

11            MR. BUTLER:  But some of us were out voted on

12  that.

13            THE COURT:  Okay.  All right.

14            MS. MEHLSACK:  Excuse me, Your Honor, since the

15  conversation was not had with Counsel for the smaller unions,

16  what I would ask Your Honor if Your Honor would entertain an

17  oral motion under Rule 52(c) for a judgment based on partial

18  findings before adjourn or if you would like to defer it to

19  Monday or not entertain it at all.

20            THE COURT:  I thought someone might bring that up

21  today.  Obviously, we've had a lengthy case put on by the

22  debtors.  And I -- is this something that you all have

23  conferred about?  I mean, I would think that you would want to

24  have argument on such a notion.  You wouldn't just want to

25  ask -- leave it up to me, right?
```

88

1              MS. MEHLSACK:  I'm -- Your Honor, I would be the

2    only one who's making that motion for the Operating Engineers.

3              THE COURT:  All right.  I --

4              MR. BAUNSTEIN:  We [inaudible] would join in it,

5    Your Honor.

6              THE COURT:  [Inaudible] --

7              MR. BAUNSTEIN:  Yes.  In other words, if Your

8    Honor is willing to consider it, if it something that you feel

9    would assist the Court in resolving this matter, we would --

10             THE COURT:  Well, I --

11             MR. BAUNSTEIN:  -- not want to -- not be part of

12   it.

13             THE COURT:  I --

14             MR. MEHLSACK:  Your Honor, I didn't realize I was

15   opening up a real can of worms.

16             THE COURT:  My inclination is at this point not

17   to consider it and to proceed with the union's case.  And any

18   particular -- in light of the unusual nature of Section 1113,

19   there are some procedural [inaudible] that people have to get

20   over, but generally [inaudible] it's -- unlike almost every

21   other statute, sort of an accumulating record, which is

22   unusual, accumulating a set of facts as the case goes on.

23             But if your request goes to -- which you believe

24   to be a specific procedural step that was omitted, I'll

25   entertain that on Monday.  But otherwise, as to the other

89

1    elements of 1113, and as to Section 360(b)'s applicability, I'm

2    going to defer that.

3              MS. MEHLSACK:  Thank you, Your Honor.

4              THE COURT:  And the union may -- you may have

5    that point.  It may be different than some other unions,

6    so what I would ask is that if you do proceed on Monday, speak

7    with Mr. Butler about it, so he knows whether he needs to

8    respond -- I mean, prepare to respond.  I'm sure he'll respond,

9    but prepare to respond.  And I'll hear at the beginning of the

10   day on Monday.

11             MS. STEINGART: [Inaudible]

12             MR. SIMON:  We suggest you use the mike.  It's --

13             THE COURT:  Why don't you stand at the podium?

14             MS. STEINGART:  Bonnie Steingart, Your Honor,

15   from Fried, Frank on behalf of the official committee of the

16   equity holders.

17             I think that there are more issues than just

18   procedural issues involved that may be raised at this point in

19   the proceedings that in a sense there are portions of debtor's

20   case that we think have not -- have not been made and will not

21   lie in amounts of the union, Your Honor.

22             THE COURT:  That will not what?

23             MS. STEINGART:  That will not lie -- the union

24   won't be able to -- the passage of time and union testimony, I

25   do not think will change the deficiencies that exist now as to

90

1   at least business judgment.  And I think that there is an issue

2   or two worth raising for the Court to consider at this point

3   before a substantial additional time is spent by all concerned.

4                  THE COURT:  I don't think that's productive.

5                  MR. KURTZ:  Glenn Kurtz for the ad hoc committee

6   of equity holders.

7                  Your Honor, I just wanted to see if I could get

8   enough clarity that Mr. Butler knows whether he needs to

9   prepare over the weekend or not.  I'm not 100 percent sure I

10  know what procedural grounds are.  I know what grounds I would

11  raise.

12                 The one I think that may or may not fall within

13  procedural is the undisputed testimony that the debtors have no

14  intent of enforcing relief that would be granted by this court

15  and, therefore, they can't demonstrate that it's necessary the

16  reorganization.  Is that something that falls within what Your

17  Honor will entertain or is that something that is being

18  reserved for later in the --

19                 THE COURT:  That's reserved --

20                 MR. KURTZ:  -- in the matter?

21                 THE COURT:  -- for a later date.

22                 MR. KURTZ:  Thank you.

23                 THE COURT:  As I noted before, on your Section

24  1113 there's an important and I think astute dynamic that

25  Congress set up, which it contemplates an ongoing bargaining

91

1    process, and there are times when unfortunately but ultimately

2    I think what needs to be done, there is a clear impact of the

3    litigation on the bargaining.  And I -- the elements of the

4    testimony on debtor's intentions and with regard to what they

5    will do if there's a rejection order entered as bearing -- as

6    in that light.

7                 I also believe recently in Judge Hardin's opinion

8    that came out right before the commencement of the case and

9    believe that he agrees with me that as a practical matter after

10   rejection under 1113, if there is such a rejection and, of

11   course, in that opinion he said there would not be a rejection,

12   but he noted that after rejection of the 1113 the parties

13   continue to bargain.  That's the way it's set up.  You can't

14   wish away employees.

15                So I think that the proper focus here is with the

16   exception of issues such as did the debtor make a proposal, did

17   the debtor provide information behind the proposal, there's

18   procedural elements that also were very recently identified by

19   Judge Kitchel in Minnesota [inaudible] any other requests under

20   Rule 52.

21                So I'll see you all on Monday at 10:00.

22                MR. SIMON:  Thank you, Your Honor.

23                MR. BUTLER:  Thank you, Your Honor.

24                THE COURT:  This is Judge Peck's courtroom.  I

25   guess you can leave your stuff here.  It will be here over the

1 weekend.  I don't know whether anyone really wants to safeguard

2 it, but you're free to leave it here.

3         MR. BUTLER:  Thank you, Your Honor.

4                 * * * * *

93

1          I certify that the foregoing is a court

2     transcript from an electronic sound recording of the

3     proceedings in the above-entitled matter.

4

5                                    _____

6                                         Ruth Ann Hager

7     Dated:   June 3, 2006

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25