**Hearing Date and Time: June 29, 2006 at 10:00 a.m.**
**Objection Deadline: June 27, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
      In re                                 :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                                            :    (Jointly Administered)
              Debtors.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND
FED. R. BANKR. P. 6004 APPROVING (I) SUPPLEMENT TO UAW SPECIAL
ATTRITION PROGRAM, AND (II) IUE-CWA SPECIAL ATTRITION PROGRAM

("HOURLY SPECIAL ATTRITION PROGRAMS MOTION NO. 2")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 approving and authorizing the Debtors to implement (i) a supplemental program in addition to the previously-approved human capital attrition program covering hourly employees represented by United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and (ii) a human capital attrition program covering hourly employees represented by the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America ("IUE-CWA").[1]  In support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

---

[1]    Due to unforeseeable and unavoidable circumstances outside of the Debtors' control, Delphi and the United Steelworkers of America ("USW") mutually agreed to suspend negotiations until the week of June 19, 2006 including framework discussions over a comparable USW-GM-Delphi Special Attrition Plan Proposal provided to the USW on June 5, 2006.  Delphi presently anticipates that the framework discussions with the USW should be completed in time for a definitive agreement to be reached and noticed for approval at the July 19, 2006 omnibus hearing.

2

On April 28, 2006, the U.S. Trustee appointed an official committee of equity security holders

(the "Equity Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 363(b)

of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

A.    Current Business Operations Of The Debtors

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") had

global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion.[2] At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues, and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from the

Bankruptcy Court.

6.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

---

[2]    The aggregated financial data used in this Application generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

3

7.       Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

B.       Events Leading To The Chapter 11 Filing

8.       In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.       The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

4

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

C.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

5

12.     In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations.  To that end, Delphi, GM and the UAW received this Court's approval on April 7, 2006, of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-represented employees (the "UAW Special Attrition Program").[4]  The UAW Special Attrition Program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings" through retirement attrition programs and GM flowbacks.

13.     The UAW Special Attrition Program constitutes an important first step in implementing the Debtors' transformation plan, but does not resolve all of the issues related to Delphi's uncompetitive labor agreements.  Moreover, because Delphi did not reach comprehensive agreements with its unions and GM prior to March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion").[5]  Contemporaneously

---

[4]     On May 18, 2006 Wilmington Trust Company ("WTC"), as indenture trustee to the Debtors' senior notes and debentures, filed a notice of appeal regarding the order approving this plan (Docket No. 3813).  On May 30, 2006 WTC filed its designation of items to be included in the record on appeal and its statement of issues to be presented on appeal (Docket No. 3961.  In addition, on May 31, 2006, Appaloosa Management L.P., Wexford Capital LLC, and Lampe Conway and Company LLC filed an untimely notice of appeal regarding the order approving the UAW Special Attrition Program (Docket No. 3974).

[5]     Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits (Docket No. 3035).

6

therewith, the Debtors also moved to reject unprofitable supply contracts with GM.[6]  Among the

reasons for the GM contract rejection motion was the Debtors' belief that GM must cover a

greater portion of the costs of manufacturing products for GM at plants that bear the burden of

the Debtors' legacy costs.  This initial motion covers approximately half of the Debtors' North

American annual purchase volume revenue from GM but only 10% of the Debtors' total

contracts with GM.  Although the filing of these motions was a necessary procedural step, the

Debtors remain focused on reaching a consensual resolution with all of Delphi's unions and GM.

Following the commencement of the 1113/1114 Motion, on June 9, 2006, hearings on the

1113/1114 Motion were adjourned to allow the Debtors and other interested parties additional

time to fully focus on reaching comprehensive consensual agreements until August 11, 2006.

Further, the commencement of the Section 365 hearing seeking cancellation of certain

commercial contracts with GM was also postponed until at least August 11, 2006 and is

scheduled to commence following the resolution or completion of the Section 1113/1114

hearings.[7]

14.    To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which the

Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.   To that end, the Company will concentrate the organization

around the following core strategic product lines: (a) Controls & Security (Body Security,

---

[6]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033).

[7]    See Fourth Amended Scheduling Order on Debtors' Motion for Order Under 11 U.S.C. Section 1113(c)
Authorizing Rejection of Collective Bargaining Agreements and Under 11 U.S.C. Section 1114(g) Authorizing
Modification of Retiree Welfare Benefits  (Docket No. 4170) and Pretrial and Scheduling Order Relating to
Debtors' Motion for Order Under 11 U.S.C. Section 365 and Fed. R. Bankr. P. 6006 Authorizing Rejection of
Certain Executory contracts with General Motors Corporation  (Docket No. 4169).

Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture
(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)
Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel
and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics),
and (f) Thermal (Climate Control & Powertrain Cooling).[8]

15.    In contrast, the Company similarly identified certain non-core product
lines that do not fit into its future strategic framework, including Brake & Chassis Systems,
Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering,
and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines
(which will include approximately one-third of its global manufacturing sites) and will consult
with its customers, unions, and other stakeholders to carefully manage the transition of such
affected product lines.  The Company intends to sell or wind down the non-core product lines
and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the
Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as
many as 8,500 employees as a result of portfolio and product rationalizations and initiatives
adopted following an analysis of the Company's selling, general, and administration ("SG&A")
cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented,
the Company should realize savings of approximately $450 million per year in addition to
savings realized from competitive measures planned for its core businesses and the disposition of
non-core assets.

---

[8]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket
or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial
vehicles, or other adjacent-market businesses and product lines.

17.    As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007 and pursue all available alternatives to amortize funding contributions over a long-term period.  Following the applicable freeze dates, the Company intends to provide certain hourly and salaried employees with a non-elective employer contribution and company match into Delphi's defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

19.    On June 5, 2006, Delphi reached agreement on the terms of an additional program to supplement the UAW Special Attrition Program though negotiations among Delphi, GM, and UAW.  On June 16, 2006, Delphi reached agreement on the terms of the IUE-CWA-GM-Delphi Special Attrition Program (the "IUE-CWA Special Attrition Program"), through negotiations among Delphi, GM, and IUE-CWA (collectively, the IUE-CWA Special Attrition Program with the UAW Special Attrition Program and the supplement to the UAW Special Attrition Program, the "Hourly Attrition Programs").  By this Motion, the Debtors seek entry of

9

an order under section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 authorizing the

Debtors to enter into (i) the Supplement to the UAW-GM-Delphi Special Attrition Program

Agreement by and among Delphi, GM, and the UAW dated March 22, 2006 (the "UAW

Supplement"), and (ii) the Agreement by and among Delphi, GM, and the IUE-CWA governing

the IUE-CWA Special Attrition Program (the "IUE-CWA Special Attrition Program

Agreement").[9]  The UAW Supplement provides certain expanded options with respect to the

UAW Special Attrition Program, which will provide UAW-represented employees with

additional soft landings as the Debtors implement their transformation plan.  Under the IUE-

CWA Special Attrition Program, certain eligible IUE-CWA-represented employees can retire

with financial incentives through early retirement or through a pre-retirement program or accept

lump sum buyout payments.  The IUE-CWA Special Attrition Program largely mirrors the UAW

Special Attrition Program taken together with the UAW Supplement.

       20.     During the April 7, 2006 hearing on the motion to approve the UAW

Special Attrition Program, the Court, in approving and authorizing the Debtors to enter into the

UAW Special Attrition Program, stated the following:

> [I]t's my view that having approved this agreement, it is quite
> likely, unless there really are different material considerations
> involving the debtor's rights against GM and/or the other unions,
> that I would promptly approve comparable agreements with the
> other unions.

---

[9]    The proposed Hourly Attrition Programs Order (the "Proposed Order") is attached hereto as <u>Exhibit A</u>. Copies of the UAW Supplement and the IUE-CWA Special Attrition Program Agreement are attached to the Proposed Order as <u>Exhibit B</u>, and <u>Exhibit C</u>, respectively.  While these programs are the product of negotiations between Delphi, GM, and each of these major unions, neither GM nor either of the interested unions are parties to this Motion.

10

Tr. Apr. 7, 2006, at 229:8-15.  The Debtors believe that, despite certain differences between the

UAW Special Attrition Program approved by this Court[10] and the IUE-CWA Special Attrition

Program, the IUE-CWA Special Attrition Program is reasonably comparable to the UAW

Special Attrition Program.

        21.     The IUE-CWA Special Attrition Program Agreement provides that any

order approving it shall include express approval of certain specific provisions in the IUE-CWA

Special Attrition Program Agreement, including paragraphs 1.b.iv.3. (funding a segregated

account to be used exclusively to satisfy pre-retirement related obligations), 3.a. (Delphi and GM

participation is subject to Court approval, and without such approval no party will have any

obligations under such program;[11] GM's participation is further subject to the order providing for

the allowance and/or treatment of its claims as described in the IUE-CWA Special Attrition

Program and that the order be reasonably satisfactory to Delphi, GM, and the IUE-CWA based

on the prior special attrition program order approved in Delphi's chapter 11 cases), 3.c. (the IUE-

CWA Special Attrition Program shall not be subject to abrogation, modification or rejection

without the mutual consent of Delphi, GM, and the IUE-CWA, and such program is without

prejudice to any party in interest in all other aspects of the Debtors' chapter 11 cases), and 3.d.

(nothing in the IUE-CWA Special Attrition Program or the Court's approval of such program, or

the performance of any obligations therein shall limit or otherwise modify Delphi's rights under

section 4041 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")

---

[10]    Portions of the UAW Special Attrition Program were solely between GM and the UAW.  Because those terms
were not related to the Debtors, and thus, not approved by this Court, this Motion will not address the omission
of those provisions from the IUE-CWA Special Attrition Program.

[11]    The first sentence of Paragraph 3.a. of the IUE-CWA Special Attrition Program Agreement inadvertently
referred to the June 29, 2006 hearing as an omnibus hearing, however the intent of this sentence was only for
Delphi to seek approval of the IUE-CWA Special Attrition Program Agreement from the Bankruptcy Court at a
specially set June 29 hearing or as promptly thereafter in the course of Delphi's Chapter 11 cases.

or its rights sections 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations

that pre-existed either respective program and nothing in either program will limit, expand or

modify the rights of any party under the Benefit Guarantee).  Among those provisions, of utmost

importance to the Debtors was that the IUE-CWA Special Attrition Program Agreement

specifically provide that it is <u>without prejudice</u> to any party in interest, including the Debtors, the

Creditors' Committee, and the Equity Committee in all other aspects of the Debtors' chapter 11

cases, including, by illustration, the Debtors' and GM's respective positions in all commercial

discussions and claims matters between them, all collective bargaining matters involving the

parties, in any potential proceedings under sections 1113 and/or 1114 of the Bankruptcy Code

with respect to the IUE-CWA, under section 365 of the Bankruptcy Code with respect to GM's

contracts with the Debtors, in any pension termination proceeding under ERISA and/or the

Bankruptcy Code, and all claims administration and allowance matters.[12]  Delphi would not have

agreed to undertake the obligations provided in the IUE-CWA Special Attrition Program

Agreement without these specific acknowledgements and therefore seeks this Court's specific

approval of these provisions.  As this Court already approved the provisions contained in the

UAW Special Attrition Program, the Debtors do not believe that this Court harbors any belief or

concern that the Debtors' ability to proceed with any necessary or desirable motions in this Court

with respect to the Debtors' rights under section 4041 of ERISA, or the Debtors' rights under

section(s) 1113 and/or 1114 of the Bankruptcy Code would be impaired in any way by the

---

[12]    The Debtors' discussion of the importance of paragraph 3.c. and 3.d. should not detract in any way from the
importance of other integrated and non-severable provisions in the IUE-CWA Special Attrition Program
Agreement.  For example, paragraph 3.e. provides that nothing contained therein will constitute the assumption
of any agreement <u>or</u> be deemed to create or give rise to an administrative or priority claim with respect to GM
<u>or</u> convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.
The paragraph 3.e. claims protection provisions are of fundamental importance to the statutory committees as
well as to the Debtors.

12

approval and implementation of the IUE-CWA Special Attrition Program Agreement.  If this

Court thinks otherwise, however, then the relief requested in this Motion should not be approved.

Basis For Relief

A.     The Debtors' Uncompetitive Cost Structure

22.     As discussed in the motion to approve the UAW Special Attrition

Program, approximately 98% of the Debtors' hourly employees, working at numerous facilities

on different product lines in the United States, are represented by three principal unions: the

UAW, which represents approximately 70% of Delphi's represented hourly workforce, the IUE-

CWA, which represents approximately 25% of the represented hourly workforce, and the USW,

which represents approximately three percent of the represented hourly employees.  Delphi has

collectively-bargained national agreements with each of these unions as well as local agreements

with affiliated local unions at each facility covering primarily local issues.[13]  The Debtors' labor

agreements with their unions are unsustainable.  Specifically, to stem the Debtors' operating

losses from their U.S. operations and achieve the Debtors' transformation, Delphi's existing labor

agreements must be modified in three principal respects.  First, Delphi must obtain hourly wage

and benefit cost levels that are competitive with other U.S. auto parts suppliers.  Second, Delphi

must address those provisions that limit Delphi's ability to respond to market forces by selling or

closing unnecessary or unprofitable operations, or by laying off excess employees.  Finally,

Delphi must also address its substantial liabilities for retirement benefits for hourly employees

and its costly retiree health care plans.

---

[13]     Delphi also has collective bargaining agreements covering smaller groups of U.S. hourly employees, totaling
approximately 125 employees in the aggregate, with three other unions – the International Association of
Machinists and Aerospace Workers; the International Brotherhood of Electrical Workers; and the International
Union of Operating Engineers.

23.     The Debtors believe that implementation of the UAW Supplement and the IUE-CWA Special Attrition Program are critical steps in enabling Delphi to transform its workforce from legacy wages and benefits to a competitive labor cost structure.  The Debtors therefore believe that implementation of these programs will accelerate necessary attrition and reduce the uncertainties and concerns over the impact of a negotiated consensual resolution, or in the alternative, a potential rejection of labor agreements and modification of retiree benefits.  By creating soft landings for many of Delphi's hourly employees, the Debtors believe that the implementation of the Hourly Attrition Programs would create a more favorable environment for reaching consensual resolution with the Debtors' major unions.

B.     The UAW Supplement

24.     Delphi, GM, and the UAW entered into the UAW Supplement to provide additional incentives for UAW-represented employees to voluntarily attrit from Delphi.  The Debtors believe that it is in their best interest to provide the additional incentives contained in the UAW Supplement.  The UAW Supplement supplements the original UAW Special Attrition Program in the following manner:[14]

(a)     The UAW Supplement supplements the UAW Special Attrition Program by allowing employees with at least 26 years of credited service, regardless of age, to also participate in a pre-retirement program.  The gross monthly wages while in the UAW Special Attrition Program at 26 years of credited service would be $2,750.  As a result, the escrow account balance to fund the UAW Special Attrition Program would increase by an additional $15 million supplement.

(b)     UAW-represented employees also would be offered buyouts to sever all ties with Delphi and GM, except vested pension benefits.  Employees would only be able to elect one option under the UAW Special Attrition Program or the UAW Supplement.  Employees with ten or more years of seniority or credited service,

---

[14]     The terms contained herein are provided solely as a summary and are qualified in all respects by the terms of the agreement underlying the UAW Supplement.  To the extent that this summary differs in any way from the terms of the UAW Supplement, the provisions of the UAW Supplement will control.

whichever is greater, would be eligible for $140,000, traditional employees with less than ten years of seniority would be eligible for $70,000, and employees hired under the Supplemental New Hire Agreement prior to March 22, 2006, would be eligible for a buyout payment amount prorated to $40,000, in each case, less withholdings (the "UAW Buyout Payments"). GM and Delphi would each pay one-half of the UAW Buyout Payments. Notwithstanding anything to the contrary in the UAW Special Attrition Program, GM would receive an allowed prepetition general unsecured claim against Delphi in the aggregate amount of all UAW Buyout Payments actually paid by GM pursuant to the UAW Special Attrition Program.

(c)    The additional options described in subparagraphs (a) and (b) above would be offered on a nation-wide basis immediately. The application period for these expanded options, timing of the pre-retirement program and UAW Buyout Payments and the release dates would be determined by the joint UAW-Delphi National Parties, but in any event, no later than January 1, 2007.

(d)    All of the remaining provisions of the UAW Special Attrition Program would be affirmed. The effectiveness of the UAW Supplement is conditioned on this Court's approval of an order satisfactory to each of Delphi, GM, and the UAW, and which provides for the allowance of GM's claim as described in subparagraph (b) above.

25.    The UAW Supplement's new options, beyond those of the UAW Special Attrition Program, are enabled by financial support from GM. As a result of the additional options provided under the UAW Supplement, if approved, the Debtors would increase the balance in the segregated account, which was established to fund the UAW Special Attrition Program, by an additional $15 million supplement, causing the balance to increase from $75 million to $90 million.[15] Implementation of the UAW Supplement would provide UAW-represented employees with additional opportunities for soft landings not previously offered under the UAW Special Attrition Program and reduce JOBS Bank and SUB (supplemental unemployment benefit) costs pending resolution of job security and site wind down contract modifications proposed by Delphi.

---

[15]    Under the Debtors' postpetition credit facility, as amended, they are permitted to fund segregated accounts related to the Hourly Attrition Programs in an amount not to exceed $100 million in the aggregate. The relief requested in the Motion complies with the relevant provisions of the Debtors' postpetition credit facility.

C.    The IUE-CWA Special Attrition Program

26.    Subsequent to this Court's approval of the UAW Special Attrition

Program, and in light of the Debtors' need to address the labor issues confronting the Debtors and

make meaningful progress toward an overall restructuring of the Debtors' U.S. operations and a

plan of reorganization, the Debtors have been discussing with each major union and GM the

terms of a comprehensive resolution of the Debtors' uncompetitive labor agreements.   Although

discussions may lead to a consensual resolution of these issues, the Debtors cannot continue to

suffer significant operating losses from their U.S. operations.  The IUE-CWA Special Attrition

Program is a significant step to enable realignment of the Debtors' global product portfolio and

manufacturing footprint, as well as reduction of the Debtors' traditional-rate hourly U.S.

workforce to levels needed to run its realigned U.S. operations.

27.    As noted above, the terms of the IUE-CWA Special Attrition Program as

they relate to the Debtors' obligations thereunder are reasonably comparable to the terms of the

UAW Special Attrition Program, taken together with the UAW Supplement.[16]  Among the

significant terms of the IUE-CWA Special Attrition Program are the following:[17]

---

[16]    In addition, the IUE-CWA Special Attrition Program would cover Delphi's IUE-CWA-represented hourly
employees at, among other facilities, the Debtors' facility located in New Brunswick, New Jersey,
notwithstanding the prior agreement between Delphi and the IUE-CWA providing for an attrition program for
employees at the Debtors' New Brunswick facility (the "New Brunswick Agreement") and notwithstanding
paragraph 3.b. of the IUE-CWA Special Attrition Program Agreement relating to certain participation costs of
such program not to be shared with GM.  As described in the Motion For Order Under 11 U.S.C. § 363(b) And
Fed. R. Bankr. P. 2002 And 6004 Authorizing And Approving Debtors' Entry Into Transfer Agreement With
Johnson Controls, Inc. Providing For (a) Sale Of Acquired Assets Free And Clear Of Liens, Claims, And
Encumbrances (b) Continuation And Transition Of Supply To Johnson Controls, Inc. Of Battery Products Out
Of Fitzgerald Facility And (c) Implementation Of Attrition Plan With Respect To New Brunswick Facility In
Accordance With IUE-CWA Memorandum (Docket No. 3927), the New Brunswick Agreement contains a
"most favored nations" clause and, therefore, the IUE-CWA Special Attrition Program would be offered to
eligible hourly employees employed at the New Brunswick facility.

[17]    The terms contained herein are provided solely as a summary and are qualified in all respects by the terms of
the agreement underlying IUE-CWA Special Attrition Program.  To the extent that this summary differs in any

16

(a)    Employees who are eligible to retire under the normal or early voluntary provisions of the Delphi Hourly-Rate Employees Pension Plan (the "HRP") would be eligible for a one-time, lump-sum incentive payment in the amount of $35,000 in exchange for their agreement to retire.  This incentive payment would be made by GM and would be retroactive to cover eligible employees who have retired since October 1, 2005.

(b)    Employees aged 50 or older with ten or more years of credited service who are eligible to retire under the MSR (i.e., mutually satisfactory retirement) provisions of the HRP could do so.[18]

(c)    Employees with at least 26 and less than 30 years of credited service (regardless of age) would be eligible for special voluntary placement in a pre-retirement program under the following terms:

(i)    Employees electing to accept placement in the pre-retirement program would have to be eligible no later than July 1, 2006;

(ii)    Employees would retire without additional incentives (i.e., such employees would not be eligible to receive the $35,000 incentive payment described in paragraph (a) above) when they first accrue 30 years of credited service under the provisions of the HRP; and

(iii)    Employees would receive gross monthly wages while in the program of:

1.    29 years credited service: $2,900

2.    28 years credited service: $2,850

3.    27 years credited service: $2,800

4.    26 years credited service: $2,750

Wages would be weekly on an hourly basis (2,080 hours per year) and would remain at that rate until 30 years of credited service is accrued.  Employees electing this program will be treated the same as protected status employees with the following exceptions:  (1) electing employees would not be eligible for Cost

---

way from the terms of the IUE-CWA Special Attrition Program, the provisions of the IUE-CWA Special Attrition Program will control.  Additionally, the IUE-CWA Special Attrition Program would be implemented consistent with the parties' past attrition programs, including requiring a release of claims by the employee participants.

[18]    Provisions in subparagraphs (a) and (b) would apply to employees who are eligible to retire by January 1, 2007. Employees would be allowed to retire when their services are no longer required, but in any event no later than January 1, 2007.

17

of Living Allowance ("COLA"); and (2) electing employees would not be eligible for vacation pay, except as was earned and unpaid prior to the commencement of this pre-retirement program.

(iv)    Within ten (10) business days after the first date on which any employees are eligible to receive wage payments in accordance with paragraph 1.b.iii. of the IUE-CWA Special Attrition Program, Delphi would establish a segregated payment account (the "Segregated Account") in the amount of $12 million (the "Ceiling Amount"). The funds in the Segregated Account would be available to reimburse Delphi for the payment of weekly wage payments (which would be paid through Delphi's normal payroll process) under such paragraph 1.b.iii. or for direct wage payments to employees entitled to receive such payments, as described in paragraph 1.b. of the IUE-CWA Special Attrition Program.

1.    Delphi would not draw funds from the Segregated Account until a date (the "Permitted Draw Down Date"), which would be the later of the Final Election Date or the Adequate Funding Date (each as defined below). Prior to the Permitted Draw Down Date, payments to satisfy the obligations to employee participants pursuant to paragraph 1.b. will be drawn from Delphi's available cash.

2.    If, on the Permitted Draw Down Date, the Anticipated Liability (as defined below) is less than the Ceiling Amount, Delphi would be permitted to draw such funds out of the Segregated Account so that the balance remaining in the Segregated Account is equal to the Anticipated Liability.

a.    The "Final Election Date" would be the first of the month following the last day on which employees at any IUE-CWA-Delphi facility can make an election to participate in the pre-retirement program described in paragraph 1.b. of the IUE-CWA Special Attrition Program, or sooner if determined by the IUE-CWA-Delphi National Parties.

b.    The "Adequate Funding Date" would be the date on which the Ceiling Amount is greater than or equal to the Anticipated Liability.

c.    The "Anticipated Liability" would be an amount, calculated after the Final Election Date, sufficient to pay all of the remaining liabilities under paragraph 1.b.iii. of the IUE-CWA Special Attrition Program for all employees who have elected to participate in such program for the full remaining duration of such program. The Anticipated Liability would be

18

calculated based on the number of eligible employees, the remaining duration of the wage payments, and the applicable pay rates.

3.      The funds in the Segregated Account would be available to satisfy the obligations of paragraph 1.b. of the IUE-CWA Special Attrition Program and for no other purpose. The order approving the IUE-CWA Special Attrition Program would be required to specifically provide that under no circumstances (including but not limited to conversion of Delphi's chapter 11 cases to chapter 7 proceedings) would the assets in the Segregated Account be available to satisfy the claims of any party other than the employees. The IUE-CWA Special Attrition Program is, in its entirety, contingent on entry of an order which, to the satisfaction of the IUE-CWA and Delphi National Parties provides the protections described in paragraph 1.b.iv.3. of the IUE-CWA Special Attrition Program Agreement.

(d)      IUE-CWA-represented employees (except employees at the Gadsden, Alabama operations) who are active or on leave status would also be offered buyouts under the IUE-CWA Special Attrition Program Agreement to sever all ties with Delphi and GM, except vested pension benefits, on or by January 1, 2007. Such employees with ten or more years of seniority or credited service, whichever is greater, would be eligible for $140,000, employees with three but less than ten years of seniority or credited service, whichever is greater, would be eligible for $70,000, and employees with one but less than three years of seniority or credited service, whichever is greater, would be eligible for a buyout payment amount of $40,000, in each case, paid in a lump sum less withholdings (the "IUE-CWA Buyout Payments"). GM and Delphi would each pay one-half of the IUE-CWA Buyout Payments except for any payments made to participants who are employed at Delphi's New Brunswick operations, where previously agreed upon terms apply. Notwithstanding anything to the contrary in paragraph 3 of the IUE-CWA Special Attrition Program Agreement, GM would receive an allowed prepetition general unsecured claim against Delphi in the aggregate amount of all IUE-CWA Buyout Payments actually paid by GM pursuant to the IUE-CWA Special Attrition Program Agreement.

(e)      Employees electing option (a), (b), or (c) as described above in this paragraph or under the corresponding provisions of the New Brunswick Special Attrition Program dated May 25, 2006 (the "New Brunswick Special Attrition Program"), would be permitted to either retire from Delphi or, provided that they "check the box," transition to GM for purposes of retirement and receive other post-retirement benefits (i.e., health care coverage and lift insurance benefits) ("OPEB") from GM as any other GM IUE-CWA retiree; provided, however, that any health care coverage from GM would be as amended pursuant to the Health Care Discussions Agreement dated April 10, 2006, between GM and the IUE-CWA (the "Health Care Discussions Agreement"); provided further that employees who retire under option (a) prior to entry of the order entered by

19

this Court approving the IUE-CWA Special Attrition Program would not be permitted to "check the box." Any employees choosing option (c) above would be considered a Delphi employee until they retire. Employees checking the box who have 100% of their credited service in the Delphi HRP would receive 100% of their pension benefits from the Delphi HRP.

       (f)    GM agrees to assume and pay OPEB benefits to Delphi employees who "check the box" for purposes of retirement, and to pay the amounts due under paragraph 1.a.i. of the IUE-CWA Special Attrition Program Agreement. GM also agrees, in the event that Delphi reduces or eliminates health care or life insurance provided to employees participating in the Pre-Retirement Program and the New Brunswick Pre-Retirement Program (although Delphi shall provide the same healthcare and life insurance coverage to employees participating in such Programs that Delphi provides to its other active IUE-CWA employees), to subsidize such employees' health care and life insurance up to the level provided to active GM-IUE-CWA represented employees as provided in the GM-IUE-CWA Health Care Discussions Agreement. Any obligations assumed by GM with respect to OPEB or active health care and life insurance would be conclusively deemed to be prepetition general unsecured claims assertable by GM against the estate of Delphi under Delphi's general indemnity of GM under the Master Separation Agreement. Neither Delphi nor any of the Affiliate Debtors could object on any ground to the allowance of such claims for OPEB; provided, however, that Delphi and the Affiliate Debtors would reserve the right to object to the economic value of such claim (in the nature of assumptions such as discount rate, health care trend rates, mortality, other withdrawal rates, and current and future expected benefit plan design changes). This limited objection waiver applies toDelphi only, and not for other parties in interest, for which all rights are expressly reserved to object to the allowance of such claim under any grounds other than it was not assertable under the Master Separation Agreement.

       28.    Unlike the UAW, the IUE-CWA does not have flowback rights to GM.

Thus, the IUE-CWA Special Attrition Program differs from the UAW Special Attrition Program

in that there are no provisions for a certain number of Delphi IUE-CWA employees to flowback

to GM. Although the parties have relied, in part, on prepetition agreements to form the basis of

the IUE-CWA Special Attrition Program Agreement, the IUE-CWA Special Attrition Program

Agreement is a postpetition agreement, based on which GM is providing additional benefits to

the Debtors' estates on a postpetition basis. Although GM presumably will assert a claim related

to its postpetition agreement to pay the OPEB benefits of those IUE-CWA represented

employees who "check the box" and for any subsidies of health care or life insurance to

participants in the Pre-Retirement Program or New Brunswick Pre-Retirement Program, GM has

agreed to accept a general unsecured prepetition claim instead of an administrative expense

claim against Delphi.

29.     To address any concern regarding the funding of Delphi's obligations

under the pre-retirement program provisions of the IUE-CWA Special Attrition Program, as

described above, Delphi has agreed to establish a segregated account for payment of such

obligations in the amount of $12 million.  The parties have agreed, and the Debtors request that

any order approving the IUE-CWA Special Attrition Program Agreement provide that no other

party would have a claim on the Segregated Account.

30.     Importantly, the Debtors' obligations under the IUE-CWA Special

Attrition Program are subject to certain conditions precedent and acknowledgements, which will

ensure that the Debtors maintain needed flexibility to effectuate their transformation plan, while

sharing the costs arising on account of implementation of the IUE-CWA Special Attrition

Program.  Specifically, the following are conditions precedent to the Debtors' obligations and

acknowledgements under the IUE-CWA Special Attrition Program:

(a)     The IUE-CWA Special Attrition Program obligations are subject to
the approval of this Court.

(b)     Any obligations assumed by GM with respect to OPEB or active
health care and life insurance would be conclusively deemed to be comprehended by,
included within, and shall constitute a prepetition, general unsecured claims assertable by
GM against the estate of Delphi under Delphi's general indemnity of GM under the
Master Separation Agreement.  GM agrees to pay the amounts due under paragraph 1.a.i.
of the IUE-CWA Special Attrition Program and to pay 50% of the IUE-CWA Buyout
Payments due under paragraph 1.c. of the IUE-CWA Special Attrition Program (except
for any payments made to participants who are employed at or retired from Delphi New
Brunswick Operations, where previously agreed upon terms apply), as well as to assume
and pay OPEB payments to Delphi employees who "check the box" for purposes of
retirement.

21

(c)     The IUE-CWA Special Attrition Program would not be subject to abrogation or rejection without the mutual consent of the IUE-CWA, GM, and Delphi and, to the extent required by section 363(b) of the Bankruptcy Code, further order of the Bankruptcy Court, and the order obtained by the Bankruptcy Court by Delphi approving this Program would so provide.  The parties further agree (and the Bankruptcy Court order would also provide) that IUE-CWA Program is without prejudice to any party in interest in all other aspect of Delphi's chapter 11 cases, including by illustration, Delphi's and GM's respective positions in all commercial discussions and claims matters between them, all collective bargaining matters involving the parties, in any proceedings under sections 1113 and 1114 of the Bankruptcy Code with respect to IUE-CWA and under section 365 of the Bankruptcy Code with respect to GM's contracts with Delphi, in any pension termination proceeding under ERISA and/or the Bankruptcy Code, and all claims administration and allowance matters.

(d)     Nothing in the IUE-CWA Special Attrition Program, the Bankruptcy Court's approval of such Program, or the performance of any obligation under such Program would limit or otherwise modify (i) Delphi's rights under section 4041 of ERISA or (ii) Delphi's rights under sections 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed the IUE-CWA Special Attrition Program (including pre-existing obligations referenced within the IUE-CWA Special Attrition Program Agreement), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in the IUE-CWA Special Attrition Program Agreement) with levels of healthcare or other benefits as specified in pre-existing labor agreements.  Under no circumstances would Delphi freeze its pension plan covering IUE-CWA represented employees in a manner that prevents employees in the pre-retirement program described in paragraph 1.b. of the IUE-CWA Special Attrition Program Agreement or employees in the New Brunswick Special Attrition Program from receiving ongoing credited service sufficient to reach 30 years of credited service.  Delphi would provide the same healthcare and life insurance coverage to employees participating in paragraph 1.b. of the IUE-CWA Special Attrition Program Agreement and employees participating in the New Brunswick Special Attrition Program that it provides to its other active IUE-CWA employees; provided, however, that if Delphi reduces or eliminates such coverage provided to its active IUE-CWA employees, GM would subsidize such coverage provided to employees participating in paragraph 1.b. of the IUE-CWA Special Attrition Program Agreement or employees participating in the New Brunswick Special Attrition Program up to the level provided to GM-IUE-CWA active employees as provided in the GM-IUE-CWA Health Care Discussions Agreement. Except as otherwise expressly provided therein, nothing in the IUE-CWA Special Attrition Program Agreement would limit, expand, or otherwise modify the rights or obligations of any party under the Benefit Guarantee between GM and the IUE-CWA.

(e)     Nothing contained in the IUE-CWA Special Attrition Program Agreement, in the Bankruptcy Court's approval of this Program, or the performance of any obligation thereunder, would constitute an assumption of any agreement described

22

therein, including, without limitation (a) any collective bargaining agreement between the IUE-CWA and Delphi or (b) any agreement between GM and the Debtors, nor would anything therein, in the Bankruptcy Court's approval of this Program, or the performance of any obligation thereunder, be deemed to create or give rise to an administrative or priority claim with respect to, in favor of, or for the benefit of GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.

31.     Like those in the UAW Special Attrition Program and the UAW Supplement, these conditions precedent and acknowledgements are crucial elements of the IUE-CWA Special Attrition Program Agreement and Delphi would not have agreed to undertake its obligations under the IUE-CWA Special Attrition Program without the protections provided by these provisions.  Of particular importance, the Debtors insisted upon the addition of paragraphs 3.c. and 3.d. of the IUE-CWA Special Attrition Program Agreement (described above) providing that entry into the Agreement be without prejudice to the rights of the Debtors and all other parties in interest in all other aspects of these cases, including in the current proceedings under sections 1113 and 1114 of the Bankruptcy Code or in any pension termination proceeding under ERISA and/or the Bankruptcy Code.

32.     Like the UAW Special Attrition Program and the UAW Supplement, the IUE-CWA Special Attrition Program is another step in the Debtors' resolution of their labor issues, but, absent a consensual agreement with its unions and adequate financial or commercial support from GM, will not eliminate the need for Delphi to resume the contested 1113/1114 Motion on August 11, 2006.  The above-cited provisions of the IUE-CWA Special Attrition Program Agreement make clear that the Debtors retain the ability to proceed as they deem appropriate in resolving their remaining labor and legacy issues and the provisions are therefore critical to the parties' overall agreement to the terms of the IUE-CWA Special Attrition Program. Therefore, the Debtors respectfully request that the Court include provisions in any order

23

approving this Motion expressly approving the provisions of paragraphs 3.c. and 3.d. of the IUE-
CWA Special Attrition Program Agreement.  Moreover, although the Debtors doubt this to be
the case, if this Court harbors any belief or concern that the Debtors' ability to proceed with any
necessary or desirable motions in the Bankruptcy Court with respect to the Debtors' rights under
section 4041 of ERISA, or the Debtors' rights under section(s) 1113 and/or 1114 of the
Bankruptcy Code would be impaired in any way by the approval and implementation of the IUE-
CWA Special Attrition Program Agreement, then the relief requested in this Motion pertaining to
that Program should not be approved.

      33.     Although the Debtors cannot predict how many additional union-
represented employees will elect to participate, each individual event of attrition will result in
positive cash flow such that, depending upon the timing and demographics of the individuals
participating, the Debtors believe that the IUE-CWA Special Attrition Program may be cash flow
positive beginning in 2006 and would generate positive cash flow each year thereafter.  The
potential cash cost of the lump-sum payments to all eligible employees represented by IUE-
CWA electing to retire under the normal or voluntary provisions of the HRP would be borne by
GM.  Although the Debtors will be obligated to make certain payments to those IUE-CWA
employees electing to participate in the pre-retirement program or to receive IUE-CWA Buyout
Payments, implementation of the Hourly Attrition Programs is anticipated to generate positive
cash flow in 2006 as a result of the reductions in the Debtors' workforce and cost savings from
utilizing lower-rate employees.  Between 2006 and 2010, the Debtors expect to generate
substantial cost savings associated with the reduction in headcount provided by the IUE-CWA
Special Attrition Program and, in those instances in which replacements might be needed, as a

24

result of replacing IUE-CWA -eligible employees with other lower-cost temporary and competitive rate employees.

34.    It is important to note that GM will receive certain allowed prepetition general unsecured claims against Delphi, and will likely assert additional prepetition general unsecured claims related to obligations assumed and/or undertaken by GM as part of the Hourly Attrition Programs.  For example, under the Hourly Attrition Programs, GM would receive an allowed prepetition general unsecured claim against Delphi in the aggregate amount of the UAW and IUE-CWA Buyout Payments actually paid by GM.  In addition, GM would have the right to assert claims on account of certain obligations that it assumes under the IUE-CWA Special Attrition Program Agreement.  The Hourly Attrition Program Agreements expressly provide, however, that nothing therein would be deemed to create an administrative or priority claim with respect to GM or to convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party to the Agreement.  Further, entry into the Hourly Attrition Program Agreements do not prejudice the rights of any party in interest (including the Debtors, the Creditors' Committee, and the Equity Committee) with respect to, among other things, the administration, reconciliation, and ultimate allowance, if ever, of such assertable claims.  With certain exceptions, the Debtors believe that any claims that would be asserted by GM under the Hourly Attrition Programs would relate to claims that GM would have otherwise asserted against Delphi under certain other agreements between GM and Delphi even absent entry into the Hourly Attrition Programs.

35.    Although the Debtors have described above certain cash-flow positive aspects of the Hourly Attrition Programs, the Debtors also acknowledge that Delphi's minimum pension funding obligations would increase as a result of the IUE-CWA Special Attrition

Program.  Moreover, depending upon the number and mix of employees who elect to participate in the IUE-CWA Special Attrition Program, the Pension Benefit Guaranty Corporation's claim for unfunded benefit liabilities in the event of a potential termination of the HRP could also increase.  Nevertheless, the Debtors believe that the IUE-CWA Special Attrition Program constitutes another important step in implementing their transformation plan.

36.    In total, the Debtors believe that implementing the Hourly Attrition Programs, and the sharing of the costs of the Hourly Attrition Programs between Delphi and GM, will likely improve the Debtors' net cash flow in 2006 and each year thereafter in comparison to the status quo.  The Debtors intend to continue seeking a resolution of their remaining labor and legacy issues, preferably through a consensual agreement but, if necessary, through the continuation of litigated proceedings under federal law including sections 1113 and 1114 of the Bankruptcy Code.  The Debtors believe that this Court's approval of the remaining provisions of the Hourly Attrition Programs is clearly in the best interests of the Debtors, their estates and all parties-in-interest.

<u>Applicable Authority</u>

A.    Approval Of The UAW Supplement, And The
      <u>IUE-CWA Special Attrition Program Agreement</u>

37.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

38.    The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." <u>In re Orion Pictures Corp.</u>, 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The debtor has the burden of establishing a valid business purpose for the use of estate property outside the ordinary course of business. <u>Lionel</u>, 722 F.2d at 1070-71.  Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992).

39.    As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo.

1991)).

       40.      The Debtors' decreased production volumes, largely as a result of the

competitive U.S. vehicle production environment for domestic OEMs, have left or will leave the

Debtors significantly overstaffed and Delphi's restrictive labor agreements do not provide the

Debtors with the flexibility to react accordingly.  Moreover, the Debtors anticipate further

reductions in domestic OEM production volumes between now and 2010 which will further

exacerbate the Debtors' overstaffing if Delphi's labor agreements remain unchanged.

Specifically, under Delphi's uncompetitive labor agreements, except for a small minority of

newer employees who are not covered by the job security protections of the agreements, Delphi

cannot lay off employees except for temporary periods during which the employees are entitled

to supplemental unemployment benefits.  Following temporary layoff, excess employees are

placed in a "JOBS Bank" where they receive full pay and benefits.  Thus, even when lower-than-

expected volumes leave Delphi with more employees than needed to run its operations, Delphi

must nonetheless pay those employees.  Employees in a JOBS Bank or on temporary layoff cost

Delphi an estimated $346 million in 2005.

       41.      In addition, Delphi's high wages and benefits have helped perpetuate this

overstaffing.  When compared to other automotive parts suppliers – both union and non-union –

whose total labor costs average approximately $22 per hour, Delphi has a total hourly labor cost

that is approximately three times that of its peers.  Understandably, employers such as Delphi

which pay high compensation premiums tend to have lower voluntary employee attrition rates

and, thus, the Debtors' current labor overcapacity situation is unlikely to be resolved through

normal attrition.  Therefore, the Debtors have determined that it is in the best interests of the

Debtors, their creditors, and their estates to implement the UAW Supplement and the IUE-CWA

Special Attrition Program to address the Debtors' excess workforce and facilitate the Debtors'

necessary restructuring of their U.S. operational footprint.

       42.     As described above, the Hourly Attrition Programs will provide significant

benefits to the Debtors and their estates.  First, these Programs should facilitate the reduction of

the hourly workforce.  The Debtors expect to realize substantial cost savings associated with the

reduction in headcount provided by the UAW Supplement and the IUE-CWA Special Attrition

Program and as a result of replacing IUE-CWA-eligible employees with lower-cost temporary

and competitive rate employees, as needed.  Under the UAW Supplement, and the IUE-CWA

Special Attrition Program Agreement, GM and Delphi each would pay one-half of the UAW and

IUE-CWA Buyout Payments due (except for any IUE-CWA Buyout Payments made to

participants who are employed at Delphi's New Brunswick operations, where previously agreed

upon terms apply).

       43.     In addition, pursuant to the terms of the IUE-CWA Special Attrition

Program Agreement, GM will share a significant portion of the costs associated with this

Program, including the assumption of Delphi's outstanding OPEB obligations related to Delphi

employees who "check the box" under the Program.  As noted above, however, GM will likely

assert claims against Delphi's estate related to obligations assumed by GM as part of the IUE-

CWA Special Attrition Program and the Debtors' underfunded pension liabilities will increase as

a result of implementation of the IUE-CWA Special Attrition Program.  Nevertheless, in sum,

the Debtors estimate that the Debtors will achieve net positive cash flow in 2006 and thereafter

as a result of the IUE-CWA Special Attrition Program.  Additionally, GM has agreed to accept

general, unsecured claims for claims related to the IUE-CWA Special Attrition Program, even though GM otherwise would presumably be entitled to file administrative expense claims for the postpetition benefits that it has agreed to provide to the Debtors under the IUE-CWA Special Attrition Program.

44.    The Debtors will also realize significant operational benefits as a result of implementation of the Hourly Attrition Programs.  Approval of the UAW Supplement and the IUE-CWA Special Attrition Program should help address the concerns of many of the Debtors' hourly employees relating to their personal options in the event of potential rejection of labor agreements and modification of retiree benefits.  The Hourly Attrition Programs should therefore contribute to a more stable environment for a consensual resolution of the Debtors' remaining labor and legacy issues with the UAW and IUE-CWA.  By doing so, implementation of the Hourly Attrition Programs should also ameliorate concerns expressed by many of the Debtors' customers and suppliers regarding an unstable labor and production environment, thus improving the opportunities for the Debtors to win new forward revenue commitments from the Debtors' customers and maintain (and improve) trade relationships (and trade terms) with the Debtors' suppliers.  Although the Debtors' implementation of the UAW Supplement and the IUE-CWA Special Attrition Program address only certain key elements in the Debtors' overall effort to transform the Debtors' current uncompetitive U.S. cost structure, it would allow the Debtors to make continued progress toward the Debtors' restructuring.  Therefore, the Debtors respectfully request that this Court authorize the Debtors to implement (a) the UAW Supplement, and (b) the IUE-CWA Special Attrition Program.

B.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

45.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Courts in this district have waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr.P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring a demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(g)).  In general, courts will grant waivers when doing so is important to the debtor's financial health.  See In re Second Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004) (affirming decision waiving ten-day stay because "time was of the essence"); In re Decora Industries, Inc., Case No. 00-4459 (JJF), 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate closing is required to remedy Debtors' precarious financial and business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

46.    As described above, the Debtors believe that implementation of the UAW Supplement, and the IUE-CWA Special Attrition Program are important steps in enabling Delphi to transform its workforce from legacy wages and benefits to a competitive labor cost structure, by accelerating necessary attrition and reducing the uncertainties and concerns over the impact of a negotiated consensual resolution, or in the alternative, a potential rejection of labor agreements and modification of retiree benefits.  By creating soft landings for the majority of Delphi's hourly employees, the Debtors believe that the implementation of the Hourly Attrition Programs will

31

create a more favorable environment for reaching consensual resolution with the Debtors' major

unions.  Given the current stance of the Debtors' negotiations with GM and their major unions

over the Debtors' labor cost issues and the 1113/1114 Motion, the Debtors believe that it is

crucial that the Debtors have the ability to begin implementing the UAW Supplement and the

IUE-CWA Special Attrition Program immediately upon entry of an order granting approval

thereof, and that a waiver of the ten-day stay provided by Bankruptcy Rule 6004 will therefore

benefit the Debtors and all parties in interest.

Memorandum Of Law

47.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE the Debtors respectfully request that the Court (a) authorize

Delphi to enter into (i) the UAW Supplement, and (ii) the IUE-CWA Special Attrition Program

Agreement, and to implement the IUE-CWA Special Attrition Program, (b) expressly approve

the provisions of paragraphs 1.b.iv.3., 3.b., 3.c. and 3.d. of the IUE-CWA Special Attrition

Program Agreement, and (c) grant the Debtors such other and further relief as is just.

Dated:          New York, New York
                June 19, 2006
                                        SKADDEN, ARPS, SLATE, MEAGHER
                                          & FLOM LLP


                                        By:  /s/ John Wm. Butler, Jr.
                                             John Wm. Butler, Jr. (JB 4711)
                                             John K. Lyons (JL 9331)
                                             Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois 60606
                                        (312) 407-0700

                                              - and -


                                        By:  /s/ Kayalyn A. Marafioti
                                             Kayalyn A. Marafioti (KM 9632)
                                             Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                          Debtors and Debtors-in-Possession

33

## **Exhibit A**

**Proposed Special Attrition Programs Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :
        In re                        :     Chapter 11
                                  :
    DELPHI CORPORATION, <u>et al.</u>,     :     Case No. 05-44481 (RDD)
                                  :
                Debtors.     :     (Jointly Administered)
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004
APPROVING (I) SUPPLEMENT TO UAW SPECIAL ATTRITION
<u>PROGRAM, AND (II) IUE-CWA SPECIAL ATTRITION PROGRAM</u>

("HOURLY SPECIAL ATTRITION PROGRAMS ORDER NO. 2")

        Upon the motion, dated June 19, 2006 (the "Motion"), of Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (each, a "Debtor," and collectively, the "Debtors"), for an order (the

"Order") under 11 U.S.C. § 363(b) and Rule 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") (a) approving and authorizing the Debtors to enter into (i) the

Supplement (the "UAW Supplement") to the UAW-GM-Delphi Special Attrition Program

Agreement by and among Delphi, GM, and the UAW dated March 22, 2006 (the "UAW Special

Attrition Program Agreement"), and (ii) the Agreement by and among Delphi, GM, and the IUE-

CWA governing the IUE-CWA Special Attrition Program (the "IUE-CWA Special Attrition

Program Agreement"), (b) authorizing the Debtors to implement the terms of (i) the UAW

Supplement, and (ii) the IUE-CWA Special Attrition Program Agreement, (c) approving the

provisions set forth in paragraphs 1.b.iv.3., 3.b., 3.c. and 3.d. of the IUE-CWA Special Attrition

Program Agreement (<u>provided</u>, <u>however</u>, that such express approval thereof shall not be deemed

to limit in any way this Court's approval of any other provisions of the IUE-CWA Special

Attrition Program Agreement); and this Court having determined that the relief requested in the

Motion is in the best interests of the Debtors, their estates, their creditors, and other parties-in-

interest; and it appearing that proper and adequate notice of the Motion has been given and that

no other or further notice is necessary; and after due deliberation thereon; and good and

sufficient cause appearing therefor, it is hereby

        ORDERED, ADJUDGED, AND DECREED THAT:

        1.      The Motion is GRANTED.

        2.      The Debtors are hereby authorized to enter into the UAW Supplement,

attached hereto as Exhibit 1, and to implement the terms of such UAW Supplement.

        3.      The Debtors are hereby authorized to enter into the IUE-CWA Special

Attrition Program Agreement, attached hereto as Exhibit 2, and to implement the terms of such

IUE-CWA Special Attrition Program Agreement.  For the avoidance of doubt, the IUE-CWA

Special Attrition Program shall be applicable to Delphi's IUE-CWA-represented hourly

employees employed at the Debtors' facility located in New Brunswick, New Jersey, only to the

extent specified in the IUE-CWA Special Attrition Program Agreement and the IUE-CWA –

Delphi Memorandum of Agreement Regarding The Sale Of Delphi New Brunswick Operations

and Special Attrition Program.

        4.      Each of the signatories to the UAW Supplement and the IUE-CWA

Special Attrition Program Agreement (each such party, a "Signatory," and collectively, the

"Signatories") is directed to take all actions necessary or appropriate to effectuate the terms of

this Order and the terms of their respective agreement, including, without limitation, any and all

actions necessary or appropriate to its implementation of and performance under such agreement.

2

5.        With respect to payment by the Debtors of gross monthly wages to those employees who participate in the voluntary pre-retirement program as provided by paragraph 1.b. of the IUE-CWA Special Attrition Program Agreement, Delphi shall establish a segregated bank account (the "IUE-CWA Segregated Account") that shall be funded in the amount of $12 million. The funds in the IUE-CWA Segregated Account shall be available to satisfy the obligations of paragraph 1.b. of the IUE-CWA Special Attrition Program Agreement and for no other purpose. Under no circumstances (including but not limited to conversion of the Debtors' chapter 11 cases to chapter 7 cases) shall the assets in the IUE-CWA Segregated Account be available to satisfy the claims of any party other than the employees except as otherwise specifically provided in the IUE-CWA Special Attrition Program Agreement.  Delphi shall be entitled to withdraw funds from the IUE-CWA Segregated Account as and when provided by the terms of paragraph 1.b.iv. of the IUE-CWA Special Attrition Program Agreement.  Upon withdrawal pursuant to the terms of paragraph 1.b.iv. of the IUE-CWA Special Attrition Program Agreement, the Debtors' use of such funds shall no longer be restricted by the terms of the IUE-CWA Special Attrition Program Agreement.

6.        The IUE-CWA Special Attrition Program Agreement shall not be subject to abrogation, modification, or rejection without the mutual consent of the Signatories.  The IUE-CWA Special Attrition Program Agreement and, this Court's approval of such agreement, or the performance of any obligation thereunder are each without prejudice to any party-in-interest (including the Signatories, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and the Official Committee of Equity Security Holders (the "Equity Committee") in all other aspects of the Debtors' chapter 11 cases, including, by illustration, the Debtors' and GM's respective positions in all commercial discussions and claims matters between them, all

3

collective bargaining matters involving the parties, in any potential proceedings under sections 1113 and/or 1114 of the Bankruptcy Code with respect to the IUE-CWA, under section 365 of the Bankruptcy Code with respect to GM's contracts with the Debtors, in any pension termination proceeding under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and/or the Bankruptcy Code, and all claims administration and allowance matters.

       7.       Nothing in the IUE-CWA Special Attrition Program Agreement, this Court's approval of such agreement, or the performance of any obligation thereunder, shall limit or otherwise modify (a) the Debtors' rights under Section 4041 of ERISA or (b) the Debtors' rights under section(s) 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed the IUE-CWA Special Attrition Program Agreement (including pre-existing obligations referenced within such agreement), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in the IUE-CWA Special Attrition Program Agreement) with levels of healthcare or other benefits as specified in pre-existing labor agreements.  Under no circumstances shall the Debtors freeze any pension plan covering IUE-CWA-represented employees in a manner that prevents such employees in the pre-retirement program described in either paragraph 1.b. of the IUE-CWA Special Attrition Program Agreement or in the New Brunswick Special Attrition Program dated May 25, 2006 (the "New Brunswick Special Attrition Program") from receiving on-going credited service sufficient to reach 30 years of credited service.  The Debtors shall provide the same healthcare and life insurance coverage to employees participating in paragraph 1.b. of the IUE-CWA Special Attrition Program Agreement and employees participating in the New Brunswick Special

4

Attrition Program that they provide to their other active IUE-CWA employees; provided,

however, that if the Debtors reduce or eliminate such coverage provided to their active IUE-

CWA employees, GM shall subsidize such coverage provided to employees participating in

paragraph 1.b. of the IUE-CWA Special Attrition Program Agreement and employees

participating in the New Brunswick Special Attrition Program up to the level provided to GM-

IUE-CWA active employees, respectively, as provided in the Health Care Discussions

Agreement dated April 10, 2006 between GM and the IUE-CWA.

        8.      Subject to paragraph 10 below, GM may conclusively assert a prepetition

general unsecured claim with respect to (x) OPEB obligations it assumes under paragraph 2 of

the IUE-CWA Special Attrition Program Agreement (excluding, for avoidance of doubt,

incentive payments made by GM to any Delphi employee under paragraph 1.a.i. of the IUE-

CWA Special Attrition Program Agreement) and (y) active health care and life insurance

obligations it assumes under paragraph 3.d. thereof against the estate of Delphi Corporation

under and/or within Delphi's general indemnity of GM under the Master Separation Agreement.

GM has agreed to assume and pay OPEB payments to Delphi employees who "check the box"

for purposes of retirement, and to pay the amounts due under paragraph 1.a.i. of the IUE-CWA

Special Attrition Program Agreement.  GM is hereby granted an allowed prepetition general

unsecured claim against Delphi in the aggregate amount of all payments actually paid by GM

pursuant to paragraph 2. of the UAW Supplement and paragraph 1.c. of the IUE-CWA Special

Attrition Program Agreement (collectively, "GM Buyout Payments").  For the avoidance of

doubt, any OPEB obligations or active health and life insurance obligations that GM assumes as

a result of paragraph 1. of the UAW Supplement shall give rise to claims under and subject to the

terms of the UAW Special Attrition Program Agreement (including, without limitation,

paragraph 7. thereof) and the amended order approving the UAW Special Attrition Program

Agreement (including, without limitation, paragraphs 8 and 10 thereof).  Except as provided in

this paragraph, GM may not assert any claim against any of the Debtors on account or in respect

of its obligations or performance under the UAW Supplement, or the IUE-CWA Special

Attrition Program Agreement.

         9.     Nothing contained in the IUE-CWA Special Attrition Program Agreement,

in this Court's approval of such agreement, or the performance of any obligation thereunder,

shall constitute an assumption of any agreement described therein, including without limitation

(a) any collective bargaining agreement between the IUE-CWA and the Debtors or (b) any

agreement between GM and the Debtors, nor shall anything in the UAW Supplement or the IUE-

CWA Special Attrition Program Agreement, in this Court's approval of such agreements or the

performance of any obligation thereunder, be deemed to create or give rise to an administrative

or priority claim with respect to, in favor of, or for the benefit of GM or convert a prepetition

claim into a postpetition claim or an administrative expense with respect to any party.

         10.    For the avoidance of doubt, nothing in the Motion, the UAW Supplement,

the IUE-CWA Special Attrition Program Agreement, this Court's approval of such agreements,

the performance of any obligation thereunder, or any other document shall prejudice the right of

any party-in-interest (including, without limitation, the Debtors, the Creditors' Committee, and

the Equity Committee) to challenge the allowability, amount, or priority of any claims asserted

by GM (including, without limitation, all defenses, objections, offsets, counterclaims, bases for

disallowance, subordination or recharacterization, all avoidance rights under chapter 5 of the

Bankruptcy Code, and all remedies with respect thereto), except that (i) GM's claims, if any, with

respect to OPEB obligations assumed under paragraph 2 of the IUE-CWA Special Attrition

6

Program Agreement or active health care and life insurance obligations assumed under paragraph

3.d. of the IUE-CWA Special Attrition Program Agreement shall not be subject to objection on

the basis that the claims were not assertable under Delphi's general indemnity of GM under the

Master Separation Agreement and (ii) GM's claims with respect to GM Buyout Payments are

allowed as provided in paragraph 8 hereof and shall not be subject to any objection by any party

for any reason.  Notwithstanding the foregoing, neither Delphi nor any of the other Debtors may

object on any grounds to the allowance of GM's claims, if any, with respect to OPEB obligations

assumed under paragraph 2 of the IUE-CWA Special Attrition Program Agreement; provided,

however, that all of the Debtors reserve the right to object to the economic value of such claims

(in the nature of assumptions such as discount rate, health care trend rates, mortality, other

withdrawal rates, and current and future expected benefit plan design changes).  Except as

expressly provided above in this paragraph 10 and except with respect to clause (ii) of the first

sentence of this paragraph 10, GM's claims remain subject to defenses under the Master

Separation Agreement or on any other ground.  GM may not assert any claim of any kind arising

under or relating to the UAW Supplement or the IUE-CWA Special Attrition Program

Agreement against any Debtor other than Delphi, and the foregoing exception shall not impair

any right or remedy that may exist with respect to the enforceability or avoidability of any such

agreement.  Further, nothing in the Motion, the UAW Supplement, the IUE-CWA Special

Attrition Program Agreement, this Court's approval of any such agreements, the performance of

any obligation thereunder, or any other document shall prejudice any right or remedy of any

Debtor against any other Debtor with respect to the allocation of Delphi's obligations under

either of these agreements or claims asserted against Delphi thereunder, all of which rights are

expressly preserved.

11.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation and performance of this Order and the UAW Supplement and the IUE-CWA Special Attrition Program Agreement, and over each of the Signatories in connection therewith; provided, however, that the Court's jurisdiction shall not extend to any bilateral agreements of (i) the UAW and GM, or (ii) the IUE-CWA and GM.

12.     Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure or any other Bankruptcy Rule, this Order shall take effect immediately upon its entry.

13.     The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
       June ___, 2006


_____
UNITED STATES BANKRUPTCY JUDGE

8

## Exhibit 1

**June 5, 2006 Supplement To UAW-GM-Delphi
Special Attrition Program Agreement Dated March 22, 2006**

June 5, 2006

**SUPPLEMENT TO**
**UAW-GM-DELPHI SPECIAL ATTRITION PROGRAM AGREEMENT**
**DATED MARCH 22, 2006**

Delphi, GM and the UAW agree on the following supplement (the "Supplement") to the Special
Attrition Program dated March 22, 2006, and the administrative clarifications dated March 27, 2006 (the
"Program"):

1. Paragraph 3.b of the Program is supplemented to make available to employees with at least 26 years
   of credited service but less than 27 years of credited service regardless of age special voluntary
   placement in a pre-retirement program. The gross monthly wages while in the program will be
   $2,750. The "Ceiling Amount" of $75 million referenced in Paragraph 3.b.iv of the Program will be
   increased to $90 million. All of the remaining terms of the Program shall apply.

2. In addition to existing Program options, GM, Delphi and the UAW agree that Delphi employees will
   be offered buyouts to sever all ties with Delphi and GM except vested pension benefits. Employees
   will only be eligible to elect one option under the UAW Special Attrition Program Agreement or this
   Supplement. Employees with 10 or more years of seniority or credited service, whichever is greater,
   are eligible for $140,000 and traditional employees with less than 10 years seniority are eligible for
   $70,000 (the "Buyout Payments"), less withholdings. Employees hired under the Supplemental New
   Hire Agreement prior to March 22, 2006 are eligible for a Buyout Payment amount prorated to
   $40,000, less withholdings. GM and Delphi will each pay one-half the buyout amounts due under
   this Paragraph 2. Notwithstanding paragraph 7 of the Program, GM will receive an allowed
   prepetition general unsecured claim in the aggregate amount of all Buyout Payments actually paid by
   GM pursuant to the Program.

3. These expanded options will be offered on a nation-wide basis expeditiously. The application period
   for these expanded options, timing of the pre-retirement program and buyouts and the release dates
   will be determined by the joint UAW-Delphi National Parties but in any event no later than January
   1, 2007.

4. All of the remaining provisions of the Program as approved by the U.S. Bankruptcy Court for the
   Southern District of New York ("the Court") are affirmed.

5. The effectiveness of all terms and conditions of this Supplement are conditioned on approval of the
   Supplement by the Court pursuant to entry of an order that is satisfactory to each of Delphi, GM and
   the UAW and which provides for the allowance of GM's claim as described in Paragraph 2 above.

General Motors Corporation          Delphi Corporation          International Union, UAW

General Motors Corporation          Delphi Corporation          International Union, UAW

General Motors Corporation          Delphi Corporation          International Union, UAW

Date:  6/5/06

**<u>Exhibit 2</u>**

**IUE-CWA-GM-Delphi Special Attrition Program
Agreement Dated June 16, 2006**

IUE-CWA-GM-DELPHI
SPECIAL ATTRITION PROGRAM

Due to the extraordinary circumstances in the domestic auto industry and the Delphi bankruptcy, the parties agree to the following special one-time program ("The Program"):

1) Delphi and the IUE-CWA agree on the following Special Attrition Program for Delphi employees who are participants in the Delphi Hourly-Rate Employees Pension Plan ("Delphi HRP"):

   a) An attrition program will be run for Delphi employees as follows:
      i) $35,000 for normal or early voluntary retirement retroactive to October 1, 2005.
      ii) 50 & 10 Mutually Satisfactory Retirement (MSR).
      Provisions 1.ai and 1.aii will apply to employees who are eligible to retire by or on January 1, 2007. Employees will be allowed to retire when their services are no longer required but in any event no later than January 1, 2007.

   b) Any employee with at least 26 and less than 30 years of credited service regardless of age will be eligible for special voluntary placement in a pre-retirement program under the following terms:
      i) Employees electing this pre-retirement program must be eligible no later than July 1, 2006.
      ii) Employees will retire without additional incentives when they first accrue 30 years of credited service under the provisions of the Delphi HRP.
      iii) The gross monthly wages while in the program will be:
         (1) 29 years credited service     $2,900
         (2) 28 years credited service     $2,850
         (3) 27 years credited service     $2,800
         (4) 26 years credited service     $2,750
      Wages will be paid weekly on an hourly basis (2,080 hours per year) and will remain at that rate until 30 years of credited service is accrued. Employees electing this program will be treated the same as protected status employees with the following exceptions: (1) not eligible for Cost of Living Allowance (COLA); and (2) not eligible for vacation pay except as was earned and unpaid prior to the commencement of this Pre-Retirement Program. For purposes of pension benefits, the Benefit Class Code will be determined using the twenty-four month look back period as specified in Appendix A of the Delphi HRP, with said period starting from the last day worked prior to the commencement of the pre-retirement program. For purposes of life insurance, the amount of life insurance will be based on the base rate as of the last day worked prior to the commencement of the pre-retirement program.
      iv) Within ten (10) business days after the first date on which any employees are eligible to receive wage payments in accordance with Paragraph 1.b.iii above, Delphi will establish a segregated payment account (the "Account") in the amount of $12 million (the "Ceiling Amount"). The funds in the Account will be available to reimburse Delphi for the payment of weekly wage payments (which will be paid through Delphi's normal payroll process) under Paragraph 1.b.iii. above or for direct wage payments to employees entitled to receive such payments, as described in this Paragraph.
         1. Delphi shall not draw funds from the Account for purposes of this Paragraph until a date (the "Permitted Draw Down Date"), which shall be the later of the Final Election Date or the Adequate Funding Date

(see definitions below).  Prior to the Permitted Draw Down Date, payments to satisfy the obligations to employee participants pursuant to this Paragraph will be drawn from Delphi's available cash.

2. If, on the Permitted Draw Down Date, the Anticipated Liability is less than the Ceiling Amount, Delphi shall be permitted to draw such funds out of the Account so that the balance remaining in the Account is equal to the Anticipated Liability.

   The Final Election Date shall be the first of the month following the last day on which employees at any IUE-CWA-Delphi facility can make an election to participate in the pre-retirement program described in Paragraph 1.b., or sooner if determined by the IUE-CWA-Delphi National Parties.

   The Adequate Funding Date shall be the date on which the Ceiling Amount is greater than or equal to the Anticipated Liability.

   The Anticipated Liability shall be an amount, calculated after the Final Election Date, sufficient to pay all of the remaining liabilities under Paragraph 1.b.iii. for all employees who have elected to participate in such program for the full remaining duration of such program.  The Anticipated Liability shall be calculated based on the number of eligible employees, the remaining duration of the wage payments, and the applicable pay rates.

3. The funds in the Account shall be available to satisfy the obligations of this Paragraph and for no other purpose.  The Bankruptcy Court order approving the Program shall specifically provide that under no circumstances (including but not limited to conversion of Delphi's Chapter 11 cases to Chapter 7 proceedings) shall the assets in the Account be available to satisfy the claims of any party other than the employees.  This Program is, in its entirety, contingent on entry of an order which, to the satisfaction of the IUE-CWA and Delphi National Parties provides the protections described in this Paragraph.

c) Delphi employees who are active or on leave status will be offered lump sum buyouts to sever all ties with Delphi and GM except vested pension benefits (exclusive of supplements) on a date no later than January 1, 2007. Employees (except employees at the Gadsden, Alabama operations) with 10 or more years of seniority or credited service, whichever is greater, are eligible for $140,000; employees with three (3) but less than 10 years seniority or credited service, whichever is greater, are eligible for $70,000; and employees with one (1) but less than three (3) years of seniority or credited service, whichever is greater, are eligible for $40,000 (the "Buyout Payments"), paid in lump sum, less withholdings.  Delphi and GM will each pay one-half of the Buyout Payments due under this paragraph 1.c. Notwithstanding paragraph 3 below, GM will receive an allowed prepetition general unsecured claim in the aggregate amount of all Buyout Payments actually paid by GM pursuant to the Program.

d) The application period, timing of retirements and buyouts, release dates, and number of sign-up dates will be determined by Delphi based upon staffing considerations. These dates may vary by location. In no event will the application period extend beyond 45 days from the agreed upon roll-out date for the Program unless mutually agreed by the Delphi-IUE-CWA National Parties.

e) All participants will be required to sign a release of all claims against Delphi and GM, except workers' compensation claims.

f) An employee may only select one of the options described in subparagraphs 1.a.i, 1.a.ii., 1.b and 1.c hereof.

2) GM, the IUE-CWA and Delphi agree that any employee electing to retire under option 1.a.i , 1.a.ii., or 1.b. above or under the New Brunswick Special Attrition Program dated May 25, 2006 (the "New Brunswick SAP") will be permitted to either retire from Delphi or, provided they "check the box", transition to GM for purposes of retirement and receive other post-retirement benefits (i.e., health care coverage and life insurance benefits) from GM as any other GM IUE-CWA retiree; provided, however that any health care coverage from GM will be as amended pursuant to the Health Care Discussions Agreement dated April 10, 2006 between GM and the IUE-CWA (the "Health Care Discussions Agreement"); provided further that employees who retire under option 1.a.i prior to entry of the order described in subparagraphs 1.b.iv.3 and 3.a hereof will not be permitted to "check the box." Any employee choosing option 1.b. above will be considered a Delphi employee until they retire. Employees checking the box who have 100% of his/her credited service in the Delphi HRP will receive 100% of their pension benefit from the Delphi HRP. Notwithstanding paragraph 3 below, any obligations assumed by GM under the "check the box" provisions of this paragraph shall be conclusively deemed to be comprehended by, included within, and shall constitute a prepetition, general unsecured claim assertable by GM against the estate of Delphi Corporation under Delphi's general indemnity of GM under the Master Separation Agreement. Neither Delphi Corporation nor any of its debtor affiliates may object on any grounds to the allowance of such claim; provided, however, that Delphi Corporation and any of its debtor affiliates reserve the right to object to the economic value of such claim (in the nature of assumptions such as discount rate, health care trend rates, mortality, other withdrawal rates and current and future expected benefit plan design changes). This limited objection waiver applies to Delphi, only, and not for other parties in interest, for which all rights are expressly reserved to object to the allowance of such claim under any grounds other than it was not assertable under the Master Separation Agreement.

3) The parties acknowledge the following matters regarding the Special Attrition Program:

a) Delphi's participation in this Program is subject to the approval of the U.S. Bankruptcy Court; which approval Delphi will seek promptly at the June 29, 2006 omnibus hearing should this Program be finalized in time for Delphi to file a motion on ten days notice without objection from the Creditors Committee or as otherwise permitted by the Case Management Order in Delphi's Chapter 11 cases. In the event such participation is not allowed by the Bankruptcy Court, no party will have any obligations under this Program. GM's obligations in respect of the Program are subject to approval of the Program by the U.S. Bankruptcy Court pursuant to entry of an order that provides for the allowance and/or treatment of GM's claims as described in this Program and is otherwise reasonably satisfactory to GM, Delphi and the IUE-CWA based on the prior special attrition program order approved in Delphi's chapter 11 cases.

b) For the avoidance of doubt, any obligations assumed by GM under this Program with respect to OPEB under Paragraph 2 above or active health care and life insurance under 3.d below shall be conclusively deemed to be comprehended by, included within, and shall constitute a prepetition, general unsecured claim assertable by GM against the estate of Delphi Corporation under Delphi's general indemnity of GM under the Master Separation Agreement. GM agrees to pay the amounts due under Paragraph 1.a.i above and to pay 50% of the aggregate amounts due under Paragraph 1.c above (except for any payments made to participants who are employed at or retired from Delphi New Brunswick Operations), as well as to assume and pay OPEB payments to Delphi employees who "check the box" for purposes of retirement.

c) This Program shall not be subject to abrogation, modification or rejection without the mutual consent of the IUE-CWA, GM and Delphi and the order obtained in the Bankruptcy Court by Delphi approving this Program shall so provide. The parties further agree (and the Bankruptcy Court order shall also provide) that this Program is without prejudice to any party-in-interest (including the parties to this Program and the official statutory committees appointed Delphi's chapter 11 cases) in all other aspects of Delphi's Chapter 11 cases, including by illustration, Delphi's and GM's respective positions in all commercial discussions and claims matters between them, all collective bargaining matters involving the parties, in any proceedings under Sections 1113 and/or 1114 of the Bankruptcy Code with respect to the IUE-CWA and under Section 365 of the Bankruptcy Code with respect to GM's contracts with Delphi, in any pension termination proceeding under ERISA and/or the Bankruptcy Code, and all claims administration and allowance matters.

d) Nothing in this Program, the Bankruptcy Court's approval of such Program, or the performance of any obligation hereunder, shall limit or otherwise modify (a) Delphi's rights under Section 4041 of ERISA, or (b) Delphi's rights under Section 1113 and/or 1114 of the Bankruptcy Code with regard to any obligations which pre-existed this Program (including pre-existing obligations referenced within this agreement), such as (by way of illustration only) the obligation to maintain the hourly pension plan or provide retirees or active employees (including employees/retirees participating in the attrition programs contained in this Program) with levels of healthcare or other benefits as specified in pre-existing labor agreements. Under no circumstances shall Delphi freeze its pension plan covering IUE-CWA represented employees in a manner that prevents employees in the pre-retirement program described in paragraph 1.b. above or in the New Brunswick SAP from receiving on-going credited service sufficient to reach 30 years of credited service. Delphi shall provide the same healthcare and life insurance coverage to employees participating in paragraph 1.b. or in the New Brunswick SAP that it provides to its other active IUE-CWA employees; provided, however, that if Delphi reduces or eliminates such coverage provided to its active IUE-CWA employees, GM shall subsidize such coverage provided to employees participating in paragraph 1.b. above or in the New Brunswick SAP up to the level provided to GM-IUE-CWA active employees as provided in the GM-IUE-CWA Health Care Discussions Agreement. Except as otherwise expressly provided herein, nothing in this Program shall limit, expand or otherwise modify the rights or obligations of any party under the Benefit Guarantee between GM and the IUE-CWA.

e) Nothing contained herein, in the Bankruptcy Court's approval of this Program, or the performance of any obligation hereunder, shall constitute an assumption of any agreement described herein, including, without limitation (a) any collective bargaining agreement between the IUE-CWA and Delphi or (b) any agreement between GM and Delphi, nor shall anything herein, in the Bankruptcy Court's approval of this Program, or the performance of any obligation hereunder, be deemed to create or give rise to an

administrative or priority claim with respect to, in favor of, or for the benefit of GM or convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party.

_____
Delphi Corporation

_____
Delphi Corporation

_____
General Motors Corp.

_____
General Motors Corp

_____
International Union, IUE-CWA

_____
.Internationl Union, IUE-CWA

Date: June 16, 2006