IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :
In re                               :    Chapter 11
                                           :
DELPHI CORPORATION, et al.,       :    Case No. 05-44481 (RDD)
                                           :
                    Debtors.    :    (Jointly Administered)
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

      I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

      On June 15, 2006, I caused to be served the documents listed below upon the parties listed on Exhibit A hereto via overnight delivery:

    1)   Ex Parte Motion to File Redacted Version of Debtors' Omnibus Response to Objections to Objections to Debtors' Motion for Order Under 11 U.S.C. § 365 and Fed.R.Bankr.P. 6006 Authorizing Rejection of Certain Executory Contracts with General Motors Corporation and to File Related Exhibits Under Seal (Docket No. 4202) [a copy of which is attached hereto as Exhibit B]

    2)   Debtors' Omnibus Response to Objections to Debtors' Motion for Order Under 11 U.S.C. § 365 and Fed.R.Bankr.P. 6006 Authorizing Rejection of Certain Executory Contracts with General Motors Corporation (Docket No. 4203) [a copy of which is attached hereto as Exhibit C]

    3)   Debtors' Corrected Objection to Motion of Cindy Palmer, Personal Representative of Estate of Michael Palmer, Deceased, for Relief from Automatic Stay (Docket No. 4219) [a copy of which is attached hereto as Exhibit D]

      On June 15, 2006, I caused to be served the documents listed below upon the parties listed on Exhibit E hereto via overnight delivery:

    4)   Ex Parte Motion to File Redacted Version of Debtors' Omnibus Response to Objections to Debtors' Motion for Order Under 11 U.S.C. § 365 and Fed.R.Bankr.P. 6006 Authorizing Rejection of Certain Executory Contracts with General Motors Corporation and to File Related Exhibits Under Seal (Docket No. 4202) [a copy of which is attached hereto as Exhibit B]

    5)   Debtors' Omnibus Response to Objections to Debtors' Motion for Order Under 11 U.S.C. § 365 and Fed.R.Bankr.P. 6006 Authorizing Rejection of

Certain Executory Contracts with General Motors Corporation (Docket No. 4203) [a copy of which is attached hereto as Exhibit C]

On June 15, 2006, I caused to be served the documents listed below upon the parties listed on Exhibit F hereto via overnight delivery:

6) Debtors' Corrected Objection to Motion of Cindy Palmer, Personal Representative of Estate of Michael Palmer, Deceased, for Relief from Automatic Stay (Docket No. 4219) [a copy of which is attached hereto as Exhibit D]

Dated: June 20, 2006

_/s/ Evan Gershbein_____
Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 20th day of June, 2006, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature : ___/s/ Amy Lee Huh_____

Commission Expires: ___3/15/09_____

# EXHIBIT A

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brandes Investment Partners LP | Ted Kim | 11988 El Camino Real | Suite 500 | San Diego | CA | 92103 | | | | Equity Security Holders Committee Member |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| DC Capital Partners LP | Douglas L. Dethy | 800 Third Avenue | 40th Floor | New York | NY | 10022 | | | | Equity Security Holders Committee Member |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2670 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com slivin@ffhsj.com | Proposed Counsel to Equity Security Holders Committee |
| James E Bishop Sr | | 502 Shiloh Dr | No 9 | Laredo | TX | 78045 | | | | Equity Security Holders Committee Member |
| James H Kelly | | 517 Lost Angel Rd | | Boulder | CO | 80302 | | | | Equity Security Holders Committee Member |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Luqman Yacub | | PO Box 1026 | | Hartville | OH | 44632 | | | | Equity Security Holders Committee Member |
| Pardus European Special Opportunities Master Fund LP | Joseph R Thornton | Pardus Capital Management LP | 1101 Avenue of the Americas Suite 1100 | New York | NY | 10018 | | | | Equity Security Holders Committee Member |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Trustee of the Koury Family Trust | James N Koury | 410 Reposado Dr | | La Habra Heights | CA | 90631 | | | | Equity Security Holders Committee Member |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

6/16/2006 9:15 AM
Response Service List

# EXHIBIT B

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

       - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                        :
          In re                                         :     Chapter 11
                                                        :
DELPHI CORPORATION, et al.,                             :     Case No. 05-44481 (RDD)
                                                        :
                                      Debtors.  :     (Jointly Administered)
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EX PARTE MOTION TO FILE REDACTED VERSION OF  DEBTORS' OMNIBUS
RESPONSE TO OBJECTIONS TO DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. §
365 AND FED. R. BANKR. P. 6006 AUTHORIZING REJECTION OF CERTAIN
EXECUTORY CONTRACTS WITH GENERAL MOTORS CORPORATION AND
TO FILE RELATED EXHIBITS UNDER SEAL

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this ex parte motion (the "Motion") for entry of an order allowing Debtors to file a redacted version of Debtors' Omnibus Response To Objections To Debtors' Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (the "Response") and to file related exhibits under seal pursuant to the Stipulation and Agreed Protective Order Governing Production and Use of Confidential and Highly Confidential Information in Connection with the Motion for Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Certain Executory Contracts with General Motors Corporation and Objections Filed Thereto (Docket No. 3326) and Stipulation and Agreed Protective Order entered June 12, 2006 (the "Stipulation and Agreed Protective Order") and General Order M-242 of this Court, and in support of this Motion respectfully represents as follows:

<u>Introduction</u>

1.    On October 8, 2005, Delphi and certain of its U.S. subsidiaries filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this Court for reorganization relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

2

2.      On March 31, 2006, the Debtors filed a Motion for Order Under 11

U.S.C. § 365 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Certain Executory

Contracts with General Motors Corporation (the "Rejection Motion").  General Motors

Corporation ("GM") filed its  Preliminary Objection to Debtor's Motion for Order Under

11 U.S.C. § 365 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Certain Executory

Contracts on April 12, 2006; and its Supplemental Objection and Memorandum of Law

in Opposition to Debtors' Motion for Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P.

6006 on June 5, 2006 (collectively, the "Objection").  The date of the hearing on the

Rejection Motion is yet to be determined.

3.      Before the commencement of discovery in connection with the

Rejection Motion and the Objection, the parties agreed upon the terms of the Stipulation

and Agreed Protective Order Governing Production and Use of Confidential and Highly

Confidential Information in Connection with the Motion for Order Under 11 U.S.C. §

365 and Fed. R. Bankr. P. 6006 Authorizing Rejection of Certain Executory Contracts

with General Motors Corporation and Objections Filed Thereto (Docket No. 3326).  On

June 12, 2006, this Court entered the Stipulation and Agreed Protective Order relating to

the production of certain confidential and highly confidential documents to various

objecting parties (Docket No. 4156) (collectively, the "Stipulation and Agreed Protective

Orders") (attached hereto as Exhibits A and B, respectively).

4.      In preparation for the hearing on the Rejection Motion, the Debtors

and GM have deposed certain witnesses who have information concerning issues central

to the Rejection Motion.  The Debtors and GM have also produced certain documents

containing information pertaining to the Rejection Motion.  The documents and

3

deposition transcripts contain "Confidential" or "Highly Confidential" information as designated by the terms of the Stipulated and Agreed Protective Orders.  In addition, portions of the Response refer to sensitive, confidential and commercial information relating to the Debtors or GM including, among other things, product pricing information, which has been designated by the Debtors or GM as Confidential or Highly Confidential.  The Debtors request, therefore, that they be authorized to file and serve only a redacted copy of the Response on all parties required to be served, and provide an unredacted copy to GM in accordance with the Stipulations and Agreed Protective Orders.

<u>Jurisdiction and Venue</u>

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

<u>Relief Requested</u>

6.      The Stipulation and Agreed Protective Order provides:

[i]f documents, materials or other information (including deposition transcripts) designated as Confidential or Highly Confidential are to be included in any papers to be filed in this Court or any other court, counsel intending to file such documents shall first seek entry of a protective order under 11 U.S.C. § 107(b), Fed. R. Bankr. P. 9018 and General Order #M242 of this Court or other applicable authority with respect to filing those portions of the proposed filing containing information subject to this Stipulation and Protective Order by date.

[Ex. A at 6-7].

7.      Section 107(b) of the Bankruptcy Code and Fed. R. Bankr. P. 9018 provide bankruptcy courts with the power to issue orders that will protect entities from potential harm that may result from the disclosure of certain confidential information.

4

"On request of a party in interest, the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information. . . ."  11 U.S.C. §107(b).

8.     Here, the Debtors seek to file a redacted version of the Response and related exhibits under seal.  This Response and the related exhibits rely on documents and testimony the parties have agreed to keep Confidential and Highly Confidential subject to the terms of the Stipulation and Agreed Protective Order.

9.     The documents and testimony to be redacted or filed under seal contain sensitive commercial information relating to the business interests of the parties.

10.     The documents and testimony also contain sensitive pricing information crucial to conducting business in the automotive industry.

11.     If the aforementioned information were released, the interested parties would be placed at a competitive disadvantage in the industry.

12.     Therefore, the Debtors request that the Court order that the Response (and exhibits hereto) discussed herein be filed with the Court pursuant to General Order M-242 and sealed by the United States Bankruptcy Clerk for the Southern District of New York.

WHEREFORE, the Debtors respectfully request that the Court enter an

order granting this Motion, authorizing Debtors to file a redacted version of the Debtors'

Omnibus Response To Objections To Debtors' Motion For Order Under 11 U.S.C. § 365

And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With

General Motors Corporation and exhibits related to the Response under seal and granting

such other further relief as is just and proper.

Dated:    New York, New York
          June 15, 2006

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                     & FLOM LLP

                              By:    /s/ John Wm. Butler, Jr.
                                     John Wm. Butler, Jr. (JB 4711)
                                     David E. Springer (DS 9331)
                                     John K. Lyons (JL 4951)
                                     Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                        - and -

                              By:    /s/ Kayalyn A. Marafioti
                                     Kayalyn A. Marafioti (KM 9632)
                                     Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession

<u>Exhibit A</u>

Stipulation And Agreed Protective Order Governing Production And Use Of Confidential And
Highly Confidential Information In Connection With The Motion For Order Under 11 U.S.C.
§ 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With
General Motors Corporation And Objections Filed Thereto

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                     :
                     :
In re                  :    Chapter 11
                     :
DELPHI CORPORATION, et al.,  :    Case No. 05–44481 (RDD)
                     :
          Debtors.  :    (Jointly Administered)
                     :
                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**STIPULATION AND AGREED PROTECTIVE ORDER GOVERNING
PRODUCTION AND USE OF CONFIDENTIAL AND HIGHLY CONFIDENTIAL
INFORMATION IN CONNECTION WITH THE MOTION FOR ORDER UNDER
11 U.S.C. § 365 AND FED. R. BANKR. P. 6006 AUTHORIZING REJECTION
OF CERTAIN EXECUTORY CONTRACTS WITH GENERAL MOTORS
CORPORATION AND OBJECTIONS FILED THERETO**

      This Stipulation and Agreed Protective Order is entered into and submitted to the Court

in accordance with the agreement of counsel for Delphi Corporation ("Delphi") and certain of its

subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the

"Debtors"), on the one hand, and General Motors Corporation, on the other hand (the Debtors

and the signatories to this Stipulation and Agreed Protective Order being collectively the

"Parties"), that discovery requested and other information provided in connection with the

Debtors' Motion For Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006 Authorizing

Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033)

and objections filed thereto (the "Motion") may involve the production of information

considered sensitive, confidential, personal, proprietary, and/or protected by statutory or other

legal privilege, and it appearing to the Court that there is good and sufficient cause that the relief

should be granted,

IT IS THEREFORE ORDERED:

1.      The terms of this stipulation and agreed protective order (the "Stipulation and Protective Order") shall take full force and effect upon execution by the Parties.

2.      Pursuant to Federal Rules of Civil Procedure 26(c), made applicable here through Federal Rules of Bankruptcy Procedure 7026 and Local Rule 7026-1, Rule 9018 of the Federal Rules of Bankruptcy Procedure, and sections 105 and 107 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330, as amended (the "Bankruptcy Code"), this Stipulation and Protective Order shall govern all discovery relating to the Motion.

3.      Any signatory to this Stipulation and Protective Order may designate as "Highly Confidential" any document, deposition testimony, or other information given by or on behalf of the Parties, and all information derived therefrom that a Party reasonably believes reflects non-public trade secrets, competitively sensitive business or development plans, forward-looking financial information, or personal information (the "Highly Confidential Information"). In addition, any signatory may designate as "Confidential" any other non-public information in any document, deposition testimony, or other information given by or on behalf of the Parties (the "Confidential Information") that the Party reasonably believes contains confidential information the distribution and use of which should be restricted in accordance with the terms of this Stipulation and Protective Order. Documents shall be designated as Confidential or Highly Confidential (a) by placing or affixing the words "Confidential" or "Highly Confidential" on each such document, (b) by written notice to other Parties, or (c) by virtue of the fact that any such document is otherwise already labeled as Confidential or Highly Confidential. Deposition testimony or deposition exhibits may be designated as Confidential or Highly Confidential either on the record during the deposition itself or by written notice (which may be by email) delivered

2

within two (2) business days following receipt of the transcript by the Party who seeks to designate such deposition testimony as Confidential or Highly Confidential. Where deposition testimony or exhibits are designated as Confidential or Highly Confidential, the deposition transcript or deposition exhibits shall be so marked as Confidential or Highly Confidential, as appropriate.

4.      Inadvertent failure to designate materials as Confidential or Highly Confidential at the time of production or at the time of a deposition may be remedied at any time thereafter by supplemental written notice (which may be by email) delivered within two (2) business days after the production of such materials. Upon the service of such notice, the identified materials shall be fully subject to this Stipulation and Protective Order as if the materials had been initially designated as Confidential or Highly Confidential.

5.      Material designated as Confidential pursuant to this Stipulation and Protective Order shall be inspected by and disseminated only to the following persons:

a.      the Court and its staff;

b.      the Parties and counsel of record to the Parties, and clerical, secretarial, and paralegal staff employed by such counsel;

c.      the Parties' retained professional advisors in the above-captioned cases;

d.      any deponent, counsel for the deponent, and clerical, secretarial, and paralegal staff employed by such counsel; and

e.      court reporters and videographers engaged for recording testimony of a deposition relating to the Motion.

6.      Material designated as Highly Confidential pursuant to this Stipulation and Protective Order shall be inspected by and disseminated only to the following persons:

3

      a.     the Court and its staff;

      b.     those counsel of record to the Parties, and clerical, secretarial, and paralegal staff employed by such counsel, who are involved in the litigation or negotiation of the Motion;

      c.     the Parties' retained professional advisors in the above-captioned cases, to the extent they are involved in the litigation or negotiation of the Motion;

      d.     any deponent, counsel for the deponent, and clerical, secretarial, and paralegal staff employed by such counsel, to the extent such deponent is actually shown Highly Confidential Information in connection with a deposition taken in connection with the Motion; and

      e.     court reporters and videographers engaged for recording testimony of a deposition relating to the Motion.

      7.     Confidential Information and Highly Confidential Information, or any information derived therefrom, shall be used or disclosed by a receiving Party solely for the purpose of the Motion, including litigation or negotiation of any objections thereto, and not for any other purpose whatsoever. Any person receiving Confidential Information or Highly Confidential Information shall not reveal or discuss such information to or with any person who is not entitled to receive such information.

      8.     The inadvertent production of any Confidential or Highly Confidential document, material, or other information subject to a claim of attorney-client privilege, attorney work product, or any other privilege or discovery exemption shall not be deemed to be a waiver of any claim of privilege, confidentiality, or other protection with respect to that or any other document, material, or information. In the event that any document or material that is subject to a

4

claim that it is confidential, privileged, or protected from discovery on any other ground is inadvertently produced, the Party who received the inadvertently produced document or material shall return it and all copies of it to the producing Party within three (3) business days after it receives written notice (by letter or email) from the producing Party that the document or material was inadvertently produced. In the case of Confidential or Highly Confidential documents or materials that were inadvertently produced without the appropriate designation but that were otherwise intended to be produced, the producing Party shall return to the Party to whom the documents or materials were inadvertently produced copies of the documents and materials containing the appropriate designation within three (3) business days of receipt of the returned documents or materials.

9.      If at any time a Party objects to the designation of documents or information produced or testimony given as Confidential or Highly Confidential under this Stipulation and Protective Order, the objecting Party shall notify the designating Party in writing (which may be by email). The objecting Party shall identify the documents or information in question and shall specify in reasonable detail the reasons for the objection. Within two (2) business days of the receipt of such notice, the disclosing and objecting Parties shall meet and confer in an effort to resolve their differences. If the Parties cannot resolve their differences, the disclosing Party may apply within two (2) days thereafter, or such longer time as the Parties may agree, for a ruling from the Court on the propriety of the designation. While any such application is pending, the documents or information that are subject to the application shall remain Confidential or Highly Confidential, as the case may be, until the Court rules. If the disclosing Party does not apply to the Court for a ruling on the propriety of the designation within two (2) days after the conclusion of the meet and confer, or within such time as the Parties may agree,

5

the documents or information that are subject of the dispute will no longer be deemed Confidential or Highly Confidential. The disclosing Party shall have the burden of proving, to the Court's satisfaction and by a preponderance of the evidence, that the document or information qualifies as sufficiently confidential, under Rule 26(c) of the Federal Rules of Civil Procedure and/or Rule 9018 of the Federal Rules of Bankruptcy Procedure, that its dissemination and use should be restricted in accordance with the terms of this Stipulation and Protective Order.

       10.    Nothing in this Stipulation and Protective Order shall be construed as preventing any Party from objecting to the designation of any document or information as Confidential or Highly Confidential or preventing any Party from seeking further protection from the Court for any materials or information it produces in discovery.

       11.    Within thirty (30) days after the entry of an order by this Court confirming a plan of reorganization or dismissing the cases, whichever first occurs, all documents and other material designated as Confidential or Highly Confidential pursuant to this Stipulation and Protective Order, and all copies thereof, including but not limited to any notes or other transcriptions made therefrom, shall either be (a) returned to the producing Party or Party creating such information, or (b) destroyed. If the receiving Party chooses to destroy any such documents or materials, then that Party shall deliver a certificate attesting to that destruction to the Party who produced the Confidential or Highly Confidential documents or materials within thirty (30) days after the entry of an order by this Court confirming a plan of reorganization or dismissal of the cases, as the case may be.

       12.    If documents, materials or information (including portions of deposition transcripts) designated as Confidential or Highly Confidential are to be included in any papers to be filed in this Court or any other court, counsel intending to file such documents shall first seek

6

entry of a protective order under 11 U.S.C. § 107(b), Fed. R. Bankr. P. 9018 and General Order #M242 of this Court or other applicable authority with respect to filing those portions of the proposed filing containing information subject to this Stipulation and Protective Order, identifying this Stipulation and Protective Order by date.

13.    This Stipulation and Protective Order shall not be construed to affect in any way the admissibility of any document, testimony, or other evidence at a hearing on the Motion.

14.    Nothing in this Stipulation and Protective Order shall be construed to limit any disclosing Party's use or disclosure of its own documents, materials, or information. In addition, nothing in this Stipulation and Protective Order shall prevent or in any way limit disclosure, use, or dissemination of any information or documents that are in the public domain. This Stipulation and Order shall not prejudice in any way the rights of any Party to introduce into evidence or use at a hearing on the Motion any document, testimony, or other information that is subject to this Stipulation and Protective Order.

15.    Any non-party producing discovery materials in connection with the Motion may be included in this Stipulation and Protective Order by endorsing a copy of this Stipulation and Protective Order and delivering it to the requesting Party who, in turn, will serve it upon counsel for the other Parties and file it with the Court. The Parties to the Motion may designate discovery materials produced by a non-Party to the Motion as Confidential or Highly Confidential in accordance and consistent with the terms and provisions of this Stipulation and Protective Order.

16.    This Stipulation and Protective Order shall not prevent any Party from applying to the Court for further or additional protective orders, for the modification of this

7

Stipulation and Protective Order, or from agreeing with other Parties to modify this Stipulation

and Protective Order, subject to the approval of the Court.

      17.    This Court retains exclusive jurisdiction to enforce, modify, or vacate all

or any portion of this Stipulation and Protective Order upon appropriate motion by a party in

interest.

    So Ordered in New York, New York, this 21st day of May, 2006

                       /s/ ROBERT D. DRAIN
                       Honorable Robert D. Drain
                       United States Bankruptcy Judge

AGREED TO AND
APPROVED FOR ENTRY:

/s/ Kayalyn A. Marafioti
John Wm. Butler, Jr.
David E. Springer
John K. Lyons
Ron E. Meisler
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700

Attorneys for Delphi Corporation, et al.,
and Debtors and Debtors-in-Possession

/s/ Penny P. Reid
Michael P. Kessler
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
Concourse 1

New York, New York 10153
(212) 310-8000

Counsel for General Motors Corporation

<u>Exhibit B</u>

Stipulation And Agreed Protective Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, <u>et</u> <u>al.</u>, | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

## <u>STIPULATION AND AGREED PROTECTIVE ORDER</u>

This Stipulation and Agreed Protective Order (the "Protective Order") is entered into among General Motors Corporation ("GM"), the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in the above-captioned chapter 11 cases, the Official Committee of Equity Security Holders appointed in the above-captioned chapter 11 cases (the "Equity Committee"), the Ad Hoc Committee of Equity Security Holders (the "Ad Hoc Committee") and Delphi Corporation and its affiliated debtor entities (the "Debtors," and together with GM, the Creditors' Committee and the Equity Committee, the "Parties"), for the purpose of amending that certain Stipulation and Agreed Protective Order Governing Production and Use of Confidential and Highly Confidential Information in Connection With the Motion for Order Under 11 U.S.C. § 365 and Fed. Bankr. P. 6006 Authorizing Rejection of Certain Executory Contracts With General Motors Corporation and Objections Filed Thereto (the "Original Protective Order," and the aforesaid Motion for Order Under 11 U.S.C. § 365 and Fed. Bankr. P. 6006 Authorizing Rejection of Certain Executory Contracts With General Motors Corporation, the "Rejection Motion"), which was entered into between GM and the Debtors and was approved by the Court on May 21, 2006.

**WHEREAS,** on June 5, 2006, GM filed its Ex Parte Motion of General Motors Corporation Pursuant to 11 U.S.C. § 107(b) and Bankruptcy Rule 9018 for Authorization to File

a Redacted Version of its Supplemental Objection and Memorandum of Law and Related

Declarations and Exhibits in Opposition to Debtors' Motion for Order Under 11 U.S.C. § 365

and Fed. R. Bankr. P. 6006 Approving Rejection of Certain Executory Contracts (the "Ex Parte

Motion").

　　　　WHEREAS, on June 5, 2006, the Creditors' Committee objected to the Ex Parte Motion

to the extent that it did not provide for service on the Creditors' Committee of the unredacted

Supplemental Objection and any related documents (the "Unredacted Documents").

　　　　WHEREAS, GM was precluded from serving the Creditors' Committee, the Equity

Committee and the Ad Hoc Committee with the Unredacted Documents because said committees

are not parties to the Original Protective Order.

　　　　WHEREAS, GM and the Debtors agreed to provide the Creditors' Committee, the

Equity Committee and the Ad Hoc Committee with the Unredacted Documents in accordance

with the terms of this Protective Order.

　　　　NOW, THEREFORE, IT IS STIPULATED AND AGREED by and between the

Parties that:

　　　　1.　　　　The terms and conditions of the Original Protective Order are incorporated herein

by reference and remain in full force and effect, and shall be binding upon the Parties as if all of

them were original parties thereto.

　　　　2.　　　　GM shall provide counsel to the Creditors' Committee, counsel to the Equity

Committee and counsel to the Ad Hoc Committee with copies of the Unredacted Documents

promptly after this Court "So Orders" this Protective Order.

　　　　3.　　　　Disclosure by counsel to the Creditors' Committee, counsel to the Equity

Committee and counsel to the Ad Hoc Committee of the Unredacted Documents, and all

2

documents and other materials produced by GM in connection with the Rejection Motion that are

designated as "Highly Confidential Information" or "Confidential Information" as those terms

are defined in the Original Protective Order, shall be limited to counsel and other professionals

retained by the Creditors' Committee, the Equity Committee and the Ad Hoc Committee, and

other personnel employed by such professionals (collectively, the "Authorized Parties").

      4.     The Authorized Parties shall use the Unredacted Documents solely in connection

with the Debtors' Motion for Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006

Approving Rejection of Certain Executory Contracts, including litigation and negotiation of any

objections or responses thereto, subject to the provisions of the Original Protective Order.

      5.     The Creditors' Committee, the Equity Committee and the Ad Hoc Committee

consent to the Court's approval of the Ex Parte Motion.

      6.     Nothing contained herein shall constitute a waiver of GM's right to challenge or

dispute the right or entitlement of any of the Parties to receive any documents or materials in

connection with any other contested matter or proceeding.

      7.     This Protective Order contains the entire understanding of the Parties hereto with

regard to the matters addressed herein, and supersedes all prior and contemporaneous

discussions, negotiations, understandings, and agreements, whether oral or written, express or

implied, between and among the parties hereto regarding the subject matter of this Protective

Order.

      8.     This Protective Order is binding upon the Parties, the Authorized Parties, and

their respective successors and assigns, and may not be changed, altered or modified except in

writing, signed by the Parties or their duly authorized attorneys and approved by the Court.

3

9.    This Protective Order may be executed by facsimile and each signature thereto

shall constitute an original signature.  This Protective Order also may be executed in counterparts

and all such counterparts when so executed shall together constitute the Protective Order as if

one document had been signed by both parties.

Dated:  June 9, 2006

**WEIL, GOTSHAL & MANGES LLP**

By: s/ Richard P. Krasnow_____
    Richard P. Krasnow (RK-5707)
    767 Fifth Avenue
    Concourse 1
    New York, New York 10153
    Telephone:  (212) 310-8000

Attorneys for General Motors Corporation


**LATHAM & WATKINS LLP**

By: s/ Mark A. Broude_____
    Robert J. Rosenberg
    Mitchell A. Seider
    Mark A. Broude
    885 Third Avenue, Suite 1000
    New York, New York 10022
    Telephone:  (212) 906-1200

Attorneys for the Official Committee of
Unsecured Creditors


**SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP**

By: s/ Kayalyn A. Maraioti_____
    Four Times Square
    New York, New York 10036

    333 West Wacker Drive, Suite 2100
    Chicago, Illinois 60606-1285
    Telephone:  (312) 407-0700

Attorneys for Delphi Corporation, et al.,
and Debtors and Debtors in Possession


**FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP**

    By: s/ Bonnie Steingart_____
    One New York Plaza
    New York, New York 10004
    Telephone:  (212) 859-8000

Attorneys for the Official Committee of Equity
Security Holders (Retention Subject to Court
Approval)

4

**WHITE & CASE LLP**

By: s/ Frank Eaton
Frank Eaton [FE 1522]
4900 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 371-2700

Attorneys for the Ad Hoc Committee of Equity
Security Holders

**SO ORDERED** this 12th day of June, 2006

/s/ ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

5

<u>Exhibit C</u>

Proposed Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                          :
         In re                            :     Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :     Case No. 05-44481 (RDD)
                                          :
                      Debtors.            :     (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - -  x


ORDER GRANTING DEBTORS' EX PARTE MOTION TO FILE REDACTED VERSION OF
DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO DEBTORS' MOTION FOR
ORDER UNDER 11 U.S.C. § 365 AND FED. R. BANKR. P. 6006 AUTHORIZING
REJECTION OF CERTAIN EXECUTORY CONTRACTS WITH GENERAL MOTORS
CORPORATION AND TO FILE RELATED EXHIBITS UNDER SEAL

          Upon the motion, dated June 15, 2006 of Delphi Corporation ("Delphi") and certain of its

subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors") pursuant to the Stipulation and Agreed Protective Order Governing

Production and Use of Confidential and Highly Confidential Information in Connection with the

Motion for Order Under 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006 Authorizing Rejection of

Certain Executory Contracts with General Motors Corporation and Objections Filed Thereto

(Docket No. 3326) and the Stipulation and Agreed Protective Order entered by this Court on

June 12, 2006 (Docket No. 4156) (collectively, the "Stipulation and Agreed Protective Order")

and General Order M-242 of this Court for an order allowing the Debtors to file a redacted

version of Debtors' Omnibus Response To Objections To Debtors' Motion For Order Under 11

U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts

With General Motors Corporation and exhibits related to the Response under seal, it appearing

that the Court has jurisdiction over this matter; and it appearing that due notice of the Motion has

been provided and that no other or further notice need be provided; and it further appearing that

the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors

and equity security holders; and upon all of the proceedings had before the Court; and after due

deliberation and sufficient cause appearing for allowing Debtors to file said Response under seal,

it is hereby

ORDERED, that the Motion is hereby GRANTED; and it is further

ORDERED, that the Debtors file a redacted version of the Debtors' Omnibus Response

To Objections to Debtors' Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006

Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation and

related exhibits under seal.


Dated: New York City, New York

_____, 2006

                                    _____
                                    Honorable Robert D. Drain
                                    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT C

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
        In re                       :    Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :    Case No. 05–44481 (RDD)
                                    :
                Debtors.            :    (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO DEBTORS' MOTION
FOR ORDER UNDER 11 U.S.C. § 365 AND FED. R. BANKR. P. 6006
AUTHORIZING REJECTION OF CERTAIN EXECUTORY CONTRACTS
WITH GENERAL MOTORS CORPORATION

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this omnibus response to the Preliminary And Supplemental Objections Of General Motors Corporation To Debtors' Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts (Docket Nos. 3210, 4019), Appaloosa Management L.P.'s Preliminary Objection To Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3243), the Limited Objection Of SPS Technologies, Inc., SPS Technologies Waterford Company And Greer Stop Nut, Inc. To Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3567), and the Preliminary And Limited Objections Of The Official Committee Of Equity Security Holders To Debtors' Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket Nos. 3926, 4128) (collectively, the "Objections").[1]

## Nature of Objections

General Motors Corporation ("GM") is the only objector to have set forth substantive objections regarding the relief sought by the Debtors, and thus this omnibus response is focused on GM's objections. GM's preliminary and supplemental objections are referred to herein collectively as the "Objection."

---

[1]    General Motors Corporation ("GM") is the only objector to have set forth substantive objections regarding the relief sought by the Debtors, and thus this omnibus response is focused on GM's objections. GM's preliminary and supplemental objections are referred to herein collectively as the "Objection." The Equity Committee's limited objection seeks a modification of the form of notice (i.e., the inclusion of notice to the Equity Committee) with which the Debtors agree.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

The Equity Committee's limited objection seeks a modification of the form of notice (i.e., the inclusion of notice to the Equity Committee) with which the Debtors agree. While the Debtors have not included the Equity Committee in its notice provisions as a matter of course, in light of the scope of the Court's mandate in appointing an equity committee in these cases, in this instance the Debtors believe that notice is appropriate in light of the nature of the Motion.

Through its Limited Objection, SPS Technologies, Inc. ("SPS") seeks information from the Debtors regarding the contracts at issue on the Motion, and the Debtors will work with SPS to provide reasonable information.

The balance of the preliminary objections were filed simply as a means to participate in discovery and therefore do not call for a response.

In the Pretrial And Scheduling Order relating to the Motion dated June 13, 2006, the Court set a June 26, 2006 deadline for the filing of a supplemental objection by Appaloosa Management L.P., Wexford Capital LLC, Lampe Conway & Co., L.L.C., Harbinger Capital Partners LLC, and Marathon Asset Management LLC (the "Appaloosa Group"). The Debtors reserve all of their rights to respond to any supplemental objection filed by the Appaloosa Group.

In response to the Objections, and in further support of their Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033) (the "Motion"), the Debtors respectfully represent as follows:

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Preliminary Statement

As has been the case since early last year, Delphi continues to be principally focused on forging a comprehensive, consensual resolution of the Debtors' unsustainable cost and revenue structure.  GM, however, was not prepared to participate in Delphi's transformation plans prior to the commencement of these chapter 11 cases, in part because GM believed that Delphi's capital structure should be impaired so as to require the participation of all stakeholders in any transformation.  Nor were the Debtors successful in persuading GM to participate in the Debtors' transformation during the first six months of these cases.  Although the pace, tone, tenor, and intensity of discussions since early 2006 have been noticeably different, constructive, and encouraging, in light of GM's historical track record, and in the absence of a comprehensive transformation plan, the Debtors reasonably determined that they owe a fiduciary duty to their creditors and other stakeholders to prepare for the sub-optimal possibility that the Debtors will not reach a comprehensive, consensual resolution in the near future.

This is why the Debtors filed the Motion, and why they continue to seek the authority to reject certain unprofitable supply contracts with GM.  The Debtors have concluded, in good faith, that <u>absent</u> a comprehensive consensual resolution, rejecting unprofitable GM contracts over an interim period will help stem operating losses, position the Debtors to maximize business enterprise value realistically available to them, and address the inequitable transfer of value from the Debtors' estates to GM.  Because the Debtors' current level of GM-related operating losses is unsustainable—a fact that GM cannot challenge—it is incumbent upon the Debtors to take appropriate measures to mitigate these losses until they resolve their GM-inherited labor-cost

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

issues. The discovery record on the Motion is entirely consistent with, and fully supports, this reasonable business judgment.

Rather than challenge the Debtors' business judgment that rejection and repricing will benefit their estates, GM in its Objection sets up and knocks down a straw man. GM repeatedly presents the specter of a shutdown of its operations. GM does so despite the fact that it knows that the Debtors' business judgment is _not_ that their estates benefit by canceling these contracts and stopping the shipment of parts to GM. In addition to invoking the catastrophic consequences of a shutdown, GM and its rebuttal expert assert that the Debtors will be committing financial "suicide" by discontinuing the production of parts at issue, in light of the Debtors' "fixed costs." GM's "fixed cost" argument proceeds on the same flawed premise, namely that the Debtors intend by rejecting the GM Loss Contracts to stop supplying GM. Thus, GM's central arguments miss the point and do not address the Debtors' actual business judgment that the Court must evaluate here.

In fact, the declarations submitted by GM emphasize that GM cannot easily re-source the parts at issue in the Motion. This only reinforces the Debtors' judgment that, following rejection of the GM Loss Contracts, GM will have every incentive to accept new terms under which the supply of parts will continue until the Debtors are able to reduce their labor costs and transition in an orderly fashion out of non-core businesses. The only way a calamitous shutdown of GM can happen as a result of this Motion is if GM itself decides to reject equitable re-pricing terms offered by Delphi and chooses to shut itself down. For a myriad of reasons, the Debtors and GM can be expected to act rationally and to seek to avoid a shutdown.

To the extent GM raises legal arguments that could pertain to the Debtors' actual business judgment, they are misplaced. For the reasons set forth fully herein: (i) the Court has discretion

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

to grant the Debtors the authority to reject; (ii) the Debtors have met the flexible, fact-specific business judgment test that applies in this Circuit on a motion under 11 U.S.C. § 365; (iii) the Debtors are acting in good faith; (iv) the equities favor the relief requested; and (v) neither the Bankruptcy Code nor Michigan law permits GM to frustrate the purpose of rejection by locking in current prices through the remedy of specific performance.

In the end, GM's position is not surprising. It wants to continue, for as long as possible, to receive parts from its former parts division at prices that do not compensate the Debtors' estates for GM-inherited production costs. It would be inequitable to allow GM to do so, to the detriment of the Debtors' estates, creditors, and other stakeholders. GM must either voluntarily resolve this historical and continuing inequity, or this Court should give the Debtors access to the tools Congress provided in the Bankruptcy Code, so that the Debtors may unilaterally address and seek to mitigate the present, unsustainable state of affairs.

The Discovery Record

The discovery record confirms and supports the Debtors' business judgment. Although GM's Objection insinuates that discovery has revealed facts inconsistent with the Debtors' Motion and supporting declarations, this is not the case.

A.    <u>The Debtors Do Not Seek To Disrupt The Supply Of Parts To GM</u>

In its Objection and supporting declarations, GM assumes that rejection of the GM Loss Contracts will result in the immediate shutdown of GM plants, with catastrophic economic reverberations throughout North America. Contrary to this doomsday scenario, the Debtors have made it clear that their goal through this Motion they do not seek to disrupt the delivery of parts to GM. In the Motion, the Debtors clearly state: "As an accommodation to GM, the Debtors are prepared to continue to ship the parts associated with the GM Loss Contracts under reasonable

6

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

and equitable price terms." (Mot. ¶ 70.)  The discovery record on this issue is entirely consistent

with the Motion itself:

**REDACTED**

Individuals at GM responsible for sourcing to Delphi and negotiating with Delphi have

testified that

**REDACTED**

\*        \*        \*

**REDACTED**

---

[2]        Excerpts from the transcript of the deposition of John Opie appear in Exhibit A hereto.

[3]

**REDACTED**

) Excerpts from the transcript of the
deposition of John Sheehan appear in Exhibit B hereto.

[4]        Excerpts from the transcript of the deposition of Steve Daniels appear in Exhibit C hereto.

[5]        Excerpts from the transcript of the deposition of Greg Ruselowski appear in Exhibit D hereto.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

**REDACTED**

(Parekh Dep. 31:8-32:2, June 12, 2006.)[6] Nor would the rejection of the contracts result in the

immediate discontinuation of GM business, as Steve Daniels, a Director of Mergers &

Acquisitions at Delphi and a former GM employee, explained:

**REDACTED**

---

[6]    Excerpts from the transcript of the deposition of Kevan Parekh appear at Exhibit E hereto.

[7]    One of GM's principal Delphi negotiators likewise conceded that it would be irrational for Delphi to cause
a shutdown.  (Parekh Dep. 83:3-8, 14-21.)

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

B.     GM Distorts The Discovery Record By Assuming That
       "Rejection" Means Immediately Ceasing Shipment

Delphi's Chief Restructuring Officer, John Sheehan, testified that

REDACTED

By ascribing a different meaning to the concept of

"rejection"—i.e., by equating "rejection" with the immediate cessation of production and

shipments to GM—GM's counsel created a confusing deposition record.  In its Objection, GM

takes advantage of that confusion.  GM has selectively quoted snippets from deposition

transcripts and documents in order to create the misleading impression that the Debtors have not

evaluated the consequences of "rejection," or that the Debtors have no intention to "actually

reject" contracts.

For example, quoting Mr. Eisenberg's testimony, GM claims that

REDACTED

---

[8]     Other instances in which GM confusingly equates rejection with the immediate cessation of shipment are
found in GM's Objection on page 20 (testimony of John Opie, Delphi's lead independent director, on fixed
costs) and page 26 (testimony of Mr. Eisenberg on the effect of rejection on the Debtors' other contracts
with GM).

9

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Similarly, GM cites an internal Delphi e-mail in support of the proposition that "Delphi admits it has no intention to actually reject the Supply Contracts." (Objection 36.) What that e-mail actually reflects is that,                **REDACTED**

All of GM's assertions regarding the Debtors' supposed failure to assess the impact of "actual rejection" (which it asserts is evidence of "bad faith") amounts to this:  GM refuses to accept that the Debtors have reasonably determined that "rejection" inures to the benefit of the Debtors by placing them in a position to supply GM with parts at higher, yet reasonable, prices, and to stop incurring unsustainable losses solely for the benefit of GM, and to the detriment of every other stakeholder in these chapter 11 cases.

GM also claims that Delphi filed the Motion "solely to gain leverage over GM—in complete disregard to the harm such action will cause Delphi if granted." (Objection 37.) In reality, the Debtors filed the Motion to address the large operating losses generated by the Debtors' U.S. operations.  As Mr. Eisenberg articulated:

**REDACTED**

An important by-product of filing the Motion is that it may provide GM with additional

---

[9]     See DPH-1GM052967 (attached hereto as Exhibit G).

[10]    (See also Daniels Dep. 89:22-89:25, 90:2-90:3 ("Under the—in the context of the way we have structured the motion, I personally feel that the Estate will be better off because, as I said before, it gives us more options in terms of reaching consensual agreement or ending up a with a mechanism, a tool, to facilitate our restructuring process."); Opie Dep. 18:16-18:25.)

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

motivation to negotiate a consensual resolution.  When questioned on this issue, Mr. Sheehan explained:

**REDACTED**

(Sheehan Dep. 96:18-96:25, 97:2-97:9.)

       GM attempts to portray the Debtors as having filed the Motion without assessing whether rejection might benefit the Debtors' estates because the potential economic benefit has not been quantified.  (See Objection 19.)  The Debtors did, however, assess the benefits and risks of filing the Motion, as Mr. Sheehan explained:

**REDACTED**

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

(Sheehan Dep. 223:2-23; see also Daniels Dep. 121:3-6

**REDACTED**

Finally, GM attempts to portray the Debtors' Motion as an attempt to disrupt GM's "just-in-time" delivery system. (Objection 27.) However, the Debtors do not seek through this Motion to cause a shutdown of GM. Indeed, the Debtors have expended well in excess of one billion dollars in estate assets since the commencement of these cases in an effort not to disrupt GM's or any other customer's continuity of supply — and have been spectacularly successful in maintaining the functioning of the automobile industry supply chain in spite of operating within the largest manufacturing reorganization in history. It should not be surprising, therefore, that the Debtors and FTI's workpapers do not evaluate the consequences of an immediate shutdown. As Mr. Eisenberg stated, "We did not analyze something that we thought was wholly and entirely unrealistic." (Eisenberg Dep. 129:25-130:2.)

C.    The Discovery Record Fully Supports The Debtors' Reasonable Business Judgment

The record developed in discovery supports and substantiates the Debtors' reasonable business judgment in seeking authority to reject the GM Loss Contracts. The record is clear that Delphi is losing money at an unsustainable rate. Delphi had an operating loss of $1.5 billion in 2005 and **REDACTED** [11] In 2005, the GM Loss Plants generated estimated negative operating income of $1.5 billion on sales revenue or $9.3 billion. (Eisenberg Decl. ¶ 31.) The GM Loss Plants are currently budgeted to generate negative

---

[11]    See Declaration of John D. Sheehan In Support Of Delphi's Motion For Authority To Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g), Exhibit C; Supplemental Declaration of John D. Sheehan In Support Of Delphi's Motion For Authority To Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) And Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) ¶ 3.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

operating income of $2.1 billion on sales revenue of $8.2 billion in 2006. (Id.) Delphi's Board of Directors (the "Board") and senior management must address these North American losses, and thus they have been actively pursuing negotiations with GM since last summer.[12] To date, however, the Debtors have been unable to reach a consensual global resolution despite protracted negotiations. Consequently, the Debtors must continue to prosecute this Motion. The Debtors do not disagree with GM that a negotiated resolution would be the optimal outcome. Delphi wants a consensual resolution. But it cannot simply pin its future on the bare hope that the parties will reach an acceptable solution.[13] Although GM's Objection attempts to portray the filing of the Motion as an effort to "stymie" discussions, it is significant that negotiations have progressed following the March 31, 2006 filing date. If GM and the Debtors are unable to come to a resolution, the Debtors will reject and reprice the GM Loss Contracts.[14]

With respect to the precise nature of the Debtors' business judgment, Delphi's Chief Restructuring Officer testified as follows:

---

[12]

[13]

**REDACTED**

[14]

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

**REDACTED**

The Debtors exercised due care in arriving at this business judgment.  Support for filing the Motion was developed over the course of several months and consisted of a reasonable examination and testing of the profitability of the Debtors' U.S. operations, including an analysis of part- and plant-level data.[15]  Indeed, unlike some other auto suppliers in chapter 11, the Debtors waited six months after filing these cases to commence the prosecution of the Motion. The Debtors arrived at their business judgment after determining that, on a net basis, the GM Loss Plants are generating substantial losses.  The Debtors did not conduct a contract-by-contract analysis in Phase Two of the analysis because of the magnitude of the losses and the substantial proportion of U.S. revenues attributable to GM.

**REDACTED**

---

[15]  "We thought looking at a plant level was reasonable because of the fact that the costs were more easily identifiable to a plant basis rather than to a contract, and that given the macro amount of losses and the level of understanding and analysis that was done for Phase 1, we thought that was a fair representation of where the problems were."  (Daniels Dep. 72:6-72:12.)

14

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

REDACTED

The decision to focus on the largest issues facing Delphi logically included focusing on GM customer contracts.

REDACTED

Delphi's Board deliberated carefully regarding the potential impact of filing the Motion. When questioned why the Board approved the filing of the Motion, Delphi's lead independent director candidly stated:

REDACTED

15

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

**REDACTED**

\* \* \*

**REDACTED**

Because GM's counsel questioned Delphi's lead director

**REDACTED**

16

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Not surprisingly, GM does not agree with the difficult decisions made by Delphi's management and directors. The Debtors have no reasonable choice, however, but to prepare for the possibility of unsuccessful consensual negotiations. As Mr. Sheehan noted:

REDACTED

D.   Discovery Has Not Revealed Any "Hidden" Purpose That Is Not Plain On the Face Of The Motion

Far from revealing a secretive, bad-faith rationale inconsistent with the Motion, the Debtors' documents cited by GM in its Objection further confirm what the Debtors set forth candidly in their motion: they seek, through this Motion, to reject contracts identified through the assessment of GM Loss Plants that allows the Debtors to maximize the value to their estates and/or to stop unprofitable operations. That Delphi is projected to lose billions of dollars in the coming years is no secret, least of all to its former parent and largest customer. The purpose of the Motion, as the Debtors have continuously stated, is not to "blackmail" GM (see Objection 16), but to relieve the Debtors from the obligation of manufacturing parts for GM at a

17

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

considerable loss.  And this protection from burdensome contracts is precisely what Congress

afforded restructuring debtors through Section 365(a) of the Bankruptcy Code.  The term

"blackmail" cannot fairly be attributed to the Debtors' efforts to seek from GM revenue sufficient

to operate viably as a supplier to GM, under a GM-inherited cost structure, until it can complete

its transformation.

REDACTED

That the Debtors ·

hardly surprising or troubling.  It is only rational to assume that the ability to reprice contracts

may affect the dynamics of ongoing negotiations.  And the Debtors' goals are clear on the face of

the Motion.

The Debtors have been engaged in open discussions with GM regarding the Debtors'

transformation plans for many months.  Ideally, the Debtors would accomplish their

transformation plan through a consensual agreement with GM.  The Motion is critical to

preserving value of the estates, because it will position the Debtors to stem losses on money-

losing contracts in North America if necessary, and it also may provide additional impetus

toward a consensual deal.  At his deposition, Mr. Daniels testified candidly about

REDACTED

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

While GM's Objection casts the foregoing testimony in a negative light, the Debtors submit that the Debtors' goals should hardly come as a surprise to GM or the Court. GM's witnesses admitted that.    **REDACTED**

GM's claim to have discovered some hidden truth behind the Debtors' Motion during the course of discovery is thus entitled to a healthy dose of skepticism.

E.    GM's Declarations And Witness Testimony Confirm
       That The Debtors' Business Judgment Is Appropriate

Finally, GM's own declarations and witnesses confirm that the Debtors' business judgment is appropriate. The timing and complexity of re-sourcing ensures that an interim period of adjusted pricing is a reasonable prospect. And during that interim period, the Debtors can execute their transformation plan, in the best long term interests of all involved.

Because Delphi is a sole-source supplier of many parts to GM, GM cannot readily resource many of the parts covered by the Motion.

**REDACTED**

---

[16]    GM-RJ 002762 (attached hereto as Exhibit H).

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

**REDACTED**

underlying reality supports the Debtors' business judgment.

In the long term, the Debtors believe that

**REDACTED**

<u>Argument</u>

I.    The Court Has The Power Under Section 365(a) To Grant The Debtors Authority To <u>Reject The GM Loss Contracts</u>

Section 365(a) of the Bankruptcy Code provides that, "subject to the Court's approval," a debtor-in-possession "<u>may</u> assume or reject any executory contract."  11 U.S.C. § 365(a) (emphasis added).  This statutory framework designed by Congress, unlike that of section 1113, does not require a showing that the rejection of the contracts is "necessary to permit the

20

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

reorganization of the debtor." 11 U.S.C. § 1113(b)(1)(A). In the Motion, as demonstrated by the discovery record, the Debtors decided, in their business judgment, to address their supply contracts with GM because they were losing billions of dollars in their North American operations, and that GM was responsible for over 60 percent of the Debtors' North American business. The Debtors believe and expect that rejection of the GM Loss Contracts will benefit the Debtors' estates.

By seeking the authority to reject the GM Loss Contracts, the Debtors are leaving open the possibility of a consensual resolution with GM that may obviate the need for rejection. It is appropriate and reasonable for the Court to grant this authority, which would, in essence, operate as an approval of the Debtors' rejection of the GM Loss Contracts should the parties fail to reach a consensual resolution. Bankruptcy courts frequently grant debtors the authority to take actions without requiring them to do so, including actions involving the rejection or assumption of executory contracts under section 365(a) of the Bankruptcy Code. See, e.g., HA-LO Indus., Inc. v. CenterPoint Props. Trust, 342 F.3d 794, 796 (7th Cir. 2003) (describing order that granted debtor "authority to reject [a] lease, at its option, effective upon 30 days' written notice" to non-debtor); In re Victory Mkts., Inc., 221 B.R. 298, 304 (B.A.P. 2d Cir. 1998) (describing order that "served merely to authorize the assumption of a lease," and explaining that debtor was "not obliged to complete that assumption"); In re Kmart Corp., No. 02-B02474, slip op. at 2 (Bankr. N.D. Ill. Jan. 25, 2002) (granting debtor's motion for authority to reject leases on ten days' notice to lessors).[17]

Indeed, this Court has previously granted Delphi precisely the authority sought here. See Order Under 11 U.S.C. §§ 365(a) And 554 And Fed. R. Bankr. P. 6006 Approving Procedures

---

[17]    A copy of the Kmart order is attached to this response as Exhibit I.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

For Rejecting Unexpired Real Property Leases And Authorizing Debtors To Abandon Certain Furniture, Fixture, And Equipment, dated Jan. 6, 2006 (Docket No. 1776) (authorizing, but not directing, Debtors to reject unexpired real property leases without further court order); Order Under 11 U.S.C. §§ 363(b) And 365(a) And Fed. R. Bankr. P. 9019 Approving Procedures To Assume Certain Amended And Restated Sole Source Supplier Agreements, dated Dec. 12, 2005 (Docket No. 1494) (authorizing, but not directing, Debtors to assume certain agreements by which debtors receive goods necessary to their on-going operations, without further court order); Order Under 11 U.S.C. §§ 105, 363(b), 564(b), 1107, And 1108 Authorizing Payment Of Contractors And Service Providers In Satisfaction Of Liens, dated Oct. 13, 2005 (Docket No. 199) (authorizing, but not directing, Debtors to pay claims of contractors and service providers).

II.    The Debtors' Decision To Seek Authority To Reject The GM Loss Contracts Was A Sound Exercise Of Business Judgment

GM contends that the Debtors cannot satisfy the legal requirements for rejecting the GM Loss Contracts. Although GM contends that In re Minges, 602 F.2d 38 (2d Cir. 1979), imposes a checklist of requirements on a debtor-in-possession seeking to reject contracts, or that the Court should apply the heightened standard set forth in NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984), it is well-settled that the standard in this Court for deciding a section 365(a) motion is the business judgment test as formulated in In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir. 1993). The Debtors' decision to seek the authority to reject the GM Loss Contracts satisfies that test because (a) rejecting the contracts would benefit the Debtors' estates by enabling the Debtors to maximize value for the estates with its current productive assets, and (b) the contracts are burdensome, as shown by the substantial operating losses at 21 plants that produce the parts covered by the GM Loss Contracts.

22

**REDACTED**
**CONFIDENTIAL/HIGHLY CONFIDENTIAL**

A.    The Applicable Standard Is Orion's Business Judgment Test

GM takes issue with the Debtors' position that the applicable legal standard is the

business judgment test set forth in Orion. GM advances two arguments on this point. First,

citing Minges, GM asserts that the Motion must be denied unless the Debtors make a showing on

a laundry list of items, among them the existence of a benefit to the Debtor's general creditors,

increased market value, "the amounts of secured debt, administrative debt, priority claims, and

whether there are other similar properties," and if so "the extent of encumbrances on them." (See

Objection 37-38, 44.) The particular items addressed in Minges are not requirements that must

be satisfied in every case, but rather were tailored to the particular circumstances raised by the

debtor's motion. Indeed, several of the factors GM identifies as "requirements" do not make

sense in the context of the Debtor's Motion—for example, the existence of similar properties and

encumbrances.

Contrary to GM's misreading of the case, Minges established that the business judgment

standard is a "flexible test" that is satisfied whenever, "as a matter of business judgment,

rejection of [a] burdensome contract may benefit the estate." 602 F.2d at 43. Indeed, the Second

Circuit in Minges expressly rejected an argument in favor of a bright-line rule that an executory

contract is burdensome "only where [it] will cause a net loss to the debtor's estate if performed."

Minges, 602 F.3d at 43. In doing so, the court expressed its distaste for the kind of "rigid"

analysis that GM proposes here. Id.

Although the Second Circuit remanded the case for further findings regarding whether

general creditors would benefit from rejection, including findings related to the debtor's secured

debt, administrative expenses, priority claims, and other properties, id. at 44, it did not hold, as

GM asserts, that these issues must be addressed whenever a debtor moves to reject a contract.

Rather, the decision was based on the unique facts and circumstances that arise when rejecting

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

leases of property subject to security interests (facts and circumstances that are not present here),

as well as specific deficiencies in the bankruptcy court's factual findings.[18]

Section 365(a) cases decided after <u>Minges</u> illustrate that the business judgment test is a

flexible approach that focuses on whether assumption or rejection would benefit the debtor's

estate. <u>See, e.g., Orion</u>, 4 F.3d at 1099 (explaining that "a bankruptcy court reviewing a . . .

decision to assume or reject an executory contract should examine a contract and the surrounding

circumstances and apply its 'business judgment' to determine if it would be beneficial or

---

[18]    The contract at issue in <u>Minges</u> was a real property lease, and the debtor-landlord's debts to certain third parties were secured by multiple mortgages on the property. <u>Id.</u> at 40. The bankruptcy court granted a trustee's motion to reject certain covenants in the lease after finding it was "obvious" that granting the motion would "automatically enhance the value of the premises to the benefit of the ultimate beneficiaries, the creditors in Class 3 (the general creditors)." <u>Id.</u> at 43-44. The Second Circuit was unable to conclude that there was an "adequate" or a "sound basis" for this finding, and therefore remanded the case to allow for the presentation of additional evidence and further findings. <u>Id.</u> at 44.

The Second Circuit's decision was driven by its concern that, while rejecting the lease provisions would benefit the secured creditors by increasing the value of the property, it would not benefit the remaining creditors. The court noted, for example, that the rejection motion was prosecuted by counsel for two of the secured creditors, rather than the trustee's counsel. <u>Id.</u> And Judge Mansfield issued a concurring opinion devoted to the theme that it is inappropriate to use contract rejection to pit the interests of secured creditors against those of general creditors, stating:

> If . . . the rejection would probably result in no benefit to general creditors or in recovery of only a few dollars for distribution to general creditors holding claims of many thousands of dollars and would result in the mortgagees gaining a windfall at the expense of the lessee, the trustee should not have the power to reject. In the latter case he would in effect be acting as a pawn for the mortgagees, benefiting them at the expense of the lessee, even though the mortgagees took their security with notice of the burdens involved . . . , without any substantial resulting benefit to creditors generally.

<u>Id.</u> at 44-45.

Because of the danger that rejecting the lease in <u>Minges</u> would benefit the mortgagees to the detriment of general creditors, and because the bankruptcy court's ruling depended on an unsupported finding that general creditors would benefit from the rejection, it was entirely appropriate for the Second Circuit to remand the matter for additional evidence and findings on this issue. In this case, however, the Debtors' Motion involves supply contracts between certain Debtors and GM, not leases of property encumbered by mortgages or other security interests. And the benefit of rejection and re-pricing in this case would take the form of higher payments from GM, rather than an increase in the value of encumbered property, as in <u>Minges</u>. Accordingly the risk that rejection would benefit the Debtors' secured creditors at the expense of their general creditors is not present here, and there is no reason to require the Debtors to present evidence addressing such a risk.

24

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

burdensome to the estate to assume it"); In re Footstar, Inc., 323 B.R. 566, 568-69 (Bankr.

S.D.N.Y. 2005) ("The standard to be applied by a court . . . is the 'business judgment' test, which

is premised upon the debtor's business judgment that assumption would be beneficial to its

estate."); In re Bradlees Stores, Inc., 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996) (stating that

question is whether assumption or rejection would be beneficial or burdensome to estate); In re

Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996) (same); In re G Survivor Corp., 171 B.R. 755, 758

(Bankr. S.D.N.Y. 1994) (quoting Minges's statement that, "[i]t is enough if, as a matter of

business judgment, rejection of the burdensome contract may benefit the estate").  Indeed, GM

has not cited a single case to support its position that Minges requires specific showings of

market value, secured debt, administrative debt, and the like in every case, and there is no basis

for reaching such a conclusion here.  To hold otherwise would transform Minges's "flexible"

business judgment test, 602 F.2d at 43, into a wooden formula that ignores the unique facts

presented by each motion.

        GM's argument that the Court should apply the Bildisco standard to the GM Loss

Contracts is equally unavailing.  While GM asserts that "nothing in Bildisco limits the

application of the heightened scrutiny standard to collective bargaining agreements" (Objection

77), that is not the case.  The question in Bildisco was whether "rejection of collective bargaining

agreements should be governed by a standard different from that governing other executory

contracts."  465 U.S. at 523.  The Court explained that the standard applicable to "other

executory contracts"—i.e., executory contracts other than collective bargaining agreements—

was the "traditional 'business judgment' standard."  Id.  There is nothing in the Court's opinion to

suggest that it would be appropriate to alter that standard as to any "other executory contracts."

Indeed, Bildisco adopted a heightened standard for collective bargaining agreements only

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

"because of the special nature of a collective-bargaining contract, and the consequent 'law of the shop' which it creates," id. at 524—considerations that are not presented by any contracts other than collective-bargaining agreements, let alone the supply contracts at issue here.[19]

GM points to In re Mirant Corp., 378 F.3d 511 (5th Cir. 2004), in support of its argument for a heightened standard. Yet that case, like Bildisco itself, is limited by its reasoning to a specific type of contract that implicated important federal policies enshrined in the United States Code. The debtor-in-possession in Mirant—"one of the largest regulated public utilities in the United States," that generated, bought, and sold electricity "for use by utilities, municipalities, electric-cooperative utilities, and generators across the country"—moved to reject contracts requiring it to purchase electricity at a certain rate. 378 F.3d at 515-16. The contracts were subject to the Federal Power Act, 16 U.S.C. §§ 791a-828c ("FPA"), which governs the interstate sale of electric energy, and the regulatory authority of the Federal Energy Regulatory Commission ("FERC"). Mirant, 378 F.3d at 514-15. At issue was whether, in light of the FPA and the FERC's authority to determine rates, the debtor-in-possession could seek rejection of the

---

[19] In its first encounter with the Bildisco standard, the Second Circuit recognized that the Court's reasoning did not extend beyond collective-bargaining agreements, explaining that "collective bargaining agreements, as cornerstones of labor law, have traditionally been accorded a higher status than the normal executory contract," resulting in a "standard for rejecting a collective bargaining agreement [that] is more stringent." In re Century Brass Prods., Inc., 795 F.2d 265, 271 (2d Cir. 1986) (discussing Bildisco); accord In re Ionosphere Clubs, Inc., 114 B.R. 379, 391 (S.D.N.Y.) (explaining that heightened standard for collective bargaining agreements was "compelled by judicial recognition of the special nature of collective bargaining agreements and the serious consequences of rejection for employees"), aff'd in part & rev'd in part on other grounds, 922 F.2d 984 (2d Cir. 1990). On the other hand, "ordinary executory contracts," the Second Circuit stated, are governed by the "traditional business judgment standard." Century Brass, 795 F.2d at 271; accord In re Banco Nacional de Obras y Servicios Publicos, S.N.C., 91 B.R. 661, 665 (Bankr. S.D.N.Y. 1988) (citing Bildisco for proposition that "a contract to manufacture widgets may be rejected with court approval if the debtor's sound business judgment so dictates"). Courts have rejected efforts to stretch the Bildisco standard beyond collective-bargaining agreements, as in In re Chateaugay Corp., 130 B.R. 162 (S.D.N.Y. 1991), where the court ruled that Bildisco did not apply to a contract for the removal, transport, and disposal of hazardous and non-hazardous waste. Chateaugay, 130 B.R. at 163, 167; accord In re Federal Mogul Global, Inc., 293 B.R. 124, 126 (D. Del. 2003) (rejecting argument that heightened standard applied to lease, and stating it was "clear" based on the Court's reasoning that Bildisco was "limited to collective-bargaining agreements").

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

contracts as part of the bankruptcy case. See id. at 516-22. After concluding in the debtor-in-possession's favor on that point, the Fifth Circuit suggested, but did not rule, that the lower court should apply the Bildisco standard in determining whether to approve rejection.[20] Id. at 524-25.

In explaining its suggestion, the Fifth Circuit noted that, as with collective-bargaining agreements, "[t]he nature of a contract for the interstate sale of electricity at wholesale is also unique. . . . Congress found when it passed the FPA that the pubic has an interest in the transmission and sale of electricity," including an "interest in the continuity of electrical service to the customers of public utilities."[21] Id. at 525. It would be inappropriate to apply the business judgment test to the electricity contracts, Mirant reasoned, because doing so would conflict with the higher public-interest standard that governs the FERC's ability to modify wholesale rates for electricity:

> The FPA and the filed rate doctrine protect the public interest by imposing severe limitations upon a public utility's ability to alter the terms of [electricity] contracts after they are certified by FERC. Under the filed rate doctrine, FERC can only approve a change to a filed rate if the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory. . . . Clearly the business judgment standard normally applicable to rejection motions is more deferential than the public interest standard applicable in FERC proceedings to alter the terms of a contract within its jurisdiction. Use of the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity.

---

[20] As GM noted (Objection 78 n.223), the district court on remand denied the rejection motion on other grounds, without applying the Bildisco standard. In re Mirant Corp., 318 B.R. 100, 107-08 (N.D. Tex. 2004).

[21] The FPA declares, for example, that "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest," and that federal regulation of "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessarily in the public interest." 16 U.S.C. § 824(a). The FPA also charges the FERC with the duty "to insure continuity of service to customers of public utilities." Id. § 824a(g).

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Id. (internal quotation marks and citation omitted). The contracts at issue here are of a different

nature than the agreements considered in Mirant. The GM Loss Contracts are governed by the

law of contracts, rather than a comprehensive statutory scheme designed to further the public

interest.[22]

Unlike the electricity contracts in Mirant (and the collective bargaining agreements in

Bildisco), the supply contracts between the Debtors and GM do not implicate any federal

statutory policy that would justify a departure from the traditional business judgment standard

applied to ordinary executory contracts. As demonstrated in the next section, GM's arguments

that the Debtors' decision to seek authority to reject the GM Loss Contracts does not satisfy that

standard are easily refuted.

B.    The Debtors Satisfy The Applicable Business Judgment Test

As stated in Orion, section 365(a) of the Bankruptcy Code "permits the trustee or debtor-

in-possession, subject to the approval of the bankruptcy court, to go through the inventory of

executory contracts of the debtor and decide which ones it would be beneficial to adhere to and

which ones it would be beneficial to reject." Orion, 4 F.3d at 1098. When presented with a

motion under section 365(a), a bankruptcy court "should examine a contract and the surrounding

circumstances and apply its best 'business judgment' to determine if it would be beneficial or

burdensome to the estate to assume it." Orion, 4 F.3d at 1099.

In this case, the Debtors' inventory of executory contracts includes thousands of

burdensome agreements that require the Debtors to supply parts to GM at prices that result in

---

[22]    Indeed, the recent decision in In re Calpine Corp., 337 B.R. 27 (S.D.N.Y. 2006), underscores the special
position occupied by contracts covered by the FPA. In that case, the court declined to adopt Mirant's
holding, ruling instead that a debtor-in-possession could not seek to reject a FERC-regulated contract under
section 365(a) of the Bankruptcy Code because of the plenary jurisdiction granted to the FERC. Calpine,
337 B.R. at 29-39; accord In re NRG Energy, Inc., No. 03 Civ. 3754 (RCC), 2003 WL 21507685, at *3
(S.D.N.Y. June 30, 2003) (concluding that court lacked jurisdiction over rejection motion because of "the
unique regulatory framework for the business of selling electric energy and [a] pending FERC proceeding").

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

significant operating losses. The Debtors, exercising sound business judgment, and after months of negotiating in good faith with GM in an attempt to reach an out-of-court solution, concluded that rejecting the GM Loss Contracts will maximize value to the estates, in the event a consensual resolution is not achieved.

1.    Rejecting The GM Loss Contracts Would Benefit The Debtors' Estates

GM contests the Debtors' business judgment by positing a doomsday scenario in which rejection of the GM Loss Contracts would trigger a chain reaction of shutdowns and business closures throughout the automotive industry and the United States economy as a whole. This argument is a straw man—the Debtors have been clear from the outset that they do not seek to disrupt the supply of parts to GM if this Motion is granted. Instead, as is evident from the Debtors' Motion and supporting materials, their primary objective is to reprice the GM Loss Contracts such that the Debtors continue to supply parts to GM, albeit under a new arrangement that enables the Debtors to generate operating income (or, at a minimum, to stem operating loss) and provide further protections to the Debtors. (See Motion ¶¶ 2, 6, 30, 48, 54, 57, 69-70 (describing the Debtors' intention to reprice the GM Loss Contracts); Eisenberg Decl. ¶ 15, 32-33 (same).)

If the Motion is granted and GM is presented with a choice between accepting parts at a higher price and a shutdown, it would be obliged to mitigate its damages by covering. This is particularly true given the availability of a middle course—if GM decided it was in its best interest to re-source the parts covered by the GM Loss Contracts, one would expect it to continue to receive parts from the Debtors until it completed the re-sourcing, thereby assuring an uninterrupted flow of automobiles along its assembly lines. The longer the duration of any potential shutdown, the greater the incentive for the parties to come to the table and reach an

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

agreement that keeps business running.  Thus, GM's assertion that

## REDACTED

GM also maintains that rejection would not benefit the Debtors' estates because it would leave the Debtors with all of their "fixed costs," including labor costs that cannot be eliminated under the Debtors' restrictive collective-bargaining agreements, and less revenue from GM to absorb those "fixed costs."  As with GM's doomsday argument, its fixed-cost argument presumes, without any reasonable foundation, that granting the Debtors' Motion would lead to a cessation of the supply of parts to GM and the corresponding stream of revenue to the Debtors.

In addition, even assuming _arguendo_ that rejection would result in the loss of some existing business from GM, the Debtors could react by eliminating related fixed costs.

## REDACTED

Finally, GM's point about labor costs, although well taken, does not counsel in favor of denying this Motion.  Rather, it substantiates what the Debtors have been saying all along:  in the absence of a consensual resolution among the Debtors, GM, and the unions representing a large share of the Debtors' employees, the Debtors will continue to generate substantial operating losses unless the Court (a) allows the Debtors to increase their revenues by rejecting and

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

renegotiating the GM Loss Contracts and (b) permits the Debtors to reduce their costs by granting the Debtors' motion to reject its collective-bargaining agreements and modify retiree benefits. GM's argument that the Debtors should proceed in a linear manner ignores the Debtors' fiduciary duty to preserve the value of the estates for the benefit of its general creditors and other stakeholders.

Finally, GM argues that rejection would make the Debtors worse off because rejection would release GM from its obligations under two agreements that GM calls "master agreements": the "GO Agreement" of November 24, 2003 and the Component Supply Agreement dated January 1, 1999 (the "CSA"). To be clear, the Debtors are requesting authority to reject the Purchase Orders listed in Exhibit A to the Motion. The Debtors have not sought authority to reject either the GO Agreement or the CSA. The argument that the Debtors have somehow flunked the business judgment test because a handful of contracts covered by the Motion might be somehow associated with the master agreements is a classic red herring.

First, GM has failed to demonstrate how purchase orders that are allegedly related to the GO Agreement and the CSA are integrated or merged into these so-called "master agreements." GM cites a single case for the proposition that contracts obtained by Delphi "based on either one of the master agreements or on its obtaining other supply contracts for related parts" are somehow integrated. (Objection 68.) In that decision, Bed v. Fallon, 12 N.W.2d 396 (Mich. 1943), the court infers, from the record, that a purchase order and "master" agreement "should be construed together." Id. Notably, the agreements at issue in Fallon did not include integration clauses.

Here, the Court need not make such an inference because the plain language of the terms and conditions made part of the purchase orders covered by the Motion clearly states that each

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

purchase order is the entire agreement between General Motors and Delphi, and supersedes all

prior oral or written representations and agreements.  (Ruselowski Decl. Ex. A.)

REDACTED

Michigan law is clear on this point:  when parties include an

integration clause in their written contract, it is conclusive.  See, e.g., UAW-GM Human

Resource Ctr. v. KSL Recreation Corp., 579 N.W. 2d 411, 418 (Mich. 1998).

REDACTED

Second, GM has not explained how the Debtors' rejection of contracts that may be

associated, but not merged with, the "master agreements" releases GM from its obligations under

either the GO Agreement or the CSA.  GM argues that "there is no rational basis to contend that

GM is obligated under a master agreement to provide Delphi supply contracts for multiple parts

if Delphi can repudiate contracts for some parts."  (Objection 68.)  The Debtors' rational basis for

this contention has been discussed throughout this response.  The Bankruptcy Code gives a

debtor the right to reject executory contracts that are burdensome to the estate.  The Bankruptcy

Code does not give a non-debtor party the option of discontinuing its performance under an

executory contract.  See, e.g., In re El Paso Refinery, L.P., 220 B.R. 37, 44 (Bankr. W.D. Tex.

1998) ("pending assumption or rejection by the estate, the non-debtor party to an executory

contract is bound by terms of the contract: '[T]he Code places an independent duty on the non-

debtor to continue the performance of an executory contract until it is assumed or

rejected ·Whether the debtor performs or not, the non-debtor must perform until assumption or

---
23

REDACTED

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

rejection.' <u>Krafsur v. UOP</u> (<u>In re El Paso Refinery, L.P.</u>), 196 B.R. 58, 72 (Bankr. W.D. Tex.

1996).").  The Debtors are not moving to reject either the CSA or the GO Agreement, and GM

must continue to perform under the terms of those agreements.

**REDACTED**

---

[24]       <u>See</u> GM-RJ 005549 (attached hereto as Exhibit J).

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

**REDACTED**

GM's argument concerning the potential impact on the CSA is even more specious. That agreement maintained the status quo with respect to existing purchase orders at the time of Delphi's spin-off from GM. GM cannot articulate any material, negative impact on the Debtors even assuming that, as GM asserts, the rejection of contracts at issue in the Motion were to free GM from any obligations under the CSA.[26]

To conclude, when one sets aside the parade of horribles conjured by GM and focuses instead on what the Debtors actually seek to accomplish by this Motion, the benefit to the estates becomes obvious and irrefutable. In the Debtors' business judgment, the authority to reject the GM Loss Contracts will result in increased value from their relationship with GM. GM makes no attempt to explain how supplying the same parts at a higher price would fail to benefit the Debtors' estates, and there is no logical line of argument that would enable them to offer such an explanation.

### 2.    The GM Loss Contracts Are Burdensome

GM also argues that the Debtors have failed to establish that the GM Loss Contracts are burdensome. In fact, the two-phase analysis performed by the Debtors with the assistance of their restructuring and financial advisor, FTI, demonstrates beyond any reasonable doubt that the

---

[25]    While GM estimates that approximately $ 4.5 billion of annual purchase value ("APV") is at issue in the Motion (Ruselowski Decl. ¶7), the total anticipated APV in 2006 for all contracts associated with the GO process business awards at issue in the Motion is only $60 million. (GM-RJ 002753 (attached hereto as Exhibit K).)

[26]    Q:    Other than the right to cancel a contract that GM would have if the CSA went away, are there any other negative impacts to Delphi of the CSA being terminated?

A:    I don't know, but I don't think so.

(Ruselowski Dep. 144:18-21.)

34

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

net cost of producing the parts covered by the GM Loss Contracts vastly exceeds the revenue received from GM for those parts, resulting in significant operating losses for the Debtors. Based on this analysis, the GM Loss Contracts easily qualify as burdensome.

Indeed, the United States Supreme Court and the Second Circuit have expressly recognized that a debtor-in-possession may, in its business judgment, conclude that a contract is burdensome even if the contract is profitable. Group of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 549–50 (1943) (rejecting lease under which debtor "received a net financial benefit"); Minges, 602 F.2d at 42–43 (rejecting non-debtor's argument that "an executory contract cannot be deemed 'burdensome' [if] it produces a profit"); accord Frostbaum v. Ochs, 277 B.R. 470, 475 (E.D.N.Y. 2002) (explaining that business judgment rule applies to "trustee's decision to reject an executory contract that potentially would provide some profit to the estate if fulfilled, but would ultimately result in greater profit to creditors if rejected"). There is no need to resort to this principle in this case, however, because GM's criticisms of the Debtors' analysis of the unprofitability of the GM Loss Contracts are unfounded.

In the Objection and supporting declaration of rebuttal expert Jeffery Baliban, GM seeks to cast doubt on whether the Debtors have shown that the GM Loss Contracts are truly burdensome to the Debtors' estates. GM offers two types of arguments in this regard. First, GM argues that the Debtors' "fixed costs" imply that the Debtors are better off performing under the GM Loss Contracts than not performing. (Objection 45.) Second, GM argues that certain methodological issues related to the Debtors' profitability analyses leave doubt as to whether all of the contracts at issue are unprofitable. (Id.) Remarkably, GM goes so far as to contend that "Delphi's declarations have not satisfied its burden of proving it is losing money because of the

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Supply Contracts."  Id.[27]  This despite the data cited in the Motion showing that the Debtors suffered actual operating losses of $1.47 billion in 2005 at the 21 GM Loss Plants at issue in the Motion — plants that, on average, have 82 percent of their sales flowing to GM and GM's tier suppliers.  (See Mot. ¶ 24.)

As discussed above, the "fixed cost" argument incorrectly assumes that "rejection" here means the cessation of all production and supply to GM of the parts at issue.

**REDACTED**

The various methodological issues GM identifies also do not raise any realistic doubt as to the burdensomeness of the GM Loss Contracts.  First, GM contends that net operating income is not an appropriate metric to use when deciding which contracts to reject, because fixed costs

---

[27]

**REDACTED**

[28]

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

are included within that calculation.  Again, the basis for this contention is a misunderstanding of the meaning of "rejection" in this context.  Given that the Debtors' goal is repricing and not the cessation of production, negative operating income is clearly a useful metric for identifying which contracts to reject.

**REDACTED**

GM next argues that the Debtors skewed the Phase One analysis by conducting a contract-by-contract analysis of four plants that were known to be particularly unprofitable, that were grouped in the Automotive Holdings Group ("AHG") because they were non-core businesses, and that mainly supplied GM.  Yet similar criteria govern the plants identified in the second, plant-wide phase of the Debtors' profitability analysis:  the 21 plants generated negative operating income on a net basis and primarily produced parts for GM vehicles

**REDACTED**

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

REDACTED

) GM emphasizes that the Phase Two methodology does not definitively establish that each of the GM contracts at issue in the Motion is unprofitable, and the Debtors readily concede this point. There is no requirement under section 365(a), however, that precludes a debtor from basing its reasonable business judgment on a net, plant-wide analysis, particularly where, as here, the debtor is rejecting contracts in order to seek a broader repricing solution. The touchstone is simply whether rejection is likely to benefit the estates, and the Debtors' Phase Two analysis is more than adequate in identifying contracts that a losing a substantial amount of money and that require repricing.

Third, GM contends that FTI's methodology was inadequate because it considered only 11 months of 2005 data and evaluated only 20 contracts in Phase One as a basis for its decision to move away from performing contract-specific profitability analyses. (Objection 48.)

REDACTED

Furthermore, the contention that the Debtors considered only 20 contracts before deciding to transition to a plant-wide analysis is demonstrably false.[29] As indicated in the Motion, the contract-specific methodology in Phase One of the analysis identified over 500 unprofitable contracts related to 1395 unprofitable GM parts. At the four Phase One plants alone, these unprofitable GM parts generated $120 million in operating losses in 2005, whereas all GM

---

29

REDACTED

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

parts generated a net of $108 million in operating losses.  These results supported the Debtors'

conclusion to proceed on a plant-wide basis, based on the realization that part- or contract-

specific allocation methods were unnecessary in order to identify a universe of significantly

unprofitable GM contracts that merit rejection and repricing.  (Mot. ¶¶ 50-51.)

III.    Although Section 365(a) Does Not Require The Court To Balance The Equities, The
        Balance Here Weighs In Favor Of Rejection

        GM argues that, in addition to evaluating the Debtors' business judgment in deciding to

seek the authority to reject the GM Loss Contracts, the Court should also weigh the equities to

determine whether rejection is appropriate.  (See Objection 69-72.)  However, in contrast to a

motion to reject a collective-bargaining contract under section 1113 of the Bankruptcy Code (or

Bildisco before section 1113 was enacted), a motion to reject an executory contract under section

365(a) of the Bankruptcy Code does not require the Court to balance the equities.  See In re

Riodizio, Inc., 204 B.R. 417, 425 n.9 (Bankr. S.D.N.Y. 1997) ("The right to assume or reject an

executory contract is designed to permit the debtor to shed its obligations under burdensome and

uneconomical contracts.  Section 365 does not require any balancing of the equities.").  Indeed,

many courts have concluded that the balance of equities between the debtor and non-debtor is an

"irrelevant" factor that should not be considered under section 365(a).  See, e.g., In re Trans

World Airlines, Inc., 261 B.R. 103, 122-23 & n.7 (Bankr. D. Del. 2001) (stating that inquiry

regarding "the potential burden imposed on a nondebtor party" is "irrelevant and unnecessary,"

and citing cases); In re Prime Motor Inns, 124 B.R. 378, 383 (Bankr. S.D. Fla. 1991) (impact of

rejection on non-debtor "is not proper for consideration"); In re H.M. Bowness, Inc., 89 B.R. 238,

242 (Bankr. M.D. Fla. 1988) ("[T]he effect of the rejection on the innocent third-party . . . is not

an appropriate factor for the Court to consider."); In re Wheeling-Pittsburgh Steel Corp., 72 B.R.

845, 847 (W.D. Pa. 1987) ("Once the debtor establishes that rejection will benefit the estate, the

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

inquiry ends. The burden that rejection may visit upon other entities is not a material fact to be considered by the court under the business judgment test."); In re Logical Software, Inc., 66 B.R. 683, 687 (Bankr. D. Mass 1986) (effects of rejection on non-debtor "are simply not relevant").

The rationale for not balancing the equities on a motion to reject an ordinary executory contract was best expressed in Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985), a case involving a technology license, in which the court explained:

> It cannot be gainsaid that allowing rejection of such contracts as executory imposes serious burdens upon contracting parties such as [the non-debtor]. Nor can it be doubted that allowing rejection in this and comparable cases could have a general chilling effect upon the willingness of such parties to contract at all with businesses in possible financial difficulty. But under bankruptcy law such equitable considerations may be not be indulged by courts in respect of the type of contract here in issue. Congress has plainly provided for the rejection of executory contracts, notwithstanding the obvious adverse consequences for contracting parties thereby made inevitable. Awareness by Congress of those consequences is indeed specifically reflected in the special treatment accorded to union members under collective bargaining contracts [citing Bildisco], and to lessees of real property [citing section 365(h) of the Bankruptcy Code]. But no comparable special treatment is provided for technology licensees such as [the non-debtor]. They share the general hazards created by § 365 for all business entities dealing with potential bankrupts in the respects at issue here.

Lubrizol, 756 F.2d at 1048. Lubrizol's reasoning applies with equal force to GM, as Congress has provided no special treatment for non-debtors that are parties to the type of supply contracts at issue here.

That said, the Debtors fully recognize that bankruptcy courts are courts of equity, and that, in some instances, courts have found it appropriate to balance the equities in deciding whether to grant a rejection motion under section 365(a). An examination of the equities in this case reveals that they weigh in favor of the Debtors and rejection.

First and foremost, the Debtors' request for relief must be viewed in light of their fiduciary duties. GM ignores the fact that a debtor-in-possession has a fiduciary duty to reject an

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

executory contract when rejection would benefit the estate. In re 68 West 127 Street, LLC, 285

B.R. 838, 845 (Bankr. S.D.N.Y. 2002). Delphi sustained an operating loss of approximately $1.5

billion in 2005. (See Sheehan Dec. (Docket No. 3037) ¶¶ 24–26.) And, as of May 1, 2006,

Delphi projects that it will suffer an operating loss of approximately $2.0 billion in 2006.

(Sheehan Supplemental Decl. (Docket No. 3552) ¶ 3.) GM is Delphi's largest customer,

accounting for approximately 63 percent of Delphi's North American revenue in 2005. (See Mot.

¶ 25.) Delphi incurs a substantial portion of its operating losses in connection with the Debtors'

provision of parts to GM under the GM Loss Contracts.

These GM Los Contracts are unprofitable for several reasons, among them the fact that

the Debtors inherited from GM burdensome collective-bargaining agreements involving

uncompetitive labor costs and other unsustainable operating restrictions. The GM Loss

Contracts do not provide the Debtors with adequate revenue to cover these high costs, in part

because of GM's practice of aggressively implementing annual price-downs. Since Delphi was

spun off, in 1999, price-downs under its agreements with GM have averaged 2.1 percent of sales

per year, far in excess of the 1.6 percent predicted by Delphi in 1999. (See Weber Decl. ¶ 14;

Sheehan Decl. ¶ 43.) Since the spin-off, GM's year-over-year price reductions have been 50

percent greater than those implemented by the other original-equipment manufacturers supplied

by the Debtors. (See Sheehan Dec.l ¶ 43.) Thus, GM has contributed to the unprofitability of

the GM Loss Contracts on both the cost and revenue sides of the equation. It would be a

dereliction of their fiduciary duties for the Debtors to continue to supply parts to GM at a loss.

GM presents a list of points that it believes show that the balance of equities weigh in

favor of denying the Motion. (Objection 71.) Those points, however, do not withstand scrutiny,

as demonstrated below:

41

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

- GM claims that rejection would cause it to suffer irreparable harm. But this claim assumes that rejection would result in a shutdown of GM. As discussed at length elsewhere in this response, shutting down GM is an unrealistic scenario that the Debtors will strive to avoid and that GM can easily avoid as well.

- According to GM, documents produced in discovery demonstrate that

REDACTED

- GM also maintains that "Delphi's threat of a shutdown" constitutes economic duress, a tort under Michigan law. (Id.) Yet there is no evidence that Delphi has ever threatened to shut down GM, and in fact Delphi has made no such threats. Moreover, as discussed in detail in Part IV.B of this response, GM's economic-duress theory does not hold water.

- The next point offered by GM is that "Delphi is attempting to have this Court approve, bless, and sponsor its inequitable, tortious conduct." (Id.) Three verbs and two adjectives do not add up to an argument, and GM's conclusory statement that Delphi has engaged in unidentified bad acts contributes nothing to its position that the balance of equities weighs in its favor.

- Finally, GM posits that any benefit the Debtors derived from rejecting the GM Loss Contracts "would be inherently speculative and incapable of quantification because the claims, demands, and needs of Delphi's unions and GM are so complex that the imposition of higher prices involuntarily through a shutdown threat does not translate into an overall better outcome for Delphi, only a more contentious one." Id. The benefit of rejection here is self-evident, not speculative. No amount of complexity or contention can alter the fact that, if the Debtors reject and reprice the GM Loss Contracts, as they expect, they will achieve a benefit for the estates by generating more revenue from the sale of parts to GM. While the precise amount of the increased revenue will not be known until the parties implement a repricing, the business judgment test does not require a debtor-in-

---

30

REDACTED

31    For further details regarding Phase One, see the Motion at ¶¶ 39–48 and the materials cited in those paragraphs.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

possession to establish with mathematical precision the benefits of rejection. Nor does a debtor need to somehow demonstrate that the rejection of burdensome contracts will resolve every conceivable difficulty in its path toward a successful restructuring.

IV.   GM's Accusations Of Bad Faith And Unlawful Conduct Are Meritless

GM's next line of defense is to accuse the Debtors of acting in bad faith in seeking authority to reject the GM Loss Contracts. In addition, GM urges the Court to deny the Motion based on GM's fear that the Debtors might exercise their authority to reject the GM Loss Contracts in a way that constitutes economic duress under Michigan law. Neither of these arguments is persuasive. Courts applying the business judgment test have consistently held that there is nothing untoward about a debtor-in-possession rejecting an executory contract for the purpose of obtaining more attractive terms from the non-debtor party. Accordingly there is no support for a finding of bad faith here. With respect to economic duress, GM's argument fails because the hypothetical set of facts on which it is based do not involve the type of unlawful conduct required under Michigan law.

To put things into broader perspective, GM has alleged bad faith and unlawful conduct by the Debtors despite the fact that the Debtors have been negotiating in good faith with GM regarding its contribution to a comprehensive consensual resolution for a period that stretches back to the summer of 2005, before the Debtors filed their petitions in these cases. As the Court is aware, the Debtors and GM have been heavily involved in negotiations with the Debtors' unions during this period as well. The Debtors have not threatened a shutdown of GM or stopped their shipments of parts to GM at any point during any of these discussions. In numerous instances involving substantial revenue, the Debtors have continued to make shipments to GM even after the applicable supply contract has expired. GM does not dispute any of this. Now, after months of negotiations and accommodations have passed, the Debtors'

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

seek the Court's assistance in obtaining the support it needs by granting it the authority to reject the GM Loss Contracts, something that GM itself predicted would happen in its Form 8-K of October 11, 2005. There is no basis for GM to accuse the Debtors of a holdup under these circumstances.

GM also stresses that the Debtors are GM's sole-source suppliers of many of the parts covered by the GM Loss Contacts, and that GM would feel the negative consequences of a shutdown almost instantaneously because of just-in-time inventory practices. Yet sole-source suppliers and just-in-time inventory are commonplace in the automotive industry. If taken to its logical end, GM's position that the Debtors should not be permitted to reject the GM Loss Contracts because it might result in a shutdown would, in effect, carve out of section 365(a) an exception that forces debtors in the automotive industry to perform burdensome supply contracts so as not to disrupt the operations of their customers and to effectively subsidize these customers at the expense of the debtors' estates and the reorganization process. As a matter of policy, the Court should not allow GM to invoke business practices in the automotive industry to override the Debtors' ability to successfully reorganize under the Bankruptcy Code.

A.    The Debtors' Are Acting In Good Faith In Pursuing The Authority To Reject The GM Loss Contracts

In support of its argument that the Debtors are attempting to use the Bankruptcy Code in bad faith as a "sword," rather than a "shield," GM relies on In re Penn Central Transportation Co., 458 F. Supp. 1346 (E.D. Pa. 1978). (Objection 70-71.) GM's use of Penn Central presents another situation in which it seeks to stretch a case beyond its limited application. Penn Central decided a narrow question of statutory interpretation under the old Bankruptcy Act—namely, whether a debtor-lessor's disaffirmation of leases including rent covenants that established below-market rents would "deprive the lessee[s] of [their] estate[s]," in violation of section 70(b)

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

of the Bankruptcy Act.[32] Penn Central, 458 F. Supp. at 1354. The leases were net leases that "generate[d] very substantial cash flow" for the debtor's estate, but the debtor wanted to disaffirm the leases and generate even more cash flow. Id. The court ruled that such a disaffirmation would violate section 70(b) based on its conclusions that "exact[ing] increased rent payments on pain of eviction would be tantamount to depriving [the lessees] of their estates." Penn Central, 458 F. Supp. at 1355-56. Although Penn Central cited "equitable considerations" in rejecting the debtor's proposed interpretation of section 70(b),[33] Penn Central, 458 F. Supp. at 1356, there is nothing in the decision that suggests a general prohibition on rejecting a contract for the purpose of renegotiating better terms with the non-debtor party.[34]

Indeed, as demonstrated in the Debtors' Motion, it is well-settled that a debtor-in-possession exercises sound business judgment when it rejects an executory contract so that it may enter into a new contract with the same party with more favorable terms. (See Motion ¶ 67 (citing Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989); Bhd. of Ry., Airline & Steamship Clerks v. REA Express, Inc., 523 F.2d 164, 169 (2d Cir. 1975);

---

[32]    Section 70(b) provided that, "Unless a lease of real property shall expressly otherwise provide, a rejection of such lease or of any covenant therein by the trustee of the lessor shall not deprive the lessee of his estate." Bankruptcy Act, former 11 U.S.C. § 110(b) (repealed 1978).

[33]    The debtor argued that the term "estate" in section 70(b) was limited to the right of possession. Penn Central, 458 F. Supp. at 1355.

[34]    The other cases cited by GM—In re Bullet Jet Charter, Inc., 177 B.R. 593 (Bankr. N.D. Ill. 1995) and In re Hirschhorn, 156 B.R. 379 (Bankr. E.D.N.Y. 1993)—are inapposite. Notably, both cases involved contracts that were not "executory," and therefore not covered by section 365(a). See Bullet Jet, 177 B.R. at 601 ("Therefore, the Agreement cannot be treated as 'executory' for bankruptcy purposes."); Hirschhorn, 156 B.R. at 389 ("[T]he non-compete clause is not an executory contract which may be rejected by the Debtor."). While both cases contain dicta observing that the debtor was misusing the bankruptcy process, one case involved a series of bad acts by the debtor, including, among other things, concealing information from the non-debtor and the court, making misrepresentations to the court in seeking an extension of the deadline to assume or reject the contract, and "ignoring the jurisdiction of [the] Court." Hirschhorn, 156 B.R. at 383-85. There are and could be no similar allegations of misconduct here. In the other case, the debtor "grossly abused its business discretion" by seeking to reject a contract to sell at market value an airplane that was depreciating and otherwise draining assets from the estate. Bullet Jet, 177 B.R. at 601. The relatively easy question answered by Bullet Jet—i.e., whether a debtor exercises sound business judgment when it refuses to unload a burdensome asset for a fair price—is not presented here.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

In re Metro Transp. Co., 87 B.R. 338, 344 (Bankr. E.D. Pa. 1988); Wheeling-Pittsburgh Steel, 72

B.R. at 848–49).)

> B.    GM's "Economic Duress" Argument Is Fundamentally Flawed

GM claims that granting this Motion could allow the Debtors to force GM to enter into

new agreements by threatening to stop shipments to GM, in violation of Michigan's economic

duress doctrine.    A party claiming economic duress must establish that it was "illegally

compelled or coerced to act by fear of serious injury to [its] person[], reputation[], or fortune."

Farm Credit Servs. of Mich.'s Heartland, P.C.A. v. Weldon, 591 N.W.2d 438, 447 (Mich. Ct.

App. 1998) (emphasis added); accord Enzymes of Am., Inc. v. Deloitte, Haskins & Sells, 523

N.W.2d 810, 814 (Mich. Ct. App. 1994) (same), rev'd in part on other grounds sub nom. Porta-

John Corp. v. Deloitte, Haskins & Sells, 539 N.W.2d 513 (Mich. 1995).   As a host of Michigan

cases have held, "fear of financial ruin alone is insufficient to establish economic duress." E.g.,

Farm Credit, 591 N.W.2d at 447; Enzymes, 523 N.W.2d at 814; Apfelblat v. Nat'l Bank

Wyandotte-Taylor, 404 N.W.2d 725, 728 (Mich. Ct. App. 1987) (per curiam).   As stated in

Truform, Inc. v. General Motors Corp., 80 Fed. Appx. 968 (6th Cir. 2003), a party's "concern

that it might go out of business [is] insufficient to establish economic duress under Michigan

law." Id. at 979.   The claimant must establish that the opposing party acted "illegally."[35] E.g.,

---

[35] GM's position that the doctrine also encompasses acts that are merely "wrongful" is mistaken. Although a
federal court applying Michigan law stated in Kelsey-Hayes Co. v. Galtaco Redlaw Casting Corp., 749 F.
Supp. 794, 796-97 & n.5 (E.D. Mich. 1990), that a wrongful act would suffice, the Michigan Court of
Appeals concluded in Enzymes that Kelsey-Hayes had misstated Michigan law on this point. 523 N.W.2d
at 814. Since Enzymes was decided, federal courts applying Michigan law have consistently held that
economic duress requires an act that is illegal. See, e.g., Flannery v. Tri-State Div., 402 F. Supp. 2d 819,
825 (E.D. Mich. 2005) (stating that economic duress occurs "when one is compelled to submit to an illegal
exaction") (internal quotation marks omitted); Myers v. U.S., 943 F. Supp. 815, 819 (W.D. Mich. 1996)
(describing Enzymes as "reiterating the requirement of showing illegality to prove duress"), rev'd on other
grounds, 145 F.3d 1332 (6th Cir. 1998).  GM was a party to one such case.  See Truform, 80 Fed. Appx.
968, 978 (6th Cir. 2003) ("To succeed on a claim of economic duress under Michigan law, a plaintiff must
show that it was illegally compelled or coerced to act by fear of serious injury to its reputation or
fortunes.").

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Farm Credit, 591 N.W.2d at 447 (rejecting economic-duress claim when defendants failed to allege that "plaintiff acted illegally"); Enzymes, 523 N.W.2d at 814 ("Illegality is an element of duress."); Apfelblat, 404 N.W.2d at 728 ("Duress requires compulsion or coercion by which one is illegally forced to act . . . .").

The basic flaw in GM's duress argument is that it fails to allege any illegal (or even "wrongful") conduct by the Debtors.  By this Motion, the Debtors seek an order authorizing them to reject the GM Loss Contracts on ten days' notice to GM and others.  If the Court issues such an order and the Debtors choose to exercise their authority to reject the contracts, they will be doing so pursuant to the legal authority granted by the Court.  Whether or not rejection would lead to a shutdown at GM (and again, the Debtors neither expect nor intend such an outcome), it defies reason to suggest that the Debtors would be acting illegally or wrongfully if they stopped performing under the GM Loss Contracts to protect the value of their estates for the benefit of their creditors and other stakeholders.

In addition, the proponent of an economic duress claim must show that it does "not have an adequate legal remedy available."  Hungerman v. McCord Gasket Corp., 473 N.W.2d 720, 721 (Mich Ct. App. 1991); Macene v. County of Wayne, No. 182966, 1997 WL 33352865, at *4 (Mich. Ct. App. Apr. 8, 1997) (per curiam).  As described in greater detail in response to GM's specific performance argument, see Part V below, if the Debtors reject the GM Loss Contracts and GM is damaged by agreeing to pay a higher price under new agreements, GM may seek breach-of-contract damages.  This avenue of relief makes it impossible for GM to establish the requisite lack of an adequate legal remedy.

GM relies on General Motors Corp. v. Paramount Metal Products Co., 90 F. Supp. 2d 861 (E.D. Mich. 2000), in support of its economic duress argument.  That case is inapposite,

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

however, because it involved a supplier's threat to <u>unlawfully</u> breach a contract that had not been

rejected under the Bankruptcy Code. The supplier in <u>Paramount</u> threatened to "immediately

cease seat frame production" under its supply contracts with GM unless GM either purchased the

supplier or granted it a retroactive price increase. <u>Id.</u> at 864. Faced with this ultimatum, GM

executed a new agreement with the defendant, but later found an alternate supplier and then filed

a lawsuit seeking to invalidate the new agreement on the basis of economic duress under Ohio

law.[36] <u>Id.</u> at 864–65, 870. The district court denied the supplier's motion for summary judgment

on this claim, ruling that it was possible for GM to demonstrate that the defendant "unlawfully

coerced [GM] into executing the [new agreement] by threatening to immediately stop producing

seat frames <u>without a legal right to do so</u>, and thereby depriving the plaintiffs of the exercise of

their free will." <u>Id.</u> at 875 (emphasis added). "A clear <u>unlawful</u> breach of contract by [the

defendant] under circumstances that would shut down production of vehicles by [GM] clearly

satisfies the 'illegal' conduct requirement of an economic duress defense." <u>Id.</u> (emphasis added).

        In contrast to the supplier in <u>Paramount</u>, which threatened to stop performing a contract it

had a legal obligation to perform, the Debtors would cease performance under the GM Loss

Contracts only after obtaining the Court's authority to do so under section 365(a) of the

Bankruptcy Code. This distinction is critical because, again, once a contract is rejected pursuant

to section 365(a), the Debtors will not have a legal obligation to continue performance of the

contract. See <u>In re Lavigne</u>, 114 F.3d 379, 398 (2d Cir. 1997) (explaining that rejection under

section 365(a) "frees the estate from the obligation to perform" the contract); <u>In re Hooker Invs.</u>,

<u>Inc.</u>, 131 B.R. 922, 928 (Bankr. S.D.N.Y. 1991) ("In seeking authorization to reject a contract, a

---

[36]    In <u>dicta</u>, <u>Paramount</u> cited <u>Kelsey-Hayes</u> for the proposition that, under Michigan law, "[e]conomic duress
        may be accomplished through a 'wrongful' act as well as an 'illegal' act." 90 F. Supp. 2d at 875. As
        discussed in footnote 78, however, the Michigan Court of Appeals has squarely rejected <u>Kelsey-Hayes</u>'s
        pronouncement of Michigan law on this point.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

debtor asks . . . for a judicial declaration that it be relieved of future obligations to perform the burdensome contract.").

When a party acts in accordance with its legal rights and duties, those acts cannot be used to satisfy the economic duress doctrine's illegal-conduct requirement. See Apfelblat, 404 N.W.2d at 728 (holding that creditors were "entitled to enforce their contractual rights" and "may properly warn of [their] intentions to pursue collection without being subject to a defense of duress"); Frank v. Henry Ford Health Sys., No. 201419, 1999 WL 33452190, at *2 (Mich. Ct. App. Mar. 26, 1999) (per curiam) (ruling that medical group's expression of "intent to comply with a federal law requiring health care facilities to disclose to a data bank any denial of privileges to a physician" did not constitute economic duress). Accordingly, when a party has no legal duty to conduct business with another, the party's threat to discontinue business with the other is not illegal for purposes of establishing economic duress. For example, in Andersons, Inc. v. Crotser, No. 226095, 2001 WL 1511567 (Mich. Ct. App. Nov. 27, 2001) (per curiam), the defendant claimed that his agent signed confirmations "because plaintiff threatened to cease conducting business with defendant and his family unless someone signed the confirmations." Id. at *2. The court found no economic duress under these circumstances, stating, "Even accepting defendant's characterization of plaintiff's threats, . . . absolutely no indication exists that plaintiff acted illegally in urging defendant's [agent] to sign the confirmations." Id.[37]

---

[37] In arguing that the Debtors have engaged in illegal conduct, or might do so at some point in the future, GM also cites 28 U.S.C. § 959(b). This provision is of no help to GM, however, because it does not create any legal obligations that do not already exist under state law; rather, it merely requires a debtor-in-possession to "manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated." Id.; see also In re Stable Mews Assocs., Inc., 41 B.R. 594, 598 (Bankr. S.D.N.Y. 1984) (explaining that section 959(b) "imposes . . . a broad obligation to comply with state law, without enumerating any specific responsibilities"). Because GM cannot establish an underlying violation of state law, this section does not apply. This conclusion would not change even if the Debtors rejected the GM Loss Contracts and stopped performance. See In re Bradlees Stores, Inc., No. 02 Civ. 0786 (WHP), 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003) ("a simple breach of contract is not

(cont'd)

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

### V.    GM Has No Right To Specific Performance If The Debtors Reject The GM Loss Contracts

The final argument presented by GM is that, upon rejection by the Debtors, GM would have a right to specific performance of the GM Loss Contracts, and that its right to this equitable remedy would give rise to a cause of action that is not dischargeable claim under the Bankruptcy Code. In other words, GM asserts that it would be futile for the Debtors to reject the GM Loss Contracts because GM could force the Debtors to perform the contracts in any event. This argument fails on two grounds. First, a debtor-in-possession's rejection of an executory contract under section 365(a) of the Bankruptcy Code defeats the non-debtor's ability to obtain specific performance of the contract, even if the non-debtor would otherwise be entitled to specific performance under applicable state law.[38] Second, even if rejection did not trump a non-debtor's right to specific performance, GM cannot satisfy the requirements for obtaining that remedy under Michigan law.

---

*(cont'd from previous page)*

cognizable under § 959(b) since any damages flowing from such a rejection are deemed to have occurred immediately prior to the filing of the debtor's petition in bankruptcy, and thus are treated as a pre-petition claim against the property of the debtor's estate"); In re Caldor, Inc., 240 B.R. 180, 195 (Bankr. S.D.N.Y. 1999) (holding that section 959(b) did not apply when debtor "simply breached a contract" pursuant to a bankruptcy court's orders regarding the payment of claims), aff'd sub nom. Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575 (S.D.N.Y. 2001).

[38]    GM's argument that 28 U.S.C. § 959(a) would allow GM to sue the Debtors for specific performance without leave of court is incorrect. As discussed in First Fiscal Fund Corp. v. Fishers Big Wheel, Inc., 36 B.R. 299 (E.D.N.Y. 1984), this section:

> provides creditors with the automatic authority to commence an action against a debtor-in-possession for post-petition acts related to the carrying on of the business of the debtor-in-possession. An action on a claim arising out of the rejection of an executory contract, however, is not included in this category since any damages flowing from such a rejection are deemed to have occurred immediately prior to the filing of the debtor's petition in bankruptcy [pursuant to section 365(g) of the Bankruptcy Code], and thus must be regarded as a pre-petition bankruptcy claim against property of the debtor's estate.

Id. at 302. This interpretation places GM's economic duress theory outside the coverage of 28 U.S.C. § 959(a) as well, because it is clear that GM's tort theory arises from the Debtors' rejection of the GM Loss Contracts.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

A.    The Bankruptcy Code Does Not Permit A Non-Debtor To Seek Specific
Performance Of A Rejected Contract

While a considerable portion of GM's brief is devoted to the argument that GM is entitled

to specific performance of the GM Loss Contracts, and that this equitable remedy is not a

"claim" that can be discharged under the Bankruptcy Code (see Objection 48-66), it gives only

token consideration to a critical threshold question—namely, whether a non-debtor has the

ability to seek specific performance of an executory contract that has been rejected pursuant to

section 365(a) of the Bankruptcy Code.

Specific performance should not be available in such circumstances, regardless of

whether the non-debtor would be entitled to specific performance under state law.  See, e.g.,

Midway Motor Lodge of Elk Grove v. Innkeepers' Telemanagement & Equip. Corp., 54 F.3d

406, 407-08 (7th Cir. 1995) (stating that "[r]ejection avoids specific performance," and that

"rejection is a device to avoid specific performance"); In re Rega Props., Ltd., 894 F.2d 1136,

1140 (9th Cir. 1990) ("specific performance [is] not an available relief under section 365");

Leasing Serv. Corp. v. First Tenn. Bank Nat'l Ass'n, 826 F.2d 434, 436 (6th Cir. 1987)

("Rejection denies the right of the contracting creditor to require the bankrupt estate to

specifically perform the then executory portions of the contract [and] limits the creditor's claim

to damages for breach of contract."); In re Ducane Gas Grills, Inc., 320 B.R. 341, 350 (D.S.C.

2004) (explaining that non-debtor cannot obtain specific performance of a rejected contract); In

re Executive Tech. Data Sys., 79 B.R. 276, 282 (Bankr. E.D. Mich. 1987) (same); In re Waldron,

36 B.R. 633, 642 n.4 (Bankr. S.D. Fla. 1984) ("The Code does not permit specific performance

as a remedy resulting from the rejection of an executory contract under § 365," despite the fact

that "this remedy may have otherwise been available to [the non-debtor] had the Debtors simply

breached the . . . contract and chosen to litigate th[e] matter in state court.").

51

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

This was the result, for example, in In re Bradlees Stores, Inc., 194 B.R. 555 (Bankr.

S.D.N.Y. 1996). In that case, the non-debtor brought an adversary proceeding against the

debtors, seeking, among other things, specific performance of an alleged contract granting the

non-debtor the right to purchase certain property. Id. at 557. The debtors moved to dismiss this

count for failure to state a claim under Fed. R. Bankr. P. 7012(b), arguing that the non-debtor

was not entitled to specific performance "because the Debtors retain the right to reject [the]

executory contract under section 365 of the Bankruptcy Code." Bradlees, 194 B.R. at 557. In its

decision granting the debtors' motion, the bankruptcy court noted that, at oral argument, the non-

debtor had "conceded that it could not sustain" its specific-performance claim "in light of the

Debtors' ability to reject executory contracts under section 365." Bradlees, 194 B.R. at 558. The

court's discussion of this point cited several cases from foreign jurisdictions, as well as the

Second Circuit's decisions in Orion and Minges. See Bradlees, 194 B.R. at 558.

The decision in Barnett v. Blachura, 618 N.W.2d 777 (Mich. Ct. App. 2000) (per curiam),

is also particularly instructive, as it reflects the views of a Michigan state court on whether

specific performance is an available remedy when a contract has been rejected under section

365(a). Barnett was a state-court action for specific performance of an alleged contract to buy

land. 618 N.W.2d at 778. When the debtor-seller rejected the contract pursuant to section 365(a)

in a separate bankruptcy case, the state court divested itself of subject-matter jurisdiction over

the specific performance action. Barnett, 618 N.W.2d at 779-80. The Michigan Court of

Appeals reversed and remanded "for a determination whether an enforceable contract to

purchase property exists," and instructed that, "If a contract is found, then plaintiff"—who, again,

was seeking specific performance—"has the option to pursue his unsecured claim for prepetition

damages through the normal bankruptcy process." Id. at 781. By directing the buyer to pursue

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

prepetition damages in the bankruptcy case, the court foreclosed the possibility that the buyer

could maintain his action for specific performance of the rejected contract. There is no reason to

believe that a Michigan court would reach a different conclusion if presented with a specific-

performance action regarding the GM Loss Contracts.

There are two principal reasons why courts have not allowed non-debtors to pursue

specific performance of rejected contracts. The first is based on 11 U.S.C. § 365(g), which

dictates the consequences that flow from rejection. Under section 365(g), the rejection of an

executory contract that has not been assumed constitutes a breach of the contract as of the date

immediately before the date of the filing of the bankruptcy petition. The non-debtor's remedy in

the event of a breach under section 365(g) is limited to damages, as explained by the Fourth

Circuit in:

> Under 11 U.S.C. § 365(g), [the non-debtor] would be entitled to treat rejection as
> a breach and seek a money damages remedy; however, it could not seek to retain
> its contract rights . . . by specific performance even if that remedy would
> ordinarily be available upon breach of this type of contract. Even though § 365(g)
> treats rejection as a breach, the legislative history of § 365(g) makes clear that the
> purpose of the provision is to provide only a damages remedy for the non-
> bankrupt party.

Id. at 1048 (internal citation omitted).

The second reason for refusing to allow specific performance of a rejected contract is that

requiring the debtor to perform would defeat the fundamental purpose of section 365(a) of the

Bankruptcy Code. As the Second Circuit has stated, the underlying purpose of that section is to

enhance the value of the estate by granting debtors the opportunity to examine their executory

contracts "and decide which ones it would be beneficial to adhere to." See Orion, 4 F.3d at 1098;

accord Lavigne, 114 F.3d at 386. This exercise provides no benefit to the estates if, after

spending the considerable time and resources necessary to evaluate executory contracts and

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

litigate a rejection motion, the debtor is nevertheless forced to perform those contracts based on a

separate action (requiring the expenditure of additional time and resources) for specific

performance that returns the debtor back to square one. Permitting specific performance of a

rejected contract "would in effect do what § 365 meant to avoid, that is, impose burdensome

contracts on the debtor." In re Fleishman, 138 B.R. 641, 648 (Bankr. D. Mass. 1992); accord

Lubrizol, 756 F.2d at 1048 ("Allowing specific performance would obviously undercut the core

purpose of rejection under § 365(a), and that consequence cannot therefore be read into

congressional intent.").

> B.     Even If The Bankruptcy Code Did Not Prohibit Specific Performance Of A
>        Rejected Contract, GM Could Not Obtain Specific Performance Of The GM Loss
>        Contracts Under Michigan Law

"[S]pecific performance is an "extraordinary remedy under Michigan law." G & V

Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1077 n.2 (6th Cir. 1994); accord

Barbers Local 552, Journeymen Barbers, 118 N.W.2d 837, 839 (Mich. 1962) ("The remedy of

specific performance is an extraordinary one granted only in unusual cases to prevent irreparable

harm."). Accordingly, a party seeking specific performance must clear several hurdles designed

to insure that the remedy is invoked only in rare cases, among them the requirement that there is

no adequate legal remedy. See 8600 Assocs., Ltd. v. Wearguard Corp., 737 F. Supp. 44, 46 (E.D.

Mich. 1990) (denying specific performance when "harm suffered by the plaintiff [was] strictly

economic, making money damages an adequate remedy"); Edidin v. Detroit Econ. Growth Corp.,

352 N.W.2d 288, 291 (Mich. Ct. App. 1984) ("Specific performance will not be decreed . . .

where there is an adequate remedy at law.").

Furthermore, under Michigan law, in the event of a breach of contract, the injured party

must make "every reasonable effort to minimize damages." Bak v. Citizens Ins. Co. of Am., 503

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

N.W.2d 94, 97 (Mich. Ct. App. 1993); accord Lorenz Supply Co. v. Am. Standard, Inc., 300

N.W.2d 335, 339 (Mich. Ct. App. 1980) (explaining that "a breach of contract imposes on the

plaintiff a duty to mitigate damages").  As explained by the Michigan Supreme Court in Morris v.

Clawson Tank Co., 587 N.W.2d 253 (Mich. 1998):

> Mitigation of damages is a legal doctrine that seeks to minimize the
> economic harm arising from wrongdoing.  Where one person has committed a tort,
> breach of contract, or other legal wrong against another, it is incumbent upon the
> latter to use such means as are reasonable under the circumstances to avoid or
> minimize the damages.  The person wronged cannot recover for any item of
> damage which could thus have been avoided.

Id. at 263 (internal quotation marks and citations omitted).

In the context of a contract for the sale of goods, the duty to mitigate includes the concept

of "cover."  Under the Michigan Uniform Commercial Code—Sales, Mich. Comp. Laws Ann.

§§ 440.2101–440.2725 ("UCC"), if a seller breaches a sales contract, the buyer must "'cover' by

making in good faith and without reasonable delay any reasonable purchase of or contract to

purchase goods in substitution for those due from the seller."  Id. § 440.2712(1); see also

Lawrence v. Will Darrah & Assocs., Inc., 516 N.W.2d 43, 49 n.18 (Mich. 1994) (explaining that

"the [UCC] imposes a duty on a plaintiff to mitigate damages") (emphasis added).  A buyer who

covers can sue for damages representing "the difference between the cost of cover and the

contract price together with any incidental or consequential damages . . . less expenses saved in

consequence of the seller's breach."[39]  Mich. Comp. Laws Ann. § 440.2712(2).

---

[39]    Under the UCC, incidental damages are "expenses reasonably incurred in inspection, receipt, transportation
and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or
commissions in connection with effecting cover and any other reasonable expense incident to the delay or
other breach." Mich. Comp. Laws Ann. § 440.2715(1).  Consequential damages include "any loss resulting
from general or particular requirements and needs of which the seller at the time of contracting had reason
to know and which could not reasonably be prevented by cover or otherwise," and "injury to person or
property proximately resulting from any breach of warranty." Id. § 440.2715(2).

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

One of the ways to achieve cover is by buying the same goods from the same seller at a higher price. See Kelsey-Hayes, 749 F. Supp. at 799 n.10 (rejecting the argument that "buying the same goods, from the same seller, on different terms is not 'cover' under" the UCC); Calbag Metals Co. v. Guy F. Atkinson Co., 770 P.2d 600, 603 n.6 (Or. Ct. App. 1989) (assuming that "buying the same goods from the seller at a higher price could qualify as cover" under Oregon's version of the UCC); B.B. Walker Co. v. Ashland Chem. Co., 474 F. Supp. 651, 661 (M.D.N.C. 1979) (explaining that buyer covered by purchasing same goods from same seller who breached contract, and who "controlled both the amount and grade of goods it would supply plaintiff, as well as the price therefor").

These principles, taken together, defeat GM's argument for specific performance of the GM Loss Contracts. GM's specific-performance theory is based on the false premise that granting this Motion would leave GM without the parts it needs from the Debtors, and without the ability to re-source those parts to other suppliers in the near future. As described above, however, the Debtors' business judgment is that rejection will not lead to the dire consequences predicted by GM, but rather will result in a new arrangement that preserves the supply of parts essential to GM under terms and conditions that help the Debtors reverse the operating losses they sustain under the GM Loss Contracts. Indeed, if the Debtors breach the GM Loss Contracts by exercising their authority to reject them, and GM cannot re-source the parts without unreasonable delay, GM would have the obligation to mitigate its damages by continuing to purchase parts from the Debtors at a higher price. Under those circumstances, GM would have a legal remedy in the form of a damages claim for the difference between the price set by the GM

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

Loss Contracts and the new, higher price. Given the existence of this adequate legal relief, it

would be improper to impose the extraordinary remedy of specific performance.[40]

---

[40] The fact that any rights arising in GM's favor from the Debtors' rejection of the GM Loss Contracts could be vindicated through cover and an award of damages also defeats GM's argument that those rights do not constitute a "claim" within the meaning of section 101(5) of the Bankruptcy Code. As GM acknowledged in its Objection, a creditor has "a dischargeable claim if money damages are an adequate alternative." (Objection 61.) In addition, GM's request that the Court provide it with "an adequate transition period" during which it would continue to purchase parts under the GM Loss Contracts until it can re-source (id. 79–81) is nothing more than a disguised call for an order requiring specific performance. This request fails for the reasons described above.

REDACTED
CONFIDENTIAL/HIGHLY CONFIDENTIAL

## Conclusion

WHEREFORE the Debtors respectfully request that the Court enter an order overruling the Objection, granting the Motion, and granting the Debtors such other and further relief as is just.

Dated: New York, New York
June 15, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: */s/ John Wm. Butler, Jr.*
    John Wm. Butler, Jr. (JB 4711)
    David E. Springer (DS 9331)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: *Kayalyn A. Marafioti*
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

# EXHIBIT A

**FILED UNDER SEAL**

**EXHIBIT B**

**FILED UNDER SEAL**

# EXHIBIT C

**FILED UNDER SEAL**

# EXHIBIT D

**FILED UNDER SEAL**

**EXHIBIT E**

**FILED UNDER SEAL**

# EXHIBIT F

**FILED UNDER SEAL**

**EXHIBIT G**

**FILED UNDER SEAL**

# EXHIBIT H

**FILED UNDER SEAL**

# EXHIBIT I

EOD JAN 2 5 2002

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 02-B02474 |
| | ) | (Jointly Administered) |
| KMART CORPORATION, et al., | ) | Chapter 11 |
| | ) | Chief Judge Susan Pierson Sonderby |
| | ) | |
| Debtors. | ) | |

## ORDER UNDER 11 U.S.C. §§ 105(a)
## AND 365(a) AUTHORIZING (A) REJECTION
## OF CERTAIN UNEXPIRED LEASES AND (B) APPROVING
## PROCEDURES FOR REJECTING OTHER UNEXPIRED LEASES

Upon the motion dated January 22, 2002 (the "Motion"), wherein

Kmart Corporation ("Kmart") and certain of its domestic subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors"), moved this Court for entry of an order, pursuant to sections 105(a) and

365(a) of the Bankruptcy Code, authorizing the Debtors to reject certain nonresiden-

tial real property leases and subleases (the "Real Property Leases"), which are defined

on Schedules A and B attached hereto; and upon the Affidavit of Charles C.

Conaway, Support of Chapter 11 Petitions and First Day Orders; it appearing to the

Court that (i) it has jurisdiction over the matters raised in the Motion pursuant to 28

U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2); (iii) the relief requested in the Motion is in the best interests of the

119

Debtors, their estates and their creditors; (iv) proper and adequate notice of the Motion and the hearing thereon has been given and that no other or further notice is necessary; and (v) upon the record herein after due deliberation thereon, that the relief should be granted as set forth below,

1.    The rejection of the Real Property Leases shall be effective for each Real Property Lease set forth on the annexed Schedule A as of the date the Motion was filed, unless the applicable lessor objects, on any ground recognized under the Bankruptcy Code, within ten days of service of this Order on such lessor.  In the absence of a timely objection or if an objection is overruled, the effective date of the rejection of a Real Property Lease set forth on the annexed Schedule A shall be as provided in the previous sentence.  The rejection of the Real Property Leases shall be effective for each Real Property Lease set forth on the annexed Schedule B as of ten days following the delivery by the Debtors to the statutory committee and (or 20 largest creditors, if no committee has yet been formed) and the lessor under that particular Real Property Lease of a notice of rejection of that particular Real Property Lease.

2.    Under this lease rejection procedure, the Debtors will pay rent due under a particular Real Property Lease on a pro-rated bases for each day between the entry of this Order and the effective date of the rejection of that Real Property Lease, notwithstanding the terms of such Real Property Lease.

2

3.      Nothing in this Order shall be deemed to extend the time to assume or
reject any Real Property Lease under section 365(d)(4) of the Bankruptcy Code.

4.      The Court shall retain exclusive jurisdiction to resolve any dispute
arising from or relating to the rejections authorized herein or this Order.

3

5.    Notwithstanding Rule 6006(d) of the Federal Rules of Bankruptcy

Procedure, this Order shall take effect immediately upon signature.

Dated: Chicago, Illinois
       January 15, 2002


Chief Judge Susan Pierson Sonderby
UNITED STATES BANKRUPTCY JUDGE

4

## SCHEDULE 1

## REAL PROPERTY LEASES
## IMMEDIATE REJECTION

SCHEDULE A
LEASES
IMMEDIATE REJECTION

| STORE # | CITY | ST | TENANT | LANDLORD |
|---|---|---|---|---|
| 1006 | Woodlands | TX | Kmart Corporation | K Realty Three Associates Ltd. |
| 1011 | Saginaw | MI | Kmart of Michigan, Inc. | East Valley Ltd. Partnership |
| 1017 | Evansville | IN | Kmart of Indiana | Evsan Company, LP |
| 1030 | El Paso | TX | Kmart of Texas, L.P. | Paso Builder Co., LC 1997-1 |
| 1036 | San Antonio | TX | Kmart of Texas, L.P. | San Builder Company LC, 1997-1 |
| 1039 | Sterling Heights | MI | Kmart Corporation | Sterling Ponds Retail Associates |
| 1114 | Forest Park | GA | PACE Membership Warehouse, Inc. | Barbara L. Goldsmith |
| 1166 | Bridgeton | MO | Kmart Corporation | American National Insurance Company |
| 1185 | Chantilly | VA | Pace Membership Warehouse, Inc. | Brookfield-Beverly Road Associates Limited Partnership |
| 1301 | Kalamazoo | MI | Kmart of Michigan, Inc. | Portage Square Associates Ltd. |
| 1305 | N. Syracuse | NY | Kmart Corporation | Norwill Associates |
| 1306 | Cincinnati | OH | Kmart Corporation | Amerishop Biggs Place LLC |
| 1318 | Matteson | IL | Kmart Corporation | LaSalle Bank N.A., Successor Trustee to American National Bank and Trust Company of Chicago, as Trustee under Trust Agreement dated 7/11/94 and known as Trust No. 118519-04 |
| 1320 | Wichita | KS | Kmart Corporation | Puget of Texas |
| 1324 | Lake Mary | FL | Builders Square, Inc. | Edward B. Lipkin, Trustee |
| 1326 | Topeka | KS | Kmart Corporation | Wannamaker Venture |
| 1339 | Florence | KY | Kmart Corporation | Jaygee Associates Inc. |
| 1350 | Orlando | FL | Kmart Corporation | William T. Mobley, Jr. |
| 1351 | Houston | TX | Kmart Corporation | Chemical Bank, as Trustee |
| 1353 | Palm Bay | FL | Kmart Corporation | The Northwestern Mutual Life Insurance Company |
| 1355 | Cutler Ridge | FL | Kmart Corporation | Myra Friedman, Rita Stein, David J. Millstein and Jack Millstein, Jr., Trustees of Millstein Industries |
| 1358 | Allentown | PA | Kmart of Pennsylvania LP | Powerline Assoc., LP |
| 1364 | Columbus | OH | Kmart Corporation | Pembroke Pines, LLC |
| 1369 | Ft. Myers | FL | Kmart Corporation | State Street Bank and Trust Company |
| 1383 | Waterford | MI | Kmart of Michigan, Inc. | Wineman Investment Co. & Summit North LP/ Ramco-Gershenson |
| 1388 | Tulsa | OK | Kmart Corporation | Soilco, L.C. |
| 1397 | Daytona Beach | FL | Kmart Corporation | Square I-1, LLC |
| 1399 | Melrose Park | IL | Kmart Corporation | Winston Plaza Associates |
| 1401 | San Antonio | TX | Kmart of Texas, L.P. | Roy L. Martin & Associates |
| 1411 | Webster | TX | Kmart of Texas, L.P. | Price/Baybrook, Ltd. |
| 1419 | Mt. Clemens | MI | Kmart of Michigan, Inc. | Ramco Clinton Development Company |
| 1420 | Houston | TX | Kmart Corporation | Quest Realty |
| 1423 | Pensacola | FL | Kmart Corporation | Kimsworth, Inc |

SCHEDULE A
LEASES
IMMEDIATE REJECTION

| STORE | CITY | ST | TENANT | LANDLORD |
|---|---|---|---|---|
| 1427 | Amarillo | TX | Kmart of Texas, L.P. | Ohio Teachers Retirement (OTR) |
| 1430 | Tinley Park | IL | Kmart Corporation | New Plan Realty Trust |
| 1434 | Palatine | IL | Kmart Corporation | LaSalle National Bank, as Trustee under Trust No. 110109 |
| 1435 | Detroit | MI | Kmart of Michigan, Inc. | DDRC Michigan, LLC |
| 1436 | Southgate | MI | Kmart of Michigan, Inc. | Walpath Centers Partnership |
| 1440 | Oklahoma City | OK | Kmart Corporation | Walker 78 Co. |
| 1441 | Dayton | OH | Kmart Corporation | Dayton-Shiloh Plaza |
| 1442 | Tulsa | OK | Kmart Corporation | Bank of New York |
| 1448 | Braddock Hills | PA | Kmart of Pennsylvania LP | Kimco Development of Braddock Hills, Inc. |
| 1450 | Ft. Myers | FL | Kmart Corporation | Manufacturers Bank |
| 1458 | Kansas City | MO | Kmart Corporation | TERK Partners |
| 1459 | Kansas City | MO | Kmart Corporation | Bayport Development, LLC |
| 1460 | Waukegan | IL | Kmart Corporation, as successor-in-interest to Builders Square, Inc. | Simon Property Group (Illinois), L.P. |
| 1473 | Lenexa | KS | Kmart Corporation | First Berkshire Business Trust |
| 1480 | Indianapolis | IN | Kmart of Indiana | Simon Property Group, LP |
| 1483 | Milwaukee | WI | Kmart Corporation | Mifflin Care Center, Inc. |
| 1487 | West Allis | WI | Kmart Corporation | Ramco-Gershenson Properties, L.P. |
| 1488 | Pittsburgh | PA | Kmart of Pennsylvania LP | First City Company |
| 1492 | Bakersfield | CA | Builders Square, Inc. | Meesob Investment Co. |
| 1495 | Albuquerque | NM | Kmart Corporation | Sal S. Zagari, Nariman D. Zagari, Rober Yohai, Ronald A. Weiss, Jocelyn R. Weiss, Robert J. Heil, Rosemary E. Heil, Howard E. Oberlander, Robert Choquette, Trustee under The Choquette Revocable Trust |
| 1503 | Tampa | FL | Kmart Corporation, as successor-in-interest to Builders Square, Inc. | AEGON USA Realty Advisors, Inc. |
| 1507 | Largo | FL | Builders Square, Inc. | E.J. Benes, Trust for the Frances M. Benes Trust of December 20, 1982 |
| 1520 | Evanston | IL | Kmart Corporation | Hanover Evanston, Inc. |
| 1522 | Webster Groves | MO | Kmart Corporation | Grant Park Properties Limited Partnership |
| 1522 | Webster Groves | MO | Kmart Corporation | Joseph Grasso |
| 1524 | Norcross | GA | Builders Square, Inc. | AECO Investment Company |
| 1526 | Casselberry | FL | Kmart Corporation | Property Development Associates |
| 1535 | Clearwater | FL | Kmart Corporation | MDL Portfolio Corp. |
| 1541 | Ypsilanti | MI | Kmart of Michigan, Inc. | New Plan Realty Trust |
| 1542 | Forest Park | OH | Kmart Corporation | Cobblewood Plaza Investors, L.P. |
| 1555 | Nashua | NH | Builders Square, Inc. | AM of NH, Inc. |

SCHEDULE A
LEASES
IMMEDIATE REJECTION

| STORE | CITY | ST | TENANT | LANDLORD |
|---|---|---|---|---|
| 1557 | Ferguson | MO | Kmart Corporation | First Berkshire Business Trust c/o Sam Plotkin & Assoc. |
| 1558 | York | PA | Kmart of Pennsylvania LP | York Holding Company, L.P. |
| 1560 | Colonie | NY | Kmart Corporation | Colonie Realty Associates, LP |
| 1565 | Lancaster | PA | Kmart of Pennsylvania LP | Hawthorne Centre Associates |
| 1572 | Oakwood Village | OH | Kmart Corporation | First Interstate Hawthorne L.P. |
| 1573 | Erie | PA | Kmart of Pennsylvania LP | Summit Towne Centre, Inc. |
| 1574 | West Mifflin | PA | Kmart of Pennsylvania LP | Michelle Hunt |
| 1578 | Canton Twp. | MI | Kmart of Michigan, Inc. | Ford Lilley Limited Partnership |
| 1579 | Springfield | MO | Kmart Corporation | K Store L.P. |
| 1586 | Chantilly | VA | Builders Square, Inc. | Brookfield-Beverly Road Associates Limited Partnership |
| 1589 | St. Louis | MO | Kmart Corporation | Starwood Ceruzzi Marketplace, LLC |
| 1592 | Columbus | OH | Kmart Corporation | The Rockola Corporation |
| 1598 | Port Huron | MI | Kmart of Michigan, Inc. | WRS Port Huron Limited Partnership |
| 2402 | Fife | WA | Kmart Corporation | State of Washington, Department of Natural Resources |
| 2424 | Pittsburg | CA | Kmart Corporation | ACG Pittsburg Investors |
| 2433 | North Houston | TX | Kmart Corporation | Houston/Weber, Ltd. |
| 2434 | S. Houston | TX | Kmart Corporation | FKM Partnership, Ltd. |
| 2437 | Naples | FL | Kmart Corporation | Donald G. Soffer, Trustee of the Donald G. Soffer Revocable Trust dated 4/29/92 |
| 2449 | Paramus | NJ | Kmart Corporation | Burroughs/LPM Limited Partnership |
| 2463 | El Centro | CA | Kmart Corporation | BLM El Centro |
| 2468 | Cutler Ridge | FL | Kmart Corporation | Parker Real Estate Partners III, Ltd. |
| 3404 | Stafford | TX | Kmart Corporation | Three Stafford Associates |
| 3429 | Winslow | AZ | Kmart Corporation | First Berkshire Business Trust |
| 3449 | Fargo | ND | Kmart Corporation | Levco Fargo Associates |
| 3463 | East Pointe | MI | Kmart of Michigan, Inc. | EBL&S Property |
| 3470 | Kimberly | WI | Kmart Corporation | Sagold Realty Company, LLC |
| 3473 | Villa Park | IL | Kmart Corporation | LaSalle National Bank, as Trustee under Trust No. 120527 |
| 3485 | Hillsboro | OH | Kmart Corporation | Gershman Properties, LLC |
| 3500 | New Philadelphia | OH | Kmart Corporation | Susan and Sanford Sandelman Trustees |
| 3505 | Laredo | TX | Kmart of Texas, L.P. | Jeffrey H Tamkin Inc. |
| 3562 | Euclid | OH | Kmart Corporation | BS Mt. Vernon Limited Partnership |
| 3567 | La Crosse | WI | Kmart Corporation | First Berkshire Business Trust |
| 3577 | Wexford | PA | Kmart of Pennsylvania LP | McCandless KM Associates |
| 3581 | Rochester | MN | Kmart Corporation | Minnwick Holding, L.L.C. |
| 3588 | Naperville | IL | Kmart Corporation | U.S. Realty 87 Naperville Associates, L.P. |
| 3698 | Victorville | CA | Kmart Corporation | Jeanette S. Hill |
| 3704 | Lake Elsinore | CA | Kmart Corporation | Rodney H. & Gertrude G. Medeiros |
| 3726 | Ocean Springs | MS | Kmart Corporation | Parkside, LLC |

SCHEDULE A
LEASES
IMMEDIATE REJECTION

| STORE# | CITY | ST | TENANT | LANDLORD |
|---|---|---|---|---|
| 3732 | Lake Jackson | TX | Kmart of Texas, L.P. | L Jackson KM Company |
| 3733 | Bay City | TX | Kmart of Texas, L.P. | Bay City KM Company |
| 3755 | Sturgeon Bay | WI | Kmart Corporation | Stearns Investments |
| 3860 | Madera | CA | Kmart Corporation | GMF Madera, LLC |
| 3898 | Forestdale | AL | Kmart Corporation | Nationwide Life Insurance Company |
| 3899 | Bessemer | AL | Kmart Corporation | JJ/LMB Griffis/ME Osborn |
| 3903 | Selma | AL | Kmart Corporation | Selma Highway 80 Venture I Joint Venture |
| 3921 | Ogdensburg | NY | Kmart Corporation | ACG Ogdensburg Associates |
| 3955 | Coachella | CA | Kmart Corporation | RIC Coachella Associates, Limited Partnership |
| 3983 | Colton | CA | Kmart Corporation | Ric Colton Associates LP |
| 3999 | Woodburn | OR | Kmart Corporation | Walt Gasser & Associates |
| 4218 | Appleton | WI | Kmart Corporation | Wisconsin DMJ Property Corp. |
| 4227 | Des Plaines (Niles) | IL | Kmart Corporation | Sidcor Dempster Associates |
| 4567 | Cleveland (Brooklyn) | OH | Kmart Corporation | John C. Parker |
| 4710 | Barstow | CA | Kmart Corporation | CRICKM Barstow Trust |
| 4834 | Brewton | AL | Kmart Corporation | 2020 Stringtown Road, L.L.C. |
| 4884 | Houston | TX | Kmart of Texas, L.P. | Rolf Piller |
| 4890 | Anaheim | CA | Kmart Corporation | William J. Wade as Owner Trustee under Trust Agreement #1995-1 (Verizon) |
| 4891 | Sanger | CA | Kmart Corporation | William J. Wade, Owner/Trustee #1995-1 (Verizon) |
| 4892 | Sebastian | FL | Kmart Corporation | Sebastian Development Ltd. |
| 4923 | Amsterdam | NY | Kmart Corporation | HNB Investment Corp./Bank of New York |
| 7072 | Webster | TX | Kmart of Texas, L.P. | Webster KM Associates |
| 7115 | Orange | TX | Kmart of Texas, L.P. | Amresco Financial I, LP |
| 7160 | Amarillo | TX | Kmart of Texas, L.P. | Elmhurst Company |
| 7181 | Littleton | CO | Kmart Corporation | Columbine Partners |
| 7199 | Troy | OH | Kmart Corporation | Diversey West Hotel Properties, Ltd. |
| 7202 | Memphis | TN | Kmart Corporation | J.R. and R.S. Sauls |
| 7210 | Mansfield | OH | Kmart Corporation | East Mansfield Assoc. Ltd. |
| 7211 | Radcliff | KY | Kmart Corporation | Radcliff Associates |
| 7218 | Lubbock | TX | Kmart of Texas, L.P. | Baltic 80 Associates |
| 7220 | Waco | TX | Kmart of Texas, L.P. | Shidler/West Finance Partners V, Limited Partnership |
| 7224 | Ft. Worth | TX | Kmart of Texas, L.P. | Lakeside - BRS Associates, L.P. |
| 7228 | Sanford | FL | Kmart Corporation | Sanford Property Group |
| 7252 | Gilroy | CA | Kmart Corporation | Marina Square Partners, LP |
| 7262 | Louisville | KY | Kmart Corporation | Abrams Properties Inc. |
| 7267 | Casper | WY | Kmart Corporation | Susan and Sanford Sandelman Trustees; Tenant # 100003376 |

4

SCHEDULE A
LEASES
IMMEDIATE REJECTION

| STORE | CITY | ST | TENANT | LANDLORD |
|---|---|---|---|---|
| 7285 | Lauderhill | FL | Kmart Corporation | Rossland Real Estate Limited and High Glen Developments Limited |
| 7292 | Jeffersontown | KY | Kmart Corporation | Two Louisville Associates L.P. |
| 7322 | Acworth | GA | Kmart Corporation | William T. Mobley Jr. |
| 7343 | Abilene | TX | Kmart Corporation | AK IV Properties |
| 7346 | Gulf Breeze | FL | Kmart Corporation | Moulton Properties Inc |
| 7406 | Matthews | NC | Kmart of North Carolina LLC | MTH Realty Inc., c/o Trammell Crow Company |
| 7411 | Texas City | TX | Kmart of Texas, L.P. | Jerry J. Moore and Jean H. Moore/JJM Management |
| 7414 | Calexico | CA | Kmart Corporation | Del Norte Campillo Associates |
| 7421 | Quincy | IL | Kmart Corporation | TDW Investment Group, L.L.C. |
| 7433 | Coralville | IA | Kmart Corporation | Iowick Holding, L.L.C. |
| 7436 | Jacksonville | FL | Kmart Corporation | Metro International Property Fund XVI L.P. |
| 7440 | Bourbonnais | IL | Kmart Corporation | TM Midland Realty Ltd Partners |
| 7441 | Spring | TX | Kmart Corporation | Woodlands, TX Limited Partnership |
| 7449 | Houston | TX | Kmart Corporation | Hopi 82 Associates |
| 7450 | Lehigh Acres | FL | Kmart Corporation | Lehigh Acres/Funding Associates, L.P. |
| 7456 | Lewisville | TX | Kmart of Texas, L.P. | U.S. Realty 87 Lewisville Associates, L.P. |
| 7457 | Manitowoc | WI | Kmart Corporation | First Berkshire Business Trust |
| 7489 | San Angelo | TX | Kmart of Texas, L.P. | US Realty 87 Associates |
| 7495 | West Monroe | LA | Kmart Corporation | Sunshine Heights Corporation |
| 7503 | Petersburg | VA | Kmart Corporation | Goodrich Associates Mgmt. Co., Inc. |
| 7506 | Newburgh | IN | Kmart of Indiana | Warrick Associates |
| 7514 | Tucson | AZ | Kmart Corporation | U.S. Realty 87 Associates |
| 7516 | Pt. St. Lucie | FL | Kmart Corporation | Rlmart Corporation |
| 7528 | Waukegan | IL | Kmart Corporation | MF Corporation |
| 7529 | Rancho Cuc | CA | Kmart Corporation | Warewick Holding, LLC |
| 7534 | Charleston | SC | Kmart Corporation | US Realty 87 James Island Associates, Limited Partnership |
| 7540 | Charlotte (Pineville) | NC | Kmart of North Carolina LLC | Norwick Holding, LLC |
| 7546 | Reno | PA | Kmart of Pennsylvania LP | Daniel G. Kamin |
| 7561 | Little Rock | AR | Kmart Corporation | Kappa Realty, Inc. |
| 7562 | Cincinnati | OH | Kmart Corporation | Susan Sandelman & Sanford Sandelman |
| 7564 | Mission Viejo | CA | Kmart Corporation | Chemical Trust Company of California/Chase Manhattan Bank & Trust |
| 7571 | Paso Robles | CA | Kmart Corporation | Melvin & Angela Dagovitz |
| 7591 | Vacaville | CA | Kmart Corporation | Double V Associates, L.P. |
| 7600 | Tracy | CA | Kmart Corporation | John B. and Kathleen McCorduck |

5

SCHEDULE A
LEASES
IMMEDIATE REJECTION

| STORE | CITY | ST | TENANT | LANDLORD |
|---|---|---|---|---|
| 7611 | Hallendale | FL | Kmart Corporation | 17070 Collins Avenue Shopping Center, Ltd and RK Hallandale L.P. |
| 7652 | Tell City | IN | Kmart of Indiana | William Tell Homes Company |
| 7658 | Palm Coast | FL | Kmart Corporation | Palm Coast/Funding Associates, L.P. |
| 7900 | Miami | FL | Kmart Corporation | Raanan Katz |
| 8270 | Ft. Wayne | IN | Kmart of Indiana | Bluefield Associates |
| 9072 | Norfolk | NE | Kmart Corporation | Elaine Stone |
| 9073 | Burley | ID | Kmart Corporation | Petand Associates |
| 9199 | Kennett | MO | Kmart Corporation | Kennett Associates |
| 9200 | Macomb | IL | Kmart Corporation | Bryson Properties XX, Ltd. |
| 9215 | Sulphur Springs | TX | Kmart of Texas, L.P. | Athens Partners |
| 9232 | Martinsville | IN | Kmart of Indiana | Founder, Inc. |
| 9236 | Gillette | WY | Kmart Corporation | C & W Manhattan Associates |
| 9239 | Sequin | TX | Kmart of Texas, L.P. | Benedict Silverman |
| 9246 | Georgetown | SC | Kmart Corporation | Susan Sandelman as Trustee of Jall Trust, c/o Kin Properties, Inc. |
| 9251 | Sylacauga | AL | Kmart Corporation | Sand Springs, LLC |
| 9254 | Talladega | AL | Kmart Corporation | Sand Springs, LLC |
| 9256 | Athens | TX | Kmart Corporation | Athens Partners |
| 9259 | Sweetwater | TX | Kmart of Texas, L.P. | Sweetwater Partners |
| 9262 | Clinton | OK | Kmart Corporation | Three Stafford Associates, L.P. |
| 9265 | Skowgegan | ME | Kmart Corporation | Young- Maine Properties |
| 9275 | Allegany | NY | Kmart Corporation | National Realty & DVLP Corp. |
| 9283 | Live Oak | FL | Kmart Corporation | South Oaks Station LLC, c/o Phillips Edison & Company |
| 9291 | Grafton | ND | Kmart Corporation | Dakota Properties |
| 9293 | Watseka | IL | Kmart Corporation | Watseka Associates |
| 9299 | Sweetwater | TN | Kmart Corporation | Park Tower, Ltd. |
| 9300 | Zachary | LA | Kmart Corporation | Daniel G Kamin |
| 9301 | Rogersville | TN | Kmart Corporation | Park Tower Ltd. |
| 9302 | London | OH | Kmart Corporation | London Development Company |
| 9303 | Thomson | GA | Kmart Corporation | Diversey West Hotel Partnership |
| 9308 | Fort Stockton | TX | Kmart of Texas, L.P. | Durant Associates |
| 9313 | Wynne | AR | Kmart Corporation | Wynne Arkansas Associates |
| 9333 | Kirkwood | MO | Kmart Corporation | KRC Kirkwood 803, Inc. |
| 9337 | Kansas City | KS | Kmart Corporation | KRC State 807, Inc. |
| 9341 | Oakbrook Terrace | IL | Kmart Corporation | KRCV Corporation |
| 9342 | Matteson | IL | Kmart Corporation | KRCV Corporation |
| 9343 | Mount Prospect | IL | Kmart Corporation | KRCV Corporation |
| 9347 | Maplewood | MO | Kmart Corporation | KRCV Corporation |
| 9350 | Addison | IL | Kmart Corporation | KRC Midwest City 857, Inc. |
| 9361 | Naperville | IL | Kmart Corporation | KRCV Corporation |
| 9366 | Elgin | IL | Kmart Corporation | KRC Elgin 860, Inc. |
| 9370 | Roeland Park | KS | Kmart Corporation | KRC Roeland Park Inc. |
| 9372 | Mundelein | IL | Kmart Corporation | KRC Mundelein 874, Inc. |

6

SCHEDULE A
LEASES
IMMEDIATE REJECTION

| STORE | CITY | ST | TENANT | LANDLORD |
|---|---|---|---|---|
| 9374 | Shawnee | KS | Kmart Corporation | Tri-State Realty |
| 9377 | Arlington Hts. | IL | Kmart Corporation | KRC Arlington Heights 896, Inc. |
| 9403 | Mojave | CA | Kmart Corporation | Mountain View Plaza, LLC |
| 9504 | Corsicana | TX | Kmart Corporation | Corsicana Partners |
| 9516 | Murray | KY | Kmart Corporation | BancKentucky, Inc. and Cumberland Bancorp, Inc. |
| 9540 | Faribault | MN | Kmart Corporation | Troy Plaza Associates, Ltd. |
| 9548 | Henderson | NC | Kmart of North Carolina LLC | Sand Springs, LLC |
| 9550 | Aberdeen | NC | Kmart of North Carolina LLC | 501 Associates |
| 9558 | Harrisburg | IL | Kmart Corporation | US Realty 86 Associates/US Realty 87 Associates |
| 9565 | Martinsburg | WV | Kmart Corporation | Pacific Beach Company, Inc. |
| 9567 | Ruston | LA | Kmart Corporation | Ruston Center- Graham Partnership & Lincoln Builders of Ruston Inc. |
| 9574 | Plainview | TX | Kmart of Texas, L.P. | Theodore C. Harris |
| 9575 | Pampa | TX | Kmart of Texas, L.P. | Daniel Weingarten |
| 9580 | Princeton | WV | Kmart Corporation | Premium Properties LLC |
| 9591 | Paintsville | KY | Kmart Corporation | Paintsville Realty, Inc |
| 9594 | Weslaco | TX | Kmart of Texas, L.P. | Two Mira Mesa Associates Limited Partnership |
| 9601 | Tyler | TX | Kmart Corporation | Tyler Partners |
| 9610 | Harlan | KY | Kmart Corporation | Village Center |
| 9616 | DeRidder | LA | Kmart Corporation | American Real Estate Holdings Limited Partnership |
| 9618 | Wilkesboro | NC | Kmart of North Carolina LLC | Wilkesboro Associates |
| 9628 | Newberry | SC | Kmart Corporation | Rogers Arkansas Associates |
| 9632 | Hornell | NY | Kmart Corporation | Security Pacific National Trust Company (New York), Trustee |
| 9635 | Henderson | KY | Kmart Corporation | Kentucky Plaza Associates |
| 9643 | Mission | TX | Kmart of Texas, L.P. | Jeffrey H. Tamkin |
| 9658 | Clewiston | FL | Kmart Corporation | Center of Clewiston, Inc. |
| 9669 | Somerset | PA | Kmart of Pennsylvania LP | Somerset KM Associates |
| 9673 | Iowa Falls | IA | Kmart Corporation | Iowa Falls Partners |
| 9677 | Alvin | TX | Kmart of Texas, L.P. | Jerry J. Moore and Jean H. Moore |
| 9685 | London | KY | Kmart Corporation | Laurel Plaza Associates, Ltd. |
| 9696 | Elizabeth City | NC | Kmart of North Carolina LLC | Holly Square Associates |
| 9700 | Edinburg | TX | Kmart Corporation | CapRealty 01 - Edinburg, L.L.C. |
| 9702 | Brooksville | FL | Kmart Corporation | SOSQ Property Investments, Inc. |
| 9722 | Liberty | TX | Kmart of Texas, L.P. | Harold A. Clark & Company |
| 9723 | Angleton | TX | Kmart of Texas, L.P. | C & W Manhattan Associates |
| 9726 | Platteville | WI | Kmart Corporation | American Real Estate Holdings Limited Partnership |
| 9732 | Lockhaven | PA | Kmart Corporation | United Real Estate Development Association |
| 9734 | Powderly | KY | Kmart Corporation | Poeg Development Co. |
| 9741 | South Pittsburgh | TN | Kmart Corporation | South Pittsburgh Associates |

SCHEDULE A
LEASES
IMMEDIATE REJECTION

| STORE # | CITY | ST | TENANT | LANDLORD |
|---|---|---|---|---|
| 9743 | Reedley | CA | Kmart Corporation | Philips Shopping Center Fund Limited Partnership |
| 9753 | Janesville | WI | Kmart Corporation | Janesville Plaza Inc. |
| 9754 | Clearfield | PA | Kmart of Pennsylvania LP | Wolf River Run Associates, LLC |
| 9765 | LaFollette | TN | Kmart Corporation | Atkins 81 Associates |
| 9766 | Moncks Corner | SC | Kmart Corporation | Baker and Baker R.E. Developers, LLC |
| 9773 | Portage | WI | Kmart Corporation | Four St. James Leasing Co./Four Naples Ltd. |
| 9774 | Johnson City | TN | Kmart Corporation | Center South Realty Limited Partnership |
| 9776 | New Lebanon | OH | Kmart Corporation | New Lebanon Realty Associates |
| 9795 | Boutte/Luling | LA | Kmart Corporation | St. Charles Partners |
| 9807 | Columbia | MS | Kmart Corporation | Daniel G Kamin |
| 0000 | Peoria (Bellevue) | IL | Kmart Corporation | Bellevue Enterprises, LA |
| 0010 | Saginaw | MI | Kmart of Michigan, Inc. | Bay Valley Shopping Center Associates, LLC |
| 0257 | North Little Rock | AR | Kmart Corporation | Osceola Investments, Inc. |
| 2014 | Reading | PA | Kmart of Pennsylvania LP | First Union National Bank |
| 2014 | Reading | PA | Kmart of Pennsylvania LP | Russell L. Ohl, Trustee |
| 2470 | North Richland Hills | TX | Pace Membership Warehouse, Inc. | Laurence A. Tisch |

SCHEDULE A
SUBLEASES
IMMEDIATE REJECTION

| STORE # | CITY | STATE | LANDLORD | SUBTENANT |
|---|---|---|---|---|
| 0000 | Peoria (Bellevue) | IL | Kmart Corporation | Mail Tech Enterprises, Inc. |
| 0010 | Saginaw | MI | Kmart of Michigan, Inc. | Kroger Company |
| 0257 | North Little Rock | AR | Kmart Corporation | Furr's/Bishop's, Inc. |
| 1166 | Bridgeton | MO | Kmart Corporation | Gordmans |
| 1185 | Chantilly | VA | PACE Membership Warehouse, Inc. | Capital Expo Center, Inc. |
| 1306 | Cincinnati | OH | Kmart Corporation | Hob-Lob, Limited Partnership (Hobby Lobby) |
| 1324 | Lake Mary | FL | Builders Square, Inc. | Old Time Pottery, Inc. |
| 1326 | Topeka | KS | Kmart Corporation | Hob-Lob, Limited Partnership (Hobby Lobby) |
| 1326 | Topeka | KS | Kmart Corporation | Discovery Furniture, Inc. |
| 1326 | Topeka | KS | Kmart Corporation | Old Time Pottery, Inc. |
| 1351 | Houston | TX | Kmart Corporation | Lowe's Companies, Inc. |
| 1353 | Palm Bay | FL | Kmart Corporation | PCB Investments, L.C. |
| 1356 | Cutler Ridge | FL | Kmart Corporation | Old Time Pottery, Inc. |
| 1358 | Allentown | PA | Kmart of Pennsylvania, L.P. | Pennsylvania Expo Center, LLC |
| 1364 | Columbus | OH | Kmart Corporation | Hob-Lob, Limited Partnership (Hobby Lobby) |
| 1399 | Melrose Park | IL | Kmart Corporation | Bally Total Fitness Corporation |
| 1399 | Melrose Park | IL | Kmart Corporation | Supervalu Holdings, Inc. |
| 1411 | Webster | TX | Kmart of Texas, L.P. | Hob-Lob, Limited Partnership (Hobby Lobby) |
| 1419 | Mt. Clemens | MI | Kmart of Michigan, Inc. | Consolidated Stores Corporation |
| 1420 | Houston | TX | Kmart of Texas, L.P. | A-K Hunting Bayou L.C. |
| 1427 | Amarillo | TX | Kmart of Texas, L.P. | Bentley & Associates, LLC |
| 1442 | Tulsa | OK | Kmart Corporation | American Airlines, Inc. |
| 1450 | Ft. Myers | FL | Kmart Corporation | Leisure Bay Industries, Inc., d/b/a Recreational Factory Warehouse |
| 1450 | Ft. Myers | FL | Kmart Corporation | Lou's Country Kitchen |
| 1450 | Ft. Myers | FL | Kmart Corporation | Old Time Pottery, Inc. |
| 1450 | Ft. Myers | FL | Kmart Corporation | TKI Holdings, Inc. |
| 1460 | Waukegan | IL | Kmart Corporation, as successor-in-interest to Builders Square, Inc. | Belvidere Associates LLC |
| 1473 | Lenexa | KS | Kmart Corporation | Hob-Lob, Limited Partnership (Hobby Lobby) |
| 1492 | Bakersfield | CA | Builders Square, Inc. | The Book Market, Inc. |
| 1503 | Tampa | FL | Kmart Corporation, as successor-in-interest to Builders Square, Inc. | Peddlers Mall LLC |
| 1522 | Webster Groves | MO | Kmart Corporation | Dolgen Corp., Inc. |
| 1522 | Webster Groves | MO | Kmart Corporation | Nails Today |
| 1522 | Webster Groves | MO | Kmart Corporation | Value City Department Stores, Inc. |
| 1522 | Webster Groves | MO | Kmart Corporation | Washington Inventory |
| 1522 | Webster Groves | MO | Kmart Corporation | Washington Beauty |
| 1522 | Webster Groves | MO | Kmart Corporation | World Martial Arts |

SCHEDULE A
SUBLEASES
IMMEDIATE REJECTION

| STORE # | CITY | ST | LANDLORD | SUBTENANT |
|---------|------|-----|----------|-----------|
| 1522 | Webster Groves | MO | Kmart Corporation | Winston Beauty Supply |
| 1524 | Norcross | GA | Builders Square, Inc. | Old Time Pottery, Inc. |
| 1555 | Nashua | NH | Builders Square, Inc. | Building 19, Inc. |
| 1574 | West Mifflin | PA | Kmart of Pennsylvania, L.P. | Levin Furniture |
| 1586 | Chantilly | VA | Builders Square, Inc. | John V. Schultz Co. |
| 1586 | Chantilly | VA | Builders Square, Inc. | Capital Expo Center, Inc. |
| 1592 | Columbus | OH | Kmart Corporation | Old Time Pottery, Inc. |
| 2014 | Reading | PA | Kmart of Pennsylvania, L.P. | KCN Limited |
| 2014 | Reading | PA | Kmart of Pennsylvania, L.P. | Philadelphia Vision Center of Cheltenham Square, Inc. |
| 2424 | Pittsburg | CA | Kmart Corporation | Tam, Phan, Thang Luu and Cindy Luu, jointly d/b/a Cost Rite Furniture |
| 2433 | North Houston | TX | Kmart Corporation | Compaq Computer Corporation |
| 2434 | S. Houston | TX | Kmart Corporation | Ace Music Center, Inc. |
| 2434 | S Houston | TX | Kmart Corporation | Hob-Lob, Limited Partnership (Hobby Lobby) |
| 2434 | S. Houston | TX | Kmart Corporation | K & G Men's Center, Inc. |
| 2434 | S. Houston | TX | Kmart Corporation | Outback Steakhouse of Houston, II, Ltd. |
| 2437 | Naples | FL | Kmart Corporation | Naples Community Hospital, Inc. |
| 2449 | Paramus | NJ | Kmart Corporation | B.J.'s Wholesale Club, Inc. |
| 2463 | El Centro | CA | Kmart Corporation | Home Depot U.S.A., Inc. |
| 2468 | Cutler Ridge | FL | Kmart Corporation | Precision Response Corporation |
| 2470 | North Richland Hills | TX | Pace Membership Warehouse, Inc. | Garden Ridge, Inc. |
| 3449 | Fargo | ND | Kmart Corporation | Fargo Cass County Economic Development Corporation |
| 3500 | New Philadelphia | OH | Kmart Corporation | Quality Stores, Inc. |
| 3505 | Laredo | TX | Kmart of Texas, L.P. | A to Z Tire & Battery, Inc. |
| 3505 | Laredo | TX | Kmart of Texas, L.P. | Consolidated Stores Corporation |
| 3505 | Laredo | TX | Kmart of Texas, L.P. | DPR Investments, Inc., d/b/a Aaron's Rentals |
| 3567 | La Crosse | WI | Kmart Corporation | APAC Teleservices, Inc. |
| 3567 | La Crosse | WI | Kmart Corporation | Office Depot, Inc. |
| 3567 | La Crosse | WI | Kmart Corporation | Powerhouse Total Fitness, Inc. |
| 3567 | La Crosse | WI | Kmart Corporation | State Wide Real Estate Services, Inc. |
| 3577 | Wexford | PA | Kmart of Pennsylvania, L.P. | Harry Products, Inc. |
| 3577 | Wexford | PA | Kmart of Pennsylvania, L.P. | Nik-Six, Inc. |
| 3581 | Rochester | MN | Kmart Corporation | Goodwill Industries, Inc., d/b/a Easter Seal Society of Minnesota |
| 3581 | Rochester | MN | Kmart Corporation | International Business Machines Corporation |
| 3588 | Naperville | IL | Kmart Corporation | Menard, Inc. |
| 3732 | Lake Jackson | TX | Kmart of Texas, L.P. | Consolidated Stores Corporation |
| 3732 | Lake Jackson | TX | Kmart of Texas, L.P. | Hob-Lob, Limited Partnership (Hobby Lobby) |

SCHEDULE A
SUBLEASES
IMMEDIATE REJECTION

| STORE | CITY | ST | LANDLORD | SUBTENANT |
|---|---|---|---|---|
| 3860 | Madera | CA | Kmart Corporation | Consolidated Stores Corporation |
| 3860 | Madera | CA | Kmart Corporation | PNS Stores, Inc. d/b/a MacFrugals |
| 3860 | Madera | CA | Kmart Corporation | Quality Stores, Inc. |
| 4218 | Appleton | WI | Kmart Corporation | Savings Galore Discount Stores, Inc. |
| 4227 | Des Plaines (Niles) | TX | Kmart Corporation | United Savings of America |
| 4567 | Cleveland | OH | Kmart Corporation | Jacobs Investments Inc. |
| 4567 | Cleveland | OH | Kmart Corporation | Harborview Investments |
| 4890 | Anaheim | CA | Kmart Corporation | U.S. Vision, Inc. d/b/a Eye Vaul |
| 4890 | Anaheim | CA | Kmart Corporation | Cleaner's Consultants, Inc. d/b/a Klean 'n Tux |
| 4890 | Anaheim | CA | Kmart Corporation | NCC Fox Company |
| 7072 | Webster | TX | Kmart of Texas, L.P. | Conn's Appliances, Inc. |
| 7072 | Webster | TX | Kmart of Texas, L.P. | Quality Christmas Tree Co., Inc. |
| 7115 | Orange | TX | Kmart of Texas, L.P. | Consolidated Stores Corporation |
| 7181 | Littleton | CO | Kmart Corporation | Church of the Southwest, Inc. |
| 7210 | Mansfield | OH | Kmart Corporation | Consolidated Stores Corporation |
| 7211 | Radcliff | KY | Kmart Corporation | Pulau Electronics Corporation |
| 7228 | Sanford | FL | Kmart Corporation | MLM, Inc. |
| 7252 | Gilroy | CA | Kmart Corporation | Quality Stores, Inc. |
| 7262 | Louisville | KY | Kmart Corporation | Derby Sports & Music Castle |
| 7262 | Louisville | KY | Kmart Corporation | The Falls City Community Art Gallery, Inc. |
| 7267 | Casper | WY | Kmart Corporation | Sutherland's Friendly Home |
| 7292 | Jeffersontown | KY | Kmart Corporation | Swope Automotive Group, Inc. |
| 7292 | Jeffersontown | KY | Kmart Corporation | Taylor Investments, Inc. |
| 7292 | Jeffersontown | KY | Kmart Corporation | Two Louisville Associates L.P. |
| 7292 | Jeffersontown | KY | Kmart Corporation | Wayside Mission Properties, Inc. |
| 7322 | Acworth | GA | Kmart Corporation | Hob-Lob, Limited Partnership (Hobby Lobby) |
| 7343 | Abilene | TX | Kmart Corporation | Consolidated Stores Corporation |
| 7411 | Texas City | TX | Kmart of Texas, L.P. | Consolidated Stores Corporation |
| 7414 | Calexico | CA | Kmart Corporation | J.V.G Enterprises, Inc. |
| 7421 | Quincy | IL | Kmart Corporation | Kirlin's, Inc. |
| 7433 | Coralville | IA | Kmart Corporation | McGregor Furniture Company |
| 7436 | Jacksonville | FL | Kmart Corporation | UFM, Inc. |
| 7440 | Bourbonnais | IL | Kmart Corporation | Girard Ace Home and Lighting Center |
| 7441 | Spring | TX | Kmart Corporation | Hewitt-Associates LLC |
| 7441 | Spring | TX | Kmart Corporation | Hob-Lob, Limited Partnership (Hobby Lobby) |
| 7456 | Lewisville | TX | Kmart of Texas, L.P. | Joyeria Geovanni Jewelry, d/b/a Lewisville Bazaar |
| 7457 | Manitowoc | WI | Kmart Corporation | Deli Concepts of Wisconsin, Inc. |
| 7457 | Manitowoc | WI | Kmart Corporation | Pepperkorn Bros., Inc. |
| 7489 | San Angelo | TX | Kmart of Texas, L.P. | The City of San Angelo, TX |

3

SCHEDULE A
SUBLEASES
IMMEDIATE REJECTION

| STORE # | CITY | ST | LANDLORD | SUBTENANT |
|---|---|---|---|---|
| 7489 | San Angelo | TX | Kmart of Texas, L.P. | US Realty 87 San Angelo Associates, L.P. |
| 7495 | West Monroe | LA | Kmart Corporation | Heilig-Meyers Furniture Company |
| 7495 | West Monroe | LA | Kmart Corporation | Sunshine Heights Corporation |
| 7503 | Petersburg | VA | Kmart Corporation | Quality Packaging Systems, Inc. |
| 7516 | Pt. St. Lucie | FL | Kmart Corporation | Fantasy Flea Markets, Inc. |
| 7528 | Waukegan | IL | Kmart Corporation | Kaufman-Worthen Machinery, Inc. |
| 7529 | Rancho Cuc | CA | Kmart Corporation | J.C. Penney Company, Inc. |
| 7534 | Charleston | SC | Kmart Corporation | PER MLO, Inc. |
| 7540 | Pineville | NC | Kmart of North Carolina, LLC | Blacklion International, Inc. |
| 7546 | Reno | PA | Kmart of Pennsylvania, L.P. | Reno Plastics, Inc. |
| 7561 | Little Rock | AR | Kmart Corporation | Carmike Cinema, Inc. |
| 7561 | Little Rock | AR | Kmart Corporation | Family Entertainment Center I, L.P. |
| 7561 | Little Rock | AR | Kmart Corporation | Kappa Realty, Inc. |
| 7561 | Little Rock | AR | Kmart Corporation | Office Depot, Inc. |
| 7561 | Little Rock | AR | Kmart Corporation | Riverdale Cinema, LLC |
| 7571 | Paso Robles | CA | Kmart Corporation | Quality Stores, Inc. |
| 7591 | Vacaville | CA | Kmart Corporation | Nugget Markets, Inc. |
| 7600 | Tracy | CA | Kmart Corporation | Consolidated Stores Corporation |
| 7600 | Tracy | CA | Kmart Corporation | Factory 2-U Stores, Inc. |
| 7600 | Tracy | CA | Kmart Corporation | Halcorp, d/b/a Van's Ace Hardware |
| 7600 | Tracy | | Kmart Corporation | PNS Stores, Inc. d/b/a McFrugal's |
| 7611 | Hallendale | FL | Kmart Corporation | Old Time Pottery, Inc. |
| 7652 | Tell City | IN | Kmart Corporation | Buehler Foods, Inc. |
| 7900 | Miami | FL | Kmart Corporation | A Place Called Hope Cathedral, Inc. |
| 8270 | Fort Wayne | IN | Kmart of Indiana | Craftline Acquisitions Corporation |
| 8270 | Fort Wayne | IN | Kmart of Indiana | Foamex L.P. |
| 8270 | Fort Wayne | IN | Kmart of Indiana | Kinder Furniture & Bedding Co. of Indiana |
| 8270 | Fort Wayne | IN | Kmart of Indiana | Schroeder Associates, Inc. |
| 8270 | Fort Wayne | IN | Kmart of Indiana | Tri State Warehousing, Inc. |
| 9072 | Norfolk | NE | Kmart Corporation | Quality Stores, Inc. |
| 9073 | Burley | ID | Kmart Corporation | C-A-L Stores Companies, Inc. |
| 9199 | Kennett | MO | Kmart Corporation | S.C. Management, Inc. |
| 9200 | Macomb | IL | Kmart Corporation | Heilig-Meyers Company |
| 9232 | Martinsville | IN | Kmart of Indiana | Quality Stores, Inc. |
| 9232 | Martinsville | IN | Kmart of Indiana | Harman- Motive, Inc. |
| 9239 | Seguin | TX | Kmart of Texas, L.P. | Albertson's Inc. |
| 9239 | Seguin | TX | Kmart of Texas, L.P. | King Properties |
| 9246 | Georgetown | SC | Kmart Corporation | Belk-Scarboro Company of Georgetown, South Carolina, Inc. |
| 9251 | Sylacauga | AL | Kmart Corporation | Pursell Industries, Inc. |
| 9252 | Carmi | IL | Kmart Corporation | Carmi Rural King Supply, Inc. |
| 9254 | Talladega | AL | Kmart Corporation | Meadowcraft, Inc. |
| 9262 | Clinton | OK | Kmart Corporation | Atwood Distributing, Inc. |
| 9265 | Skowhegan | ME | Kmart Corporation | Aaron Rents, Inc. |

4

SCHEDULE A
SUBLEASES
IMMEDIATE REJECTION

| STORE | CITY | ST | LANDLORD | SUBTENANT |
|---|---|---|---|---|
| 9283 | Live Oak | FL | Kmart Corporation | Aaron Rents, Inc. |
| 9291 | Grafton | ND | Kmart Corporation | Duckwall-Alco Corporation |
| 9299 | Sweetwater | TN | Kmart Corporation | Sweetwater Salvage and Surplus |
| 9301 | Rogersville | TN | Kmart Corporation | Wilhopar Retail Store, Inc. |
| 9301 | Rogersville | TN | Kmart Corporation | Reed's Auto Repair, Inc. |
| 9302 | London | OH | Kmart Corporation | Quality Stores, Inc. |
| 9303 | Thomson | GA | Kmart Corporation | St. Joseph Hospital, Augusta, Georgia, Inc. |
| 9516 | Murray | KY | Kmart Corporation | Consolidated Stores Corporation |
| 9516 | Murray | KY | Kmart Corporation | Orscheln Farm and Home LLC |
| 9548 | Henderson | NC | Kmart of North Carolina LLC | Quality Stores, Inc. (f/k/a Quality Farm & Fleet, Inc.) |
| 9550 | Aberdeen | NC | Kmart Corporation | Consolidated Stores Corporation |
| 9558 | Harrisburg | IL | Kmart Corporation | Tractor Supply Company |
| 9565 | Martinsburg | WV | Kmart Corporation | Quality Farm & Fleet, Inc. |
| 9565 | Martinsburg | WV | Kmart Corporation | Quality Stores, Inc. |
| 9567 | Ruston | LA | Kmart Corporation | Office Depot, Inc. |
| 9567 | Ruston | LA | Kmart Corporation | Heilig-Meyers Company |
| 9567 | Ruston | LA | Kmart Corporation | Rebel Properties, L.L.C |
| 9575 | Pampa | TX | Kmart of Texas, L.P. | Quality Stores, Inc. |
| 9594 | Weslaco | TX | Kmart of Texas, L.P. | Tractor Supply Company |
| 9601 | Tyler | TX | Kmart of Texas, L.P. | Brookshire Grocery Company |
| 9610 | Harlan | KY | Kmart Corporation | Consolidated Stores Corporation |
| 9610 | Harlan | KY | Kmart Corporation | General Leasing, Inc. |
| 9618 | Wilkesboro | NC | Kmart of North Carolina, LLC | Ithaca Industries, Inc. |
| 9618 | Wilkesboro | NC | Kmart of North Carolina, LLC | Schas Industries, Inc. |
| 9628 | Newberry | SC | Kmart Corporation | Aaron Rents, Inc. |
| 9628 | Newberry | SC | Kmart Corporation | Heilig-Meyers Company |
| 9628 | Newberry | SC | Kmart Corporation | Tractor Supply Company |
| 9635 | Henderson | KY | Kmart Corporation | Mattoon Rural King Supply, Inc. |
| 9635 | Henderson | KY | Kmart Corporation | Maynard Hust |
| 9635 | Henderson | KY | Kmart Corporation | Maynard Hust, Inc. |
| 9643 | Mission | TX | Kmart of Texas, L.P. | Converse, Inc. |
| 9669 | Somerset | PA | Kmart of Pennsylvania, L.P. | Supervalu Holding, Inc. |
| 9677 | Alvin | TX | Kmart of Texas, L.P. | Tractor Supply Co. of Texas, L.P. |
| 9685 | London | KY | Kmart Corporation | Nathan Wright (d/b/a Wright Lumber) |
| 9696 | Elizabeth City | NC | Kmart of North Carolina, LLC | Consolidated Stores Corporation |
| 9696 | Elizabeth City | NC | Kmart of North Carolina, LLC | Fitness, Inc. |
| 9700 | Edinburg | TX | Kmart Corporation | Pedro and Maria Rodriguez d/b/a Edinburg Bazaar |
| 9702 | Brooksville | FL | Kmart Corporation | Consolidated Stores Corporation |
| 9722 | Liberty | TX | Kmart of Texas, L.P. | Dolgen Corp. of Texas, Inc. |

SCHEDULE A
SUBLEASES
IMMEDIATE REJECTION

| STORE | | | LANDLORD | SUBTENANT |
|---|---|---|---|---|
| 9722 | Liberty | TX | Kmart of Texas, L.P. | Tractor Supply Co. of Texas, L.P. |
| 9723 | Angleton | TX | Kmart of Texas, L.P. | Thermo ONIX |
| 9723 | Angleton | TX | Kmart of Texas, L.P. | Onix Process Analysis, Inc. |
| 9726 | Platteville | WI | Kmart Corporation | Panda Corporation |
| 9734 | Powderly | KY | Kmart Corporation | Muhlenberg County Rural King Supply, Inc. |
| 9741 | South Pittsburg | TN | Kmart Corporation | Robert M. Forshee |
| 9743 | Reedly | WI | Kmart Corporation | Factory 2-U Stores, Inc. |
| 9753 | Janesville | WI | Kmart Corporation | Rock County, Wisconsin |
| 9754 | Clearfield | PA | Kmart of Pennsylvania, L.P. | Quality Stores, Inc. |
| 9765 | Lafollette | TN | Kmart Corporation | Tractor Supply Co. |
| 9773 | Portage | WI | Kmart Corporation | Jondex Corp. |
| 9776 | New Lebanon | OH | Kmart Corporation | Duckwall- Alco Corporation |
| 9807 | Columbia | MS | Kmart Corporation | Daniel G. Kamin |

6

## SCHEDULE 2

## REAL PROPERTY LEASES
## REJECT UPON 10 DAYS NOTICE

303295-Chicago S2A

SCHEDULE B
LEASES
REJECTION UPON 10 DAYS NOTICE

| STORE | CITY | ST | LANDLORD | SUBTENANT |
|---|---|---|---|---|
| 1003 | Rockford | IL | Kmart Corporation | LaSalle National Trust, N.A., as Trustee under Trust No. 117853 |
| 1020 | Livonia | MI | Kmart of Michigan, Inc. | Michigan Shopping Center Ventures II, LP |
| 1035 | Walker | MI | Kmart of Michigan, Inc. | Kimco Green Orchard 606, Inc. |
| 1049 | Merrillville (Hobart) | IN | Kmart of Indiana | Jubilee L.P. |
| 1323 | Brandon | FL | Kmart Corporation | Brandon Development Associates |
| 1348 | Brownsville | TX | Kmart of Texas, L.P. | JP Morgan Chase 1993 K1 |
| 1426 | Peoria | IL | Kmart Corporation | The David Joseph Companies |
| 1464 | Portland | OR | Kmart Corporation | Barry Menashe |
| 1465 | Lorain | OH | Kmart Corporation | Lorain Associates |
| 1486 | Cuyahoga Falls | OH | Kmart Corporation | Plaza Chapel Hill East Co. |
| 1510 | Langhorne | PA | Kmart of Pennsylvania LP | Lincoln Plaza Associates |
| 1531 | Countryside | IL | Kmart Corporation | First Berkshire Business Trust |
| 1533 | Lansing | MI | Kmart of Michigan, Inc. | Maureen Brown |
| 2490 | Bridgewater | NJ | Pace Membership Warehouse, Inc. | Mack Bridgewater II |
| 3037 | Brooklyn Center | MN | Kmart Corporation | First Berkshire Business Trust |
| 3303 | Fairview Hgts | IL | Kmart Corporation | Malan Mortgagor, Inc. |
| 3046 | Swansea | MA | Kmart Corporation | The Hayman Company |
| 3323 | Bolingbrook | IL | Kmart Corporation | Bolingbrook Properties |
| 3377 | Homewood | IL | Kmart Corporation | First Berkshire Business Trust |
| 3400 | Gainsville | FL | Kmart Corporation | Walter Dickinson, Inc. |
| 3445 | West St. Paul | MN | Kmart Corporation | Abrams Properties, Inc. |
| 3468 | Jenison | MI | Kmart of Michigan, Inc. | W&M Properties |
| 3503 | Harwood Hgts | IL | Kmart Corporation | American Real Estate Holdings L.P. |
| 3610 | Joplin | MO | Kmart Corporation | G & S Holdings, LLC |
| 3833 | Fayetteville | GA | Kmart Corporation | AIG Baker Shopping Center Properties, L.L.C. |
| 3693 | Matteson | IL | Kmart Corporation | R D Management Corp. |
| 4074 | Southfield | MI | Kmart of Michigan, Inc. | Eccelston Properties, Inc. |
| 4756 | Campbellsville | KY | Kmart Corporation | F and F Investments, L.L.C. |
| 4789 | Perris | CA | Kmart Corporation | Perris Marketplace |
| 4818 | Marina | CA | Kmart Corporation | State Street Bank and Trust Company |
| 4900 | Stone Mountain | GA | Kmart Corporation | International Banking Technologies, Inc. |
| 4900 | Stone Mountain | GA | Kmart Corporation | Haagen Alahambra Associates |
| 7173 | Lackawanna | NY | Kmart Corporation | M & W Limited Partnership |
| 7311 | Denham Springs | LA | Kmart Corporation | Spring Park Plaza Associates LP |
| 7424 | Cheyenne | WY | Kmart Corporation | EIG Cheyenne, LLC |
| 7452 | Cranston | RI | Kmart Corporation | Cranston/BVT Associates, LLP |
| 7508 | Coal Township | PA | Kmart of Pennsylvania LP | Northumberland 81 Associates |
| 7573 | Naples | FL | Kmart Corporation | Four St. James Leasing Co., Inc. |
| 7578 | Sarasota | FL | Kmart Corporation | 4 Naples Park Limited Partnership |
| 9041 | Charles City | IA | Kmart Corporation | C & W Manhattan Associates |

SCHEDULE B
LEASES
REJECTION UPON 10 DAYS NOTICE

| STORE # | CITY | ST | LANDLORD | LESSEE NAME |
|---|---|---|---|---|
| 9057 | Columbia | TN | Kmart Corporation | Worldwide Properties U.S.A., Inc. |
| 9136 | Canton | IL | Kmart Corporation | American Real Estate Holdings Limited Partnership |
| 9141 | Hazard | KY | Kmart Corporation | Developers Diversified, Inc. |
| 9165 | Lebanon | MO | Kmart Corporation | Lebanon School District R-III |
| 9174 | Montrose | CO | Kmart Corporation | The Frank Benton Land and Livestock Co. |
| 9183 | Williston | ND | Kmart Corporation | Williston Partners |
| 9185 | Devils Lake | ND | Kmart Corporation | DLG Partners |
| 9191 | Craig | CO | Kmart Corporation | Del Mar Properties |
| 9194 | Cortez | CO | Kmart Corporation | CC Partners |
| 9197 | Laurenburg | NC | Kmart of North Carolina LLC | Scotland Associates, c/o Trammell Crow Company |
| 9227 | Grayson | KY | Kmart Corporation | 4th Leaf, LLC |
| 9230 | Kenton | OH | Kmart Corporation | Developers Diversified, Ltd. |
| 9240 | Forest City | NC | Kmart of North Carolina LLC | Kanbee Management, Inc. |
| 9247 | Bainbridge | GA | Kmart Corporation | Sand Springs, LLC |
| 9250 | Uvalde | TX | Kmart Corporation | Alabama Realty Associates, Ltd. |
| 9252 | Carmi | IL | Kmart Corporation | Sand Springs, LLC |
| 9507 | Mitchell | SD | Kmart Corporation | Norwest Bank Minnesota, N.A. |
| 9517 | Newton | KS | Kmart Corporation | Newton Kansas Account |
| 9638 | Shakopee | MN | Kmart Corporation | American Real Estate Holdings Limited Partnership |
| 9663 | Omaha | NE | Kmart Corporation | Midwest Fitness Systems LLC |
| 9681 | Magnolia | AR | Kmart Corporation | Ashley & Wallace |
| 9707 | Rolla | MO | Kmart Corporation | Maco Management Co., Inc. |
| 9780 | Shrewsbury | PA | Kmart Corporation | Shrewsbury Shopping Center Associates |

2

## SCHEDULE B
## SUBLEASES
### REJECTION UPON 10 DAYS NOTICE

| STORE | CITY | ST | LANDLORD | SUBTENANT |
|---|---|---|---|---|
| 1003 | Rockford | IL | Kmart Corporation | Rubloff Development Group, Inc. |
| 1020 | Livonia | MI | Kmart of Michigan, Inc. | Borman's Inc. |
| 1035 | Walker | MI | Kmart of Michigan, Inc. | Rubloff Development Group, Inc. |
| 1049 | Merrillville (Hobart) | IN | Kmart of Indiana | Rubloff Development Group, Inc. |
| 1323 | Brandon | FL | Kmart Corporation | Burlington Coat Factory Warehouse of Brandon, Inc. |
| 1348 | Brownsville | TX | Kmart of Texas, L.P. | Windmill Watermill, Inc. |
| 1348 | Brownsville | TX | Kmart of Texas, L.P. | Burlington Coat Factory Warehouse of Brownsville, Inc. |
| 1486 | Cuyahoga Falls | OH | Kmart Corporation | Burlington Coat Factory Warehouse of Cuyahoga, Inc. |
| 1510 | Langhorne | PA | Kmart of Pennsylvania, L.P. | Burlington Coat Factory Warehouse of Langhorne, Inc. |
| 1531 | Countryside | IL | Kmart Corporation | Burlington Coat Factory Warehouse of Countryside, Inc. |
| 1533 | Lansing | MI | Kmart of Michigan, Inc. | Borman's Inc. |
| 2490 | Bridgewater | NJ | PACE Membership Warehouse, Inc. | Best Buy, Inc. |
| 2490 | Bridgewater | NJ | PACE Membership Warehouse, Inc. | Border's |
| 3037 | Brooklyn Center | MN | Kmart Corporation | Slumberland, Inc. |
| 3037 | Brooklyn Center | MN | Kmart Corporation | Thunder Alley Indoor Speedway, Inc. |
| 3046 | Swansea | MA | Kmart Corporation | Lee Shops, Inc. |
| 3303 | Fairview Heights | IL | Kmart Corporation | Rubloff Development Group, Inc. |
| 3323 | Bolingbrook | IL | Kmart Corporation | Menards |
| 3377 | Homewood | IL | Kmart Corporation | Rubloff Development Group, Inc. |
| 3400 | Gainesville | FL | Kmart Corporation | Consolidated Stores Corporation |
| 3400 | Gainesville | FL | Kmart Corporation | Lowe Furniture, Inc. |
| 3468 | Jenison | MI | Kmart of Michigan, Inc. | Rubloff Development Group, Inc. |
| 3503 | Harwood Heights | IL | Kmart Corporation | Rubloff Development Group, Inc. |
| 3693 | Matteson | IL | Kmart Corporation | Rubloff Development Group, Inc. |
| 4789 | Perris | CA | Kmart Corporation | County of Riverside |
| 4789 | Perris | CA | Kmart Corporation | County of Riverside |
| 4900 | Stone Mountain | GA | Kmart Corporation | Bank of America, N.A. |
| 4900 | Stone Mountain | GA | Kmart Corporation | NationsBank of Georgia N.A. |
| 4900 | Stone Mountain | GA | Kmart Corporation | Paul V. Nguyen d/b/a Nail Castle |
| 4900 | Stone Mountain | GA | Kmart Corporation | Song U. Kye and Kil S. Kye |
| 4900 | Stone Mountain | GA | Kmart Corporation | Super Discount Markets, Inc. |
| 4900 | Stone Mountain | GA | Kmart Corporation | Trung D. Nguyen and Bon Hi Tran |
| 4900 | Stone Mountain | GA | Kmart Corporation | Bruno's Inc. |
| 4900 | Stone Mountain | GA | Kmart Corporation | International Banking Technologies, Inc. |
| 4900 | Stone Mountain | GA | Kmart Corporation | Haagen Alahambra Associates |
| 7173 | Lackawana | NY | Kmart Corporation | Metroteller Systems Inc. |
| 7311 | Denham Springs | LA | Kmart Corporation | Delchamps, Inc. |

1

SCHEDULE B
SUBLEASES
REJECTION UPON 10 DAYS NOTICE

| STORE | CITY | ST | LANDLORD | SUBTENANT |
|---|---|---|---|---|
| 7424 | Cheyenne | WY | Kmart Corporation | Arkansas Post & Pole Company |
| 7573 | Naples | FL | Kmart Corporation | Dr. Richard J. Lotze |
| 7573 | Naples | FL | Kmart Corporation | Dr. Shawn Slattery |
| 7578 | Sarasota | FL | Kmart Corporation | Animal Medical Clinic of Gulf Gate, Inc. |
| 7578 | Sarasota | FL | Kmart Corporation | Burlington Coat Factory Warehouse of Sarasota, FL |
| 7578 | Sarasota | FL | Kmart Corporation | Colonial Bank |
| 7578 | Sarasota | FL | Kmart Corporation | Idol's |
| 7578 | Sarasota | FL | Kmart Corporation | Hogan's Insurance |
| 7578 | Sarasota | FL | Kmart Corporation | Cash 'n Carry |
| 7578 | Sarasota | FL | Kmart Corporation | Pizza Hut of America, Inc. |
| 7578 | Sarasota | FL | Kmart Corporation | Rose's Cleaners, Inc. |
| 7578 | Sarasota | FL | Kmart Corporation | Shapes Family Fitness, Inc. |
| 7578 | Sarasota | FL | Kmart Corporation | Silks Alive, Inc.  (d/b/a Garden Center) |
| 7578 | Sarasota | FL | Kmart Corporation | Sonny Ho |
| 7578 | Sarasota | FL | Kmart Corporation | Than Thi Dinh |
| 7578 | Sarasota | FL | Kmart Corporation | The Compute Annex, Inc. |
| 7578 | Sarasota | FL | Kmart Corporation | Union Planters Bank |
| 7578 | Sarasota | FL | Kmart Corporation | Walgreens 1238 |
| 7578 | Sarasota | FL | Kmart Corporation | Vincenzo Pizza and Pasta House |
| 9041 | Charles City | IA | Kmart Corporation | Theisen's, Inc. |
| 9041 | Charles City | IA | Kmart Corporation | Cedar Valley Farm Fleet Distributing Center, Inc. |
| 9057 | Columbia | TN | Kmart Corporation | U- DO- IT- RENT- ALL, Inc. |
| 9136 | Canton | IL | Kmart Corporation | Heilig Meyers Furniture Co. |
| 9136 | Canton | IL | Kmart Corporation | APAC Teleservices, Inc.. |
| 9141 | Hazard | KY | Kmart Corporation | Nathan Wright (d/b/a Wright Lumber) |
| 9141 | Hazard | KY | Kmart Corporation | Nathan Wright (d/b/a Wright Lumber) |
| 9174 | Montrose | CO | Kmart Corporation | Quality Stores, Inc. |
| 9183 | Williston | ND | Kmart Corporation | Friendly True Value, Inc. |
| 9185 | Devils Lake | ND | Kmart Corporation | Friendly True Value, Inc. |
| 9191 | Craig | CO | Kmart Corporation | Quality Stores, Inc. |
| 9194 | Cortez | CO | Kmart Corporation | Graffis Motors, Inc. |
| 9197 | Laurenburg | NC | Kmart of North Carolina, LLC | B.C. Moore & Sons, Inc. |
| 9197 | Laurenburg | NC | Kmart of North Carolina, LLC | Triton PCS Property Company L.L.C. |
| 9227 | Grayson | KY | Kmart Corporation | Farmers Hardware Company |
| 9230 | Kenton | OH | Kmart Corporation | Quality Stores, Inc. |
| 9230 | Kenton | OH | Kmart Corporation | Consolidated Stores Corporation |
| 9240 | Forest City | NC | Kmart of North Carolina, LLC | Transit Damage Freight, Inc. |

### SCHEDULE B
### SUBLEASES
### REJECTION UPON 10 DAYS NOTICE

| STORE | CITY | ST | LANDLORD | SUBTENANT |
|-------|------|-----|----------|-----------|
| 9247 | Bainbridge | GA | Kmart Corporation | Associated Distributors, Inc. d/b/a West Building Materials |
| 9250 | Uvalde | TX | Kmart Corporation | Dolgen Corp. of Texas, Inc. |
| 9250 | Uvalde | TX | Kmart Corporation | Tractor Supply Co. of Texas, L.P. |
| 9252 | Carmi | IL | Kmart Corporation | Carmi Rural King Supply, Inc. |
| 9252 | Carmi | IL | Kmart Corporation | Chester Passmore d/b/a "Chet's Market" |
| 9507 | Mitchell | SD | Kmart Corporation | Menard, Inc. |
| 9517 | Newton | KY | Kmart Corporation | Falley's, Inc. |
| 9663 | Omaha | NE | Kmart Corporation | Northwest Fitness Centers |
| 9663 | Omaha | NE | Kmart Corporation | Midwest Fitness Systems |
| 9663 | Omaha | NE | Kmart Corporation | Omaha Bible Church |
| 9663 | Omaha | NE | Kmart Corporation | The Creative Center, Inc. |
| 9707 | Rolla | MO | Kmart Corporation | Maco Management Co., Inc. |

**EXHIBIT J**

**FILED UNDER SEAL**

**EXHIBIT K**

**FILED UNDER SEAL**

# EXHIBIT L

**FILED UNDER SEAL**

# EXHIBIT D

**Hearing Date: June 19, 2006**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                           :
          In re                            :    Chapter 11
                                           :
DELPHI CORPORATION, et al.,                :    Case No. 05-44481 (RDD)
                                           :
                                           :    (Jointly Administered)
                        Debtors.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DEBTORS' CORRECTED OBJECTION TO MOTION
OF CINDY PALMER, PERSONAL REPRESENTATIVE OF ESTATE OF
MICHAEL PALMER, DECEASED, FOR RELIEF FROM AUTOMATIC STAY

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this corrected objection (the "Corrected Objection")[1] to the motion of Cindy Palmer, personal representative of the estate of Michael Palmer, deceased ("Palmer"), for relief from the automatic stay, dated March 6, 2006 (the "Motion") (Docket No. 2708), and the Supplement to the Motion, dated April 18, 2006 (the "Supplement") (Docket No. 3267). In support of the Corrected Objection, the Debtors respectfully represent as follows:

<u>Preliminary Statement</u>

1.        With respect to the Motion, the Debtors are amenable to modifying the automatic stay for the <u>sole</u> and <u>limited</u> purpose of allowing Palmer to prosecute the Palmer Appeal (as defined below). The Debtors object to the Motion, however, to the extent that Palmer seeks any additional relief beyond allowing Palmer to prosecute the Palmer Appeal in the Michigan Court of Appeals. If Palmer receives a favorable ruling in the Palmer Appeal, she should return to this Court to request any additional relief that she may deem necessary.

2.        On August 24, 2001, Palmer commenced an action against Delphi alleging that the actions of Delphi proximately caused the wrongful death of Michael Palmer. On November 21, 2002, the trial court granted Delphi's motion for summary disposition, and Palmer appealed to the Michigan Court of Appeals (the "Palmer

---

[1]    The Debtors are correcting their original objection to the Motion to correct information regarding the Debtors' insurance. The Debtor's filed its initial objection to the Motion on June 9, 2006 (Docket No. 4111).

2

Appeal").  Oral arguments were scheduled for October 12, 2005, but due to the

commencement of the Debtors' Chapter 11 cases, the oral arguments were stayed.  By the

Motion, Palmer has asked the Court for relief from the automatic stay, not only to

adjudicate the Palmer Appeal, but if successful on the appeal to prosecute the Palmer

litigation in the lower court.

3.    The Palmer Appeal has been fully briefed and filed with the

Michigan Court of Appeals.  Only oral arguments in front of the Michigan Court of

Appeals and a decision from the appellate court remain to adjudicate the Palmer Appeal.

Because the Debtors have already expended the resources required to prepare Delphi's

defense and brief the issues raised on appeal, the Debtors do not object to the

modification of the automatic stay for the <u>sole</u> and <u>limited</u> purpose of allowing Palmer to

prosecute the Palmer Appeal with the Michigan Court of Appeals.  Upon conclusion of

the proceedings in the Michigan Court of Appeals (whether by affirmation, reversal, or

other ruling), however, Palmer should be required to return to this Court if she desires

further relief from the automatic stay.  To the extent that Palmer is not willing to modify

the automatic stay under the terms set forth above, and is seeking to continue the

litigation beyond a judgment in the Michigan Court of Appeals, the Debtors object to the

Motion as set forth further below.

4.    The automatic stay should either be modified for the <u>sole</u> and

<u>limited</u> purpose of allowing Palmer to prosecute the Palmer Appeal or, in the alternative,

the Motion should be denied because Palmer has failed to offer sufficient evidence to

show adequate cause for relief from the automatic stay to continue her personal injury

litigation against Delphi, among other defendants.  Indeed, the movant has not shown <u>any</u>

3

cause to take any action beyond the prosecution of the Palmer Appeal. In support of its

Motion, Palmer alleges that (i) its lawsuit will require no significant time from any

employee involved in the Debtors' bankruptcy cases and (ii) both the Debtors and Palmer

will benefit if the stay is lifted and these matters are brought to judgment and collection.

Neither allegation is correct.

    5.  In their original Objection, the Debtors stated their belief that the

insurance policies under which Palmer's claim arose had been assumed pursuant to an

Order Authorizing Renewal of Insurance Coverage and Certain Related Relief, entered

on January 9, 2006 (the "Insurance Order") (Docket No. 1779). The Debtors have

subsequently determined, however, that because the event that gave rise to the Palmer

Appeal occurred prior to the January 1, 1999 spinoff,[2] the Debtors policies that were

assumed pursuant to the Insurance Order do not cover this Claim. Moreover, after further

investigation, the Debtors have discovered that in fact they do not have insurance for the

first million dollars of liability related to this claim. The excess insurance that the

Debtors have that may cover the Palmer action covers only any liability in excess of one

million dollars. Therefore, the first million dollars of any liability that may arise as a

result of the Palmer litigation would be borne directly by the Debtors' estates. In

addition, the Debtors are liable for all costs associated with defending the action. Thus,

the continuation of the Palmer litigation will directly affect the Debtors and their estates.

    6.  It is important to note that although the Palmer Appeal is in

advanced stages, if the Michigan Court of Appeals were to reverse the trial court's

---

[2]  Effective January 1, 1999, the assets and liabilities of certain divisions and subsidiaries were
transferred (i.e., spun off) to Delphi and its subsidiaries and affiliates in accordance with the terms of a
Master Separation Agreement between Delphi and GM.

4

decision, the litigation would once again be active.  Under such a scenario, the Debtors

would be unnecessarily distracted and valuable resources that would otherwise be

allocated to the administering of the estate would be wasted.

7.      Indeed, on March 31, 2006, the Debtors announced their strategy

to prepare for their return to stable, profitable business operations through a broad-based

global restructuring.  In furtherance of the Debtors' restructuring efforts, on May 9, 2006,

the hearing on the Debtors' motion for authority to reject U.S. labor agreements and to

modify retiree benefits under sections 1113 and 1114 of the Bankruptcy Code (the

"Section 1113/1114 Motion") commenced.  The Court has adjourned hearing on the

Section 1113/1114 Motion to August 11, 2006.  Moreover, the Debtors expect to

commence the hearing on their motion for authority to reject certain unprofitable supply

contracts with GM on August 15, 2006, provided that the hearing on the Section

1113/1114 Motion is completed or resolved prior to that time.  The Debtors are also

preparing to implement other aspects of their transformation plan including streamlining

the Debtors' product portfolio, transforming the Debtors' salaried workforce to ensure that

the Debtors' organizational and cost structure is competitive, and devising a workable

solution to the Debtors' current pension issues.  The resolution of these matters, which

will require the Debtors' undivided attention, is key to the Debtors' ability to complete its

U.S.-based restructuring and emerge from chapter 11.

8.      Accordingly, the Debtors should not now be forced to divert their

focus from the formidable issues at hand to enable Palmer to resume the litigation related

to her claims and collect any judgment from the Debtors.  To permit adjudication of

Palmer's claims at this time would giver her a preference over other holders of disputed,

5

unliquidated claims and would encourage other similarly situated parties to seek similar

relief.  The Debtors are parties to more than two hundred active and threatened lawsuits

throughout the country.  If the automatic stay is lifted for Palmer for the purpose of

allowing her to proceed against Delphi other than simply to argue the Palmer Appeal, the

Debtors may be inundated with similar motions by other litigants.  Thus, rather than

focusing on restructuring efforts in order to emerge from chapter 11 as soon as possible,

the Debtors would be required instead to reallocate needed resources to defend against

numerous motions to modify the automatic stay.

        9.     The Debtors should not be forced to litigate prepetition claims with

Palmer or any other similarly situated claimant at this time.  The automatic stay was

designed to avoid precisely this type of distraction for debtors.  Permitting a modification

of the stay to allow Palmer to proceed against Delphi – other than oral argument of the

Palmer Appeal – would defeat the this fundamental protection afforded by Congress to a

chapter 11 debtor.   Furthermore, should Palmer succeed in the Palmer Appeal, she may

return to this Court to request additional relief from the automatic stay to pursue her

action further.

<u>Argument</u>

        10.    The automatic stay imposed by section 362 of the Bankruptcy

Code is one of the most fundamental and significant protections that the Bankruptcy

Code affords a debtor.  <u>Midlantic Nat'l Bank v. N.J. Dep't of Envt'l. Prot.</u>, 474 U.S. 494,

503 (1986); <u>see also</u> <u>In re Drexel Burnham Lambert Group Inc.</u>, 113 B.R. 830, 837

(Bankr. S.D.N.Y. 1990) ("[A]utomatic stay is key to the collective and preservative

nature of a bankruptcy proceeding.").  The automatic stay is designed to, among other

6

purposes, give the debtor a "breathing spell" after the commencement of a chapter 11

case and shield the debtor from creditor harassment and a multitude of litigation in a

variety of forums at a time when the debtor's personnel should be focusing on

restructuring.  See Taylor v. Slick, 178 F.3d 698, 702 (3d Cir. 1999), cert. denied, 528

U.S. 1079 (2000); In re Enron Corp., 300 B.R. 201 (Bankr. S.D.N.Y. 2003).

> 11.    The automatic stay broadly extends to all matters that may have an

effect on a debtor's estate, enabling bankruptcy courts to ensure that debtor has the

opportunity to rehabilitate and reorganize its operations.  See Manville Corp. v. Equity

Sec. Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 62–64 (2d Cir. 1986);

see also Fid. Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47, 53 (2d Cir.

1976) ("Such jurisdiction is necessary 'to exclude any interference by the acts of others or

by proceedings in other courts where such activities or proceedings tend to hinder the

process of reorganization.'") (citation omitted); AP Indus. Inc. v. SN Phelps & Co. (In re

AP Indus., Inc.), 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) ("The automatic stay

prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves

the debtor's estate so that all creditors and their claims can be assembled in the

bankruptcy court for a single organized proceeding.").

> 12.    Section 362(d)(1) of the Bankruptcy Code provides that the court

may grant relief from the automatic stay "for cause." In Sonnax Indus. v. Tri Component

Prods. Corp. (In re Sonnax Indus.), 907 F.2d 1280, 1285 (2d Cir. 1990), the Court of

Appeals explained the burden-shifting regime on a motion to modify the automatic stay:

> > The burden of proof on a motion to lift or modify the automatic
> > stay is a shifting one. Section 362(d)(1) requires an initial showing
> > of cause by the movant, while Section 362(g) places the burden of

7

proof on the debtor for all issues other than "the debtor's equity in property," 11 U.S.C. § 362(g)(1). See 2 Collier on Bankruptcy ¶ 362.10, at 362–76. If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection.

13.    "If the movants fail to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." In re Sonnax Indus., 907 F. 2d at 1285; see also In re Metro Transp. Co., 82 B.R. 351, 353 (Bankr. E.D. Pa. 1988) (noting that unsecured creditors face difficult task of producing evidence to establish balance of hardships tips in their favor to obtain stay relief).  Moreover, during the debtor's exclusivity period, "an unsecured, unliquidated claim holder should not be permitted to pursue litigation against the debtor in another court unless extraordinary circumstances are shown." See In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990).  As more fully described below, Palmer has not shown any cause, let alone extraordinary cause, sufficient to obtain relief from the automatic stay.  The failure of Palmer to satisfy her burden to show cause is sufficient grounds to deny her Motion and Supplement.

14.    Even if the movant had offered any evidence to satisfy cause, this Court may nonetheless evaluate the propriety of lifting the stay under the circumstances. In re Sonnax Indus., 907 F.2d at 1288.  Courts have traditionally used multifactor tests to determine whether cause exists to modify or lift the automatic stay.  The Second Circuit has used a twelve-factor lift stay test articulated in the Sonnax case.[3]  In re Sonnax sets

---

[3]    In lieu of applying the twelve-factor test set forth in Sonnax, Palmer seeks to have this Court consider only three factors used in the Seventh Circuit by directing the Court's attention to In re Fernstrom Storage & Van Co., 938 F.2d 731 (7th Cir. 1991).

forth a list of twelve factors that should be considered when deciding whether the stay

should be lifted to allow litigation against a debtor to continue in another forum:

> (1) whether relief would result in a partial or complete resolution of the
> issues; (2) lack of any connection with or interference with the bankruptcy
> case; (3) whether the other proceeding involves the debtor as a fiduciary;
> (4) whether a specialized tribunal with the necessary expertise has been
> established to hear the cause of action; (5) whether the debtor's insurer has
> assumed full responsibility for defending it; (6) whether the action
> primarily involves third parties; (7) whether litigation in another forum
> would prejudice the interests of other creditors; (8) whether the judgment
> claim arising from the other action is subject to equitable subordination;
> (9) whether movant's success in the other proceeding would result in a
> judicial lien avoidable by the debtor; (10) the interests of judicial economy
> and the expeditious and economical resolution of litigation; (11) whether
> the parties are ready for trial in the other proceeding; and (12) impact of
> the stay on the parties and the balance of harms.

Id. at 1286.  See also In re Curtis, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984).  All

twelve factors will not be relevant in every case, Mazzeo v. Lenhart (In re Mazzeo), 167

F.3d 139, 143 (2d Cir. 1999), nor must the Court afford equal weight to each of the

twelve factors.  See Burger Boys, Inc. v. S. St. Seaport Ltd. P'ship (In re Burger Boys,

Inc.), 183 B.R. 682, 688 (S.D.N.Y. 1994).  The relevant factors with regard to this

Motion are (i) whether the Debtors' insurer has assumed full responsibility for defending

them; (ii) whether litigation in another forum would prejudice the interests of other

creditors; (iii) whether the parties are ready for trial in the other proceeding; (iv) lack of

any connection with or interference with the bankruptcy case; and (v) impact of the stay

on the parties and the balance of harms.  As demonstrated below, Palmer has not, and

indeed cannot, carry the burden of establishing that sufficient cause exists to lift the

automatic stay.

9

I.     The Debtors And Their Creditors Will Be Prejudiced
       Because The Debtors' Insurer Has Not Assumed Full
       Responsibility For Defending The Case

        15.     As noted above, the Debtors do not have insurance to cover any liability associated with the first million dollars of Palmer's claim.[4]  Therefore, any liability would be borne directly by the Debtors for such amount.  In addition, the Debtors are liable for costs associated with defending the action.  As a result, the Debtors and their estates would be prejudiced if the automatic stay were modified to permit the Palmer's litigation to proceed at this point in these chapter 11 cases.

II.    The Debtors Are Not Prepared For Trial

        16.     As discussed above, although the Palmer Appeal is in advanced stages, if the Michigan Court of Appeals were to reverse the trial court's decision, the case would once again become active.  Modifying the automatic stay to allow Palmer to proceed with the litigation against the Debtors would require the Debtors and their counsel to invest in potentially time-consuming and costly litigation.

III.   Lifting The Stay Would Unnecessarily Interfere
       With The Debtors' Restructuring Efforts

        17.     The Debtors and their estates would be prejudiced if the automatic stay were modified now to permit the Palmer litigation to proceed.  The Debtors are in the midst of critical negotiations with their unions and GM to address numerous issues regarding U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements.  In furtherance of these efforts, and as stated above, the Debtors commenced the prosecution of their motion under sections 1113 and 1114 of the

---

[4]     Palmer's claim may be covered under the Debtors' excess insurance, but only for the amounts in excess of $1 million.

10

Bankruptcy Code seeking authority to reject U.S. labor agreements.  The hearing on the

Section 1113/1114 Motion is scheduled to begin on August 11, 2006.  Moreover, the

Debtors expect to commence the hearing on their motion for authority to reject certain

unprofitable supply contracts with GM on August 15, 2006, provided that the hearing on

the Section 1113/1114 Motion is completed or resolved prior to that time.

18.     Allowing Palmer to proceed with its litigation, other than to

complete the appeal process that is already under way, would distract the Debtors from

these critical issues and would thus cause significant prejudice to the Debtors.  In re U.S.

Brass Corp., 173 B.R. 1000, 1006 (Bankr. E.D. Tex. 1994) ("When balancing the

hardships in lifting the stay, the most important factor is the effect of such litigation on

the administration of the estate; even slight interference with the administration may be

enough to preclude relief.") (citing In re Curtis, 40 B.R. 795, 806 (Bankr. D. Utah 1984));

see In re Comdisco, 271 B.R. at 280 (finding that "it would be irresponsible and

subversive of the purpose of the automatic stay to allow any resources and attention of

the Debtor to be diverted to other matters not directly related to its reorganization").

Denying Palmer's Motion is consistent with one of the purposes of the automatic stay,

which is to allow the Debtors breathing space.  See, e.g., In re Enron Corp., 300 B.R. at

211 (finding that "'[t]he purpose of the automatic stay is to give the debtor a breathing

spell from creditors'") (citations omitted).

19.     In addition to the reasons set forth above, the Debtors are parties to

more than two hundred active and threatened lawsuits throughout the country.  Lifting the

automatic stay for Palmer presumably would encourage other parties with litigation

claims against the Debtors, even those in the preliminary stages of litigation, to seek

11

similar relief, thereby forcing the Debtors to defend against dozens of motions to modify

the automatic stay.  This result would be contrary to the purpose of section 362 of the

Bankruptcy Code.  See, e.g., LTV Steel Co. v. Bd. of Educ. (In re Chateaugay Corp.), 93

B.R. 26, 30 (S.D.N.Y. 1988) (noting that automatic stay is intended to prevent "chaotic

and uncontrolled scramble for the debtor's assets in a variety of uncoordinated

proceedings in different courts"); Midlantic Nat'l Bank, 474 U.S. at 503; In re Drexel

Burnham Lambert Group, Inc., 113 B.R. at 837.  Therefore, Palmer should not be

allowed to lift the stay and proceed with her litigation against the Debtors, other than to

argue her pending appeal.

IV.    The Balance Of The Harms Weighs In Favor Of
       Denying The Palmer's Motion

20.    In stark contrast to the substantial prejudice that the Debtors would

suffer, Palmer cannot show that it would be prejudiced if the Motion were denied.

Palmer will face only the ordinary delay that all creditors face in complex Chapter 11

cases.  See In re Comdisco, 271 B.R. at 277–80 (finding that "the automatic stay almost

always delays litigants … [t]hat, after all, is its purpose, and the reason they call it a

'stay'").  Palmer simply would experience the creditor delay that is inherent in the

bankruptcy process, and is an unavoidable – and intended – consequence of the automatic

stay.[5]  Moreover, to the extent that Palmer is successful in the Palmer Appeal, she may

---

[5]    The Debtors attempted to resolve the Motion consensually and offered to enter into a Stipulation and
       Agreed Order (the "Proposed Stipulation") whereby, with this Court's consent, the automatic stay
       would be modified for the sole and limited purpose of allowing Palmer to prosecute to decision the
       Palmer Appeal.  Under the proposed stipulation, Palmer's rights to seek further relief from the
       automatic stay would be preserved in full, and the Debtors would reserve all rights to object to any
       further relief requested by Palmer.  Palmer rejected the Proposed Stipulation.

return to this Court to request additional relief from the automatic stay to pursue her action further.

Conclusion

21.      A balancing of the competing interests of the Debtors and Palmer demonstrates that the automatic stay should not be modified to permit Palmer to proceed with the Palmer litigation other than to argue the pending appeal.  Palmer has failed to meet the burden of establishing that sufficient cause exists to lift the automatic stay.  For the reasons set forth above, the automatic stay should be lifted for the <u>sole</u> and <u>limited</u> purpose of allowing Palmer to prosecute the Palmer Appeal.

Notice

22.      Notice of this Corrected Objection has been provided in accordance with the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

23.      Because the legal points and authorities upon which this Corrected Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

13

WHEREFORE the Debtors respectfully request that the Court enter an order (i) denying the Motion and (ii) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        June 15, 2006

                    SKADDEN, ARPS, SLATE, MEAGHER
                      & FLOM LLP

                    By: /s/   John Wm. Butler, Jr.
                        John Wm. Butler, Jr. (JB 4711)
                        John K. Lyons (JL 4951)
                        Ron E. Meisler (RM 3026)
                    333 West Wacker Drive, Suite 2100
                    Chicago, Illinois  60606
                    (312) 407-0700

                      - and -

                    By: /s/   Kayalyn A. Marafioti
                        Kayalyn A. Marafioti (KM 9632)
                        Thomas J. Matz (TM 5986)
                    Four Times Square
                    New York, New York 10036
                    (212) 735-3000

                    Attorneys for Delphi Corporation, et al.,
                      Debtors and Debtors-in-Possession

14

# EXHIBIT E

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Curtin & Heefner, LLP | Robert Szwajkos Daniel P. Mazo | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | Counsel top SPS Technologies, LLC |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | | Counsel to General Motors Corporation |
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | Counsel for Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | Counsel for Appaloosa Management, LP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

6/16/2006 9:14 AM
GM Contract Special Parties

# EXHIBIT F

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---------|---------|----------|----------|------|-------|-----|
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

6/16/2006 9:14 AM
H.E. Services - Cindy Palmer Special Party