IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re                                     :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                          Debtors.        :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On June 16, 2006, I caused to be served the documents listed below upon the parties listed on Exhibit A hereto via overnight delivery:

1) Debtors' Response to Limited Omnibus Objection of the Official Committee of Equity Security Holders in Opposition to Debtors' (1) settlement Procedures Motion, (II) Lift Stay Motion and (III) MobileAria Sale Motion (Docket No. 4241) [a copy of which is attached hereto as Exhibit B]

2) Debtors' Omnibus Response to Objections to Debtors' Motion for Order Under 11 U.S.C. §§ 363, 502, and 503 and Fed.R.Bankr.P. 9019(b) Authorizing Debtors to Compromise or Settle Certain Classes of Controversy and Allow Claims without Further Court Approval (Docket No. 4242) [a copy of which is attached hereto as Exhibit C]

3) Debtors' Response to O'Neill Claimants' Supplement to Motion for Relief from Automatic Stay and Objections to Debtors' Application to Establish Claims Procedures (Docket No. 4243) [a copy of which is attached hereto as Exhibit D]

4) Debtors' Response to Objection of the Ace Companies to the Debtors Motion for Order Under 11 U.S.C. § 362 and Fed.R.Bankr.P. 7016 and 9019 Approving Procedures for Modifying the Automatic Stay to Allow for (I) Liquidating and Settling and/or (II) Mediating Certain Prepetition Litigation Claims (Docket No. 4244) [a copy of which is attached hereto as Exhibit E]

5) Debtors' Reply to Limited Objection of Wilmington Trust Company as Indenture trust, to Motion for Order Under 11 U.S.C. § 636(b) and Fed.R.Bankr.P. 2002 and 6004 Authorizing and Approving Debtors' Entry into Transfer Agreement with Johnson Controls, Inc. Providing for (A) Sales of Acquired Assets Free and Clear of Lien, Claims, and encumbrances (B) Continuation and Transition of Supply to Johnson Controls, Inc. of Battery

Products Out of Fitzgerald Facility and (C) Implementation of Attrition Plan with Respect to New Brunswick Facility in Accordance with IUE-CWA Memorandum (Docket No. 4245) [a copy of which is attached hereto as Exhibit F]

6) Debtors' Response to Limited Omnibus Objection of the Official Committee of Equity Security Holders in Opposition to Debtors' (I) Settlement Procedures Motion, (II) Lift Stay Motion and (III) MoblieAria Sale Motion (Docket No. 4246) [a copy of which is attached hereto as Exhibit G]

On June 16, 2006, I caused to be served the document listed below upon the parties listed on Exhibit H hereto via overnight delivery:

7) Debtors' Omnibus Response to Objections to Debtors' Motion for Order Under 11 U.S.C. §§ 363, 502, and 503 and Fed.R.Bankr.P. 9019(b) Authorizing Debtors to Compromise or Settle Certain Classes of Controversy and Allow Claims without Further Court Approval (Docket No. 4242) [a copy of which is attached hereto as Exhibit C]

On June 16, 2006, I caused to be served the document listed below upon the parties listed on Exhibit I hereto via overnight delivery:

8) Debtors' Response to O'Neill Claimants' Supplement to Motion for Relief from Automatic Stay and Objections to Debtors' Application to Establish Claims Procedures (Docket No. 4243) [a copy of which is attached hereto as Exhibit D]

On June 16, 2006, I caused to be served the document listed below upon the parties listed on Exhibit J hereto via overnight delivery:

9) Debtors' Response to Objection of the Ace Companies to the Debtors Motion for Order Under 11 U.S.C. § 362 and Fed.R.Bankr.P. 7016 and 9019 Approving Procedures for Modifying the Automatic Stay to Allow for (I) Liquidating and Settling and/or (II) Mediating Certain Prepetition Litigation Claims (Docket No. 4244) [a copy of which is attached hereto as Exhibit E]

On June 16, 2006, I caused to be served the document listed below upon the parties listed on Exhibit K hereto via overnight delivery:

10) Debtors' Reply to Limited Objection of Wilmington Trust Company as Indenture trust, to Motion for Order Under 11 U.S.C. § 636(b) and Fed.R.Bankr.P. 2002 and 6004 Authorizing and Approving Debtors' Entry into Transfer Agreement with Johnson Controls, Inc. Providing for (A) Sales of Acquired Assets Free and Clear of Lien, Claims, and encumbrances (B) Continuation and Transition of Supply to Johnson Controls, Inc. of Battery Products Out of Fitzgerald Facility and (C) Implementation of Attrition Plan

with Respect to New Brunswick Facility in Accordance with IUE-CWA
Memorandum (Docket No. 4245) [a copy of which is attached hereto as
Exhibit F]

Dated: June 20, 2006

_____*/s/ Evan Gershbein*_____
Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 20th day of June, 2006, by
Evan Gershbein, personally known to me or proved to me on the basis of satisfactory
evidence to be the person who appeared before me.

Signature : _____*/s/ Amy Lee Huh*_____

Commission Expires: ___*3/15/09*_____

# EXHIBIT A

Delphi Corporation
Response Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brandes Investment Partners LP | Ted Kim | 11988 El Camino Real | Suite 500 | San Diego | CA | 92103 | | | | Equity Security Holders Committee Member |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| DC Capital Partners LP | Douglas L Dethy | 800 Third Avenue | 40th Floor | New York | NY | 10022 | | | | Equity Security Holders Committee Member |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2670 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Proposed Counsel to Equity Security Holders Committee |
| James E Bishop Sr | | 502 Shiloh Dr | No 9 | Laredo | TX | 78045 | | | | Equity Security Holders Committee Member |
| James H Kelly | | 517 Lost Angel Rd | | Boulder | CO | 80302 | | | | Equity Security Holders Committee Member |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Luqman Yacub | | PO Box 1026 | | Hartville | OH | 44632 | | | | Equity Security Holders Committee Member |
| Pardus European Special Opportunities Master Fund LP | Joseph R Thornton | Pardus Capital Management LP | 1101 Avenue of the Americas Suite 1100 | New York | NY | 10018 | | | | Equity Security Holders Committee Member |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Trustee of the Koury Family Trust | James N Koury | 410 Reposado Dr | | La Habra Heights | CA | 90631 | | | | Equity Security Holders Committee Member |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

6/19/2006 11:34 AM
Response Service List

# EXHIBIT B

**Hearing Date: June 19, 2006**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                          :
In re                      :    Chapter 11
                           :
DELPHI CORPORATION, et al.,  :    Case No. 05-44481 (RDD)
                           :
                           :    (Jointly Administered)
           Debtors.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' RESPONSE TO LIMITED OMNIBUS OBJECTION OF THE OFFICIAL
COMMITTEE OF EQUITY SECURITY HOLDERS IN OPPOSITION TO DEBTORS'
(I) SETTLEMENT PROCEDURES MOTION, (II) LIFT STAY MOTION
AND (III) MOBILEARIA SALE MOTION

Delphi Corporation and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this response (the "Response") to the limited omnibus objection (the "Objection") of the Official Committee of Equity Security Holders (the "Equity Committee") to the Debtors' (i) Motion For Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b) Authorizing The Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval, filed on June 6, 2006 (Docket No. 4037) (the "Settlement Procedures Motion"), (ii) Motion For Order Under 11 U.S.C. § 362 And Fed. R. Bankr. P. 7016 And 9019 Approving Procedures For Modifying The Automatic Stay To Allow For (I) Liquidating And Settling And/Or (II) Mediating Certain Prepetition Litigation Claims, filed on June 6, 2006 (Docket No. 4038) (the "Lift Stay Procedures Motion"), and (iii) Motion For Orders Under 11 U.S.C. §§ 363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014 (A) Approving (I) Bidding Procedures, (II) Certain Bid Protections, (III) Form And Manner Of Sale Notices, And (IV) Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of Certain Of The Debtors' Assets Comprising Substantially All Assets Of MobileAria, Inc. ("MobileAria") Free And Clear Of Liens, Claims, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities, filed on June 6, 2006 (Docket No. 4040) (the "MobileAria Motion," collectively with the Settlement Procedures Motion and Lift Stay Procedures Motion, the "Motions").  In support of the Response, the Debtors respectfully represent as follows:

<u>Background</u>

1.    On June 15, 2006, the Equity Committee filed the Objection, which objects to the relief the Debtors requested in the Motions solely on the grounds that the Equity Committee requests that it be added as a party to the notice and reporting provisions in each of

2

the Motions.  In addition, in its Objection, the Equity Committee has also requested that the

Court modify various previously-entered orders to allow the Equity Committee to duplicate the

role played by the Official Committee of Unsecured Creditors (the "Creditors' Committee")

thereunder.[1]  The Equity Committee has not, however, objected to any of the substantive relief

the Debtors requested in the Motions.

       2.      On March 21 and 22, 2006, this Court conducted an evidentiary hearing

(the "Hearing") on the Motion Pursuant To 11 U.S.C. § 1102(a)(2) For An Order Directing The

United States Trustee To Appoint An Equity Committee In These Chapter 11 Cases filed on

December 22, 2005, by Appaloosa Management L.P. (Docket No. 1604) (the "Equity Committee

Motion").[2]  On March 30, 2006, this Court entered an order directing the United States Trustee

to appoint an equity committee in these cases (Docket No. 3024) (the "Equity Committee

Order").[3]

       3.      The Debtors believe that the Equity Committee Order and this Court's

bench ruling on the Equity Committee Motion make it abundantly clear that the Equity

---

[1]    Specifically, the Objection requests modification of the following previously-entered orders: (i) the Order Under 11 U.S.C. §§ 363(b)(3) And 365(a) And Fed. R. Bankr. P. 9019 Approving Procedures To Assume Certain Amended And Restated Sole Source Supplier Agreements, entered on December 12, 2005; (ii) the Order Under 11 U.S.C. §§ 365(a) And 554 And Fed. R. Bankr. P. 6006 Approving Procedures For Rejecting Unexpired Real Property Leases And Authorizing Debtors To Abandon Certain Furniture, Fixture, And Equipment, entered on January 6, 2006; (iii) the Order Under 11 U.S.C. §§ 363, 1107, And 1108 Approving Procedures To Enter Into Or Renew Real Property Leases Without Further Court Approval, entered on January 6, 2006; (iv) the Order Under 11 U.S.C. §§ 105, 362, And 541 And Fed. R. Bankr. P. 3001 (A) Establishing Notification Procedures Applicable To Substantial Holders Of Claims And Equity Securities And (B) Establishing Notification And Hearing Procedures For Trading In Claims And Equity Securities, entered on January 6, 2006; (v) the Order Under 11 U.S.C. §§ 363, 1107, And 1108 Authorizing Delphi Automotive Systems LLC To Make Equity Investments In Delphi Furukawa Wiring Systems LLC And Approving Procedures to Make Additional Contributions Without Further Court Approval, entered on March 17, 2006; and (vi) the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on March 20, 2006 (as supplemented) (collectively, the "Prior Orders").

[2]    The relevant portions of the Transcript of Section 1102(a)(2) Evidentiary Hearing Before The Honorable Robert D. Drain United States Bankruptcy Judge ("March 22 Transcript of Hearing") are attached hereto as <u>Exhibit A</u>.

[3]    The Equity Committee Order is attached hereto as <u>Exhibit B</u>.

Committee was appointed for a limited purpose – to provide holders of Delphi Corporation

common stock with a voice on a narrowly-defined set of key transformational issues in these

chapter 11 cases.  The Equity Committee was not granted carte blanche authority to inject itself

into all other areas of these cases, particularly where the interests of creditors and equityholders

are aligned.

4.    In the Equity Committee Order, this Court stated that the Equity

Committee "needs to be informed of, . . . among other things, issues involving labor, pension,

OPEB, and GM, and to be informed in respect of agreements that the Debtors may reach with

their unions and GM."  Equity Committee Order at ¶ 5.  Similarly, in its bench ruling on the

Equity Committee Motion, this Court stated that "one could at least see a rationale for having an

equity committee with counsel in the near future to deal at least with those transformational

issues on behalf of the shareholders."  March 22 Transcript of Hearing at 175.  Following this

statement and the Court's discussion of its reluctance to allow the Equity Committee to retain

investment bankers, accountants, or actuaries, this Court noted that "given the important

transformative events that will be taking place in this company . . . it's important to give

[shareholders] representation . . . within the parameters that I've already described."  March 22

Transcript of Hearing at 183.  Finally, near the conclusion of its bench ruling, this Court

reiterated that "[w]hat an equity committee needs to do is to understand through its own

members' expertise . . . and through the assistance of its counsel, the pressing issues of this case

in respect of labor, pension, other benefits and GM."  March 22 Transcript of Hearing at 184.

A.    The Objection Should Be Overruled Because The Requested Notice Is Outside
      Of The Scope Of The Equity Committee's Appointment

5.    In light of the language of the Equity Committee Order and the direction

this Court gave in its bench ruling at the conclusion of the Hearing, the Debtors assert that the

4

Objection should be overruled in its entirety.  The relief requested in the Objection goes beyond

the scope of the circumscribed role that this Court has authorized the Equity Committee to play

in these cases.  The Equity Committee was formed as a limited purpose committee to provide

shareholders a voice in those aspects of these cases directly relating to the Debtors' labor

transformation.  The Objection expressly acknowledges the limited role that the Equity

Committee is intended to play in these cases.  Objection at ¶ 6 ("The Equity Committee is

mindful of the scope limitations imposed on the Equity Committee by the Court. . . .").  Neither

the Equity Committee Order nor this Court's bench ruling at the Hearing contemplated that the

Equity Committee would have a role in (a) potential agreements to lift the automatic stay for the

limited purpose of allowing certain litigants to liquidate their prepetition claims, (b) potential

settlements of claims below certain materiality thresholds under the proposed settlement

procedures, or (c) sales of assets such as those proposed in the MobileAria Motion.

        6.    Furthermore, the Debtors' appropriate exercise of their business judgment

is already subject to close and careful review in these cases by the Creditors' Committee.  This

Court has specifically noted the meaningful and effective role that the Creditors' Committee has

played to date in exercising its duties in these cases.  See March 22 Transcript of Hearing at 171

("I say 'constructive,' rather than 'hand-in-glove' because it is very clear to me that the Creditors'

Committee is nobody's patsy by any means and makes its views known to the debtor very clearly

and forcefully, even if those views are unwelcome.").  The procedures proposed in the

Settlement Procedures Motion and the Lift Stay Procedures Motion are the product of extensive

negotiation between the Debtors and the Creditors' Committee.  In addition, the Creditors'

Committee has not objected to the MobileAria Motion.  Nevertheless, the Equity Committee

seeks through the Objection to duplicate the role of the Creditors' Committee and interject itself

broadly into numerous areas of these cases wholly unrelated to the Debtors' labor transformation.

      7.      Simply put, the Objection, if granted, would have the Creditors'

Committee and the Equity Committee fulfill the same role.  Such a duplication of effort is not

only inconsistent with the Equity Committee Order and the Court's bench ruling at the Hearing,

but also would be inefficient, a waste of the estates' resources, and wholly-unnecessary as it will

not provide any material benefit to the equityholders or any other party-in-interest.  Notably, the

Equity Committee has not even suggested that the interests of the equityholders would materially

diverge from the interest of creditors with respect to the relief sought in any of the Motions.

      8.      With respect to the MobileAria transaction, the Equity Committee, as the

representative solely of holders of equity interests in Delphi Corporation, has a minimal interest

(at best) in the outcome of the sale of MobileAria's assets contemplated by the MobileAria

Motion.  MobileAria is a joint venture in which Delphi Automotive Systems LLC ("DAS LLC"),

a subsidiary of Delphi Corporation, holds a 71.2% equity interest in MobileAria and is

MobileAria's largest creditor.  The only arguable interest that the Equity Committee would have

in the sale of MobileAria would come through Delphi Corporation's equity interest in DAS LLC.

Again, the Equity Committee's interests are aligned with the Creditors' Committee's interests –

namely, maximizing the proceeds realized by MobileAria through the sale.  The Creditors'

Committee represents, among others, the creditors of each of MobileAria, DAS LLC, and Delphi

Corporation, all of whom have a much more particularized interest in maximizing the proceeds

from the sale of MobileAria's assets than do any of the Equity Committee's constituents.  Also,

while the MobileAria Motion does not contemplate the Equity Committee's participation in the

sale process to the extent requested in the Objection, the Equity Committee does have the right to

object to any proposed sale of MobileAria's assets if it believes that MobileAria did not accept

the highest or otherwise best bid.  Again, the Equity Committee has not objected to any of the

substantive relief that the Debtors are seeking with respect to the MobileAria Motion at the June

19, 2006 hearing.

B.    The Equity Committee's Request to Receive Notice Under Procedures Previously
      Entered By This Court Was Procedurally Deficient And Should Be Denied

          9.      As noted in footnote 1 above, the Objection requests that "previously

entered orders that provide notice and related rights to the Creditors' Committee be deemed

amended to provide such notice and related rights to the Equity Committee."  Objection at ¶ 8.  It

is procedurally improper to include in an objection to wholly unrelated motions a request for the

Court to modify the Prior Orders.  Moreover, with respect to the relief requested, the Debtors

submit that, for the reasons provided above, the Equity Committee's request that this Court

amend the Prior Orders is without merit and should be denied.

C.    The Equity Committee's Requested Relief Would Constitute A
      Significant And Unwarranted Burden On The Debtors' Estates

          10.     Finally, in the Objection, the Equity Committee asserts that "the provision

of notice and reports to the Equity Committee, which are already being provided to the Creditors'

Committee, does not prejudice or place an undue burden on the Debtors." Objection at ¶ 6.

While the mere giving of notice arguably would not place an undue burden on the Debtors, the

reality is that the Equity Committee is not merely asking for notice.  Rather, the Equity

Committee is, in fact, asking for the same rights as are granted to the Creditors' Committee: for

example, to have the opportunity to object to notices of settlement, receive the same reports that

the financial advisors to the Creditors' Committee would receive, and play an active role in the

MobileAria sale process.  Furthermore, providing the Equity Committee with the expanded role

it seeks with respect to nine separate orders of this Court would require the Debtors' estates to

bear significantly increased administrative expenses and other burdens without providing any appreciable benefit to the estates.

Notice

11.    Notice of this Response has been provided in accordance with the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures, entered May 19, 2006 (Docket No. 3824).  The Debtors submit that no other or further notice is necessary.

Memorandum Of Law

12.    Because the legal points and authorities upon which this Response relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i)

overruling the Objection, and (ii) granting the Debtors such other and further relief as is just.

Dated:          New York, New York
                June 16, 2006

                                SKADDEN, ARPS, SLATE, MEAGHER
                                  & FLOM LLP


                                By:   /s/ John Wm. Butler, Jr.
                                      John Wm. Butler, Jr. (JB 4711)
                                      John K. Lyons (JL 9331)
                                      Ron E. Meisler (RM 3026)
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois 60606
                                (312) 407-0700

                                      - and -


                                By:   /s/ Kayalyn A. Marafioti
                                      Kayalyn A. Marafioti (KM 9632)
                                      Thomas J. Matz (TM 5986)
                                Four Times Square
                                New York, New York 10036
                                (212) 735-3000

                                Attorneys for Delphi Corporation, et al.,
                                  Debtors and Debtors-in-Possession

# EXHIBIT C

**Hearing Date: June 19, 2006**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
          In re                           :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                                          :    (Jointly Administered)
                          Debtors.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO DEBTORS'
MOTION FOR ORDER UNDER 11 U.S.C. §§ 363, 502, AND 503 AND
FED. R. BANKR. P. 9019(b) AUTHORIZING DEBTORS TO COMPROMISE
OR SETTLE CERTAIN CLASSES OF CONTROVERSY AND ALLOW
CLAIMS WITHOUT FURTHER COURT APPROVAL

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this omnibus response (the "Response") to the objections[1] to the Debtors' Motion For Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(B) Authorizing The Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval (Docket No. 4037) (the "Motion").  In support of the Response, the Debtors respectfully represent as follows:

Argument

1.      Of the hundreds of parties-in-interest that received the Motion, only three parties, including the Ad Hoc Equity Committee and Riverside, objected to the requested relief in the Motion.[2]  The objections of the Ad Hoc Committee and Riverside raise the following four issues:  (1) whether the Debtors sufficiently identified the classes of controversy that fall within scope of the Settlement Procedures[3]; (2) whether the Settlement Procedures provide the Debtors too much discretion to effectuate settlements; (3) whether additional parties should be added to the list of Notice Parties under the Settlement Procedures; and (4) whether the Debtors should be required to file with the

---

[1]    The limited objection of Riverside Claims LLC (the "Riverside Objection") can be found at Docket No. 4154.  The objection of "Ad Hoc Equity Committee," which is comprised of Appaloosa management L.P., Wexford Capital LLC, Lampe Conway & Co., LLC, Harbinger Capital Partners LLC, and Marathon Asset Management LLC (the "Ad Hoc Equity Committee Objection") can be found at Docket No. 4162.

[2]    The Debtors will respond to the Equity Committee's objection in a separate pleading, which will be filed contemporaneously herewith.

[3]    Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2

Court quarterly reports of all settlements reached under the Settlement Procedures.  As

discussed below, none of these objections warrant the denial of the Motion.

A.    The Settlement Procedures Sufficiently Identifies Classes
      Of Controversies That Fall Within The Scope of the Motion

2.    Despite acknowledging that the Debtors' settlement authority and

notice requirements varies by the priority and amount of the claim, the Ad Hoc Equity

Committee alleges that the Debtors have not identified <u>any</u> classes of controversy to

warrant the relief requested.  The Ad Hoc Equity Committee also argues that there is "no

legal basis for granting such expansive settlement authority."  That is not correct.  Rule

9019(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") states

"[a]fter a hearing . . . the court may direct, the court may fix a class or classes of

controversies and authorize the trustee to compromise or settle controversies within such

class or classes without further hearing or notice."  Fed. R. Bankr. P. 9019(b).  Nowhere

in Bankruptcy Rule 9019(b) does it state that a class of controversy cannot be defined by

a monetary amount.  Moreover, the Ad Hoc Equity Committee fails to cite to any case in

support of that proposition.

3.    Indeed, numerous cases, including at least one before this Court,

have implemented procedures where the classes of controversy were defined by monetary

thresholds.  <u>See</u> <u>In re Parmalat USA Corp., et al.</u>, jointly administered under Case No. 04-

11139 (RDD) (Bankr. S.D.NY. Nov. 3, 2004) (a copy of which is attached hereto as

Exhibit A) (the "Parmalat Order"); <u>In re WorldCom, Inc., et al.</u>, jointly administered

under Case No. 02-13533 (Bankr. S.D.N.Y. Oct. 8, 2002) (a copy of which was attached

to the Ad Hoc Equity Committee's Objection as Exhibit A) (the "WorldCom Order"); <u>In</u>

<u>re Kmart Corporation, et al.</u>, jointly administered under Case No. 02-02474 (Bankr. N.D.

3

Ill. Aug. 29, 2002) (a copy of which is attached hereto as Exhibit B) (the "Kmart Order").

For example, in the Parlamat Order, the debtors similarly requested authority to settle

certain prepetition claims under both section 363(b) of the Bankruptcy Code and

Bankruptcy Rule 9019(b).  Although the Parmalat Order appears to address a global

claims reconciliation procedure, this Court nonetheless gave the debtor authority to settle

non-ordinary course disputes under a settlement procedure where the classes of

controversy were defined by monetary thresholds.  Exhibit A.  Similarly, the WorldCom

Order, which was relied on by the Ad Hoc Equity Committee for other purposes,

establishes various noticing requirements based on monetary thresholds.

        4.     The Debtors, however, have gone beyond simply identifying

classes of controversy by monetary amounts.  Indeed, the Debtors have identified

settlement and noticing procedures for the following classes of claims: (i) non-ordinary

course prepetition general unsecured claims, (ii) non-ordinary course prepetition secured

claims, (iii) non-ordinary course prepetition priority claims, (iv) non-ordinary course

administrative expense priority claims, and (iv) non-ordinary course other postpetition

claims.  For each of these classes, the Debtors have proposed various levels of notice

required, depending on the amount of the proposed settlement.  Thus, the proposed

Settlement Procedures identifies the classes of controversy in more detail than approved

settlement procedures in other large chapter 11 cases, including at least one case before

this Court.  See Parlamat Order.  Because the Motion sufficiently defines the classes of

controversy, this objection should be overruled.

4

B.    The Settlement Procedures Do Not Provide The Debtors With
       An Unreasonable Amount Of Discretion To Settle Controversies

5.    The Ad Hoc Equity Committee argues that the Settlement

Procedures provide the Debtors with too much discretion because there is no aggregate

cap on the amount of the claims that can be settled under the Settlement Procedures.  The

official committee of unsecured creditors (the "Creditors' Committee"), however,

reviewed the Motion prior to its filing and provided the Debtors with comments

regarding the defined classes of controversy and related noticing requirements.  The

Creditors' Committee did not request that an aggregate cap be placed on the Debtors'

settlement authority.  The Creditors' Committee will be provided not only notice of

settlements above a certain threshold, but also will receive periodic reports of claims that

the Debtors are in the process of negotiating.  Given this level of oversight from the

Creditors' Committee, an aggregate cap on the Debtors' authority is not required.

6.    The Ad Hoc Equity Committee also alleges  that this Court should

not grant the requested relief because the Bar Date has not passed and the parties-in-

interest, therefore, do not know the extent of claims that fall within the scope of the

Settlement Procedures.  What has been abundantly clear in these cases, however, is that

the Debtors do not operate in a vacuum.  The Ad Hoc Equity Committee is a group of

sophisticated institutional investors having the skill and experience to review the Debtors'

publicly-filed schedules of assets and liabilities and monthly operating reports to obtain a

sense of the scope of the claims against the Debtors.  There is sufficient information

available at this time to obtain a reasonable understanding of the scope of  the relief

requested in this Motion, and this Court need not wait until after the bar date to

implement the Settlement Procedures.

5

C.    Additional Parties Need Not Receive Notice And An Opportunity To Respond To
Proposed Settlements Under The Settlement Procedures

7.    The Ad Hoc Equity Committee requests that the proposed

Settlement Procedures include it in the list of Notice Parties.  The Ad Hoc Equity

Committee, however, does not have the same fiduciary duties as that of the Creditors'

Committee, and they only seek this information to serve their own interests.  Providing

the Ad Hoc Equity Committee with notice and an opportunity to object to proposed

settlements could result in the Ad Hoc Equity Committee injecting themselves into

discussions regarding the Debtors' day-to-day business strategies.  As noted in paragraph

8 below, it is the Debtors' position that such activities are not within the scope of the

Equity Committee that has been appointed in these cases and clearly, by extension, are

not within the purview of the Ad Hoc Equity Committee.  Furthermore, in the Debtors'

view, adding the Ad Hoc Equity Committee to the list of Notice Parties would increase

the time and resources that the Debtors seek to save through the implementation of these

Procedures.

8.    The Ad Hoc Equity Committee also requests that the Debtors add

the Equity Committee to the list of Notice Parties under the Settlement Procedures.  This

request is duplicative of the Equity Committee's request in its Limited Omnibus

Objection of the Official Committee of Equity Security Holders to the Debtors' (i)

Motion For Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b)

Authorizing The Debtors To Compromise Or Settle Certain Classes Of Controversy And

Allow Claims Without Further Court Approval, filed on June 6, 2006 (Docket No. 4037).

The Debtors do not agree with the Equity Committee's request and will respond to the

6

Equity Committee's objection in a separate pleading, which will be filed contemporaneously herewith.

D.    <u>The Debtors Should Not Be Required To File Quarterly Reports With The Court</u>

9.    Riverside objects to the Settlement Procedures because the Debtors are not required to file with the court quarterly reports of all settlements that fall within the scope of the Settlement Procedures.[4]  Although the Debtors are aware that in the <u>Parmalat Order</u> this Court ordered the debtors to file periodic reports, such a requirement is both unnecessary and could, in fact, adversely affect the Debtors' estate.  If the Debtors were required to provide public notice of all settlements under the Settlement Procedures, such public information could be used to the detriment of the Debtors and their estates in potential settlement discussions with other creditors.  It would not be in the best interests of the Debtors' estate if certain creditors obtained negotiating leverage by obtaining information about the Debtors' settlement strategy as it pertains to issues applicable to many creditors.  Indeed, in this instance, the Debtors believe that the Creditors' Committee, in accordance with its fiduciary duty, will provide sufficient oversight for all parties-in-interest, and will independently determine whether settlements entered into by the Debtors are in the best interests of the Debtors' estates.  Moreover, reports would create an unnecessary reporting burden for the Debtors.

---

[4]    Riverside objects to the Motion to the extent that the Debtors seek to settle any claims for which it is the assignee.  This is not an objection to the Debtors' requested relief, but merely a statement that it wants the Debtors to negotiate directly with Riverside on all claims assigned to Riverside.  Obviously, the Debtors will seek to negotiate with the party with authority to settle a claim.  The Debtors will require parties with whom the Debtors have reached a settlement on a claim to represent and warrant that they are the rightful holder of the claim.

<u>Notice</u>

10.     Notice of this Response has been provided in accordance with the

Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P.

2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice,

Case Management, and Administrative Procedures, entered May 19, 2006 (Docket No.

3824).  The Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

11.     Because the legal points and authorities upon which this Response

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to compromise or settle certain classes of controversy and allow certain claims within those classes pursuant to the Settlement Procedures set forth in the Motion, (ii) overruling the objections to the Motion, and, (iii) granting the Debtors such other and further relief as is just.

Dated:       New York, New York
             June 16, 2006

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                       & FLOM LLP

                                    By:  /s/ John Wm. Butler, Jr.
                                        John Wm. Butler, Jr. (JB 4711)
                                        John K. Lyons (JL 9331)
                                        Ron E. Meisler (RM 3026)
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois 60606
                                    (312) 407-0700

                                        - and -

                                    By:  /s/ Kayalyn A. Marafioti
                                        Kayalyn A. Marafioti (KM 9632)
                                        Thomas J. Matz (TM 5986)
                                    Four Times Square
                                    New York, New York 10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                       Debtors and Debtors-in-Possession

9

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                        :
                                             :        **Chapter 11 Case No.**
                                             :
**PARMALAT USA CORP., et al.,**              :        **04-11139 (RDD)**
                                             :
            **Debtors.**                     :        **(Jointly Administered)**
                                             :
-------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019(b) AUTHORIZING THE ESTABLISHMENT OF PROCEDURES TO SETTLE CERTAIN PREPETITION CLAIMS

Upon the motion, dated October 18, 2004 (the "Motion"), of Parmalat USA

Corp., Farmland Dairies LLC, and Milk Products of Alabama L.L.C., as debtors and debtors in

possession (collectively, the "Debtors"), for an order pursuant to sections 105(a) and 363(b) of

title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019(b) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the establishment of

procedures to settle certain prepetition claims, as more fully set forth in the Motion; capitalized

terms used but not defined herein shall have the meaning ascribed to them in the Motion; and the

Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28

U.S.C. §§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges

of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting

C.J.); and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and due and proper notice of the Motion having been provided, and no other

or further notice need be provided; and there being no objection to the Motion; and the relief

requested in the Motion being in the best interests of the Debtor and its estate and creditors; and

the Court having reviewed the Motion and having heard the statements in support of the relief

requested therein at a hearing before the Court (the "Hearing"); and the Court having determined

that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for

the relief granted herein; and upon all of the proceedings had before the Court; and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors may file objections to proofs of claim on an omnibus

basis (the "Objections") and that each Objection shall be numbered sequentially; and it is further

ORDERED that a response deadline for each Objection shall be scheduled no

sooner than 33 days after the date on which the Objection was filed and served; and it is further

ORDERED that the Debtors shall be, and hereby are, authorized to compromise

and settle claims against the Debtors' estates in accordance with the settlement procedures set

forth in the Motion (the "Procedures") and as follows:

a.    If (i) the Settlement Amount results in the allowance of a claim of $25,000 or less or (ii) the Claim Difference is $25,000 or less, the Debtors will be authorized to settle the claim without prior notice or further approval of the Court.

b.    If (i) the Settlement Amount calls for the allowance of an unsecured claim of greater than $25,000, but less than $100,000, and the Claim Difference is greater than $25,000, or (ii) the Claim Difference is greater than or equal to $25,000, but less than $100,000:

(i)    The Debtors will provide notification to the attorneys for the Creditors' Committee, the attorneys for General Electric Capital Corporation, as agent under the DIP Credit Agreement, the attorneys for Citicorp, N.A., and the U.S. Trustee (together, the "Notice Parties") of the settlement along with a summary of the terms and background of the proposed settlement (the "Settlement Summary").

(ii)   If there is an objection made by a Notice Party within five (5) business days of the notification of the Settlement

Summary, the Debtors may either (A) renegotiate the settlement and re-submit a revised notification of Settlement Summary to the Notice Parties with the new terms; or (B) file a Rule 9019 motion with the Court seeking approval of the existing Settlement Summary on no less than ten (10) days' notice.

(iii)    In the absence of an objection to notice of the Settlement Summary within the timeframe established above, the Debtors shall be deemed authorized to settle the claim as provided in the Settlement Summary without further Court approval.

c.    If the Settlement Amount and the Claim Difference are greater than or equal to $100,000 but less than $1 million:

(i)    The Debtors shall be required to file a notice of presentment with the Court of proposed settlement on not less than ten (10) days' notice, but will not be required to file a Rule 9019 motion.

(ii)    Absent an objection to the proposed settlement, the Court may enter an order approving the settlement without further notice or a hearing.  If there is an objection to a proposed settlement covered by this paragraph, the Debtors may either (A) renegotiate the settlement and file a revised notice of proposed settlement with the Court on no less than five (5) days' notice; or (B) file a Rule 9019 motion with the Court seeking approval of the existing settlement on no less than ten (10) days prior notice.

(iii)    Absent an objection to a revised notice of proposed settlement or a Rule 9019 motion, as applicable, the Court may enter an order approving the proposed settlement without a hearing.

d.    If the Settlement Amount and Claim Difference are each equal to or greater than $1 million, the Debtors will be required to seek the approval of the Court by way of a Rule 9019 motion on no less than fifteen (15) days' notice.

e.    Notwithstanding the foregoing, for any compromise or settlement of insider claims, the Debtors shall file a motion with the Court requesting approval of such compromise and settlement under Bankruptcy Rule 9019.

f.    The Debtors shall file periodically with the Court, a report of all settlements of claims entered into by the Debtors during such

period pursuant to the authority requested in this Motion (the "Periodic Reports"). The Periodic Reports shall set forth the name of the party with whom the Debtors have settled, the types of claims asserted by or against such party, and the amounts for which such claims have been settled. The Debtors shall serve copies of such Periodic Reports on the Notice Parties and the Debtors' claims agent.

; and it is further

ORDERED that nothing in the Motion or herein shall preclude the Debtors from presenting a settlement to the Court to be so ordered and nothing in the Motion or herein shall preclude the Debtors from settling any claims against the Debtors' estates upon further application of the Court; and it is further

ORDERED that this Order shall not obligate or require the Debtors to settle any claims that they do not consider, in their sole discretion, appropriate to compromise and settle; nor shall this Order obligate or require the Debtors to settle any claims in excess of the amounts which the Debtors, in their sole discretion, believe to be reasonable and appropriate consistent with the factors set forth herein; and it is further

ORDERED that, pursuant to Bankruptcy Rule 6004(g), this Order shall be effective immediately; and it is further

ORDERED that the requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York for the filing of a memorandum of law is waived.

Dated:    November 3, 2004
          New York, New York

/s/Robert D. Drain
UNITED STATES BANKRUPTCY JUDGE

**EOD**    SEP 4 - 2002

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 02-B02474 |
| | ) | (Jointly Administered) |
| KMART CORPORATION, et al., | ) | Chapter 11 |
| | ) | Hon. Susan Pierson Sonderby |
| | ) | |
| | ) | Hearing Date: **August 29, 2002** |
| Debtors. | ) | |

## ORDER, PURSUANT TO 11 U.S.C. §§ 105 AND 502 AND RULE 9019(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AUTHORIZING DEBTORS TO COMPROMISE OR SETTLE CERTAIN CLASSES OF DE MINIMIS CONTROVERSY AND ALLOW CLAIMS WITHOUT FURTHER COURT APPROVAL

This matter having come before the court on the motion, dated August 9, 2002 (the "Motion"), of Kmart Corporation ("Kmart") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for an order, pursuant to sections 105 and 502 of the Bankruptcy Code and Rule 9019(b) of the Federal Rules of Bankruptcy Procedure, authorizing the Debtors to settle certain claims; it appearing to the Court that (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors; (iv) proper and adequate notice of the Motion and the hearing thereon has been given and that no other or further notice is necessary; and (v) upon the record herein, after

61068

due deliberation thereon, that the relief should be granted as set forth below, it is
therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.      The Debtors are hereby authorized, but not directed, to resolve the
following general categories of both pre-petition and post-petition controversy without
further Court approval, provided that (i) the controversy to be resolved is one where
the amount originally claimed by the Debtors to be due and owing is $2,000,000 or
less with respect to each matter or related series of matters, (ii) the final settlement of
the controversy does not exceed the sum of $2,000,000, and (iii) the final settlement
amounts of all controversies outside the ordinary course settled pursuant to this Order
does not exceed $75 million in the aggregate without approval of an increase in such
limit by consent of the committees appointed in these cases, or  further order of the
Court: (a) disputes regarding any obligations owed by third parties to the Debtors, or
other claims of the Debtors against third parties; (b) disputes with regulatory or other
governmental or quasi-governmental agencies; and (c) any other claim or controversy
which, in the Debtors' business judgment, affects the ability of the Debtors to operate,
manage or otherwise conduct their businesses.

2.      Resolution of the disputes within such classes are subject to the
following parameters:

(a)      for controversies where the amount originally claimed
by the Debtors to be due and owing is $250,000 or less with respect to

2

each matter or related series of matters and the final settlement amount does not exceed $250,000, the compromise or settlement may be agreed and consummated without need for further Court approval or further notice;

(b)     for controversies where the amount originally claimed by the Debtors to be due and owing is greater than $250,000 but less than or equal to $2,000,000 with respect to each matter or related series of matters and the final settlement amount does not exceed $2,000,000, the Debtors shall notify: (i) the United States Trustee, (ii) counsel to the committees officially formed in these cases, and (iii) general counsel and local counsel for the Debtors' pre-petition and post-petition lenders (collectively, the "Notice Parties") of the terms of the proposed settlement (the "Notice"). The Notice shall include a reasonable description of the dispute. The Notice Parties shall have ten business days from receipt of the Notice to serve a written objection to the settlement upon counsel for the Debtors. If no such objection is made, the Debtors shall be authorized to accept and consummate the settlement. If any of the Notice Parties object to the settlement, which objection can not otherwise be resolved, the Debtors may file a motion to approve the proposed compromise.

(c)     for the period following the date of entry of this Order, the Debtors shall provide a report to the Notice Parties within 15 days after the end of each calendar quarter setting forth the cumulative amount of all claims resolved pursuant to this order. The Debtors will work with the committees appointed in these cases to come to a mutually satisfactory form of report.

3.     Notwithstanding anything to the contrary contained herein, this order shall in no manner affect, impair, impede or otherwise alter the right of Debtors to resolve any post-petition controversy arising in the ordinary course of the Debtors' business, or resolve any controversy authorized by any other order of the Court.

3

4.      Settlement of any pre-petition controversies resulting in monetary claims against the Debtors will be resolved by simply the determination and allowance of a claim.  The Debtors shall not pay any pre-petition claims without separate Court order.

4.      Notwithstanding anything contained herein, any settlements that involve an "insider," as defined in section 101(31) of the Bankruptcy Code, shall require individual hearings as prescribed by Bankruptcy Rule 9019(a).

5.      Notwithstanding anything contained herein, this order shall not supercede, amend or in any way affect the terms of any other order of this Court.

6.      Nothing in this order shall be construed to alter the rights or obligations of any insurer of the Debtors.  In all instances where an insurer has a right to receive notice, participate in the resolution of a controversy, or decide upon or approve the resolution of a controversy, that right is preserved.  Nothing in this order shall be construed to authorize the Debtors to act on behalf of or as an agent for any insurer of the Debtors.

7.      Notwithstanding any Rule of the Federal Rules of Bankruptcy Procedure to the contrary, this Order shall take effect immediately upon its entry.

Dated August 21 2002

Hon. Susan Pierson Sonderby
United States Bankruptcy Judge

4

# EXHIBIT D

**Hearing Date: June 19, 2006**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :
       In re                :   Chapter 11
                                 :
DELPHI CORPORATION, et al.,    :   Case No. 05-44481 (RDD)
                               :
                               :   (Jointly Administered)
                  Debtors.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' RESPONSE TO O'NEILL CLAIMANTS' SUPPLEMENT TO MOTION
FOR RELIEF FROM AUTOMATIC STAY AND OBJECTIONS TO DEBTORS'
APPLICATION TO ESTABLISH CLAIMS PROCEDURES

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this response (the "Response") to the supplement to motion of Mary P. O'Neill and Liam P. O'Neill (the "O'Neills") for relief from automatic stay and objections to Debtors' application to establish claims procedures (the "Supplement"), dated June 13, 2006 (Docket No. 4173), and respectfully represent as follows:

<u>Preliminary Statement</u>

1.     The O'Neills, litigation claimants with alleged unsecured claims against the Debtors, originally filed their motion for relief from the automatic stay on March 8, 2006 (Docket No. 2748) (the "Motion").  The Debtors objected to the Motion for several reasons, but primarily because the mechanics of their insurance program causes the O'Neills' unsecured claims to diminish the Debtors' estate as an administrative expense priority claim.  After reviewing the applicable insurance policies, the O'Neills do not dispute this fundamental point.  Because the O'Neills' unsecured claim will have such an effect on the estates, the Debtors' protection under the automatic stay should be maintained, and the Motion should be denied.

A.     The O'Neills Do Not Dispute The Debtors' Description
Of The Mechanics Of Their Insurance Program

2.     In the Motion, the O'Neills asserted that they had cause to lift the automatic stay and proceed with their litigation because they were allegedly willing to limit any recovery to the proceeds of any applicable insurance policies, and that granting relief from the stay "would not create any liability upon [the] Debtors."  Motion ¶¶ 4, 5. But in the Debtors' March 31, 2006 objection to the Motion (Docket No. 3051) (the

2

"Objection"), the Debtors explained that because of the mechanics of the Debtors' insurance program, there are effectively no insurance proceeds to pay the first $1 million of any claim the O'Neills may have, because that sum represents the deductible under the applicable insurance policy.  Thus, the O'Neills' premise that their claim would not create liability for the estates was incorrect.

        3.      The mechanics of the Debtors' insurance program first require the Debtors' insurer to pay any portion of the claim that falls within the deductible _if_ the Debtors cannot pay, which is the case now that Delphi filed for chapter 11 relief.  On the other hand, amounts paid by the Debtors' insurer within the $1 million deductible result in the insurer's holding a heightened priority claim in an equal amount against the Debtors.  Thus, for every dollar paid to the O'Neills by the Debtors' insurer up to the $1 million deductible, the Debtors would have to reimburse their insurer that same amount on an administrative claim basis.  In the Objection, the Debtors expressly noted that this mechanism was previously disclosed in the Debtors' motion for order authorizing renewal of insurance coverage (Docket No. 1559) (the "Insurance Agreement Motion").

        4.      The O'Neills subsequently filed a reply on April 6, 2006 (Docket No. 3132) (the "Reply").  In the Reply, the O'Neills no longer requested to collect any judgment solely from the insurance proceeds, nor did they agree to release the Debtors from any liability.  Instead, the O'Neills alleged that they needed to review the Debtors' insurance policies to verify the mechanics of the Debtors' insurance program, and how those mechanics might affect the O'Neills' right to recover any judgment related to their claim.  The O'Neills sought this discovery to confirm the Debtors' assertion that claims paid by their insurer would circle back as priority claims against the estate.

5.     After receiving discovery sufficient to demonstrate the mechanics of the Debtors' insurance program applicable to their claims, on June 13, 2006, the O'Neills filed the Supplement.  In the Supplement, the O'Neills agree with the Debtors' description of the mechanics of their insurance program as it relates to the ultimate effect on the Debtors' estate, but now allege that it is irrelevant.[1]  Supplement ¶¶ 11, 21. Instead, the O'Neills now contend that by obtaining an order approving the Insurance Agreement Motion (the "Insurance Agreement Order"), the Debtors have waived the protections of the automatic stay as it pertains to the alleged prepetition claims affected by the Insurance Agreement Order.  That is not correct.

6.     First, the insurer's obligation to pay a claim like the O'Neills arises out of the applicable insurance policies, not the Insurance Agreement Order.  Nothing in the Insurance Agreement Order creates any additional obligations to the Debtors' insurer under the prepetition insurance program.  Indeed, if the Debtors had never filed the Insurance Agreement Motion, their insurer's obligations under the prepetition insurance program with respect to the O'Neills' claims would be the same as they are today. Second, the insurer's right to seek reimbursement from the Debtors for payments made in accordance with the insurance program also arises from the applicable insurance policies, not the Insurance Agreement Order.  As previously stated in the Objection, even if the Debtors had not assumed these insurance agreements, the insurers, after paying the O'Neills amounts within the applicable deductible, would have the right under the

---

[1]    The O'Neills incorrectly allege that the insurer has an initial obligation to pay claims under the Debtors' insurance program.  Such an obligation arises only when the Debtors fail to pay the claims, which is the case now that the Debtors have sought chapter 11 relief.  Regardless of this disagreement, the O'Neills do not dispute that given the current circumstances, if Debtors' insurer pays the O'Neills' claim, the insurer would have the right to seek reimbursement from the Debtors, and such reimbursement would be paid in full.

4

insurance agreements to draw down on the letter of credit that was issued under the

Debtors' prepetition security facility.  This would in turn increase the amount of funded

debt owed to prepetition lenders.  Thus, even if the Debtors had not assumed the

insurance agreements, any claim paid by the Debtors' insurers would affect the Debtors'

estates.  Objection ¶ 12, n.5.  The Insurance Agreement Order simply provides the insurer

with a second option for recovering, in full, any payments that it makes on behalf of the

Debtors.  Either way, because the harm to the estates that the Debtors have described is

not disputed by the O'Neills, this Court should deny the Motion.

7.      In the Supplement, the O'Neills also request to take additional

discovery, including depositions of the individuals employed by the Debtors' and their

claims administrators purportedly to explore any "remaining issue of fact" related to the

mechanics of the Debtors' insurance program.  This is a red herring:  Although the

O'Neills mischaracterize several aspects of the insurance program, they ultimately do not

dispute that claims paid by the insurer would circle back as heightened priority claims

against the Debtors' estate.  Supplement ¶¶ 11, 21.  Thus, there is no material dispute of

facts pertinent to the Motion and the O'Neills' request for additional discovery should be

rejected.

8.      Indeed, the O'Neills' latest request for more discovery fits into a

well-established pattern that has played out in this Court.  To date, the O'Neills have filed

the Motion, the memorandum in support of the Motion, the Reply, and the Supplement.

In addition, the O'Neills have propounded interrogatories and a request for production of

documents on the Debtors related to an issue that they now argue should be irrelevant,

and they now seek to take additional discovery and depositions of individuals to better

5

understand facts that are not in dispute, and which they now claim are irrelevant to the

Motion.  Additionally, the June 19, 2006 omnibus hearing will mark the third time that

the Motion has been set for hearing, with none of the prior adjournments being at the

Debtors' request.  The Motion already has distracted the Debtors from critical issues in

these cases.  The automatic stay was designed to avoid precisely this type of distraction

for debtors.  For this additional reason, the Motion should be denied without further

delay.

B.    The O'Neills' Objection To The Lift Stay Procedures Is Moot

9.    In the Supplement, the O'Neills also assert a limited objection to

the Debtors' motion for order establishing procedures (the "Lift Stay Procedures") for

modifying the automatic stay applicable in these cases, to the extent necessary, for (i)

liquidating and settling and/or (ii) mediating certain prepetition litigation claims (Docket

No. 4038) (the "Lift Stay Procedures Motion").  The O'Neills do not object to the general

implementation of the Lift Stay Procedures.  Instead, the O'Neills "object strenuously to

any attempt by Debtors to use those procedures to preempt their state court action and

force O'Neills to submit to the procedures instead."  Supplement ¶ 26. But this objection

obviously is misplaced, because the O'Neills themselves correctly point out that there is

no requirement that a litigation claimant, including the O'Neills, proceed under the Lift

Stay Procedures.  Supplement ¶ 28.  The Lift Stay Procedures only applies to claimants

who voluntarily choose to participate.  Thus, by their own acknowledgment, the O'Neills'

objection to the Lift Stay Procedures is moot and should be overruled.

Conclusion

10.    The automatic stay should not be modified to permit the O'Neills

to proceed with litigation of their unsecured prepetition claims.  Modification of the

6

automatic stay would prejudice the Debtors. For the reasons set forth above, the Motion

should be denied. Additionally, the O'Neills' objection to the Lift Stay Procedures

Motion should be overruled.

Notice

11.     Notice of this Response has been provided in accordance with the

Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P.

2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice,

Case Management, and Administrative Procedures, entered May 19, 2006 (Docket No.

3824). The Debtors submit that no other or further notice is necessary.

Memorandum Of Law

12.     Because the legal points and authorities upon which this Response

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an

order (i) denying the Motion and, (ii) overruling the O'Neills' objection to the Lift Stay

Procedures Motion, and (iii) granting the Debtors such other and further relief as is just.

Dated:        New York, New York
              June 16, 2006

                                SKADDEN, ARPS, SLATE, MEAGHER
                                   & FLOM LLP

                                By:   /s/ John Wm. Butler, Jr.
                                   John Wm. Butler, Jr. (JB 4711)
                                   John K. Lyons (JL 9331)
                                   Ron E. Meisler (RM 3026)
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois 60606
                                (312) 407-0700

                                   - and -

                                By:   /s/ Kayalyn A. Marafioti
                                   Kayalyn A. Marafioti (KM 9632)
                                   Thomas J. Matz (TM 5986)
                                Four Times Square
                                New York, New York 10036
                                (212) 735-3000

                                Attorneys for Delphi Corporation, et al.,
                                   Debtors and Debtors-in-Possession

# EXHIBIT E

**Hearing Date: June 19, 2006**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :
             In re                          :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                                            :    (Jointly Administered)
                      Debtors.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - -x

DEBTORS' RESPONSE TO OBJECTION OF THE ACE COMPANIES TO THE
DEBTORS MOTION FOR ORDER UNDER 11 U.S.C. § 362 AND FED. R. BANKR.
P. 7016 AND 9019 APPROVING PROCEDURES FOR MODIFYING THE
AUTOMATIC STAY TO ALLOW FOR (I) LIQUIDATING AND SETTLING
AND/OR (II) MEDIATING CERTAIN PREPETITION LITIGATION CLAIMS

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this response (the "Response") to the objection of ACE American Insurance Company, Pacific Employers Insurance Company, and their respective affiliates (collectively, "ACE") to the Debtors' Motion For Order Under 11 U.S.C. § 362 And Fed. R. Bankr. P.7016 and 9019 Approving Procedures (the "Lift Stay Procedures") For Modifying The Automatic Stay To Allow For (i) Liquidating And Settling And/Or (ii) Mediating Certain Prepetition Litigation Claims, dated June 14, 2006 (the "Objection") (Docket No. 4205). In support of the Response, the Debtors respectfully represent as follows:

<u>Preliminary Statement</u>

1.      As reflected in the correspondence attached hereto as Exhibit A, on May 23, 2006, the Debtors provided ACE with a courtesy copy of the proposed Motion to ensure that ACE was comfortable with the relief requested in the Motion.[1] The Motion was filed on June 6, 2006. ACE failed to express any concerns about the relief requested in the Motion during that two week period. Subsequent to the filing of the Motion, ACE informally identified some issues it had with the provisions of the Lift Stay Procedures, and the Debtors agreed with ACE in principal on many, if not most issues. In an attempt to resolve ACE's issues consensually, the Debtors extended ACE's objection deadline by two business days. ACE's counsel provided the Debtors with proposed changes to the proposed order granting the Motion (the "Order") late in the day on June 13, 2006, yet

---

[1]     Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

even those proposed changes were subject to further review by ACE.  The Debtors

reviewed the proposed changes that evening, and were prepared to agree to most of

ACE's changes the very next morning.  Despite the Debtors attempts to reach ACE's

counsel, ACE filed the Objection without responding to the Debtors or their counsel.

A.    The Debtors' Revised Order Satisfies ACE's Material
      Concerns To The Relief Requested In The Motion

            2.    Attached hereto as Exhibit B is a blackline version of the Debtors'

revised proposed order approving the Motion (the "Revised Order").  The Revised Order

reflects changes to the Order originally submitted with the Motion.  The Revised Order

amends the Lift Stay Procedures in the following material ways:  First, the Debtors have

decided that the Lift Stay Procedures would apply only to Claims that can be settled for

an amount that does not exceed any applicable deductibles under the Insurance Program.

Second, the Debtors have agreed to include specific release language in the Order, so as

to avoid any ambiguity relating to the proposed release of insurer liability in connection

with the settlement of a claim.  Third, the Debtors agreed to add language that the

Revised Order is not intended to modify, impair, or affect any party's rights or obligations

under the relevant agreements or applicable law.  Fourth, the Debtors agreed to delete

language that ACE suggests may give the Debtors a declaratory judgment relating to their

performance under any agreement under the Insurance Program or with any Third Party

Indemnitor.  If an order is entered by this Court without any material changes to the

Revised Order, ACE has agreed to withdraw the Objection with prejudice.

B.    The Motion May Be Heard On Ten-Days' Notice

            3.    ACE alleges that it did not receive adequate time to review and

consider the Motion.  That simply is not true.  The Debtors provided ACE with copies of

3

the proposed motion and order 14 days before the Motion was filed and 27 days before

the June 19, 2006 omnibus hearing.  As stated above, the Debtors received no comments

from ACE during the two weeks that elapsed before the Motion was filed on June 6,

2006.  The Debtors and ACE initiated informal discussions regarding the Motion on June

7, 2006.  On June 12, 2006, the Debtors requested from this Court that ACE's objection

deadline be extended from June 13, 2006, to June 15, 2006, so that the parties could have

more time to negotiate revisions to the Order.  ACE's counsel did not provide the Debtors

with written comments to the Motion or Order until approximately 5:00 PM Eastern on

June 13, 2006.

       4.     ACE was given more than sufficient time to review and consider

the Motion.  Indeed, they were given nearly three times the minimum notice period

permitted under the Court's case management order.  Following the filing of the Motion,

the Debtors spent considerable amounts of time discussing with ACE the intent of the

Lift Stay Procedures and attempted to work through any issues that ACE may have had

regarding the relief requested.

       5.     ACE also alleges that the Motion does not need to be considered

on an expedited basis.  The Debtors, however, have complied with the Seventh

Supplemental Case Management Order (as defined below), and therefore, there is no

basis for denying the Debtors' request for expedited relief.   The Creditors' Committee

had consented to this Motion being heard at the June omnibus hearing.  Therefore, ACE's

objection to the expedited nature of the Motion should be overruled.

<u>Notice</u>

       6.     Notice of this Response has been provided in accordance with the

Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P.

4

2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice,

Case Management, and Administrative Procedures, entered May 19, 2006 (Docket No.

3824) (the "Seventh Supplemental Case Management Order").  The Debtors submit that

no other or further notice is necessary.

<u>Memorandum Of Law</u>

       7.      Because the legal points and authorities upon which this Response

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to compromise or settle certain classes of controversy and allow certain claims within those classes pursuant to the Lift Stay Procedures set forth in the Motion, as modified by the Revised Order, (ii) overruling the Objection, and, (iii) granting the Debtors such other and further relief as is just.

Dated:          New York, New York
                June 16, 2006

                          SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM LLP

                          By:   /s/  John Wm. Butler, Jr.
                              John Wm. Butler, Jr. (JB 4711)
                              John K. Lyons (JL 9331)
                              Ron E. Meisler (RM 3026)
                          333 West Wacker Drive, Suite 2100
                          Chicago, Illinois 60606
                          (312) 407-0700

                              - and -

                          By:   /s/ Kayalyn A. Marafioti
                              Kayalyn A. Marafioti (KM 9632)
                              Thomas J. Matz (TM 5986)
                          Four Times Square
                          New York, New York 10036
                          (212) 735-3000

                          Attorneys for Delphi Corporation, et al.,
                            Debtors and Debtors-in-Possession

6

**Fern, Brian**

| | |
|---|---|
| **From:** | Fern, Brian |
| **Sent:** | Tuesday, May 23, 2006 3:47 PM |
| **To:** | ilana.hessing@ace-ina.com |
| **Cc:** | 'Telgen, William D' |
| **Subject:** | RE: Delphi: US liability lift-stay motion |
| **Attachments:** | DRAFT - Lift Stay Procedure Motion.doc; DRAFT - Lift Stay Procedure Order (proposed).doc |

Ilana,

Attached please find drafts of the lift stay procedure motion and proposed order.  As Bill mentioned, these drafts remain subject to futher review and change.  Additionally, although the current plan is to file by Friday 5/26, that too is subject to change.  We will let you know if there are any material changes to the draft pleadings.  Thanks.

Brian

Brian M. Fern
Skadden Arps Slate Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, IL 60606
Tel:  (312) 407-0815
Fax: (312) 827-9315
brfern@skadden.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -    x
                                                         :
    In re                                                :        Chapter 11
                                                         :
DELPHI CORPORATION, et al.,                              :        Case No. 05-44481 (RDD)
                                                         :
                                    Debtors.             :        (Jointly Administered)
                                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - -    x

ORDER APPROVING PROCEDURES FOR MODIFYING AUTOMATIC STAY
UNDER 11 U.S.C. § 362 TO ALLOW FOR (I) LIQUIDATIONG AND SETTLING
AND/OR (II) MEDIATIONG OF CERTAIN PREPETITION LITIGATION CLAIMS

("LIFT STAY PROCEDURES ORDER")

Upon the motion, dated June 6, 2006 (Docket No. ⁓4038), of Delphi Corporation

and certain of its domestic subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors"), for an order under 11 U.S.C. § 362 and Fed.

R. Bankr. P. 7016 and 9019 establishing procedures (the "Lift Stay Procedures") for modifying

the automatic stay applicable in these cases (the "Motion"), to the extent necessary, for (i)

liquidating and settling and/or (ii) mediating certain prepetition litigation claims; and upon the

record of the hearing held on the Motion; and this Court having determined that the relief

requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and

other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been

given and that no other or further notice is necessary; and after due deliberation thereon; and

good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

---

1_____DeltaView comparison of pcdocs://chisr01a/490929/6 and pcdocs://chisr01a/490929/8.
Performed on 6/16/2006.

1.      The Motion, as modified herein, is GRANTED.  The objection of ACE American Insurance Company, Pacific Employers Insurance Company, and their respective affiliates to the Motion (Docket No. 4205) is hereby withdrawn with prejudice.

2.      1.  The Debtors are hereby authorized to utilize the Lift Stay Procedures, as modified herein, to liquidate and settle and allow the Claims.[1]

3.      2.  The Lift Stay Procedures, as described in the Motion and as modified herein, are approved in all respects.  The automatic stay applicable to these cases pursuant to 11 U.S.C. § 362 is hereby modified to the extent necessary for the Debtors to implement and administer the Lift Stay Procedures, as modified herein.

4.      3.  The Debtors, in their discretion, are authorized to settle Claims in the manner described and contemplated by the Motion.  The Debtors are hereby authorized to settle Claims such Claims that do not exceed the amounts of any applicable deductibles under the Insurance Program in accordance with the following terms:

    (a)    In settlement of a Claim, Bankruptcy Court approval shall not be required for the allowance of any Claim as a prepetition general unsecured non-priority claim in an amount equal to or less than $500,000, and the Debtors (and their insurer or other third party required to indemnify the Debtors (collectively, the "Third Party Indemnitors"), if applicable) may settle and allow any such Claim equal to or less than such amount without further notice or hearing;

    (b)    In settlement of a Claim in a sum greater than $500,000 but less than or equal to $20,000,000, the applicable deductibles under the Insurance Program, the Debtors shall give notice of the terms of the proposed settlement (the "Proposed Settlement Notice") to counsel to the Creditors' Committee, the agent for the Debtors' prepetition financing facility (the "Prepetition Lenders' Agent"), the agent for the Debtors' postpetition financing facility (the "DIP Facility Agent"), and the United States Trustee (the "U.S. Trustee") (collectively, the "Notice Parties").  The Proposed Settlement Notice may be served by e-mail (except the U.S. Trustee), facsimile, overnight delivery, or hand delivery.  The Notice Parties shall have ten business days following initial receipt of the Proposed Settlement Notice to object to or request additional time to evaluate the proposed settlement.  If counsel to the Debtors receive no written objection or

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2    DeltaView comparison of pcdocs://chisr01a/490929/6 and pcdocs://chisr01a/490929/8.  Performed on 6/16/2006.

written request for additional time prior to the expiration of such ten business day period, the Debtors shall be authorized to accept and consummate the proposed settlement. ~~The Debtors shall seek court approval when they seek to settle any Claim for an amount in excess of $20,000,000.~~

      (c)    If a Notice Party objects to the proposed settlement within ten business days after the Proposed Settlement Notice is received, the Debtors and such objecting Notice Party shall meet and confer in an attempt to negotiate a consensual resolution.  Should either party determine that court intervention is necessary, then the Debtors shall seek authority to approve the proposed settlement pursuant to Bankruptcy Rule 9019(a).

      <u>5.</u>    <u>As a condition precedent to settling any such Claim in accordance with the procedures set forth above, the Debtors shall require a Claimant to execute a release in favor of the Insurers, in form and substance acceptable to the Insurers, pursuant to which the Claimant shall release the Insurers from all liability to the Claimant, his/her/its heirs, administrators, executors, successors, and assigns with respect to such Claim arising under or relating to the Debtors' insurance policies and related agreements (including, without limitation, the Multi-Line Deductible Program Agreement and the amendments and addendum thereto) (the "Insurance Agreements") ,the Insurance Program, and applicable law.</u>

      <u>6.</u>    ~~4.~~The Debtors shall provide the Creditors' Committee periodic summary reporting, commencing 120 days after the Bar Date, and quarterly thereafter, until confirmation of a plan of reorganization in these cases.  This periodic reporting shall include, with respect to each Claim resolved since the prior report, (i) the names of the Claimants with whom the Debtors have reached settlement under the Lift Stay Procedures, (ii) the asserted amount of each Claimant's Claim, (iii) the amounts of and other consideration for such consummated settlement, and (iv) a general description of the particulars underlying the Claimant's Claim.

      <u>7.</u>    ~~5.~~In addition, with respect to Claims that the Debtors are in the process of negotiating, where compromise or settlement of such Claims would fall within the scope of this Order, the financial advisors to the Creditors' Committee shall be entitled to receive periodic

---

3      DeltaView comparison of pcdocs://chisr01a/490929/6 and pcdocs://chisr01a/490929/8. Performed on 6/16/2006.

reports containing aggregate summary information without any individual Claimant data.  The

periodic reporting described in this paragraph shall be in the format currently being shared

between the Debtors and the Creditors' Committee and shall take place not less frequently than

monthly until further order of this Court.

8.    6. Nothing in this Order is intended to, nor shall this Order be deemed to,

alter any requirements under the Insurance Program or to, modify, impair, or affect any rights or

obligations of the Debtors or the Insurers under the Insurance Agreements, the Insurance

Program, or applicable law, or limit or otherwise prejudice any Third Party Indemnitor's rights,

claims, or defenses, all of which are expressly reserved. Moreover, the implementation of the

Lift Stay Procedures by the Debtors shall not be deemed a breach of any agreement under the

Insurance Program or agreement with any Third Party Indemnitor.  and preserved.

9.    In accordance with the terms of the Insurance Program or the agreement

with a Third Party Indemnitor, and if required with respect to any aspect of the Lift Stay

Procedures thereunder, the Debtors shall not liquidate allow or settle any eClaim that involves a

Third Party Indemnitor, without notice to the Third Party Indemnitor, without providing an

opportunity for such Third Party Indemnitor to be involved in the settlement discussions and

providing the Third Party Indemnitor an opportunity to approve such settlement.

10.    7. Nothing in this Order is intended to, nor shall this Order be deemed to,

obviate the need for any Claimant to file a proof of claim prior to the Bar Date.

11.    8. This Order shall survive and remain in full force and effect

notwithstanding any of the dismissal, conversion, appointment of a trustee, or confirmation of a

plan of or in these chapter 11 cases.

---

4    DeltaView comparison of pcdocs://chisr01a/490929/6 and pcdocs://chisr01a/490929/8.
Performed on 6/16/2006.

12. ~~9.~~ This Court shall retain jurisdiction to hear and determine all matters arising from the implementation and performance of this Order.

13. ~~10.~~ The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.


Dated:    New York, New York
          June ___, 2006

_____
UNITED STATES BANKRUPTCY JUDGE

---

5       DeltaView comparison of pcdocs://chisr01a/490929/6 and pcdocs://chisr01a/490929/8. Performed on 6/16/2006.

Document comparison done by DeltaView on Friday, June 16, 2006 2:30:03 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr01a/490929/6 |
| Document 2 | pcdocs://chisr01a/490929/8 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: |
|---|
| Insertion |
| Deletion |
| <Moved from > |
| >Moved to < |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | Count |
|---|---|
| Insertions | 20 |
| Deletions | 23 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 43 |

# EXHIBIT F

**Hearing Date: June 19, 2006**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x
                                                              :
      In re                                                   :    Chapter 11
                                                              :
DELPHI CORPORATION, et al.,                                   :    Case No. 05-44481 (RDD)
                                                              :
                        Debtors.                              :    (Jointly Administered)
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x

DEBTORS' REPLY TO LIMITED OBJECTION
OF WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE, TO MOTION FOR ORDER
UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 2002 AND 6004 AUTHORIZING AND
APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH JOHNSON CONTROLS,
INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES (B) CONTINUATION AND TRANSITION OF SUPPLY TO
JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD FACILITY AND
(C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW BRUNSWICK
FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this response (the "Reply") to the preliminary objection (the "Objection") timely filed by Wilmington Trust Company, as indenture trustee ("WTC") (Docket No. 4098) to the Debtors' Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 2002 And 6004 Authorizing And Approving Debtors' Entry Into Transfer Agreement With Johnson Controls, Inc. Providing For (A) Sale Of Acquired Assets Free And Clear Of Liens, Claims, And Encumbrances (B) Continuation And Transition Of Supply To Johnson Controls, Inc. Of Battery Products Out Of Fitzgerald Facility And (C) Implementation Of Attrition Plan With Respect To New Brunswick Facility In Accordance With IUE-CWA Memorandum, dated May 29, 2006 (Docket No. 3927) (the "Motion").[1]   In support of this Reply, the Debtors respectfully represent as follows:[2]

---

[1]    The United States Department of Justice ("DOJ"), on behalf of the United States Environmental Protection Agency, filed an objection going to certain environmental issues (Docket No. 4116).  The Debtors, JCI, and the DOJ have resolved the DOJ's objection by agreeing to include the following paragraph in the proposed order:

> 32.    Nothing in this Order approving the Transfer Agreement: (a) releases or nullifies any liability to a government entity under environmental statutes or regulations that any entity would be subject to as owner or operator of such property; and (b) precludes or prevents a governmental entity from exercising any powers under police and regulatory statutes, or regulations, that would be applicable to any entity as an owner or operator of property.  However, this Order does not act as a determination that JCI is or will be an owner or operator of any property.

A blacklined version of the Proposed Order is attached hereto as Exhibit A

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

2

Preliminary Statement

1.        In its continued quest to shift the obligations and liabilities of Delphi

Corporation to its Affiliate Debtors in order to improperly isolate non-bondholder claims from

Delphi Corporation's assets, WTC has filed yet another in a series of similar objections – this

time in opposition to Delphi Corporation's funding of the IUE-CWA New Brunswick Attrition

Plan.[3]  Delphi is funding this attrition program on account of the national collective bargaining

agreement between Delphi Corporation and the IUE-CWA, dated November 16, 2003 and all of

the supplemental agreements thereto (the "IUE-CWA National Agreement").  By its Objection,

WTC seeks to prevent Delphi Corporation, the signatory to the IUE-CWA Memorandum, from

funding the costs of the IUE-CWA New Brunswick Attrition Plan.  Instead, WTC would require

Delphi Automotive Systems LLC ("DAS LLC"), the signatory to the Transfer Agreement, to

fund these costs on Delphi Corporation's behalf.

2.        The Debtors and WTC have resolved part of WTC's objection by

confirming that the payment of $12.5 million by Johnson Controls, Inc. ("JCI") pursuant to the

Transfer Agreement will be paid to Delphi Corporation (as had been the Debtors' intention in any

event).  Accordingly, paragraph 20 of the proposed order has been revised as follows:

> 20.        Both the $12.5 million to be paid by JCI pursuant to
> Section 3.A(xi) of Exhibit 4.1 to the Transfer Agreement and the
> economic support to be provided by General Motors Corporation

---

[3]        This attempt to shift liabilities away from Delphi Corporation – the issuer of the senior
bonds – is particularly striking since the bondholders were well aware that Delphi
Corporation was liable for pension and other human capital obligations arising from the
collective bargaining agreements between Delphi Corporation and its unions.  See
Prospectus Supplement dated April 28, 1999, pages S-4 and S-20.  Similar language is
contained or is otherwise incorporated by reference in each of the two other prospectus
supplements covering the series of senior bonds outstanding, dated May 31, 2001 and
July 22, 2003.

> to Delphi Corporation upon the transfer of the New Brunswick
> Facility to JCI shall be paid to Delphi Corporation.

The economic support to be provided by General Motors Corporation ("GM") is pursuant to an agreement between GM and Delphi Corporation, so those funds will flow directly to Delphi Corporation, the party that is the signatory to the IUE-CWA Memorandum and is therefore responsible for funding the IUE-CWA New Brunswick Attrition Plan.

3.      The only unresolved issues are WTC's assertions that (i) Delphi Corporation is not the proper debtor entity to fund the IUE-CWA New Brunswick Attrition Plan and (ii) it is not in the best interests of Delphi Corporation to fund that attrition plan.  Both assertions are wrong.

4.      First, Delphi Corporation is the proper party to fund the IUE-CWA New Brunswick Attrition Plan because Delphi Corporation is the signatory and consequent obligor to the IUE-CWA National Agreement.  Since the IUE-CWA New Brunswick Attrition Plan relates to and modifies the obligations under the IUE-CWA National Agreement, it is only logical that Delphi Corporation would execute the agreement with the IUE-CWA memorializing the attrition program.  Second, it is in the best interests of Delphi Corporation to enter into the IUE-CWA Memorandum and fund the IUE-CWA New Brunswick Attrition Plan because to do otherwise would expose Delphi Corporation to even greater losses.  Finally, Delphi Corporation has secured significant economic support that will fund substantially all, if not all, of the cost of the IUE-CWA New Brunswick Attrition Plan.  As set forth below, the Debtors estimate that the IUE-CWA New Brunswick Attrition Plan would pay for itself well before the end of 2006.

<u>Argument</u>

A.    <u>Delphi Corporation Is The Proper Party To Fund
      The IUE-CWA New Brunswick Attrition Program</u>

       5.      Delphi Corporation is the signatory and consequent obligor to the IUE-

CWA National Agreement.  It ultimately is responsible for the wages and benefits provided to

IUE-CWA-represented employees under that agreement, including but not limited to other post-

employment benefits ("OPEB") and JOBS Bank benefits for laid-off employees.

       6.      To the extent that a subsidiary of Delphi Corporation pays for any of these

benefits provided for under the IUE-CWA National Agreement, that subsidiary has an assertable

claim against Delphi Corporation.  As this Court noted at the April 7, 2006 hearing on the

Debtors' motion to approve the UAW Special Attrition Program, subsidiaries of Delphi

Corporation that pay benefits to UAW-represented employees have claims against Delphi

Corporation, as the signatory and consequent obligor to the Debtors' national collective

bargaining agreement with the UAW.  At that hearing, WTC's counsel asserted that Delphi

Corporation's subsidiaries are reaping the benefits of attriting union-represented employees while

Delphi Corporation is paying the bill.  In response, the Court said:

> Well, at the minimum, if the agreement said that GM was going to
> assert its claim against the subsidiaries that use UAW employees,
> wouldn't the subsidiaries go right back and assert that that's – they
> should be reimbursed for that by Delphi since Delphi is the party
> on the collective bargaining agreement and on the contracts with
> GM?

April 7, 2006 Tr. at 117:10-19.[4]

       7.      The Court's observation was entirely consistent with the Debtors'

corporate structure.  The Debtors have an intercompany mechanism in place to allow subsidiaries

---

[4]        A copy of this excerpt from the April 7, 2006 transcript is attached hereto as <u>Exhibit B</u>.

5

of Delphi Corporation, such as DAS LLC, to assert those claims against Delphi Corporation.

Delphi Corporation (under "Delphi Automotive Systems, Inc.," the name by which it was known

at the time), DAS LLC, and Delphi Automotive Systems (Holding), Inc. are parties to that

certain Intercompany Agreement dated May 17, 1999, a copy of which is attached hereto as

Exhibit C.  The Intercompany Agreement is an intercompany cash pooling agreement allowing

for Delphi Corporation and its subsidiaries to engage in intercompany transactions, track

intercompany transfers of funds, and obtain reimbursement for services provided to each other.

B.      It Is In The Best Interests Of Delphi Corporation To Fund
        The IUE-CWA New Brunswick Attrition Plan

        8.      The presence of this intercompany mechanism allowing subsidiaries of

Delphi Corporation to assert claims against their parent corporation shows why, contrary to

WTC's assertion, it is in Delphi Corporation's best interests to fund the IUE-CWA New

Brunswick Attrition Plan.  This attrition plan is an essential component of the Transfer

Agreement, without which the transaction would not have been consummated.  Were the

transaction to fail, DAS LLC would likely be forced to close the New Brunswick Facility rather

than allow it to remain a cash drain in the amount of approximately $3 million per month.

        9.      Closing the facility and laying off its approximately 300 employees,

would create significant costs, as the Debtors estimate that approximately two-thirds of those

employees would be eligible for JOBS Bank benefits under the IUE-CWA National Agreement.

The Debtors estimate that those benefits (which are the responsibility of Delphi Corporation on

account of its obligations under the IUE-CWA National Agreement), would total approximately

$2.2 million per month in payroll costs.  As set forth below, the costs to Delphi Corporation of

funding that attrition program would quickly be exceeded by the costs of not funding it.

6

10.     The costs to Delphi Corporation of funding the IUE-CWA New Brunswick Attrition Plan are estimated to be between $18.5 million to $22.8 million, less the aggregate of $12.5 million to be paid by JCI under the Transfer Agreement plus the economic support to be provided by GM under its separate agreement with Delphi Corporation.  (As set forth in the Motion, the terms of this agreement with GM, including the amount of this economic support, are confidential.)  Thus, the costs to Delphi Corporation will be between $5.5 million and $10.3 million, less GM's significant support.  Without even considering GM's support, the cost of closing the New Brunswick Facility, at $2.2 million per month in JOBS Bank benefits, would exceed the costs of funding the IUE-CWA New Brunswick Attrition Plan within 2½ to 5 months.  After factoring in GM's support, the attrition plan would pay for itself even sooner.

11.     In sum, the Debtors believe that Delphi Corporation's entry into the IUE-CWA New Brunswick Attrition Plan constitutes a reasonable exercise of business judgment, will improve net cash flow, and reduce projected operating losses flowing from, among other sources, Delphi Corporation's obligations under the IUE-CWA National Agreement.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

overruling the Objection, (b) granting the Motion, and (c) granting the Debtors such other and

further relief as is just.

Dated:  New York, New York
       June 16, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP


By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Albert L. Hogan III (AH 8807)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -


By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :

           In re                               :         Chapter 11

                                              :

    DELPHI CORPORATION, et al.,         :         Case No. 05-44481 (RDD)

                                              :

                    Debtors.             :         (Jointly Administered)

                                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 2002 AND 6004 AUTHORIZING AND APPROVING DEBTORS' ENTRY INTO TRANSFER AGREEMENT WITH JOHNSON CONTROLS, INC. PROVIDING FOR (A) SALE OF ACQUIRED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES (B) CONTINUATION AND TRANSITION OF SUPPLY TO JOHNSON CONTROLS, INC. OF BATTERY PRODUCTS OUT OF FITZGERALD FACILITY AND (C) IMPLEMENTATION OF ATTRITION PLAN WITH RESPECT TO NEW BRUNSWICK <u>FACILITY IN ACCORDANCE WITH IUE-CWA MEMORANDUM</u>

("NEW BRUNSWICK TRANSFER ORDER")

           Upon the motion, dated May 26, 2006 (the "Motion"), of Delphi Corporation and

certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned

cases (collectively, the "Debtors"), for an order (the "Order") pursuant to 11 U.S.C. § 363(b) and

Fed. R. Bankr. P. 2002 and 6004 authorizing and approving the Debtors' entry into the Transfer

Agreement dated May 26, 2006 by and between Delphi Automotive Systems LLC, a Debtor in

these cases, and Johnson Controls, Inc. ("JCI"), a copy of which is attached hereto as <u>Exhibit 1</u>

(together, with the exhibits and schedules attached thereto, the "Transfer Agreement"), providing

for (a) sale of certain assets (the "Acquired Assets") of the Debtors' battery manufacturing facility

in New Brunswick, New Jersey (the "New Brunswick Facility") free and clear of liens, claims, and

encumbrances (the "Sale"), (b) the continuation and transition of supply to JCI of battery products

out of the Debtors' manufacturing facility in Fitzgerald, Georgia (the "Fitzgerald Facility"), and (c)

implementation of an attrition plan with respect to the New Brunswick Facility; and upon the

record of the hearing held on the Motion; and this Court having determined that the relief

requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and

other parties in interest; and it appearing that proper and adequate notice of the Motion has been

given and that no other or further notice is necessary; and after due deliberation thereon; and good

and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[1]

      A.     The court has jurisdiction over the Motion and the transactions

contemplated by the Transfer Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is

a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the

Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

      B.     The statutory predicates for the relief sought in the Motion are sections 363

of 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and Fed. R. Bankr. P. 2002 and

6004.

      C.     As evidenced by the affidavits of service previously filed with the Court,

and based on the representations of counsel at the hearing on the Motion (the "Hearing"), (i) proper,

timely, adequate and sufficient notice of the Motion, the Hearing and the sale of the Acquired

Assets (as defined in the Transfer Agreement) has been provided in accordance with 11 U.S.C. §§

102(l) and 363 and Fed. R. Bankr. P. 2002 and 6004, (ii) such notice was good and sufficient, and

appropriate under the particular circumstances, and (iii) no other or further notice of the Motion,

the Hearing, or the Sale is or shall be required.

---

[1]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

2     DeltaView comparison of pcdocs://chisr02a/573529/16 and pcdocs://chisr02a/573529/26. Performed on 6/15/2006.

D.      Each applicable Debtor (i) has full corporate power and authority to execute the Transfer Agreement and all other documents contemplated thereby, and the transfer and conveyance of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Transfer Agreement, and (iii) has taken all corporate action necessary to authorize and approve the Transfer Agreement and the consummation by such Debtor of the transactions contemplated thereby, and no consents or approvals, other than those expressly provided for in the Transfer Agreement, are required for each applicable Debtor to consummate such transactions.

E.      Approval of the Transfer Agreement and consummation of the Sale at this time are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

F.      The Debtors have demonstrated good, sufficient, and sound business purpose and justification in that, among other things, the Debtors and their advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Acquired Assets and determined that the terms and conditions set forth in the Transfer Agreement, and the transfer to JCI of the Acquired Assets pursuant thereto, represent a fair and reasonable purchase price and constitute the highest and best value obtainable for the Acquired Assets.  A sale of the Acquired Assets at this time to JCI pursuant to 11 U.S.C. § 363(b) is the most favorable alternative to minimize the Debtors' losses attributable to the Acquired Assets, and maximizes the Debtors' estates for the benefits of all constituencies.  Delaying approval of the Sale might result in JCI's termination of the Transfer Agreement and may result in an alternative outcome that will achieve less value and cause greater losses for the Debtors, their estates, and their creditors.

3       DeltaView comparison of pcdocs://chisr02a/573529/16 and pcdocs://chisr02a/573529/26. Performed on 6/15/2006.

G.      The Debtors have demonstrated good, sufficient, and sound business purpose and justification regarding the continuation and ultimate transition to JCI of the supply of battery products out of the Fitzgerald Facility pursuant to the Transfer Agreement.

H.      The Debtors have demonstrated good, sufficient, and sound business purpose and justification in that, among other things, the Debtors and their advisors diligently and in good faith analyzed the terms and conditions of the IUE-CWA Memorandum (as defined below) and determined that the terms and conditions thereof and in particular the terms and conditions of the IUE-CWA New Brunswick Attrition Plan (as defined below) set forth in the IUE-CWA Memorandum is an appropriate plan under the circumstances and is in the best interests of the Debtors, their estates, and their creditors.

I.      A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including: (i) the Office of the United States Trustee for the Southern District of New York, (ii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Acquired Assets, including but not limited to environmental, employee, and product liability claims, (iii) all federal, state, and local regulatory or taxing authorities or recording offices, including but not limited environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (iv) all entities known to have an interest in a transaction with respect to the Acquired Assets during the past six months, (v) the United States Attorney's office, (vi) the United States Department of Justice, (vii) the Securities and Exchange Commission, (viii) the Internal Revenue Service, (ix) all entities on the Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

---

4      DeltaView comparison of pcdocs://chisr02a/573529/16 and pcdocs://chisr02a/573529/26. Performed on 6/15/2006.

And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management Order"))

and such other entities that are required to be served with notices under the Supplemental Case

Management Order, (x) counsel for JCI, (xi) counsel for the Official Committee of Unsecured

Creditors appointed in these chapter 11 cases, and (xii) counsel for the Official Committee of

Equity Security Holders appointed in these chapter 11 cases.

J.      JCI is not an "insider" of any of the Debtors, as that term is defined in 11

U.S.C. § 101(31).

K.      The Transfer Agreement was negotiated, proposed, and entered into by the

Debtors and JCI without collusion, in good faith, and from arm's-length bargaining positions.

Neither the Debtors nor JCI have engaged in any conduct that would cause or permit the Transfer

Agreement to be avoided under 11 U.S.C. § 363(n).

L.      JCI is a good faith purchaser under 11 U.S.C. § 363(m) and, as such, is

entitled to all of the protections afforded thereby.

M.      The consideration provided by JCI for the Acquired Assets pursuant to the

Transfer Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired

Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by

any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair

consideration under the Bankruptcy Code and under the laws of the United States, any state,

territory, possession, or the District of Columbia.

N.      The transfer of the Acquired Assets to JCI will be a legal, valid, and

effective transfer of the Acquired Assets, and, except as expressly permitted or otherwise

specifically provided for in the Transfer Agreement or this Order, will vest JCI with all right, title,

and interest of the Debtors to the Acquired Assets free and clear of all liens, claims, and

encumbrances, including, but not limited to those (A) that purport to give to any party a right or

option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors' or

JCI's interest in the Acquired Assets, or any similar rights, (B) relating to taxes arising under or out

of, in connection with, or in any way relating to the operation of the Debtors' battery business prior

to the transfer of the Acquired Assets to JCI, and (C) mortgages, restrictions, hypothecations,

charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security

interests, conditional sale or other title retention agreements, pledges, liens (including, without

limitation, mechanics', materialmens', and other consensual and non-consensual liens and statutory

liens), judgments, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment,

rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products

liability, alter-ego, environmental, or tax, decrees of any Court or foreign or domestic

governmental entity, or charges of any kind or nature, if any, including, but not limited to, any

restriction on the use, transfer, receipt of income, or other exercise of any attributes of ownership,

debts arising in any way in connection with any agreements, acts, or failures to act, of any of the

Debtors or any of the Debtors' predecessors or affiliates, claims (as that term is defined in the

Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options,

rights, contractual or other commitments, restrictions, interests and matters of any kind and nature,

whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled,

noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed,

contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or

non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement

of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity or

otherwise, including claims otherwise arising under doctrines of successor liability (the items and concepts listed in (A), (B), and (C) above, collectively, the "Interests or Claims").

O.     If the Sale of the Acquired Assets were not free and clear of all Interests or Claims as set forth in the Transfer Agreement and this Order, or if JCI would, or in the future could, be liable for any of the Interests or Claims as set forth in the Transfer Agreement and this Order, JCI would not have entered into the Transfer Agreement and would not consummate the Sale or the transactions contemplated by the Transfer Agreement, thus adversely affecting the Debtors, their estates, and their creditors.

P.     The Debtors may sell their interests in the Acquired Assets free and clear of all Interests or Claims because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  All holders of Interests or Claims who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale, pursuant to 11 U.S.C. § 363(f)(2).  Those holders of Interests or Claims who did object fall within one or more of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their Interests or Claims, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim an Interest or Claim.

Q.     The Debtors are authorized to sell, transfer, convey or assign to JCI, all of the Debtors' right, title, and interest (including common law rights) to all of their intangible property included in the Acquired Assets to the broadest extent permitted by law and the terms of the Transfer Agreement.

R.     Approval of the Transfer Agreement and consummation of the Sale of the Acquired Assets at this time are in the best interests of the Debtors, their creditors, their estates and other parties in interest.

---

7     DeltaView comparison of pcdocs://chisr02a/573529/16 and pcdocs://chisr02a/573529/26. Performed on 6/15/2006.

S.      The liabilities being assumed by JCI under the Transfer Agreement,

including but not limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters) and

Exhibit 4.1 (Employee Matters) to the Transfer Agreement, are an integral part of the Acquired

Assets being purchased by JCI and, accordingly, such assumption is reasonable, enhances the

value of the Debtors' estates, and does not constitute unfair discrimination.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

### General Provisions

1.      The Motion is GRANTED.

### Approval Of The Transfer Agreement

2.      Pursuant to 11 U.S.C. § 363(b), the Transfer Agreement, and all of

the terms and conditions thereof, are hereby approved.

3.      Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized to

perform their obligations under the Transfer Agreement and comply with the terms thereof

and consummate the Sale in accordance with and subject to the terms and conditions of the

Transfer Agreement.

4.      Each of the signatories to the Transfer Agreement is directed to take

all actions necessary or appropriate to effectuate the terms of this Order with respect to the

Sale.

5.      The Debtors are authorized and directed to execute and deliver, and

empowered to perform under, consummate, and implement, the Transfer Agreement,

together with all additional instruments and documents that may be reasonably necessary

or desirable to implement the Transfer Agreement, and to take all further actions as may be requested by JCI for the purpose of assigning, transferring, granting, conveying, and conferring to JCI or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Transfer Agreement.

6.      This Order and the Transfer Agreement shall be binding in all respects upon all creditors (whether known or unknown) of any Debtor, JCI, all successors and assigns of JCI, the Debtors and their affiliates and subsidiaries, and any subsequent trustees appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection.  To the extent any provision of this Order is inconsistent with the terms of the Transfer Agreement, this Order shall govern.

7.      The Transfer Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such modification, amendment, or supplement is not material.

Sale And Transfer Of The Acquired Assets

8.      Except as expressly permitted or otherwise specifically provided for in the Transfer Agreement or this Order, pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the consummation of the Transfer Agreement, the Acquired Assets shall be transferred to JCI free and clear of all Interests or Claims, with all such Interests or Claims to attach to the cash proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, subject to any claims and

9      DeltaView comparison of pcdocs://chisr02a/573529/16 and pcdocs://chisr02a/573529/26. Performed on 6/15/2006.

defenses the Debtors may possess with respect thereto.  Following the date of the
completion of the transfer of the New Brunswick Facility to JCI under the Transfer
Agreement (the "Completion Date"), no holder of any Interests or Claims in the Acquired
Assets shall interfere with JCI's use and enjoyment of the Acquired Assets based on or
related to such Interests or Claims, or any actions that the Debtors may take in their chapter
11 cases and no person shall take any action to prevent, interfere with or otherwise enjoin
consummation of the transactions contemplated in or by the Transfer Agreement or this
Order.

        9.      Except as expressly provided in the Transfer Agreement or this
Order, other than the liabilities assumed under the Transfer Agreement, including but not
limited to those liabilities set forth on Exhibit 3.6H (Environmental Matters) and Exhibit
4.1 (Employee Matters) to the Transfer Agreement, the sale, transfer, assignment, and
delivery of the Acquired Assets pursuant to the Transfer Agreement shall not be subject to
any Interests or Claims, and Interests or Claims of any kind or nature whatsoever shall
attach only to the net proceeds of the Sale in their order of priority, with the same validity,
force, and effect which they now have as against the Acquired Assets, subject to any claims
and defenses the Debtors may possess with respect thereto.  All persons and entities,
including, but not limited to, all debt security holders, equity security holders,
governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding
Interests or Claims arising in any way in connection with any acts, or failure to act, of the
Debtors or the Debtors' predecessors or affiliates, claims (as that term is defined in section
101(5) of the Bankruptcy Code), obligations, demands, or guaranties of any kind and
nature against or in the Debtors or the Acquired Assets (whether legal or equitable, secured

10    DeltaView comparison of pcdocs://chisr02a/573529/16 and pcdocs://chisr02a/573529/26.
Performed on 6/15/2006.

or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated),

arising under or out of, in connection with, or in any way relating to the Debtors, the

Acquired Assets, the operation of the Debtors' battery business prior to the Completion

Date, or the transfer of the Acquired Assets to JCI, hereby are, and will be, forever barred,

estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing

such Interests or Claims of any kind or nature whatsoever against JCI, its successors or

assigns, their property, or any designee, such persons' or entities' Interests or Claims.

Following the Completion Date, no holder of an Interest or Claim (other than holders of

liabilities assumed under the Transfer Agreement, including but not limited to those

liabilities set forth on Exhibit 3.6H (Environmental Matters) and Exhibit 4.1 (Employee

Matters) to the Transfer Agreement, on account of such liabilities only) against the Debtors

shall interfere with JCI's title to or use and enjoyment of the Acquired Assets based on or

related to such Interests or Claims and all such Interests or Claims, if any, shall be and

hereby are channeled, transferred and attached solely and exclusively to the proceeds of the

Sale in their order of priority.

10.    Except as expressly provided in the Transfer Agreement or this

Order, the transfer of the Acquired Assets to JCI pursuant to the Transfer Agreement does

not require any consents other than as specifically provided for in the Transfer Agreement

and constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest

JCI with all right, title, and interest of the Debtors in and to the Acquired Assets free and

clear of all Interests or Claims of any kind or nature whatsoever (except for the liabilities

assumed under the Transfer Agreement, including but not limited to those liabilities set

forth on Exhibit 3.6H (Environmental Matters) and Exhibit 4.1 (Employee Matters) to the

Transfer Agreement).

11.    If any person or entity that has filed financing statements, mortgages,

mechanic's liens, <u>lis pendens</u>, or other documents or agreements evidencing Interests or

Claims against or in the Acquired Assets shall not have delivered the foregoing to the

Debtors prior to the Completion Date, in proper form for filing and executed by the

appropriate parties, termination statements, instruments of satisfactions, releases of all

Interests or Claims that the person or entity has with respect to the Acquired Assets, or

otherwise, then (a) the Debtors are hereby authorized to execute and file such statements,

instruments, releases and other documents on behalf of the person or entity with respect to

the Acquired Assets and (b) JCI is hereby authorized to file, register or otherwise record a

certified copy of this Order, which, once filed, registered or otherwise recorded, shall

constitute conclusive evidence of the release of all Interests or Claims in the Acquired

Assets of any kind or nature whatsoever.

12.    This Order (a) shall be effective as a determination that, on the

Completion Date, all Interests or Claims of any kind or nature whatsoever existing as to the

Debtors or the Acquired Assets prior to the Completion Date have been unconditionally

released, discharged, and terminated (other than any surviving obligations), and that the

conveyances described herein have been effected and (b) shall be binding upon and shall

govern the acts of all entities including without limitation, all filing agents, filing officers,

title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state, and

local officials, and all other persons and entities who may be required by operation of law,

the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

13.    Except as otherwise expressly provided in the Transfer Agreement, no person or entity, including, without limitation, any federal, state or local governmental agency, department or instrumentality, shall assert by suit or otherwise against JCI or its successors in interest any claim that they had, have or may have against the Debtors, or any liability, debt, or obligation relating to or arising from the Acquired Assets, or the Debtors' operation of the Business or use of the Acquired Assets, including, without limitation, any liabilities calculable by reference to the Debtors or their assets or operations, and all persons and entities are hereby enjoined from asserting against JCI in any way any such claims, liabilities, debts or obligations.

14.    Except as expressly provided in the Transfer Agreement or this Order, JCI is not assuming nor shall it in any way whatsoever be liable or responsible, as a successor or otherwise, for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) of the Debtors or any liabilities, debts, commitments, or obligations in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operation of their business or use of the Acquired Assets on or prior to the Completion Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Completion Date or are to be observed, paid, discharged, or performed on or prior to the Completion Date (in each case, including any liabilities that result from, relate to or arise out of tort or other product liability claims), or any liabilities calculable by

---

13    DeltaView comparison of pcdocs://chisr02a/573529/16 and pcdocs://chisr02a/573529/26. Performed on 6/15/2006.

reference to the Debtor or their assets or operations, or relating to continuing conditions

existing on or prior to the Completion Date, which liabilities, debts, commitments, and

obligations are hereby extinguished insofar as they may give rise to successor liability,

without regard to whether the claimant asserting any such liabilities, debts, commitments,

or obligations has delivered to JCI a release thereof. Without limiting the generality of the

foregoing, except as expressly provided in the Transfer Agreement or this Order, JCI shall

not be liable or responsible, as a successor or otherwise, for the Debtors' liabilities, debts,

commitments, or obligations, whether calculable by reference to the Debtors, arising on or

prior to the Completion Date and under or in connection with (i) any employment or labor

agreements (including, without limitation, the payment of wages, bonuses, severance pay,

benefits (including, without limitation, contributions or payments on account of any

under-funding with respect to any and all pension plans) or any other payment to

employees of Debtors while such individuals were employed by the Debtors), consulting

agreements, severance arrangements, change-in-control agreements, or other similar

agreement to which any Debtor is a party, (ii) any pension, welfare, compensation, or other

employee benefit plans, agreements, practices, and programs, including, without limitation,

any pension plan of the Debtors (including, without limitation, retention, benefit and/or

incentive plan to which any Debtors are a party and relating to the battery business

(including, without limitation, arising from or related to the rejection or other termination

of any such agreement)), (iii) the cessation of the Debtors' operations, dismissal of

employees, or termination of employment or labor agreements or pension, welfare,

compensation, or other employee benefit plans, agreements, practices, and programs,

obligations that might otherwise arise from or pursuant to the Employee Retirement

Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the

Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the

Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated

Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and

Retraining Notification Act, (iv) workers' compensation, occupational disease, or

unemployment or temporary disability insurance claims, (v) environmental liabilities,

debts, claims, or obligations arising from conditions first existing on or prior to Completion

Date (including, without limitation, the presence of hazardous, toxic, polluting, or

contaminating substances or wastes), which may be asserted on any basis, including,

without limitation, under the Comprehensive Environmental Response, Compensation and

Liability Act, 42 U.S.C. § 9601 et seq., (vi) any bulk sales or similar law, (vii) any

liabilities, debts, commitments, or obligations of, or required to be paid by, the Debtors for

any Taxes of any kind for any period, (viii) any liabilities, debts, commitments, or

obligations for any Taxes relating to the business of the Debtors or the Acquired Assets for

or applicable to the period prior to the Completion Date, (ix) any litigation relating to the

Acquired Assets for or applicable to the period prior to the Completion Date, and (x) any

products liability or similar claims, whether pursuant to any state or any federal laws or

otherwise, relating to the Acquired Assets for or applicable to the period prior to the

Completion Date.  JCI shall in no way be deemed a party to or assignee of any such

agreement set forth in (i), (ii), and (iii) above, and no employee of JCI shall be deemed in

any way covered by or a party to any such agreement, and all parties to any such agreement

are hereby enjoined from asserting against JCI any and all claims arising from or relating to

such agreement.  Any and all notices, if any, required to be given to the Debtors' employees

15     DeltaView comparison of pcdocs://chisr02a/573529/16 and pcdocs://chisr02a/573529/26.
Performed on 6/15/2006.

pursuant to the Workers Adjustment and Retraining Notification Act, or any similar federal

or state law, shall be the sole responsibility and obligation of the Debtors and JCI shall

have no responsibility or liability therefore.

15.    Upon the completion of the transactions contemplated by the

Transfer Agreement, JCI shall not be deemed to (i) be the successor of the Debtors, (ii)

have, de facto, or otherwise, merged with or into the Debtors, (iii) be a mere continuation

or substantial continuation of the Debtors or the enterprise(s) of the Debtors, or (iv) be

liable for any acts or omissions of the Debtors in the conduct of the Debtors' business.

<u>Continuation And Transition Of Supply Out Of Fitzgerald</u>

16.    The Debtors are hereby authorized to (a) continue manufacturing

and supplying JCI with battery products manufactured at the Fitzgerald Facility in

accordance with JCI's diminishing supply requirements and (b) to transition production of

battery products manufactured at the Fitzgerald Facility to other JCI facilities.

17.    The Debtors and JCI are each directed to take all actions necessary

or appropriate to effectuate the terms of this Order with respect to the supply and transition

of battery products from the Fitzgerald Facility.

<u>IUE-CWA Consent And IUE-CWA New Brunswick Attrition Plan</u>

18.    The Debtors are hereby authorized to enter into the agreement by

and among Delphi Corporation, the International Union, IUE-CWA and IUE-CWA Local

416 (collectively the "IUE-CWA") attached to the Transfer Agreement as Exhibit 1.13

thereto (the "IUE-CWA Memorandum") and to implement the terms of such IUE-CWA

Memorandum, including without limitation (i) that certain attrition plan between Delphi

and the IUE-CWA (the "IUE-CWA New Brunswick Attrition Plan") with respect to the

New Brunswick Facility and (ii) that certain consent to the waiver of that certain no-sale

clause and neutrality obligations (the "IUE-CWA Consent").

19.    Each of the signatories to the IUE-CWA Memorandum is directed

to take all actions necessary or appropriate to effectuate the terms of this Order with respect

to the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan and the terms

of the IUE-CWA Consent and the IUE-CWA New Brunswick Attrition Plan, including,

without limitation, any and all actions necessary or appropriate to its implementation of

and performance under the IUE-CWA Consent and the IUE-CWA New Brunswick

Attrition Plan.

20.    Both the $12.5 million to be paid by JCI pursuant to Section 3.A(xi) of

Exhibit 4.1 to the Transfer Agreement and the economic support to be provided by General Motors

Corporation to Delphi Corporation upon the transfer of the New Brunswick Facility to JCI shall be

paid to Delphi Corporation.

<u>Additional Provisions</u>

21.    20.The consideration provided by JCI for the Acquired Assets under the

Transfer Agreement is hereby deemed to constitute reasonably equivalent value and fair

consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform

Fraudulent Transfer Act, and under the laws of the United States, and any state, territory,

possession, or the District of Columbia.

22.    21.On the Completion Date, this Order shall be construed and shall

constitute for any and all purposes a full and complete general assignment, conveyance, and

transfer of all of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to JCI on pursuant to the terms of the Transfer Agreement.

23.    22. Except as otherwise provided in the Transfer Agreement, on the Completion Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary (or, in the case of the agent under the Debtors' prepetition credit facility, as may be reasonably requested) to release their respective Interests or Claims against the Acquired Assets, if any, as may have been recorded or may otherwise exist.

24.    23. Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Transfer Agreement.

25.    24. All entities who are currently, or as of the Completion Date may be, in possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to the Transfer Agreement are hereby directed to surrender possession of the Acquired Assets to JCI on the Completion Date.

26.    25. The transactions contemplated by the Transfer Agreement are undertaken by JCI in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of the Acquired Assets shall not affect the validity of the Sale to JCI, unless such authorization is duly stayed pending such appeal.  JCI is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

27.    26. The consideration paid by JCI in the Sale for the Acquired Assets under the Transfer Agreement is fair and reasonable, and may not be avoided or otherwise challenged under 11 U.S.C. § 363(n).

28.    27. The Debtors, including but not limited to their respective officers, employees, and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Transfer Agreement and this Order.  The Debtors shall be, and they hereby are, authorized to take all such actions as may be necessary to effectuate the terms of this Order.

29.    Nothing in this Order or the performance of any obligation hereunder shall be deemed to create or give rise to any claims, except those claims created or arising pursuant to the Transfer Agreement, including, without limitation, the IUE-CWA Memorandum and Exhibit 4.1 (Employee Matters) to the Transfer Agreement.  For the avoidance of doubt, this Order is without prejudice (a) to the Debtors' right to seek further Court approval to permit the allowance of additional claims against the Debtors not contemplated by the Transfer Agreement but necessary to effectuate the transactions contemplated thereunder, and (b) to the right of any party-in-interest to challenge the allowability, amount, or priority of any such additional claims referred to in (a) above.  Nothing contained in the Transfer Agreement or in this Order, or the performance of any obligation hereunder and thereunder, shall constitute an assumption or rejection of any agreement.

30.    28. The terms and provisions of the Transfer Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, JCI, and its respective affiliates, successors, and assigns, and any affected third parties, including, but not limited to, all persons asserting an Interest or Claim in the Acquired Assets to be sold to JCI pursuant to the Transfer Agreement, notwithstanding any subsequent

appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.

31.    29. Notwithstanding anything contained herein to the contrary, the term "Acquired Assets" as defined herein does not include property that is not property of the Debtors' estates, such as funds that are trust funds under any applicable state lien laws.

32.    Nothing in this Order approving the Transfer Agreement: (a) releases or nullifies any liability to a government entity under environmental statutes or regulations that any entity would be subject to as owner or operator of such property; and (b) precludes or prevents a governmental entity from exercising any powers under police and regulatory statutes, or regulations, that would be applicable to any entity as an owner or operator of property.  However, this Order does not act as a determination that JCI is or will be an owner or operator of any property.

33.    30. To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred, or conveyed to JCI on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

34.    31. The failure specifically to include or to reference any particular provision of the Transfer Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Transfer Agreement be authorized and approved in their entirety.

35.    32. The Transfer Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

36.    33. The provisions of this Order are nonseverable and mutually dependent.

37.    34. Nothing in this Order shall alter or amend the Transfer Agreement and the obligations of the Debtors and JCI thereunder.

38.    35. This Court retains jurisdiction to enforce and implement the terms and provisions of the Transfer Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to JCI, (b) compel delivery of the purchase price, reimbursement of costs under the IUE-CWA New Brunswick Attrition Plan, or performance of other obligations owed to the Debtors pursuant to the Transfer Agreement, (c) resolve any disputes arising under or related to the Transfer Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect JCI against any Interests or Claims against the Debtors or the Acquired Assets, of any kind or nature whatsoever, attaching to the proceeds of the Sale.

39.    36. Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure or any other Bankruptcy Rule, this Order shall take effect immediately upon its entry.

40.    37. The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated:  New York, New York
        June ___, 2006

_____
        UNITED STATES BANKRUPTCY JUDGE

Document comparison done by DeltaView on Thursday, June 15, 2006 5:05:04 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://chisr02a/573529/16 |
| Document 2 | pcdocs://chisr02a/573529/26 |
| Rendering set | Option 3a strikethrough double score no moves |

| Legend: |
|---|
| Insertion |
| Deletion |
| <Moved from> |
| >Moved to< |
| Style change |
| Format change |
| Moved deletion |

| | |
|---|---|
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 9 |
| Deletions | 20 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 29 |

Exhibit B

1

Filed Pursuant To Rule 424(b)(5)
Registration Statement No. 333-73285

PROSPECTUS SUPPLEMENT
(To prospectus dated March 30, 1999)

$1,500,000,000
[DELPHI LOGO]

Delphi Automotive Systems Corporation
$500,000,000 6 1/8% Notes due 2004
$500,000,000 6 1/2% Notes due 2009
$500,000,000 7 1/8% Debentures due 2029
------------------------

The notes due 2004 will bear interest at 6 1/8% per year and will mature on
May 1, 2004, the notes due 2009 will bear interest at 6 1/2% per year and will
mature on May 1, 2009 and the debentures due 2029 will bear interest at 7 1/8%
per year and will mature on May 1, 2029. We will pay interest on the notes and
debentures (collectively, the "Offered Securities") on May 1 and November 1 of
each year, beginning November 1, 1999. We may redeem the Offered Securities
prior to maturity, in whole or in part, as described in this prospectus
supplement.

------------------------

INVESTING IN THE OFFERED SECURITIES INVOLVES CERTAIN RISKS.
SEE "RISK FACTORS" BEGINNING ON PAGE S-3.
------------------------

| | PUBLIC OFFERING PRICE(1) | UNDERWRITING DISCOUNT | PROCEEDS BEFORE EXPENSES |
|---|---|---|---|
| Per Note due 2004............................................ | 99.873% | .350% | 99.523% |
| Total................................................... | $499,365,000 | $1,750,000 | $497,615,000 |
| Per Note due 2009............................................ | 99.393% | .450% | 98.943% |
| Total................................................... | $496,965,000 | $2,250,000 | $494,715,000 |
| Per Debenture due 2029...................................... | 99.230% | .875% | 98.355% |
| Total................................................... | $496,150,000 | $4,375,000 | $491,775,000 |

- ------------------------
(1) Plus accrued interest from May 4, 1999, if settlement occurs after that
    date.

Neither the Securities and Exchange Commission nor any state securities
commission has approved or disapproved of these securities or determined if this
prospectus supplement or the accompanying prospectus is truthful or complete.
Any representation to the contrary is a criminal offense.

The Offered Securities are being offered for sale in the United States,
Europe and Asia. We have applied to have the Offered Securities listed and
traded in accordance with the rules of the Luxembourg Stock Exchange. The
Offered Securities will be ready for delivery in book-entry form only through
The Depository Trust Company, Cedelbank or the Euroclear System, as the case may
be, on or about May 4, 1999.
------------------------
Joint Bookrunners

MERRILL LYNCH & CO.                          MORGAN STANLEY DEAN WITTER
------------------------
Co-Lead Managers

CHASE SECURITIES INC.                          GOLDMAN, SACHS & CO.
------------------------
Co-Managers

BNY CAPITAL MARKETS, INC.        BANC ONE CAPITAL MARKETS, INC.              BARCLAYS CAPITAL
FIRST UNION CAPITAL MARKETS CORP.    BLAYLOCK &PARTNERS, L.P.          BEAR, STEARNS &CO. INC.
LEHMAN BROTHERS                   BNP CAPITAL MARKETS, LLC                   DEUTSCHE BANK
ORMES CAPITAL MARKETS, INC.         CIBC WORLD MARKETS      NATIONSBANC MONTGOMERY SECURITIES LLC
SG COWEN                           CREDIT LYONNAIS S.A.                 SALOMON SMITH BARNEY

------------------------

The date of this prospectus supplement is April 28, 1999.

2

TABLE OF CONTENTS

PROSPECTUS SUPPLEMENT                              PAGE
---------------------                             ----

Risk Factors.............................      S-3
The Company..............................      S-5
Use of Proceeds..........................      S-6
Capitalization...........................      S-7
Selected Financial Data..................      S-8
Management's Discussion and Analysis of
   Financial Condition and Results of
   Operations............................      S-11
Business of Delphi.......................      S-28
Executive Officers and Directors.........      S-39
Description of the Offered Securities.....     S-45
Certain United States Federal Tax Matters...   S-52
Underwriting.............................      S-56
General Information......................      S-58
Legal Matters............................      S-59


PROSPECTUS                                        PAGE
----------                                        ----

About this Prospectus....................       2
Where You Can Find More Information.......       3
The Company..............................       4
Risk Factors.............................       5
Use of Proceeds..........................       5
Ratio of Earnings to Fixed Charges........      5
Description of Debt Securities............      5
Plan of Distribution.....................      13
Experts..................................      15
Legal Opinions...........................      15

     THE LUXEMBOURG STOCK EXCHANGE TAKES NO RESPONSIBILITY FOR THE CONTENTS OF
THIS DOCUMENT, MAKES NO REPRESENTATION AS TO ITS ACCURACY OR COMPLETENESS AND
EXPRESSLY DISCLAIMS ANY LIABILITY WHATSOEVER FOR ANY LOSS HOWSOEVER ARISING FROM
OR IN RELIANCE UPON THE WHOLE OR ANY PART OF THE CONTENTS OF THIS DOCUMENT AND
THE ACCOMPANYING PROSPECTUS.

     No person is authorized to give any information or to represent anything
not contained in this prospectus supplement or the accompanying prospectus. You
must not rely on any unauthorized information or representations. This
prospectus supplement and the accompanying prospectus are an offer to sell or to
buy only the Offered Securities, but only under circumstances and in
jurisdictions where it is lawful to do so. The information contained in this
prospectus supplement or the accompanying prospectus as well as information
previously filed with the Securities and Exchange Commission and incorporated by
reference is current only as of the date of such information. Our business,
financial condition, results of operations and prospects may have changed since
that date.

     OFFERS AND SALES OF THE OFFERED SECURITIES ARE SUBJECT TO RESTRICTIONS IN
RELATION TO THE UNITED KINGDOM, DETAILS OF WHICH ARE SET OUT IN "UNDERWRITING"
BELOW. THE DISTRIBUTION OF THIS PROSPECTUS SUPPLEMENT AND THE ACCOMPANYING
PROSPECTUS AND THE OFFERING OF THE OFFERED SECURITIES IN CERTAIN OTHER
JURISDICTIONS MAY ALSO BE RESTRICTED BY LAW. THIS PROSPECTUS SUPPLEMENT AND THE
ACCOMPANYING PROSPECTUS DO NOT CONSTITUTE AN OFFER, OR AN INVITATION ON OUR
BEHALF OR ON BEHALF OF THE UNDERWRITERS OR ANY OF THEM TO SUBSCRIBE FOR AND
PURCHASE, ANY OF THE OFFERED SECURITIES, AND MAY NOT BE USED FOR OR IN
CONNECTION WITH AN OFFER OR SOLICITATION BY ANYONE, IN ANY JURISDICTION IN WHICH
SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS
UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION.

     We cannot guarantee that application to the Luxembourg Stock Exchange will
be approved, and sale of the Offered Securities is not conditioned on obtaining
this listing.

     References in this prospectus supplement and the accompanying prospectus to
"we," "us," "our" and the "company" are to Delphi Automotive Systems
Corporation.

     In this prospectus supplement and the accompanying prospectus, unless
otherwise specified or the context otherwise requires, references to "dollars,"
"$" and "U.S. $" are to United States dollars.

3

RISK FACTORS

In considering whether to purchase the Offered Securities, you should
carefully consider all the information we have included or incorporated by
reference in this prospectus supplement and the accompanying prospectus. In
particular, you should carefully consider the risk factors described below. In
addition, please read "Management's Discussion and Analysis of Financial
Condition and Results of Operations--Forward-Looking Statements" beginning on
page S-26 of this prospectus supplement, where we describe additional
uncertainties associated with our business and the forward-looking statements in
this prospectus supplement and the accompanying prospectus.

WE MAY NOT BE ABLE TO REALIZE THE EXPECTED BENEFITS OF OUR SEPARATION FROM
GENERAL MOTORS

As a result of our initial public offering of common stock in February
1999, General Motors now owns approximately 82.3% of our outstanding common
stock and the public owns the rest. On April 12, 1999, the General Motors board
of directors approved the complete separation of our company from General Motors
principally by means of a tax-free spin-off to holders of General Motors $1- 2/3
common stock. To effect the spin-off of our company, the General Motors board
declared a dividend on the $1- 2/3 common stock consisting of approximately
80.1% of our outstanding common stock, payable on May 28, 1999 to holders of
record as of May 25, 1999. General Motors intends to contribute the remaining
approximately 2.2% of our outstanding common stock owned by it to a voluntary
employees' beneficiary association trust for General Motors' hourly retirees if
General Motors receives confirmation from the Internal Revenue Service that such
contribution will not affect the tax-free status of the spin-off of our company.
If General Motors does not receive such a confirmation from the Internal Revenue
Service on a timely basis, the remaining shares of our common stock owned by
General Motors will be distributed to the holders of the $1- 2/3 common stock as
part of the spin-off. If General Motors fails to complete the separation of our
company from General Motors as contemplated, our business would be adversely
affected. Specifically, we would likely not realize the increased non-General
Motors sales, improved labor relations, capital planning flexibility and other
benefits we expect to achieve in connection with the separation, all of which
are important to our business strategy.

Although we expect General Motors to continue to be our largest customer
for a significant period of time, our ability to realize future sales to General
Motors is subject to a number of risks. These risks include uncertainties
relating to our business under the supply agreement that we have entered into
with General Motors, under which General Motors has certain rights to move
business from us to other suppliers. The supply agreement also requires General
Motors to provide us the opportunity to supply on competitive terms the first
replacement cycle of certain product programs. However, in order to utilize this
ability to secure next generation business, we must be competitive in a number
of areas. Other suppliers' bids to provide particular products may include
offers of price reductions to General Motors on other current or future
products, and General Motors may under the supply agreement consider the overall
economic effect of such package proposals in assessing our competitiveness.
Accordingly, we cannot provide any assurance as to the amount of our future
business with General Motors. While we intend to continue to focus on retaining
and winning General Motors' business, we cannot assure you that we will succeed
in doing so.

Nor can we assure you that we will successfully enhance our ability to
expand our revenue base through additional sales to customers other than General
Motors. We face significant competition within each of our major product areas,
including some competitors which have substantial size and scale and some which
have lower cost structures. Even if we successfully increase our sales to other
customers, such sales, if any, will likely not be realized, if at all, for
several years because the majority of vehicle manufacturer parts purchases for
the next several years have already been sourced.

§-3

OUR HISTORICAL FINANCIAL INFORMATION MAY NOT BE REPRESENTATIVE OF OUR RESULTS AS
A SEPARATE INDEPENDENT COMPANY

    Our historical financial information for periods before January 1, 1999 may
not reflect what our results of operations, financial position and cash flows
would have been had we been a separate, independent entity during the periods
presented or what our results of operations, financial position and cash flows
will be in the future. This is because:

    - we have made certain adjustments and allocations because General Motors
      did not account for us, and we were not operated, as a stand-alone
      business for all periods presented; and

    - the information does not reflect many significant changes that will occur
      in our funding and operations as a result of our separation from General
      Motors, including employee and tax matters.

    We cannot assure you that the adjustments and allocations we have made in
preparing our historical consolidated financial statements appropriately reflect
our operations during such periods as if we had in fact operated as a
stand-alone entity or what the actual effect of our separation from General
Motors will be. Accordingly, we cannot assure you that our historical results of
operations are indicative of our future operating or financial performance.

WE MAY HAVE GREATER THAN EXPECTED CAPITAL REQUIREMENTS

    In connection with our separation from General Motors, we have agreed to
assume certain obligations relating to pensions and other postretirement
employee benefits-principally medical benefits-for our employees as well as for
certain employees associated with prior divestitures. We expect that our pension
contributions will be material to our results of operations and financial
condition, and, under certain circumstances, we could be required to make a
significant payment to General Motors in connection with the allocation of other
postretirement employee benefits. As a result of these obligations, our
liquidity position may be adversely affected if we fail to realize our expected
cash flows from operations. In addition, under our supply agreement with General
Motors, the timing of payments from General Motors to us under existing
contracts changed as of January 1, 1999, with the result that our working
capital needs have increased substantially from the levels assumed by the
historical consolidated financial statements.

OUR BUSINESS MAY BE ADVERSELY IMPACTED BY WORK STOPPAGES AND OTHER LABOR
RELATIONS MATTERS ARISING FROM THE GENERAL CONDUCT OF OUR BUSINESS OR FROM THE
SEPARATION

    We are subject to a risk of work stoppages and other labor relations
matters because our hourly workforce is highly unionized. In connection with
General Motors' proposed separation of our company, we will assume the terms of
the national labor agreements negotiated by General Motors. We expect to achieve
from the separation of our company increased competitiveness over time as a
result of improving our labor relations and establishing more flexible local
work rules and practices, but our largest union, the UAW, which represents about
28% of our unionized employees, has stated that it is on record as opposing
General Motors' divestiture of our company and that the UAW can and will
aggressively work to protect the rights and interests of its members who would
be impacted by the separation. We cannot assure you that this and other issues
with our labor unions will be resolved favorably to us in the future, that we
will not experience significant work stoppages or that we will not record
significant charges related to those work stoppages. In addition, if one or more
of our customers, including General Motors, experiences a material work
stoppage, such work stoppage may have a resulting effect on our company,
including the possible shutdown of our production lines related to such
customers, which could have a material adverse effect on our business.

5

## THE COMPANY

The information contained in this section is qualified in its entirety by
and should be read together with the more detailed information and financial
statements included elsewhere, or incorporated by reference, in this prospectus
supplement and the accompanying prospectus.

Delphi Automotive Systems Corporation is the world's largest and most
diversified supplier of components, integrated systems and modules to the
automotive industry, with 1998 net sales of $28.5 billion. We have become a
leader in the global automotive parts industry by capitalizing on the extensive
experience we gained as the principal supplier of automotive parts to General
Motors Corporation ("General Motors"), the world's largest manufacturer of
automotive vehicles. We are primarily a Tier 1 supplier, which means that we
generally provide our products directly to automotive vehicle manufacturers
("VMs"). We also sell our products to the worldwide aftermarket for replacement
parts and to customers other than VMs. We have established an expansive global
presence, with a network of manufacturing sites, technical centers, sales
offices and joint ventures located in every major region of the world, and sell
our products to every major manufacturer of light vehicles in the world.

Through our experience with General Motors, we have developed a
sophisticated understanding of the design, engineering, manufacture and
operation of all aspects of the automotive vehicle. We have both extensive,
technical expertise in a broad range of product lines and strong systems
integration skills, which enable us to provide comprehensive, systems-based
solutions for our customers. We operate our business along three major product
sectors that work closely together to coordinate our product development and
marketing efforts. We believe that we are one of the leading Tier 1 suppliers in
each of our focused product areas. Our three product sectors are:

- Electronics & Mobile Communication, which includes our automotive
  electronics and audio and communications systems;

- Safety, Thermal & Electrical Architecture, which includes our interior,
  thermal and power and signal distribution products; and

- Dynamics & Propulsion, which includes our energy and engine management,
  chassis and steering products.

Our core business objective is to increase our earnings by expanding our
sales globally while improving our operating performance. We believe that our
comprehensive vehicle knowledge and expansive global presence provide a solid
foundation for our continued growth, particularly as VMs increasingly seek
suppliers with technical expertise who can provide competitively-priced systems
solutions to meet consumers' requirements for ride and handling performance,
safety, security, communications, convenience and entertainment and who can
deliver products and offer customer service on a worldwide basis. Although we
expect that General Motors will remain our largest customer for a significant
period of time, we also expect that our sales to General Motors' North American
operations will decline over time. Accordingly, our strategy focuses on
increasing sales to other customers while maintaining our strong relationship
with General Motors.

Our company was incorporated in Delaware in late 1998. Effective as of
January 1, 1999, we acquired the assets and assumed the liabilities of the
businesses of the Delphi Automotive Systems business sector of General Motors.
Before the initial public offering in February 1999 of our common stock, we were
a wholly-owned subsidiary of General Motors. General Motors now owns
approximately 82.3% of our outstanding common stock and the public owns the
rest. On April 12, 1999, the General Motors board of directors approved the
complete separation of our company from General Motors principally by means of a
tax-free spin-off to holders of General Motors $1- 2/3 common stock (the
"Spin-off"). To effect the Spin-off, the General Motors board declared a
dividend on the $1- 2/3 common stock consisting of approximately 80.1% of our
outstanding common stock, payable on May 28, 1999 to holders of record as of May
25, 1999. General Motors intends to contribute the remaining approximately 2.2%
of our outstanding common stock owned by it to a voluntary employees'
beneficiary association trust for General Motors' hourly retirees if General
Motors receives confirmation from the Internal Revenue Service that such
contribution

S-5

6

will not affect the tax-free status of the Spin-off. If General Motors does not
receive such a confirmation from the Internal Revenue Service on a timely basis,
the remaining shares of our common stock owned by General Motors will be
distributed to the holders of the $1- 2/3 common stock as part of the Spin-off.
General Motors has previously received a private letter ruling from the Internal
Revenue Service to the effect that the Spin-off would be tax-free to General
Motors and its stockholders for United States federal income tax purposes.

## USE OF PROCEEDS

We will receive net proceeds from the offering of the Offered Securities of
about $1,484 million. We intend to use such proceeds for general corporate
purposes, including repayment of about $1,075 million of amounts currently
outstanding under our revolving credit facilities. Our borrowings under these
revolving credit facilities, which have due dates of January 3, 2000 and January
3, 2004, were about $1.6 billion as of March 31, 1999. As of March 31, 1999, the
interest rates on our borrowings under the credit facilities ranged between
about 5.39% and 5.44%. For more information about our credit facilities, see
"Management's Discussion and Analysis of Financial Condition and Results of
Operations--Liquidity and Capital Resources--Debt Capitalization and Available
Financing Sources" and Note 8 to our consolidated financial statements
incorporated by reference in this prospectus supplement and the accompanying
prospectus.

S-6

7

## CAPITALIZATION

Set forth below is the historical capitalization of our company at December 31, 1998 and as adjusted to give effect to our initial public offering of common stock, the terms of a master separation agreement to which we and General Motors are parties (the "Separation Agreement") and the offering of the Offered Securities pursuant to this prospectus supplement. Except as described in this prospectus supplement, the accompanying prospectus or the documents we incorporate by reference, there has been no material change in our consolidated capitalization since December 31, 1998. You should read the information set forth below in conjunction with "Selected Financial Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" which appear elsewhere in this prospectus supplement and our consolidated financial statements, including the notes thereto, which are incorporated by reference in this prospectus supplement and the accompanying prospectus.

| | DECEMBER 31, 1998 | | |
| | HISTORICAL | ADJUSTMENTS | PRO FORMA |
| --- | --- | --- | --- |
| | | (UNAUDITED) (IN MILLIONS) | (UNAUDITED) |
| DEBT: | | | |
| Notes payable and current portion of long-term debt............................................. | $  359 | $    -- | $  359 |
| Long term debt: | | | |
| Intracompany note payable and other long-term debt............................................. | 3,141 | (3,141)(1) 3,141(1) (1,484)(2) | 1,657 |
| Offered Securities............................... | -- | 1,484(2) | 1,484 |
| Total debt................................... | 3,500 | -- | 3,500 |
| EQUITY: | | | |
| Common stock, par value $.01, 1,350,000,000 shares authorized; 465,000,000 shares issued and outstanding; 565,000,000 shares pro forma as adjusted............................................ | -- | 1(3) 5(4) | 6 |
| Preferred stock, par value $.10, 650,000,000 shares authorized; none issued........................... | -- | -- | -- |
| Additional paid-in capital........................... | -- | 1,620(3) 1,613(4) | 3,233 |
| General Motors' net investment..................... | 77 | 1,541(1) (1,618)(4) | -- |
| Accumulated translation adjustments................ | (68) | -- | (68) |
| Total equity.................................. | 9 | 3,162 | 3,171 |
| Total capitalization.......................... | $3,509 | $ 3,162 | $6,671 |

- ---------------
The following pro forma adjustments were made to reflect our initial public offering of common stock, the terms of the Separation Agreement and the offering of the Offered Securities as if the transactions occurred on December 31, 1998. See Note 17 of our consolidated financial statements incorporated by reference in this prospectus supplement and the accompanying prospectus for additional information.

(1) Reflects the settlement of certain intracompany accounts receivable from General Motors with the intracompany note payable to General Motors. On January 1, 1999, immediately prior to the transactions contemplated by the Separation Agreement, certain intracompany accounts receivable from General Motors, of about $1.6 billion, were settled with the $3.1 billion outstanding intracompany note payable to General Motors with the difference resulting in an increase in General Motors' net investment in Delphi. Delphi initially financed its operations with borrowings from revolving credit facilities. See "Use of Proceeds."

(2) Reflects the net proceeds from the issuance of the Offered Securities. The Offered Securities are presented net of discounts and other costs of issuance. The net proceeds will be used for general corporate purposes, including repayment of amounts outstanding under our revolving credit facilities. See "Use of Proceeds" and "Management's Discussion and Analysis of Financial Condition and Results of Operations--Liquidity and Capital Resources--Debt Capitalization and Available Financing Sources."

(3) Reflects the net proceeds from the sale of one hundred million shares of common stock in our initial public offering, at a price of $17.00 per share. The initial public offering proceeds are being used for general corporate purposes, including working capital requirements which were impacted by the change in General Motors accounts receivable payment terms. Such payment

terms were modified to require payment by General Motors on the second day
of the second month following shipment by Delphi.

(4) Reflects the adjustment to equity to reclassify General Motors' net
    investment in Delphi as common stock and additional paid-in-capital.

S-7

8

## SELECTED FINANCIAL DATA

The following selected financial data of Delphi reflect the historical results of operations and cash flows of the businesses that were considered part of the Delphi Automotive Systems business sector of General Motors during each respective period. In addition, the data for all periods include amounts relating to Delco Electronics Corporation ("Delco Electronics"), the electronics and mobile communication business that was transferred by General Motors from Hughes Electronics to Delphi in December 1997. The historical consolidated statement of operations data set forth below do not reflect many significant changes that have occurred or will occur in the operations and funding of our company as a result of our separation from General Motors effective as of January 1, 1999 and our initial public offering of common stock in February 1999.

The selected financial data of Delphi should be read in conjunction with, and are qualified by reference to, "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus supplement and the consolidated financial statements and notes thereto incorporated by reference in this prospectus supplement and the accompanying prospectus. The consolidated statement of operations and cash flow data set forth below for each of the three years in the period ended December 31, 1998, and the consolidated balance sheet data as of December 31, 1998 and 1997, are derived from, and qualified by reference to, the consolidated financial statements incorporated by reference in this prospectus supplement and the accompanying prospectus, and should be read in conjunction with those consolidated financial statements and the notes thereto. The consolidated statement of operations and cash flow data for the year ended December 31, 1995, and the consolidated balance sheet data as of December 31, 1996, are derived from audited consolidated financial statements not included elsewhere or incorporated by reference in this prospectus supplement or the accompanying prospectus. The consolidated statement of operations and cash flow data for the year ended December 31, 1994, and the consolidated balance sheet data as of December 31, 1995 and 1994, are derived from unaudited consolidated financial statements not included elsewhere or incorporated by reference in this prospectus supplement or the accompanying prospectus, which in our opinion, include all adjustments, consisting of only normal recurring adjustments, necessary for a fair presentation of the results for such periods.

The financial information presented below may not be indicative of our future performance and does not necessarily reflect what our financial position and results of operations would have been had we operated as a separate, stand-alone entity during the periods presented. You should read the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section, which describes a number of factors which have affected our financial results, including significant price reductions as General Motors implemented its global sourcing initiative, labor disruptions at both General Motors and Delphi and charges associated with certain competitiveness initiatives.

The pro forma selected financial data as of and for the year ended December 31, 1998 were derived from the application of pro forma adjustments to our historical consolidated financial statements and give effect to our initial public offering of common stock and the impact of the terms of the Separation Agreement. The pro forma balance sheet data have been prepared as if our separation from General Motors and our initial public offering occurred on December 31, 1998. The pro forma statement of operations data have been prepared as if our separation from General Motors had been completed and our initial public offering had occurred on January 1, 1998. Specifically, the pro forma financial data give effect to:

- our initial public offering of common stock;

- the settlement of certain intracompany accounts with General Motors and a change in General Motors' accounts receivable payment terms;

- decreased employee benefit costs due to General Motors' retention of certain benefit obligations; and

- certain incremental costs associated with operating Delphi as a stand-alone publicly traded company.

S-8

9

The pro forma balance sheet data are not necessarily indicative of what our financial position would have been had the separation of our business from General Motors been completed and had our initial public offering occurred on December 31, 1998. The pro forma statement of operations data are not necessarily indicative of what our results of operations would have been had the separation of our business from General Motors been completed and had our initial public offering occurred at the beginning of 1998.

| | | YEAR ENDED DECEMBER 31, | | | | |
|---|---|---|---|---|---|---|
| | PRO FORMA 1998 | 1998 | 1997 | 1996 | 1995 | 1994(1) |
| | (IN MILLIONS, EXCEPT PER SHARE AMOUNTS) | | | | | |
| STATEMENT OF OPERATIONS DATA: | | | | | | |
| Net sales........................ | $28,479 | $28,479 | $31,447 | $31,032 | $31,661 | $31,044 |
| Operating expenses: | | | | | | |
| Cost of sales, excluding items listed below................. | 25,887 | 26,135 | 27,710 | 27,471 | 27,384 | 27,081 |
| Selling, general and administrative............... | 1,600 | 1,463 | 1,415 | 1,445 | 1,366 | 1,157 |
| Depreciation and amortization................. | 1,102 | 1,102 | 1,970 | 843 | 773 | 722 |
| Operating (loss) income........... | (110) | (221) | 352 | 1,273 | 2,138 | 2,084 |
| Interest expense.................. | (277) | (277) | (287) | (276) | (293) | (310) |
| Other income, net................. | 232 | 232 | 194 | 115 | 101 | 103 |
| (Loss) income before income taxes........................... | (155) | (266) | 259 | 1,112 | 1,946 | 1,877 |
| Income tax (benefit) expense...... | (131) | (173) | 44 | 259 | 639 | 644 |
| (Loss) income before cumulative effect of change in accounting principle...................... | (24) | (93) | 215 | 853 | 1,307 | 1,233 |
| Cumulative effect of change in accounting principle, net of tax............................ | -- | -- | -- | -- | -- | (258) |
| Net (loss) income................. | $ (24) | $ (93) | $ 215 | $ 853 | $ 1,307 | $ 975 |
| Basic and diluted (loss) earnings per share..................... | $ (0.04) | $ (0.20) | $ 0.46 | $ 1.83 | $ 2.81 | $ 2.10 |

|  | PRO FORMA 1998 | 1998 | 1997 | 1996 | 1995 | 1994 |
|---|---|---|---|---|---|---|
| **STATEMENT OF CASH FLOWS DATA:** | | | | | | |
| Cash provided by operating activities | n/a | $ 849 | $ 2,918 | $ 2,701 | $ 1,370 | n/a |
| Cash used in investing activities | n/a | (1,216) | (1,320) | (995) | (1,141) | n/a |
| Cash provided by (used in) financing activities | n/a | 384 | (1,549) | (1,686) | (263) | n/a |
| **OTHER FINANCIAL DATA:** | | | | | | |
| EBITDA(2) | $ 1,167 | $ 1,056 | $ 2,459 | $ 2,182 | $ 2,959 | $ 2,603 |

AT DECEMBER 31,

(IN MILLIONS)

BALANCE SHEET DATA:

| | | | | | | |
|---|---|---|---|---|---|---|
| Total assets...................... | $18,668 | $15,506 | $15,026 | $15,390 | $15,635 | $14,494 |
| Total debt........................ | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Equity (deficit)................. | 3,171 | 9 | (413) | 922 | 1,354 | 120 |

_ ---------------

(1) Delphi adopted Statement of Financial Accounting Standards ("SFAS") No. 112,
    "Employers' Accounting for Postemployment Benefits," effective January 1,
    1994. The adoption had an unfavorable cumulative effect of $258 million
    after-tax, which is reflected in 1994 net income. Earnings per share before
    the unfavorable cumulative effect of the change in accounting principle was
    $2.65 per share. The unfavorable cumulative effect of the change in
    accounting principle was $0.55 per share.

10

(2) "EBITDA" is defined as income before provision for interest expense and interest income, income taxes, depreciation and amortization. EBITDA is not presented as an alternative measure of operating results or cash flow from operations, as determined in accordance with generally accepted accounting principles, but because we believe it is a widely accepted indicator of our ability to incur and service debt. EBITDA does not give effect to cash used for debt service requirements and thus does not reflect funds available for dividends, reinvestment or other discretionary uses. In addition, EBITDA, as presented herein, may not be comparable to similarly titled measures reported by other companies.

11

MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

HISTORICAL FINANCIAL STATEMENTS

Our consolidated financial statements, which are discussed below, reflect
the historical results of operations and cash flows of the businesses that were
considered part of the Delphi business sector of General Motors during each
respective period; however, they do not reflect many significant changes that
have occurred and will occur in the operations and funding of our company as a
result of our separation from General Motors and our initial public offering of
common stock. The historical consolidated balance sheets reflect the assets and
liabilities transferred to our company in accordance with the transactions
contemplated by the Separation Agreement. Delphi and Delco Electronics were
under the common control of General Motors during such periods; therefore, our
consolidated financial statements include amounts relating to Delco Electronics
for all periods presented, although Delco Electronics was not integrated with
our company until December 1997. See Note 1 to our consolidated financial
statements incorporated by reference in this prospectus supplement and the
accompanying prospectus for a summary of our organization and significant
factors reflected in our historical financial statements. See "--Results of
Operations--Liquidity and Capital Resources" and Note 17 to those consolidated
financial statements for information on changes in our operations and funding
that are expected to result from our separation from General Motors and our
initial public offering of common stock.

SEPARATION FROM GENERAL MOTORS

Delphi and General Motors (and, in some cases, their respective affiliates)
have entered into certain agreements providing for the separation of Delphi's
business from General Motors, including the Separation Agreement. For more
information regarding the separation terms, see the description of the
arrangements between General Motors and Delphi contained in our Annual Report on
Form 10-K for the fiscal year ended December 31, 1998, which is incorporated by
reference in this prospectus supplement and the accompanying prospectus.

RECENT FINANCIAL RESULTS

A strong North American market coupled with aggressive cost-reduction more
than offset the impact of the economic downturn in South America as we reported
net income for the first three months of 1999 of $284 million.

Historical net income for the first quarter of 1998, as measured under
generally accepted accounting principles, was $236 million. However, the $236
million does not reflect the impact of the terms of the Separation Agreement.
After including the effect of the Separation Agreement, pro forma first quarter
1998 net income was $254 million. Thus, on a comparable basis, Delphi's first
quarter 1999 net income of $284 million reflects a 12 percent increase over the
1998 level of $254 million.

Consolidated net sales were $7.5 billion for the first three months of 1999
compared to $7.6 billion for the first three months of 1998. This reflects
growth in sales revenue from ongoing operations and strong North American sales,
offset by the impact of businesses divested in late 1998 and a decline in South
American sales. Non-General Motors sales for the first three months of 1999 were
up 12 percent, after adjusting to eliminate the 1998 sales of our seating,
lighting, coil spring and several smaller businesses, which were divested in
1998.

Our balance sheet as of March 31, 1999 reflected cash and marketable
securities of $1.1 billion and total debt of $1.9 billion, resulting in net
liquidity of $(0.8) billion, a significant improvement compared to net liquidity
of $(2.5) billion, or $(1.4) billion on a pro forma basis, at December 31, 1998.
Our pension obligations and total stockholders' equity were $2.2 billion and
$3.4 billion, respectively, as of March 31, 1999.

S-11

12

Additional information concerning our recent financial results is set forth in our Current Report on Form 8-K filed April 16, 1999, which is incorporated by reference in this prospectus supplement and the accompanying prospectus.

RESULTS OF OPERATIONS

To facilitate analysis, the following table sets forth historical consolidated statement of operations data as a percentage of consolidated net sales for each of the periods presented:

|  | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 1998 | 1997 | 1996 |
| NET SALES........................................................ | 100.0% | 100.0% | 100.0% |
| Operating expenses: |  |  |  |
| Cost of sales, excluding items listed below.............. | 91.8 | 88.1 | 88.5 |
| Selling, general and administrative...................... | 5.1 | 4.5 | 4.7 |
| Depreciation and amortization............................ | 3.9 | 6.3 | 2.7 |
| OPERATING (LOSS) INCOME.................................... | (0.8) | 1.1 | 4.1 |
| Interest expense......................................... | (0.9) | (0.9) | (0.9) |
| Other income, net........................................ | 0.8 | 0.6 | 0.4 |
| (Loss) income before income taxes........................ | (0.9) | 0.8 | 3.6 |
| Income tax (benefit) expense............................. | (0.6) | 0.1 | 0.8 |
| NET (LOSS) INCOME........................................ | (0.3)% | 0.7% | 2.8% |

In order to more fully understand the fluctuations, you should consider the impact of special items and work stoppages as discussed below.

SPECIAL ITEMS AND WORK STOPPAGES

The global automotive components and systems market is increasingly competitive and is undergoing significant restructuring and consolidation activities. All of our major industry competitors continue to increase their focus on efficiency and cost improvements, while facing increasing price pressures from VMs. As a result, in 1997 we initiated a study to evaluate the long-term competitiveness of all facets of our businesses ("Competitiveness Study"). As market conditions continued to warrant such review, a Competitiveness Study was again completed in 1998 in conjunction with our annual business planning cycle. Additional information regarding the results of each Competitiveness Study is included below and in Note 3 to our consolidated financial statements incorporated by reference in this prospectus supplement and the accompanying prospectus.

Our operating results for the periods presented also were impacted by a number of other special items which management views as non-recurring in nature. Such special items included divestitures and plant closing charges as well as work stoppages at certain General Motors and Delphi locations. Although these items are considered non-recurring, we cannot provide assurance that other special items and/or work stoppages will not occur with greater or lesser effects in future periods.

The following is a summary of the special items that impacted our operating results during the periods presented:

1998

- During 1998, we recorded a $310 million charge, or $192 million after-tax, related to the 1998 Competitiveness Study. Overall, the charge had the effect of increasing cost of sales and depreciation and amortization by $154 million and $156 million, respectively.

- During 1998, we recorded a loss of $430 million, or $271 million after-tax, related to divestitures involving our seating, lighting, and coil spring businesses. The charge had the effect of increasing cost of sales and depreciation and amortization by $382 million and $48 million, respectively.

13

- Work stoppages at General Motors and Delphi during 1998 reduced operating income by about $726 million, or $450 million after-tax, after considering partial recovery of lost production in subsequent periods.

1997

- During 1997, we recorded a $1.4 billion charge, or $870 million after-tax, relating to the 1997 Competitiveness Study. Overall, the charge had the effect of increasing 1997 cost of sales and depreciation and amortization by $262 million and $1.1 billion, respectively.

- Work stoppages during 1997 reduced operating income by about $148 million, or $92 million after-tax, after considering partial recovery of lost production in subsequent periods.

- During 1997, we recorded an $80 million plant closing charge, or $50 million after-tax, relating to a facility in Trenton, New Jersey. This charge had the effect of increasing cost of sales by $80 million.

- Other special items included gains aggregating $97 million, or $60 million after-tax. These gains primarily related to the sale of certain businesses and investments, none of which were material on an individual basis.

1996

- During 1996, we sold four facilities located in Flint and Livonia, Michigan and Oshawa and Windsor, Ontario, which resulted in a loss of $247 million, or $153 million after-tax. The loss had the effect of increasing cost of sales and depreciation and amortization by $167 million and $80 million, respectively.

- During 1996, three major work stoppages at various General Motors and Delphi facilities in the United States and Canada had an unfavorable impact of about $453 million, or $281 million after-tax, resulting from lower General Motors production volumes, after considering partial recovery of lost production in subsequent periods.

- Retiree lump sum benefit payments resulting from U.S. labor negotiations during 1996 resulted in a charge of $86 million, or $53 million after-tax.

- Other special charges totaled $50 million, or $31 million after-tax. These costs primarily reflect the sale of certain business investments, none of which were material on an individual basis.

1998 VERSUS 1997

Net Sales. Consolidated net sales and changes in net sales by product sector and in total for the years ended December 31, 1998 and 1997 were:

| PRODUCT SECTOR | YEAR ENDED DECEMBER 31, | | CHANGE | |
| | 1998 | 1997 | $ | % |
| | | | (DOLLARS IN MILLIONS) | |
| Electronics &Mobile Communication...... | $ 4,823 | $ 5,539 | $  (716) | (12.9)% |
| Safety, Thermal &Electrical Architecture........................ | 11,226 | 12,728 | (1,502) | (11.8) |
| Dynamics &Propulsion................... | 12,862 | 13,733 | (871) | (6.3) |
| Eliminations........................... | (432) | (553) | 121 | n/a |
| Consolidated net sales................ | $28,479 | $31,447 | $(2,968) | (9.4)% |

The decrease in consolidated net sales for each product sector reflects unfavorable volume associated with work stoppages, after considering partial recovery of lost production, divested businesses (primarily in our Safety, Thermal & Electrical Architecture product sector) and unfavorable economic conditions in

Asia and Latin America. In addition, our net sales continue to be impacted by pricing pressures as vehicle manufacturers reduce their cost structures through competitive sourcing initiatives and global vehicle platforms. Specifically, all of our product sectors were impacted by price reductions required by General Motors and other customers which totaled $465 million (or 1.6% of net sales). As a percentage of net sales, price reductions declined from 1997 levels to levels which we believe will be more indicative of future pricing pressures from VMs, although we cannot assure you in this regard. Overall, price reductions had the largest impact on our Electronics & Mobile Communication product sector (2.7% of net sales) due to the impact of General Motors-North America's continued implementation of its global sourcing strategy and reflecting the overall price declines throughout the electronics industry. The unfavorable impact of lower volumes, as discussed above, and price reductions was partially offset by an increase in sales to customers other than General Motors. Sales to customers other than General Motors during 1998 increased about $620 million or 11% compared to 1997.

Cost of Sales. Cost of sales represented 91.8% of consolidated net sales for 1998 compared to 88.1% for 1997. The increase reflects the impact of special items and work stoppages along with other factors which are described in greater detail in the operating (loss) income discussion below.

Selling, General and Administrative Expenses and Depreciation and Amortization. Selling, general and administrative expenses increased by $48 million during 1998 compared to 1997. Depreciation and amortization increased by $28 million during 1998 excluding the impact of special charges during 1998 and 1997 totaling $204 million and $1.1 billion, respectively, related to divestitures and the Competitiveness Study for each period. The increase in depreciation and amortization, excluding the impact of special charges, reflected incremental depreciation associated with a larger fixed asset base.

Operating (Loss) Income. Our operating loss was $221 million for 1998 compared to operating income of $352 million in 1997. Excluding the impact of special items and work stoppages, operating income totaled $1.2 billion and $1.9 billion for the years ended December 31, 1998 and 1997, respectively. The following information on operating income and changes in operating income and its components excludes the impact of special items and work stoppages. See "--Special Items and Work Stoppages" for additional information.

Operating income by product sector and in total, excluding the impact of special items and work stoppages, was:

| PRODUCT SECTOR | YEAR ENDED DECEMBER 31, | |
| --- | --- | --- |
| | 1998 | 1997 |
| | (IN MILLIONS) | |
| Electronics & Mobile Communication............................ | $ 511 | $ 612 |
| Safety, Thermal & Electrical Architecture..................... | 707 | 1,060 |
| Dynamics & Propulsion......................................... | 314 | 400 |
| Other......................................................... | (287) | (130) |
| Total operating income excluding the impact of special items and work stoppages............................... | $1,245 | $1,942 |

Operating income, excluding the impact of special items and work stoppages, was unfavorably impacted by continuing price pressures, the economic downturn in Latin America and unfavorable design costs and product mix. These unfavorable items were significantly offset by our aggressive cost reduction efforts as we have implemented several strategies to reduce our cost structure and maintain our desired level of profitability. Specifically, each of our product sectors achieved material and manufacturing cost savings which totaled about $945 million during 1998, exceeding price reductions and unrecovered design change costs by $110 million. Cost savings achieved primarily reflect the results of our global sourcing initiatives and continued implementation of lean manufacturing strategies. In addition, operating income was favorably impacted by greater sales penetration of non-General Motors customers during 1998.

S-14

Interest Expense. Interest expense totaled $277 million and $287 million for the years ended December 31, 1998 and 1997, respectively. The decrease in interest expense reflects lower interest rates during 1998 in comparison to 1997 rates.

Other Income, Net. Other income, net totaled $232 million for 1998, compared to $194 million in 1997. The increase primarily reflects improved profitability for certain non-consolidated ventures during 1998.

Taxes. The effective income tax rate for 1998 was a 65.0% credit compared to an effective income tax rate of 17.0% for 1997. During 1998, certain deductions and tax credits remained constant while taxable income decreased substantially, resulting in a greater effective tax benefit as a percentage of pretax income.

Net (Loss) Income. Our historical net loss totaled $93 million in 1998 compared to net income of $215 million during 1997. Excluding special items and work stoppages, our income was $820 million and $1.2 billion for the years ended December 31, 1998 and 1997, respectively, reflecting the impact of items discussed above.

PRO FORMA 1998

Our operating loss and net loss, as reported for 1998, does not reflect the impact of many changes in our operations that are expected to result from our separation from General Motors. After giving effect to the terms of the Separation Agreement, our operating loss and net loss would have been $110 million and $24 million, respectively, for 1998. Excluding the impact of special items and work stoppages and after giving effect to the terms of the Separation Agreement, operating income and net income would have been $1.4 billion and $889 million, respectively, for 1998. Overall, the terms of the Separation Agreement would have had a favorable impact on our reported operating loss and net loss of $111 million and $69 million, respectively, for the year ended December 31, 1998, reflecting the net effect of lower employee benefit costs and higher other costs associated with operating Delphi as a stand-alone company. For additional information on the impact of the terms of the Separation Agreement, see Note 17 to our consolidated financial statements incorporated by reference in this prospectus supplement and the accompanying prospectus.

1997 VERSUS 1996

Net Sales. Consolidated net sales and changes in net sales by product sector and in total for the years ended December 31, 1997 and 1996 were:

|  | YEAR ENDED DECEMBER 31, | | CHANGE | |
| PRODUCT SECTOR | 1997 | 1996 | $ | % |
|  | (DOLLARS IN MILLIONS) | | | |
| Electronics &Mobile Communication........... | $ 5,539 | $ 5,315 | $ 224 | 4.2% |
| Safety, Thermal &Electrical Architecture..... | 12,728 | 12,942 | (214) | (1.7) |
| Dynamics &Propulsion...................... | 13,733 | 13,293 | 440 | 3.3 |
| Eliminations................................. | (553) | (518) | (35) | n/a |
| Consolidated net sales..................... | $31,447 | $31,032 | $ 415 | 1.3% |

The increase in consolidated net sales during 1997 reflects a $260 million increase in sales to non-General Motors customers and improved General Motors-North America production volumes, after adjusting for the impact of work stoppages. These improved volumes during 1997 were partially offset by the impact of the 1996 sale of four plants by the Safety, Thermal & Electrical Architecture product sector, which had combined historical annual net sales of about $1.0 billion, as well as continued price pressures. Price reductions required by General Motors and non-General Motors customers had an unfavorable sales impact on all of our product sectors and totaled about $730 million, or 2.3% of net sales, during 1997.

16

Price reductions for our Electronics & Mobile Communication product sector, representing 3.3% of net sales, exceeded the overall percentage for Delphi on a consolidated basis due to the timing of the implementation of General Motors-North America's global sourcing as it related to electronics products and the overall price declines throughout the electronics industry.

Cost of Sales. Cost of sales, as a percentage of consolidated net sales, decreased to 88.1% in 1997 from 88.5% in 1996. The decrease as a percentage of net sales reflects a lower impact of work stoppages in 1997 compared to 1996 along with other factors which are described in greater detail in the operating income discussion below.

Selling, General and Administrative Expenses and Depreciation and Amortization. Selling, general and administrative expenses remained constant during 1997 and 1996 while depreciation and amortization, excluding the $1.1 billion charge associated with the Competitiveness Study, increased slightly.

Operating Income. Operating income decreased to $352 million in 1997 from $1.3 billion in 1996. Excluding the impact of special items and work stoppages, operating income totaled $1.9 billion in 1997 compared to $2.1 billion in 1996. The following information on operating income and changes in operating income and its components excludes the impact of special items and work stoppages. See "--Special Items and Work Stoppages" for additional information.

Operating income by product sector and in total, excluding the impact of special items and work stoppages, was:

| PRODUCT SECTOR | YEAR ENDED DECEMBER 31, | |
| --- | --- | --- |
| | 1997 | 1996 |
| | (IN MILLIONS) | |
| Electronics &Mobile Communication........................... | $ 612 | $ 810 |
| Safety, Thermal &Electrical Architecture................... | 1,060 | 955 |
| Dynamics &Propulsion....................................... | 400 | 321 |
| Other...................................................... | (130) | (27) |
| Total operating income excluding the impact of special items and work stoppages............................... | $1,942 | $2,059 |

As a result of strategies implemented to reduce our cost structure, we realized material and manufacturing cost savings of about $450 million during 1997. Cost savings were realized by all of our product sectors; however, price reductions and unrecovered design change costs, which together totaled about $960 million in 1997, more than offset the cost savings. Unrecovered design change costs had an unfavorable impact on operating income of about $230 million in 1997, primarily affecting our Electronics & Mobile Communication product sector. In addition, operating income was favorably impacted by greater sales penetration of non-General Motors customers and improved General Motors-North America production volumes after adjusting for the impact of work stoppages.

Interest Expense. Interest expense totaled $287 million and $276 million in 1997 and 1996, respectively. The increase in interest expense in 1997 primarily reflected slightly higher interest rates during the period.

Other Income, Net. Other income, net totaled $194 million in 1997 compared with $115 million in 1996. The amount reported for 1997 includes a gain of $97 million, or $60 million after-tax, relating to the sale of certain business investments. The gain was partially offset by a decline in earnings of nonconsolidated affiliates, which decreased to $27 million in 1997 compared with $57 million in 1996. The decline reflected lower equity earnings due to the sale of certain minority owned investments and the unfavorable impact of economic volatility on overseas joint ventures.

S-16

17

Taxes. The effective income tax rate for 1997 was 17.0% compared with 23.3% for 1996. The lower 1997 effective income tax rate primarily reflected the favorable impact of state and local income tax rates which were generally lower than in 1996. The favorable impact of state and local tax rates was partially offset by higher foreign tax rates during 1997.

Net Income. Net income totaled $215 million in 1997 and $853 million in 1996. Income, excluding the impact of special items and work stoppages, totaled $1.2 billion in 1997 compared to $1.4 billion in 1996 reflecting the items discussed above.

LIQUIDITY AND CAPITAL RESOURCES

Pursuant to a cash and debt management agreement with General Motors and an intracompany note payable to General Motors, our historical balance sheets reflect cash and marketable securities of $1.0 billion and combined short-term and long-term debt capitalization of $3.5 billion at December 31, 1998 and 1997. The short-term and long-term debt capitalization included a $3.1 billion intracompany note payable to General Motors and outstanding debt at our international subsidiaries. The $3.1 billion intracompany note payable to General Motors represented the portion of General Motors' outstanding debt that was specifically related to our operations.

Our net liquidity was $(2.5) billion at December 31, 1998 and 1997. Our net liquidity consists of cash and marketable securities less the total of short-term and long-term debt. The ratio of total debt to total capital, which consists of total debt plus equity, was 100% at December 31, 1998 compared to 113% at December 31, 1997. The ratio of total debt to total capital was greater than 100% at December 31, 1997, reflecting the impact of a net deficit in stockholder's equity. The ratio of total debt to total capital decreased during 1998, reflecting differences in various separation adjustments required at each date. Our initial public offering and other related transactions resulted in a pro forma total debt to total capital ratio of 52% at December 31, 1998.

LIQUIDITY PRIOR TO AND UPON OUR SEPARATION FROM GENERAL MOTORS AND OUR INITIAL PUBLIC OFFERING

The following table sets forth the changes in our net liquidity, certain of which occurred immediately prior to or in connection with the transfer of assets and liabilities from General Motors to our company. The impact of the offering of the Offered Securities is not reflected below. The extension of payment terms for intracompany accounts receivable and the settlement of intracompany accounts receivable with the intracompany note payable occurred before assets and liabilities were transferred to Delphi Automotive Systems Corporation. Consequently, these transactions were executed by the Delphi businesses, and not by Delphi Automotive Systems Corporation.

| | CASH AND MARKETABLE SECURITIES | SHORT- AND LONG-TERM DEBT | NET LIQUIDITY |
|---|---|---|---|
| | | (IN BILLIONS) | |
| Net liquidity at December 31, 1998--as reported........ | $ 1.0 | $ 3.5 | $(2.5) |
| Extension of payment terms for intracompany accounts receivable from General Motors...................... | (2.1) | -- | (2.1) |
| Settlement of intracompany note payable to General Motors................................................ | -- | (3.1) | 3.1 |
| Increase in accounts receivable, subsequent to settlement of intracompany accounts receivable....... | (1.6) | -- | (1.6) |
| Proceeds from revolving credit facilities............. | 3.1 | 3.1 | --- |
| Proceeds from initial public offering of common stock................................................ | 1.6 | -- | 1.6 |
| Pro forma net liquidity............................... | $ 2.0 | $ 3.5 | $(1.5) |

Each of the above changes in our net liquidity is discussed in the sections that follow.

S-17

18

EXTENSION OF PAYMENT TERMS

In accordance with the terms of our supply agreement with General Motors, which became effective as of January 1, 1999, payment terms for intracompany accounts receivable from General Motors have been modified such that payments will generally be due from General Motors on the second day of the second month following the date of shipment by Delphi. These modified payment terms are consistent with those General Motors is currently in the process of introducing to all of its suppliers. Previous payment terms generally required General Motors to make intracompany accounts receivable payments in the month following shipment by Delphi. Overall, this change increased accounts receivable by about $2.1 billion beginning in 1999. While Delphi intends to seek an extension of payment terms with its suppliers over time, in most cases, it currently pays suppliers on the 25th day of the month following the date a shipment is received. The difference in the payment terms for accounts receivable and accounts payable results in a monthly short-term cash flow gap. Delphi is financing this short-term cash flow gap through short-term borrowings, as discussed below.

DEBT CAPITALIZATION AND AVAILABLE FINANCING SOURCES

Immediately prior to the transactions contemplated by the Separation Agreement, approximately $1.6 billion of certain intracompany accounts receivable from General Motors were offset with the $3.1 billion outstanding intracompany note payable to General Motors, with the difference resulting in an increase in General Motors' net investment in Delphi. We expect to finance our operations with third party funding of up to $3.1 billion. Such funding will be in the form of drawdowns from the available $4.9 billion third party revolving credit facilities and structured financing arrangements, including this offering of the Offered Securities. In this regard, borrowings under third party revolving credit facilities were about $1.6 billion as of March 31, 1999. In addition, during the fourth quarter of 1998, we implemented a $175 million accounts receivable factoring program.

In January 1999, we entered into two financing arrangements with a syndicate of lenders providing for an aggregate of $4.9 billion in available revolving credit facilities. In general, we may borrow up to $4.9 billion under the facilities through January 3, 2000, after which $1.5 billion will be available through January 3, 2004. The $4.9 billion we may borrow will be reduced to the extent of any net cash proceeds received from public offerings of common stock subsequent to our initial public offering and cash proceeds from public offerings and private placements of debt securities, excluding debt securities with a maturity of less than one year but including the Offered Securities. The total reduction arising from issuances of common stock and debt securities (including in our initial public offering) will not reduce aggregate availability by more than $2.0 billion. Generally, following the issuance of the Offered Securities, we expect our borrowings under the revolving credit facilities to be split between 364-day and five-year tranches. We may borrow under these financing arrangements for general corporate purposes. The credit facilities include certain customary affirmative and negative covenants, including maintenance of a ratio of consolidated total debt to consolidated EBITDA, excluding extraordinary items. The credit facilities also provide for certain events of default, including upon a change in control, which is generally defined to include the acquisition of more than 20% of the voting power of our common stock by any person other than General Motors. For additional information on our revolving credit facilities, see Note 8 to the consolidated financial statements incorporated by reference in this prospectus supplement and the accompanying prospectus.

General Motors currently owns about 82.3% of our common stock. As a result, General Motors will continue to include us as a "subsidiary" for various financial reporting, accounting and other purposes until after the Spin-off is completed. Accordingly, we have agreed to certain covenants regarding the incurrence of debt. Specifically, so long as General Motors owns at least 50% of our outstanding shares of common stock, these covenants limit our maximum indebtedness, including indebtedness incurred in connection with acquisitions.

Delphi's intra-year cash fluctuations are impacted by the volume and timing of worldwide vehicle production. Examples of seasonal effects in the industry include the shut-down of operations of our

S-18

19

primary North American customers for about two weeks in July, the subsequent ramp-up of new model production and the additional one-week shut-down in December. We believe that our company has sufficient financial flexibility to fund these fluctuations and to access the global capital markets on terms and in amounts satisfactory to it, although there can be no assurance that this will be the case. In addition, we expect cash flows from operations, the establishment of the revolving credit facilities and other short-term sources to be sufficient to satisfy future working capital, capital expenditures, research and development, pension funding requirements and debt service requirements during the next 12 to 18 months. We expect cash flows from operations, the establishment of the revolving credit facilities and access to the short-term and long-term capital markets to satisfy our funding needs during our five-year business planning cycle. See "--Cash Flows--Investing Activities" and "--Our Other Postretirement Employee Benefits and Underfunded Pension Obligations."

CASH FLOWS

Operating Activities. Net cash provided by operating activities was $849 million for the year ended December 31, 1998 compared to $2.9 billion in 1997 and $2.7 billion in 1996. The decrease in 1998 cash flows reflects the impact of work stoppages and the related overall net loss for 1998, as well as decreases in accrued and other liabilities. The decrease in accrued and other liabilities in 1998 reflected a reduction in income taxes payable and the timing of settlements for amounts accrued in prior periods. The 1997 increase in cash flows from operating activities primarily reflects increases in accounts payable, accrued liabilities and other liabilities partially offset by increased accounts receivable and cash used for other postretirement benefits as discussed below. The 1997 changes referenced above primarily reflected an increased volume of activity, differences in the timing of settlements, and amounts accrued in connection with the Competitiveness Studies.

Operating cash flow during 1998 and 1997 reflected contributions to a Voluntary Employees' Beneficiary Association trust. The contributions, which totaled $677 million in 1998 and $925 million in 1997, were made in connection with General Motors' pre-funding of a portion of its other postretirement benefit liabilities. In accordance with the terms of the Separation Agreement, General Motors will retain 100% of the pre-funding and, accordingly, Delphi's other postretirement benefit liabilities do not reflect an allocation of the Voluntary Employees' Beneficiary Association trust assets.

Investing Activities. Cash flows used in investing activities totaled $1.2 billion, $1.3 billion and $1.0 billion for the years ended December 31, 1998, 1997 and 1996, respectively. Overall, cash flows used in investing activities primarily relate to our capital expenditure program, partially offset by proceeds from asset sales. Our capital expenditure program promotes our growth-oriented business strategy by investing in existing core areas, where efficiencies and profitability can be enhanced, and by targeting funds for new innovative technologies, where long-term growth opportunities can be realized.

Capital expenditures by product sector and geographic region for the periods presented were:

|  | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 1998 | 1997 | 1996 |
|  | (IN MILLIONS) | | |
| Electronics &Mobile Communication | $ 180 | $ 122 | $ 195 |
| Safety, Thermal &Electrical Architecture | 449 | 464 | 418 |
| Dynamics &Propulsion | 741 | 778 | 548 |
| Other | 11 | 19 | 16 |
| Total Capital Expenditures | $1,381 | $1,383 | $1,177 |
| United States | $ 888 | $ 930 | $ 809 |
| Canada &Mexico | 127 | 88 | 65 |
| Other International | 366 | 365 | 303 |
| Total Capital Expenditures | $1,381 | $1,383 | $1,177 |

The increased spending during 1998 and 1997 primarily relates to the timing of the start-up of new product programs, increased penetration with non-General Motors customers and expansion into new market areas primarily outside the United States.

We expect capital expenditures to total $1.5 billion in 1999. Such expenditures will primarily be utilized for equipment, tooling and other spending associated with new product programs, including increasing sales to non-General Motors customers. Expenditures will also be used for expansion into new markets outside the United States and the continued implementation of lean manufacturing strategies. About 43% of 1999 capital expenditures are targeted outside the United States. The Electronics & Mobile Communication, the Safety, Thermal & Electrical Architecture and the Dynamics & Propulsion product sectors are expected to account for about 18%, 34% and 48%, respectively, of 1999 capital expenditures.

Financing Activities. Net cash provided by financing activities was $384 million during 1998 compared to net cash used in financing activities of $1.5 billion and $1.7 billion in 1997 and 1996, respectively. Cash provided by or used in financing activities primarily related to the transfer or assumption of assets and liabilities to our company from General Motors under the terms of the Separation Agreement. The period-to-period changes reflect differences in separation adjustments for various assets and liabilities.

OUR OTHER POSTRETIREMENT EMPLOYEE BENEFITS AND UNDERFUNDED PENSION OBLIGATIONS

In connection with our separation from General Motors, we have entered into several agreements relating to pensions and other postretirement employee benefits for our employees as well as certain employees associated with prior divestitures. Our pension obligations are based on the pension plans' assets, the expected investment return on those assets and the plans' expected liabilities. Under current economic conditions and federal government regulations, our pension obligations would be considered to be "underfunded." The amount of underfunding can vary from time to time, depending on factors such as discount rates, asset returns, contributions and other factors. As of December 31, 1998, Delphi's U.S. salaried and hourly other postretirement employee benefit obligation was about $4.6 billion and the underfunded pension obligation was about $2.2 billion.

Because of the underfunded nature of certain pension plans, federal regulations will require that our contributions over time meet minimum funding requirements. Delphi is responsible for assuming the underfunded hourly pension liability associated with Delphi hourly employees or paying General Motors for underfunding relating to such employees.

Although we are not required to do so, we have commenced discussions with the Pension Benefit Guaranty Corporation regarding the underfunded nature of certain pension plans. In connection with these discussions, the Pension Benefit Guaranty Corporation may request that we take actions in excess of federal regulatory minimum requirements. The outcome of these discussions is as yet unknown, but if any actions in excess of federal regulatory minimum requirements are discussed, we intend to seek to maintain sufficient financial flexibility in order to execute our business strategy. We also may determine, as part of our capital planning process, to make voluntary contributions to our pension plans in excess of federal regulatory minimum requirements in order to further address the underfunded status of our pension plans.

In any event, regardless of the outcome of our discussions with the Pension Benefit Guaranty Corporation, we expect these contributions to be material to our results of operations and financial condition. We cannot accurately predict the amount or timing of contributions that will be required in the future or the related impact on our financial results and financial condition. These amounts may be affected by general economic conditions, including anticipated interest rates, the actual investment return on plan assets, the retirement rate of our employees, the attrition rate of our employees and other factors.

In addition, we and General Motors have agreed with the UAW and the IUE that any of our hourly employees who are members of such unions and who retire on or before October 1, 1999 will be treated as General Motors employees for purposes of postretirement benefit obligations. We anticipate that we will assume other postretirement employee benefits obligations and pension obligations for such employees who retire after October 1, 1999. The allocation of pension and other postretirement benefit obligations between

21

us and General Motors assumes certain levels of employee retirements prior to October 1, 1999, based on historical experience and conditions surrounding our separation from General Motors. We have agreed with General Motors to recalculate the allocation of those liabilities based on the actual level of retirements on or before October 1, 1999. Accordingly, if and to the extent that greater than the assumed number of our employees retire on or before October 1, 1999, we would be required to make a payment to General Motors. Depending on the amount of such a payment, if any, it could have a material adverse effect on our short-term liquidity.

INFLATION

Inflation generally affects Delphi by increasing the cost of labor, equipment and raw materials. We believe that, because rates of inflation in countries where we have significant operations have been moderate during the periods presented, inflation has not had a significant impact on our results of operations.

YEAR 2000

Many computerized systems and microprocessors that are embedded in a variety of products either made or used by Delphi have the potential for operational problems if they lack the ability to handle the transition to the Year 2000. This issue has the potential to cause disruption to our business, our suppliers and the companies we supply. In our capacity as principal supplier to and majority-owned subsidiary of General Motors, we are part of General Motors' comprehensive worldwide Year 2000 program. As part of that program, Delphi is identifying and remediating potential Year 2000 problems in its business information systems and other systems embedded in its engineering and manufacturing operations. Delphi, in conjunction with General Motors' supplier assessment and remediation program, has also initiated communications and site assessments with its suppliers and other third parties in order to assess and reduce the risk that Delphi's operations could be adversely affected by the failure of these third parties to address adequately the Year 2000 issue.

One of our first priorities was the analysis of microprocessors used in our automotive components, integrated systems and modules supplied to vehicle manufacturers, which has now been completed. Most of the processors reviewed have no date-related functionality, and accordingly have no specific Year 2000 issues. Of the vehicle processors that perform date-related functions, none had any Year 2000 issues. However, one trip computer module supplied by us to another vehicle manufacturer does not recognize 2000 as a leap year but can be reset without affecting performance. This does not affect vehicle operation or occupant safety nor is it expected to result in material cost to Delphi.

Our Year 2000 program teams are responsible for remediating all of our information technology and embedded systems. Information technology principally consists of business information systems, such as mainframe and other shared computers and associated business application software, and infrastructure, such as personal computers, operating systems, networks and devices like switches and routers. Embedded systems include microprocessors used in factory automation and in systems such as elevators, security and facility management. Delphi's Year 2000 program includes assessment and remediation services provided by Electronic Data Systems Corporation ("EDS"), which is a principal supplier of information technology services to Delphi.

The Year 2000 program is being implemented in seven phases, some of which are being conducted concurrently:

- Inventory. This phase involves the identification and validation of an inventory of all systems that could be affected by the Year 2000 issue. The inventory phase commenced in earnest in 1997 and is substantially complete. As a result, we have identified approximately 1,600 business information systems and about 300,000 infrastructure items and embedded systems.

- Assessment. This phase involves the initial testing, code scanning and supplier contacts to determine whether remediation is needed and to develop a remediation plan, if applicable. The

S-21

22

assessment of business information systems is substantially complete and included a determination that about one quarter of such systems should be regarded as "critical" based on criteria such as the potential for business disruption. The assessment of infrastructure items and embedded systems was substantially complete by the end of 1998.

- Remediation. This phase involves the design and execution of a remediation plan, followed by testing for adherence to the design. Although we have substantially completed the remediation of our critical systems, we expect to continue to address remediation of these and other systems on a selectively prioritized basis in the future. Unimportant systems have been and will continue to be removed from our Year 2000 inventory and will not be remediated. We believe that we are substantially on track to meet our remediation targets. Based on our ongoing plan to implement new enterprise software incrementally, we will replace rather than remediate certain existing information systems. In this regard, a number of implementations are scheduled to be completed in Europe in the first half of 1999. In the United States, implementation of the enterprise software at one of our principal product groups is expected to be completed in July 1999.

- System Test. This phase involves the testing of remediated items to ensure that they function normally after being replaced in their original operating environment. It is closely related to the remediation phase and follows essentially the same schedule.

- Implementation. This phase involves the return of items to normal operation after satisfactory performance in system testing. It follows essentially the same schedule as remediation and system testing.

- Readiness Testing. This phase involves the planning for and testing of integrated systems in a Year 2000 ready environment, including ongoing auditing and follow-up. Readiness testing is currently underway. This phase commenced in the fourth quarter of 1998 and is expected to be a major focus of the Year 2000 program throughout 1999.

- Contingency Planning. This phase involves the development and execution of plans that narrow the focus on specific areas of significant concern and concentrate resources to address them. We currently believe that the most reasonably likely worst case scenario is that there will be some localized disruptions of systems that will affect individual business processes, facilities or suppliers for a short time rather than systemic or long-term problems affecting our business operations as a whole. Our contingency planning will continue to identify systems or other aspects of our business or that of our suppliers that we believe would be most likely to experience Year 2000 problems as well as those business operations in which a localized disruption could have the potential for causing a wider problem by interrupting the flow of products, materials or data to other operations. Because there is uncertainty as to which activities may be affected and the exact nature of the problems that may arise, our contingency planning will focus on minimizing the scope and duration of any disruptions by having sufficient personnel, inventory and other resources in place to permit a flexible, real-time response to specific problems as they may arise at individual locations around the world. Some of the actions that we may consider include the deployment of emergency response teams on a regional or local basis and the development of plans for the allocation, stockpiling or re-sourcing of components and materials that may be critical to our continued production. Specific contingency plans and resources for permitting the necessary flexibility of response are expected to be identified and put into place commencing in mid-1999.

The assessment and remediation phases described above include communicating with our suppliers as part of a broader supplier assessment program in which we are participating with General Motors. As part of that program, an industry trade association, the Automotive Industry Action Group, has distributed Year 2000 compliance questionnaires as well as numerous Year 2000 awareness and assistance mailings to many of the 40,000 supplier sites that supply Delphi throughout the world. We are not relying entirely on assurances contained in those questionnaire responses and we are participating in General Motors' own further assessment of our suppliers. That further assessment includes General Motors' own on-site review of suppliers considered to be critical to General Motors' operations, including Delphi's operations as part of

S-22

General Motors. These supplier assessment efforts have been substantially completed with respect to our critical supplier sites. Based on our participation with General Motors in this assessment activity to date, we believe that a substantial majority of our suppliers are making acceptable progress toward Year 2000 readiness. We are also participating in a program that General Motors has established to provide further assistance to suppliers that desire more input or that are believed to be at high risk of noncompliance as a result of the foregoing assessment efforts. This supplier assistance program currently includes providing compliance workshops and remediation consultants to work with suppliers on developing and implementing their own remediation programs. We also expect that our contingency planning efforts described above will address any critical suppliers that we still identify as being at high risk of encountering Year 2000 problems upon completion of the supplier assistance program. We have entered into arrangements with General Motors to provide for continued coordination of our respective supplier assessment and assistance efforts after our separation from General Motors.

In contrast to some Year 2000 programs, we are not relying entirely on the receipt of written assurances from our suppliers with respect to their Year 2000 compliance; rather, together with General Motors, we are also evaluating certain suppliers on a first-hand basis and are seeking to enhance their likelihood of full Year 2000 readiness by actively assisting them with training and consultation regarding Year 2000 remediation projects. We expect that information from our suppliers, written responses and our interactions with them will provide us with a basis for further contingency planning and risk management.

The cost of our Year 2000 program is being expensed as incurred with the exception of capitalizable replacement hardware and, beginning in 1999, capitalizable computer software costs developed for internal use. Total incremental spending by Delphi is not expected to be material to our operations, liquidity or capital resources. We incurred about $40 million and $7 million of Year 2000 expense during 1998 and 1997, respectively. Delphi currently expects its total Year 2000 spending to be about $106 million, which will be funded from operations, with peak spending occurring in late 1998 and early 1999, plus about $9 million of additional costs associated with information technology projects that were already underway or scheduled independently of our Year 2000 program but that have been accelerated due to the Year 2000 issue. This total spending also includes an additional payment of about $13 million, part of General Motors' overall additional payment to EDS of $75 million at the end of the first quarter of 2000 if systems remediated by EDS under its master information technology services agreement with General Motors are capable of continued operation before, on and after January 1, 2000 without causing a significant business disruption that results in a material financial loss to "General Motors" due to the millennium change. For this purpose, "General Motors" includes Delphi and all other General Motors units being supported by EDS as of December 31, 1998, taken in the aggregate, including any such General Motors unit which may subsequently be divested but that continues to be supported by the remediation services of EDS. The estimated value of the services EDS is required to provide to Delphi under its master information technology services agreement with General Motors that are included in normal fixed price services and other on-going payments to EDS that are attributable to work being performed in connection with Delphi's Year 2000 program is about $73 million, which is part of the estimated $260 million attributable to General Motors overall. This does not represent incremental spending to Delphi. None of our information technology projects has been delayed due to Year 2000.

In view of the foregoing, we do not currently anticipate that we will experience a significant disruption of our business as a result of the Year 2000 issue. However, there is still uncertainty about the broader scope of the Year 2000 issue as it may affect Delphi and third parties, including our customers, that are critical to Delphi's operations. For example, lack of readiness by electrical and water utilities, financial institutions, governmental agencies or other providers of general infrastructure could, in some geographic areas, pose significant impediments to Delphi's ability to carry on our normal operations in the area or areas so affected. In the event that Delphi is unable to complete the remedial actions as described above and is unable to implement adequate contingency plans in the event that problems are encountered, there could be a material adverse effect on Delphi's business, results of operations or financial condition.

Statements made herein about the implementation of various phases of Delphi's Year 2000 program, the costs expected to be associated with that program and the results that Delphi expects to achieve

S-23

constitute forward-looking information. As noted above, there are many uncertainties involved in the Year 2000 issue, including the extent to which Delphi will be able to successfully remediate systems and adequately provide for contingencies that may arise, as well as the broader scope of the Year 2000 issue as it may affect third parties that are not controlled by Delphi. Accordingly, the costs and results of Delphi's Year 2000 program and the extent of any impact on Delphi's operations could vary materially from those stated herein.

EUROPEAN MONETARY UNION

   Within Europe, the European Economic and Monetary Union introduced a new currency, the euro, on January 1, 1999. The new currency is in response to the European Economic and Monetary Union's policy of economic convergence to harmonize trade policy, eliminate business costs associated with currency exchange and to promote the free flow of capital, goods and services.

   On January 1, 1999, the participating countries adopted the euro as their local currency, initially available for currency trading on currency exchanges and non-cash transactions such as banking. The existing local currencies, or legacy currencies, will remain legal tender through January 1, 2002. Beginning on January 1, 2002, euro-denominated bills and coins will be issued for cash transactions. For a period of up to six months from this date, both legacy currencies and the euro will be legal tender. On or before July 1, 2002, the participating countries will withdraw all legacy currencies and use exclusively the euro.

   The introduction of the euro is a significant event with potential implications for our existing operations within countries participating in the European Economic and Monetary Union. As such, we have committed resources to conduct risk assessments and to take corrective actions, where required, to ensure that we are prepared for the introduction of the euro. We have undertaken a review of the euro implementation and concentrated on areas such as operations, finance, treasury, legal, information management, procurement and others, both in participating and non-participating European Union countries where we have operations. Also, existing legacy accounting and business systems and other business assets have been reviewed for euro compliance, including assessing any risks from third parties. Progress regarding euro implementation is reported periodically to management.

   We have not experienced any significant operational disruptions to date and do not currently expect the continued implementation of the euro to cause any significant operational disruptions. In addition, we have not incurred and do not expect to incur any significant costs from the continued implementation of the euro, including any currency risk, which could materially affect our liquidity or capital resources.

DEFERRED INCOME TAXES

   As of December 31, 1998, Delphi's consolidated balance sheet included a net deferred tax asset of about $2.9 billion. This net deferred tax asset relates to temporary differences between amounts of assets and liabilities for financial reporting purposes and the basis of such assets and liabilities as measured by tax laws. For more information, see Note 5 to our consolidated financial statements incorporated by reference in this prospectus supplement and the accompanying prospectus. About $1.6 billion of the net deferred tax asset balance is related to the obligation for postretirement benefits other than pensions. Realization of the net deferred tax asset is dependent upon profitable operations in the United States and future reversals of existing taxable temporary differences. Although realization is not assured, we believe that it is more likely than not that such benefits will be realized through the reduction of future taxable income. Management has carefully considered various factors in assessing the probability of realizing these deferred tax assets, including:

   - Delphi's operating results, excluding the impact of special items and
     work stoppages, over the most recent three year period and overall
     financial forecasts of book and taxable income for the 1999-2004 period.

25

- The ability to utilize tax planning, such as capitalization of research and experimentation costs for tax purposes, so that Delphi does not generate any significant U.S. federal tax net operating loss carryforwards.

- The extended period of time over which the tax assets can be utilized. Postretirement benefits become tax deductions over periods up to 50 years.

ENVIRONMENTAL MATTERS

Delphi is subject to various laws governing the protection of the environment, including laws regulating air emissions, water discharges and waste management. Delphi has made and will continue to make capital and other expenditures to comply with environmental requirements. However, such expenditures were not material during the years ended December 31, 1998, 1997 and 1996 and are not expected to be material in 1999 or 2000. Environmental requirements are complex, change frequently and have tended to become more stringent over time. Accordingly, we cannot assure you that these requirements will not change or become more stringent in the future in a manner that could have a material adverse effect on our business.

Delphi is also subject to environmental laws requiring investigation and cleanup of environmental contamination and is in various stages of investigation and cleanup at its manufacturing sites where contamination has been alleged. As of December 31, 1998, our reserve for such environmental investigation and cleanup totaled about $20 million.

The process of estimating environmental clean up liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remedy and technology will be required, the outcome of discussions with regulatory agencies and, at multi-party sites, other potentially responsible parties. In future periods, new laws or regulations, advances in cleanup technologies and additional information about the ultimate cleanup remedy that is used could significantly change our estimates. Accordingly, we cannot assure you that our environmental cleanup costs and liabilities will not exceed the amount of our current reserve.

RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In June 1998, the Financial Accounting Standards Board issued SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." SFAS No. 133 requires recognition of all derivative financial instruments as either assets or liabilities in consolidated balance sheets at fair value and determines the method(s) of gain/loss recognition. We are required to adopt SFAS No. 133 with our fiscal year ending December 31, 2000 and are currently assessing the effect that it may have on our consolidated financial statements.

SFAS No. 133 provides that, if certain conditions are met, a derivative may be specifically designated as:

- a hedge of the exposure to changes in the fair value of a recognized asset or liability or an unrecognized firm commitment (a "fair value hedge");

- a hedge of the exposure to variable cash flows of a forecasted transaction (a "cash flow hedge"); or

- a hedge of the foreign currency exposure of a net investment in a foreign operation, an unrecognized firm commitment, an available-for-sale security or a foreign-currency-denominated forecasted transaction (a "foreign currency hedge").

Under SFAS No. 133, the accounting for changes in the fair value of a derivative depends on its intended use and designation. For a fair value hedge, the gain or loss is recognized in earnings in the period of change together with the offsetting loss or gain on the hedged item. For a cash flow hedge, the effective portion of the derivative's gain or loss is initially reported as a component of other comprehensive income and subsequently reclassified into earnings when the forecasted transaction affects earnings. For a

S-25

foreign currency hedge, the gain or loss is reported in other comprehensive income as part of the cumulative translation adjustment. For all other items not designated as hedging instruments, the gain or loss is recognized in earnings in the period of change.

In March 1998, the Accounting Standards Executive Committee for the American Institute of Certified Public Accountants released Statement of Position ("SOP") 98-1, "Accounting for the Costs of Computer Software Developed for Internal Use." SOP 98-1 requires the capitalization of certain expenditures for software that is purchased or internally developed once certain criteria are met. Currently, we generally expense the costs of developing or obtaining internal use software as incurred. We adopted SOP 98-1 on January 1, 1999, as required. We expect that about $30 million to $40 million of spending that would have otherwise been expensed as incurred will be capitalized in 1999 in accordance with the provisions of SOP 98-1.

FORWARD-LOOKING STATEMENTS

Delphi is subject to various factors, many of which are outside of its control, that could cause actual results to differ from those expressed in forward-looking statements made by us throughout this prospectus supplement or the accompanying prospectus and elsewhere. All statements which address operating performance, events or developments that we expect or anticipate will occur in the future, including statements relating to volume growth, share of sales and earnings per share growth or statements expressing general optimism about future operating results, are forward-looking statements. The following are the principal important factors which, in addition to those factors identified in our filings with the Securities and Exchange Commission and incorporated into this prospectus supplement and the accompanying prospectus by reference, may cause actual results to differ from those expressed in such forward-looking statements:

- Changes in General Motors' previously announced intention to complete the Spin-off during the second quarter of 1999.

- The ability of our company to increase sales to customers other than General Motors and to achieve the labor benefits we expect from our separation from General Motors.

- Changes in the operations, financial condition or results of operations of our customers, including our largest customer, General Motors.

- Changes in the level of future business we expect from General Motors and other customers because, among other reasons, of a customer's decision to delay, cancel or redesign a vehicle model, a lower than expected volume of vehicles produced, or the contractual right of the vehicle manufacturer to cancel our agreement or replace us as a supplier for certain reasons.

- Changes in economic conditions or political instability in the major markets where our company procures material, components, and supplies for the production of our principal products or where our products are produced, distributed or sold (i.e., North America, Europe, Latin America and Asia-Pacific), including the effects of current economic problems in Asia, Brazil and other regions of Latin America, including Mexico.

- Shortages of materials or interruptions in transportation systems, labor strikes, work stoppages, or other interruptions to or difficulties in the employment of labor in the major markets where our company purchases material, components and supplies for the production of our products or where our products are produced, distributed or sold.

- Significant changes in the competitive environment in the major markets where our company purchases material, components and supplies for the production of our products or where our products are produced, distributed or sold.

- Changes in the laws, regulations, policies or other activities of governments, agencies and similar organizations where such actions may affect the production, licensing, distribution or sale of our company's products, the cost thereof or applicable tax rates.

27

- The ability of our company to generate cost savings and operational
  improvements in the future sufficient to offset contractually required
  price reductions, price reductions necessary to win additional business
  and increases in raw material costs.

- The ability of our company to maintain financial flexibility to make
  payments for pensions and other postretirement employee benefits and to
  implement capital expenditures, all at the levels and times planned by
  management.

- Changes in currency rates and certain commodity prices, which could have
  an adverse effect on the value of our international assets or on our
  reported revenues and operating profits. At present, fluctuations in the
  U.S. dollar, Mexican peso, French franc, Spanish peseta, German mark and
  South Korean won will have the greatest impact on our financial
  performance. As our business grows in China and other countries, we will
  become subject to greater risks related to the local currencies.

- Additional risk factors include our ability to provide high quality
  products at competitive prices, to sustain technological competitiveness,
  to develop new products that meet changing consumer preferences, to meet
  changing vehicle manufacturer supply requirements on a timely, cost
  effective basis, and the ability to respond to competitive pressures and
  react quickly to other major changes in the marketplace.

S-27

BUSINESS OF DELPHI

OVERVIEW

Delphi is the world's largest and most diversified supplier of components, integrated systems and modules to the automotive industry, with 1998 net sales of $28.5 billion. We have become a leader in the global automotive parts industry by capitalizing on the extensive experience we gained as the principal supplier of automotive parts to General Motors, the world's largest manufacturer of automotive vehicles. We are primarily a Tier 1 supplier, which means that we generally provide our products directly to VMs. We also sell our products to the worldwide aftermarket for replacement parts and to non-VM customers. We have established an expansive global presence, with a network of manufacturing sites, technical centers, sales offices and joint ventures located in every major region of the world.

Delphi was incorporated in Delaware on September 16, 1998. In 1991, General Motors organized its many separate automotive parts operations into a single group, which since that time has transformed from a North America-based, captive component supplier to General Motors into a global supplier of components, integrated systems and modules for a wide range of customers. In 1995, the group was given the name "Delphi Automotive Systems" in order to establish its separate identity in the automotive parts industry. In late 1997, in connection with the spin-off by General Motors of its defense electronics business, General Motors transferred Delco Electronics to us in order to more closely integrate Delco Electronics' expertise in electronics with our capabilities in automotive components and systems. Effective January 1, 1999, General Motors transferred or agreed to transfer the assets used in our business to our company and our subsidiaries, and we and our subsidiaries assumed, or agreed to assume, pay, perform, satisfy and discharge, the related liabilities.

In February 1999, we completed an initial public offering of 100 million shares of our common stock, which represents about 17.7% of our outstanding common stock. General Motors now owns the remaining 82.3% of our outstanding common stock. On April 12, 1999, the General Motors board of directors approved the complete separation of our company from General Motors principally by means of a tax-free spin-off to holders of General Motors $1- 2/3 common stock. To effect the Spin-off, the General Motors board declared a dividend on the $1- 2/3 common stock consisting of approximately 80.1% of our outstanding common stock payable on May 28, 1999 to holders of record as of May 25, 1999. General Motors intends to contribute the remaining approximately 2.2% of our outstanding common stock owned by it to a voluntary employees' beneficiary association trust for General Motors' hourly retirees if General Motors receives confirmation from the Internal Revenue Service that such contribution will not affect the tax-free status of the Spin-off. If General Motors does not receive such a confirmation from the Internal Revenue Service on a timely basis, the remaining shares of our common stock owned by General Motors will be distributed to the holders of the $1- 2/3 common stock as part of the Spin-off. General Motors has previously received a private letter ruling from the Internal Revenue Service to the effect that the Spin-off would be tax-free to General Motors and its stockholders for United States federal income tax purposes.

INDUSTRY

The automotive parts industry generally provides components, systems, subsystems and modules to VMs for the manufacture of new vehicles, as well as to the aftermarket for use as replacement parts for current production and older vehicles. Five key trends have been reshaping our industry over the past several years:

- INCREASED EMPHASIS ON SYSTEMS AND MODULES SOURCING. In order to simplify the vehicle design and assembly processes and reduce their costs, VMs increasingly look to their suppliers to provide fully engineered, pre-assembled combinations of components rather than individual components. By offering sophisticated systems and modules rather than individual components, suppliers have assumed many of the design, engineering, research and development and assembly functions traditionally performed by VMs. In addition, suppliers now often manufacture and ship component parts to the general location of a VM's assembly line and then provide local assembly of systems and modules.

29

- GLOBALIZATION OF SUPPLIERS. The globalization of VMs, which reflects the broader global market for vehicle sales and the desire of VMs to increase vehicle production in low-cost markets, has driven the globalization of suppliers as they follow their customers. In order to serve multiple markets in a more cost effective manner, many VMs are turning to global vehicle platforms such as "world cars," which typically are designed in one location but produced and sold in many different geographic markets around the world.

- INCREASING ELECTRONIC CONTENT. We believe that the electronic content of vehicles has been increasing and will continue to increase in the future. This increase in electronic content is largely driven by continued, and often increasingly stringent, regulatory standards for automotive emissions and safety as well as consumer demand for increased vehicle performance and functionality at lower cost. Replacing mechanical with electronic components and integration of mechanical and electrical functions within the vehicle allows VMs to achieve substantial reduction in the weight and complexity of automotive vehicles, resulting in easier assembly, enhanced fuel economy, improved emissions control and better vehicle performance.

- ONGOING INDUSTRY CONSOLIDATION. The worldwide automotive parts industry is consolidating as suppliers seek to achieve operating synergies through business combinations, shift production to locations with more flexible local work rules and practices, acquire complementary technologies, build stronger customer relationships and follow their customers as they expand globally. The need for suppliers to provide VMs with single-point sourcing of integrated systems and modules on a global basis has also helped fuel industry consolidation.

- SHORTER PRODUCT DEVELOPMENT CYCLES. Suppliers are under pressure from VMs to respond more quickly with new designs and product innovations in order to support rapidly changing consumer tastes and regulatory requirements. In addition, in developing countries, as broad economic improvements are made, demand has increased for smaller, less expensive vehicles that satisfy basic transportation needs.

STRATEGY

The key elements of our business strategy are:

- to supply our customers with high-quality, innovative components, systems and modules;

- to exceed existing customers' expectations while building new relationships;

- to leverage our global presence to meet our customers' needs;

- to improve our operating performance; and

- to complete strategic acquisitions, joint ventures and alliances.

SUPPLY HIGH-QUALITY, INNOVATIVE COMPONENTS, SYSTEMS AND MODULES. We believe that the current industry trend towards increased system and module sourcing by VMs creates a substantial competitive advantage for our company. We believe that our extensive operating history as a vertically integrated supplier to the world's largest VM provides us with the technical expertise, breadth of product offerings and manufacturing scale needed to compete successfully on a system and module basis while continuing to supply high-quality components. By building on our electronics integration expertise, our systems capabilities and the breadth of our product offerings, we are working to develop high-quality product offerings which will provide our customers with the ability to offer consumers enhanced vehicle control, superior occupant protection, collision avoidance systems, onboard communications systems, advanced energy and engine management systems, advanced electrical and electronic vehicle architecture and passenger entertainment and convenience features at competitive prices.

EXCEED EXISTING CUSTOMERS' EXPECTATIONS WHILE BUILDING NEW RELATIONSHIPS. Although we intend to pursue new business with General Motors and expect to continue to be a principal supplier to General Motors and its General Motors-North America operations for a significant period of time, our strategy

S-29

focuses on growing our business across a more diversified customer base, thereby making us less dependent on the volume of vehicles produced by General Motors-North America. We believe that our focus on customer satisfaction, as demonstrated by our technology leadership, product quality, cost control and customer responsiveness, positions us well as we strive to increase our sales to other customers. In order to better serve our customers, our sales and marketing personnel are organized into 25 dedicated customer service teams, 19 of which work with customers other than General Motors. Each team is led by one of our managers and functions as a single point of contact within the company to represent the interests of the customer throughout our organization. These teams are supported by our network of manufacturing facilities and engineering and technical resources worldwide.

LEVERAGE GLOBAL PRESENCE. We can provide significant manufacturing, engineering, technical and other support to our customers in every major market in which they operate. We believe that our geographic presence is one of the broadest in the industry. As of December 31, 1998, we had 168 wholly owned and leased manufacturing sites, 27 technical centers, 51 customer service centers and sales activity offices and 40 joint ventures or other strategic alliances in 36 countries on six continents. We are continuously evaluating and enhancing our engineering and technical resources, which currently include over 15,000 engineers, scientists and technicians, to provide an efficient, customer-focused global network of engineering and technology customer centers that we believe will better serve our customers around the world. For financial information regarding the principal geographic areas in which we operate, see Note 14 to the consolidated financial statements incorporated by reference in this prospectus supplement and the accompanying prospectus.

IMPROVE OPERATING PERFORMANCE. We have developed, and are implementing, initiatives to improve our operating performance. Operational improvements have enabled Delphi to achieve significant cost reductions and improve productivity in the face of an increasingly aggressive cost focus by most major VMs. Our continued ability to realize operating performance improvements is important to our ability to achieve our business objective. Our primary initiatives to improve operating performance are:

- Delphi Manufacturing System. The Delphi Manufacturing System involves reorganizing the workplace and improving the production process in order to maximize manufacturing flexibility, reduce total manufacturing costs and achieve lean production. Under the Delphi Manufacturing System, traditional manufacturing production lines are replaced by more flexible manufacturing cells which typically consist of clusters of individual manufacturing operations and efficient work stations, with the operators placed centrally within each cellular configuration to increase operational availability.

- Structural Cost Reductions. We continuously seek to achieve savings through reducing our structural costs, principally through infrastructure improvements, such as combining operations whenever possible to reduce our overhead, administrative and related costs, and eliminate redundancies. We also seek to reduce our structural costs by implementing a unified, common approach to operations globally, including a common organizational and management structure, application of the Delphi Manufacturing System at all of our manufacturing plants, common training programs and a common set of key metrics for measuring performance.

- Global Sourcing. We use global sourcing in order to obtain the best prices for our direct and indirect materials, machinery and equipment and services. Our purchasing process focuses on advance, long-term sourcing through long-term or lifetime contracts. In order to ensure a consistent high-quality supply of goods and services, we utilize common systems, policies and procedures across our company, including a common supplier quality improvement process. On average, since 1993 we have reduced our materials costs by about 3% to 4% per year based on a year-to-year actual price comparison, excluding Delco Electronics, which was not integrated into our operations until December 1997.

- Labor Relations. We emphasize the sharing of relevant information with our international and local union leadership worldwide and working with the unions to jointly develop local work rules and practices. While we have been a part of General Motors, the national labor agreements negotiated

31

by General Motors with the unions have applied to our workforce in the
United States and Canada. We believe that, as a fully independent company
with control over our own labor relations after the Spin-off, we would
have the right to negotiate regarding our own national and local labor
agreements directly with the unions representing our employees. We
believe that our complete separation from General Motors will enable us,
over time, to increase our competitiveness by establishing local work
rules and practices more consistent with those generally prevailing in
the automotive parts industry, but our largest union, the UAW, which
represents about 28% of our unionized employees, has stated that it is on
record as opposing General Motors' divestiture of our company and that
the UAW can and will aggressively work to protect the rights and
interests of its members who would be impacted by the divestiture. We
cannot assure you as to when or the extent to which we will be able to
achieve the benefits we contemplate.

   - Product Portfolio Management. We have implemented a portfolio management
     process designed to streamline and focus our product portfolio to
     facilitate our emphasis on comprehensive, integrated systems-based
     solutions for customers. Our current product portfolio includes about 190
     product lines and reflects the integration of 30 product lines from Delco
     Electronics as well as new product development activities.

   - Fix/Sell/Close Process. We have adopted a "fix/sell/close" process to
     improve our cost competitiveness. Under this process, we review our
     global operations and investments, including our joint ventures, to
     identify operations or investments not performing at desired levels.
     These operations or investments are placed into a category to be fixed,
     sold or closed. With input from our unions, management then develops a
     specific plan to deal with each operation in a timely manner. We will
     continue to monitor our operations and investments and we believe that
     this ongoing process will continue to improve our cost competitiveness in
     the future. However, our ability to eliminate product lines, close plants
     and divest businesses is subject to certain restrictions in our supply
     agreement with General Motors as described in our Annual Report on Form
     10-K for the fiscal year ended December 31, 1998, which is incorporated
     by reference in this prospectus supplement and the accompanying
     prospectus.

    COMPLETE STRATEGIC ACQUISITIONS, JOINT VENTURES AND ALLIANCES. We intend to
participate actively in the industry trend towards consolidation by pursuing
strategic acquisitions and alliances in order to complement or fill gaps in our
existing product portfolio, enhance our design and manufacturing capabilities,
improve our geographic presence in selected areas and increase our access to new
customers.

    While we currently believe that we will be able to successfully execute the
business strategies outlined above, we cannot assure you in this regard. Our
ability to execute each of the business strategies discussed above is subject to
numerous risks and uncertainties, including those described elsewhere in this
prospectus supplement and in our filings with the Securities and Exchange
Commission.

MANAGEMENT

    We believe that our experienced and highly skilled management team provides
us with a significant competitive advantage. Our 21 most senior managers have an
average of about 25 years of experience in the automotive industry, including in
many cases extensive experience with General Motors in the areas of vehicle
design, engineering and manufacturing. We have also been successful in hiring a
significant number of managers from several of our other VM and non-VM customers
as well as from our competitors, which has enhanced our understanding of and
ability to serve our customers' needs.

    We have developed an organizational structure for the management of our
company which utilizes a lean, multi-functional matrix approach. Our chief
operating decision-making group is the Delphi Strategy Board, which is comprised
of the Chief Executive Officer and 20 senior executives representing all three
of our product sectors as well as our world and regional headquarters staff.
Each product sector is managed by a strategy board or equivalent managing
committee comprised of individuals that have responsibility for managing the
profitability and cash flow of the sector's various product lines and
businesses. Our three product sectors are managed separately because of
differences in the nature of the respective product groupings.

RESEARCH AND DEVELOPMENT

We have substantial technical and vehicle integration expertise as a result of our extensive operating history as the in-house supplier to the world's largest VM. We were the first supplier to produce a number of new products, including the first electric self-starter, in-dash radio, turn signal, catalytic converter, airbag, tilt steering column, independent front-wheel suspension, energy-absorbing steering column, electric power sliding door and integrated child safety seat. More recently, we were the first supplier to produce brake-by-wire systems and computer-controlled engine management systems. As a result, we have developed a comprehensive knowledge of the design, engineering, manufacture and operation of all aspects of the automotive vehicle.

We believe that our engineering and technical expertise, together with our emphasis on continuing research and development, allows us to use the latest technologies, materials and processes to solve problems for our customers and to bring new, innovative products to market. We maintain technical engineering centers in every major region of the world to develop and provide advanced products, processes and manufacturing support for all of our manufacturing sites and to provide our customers with local engineering capabilities and design development on a global basis. As of December 31, 1998, we employed more than 15,000 engineers, scientists and technicians around the world. We continuously evaluate and enhance our engineering and technical resources and are currently considering plans to reorganize our worldwide engineering and technical resources into a more efficient, customer-focused global network.

We believe that continued research and development activities are critical to maintaining our leadership position in the industry. Our total expenditures for research, development and engineering activities were $1.4 billion, $1.5 billion and $1.6 billion in 1998, 1997 and 1996, respectively. As a result, we have introduced over 50 new products and processes during each of the last several years.

INTELLECTUAL PROPERTY

We have generated a large number of patents and trademarks in the operation of our business. Under our separation arrangements with General Motors, generally speaking, we own the patents, patent applications and records of invention that are primarily related to components produced or sold by us and any other patents that would be more valuable to us than to General Motors. Accordingly, General Motors has transferred to us full or partial ownership of about 2,800 patents, 640 U.S. patent applications and 620 records of invention as well as the corresponding foreign patents and patent applications. In addition, we and General Motors have agreed to license certain of our existing patents to each other. While we believe that these patents, inventions and licenses are, in the aggregate, important to the conduct of our business, none is individually considered material to our business.

Although we do not rely on material "patent-protected" technology, our ability to continue to generate technological innovations is important to ensure our long-term success as well as the competitiveness of our business. Our focus on innovation is evidenced by the 586 patents relating to our business which have been recorded in recent years. We intend to continue to actively pursue technological innovation.

General Motors has transferred to us ownership of about 1,170 trademark registrations and applications, including about 70 in the United States, as well as unregistered trademarks. Our trademarks include the following: E-STEER, FOREWARN, Freedom, Gold Dot, INTELLEK, Monsoon, QUADRASTEER and TRAXXAR.

PRODUCTS AND COMPETITION

We believe that we have the largest and most diversified portfolio of products in the industry. Our product offerings are organized in three product sectors: Electronics & Mobile Communication; Safety, Thermal & Electrical Architecture; and Dynamics & Propulsion.

Our overall product portfolio is extremely broad by industry standards. Very few other Tier 1 suppliers compete across the full range of our product areas. However, we do face significant competition across all three of our principal product sectors from each of the following major Tier 1 suppliers: Robert Bosch

GmbH, Denso Inc. and Visteon Automotive Systems, a unit of Ford Motor Company. Our product sector offerings and principal competitors are summarized below. For more information on our product sectors, see Note 14 to the consolidated financial statements incorporated by reference in this prospectus supplement and the accompanying prospectus.

ELECTRONICS & MOBILE COMMUNICATION. Our Electronics & Mobile Communication product sector accounted for $4.6 billion, or 16.1%, of our 1998 net sales, excluding certain inter-sector sales which we eliminate for purposes of determining our total consolidated net sales. This sector is one of the leading global providers of automotive electronics products and offers a wide variety of audio and communication systems for vehicles including the Monsoon(R) Audio System, the FOREWARN(R) collision warning system and TEXALARM(TM) security systems. The automotive electronics capabilities of this sector are utilized in connection with many of the product offerings of our two other product sectors to produce systems, subsystems and modules designed to enhance vehicle safety, comfort, security and efficiency. Our principal competitors in the Electronics & Mobile Communication product sector include the following: Denso Inc., Siemens AG, Robert Bosch GmbH, Mannesman VDO AG and Motorola, Inc.

SAFETY, THERMAL & ELECTRICAL ARCHITECTURE. Our Safety, Thermal & Electrical Architecture product sector accounted for $11.1 billion, or 39.0%, of our 1998 net sales, excluding inter-sector sales. This sector offers a wide range of products relating to the vehicle interior as well as the expertise to integrate them into individual vehicle designs to simplify manufacturer assembly and enhance vehicle marketability. The sector also offers safety/airbag systems and thermal products, including powertrain cooling systems and climate control systems that meet global mandates for alternative refrigerant capabilities. The sector is also a global leader in the production of wiring harnesses and connectors for electrical power and signal distribution. Our principal competitors in the Safety, Thermal & Electrical Architecture product sector include the following: Yazaki Corp., Valeo SA, Autoliv Inc., Denso Inc. and TRW Inc.

DYNAMICS & PROPULSION. Our Dynamics & Propulsion product sector accounted for $12.8 billion, or 44.9%, of our 1998 net sales, excluding inter-sector sales. This sector offers a wide range of energy and engine management systems designed to optimize engine performance and emissions control through management of vehicle air intake, fuel delivery, combustion and exhaust after-treatment. The sector also offers all major chassis control systems-steering, braking, suspension and engine, including the TRAXXAR(R) vehicle stability system with a focus on providing superior ride and handling performance, high reliability, reduced mass and improved fuel efficiency. The sector's steering products feature vehicle control and driveline technologies and advanced electronic controls to improve performance. Our principal competitors in the Dynamics & Propulsion product sector include the following: Robert Bosch GmbH, LucasVarity PLC, NSK Ltd., Siemens AG and TRW Inc.

CUSTOMERS

GENERAL. We currently sell our products to all of the major VMs. While we expect our business with customers other than General Motors to increase over time, we also expect that General Motors will remain our largest customer by far for a significant period of time due to the long-term nature of sales contracts in our industry, our strong customer-supplier relationship with General Motors and the supply agreement we entered into with General Motors in January 1999 in connection with our separation from General Motors. We supply to each regional sector of General Motors' Automotive Operations, including its automotive operations in the United States, Canada and Mexico ("General Motors-North America"), and to General Motors' automotive operations throughout the rest of the world ("General Motors-International"). In addition, we sell our products to the worldwide aftermarket for replacement parts. Currently, most of our aftermarket sales are to General Motors' Service Parts Operations ("General Motors-SPO") for distribution principally to the North American aftermarket.

34

The following table shows how our total sales were derived for each of the last three years. The percentages for 1998 were affected by work stoppages at certain General Motors and Delphi locations in the United States in June and July 1998.

| | TOTAL SALES | | |
| | YEAR ENDED DECEMBER 31, | | |
| CUSTOMER | 1998 | 1997 | 1996 |
|---|---|---|---|
| General Motors-North America............................ | 62.2% | 65.4% | 66.6% |
| General Motors-International........................... | 11.0 | 11.2 | 11.7 |
| General Motors-SPO.................................... | 5.4 | 5.1 | 5.2 |
| Total General Motors................................. | 78.6 | 81.7 | 83.5 |
| Other Customers...................................... | 21.4 | 18.3 | 16.5 |
| | 100.0% | 100.0% | 100.0% |

For purposes of the foregoing table, "total sales" include all of the sales from joint ventures and other investments in which we own a minority interest even though these sales are not reflected in our sales as reported in our consolidated financial statements incorporated by reference in this prospectus supplement and the accompanying prospectus. This is how we have historically tracked our sales by customer for internal purposes. We include our minority joint venture sales for this purpose because, among other things, they principally relate to our joint ventures outside the United States where we frequently have significant influence over product design and technology and customer relationships but do not own more than 50%. If we owned more than 50% of these joint ventures, in most cases, we would include these sales in our consolidated sales. In addition, many of these joint ventures use our technologies. If we did not include these sales, the percentages set forth above for General Motors would be higher.

AWARDED BUSINESS. We have a substantial base of awarded business from VMs, including business with General Motors-North America under arrangements that are governed by our supply agreement with General Motors. We track as "awarded business" the future sales that we have a strong expectation of realizing based on various types of VM awards to us and various assumptions we make regarding, among other things, the timing and volume of vehicle production, option mix and product pricing. On that basis, we believe that we currently have a solid foundation of awarded business upon which to grow our company. We cannot assure you, however, that we will in fact realize any specific amount of awarded business because it remains in all cases subject to a number of important risks and uncertainties, including the volume and option mix of vehicles actually produced, the timing of such production, the determination by our VM customers to delay, cancel or redesign vehicle programs and price reductions negotiated in connection with a VM customer's sourcing of new business with us. In addition, our VM customers generally have a contractual right to replace us with another supplier throughout the duration of a contract for a variety of reasons, although the impact of this contractual right is mitigated to some extent by the substantial re-engineering costs that a VM typically would need to incur in order to introduce a new supplier to an established vehicle platform. Subject to the foregoing risks and uncertainties, we currently estimate revenues from our existing awarded business to be about $28 billion for 1999 and about $22 billion for 2003. The amount of our awarded business declines over time as the vehicle programs in which we are currently participating mature and eventually terminate. However, particularly in the later years, we expect that we will be awarded additional business from General Motors and other customers.

SALES TO GENERAL MOTORS. In 1992, General Motors launched a major reorganization of its automotive business to streamline its business practices and downsize its North American automotive operations. At that time, General Motors announced its intention to begin filling its procurement needs on a global basis. Pursuant to this initiative, General Motors has provided suppliers worldwide with the opportunity to bid for the business of General Motors-North America, historically sourced with us. As a result, our share of General Motors-North America automotive parts requirements has declined since 1992.

35

We believe that we are and will continue to be able to compete effectively for General Motors-North America business because of the high quality of our products, our ongoing cost reduction efforts and our product and technological innovations. As a principal supplier to General Motors, we periodically have discussions with General Motors relating to its future vehicle programs and our long-term technology and product development. Although we have no commitments to General Motors in this regard, we expect to continue these discussions for some period of time after our complete separation from General Motors based on our strong customer-supplier relationship. However, we do expect the portion of General Motors-North America's automotive parts requirements which we supply and the prices we charge to General Motors-North America to continue to decline over the next several years. As a result, we also expect that our total sales to General Motors will decline over the next several years. Through our strategy of aggressively pursuing increased business with customers other than General Motors-North America, including additional sales to General Motors-International, however, we will strive to mitigate these effects and increase our total sales.

We have historically supplied a lower percentage of General Motors-International's automotive parts requirements than the percentage of parts we have supplied to General Motors-North America. Until the last several years, we were operated by General Motors as a captive, North American-based supplier to General Motors' North American operations. As a result, we did not focus heavily on our global business opportunities, including those with General Motors-International. We also did not have the global presence to compete effectively for General Motors-International business. As noted above, we have substantially expanded our global presence over the last several years and intend to continue to compete for additional General Motors-International business.

SUPPLY AGREEMENT. The supply agreement we have entered into with General Motors in connection with our separation from General Motors provides that all existing contracts between General Motors and our company as of January 1, 1999 generally remain in effect, including the pricing, duration and purchase order terms and conditions. However, the timing of payments from General Motors to us under the existing contracts changed as of January 1, 1999 to generally require payment by General Motors on the second day of the second month following shipment, rather than in the month following General Motors' receipt of the related invoice. These modified payment terms are consistent with the new payment terms that General Motors is currently in the process of introducing to its other suppliers.

The supply agreement provides us with certain rights to provide on competitive terms the first replacement cycle of all product programs in the United States and Canada which we were providing to General Motors as of January 1, 1999, provided that General Motors sources such replacement programs prior to January 1, 2002 and we are competitive in terms of design, quality, price, service and technology as these factors relate to all aspects of bid packages that may be submitted by other suppliers. Other suppliers' bids to provide particular products may include offers of price reductions to General Motors on other current or future products, and General Motors may under the supply agreement consider the overall economic effect of such package proposals in assessing our competitiveness. Given the general duration of most vehicle programs of about five to eight years, depending on the vehicle model, we expect that this ability to secure next generation business from General Motors-North America, together with our existing contracts and other commitments, will provide us with the opportunity to maintain substantial business with General Motors-North America well into the next decade. We will also have the opportunity to bid on the same basis as other suppliers for other new General Motors-North America business as well as for General Motors-International business. Our ability to realize revenues on all General Motors business, including business awarded pursuant to existing contracts, is in all cases subject to a variety of factors, including the volume and option mix of vehicles actually produced by General Motors, the timing of such production and our continuing competitiveness.

The supply agreement specifies that General Motors has the right to move its existing business with us to other suppliers in the event that we are not competitive in terms of quality, service, design or technology. In addition, General Motors has the right at all times to adopt new technology, whether or not such technology is available through us. If we are unable to provide the new technology or an equivalent technology acceptable to General Motors on a competitive basis, General Motors is free to move the

S-35

business from us to another supplier. For more information regarding the terms of the supply agreement, you should refer to our Annual Report on Form 10-K for the fiscal year ended December 31, 1998, which is incorporated by reference in this prospectus supplement and the accompanying prospectus.

OTHER VMS. Although General Motors is by far our largest customer, we do business with all of the other major VMs worldwide. Our top five VM customers other than General Motors are DaimlerChrysler, Toyota, Fiat, Volkswagen, and Renault. Our combined sales to these customers accounted for about 8% of our total 1998 net sales, and our top ten VM customers other than General Motors accounted for about 11% of our total 1998 net sales. In determining these percentages, we have not included sales of entities in which we have a minority interest.

AFTERMARKET. We sell products to the worldwide aftermarket as replacement parts for current production and older vehicles. In 1998, our aftermarket revenues of $2.1 billion represented 7.2% of our total net sales. We currently sell most of these products into the North American aftermarket under arrangements with General Motors-SPO, the principal aftermarket sales organization of General Motors. General Motors-SPO distributes replacement parts to the aftermarket primarily through General Motors automobile dealerships and independent distributors, including warehouse distributors and direct retailers. Outside North America, we principally sell into the aftermarket through independent distributors.

Under the terms of our separation from General Motors, we and General Motors have agreed that, subject to certain exceptions, General Motors-SPO will be the exclusive distributor of our products into the U.S. aftermarket and we will be the exclusive supplier of these products to General Motors-SPO through at least December 31, 2000. General Motors-SPO currently markets our products under a number of brand names, including ACDelco(R), Freedom(R) and Voyager(R). In connection with our separation from General Motors, we have agreed with General Motors-SPO to split the ownership of these aftermarket brands. General Motors-SPO owns the ACDelco brand and any AC and Delco derivatives and formatives. However, we have been granted a perpetual, worldwide, royalty-free license to use the trade name "Delco Electronics" and the trademarks "DELCO" and "DELCO ELECTRONICS" in connection with certain of our products as well as a worldwide license to use the trademarks "AC," "DELCO" and "AC Delco" until January 1, 2000. We own the Freedom brand, although we may not use the brand in the United States until the expiration of our arrangement with General Motors-SPO. General Motors-SPO will own the Voyager battery brand, but may only use it on batteries it purchases from us. For more information about these arrangements, you should refer to our Annual Report on Form 10-K for the fiscal year ended 1998, which is incorporated by reference in this prospectus supplement and the accompanying prospectus.

We have historically derived our principal aftermarket revenues through our relationship with General Motors-SPO. We believe that there exist opportunities to increase our revenues from sales in the aftermarket and augment the "Delphi" brand presence in the aftermarket over time by establishing new supply relationships with various participants along the aftermarket distribution channel. We believe that our ability to sell products developed for the VM market to aftermarket customers can reduce the impact of adverse changes in demand for new vehicles. With respect to the aftermarket in the United States, we intend to continue to sell products through General Motors-SPO until the expiration of the transitional arrangements described above. Outside the United States, we are initially focusing on the aftermarket business in Europe and South America.

We believe that incremental aftermarket sales opportunities will be available to us following our complete separation from General Motors. However, growth in the highly competitive aftermarket business will take time to achieve in light of the significant investment in an aftermarket distribution infrastructure that is required.

NON-VM CUSTOMERS. We are also diversifying by supplying certain of our products, including connection systems, flex-circuits wiring, instrumentation and map sensors, to new customer areas, such as the aerospace, motorcycle and computer industries. Our non-VM customers include Boeing Company, Harley-Davidson Inc. and Silicon Graphics Inc. We are also building relationships with Tandem Computers Inc., Storage Technologies and Lucent Technologies Inc. These non-VM sales accounted for

only a nominal amount of our total 1998 net sales. We believe that opportunities exist to increase our sales in this area and we intend to continue to work to expand our sales to non-VM customers.

VARIABILITY IN DELPHI'S BUSINESS

There are a number of factors that contribute to variability in our business. The variability can produce significant fluctuations in sales and earnings from quarter to quarter, and in some cases from year to year. The primary factors that affect variability are summarized below.

AUTOMOTIVE INDUSTRY. Almost all of our business is directly related to automotive sales and production by our customers, which are highly cyclical and depend on general economic conditions and other factors, including consumer spending and preferences. Any significant reduction in automotive production and sales by our customers would have a material adverse effect on our business.

REGIONAL. We have substantial operations in every major region of the world and economic conditions in these regions often differ. The recent economic downturn in Asia and in Brazil and other regions of Latin America, including Mexico, has led to reductions in demand for automobiles and component parts in those areas and has had an adverse effect on our financial results in 1998. To the extent that these conditions continue to worsen, or spread to other regions, particularly in the United States, our business will continue to be adversely affected.

SEASONAL. Our business is moderately seasonal as our primary North American customers historically halt operations for about two weeks in July and about one week in December. In addition, third quarter automotive production is traditionally lower as new models enter production. Accordingly, third and fourth quarter results may reflect these trends.

ARRANGEMENTS BETWEEN GENERAL MOTORS AND DELPHI

The separation of Delphi from General Motors and the transactions being undertaken in connection therewith are being effected pursuant to the Separation Agreement, under which General Motors and its subsidiaries transferred to us the assets of its automotive components business, and we assumed the liabilities of that business. Among other things, (1) the Separation Agreement provides for the allocation of liability between us and General Motors for product liability claims, general litigation claims and employment-related claims, all relating to the General Motors automotive components business and (2) requires General Motors to maintain, for a specified period, insurance policies for our benefit that are comparable to General Motors' own insurance policies.

In addition, we have entered into certain ancillary agreements contemplated by the Separation Agreement that govern various interim and ongoing relationships between us and General Motors. Among these ancillary agreements, (1) the IPO and Distribution Agreement requires us to cooperate with General Motors in all respects to complete the Spin-off, (2) the Registration Rights Agreement provides for registration rights for General Motors if our separation from General Motors is not completed or is completed without General Motors divesting itself of all of the Delphi common stock held by it, (3) the Component Supply Agreement governs our sale of products to General Motors, (4) the U.S. Employee Matters Agreement governs the allocation of responsibility for certain employee-related matters between General Motors and us, (5) certain income tax allocation agreements govern the allocation of U.S. income tax liabilities between General Motors and us, (6) various intellectual property agreements govern the division, transfer and use of certain intellectual property to or by us, (7) the Real Estate Matters Agreement governs the assignment or sub-lease of General Motors' real estate portfolio related to its automotive components parts business, (8) the Environmental Matters Agreement governs the allocation of environmental liabilities between General Motors and us, (9) the Business Relationship Agreement governs the sale and distribution of aftermarket products in the United States and (10) various transition services agreements govern the provision by General Motors to us, for specified periods of time until we develop an independent means of obtaining or the ability to provide ourself, services such as purchasing systems services, audit services, administrative support services, treasury, accounting and payroll services, tax and customs services and information systems services.

All of the foregoing agreements were made in the context of a parent-subsidiary relationship and were negotiated in the overall context of our separation from General Motors. The terms of these agreements may be more or less favorable to us than if they had been negotiated with unaffiliated third parties. Certain of these agreements, including the Separation Agreement, the IPO and Distribution Agreement, the Registration Rights Agreement, the Component Supply Agreement, the Business Relationship Agreement, the U.S. Employee Matters Agreement and the tax allocation agreements have been filed as exhibits to our Annual Report on Form 10-K for the fiscal year ended December 31, 1998, which is incorporated by reference in this prospectus supplement and the accompanying prospectus.

Certain international, intellectual property and real property assets relating primarily to the business of Delphi are still held by General Motors or its affiliates, pending receipt of consents or approvals or satisfaction of other applicable requirements necessary for the transfer of such assets to Delphi. We do not believe that these assets and operations are, individually or in the aggregate, material to our company. However, the information included or incorporated by reference in this prospectus supplement and the accompanying prospectus, including our consolidated financial statements, assumes and gives effect to the completion of all such transactions. In addition, certain information technology assets relating primarily to our business are still held by General Motors or its affiliates, pending receipt of consents necessary for the transfer of such assets to Delphi, or may be retained by General Motors if consents to their transfer cannot be obtained. Also, certain assets and liabilities relating to employees working under collective bargaining agreements were transferred to Delphi in connection with our separation from General Motors.

We have also entered into a series of agreements with General Motors similar to the ancillary agreements discussed above with respect to those Delphi assets located outside the United States. In most countries, General Motors' vehicle and component businesses were operated by separate legal entities. In such countries, the entities that operate the components business were transferred to Delphi. Where certain facilities or functions were shared by such separate legal entities, the shared functions or facilities were generally separated in accordance with the principles set forth in the corresponding ancillary agreement in the United States. In those countries in which the vehicle and components businesses are owned by one legal entity, new entities have been or will be formed in order to separate the Delphi business from the General Motors business. Agreements have been or will be entered into in each of the countries where operations are to be transferred to Delphi. Although the agreements for most countries have or will have different terms than the ancillary agreements in the United States, in general they are or will be similar in scope to the ancillary agreements.

39

EXECUTIVE OFFICERS AND DIRECTORS

EXECUTIVE OFFICERS, KEY EMPLOYEES AND DIRECTORS OF DELPHI

Set forth below is certain information concerning the executive officers and key employees of our company, and the individuals who are serving on our Board of Directors. Our Board of Directors currently has 11 members. Messrs. Losh, Pearce, and Smith are currently executive officers and/or directors of General Motors, and Mr. Wyman was a director of General Motors until October 1998. The three directors who are currently executive officers and/or directors of General Motors have advised us that they will resign from our Board of Directors in connection with the Spin-off.

EXECUTIVE OFFICERS AND KEY EMPLOYEES

| NAME | POSITION |
| --- | --- |
| J.T. Battenberg III | Chairman of the Board, Chief Executive Officer and President |
| Alan S. Dawes | Chief Financial Officer and Vice President |
| Volker J. Barth | Vice President |
| William A. Ebbert | Vice President |
| Guy C. Hachey | Vice President |
| David R. Heilman | Vice President |
| Rodney O'Neal | Vice President |
| Ronald M. Pirtle | Vice President |
| Donald L. Runkle | Vice President |
| Paul J. Tosch | Vice President |
| Hans J. Weiser | Vice President |
| David B. Wohleen | Vice President |
| John P. Arle | Vice President, Mergers, Acquisitions and Planning |
| James A. Bertrand | Vice President, Operations |
| John G. Blahnik | Vice President and Treasurer |
| Ray C. Campbell | Vice President, Purchasing |
| Karen L. Healy | Vice President, Corporate Affairs |
| Peter H. Janak | Vice President and Chief Information Officer |
| Mark C. Lorenz | Vice President, Production Control and Logistics |
| Logan G. Robinson | Vice President and General Counsel |
| Mark R. Weber | Vice President, Human Resources Management |

DIRECTORS

| NAME | PRINCIPAL OCCUPATION |
| --- | --- |
| J.T. Battenberg III | Chairman of the Board, Chief Executive Officer and President |
| Thomas H. Wyman | Former Chairman, President and Chief Executive Officer of CBS, Inc. |
| John F. Smith, Jr. | Chairman and Chief Executive Officer of General Motors Corporation |
| Harry J. Pearce | Vice Chairman of General Motors Corporation |
| J. Michael Losh | Chief Financial Officer of General Motors Corporation |
| Oscar De Paula Bernardes Neto | Chairman of the Boards of Santista Alimentos S/A and Seara Alimentos S/A |
| Virgis W. Colbert | Executive Vice President of Miller Brewing Company |
| Shoichiro Irimajiri | President and Representative Director of Sega Enterprises, Ltd. |
| Susan A. McLaughlin | President, Consumer Services for BellSouth Telecommunications, Inc. |
| John D. Opie | Vice Chairman and Executive Officer, General Electric Company |
| Roger S. Penske | Chairman and Chief Executive Officer of Penske Corporation |

S-39

MR. BATTENBERG has led Delphi and its precursor, the Automotive Components Group Worldwide ("ACG Worldwide"), since 1992. In July 1995, he was named President of Delphi. He was named Chief Executive Officer of Delphi in August 1998 and Chairman of the Board of Delphi in November 1998. Mr. Battenberg also serves as the Chairman of the Delphi Strategy Board. Mr. Battenberg held various positions with General Motors beginning in 1961, including Superintendent of Industrial Engineering, Comptroller, Production Manager and Plant Manager. In 1986, he was appointed Product Manager for the former Buick-Oldsmobile-Cadillac Group's Flint Automotive Division. He later served as Vice President of the division, and then Vice President and Group Executive for the Buick-Oldsmobile-Cadillac Group. Mr. Battenberg was named Vice President and Group Executive of ACG Worldwide in 1992. Two years later, he was elected a Senior Vice President and President of ACG Worldwide. In July 1995, he was elected Executive Vice President of General Motors and President of Delphi Automotive Systems, formerly ACG Worldwide. Mr. Battenberg is on the Board of Trustees of Kettering University, formerly known as General Motors Institute ("GMI"), and the National Advisory Board for Chase Manhattan Corp. He is also a member of the Council on Competitiveness.

MR. DAWES was named Chief Financial Officer of Delphi in August 1998 and a Delphi Automotive Systems Vice President in November 1998. Previously, Mr. Dawes served as General Manager of Delphi Chassis Systems, formerly Delco Chassis Systems, a position to which he was named in 1994. From 1992 to 1994, he was Executive-in-Charge of Operations for ACG Worldwide. Mr. Dawes joined General Motors in 1981, originally as a financial analyst with its Treasurer's Office, and held a number of positions including Assistant Treasurer in 1988 and Assistant Comptroller in 1991.

MR. BARTH was named a Delphi Automotive Systems Vice President in November 1998 and President of Delphi South America in November 1996. He had been Executive Director of Worldwide Purchasing for Delphi since 1994. From 1993 to 1994, he was Executive Director of Worldwide Purchasing-Metallic. From 1992 to 1993, he was Director of Materials Management for General Motors do Brasil in Sao Paulo, and from 1991 to 1992, he was Director of Purchasing for the same. Prior thereto, he held several purchasing assignments for General Motors' Adam Opel subsidiary since joining General Motors in 1963.

MR. EBBERT was named a Delphi Automotive Systems Vice President in November 1998 and President of Delphi Asia Pacific in July 1993. He had been Chairman and Managing Director of Vauxhall Motors Limited, UK, since 1988. Previously, Mr. Ebbert had been Group Director of Business Operations for Delphi Automotive Systems. Prior thereto, he held a number of senior assignments with Delphi Saginaw Steering Systems' central office. He joined General Motors in 1965.

MR. HACHEY was named a Delphi Automotive Systems Vice President and President of Delphi Chassis Systems in November 1998. He had been General Manager of Delphi Chassis Systems since August 1998. Previously, Mr. Hachey had been Manufacturing Manager, Worldwide Operations, for the former Delphi Interior & Lighting Systems since 1995. From 1994 to 1995, he was Director of Manufacturing Operations for Delphi Automotive Systems and, from 1992 to 1994, he was Director of Manufacturing Operations for the heating, ventilation and air conditioning/heat exchangers business unit of what is now Delphi Harrison Thermal Systems. Prior thereto, Mr. Hachey held several manufacturing positions with General Motors since 1978.

MR. HEILMAN was named a Delphi Automotive Systems Vice President and President of Delphi Packard Electric Systems in November 1998. He had been General Manager of Delphi Packard Electric Systems since October 1994. From 1993 to 1994, Mr. Heilman served as Director of Delphi Packard Electric Systems' North American Business Unit and from 1991 to 1993, he was Director of Packard International. Prior thereto, Mr. Heilman served in numerous engineering, manufacturing and product-related positions since joining Delphi Packard Electric Systems in 1964.

MR. O'NEAL was named a Delphi Automotive Systems Vice President and President of Delphi Interior Systems in November 1998. He had been General Manager of the former Delphi Interior & Lighting Systems since May 1997. Previously, Mr. O'Neal had been General Director of Warehousing and Distribution for General Motors-SPO since 1994. From late 1992 to 1994, Mr. O'Neal served as Director of Manufacturing for ACG Worldwide. From 1991 to late 1992, Mr. O'Neal was first Director of

41

Industrial Engineering for Chevrolet-Pontiac-General Motors of Canada ("C-P-C") and later was named Director of Manufacturing Engineering with General Motors. Prior thereto, Mr. O'Neal held numerous engineering and manufacturing positions with General Motors since 1971. Mr. O'Neal is a board member of Woodward Governor Company.

MR. PIRTLE was named a Delphi Automotive Systems Vice President and President of Delphi Harrison Thermal Systems in November 1998. He had been General Manager of Delphi Harrison Thermal Systems since November 1996. Previously, Mr. Pirtle had been Director of North American Operations at Delphi Packard Electric Systems since 1994. From 1992 to 1994, Mr. Pirtle was Finance Director for AC Delco Systems and, from 1990 to 1992, he was Executive-in-Charge of General Motors' Corporate Strategic Planning Group. Prior thereto, Mr. Pirtle held various engineering and financial and planning positions with General Motors since 1972. Mr. Pirtle is a Board member of the Alumni Association of Kettering University, formerly GMI, and a Board member of the University of Pittsburgh School of Engineering.

MR. RUNKLE was named a Delphi Automotive Systems Vice President and President of Delphi Energy and Engine Management Systems in November 1998. He had been General Manager of Delphi Energy & Engine Management Systems since May 1996. Previously, Mr. Runkle had been General Manager of Delphi Saginaw Steering Systems since August 1993. From 1992 to 1993, Mr. Runkle was in charge of General Motors' North American Advanced Engineering Center and, from 1988 to 1992, he was in charge of General Motors' former Advanced Engineering Staff. Prior thereto, Mr. Runkle served in a series of engineering positions with General Motors since 1968.

MR. TOSCH was named a Delphi Automotive Systems Vice President and President of Delphi Saginaw Steering Systems in November 1998. He had been General Manager of Delphi Saginaw Steering Systems since May 1997. Previously, Mr. Tosch had been General Manager of the former Delphi Interior & Lighting Systems since October 1994. From 1991 to 1994, Mr. Tosch was General Manager of Delphi Harrison Thermal Systems. From 1987 to 1991, he was Managing Director of Vauxhall Motors Limited. Prior thereto, Mr. Tosch held various engineering and managerial positions with General Motors since 1963.

MR. WEISER was named a Delphi Automotive Systems Vice President in November 1998 and has been President of Delphi Automotive Systems Europe, formerly ACG Europe, since 1993. He became Managing Director of Packard Electric Europa in Wuppertal, Germany, in 1990 and was appointed Chairman of the Supervisory Board of all Corporate Subsidiaries of Packard Electric Europa, a position he held until his current assignment. Mr. Weiser was appointed Chairman of the Executive Board of Kabelwerke Reinshagen GmbH in 1986. Mr. Weiser had been with Kabelwerke Reinshagen GmbH since 1974, which was acquired by Delphi Packard Electric in 1981.

MR. WOHLEEN was named a Delphi Automotive Systems Vice President and President of Delphi Delco Electronics in November 1998. He had been General Manager of Delphi Delco Electronics since August 1998. Prior to his current position, he had been a General Director of Engineering with Delco Electronics, which is now Delphi Delco Electronics, since February 1997. In 1994, Mr. Wohleen was named Director of Electrical, Interior and HVAC for General Motors' Midsize Car Division in Warren, Michigan, and in 1995, he assumed additional responsibility for general assembly, tools and process and powertrain coordination for General Motors' MidLux Car Division in Warren. Prior thereto, Mr. Wohleen held a series of engineering and manufacturing positions with General Motors since 1978.

MR. ARLE was named Vice President of Mergers, Acquisitions and Planning for Delphi Automotive Systems in November 1998. He had been Executive Director of Planning for Delphi since February 1998. Previously, he was Vice President and Chief Financial Officer for Saab Automobile AB since 1993. From 1992 to 1993, he was Vice President and Finance Manager for General Motors of Canada, Ltd. From 1988 to 1992, he was General Manager and Comptroller for the General Motors/Toyota NUMMI joint venture. Prior thereto, he held several finance and human resources positions at General Motors since 1975.

S-41

42

MR. BERTRAND was named Vice President of Operations for Delphi Automotive
Systems in November 1998. He had been Executive Director of Operations for
Delphi since June 1997. Previously, he was Executive Director of Development for
small cars at General Motors' International Operations since 1995. From 1992
until 1995, he was Comptroller at Adam Opel AG in Russelsheim, Germany. From
1989 to 1992, he was Director of Financial Analysis and Planning for General
Motors Europe. Prior thereto, he held finance, business and engineering
positions for General Motors since 1979.

MR. BLAHNIK was named Treasurer of Delphi Automotive Systems in August 1998
and a Delphi Vice President in November 1998. He had been Executive Director of
Finance for Delphi since June 1996. Previously, he was Senior Vice President and
Chief Financial Officer at Delco Electronics since 1995. From 1994 to 1995, he
was Director of Finance for General Motors' Lansing Automotive Division. From
1991 to 1994, he was Executive Director for General Motors' Latin American
Operations and President of Banco General Motors, and from 1988 until 1991, he
was a Comptroller of General Motors do Brasil. Prior thereto, he held several
finance positions at General Motors since 1978.

MR. CAMPBELL was named Vice President of Purchasing for Delphi Automotive
Systems in November 1998. He had been Executive Director of Worldwide Purchasing
for Delphi since November 1996. Previously, he was Executive Director of
Worldwide Purchasing, Quality/Supplier Development, at General Motors' North
American Operations since 1995. From 1994 to 1995, he was Executive Director of
Worldwide Purchasing, Strategic and Metallic Activities. Prior thereto, he held
a variety of managerial and purchasing positions at General Motors since 1964.

MS. HEALY was named Vice President of Corporate Affairs for Delphi
Automotive Systems in November 1998. She had been Executive Director of
Communications for Delphi since June 1997. Previously, she was Manufacturing
Manager for Delphi's Flint East Operations, Plants 6 and 7, since July 1996.
From June 1995 to July 1996, she was Director of Corporate Communications at
General Motors' central office. From January 1995 to June 1995, she was Director
of Communications for Delphi. Prior thereto, Ms. Healy held several personnel,
labor relations and communications positions at General Motors since 1976. She
serves on the Board of Trustees for the Music Hall Center for the Performing
Arts in Detroit and the Executive Board for the Troy Chamber of Commerce.

MR. JANAK was named Chief Information Officer for Delphi Automotive Systems
in April 1998 and a Delphi Vice President in November 1998. He had been a Vice
President and Chief Information Officer at TRW Inc. since February 1995.
Previously, he was Vice President and General Manager of TRW's Information
Services Division. Prior thereto, he worked in propulsion engineering for NASA's
Apollo program and worked for Chrysler Corporation, Teledyne Brown Engineering,
Planning Research Corporation and the German firm, Technologieforshung.

MR. LORENZ was named Vice President of Production Control and Logistics for
Delphi Automotive Systems in November 1998. He had been Director of Production
Control and Logistics for Delphi since March 1996. Previously, he had been
Director of Materials Management for Delphi since June 1994. From 1991 to 1993, he was Director of Materials
Management, Experimental Manufacturing. From 1990 to 1991, he was Manager of
Synchronous Organization, and from 1989 to 1990, he was Advisor, C-P-C
production systems. Prior thereto, he held various manufacturing and materials
management positions at General Motors since 1973.

MR. ROBINSON was named General Counsel and a Delphi Automotive Systems Vice
President in December 1998. Previously, he was Of Counsel to the Corporate,
Securities and Business Law group at Dickinson Wright PLLC, a Michigan law firm
headquartered in Detroit, since April 1998. From February 1996 to April 1998, he
was Senior Vice President, Secretary and General Counsel for ITT Automotive,
Inc. From April 1987 to February 1996, he was a lawyer for Chrysler Corporation
serving, among other positions, as Vice President and General Counsel for
Chrysler International Corporation, a subsidiary of Chrysler Corporation, and
Geschaftsfuhrer, or Managing Director, of Chrysler Austria GmbH. Prior thereto,
he held positions at TRW Inc. in Cleveland, Ohio, and at Coudert Brothers and
Wender, Murase & White in New York City.

S-42

MR. WEBER was named Vice President of Human Resources Management for Delphi Automotive Systems in November 1998. He had been Executive Director of Human Resources Management for Delphi since January 1995. Previously, he was General Director of Personnel and Public Affairs at the former Inland Fisher Guide since 1993. From 1991 to 1993, he was General Director of Personnel for the same. From 1988 to 1991, he was Director of Industrial Relations at C-P-C, and from 1986 to 1988, he served as Director of Human Resources for Salaried Personnel at C-P-C. From 1985 to 1986, he was Director of General Offices Personnel at C-P-C. Prior thereto, he held a number of human resource and personnel positions at General Motors since 1966.

MR. WYMAN was named Lead Independent Director for Delphi Automotive Systems in October 1998. Mr. Wyman had served on the Board of Directors of General Motors from 1985 until October 1998. Mr. Wyman was formerly Chairman, President and Chief Executive Officer of CBS, Inc., New York. Mr. Wyman was Senior Advisor of SBC Warburg Inc. from 1996 to 1997 and Chairman of S.G. Warburg & Co. Inc. from 1992 to 1996. Mr. Wyman is also a Director of AT&T Corporation. Mr. Wyman is a member of the Advisory Board of Nestle USA, Inc., the International Advisory Group of Toshiba Corporation (Tokyo) and The Business Council. Mr. Wyman is Trustee Emeritus of The Ford Foundation and The Aspen Institute and Chairman Emeritus of Amherst College.

MR. SMITH has been associated with General Motors since 1961 and was named a Director of Delphi Automotive Systems in October 1998. On January 1, 1996, Mr. Smith became Chairman of the Board of Directors of General Motors and in October 1998, Mr. Smith's title was changed from Chief Executive Officer and President to Chief Executive Officer of General Motors. Effective November 1992, Mr. Smith was elected as General Motors' Chief Executive Officer and President. Effective August 1990, Mr. Smith was elected Vice Chairman of the Board of Directors of General Motors and, on April 6, 1992, he was elected President and Chief Operating Officer of General Motors. Mr. Smith was elected Executive Vice President in charge of International Operations for General Motors in 1988. He is also a Director of Hughes Electronics and The Procter & Gamble Company. Mr. Smith is Co-Chairman of The Business Roundtable and a member of The Business Council, the U.S.-Japan Business Council, Catalyst and The Chancellor's Executive Committee of the University of Massachusetts. Mr. Smith is a member of the Board of Trustees, Boston University; the Board of Overseers of Memorial Sloan-Kettering Cancer Center; the Board of Governors of The Nature Conservancy; and the Board of Polish-American Enterprise Fund.

MR. PEARCE has been associated with General Motors since 1985 and was named a Director of Delphi Automotive Systems in October 1998. Effective January 1, 1996, Mr. Pearce was elected a Director and became Vice Chairman of the Board of Directors of General Motors. In July 1994, Mr. Pearce assumed responsibility for General Motors' Strategic Decision Center, Corporate Communications, Allison Transmission Division, Electro-Motive Division, Urban and Community Affairs, Executive Compensation and Corporate Governance and the Corporate Services Staff. Effective November 1992, he was elected Executive Vice President of General Motors. In May 1987, Mr. Pearce was elected Vice President and General Counsel of General Motors, a position he retained through August 1, 1994. Mr. Pearce is also a Director of Hughes Electronics, Marriott International, Inc. and MDU Resources Group, Inc. Mr. Pearce is a member of The Conference Board, Northwestern University School of Law Dean's Advisory Council and the Board of Visitors of the United States Air Force Academy. Mr. Pearce is also a Trustee of Howard University.

MR. LOSH has been associated with General Motors since 1964 and was named a Director of Delphi Automotive Systems in October 1998. In July 1994, Mr. Losh was elected Executive Vice President and Chief Financial Officer of General Motors. Effective May 1992, Mr. Losh was elected Group Executive in charge of North American Vehicle Sales, Service and Marketing of General Motors. He was named General Manager of General Motors' Oldsmobile Division in June 1989. In July 1984, Mr. Losh was elected Vice President of General Motors and General Manager of its Pontiac Division.

MR. BERNARDES NETO is Chairman of the Boards of Directors of Santista Alimentos S/A and Seara Alimentos S/A, two food companies headquartered in Brazil and controlled by Bunge International, a Bermuda holding company headquartered in Sao Paulo, Brazil, which controls a number of food, agribusiness and fertilizer companies around the world. Previously, Mr. Bernardes Neto was the Chief

Executive Officer of Bunge International. Before joining Bunge, he was a Senior Partner with Booz-Allen & Hamilton where he specialized in strategy and organization consulting to industry in Latin America. His 15 years of consulting experience include several projects related to the automotive industry in South America. Mr. Bernardes Neto is a Director for RBS and Alcoa in Brazil. He is also a member of the Advisory Board for Booz-Allen & Hamilton.

MR. COLBERT was appointed an Executive Vice President of Miller Brewing Company in July 1997. He is responsible for all plant operations, brewing, research, quality assurance, engineering, purchasing, corporate operations planning and improvement and information systems. He had been a Senior Vice President, Worldwide Operations since 1995. In 1993, he was elected to the Miller Board of Directors and Executive Committee. Also in 1993, he was named Senior Vice President, in charge of operations, a position he held until 1995. From 1990 to 1993, he was Vice President of plant operations, and from 1989 to 1990 he was Vice President of materials manufacturing. Prior thereto, he held several manufacturing and production positions at Miller since joining the company in 1979. Mr. Colbert is a Director for Aeroquip-Vickers, Inc., Milwaukee County Council, Boy Scouts of America, Columbia Health Systems and Greater Milwaukee Open. He is Chairman of the Board of the Thurgood Marshall Scholarship Fund and he is a member of the Board of Trustees of Fisk University, Nashville, Tennessee. Mr. Colbert also serves on the Board of Regents of the Milwaukee School of Engineering, is a member of the Executive Advisory Committee for the National Urban League's Black Executive Exchange Program, and serves on the Opportunities Industrialization Centers of America's National Industrial Council.

MR. IRIMAJIRI was elected President and Representative Director of Sega Enterprises, Ltd. in February 1998. He had been responsible for the CS Business Group, Quality Assurance Division and Intellectual Property Rights Department since August 1997. Previously, he was Co-Chairman of Sega Enterprises, Inc., since July 1996. From April 1996 to July 1996, he was responsible for CS Research & Development Group, Overseas Consumer Business Group, Quality Assurance Division, Multimedia Office and Intellectual Property Department. Prior thereto, he held various positions at Sega since 1993. Before joining Sega, Mr. Irimajiri had been an Executive Vice President at Honda Motor Co. Ltd. since June 1990. He was responsible for directing Honda's development and production activities. He had been associated with Honda since 1963.

MS. MCLAUGHLIN is President, Consumer Services for BellSouth Telecommunications, Inc., a position she has held since March 1998. From 1987 to 1998, Ms. McLaughlin held numerous financial and marketing management positions at Eastman Kodak in Rochester, N.Y. Her most recent position was Vice President and Chief Operating Officer of Kodak Professional, where she managed that division's worldwide operations, including sales and marketing. Before joining Kodak, Ms. McLaughlin spent 13 years in corporate banking with Citibank and Chase. Ms. McLaughlin serves on the Board of Directors of Dayton Hudson Corporation.

MR. OPIE was elected Vice Chairman of the Board and an Executive Officer for General Electric Company in 1995. He had been President and Chief Executive Officer of GE Lighting and a GE Senior Vice President since 1986. Previously, he had been Vice President of GE's distribution equipment business since 1983. From 1982 to 1983, he was President of the Specialty Plastics Division. From 1980 to 1982, he was Vice President of the Lexan Products Division of GE Plastics, and from 1977 to 1980, he was General Manager of the division. In 1975, Mr. Opie became General Manager of the battery business, a position he held until moving to GE Plastics. He has been associated with General Electric since 1961.

MR. PENSKE is the founder and Chairman of Penske Corporation, which was established in 1969 and is comprised of three business groups: Transportation Services, Automotive and Performance. In the Transportation Services Group, Mr. Penske serves as the Chairman and Chief Executive Officer of Detroit Diesel Corporation. He is Chairman of the Board of Penske Truck Leasing Corporation and Penske Motorsports, Inc. and a Director of General Electric Company and Gulfstream Aerospace Corporation. He is Chairman of the Detroit Investment Fund, which was created by Detroit Renaissance, of which he is also a Director. Mr. Penske is also a member of the Robert Bosch International AG Advisory Board and a Trustee of the Henry Ford Museum & Greenfield Village and a member of the Business Council.

45

## DESCRIPTION OF THE OFFERED SECURITIES

Information in this section should be read in conjunction with the statements under "Description of Debt Securities" in the accompanying prospectus.

GENERAL

The notes in the aggregate principal amount of $500,000,000 due 2004 mature on May 1, 2004 and bear interest at 6 1/8% per annum. The notes in the aggregate principal amount of $500,000,000 due 2009 mature on May 1, 2009 and bear interest at 6 1/2% per annum. The debentures in the aggregate principal amount of $500,000,000 due 2029 mature on May 1, 2029 and bear interest at 7 1/8% per annum.

The Offered Securities:

- will be issued in U.S. dollars in denominations of $1,000 and integral multiples of $1,000.

- will be issued pursuant to an Indenture dated April 28, 1999 (the "Indenture") between Delphi and The First National Bank of Chicago, as trustee, and each of the notes and debentures will represent a new and separate series under the Indenture.

- are redeemable before maturity at the option of Delphi, in whole or in part, at the redemption prices set forth herein plus accrued interest, and each series is redeemable in whole, but not in part, at 100% of the principal amount plus accrued interest of the relevant Offered Securities in the event of certain changes relating to United States taxation.

- are not subject to any sinking fund.

- will be represented by one or more global certificates in fully registered form. Except in certain limited circumstances, the Offered Securities will not be issued in definitive form. If the Offered Securities are issued in definitive form, they will be issued in registered form, and payments of principal and interest will be made according to alternative arrangements.

- represent unsecured and unsubordinated debt.

- will be repaid at par at maturity.

- will rank pari passu with each other and with Delphi's other unsecured and unsubordinated debt.

Interest:

- is payable on May 1 and November 1 of each year, payable to the persons in whose names the Offered Securities are registered at the close of business on April 15 and October 15, as the case may be, prior to the payment date.

- will be calculated on the basis of a 360-day year of twelve 30-day months.

- payments begin on November 1, 1999 and interest will begin to accrue from May 4, 1999.

We will deliver to the trustee, annually, an officers' certificate as to the existence or absence of defaults under the Indenture. We may, without the consent of the holders of the Offered Securities, issue additional securities having the same ranking and the same interest rate, maturity and other terms as the Offered Securities. Any additional securities, together with the related series of Offered Securities, will consist of a single series of securities under the Indenture.

OPTIONAL REDEMPTION

Each of the notes due 2004, the notes due 2009 and the debentures due 2029 may be redeemed in whole at any time or in part from time to time, at the option of Delphi at a redemption price equal to the greater of (1) 100% of the principal amount of the applicable series of notes or debentures to be redeemed, and (2) the sum of the present values of the remaining scheduled payments of principal and interest on the applicable series of notes or debentures to be redeemed discounted to the date of

redemption on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the applicable Treasury Rate plus 10 basis points for the notes due 2004, the applicable Treasury Rate plus 15 basis points for the notes due 2009 or the applicable Treasury Rate plus 25 basis points for the debentures due 2029 plus, in each case, accrued and unpaid interest on the principal amount being redeemed to the redemption date.

"Treasury Rate" means, with respect to any redemption date, (1) the yield, under the heading which represents the average for the immediately preceding week, appearing in the most recently published statistical release designated "H.15(519)" or any successor publication which is published weekly by the Board of Governors of the Federal Reserve System and which establishes yields on actively traded United States Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities," for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after the Remaining Life, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue will be determined and the Treasury Rate will be interpolated or extrapolated from such yields on a straight line basis, rounding to the nearest month) or (2) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per annum equal to the semi-annual equivalent yield-to-maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price of such redemption date. The Treasury Rate will be calculated on the third Business Day preceding the redemption date.

"Business Day" means any calendar day that is not a Saturday, Sunday or legal holiday in New York, New York and on which commercial banks are open for business in New York, New York.

"Comparable Treasury Issue" means the United States Treasury security selected by an Independent Investment Banker as having a maturity comparable to the remaining term ("Remaining Life") of the notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such notes.

"Independent Investment Banker" means either Merrill Lynch, Pierce, Fenner & Smith Incorporated or Morgan Stanley & Co. Incorporated, and their respective successors, or, if both firms are unwilling or unable to select the Comparable Treasury Issue, an independent investment banking institution of national standing appointed by the trustee after consultation with Delphi.

"Comparable Treasury Price" means (1) the average of five Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest Reference Treasury Dealer Quotations, or (2) if the Independent Investment Banker obtains fewer than five such Reference Treasury Dealer Quotations, the average of all such quotations.

"Reference Treasury Dealer" means (1) Merrill Lynch, Pierce, Fenner & Smith Incorporated and Morgan Stanley & Co. Incorporated, and their respective successors, provided, however, that if any of the foregoing shall cease to be a primary U.S. government securities dealer in New York City (a "Primary Treasury Dealer"), Delphi will substitute for such underwriter another Primary Treasury Dealer and (2) any other Primary Treasury Dealer selected by the Independent Investment Banker after consultation with Delphi.

"The Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker at 5:00 p.m., New York City time, on the third Business Day preceding such redemption date.

Holders of Offered Securities to be redeemed will receive notice thereof by first-class mail at least 30 and not more than 60 days before the date fixed for redemption. If fewer than all of the securities are to be redeemed, the trustee will select, not more than 60 days before the redemption date, the particular

47

securities or portions thereof for redemption from the outstanding securities
not previously called by such method as the trustee deems fair and appropriate.

BOOK-ENTRY, DELIVERY AND FORM

        The Offered Securities will be issued in the form of one or more definitive
global securities in registered form (each, a "Global Security"). The Global
Securities will be deposited, until all obligations of Delphi with respect to
the Offered Securities are satisfied, with, or on behalf of, The Depository
Trust Company ("DTC") and registered, at the request of DTC, in the name of Cede
& Co. Beneficial interests in the Global Securities will be represented through
book-entry accounts of financial institutions acting on behalf of beneficial
owners as direct and indirect participants in DTC (the "DTC Participants").
Investors may elect to hold their interests in the Global Securities through
either DTC or Cedelbank or Morgan Guaranty Trust Company of New York, Brussels
Office, as operator of the Euroclear System ("Euroclear"), either directly if
they are participants in such systems, or indirectly through organizations that
are participants in such systems. Cedelbank and Euroclear will hold interests on
behalf of their participants through customers' securities accounts in
Cedelbank's and Euroclear's names on the books of their respective U.S.
depositaries, which in turn will hold such interests in customers' securities
accounts in the U.S. depositaries' names on the books of DTC. The Chase
Manhattan Bank will act as U.S. depositary for Euroclear, and Citibank, N.A.
will act as U.S. depositary for Cedelbank (in such capacities, the "U.S.
Depositaries"). Beneficial interests in the Global Securities may be held in
denominations of $1,000 and integral multiples thereof. The Global Securities
may be transferred, as a whole but not in part, only to another nominee of DTC
or to a successor of DTC or its nominee.

        So long as DTC or its nominee is the registered owner of a Global Security,
DTC or such nominee, as the case may be, will be considered the sole owner and
holder of the Offered Securities represented by such Global Security for all
purposes of the notes or debentures, as the case may be. Owners of beneficial
interests in Global Securities will not be entitled to have the Offered
Securities represented by such Global Securities registered in their names.
Accordingly, each person owning a beneficial interest in a Global Security must
rely on the procedures of DTC, or its nominee, and, if such person is not a
participant, on the procedures of the participant through which such person owns
its interest, to exercise any rights of a holder of notes or debentures, as the
case may be.

        DTC advises that it is a limited-purpose trust company organized under the
laws of the State of New York, a member of the Federal Reserve system, a
"clearing corporation" within the meaning of the New York Uniform Commercial
Code and a "clearing agency" registered under the provision of Section 17A of
the Securities Exchange Act of 1934, as amended. DTC was created to hold
securities of DTC Participants and to facilitate the clearance and settlement of
securities transactions among DTC Participants in such securities through
electronic book-entry changes in accounts of DTC Participants, thereby
eliminating the need for physical movement of securities. DTC Participants
include securities brokers and dealers (including underwriters), banks, trust
companies, clearing corporations and certain other organizations. Access to
DTC's book-entry system is also available to others, such as banks, brokers,
dealers and trust companies that clear through or maintain a custodial
relationship with a DTC Participant, either directly or indirectly. DTC agrees
with and represents to DTC Participants that it will administer its book-entry
system in accordance with its rules and by-laws and requirements of law.

        DTC also advises that:

        1. DTC management is aware that some computer applications, systems,
and the like for processing dates ("Systems") that are dependent upon
calendar dates, including dates before, on, and after January 1, 2000, may
encounter "Year 2000 problems." DTC has informed DTC Participants and other
members of the financial community (the "Industry") that it has developed
and is implementing a program so that its Systems, as the same relate to
the timely payment of distributions (including principal and income
payments) to securityholders, book-entry deliveries, and settlement of
trades within DTC ("DTC Services"), continue to function appropriately.
This program includes a

technical assessment and a remediation plan, each of which is complete.
Additionally, DTC's plan includes a testing phase, which is expected to be
completed within appropriate time frames.

2. DTC's ability to perform properly its services is also dependent
upon other parties, including but not limited to issuers and their agents,
as well as third party vendors from whom DTC licenses software and
hardware, and third party vendors on whom DTC relies for information or the
provision of services, including telecommunication and electrical utility
service providers, among others. DTC has informed the Industry that it is
contacting (and will continue to contact) third party vendors from whom DTC
acquires services to: (i) impress upon them the importance of such services
being Year 2000 compliant and (ii) determine the extent of their efforts
for Year 2000 remediation (and, as appropriate, testing) of their services.
In addition, DTC is in the process of developing such contingency plans as
it deems appropriate.

3. The foregoing information with respect to DTC has been provided to
.the Industry for informational purposes only and is not intended to serve
as a representation, warranty, or contract modification of any kind.

Cedelbank advises that it is incorporated under the laws of Luxembourg as a
professional depositary. Cedelbank holds securities for its participating
organizations ("Cedelbank Participants") and facilitates the clearance and
settlement of securities transactions among Cedelbank Participants through
electronic book-entry changes in accounts of Cedelbank Participants, thereby
eliminating the need for physical movement of certificates. Cedelbank provides
to Cedelbank Participants, among other things, services for safekeeping,
administration, clearance and settlement of internationally traded securities
and securities lending and borrowing. Cedelbank interfaces with domestic markets
in several countries. As a professional depositary, Cedelbank is subject to
regulation by the Luxembourg Monetary Institute. Cedelbank Participants are
recognized financial institutions around the world, including underwriters,
securities brokers and dealers, banks, trust companies, clearing corporations
and certain other organizations and may include the underwriters. Indirect
access to Cedelbank is also available to others, such as banks, brokers, dealers
and trust companies that clear through or maintain a custodial relationship with
a Cedelbank Participant either directly or indirectly.

Distributions with respect to Offered Securities held beneficially through
Cedelbank will be credited to cash accounts of Cedelbank Participants in
accordance with its rules and procedures, to the extent received by the U.S.
Depositary for Cedelbank.

Euroclear advises that it was created in 1968 to hold securities for
participants of Euroclear ("Euroclear Participants") and to clear and settle
transactions among Euroclear Participants through simultaneous electronic
book-entry delivery against payment, thereby eliminating the need for physical
movement of certificates and any risk from lack of simultaneous transfers of
securities and cash. Euroclear includes various other services, including
securities lending and borrowing, and interfaces with domestic markets in
several countries. Euroclear is operated by the Brussels, Belgium office of
Morgan Guaranty Trust Company of New York (the "Euroclear Operator"), under
contract with Euroclear Clearance Systems S.C., a Belgian cooperative
corporation (the "Cooperative"). All operations are conducted by the Euroclear
Operator, and all Euroclear securities clearance accounts and Euroclear cash
accounts are accounts with the Euroclear Operator, not the Cooperative. The
Cooperative establishes policies for Euroclear on behalf of Euroclear
Participants. Euroclear Participants include banks (including central banks),
securities brokers and dealers and other professional financial intermediaries
and may include the underwriters. Indirect access to Euroclear is also available
to other firms that clear through or maintain a custodial relationship with a
Euroclear Participant, either directly or indirectly.

The Euroclear Operator is the Belgian branch of a New York banking
corporation which is a member bank of the Federal Reserve System. As such, it is
regulated and examined by the Board of Governors of the Federal Reserve System
and the New York State Banking Department, as well as the Belgian Banking
Commission.

49

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System, and applicable Belgian law (collectively, the "Terms and Conditions"). The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions only on behalf of Euroclear Participants, and has no record of or relationship with persons holding through Euroclear Participants.

Distributions with respect to Offered Securities held beneficially through Euroclear will be credited to the cash accounts of Euroclear Participants in accordance with the Terms and Conditions, to the extent received by the U.S. Depositary for Euroclear.

Offered Securities will not be issued in definitive form, except in very limited circumstances. If any of Euroclear, Cedelbank or DTC notifies Delphi that it is unwilling or unable to continue as a clearing system in connection with the Global Securities or, in the case of DTC only, DTC ceases to be a clearing agency registered under the Exchange Act, and in each case a successor clearing system is not appointed by Delphi within 90 days after receiving such notice from Euroclear, Cedelbank or DTC or on becoming aware that DTC is no longer so registered, Delphi will issue or cause to be issued individual certificates in registered form on registration of transfer of, or in exchange for, book-entry interests in the Offered Securities represented by such Global Securities upon delivery of such Global Securities for cancellation. In the event definitive Offered Securities are issued, the holders thereof will be able to receive payments on the notes and effect transfers of the notes at the offices of the Luxembourg paying agent and transfer agent. Delphi has appointed Banque Internationale a Luxembourg S.A. as paying agent and transfer agent in Luxembourg with respect to the Offered Securities in definitive form, and as long as the Offered Securities are listed on the Luxembourg Stock Exchange, Delphi will maintain a paying agent and transfer agent in Luxembourg, and any change in the Luxembourg paying agent and transfer agent will be published in Luxembourg. See "--Notices."

GLOBAL CLEARANCE AND SETTLEMENT PROCEDURES

Initial settlement for the Offered Securities will be made in immediately available funds. Secondary market trading between DTC Participants will occur in the ordinary way in accordance with DTC rules and will be settled in immediately available funds using DTC's Same-Day Funds Settlement System. Secondary market trading between Cedelbank Participants and/or Euroclear Participants will occur in the ordinary way in accordance with the applicable rules and operating procedures of Cedelbank and Euroclear and will be settled using the procedures applicable to conventional Eurobonds in immediately available funds.

Cross-market transfers between persons holding directly or indirectly through DTC on the one hand, and directly or indirectly through Cedelbank or Euroclear Participants, on the other, will be effected in DTC in accordance with DTC's rules on behalf of the relevant European international clearing system by its U.S. Depositary; however, such cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such systems in accordance with its rules and procedures and within its established deadlines (European time). The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to its U.S. Depositary to take action to effect final settlement on its behalf by delivering or receiving Offered Securities in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Cedelbank Participants and Euroclear Participants may not deliver instructions directly to the U.S. Depositaries.

Because of time-zone differences, credits of Offered Securities received in Cedelbank or Euroclear as a result of a transaction with a DTC Participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions

S-49

in such Offered Securities settled during such processing will be reported to the relevant Euroclear or Cedelbank Participants on such business day. Cash received in Cedelbank or Euroclear as a result of sales of Offered Securities by or through a Cedelbank Participant or a Euroclear Participant to a DTC Participant will be received with value on the DTC settlement date but will be available in the relevant Cedelbank or Euroclear cash account only as of the business day following settlement in DTC.

Although DTC, Cedelbank and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of Offered Securities among participants of DTC, Cedelbank and Euroclear, they are under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

PAYMENT OF ADDITIONAL AMOUNTS

Delphi will, subject to the exceptions and limitations set forth below, pay as additional interest on the Offered Securities such additional amounts as are necessary in order that the net payment by Delphi or a paying agent of the principal of and interest on the Offered Securities to a holder who is a non-United States person (as defined below), after deduction for any present or future tax, assessment or governmental charge of the United States or a political subdivision or taxing authority thereof or therein, imposed by withholding with respect to the payment, will not be less than the amount provided in the Offered Securities to be then due and payable; provided, however, that the foregoing obligation to pay additional amounts will not apply:

(1) to a tax, assessment or governmental charge that is imposed or withheld solely by reason of the holder, or a fiduciary, settlor, beneficiary, member or shareholder of the holder if the holder is an estate, trust, partnership or corporation, or a person holding a power over an estate or trust administered by a fiduciary holder, being considered as:

(a) being or having been present or engaged in trade or business in the United States or having or having had a permanent establishment in the United States;

(b) having a current or former relationship with the United States, including a relationship as a citizen or resident thereof;

(c) being or having been a foreign or domestic personal holding company, a passive foreign investment company or a controlled foreign corporation with respect to the United States or a corporation that has accumulated earnings to avoid United States federal income tax; or

(d) being or having been a "10-percent shareholder" of Delphi as defined in section 871(h)(3) of the United States Internal Revenue Code of 1986, as amended (the "Code"), or any successor provision;

(2) to any holder that is not the sole beneficial owner of the Offered Securities, or a portion thereof, or that is a fiduciary or partnership, but only to the extent that a beneficiary or settlor with respect to the fiduciary or a beneficial owner or member of the partnership would not have been entitled to the payment of an additional amount had the beneficiary, settlor, beneficial owner or member received directly its beneficial or distributive share of the payment;

(3) to a tax, assessment or governmental charge that is imposed or withheld solely by reason of the failure of the holder or any other person to comply with certification, identification or information reporting requirements concerning the nationality, residence, identity or connection with the United States of the holder or beneficial owner of such Offered Securities, if compliance is required by statute, by regulation of the United States Treasury Department or by an applicable income tax treaty to which the United States is a party as a precondition to exemption from, or reduction of, such tax, assessment or other governmental charge;

(4) to a tax, assessment or governmental charge that is imposed otherwise than by withholding by Delphi or a paying agent from the payment;

51

(5) to a tax, assessment or governmental charge that is imposed or withheld solely by reason of a change in law, regulation, or administrative or judicial interpretation that becomes effective more than 15 days after the payment becomes due or is duly provided for, whichever occurs later;

(6) to an estate, inheritance, gift, sales, excise, transfer, wealth or personal property tax or a similar tax, assessment or governmental charge;

(7) to any tax, assessment or other governmental charge required to be withheld by any paying agent from any payment of principal of or interest on any Offered Security, if such payment can be made without such withholding by any other paying agent; or

(8) in the case of any combination of items (1), (2), (3), (4), (5), (6) or (7) above.

The Offered Securities are subject in all cases to any tax, fiscal or other law or regulation or administrative or judicial interpretation applicable thereto. Except as specifically provided under this heading "--Payment of Additional Amounts," Delphi will not be required to make any payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein.

As used under this heading "--Payment of Additional Amounts" and under the headings "--Redemption for Tax Reasons" and "Certain United States Federal Tax Matters," the term "United States" means the United States of America (including the States and the District of Columbia) and its territories, its possessions and other areas subject to its jurisdiction. "United States person" means (1) any individual who is a citizen or resident of the United States, (2) a corporation, partnership or other entity created or organized in or under the laws of the United States, (3) any estate the income of which is subject to United States federal income taxation regardless of its source or (4) any trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust or if the trust elects under United States Treasury Regulations to be treated as a U.S. person, and "non-United States person" means a person who is not a United States person.

REDEMPTION FOR TAX REASONS

If (1) as a result of any change in, or amendment to, the laws (or any regulations or rulings promulgated thereunder) of the United States (or any political subdivision or taxing authority thereof or therein), or any change in, or amendments to, the official position regarding the application or interpretation of such laws, regulations or rulings, which change or amendment is announced or becomes effective on or after the date of this prospectus supplement, Delphi becomes or will become obligated to pay additional amounts as described herein under the heading "--Payment of Additional Amounts" or (2) any act is taken by a taxing authority of the United States on or after the date of this prospectus supplement, whether or not such act is taken with respect to Delphi or any affiliate, that results in a substantial probability that Delphi will or may be required to pay such additional amounts, then Delphi may, at its option, redeem, in whole, but not in part, each affected series of the Offered Securities on not less than 30 nor more than 60 days' prior notice, at a redemption price equal to 100% of the principal amount of the relevant Offered Securities, together with interest accrued but unpaid thereon to the date fixed for redemption; provided that Delphi determines, in its business judgment, that the obligation to pay such additional amounts cannot be avoided by the use of reasonable measures available to it, not including substitution of the obligor under the Offered Securities. No redemption pursuant to (2) above may be made unless Delphi shall have received an opinion of independent counsel to the effect that an act taken by a taxing authority of the United States results in a substantial probability that it will or may be required to pay the additional amounts described herein under the heading "--Payment of Additional Amounts" and Delphi shall have delivered to the trustee a certificate, signed by a duly authorized officer, stating that based on such opinion Delphi is entitled to redeem the Offered Securities pursuant to their terms.

S-51

52

NOTICES

Notices to holders of the Offered Securities will be published in certain
authorized newspapers in The City of New York, in London, and, so long as the
Offered Securities are listed on the Luxembourg Stock Exchange, in Luxembourg.
It is expected that publication will be made in The City of New York in The Wall
Street Journal, in London in the Financial Times, and in Luxembourg in the
Luxembourg Wort. Any such notice shall be deemed to have been given on the date
of such publication or, if published more than once, on the date of the first
such publication. So long as the Offered Securities are listed on the Luxembourg
Stock Exchange, we will publish notice of any change in the Luxembourg paying
agent and transfer agent in Luxembourg in this manner.

APPLICABLE LAW

The Offered Securities and the Indenture will be governed by and construed
in accordance with the laws of the State of New York.

CERTAIN UNITED STATES FEDERAL TAX MATTERS

UNITED STATES TAXATION OF NON-UNITED STATES PERSONS

In the opinion of Drinker Biddle & Reath LLP, as tax counsel to Delphi,
under United States federal tax law as of the date of this prospectus
supplement, and subject to the discussion of backup withholding below:

(1) payments of principal and interest on any of the Offered
Securities that is beneficially owned by a non-United States person will
not be subject to United States federal withholding tax; provided, that in
the case of interest,

(x) (a) the beneficial owner does not actually or constructively own
10% or more of the total combined voting power of all classes
of stock of Delphi entitled to vote,

(b) the beneficial owner is not a "controlled foreign
corporation," within the meaning of the United States
Internal Revenue Code of 1986, as amended, that is related to
Delphi through stock ownership, and

(c) either (A) the beneficial owner certifies, under penalties of
perjury, that he is not a United States person and provides
his name and address or (B) a securities clearing
organization, bank or other financial institution that holds
customers' securities in the ordinary course of its trade or
business and holds the securities certifies, under penalties
of perjury, that such statement has been received from the
beneficial owner by it or by a financial institution between
it and the beneficial owner and, if any such financial
intermediary is a foreign intermediary that is not a
"qualified" foreign intermediary (as defined in applicable
Treasury regulations), furnishes the payor with a copy of
such statement by the beneficial owner;

(y) the beneficial owner is entitled to the benefits of an income
tax treaty under which the interest is exempt from United States federal
withholding tax and the beneficial owner of the security or such owner's
agent provides an appropriate IRS Form claiming the exemption; or

(z) the beneficial owner conducts a trade or business in the United
States to which the interest is effectively connected and the beneficial
owner of the security or such owner's agent provides an appropriate IRS
Form to that effect;

provided that in each such case, the relevant certification or IRS Form
is delivered pursuant to applicable procedures and is properly
transmitted in a timely manner to the person otherwise required to
withhold United States federal income tax, and none of the persons
receiving the relevant certification or IRS Form has actual knowledge
that the certification or any statement on the IRS Form is false;

S-52

53

    (2) a non-United States person will not be subject to United States
federal income tax on any gain realized on the sale, exchange or redemption
of an Offered Security unless the gain is effectively connected with the
beneficial owner's trade or business in the United States or, in the case
of an individual, the beneficial owner is present in the United States for
183 days or more in the taxable year in which the sale, exchange or
redemption occurs and certain other conditions are met; and

    (3) an Offered Security owned by an individual who at the time of
death is not a citizen or resident of the United States will not be subject
to United States federal estate tax as a result of the individual's death
if the individual does not actually or constructively own 10% or more of
the total combined voting power of all classes of stock of Delphi entitled
to vote and the interest on the Offered Security would not have been
effectively connected with a United States trade or business of the
individual.

    Interest on an Offered Security that is effectively connected with the
conduct of a trade or business in the United States by a beneficial owner who is
a non-United States person, although exempt from United States withholding tax,
may be subject to United States income tax as if such interest were earned by a
United States person.

    For purposes of this discussion, a "non-United States person" is a person
other than an individual citizen or resident of the United States, a partnership
or corporation formed under the laws of the United States or any state of the
United States, an estate that is subject to United States federal income tax on
its worldwide income or a trust that is subject to primary supervision and
administration by a court within the United States and all substantial decisions
with respect to which are controlled by one or more United States persons.

UNITED STATES TAXATION OF UNITED STATES PERSONS

    PAYMENTS OF INTEREST. Interest on an Offered Security will generally be
taxable to a United States person as ordinary interest income at the time it is
accrued or is received, in accordance with such United States person's method of
accounting for tax purposes.

    SALE, EXCHANGE OR REDEMPTION OF THE OFFERED SECURITIES. Upon the sale,
exchange or redemption of an Offered Security, a United States person will
recognize taxable gain or loss equal to the difference between the amount
realized on the sale, exchange or redemption, and such United States person's
adjusted tax basis in the Offered Security. For these purposes, the amount
realized does not include any amount attributable to accrued interest on the
Offered Security. Amounts attributable to accrued interest are treated as
interest as described under "Payments of Interest" above. A United States
person's adjusted tax basis in an Offered Security generally will equal the cost
of the Offered Security to such United States person.

    In general, gain or loss realized on the sale, exchange or redemption of an
Offered Security will be capital gain. Such gain will be long-term capital gain
if at the time of such sale, exchange or redemption, the Offered Security has
been held for more than 12 months. Under current law, the excess of net long-
term capital gains over net short-term capital losses is taxed at a lower rate
than ordinary income for certain non-corporate taxpayers. The distinction
between capital gain or loss and ordinary gain or loss is also relevant for
other purposes, including, among other things, limitations on the deductibility
of capital losses.

BACKUP WITHHOLDING AND INFORMATION REPORTING

    In general, information reporting requirements will apply to payments of
principal and interest made on any of the Offered Securities and the proceeds of
the sale of an Offered Security within the United States to non-corporate
holders of the Offered Securities, and "backup withholding" at a rate of 31%
will apply to such payments or proceeds if the holder fails to provide an
accurate taxpayer identification number in the manner required or to report all
interest and dividends required to be shown on his federal income tax returns.

S-53

54

Information reporting on IRS Form 1099 and backup withholding will not apply to payments made by Delphi or a paying agent on a security to a non-United States person if, in the case of interest, the IRS Form described in clause (y) in Paragraph (1) above has been provided under applicable procedures, or, in the case of interest or principal, the certification described in clause (x)(c) in Paragraph (1) above and a certification that the beneficial owner satisfies certain other conditions have been supplied under applicable procedures, provided that the payor does not have actual knowledge that the certifications are incorrect.

Payments to a non-United States person of the proceeds from the sale of an Offered Security made to or through a foreign office of a broker will not be subject to information reporting or backup withholding, except that if the broker is a United States person, a controlled foreign corporation for United States tax purposes or a foreign person 50% or more of whose gross income is effectively connected with a United States trade or business for a specified three-year period, information reporting may apply to such payments. Payments of the proceeds from the sale of an Offered Security to or through the United States office of a broker are subject to information reporting and backup withholding unless the holder or beneficial owner certifies that he is a non-United States person and that he satisfies certain other conditions or otherwise establishes an exemption from information reporting and backup withholding.

Backup withholding is not a separate tax, but is allowed as a refund or credit against the holder's United States federal income tax, provided the necessary information is furnished to the Internal Revenue Service. Interest on a security that is beneficially owned by a non-United States person will be reported annually on IRS Form 1042-S, which must be filed with the Internal Revenue Service and furnished to such beneficial owner.

CERTAIN UNITED STATES TAX DOCUMENTATION REQUIREMENTS

A beneficial owner of the Offered Securities will generally be subject to the 30% United States federal withholding tax that generally applies to payments of interest on a registered form debt obligation issued by a United States person, unless one of the following steps is taken to obtain an exemption from or reduction of the tax:

EXEMPTION FOR UNITED STATES PERSONS (IRS FORM W-9). A beneficial owner of Offered Securities who is a United States person can obtain a complete exemption from the 30% withholding tax by providing a properly completed IRS Form W-9 (Request for Taxpayer Identification Number and Certification). As discussed above, interest on the Offered Securities will, however, be generally reportable as gross income to such a beneficial owner in accordance with his method of accounting for federal income tax purposes.

EXEMPTION FOR NON-UNITED STATES PERSONS UNRELATED TO DELPHI (IRS FORM W-8 OR W-8BEN). A beneficial owner of Offered Securities who is a non-United States person (other than certain persons who are related to Delphi through stock ownership as described in clauses (x)(a) and (b) of Paragraph (1) above, can obtain an exemption from withholding tax by providing a properly completed IRS Form W-8 (Certificate of Foreign Status) or Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding). Copies of IRS Form W-8 or W-8BEN may be obtained from Banque Internationale a Luxembourg S.A., the Luxembourg listing agent.

EXEMPTION FOR NON-UNITED STATES PERSONS WITH EFFECTIVELY CONNECTED INCOME (IRS FORM 4224 OR W-8ECI). A beneficial owner of Offered Securities who is a non-United States person, including a non-United States corporation or bank with a United States branch, and who conducts a trade or business in the United States with which interest income on the securities is effectively connected, can obtain an exemption from withholding tax by providing a properly completed IRS Form 4224 (Exemption from Withholding of Tax on Income Effectively Connected with the Conduct of a Trade or Business in the United States) or Form W-8ECI (Certificate of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with the Conduct of a Trade or Business in the United States).

EXEMPTION OR REDUCED RATE FOR NON-UNITED STATES PERSONS ENTITLED TO THE BENEFITS OF A TREATY (IRS FORM 1001 OR W-8BEN). A beneficial owner of Offered Securities who is a non-United States person

S-54

entitled to the benefits of an income tax treaty to which the United States is a party can obtain an exemption from or reduction of the withholding tax (depending on the terms of the treaty) by providing a properly completed IRS Form 1001 (Ownership, Exemption or Reduced Rate Certificate) or Form W-8BEN.

Recently promulgated Treasury Regulations (the "New Withholding Tax Regulations") have modified certain of the foregoing requirements with which foreign persons must comply to be entitled to an exemption from United States withholding tax or a reduction in the applicable United States withholding tax rate. Under the New Withholding Tax Regulations, IRS Forms W-8BEN and W-8ECI are now applicable under the circumstances described above, although during 1999 the old Forms (IRS Forms W-8, 4224 and 1001) may continue to be used. If an old Form is used during 1999, it will continue to be effective until December 31, 2000.

The New Withholding Tax Regulations also permit the shifting of primary responsibility for withholding to certain qualified financial intermediaries acting on behalf of beneficial owners. Although a beneficial owner will still be required to submit a Form W-8 or its equivalent to such an intermediary, the intermediary generally will not be required to forward a Form W-8 or its equivalent received from a beneficial owner to the U.S. withholding agent as under prior procedures. Instead, the intermediary to the extent that it is a foreign intermediary will be required to submit Form W-8IMY (Certificate of Foreign Intermediary, Foreign Partnership, or Certain U.S. Branches for United States Tax Withholding) to the withholding agent to make representations that the intermediary is not the beneficial owner of the payments it receives and about the status of the beneficial owner(s). However, if a foreign intermediary is a nonqualified intermediary, it will still need to transmit to the ultimate U.S. withholding agent a copy of the Form W-8 of the beneficial owner or its equivalent, as under prior procedures.

Each holder of Offered Securities who is a non-United States person should be aware that if he does not properly provide the required IRS Form, or if a required IRS Form (or, if permissible, a copy of such Form) is not properly transmitted to and received by the person otherwise required to withhold United States federal income tax, interest on the Offered Securities may be subject to United States withholding tax at a 30% rate (or backup withholding at a 31% rate, as discussed above) and the holder (including the beneficial owner) will not be entitled to any additional amounts from Delphi described above under the heading "Description of the Offered Securities--Payment of Additional Amounts" with respect to such withholding tax. Such withholding tax, however, may in certain circumstances be allowed as a refund or as a credit against such holder's United States federal income tax.

Prospective investors should also note that the foregoing discussion does not deal with all aspects of the New Withholding Tax Regulations and other United States federal tax matters that may be potentially relevant to them. Investors are advised to consult their own tax advisors for specific advice regarding their particular situation and all relevant tax matters, including taxes other than United States federal taxes.

56

## UNDERWRITING

We are selling the Offered Securities to the underwriters named below pursuant to an underwriting agreement dated April 28, 1999. Merrill Lynch, Pierce, Fenner & Smith Incorporated and Morgan Stanley & Co. Incorporated are acting as joint bookrunners. Subject to certain conditions, we have agreed to sell to each of the underwriters, and each of the underwriters has severally agreed to purchase, the principal amount of Offered Securities set forth in the following tables:

| UNDERWRITER | PRINCIPAL AMOUNT OF NOTES DUE 2004 |
| --- | --- |
| Merrill Lynch, Pierce, Fenner &Smith Incorporated.......... | $175,000,000 |
| Morgan Stanley &Co. Incorporated........................... | 175,000,000 |
| Chase Securities Inc. ..................................... | 50,000,000 |
| Goldman, Sachs &Co. ...................................... | 50,000,000 |
| BNY Capital Markets, Inc. ................................. | 10,000,000 |
| First Union Capital Markets Corp. ......................... | 10,000,000 |
| Lehman Brothers Inc. ...................................... | 10,000,000 |
| Ormes Capital Markets, Inc. ............................... | 10,000,000 |
| SG Cowen Securities Corporation............................ | 10,000,000 |
| Total............................................. | $500,000,000 |

| UNDERWRITER | PRINCIPAL AMOUNT OF NOTES DUE 2009 |
| --- | --- |
| Merrill Lynch, Pierce, Fenner &Smith Incorporated.......... | $175,000,000 |
| Morgan Stanley &Co. Incorporated........................... | 175,000,000 |
| Chase Securities Inc. ..................................... | 50,000,000 |
| Goldman, Sachs &Co. ...................................... | 50,000,000 |
| Banc One Capital Markets, Inc. ............................ | 10,000,000 |
| Blaylock &Partners, L.P. ................................. | 10,000,000 |
| BNP Capital Markets, LLC .................................. | 10,000,000 |
| CIBC Oppenheimer Corp. .................................... | 10,000,000 |
| Credit Lyonnais S.A. ...................................... | 10,000,000 |
| Total............................................. | $500,000,000 |

| UNDERWRITER | PRINCIPAL AMOUNT OF DEBENTURES DUE 2029 |
| --- | --- |
| Merrill Lynch, Pierce, Fenner &Smith Incorporated.......... | $175,000,000 |
| Morgan Stanley &Co. Incorporated........................... | 175,000,000 |
| Chase Securities Inc. ..................................... | 50,000,000 |
| Goldman, Sachs &Co. ...................................... | 50,000,000 |
| Barclays Bank PLC.......................................... | 10,000,000 |
| Bear, Stearns &Co. Inc. .................................. | 10,000,000 |
| Deutsche Bank AG London ................................... | 10,000,000 |
| NationsBanc Montgomery Securities LLC...................... | 10,000,000 |
| Salomon Smith Barney Inc. ................................. | 10,000,000 |
| Total............................................. | $500,000,000 |

Under the terms and conditions of the underwriting agreement, if the underwriters take any of the Offered Securities, then they are obligated to take and pay for all of the Offered Securities.

57

The Offered Securities are a new issue of securities with no established trading market. We will apply for listing of the Offered Securities on the Luxembourg Stock Exchange. We cannot guarantee that application to the Luxembourg Stock Exchange will be approved, and sale of the Offered Securities is not conditioned on obtaining this listing. We have been advised by the underwriters that the underwriters intend to make a market in the Offered Securities, but they are not obligated to do so and may discontinue market making at any time without notice. We cannot give any assurance as to the liquidity of any trading market for the Offered Securities.

The underwriters propose initially to offer the Offered Securities of each series to the public at the respective public offering prices set forth on the cover page of this prospectus supplement and to offer some of the Offered Securities of each series to certain dealers at the public offering prices less a concession not in excess of:

- .225% of the principal amount in the case of the Notes due 2004

- .30% of the principal amount in the case of the Notes due 2009

- .50% of the principal amount in the case of the Debentures due 2029

After the initial public offering, the underwriters may change the public offering prices, concessions and discounts.

The Offered Securities are offered for sale in those jurisdictions in the United States, Europe and Asia where it is legal to make such offers.

Each of the underwriters has agreed that it will not offer, sell or deliver any of the Offered Securities, directly or indirectly, or distribute this prospectus supplement or the accompanying prospectus or any other offering material relating to the Offered Securities, in or from any jurisdiction except under circumstances that will, to the best knowledge and belief of such underwriter, result in compliance with the applicable laws and regulations thereof and which will not impose any obligations on Delphi except as set forth in the underwriting agreement.

Each underwriter has represented and agreed that (a) it has not offered or sold, and, prior to the expiration of the period of six months from the closing date for the Offered Securities, will not offer or sell any Offered Securities to persons in the United Kingdom, except to those persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995, (b) it has complied and will comply with all applicable provisions of the Financial Services Act of 1986, with respect to anything done by it in relation to the Offered Securities in, from or otherwise involving the United Kingdom, and (c) it has only issued or passed on and will only issue or pass on in the United Kingdom any document received by it in connection with the issue of the Offered Securities to a person who is of a kind described in Article 11 (3) of the Financial Services Act 1986 (Investment Advertisements) (Exemptions) Order 1996, as amended, or is a person to whom such documents may otherwise lawfully be issued or passed on.

Each underwriter has represented and agreed that it has not, directly or indirectly, offered or sold and will not, directly or indirectly, offer or sell in the Netherlands any of the Offered Securities to any persons other than persons who trade or invest in securities in the conduct of a profession or business (which includes banks, stockbrokers, insurance companies, pension funds, other institutional investors and finance companies and treasury departments of large enterprises).

Purchasers of the Offered Securities may be required to pay stamp taxes and other charges in accordance with the laws and practices of the country of purchase in addition to the issue price set forth on the cover page hereof.

S-57

58

In connection with the offering of the Offered Securities, the underwriters may, to the extent permitted by applicable law, engage in transactions that stabilize, maintain or otherwise affect the price of the Offered Securities. Specifically, the underwriters may overallot in connection with the offering of the Offered Securities, creating a short position in the Offered Securities for their own account. In addition, the underwriters may bid for, and purchase, Offered Securities in the open market to cover short positions or to stabilize the price of the Offered Securities. Finally, the underwriters may reclaim selling concessions allowed for distributing the Offered Securities in the offering, if the underwriters repurchase previously distributed Offered Securities in transactions to cover short positions, in stabilization transactions or otherwise. Any of these activities may stabilize or maintain the market prices of the Offered Securities above independent market levels. The underwriters are not required to engage in any of these activities and may end any of these activities at any time.

Certain underwriters have agreed to reimburse Delphi for certain expenses incurred by Delphi in connection with the offering of the Offered Securities. We currently estimate that our share of the total expenses of the offering of the Offered Securities, excluding underwriting discounts and commissions, will be approximately $500,000.

Affiliates of certain of the underwriters are lenders under our revolving credit facilities and will receive a portion of the amounts repaid under these facilities with the net proceeds of the offering of the Offered Securities. Because more than 10% of the net proceeds of the offering will be paid to certain affiliates of the underwriters, the offering is being made in accordance with Rule 2710(c)(8) of the Conduct Rules of the National Association of Securities Dealers, Inc. In addition, in the ordinary course of their respective businesses certain of the underwriters and their affiliates have engaged and may in the future engage in various other banking and financial services for and commercial transactions with Delphi and its affiliates.

We have agreed to indemnify the several underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended, or to contribute payments which the underwriters may be required to make in respect of such liabilities.

GENERAL INFORMATION

Application will be made to list the Offered Securities on the Luxembourg Stock Exchange. In connection with the listing application, the Amended and Restated Certificate of Incorporation and the Bylaws of Delphi and a legal notice relating to the issuance of the Offered Securities have been deposited prior to listing with the Greffier en Chef du Tribunal d'Arrondissement de et a Luxembourg, where copies thereof may be obtained upon request. Copies of the above documents together with this prospectus supplement, the accompanying prospectus, the Indenture and Delphi's current Annual and Quarterly Reports, as well as all future Annual Reports and Quarterly Reports, so long as any of the Offered Securities are outstanding, will be made available for inspection at the main office of Banque Internationale a Luxembourg S.A. in Luxembourg. Banque Internationale a Luxembourg S.A. will act as intermediary between the Luxembourg Stock Exchange and Delphi and the holders of the Offered Securities. In addition, copies of the Annual Reports and Quarterly Reports of Delphi and all other documents incorporated by reference in this prospectus supplement and the accompanying prospectus may be obtained free of charge at such office.

Other than as disclosed or contemplated herein or in the documents incorporated herein by reference, there has been no material adverse change in the financial position of Delphi since December 31, 1998.

Neither Delphi nor any of its subsidiaries is involved in litigation, arbitration, or administrative proceedings relating to claims or amounts that are material in the context of the issue of the Offered Securities.

Delphi accepts responsibility for the information contained in relation to Delphi and the provisions of the Offered Securities in this prospectus supplement and the accompanying prospectus.

The Offered Securities have been accepted for clearance through Euroclear and Cedelbank.

S-58

59

Resolutions relating to the issue and sale of the Offered Securities were adopted by the Board of Directors of Delphi on March 15, 1999.

The notes due 2004 have been assigned Euroclear and Cedel Common Code No. 9726373, International Security Indemnification Number (ISIN) US247126AA38 and CUSIP No. 247126 AA 3.

The notes due 2009 have been assigned Euroclear and Cedel Common Code No. 9726381, International Security Indemnification Number (ISIN) US247126AB11 and CUSIP No. 247126 AB 1.

The debentures due 2029 have been assigned Euroclear and Cedel Common Code No. 9726390, International Security Indemnification Number (ISIN) US247126AC93 and CUSIP No. 247126 AC 9.

## LEGAL MATTERS

The validity of the Offered Securities, as well as certain other legal matters, will be passed upon for Delphi by Drinker Biddle & Reath LLP. Certain legal matters will be passed upon for the underwriters by O'Melveny & Myers LLP. Certain legal matters relating to the federal tax consequences of the issuance of the Offered Securities and other matters relating thereto will be passed upon for Delphi by Drinker Biddle & Reath LLP.

S-59

60

PRINCIPAL OFFICE OF
DELPHI AUTOMOTIVE SYSTEMS CORPORATION

5725 Delphi Drive
Troy, Michigan 48098

TRUSTEE

The First National Bank of Chicago
Corporate Trust Office
One First National Plaza
Suite 0126
Chicago, Illinois 60670-0126

LUXEMBOURG PAYING AGENT AND TRANSFER AGENT

Banque Internationale a Luxembourg S.A.
69 route d'Esch
L-1470 Luxembourg

LUXEMBOURG STOCK EXCHANGE LISTING AGENT

Banque Internationale a Luxembourg S.A.
69 route d'Esch
L-1470 Luxembourg

LEGAL ADVISERS

| To Delphi Automotive Systems Corporation as to United States Law | To Delphi Automotive Systems Corporation as United States Tax Counsel | To the underwriters as to United States Law |
|---|---|---|
| Drinker Biddle &Reath LLP 1345 Chestnut Street Philadelphia, Pennsylvania 19107-3496 | Drinker Biddle &Reath LLP 1345 Chestnut Street Philadelphia, Pennsylvania 19107-3496 | O'Melveny &Myers LLP Citicorp Center 153 East 53rd Street New York, New York 10022 |

AUDITORS TO
DELPHI AUTOMOTIVE SYSTEMS CORPORATION

Deloitte & Touche LLP
600 Renaissance Center
Suite 900
Detroit, Michigan 48243-1704

S-60

61

PROSPECTUS

U.S. $2,500,000,000
[LOGO]

DELPHI AUTOMOTIVE SYSTEMS CORPORATION
5725 DELPHI DRIVE
TROY, MICHIGAN 48098
(248) 813-2000

DEBT SECURITIES

We may offer to sell up to U.S. $2,500,000,000 of our debt securities in one or more offerings. In this prospectus, we describe generally the terms of these securities. We will describe the specific terms of the securities that we offer in a supplement to this prospectus at the time of each offering. If any offering involves underwriters, dealers or agents, we will describe our arrangements with them in the prospectus supplement that relates to that offering.

SEE "RISK FACTORS" ON PAGE 5 FOR INFORMATION YOU SHOULD CONSIDER BEFORE BUYING THESE SECURITIES.

----------------------

The Securities and Exchange Commission and State Securities regulators have not approved or disapproved these securities, or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

----------------------

The date of this prospectus is March 30, 1999.

TABLE OF CONTENTS

|                                              | PAGE |
| -------------------------------------------- | ---- |
| About this Prospectus.......................................... | 2  |
| Where You Can Find More Information............................ | 3  |
| The Company................................................... | 4  |
| Risk Factors.................................................. | 5  |
| Use of Proceeds............................................... | 5  |
| Ratio of Earnings to Fixed Charges............................ | 5  |
| Description of Debt Securities................................ | 5  |
| Plan of Distribution.......................................... | 13 |
| Experts....................................................... | 15 |
| Legal Opinions................................................ | 15 |

------------------------

You should rely only on the information incorporated by reference or contained in this prospectus and any applicable prospectus supplement. We have not authorized anyone to provide you with information different from that contained in this prospectus. We are offering to sell, and seeking offers to buy, our securities only in jurisdictions where offers and sales are permitted. The information contained in this prospectus or the applicable prospectus supplement is accurate only as of the date on the front of those documents, regardless of the time of delivery of this prospectus or the applicable prospectus supplement or of any sale of our securities.

In this prospectus, "we", "us", "our" and the "Company" each refers to Delphi Automotive Systems Corporation.

ABOUT THIS PROSPECTUS

This prospectus is part of a registration statement that we have filed with the Securities and Exchange Commission using a "shelf" registration process. Under this shelf registration, we may sell the securities described in this prospectus in one or more offerings up to a total dollar amount of $2,500,000,000. We provide information to you about these securities in three documents that progressively provide more detail:

1. This prospectus, which contains general information that may or may not apply to each offering of securities.

2. The applicable prospectus supplement, which will contain more specific information than this prospectus and may also add, update or change information contained in this prospectus. To the extent information differs from this prospectus, as amended, you should rely on the different information in the applicable prospectus supplement.

3. The pricing supplement, if applicable, will provide final details about a specific offering and the terms of the offered securities, including their price. To the extent information differs from this prospectus or the prospectus supplement, you should rely on the different information in the pricing supplement.

You should read both this prospectus and any prospectus supplement or pricing supplement together with any additional information described under the heading "Where You Can Find More Information" to learn more about the Company and the securities offered.

63

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC, Washington, D.C., a registration statement on Form S-3 under the Securities Act of 1933, as amended, with respect to the securities that we are offering by this prospectus. This prospectus does not contain all of the information set forth in the registration statement and the exhibits and schedules thereto. Certain items are omitted in accordance with the rules and regulations of the SEC. For further information with respect to the Company and the securities offered hereby, reference is made to the registration statement and the exhibits and any schedules filed with the registration statement. Statements contained in this prospectus as to the contents of any contract or other document referred to are not necessarily complete and in each instance, if such contract or document is filed as an exhibit, reference is made to the copy of such contract or other document filed as an exhibit to the registration statement, each statement being qualified in all respects by such reference.

We file annual, quarterly and special reports, proxy statements and other information with the SEC. You may read and copy any document we file, including the registration statement, at the SEC's Public Reference Room at Room 1024, 450 Fifth Street, N.W., Washington, D.C. 20549 and at the SEC's regional offices located at Seven World Trade Center, Suite 1300, New York, New York 10048 and at Citicorp Center, Suite 1400, 500 West Madison Street, Chicago, IL 60661. For further information on the operation of the Public Reference Room, you may call the SEC at 1-800-SEC-0330. Our SEC filings are also available to the public over the Internet at the SEC's website at http://www.sec.gov. You may also inspect our SEC filings at the New York Stock Exchange, the exchange on which our common stock is listed, at 20 Broad Street, 7th Floor, New York, New York 10005.

The SEC allows us to "incorporate by reference" the information in documents that we file with them. This means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and information in documents that we file after the date of this prospectus and before the termination of the offering contemplated by this prospectus will automatically update and supersede information in this prospectus.

We incorporate by reference our Annual Report on Form 10-K for the year ended December 31, 1998 (File No. 1-14787), and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, until we sell all of the securities offered by this prospectus.

We will provide without charge, upon written or oral request, to each person to whom this prospectus is delivered, a copy of any or all of the documents described above which have been or may be incorporated by reference in this prospectus but not delivered with this prospectus. Such request should be directed to:

Delphi Automotive Systems Corporation
Attn: Investor Relations
5725 Delphi Drive
Troy, Michigan 48098
Telephone Number: (248)813-2000

3

64

This prospectus contains or incorporates by reference forward-looking
statements that have been made pursuant to the provisions of the Private
Securities Litigation Reform Act of 1995. These forward-looking statements are
not historical facts, but rather are based on our current expectations,
estimates and projections about Delphi's industry, our beliefs and assumptions.
Words such as "anticipates", "expects", "intends", "plans", "believes", "seeks",
"estimates" and similar expressions are intended to identify forward-looking
statements. These statements are not guarantees of future performance and are
subject to certain risks, uncertainties and other factors, some of which are
beyond our control, are difficult to predict and could cause actual results to
differ materially from those expressed or forecasted in the forward-looking
statements. Many of these risks and uncertainties will be described with
particularity in the applicable prospectus supplement. We caution you not to
place undue reliance on these forward-looking statements, which reflect our
management's view only as of the date of this prospectus or the prospectus
supplement containing such forward-looking statements. We are not obligated to
update these statements or publicly release the result of any revisions to them
to reflect events or circumstances after the date of this prospectus or the
applicable prospectus supplement, or to reflect the occurrence of unanticipated
events.

THE COMPANY

We are the world's largest and most diversified supplier of components,
integrated systems and modules to the automotive industry, with 1998 net sales
of $28.5 billion. We have become a leader in the global automotive parts
industry by capitalizing on the extensive experience we have gained as the
principal supplier of automotive parts to General Motors, the world's largest
manufacturer of automotive vehicles. We are primarily a "Tier 1" supplier, which
means that we generally provide our products directly to automotive vehicle
manufacturers. We also sell our products to the worldwide aftermarket for
replacement parts and to customers other than vehicle manufacturers.

Before the initial public offering of our common stock in February 1999, we
were a wholly-owned subsidiary of General Motors. General Motors now owns
approximately 82.3% of our outstanding common stock and the public owns the
rest. Several years ago, we began to transform our Company from a North
America-based, captive component supplier to General Motors into a global
supplier of components, integrated systems and modules for a wide range of
customers. We now sell our products to every major manufacturer of light
vehicles in the world. We have also established an expansive global presence,
with a network of manufacturing sites, technical centers, sales offices and
joint ventures located in every major region of the world.

Through our experience with General Motors, we have developed a
sophisticated understanding of the design, engineering, manufacture and
operation of all aspects of the automotive vehicle. We have both extensive,
technical expertise in a broad range of product lines and strong systems
integration skills, which enable us to provide comprehensive, systems-based
solutions for our customers. We believe that we are one of the leading Tier 1
suppliers in each of our focused product areas. We operate our business along
three major product sectors which work closely together to coordinate our
product development and marketing efforts. Our three product sectors are:
Electronics & Mobile Communication, which includes our automotive electronics
and audio and communication systems; Safety, Thermal & Electrical Architecture,
which includes our interior, thermal and power and signal distribution products;
and Dynamics & Propulsion, which includes our energy and engine management,
chassis and steering products.

Our Company was incorporated in Delaware in late 1998 in preparation for
our initial public offering and for the separation of our business from General
Motors effective as of January 1, 1999, when we acquired the assets and assumed
the liabilities of the business of the Delphi Automotive Systems business sector
of General Motors.

General Motors has announced that it currently plans to complete its
divestiture of our Company later in 1999 by distributing all of its shares of
our common stock to the holders of General Motors' $1-2/3 common stock. General
Motors currently expects to accomplish this distribution through a split-off
(such as an exchange offer by General Motors in which holders of General Motors'
$1-2/3 common stock would

4

be invited to tender shares of that stock to General Motors in exchange for the 465 million shares of our common stock held by General Motors), a spin-off or some combination of both transactions. General Motors has sole discretion to determine the timing, structure and terms of the distribution. We have agreed to cooperate with General Motors in all respects to complete the divestiture because we believe that our complete separation from General Motors will enhance our ability to pursue our business strategy. General Motors is not, however, obligated to complete the divestiture and we cannot assure you as to whether or when it will occur.

## RISK FACTORS

You should carefully consider the specific risks set forth under the caption "Risk Factors" in the applicable prospectus supplement before making an investment decision. The risks and uncertainties described in the applicable prospectus supplement are not the only ones facing our Company. Additional risks and uncertainties not currently known to us or that we currently think are immaterial may also impact our business operations.

## USE OF PROCEEDS

Unless we otherwise state in the applicable prospectus supplement, we will use the net proceeds from the sale of the securities to repay portions of the indebtedness outstanding under our revolving credit facilities or for other general corporate purposes.

## RATIO OF EARNINGS TO FIXED CHARGES

Our ratios of earnings to fixed charges were 6.4, 6.8, 4.3 and 1.7 for the years ended December 31, 1994, 1995, 1996 and 1997, respectively. Fixed charges exceeded earnings by $320 million for the year ended December 31, 1998, resulting in a ratio of less than one.

Our earnings available for fixed charges for the years ended December 31, 1998, 1997 and 1996 were impacted by a number of special items which management views as non-recurring in nature. The special items included charges associated with our evaluation of the competitiveness of our business, divestitures and plant closing charges as well as work stoppages at certain General Motors and Delphi locations. Excluding the impact of these special items, our ratio of earnings to fixed charges would have been 4.6, 6.3 and 7.0 for the years ended December 31, 1998, 1997 and 1996, respectively. For more information on special items and work stoppages, see "Management's Discussion and Analysis of Financial Condition and Results of Operations-Results of Operations-Special Items and Work Stoppages" and Note 3 to our consolidated financial statements included in our 1998 Annual Report on Form 10-K incorporated herein by reference.

Our ratio of earnings to fixed charges for each of the periods indicated has been computed by dividing earnings before income taxes and fixed charges by the fixed charges. Earnings have been adjusted to exclude equity earnings of non-consolidated affiliates and include cash distributions received from non-consolidated affiliates. This ratio includes the earnings and fixed charges of the Company and its consolidated subsidiaries. Fixed charges primarily include interest expense and amortization of debt expense.

## DESCRIPTION OF DEBT SECURITIES

We describe in this section the general terms that will apply to any particular series of debt securities that the Company may offer in the future. When the Company issues a particular series, we will describe in the prospectus supplement that relates to the series (i) the specific terms of the debt securities and (ii) the extent to which the general terms described in this section apply to the debt securities of that series.

5

The Company expects to issue the debt securities under an Indenture with The First National Bank of Chicago as Trustee, which is included as an exhibit to the registration statement of which this prospectus forms a part. In the discussion that follows, we summarize particular provisions of the Indenture and include the relevant section numbers of the Indenture in parentheses. Our discussion of Indenture provisions is not complete; you should read the Indenture for a more complete understanding of the provisions we describe.

The aggregate principal amount of debt securities that the Company may issue under the Indenture is unlimited. (Section 2.01)

GENERAL

Each prospectus supplement relating to a particular series of debt securities that the Company offers will describe the specific terms of the series of debt securities. Those specific terms will include some or all of the following:

(i) the designation of the debt securities;

(ii) the authorized denominations if other than $1000 (or integrals of $1000) for registered debt securities and if other than $5000 for unregistered securities, and any limit on the aggregate principal amount of the debt securities;

(iii) the percentage of their principal amount at which the debt securities are issued;

(iv) the maturity date or dates of the debt securities (or the manner of determining the maturity date);

(v) the annual interest rate or rates, if any, which may be fixed or variable; and the manner of calculating any variable interest rate;

(vi) the date or dates from which interest, if any, will accrue (or the method of determining such date or dates), and the interest payment dates and their associated record dates;

(vii) whether the Company may redeem the debt securities and, if so, the redemption date or dates, redemption price or prices, and other applicable terms of redemption;

(viii) any mandatory or optional sinking fund or analogous provisions;

(ix) provisions for the defeasance of the debt securities;

(x) the form in which we will issue debt securities (registered or bearer), any restrictions on the exchange of one form for another and on the offer, sale and delivery of debt securities in either form;

(xi) whether and under what circumstances the Company will pay additional amounts on debt securities held by a person who is not a United States person (as defined in the prospectus supplement) in respect of specified taxes, assessments or other governmental charges withheld or deducted; and if so, whether the Company has the option to redeem the affected debt securities rather than pay such additional amounts;

(xii) if other than U.S. dollars, the currency or currencies for which the debt securities may be purchased and the currency in which the principal of, premium, if any, and interest, if any, on the debt securities is payable;

(xiii) any exchanges on which the debt securities are listed;

(xiv) whether the debt securities are to be issued in book-entry form and, if so, the identity of the depositary for such book-entry debt securities;

(xv) the place or places where the principal of, premium, if any, interest, if any, and certain additional amounts required in respect of taxes owed to holders of the debt securities, if any, on the debt securities is payable;

6

67

(xvi) if the amount of principal of and interest on the debt securities may be determined with reference to an index based on a currency other than that in which the debt securities are denominated, the manner of determining such amounts;

(xvii) the portion of the principal amount (if other than the principal amount) of the debt securities payable upon declaration of acceleration of their maturity date;

(xviii) the form and terms of any certificates, documents or conditions required for the issuance of debt securities in definitive form;

(xix) any trustees, depositories, authenticating or paying agents, transfer agents, registrars or any other agents with respect to the debt securities;

(xx) any other specific terms of the debt securities, including any additional covenants and any terms that may be required or advisable under applicable laws or regulations. (Section 2.01)

The debt securities will be unsecured and will rank equally and ratably with all other unsecured and unsubordinated indebtedness of the Company (other than obligations preferred by mandatory provisions of law).

Unless we say otherwise in a prospectus supplement, holders of debt securities may present them for transfer (unless the debt securities are issued in book-entry form) or payment at the office of the Trustee, One First National Plaza, Suite 0126, Chicago, Illinois 60670-0126. The Company may, however, pay the interest on registered debt securities by mailing checks to the holders of those debt securities at the addresses listed in the Company's register or, for holders of at least U.S. $10,000,000 aggregate principal amount of debt securities, by wire transfer of immediately available funds. (Sections 4.01 and 4.02) The Company will not levy a service charge for any transfer or exchange of registered debt securities, but may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection with a transfer or exchange. (Section 2.05)

Holders of debt securities in bearer form (together with any coupons attached to them) must physically present such debt securities or coupons for payment, subject to any applicable laws and regulations, at one of the paying agencies that the Company maintains in a city or cities located outside the United States. (Sections 4.01 and 4.02) Debt securities in bearer form (except for temporary bearer securities) and any coupons attached to them will be transferable by delivery. (Section 2.05)

The Company may issue some of the debt securities as discounted debt securities (bearing no interest or interest at a rate that is below market at the time of issuance), which are sold at a substantial discount below their stated principal amount. When an event of default occurs with respect to a particular series of debt securities, the amount that the holders of such series may declare to be immediately due and payable will be less than the principal amount in the case of discounted debt securities. (Section 6.01)

If a prospectus supplement specifies that the debt securities will have a redemption option, the "Option to Elect Repurchase" will constitute an issuer tender offer under the Exchange Act of 1934, as amended. The Company will comply with all issuer tender offer rules and regulations under the Securities Exchange Act of 1934, as amended, if such redemption option is elected, including making any required filings with the Securities and Exchange Commission and furnishing certain information to the holders of the debt securities.

BOOK-ENTRY SECURITIES--DELIVERY AND FORM

Some or all of the debt securities of a series may be issued in the form of one or more global securities, each of which will have an aggregate principal amount equal to the aggregate principal amount of the debt securities that it represents. Each global security will be deposited with a depositary (to be specified in the applicable prospectus supplement) or its nominee, and, if in registered form, registered in the name of the depositary or the depositary's nominee. Each depositary for a global security in registered form must be a clearing agency registered under the Securities Exchange Act of 1934, as amended, and any other applicable statute or regulation. (Section 2.03)

7

The beneficial owner of a debt security represented by a global security in bearer form may exchange its interest in the global security for a debt security or debt securities in either bearer or registered form of any authorized denomination, subject to the rules of the depositary. (Section 2.10)

We will describe the specific terms of the depositary arrangement with respect to a series of debt securities in the applicable prospectus supplement.

CERTAIN COVENANTS

In this section we describe the principal covenants that will apply to the debt securities unless otherwise indicated in the applicable prospectus supplement. We make use of several defined terms; the associated definitions are located at the end of this section.

Limitation on Liens.

The Indenture provides that the Company will not, and will not permit any of its Manufacturing Subsidiaries to, issue or assume any Debt secured by a Mortgage upon any Domestic Manufacturing Property of the Company or of any Manufacturing Subsidiary, or upon any shares of stock or indebtedness of any Manufacturing Subsidiary (whether that Domestic Manufacturing Property, those shares of stock or that indebtedness are then currently owned or later acquired) without providing at the same time that the Company issues or assumes any such Debt that the debt securities (together with any other indebtedness of the Company or the Manufacturing Subsidiary ranking equally with the debt securities then existing or later created) will be secured equally and ratably with such Debt.

The foregoing restriction does not, however, apply if the aggregate amount of Debt that the Company or any Manufacturing Subsidiary issues or assumes and so secures by Mortgages, together with (i) all other Debt of the Company and its Manufacturing Subsidiaries which (if originally issued or assumed at such time) would otherwise be subject to the foregoing restrictions, but not including Debt permitted to be secured under clauses (i) through (v) of the immediately following paragraph and not including Permitted Receivables Financings, and (ii) all Attributable Debt of the Company and its Manufacturing Subsidiaries in respect of sale and lease-back transactions, does not at the time exceed 15% of Consolidated Net Tangible Assets as shown on the audited consolidated financial statements for the most recently completed fiscal year.

In addition, the covenant described in the first paragraph above does not apply to:

(i) Mortgages on property, shares of stock or indebtedness of any corporation or other entity existing at the time (a) that the corporation or other entity becomes a Manufacturing Subsidiary or (b) of a sale, lease or other disposition of all or substantially all of the properties of the corporation or other entity to the Company or a Manufacturing Subsidiary;

(ii) Mortgages on property that exist at the time the Company or a Manufacturing Subsidiary acquires the property; or Mortgages to secure (a) the payment of all or part of the purchase price of such property when the Company or a Manufacturing Subsidiary acquires it, (b) any Debt incurred prior to, at the time of, or within 180 days after, the later of the date of acquisition of such property and the date such property is placed in service, for the purpose of financing all or any part of its purchase price, or (c) any Debt incurred for the purpose of financing the Company's or a Manufacturing Subsidiary's cost of improvements to such acquired property;

(iii) Mortgages securing a Manufacturing Subsidiary's Debt to the Company or to another Subsidiary;

(iv) Mortgages on property of the Company or a Manufacturing Subsidiary in favor of:

(a) the United States of America or any State,

(b) any department, agency or instrumentality or political subdivision of the United States of America or any State, or

8

69

  (c) any other country, or any political subdivision of any other country,

in connection with financing arrangements between the Company or a Manufacturing Subsidiary and any of the foregoing governmental bodies or agencies, to the extent that Mortgages are required by the governmental programs under which those financing arrangements are made, to secure partial, progress, advance or other payments under any contract or statute or to secure any indebtedness incurred for the purpose of financing all or part of the purchase price or the cost of construction of the property subject to such Mortgages;

  (v) Any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any Mortgage referred to in the foregoing clauses (i) to (iv), as long as (a) the principal amount of Debt secured by any such Mortgage does not exceed the principal amount of Debt so secured at the time of such extension, renewal or replacement and (b) the extension, renewal or replacement is limited to all or a part of the property (including improvements) that secured the Mortgage being extended, renewed or replaced. (Section 4.06)

Limitation on Sale and Lease-Back.

  The Indenture provides that the Company will not, and will not permit any Manufacturing Subsidiary to, enter into any arrangement with any person in which the Company or a Manufacturing Subsidiary leases from such person any Domestic Manufacturing Property that (i) the Company or the Manufacturing Subsidiary owns on the date that the debt securities are originally issued and (ii) the Company or the Manufacturing Subsidiary has sold or will sell to such person (except for temporary leases having a maximum term of three years and except for leases between the Company and a Manufacturing Subsidiary or between Manufacturing Subsidiaries), unless either:

  (i) The Company or the Manufacturing Subsidiary could, under the covenant on limitation on liens described above, issue, assume, extend, renew or replace Debt secured by a Mortgage on the Domestic Manufacturing Property equal in amount to the Attributable Debt in respect of such sale and lease-back arrangement without equally and ratably securing the debt securities; however, on and after the date that the sale and lease-back arrangement becomes effective, the Attributable Debt in respect of such sale and lease-back arrangement would be deemed for all purposes under the covenant on limitation on liens described above and the covenant on limitation on sale and lease-back to be Debt subject to the provisions of the covenant on limitation on liens described above (which provisions include the exceptions set forth in clauses (i) through (v) of this description of such covenant), or

  (ii) Within 180 days of the effective date of the sale and lease-back arrangement, the Company applies a cash amount equal to the Attributable Debt in respect of the arrangement to the retirement (other than any mandatory retirement or by way of payment at maturity) of Debt of the Company or any Manufacturing Subsidiary (other than Debt owned by the Company or any Manufacturing Subsidiary) that by its terms matures at, or is extendible or renewable at the borrower's option to a date more than twelve months after the date of the creation of such Debt. (Section 4.07)

Limitation on Consolidation, Merger, Sale or Conveyance.

  The Indenture provides that the Company will not merge or consolidate with any other entity, and will not sell or convey all or substantially all of its assets to any person or entity, unless:

  (i) Either the Company is the surviving corporation, or if not, the successor entity is organized under the laws of the United States or any State and expressly assumes, by executing a supplemental indenture, (a) the obligation to pay the principal of, premium, if any, interest, if any, and any other additional amounts, on all the debt securities and any coupons and (b) the performance of all of the Company's covenants and the satisfaction of all the conditions to be satisfied by the Company under the Indenture;

9

70

(ii) Immediately after the merger, consolidation, sale or conveyance is effective, no event of default under the Indenture will have occurred or be continuing; and

(iii) The Company delivers to the Trustee under the Indenture a certificate and legal opinion each stating that the merger, consolidation, sale or conveyance, any supplemental indenture, and any assumption by the successor entity of the Company's obligations described above, complies with the requirements set forth in Article Eleven of the Indenture regarding the Company's ability to carry out a merger, consolidation, sale or conveyance of assets. (Section 11.01)

Definitions Applicable to Covenants.

The following definitions will apply to the covenants summarized above:

(i) "Attributable Debt" means, at the time of determination as to any lease, the present value (discounted at the actual rate, if stated, or, if no rate is stated, the implicit rate of interest of such lease transaction as determined by the chairman, president, any vice chairman, any vice president, the treasurer or any assistant treasurer of the Company), calculated using the interval of scheduled rental payments under such lease, of the obligation of the lessee for net rental payments during the remaining term of such lease (excluding any subsequent renewal or other extension options held by the lessee). The term "net rental payments" means, with respect to any lease for any period, the sum of the rental and other payments required to be paid in such period by the lessee thereunder, but not including, however, any amounts required to be paid by such lessee (whether or not designated as rental or additional rental) on account of maintenance and repairs, insurance, taxes, assessments, water rates, indemnities or similar charges required to be paid by such lessee thereunder or any amounts required to be paid by such lessee thereunder contingent upon the amount of sales, earnings or profits or of maintenance and repairs, insurance, taxes, assessments, water rates, indemnities or similar charges; provided, however, that, in the case of any lease which is terminable by the lessee upon the payment of a penalty in an amount which is less than the total discounted net rental payments required to be paid from the later of the first date upon which such lease may be so terminated and the date of the determination of net rental payments, "net rental payments" shall include the then-current amount of such penalty from the later of such two dates, and shall exclude the rental payments relating to the remaining period of the lease commencing with the later of such two dates.

(ii) "Consolidated Net Tangible Assets" means, at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on a consolidated balance sheet of the Company and its consolidated Subsidiaries less (i) all current liabilities and (ii) goodwill, trade names, patents, unamortized debt discount, organization expenses and other like intangibles of the Company and its consolidated Subsidiaries.

(iii) "Debt" means notes, bonds, debentures or other similar evidences of indebtedness for money borrowed.

(iv) "Domestic Manufacturing Property" means any manufacturing plant or facility owned by the Company or any Manufacturing Subsidiary which is located within the continental United States of America and, in the opinion of the Board of Directors, is of material importance to the total business conducted by the Company and its consolidated affiliates as an entity.

(v) "GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by a successor entity as may be in general use by significant segments of the accounting profession, which are applicable to the circumstances as of the date of determination.

(vi) "Manufacturing Subsidiary" means any Subsidiary (A) substantially all the property of which is located within the continental United States of America, (B) which owns a Domestic

10

Manufacturing Property and (C) in which the Company's investment, direct or indirect and whether in the form of equity, debt, advances or otherwise, is in excess of $1 billion as shown on the books of the Company as of the end of the fiscal year immediately preceding the date of determination; provided, however, that "Manufacturing Subsidiary" shall not include any Subsidiary that is principally engaged in leasing or in financing installment receivables or otherwise providing financial or insurance services to the Company or others or that is principally engaged in financing the Company's operations outside the continental United States of America.

(vii) "Mortgage" means any mortgage, pledge, lien, security interest, conditional sale or other title retention agreement or other similar encumbrance.

(viii) "Non-Recourse Debt" means all Debt which, in accordance with GAAP, is not required to be recognized on a consolidated balance sheet of the Company as a liability.

(ix) "Permitted Receivables Financings" means, at any date of determination, the aggregate amount of any Non-Recourse Debt outstanding on such date relating to securitizations or other similar off-balance sheet financings of accounts receivable of the Company or any of its Subsidiaries.

(x) "Subsidiary" means any corporation or other entity of which at least a majority of the outstanding stock or other beneficial interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other governing body of such corporation or other entity (irrespective of whether or not at the time stock or other beneficial interests of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by the Company, or by one or more Subsidiaries, or by the Company and one or more Subsidiaries. (Section 4.07)

DEFEASANCE

If the terms of a particular series of debt securities provide for defeasance of those debt securities, the Company may, at its option, (i) discharge its obligations under the Indenture with respect to, and the entire indebtedness on all the outstanding debt securities of, that series or (ii) not comply with any term, provision, condition or covenant contained in the Indenture with respect to that series, in each case by:

(i) depositing with the Trustee funds, or obligations issued or guaranteed by the United States of America, sufficient to pay and discharge the entire indebtedness on all outstanding debt securities of the series, or fulfilling other terms and conditions of the satisfaction and discharge of the debt securities of the series;

(ii) paying all other sums payable with respect to the outstanding debt securities of the series;

(iii) delivering to the Trustee a legal opinion confirming that the holders of the outstanding debt securities and any related coupons will not recognize income, gain or loss for Federal income tax purposes as a result of the defeasance of their debt securities; and

(iv) delivering to the Trustee an officer's certificate and legal opinion each confirming that the Company has complied with all conditions relating to defeasance of the debt securities contained in the Indenture. (Section 12.02)

MODIFICATION OF THE INDENTURE

The Indenture provides that the Company and the Trustee may enter into supplemental indentures without the consent of the holders of the debt securities to (a) evidence the assumption by a successor corporation of the obligations of the Company, (b) add covenants for the protection of the holders of the debt securities, (c) add or change any of the provisions of the Indenture to permit or facilitate the issuance of debt securities of any series in bearer form and to provide for the exchange of debt securities in bearer form with registered debt securities, (d) cure any ambiguity or correct any inconsistency in the Indenture or in a supplemental indenture, (e) transfer, assign, mortgage or pledge any property to or with the Trustee, (f) establish the form or terms of debt securities of any series as permitted by the terms of

11

the Indenture, (g) evidence the acceptance of appointment by a successor trustee and (h) change or eliminate provisions of the Indenture where the changes or eliminations do not apply to any debt security outstanding and become effective only when there is no debt security outstanding of a series created before the execution of the supplemental indenture that is entitled to the benefit of the provision being changed or eliminated. (Section 10.01)

The Indenture also provides that the Company and the Trustee may enter into a supplemental indenture to modify the Indenture, any supplemental indenture or the rights of the holders of the debt securities issued under either such Indenture or supplemental indenture, with the consent of the holders of not less than a majority in principal amount of the debt securities of all series at the time outstanding that are affected by that modification (voting as one class) if the modification does not:

(i) (a) change the fixed maturity of any debt securities, (b) reduce their principal amount or premium, if any, (c) reduce the rate or extend the time of payment of interest or any additional amounts payable on the debt securities, (d) reduce the amount due and payable upon acceleration of the maturity of the debt securities or the amount provable in bankruptcy or (e) make the principal of, or any interest, premium or additional amounts on, any debt security payable in a coin or currency different from that provided in the debt security,

(ii) impair the right to initiate suit for the enforcement of any such payment on or after the stated maturity of the debt securities, or

(iii) reduce the requirement, stated above, for the consent of the holders of the debt securities to any modification described above, or the percentage required for the consent of the holders to waive defaults, without the consent of the holder of each debt security so affected. (Section 10.02)

EVENTS OF DEFAULT

An event of default with respect to any series of debt securities is defined in the Indenture as: (a) default in payment of any principal or premium, if any, on the series; (b) default for 30 days in payment of any interest or additional amounts due with respect to the series; (c) default for 90 days after notice in performance of any other covenant or agreement applicable to the debt securities or contained in the Indenture; (d) default by the Company or any Significant Subsidiary in any payment of $25,000,000 or more of principal of or interest on any Debt or in the payment of $25,000,000 or more on account of any guarantee in respect of Debt, beyond any period of grace that may be provided in the instrument or agreement under which such Debt or guarantee was created (for these purposes, the term "Significant Subsidiary" is defined as any Subsidiary of the Company that, at any time, has at least 5% of the consolidated revenues of the Company and its Subsidiaries at such time as reflected in the most recent annual audited consolidated financial statements of the Company; the term "Subsidiary" is defined as in our description of the covenants under the Indenture); or (e) certain events of bankruptcy, insolvency or reorganization. (Section 6.01)

If an event of default under clause (a), (b), (c) or (d) above occurs with respect to any series, the Trustee or the holders of at least 25% in aggregate principal amount of all debt securities then outstanding affected by the event of default may declare the principal (or, in the case of discounted debt securities, the amount specified in their terms) of all debt securities of the affected series to be due and payable. (Section 6.01)

If an event of default under clause (e) above occurs, the Trustee or the holders of at least 25% in aggregate principal amount of all the debt securities then outstanding (voting as one class) may declare the principal (or, in the case of discounted debt securities, the amount specified in their terms) of all outstanding debt securities not already due and payable to be due and payable. (Section 6.01)

If the principal amount of debt securities has been declared due and payable, the holders of a majority in aggregate principal amount of the outstanding debt securities of the applicable series (or of all

12

the outstanding debt securities) may waive any event of default with respect to that series (or with respect to all outstanding debt securities) if:

    (i) The Company deposits with the Trustee all required payments on the debt securities, plus certain fees, expenses, disbursements and advances of the Trustee and

    (ii) all defaults under the Indenture have been remedied. (Section 6.01)

The holders of a majority in aggregate principal amount of the debt securities of a particular series may also waive any default with respect to that series and its consequences, except a default:

    (i) in the payment of principal of, or any premium, interest or additional amounts on, any debt securities of that series or

    (ii) in respect of a covenant or provision in the Indenture that may not be modified without the consent of the holders of each outstanding debt security that would be affected by the modification. (Section 6.06)

The Indenture provides that the Trustee may withhold notice of any default to the securityholders (except for default in the payment of principal or any premium, interest or additional amounts) if it considers it in the interests of the securityholders to do so. (Section 6.07)

Subject to the provisions of the Indenture relating to the duties of the Trustee when an event of default occurs, the Trustee is not obligated to exercise any of its rights or powers under the Indenture at the request, order or direction of any of the securityholders, unless those securityholders have offered to the Trustee reasonable indemnity. (Sections 7.01 and 7.02)

Subject to such provisions for the indemnification of the Trustee and to certain other limitations, the holders of a majority in aggregate principal amount of the debt securities of all series affected by the occurrence of an event of default (voting as one class) at the time outstanding may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee. (Section 6.06)

CONCERNING THE TRUSTEE

The First National Bank of Chicago is the Trustee under the Indenture. The First National Bank of Chicago acts as depositary for funds of, makes loans to, acts as trustee and performs certain other services for, the Company and certain of its subsidiaries and affiliates in the normal course of its business.

PLAN OF DISTRIBUTION

We may sell the securities from time to time: (i) directly to purchasers, (ii) through agents, (iii) through underwriters or dealers or (iv) through a combination of these methods.

GENERAL

Underwriters, dealers, agents and remarketing firms that participate in the distribution of the offered securities may be "underwriters" as defined in the Securities Act of 1933, as amended. Any discounts or commissions they receive from us and any profits they receive on the resale of the offered securities may be treated as underwriting discounts and commissions under the Securities Act of 1933, as amended. We will identify any underwriters, agents or dealers and describe their commissions, fees or discounts in the applicable prospectus supplement or pricing supplement.

AGENTS

We may designate agents to sell the securities. The agents will agree to use their best efforts to solicit purchases for the period of their appointment.

## UNDERWRITERS

If underwriters are used in a sale, they will acquire the offered securities for their own account. The underwriters may resell the securities in one or more transactions, including negotiated transactions. These sales will be made at a fixed public offering price or at varying prices determined at the time of the sale. We may offer the securities to the public through an underwriting syndicate or through a single underwriter.

Unless the applicable prospectus supplement or pricing supplement states otherwise, the obligations of the underwriters to purchase the offered securities will be subject to certain conditions contained in an underwriting agreement that the Company and the underwriters will enter into. The underwriters will be obligated to purchase all of the securities of the series offered if any of the securities are purchased, unless the applicable prospectus supplement or pricing supplement says otherwise. Any initial public offering price and any discounts or concessions allowed, re-allowed or paid to dealers may be changed from time to time.

## DEALERS

We may sell the offered securities to dealers as principals, who may then resell such securities to the public either at varying prices determined by such dealers or at a fixed offering price agreed to with the Company.

## REMARKETING FIRMS

We may sell securities to one or more remarketing firms, acting as principals for their own accounts or as agents for the Company, who will remarket the securities upon purchasing them in accordance with a redemption or repayment pursuant to the terms of such securities.

## DIRECT SALES

We may choose to sell the offered securities directly. In this case, no underwriters or agents would be involved.

## INSTITUTIONAL PURCHASERS

We may authorize agents, dealers or underwriters to solicit certain institutional investors to purchase offered securities on a delayed delivery basis pursuant to delayed delivery contracts providing for payment and delivery on a specified future date. The applicable prospectus supplement or pricing supplement will provide the details of any such arrangement, including the offering price and commissions payable on the solicitations.

We will enter into such delayed delivery contracts only with institutional purchasers that we approve. Such institutions may include commercial and savings banks, insurance companies, pension funds, investment companies and educational and charitable institutions.

## INDEMNIFICATION

We may have agreements with agents, underwriters, dealers and remarketing firms to indemnify them against certain civil liabilities, including liabilities under the Securities Act of 1933, as amended. Agents, underwriters, dealers and remarketing firms, and their affiliates, may engage in transactions with, or perform services for, us in the ordinary course of business. This includes commercial banking and investment banking transactions.

## MARKET MAKING, STABILIZATION AND OTHER TRANSACTIONS

Each series of offered debt securities will be a new issue and will have no established trading market. We may elect to list any series of offered debt securities on an exchange. Any underwriters that we use in the sale of offered securities may make a market in such securities, but may discontinue such market

making at any time without notice. Therefore, we cannot assure that the
securities will have a liquid trading market.

Any underwriter may engage in stabilizing transactions, syndicate covering
transactions and penalty bids in accordance with Rule 104 under the Securities
Exchange Act of 1934, as amended. Stabilizing transactions permit bids to
purchase the underlying security so long as the stabilizing bids do not exceed a
specified maximum. Syndicate covering transactions involve purchases of the
securities in the open market after the distribution has been completed in order
to cover syndicate short positions. Penalty bids permit the underwriters to
reclaim a selling concession from a syndicate member when the securities
originally sold by such syndicate member are purchased in a syndicate covering
transaction to cover syndicate short positions. Such stabilizing transactions,
syndicate covering transactions and penalty bids may cause the price of the
securities to be higher than it would otherwise be in the absence of such
transactions. The underwriters may, if they commence these transactions,
discontinue them at any time.

## EXPERTS

The financial statements incorporated by reference in this prospectus from
the Company's Annual Report on Form 10-K have been audited by Deloitte & Touche
LLP, independent auditors, as stated in their report incorporated herein, and
have been so incorporated in reliance upon the report of that firm given upon
their authority as experts in accounting and auditing.

## LEGAL OPINIONS

Unless we indicate otherwise in the applicable prospectus supplement,
Drinker Biddle & Reath LLP, Philadelphia, Pennsylvania, will issue an opinion
about the legality of the securities that we are offering in this prospectus. We
will also provide in the applicable prospectus supplement the name of counsel
that will issue an opinion as to certain legal matters for any underwriters,
dealers or agents.

76

[DELPHI LOGO]

```
</TEXT>
</DOCUMENT>
```

Exhibit C

1                                                          1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   DELPHI CORPORATION,

8

9           Debtor.

10

11  - - - - - - - - - - - - - - - - - - - -x

12

13              U.S. Bankruptcy Court

14              One Bowling Green

15              New York, New York

16

17              April 7, 2006

18              1:49 p.m.

19

20  B E F O R E:

21

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

DELPHI CORPORATION                          115

1
2       THE COURT:  But nothing in this
3   settlement prevents anyone from arguing
4   that down the road.
5       MR. FOX:  We could certainly, I
6   guess, make some argument vis-a-vis the
7   debtor Delphi Corp. that it has some
8   obligation to assert these claims against
9   the subsidiaries.
10      I would make one other point.  I
11  think Mr. Butler's argument is a little
12  too facile, as well though, when he says
13  that the subsidiaries are merely doing a
14  benefit to Delphi Corp. by carrying out
15  the terms of Delphi Corp.'s agreement.
16  If they're not bound by this or parties
17  to this, then I don't why they're using
18  these, you know, union employees at too
19  high a price and why they're not just
20  going out and doing something different.
21  I mean, then it's a little disingenuous,
22  I think, to say they're not parties to
23  the agreement, they're not bound by it,
24  yet, they can't just go out and do what
25  they want.

DELPHI CORPORATION                    116

1
2        THE COURT:  Well, that's a good
3    question, but I, well, have to assume
4    that in all of the turmoil that
5    surrounded the labor issues, someone has
6    an answer to that that says they can't go
7    out and hire --
8        MR. FOX:  I'm sure that's the case.
9    I'm sure that --
10        THE COURT:  Ms. Ceccotti is
11    standing up to tell me why.
12        MR. FOX:  And I think that Ms.
13    Ceccotti is going to jump up to say that.
14        MS. CECCOTTI:  Well, I feel that
15    we're burdened today because nobody
16    apparently has in the courtroom a copy of
17    the collective bargaining agreement --
18        MR. FOX:  No, we do.  We do have
19    it.  There is a copy.
20        MS. CECCOTTI:  -- because if you
21    look in it you would see that the
22    agreement probably provides for certain
23    classes and class of employees wherever
24    they are in the system.  I mean, this is
25    how agreements are set up.  I've been

1        DELPHI CORPORATION                    117

2        listening to this description and it's

3        extremely foreign to me because I know

4        how CBAs are set up.  So, I don't think

5        that this is really a productive plan at

6        all.

7             MR. FOX:  At my request the

8        agreement is here.  And I don't

9        understand these things very well.

10            THE COURT:  Well, at the minimum,

11       if the agreement said that GM was going

12       to assert its claim against the

13       subsidiaries that use UAW employees,

14       wouldn't the subsidiaries go right back

15       and assert that that's -- they should be

16       reimbursed for that by Delphi since

17       Delphi is the party on the collective

18       bargaining agreement and on the contracts

19       with GM?

20            MR. FOX:  Yes.  I'd be happy to be

21       involved in that discussion.  But that

22       doesn't, I don't think, answer the point

23       today.

24            THE COURT:  I guess that my

25       question is it doesn't seem to be a magic

DELPHI CORPORATION                    118

1
2   fix.  It's not an either or issue to me

3   to just say that we're going to shift it

4   to be asserted against the subsidiaries.

5   I don't see how that fixes it.

6         MR. FOX:  Well, that, I think, from

7   the perspective of the significant

8   creditor of Delphi Corporation, that

9   certainly would help someone.

10        THE COURT:  But leaving aside

11  whether anyone would agree to it since

12  Delphi Corporation is the party on the

13  agreements, even if someone did agree to

14  it doesn't Delphi Corporation have to

15  assume that it's going to get a claim

16  back from the subsidiaries?

17        MR. FOX:  I'm not sure about that.

18  Particularly, if what Ms. Ceccotti

19  described is correct.  I mean, as I

20  understand it, each subsidiary is paying

21  --

22        THE COURT:  But it's liable, too.

23  It's a question of being liable.  I just

24  --

25        MR. FOX:  Well, if they're getting

```
 1        DELPHI CORPORATION                  119
 2    the benefit of the reduced wages and the
 3    flowbacks and all the benefits that this
 4    agreement -- the attrition agreement
 5    presumably provides then I don't know
 6    what they'd have to complain about in
 7    being part of --
 8        THE COURT:  Because Delphi's being
 9    relieved of an enormous liability under
10    your formulation.
11        MR. FOX:  But so, presumably, are
12    the subsidiaries.  You can't separate
13    them.  I mean, as Ms. Ceccotti said --
14        THE COURT:  Well, but if that's the
15    case then it doesn't matter either way.
16        MR. FOX:  No, it does.  Because
17    you're putting all of GM's claim in one
18    particular entity.
19        THE COURT:  But if the subsidiaries
20    are benefiting, too, --
21        MR. FOX:  Yes.
22        THE COURT:  -- and, therefore,
23    wouldn't have a basis of asserting the
24    claim against Delphi then Delphi, through
25    its equity interest in the subsidiaries,
```

```
 1        DELPHI CORPORATION                    235

 2        C E R T I F I C A T I O N

 3          I, Esther Accardi, hereby certify that

 4     the foregoing is a true and correct

 5     transcription, to the best of my ability, of

 6     the sound recorded proceedings submitted for

 7     transcription in the matter of:

 8     Delphi Corporation.

 9

10          I further certify that I am not employed

11     by nor related to any party to this action.

12

13          In witness whereof, I hereby sign this

14     date:

15     April 13, 2006

16

17     _____

18     Esther Accardi

19

20

21

22

23

24

25
```

Exhibit D

EXHIBIT D

INTERCOMPANY AGREEMENT

This Agreement is made and entered into this _17th_ day of May 1999 by and among Delphi Automotive Systems, Inc., a Delaware corporation, Delphi Automotive Systems LLC, a Delaware limited liability company, and Delphi Automotive Systems (Holding), Inc., a Delaware corporation, (individually a "Company" and collectively, the "Companies") in their own name and in the name of and on behalf of each of their subsidiaries. As used in this Agreement, "subsidiary" means any corporation, partnership, limited liability company, or other legal business organization, in which any of the parties hereto holds, directly or indirectly, a majority of the stock, partnership or other interest, entitled to select the Board of Directors or other governing body of such entity.

NOW, THEREFORE, for good and valuable consideration, and intending to be legally bound hereby, each of the parties hereto agrees on its own behalf, and on behalf of each of its subsidiaries, as follows:

1.    <u>Intercompany Transactions</u>.  Each Company, and each subsidiary, shall maintain books and records in accordance with generally accepted accounting principles consistently applied, to reflect all intercompany transactions, including transactions involving loans, dividends, capital contributions, advances.  Payments and repayments on account thereof shall be reflected in an intercompany account, established in the books and records of each of the Companies and the subsidiaries involved in such transactions.  Each intercompany transaction shall be promptly evidenced by an entry, so that the intercompany account shall indicate the dates on which advances, contributions, payments, repayments, or prepayments are made and the amount thereof so as to accurately and fairly reflect at all times the status of each transaction.  If the applicable intercompany account entry does not otherwise specify, the transaction shall be treated as provided in paragraph 3 below.

2.    <u>Intercompany Transfers</u>.  Any party hereto may, and may cause any of its subsidiaries to, transfer to any other party hereto, or to any subsidiary of any party hereto, all or any cash, securities, notes, evidences of indebtedness or other cash equivalents (including, without limitation, proceeds of borrowings and financings) held by it ("Funds"), at any time, and on such terms and conditions as it may determine at that time to be appropriate, without any further action on its part, or on the part of any of its subsidiaries, other than as set forth in this Agreement.

3.    <u>Standard Treatment of Intercompany Transactions</u>.  Unless otherwise indicated in the applicable intercompany account entry, each intercompany transaction involving transfers of monies shall be treated as a loan bearing interest at the usual intercompany rate, payable simultaneously with the repayment of the loan.  All such loans may be prepaid in whole or in part at any time without premium or penalty.  If transfers are to be treated as dividends or contributions to capital, such treatments shall be duly authorized by the appropriate corporate action of the subsidiary or Company effecting the transfer and such treatment and the terms thereof shall have been appropriately reflected by a notation made in the appropriate ledgers of such entities at the time of transfer.

4.    <u>Separate Evidence of Indebtedness</u>. Any intercompany debt obligation effected pursuant to this Agreement may, but need not be, evidence by a promissory note, agreement or other instruments; provided, however, that any such promissory note, agreement or other instrument shall not be inconsistent with the terms of this Agreement.

5.    <u>Movement of Funds</u>. To facilitate the efficient management of transactions, in connection with any series of transactions, the Companies and their subsidiaries shall not be required to physically transfer funds to each participant in the series of transactions. Rather, the transactions may be cumulated and funds transferred so as to achieve settlement of partial settlement in accordance with that cumulation. The absence of any physical transfer of Funds though each bank account or other account of each entity which is party to the series of transactions shall not affect the characterization of the transactions as reflected in the applicable intercompany accounts. By way of example and illustration and not limitation, if four subsidiaries (herein designated as Subsidiary One, Subsidiary Two, Subsidiary Three and Subsidiary Four) have engaged in intercompany transactions which may be settled by a direct transfer from Subsidiary One to Subsidiary Four, Funds may be wired directly from Subsidiary One to Subsidiary Four without physically passing through bank accounts maintained by Subsidiary Two and Subsidiary Three so long as the appropriate notations are made in the books of Subsidiary Two and Subsidiary Three.

6.    <u>Assignment</u>. No party to this Agreement may assign, in whole or in part, any of its rights and obligations under this Agreement, except to its legal successor in interest.

7.    <u>Third Party Beneficiaries</u>. No person including the holders of any of the Company's indebtedness shall be third party beneficiaries of this Agreement, unless they shall have been specifically designated as such in a writing duly executed by each of the Companies.

8.    <u>Headings</u>. Headings in this Agreement are included for convenience of reference only and shall not constitute a part of it for any other purpose.

9.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto and separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one in the same agreement.

10.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the state of Michigan without giving affect to the conflict of laws principals thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respected officers set forth below, as of the date first above written.

DELPHI AUTOMOTIVE
SYSTEMS CORPORATION

By: _John G. Blahnik_
    Name: John G. Blahnik
    Title: Vice President and Treasurer

DELPHI AUTOMOTIVE
SYSTEMS LLC

By: _John G. Blahnik_
    Name: John G. Blahnik
    Title: Vice President and Treasurer

DELPHI AUTOMOTIVE
SYSTEMS (HOLDING), INC.

By: _John G. Blahnik_
    Name: John G. Blahnik
    Title: Chief Financial Officer and Treasurer

LEGAL
Roll-up

Revised
05/05/1999

CJVs
DAS Elims
L6000

CJVs - SPV
L5065

Securitization
SPV
L5965

SPV T.B.

Delphi Foreign
Sales Corp.
L4935

TB's 00288x

CJVs - DAS LLC
L5010

DAS LLC
Divisions
L5910

DAS Divs
TBs 001xx

see
attached "A"

DELCO Foreign
L4900

see
attached "G"

DELCO &
SUBSIDS
L5960

DELCO U.S.(00280)

Delphi
Technologies
Inc.
L4920
T.B. = 00285

DAS
LLC & Subs
L5970

CJVs
DELCO &
SUBSIDS
L5060

CJVs - DAS
LLC & Subs
L5070

DAS Corp
TB = 0020

DAS Corp
L5900

CJV-DAS Corp
L5090

DAS
U.S. Consol.
Subsids.
L5920

CJVs - DAS U.S.
Consol. Subs.
L5020

DAS U.S.
Consol Subs

see
attached "B"

DASHI
U.S. Subs
L4930

DASHI
U.S. Subs

see
attached "C"

CJVs - DASHI U.S.
L4030

DAS
Holdings
Inc.
(DASHI)
L5980

DASHI
Canada Ops.
L5930

CJVs DAS Canada
L5030

DASHI Canada
TBs 003xx

CJVs - DASHI
L5080

DASHI
Mexico Ops.
L5940

CJVs DASHI Mex
L5040

DASHI Mexico
TBs 007xx

see
attached "D"

DASHI
Int'l Ops.
L5950

CJVs DASHI Int'l
L5050

DASHI (Intl)
L4940

see
attached "F"

= CJV Levels

Page 1

Revised
05/05/1999

**Attached "A" (Delphi Divisions)**

```
-0122:DELPHI INTERIOR & LIGHTING
 J123:DELPHI HARRISON THERMAL
00129:DELPHI PACKARD ELECTRIC · U.S.
00132:DELPHI SAGINAW STEERING
00141:DELPHI AUTOMOTIVE SYSTEMS H.Q.
00144:DELPHI CHASSIS
00161:DELPHI CORPORATE SECTOR
00168:DELPHI ENERGY & ENGINE MGMT
```

**Attached "B" (DAS U.S. Consolidated Subs)**

```
00265:PACKARD HUGHES INTERCONNECT, INC
00283:EXHAUST SYSTEMS CORP.
```

**Attached "C" (DASHI U.S. Consolidated Subs)**

```
TBD  :DELPHI CORPORATION
002xx:DASHI · "A"
002xx:DASHI · "C"
002xx:DASHI · "D"
002xx:DASHI · "E"
002xx:DASHI · "H"
J02xx:DASHI · "P"
  2xx:DASHI · "S"
00269:ARABIAN BATTERY HOLDING COMPANY
00270:BATTERY TECHNOLOGY SERVICES, INC
00276:DELPHI AUTO SYSTEMS INTERNATIONAL, INC  ????.
00287:DELPHI INTERNATIONAL SERVICES, INC.
00289:DELPHI AUTO SYSTEMS HOLDINGS, INC. (DASHI)
00591:GMODC - HANNOVER GERMANY BRANCH
L3920:DELPHI AUTOMOTIVE SYSTEMS, CHINA, INC.
     00443:DELPHI AUTOMOTIVE SYSTEMS, CHINA
     00447:DELPHI AUTOMOTIVE SYSTEMS, BEIJING
L3930:DELPHI AUTOMOTIVE SYSTEMS, KOREA, INC.
     00416:DELPHI KOREA
     00434:DELPHI KOREA, KOREA BRANCH
```

**Attached "D" (DASHI Mexican Operations)**

```
00702:CABLEADOS DE JUAREZ
00704:DELPHI RIMIR SA DE CV
00710:RIO BRAVO ELECTRICOS
00715:DELPHI COMPONENTES MECANICOS
00716:SISTEMAS ELECTRICOS Y CONMUTADORES
00720:ALAMBRADOS Y CIRCUITOS (PACKARD)
  721:ALAMBRADOS Y CIRCUITOS (SAGINAW)
U0722:DELPHI SISTEMAS DE ENERGIA
00724:ALAMBRADOS AUTOMOTRICES
00726:ENSAMBLES DE CABLES & COMPNNTS
```

Revised
05/05/1999

00729:DELPHI DE CHIHUAHUA SA DE CV
00730:DELPHI ENSAMBLES DE CUBIERLOSAUTO
00731:CENTRO TECNICO HERRAMENTAL SA DE CV
 0735:ACCUMULADORES CALE DELPHI TLAXCALA
 ?752:CONTROLLADORA DELPHI
ᴗᴗ758:DELPHI SISTEMAS de ENERGIA

## Attached "F" (DASHI International Operations)

00436:DELPHI AUTO SYSTEMS AUSTRALIA LTD
00444:PACKARD ELECTRIC BAICHENG. LTD
00445:PACKARD ELECTRIC HEBI LTD
00446:PT PACKARD KABELINDO INDONESIA
00448:DELPHI AUTOMOTIVE SYSTEMS PVT LTD
00449:DELPHI AUTO SYSTEMS PTE LTD
00451:SAGINAW NORINCO LINGYUN DRIVE SHFT
00452:DELPHI PACKARD ELECTRIC GUANGZHOU
00454:HUBEI DELPHI AUTOMOTIVE GEN
00455:SHANGHAI DELCO INTL BTY DELPHI E
00459:DELPHI SHANGHAI
00460:SAGINAW ZHEJIANG XIAOSHAN
00465:DELPHI PACKARD ELECTRIC SHANGHIA
00468:D.A.S. THAILAND, LTD
00469:D.A.S. CHINA CO. LTD
00471:TINAJIN DELPHI SUSPENSION SYSTEMS
00472:SUNGWOO CORPORATION
?0473:DELPHI AUTO SYSTEMS JAPAN
 ᴗ5A1:DELPHI AUTO SYSTEMS ESPANA SA
005A5:PACKARD ELECTRIC/SAMARA CABLE CO
005A6:DELPHI AUTO SYSTEMS POLAND Z.O.O.
005A8:DELPHI HARRISON - CALSONIC
005B1:DELPHI HARRISON THERMAL SYS SPZOO
005B4:DELPHI CALSONIC COMPRESSORS
005B7:DELPHI PACKARD ROMANIA SRL
005B9:DELPHI CHASSIS SYS-POLAND
005C1:DELPHI SWEDEN AB
005C5:DELPHI AUTOMOTIVE SYS-POLAND
005C6:DELPHI EEMS-POLAND
005C7:DELPHI SAGINAW STEERING-POLSKA
005C8:DELPHI SAGINAW STEERING-POLAND
005D1:TEXTON
005D5:DELPHI PACKARD-HUNGARY
00511:DELPHI AUTO SYSTEMS - LUXEMBURG
00523:DELPHI PACKARD. SISTEMAS ELECTRICOS
00526:DELPHI INLAN-INDUSTRIA DE COMPONENT
00529:DELPHI AUTO SYSTEMS DEUTSCHLAND
00530:UNICABLES, S.A.
00532:DELPHI AUTO SYSTEMS UK LTD
?0536:DELPHI SAGINAW STEERING SYSTEMS LTD
 .ᴗ540:GM IMPORTAKIENBOLAG
00553:DELPHI AUTO SYSTEMS VIENNA GMBH
00555:PACK. ELECT. EUROPA
00562:SFA DE CARBON (SEE 00599)

Revised
05/05/1999

00566:PACKARD ELECTRIK SISTEMLIER
00568:DELPHI COMPONENTES SA
00569:ACG EUROPE
0571:DELPHI SISTEMAS DE ENERGIA
0572:DELPHI ITALIA AUTO SYSTEMS S.R.L
00573:REINSHAGEN TOURNAI
00574:DIAVIA
00575:PACKARD ELECTRIC VAS KFT
00585:GM HOLDING SGPS,LTD - PORTUGAL
00586:PACKARD ELECTRIC CS S. R. O.
00595:DELPHI ITALIA SERVICE CENTER SRL
00599:ACG FRANCE
00605:SODEX (DELPHI CHASSIS) (NEW)
00739:D.A.S. ARGENTINA-PE SIELIN ARGNTINA
00740:D.A.S. DO BRASIL LTDA
00741:DIAVIA BRASIL-AR CONDICIONADA LTDA
00743:DELPHI AUTO SYSTEMS S.A. DE C.V.
00746:DELPHI L'EM ARGENTINA SA
00760:DELPHI COMPONENTES AUTOMOTIVOS


**Attached "G" (Delco Foreign Operations)**

00407:DELCO ELECTRONICS SINGAPORE PTE
00435:DELCO ELECTRONICS ASIA/PACIFIC PTE
005A2:DELCO ELECTRONICS EUROPE GMBH
005C3:FUBA AUTOMOTIVE (D.E.)
0509:DELCO ELECTRONICS OC (88509)
00588:MEGAMOS
00719:DELTRONICOS
00723:DELNOSA SA De CV

# EXHIBIT G

**Hearing Date: June 19, 2006**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :
        In re                                :    Chapter 11
                                             :
DELPHI CORPORATION, et al.,                  :    Case No. 05-44481 (RDD)
                                             :
                                             :    (Jointly Administered)
        Debtors.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' RESPONSE TO LIMITED OMNIBUS OBJECTION OF THE OFFICIAL
COMMITTEE OF EQUITY SECURITY HOLDERS IN OPPOSITION TO DEBTORS'
(I) SETTLEMENT PROCEDURES MOTION, (II) LIFT STAY MOTION
AND (III) MOBILEARIA SALE MOTION

Delphi Corporation and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this response (the "Response") to the limited omnibus objection (the "Objection") of the Official Committee of Equity Security Holders (the "Equity Committee") to the Debtors' (i) Motion For Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b) Authorizing The Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval, filed on June 6, 2006 (Docket No. 4037) (the "Settlement Procedures Motion"), (ii) Motion For Order Under 11 U.S.C. § 362 And Fed. R. Bankr. P. 7016 And 9019 Approving Procedures For Modifying The Automatic Stay To Allow For (I) Liquidating And Settling And/Or (II) Mediating Certain Prepetition Litigation Claims, filed on June 6, 2006 (Docket No. 4038) (the "Lift Stay Procedures Motion"), and (iii) Motion For Orders Under 11 U.S.C. §§ 363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014 (A) Approving (I) Bidding Procedures, (II) Certain Bid Protections, (III) Form And Manner Of Sale Notices, And (IV) Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of Certain Of The Debtors' Assets Comprising Substantially All Assets Of MobileAria, Inc. ("MobileAria") Free And Clear Of Liens, Claims, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities, filed on June 6, 2006 (Docket No. 4040) (the "MobileAria Motion," collectively with the Settlement Procedures Motion and Lift Stay Procedures Motion, the "Motions").  In support of the Response, the Debtors respectfully represent as follows:

<u>Background</u>

1.      On June 15, 2006, the Equity Committee filed the Objection, which objects to the relief the Debtors requested in the Motions solely on the grounds that the Equity Committee requests that it be added as a party to the notice and reporting provisions in each of

2

the Motions.  In addition, in its Objection, the Equity Committee has also requested that the

Court modify various previously-entered orders to allow the Equity Committee to duplicate the

role played by the Official Committee of Unsecured Creditors (the "Creditors' Committee")

thereunder.[1]  The Equity Committee has not, however, objected to any of the substantive relief

the Debtors requested in the Motions.

2.        On March 21 and 22, 2006, this Court conducted an evidentiary hearing

(the "Hearing") on the Motion Pursuant To 11 U.S.C. § 1102(a)(2) For An Order Directing The

United States Trustee To Appoint An Equity Committee In These Chapter 11 Cases filed on

December 22, 2005, by Appaloosa Management L.P. (Docket No. 1604) (the "Equity Committee

Motion").[2]  On March 30, 2006, this Court entered an order directing the United States Trustee

to appoint an equity committee in these cases (Docket No. 3024) (the "Equity Committee

Order").[3]

3.        The Debtors believe that the Equity Committee Order and this Court's

bench ruling on the Equity Committee Motion make it abundantly clear that the Equity

---

[1]    Specifically, the Objection requests modification of the following previously-entered orders: (i) the Order
Under 11 U.S.C. §§ 363(b)(3) And 365(a) And Fed. R. Bankr. P. 9019 Approving Procedures To Assume
Certain Amended And Restated Sole Source Supplier Agreements, entered on December 12, 2005; (ii) the
Order Under 11 U.S.C. §§ 365(a) And 554 And Fed. R. Bankr. P. 6006 Approving Procedures For Rejecting
Unexpired Real Property Leases And Authorizing Debtors To Abandon Certain Furniture, Fixture, And
Equipment, entered on January 6, 2006; (iii) the Order Under 11 U.S.C. §§ 363, 1107, And 1108 Approving
Procedures To Enter Into Or Renew Real Property Leases Without Further Court Approval, entered on January
6, 2006; (iv) the Order Under 11 U.S.C. §§ 105, 362, And 541 And Fed. R. Bankr. P. 3001 (A) Establishing
Notification Procedures Applicable To Substantial Holders Of Claims And Equity Securities And (B)
Establishing Notification And Hearing Procedures For Trading In Claims And Equity Securities, entered on
January 6, 2006; (v) the Order Under 11 U.S.C. §§ 363, 1107, And 1108 Authorizing Delphi Automotive
Systems LLC To Make Equity Investments In Delphi Furukawa Wiring Systems LLC And Approving
Procedures to Make Additional Contributions Without Further Court Approval, entered on March 17, 2006; and
(vi) the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007,
And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative
Procedures, entered by this Court on March 20, 2006 (as supplemented) (collectively, the "Prior Orders").

[2]    The relevant portions of the Transcript of Section 1102(a)(2) Evidentiary Hearing Before The Honorable Robert
D. Drain United States Bankruptcy Judge ("March 22 Transcript of Hearing") are attached hereto as Exhibit A.

[3]    The Equity Committee Order is attached hereto as Exhibit B.

3

Committee was appointed for a limited purpose – to provide holders of Delphi Corporation

common stock with a voice on a narrowly-defined set of key transformational issues in these

chapter 11 cases.  The Equity Committee was not granted carte blanche authority to inject itself

into all other areas of these cases, particularly where the interests of creditors and equityholders

are aligned.

        4.     In the Equity Committee Order, this Court stated that the Equity

Committee "needs to be informed of, . . . among other things, issues involving labor, pension,

OPEB, and GM, and to be informed in respect of agreements that the Debtors may reach with

their unions and GM."  Equity Committee Order at ¶ 5.  Similarly, in its bench ruling on the

Equity Committee Motion, this Court stated that "one could at least see a rationale for having an

equity committee with counsel in the near future to deal at least with those transformational

issues on behalf of the shareholders."  March 22 Transcript of Hearing at 175.  Following this

statement and the Court's discussion of its reluctance to allow the Equity Committee to retain

investment bankers, accountants, or actuaries, this Court noted that "given the important

transformative events that will be taking place in this company . . . it's important to give

[shareholders] representation . . . within the parameters that I've already described."  March 22

Transcript of Hearing at 183.  Finally, near the conclusion of its bench ruling, this Court

reiterated that "[w]hat an equity committee needs to do is to understand through its own

members' expertise . . . and through the assistance of its counsel, the pressing issues of this case

in respect of labor, pension, other benefits and GM."  March 22 Transcript of Hearing at 184.

A.     The Objection Should Be Overruled Because The Requested Notice Is Outside
        Of The Scope Of The Equity Committee's Appointment

        5.     In light of the language of the Equity Committee Order and the direction

this Court gave in its bench ruling at the conclusion of the Hearing, the Debtors assert that the

Objection should be overruled in its entirety.  The relief requested in the Objection goes beyond

the scope of the circumscribed role that this Court has authorized the Equity Committee to play

in these cases.  The Equity Committee was formed as a limited purpose committee to provide

shareholders a voice in those aspects of these cases directly relating to the Debtors' labor

transformation.  The Objection expressly acknowledges the limited role that the Equity

Committee is intended to play in these cases.  Objection at ¶ 6 ("The Equity Committee is

mindful of the scope limitations imposed on the Equity Committee by the Court. . . .").  Neither

the Equity Committee Order nor this Court's bench ruling at the Hearing contemplated that the

Equity Committee would have a role in (a) potential agreements to lift the automatic stay for the

limited purpose of allowing certain litigants to liquidate their prepetition claims, (b) potential

settlements of claims below certain materiality thresholds under the proposed settlement

procedures, or (c) sales of assets such as those proposed in the MobileAria Motion.

      6.      Furthermore, the Debtors' appropriate exercise of their business judgment

is already subject to close and careful review in these cases by the Creditors' Committee.  This

Court has specifically noted the meaningful and effective role that the Creditors' Committee has

played to date in exercising its duties in these cases.  See March 22 Transcript of Hearing at 171

("I say 'constructive,' rather than 'hand-in-glove' because it is very clear to me that the Creditors'

Committee is nobody's patsy by any means and makes its views known to the debtor very clearly

and forcefully, even if those views are unwelcome.").  The procedures proposed in the

Settlement Procedures Motion and the Lift Stay Procedures Motion are the product of extensive

negotiation between the Debtors and the Creditors' Committee.  In addition, the Creditors'

Committee has not objected to the MobileAria Motion.  Nevertheless, the Equity Committee

5

seeks through the Objection to duplicate the role of the Creditors' Committee and interject itself

broadly into numerous areas of these cases wholly unrelated to the Debtors' labor transformation.

7.    Simply put, the Objection, if granted, would have the Creditors'

Committee and the Equity Committee fulfill the same role.  Such a duplication of effort is not

only inconsistent with the Equity Committee Order and the Court's bench ruling at the Hearing,

but also would be inefficient, a waste of the estates' resources, and wholly-unnecessary as it will

not provide any material benefit to the equityholders or any other party-in-interest.  Notably, the

Equity Committee has not even suggested that the interests of the equityholders would materially

diverge from the interest of creditors with respect to the relief sought in any of the Motions.

8.    With respect to the MobileAria transaction, the Equity Committee, as the

representative solely of holders of equity interests in Delphi Corporation, has a minimal interest

(at best) in the outcome of the sale of MobileAria's assets contemplated by the MobileAria

Motion.  MobileAria is a joint venture in which Delphi Automotive Systems LLC ("DAS LLC"),

a subsidiary of Delphi Corporation, holds a 71.2% equity interest in MobileAria and is

MobileAria's largest creditor.  The only arguable interest that the Equity Committee would have

in the sale of MobileAria would come through Delphi Corporation's equity interest in DAS LLC.

Again, the Equity Committee's interests are aligned with the Creditors' Committee's interests –

namely, maximizing the proceeds realized by MobileAria through the sale.  The Creditors'

Committee represents, among others, the creditors of each of MobileAria, DAS LLC, and Delphi

Corporation, all of whom have a much more particularized interest in maximizing the proceeds

from the sale of MobileAria's assets than do any of the Equity Committee's constituents.  Also,

while the MobileAria Motion does not contemplate the Equity Committee's participation in the

sale process to the extent requested in the Objection, the Equity Committee does have the right to

6

object to any proposed sale of MobileAria's assets if it believes that MobileAria did not accept

the highest or otherwise best bid.  Again, the Equity Committee has not objected to any of the

substantive relief that the Debtors are seeking with respect to the MobileAria Motion at the June

19, 2006 hearing.

B.    The Equity Committee's Request to Receive Notice Under Procedures Previously
        Entered By This Court Was Procedurally Deficient And Should Be Denied

9.    As noted in footnote 1 above, the Objection requests that "previously

entered orders that provide notice and related rights to the Creditors' Committee be deemed

amended to provide such notice and related rights to the Equity Committee."  Objection at ¶ 8.  It

is procedurally improper to include in an objection to wholly unrelated motions a request for the

Court to modify the Prior Orders.  Moreover, with respect to the relief requested, the Debtors

submit that, for the reasons provided above, the Equity Committee's request that this Court

amend the Prior Orders is without merit and should be denied.

C.    The Equity Committee's Requested Relief Would Constitute A
        Significant And Unwarranted Burden On The Debtors' Estates

10.    Finally, in the Objection, the Equity Committee asserts that "the provision

of notice and reports to the Equity Committee, which are already being provided to the Creditors'

Committee, does not prejudice or place an undue burden on the Debtors."  Objection at ¶ 6.

While the mere giving of notice arguably would not place an undue burden on the Debtors, the

reality is that the Equity Committee is not merely asking for notice.  Rather, the Equity

Committee is, in fact, asking for the same rights as are granted to the Creditors' Committee: for

example, to have the opportunity to object to notices of settlement, receive the same reports that

the financial advisors to the Creditors' Committee would receive, and play an active role in the

MobileAria sale process.  Furthermore, providing the Equity Committee with the expanded role

it seeks with respect to nine separate orders of this Court would require the Debtors' estates to

7

bear significantly increased administrative expenses and other burdens without providing any

appreciable benefit to the estates.

Notice

11.     Notice of this Response has been provided in accordance with the Seventh

Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006,

9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and

Administrative Procedures, entered May 19, 2006 (Docket No. 3824).  The Debtors submit that

no other or further notice is necessary.

Memorandum Of Law

12.     Because the legal points and authorities upon which this Response relies

are incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i)

overruling the Objection, and (ii) granting the Debtors such other and further relief as is just.

Dated:       New York, New York
             June 16, 2006

                             SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP


                             By:   /s/ John Wm. Butler, Jr.
                                   John Wm. Butler, Jr. (JB 4711)
                                   John K. Lyons (JL 9331)
                                   Ron E. Meisler (RM 3026)
                             333 West Wacker Drive, Suite 2100
                             Chicago, Illinois 60606
                             (312) 407-0700

                                   - and -


                             By:   /s/ Kayalyn A. Marafioti
                                   Kayalyn A. Marafioti (KM 9632)
                                   Thomas J. Matz (TM 5986)
                             Four Times Square
                             New York, New York 10036
                             (212) 735-3000

                             Attorneys for Delphi Corporation, et al.,
                               Debtors and Debtors-in-Possession

9

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3                                      .
        IN RE:                          .    Case No. 05-44481
 4                                      .
        DELPHI CORPORATION, et al,      .    New York, New York
 5                                      .    Wednesday, March 22, 2006
                            Debtors.    .    2:18 p.m.
 6      . . . . . . . . . . . . . . .

 7
              TRANSCRIPT OF SECTION 1102(a)(2) EVIDENTIARY HEARING
 8                 BEFORE THE HONORABLE ROBERT D. DRAIN
                     UNITED STATES BANKRUPTCY JUDGE
 9
        APPEARANCES:
10
        For the Debtors:              John Wm. Butler, Jr., Esq.
11                                    David E. Springer, Esq.
                                      Dhananjai Shivakumar, Esq.
12                                    SKADDEN, ARPS, SLATE, MEAGHER
                                       & FLOM, LLP
13                                    333 West Wacker Drive, Suite 2100
                                      Chicago, Illinois 60606
14
                                      Kayalyn A. Marafioti, Esq.
15                                    SKADDEN, ARPS, SLATE, MEAGHER
                                       & FLOM, LLP
16                                    Four Times Square
                                      New York, New York 10036
17
        (Appearances continued)
18
        Audio Operator:              Electronically Recorded
19                                   by Greg White, ECRO

20      Transcription Company:       Rand Transcript Service, Inc.
                                     311 Cheyenne Road
21                                   Lafayette, New Jersey  07848
                                     (973) 383-6977
22

23
        Proceedings recorded by electronic sound recording,
24      transcript produced by transcription service.

25
</pre>

```
 1   A P P E A R A N C E S:   (Continued)

 2   For Appaloosa
     Management, LP:                    Thomas E. Lauria, Esq.
 3                                      Rudolph F. Aragon, Esq.
                                        Frank L. Eaton, Esq.
 4                                      WHITE & CASE, LLP
                                        Wachovia Financial Center
 5                                      200 South Biscayne Boulevard
                                        Suite 4900
 6                                      Miami, Florida 33131

 7                                      Glenn M. Kurtz, Esq.
                                        Douglas P. Baumstein, Esq.
 8                                      WHITE & CASE, LLP
                                        1155 Avenue of the Americas
 9                                      New York, New York 10036

10
     For the U.S. Trustee:             Alicia M. Leonhard, Esq.
11                                      U.S. DEPARTMENT OF JUSTICE
                                        Office of the U.S. Trustee
12                                      33 Whitehall Street, Suite 2100
                                        New York, New York 10004
13

14   For the Official Committee
     of Unsecured Creditors:           Robert J. Rosenberg, Esq.
15                                      John W. Weiss, Esq.
                                        LATHAM & WATKINS, LLP
16                                      53rd at Third, 885 Third Avenue
                                        New York, New York 10022
17

18   For JPMorgan, et al:              Kenneth S. Ziman, Esq.
                                        Robert Trust, Esq.
19                                      SIMPSON, THACHER & BARTLETT, LLP
                                        425 Lexington Avenue
20                                      New York, New York 10017

21   For Brandes Investment
     Partners, LP:                     Daniel A. Lowenthal, Esq.
22                                      THELEN, REID & PRIEST, LLP
                                        875 Third Avenue
23                                      New York, New York 10022

24

25
```

Closing Argument - Leonhard and Court Decision          156

1   I think others involved in this matter will have an

2   opportunity to weigh in after the fact and Appaloosa, as Mr.

3   Rosenberg pointed out, will have that opportunity, too, as

4   would Brandes, given its substantial resources.

5          I think with that, Your Honor, I'll step down and

6   let Ms. Leonhard make her remarks.  Again, I would propose

7   granting the motion.

8          THE COURT:  Okay.

9              **CLOSING ARGUMENT FOR THE U.S. TRUSTEE**

10         MS. LEONHARD:  Good evening, Your Honor.  Alicia

11  Leonhard for the United States Trustee.

12         Last, but not least, Your Honor, the United States

13  Trustee joins in the comments and the arguments of the

14  objectors and requests that the Court deny the motion.  Thank

15  you very much.

16         THE COURT:  Okay.  All right.  I'll take a five-

17  minute break and then I'll be back.  Well, I'll be back at

18  6:15.

19      (Recess taken at 6:01 p.m.)

20         THE COURT:  Please be seated.

21         I have in front of me a motion by Appaloosa

22  Management, LP, a substantial shareholder of the parent

23  Delphi entity, for the appointment of an official committee

24  of equity security-holders under Section 1102(a)(2) of the

25  Bankruptcy Code.

Court Decision                                              157

1              The motion is opposed by the debtors, the Official

2       Unsecured Creditors' Committee, the agent for the pre-

3       petition lenders, and the United States Trustee.

4              It has been joined in by another large and

5       sophisticated management company, Brandes, which unlike

6       Appaloosa, was a pre-petition holder of the debtor's equity

7       interests and represents to the Court that it has, under

8       management with authority to vote, again, a substantial stake

9       in the debtor's equity interests.  I believe, if you add the

10      two of them together, they own or control approximately

11      fifteen or sixteen percent of the outstanding shares.

12             Those shares are widely held.  There was no

13      testimony on this point, but I believe the record is clear

14      that there are approximately 300,000 shareholders of the

15      publicly traded equity interests.  In light of that fact, I

16      believe that it is relevant that the SEC has not taken a

17      position on this motion.  There were perhaps contrary

18      representations made to the Court as to why the SEC had not

19      done that, made by counsel to the U.S. Trustee on the one

20      hand, saying that the SEC did not support the motion; and by

21      counsel for Appaloosa, saying the SEC did not support the

22      motion, absent a showing, which it was not taking a position

23      on -- that is, that the SEC was not taking a position on,

24      with regard to whether the debtors at this point are

25      insolvent.

Court Decision                                              158

1        This is an important motion because it affects the

2   cost of this case, both directly--that is, the cost of an

3   equity committee and its professionals if I grant the motion-

4   -as well as indirectly, in connection with both the cost of

5   the estate and other estate-compensated professionals,

6   including the Creditors' Committee, in dealing with

7   litigation and other matters raised by an equity committee;

8   and then, in addition, also indirectly, in respect of

9   potential delay that the existence of an equity committee

10  might cause at various stages in the case.

11       Because of its importance, and because of the desire

12  by all parties, at least as initially expressed by all

13  parties, including Appaloosa, to have this matter heard and

14  decided by me quickly, so that if I rule in favor of an

15  equity committee, an equity committee could be appointed

16  quickly before passage of much more time in this case, I have

17  decided to rule from the bench.

18       As I often do with long bench rulings, however,

19  particularly where I cite extensive case law, I reserve the

20  right to correct the ruling based on my review of the

21  transcript.

22       This is a core proceeding under the Bankruptcy Code,

23  as it deals with a committee's appointment under the Code.

24  And one begins, as one must, with the statute, which provides

25  at Section 1102(a)(2) that:

Court Decision                                    159

1          "On request of a party in interest, the Court may

2          order the appointment of additional committees of

3          creditors or of equity security-holders, if

4          necessary to assure adequate representation of

5          creditors or of equity security-holders.  The United

6          States Trustee shall appoint any such committee once

7          the Court has ordered the appointment."

8          It's well recognized that there is no statutory test

9    for "adequacy of representation," as used in Section

10   1102(a)(2).  See, for example, In Re:  Johns Manville

11   Corporation, 68 B.R. 155 (SDNY 1986), appeal dismissed 824

12   F.2d 176 (2d Cir. 1987).

13         In light of the absence of a statutory definition of

14   "adequacy of representation," and in light further of the

15   fact that the statute says the Court "may" order the

16   appointment of an additional committee besides the Official

17   Creditors' Committee, the courts have made such

18   determinations on a case-by-case basis in the exercise of the

19   Bankruptcy Court's discretion.  See, again, In Re:  Johns

20   Manville, 68 B.R. 155, as well as In Re:  Becker Industries

21   Corporation, 55 B.R. 945, 948, (Bankruptcy, SDNY 1985), for

22   lists of the factors that the courts have employed in

23   exercising their discretion on a case-by-case basis.

24         I should further note that the case law is clear

25   that the burden of showing a lack of adequacy of

Court Decision                                                          160

1 | representation is upon the movant.  Again, see <u>In Re:  Johns</u>

2 | <u>Manville Corporation</u>, 68 B.R. 155.

3 |        The factors that the Court is to consider on a case-

4 | by-case basis are, by this time, fairly well established,

5 | although I should say first and foremost, again, they are

6 | merely factors informing the Court's discretion.  It is not a

7 | litmus test, and no particular factor's absence precludes the

8 | appointment of a committee; and, conversely, although if all

9 | the factors were present, one would assume a committee would

10 | be appointment, the Court still has discretion under the

11 | statute, in light of other factors that might be present and

12 | relevant, not to appoint a committee.  The case law has in

13 | large measure developed out of cases decided in the Southern

14 | District of New York, but the factors are employed throughout

15 | the country.  They are laid out in the <u>Becker Industries</u>

16 | case, and in the <u>Johns Manville</u> case that I have cited.

17 | They're also discussed in, for example, <u>In Re:  Kalvar</u>

18 | <u>Microfilm, Inc.</u>, 195 B.R. 599 (Bankruptcy, District Court of

19 | Delaware 1996), and numerous other cases throughout the

20 | country.  They include:

21 |        Whether the shares are widely held and publicly

22 | traded.

23 |        The size and complexity of the Chapter 11 case.

24 |        The delay and additional cost that would result if

25 | the Court grants the motion.

1          The likelihood of whether the debtors are insolvent.

2          The timing of the motion relative to the status of

3    the Chapter 11 case.

4          And other factors relevant to the issue of adequate

5    representation, including:

6          The role of the board and management acting on

7    behalf of shareholders.

8          The role of other estate-compensated parties,

9    including the Official Creditors' Committee, and whether they

10   can be said in large measure to be acting on behalf of

11   shareholders, at least insofar as maximizing the value of the

12   estate.

13         And according to some courts, the sophistication of

14   the shareholders, particularly those who have made the

15   motion, and their ability to retain counsel and other

16   advisors.

17         And according to some courts, the right of such

18   parties, if they do make a substantial contribution in the

19   case, to be compensated under Section 503(b) of the

20   Bankruptcy Code.

21         Before discussing those factors in more detail,

22   however, and particularly focusing upon the factor dealing

23   with the debtors' financial condition, which has occupied a

24   great deal of the hearing in front of me, I believe it's

25   relevant and significant also to quote the legislative

Court Decision                                                    162

1  history of Section 1102(a)(2), because, given the lack of a

2  statutory definition of "adequacy of representation," I

3  believe congressional intent is relevant.

4        The relevant legislative history on the section is

5  not only quoted, but astutely critiqued in Johns Manville at

6  68 B.R. 155 at 160.  As noted in that case, one of the

7  purposes of the legislation was, quote:

8            "-- to counteract the natural tendency of a debtor

9            in distress to pacify large creditors with whom the

10           debtor would expect to do business at the expense of

11           small and scattered public investors."

12       That's from S. Rep. No. 989, 95th Congress, Second

13  Session at 10 (1978).

14       The Congressional Report went on to state:

15           "The committee believes that it should be emphasized

16           that investor protection is most critical when the

17           company in which the public invested is in financial

18           difficulties and is forced to seek relief under the

19           bankruptcy laws.  A fair and equitable

20           reorganization as provided in the bill is literally

21           the last clear chance to conserve for them values

22           that corporate financial stress or insolvency have

23           placed in jeopardy.  As public investors are likely

24           to be junior or subordinated creditors or debt-

25           holders, it is essential for them to have

1              legislative assurance that their interests will be

2              protected.  Such assurance should not be left to a

3              plan negotiated by a debtor in distress and senior

4              or institutional debtors who will have their own

5              best interests to look after." Id.

6         The Court in Manville noted, however, that because

7    Congress made the appointment discretionary in the Bankruptcy

8    Court, finding that the Court "may" appoint a committee if

9    necessary to assure adequate representation, it obviously did

10   not take this principle beyond the meaning of the statute.

11        I believe there has been a development in the case

12   law since the Congressional Report was issued, and, frankly,

13   since the Becker Industries case, which was one of the first

14   cases to deal with the appointment of a committee under

15   1102(a)(2), although starting, frankly, with an earlier case,

16   Judge Beatty's case in Emons Industries.

17        The Courts have recognized that even where a Chapter

18   11 case involves a substantial number of public shareholders

19   and is large and complex, the Court should not appoint an

20   equity committee if the debtor appears to be clearly

21   insolvent.  That is because, in the words of Judge Beatty in

22   Emons, which appears at 50 B.R. 692 (Bankruptcy SDNY 1985):

23   to do so would, in effect, give the equity committee and the

24   shareholders a gift.  And that is because the cost of the

25   committee is borne by the estate.

Court Decision                                                    164

1          And if it appears, in the words of <u>Emons</u>, that

2     the debtor is hopelessly insolvent, that cost should not be

3     borne.

4          Courts, I believe, because of their experience of

5     cases where equity committees were formed, where equity

6     committees were inordinately litigious and active in such

7     cases and ultimately obtained for their constituents what

8     might charitably be described as a gift, that is, an

9     inducement to go away through a plan, have come to emphasize

10    the point.  It's discussed in some detail and with some

11    candor in the <u>Wang Laboratories</u> decision by Judge Hillman at

12    149 B.R. 1 (Bankruptcy, District of Massachusetts 1992), in

13    which Judge Hillman recognized the need not to legitimize

14    what he called the, quote, "blackmail factor" inherent in the

15    presence of an equity committee where, in fact, it appears

16    that the debtor is hopelessly insolvent.

17         The Bankruptcy Code gives parties in interest

18    considerable access to the Court and considerable issues to

19    raise, if they choose, in front of the Court, which obviously

20    has the effect potentially of delaying the prosecution of a

21    Chapter 11 case and causing other parties to incur

22    substantial costs.  The benefit to a litigant of controlling

23    an equity committee, or any other official committee, is

24    that, subject of course to Court review, the cost of such

25    litigation is borne by the estate, which raises the stakes

1   and makes it tempting to implement the "blackmail factor"

2   strategy.

3          I believe these are legitimate concerns in this area

4   and they have been recognized by numerous courts, and

5   specifically, in what I believe today to be the leading

6   decision in this area, they were recognized by Judge Lifland

7   in In Re:  Williams Communications Group, Inc., 281 B.R. 216

8   (Bankruptcy SDNY 2002), in which he repeated Judge Beatty's

9   concern that an equity committee where the debtor appears to

10  be hopelessly insolvent should not be warranted because, this

11  is a quote:

12          "-- because neither the debtor nor the creditor

13          should have to bear the expense of negotiating over

14          the terms of what is in essence a gift."

15          Judge Lifland used in that quote Judge Beatty's

16  phrase, "appears to be hopelessly insolvent."  He also used

17  it at Page 222 -- I'm sorry, at 221 of his opinion.

18          Interestingly, in his conclusion, however, he

19  provides for a somewhat different test than "hopelessly

20  insolvent."  He states:

21          "The appointment of official equity committees

22          should be the rare exception.  Such committees

23          should not be appointed unless equityholders

24          establish that (i) there is a substantial likelihood

25          that they will receive a meaningful distribution in

Court Decision                                                              166

1          the case under a strict application of the absolute

2          priority rule, and (ii) they are unable to represent

3          their interests in the bankruptcy case without an

4          official committee."  Id. at 223.

5          That is, as to the first prong of his test, it

6   requires more of the movant for an official equity committee

7   to establish than that there are signs of hope of solvency,

8   at least in the general run of such applications.

9          That formulation has since been picked up by another

10  court.  Judge Case, whom I certainly respect as a very astute

11  scholar of bankruptcy law, applied the same test in In Re:

12  Northwestern Corporation, 2004 Westlaw 1077913 (Bankruptcy,

13  District of Delaware, May 13, 2004).

14         Now I say that without necessarily accepting it as

15  an ironclad test myself because I believe that all of the

16  courts that look at these issues, including Judge Lifland and

17  Judge Case, would say first and foremost that the various

18  factors enunciated by the Courts are to be applied on a case-

19  by-case basis, in light of the statute and the congressional

20  policy.  And that's what I have done in my balancing analysis

21  of all of the factors; that is, I have not imposed upon the

22  movant here the burden of showing "a substantial likelihood

23  that it will receive a meaningful distribution in the case."

24         I do that because this motion is filed early in the

25  case, as opposed to at the time a plan is to be negotiated

1    and/or litigated at confirmation.  And I believe that it is,

2    as a result, important for me to give the benefit of the

3    doubt to the movants here.

4         As the debtors have acknowledged candidly, it is too

5    early to formulate a business plan.  It is, consequently, too

6    early to formulate a going concern valuation with any

7    credibility; and, finally, it is too early to negotiate a

8    chapter 11 plan.  Consequently, all of the analysis of

9    solvency or insolvency here has around it a substantial

10   amount of speculation and doubt.  And I believe it would be

11   unfair to impose upon a movant in that context the burden of

12   doing a full-scale going-concern valuation to show a

13   "substantial likelihood of a meaningful distribution."

14        Moreover, I believe that such a full-blown valuation

15   at this time is not what is called for in connection with a

16   motion for the appointment of an equity committee.  As Judge

17   Lifland made quite clear in Williams, this is a summary

18   proceeding.  The valuation that the Court performs in

19   connection with the proceeding is not binding in any respect

20   on any party with respect to any future valuation of the

21   debtor or its assets, including, most importantly of course,

22   a valuation for chapter 11 plan confirmation purposes.

23        There's an obvious reason for that.  It's tied into

24   both the strengths of Congressional policy in permitting

25   equity committees to be appointed under the proper

Court Decision                                                    168

1   circumstances as well as the potential for abuse of that

2   right; that is, on the one hand, it's unfair to impose the

3   burden of a full-scale valuation on public shareholders in

4   all circumstances, although the burden may be increased in

5   certain circumstances.  It is also unfair to the debtor and

6   the other parties whose money is very clearly at risk in the

7   bankruptcy case, namely the creditors, and in this case the

8   workers, of, in essence, causing the motion for the

9   appointment of an equity committee to take over the entire

10  case so that under the rubric of "valuation" the movant for an

11  equity committee can use all of the cost and delay leverage

12  that an equity committee might have even before the equity

13  committee is appointed, to engage the parties in litigation

14  on the merits of the key issues in the case.

15      That would be an absurd result.  I believe, frankly,

16  that's why I was so angry at Appaloosa's attempt repeatedly

17  to turn this matter into such a proceeding and why the case

18  law is crystal-clear that that is not what the Court is to

19  consider.

20      Now let me -- before that, let me note that although

21  Judge Lifland makes that crystal-clear in his opinion, he's

22  not the only judge to have done so.  In fact, Judge Case in

23  Northwestern didn't have an evidentiary hearing at all.  He

24  did not believe it was appropriate.  The Court in Leap

25  Wireless, 295 B.R. 135 (Bankr. S.D. Cal. 2003) was frustrated

1    as to the lack of substance behind the debtors' schedules,

2    but, again, only treated the matter as a summary proceeding

3    and took whatever evidence she had and weighed that into her

4    analysis with respect to whether a committee should be

5    appointed.

6           So I believe, both logically and under the case law,

7    there is no basis to expand the inquiry that I need to

8    undertake here to force parties to conduct full-blown

9    valuations on either side of the solvency issue.

10          Now, to apply the various factors.  As I noted

11   before, this is a large public company.  There's over 500

12   million of issued and outstanding common shares and over

13   300,000 public shareholders.  This is obviously also a large

14   and complex bankruptcy case.  The docket is already

15   substantial, and it is clear to me that far more than is

16   reflected in the docket is being done by the debtor and other

17   parties behind the scenes in respect to resolving the key

18   issues in this case.

19          Those issues are complex, both in terms of the

20   negotiating and human dynamics, as well as the qualitative

21   and quantitative analysis in regard to the underlying

22   documentation, the parties' rights under the Bankruptcy Code

23   and other law, including labor law and ERISA; and they

24   ultimately involve numerous important judgment calls that in

25   the first instance the debtor must make in consultation with

1    key constituencies in the case, and that ultimately I must

2    make when the debtor goes to seek approval of what it has

3    negotiated.  So those factors clearly call for the

4    appointment of an equity committee.

5         It is also argued that the debtors' management and

6    board is not actually representing the interests of the

7    shareholders as well as those of all of the other

8    constituencies for which they are fiduciaries; and, to some

9    extent, it is argued that they cannot represent those

10   interests.

11        As to the latter point, to the extent it's made, I

12   do not accept that analysis.  Clearly, the board of a public

13   company and its management owes a duty in a bankruptcy case

14   not only to the creditors, assuming that the debtor is

15   insolvent, but also to the shareholders.  And there is no

16   built-in bias there against shareholders.  As noted by Judge

17   Robinson in Edison Brothers Stores, 1996 Westlaw 534, 853

18   (District Court of Delaware, 1996), a movant needs to show

19   more than simply speculation as to such a conflict.

20        It's additionally argued that the very fact of the

21   complexity of this case and the debtors' natural desire to

22   resolve the case may lead the debtor to give short shrift to

23   shareholders' views.  That, I believe, has some merit to it;

24   and, frankly, the argument is, I believe, consistent with the

25   legislative history that I quoted earlier.

1    That's particularly the case here where there truly

2  are extremely difficult negotiations that the debtors must go

3  through.  And I believe that it is important for the debtors

4  to be fortified in those negotiations by the views of key

5  constituencies.  I believe that has occurred with regard to

6  the Creditors' Committee, as is reflected, I believe, by the

7  constructive relationship between the Creditors' Committee

8  and the debtors that I've viewed in this case.  I say

9  "constructive," rather than "hand-in-glove" because it is very

10 clear to me that the Creditors' Committee is nobody's patsy

11 by any means and makes its views known to the debtor very

12 clearly and forcefully, even if those views are unwelcome.

13    It's not particularly clear to me that that same

14 voice has been expressed by the shareholders.  Partly, that

15 is the fault of the shareholders, at least the sophisticated

16 ones.  For example, I am shocked that Appaloosa made this

17 motion and sent the threatening letter to the board that it

18 sent asserting the allegations that it made without once

19 communicating with the debtor.  And I'll return to that

20 later.

21    But Appaloosa, as Mr. Lauria stated, should not

22 really be the focus of a motion to appoint an official equity

23 committee, although Appaloosa's problems may be the focus of

24 who the U.S. Trustee appoints to a committee.

25    Now Appaloosa also alleges that there are actual

1   conflicts over and above the debtor's tendency in a very

2   large and difficult case not to reach out to a constituency

3   that has not reached out to it.  Again, I have a hard time

4   seeing that.  I certainly do not see a level of actual

5   conflict at the level alleged by Appaloosa in what I again

6   believe was irresponsibly loose language.

7           There are really two bases for Appaloosa's

8   allegation.

9           The first is that because at the start of these

10  cases the debtors proposed what I feel free in calling a

11  generous KECP package that included an allocation of post-

12  reorganization equity to post-reorganization management,the

13  debtors' management--and to the extent the board approved the

14  KECP, the board--believes that management's interests are

15  different than shareholder interests.  I note, however, and

16  this, frankly, was obvious to Appaloosa, or at least should

17  have been, that that motion has been repeatedly adjourned and

18  tabled pending further negotiations with the creditors

19  committee, which as I said is nobody's patsy, and secondly,

20  is subject ultimately to my approval.

21          I also note that, traditionally, provisions for

22  allocation of post-reorganization equity for management are

23  dealt with in a plan that is voted upon by those entitled to

24  vote, and, generally, that is done because those entitled to

25  vote then see how they're being diluted.  Generally,

1    notwithstanding some cases where shareholders recover

2    something in respect of their old equity, the major issuance

3    of post-reorganization equity in chapter 11 cases goes to the

4    creditors, and they are the ones who are usually most diluted

5    by such management incentive plans in respect of post-

6    reorganization equity.  In other words, I believe Appaloosa's

7    argument on this point is miscast and at best irrelevant and

8    I believe, again, almost willfully so.

9          Secondly, Appaloosa argues that the debtors' very

10   opposition to this motion shows that the debtors' management

11   and board have an actual conflict in representing the

12   interests of the shareholders, primarily because the debtors

13   have stated that for purposes of this motion, at this time,

14   they are clearly or hopelessly insolvent.  The debtors'

15   objection to the motion, to the contrary, is clearly in good

16   faith.  As Mr. Sheehan and Mr. Resnick testififed, the

17   debtors' goal is to maximize value for all constituencies.  I

18   might understand why an unsophisticated shareholder who did

19   not understand the limited issues and inquiries relevant to a

20   motion under section 1102(a)(2) might make the argument, but,

21   knowing Appaloosa's sophistication, I find this "actual

22   conflict" argument to be rhetoric.

23         As to the timing factor, because of the very serious

24   issues that the debtors are dealing with in these cases,

25   going to the heart of their business, this is to me obviously

Court Decision                                            174

1   not a simple balance sheet restructuring where the capital

2   structure simply needs to be adjusted because there's too

3   much funded debt on the books.

4        There are serious -- to use the debtors' phrase

5   "transformational issues" that have to be resolved here.

6   Because of that, I believe that this is the appropriate time

7   to move for an equity committee, and not to wait until later

8   in the day when a plan is actually being negotiated.

9        I also believe as a corollary to that, the function

10  of the equity committee and the makeup of its professional

11  advisors should be reflected by this timing.  As I'll say

12  later, again, I think this leads to the conclusion that

13  although it's not before me, except in my need to weigh the

14  cost of an equity committee's appointment, that it's unlikely

15  that I would approve the retention of investment bankers and

16  accountants or even actuaries at this time for an equity

17  committee, since those functions are not really the functions

18  that need to be performed at this time by an equity

19  committee.

20       So that in contrast, while in the <u>Loral</u> case I

21  believe that it was incumbent to have an equity committee, if

22  at all, towards the end of the case, here, I believe if it is

23  incumbent on there being an equity committee, this is the

24  time to have one formed.

25       It is even conceivable to me that if I did form an

Court Decision                                    175

1   equity committee now and it turned out that ultimately I

2   approved interim transformational solutions --

3   transformational solutions to the labor and related pension

4   and GM problems that the debtors face--it might be

5   appropriate to disband the equity committee because, in light

6   of those solutions, it might appear clearly at that time that

7   the debtor was hopelessly insolvent or at least that it was

8   likely that there would be no distribution to shareholders.

9           But because of the importance of those pending

10  issues, one could at least see a rationale for having an

11  equity committee with counsel in the near future to deal at

12  least with those transformational issues on behalf of the

13  shareholders.

14          Now, as far as whether the debtor is insolvent or

15  hopelessly insolvent or there is a likelihood of a meaningful

16  distribution to shareholders, I am at this time on this

17  record frankly skeptical that there will be a meaningful

18  distribution, but I'm not prepared to rule it out.  I say

19  that for a number of reasons.

20          First of all, it's undisputed that on a balance-

21  sheet basis, and it is correct that the movants' experts did

22  not disagree that on a balance sheet basis, the debtors'

23  operating -- most recent operating numbers comply with GAAP,

24  there is roughly a 6.3-billion-dollar hole, or insolvency.

25          The question, obviously, is how does one fill that

Court Decision                                    176

1    hole or bridge that gap?

2         Although Appaloosa's experts made some effort to do

3    it on the asset side, my review of their analysis is that

4    they have not in any meaningful respect convinced me on the

5    asset side of the balance sheet or in their going-concern

6    value, their enterprise value before deductions, that they

7    have -- they have established a credible case to do so.

8         When you really boil it down, giving the benefit of

9    the doubt to why and how the admitted one-billion-two-dollar

10   -- two-hundred-million-dollar error was corrected by Eureka,

11   what Eureka did was essentially look at the debtors' 2005

12   actual performance and annualize the debtors' actual

13   performance for the first 115 days of 2006 for an EBITDA

14   figure that they then multiplied by two different multiples.

15        I believe Mr. Sheehan's testimony as to why,

16   particularly in respect of the annualization of the first

17   quarter of 2006, Eureka's process was materially if not

18   perhaps fatally flawed, in respect of the Eureka expert's

19   analysis of why the debtors did better in the first quarter

20   of 2006 and what the debtors' properly projected earnings

21   should be.

22        Clearly, to me, Mr. Sheehan's explanation of the

23   debtors' analysis of their projected business with GM and the

24   reason for the potential front-loading of income in 2006 was

25   credible and accounted for the difference between the

Court Decision                                        177

1    bottoms-up projections that the debtors did and the

2    effectively back-of-the-envelope calculation that Eureka did

3    in respect of EBITDA, and I say "back of the envelope"

4    because,  frankly, given the billion-two error on its March

5    10th report, that's all Eureka was really left with: applying

6    a multiple to 2005 and the first quarter actual numbers of

7    2006 without proper analysis of why those figures can be

8    relied upon as the basis for projected EBITDA.

9         I do recognize, however, that Mr. Sheehan

10   acknowledged that it is possible that the debtor's balance-

11   sheet numbers on the asset side might be higher.  It's my

12   experience, and I think most people's experience who've dealt

13   with Chapter 11 debtors for a lengthy period, that that's

14   hardly ever the case.  Almost invariably, the balance sheet

15   overstates the assets, but that's Mr. Sheehan's belief, and

16   he has clearly been through an intensive analysis of the

17   business on a bottoms-up basis and I accept his statement.

18        Now, on the balance sheet liability side, which is

19   most -- where most of the dispute arises, I've considered the

20   testimony of Messrs. Reese and Williams.  And, frankly, I

21   believe that it's very hard on the record to find any exact

22   number as far as what would be the appropriate net savings in

23   respect of OPEB liabilities after the debtors resolve their

24   transformational issues.

25        Clearly, Appaloosa's argument that the OPEB

Court Decision                                              178

1   liabilities go away because the collective bargaining

2   agreements go away in 2007 is -- well, it's almost laughable.

3   The unions aren't going away, and the employees aren't going

4   away without being paid for giving up those rights or having

5   them reinstated in some form.

6           So all the parties recognize that there is a price

7   to resolve those liabilities, including Appaloosa.  The issue

8   is how much of a price has to be paid and how much of a

9   savings can the debtors generate.  I find it hard to believe

10  that despite all of their efforts and all of an equity

11  committee's efforts, there will be a material recovery for

12  shareholders in light of those OPEB negotiations, but the

13  company doesn't preclude it as a possibility.  There are

14  scenarios in which it could occur.  That's agreed to by both

15  sides in this proceeding.

16          And, therefore, while Eureka's March 10th report, as

17  corrected for the billion-two error, still shows on even the

18  most optimistic basis a two-hundred-and-thirty-four-million-

19  dollar insolvency hole, given the huge amounts at stake here

20  in respect of the labor negotiations--and we're talking about

21  potential savings of billions of dollars, I know it's hard to

22  believe it, but $234 million may not be that big of a gap, at

23  least on today's record.

24          I also looked, of course, as Judge Lifland did and

25  Judge Hillman did and other courts have done in connection

1   with motions under 1102(a)(2), at the trading prices of the

2   debtors' securities when evaluating the debtors' solvency.

3        It's common knowledge that the market in distressed

4   debt and to some extent distressed stock, but more -- more

5   the case of distressed debt, is large, indeed, huge, and

6   active, particularly with respect to public companies such as

7   Delphi.  That is reflected among other things by the numerous

8   Wall Street analysts' reports covering the debt introduced

9   here.

10       There's uncontroverted evidence that Delphi's public

11  debt has consistently traded since the petition date at or

12  below sixty cents on the dollar.  The courts at times have,

13  although not accepting as controlling the trading prices of

14  debt securities, consistently looked at trading prices in the

15  debtors' securities as a indication in this type of summary

16  proceeding of value.

17       Courts obviously know, at least this Court knows,

18  that people engage in a market because they're making various

19  bets on the value of securities.  Some are betting that it's

20  a good idea to sell, and some are betting it's a good idea to

21  buy.  Generally, it's an active market; and, generally,

22  active markets are a good indication of value because there

23  are both buyers and sellers at reasonably arm's length

24  bargaining positions.

25       However, of course, those markets are not guarantees

Court Decision                              180

1   of value.  That's why some analysts get fired and some get

2   promoted.  Market security trading price indicators are most

3   telling where they're quite low, where they're in my

4   experience below or well below fifty cents on the dollar,

5   particularly in respect of cases that are in all likelihood

6   going to be resolved one way or another in a fairly short

7   term, and, in the life of a chapter 11 case of a large

8   company, fairly short term is around a year.

9          It's clear to me and it's been clear from the start

10  of these cases that although the debtors are pushing these

11  cases, appropriately so, as fast as they can, this is a

12  longer term process.  They project emergence from bankruptcy

13  in 2007, although they are doing everything they can to

14  emerge sooner than that.

15         Given that, I am not particularly moved either way

16  by the trading ratios or prices.  Mr. Lauria is correct that

17  anyone buying distressed debt is looking for a large return

18  to make up for the risk, particularly where the debt is

19  unsecured, and so it's conceivable that a sixty-percent-on-

20  the-dollar level, while obviously not suggesting solvency,

21  may indicate at least a hope of solvency.

22         This is, for example, different than the trading

23  levels in <u>Loral</u>, which were considerably lower, or in

24  <u>Williams</u>, which were at 15% to 6% of face value.

25         So, all things considered, in respect of the

Court Decision                                    181

1   solvency analysis, at this point in the case, I cannot find

2   that appointing an equity committee would be a gift.  On the

3   other hand, I am very mindful of the cost to these estates of

4   an equity committee.

5         Some cost clearly is legitimate.  The whole reason

6   you have an equity committee is that the estate bears the

7   cost.  On the other hand, the way that this litigation has

8   been conducted, I mean this litigation in front of me right

9   now, by Appaloosa, gives me very serious pause as to whether

10   the cost ultimately will be appropriate in this case.

11         Now, Appaloosa says I can regulate that by looking

12   at fee applications and the like, but, to some extent, once

13   an equity committee is appointed the cat is out of the bag,

14   and so I have thought very long and hard about whether the

15   cost factor here should lead me not to appoint a committee.

16         I can say this, that I will look very carefully at

17   fee applications of any counsel that is chosen to represent a

18   committee.  I also will look very carefully at whether the

19   continued incurrence of fees is appropriate at various stages

20   in the case where the picture on valuation becomes clearer.

21         But, ultimately, standing alone, as I do believe

22   that I can perhaps with the help of the United States Trustee

23   control costs, the costs alone are not in my mind

24   dispositive, although they are a major factor here calling --

25   arguing that I should not appoint a committee.

Court Decision                                      182

1          The last point which is raised by some courts, it's

2    specifically raised by Judge Case in the Northwestern

3    opinion, is that at least Appaloosa went into this bankruptcy

4    case with its eyes wide open.  Judge Case thought that was a

5    clear factor calling for denial of the motion.  And of course

6    the ability of certain shareholders to fund their own

7    professionals also is clearly a factor arguing against a

8    committee.  See Williams, 281 B.R. at 223.

9          If this were a relatively small pool of

10   shareholders, I would -- I would obviously do the same.  I

11   don't think the fact that Brandes has joined in the motion

12   particularly helps Appaloosa's cause, because Brandes is

13   obviously very well-heeled, very sophisticated and is well

14   represented by another large national firm with a bankruptcy

15   practice.

16         However, I go back to the first point I made.  There

17   are over 300,000 shareholders here.  Given the rapid change

18   in their fortunes from June of 2005 to today, it's fair for

19   me, I think, to assume that some of them may be in the

20   investor equivalent of a state of shock or disbelief and that

21   that's why they're not showing up here today.

22         It seems to me, again, that given the important

23   transformative events that will be taking place in this

24   company through this bankruptcy case over the next few

25   months, it's important to give those people representation,

Court Decision                                                        183

1   and if a committee is formed that adequately represents them,

2   then I think that they're entitled to it within the

3   parameters that I've already described.

4          Now, in discussing or mentioning the abrupt changes

5   that have taken place in the fortunes of this company, I do

6   not want to suggest, as Appaloosa, I think, has, that the

7   company has done something over the last several months

8   between June of 2005 and today or even between June of 2005

9   and October when it filed for bankruptcy that is somehow

10  nefarious or improper in respect of its business or its

11  shareholders.

12         I think it's irresponsible to suggest that.

13  Clearly, this company has extremely difficult problems to

14  resolve.  To suggest that it should have spent all of its

15  cash on hand before filing to resolve those problems, to

16  suggest that it should continue with the steady-state

17  projections, which even Appaloosa recognized would lead to

18  the destruction of the debtors' business is absurd and was

19  truly a waste of this Court's time, and, frankly, for those

20  who are not particularly sophisticated and read such

21  allegations in the press, again, Appaloosa's argument or

22  insinuation in this regard was a truly irresponsible attack

23  on the company.

24         So I will order the appointment of an official

25  equity committee.  I'm going to be very clear as to the -- my

1   expectation as to at least the -- my initial reaction to a

2   request by that committee for retention of professionals.

3          I do not believe that the proper functioning of a

4   committee of equityholders at this time calls for the

5   appointment and retention of investment bankers, accountants

6   or actuaries, and a premise -- a fundamental premise of my

7   ruling is that I would not appoint such parties,

8   professionals at this time.

9          What an equity committee needs to do is to

10  understand through its own members' expertise, and I trust

11  that there will be sophisticated parties like Brandes on the

12  committee, and through the assistance of its counsel, the

13  pressing issues of this case in respect of labor, pension,

14  other benefits and GM.

15         It needs to be informed, it needs to give the debtor

16  its views so that they can be taken into account as the

17  debtor proceeds.

18         To the extent that it feels it needs to do due

19  diligence on actuarial assumptions, I believe an appropriate

20  arrangement can be worked out with regard to using the

21  creditors committee's actuaries.

22         I do not expect an equity committee or its

23  professionals to try to inject themselves into the extremely

24  sensitive negotiations that are ongoing between the debtors,

25  the unions, GM and other parties in the labor transformation

Court Decision                                                    185

1    issue process.

2          They should be able, however, again, to communicate

3    their views to the debtor and be able to be reasonably

4    informed as to the process so that they can make a

5    determination as to whether to oppose or support it whenever

6    an agreement is brought to the Court.

7          It's very clear that one function of a committee may

8    require the committee at times to take an adversarial role in

9    a case.  However, I believe that consistent with all the case

10   law that I've just cited, it is not proper for an equity

11   committee to view its job as one to create leverage by being

12   a thorn in everyone's side.

13         If the equity committee is not engaged in a two-way

14   dialogue with the debtor, I will believe, and I will act on a

15   motion that contends that, the committee is dysfunctional and

16   disband it.

17         I will also look very closely, and I know that the

18   United States Trustee will look very closely, at any

19   suggestion that the equity committee is taking action in

20   court or otherwise not to maximize recoveries for all

21   committee constituents, but instead to artificially pump up

22   the value of the current stock on a trading basis.

23         I am very concerned about the potential that that

24   has already happened in this case--not by an official

25   committee and obviously not by an equity committee, because

Court Decision                                                    186

1    one has not been appointed, but by parties involved in this

2    litigation, and I will look at the facts closely, and I've

3    already looked closely at the facts of the apparent release

4    of confidential information.

5            And, having looked at those facts, I continue to

6    have serious questions about that apparent release, and if,

7    in fact, Appaloosa applies to be a member of this committee,

8    I direct the U.S. Trustee to investigate those facts.

9            In short, the equity committee needs to be

10   responsible in looking after the interests of the equity-

11   holders as a group, and I trust it will do so.

12           So, Mr. Lauria, you can submit an order to that

13   effect.

14           COUNSEL:  Thank you, Your Honor.  Thank you, Your

15   Honor.

16           THE COURT:  Thank you.

17      (Proceedings concluded at 7:17 p.m.)

18                        <u>CERTIFICATION</u>

19          We certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter to the best of our

22   knowledge and ability, except where, as indicated, the Court

23   has modified its bench ruling.

24   _____            March 23, 2006
     Coleen Rand
25   Certified Court Transcriptionist/Agency Director
     Rand Transcript Service, Inc.

1  _____        March 23, 2006
   Jennifer Linnartz
2  Certified Court Transcriptionist
   For Rand Transcript Service, Inc.

3
                                           March 23, 2006
   _____
4  Cathryn Lynch
   Certified Court Transcriptionist
5  For Rand Transcript Service, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
          In re                           :        Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :        Case No. 05-44481 (RDD)
                                          :
                         Debtors.         :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## ORDER PURSUANT TO 11 U.S.C. § 1102(a)(2) DIRECTING THE UNITED STATES TRUSTEE TO APPOINT AN EQUITY COMMITTEE IN THESE CHAPTER 11 CASES

On March 21 and 22, 2006, the Court held a hearing (the "Hearing") on the

Motion Pursuant to 11 U.S.C. § 1102(a)(2) for an Order Directing the United States

Trustee to Appoint an Equity Committee in these Chapter 11 Cases (the "Motion")

(Docket No. 1604) filed by Appaloosa Management L.P. ("Appaloosa"); and the Court

having considered (i) the Motion; (ii) each of the objections (the "Objections") to the

Motion filed by (a) Delphi Corporation ("Delphi") and its affiliated debtors (together, the

"Debtors") (Docket No. 2629), (b) the Official Committee of Unsecured Creditors

(Docket No. 1634), (c) JPMorgan Chase Bank, N.A., in its capacity as administrative

agent for itself and a syndicate of senior secured lenders (Docket No. 1693), and (d) the

United States Trustee (the "U.S. Trustee") (Docket Nos. 1682 & 2636); (iii) the

responsive statement filed by General Motors Corporation ("GM") (Docket No. 1712);

(iv) Appaloosa's memorandum of law in reply to each of the Objections (Docket No.

2915); (v) the Statement in Support of the Motion filed by Brandes Investment Partners

L.P. (Docket No. 2878); (vi) the documentary evidence admitted into the record at the



Hearing; (vii) the sworn testimony of each of the witnesses provided during the Hearing;

and (viii) the arguments of counsel presented during the Hearing; and the Motion being a

core proceeding under 28 U.S.C. § 157(b)(2) over which the Court has jurisdiction under

28 U.S.C. § 1334(b); and notice of the Motion and the Hearing being due and proper; and

at the conclusion of the Hearing the Court having stated its decision on the record (as

modified in the final, filed transcript of the hearing, the "Decision"); and it appearing for

the reasons, and subject to the limitations, set forth in the Decision, which is incorporated

herein, that (a) it is necessary to assure adequate representation of Delphi's equity

security holders that an official committee of equity security holders be appointed, and

(b) under the present circumstances and subject to the terms and conditions of this Order,

it is a proper exercise of the Court's discretion to direct such appointment, it is hereby

ORDERED, ADJUDGED, AND DECREED:

1.      The Motion is a core proceeding and a summary proceeding, and neither

the Decision nor this Order is binding on Appaloosa, the Objectors or any other party in

interest in these chapter 11 cases except in respect of the Court's determination to

exercise its discretion under 11 U.S.C. § 1102(a)(2) to direct the appointment of an

official equity committee at this juncture in the Debtors' chapter 11 cases and to the

conduct of an equity committee once appointed.

2.      Notice of the Motion was proper under the circumstances.

3.      Each of the Objections is overruled, the Motion is granted to the extent

provided herein, and the U.S. Trustee is directed promptly to appoint an official

committee of equity security holders (the "Equity Committee"), subject to the terms and

conditions of this Order.

2

4.      Without prior leave of this Court after notice and a hearing pursuant to the Case Management Order (as supplemented) (Docket Nos. 245 & 2883), the Equity Committee shall not retain, and may not file applications seeking the retention of, any professionals, including, investment bankers, accountants, or actuaries, other than a law firm to represent the Equity Committee.

5.      The Equity Committee, once appointed, needs to be informed of, and to relay to the Debtors and other parties in interest in these cases, the Equity Committee's views with respect to, among other things, issues involving labor, pension, OPEB, and GM, and to be informed in respect of agreements that the Debtors may reach with their unions or GM. The Equity Committee should not inject itself into negotiations between or among the Debtors, the unions, and GM.

7.      The Court will entertain a motion to disband the Equity Committee if subsequent circumstances or conduct of the Equity Committee or its professionals support the conclusion that the Debtor appears to be hopelessly insolvent or the Equity Committee has become dysfunctional, has directly or indirectly influenced the trading value of Delphi's securities for a tactical purpose or not for the benefit of all holders of Delphi's common stock, or has sought to gain undue leverage for itself.

8.      In the event that Appaloosa applies to be appointed to the Equity Committee, the U.S. Trustee is directed to investigate, among other issues pertaining to Appaloosa's ability to serve as a fiduciary for equity security holders, all facts relating to the apparent release of confidential information covered by the Court's protective order in the prosecution of the Motion.

9.      This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this order.

Dated:  New York, New York
          March 30, 2006


                              /s/ ROBERT D. DRAIN
                              ROBERT D. DRAIN
                              UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT H

Delphi Corporation
Settlement Procedures Special Service Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| White & Case LLP | Glenn Kurtz<br>Gerard Uzzi<br>Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | |
| White & Case LLP | Thomas Lauria<br>Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | |
| Riverside Claims LLC c/o ReGen Capital LLC | Elizabeth L. Abdelmasieh | 2109 Broadway | Suite 206 | New York | NY | 10023 | |

# EXHIBIT I

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| Clark & Scott | Anthony N. Fox | P.O. Box 380548 | | Birmingham | AL | 35238-0548 | |
| Ferguson, Frost & Dodson, LLP | Jinny M. Ray | P.O. Box 430189 | | Birmingham | AL | 35243-0189 | |
| Ferguson, Frost & Dodson, LLP | John W. Dodson | P.O. Box 430189 | | Birmingham | AL | 35243-0189 | |
| Gene T. Moore Attorney at Law, P.C. | Gene Moore | 1802 15th Street | | Tuscaloosa | AL | 35401 | |
| Huie, Fernambucq & Stewart, LLP | Christopher S. Rodgers | Three Protective Center | 2801 Highway 280 S., Suite 200 | Birmingham | AL | 35223 | |
| Lightfoot, Franklin & White, LLC | J. Banks Sewell | The Clark Building | 400 – 20th Street North | Birmingham | AL | 35203-3200 | |
| Lightfoot, Franklin & White, LLC | S. Andrew Kelly | The Clark Building | 400 – 20th Street North | Birmingham | AL | 35203-3200 | |
| Menaker & Herrmann LLP | Richard G. Menaker | 10 East 40th Street, 43rd Floor | | New York | NY | 10016 | |
| Porterfield, Harper, Mills & Motlow, PA | Keith J. Pflaum | P.O. Box 530790 | | Birmingham | AL | 35253-0790 | |
| Porterfield, Harper, Mills & Motlow, PA | Larry W. Harper | P.O. Box 530790 | | Birmingham | AL | 35253-0790 | |
| Rieck and Crotty, P.C. | Jerome F. Crotty and Maria E. Mazza | 55 West Monroe Street, Suite 3390 | | Chicago | IL | 60603 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

6/19/2006 11:39 AM
O'Neill Special Parties

# EXHIBIT J

Delphi Corporation
Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Ace Rent A Car | | 2333 Hazelnut Ln | | Kokomo | IN | 46902 |
| Ace Rent A Car | | 5773 West Washington St | | Indianapolis | IN | 46241 |
| Allison Dotter | | 1608 Mistletoe Ln | | Edmond | OK | 73034 |
| Andrea L Melenbrink | Collison & Collison Pc | Joseph Collison | 5811 Colony Dr North PO Box 6010 | Saginaw | MI | 48608 |
| Andrea L Melenbrink | | 12393 Block Rd | | Birch Run | MI | 48415 |
| Annie S Callender | | 420 S 9th Ave | Apt B 7 | Highland Pk | NJ | 08904 |
| Arlie Campbell | The Abood Law Firm | Andrew P Abood | 246 East Saginaw Ste 1 | East Lansing | MI | 48823 |
| Arlie Campbell | | 6320 Island Lake Dr | | East Lansing | MI | 48823 |
| Arlis Elmore Jr | Gene T Moore | Gene T Moore Attorney At Law | 1802 15th St | Tuscaloosa | AL | 35401 |
| Arlis M Elmore | Gene T Moore | Gene T Moore | 1802 Fifteenth St | Tuscaloosa | AL | 35401 |
| Arlis M Elmore | | 3611 Rice Mine Rd | Ne Lot 317 | Tuscaloosa | AL | 35406 |
| Arthur M Keighley | | 8741 Washington Colony | | Centerville | OH | 45458 |
| Avis Rent A Car | | 7999 Prestige Plaza Dr | | Miamisburg | OH | 45342 |
| Avis Rent A Car | | PO Box 652 | | Parsippany | NJ | 07054 |
| Barbara Hernandez | Kramer And Jacob Llp | Morin Jacob | 801 South Figueroa St Ste 1130 | Los Angeles | CA | 90017 |
| Barbara Hernandez | | 801 S Figueroa St | Ste 1130 | Los Angeles | CA | 90017 |
| Billy W Brady | Weaver And Young Pc | Gregory T Young | 32770 Franklin Rd | Franklin | MI | 48025 |
| Billy W Brady | | 5047 Raymond Ave | | Burton | MI | 48509 |
| Brenda Whitmire | Mcguire Wood And Bissette Pa | Frederick Barbour | PO Box 3180 | Asheville | NC | 28802 |
| Brenda Whitmire | | 1441 Cashiers Valley | | Brevard | NC | 28712 |
| Brian Dickerson | Black Law Offices | Randie K Black | 1422 West Saginaw St | East Lansing | MI | 48823 |
| Brian Dickerson | | 1021 Princeton Ave | | Lansing | MI | 48917 |
| Bruce C Wheeler | Morris Cantor Lukasik Dolce Panepinto | Marc C Panepinto | 1000 Liberty Building 420 Main St | Bufflao | NY | 14202 |
| Bruce C Wheeler | | 9792 Chestnut Ridge Rd | | Middleport | NY | 14105 |
| Building Material Holding Corp | Holden Kidwell Hahn And Crapo | William D Faler | 1000 Riverwalk Dr | Idaho Falls | ID | 83402 |
| Building Material Holding Corp | | 330 Shoup Ave 3rd Fl | PO Box 50130 | Idaho Falls | ID | 83405 |
| Chante M Rich | Garrison Law Firm | Christopher Garrison | 8720 Castle Creek Pkwy Ste 200 | Indianapolis | IN | 47404 |
| Chante M Rich | | 2620 Flying Cloud Court | | Anderson | IN | 46012 |
| Charles Clark | Kelman Loria Pllc | Alan Posner | 660 Woodward Ave Ste 1420 | Detroit | MI | 48226-3588 |
| Charles Clark | | 273 Nebraska | | Pontiac | MI | 48341 |
| Charles Haney | Provost Umphrey Law Firm Llp | Matthew C Matheny | 490 Pk St | Beaumont | TX | 77701 |
| Clarence & Audrey Houston | Cooper And Elliott | Rex H Elliott | 2175 Riverside Dr | Columbus | OH | 43721 |
| Clarence & Audrey Houston | | 10591 Engle | | Vandalia | OH | 45377 |
| Corey Boston | | 2775 Charlottesville Dr | | Colorado Springs | CO | 80922 |
| Dan Peterkin | | 13 Norfolk Court | | Bordentown | NJ | 08505 |
| David B Loessel | | PO Box 6601 | | Saginaw | MI | 48608 |
| Dean F Conrad | Lewis And Lewis | Emily L Downing | 800 Cathedral Pk Tower 37 Franklin St | Buffalo | NY | 14202 |
| Deborah Manns | Morris Cantor Lukasi | Frank J Dolce | 1000 Liberty Bldg 420 Main St | Buffalo | NY | 14202 |
| Deborah Manns | | 714 South Fish St | | Miamisburg | OH | 45342 |
| Dennis Stejakowski | Liss & Shapero | Anthony Shapero | 2695 Coolidge Hwy | Berkley | MI | 48072 |
| Dennis Stejakowski | | 56100 Fairchild Rd | | Macomb | MI | 48042 |
| Edward A Gillette | Maloney And Campolo | Tim Maloney | 900 Se Military Dr | San Antonio | TX | 78214 |
| Edward A Gillette | | 1202 Calcutta Ln | | San Antonio | TX | 78258 |
| Edward Washington | Mansour And Adams | Philip Mansour Jr | 143 North Edison St | Greenville | MS | 38701 |
| Edward Washington | | 102 Palm | | Leland | MS | 38756 |
| Eric J Haupert | | Vaughn Wamsley | 851 South Rangeline Rd | Carmel | IN | 46032 |
| Eric J Haupert | | 1107 Blue Jay Dr | | Greentown | IN | 46936 |
| Estate Of Charles Kelly | Richardson Patrick Westbrook Brickman | Thomas Hart | 174 East Bay St | Charleston | SC | 29402 |
| Estate Of Charles Kelly | | 4403 York St | | Wichita Falls | TX | 76309 |
| Estate Of Jose Mata Chiquito | Law Office Of Carlos Hernandez Jr | Carlos Hernandez | 101 North 10th St | Edinburg | TX | 78539 |
| Estate Of Jose Mata Chiquito | | Aparto Ruiz C 39 | Col Vicerati H Matamoros | Tarnaulipas Mexico | TX | 99999 |
| Estate Of Michael Palmer | Cady Mastromarco And Jahn Pc | Victor J Mastromarco Jr | 1024 N Michigan Ave | Saginaw | MI | 48605 |
| Estate Of Michael Palmer | | 2119 S Van Buren | | Reese | MI | 48757 |
| Estate Of Stella Demwniuk | Thomas Garvey Garvey And Sciotti | Robert F Garvey | 24825 Little Mack | St Clair Shores | MI | 48080 |
| Estate Of Stella Demwniuk | | Macomb County | | Clinton Township | MI | 48035 |
| George Wuo | | 1261 Byrmwyck Court | | Defiance | OH | 43512 |

In re: Delphi Corporation, et al.
Case No. 05-44481

Page 1 of 4

6/19/2006 11:40 AM
Lift Stay Procedures Motion SP 060526

Delphi Corporation
Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Gerald U Weller | | 260 Oakshire Court | | Ada | MI | 49301 |
| Hertz Rental Car | | PO Box 5075 | | Des Plaines | IL | 60017-5075 |
| Israel Chapa | Lieff Cabraser Heimann Bernstein | Lisa Leebove | 275 Battery St 30th Fl | San Francisco | CA | 94111 |
| Jack M Carpenter | | 8371 Seymour Rd | | Flushing | MI | 48433 |
| James Hutz Jr | | 6365 Thompson Sharpsville Rd | | Fowler | OH | 44418 |
| James L Brown | Attorney At Law | David A Hodges | Centre Pl Building 212 Ctr St Fifth Fl | Little Rock | AR | 72201 |
| James L Brown | | 1605 Beresford Rd | | North Little Rock | AR | 72116 |
| James Sr D Bishop | Davis And Davis | Fred Davis | 2900 Trophy Dr | Bryan | TX | 77805 |
| James Sr D Bishop | | Rr 2 | Box 777 | Hearne | TX | 77859 |
| Jeff Pennington | Casper And Casper | Margaret Mccollum | One North Main St PO Box 510 | Middletown | OH | 45042 |
| Jeff Pennington | | 9150 State Route 348 | | Blue Creek | OH | 45616 |
| Jefferi Tatum | Boyd And Akin Pllc | Gail S Akin | PO Box 24207 | Jackson | MS | 39225-4207 |
| Jefferi Tatum | | 2123 Hwy 17 | | Delhi | LA | 71232 |
| Jennifer T Asherbranner | Hardwick And Knight | Travis W Hardwick | 210 East Moulton St PO Box 968 | Decatur | AL | 35602 |
| Jennifer T Asherbranner | | 66 Pleasantview Rd | | Falkville | AL | 35622 |
| Jeremiah J Saunders | Morgan And Morgan | Randy Schimmelpfennig | 16th Fl 20 N Orange Ave PO Box 4979 | Orlando | FL | 32802 |
| Jeremiah J Saunders | | 210 Chessgate Court | | Alpharetta | GA | 30022 |
| Jessica Kraus | Cellino & Barnes | Christopher Damato | 17 Court St 17th Fl | Buffalo | NY | 14202-3290 |
| Jessica Kraus | | 114 Buell Ave | | Cheektowaga | NY | 14225 |
| Joan Venoy | | 3919 Henry Rowell Rd | | Plant City | FL | 33567 |
| John Bedrin | Simmons Cooper | Tim Thompson | 707 Berkshire Blvd | E Alton | IL | 62024 |
| John Grimes | Fieger Fieger Kenney And Johnson | Ven Rjohnson | 19390 West Ten Mile Rd | Southfield | MI | 48075 |
| John Grimes | | 5621 Arden Ave | | Warren | MI | 48092 |
| Jon C Cox | Leon R Russell | Russell & Shiver Llp | 3102 Oak Lawn Ste 600 Lb 164 | Dallas | TX | 75219 |
| Jon C Cox | | 2925 Briarwood Dr | | Paris | TX | 75460 |
| Jon Reel | | 14701 Alsong Ct | | Carmel | IN | 46032 |
| Jonathan Brown | Hoagland Longo Moran Dunst & Doukas | Douglas M Fasciale | 40 Paterson St PO Box 480 | New Brunswick | NJ | 08903 |
| Jonathan Brown | | 369 Franklin Blvd | | North Brunswick | NJ | 08902 |
| Jose C Alfaro | Stanley J Walter | Stanley J Walter | 1017 S Gaylord St | Denver | CO | 80209 |
| Jose C Alfaro | | 304 West 5th St | | Goodland | KS | 67735 |
| Josefa Chavez | | 9177 Socorro Rd | | El Paso | TX | 79905 |
| Joseph A Johnson | | 6981 Rathbun Rd | | Birch Run | MI | 48415 |
| Joyce Sedberry | G Lynn Shumway | 6909 E Greenway | Ste 200 | Scottsdale | AZ | 85254 |
| Joyce Sedberry | | 1400 Sunflower Ave South | | Palm Springs | CA | 92262 |
| Julie & David Brittingham | Meyer And Williams | Prichard Mayer | 350 East Broadway | Jackson | WY | 83001 |
| Julie & David Brittingham | | 523 Eavey St | | Xenia | OH | 45385 |
| Karen H Hurst | | 923 Highland Ave | | Anniston | AL | 36207 |
| Keith Smith | | 8223 Spruce Needle Court | | Columbus | OH | 43235 |
| Kelly Groce | Michael J Sobieray | Stewart & Stewart | 931 S Rangeline Rd | Carmel | IN | 46032 |
| Kelly R Groce | | 1618 Ross St | | New Castle | IN | 47362 |
| Larry Quinn | Johnson Rasmussen Robinson & Allen | John Rasmussen Dale Robinson & Jay Alle | 48 North Macdonald St | Mesa | AZ | 85201 |
| Larry Quinn | | Embarcadero Ctr West | 275 Battery St 30th Fl | San Francisco | CA | 94111-3339 |
| Lawrence J. Kotler | Duane Morris LLP | 380 Lexington Avenue | | New York | NY | 10168 |
| Leticia Guerra Gillette | Maloney And Campolo | Tim Maloney | 900 Se Military Dr | San Antonio | TX | 78214 |
| Leticia Guerra Gillette | | 1202 Calcutta Ln | | San Antonio | TX | 78258 |
| Liam Oneill | Clifford Law Offices | Richard F Burke Jr | 120n Lasalle St 31st Fl | Chicago | IL | 60602 |
| Liam Oneill | | 9343 183rd St | | Tinley Pk | IL | 60477 |
| Lillie Smolik | Cole Cole And Easley Pc | Rex L Easley Jr | 302 West Forrest St Po Drawer 510 | Victoria | TX | 77902-0510 |
| Lillie Smolik | | 359 Burkhart Rd | | Victoria | TX | 77905 |
| Lori J Gabrielle | Harris Karstaedt Jamison And Powers | Adam B Kehrli | 383 Inverness Pkwy Ste 400 | Englewood | CO | 80112-5816 |
| Lori J Gabrielle | | 39 Boomerang Rd | 8120 | Aspen | CO | 81611 |
| Lori Smith | Hochman Roach And Plunkett Co | Gary Plunkett | Ste 650 Talbot Tower | Dayton | OH | 45402 |
| Lori Smith | | 215 E Wadsorth St | | Eaton | OH | 45320 |
| Margery N Reed Wendy M. Simkulak | | Duane Morris Llp | 30 South 17th St | Philadelphia | PA | 19103 |
| Maria D Clevenger | | 2804 Catalina Dr | | Anderson | IN | 46011 |
| Marion Ross | Archer And Greiner | Frank D Allen | One Centennial Square PO Box 3000 | Haddonfield | NJ | 08033 |

In re: Delphi Corporation, et al.
Case No. 05-44481.

Page 2 of 4

6/19/2006 11:40 AM
Lift Stay Procedures Motion SP 060526

Delphi Corporation
Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Marion Ross | | 1210 East Grant Ave | | Vineland | NJ | 08361 |
| Mark And Judy Couch | | 10440 Cassel | | Vandalia | OH | 45377 |
| Mark Pyc | Brown Chiari Llp | David W Olson | 5775 Broadway | Lancaster | NY | 14086-2360 |
| Mark Pyc | | 6374 Jennifer Dr | | Lockport | NY | 14094 |
| Mark S Presnall | | PO Box 4 | | Mt Meigs | AL | 36057 |
| Martha Alfaro | Stanley J Walter | Stanley J Walter | 1017 S Gaylord St | Denver | CO | 80209 |
| Martha Alfaro | | 304 West 5th St | | Goodland | KS | 67735 |
| Martin L Shannon Shaw | Chapman Lewis And Swan | Ralph Chapman | PO Box 428 | Clarksdale | MS | 38614 |
| Martin L Shannon Shaw | | 443 Sawyer Rd | | Winona | MS | 38967 |
| Mary And Liam Oneill | Richard G Menaker | Menaker & Herrmann Llp | 10 East 40th St 43rd Fl | New York | NY | 10016 |
| Mary Oneill/liam Oneill Plaintiff | Richard G Menaker | Menaker & Herrmann Llp | 10 East 40th St 43rd Fl | New York | NY | 10016 |
| Mary P Oneill | Clifford Law Offices | Richard F Burkejr | 120 N Lasalle St 31st Fl | Chicago | IL | 60602 |
| Mary P Oneill | | 9343 183rd St | | Tinley Pk | IL | 60477 |
| Michael Gutjahr | Padberg And Corrigan Law Firm | Matthew Joseph Padberg | 1010 Market St Ste 650 | St Louis | MO | 63101 |
| Michael Gutjahr | | 4808 Hazel Run | | Bonne Terre | MO | 63628 |
| Myron Simonson | | 785 Leon St | | Jordan | MN | 55352 |
| Nancy Petro | | 5665 W 224th St | | Fairview Pk | OH | 44126 |
| National Rent A Car | | 1401 Crooks Rd | | Troy | MI | 48098 |
| Nelda M Bishop | Davis And Davis | Fred Davis | 2900 Trophy Dr | Bryan | TX | 77805 |
| Nelda M Bishop | | Rr 2 | Box 777 | Hearne | TX | 77859 |
| Peter J. McEnery, Senior Underwriter | ACE Risk Management | 525 W. Monroe Street | 4th Floor | Chicago | IL | 60661 |
| Phyllis LeGrand | Reliance in Liquidation | 5 Hanover Square | | New York | NY | 10004 |
| Plaintiff Martin Shannon Shaw | Ralph E Chapman | Chapman Lewis & Swan | 501 East St PO Box 428 | Clarksdale | MS | 38614 |
| Ray Sedberry | G Lynn Shumway | G Lynn Shumway | 6909 E Greenway Ste 200 | Scottsdale | AZ | 85254 |
| Ray Sedberry | | 1400 Sunflower Ave South | | Palm Springs | CA | 92262 |
| Rhonda Gillespie | | 4480 Kashmire Dr | | Colorado Springs | CO | 80920 |
| Richard Dorociak | Thorson Switala Winkins & Snead Llp | Joseph J Mondock | First National Plaza 130 West Second St Ste 1508 | Dayton | OH | 45402 |
| Richard Dorociak | | 4358 Hillcrest Dr | | Bellbrook | OH | 45305 |
| Richard Fryson | Attorney At Law | Brian Kish | 6630 Seville Dr | Canfield | OH | 44406 |
| Richard Fryson | | 462 S Raccoon Rd | C23 | Austintown | OH | 44515 |
| Rita Grimes | Fieger Fieger Kenney And Johnson | Ven R Johnson | 19390 West Ten Mile Rd | Southfield | MI | 48075 |
| Rita Grimes | | 5621 Arden Ave | | Warren | MI | 48092 |
| Robert Campbell | The Abood Law Firm | Andrew P Abood | 246 East Saginaw St Ste 1 | East Lansing | MI | 48823 |
| Robert Campbell | | 6320 Island Lake Dr | | East Lansing | MI | 48823 |
| Robert E Davis | | 3564 Hanover Dr | | Kent | OH | 44240 |
| Robert W Lemanski | | 3810 Hamlet Dr | | Saginaw | MI | 48603 |
| Rodger Jones | Law Office Of Alfredo Z Padilla | Alfredo Z Padilla | 104 N 5th St Po Drawer 355 | Carrizo Springs | TX | 78834 |
| Rodger Jones | | 1238 St Michaels | | Laredo | TX | 78041 |
| Roseleen Brown | David A Hughes | 212 Ctr St | Fifth Fl | Little Rock | AR | 72201 |
| Roseleen Brown | | 1605 Beresford St | | North Little Rock | AR | 72116 |
| Rutilio Alvarado | | 3133 Clay Ave | | San Diego | CA | 92113 |
| Sandra Baldwin | Allen Jcounard | Allen J Counard | 2320 West Jefferson | Trenton | MI | 48103 |
| Sandra Baldwin | | 8616 Whitehorn St | | Romulus | MI | 48174 |
| Stephen Smith | Hochman Roach And Plunkett Co | Gary Plunkett | Ste 650 Talbot Tower | Dayton | OH | 45402 |
| Stephen Smith | | 215 E Wadsorth St | | Eaton | OH | 45320 |
| Steve Meyer | | 6960 Heatheridge | | Saginaw | MI | 48603 |
| Steven L Whitmire | Mcguire Wood And Bissette Pa | Frederick S Barbour | PO Box 3180 | Asheville | NC | 28802 |
| Steven L Whitmire | | 1441 Cashiers Valley | | Brevard | NC | 28712 |
| Sylvia And Andre Cook | Gilbert Frank Ollanik And Komyatte | Paul J Komyatte | 5400 Ward Rd Building Iv Ste 200 | Arvada | CO | 80002 |
| Sylvia And Andre Cook | | 710 Elk Glen Court | | Colorado Springs | CO | 80906 |
| Tanya L Stubbs | Culley Marks Tanenbaum And Pezzulo | Frank Montemalo | 36 Main St West Ste 500 | Rochester | NY | 14614-1790 |
| Tanya L Stubbs | | 351 Magee Ave | | Rochester | NY | 14614 |
| Teresa Kirkland | | 821 W Martindale Dr | | Englewood | OH | 45322 |
| Thomas Adams | Padberg And Corrigan | Michael Corrigan | 1010 Market St Ste 650 | St Louis | MO | 63101 |
| Thomas Falencik | | 12350 Montano Way | | Castle Rock | CO | 80108 |
| Thomas L Else | | 51 Ferris St | | South River | NJ | 08882 |

Delphi Corporation
Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Thomas Pinkerton | | 536 Underridge Rd | | Conneaut | OH | 44030 |
| Thomas Valtierra | | 2688 Starlite Dr | | Saginaw | MI | 48603 |
| Timothy D Groh | | 2656 Main St | | Standish | MI | 48658 |
| Todd Sealock | Law Office Of Lynn Shumway | G Lynn Shumway | 6909 East Greenway Pkwy Ste 200 | Scottsdale | AZ | 85254 |
| William Ross | Archer And Greiner | Frank D Allen | One Centennial Square PO Box 3000 | Haddonfield | NJ | 08033 |
| William Ross | | 1210 East Grant Ave | | Vineland | NJ | 08361 |

In re: Delphi Corporation, et al.
Case No. 05-44481

Page 4 of 4

6/19/2006 11:40 AM
Lift Stay Procedures Motion SP 060526

# EXHIBIT K

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Crusader Servicing Corporation | | 732 Montgomery Avenue | | Narberth | PA | 19072 |
| Daniel A. Torrisi | New Brunswick City Clerk | 78 Bayard Street | | New Brunswick | NJ | 08901 |
| David J. Kennedy | Assistant United States Attorney for the Southern District of New York | 86 Chambers Street | 3rd Floor | New York | NY | 10007 |
| Dr. Carol O'Cleireacain, Deputy State Treasurer and Acting Director | New Jersey Division of Taxation, | 50 Barrack Street, | | Trenton | NJ | 08695 |
| Ed Reddy | Adler Industrial Services, Inc. | 95-123 Firmenich Way | | Newark | NJ | 07114 |
| Edward M. Fox | Kirkpatrick & Lockhart Nicholson Graham LLP | 599 Lexington Avenue | | New York | NY | 10022 |
| Edwin J. Walters, Jr., Darrell J. Papillion | Moore, Walters, Thompson, Thomas, Papillion & Cullens | 6513 Perkins Road | | Baton Rouge | LA | 70808 |
| Elaine M. Flynn | Middlesex County Clerk | County Administration Building | 75 Bayard Street, P.O. Box 1110, County Clerk 4th Floor | New Brunswick | NJ | 08901 |
| Eva Kolb | Northeast Regional Office Securities and Exchange Commission | 3 World Financial Center | Room 4300 | New York | NY | 10281 |
| Geri Margin | North Brunswick Township Public Schools, Administrative Offices | Maple Meade School | Old Georges Road | North Brunswick | NJ | 08902 |
| Hector Canales | Canales & Simonson, P. C. | 2601 Morgan Avenue | | Corpus Christie | TX | 78405 |
| Hires Automotive Centers | Roger Ake | 5809 Illinois Rd. | | Fort Wayne | IN | 46804 |
| Insolvency | Internal Revenue Service | 290 Broadway | 5th Floor | New York | NY | 10007 |
| Insolvency | Environmental Protection Agency | Ariel Building | 1200 Pennsylvania Ave, N.W. | Washington | DC | 20460 |
| Jacqueline J. Ertl, Vice President and General Counsel | Johnson Controls Inc. | 5757 North Green Bay Avenue | Mail Stop X-18 | Milwaukee | WI | 53209 |
| James T. Phillips | Treasurer of Middlesex County | County Administration Building | 75 Bayard Street, P.O. Box 1110, County Clerk 4th Floor | New Brunswick | NJ | 08901 |
| Jeff C. Spahn | Martin, Pringle, Oliver, Wallace & Bauer, L.L.P. | 100 North Broadway | Suite 500 | Wichita | KS | 67202 |
| John B. Quinn | Quinn, Emanuel, Urquhart & Oliver & Hedges LLP | 865 S. Figueroa Street | 10th Floor | Los Angeles | CA | 90017-2543 |
| John Robertson, Mark Carrigan | Carrigan, McCloskey & Roberson, LLO | 5300 Memorial Drive | Suite 700 | Houston | TX | 77007 |
| John W. Rasmussen, Dale W. Robinson, Jay M. Allen | Johnson, Rasmussen, Robinson & Allen, P.L.C. | 48 North MacDonald Street | | Mesa | AZ | 85201 |
| Jonathan D. Selbin, Rachel Geman | Lieff, Cabaser, Heiman & Bernstein, LLP | 780 Third Avenue | 48th Floor | New York | NY | 10017 |
| Josh Gradwohl | New Jersey Department of Environmental Protection | 401 East State Street, 5th Floor | PO Box 028 | Trenton | NJ | 08625 |
| Lisa J. Leebove | Lieff, Cabraser, Heimann & Bernstein, LLP | Embarcadero Center West | 275 Battery Street, 30th Floor | San Francisco | CA | 94111 |
| Lori J. Gabrielle | | 39 Boomcrang Road 8120 | | Aspen | CO | 81611 |
| Michael J. Garcia | United States Attorney, SDNY | 1 St. Andrews Plaza | | New York City | NY | 10007 |
| New Brunswick Tax Collector's Office | | 78 Bayard Street | | New Brunswick | NJ | 08901 |
| Office of the Tax Collector | City of New Brunswick | City Hall | 78 Bayard St., | New Brunswick | NJ | 08903 |
| Patricia Schrage | Northeast Regional Office Securities and Exchange Commission | 3 World Financial Center | Room 4300 | New York | NY | 10281 |
| Peter Morris | PDM Group Inc. | 1258 South River Road | | Cranbury | NJ | 08512 |
| Regional Administrator | Environmental Protection Agency, Region 2 | 290 Broadway | | New York | NY | 10007-1866 |
| Regional Administrator | Environmental Protection Agency, Region 4 | Atlanta Federal Building | 61 Forsyth Street, SW | Atlanta | GA | 30303 |
| Steve Bobo | Sachnoff & Weaver | 10 South Wacker | | Chicago | IL | 60606 |
| Steve Danneker | AM Sheet Metal | 410 W 2nd Ave | | S. Williamsport | PA | 17702 |