1

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   Case No. 05-44481

 4   - - - - - - - - - - - - - - - - - - -x

 5   In the Matter of:

 6

 7   DELPHI CORPORATION,

 8

 9        Debtor.

10

11   - - - - - - - - - - - - - - - - - - -x

12              (P.M. SESSION)

13              U.S. Bankruptcy Court

14              One Bowling Green

15              New York, New York

16

17              May 24, 2006

18              15:05 PM

19

20   B E F O R E:

21   HON. ROBERT D. DRAIN

22   U.S. BANKRUPTCY JUDGE

23

24

25
```

2

```
 1   MOTION to Authorize Motion For Order Under 11

 2   U.S.C. Section 1113(c) Authorizing Rejection

 3   Of Collective Bargaining Agreements And Under
```

4   11 U.S.C. Section 1114(g) Authorizing

5   Modification Of Retiree Welfare Benefits filed

6   by John Wm. Butler Jr. on behalf of Delphi

7   Corporation.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed By:  Sharona Shapiro

25

3

1

2   A P P E A R A N C E S :

3

4   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

5        Attorneys for Delphi Corporation

6        Four Times Square

7        New York, NY 10036

8

```
 9   BY:   JOHN WM. BUTLER, JR., ESQ.

10

11   O'MELVENY & MYERS, LLP

12        Attorneys for Debtors

13        7 Times Square

14        New York, NY 10036

15

16   BY:   JEFFREY I. KOHN, ESQ.

17

18   O'MELVENY & MYERS, LLP

19        Attorneys for Debtors

20        1625 Eye Street

21        Washington, DC 20006

22

23   BY:   TOM JERMAN, ESQ.

24

25
```

4

```
 1   O'MELVENY & MYERS, LLP

 2        Attorneys for Debtors

 3        400 South Hope Street

 4        Los Angeles, CA 90071

 5

 6   BY:   ROBERT A. SIEGEL, ESQ.

 7

 8   WEIL GOTSHAL & MANGES, LLP

 9        Attorneys for General Motors

10        767 Fifth Avenue

11        New York, NY 10153

12

13   BY:   MR. JEFFREY TANENBAUM, ESQ.
```

```
14

15   KENNEDY, JENNIK & MURRAY, P.C.

16        Attorneys for IUE

17        113 University Place

18        New York, NY 10003

19

20   BY:   THOMAS KENNEDY, ESQ.

21

22

23

24

25
```

5

```
1    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

2         Attorneys for Steelworkers Union

3         1350 Broadway

4         Suite 501

5         New York, NY 10018

6

7    BY:   LOWELL PETERSON, ESQ.

8

9    PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER &

10   BRUEGGEMAN, S.C.

11        Attorneys for IBEW and IAM

12        1555 North River Center Drive

13        Suite 202

14        Milwaukee, WI 53212

15

16   BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

17

18   GORLICK, KRAVITZ & LISTHAUS, P.C.
```

```
19        Attorneys for Operating Engineers

20        Locals 18-S, 101-S, 832-S

21        17 State Street,4th Floor

22        New York, NY 10004

23

24   BY:   BARBARA S. MEHLSACK, ESQ.

25
```

6

```
1    COHEN, WEISS AND SIMON, LLP

2         Attorneys for UAW

3         330 West 42nd Street

4         New York, NY 10036

5

6    BY:   BRUCE H. SIMON, ESQ.

7

8    WHITE & CASE, LLP

9         Attorneys for Appaloosa Management

10        1155 Avenue of the Americas

11        New York, NY 10036

12

13   BY:   GLENN M. KURTZ, ESQ.

14        DOUGLAS P. BAUMSTEIN, ESQ.

15

16   KIRKPATRICK & LOCKHART NICHOLSON GRAHAM, LLP

17        Attorneys for Wilmington Trust Company

18        599 Lexington Avenue

19        New York, NY 10022

20

21   BY:   EDWARD M. FOX, ESQ.

22

23
```

24

25

7

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  Okay.

3    We're back on the record in Delphi Corporation

4    and, Mr. Sheehan, you're still under oath.

5            THE WITNESS:  Yes, sir.

6    DIRECT EXAMINATION BY

7    MR. BUTLER:

8    Q.   Mr. Sheehan, during your cross-

9    examination, you testified as to a press

10   release dated March 31st that went out

11   regarding a transformation plan.  Do you

12   recall that testimony?

13   A.   I do.

14   Q.   Was that plan presented to the board of

15   directors of the company?

16   A.   Yes, it was.

17   Q.   Was the plan approved by the board before

18   that press release was issued?

19   A.   Yes, it was.

20   Q.   You were also examined this morning on

21   various aspects in connection with some of the

22   modeling that the company had done.  Do you

23   recall some of that testimony?

24   A.   I do.

25   Q.   Do you recall a line of questions

8

1   regarding the company's performance during the

2   first quarter of 2006?

3   A.   Yes, sir.

4   Q.   Did the company over perform from its

5   first half operating plan or steady state

6   projections?

7   A.   Yes, it did.

8   Q.   And in what amount did it over perform,

9   approximately?

10   A.   At the operating income level at

11   approximately -- or operating loss level of

12   approximately 500 million dollars.

13   Q.   Now, is that taking into consideration or

14   not taking into consideration subsidies from

15   General Motors that had been put into the

16   business plan?

17   A.   That does not take into con -- there was

18   no subsidies from -- excuse me, there was a

19   price-down that would otherwise have gone into

20   effect in the first quarter of 2006.  That did

21   not occur and as a result you could look at

22   that as a subsidy.

23   Q.   Looking just at the first half operating

24   plan for 2006, did the company plan any

25   additional subsidies from General Motors to be

9

1   received in connection with the first six

2   months of this year?

3   A.   The first six half -- first six months of

4   the year, the first half operating plan

5   presumed or expected a 500 million dollar

https://vip21.veritextllc.com/myfiles/297485/117758pm.TXT

6    subsidy from General Motors to start March 1st

7    of 2006.

8    Q.   Was that subsidy received?

9    A.   No, we have subsequently not been

10   collecting that amount.

11   Q.   So when you talk of this overperformance

12   of 500 million dollars, does that include or

13   exclude the GM subsidy that had been planned

14   for the year -- for six months?

15   A.   The performance that we achieved in the

16   first quarter excludes the subsidy.  We did

17   not receive a subsidy from General Motors.

18   Q.   And that 500 million dollars worth of

19   performance or overperformance, was that based

20   on global performance, North American

21   performance or some other kind of performance?

22   A.   That's global performance.

23   Q.   During cross-examination this morning,

24   you testified that in connection with your

25   modeling, you looked at the company globally

10

1    and then you split it down into two subsets.

2    What are those subsets, again?

3    A.   Well, we generally look at our operations

4    between the North American operations and the

5    non-North American operations.  That's how our

6    systems are really designed, combining our

7    U.S. and Mexican -- princiapally Mexican,

8    small amount of Canadian -- operations

9    together.  We do have the ability to be able

10   to break apart the North American operations

11    into its components.  But the system doesn't

12    do that for us quite so easily.

13    Q.    Just to be clear, when you were talking

14    about the susbsets, one was North America?

15    A.    That's correct.

16    Q.    And one was non-North America?

17    A.    That's correct.

18    Q.    During your testimony this morning, Mr.

19    Sheehan, you were asked a series of questions

20    about the portions of your declaration that

21    dealt with trade creditors.  Do you recall

22    that testimony?

23    A.    Yes, I do.

24    Q.    Do you have a view as to whether or not

25    the prices that we pay our suppliers -- Delphi

11

1    pays its suppliers are competitive or not

2    competitive in the marketplace?

3    A.    I believe in all instances that the

4    prices we pay are competitive.

5    Q.    You might want to get a little closer to

6    the microphone.

7    A.    Sorry.

8    Q.    Would you restate your answer to that

9    question, please?

10    A.    I believe that in all situations the

11    prices we're paying are competitive.

12    Q.    So, when your declaration talks about

13    compromises -- and you testified this morning

14    there had been compromises of around 25

15    percent, is that your testimony?

16   A.   That's correct.

17   Q.   And so, those are compromises, from what

18   you've testified, were competitive pricing.

19   Is that correct?

20   A.   Based upon the amounts that were

21   outstanding pre-petition that are not being

22   settled -- paid upon settlement, excuse me.

23   Q.   During the course of your examination,

24   Mr. Sheehan, you were asked questions about

25   estimating proceeds from the sale of assets.

12

1   Do you recall that line of testimony?

2   A.   Yes, I do.

3   Q.   Do you plan to sell assets while in the

4   Chapter 11 case?

5   A.   It is our intention to be able to sell

6   product lines, yes, or business lines.

7   Q.   Are there assets that you think are not

8   saleable?

9   A.   We do believe that certain of the assets,

10   the business lines, will not be saleable.

11   Q.   Is there any defining criteria between

12   what would be saleable and not saleable?

13   A.   I think that as it relates to saleable

14   versus not saleable, it will depend upon the

15   viability of production of that product in the

16   United States.  There are just some products

17   that are inherently not going to be able to be

18   competitively manufactured in the United

19   States.

20   Q.   Any factor other than whether something

https://vip21.veritextllc.com/myfiles/297485/117758pm.TXT

```
21   is a competitive product?

22   A.   Our ability to sell the business lines

23   will also depend upon the support of the

24   customer base and whether the customer or

25   customers are supporting the sale.
```

13

```
 1   Q.   In your own words, can you tell the Court

 2   what you mean by "being supportive?"

 3   A.   One of the principal assets of the

 4   business will be the book of business and that

 5   book of business belongs to the customer.

 6   And, therefore, to the extent that a customer

 7   is not supportive of a transaction then, in

 8   the long run, maybe in the short run too, that

 9   customer will not be willing to continue to

10   source to our business line that we're trying

11   to sell.  And as a result, the value of the --

12   there will not be value in the business there.

13   So any buyer of the business is clearly going

14   to want to understand that they have the

15   support of the customer and a book of business

16   that will be determinable.

17   Q.   Do you have a view, Mr. Sheehan, as to

18   whether there is value to be extracted from

19   these businesses that are being held for sale

20   without the support of the specific customers

21   that are associated with each business?

22   A.   I think that the value of the businesses,

23   if you don't have the support of the customer

24   base, is questionable.

25   Q.   Mr. Sheehan, would you turn to Exhibit
```

14

1    135, please?  Mr. Sheehan, during your cross-

2    examination, you were asked a series of

3    questions from a number of examiners about the

4    three plus nine forecast and about the steady

5    state and other models of the company.  Do you

6    recall that examination from this morning?

7    A.    Yes, I do.

8    Q.    The document marked Exhibit 135, is this

9    the three plus nine forecast about which you

10   gave testimony?

11   A.    Yes, it is.  It is the presentation that

12   we made to the board of directors regarding

13   that forecast.

14   Q.    Could you take a look at the entire

15   document?  Is this the full presentation

16   presented to the board on this subject matter?

17   A.    I believe it is.

18   Q.    Mr. Sheehan, has the business modeling

19   that the company has undertaken since the

20   beginning of 2005 been under your direction?

21   A.    Yes, it has.  As well as our chief

22   financial officer, Bob Dellinger.

23   Q.    During your examination this morning, you

24   were asked questions about many of those

25   models, I believe starting with the -- what

15

1    was called the base case to the lenders.  Do

2      you recall that?

3      A.   I do.

4      Q.   Just so we have some chronology in the

5      record, I'd like to walk briefly through those

6      models with you.

7      A.   Okay.

8      Q.   In your own words, will you please

9      explain to the Court what the base case model

10     was and what it was intended to do?

11     A.   The base case was an updating of our 2005

12     business plan.  We had prepared a business

13     plan in the fourth quarter of 2004 for the

14     years 2005, 2006 and 2007.  And in the first

15     quarter of 2005, as the automotive industry

16     was changing and General Motors' production

17     volumes were changing dramatically, we found

18     ourselves in a situation where we were not

19     going to be able to maintain our unsecured

20     credit status and as a result, we engaged in

21     renegotiations with our banks.

22          In conjunction with that process in the

23     second quarter, we -- in recognizing that we

24     were going forward with a refinancing of the

25     business -- we updated the business plan from

16

1      the fourth quarter of 2005 and used that or

2      presented that to our banks in conjunction

3      with the refinancing.

4      Q.   When did the refinancing close?

5      A.   Approximately June 10th of 2005.

6      Q.   Were there any other cases presented

7      to -- or models presented to the banks, prior

8      to the closing of that financing?

9      A.    No, there were not.

10     Q.    You were asked in testimony earlier today

11     about something called the downside case?

12     A.    Yes.

13     Q.    In your own words, will you tell the

14     Court, please, what the downside case is and

15     why it was created?

16     A.    The downside case was created recognizing

17     that there was substantial risk that lay

18     within the U.S. automotive industry and that

19     the company needed to be able -- given those

20     unsettled circumstances and the company's

21     unsettled circumstances, that it needed to

22     understand if in fact performance was to

23     deteriorate, if General Motors' production

24     volumes, in particular, were to decline, if

25     the U.S. automotive sales rate was to decline,

17

1      if commodity costs increased, you know, in a

2      so-called downside scenario, what would that

3      mean for the company's financial situation and

4      then how would the company deal with that

5      matter.  And it was something that, quite

6      honestly, we had not ourselves done, at that

7      point in time, and as has been documented or

8      discussed in this hearing, was something that

9      our financial advisors, as we moved into this

10     period, believed was an appropriate thing for

11     us to do.

12    Q.    And when was that downside case prepared,

13    generally?

14    A.    It was prepared starting in the second

15    quarter and completed in the third quarter of

16    2005.

17    Q.    Was that downside case presented to the

18    board of directors?

19    A.    I believe it was discussed and presented

20    with the board of directors, yes.

21    Q.    Do you recall, generally, a timeframe in

22    which that would have been presented?

23    A.    I believe that would have been in the

24    late July 2005 timeframe, if I'm not correct.

25    Q.    Now, in your testimony this morning, you

18

1    testified the company then moved on to the

2    steady state plan.  Is that right?  Or the

3    steady state scenario?

4    A.    The company, at that time we didn't --

5    yes, that is correct.

6    Q.    In your own words, can you describe to

7    the Court how the steady state scenario came

8    to being, what the purpose of it was and the

9    timeframe for its development?

10    A.    The steady state scenario derived out of

11    our normal business planning process.  So in

12    early third quarter, we developed a set of

13    instructions -- a set of assumptions and a set

14    of instructions to our operating divisions and

15    those instructions go out to the divisions

16    each year in the early August timeframe.  The

https://vip21.veritextllc.com/myfiles/297485/117758pm.TXT

17    divisions then submit their -- the business

18    plan information in the late September

19    timeframe at which point it is consolidated

20    and analyzed.  We hold business plan reviews

21    with our divisions and run through it in the

22    completion of the business plan.

23         The -- given the situation as it was

24    unfolding in 2005 in the filing for

25    reorganization in October, what we instructed

19

1    the divisions to do was to prepare the

2    business plan without regard to any changes in

3    the labor agreements or any other changes that

4    might occur out of the strategic initiatives

5    that we were pursuing.  And we determined that

6    we would then overlay the assumptions with

7    respect to those strategic initiatives at the

8    headquarters level.  And so that's where the

9    name steady state came from.  We had

10   instructed the divisions to prepare the

11   business plan on a steady state scenario.

12   Q.    In your cross-examination this morning, I

13   think with Counsel for the USW, the steel

14   workers -- you conceded in that examination

15   that there were a variety of factors he asked

16   you about that weren't factored into the

17   steady state business plan or scenario.  Do

18   you recall that testimony?

19   A.    Generally, yes.

20   Q.    Can you tell the Court, in your own

21   words, why it would have been that those

22    things wouldn't have been factored into the

23    steady state scenario as opposed to some of

24    the other models?

25    A.    For example, I think that there was

20

1    discussion about the attrition proposal and

2    other factors and at that point in time, when

3    we were preparing the plan, the steady state

4    model couldn't have contemplated those, as we

5    did not -- I mean, they weren't -- we weren't

6    developed enough in our strategic initiatives

7    with the unions.

8    Q.    From a design perspective is the steady

9    state scenario, as opposed to the GM

10    consensual plan or the model or the

11    competitive benchmark model -- was the steady

12    state scenario, from a design perspective,

13    intended to comprehend changes to the

14    business?

15    A.    No, it was not.  It was to be a -- let me

16    call it a business-as-usual -- certainly it

17    was not usual from the perspective that it

18    wasn't viable -- but was to provide a baseline

19    upon which we then could model the impacts or

20    the effects of the strategic initiatives that

21    we were pursuing, labor and GM financial

22    support and sale or wind down of non-core

23    facilities.  So it was to establish a baseline

24    upon which, then, modeling could be done to

25    determine the impacts that would come out of

21

1    the transformation process.

2    Q.    What was the next modeling that the

3    company did?

4    A.    Once the steady state was completed, we

5    then began to model differing assumptions.

6    For example, we had made the November 15th

7    labor proposal, and so we then overlaid

8    against the steady state plan -- we overlaid

9    those proposals that we had made.

10    So we overlaid the November 15th labor

11    proposal.  We had discussions with respect to

12    General Motors' pricing.  We overlaid that.

13    We overlaid the SGNA plan.  We overlaid the

14    sale or wind-down of right side businesses to

15    develop a transformation model -- and I think

16    we, at that time, were calling that the

17    transformation plan.

18    As we progressed through the course of

19    early 2006, the -- and especially as we

20    developed other labor proposals that maybe

21    were not as immediate of a transformation as

22    the November 15th labor proposal -- at that

23    time it was called the next steps plan or the

24    zip code plan -- we needed to differentiate

25    the transformation plan.  And that's how the

22

1    competitive benchmark, representing the

2    November 15th labor proposal, and the GM

3    consensual plan, representing the March 24th

 4    labor proposal, got their names, if they will.

 5    Q.    Let's go back to the summer of 2005 one

 6    more time.  Was the base case and the downside

 7    base case prepared by the divisions or

 8    prepared by corporate?

 9    A.    Corporate.  It was -- the base case and

10    the downside cases were corporate overlays

11    based upon developments since the time of the

12    preparation of the 2005 business plan in the

13    fourth quarter of 2004.

14    Q.    And then the steady state scenario -- was

15    that prepared by the divisions or by

16    corporate?

17    A.    It was prepared by the divisions.  It was

18    a bottom-up exercise as opposed to a top-down

19    exercise.

20    Q.    And that was part of your normal 2005

21    business plan, is that correct?

22    A.    That's correct.

23    Q.    And just looking back at 2005, at some

24    point in time during this chronology the

25    company circulated a model that was called

                                                    23

 1    scenario C.  Do you recall that?

 2    A.    Yes, I do.

 3    Q.    Can you explain to the Court, in your own

 4    words, what scenario C was -- came into being,

 5    what it was intended to represent?

 6    A.    Scenario C was one of our first modeling

 7    or one of our first attempts to reflect what

 8    the impact of a transformation to a

```
 9   competitive wage and benefit package of our

10   North American or United States labor

11   agreements would be.  And it used as its base

12   or as its starting point, the base case and

13   the downside case and then modeled on top of

14   it a set of assumptions with respect to a wage

15   and benefit transform -- a competitive wage

16   and benefit package that would be agreed

17   between the company and the unions.

18   Q.    So first is base case, correct?

19   A.    Yes, sir.

20   Q.    Then what's next?  Downside case?

21   A.    Downside case, yes.

22   Q.    Then next?

23   A.    Scenario C.

24   Q.    Then, next?

25   A.    Would be the steady state scenario.
```

                                                    24

```
 1   Q.    And then the two transformation models,

 2   correct?

 3   A.    That's correct.

 4   Q.    Okay.  About when was the competitive

 5   benchmark model completed?  Rough timeframe is

 6   fine.

 7   A.    Yeah.  In the early first quarter of 2006

 8   I think we did present information to our

 9   board of directors.  You know, I think it was

10   an iterative process.  But in the December

11   board of directors meeting we did demonstrate

12   some financial information about the

13   transformation plan, as we called it at that
```

14    time.  It wasn't yet called the competitive

15    benchmark.  But it still continued to evolve

16    in the very early part of 2006.

17    A.    And then the GM consensual plan, when was

18    that pretty much completed?

19    Q.    The end of March, you know, during March

20    2006.  We had -- again it was being referred

21    to early on as the so-called zip code plan or

22    the next steps plan and so it -- certainly I

23    would say financial modeling of the impact of

24    a slower transition to a competitive wage and

25    benefit package started in the February

25

1    timeframe.  But in terms of being completed

2    and reviewed with the board, it was more in

3    the March timeframe, late March timeframe.

4    Q.    Now how does Exhibit 135, how does that

5    three plus nine forecast fit into all of this?

6    A.    Well, the three plus nine forecast is a

7    normal part of our operating -- our financial

8    processes.  We reforecast the current year

9    four times a year in each of the four quarters

10    of the year.  So we went through a normal

11    reforecasting process in the first quarter for

12    2006 and then, given the fact that we're in

13    this process and given that we are -- have

14    been discussing the transformation plan, we

15    then extrapolated those results -- or believed

16    we extrapolated the results out over the five-

17    year period of time.

18    Q.    And the three plus nine forecast means

19   three actual plus nine forecasted for the

20   year?

21   A.    That's correct.

22   Q.    So the next forecast will be what, the

23   six and six?

24   A.    We will start it in the middle of June

25   based upon what we call the five plus seven.

26

1    Q.    So the next time you -- when would do it

2    -- when would the next one be?

3    A.    Eight plus four.

4    Q.    And when would that be normally

5    available?

6    A.    That would be available in the mid-

7    September timeframe.

8    Q.    And the next one --

9    A.    Will be the twelve plus zero, you know.

10   At that point in time, we're also preparing

11   the business plan so it's in the mid-

12   December/January timeframe.

13   Q.    If you turn to page 2 of Exhibit 135,

14   could you explain to the Court the reasoning

15   behind -- and by the way, were you responsible

16   for the preparation of this presentation to

17   the board?

18   A.    Together with our CFO, Bob Dellinger.  We

19   operate very seamlessly with respect to this

20   information because it effects both our

21   reorganization and the operations.

22   Q.    Can you explain to the Court, in your own

23   words, why you chose to compare the three plus

24    nine forecast to the steady state?  That's

25    what this page 2 does, isn't that correct?

27

1    A.    That's correct.  It compares it to the

2    steady state because in the first quarter of

3    2006 we have not yet achieved any of the

4    transformation overlays and, therefore, the

5    appropriate business plan to be comparing to

6    would be the steady state scenario.

7    Q.    And how much of -- just explain -- the

8    cash impact of the change due to the positive

9    variances in the first quarter was how much?

10    A.    The positive variance in operating result

11    was 512 million dollars in the first quarter.

12    Q.    How much of that was cash?

13    A.    I believe that if I'm not correct, it's

14    about 200 million of the 500.  But I think the

15    cash impact is presented more for the full

16    year than necessarily the one quarter.  But I

17    believe it's about the same.

18    Q.    So the column on this, it says 2006 cash

19    impact, that adds up to 219 million and then

20    on to 252 million, that's really for the year?

21    A.    Yes, sir.

22    Q.    Got it.  Page 3 is entitled, "2006

23    Operating Plan Performance."  Can you explain,

24    in your own words, to the Court, this analysis

25    of the three plus nine against this?

28

1    A.    This is the operating plan that was --

2    has been previously presented as part of the

3    KECP motion and the plan -- I'll use the word

4    approved -- not use the word -- it was

5    approved by our board of directors and

6    reviewed with our constituencies and it

7    includes the 500 million dollar subsidy from

8    General Motors that we were referring to

9    previously and demonstrates what we see the

10    performance to be in the first and the second

11    quarters.

12    Q.    So as against this -- against the

13    operating plan performance which included a

14    plan subsidy, the improvement was only 123

15    million.  Is that correct?

16    A.    That is correct.

17    Q.    So, in another way, to understand it

18    correctly, that the improved operating

19    performance meant that the GM subsidy really

20    wasn't required.

21    A.    That is correct.

22    Q.    Now, the next page of this three plus

23    nine analysis you've already, I think, talked

24    about, is the analysis against the steady

25    state variance for the five-year period.  Is

29

1    that correct?

2    A.    That's correct.  As we extrapolated it

3    out based upon what we had seen in the first

4    quarter.

5    Q.    And some of the numbers that are in your

6    affidavit and that was the subject of the

7    cross-examination, the variance analysis comes

8    from this report, does it not?

9    A.    Yes, it does.

10    Q.    And could you explain page 5 to the

11    Court, in your own words?  What's that

12    intended to represent?

13    A.    What we did is we looked at the expense

14    categories that were driving the variance

15    between the steady state scenario and the

16    three plus nine forecast out during this five-

17    year period of time.  And then we sought to

18    determine whether that performance would carry

19    forward into the competitive benchmark and

20    consensual scenarios, recognizing that a

21    portion of the performance for the first

22    quarter drove from lower jobs and employee

23    costs, from lower pension and OPEB costs and

24    lower SGNA.  And we recognized that those were

25    transformation initiatives that wouldn't

30

1    necessarily carry forward into the

2    transformation plans that we had developed.

3    Q.    So why -- can you explain to the Court

4    again, just comparing, for example, operating

5    income from the steady state on page 4, the

6    variance there to the variance in the -- the

7    two variances in the competitive and

8    consensual scenarios.  The three plus nine had

9    a positive variance and operating income in

https://vip21.veritextllc.com/myfiles/297485/117758pm.TXT

10    the steady state of approximately 3.1 billion.

11    Is that correct?

12    A.    Yes, sir.

13    Q.    But it only had a positive variance of

14    about 750 million in the two other models.    Is

15    that correct?

16    A.    Yes, sir.

17    Q.    Can you explain to the Court, in your own

18    words, why -- can you reconcile that

19    difference between the untransformed and the

20    transformed state of the company as to why

21    three plus nine had less influence on the

22    transformed state than on the nontransformed

23    state?

24    A.    The two principal factors are the

25    elimination of the OPEB benefit in the

31

1    consensual -- competitive benchmark and

2    consensual -- the OPEB plan, in the

3    competitive benchmark and consensual scenarios

4    and therefore the positive performance that is

5    in the steady state plan that results from

6    OPEB and grows during the five-year period of

7    time does not carry into the competitive

8    benchmark and the consensual scenarios.

9         In addition to that, the positive

10    performance that we have versus the steady

11    state plan in the three plus nine forecast,

12    resulting from lower nonproductive employee

13    costs, or otherwise known as job costs and

14    1112 costs, will not carry forward into the

15    competitive benchmark and the consensual

16    scenarios because those scenarios assume that

17    the guaranteed employment provisions of our

18    current labor agreements are eliminated.

19    Q.    Can you explain to the Court what page 6

20    is?  You were asked questions about the

21    special attrition program in cross-examination

22    too.  Could you explain to the Court, in your

23    own words, what the sixth page of this report

24    is intended to portray with respect to the

25    three plus nine analysis?


32


1    A.    At the time that the attrition -- excuse

2    me, at the time that the three plus nine

3    forecast was put together, we had not yet

4    concluded -- or we were in the process of

5    concluding the attrition program, the special

6    attrition program with the UAW and, therefore,

7    what we sought to do was to overlay on top of

8    the three plus nine forecast, that excludes

9    any effects coming out of the attrition

10    program, what the earnings or income and cash

11    impacts from the special attrition program

12    would be.

13    Q.    Looking back at page 5, the competitive

14    benchmark and consensual scenario variances

15    compared to the three plus nine -- Mr. Simon

16    asked you a question earlier, or examined you

17    earlier on the issue of potential pension

18    termination.  Do you recall that line of

19    questioning?

20    A.    Vividly.

21    Q.    And let's assume, for a moment, that you,

22    in fact, could jump over all the legal hurdles

23    and terminate the pension.

24    A.    Okay.

25    Q.    So, take those out of your mind.  My

33

1    question to you is, first, if you terminated

2    the pension, there'd be a savings of about 3.1

3    billion.  Is that correct?  Cash?

4    A.    I think, yes, that's correct.  That's

5    what we discussed this morning.

6    Q.    My question to you, Mr. Sheehan, is would

7    the company still have to transform its

8    business or could it avoid transforming its

9    business if it terminated the pension?

10    A.    It would still have to transform the

11    business.

12    Q.    And could you explain to the Court, in

13    your own words, why that is the case?

14    A.    We would still have to transform the

15    business.  We would still need modification of

16    the -- our collective bargaining agreements as

17    the wages and benefits that are being paid

18    under those collective bargaining agreements

19    are not competitive.  And our ability to win

20    business is directly attributable to having

21    all aspects of our business being competitive.

22    And when you look at the -- I'll call it price

23    penalty that certain of our customers, in

24    particular General Motors, pay, maybe

25   exclusively General Motors pays, as a result

34

1   of the collective bargaining agreements, that

2   can't continue indefinitely.  And, therefore,

3   we've got to get the company to be able to

4   stand on its own competitively.

5   Q.   Now Mr. Sheehan, most of these numbers

6   are presented in variance form.  Is that

7   correct?

8   A.   That's correct.

9   Q.   Even with the three plus nine performance

10   improvements that are included in that, how

11   much money is Delphi still slated to lose in

12   2006?

13   A.   They'll still lose approximately two

14   billion dollars of operating income, two and a

15   half billion dollars of net income -- net

16   loss.

17   Q.   Mr. Sheehan, do you have any sense of

18   what the cost will be of implementing the

19   consensual scenario?  Let's assume for a

20   moment that, in fact, we were able to reach

21   agreement with all the unions.

22   A.   Um-hum.

23   Q.   Buy-outs, buy-downs, all the various

24   elements of trying to put together a

25   consensual plan.  Just in a very rough

35

1   ballpark frame, because I know you don't know

2    precise numbers, do you have any sense of what

3    the general range of the cost of implementing

4    that program will be, all in terms of moving

5    OPEB off, having it all taken care of the

6    summit.  What would the total cost be?  Do you

7    have any sense?

8    A.    It would be, in our estimation, between,

9    in the consensual scenario, between 8 and 12

10   billion dollars.

11   Q.    Does Delphi have 8 to 12 billion dollars

12   to spend on that project?

13   A.    Not at the current time.

14   Q.    Does it have the debt capacity to

15   generate 8 to 12 billion dollars to make those

16   payments?

17   A.    Not in my opinion.

18   Q.    You were asked earlier about -- in

19   examination, about whether there would be

20   sales proceeds, if you'd estimated sale

21   proceeds. Do you recall that testimony?

22   A.    I do.

23   Q.    All right.  Let's assume, for a moment,

24   that the customers will support you so that

25   there will positive --

                                              36

1    A.    Proceeds.

2    Q.    -- proceeds.

3    A.    Yes.

4    Q.    Okay.  Do you have any, in your view, as

5    you sit here today, any view of how those

6    proceeds would be used?

 7   A.   I think the proceeds will be used to

 8   offset the cost of the transformation and the

 9   8 to 12 billion dollars that we just

10   discussed.

11   Q.   Is there any scenario in which you

12   believe that there would be excess proceeds

13   available to the estate or for distribution?

14   A.   I can't imagine that, given the cost of

15   transformation.  And while we recognize that

16   some of the businesses will be saleable, I

17   can't imagine the proceeds being greater than

18   8 to 12 billion dollars.

19   Q.   So while you're not sure, as you sit here

20   today, what the gross proceeds would be,

21   you've got a pretty good idea of what the net

22   proceeds would be.  Is that correct?

23   A.   The net proceeds will still be a cost to

24   transform the business.  That's correct.

25            MR. BUTLER:  Thank you.  I have no

                                              37

 1   further questions.

 2            THE COURT:  Mr. Kennedy, are you

 3   going to follow the same order?

 4            MR. KENNEDY:  No, I don't think we

 5   are, Your Honor.

 6            THE COURT:  This is sort of --

 7            MR. KENNEDY:  This is catch as catch

 8   can.

 9            THE COURT:  Okay, very well.

10   RE-CROSS EXAMINATION BY

11   MS. ROBBINS:

12    Q.    Perhaps it's because I understood the

13    least that I have not a lot of questions but a

14    few things that came up on direct that I --

15    really made me need to clarify some things.

16    A.    Please.

17    Q.    When you talk about the competitive

18    benchmark scenario --

19    A.    Um-hum.

20    Q.    -- is that the steady state scenario with

21    adjustments made for the November 15th

22    proposal?

23    A.    Not -- it includes -- yes, it includes

24    the steady state scenario adjusted for labor

25    with the November 15th labor proposal.  There

38

1    are other adjustments, too.

2    Q.    Well, that's what I wanted to clarify.

3    A.    Sure.

4    Q.    For example, if you were expecting to

5    seek concessions from General Motors in their

6    contracts with Delphi -- I'm not talking about

7    in relation to labor but just in terms of the

8    price you were getting for your product --

9    would that show up in the competitive

10    benchmark scenario?

11    A.    No, ma'am.

12    Q.    Okay.  So if there is something other

13    than a --

14          THE COURT:  Can I interrupt for a

15    second?  I thought you had 500 million in

16    there.

17            THE WITNESS:  In --

18            THE COURT:  Because the competitive

19   benchmark is based on steady state which has

20   the extra 500 million, doesn't it?

21            THE WITNESS:  The 500 million is

22   only in the operating plan, Your Honor --

23            THE COURT:  Okay.

24            THE WITNESS:  -- not in the steady

25   state plan.

                                          39

1             THE COURT:  All right.  Okay.

2             THE WITNESS:  Too many plans.

3             THE COURT:  All right.

4    BY MS. ROBBINS:

5    Q.   So, the only adjustments that were made

6    to the steady state scenario and the

7    competitive benchmark scenario are those

8    related to the concessions -- are those that

9    are based on the concessions you seek from

10   labor.  Is that right?

11   A.    No.  There were other -- there are other

12   adjustments.  For example, with respect to

13   General Motors, the competitive benchmark plan

14   recognizes that at such time that we have a

15   competitive wage and benefit package with our

16   U.S. labor unions, that the pricing of our

17   products with General Motors would be adjusted

18   also to market value and, therefore, there is

19   a reduction in revenue coming out of the

20   General Motors contracts.  There is the SGNA

21   initiative.  There is the wind down of the

22    right side businesses, so --

23    Q.    Were there any adjustments that were not

24    related -- that were not a direct consequence

25    of the labor concessions you were seeking?

40

1    Are there any adjustments in the competitive

2    benchmark that are not related to the labor

3    concessions?

4    A.    I guess, you know, if I take the

5    components of the overlays that are in the

6    competitive benchmark and I consider -- if you

7    were to consider the reduction in revenue from

8    General Motors as a direct result of having a

9    competitive wage and benefit package, if you

10    consider the winding down of the right side

11    businesses as a direct result of having the

12    authority to do so --

13    Q.    Sir, excuse me, I didn't mean to cut you

14    off.

15    A.    Last comment and I'll stop -- was that

16    the only one that I would say is not a direct

17    result is the SGNA initiative which I believe

18    the company will implement or seek to

19    implement regardless of our success in this

20    process.  Sorry if it was too long.

21    Q.    Is there some place where the adjustments

22    are listed?

23    A.    In the --

24    Q.    That is an exhibit in this case?

25    A.    I will admit to not knowing all the

41

1    exhibits in this case so there are -- yes,

2    there are documents that demonstrate all of

3    the particular overlays which -- there are

4    documents that --

5          MR. BUTLER:  Your Honor, just a

6    minute.  The data room, to which all of the

7    parties have access, has this complete model

8    in it with all the supporting -- in fact, I

9    believe Exhibit Number 136 has the steady

10   state scenario and all the supporting

11   documentation for it leading into the next --

12         MS. ROBBINS:  I apologize that we

13   had asked to be able to have guidance in how

14   to get two locations within -- I didn't want

15   to get into the data room.  I mean, that's not

16   the purpose of this witness, Mr. Butler.

17         THE COURT:  But, I mean, Mr. Butler,

18   is there some exhibit that has this or is

19   it -- is that --

20         MR. BUTLER:  The steady state

21   scenario and supporting documentation is

22   Exhibit 136.

23         THE COURT:  And does that have a

24   list of the assumptions?

25         MR. BUTLER:  I believe that it does.

42

1          THE COURT:  Okay.

2          MR. BUTLER:  Can you guys help me on

3    where the other models are, please?

4    BY MS. ROBBINS:

5    Q.   To try to complete the line of thought,

6    Exhibit M and N, in your declaration, make

7    reference to the competitive benchmark.

8    A.   Right.

9    Q.   Can we assume that only the assumptions

10   that are in Exhibit 138 were used in those

11   documents?

12           MR. BUTLER:  Your Honor, it might be

13   helpful, if this is really the kind of

14   questions that want to be asked, if we took a

15   five minute recess and tried to help get the

16   right exhibits together.

17           MS. ROBBINS:  No.  I was not

18   planning on examining on the --

19           THE COURT:  Yeah.  If she's not --

20           MS. ROBBINS:  I was just trying to

21   get a clarification of what this was because

22   it got more confusing as we went along.

23           THE COURT:  So that at a proper

24   point you can -- if that's not the correct

25   answer, if there's some other exhibit or some

43

1    other chart, you can let me know.  But, if you

2    had planned to question him on that --

3           MS. ROBBINS:  I was not planning,

4    Your Honor --

5           THE COURT:  All right.

6           MS. ROBBINS:  -- all I wanted to do

7    was ask Mr. Sheehan about Exhibits M and N and

8    whether we can assume that the only

9    adjustments made to reach those charts are

10    those -- that basically we're talking about

11    the steady state plus the adjustments that are

12    listed in the exhibit that we're going to get

13    the number of.

14    A.    I'll wait to answer to hear what the

15    exhibit is you're referring to 'cause I

16    apologize, I don't --

17             MS. ROBBINS:  Maybe we're going to

18    need the recess, Your Honor.  I'm sorry.  I

19    apologize.  I --

20             THE COURT:  All right.

21             MS. ROBBINS:  It seemed like --

22             THE COURT:  I can give you five

23    minutes, but I just think --

24             MS. ROBBINS:  -- a simple question

25    but we're going to have a messy record out of

44

1    it.

2             MR. BUTLER:  I have the exhibit in

3    front of me, Your Honor.  I just, you know,

4    can I have just a moment to consult --

5             THE COURT:  Yes.

6             MR. BUTLER:  Exhibit 96 has in it

7    steady state and then it takes you through the

8    steady state and then you have the competitive

9    benchmark essentials.

10             MS. ROBBINS:  I'm not asking that.

11    I'm asking for a list of assumptions.

12             MR. BUTLER:  I think they're in the

13    presentations.

14            MS. ROBBINS:  Well anyway, that's --

15    I mean --

16            MR. BUTLER:  I can't help you then.

17    BY MS. ROBBINS:

18    Q.    If you would look at Exhibit N, for a

19    moment, sir --

20    A.    N?

21    Q.    N.

22    A.    From my declaration?

23    Q.    In your declaration.

24    A.    Yes, ma'am.

25    Q.    Do you have it in front of you?

45

1    A.    Yes, I do.

2    Q.    Do these -- does this chart indicate what

3    we would expect to see if we used the steady

4    state assumptions and then we make two

5    adjustments; for one line, a freeze in the

6    pension plan and for the other line, no

7    contributions to the pension plan.

8    A.    Not if you use the steady state scenario.

9    Q.    Okay.

10    A.    If I understood your question properly.

11    Q.    Is there -- can you identify for me where

12    I would see a list of the assumptions that

13    were made to vary the competitive benchmark

14    from the steady state.  I know we're back to

15    the same question but --

16            MR. BUTLER:  There is, in

17    declaration, and in the testimony at the

18    beginning of paragraph 59 and going on from 59

19    to 64 of his principled declaration, describes

20    each of the changes between the steady state

21    and the competitive benchmark.  And paragraphs

22    65 through 70 describe each of the changes

23    between the steady state and the GM consensual

24    model.  They're all listed out there in his

25    testimony.

46

1          MS. ROBBINS:  Your Honor, I don't

2    know that I agree with Mr. Butler but I

3    accept.  If the witness will accept his

4    testimony, then I will accept it and move on.

5          THE COURT:  Well, no, 'cause I'm

6    curious about this too.  Is there a financial

7    model?

8          THE WITNESS:  Yes, there is.

9          THE COURT:  And you have the steady

10    state financial model?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  And then you have the

13    competitive benchmark financial model,

14    correct?

15          THE WITNESS:  It derives -- that's

16    correct.

17          THE COURT:  And in that model,

18    separate and apart from your affidavit, does

19    it list the assumptions that you're overlaying

20    on the steady state scenario?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Okay.  And is that --

23    when we use the word "model", is something

24    that's programmed into a computer?

25              THE WITNESS:  I believe that's

47

1    correct, yes.

2              THE COURT:  And is it -- so is it

3    printed out somewhere, including the

4    assumptions?

5              THE WITNESS:  Yes, it is.

6              THE COURT:  All right.

7              THE WITNESS:  I mean, it can be.

8    It's a financial model.  At least, you know,

9    for -- well, I can't speak --

10             MS. ROBBINS:  I guess the best --

11    the bottom line is, is there a place that it's

12    written in English for us to understand it

13    without pulling apart a computer model.

14    That's really what I'm asking.

15             THE WITNESS:  Yes, I believe there

16    is and I believe that we've been -- with due

17    respect, I know you don't have financial

18    advisors, but I believe we've been reviewing

19    that with the other unions' financial

20    advisors.

21             MR. BUTLER:  And the specific -- you

22    know, again, I don't know how to say --

23    Exhibit 90, you know, I mean, we'll review the

24    exhibits.  Exhibit 96 has all these things,

25    all the assumptions in it as you walk it

48

1    through.  These are all the presentations that

2    were made.  One of them's the creditors'

3    committee, walking them through each of the

4    basic assumptions on all these models and how

5    you get from one to the next.  And Mr.

6    Sheehan's declaration describes it in English

7    and these presentations lay it out in graphic

8    form with the assumptions laid out.  I mean --

9    and the models themselves were made available

10   and produced in connection with each of the

11   proposals.

12            MS. ROBBINS:  Your Honor, I'll move

13   on.  I don't find it as clear as Mr. Butler

14   says.  But we don't need to, I think, prolong

15   this examination on that basis.

16   BY MS. ROBBINS:

17   Q.   Sir, I have just a couple other

18   questions.  And you mentioned that -- you said

19   it "costs" for the consensual proposal, 8 to

20   12 billion dollars.  Is there anywhere, that

21   you're aware of, where that amount is

22   calculated?

23   A.   There are certainly documents where we

24   have accumulated -- as I said a few moments

25   ago, I don't know all these exhibits and --

49

1    Q.   You don't know where I would find that.

2    A.   I do not.

3    Q.   Okay.  And when you say "8 to 12 billion

4    dollars," are you including in that figure the

 5    wages that are paid for work?

 6    A.    I think what we're talking about was the

 7    GM consensual model --

 8    Q.    Yes.

 9    A.    -- and what the costs there was.

10    Q.    And I'm asking whether part of the 8 to

11    12 billion dollars is basic compensation paid

12    to workers for the work they perform?

13    A.    No.

14    Q.    No?

15    A.    No.

16    Q.    Does it include the benefits they receive

17    for the work they perform?

18    A.    No.

19    Q.    So, basically, you're not talking about

20    the concessions that you're seeking from the

21    unions here.  You're talking about something

22    else?

23    A.    Yes.

24    Q.    You were asked some questions earlier

25    about terminating the pension plan.  Do you

                                              50

 1    understand that employees who are covered by

 2    the hourly pension plan, who do not have a

 3    benefit guarantee, could be injured

 4    substantially by termination of the pension

 5    plan?

 6    A.    I do.

 7           MS. ROBBINS:  No other questions,

 8    Your Honor.

 9           THE COURT:  Okay.

10    RE-CROSS EXAMINATION BY

11    MR. KENNEDY:

12    Q.    I really do just have a few questions.

13    John, I want to try to get the timing down a

14    little better on the sequence of plans that

15    Mr. Butler was asking you about.

16    A.    Sure.

17    Q.    We know that the steady state plan was

18    essentially compiled in or around November of

19    2005?  Is that correct?

20    A.    Yeah.  October, I would say.

21    Q.    Okay.  And then the competitive benchmark

22    scenario, when was that put together?

23    A.    The competitive benchmark -- the

24    competitive benchmark scenario was prepared in

25    the December, late November/December

51

1    timeframe.  At least it began then and it was

2    finalized in the January timeframe.

3    Q.    And then the GM consensual proposal was

4    finished by mid-March of 2006?

5    A.    Mid to late March, yeah.

6    Q.    Is it accurate to state that the -- of

7    those three financial models, the one that

8    generated the highest amount of losses or

9    negative operating income for the company was

10    the steady state scenario?

11    A.    That's correct, yes.

12    Q.    And I noticed that in your statement

13    which you, I believe, signed -- and I'm

14    referring to Exhibit 5, on March 31st --

15    A.    Um-hum.

16    Q.    -- the scenario that you used to compare

17    the operating performance of the various

18    Delphi divisions, was the steady state

19    scenario, correct?

20    A.    Yes, sir.

21    Q.    And did you attempt to include

22    measurements of what the financial performance

23    of the various divisions would be under the

24    competitive benchmark or the GM consensual

25    scenarios in your statement of March 31st,

52

1    your declaration?

2    A.    I described the -- the answer to that is

3    no and the reason for that is as I indicated,

4    we have not prepared the -- those two

5    scenarios at a division level.  We have

6    prepared them at a company-wide level.

7    They're overlays to the plan.

8    Q.    Okay.  Can I see that?  I'd like to

9    direct your attention to Exhibit 135, the

10    three plus nine document.

11    A.    Um-hum.

12    Q.    Do you have it?

13    A.    Yes, I do.

14    Q.    Just to make sure I understand how these

15    numbers work, if you look at page 4.  Page 4

16    describes the steady state operating income

17    analysis and let's use 2008 as an example.  It

18    indicates that under the steady state -- I

19    take it this is corporate-wide -- the negative

20    operating income is 1.5 billion?

21    A.    That's correct.

22    Q.    All right.  And the variance that

23    resulted from the positive operating income in

24    the first quarter of 2006 resulted in that

25    negative number diminishing to a loss of 879

53

1    million in operating income corporate-wide in

2    2008, correct?

3    A.    When considering the factors that led to

4    the diminished loss in the first quarter of

5    2006 and then extrapolating that over that

6    five-year period of time, on that period that

7    you're referring to, 2008, it is the 700

8    thousand dollar number --  700 million dollar

9    number, yes.

10    Q.    All right.  So, then, if we just looked

11    at the steady state and corrected it for a

12    projection incorporating the first quarter of

13    2006, the actual amount of loss goes down to

14    879 million, right?

15    A.    For the year 2008.

16    Q.    The year 2008.  All right.  And if we

17    turn to page 6.  Now as I understand it, page

18    6 overlays, again corporate-wide, the impact

19    of the attrition program that was negotiated

20    with the UAW.  Am I correct in that?

21    A.    This overlays the effect of the attrition

22    program on the -- that is correct, on the

23    three plus nine forecast.

24    Q.    Okay.  Now, just so I understand the

25    impact, the attrition program overlay, this

54

1    assumes basically all North America unions are

2    given the benefit of that attrition program?

3    Or is this just reflecting the fact that you

4    only have in place an agreement with the UAW?

5    A.    I'm pretty sure it's all unions.

6    Q.    It looks that way to me, too.

7    A.    I'm pretty sure.

8    Q.    So let's assume it's all unions for

9    purposes of this discussion.

10    A.    I believe it is.

11    Q.    And if there is a 75% take rate, the

12    presumed steady state operating income loss of

13    879 million dollars is reduced corporate-wide

14    to an operating income loss of 51 million

15    dollars, correct?

16    A.    Yes, sir.

17    Q.    And if there's a 100 percent take rate,

18    the steady state performance in 2008 is

19    assumed to be a positive 65 million dollars?

20    A.    That's correct.

21        MR. KENNEDY:  All right.  I have no

22    further questions, Your Honor.

23    RE-CROSS EXAMINATION BY

24    MR. PETERSON:

25    Q.    Briefly, Mr. Sheehan, I think you

55

1    testified that among the assumptions overlaid

2    onto the steady state scenario in connection

3    with the competitive benchmark was the

4    reductions and price-downs from General Motors

5    to account for reduced wage rates.  Does that

6    sound right?

7    A.    To account for that we would have a

8    competitive labor model, yes.

9    Q.    In other words, General Motors is

10   currently paying more than it otherwise would

11   to account for the fact that Delphi is paying

12   higher wages.

13   A.    That's correct.

14   Q.    All right.  How much more is General

15   Motors paying as a result of these wages?

16   A.    I think General Motors has made

17   statements that, in its opinion, that it's

18   paying a wage premium of approximately two

19   billion dollars per year -- wage penalty, let

20   me use that word.

21   Q.    So if you cut the wages then Delphi loses

22   the revenue also, correct?

23   A.    I think that at such time that we have a

24   competitive wage and benefit package or wage

25   and benefit scale with our U.S unions that our

56

1    pricing with General Motors would also have to

2    be competitive, yes.

3    Q.    You were asked a couple of questions

4    about the proceeds of sales --

5    A.    Yes.

6    Q.    -- sales of operations --

7    A.    Right.

8    Q.    -- so that you could sell them, and I

9    just want to make sure I understood.

10    A.    Um-hum.

11    Q.    'Cause Mr. Butler asked you about whether

12    you knew what the net proceed of the sales of

13    operation would be and you said it would be

14    negative.  That's not exactly correct, is it?

15    I mean, you -- Delphi will receive a certain

16    amount of money --

17    A.    It will be used to offset the cost of the

18    transformation, that's correct.

19    Q.    All of the transformation costs?

20    A.    I believe all of its transformation

21    costs.

22    Q.    A certain percentage of Delphi's revenues

23    will have to be used to offset the

24    transformation costs, correct?  You've got to

25    pay them from some source.  Is that a fair

57

1    statement?

2    A.    No, I don't think that's a fair

3    statement.

4    Q.    So, in other words, you won't have to pay

5    transformation costs if you don't sell

6    facilities?

7    A.    I think that the way that this line of

8    discussion went a little bit earlier was

9    discussing what the costs would be and whether

10    Delphi had 8 to 12 billion dollars and the

11   answer was no, Delphi doesn't have 8 to 12

12   billion dollars and --

13   Q.    But if you sell facilities, you'll get

14   closer to having 8 to 12 billion dollars,

15   won't you?

16   A.    The party that funds the costs associated

17   with the 8 to 12 billion dollars will be the

18   beneficiary of the sales of those businesses

19   as it will go to offset the cost of those --

20   the cost of transformation.

21           THE COURT:  Well, can I interrupt?

22           THE WITNESS:  Yes.

23           THE COURT:  Let's use a hypothetical

24   example.  You have a plant that is not

25   profitable so it's in the group that you want

58

1    to sell.

2            THE WITNESS:  Correct, non-core

3    facilities.

4            THE COURT:  And it's a non-core

5    facility and you sell it.

6            THE WITNESS:  Um-hum.

7            THE COURT:  There are costs that

8    arise from shutting down the plant and/or

9    selling it.

10           THE WITNESS:  Right.

11           THE COURT:  Are you saying that --

12   when you say there won't be net proceeds, are

13   you looking at, specifically, the costs

14   created by the sale or shutdown of that plant

15   and, therefore, the proceeds from that sale

16    are basically going to eaten up by the plant's

17    disposition, one way or another?  Or are you

18    saying something different, which is that the

19    transformation costs throughout the company

20    and whatever proceeds you receive would be

21    applied to those costs throughout the company?

22            THE WITNESS:  Right.  What we have,

23    not in the transformation model, Your Honor,

24    is we have not built into that the costs

25    associated with terminating the pension plan.


59


1    And a party, assuming my number 8 billion

2    dollars of obligation, we have not built in

3    any costs associated with the transformation.

4    There is a party, I'll assume that's General

5    Motors, that is going to bear the costs

6    associated with the transformation.  And,

7    therefore, what we have assumed in our

8    transformation model is that the costs

9    associated with the transformation of the

10    company will be in excess of any proceeds that

11    we would get from selling those non-core

12    businesses and, therefore, will only serve to

13    reduce the overall costs to that third party.

14            THE COURT:  All right.  But if you

15    aren't -- if you're not going on the GM

16    consensual model or the consensual model and

17    you sell non-core businesses --

18            THE WITNESS:  Yeah.

19            THE COURT:  -- is it your testimony

20    that there will never be any net proceeds from

21    those sales?

22          THE WITNESS:  It would be, Your

23    Honor, because -- well, no, I am sorry.  I

24    apologize.  No, if in fact we were to be able

25    to impose or to achieve the competitive

60

1     benchmark scenario and there is no -- nobody

2     incurs any costs associated with that then

3     presumably there would be proceeds of --

4     proceeds from the sales which would be

5     available to, I'll use the word compensate,

6     that party that had been harmed by those

7     transformation costs.  In other words, if the

8     union was to take a significant wage and

9     benefit reduction and General Motors didn't

10    fund that, the proceeds would be available to

11    the unions and Delphi wouldn't be keeping that

12    money.

13          THE COURT:  Okay.  All right.

14          THE WITNESS:  Don't think that we're

15    trying to shelter anything here.

16          THE COURT:  All right.  All right.

17    Maybe it's a question of too many miles, but I

18    think we understand that.

19    BY MR. PETERSON:

20    Q.   I think so.  I mean, in my simple minded

21    way, if you sell something, you get money for

22    it, you've got the money.  And if you chose to

23    allocate it somewhere else, that's another --

24    that's a separate transaction, if you will.

25    Although what you're suggesting is if GM kicks

61

1    in a lot of money, part of that would be an

2    agreement that they would get the net proceeds

3    of the sale.  Or if GM didn't kick it in and

4    it comes out someone else's diet, your plan

5    would be to allocate the net proceeds of the

6    sales to that party.

7    A.    We may have made a simplification

8    assumption that makes this confusing, but we

9    assumed that the costs associated with the

10   transformation would be in excess of any

11   proceeds from the sales of businesses and,

12   therefore, we would not include the cost of

13   the transformation nor the proceeds of the

14   business and under the assumption that a third

15   party was bearing that cost and, therefore,

16   would receive that benefit.

17        In my assumption here, I talk about

18   General Motors.  But if the union is the chief

19   bearer of the liability, the proceeds from the

20   sales of the businesses would be theirs too.

21   Q.    But the 8 to 12 billion cost is a gross

22   figure not a net of sales price, correct?

23   A.    That's correct.

24   Q.    Thank you.

25   RE-CROSS EXAMINATION BY

62

1    MR. SIMON:

2    Q.    Maybe it's the hour.  If the union bears

 3    the cost of transformation then it will be the

 4    beneficiary of the sale of the non-core

 5    businesses?  Is that an offer?  I mean, how

 6    does that work?  How does the union reap the

 7    benefit of the proceeds of the sale of the

 8    non-core facility?

 9            THE COURT:  Well, let me ask it a

10    different way, maybe.  In your models of the

11    competitive benchmark scenario, you're not

12    showing the company receiving the proceeds of

13    the sales of the non-core businesses, are you?

14            THE WITNESS:  No, we are not.

15            THE COURT:  So you're assuming they

16    go somewhere else, outside of the company?

17            THE WITNESS:  That's correct.

18            THE COURT:  And although this may

19    not have been identified in the papers, what

20    you're saying is that your assumption is that

21    it goes to the party who's contributing to the

22    competitive benchmark scenario, which is the

23    unions.  Unless you're assuming it wasn't

24    going to the company.

25            THE WITNESS:  It wasn't coming to

63

 1    the company, that's correct.

 2            THE COURT:  Okay.

 3    BY MR. SIMON:

 4    Q.   Yeah, I'd just like to understand how it

 5    gets to the union.  You'll forgive me, I

 6    represent a union.  How does that money get to

 7    the union?

8              UNIDENTIFIED SPEAKER:  You write a

9    check for 8 billion dollars.

10             MR. BUTLER:  That's what you were

11   asking.

12   BY MR. SIMON:

13   Q.   How does that money get to the union?

14   A.   If the union ends up, or its

15   constituencies end up foregoing their OPEB

16   benefit, then they have borne a cost and the

17   proceeds associated with the sales of those

18   non-core businesses would be available to

19   compensate them for that cost that they --

20             THE COURT:  But that's not in the

21   proposals, is it?

22             MR. SIMON:  I want to know where I

23   would find that in the 1113 proposal.

24             THE COURT:  It's not in the November

25   proposal.

64

1              MR. SIMON:  Maybe treat that as an

2    amendment to your Section 1113 proposal?  A

3    serious question.

4              MR. BUTLER:  No, it's not a serious

5    question, Bruce.

6              THE COURT:  I don't think he's --

7    he's testifying about his financial modeling.

8    I don't think he's authorized to submit it.

9    He's just saying he assumed the company didn't

10   get it, in his model.

11   BY MR. SIMON:

12   Q.   Perhaps it will help if we put models to

13    the side for the moment and talk about real

14    life.  What is the range of proceeds that you

15    project from the sale of your non-core product

16    lines or plants or sites or whatever it is

17    that you're going to be selling.  Not now

18    offset by the cost of transformation.  You

19    sell the sites.  You've got a broker's fee.

20    You have closing fees.  So, net of the

21    expenses directly associated with the sale of

22    those sites, what do you project the range of

23    proceeds to be?

24    A.    It's not possible for me, at the current

25    time, to do that.

65

1    Q.    And the company has made no projection,

2    whatsoever, of the range of proceeds from the

3    sale of non-core facilities?

4    A.    No, sir.

5    Q.    What are the components of the 8 to 12

6    billion dollars of transformation costs?  Can

7    you give us the component and the portion of

8    the 8 to 12 billion dollars it represents?

9    A.    The by far and away largest portion of

10    the 8 to 12 billion dollars is the assumption

11    of the OPEB obligation or the termination of

12    the company's OPEB obligation which is an

13    approximately 8 billion dollar number all by

14    itself.  And then, when Mr. Butler was asking

15    me, it was in relation to the GM consensual

16    model which calls for the wind-down or the

17    stepping down of the wage and benefit package,

18    too, of the U.S. hourly employees over a

19    period of time.  And it's estimated that's

20    approximately 2 billion dollars cost over the

21    competitive benchmark scenario.  And then,

22    finally, there will be costs associated with

23    winding down the right side businesses.

24    Q.   I think, perhaps you've clarified it.  So

25    that when you describe the costs of 8 to 12

66

1    billion dollars for the implementation of the

2    transformation plan, you don't mean costs to

3    Delphi.  In fact, you mean precisely the

4    opposite.  You mean savings to Delphi,

5    correct?

6    A.   I mean a cost to -- I agree with you I

7    don't mean costs to Delphi.  I mean costs to

8    the constituencies to this Chapter 11 process.

9    Q.   So that makes a bit of a difference.  So

10    okay, so that's very helpful.  So that the

11    transformation plan saves Delphi, assuming its

12    implementation, 8 to 12 billion dollars.  And

13    in addition to that will bring in proceeds to

14    Delphi of some, you say, undetermined amount

15    of proceeds from the sale of non-core

16    facilities, correct?  So Delphi gets it both

17    ways.  It gets the savings and it gets the

18    proceeds.

19    A.   No, sir.

20    Q.   Pardon?

21    A.   It is -- I think I've tried to be clear

22    here.  You may not like how we put our model

23    together. I believe that the proceeds from the

24    sales of the non-core businesses, whatever

25    those proceeds will, be will be part of the


67


1    estate which is shared with the parties that

2    bear the cost of Delphi's transformation.

3    Q.    I'm sorry. You're telling us that your

4    model actually identifies that the

5    beneficiaries of the cost of your

6    transformation are going to receive the

7    proceeds of the sale of your non-core

8    businesses.  That is ascertainable from your

9    model?

10    A.    What is not included in the model is the

11    determination of the pension oblig -- the

12    termination of the OPEB obligation.  That

13    liability is just eliminated off of the

14    balance sheet.

15        And there's no proceeds assumed from

16    General Motors as they fund the stepping down

17    of employee wages from the current competitive

18    level to -- sorry, the uncompetitive level to

19    a competitive level.  Those proceeds are not

20    included in the model, nor is the proceeds

21    from the sales of the right side -- the non-

22    core businesses.

23    Q.    I'm going to ask you, please, to restrict

24    yourself to your role as chief restructuring

25    officer and your various other titles for

```
 1   Delphi and not to assume that you're speaking
 2   for others, either the unions or General
 3   Motors.  I want to approach this from Delphi's
 4   financial position and financial analysis.
 5   And I want to ask you specific questions.
 6        As a result of Delphi's implementation of
 7   its transformation plan, Delphi will realize 8
 8   to 12 billion dollars in savings, correct?
 9   What it does with that savings, what someone
10   else may try to do with those savings, in
11   terms of your approach of Delphi's CRO, when
12   the plan is implemented, Delphi receives 8 to
13   12 billion dollars cost savings.  Let's just
14   start with that grain.  Is that correct?
15   A.   Okay.
16   Q.   Pardon?
17   A.   Okay.
18   Q.   Thank you.  Now, let's move on, again
19   restricting yourself to Delphi.  Delphi is
20   going to sell its non-core sites and
21   facilities, correct?
22   A.   Yes, sir.
23   Q.   The receipt of the proceeds of those
24   sales, in the first instance, is going to be
25   receipt by Delphi, correct?
```

```
 1   A.   Yes, sir.
 2   Q.   Now, I'd like to get a sense of your best
 3   estimate, given your current role, of the
```

4    range of proceeds from the sale of the non-

5    core facilities.  Are we talking about --

6    let's do it easier -- tens of millions,

7    hundreds of millions, or billions of dollars?

8    A.    Hundreds of millions.

9    Q.    Are we talking about more than 500

10    million?

11    A.    I can't be more specific than that.

12    Q.    Is 500 million as good a guess as you're

13    able to come up with, sitting here today?

14    A.    I don't want to speculate.  Maybe I'll

15    try to clari --

16    Q.    I'm sorry?

17    A.    I'm sorry.  I have to let him ask

18    questions.

19    Q.    I'm sorry?  But in any event, in the last

20    few minutes, we have identified somewhere

21    north of 8 billion -- between 8 and 12 billion

22    dollars in cost avoidance and some hundreds of

23    millions in dollars in sales proceeds received

24    by Delphi as a consequence of the

25    implementation of its transformation plan,

70

1    correct?

2    A.    The current plans don't represent the

3    recapitalization of the business either.  And,

4    I believe that maybe that's where this issue

5    gets muddied here because I believe that in

6    conjunction with the recapitalization is where

7    this issue would be resolved.

8    Q.    Would you help us understand that?  What

9   do you mean by that?

10  A.    I talk about the resolution of the claims

11  that will arise out of this Chapter 11 case --

12          THE COURT:  No, but just going on

13  Mr. Simon's prior question.  He asked you, the

14  transformation program will result in a

15  savings to Delphi of between 8 and 12 billion.

16  First of all, do you understand what he meant

17  by the transformation program?  Is it the

18  November 15th program, or is it something

19  else?

20          THE WITNESS:  This all drove off of

21  Mr. Butler's original question to me regarding

22  the GM consensual plan and what the costs

23  associated with the GM consensual plan would

24  be, so --

25          THE COURT:  But there's a cost to GM

71

1   we've established, right?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  Okay.  So, are the

4   savings to Delphi the ones that are set forth

5   in your declaration or is there something on

6   top of that?

7           THE WITNESS:  I don't believe there

8   is something on top of that.  If you want to

9   assume that GM will bear the cost of the

10  transformation and not get the proceeds of the

11  right side bus -- the non-core -- of the sale

12  of the non-core businesses, then I guess maybe

13  there is.  But I doubt very much that that's

14    how this will play out in the end.

15    BY MR. SIMON:

16    Q.    But you realize there are folks that

17    stand up at this podium from time to time that

18    take precisely that position, do you not?

19    That is to say that General Motors has no

20    claim or call upon any of the savings which

21    Delphi might realize as a consequence of these

22    proceedings.  And you're simply handicapping

23    the likelihood of their success.  Is that

24    correct?

25    A.    I don't know.  The model stands on its

72

1    own.

2    Q.    I'm sorry?

3    A.    The model stands on its own in how we put

4    it together.

5    Q.    On direct -- I'm sorry, on redirect, in

6    response to Mr. Butler's question, you

7    testified that even if you got past all of the

8    legal hurdles that Mr. Butler set up for you

9    and you could terminate, and in fact did

10    terminate, your hourly pension plans, the 3.1

11    billion in savings, you said, would not be

12    enough.  Do you recall that testimony?

13    A.    Yes, sir.

14    Q.    And that Delphi would still have to

15    transform itself.  Do you recall that?

16    A.    Yes, sir.

17    Q.    Are you saying that even if you had 3.1

18    billion in savings attributable to pension

19    termination, you would still have the need for

20    the same level of labor cost modifications you

21    seek in this 1113 proceeding?

22    A.    The -- if the only determ -- if only the

23    pension plan is terminated, then a -- there

24    would be a portion of the overall reduction

25    from the current wage and benefit package to a

73

1    competitive level.  But we still, ultimately,

2    need to get to a competitive level of 20 to 22

3    dollars an hour.  And, presumably, if you

4    terminate the pension plan, then some other

5    component of the overall wage and benefit

6    package could be retained, but you got to get

7    to 20 to 22 dollars an hour at the end, to be

8    competitive.

9    Q.    I'm sorry.  Have you quantified what the

10    impact would be on Delphi's view of what it

11    needs to achieve by way of competitive wages

12    and benefits if it in fact received a 3.1

13    billion in savings, attributable to pension

14    termination?

15    A.    No, I have not.

16    Q.    Why not?

17    A.    Because our current plan doesn't call for

18    that and we haven't modeled that.

19    Q.    You are aware, are you not, that your

20    current 1113 proposal and plan, specifically

21    reserves the right to seek pension plan

22    termination, are you not?

23    A.    I am.

24    Q.    And notwithstanding that specific

25    reservation, you have not gone to the trouble

74

1    of calculating what the impact of those

2    savings would be on your 1113S?

3    A.    No, sir.

4              MR. SIMON:  No further questions.

5    RE-CROSS EXAMINATION BY

6    MR. FOX:

7    Q.    Mr. Sheehan, good afternoon.  Edward Fox,

8    again.  Let me be very brief but I just want

9    to ask a couple of questions.  If a vendor

10   supplies goods or services to the debtors, or

11   any of them, on a post-petition basis, it's

12   being paid 100 cents on the dollar, right?

13   A.    For post-petition goods and services

14   they're being paid 100 cents on the dollar,

15   yes.

16   Q.    Okay.  In Exhibit 135, the three plus

17   nine forecast that Mr. Butler asked you about,

18   this forecast doesn't show any -- it was

19   prepared on a consolidated basis, correct?

20   A.    Yes, sir.

21   Q.    Okay.  And it does not show any

22   liabilities that would be incurred by Delphi

23   Corporation if the competitive benchmark

24   proposal were implemented, correct?

25   A.    No, it does not.

75

1    Q.    Now, with respect to the 8 to 12 billion

2    of costs or as Mr. Simon brought out, savings

3    to Delphi Corporation, if Delphi Corporation

4    is able to eliminate the OPEB costs prior to,

5    I guess it's October of 2007 when the benefit

6    guarantees expire, the unions who have the

7    benefit of those would be able to seek those

8    benefits from General Motors and in the case

9    of the UAW, GM would then be able to recover

10   back under the indemnification agreement with

11   Delphi Corporation the cost to GM of paying

12   the UAW, correct?

13   A.    That, assuming that played out, yes.

14   Q.    Well, under the way the documents exist

15   today, that's how it would play out, correct?

16   A.    That's my general understanding.

17   Q.    Thank you.

18          THE COURT:  Well, has the company

19   done any present value analysis comparing

20   the -- well, let me back up.  Your

21   transformation program projections show,

22   eventually, net income for the U.S. operations

23   that remain, correct?

24          THE WITNESS:  That's correct.

25          THE COURT:  Has the company done

76

1    a -- leaving Mr. Fox's question, assume for

2    the moment, leave aside potential objections

3    to GM's claims -- any present value

4    calculation of the claim that GM might have if

5    its guarantees were called upon in relation to

6    the present value of the positive income in

7    the North American operations that result from

8    the transformation plan?

9              THE WITNESS:  In relation to the --

10             THE COURT:  Well, you're proposing

11   to transform the U.S. operations rather than

12   just shut them down --

13             THE WITNESS:  Right.

14             THE COURT:  -- even though on an

15   outwardly basis they're losing money.  The

16   basis for that is an assumption that at some

17   point in the future they'll start earning

18   money, albeit greatly reduced in the number of

19   facilities that are operating.

20             THE WITNESS:  With a competitive

21   wage and benefit package.

22             THE COURT:  Right.  But there will

23   be a cost of that if you eliminate the OPEB

24   unless the GM -- GM's claim, segregation claim

25   is disallowed for some reason.  Have you done

77

1    any comparison of that cost as against the

2    actual savings -- not savings, actual benefit,

3    income --

4              THE WITNESS:  I understand.

5              THE COURT:  -- that is derived by

6    the North American operations as restructured?

7              THE WITNESS:  I don't think you can

8    look only at the North American operations

9    because it's a global integrated operation.

10   So that to consider that you would shut down

11   the U.S. operations entirely is, I think that,

12   you know, I think you have to have some North

13   America -- United States presence.  But,

14   specifically, we have not done that analysis,

15   no.

16            THE COURT:  And I think you said

17   you've done an analysis of potentially what

18   the termination claim might be if the pension

19   plan were terminated?

20            THE WITNESS:  We know what the

21   termination liability of the plan is and the

22   PBGC has publicly announced that.

23            THE COURT:  And what is that?

24            THE WITNESS:  For the hourly --

25            THE COURT:  What had they announced

                                                        78

1   for the hourly plan?

2            THE WITNESS:  For the hourly pension

3   plan, it's approximately 10 billion dollars.

4            THE COURT:  How much?

5            THE WITNESS:  10 billion dollars.

6            THE COURT:  I guess if you shut down

7   the North American operations completely,

8   there'd be a serious question of whether you'd

9   continue the pension plan.

10            THE WITNESS:  I think that would be

11   a fair assumption.

12            THE COURT:  Okay.  Okay.  Do you

13   have a question, Mr. Kurtz?  Can I -- I'm

14   sorry.  I --

15            UNIDENTIFIED SPEAKER: I'm sorry.  I

16    got one here.

17              THE COURT:  In response to one of

18    Mr. Butler's questions, I think you said that

19    in 2006 the company is still projecting a 2.5

20    billion dollar net loss and a 2 billion dollar

21    operating -- negative operating income.  Is

22    that right?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  And projecting under

25    what scenario?

79

1              THE WITNESS:  Under the steady state

2    scenario.

3              THE COURT:  Okay.

4              THE WITNESS:  You can see that on

5    page 4 of Exhibit 135.

6              THE COURT:  All right.  And how much

7    of that is attributable to pension

8    contributions?

9              THE WITNESS:  I only have the

10    amount, in total, between pension and OPEB on

11    page 2 --

12              THE COURT:  Okay.

13              THE WITNESS:  -- Exhibit 135, in

14    2006 is 116 million dollars.

15              THE COURT:  Okay.   Okay.   Thank

16    you.

17              MR. BUTLER:  Your Honor, I just have

18    one question.

19    RE-DIRECT EXAMINATION BY

20    MR. BUTLER:

21    Q.    On the sale proceeds there was a lot of

22    colloquy up here about proceeds on other than

23    the GM consensual model.  Mr. Sheehan, do you

24    recall that discussion?

25    A.    Yes, I do.


80


1    Q.    Do you have a view as to whether there'll

2    be any material proceeds from the sale of the

3    right-hand, side businesses without GM's

4    support?

5    A.    No, we have to have GM's support.  The

6    book of business is the most valuable asset

7    that those businesses have.

8    Q.    So assume there's no -- assume that GM is

9    not being consensual with Delphi, for a

10    moment, therefore there is no GM consensual

11    plan or something approaching it, all right?

12    A.    Yes, sir.

13    Q.    And assume, for a moment, that Delphi

14    prosecutes its GM contract rejection motion to

15    completion and imposes relief.

16    A.    Okay.

17    Q.    Do you believe that the right-side

18    businesses are salable, those that have been

19    declared non-core businesses are saleable?

20    A.    No, sir.  We will not have General

21    Motors' support at that point in time.  Then

22    the book -- there will be no book of business

23    to sell.

24    Q.    And do you believe there will be costs

25     incurred with shutting down those businesses?

81

1     A.     Substantial costs incurred in shutting

2     down those businesses, yes.

3     Q.     Does that include, for example, all the

4     environmental costs associated with all those

5     manufacturing facilities?

6     A.     We have many contracts that would have to

7     be broken and -- at that point in time.

8     Q.     And who would bear those costs?

9     A.     The company.

10            MR. BUTLER:  No further questions,

11     Your Honor.

12            THE COURT:  Okay.

13     RE-CROSS EXAMINATION BY

14     MR. SIMON:

15     Q.     Just one.  And if you pursued your GM

16     motions to their conclusion and therefore lost

17     General Motors' support, and if you pursued

18     the 1113 motions to their conclusion and

19     implemented -- forget about whether you would

20     have a plan, would you have a company, Mr.

21     Sheehan?

22            MR. BUTLER:  Objection.  Outside of

23     redirect, Your Honor.  He's editorializing

24     here.  It's outside of redirect.

25            MR. SIMON:  I think it's a real

82

1     question.

2          THE COURT:  I think it's rhetorical,

3     though.

4          MR. SIMON:  That doesn't mean it's

5     not a real question.

6          MR. BUTLER:  I think that's the last

7     question for Mr. Sheehan.

8          THE COURT:  All right.  You can step

9     down, sir.

10          MR. BUTLER:  Your Honor, you asked

11     in our colloquy during the lunch hour -- you

12     asked the debtors to make a judgment about, as

13     we approached this hour, whether we could get

14     another witness on prior to 6 o'clock and

15     complete it.  The answer to that question is

16     no --

17          THE COURT:  Okay.

18          MR. BUTLER:  -- after having

19     consulted with some of the cross-examiners who

20     plan cross-examination of Mr. Weber, the next

21     witness.  So, I think this is the appropriate

22     time, probably, to conclude today.

23          Our next hearing date is on Friday

24     and we wanted to get -- to the extent your

25     Your Honor is going to give us guidance --

83

1     guidance towards a starting time and an ending

2     time.

3          THE COURT:  I can start again at 9

4     and, you know, again, depending on the order

5     of the witnesses, I can go till 7.

6          MR. BUTLER:  Okay.  Your Honor, I

```
 7    also --

 8           THE COURT:  But that's within the

 9    control of the parties.  They may want to

10    break for settlement discussions at 12 if they

11    want to get away for the long weekend, so --

12           MR. BUTLER:  Your Honor, I think the

13    other thing that we had spoken at a meet and

14    confer at lunch with the parties regarding the

15    calendar for next week.  We are already

16    scheduled for June 2nd and 5th.  There is the

17    May 30th date which is an omnibus hearing

18    date.  We have moved most of the things off

19    that omnibus date.  There is a clear lack of

20    enthusiastic support for book ending the

21    Memorial Day weekend with hearings here.  We

22    wanted to proceed.

23           And the concern we have, and I'll

24    just say on the record, that at the pace we're

25    going, where Mr. Sheehan had over 500
```

84

```
 1    questions asked of him today, we're going to

 2    need more trial days if this is going to be

 3    the pace of cross-examination.  I'm not

 4    questioning it.  People need to do what they

 5    need to do to put their cases in.  But we do

 6    have a need to move this forward in some

 7    reasonable pace under the statute.  And so, if

 8    the parties are not prepared to entertain May

 9    30th, if Your Honor's not prepared to

10    entertain it, I think we're going to need to

11    begin search for additional trial dates.
```

```
12            THE COURT:  I mean, I'm free on the

13   30th, so I could do it then.  I have time.

14            MR. BUTLER:  The debtors are

15   prepared, Your Honor, to go forward on the

16   30th if Your Honor wants to proceed on that

17   date.  I think Mr. Kennedy and some other

18   counsel advised me that they would oppose

19   that.  But I wanted to --

20            THE COURT:  Okay.   All right.

21            MR. KENNEDY:  Well, it's just a

22   question of other things being scheduled, Your

23   Honor.  I know how important this trial is.

24   We're certainly happy to work --

25            THE COURT:  Well, that's a fair
```

                                                        85

```
1   point.  This -- the 30th had not originally

2   been a trial date, right?

3            MR. KENNEDY:  No.  That's correct,

4   sir.

5            THE COURT:  If people have other

6   scheduled matters, and that includes vacation

7   matters, I understand that.  You weren't going

8   to come to the omnibus day.

9            MR. KENNEDY:  I certainly wasn't,

10  Your Honor --

11            THE COURT:  So if the reason for not

12  wanting to continue the trial on the 30th is

13  that people had other commitments that had

14  been booked before -- before the notion of

15  doing this on the 30th as opposed to the

16  omnibus day, then I understand.  Then I
```

17      wouldn't have it on the 30th.

18              MR. BUTLER:  I'll check and see if

19      anyone has those kind of commitments, Your

20      Honor.

21              THE COURT:  Okay.   All right.

22              MR. BUTLER:  So, we'll be back at 9

23      o'clock on Friday.

24              THE COURT:  That's fine.

25              MR. BUTLER:  Thank you, Your Honor.


                                                        86


1               MR. BUTLER:  See you then.

2               THE COURT:  My clerk reminds me --

3       with regard to our view exhibits, I have this

4       room tomorrow but it's an odd combination of

5       Ucose and Chapter 13 days so I don't think you

6       want your stuff all over the courtroom.  But

7       if you can put it in a corner or something

8       like that, that's fine.

9               MR. BUTLER:  Thank you, Your Honor.

10              THE COURT:  Okay.   So I'll see you

11      at 9 on Friday.

12         (Time noted:  4:57 PM)

13

14

15

16

17

18

19

20

21

```
22
23
24
25
```

87

```
 1                    I N D E X
 2
 3   WITNESS              EXAMINATION BY      PAGE
 4   Mr. Sheehan          Mr. Butler          7
 5   Mr. Sheehan          Ms. Robbins         37
 6   Mr. Sheehan          Mr. Kennedy         50
 7   Mr. Sheehan          Mr. Peterson        53
 8   Mr. Sheehan          Mr. Simon           61
 9   Mr. Sheehan          Mr. Fox             74
10   Mr. Sheehan          Mr. Butler          79
11   Mr. Sheehan          Mr. Simon           81
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

https://vip21.veritextllc.com/myfiles/297485/117758pm.TXT

88

```
 1              C E R T I F I C A T I O N

 2        I, Sharona Shapiro, hereby certify that

 3   the foregoing is a true and correct

 4   transcription, to the best of my ability, of

 5   the sound recorded proceedings submitted for

 6   transcription in the matter of:

 7   Delphi Corporation.

 8

 9        I further certify that I am not employed

10   by nor related to any party to this action.

11

12        In witness whereof, I hereby sign this

13   date:

14   May 29, 2006.

15

16   _____

17   Sharona Shapiro

18

19

20

21

22

23

24

25
```