1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DELPHI CORPORATION,

9

10        Debtor.

11

12    - - - - - - - - - - - - - - - - - - - -x

13                    (AFTERNOON SESSION)

14                    U.S. Bankruptcy Court

15                    One Bowling Green

16                    New York, New York

17

18                    May 26, 2006

19                    1:38 p.m.

20

21    B E F O R E:

22    HON. ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25

2

1    MOTION to Authorize Motion For Order Under 11

2    U.S.C. Section 1113(c) Authorizing Rejection

3    Of Collective Bargaining Agreements And Under

4    11 U.S.C. Section 1114(g) Authorizing

5    Modification Of Retiree Welfare Benefits filed

6    by John Wm. Butler Jr. on behalf of Delphi

7    Corporation.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed By:  Pnina Eilberg

25

3

1

2    A P P E A R A N C E S :

3

4    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

5         Attorneys for Delphi Corporation

6         Four Times Square

7         New York, New York 10036

8

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

```
 9   BY:   JOHN WM. BUTLER, JR., ESQ.

10

11   O'MELVENY & MYERS, LLP

12         Attorneys for Debtors

13         7 Times Square

14         New York, New York 10036

15

16   BY:   JEFFREY I. KOHN, ESQ.

17

18   O'MELVENY & MYERS, LLP

19         Attorneys for Debtors

20         1625 Eye Street

21         Washington, D.C. 20006

22

23   BY:   TOM JERMAN, ESQ.

24

25
```

                                                    4

```
 1

 2   O'MELVENY & MYERS, LLP

 3         Attorneys for Debtors

 4         400 South Hope Street

 5         Los Angeles, California 90071

 6

 7   BY:   ROBERT A. SIEGEL, ESQ.

 8

 9   KENNEDY, JENNIK & MURRAY, P.C.

10         Attorneys for IUE

11         113 University Place

12         New York, New York 10003

13
```

```
14   BY:   THOMAS KENNEDY, ESQ.

15

16   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

17         Attorneys for Steelworkers Union

18         1350 Broadway

19         Suite 501

20         New York, New York 10018

21

22   BY:   LOWELL PETERSON, ESQ.

23

24

25
```

5

```
 1

 2   PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER &

 3   BRUEGGEMAN, S.C.

 4         Attorneys for IBEW and IAM

 5         1555 North River Center Drive

 6         Suite 202

 7         Milwaukee, Wisconsin 53212

 8

 9   BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

10

11   COHEN, WEISS AND SIMON, LLP

12         Attorneys for UAW

13         330 West 42nd Street

14         New York, New York 10036

15

16   BY:   BRUCE H. SIMON, ESQ.

17         BRUCE LEVINE, ESQ.

18
```

```
19  GORLICK, KRAVITZ & LISTHAUS, P.C.

20        Attorneys for Operating Engineers

21        Locals 18-S, 101-S, 832-S

22        17 State Street, 4th Floor

23        New York, New York 10004

24

25  BY:   BARBARA S. MEHLSACK, ESQ.
```

6

```
 1

 2  WHITE & CASE, LLP

 3        Attorneys for Appaloosa Management

 4        1155 Avenue of the Americas

 5        New York, New York 10036

 6

 7  BY:   GLENN M. KURTZ, ESQ.

 8        DOUGLAS P. BAUMSTEIN, ESQ.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

24

25

7

1

2              P R O C E E D I N G S

3              THE COURT:  Please be seated.  Okay.

4    Now, we're back on the record in Delphi.  You

5    are still under oath sir.

6              THE WITNESS:  Okay.

7              MS. MEHLSACK:  Your Honor, Ms.

8    Robbins has some follow-up questions before I

9    begin questioning him.

10             MS. ROBBINS:  If this is the

11   appropriate time, Your Honor.

12   RECROSS EXAMINATION BY

13   MS. ROBBINS:

14   Q.   The Court asked you a question about most

15   favored nations' clause, when that was

16   initial -- when the union's initial proposal

17   was submitted, the unions being the IAM and

18   the IBEW --

19   A.   Right.

20   Q.   -- proposal was first submitted to you,

21   Mr. Gerling, back on April 20th and you had a

22   chance to ask questions on the 21st, in terms

23   of the most favored nations clause, you simply

24   indicated that you understood what the

25   union -- where the union was coming from, is

8

1    that right?

2    A.    Something like that -- but I knew what

3    the terms are, yes.

4    Q.    You didn't have any questions concerning

5    the clause?

6    A.    Not particularly, that come to mind.

7    Q.    And since then there's really been no

8    discussion, other than the fact that if there

9    were going to be a holiday schedule, you'd

10    want it to be the same for various unions in

11    the same plant?

12    A.    I don't remember a specific discussion to

13    that.  But on holiday we would want to have

14    everybody the same.  We couldn't have one, and

15    we didn't want to have different holiday

16    schedules.

17    Q.    And in terms of the IAM, are you aware

18    that they do not have a jobs bank provision in

19    their contract?

20    A.    I believe that's correct, yes.

21            MS. ROBBINS:  No other questions are

22    prompted by the Court's questions, Your Honor.

23            THE COURT:  Okay.

24    CROSS EXAMINATION BY

25    MS. MEHLSACK:

9

1    Q.    Good afternoon, Mr. Gerling.  Barbara

2    Mehlsack for the operating engineers.

3    A.    Good afternoon.

4    Q.    We've met before.  Now, just -- would you

5    confirm for me what the testimony earlier

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

6    today that you report to Mr. Kidd, Mr. Kidd

7    reports to Mr. Butler, is that correct?

8    A.    Well, I actually have dual reporting

9    relationships.  I report to Mr. Kidd and to

10   another person but -- Ms. Polk.  But Mr. Kidd

11   then reports up to Mr. Butler who Ms. Polk

12   also reports up to.

13   Q.    Who, I'm sorry, and again, I'm having

14   trouble hearing you.

15   A.    Am I too far away?

16   Q.    Maybe you're too far away now.  And who

17   else is it that you report to?

18   A.    A woman by the name of Ms. Polk, P-O-L-K.

19   Q.    And does Mrs. Polk have any

20   responsibilities for labor relations for the

21   Rochester and Columbus plants?

22   A.    Just in the fact that Columbus is part of

23   the thermal and interior division, which is

24   part of my responsibility on a non-bankruptcy

25   type of world, you know.

10

1    Q.    I'm sorry?

2    A.    So yeah -- so Ms. Polk has responsibility

3    for Columbus as a plant that's within our

4    division.

5    Q.    And have you provided any summaries of

6    your negotiations to any of the individuals in

7    the reporting hierarchy, who you've mentioned

8    today?

9    A.    Yes, I have.  They've been -- the written

10   one's I've submitted have been ever since we

11   met in May.  The other ones I had left were

12   voice mail summaries to Mr. Kidd and others,

13   based on the previous meetings I have had with

14   Mr. Glather in Rochester and Mr. Shearer who

15   represents the folks in Columbus.

16   Q.   Thank you.  And I take it from your

17   declarations that this round of negotiations,

18   1113 negotiations, is the first time you've

19   had any responsibility for operating

20   engineers' contracts or negotiations?

21   A.   Well, like I said, the Columbus plant is

22   part of my responsibility on a regular basis.

23   But I have not had the opportunity to deal

24   with them on contract negotiations, because

25   when I took over my other assignment, their

11

1    agreement was already done.  And I've not had

2    any previous experience with the group in

3    Rochester.

4    Q.   Had you met Mr. Shearer of the operating

5    engineers before meeting him in October of

6    this year -- of 2005, sorry?

7    A.   No, I have never met him before.

8    Q.   Uh-huh.  And have you had -- prior to

9    meeting him, you had no written communication

10   with Mr. Shearer, is that correct?

11   A.   I don't believe so.  I probably called

12   him on the phone once this process got

13   started, but I don't -- I'm not remembering

14   any.

15   Q.   And you never submitted any proposals to

16    him directly, prior to October?

17    A.    Not that I'm aware of.

18    Q.    And, in fact, until the last couple of

19    days, you've never submitted any proposals at

20    all to Mr. Shearer?

21    A.    Well, I guess I'd go back to the

22    documents that I gave him in October and then

23    in November.  Those are certainly Delphi's

24    proposals relative to the bankruptcy process.

25    Q.    Now, are those the October modifications

12

1     and then the November, the competitive

2     benchmark proposals?

3     A.    Yes.

4     Q.    And the first time you gave them to Mr.

5     Shearer were when you met with him in October,

6     is that correct?

7     A.    That's correct, yes.

8     Q.    And Mr. Shearer is the business agent for

9     Local 18S, is that correct?

10    A.    Yes.

11    Q.    And that's the Local that represents the

12    operating engineers in the Columbus facility?

13    A.    That's correct.

14    Q.    All right.  Now, is it -- the first time

15    that you met Mr. Glather was also in October

16    when you presented him with the October

17    proposals?

18    A.    That's correct.

19    Q.    And Mr. Glather is the business agent for

20    the Rochester Local, is that correct?

21    A.    That's correct.

22    Q.    And it is the case, is it not, that these

23    are two separate contracts, two separate

24    Locals that bargain and historically have

25    bargained separately?

13

1    A.    As far as I know that's correct.

2    Q.    Mr. Gerling is it -- is it your testimony

3    today that your declaration and your

4    supplemental declaration accurately and

5    completely summarize the status of the

6    negotiations with each of the operating

7    engineer's Locals as of the date of your

8    supplemental declaration, which is May 23rd?

9    A.    Yes.

10    Q.    You've read Mr. Shearer's declaration?

11    A.    I've read one of them, yes.

12    Q.    And you've -- which one --

13    A.    I don't know if he's submitted more than

14    the one.

15    Q.    He's submitted a supplemental declaration

16    as well.

17    A.    Okay.

18    Q.    But you've not --

19    A.    I don't know that I've read that one.

20    I've read the first one.

21    Q.    Would you -- well, would you turn to --

22    and you'll bear with me --

23            MS. MEHLSACK:  Withdraw that

24    question.

25    Q.    Would you agree with the statement, Mr.

14

1    Gerling, that prior to these negotiations the

2    pattern at Delphi for the operating engineers

3    was, that Delphi reached an agreement with the

4    UAW at both the national and Local level, and

5    then presented the results of that agreement

6    to the Local and began negotiations at the

7    Local level?

8    A.    That's my understanding, yes.

9    Q.    Okay.  And that basically the pattern of

10   bargaining was that most, if not all, of the

11   economic terms that were reached with the UAW

12   were then offered to the various Local unions.

13   And then negotiations on Local plant issues

14   preceded at -- after that offer was made to

15   the Local unions?

16   A.    That's my understanding, yes.

17   Q.    Did Delphi ever negotiate with the

18   international union of operating engineers

19   over the terms of the operating engineers

20   bargaining units?

21   A.    I don't know that they have.

22   Q.    You never have?

23   A.    No, I've --

24   Q.    And you have not in this case?

25   A.    No.

15

1    Q.    And the agreements between the Locals and

2    Delphi are agreements with the Locals, is that

3    correct?  Not with the internationals?

4    A.    I'm not sure how the actual document

5    reads, but it's with that Local.  And that

6    Local is part of the international operating

7    engineers' international group.

8    Q.    So you're not sure how each of the

9    contracts between Local 18S and Delphi and

10   Local 832S and Delphi read?

11   A.    The cover page, I don't, off the top of

12   my head.

13   Q.    What about the signature pages?  Do you

14   know who signs the documents?

15   A.    The business agent and the -- usually the

16   chief steward with the Local management.  And

17   there may have been -- the Chief steward and

18   the business agent.

19   Q.    And who, historically, has negotiated

20   those contracts, in terms of the individuals

21   on each side?  Do you know?

22   A.    Typically it is the Local plant

23   management with the chief steward and the

24   business agent.

25   Q.    Okay.  And who is the Local plant

16

1    management at Columbus?

2    A.    Currently, the personnel director is a

3    gentleman by the name of Jim Barr.

4    Q.    And is that -- is Mr. Barr the only

5    person who's responsible for the negotiations

6    at the Local plant level with the --

```
 7   A.    There's a supervisor --

 8   Q.    -- operating engineers?

 9   A.    There's another gentleman there, David

10   Cox.

11   Q.    And Rochester?

12   A.    The personnel director there is a

13   gentleman by the name of Ed Peet, P-E-E-T.

14   And the supervisor of labor relations is a

15   gentleman by the name of Carlton Smith.

16   Q.    Now, when you met with --

17            MS. MEHLSACK:  Withdrawn.

18   Q.    At some point in October you made an

19   arrangement to present the October proposals

20   to the Columbus plant, is that correct?

21   A.    Yes.

22   Q.    Okay. And you contacted Mr. Struckman

23   about that presentation, is that correct?

24   A.    No.  I think I contacted both Mr. Shearer

25   and Mr. Struckman.  When I had the meeting Mr.
```

17

```
 1   Shearer was unable to make it and I made

 2   arrangements to meet him afterwards.  But I

 3   presented the information to Mr. Struckman who

 4   is the chief steward.  And then, when Mr.

 5   Shearer was available I presented it to him.

 6   Q.    And that's because you had given --

 7   called up on one day's notice and Mr. Shearer

 8   had a previous engagement and couldn't make

 9   it.

10   A.    I don't remember the timing, but he

11   certainly had a previous engagement, that's
```

12    correct.

13    Q.    And you then met with Mr. Shearer to

14    present those proposals to him and explain

15    that -- them to him, correct?

16    A.    That's correct.  There was also some

17    financial information that went along with the

18    package.

19    Q.    And you understood that negotiations

20    would have to occur with the Local plant

21    people present, is that correct?  When it

22    comes to the Columbus --

23    A.    We surely wanted to have -- Mr. Shearer

24    wanted to have Mr. Struckman involved.

25    Q.    And did there come a time that you met

18

1    with Mr. Shearer in November to present the

2    November proposals to him?

3    A.    That's correct.

4    Q.    And the purpose of that meeting was,

5    again, also to present the information about

6    the proposals?

7    A.    That's correct.

8    Q.    Did you come -- did there come -- and at

9    that point in time there had been no attrition

10    package presented to the operating engineers,

11    is that correct?

12    A.    In the time frame of November?

13    Q.    Of October and November.

14    A.    That's correct.

15    Q.    And subsequent to that timeframe was when

16    Delphi withdrew the competitive benchmark

17    proposals, is that correct?

18    A.    The October and November proposals?

19    Q.    The October and November proposals.

20    A.    That's correct. They were withdrawn in

21    December, I believe.

22    Q.    And the next time that you had contact

23    with the operating engineers, I believe, was

24    on March 22nd when you called Mr. Shearer to

25    let him know that you would have an attrition

                                                    19

1    proposal for him?

2    A.    That we were preparing one for them

3    similar to how we did with the UAW, that's

4    correct.

5    Q.    And Mr. Shearer -- am I correct that Mr.

6    Shearer told you that, if you're going to

7    present the proposal and negotiations were

8    going to begin, he wanted it -- the meeting to

9    be at the plant so that Mr. Struckman could be

10    present?

11    A.    He had said that previously so I believe

12    he probably said something along those lines.

13    Q.    Okay.  So you were very clear that for

14    negotiations to take place, it would have to

15    be at the plant where Roger Struckman could be

16    -- could be present.

17    A.    He wanted to have Roger present, that's

18    correct.

19    Q.    Uh-huh.  Now, you subsequently cancelled

20    that meeting is that correct?  Because --

21    A.    Because we did not have an attrition

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

22    program, that's correct.

23    Q.    Now, were you present when Mr. Butler

24    testified that there came a point in time when

25    the Delphi and the UAW agreed to -- it's been

                                                        20

1    called the two-step process, sometimes a

2    three-step process, that is a process by which

3    an attrition agreement would be reached first.

4    Then there would be negotiations to deal with,

5    what's been called the footprint.  In other

6    words, the employee compliments, the effects

7    of the attrition proposal.  And the third step

8    would be wages and benefits and other terms

9    and conditions of employment?

10          MR. JERMAN:  Objection, Your Honor,

11    insofar as she's characterizing the testimony,

12    but no objection to the fact that he was

13    present when Mr. Butler testified.

14          THE COURT:  All right.

15    Q.    Were you present when Mr. Butler

16    testified?

17    A.    Yes.

18    Q.    Are you familiar with what's called the -

19    - what's been called -- what Mr. Butler called

20    the two-step and sometimes, I believe, the

21    three-step process?

22    A.    I've heard the terms used, yes.

23    Q.    Okay.  Do you understand what they mean?

24    A.    Yes.

25    Q.    And what do they mean to you?

21

1  A.    That they would be done in sequence of

2  events.  One would be the attrition program

3  and then the other two elements, essentially,

4  would happen individually.

5  Q.   An attrition program would be agreed to

6  first.  And is the reason for -- that's so

7  that there could be an assessment made of what

8  employees would be left at the various plants,

9  is that correct?

10           MR. JERMAN:  Objection.  That

11  mischaracterizes Mr. Butler's testimony.

12           THE COURT:  Well --

13           MS. MEHLSACK:  I'm asking if that's

14  correct, Your Honor.  I mean, he can tell me

15  that's not correct.

16           MR. JERMAN:  Your Honor, this was

17  discussions with the UAW, he was not involved

18  in those discussion.

19           MS. MEHLSACK:  I'm asking him, Your

20  Honor, if his understanding of that process,

21  two or three-step process, if it -- if he does

22  not understand it the way I described it, he

23  can tell me he doesn't understand it that way.

24           THE COURT:  Well, is this -- I guess

25  -- is the questioning going on how this

22

1  relates to the witness's own testimony?

2           MS. MEHLSACK:  Yes.

3           THE COURT:  With regard to this --

4           MS. MEHLSACK:  And I -- this is a

5    foundation, Your Honor.

6           THE COURT:  Rather than just whether

7    he was paying attention in court the other

8    day?  I'm just trying to figure out the --

9           MS. MEHLSACK:  No, it's to -- well,

10   let me -- Your Honor, it's to get the

11   witness's understanding of the process and

12   whether the witness has ever been instructed

13   to follow the same process --

14          THE COURT:  All right.

15          MS. MEHLSACK:  -- with the operation

16   engineers.

17          THE COURT:  Fine, you could ask --

18   you could ask that question.

19   Q.   Had you, Mr. Gerling, been instructed or

20   advised by your superiors to follow that same

21   two or three-step process with the operating

22   engineers?

23   A.   No.

24   Q.   When was the first time you made an

25   attrition proposal to the operating engineers?

                                           23

1    A.   Wednesday of last week.  Whatever date

2    that was, I'm not sure.

3    Q.   Uh-huh.  And that attrition proposal is

4    conditioned on the operating engineers

5    accepting the GM consensual proposals, is it

6    not?

7    A.   It was an addendum to the March proposal.

8    And during that meeting I said, if we could

9     come to terms on the entire package, we would

10    remove the GM contingencies and Delphi would

11    fund it without any GM support.

12    Q.    So that --

13    A.    Delphi would fund the program without any

14    GM financial support.

15    Q.    And by coming to terms on the entire

16    package, you meant coming to terms on the GM

17    consensual proposals, is that correct?

18    A.    Is that the March proposal?  I just want

19    to make sure.  There's all sorts of different

20    ones.  I refer to them by dates.

21    Q.    I fully appreciate your confusion, Mr.

22    Gerling.

23    A.    The March proposal was the one that we

24    would agree to terms upon.

25    Q.    The March proposal?

24

1     A.    Yes.

2     Q.    And is -- bear with me a moment, please.

3     Is the attrition proposal that you offered to

4     the operating engineers, now is that --

5                MS. MEHLSACK:  Question withdrawn.

6     Q.    Did you with -- make the same proposals

7     to both Mr. Glather and Mr. Shearer?

8     A.    Yes.

9     Q.    Okay.  And does that proposal contain a

10    buyout program?

11    A.    The attrition package, that was an

12    addendum, did not have a buyout proposal.  It

13    was part of the original March proposal that I

14  subsequently gave them information on.  Or it

15  may even have been contained in.  The 140 and

16  70, I assume is what you're referring to,

17  correct?

18  Q.   The 140, 70.

19  A.   Yeah.  That was not in the attrition

20  package.  It was part of the original March

21  proposal.

22  Q.   It was part of the original March

23  proposal.  And in March it was contingent on

24  GM funding, is that correct?

25  A.   Correct.

                                                        25

1  Q.   But when you offered the attrition

2  proposal, is it your -- am I understanding you

3  correctly, that what you were offering was, if

4  you make a deal, if we come to an agreement on

5  the overall proposal, the buyout program and

6  the attrition program will no longer be

7  contingent on GM funding.

8  A.   That's correct.

9  Q.   Now, the attrition proposal itself was

10  a -- the proposal to, in effect, bridge a

11  three year of service gap for anyone who had

12  27 years of service --

13  A.   Uh-huh.

14  Q.   -- in Delphi as of a certain date?

15  A.   Uh-huh.  Yes, I'm sorry.

16  Q.   Okay.  Do you know what the service

17  accruals are for the various employees at the

18  Columbus plant?

19   A.   On individual names, no.  But I remember,

20   in general, eleven of the thirteen would be

21   eligible for one of the options of the

22   retirement program that we offer.  And four of

23   the six would be eligible for one of the

24   programs in Rochester.  How much service each

25   individual had, I don't recall.


26


1    Q.   When you say eleven of the thirteen would

2    be eligible for the options, you're including

3    the buyout option --

4    A.   No.

5    Q.   Now, it's your understanding --

6         MR. JERMAN:  Objection, Your Honor.

7         THE COURT:  He didn't finish his

8    answer to that one.

9         MS. MEHLSACK:  Okay.

10   Q.   Is it -- are you including --

11        THE COURT:  I'm sorry.  You

12   should --

13        MS. MEHLSACK:  Okay.  I'm sorry.

14        THE COURT:  You should let him

15   answer your first -- the first part of your

16   question.

17        MS. MEHLSACK:  I'm sorry.

18   A.   The eleven of the thirteen would -- as I

19   recall, qualified for either the normal or

20   early retirement option, the MSR or the pre-

21   retirement program.

22   Q.   And so, when you say the normal or early

23   retirement, you're talking about the ten year

24    -- ten years, age fifty program?

25    A.    No, that's the MSR.

27

1    Q.    And that's the MSR, I apologize.

2    A.    That's okay.

3    Q.    The ten -- the MSR is the ten years and

4    age fifty?

5    A.    Yes.

6    Q.    And --

7    A.    Do you want me to explain -- do you want

8    me to try and explain it, or you got it?

9    Q.    And the normal is age sixty-five?

10    A.    With seniority.

11    Q.    With seniority.  And the early is the --

12    you're referring to the bridging -- no, the --

13    A.    No.

14    Q.    -- the early retirement is age fifty-five

15    and how many years of service?

16    A.    No, it's age sixty with ten years of

17    service.  Eighty-five points which is a

18    combination of age and credited service, or

19    thirty years of credited service would qualify

20    for an early retirement.

21    Q.    Okay.  And two of those employees would

22    not qualify for any of those options?

23    A.    I believe that's correct.

24    Q.    Okay.  And what is the -- it is -- Delphi

25    proposes to close the Columbus facility, is

28

1  that right?

2  A.    That's correct.

3  Q.    And you've advised Mr. Shearer and Mr.

4  Struckman of that?

5  A.    I believe I have, yes.

6  Q.    So, of the -- two of those employees,

7  with the facility to be closed, would have no

8  options under the attrition program?

9  A.    From a retirement standpoint, that's

10  correct.  They would be -- they qualify for

11  the buyout piece.

12  Q.    They would -- their only option would

13  then be under the buyout?

14  A.    Correct.

15  Q.    Now, in your -- do you have your

16  declaration -- your supplemental declaration

17  in front of you?

18  A.    I don't think so.

19  Q.    If you could, it's 280.  Now if you refer

20  to paragraph 12, where you say -- let's start

21  with the first sentence.  On May 17th you got

22  a counterproposal from the operating engineers

23  Local 18S, is that correct?

24  A.    Mr. Shearer handed me responses to

25  several of the items and we discussed them,

29

1  yes.

2  Q.    And that counterproposal contained

3  several concessions including a willingness to

4  -- agreement to give up COLA, limitation on

5    holidays, reduced shift premium, is that

6    correct?

7    A.    I believe that's correct.

8    Q.    All right.  Well, if you don't, would you

9    -- I'd refer you to Exhibit 291.

10   A.    My book goes 290 to 292.

11   Q.    Is that a correct copy of the proposals

12   that you received on May 17th?

13   A.    Yes.  Yes, it is.  Yes, it is.

14   Q.    Now, in paragraph 12 you referred to

15   your -- you say, "I also discussed with the

16   IUOE representatives the same approach that

17   Delphi offered to the IAM and IBEW, with

18   regard to receiving the same agreement entered

19   into by the UAW."  Now, I'm going to refer you

20   back to your paragraph 8, because I'm going to

21   ask you, when you talk about the same

22   approach, are you talking about the approach

23   that you describe in paragraph 8, in which you

24   say, "Delphi also offered to approach

25   negotiations with the IBEW and IAM in a

30

1    different manner.  Similar to the proposal

2    previously extended by counsel, under which

3    the IAM and IBEW represented employees would

4    be provided the same terms and conditions,

5    eventually negotiated with the UAW."  So your

6    paragraph -- am I correct that your statement

7    on paragraph 12 is referring to the same

8    approach.  It's the approach based on the e-

9    mail that was sent to me and to Ms. Robbins on

10    May 8?

11    A.    That's correct.

12    Q.    Okay.  And that -- and that e-mail, you -

13    - you've read that e-mail?

14    A.    I've read it, yes.

15    Q.    Okay.  And that e-mail asked the

16    operating engineers and the IBEW to remove

17    themselves from this process and agree to

18    accept whatever results were arrived at

19    through the process, for the UAW.  That is, if

20    this court should decide to approve rejection,

21    our cut -- the IUOE contracts would be

22    rejected.  If there was an agreement reached

23    with the UAW, that agreement would be imposed

24    upon the operating engineers, subject -- well,

25    I'm not sure that whether it was subject to

31

1    ratification.  And that with the exception,

2    however, that there would be no GM benefit

3    guarantees and no flow-back rights?

4    A.    I believe that is correct.

5    Q.    And that was what you offered in the --

6    in your initial May meetings to the operating

7    engineer Locals, is that correct?

8    A.    We discussed that.

9    Q.    Okay.  Well --

10    A.    Yeah.  Yeah.  They knew it.

11    Q.    Okay.  You have a statement that the

12    operating engineers expressed interest in this

13    approach.  Isn't it the case that only Mr.

14    Glather expressed an interest in the approach

15    and not Mr. Shearer?

16    A.    Mr. Shearer didn't say.  He had

17    provisions of his agreement that were me --

18    what I would call me too, which were patterned

19    after that.  But he had presented me

20    proposals.  Charlie also made a note, not --

21    sorry, Mr. Shearer also made proposals that

22    said, we'll do whatever everybody else wants

23    because we're not going to do any better.  To

24    me that indicated an interest in going with

25    the pattern approach.

32

1    Q.    Well would you -- would you read please -

2    - would you turn back to Exhibit 291?

3    A.    Yes.

4    Q.    And are you referring to -- I'm sorry, I

5    have to go to -- I guess it's not in the

6    confidential binder.  And are you referring to

7    the -- is there something in this May 17th

8    proposal that talks to what you are referring

9    to as a me-too approach?

10    A.    When we talk -- walk through the term

11    sheets, and we talked about each individual

12    element -- are you going to ask another

13    question, or do you want me to go on?

14    Q.    Finish your answer.

15    A.    Okay.  As we discussed it and we walked

16    through the term sheets, there were elements

17    that -- and specifically health care was one

18    that Mr. Shearer said, we'll take what

19    everybody else takes.

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

20    Q.    I'm --

21    A.    We walked through every element in the

22    term sheet.

23           MS. MEHLSACK:  Your Honor, I'm going

24    to move to strike, because that was not

25    responsive to my question.  I asked if there

33

1    was anything in this proposal, on May 17th,

2    that has a -- what Mr. Gerling characterizes

3    as a me-too approach.

4           THE COURT:  Was the term sheet

5    you're referring to the May 17th?

6           THE WITNESS:  The March proposal,

7    sir.

8           THE COURT:  Okay.  No, she should

9    ask a specific question.

10    A.    Okay.  In this -- in this document here,

11    there's nothing that references me-too.

12    Q.    Now, when you went through the term

13    sheet, Mr. Shearer indicated to you that there

14    were certain specific items --

15    A.    Uh-huh.

16    Q.    -- that he would want to be able to do at

17    least as well as the other unions, is that

18    correct?  And that's what you're

19    characterizing as a me-too approach?

20    A.    No.  In some he said he couldn't -- he

21    wouldn't be able to do any better so he'd just

22    take whatever we gave him.  And that was

23    specifically health care.  There were other

24    elements that he talked about -- he wouldn't

25    be able to do any better so he would do the

34

1    me-too there, like holidays.  He knew he

2    wasn't going to get more or less.

3    Q.    Well, but in fact, Mr. Shearer gave you a

4    specific proposal in agreement to reduce

5    holidays?

6    A.    He agreed to reduce holidays, that's

7    right.

8    Q.    And he gave you a specific proposal to do

9    away with COLA, is that correct?

10    A.    That's correct.

11    Q.    Let's go through -- after the May 17th

12    proposal, did you have subsequent negotiations

13    with Mr. Shearer and Mr. Struckman?

14    A.    I did not meet with them further because

15    I was meeting with the operating engineers in

16    Rochester and then with the IAM IBEW in

17    Milwaukee the following days.  But Mr. Barr

18    and Mr. Cox met with Mr. Struckman and Mr.

19    Shearer, although Mr. Shearer wasn't available

20    on all days, because he had prior commitments.

21    Q.    In fact, was there not a meeting on

22    Saturday the 20th between Mr. Barr and Mr.

23    Struckman and Mr. Cox?

24    A.    I believe there was.

25    Q.    And that meeting resulted in a document

35

1    that was signed by plant -- by Mr. Cox, I

2    believe, and by Mr. Struckman?

3    A.    I haven't seen a signed copy.  But I do

4    remember seeing that there was a document on

5    the elements that they talked about in that.

6    Q.    And you haven't seen the signed copy?

7    A.    No, but I've seen the -- I've seen a copy

8    of it that was sent, but I don't have a signed

9    copy.

10    Q.    Well, would you turn to Exhibit 295,

11    please?

12    A.    Okay.  I have it.

13    Q.    Again, not in the confidential binder.

14    And that -- I'm sorry, I will correct my

15    statement.  That document is signed by Mr.

16    Barr for Delphi, right?  And Mr. Struckman

17    for --

18    A.    Uh-huh.

19    Q.    -- the operating engineers?

20    A.    Yeah.

21    Q.    And that document reflects an

22    understanding at the plant level, is that not

23    correct?  Subject to approval by Delphi

24    corporate labor relations and the operating

25    engineers' business agent?

36

1    A.    That's correct.

2    Q.    And that document reflects an agreement

3    to both waive GM support contingency language

4    and maintain the buyout of the 140,000, 70,000

5    dollar buyout, is that correct?  If you look

6    at page one --

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

7    A.    Oh, I see the buyout provisions.

8    Q.    And do you see the waived GM support

9    contingency language?

10    A.    I see that.  Yes, I do.

11    Q.    Okay.  Subsequent to your receiving that

12    document, Mr. Gerling, did you send another

13    proposal to the operating engineers' Local

14    18S?

15    A.    The one yesterday that I reviewed with

16    Mr. Shearer.

17    Q.    And nothing was sent prior to yesterday?

18    A.    I'm -- prior to yesterday?  I'm not aware

19    of any.  I mean --

20    Q.    So you're not aware of the fact that Mr.

21    Barr sent Mr. Shearer a proposal on May 23rd?

22    A.    If he sent one, I'm not aware of that.

23    No, I'm not.

24    Q.    Would you take a look at Exhibit 300?

25    A.    Oh.  Okay.

37

1    Q.    Now, were you aware that that proposal

2    was sent by Mr. Barr to Mr. Shearer?

3    A.    Yeah.  I was -- I was thinking of a new

4    term sheet proposal, I'm sorry for my

5    mischaracterization.

6    Q.    Okay.

7    A.    This is the medical information that we

8    reviewed.  And there should be some pension

9    stuff in here as well.  We reviewed with him

10    and Mr. Glather Friday morning the 20th, I

11    believe.

12    Q.    I'm sorry.  I may have -- I may have

13    referred you to the wrong number and I

14    apologize.  It's very confusing as to what's

15    in the confidential binder and what's not.

16    And what the rationale is for it being one way

17    or the other.  Okay.  I apologize, Mr.

18    Gerling.

19    A.    It's okay.

20    Q.    I actually mean to refer you to Exhibit

21    301, which is not in the confidential -- which

22    is in the confidential binder.

23    A.    Okay.

24             THE COURT:  No, it's not.

25    Q.    And is it -- have you seen that document?

                                              38

1    A.    I've not seen it with these me-too

2    provisions put in it.

3    Q.    Well, do you know that -- that -- those

4    me-too provisions were put in by Mr. Barr?

5             MR. JERMAN:  Objection, foundation,

6    if he hasn't seen it.

7             THE COURT:  You should --

8             MS. MEHLSACK:  But that doesn't mean

9    he doesn't know.

10    Q.    Do you know who put in those me-too

11    provisions?

12    A.    No, I don't.

13    Q.    Okay.

14             THE COURT:  Well, okay fine.

15             MS. MEHLSACK:  I'm sorry, Your

16    Honor, I didn't hear you, Your Honor.  I

17    apologize.

18          THE COURT:  You don't need to hear

19    me -- he doesn't know.

20    Q.   And that -- that proposal of the 23rd --

21          THE COURT:  Well, he -- if you're

22    going to actually pass that as a question, you

23    have to lay some foundation.  Because he said,

24    so far there's no real --

25    Q.   Well, do you know -- do you know that

39

1    that was sent by Mr. Barr to Mr. Shearer, or

2    you don't know that as well?

3    A.   I'm not aware of that either.

4    Q.   So that as far as you know, between the

5    May 20th plant level agreement and today, the

6    next time that there was any bargaining at the

7    Columbus facility was when you sent a

8    proposal -- the March 25th proposal to Mr.

9    Shearer?

10    A.   Well, I know -- I know I sent -- I faxed

11    him the copy last night and we walked through

12    it.  Now, I'm recalling that Mr. Shearer

13    thought -- I'm -- get my dates right.  He was

14    available to go to Columbus on the 23rd.

15    I'm -- because his schedule was, kind of,

16    committed to.  So, I believe he was in

17    Columbus on the 23rd, but I was not in

18    Columbus on the 23rd.

19    Q.   And you don't know what happened in

20    Columbus on the 23rd, is that the case?

21    A.   No, I don't.  That's correct.

22    Q.    Because neither Mr. Barr nor Mr. Cox have

23    told you what happened on the 23rd?

24    A.    I can't recall that they gave me any

25    update.

40

1    Q.    So, last night --

2    A.    Well, can I --

3    Q.    Yeah.

4    A.    -- add on to that?

5    Q.    Well, no.  There's no question.

6              THE WITNESS:  Your Honor, may I

7              THE COURT:  Well, if it's for his --

8    in response to that last question?

9              THE WITNESS:  Yes.  Yeah.

10             THE COURT:  Okay.  Go ahead.

11    Q.    I'm sorry, I couldn't hear you.

12    A.    Yes, it is.  Because when I met -- I have

13    to take a step back to the Wednesday meeting

14    with Mr. Struckman and Mr. Shearer, that I

15    informed them that I would be having further

16    dialogue with the IAM and the IBEW.  And that

17    one of my associates, Mr. McQuee, would be

18    working with them in my absence because I

19    couldn't physically be in Columbus and

20    Rochester and Milwaukee all at the same time.

21    Q.    But again, you -- understood.  But you --

22    so but the next time -- the next time a

23    proposal was sent to the operating engineers

24    was the May 25th document that was sent last

25    night?

41

1   A.   I sent that last night.  It's the one I'm

2   aware of.

3   Q.   Okay.  And that is Exhibit 316, am I

4   correct?

5   A.   I don't know what exhibit.

6   Q.   Would you turn -- that is Exhibit 316.

7   Would you please turn to that exhibit?  And

8   you'll forgive me if I ask, what may seem a

9   number of stupid questions, since I just got

10  that document this morning.  And I gather it

11  had not been sent to Mr. Struckman as of

12  yesterday.  Because Mr. Struckman had to leave

13  the plant, is that correct?

14  A.   Yeah.  Mr. Struckman left at 4:00.  They

15  were going to review it with him this morning.

16  Q.   Okay.  Now that is the, what's called

17  pattern bargaining proposal, is that correct?

18  A.   I just like to refer to it by the date.

19  May 25th proposal, yes.  That's the pattern

20  treatment, yes.

21  Q.   Okay.  And that proposal -- is that

22  proposal that offers to the operating

23  engineers' retiree health insurance comparable

24  to that of the salaried employees?

25  A.   This proposal has that in it, yes.

42

1   Q.   And is that the first time that is

2   offered to the operating engineers?

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

```
 3   A.    When I talk to -- in written form, yes.

 4   Charlie had indicated, like I said -- I'm

 5   sorry.  Mr. Shearer had indicated previously,

 6   as had Mr. Glather, they would take whatever

 7   was offered because they wouldn't be able to

 8   do any better.  It's the first time I put it

 9   in writing.  You're absolutely correct.

10   Q.    So on May 23rd there were no 1114

11   proposals that had been put before the

12   operating engineers, is that correct?

13   A.    The -- prior to -- I'm sorry, the date

14   May 23rd?

15   Q.    No.  Prior -- on -- as of May 23rd, there

16   were no retiree health care proposals

17   comparable to the salaried -- treatment of

18   salaried employees on the table to the

19   operating engineers, is that correct?

20   A.    With respect to the operating engineers,

21   they had told me that they would --

22             MR. JERMAN:  Objection.

23             MS. MEHLSACK:  Your Honor, I'm going

24   to ask that the answer be struck.  My question

25   called for a simple yes or no answer.
```

                                                        43

```
 1             MR. JERMAN:  Your Honor, he didn't

 2   even complete his answer.  So we don't know

 3   what he was going to say.

 4             THE COURT:  Well, I think the -- in

 5   your question, are you saying written

 6   proposals or -- is that what you mean when you

 7   say proposals on the table, you mean written,
```

8    formal proposals?

9            MS. MEHLSACK:  There were no written

10   proposals to the operating engineers offering

11   them health care comparable, or what Delphi is

12   characterizing as health care comparable, to

13   the salaried employees.

14           THE COURT:  Okay.

15           THE WITNESS:  In writing, no.

16           THE COURT:  Okay.

17   Q.   And Mr. Gerling, that March -- that May

18   25th proposal --

19   A.   Uh-huh.

20   Q.   -- the buyout provisions are struck from

21   that proposal, is that correct?

22   A.   They have the -- they're struck with the

23   pattern treatment added in, yes.

24   Q.   Okay.  And pattern treatment means, in

25   the context of the buyout proposals that

44

1    whatever is offered to the UAW, whatever that

2    may be, will be offered to the operating

3    engineers?

4    A.   With respect to the buy -- yeah.  For

5    that element, yes.

6    Q.   Okay.  However, the operating engineers

7    do not have the GM benefit guarantees, is that

8    correct?

9    A.   As far as I know, that's correct.

10   Q.   Uh-huh.  And that pattern proposal has no

11   specific wages in it, is that correct?

12   A.   They would -- they would get whatever the

13   UAW -- so the proposal was withdrawn, or

14   struck through and they would accept the

15   pattern treatment.

16   Q.   So that virtually every paragraph and

17   it's not the case that every paragraph,

18   virtually every paragraph is struck through

19   and the operating engineers are being asked to

20   accept the proposal that says, we will get

21   whatever the UAW may get with several

22   exceptions, however.  Is that not the case?

23   A.   Yeah, because of the retiree healthcare.

24   Yes, that's correct. There are exceptions to

25   the pattern.

45

1   Q.   Okay.  And what are those exceptions, if

2   you want to --

3   A.   The pension piece, the ISP, active or --

4   I'm sorry, retiree health care, it says in the

5   beginning here -- pensions representation,

6   OPEB, the addendum to the special attrition

7   program and the income security plan.  There

8   are a couple provisions that we've removed as

9   well that didn't apply to the operating

10   engineers.

11   Q.   So this special attrition program will

12   not be patterned after the UAW special

13   attrition program?

14   A.   They would do their own because, as we

15   talked in our meeting of the 17th, it would be

16   similar.  We discussed moving the dates around

17   to coincide the departure of employees with

18    the closing of the facility.

19    Q.    Would that be the only difference?

20    A.    No, there was -- they don't have -- since

21    they don't have flow-backs or the benefit

22    guarantee there was no check the box option.

23    Q.    Okay.  And is not also the case that

24    there's no provision for a special fund to be

25    set up --

46

1    A.    That's correct.

2    Q.    -- to insure the payment of those

3    benefits.

4    A.    There is no special fund set up.

5    Q.    Now is -- was that proposal -- has that

6    proposal been offered to Mr. Glather yet?

7    A.    Which one?  May 25th?

8    Q.    The pattern bargaining proposal?

9    A.    Mr. Glather was having some medical

10    treatment done yesterday.  So, he told me he

11    would be unavailable on Thursday when I talked

12    to him on Wednesday.  I've e-mailed him the

13    proposal.  And Mr. Peet, in Rochester,

14    reviewed it with the chief steward and another

15    member of the bargaining committee this

16    morning.

17    Q.    And let me -- returning to that proposal,

18    there's another exception for pattern

19    treatment as well.  And that's for the defined

20    contribution plan, is there not?

21    A.    Yes.  I said pension earlier, but that's

22    what I meant.

23    Q.    You encompassed that.  And that is

24    because -- has there been a percentage offered

25    to the operating engineers for the defined

47

1    contribution plan?

2    A.    It's a five percent base contribution and

3    a hundred percent match on two and a half

4    percent of the employees' contribution.

5    Q.    And the UAW offer is the seven and half

6    percent offer, is that not the case?

7    A.    But that adds up to seven and a half

8    percent.

9    Q.    Now the UAW piece -- the Delphi piece,

10    instead of five percent, the UAW piece is the

11    seven and half percent, is it not?

12    A.    I just think were splitting hairs.  It's

13    the five percent match -- base contribution by

14    the company and then a two and a half percent

15    match on the employees' contribution.  That

16    adds up to the seven and half percent.

17    Q.    And I -- it's my understanding, and

18    perhaps I'm wrong.  That the base contribution

19    without a match is seven and a half percent

20    for the UAW?

21    A.    I'm not aware of that.

22    Q.    Now, you've received, and I apologize

23    it's not an exhibit yet, you've received

24    another counterproposal from Mr. Shearer, is

25    that not correct?  Actually you may not have

48

 1   received it because --

 2   A.    Okay.  Because I'm not aware of one.  I

 3   mean, when we finished talking last night he

 4   did not send me anything.  But that doesn't

 5   mean -- I've not been in my normal office, so

 6   he may have sent something to my regular

 7   office.  I haven't received anything, no.

 8           MS. MEHLSACK:  Question withdrawn at

 9   the risk of testifying.  Because I haven't

10   seen it yet either.  I just -- my

11   understanding that --

12           THE WITNESS:  I've been here with

13   you all day, so --

14           MS. MEHLSACK:  -- that it's been

15   sent to you.

16   Q.   Mr. Gerling, what is the intention --

17   Delphi's intention with respect to the

18   Rochester facility?

19   A.    The Rochester facility has been

20   designated as a plant that will stay open, be

21   retained.

22   Q.    Okay.  And is it not the case that -- and

23   I believe you testified that it's your

24   understanding that four out of the six

25   employees at that -- stationary engineers,

49

 1   will be eligible to take an attrition package?

 2   A.    That's correct.

 3   Q.    And at the Columbus facility, you said

4    that it's your understanding that eleven out

5    of the thirteen employees would be eligible to

6    have some form of retirement package?

7    A.    Yes.

8    Q.    Okay.  Is it not the case that you told

9    Mr. Shearer that Delphi wants to have control

10   over who selects the retirement package and at

11   what points in time; so that you can insure

12   that there is a sufficient number of

13   experienced stationary engineers remaining at

14   the facility?

15   A.    I don't know if I used those --

16            MR. JERMAN:  Objection, compound.

17            MS. MEHLSACK:  I think he was having

18   no trouble answering the question.

19            THE COURT:  Well, can you --

20   separate your question?

21   Q.    Is it not the case that you told Mr.

22   Shearer that Delphi wants to control the

23   timing and identity of who selects the

24   retirement packages?

25   A.    What we talked about, and what I talked

50

1    to Mr. Shearer about, was that since the plant

2    was going to stay open -- I'm sorry.  And

3    we're talking about Columbus.  Since the plant

4    was going to close at the end of December

5    2007, it would be our preference to have the

6    employees work up until the time the plant

7    closes, unlike the UAW where the people all

8    left in 2006.  A powerhouse operation is one

9    where it's all on or it's all off.  If I were

10   to let one or two people go, I'd have to find

11   a way to replace them.  And so the fact is, is

12   that we thought it would be best to have

13   people work up until the closure.  Now, if

14   there was a way to let people go and we could

15   still run the powerhouse without that, we

16   would work through that.  But the fact is, a

17   powerhouse runs seven days a week, twenty-four

18   hours a day.  And it's either all on or it's

19   all off.  So you can't run with six guys.  And

20   the way they're set up, unlike in Rochester,

21   they're just set up different.

22   Q.   And in the case -- you're referring now

23   to the Columbus facility?

24   A.   Yes.

25   Q.   In the case of Rochester, it's a

51

1    different kind of powerhouse operation, right?

2    A.   It's a -- yes.  It's a little different.

3    They don't need as many people.

4    Q.   And have you -- has Delphi done an

5    analysis of the savings to Delphi of the

6    proposals that have been made to the operating

7    engineers at each of the plants?

8    A.   An analysis of --

9    Q.   The specific cost savings?

10   A.   Well, like I had mentioned previously.

11   We haven't quantified a target amount, but we

12   know that we're going to competitive wages and

13   benefits.  So I -- to your point, a specific

14    analysis, I'm not aware of one.

15    Q.    Now, have you done, when you talked about

16    competitive wages, have you done an analysis

17    of what powerhouse operators earn in the

18    automotive parts industry?

19    A.    I have not, no.

20    Q.    Okay.  Are you aware of what the average

21    wage is for powerhouse operators in the

22    automotive parts industry?

23    A.    Just the Delphi people.  And they make,

24    approximately, thirty-one dollars an hour.

25    Q.    Okay.  Are you aware that the average

52

1    is -- in 2004; was twenty-eight dollars an

2    hour?

3    A.    No, I'm not.

4    Q.    Okay.  Are you -- have you done any

5    analysis or has anybody given you an analysis

6    of what powerhouse operators earn in the

7    Columbus, Ohio area?

8    A.    No, I have not seen one, no.

9    Q.    Or in Ohio generally?

10    A.    No.

11    Q.    Or in the Rochester, New York area?

12    A.    No.

13    Q.    Or in New York, generally?

14    A.    I've not seen one, no.

15    Q.    Okay.  At this point, Mr. Gerling, is the

16    pattern bargaining proposal, am I

17    characterizing it fairly if I say that it is a

18    proposal to the operating engineers that the

19    GM contingencies will be removed from the

20    buyout, wage and attrition aspects of the

21    March proposal?

22    A.    Yes.

23    Q.    If the operating engineers agree that

24    they will take whatever the UAW gets in every

25    area except what's not covered by the pattern

53

1    bargaining?

2    A.    That's the principal, yes.

3          MS. MEHLSACK:  I have no further

4    questions.

5          THE COURT:  Okay.  Any redirect?

6          MR. JERMAN:  Good afternoon, Your

7    Honor, Tom Jerman of O'Melveny and Meyers for

8    the debtors.

9    REDIRECT EXAMINATION BY

10   MR. JERMAN:

11   Q.    Good morning -- or good afternoon Mr.

12   Gerling.  Just two questions really.  Can you

13   refer back to Exhibit 291?  I'd like you to

14   look at paragraph 11 of that document on the

15   second page.

16   A.    Okay.  Yeah, I have it in front of me.

17   Q.    The paragraph 11 says, "The union

18   requests that any agreement, or portion

19   thereof, is better terms and/or conditions

20   than those negotiated with the IUOE be

21   guaranteed to the IUOE."  What did you

22   understand that to mean?

23   A.    That would mean, kind of, the me-too or

24    the most favored nations kind of concept that

25    we talked about earlier today.

54

1    Q.    And can you tell the court why the

2    company decided to change from the specific

3    proposal that had been provided a couple of

4    weeks ago, to the -- what I'll call the

5    pattern proposal that was provided to the

6    various unions, the IAM, the IBEW and the IUOE

7    yesterday?

8    A.    Well one is is that we recognized in our

9    discussions with them that their lack of a

10    benefit guarantee, and they had concerns about

11    retiree health care, was a big issue for them.

12    The other piece was our health care proposal

13    for active employees.  And then the fact that

14    when we had bargained with these individual

15    groups in the past, they had typically taken

16    the -- and accepted the terms of what had been

17    negotiated with the UAW, which then, kind of,

18    rolled down to the IUE and then the

19    traditional employees at the steelworkers. So

20    consistent with that approach.

21    Q.    Had the union represented indicated to

22    you that adopting a pattern approach would be

23    acceptable to them?

24    A.    At different time, because of the most

25    favored nations, that would be acceptable,

55

1    yes.

2    Q.    Thank you.

3              MR. JERMAN:  No further questions.

4              THE COURT:  Okay.  Do you have

5    anything?

6              MS. ROBBINS:  Uh-huh.

7              THE COURT:  No.  You could step down

8    sir.  Oh, you do have something, I'm sorry.

9              MS. ROBBINS:  Yeah, because I --

10   RECROSS EXAMINATION BY

11   MS. ROBBINS:

12   Q.   Mr. Gerling, you were quite aware that

13   the IBEW and the IAM spokespeople, Mr.

14   Middleton and Mr. Griffin --

15   A.   Uh-huh.

16   Q.   -- were not proposing that they be put in

17   the position of your pattern bargaining?  That

18   is that they would agree to be bound by

19   whatever was negotiated by another union?

20   A.   They also had the most favored nation

21   clause in their agreements.

22   Q.   Would you answer my question, sir?

23             MR. JERMAN:  Objection --

24   Q.   Did you --

25             MR. JERMAN:  -- Your Honor.  I

                                                56

1    believe he was answering.

2              THE COURT:  No.  No, he's saying

3    that they wanted the upside but not the

4    downside.  But that's not the answer.

5    Q.   Did you understand, from your discussions

6    with Mr. Middleton and Mr. Griffin, who are

7    the spokespeople --

8    A.   Uh-huh.

9    Q.   -- of the IBEW and the IAM, that it was

10   unacceptable to be put in the position where

11   they had agreed ahead of time, to a

12   negotiation that they had not been part of?

13   A.   They mentioned that to me yesterday,

14   that's correct.

15   Q.   And they certainly had never agreed to

16   the contrary?

17   A.   In a formal, no they hadn't.  But I had

18   always used a most favored nations, as an

19   approach to the pattern.

20   Q.   In a most favored nations clause, first

21   of all, the company and the union have already

22   agreed to a term and condition of employment.

23   A.   Okay.

24   Q.   Is that right?

25   A.   Well --

57

1    Q.   They have a proposal that they both

2    agreed to.

3    A.   There's something already established

4    that they --

5    Q.   A specific wage rate --

6    A.   Uh-huh.

7    Q.   -- a specific benefit package, is that

8    right?

9    A.   Uh-huh.

10   Q.   In terms of your experience --

11    A.    The way we've done it, that's correct.

12    Q.    Yes.  And then, basically, the question

13    is whether the company has agreed to something

14    more favorable with another group?

15    A.    Okay.

16    Q.    And whether that will apply to this

17    union, that's a most favored nations clause,

18    is that right?

19    A.    I guess it could be.  But I was looking

20    at it as, in addition to that, the pattern

21    that was also set in terms of other things.

22    But your point is part of that, absolutely.

23    Q.    And so, the company is in control of both

24    what they agreed to initially, with the given

25    union, right?

58

1    A.    Yeah.

2    Q.    And what the company has agreed to with

3    other unions?

4    A.    Yes.

5    Q.    On the other hand, your proposal to the

6    IAM and the IBEW puts them in the position

7    where they're agreeing to something they have

8    no control over?

9    A.    They would be accepting what -- what the

10    pattern would be from other folks, that's

11    correct.

12            THE COURT:  Okay.

13            MS. ROBBINS:  No further questions,

14    sir.

15    RECROSS EXAMINATION BY

16     MS. MEHLSACK:

17     Q.     Just to follow-up on Ms. Robbins'

18     question, Mr. Gerling.  There are different

19     types of most favored nations clauses, are

20     there not?

21     A.     I suppose there could be, yes.

22     Q.     Okay.  So you've not had experience with

23     most favored nations clauses, is that correct?

24     A.     My experience has been, typically,

25     bargaining from, you know, in control of

59

1     everything.  And we haven't done the most

2     favored nations approach, that's correct.

3     Q.     You've not done that?

4     A.     That's correct.

5             MS. MEHSLACK:  No further questions,

6     thank you.

7             THE COURT:  Okay.  You can step down

8     sir.

9             THE WITNESS:  Okay.

10             MR. BUTLER:  Your Honor, the

11     debtor's next witness in support of its

12     section 1113, 1114 motion is Mr. Darrell Kidd.

13     The debtors -- Mr. Kidd is divisional director

14     of labor relations at Delphi Corporation.  And

15     the debtors call Mr. Kidd to the stand for

16     cross examination in support of his

17     declaration, supplemental declarations filed

18     as Exhibits number 9, 10 and 278.  And subject

19     to cross examination, move those declarations

20     into evidence.

21          THE COURT:  Okay.

22          MR. KENNEDY:  Your Honor, the order

23   of union cross examination is going to be,

24   steelworkers, auto workers, IAM and then, if

25   necessary, IUE.


60


1           THE COURT:  Okay.  Mr. Kidd would

2    you raise your right hand, please?

3       (Witness is duly sworn.)

4           THE COURT:  For the record, could

5    you spell your name?

6           THE WITNESS:  Darrell, D-A-R-R-E-L-

7    L.  Last name, Kidd, K-I-D-D.

8    CROSS EXAMINATION BY

9    MR. PETERSON:

10   Q.   Good afternoon Mr. Kidd.  Lowell Peterson

11   for the steelworkers.  I'm going to be very

12   brief.  You mentioned the steelworks just in

13   one paragraph of your most recent declaration.

14   You said you met with the steelworkers, I

15   believe, it was Monday, May 15?

16   A.   Yes, sir.  That's true.

17   Q.   Now, that was a meeting that lasted about

18   fifteen, twenty minutes, right?

19   A.   We actually had two meetings, counselor.

20   We had one with the thermal and interior

21   division.  And then we had another meeting

22   with the automotive holdings group.  Because

23   we actually were meeting on Vandalia and then

24   we had a meeting on Home Avenue.

25   Q.   You're talking about Monday the 15th?

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

61

```
 1   A.    I'm not quite sure of the date, but
 2   around that timeframe.
 3   Q.    All right.  Well, I'm just asking you
 4   about the one you referred to in your
 5   declaration.  I know Mr. Quick has submitted
 6   an additional declaration. But let's talk
 7   about the Monday, the May 15th meeting.  That
 8   was when the USW people just first showed up
 9   in Detroit, right?
10   A.    I think so, yes.
11   Q.    All right.  Now was that the meeting,
12   perhaps you're referring to a different
13   meeting.  Is that the meeting where Mr.
14   O'Neil, the COO of the company, met with Denny
15   Bingham, the president of Local 87?
16   A.    Yes.  There was a meeting between Rodney
17   O'Neil, myself and Denny Bingham.
18   Q.    That was -- those -- the three of you
19   were the only people at that meeting then?
20   A.    That's correct.
21   Q.    All right.  And that was about fifteen,
22   twenty minutes long.
23   A.    That's what was throwing me.  That
24   meeting, in my perception, was more like an
25   hour.
```

62

```
 1   Q.    All right.
```

2    A.    I couldn't remember a fifteen minute

3    meeting that Denny and I had had.

4    Q.    All right.  Maybe it felt like an hour.

5            THE COURT:  And I'm sorry, you said

6    this is May 15th?

7            MR. PETERSON:  May 15th, yes.  Last

8    Monday.

9            THE COURT:  Okay.

10            MR. PETERSON:  A week ago, last

11    Monday.

12    Q.    And at that meeting Mr. O'Neil thanked

13    Denny Bingham for the work that the

14    steelworkers had done with Delphi in the past,

15    to help keep the company competitive, correct?

16    A.    That's correct.

17    Q.    All right. And you didn't actually get

18    into any discussions about specific terms and

19    conditions of employment, wages, changes to

20    benefit plans, at that level of detail, right?

21    A.    That's not correct.

22    Q.    Did you -- that was a negotiating session

23    at which the company made proposals and the

24    union made counterproposals?

25    A.    There was not a proposal and

63

1    counterproposal but the subject matter of that

2    meeting between Mr. O'Niel, myself and Mr.

3    Bingham was on the sites.

4    Q.    Which sites would remain open?

5    A.    That's correct.

6    Q.    All right.  Sorry.  And Home Avenue was

7   not scheduled to remain open, while Vandalia

8   is scheduled to remain open, correct?

9   A.   Our proposal was that Home Avenue would

10  be sold or closed.  And we were trying to put

11  together a process to keep Vandalia open,

12  that's correct.

13  Q.   All right.  Now when you say you're

14  trying to put together a process to keep

15  Vandalia open, are you referring to a process

16  similar to the fix-it program that had been

17  put into place in the fall of 2004?

18  A.   No, what I'm talking about is a

19  presentation that we gave to Mr. Bingham and

20  the whole executive committee of Local 87L.

21  Where we outlayed for them a proposal which

22  would bring work into the Vandalia facility

23  and allow it to continue.

24  Q.   All right.  I think we are talking

25  different meetings again.  I'm talking about

64

1   this Mon -- when did you have -- when did you

2   make that proposal that was later in the week,

3   correct?

4   A.   We had made the original proposal prior

5   to the May 15th meeting with Mr. O'Neil.  Mr.

6   O'Neil was doing a follow-up discussion with

7   Mr. Bingham because Mr. Bingham had expressed

8   concern about the viability of that business

9   that we were bringing in.

10  Q.   All right. The business that you're

11  referring to bringing in is thermal business

12    that was going to be brought into Vandalia,

13    correct?

14    A.    That's correct.

15    Q.    All right.  Business that -- and the

16    union had expressed interest in working with

17    the company to facilitate bringing that

18    business into Vandalia, correct?

19    A.    That's correct.

20    Q.    All right.  And so what your discussion

21    was, was, if you will, the business plan.

22    What kinds of products would be manufactured

23    at the Vandalia facility, rather than specific

24    deductibles of medical insurance and so forth,

25    is that --

65

1    A.    That's correct.

2    Q.    Okay.  Thank you.

3            MR. LEVINE:  Your Honor, Bruce

4    Levine, Cohen, Weiss and Simon for the

5    autoworkers.

6    CROSS EXAMINATION BY

7    MR. LEVINE:

8    Q.    Good afternoon Mr. Kidd.

9    A.    Yeah.

10    Q.    I know we've met, not only in the

11    courtroom, but out in Detroit for Mr. Rupert's

12    deposition, is that correct?

13    A.    That's correct.

14    Q.    And Mr. Rupert is one of the people that

15    you negotiate with across the table?  He's a

16    representative of the UAW, is that correct?

17    A.    Yes.  He's administrative assistant to

18    Mr. Shoemaker.

19    Q.    Uh-huh.  Very well.  And your current

20    position again is?

21    A.    I'm the executive director of labor

22    relations for Delphi.

23    Q.    Okay.  And how long have you served in

24    that capacity?  It wasn't quite clear from

25    your declaration.

66

1    A.    I lose track myself, but I think it's

2    about two years.

3    Q.    Okay.  And how have your duties changed

4    in those two years then?  I guess, I know now

5    you've stated in your declaration that you

6    negotiate the national agreement with the UAW,

7    among other things.  Is that something that

8    you also did more than two years ago?

9    A.    I guess the answer, Bruce, would be -- in

10    my previous assignment I was a divisional

11    director.  And so I was responsible for the

12    labor activities at the divisional level.  But

13    as part of those divisional activities, I also

14    sat on sub-committees with Delphi.  And in

15    previous experience, with General Motors, I

16    sat on sub-committees with General Motors, as

17    well.  In my new assignment, Mr. Butler and I,

18    coordinate national hiring for Delphi.

19    Q.    Now how long, not only in your current

20    position, have you been involved at the table

21    in negotiations with the UAW?

22    A.    Would you repeat the question?

23    Q.    For how long have you been involved in

24    negotiations with UAW, both in your current

25    position and in your prior positions?


67


1    A.    At any bargaining table?

2    Q.    Yeah, with UAW on behalf of Delphi and/or

3    GM?

4    A.    Twenty-seven years.

5    Q.    Okay.  Now, I'd like you to turn, if you

6    could to, I believe its Exhibit 89, which

7    contains the consensual proposal.  The GM

8    consensual proposal tendered to UAW --

9            THE COURT:  I'm sorry, 279?

10            MR. LEVINE:  No, I'm sorry, Your

11    Honor.  I think it's 89.

12            THE COURT:  Eight --

13            MR. LEVINE:  Eight, nine.  And for

14    the record, this is the GM consensual proposal

15    tendered to the UAW in late March of 2006.

16    Actually, I believe it was March 24, 2006.

17    Q.    Is that correct?

18    A.    That's correct.

19    Q.    And you're familiar with this document?

20    A.    Yes, I am.

21    Q.    Okay.  Turn please, to the second page.

22    Actually --

23            MR. LEVINE:  Strike that.

24    Q.    On the first and second pages, there are

25    a number of agreements between UAW and Delphi,

68

1    identified as national agreements.  Could you

2    just give the court an idea of which of those

3    agreements you've been involved with, in terms

4    of negotiating those agreements?

5    A.   Well I guess, in terms of involved with,

6    counselor, I would have been involved in the

7    2003 bargaining and the supplemental

8    bargaining in 2004.  And then when we go over

9    to pages two and three, I would have to

10   actually go through item by item, and try and

11   figure out which ones I had participated in.

12   Q.   How about any of the special attrition

13   plans on the bottom of page two, beginning

14   with the Trenton plan and going on over to the

15   Livonia plan.

16   A.   Okay.  My recollection would be the 2005

17   March 10th, Tulsa attrition plan.

18   Q.   Is that Tuscaloosa?

19   A.   Excuse me, Tuscaloosa.  Thank you.  The

20   special attrition plan for the automotive

21   holdings group at Flint West, dated July 22,

22   2004.  And I think that's it in terms of

23   attrition plans.

24   Q.   Okay.  That's fine.  Now, were any of

25   those agreements that you were involved with,

69

1    negotiated in the context of a pending

2    bankruptcy?

3    A.   No, sir.

4    Q.    And were there any deadlines associated

5    with any of those attrition agreements that

6    you were involved with?

7    A.    Official deadlines, no.  But in the case

8    of Flint West we had -- we had a generic time

9    line that we were working toward.  That plant

10   closure flowed from 2003 bargaining.  And

11   there was an understanding between the parties

12   that we would work toward what we would do

13   with the people.

14   Q.   So the parties agreed to a deadline and

15   worked to consummate an agreement within that

16   agreed to deadline?

17   A.    Yes.  But it wasn't a hard and fast date.

18   Q.    Okay.  But that's what the parties agreed

19   to?

20   A.    Correct.

21   Q.    Okay.  Now, were you involved in the

22   negotiation of the special attrition program

23   that UAW, Delphi and GM agreed to on the eve

24   of the filing of this motion, the 1113 motion?

25   A.    Only generically.

70

1    Q.    But you signed the agreement, didn't you?

2    A.    Yes.

3    Q.    Okay.  Please refer to Exhibit 72 now,

4    which, I believe, is the special attrition

5    program to which I'm referring.

6    A.    Let's see.

7    Q.    Are you there, Mr. Kidd?

8    A.    Yes, sir.

9   Q.   Look on the last page, please, page 6.

10   Right there, smack in the middle, is that your

11   signature, sir?

12   A.   Yes, sir.  It is.

13   Q.   Okay.  So you're one of three people, on

14   behalf of Delphi Corporation, who signed on to

15   the special attrition program, reached last --

16   in March, is that correct?

17   A.   That's correct.

18   Q.   Okay.  And do you know the three folks

19   from the United Auto Workers who signed off on

20   this agreement?

21   A.   Yes, sir.  I do.

22   Q.   Okay.  And you've worked with them

23   before?

24   A.   Yes, I have.

25   Q.   One of whom is Mr. Rupert, who will be

71

1   testifying in this proceeding, is that

2   correct?

3   A.   That's correct.

4   Q.   All right.  And you've negotiated with

5   the --

6           MR. LEVINE:  Withdrawn.

7   Q.   Shook their hands after this agreement

8   was consummated, do you recall that?

9   A.   I don't recall shaking their hands, but I

10   would have.

11   Q.   You would.  In the ordinary course of --

12   we bargainers tend to shake hands once we

13   consummate a collective bargaining agreement,

14    isn't that correct?

15    A.    That's correct.

16            THE COURT:   Sometimes before.

17            MR. LEVINE:   I'm sorry, Your Honor.

18            THE COURT:   Sometimes before, too?

19            MR. LEVINE:  sometimes before too,

20    Your Honor.  And sometimes not, but when we're

21    done we generally try and shake hands.

22            THE COURT:   Okay.

23            MR. LEVINE:   Go home miserable or

24    happy but glad that we've done the deal.

25    Q.    Now, I want to refer you to paragraph 25

72

1    of your supplemental declaration.  That's your

2    first supplemental declaration.  And I believe

3    that's marked as joint Exhibit 10.

4    A.    I'm sorry, Bruce, could you tell me what

5    reference you're looking for again?

6    Q.    Paragraph 25 of your supplemental

7    declaration.

8    A.    Okay.

9    Q.    Are you there?

10    A.    Yes, sir.  I am.

11    Q.    Could you refer, please, to -- give me

12    one moment please, I need to get a copy for

13    myself.

14            MR. LEVINE:   I apologize, Your

15    Honor.

16    Q.    I'm referring you to paragraph 25.  In

17    which you state, in the first sentence, "the

18    UAW's arguments that the attrition programs

19   would solve Delphi's problems."  Then you site

20   to, "UAW memorandum at 37 to 38, assume away a

21   number of contract terms that the unions have

22   never offered to modify."

23   A.   I'm sorry Bruce.  I'm in my declaration

24   at 25 and that's over time.

25        THE COURT:  Now, this is Exhibit 10?

                                                    73

1        MR. JERMAN:  Its number 9, I think.

2        THE COURT:  No, it's number 10.

3        MR. BUTLER:  Whoever was saying 9 is

4   wrong, it's 10.

5   Q.   Your first supplemental.

6   A.   Okay.  I'm there now.

7   Q.   You're there.  Okay.  Did I -- let me

8   read that sentence again. "The UAW arguments

9   that the attrition program -- programs, would

10   solve Delphi's problems.  UAW memorandum at 37

11   and 38, assume away a number of contract terms

12   that that the unions have never offered to

13   modify."  Is that your statement?

14   A.   That's correct.

15   Q.   And do you stand by that statement?

16   A.   I do.

17   Q.   Did you read the UAW's memorandum at

18   pages 37 and 38?

19   A.   Generically, yes, I've read the document.

20   Q.   Generically, or did you read those pages

21   when you swore to this declaration, or prior

22   to swearing to this declaration?

23   A.   I've went through the documents and

24    others, Bruce.

25    Q.    Well, let's look at page 37 and 38,

74

1     which, I believe, is joint Exhibit 175.

2              MR. LEVINE:   Your Honor, that's the

3     UAW's objection.

4     Q.    And when you get there, Mr. Kidd, I'd

5     like you to review pages 37 and 38 and tell me

6     if you can find, anywhere on those pages,

7     where the UAW says that the special attrition

8     programs will solve Delphi's problems?

9     A.    On 37 and 38?

10    Q.    Correct.

11    A.    Okay.   I don't, specifically, see a

12    reference that it would -- that the attrition

13    plan would solve Delphi's problems.

14    Q.    I think you could infer from those pages

15    that UAW thinks that the special attrition

16    program is a good thing, right?

17    A.    Yes.

18    Q.    And you would agree that the special

19    attrition program was an important step in

20    restructuring Delphi, correct?

21    A.    I would.

22    Q.    Yeah.   And would you believe that it was

23    a critical step?

24    A.    I believe it was an important step,

25    counselor.   I don't know that I could say that

75

1    it was a critical step.

2    Q.   Well, Delphi thinks it was a critical

3    step, doesn't it?

4    A.   I think Delphi thinks it's an important

5    step.  The reason I say important instead of

6    critical is, I suppose, there would have been

7    other ways to go about trying tot solve the

8    problem.

9    Q.   Okay.

10   A.   But I do believe it's an important step.

11   Q.   All right.  Well then, let's turn to

12   exhibit number 53, which is Delphi's press

13   release tendered to the world on the eve -- on

14   the day that the special attrition program was

15   entered into.

16          THE COURT:  Let's not.  I mean, it's

17   a press release.  I mean, critical, important.

18   In the context of a press release -- I think

19   we should move on.

20          MR. LEVINE:  Your Honor, this is an

21   exhibit that was offered by Delphi. This is an

22   exhibit that was

23          THE COURT:  All right.  Fine.  You

24   know --

25          MR. LEVINE:  Well, Your Honor -

76

1          THE COURT:  We'll spend fifteen

2    minutes on the press release, that's fine.

3          MR. LEVINE:  Your Honor, I just

4    wanted to suggest that -- I just wanted to

5    show for the record that Delphi said --

6         THE COURT:  You could point to it in

7    your brief.  It's a press release.

8         MR. LEVINE:  For the record, Your

9    Honor, I will not go into it.  But the first

10   sentence of Exhibit 53 states that Delphi

11   announced that the special attrition program

12   was a critical milestone in its restructuring.

13        THE COURT:  Okay.

14        MR. LEVINE:  That's all for that.

15        THE COURT:  I'm not doubting the

16   importance of it.  I'm just talking about how

17   people like press releases and --

18        MR. BUTLER:  We did not insert that

19   press release into the record.

20        THE COURT:  That's fine.  I'm just

21   trying to move things along.

22        MR. LEVINE:  Thank you, Your Honor.

23   Q.   Now, let's turn back to your supplemental

24   declaration, Mr. Kidd.  And I'm looking at

25   paragraphs 25 and 26.  Are you there, Mr.


                                              77


1    Kidd?

2    A.   Yes, sir.  I am.

3    Q.   I take it, and tell me if I'm wrong.  I

4    don't mean to put words in your mouth.  But,

5    are you saying there, basically, that Delphi's

6    current agreement with UAW makes it almost

7    impossible for Delphi to reduce its UAW

8    workforce?  Is that fair to say?

9    A.   Repeat your statement.

10    Q.    Well, is it your basic point that the

11    current provisions of the collective

12    bargaining agreement between the UAW and

13    Delphi, makes it almost impossible for Delphi

14    to reduce its workforce -- its UAW workforce?

15    A.    I'm not getting into semantics here, but

16    I don't think that impossible is the right

17    word, difficult, but not impossible.

18    Q.    But it is true, is it not, since Delphi's

19    spin off from GM, Delphi's hourly workforce,

20    in general, and the UAW's hourly workforce in

21    particular, has been dramatically reduced,

22    correct?

23    A.    That's correct.

24    Q.    And I'd like to review with you the

25    extent to which that hourly workforce has been

78

1    reduced.  And I would refer you, please, to

2    Exhibit 237, which is Delphi's 10K filed with

3    the SEC on March 17, 1999, specifically page

4    35.

5    A.    I think I'm there, counselor.

6    Q.    Are you there?

7    A.    I think so, yes.

8    Q.    And you see the chart there which states

9    that as of December 31, 1998, there were

10    43,150 members of the United Auto Workers

11    employed by Delphi?

12    A.    That's correct.

13    Q.    Would you, please, refer now to Exhibit

14    253, Delphi's 10K filed with the SEC on June

15    30, 2005, page 12?

16    A.    I'm there.

17    Q.    Okay.  And Delphi indicates in that

18    filing that as of December 31, 2004, Delphi

19    employed 25,200 UAW employees, is that

20    correct?

21    A.    That's correct.

22    Q.    So the workforce was reduced from -- the

23    UAW workforce with the contract provisions

24    that you discuss in your declaration

25    notwithstanding, was reduced from 43,150 to

79

1    25,200 between 1999 and the end of 2004,

2    correct?

3    A.    That's correct.

4    Q.    Okay.  And refer now, please, to

5    paragraph 11 of Kevin Butler's declaration,

6    which I believe is exhibit number --

7              THE COURT:  I'm sorry.  Which one is

8    it?

9              MR. LEVINE:  I'm sorry, Your Honor,

10    its Exhibit 7.

11              THE COURT:  Seven.

12    Q.    Paragraph 11.

13    A.    I'm there, counselor.

14    Q.    Okay.  So, according to Mr. Butler, as of

15    the date of that declaration, March 31, 2006,

16    there were 23,317 UAW represented workers, is

17    that correct?

18    A.    That's correct.

19    Q.    And you don't have any reason to dispute

20    Mr. Butler's declaration, do you?

21    A.    None.

22    Q.    Okay.  Based on my mathematical

23    calculations, it appears that the UAW hourly

24    workforce at Delphi, has been reduced forty-

25    six percent since the spin off, have any

80

1    reason to challenge those numbers and that

2    percentage?

3    A.    No, I don't.

4    Q.    Mr. Kidd, can we look to the special

5    attrition program again, please?  It's Exhibit

6    72.

7    A. Okay, counselor.

8    Q.    Okay.  Page 4, subsection 6, paragraph 6,

9    towards the bottom of page 4, are you there?

10    A.    Yes, sir.

11    Q.    I want to read that into the record.

12    "Delphi and UAW agree to the following:

13    Delphi will use temporary employees as needed,

14    to bridge any difficulties arising from the

15    implementation of the special attrition

16    program, subject to the approval of the UAW

17    Delphi national parties."  Does that

18    subsection A, give Delphi a right it does not

19    have under the national agreement, to hire

20    temporary employees?

21    A.    It basically says that the UAW will work

22    with us during the attrition plan for the use

23    of temporaries.

24    Q.    And, in fact, Delphi has been recruiting

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

25    temporary employees already, isn't that

81

1    correct?

2    A.    By recruiting, what do you mean?

3    Q.    Hiring.

4    A.    We have started bringing some temporaries

5    in, yes.

6    Q.    And but for the special attrition

7    program, you wouldn't have the right to do

8    that, isn't that correct?

9    A.    The use of temporary employees is at the

10    agreement of the UAW.

11    Q.    B reads, this is 6(b), "Delphi and the

12    UAW may agree to use separated employees as

13    contract personnel on a case by case basis, as

14    needed to bridge any difficulties arising from

15    the implementation of the special attrition

16    program."  Does that provision give Delphi a

17    right it does not have under the national

18    agreement with the UAW?

19    A.    It's basically a right we don't normally

20    have under the national agreement.

21    Q.    And that's to use contract personnel?

22    A.    That's correct.

23    Q.    And what is a contract person?  What are

24    contract personnel?

25    A.    In the context of this agreement what we

82

1    mean by that is, we would bring someone who,

2    indeed, may have been a retiree back through a

3    contract agency, for the purposes of training

4    other employees, which is something we've done

5    before.

6    Q.    Okay.  And let me read paragraph 6 --

7    subparagraph 6, paragraph 6(c), "during the

8    course of the special attrition program, the

9    eligibility of GM employees to float at Delphi

10    will be suspended.  And no additional hiring

11    obligations due to attritions or flow-backs

12    from Delphi to GM will accrue."  Does that

13    provision give Delphi rights that it does not

14    have under the national agreement?

15    A.    I believe it does.

16    Q.    Now, Mr. Kidd, I understand that you've

17    filed a second supplemental declaration in

18    connection with negotiations between UAW,

19    since the last hearing date in this matter, is

20    that correct?

21    A.    A second supplemental, yes.

22    Q.    All right.  I'm not going to ask you a

23    lot of questions about that; I'll let Mr.

24    Rupert speak for himself when he testifies.

25    But let me ask you this; is it your intention

83

1    to file a declaration every time you meet with

2    UAW during the penance of these proceedings?

3         MR. BERKE:  Your Honor, I object to

4    that.  This is a proceeding, a legal

5    proceeding and based on law and appropriate

6    procedures during 1113, 1114 and this

7   gentleman should not be tarred by his

8   attorney's determinations as to what is

9   relevant and appropriate.

10        THE COURT:  Are you objecting on the

11   basis of privilege?

12        MR. BERKE:  I'm objecting -- yeah.

13   I will also say it is irrelevant.

14        THE COURT:  All right.  Let's --

15   well, I don't know if it's irrelevant, but --

16        MR. LEVINE: Your Honor, I'll

17   withdraw the question.

18        THE COURT:  Okay.

19        MR. LEVINE:  Thank you Mr. Kidd.

20        THE COURT:  But it raises an

21   interesting and good point.  Could I, just

22   while we're on this exhibit, if you look at

23   paragraph 6(c) there on that page 4 --

24        THE WITNESS:  Uh-huh.

25        THE COURT:  What -- maybe I'm

84

1   missing something but, doesn't -- isn't that

2   inconsistent with the paragraph in your

3   affidavit that says that the attrition program

4   assumes away provisions of the contract?  This

5   seems to permit the waiver of those

6   provisions, or am I missing something.  Let me

7   take you back to -- if you look at paragraph

8   26 of your affidavit, it talks about -- no,

9   25, excuse me -- that the attrition program --

10   I'll wait till you get there.

11        THE WITNESS:  Yes, Your Honor.

12            THE COURT:  It says the attrition

13    program -- in relying on the -- I'm just

14    paraphrasing, in relying on the attrition

15    program the UAW assumes away various

16    provisions of the collective bargaining

17    agreements, such as hiring requirements that

18    are still there.  I think -- and we recognized

19    earlier that didn't -- UAW didn't really say

20    everything you said in that paragraph, but the

21    just of the paragraph was that the UAW was

22    asserting that -- notwithstanding the

23    attrition program, the company would still

24    have to continue to hire people, that's what I

25    took away from that paragraph.

85

1            THE WITNESS:  Let me see if I can

2    answer the questions.  I think what we're

3    saying is, the attrition program the UAW has

4    agreed to waive provisions for the

5    implementation of the program.  They have not

6    agreed to cancel provisions of the national

7    agreement.

8            THE COURT:  But, where else would

9    that be relevant except in connection with the

10    attrition program.  Just as far as that

11    paragraph is concerned.

12            THE WITNESS:  Well, we could --

13            THE COURT:  You're saying you can't

14    do more attrition under other normal attrition

15    processes.  You're not referring,

16    specifically, to the fact that they can do --

17    they can still, in connection with the

18    attrition program, rely on other provisions of

19    the agreement?

20             THE WITNESS:  What I'm saying is,

21    particularly as it pertains to hiring

22    requirements, which if you look at, I think

23    it's 6(c) and it talks no additional hiring

24    obligations --

25             THE COURT:  Right.


86


1             THE WITNESS:  In terms of the

2    attrition program, that's a UAW waiver in my

3    opinion.

4             THE COURT:  Okay.

5             THE WITNESS:  The hiring provisions

6    of the national agreement still exist and --

7             THE COURT:  If you have other -- if

8    people don't take advantage of the attrition

9    program and the company still wants or needs

10    to terminate.

11             THE WITNESS:  Or for sake of

12    argument, if you got passed the attrition

13    program, the hiring obligations come in.

14             THE COURT:  All right.  Okay.

15    Thanks.  But it's the company's hope that the

16    attrition program will take care of a large

17    portion?

18             THE WITNESS:  Yes, Your Honor.

19             THE COURT:  Okay.  All right.

20             MR. KENNEDY:  Your Honor, Tom

21    Kennedy, IUE-CWA.  I just had a couple of

22    questions to follow-up and then the IAM and

23    IBEW will conclude the union cross examining,

24    at least this round.

25    CROSS EXAMINATION BY

87

1    MR. KENNEDY:

2    Q.    Darrell, if you'd look at -- well, first

3    let me just ask you a question.  Maybe we

4    don't need the documents.  Mark Weber was

5    unable to answer the question.  Do you know

6    what the IUE-CWA membership was at the time of

7    the spin off?

8    A.    Not precisely, no.

9    Q.    All right.  Then why don't I direct your

10    attention to Exhibit 237, page 35.

11    A.    I'm there, counselor.

12    Q.    All right.  Do you see that the IUE union

13    representation at that time was identified as

14    15,837 represented Delphi employees?

15    A.    Yes.

16    Q.    And as we sit here today, the current IUE

17    representation in the Delphi chain is

18    approximately 8,400?

19    A.    That's correct.

20    Q.    And all of that was accomplished under

21    the current agreements, correct?  That

22    reduction in head count?

23    A.    Yes.

24          MR. KENNEDY:  All right.  No other

25    questions.

88

1    CROSS EXAMINATION BY

2    MS. ROBBINS:

3    Q.    Good afternoon, Mr. Kidd.

4    A.    Good afternoon, counselor.

5    Q.    Marianne Robbins representing the IAM and

6    the IBEW.  In your initial declaration you go

7    through a number of the contract provisions in

8    the various labor agreements.  Do you happen

9    to know what the overtime provision is for

10   first-line supervisors?  These are salaried --

11   they're non-bargaining unit employees.

12   A.    Specifically, no I don't.

13   Q.    Okay.  Do you have any knowledge of the

14   specific contract provisions for the IAM and

15   IBEW?

16   A.    No, I do not.

17   Q.    This is going to be a quick examination

18   if things keep going this way.  You also have,

19   in your declaration, a number of references to

20   information requests.  Do you have any first-

21   hand knowledge concerning responses to the

22   information requests of the IAM and IBEW?

23   A.    I'm sorry, repeat the question.

24   Q.    Do you have first-hand knowledge of the

25   responses to the request for information made

89

1    by the IAM or the IBEW?

2    A.    No, I do not.

3    Q.    Would you agree that the company has not

4    put together any specific cost savings for the

5    language issues that you describe in your

6    declaration?  I think it starts at about

7    paragraph 37 and it goes through 49.

8    A.    Specific individualized costing by

9    element?

10    Q.    Of language issues.

11    A.    Uh-huh.

12    Q.    Such as, if there was a change in the

13    current contract language, and I'm not talking

14    about economic issues such as wages, but you

15    go through a number of issues concerning

16    changes in language you would like to see, and

17    I'm asking whether you would agree that the

18    company has not done any costing of those, in

19    terms of the cost savings that would be

20    realized by changing the language?

21    A.    No, I cannot agree that we haven't done

22    any.

23    Q.    Okay. Would you agree that you have not

24    shared any of the information concerning cost

25    savings with the IAM and IBEW?


90


1    A.    Repeat your question, counselor.  Repeat

2    your question.

3    Q.    Okay.  I'm sorry.  I think I've got a

4    solution to this problem.  That is, stand up

5    straight and not get to close to the

6    microphone.  Do you -- would you agree that

7    you have no direct knowledge of whether any

8    costing information on specific language

9    proposals has been provided to the IAM and

10    IBEW?

11    A.    That's correct.

12    Q.    Would you agree that the penny sheets

13    that you make reference to do not show any

14    cost savings from language issues, such as,

15    you know, a change in successorship language,

16    or things of that sort?

17    A.    The penny sheets would not show reference

18    to change in successorship.

19          MS. ROBBINS:  No further questions.

20          THE COURT:  Okay.

21          MR. BERKE:  Your Honor, if that

22    concludes the cross examination, I would

23    conduct a little bit of re-direct.

24          THE COURT:  All right. All done?

25    Yes.  Okay go ahead.


91


1          MR. BERKE:  Thank you.  Your Honor,

2    I'm Jay Berke from Skadden Arps, representing

3    Delphi Corporation.

4    REDIRECT EXAMINATION BY

5    MR. BERKE:

6    Q.    Now, Mr. Kidd, you were asked questions

7    about reduction in head count of UAW and IUE

8    member employees, which occurred prior to the

9    special attrition program, is that correct?

10    A.    That's correct.

11    Q.    And can you tell us, with respect to the

12    UAW reduction in head counts that were

13    referred to, how did those come about?

14    A.    Well, in some cases they were part of

15    attrition programs like the Tuscaloosa special

16    attrition program.  In other cases it's normal

17    attrition.

18    Q.    And when you say attrition programs like

19    the Tuscaloosa, what do you mean?  What was

20    the Tuscaloosa program?

21    A.    Tuscaloosa was a UAW Delphi site that

22    had, basically, lost its product and we

23    agreed, between the parties, to do two things.

24    One, we ran an attrition program so that we

25    could alleviate the jobs bank.  And two, we

92

1    agreed to transfer some of the employees to

2    Cottondale, which was another Delphi site.

3    Q.    So, could you have just attrited

4    employees at the Tuscaloosa site without

5    negotiating and without giving something up

6    for it?

7            MR. LEVINE:  Objection, Your Honor,

8    leading.

9            THE COURT:  Sustained.

10            MR. BERKE:  Sustained?

11    Q.    Well, in the program, did the Tuscaloosa

12    attrition program cost Delphi anything?

13    A.    Yes, it did.

14    Q.    What did it cost?

15    A.    We, basically, ran a program that was, as

16    I recall, 89,000 dollars to have an employee

17    leave the Tuscaloosa site.  And, as I recall

18    counselor, there was more to the attrition

19    plan than that, but that was the piece that

20    sticks out in my mind.

21    Q.    And when you say, as you recall there was

22    more than that, are you saying you can't

23    remember what else was there?

24    A.    That's correct.

25    Q.    And how about the attrition of the IUE

93

1    employees.  Do you know how that came about?

2    The pre -- special attrition program,

3    attrition of IUE employees, which Mr. Kennedy

4    asked you about?

5    A.    Again, I would think it would be two

6    things.  Normal ordinary attrition people,

7    retiring people quitting, that sort of things,

8    and then special attrition programs.

9    Q.    And when you have normal and ordinary

10    attrition, does that cost the company

11    anything?

12    A.    Well, it cost the company in terms of the

13    pension plan.

14    Q.    And what about OPEB?

15    A.    And OPEB.

16    Q.    Anything else?

17    A.    Life insurance in retirement.

18    Q.    And does the company have any obligations

19    to back fill any of those positions that were

20    normally attrite?

21    A.    With the IUE?

22    Q.    With the IUE or the UAW.

23    A.    With the IUE, normally not.    With the

24    UAW, we do have secured employment level

25    provisions.    However, they have not been

94

1    implemented lately.

2    Q.    Okay.  Now, would you turn, with me, to

3    Exhibit 76?  Which was the special attrition

4    program, I believe.  72.  That is 72 not 76.

5    A.    I'm there, counselor.

6    Q.    And I believe during your cross

7    examination your attention was directed to

8    paragraph 6 on page 4 of that program,

9    correct?

10    A.    That's correct.

11    Q.    In 6(a) it says, "Delphi will use

12    temporary employees as needed to bridge any

13    difficulties arising from the implementation

14    of the special attrition program, subject to

15    the approval of the UAW, Delphi national

16    parties," correct?

17    A.    That's correct.

18    Q.    What do they mean when they say, to

19    bridge any difficulties?  What sort of

20    difficulties were contemplated?

21    A.    What we were contemplating at that point

22    in time is, when you run an attrition program

23    you normally get a preference from the

24    employee of when they would like to retire,

25    particularly.  And if you try and meet those

95

1    retirement dates, sometimes you find yourself

2    in a situation where, for a short period of

3    time, you still need an employee at that work

4    station.  So this was a provision to alleviate

5    that concern.

6    Q.    And was there -- were there provisions

7    elsewhere in this agreement that said, you

8    were required to accommodate the employee on

9    when he or she wanted to leave?

10   A.    Required, no.

11   Q.    But the company would attempt to do,

12   wouldn't they?

13   A.    The parties would work together.

14   Q.    The parties would want to do so, because

15   that would encourage individuals to take

16   advantage of the special attrition program,

17   correct?

18   A.    Certainly.

19   Q.    And so, this doesn't provide, does it,

20   6(a), that you absolutely can use temporary

21   employees when there is attrition under the

22   program?

23   A.    It's subject to the approval of the UAW.

24   Q.    So, how do you know when you can use

25   them, these temporary employees, and when you

96

1    can't use them?

2    A.    I know when the United Auto Workers tell

3    me they're in agreement.

4    Q.    So this was something that would be

 5    subject to discussion as you went along, is

 6    that correct?

 7    A.   Certainly.

 8    Q.   Can you tell me how the unions were

 9    able --

10           THE COURT:  It works better if you

11    don't lead.  It just -- it comes off better.

12    I'd like to hear him answer it.

13           MR. BERKE:  Okay.

14           MR. SIMON:  Your Honor, we have been

15    more than tolerant.  But what's good for the

16    goose is good for the gander, I mean.  This

17    counsel has been fairly aggressive in his

18    objections.  I think we have been fairly

19    limiting in our objections.

20           THE COURT:  Anyway I -- I know

21    you're trying to move things along but --

22           MR. BERKE:  Duly chastised by Mr.

23    Simon and the Court.

24           THE COURT:  Okay.

25           MR. BERKE:  Apologetic to both.


                                              97


 1    Q.   Do you know how it was that the UAW was

 2    able to approve this program, if there were

 3    issues such as 6(a) that were subject to

 4    discussion in it?

 5    A.   How they were able to approve it?  My

 6    opinion would be that they approved it based

 7    on historical practice of having run attrition

 8    programs before.

 9    Q.   Now, does the special attrition program

10    permit forced involuntary attrition?

11    A.    Forced involuntary?

12    Q.    Correct.

13    A.    No.

14    Q.    Does it permit Delphi to close or wind

15    down any facilities?

16    A.    No, it does not.

17    Q.    Does it permit Delphi to sell any

18    facilities?

19    A.    No, it does not.

20    Q.    Does it permit Delphi to lower any wage

21    for benefits in existing contracts?

22    A.    It is exclusively an attrition program.

23    Q.    And does it have a time span in it?

24    A.    I don't recall.

25    Q.    And is it binding on any employee, such

98

1    that he or she is required to accept attrition

2    pursuant to the program?

3    A.    This is a voluntary special attrition

4    program.

5             MR. BERKE:  Okay.

6             THE COURT:  Okay.

7             MR. BERKE:  Nothing more.

8             THE COURT:  Any re-cross?

9             MR. LEVINE:  No thank you, Your

10    Honor.

11             MR. KENNEDY:  I just have one or two

12    problems, Your Honor.

13             THE COURT:  I'm sorry.

14    RECROSS EXAMINATION BY

15    MR. KENNEDY:

16    Q.    Just to clarify the back-fill

17    arrangements that you discussed on re-direct.

18    Most of the IUE plants do not require the

19    employer to re-hire individuals who attrite

20    for any reason, correct?

21    A.    That's correct.

22    Q.    Is it also true that the Warren, Ohio

23    facilities that the IUE represents there, has

24    in place a job and income security agreement?

25    A.    I believe that's true.

99

1    Q.    And the job and income security

2    agreement, for a substantial period of time,

3    required the company to back-fill one

4    individual for each three who attrited?

5    A.    I believe that's correct.

6    Q.    And isn't it also true that the IUE

7    waived, in recent years, any commitment by the

8    company to back-fill jobs because of the lack

9    of available work at Warren?

10    A.    I believe that's correct also.

11    Q.    And that was done under the existing

12    contract?

13    A.    Yes.

14    Q.    All right.  Thank you.

15          THE COURT:  No other recross?  Okay,

16    you can step down Mr. Kidd.

17          THE WITNESS:  Thank you.

18          MR. BUTLER:  Your Honor, the next

19    witness the debtor's would call in support of

20    its section 1113, 1114 motion is Bernard J.

21    Quick.  Mr. Quick is a director of labor

22    relations at Delphi Corporation.  And we call

23    him for cross examination in connection with

24    his declarations and supplemental directions

25    that have been marked as Exhibits 11, 12 and

100

1    279.  And I call him for cross examination in

2    connection with those declarations which we

3    move into evidence subject to cross

4    examination.

5              THE COURT:  Okay.

6              MR. KENNEDY:  Your Honor, the order

7    of union cross examination would be the

8    steelworkers and then the IUE-CWA.

9              THE COURT:  All right.  Mr. Quick

10   would you raise your right hand please?

11             THE WITNESS:  Yes, sir.

12      (Witness is duly sworn.)

13             THE COURT:  Okay.  And would you

14   spell your name for the record?

15             THE WITNESS:  Yes.  B-E-R-N-A-R-D Q-

16   U-I-C-K.

17   CROSS EXAMINATION BY

18   MR. PETERSON:

19   Q.   Good afternoon, Mr. Kidd.  Lowell

20   Peterson, steelworkers.

21   A.   Counselor, good afternoon.

22   Q.   You've been anticipated.  Your

23   declarations are in front of you now, that's

24   great.  I want to start though with something

25    a little different, which is the Vandalia fix-

101

1    it program.  Are you familiar with that?

2    A.    Somewhat, yes sir.

3    Q.    In the fall of 2004, the steelworkers

4    negotiated modifications to the contract

5    covering the Vandalia plant at the request of

6    the company.  Does that sound right?

7    A.    That's correct.

8    Q.    Now, one of the agreements there, with

9    respect to the Vandalia fix-it program was

10    that the COLA provisions of the contract would

11    be suspended.  In other words, there would be

12    no COLA for the balance of the contract, does

13    that sound right?  COLA being, cost of living

14    adjustment.

15    A.    I think suspended is the correct word.

16    They weren't eliminated.

17    Q.    Well, there wouldn't be any pay increases

18    or any payments because of increases in the

19    cost of living, right?

20    A.    That's correct.  It would be frozen.

21    Q.    So in your declaration, where you said

22    that there are COLA provisions in various

23    collective bargaining agreements, at this

24    point that doesn't include Vandalia, correct?

25    A.    I don't think Vandalia, at the current

102

1    time, was a COLA provision that froze.

2    Q.    I'm sorry.

3    A.    They do not, at the current time, to my

4    understanding, have a COLA provision that

5    continues to escalate up or down.  It's

6    frozen.

7    Q.    Right.  And that was pursuant to the

8    negotiations in the fall of 2004?

9    A.    Yes, sir.

10    Q.    All right.  Now, there was a three

11    percent annual improvement factor in the

12    Vandalia contract also, which has been frozen,

13    pursuant to that fix-it negotiation, correct?

14    A.    I'm not positive of that, but it's very

15    possible.

16    Q.    There is a 4,000 -- excuse me, four

17    percent performance bonus that was in the

18    contract, and that has been frozen me for the

19    length of the agreement, correct?

20    A.    That's probably accurate, but I'm not

21    positive.

22    Q.    Shift premiums were reduced, pursuant to

23    that agreement, correct?

24    A.    Yes, they were.

25    Q.    All right.  There were modifications in

103

1    work groups and other language in the

2    contract, correct?

3    A.    I'm not aware of what they were, but

4    probably there were.

5    Q.    All right.  To increase the flexibility

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

```
 6   of the company in assigning personnel, for

 7   example.  Is that a fair statement?

 8   A.   I'm not aware of any specifics but that,

 9   you know, that's the sort of thing that you do

10   during bargaining.

11   Q.   All right.  Let's talk about the

12   attrition program.  It's true, isn't it, that

13   the representatives of the steelworkers, that

14   would mostly the Local folks, Dennis Bingham

15   and others from Local 87.  You know those

16   folks, right?

17   A.   Very well.

18   Q.   Yeah.  You have negotiated with them over

19   the course of a number of years, right?

20   A.   Correct.

21   Q.   Now, from really the time of -- sometime

22   December '05, January '06 to the present, Mr.

23   Bingham and others at the Local have asked

24   Delphi to make an attrition proposal to the

25   union, does that sound right?
```

104

```
 1   A.   I think during the early part of your

 2   timeframe there was dialogue with the United

 3   Steelworkers -- excuse me.  During the early

 4   part of your timeframe, you just identified,

 5   there was some preliminary discussions with

 6   the United Steelworkers.  At the time there

 7   was bargaining going on between General Motors

 8   and the UAW over this plan.  And periodically

 9   we would have conversations, dialogue,

10   meetings to, kind of, give the steelworkers,
```

11    kind of, an update as to what the progress was

12    with those discussions.

13    Q.    And the steelworkers -- and you indicated

14    to the steelworkers that it was Delphi's

15    intent to make a similar -- to discuss a

16    similar attrition program with the

17    steelworkers, correct?

18    A.    It would be our intent.

19    Q.    Uh-huh.  And at various points the

20    steelworkers said to you, we would like this

21    proposal.  When are we going to get this

22    proposal, is that right?

23    A.    That's accurate.

24    Q.    And in fact that -- on a number of

25    occasions you said to the steelworkers yes, an

105

1    attrition program is in the works, we will

2    make this proposal to you in the future, is

3    that a fair statement?

4    A.    I think that's fair, yes.

5    Q.    And the steelworkers said, if you were

6    able to negotiate an attrition program, that

7    will reduce the average wage at our

8    facilities, because the higher paid people

9    would be the people most likely to take the --

10    to attrite under the attrition program, is

11    that accurate?

12    A.    I don't recall that statement.

13    Q.    You don't recall Mr. Bingham saying to

14    you that an attrition program would make the

15    wages more competitive at the steelworkers

16    representative plants?

17    A.    I don't recall him saying that, no.

18    Q.    Is it accurate that the people most

19    likely to take -- to attrite under an

20    attrition program would be the higher paid

21    people.  That is to the say, the people at the

22    so-called non-competitive wage?

23    A.    It depends on the -- what kind of an

24    attrition plan you're running.

25    Q.    All right.  But that's -- do you recall

106

1    whether that's the kind of attrition program

2    the USW suggested that it thought Delphi was

3    going to make -- going to propose to it?

4    A.    Well, the USW was very familiar with the

5    attrition program that was being negotiated

6    between the United Auto Workers and General

7    Motors.  They attend all the meetings that the

8    UAW calls.  So they are tuned up, they know

9    what's on the table and they, you know, can

10   anticipate what's coming.  Our history with

11   the United Steelworkers is pattern bargaining.

12   Q.    Well, I don't want to get distracted too

13   much from attrition but you're not saying that

14   the steelworkers attended every meeting

15   between Delphi and the UAW, are you?

16   A.    No, I didn't say that.  I said, they

17   attend meetings between the UAW and General

18   Motors.  And whenever the UAW has a meeting,

19   they invite the steelworkers to the meeting.

20   Q.    These are the informational meetings at

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

21   which --

22   A.   Correct.

23   Q.   -- the updates are given, correct?

24   A.   Correct.

25   Q.   All right.  You're not talking about

107

1    these steelworkers being invited to

2    negotiations?

3    A.   No.

4    Q.   All right.  So, let's get back to

5    attrition.  The first time that Delphi

6    actually made an attrition proposal to the USW

7    was on May 16 of this year, correct?

8    A.   I think that's accurate.  Was that, like,

9    a Tuesday?

10   Q.   Yeah, I think that's Tuesday.

11   A.   Yeah, that's accurate.

12   Q.   All right.  And you had a meeting with

13   the USW in Troy to go over the contents of the

14   attrition program, is that right?

15   A.   That's correct.

16   Q.   And you referred to that meeting --

17   that's one of the meetings you referred to in

18   your second supplemental affidavit, correct?

19   A.   Correct.

20   Q.   Now, there was some open items, even in

21   the proposal that were -- that was given to

22   the USW, correct?

23   A.   That's correct.

24   Q.   Including dates and even some of the

25   dollar figures, is that a fair statement?

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

108

1    A.    That's a fair statement.

2    Q.    And it wasn't until, I guess, Thursday,

3    May 18, that Delphi made a proposal to the USW

4    that filled in those blanks, is that a fair

5    statement?

6    A.    I can't recall if it was the next day or

7    two days later, but, you know, it was in that

8    same -- that timeframe.

9    Q.    Okay.  And the USW made a counterproposal

10   two days later to the company's attrition

11   program, correct?

12   A.    Don't hold me to the date, but yeah.  It

13   was certainly after our second proposal that

14   filled in the dates.

15   Q.    Okay.

16   A.    It might have been the 19th, it might

17   have been the 20th.  It might have been on the

18   weekend because we -- we went all weekend.

19   Q.    Yeah.  The USW people stayed in Troy

20   until this past Monday, the 22nd, correct?

21   A.    That's correct.

22   Q.    Now, let me ask you a little bit about

23   the attrition proposal.  Not so much the

24   details of it, because this is a work in

25   progress, but when the company presented this

109

1    attrition proposal to the union, did it say

2    that this was part of the 1113 term sheet.

3    That is to say, the proposed modifications to

4    the collective bargaining agreement?

5    A.    I'd have to look at the actual document

6    to see how it's titled.

7    Q.    Well, is the attrition program -- let me

8    phrase this a different way.  Is the proposed

9    attrition -- the attrition program proposed by

10   Delphi bound to the USW agreement to other

11   modific -- or to modifications in the current

12   collective bargaining agreement?

13   A.    Yes.  The way we've agreed to proceed

14   with the steelworkers is a one-step process.

15   Q.    Well --

16   A.    Everything is included before anything is

17   finalized.

18   Q.    Well, the steelworkers haven't agreed to

19   that.

20   A.    Yes, I believe they have.

21   Q.    You're saying the steelworkers have

22   agreed that they don't get an attrition

23   program unless they agree to cut their

24   contract?

25   A.    They said that it is part of the total

110

1    package.  Nothing is settled until everything

2    is settled.

3    Q.    Well, the steelworkers have told you that

4    they believe that an attrition program is a

5    necessary first step to addressing Delphi's

6    labor cost, isn't that the way they put it?

7    A.    No, sir.  That is not the way they put

8    it.

9    Q.    Is Delphi willing to negotiate an

10   attrition program without reductions in wages

11   by the steelworkers?

12   A.    Our plan is to proceed as we've agreed

13   with the union and that's to try to wrap

14   everything up all at one time.

15   Q.    All right.  Now, have you done an

16   analysis -- you Delphi, are you familiar with

17   an analysis by Delphi of the impact of this

18   attrition proposal on Delphi's steelworkers

19   represented workforce, headcount, wages,

20   etcetera?

21   A.    Can you be more specific?

22   Q.    Well, have you looked at what -- how many

23   people are going to take the attrition

24   proposal, for example?

25   A.    We've modeled it, yes, sir.

111

1    Q.    And what do your models indicate in terms

2    of the effect on the wage rate?  The actual

3    wage rate.

4    A.    Well, the attrition plan, itself, doesn't

5    impact the wage rate.  It will just reduce

6    people from the workforce through retirement.

7    Q.    Right. But have you identified what wages

8    the people who are likely to take the

9    attrition are currently making?

10   A.    Well, I think, historically, it would be

11   your higher seniority employees.

12   Q.    Right.

13    A.    Those are the one who would have; you

14    know, enough years to qualify for the

15    attrition plan.

16    Q.    Right.

17    A.    Right.

18    Q.    It would mostly be the people earning

19    the, so-called, traditional wage, right?

20    A.    I think that's accurate.

21    Q.    All right.  So the people who are earning

22    the starting rate of eight dollars or ten

23    dollars an hour, probably do not have enough

24    seniority to qualify under the attrition

25    program, correct?

112

1    A.    I'd agree with that.

2    Q.    All right.  So, in fact the average

3    wages, if you will, in the steelworkers unit,

4    would be reduced as people took these --

5    A.    Yeah, they probably would.

6    Q.    But have you analyzed how much?

7    A.    I have not.

8    Q.    Now, when you made the proposal to the

9    steelworkers for an attrition program, did you

10    say whether General Motors had agreed to fund

11    it?

12    A.    No, we did not say it was contingent.

13    Q.    I want to make sure I understood your

14    answer.  You said it was contingent on GM

15    funding it, correct?

16    A.    Yes, sir.

17    Q.    All right.  And you also said that GM had

18    not agreed to fund it, correct?

19    A.    That's correct.

20    Q.    So, if GM doesn't fund it, there's no

21    attrition program, correct?

22    A.    Not the way it's designed there.  It'll

23    have to be rebargained.

24    Q.    USW has never demanded a "me too"

25    approach to bargaining here, has it?

113

1    A.    In this context?

2    Q.    This round, yes.  This time around.

3    A.    Not that I'm aware of.

4    Q.    Okay.  If you could take a look at your

5    supplemental declaration and I wish I could

6    tell you I knew the exhibit number, but I --

7                MR. BUTLER:  Which one?

8                MR. PETERSON:  The supplemental.

9                MR. BUTLER:  The first one is 12.

10               MR. PETERSON:  Twelve.  Thank you.

11               MR. BUTLER:  The second one is 279.

12    Q.    All right.

13    A.    Okay.  The exhibit?

14    Q.    Yeah, the last page.  Delphi USWA

15    Meetings.  This is the supplemental.  Yeah,

16    he's got it.  All right, this is the chart.  I

17    just want to go through them.  The first one

18    you have on the chart is October 25, 2005.

19    You see that?

20    A.    Yes, sir.

21    Q.    That's the meeting at which the company

22    presented its October 1113 proposals to the

23    union, correct?

24    A.    I think that's correct.

25    Q.    All right.  And those, I think we've

114

1    established, those were all withdrawn in

2    December of 2005, correct?

3    A.    Conditionally withdrawn, yes.

4    Q.    Okay.  So the meetings -- the next

5    meeting on the list here is February 21, 2006?

6    A.    That's the next meeting on this list,

7    correct.

8    Q.    There was no contract modification

9    proposal on the table during that meeting,

10    correct?

11    A.    Well, as I said, the one that was

12    withdrawn in December was a conditional

13    withdrawal.

14    Q.    Well, conditioned on what?

15    A.    It was conditioned on continuing to

16    bargain with our unions to try to get some

17    additional financial relief from General

18    Motors, but in the absence of that, the

19    October or the November 15th proposal was

20    still on the table.

21    Q.    Well, that isn't what you discussed.  You

22    didn't discuss the details of the November or

23    October proposal at this February 21 meeting

24    with the Steelworkers, correct?

25    A.    I'm trying to remember what we -- you

1    know -- what we did discuss at that meeting.

2    My recollection is that we had a site walk

3    review with the Steelworkers during that

4    meeting which is part and parcel to our total

5    consensual proposal.

6    Q.    Site walk review at Home Avenue?

7    A.    Right.

8    Q.    "Site walk review" means going around the

9    plant and doing what?

10   A.    No, site walk review means what our

11   proposal contains vis-a-vis what plants we're

12   going to keep, sell, close and that's what we

13   reviewed.

14   Q.    All right.  And as of February 21, 2006,

15   had a determination been made to sell or close

16   the Home Avenue facility?

17   A.    Yes.

18   Q.    And this was -- you informed the

19   Steelworkers of that at that time?

20   A.    Yes, we did.

21   Q.    All right.  That was the content of that

22   meeting?

23   A.    That was the principal content, right.

24   Q.    All right.  Next one is March 21 in Troy.

25   Again, there was no bargaining proposal on the


116

1    table subject to your comment about it being

2    having been conditionally withdrawn, correct?

3    A.    There wasn't any additional one put on

4    the table, that's correct.

5    Q.    All right.  The next two you've got, also

6    at the hotel in Troy, March 22 and March 23,

7    those are listed as joint meetings.  Those

8    were big sessions at which a number of unions

9    got together and heard presentations about the

10   status of negotiations with the UAW, correct?

11   A.    My recollection was that we did have

12   multi-unions, the IUE and the Steelworkers, in

13   some of the meetings.  The meetings were also

14   attended by Delphi corporate folks as well as

15   General Motors executives.  And again, we

16   walked through the site review plants with the

17   full committee so that everybody knew exactly

18   what was contained in our proposal.

19   Q.    So that was what happened on the 22nd and

20   23rd?  These were these big meetings attended

21   by GM, Delphi, the three major unions and

22   these were presentations of information about

23   what the company planned to do in terms of its

24   footprint, if you will?

25   A.    The UAW was not present.


117


1    Q.    All right.  Steelworkers and IUE, GM,

2    Delphi talking about the business plan, if you

3    will?

4    A.    Right.

5    Q.    Okay.  Now, the next one here is March

6    30.  Now, that is, I take it, after the

7    company had tendered the dual proposal to the

8    Steelworkers that is the subject of this

9   proceeding?  That is to say, the competitive

10   benchmark and GM consensual proposal?  You

11   recognize what I'm referring to with those

12   terms?

13   A.    Yes, sir, and that's accurate.

14   Q.    Okay.  On March 30, do you recall how

15   long that meeting lasted?

16   A.    Three hours perhaps.

17   Q.    And that was an information meeting and

18   the union was asking questions about specific

19   details in the company's proposals, correct?

20   A.    Part of the bargaining process, correct.

21   Q.    That's been part of the bargaining

22   process you've gone through with the USW over

23   the years, correct?

24   A.    Correct.

25   Q.    It takes some time to go through the

118

1   proposals and talk through what exactly they

2   mean and how they would work, correct?

3   A.    That's correct.

4   Q.    And that's what happened here?

5   A.    That's correct.

6   Q.    All right.  And at that meeting, Delphi

7   indicated that it needed General Motors'

8   support to make the GM consensual proposals

9   work, correct?

10   A.    That's correct.

11   Q.    And that GM support had not yet been

12   committed to, correct?

13   A.    That's correct.

14    Q.    The next meeting listed here is April 4,

15    2006 back in Troy.  It says "Health Care."

16    That was a meeting at which the union asked

17    questions about the company's health care

18    proposals, correct?

19    A.    Yeah.  At the meeting in Dayton on the

20    30th, there were a number of issues that came

21    up that we needed to do some more research on

22    and we agreed to do that and try to get back

23    with the Steelworkers as quick as possible.

24    And the meetings we set up at Troy the

25    following week were intended to, in fact, do

119

1    that.

2    Q.    So, what you were talking about on the

3    4th were answers to some questions about the

4    health care proposals?

5    A.    Yes, sir.

6    Q.    And additional -- the union asked some

7    additional questions based on those answers,

8    correct?

9    A.    I'm sure they did.

10    Q.    There was a fair amount of change

11    involved in the health care proposal, correct?

12    A.    That's correct.

13    Q.    Union wanted to know how it would affect

14    its members in some detail, correct?

15    A.    Yes, sir.

16    Q.    Union asked some questions about the cost

17    savings that Delphi expected from these

18    proposed changes, correct?

19    A.    Yes, they did.

20    Q.    And, in fact, even on April 4, the

21    company said well, we'll have to get back to

22    you with answers to some of your questions

23    about the health care plan, correct?

24    A.    That's my recollection.

25    Q.    Let me take you down to the next day,

120

1    April 5.  It says "Pensions."  I gather that

2    was a meeting at which Delphi answered some of

3    the unions' questions about the pension plan

4    proposals, correct?

5    A.    That's correct.

6    Q.    And the union asked for -- asked more

7    questions based on those answers, correct?

8    A.    I'm sure they did.

9    Q.    And even at that point, the company said,

10    well, we have to get back to you with some of

11    the answers to some of your questions,

12    correct?

13    A.    That's correct.

14    Q.    All right.  The next meetings listed here

15    are April 6 and April 12 of this year.  April

16    6th is "Vandalia Transformation" and the 12th

17    is "Transformation Sheet."  Let me start with

18    April 6th.  What do you mean by "Vandalia

19    Transformation"?

20    A.    I can't recall if I was in that meeting,

21    but I can give you generally what I believe

22    the meeting was about.

23    Q.    I thought this exhibit indicated that

24    these were the meetings that you personally

25    attended.

121

1    A.    Yeah, maybe I was at that one.  There's

2    been two or three on this particular topic and

3    your -- if that's what the record shows.  I

4    was at one of them, that's correct.

5    Q.    Well, so, the one that you were at, and

6    let's presume it was April 6th --

7    A.    All right.

8    Q.    -- what was discussed?

9    A.    All right.  Generally, the discussion

10    centered around what the company's proposal

11    was for the Vandalia site going forward.  The

12    products that were there, what the intent was

13    to do with those products and the intent as to

14    what products would be coming in to backfill

15    the products that were leaving.  So that's the

16    transformation piece.

17    Q.    Is it transformation, if you will, of the

18    product line at Vandalia?

19    A.    Correct.

20    Q.    All right.  And, broadly speaking, that

21    could be summarized by saying the Vandalia

22    plant will be focused more on thermal products

23    now and the non-thermal products would be sent

24    elsewhere or discontinued.  Is that a fair

25    summary of the discussion?

122

1    A.    Yes, it is.

2    Q.    Because that's a potentially profitable

3    product line for Delphi to be in, correct?

4    A.    It's a plant that we would like to keep

5    operating and make money at, correct?

6    Q.    In the thermal area?

7    A.    Correct.

8    Q.    All right.  Now, the April 12 meeting

9    back in Dayton, that was a short meeting,

10   wasn't it, if you recall?

11   A.    I can't recall.

12   Q.    Is it fair to characterize as an update

13   on the sort of product transformation

14   discussions that had taken place on the 6th?

15   A.    Again, I can't recall.

16   Q.    Let me ask you about your second

17   supplemental affidavit -- excuse me,

18   declaration.  279, I think.  I want to get a

19   sense of what the discussions have been.  I

20   guess, the discussions started on -- that you

21   were involved in started on May 16, according

22   to your supplemental -- second supplemental

23   declaration.  If you want to take a look at it

24   to refresh your recollection, that's fine with

25   me.  USW stuff starts on page 3.  You didn't

123

1    participate in the May 15 discussions,

2    correct?  That's the Monday.

3    A.    No, that was done at TNI headquarters and

4    I was meeting, I believe, with the IUE at the

5    time, so I was not there.

6    Q.    So, I think you've testified that, to the

7    best of your recollection, that Tuesday, the

8    May 16th, is when Delphi first presented an

9    attrition proposal to the USW?

10   A.    Yes, sir.

11   Q.    Okay.  That was the subject of the

12   meeting on the 16th.  Delphi went through the

13   terms of its proposal and the union asked it

14   some questions, correct?

15   A.    Yes.

16   Q.    All right.  That meeting lasted

17   approximately 45 minutes?

18   A.    That's probably close.

19   Q.    Now, the next USW meeting you mention is

20   May 19 and you say "members of my staff met

21   with the USW."  Were you not present at that

22   meeting?

23   A.    I was not.

24   Q.    Then I won't ask you a lot of details,

25   but is it your understanding that that meeting

124

1    was to discuss information that the union

2    needed to evaluate the attrition proposal?

3    A.    No, I think the meeting was focused on

4    Vandalia as opposed to the attrition program.

5    Q.    All right.  That's the transformation

6    plan again?

7    A.    Yes, sir.

8    Q.    All right.  You mention a Sunday, May 21

9    meeting.  That's the meeting at which the USW

10   made its counterproposal to the attrition

11    program, correct?

12    A.    That's my recollection.

13    Q.    All right.  It is what you said in

14    Paragraph 9.  And the next day, Monday, that

15    meeting lasted about an hour, correct?  You

16    discussed subcommittees to break down the

17    various issues still to be discussed between

18    the parties and how to go forward in the

19    discussions.  Is that a fair characterization

20    of Monday's meeting?

21    A.    Yes, I think we were setting the stage

22    for how bargaining was going to proceed.

23    Q.    Now, in the course of these Vandalia

24    transformation discussions, the company hasn't

25    proposed greater wage cuts than the wage cuts

125

1    it proposes in its 1113 proposals, has it?

2    A.    Define "greater."

3    Q.    Cutting more -- cutting wages lower.

4    Cutting more off the wages than it is proposed

5    in the 1113 proposals.

6    A.    I believe there is a lower floor, yes.

7    Q.    So, the company's got three sets of

8    proposals on the table now.  The competitive

9    benchmark, the GM consensual and now an even

10    lower proposed set of wages in connection with

11    Vandalia.  Is that a fair statement?

12    A.    We have plant specific issues at Vandalia

13    that are different than some of our other

14    operations.  And part --

15    Q.    No, I'm focusing on the wage proposals.

16    A.    Right.

17    Q.    Yeah.  So you got three sets of wage

18    proposals on the table.  Is that a fair

19    statement?

20    A.    We've got the benchmark proposal; we've

21    got the GM consensual proposal and this Local

22    proposal.  That's right.

23    Q.    And the Local is the lowest of all?

24    A.    Yes, it is.

25    Q.    And Home Avenue is scheduled to be sold

126

1    or closed, correct?

2    A.    We're talking about Vandalia.   Are you

3    switching --

4    Q.    No, Home Avenue is going to be closed or

5    sold, correct?

6    A.    We were talking about Vandalia before.

7    Q.    I know.  I'm asking you a question.

8    That's right.

9    A.    Okay.  Yes.  Yes, sir, it is.

10    Q.    So, the only going forward work force is

11    going to be Vandalia?

12    A.    That's our proposal.

13    Q.    Right.  So these three sets of proposals

14    would affect Vandalia?

15    A.    Portions of them, yes.

16    Q.    What is it exactly that you're proposing

17    in the way of a wage rate at Vandalia under

18    Number 3 here?

19    A.    I think our proposal, and again, it's all

20    being bargained as we speak, we had a meeting

21    yesterday and I think there's another meeting

22    today at the plant to continue dialogue, but

23    the proposal is to take the wages down through

24    a step-down process to the tier 3 wage that's

25    currently in existence at the plant.


127


1    Q.    That's eight dollars an hour.

2    A.    Growing to ten, I believe.

3    Q.    If you'll take a look at the March 24

4    1113 proposals, I think that's an exhibit to

5    Exhibit 7.  It might take you a couple of

6    minutes to get there to find the USW specific

7    proposals.

8        All right.  Well, since we're fiddling

9    with documents, Mr. Butler suggests maybe we

10    should take a break now, the sort of afternoon

11    break.  I don't have a problem with that.

12            MR. BUTLER:  If it's acceptable,

13    Your Honor, we've been here about two and a

14    half hours.  If it would be possible to take a

15    short break.

16            THE COURT:  All right.  It might

17    help people find this particular document.

18            MR. BUTLER:  Yeah, I think that's

19    right.

20            THE COURT:  All right.  I'll be back

21    at ten after four.

22            MR. BUTLER:  Thank you, Your Honor.

23            MR. PETERSON:  Thank you, Your

24    Honor.

25            (Recess from 3:57 p.m. until 4:18

128

1    p.m.)

2            THE COURT:  Please be seated.  Okay.

3    Back on the record in Delphi.  You're still

4    under oath, sir.

5    DIRECT EXAMINATION

6    BY MR. PETERSON:

7    Q.   I think we've determined that the most

8    efficient route is to look at Exhibit 91 which

9    I think you have in front of you.

10   A.   Yes, sir.

11   Q.   This is the March 24 proposal to the USW,

12   correct?

13   A.   Correct.

14   Q.   All right.  If you'll take a look at page

15   12 at the bottom.

16   A.   Yes, sir.

17   Q.   It says "Traditional and Tier 2 employees

18   at the TNI and Vandalia site will be converted

19   to Tier 3 wages and benefits on July 3, 2006

20   or as soon as practicable thereafter."  In

21   fact, Delphi is proposing that everyone at

22   Vandalia go down to eight dollars an hour

23   rising to ten dollars an hour, no matter which

24   proposal is on the table, isn't that a fair

25   statement?

129

1    A.   Our proposal is that they go down to Tier

2   3 wages, that's correct.

3   Q.   All right.  Regardless of whether GM

4   kicks in any money?

5   A.   No, this proposal is contingent on GM

6   support.

7   Q.   Well, the only -- if you'll read up to

8   the top of the next page, just to refresh your

9   recollection, the only piece of this that's

10  contingent on GM is payment of 35,000 dollars

11  to go down to eight dollars an hour, correct?

12  A.   That's the way it reads, you're right.

13  Q.   So, no matter what happens, people in

14  Vandalia are going to go down to eight bucks

15  an hour.  Is that a fair statement of what the

16  company proposes?

17  A.   That's our proposal.  To Tier 3 wages.

18  Q.   Tier 3 is eight dollars an hour?

19  A.   For a new hire, that's correct.

20  Q.   Increasing to ten dollars an hour after a

21  number of years, correct?

22  A.   Correct.

23  Q.   And if General Motors doesn't kick in any

24  money, they don't even get a buy down for

25  that, correct?

130

1   A.   That's correct.

2   Q.   All right.  And they also go to the

3   reduced benefit -- medical benefit levels that

4   the Tier 3 employees currently get, correct?

5   I think it says "converted to Tier 3 wages and

6   benefits on July 3, 2006."

7   A.   That's correct.

8   Q.   And it changes their pension benefits

9   that would be taken out of the defined benefit

10  plan, too, correct?  Pension plan?

11  A.   I'm not sure what plan they're in.

12  Q.   Well, the Tier 3s at Vandalia are not in

13  the defined benefit pension plan, are they?

14  A.   I don't think they are, that's correct.

15  Q.   Do you know what the so-called

16  competitive wage identified by Delphi's expert

17  is for production employees?

18  A.   Twenty-two dollars all-in, as I recall.

19  Q.   All right.  The Tier 3s are significantly

20  below 22 dollars all-in, aren't they?

21  A.   No, sir, they're not.

22  Q.   Well, you've proposed an 18 dollar and 69

23  cent all-in cost at Vandalia, haven't you?

24  A.   I think there's a range from 18 to 21.

25  Q.   All right.  That's below market, isn't

131

1   it?  According to your expert?

2   A.   It's right on the cusp.

3   Q.   Now, have you had discussions with

4   General Motors or are you aware of discussions

5   with General Motors about funding the USW

6   component of the 1113 proposals?

7   A.   I, personally, have not.

8   Q.   Do you have any reason to think that GM

9   would fund just the USW component without

10  first agreeing to fund the UAW of the GM

11  consensual proposal?

12    A.    Would you repeat the question, please?

13    Q.    Do you have any reason to think that GM

14    would fund the USW GM consensual proposals

15    before agreeing to fund the UAW GM consensual

16    proposals?

17    A.    They've already funded the UAW GM

18    consensual proposals.

19            THE COURT:  No, not the attrition.

20            MR. PETERSON:  Not the attrition

21    program.

22            THE COURT:  The --

23            THE WITNESS:  UAW GM is what you

24    said, right?

25    Q.    I did say UAW GM.  They've already funded


                                                    132


 1    the --

 2            THE COURT:  I think you're confusing

 3    the attrition program with the March 24

 4    proposal that's labeled the "Consensual GM

 5    Proposal."

 6    Q.    I'll ask the question in a different way.

 7    It's -- you mentioned the word "pattern."

 8    This is probably a more efficient way of doing

 9    it.  You mentioned "pattern bargaining"

10    earlier in your testimony.  Isn't it the case

11    that to ultimately reaching a deal with the

12    USW is going to have to wait until after the

13    broader deal is reached with -- between Delphi

14    and UAW?

15    A.    If we follow what pattern bargaining has

16    been in the past, that's accurate.

17   Q.   And that's what you're following this

18   time, correct?

19   A.   We can get a deal anytime they want to

20   make us a counterproposal.

21   Q.   But, in fact, you used the phrase

22   "pattern bargaining."  In fact, what you have

23   talked about with the USW is continuing to

24   follow the pattern bargaining process this

25   time around also, correct?

133

1   A.   I wouldn't characterize it that way.

2   Q.   What do you think the likelihood of

3   reaching an agreement with the USW that

4   includes GM money is -- the likelihood of

5   reaching that agreement before the UAW and --

6   and Delphi and UAW reach an agreement.  What

7   do you -- in your experience as a bargainer,

8   what do you think the odds of that happening

9   are?

10   A.   I think it's very possible.

11   Q.   Really?

12   A.   Yes.

13   Q.   Okay.

14        MR. PETERSON:  No further questions.

15        THE COURT:  Okay.

16   DIRECT EXAMINATION

17   BY MR. KENNEDY:

18   Q.   Good afternoon.

19   A.   Good afternoon.

20   Q.   Mr. Quick, you are responsible in

21   Delphi's hierarchy for negotiating or

22    overseeing the negotiation of Delphi's

23    agreements with the IUE-CWA , correct?

24    A.    That's accurate.

25    Q.    And how long have you had that

134

1    responsibility?

2    A.    I think 1999.

3    Q.    So, from 1999 until the present you've

4    had that responsibility for Delphi?

5    A.    Yes, sir.

6    Q.    And how would you characterize the

7    relationship between IUE-CWA  and Delphi, the

8    collective bargaining relationship?

9    A.    Excellent.

10    Q.    Has the IUE-CWA  been cooperative with

11    Delphi in responding to competitive pressures

12    facing Delphi plants?

13    A.    To a degree, yes, they have.

14    Q.    Well, is the Kettering, Ohio IUE facility

15    an example where the IUE-CWA  has agreed with

16    the company to terms and conditions of

17    employment that help make the plant more

18    competitive?

19    A.    They have agreed to a tool that could, in

20    fact, make it more competitive but it hasn't.

21    Q.    And that tool is the special tier

22    allowing individuals to be hired at eight

23    dollars an hour, correct?

24    A.    That's part of it.

25    Q.    And there are other reductions in wage --

135

1   in benefits that go along with that particular

2   employment tier, correct?

3   A.   That's correct.

4   Q.   Now, the IUE-CWA  doesn't decide which

5   product and which work is going to be assigned

6   to the Kettering facility, does it?

7   A.   No, they do not.

8   Q.   That is a decision made by Delphi and its

9   wisdom as to where to assign its various

10  production capacity, correct?

11  A.   Correct.

12  Q.   Do you know a man by the name of Keith

13  Bailey?

14  A.   Yes, I do.

15  Q.   And who is Mr. Bailey?

16  A.   He is currently the chairman of the shop

17  committee for Local 755, Kettering, Ohio.

18  Q.   And for those who don't know, is that a

19  responsible position, an important position in

20  an IUE-CWA  Local?

21  A.   Yeah.  He's the lead chief bargainer for

22  the Local.  Very important position.

23  Q.   And did you review Mr. Keith Bailey's

24  declaration that he submitted in this case,

25  which is Exhibit 28, if you care to take

136

1   another look at it?

2   A.   I remember reviewing it.

3   Q.   And isn't it a fact that he accurately

```
 4   recites steps that have been taken by Local

 5   755 to create competitive agreements with

 6   Delphi?

 7   A.   My recollection is that what he outlined

 8   in his declaration was accurate, yes.

 9   Q.   Now, did it take a Section 1113

10   proceeding to secure the IUE-CWA's cooperation

11   at Kettering to try to make the plant more

12   competitive?

13   A.   Would you repeat the question?

14   Q.   Sure.  This is the first time that

15   Delphi's filed the Section 1113 proceedings

16   that has anything to do with Kettering,

17   correct?

18   A.   Correct.

19   Q.   And those prior agreements that have been

20   made in the past at Kettering were not

21   produced under the stimulus of a Section 1113

22   proceeding, were they?

23   A.   That's correct.

24   Q.   Isn't it also accurate to state that at

25   Warren, Ohio, IUE-CWA is entered into
```

137

```
 1   competitive agreements to make the plant more

 2   productive and competitive?

 3   A.   They have entered into agreements that

 4   had that -- if we could get to them could, in

 5   fact, perhaps make the plant more productive

 6   and competitive, that's correct.

 7   Q.   Well, do you know Mr. Don Arbogast?

 8   A.   Yes, I do.
```

```
 9    Q.    And what position does he hold with the

10    IUE Local at Warren, which is Local 717?

11    A.    He has the same capacity that Mr. Bailey

12    has at Warren, Ohio.

13    Q.    Did you have a chance to review his

14    declaration in this case?

15    A.    Yes, I did.

16    Q.    And would you also agree that he

17    accurately sets forth the steps that Local 717

18    has taken to make the Warren facility more

19    competitive?

20          MR. BERKE:  Objection.  If you're

21    going to refer to the accuracy of a

22    substantially long document, I think you

23    should be in front of the witness.

24          THE COURT:  Do you want to review

25    the declaration or are you familiar with it
```

138

```
 1    enough to --

 2          MR. KENNEDY:  I could also refer the

 3    witness to his deposition at page 12, lines 10

 4    to 17, Your Honor, where he so testified.

 5          THE COURT:  Okay.

 6    Q.    Would you prefer to be reminded of your

 7    deposition?

 8    A.    No, I think in my deposition, I also

 9    indicated that what Mr. Arbogast set forth in

10    his declaration was accurate.

11    Q.    Okay.  Now, would you agree with me, Mr.

12    Quick, that 1,910 IUE-CWA  represented

13    employees are employed on competitive
```

14    agreements that provide less than the

15    traditional wages and benefits paid to

16    Delphi's workers?

17    A.    In part, I would agree with that

18    statement.

19    Q.    Okay.  Well, you would certainly agree

20    that their are 1,910 IUE represented employees

21    receiving less than traditional wages,

22    correct?

23    A.    Correct.

24    Q.    And that number does not include the

25    employees at Kettering who are below

139

1    traditional wage rate because they took a

2    four-year wage freeze, isn't that also true?

3    A.    That's correct.

4    Q.    Would you agree with me that more than 25

5    percent of the IUE-CWA represented employees

6    are receiving wages below what the company has

7    identified as the traditional wage in this

8    proceeding?

9    A.    No, I would not.

10    Q.    What percentage would you estimate of the

11    8,400 IUE-CWA represented Delphi employees are

12    receiving less than the traditional wages that

13    Delphi has identified in this proceeding?

14            MR. BERKE:  Objection to the form of

15    the question.  "Wages", does it mean wage rate

16    or all-in wage cost?

17    Q.    All right.  That's a fair question.  I'm

18    referring to hourly wages, take home pay,

19    actual wage rate in effect.

20    A.    Wage rate in effect?

21    Q.    Yeah.

22    A.    Ten to twelve percent.

23    Q.    Does that include the Kettering people?

24    A.    No, it does not.

25    Q.    If you added the Kettering people, what

140

1    would the percentage be?

2    A.    What was the question again?

3    Q.    What is the percentage of -- well, let me

4    ask this so we're clear about our comparison.

5    Delphi has identified its traditional hourly

6    wage for production employees as 27 dollars an

7    hour, correct?

8    A.    Correct.

9    Q.    And you've just told us that ten or

10    twelve percent of IUE-CWA  represented

11    employees make less than that.  Is that what

12    you intended to say?

13    A.    That's not the way you asked the

14    question.

15    Q.    Well, if I need to be corrected, I

16    appreciate it.  If we look at the wage rate of

17    27 dollars an hour, what percentage of IUE-CWA

18    represented employees are earning an hourly

19    wage rate less than that?

20    A.    Well, it would be your 1,910 you

21    identified.

22    Q.    Yeah.

23    A.    And if you're talking about the folks at

24    Kettering that took a freeze, you'd have to

25    add that number in there.


141


1    Q.    All right.  So, there's about 500 people

2    at Kettering that took the freeze, correct?

3    A.    Right.

4    Q.    So, that's about 2,400 people?

5    A.    If you took a snapshot today, that's

6    correct.  It changes.

7    Q.    Yeah.

8    A.    It moves.

9    Q.    Okay.  Well, looking at today, the

10    percentage we would have to calculate would be

11    what percentage 2,400 represents of 8,400?

12    A.    That's fair.

13    Q.    Okay.  Now, I'd like to direct your

14    attention to paragraph 10 of your initial

15    declaration which is in evidence as --

16    actually, I guess it's proposed to be in

17    evidence as number 11.  Are you there?

18    A.    Yes, sir.

19    Q.    Okay.  Now, you identified wage rate

20    ranges for the seven IUE-CWA  represented

21    facilities, correct?

22    A.    Base wage rate ranges, yes.

23    Q.    Okay.  Now, the top end of those rates,

24    let's look at, for instance, Kettering, which

25    says 30 dollars and 36 cents.  Those are


142

1    skilled trade rates, aren't they?

2    A.    That's correct.

3    Q.    So that your base wage rate comparison is

4    from the lowest paid individual in the shop up

5    to the highest paid individual in the shop,

6    correct?

7    A.    That's what the table is about.

8    Q.    Okay.

9    A.    Wage rate range.

10   Q.    Now, if you had presented a wage rate

11   range which was focusing on production

12   employees, what would the top end of the rates

13   be at the seven facilities?  Do you know?

14   A.    Without looking it up, I would say that

15   with the exception of Gadsden, they would all

16   be at the 27 dollar range.

17   Q.    Okay.  So, these five of the seven rates

18   that are 30 dollars and above don't accurately

19   reflect the top end production rates at IUE

20   facilities, do they?

21   A.    No, that wasn't the intent of the chart.

22   Q.    Okay.  And the individuals who are making

23   the 30 dollar rates, they are typically

24   plumbers, pipe fitters, electricians, mill

25   rights, those sorts of skilled jobs?

143

1    A.    That's accurate.

2    Q.    Now, have you performed an analysis of

3    the average production rates at these

4    facilities?

5     A.    I personally have not.

6     Q.    Well, are you aware of such an

7     analysis -- I mean, it wouldn't be all that

8     hard -- having been done by Delphi at these

9     facilities?

10    A.    I believe it's been done, yes.

11    Q.    Do you know the information?  Do you know

12    what the average rates are?

13    A.    No, I don't.  I don't have it.

14    Q.    If I told you that the average rate at

15    Gadsden was below ten dollars an hour, would

16    that sound right to you?

17    A.    It'd be close -- close to ten bucks

18    probably.

19    Q.    And the average rate in Kettering is

20    below 20 dollars an hour, about 18?

21    A.    I think it's a little higher than that.

22    Q.    You think it's below 20?

23    A.    Perhaps.

24    Q.    I'd like to direct your attention, Mr.

25    Quick, to Exhibit 187 which I believe is in


                                                    144


1     one of the confidential -- yes, it's one of

2     the confidential volumes.  Now, that document

3     is entitled "Estimated Benchmark Comparison."

4     A.    Yes, sir.

5     Q.    You've seen that before, correct?

6     A.    Yes, I have.

7     Q.    And that document was prepared by Delphi?

8     A.    Yes, it was.

9     Q.    It was prepared in response to a request

10   by the IUE-CWA to benchmark where the

11   Kettering plant would fall given the Tier 3

12   wages and benefits, is that correct?

13   A.   It appears that's the reason, yes.   I

14   didn't prepare it, but it --

15   Q.   Well, you are --

16   A.   It spells out Kettering on the chart.

17   Q.   And you're the corporate official

18   responsible for negotiations with the IUE,

19   correct?

20   A.   That's correct.

21   Q.   So, isn't accurate to state that if you

22   look at the benchmark comparisons Delphi has

23   chosen to exemplify where it wants to be at

24   the 21 dollar rate, the Kettering all-in rate

25   is 18 dollars and 79 cents?

145

1   A.   Correct.

2   Q.   And that, in fact, is below six of the

3   eight comparators that Delphi selected as

4   appropriate comparisons, isn't that also

5   correct?

6   A.   It appears to be correct, yes.

7   Q.   I'd like to direct your attention to your

8   second supplemental declaration, which is

9   number 279.   You have that in front of you,

10   sir?

11   A.   Yes, sir.

12   Q.   All right.   Examining paragraph 5, would

13   you read into the record for purposes of

14   framing some questions the first sentence of

15    that paragraph?

16    A.    "On Saturday, May 20, 2006, the IUE-CWA

17    offered additional responses indicating that

18    they would like an agreement patterned on

19    economics of any agreement reached between

20    Delphi and the UAW."

21    Q.    Okay, thank you.  Now, attached to your

22    second supplemental declaration, as Exhibits

23    A,B and C, are written counterproposals IUE-

24    CWA  has made to Delphi prior to today,

25    correct?

146

1    A.    Correct.

2    Q.    Exhibit A is a counterproposal that was

3    provided on May 18th and Exhibit B is a

4    counterproposal dated May 20th and C is a

5    counterproposal dated May 21st, correct?

6    A.    Correct.

7    Q.    Now, is it your contention that the

8    language of any of these three

9    counterproposals indicates that IUE-CWA  would

10    like an agreement pattern on the economics of

11    any agreement reached between Delphi and UAW?

12    A.    If you look at the second half of Exhibit

13    A, page 2, Exhibit A --

14    Q.    I'm just puzzled by the second half.  You

15    mean --

16    A.    Well, it's page 2 --

17    Q.    I see, okay.

18    A.    It's printed on both sides of the page.

19    Q.    Gotcha.    Okay.

20    A.    The one entitled "Holidays."

21    Q.    Uh-huh.  All right.

22    A.    This is an example.

23    Q.    Okay.  And the example there is that

24    similar to the notion of trying to take the

25    high side but not taking the down side that

147

1     the Court was referring to earlier, the IUE

2     said we'll agree to this particular proposal

3     but if the UAW gets more, we want that, too.

4     A.    Or less.  Both.  They asked for pattern.

5     Q.    Okay.  Now, what other parts of this

6     proposal, either A, B or C, indicate that

7     apart from holidays, IUE-CWA is looking to buy

8     into whatever it is the UAW negotiates?

9     A.    Well, I think the inference is there

10    based on the responses to all the economic

11    provisions of their counterproposal.  They say

12    they want to wait and see.

13    Q.    Well, actually, would you point out to me

14    where the words "wait and see" appear on any

15    of these three counterproposals?

16    A.    Those aren't the right words.

17    Q.    Okay.  In fact, isn't the words that

18    appear, and I'm referring primarily to Exhibit

19    B, if we look for instance with respect to the

20    COLA response which appears on the fourth page

21    of Exhibit B, it says "IUE-CWA defer" -- I

22    assume that means prefers -- "to be discussed

23    as one economic package."  Isn't that the

24    language that IUE-CWA used in responding to

25    certain of your economic terms?

148

1    A.    Yes, it is.

2    Q.    And that is language that you interpret

3    as saying that they'll take what the UAW

4    provides?  That the UAW gets?

5    A.    In the absence of a proposal, yes, sir.

6    Q.    All right.  Well, would you turn to

7    Exhibit 186?  Do you recognize the Exhibit

8    186, sir?  It's intended to be a letter.

9    A.    I must have the wrong exhibit.  This is a

10   Butler exhibit.  Exhibit 1, is that what

11   you're referring to?

12   Q.    Oh, I know what it is.  It's the last

13   page of 186, that's what it is.

14   A.    A letter?

15   Q.    I think the last page of Exhibit 186 is a

16   letter from Henry Reichert to Kevin Butler?

17   A.    I don't find it here.

18   Q.    Okay.  It's marked as Exhibit 11 in the

19   Butler deposition.

20         MR. KENNEDY:  May I approach and

21   show him, Your Honor?

22         THE COURT:  It's the last page of

23   all the exhibits to that exhibit.

24         THE WITNESS:  I think -- I may have

25   found it here.  Is it dated October 31st?

149

1         MR. KENNEDY:  No, it's dated March

2    31st.  Could I approach, Your Honor?

3           THE COURT:  Yes.

4           MR. KENNEDY:  All right.

5    Q.    Now, just for the record, Mr. Quick, who

6    is Henry Reichard?

7    A.    Henry is the chairman of the IUE

8    automotive conference board.

9    Q.    Is it accurate to state that he is the

10   official in the IUE-CWA  who bears the primary

11   responsibility for negotiating with Delphi?

12   A.    Yes, it is.

13   Q.    Would you look at the fourth paragraph of

14   that letter dated March 31st?  Would you read

15   the first three sentences of that paragraph

16   into the record, please?  They're pretty

17   short.

18   A.    This is a letter from Henry Reichard

19   dated March 31, 2006 to Mr. Kevin Butler,

20   Delphi Corporation.  Fourth paragraph:

21   "Delphi chose to limit its negotiations for

22   months to the UAW.  Our members have had their

23   own contracts and their own priorities with

24   Delphi.  Your need to negotiate with the IUE-

25   CWA is not met by meeting with any other

150

1    union."

2    Q.    Thank you.  Did you or Mr. Butler or

3    anyone else from Delphi respond in writing to

4    Mr. Reichard's letter of March 31st, 2006?

5    A.    I'm not aware of a written response.

6    Q.    Okay.  And would you agree with me that

7    that's a pretty strong statement by Mr.

8    Reichard on March 31st after this or as this

9    hearing was being begun that only negotiations

10   directly with the IUE-CWA  are going to get an

11   agreement?

12   A.    Well, it is what it is.

13   Q.    Okay.  But given that statement, how can

14   you infer from the proposals provided on May

15   20th which indicate that the IUE wants to

16   address economic matters as one package, how

17   can you infer from that what the IUE-CWA was

18   intending to convey is that they were -- they

19   would like "an agreement patterned on the

20   economics of any agreement reached between

21   Delphi and UAW" which is what you say in your

22   supplemental declaration dated May 23rd?

23   A.    I think, as I stated before, the holiday

24   pay answer they gave us certainly indicates

25   pattern.  And the fact that they elected not

                                               151

1    to give us a counteroffer on any of the

2    economic provisions of our proposal also

3    implies -- maybe I'm incorrect, but it implies

4    to me that they're going to wait.

5    Q.    So, that's why you're affidavit uses the

6    word "indicates" rather than stating that IUE

7    told you that they were going to wait until a

8    UAW agreement?

9    A.    I'd have to look at the document.

10   Q.    All right.  Well, never -- never mind.

11   Let me withdraw it.  Now, your testimony is

12    that the IUE-CWA did not respond to any of the

13    economic portions of the March 24 GM

14    consensual proposal?

15    A.    I don't recall saying that.

16    Q.    Okay.  Has -- then let me ask you that.

17    Has the IUE-CWA responded, counterproposed to

18    any of the economic terms set forth in the

19    March 24th GM consensual provision -- or

20    proposal?

21    A.    Yes, they have.

22    Q.    Okay.  And those proposals are set forth

23    at -- as attached to your supplemental

24    declaration -- your second supplemental?

25    A.    Correct.

152

1    Q.    Now, as things stand today, is it

2    accurate to state that the written proposal on

3    the table for the IUE-CWA is the March 24th GM

4    consensual proposal?

5    A.    It's the November 15th proposal with an

6    addendum to it, which is the GM consensual

7    proposal.

8    Q.    Let's do this by -- let's do it by days.

9    Is it fair to say that the March 24, 2006

10    proposal that was sent to the IUE-CWA remains

11    the company's proposal today as we testify?

12    A.    Yes, sir.

13    Q.    Delphi has not modified that proposal in

14    any way, correct?

15    A.    We've attached an attrition addendum to

16    that proposal.

17    Q.    Would you explain what you mean by

18    "attrition addendum"?

19    A.    The March 24th proposal did not contain a

20    provision for attrition, retirement attrition,

21    and we've attached an addendum to the March

22    24th proposal which details our proposal on

23    attrition.

24    Q.    All right.  And that has been the subject

25    of a counterproposal by the IUE-CWA, correct?

153

1    A.    That's correct.

2          MR. KENNEDY:  All right.  I have no

3    further questions, Your Honor.

4          THE COURT:  Okay.  Any other

5    questions by the unions?  Okay.  No redirect?

6    All right.  You can step down, sir.

7          MR. BUTLER:  Your Honor, in looking

8    at the testimony for the balance of our three

9    remaining witnesses and while we appreciate

10    Your Honor's willingness on Memorial Day

11    weekend to stay here till as late as 7, we

12    don't think we can complete those witnesses in

13    that time period.  We may complete one but

14    we're not sure we could complete the balance.

15    So, we've chatted with counsel about an

16    appropriate -- or, at least tried to -- I was

17    about to complete the conversation with --

18    when Your Honor came back on the bench, but we

19    think it's appropriate, having now just

20    completed the labor witnesses, if it's

21    acceptable to Your Honor, to break or do next

https://vip21.veritextllc.com/myfiles/320925/117765pm.TXT

22   up on June 2nd.  We have agreed with counsel

23   for the UAW which I believe is the first of

24   the unions to present witnesses under the meet

25   and confer that their witnesses would not be

154

1    presented prior to the afternoon session on

2    June 2nd.  So, if we -- we have three

3    witnesses to present in the morning.  If it

4    turns out that everyone decides not to cross-

5    examine them, then we will end up having a

6    shorter morning session and we'll come back

7    for the afternoon session unless Mr. Simon is

8    ready to start earlier than that.  But that

9    was our understanding and I wanted to place it

10   on the record.

11         THE COURT:  Okay.  That's fine.  I

12   want to address just one thing.  Mr. Levine

13   brought this up.  Obviously, as bargaining

14   continues, counsel may feel inappropriate to

15   attach supplemental, supplemental,

16   supplemental affidavits describing the ongoing

17   bargaining and I'm not going to discourage

18   them from doing that because that's part of

19   their analysis of 1113 and 1114.  However, I

20   would encourage you, if you think it's

21   productive, to discuss some means to save all

22   of that and to be introduced in some fashion

23   when you all think you're done so that people

24   can bargain with a little more assurance that

25   at least if they make a deal, or the interim

155

1    steps will not be spread out on the record.

2    And that's something I'd encourage you all to

3    discuss.  On the other hand, hearing the

4    echoes of all your discussions that makes

5    known may encourage you to expedite reaching a

6    deal.  So, I'm not going to tell you to do it

7    but I think it's worth discussing.

8             MR. BUTLER:  Your Honor --

9             THE COURT:  So it really doesn't

10   necessarily have an iceberg effect on the

11   negotiations.

12            MR. BUTLER:  Your Honor, on that

13   point, we will have some discussions with the

14   unions about that.  I think that with our

15   labor witnesses now off the stand, they'll

16   provide an opportunity for that discussion.

17   We will need, I think, at the end of the

18   process, whenever that process does come to a

19   conclusion, if in fact we can't settle prior

20   to the coming of a conclusion, we are going to

21   need to refreshen the record in light of Your

22   Honor's rulings on that.  I do want to

23   indicate to Your Honor that we have --

24            THE COURT:  Yeah.  The union's

25   negotiators are not done so -- and I don't

156

1    necessarily want to put down if there's a way

2    around it that people can agree upon to the

3    burden of submitting four, five or six

4    supplemental affidavits every day after they

5    finish bargaining.

6            MR. BUTLER:  Right.  And, Your

7    Honor, on that point, I should also indicate

8    and we've had some informal discussions with a

9    number of the unions, principally with the

10   UAW.  There are some discussions at the senior

11   levels of the organizations that have been

12   occurring that we have agreed will not be

13   introduced into this record.  Because there is

14   a need for people to be able to have

15   conversations that they understand won't be a

16   part of this record period, and while that

17   puts obviously on the debtors perhaps some

18   risk, it's an appropriate balance.  And I just

19   want the Court to understand we have that

20   understanding, for example with UAW, as to

21   some conversations with two of their senior

22   parties and we will not introduce those

23   conversations into the record.

24           THE COURT:  Okay.  All right.  I

25   guess also on that topic, I wish you all a

157

1    good holiday.  I feel sorry that these people

2    are negotiating over weekends but I think,

3    given the importance of these issues, the

4    folks who have been doing that are to be

5    commended and we're not getting together again

6    for a while so I hope you guys continue to use

7    those days productively.

```
 8                MR. BUTLER:  Thank you, Your Honor.

 9                THE COURT:  Okay.

10                (Whereupon the proceedings were

11     concluded at 4:58 PM.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

158

```
 1

 2                    I N D E X

 3

 4     WITNESS              EXAMINATION BY        PAGE
```

```
 5     Robert Gerling       Ms. Robbins            7

 6     Robert Gerling       Ms. Mehlsack           9

 7     Robert Gerling       Mr. Jerman            53

 8     Robert Gerling       Ms. Robbins           55

 9     Robert Gerling       Ms. Mehlsack          58

10     Robert Gerling       Mr. Jerman            53

11     Darrell Kidd         Mr. Peterson          60

12     Darrell Kidd         Mr. Levine            65
```

| | | | |
|---|---|---|---|
| 13 | Darrell Kidd | Mr. Kennedy | 87 |
| 14 | Darrell Kidd | Ms. Robbins | 88 |
| 15 | Darrell Kidd | Mr. Berke | 91 |
| 16 | Darrell Kidd | Mr. Kennedy | 98 |
| 17 | Bernard J. Quick | Mr. Peterson | 100 |
| 18 | Bernard J. Quick | Mr. Kennedy | 153 |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

159

1

2          C E R T I F I C A T I O N

3

4      I, Pnina Eilberg, hereby certify that the

5   foregoing is a true and correct transcription,

6   to the best of my ability, of the sound

7   recorded proceedings submitted for

8   transcription in the matter of the bankruptcy

9   hearing of:

10   DELPHI CORPORATION.

11

12      I further certify that I am not employed

13   by nor related to any party to this action.

14

15      In witness whereof, I hereby sign this

16   date:

17   April 29, 2006.

18

19    _____

20                    Pnina Eilberg

21

22

23

24

25