1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DELPHI CORPORATION,

9

10           Debtor.

11

12    - - - - - - - - - - - - - - - - - - - -x

13                  (MORNING SESSION)

14                  U.S. Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  May 26, 2006

19                  9:04 a.m.

20

21    B E F O R E:

22    HON. ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25


2

1    MOTION to Authorize Motion For Order Under 11

2    U.S.C. Section 1113(c) Authorizing Rejection

3    Of Collective Bargaining Agreements And Under

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

4    11 U.S.C. Section 1114(g) Authorizing

5    Modification Of Retiree Welfare Benefits filed

6    by John Wm. Butler Jr. on behalf of Delphi

7    Corporation.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed By:  Esther Accardi

25

                                                    3

1

2    A P P E A R A N C E S :

3

4    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

5        Attorneys for Delphi Corporation

6        Four Times Square

7        New York, New York 10036

8

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

```
 9   BY:   JOHN WM. BUTLER, JR., ESQ.

10

11   O'MELVENY & MYERS, LLP

12         Attorneys for Debtors

13         7 Times Square

14         New York, New York 10036

15

16   BY:   JEFFREY I. KOHN, ESQ.

17

18   O'MELVENY & MYERS, LLP

19         Attorneys for Debtors

20         1625 Eye Street

21         Washington, D.C. 20006

22

23   BY:   TOM JERMAN, ESQ.

24

25
```

                                                           4

```
 1   O'MELVENY & MYERS, LLP

 2         Attorneys for Debtors

 3         400 South Hope Street

 4         Los Angeles, California 90071

 5

 6   BY:   ROBERT A. SIEGEL, ESQ.

 7

 8   KENNEDY, JENNIK & MURRAY, P.C.

 9         Attorneys for IUE

10         113 University Place

11         New York, New York 10003

12

13   BY:   THOMAS KENNEDY, ESQ.
```

14

15    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

16        Attorneys for Steelworkers Union

17        1350 Broadway

18        Suite 501

19        New York, New York 10018

20

21    BY:   LOWELL PETERSON, ESQ.

22

23

24

25

5

1    PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER &

2    BRUEGGEMAN, S.C.

3        Attorneys for IBEW and IAM

4        1555 North River Center Drive

5        Suite 202

6        Milwaukee, Wisconsin 53212

7

8    BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

9

10    COHEN, WEISS AND SIMON, LLP

11        Attorneys for UAW

12        330 West 42nd Street

13        New York, New York 10036

14

15    BY:   BRUCE H. SIMON, ESQ.

16        BRUCE LEVINE, ESQ.

17

18

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

```
19

20

21

22

23

24

25
```

6

```
 1

 2   GORLICK, KRAVITZ & LISTHAUS, P.C.

 3        Attorneys for Operating Engineers

 4        Locals 18-S, 101-S, 832-S

 5        17 State Street, 4th Floor

 6        New York, New York 10004

 7

 8   BY:   BARBARA S. MEHLSACK, ESQ.

 9

10   WHITE & CASE, LLP

11        Attorneys for Appaloosa Management

12        1155 Avenue of the Americas

13        New York, New York 10036

14

15   BY:   GLENN M. KURTZ, ESQ.

16        DOUGLAS P. BAUMSTEIN, ESQ.

17

18

19

20

21

22

23
```

24

25

7

```
 1              P R O C E E D I N G S

 2              THE COURT:  Please be seated.  Okay.

 3    Delphi Corporation.

 4              MR. BUTLER:  Your Honor, good

 5    morning.  Jack Butler from the firm of Skadden

 6    Arps Slate Meagher Flom, LLP, here with my

 7    colleagues from O'Melveny & Myers law firm for

 8    the fifth day of the debtor's section 1113,

 9    1114 contested hearing.  Your Honor, we are

10    moving forward today with the first witness

11    being Mark R. Weber.  I'd like to call Mr.

12    Weber, who's the executive vice president of

13    operations human resource management,

14    corporate affairs of Delphi Corporation.  For

15    cross examination in connection with his

16    declaration which has been marked Exhibit 14

17    in the exhibit list which I move into

18    evidence, subject to cross examination.

19         (The Weber Declaration was hereby

20    received as Debtor's Exhibit 14 for

21    identification, as of this date.)

22              MR. BAUMSTEIN:  Good afternoon, Your

23    Honor.  Doug Baumstein on behalf of the ad hoc

24    committee of equity holders.  Our concern with

25    Mr. Weber's declaration and perhaps that this
```

8

1    may be the time that's appropriate for less or

2    included relief.  There are two things he

3    addresses.  One is sort of the sacrifices made

4    by the salaried and management employees,

5    which is really not our issue.  But one issue

6    he does talk about is the Delphi spin-off from

7    General Motors.  And we don't see the

8    relevance of that in any way to the

9    proceedings here.  And we're very concerned

10   that there may be factual findings with

11   respect to that as the spin-off from GM will

12   be very relevant to the various issues

13   concerning the validity of General Motors'

14   claims down the line.  And we would just be

15   concerned about having any factual findings in

16   the record that could later be used collateral

17   estopped, any of the parties here, whether

18   it's General Motors or the creditors'

19   committee or the equity committee, with

20   respect to the facts and circumstances

21   surrounding the spin-off from General Motors.

22   So perhaps if we knew there was -- if there's

23   a finding that's irrelevant we don't

24   necessarily need to preclude the testimony.

25   But there is a chance that we've not had a

9

1    chance to challenge that testimony which will

2    at some point be relevant down the line in

3    this case, although not at this hearing.

4          THE COURT:  I don't understand

5    anything you said.  Collateral estoppel is

6    collateral estoppel.  And I think you're

7    right.  I don't think that Mr. Weber's

8    affidavit really pertains to issues that

9    creditors and shareholder may have about GM,

10   but I can't say conclusively that.  But I

11   think it's highly unlikely that it will, given

12   the different issues under 1113 and 1114 on

13   the one hand and what I understand of the

14   committee's and the shareholders' and the

15   debtor's contentions about GM's claims.  So,

16   you know -- I mean, there may be some

17   reference to the existence of a benefit

18   guarantee as part of the analysis under 1113

19   and 1114.  But I think you just have to look

20   at 1113 and 1114 and see where -- as you said,

21   it's unlikely there'd be collateral estoppel.

22   But I can't give you some advance ruling on

23   that.

24          MR. BAUMSTEIN:  Right.  Our concern

25   isn't that it merely identifies the exist, it

                                              10

1    talks a lot about the intention of the parties

2    from the spin-off.  And that, obviously, will

3    be an issue much later in this case.  And we

4    have real concerns that there might be a

5    factual finding there, although we do not see

6    the relevance at all.

7          THE COURT:  Well, I think you're

8    probably right about the relevance.  But that

9    will have to be developed.  I doubt there's

10   going to be any -- he's just quoting the

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

11   documents, as far as I can see.  He's quoting

12   the S4s and S1s that were filed.  He's just

13   quoting them.

14         MR. BAUMSTEIN:  Okay.

15         THE COURT:  So, that's a matter of

16   public record.  And whether there's anything

17   more behind it, he hasn't said.  So I think

18   this should not turn into a litigation of,

19   generally speaking, you know, the company's

20   financial condition at the time these things

21   were entered into and what the party's --

22   whether the parole evidence rule applies, or

23   what the party's intent was and the like.  I

24   think he's just quoting the language.

25         THE BAUMSTEIN:  Okay.  Thank you,

                                                       11

1   Your Honor.

2         THE COURT:  Okay.  All right.  Mr.

3   Weber, will you raise your right hand, please?

4     (Witness sworn in.)

5         THE COURT:  Just for the record can

6   you spell your name?

7         THE WITNESS:  My name is Mark M-A-R-

8   K, Weber W-E-B-E-R.

9         MR. KENNEDY:  Your Honor, Tom

10   Kennedy for the IUE-CWA.  The order of cross

11   examination among the unions this morning will

12   be, after IUE-CWA completes its cross

13   examination, the UAW, the Steel Workers, the

14   IAM-IBEW and then the Operating Engineers.

15         THE COURT:  Okay.

16    CROSS EXAMINATION BY

17    MR. KENNEDY:

18    Q.    Mr. Weber, you are currently Delphi's

19    executive vice president of operations and

20    human resource management, is that correct?

21    A.    Corporate affairs, also.

22    Q.    All right.  And your responsibilities in

23    that position include overseeing Delphi's

24    human resource management and corporate

25    affairs?

12

1    A.    And the support staff for operations,

2    correct.

3    Q.    Okay.  The date of the spin-off of Delphi

4    from General Motors was February of 1999, is

5    that correct?

6    A.    I think the completion was in May.

7    Q.    The completion was in May, okay.  And

8    would you agree with me that at the time of

9    that spin-off in May of 1999, from the point

10    of view of labor relations, putting other

11    issues aside, Delphi recognized two

12    imperatives that it had to achieve?

13    A.    Go ahead.

14    Q.    And those were first, the ability to

15    negotiate its own labor agreements.  And

16    second, the ability to fix, sell or close on

17    profitable product lines?

18    A.    That's correct.

19    Q.    And in May of 1999, you also understood,

20    you meaning Delphi, that those were

21    imperatives that were only achievable over

22    time, correct?

23    A.    I believe that's correct.

24    Q.    And in May of 1999, Delphi was aware that

25    it would first be able to negotiate

13

1    independently national agreements with the

2    IUE-CWA and its other national unions in 2007,

3    isn't that also correct?

4    A.    Not in May of 1999, that is not correct.

5    Q.    When did Delphi first become aware that

6    agreements would be entered into that required

7    it to mirror GM agreements up until 2007?

8    A.    In September of 1999.

9    Q.    So that some few months after May of

10    1999, Delphi became aware that it would first

11    be able to negotiate its labor agreements in

12    2007?

13    A.    Yes.

14    Q.    Now, in connection with the spin-off,

15    Delphi filed various documents including S1s

16    that identified what its assumptions were

17    concerning the impact on labor relations of

18    the spin-off, is that correct?

19    A.    Yes.

20    Q.    After September of 1999, did Delphi file

21    any public documents advising that it would be

22    unable to achieve its imperatives because the

23    first time it would be able to negotiate its

24    labor agreements would be 2007?

25    A.    I don't recall any.

14

1    Q.    Would you also agree with me that even in

2    the current collective bargaining context, the

3    '99 agreement and then the 2003 agreement, the

4    IUE-CWA has agreed to substantial concessions

5    with Delphi, if necessary, to allow its plants

6    to be competitive?

7    A.    I believe they have entered into

8    agreements in an attempt to let the plants be

9    competitive.  We have not been successful in

10   accessing some of the wage and benefit

11   concessions to make the plants competitive.

12   Q.    And that's because Delphi has assigned

13   work that could be done at IUE-CWA plants to

14   other facilities, be they in Mexico or around

15   the world?

16   A.    I think that's principally because of

17   dropping volumes from our major U.S. customer,

18   General Motors.  It's made it very difficult.

19   Q.    Has Delphi assigned any work that could

20   have been done at IUE-CWA plants with

21   competitive agreements to either its Mexican

22   facilities or facilities in other parts of the

23   world?

24   A.    I don't know how -- I don't the answer to

25   that ques -- I don't know.

15

1    Q.    How many employees does Delphi currently

2    have in Mexico doing production work?

3    A.    I would guess fifty to sixty thousand.

4    Q.    And in 1999, how many employees did

5    Delphi have in Mexico doing production work?

6    A.    I would guess a like number.

7    Q.    Do those fifty or sixty thousand Mexican

8    production employees do any work that could be

9    assigned to IUE-CWA facilities in the United

10   States?

11   A.    Profitably?

12   Q.    I didn't ask profitably.

13   A.    Oh.

14   Q.    I asked if they could be assigned, does

15   that work?

16   A.    You can always assign work wherever you

17   want, of course.

18   Q.    Okay.

19   A.    Yes.

20   Q.    And that work could have been assigned to

21   being done under the competitive agreements

22   which start out with wage rates as low as

23   eight dollars an hour?

24   A.    It could have.

25   Q.    How many production employees, union-

16

1    represented production employees, did Delphi

2    have in 1999?

3    A.    I'll do some mental gymnastics and give

4    you a number, okay?

5    Q.    Somewhere a little over sixty thousand?

6    A.    Around the world?

7    Q.    No.  No, in the United States.  I'm

8    sorry.

9    A.    Oh the United States.  Roughly right,

10   yes, I'm sorry.

11   Q.    About sixty thousand?

12   A.    I think so.

13   Q.    And from 1999 through today, in 2006,

14   that number has shrunk to approximately

15   thirty-three thousand, correct?

16   A.    That's correct.

17   Q.    And that shrinkage from sixty thousand

18   has gone down to thirty-three thousand under

19   the myriad labor agreements that Delphi has

20   entered into with IUE-UAW and the other major

21   unions, correct?

22   A.    That's correct, yes.

23   Q.    Do you know how many IUE-CWA production

24   employees there were employed by Delphi in

25   1999?

17

1    A.    Not specifically.

2    Q.    Now, you also indicated that one of the

3    imperatives the company intended to accomplish

4    in 1999 was the ability to achieve more

5    flexible work rules, is that true?

6    A.    That's true.

7    Q.    Would you agree with me that the

8    Portland, Ohio IUE-CWA plant, represented by

9    Local 717, is an example of the union and the

10   company working together to achieve more

11   flexible rules under the current agreement?

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

12    A.    Yes.

13    Q.    Are you familiar with the Shingo Prize?

14    A.    Yes.

15    Q.    And what is that?

16    A.    It's a prize for manufacturing

17    excellence.

18    Q.    And that prize was bestowed upon the

19    Portland, Ohio plant, correct?

20    A.    As I recall.

21    Q.    And didn't the Portland, Ohio plant also

22    win the 2000 Global Excellence award?

23    A.    I don't know.

24    Q.    Do you remember?

25    A.    Don't remember that.

18

1    Q.    Were you familiar with the details of the

2    work rule agreements that were reached between

3    IUE-CWA and Delphi at the time that the

4    Portland, Ohio plant was made operational in

5    the late 1990s?

6    A.    No.

7    Q.    Do you know if IUE-CWA essentially agreed

8    that two people would do the work for three

9    people who had previously done it in the past?

10    A.    I don't know that.

11    Q.    Is it the position of Delphi that its

12    production employees should be paid no more or

13    no less than the average production wage paid

14    across all industries and across all sectors

15    of the economy and geography in the United

16    States?

17    A.    It's our position that we have to be

18    competitive in all elements of cost to win

19    work with our customers.  Our customers are

20    very good at ciphering out the cost structure

21    of all of their suppliers.  And so, we had big

22    sheets, for example, that we have to fill out

23    and labor costs are part of the big sheets.

24    So we don't really have much of a choice

25    except to be competitive in all elements of

19

1    cost.

2    Q.    Well, I'm really directing you to the

3    testimony of the expert witness in the

4    beginning of this case that Delphi called.

5    A.    Dr. Wachter.

6    Q.    Dr. Wachter, yes.  To identify the

7    appropriate wage rate at Delphi production

8    facilities as no more or no less than the

9    average production wage across all industries

10    and sectors.  Do you agree with that, that

11    that's what Delphi's wage rate should be?

12    A.    Roughly right, I think that's correct,

13    yes.

14    Q.    How would that average apply to the

15    individuals working at the Portland, Ohio

16    plant that have been recognized for their

17    manufacturing excellence?  Should they also

18    receive no more or less than the average wage

19    which is paid to production workers across the

20    United States?

21    A.    I -- what do they make?  I don't know

22    what they make.

23    Q.    You're unfamiliar with the product in

24    that plant?

25    A.    No.  I'm not familiar how much the wage

20

1    rate is there.

2    Q.    They pay traditional wage rate, probably

3    twenty-seven dollars an hour.

4    A.    I see.  Should that ultimately apply?  I

5    believe it should, yes.

6    Q.    In your declaration, Mark, you identified

7    factors that applied to the compensation of

8    Delphi's salaried to management employees --

9    the section begins at paragraph 21 of Exhibit

10    14, which is your declaration.

11    A.    Yes.

12    Q.    In there you identify, at least in

13    paragraph 19, the philosophy that hourly and

14    salaried employees should be at market levels,

15    neither higher nor lower?

16    A.    That's correct.

17    Q.    So is it Delphi's understanding that its

18    salaried employees are now paid at market

19    levels?

20    A.    The salaried employees are paid -- the

21    paid salaried employees is targeted at market

22    levels.  They're not necessarily always paid

23    at target levels because part of the pros at

24    risk, and they may or may not receive that at

25    risk pay.

21

1    Q.    Well the -- at the time of the spin-off,

2    is it accurate to state that salaried Delphi

3    employees were paid salaries commensurate with

4    original equipment manufacturer wages?

5    A.    I think that the salaried employees' pay

6    was essentially target at a market value could

7    pay across the country, not just OE.

8    Q.    It wasn't just OE?

9    A.    No, it was not.

10   Q.    Okay.  Now since 1999, Delphi's had a

11   free hand to design its salaried employees'

12   wages and benefits, correct?

13   A.    That's correct.

14   Q.    Since the spin-off in 1999, have any

15   salaried employees had their wages reduced by

16   Delphi?

17   A.    Base wages or total compensation?

18   Q.    Base wages?

19   A.    No.

20   Q.    And am I correct that based upon the

21   information in this hearing that the short-

22   term incentive plan for the first six months

23   of 2006 is about to pay out sixty million

24   dollars in short-term incentive compensation

25   to your United States workforce?  Isn't it

22

1    accurate to state that Delphi's salaried

2    employees in 2006 will receive a higher

3    compensation than they did in 2005?

```
 4   A.    You made a couple of points, I'll try to
 5   address them both, okay?
 6   Q.    Okay.
 7   A.    The first point is that the sixty million
 8   dollars is the annual target, not the happier
 9   target for those employees.  So the happier
10   target would roughly right be thirty million
11   dollars.
12   Q.    All right.  I understood from Kevin that
13   it was the half year.  If I was wrong, I
14   apologize.
15   A.    That preset pay is pay at risk, it's
16   roughly five and a half percent of the
17   weighted average pay of the salaried
18   workforce.  And if they were to receive that
19   it would make them roughly right competitive
20   with other people across the country.  Who
21   also are point risk and receive it or don't
22   receive it.  So, they're sort of complaintive
23   on that basis.  Will they make more or less
24   than last year, that was your last part of the
25   question?
```

                                                    23

```
 1   Q.    Yes.
 2   A.    All things being equal, it will be
 3   higher.
 4   Q.    Now, in your declaration at paragraph 24,
 5   you provided a chart that highlights the
 6   current differences in compensation between
 7   Delphi's hourly and salaried managerial
 8   employees?
```

9    A.    Yes, sir.

10   Q.    Did that chart represent all of the

11   important differences between those two types

12   of employees?

13   A.    No.  I think -- the other declarations

14   had other differences.

15   Q.    I take it from your chart in paragraph

16   24, that Delphi's front line supervisors do

17   receive overtime?

18   A.    That's correct.

19   Q.    And how many of the fourteen thousand

20   supervisors at Delphi are eligible for

21   overtime?

22   A.    I don't know how many are front line

23   supervisors, can't help you.

24   Q.    Do you know what the rules and conditions

25   are for their receiving overtime?


24


1    A.    I've lost that, I don't know anymore.

2    Q.    Okay.

3    A.    Yeah.

4    Q.    Now, in your chart, you indicate that

5    "most hourly employees are entitled to return

6    to open positions at General Motors."  That's

7    not applicable to IUE-CWA members, is it?

8    A.    That's correct.

9    Q.    And they represent about twenty-five

10   percent of your workforce?

11   A.    That's correct.

12   Q.    So how is it that you indicated that

13   "most hourly employees are entitled," you mean

14   the majority?

15   A.   Majority, right.   Sure.

16   Q.   You also mentioned staffing requirements.

17   Do any IUE contracts allow for outsourcing?

18   A.   I don't know that they specifically

19   they -- the contracts, the IUE contracts.   But

20   local contracts?

21   Q.   Yes.

22   A.   I don't know.

23   Q.   Do you know whether the IUE local plant

24   contracts that allow for temporary employees

25   to be brought actually inside the plant to

25

1   perform production work, if necessary, to meet

2   production goals?

3   A.   I think there are some, yes.

4   Q.   And those temporary employees are not

5   covered under the collective bargaining

6   agreements, correct?

7   A.   That's correct.

8   Q.   The company has a right to set those

9   wages and benefits at whatever level they

10   want?

11   A.   I believe so.

12   Q.   And there's no restriction on brining in

13   or laying off or terminating those employees

14   and any of the union contracts?

15   A.   I believe so.

16   Q.   So that the reference to the staffing

17   requirements that appear in your chart don't

18   apply to the IUE-CWA plants that allow

19    temporary employees, do they?

20    A.    It would not apply to those employees.

21    Q.    Now, at paragraph 25 of your declaration,

22    you -- and 26, you identify the reductions in

23    the ranks of the salaried and management

24    employees that you expect will occur as a

25    result of your reorganization, is that

26

1     correct?

2     A.    Both the reorganization and the SG&A

3     initiative, both.

4     Q.    All right.  And I take it that together,

5     if we were looking at the impact of both of

6     those programs, we would lose thirty-six

7     hundred salaried employees as a result of

8     sales or wind-downs of Delphi production

9     operations and another sixteen hundred under

10    the SG&A program?

11    A.    In the U.S., that's right.

12    Q.    In the U.S., yeah.  Now, have you

13    computed the percentage of salary to

14    management employees that those reductions

15    represent?

16    A.    No, but it's something like a thirty to

17    forty percent, roughly.

18    Q.    And the proposals that the company has

19    provided to the IUE would require it to lose

20    seventy-seven percent of its membership,

21    correct?

22    A.    I don't know, is that right?  It's right,

23    it's right, don't know the answer to that one.

24   Q.   You don't know?

25   A.   No.


                                                              27


1    Q.   Do you have any idea what the approximate

2    percentage reduction of IUE membership would

3    be under the proposals the company has

4    provided?

5    A.   It would be high.

6    Q.   It would be much higher than the one-

7    third to forty percent that's affecting the

8    salaried to managerial employees, correct?

9    A.   I believe so.

10            MR. KENNEDY:  All right.  I have no

11   further questions, Your Honor.

12            THE COURT:  Okay.

13            MR. LEVINE:  Good morning, Mr.

14   Weber.  Your Honor, Bruce Levine, Cohen Weiss

15   & Simon for the UAW.

16   CROSS EXAMINATION BY

17   BRUCE LEVINE:

18   Q.   Mr. Weber, do you have your declaration

19   in front of you, sir?

20   A.   Yes, I do.

21   Q.   Would you please turn to paragraph 19?

22   A.   I have it.

23   Q.   Okay.  Now, you state in your declaration

24   in paragraph 19, do you not, that Delphi's

25   philosophy is that "the compensation of its

                                                              28

1   entire workforce, including its hourly and

2   salaried employees, should be at market

3   levels, neither higher or lower."

4           MR. BUTLER:  Objection.  Your Honor,

5   this question -- and this was asked on the

6   last cross examination.  Are we going to go

7   over the same territory that Mr. Kennedy --

8           THE COURT:  Well, let's see where

9   he's going --

10          MR. LEVINE:  Your Honor, I can

11  assure you that I will endeavor not to repeat

12  Mr. Kennedy's questions.

13          THE COURT:  Okay.

14          MR. LEVINE:  I can assure you too,

15  Mr. Butler?

16  A.   The answer's yes.

17  Q.   Thank you.  Now as I understand it, your

18  contention that Delphi does, in fact, or at

19  least has tried to pay market rates with

20  respect to Delphi's salaried and managerial

21  workforce, is that correct?

22  A.   Yes, sir.

23  Q.   Okay.  Now, turning to your declaration

24  at paragraph 25, you indicate that Delphi

25  employs approximately 14,300 salaried and

                                          29

1   managerial employees in the United States, is

2   that correct?

3   A.   Yes, sir.

4   Q.   And in establishing a market rate for the

5    base salary of salaried and managerial

6    employees, is it your contention that Delphi

7    looked to what similarly situated employees of

8    a comparator group of companies are paid?

9    A.    Largely speaking, yes.

10    Q.    Okay.  And with respect to the

11    comparative group of companies used to

12    establish the base salary market rate for

13    salaried and managerial employees, you state

14    in your declaration at paragraph 23, that you

15    look to companies of similar size to that of

16    Delphi's, is that correct?

17    A.    That's correct.

18    Q.    Okay.  And I take it you stand by that

19    statement in your declaration, is that

20    correct?

21    A.    Yes, I do.

22    Q.    Okay.  Now in the last sentence of

23    paragraph 23, you state that "the design and

24    modifications to the compensation approach

25    resulted from studies and recommendations of

30

1    independent expert compensation consulting

2    companies."  That statement is accurate,

3    correct?

4    A.    Yes, sir.

5    Q.    Okay.  Could you identify the independent

6    expert compensation consulting companies that

7    you are referring to in paragraph 23?

8    A.    It used to be Mercer Consulting, it's now

9    Watts & Wyatt.

10    Q.    And what did each of those companies do?

11    I guess first Mercer and then Watts?

12    A.    What is their methodology is that what

13    you're asking me?

14    Q.    What did they do for you, for Delphi?

15    A.    Well, first of all, they didn't work for

16    Delphi they worked for the board of directors

17    of Delphi.  Because the board of directors has

18    an independent compensation committee, and

19    they worked for that committee.  So they --

20    Mercer did, at the spin-off, a look at the

21    various compensation plans that are around

22    corporate American.  They compared a group of

23    companies and designed the compensation system

24    that the board ultimately approved.  Watts &

25    Wyatt updated it a year or so ago to help

31

1    understand the most current thinking and to

2    provide the board with the recommendations of

3    that approach for compensation.

4    Q.    Okay.  And did either of those consulting

5    companies issue any written reports to the

6    board of directors of Delphi?

7    A.    I believe so.

8    Q.    And when were those reports issued, if

9    you know?

10    A.    Well one would have been around '99.

11    Q.    Right.

12    A.    That doesn't count.

13    Q.    Fair enough.

14    A.    And -- I don't recall the most recent

15    one -- the date of that.  I don't know.

16    Q.    And do you know whether the results of

17    those studies have been provided to the UAW or

18    to any of the unions in connection with this

19    proceeding and the negotiations between the

20    parties?

21    A.    I do not know.

22    Q.    Okay.  Now would you please refer, once

23    again, to paragraph 24 of your declaration?

24    A.    Yes.

25    Q.    And, again, that, as I understand it from

32

1    reading your declaration, highlights the

2    current differences in compensation and job

3    security provisions between Delphi's hourly

4    employees and its salaried and management

5    employees?

6    A.    It lists some of them, correct.

7    Q.    Okay.  Now, as Mr. Kennedy pointed out,

8    that chart doesn't deal with a number of other

9    indicia of compensation for salaried and

10    managerial employees, is that correct?

11    A.    That's correct.

12    Q.    Okay.  And it doesn't deal with the

13    short-term incentive plan as Mr. Kennedy asked

14    you about, is that correct?

15    A.    That's correct.

16    Q.    Now as I understand it, Delphi

17    anticipates that its annual expense for that

18    program will be approximately seventy million

19    dollars, not sixty million dollars through

20   2010, is that correct?

21   A.   I think one is a target and one includes

22   FICA taxes on top of that.

23   Q.   Okay.  But the cost to Delphi inclusive

24   of those taxes is seventy million dollars --

25   A.   I believe --

33

1   Q.   -- rather than sixty million dollars --

2   A.   I believe that's correct.

3   Q.   Let me finish my question, please?

4   A.   I'm sorry.

5   Q.   Is that correct?

6   A.   Yes.

7   Q.   Okay.  Thank you.  And as I also

8   understand it, Mr. Weber, this expense has not

9   been adjusted downward to take into account

10   planned reduction in Delphi's salaried and

11   management workforce through 2010, is that

12   correct?

13   A.   I believe that's correct.

14   Q.   And as I understand from your

15   declaration, Delphi plans to reduce its

16   salaried and management workforce by more than

17   five thousand workers over the next five

18   years, is that correct?

19   A.   That's correct.

20   Q.   So this remaining reduced workforce will

21   be eligible to receive a higher per capita

22   piece of the annual expense for that program,

23   is that correct?

24   A.   Is your question will the same amount of

25    money be available to your people?

34

1    Q.    Correct.

2    A.    No.

3    Q.    And how do you explain that?

4    A.    Because groups of employees in those

5    classifications have a target of incentive pay

6    and the target times the number of employees

7    is the number.

8    Q.    Okay.  But the company has not adjusted

9    downward the seventy million dollar expense

10    that is available under that program in

11    connection with transformation, is that

12    correct?

13    A.    I don't believe we have yet done that,

14    that's true.

15    Q.    Okay.  You have not yet done that?

16    A.    Correct.

17    Q.    Thank you.  Now I want to ask you a

18    couple of questions about Delphi's plans to

19    reduce its salaried and managerial workforce.

20    And as I understand it, from your declaration,

21    just to be clear, 3,650 --

22            MR. LEVINE:  Withdrawn.

23    Q.    Thirty-six hundred and fifty salaried and

24    managerial employees will be reduced as a

25    result of the transformation and the wind-

35

1    downs, is that correct?  Through 2010?

2    A.    That's correct.

3    Q.    Okay.  And another sixteen hundred

4    salaried and managerial employees will be

5    eliminated based upon the recommendations of

6    Booze Allen on SG&A expense, is that correct?

7    A.    Yes, these are EF numbers right?

8    Q.    Okay.  Now I did the actual calculations.

9    That's a thirty-seven percent reduction, does

10   that sound fair?

11   A.    Sounds fair.

12   Q.    Okay.  I also went to the same school as

13   Dr. Wachter, so you might want to check.  Just

14   kidding.  Dr. Wachter and I know each other.

15   Now, as Mr. Kennedy focused on with respect to

16   IUE, this reduction in both absolute and

17   percentage terms is far less than the number

18   of domestic hourly workers overall of all

19   unions will lose their jobs, do you agree with

20   that?

21   A.    Yes.

22   Q.    In fact, Delphi proposes, and I get this

23   out of Mr. Butler's declaration, and we can go

24   there if you like, Delphi proposes that as

25   part of its proposed transformation it will

36

1    reduce its domestic hourly workforce from

2    approximately thirty-three thousand workers to

3    roughly six thousand workers.  Is that

4    correct?

5    A.    I accept the declaration statement you

6    made, yes.

7    Q.    That is based on paragraph 11, for the

8    record, and paragraph 25 of Mr. Butler's

9    declaration.  So using Mr. Butler's figures,

10    and assuming my math is correct again, it

11    appears that Delphi plans to reduce its

12    salaried and managerial workforce by

13    approximately thirty-seven percent.  And to

14    reduce its domestic hourly workforce by

15    approximately eighty-two percent, does that

16    sound correct?

17    A.    Okay.

18    Q.    Okay.  Now, if these head count

19    reductions are put into effect, Delphi plans

20    to employ more salaried and managerial workers

21    in the U.S. than hourly workers in the U.S.,

22    is that correct?

23    A.    Yes.

24    Q.    More particularly, according to my math,

25    Delphi plans to employ approximately six

37

1    thousand hourly workers by 2010 and

2    approximately nine thousand salaried and

3    management workers at that time, does that

4    sound correct?

5    A.    It sounds correct.

6    Q.    Okay.  Now I want to ask you a couple of

7    questions about the Booze Allen study

8    concerning SG&A expense.  Are you familiar

9    with that study?  You did refer to it in your

10    declaration.

11    A.    Yes, I am familiar.

12    Q.    Okay.  Now, as I understand it, Booze

13    Allen proposes changes that by 2010 would

14    yield annual savings of 450 million dollars at

15    steady state, is that correct?

16    A.    Yeah.  My declaration is a little old.

17    The number is now 540 million dollars.

18    Q.    And that -- it's 540 million dollars

19    because that overlays the transformation, is

20    that correct?

21    A.    Yes.

22    Q.    Okay.  So there's an additional projected

23    savings based upon the anticipated

24    transformation of ninety million dollars?

25    A.    Yes.


                                                    38


1    Q.    So that marginal ninety million dollars

2    is related to Delphi's planned shutdown of

3    twenty-one of twenty-eight of its domestic

4    facilities, is that correct?

5    A.    Yes.

6    Q.    And its only ninety million dollars even

7    though twenty-one of twenty-eight facilities

8    are planned to be closed, is that correct?

9    A.    Yeah.  You can only take the SG&A out

10    where it is.

11    Q.    Yes or no?

12    A.    Yes.

13    Q.    Now, as I understand it, one of the

14    findings made by Booze Allen was that Delphi's

15    SG&A expense, measured as a percent of

16    Delphi's sales, was higher than its peers, is

17    that correct?

18    A.    I don't know that.

19    Q.    You don't know that?

20    A.    No.

21    Q.    Okay.  So you don't know that even after

22    the transformation, Delphi's SG&A expense

23    measured as a percent of its sales, will still

24    be higher than the average SG&A measured as a

25    percent of its peers?

39

1    A.    I do not know that.

2    Q.    You do not know that.  Okay.  Isn't it

3    also -- well, I don't know if you know this,

4    but as I understand it, after the

5    transformation Delphi's SG&A expense, measured

6    as a percent of sales, will be roughly the

7    same as it is currently, do you know that?

8    A.    I believe it will be lower.

9    Q.    How much lower?

10    A.    Five hundred and forty million dollars

11    lower.

12    Q.    As --

13    A.    I'm going to have to calculate it now in

14    my head.

15    Q.    I calculate about .4 percent, does that

16    sound right?

17    A.    Could be.

18    Q.    Okay.  Mr. Weber, I have no further

19    questions.  Thank you, sir.

20    CROSS EXAMINATION BY

21    LOWELL PETERSON:

22    Q.    Good morning, Mr. Weber.

23    A.    Good morning.

24    Q.    Lowell Peterson, Meyer, Suozzi, English &

25    Klein, for the steel workers.  Your

40

1    declaration speaks of the mirror agreement

2    pursuant to which Delphi would -- that

3    Delphi's collective bargaining terms would

4    mirror those of General Motors' collective

5    bargaining agreements.  That doesn't apply to

6    the steel workers, correct?

7    A.    No.  They have a different structure.

8    Q.    And, in fact, the collective bargaining

9    agreements between Delphi -- the terms of the

10   collective bargaining agreements between

11   Delphi and the steel workers now are

12   substantially different from the terms between

13   the steel workers and GM had been, correct?

14   A.    They are different.

15   Q.    In fact, the wages are substantially

16   lower than they had been at GM, correct?

17   A.    I think the all-in wage for the UAW I'd

18   roughly right at seventy-seven and the current

19   all-in wage for the steel workers is fifty-

20   seven now, roughly right.

21   Q.    Well, that's not a weighted average?

22   A.    Yeah, I think it is.

23   Q.    You're aware of the wage rates at

24   Vandalia?

25   A.    Yes.

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

41

1   Q.   You're aware that the substantial

2   majority of people -- of steel workers

3   represented employees at Vandalia are

4   nontraditionally paid?

5   A.   I believe they are.

6   Q.   Right.  And they don't -- they're not on

7   traditional benefit plans either, medical or

8   pension, correct?

9   A.   Yeah.

10  Q.   All right.  You talked about the -- in

11  your declaration and in testimony about the

12  company's need for flexibility in work rules

13  and flexibility in adjusting not only

14  production methods but also the size of the

15  workforce.  Isn't it true that the steel

16  workers negotiated more flexible terms both in

17  terms of wages and work rules with Delphi

18  several times since the spin-off?

19  A.   I believe they have.

20  Q.   And most recently that was at the

21  Vandalia plan where there was substantial

22  concessions by the union both with respective

23  to work rules and wages, correct?

24  A.   I believe so.

25  Q.   Steel workers don't have any flow-back

42

1   rights to General Motors, correct?

2   A.   I don't think so.

3    Q.    I don't want to repeat too much about the

4    comparisons of salary versus hourly job loss.

5    But if I could just bring it home to the steel

6    workers' scenario.  Home Avenue is going to be

7    out of the Delphi system under the current

8    plans, correct?

9    A.    Correct.

10   Q.    And that's where the substantial majority

11   of steel workers employees currently work?

12   A.    Correct.

13   Q.    So, in fact, Delphi will have

14   approximately twenty percent as many steel

15   workers post-transformation as it currently

16   has?

17   A.    Could be.  I haven't done the calc.

18   Q.    All right.  Let's talk a little bit about

19   the salaried concessions that you've addressed

20   in your declaration.  For example, at

21   paragraph 24, I note you didn't mention the

22   salaried employee retirement plan in your

23   declaration.

24   A.    No.

25   Q.    All right, that's the -- as I understand

43

1    it, from prior testimony, the liabilities that

2    Delphi has under the SERP are approximately

3    300 million dollars, does that sound right?

4    A.    We're talking about the executive SERP

5    program now?

6    Q.    That's correct.

7    A.    Yes.  That's what John said yesterday.

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

8   Q.   All right.  Now, do you know whether that

9   covers just U.S. executives or global?

10   A.   I believe it's only U.S.

11   Q.   All right.  So if I divide that's about

12   450 people?

13   A.   Roughly right.

14   Q.   All right.  That's approximately 667

15   thousand dollars each then?

16   A.   Is that the math finds?

17   Q.   I think so.

18   A.   Okay.

19   Q.   I didn't go to the same school, but I am

20   a lawyer, so we could double check.

21   A.   I could have brought a calculator if I'd

22   have known.

23   Q.   It's 667 thousand dollars each.

24   A.   Okay.

25   Q.   Now, in 2005, Delphi terminated a


                                                      44


1   deferred compensation plan covering executives

2   too, correct?

3   A.   I don't know what that is.

4   Q.   Well according to -- well, let me ask you

5   a different way.  You're aware that executives

6   received substantial payments in 2005 related

7   to termination of a plan, correct?

8   A.   I'm working it out, yeah.  Part of our

9   total compensation package was eliminated,

10   that's correct.

11   Q.   All right.  And -- where it was

12   eliminated, executives received cash payments,

13    correct?

14    A.    I want to be very careful to make sure

15    we're talking about apples to apples.  There

16    was a deferred compensation program where

17    people put money in the program -- their own

18    money in the program.  And we did, in fact,

19    terminate that and they got their own money

20    back out, is that what you mean?  That's the

21    only one I know of right now.

22    Q.    There was a tax -- was that a tax

23    qualified plan you're talking about now?

24    A.    I don't know about the tax qualification

25    of that, but there was a deferred compensation

45

1    program.  Some people put money in that plan.

2    We deferred the program -- we cancelled the

3    program and they got their money out.

4    Q.    Why was that program terminated?

5    A.    As I recall, the law was changing, it was

6    making it very complex to administer and it

7    just wasn't worth it for us to have it any

8    longer.

9    Q.    So if I ask you a question of whether

10    there was a "tax bubble payment made by Delphi

11    in connection with a termination" you wouldn't

12    be able to answer that?

13    A.    I wouldn't know that, no.

14    Q.    All right.  Do you know anybody who might

15    be able to answer that question?

16    A.    You have to talk to a tax attorney, I

17    think.

18    Q.    No, I mean at Delphi?

19    A.    Oh, at Delphi.  Well, sure.

20    Q.    I'd rather not talk to a tax attorney.

21    A.    Our chief tax man could tell you that.

22    Q.    All right.  He would know whether, in

23    fact, Delphi bubbled those payments?  By

24    bubble I mean -- it's a generic term that

25    Delphi paid additional amounts to account for

46

1    tax liabilities that the executives incur?

2    A.    Oh, I don't know.  I don't know that.

3    Q.    You don't one or the other?

4    A.    No.

5    Q.    The executives did receive R&R grants,

6    several hundred thousand -- some of them,

7    several hundred thousand dollars apiece in

8    2005, correct?

9          MR. BUTLER:  Objection.  Foundation.

10    Can you just state for the record what R&R

11    grant is?

12    Q.    Do you know what an R&R grant is?

13    A.    Are you talk about the retention

14    recognition grant?

15    Q.    Correct.

16    A.    Yes.

17    Q.    All right.  They received those payments?

18    A.    Yes.

19    Q.    Okay.  And do you know when in 2005 they

20    received those payments?

21    A.    Q4, Q3, something around that time frame.

22    Q.    Around the time that the bankruptcy

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

23    petition was filed?

24    A.    Before it.

25    Q.    Q3 would be shortly before?

47

1    A.    Yeah, I think it was before.

2    Q.    Okay.  But after the refinancing, that

3    we've heard testified about, was closed in

4    June?

5    A.    Yes, I think that's right.

6    Q.    Now, you're familiar with the key

7    employee compensation program that Delphi has

8    obtained partial approval from, from this

9    Court?

10    A.    That is correct.

11    Q.    Delphi currently plans to obtain approval

12    for the entire balance of that program before

13    this Court in July, correct?

14    A.    Correct.

15    Q.    Thank you.  I'm sorry, I missed one

16    question.  In 2005, executives in the G band

17    received pay increases of twenty-five thousand

18    dollars a year, correct?  If you know?

19    A.    In 2005, executives in the G band?

20    Q.    Yes.  You know what -- the executives are

21    classified by --

22    A.    Yeah, I know that.  But I don't recall a

23    twenty-five thousand dollar pay increase in

24    2005 in the G band, I don't recall that.

25    Q.    All right.

48

1    A.    Okay.

2    Q.    But that information is available in

3    documents provided by Delphi, correct?  I

4    don't mean to be --

5    A.    I'm assuming it is.  I just don't recall

6    executives in the G band all getting a twenty-

7    five thousand dollar increase in 2005.  I

8    don't recall that.

9    Q.    Okay.

10   A.    Yeah.

11   Q.    I don't mean to be mysterious about this,

12   we obtained that --

13   A.    I understand.

14   Q.    -- document in connection with the KECP.

15   We'll work out the evidentiary issue.

16   A.    Okay.

17   Q.    If he doesn't remember, he doesn't

18   remember.  That's okay.  Thank you.

19   CROSS EXAMINATION BY

20   MS. ROBBINS:

21   Q.    Good morning, Mr. Weber.

22   A.    Good morning.

23   Q.    Marianne Robbins representing the IAM and

24   the IBEW.  Are you familiar with the labor

25   agreements involving Irvine, California?

49

1    A.    No.

2    Q.    Would the same be true with Landrum,

3    South Carolina?

4    A.    Yes.

5    Q.    You held the human resource position at

6    the time of the spin-off, is that right?

7    A.    Yes.

8    Q.    Are you aware of the communication

9    provided to IAM and IBEW members as to the

10   impact of the spin-off on them?

11   A.    No.

12   Q.    Were you involved in negotiations with

13   General Motors concerning the benefit

14   guarantees?

15   A.    No.

16   Q.    Who at Delphi was involved in those?

17   A.    No one was.  That's the guarantee between

18   unions and General Motors, not between us and

19   the parties.

20   Q.    Well there were agreements, were there

21   not?  There is an employee matters agreement

22   with GM and Delphi, is there not?

23   A.    Yes.

24   Q.    And were you involved in negotiating

25   that?

                                                    50

1    A.    Yes.

2    Q.    Are you aware of whether or not a copy of

3    that document has been provided to the IAM and

4    IBEW?

5    A.    I am not.

6    Q.    Was there also a separation agreement

7    between Delphi and General Motors that

8    involved employee separation?

9    A.    Yes.

10    Q.    Were you involved in that?

11    A.    Insofar as the employee management

12    agreement was part of that, yes.

13    Q.    And do you know whether a copy of that

14    has been provided to the IAM and IBEW?

15    A.    No, I don't.

16    Q.    And do those agreements which --

17    A.    I'm sorry?

18    Q.    Do those agreements provide some

19    information on the impact of the spin-off on

20    various groups of employees?

21    A.    In what sense?

22    Q.    I don't know, I don't have the agreement.

23    A.    Oh.

24            MR. BUTLER:  Objection, Your Honor.

25    That statement by counsel -- the agreement

51

1    she's testifying to -- she's talking about are

2    in the exhibits of this trial.  And for her to

3    say to the Court or suggest to the witness she

4    doesn't have them, I think we need to have the

5    record be corrected.

6            MS. ROBBINS:  Counsel, you can --

7            MR. BUTLER:  My objection is to the

8    Court.

9            THE COURT:  Which agreements are you

10    talking about now?  I wasn't sure which ones

11    your question related to.

12            MS. ROBBINS:  Your Honor --

13            THE COURT:  The separation

14    agreement?

15            MS. ROBBINS:  The separation

16    agreement and employee matters agreement.

17            MR. BUTLER:  The employee matters

18    agreement is Exhibit 251.  The separation

19    agreement is Exhibit 254.

20            MS. ROBBINS:  That's helpful

21    information, Your Honor.  As you know, the

22    exhibits have been coming in after this trial

23    began.  It's a moving target in terms of what

24    documents are and are not in.  And it's

25    unfortunate that I should have to take up the

52

1    Court's time asking those questions.

2            THE COURT:  Okay.

3    BY MS. ROBBINS:

4    Q.  Mr. Weber?

5    A.  Yes, ma'am?

6    Q.  Are you aware that the IAM and IBEW

7    requested information concerning salaried

8    compensation and any concessions salaried

9    employees may have taken?

10    A.  No.

11    Q.  Are you aware that they were informed

12    that that information would not be provided to

13    the unions?

14    A.  No.

15    Q.  If, in fact, other evidence would

16    establish that the unions, the IAM and IBEW

17    requested that information and were denied

18    that information, would you agree that that

19    would impact the union's ability to evaluate

20    your claim that salaried employees are

21    receiving market rate?

22    A.    It could.

23    Q.    And that would impact the union's ability

24    to evaluate Delphi's proposal to them to cut

25    their wages, isn't that right?

53

1    A.    I don't know.  You're asking me to get

2    inside your head now and I don't know.

3    Q.    No.  I'm asking you, sir, whether or not

4    information concerning the impact or the

5    compensation and concessions made by salaried

6    employees is relevant to evaluating Delphi's

7    proposal to the IAM and IBEW?

8    A.    It could be.

9    Q.    On the issue of the impact of Delphi's

10    plans on the IAM and IBEW, are you aware that

11    one hundred percent of the employees they

12    represent are scheduled to lose their jobs by

13    the end of 2007?

14    A.    I believe that's true.

15    Q.    You have a chart on page -- on paragraph

16    24 of your declaration.  Are you aware that

17    the IAM and IBEW do not have flow-back rights

18    to General Motors?

19    A.    I believe that's correct.

20    Q.    In your declaration, sir, you make

21    reference to 470 salaried employees quitting,

22    or leaving their positions over a six-month

23    period?

24    A.    Yes.

```
25   Q.   That would be -- if it kept at that rate,
```

54

```
 1   which we don't know, 940 for year.  Is that
 2   right?
 3   A.   That's correct.  It would be two times
 4   that number.
 5   Q.   Huh?
 6   A.   Two times that number.
 7   Q.   And you have 14,300 salaried employees,
 8   is that right?
 9   A.   Yes.
10   Q.   So that would be a 6.6 quit rate?
11   A.   Yes.
12   Q.   And according to your expert, Dr.
13   Wachter, the economy wide quit rate, which he
14   would consider appropriate for determining
15   whether or not compensation is competitive is
16   23.7 percent, isn't that right?
17   A.   I can't answer to that number.
18   Q.   But in any case, the quit rate among
19   salaried employees is far less than 23.7
20   percent, isn't that right?
21   A.   That's less than that number, that's
22   right.
23        MS. ROBBINS:  No further questions.
24        THE COURT:  Okay.
25   CROSS EXAMINATION BY
```

55

1    MS. MEHLSACK:

2    Q.    Good morning, Mr. Weber.

3    A.    Good morning.

4    Q.    Barbara Mehlsack representing the

5    operating engineers.  Could you turn to

6    paragraph 12 of your declaration?

7    A.    I have it.

8    Q.    Okay.  When you state that one of the

9    goals that Delphi had at the time of the spin-

10   off was to -- the ability to negotiate its own

11   national and local agreements, establish more

12   flexible work rules in order to achieve

13   productivity improvements.  And in the absence

14   of those productivity improvements, Delphi

15   would have to address allegedly noncompetitive

16   wages.  Are you aware of any efforts on the

17   part of Delphi to achieve flexibility in work

18   rules --

19           BY MS. MEHLSACK:   Question

20   withdrawn.

21   Q.    Back up.  Are you aware that the

22   agreements between the operating engineers and

23   Delphi are negotiated at the local level

24   already?

25   A.    Yes.


56


1    Q.    And are you aware of any efforts by

2    plant -- by Delphi plant managers to achieve

3    flexibility and work rules that was resisted

4    by the operating engineers?

5    A.    I have no specific knowledge of that.

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

6   Q.   And are you aware of any specific

7   productivity improvements that have been

8   sought by Delphi plant management from the

9   stationary engineers that have been resisted

10  by the stationary engineers?

11  A.   I'm not aware.

12  Q.   Would it be fair to say that when you're

13  talking about productivity improvements,

14  you're talking about production employees,

15  basically?

16  A.   No.

17  Q.   Are you talking about specific

18  productivity improvements with respect to the

19  stationary engineers?

20  A.   Productivity crosses the entire

21  workforce, hourly and salaried, I would say,

22  yes.

23  Q.   But you cannot identify, specifically,

24  any productivity improvement sought from the

25  stationary engineers?

57

1   A.   I'm not aware of any specific

2   conversation, no.

3   Q.   Turn to paragraph 13 of your declaration,

4   please.

5   A.   I have that.

6   Q.   Address the problem of the unfunded

7   liabilities, OPEB, and the hourly retirement

8   plan.  Those are basically what Delphi has

9   called its legacy -- retiree legacy

10  liabilities, is that correct?

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

11    A.    Goes to the liabilities at that time.

12    Q.    Okay.  Are you aware of whether there are

13    any liabilities in connection with the

14    stationary engineers?

15    A.    I don't know.

16    Q.    In that nature?

17    A.    I don't know what those specific

18    liabilities are.  No, I don't know.

19    Q.    You referenced the GM benefit guarantee,

20    at paragraph 18, as alleviating the impact on

21    Delphi's employees of the concessions?

22    A.    Yes.

23    Q.    Are you aware whether or not the

24    operating engineers have the GM benefit

25    guarantee?

58

1    A.    I do not believe I negotiated with them,

2    no.

3    Q.    Have you -- in connection with those

4    hourly retirement plan obligations, are you --

5    have you looked at the consequences for the

6    employees who don't have the GM benefit

7    guarantee, the termination of the HRP, the

8    hourly retiree plan?

9    A.    Can you help it with consequences?

10    Q.    Have you or has anyone on your staff done

11    a calculation of what benefit levels would be

12    guaranteed by the PBGC in the event there was

13    a termination of the HRP?

14    A.    I haven't done that, but I'm sure someone

15    has done that.

16   Q.   But you have today no knowledge of how,

17   for example, the stationary engineers would be

18   affected if the plan were terminated?

19   A.   I cannot specifically talk about that,

20   no.

21   Q.   Now, turning to paragraph 29 of your

22   declaration.  You talk about the importance of

23   retaining the knowledge base of skilled

24   engineers.  Wouldn't that apply to the skilled

25   trades and skilled engineers who are part of

59

1   the operating engineers, bargaining units, as

2   well as the engineers that you referenced?

3   A.   I would think it's important to retain

4   the right amount of employees, sure.

5   Q.   And are you aware of the fact that at the

6   Columbus plant your --

7           BY MS. MEHLSACK:   Question

8   withdrawn.

9   Q.   Do the labor relations negotiators report

10   ultimately to you?

11   A.   Ultimately, yes.

12   Q.   Okay.  Can you help me with chain of

13   command.  Is it you to Mr. Butler, to Mr. --

14   A.   Mr. Kidd.

15   Q.   Mr. Kidd and then Mr. Gerling would

16   report to Mr. Kidd?

17   A.   I believe that's right.

18   Q.   Okay.  Has Mr. Gerling provided you with

19   any summaries of negotiations with the

20   operating engineers?

21    A.    No, he hasn't.  Mr. Butler has talked to

22    me about them, generally.

23    Q.    But you've not received any written

24    summaries from Mr. Gerling or any written

25    summaries from anyone in the chain of command

60

1    summarizing the state of negotiations?

2    A.    That's correct.

3    Q.    So, are you aware, however, that Mr.

4    Gerling has advised the stationary engineers

5    of Columbus that Delphi wants to control the

6    take on of any attrition plan in order that

7    Delphi be able to retain the necessary number

8    of skilled engineers at that plant until the

9    closing of the plant?

10    A.    Not specifically.

11    Q.    You have no awareness of that?

12    A.    Huh-uh.

13    Q.    There's been some discussion of the KECP

14    and the short-term aspect of it and its

15    extension to salaried employees.  And you

16    mention that the employees are grouped in

17    terms of their achievement in certain targets.

18    Now, do those groups cut across plant lines or

19    are they plant specific?

20    A.    Well, you have to help me to be more

21    specific on the question.

22    Q.    If a plant is experiencing a loss --

23    A.    Yes.

24    Q.    -- will an employee in a specific group

25    that's met its target nationwide get a short-

61

1  term benefit regardless of whether or not the

2  specific plant that salaried employee is

3  associated with is experiencing losses?

4  A.   Okay.  I'm not being evasive, I'm just

5  trying to be precise.  Classified salaried

6  employees in the plants that I think you are

7  talking about are not part of the KECP.

8  Q.   So there are no salaried employees in any

9  plants who will be eligible for the KECP?

10  A.   If there are executives in those plants,

11  they could be eligible.

12  Q.   But Delphi plans to extend that KECP and

13  seek permission to -- as I understand it,

14  believes it already has permission, through

15  the human hourly attrition program order at

16  the beginning of the case, to further extend

17  that plan to its salaried employees?

18  A.   It's a very different plan.  The KECP and

19  the salaried incentive plan are different

20  plans.

21  Q.   Well, let's talk about the KECP.  If I'm

22  an executive at a plant that's losing money,

23  would I receive a KECP benefit if I'm in a

24  category that nationwide will get that

25  benefit, regardless of whether my plant that

62

1  I'm associated with is losing money?

2  A.   I'll be precise, again, to the question.

3    The design of the KECP is what the targets --

4    corporate targets, individual targets.  Both

5    have impact on that individual new plan

6    because anybody in the plant will be in the

7    version.  So roughly, you're right.  Let me

8    just say this, maybe this will be helpful.

9    Q.    Could you -- I'm sorry, I'm having

10   trouble hearing you.

11   A.    I'm sorry.  Oh, I'm too close.  Is this

12   better?

13   Q.    Yes.

14   A.    Oh, I'm sorry.  The KECP for executives

15   for plant people, which is the annual and

16   standard we're talking about for the first six

17   months, has a component that is divisional and

18   a component that is corporate.  And it will be

19   possible, if the division and the corporation

20   hit its number, for a person in the plant to

21   have a pay-out.

22   Q.    So take the Rochester plant, for example,

23   which is losing money at this point, right?

24   A.    Yes.

25   Q.    It is possible that an executive

63

1    associated with the Rochester plant,

2    regardless of those losses, will get a KECP

3    benefit if a division -- if his division or

4    her division is entitled to a KECP?

5    A.    And, again, the KECP metric is OBATAR or

6    EBITDA.  So the two --

7    Q.    It's not plan-specific?

8    A.    It's a different number, correct.

9    Q.    Okay.  And now the short-term incentive

10   plan that's going to apply to the salaried

11   employees, is it also true that a salaried

12   employee could obtain a benefit regardless of

13   the fact that the plant that salaried employee

14   is at or is associated with is losing money?

15   A.    It is possible, yes.

16   Q.    In connection with executive

17   compensation, are there any arrangements by

18   contract that provide any kind of retiree

19   health insurance benefit to current executives

20   other than the benefit that's available

21   through the salaried employees' plans?

22   A.    Not that I'm aware, no.

23   Q.    Are there any currently retired

24   executives who are receiving any kind of

25   benefit in connection with health insurance

                                              64

1    other than a benefit that's available through

2    the salaried plan?

3    A.    No.

4            MS. MEHLSACK:  I have no further

5    questions.

6            THE WITNESS:  Thank you.

7            MR. KURTZ:  Glenn Kurtz for the ad

8    hoc committee of equity holders.  Your Honor,

9    may I proceed?

10           THE COURT:  Yes.

11   CROSS EXAMINATION BY

12   MR. KURTZ:

13    Q.    Mr. Weber, I just have questions about

14    one paragraph of your declaration which is

15    Exhibit 14.  Do you have that in front of you?

16    A.    Yes.

17    Q.    Can you turn to paragraph 13?

18    A.    Yes.

19    Q.    All right.  You see where you testify

20    that GM and Delphi recognize that Delphi might

21    be unable to meet its future capital

22    requirements?

23    A.    I see that.

24    Q.    What did you mean by capital

25    requirements?

65

1    A.    Capital to do the normal things you do

2    with capital in the business.

3    Q.    To operate the business?

4    A.    Sure.

5    Q.    And what's the basis for your testimony

6    that GM was aware that Delphi might be unable

7    to meet its future capital requirements to

8    operate its business?

9    A.    I believe it was a possibility

10    identified.  Not necessarily a probability

11    identified.

12    Q.    You testified that GM recognized the fact

13    that Delphi might be unable to meet its future

14    capital requirements, correct?

15    A.    Yes.

16    Q.    And how do you know that?

17    A.    I don't know that, specifically.

18    Q.    Did anyone from GM ever tell you that

19    they have recognized that Delphi might be

20    unable to meet its future capital

21    requirements?

22    A.    Did anyone from General Motors tell me?

23    Q.    Correct.

24    A.    Is that what you said?

25    Q.    Yes.

66

1    A.    No.  No one told me from General Motors.

2    Q.    Nobody.  So can you tell me what the

3    basis was for the testimony that you have

4    included in paragraph 13 of your declaration?

5    A.    Again, I think it was a possibility.  Not

6    necessarily a probability.

7    Q.    Okay.  But what was the basis for your

8    testimony about the possibility that -- well,

9    what was the basis for your testimony that GM

10    was aware of the possibility that Delphi might

11    not be able to meet its future capital

12    requirements?

13    A.    I think this is an S1 lift.

14    Q.    Based on --

15    A.    A lift from the S1.

16    Q.    Okay.

17          MR. KURTZ:  No further questions.

18          THE COURT:  Okay.  Redirect?

19    REDIRECT EXAMINATION BY

20    MR. BUTLER:

21    Q.    Mr. Weber, during your cross examination,

22    you were asked about a line of questions

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

23    regarding competitiveness and the impact on

24    customers.  And you testified about customers

25    caring about competitive labor rates, do you

67

1    recall that testimony?

2    A.    Yes, I do.

3    Q.    Could you please turn to Exhibit 311?

4    A.    I have it.

5    Q.    Could you explain to the Court what this

6    document is?

7          UNIDENTIFIED ATTORNEY:  Your Honor,

8    could we have a minute to get it out before

9    the witness answers the question?

10         THE COURT:  That's fine.

11         MR. SIMON:  Your Honor, I do want to

12    make it clear for the record that this was a

13    document provided to at least UAW counsel and

14    I believe all counsel, just last night.

15         THE COURT:  Okay.

16         MR. BUTLER:  It's a two page

17    document and I only have a couple of

18    questions.  I don't think this was raised on

19    cross examination, the issues.

20         THE COURT:  I guess the first point

21    is, you had gone over other documents and I

22    guess there were no issues as to their

23    admissibility.  I don't know if this is

24    covered by the same arrangement or not.

25         MR. BUTLER:  Your Honor, we're going

68

```
 1    to deal with it -- the final admissibility of

 2    all documents at the close of the case.

 3              THE COURT:  Okay.

 4              MR. BUTLER:  We have some objections

 5    to some documents.  We've got a meet and

 6    confer as to the balance.

 7              THE COURT:  All right.

 8    BY MR. BUTLER:

 9    A.   I do have it.

10    Q.   Mr. Weber, can you explain briefly to the

11    Court, in your own words, what this document

12    is?

13    A.   This looks like a document from General

14    Motors that requires us to provide information

15    to support a bid for a piece of work we might

16    be bidding on with General Motors.

17              MR. KENNEDY:  Objection, Your Honor,

18    there's no foundation.  The witness is

19    indicating what the document looks like.

20              THE COURT:  You should lay a

21    foundation.

22              MR. BUTLER:  Okay.

23    Q.   Mr. Weber, are you aware as to whether or

24    not Delphi bids its jobs to customers like

25    General Motors Corporation?
```

69

```
 1    A.   Yes, I am.

 2    Q.   When it bids its job, does General Motors

 3    require to complete any documentation in
```

4    connection with that bid?

5    A.    Yes.

6    Q.    In connection with completing its bidding

7    with General Motors, is it required to submit

8    cost analysis relating to its bid?

9    A.    Yes.

10   Q.    Does General Motors provide Delphi with

11   forms on how to complete those bids?

12   A.    Yes.

13   Q.    Is Exhibit 311 one of those forms?

14   A.    Yes, it is.

15   Q.    Now looking to Exhibit 311, does General

16   Motors require Delphi to specifically call out

17   the labor costs associated with the particular

18   piece of work product being bid?

19   A.    Yes, it does.

20   Q.    And where on Exhibit 311 is that

21   instruction given?

22   A.    It's on the bottom half of the page,

23   roughly right, it says labor and burden.  It

24   has description of the operation, the hourly

25   labor rates, standard hours, labor costs,

70

1    operators and so on.

2    Q.    And the second page of 311 is the

3    spreadsheet?

4    A.    Yes.

5    Q.    Where you have to lay out all of the

6    actual labor costs in the plant associated

7    with the work that's being bid?

8    A.    That is correct.

9    Q.    In your cross examination, Mr. Kennedy

10    asked you about mirror labor agreements, and

11    implied that the IUE had a mirror agreement.

12    Does the IUE have a mirror agreement with

13    Delphi?

14          THE COURT:  You're saying mirror,

15    right?

16          MR. BUTLER:  Mirror, a mirror.

17    Sorry.

18          THE COURT:  Okay.

19    A.    I do not believe so.

20    Q.    The only mirror agreement is with the

21    UAW, isn't that correct?

22    A.    I believe so.

23    Q.    During your cross examination, you were

24    asked about whether any compensation had been

25    reduced since 1999, and Mr. Kennedy delimited

71

1    your answer to base wages?

2    A.    That's correct.

3    Q.    If you took into account total

4    compensation would your answer have been the

5    same?

6    A.    No.

7    Q.    Would you tell the Court, in your own

8    words, what your answer would have been had

9    Mr. Kennedy asked you about total compensation

10    rather than just a single element of

11    compensation?

12    A.    There are various aspects of our benefit

13    program which are changing and which have been

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

14    reduced over time, including healthcare,

15    higher co-pays for healthcare and culminating

16    in the decision to have no post-retiree

17    healthcare starting in '07.

18    Q.    So during the period from 1999 through

19    2007, has salaried total compensation

20    increased or decreased?

21    A.    I'd say it's, roughly right, gone down.

22    Q.    Since the filing of these Chapter 11

23    cases, or in 2000 --

24         MR. BUTLER:  Strike, withdrawn.

25    Q.    In 2005, since beginning of 2005, have

72

1    any executives at Delphi foregone any

2    compensation?

3    A.    Yes.

4    Q.    And were those senior executives?

5    A.    Yes.

6    Q.    And approximately how much of their

7    compensation did they forego?

8    A.    The CEO reduces pay from a million-five

9    to one dollar.  The president reduces pay by

10    twenty percent.  And we have reduced our pay

11    voluntarily by ten percent.

12    Q.    During your cross examination, Mr. Levine

13    asked you a series of questions regarding the

14    rate by which salaried workers and hourly

15    workers were being reduced in the United

16    States under the transformation plan.  And

17    that line of question concluded, in his

18    observation, that there would be more salaried

19    workers than hourly workers at the end of the

20    transformation plan.  Do you recall that line

21    of questioning?

22    A.    Yes, I do.

23    Q.    Would you explain to the Court, in your

24    own words, why it would be that at the end of

25    the transformation plan there would be so many

73

1    salaried workers in United States?

2    A.    Because first of all, the corporate

3    headquarters for the companies is in the U.S.

4    So those people are going to be required for

5    operations around the world.  And secondly,

6    even larger numbers of individuals are in the

7    U.S. because they engineer the products for

8    the various divisions around the world.

9    Q.    How many employees does Delphi have

10    today, Mr. Weber?

11    A.    On hundred and eighty thousand.

12    Q.    And how many of those employees reside in

13    the United States, all in?

14    A.    Fifty.  Fifty thousand.

15    Q.    So approximately a 135 thousand employees

16    reside outside the United States?

17    A.    Roughly right, yes.

18    Q.    And these salaried employees are involved

19    in management of those employees, is that

20    correct?

21    A.    Yes, they are.

22          THE COURT:  I'm sorry.  Does the 180

23    thousand include management or is that just --

24                THE WITNESS:  It's everybody.

25                THE COURT:  That's everybody?

74

1                THE WITNESS:  Yes.

2    Q.    In your cross examination, you were asked

3    a line of questions, also by Mr. Levine, that

4    went into the fact that the transformation

5    plan had not been adjusted for the salaried

6    incentive payments going forward even though

7    the number of salaried workers is going to go

8    down.  Do you recall that, Mr. Weber?

9    A.    Yes, I do.

10   Q.    Is it Delphi's intention that Delphi is

11   going to increase its salaried incentive

12   design to capture all of that additional money

13   for a lower group of people per capita?

14   A.    No, sir.

15   Q.    What is Delphi's intention?

16   A.    The salaried incentive plan design over

17   the period will be whatever's competitive in

18   the market place.  However, we will not hold

19   the dollars constant if we have fewer people

20   to have higher paid people.  So whatever the

21   market competitiveness is, is what it should

22   be, in our judgment.

23   Q.    So do you expect that the gross number of

24   dollars that will be spent on incentive

25   compensation under a KECP type program in the

75

1    future, if such program is adopted would in

2    fact be less or more?

3             MR. LEVINE:  Objection, Your Honor.

4    We've been pretty tolerant.  That's a fairly

5    leading question.

6             THE COURT:  Sustained.

7             MR. LEVINE:  Leading question

8    objection.

9    Q.    Do you have any views regarding the

10   future design of KECP programs, Mr. Weber?

11   A.    The designs will be competitive and with

12   fewer people it should be fewer dollars.

13   Q.    I have no further questions, thank you

14   very much.

15   A.    Thank you.

16            MR. KENNEDY:  Tom Kennedy, IUE-CWA,

17   Your Honor.

18   RECROSS EXAMINATION BY

19   MR. KENNEDY:

20   Q.    The lack of a mirror agreement, that you

21   identified a minute ago, with the IUE means

22   that in the 2003 negotiations between IUE-CWA

23   and Delphi, Delphi had a free hand to reach

24   whatever labor agreements it thought was

25   appropriate, correct?

76

1    A.    Yes.

2    Q.    Mr. Butler was asking you some questions

3    concerning total compensation paid to salaried

4    to managerial employees?

5    A.    Yes.

6   Q.   Now, as I understand your testimony, from

7   1999 until now, total compensation paid to a

8   typical or average salaried or managerial

9   employee has roughly gone down.  Is that your

10  testimony?

11  A.   Yes.

12  Q.   By what percentage has their compensation

13  gone down from 1999 through the present?

14  A.   I don't know the percentage.

15  Q.   Well, give me an order of magnitude.  Is

16  it less than five percent?

17  A.   It's a hard calculation to make.  And I

18  can explain why.

19  Q.   Well, what are the components of the

20  total compensation package that from 1999

21  until now have gone down for Delphi's salaried

22  and executive personnel?

23  A.   An executive program includes base pay,

24  its called an AIP or an annual incentive

25  program, which is the bonus program.  It

77

1   includes a long term incentive program which

2   typically is stock options and restricted

3   stock.  For nonexecutives -- and then it

4   includes a myriad of benefits like healthcare,

5   dental, vision, life insurance and so on.  For

6   the classified workforce it would include the

7   base pay, roughly any one center that we

8   discussed, and all those benefits that are --

9   that I described to you.  In 1999, and in

10  2000, for sure, the annual incentive paid out.

11    It paid out in 2000, did not in '01, partial

12    payment in '02, did not in '03, did not in

13    '04, did not in '05.  So that number is out of

14    the calculations over that time because it was

15    not paid.  And it varies by individual and by

16    level so its going to be a very hard

17    calculation to even guesstimate for you.

18    Q.    Well, would it be fair to say that the

19    largest single element of executive and

20    managerial and salaried compensation that has

21    been reduced since 1999, has been the at-risk

22    portion of their pay under either the AIP or

23    the LTIP programs?

24    A.    Yes.

25    Q.    And isn't it the company's position that

78

1    in the years 2001, 2003, 2004 and 2005 Delphi

2    lost billions of dollars?

3    A.    I don't know that we lost billions of

4    dollars in 2001.

5    Q.    Well, I didn't say 2001.  If I did, I

6    didn't mean to.  The years in which the

7    incentive programs have not paid out, have not

8    paid out because the performance of the

9    company has been extremely negative in terms

10    of money production or loss, right?

11    A.    I believe in 2001 if the proponents of

12    the company was below target but not

13    necessarily negative.

14    Q.    Have you completed your answer?

15    A.    Yeah.

16    Q.    Okay.  If the company had met its

17    performance targets from the year 1999 through

18    2006, would you agree with me that executive

19    compensation would not have gone down but

20    would rather have increased?

21    A.    No, it would have gone down.

22    Q.    Okay.  And why would it have gone down?

23    A.    Because if it met its targets in those

24    other years, the payout would have been less

25    than in '99 and 2000 when we exceeded our

79

1    targets.

2    Q.    If I look puzzled, it's because I am.  If

3    the company had met its performance targets in

4    '02, '03, '04 and '05 --

5    A.    Yes.

6    Q.    -- executive compensation would have gone

7    down in those years?  Is that what you

8    testified?

9    A.    It would have been -- actually, what I

10    think would have been -- it would have gone

11    down relative to '99 and '00.

12    Q.    No.  If I asked that question let me

13    withdraw it, and let me ask you this question.

14    A.    All right.

15    Q.    Isn't it a fact that if the company had

16    met its performance targets in '02, '03, '04

17    and '05, executive compensation would have

18    risen in those years?

19    A.    It's possible.

20    Q.    Possible?

21    A.    Yeah, it's very individual, it's

22    possible.

23    Q.    Very individual?

24    A.    Yes.

25    Q.    So it could have been that the company

80

1    made lots of money in each one of those years

2    and the salaried and executive workforce would

3    have experienced decreases in their

4    compensation?  Does that strike you as very

5    likely?

6    A.    The only reason I'm thinking about the

7    answer like I am, that if we met our

8    targets -- met our targets, the only way it

9    would go up is if we changed the targets to be

10    higher.

11    Q.    Well, wouldn't that have been a rational

12    management reaction to continue to inspire and

13    incentivize people to make the targets higher

14    each year?

15    A.    It would all depend on what the market

16    study was for the targets on a given year.

17    Q.    So that Delphi could have a situation in

18    which it was meeting its performance targets

19    but under a market driven analysis to be

20    competitive, it reduced its targets for its

21    managers' financial performance?

22    A.    It could.

23    Q.    Okay.  Now  you identified as a area in

24    which executive and managerial compensation

25    had gone down in health care, the issue of

81

1   post-retirement healthcare, correct?

2   A.   Yes.

3   Q.   Would you agree with me that that is the

4   single most important area in which executive

5   and salaried compensation and healthcare has

6   gone down?

7   A.   Since?

8   Q.   Since 1999?

9   A.   Yes.

10  Q.   Okay.  Now, isn't it true that, in fact,

11  Delphi continues to provide retirement

12  healthcare through age sixty-five for its

13  salaried and managerial workforce?

14  A.   Yes.

15  Q.   And there are no plans to change that,

16  correct?

17  A.   The providing of the healthcare or the

18  amount of coverage?

19  Q.   The providing healthcare until age sixty-

20  five?

21  A.   That's correct.

22  Q.   Now I know this is difficult, Mark, and

23  if you can't answer it just let me know, but

24  can you compare the relative percentage

25  decreases in compensation that Delphi is

82

1   asking its hourly workforce to accept as part

2      of the competitive benchmark scenario versus

3      whatever percentage decline you think salaried

4      to management has had from 1999 to now?

5      A.    No, I can't do that.

6      Q.    Well, can you look at the one piece of

7      the equation?  What is the percentage

8      reduction in compensation Delphi is asking its

9      hourly workforce to accept under the

10     competitive benchmark scenario?

11     A.    Sixty percent.

12     Q.    Is there any possibility, just talking

13     between us, that executive compensation has

14     declined by sixty percent from 1999 until now?

15     A.    Yes, there is.

16     Q.    Really?

17     A.    Oh, yes.

18     Q.    Have you been that unfortunate feller?

19     A.    I'm amongst them, yes.

20     Q.    Okay.  And that's because of the foregone

21     compensation that Mr. Butler asked you about

22     at the end of the redirect?

23     A.    No.

24     Q.    Okay.  Is that function of stock

25     opportunities and options and so forth?

83

1      A.    Yeah, it's a function of the annual

2      incentive piece of the compensation not paying

3      out, and the stock options not materializing,

4      and then you have the stock being virtually

5      valueless.

6      Q.    Okay.

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

```
 7   A.   Yes.

 8   Q.   And, again, those are all a function of

 9   the financial performance of the company,

10   correct?

11   A.   According to the market

12   Q.   Or the market.

13   A.   Yes.

14   Q.   In any event, those are aspects related

15   to what you called the at-risk elements of

16   executive compensation?

17   A.   Yes, sir.

18   Q.   You pointed out, and I don't believe

19   you're the first, that Mr. Miller has reduced

20   his wages, I guess we'll call them, from 1.5

21   million per year down to one dollar?

22   A.   Yes.

23   Q.   Now, Mr. Miller got a three million

24   dollar, just about three million dollar

25   signing bonus in July of 2005, correct?
```

84

```
 1   A.   Correct.

 2   Q.   How much of that has he given back as

 3   part of this program of reducing compensation?

 4   A.   None that I know.

 5   Q.   And am I correct that in either '04 or

 6   '05 the president of Delphi received a salary

 7   increase?

 8   A.   We didn't have a president in '04, so

 9   possibly in '05 I'm sure he -- when he was

10   promoted to president, sure.

11   Q.   Okay.
```

12    A.    Yes.

13    Q.    Because sometime at the end of '05 he

14    took a twenty percent decrease, correct?

15    A.    Correct?

16    Q.    It's what you testified to?

17    A.    Yes.

18    Q.    How did that twenty percent decrease

19    stack up against the increase he had gotten

20    earlier that year?  Wasn't it about the same?

21    A.    I'm searching from the memory, those

22    numbers.  I think it's roughly right.

23    Q.    Roughly right?

24    A.    Yeah.

25    Q.    That this twenty percent decrease was

85

1    essentially moving him back to where he was

2    before he got the increase in '05?

3    A.    With different responsibilities.

4    Q.    Well.

5    A.    Well.

6    Q.    And isn't it also true that the other

7    executives who had to forego wage increases,

8    including yourself, I guess, had gotten

9    increases prior to that act of forbearance?

10    A.    In '04?

11    Q.    Yeah.

12    A.    I believe that's right.

13    Q.    And, again, I'm not asking you for the

14    amounts, but would it be roughly true that the

15    amount that was foregone in '05 was equivalent

16    to the increase that had been given in '04?

17    A.    I don't know all the numbers, I only know

18    mine.

19    Q.    Well, can you tell us again, I'm not

20    asking you the number for purposes of privacy,

21    but would the increase that you gave up be

22    about the amount that you got?

23    A.    It was roughly twice as much as my

24    increase.

25              MR. KENNEDY:  Thank you.  No other

86

1    questions.

2    RECROSS EXAMINATION BY

3    MR. PETERSON:

4    Q.    Mr. Weber, Exhibit 311, you testified

5    about the GM bid document?

6    A.    Yes.

7    Q.    This document indicates that General

8    Motors requires Delphi to describe its hourly

9    labor rates, correct?

10    A.    Correct.

11    Q.    You were here yesterday when Mr. Sheehan

12    was testifying, correct?

13    A.    Yes, I was.

14    Q.    And he testified that General Motors

15    estimates that it pays a 2 billion dollar

16    annual wage premium to reflect the fact that

17    Delphi's hourly wages are high, correct?

18    A.    That's the number he said.

19    Q.    All right.  So, when General Motors looks

20    at the -- Delphi's answer to item 10, their

21    hourly labor rate, presumably that forms the

22    basis for this wage subsidy in some manner,

23    isn't that a fair statement?  GM takes a look

24    at this and says, oh, this is Delphi, it's

25    paying higher wages, we are going to pay a

87

1    wage penalty, is that a fair statement?

2    A.    I can't link those two together and

3    conclude that's the rationale for GM.  I don't

4    know how to describe their rationale.

5    Q.    Are you saying they don't pay a wage

6    penalty to reflect Delphi's hourly -- higher

7    hourly wage rates?

8    A.    I'm saying they say they pay a wage

9    penalty.  I don't know how they -- I'm not

10    sure I can link it as carefully as you have,

11    one to the other.

12    Q.    In other words, you don't know that it's

13    this form that does it, but General Motors

14    does know that Delphi pays hourly wages of a

15    certain level, correct?

16    A.    That's correct, they do know that.

17    Q.    And General Motors says that it pays two

18    billion dollars a year in -- more than it

19    would otherwise pay to Delphi as a result of

20    the high wages, correct?

21    A.    Yes.

22              MR. PETERSON:  Thank you.

23              THE COURT:  Well, can I -- let me

24    ask you a little bit more about Exhibit 311.

25              THE WITNESS:  Okay.

1           THE COURT:  To your knowledge, and

2     you referred to bid sheets generally, with

3     other customers too, besides GM?

4           THE WITNESS:  I believe they are,

5     yes.

6           THE COURT:  Are -- is a function of

7     the detail of this information to substantiate

8     some form of, like, cost plus contract?

9           THE WITNESS:  Typically, no.  The

10    function is for the OE to try to determine

11    what their cost base might be.  And if, in

12    fact, they see areas what would be high versus

13    market, it would try to redirect you to think

14    about that area of your bid sheet and to work

15    on that to lower it to market rates.  It could

16    be material, it could be engineering cost, it

17    could be labor cost.

18          THE COURT:  But if the overall price

19    that you're bidding at is at market, why do

20    they care about the elements of it?  If they

21    can buy, you know, catalytic converters from

22    Delphi at ten dollars less per converter than

23    a competitor, why do they care what Delphi's

24    paying its unions?

25          THE WITNESS:  The -- there's a, sort

89

1     of, a precept that many OEs think.  The only

2     thing worse than a bad supplier is a new

3     supplier, because that brings risk and

4    uncertainty.  And so they would always prefer

5    to keep the supplier that they happen to have,

6    because they have a relationship and they

7    understand each other's business.  And if they

8    see a bid that might be out of line, they

9    would prefer to keep the supplier, but to get

10   your cost "back in line."  That's a very

11   strong rationale for why they want to look at

12   this kind of data.

13            THE COURT:  Okay.  So, to your

14   knowledge they're not really tied to some --

15   the contracts were not normally cost plus or

16   something like that?

17            THE WITNESS:  No, they are not.

18            THE COURT:  All right.  Mr. Kennedy

19   asked you some questions about a particular

20   plant in Ohio, do you remember that?

21            THE WITNESS:  Portland.

22            THE COURT:  Okay.  Now, under

23   Delphi's transformation plan in the U.S. its

24   limited -- eliminating what, twenty-one of the

25   twenty-seven plants?

90

1            THE WITNESS:  That's roughly right,

2    yeah.

3            THE COURT:  The proposal, at least,

4    is all read to the UAW and the IUE, was on a

5    national basis, correct?

6            THE WITNESS:  The wage rate or the

7    plants?

8            THE COURT:  The wage rate.

```
 9              THE WITNESS:  Yes.
10              THE COURT:  What is to keep Delphi,
11   particularly given the substantial
12   transformation going down from twenty-seven to
13   twenty-four plants, from negotiating wages on
14   a plant-by-plant basis?
15              THE WITNESS:  The -- wow --
16   technically, we do.  Although, I believe in
17   the UAW plants they have to be approved by the
18   national parties.  And they exercise control
19   over those.  So it's -- it's a technical
20   issue, but in truth and in fact, I believe,
21   that the UAW International negotiates the wage
22   rates by controlling the wage rates in the
23   plants through the approval process.  With the
24   other unions, we do have plant-by-plant
25   negotiations on wage rates.
```

                                                    91

```
 1              THE COURT:  If the unions, in light
 2   of the dramatic changes proposed by Delphi in
 3   terms of the plant footprint, are prepared to
 4   negotiate on a plant-by-plant basis to make
 5   Delphi more competitive with respect to the
 6   particular plants, is Delphi prepared to do
 7   that?
 8              THE WITNESS:  Sure.
 9              THE COURT:  Okay.  Okay, thanks.
10              MR. PETERSON:  Your Honor, can I ask
11   a follow-up question based on your questions?
12              THE COURT:  Yes.
13   Q.  Mr. Weber, I am not a UAW negotiator, but
```

14    I want to ask you in response to the Judge's

15    question, if there were to be plant-by-plant

16    negotiations, wouldn't there first have to be

17    an understanding of what plants were going to

18    be closed?

19    A.    Yes.

20    Q.    And what ones were going to remain open?

21    A.    Yes.

22            MR. PETERSON:  No further questions.

23            MR. KENNEDY:  Just one question,

24    Your Honor.

25    RECROSS EXAMINATION BY


                                                    92


1    MR. KENNEDY:

2    Q.    I think you've testified to this, but to

3    make sure the record is clear, the IUE-CWA

4    does negotiate its wages plant-by-plant,

5    correct?

6    A.    That's what I said.

7    Q.    And your proposal to the IUE, however, is

8    to establish a single national and lower wage

9    rate, isn't that also correct?

10    A.    Yes.

11    Q.    That's different than what the history

12    has been between the parties?

13    A.    Yes.

14            MR. KENNEDY:  All right, no other

15    questions.

16            MS. MEHLSACK:  Your Honor, if I may,

17    I just have one question.

18    RECROSS EXAMINATION BY

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

19    MS. MEHLSACK:

20    Q.   If your aim is to achieve flexibility at

21    the plant level and you currently negotiate,

22    am I right, the stationary engineers'

23    contracts plant-by-plant, why has Delphi

24    proposed, as of late yesterday afternoon, that

25    the stationary engineers accept pattern

93

1    treatment so that they will be replicating the

2    UAW contract at a national level?  Can you

3    explain that?

4    A.   Because, I believe, we think that roughly

5    right there's a market rate for that skill set

6    and that's roughly right the rate for the

7    skill set.

8    Q.   And do you know what the market rate for

9    the skill set for the stationary engineers is?

10   A.   No, I do not.

11   Q.   Are you aware that Dr. Wachter testified

12   that he didn't even consider the stationary

13   engineers either in the Delphi population or

14   in the national population that he utilized to

15   determine comparability at all?

16          MR. BUTLER:  Objection.  I'm not

17   sure that's what Dr. Wachter testified to.

18          THE COURT:  Are you aware of --

19          THE WITNESS:  I don't know what he

20   said about that issue.

21          MS. MEHLSACK:  I have no further

22   questions.

23          THE COURT:  Okay.  Anything else?

24    You can step down, sir.

25             MR. BUTLER:  Your Honor, our next

94

1    witness in support of the debtor's section

2    1113, 1114 motion is Robert Gerling.  Mr.

3    Gerling is labor director, thermal interior

4    division.  And we are calling him for cross

5    examination in connection with his declaration

6    -- declarations, at Exhibits 20 and 280 which

7    we move into evidence subject to cross

8    examination.

9             MR. KENNEDY:  Your Honor, the union

10   cross examiners will be, first the IBEW IAM

11   and secondly the IUOE.

12            THE COURT:  Okay.  Mr. Gerling would

13   you raise your right hand, please?

14      (Witness sworn in.)

15            THE COURT:  Oh, I'm sorry, Mr.

16   Gerling, could you spell your name for the

17   court reporter?

18            THE WITNESS:  Robert, R-O-B-E-R-T.

19   Gerling G-E-R-L-I-N-G.

20            THE REPORTER:  Thank you.

21            THE COURT:  Ms. Robbins.

22   CROSS EXAMINATION BY

23   MS. ROBBINS:

24   Q.   Good morning, Mr. Gerling.

25   A.   Good morning.

95

```
 1    Q.    Although I believe we've met --

 2    A.    Couple times.

 3    Q.    I'm Marianne Robbins representing the IAM

 4    IBEW for the purposes of the record.  How many

 5    years have you been a negotiator?

 6    A.    Since about 1992, so about fourteen

 7    years.

 8    Q.    You recently received a request from the

 9    IAM IBEW for information concerning the

10    collective bargaining agreements that were not

11    part of the 1113 proceeding, is that right?

12    A.    Is that the one on the Mountain View and

13    Irvine and Landrum?  Yes.

14    Q.    That's right.

15    A.    Yeah.  Last night I received that.

16    Q.    And you provided, in response, an e-mail

17    to the IBEW and IAM, is that right?

18    A.    I sent the request to Mr. McQuee asking

19    for the information and Mr. McQuee later that

20    evening e-mailed the information back to Mr.

21    Middleton and Mr. Griffin.

22    Q.    I think this is going to be marked --

23    excuse me, I'm away from the mike.

24          THE COURT:  Okay, do you all have a

25    copy of this?
```

96

```
 1          MR. BUTLER:  Yeah.  We just got --

 2    we just received it.  We have it, Your Honor.

 3          THE COURT:  Okay.

 4          MR. BUTLER:  We've been given it
```

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

5  this morning at the beginning of things.  It's

6  marked at 370.

7         THE COURT:  Is someone going to put

8  this in the binder?

9         MS. ROBBINS:  Yeah.

10        MR. BULTER:  It will find its way

11  into the books, Your Honor.

12        THE COURT:  Okay.  All right.

13  Q.   I'm showing you what's been marked as

14  Exhibit 317, can you identify that as the e-

15  mail chain that discusses those two plants?

16  A.   There's three sites, but --

17  Q.   The three sites?

18  A.   Yeah, but there is another subsequent e-

19  mail from Mr. McQuee that's not attached to

20  this.

21  Q.   Okay.  But you recognize this as an e-

22  mail chain between yourself, Mr. McQuee and

23  IBEW 663's general manager, Randy Middleton,

24  is that right?

25  A.   Yes.  Yes, I do.


                                              97


1  Q.   And I'm going to direct your attention to

2  the last statement on the first sheet, and it

3  indicates that you knew that the Irvine and

4  Landrum plants were either closed or in the

5  process of being closed?

6  A.   That's my understanding, yes.

7  Q.   And that's why they were excluded from

8  the bankruptcy process?

9  A.   As far as I know, I think, because they

10      were in the process of already being closed.

11      Q.    And is that accurate?

12      A.    To my knowledge, it's accurate.

13      Q.    And you know that in terms of the

14      Milwaukee facility where the IAM and IBEW are

15      located, that has also been announced for

16      closure?

17      A.    Yes, I do know that.

18      Q.    But we're here today?

19      A.    Yes, we are.

20      Q.    I'm going to ask you to take a look at

21      Exhibit 140.  It's in volume 6.  Do you

22      recognize that as an information request you

23      received from IBEW local 663 on October 26th

24      of 2005?  Just days -- about the time that the

25      initial proposal came out.

98

1      A.    Yes, I do.

2      Q.    And what, if anything, was your role in

3      addressing this information request?

4      A.    I took the information request and gave

5      it to Mr. McQuee who was coordinating the

6      information requests for all the unions and so

7      that we could track that and make sure we got

8      responses back.  So, I made sure it got to Mr.

9      McQuee.

10      Q.    And did you have any role in verifying

11      whether or not there were responses to these

12      questions?

13      A.    Mr. McQuee would send out updates on a

14      regular basis and I would track to see that

15    the unions I was dealing with, their responses

16    were coming back as accurately and as quickly

17    as they could be.

18    Q.    Can you confirm that, with respect to

19    Exhibit 140, there was a reply to the first

20    two questions but not to the other questions?

21    A.    I can't verify whether the first two and

22    the others weren't.  I don't --

23    Q.    You don't know?

24    A.    I don't know.

25    Q.    You did nothing to check whether the IBEW

                                                            99

1     and IAM were provided with the information

2     that had already been provided to the UAW, IUE

3     and USW?

4     A.    I can't confirm what the USW got.  I only

5     had the Milwaukee piece.

6     Q.    And you also don't know whether any

7     information was provided to the IAM and IBEW

8     as information flowed subsequently to October

9     to the larger unions?

10    A.    I wasn't involved with those discussions.

11    Q.    Do you understand that if the IAM and

12    IBEW did not receive the same information they

13    were at a disadvantage at evaluating the

14    employer's proposal?

15    A.    Yes.

16         MR. JERMAN:  Objection, Your Honor.

17    That assumes that they did not get the same

18    information when, in fact, all the information

19    is on the virtual data room, to which they

20    have access.

21              THE COURT:  Well, you can ask it as

22    a hypothetical question.  If, in fact, this

23    information had not been provided, would that

24    have, in your view, put the union at a

25    disadvantage?

100

1              THE WITNESS:  I guess I would answer

2    the question that each group that looks at the

3    proposal will look at it differently, based on

4    their circumstances.  So the information that

5    they would request would be -- may be

6    different.  So that's, you know, there was a

7    lot of questions asked to the IBEW, IAM did

8    not ask as many questions as the other unions

9    in total.  So, it just depends on what

10    information you want to whatever, perform

11    whatever analysis upon the proposals you want

12    to.

13    Q.   Did you understand from Exhibit 140 --

14    A.   Uh-huh.

15    Q.   -- that the IAM and IBEW were asking for

16    all of the information which the larger unions

17    received?

18    A.   That's what's written in the document,

19    yes.

20    Q.   But you have no information as to whether

21    that was provided?

22    A.   I know that all the requests made by the

23    IBEW and IAM have been responded to, to my

24    knowledge.

25   Q.   But you can't point to a response to the

101

1   questions 3 through the end of 140?

2   A.   I can't tell you what date they were

3   responded to, but I know they were all

4   responded to.

5   Q.   There was a subsequent information

6   request from the IBEW on October 31, 2005.

7   It's Exhibit 198F.  That's volume 9 if you

8   need to get it in front of you, Mr. Gerling.

9   A.   I have it now.

10   Q.   Did you have any role in responding to

11   this information request, although it was

12   directed to Kevin Butler initially?

13   A.   198 is Randy Middleton's declaration.

14   Q.   That's right.  And there should be,

15   attached to that, as Exhibit F --

16   A.   Oh, okay.  I didn't hear you say that,

17   I'm sorry.

18   Q.   Sorry.

19        THE COURT:  Is that next to the

20   last?

21        MS. ROBBINS:  Next to the last, yes.

22   Blue sheet.

23        THE WITNESS:  Okay.  I now have it

24   here, would you ask your question again?

25   Q.   Yes.  And the question is did you have

102

1   any role in arranging for the response to this

2    information request?

3    A.    I received a copy of it from Mr. Butler

4    and I did the same thing.  I sent it to Mr.

5    McQuee to coordinate the information to go

6    back to the IAM IBEW.

7    Q.    And do you have any knowledge as to what

8    extent there were responses to this request

9    for information?

10   A.    As far as I know, all our information

11   requests, based on the tracking sheet that we

12   use, have been answered -- have been replied

13   to.

14   Q.    But you yourself do not know what

15   information was provided in response to the

16   inquiries, is that right?

17   A.    To the individual questions, I don't have

18   detailed knowledge of, you know, what was the

19   response to the individual request.

20   Q.    Okay.  Why don't you turn to Exhibit 141,

21   and that's in volume 6.

22   A.    Okay.  I have it.

23   Q.    Did you receive copy of this document

24   that was in response to the union's initial

25   information requests?

103

1    A.    I'm not on the distribution, I can't

2    confirm whether or not I got a copy of it or

3    not.

4    Q.    Okay.  So even though you were the chief

5    negotiator, with respect to the IAM and IBEW

6    the company did not copy you with -- Delphi

7   did not copy you with the responses to the

8   information requests that were provided to the

9   IAM and IBEW?

10   A.   As we move forward on the process,

11   subsequent ones were.  I can't confirm whether

12   this one was or not.

13   Q.   Okay.  Can you see, from this document,

14   that only the first two questions asked by Mr.

15   Riley in Exhibit 140 are responded to?

16   A.   I've got to look at 140 again to answer

17   your question.

18   Q.   If you have the notebook with 141, all

19   you have to do is flip one exhibit.

20   A.   To 142, okay.

21   Q.   It's 140 is Mr. Riley's request.

22   A.   Oh, okay.

23   Q.   And 141 is a response.

24   A.   Okay.

25   Q.   And can you confirm that there's only a

104

1   response to the first two of Mr. Riley's

2   questions?

3   A.   I believe you're correct.

4   Q.   Okay.  And item number 3 references --

5   A.   Excuse me, on which one?

6   Q.   Item number 3 on Exhibit 141, the

7   response.

8   A.   Uh-huh.

9   Q.   References questions 6, 7 and 8 of the

10   October 31st information request and the

11   response indicates that that had to do with

12    salaries and bonuses, compensation of salaried

13    employees.

14    A.    Yeah, that's what it refers to.

15    Q.    And essentially, the company's position

16    there is that that's confidential information,

17    it's not going to be provided, is that right?

18    A.    It talks about individual employee's

19    information is considered to be confidential.

20    That's what it states.

21    Q.    And there's no substantive information

22    that is provided?

23    A.    No.  It says in lieu of this personal

24    information, we have attached copies of the

25    most salary range table for classified


105


1    salaried employees.  There's also a reference

2    to senior corporate officer David being

3    available.

4    Q.    Unfortunately, the response to this

5    document was put in the confidential booklet.

6    So it gets a little more complicated in terms

7    of being able to follow it.  Let's see if we

8    can find it.  If you turn to Exhibit 143,

9    which unfortunately is in confidential volume

10    1 --

11           MR. JERMAN:  Objection, Your Honor.

12    Characterization.

13           THE COURT:  You're just saying

14    unfortunately because we have to switch

15    volumes, right?

16           MS. ROBBINS:  Yeah.  That's all I'm

17    saying, Your Honor, is --

18              THE COURT:  Okay.  Just

19    mechanically.

20              MS. ROBBINS:  It's just

21    mechanically.

22              THE COURT:  All right.  Fair enough.

23    Q.    And when you get, Mr. Gerling, Exhibit

24    143 in front of you, which is in confidential

25    binder number 1.

106

1    A.    Okay.

2    Q.    If you turn to the last page of Exhibit

3    143, can you identify that as the wage

4    structure that is referred to?

5    A.    It's titled 2005 Salary Range Structure,

6    you're correct.

7    Q.    Okay.  And if you look at this document

8    by itself, which is what we have in front of

9    us, it's impossible to tell anything about the

10    compensation that is provided for a given

11    skill set or responsibility level, isn't that

12    right?

13    A.    Well, I mean, I can make an inference

14    from the data that a level two person

15    compensated less has certain skill sets that

16    aren't the same as a level nine person.

17    Q.    But you have no idea, from this chart,

18    whether someone is above market, below market

19    or where they are, because you don't know

20    where the skill sets are, they're not defined

21     in this document, isn't that right?

22    A.    Although I'm not a compensation expert,

23    this -- the midpoint typically refers to the

24    market competitive rates for those ranges.

25    Q.    Would you agree that if the IAM and IBEW


107


1    wanted to test the assertion that was made by

2    Mr. Weber, this document provides no

3    information that would allow you to test

4    whether, in fact, for any given skill set this

5    was a market level rate?

6    A.    I think you'd have to use this in

7    conjunction with more questions.  This, in and

8    of itself, I don't think will answer all your

9    questions.  This is vital to answering your

10    question.

11    Q.    Do you have any idea why Delphi provided

12    only this sheet without any of the additional

13    information that would be needed to interpret

14    this document?

15    A.    That request was not made of me, so it's

16    not fair for me to answer that question.

17    Q.    And you did not check, in terms of what

18    kind of response was being provided to the

19    unions you were negotiating with, with respect

20    to how their information requests were being

21    responded to?

22    A.    There were no follow-up questions to me,

23    based on these data requests.

24    Q.    And the company's basic position was,

25    that's confidential, this is the information

108

1    we're providing.

2    A.    Based on the previous exhibits we looked

3    at, that was the statement.

4    Q.    While we're on 143 for a moment, do you

5    understand the union reiterated the same

6    question on March 30th, with respect to

7    salaried compensation --

8            MR. JERMAN:  I'm sorry, which

9    exhibit?

10           MS. ROBBINS:  This is 143, the first

11   page.

12   A.    Which one of these e-mails?

13   Q.    Item number 4, in the first e-mail.

14   A.    Okay.

15   Q.    Do you see that that is a response --

16   actually, I think, Mr. Middleton's request is

17   on the back.  I'm sorry.  E-mail chain, the

18   lower one is the first one --

19   A.    Sure.

20   Q.    -- and his question number 4 is then

21   responded to on the first page by Mr. McQuee,

22   basically saying, again, it's confidential

23   information and providing a copy of that wage

24   schedule we just discussed.

25   A.    The response to number 4 states, as he

109

1    communicated to you previously.  That's right.

2    They're not --

3    Q.    So the union asked a question?

4    A.    I'm sorry.  The information, because of

5    the confidential nature, that wasn't shared.

6    Q.    So the IAM -- excuse me.  The IBEW asked

7    the question twice and the response they got

8    twice was, it's confidential and one sheet of

9    paper that you can't make sense of by itself,

10   is that right?

11             MR. JERMAN:  Objection, Your Honor.

12             THE COURT:  You should rephrase the

13   question.

14             MR. JERMAN:  Your Honor, I'm

15   objecting to that as assuming facts not in the

16   record.

17             THE COURT:  I sustain the objection.

18             MS. ROBBINS:  I'll withdraw the

19   question.

20   Q.    Can you confirm, Mr. Gerling, that in

21   response to the union asking the question

22   twice, concerning salaried compensation, the

23   union was informed that the information was

24   confidential and received one sheet of paper

25   only?


110


1    A.    Based on the information I have in front

2    of me, it appears they asked twice.  I don't

3    know if there were other requests and other

4    responses given, but based on the information

5    I have here.

6    Q.    I'm going to now address your attention

7    to the meeting on -- that you had with the IAM

8    and IBEW bargaining committees on October --

9    in October of 2005.

10    A.    Okay.

11    Q.    You were aware, at that time, that Mr.

12    Middleton was out of town, is that right?

13    A.    When the meeting was -- when we scheduled

14    the meeting, yes.  I was informed he was on

15    vacation.

16    Q.    And you understood that he was the chief

17    spokesperson for the IBEW?

18    A.    I was informed that, yes.  I'd never met

19    Mr. Middleton at that point.

20    Q.    Yeah.  But you -- in -- do you know

21    whether the IAM business agent was present or

22    not, at that meeting?

23    A.    There was a gentleman on the phone and I

24    don't remember which one he was.  And there

25    was a gentleman there by the name of Bill

111

1    Christianson who was not a plant person.  So

2    there was somebody from the international

3    there for the IBEW.

4    Q.    Uh-huh.

5    A.    I think he might have been on the phone.

6    Q.    And were you aware that he was not the

7    regular business agent assigned to that unit?

8    A.    He told us that, yes.

9    Q.    Okay.  And yet, at that meeting, you

10    presented the company's proposal as of October

11    2005 to the IAM and IBEW, is that right?

12    A.    In separate meetings.  Yes, I did.

13    Q.    And you did not say, at that meeting,

14    that you wanted to sit down and negotiate

15    concerning that proposal at that time, isn't

16    that right?

17    A.    I don't know that I said I didn't --

18    wouldn't sit down and negotiate.  What I

19    believe I said is I gave them the information

20    and they should review it and ask questions

21    and then get back with me.

22    Q.    Okay.  And the response that you made,

23    review this and get back to me, or review this

24    and we'll talk about it later, rather than

25    negotiating at that point in time, you

112

1    understood to be appropriate because you had

2    presented this without the chief negotiators

3    being present?

4    A.    Well, Mr. Middleton was not present, but

5    the way I looked at it is I presented them

6    quite a big or a large amount of information

7    that they probably wouldn't be able to

8    negotiate without further review.

9    Q.    Okay.  So you understood that that

10    meeting was not a negotiating meeting, it was

11    an information providing meeting?

12    A.    Well, it was going to set the stage for

13    future negotiations, however they occur.

14    Q.    But in terms of that meeting, you

15    understood it was not a negotiating meeting,

16    it was to present information to the unions?

17    A.    Well, they could certainly negotiate if

18    they wanted to.  I didn't think they were

19    going to, to be honest with you.

20    Q.    And you knew that since you'd had the

21    meeting without the chief negotiators present,

22    it would not have been appropriate for you to

23    engage in negotiations without giving them a

24    chance to get their spokespeople there and

25    informed?

113

1    A.    Well, I have --

2    Q.    Isn't that right?

3         MR. BUTLER:  Can he answer the

4    question you first asked?

5    A.    I guess the quest -- is the question you

6    asked about, is it appropriate for me to

7    negotiate without their chief negotiator?  I

8    have bargained with folks when their chief

9    negotiator has not been present.  Now, that

10    was my first meeting with the IBEW and Mr.

11    Middleton was not present.  I didn't think

12    they were going to want to sit down and

13    negotiate the terms because he wasn't there.

14    Q.    And for that reason you understood the

15    meeting to be an information providing

16    meeting, rather than a negotiating meeting?

17         MR. BUTLER:  Objection, asked and

18    answered.

19         THE COURT:  All right.  Sustained.

20    Q.    Now, in November of 2005 there was

21    another proposal from the company, and will

22    you agree with me that you did not go to

23    Milwaukee and have a meeting with the IAM or

24    with the IBEW concerning that proposal?

25    A.    I only met with Mr. Middleton.

114

1    Q.    Okay.

2    A.    And we met in Detroit so I did not go to

3    Milwaukee, you're correct.

4    Q.    Okay.  And so any implication in your

5    declaration that you came to Milwaukee or met

6    with the committees would be an error?

7    A.    I corrected that statement in my

8    supplemental declaration, so if it's stated,

9    it was not correct.  That's why I corrected

10    it.  So I didn't go to Milwaukee in November,

11    if that's what you're asking.

12    Q.    That's what I'm asking.

13    A.    No, I didn't.

14    Q.    And you didn't meet with the committees

15    in November of 2005, you only met with Mr.

16    Middleton in Detroit?

17    A.    He was in town, and that's correct.

18    Q.    And at that meeting you indicated that

19    you had -- that Delphi would be meeting with

20    the larger unions first?

21    A.    Yeah.  It is our traditional bargaining,

22    has been, we've done the UAW, IUE and then,

23    kind of, through the process and then got down

24    to the smaller groups, yes.

25    Q.    And you received a letter from an

115

1    attorney in our office, Kim Hall, confirming

2    that you were -- that the Delphi plan to meet

3    with the larger unions first, isn't that

4    right?

5    A.    I received a letter from Mr. Hall and I

6    have -- I don't have it in front of me, but I

7    did receive it and I did attempt to call Mr.

8    Hall back, who never returned my phone call.

9    Q.    This would be volume 9, again, 189

10    Exhibit B, I think.  Did I say something else?

11            MS. ROBBINS:  I'm inverting my

12    numbers, Your Honor.

13    Q.    Let's try 198.  And, unfortunately, that

14    means a different volume.  I apologize.  But

15    not confidential.  I lost my place.  Okay.

16    Mr. Gerling, do you now have that in front of

17    you?

18    A.    Yes, I do.

19    Q.    And in the first paragraph, Mr. Hall --

20    A.    Wait.  I have Randy's declaration.

21    Q.    Okay.

22    A.    Is it attached to it somewhere?

23    Q.    Exhibit B.

24    A.    B?  Okay.  Yeah, I got it.

25    Q.    And Mr. Hall wrote to you indicating that

116

1    you had -- that we understood that Delphi does

2    not intend to bargain with the IAM and IBEW in

3    this matter until Delphi had already met with

4    its larger unions, example IUE and UAW, is

 5    that right?

 6    A.    That's what his letter says.

 7    Q.    And he asked that if we were mistaken in

 8    this regard, or if it changes, that you would

 9    let us know.

10    A.    And I called Mr. Hall the day I received

11    the letter, who never returned my phone call.

12    Q.    Mr. Gerling, you're an experienced

13    negotiator, are you not?

14    A.    Yes.

15    Q.    And generally, when you receive a written

16    statement, and you're asked to correct the

17    statement if it's wrong or if it changes,

18    isn't it your practice to respond in writing?

19    A.    We respond all sorts of ways.  I did not

20    respond to this letter in writing.  I did call

21    Mr. Hall.

22    Q.    And, basically, what he was saying was

23    consistent with pattern bargaining, isn't that

24    right?

25    A.    Yes, because that's what Mr. Middleton

                                          117

 1    and I spoke about in Detroit.  We were going

 2    to do some pattern -- we were going to follow

 3    the pattern.

 4    Q.    So, the statement wasn't inaccurate.

 5    A.    No.  No, that's what Mr. Middleton and I

 6    talked about.  We were going to see what the

 7    other unions did.

 8    Q.    Between the November 16th meeting with

 9    Mr. Middleton and March of 2006, you did not

10    contact the IAM and IBEW to set up negotiating

11    meetings, is that right?

12    A.    I can't recall any specific meetings that

13    I set up.

14    Q.    And you were not surprised that you did

15    not receive contacts from them, because you

16    were engaged in pattern bargaining?

17    A.    That was the approach we were taking,

18    yeah.

19    Q.    Now, on March 30, 2006, initially you

20    were going to come to Milwaukee but then later

21    you participated, through conference call, in

22    a presentation of a new proposal to the IAM

23    and IBEW?

24    A.    I believe -- I don't remember the exact

25    date, but it's the right time frame,

118

1    absolutely.

2    Q.    And basically, the main thing that you

3    talked about in that conference call was the

4    UAW attrition package, isn't that right?

5    A.    We talked about the attrition package and

6    the fact that we would be offering something

7    similar to IAM IBEW.

8    Q.    And in the course of that call Mr.

9    Middleton and Mr. Griffin asked you when you'd

10    be available to bargain?

11    A.    I believe they did.

12    Q.    And you said you'd get back to them?

13    A.    Yes.

14    Q.    But the next thing that happened was the

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

15    company filed the 1113 petition?

16    A.    I believe in the sequence of events,

17    that's correct.

18    Q.    Before you ever got back to them?

19    A.    I believe that's correct.

20    Q.    Were you surprised that the motion was

21    filed against the IAM and IBEW?

22    A.    I guess I don't know what you mean by

23    surprised.

24    Q.    Well, did you understand that the 1113

25    was going to be focused on the unions with

119

1    which the company had negotiated thus far?

2    A.    I'm not -- I'm not following your train

3    of thought here.  Am I surprised that the

4    motions to do 1113 and 14 with the IAM and

5    IBEW were filed?

6    Q.    Uh-huh.  At the time they were?

7    A.    No, because they were all filed at the

8    same time, I believe.

9    Q.    Now, you received -- did you receive

10    notice of an e-mail from an attorney in our

11    office, Joel Hartley, on or about April 12,

12    2006?

13    A.    I don't know.

14    Q.    Volume 9, Exhibit 198, Exhibit E.

15    A.    Is it this one?  I've got 198.  I've

16    not -- until right now, I've never seen this

17    e-mail.

18    Q.    Okay.  Were you informed -- if you look

19    at the second paragraph from the bottom, on

20    the first page of Exhibit E, were you

21    contacted on or about -- excuse me.

22              MS. ROBBINS:  Withdraw the question.

23    Q.   If you look -- I'm sorry.  Exhibit 145,

24    volume 6, did you receive a copy of that

25    letter?

120

1    A.   I don't see that I -- I don't recall ever

2    seeing this before.

3    Q.   The next to the last paragraph indicates

4    that you will be contacting the IAM and IBEW.

5    Does that refresh your recollection at all?

6    A.   Which paragraph?

7    Q.   The next to the last paragraph.  It says

8    Mr. --

9    A.   Oh, okay.

10    Q.   -- Gerling will contact your clients

11    immediately.

12    A.   Uh-huh.  We had a meeting in Milwaukee

13    the following week.

14    Q.   Okay.

15    A.   I don't remember when I contacted them,

16    but I did contact them.

17    Q.   Your declaration, sir, says that it was

18    on April 13th, which is one day after your

19    counsel indicated that you would contact the

20    unions?

21    A.   That could be correct.  I'm --

22    Q.   And were you informed --

23    A.   -- I don't remember the date I contacted

24    them.

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

25   Q.   -- yeah.  Were you informed that Ms.

121

1    Hartley had inquired about why there had not
2    been a meeting set up?  And that you were to
3    contact the unions as per your counsel's
4    instruction?
5    A.   I don't recall that conversation at all,
6    to be honest with you.
7    Q.   In any case, you contacted Mr. Middleton
8    on April 13th, and he said he would be
9    available to meet on the 14th and 15th and the
10   next week, is that right?
11   A.   Could be.  I don't recall his exact
12   comments but it's -- he could have said that.
13   Q.   And you indicated to him that you would
14   first be available on the 20th and 21st.  And
15   the parties met on those dates?
16   A.   That's correct.
17   Q.   And on the 20th, the first day that you
18   had met in person with Mr. Middleton and Mr.
19   Griffin and their committees, they provided
20   you with a counter-proposal?
21   A.   At the end of the day, they did.
22   Q.   And on the 21st you asked some questions
23   about that counterproposal?
24   A.   Yes, I did.
25   Q.   And then you indicated to them that you'd

122

06/14/2006 10:57 AM

1   be providing them with an attrition package?

2   A.   Yeah.

3   Q.   And that you could not give them new

4   dates for bargaining?

5   A.   I told them I would get back with them on

6   dates. So yeah, at the end of the meeting I

7   didn't -- we didn't have another meeting set

8   up, that's correct.

9   Q.   And they asked you about that, but you'd

10  said you'd contact Mr. Middleton on Monday or

11  Tuesday of the following week?

12  A.   Uh-huh.

13  Q.   Is that right?

14  A.   I believe that's correct.

15  Q.   But you didn't call Mr. Middleton on

16  Monday or Tuesday, did you?

17  A.   I think he called me Wednesday, so you're

18  correct.

19  Q.   Later in the week he called you, and you

20  indicated that you were not ready to meet?

21  A.   Because we did not have the attrition

22  package ready to present.

23  Q.   You indicated to him that there would

24  also be a counterproposal to the union's

25  counterproposal, but you also didn't have that

123

1   ready?

2   A.   At the time I did not have it ready.

3   Q.   And lo and behold, when we started this

4   hearing on May 9, 2006, you still did not have

5   the attrition package or the counterproposal

6   ready, isn't that right?

7          MR. JERMAN:  Objection, Your Honor.

8   Counsel is aware that the company, through me,

9   made offer to her prior to that date.

10          MR. ROBBINS:  We'll get there in a

11   minute.

12          MR. SIMON:  Yeah, that's not an

13   objection, that's testimony.

14          THE COURT:  Well, when you say you,

15   what do you mean?

16          MS. ROBBINS:  Does anyone have any

17   water?  I'm sorry.

18          MR. BUTLER:  Sure.

19          MR. KENNEDY:  Don't drink their

20   water, Marianne.

21          MS. ROBBINS:  Don't drink their Kool

22   Aid, isn't that the phrase?

23          MS. ROBBINS:  I'm sorry, Mr.

24   Gerling.

25          THE WITNESS:  It's okay.


124


1          MS. ROBBINS:  Do you have water up

2   there?

3          THE WITNESS:  For now.

4          MS. ROBBINS:  We don't want you to

5   be as parched as counsel is right now.  Excuse

6   me.  To get back to the questions, Mr.

7   Gerling.

8          THE WITNESS:  Okay.

9   Q.   As of the first day of hearing, you had

10   not been able to provide to the union the

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

11  attrition package that you said you were

12  working on, is that right?

13  A.   That's right.  It was given to them later

14  in the week.

15  Q.   Okay.  And as of the first day of

16  hearing, you also had not presented to the

17  union any counterproposal that you were

18  working on?

19  A.   And I had not presented a

20  counterproposal, that's correct.

21  Q.   And you also had not come up with any

22  firm dates for bargaining as of the beginning

23  of the hearing on May 9th?

24  A.   We set those dates during that week for

25  them to come to Troy.  But on the 9th, no.

125

1   Q.   But to answer my question --

2   A.   But on the 9th, no.  But it was a couple

3   of days later.

4   Q.   -- at the beginning of the hearing --

5   A.   That's correct, at the beginning of the

6   hearing --

7   Q.   -- there was not?

8   A.   -- yes.

9   Q.   Now, Mr. Butler would like me to skip

10  ahead to Exhibit 272, I believe --

11          THE COURT:  Did you know that, Mr.

12  Butler?

13          MS. ROBBINS:  Or Mr. Jerman, excuse

14  me.

15          MR. JERMAN:  I'm honored.

16          MR. BUTLER:  Counsel hasn't shared

17   her examination outline with me, but I -- but

18   if that's where we're going, I'm delighted to

19   go there.

20          THE WITNESS:  270 --

21          MS. ROBBINS:  I don't even know if I

22   have that book up there.

23          THE COURT:  What do you need?

24          MS. ROBBINS:  270.  We'll see if

25   I've got it right.


126


1   A.   I have it.

2   Q.   Okay.  Were you aware of a proposal from

3   Delphi that essentially said the IAM and IBEW

4   should not participate in these hearings, but

5   that they would be treated the same as the

6   UAW?

7          MR. JERMAN:  Objection, Your Honor,

8   that mischaracterizes the document when

9   counsel adds.

10          MS. ROBBINS:  Well, if you want to

11   show me where it is.

12          THE COURT:  I'm sorry, are you just

13   asking a general question --

14          MS. ROBBINS:  Yeah

15          THE COURT:  -- and not referring to

16   the document?

17          MS. ROBBINS:  Well, this is an

18   explanation.  What I have here is Mr. Jerman's

19   explanation of the proposal. And it's not the

20   initial proposal, it's an explanation of the

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

21    proposal and I --

22              THE COURT:  Well, why don't you just

23    ask the question?

24              MS. ROBBINS:  I tried to --

25              THE COURT:  It's fine to ask the

127

1    question as it is, just based on your general

2    knowledge as opposed to any specific proposal

3    or --

4              THE WITNESS:  Can you just say the

5    question again?

6    Q.   Okay.  Are you familiar with a proposal

7    Delphi made on or about the beginning of this

8    hearing, that essentially proposed that the

9    IAM and IBEW not participate in this hearing

10   and that they would later be treated the same

11   as the UAW?

12   A.   I'm familiar with that approach that

13   they -- that offer was going to be made to the

14   IBEW IAM.

15   Q.   I'm going to ask you to take a look at

16   page 272.

17              THE COURT:  Exhibit 272?

18   Q.   Exhibit 272, excuse me.

19   A.   Okay, now I have it.

20              MS. MEHLSACK:  Excuse me Judge, 277

21   is the original offer.

22              MS. ROBBINS:  Uh-huh.

23   A.   I have it.

24   Q.   Okay.

25   A.   Okay.

128

1    Q.    And are you familiar with this document?

2    A.    I've subsequently seen it, yes.

3    Q.    Okay.  And do you understand that the

4    employer's proposal was such that if the UAW's

5    contract was rejected in these proceedings,

6    even though the IAM and IBEW would not have

7    participated, their contracts would be

8    rejected as well?

9            MR. JERMAN:  Objection, best

10        evidence.

11            MS. ROBBINS:  We have the Exhibit

12    272.

13            MR. JERMAN:  No, the proposal is

14    Exhibit 277 and it's in evidence, and it's the

15    best evidence of what the proposal was.

16            MS. ROBBINS:  Look, Your Honor, I

17    did not ask him what the initial proposal was.

18    I was asking him whether this is part of the

19    proposal that the IAM and IBEW be bound by

20    this -- by rejection of the UAW contract.  And

21    they may not like this document, but I am

22    questioning the witness on a document that

23    came from counsel that he's familiar with.

24            THE COURT:  Well --

25            MR. JERMAN:  Your Honor, she's

129

1    questioning this witness about the meaning of

2    an offer I extended to her.  And I just don't

3    think that by questioning Mr. Gerling, at

4    least in the manner she's been doing so, is

5    appropriate.  The offer speaks for itself.

6           THE COURT:  Well, have you --

7           MS. ROBBINS:  Well, a minute ago --

8           THE COURT:  Well, let -- Mr.

9    Gerling, have you yourself done anything in

10   respect of this offer?  Have you communicated

11   it in any -- or discussed it with the union?

12          THE WITNESS:  We've had discussion

13   about the offer that was made, yes.

14          THE COURT:  What I'm talking

15   about -- I'm now talking about the offer that

16   came from Mr. Jerman --

17          THE WITNESS:  Yeah, yes.

18          THE COURT:  So you could ask him

19   about those discussions, that's fine.

20          MS. ROBBINS:  Uh-huh.

21   Q.   Is it your understanding that under the

22   proposal, if the IAM and IBEW accepted the

23   proposal and did not participate in this

24   hearing, the company's position was, if the

25   UAW contract was rejected, so was the IBEW and

130

1    IAM contracts?

2    A.   It would be similar treatment at the

3    UAW had received, that was my understanding.

4    Q.   Did you understand that the IAM and IBEW

5    did not have flow-back rights that the UAW

6    has?

7    A.   Yes, I'm aware of that.

8    Q.    Were you aware that the IAM and the IBEW

9    did not have benefit guarantees, at least --

10            MS. ROBBINS:  Let me retract that

11    question.  Strike that question.

12    Q.    Were you aware that the company's

13    position has been that they are not aware of

14    any benefit guarantees for the IAM and IBEW?

15    A.    I believe I raised that issue to Randy.

16    I asked them if they had one, because we were

17    not aware that they had or done.

18    Q.    And sitting here today, you do not know

19    of any benefit guarantee?

20    A.    That's correct.

21    Q.    For the IAM and IBEW?

22    A.    That's correct.

23    Q.    And so, did you understand that treating

24    the IAM and the IBEW the same as the UAW would

25    have a much more severe impact on their

131

1    members?

2    A.    It would have a different impact because

3    of the benefit guarantees, absolutely.

4    Q.    Specifically, the UAW members, if their

5    retiree benefits, insurance benefits and life

6    insurance benefits were removed by Delphi,

7    they would be provided by General Motors, is

8    that your understanding?

9    A.    I'm not a benefit guarantee expert, but I

10    know there's -- that it speaks to those terms

11    that if something were to happen within a

12    certain time frame that the benefit guarantee

13    would cover them.

14    Q.    And if Delphi terminated its hourly

15    pension plan --

16    A.    Uh-huh.

17    Q.    -- as it seeks the right to, the IAM and

18    IBEW members could be left with no benefit

19    from GM to bring them back up to the

20    contractual pension level?

21    A.    As I understand it, that is correct.

22    Q.    And because there are substantial

23    supplemental benefits, that would be a huge

24    detriment to those who were not already

25    eligible for full Social Security benefits?

132

1    A.    No, there would be a difference actually.

2    I'm not sure what all the supplements speak

3    to, but it would be less, obviously.

4    Q.    You're aware, as the negotiator with the

5    IAM and IBEW that it would be substantially

6    less?

7    A.    It would be less, I don't know if it's a

8    hundred, but I generally spoke in terms of

9    about fifty percent. Less than what the

10    regular pension was when they -- when we

11    talked about it.

12    Q.    So their pension would be cut in half and

13    they would not have retiree health benefits?

14    A.    Yeah.  If they were all terminated, yeah.

15    Q.    So under your proposal, the pension could

16    be cut in half, no retiree benefits and any

17    concessions that were imposed on the UAW, in

18    addition to that, would be imposed on them?

19    A.    Well there would be retire --

20            MR. JERMAN:  Object.  That

21    mischaracterizes the record.  There was no

22    proposal from the company on the table, in any

23    form, to terminate the pension plan.  The

24    proposal is to decrease the plan.

25            MS. ROBBINS:  There is a proposal

133

1    that would give or claim, acknowledge --

2    there's a proposal that the company have the

3    right to do it in the future, Your Honor.  And

4    there is also evidence in this record that the

5    company says it does not know how it's going

6    to fund it without a legislative solution.

7            THE COURT:  All right.  I think the

8    objection is sustained.  You went beyond that,

9    I think.  Assuming that those things -- you

10    assumed those things would happen.  You could

11    ask it hypothetically, if those things did

12    happen --

13            MS. ROBBINS:  Yes.

14            THE COURT:  -- what would the affect

15    be.

16            MS. ROBBINS:  Yeah.  And I don't

17    think that that question is irrelevant in this

18    proceeding, Your Honor.

19            THE COURT:  It was not a relevance

20    objection, so that's fine.  You could ask it

21    hypothetically if you want to, or I could

22    treat the answer as a hypothetical response.

23          MS. ROBBINS:  I think I got the

24    response.

25          THE COURT:  Okay.


                                                            134


1    Q.   Mr. Gerling, are you familiar with a

2    request that the union made on May 1, 2006,

3    reiterating a request that it receive

4    information provided to the UAW experts?  And

5    I think that the -- it's 158 and it's in

6    volume 6.

7    A.   What number?

8    Q.   158.

9    A.   Yeah, I've seen this letter.

10    Q.   Okay.  And did you receive it on or

11    shortly after May 1st of 2006?

12    A.   Yes.

13    Q.   And did you understand that this letter

14    was seeking information that had been provided

15    to the UAW's expert?  Mr. Yearly,

16    specifically?

17    A.   I don't know Mr. Yearly, but that's what

18    the information request was, yes.

19    Q.   Are you aware that there's been no

20    response to this?

21    A.   No, I'm not.

22    Q.   Have you checked to see whether there's a

23    response to this?

24    A.   I have checked and my last information

25    showed that all the responses were addressed.

1   Q.   Did you check to see if this request was

2   even in -- even on -- listed?

3   A.   I forwarded the request.  I assume it was

4   in there.  I don't know that it wasn't.

5   Q.   But you don't know that it was?

6        MR. JERMAN:  Objection, Your Honor.

7   Counsel is aware that all of this information,

8   including the information that was provided to

9   Lazar is in the virtual data room, to which

10   they have access.  And it seems to me

11   inappropriate to be asking a line of

12   questions, implying that the company didn't

13   provide anything when she knows it's in the

14   virtual data room and available to her.

15   Q.   Mr. Gerling, would you read the last

16   paragraph of the letter to you, sir?

17   A.   "We have not been able to find the

18   information or referred to in this request or

19   the upstanding portions of the prior requests

20   on the website. If you believe it is there,

21   please give us specific directions on where

22   and how we can find it.  Or better yet, send

23   us the hard copies."

24   Q.   Was there any response to that request?

25   A.   From me, no, because I gave it to Mr.


136

1   McQuee who handles all the information

2   requests.

3   Q.   Now, after the first day of the trial,

4    May 9, 2006, you've had several meetings with

5    the IAM and the IBEW, is that right?

6    A.    That's correct.

7    Q.    And you were able, at one point, to reach

8    tentative agreements on some issues, subject

9    to getting an agreement on everything --

10    A.    Yes, that's right.  That's how we spoke

11    about it, yeah.

12    Q.    For example, an agreement on how many

13    holidays there would be?

14    A.    They had made a proposal on ten, with the

15    understanding that if anybody got something

16    better, they would want it.  So, yeah.

17    Q.    There was -- you considered it a

18    tentative agreement?

19    A.    Basically, yes.

20    Q.    Subject to everything get --

21    A.    Yeah.  Subject to everything else --

22    Q.    -- getting everything else agreed to?

23    And there was an agreement on shift premium?

24    A.    The amounts, yes.

25    Q.    Okay.  And there was an agreement on


137


1    discount programs?

2    A.    The subsidized discount portion, yes.

3    Q.    And, as part of the proposal, the

4    union -- the union's counterproposal, the

5    union had agreed to a wage rate that was

6    twenty-eight dollars per hour, rather than

7    thirty, but keeping the COLA and freezing it?

8    A.    I believe that's --

```
 9            THE COURT:  I'm sorry, Ms. Robbins.

10    Is this -- what's the time frame for this?  Is

11    this the April meeting or is this a subsequent

12    meeting?

13            MS. ROBBINS:  This is a subsequent

14    meeting.  Well --

15            THE COURT:  When?

16            MS. ROBBINS:  I'll withdraw that

17    question, Your Honor, because that was

18    confusing.

19            THE COURT:  No, you don't have to

20    withdraw, I just -- I may have missed it.  I

21    was writing a note.

22            MS. ROBBINS:  Yeah.  That -- I'll

23    withdraw that statement because it -- let me

24    go back to that last --

25            THE COURT:  Okay.
```

138

```
 1            MS. ROBBINS:  -- question and

 2    clarify it.  Because the Court is right, I

 3    muddied the waters terribly on that question.

 4    Q.   In terms of the union's proposal or

 5    counterproposal that reduced the wage rate but

 6    froze the COLA payment --

 7    A.   Uh-huh.

 8    Q.   -- that was provided to the company on

 9    April 20th?

10    A.   Yes.

11    Q.   And there had not been yet a tentative

12    agreement on that issue?

13    A.   That's correct.
```

14    Q.    Now, you gave a supplemental declaration,

15    which I have somewhere here.  I think it is

16    280.  No, I'm wrong.  280, it's in the

17    confidential, it's just not in the regular.  I

18    had the number right.  Mr. Gerling, Exhibit

19    280 in the confidential binder, volume 5 of

20    the confidential binder, is your supplemental

21    declaration, is that right?

22    A.    Yeah.

23    Q.    And attached to this declaration are

24    proposals made to the IAM and IBEW as of May

25    20, 2006, is that right?

139

1    A.    Yes, that's correct.

2    Q.    And as of that date, if we wanted to see

3    what the medical insurance proposal was, we

4    could look at appendix B, is that right?

5    A.    For active employees or retired

6    employees?

7    Q.    For active.

8    A.    Are you looking at the one dated May

9    20th?

10    Q.    Yes, I am.

11    A.    Okay.

12    Q.    The first one.

13    A.    Okay.  I think I have it.  No, no, no.

14    Okay.

15    Q.    And your proposal to the IAM as of that

16    date was a plan that had a 450 individual 900

17    dollar deductible, is that right?

18    A.    That's correct.

19   Q.   And that's not the salaried plan.

20   There's a salaried plan -- there are various

21   salary plans, but that's not the salaried

22   plan, is that right?

23   A.   I think the phrase that was used when the

24   benefit folks reviewed it was it's similar to

25   the salary plan.  I don't know the exact co-

140

1    pays or deductibles.

2    Q.   Well, do you remember the clarification

3    that -- first of all, does this proposal have

4    an employee contribution?

5    A.   You mean a monthly contribution?

6    Q.   Yeah.

7    A.   Yeah.

8    Q.   And there's a salaried program that

9    doesn't have a monthly contribution, isn't

10   that right?

11   A.   There may be.  I know my health insurance

12   I have a monthly contribution.

13   Q.   You're not familiar with that?

14   A.   There may be one, I'm just not sure.  I

15   just know the one I have.

16   Q.   Are you aware that there is a salaried

17   plan that has coverage for doctor visits?

18   A.   I can't speak definitively, but I believe

19   there is.

20   Q.   And you're aware that the proposal that

21   is attached to Exhibit A and that was made to

22   the IAM as recently as May 20th did not cover

23   doctor visits?

24    A.    I think that when we asked the benefit

25    folks, routine were not but diagnostic office

141

1    visits were covered.

2    Q.    Routine were not?

3    A.    Subject to the, you know, deductible or

4    whatever.

5    Q.    Routine office visits were not covered?

6    A.    That's right.  That's what the answer

7    was.

8    Q.    And there was an explanation that the

9    salaried plan did have coverage for routine

10   office visits?

11   A.    It may have, I don't recall specifically.

12   Q.    Now, in this proposal also, page 19, the

13   proposal for retiree benefits was an account

14   but no insurance?

15   A.    That's correct.  There was a retiree

16   medical account established, based on

17   employee's years of accredited service, then a

18   funding for active employees and for retirees.

19   It was just the account based on their years

20   of service when they retire, even though they

21   had already retired.

22   Q.    And as of the 20th, that was your

23   proposal to the IAM and IBEW, is that there be

24   an account, not a health insurance program?

25   A.    As of the 20th, that's correct.

142

1    Q.    Now, yesterday you submitted a new

2    counterproposal to the IAM and IBEW, is that

3    right?

4    A.    Yes, I did.

5    Q.    And you may have to help me with the

6    exhibit number because --

7    A.    I can't help you there.

8    Q.    Mr. Butler I'm sure can help, he's been

9    helping me all morning.

10          MR. BUTLER:  312, I think, may be

11    the right number.  We're just double checking.

12    For the IAM I believe it's 312.

13          MS. ROBBINS:  312.

14          MR. BUTLER:  Yes, Exhibit 312.

15          MS. ROBBINS:  We do have lots of

16    extra copies because I did not know that it

17    had already been bound.  But I'm sure we'd

18    rather have the one that's numbered.

19    Q.    Mr. Gerling, do you have Exhibit 312 in

20    front of you?

21    A.    Yes, I do.

22    Q.    And there's, I believe, this is the IAM

23    proposal and it's dated May 25, 2006?

24    A.    Correct.

25    Q.    And then there is similar, but not


143


1    identical proposals to the IBEW under tabs 313

2    and 314?

3    A.    That's correct.

4    Q.    I'm sorry, but there's one question I

5    forgot to ask you --

6      A.    That's okay.

7      Q.    -- before we get to these.

8      A.    That's fine.

9      Q.    In terms of your discussions with the IAM

10     and the IBEW on the 20th and 21st of May,

11     which I believe are described in your

12     supplemental declaration, during that period

13     of time, the only proposal -- draft

14     counterproposal that you actually provided to

15     the unions was the proposal for the IAM, is

16     that right?

17     A.    Yeah.   We were working up one document,

18     that's correct.

19     Q.   And so --

20            THE COURT:   I'm sorry, when you say

21     the unions you mean?

22            MS. ROBBINS:   The IBEW and the IAM.

23            THE COURT:   All right.

24     Q.    When you were meeting with them on the

25     21st and 20th of May, as per your declaration,

144

1      you were just working off of the IAM proposal

2      that the company had prepared?

3      A.    At that time, that was -- we were -- we

4      hadn't pulled it through all three of the

5      agreements.   We were just using one because

6      you guys had -- or the IAM IBEW had elected to

7      bargain together.   So that's how we were -- we

8      had proceeded that way.

9      Q.    And so, there was never really any -- a

10     lot of the provisions were similar for --

11   A.   Most all the provisions are similar.

12   Q.   Everybody was -- yeah, right.

13   A.   There's only two or three in the union --

14   Q.   But, in fact, if we look at your

15   supplemental declaration, the ones for the

16   IBEW were not actually shared across the

17   table?

18   A.   That's right, because we were using the

19   IAM one.

20   Q.   They were prepared after the fact?

21   A.   Right.

22   Q.   And before there was any specific

23   discussion about them, you met yesterday, May

24   25th, and Delphi provided new proposals to the

25   IAM and IBEW which are the 312, 313 and 314

                                              145

1   documents we have here?

2   A.   Correct.

3   Q.   And these documents, if we look through

4   them.  Let's start with the wage proposal.

5   The prior proposal is crossed out and all we

6   see is pattern treatment?

7   A.   No, you have to go back to the first part

8   to get the reference to pattern treatment.

9   Because what we did was, we removed all the GM

10   contingencies in this proposal.  And then we

11   said that what we would do, unless it's

12   otherwise noted, would give the IAM IBEW

13   pattern treatment.  That's the reference to

14   pattern treatment and how we settled these

15   issues with the UAW.  Which has been,

16    historically, how they bargained in the past

17    on many of their issues.  With the exception

18    of those things that are not striked through.

19    Q.    So in terms of base wage rates, you've

20    crossed out every proposal you've made thus

21    far to the IAM and you use the term pattern

22    treatment?

23    A.    Uh-huh.  That's correct.

24    Q.    And in terms of COLA, you've crossed out

25    everything else and you put in pattern

146

1    treatment?

2    A.    Correct.

3    Q.    And the IAM and the IBEW cannot determine

4    what they're negotiating because we don't know

5    what will be agreed to between the UAW and the

6    company, or what the company will impose,

7    isn't that right?

8    A.    They would accept what -- with the

9    acceptance of this proposal, they would accept

10    whatever was negotiated with GM -- with Delphi

11    and the UAW, which is typically how they've

12    done it in the past.  Oh, I'm sorry.  I've got

13    to remember what I was thinking there.  With

14    the acceptance of this proposal, they would

15    accept what was negotiated between Delphi and

16    the UAW, which is how they've patterned in

17    the -- how they've bargained in the past.

18    Q.    But Mr. Gerling, in the past when you

19    have come to the IAM and the IBEW you have

20    been able to show the IAM and the IBEW what

21    the UAW and Delphi have agreed to?

22    A.    In the past, that's correct.

23    Q.    And so this is very different.  Because

24    this time you're not coming to the IAM and the

25    IBEW saying this is the wage rate for skilled

147

1    trades.  You're saying whatever ends up being

2    it, you've accepted it, even though we can't

3    tell you what it is?

4    A.    Well, the UAW proposal is similar to this

5    one in terms of what is on the table with

6    them.  Which is, you know, for plants that

7    we're closing wages were going to go down to

8    twenty-eight dollars an hour.  And if it was

9    subsequently, you know -- a plant was going to

10    be open, there would be another wage

11    reduction. So the proposal in front of the UAW

12    was the same to them.

13    Q.    But if the UAW decided that they would

14    take a larger cut?

15    A.    Uh-huh.

16    Q.    For the skilled trades, versus the

17    production trades, then the IAM and the IBEW

18    would be stuck with that?

19    A.    That's correct.

20    Q.    And if the company decided -- had the

21    contract rejected, we don't know what would

22    happen after that.  There might be a strike.

23    We don't know what the end result would be?

24    A.    That's true.  We talked about whatever we

25    imposed, we would impose the same.

148

1   Q.   So your proposal now to the IAM and IBEW

2   is, we don't have a wage proposal to you, our

3   proposal is that you end up with whatever is

4   negotiated or litigated between other parties.

5   You don't get to know what it is?

6   A.   The proposal would be they would accept

7   whatever had been negotiated, with the

8   exceptions that are outlined in here.

9   Q.   Let's go back to the attrition program at

10  the back of -- we'll just use 312.

11  A.   Okay.

12  Q.   Now, the attrition plan that's been

13  approved by the Court for the UAW includes a

14  severance benefit for those who are willing to

15  forego other than vested benefits, 70,000 and

16  140,000, is that right?

17  A.   No, that's not right.  Well, I should say

18  for GM it is but not for Delphi.

19  Q.   It's in the attrition program?

20  A.   For General Motors employees.

21  Q.   It's in the attrition program and

22  available to people who are currently Delphi

23  employees?

24  A.   No.

25            MR. BUTLER:  Objection.  That just

149

1   mischaracterizes the --

2          MS. ROBBINS:  Well, maybe we'll find

3    out what it is.

4          THE COURT:  But he says no.

5          MS. ROBBINS:  Okay.

6          MR BUTLER:  Your Honor, there's an

7    order of this Court that approves that

8    program.

9          THE COURT:  Ms. Robbins is entitled

10   to ask the witness, he just said no.

11   Q.   Would you agree that the 70,000 and

12   140,000, if you're willing to forego your

13   other benefits and just have your vested

14   benefits, applies to people who, as of today,

15   are Delphi employees?

16   A.   No, it clearly states in the attrition

17   document it's for General Motors employees.

18   Q.   Aren't we talking about Delphi employees

19   who check the box?

20   A.   No, that's for purposes of retirement.

21   Q.   Did you explain this program to the IAM

22   and IBEW what the UAW had?

23   A.   I -- yes, I'm sure -- I know I did, yes.

24   Q.   And didn't you refer to the 70 -- 70,000

25   and 140,000 in the course of those

                                              150

1    descriptions?

2    A.   Yeah, as it applied to General Motors

3    employees.

4    Q.   And wasn't that described to Delphi

5    employees of the UAW as well?

6          MR. BUTLER:  Objection, asked and

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

```
 7   answered.
 8            MS. ROBBINS:  No, that one wasn't.
 9   I didn't ask --
10            THE COURT:  When you say described,
11   you mean explained to them or applied to --
12            MS. ROBBINS:  Explained to them.
13            THE COURT:  The terms of the
14   attrition program?
15            MS. ROBBINS:  As it applies to the
16   70 and 140,000 --
17            THE COURT:  Was it explained to all
18   Delphi employees?
19            MS. ROBBINS:  The UAW Delphi
20   employees.
21            THE COURT:  The UAW Delphi
22   employees.
23            MS. ROBBINS:  Not --
24            THE COURT:  You can answer that
25   question.
```

151

```
 1            THE WITNESS:  I guess I need you to
 2   ask it again.
 3   Q.   Okay.  Did you explain the severance
 4   benefit that was available, under the
 5   attrition program of 70,000 or 140,000 to
 6   forego your nonvested benefits and sever your
 7   employment?
 8   A.   I explained -- I explained the program
 9   and I explained it as it applied to General
10   Motors employees.  And how it applied to
11   General Motors employees, because it's in the
```

12   document of the seven pages.  And when I --

13   when we explained it, there was some confusion

14   as to whether Delphi employees were eligible

15   for it or GM.  And we explained that it was GM

16   and explained how it worked, yes.

17   Q.   Okay.  And what was the relevance of that

18   program to Delphi employees?

19   A.   What, the buy-outs or something else?

20   Q.   The buy-outs.

21   A.   Well, it didn't apply to Delphi

22   employees.

23   Q.   What was the relevance of explaining it

24   to them?

25   A.   Because they had questions about it and

152

1   they asked if it applied to them, those Delphi

2   employees.  I guess that's the answer.

3   Q.   And if they flowed back they would apply

4   to them, would it not?

5   A.   If they are able to flow back within the

6   application period that General Motors had,

7   they could -- in theory, they could flow back

8   and then accept that term.

9   Q.   And, as a matter of fact, if we go back

10   to the proposal you made to the IAM and the

11   IBEW on May 20th, you had proposed the 70 and

12   140 severance?

13   A.   That was in there, that's correct.

14   Q.   And then on the 25th you crossed it out.

15   A.   I said we would give them pattern

16   treatment.  Yes.  I said, yes, it was -- had

17    the title pattern treatment underneath it.

18    Q.    But the pattern treatment meant that the

19    70 and 140 would not apply to IAM and IBEW

20    members in the way that it would apply to UAW

21    members.

22    A.    No, because I believe in the UAW document

23    they still have severance as an item.  And it

24    hasn't been agreed upon one way or another,

25    because it wasn't applicable to all Delphi

153

1    employees.

2    Q.    But they do have through General Motors,

3    that severance package.

4    A.    If they get a flow-back opportunity and

5    can flow back during the application period.

6    Q.    Now, the attrition package between Delphi

7    and the UAW has a protected fund to assure

8    that people who take the going to retirement

9    package have the funds that are promised to

10    them?

11    A.    That's -- I believe that's correct.

12    Q.    And that is not part of your proposal to

13    the IAM and IBEW?

14    A.    When we talked about item number 4, we

15    talked about allowing employees to grow in

16    accredited service to draw at, with our

17    original proposal. But a dollar amount

18    specifying it?  No, there isn't in there.

19    Q.    Most imp --

20          MS. ROBBINS:  Strike that.

21    Q.    If an individual were to accept an IBEW

22    or IAM individual were to accept the proposed

23    attrition package that are here, they would be

24    retiring, is that right?

25    A.    Yes.

154

1    Q.    This is only applicable to people who are

2    retiring?

3    A.    Correct.

4    Q.    And the people who are retiring will not

5    have retiree health insurance of the type that

6    the UAW has, they don't have a guarantee?

7    A.    They don't have a benefit guarantee, but

8    in this proposal we offered them the salaried

9    health care treatment and design upon

10    retirement.

11    Q.    And you also proposed that the company

12    have the right to terminate the pension plan?

13    A.    That

14          MR. BUTLER:   Objection.   That just

15    mischaracterizes this document.   I don't think

16    counsel should be asking questions that are

17    blatant mischaracterizations of the proposal.

18          THE COURT:   Well, he's presenting it

19    to the union.   I think he can answer the

20    question generally.

21          MS. ROBBINS:   It wasn't my choice to

22    get this proposal yesterday and to have Mr.

23    Gerling today.   We're doing the best we can.

24    A.    Would you state your question again?

25    Q.    In terms of the pension plan, do you

155

1  continue to propose that the company have the

2  right to terminate the pension plan?

3  A.   We certainly didn't waive the right to

4  terminate the pension plan.

5  Q.   And if you were to act on your provision

6  with respect to the right to terminate the

7  pension plan, employees who elected retirement

8  would have only about 50 percent of the

9  pension that a UAW member would have through

10 the GM guarantee.

11 A.   As I understand, it would be reduced, yes.

12 And I used the number 50 percent before.

13 Q.   So the pattern treatment is not pattern

14 treatment in all respects?

15 A.   Because they don't have a benefit

16 guarantee.

17 Q.   And yet you're asking the IAM and the IBEW

18 to wait and see what is negotiated by other

19 parties that have other protections?

20 A.   We were asking them to accept the pattern

21 negotiated with Delphi and the UAW.

22 Q.   Even though their members would be living

23 on half as much money afterwards.

24         MR. BUTLER:   Objection.

25 Argumentative and this characterizes the

156

1  record.

2         THE COURT:   Sustained.

3  Q.   You are aware that the Milwaukee plant is

4   due to shut down?

5   A.  Yes, I am.

6   Q.  So when we talk about what people will be

7   living on, we're talking about what they would

8   be living on if they're of retirement age?

9   A.  Yes, I am.

10   Q.  Now, the UAW has a sub-benefit that the

11   IAM and IBEW do not have, isn't that right?

12   A.  The have, what's referred to as income

13   security funding -- they have what's called

14   ISPV income security plan.

15   Q.  Okay.  To respond to my question, there's

16   something called sub-benefits that the UAW

17   has?

18   A.  Uh-huh.

19   Q.  And that the IAM and IBEW don't have?

20   A.  That's correct.

21   Q.  And if you agree to continue that plan

22   that will not be offered to the IAM or the

23   IBEW?

24   A.  That's correct.

25   Q.  And your proposal on the ISP plan is that


157


1   it be frozen?

2   A.  At the time the agreement would go --

3   become effective.

4   Q.  You had an agreement, or tentative

5   agreement on an offer you had made for

6   relocation of the IAM and IBEW employees, is

7   that right?

8   A.  That's correct.

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

9    Q.   And you've now rescinded that proposal?

10   A.   Based on this document, that's correct.

11   Q.   So now there would be no opportunity for

12   IAM and IBEW members to get relocation costs

13   if there were a job available in another

14   Delphi facility?

15   A.   Well, as we talked earlier, they don't

16   have flow-back rights.

17   Q.   There are provisions that Delphi will help

18   to try to find a position for one if it's

19   available?

20   A.   I believe that's correct.

21   Q.   But in any case, now you've removed the

22   relocation rights?

23   A.   In this proposal the relocation right --

24   Q.   The relocation benefit.

25   A.   In this proposal it was removed, yes.

158

1    Q.   And that had been agreed to previously?

2    A.   We had an under -- they had accepted that

3    before, yes.

4    Q.   I'm going to ask you to look at the last

5    paragraph of your initial declaration, which

6    is Exhibit 20.  You probably have it in front

7    of you there somewhere.

8    A.   Yeah.

9    Q.   Paragraph 26, next to the last sentence,

10   you characterized the union's counter-proposal

11   of April 20th as not even approaching the

12   level of modifications required by Delphi.  Do

13   you see that?

14    A.   Yeah.

15    Q.   Do you have a target dollar amount of

16    concessions that you are trying to obtain from

17    the IAM and the IBEW?

18    A.   Not a dollar amount, no.  We were looking

19    to get competitive agreements based on what

20    the wages and benefits would be in the market

21    place.  Because that questions was asked and I

22    -- that was the same answer I gave previously.

23    Not to you but to the committee.

24    Q.   So the answer was, you did not provide any

25    target amount.

159

1    A.   No.  No, other than the wages and the

2    benefits that are contained in here, but not a

3    quantifiable lump sum.

4    Q.   Isn't it true that the company has done no

5    survey of skilled trades in the Milwaukee area

6    to see what is competitive?

7    A.   I don't believe we did anything specific

8    to the Milwaukee region.

9    Q.   And that's where your bargaining agreement

10    is with the IAM and IBEW?

11    A.   That's correct.

12    Q.   So you don't know what would be

13    competitive there?

14    A.   We've not done a survey, to answer your

15    question.

16         MS. ROBBINS:  Your Honor, those are

17    the questions that I have.

18         THE COURT:  Okay.  All right.  Who

19   else wants to examine Mr. Gerling?

20             MS. MEHLSACK:  I do, Your Honor, for

21   the operating engineers.

22             THE COURT:  How long do you think

23   you'll be?

24             MS. MEHLSACK:  A while, Your Honor.

25             THE COURT:  All right.  Well, you

160

1    could probably -- I actually just had a couple

2    of questions.

3              THE WITNESS:  Sure.

4              THE COURT:  Maybe I'll ask those and

5    then we'll break.  Has the IAM or IBEW in its

6    discussions with you, sought most favored

7    nation treatment?

8              THE WITNESS:  Yes, that was in their

9    original April 20th proposal.

10             THE COURT:  No, but is that still a

11   -- is that still an element of their proposal?

12             THE WITNESS:  That was their April

13   20th proposal to us and then we talked about

14   specific items.  We talked about having that

15   apply to it.

16             THE COURT:  But what I'm saying is

17   that -- is that continuing to be a demand?

18             THE WITNESS:  In the -- they've only

19   given me the April 20th proposal.

20             THE COURT:  Okay.

21             THE WITNESS:  The other proposals

22   come from me based on our discussions.

23             THE COURT:  Okay.  I may have taken

24    this down wrong, but I think when Ms. Robbins

25    was cross examining Mr. Weber he acknowledged

161

1    that 100 percent of the IAM IBEW employees

2    would be terminated by 2007?

3             THE WITNESS:  Well, the plant will

4    close.  But we had offered the attrition

5    package so the employees that don't retire

6    under the attrition package, and if we don't

7    have anything else they would -- assuming that

8    everything else would be waived, they -- some

9    of them currently have job security.  But if

10   that was waived, we were offering the

11   severance package that we would buy out those

12   employees that didn't qualify for retirement.

13   But the plant is going to close at the end of

14   '07 so there's going to be no work there.

15            THE COURT:  The people at the other

16   plants that you're not -- that are being

17   closed --

18            THE WITNESS:  Uh-huh.

19            THE COURT:  -- that you're not

20   covering by this motion, do they not have the

21   same type of protections under their

22   collective bargaining agreements?

23            THE WITNESS:  No.

24            THE COURT:  They don't?

25            THE WITNESS:  No.

162

1           THE COURT:  Okay.  In past

2    bargaining has -- is it typical for the union

3    to receive individual salary information, with

4    regard to individual executives and salaried

5    employees?

6           THE WITNESS:  I have not, typically

7    been asked that.  Although this is the first

8    time I've negotiated with the IAM IBEW.

9           THE COURT:  Has it ever been, to

10   your knowledge, provided by Delphi to any

11   union?

12          THE WITNESS:  Not on an individual

13   basis, no.

14          THE COURT:  All right.  I think Ms.

15   Mehlsack, given that we've been going since

16   9:00, let's take a break for lunch and we'll

17   pick up at 1:30.

18          MS. MEHLSACK:  Thank you, Your

19   Honor.

20          MR. BUTLER:  Thank you, Your Honor.

21          THE COURT:  And Ms. Robbins you can

22   follow-up on my questions.

23      (Time noted:  12:11 p.m.)

24

25

                                                      163

1

2                   I N D E X

3

4    WITNESS              CROSS              PAGE

```
 5                      EXAMINATION BY

 6   Mark Weber         Mr. Kennedy         11

 7   Mark Weber         Mr. Levine          27

 8   Mark Weber         Mr. Peterson        39

 9   Mark Weber         Ms. Robbins         48

10   Mark Weber         Ms. Mehlsack        55

11   Mark Weber         Mr. Kurtz           64

12

13   WITNESS            REDIRECT            PAGE

14                      EXAMINATION BY

15   Mark Weber         Mr. Butler          66

16

17   WITNESS            RECROSS             PAGE

18                      EXAMINATION BY

19   Mark Weber         Mr. Kennedy         75, 92

20   Mark Weber         Mr. Peterson        86

21   Mark Weber         Ms. Mehlsack        92

22

23   WITNESS            CROSS               PAGE

24                      EXAMINATION BY

25   Robert Gerling     Ms. Robbins         94
```

164

```
 1

 2                I N D E X

 3                (continued)

 4

 5              E X H I B I T S

 6   DEBTOR'S           DESCRIPTION         PAGE

 7   14                 Weber Declaration   7

 8

 9
```

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

165

1          C E R T I F I C A T I O N

2      I, Esther Accardi, hereby certify that

3  the foregoing is a true and correct

4  transcription, to the best of my ability, of

5  the sound recorded proceedings submitted for

6  transcription in the matter of:

7  Delphi Corporation.

8

9      I further certify that I am not employed

10  by nor related to any party to this action.

11

12      In witness whereof, I hereby sign this

13  date:

14  May 30, 2006.

https://vip21.veritextllc.com/myfiles/298901/117765am.TXT

15

16   _____

17   Esther Accardi

18

19

20

21

22

23

24

25

06/14/2006 10:57 AM