**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Email: robert.rosenberg@lw.com
          mitchell.seider@lw.com
          mark.broude@lw.com

Hearing Date: June 29, 2006
Objection Deadline: June 27, 2006, at 6:00 p.m.
(Extended with consent of the Debtors)

Counsel for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Delphi Corporation, et al., | : | Case No. 05-44481 (RDD) |
| Debtors. | : | Jointly Administered |

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO MOTION FOR ORDER UNDER 11 U.S.C. § 363(b)
AND FED. R. BANKR. P. 6004 APPROVING (I) SUPPLEMENT TO UAW SPECIAL
ATTRITION PROGRAM, AND (II) IUE-CWA SPECIAL ATTRITION PROGRAM**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Delphi Corporation ("Delphi") and certain of its affiliates (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this Limited Objection (the "Objection") to the Debtors' *Motion for Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW Special Attrition Program, and (II) IUE-CWA Special Attrition Program* (the "Motion"). In support of this Objection, the Committee respectfully states as follows:

NY\1160366.7

**PRELIMINARY STATEMENT**

1. The Committee continues to support the Debtors' efforts to provide their hourly employees with programs providing them a "soft landing" in the wake of the Debtors' decision to reduce the size of their workforce and legacy costs. The Committee does object, however, to the agreement the Debtors propose to enter into with General Motors Corporation ("GM") to the extent it provides for the allowance of any claims asserted by GM at this time, as well as to the binding waiver of critical defenses to GM's claims. As the Debtors proceed with their "transformation plan" and enlist GM's assistance therewith through a series of motions for approval of discrete programs, the Debtors are embarking these estates on a program of incremental allowance of and waiver of defenses to GM's claims that ultimately could preclude a full and fair opportunity to bring before this Court the serious questions as to GM's responsibility for the Debtors' financial and labor difficulties.

2. It would be a mistake to consider GM's agreement to fund a portion of the proposed attrition programs as an act of goodwill. Quite to the contrary, GM is acting out of its own self-interest by agreeing to provide some funding now in exchange for substantial allowed claims and a dramatic reduction of its own contingent liabilities to the Debtors' unions. Indeed, under the proposed attrition programs, the Debtors have agreed either to allow or not to object to claims of GM that could total approximately $700 million. The Committee believes that GM should bear more of the costs of the proposed attrition programs than the Motion provides for two reasons. First, GM independently agreed to pay a significant portion of the costs relating to these programs in bilateral prepetition benefit guarantees it entered into with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") and the International Union of Electronic, Electrical, Salaried, Machine and Furniture

2

Workers-Communications Workers of America (the "IUE-CWA"). Second, even though GM has undertaken other obligations under these programs, which it apparently is not already required to undertake under such prepetition contracts, these obligations are an unfortunate but unavoidable consequence of its spin-off of the Debtors.

3. Contrary to the Debtors' arguments, the Court should not view these proposed programs as "reasonably comparable" to the original attrition program with the UAW (the "Original UAW Attrition Program"), and should not favor the Debtors with a presumption that the proposed programs are appropriate. This is particularly so as the attrition programs, as presented, would allow GM to dodge a portion of its liability to the estates. At the April 7, 2006 hearing on the Original UAW Attrition Program, this Court stated that it would approve future attrition programs with other unions, unless those future programs involve different material considerations involving the Debtors' rights against GM. For at least two reasons, the proposed attrition programs covered by the Motion do involve different material considerations involving the Debtors' rights against GM. First, unlike the Original UAW Attrition Program, both of the Debtors' proposed attrition programs would create massive *allowed* claims in favor of GM against the Debtors on account of the "buyout payments" GM makes to UAW-represented and IUE-represented employees who agree to sever all ties with GM and Delphi except vested pension benefits. These claims would be completely immune from challenge on any ground by any party, including the Committee. Second, unlike in the Original UAW Attrition Program, in the proposed attrition program with the IUE-CWA, the Debtors are waiving their right to object to the allowance of certain GM claims relating to GM's obligation to provide OPEB to the Debtors' IUE-represented employees who "check the box" and transition to GM for purposes of retirement. The Debtors, moreover, effectively seek to extend this waiver to *all* parties in

3

interest by procuring a court order that these GM claims arise under the Master Separation Agreement, when in fact GM has *no* valid contractual basis for such claims.

4.    While the Committee strongly objects to any allowance of GM's claims at this time, it does not seek to preclude GM's assertion of claims against the Debtors' estates, so long as all rights and defenses of the Committee to such claims are preserved. Based on its investigation of the spin-off, as well as GM's involvement in the Debtors' business affairs thereafter, the Committee strongly believes that the Debtors have significant affirmative claims and causes of action against GM, as well as viable defenses and objections to any claims GM may assert against the Debtors (collectively, the "Claims and Defenses"). The Claims and Defenses are valuable assets of the Debtors' estates, and the Debtors are duty-bound to prosecute them for the benefit of their estates and unsecured creditors.

5.    Under these circumstances, the Committee respectfully asserts that this Court should assure the Debtors' unsecured creditors that their interest in minimizing GM's claims are fully protected and are in no way diminished by the relief the Debtors seek in the Motion. Accordingly, the Committee requests that no order approving the Motion grant GM any allowed claim that is immune from reduction in amount and priority. GM should not be granted allowed claims in exchange for making good on the very obligations it contracted for in prepetition agreements, including the benefit guarantees with the UAW and the IUE-CWA (respectively, the "UAW Benefit Guarantee" and the "IUE Benefit Guarantee"). The Committee also asserts that all rights, claims and defenses against GM that are property of the Debtors' estates must be preserved and pursued. To that end, the Committee requests that the Court, in any order approving the Motion, grant the Committee authority to prosecute on behalf of the Debtors and against GM any and all of the estates' Claims and Defenses and other rights that may reduce the

4

amount or priority of, or otherwise eliminate, the claims of GM for which the Debtors have waived objections under the proposed attrition programs.

## BACKGROUND

6. On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On October 14, 2005, the three remaining Debtors similarly filed voluntary petitions. The Committee was appointed nine days after the Petition Date, on October 17, 2005.[1] Shortly thereafter, the Committee selected Latham & Watkins LLP as its counsel, Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. as its investment banker.

7. On March 22, 2006, the Debtors filed a motion for authority to enter into the Original UAW Attrition Program, which represented a trilateral agreement among Delphi, GM and the UAW to provide for the voluntary retirement of certain UAW-represented GM and Delphi hourly employees and to provide for the "flowback" of up to 5,000 UAW-represented Delphi hourly employees to GM. On April 7, 2006, this Court held a hearing to consider approval of the Original UAW Attrition Program. On May 12, 2006, this Court entered an amended order granting the Motion in part and denying it in part, as set forth therein (the "May 12 Order").

8. On June 19, 2006, the Debtors filed the Motion, pursuant to which they seek to enter into (a) a supplemental attrition program (the "Supplemental UAW Attrition Program")

---

[1] The following members originally were appointed to the Committee: (a) Capital Research and Management Company; (b) Electronic Data Systems Corp.; (c) Flextronics International Asia-Pacific, Ltd.; (d) Freescale Semiconductor, Inc.; (e) General Electric Company; (f) IUE-CWA and (g) Wilmington Trust Company, as Indenture Trustee. Flextronics International Asia-Pacific, Ltd., has since resigned from the Committee, and Tyco Electronics Corporation has since been appointed to the Committee. The Pension Benefit Guaranty Corporation and the UAW have been added as *ex officio* members of the Committee.

5

NY\1160366.7

relating to the Debtors' UAW-represented employees and (b) an attrition program (the "IUE Attrition Program" and, together with the Supplemental UAW Attrition Program, the "Programs") relating to the Debtors' employees represented by the IUE-CWA. As described in more detail herein, in connection with the Programs, the Debtors propose to waive their own right to object to the allowance of certain GM claims arising under the Programs, and to waive the rights of any party to object to the allowance of other GM claims.

9. The Supplemental UAW Attrition Program would (a) extend the pre-retirement program, which was offered under the Original UAW Attrition Program, to employees having at least 26 years of credited service but less than 27 years of credited service and (b) offer buyout payments ("Buyout Payments") to certain UAW-represented employees, in which an accepting employee would agree to sever all ties with Delphi and GM except vested pension benefits in exchange for a cash payment of $40,000, $70,000 or $140,000 (less withholdings) depending on the number of years of seniority.[2]  *See* Supplemental UAW Attrition Program at ¶ 2.

10. The IUE Attrition Program would offer the Debtors' IUE-represented employees attrition incentives that are substantially similar to those in the Original UAW Attrition Program, as supplemented by the Supplemental UAW Attrition Program. For example, the Debtors' IUE-represented employees would be offered Buyout Payments of $40,000, $70,000 or $140,000 (less withholdings) depending on the number of years of seniority, in exchange for their agreement to sever all ties with Delphi and GM except vested pension benefits.[3]  *See* IUE

---

[2] UAW-represented employees with ten or more years of seniority or credited service, whichever is greater, are eligible for $140,000, while "traditional" employees with less than ten years of seniority are eligible for $70,000. Employees hired under the Supplemental New Hire Agreement prior to March 22, 2006 are eligible for $40,000.

[3] IUE-represented employees with ten or more years of seniority or credited service, whichever is greater, are eligible for $140,000. Employees with more than three, but less than ten, years of seniority or credited service, whichever is greater, are eligible for $70,000. Employees with more than one, but less than three, years of seniority

6

Attrition Program at ¶ 1.c.  Moreover, the Debtors would offer a pre-retirement program for IUE-represented employees with 26 to 29 years of credited service.  The Debtors would establish a segregated escrow account in the amount of $12 million to fund their obligations under the pre-retirement program.[4]

11.     Under the Programs, Delphi and GM would each pay one-half of the Buyout Payments that are made to the Debtors' UAW-represented and IUE-represented employees.  The Debtors propose to allow GM a prepetition general unsecured claim in the aggregate amount of all Buyout Payments GM actually pays under the Programs.  *See* Supplemental UAW Attrition Program at ¶ 2; IUE Attrition Program at ¶ 1.c.  This means that no party, including the Committee, would be permitted to challenge the allowance, amount or priority of such claim in the future.  Though the terms of the Programs are not clear on this point, GM apparently can assert this claim against of all of the Debtors.

12.     Under the IUE Attrition Program, GM agreed to assume obligations for certain OPEB benefits of the Debtors' IUE-represented employees who elect to "check the box," and transition to GM for purposes of retirement.  The Debtors propose in the Motion to waive their right to object to the allowance of any claim GM may assert with respect to these obligations (the "OPEB Claim") and to preclude any party in interest from objecting to such claim on the ground that there is no contractual basis for such claim under Delphi's general indemnity obligations under that certain Master Separation Agreement dated December 22, 1998 (the "Master Separation Agreement") among GM, Delphi Automotive Systems Corporation (Delphi's

---

or credited service, whichever is greater, are eligible for $40,000.  Employees at the Debtors' Gadsden, Alabama facility are not eligible for Buyout Payments.

[4] The Committee understands that the Debtors' postpetition debtor-in-possession financing lenders have agreed to increase the permitted amount of segregated funds in connection with the Debtors' attrition programs from the original $100 million amount.

7

NY\1160366.7

predecessor), and certain other Delphi affiliates. *See* IUE Attrition Program at ¶ 2. Put simply, the Committee and other parties in interest would not be permitted to defend against the OPEB Claim on the basis that it is not assertable under the terms of the Master Separation Agreement.

13.   Moreover, under the Original UAW Attrition Program and the IUE Attrition Program, employees who are eligible for retirement under the normal or early voluntary provisions of the Delphi Hourly-Rate Employees Pension Plan may elect to receive a cash payment of $35,000 in exchange for leaving the Debtors' employ (the "$35,000 Payments"). GM is responsible for funding the $35,000 Payments under both Programs. The terms of the Supplemental UAW Attrition Program appear, potentially, to grant retroactively to GM the right to an allowed claim that is equal to the aggregate amount of the $35,000 Payments it has made to UAW-represented employees who elected to receive them under the Original UAW Attrition Program. *See* Supplemental UAW Attrition Program ¶ 2 (stating, in part, that "[n]otwithstanding paragraph 7 of the [Original UAW Attrition Program], GM will receive an allowed prepetition general unsecured claim in the aggregate amount of all Buyout Payments actually paid by GM pursuant to the [Original UAW Attrition Program].").[5]

## LIMITED OBJECTION

### I. The Debtors Have Failed to Demonstrate that the Allowance of the GM Claims and the Waiver of Defenses is Warranted

14.   Though the Debtors will realize an improvement in EBITDA and a positive impact on its balance sheet as a result of the Programs, such improvement is counterbalanced by

---

[5] During a telephone call shortly before this Objection was filed, counsel for the Debtors represented to counsel for the Committee that the Supplemental UAW Attrition Program does not grant GM the right to assert a claim against the Debtors on account of the $35,000 Payments it made under the Original UAW Attrition Program. If GM were being granted retroactively the right to assert a claim with respect to these payments, the Committee would have objected thereto. However, based on the representation by Debtors' counsel, the Committee accepts that GM is not permitted to assert any claim relating to the $35,000 Payments under the Supplemental UAW Attrition Program. The Committee expects that any order granting the Motion will so state expressly.

8

NY\1160366.7

substantial claims in favor of GM, which the Debtors have agreed either to allow or not to object thereto. Below is a description of the potential GM claims with respect to which the Debtors have waived their rights under the Programs.

### A. The Debtors' Waiver of their Right to Object to the Allowance of the OPEB Claim

15.     In the IUE Attrition Program, the Debtors agreed to waive their right to challenge the allowance of GM's OPEB Claim with respect to IUE-represented employees who "check the box" and transition to GM for purposes of retirement. *See* IUE Attrition Program ¶ 2.[6] The amount of the OPEB Claim likely will be significantly over $400 million.

16.     Consideration of the propriety of the Debtors' proposal to allow the OPEB Claim at this juncture must confront the basic economic realities of this case – that the OPEB obligations to UAW and IUE employees that will be absorbed by GM are, first and foremost, liabilities of *GM,* for which GM has only highly questionable (if any) bases for claims over against the Debtors. GM's liabilities arise from benefit guarantees GM granted to the UAW and IUE in order to obtain those unions' consent to the Delphi spin-off (respectively, the "UAW Benefit Guarantee" and the "IUE Benefit Guarantee"). Pursuant to those benefit guarantees, eligible Delphi employees represented by the UAW and the IUE-CWA may look to GM to provide them with OPEB and pension benefits comparable to those being provided to GM employees in the event that Delphi, due to "financial distress,"[7] on or before October 2007, either

---

[6] Paragraph 2 of the IUE Attrition Program provides, in part, that "[n]otwithstanding paragraph 3 below, any obligations assumed by GM under the 'check the box' provisions of this paragraph shall be conclusively deemed to be comprehended by, included within, and shall constitute a prepetition, general unsecured claim assertable by GM against the estate of Delphi Corporation under Delphi's general indemnity of GM under the Master Separation Agreement. Neither Delphi Corporation nor any of its debtor affiliates may object on any grounds to the allowance of such claim …" Paragraph 2 goes on to state that the Debtors reserve the right to "object to the economic value of such claim."

[7] "Financial distress" means a risk affecting Delphi's continuing financial viability.

9

NY\1160366.7

(a) fails or refuses to provide such benefits or (b) reduces the level of such benefits below the level of benefits which, at that time, GM is providing to its hourly retirees.[8] If the UAW Benefit Guarantee is triggered and GM becomes obligated to make payments thereunder, GM may assert a prepetition general unsecured claim against the Debtors under a December 1999 indemnity agreement between Delphi and GM. However, the Committee believes that any such claim would likely be subject to challenge on a number of grounds. If the IUE Benefit Guarantee is triggered and GM becomes obligated to make payments thereunder, there exists *no* prepetition agreement under which GM is entitled to indemnity from the Debtors. It is to remedy that gap that GM seeks to extract the waiver of any party in interest's ability to challenge GM's OPEB indemnity claim as arising under the Master Separation Agreement.[9]

17.     It is highly unlikely that the Master Separation Agreement, which predates the IUE Benefit Guarantee but nevertheless would be the vehicle for GM's claim under the IUE Attrition Program, obligates the Debtors to indemnify GM for the OPEB it provides under the IUE Benefit Guarantee. The Master Separation Agreement is governed by Delaware law. Delaware law requires that, to be enforceable, the intent to indemnify against a particular loss must be clear and unequivocal on the face of an indemnity provision. *See, e.g.*, *Fina, Inc. v. ARCO*, 200 F.3d 266, 270 (5th Cir. 2000); *DRR, L.L.C. v. Sears, Roebuck and Co.*, 949 F.Supp. 1132, 1143 (D. Del. 1996) (stating that Delaware law requires indemnification clauses to be clear and unequivocal, and noting that "if a contrary intent can reasonably [be] entertained, the Court

---

[8] The benefit guarantees also provide that if Delphi, on or before October 18, 2007, as a result of financial distress, (a) ceases doing business, (b) terminates its pension plan or (c) ceases to provide ongoing credited service under such pension plan, then GM would provide up to seven years of credited service.

[9] Recognition of GM Claim as allegedly arising under the Master Separation Agreement is particularly egregious inasmuch as that agreement was entered into more than six years prior to Delphi's bankruptcy filing, and hence may be believed by GM to be insulated from fraudulent transfer challenge. While the Committee believes there are viable responses to that defense, there can be no doubt that GM is here seeking a far more comfortable litigation posture than the one in which it presently finds itself.

10

NY\1160366.7

will rule against indemnification."). The Master Separation Agreement provides in part that Delphi and each of its subsidiaries would indemnify and defend GM and each of its subsidiaries against any losses, claims, damages, liabilities or actions arising from (a) the Delphi Liabilities (as defined in the Master Separation Agreement)[10] or (b) Delphi's conduct of its business after the "Contribution Date" (*i.e.*, January 1, 1999). The Master Separation Agreement, however, does not specify that the Debtors must indemnify GM in connection with the provision of benefits to the Debtors' employees.

18.    The fact that the Master Separation Agreement likely does not obligate the Debtors to indemnify GM for the costs it incurs under the IUE Benefit Guarantee is further demonstrated by the fact that Delphi and GM entered into a separate agreement on December 22, 1999 that purports to obligate Delphi to indemnify GM for costs it incurs under the UAW Benefit Guarantee. If the general indemnity provision of the Master Separation Agreement contemplated the Debtors' indemnification of GM for its obligations under the UAW Benefit Guarantee, then there would have been no need for the parties to enter into a separate indemnity agreement a year after the Master Separation Agreement.

19.    Despite the fact that GM is obligated under a prepetition agreement to provide OPEB to the Debtors' IUE-represented employees if certain conditions are met, and the Debtors are not contractually obligated to indemnify GM for those costs, the Debtors have agreed to

---

[10] In summary, the Master Separation Agreement defines "Delphi Liabilities" as: liabilities of GM that (a) either are (with certain exceptions) reflected in the Delphi financial statements for the period ended September 30, 1998 as set forth in the IPO Registration Statement (the "Delphi Financial Statements") and remain outstanding on January 1, 1999, or are to be transferred pursuant to section 2.01(c) of the Master Separation Agreement, (b) arise in connection with Delphi's business after the date of the Delphi Financial Statements and would be reflected in financial statements of Delphi as of January 1, 1999 if such financial statements were prepared using the same accounting principles under which the Delphi Financial Statements were prepared, (c) are expressly provided by the Master Separation Agreement or any ancillary agreement to be transferred to and assumed by Delphi, (d) except as otherwise provided, are related to or arise out of or in connection with the Delphi Assets or (e) except as otherwise provided, are related to or arise out of or in connection with Delphi's business before or after the date of the Delphi Financial Statements.

11

NY\1160366.7

refrain from challenging the allowance of the OPEB Claim. Moreover, the Debtors agreed to waive any party in interest's right to challenge the OPEB Claim on the ground that it is not assertable under the Master Separation Agreement. This waiver denies the estates the benefit of a viable defense to a very large claim.[11]

        **B.**        **GM's Allowed Claim on Account of its Half of the Buyout Payments**

20.    Under the Programs, in lieu of being obligated to pay or accrue the OPEB and other benefits of the Debtors' UAW-represented and IUE-represented employees if the benefit guarantees that are described above are triggered, GM simply must pay one-half of the Buyout Payments made to the employees who choose to accept such payments. In exchange for funding its half of the Buyout Payments, GM would receive an allowed claim. Because employees who accept the Buyout Payments would sever all ties with Delphi and GM except for vested pension benefits, the Programs shield GM from liability under the benefit guarantees. Thus, GM's payment of half of these employees' Buyout Payments should be viewed as an alternative to satisfying its obligation to provide benefits under the benefit guarantees. It should not be viewed as "new money" provided by GM for the Debtors' benefit.

21.    However, though GM's payments to the Debtors' downsized UAW-represented employees who accept the Buyout Payments merely take another form (*i.e.*, Buyout Payments rather than OPEB and other benefits under the UAW Benefit Guarantee), GM's claim would be transformed from a claim under the GM/Delphi indemnity agreement that is subject to all challenges to an allowed claim that is immune from those challenges. More strikingly, GM's

---

[11] The grant to GM of an allowed claim under the Master Separation Agreement would expose Delphi's subsidiaries to claims to which they otherwise would not be exposed under the relevant prepetition agreements. This is due to the fact that the Master Separation Agreement states that Delphi and its subsidiaries are jointly and severally liable with respect to the indemnity obligation thereunder. *See* Master Separation Agreement at § 5.01. Delphi is the counterparty to the collective bargaining agreements with the UAW and the IUE, and Delphi is also a party to an agreement providing an indemnity to GM in connection with GM's obligations under the UAW Benefit Guaranty. Delphi's subsidiaries are not parties to those agreements.

12

payments to the Debtors' IUE-represented employees who accept the Buyout Payments would result in an allowed GM claim, even though GM appears to have no basis under any prepetition agreement to assert a claim for benefits it provides under the IUE Benefit Guarantee.

22.  Even without the allowed claim, GM stands to gain handsomely from dodging its OPEB liability under the benefit guarantees by paying one-half of the Buyout Payments. In his declaration in support of the Motion, John D. Sheehan estimated that approximately 20% of eligible UAW-represented and IUE-represented employees will accept the Buyout Payments. According to Mr. Sheehan, the Buyout Payments at this level of acceptance will cost each of GM and the Debtors $135 million. *See* Sheehan Dec. at ¶¶ 13, 18. At the level of OPEB that GM is presently providing to their employees, as a result of those buyouts GM stands to save substantially more than the $135 million it would pay if approximately 20% of eligible UAW-represented and IUE-represented employees accept the Buyout Payments, because it would no longer guarantee the OPEB of the employees who accept the Buyout Payments. Adding to GM's bonus, of course, is the fact that it can assert an allowed claim in the amount of the Buyout Payments it makes.

23.  By agreeing to provide GM an allowed claim in connection with its half of the Buyout Payments, the Debtors are waiving their estates' ability to assert availing defenses to that claim. For example, the Debtors are waiving their right to have GM's claim disallowed on the basis of section 502(d) of the Bankruptcy Code, which disallows the claim of any entity (a) from which property is recoverable or (b) that is a transferee of an avoidable transfer, unless and until that entity has returned the property or transfer to the debtor's estate. The ability to assert a section 502(d) defense to GM's claim is valuable to the Debtors' estates, because the Committee believes that GM has received preferential or fraudulent transfers from the Debtors prior to the

13

NY\1160366.7

Petition Date, but has not returned those transfers to the Debtors.  This is yet another example of the Debtors' failure to preserve and pursue valuable claims and defenses that are the property of their estates.

## II.  Allowance of GM's Claims is Impermissible Under Section 363(b) of the Bankruptcy Code

24.  The Debtors purport to bring their Motion pursuant to section 363(b) of the Bankruptcy Code, and thereby cloak the relief sought therein under the highly deferential business judgment rule applied to applications by the debtor-in-possession to use property of the estate "other than in the ordinary course of business."  Whatever the merits of invoking this section as authority for entry into the attrition agreements with the UAW and IUE-CWA, the Debtors have cited no authority for the extraordinary request to use section 363(b) as a statutory basis for the allowance of, and waiver of defenses with respect to, GM claims.  Indeed, the Debtors have cited no precedent for the use of section 363(b) that is contemplated by the Motion.  Inasmuch as a dispute plainly exists as to GM's right to allowed claims in this case in light of the Claims and Defenses, the Debtors' failure to make even the showing required for approval of a settlement under Bankruptcy Rule 9019 should be fatal to the Motion.  *See* Bankr. Rule 9019; *see also In re Git-and-Go, Inc.*, 322 B.R. 164, 175 (Bankr. N.D. Okla. 2004) (parties' failure to label agreement as settlement or compromise did not free parties of obligation to meet requirements of Bankruptcy Rule 9019).

25.  While approval of a settlement under Bankruptcy Rule 9019 does not require a mini-trial on the merits, it does require the Debtors to make a sufficient showing on the merits to permit the Court to evaluate whether the settlement falls "within the lowest end of the range of reasonableness."  *In re W.T. Grant Co.,* 699 F.2d 599, 613 (2d Cir. 1983); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc., v. Anderson,* 390 U.S. 414, 424

14

(1968) (bankruptcy court must apply its "informed, independent judgment" as to whether a settlement is "fair and equitable"; no such judgment can be made "until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated"). However, the court is not obligated to approve a settlement at the lowest level of reasonableness. *See, e.g.*, *In re Lion Capital Group*, 49 B.R. 163, 176 (Bankr. S.D.N.Y. 1985). Though creditors' views on a settlement are not binding, courts give particularly great weight to the paramount interest of creditors in considering whether a settlement meets the standards of Bankruptcy Rule 9019. *See, e.g.*, *In re Remsen Partners, Ltd.*, 249 B.R. 557, 566 (Bankr. S.D.N.Y. 2003) (stating that, "other than an assessment of the merits," the interests of creditors are "the most important consideration"); *In re Matco Elecs. Group, Inc.*, 287 B.R. 68, 77 (Bankr. N.D.N.Y. 2002) (describing the creditors' committee's objection to a settlement agreement as a "major consideration for the Court" in finding that proponents failed to establish that settlement was in best interest of estate).

26. Given the Debtors' failure to provide the Court with any explication of the complicated factual, economic and legal backdrop to the issues presented by the Motion arising out of GM's spin-off of Delphi and the agreements entered into in connection therewith and thereafter, the Debtors have deprived the Court of any ability to determine whether the proposed allowance of GM's claims is a reasonable outcome to the dispute between GM and the estates.

27. Beyond this, a question exists as to whether the Debtors are empowered in any event to deprive the Committee of its statutory right under section 502(a) of the Bankruptcy Code to file and prosecute its own objection to the GM claims. *See, e.g.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 646 (2d Cir. 1988) ("Claims are 'allowed' in the amount filed unless they

15

are objected to by a party in interest, including the debtor *or another creditor*." (emphasis added); *Blumenberg v. Yihye (In re Blumenberg)*, 263 B.R. 704, 718 (Bankr. E.D.N.Y. 2001) ("Section 502(a) contemplates that creditors may object to proofs of claim as parties in interest").

28. The Debtors' agreements with GM regarding the allowance of GM's claims are analogous to the familiar scenario of the debtor-in-possession that is compelled to waive its right to object to its lenders' claims in order to obtain DIP financing. As the Court is well aware, in that circumstance the debtor-in-possession is generally required to preserve the right to challenge the lender's liens for the statutory committees for at least a defined time period, as well as to confer an explicit grant of standing upon the statutory committees to prosecute an adversary proceeding against the lenders. While these financing orders rarely if ever result in published decisions, the decision in *In re FCX, Inc.*, 54 B.R. 833, 842 (Bankr. E.D.N.C. 1985), is instructive. There, the debtor and its primary lender entered into an agreement that granted the lender super-priority status and validation of its pre-petition liens in exchange for post-petition financing. The court concluded that, while the debtor could waive its own right to object to the amount and validity of the lender's pre-petition claims, "[t]he debtor may not waive that right on behalf of creditors." Similarly, the Debtors should not be permitted to allow claims and waive defenses thereto on behalf of its creditors, or without vesting in the Committee an explicit grant of standing to pursue the Claims and Defenses on the estates' behalf.

**III. The Committee Should Be Granted Authority to Pursue the Rights of the Debtors' Estates Against GM that the Debtors Have Waived**

29. Based on information in the public record and information produced by the Debtors, the Committee believes that Claims and Defenses are available to the Debtors as a means of recovering from GM billions of dollars in payments that benefited GM and avoiding burdensome obligations of GM assumed or incurred by the Debtors in connection with the 1999

16

spin-off. The Debtors can also use these affirmative claims defensively against GM with respect to any claims GM may assert. In addition to these affirmative claims and causes of action, the Claims and Defenses available to the Debtors include contract, statutory and common law defenses and objections to GM's claims that will reduce the amount or priority of, or otherwise eliminate, such claims. Despite this, the Debtors seek to grant GM an allowed claim equal to the aggregate amount it pays in connection with the Buyout Payments and to waive their right to object to the allowance of the OPEB Claim.

30. The Debtors have a fiduciary duty to maximize the value of their estates for their creditors by, among other things, collecting the property of their estates and objecting to the allowance of improper claims. *See, e.g.*, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352, 105 S. Ct. 1986, 85 L. Ed. 2d 372 (1985) (stating that "[t]he trustee is 'accountable for all property received,'. . . and has the duty to maximize the value of the estate …") (internal citations omitted); *In re Commodore International Ltd.*, 262 F.3d 96, 99 (2d Cir. 2001) (stating that "[t]he [debtor in possession] has an obligation to pursue all actions that are in the best interests of creditors and the estate"); *Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d 233, 249 (5th Cir. 1988) (stating that "[i]f a valid – and potentially profitable – cause of action exists under state law which the debtor-in-possession may assert on behalf of the corporation, *all* creditors are harmed when the debtor-in-possession refuses to pursue it. The value of the estate is not maximized and the ultimate recovery of all creditors is diminished.") (emphasis in original).

31. As noted by the Second Circuit in *Unsecured Creditors' Committee of STN Enterprises, Inc. v. Noyes (In re STN Enterprises, Inc.)*, 779 F.2d 901, 904 (2d Cir. 1985), sections 1103 and 1109 of the Bankruptcy Code imply a "qualified right for creditors'

17

committees to initiate suit [on behalf of a debtor in possession] with approval of the bankruptcy court." Where a debtor is unable or unwilling to fulfill its statutory obligation to maximize the value of its estate, "[t]he practice of authorizing the prosecution of actions on behalf of an estate by committees …, upon a showing that such is in the interests of the estate, is one of long standing, and nearly universally recognized." *Official Committee of Unsecured Creditors of Adelphia Communications Corp. v. Bank of America, N.A. (In re Adelphia Communications Corp.)*, 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005) (citations omitted). A bankruptcy court's approval of a committee's prosecution of litigation on behalf of a debtor that failed to pursue the litigation is appropriate when (a) the committee presents a colorable claim for relief that, upon appropriate proof, would support recovery and (b) the litigation is likely to benefit the debtor's estate. *See, e.g.*, *STN*, 779 F.2d at 905; *Adelphia*, 330 B.R. at 374, n.19; *Official Committee of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 374 (Bankr. S.D.N.Y. 2002).

32.     To establish a colorable claim, a committee need only provide minimal evidentiary basis for its allegations. *See, e.g.*, *STN*, 779 F.2d at 905; *see also Official Committee of Unsecured Creditors v. Austin Financial Services, Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999) (a court's analysis of the claims involved is similar to that applied in assessing a motion to dismiss a complaint for failure to state a claim). In determining whether an action would be beneficial to the estate, courts perform a cost-benefit analysis to determine whether the costs to the estate in pursuing the action would be outweighed by the potential gain if the action is successful. *See, e.g.*, *STN*, 779 F.2d at 905 (the court need only find a sufficient likelihood of success to justify any delay and expense to the bankruptcy estate that the initiation and continuation of the litigation may produce).

NY\1160366.7

33.     It is apparent from the relief sought in the Original Attrition Motion and the instant Motion that the Debtors are embarked upon a program of incremental allowance of GM's claims against the estates that is likely to preclude the maximization of value for the estates by pursuit of the Claims and Defenses against GM.  Accordingly, as a condition to any grant of the relief sought in the Motion with respect to the Debtors' rights vis-à-vis GM, the Committee requests that the Court grant the Committee authority to prosecute on behalf of the Debtors any and all of the Debtors' Claims and Defenses and other rights that may reduce the amount or priority of, or otherwise eliminate, GM's claims to which the Debtors have waived objections under the Programs.[12]  While the Committee had hoped, and continues to hope, that a consensual resolution of issues concerning GM's alleged claims and other matters of importance to GM and the Committee can be achieved, the Committee cannot stand idly by while the "starting line" for negotiations keeps moving farther and farther down the field.

---

[12] The Committee notified the Debtors of the Claims and Defenses in detail over six weeks ago.  Though the Committee strongly prefers to negotiate with GM, it cannot allow the rights of the Debtors' estates with respect to the Claims and Defenses to be prejudiced.

19

**WHEREFORE,** the Committee respectfully requests that this Court deny the Motion unless any order approving the Motion expressly provides that (a) the right of any party in interest to object to, set off against, seek to subordinate, or otherwise challenge on any grounds the allowance, amount or priority of GM's claims against the Debtors, including but not limited to those claims arising under the Programs, is fully preserved and (b) the Committee has authority to prosecute on behalf of the Debtors any and all of the estates' Claims and Defenses and other rights that may reduce the amount or priority of, or otherwise eliminate, the claims of GM to which the Debtors have waived objections under the Programs. The Committee also requests that this Court grant it such other relief as is just and proper.

Dated: June 27, 2006
      New York, New York

                                 **LATHAM & WATKINS LLP**

                                 By: /s/ Robert J. Rosenberg
                                     Robert J. Rosenberg (RR-9585)
                                     Mitchell A. Seider (MS-4321)
                                     Mark A. Broude (MB-1902)
                                     885 Third Avenue, Suite 1000
                                     New York, New York 10022
                                     Telephone: (212) 906-1200

                                 Attorneys for the Official Committee
                                 of Unsecured Creditors

NY\1160366.7