**REDACTED**

KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
Edward M. Fox, Esq. (EF1619)
599 Lexington Avenue
New York, New York 10022
Telephone (212) 536-3900

Hearing Date: June 29, 2006
10:00 A.M.

Attorneys for Wilmington Trust Company,
as Indenture Trustee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                           :
                                                 :
DELPHI CORPORATON, *et al.*,                     :
                                                 :
    Debtors.                                     :
                                                 :
-------------------------------------------------------X

Chapter 11
Case No. 05-44481 (RDD)
(Jointly Administered)

## LIMITED OBJECTION OF WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE, TO MOTION FOR ORDER UNDER 11 U.S.C. § 363(B) AND FED. R. BANKR. P. 6004 APPROVING (I) SUPPLEMENT TO UAW SPECIAL ATTRITION PROGRAM, AND (II) IUE-CWA SPECIAL ATTRITION PROGRAM

Wilmington Trust Company ("WTC"), in its capacity as indenture trustee with respect to the senior notes and debentures (the "Senior Debt") in the aggregate principal amount of $2 billion issued by Delphi Corporation ("Delphi"), by and through its attorneys, Kirkpatrick & Lockhart Nicholson Graham LLP, hereby files this limited objection to the Motion for Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW Special Attrition Program, and (II) IUE-CWA Special Attrition Program (the "Motion") filed by Delphi and its debtor subsidiaries and affiliates (collectively, the "Debtors"), stating as follows:[1]

---

[1]    WTC incorporates herein by reference its Limited Objection of Wilmington Trust Company, as Indenture Trustee, to Motion for Order Under 11 U.S.C. § 363(B) and Fed. R. Bankr. P. 6004 approving Debtors' Human Capital Hourly Attrition Programs dated April 4, 2006 and its arguments at the hearing on April 7, 2006 in connection with the Motion for Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving Debtors' Human Capital Hourly Attrition Programs dated March 22, 2006.

## INTRODUCTION

1.    WTC does not oppose the Debtors' efforts to reduce the size and cost of their labor force by encouraging voluntary attrition among their unionized employees, nor to the Debtors' efforts to obtain financial and other assistance from General Motors Corporation ("GM") in accomplishing that result.

2.    WTC does object, however, to the Debtors' continuing efforts to force Delphi Corporation to bear the entire financial burden of restructuring the labor costs paid by its operating subsidiaries, particularly since the Debtors have not demonstrated that Delphi Corporation and its creditors will receive *any* concrete benefit from that restructuring.

3.    For the same reason, WTC objects to the Debtors' effort to grant GM an allowed unsecured claim against Delphi Corporation without any showing that GM has provided a post-petition benefit to Delphi Corporation (as opposed to its operating subsidiaries), and under circumstances where GM appears to be acting principally for its own benefit by preserving a stable supply chain of necessary components, as well as managing relationships with the same unions that represent GM's own unionized workforce.

4.    Notwithstanding the Debtors' rhetorical inclination to describe the Debtors as part of a single integrated enterprise, the fact of the matter is that Delphi Corporation is a separate legal entity with a fiduciary duty to act in the best interests of its creditors and shareholders without regard to the distinct and sometimes conflicting interests of its subsidiaries.

5.    Consequently, since Delphi Corporation does not actually employ any of the Debtors' unionized employees, and will not realize any direct benefit from a reduction in the level of the Debtors' unionized workforce, there is no business justification for Delphi Corporation to expend millions of dollars and incur substantial additional liabilities to GM to

fund an attrition program for the benefit of its operating subsidiaries, which appear to be insolvent.

6.     Accordingly, the Debtors' Motion must be denied insofar as it pertains to Delphi Corporation.

## BACKGROUND

### A.    Procedural Posture

7.     On October 8, 2005 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued to operate their businesses and remained in possession of their assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.     On March 22, 2006, the Debtors filed their Motion for Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving Debtors' Human Capital Hourly Attrition Programs, and thereby sought approval to implement the UAW-GM-Delphi Special Attrition Program (the "UAW Attrition Program"), which provided various incentives to the Debtors' UAW-represented employees to retire and/or flow back to General Motors Corporation ("GM").

9.     On May 8, 2006, the Court entered an Order approving the Debtors' participation in the UAW Attrition Program, which was amended on May 12, 2006 to address various technical issues raised by GM.

10.     By means of the Motion, the Debtors now seek permission to enter into a supplement (the "Supplement") to the original UAW Attrition Program that is designed to provide increased incentives for the Debtors' UAW-represented employees to attrite voluntarily from the Debtors' payrolls.

11.    The Motion also seeks approval for the Debtors' participation in the IUE-CWA-GM-Delphi Special Attrition Program (the "IUE-CWA Attrition Program," and, together with the UAW Attrition Program, as amended by the Supplement, collectively, the "Attrition Programs"), which is designed to provide incentives for the Debtors' IUE-CWA-represented employees to retire or otherwise voluntarily attrite.

## B.    Overview of the Debtors' Corporate Organizational Structure and Operations

12.    Delphi Corporation is a holding company that directly owns one hundred percent of the equity of Delphi Automotive Systems, LLC ("DAS"), its principal operating subsidiary. Delphi Corporation is also the direct or indirect parent of all of the other Debtors.[2]

13.    Delphi Corporation does not own or operate any of the Debtors' manufacturing facilities in the United States. Instead, all, or substantially all, of the Debtors manufacturing facilities are owned and operated directly by DAS.[3]

14.    Delphi Corporation is a signatory to collective bargaining agreements ("CBAs") with, among others, the IUE-CWA and the UAW, which establish the terms and conditions of employment for the Debtor's unionized workforce.

15.    Nevertheless, while the CBAs to which Delphi Corporation is a party establish the terms and conditions of employment applicable to all of the Debtors' unionized

---

[2]    A corporate organization chart reflecting the relationships between the various Debtors is annexed hereto as **Exhibit A**.

[3]    See Transcript of May 24, 2006 Hearing, relevant excerpts of which are annexed hereto as **Exhibit B**, at p. 188, wherein John D. Sheehan, the Debtors' Chief Restructuring Officer, testified as follows:

Q.    Okay. Now the U.S. operations though are not run directly by Delphi Corporation, correct?
A.    The – Delphi is the parent company and there are – most of the oper – U.S. operations are included in a subsidiary that's owned by Delphi Corporation.
Q.    But Delphi Corporation, itself, does not directly own or operate the U.S. manufacturing operations, correct?
A.    Not directly.
Q.    Okay. In fact, they're owned and operated by Delphi Automotive Systems LLC, correct?
A.    Largely, that's correct, yeah.

employees, Delphi Corporation does not directly employ any of the Debtors' unionized workers,[4] nor does it pay the wages and benefits attributable to those workers.[5]

    16.  Instead, all, or substantially all, of the Debtors' unionized employees are

    17.  Consistent with this arrangement, the wages and benefits owed to the Debtors' unionized workers are paid directly by DAS, both for actual services rendered at DAS-owned and operated manufacturing facilities,[7] :

---

[4]   See Debtors Employee Information (DPH-WTC 000127), a copy of which is annexed hereto as **Exhibit C**, at Line 2 (

[5]   See Transcript of June 15, 2006 Deposition of John D. Sheehan ("Sheehan Depo"), relevant excerpts of which are annexed hereto as **Exhibit D**, at p. 35-36 wherein Mr. Sheehan testified as follows:

[6]   Copies of the Employee Leasing Agreement between DASHRLLC and DAS, and DASSLLC and DAS, are annexed hereto as **Exhibits E and F**, respectively.

[7]   See Ex. D, Sheehan Depo, at p. 36, wherein Mr. Sheehan testified as follows:

[8]   See Ex. D, Sheehan Depo, at p. 46, wherein Mr. Sheehan testified as follows (emphasis added):

C.    **Overview of the Debtors' Proposed Attrition Programs**

18.    The UAW Attrition Program, which has already been approved, and the

IUE-CWA Attrition Program, which is presently under consideration, are not identical in every

respect. However, both Attrition Programs are structurally similar in that they require Delphi

Corporation to bear virtually all of the costs (and claims) associated with providing attrition

incentives to unionized workers presently employed and compensated by DAS.

19.    Both of the Attrition Programs provide for Delphi Corporation (as

opposed to DAS) to establish a dedicated funding account for payments to attriting employees --

$90 million in the case of the UAW Attrition Program (as modified by the Supplement) and $12

million in the case of the IUE-CWA Attrition Program.

20.    Likewise, both Attrition Programs rely on significant funding assistance

from GM, in exchange for which GM is given the right to assert a general unsecured claim

against Delphi Corporation (as opposed to DAS) for the cost of any payments made or

obligations assumed with respect to attriting DAS employees.

21.    Finally, neither the Attrition Programs, nor the Supplement, provide any

mechanism for Delphi Corporation to recover any of the costs of providing attrition programs for

the Debtors' employees from DAS or any of its other operating subsidiaries, which will enjoy the

direct benefits of a smaller and less costly unionized workforce.

## DELPHI CORPORATION'S REQUEST TO PARTICIPATE
## IN THE ATTRITION PROGRAMS IS NOT SUPPORTED
## <u>BY A GOOD BUSINESS REASON AND SHOULD BE DENIED</u>

**A.     There Is No Business Justification for Delphi
<u>Corporation's Agreement To Fund the Attrition Programs</u>**

22.     Section 363(b) of the Bankruptcy Code provides that the Debtors "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

23.     Under section 363(b), the Debtors bear the burden of demonstrating that there is "a good business reason" for implementing the IUE-CWA Attrition Program and the UAW Supplement described by the Motion. In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). In considering whether the Debtors have met that burden, the Court may not blindly defer to the Debtors' collective business judgment, but must, instead "consider all salient factors pertaining to the proceeding, and . . . act to further the diverse interests of the debtor, creditors and equity holders, alike." Id.

24.     Furthermore, because the Debtors estates are not substantively consolidated, the "good business reason" test established by section 363(b) of the Bankruptcy Code must be considered and applied separately with respect to each Debtor that proposes to use property of its estate out of the ordinary course of business. See Mission Iowa Wind Co. v. Enron Corp., 291 B.R. 39, 42 (S.D.N.Y. 2003) ("[I]t is incumbent on the Bankruptcy Court in these circumstances not to defer in conclusory fashion to the debtors' business judgment but to consider on the merits whether the price allocated to the U.S. Asset Sellers was a fair reflection of those assets' relative value and to make findings of fact on that question.").

25.     Nevertheless, the Debtors' Motion makes no effort to distinguish between the differing interests of the Debtors' respective estates and creditors, and persistently refers to

the Debtors in the plural, suggesting that the Debtors' view the interests of all of their respective estates as somehow aligned.

26.     As a result, the Debtors' Motion appears to be premised on the factually unsustainable notion that if the Attrition Programs make good business sense for the Debtors' operating companies, they must necessarily make good business sense for Delphi Corporation as well.

27.     Unfortunately, while implementation of the Attrition Programs appears to be a sound exercise of business judgment by DAS, which will realize tangible benefits in the form of a smaller and less expensive unionized workforce, Delphi Corporation's agreement to expend substantial resources and incur significant claims in order to participate in Attrition Programs that will provide it with no measurable benefits is simply incomprehensible.

28.     Simply put, the Debtors have asked this Court to approve the expenditure of millions of dollars by Delphi Corporation, and the creation of potentially billions of dollars of additional claims against Delphi Corporation, for the sole purpose of creating and improving Attrition Programs that will result a more streamlined and less costly workforce for DAS.

29.     In the absence of a showing that the value of Delphi Corporation's ownership interest in DAS will be increased by the Attrition Programs – something that is notably absent from the Motion, presumably because DAS is insolvent and likely to remain that way for the foreseeable future – it is simply impossible for Delphi Corporation to justify its decision to fund the Attrition Programs, which will not provide any direct benefit to it or its creditors.

30.     In an effort to explain away this obvious disconnect between the costs and benefits of implementing the Attrition Programs – Delphi Corporation bears all of the costs,

- 8 -

while DAS enjoys all of the benefits – the Debtors have suggested that Delphi Corporation will realize a benefit from the Attrition Programs because the Attrition Programs will reduce the number of employees to whom it is obligated under the CBAs.

31.    Of course, the Debtors have never attempted to quantify the benefit of eliminating such potential future claims under the CBAs, or to show that any such benefit would be sufficient to offset the substantial and quantifiable costs being incurred by Delphi Corporation to implement the Attrition Programs.

32.    Moreover, this putative justification for imposing on Delphi Corporation the cost of providing incentives to DAS employees to retire or otherwise leave their employment is premised on a number of legal errors and factual distortions.

33.    First, Delphi Corporation's status as a signatory to the CBAs does not mean that Delphi Corporation actually *employs* any of the workers covered by the CBAs, nor that it has any obligation to provide such employment for workers covered by the CBAs.

34.    Contrary to the Debtors' repeated suggestions, a CBA is simply not the same thing as an employment contract. As explained by the Supreme Court in J.J. Case Co. v. National Labor Relations Board, 321 U.S. 332 (1944):

> Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to the terms which will govern hiring and work and pay in that unit. **The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone.** The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment.

Id. at 335 (emphasis added); see also Airline Pilots Assoc. Int'l. v. Continental Airlines, Inc. (In re Continental Airlines Corp.), 901 F.2d 1259, 1264 (5th Cir. 1990) ("Unlike a contract of employment, ordinarily a collective bargaining agreement does not create an employer-employee

relationship; and its rejection does not terminate an employment relationship. It neither obligates any employee to perform work nor requires the employer to provide work.").

35.     Moreover, as a factual matter, the Debtors have admitted that their unionized employees are not employed by Delphi Corporation, nor are their wages and benefits paid by Delphi Corporation.

36.     Thus, attrition among the Debtors' unionized employees will not result in any measurable benefit to Delphi Corporation, and all cost savings associated with such attrition will be realized by DAS.

37.     In fact, not only will Delphi Corporation not receive any of the immediate cost savings generated by the Attrition Programs, the Motion suggests that implementation of the Attrition Programs will also increase Delphi Corporation's minimum pension funding obligations.[9]

38.     Equally misleading is the Debtors' suggestion that DAS is somehow not bound by the CBAs that cover its employees – and is thus doing a favor to Delphi Corporation by abiding by its terms -- simply because DAS is not a signatory to those Agreement.

39.     As WTC has noted on previous occasions, under the so-called "joint employer" doctrine of labor law, a non-signatory to a CBA, like DAS, may nevertheless be bound its terms if "it *share[s]* or co-determine[s] those matters governing the essential terms and conditions of employment" with a signatory. See N.L.R.B. v. Browning Ferris Indus. of Pennsylvania, Inc., 691 F.2d 1117 (3d Cir. 1982).

40.     In this case, it is clear that the employees covered by the CBA at issue here are employees of DAS, perform their services at facilities owned by DAS and are paid for

---

[9]     Motion, p. 29.

their services by DAS. Moreover, if DAS truly believed that it was not bound to observe the provisions of the CBA, it is inconceivable that it would continue to pay what it considers to be substantially above market compensation and benefit arrangements for its employees.

41.      Despite DAS' indisputable status as an employer to the workers covered by the Attrition Programs, DAS has not been asked to share any of the costs of implementing the Attrition Programs.

42.      Under the circumstances, it may even make good business sense for DAS to implement the Attrition Programs on its own, using its own resources to reduce the overall cost of the wage and benefit structures governing its employees, without any assistance from Delphi Corporation.

43.      Regardless, the Debtors have not provided any business justification for Delphi Corporation to expend substantial resources and expose itself to substantial additional claims for the sole purpose of benefiting DAS, or any of its other operating subsidiaries.

44.      Accordingly, the Motion must be denied insofar as it requests authorization for Delphi Corporation to implement the IUE-CWA Attrition Program and the UAW Supplement.

**B.      There Is No Legal Basis for Awarding a Claim Against Delphi Corporation to GM**

45.      In addition to requiring cash contributions from Delphi Corporation, the IUE-CWA Attrition Program provide for the allowance of a general unsecured claim under the Master Separation Agreement dated as of December 22, 1998 among GM, Delphi, DAS, Delphi Technologies, Inc. and Delphi Automotive Systems (Holding) Inc. (the "MSA") in favor of GM and only against the estate of Delphi Corporation for any obligations assumed by GM with respect to retiring DAS employees.

- 11 -

46.     Specifically, the IUE-CWA Attrition Program Agreement provides that:

> Notwithstanding paragraph 3 below, any obligations assumed by
> GM under the "check the box" provisions of this paragraph shall
> be conclusively deemed to be comprehended by, included within,
> and shall constitute a prepetition, general unsecured claim
> assertable by GM against the estate of Delphi Corporation under
> Delphi's general indemnity of GM under the Master Separation
> Agreement. Neither Delphi Corporation nor any of its debtor
> affiliates may object on any grounds to the allowance of such
> claim; provided, however, that Delphi Corporation and any of its
> debtor affiliates reserve the right to object to the economic value of
> such claim (in the nature of assumptions such as discount rate,
> health care trend rates, mortality, other withdrawal rates and
> current and future expected benefit plan design changes).

IUE-CWA Attrition Program, § 2.

47.     The IUE-CWA Attrition Program further provides that other parties in

interest – but not the Debtors – may object to GM's claim on "any grounds other than it was not

assertable under the Master Separation Agreement." IUE-CWA Attrition Program, § 2.

48.     Absent Court approval of the Motion approving the IUE-CWA Attrition

Program, however, there would be no basis for GM to assert any claim against Delphi

Corporation on account of retiring IUE-CWA-represented workers.

49.     In an attempt to justify the award of such a claim, the Debtors allege that

they could not fund the IUE-CWA Attrition Program without financial assistance from GM, and

that GM would not agree to provide the requisite financial assistance without the ability to assert

a corresponding claim against Delphi Corporation.

50.     Even if true, the Debtors' assertions are entirely irrelevant. The Debtors'

collective inability to fund the IUE-CWA Attrition Program without assistance from GM does

not establish (or even suggest) that it is in the best interests of Delphi Corporation to suffer the

burdens of additional claims from GM in order to allow the program to proceed.

51.    Delphi Corporation simply has no obligation to use its limited resources to preserve the viability of its insolvent subsidiaries, no matter how great a harm they may suffer if it fails to do so. In fact, in the absence of an affirmative showing that funding the IUE-CWA Attrition Program would increase the value of Delphi Corporation's interest in its subsidiaries, Delphi Corporation has a fiduciary duty to refrain from acting.

52.    The Debtors' further suggestion that, in the absence of GM's voluntary agreement to accept lesser treatment, GM would be entitled to assert an administrative claim for the cost of benefits provided under the IUE-CWA Attrition Program[10] (and, presumably under the UAW Supplement) is seriously misleading.

53.    If GM asserted an administrative claim against Delphi Corporation, it would be required to demonstrate that it provided "a concrete, discernable benefit . . . because a speculative benefit is not enough to warrant an administrative claim priority." In re Enron Corp., 279 B.R. 79, 86 (Bankr. S.D.N.Y. 2002). Moreover, GM would have to demonstrate that the benefit of its payments flowed directly to Delphi Corporation rather than DAS or one of the other Debtors. In re Adelphi Bus. Comm., Inc., 296 B.R 656, 663 (Bankr. S.D.N.Y. 2003) ("Acting as a conduit without profit . . . is not eligible for administrative status.").

54.    GM would also have to establish that it is not acting out of its own self interest in making the payments under the IUE-CWA Attrition Program and under the UAW Supplement. In re Cheatle, 150 B.R. 266, 269 (Bankr. D. Colo.1993).

55.    Based on the undisputed facts in the record, however, it appears that GM's payments – like the rest of the IUE-CWA Attrition Program – will not provide any demonstrable benefit to Delphi Corporation. Accordingly, they would not be entitled to administrative

---

[10]    Motion, p. 30.

expense priority, and the general unsecured claim being granted to GM under the IUE-CWA

Attrition Program cannot be justified on the basis of an administrative claim that GM would

otherwise be entitled to assert.

56.     In short, there is no justification for allowing GM to assert any kind of

claim against Delphi Corporation based on its agreement to provide funding for the IUE-CWA

Attrition Program because the IUE-CWA Attrition Program will not provide any benefit to

Delphi Corporation.

57.     The Debtors' Motion must therefore be denied.

WHEREFORE, WTC respectfully requests that the Court enter an Order denying

the Motion insofar as it obligates Delphi Corporation to fund the cost of the Attrition Program

and granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
     June 27, 2006

                                   KIRKPATRICK & LOCKHART
                                   NICHOLSON GRAHAM LLP

                                   By:___*/s/ Edward M. Fox*_____
                                      Edward M. Fox (EF1619)
                                      A Member of the Firm
                                  Attorneys for Wilmington Trust Company,
                                  as Indenture Trustee
                                  599 Lexington Avenue
                                  New York, NY 10022
                                  (212) 536-3900

# Exhibit A



Corporate Structure – Domestic U.S. Entities

DELPHI

Page 31

February 3, 2006 –
Section 341 Creditors Meeting



Corporate Structure –
U.S./Foreign Entity Relationships

DELPHI

# Exhibit B

1

```
 1
 2    UNITED STATES BANKRUPTCY COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4    Case No. 05-44481
 5    - - - - - - - - - - - - - - - - - - - -x
 6    In the Matter of:
 7
 8    DELPHI CORPORATION,
 9
10          Debtor.
11
12    - - - - - - - - - - - - - - - - - - - -x
13                (A.M. SESSION)
14                U.S. Bankruptcy Court
15                One Bowling Green
16                New York, New York
17
18                May 24, 2006
19                9:04 a.m.
20
21    B E F O R E:
22    HON. ROBERT D. DRAIN
23    U.S. BANKRUPTCY JUDGE
24
25
```

2

```
 1
 2    MOTION to Authorize Motion For Order Under 11
 3    U.S.C. Section 1113(c) Authorizing Rejection
```

25   corporation and we prepare our financial

188

1    information on a consolidated basis under GAP.

2    Q.   So you're referring to Delphi, here in

3    paragraph 6, you're talking about Delphi on a

4    consolidated basis, that's correct?

5    A.   Yes, sir.

6    Q.   Okay.  Now the U.S. operations though are

7    not run directly by Delphi Corporation,

8    correct?

9    A.   The -- Delphi is the parent company and

10   there are -- and most of the oper -- U.S.

11   operations are included in a subsidiary that's

12   owned by Delphi Corporation.

13   Q.   But Delphi Corporation, itself, does not

14   directly own or operate the U.S. manufacturing

15   operations, correct?

16   A.   Not directly.

17   Q.   Okay.  In fact, they're owned and

18   operated by Delphi Automotive Systems LLC,

19   correct?

20   A.   Largely, that's correct, yeah.

21   Q.   Now, the manufacturing sites that you

22   referred to in your declaration also are not

23   owned directly by Delphi Corporation, correct?

24   A.   That's correct.

25   Q.   Okay.  And, in fact, according to

189

1    schedule A, which you filed for Delphi

2    Corporation with the schedules and statement

3    of affairs -- don't look yet, Delphi

4    Corporation releases, at the time of the

5    filing, owned no real property, correct?

6    A.   Off the top of my head, I believe that's

7    correct.

8    Q.   I have a copy here if you'd like to

9    refresh your recollection?

10   A.   No.  If you tell me I believe you.

11   Q.   Okay.

12   A.   I believe its correct, so I trust your

13   correct.

14   Q.   Would you like to take a look just to be

15   sure?

16   A.   No, sir.

17   Q.   Now, in paragraph 12 of your declaration

18   on page 5 where you say Delphi is organized

19   into three sectors, you see that?

20   A.   Yes.

21   Q.   Again, here you're not talking about

22   Delphi Corporation, correct?

23   A.   I'm talking about the consolidated

24   company.

25   Q.   Okay.  But these are sectors at the

190

1    operating level, correct?

2    A.   That is correct.

3    Q.   Okay.  So that's sectors of DAS -- Delphi

4    Automotive Systems LLC, correct?

5    A.   Not only DAS LLC, but also -- our sectors

# Exhibit C

Filed Under Seal Pursuant to Agreed
Protective Order Governing Production
and Use of Confidential and Highly
Confidential Information In Connection
With The Within Chapter 11 Cases,
Including Contested Matters and Adversary
Proceedings dated January 12, 2006

# Exhibit D

Filed Under Seal Pursuant to Agreed
Protective Order Governing Production
and Use of Confidential and Highly
Confidential Information In Connection
With The Within Chapter 11 Cases,
Including Contested Matters and Adversary
Proceedings dated January 12, 2006

# Exhibit E

Filed Under Seal Pursuant to Agreed
Protective Order Governing Production
and Use of Confidential and Highly
Confidential Information In Connection
With The Within Chapter 11 Cases,
Including Contested Matters and Adversary
Proceedings dated January 12, 2006

# Exhibit F

Filed Under Seal Pursuant to Agreed
Protective Order Governing Production
and Use of Confidential and Highly
Confidential Information In Connection
With The Within Chapter 11 Cases,
Including Contested Matters and Adversary
Proceedings dated January 12, 2006