SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
     In re                                :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
               Debtors.                   :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF KEVIN M. BUTLER IN SUPPORT OF DEBTORS' MOTION
FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004
APPROVING (I) SUPPLEMENT TO UAW SPECIAL ATTRITION PROGRAM
AND (II) IUE-CWA SPECIAL ATTRITION PROGRAM

Kevin M. Butler declares:

1.  Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases (collectively, the "Debtors"). I submit this declaration in support of the Debtors' Motion For Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW Special Attrition Program and (II) IUE-CWA Special Attrition Program ("Hourly Attrition Programs Motion No. 2"). Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Hourly Attrition Programs Motion No. 2. I hereby incorporate by reference my Declaration In Support Of The Debtors' Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. P. 6004 Approving Debtors' Human Capital Hourly Attrition Programs, a copy of which is attached hereto as Exhibit A. I have personal knowledge of all of the matters discussed in this declaration, or have obtained such knowledge from employees in the Company, and am competent to testify as follows:

2.  I am the Vice President, Human Resource Management, of Delphi, and am responsible for oversight of Delphi's worldwide human resources. I am also a member of the Delphi Strategy Board, Delphi's top policy-making group, and I am the executive champion for Delphi's Personnel Task Team. I began my career in the automotive industry 30 years ago, in the Chevrolet Motor Division of General Motors Corporation ("GM"). I held a series of positions with GM, including production supervisor, plant personnel manager, senior health-care administrator, senior administrator of classified-employee compensation, and manager of executive compensation. In 1989, I was named the director of human resources for GM's former Hydramatic Division operations in Ypsilanti, Michigan. In 1991, I became the director of GM Health Care Plans, and in February 1995, I was promoted to general director of GM's Health Care Initiatives. I started working for what is now known as Delphi in 1997, when I became the

2

**Declaration of Kevin M. Butler**

general director of human resources for Delphi Delco Electronics Systems. I have held my current position as Delphi's Vice President, Human Resource Management, since January 2000.

3. In my current position with Delphi, I am responsible for oversight of Delphi's human resources worldwide. In that capacity, I oversee Delphi's relations and collective bargaining with each of the Unions representing Delphi's hourly employees (the "Unions").

4. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, my experience with and knowledge of Delphi's labor relations, or are based upon knowledge obtained from Delphi employees reporting to me in the course of their duties. If I were called upon to testify, I could and would testify to the facts set forth herein.

## Hourly Attrition Programs

5. As I previously stated in my declaration in support of the Hourly Attrition Programs Motion No. 1, the Debtors' labor agreements are unsustainable. Delphi has extremely high "all in" labor costs. Other automotive parts suppliers, both union and non-union, have total labor costs of approximately $22 per hour. Delphi currently provides its traditional hourly employees with all-in wages and benefits (including legacy pension and OPEB) of $78.63 per hour. Understandably, when the differential between the compensation an employee receives from an employer like Delphi and the compensation the employee could receive elsewhere is so great, employers like Delphi tend to have lower voluntary employee attrition rates. It is my understanding that between 2002 and 2004, Delphi's employees voluntarily terminated their employment at a rate of less than one percent, rising to a mere 1.7% in 2005. By comparison, the economy-wide average "quit rate" is 19 to 21 percent while the manufacturing sector "quit rate" is 15 percent.

**Declaration of Kevin M. Butler**

6. In order to stem the Debtors' operating losses from their U.S. operations and achieve the Debtors' transformation, Delphi's existing labor agreements must be modified in three principal respects. First, Delphi must obtain hourly wage and benefit cost levels that are competitive with other U.S. auto parts suppliers. Currently, Delphi's total hourly labor costs, including legacy retirement liabilities, for its traditional production and skilled trades employees are approximately three times the labor costs of a typical U.S. auto parts supplier. Second, Delphi must address those provisions that limit Delphi's ability to respond to market forces by selling or closing non-core or unprofitable operations, and/or by laying off excess employees. Third, Delphi must address its substantial liabilities for retirement benefits for hourly employees and its costly retiree health care plans. The Hourly Attrition Programs are designed to begin to address, either directly or indirectly, each of these issues.

7. The value of the Debtors' estates is materially dependent on maintaining customer supply through rigorous shipping compliance at world-class quality levels as well as the ability to win profitable new business (especially non-GM business). The Debtors' ability to achieve shipping compliance, world-class quality, and customer confidence for new business is affected significantly by employee sentiment, focus, and efficiency. During trilateral discussions among the Debtors, the UAW, and GM, the parties expressed mutual concern regarding the difficulty and complexity of the issues surrounding the Debtors' restructuring. Indeed, there was deep concern that the prospects for significant risk to the business could arise if the parties could not respond to certain issues until a comprehensive settlement was reached on all issues.

8. On March 22, 2006, Delphi filed the Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving Debtors' Human Capital Hourly Attrition Programs (the "Hourly Attrition Programs Motion No. 1") in order to facilitate soft landings for a

4

**Declaration of Kevin M. Butler**

large percentage of Delphi's hourly workforce, and alleviate some concern related to the potential filing of a motion under sections 1113 and 1114 of the Bankruptcy Code. The Hourly Attrition Programs Motion No. 1 sought approval and authorization to implement a tripartite agreement among Delphi, GM, and the UAW that would create retirement incentives and flow back opportunities for UAW-represented Delphi employees (the "UAW Special Attrition Program"). On April 7, 2006, the Bankruptcy Court approved the UAW Special Attrition Program.

9.  As I stated in my declaration in support of the Hourly Attrition Programs Motion No. 1, I believe that the UAW Special Attrition Program is a significant step in enabling realignment of the Debtors' global product portfolio and manufacturing footprint, as well as reduction of the Debtors' traditional-rate hourly U.S. workforce to levels needed to run its realigned U.S. operations. In that regard, the UAW Supplement and the IUE-CWA Special Attrition Program are integral components of the Debtors' transformation plan that will allow the Debtors to continue transforming their workforce.

10. The Debtors believe that it is in their best interests to offer buyout programs to their hourly workforce pursuant to the UAW Supplement and the IUE-CWA Special Attrition Program. If Delphi were to wait until the existing labor agreements expired in September 2007, and then attempt unilaterally to impose significant wage, benefit, and other contractual changes on the grounds that Delphi had no obligation going forward because OPEB liabilities do not vest, I believe that course of action would virtually assure a labor disruption. As a result of such labor disruption, Delphi would be forced to shut down its customers, resulting in potential claims to Delphi's estate and resulting loss of business, including non-GM business.

### UAW Supplement

11.     As of June 20, 2006, approximately 9,800 of 14,000 eligible UAW hourly employees have elected to participate in the UAW Special Attrition Program.  The acceptance rate of approximately 70% validates the Debtors' business judgment, and provides a starting point that will allow the Debtors to begin the transformation of their legacy workforce while providing a soft landing for their employees.  In light of the success of the UAW Special Attrition Program, and to facilitate attrition and provide additional soft landing opportunities to its employees, Delphi with the UAW and GM entered into a tripartite agreement that would provide additional options to employees in addition to the UAW Special Attrition Program.  The UAW Supplement includes two main components:  (i) the addition of a class of employees (those with 26 years of credited service) to the pre-retirement program and (ii) lump sum buyouts to sever all ties with Delphi and GM (except vested pension benefits).

12.     The UAW Special Attrition Program offered special voluntary placement in a pre-retirement program to employees with at least 27 and less than 30 years of credited service.  The UAW Supplement is incremental to the prior pre-retirement program by adding an option to Delphi employees with at least 26 years of credited service.  The Debtors estimate that approximately 400 additional UAW represented employees would be eligible to participate in the expanded pre-retirement program.

13.     The UAW Supplement also included buyout options to UAW-represented employees to sever all ties with Delphi and GM, except vested pension benefits.  Under the buyout options, employees with ten or more years of seniority or credited service, whichever is greater, would be eligible for $140,000, traditional employees with fewer than ten years of seniority would be eligible for $70,000, and employees hired under the Supplemental New Hire

Agreement prior to March 22, 2006 would be eligible for a buyout payment amount prorated to $40,000, in each case, less withholdings (the "UAW Buyout Payments").

14. The UAW Buyout Payments are modeled on previous agreements reached between GM and/or Ford and their unions. Ford recently offered buyouts at the $100,000-per-employee level. As detailed in the UAW Special Attrition Program, GM offered buyouts to GM employees represented by the UAW of $140,000 for employees with ten years of service and $70,000 for employees with fewer than 10 years of seniority. The Debtors believe that the amount of the UAW Buyout Payments are reasonable, within the range of similar buyout payments offered in the domestic auto industry, and in the best interests of the estates. Consequently, the Debtors believe it is appropriate to offer buyouts at the same level as GM offered to UAW-represented employees. Moreover, since the UAW negotiated buyout amounts with GM in March 2006, it was the expectation and demand of the UAW that the same opportunity be made available to eligible UAW-represented Delphi employees. The buyouts offered to UAW employees will reduce the number of traditional, high-wage and benefit employees as well as eliminate future OPEB obligations for those participants.

15. Under the terms of the UAW Supplement, GM and Delphi would each pay one-half of the total cost of the UAW Buyout Payments. Although participation rates cannot be predicted with precision, the Debtors estimate that approximately 20% of eligible UAW employees, who are not otherwise eligible for retirement incentives or pre-retirement programs through the UAW Special Attrition Program, will participate in the buyouts.

7

**Declaration of Kevin M. Butler**

IUE-CWA Special Attrition Program

16.    The implementation of the IUE-CWA Special Attrition Program is another important step in enabling Delphi to transform its workforce from legacy wages and benefits to a competitive labor cost structure. Approximately 25% of the Debtors' hourly workforce is represented by the IUE-CWA. The Debtors believe that the IUE-CWA Special Attrition Program could provide approximately 8,000 existing IUE-CWA represented hourly employees with an opportunity for "soft landings," either through the retirement attrition program or the buyout program. I therefore believe that the implementation of this program, similar to the UAW Special Attrition Program, will accelerate necessary attrition and reduce the uncertainties and concerns over the impact of a negotiated consensual resolution, or in the alternative, a potential rejection of labor agreements and modifications of retiree benefits.

17.    The IUE-CWA Special Attrition Program consists of a retirement component and a buyout component. The retirement component of the IUE-CWA Special Attrition Component fundamentally is patterned after terms previously approved by the Court in connection with the UAW Special Attrition Program. The IUE-CWA Special Attrition Program, like the UAW Special Attrition Program, offers a $35,000 lump sum incentive payment to employees who are eligible to retire under the normal or early voluntary provisions of the Delphi Hourly-Rate Employees Pension Plan (the "HRP"). The total cost of these incentive payments would be paid by GM and would be retroactive to cover eligible employees who have retired since October 1, 2005. While GM will not be able to assert a claim against the Debtors on account of these payments, GM has informed Delphi that it will seek compensation for these payments in connection with any comprehensive agreement with Delphi. The Debtors estimate that approximately 1,800 employees are eligible to receive the lump sum retirement incentive

8

**Declaration of Kevin M. Butler**

payments, and estimate that approximately 50 to 75 percent of eligible employees will elect to participate. An additional retirement element of the IUE-CWA Special Attrition Program is a mutually satisfactory retirement opportunity for those employees 50 years old or older with at least ten years of credited service. The Debtors estimate that approximately 825 employees are eligible to participate in the MSR option, and estimate that 50 to 75 percent of eligible employees will elect to participate.

18. The IUE-CWA Special Attrition Program also offers special voluntary placement in a pre-retirement program for employees with at least 26 and less than 30 years of credited service. The Debtors estimate that approximately 390 employees are eligible to participate in the pre-retirement program, and estimate that 50 to 75 percent of eligible employees will elect to participate. All participants in the retirement options are eligible to "check the box" and transition to GM for purposes of retirement, including OPEB at levels available to GM's IUE-CWA represented retirees.

19. The buyout component of the IUE-CWA Special Attrition Program is very similar to the UAW Buyout Payments described above. Under the terms of the IUE-CWA Special Attrition Program, employees (other than those at Delphi's Gadsden, Alabama Operations) with ten or more years of seniority or credited service, whichever is greater, would be eligible for $140,000, employees with three but fewer than ten years of seniority or credited service, whichever is greater, would be eligible for $70,000, and employees with one but fewer than three years of seniority or credited service, whichever is greater, would be eligible for a buyout payment of $40,000, paid in a lump sum less withholdings (the "IUE-CWA Buyout Payments"). GM and Delphi would each pay one-half of the total cost of the IUE-CWA Buyout

9

**Declaration of Kevin M. Butler**

Payments (except for any payments made to participants who are employed at Delphi's New Brunswick operations, where previously agreed upon terms apply).

20.     Although participation rates cannot be predicted with precision, the Debtors estimate that approximately 20 percent of eligible IUE-CWA employees, who are not otherwise eligible for retirement incentives or pre-retirement programs through the IUE-CWA Special Attrition Program, will participate in the buyouts. The Debtors believe the amount of the IUE-CWA Buyout Payments are reasonable, within the range of similar buyout amounts offered in the auto industry, and in the best interests of the estates. The buyouts offered to IUE-CWA employees will reduce the number of high-wage and benefit employees as well as eliminate future OPEB obligations.

<u>Impact Of Hourly Attrition Programs</u>

21.     Regardless of whether consensual resolution is reached or whether Delphi receives Court authority under sections 1113 and 1114 of the Bankruptcy Code to reject and subsequently modify its collective bargaining agreements and modify its retiree benefits, Delphi believes that the UAW Supplement and the IUE-CWA Special Attrition Program would be beneficial to Delphi's labor cost transformation because the Hourly Attrition Programs accelerate attrition and provide most of Delphi's long-term employees represented by the UAW and the IUE-CWA alternatives to continued employment at levels sought by Delphi's proposed labor contract modifications. It should be noted, however, that entry into the UAW Supplement and the IUE-CWA Special Attrition Program will be without prejudice to the rights of the Debtors and all other parties-in-interest in all other aspects of these cases, including in the current proceedings under sections 1113 and 1114 of the Bankruptcy Code or in any pension termination proceeding under ERISA and/or the Bankruptcy Code.

10

**Declaration of Kevin M. Butler**

22.     It is anticipated that the Hourly Attrition Programs will result in an increase in Delphi's minimum pension funding obligation.  An increase would occur regardless of whether the Court approves the Hourly Attrition Programs because, to transform their businesses, the Debtors will need to close unprofitable U.S. plants.  These closures would also result in an increase of minimum pension funding obligations.

23.     GM will receive certain allowed prepetition general unsecured claims against Delphi Corporation on account of the funding of one half of the total cost of the Buyout Payments and will likely assert additional prepetition general unsecured claims related to obligations assumed and/or undertaken by GM as part of the Hourly Attrition Programs.  I believe Delphi could not have offered the Hourly Attrition Programs without GM's involvement in and financial support for these Programs.  Many of Delphi's hourly employees will view the option to transition to GM for the purposes of retirement and receipt of GM OPEB as more appealing than retiring as a Delphi retiree.  As of June 20, 2006, of the 9,776 retirement eligible Delphi employees electing to participate in the UAW Special Attrition Program, 9,775 have elected to "check the box" and receive GM OPEB.  GM's financial support also enables the Debtors to provide their most senior hourly employees sufficient incentive to retire at an accelerated rate.

24.     As the lead negotiator on the Hourly Attrition Programs for Delphi, prior to the execution of the UAW Supplement and the IUE-CWA Special Attrition Program, I had no discussions with GM regarding GM's assertion of claims against any Debtor estate other than the estate of Delphi Corporation.

25.     I also believe that the Hourly Attrition Programs have had, and will continue to have, a positive effect on the overall negotiations between the Debtors, the Unions,

11

**Declaration of Kevin M. Butler**

and GM. The implementation of the UAW Supplement and the IUE-CWA Special Attrition Program are important steps in enabling Delphi to transform its workforce from legacy wages and benefits to a competitive labor cost structure, by accelerating necessary attrition and reducing the uncertainties and concerns over the impact of a negotiated consensual resolution, or in the alternative, a potential rejection of labor agreements and modification of retiree benefits. The Hourly Attrition Programs are essential to allow the Debtors to successfully reorganize and emerge from these chapter 11 cases.

26.     I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on June 25, 2006 in Troy, Michigan.

                                                  __/s/ Kevin M. Butler_____
                                                  Kevin M. Butler
                                                  Vice President, Human Resource Management

**Declaration of Kevin M. Butler**