SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
Albert L. Hogan, III (AH 8807)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF DAVID L. RESNICK IN SUPPORT OF DEBTORS' MOTION
FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004
APPROVING (I) SUPPLEMENT TO UAW SPECIAL ATTRITION PROGRAM
AND (II) IUE-CWA SPECIAL ATTRITION PROGRAM

David L. Resnick declares:

1.  Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases (collectively, the "Debtors"). I submit this declaration in support of the Debtors' Motion For Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW Special Attrition Program, and (II) IUE-CWA Special Attrition Program ("Hourly Attrition Programs Motion No. 2"). Capitalized terms not otherwise defined in this declaration shall have the meanings ascribed to them in the Hourly Attrition Programs Motion No. 2. The conclusions and analysis set forth below are based on my direct experience in the Debtors' chapter 11 cases, and on my expertise in complex restructuring cases more generally. If I were called on to testify, I could and would testify to the facts set forth herein:

2.  I am a Managing Director at Rothschild Inc. ("Rothschild"), which maintains an office at 1251 Avenue of the Americas, 51st Floor, New York, New York 10020.

3.  Rothschild is a member of one of the world's leading independent investment banking groups, with expertise in domestic and cross-border mergers, acquisitions, restructurings, privatization advice, and other financial advisory services, and with particular experience in providing high-quality investment banking and financial advisory services to financially-troubled companies. Rothschild has significant experience in a variety of industries, including the automobile industry. Our restructuring clients include debtors, bondholders, creditors' committees, single creditor classes, and secured creditors. I have more than 20 years of experience in investment banking, specializing in restructuring. In the course of my corporate restructuring engagements, I have been responsible for advising many large companies in all aspects of the chapter 11 process. In particular, I have advised the following companies or

2

**Declaration of David L. Resnick**

creditors' committees on restructuring issues in and outside of chapter 11: Delphi, PG&E, TWA, Ad-hoc Creditors' Committee of Eurotunnel, Thermadyne, Service Merchandise, NTL (advised France Telecom), Next Wave (advised FCC), Orbimage, Crown Vantage, Bradley Pharmaceuticals, James River Coal, Superior Telecom, Guilford Mills, and Outsourcing Solutions. In addition, I have advised companies in the automobile sector, including Key Plastics and Guilford Mills.

4. I received a B.A. with high honors from Wesleyan University in 1981 and my M.B.A. and J.D. degrees from the University of Chicago in 1985. From 1985 to 1990, I worked at Merrill Lynch & Co. in the investment banking division specializing in merchant banking/restructuring and M&A. From 1990 to 1996, I worked at Lazard Frères & Co., handling restructuring and M&A assignments for clients in broad range of industries. From 1996 to 2000, I worked at the Peter J. Solomon Co., where I founded and headed the firm's restructuring group. From 2000 to the present, I have been a Managing Director of Rothschild, with responsibility for leading the firm's global restructuring practice.

5. I have provided expert testimony in the following cases: Barney's Inc. (by affidavit), Bedford Fair Industries, Crown Vantage Corporation, Delphi Corporation, Edison Brothers Stores, Inc., Key Plastics, Outsourcing Solutions, Inc., Service Merchandise Company, Inc., Thermadyne Holdings Corporation, Thorn Apple Valley, Inc., Today's Man, Inc., and TransWorld Airlines. I have no publications authored within the preceding ten years. I am not being compensated for my testimony in these Delphi's chapter 11 cases, but Rothschild, Inc. is being compensated in accordance with the Bankruptcy Court's Rothschild Retention Final Order, dated November 30, 2005.

      6.      I have been previously recognized as an expert by this Court in this matter, including in connection with Delphi's motion for relief under sections 1113 and 1114 of the Bankruptcy Code.

      7.      Rothschild is directly involved in all aspects of the Debtors' restructuring. Delphi retained Rothschild on May 1, 2005 as financial advisors and investment bankers. As part of this engagement, Rothschild has been retained to, among other things: (a) to the extent Rothschild deems necessary, appropriate and feasible, or as the Company may request, review and analyze the Company's assets and the operating and financial strategies of the Company; (b) assist the Company in developing and evaluating a range of strategic alternatives to restructure the Company's legacy liabilities, including without limitation the Company's current labor costs, liabilities for pension and other post-employment benefits; (c) review and analyze the business plans and financial projections prepared by the Company including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends; (d) evaluate the Company's debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for the Company; (e) assist or participate in negotiations with the parties in interest, including, without limitation, any current or prospective creditors of, holders of equity in, or claimants against the Company and/or their respective representatives in connection with a transaction; (f) advise and attend meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as the Company determines to be necessary or desirable; and (g) render such other financial advisory and investment banking services as may be reasonably requested by the Company.

8. I am submitting this Declaration to address certain aspects of the Hourly Attrition Programs Motion No. 2, and in particular, the negotiations with and involvement of General Motors Corporation ("GM") in the Hourly Attrition Programs.

GM's Participation In Delphi's Hourly Attrition Programs

9. On April 7, 2006, the Bankruptcy Court approved the UAW Special Attrition Program. Thereafter, Delphi has continued discussions with its unions and GM in an attempt to reach an overall consensual resolution to Delphi's transformation issues, and also to reach incremental resolutions that will assist the parties in reaching that ultimate goal.

10. On June 5, 2006, Delphi entered into a tripartite agreement with GM and the UAW to provide additional options to employees beyond those offered in the UAW Special Attrition Program (the "UAW Supplement"). The UAW Supplement added a pre-retirement option to Delphi employees with at least 26 years of credited service. The UAW Supplement also included buyout options to UAW-represented employees to sever all ties with Delphi and GM except vested pension benefits. Under the buyout options, employees with ten or more years of seniority or credited service, whichever is greater, would be eligible for $140,000, traditional employees with less than ten years of seniority would be eligible for $70,000, and employees hired under the Supplemental New Hire Agreement prior to March 22, 2006 would be eligible for a buyout payment amount prorated to $40,000, in each case, less withholdings (the "UAW Buyout Payments"). GM and Delphi would each pay one-half of the total cost of the UAW Buyout Payments.

11. On June 16, 2006, Delphi reached agreement with GM and the IUE-CWA on the terms of the IUE-CWA Special Attrition Program, which largely mirrors the UAW Special Attrition Program and the UAW Supplement.

12. I was personally involved in the discussions and negotiations with GM concerning their participation in the UAW Supplement and the IUE-CWA Special Attrition Program. Discussions with GM regarding the UAW Supplement and substantially all of the discussions with GM regarding the IUE-CWA Special Attrition Program were completed no later than June 4, 2006.

13. Under the Hourly Attrition Program, GM has agreed to pay half of the total cost of the Buyout Payments with respect to both the UAW and the IUE-CWA. In exchange, GM will be granted an allowed prepetition unsecured claim for the total amount of Buyout Payments actually paid by GM. This financial support is critical to making the Buyout Payment option available to employees who otherwise would have had no attrition choice under the programs. During the negotiations concerning this aspect of the programs, GM expressed its understanding that Delphi's overall interests would be served by maximizing the number of employees who would be eligible for some kind of attrition option, and ultimately agreed to provide the 50% support of the total cost of the Buyout Payments to further that goal. This financial support is a postpetition benefit to the Debtors' estates. GM agreed, however, to accept only an allowed prepetition unsecured claim for these Buyout Payments. Because GM was not otherwise obligated to make the Buyout Payments, and because GM was willing to accept a prepetition unsecured claim, as opposed to an administrative or priority claim, I recommended that Delphi accept GM's proposal to provide the Buyout Payment support, in exchange for an allowed prepetition claim. At no time during the negotiations with GM was there any discussion

6

**Declaration of David L. Resnick**

with me or to my knowledge any other member of the Delphi team regarding GM's assertion of a claim on account of the Hourly Attrition Program against subsidiary Debtors.

14.     As compared to other alternatives available to Delphi to fund the Buyout Payments, such as using its available cash or through its DIP financing sources, it is my view that obtaining the support from GM in exchange for a prepetition unsecured claim is clearly in the Debtors' best interests.

15.     Unlike the UAW, the IUE-CWA does not have flowback rights to GM. Thus, without further consideration there would be no opportunity for IUE employees to retire as GM employees, such as was provided under the UAW Special Attrition Plan. However, under the IUE-CWA Special Attrition Plan, GM did agree to provide a "check the box" alternative to employees exercising an early retirement option to allow them to retire as GM instead of Delphi employees. For those eligible Delphi IUE-CWA employees who "check the box," GM has agreed to assume Delphi's outstanding OPEB obligations to those employees. In exchange, GM insisted that it would be allowed to assert a prepetition unsecured claim for these obligations under Delphi's indemnity of GM under the Master Separation Agreement. The Debtors agreed with the further understanding that, in the event that GM asserts such a claim, the Debtors will retain the right to object to the economic value of such claim. From the Debtors' perspective, the ability to challenge the economic value of any such asserted claim is a critical aspect in terms of protecting estate value in the claims administration process. Moreover, all other parties-in-interest retain their rights to object to the allowance of any such claim under any grounds other than the fact that the claim is assertable under the Master Separation Agreement.

16.     Here again, I advised Delphi that it should accept GM's support of the IUE-CWA "check the box" option in exchange for the provision of the prepetition unsecured

**Declaration of David L. Resnick**

claim that GM may assert. Delphi believes that the "check the box" option is an important incentive for eligible employees to participate in the attrition program. Moreover, I understand from Delphi that the "check the box" option was a necessary condition demanded by the IUE-CWA leadership in the course of reaching this agreement. Thus, GM's support in this regard is valuable and indispensable.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on June 25, 2006 in New York, New York

                                          /s/ David L. Resnick
                                          DAVID L. RESNICK