05-44481-rdd   Doc 4396   Filed 06/28/06   Entered 06/28/06 15:39:47   Main Document
Pg 1 of 19

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)


- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York, 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|   |   :   |   |
|---|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF JOHN D. SHEEHAN IN SUPPORT OF DEBTORS' MOTION
FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004
APPROVING (I) SUPPLEMENT TO UAW SPECIAL ATTRITION PROGRAM
AND (II) IUE-CWA SPECIAL ATTRITION PROGRAM

John D. Sheehan declares as follows:

1.      Delphi Corporation and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases.  I submit this declaration in support of the Debtors' Motion For Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving (a) the Supplement to the UAW Special Attrition Program and (b) the IUE-CWA Special Attrition Program (together, the "Hourly Attrition Programs Motion No. 2").  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Hourly Attrition Programs Motion No. 2.

2.      I am the Vice President, Chief Restructuring Officer, and Chief Accounting Officer for Delphi Corporation (which, with certain of its subsidiaries and affiliates, the debtors and debtors-in-possession in the above-captioned cases, are referred to collectively and variously herein as "Delphi" or the "Debtors").  I joined Delphi in July 2002 as Chief Accounting Officer and Controller.  On March 4, 2005, I also assumed the position of acting Chief Financial Officer, a position that I held until October 8, 2005, when I was appointed Chief Restructuring Officer.  I am familiar with, and have had direct personal involvment with, the events and circumstances giving rise to the Debtors' decision to seek chapter 11 protection on October 8, 2005 (the "Initial Filing Date").  Since the Initial Filing Date, I have been involved to some degree in virtually all of the significant decisions made by the Debtors in connection with these chapter 11 cases.

3.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, my experience with and knowledge of Delphi's financial condition, or are based upon knowledge obtained

2

**Declaration of John D. Sheehan**

from Delphi employees reporting to me in the course of their duties.  If I were called upon to tes-

tify, I could and would testify to the facts set forth herein.

Background: The UAW Special Attrition Program

4.       On March 22, 2006, the Debtors filed their Motion For Order Under 11

U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving Debtors' Human Capital Hourly Attri-

tion Programs (the "Hourly Attrition Programs Motion No. 1").  By the hearing date for the

Hourly Attrition Programs Motion No. 1 (April 7, 2006), the Debtors, GM, and the UAW had

negotiated a specific attrition program (the "UAW Special Attrition Program") that focused on

incentivizing retirement-eligible hourly UAW Delphi employees to retire and offering certain

pre-retirement options to UAW employees with at least 27 years of credited service.  The UAW

Special Attrition Program was the product of extensive negotiations between the Debtors, the

UAW and GM.  On April 7, 2006, this Court approved the UAW Special Attrition Program and

indicated that it anticipated similar attrition terms to be offered to the Debtors' other unions.

5.       I submitted a declaration in support of the Hourly Attrition Programs Mo-

tion No. 1, dated April 4, 2006 ("April 4 Declaration"), a copy of which is attached as Exhibit 1

hereto.  My April 4 Declaration explains the basis for the Debtors' business judgment that im-

plementing hourly attrition programs would benefit the Debtors' estates financially and opera-

tionally and would promote a "soft landing" for the Debtors' union workforce in furtherance of

the Debtors' transformation plan.  Specifically, my April 4 Declaration explains that the Debtors

carefully considered the cost of payments to eligible employees (to the extent these costs are not

borne by GM) and modeled net cash flow benefits and the reduction of operating losses in com-

parison to the Company's projections under status quo assumptions over the next five years (i.e.,

in comparison with the "Steady State" projections).  It is worth emphasizing that these various

3

**Declaration of John D. Sheehan**

financial analyses[1] modeled the impact of hourly attrition programs, at various hypothetical par-

ticipation levels, for all of the Debtors' retirement-eligible union workers and was not limited to

analyzing the impact of potential attrition by eligible UAW members.  Although the Debtors

have since revised the Steady State projections to reflect actual 2006 results, I believe that the

analysis performed in March 2006 that supported the implementation of hourly attrition pro-

grams remains valid today and supports the Debtors' agreement with GM to offer the IUE-CWA

similar attrition incentives for its retirement-eligible and near-retirement-eligible workforce.

6.      The successful implementation of the UAW Special Attrition Program has

confirmed the validity of the Debtors' business judgment.  As of June 20, 2006, approximately

9,800 of approximately 14,000 eligible UAW workers have elected to participate in the UAW

Special Attrition Program.  This acceptance rate of 70 percent validates the Debtors' business

judgment that the UAW Special Attrition Program would be a key step in the Debtors' transfor-

mation of their legacy workforce while providing a soft landing for many longstanding union

employees.  Delphi's Board has been updated on the beneficial net cash flow impacts of the

UAW Special Attrition program in comparison with the Steady State projections (as adjusted in

light of first quarter 2006 results), including a detailed presentation on this subject at its May 1,

2006 board meeting.

7.      Through the Hourly Attrition Programs Motion No. 2, the Debtors seek

authority to offer similar retirement incentives to retirement-eligible and near-retirement-eligible

IUE-CWA workers.  In addition, the Debtors seek through the motion to build upon the hourly

attrition plan previously authorized by this Court, as explained in detail below, by offering a pre-

---

[1]   The financial analyses relating to the Debtors' business judgment were produced to objecting parties during dis-
covery prior to the April 7, 2006 hearing on the Hourly Attrition Programs Motion No. 1.

**Declaration of John D. Sheehan**

retirement program to employees with 26 years of credited service, and by offering one-time,

lump sum buy-outs to its UAW and IUE-CWA work force, backed by additional financial sup-

port from GM.  All of these terms are the product of intensive negotiations between Delphi, GM,

and their unions over the past two months.  The Debtors believe that the relief sought in the mo-

tion is essential to improving the prospects of a comprehensive, consensual resolution of the

Debtors' legacy labor cost issues.

        8.      The implementation of the UAW Supplement and the IUE-CWA Special

Attrition Program will: (a) continue the progress made through the UAW Special Attrition Pro-

gram, (b) accelerate necessary attrition and reduce the uncertainties and concerns over the impact

of a negotiated consensual resolution, and (c) in the alternative, reduce the impact of any court-

approved rejection of labor agreements and modification of retiree benefits.  By creating a soft

landing for a large number of Delphi's hourly employees, the Hourly Attrition Programs will bet-

ter position the Debtors to pursue successfully their plan to reduce the size of their U.S. labor

force consistent with their transformation plan.

The UAW Supplement

        9.      On April 7, 2006, the Bankruptcy Court approved the UAW Special Attri-

tion Program.  The UAW Special Attrition Program provided retirement incentives to certain

Delphi employees represented by the UAW.  The UAW Special Attrition Program offered three

options to certain eligible UAW employees:  (a) a lump sum payment of $35,000 (paid by GM)

to employees who are eligible to retire under the normal or early voluntary provisions of the

Delphi Hourly-Rate Employees Pension Plan (the "HRP"), (b) mutually satisfactory retirement to

employees age 50 or older with ten or more years of credited service who were eligible to retire

5

**Declaration of John D. Sheehan**

under the MSR provisions of the HRP, and (c) special voluntary placement in a pre-retirement

program for employees with at least 27 years and less than 30 years of credited service.

        10.     The June 5, 2006 Supplement to the UAW-GM-Delphi Special Attrition

Program Agreement ("UAW Supplement") provides two additional options for UAW employ-

ees: (i) hourly employees with at least 26 years of service and fewer than 27 years of service

also would be eligible for voluntary placement in a pre-retirement program and would receive

gross monthly payments of $2,750 while in the program (representing an approximate 40 to 50

percent reduction from average monthly wages) and (ii) virtually all UAW-represented hourly

employees would be offered buyouts paid in equal parts by GM and Delphi to sever all ties with

Delphi and GM (other than vested pension benefits), with employees with ten or more years of

seniority or credited service eligible for a $140,000 payment, employees with fewer than ten

years of seniority or credited service eligible for a $70,000 payment, and employees hired under

the Supplemental New Hire Agreement prior to March 22, 2006 eligible for a buyout payment

amount prorated to $40,000 (the "Buyout Payments").[2]

        11.     I believe it is in the best interests of the Debtors, their estates, and their

stakeholders to provide the additional pre-retirement option offered in the UAW Supplement.

The UAW Special Attrition Program offered special voluntary placement in a pre-retirement

program to employees with at least 27 and fewer than 30 years of credited service. The UAW

Supplement provides a new pre-retirement option to employees with 26 years of credited service

(which is consistent with the GM-UAW program addressing situations in which GM's traditional

wage positions are to be eliminated). The Debtors estimate that approximately 400 UAW em-

---

[2]    Employees eligible to select more than one option under the UAW Special Attrition Plan or the UAW Supple-
ment must select one option only (i.e., for example, a retirement-eligible employee cannot select both the
$35,000 lump sum payment and the Buyout Payment).

**Declaration of John D. Sheehan**

ployees would be eligible to participate in the expanded pre-retirement program. The new op-

tions available under the UAW Supplement would provide the Debtors more flexibility in re-

shaping and reducing their workforce, while providing a soft landing option to more employees

who have significant years of service. The Debtors made this option available with the benefit of

knowing the level of participation to date among employees with 27 to 30 years of service (as of

June 20, 2006, the participation rate in the UAW pre-retirement program was approximately 70

percent).

       12.     As a result of the new option under the  pre-retirement program, the Debt-

ors would increase the balance in the $75 million segregated account established by the UAW

Special Attrition Program by an additional $15 million.

       13.     Further, with the benefit of knowing the results to date of participation in

the UAW Special Attrition Program, the Debtors also have reasonably determined that offering

Buyout Payments to UAW-represented employees, along the lines offered by GM to its UAW

workers under the UAW Special Attrition Program, is in the best interests of the Debtors. Under

the terms of the UAW Supplement, GM and Delphi would each pay one-half of the Buyout

Payments. The Debtors estimate that approximately 20 percent of eligible UAW employees,

who are not otherwise eligible for retirement through the UAW Special Attrition Program, will

participate in the buyouts, at a cost of approximately $75 million to the Debtors. GM will re-

ceive an allowed prepetition, general unsecured claim against Delphi Corporation in the aggre-

gate amount of the total cost of the Buyout Payments actually paid by GM pursuant to the UAW

Supplement. It is reasonable to assume that only a small number of retirement-eligible UAW

workers who opted for the $35,000 retirement incentive will change their minds and opt for the

buyout payments instead, in light of the attendant loss of OPEB benefits.

**Declaration of John D. Sheehan**

14.    The amounts of the Buyout Payments are structured similar to GM's exist-ing buyout offer to its UAW employees (and for this reason Delphi's unions could not reasonably have been expected to agree to a lesser level).  The Debtors believe that the Buyout Payments are reasonable and in the best interest of the Debtors' estates because the Debtors will be able to ei-ther reduce its workforce to the Company's need-to-run level and replace certain accepting em-ployees with lower cost employees, thereby continuing to transform Delphi's legacy workforce. In addition, Delphi will no longer be obligated to make future OPEB payments for the UAW employees accepting the buyout.

15.    The UAW Supplement's new options are enabled by financial support from GM.  Implementation of the UAW Supplement would provide UAW-represented employ-ees with additional opportunities for soft landings not previously offered under the UAW Special Attrition Program and reduce JOBS Bank and SUB (supplemental unemployment benefit) obli-gations pending resolution of job security and site wind down contract modifications proposed by Delphi.

The IUE-CWA Special Attrition Program

16.    The IUE-CWA agreement fundamentally is patterned after terms previ-ously approved by this Court, aside from the Buyout Payment.  The IUE-CWA Special Attrition Program will provide additional soft landing opportunities to approximately 1,800 retirement-eligible employees, approximately 825 MSR-eligible employees, and approximately 390 em-ployees with between 26 and 30 years of credited service.  The IUE-CWA Special Attrition Pro-gram is another significant step toward enabling the realignment of the Debtors' global product portfolio and manufacturing footprint, as well as the reduction of the Debtors' traditional-rate hourly U.S. workforce to levels needed to run its realigned U.S. operations.

8

**Declaration of John D. Sheehan**

17.    Delphi has agreed to establish a segregated account in the amount of $12 million for funding obligations under the pre-retirement option for employees with at least 26 and less than 30 years of credited service.

18.    The Debtors estimate that approximately 8,000 employees represented by the IUE-CWA would be eligible to participate in the Buyout Payments described above.  The Debtors estimate that slightly more than 1,000 IUE-CWA-represented employees would partici-pate in the buyout program (approximately 20 percent of those eligible employees who are not otherwise eligible for the retirement lump-sum payment or the pre-retirement program), resulting in an approximate cost of $120 million to be shared equally by the Debtors and GM.

19.    The Debtors estimate that each individual event of IUE-CWA attrition pursuant to a Buyout Payment would result in positive cash flow such that, depending upon the timing and demographics of the individuals participating, the IUE-CWA Special Attrition Pro-gram may be cash flow positive beginning in 2006 and would generate positive cash flow each year thereafter.  Between 2006 and 2010, the Debtors expect to generate substantial cost savings associated with the reduction in headcount provided by the IUE-CWA Special Attrition Program and, in those instances in which replacements might be needed, as a result of replacing IUE-CWA eligible employees with lower-cost temporary and competitive rate employees.

20.    As described in the Hourly Attrition Programs Motion No. 2, GM will re-ceive a general unsecured claim against Delphi Corporation in the aggregate amount of the total cost of the UAW and IUE-CWA Buyout Payments actually paid by GM.  In addition, GM may assert claims against the estate of Delphi Corporation on account of certain obligations that it assumes under the IUE-CWA Special Attrition Program Agreement, including with respect to employees who choose to retire as GM employees.  The Hourly Attrition Program Agreements

9

**Declaration of John D. Sheehan**

expressly provide, however, that nothing therein would be deemed to create an administrative or priority claim with respect to GM or to convert a prepetition claim into a postpetition claim or an administrative expense with respect to any party to the Agreement.

21.     Although I have described above certain cash-flow positive aspects of the Hourly Attrition Programs, Delphi's minimum pension funding obligations would increase as a result of the IUE-CWA Special Attrition Program. Moreover, depending upon the number and mix of employees who elect to participate in the IUE-CWA Special Attrition Program, the Pension Benefit Guaranty Corporation's claim for unfunded benefit liabilities in the event of a potential termination of the HRP could also increase. Nevertheless, the Debtors believe that the IUE-CWA Special Attrition Program constitutes an important step forward in implementing the Debtors' transformation plan because it reduces the workforce on a voluntary basis and in a manner that increases the likelihood of a global, consensual resolution while reducing the risk of labor disruptions.

22.     In sum, the Debtors believe that implementing the Hourly Attrition Programs, and the sharing of the costs of the Hourly Attrition Programs between Delphi and GM, will likely improve the Debtors' net cash flow in 2006 and each year thereafter. More importantly, the attrition program continues progress in the necessary reduction of the Debtors' unsustainable, high-cost labor force. The Debtors intend to continue seeking a resolution of their remaining labor and legacy issues, preferably through a consensual agreement but, if necessary, through the continuation of litigated proceedings under federal law including sections 1113 and 1114 of the Bankruptcy Code. Therefore, I believe that this Court's approval of the Hourly Attrition Programs is clearly in the best interests of the Debtors, their estates, and all parties-in-interest.

10

**Declaration of John D. Sheehan**

23.    I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

foregoing statements are true and correct.

Executed on June 25, 2006 in Troy, Michigan:

/s/ John D. Sheehan
JOHN D. SHEEHAN

11

**Declaration of John D. Sheehan**

**Exhibit A**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
David E. Springer (DS 9331)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York, 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
                                        :
                                        :
        In re                           :       Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :       Case No. 05–44481 (RDD)
                                        :
                        Debtors.        :       (Jointly Administered)
                                        :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF JOHN D. SHEEHAN IN SUPPORT OF THE DEBTORS'
MOTION FOR ORDER UNDER 11 U.S.C. § 363(B) AND FED. R. BANKR. P. 6004
APPROVING DEBTORS' HUMAN CAPITAL HOURLY ATTRITION PROGRAMS

John D. Sheehan declares as follows:

1.    Delphi Corporation and certain of its subsidiaries and affiliates are debtors
and debtors-in-possession in these Chapter 11 cases.  I submit this declaration in support of the
Motion For Order Under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving Debtors'
Human Capital Hourly Attrition Programs ("Attrition Programs Motion").  Capitalized terms not
otherwise defined in this declaration shall have the meanings ascribed to them in the Attrition
Programs Motion.

2.    I am the Vice President, Chief Restructuring Officer, Chief Accounting
Officer, and Controller for Delphi Corporation (which, with certain of its subsidiaries and affili-
ates, the debtors, and the debtors-in-possession in the above-captioned cases, are referred to col-
lectively and variously herein as "Delphi" or the "Debtors").  I joined Delphi in July 2002 as
Chief Accounting Officer and Controller.  On March 4, 2005, I also assumed the position of act-
ing Chief Financial Officer, a position that I held until October 8, 2005, when I was appointed
Chief Restructuring Officer.  Consequently, I am familiar with, and personally was involved in,
the events and circumstances giving rise to the Debtors' decision to seek chapter 11 protection on
October 8, 2005 (the "Initial Filing Date").  Since the Initial Filing Date, I have been involved at
some level in virtually all of the significant decisions made by the Debtors in connection with
these chapter 11 cases.

3.    Except as otherwise indicated, all facts set forth in this declaration are
based upon my personal knowledge, my review of relevant documents, my opinion, my experi-
ence with and knowledge of Delphi's financial condition, or are based upon knowledge obtained
from Delphi employees reporting to me in the course of their duties.  If I were called upon to tes-
tify, I could and would testify to the facts set forth herein.

2

<u>Financial Impact of Implementation of the Hourly Attrition Programs</u>

4.      As described in my Declaration in Support of Delphi's Motion for Author-

ity to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) and Modify Retiree

Welfare Benefits Under 11 U.S.C. § 1114(g) dated March 31, 2006, on February 14, 2006, Del-

phi's management reviewed with its Board of Directors Delphi's progress in creating a five-year

business plan to guide its restructuring efforts.  In formulating its restructuring business plan,

Delphi began by determining a "Steady State Scenario" that represents Delphi's best estimate of

costs and revenue based on (a) the assumption that Delphi's existing labor agreements continued

in effect, (b) the assumption that Delphi retained all of its existing lines of business, and (c) Del-

phi's best estimate of business volumes, pricing, and material costs based on existing economic

trends.  Put simply, the Steady State Scenario assumes that the Debtors continue to operate with-

out restructuring their operations or capital structure.  The Steady State Scenario did not consider

the potential effect of the Hourly Attrition Programs.

5.      In creating the Steady State Scenario, Delphi took a "bottom-up" approach

and conducted an in-depth evaluation of each of its businesses, taking into account revenue and

costs forecasts in light of changed economic conditions, including the chapter 11 filings.  Delphi

concluded that most of the economic trends leading to Delphi's current financial crisis – GM's

loss of market share, reduced GM revenues, pressure for price-downs, higher material costs, and

the like – will continue for the foreseeable future.

6.      Under Delphi's Steady State Scenario, Delphi projects an operating loss of

$8.1 billion, and a net loss of $12.9 billion over the five-year period from 2006-2010.  As with its

historical financial results, these losses are in large part attributable to Delphi's U.S. operations.

Under the Steady State Scenario, even with the deterioration in revenue and costs that Delphi has

3

assumed for 2006 to 2010, Delphi's projections show that Delphi's international operations will be profitable during the period, earning approximately $3.4 billion in operating income over the five-year period. These same projections show that Delphi's North American operations, on the other hand, would lose approximately $11.5 billion in operating income during the same period. Delphi's North American operations perform better than the U.S. operations alone.

7.      On March 22, 2006, the Debtors filed the Attrition Programs Motion. As is described in the Attrition Programs Motion, it is the product of extensive negotiations between the Debtors, the UAW and GM. Throughout those negotiations, Delphi's Board of Directors was kept apprised of the status of such negotiations, the potential outcomes, and the financial impact of the terms of the parties' likely agreement. Specifically, Delphi's professional advisors and management, including me, provided the Board of Directors with information regarding the on-going negotiations at meetings held on March 9, March 14, and March 17, 2006. Delphi's Board of Directors was also provided with additional information regarding the Hourly Attrition Pro-grams following the filing of the Attrition Programs Motion on March 29, 2006.

8.      In modeling the financial impact of the implementation of the Hourly At-trition Plans, the Debtors carefully considered, among other things, the cost of payments to Eli-gible Employees under the Plans (to the extent not being borne by GM), potential pension im-pacts, the cost savings of reductions in Delphi's hourly workforce and of replacing Eligible Em-ployees with lower-cost temporary and nontraditional rate employees as needed.

9.      The Debtors also considered the sensitivity of their financial model by utilizing multiple sets of assumptions. In particular, the Debtors modeled the financial impact assuming each of (a) a 100 percent acceptance rate of the Programs by Eligible Employees; (b) a 75 percent acceptance rate of the Programs by Eligible Employees; and (c) a 65 percent accep-

4

tance rate of the Programs by Eligible Employees who are eligible to retire under the normal or early voluntary provisions of the Delphi Hourly-Rate Employees Pension Plan ("HRP") and a 55 percent acceptance rate of the Programs by Eligible Employees who are eligible to retire under the MSR (or mutually satisfactory retirement) provisions of the HRP.

10.     Under each of the above-described sets of assumptions, the Debtors estimate that implementation of the Hourly Attrition Programs would generate significant positive cumulative net cash flow during the five-year period from 2006 through 2010 as compared with the Steady State Scenario. Delphi's costs with respect to the implementation of the Hourly Attrition Programs would be immediately paid back by GM's agreement to assume non-pension post-retirement employee benefit (i.e., health care coverage and life insurance benefits) obligations for Eligible Employees flowing back to GM.

11.     As noted above, the analyses of the financial impact of implementation of the Hourly Attrition Programs were presented to the Board of Directors, including a detailed presentation of the financial impact models described above, on March 14, 2006. On March 17, 2006, the Board of Directors, in the exercise of its business judgment, formally approved and adopted the UAW Special Attrition Program Agreement on the terms presented to it by Delphi's professional advisors and management.

12.     In addition, the Debtors also developed models of the affect of implementation of the Hourly Attrition Programs on the Debtors' projected operating income under the Steady State Scenario. The Debtors modeled the affect of implementation of the Hourly Attrition Programs on projected operating income under two sets of alternative assumptions: (a) a 100 percent acceptance rate of the Programs by Eligible Employees and (b) a 75 percent acceptance rate of the Programs by Eligible Employees. Under either set of assumptions, implementation of

5

the Hourly Attrition Programs would improve Delphi's financial projections in the sense of re-
ducing (but not eliminating) the projected loses. Under even the more conservative scenario,
implementation of the Hourly Attrition Programs would reduce projected operating losses over
the five-year period from 2006-2010 by nearly $2 billion.

13.    However, as noted above, under the Steady State Scenario, Delphi projects
an operating loss of $8.1 billion, and a net loss of $12.9 billion, over the same period. Thus,
while implementation of the Hourly Attrition Programs is a critical first step in enabling Delphi
to transform its workforce from legacy wages and benefits to a competitive labor cost structure,
it does not alleviate the need for the modifications that Delphi seeks in its labor agreements pur-
suant to the Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C.
§ 1113(c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g) dated March 31,
2006.

<u>Other Impacts of Implementation of the Hourly Attrition Programs</u>

14.    As described in the Attrition Program Motion, GM will likely assert
claims against the Debtors related to obligations assumed and/or undertaken by GM as part of
the UAW Special Attrition Program. The UAW Special Attrition Program Agreement expressly
provides, however, that nothing therein would be deemed to create an administrative or priority
claim with respect to GM or to convert a prepetition claim into a postpetition claim or an admin-
istrative expense with respect to any party to the Agreement. Further, entry into the UAW Spe-
cial Attrition Program Agreement does not prejudice the rights of any interested party (including
the Debtors and the Creditors' Committee) with respect to, among other things, the administra-
tion, reconciliation, and ultimate allowance, if ever, of such assertable claims. With certain ex-
ceptions, the Debtors believe that any claims that would be asserted by GM under the UAW

6

Special Attrition Program Agreement would relate to claims that GM would have otherwise asserted against Delphi under certain other agreements between GM and Delphi even absent entry into the UAW Special Attrition Program Agreement.[1]

15.   The Debtors also acknowledge that the Debtors' minimum pension funding obligations would increase as a result of the Hourly Attrition Programs.  Moreover, depending upon the number and mix of employees who elect to participate in the Hourly Attrition Programs, the Pension Benefit Guaranty Corporation's claim for unfunded benefit liabilities in the event of a potential termination of the HRP could also increase.

16.   Nevertheless, the Debtors believe that the Hourly Attrition Programs constitute an important first step in implementing their transformation plan.  In total, the Debtors believe that implementing the Hourly Attrition Programs, and the sharing of the costs of the Hourly Attrition Programs between the Debtors and GM, will improve the Debtors' net cash flow and reduce the Debtors' projected operating losses in comparison to the status quo over the five-year period from 2006 through 2010.  Therefore, I believe that this Court's approval of the Hourly Attrition Programs is clearly in the best interests of the Debtors, their estates and all parties-in-interest.

---

[1]   It is possible that a significant portion of the claims that may be asserted by GM under the UAW Special Attrition Program Agreement would relate to GM's assumption of OPEB obligations for Eligible Employees who elect to flowback to GM.  Although Appaloosa Management L.P. ("Appaloosa"), which has objected to the Attrition Programs Motion, has previously argued that Delphi's OPEB obligations would "go away because the collective bargaining agreements go away in 2007," the Debtors do not consider this argument tenable.

7

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the forego-

ing statements are true and correct.

Executed on April 4, 2006, in Troy, Michigan.

　　　　　　　　　　　　　　　　　　　 /s/ John D. Sheehan
　　　　　　　　　　　　　　　　　　　 John D. Sheehan