Hearing Date:  **June 29, 2006**
Hearing Time:  **10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
Albert L. Hogan (AH 8807)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

　　　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
　　　　　　　　　　　　　　　　　　　　　:
　　In re　　　　　　　　　　　　　　　:　　Chapter 11
　　　　　　　　　　　　　　　　　　　　　:
DELPHI CORPORATION, et al.,　　　　　:　　Case No. 05-44481 (RDD)
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　Debtors.　　　　:　　(Jointly Administered)
　　　　　　　　　　　　　　　　　　　　　:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004 APPROVING (I) SUPPLEMENT TO UAW SPECIAL ATTRITION PROGRAM AND (II) IUE-CWA SPECIAL ATTRITION PROGRAM

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this response (the "Reply") to the objections filed to the Debtors' Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW Special Attrition Program and (II) IUE-CWA Special Attrition Program, dated June 19, 2006 (the "Motion").  Such objections include (a) the Preliminary Objection Of The Ad Hoc Equity Committee To The Debtors' Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW Special Attrition Program and (II) IUE-CWA Special Attrition Program, dated June 21, 2006  (Docket No. 4292) (filed by Appaloosa Management L.P., Wexford Capital LLC, Lampe Conway & Co., LLC, Harbinger Capital Partners LLC, and Marathon Asset Management LLC (collectively, the "Appaloosa Group" or the "Ad Hoc Equity Committee")), supplemented by the Supplemental Objection Of The Ad Hoc Equity Committee To Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 (I) Supplement to UAW Special Attrition Program and (II) IUE-CWA Special Attrition Program, dated June 28, 2006 (Docket No. 4381); (b) Preliminary Objection of Wilmington Trust Company ("WTC"), as Indenture Trustee, To Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW Special Attrition Program and (II) IUE-CWA Special Attrition Program, dated June 23, 2006 (Docket No. 4343), supplemented by the Limited Objection of Wilmington Trust Company ("WTC"), as Indenture Trustee, To Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW Special Attrition Program and (II) IUE-CWA Special Attrition Program , dated June 27, 2006 (Docket No. 4379); (c) the Limited Objection of the Official Committee of Unsecured Creditors (the "Creditors' Committee") To Motion For Order

2

Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW

Special Attrition Program and (II) IUE-CWA Special Attrition Program , dated June 27, 2006

(Docket No. 4379); and (d) the Limited Objection of the Official Committee of Equity Security

Holders ("Equity Committee") in Opposition to Debtors' Motion for Order Under 11 U.S.C. §

363(b) and Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW Special Attrition Program

and (II) IUE-CWA Special Attrition Program, dated June 27, 2006 (Docket No. 4369)

(collectively, the "Objectors" and the "Objections").  In support of this Reply, the Debtors

respectfully submit herewith the declarations of Kevin M. Butler, David L. Resnick, and John D.

Sheehan (each executed on June 25, 2006) in support of the Motion and further represent as

follows:[1]

<u>Preliminary Statement</u>

      1.     On April 7, 2006, Delphi, GM and UAW received this Court's approval of

a tripartite agreement providing retirement and pre-retirement attrition incentives for certain of

Delphi's hourly, UAW-represented employees (the "UAW Special Attrition Program").  In

support of their Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004

Approving Debtors' Human Capital Hourly Attrition Programs ("Hourly Attrition Motion No.

1"), the Debtors estimated that approximately 13,000 UAW-represented Delphi employees

would have the opportunity to participate in the UAW Special Attrition Program.  In fact, as of

Friday, June 23, 2006, approximately 87% (over 12,600) of Delphi's UAW employees have

elected to participate in these programs.[2]  While the success of this program does not alter the

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[2]    Although some of these participants are entitled to revoke their election of an option under the UAW
    Special Attrition Program, the Debtors do not expect that a material number of employees will do so.

need for Delphi's restrictive collective bargaining agreements to be transformed, the fact that the

vast majority of Delphi's UAW employees were able to consider voluntary attrition options and

exercise their individual judgment about what was best for their individual circumstances in light

of the economic and competitive realities of Delphi's transformation plan will be a cornerstone of

Delphi's restructuring.

        2.     The robust participation of Delphi's UAW employees validates the

Debtors' business judgment that offering attrition programs clearly benefits Delphi's labor

reorganization by providing voluntary "soft landings" to high-wage hourly employees at a time

when the Debtors and their unions are working hard to negotiate a comprehensive, consensual

resolution of Delphi's unsustainable labor cost structure.  As the UAW acknowledges in its

Statement Of UAW In Support Of Debtors' Motion For Approval Of Hourly Attrition Programs

(Docket No. 4367) ("UAW Statement"), this participation rate is "a measure of the degree to

which Delphi employees are concerned about the uncertain prospects for future employment

given Delphi's stated transformation plans and the overall economic climate in the automotive

supply industry generally" and counsels in favor of expanding the attrition programs.  (UAW

Statement ¶ 2.)

        3.     Indeed, it is telling that not a single Objector actually objects to the labor

transformation represented by, or any specific element of, the attrition programs brought by the

Debtors to this Court in the Motion.  Instead, the Objectors uniformly use the Objections as a

strategic platform to unreasonably, unwisely and inappropriately bring forward a plan of

reorganization negotiation into a labor transformation motion.  It is unreasonable because neither

the Motion nor the record supports the notion that this hearing is about the Debtors' claims

against or defenses against the affirmative claims of General Motors Corporation, its former

4

parent and largest OEM customer.  It is unwise because the very labor transformation that all of

the Objectors desperately want to occur in order to preserve – and likely create – value for the

Debtors' estates is put at risk by the Objectors' almost fanatical opposition to GM (which appears

to be undertaken without any realistic assessment of the constructive role GM can play in this

reorganization).[3]  It is inappropriate because most of the Objectors appear to either

misunderstand the relief sought in the Motion – or choose to intentionally mischaracterize the

relief sought.  (For example, the Motion does not seek to allow any claim of any priority to GM

in connection with any pre-existing claim that GM might be able to assert and, in fact, relegates

GM's agreement to assume "check the box" exposure for IUE-CWA members to nothing more

than an assertable general unsecured claim limited to a preexisting claims channel as to which

virtually all of the Objectors maintain can be blocked entirely or equitably subordinated.)

      4.      During the April 7 hearing on the Hourly Attrition Motion No. 1, this

Court stated:

> [I]t's my view that having approved this agreement, it is quite likely, unless there
> really are different material considerations involving the debtor's rights against
> GM and/or the other unions, that I would promptly approve comparable
> agreements with the other unions.

Tr. Apr. 7, 2006, at 229:8-15.  On May 5, 2006, this Court entered an order authorizing and

approving the UAW Special Attrition Program.  The Court issued an amended order on May 12,

2006 in response to technical issues that GM had raised.

      5.      The Debtors subsequently engaged in intensive and ultimately successful

negotiations with GM and the Debtors' second-largest union, the IUE-CWA, and, as a result, are

---

[3]      For example, all but five members of the UAW workforce who elected voluntary attrition also elected to
"check the box" and retire on GM's balance sheet – an opportunity fashioned from whole cloth by the
UAW, GM and the Debtors which could not have been "forced" on any party including GM.

now able to offer Delphi's IUE-CWA-represented employees with retirement attrition incentives analogous to those previously offered to the UAW.  As acknowledged by the IUE-CWA in its Response Of IUE-CWA In Support Of Debtors' Motion For Approval Of IUE-CWA Special Attrition Program (Docket No. 4364) ("IUE-CWA Response"), these negotiations were "complex and sometimes difficult."  (IUE-CWA Response ¶ 1).  The Debtors have also succeeded in negotiating substantial financial support from GM that enables Delphi to extend to additional UAW and IUE-CWA employees the opportunity to sever ties with Delphi and GM through lump-sum buyouts that GM had previously offered its own UAW workers under the UAW Special Attrition Program.

      6.      On June 5, 2006, Delphi reached agreement on the terms of additional programs to supplement the UAW Special Attrition Program through negotiations among Delphi, GM, and UAW (the "UAW Supplement").  On June 16, 2006, Delphi reached agreement on the terms of the IUE-CWA-GM-Delphi Special Attrition Program (the "IUE-CWA Special Attrition Program"), through negotiations among Delphi, GM, and IUE-CWA.[4]  On June 19, 2006, the Debtors filed the Motion seeking entry of an order under section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 authorizing the Debtors to enter into (i) the Supplement to the UAW-GM-Delphi Special Attrition Program Agreement by and among Delphi, GM, and the UAW dated March 22, 2006 (the "UAW Supplement Agreement"), and (ii) the Agreement by and among Delphi, GM, and the IUE-CWA governing the IUE-CWA Special Attrition Program (the "IUE-CWA Special Attrition Program Agreement").[5]  The Debtors obtained relief from the

---

[4]      Collectively, the IUE-CWA Special Attrition Program, the UAW Special Attrition Program, and the UAW Supplement are referred to herein as the "Hourly Attrition Programs."

[5]      The proposed Hourly Attrition Programs Order (the "Proposed Order") is attached hereto as <u>Exhibit B</u>. Copies of the UAW Supplement Agreement and the IUE-CWA Special Attrition Program Agreement are

*(cont'd)*

Court at the June 19, 2006 omnibus hearing to file the Motion on ten days notice later that

evening.  All of the Objectors were present at the omnibus hearing and no Objector opposed the

scheduling order approved by the Court.[6]  The Debtors obtained the scheduling relief and seek in

the Motion a waiver of the ten day stay provided under Bankruptcy Rule 6004(g) for essentially

the same showing of cause.  The attrition programs are an important element of labor

transformation.  Given what the Court and the Objectors understand to be the unavoidable delay

in the IUE-CWA negotiations leading up to the agreed program, the IUE-CWA program is

weeks behind the UAW program and must be implemented immediately.  As importantly,

Delphi and its unions need to be able to move beyond the attrition programs to negotiating a

comprehensive labor transformation solution during the summer recess in the 1113/1114 hearing

which resumes on August 11, 2006.  The Debtors believe that any delay in the implementation of

the relief sought in the Motion will be confusing to its hourly employees and disruptive to the

labor transformation process – the success of which is an indispensable precondition to the

formulation of a reorganization plan which maximizes the business enterprise value available to

its stakeholders.

       7.       It is important to highlight that there are only two material differences

between the relief sought in the Motion and that which was approved previously by the Court.

First, the UAW, IUE-CWA, GM and the Delphi Corporation have agreed to expand the menu of

voluntary attrition options to include a buyout provision.   Not a single objector takes issue with

_____

*(cont'd from previous page)*
        attached to the Proposed Order.  While these programs are the product of negotiations between Delphi, GM,
        and each of these major unions, neither GM nor either of the interested unions are parties to this Motion.

[6]     Order Shortening Notice Period And Establishing Objection Deadline And Hearing Date On Debtors'
     Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving (I) Supplement To
     UAW Special Attrition Program, And (II) IUE-CWA Special Attrition Program (Docket No. 4281).

paying from $140,000 to $40,000 per employee for employees (depending on seniority and classification) to voluntarily give up their employment and all retirement claims that the employee may have (except for vested pension benefits). Delphi Corporation elected to enter into this agreement in its reasonable business judgment because it is directly liable for CBA obligations, pension obligations and retiree obligations including OPEB. In determining how to fund the potential cost of the program – presumably in the hundreds of millions of dollars – Delphi could have elected to self-fund the program using postpetition borrowing lines or current estate liquidity to fund the entire program. Such an approach would by nature cause the funding to be "senior" to the claims of every Objector. Instead, Delphi was able to induce GM to fund half of the costs of the program and to accept a prepetition unsecured claim (as opposed to an administrative claim). While GM did not agree to this approach as a matter of altrusim – GM will benefit from the reduction in potential benefit guarantee exposure if the guarantee were ever triggered – GM had absolutely no legal obligation to advance postpetition funds to Delphi and Delphi is not waiving any claims of any kind for itself or anyone else vis a vis any existing contractual obligations that GM may have or with respect to any pre-existing claim that GM might be able to exert.[7]

8.      Aside from the new buyout option, the IUE-CWA and UAW programs as they relate to Delphi are virtually identical (with one exception discussed below). For example, the relevant portions of paragraph 7 of the UAW program are replicated nearly verbatim in

---

[7]      Another enhancement in the UAW Supplement is the addition of another eligible class for the preretirement program (i.e., employees with at least 26 years but less than 27 years of seniority or credited service). This enhancement also is included in the IUE-CWA program. However, no element of the other aspects of the preretirement program was affected, except that Delphi Corporation will reserve addition funds to finance the program since the preretirement program wage payments are entirely self-funded by Delphi Corporation without GM involvement.

8

paragraph 3 of the IUE-CWA program, including the concept in paragraph 3(b) that "any

obligations assumed by GM under this Program with respect to OPEB . . . or active health care

and life insurance . . . shall be conclusively deemed to be comprehended by, included within, and

shall constitute a prepetition, general unsecured claim assertable by GM against the estate of

Delphi Corporation under . . . the Master Separation Agreement."  Moreover, the reservation of

rights to parties in interest, including the statutory committees, is virtually identical in the prior

approved program and the proposed program.  What is different is that, unlike the broader claims

channels that GM could use in the UAW program to assert claims (i.e., a prepetition indemnity

agreement related to the benefit guaranty, the Master Separation Agreement and the Employee

Matters Agreement relating to flowbacks), the IUE-CWA program limits GM's opportunities to

assert claims to a single channel because the other two channels do not exist as to the IUE-CWA.

In consideration for inducing GM to accept this limitation (and to drop its demand that a new

program document be created pursuant to which it could assert a claim), the Debtors agreed that

they would not (for themselves only and with a full reservation of rights for the statutory

committees and all other parties) object to the GM claim in the single Master Separation

Agreement claim channel -- with an extraordinarily important exception.  The Debtors reserved

the right to litigate the proper allowable economic value of an OPEB claim and not simply be

tied to an actuarial valuation linked to a balance sheet accounting standard.  Thus, the Debtors

continued to reserve the precise issue that the Objectors have litigated in various contexts in this

case—the proper claims valuation and treatment of OPEB—while leaving to all other parties any

other claims allowance litigation.

        9.        As explained fully herein, the UAW Supplement provides certain

expanded options with respect to the UAW Special Attrition Program, which will provide

additional UAW-represented employees with voluntary "soft landing" opportunities as the

Debtors implement their transformation plan.  The IUE-CWA Special Attrition Program largely

mirrors the UAW Special Attrition Program taken together with the UAW Supplement.

       10.    The Debtors exercised due care in analyzing the potential costs and

benefits of each of the features of the Hourly Attrition Programs in the course of determining that

the Hourly Attrition Programs are in the best interests of the Debtors' estates.  As this Court

knows, based on the contested hearing on the Hourly Attrition Motion No. 1, Delphi's Board of

Directors (the "Board") received numerous detailed presentations regarding the Hourly Attrition

Programs prior to this Court's approval of the Hourly Attrition Motion No. 1.  Thereafter, as

discussed further herein, the Debtors' management team and advisors have updated the Board

regularly on progress under the UAW Special Attrition program and on the incremental attrition

programs (i.e., the lump-sum buyouts and additional pre-retirement incentives) that the Debtors

have subsequently negotiated with their unions and GM.

       11.    No Objector challenges the business judgment to offer soft landings to the

Debtors' labor force through the Hourly Attrition Programs.  The Creditors' Committee, the

Equity Committee, and the Appaloosa Group have each filed limited objections focused on GM

claims matters.  The only disagreements that are unresolved with respect to these limited

objections are  whether the proposed Order, as drafted, expands the claims GM might otherwise

be able to assert, to the supposed detriment of the Debtors' creditors and equity holders.  In

addition, WTC has once again objected based on the argument that Delphi Corporation (which

WTC concedes is a signatory to collective bargaining agreements with UAW and IUE-CWA

(WTC Lim. Obj. ¶ 14)) should not fund any attrition programs or generate any claims in

connection with the attrition programs.  WTC's counsel spins this legal assertion without any

balanced assessment of the fabric of the indenture and underlying offering memoranda and

related documents that provide the factual context of the bondholders' investments in Delphi

Corporation and while choosing to essentially ignore (or alternatively claim the irrelevance of)

such facts as Delphi Corporation being the employer under applicable labor law, the signatory to

the relevant collective bargaining agreements and the legal sponsor and obligor with respect to

retirement benefits including the relevant pension and healthcare plans.[8]

        12.     As discussed fully below, the Motion is in the best interests of the

Debtors, their estates, their creditors, and other stakeholders.  The Debtors' decision to enter into

the UAW Supplement Agreement and IUE-CWA Special Attrition Program Agreement

constitutes a reasonable exercise of their business judgment.  Moreover, the limited objections

regarding potential claims by GM also should be denied because they are either premature or fail

to acknowledge the potential value and benefit of GM's financial contribution under the terms of

the Hourly Attrition Programs.

<u>Argument</u>

A.    <u>The Hourly Attrition Programs Reflect A Sound Exercise Of Business Judgment</u>

    1.    <u>The Applicable Legal Standard</u>

---

[8]    Although WTC claims that Delphi Corporation's business judgment is "incomprehensible" for this reason, it concedes that "implementation of the Attrition Programs appears to be a sound exercise of business judgment by DAS [Delphi Automotive Systems LLC], which will realize tangible benefits in the form of a smaller and less expensive unionized workforce."  (WTC Lim. Obj. ¶ 27.)  On the other hand, discovery taken on June 28, 2006 of WTC's Rule 30(b)(6) witness makes clear that WTC, itself, undertook no analysis of the risk to Delphi Corporation or its affiliates in the event that the attrition program was not approved or labor transformation was not achieved.  Moreover, WTC conceded that it is prosecuting its Objection without the instruction of bondholders under the relevant indenture and without WTC having reviewed the offering memoranda, Form 10-Ks or other documents that would evidence what liabilities bondholders were "investing into" at the time that the offerings occurred or subsequently.  Said another way, the WTC Rule 30(b)(6) deponent could not offer a single factual basis in support of its Objection relying instead solely upon the legal argument constructed by WTC's counsel.

13.     Bankruptcy Code section 363(b) permits a debtor-in-possession, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts may authorize a debtor to use estate property pursuant to section 363(b)(1) whenever the debtor, in good faith, has provided a "good business reason" that the proposed usage will ultimately "aid in the reorganization." In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). The Code provides the court "considerable discretion" in addressing such a section 363(b) motion, and the Court's factual findings will stand unless clearly erroneous. In re Montgomery Ward Holding Corp., 242 B.R. 147, 152-53 (Bankr. D. Del. 1999).

14.     The Second Circuit has held that, while the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "the arbiter of disputes between creditors and the estate." In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Orion Pictures, 4 F.3d at 1098-99.

15.     The debtor has the burden of establishing a valid business purpose for the use of estate property outside the ordinary course of business. Lionel, 722 F.2d at 1070-71. Once the debtor has done so, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in an honest belief that the action was in the best interests of the estate. In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of

rebutting the presumption of validity." Id.  To satisfy its burden, it is not enough for an objector

simply to raise and argue an objection.  Rather, an objector "is required to produce some

evidence respecting its objections." Lionel, 722 F.2d at 1071.

16.      As a rule, the debtor's business judgment "should be approved by the court

unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Mass 2001) (quoting In re Logical Software, Inc., 66 B.R. 683 (Bankr. D. Mass.

1986)).

17.      Further, the Court's role should not be to rewrite the terms of an agreement

reached between Delphi and third parties.  In re Global Crossing Securities and ERISA Litig.,

225 F.R.D. 436, 455 (S.D.N.Y. 2004) ("Although the Court must make its own independent

evaluation of the settlement, the Court must also assess the settlement as it stands, without

modifying its terms . . . and without substituting its 'business judgment for that of counsel, absent

evidence of fraud or overreaching.'") (citing In re Warner Commc'ns Sec. Litig., 798 F.2d 35, 37

(2d Cir. 1986)).

18.      Courts have given deference to a debtor's business decisions when those

decisions follow thorough financial analyses and the considered deliberation of senior

management and directors.  In re Adelphia Commc'ns Corp., No. 02-41729 (REG), 2003 WL

22316543, at *31 (Bankr. S.D.N.Y. Mar. 4, 2003); In re Global Crossing Ltd., 295 B.R. 726,

744-46 (Bankr. S.D.N.Y. 2003); In re Brooklyn Hosp. Ctr., Inc., 341 B.R. 405, 412 (Bankr.

E.D.N.Y. 2006).   Furthermore, Courts have also found that arms-length negotiations between

entities that result in agreement is evidence of the exercise of sound business judgment.  In re

Eaglepicher Holdings, Inc.,  No. 05-12601, 2005 WL 4030132, at *4 (Bankr. S.D. Ohio Aug 26,

2005).  As discussed below, the Debtors here have engaged in extensive and often-contentious

discussions with GM and their unions.  These negotiations have been conducted under the

continual auspices of both senior management and the Board.  (Sheehan Dep. Tr. 12:21-13:9).

After much deliberation and analysis, the final product of those negotiations resulted in

unanimous Board support for the Supplemental Programs.  (Sheehan Dep. Tr. 204:20-24; 208:2-

5.)

> 2.      The Role Of "Soft Landings" In The Restructuring Process

19.      In order to stem the Debtors' operating losses from their U.S. operations

and achieve the Debtors' transformation, Delphi's existing labor agreements must be modified in

three principal respects.  First, Delphi must obtain hourly wage and benefit cost levels that are

competitive with other U.S. auto parts suppliers.  Currently, Delphi's total hourly labor costs,

including legacy retirement liabilities, for its traditional production and skilled trades employees

are approximately three times the labor costs of a typical U.S. auto parts supplier.  Second,

Delphi must address those provisions that limit Delphi's ability to respond to market forces by

selling or closing non-core or unprofitable operations, and/or by laying off excess employees.

Third, Delphi must address its substantial liabilities for retirement benefits for hourly employees

and its costly retiree health care plans.  The Hourly Attrition Programs are designed to begin to

address, either directly or indirectly, each of these issues. (Butler Dec. ¶6.)

20.      The value of the Debtors' estates is materially dependent on maintaining

customer supply through rigorous shipping compliance at world-class quality levels as well as

the ability to win profitable new business (especially non-GM business).  Although Delphi must

modify its labor agreements, it cannot operate or maximize enterprise value without the ultimate

support of its employees.  Therefore, as stated in Delphi's March 31, 2006 press release, while

14

the Debtors, through their Court filings on March 31, 2006, have taken necessary procedural

steps to enable action that may become necessary at some point in the future, Delphi is singularly

focused on reaching a consensual resolution with all of its unions and GM before any court

hearing is necessary.

        21.      Delphi negotiated the terms of and entered into the UAW Supplement

Agreement and the IUE-CWA Special Attrition Program Agreement in the spirit of fostering the

prospects of a comprehensive, consensual resolution.  The UAW Supplement and IUE-CWA

Special Attrition Program are the product of extensive and complex negotiations among the

Debtors, UAW, IUE-CWA, and GM.  The Debtors' ability to achieve shipping compliance,

world-class quality, and customer confidence for new business is affected significantly by

employee sentiment, focus, and efficiency.  During trilateral discussions among the Debtors,

GM, and their major unions, the parties expressed mutual concern regarding the difficulty and

complexity of the issues surrounding the Debtors' restructuring.  Indeed, there was deep concern

that the prospects for significant risk to the business could arise if the parties could not respond

to certain issues until a comprehensive settlement was reached on all issues.  (Butler Dec. ¶ 7.)

The Hourly Attrition Programs are a mutual agreement that Delphi believes is a reasonable and

one that will benefit the estates and aid in the reorganization.  Moreover, entry into the UAW

Supplement Agreement and IUE-CWA Special Attrition Program Agreement has had, and will

continue to have, a positive effect on the overall negotiations between Delphi, its unions, and

GM.  (Butler Dec. ¶ 17.)

        22.      Delphi maintains that the Hourly Attrition Programs are beneficial for

Delphi's labor reorganization because they will incentivize attrition and prevent most of Delphi's

long-term employees from feeling the full weight of the necessary modifications to Delphi's

labor agreements.

23.       In light of the Debtors' transformation plan described in Delphi's March

31, 2006, press release, the Hourly Attrition Programs' "soft landings" should ease the sudden

impact upon employees from the economic hardship that they might otherwise face as a result of

Delphi's financial situation and enhance Delphi and its unions' ability to achieve a consensual

resolution of Delphi's remaining labor issues that will be ratifiable by the unions' members.

Even if Delphi must proceed in chapter 11 and obtain Court authority to reject and subsequently

modify its collective bargaining agreements and modify its retiree benefits, to continue its

ongoing operations, Delphi must reach a resolution with its unions that the unions' membership

will ratify and will keep employees working.  Delphi believes that creating a "soft landing" for

excess or high cost employees is critical to facilitating the structure of and subsequent ratification

of any modified labor agreement that Delphi ultimately reaches with its unions.

24.        Finally, the Debtors anticipate that the Hourly Attrition Programs will

generate positive cash flow over the next four years resulting from the reductions in the Debtors'

workforce and cost savings from utilizing lower-rate employees.  (Sheehan Dec. ¶¶ 22, 14, 19.)

25.       Delphi could not achieve this "soft landing" without GM's support.  Many

of Delphi's hourly employees may view the option to retire as a GM retiree as more appealing

than retiring as a Delphi retiree.  In addition, GM's financial support enables the Debtors to

provide their most senior hourly employees appropriate incentives to retire at an accelerated rate.

Should the Motion not be approved, the Debtors may not have a future opportunity to achieve

these "soft landings."  GM is not obligated to enter a deal with Delphi and will only enter a deal

if it receives some benefit under such agreement.

3.     The UAW Supplement Will Benefit The Debtors'
       Estates And The Reorganization Process

26.     As of June 23, 2006, approximately 12,600 of 14,000 eligible UAW

hourly employees have elected to participate in the UAW Special Attrition Program.  The

acceptance rate of approximately 87% validates the Debtors' business judgment and provides a

starting point that will allow the Debtors to begin the transformation of their legacy workforce

while providing a soft landing for their employees.  In light of the success of the UAW Special

Attrition Program, and to facilitate attrition and provide additional soft landing opportunities to

its employees, Delphi with the UAW and GM entered into a tripartite agreement that would

provide additional options to employees in addition to the UAW Special Attrition Program.  The

UAW Supplement includes two main components:  (i) the addition of a class of employees

(those with 26 years of credited service) to the pre-retirement program and (ii) lump sum buyouts

to sever all ties with Delphi and GM (except vested pension benefits).  (Butler Dec. ¶ 11.)

27.     The UAW Special Attrition Program offered special voluntary placement

in a pre-retirement program to employees with at least 27 and less than 30 years of credited

service.  The UAW Supplement is incremental to the prior pre-retirement program by adding an

option to Delphi employees with at least 26 years of credited service.  Thus, additional high-

wage and long-serving union employees will have the opportunity to "check the box" and retire

on terms akin to GM's UAW employees.  The Debtors estimate that approximately 400

additional UAW represented employees would be eligible to participate in the expanded pre-

retirement program.  (Butler Dec. ¶ 12.)  In connection with the new option under the  pre-

retirement program, the Debtors would increase the balance in the $75 million segregated

account established by the UAW Special Attrition Program by an additional $15 million.

(Sheehan Dec. ¶ 12.)

17

28.    The UAW Supplement also includes buyout options to UAW-represented employees to sever all ties with Delphi and GM, except vested pension benefits.  Under the buyout options, employees with ten or more years of seniority or credited service, whichever is greater, would be eligible for $140,000, traditional employees with fewer than ten years of seniority would be eligible for $70,000, and employees hired under the Supplemental New Hire Agreement prior to March 22, 2006 would be eligible for a buyout payment amount prorated to $40,000, in each case, less withholdings (the "UAW Buyout Payments").

29.    The UAW Buyout Payments are modeled on previous agreements reached between GM and/or Ford and their unions.  Ford recently offered buyouts at the $100,000-per-employee level.  As detailed in the UAW Special Attrition Program, GM offered buyouts to GM employees represented by the UAW of $140,000 for employees with ten years of service and $70,000 for employees with fewer than 10 years of seniority.  The Debtors believe that the amount of the UAW Buyout Payments are reasonable, within the range of similar buyout payments offered in the domestic auto industry, and in the best interests of the estates.  Consequently, the Debtors believe it is appropriate to offer buyouts at the same level as GM offered to UAW-represented employees.  Moreover, since the UAW negotiated buyout amounts with GM in March 2006, it was the expectation and demand of the UAW that the same opportunity be made available to eligible UAW-represented Delphi employees.  The buyouts offered to UAW employees will reduce the number of traditional, high-wage and benefit employees as well as eliminate future OPEB obligations for those participants.  (Butler Dec. ¶ 14.)

30.    Under the terms of the UAW Supplement, GM and Delphi would each pay one-half of the total cost of the UAW Buyout Payments.  Although participation rates cannot be

predicted with precision, the Debtors estimate that approximately 20% of eligible UAW employees, who are not otherwise eligible for retirement incentives or pre-retirement programs through the UAW Special Attrition Program, will participate in the buyouts.  At estimated participation levels, the Debtors estimate that the cost to each of the Debtors and GM of the UAW Buyouts will be approximately $75 million, with GM receiving an allowed, prepetition claim for amounts it actually pays for the UAW Buyouts.  (Sheehan Dec. ¶ 13.)  The buyout program will save Delphi money by removing unnecessary workers and allowing the replacement of necessary workers with lower cost employees, who can be released when no longer needed, consistent with the Debtors' transformation plan.  (Butler Dep. Tr. 76:3-13.)

31.     In sum, the benefits to the Debtors of the UAW Buyouts outweigh the costs, in light of (i) the added ability to provide voluntary attrition opportunities to high-wage employees, (ii) the added operational flexibility in reshaping the workforce around core operations, (iii) the elimination of associated OPEB benefits, and (iv) the 50 percent subsidization of the program through "new money" from GM in return for a prepetition, unsecured claim.

4.     The IUE-CWA Special Attrition Program Will Benefit
The Debtors' Estates And The Reorganization Process

32.     The implementation of the IUE-CWA Special Attrition Program is another important step in enabling Delphi to transform its workforce from legacy wages and benefits to a competitive labor cost structure.  Approximately 25% of the Debtors' hourly workforce is represented by the IUE-CWA.  The Debtors believe that the IUE-CWA Special Attrition Program could provide approximately 8,000 existing IUE-CWA represented hourly employees with an opportunity for "soft landings," either through retirement attrition programs or the buyout program.  The implementation of this program, similar to the UAW Special Attrition

19

Program, is expected to accelerate necessary attrition and reduce the uncertainties and concerns

over the impact of a negotiated consensual resolution, or in the alternative, a potential rejection

of labor agreements and modifications of retiree benefits.  (Butler Dec. ¶ 16.)

   33. The IUE-CWA Special Attrition Program consists of a retirement

component and a buyout component.  The retirement component of the IUE-CWA Special

Attrition Program fundamentally is patterned after terms previously approved by the Court in

connection with the UAW Special Attrition Program.  The IUE-CWA Special Attrition Program,

like the UAW Special Attrition Program, offers a $35,000 lump sum incentive payment to

employees who are eligible to retire under the normal or early voluntary provisions of the Delphi

Hourly-Rate Employees Pension Plan (the "HRP").  The total cost of these incentive payments

would be paid by GM and would be retroactive to cover eligible employees who have retired

since October 1, 2005.  While GM will not be able to assert a claim against the Debtors on

account of these payments, GM has informed Delphi that it will seek compensation for these

payments in connection with any comprehensive agreement with Delphi.  The Debtors estimate

that approximately 1,800 employees are eligible to receive the lump sum retirement incentive

payments, and estimate that approximately 50 to 75 percent of eligible employees will elect to

participate.  An additional retirement element of the IUE-CWA Special Attrition Program is a

mutually satisfactory retirement opportunity for those employees 50 years old or older with at

least ten years of credited service.  The Debtors estimate that approximately 825 employees are

eligible to participate in the MSR option, and estimate that 50 to 75 percent of eligible

employees will elect to participate.  (Butler Dec. ¶ 17.)

   34. The IUE-CWA Special Attrition Program also offers special voluntary

placement in a pre-retirement program for employees with at least 26 and less than 30 years of

credited service.  The Debtors estimate that approximately 390 employees are eligible to

participate in the pre-retirement program, and estimate that 50 to 75 percent of eligible

employees will elect to participate.  All participants in the retirement options are eligible to

"check the box" and transition to GM for purposes of retirement, including OPEB at levels

available to GM's IUE-CWA represented retirees.  (Butler Dec. ¶ 18.)

       35.    The buyout component of the IUE-CWA Special Attrition Program is very

similar to the UAW Buyout Payments described above.  Under the terms of the IUE-CWA

Special Attrition Program, employees (other than those at Delphi's Gadsden, Alabama

Operations) with ten or more years of seniority or credited service, whichever is greater, would

be eligible for $140,000, employees with three but fewer than ten years of seniority or credited

service, whichever is greater, would be eligible for $70,000, and employees with one but fewer

than three years of seniority or credited service, whichever is greater, would be eligible for a

buyout payment of $40,000, paid in a lump sum less withholdings (the "IUE-CWA Buyout

Payments," together with the UAW Buyout Payments, the "Buyout Payments").  GM and Delphi

would each pay one-half of the total cost of the IUE-CWA Buyout Payments (except for any

payments made to participants who are employed at Delphi's New Brunswick operations, where

previously agreed upon terms apply).  (Butler Dec. ¶ 19.)

       36.    Although participation rates cannot be predicted with precision, the

Debtors estimate that approximately 20 percent of eligible IUE-CWA employees, who are not

otherwise eligible for retirement incentives or pre-retirement programs through the IUE-CWA

Special Attrition Program, will participate in the buyouts.  At this level of participation, the

Debtors estimate that the cost to each of the Debtors and GM will be $60 million.  (Sheehan Dec.

¶ 18.)  The Debtors believe the amount of the IUE-CWA Buyout Payments are reasonable,

within the range of similar buyout amounts offered in the auto industry, and in the best interests

of the estates. The buyouts offered to IUE-CWA employees will reduce the number of high-

wage and benefit employees as well as eliminate future OPEB obligations. (Butler Dec. ¶ 20.)

37.    The Debtors estimate that each individual event of IUE-CWA attrition

pursuant to the IUE-CWA Buyout Payments would result in positive cash flow such that,

depending upon the timing and demographics of the individuals participating, the IUE-CWA

Special Attrition Program may be cash flow positive beginning in 2006 and would generate

positive cash flow each year thereafter. Between 2006 and 2010, the Debtors expect to generate

substantial cost savings associated with the reduction in headcount provided by the IUE-CWA

Special Attrition Program and, in those instances in which replacements might be needed, as a

result of replacing IUE-CWA eligible employees with lower-cost temporary and competitive rate

employees. (Sheehan Dec. ¶ 19.)

38.    It is anticipated that the Hourly Attrition Programs will result in an

increase in Delphi's minimum pension funding obligation. An increase would occur regardless

of whether the Court approves the Hourly Attrition Programs because, to transform their

businesses, the Debtors will need to close unprofitable U.S. plants. These closures would also

result in an increase of minimum pension funding obligations. (Butler Dec. ¶ 22.)

39.    GM will receive certain allowed prepetition general unsecured claims

against Delphi Corporation on account of the funding of one half of the total cost of the Buyout

Payments and will likely assert additional prepetition general unsecured claims related to

obligations assumed and/or undertaken by GM as part of the Hourly Attrition Programs. Delphi

could not have offered the Hourly Attrition Programs, however, without GM's involvement in

and financial support for these Programs. Many of Delphi's hourly employees will view the

option to transition to GM for the purposes of retirement and receipt of GM OPEB as more

appealing than retiring as a Delphi retiree.  As of June 20, 2006, of the 9,776 retirement eligible

Delphi employees electing to participate in the UAW Special Attrition Program, 9,775 have

elected to "check the box" and receive GM OPEB.  GM's financial support also enables the

Debtors to provide their most senior hourly employees sufficient incentive to retire at an

accelerated rate.  (Butler Dec. ¶ 23.)

    40.  In sum, the Debtors believe that the Hourly Attrition Programs constitute

an important step in implementing their transformation plan.  Particularly, the Debtors believe

that implementing the Hourly Attrition Programs, and the anticipated sharing of the costs of the

Hourly Attrition Programs between the Debtors and GM, including GM's commitment to provide

significant financial support toward the UAW Supplement and IUE-CWA Special Attrition

Program Agreement, will improve the Debtors' net cash flow and reduce the Debtors' projected

operating losses in comparison to the status quo over the five-year period from 2006 through

2010.  Even more, the Hourly Attrition Programs are a critical step to facilitating the Debtors'

labor reorganization and transformation plan and will only increase the prospects for a

comprehensive, consensual resolution of the Debtors' labor cost issues.

B.  The Objectors' Arguments Should Be Overruled And The Relief Granted

    1.  Objections Regarding GM's Claims

    41.  Pursuant to the UAW Supplement and IUE-CWA Special Attrition

Program Agreement, GM has agreed to assume a substantial portion of the costs associated with

implementation of the Hourly Attrition Programs.  Specifically, GM has agreed to pay one-time,

lump-sum incentive payments in the amount of $35,000 to employees who are eligible to retire

under the normal or early voluntary provisions of the Delphi Hourly-Rate Employees Pension

Plan (the "HRP") in exchange for their agreement to retire and grant a release of claims. [9]

Furthermore, GM has agreed to assume OPEB obligations for employees who "check the box"

and flowback to GM for purposes of retiring.  GM has also committed to subsidize any health

care coverage differential for Delphi employees participating in the Delphi pre-retirement

program.  Finally, GM has committed to paying one-half of the lump-sum buyouts offered to the

Debtors' UAW and IUE-CWA employees.  GM's financial commitment to Delphi employees

under the Hourly Attrition Programs is so substantial that Delphi's entry into these programs

would likely not have been feasible without GM's commitments.

      42.     Delphi's entry into the UAW Supplement and IUE-CWA Special Attrition

Program Agreement are critical steps in the Debtors' efforts to realign their global product

portfolio and manufacturing footprint, as well as to reduce the Debtors' traditional-rate hourly

U.S. workforce to levels needed to run its realigned U.S. operations.

      43.     Nevertheless, and despite the financial obligations GM has agreed to

assume under the Special Attrition Programs, the Creditors' Committee, the Equity Committee,

the Appaloosa Group, and WTC (collectively, the "Objectors") assail the terms that GM

negotiated from Delphi as a condition of GM's financial support.  The Objectors do not

acknowledge that GM's financial support of the UAW Special Attrition Program is critical to the

overall viability of the Program or that GM was under no obligation to provide such financial

support to Delphi.  Rather, each of such Objectors appears to take the untenable position that

Delphi should have been able to receive all of the benefits of the Hourly Attrition Programs

without providing GM with any corresponding claims.  To expect GM to take on what will likely

---

[9]     GM will likely seek "credit" to recoup these contributions in any comprehensive settlement but GM's
obligations are not conditioned on such a settlement.

amount to hundreds of millions of dollars in obligations without receiving any benefit whatsoever simply does not acknowledge the respective leverage of the parties or the commercial realities of the Debtors' situation.

44.    The Objectors focus two provisions of the UAW Supplement Agreement and the IUE-CWA Special Attrition Program Agreement that would (a) grant GM an allowed unsecured, prepetition claim with respect to amounts actually paid by GM in connection with lump-sum buyout payments and (b) allow GM to assert unsecured, prepetition claims in connection with liabilities GM incurs with respect to OPEB obligations for IUE-CWA employees who "check the box."  These arguments are without merit, for they ignore the realities of the complex bargaining and negotiations out of which the supplemental Hourly Attrition Programs arose.

45.    With respect to GM's payments in support of lump-sum buyouts, the Objectors present a false choice between either granting GM an allowed, pre-petition claim or remaining silent on that issue and reserving all rights.  In reality, the choice that the Debtors had to make was between relying on debtor-in-possession ("DIP") financing to fund the buyouts by themselves, or taking direct, GM financial support in exchange for an allowed prepetition, unsecured claim.  To the extent that the  DIP financing is utilized to fund these payments, any payments by the Debtors to fund the program from the proceeds of such financing would give rise to administrative claims (while providing GM the same speculative, OPEB-related "benefits" flowing from buyouts emphasized by the Objectors).  Had the Debtors chosen to fund the Buyout Programs in this fashion, they plainly would have had the authority to implement them under the business judgment standard of section 363(b) of the Bankruptcy Code. Instead, the program as

25

proposed gives rise to a general prepetition unsecured claim for GM rather than an administrative

claim to a DIP lender.  The benefits of this structure to the estate are perfectly clear.

46.     Under the Hourly Attrition Programs, GM has agreed to pay half of the

total cost of the Buyout Payments with respect to both the UAW and the IUE-CWA.  This

financial support is critical to making the Buyout Payment option available to employees who

otherwise would have had no attrition choice under the programs.  During the negotiations

concerning this aspect of the programs, GM expressed its understanding that Delphi's overall

interests would be served by maximizing the number of employees who would be eligible for

some kind of attrition option, and ultimately agreed to provide the 50 percent support of the total

cost of the Buyout Payments to further that goal.  This financial support is a postpetition benefit

to the Debtors' estates.  GM agreed, however, to accept only an allowed prepetition unsecured

claim for these Buyout Payments.  Because GM was not otherwise obligated to make the Buyout

Payments, and because GM was willing to accept a prepetition unsecured claim, as opposed to

an administrative or priority claim, the Debtors' financial advisors recommended that Delphi

accept GM's proposal to provide the Buyout Payment support, in exchange for an allowed

prepetition claim.  (Resnick Dec. ¶ 13.)  As compared to other alternatives available to Delphi to

fund the Buyout Payments, such as using its available cash or through its DIP financing sources,

the Debtors concluded that obtaining the support from GM in exchange for a prepetition

unsecured claim is clearly in the Debtors' best interests.  (Id. ¶ 14.)

47.     Second, with respect to GM's potential OPEB claims, the Debtors have

expressly reserved the right to object to the economic value of any such claim even thought the

Debtors concede that the claim could be asserted under the Master Separation Agreement.  IUE-

CWA Special Attrition Program Agreement ¶ 2. Unlike the UAW, the IUE-CWA does not have

flowback rights to GM. Thus, without further consideration there would be no opportunity for IUE employees to retire as GM employees, such as was provided under the UAW Special Attrition Plan. However, under the IUE-CWA Special Attrition Plan, GM did agree to provide a "check the box" alternative to employees exercising an early retirement option to allow them to retire as GM instead of Delphi employees. For those eligible Delphi IUE-CWA employees who "check the box," GM has agreed to assume Delphi's outstanding OPEB obligations to those employees. In exchange, GM insisted that it would be allowed to assert a prepetition unsecured claim for these obligations under Delphi's indemnity of GM under the Master Separation Agreement. The Debtors agreed with the further understanding that, in the event that GM asserts such a claim, the Debtors will retain the right to object to the economic value of such claim. From the Debtors' perspective, the ability to challenge the economic value of any such asserted claim is a critical aspect in terms of protecting estate value in the claims administration process. Moreover, all other parties-in-interest retain their rights to object to the allowance of any such claim under any grounds other than the fact that the claim is assertable under the Master Separation Agreement.

48.    The Debtors determined, with the assistance of their financial advisors, that they should accept GM's support of the IUE-CWA "check the box" option in exchange for the provision of the prepetition unsecured claim that GM may assert. Delphi believes that the "check the box" option is an important incentive for eligible employees to participate in the attrition program. Moreover, the "check the box" option was a necessary condition demanded by the IUE-CWA leadership in the course of reaching this agreement. Thus, GM's support in this regard is valuable and indispensable. (Id. ¶¶ 15-16.)

27

49.     The Objectors' specific legal arguments relating to the validity of the Debtors' agreement to allow (or acknowledge the source of) certain pre-petition, unsecured GM claims are equally without merit.

50.     Contrary to the UCC's Objection, the Motion does not seek authority to settle a pending dispute.  Rather, it seeks Court approval to establish a new program for Delphi's employees designed to serve the best interests of the Debtors' estates.  The buyouts under the program by themselves will result in a significant savings over time.  GM's contribution to the pool of funds that will finance the buyouts provide a substantial, additional benefit to the Debtors.

51.     The Debtors have not proposed, nor does the Motion purport to effect, a settlement of any dispute over GM's claims against the Debtors' estates generally.  Bankruptcy Rule 9019 does not apply here.  Even if it did apply, the Hourly Attrition Programs would fall above the lowest point in the "range of reasonableness."  In re W. T. Grant Co., 699 F.2d 599, 613 (2d Cir. 1983).  The attrition programs provide for an exchange of value that serves the best interests of the Debtors' estates.  Under the programs, GM will contribute new funds equal to half of the amount required to fund the buyouts.  GM has no existing or prior obligation to make these contributions; they constitute and infusion of new money into the Debtors' estates.  In exchange for its new funds, GM will receive only an allowed general unsecured prepetition claim.  Against Delphi, rather than the administrative claim that Delphi would incur from a DIP lender providing these funds.  Had Delphi and GM arrived at such an agreement in settlement of a dispute, these terms would easily satisfy the requirements of Bankruptcy Rule 9019.

52.     Furthermore, the terms provided to GM under the Special Attrition Programs are narrowly-tailored, reasonable, and preserve substantial rights for all parties-in-

28

interest to later challenge any claims that GM may assert related to the obligations which it has

agreed to assume under the Hourly Attrition Programs.  Paragraph 10 of the proposed Order

provides:

> 10.    For the avoidance of doubt, nothing in the Motion, the UAW Supplement, the IUE-CWA Special Attrition Program Agreement, this Court's approval of such agreements, the performance of any obligation thereunder, or any other document shall prejudice the right of any party-in-interest (including, without limitation, the Debtors, the Creditor's Committee, and the Equity Committee) to challenge the allowability, amount, or priority of any claims asserted by GM (including, without limitation, all defenses, objections, offsets, counterclaims, bases for disallowance, subordination or recharacterization, all avoidance rights under chapter 5 of the Bankruptcy Code, and all remedies with respect thereto), except that (i) GM's claims, if any, with respect to OPEB obligations assumed under paragraph 2 of the IUE-CWA Special Attrition Program Agreement or active health care and life insurance obligations assumed under paragraph 3.d. of the IUE-CWA Special Attrition Program Agreement shall not be subject to objection on the basis that the claims were not assertable under Delphi's general indemnity of GM under the Master Separation Agreement and (ii) GM's claims with respect to GM Buyout Payments are allowed as provided in paragraph 8 hereof and shall not be subject to any objection by any party for any reason. Notwithstanding the forgoing, neither Delphi nor any of the other Debtors may object on any grounds to the allowance of GM's claims, if any, with respect to OPEB obligations assumed under paragraph 2 of the IUE-CWA Special Attrition Program Agreement; provided, however, that all of the Debtors reserve the right to object to the economic value of such claims (in the nature of assumptions such as discount rate, health care trend rates, mortality, other withdrawal rates, and current and future expected benefit plan design changes).  Except as expressly provided above in this paragraph 10, GM's claims remain subject to defenses under the Master Separation Agreement or on any other ground.  GM may not assert any claim of any kind arising under or relating to the UAW Supplement or the IUE-CWA Special Attrition Program Agreement against any Debtor other than Delphi, and the foregoing exception shall not impair any right or remedy that may exist with respect to the enforceability of avoidability of any such agreement. Further, nothing in the Motion, the UAW Supplement, the IUE-CWA Special Attrition Program Agreement, this Court's approval of any such agreements, the performance of any obligation thereunder, or any other document shall prejudice any right or remedy of any Debtor against any other Debtor with respect to the allocation of Delphi's obligations under either of these agreements or claims asserted against Delphi thereunder, all of which rights are expressly preserved.

> 53.    The UAW Supplement and IUE-CWA Special Attrition Program

Agreement are the product of extensive negotiations among Delphi, GM,  UAW and the IUE-

CWA spanning multiple days of round-the-clock face-to-face meetings.  Importantly, the

Debtors could not have implemented such an attrition program on a stand-alone basis (i.e.,

without the cooperation and support of GM, UAW and IUE), nor do the Debtors have the ability

to force non-consensual reductions in workforce (outside of the section 1113 process).

Therefore, entry into a tripartite agreement with the GM and its unions was essential to the

Debtors' ability to enact these important plans.

    54.    The Appaloosa Group alleges that the Debtors cannot allow GM claims on

account of the Buyout Payments because section 502(e) of the Bankruptcy Code prohibits the

allowance of such claims at this time.  The Appaloosa Group has completely misundersood how

this program works and thus misapplies section 502(e) of the Bankruptcy Code.  Indeed, GM

does not get an allowed claim until it makes a payment on account of the buyout program, at

which time the claim will not be contingent.  Accordingly, section 502(e) does not apply to the

Buyout Payments.

    55.    The Appaloosa Group also alleges that pursuant to section 502(e) the

Debtors are prohibited from allowing GM claims on account of OPEB.  This argument is wholly

inapplicable.  The debtors are not allowing GM's assertable OPEB claims at this time, but merely

affording GM the right to assert a prepetition general unsecured claim under the general

indemnity under the Master Separation Agreement.  The explicit reservation of rights by the

Debtors to object to the economic value of the OPEB claims is affirmative evidence that such

claims are not allowed at this time.  See IUE-CWA Special Attrition Program ¶ 2.  In addition,

all other parties-in-interest retain their rights to object to such claims on any grounds other than

that they may be asserted under the general indemnity provision of the Master Separation

Agreement.  See id.  Consequently, section 502(e) of the Bankruptcy Code is in applicable and the Appaloosa Group's objection on this ground should be overruled.

56.     The alleged Section 502 violations are a red herring – objectors argue that because the buyouts are not yet funded that no claim can be allowed – that is not the case in financing orders approved by the Bankruptcy Court or adequate protection orders where future obligations will be occurred and not yet funded or a variety of other circumstances. Similarly, the assertion that some speculative future chapter 5 assertion against GM bars GM from transferring new value to the estate for an allowed claim that is subordinated in priority to what the Code would otherwise require turns Section 502(d) on its head. The buyout funding also does not constitute a claim for reimbursement or contribution; even it did, the claim here is limited to actual future funding.

57.     Finally, the Creditors' Committee requests that "the Court grant the Committee authority to prosecute on behalf of the Debtors any and all of the Debtors' Claims and Defenses and other rights that may reduce the amount or priority of, or otherwise eliminate, GM's claims to which the Debtors have waived objections under the Programs."  Committee Limited Objection at ¶ 33.  This request is, at best, premature.  The Committee has not established that the Debtors have colorable claims that would reduce the priority of or otherwise eliminate the GM claims at issue in this Motion, and, more importantly, the Committee has not established that pursuing such claims at this juncture – even if colorable – would "maximize the value of [the Debtors'] estate."  Committee Limited Objection at ¶ 31.  Indeed, the Debtors' have here exercised their business judgment to determine that allowance of certain GM claims in exchange for new value from GM's participation in the Programs *is* in the best interest of the

estate.  That is precisely the business judgment that the Court is evaluating under 11 U.S.C. §

363(b).

      2.      <u>Objections Regarding The Debtors' Business Judgment</u>

      58.    Whether directly or indirectly, the Objectors, while styling their objections

as "limited," are fundamentally questioning the Debtors' business judgment to agree with GM on

central aspects of the Hourly Attrition Programs.  As explained more fully above, the appropriate

standard for review of a debtor's motion to use estate property outside the ordinary course of

business is whether the debtor has provided, in good faith, a sound business reason as to why the

proposed use of estate property will aid in the debtor's reorganization.  Once such a showing is

made, an objecting party must overcome the substantial deference provided to a debtor's exercise

of its business judgment by demonstrating that the debtor's business judgment is so manifestly

unreasonable that it could not possibly be based upon sound business judgment.  The Debtors

respectfully assert that the Debtors have clearly met their burden under section 363(b) with

respect to the relief sought in the Motion, while neither the Appaloosa Group nor any other

objecting party has come forward with any evidence of "manifest unreasonableness."

      59.    As a threshold matter, the Debtors' business judgment here is entitled to a

deferential standard of review because the Debtors' management and Board engaged in a good

faith process of diligently studying the potential impacts of attrition programs.  Prior to filing the

Hourly Attrition Motion No. 1 (seeking authority to implement the UAW Special Attrition

Program), the Debtors carefully considered the cost of payments to eligible employees (to the

extent these costs are not borne by GM) and modeled net cash flow benefits and the reduction of

operating losses in comparison to the Company's projections under status quo assumptions over

the next five years (<u>i.e.</u>, in comparison with the "Steady State" projections).  It is worth

emphasizing that these various financial analyses[10] modeled the impact of hourly attrition

programs, at various hypothetical participation levels, for all of the Debtors' retirement-eligible

union workers and was not limited to analyzing the impact of potential attrition by eligible UAW

members.  Although the Debtors have since revised the Steady State projections to reflect actual

2006 results, the analysis performed in March 2006 that supported the implementation of hourly

attrition programs remains valid today and supports the Debtors' agreement with GM to offer

Delphi's IUE-CWA-represented employees attrition incentives similar to those already offered to

the UAW. (Sheehan Dec. ¶ 7.)

60.    As negotiations with the IUE-CWA ensued following this Court's

approval of the UAW Special Attrition Program, the Debtors' senior labor negotiators kept

Delphi's senior management team informed of the progress of those negotiations.  (Sheehan Dep.

Tr. 195:14-20.)  Each incremental feature of the Hourly Attrition Programs were vetted first by

Delphi's senior management team, and then presented to the Board for approval.  (Sheehan Dep.

Tr. 12:21 – 13:9.)  By the time that the Debtors moved this Court for authority to implement the

UAW Special Attrition Program, GM was not prepared to finance any portion of lump-sum

buyouts for Delphi's UAW-represented employees.  (Sheehan Dep. Tr. 232:20 – 233:5

(explaining that for this reason, "Delphi didn't go forward with the 70-140 at that time.").)  As

Delphi's chief labor negotiator testified, however, lump-sum buyouts have been analyzed and

discussed by the Debtors' management and Board as early as January or February 2006.  (Butler

Dep. Tr. 19:4-6.)  The Debtors studied GM's buyout experience and modeled the potential

impacts conservatively, based on doubling GM's participation rates.  (Id. 61:25 – 62:8.)  The

---

[10]    The financial analyses relating to the Debtors' business judgment were produced to objecting parties during
discovery prior to the April 7, 2006 hearing on the Hourly Attrition Programs Motion No. 1.

record thus reflects that all aspects of the Hourly Attrition Program received due consideration and analysis by the Debtors and Delphi's Board.

61.    The UAW Supplement and the IUE-CWA Special Attrition Program were discussed in detail during a special Board Meeting on June 2, 2006.  (Sheehan Dep. Tr. 17:12-18.)  Kevin Butler, Delphi's head of human resources and chief labor negotiator, reviewed the proposals for the Board from a labor perspective, and Robert Dellinger, Delphi's Chief Financial Officer, reviewed the proposals from a cost/benefit perspective.  (Sheehan Dep. Tr. 200:3-6.) The Board was supportive and believed that management was making good progress towards transforming the Debtors' workforce.  (Id. 204:20-24.)  The Board passed the programs – both the IUE-CWA Special Attrition Program and UAW Supplemental Program – unanimously.  (Id. 208:2-5.)

62.    Fundamentally, the Debtors have determined that, to reorganize successfully, they must "transform 100 percent of the non-competitive wage employees to competitive wage status."  (Butler Dep. Tr. 11:21 – 12:3.)  Delphi's Board recognizes this fact. (Sheehan Dep. Tr. 204: 7-10.)  This explains the fundamental purpose of the Motion, which is to provide additional soft landing opportunities, beyond the UAW Special Attrition Program previously authorized by this Court, to help further transform the Debtors' labor force.

63.    There is ample justification for Delphi's determination to enter into the Hourly Attrition Programs.  Implementation of the Hourly Attrition Programs constitutes a significant step to enable realignment of the Debtors' global product portfolio and manufacturing footprint.  Furthermore, hourly attrition programs, while representing only one element in the Debtors' overall effort to address the Debtors' current uncompetitive U.S. cost structure, evidences crucial progress in the Debtors' negotiations of a consensual resolution with three key

constituencies – GM, UAW and the IUE-CWA.  By providing a substantial number of Delphi's

employees with a "soft landing," implementation of the Hourly Attrition Programs directly

addresses the concerns of the Debtors' employees, customers, and other key constituent groups,

thereby providing distinct operational benefits.  Finally, because GM has agreed to shoulder a

significant portion of the obligations arising as a result of the UAW Supplement and IUE-CWA

Special Attrition Program Agreement, the Debtors' implementation of the Hourly Attrition

Programs will generate significant financial benefits, both by way of enhanced cash flow and

decreased operating losses over the five-year period from 2006 through 2010 versus the status

quo.

> 3. WTC's Objections Related To Potential Claims

64.    By its Objection, WTC once again alleges that potential obligations

undertaken by Delphi Corporation, and claims granted against Delphi Corporation, should be

borne by Affiliate Debtors.  This is the same objection that WTC made to the Debtors' motion

for authority to transfer its battery manufacturing facility in New Brunswick, New Jersey and

enter into an attrition plan with the IUE-CWA for its hourly employees at that facility.  See

Limited Objection Of Wilmington Trust Company, As Indenture Trustee, To Motion For Order

Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 2002 And 6004 Authorizing And Approving

Debtors' Entry Into Transfer Agreement With Johnson Controls, Inc. Providing For (A) Sale Of

Acquired Assets Free And Clear Of Liens, Claims, And Encumbrances (B) Continuation And

Transition Of Supply To Johnson Controls, Inc. Of Battery Products Out Of Fitzgerald Facility

And (C) Implementation Of Attrition Plan With Respect To New Brunswick Facility In

Accordance With IUE-CWA Memorandum (Docket No. 4098).

65.     WTC's Objection is premature and should be denied.  At the June 19, 2006 hearing on that motion, when presented with this issue, this Court posed the following question to counsel for the Debtors and WTC:  "Have you discussed the issue of reserving rights as to claims over in respect to the, you know, the inter-company claim issue that Wilmington Trust raises?"  See June 19, 2006 Tr. at 111:14-17.  After a short discussion on the record with counsel for both parties, this Court added:  "[I]t just strikes me that if you want to get into which of these debtors ultimately is legally responsible it should be done in a different setting than this."  See id. at 114:9-12.  Likewise here, WTC's objection is no reason to scuttle the substantial progress made between the Debtors, GM, and their unions in negotiating soft landings for a substantial number of high-wage employees.

66.     The Debtors further submit that the language contained in paragraph 10 of the proposed order obviates the need for WTC's Objection.  The proposed order is explicit:  "[N]othing in the Motion, the UAW Supplement, the IUE-CWA Special Attrition Program, [the] Court's approval of any such agreements, the performance of any obligation thereunder, or any other document shall prejudice the right or remedy of any Debtor against any other Debtor with respect to the allocation of Delphi's obligations under [the attrition plan] or claims asserted against Delphi thereunder, all of which rights are expressly preserved." (emphasis added).  Considering this Court's statements regarding the issue that WTC raises in its Objection, and further considering that the proposed order reserves WTC's rights with respect to the subject matter of its Objection, the Debtors submit that WTC has not raised an appropriate ground for this Court to deny the relief the Debtors have requested under 11 U.S.C. § 363(b).

<u>Conclusion</u>

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

overruling the Objections, (b) granting the Motion, and (c) granting the Debtors such other and

further relief as is just.

Dated: New York, New York
       June 28, 2006

                                      SKADDEN, ARPS, SLATE, MEAGHER
                                          & FLOM LLP

                                By:  /s/ John Wm. Butler, Jr.
                                      John Wm. Butler, Jr. (JB 4711)
                                      David E. Springer (DS 9331)
                                      John K. Lyons (JL 4951)
                                      Ron E. Meisler (RM 3026)
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois  60606
                                (312) 407-0700

                                - and -

                                By:  /s/ Kayalyn A. Marafioti
                                      Kayalyn A. Marafioti (KM 9632)
                                      Thomas J. Matz (TM 5986)
                                Four Times Square
                                New York, New York  10036
                                (212) 735-3000

                                Attorneys for Delphi Corporation, <u>et al.,</u>
                                  Debtors and Debtors-in-Possession