**Hearing Date and Time: July 19, 2006 at 10:00 a.m.**
**Objection Deadline: July 12, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :
      In re                :    Chapter 11
                           :
DELPHI CORPORATION, et al.,  :    Case No. 05-44481 (RDD)
                           :
                           :    (Jointly Administered)
            Debtors.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER
UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004 AUTHORIZING
THE DEBTORS TO ENTER INTO AN AGREEMENT WITH A.T. KEARNEY, INC.

("A.T. KEARNEY AGREEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 authorizing, but not directing, the Debtors to enter into and perform under an agreement with A.T. Kearney, Inc. ("A.T. Kearney") to provide ongoing support for the Debtors' restructuring of certain costs and analysis of certain executory contracts.  In support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in the Debtors' cases.  On April 28, 2006, the Office of the United States Trustee appointed an official committee of equity holders.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 363(b) of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion.  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers

3

and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.      The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

4

D.      The Debtors' Transformation Plan

11.      On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

12.      In connection with the first two elements of the Company's transformation

plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those

discussions, Delphi has consistently communicated a clear message to both its hourly workforce

and GM: Delphi is committed to finding a consensual resolution to its issues and intends to

continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S.

operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a

tripartite agreement providing for a special hourly attrition program for Delphi's UAW-

represented employees.  This special hourly attrition program could provide as many as 18,000

of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings"

through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

13.    These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits.   Contemporaneously therewith, the Debtors also moved to reject unprofitable supply contracts with GM.   Among the reasons for the GM contract rejection motion was the Debtors' belief that GM must cover a greater portion of the costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This initial motion covers approximately half of the Debtors' North American annual purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the filing of these motions was a necessary procedural step, the Debtors remain focused on reaching a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is necessary.

14.    To implement the third element of the Debtors' transformation plan, the Company announced plans to focus its product portfolio on those core technologies for which the Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth.   To that end, the Company will concentrate the organization around the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture

(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)

Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics),

and (f) Thermal (Climate Control & Powertrain Cooling).

15.    In contrast, the Company similarly identified certain non-core product

lines that do not fit into its future strategic framework, including Brake & Chassis Systems,

Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering,

and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines

(which will include approximately one-third of its global manufacturing sites) and will consult

with its customers, unions, and other stakeholders to carefully manage the transition of such

affected product lines.  The Company intends to sell or wind down the non-core product lines

and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the

Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as

many as 8,500 employees as a result of portfolio and product rationalizations and initiatives

adopted following an analysis of the Company's selling, general, and administration ("SG&A")

cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented,

the Company should realize savings of approximately $450 million per year in addition to

savings realized from competitive measures planned for its core businesses and the disposition of

non-core assets.

17.    As noted above, the final key tenet of the transformation plan is to devise

a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the

benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors'

hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current

hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension

plan as of January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will

also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation,

the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize

funding contributions over a long-term period.  The Company intends to replace the hourly plan

(for certain employees) and the salaried plan with defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

Relief Requested

19.    By this Motion, the Debtors seek entry of an order under section 363(b) of

the Bankruptcy Code and Bankruptcy Rule 6004 authorizing, but not directing, the Debtors to

enter into and perform under an agreement to be executed with A.T. Kearney substantially in the

form of the proposal attached hereto as Exhibit A (the "Proposal"), which provides for the

restructuring of various costs including, without limitation, the review and analysis of certain

executory contracts.

Basis For Relief

20.    As part of the execution of their transformation through the chapter 11

process, the Debtors are reviewing a substantial portion of their executory contracts covering the

purchase of items required to sustain the Company's operations – known as the Company's

8

"indirect spend."  Indirect spend includes items related to maintenance, repair, and operation

("MRO") as well as support services that do not contribute directly to revenue generating

products or services.  As set forth in the Proposal, A.T. Kearney suggests that the Debtors can

significantly reduce their total indirect spend in North America through strategic sourcing,

outsourcing, and demand management, combined with the use, where appropriate, of the

authority that can be granted under section 365 of the Bankruptcy Code to reject executory

contracts and unexpired leases.  A.T. Kearney will assist the Debtors in identifying executory

contracts and realizing savings where (i) market conditions have changed since the applicable

contract was executed (e.g., the executory contract is above market in the face of declining

prices), (ii) the Debtors' spending is fragmented and consolidated purchasing will reduce price

and increase the Debtors' buying power, and (iii) business requirements have changed and the

goods and services in question are no longer needed or are needed in reduced quantities.[1]

Pursuant to the services provided under A.T. Kearney's Proposal the Debtors are estimated to

achieve $30 million to $60 million in annual savings.

21.    A.T. Kearney's Proposal is divided into two parallel phases:  Phase 1A,

which includes implementation of strategic sourcing with respect to $700 million in indirect

spend and is anticipated to generate all the savings under this proposal, and Phase 1B, which will

identify projects and savings opportunities with respect to another $2.3 billion in indirect spend.[2]

---

[1]    Notwithstanding anything to the contrary in the attached Proposal, the services to be performed by A.T.
Kearney will not include review or implementation of strategic sourcing with respect to contracts that are
exclusively related to operations that are targeted for sale.

[2]    Phases 1A and 1B will be preceded by "Phase 0," which will involve data collection and organization to be
completed by Delphi personnel.  A.T. Kearney will provide recommended templates and coaching, but Delphi
will be responsible for collecting indirect spend data and contracts, organizing such data and contracts into
categories, and centralizing such data and contracts electronically.

22.    Specifically, in Phase 1A, A.T. Kearney will immediately begin strategically sourcing $700 million of the Debtors' North American indirect spend.  This phase will cover certain categories[3] with a high potential for savings, specifically those categories:  (i) with a large amount of spending (i.e., greater than $10 million per item of indirect spend); (ii) which contain few sub-categories; and (iii) with a high proportion of spending under contract. The Debtors retain the right, in their sole discretion, to direct A.T. Kearney as to which categories, sub-categories, and contracts will be included in the $700 million of indirect spend to be strategically sourced under this phase.  Phase 1A is expected to last up to 24 weeks and will address indirect spend across 12 categories.  As mentioned above, A.T. Kearney estimates that Phase 1A will deliver $30 million to $60 million in annual savings, which will be partially realized in 2006 and fully realized in 2007.  To capture these savings, A.T. Kearney and the Debtors will use a portfolio of strategic sourcing solutions, including but not limited to the use of sourcing solutions proprietary to A.T. Kearney, online resources for procurement and auctions, analysis of supplier relationships, outsourcing, and supply chain collaboration.

23.    Phase 1B will run concurrently with Phase 1A but is anticipated to last only 12 weeks.  In this phase, A.T. Kearney will identify opportunities for savings using its strategic sourcing solutions with respect to contracts comprising $2.3 billion in the Debtors' North American indirect spend and A.T. Kearney will analyze, prioritize, and develop strategies for these contracts.  The Debtors retain the right, in their sole discretion, to direct A.T. Kearney as to which categories, sub-categories, and contracts will be included in the review under this phase.

---

[3]    These categories are grouped into the following "high level buckets:"  industrial supplies (e.g., MRO services); corporate services (e.g., media); facilities services (e.g., site services, property leasing); machinery and equipment; and transportation and logistics.

24.     This contractual review process for Phase 1B will consist of two primary activities:  (i) contract review and analysis and (ii) functional workshops.  First, all North American contract information will be collected, organized, and analyzed for preliminary prioritization.  A.T. Kearney will assess market condition changes, business needs changes, and financial implications.[4]  The contract review and analysis will in turn serve as input into the functional workshops where the Debtors will review the analysis and options and determine the strategy and disposition for the contracts.  Subsequent phases, which are not included in the scope of the agreement between the Debtors and A.T. Kearney, would execute the sourcing strategies identified in Phase 1B as well as potentially expand the scope beyond North America. The Debtors and A.T. Kearney estimate that the execution of those strategies in subsequent phases could realize an estimated annual savings of $80 million to $150 million in addition to the Phase 1A savings, and even more if the scope of those subsequent phases is expanded to include global indirect spend.[5]

25.     To manage the indirect spend review, the Debtors and A.T. Kearney will establish a program management office to be run by Delphi's Director of Purchasing and A.T. Kearney's principal consultant on the engagement.  The program management office will report to an executive steering committee (the "Executive Steering Committee"), which will include, among others, Delphi's Chief Financial Officer, General Director of Purchasing, and General Counsel in addition to the two persons overseeing the program management office.  The

---

[4]     The Debtors previously entered into an agreement with Booz Allen Hamilton Inc. ("Booz Allen") to perform certain services related to the restructuring of Delphi's SG&A expenses and organization transformation.  The Debtors will ensure that there will be no redundancy between the services provided by Booz Allen and those performed by A.T. Kearney.

[5]     If the Debtors seek to engage A.T. Kearney further for those subsequent phases which are not covered in the scope of the agreement that is the subject of this Motion, then the Debtors will file an additional motion to seek this Court's approval and authorization of such further engagement of A.T. Kearney.

Executive Steering Committee is essential to ensuring that the project is completed on time and

that the necessary organizational support is in place to enable successful implementation.  Most

importantly, the Executive Steering Committee will be asked to approve the recommendations of

the project team and ensure organizational alignment behind these recommendations.

<u>Terms Of Agreement</u>

26.    The Debtors anticipate that the agreement to be executed will be

substantially in the form of the attached Proposal, with certain clarifications consistent with the

descriptions contained in this Motion.  To the extent that there are material changes to the terms

and conditions of the Proposal that are adverse to Delphi in comparison to those contained in the

attached, the Debtors will serve the revised agreement (blacklined against the Proposal) on or

prior to the fifth calendar day before the applicable omnibus hearing on the parties-in-interest

who were served this Motion and those recipients will have until the second calendar day prior to

the applicable omnibus hearing date to file and serve any objection to the revised agreement.

27.    Subject to the Court's approval the Debtors would agree to pay A.T.

Kearney as follows:

(a)    <u>Fixed Fee:</u>  A fee of $3,900,000, including expenses, due in six monthly
installments.  The first five fee payments would be in the amount of
$700,000.  The sixth and final fee payment would be in the amount of
$400,000.

(b)    <u>Contingent Fee:</u> The Debtors would pay A.T. Kearney $300,000 if the
project team recommends, and the Executive Steering Committee
approves, recommendations totaling at least $30 million in annualized
savings.  In addition to a contingent payment of $300,000, the Debtors
would pay A.T. Kearney $200,000 if the project team recommends, and
the Executive Steering Committee approves, recommendations totaling at
least $45 million in annualized savings.  Any contingent payments earned
would be due as part of the sixth and final monthly invoice.

12

28.     The Debtors and A.T. Kearney have bargained in good faith to arrive at the terms and conditions of the Proposal, as is evidenced, in part, by the fact that the Debtors were able to reduce the requested fixed fee amount by nearly 20%, a portion of which is now included as a contingent fee.  Moreover, A.T. Kearney has decades of experience with large-scale procurement management with a global scope, automotive companies worldwide, broad sourcing experience, and in-depth bankruptcy and restructuring expertise.  Thus, the Debtors submit that A.T. Kearney has the expertise, skills, and tools to help Delphi maximize benefits from the indirect spend review program.

29.     In the exercise of their business judgment, the Debtors believe that the savings and organizational efficiency to be achieved through the work of A.T. Kearney and Delphi will maximize the recovery for all stakeholders and therefore the proposed agreement with A.T. Kearney is in the best interests of the Debtors' estates and the relief sought herein should be approved.

<u>Applicable Authority</u>

30.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  <u>See</u> <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

31.     The Second Circuit has held that, while the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

13

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Orion Pictures, 4 F.3d at 1098-99.

32.    Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  Id.   To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections."  Lionel, 722 F.2d at 1071.

33.    As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'"  In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

34.    The Debtors submit that entering into an agreement with A.T. Kearney  in accordance with the terms described above reflects a sound use of the Debtors' business judgment.  As part of its transformation plan and restructuring strategy, Delphi is committed to realizing indirect spend cost saving opportunities.  The Debtors anticipate that by working with

A.T. Kearney to streamline their organization and reduce indirect spend, the Debtors will achieve up to $30 to $60 million in projected savings.  Moreover, the resulting structure will allow the Debtors to operate more efficiently and effectively going forward, which will benefit all of the Debtors' stakeholders.

Notice Of Motion

35.     Notice of this Motion has been provided in accordance with the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

36.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing, but not directing, the Debtors to enter into and perform under an agreement with A.T. Kearney to provide ongoing support for the Debtors and (b) granting the Debtors such other and further relief as is just.

Dated:          New York, New York
                June 29, 2006

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                     & FLOM LLP

                                    By:    /s/ John Wm. Butler, Jr.
                                           John Wm. Butler, Jr. (JB 4711)
                                           John K. Lyons (JL 4951)
                                           Ron E. Meisler (RM 3026)
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois 60606
                                    (312) 407-0700

                                                - and -

                                    By:    /s/ Kayalyn A. Marafioti
                                           Kayalyn A. Marafioti (KM 9632)
                                           Thomas J. Matz (TM 5986)
                                    Four Times Square
                                    New York, New York 10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                      Debtors and Debtors-in-Possession

16

**Exhibit A**
**<u>Proposal</u>**



*A.T. Kearney, Inc.*
*2000 Town Center, Suite 1600*
*Southfield, Michigan 48075*
*1 248 354 2226*
*1 248 204 9100 Fax*

April 27, 2006


Mr. Jonathan Stegner
General Director
Delphi Corporation
5825 Delphi Drive
Troy, MI 48098-2815


RE: Letter Agreement for "Indirect Material Cost Reduction: Strategic Sourcing and Contract Review" Initiative


Dear Mr. Stegner:

We are pleased to submit this letter agreement to support Delphi in indirect material cost reduction through a comprehensive Strategic Sourcing and Contract Review process. Delphi has the opportunity to realize substantial savings across the estimated $3.7 billion of indirect spend.

In the spring of 2005, A.T. Kearney was asked to perform an assessment of the indirect material cost reduction opportunity at Delphi. Based on that assessment, and our experience in driving comprehensive Indirect Strategic Sourcing and Executory Contract Reviews for other clients, A.T. Kearney estimates there is an annual savings opportunity of $150 to $225 million globally.

This proposal is focused on Delphi's North American operations, and is divided into two parallel phases. In Phase 1A (the "Fast Track" Phase), we will immediately begin sourcing of $700 million in spend that offers a high potential for savings. The Fast Track Phase will deliver between $30 and $60 million in annual savings, with some of the savings realized in the latter part of 2006. In Phase 1B we will analyze, prioritize and develop category specific strategies for an additional $2.3 billion of North American indirect spend. Subsequent phases (not included in the scope of this agreement) will execute the sourcing strategies identified in Phase 1B, as well as potentially expend the scope beyond North America.

A.T. Kearney is a leader in providing indirect material and services sourcing, and we consistently deliver savings comparable to those we are targeting at Delphi. Delphi is a key client for A.T. Kearney and we hope to use this project to build on the relationship and position A.T. Kearney to help Delphi with other improvement opportunities. To that end, I personally will be committed to bring the strength of my firm to bear to help deliver these savings. We value Delphi as a client and we appreciate the opportunity to work with you on this important initiative.

Page 2

This proposal addresses the following areas for each of the two main phases (1A and 1B):
- Objectives and Scope
- Project Approach, Deliverables and Timing
- Project Management and Governance
- Fees and Expenses

**Indirect Material Cost Reduction: Strategic Sourcing and Contract Review Initiative**

**Objectives and Scope**

The objective of the Indirect Material Cost Reduction initiative is to identify, prioritize and deliver indirect cost savings. The initiative will cover over 40 categories within Delphi's North American operations, addressing annual spend of $3.0 billion out of a total North American spend of $3.3 billion (See Figure 1).

A.T. Kearney will work in concert with Delphi to accelerate strategic sourcing and contract review to realize the saving based on a two phase plan (See Figure 2). In Phase 1A, the identified twelve "Fast Track" categories will move directly to strategy development and contract negotiations and implementation. These identified categories have a large indirect spend and a high potential for savings. Within the first 2-4 weeks of the project, Delphi and A.T. Kearney may mutually choose to modify the commodities in scope for in the Fast Track Phase. In Phase 1B, we will perform a contract review, prioritization and strategy development for many of the functional specific categories and the medium potential categories. These categories will be reviewed to identify specific follow-on cost reduction projects, such as contract renegotiation, strategic sourcing, outsourcing, etc.

Page 3

## Figure 1.  North American Spend and Major Categories

**Cost Reduction Estimated Project Scope ($ Billions)**   `Preliminary Recommendation`

| | Industrial Supplies | Facilities Services | Corporate Services | IT | Machinery & Equipment | Transportation & Logistics | Engineering Prototypes |
|---|---|---|---|---|---|---|---|
| **Phase 1A:** Scope: 12 Categories; $0.7 billion <br> **Phase 1A Criteria** <br> • Spend >$10 million <br> • Few sub-categories (low fragmentation) <br> • High proportion of spend under contract | • MRO Services / Management Fees ($0.12) <br> • Car Fleet (TBC) | • Site Services ($0.10)[4] <br> • Prop. Leases ($0.03) | • Temp Labor ($0.14)[5] <br> • Outsourced Services ($0.07) <br> • Eng. Services ($0.07)[6] <br> • Media ($0.03) | | • Handling Equip ($0.03) | • Warehousing ($0.06) [1] <br> • Packaging ($0.05) [1] <br> • Corp Jets (TBC) | |
| | $0.12 | $0.13 | $0.31 | $0 | $0.03 | $0.11 | $0 |
| **Phase 1B:** Scope: 29 Categories; $2.0 billion <br> **Phase 1B Criteria** <br> • Highly fragmented spend – many plants, suppliers or sub-categories <br> • Lower proportion of spend under contract <br> • May be addressed by other corporate initiatives (e.g., Healthcare) | • MRO Parts ($0.31) <br> • Perishable Tools ($0.15) <br> • Ind. Gases ($0.04) <br> • Durable Tools ($0.04) <br> • Welding Cons. ($0.02) <br> • Fixtures ($0.01) <br> • Chemicals (TBC) | • Utilities ($0.07) <br> • Construction ($0.05) | • Healthcare ($0.76) [3] <br> • Travel & Ent. ($0.08) <br> • Legal ($0.04) <br> • Other Mktg ($0.04)[7] <br> • Mailroom ($0.03) <br> • Others ($0.03)[8] <br> • Risk Mgmt ($0.02) <br> • HR ($0.02) <br> • Relocation Srvs ($0.01) <br> • Financial Srvs ($0.01) | | • Mfg Equip. ($0.22) <br> • Lab Equip. ($0.02) <br> • Assembly Equip./ Tooling & Fixtures ($0.01) | • Freight ($0.13) <br> • Truck & Trailer/ Rail/ Ocean ($0.02) <br> • Air ($0.01) | • Prototype Parts (TBC) <br> • Prototype Tools (TBC) <br> • Prototype Testing (TBC) <br> • Engineering Vehicles (TBC) |
| | $0.57 | $0.12 | $1.01 | $0 | $0.25 | $0.16 | $0.34 |
| **Out of Scope** $0.3 billion addressed by other Delphi initiatives | | | • Office Sup. (TBC) <br> • Office Equip. (TBC) | • Telecom ($0.05) <br> • Hardware ($0.03) <br> • Software ($0.03) <br> • IT Services ($0.17) | | | |
| | | | $TBD | $0.25 | | | |

**All contracts will be reviewed by the end of Phase 1A (24 weeks)**

Note:  (1)  Packaging and Warehousing spend estimated in interviews February 23, 2005, additional to IMAC data
(2)  Healthcare spend estimated based on public information in addition to IMAC; Spend may change as number of employees covered is adjusted over time
(3)  Includes Benefits, Retirement, Worker's Compensation, and Income Protection
(4)  Delphi interview estimate at $0.06 B, excluding employee wages
(5)  Includes Delphi estimated ~$0.10 B in unclassified temp labor spend
(6)  Delphi interview estimate at $0.05 B
(7)  e.g., branding, public relations, and event marketing
Source: January 2005 IMAC Discussion, Delphi Management interviews, A.T. Kearney analysis

Support of these parallel activities (Phases 1A and 1B) will be accomplished through a combination of Delphi's Indirect Global Supply Management Team and A. T. Kearney resources.  A.T. Kearney resources will lead the Strategic Sourcing and Executory Contract Review process addressing over 90% of the indirect spend within North American operations.

Our intent is to include the spend of operations that may be for sale, as long as the sale is not imminent with an agreed to price.  Any indirect material savings should be represented as having direct bottom line impact to potential buyers and, as such, should bring the corresponding multiple in additional value

Page 4

### Project Approach, Deliverables and Timing

The project approach begins with a Phase 0 data collection process. Working with Delphi, we will leverage the data that has already been collected. Where gaps exist we will collect the necessary data for both the indirect material sourcing and the contract review work streams. Based on a preliminary review, it appears that we can leverage the purchasing and financial systems to obtain the necessary sourcing data. Information relative to non purchasing contracts as well as financial and usage data for all contracts will likely need to be obtained from the contract owners. A.T. Kearney will coordinate the data collection process – however to insure timely realization of savings it is critical that Delphi supports the process and response timely to data requests.

Upon completion of the data collection phase, the project approach will be based on two parallel activities. Phase 1A, Fast Track, and Phase 1B, Contract Review and Prioritization, will both last twenty four weeks, however some categories will be complete and begin delivering savings in as early as twelve weeks. Figure 2 outlines the data collection phase as well as Phase 1A & 1B (Phase 2 and 3 are not included under this agreement).

**Figure 2. Approach and Associated Timing**

**Recommended Approach**



Note: (1) Timing dependent on category complexity

Page 5

## Phase 1A: Fast Track Contract Negotiations and Implementation

Delphi and A.T. Kearney have jointly defined the twelve "Fast Track" commodities in Phase 1A that will address approximately $0.7 billion in North American annual spend and will yield annual savings of $30 to $60 million. The Phase 1A savings will be partially realized in 2006 and fully realized in 2007. To capture these savings, the joint A.T. Kearney and Delphi teams will utilize a portfolio of Strategic Sourcing solutions, which maximize savings while minimizing time-to-benefits (See Figure 3)

### Figure 3. A.T. Kearney's Portfolio of Strategic Sourcing Solutions



## Phase 1B: Contract Review and Prioritization

In parallel, Phase 1B will be launched to address much of the remaining North American spend of approximately $2.3 billion. Phase 1B will identify additional projects and savings opportunities with an estimated annual savings of $80 to $150 million, which will be delivered in future Phases 2 and 3. Savings could be even higher if the scope of Phases 2 and 3 is expanded to include global spend.

**Page 6**

The contract review process will consist of two primary activities: 1) Contract Review and Analysis; and 2) Functional Workshops. First, all North American contract information will be collected, organized, and analyzed for preliminary prioritization (we will leverage the contract information already collected). As part of this analysis we will assess market condition changes, business needs changes, and financial implications. This will serve as input into the Functional Workshops where the contract stakeholders will review the analysis and options, and determine the strategy and disposition for the contracts. See Figure 4.

**Figure 4. A.T. Kearney's Contract Review and Prioritization**



**Contract Reviews Activities**
- Conduct pre-workshop reviews of all relevant contracts:
    — Develop summaries for each contract
    — Assign contacts to categories based on function or procurement code
    — Analyze financial implications to determine prioritization
    — Upload contract information into databases
    — Coordinate with function/contract owner to resolve discrepancies and missing information
- Develop preliminary priority and potential alternatives by category type

Page 7

**Functional Workshops Activities**
- Use Contract review output to prepare for workshop
  — Frame potential alternatives
  — Schedule subsequent workshops
- Conduct workshops in all functions and business units
  — Evaluate alternative strategies by contract type
    – Develop preliminary disposition
    – Establish action plan to validate and implement strategy

**Project Management, Governance and Reporting**

Doug Harvey will be responsible for the overall project. He will be supported by an experienced project leader that will drive the overall day-to-day activities. This project leadership will be actively involved in driving the deliverables and savings attainment in each of the identified "Fast Track" categories in Phase 1A and Contract Review and Prioritization of the categories in Phase 1B.

The project reporting process will be supported by a Project Management team and a Project Management Office (PMO). The role of the PMO should not be underestimated - throughout this project there will be a significant amount of project coordination and information management both within this project and across other ongoing Delphi projects. We will leverage A.T. Kearney's significant know-how and tools to ensure the project is executed smoothly. Each sub-team will generate a one-page weekly status report that will used by the Project Management team and the PMO. These reports will be used as a basis for weekly reviews and calls led by the Project Management team which will be used to review status, share information, and provide guidance to the teams, as required.

Each team will consist of 1-2 fulltime A.T. Kearney consultants working with the Delphi team members to drive the deliverables for that team. We will also leverage A.T. Kearney's subject matter experts (SMEs) with category specific expertise. In total, we will have twelve full time resources on the project along with many SMEs that we be engaged as needed throughout the project. The teams will report out on a regular basis (presumably monthly) to the Executive Steering Committee.

The role of the Executive Steering Committee is essential to insure that the project is completed on time and that the necessary organizational support is in place to enable successful implementation. Specifically, the Executive Steering Committee will insure that the appropriate resources are assigned to the project and that any requests from the project team are given sufficient priority within the organization to insure timely response. Most importantly, the Executive Steering Committee will be asked to approve the recommendations of the project team and insure organizational alignment behind these recommendations. The recommendations will include the over-all strategy by category and the associated resource/cost requirements, savings and implementation timing. The project organizational structure is depicted in Figure 5.

Page 8

**Figure 5.  Project Management and Governance Structure**



It is essential that each team include the appropriate Delphi representatives to insure the right Delphi specific solutions are developed.  We will also facilitate a knowledge transfer of A.T. Kearney's "best in class" Strategic Sourcing tools by providing both formal and hands-on training for the Delphi team members.

Page 9

**Fees and Expenses**

A.T. Kearney is proposing a combined fixed fee and contingent fee engagement. The fixed fee and expenses component of this engagement will be $3,900,000. This fee is at a reduced rate as compared to previous engagements at Delphi and our other key clients. Delphi will pay A.T. Kearney an additional $300,000 if the project team recommends, and the Executive Steering Committee approves, recommendations totaling at least $30 million in annualized savings. In addition to this $300,000 contingent payment, Delphi will pay A.T. Kearney $200,000 if the project team recommends, and the Executive Steering Committee approves, recommendations totaling at least $45 million in annualized savings. After the initial month of the engagement, we will submit five monthly invoices to Delphi for $700,000 each. The sixth and final invoice will include the $400,000 fixed fee remaining balance and any contingent payment that has been earned. A.T. Kearney anticipates payment to be made within 30 days of invoicing, which is consistent with our previous engagements with Delphi's management team.

Your signature on this document indicates agreement to the terms of this letter and to the attached "General Terms and Conditions" (See Attachment 1).

A.T. Kearney understands the importance of these cost reduction initiatives. We appreciate the opportunity to work with you and the Delphi Team and we looking forward to starting this project as soon as possible.

Sincerely,

Doug Harvey

Vice President

Accepted_____
Mr. Jonathan Stegner
General Director

Date_____

## A.T. KEARNEY, INC.
### *GENERAL TERMS AND CONDITIONS*

These General Terms and Conditions relate to the Letter dated April 27, 2006 (the "Letter") from AT. Kearney, Inc. ("Consultant") to Delphi Corporation ("Client").

The Letter, together with these General Terms and Conditions (collectively, the "Terms of Engagement"), constitute the full, final and entire agreement of Consultant and Client relating to the services referred to in the Letter (the "Services").  The Terms of Engagement shall control over any provisions contained in any correspondence, request for proposal, prior proposal, purchase order or other document of Consultant and/or Client and any oral statements or representations of Consultant and/or Client.   No modification or waiver of the Terms of Engagement shall be effective against either Consultant or Client unless it expressly agrees to such modification or waiver in a written agreement signed by its authorized signatory.   The Terms of Engagement may not be assigned by either party without the prior written consent of the other.

Client's signed acceptance of the Letter or the commencement of performance of the Services at the request of Client, whichever occurs earlier, shall constitute Client's acceptance of the Terms of Engagement.

**1.    CONSULTANT'S RESPONSIBILITIES**.   Consultant shall perform the Services utilizing the standards of care normally and customarily exercised by professional consulting firms in performing comparable services under similar conditions.  Consultant shall be entitled to rely, without verification or investigation, upon any information and materials that (a) may be provided or made available by or through Client or its affiliates or (b) may be obtained from any generally accepted source.

**2.    DELIVERABLES**.  Subject to payment of Consultant's fees and expenses in connection with the Services and subject to the provisions of Paragraphs 3 and 4 below, all information, materials, reports, and other work product that Consultant creates, develops, and delivers to Client for Client's exclusive use as part of the Services ("Deliverables") shall be the property of Client and shall be treated by Consultant as Client's Confidential Materials.  Consultant shall be permitted to retain copies of the Deliverables for archival purposes.   The Services and Deliverables are personal to Client and intended solely for the internal use of Client.  No person or entity other than Client may use or rely upon the Deliverables, the Services or any recommendations that Consultant may make.   Client shall reimburse, indemnify and hold harmless Consultant for, from and against losses, damages, liabilities, suits and claims (and costs and expenses in connection therewith, including reasonable attorneys fees and other investigation and defense costs) to the extent such losses, damages, liabilities, suits and claims arise out of or are  caused by (a) any use of or reliance upon the Deliverables, the Services or Consultant's recommendations by a third party, or (b) any use of or reliance upon the Deliverables, the Services or Consultant's recommendations by Client in any manner other than for Client's internal use.

3.    **INTELLECTUAL CAPITAL**.    All methodologies, procedures, management tools, workshops, manuals, software, data files, work papers, concepts, ideas, inventions, know-how and other intellectual capital that Consultant has heretofore created or acquired or may hereafter create or acquire, while performing the Services or otherwise ("Intellectual Capital"), are and shall be the exclusive property of Consultant.  Before using, for any person or entity other than Client, any Intellectual Capital created or acquired while performing the Services, Consultant shall first purge any information or materials that were furnished to Consultant by Client and constitute Client's Confidential Materials subject to the provisions of Paragraph 5 below.  Except as provided in Paragraph 4 below, Client shall not have or acquire any title or interest in or to any Intellectual Capital.

4.    **LICENSE TO INTELLECTUAL CAPITAL**.    Subject to payment of Consultant's fees and expenses in connection with the Services, Client shall have an irrevocable perpetual, non-exclusive right and license to use, reproduce, display and prepare derivative works based upon Intellectual Capital that is contained or incorporated in the Deliverables or is otherwise provided by Consultant to Client for its use in connection with the Deliverables.  Except as specifically authorized in writing by Consultant, however, Client may not use, reproduce, or display such Intellectual Capital or prepare such derivative works for the benefit of any person or entity other than Client.

5.    **CONFIDENTIAL MATERIALS**.    In connection with the performance of the Services, a party (the "receiving party") may be provided or granted access to information and materials of the other party (the "disclosing party"), including information and materials of third parties that are in the possession of the disclosing party, that are considered to be confidential or proprietary (collectively "Confidential Materials").  The receiving party may not disclose or make available any of disclosing party's Confidential Materials to any other person or entity or make use of any of disclosing party's Confidential Materials for any purpose except: (a) as specifically authorized in writing by the disclosing party; (b) the receiving party may disclose and make available disclosing party's Confidential Materials, on a confidential and restricted basis, to its employees, associated consultants and subcontractors who have a reasonable need to know or have access to such information and materials in connection with the Services; and (c) the receiving party may use the disclosing party's Confidential Materials for any proper purpose related to the Services.

6.    **EXCEPTIONS TO CONFIDENTIALITY OBLIGATIONS**.

(a)    The provisions of Paragraph 5 shall not apply to any information or materials that (i) are already lawfully known to or in the possession of the receiving party at the time such information or materials are first disclosed or made available to the receiving party by the disclosing party, (ii) are hereafter lawfully obtained by the receiving party from a person other than the disclosing party, (iii) are in the public domain or generally known in the relevant trade, industry or business at the time such information or material are first disclosed or made available to the receiving party or thereafter come into the public domain or become generally known in the relevant trade, industry or business other than by reason of an improper disclosure or use of the same by the receiving party, or (iv) are independently developed or otherwise lawfully obtained by the receiving party independent of, and without reference to, the Services.

(b)      Each party may disclose (without prior notification, or approval or consent by, the other party), to taxing authorities and/or to such party's representatives, outside counsel and advisors, any Confidential Materials that are required to be disclosed in connection with such party's tax filings, reports, claims, audits, and litigation.

(c)      In addition, the receiving party may disclose and make available the other party's Confidential Materials to the extent required to comply with any law, rule or regulation or any subpoena, order or directive of any court or governmental agency or body; *provided, however*, that the receiving party shall use reasonable efforts to give the disclosing party prior notice of any such disclosure for the purpose of enabling the disclosing party to obtain a protective order.

**7.      DISCLAIMER OF WARRANTY**.      CONSULTANT MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING ANY MATTER INCLUDING THE MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR USE OR PURPOSE, OR RESULTS TO BE DERIVED FROM THE USE OF ANY MATERIALS, DELIVERABLES OR SERVICES PROVIDED UNDER THESE TERMS OF ENGAGEMENT.  CONSULTANT DOES NOT GUARANTEE THAT ANY RECOMMENDATIONS MAY BE IMPLEMENTED AT THE COST OR WITH THE RESULTS THAT CONSULTANT MAY ESTIMATE OR PROJECT OR THAT ANY WORK PRODUCT OR DELIVERABLE WILL BE ERROR FREE.

**8.      LIMITATIONS ON LIABILITY**.  IN NO EVENT SHALL EITHER CONSULTANT OR CLIENT BE LIABLE FOR ANY INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR CONSEQUENTIAL DAMAGES WHATSOEVER (INCLUDING DAMAGES FOR LOST PROFITS, INCOME OR SAVINGS, OR INTERRUPTION OF BUSINESS) THAT MAY BE SUFFERED OR INCURRED BY THE OTHER PARTY OR ANY PERSON OR ENTITY AFFILIATED OR ASSOCIATED WITH THE OTHER PARTY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  IN ADDITION, THE LIABILITY OF CONSULTANT FOR LOSSES, DAMAGES, LIABILITIES, SUITS AND CLAIMS ARISING OUT OF OR RELATED TO THESE TERMS OF ENGAGEMENT, REGARDLESS OF THE FORM OF ACTION AND THE PERSON OR ENTITY BRINGING SUCH ACTION, SHALL NOT EXCEED, IN THE AGGREGATE, THE TOTAL AMOUNT OF THE FEES PAID (EXCLUDING PAYMENTS FOR TAXES AND EXPENSES) BY CLIENT TO CONSULTANT FOR THE SERVICES PERFORMED UNDER THESE TERMS OF ENGAGEMENT. THE LIMITATIONS ON LIABILITY SET FORTH IN THIS PARAGRAPH 8 SHALL NOT APPLY TO A BREACH OF PARAGRAPH 5 HEREOF.

**9.      INDEPENDENT CONTRACTOR STATUS**.  In performing the Services, Consultant will be acting solely as an independent contractor, and neither Consultant nor any of its employees, associated consultants or subcontractors shall be deemed to be employees of Client for any purpose.  Neither Consultant nor Client shall have the authority to bind, commit or incur any liability on behalf of the other party or to otherwise act in any way as an agent or representative of the other party.

**10.      PAYMENT TERMS; TAXES**.  In consideration for the performance of the Services, Client will pay to Consultant the fees and expenses described in the Letter in the manner set forth in the Letter.  The payment of such fees and expenses is due and payable upon Client's receipt of

Consultant's invoice, and in any event, not to exceed 30 days from the invoice date. Actual expenses charged to Client will be net of any up-front discounts made available by the applicable vendor; however, such expenses will not be adjusted for other rebates, if any, issued at any time by a vendor even if related in whole or in part to such expenses and any such rebates will be retained by Consultant. Any past due amounts will bear interest until paid at a rate of interest equal to be the lesser of (i) the prime rate established from time to time by Citibank of New York plus four percent or (ii) the maximum rate of interest allowed by applicable law. If any portion of an amount due to Consultant under these Terms of Agreement is subject to a bona fide dispute between the parties, Client will pay to Consultant on the date such amount is due all amounts not disputed in good faith by Client. An amount will not be considered to be the subject of a bona fide dispute between the parties unless Client notifies Consultant in writing on or before the date a disputed amount is due of the specific items in dispute and describes in detail the reasons for disputing each item. Such notice is for purposes of permitting Consultant a reasonable opportunity to address the dispute. However, such notice will not operate to abate the accrual of interest on past due amounts or to prevent Consultant from exercising its right to suspend performance or terminate its engagement as described in Paragraph 11. All fee and expense payments to Consultant are intended to be exclusive of taxes and other governmental charges (other than Consultant's income taxes), referred to herein as "Taxes". Any Taxes that may be imposed with respect to any fee or expense reimbursement payments to Consultant shall be borne by Client, and Client shall pay or reimburse the Consultant for such Taxes. Consultant acknowledges that it is liable for any income taxes that may be imposed on Consultant and any payroll taxes in respect of Consultant's employees.

11.    **SUSPENSION/TERMINATION**. Client shall have the right, at any time and for any reason, to suspend performance of the Services and/or to terminate Consultant's engagement to perform the Services, in whole or in part. If Client fails to make any fee or expense reimbursement payment to Consultant when due or otherwise breaches the Terms of Engagement, Consultant shall have the right to suspend performance of the Services and/or to terminate its engagement to perform the Services, in whole or in part. Upon any such suspension or termination, Consultant shall be entitled to (a) immediate payment for all work performed and expenses incurred or committed by Consultant through the date of suspension or termination, and (b) payment of such additional amounts, if any, as may be provided in the Letter. The expiration, suspension or termination of these Terms of Engagement will not release either party from any liabilities or obligations set forth in these Terms of Engagement which (x) the parties have expressly agreed will survive any such expiration, suspension or termination, or (y) by their nature would be intended to be applicable following any such expiration, suspension or termination.

12.    **NO PUBLICITY**. Except as the Client deems necessary to satisfy the requirements of the Bankruptcy Code or as specifically authorized in writing by the other party, neither Client nor Consultant shall publicly disclose (in any press release, prospectus, offering memorandum, or otherwise) that Consultant is performing the Services, the nature of the Services, or the Deliverables.

13.    **CONSULTANT'S EMPLOYEES**. During Consultant's performance of the Services for Client and for a period of one (1) year after the termination of the Services for any reason, Client shall not directly or indirectly (a) enter into an agreement or relationship for the provision of

services (including as an officer, employee, partner, director, consultant, agent or otherwise) with any current or former employee of Consultant who, at the time of entering into such agreement or relationship with Client, is providing or has at any time in the past year provided the Services to Client under the Terms of Engagement, or (b) solicit, induce, persuade or attempt to solicit, induce or persuade any employee of Consultant who is providing or has provided the Services to Client under the Terms of Engagement to terminate his or her employment with Consultant.

**14.**    **REMEDIES**.  If any of the prohibitions or restrictions in these Terms of Engagement are found by a court of final and competent jurisdiction to be unreasonable and unenforceable, the parties intend that any such prohibitions or restrictions shall be deemed modified or limited so that, as modified or limited, they may be enforced to the fullest extent possible by such court.

**15.**    **PRIVACY LAWS**.  For purposes of all applicable laws relating to data privacy, personal data, transborder data flow and data protection (collectively, the "Privacy Laws"), the parties acknowledge and agree that Client will be considered the controller of the information relating to Client or its customers (the "Client Data") with rights to determine the purposes for which the Client Data is analyzed, reviewed, disclosed, manipulated or processed.  Nothing in this Agreement will restrict or limit in any way Client's rights or obligations as owner and/or controller of the Client Data for such purposes.  The parties further acknowledge and agree that, for purposes of the Privacy Laws, Consultant will be considered the processor of the Client Data. As controller of the Client Data, Client is directing Consultant to analyze, review, disclose, manipulate or process, as applicable, the Client Data in accordance with these Terms of Engagement.

**16.**    **EXPORT REGULATIONS**.  These Terms of Engagement are subject to any United States government laws, regulations, orders or other restrictions regarding export or re-export of U.S. origin information, technology, processes or other items, or derivatives of such items. Consultant and Client agree (i) to comply with all such laws or restrictions and (ii) not to export or re-export any such items to a destination or end user for which a U.S. authority requires an export license or other approval without first having obtained such license or approval. Each party will reasonably cooperate with the other to assure compliance with this Section 17.

**17.**    **GOVERNING LAW**.  These Terms of Engagement will be governed by the substantive laws of the State of Illinois (without giving effect to any choice-of-law rules that may require the application of the laws of another jurisdiction).  The Consultant and the Client irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to the Letter and the services contemplated thereby and agree not to commence any litigation relating thereto in any forum other than the Bankruptcy Court.

Rev. 02/20/06