UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                :
    In re                                   :        Chapter 11
                                                :
DELPHI CORPORATION, <u>et al.</u>,        :        Case No. 05-44481 (RDD)
                                                :
                     Debtors.        :        (Jointly Administered)
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ORDER UNDER 11 U.S.C. § 363(b)
AND FED. R. BANKR. P. 6004 AUTHORIZING THE
<u>DEBTORS TO ENTER INTO AN AGREEMENT WITH A.T. KEARNEY, INC.</u>

("A.T. KEARNEY AGREEMENT ORDER")

       Upon the motion, dated June 29, 2006 (the "Motion"), of Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for an order (the "Order") under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 authorizing, but not directing, the Debtors to enter into and perform under an agreement with A.T. Kearney, Inc. ("A.T. Kearney"); and upon the record of the hearing held on the Motion; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

       ORDERED, ADJUDGED, AND DECREED THAT:

       1.       The Motion is GRANTED.

       2.       The Debtors are authorized, but not directed, to enter into and fully perform under an agreement with A.T. Kearney, the form of which is attached hereto as

Exhibit 1, for Phases 1A and 1B of the Debtors' restructuring of their indirect spend, including making all payments due to A.T. Kearney under the agreement.

        3.        The Debtors are further authorized, but not directed, to exercise their sole discretion in determining the categories, sub-categories, and contracts to be strategically sourced under Phase 1A and to be reviewed under Phase 1B.

        4.        This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

        5.        The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
       July ___, 2006

                                            _____
                                            UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**
**A.T. Kearney Agreement**



*A.T. Kearney, Inc.*
*2000 Town Center, Suite 1600*
*Southfield, Michigan 48075*
*1 248 354 2226*
*1 248 204 9100 Fax*

April 27, 2006

Mr. Jonathan Stegner
General Director
Delphi Corporation
5825 Delphi Drive
Troy, MI 48098-2815

RE: Letter Agreement for "Indirect Material Cost Reduction: Strategic Sourcing and Contract Review" Initiative

Dear Mr. Stegner:

We are pleased to submit this letter agreement to support Delphi in indirect material cost reduction through a comprehensive Strategic Sourcing and Contract Review process. Delphi has the opportunity to realize substantial savings across the estimated $3.7 billion of indirect spend.

In the spring of 2005, A.T. Kearney was asked to perform an assessment of the indirect material cost reduction opportunity at Delphi. Based on that assessment, and our experience in driving comprehensive Indirect Strategic Sourcing and Executory Contract Reviews for other clients, A.T. Kearney estimates there is an annual savings opportunity of $150 to $225 million globally.

This proposal is focused on Delphi's North American operations, and is divided into two parallel phases. In Phase 1A (the "Fast Track" Phase), we will immediately begin sourcing of $700 million in spend that offers a high potential for savings. The Fast Track Phase will deliver between $30 and $60 million in annual savings, with some of the savings realized in the latter part of 2006. In Phase 1B we will analyze, prioritize and develop category specific strategies for an additional $2.3 billion of North American indirect spend. Subsequent phases (not included in the scope of this agreement) will execute the sourcing strategies identified in Phase 1B, as well as potentially expend the scope beyond North America.

A.T. Kearney is a leader in providing indirect material and services sourcing, and we consistently deliver savings comparable to those we are targeting at Delphi. Delphi is a key client for A.T. Kearney and we hope to use this project to build on the relationship and position A.T. Kearney to help Delphi with other improvement opportunities. To that end, I personally will be committed to bring the strength of my firm to bear to help deliver these savings. We value Delphi as a client and we appreciate the opportunity to work with you on this important initiative.

Page 2

This proposal addresses the following areas for each of the two main phases (1A and 1B):
- Objectives and Scope
- Project Approach, Deliverables and Timing
- Project Management and Governance
- Fees and Expenses

**Indirect Material Cost Reduction: Strategic Sourcing and Contract Review Initiative**

**Objectives and Scope**

The objective of the Indirect Material Cost Reduction initiative is to identify, prioritize and deliver indirect cost savings. The initiative will cover over 40 categories within Delphi's North American operations, addressing annual spend of $3.0 billion out of a total North American spend of $3.3 billion (See Figure 1).

A.T. Kearney will work in concert with Delphi to accelerate strategic sourcing and contract review to realize the saving based on a two phase plan (See Figure 2). In Phase 1A, the identified twelve "Fast Track" categories will move directly to strategy development and contract negotiations and implementation. These identified categories have a large indirect spend and a high potential for savings. Within the first 2-4 weeks of the project, Delphi and A.T. Kearney may mutually choose to modify the commodities in scope for in the Fast Track Phase. In Phase 1B, we will perform a contract review, prioritization and strategy development for many of the functional specific categories and the medium potential categories. These categories will be reviewed to identify specific follow-on cost reduction projects, such as contract renegotiation, strategic sourcing, outsourcing, etc.

Page 3

### Figure 1. North American Spend and Major Categories

**Cost Reduction Estimated Project Scope ($ Billions)** — Preliminary Recommendation

| | Industrial Supplies | Facilities Services | Corporate Services | IT | Machinery & Equipment | Transportation & Logistics | Engineering Prototypes |
|---|---|---|---|---|---|---|---|
| **Phase 1A:** Scope: 12 Categories, $0.7 billion — *Phase 1A Criteria*: Spend >$10 million; Few sub-categories (low fragmentation); High proportion of spend under contract | • MRO Services / Management Fees ($0.12) • Car Fleet (TBD) | • Site Services ($0.10)[4] • Prop. Leases ($0.03) | • Temp Labor ($0.14)[5] • Outsourced Services ($0.07) • Eng. Services ($0.07)[4] • Media ($0.03) | | • Handling Equip ($0.03) | • Warehousing ($0.05)[1] • Packaging ($0.05)[1] • Corp Jets (TBD) | |
| | $0.12 | $0.13 | $0.31 | $0 | $0.03 | $0.11 | $0 |
| **Phase 1B:** Scope: 29 Categories, $2.3 billion — *Phase 1B Criteria*: Highly fragmented spend – many plants, suppliers or sub-categories; Lower proportion of spend under contract; May be addressed by other corporate initiatives (e.g., Healthcare) | • MRO Parts ($0.31) • Perishable Tools ($0.15) • Ind. Gases ($0.04) • Durable Tools ($0.04) • Welding Cons. ($0.02) • Fixtures ($0.01) • Chemicals (TBD) | • Utilities ($0.07) • Construction ($0.05) | • Healthcare ($0.76)[2] • Travel & Ent. ($0.05) • Legal ($0.04) • Other Mktg ($0.04)[7] • Mailroom ($0.03) • Others ($0.03)[5] • Risk Mgmt ($0.02) • HR ($0.02) • Relocation Srvs ($0.01) • Financial Srvs ($0.01) | | • Mfg Equip. ($0.22) • Lab Equip. ($0.02) • Assembly Equip./ Tooling & Fixtures ($0.01) | • Freight ($0.13) • Truck & Trailer/ Rail/ Ocean ($0.02) • Air ($0.01) | • Prototype Parts (TBD) • Prototype Tools (TBD) • Prototype Testing (TBD) • Engineering Vehicles (TBD) |
| | $0.57 | $0.12 | $1.01 | $0 | $0.25 | $0.16 | $0.24 |
| **Out of Scope** $0.3 billion addressed by other Delphi initiatives | | | • Office Sup. (TBD) • Office Equip. (TBD) | • Telecom ($0.05) • Hardware ($0.03) • Software ($0.03) • IT Services ($0.17) | | | |
| | | | $TBD | $0.28 | | | |

**All contracts will be reviewed by the end of Phase 1A (24 weeks)**

Note: (1) Packaging and Warehousing spend estimated in interviews February 23, 2006, additional to IMAC data
(2) Healthcare spend estimated based on public information in addition to IMAC; Spend may change as number of employees covered is adjusted over time
(3) Includes Benefits, Retirement, Worker's Compensation, and Income Protection
(4) Delphi interview estimate at $0.06 B, excluding employee wages
(5) Includes Delphi estimated ~$0.10 B in unclassified temp labor spend
(6) Delphi interview estimate at $0.05 B
(7) e.g., branding, public relations, and event marketing
Source: January 2005 IMAC Discussion, Delphi Management Interviews, A.T. Kearney analysis

Support of these parallel activities (Phases 1A and 1B) will be accomplished through a combination of Delphi's Indirect Global Supply Management Team and A. T. Kearney resources. A.T. Kearney resources will lead the Strategic Sourcing and Executory Contract Review process addressing over 90% of the indirect spend within North American operations.

Our intent is to include the spend of operations that may be for sale, as long as the sale is not imminent with an agreed to price. Any indirect material savings should be represented as having direct bottom line impact to potential buyers and, as such, should bring the corresponding multiple in additional value

Page 4

**Project Approach, Deliverables and Timing**

The project approach begins with a Phase 0 data collection process. Working with Delphi, we will leverage the data that has already been collected. Where gaps exist we will collect the necessary data for both the indirect material sourcing and the contract review work streams. Based on a preliminary review, it appears that we can leverage the purchasing and financial systems to obtain the necessary sourcing data. Information relative to non purchasing contracts as well as financial and usage data for all contracts will likely need to be obtained from the contract owners. A.T. Kearney will coordinate the data collection process – however to insure timely realization of savings it is critical that Delphi supports the process and response timely to data requests.

Upon completion of the data collection phase, the project approach will be based on two parallel activities. Phase 1A, Fast Track, and Phase 1B, Contract Review and Prioritization, will both last twenty four weeks, however some categories will be complete and begin delivering savings in as early as twelve weeks. Figure 2 outlines the data collection phase as well as Phase 1A & 1B (Phase 2 and 3 are not included under this agreement).

**Figure 2. Approach and Associated Timing**

**Recommended Approach**



Note: (1) Timing dependent on category complexity

**Phase 1A: Fast Track Contract Negotiations and Implementation**

Delphi and A.T. Kearney have jointly defined the twelve "Fast Track" commodities in Phase 1A that will address approximately $0.7 billion in North American annual spend and will yield annual savings of $30 to $60 million. The Phase 1A savings will be partially realized in 2006 and fully realized in 2007. To capture these savings, the joint A.T. Kearney and Delphi teams will utilize a portfolio of Strategic Sourcing solutions, which maximize savings while minimizing time-to-benefits (See Figure 3)



Figure 3. A.T. Kearney's Portfolio of Strategic Sourcing Solutions

**Phase 1B: Contract Review and Prioritization**

In parallel, Phase 1B will be launched to address much of the remaining North American spend of approximately $2.3 billion. Phase 1B will identify additional projects and savings opportunities with an estimated annual savings of $80 to $150 million, which will be delivered in future Phases 2 and 3. Savings could be even higher if the scope of Phases 2 and 3 is expanded to include global spend.

Page 6

The contract review process will consist of two primary activities: 1) Contract Review and Analysis; and 2) Functional Workshops. First, all North American contract information will be collected, organized, and analyzed for preliminary prioritization (we will leverage the contract information already collected). As part of this analysis we will assess market condition changes, business needs changes, and financial implications. This will serve as input into the Functional Workshops where the contract stakeholders will review the analysis and options, and determine the strategy and disposition for the contracts. See Figure 4.

**Figure 4. A.T. Kearney's Contract Review and Prioritization**

**Contract Reviews Activities**
- Conduct pre-workshop reviews of all relevant contracts:
    — Develop summaries for each contract
    — Assign contacts to categories based on function or procurement code
    — Analyze financial implications to determine prioritization
    — Upload contract information into databases
    — Coordinate with function/contract owner to resolve discrepancies and missing information
- Develop preliminary priority and potential alternatives by category type

Page 7

**Functional Workshops Activities**
- Use Contract review output to prepare for workshop
  — Frame potential alternatives
  — Schedule subsequent workshops
- Conduct workshops in all functions and business units
  — Evaluate alternative strategies by contract type
    – Develop preliminary disposition
    – Establish action plan to validate and implement strategy

**Project Management, Governance and Reporting**

Doug Harvey will be responsible for the overall project. He will be supported by an experienced project leader that will drive the overall day-to-day activities. This project leadership will be actively involved in driving the deliverables and savings attainment in each of the identified "Fast Track" categories in Phase 1A and Contract Review and Prioritization of the categories in Phase 1B.

The project reporting process will be supported by a Project Management team and a Project Management Office (PMO). The role of the PMO should not be underestimated - throughout this project there will be a significant amount of project coordination and information management both within this project and across other ongoing Delphi projects. We will leverage A.T. Kearney's significant know-how and tools to ensure the project is executed smoothly. Each sub-team will generate a one-page weekly status report that will used by the Project Management team and the PMO. These reports will be used as a basis for weekly reviews and calls led by the Project Management team which will be used to review status, share information, and provide guidance to the teams, as required.

Each team will consist of 1-2 fulltime A.T. Kearney consultants working with the Delphi team members to drive the deliverables for that team. We will also leverage A.T. Kearney's subject matter experts (SMEs) with category specific expertise. In total, we will have twelve full time resources on the project along with many SMEs that we be engaged as needed throughout the project. The teams will report out on a regular basis (presumably monthly) to the Executive Steering Committee.

The role of the Executive Steering Committee is essential to insure that the project is completed on time and that the necessary organizational support is in place to enable successful implementation. Specifically, the Executive Steering Committee will insure that the appropriate resources are assigned to the project and that any requests from the project team are given sufficient priority within the organization to insure timely response. Most importantly, the Executive Steering Committee will be asked to approve the recommendations of the project team and insure organizational alignment behind these recommendations. The recommendations will include the over-all strategy by category and the associated resource/cost requirements, savings and implementation timing. The project organizational structure is depicted in Figure 5.

Page 8



Figure 5. Project Management and Governance Structure

It is essential that each team include the appropriate Delphi representatives to insure the right Delphi specific solutions are developed. We will also facilitate a knowledge transfer of A.T. Kearney's "best in class" Strategic Sourcing tools by providing both formal and hands-on training for the Delphi team members.

Page 9

**Fees and Expenses**

A.T. Kearney is proposing a combined fixed fee and contingent fee engagement. The fixed fee and expenses component of this engagement will be $3,900,000. This fee is at a reduced rate as compared to previous engagements at Delphi and our other key clients. Delphi will pay A.T. Kearney an additional $300,000 if the project team recommends, and the Executive Steering Committee approves, recommendations totaling at least $30 million in annualized savings. In addition to this $300,000 contingent payment, Delphi will pay A.T. Kearney $200,000 if the project team recommends, and the Executive Steering Committee approves, recommendations totaling at least $45 million in annualized savings. After the initial month of the engagement, we will submit five monthly invoices to Delphi for $700,000 each. The sixth and final invoice will include the $400,000 fixed fee remaining balance and any contingent payment that has been earned. A.T. Kearney anticipates payment to be made within 30 days of invoicing, which is consistent with our previous engagements with Delphi's management team.

Your signature on this document indicates agreement to the terms of this letter and to the attached "General Terms and Conditions" (See Attachment 1).

A.T. Kearney understands the importance of these cost reduction initiatives. We appreciate the opportunity to work with you and the Delphi Team and we looking forward to starting this project as soon as possible.

Sincerely,

Doug Harvey
Vice President

Accepted_____
Mr. Jonathan Stegner
General Director

Date_____

# A.T. KEARNEY, INC.
## *GENERAL TERMS AND CONDITIONS*

These General Terms and Conditions relate to the Letter dated April 27, 2006 (the "Letter") from AT. Kearney, Inc. ("Consultant") to Delphi Corporation ("Client").

The Letter, together with these General Terms and Conditions (collectively, the "Terms of Engagement"), constitute the full, final and entire agreement of Consultant and Client relating to the services referred to in the Letter (the "Services"). The Terms of Engagement shall control over any provisions contained in any correspondence, request for proposal, prior proposal, purchase order or other document of Consultant and/or Client and any oral statements or representations of Consultant and/or Client. No modification or waiver of the Terms of Engagement shall be effective against either Consultant or Client unless it expressly agrees to such modification or waiver in a written agreement signed by its authorized signatory. The Terms of Engagement may not be assigned by either party without the prior written consent of the other.

Client's signed acceptance of the Letter or the commencement of performance of the Services at the request of Client, whichever occurs earlier, shall constitute Client's acceptance of the Terms of Engagement.

1. **CONSULTANT'S RESPONSIBILITIES**. Consultant shall perform the Services utilizing the standards of care normally and customarily exercised by professional consulting firms in performing comparable services under similar conditions. Consultant shall be entitled to rely, without verification or investigation, upon any information and materials that (a) may be provided or made available by or through Client or its affiliates or (b) may be obtained from any generally accepted source.

2. **DELIVERABLES**. Subject to payment of Consultant's fees and expenses in connection with the Services and subject to the provisions of Paragraphs 3 and 4 below, all information, materials, reports, and other work product that Consultant creates, develops, and delivers to Client for Client's exclusive use as part of the Services ("Deliverables") shall be the property of Client and shall be treated by Consultant as Client's Confidential Materials. Consultant shall be permitted to retain copies of the Deliverables for archival purposes. The Services and Deliverables are personal to Client and intended solely for the internal use of Client. No person or entity other than Client may use or rely upon the Deliverables, the Services or any recommendations that Consultant may make. Client shall reimburse, indemnify and hold harmless Consultant for, from and against losses, damages, liabilities, suits and claims (and costs and expenses in connection therewith, including reasonable attorneys fees and other investigation and defense costs) to the extent such losses, damages, liabilities, suits and claims arise out of or are caused by (a) any use of or reliance upon the Deliverables, the Services or Consultant's recommendations by a third party, or (b) any use of or reliance upon the Deliverables, the Services or Consultant's recommendations by Client in any manner other than for Client's internal use.

3. **INTELLECTUAL CAPITAL**. All methodologies, procedures, management tools, workshops, manuals, software, data files, work papers, concepts, ideas, inventions, know-how and other intellectual capital that Consultant has heretofore created or acquired or may hereafter create or acquire, while performing the Services or otherwise ("Intellectual Capital"), are and shall be the exclusive property of Consultant. Before using, for any person or entity other than Client, any Intellectual Capital created or acquired while performing the Services, Consultant shall first purge any information or materials that were furnished to Consultant by Client and constitute Client's Confidential Materials subject to the provisions of Paragraph 5 below. Except as provided in Paragraph 4 below, Client shall not have or acquire any title or interest in or to any Intellectual Capital.

4. **LICENSE TO INTELLECTUAL CAPITAL**. Subject to payment of Consultant's fees and expenses in connection with the Services, Client shall have an irrevocable perpetual, non-exclusive right and license to use, reproduce, display and prepare derivative works based upon Intellectual Capital that is contained or incorporated in the Deliverables or is otherwise provided by Consultant to Client for its use in connection with the Deliverables. Except as specifically authorized in writing by Consultant, however, Client may not use, reproduce, or display such Intellectual Capital or prepare such derivative works for the benefit of any person or entity other than Client.

5. **CONFIDENTIAL MATERIALS**. In connection with the performance of the Services, a party (the "receiving party") may be provided or granted access to information and materials of the other party (the "disclosing party"), including information and materials of third parties that are in the possession of the disclosing party, that are considered to be confidential or proprietary (collectively "Confidential Materials"). The receiving party may not disclose or make available any of disclosing party's Confidential Materials to any other person or entity or make use of any of disclosing party's Confidential Materials for any purpose except: (a) as specifically authorized in writing by the disclosing party; (b) the receiving party may disclose and make available disclosing party's Confidential Materials, on a confidential and restricted basis, to its employees, associated consultants and subcontractors who have a reasonable need to know or have access to such information and materials in connection with the Services; and (c) the receiving party may use the disclosing party's Confidential Materials for any proper purpose related to the Services.

6. **EXCEPTIONS TO CONFIDENTIALITY OBLIGATIONS**.

    (a)    The provisions of Paragraph 5 shall not apply to any information or materials that (i) are already lawfully known to or in the possession of the receiving party at the time such information or materials are first disclosed or made available to the receiving party by the disclosing party, (ii) are hereafter lawfully obtained by the receiving party from a person other than the disclosing party, (iii) are in the public domain or generally known in the relevant trade, industry or business at the time such information or material are first disclosed or made available to the receiving party or thereafter come into the public domain or become generally known in the relevant trade, industry or business other than by reason of an improper disclosure or use of the same by the receiving party, or (iv) are independently developed or otherwise lawfully obtained by the receiving party independent of, and without reference to, the Services.

(b)     Each party may disclose (without prior notification, or approval or consent by, the other party), to taxing authorities and/or to such party's representatives, outside counsel and advisors, any Confidential Materials that are required to be disclosed in connection with such party's tax filings, reports, claims, audits, and litigation.

(c)     In addition, the receiving party may disclose and make available the other party's Confidential Materials to the extent required to comply with any law, rule or regulation or any subpoena, order or directive of any court or governmental agency or body; *provided, however,* that the receiving party shall use reasonable efforts to give the disclosing party prior notice of any such disclosure for the purpose of enabling the disclosing party to obtain a protective order.

7.   **DISCLAIMER OF WARRANTY**.   CONSULTANT MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING ANY MATTER INCLUDING THE MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR USE OR PURPOSE, OR RESULTS TO BE DERIVED FROM THE USE OF ANY MATERIALS, DELIVERABLES OR SERVICES PROVIDED UNDER THESE TERMS OF ENGAGEMENT. CONSULTANT DOES NOT GUARANTEE THAT ANY RECOMMENDATIONS MAY BE IMPLEMENTED AT THE COST OR WITH THE RESULTS THAT CONSULTANT MAY ESTIMATE OR PROJECT OR THAT ANY WORK PRODUCT OR DELIVERABLE WILL BE ERROR FREE.

8.   **LIMITATIONS ON LIABILITY**. IN NO EVENT SHALL EITHER CONSULTANT OR CLIENT BE LIABLE FOR ANY INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR CONSEQUENTIAL DAMAGES WHATSOEVER (INCLUDING DAMAGES FOR LOST PROFITS, INCOME OR SAVINGS, OR INTERRUPTION OF BUSINESS) THAT MAY BE SUFFERED OR INCURRED BY THE OTHER PARTY OR ANY PERSON OR ENTITY AFFILIATED OR ASSOCIATED WITH THE OTHER PARTY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN ADDITION, THE LIABILITY OF CONSULTANT FOR LOSSES, DAMAGES, LIABILITIES, SUITS AND CLAIMS ARISING OUT OF OR RELATED TO THESE TERMS OF ENGAGEMENT, REGARDLESS OF THE FORM OF ACTION AND THE PERSON OR ENTITY BRINGING SUCH ACTION, SHALL NOT EXCEED, IN THE AGGREGATE, THE TOTAL AMOUNT OF THE FEES PAID (EXCLUDING PAYMENTS FOR TAXES AND EXPENSES) BY CLIENT TO CONSULTANT FOR THE SERVICES PERFORMED UNDER THESE TERMS OF ENGAGEMENT. THE LIMITATIONS ON LIABILITY SET FORTH IN THIS PARAGRAPH 8 SHALL NOT APPLY TO A BREACH OF PARAGRAPH 5 HEREOF.

9.   **INDEPENDENT CONTRACTOR STATUS**. In performing the Services, Consultant will be acting solely as an independent contractor, and neither Consultant nor any of its employees, associated consultants or subcontractors shall be deemed to be employees of Client for any purpose. Neither Consultant nor Client shall have the authority to bind, commit or incur any liability on behalf of the other party or to otherwise act in any way as an agent or representative of the other party.

10.  **PAYMENT TERMS; TAXES**. In consideration for the performance of the Services, Client will pay to Consultant the fees and expenses described in the Letter in the manner set forth in the Letter. The payment of such fees and expenses is due and payable upon Client's receipt of

Consultant's invoice, and in any event, not to exceed 30 days from the invoice date. Actual expenses charged to Client will be net of any up-front discounts made available by the applicable vendor; however, such expenses will not be adjusted for other rebates, if any, issued at any time by a vendor even if related in whole or in part to such expenses and any such rebates will be retained by Consultant. Any past due amounts will bear interest until paid at a rate of interest equal to be the lesser of (i) the prime rate established from time to time by Citibank of New York plus four percent or (ii) the maximum rate of interest allowed by applicable law. If any portion of an amount due to Consultant under these Terms of Agreement is subject to a bona fide dispute between the parties, Client will pay to Consultant on the date such amount is due all amounts not disputed in good faith by Client. An amount will not be considered to be the subject of a bona fide dispute between the parties unless Client notifies Consultant in writing on or before the date a disputed amount is due of the specific items in dispute and describes in detail the reasons for disputing each item. Such notice is for purposes of permitting Consultant a reasonable opportunity to address the dispute. However, such notice will not operate to abate the accrual of interest on past due amounts or to prevent Consultant from exercising its right to suspend performance or terminate its engagement as described in Paragraph 11. All fee and expense payments to Consultant are intended to be exclusive of taxes and other governmental charges (other than Consultant's income taxes), referred to herein as "Taxes". Any Taxes that may be imposed with respect to any fee or expense reimbursement payments to Consultant shall be borne by Client, and Client shall pay or reimburse the Consultant for such Taxes. Consultant acknowledges that it is liable for any income taxes that may be imposed on Consultant and any payroll taxes in respect of Consultant's employees.

11.    **SUSPENSION/TERMINATION**. Client shall have the right, at any time and for any reason, to suspend performance of the Services and/or to terminate Consultant's engagement to perform the Services, in whole or in part. If Client fails to make any fee or expense reimbursement payment to Consultant when due or otherwise breaches the Terms of Engagement, Consultant shall have the right to suspend performance of the Services and/or to terminate its engagement to perform the Services, in whole or in part. Upon any such suspension or termination, Consultant shall be entitled to (a) immediate payment for all work performed and expenses incurred or committed by Consultant through the date of suspension or termination, and (b) payment of such additional amounts, if any, as may be provided in the Letter. The expiration, suspension or termination of these Terms of Engagement will not release either party from any liabilities or obligations set forth in these Terms of Engagement which (x) the parties have expressly agreed will survive any such expiration, suspension or termination, or (y) by their nature would be intended to be applicable following any such expiration, suspension or termination.

12.    **NO PUBLICITY**. Except as the Client deems necessary to satisfy the requirements of the Bankruptcy Code or as specifically authorized in writing by the other party, neither Client nor Consultant shall publicly disclose (in any press release, prospectus, offering memorandum, or otherwise) that Consultant is performing the Services, the nature of the Services, or the Deliverables.

13.    **CONSULTANT'S EMPLOYEES**. During Consultant's performance of the Services for Client and for a period of one (1) year after the termination of the Services for any reason, Client shall not directly or indirectly (a) enter into an agreement or relationship for the provision of

services (including as an officer, employee, partner, director, consultant, agent or otherwise) with any current or former employee of Consultant who, at the time of entering into such agreement or relationship with Client, is providing or has at any time in the past year provided the Services to Client under the Terms of Engagement, or (b) solicit, induce, persuade or attempt to solicit, induce or persuade any employee of Consultant who is providing or has provided the Services to Client under the Terms of Engagement to terminate his or her employment with Consultant.

14. **REMEDIES**. If any of the prohibitions or restrictions in these Terms of Engagement are found by a court of final and competent jurisdiction to be unreasonable and unenforceable, the parties intend that any such prohibitions or restrictions shall be deemed modified or limited so that, as modified or limited, they may be enforced to the fullest extent possible by such court.

15. **PRIVACY LAWS**. For purposes of all applicable laws relating to data privacy, personal data, transborder data flow and data protection (collectively, the "Privacy Laws"), the parties acknowledge and agree that Client will be considered the controller of the information relating to Client or its customers (the "Client Data") with rights to determine the purposes for which the Client Data is analyzed, reviewed, disclosed, manipulated or processed. Nothing in this Agreement will restrict or limit in any way Client's rights or obligations as owner and/or controller of the Client Data for such purposes. The parties further acknowledge and agree that, for purposes of the Privacy Laws, Consultant will be considered the processor of the Client Data. As controller of the Client Data, Client is directing Consultant to analyze, review, disclose, manipulate or process, as applicable, the Client Data in accordance with these Terms of Engagement.

16. **EXPORT REGULATIONS**. These Terms of Engagement are subject to any United States government laws, regulations, orders or other restrictions regarding export or re-export of U.S. origin information, technology, processes or other items, or derivatives of such items. Consultant and Client agree (i) to comply with all such laws or restrictions and (ii) not to export or re-export any such items to a destination or end user for which a U.S. authority requires an export license or other approval without first having obtained such license or approval. Each party will reasonably cooperate with the other to assure compliance with this Section 17.

17. **GOVERNING LAW**. These Terms of Engagement will be governed by the substantive laws of the State of Illinois (without giving effect to any choice-of-law rules that may require the application of the laws of another jurisdiction). The Consultant and the Client irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to the Letter and the services contemplated thereby and agree not to commence any litigation relating thereto in any forum other than the Bankruptcy Court.

Rev. 02/20/06