IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :

In re                            :     Chapter 11
                                              :

DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                                              :

                  Debtors.    :     (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF SERVICE

     I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

     On June 24, 2006, I caused to be served the document listed below upon the parties listed on Exhibit A hereto via overnight delivery and via facsimile:

     Notice of Proposed De Minimis Sale of Assets Located in Flint, Michigan Free and Clear of Liens, Claims, and Encumbrances [a copy of which is attached hereto as Exhibit B]

Dated: June 29, 2006

                                  */s/ Evan Gershbein*
                                  Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 29th day of June, 2006, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature :    */s/ Amy Lee Huh*

Commission Expires:   *3/15/09*

# EXHIBIT A

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | FAX |
|---|---|---|---|---|---|---|---|---|
| Davis Polk & Wardwell | Donald S. Bernstein, Esq. | 450 Lexington Avenue | | New York | NY | 10017 | | 212-450-3092 |
| Davis Polk & Wardwell | Brian Resnick, Esq. | 450 Lexington Avenue | | New York | NY | 10017 | | 212-450-3213 |
| Dove Bid | John Miller | 16042 Meadow Oak Dr | | Chesterfield | MO | 63017 | | 636-537-5449 |
| Fried, Frank, Harris, Shriver & Jacobson LLP | Bonnie Steingart, Esq. | One New York Plaza | | New York | NY | 10004 | | 212-859-8585 |
| Galaxy International Machinery Inc | John Marshall | 1685 Maroon Bells Lane | | Bolingbrook | IL | 60490-6530 | | 630-226-9111 |
| Genesee County Treasurer | Office of Daniel T. Kildee | 1101 Beach Street | | Flint | MI | 48502-1475 | | 810-257-3885 |
| Great American Group | Scott Magnuson | Nine Parkway North, Suite 300 | | Deerfield | IL | 60015 | | 847-444-1401 |
| Honeywell | Tim Bensette | 16671 Old Bedford | | Northville | MI | 48167 | | 419-436-5624 |
| Latham & Watkins LLP | Robert J. Rosenberg, Esq. | 885 Third Avenue | | New York | NY | 10022 | | 212-751-4864 |
| Latham & Watkins LLP | Mark A. Broude, Esq. | 885 Third Avenue | | New York | NY | 10022 | | 212-751-4864 |
| NGK Spark Plugs USA | Rick Sullivan | 46929 Magellan Dr | | Wixom | MI | 48393 | | 248-926-6910 |
| Office of the United States Trustee for the Southern District of New York | Alicia M. Leonhard, Esq. | 33 Whitehall Street | Suite 2100 | New York | NY | 10004 | | 212-668-2255 |
| Payson Plating | Tony Payson | 6889 Orchard Lake Rd #301 | | West Bloomfield | MI | 48332 | | 248-626-4199 |
| Simpson Thacher & Bartlett LLP | Kenneth S. Ziman, Esq. | 425 Lexington Avenue | | New York | NY | 10017 | | 212-455-2502 |
| Treasurer, City of Flint | Office of Doug Bingaman | 1101 S. Saginaw St. | | Flint | MI | 48502 | | 810-238-8481 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

6/28/2006 8:26 PM
Notice Special Parties 060624

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                        :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - -  x

NOTICE OF PROPOSED DE MINIMIS SALE OF ASSETS
LOCATED IN FLINT, MICHIGAN FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES

PLEASE TAKE NOTICE THAT in accordance with the Order Under 11

U.S.C. § 363 Approving Procedures To Sell Certain De Minimis Assets Free And Clear Of

Liens, Claims, And Encumbrances And To Pay Market Rate Broker Commissions In

Connection With Such Sales Without Further Court Approval, entered on October 28, 2005

(Docket No. 766) (the "De Minimis Asset Sale Order"), Delphi Automotive Systems LLC, a

Delaware limited liability company, and its wholly owned subsidiary, Delphi Technologies,

Inc., (the "Sellers"), hereby give notice of their intention to sell certain assets and equipment

located at their facility at 2926 Davison Road, Flint, Michigan (the "Facility") to Torch Spark

Plug Company, located at No. 3 Hongqi Road, Zhuzhou, Hunan, China (the "Purchaser")

pursuant to the Asset Sale Agreement (the "Agreement").  A copy of the Agreement is

attached hereto as Exhibit A.  The assets and equipment subject to the Agreement include,

but are not limited to, machinery, equipment, spare parts, inventory, tooling, and intellectual

property (collectively, the "Assets").

PLEASE TAKE FURTHER NOTICE THAT in consideration of the foregoing, Purchaser shall pay Delphi Automotive Systems LLC $1,000,000 in two installments during calendar year 2006 and Delphi Technologies, Inc. $900,000 in four installments during the period from the closing date through January 1, 2009.

PLEASE TAKE FURTHER NOTICE THAT the Purchaser is not an insider of the Sellers as such term is defined in section 101(31) of the Bankruptcy Code and has no other connections to the Sellers.

PLEASE TAKE FURTHER NOTICE THAT no broker was used in the sale of the Assets.

PLEASE TAKE FURTHER NOTICE THAT pursuant to the De Minimis Assets Sale Order, the Sellers will consummate the sale of the Assets free and clear of liens, claims, and encumbrances, and take such actions as are necessary to close the transaction, including but not limited to collection of proceeds of the sale of the Assets, provided that counsel to the Sellers does not receive from a party which receives this notice (a "Notice Party"), within five business days after the date following the Notice Party's initial receipt of this notice, a written objection or written request for additional time to evaluate the proposed sale.

Dated: New York, New York
       June 24, 2006

                              SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP

                              By: /s/  John Wm. Butler, Jr.
                                  John Wm. Butler, Jr. (JB 4711)
                                  John K. Lyons
                                  Ron E. Meisler
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois  60606
                                (312) 407-0700

                                  - and -

                              By: /s/  Kayalyn A. Marafioti
                                  Kayalyn A. Marafioti (KM 9632)
                                  Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession

3

**Exhibit A**
**Asset Sale Agreement**

May 10, 2006

## ASSET SALE AGREEMENT

**THIS ASSET SALE AGREEMENT** is made by and between TORCH Spark Plug Company, located at No.3 Hongqi Road, Zhuzhou, Hunan, China ("Buyer"), and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company ("DAS") and its wholly owned subsidiary Delphi Technologies, Inc. ("DTI," and together with DAS, the "Sellers"), each individually referred to as a "Party", and collectively referred to as the "Parties" to this Agreement.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in Article 1.

**WHEREAS,** on October 8, 2005, the Sellers, along with certain of their affiliated companies, filed voluntary petitions (the "Petitions") for relief commencing a case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS,** the Sellers, along with certain of their affiliated companies, continue to operate their businesses and manage their assets and properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS,** the Buyer desires to purchase from the Sellers, and the Sellers desire to sell to Buyer, on an "as is, where is" basis, the Acquired Assets and the Intellectual Property, all in the manner and subject to the terms and conditions set forth herein and in the De Minimis Sale Order;

**WHEREAS,** prior to its acquisition of the Intellectual Property, the Buyer desires to obtain certain rights to use the Intellectual Property; and

**NOW, THEREFORE,** in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

**Section 1.01** "Acquired Assets" means M&E, Spare Parts, Inventory, and Tooling, collectively.

**Section 1.02** "De Minimis Sale Order" means the Order under 11 U.S.C. § 363 Approving Procedures to Sell Certain De Minimis Assets Free and Clear of Liens, Claims, and Encumbrances and to Pay Market Rate Broker Commissions in Connection with Such Sales Without Further Court Approval, entered by the Bankruptcy Court on October 27, 2005, in the Chapter 11 Case and attached hereto as Exhibit 1.02.

**Section 1.03** [reserved]

**Section 1.04** "Intellectual Property" means the Patents and the Technical Documentation.

**Section 1.05** "Inventory" means substantially all of the work-in-process Inventory of spark plug components for the M&E, which DAS has on hand on the Closing Date.



06/02/2006   08:11      2488132410           DELPHI                        PAGE   02/20

May 10, 2006

**Section 1.06** "M&E" means machinery and equipment owned by DAS that is used exclusively to manufacture spark plugs, as listed on Exhibit 1.06 hereto. The M&E does not include any items that are associated with, or used by, the Sellers in their other products.

**Section 1.07** "Patents" means the patents listed on Exhibit 1.07.

**Section 1.08** "Spare Parts" means the percentage of available and usable replacement parts, as identified on Exhibit 1.06, for each item of M&E purchased hereunder.

**Section 1.09** "Technical Documentation" means the items listed on Exhibit 1.09, which contain proprietary know-how, trade secrets, and technical information related to the design and manufacture of spark plug products.

**Section 1.10** "Tooling" means the percentage of available and usable tooling, as identified on Exhibit 1.06, for each item of M&E purchased hereunder.

## ARTICLE 2

## SALE OF ACQUIRED ASSETS

**Section 2.01** **Assets Transferred.**   On the terms and subject to the conditions set forth in this Agreement and in the De Minimis Sale Order, DAS shall sell, transfer and convey to Buyer and Buyer shall purchase and acquire, on an "as is where is" basis, good title to the Acquired Assets.

**Section 2.02** **Purchase Price of Acquired Assets.**

A.      Buyer will pay to DAS, in payment for the Acquired Assets, the non-refundable amount of $1,000,000 (the "Purchase Price"), in two installments as set forth below:

1.      On the Closing Date (as defined in Section 2.03 below), and prior to the date of delivery of any of the Acquired Assets, Buyer will pay to DAS $500,000 (Five Hundred Thousand US Dollars) by wire transfer to the DAS's bank account.

2.      Upon the earliest to occur of: (i) one hundred eighty (180) days after the Closing Date, (ii) the date on which Buyer disconnects and dismantles the final piece of M&E in preparation for removal from DAS's facility in accordance with Section 5.02, or (iii) December 1, 2006, Buyer will pay to DAS $500,000 (Five Hundred Thousand US Dollars) by wire transfer to DAS's bank account.

B.      All payments by Buyer to DAS under this Agreement shall be accomplished by a wire transfer to the following account or such other account as may be designated by DAS:

> Bank One
> Detroit, Michigan
> Account of: Delphi Automotive Systems, LLC
> Account #: 361388594
> ABA #:072000326
> Swift Code: FNBCUS44

2



May 10, 2006

C.     DAS agrees to pay for any such United States taxes, fees, or charges as may be applicable to the transactions contemplated hereby, including any taxes, fees, or charges imposed on the sale or transfer of the Acquired Assets.

D.     Buyer agrees to pay for any such non-United States taxes, fees, or charges as may be applicable to the transactions contemplated hereby, including any taxes, fees, or charges imposed on the sale or transfer of the Acquired Assets.

E.     If Buyer fails to make payment for the Acquired Assets in accordance with the payment schedule specified in Section 2.02(A), interest shall accrue on the unpaid portion of the Purchase Price at the prime rate charged by US banks during the relevant time period. Notwithstanding the foregoing, in the event Buyer fails to pay either installment of the Purchase Price within 60 days after such payment is due, the Sellers may terminate this Agreement and/or exercise any other available remedies, in Sellers' sole discretion.

**Section 2.03  Closing.** The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place 30 days following the execution of this Agreement by all of the Parties, provided that: (i) all of the conditions set forth in Article 8 shall have been satisfied or waived and (ii) Buyer shall have obtained the Certificate or License specified in Section 4.02(B) (the date of the Closing being herein referred to as the "Closing Date"). For financial, accounting and tax purposes, the Closing shall be deemed conclusively to have occurred at 11:59 p.m. Eastern Time on the Closing Date.

**Section 2.04  Transfer Documents.** Upon full payment for, and completion of delivery of the Acquired Assets, DAS will deliver to Buyer a bill of sale, invoice, or such other similar document to vest Buyer with full and complete title to the Acquired Assets. Concurrently with the execution of this Agreement, Buyer will deliver to the Sellers a certified copy of resolutions of Buyer's board of directors authorizing and approving the transactions contemplated by this Agreement.

**Section 2.05  Post-Closing Asset Deliveries.** Should the Sellers in their reasonable discretion determine after the Closing that books, records, or other materials constituting Acquired Assets are still in the possession of Sellers or any of their affiliated companies, the Sellers shall or shall cause such affiliates to promptly deliver them to Buyer at no cost to Buyer, other than as contemplated in this Agreement. Should Sellers or Buyer in its reasonable discretion determine after the Closing that books, records, or other materials not constituting Acquired Assets were delivered to Buyer, Buyer shall promptly return them to the Sellers at no cost to Sellers.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLER

The Sellers represent and warrant to Buyer as follows:

**Section 3.01  Corporate Authority.** Subject to the De Minimis Sale Order, each of the Sellers has full corporate authority to execute and perform in accordance with this Agreement, and, upon full satisfaction of the terms and conditions of the De Minimis Sale Order, this Agreement shall constitute a valid and binding obligation of each of the Sellers.  This Agreement and all transactions contemplated hereby have been duly authorized by all requisite corporate authority, and will not result in a violation of any of the terms and provisions of either Sellers' certificate of incorporation or by-

3



May 10, 2006

laws, or certificate of formation, as applicable, or of any other agreement to which either of the Sellers is a party or by which it is bound, except for those violations that are excused by or are unenforceable as a result of the filing of the Petitions or the entry of the De Minimis Sale Order.

**Section 3.02  Title to Acquired Assets.**  DAS warrants that, as of the date of delivery of the Acquired Assets, DAS will have good and marketable title to the Acquired Assets and the Acquired Assets will be sold, assigned, transferred or delivered, as the case may be, free and clear of any pledge, security interest, lien, charge, encumbrance, purchase option and/or agreement limiting the transfer of such Acquired Assets.

**Section 3.03  Litigation.**  There is no litigation - equitable or legal, administrative, arbitrative or other proceedings - pending against DAS with respect to the Acquired Assets, and DAS is unaware of any investigation regarding any charge of violation of any applicable law, rule or regulation with respect to the Acquired Assets.

**Section 3.04  Disclaimer of Warranties.**  THE ACQUIRED ASSETS, INTELLECTUAL PROPERTY, AND ANY OTHER PROPERTY, RIGHTS AND SERVICES FURNISHED OR TO BE FURNISHED UNDER OR IN CONNECTION WITH THIS AGREEMENT BY SELLER TO BUYER ARE BEING FURNISHED ON AN "AS IS, WHERE IS" BASIS, WITH ALL FAULTS, AND THE SELLERS MAKE NO WARRANTIES (EXCEPT TITLE) OR REPRESENTATIONS WHATSOEVER, EXPRESS OR IMPLIED, CONCERNING ANY OF THE ACQUIRED ASSETS OR INTELLECTUAL PROPERTY, OR THE CONDITION, ACCURACY, QUALITY, UTILITY OR COMPLETENESS THEREOF, AND HEREBY EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY OF NONINFRINGEMENT OF THE PROPRIETARY RIGHTS OF THIRD PARTIES.

**Section 3.05  Survival of Representations and Warranties.**  No representations and warranties made by the Sellers in this Article 3 shall survive beyond the Closing Date.

## ARTICLE 4

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer represents, warrants and covenants to the Sellers as follows:

**Section 4.01  Corporate Authority.**  Buyer has full corporate authority to execute and perform in accordance with this Agreement, and this Agreement constitutes a valid and binding obligation of Buyer; this Agreement and all transactions contemplated hereby have been duly authorized by all requisite corporate authority, and will not result in a violation of any of the terms and provisions of Buyer's certificate of incorporation, articles of association, or by-laws or of any other agreement to which Buyer is a party or by which it is bound.

**Section 4.02  Permits, Licenses and Approvals.**

A.      Buyer has obtained all permits, licenses and approvals from any foreign, federal, state or local authority or administrative agency necessary to engage in business utilizing the Acquired Assets and/or the Intellectual Property.

B.      Immediately following the execution of this Agreement by all of the Parties, Buyer shall register with MOFCOM or its authorized local COFTEC and obtain a Technology Import Contract Registration Certificate.

4



May 10, 2005

**Section 4.03  Consents and Approvals.**  No consent, approval, or authorization of any non-governmental third party and no consent, approval, authorization or declaration of or filing or registration with any foreign, federal, state or local governmental or regulatory authority is required to be made or obtained by Buyer in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

**Section 4.04  No Assumption of Liabilities.**  Except as specifically provided in this Agreement, Buyer does not assume or agree to pay, perform or discharge any debts, obligations, contracts or liabilities of the Sellers, wherever or however incurred.

**Section 4.05  Survival of Representations and Warranties.**  All representations and warranties made by Buyer in this Article 4 shall survive for a period of two (2) years after the Closing Date of this Agreement.

## ARTICLE 5

## INSPECTION AND DELIVERY OF ACQUIRED ASSETS

**Section 5.01  Inspection.**  Buyer acknowledges that it has inspected the Acquired Assets, and is satisfied with (i) the condition thereof as referred to in Section 5.04, and (ii) the amount and identity of the Spare Parts and Tooling included among the Acquired Assets. DAS agrees to maintain the M&E in its present condition, ordinary wear and tear excepted, until such time as title and risk of loss shall pass to Buyer.

**Section 5.02  Preparation For Shipment.**  The Acquired Assets are being delivered ex-works, DAS's facility, Flint, Michigan, USA; Buyer shall be responsible for, and at its own cost and expense shall effect, the disconnecting, dismantling, packaging, preparation for shipment, and loading, shipment (including without limitation, skidding, movement to, and removal from DAS's facility), and transportation of the Acquired Assets from DAS's facility to its ultimate destination. Buyer shall cause such Acquired Assets to be completely dismantled and removed from DAS's facility on or before December 1, 2006. Such activities of Buyer's agents and employees shall be performed in a careful and workmanlike manner without damage to DAS's facility and at such times and in such manner reasonably approved by DAS so as to not interfere with or disrupt production or other operations at DAS's facility. Buyer will have the right to have up to three (3) of its employees at DAS's facility during the time the Acquired Assets are being disconnected, dismantled and loaded onto trucks. Buyer, its employees, agents, representatives and contractors, shall comply with all applicable federal, state, and local laws, ordinances, regulations and standards and all applicable DAS safety rules and regulations while on DAS's premises. If Buyer does not completely remove the Acquired Assets on or before the date set forth above, DAS may dismantle and move the Acquired Assets to a place of its reasonable choice at Buyer's expense. DAS shall not have any obligations or duties with respect to disconnecting, dismantling, packaging, preparation for shipment, loading, and/or delivery of the Acquired Assets.

**Section 5.03  Delivery.**  Delivery of the Acquired Assets shall take place, and risk of loss to such Assets shall pass from DAS to Buyer, upon the commencement of the activities contemplated by Section 5.02.

**Section 5.04  Acknowledgment.**  BUYER IS ACQUIRING THE ACQUIRED ASSETS AND CERTAIN OWNERSHIP AND RIGHTS OF USE IN THE INTELLECTUAL PROPERTY AND ANY OTHER PROPERTY, RIGHTS AND SERVICES FURNISHED OR TO BE FURNISHED UNDER OR IN CONNECTION WITH THIS AGREEMENT FROM THE SELLERS TO BUYER "AS IS," WITH ALL



May 10, 2006

FAULTS AND WITHOUT WARRANTIES OF ANY KIND (EXCEPT TITLE), EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY WARRANTY OF NONINFRINGEMENT OF THE PROPRIETARY RIGHTS OF THIRD PARTIES, AND BUYER HEREBY WAIVES ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR DEMAND IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE WITH RESPECT THERETO.

Without limiting the generality of the foregoing waiver or Sellers' disclaimer in Section 3.04, Buyer agrees that:  (i) the Sellers neither represent nor warrant that any of the Acquired Assets will operate satisfactorily or that any of the Acquired Assets comply with any applicable foreign, federal, state, or local laws, ordinances, regulations, or standards, including, but not limited to, regulations and standards promulgated under federal and state environmental or occupational safety and health laws; (ii) Buyer accepts the entire risk and responsibility of taking any necessary action (including performing inspections and undertaking physical modifications) to make the Acquired Assets operate safely and satisfactorily in Buyer's plant and comply with any applicable foreign, federal, state, or local laws, ordinances, regulations, or standards, including regulations and standards promulgated under federal and state environmental, occupational safety and health laws, or import and export laws; (iii) the Sellers shall have no liability or responsibility for the condition, yield and/or operation of the Acquired Assets after transfer to Buyer, its employees, agents, representatives and/or contractors; and (iv) Buyer is purchasing the Acquired Assets based solely upon its own inspection, evaluation, review and analysis, and Buyer assumes the entire risk associated with such inspection, evaluation, review and analysis being incomplete or inaccurate.

## ARTICLE 6

## INSURANCE

Buyer and/or its agents, representatives and/or contractors shall, during the performance of activities under Articles 5 and 7 of this Agreement, maintain the following insurance coverage:

| Kind of Insurance | Minimum Limits |
| --- | --- |
| Workers Compensation | Statutory per applicable state law, including Employer's Liability with limits of not less than $250,000 |
| Comprehensive General Liability (including contractual liability) | $1,000,000 per occurrence combined single limit for personal injury and property damage |
| Comprehensive Automobile Liability (covering owned, non-owned and hired vehicles) | $1,000,000 per occurrence combined single limit for personal injury and property damage |

Before any of the activities referred to in Articles 5 and 7 are started, Buyer shall furnish the Sellers with a certificate showing the applicable coverage, naming each of the Sellers as an additional insureds (except Workers Compensation), stating that such insurance is primary in coverage to any other insurance that may be available to the Sellers, and providing at least 30 days' prior written notice to the Sellers of cancellation, modification or material change to the policy.  Such certificate shall be in a form, and underwritten by a carrier, acceptable to the Sellers.  Buyer's furnishing of such

6



May 10, 2006

insurance and certificate shall not release Buyer from its obligations or liabilities under this Agreement.

## ARTICLE 7

## INTELLECTUAL PROPERTY

### Section 7.01 Purchase Price of Intellectual Property.

A.  Subject to the terms and conditions contained in this Agreement and in the De Minimis Sale Order, the Sellers agree to assign to Buyer all right, title and interest in and to the Intellectual Property (subject to any prior rights granted before the Closing Date, and rights granted by the Sellers under Section 7.05 below), within fifteen (15) days after DTI receives the final installment of the non-refundable purchase price of $900,000 (Nine Hundred Thousand US Dollars, the "Intellectual Property Purchase Fee").  The Intellectual Property Purchase Fee is to be paid in the following four installments:

1.  On the Closing Date, Buyer will pay to DTI $200,000 (Two Hundred Thousand US Dollars) by wire transfer to DTI's bank account (the "Initial Payment").

2.  Within thirty (30) days after January 1, 2007, Buyer will pay to DTI $300,000 (Three Hundred Thousand US Dollars) by wire transfer to DTI's bank account.

3.  Within thirty (30) days after January 1, 2008, Buyer will pay to DTI $200,000 (Two Hundred Thousand US Dollars) by wire transfer to the DTI's bank account.

4.  Within thirty (30) days after January 1, 2009, Buyer will pay to DTI $200,000 (Two Hundred Thousand US Dollars) by wire transfer to DTI's bank account.

B.  All such payments of the Intellectual Property Purchase Fee by Buyer to DTI under this Agreement shall be accomplished by a wire transfer to the following account or such other account as may be designated by DTI:

JP Morgan Chase Bank
One Chase Manhattan Plaza
New York, New York, 10081, USA
ABA #021000021

Credit to: Delphi Technologies, Inc.
            Account Number 323 022 537

C.  Within one hundred eighty (180) days after receiving the Initial Payment, provided that DAS has received full payment of the Purchase Price, the Sellers will deliver one (1) copy of the Technical Documentation to Buyer, or to Buyer's representative, at the DAS plant in Flint, Michigan in the form and language in which it exists in the Sellers's files as of the date of this Agreement. The Sellers will have no obligation to complete or generate any Technical Documentation that is not in existence as of the date of this Agreement.  Delivery of such Technical Documentation shall not constitute a sale, transfer or assignment of the Technical Documentation.

D.  Buyer will be responsible for, and bear all costs associated with, (i) obtaining any approval or registration of the Patents assigned to Buyer or of papers associated with the Patents that are

7



06/02/2006  08:11    2488132410         DELPHI                        PAGE  08/20

May 10, 2006

legally required or desirable and (ii) for providing to the Sellers written notice prior to the Sellers's assignment of the Patents and delivery of the Technical Documentation that all appropriate governmental agencies have given consent to such assignment and delivery, in form and substance acceptable to both Parties. Prior to DTI assigning the Patents to Buyer, DTI agrees to pay the maintenance fees required to keep the Patents in force and active.

E.  Except as provided in Section 7.01(D), the Sellers agree to pay for any such United States taxes, fees, or charges as may be applicable to the sale, transfer, use or possession of the Intellectual Property, including any taxes, fees, or charges imposed on the sale transfer, or licensing of the Intellectual Property.

F.  Buyer agrees to pay for any such non-United States taxes, fees, or charges as may be applicable to the sale, transfer, use or possession of the Intellectual Property, including any taxes, fees, or charges imposed on the sale transfer, or licensing of the Intellectual Property.

G.  Assuming that the conditions set forth in Section 8.01 shall have been satisfied, the Sellers are not aware of any government contract, act, regulation or restriction or the proprietary interest of a third party that would preclude the Sellers from furnishing any Intellectual Property as contemplated in this Agreement, however, the Sellers will not furnish any Intellectual Property if the provision of such Intellectual Property violates any government contract, act, regulation or restriction or would represent a misuse or misappropriation of the proprietary information of a third party.

H.  Buyer agrees to abide by the United States Government Export Administration Regulations.

I.  If Buyer fails to pay timely for the any of the installments of the Intellectual Property Purchase Fee, the Sellers may suspend their performance with regard to the assignment of the Intellectual Property under this Agreement, terminate the licenses granted to Buyer under Section 7.02, and/or exercise any other available remedies, in Sellers' sole discretion.

**Section 7.02  Granted License.**  Subject to DAS's receipt of the Purchase Price under Section 2.02, and the terms and conditions of Sections 7.01 and 8.01, the Sellers grant to Buyer a non-exclusive license under the Intellectual Property to manufacture, use, offer to sell, sell, and import spark plug products.

**Section 7.03  Other Technical Information.**  Nothing in this Agreement shall be construed to require either of the Sellers to furnish technical information: developed by any division or business segment of the Sellers or their affiliated companies other than the Technical Documentation of the Sellers' spark plug business segment identified in Exhibit 1.09; developed by its suppliers; or which is restricted due to government contract, law, rule or regulation or proprietary interests of third parties.

**Section 7.04  Trade names, Trademarks.**  Buyer acknowledges that it is not acquiring any rights in or to any trade names or trademarks of the Sellers under this Agreement, and agrees not to use any trade name or trademark of the Sellers with respect to any products produced by Buyer after execution of this Agreement. In addition, Buyer shall conspicuously mark and identify any products produced by it utilizing any of the Acquired Assets and/or the Intellectual Property as being products of Buyer.

**Section 7.05  Retained License.**  When the Intellectual Property is assigned to Buyer pursuant to Section 7.01, the Sellers and its affiliated companies shall retain a perpetual, irrevocable, royalty-free, non-exclusive license under the Intellectual Property, with all rights necessary for the purposes of:

8



May 10, 2006

A.    Selling any finished spark plug stock existing at the date both parties have executed this Agreement, but not in connection with the manufacture of further spark plugs for sale;

B.    The manufacture and use of spark plugs for development and test purposes; and

C.    The right to grant sublicenses under the Intellectual Property (including, without limitation, the right to provide copies of the Technical Documentation) to other purchasers of Seller's machinery and equipment as needed to use such machinery and equipment for its intended purpose of making spark plug products for commercial distribution and sale.

## ARTICLE 8

## CONDITIONS PRECEDENT

**Section 8.01  Conditions Precedent to Obligation of the Sellers and the Buyer.** The respective obligations of each party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction of the following conditions:

A. no action, suit or proceeding (including any proceeding over which the Bankruptcy Court has jurisdiction under 28 U.S.C. § 157(b) and (c)) brought by any governmental entity shall be pending to enjoin, restrain or prohibit the transactions contemplated by this Agreement, or that would be reasonably likely to prevent or make illegal the consummation of the transactions contemplated by this Agreement;

B. no governmental entity shall have issued any order, decree or ruling, and there shall not be any statute, rule or regulation, restraining, enjoining or prohibiting the consummation of the transactions contemplated by this Agreement; and

C. the full satisfaction of the terms and conditions of the De Minimis Sale Order.

**Section 8.02  Conditions Precedent to Obligation of the Sellers.** The obligation of the Sellers to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following additional conditions:

A.   The Buyer shall have performed in all material respects its obligations under this Agreement required to be performed by the Buyer at or prior to the Closing Date; and

B.  Each of the representations and warranties of the Buyer contained in this Agreement shall be true and correct as of the Closing Date as if made at and as of such date.

**Section 8.03  Conditions Precedent to Obligation of the Buyer.** The obligation of the Buyer to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following additional conditions:

A.  The Sellers shall have performed in all material respects its obligations under this Agreement required to be performed by the Sellers at or prior to the Closing Date; and

B. Each of the representations and warranties of the Sellers contained in this Agreement shall be true and correct, in all material respects, as of the Closing Date as if made at and as of such date.

9



May 10, 2006

## ARTICLE 9

## GENERAL PROVISIONS

**Section 9.01 Force Majeure.** Each party shall be temporarily excused from performing its obligations under this Agreement for so long as such performance is prevented or delayed by any event of Force Majeure. The term "Force Majeure" shall, for purposes of this Agreement, include: (i) any strike, lockout or labor dispute at the plant of a party or its suppliers, (ii) any shortage or curtailment of utilities, materials or transportation, (iii) any act or omission of any government authority, or (iv) any other cause beyond the reasonable control of a party. A party affected by an event of Force Majeure shall promptly notify the other party and shall use its best efforts to overcome and mitigate such event of Force Majeure.

**Section 9.02 Indemnification by Buyer.** Buyer shall defend, indemnify, and hold harmless the Sellers and their affiliated companies, and each of their respective officers, agents, and employees, from and against any and all claims, suits, causes of action, liabilities, losses (including death, personal injury, and property damage), judgments, obligations, fines, damages, penalties, costs of defending or settling, and expenses (including consequential damages and attorneys' fees) of any kind or character (whether based on breach of contract, breach of warranty, tort (including negligence), strict liability, environmental laws, intellectual property rights or otherwise), arising out of or in any manner, relating or attributable to: (a) the breach or performance by Buyer of any of its obligations under this Agreement; (b) the accuracy, utility, completeness or use of any of the Intellectual Property; (c) the design, transportation, manufacture, operation, use, handling, storage, maintenance, sale, transfer or disposal of (i) any of the Acquired Assets, or (ii) any products, components, parts or subassemblies produced from or with the Acquired Assets, Intellectual Property; and/or (d) the actual or alleged infringement or violation of any United States or foreign patent, trademark, copyright, trade secret, or other proprietary right by Buyer or Buyer's affiliated companies, and/or their respective officers, agents, contractors, employees, transferees, assignees, or vendees arising from the use of the Intellectual Property provided by the Sellers to Buyer hereunder.

**Section 9.03 Limitation of Liability.** SELLER SHALL NOT BE LIABLE TO BUYER FOR ANY DAMAGES, INCLUDING INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES ARISING OUT OF ANY ACT OR OMISSION REFERRED TO IN OR RELATED TO THE PERFORMANCE OF THIS AGREEMENT, OR TO THE USE, OPERATION, OR MAINTENANCE OF ANY ACQUIRED ASSET, INTELLECTUAL PROPERTY BY ANY PERSON, WHETHER OCCASIONED BY BREACH OF CONTRACT, BREACH OF WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, ENVIRONMENTAL LAWS, INTELLECTUAL PROPERTY INFRINGEMENT, OR OTHERWISE.

**Section 9.04 PCB Items.** The Sellers hereby inform Buyer that the M&E may contain polychlorinated biphenyls ("PCBs") and therefore may be a regulated PCB Item as defined under Title 40, US Code of Federal Regulations, Part 761 (40 CFR 761), the use, disposal, import, export or other distribution of which may be subject to specific requirements under federal regulations pursuant to the federal Toxic Substances Control Act ("TSCA"), as well as state and local additional regulatory requirements. Once title to the M&E is transferred to Buyer under this Agreement: (i) the Sellers shall be relieved of any further obligation with regard to the design, transportation, manufacture, operation, use, handling, storage, maintenance, sale, transfer or disposal of these items; and (ii) Buyer agrees to transport, operate, use, handle, store, mark, and/or properly dispose of PCB items in

10



May 10, 2006

an environmentally safe manner and in compliance with all applicable federal, state and local laws, ordinances, regulations, standards, etc., including the TSCA.

**Section 9.05  Termination.**  If, after the date of this Agreement and prior to the passage of title and risk of loss to any Acquired Asset, an item of M&E or Inventory is lost, damaged or destroyed by any cause whatsoever (excluding ordinary wear and tear and damage caused by the acts or omissions of Buyer or its agents or employees), this Agreement shall terminate with respect to the affected M&E or Inventory, and an appropriate adjustment will be made to the Purchase Price by DAS.

**Section 9.06  Independent Contractors, Expenses.**  This Agreement does not constitute any party the agent or legal representative of any another party. Each party is an independent contractor, responsible for its own expenses, including attorneys' and other professional fees incurred in connection with the transactions contemplated by this Agreement.  No party is authorized to create any obligation on behalf of another party.

**Section 9.07  Bulk Sales.**  The Buyer hereby waives compliance with any bulk sales or other similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement.

**Section 9.08  Entire Agreement, Waiver.**  This Agreement constitutes the entire agreement of the parties, and supersedes all prior and contemporaneous agreements and negotiations between the parties, concerning the subject matter herein.  No amendment to this Agreement shall be binding upon either party unless it is in writing and is signed by authorized representatives of all parties. Failure by any party to enforce any term or condition of this Agreement, or to exercise any right hereunder, shall not be construed as thereafter waiving such term, condition or right; and in no event shall any course of dealing, custom or usage of trade modify, alter or supplement any term of this Agreement.

**Section 9.09  Assignment.**  Neither party may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other party, except that the Sellers may freely assign their rights and delegate any of their duties to a subsidiary or affiliated company, or any successor in interest by operation of law.  Buyer's obligations under this Agreement shall be binding upon any transferee of the Acquired Assets or Intellectual Property, to the extent such obligations may relate to the Acquired Assets or Intellectual Property so transferred, and Buyer shall obtain and deliver to the Sellers a copy of such transferee's agreement to be so bound.

**Section 9.10  Notices.**  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been given when delivered personally or by expedited courier service, or when mailed by certified mail (return receipt requested) with postage prepaid, or upon receipt of the facsimile transmission report in the case of a telefax, addressed to a party at its address set forth below, or to such other address as may be designated by notice given to the other party:

(i)      To the Sellers: Delphi Technologies, Inc.
             P.O. BOX 5052
             Troy, Michigan 48007, U.S.A.
             Facsimile: 248-813-1211
             Attention:  Assistant General Counsel, Intellectual Property

(ii)     To Buyer:    Torch Spark Plug Co., LTD.
             3N HONGQI ROAD
             ZHUZHOU, HUNAN

11



06/02/2006   08:11      2480132410            DELPHI                                PAGE   12/20

May 10, 2006

CHINA 412002
Facsimile: 011-86-733-845-0227
Attention: Mr. Chen Guangyun, General Manager

**Section 9.11  Law and Jurisdiction; Severability.**  If there is any dispute or difference of opinion between the parties regarding the construction or interpretation of this Agreement or the rights and liabilities of the parties, the parties shall strive to settle the same amicably.  This Agreement shall be governed by, and construed and enforced in accordance with the laws of the state of Michigan and, to the extent applicable the Bankruptcy Code, excluding any such laws which direct the application of laws of any other jurisdiction.  If any provision of this Agreement contravenes any applicable law, then such provision shall be deemed reformed or severed, but only to the extent necessary to comply with such law, and the remaining provisions shall remain in full force and effect.  The Buyer and the Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated thereby (and agree not to commence any litigation relating thereto except in the Bankruptcy Court).

**Section 9.12  Captions.**   The captions shall not be deemed a part of this Agreement, but are inserted merely for the convenience of the parties.

**Section 9.13  Public Announcements.**  The Sellers and Buyer will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except (a) as may be required by law and then only with such prior consultation and (b) as the Seller deems necessary, in its sole discretion, to satisfy the requirements of the De Minimis Sale Order.

**[Signature Page Follows]**

12



May 10, 2006

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be signed in duplicate by their
duly authorized representatives.

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By: _____

Name: _Ronald M. Pogue_

Title: _Business Line Executive_

Date: _5-15-2006_

**TORCH SPARK PLUG COMPANY**

By: _____

Name: _Chen Guang Yun_

Title: _General Manager_

Date: _3 MAY 2006_

**DELPHI TECHNOLOGIES, INC.**

By: _____

Name: _TIMOTHY FORBES_

Title: _VICE - PRESIDENT_

Date: _10 MAY 2006_

_Cgy_

May 10, 2006

## EXHIBIT 1.06:    MACHINERY & EQUIPMENT

| M&E Description and Relevant Serial Numbers | Approximate Percentage of Available Tooling | Approximate Percentage of Available Spare Parts | Number Of Pieces of M&E |
|---|---|---|---|
| Minster 200 ton stamping press 36 x30 bed and feed system. Identification Numbers:  111648; 111645; 111647; 119097; 111643; 111644; 111646 | 100% | 30% | 7 |
| National Machinery 141 (14 mm) Ball Header with straightener and stock reel  Identification Number:  129185 | 100% | 50% | 1 |
| 2 3/8 Gridley Chuckers with feed system and chip removal.  Identification Numbers:  108589; 108590; 108592; 109781; 109789; 109790; 110029; 110030; 110031; 110032; 110033; 110034; 110042; 113957; 113959; 115269; 116053; 116054; 116709; 116713 | 75% | 70% | 20 |
| Helfrecht Shell And Wire Machine: ground electrode weld and trim machines (auto load/unload).  Identification Numbers:  89457; 89549; 97005; 97007; 97008; 97009; 97013; 108586; 109721; 109997; 109998; 113082; 116187; 118163; 118995; 118996; 118997; 118998. | 80% | 80% | 18 |
| Prutton high speed thread rolling machine.  Identification Numbers:  117180; 127269; 127270. | 100% | 100% | 3 |
| Reed speed thread rolling machine.  Identification Numbers:  96757; 116005; 70425. | 100% | 100% | 3 |
| National ¼ inch four station boltmaker.  Identification Numbers:  138181; 137009; 137653. | 50% | 30% | 3 |
| Machine to weld platinum to ground electrode.  Identification Numbers: | 100% | 100% | 3 |
| Retina vision inspection system.  Identification Numbers: 723611; 723578, | 100% | 100% | 1 |
| Machine to weld copper core ground electrode to shell after wash.  Identification Numbers:  140367; 140368; 140370; 140371; 14037; 140373. | 100% | 100% | 6 |
| Machine to weld platinum to center electrode.  Identification Numbers: 137597; 138179; 138180; 139134; 138874. | 100% | 100% | 5 |
| Pfiffner Platinum center electrode shaping lathe.  Identification Numbers: 140105; 140695; 140713; 140714. | 100% | 100% | 4 |

*The Identification Numbers only for Ref*

*Chen Guang Yun*

*DM 5/1/06*

May 10, 2006

| | | | |
|---|---|---|---|
| Retina Vision based sorting system. Identification Number: 140986 | | | 1 |
| SIMAC Insulator Mold & Grind Machine. Identification Numbers: 129130; 129131; 129132; 129134; 129133; 130610; 130599; 130600; 130601; 130602; 130603; 130604; 130696; 130607; 130608; 130615; 130617. | 75% | 75% | 18 |
| Large Optical Comparators. Identification Numbers: 123688; 128155; 1005951 101264. | 100% | 40% | 4 |
| Small Optical Comparators. Identification Numbers: 1054; 1046; 1050; 1034; 1036; 1043; 1038; 1037 | 100% | | 8 |
| Storage Cabinets | N/A | N/A | 10 |
| Pick & Place machine for SIMAC Insulator Mold & Grind Machine. Identification Numbers: 134112; 134113; 134114; 134115; 134116; 134117; 134118; 134119; 134110; 134311; 134312; 134313; 134314; 134315; 134534; 134535; 134536; 134537. | 75% | 75% | 18 |
| SIMAC Insulator Assembly Line. Identification Numbers: 134615; 134616; 134617; 134618; 134619; 134620; 134621; 134622. | 100% | 100% | 8 |
| Insulator Assembly Line Furnace. Identification Numbers: 82076; 135300; 122908; 117455. | 100% | 100% | 4 |
| Insulator Assembly Resistance Checker. Identification Numbers: 135303; 135305; 135306; 135307. | | | 4 |
| Capitol Insulator Assembly Machine. Identification Numbers: 139606; 139607. | 66% | 66% | 2 |
| Bodine Spark Plug Final Assembly Machine. Identification Numbers: 139597; 139598. | 66% | 66% | 2 |
| Helfrecht Spark Plug Final Assembly Line (two assembly machines per line). Identification Numbers: 119814; 119813; 116934; 116935. | 50% | 50% | 2 |
| Machine to pack individual spark plug to carton. Identification Numbers: 120566; 117715. | N/A | N/A | 2 |
| Machine to pack 8 individually packaged spark plugs to 8-pack carton. Identification Numbers: 120619; 115921 | N/A | N/A | 2 |
| Machine to pack 8-pack cartons of spark plug to over-pack carton. Identification Numbers: 120640; 116648. | N/A | N/A | 2 |
| Ionization Test Equipment (pre-ignition) | N/A | N/A | 1 |
| Spark Plug Thermocouple test equipment | N/A | N/A | 1 |
| CNC profile wheel grinder | 100% | 100% | 1 |



May 10, 2006

## EXHIBIT 1.07: Patents

| Country | Grant Number | Description |
|---|---|---|
| US | 6509676 | A spark plug having enhanced heat transfer capabilities is provided. The spark plug comprises a tubular insulator body, a center electrode and a thermally conductive filler material. The tubular insulator body has an inner surface, and the center electrode has an outer surface. The center electrode is positioned within the tubular insulator body such that a gap is formed between at least a portion of the inner surface of the tubular insulator body and at least a portion of the outer surface of the center electrode. The thermally conductive filler material has a high heat transfer coefficient. It is positioned within at least a portion of the gap so as to intimately contact the inner surface of the tubular insulator body and the outer surface of the center electrode. Positioned accordingly in the gap, the thermally conductive filler material enhances the ability of the spark plug to transfer heat away from the firing tip and into the body of the spark plug. This enables a designer to employ performance-improving features in a spark plug without the compromises inherent in currently used spark plug designs. |
| US | 6677698 | A spark plug electrode is disclosed. The electrode comprises, based upon the total weight of the electrode, about 83 wt. % to about 96.8 wt. % copper, about 3.0 wt. % to about 9.0 wt. % chromium, and about 0.2 wt. % to about 8.0 wt. % niobium. A spark plug is also disclosed. The spark plug comprises a shell disposed in contact with an insulator body. A center electrode is disposed at a lower end of the insulator body. A side electrode is also disposed at a lower end of the shell. This side electrode is coaxially aligned with the center electrode. At least one of the center electrode and the side electrode comprises a core composition of about 83 wt. % to about 96.8 wt. % copper, about 3.0 wt. % to about 9.0 wt. % chromium and about 0.2% to about 8.0% niobium, based upon the total weight of the composition. A resistor section is also disposed in electrical communication with the center electrode. |
| US | 4795944 | The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows: 1. A metal-glass seal resistor composition for use between a terminal member and an electrode member in a resistor spark plug, such composition being adapted to provide an electrical resistance in the range of 4,000 to 7,000 ohms upon glass sealing in the spark plug and to provide resistance stability thereafter during spark plug use, the composition consisting essentially by weight of 24 to 33 percent glass, 18 to 25 percent mullite, 36 to 49 percent zirconia, 1.2 to 1.6 percent carbon black, 0 to 2.0 percent bentonite, 0.6 to 0.8 percent sucrose, 0.8 to 1.2 percent lithium carbonate, 0.5 to 1.3 percent antimony and 0.5 to 1.3 percent silicon, the glass content of the seal initially consisting essentially by weight of about 25 to 50 percent borosilicate glass and about 50 to 75 percent barium borate glass. |
| US | 5304894 | A metal-glass seal resistor composition for use between a terminal member and an electrode member in a resistor spark plug, such composition being adapted to provide a narrow range of electrical resistance upon glass sealing in the spark plug and to provide resistance stability thereafter during spark plug use, the composition comprising by weight of 24 to 33 percent glass, 18 to 25 percent mullite, 36 to 49 percent zirconia, 0.5 to 1.6 percent carbon black, 0 to 2.0 percent bentonite, 0.3 to 0.8 percent sucrose, 0.8 to 1.2 percent lithium carbonate, 0.5 to 1.3 percent antimony and 0.5 to 1.3 percent silicon, the glass content of the seal initially comprising by weight about 25 to 50 percent borosilicate glass and about 50 to 75 percent strontium borate glass. |
| US | 5856724 | A spark plug is provided which is suitable for use in a spark ignition system for an internal combustion engine. The spark plug is equipped with a specially configured firing tip on each of its electrodes for the purpose of minimizing the demand voltage of the spark plug, as well as extending the life of the spark plug by maximizing the time over which the demand voltage will remain within an acceptable level. For this purpose, the firing tips are configured such that their firing surfaces include at least three edges and three corners which serve as arc initiation sites of a relatively low resistance arc path between the electrodes. |



May 10, 2006

| US | 5250778 | Apparatus and method for welding a platinum wire to a ground electrode of a spark plug to form a contact pad of platinum material that is welded to the ground electrode. The ground electrode is attached to and extends from a metallic spark plug shell. The apparatus includes a pivotally mounted nest for receiving and supporting the spark plug shell. A movable welding electrode can be moved into engagement with a lower surface of the ground electrode. The welding electrode has a spherical end surface that engages the ground electrode. The apparatus has opposed gripping fingers that can be moved toward or away from each other. The gripping fingers each have an inclined surface. When the gripping fingers are moved toward each other their inclined surfaces engage the ground electrode to force it into tight engagement with the spherical end surface of the welding electrode. A source of welding current is connected to the wire and to the welding electrode to weld an end portion of the wire to the ground electrode. The wire may have a diameter of about 0.5 mm and the welded pad may be as large as 1.0 mm. |
|---|---|---|
| US | 5371335 | A method of welding a noble metal tip to a spark plug center electrode comprises the steps of placing a plurality of spark plug center electrodes into a plurality of carriers so that each carrier carries one spark plug center electrode, one by one moving each carrier into a weld station, lifting the one spark plug center electrode carried in the carrier located in the weld station out of the carrier into a weld position, clamping the one spark plug center into the weld position with a single clamp located in the weld station, and welding the noble metal tip to the one spark plug center electrode, wherein the single clamp eliminates clamp-to-clamp process variations. |
| US | 5558575 | Generally, the invention includes a spark plug with a platinum tip partially embedded in one of the spark plug's electrodes. A spark plug according to the present invention may be prepared by first heating the area of the electrode where the platinum tip is to be attached to a temperature such that the platinum tip may be pushed into and embedded in the electrode. Thereafter the platinum tip is welded to the electrode. Heating the electrode allows the platinum tip to penetrate deeper into the electrode material. This deeper penetration or embedment will reduce the operating temperature at the weld interface (junction) which will in turn reduce the thermal stress and hence prevent cracking of the platinum tip. This deeper penetration or embedment will also reduce the rate of oxidation at the platinum tip near the weld junction and hence prevent cracking of the platinum tip. |
| US | 5530313 | The present invention includes a spark plug with a copper cored ground electrode wherein the copper core has a cross-sectional area of about 1.6 mm2 to about 3.0 mm2 and the remainder of the electrode is made from a nickel alloy sheath. The open end copper cored ground electrode is resistance welded to the steel shell using a light welding force of about 100 lbs. coupled with a low welding energy to eliminate voids and embrittlement in the copper core adjacent to the weld interface. |
| US | 5527198 | A spark plug is provided which is suitable for use in a spark ignition system for an internal combustion engine. The spark plug is equipped with a specially configured firing tip on each of its electrodes for the purpose of minimizing the demand voltage of the spark plug, as well as extending the life of the spark plug by maximizing the time over which the demand voltage will remain within an acceptable level. For this purpose, the firing tips are configured such that their firing surfaces include at least three edges and three corners which serve as arc initiation sites of a relatively low resistance arc path between the electrodes. |
| US | 5818152 | A spark plug for an internal combustion engine comprising: a cylindrical metal tube; a rod-shaped central electrode within the cylindrical metal tube; a tubular insulator within which the rod-shaped central electrode is located, wherein the tubular insulator is arranged substantially centrally in and substantially coaxially with the cylindrical metal tube; and at least two ground electrodes affixed to the cylindrical metal tube, wherein the at least two ground electrodes are each bent toward the metal electrode, wherein each ground electrode together with the central electrode forms a different member of a set of spark paths comprising: (i) an air sliding spark path, (ii) and air-air sliding spark path and (iii) an air spark path. |



May 10, 2006

| US | 5821676 | The invention includes a spark plug for a combustion engine including a center electrode having a tapered portion with a plurality of ridges formed thereon. The spark plug may also include a tapered, ground electrode positioned over the center of the center electrode. The tapered center and ground electrodes allow for flames to propagate freely from the spark gap into the combustion chamber and to ignite an air-fuel mixture in the chamber leading to smooth idle and faster starts. |
| US | 6320317 | A resistor seal composition useful in resistor spark plugs comprises glass, at least one metal oxide, at least one filler material, and a branched or straight chained zirconium carboxylate. The glass comprises a strontium borate glass and/or a borosilicate glass. Metal oxides include aluminum oxide, zinc oxide, and zirconium oxide. Filler materials include silicon dioxide and mullite. |
| US | 6586865 | A spark plug for igniting an air/fuel mixture in a combustion chamber of an internal combustion engine includes a spark gap having a variable distance defined between a central electrode and a ground electrode portion of a ground terminal. The ground terminal is formed using either a bimetallic layer arrangement wherein one of the metallic materials has a different coefficient of thermal expansion than the other metallic material, or is formed using a strut or by thickening the metal where the ground terminal is connected to a metal housing of the spark plug. The ground terminal deflects away from the central electrode when subjected to an increased temperature, such as may occur when the engine warms up during operation. |



May 10, 2006

# EXHIBIT 1.09:   TECHNICAL DOCUMENTATION

Assembly And Parts Drawings;
Service Information.
Machine And Tooling Prints
Electrical Controls Diagrams, Computer Readable Media, Or Other Descriptions
Assembly Tool Drawings
Bills Of Material
Drawings Of Special Tools, Fixtures, Dies, Jigs, Gauges And Patterns
Employee Job Descriptions
Engineering Specifications
Engineering Standards
Equipment Layout Information
Equipment Specifications Including Assembly Equipment
Facilities Requirements
Field Failure Analysis Procedures
Field Service Procedures
Final Test Descriptions
Gauge Drawings
GP3 Process Definitions
GP8 Process Definitions
Information To Assemble Products
In-Process Test Description
In Process Test Equipment Drawings
Labor Routings And Tool Routing Sheets
Machine Qualification Procedures
Maintenance Procedures
Material Specifications
Operating Procedures
Operator Instructions
Part Lists
Process Control Plans
Process Flow Charts
Product Design Prints
PFMEA
Process Specification
Quality Plans
QC Inspection Standards
Receiving Inspection Specifications
Relevant Purchasing Information
Service Equipment Specifications
Service Information
Service Test Manuals
Spare Parts Lists
Special Tools Drawings
Supplier Names And Addresses
Supply Specifications
Tool & Gauge Routings
Traceability System Specifications
Workmanship Standards
Trouble Shooting Documentation