THE COURT:  I have a motion in front of me by the debtors in

this case for approval of a supplemental special attrition

program agreement between themselves, the UAW and GM, as well as

an agreement for a special attrition program between themselves,

their second largest union, the IUE-CWA and GM.  The Court had a

lengthy hearing regarding the first agreement between Delphi,

the UAW and GM a couple of months ago and approved that

agreement.  The current supplement is an add-on to that

agreement, and it doesn't change any of the prior terms of that

agreement or the Court's order approving it; but, it is

important to understand —that previously approved program in

that it provides some context for this motion.  The other

contextual point that is important is that between the date that

I approved the main special attrition program between the UAW,

GM and Delphi and today, the debtors filed a motion to reject

their collective bargaining agreements with not only the UAW and

the IUE-CWA but their three other unions.  The Court held

several days of trial on that motion and then, at the parties'

request, adjourned the trial to permit further negotiations

among the unions and Delphi and GM.  In that trial of the

section 1113 and 1114 issues, the unions, and in particular the

UAW, strongly asserted that they had been on a path with both

Delphi and GM to deal with the union issues prior to the debtors

having filed the 1113 and 1114 motion.  That path, UAW asserted,

included, as a critical step, the reduction of the debtors'
hourly workforce pursuant to attrition programs, including the
program that had been negotiated with the UAW and further
programs with other unions that were under consideration.  And
that statement was born out in large measure by the subsequent
negotiation of the supplemental attrition program with the UAW
as well as the program with the IUE, both of which are now
before me.

The motion has been objected to by the four active
non-union parties in interest in this case: the official
creditors' committee and official equity holders' committee, the
indenture trustee of approximately two billion dollars of
unsecured debt, and the ad hoc equity committee.  Those
objections, however, in large part--if not exclusively--go to
one aspect of the proposed agreements and not to the merits of
Delphi's entering into an attrition program with the IUE and
supplementing its current attrition program with the UAW.
Consequently, the evidentiary hearing -- the evidentiary portion
of this hearing--was much briefer than the earlier hearing.

The primary basis for each of the four objections is
the objectors' view that the proposed agreements unduly benefit
GM to the detriment of Delphi.  Specifically, each objector
contends that, in two respects, GM is improperly obtaining
preferred treatment pursuant to the agreements.

The first respect is that under the agreements, GM has agreed, both with respect to the UAW and the IUE, to pay one-half of the proposed actual buyout of those employees who choose to take a buyout, and GM will, under the agreements, receive an allowed claim, an unsecured claim, against Delphi Corporation for the buyout money actually spent by GM.

Secondly, each objector points to the provision of the agreements which would deem GM's claim in respect of its assuming liability for OPEB obligations--for those employees who check the box to transfer those obligations to GM-- as one that is "assertable" under the Master Separation Agreement between Delphi and GM entered into in 1998, whether or not, in actual fact, such a claim could be asserted under or covered by the plain language of the debtors' indemnity of GM in the Master Separation Agreement or any other agreement.

Before discussing the merits of those objections, as well as the remaining objections by Wilmington Trust and the ad hoc equity committee, however, I should note the standard under which I am reviewing this motion.  The motion is couched as a request under section 363(b) of the Bankruptcy Code, which requires that if the debtor uses, sells or leases assets of its estate out of the ordinary course it needs to provide an opportunity for a hearing on notice to parties in interest.  And I believe that this is, properly, a motion under section 363(b)

of the Code, in that, among other things, the debtor would be

expending approximately 135 million dollars, if its projections

are accurate, in respect of the buyout aspect of the programs.

In addition, however, I have reviewed the motion under

the standard for review of settlements in bankruptcy cases as

laid out by the courts, starting with Protective Committee for

Independent Stockholders of TMT Trailer Ferry v. Anderson, 390

US 414, 424 (1968).  I do that because there are elements of

this proposal which do change the treatment of GM's contingent,

unliquidated claims.  I know that the debtors and GM argue, to

the contrary, that these agreements only effect new undertakings

by GM, but I do not entirely accept that analysis for the

purposes of this hearing because the agreements should be

evaluated in the light of GM's existing claims, among other

considerations, and, therefore, I'm going to apply the

settlement standard to those aspects of the motion that allow

GM's claim, in one instance, and, in the other, deem it to be

"assertable" under the MSA, which happen to be the aspects of

the motion that the objectors primarily oppose.  As set forth in

TMT Trailer Ferry and many cases following it, including In re

Ionosphere Clubs, 156 B.R. 414, 424 (S.D.N.Y. 1993), and In re

Remsen Partners, Ltd., 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003),

when considering a settlement in bankruptcy, a court needs to

consider the probability of success if litigation were continued

to be, the difficulty in collection, the complexity of the
litigation involved, and the expense, inconvenience and delay
necessarily attending to it, and a proper deference to the
interests of creditors and stockholders.  Settlements in
bankruptcy are favored, perhaps even more so than in general
litigation, given the limited resources of most debtors.  And
it's clear from the case law, as best set out in In re WT Grant
Co., 69 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 822
(1983), that the Court need not conduct a mini-trial or a
lengthy evidentiary hearing when considering a proposed
settlement, but that it should evaluate the record in the light
of the foregoing factors and has the discretion to approve the
settlement if it falls within the low point in the range of
reasonableness in the light of those factors.

      With respect to motions under section 363(b), the
courts in this Circuit require the bankruptcy court to evaluate
the debtor's action to be taken out of the ordinary course in
the light of its own business judgment, although heavily
informed by -- under proper circumstances – the business
judgment rule that defers to the debtor's exercise of its
business judgment.  See In re Orion Pictures Corp., 4 F.3d 1095
(2d Cir. 1993); In re Integrated Resources, Inc., 147 B.R. 650
(S.D.N.Y. 1992).  See also In re Lionel Corp., 722 F.2d 1063,
1071 (2d Cir. 1983) (requiring showing of "good business

reasons" for proposed action out of the ordinary course).  The
courts determine, when applying the business judgment rule,
whether the debtor has followed proper procedures in evaluating
the proposal and whether the proposal is one involving an
insider as opposed to arms-length negotiations (and, of course,
arms-length negotiations may involve one party having more or
less leverage than the other), as well as, again, the views of
third parties, such as an official committee that may have
access to nearly as much, if not as much, information as the
debtor's decision-makers, particularly if those third parties
object to the relief being sought.  Again, I have reviewed this
motion in the light of both of the foregoing standards.

        Turning to the objections, it is clear to me from the
statements of the objectors, with one exception -- an exception
I'll deal with later -- that the objectors agree with the
debtors that a formal program, such as that covered by this
motion, providing for and encouraging attrition of the debtors'
union employees is beneficial to the debtors generally.  In any
event, the record of the benefit to the debtors provided by
these programs is clear, and I don't need to elaborate on it at
length.  However, I should note that, as these debtors have
clearly set forth, and I think it is undisputed, the debtors
need to substantially reduce their operations in the United
States.  This would involve, in the normal course, a substantial

reduction, of course, in their hourly and salaried workforce
engaged in United States operations.   The attrition program that
already has been substantially implemented with the UAW and GM
has proven to be successful in leading to substantial and
beneficial reductions in the debtors' hourly workforce.
Moreover, those reductions occurred, by and large, at the level
of the most highly paid hourly workers, thereby not only
reducing the numbers of the debtors' workforce but also,
disproportionately, the debtors' per-worker costs.   The cost
benefits were described in the debtors' declarations and are not
contested.

The personnel reductions have also helped the debtors
in another respect, in that they have shifted from their books
to the books of GM a substantial liability for retiree and other
OPEB benefits.   As made clear in Mr. Sheehan's testimony, the
attrition programs do not actually provide for a release of the
debtors in respect of OPEB, but, on the other hand, the OPEB
check-the-box mechanism in the UAW and IUE programs essentially
transfers seamlessly Delphi employees to GM's benefits package
without raising the uncertainties as to when that might
otherwise occur under GM's guaranties of benefits to those two
unions that were entered into in 1999.

Further, the testimony on the record is clear-- and I
include as part of the record the representations by counsel

directly involved in the negotiations, such as Mr. Kennedy and

Ms. Ceccotti and Mr. Butler and GM's counsel-- that the

existence of an attrition program for the UAW as well as the

implementation of an attrition program for the IUE is of very

material importance to the debtors' resolution of their other

issues with the unions in respect of prevailing wage rates,

plant shutdowns, and the like, in that it clarifies the

parameters, or size, of the debtors' workforce going forward and

means that the parties will be negotiating issues in the proper

factual context as opposed to a hypothetical one, and issues

pertaining to the unions' plant shutdown rights are more easily

addressed if most workers at plants slated for closure by the

debtors have already decided to leave.  As Mr. Kennedy said,

there is also a substantial timing element in respect of these

last two points.  The 1113/1114 hearing was adjourned only until

August 11th.  For various reasons, one of which is quite

unfortunate, i.e., the death of the chief negotiator for the

IUE, the IUE is a couple of months behind the UAW in having an

actual track record of participation in an attrition program.

The record is clear, and I think undisputed, that it is very

important for the ongoing labor negotiations that there be a

track record of actual experience under the attrition program

for the IUE and that it occur promptly and well before August

11th, so that the parties can meaningfully negotiate the rest of

their labor issues.  On the other hand, were this program to be
disapproved by me, Mr. Kennedy also represented, and it is, I
believe, fully understandable, that there would be a serious
disruption in the debtors' attempts to resolve the labor issues.

So, as I noted, the reasons for approving an attrition
program like this one, I believe, are clear and largely
acknowledged by the objectors.

As I noted, the primary objection raised by the
objectors goes to the two aspects of GM's claims affected by
this program.  Let me address the buyout point first, although I
should note that these points, to my mind, are not discreet in
that this is a comprehensive attrition program.  If I were to
find fault with one aspect of the program, whether it's the
buyout claim or the right of GM to assert a claim under the MSA
in respect of "check the box" OPEB, I don't have the power to
amend the attrition agreements.  At best, what would occur would
be a return by the three parties to the bargaining table to
renegotiate the attrition agreements.

As regards the buyout point, the attrition agreements
provide that GM will have an allowed claim for the actual
dollars it spends, in respect of the buyout, which would be 50
percent of the aggregate buyout amount.  It was suggested by the
ad hoc committee's objection that this claim allowance would
violate section 502(e) of the Bankruptcy Code.  Mr. Kurtz, at

oral argument, did not press that point, but the debtors' papers adequately address the issue.  The claim is only allowed to the extent that GM actually pays, out-of-pocket in respect of the buyout; therefore, allowance is conditional on the claim becoming fixed and liquidated and thus does not run afoul of section 502(e).

Moreover, the record of the hearing has made it clear that GM's rights in respect of the buyout claim are no different than those of any creditor with an allowed unsecured claim, in that GM would still be subject to the requirements of confirmation of a plan and may be paid out only pursuant to a plan; the disallowance of such a claim under section 502(d) of the Bankruptcy Code, were GM to be found to have received an avoidable transfer and not have returned that transfer; and the other provisions of the Bankruptcy Code that apply to allowed claims of unsecured creditors.

The debtors contend that this allowed buyout claim is for new money provided to them by GM and that they otherwise would either have to go out-of-pocket themselves for the 50 percent that GM is paying or borrow such funds from another third party, at interest, and in return for a first priority secured claim.  Based on that logic, GM's agreement to provide the money, in return for only an allowed unsecured claim is of benefit to the estate.  The record suggests that, at least as of

today, there's no assurance that unsecured creditors, as GM
would be under this agreement, would receive a hundred cents on
the dollar plus interests on their claims.  Therefore, the
debtor is funding half of the buyout with small bankruptcy
dollars, as opposed to a hundred cent dollars.

The objectors argued, nonetheless, that GM is
obtaining for itself an undue benefit through this approach, and
that the debtors are not getting enough in return for giving GM
even an allowed unsecured claim, because GM has, as I mentioned
earlier, previously guarantied OPEB benefits to the IUE and the
UAW, and a consequence of the employees' election of the buyout
would be elimination of that contingent liability on GM's part.

It is no surprise that GM is not entering into these
agreements so as to make a gift to Delphi.  Rather it's entering
into them in its own best interest.  And I'm sure that one of
the consequences that GM considered when deciding to enter into
these agreements is that it would be relieved of its contingent
benefit guaranty liability in respect of those parties who elect
the buyout.  But the issue before me is not the benefit that GM
receives, but whether the debtors are obtaining a reasonable
benefit in return for funding 50 percent of the buyout and
giving GM an allowed unsecured non-priority claim for the other
50 percent, in light of the alternatives available to them.
I've spent a considerable amount of this hearing trying to

evaluate the alternatives available to the debtors with respect

to the buyout proposal.  It seems to me that the first one, to

pay the whole buyout themselves, as suggested by the creditors'

committee, standing alone, is not, for the reasons I stated

earlier, a valid alternative, in that the debtors would be

paying with hundred cent dollars, plus interest --clearly

hundred cent dollars-- in that instance instead of "small"

bankruptcy dollars under the proposed agreements.  In addition,

the creditors' committee's suggested approach would still

relieve GM of its contingent liability on the benefit guaranties

to the unions, with no corresponding benefit to the debtors'

estate.

        With one exception to be discussed later, no objector

posed any other alternative to the buyout, except, as suggested

by the creditors committee, to eschew any support from GM in the

proposed agreements, including as to the buyout funding and the

35,000 dollar inducement to attrition, in return for also not

accepting GM's agreement to the "check-the-box" OPEB assumption.

That is, the objectors took the position that the

acknowledgement of an "asertable" claim by GM in connection with

the "check-the-box" provision of the proposed attrition program

was so beneficial to GM and so detrimental to Delphi that it

outweighed any benefits of GM's participation, including in

funding the buyout and the $35,000 provision's, generally in the

agreements.  Alternatively, the objectors may be suggesting,
although their papers were not particularly clear about this,
that GM would continue to fund 50 percent of the buyouts and the
$35,000 per-person payments even if I disapproved the agreements
on the basis that they gave GM an allowed, unsecured claim and
the right to assert an OPEB claim under the MSA-- that is, the
objectors suggested that if I dared GM, in the light of the
other benefits GM receives under the attrition program, not to
support the program, GM would not take the dare.  It is further
suggested by the objectors that the unions would be as
comfortable -- or should be as comfortable--with such an
approach as with the currently proposed programs, even if GM
refused to amend the agreements and the debtors did not have a
"check-the-box" OPEB program, but rather, continued to pay OPEB
in the ordinary course, with the backup of the 1999 GM benefit
guaranties to the unions.

        Would the debtors obtain, not only the same benefit
under such an approach as under the currently proposed programs,
but, in fact, an even greater benefit?

        Certainly the record, including the statements by the
unions' counsel, is to the contrary, and I accept those
representations by counsel based on my review of the GM/IUE and
GM/UAW benefit guaranties, as well as on my belief that a clear
check-the-box provision is something that not only is definitely

understandable but inherently more reliable to an hourly

employee than his or her reliance upon GM's 1999 benefit

guaranties to the unions, and, therefore, provides a much

greater inducement to elect to attrit.  Thus, the currently

proposed agreements, as opposed to a proposal that includes only

a 100 percent self-funded buyout provision, are, therefore, a

lot more likely to induce an employee to accept attrition

promptly.  And I am not prepared to dare GM not to support an

attrition program in the light of the clear benefits to the

debtors of having GM's support, including, without limitation,

in respect of the OPEB/"check-the-box" feature of the agreements

in addition to the $35,000 provision (for which GM has no

assurance of a claim over against the debtors) and GM's funding

of 50 percent of the buyout in return for an allowed non-

priority unsecured claim.

Moreover, it appears to me that if Delphi simply

excludes GM from a (less effective) attrition program, it is

only deferring the issue of the claims GM will assert in

connection with the performance of the 1999 benefit guaranties.

I believe that ultimately the issues of how and when GM's

benefit guaranties would be triggered will arise in any event in

this case, on either a negotiated basis or as a result of a

ruling in the 1113/1114 litigation, and lead to some form of

liquidated, non-contingent claim by GM.  Consequently, I don't

believe that one should reasonably be able to make GM part of

the solution of Delphi's problems now without some form of

inducement to GM in a tangible form.

Given that GM is, in fact, going to be going out-of-

pocket for 50 percent of the buyout, it seems to me that the

inducement that the debtors have provided for GM is appropriate,

which is an unsecured, pre-petition claim subject to the

limitations previously discussed, and that there is no

meaningful alternative that gets the debtors the same type of

benefit.  Clearly, this falls within the range of reasonableness

for a settlement, to the extent it is a settlement with GM, and

also, in my mind, it is supported by good business reasons.  As

with any settlement or any deal, one can imagine different ways

that it might have been negotiated, but that's not the role of

the Court under either the settlement or section 363(b) business

judgment standards, unless the settlement is not reasonable and

the proposed action is not supported by a good business reason.

I've already addressed, in some measure, the second

issue raised by the objectors, which is that under the

agreements GM is deemed to have an "assertable" claim under the

MSA.  This does, clearly, give GM a benefit in return for its

acceptance of the check-the-box OPEB transfer.  That is because

it is far from clear, and probably unlikely, that without it

being deemed to be assertable under the MSA, GM would have a

claim for indemnity in respect of performance of its benefit

guaranties to the IUE/CWA or the UAW under the MSA (although it

might have a common law contribution claim or subrogation claim

and GM has a separate indemnity agreement with Delphi regarding

the GM/UAW benefit guaranty).  Moreover, with regard to the

IUE, in contrast to the UAW, there is no separate indemnity

agreement whereby Delphi indemnified GM for performance to the

IUE under the GM benefit guaranty.

So, absent deeming the indemnity claims in respect of

the IUE/OPEB claim to be assertable under the MSA, it appears

that GM would have to fall back on its rights under common law

subrogation or contribution doctrines, which might be different

than under the MSA.  That being said, the benefit to GM is

limited in the following respects; first, the debtors expressly

reserve the right to object to the quantification of such a

claim under the MSA, which is a significant reservation, given

the different ways that one may quantify the OPEB liabilities

assumed under the check-the-box program.  Secondly, except for

the right to have the claim deemed assertable under the MSA, all

parties other than the debtors have the right to object on any

basis to such a claim of GM asserted under the MSA, including,

for example, on equitable subordination and fraudulent transfer

bases and the like.

Moreover, as noted earlier, there is a material

difference between GM performing under its benefit guaranties to
the two unions and what GM has agreed to do under these
attrition programs:  accept OPEB liability for those who "check
the box."  Thus, complaining about the difference between GM's
rights against the debtors if GM performs under its benefit
guaranties, which GM is not doing here, and GM's ability to
assert a claim under the MSA as a result of GM's participation
in the attrition programs' check-the-box provision, is largely a
red herring.

        As noted, today GM has no obligation to accept check-
the-box liability for OPEB.  It merely has its obligations to
the two unions under the benefit guaranties.  It's argued by the
objectors that those are the same things -- or tantamount to the
same things.  As I said before, however, I disagree with that.
I believe that the form --the check-the-box provision and the
concession by GM to honor the check-the-box election-- is
substantially more likely to induce hourly workers to accept the
attrition program than simply workers' reliance on the benefit
guaranties, which do not run to any individual worker, and are,
furthermore, tied up in the unpredictable outcome of the pending
section 1113 and 1114 litigation.

        Further, as previously noted, even were
GM somehow forced into accelerating its performance of the
benefit guaranties, in the context of either the 1113/1114

litigation or negotiations with the backdrop of the 1113/1114

litigation, not all issues regarding GM's claims against the

debtors would necessarily be decided or negotiated in the

estates' favor and contrary to GM.  There's a substantial

likelihood that were I to disapprove these attrition agreements

on this basis, therefore, the parties would simply be postponing

the GM negotiations for several months and yet not obtain

ultimately a result more beneficial to the estates (and, as

noted, GM's claim under this provision is still open to serious

challenges).  And of course the consequence of postponing the

negotiations with GM for more months would be, I believe,

severely detrimental to the ongoing negotiations among GM, the

unions and the debtors and essentially deprive the debtors of

the benefits of the attrition programs proposed, leading to

serious deterioration of the labor negotiations.  So

consequently, I'm not prepared to disapprove the proposed

agreements on this basis or to play a game of chicken with GM by

suggesting that if it only made this change I would approve the

debtors' motion.  Again, one could posit different ways that

this provision might have been negotiated, but the provision in

the context of the overall agreements that have resulted is

within the debtors' business judgment and also within the bounds

of reasonableness to the extent that this can be viewed as a

partial settlement of how GM's contingent, unliquidated

indemnification claim with respect to these employees' OPEB
would be treated.

Let me turn to the other objections.  First I'll
address a point that actually was not raised in any objection
but was briefly mentioned in oral argument by the ad hoc
committee's counsel, who suggested that these two attrition
agreements constitute a disguised, de facto or sub-rosa plan of
reorganization and consequently could not be approved without
prior approval of a disclosure statement, voting by parties in
interest and confirmation of a plan.  I disagree with that
assertion.  These agreements do not effect a sub-rosa Chapter 11
plan, in that they do not determine or prescribe the treatment
of, and distributions to, creditors but, rather, deal with a
settlement of a claim to the extent that it is being settled and
the infusion of new money of the debtors and GM to buy out and
induce the attrition of the debtors' employees.  This is not the
type of matter that creditors would be expected to vote on.
Obviously, as with any action out of the ordinary course, there
are consequences that flow from the agreements that affect the
debtors' businesses and, therefore, their chances to reorganize,
but as the Second Circuit has made clear since Lionel, the
existence of such consequences does not constitute a sub rosa
plan.  See, In re Tower Automotive, Inc., 342 B.R. 158 (Bankr.
S.D.N.Y. 2006).

Secondly, the ad hoc committee argued, again I believe only in oral argument, that it questioned whether the proposed buyout was even necessary, in that the debtors had already obtained very significant and beneficial results from the original UAW attrition program.  The assertion came as somewhat of a surprise to me and I believe also to the debtors, since it does not appear to have been raised earlier, the ad hoc committee offered no evidence of its own on this point, did not cross examine any of the debtors' witnesses on it and did not point to anything in the record that suggested that the buyout proposal was not, in and of itself, beneficial to the debtors' estates.  In any event, I believe the argument has been sufficiently rebutted by the counsel involved in the negotiations in the following two respects.  First, with regard to the UAW employees, it appears that there may be some overlap between the existing program and the new buyout, but that the overlap is minor in that the retirement and check-the-box OPEB options, as they benefit more senior workers, would logically continue to be chosen by those workers, whereas the buyout would logically be chosen by others who did not have such seniority.

Also, Mr. Kennedy represented, and based on my understanding of the record in the 1113/1114 hearings his representation is correct, that the buyout is critically important to the success of the IUE/CWA attrition program

because of the age of its workforce, which is substantially

younger than the threshold ages for the other aspects of the

attrition program.  Again, it is uncontroverted that attrition

here is good for the debtors; therefore, I believe that whether

a buyout would encourage attrition on its own as opposed to

being simply redundant with the other aspects of the programs is

the only issue that I needed to consider in connection with this

objection, and I'm satisfied that the buyout does encourage

attrition, in a very meaningful way, on its own.

Finally, the equity committee, the ad hoc committee and

Wilmington Trust have objected to the motion on the basis that

Delphi Corporation -- the parent corporation--is the only

obligor and payor, as opposed to other debtors who may well

benefit from the agreements and Delphi Corp.'s payments under

the attrition agreements.  It was contended by each of those

three objectors that other entities, in particular the North

American subsidiaries of Delphi Corp. actually employ the hourly

workers affected by the attrition agreements, and that those

debtors therefore should be responsible for making the payments

and having a claim asserted against them by GM for GM's buyout

payments and the check-the-box OPEB liability that GM is taking

on.

The proposed order approving the motion is similar,

however, to the order with regard to the existing UAW attrition

program in that it provides that all rights of every debtor are

fully preserved against every other debtor, so that, for

example, Delphi Corporation is not precluded by the agreements

or the order from asserting a claim against Delphi Automotive

Systems for the money that Delphi Corporation has to pay out,

either to GM or to the IUE workers employed, for example, by

Delphi Automotive Systems.  There is no determination anywhere

in the order, moreover, as to what level of priority such a

claim would have, but I note that Delphi Corp.'s payments would

occur post-petition, and if it benefits another debtor, arguably

would give rise to a post-petition, administrative claim against

such debtor.

As I noted during oral argument, it seems to me that,

perhaps with one exception, the foregoing preservation and

reservation of rights sufficiently addresses the objectors'

allocation issue.  This is particularly the case because Delphi

Corporation is not simply a volunteer or an innocent bystander

here.  In addition to being a party to the collective bargaining

agreements with the IUE and UAW, which may or may not have

independent legal significance as far as claims asserted against

it, Delphi Corp. is also the sponsor of the various benefit

plans providing retiree health/OPEB benefits to the employees

covered by these attrition programs and, consequently, would be

benefited by a reduction of such OPEB.

But even leaving that aside, Delphi Corp. is also the parent of DAS, and as far as the record of this hearing is concerned and based on my knowledge of the debtors' business planning, including as set forth in the 1113/1114 trial, it is clear to me that the debtors presently do not intend to jettison their U.S. operations and that they see tangible benefit to Delphi Corp. in those operations' continuation, albeit on a reduced scale. Moreover, it does not appear to me, on this record, that those North American subsidiaries are so hopelessly insolvent that they could not satisfy all or a material portion of a claim over for their fair share of payments by Delphi Corp. under these attrition agreements. And to the extent that they could not, on an absolute priority rule basis, pay Delphi Corporation in full, then at a minimum, Delphi Corp. would share in the equity of those North American subsidiaries under a plan. The debtors therefore have satisfied at least an initial burden of production on the allocation issue, on which Wilmington Trust and the other two objectors have offered nothing in rebuttal.

Consequently, the reservation of rights does sufficiently protect Delphi Corporation from having to pay more than its fair share under these attrition agreements.

So consequently, I'll approve the motion and authorize the debtors to enter into the two agreements.

There's a remaining aspect of the motion aside from

such approval, however, which is the debtors' request that the

ten-day stay, under Bankruptcy Rule, 6004(g), not apply.  There

was no attempt to rebut the debtors' assertion, which I accept,

that the prompt implementation of these attrition programs is of

the greatest importance to the debtors' ability to continue to

resolve the collective bargaining issues, which, of course, are

of fundamental importance to this Chapter 11 case.  I believe

that the need for such speed is sufficiently important to

establish cause under Rule 6004(g), notwithstanding the fact

that there were four objections to the motion.  Again, with the

limited exceptions that I discussed, those objections were not

based on the merits of the attrition programs themselves.  They

went to issues involving GM, and, as I previously said, I

believe that the treatment of GM in these agreements is

essential to the agreements and cannot be changed without losing

the agreements and is reasonable and supported by good business

reasons.  So I believe that the attrition programs need to be

implemented promptly and that the existence of a ten-day stay,

which would take us into, basically, mid-July, would so delay

the implementation of these attrition programs as to materially

impair the ongoing negotiations of the remaining collective

bargaining issues.  So I'll grant this aspect of the debtors'

motion as well.

          MR. BUTLER:  Thank you, Your Honor.  Your Honor, we

submitted an order to the court for the Court's consideration

and I didn't hear anything and the ruling didn't direct us to

change aspects of that and would ask the Court to consider

entering it.

THE COURT:  I think that's fair.  There were some

clarifications on the record.  But I believe that they are

consistent with the document and the proposed order.  I don't

think you need add any language, for example, on 502(d) and the

like.  Has everyone had a chance to review that order?    Okay.

So, it will be entered.

MR. BUTLER:  Thank you, Your Honor.  Your Honor, what

do you want to do with the chambers conference at this point?

THE COURT:  Well, can everyone -- would everyone like

about -- I can either break for about fifteen minutes or five

minutes or I could break for an hour.

MR. KENNEDY:  I'd say five minutes, Your Honor.

THE COURT:  Okay.

MR. BUTLER:  All right.  So 2:30 Your Honor, for the

chamber's conference?

THE COURT:  Yes.

MR. BUTLER:  And -- okay.  And that would involve just

people who are actually --

THE COURT:  Yes, let me be clear.  That conference is

just going to involve the parties who are actively participating

in the 1113/1114 litigation.  So if you are looking to press, or

just a general comment or equity voter or employee, I'd just

exclude you anyway so you ought to leave now.  Otherwise, I'll

be back at 2:30, excuse me.

       MR. BUTLER:  Thank you, Your Honor.