SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                 :
            In re                                :   Chapter 11
                                                 :
    DELPHI CORPORATION, et al.,                  :   Case No. 05- 44481 (RDD)
                                                 :
                                Debtors.         :   (Jointly Administered)
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

AFFIDAVIT OF SERVICE

PLEASE NOTE that on July 10, 2006, I caused to be served true copies of the

documents listed below upon Marc Mitchell,  Enterprise Information Solutions, Inc., 4910 Main

Street, Downers Grove, IL 60515 via messenger delivery:

    1) Notice Of Cure Amount With Respect To Executory Contract Or Unexpired Lease To Be Assumed And/Or Assigned (Docket No. 4506) [a copy of which is attached hereto as Exhibit A]

    2) Notice Of Assumption And/Or Assignment Of Executory Contract Or Unexpired Lease (Docket No. 4506) [a copy of which is attached hereto as Exhibit B]

    3) Notice Of Sale Of Certain Assets At Auction [a copy of which is attached hereto as Exhibit C]

    4) Motion For Orders Under 11 U.S.C. Sections 363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014 (A) Approving (I) Bidding Procedures, (II) Certain Bid Protections, (III) Form And Manner Of Sale Notices, And (IV) Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of Certain Of The Debtors' Assets Comprising Substantially All Assets Of Mobilearia, Inc. Free And Clear Of Liens, Claims, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities (Docket No. 4040) [a copy of which is attached hereto as Exhibit D]

    5) Asset Sale And Purchase Agreement Between Wireless Matrix USA, Inc. And MobilAria, Inc. [a copy of which is attached hereto as Exhibit E]

    6) Proposed Order Under 11 U.S.C. Sections 363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014 (A) Approving (I) Bidding Procedures, (II) Certain Bid Protections, (III) Form And Manner Of Sale Notices, And (IV) Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of Certain Of The Debtors' Assets Comprising Substantially All Assets Of Mobilearia, Inc. Free And Clear Of Liens, Claims, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities [a copy of which is attached hereto as Exhibit F]

2

7) Order Under 11 U.S.C. Section 105(a) And Fed. R. Bankr. P. 2002 And 9014
Approving (I) Bidding Procedures, (II) Certain Bid Protections, (III) Form And
Manner Of Sale Notices, And (IV) Setting Of A Sale Hearing (Docket No. 4328)
[a copy of which is attached hereto as Exhibit G]


Executed in: Chicago, Illinois
        On: July 11, 2006

                                           /s/ Jeffrey C. Demma
                                          Jeffrey C. Demma

    /s/ Mirjana Mirkovic
    Notary Public

3

**EXHIBIT A**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :
     In re                        :    Chapter 11
                            :
DELPHI CORPORATION, et al.,     :    Case No. 05-44481 (RDD)
                            :
                Debtor.    :    (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF CURE AMOUNT WITH RESPECT TO EXECUTORY
CONTRACT OR UNEXPIRED LEASE TO BE ASSUMED AND/OR ASSIGNED

PLEASE TAKE NOTICE THAT:

        1.      Pursuant to the Order Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P.

2002 And 9014 Approving (i) Bidding Procedures, (ii) Certain Bid Protections,  (iii) Form

And Manner Of Sale Notices, And (iv) Setting Of A Sale Hearing (the "Bidding Procedures

Order") entered by the United States Bankruptcy Court for the Southern District of New York

(the "Bankruptcy Court") on June 22, 2006, MobileAria, Inc. ("MobileAria") hereby provides

notice (the "Notice") of its intent to assume and/or assign the executory contract or unexpired

lease (the "Assigned Contract") listed on Exhibit 1 hereto to the Successful Bidder with

respect to MobileAria's assets.  Capitalized terms used but not otherwise defined in this

notice shall have the meaning ascribed to them in the Bidding Procedures Order.

   2. On the Closing Date, or as soon thereafter as reasonably practicable,

MobileAria will pay the amount MobileAria's records reflect is owing for prepetition

arrearages, if any, as set forth on Exhibit 1 (the "Cure Amount").  MobileAria's records

reflect that all postpetition amounts owing under the Assigned Contract have been paid and

will continue to be paid until the assumption and/or assignment of the Assigned Contract and

that, other than the Cure Amount, there are no other defaults under the Assigned Contract.

   3. Objections, if any, to the proposed Cure Amount must (a) be in

writing, (b) state with specificity the cure asserted to be required, (c) include appropriate

documentation thereof, (d) conform to the Federal Rules of Bankruptcy Procedure, the Local

Bankruptcy Rules for the Southern District of New York, and the Seventh Supplemental

Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And

9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And

Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824), (e) be

filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) –

registered users of the Bankruptcy Court's case filing system must file electronically, and all

other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format

(PDF), WordPerfect, or any other Windows-based word processing format), (f) be submitted

in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States

Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York,

One Bowling Green, Room 610, New York, New York 10004, and (g) be served in hard-copy form so that it is actually received within ten days of service of this Notice upon (i) MobileAria, Inc., 800 West El Camino Real, Suite 240, Mountain View, California 94040 (Att'n: Richard Lind), (ii) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (iii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iv) counsel for the agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S. Ziman), (v) counsel for the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and Brian Resnick), (vi) counsel for the Official Committee of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg and Mark A. Broude), (vii) counsel for the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 (Att'n: Bonnie Steingart), (viii) counsel for the Purchaser, Cooley Godward LLP, 101 California Street, Fifth Floor, San Francisco, California 94114 (Att'n: Gregg S. Kleiner), and (ix) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:  Alicia M. Leonhard).

4.    If an objection to the Cure Amount is timely filed, a hearing with respect to the objection will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004, at such date and time as the Court may schedule.  A hearing regarding the Cure Amount, if any, may be continued at the sole discretion of MobileAria until after the Closing Date.

5.      If no objection is timely received, the Cure Amount set forth in <u>Exhibit</u>
<u>1</u>, hereto, shall be controlling, notwithstanding anything to the contrary in any Assigned

Contract or any other document, and the nondebtor party to the Assigned Contract shall be

forever barred from asserting any other claims against the Debtors, the Purchaser, or the

Successful Bidder (as appropriate), or the property of either of them, as to such Assigned

Contract.  The failure of any objecting person or entity to timely file its objection shall be a

bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the

Sale, or MobileAria's consummation and performance of the Agreement (including the

transfer of the Assets and the Assigned Contracts free and clear of all Interests), if authorized

by the Court.

6.      Prior to the Closing Date, MobileAria may amend its decision with

respect to the assumption and/or assignment of the Assigned Contract and provide a new

notice amending the information provided in this Notice.

Dated:  New York, New York
        July 7, 2006

                          SKADDEN, ARPS, SLATE, MEAGHER
                          & FLOM LLP

                          By: /s/ John Wm. Butler, Jr.
                              John Wm. Butler, Jr. (JB 4711)
                              John K. Lyons (JL 4951)
                              Ron E. Meisler (RM 3026)
                          333 West Wacker Drive, Suite 2100
                          Chicago, Illinois  60606
                          (312) 407-0700

                                  - and -

                          By: /s/ Kayalyn A. Marafioti
                              Kayalyn A. Marafioti (KM 9632)
                              Thomas J. Matz (TM 5986)
                          Four Times Square
                          New York, New York 10036
                          (212) 735-3000

                          Attorneys for Delphi Corporation, et al.,
                           Debtors and Debtors-in-Possession

5

# EXHIBIT 1

Enterprise Information Solutions, Inc.
Marc Mitchell
4910 Main Street
Downers Grove, IL 60515

| Contract to be assumed: | Cure amount: |
|---|---|
| Mutual Confidentiality Agreement effective February 27, 2004 between MobileAria, Inc. and Enterprise Information Solutions, Inc. | $0.00 |

**EXHIBIT B**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
     In re                                              :     Chapter 11
                                                        :
DELPHI CORPORATION, et al.,                             :     Case No. 05-44481 (RDD)
                                                        :
                              Debtor.                   :     (Jointly Administered)
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF ASSUMPTION AND/OR ASSIGNMENT
OF EXECUTORY CONTRACT OR UNEXPIRED LEASE

PLEASE TAKE NOTICE THAT:

        1.        Pursuant to the Order Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P.

2002 And 9014 Approving (i) Bidding Procedures, (ii) Certain Bid Protections,  (iii) Form

And Manner Of Sale Notices, And (iv) Setting Of A Sale Hearing (the "Bidding Procedures

Order") entered by the United States Bankruptcy Court for the Southern District of New York

(the "Bankruptcy Court") on June 22, 2006, MobileAria, Inc. ("MobileAria") has accepted

the bid of @Road, Inc. (the "Successful Bidder") for the purchase of substantially all of

MobileAria's assets (the "Assets").  The terms of the bid are set forth in the Asset Sale and

Purchase Agreement, dated as of July 7, 2006 between MobileAria and the Successful Bidder

(the "Agreement").  Capitalized terms used but not otherwise defined in this notice shall have

the meaning ascribed to them in the Bidding Procedures Order.

        2.      Pursuant to the terms of the Agreement, MobileAria will seek to

assume and/or assign the contracts listed on Exhibit 1 hereto (the "Assigned Contracts") at

the hearing to be held at 10:00 a.m. (Prevailing Eastern Time) on July 19, 2006 (the "Sale

Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Judge, United

States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room

610, New York, New York 10004.

        3.      This notice shall amend and replace that certain Notice Of Assumption

And/Or Assignment Of Executory Contract Or Unexpired Lease dated June 26, 2006

providing notice of MobileAria's intent to assume and/or assign the Assigned Contracts to

Wireless Matrix USA, Inc.

        4.      Objections, if any, to the assumption and/or assignment of an Assigned

Contract must (a) be in writing, (b) state with specificity the reasons for such objection, (c)

conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the

Southern District of New York, and the Seventh Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing

Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative

Procedures, entered by this Court on May 19, 2006 (Docket No. 3824), (d) be filed with the

Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users

2

of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (e) be submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004, and (f) be served in hard-copy form so it is actually received within ten days after the date of this Notice upon (i) MobileAria, Inc., 800 West El Camino Real, Suite 240, Mountain View, California 94040 (Att'n: Richard Lind), (ii) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (iii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iv) counsel for the agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S. Ziman), (v) counsel for the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and Brian Resnick), (vi) counsel for the Official Committee of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg and Mark A. Broude), (vii) counsel for the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 (Att'n: Bonnie Steingart), (viii) counsel for the Successful Bidder, Heller Ehrman LLP, 7 Times Square, New York, New York 10036 (Att'n: Carren Shulman), and (ix) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:  Alicia M. Leonhard).

     5.     If an objection to the assumption and/or assignment of an Assigned Contract is timely filed, a hearing with respect to the objection will be held before the

Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court

for the Southern District of New York, One Bowling Green, Room 610, New York, New

York 10004, at the Sale Hearing or such date and time as the Court may schedule.  If no

objection is timely received, the nondebtor party to the Assigned Contract shall be forever

barred from asserting any other claims, including, but not limited to, the propriety or

effectiveness of the assumption and/or assignment of the Assigned Contract, against the

Debtors or the Successful Bidder, or the property of either of them as to such Assigned

Contract.

      6.     Pursuant to 11 U.S.C. § 365, there is adequate assurance of future

performance that the Cure Amount set forth in the Cure Notice shall be paid in accordance

with the terms of the Sale Order.  Further, there is adequate assurance of the Successful

Bidder's future performance under the executory contract or unexpired lease to be assumed

and assigned because of the significant resources of the Successful Bidder.

7.      Prior to the Closing Date, MobileAria may amend its decision with respect to the assumption and/or assignment of any Assigned Contract and provide a new notice amending the information provided in this Notice.

Dated:  New York, New York
         July 7, 2006

                        SKADDEN, ARPS, SLATE, MEAGHER
                        & FLOM LLP

                        By: /s/ John Wm. Butler, Jr.
                           John Wm. Butler, Jr. (JB 4711)
                           John K. Lyons (JL 4951)
                           Ron E. Meisler (RM 3026)
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois  60606
                        (312) 407-0700

                              - and -

                        By: /s/ Kayalyn A. Marafioti
                           Kayalyn A. Marafioti (KM 9632)
                           Thomas J. Matz (TM 5986)
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                        Attorneys for Delphi Corporation, et al.,
                           Debtors and Debtors-in-Possession

# EXHIBIT 1

Enterprise Information Solutions, Inc.
Marc Mitchell
4910 Main Street
Downers Grove, IL 60515

| **Contract to be assumed:** |
| --- |
| Mutual Confidentiality Agreement effective February 27, 2004 between MobileAria, Inc. and Enterprise Information Solutions, Inc. |

**EXHIBIT C**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                     :
    In re                 :    Chapter 11
                     :
DELPHI CORPORATION, et al.,  :    Case No. 05-44481 (RDD)
                     :
            Debtor.   :    (Jointly Administered)
                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>NOTICE OF SALE OF CERTAIN ASSETS AT AUCTION</u>

PLEASE TAKE NOTICE OF THE FOLLOWING:

        1.       Pursuant to the Order Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P.

2002 And 9014 Approving (i) Bidding Procedures, (ii) Certain Bid Protections, (iii) Form

And Manner Of Sale Notices, And (iv) Setting Of A Sale Hearing (the "Bidding Procedures

Order") entered by the United States Bankruptcy Court for the Southern District of New York

(the "Bankruptcy Court") on June 22, 2006, the above-captioned debtors and debtors-in-

possession (collectively, the "Debtors") are offering for sale the assets (the "Assets") of

MobileAria, Inc. ("MobileAria").  Capitalized terms used but not otherwise defined in this

notice shall have the meanings ascribed to them in the Bidding Procedures.

        2.      All interested parties are invited to make an offer to purchase the

Assets in accordance with the terms and conditions approved by the Bankruptcy Court (the

"Bidding Procedures").  Pursuant to the Bidding Procedures, the Debtors may conduct an

auction for the Assets (the "Auction") beginning at 10:00 a.m. on July 6, 2006 at the offices

of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York.

        3.      Participation at the Auction is subject to the Bidding Procedures and

the Bidding Procedures Order.  A copy of the Bidding Procedures is attached hereto as

Exhibit 1.

        4.      The Debtors have accepted a bid only when the bid has been approved

by the Bankruptcy Court at the Sale Hearing.  Notwithstanding Bankruptcy Court approval of

a sale pursuant to the terms of a bid by a Qualified Bidder, the Good Faith Deposits of all

bidders will be retained by the Debtors, and all bids will remain open, until the earlier of 48

hours after the closing of the sale of the Assets or August 31, 2006 (the "Return Date");

provided, however, that if the Debtors determine not to sell the Assets, the Good Faith

Deposits of all Qualified Bidders will be returned by the Debtors within 48 hours of the

Auction.  Upon failure to consummate the sale of the Assets because of a breach or failure on

the part of the Successful Bidder, the Debtors may select in their business judgment the next

highest or otherwise best Qualified Bid to be the Successful Bid without further order of the

Court.  On the Return Date, the Seller will return the Good Faith Deposits of all Qualified

Bidders, except the Successful Bidders, with accrued interest.

5.      The Debtors may: (a) determine, in their business judgment, which Qualified Bid is the highest or otherwise best offer and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid any bid which, in the Debtors' sole discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, its estate, and its creditors.

6.      A hearing to approve the Sale of the Assets to the highest and best bidder will be held on July 19, 2006 at 10:00 a.m. (Prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004, before the Honorable Robert D. Drain, United States Bankruptcy Judge.  The hearing on the Sale my be adjourned without notice other than an adjournment in open court.

7.      Objections, if any, to the proposed Sale must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824), (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (d) be submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, and (e) be served in hard-copy form upon (i) MobileAria, Inc., 800 West El Camino Real, Suite 240, Mountain View, California 94040 (Att'n: Richard Lind), (ii)

Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (iii)

counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker

Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iv) counsel for the

agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425

Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S. Ziman), (v) counsel for

the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington

Avenue, New York, New York 10017 (Att'n: Donald Bernstein and Brian Resnick), (vi)

counsel for the Official Committee of Unsecured Creditors, Latham & Watkins LLP, 885

Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg and Mark A.

Broude), (vii) counsel for the Official Committee of Equity Security Holders, Fried, Frank,

Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 (Att'n:

Bonnie Steingart), (viii) counsel for the Purchaser, Cooley Godward LLP, 101 California

Street, Fifth Floor, San Francisco, CA 94114 (Att'n: Gregg S. Kleiner), and (ix) the Office of

the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite

2100, New York, New York 10004 (Att'n:  Alicia M. Leonhard), in each case so that it is

**actually received** no later than **4:00 p.m. (Prevailing Eastern Time) on July 14, 2006**.

8.    This notice is qualified in its entirety by the Bidding Procedures Order.

Dated:  June 23, 2006

BY ORDER OF THE COURT

John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

**EXHIBIT D**

**Bidding Procedures Hearing Date And Time: June 16, 2006 at 10:00 a.m.**
**Bidding Procedures Objection Deadline: June 13, 2006 at 4:00 p.m.**
**Sale Hearing Date And Time: July 19, 2006 at 10:00 a.m.**
**Sale Hearing Objection Deadline: July 12, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x
                                              :
        In re                                 :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                                              :    (Jointly Administered)
            Debtors.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x

MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002,
6004, 6006, AND 9014 (A) APPROVING (I) BIDDING PROCEDURES, (II) CERTAIN BID
PROTECTIONS, (III) FORM AND MANNER OF SALE NOTICES, AND (IV) SALE
HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF CERTAIN
OF THE DEBTORS' ASSETS COMPRISING SUBSTANTIALLY ALL ASSETS OF
MOBILEARIA, INC. FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES,
(II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES

("MOBILEARIA SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for orders under 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 approving (i) the bidding procedures set forth herein and attached hereto as <u>Exhibit A</u> (the "Bidding Procedures"), (ii) the granting of certain bid protections, (iii) the form and manner of sale notices (the "Notice Procedures"), and (iv) the setting of a sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of certain of the Debtors' assets (the "Acquired Assets") comprising substantially all of the assets of MobileAria, Inc. ("MobileAria") for $6.5 million and other consideration, free and clear of liens, claims, and encumbrances to Wireless Matrix USA, Inc. (the "Purchaser") pursuant to the Asset Sale and Purchase Agreement dated June 6, 2006 by and between MobileAria and the Purchaser (the "Agreement")[1] or to the Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid, (ii) the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Contracts") to the Purchaser or the Successful Bidder, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Purchaser or the Successful Bidder.  In support of this Motion, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates, including MobileAria, filed voluntary petitions in this Court for reorganization relief

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

2

under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the

"Bankruptcy Code").  The Debtors continue to operate their businesses and manage their

properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11

cases.

2.        On October 17, 2005, the Office of the United States Trustee appointed an

official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the

Office of the United States Trustee appointed an official committee of equity security holders

(the "Equityholders' Committee").  No trustee or examiner has been appointed in the Debtors'

cases.

3.        This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.        The statutory predicates for the relief requested herein are sections 363

and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

B.        Current Business Operations Of The Debtors

5.        Delphi and its subsidiaries and affiliates (collectively, the "Company") had

global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion.[2] At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues, and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

---

[2]      The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
         and its worldwide subsidiaries and affiliates.

3

not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

---

[3]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.      The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.      In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

11.      On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

5

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

12.    In connection with the first two elements of the Company's transformation

plan, Delphi continues to participate in discussions with its unions and GM.  Throughout those

discussions, Delphi has consistently communicated a clear message to both its hourly workforce

and GM: Delphi is committed to finding a consensual resolution to its issues and intends to

continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S.

operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a

tripartite agreement providing for a special hourly attrition program for Delphi's UAW-

represented employees.  This special hourly attrition program could provide as many as 18,000

of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landings"

through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement

on similar hourly attrition programs with its other unions, which could provide as many as 4,500

additional hourly employees with retirement programs or incentives.

13.    These hourly attrition programs constitute an important first step in

implementing the Debtors' transformation plan, but will not resolve all of the issues related to

Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive

agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under

sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements

and to modify retiree benefits.[4]  Contemporaneously therewith, the Debtors also moved to reject

unprofitable supply contracts with GM.[5]  Among the reasons for the GM contract rejection

motion was the Debtors' belief that GM must cover a greater portion of the costs of

manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This

initial motion covers approximately half of the Debtors' North American annual purchase

volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the

filing of these motions was a necessary procedural step, the Debtors remain focused on reaching

a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is

necessary.

14.    To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which the

Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.   To that end, the Company will concentrate the organization

around the following core strategic product lines: (a) Controls & Security (Body Security,

Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture

(Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c)

Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel

---

[4]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And
Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

[5]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033).

and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics),

and (f) Thermal (Climate Control & Powertrain Cooling).[6]

15.    In contrast, the Company similarly identified certain non-core product

lines that do not fit into its future strategic framework, including Brake & Chassis Systems,

Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering,

and Wheel Bearings.  The Company will seek to sell or wind down these non-core product lines

(which will include approximately one-third of its global manufacturing sites) and will consult

with its customers, unions, and other stakeholders to carefully manage the transition of such

affected product lines.  The Company intends to sell or wind down the non-core product lines

and manufacturing sites by January 1, 2008.

16.    As part of its organizational restructuring, the fourth element of the

Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as

many as 8,500 employees as a result of portfolio and product rationalizations and initiatives

adopted following an analysis of the Company's selling, general, and administration ("SG&A")

cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented,

the Company should realize savings of approximately $450 million per year in addition to

savings realized from competitive measures planned for its core businesses and the disposition of

non-core assets.

17.    As noted above, the final key tenet of the transformation plan is to devise

a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the

benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors'

---

[6]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket
or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial
vehicles, or other adjacent-market businesses and product lines.

hourly and salaried workforce.  To do so, however, it will be necessary to freeze the current

hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension

plan as of January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will

also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation,

the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize

funding contributions over a long-term period.  The Company intends to replace the hourly plan

(for certain employees) and the salaried plan with defined contribution plans.

18.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

Relief Requested

19.    On June 6, 2006, MobileAria and the Purchaser entered into the

Agreement which provides for the Sale of the Acquired Assets, which comprise substantially all

of the assets of MobileAria, to the Purchaser for $6.5 million and other consideration.  The

proposed Sale is subject to approval by this Court and additional competitive bidding pursuant to

the proposed Bidding Procedures.  By this Motion, the Debtors seek entry of two orders.  First, at

the omnibus hearing scheduled to be held on June 16, 2006, the Debtors request entry of an order

substantially in the form attached hereto as Exhibit B (the "Bidding Procedures Order")

approving the Bidding Procedures, Notice Procedures, and certain bid protections to be provided

to the Purchaser pursuant to the Agreement and as described more fully herein.  Second, subject

to the terms of the Bidding Procedures Order, at the omnibus hearing scheduled to be held on

9

July 19, 2006, the Debtors request entry of an order substantially in the form attached hereto as

Exhibit C (the "Sale Order") authorizing and approving the Sale, the assumption and assignment

of the Assumed Contracts, and the assumption of the Assumed Liabilities.

20.    As more fully set forth below, after a comprehensive strategic review,

MobileAria believes that the Sale is its best opportunity under the circumstances to maximize the

underlying core value of its business and that, therefore, the sale is in the best interests of its

estate and its creditors.

Basis For Relief

A.    MobileAria's Business

21.    MobileAria is a technology leader in next generation mobile resource

management (MRM) solutions designed to maximize mobile workforce productivity.  By

enabling a high-speed data connection between mobile resources and an enterprise's IT

infrastructure, MobileAria's end-to-end solutions deliver unique dual functionality by (a)

enabling real-time central monitoring and control of mobile assets through intelligent web

applications and (b) providing field workers with real-time wireless access to corporate data

networks and the internet while providing field services, both in and away from a vehicle.

22.    Founded in 2000 to serve the long-haul trucking industry, in 2004

MobileAria identified escalating demand for customized telematics solutions among operators of

the nation's largest fleets.  Soon thereafter, MobileAria refocused its development efforts on

designing a flexible and adaptable technology platform and positioning MobileAria as a provider

of custom MRM and mobile workforce connectivity solutions.  In 2005, MobileAria won a

20,000 unit, five-year service contract from Verizon Services Corp., one of the largest service

fleet operators in the U.S., validating MobileAria's solutions approach and the superiority of its

technology platform.

10

23.     Although the Debtors believe that MobileAria is a fundamentally strong business in a emerging and rapidly growing market, MobileAria's business does not present a strong fit within the Debtors' anticipated product portfolio under their transformation plan.  The Debtors and MobileAria have, therefore, determined that MobileAria's value will be maximized through the divestiture of its assets.

B.     Factors Leading To The Sale

24.     As a result of the Debtors' development of their transformation plan, the Debtors and MobileAria determined that MobileAria's business was not a good strategic fit with the Debtors' restructured product portfolio.  Therefore, in March of this year, MobileAria engaged Pagemill Partners LLC ("Pagemill") to develop, solicit and assist MobileAria in analyzing potential transactions including a sale of MobileAria's assets or a merger with a strategic partner.  Pagemill, as a technology-focused investment bank located in the Silicon Valley region of California (as is MobileAria's headquarters) with extensive transactional experience focusing on emerging and middle-market transactions, was uniquely qualified to provide such services to MobileAria.

25.     In seeking potential acquirers of MobileAria's assets, Pagemill identified approximately 70 potential bidders based upon those companies' strategic fit and financial characteristics ("Potential Bidders").  Beginning in early April, Pagemill contacted each such potential bidders to gauge their interest in acquiring MobileAria's assets or otherwise entering into a strategic transaction with MobileAria.  Of those targeted companies, 16 requested and were provided an information memorandum prepared by MobileAria and Pagemill.

26.     Following receipt of the information memorandum, six of the potential acquirers submitted preliminary indications of interest to MobileAria.  MobileAria, with the

11

assistance of its retained advisors, assembled an electronic data room and prepared management

presentations to provide for an organized and efficient transmission of significant amounts of

data related to MobileAria's business.  During the week of May 15, five in-person and one

telephonic management presentations were made to the potential bidders.

27.     Following this initial round of diligence, four of the potential bidders

submitted proposals for the acquisition of MobileAria's assets on May 24, 2006.  MobileAria, in

conjunction with Pagemill and its other retained advisors, evaluated the terms and benefits of

each proposal, as well as the benefits of other alternatives.  MobileAria, in its business judgment,

concluded that the proposal from the Purchaser, which formed the basis of the Agreement

attached hereto as <u>Exhibit D</u>,[7] offered the most advantageous terms and the greatest economic

benefit to MobileAria.

C.     The Need For An Expedited Sale Process

28.     Although MobileAria is a technology leader in next generation MRM

solutions and remains poised for significant growth, MobileAria's present growth requires

current cash infusions.  The Debtors' current financial condition has therefore put a strain on

MobileAria's potential future growth.  In light of MobileAria's current cash needs and the other

Debtors' desire to focus their available free cash on investments in those business lines which are

more likely to comprise their restructured product portfolio, there is a risk of value erosion if a

sale is not effectuated promptly.  While the proposed Sale of the Acquired Assets to a solid,

financially-strong party will provide some stability to prevent business deterioration during this

---

[7]     The copy of the Agreement attached hereto as <u>Exhibit D</u> omits the schedules thereto, certain of which contain
        information which MobileAria has determined is highly confidential.  Copies of such schedules will be
        provided to all Qualified Bidders (as defined below) upon execution of the confidentiality agreement provided
        for under the Bidding Procedures.

process, the overall value of MobileAria's assets will be maintained and maximized through an

expedited sale process.

D.    <u>The Agreement</u>

29.    Pursuant to the Agreement, (a) MobileAria will (i) sell the Acquired

Assets for $6.5 million and other consideration, free and clear of all liens, claims, interests and

encumbrances and (ii) assume and assign the Assumed Contracts to the Purchaser and (b) the

Purchaser will assume the Assumed Liabilities of MobileAria.

30.    The significant terms of the Agreement are as follows:[8]

(a)    <u>General Terms</u>.  It is proposed that the Purchaser will acquire the
Acquired Assets, which comprise substantially all of the assets of MobileAria.  The transaction
will be accomplished through an asset sale.  Among others, certain bailed assets, personnel
records, financial assets, contracts, tax refunds, benefits arising under insurance policies, and
MobileAria's rights under chapter 5 of the Bankruptcy Code are excluded from the Acquired
Assets.

(b)    <u>Bankruptcy Approval</u>.  The Sale is subject to approval by the Court and
competitive bidding pursuant to the Bidding Procedures.

(c)    <u>Documentation</u>.  The Sale will be effected pursuant to the Agreement and
related documentation.  At the closing, MobileAria and the Purchaser will enter into, among
others, the following agreements: (i) certain agreements governing the transfer of intellectual
property from MobileAria to the Purchaser, (ii) an escrow agreement by and among MobileAria,
the Purchaser, and JPMorgan Chase Bank, N.A. for the purposes described below, and (iii) a
software license agreement between Delphi Technologies, Inc. ("DTI") and the Purchaser
providing for a license of certain proprietary software belonging to DTI used in conjunction with
MobileAria's vehicle tracking and control unit product.

(d)    <u>Purchase Price</u>.  The purchase price to be paid by the Purchaser is $6.5
million.

(e)    <u>Escrow</u>.  $975,000.00 of the purchase price will be placed into an escrow
account to satisfy MobileAria's indemnification obligations to the Purchaser.  The remaining
available funds from the escrow are to be released on the first anniversary of the date of closing;
<u>provided</u>, <u>however</u>, that if the Purchaser has made an indemnification claim prior to such date,
then the escrow agent will continue to hold in escrow an amount sufficient to satisfy such
indemnification claim until such claim is fully and finally resolved.

---

[8]    In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of
the Agreement are controlling.

(f)    <u>Representations And Warranties</u>.  Pursuant to the Agreement, MobileAria
will provide comprehensive representations and warranties relating to the Sale and the Acquired
Assets.  The representations and warranties of MobileAria will survive the closing of the Sale
and expire on the first anniversary of the date of closing.  Purchaser will also provide standard
representations and warranties which will survive the closing of the Sale and expire on the first
anniversary of the date of closing.

(g)    <u>Covenants</u>.  Between the date of signing the Agreement and the closing,
MobileAria is required to, among other things: (i) carry on its business in substantially the same
manner as it has heretofore and perform in all material respects all of its obligations under certain
enumerated contracts, (ii) use commercially reasonable efforts to maintain and preserve relations
with customers, suppliers, and employees, and (iii) use commercially reasonable efforts to take
all actions necessary, proper, or advisable to effectuate the Sale in accordance with the
Agreement.  For a period of three years after the closing, MobileAria is required not to take
certain actions which would place it in competition with the Purchaser with respect to
MobileAria's current business line.

(h)    <u>Indemnification</u>.  MobileAria has agreed to indemnify the Purchaser for
damages related to the following items: (i) those liabilities and assets retained by MobileAria at
closing, (ii) MobileAria's breach of any representation or warranty in the Agreement, and (iii) a
breach of any agreement or covenant of MobileAria in the Agreement.  The sole and exclusive
recourse of the Purchaser with respect to breaches of representations and warranties described
above is a claim against the $975,000.00 escrow account described above.

(i)    <u>Closing Conditions</u>.  In addition to certain other customary closing
conditions relating to bankruptcy court approvals and regulatory matters, the obligation of the
Purchaser to close the Sale is subject to the satisfaction of the following conditions: (i) the
performance in all respects by MobileAria of its covenants under the Agreement and (ii) the
accuracy of MobileAria's representations and warranties in all material respects.

(j)    <u>Termination</u>.  The Agreement may be terminated in the following
circumstances (but not by a party that is in breach of the Agreement): (i) upon mutual written
consent of MobileAria and the Purchaser, (ii) by either MobileAria or the Purchaser if
consummation of the Sale would violate any final non-appealable order of any regulatory
governmental entity other than the Court, (iii) by either MobileAria or the Purchaser if
MobileAria consummates an alternative transaction, (iv) by either MobileAria or the Purchaser if
the closing shall not have occurred by July 31, 2006, (v) by either MobileAria or the Purchaser if
the Sale Order is not entered by the Court by July 26, 2006 or if the Sale Order is subject to a
stay or injunction, (vi) within ten business days of receiving written notice thereof, by the
Purchaser if a material adverse effect has occurred and is continuing, (vii) by the Purchaser if
Verizon Services Corp. has terminated, threatened to terminate, or otherwise evidenced an intent
to terminate a certain agreement with MobileAria or materially reduce the amount of business
conducted pursuant to such agreement, (viii) by the Purchaser if the Purchaser provides
MobileAria with written notice by 6:00 p.m. (prevailing Eastern time) on June 9, 2006 (or such
later date as the Purchaser and MobileAria may mutually agree) that the results of the Purchaser's
further due diligence into certain matters specifically enumerated in the Agreement are not
reasonably acceptable to the Purchaser, and MobileAria and the Purchaser are not able to agree

14

upon a mutually-acceptable resolution to such concerns (provided that, in the event of a termination under (viii), the Purchaser's sole remedy will be the immediate return of the Purchaser's deposit and MobileAria will have no other liability to the Purchaser whatsoever, including, without limitation, for payment of the Break-Up Fee or the Expense Reimbursement), or (ix) by MobileAria if MobileAria accepts or is about to accept a qualified bid at the auction other than that of the Purchaser (provided that such termination under (ix) will be of no effect unless MobileAria enters into an agreement with respect to such qualified bid within two business days of termination and subsequently completes the Sale pursuant thereto).

   (k) <u>Break-up Fee</u>.  Subject to Court approval, MobileAria will be required to pay a Break-Up Fee to the Purchaser in the amount of 3.0% of the purchase price if (i) MobileAria sells, transfers, leases, or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, or other similar transaction, all or substantially all or a material portion of the Acquired Assets in a transaction or a series of transactions with one or more parties other than the Purchaser or (ii) (A) MobileAria accepts a Qualified Bid or Qualified Bids at the Auction other than that of the Purchaser, (B) the Purchaser does not submit a subsequent bid at the Auction, and (C) MobileAria does not provide written notice to the Purchaser and its counsel on or before 5:00 p.m. (prevailing Eastern time) on July 26, 2006 that, notwithstanding MobileAria's acceptance of a Qualified Bid or Qualified Bids other than that of the Purchaser at the Auction, it intends to close the transactions contemplated by the Agreement on or before July 31, 2006.  The Purchaser has agreed that, in the event that it is entitled to receive both the break-up fee and the expense reimbursement under the Agreement, the Purchaser shall only be entitled to receive the larger of the two and in no case shall be entitled to receive payment of both.

   (l) <u>Expense Reimbursement</u>.  Subject to Court approval, MobileAria will be required to reimburse the Purchaser's reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement in an amount not to exceed $120,000.00 to the Purchaser upon (i) a termination of the Agreement by reason of the failure of the Closing to occur by July 31, 2006 or (ii) a termination of the Agreement by reason of (A) the failure of the Sale Order to be entered on or before July 26, 2006 or (B) the Sale Order being subject to a stay or injunction, in any case provided that the Purchaser is not then in breach of the Agreement for which MobileAria had previously notified the Purchaser.

E. <u>Bidding Procedures</u>

   31. The Sale of the Acquired Assets is subject to higher or otherwise better offers pursuant to the Bidding Procedures.  Accordingly, MobileAria seeks approval of the Bidding Procedures for the Sale of the Acquired Assets.  MobileAria has determined that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Acquired Assets for the benefit of MobileAria's estate, creditors, and other interested parties.

32.     The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process").

33.     The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> provide, in relevant part, as follows:[9]

(a)     <u>Assets To Be Sold</u>:  The assets proposed to be sold are the Acquired Assets.

(b)     <u>"As Is, Where Is"</u>:  The Bidding Procedures provide that the sale of the Acquired Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description except as set forth in the Agreement or the purchase agreement of a Successful Bidder.

(c)     <u>Free Of Any And All Claims And Interests</u>: The Acquired Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon (collectively, the "Claims and Interests") and the Claims and Interests shall attach to the net proceeds of the sale of such Acquired Assets.

(d)     <u>Participation Requirements</u>:  To ensure that only bidders with a serious interest in the purchase of the Acquired Assets participate in the Bidding Process, the Bidding Procedures provide for certain minimal requirements for a potential bidder to become a "Qualified Bidder."  These requirements include (i) executing a confidentiality agreement substantially in the form attached to the Bidding Procedures, (ii) providing MobileAria with certain financial assurances as to such bidders ability to close a transaction, and (iii) submitting a preliminary proposal reflecting any Acquired Assets expected to be excluded and the purchase price range.

(e)     <u>Due Diligence</u>:  The Bidding Procedures permit all Qualified Bidders an opportunity to participate in the diligence process.  MobileAria will coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.

(f)     <u>Bid Deadline</u>:  The Bidding Procedures provide for a bid deadline of 11:00 a.m. (prevailing Eastern time) on June 29, 2006 (the "Bid Deadline").  As soon as

---

[9]     In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the provisions of the Bidding Procedures shall control.  Capitalized terms used but not otherwise defined in this summary have the meanings ascribed to them in the Bidding Procedures.

reasonably practicable following receipt of each Qualified Bid, MobileAria will deliver to Purchaser and its counsel complete copies of all items and information set forth in section (g) below.

(g)    Bid Requirements:  All bids must include the following documents: (i) a letter stating that the bidder's offer is irrevocable for the period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a good faith deposit of $500,000.00, and (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

(h)    Qualified Bids: To be deemed a "Qualified Bid," a bid must be received by the Bid Deadline and, among other things, (i) must be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to MobileAria than those contained in the Agreement, (ii) must not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) must have a value greater than the purchase price reflected in the Agreement plus the amount of the Break-Up Fee plus $400,000.00, (iv) must not be conditioned on bid protections, other than those contemplated in the Bidding Procedures, (v) must contain acknowledgements and representations as set forth in the Bidding Procedures, and (vi) includes a commitment to consummate the purchase or the Acquired Assets within not more than 15 days after entry of a Bankruptcy Court order approving such purchase.  With certain limited exceptions, MobileAria retains the sole right to deem a bid a Qualified Bid, if such bid does not conform to one or more of the aforementioned requirements, provided however, that such bid must have a value greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus $400,000.00, taking into account all material terms of any such bid. Each Qualified Bid other than that of the Purchaser shall be called a "Subsequent Bid."

(i)    Conduct Of Auction: If MobileAria receives at least one Qualified Bid in addition to the Agreement, MobileAria will conduct an auction (the "Auction") of the Acquired Assets at 10:00 a.m. (prevailing Eastern time) on or before July 10, 2006, in accordance with the procedures outlined in the Bidding Procedures which include: (i) attendance at the Auction will be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two business days prior to the Auction, each Qualified Bidder with a Qualified Bid must inform MobileAria whether it intends to participate in the Auction and at least one business day prior to the Auction, MobileAria will provide such bidders copies of the Qualified Bid which MobileAria believes is the highest or otherwise best offer for the Acquired Assets, (iii) all Qualified Bidders will be entitled to be present for all Subsequent Bids, and (iv) bidding at the Auction will begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $100,000, and conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids.

(j)    Selection of Successful Bid:  As soon as practicable after the conclusion of the Auction, MobileAria will, in consultation with its financial advisors, review each Qualified Bid and identify the highest or otherwise best offer for the Acquired Assets (the "Successful Bid") and the bidder making such bid (the "Successful Bidder").  MobileAria will sell

17

the Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "Sale Hearing").

(k)    Sale Hearing: MobileAria requests that the Sale Hearing be scheduled for July 19, 2006 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing may be adjourned or rescheduled by MobileAria without notice other than by an announcement of the adjourned date at the Sale Hearing. If no Qualified Bids other than that of the Purchaser are received, MobileAria will proceed with the sale of the Acquired Assets to the Purchaser following entry of the order approving the Sale. If MobileAria does receive additional Qualified Bids, then, at the Sale Hearing, MobileAria shall seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid" and such bidder, the "Alternate Bidder"). A bid will not be deemed accepted by MobileAria unless and until approved by the Bankruptcy Court. Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid will be deemed to be the Successful Bid and MobileAria will effectuate a sale to the Alternate Bidder without further order of the Bankruptcy Court.

(l)    Return Of Good Faith Deposits: The Bidding Procedures provide that good faith deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open until two business days following the closing of the Sale (the "Return Date"). Notwithstanding the foregoing, the good faith deposit submitted by the Successful Bidder, together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder. If a Successful Bidder fails to consummate an approved sale, MobileAria will not have any obligation to return such good faith deposit and it shall irrevocably become property of MobileAria. On the Return Date, MobileAria will return the good faith deposits of all other Qualified Bidders, together with the accrued interest thereon.

(m)    Reservation of Rights: MobileAria, after consultation with the agent for the debtors' prepetition secured lenders and the Creditors' Committee: (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer, and (ii) may reject at any time, any bid (other than the Purchaser's bid) that is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of MobileAria, its estate and creditors as determined by MobileAria in its sole discretion.

F.    Bid Protections

34.    The Purchaser has expended, and likely will continue to expend, considerable time, money, and energy pursuing the Sale and has engaged in extended arms' length and good faith negotiations. The Agreement is the culmination of these efforts.

35.    In recognition of this expenditure of time, energy, and resources, MobileAria has agreed to provide certain bid protections to the Purchaser (the "Bid

Protections").  Specifically, the Agreement provides, and MobileAria respectfully requests that

the Bidding Procedures Order approve, a break-up fee payable by MobileAria to the Purchaser in

the amount of 3.0% of the purchase price if (a) MobileAria sells, transfers, leases or otherwise

disposes of, directly or indirectly, including through an asset sale, stock sale, merger, or other

similar transaction, all or substantially all or a material portion of the Acquired Assets in a

transaction or a series of transactions with one or more parties other than the Purchaser, or (b) (i)

MobileAria accepts a Qualified Bid or Qualified Bids at the Auction other than that of the

Purchaser (ii) the Purchaser does not submit a subsequent bid at the Auction, and (iii)

MobileAria does not provide written notice to the Purchaser and its counsel on or before 5:00

p.m. (prevailing Eastern time) on July 26, 2006 that, notwithstanding MobileAria's acceptance of

a Qualified Bid or Qualified Bids other than that of the Purchaser at the Auction, it intends to

close the transactions contemplated by the Agreement on or before July 31, 2006.  MobileAria's

obligation to pay the Bid Protections, as provided by the Agreement, shall survive termination of

the Agreement and, until paid, shall constitute a superpriority administrative expense pursuant to

section 507(b) of the Bankruptcy Code.

      36.     In addition, the Agreement provides, and MobileAria respectfully requests

that the Bidding Procedures Order approve, reimbursement of the Purchaser's reasonable, actual

out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the

Agreement not to exceed $120,000.00 will be payable to the Purchaser, subject to this Court's

approval pursuant to the Bidding Procedures Order, upon (y) a termination of the Agreement by

reason of the failure of the Closing to occur on or before July 31, 2006 or (z) a termination of the

Agreement by reason of (1) the failure of the Sale Order to be entered on or before July 26, 2006

or (2) the Sale Order being subject to a stay or injunction, in any case provided that the Purchaser

is not then in breach of the Agreement for which MobileAria had previously notified the Purchaser.  The Purchaser has agreed that, in the event that it would otherwise be entitled to receive both the break-up fee and the expense reimbursement under the Agreement, the Purchaser shall only be entitled to receive the larger of the two and in no case shall be entitled to receive payment of both.

37.    The Bid Protections were a material inducement for, and a condition of, the Purchaser's entry into the Agreement.  MobileAria believes that the Bid Protections are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Purchaser in connection with the Sale and (b) the fact that the Purchaser's efforts have increased the chances that MobileAria will receive the highest or otherwise best offer for the Acquired Assets, to the benefit of MobileAria, its estate, its creditors, and all other parties in interest.

38.    The Purchaser is unwilling to commit to hold open its offer to purchase the Acquired Assets under the terms of the Agreement unless the Bidding Procedures Order authorized payment of the Bid Protections.  Thus, absent entry of the Bidding Procedures Order and approval of the Bid Protections, MobileAria may lose the opportunity to obtain what it believes to be the highest and best offer for the Acquired Assets.

39.    Payment of the Bid Protections will not diminish MobileAria's estate. MobileAria will not terminate the Agreement so as to incur the obligation to pay either of the Bid Protections unless to accept an alternative Successful Bid, which must exceed the price offered by the Purchaser by an amount sufficient to pay the applicable Bid Protections. MobileAria thus requests that the Court authorize payment of the Bid Protections pursuant to the terms and conditions of the Agreement.

G.    Notice Of Bid Procedures And Sale

40.    Notice Of Sale Hearing.  Within five days after entry of the Bidding

Procedures Order (the "Mailing Date"), MobileAria (or its agent) proposes to serve the Motion,

the Agreement, the proposed Sale Order, the Bidding Procedures, and a copy of the Bidding

Procedures Order by first-class mail, postage prepaid, upon (a) all entities known to have

expressed an interest in a transaction with respect to the Acquired Assets during the past six

months,[10] (b) all entities known to have asserted any lien, claim, interest, or encumbrance in or

upon the Acquired Assets, (c) all federal, state, and local regulatory or taxing authorities or

recording offices which have a reasonably known interest in the relief requested by the Motion,

(d) all parties to the Assumed Contracts, (e) all parties to Post-Petition Contracts, (f) the United

States Attorney's office, (g) the Securities and Exchange Commission, (h) the Internal Revenue

Service, (i) all entities on the 2002 List, and (j) counsel to the Creditors' Committee and the

Equityholders' Committee.

41.    Sale Notice.  On or before the Mailing Date, MobileAria (or its agent)

proposes to serve by first-class mail, postage prepaid, a notice of the Sale (the "Sale Notice"),

substantially in the form annexed hereto as Exhibit E, upon all other known creditors of

MobileAria.

H.    Assumption And Assignment Of Contracts

42.    In connection with the proposed Sale, MobileAria seeks authority to

assume and assign the Assumed Contracts to the Purchaser or the Successful Bidder.  With

respect to the Assumed Contracts, MobileAria no later than ten days after the entry of the

Bidding Procedures Order will file with the Court and serve on each party to an Assumed

---

[10]    All such entities will also be served by electronic mail to the extent MobileAria has electronic mail addresses
for such parties.

Contract a cure notice substantially in the form attached hereto as <u>Exhibit F</u> (the "Cure Notice").

The Cure Notice will state the cure amount that MobileAria believes is necessary to assume such

contract or lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and notify

each party that such party's lease or contract will be assumed and assigned to the Purchaser or the

Successful Bidder to be identified at the conclusion of the Auction.  In addition, such Cure

Amounts will be listed on a schedule to the Sale Order.

43.    Any objection to the Cure Amount must be filed by within ten days of the

date of the Cure Notice (the "Cure Objection Deadline").  Any objection to the Cure Amount

must state with specificity what cure the party to the Assumed Contract believes is required with

appropriate documentation thereof.  If no objection is timely received, the Cure Amount set forth

in the Cure Notice will be controlling notwithstanding anything to the contrary in any Assumed

Contract or other document and the nondebtor party to the Assumed Contract will be forever

barred from asserting any other claim arising prior to the assignment against MobileAria, the

Debtors, or the Purchaser or the Successful Bidder (as appropriate) as to such Assumed Contract.

44.    Within two business days of the conclusion of the Auction, MobileAria

will send a notice (the "Assumption Notice"), in a form substantially similar to the form attached

hereto as <u>Exhibit G</u>, to each nondebtor party to an Assumed Contract identifying the Successful

Bidder.  Any objection to the assumption and assignment of any Assumed Contract will be filed

no later than two business days prior to the Sale Hearing, unless otherwise ordered by the Court.

<u>Applicable Authority</u>

A.    <u>Bidding Procedures</u>

45.    Section 363 of the Bankruptcy Code provides that the Debtors, "after

notice and a hearing, may use, sell or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b).  To approve the use, sale, or lease of property

22

outside the ordinary course of business, this Court need only determine that the Debtors' decision

is supported by "some articulated business justification."  See, e.g., Committee of Equity Sec.

Holders v. Lionel Corp. (In re Lionel Corp.) 722 F.2d 1063, 1070 (2d Cir. 1983); In re

Chateaugay Corp., 973 F.2d 141, 143-145 (2d Cir. 1992) (affirming, based in part on Lionel,

decision "authoriz[ing] the sale of an important asset of the bankrupt's estate, out of the ordinary

course of business and prior to acceptance and outside of any plan of reorganization"); see also

Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the

debtor in possession can sell property of the estate outside the ordinary course of business if he

has an articulated business justification.") (citations omitted); Stephens Indus. Inc. v. McClung,

789 F.2d 386, 389-90 (6th Cir. 1986) (adopting reasoning in Lionel and concluding "that a

bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when

a sound business purpose dictates such action"); In re Abbott Dairies of Pa., Inc., 788 F.2d 143,

1447-48 (3d Cir. 1986).

    46.    The Court should approve MobileAria's Sale of the Acquired Assets

outside the ordinary course of business if MobileAria can demonstrate a sound business

justification for the proposed transaction.  See In re Lionel, 722 F.2d at 1070-71; In re

Ionosphere Clubs, Inc., 100 B.R. 670, 674-78 (Bankr. S.D.N.Y. 1989) (applying Lionel).  Once

MobileAria articulates a valid business justification, a presumption arises that "in making a

business decision the directors of a corporation acted on an informed basis, in good faith and in

the honest belief that the action was in the best interests of the company."  In re Integrated

Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotations omitted).  MobileAria's

business judgment "should be approved by the court unless it is shown to be so manifestly

unreasonable that it could not be based upon sound business judgment, but only on bad faith, or

whim or caprice." In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal citations omitted).

47.    The business judgment rule shields a debtor's management from judicial second-guessing. In re Johns-Manville Corp., 60 B.R. 612, 615-616 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

48.    As set forth above, MobileAria has sound business justifications for pursuing a sale process at this time.  Although the Debtors believe that MobileAria is a fundamentally strong business in a emerging and rapidly growing market, MobileAria does not present a strong fit within the Debtors' anticipated product portfolio under their transformation plan.  Thus, the Debtors and MobileAria have determined that MobileAria's value will be maximized through the divestiture of its assets to an entity that is a better strategic fit and in a financial position to make the necessary cash infusions to support MobileAria's future growth.  Moreover, delaying the sale of the Acquired Assets proposed by MobileAria pursuant to these procedures may result in the erosion of MobileAria's value.  Accordingly, there is a sound business purpose for pursuing the sale process.

49.    Moreover, a prospective purchaser of assets from a chapter 11 debtor may be reluctant to make an offer, because it knows that even if it reaches agreement with the debtor, its offer is subject to overbid.  Pre-approved bidding procedures address these concerns, by assuring initial bidders that any auction procedure will be reasonable.  Thus, MobileAria submits that the use of the Bidding Procedures also reflects sound business judgment.

B.    Sale Of The Acquired Assets Free And
      Clear Of Liens, Claims, Encumbrances, And Interests

50.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such
interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is great that the
aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled in a legal or equitable proceeding, to accept a
money satisfaction of such interest.

11 U.S.C. § 363(f).

51.    Therefore, section 363(f) permits MobileAria to sell the Acquired Assets

free and clear of all liens, claims, and encumbrances, _except_ the liabilities specifically assumed

by a Successful Bidder.  Each lien, claim or encumbrance that is not the result of an assumed

liability satisfies at least one of the five conditions of 11 U.S.C. § 363(f), and MobileAria

submits that any such lien, claim, or encumbrance will be adequately protected by attachment to

the net proceeds of the Sale, subject to any claims and defenses MobileAria may posses with

respect thereto.  Accordingly, MobileAria requests that the Acquired Assets be transferred to the

Successful Bidder(s) free and clear of all liens, claims, and encumbrances, except for the liens

resulting from assumed liabilities, with such liens, claims, and encumbrances to attach to the

proceeds of the Sale of the Acquired Assets.

C.    The Purchase Is A Good Faith Purchaser Pursuant To
Section 363(m) Of The Bankruptcy Code And The Transaction
Contemplated By The Agreement Should Be Deemed Not
Avoidable Pursuant To Section 363(n) Of The Bankruptcy Code

52.    Section 363(m) of the Bankruptcy Code provides:

25

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci held that the

> good faith of a purchaser is shown by the integrity of his conduct during
> the course of the sale proceedings; where there is a lack of such integrity,
> a good faith finding may not be made.  A purchaser's good faith is lost by
> 'fraud, collusion between the purchaser and other bidders or the trustee, or
> an attempt to take grossly unfair advantage of other bidders.'

126 F.3d at 390 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir.

1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen

Int'l Airlines Inc. v. Pan Am Corp. (In re Pam Am Corp.), Case Nos. 91 Civ. 8319 (LMM) to 91

Civ. 8324 (LMM), 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992); In re Sasson Jeans, Inc., 90

B.R. 608, 610 (S.D.N.Y. 1988).

     53.     Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

> The trustee may avoid a sale under this section if the sale price was
> controlled by an agreement among potential bidders at such sale, or may
> recover from a party to such agreement any amount by which the value of
> the property sold exceeds the price at which such sale was consummated,
> and may recover any costs, attorneys' fees, or expenses incurred in
> avoiding such sale or recovering such amount.

     54.     MobileAria submits, and will present evidence at the Sale Hearing, that as

set forth above, the Agreement is an intensely negotiated, arm's-length transaction, in which the

Purchaser has at all times acted in good faith.  MobileAria, therefore, requests that the Court

make a finding that the Purchaser has purchased the Acquired Assets and assumed the Assumed

Contracts and Assumed Liabilities in good faith within the meaning of section 363(m) of the

Bankruptcy Code.  Further, MobileAria submits that any asset purchase agreement reached as a result of the Bidding Procedures will be an arm's-length, intensely-negotiated transaction entitled to the protections of section 363(m) of the Bankruptcy Code and MobileAria will present evidence of the same at the Sale Hearing.  As a key element of a good faith finding is that the Purchaser's successful bid is not the product of fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders, MobileAria further requests that the Court make a finding that the transactions contemplated by the Agreement are not avoidable under section 363(n) of the Bankruptcy Code.

D.      The Assumption And Assignment Of The Assumed Contracts

55.      Section 365(f)(2) of the Bankruptcy Code provides that:

[t]he trustee may assign an executory contract or unexpired lease of the debtor only if –

(A)      the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)      adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

56.      Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  It provides:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee –

27

      (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

      (B)    compensates, or provides adequate assurances that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

      (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

57.    Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction." See In re Sanshoe Worldwide Corp., 139 B.R. 585, 592 (S.D.N.Y. 1992) (the presence of adequate assurance should be "determined under the facts of each particular case"); see also In re Fifth Avenue Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds). Courts have consistently held that the phrase does not provide total assurances. In re Natco Industries, Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). In fact, adequate assurance has been provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See In re Bygraph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

58.    To the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Acquired

Assets or any portion thereof, MobileAria will cure any such default prior to such assumption

and assignment.  Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the

financial wherewithal of any Successful Bidder, its experience in the industry, and its willingness

and ability to perform under the contracts to be assumed and assigned to it.

> 59.    The Sale Hearing therefore will provide this Court and other parties in

interest ample opportunity to evaluate and, if necessary, challenge the ability of the Successful

Bidder(s) to provide adequate assurance of future performance under the contracts to be

assumed.  This Court therefore should have a sufficient basis to authorize MobileAria to assume

and assign contracts as set forth in the Agreement.

E.    Approval Of The Bid Protections

> 60.    Bidding incentives encourage potential purchasers to invest the requisite

time, money, and effort to negotiate with a debtor and perform the necessary due diligence

attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the

chapter 11 process.  See, e.g., In re 995 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to

enter the bidding by providing some form of compensation for the risks it is undertaking")

(citation omitted).  Bankruptcy courts often approve bidding incentives under the business

judgment rule.  In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o

litigant has seriously argued the inapplicability of the business judgment test, and if any such

argument had been made, the Court would be compelled . . . to reject it."); In re Bethlehem Steel

Corp., Case No. 02 Civ. 2854 (MBM), 2003 WL 21738964 at *8 n.13 (S.D.N.Y. July 28, 2003)

(the court should approve agreements providing bidding incentives "unless they are unreasonable

or appear more likely to chill the bidding process than to enhance it").  One court, explaining the

force of the business judgment rule in this context, stated "the business judgment rule does not

become inapplicable simply because a court decides a break-up fee is too large."  In re Integrated

Resources, 147 B.R. at 660.

61.    This district has established a three part test for determining when to

permit bidding incentives.  Id. at 657-58.  The three factors are: "whether (1) relationship of

parties who negotiated breakup fee is tainted by self-dealing or manipulation; (2) whether fee

hampers, rather than encourages, bidding; and (3) amount of fee is unreasonable relative to

purchase price."  Id.

62.    Here, MobileAria seeks authority to utilize the Bidding Process and Bid

Protections in the event that the Purchaser is not ultimately the Successful Bidder or must

increase the Purchaser's bid price to become the Successful Bidder.  The Bid Protections are fair

and reasonable in amount, particularly in view of the efforts to be made by the Purchaser and the

risk to the Purchaser of being used as a stalking horse.  Indeed, the maximum amount of the

Break-Up Fee – 3.0% of the purchase price – not only constitutes a fair and reasonable

percentage of a proposed purchase price, but also is customary for similar transactions of this

type in the bankruptcy context.  In addition, the payment of expenses and the indemnification

and expense reimbursement provisions of the Agreement are reasonable given the significant

investment in time and resources that the Purchaser will have contributed as the stalking horse

bidder.  Further, the Purchaser has agreed that the break-up fee and the expense reimbursement

shall be mutually-exclusive -- in the event that it would otherwise be entitled to receive both the

break-up fee and the expense reimbursement under the Agreement, the Purchaser shall only be

entitled to receive the larger of the two and in no case shall be entitled to receive payment of

both.  Moreover, the amount of the proposed Break-Up Fee is within the range of breakup fees

typically approved by courts in this district.  See, e.g., In re Allegiance Telecom, Inc., Case No.

03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense

reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-16034 (AJG)

(Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closes on a superior transaction);

In re Loral Space & Communications Ltd., Case Nos. 03-41710 and 03-41709 (RDD) (Bankr.

S.D.N.Y. 2003) (allowing 2% for break-up fee and .8% for expense reimbursement allowed only

if court enters order approving alternative transaction).

> 63.    Further, MobileAria submits that the Bidding Procedures and the Bid

Protections have encouraged competitive bidding in that the Purchaser would not have entered

into the Agreement without such provisions.  The Bidding Procedures and the Bid Protections

have thus induced a bid that otherwise would not have been made and without which bidding

would be limited.  Finally, the mere existence of the Bidding Procedures and Bid Protections

permits MobileAria to insist that competing bids be materially higher or otherwise better than the

Agreement, a clear benefit to MobileAria, its estate, its creditors, and all other parties in interest.

G.    Waiver Of The Ten-Day Stays Provided By Bankruptcy Rules 6004 And 6006

> 64.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides: "An

order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is

stayed until the expiration of 10 days after the entry of the order, unless the court orders

otherwise."

> 65.    Courts in this district have waived these ten-day stays upon a showing of

business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005)

31

("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr.P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring a demonstration of "a business exigency" for a waiver of the ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)). In general, courts will grant waivers when doing so is important to the Debtor's financial health. See In re Second Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004) (affirming decision waiving ten-day stay because "time was of the essence"); In re Decora Industries, Inc., Case No. 00-4459 (JJF), 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate closing is required to remedy Debtors' precarious financial and business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

66.    As described above, MobileAria's growth requires current cash contributions that the Debtors' current financial position and the Debtors' focus on investments on its business lines that are more likely to comprise their restructured product portfolio do not allow the Debtors to make. By delaying the time in which the Sale may be completed, there is a risk that MobileAria will suffer business deterioration. Moreover, a delay in the ability of a Successful Bidder to close the Sale could chill prospective bidders from entering the sale process out of a reluctance to keep bids open for an extended period of time and thus could prevent MobileAria from maximizing the value of its assets. Finally, the Purchaser has insisted upon the ability to close the transactions contemplated by the Agreement, assuming that MobileAria does not receive a higher or otherwise better bid at the auction, quickly following entry of the Sale Order and has therefore required that the Sale Order include a waiver of the ten-day stays provided under Bankruptcy Rules 6004(g) and 6006(d) by the terms of the Agreement.

32

67.     Because MobileAria has demonstrated a business need requiring closing within ten days, this Court should exercise its authority under Bankruptcy Rules 6004(g) and 6006(d) and waive the ten-day stays.

H.     Conclusion

68.     MobileAria submits that the granting of the Bidding Procedures, Bid Protections, and Notice Procedures, the setting of the Sale Hearing, and an order approving the Sale of the Acquired Assets free and clear of liens, claims, and encumbrances to the Purchaser or to the Successful Bidder, the assumption and assignment of the Assumed Contracts to the Purchaser or the Successful Bidder, and the assumption of the Assumed Liabilities by the Purchaser or the Successful Bidder are in the best interests of MobileAria's estate and will maximize value for all creditors as described above.

Notice Of Motion

69.     Notice of this Motion has been provided in accordance with the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824) ("Supplemental Case Management Order").  In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief. [11]  Notice will be provided in accordance with the Notice Procedures described

---

[11]    The Debtors have noticed this Motion for hearing at the June 16, 2006 regularly-scheduled omnibus hearing in these cases in compliance with the Supplemental Case Management Order.  Pursuant to the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard at the June omnibus hearing.  Because this Motion is being filed on less than 20 days' notice, parties-in-interest will have until June 13, 2006 to file an objection.

herein.[12]  In light of the nature of the relief requested, the Debtors submit that no other or further

notice is necessary.

Memorandum Of Law

70.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

---

[12]    In addition, notice of this Motion has also been provided by electronic mail to the Potential Bidders.

WHEREFORE the Debtors respectfully request that the Court (a) enter an order approving (i) the Bidding Procedures, (ii) the Bid Protections, (iii) the Notice Procedures, and (iv) the setting of the Sale Hearing; (b) enter an order approving (i) the Sale of the Acquired Assets free and clear of liens, claims, and encumbrances to the Purchaser or to the Successful Bidder, (ii) the assumption and assignment of the Assumed Contracts to the Purchaser or the Successful Bidder, and (iii) the assumption of the Assumed Liabilities by the Purchaser or the Successful Bidder; and (c) grant them such other and further relief as is just.

Dated:  New York, New York
      June 6, 2006

                  SKADDEN, ARPS, SLATE, MEAGHER
                    & FLOM LLP

                  By: /s/ John Wm. Butler, Jr.
                    John Wm. Butler, Jr. (JB 4711)
                    John K. Lyons (JL 4951)
                    Ron E. Meisler (RM 3026)
                  333 West Wacker Drive, Suite 2100
                  Chicago, Illinois  60606
                  (312) 407-0700

                        - and -

                  By: /s/ Kayalyn A. Marafioti
                    Kayalyn A. Marafioti (KM 9632)
                    Thomas J. Matz (TM 5986)
                  Four Times Square
                  New York, New York 10036
                  (212) 735-3000

                  Attorneys for Delphi Corporation, et al.,
                    Debtors and Debtors-in-Possession

**EXHIBIT E**

**EXECUTION COPY**

**ASSET SALE AND PURCHASE AGREEMENT**

**BETWEEN**

**WIRELESS MATRIX USA, INC.**

**AND**

**MOBILEARIA, INC.**

**June 6, 2006**

## TABLE OF CONTENTS

**PAGE**

1. **CONVEYANCE OF THE ACQUIRED ASSETS** .................................................. **10**
   - 1.1 Acquired Assets Transaction.......................................................... 10
     - 1.1.1 Acquired Assets............................................................ 10
     - 1.1.2 Excluded Assets............................................................ 10
     - 1.1.3 Post-Closing Asset Deliveries ................................ 11
     - 1.1.4 Prorations ....................................................................... 12
     - 1.1.5 Non-Assignable Permits and Contracts.................... 13
2. **ASSUMPTION OF LIABILITIES**.......................................................... **14**
   - 2.1 Assumed Liabilities................................................................. 14
   - 2.2 No Expansion of Third Party Rights ................................... 14
   - 2.3 Retained Liabilities ................................................................ 14
3. **ACQUIRED ASSETS – PERSONNEL MATTERS – TRANSFERRED EMPLOYEES**.......................................................................................... **15**
   - 3.1 Business Employees .............................................................. 15
   - 3.2 Cooperation............................................................................. 16
   - 3.3 No Third Party Rights ............................................................ 16
4. **PURCHASE PRICE** ...................................................................................... **16**
   - 4.1 Purchase Price; Deposit Amount ......................................... 16
     - 4.1.1 Deposit Amount ............................................................ 16
     - 4.1.2 Delivery of Purchase Price ........................................ 16
   - 4.2 Allocation of Purchase Price ................................................ 17
   - 4.3 Other Adjustments................................................................. 17
5. **REPRESENTATIONS AND WARRANTIES** ............................................. **17**
   - 5.1 Representations and Warranties of Seller............................ 17
     - 5.1.1 Organization and Good Standing .............................. 18
     - 5.1.2 Corporate Power; Due Authorization......................... 18
     - 5.1.3 No Violations ................................................................. 18
     - 5.1.4 Sufficiency of Acquired Assets .................................. 18
     - 5.1.5 Personal Property; Condition of Personal Property.......... 18
     - 5.1.6 Litigation ....................................................................... 19
     - 5.1.7 Intellectual Property Assets ...................................... 19
     - 5.1.8 Insurance....................................................................... 20
     - 5.1.9 Compliance with Other Instruments and Laws; Permits.................... 20
     - 5.1.10 Brokers ........................................................................ 21
     - 5.1.11 Consents and Approvals ............................................ 21
     - 5.1.12 Financial Statements .................................................. 21
     - 5.1.13 Events Subsequent to Latest Financial Statements .......................... 22
     - 5.1.14 Contracts ..................................................................... 22
     - 5.1.15 Tax Matters................................................................... 23
     - 5.1.16 Employee Issues ........................................................ 24
     - 5.1.17 Absence of Other Representations or Warranties.............................. 24
   - 5.2 Representations and Warranties of Purchaser ................... 24
     - 5.2.1 Corporate Data ............................................................ 24
     - 5.2.2 Corporate Power; Due Authorization......................... 25
     - 5.2.3 No Violations ................................................................. 25
     - 5.2.4 Litigation ....................................................................... 25
     - 5.2.5 Brokers .......................................................................... 25

i

|  | 5.2.6 | Solvency | 25 |
|  | 5.2.7 | Availability of Funds | 25 |
|  | 5.2.8 | Adequate Assurance of Future Performance | 25 |
|  | 5.2.9 | Compliance with Law | 26 |
|  | 5.2.10 | Anti-Money Laundering | 26 |
| 5.3 | Survival of Representations, Warranties and Certain Covenants of Seller | | 26 |
| 5.4 | Survival of Representations, Warranties and Certain Covenants of Purchaser | | 26 |

**6. CONDITIONS TO CLOSING** ........................................................................ **27**
| 6.1 | Conditions to Obligations of Seller and Purchaser | 27 |
|  | 6.1.1 | Sale Approval Order | 27 |
|  | 6.1.2 | No Law, Judgments, Etc. | 27 |
| 6.2 | Conditions to Obligations of Purchaser | 27 |
|  | 6.2.1 | Accuracy of Representations and Warranties | 27 |
|  | 6.2.2 | Performance of Covenants | 27 |
|  | 6.2.3 | Payment of Cure Amounts | 27 |
|  | 6.2.4 | Certification | 27 |
|  | 6.2.5 | Other Approvals | 28 |
| 6.3 | Conditions to Obligations of Seller | 28 |
|  | 6.3.1 | Accuracy of Representations and Warranties | 28 |
|  | 6.3.2 | Performance of Covenants | 28 |
|  | 6.3.3 | Delivery of Purchase Price | 28 |

**7. CLOSING** .................................................................................................... **28**
| 7.1 | The Closing | 28 |
| 7.2 | Ancillary Agreements | 28 |
| 7.3 | Seller's Deliveries | 29 |
| 7.4 | Purchaser's Deliveries | 29 |

**8. CERTAIN ADDITIONAL COVENANTS** ........................................................ **30**
| 8.1 | Bankruptcy Actions | 30 |
| 8.2 | Registrations, Filings and Consents; Further Actions | 30 |
| 8.3 | Operation of the Business Pending Closing | 30 |
| 8.4 | Assumed Contracts; Cure Amounts | 31 |
| 8.5 | Post-Closing Covenants | 31 |
|  | 8.5.1 | Seller Post-Closing Covenants | 31 |
|  | 8.5.2 | Technical Documentation | 33 |
|  | 8.5.3 | Books and Records and Litigation Assistance From and After Closing | 33 |
|  | 8.5.4 | Payment and Collections | 34 |
|  | 8.5.5 | Intellectual Property Transition Rights | 34 |
| 8.6 | Further Assurances | 34 |
| 8.7 | [Reserved] | 34 |
| 8.8 | Certain Transactions | 34 |
| 8.9 | Communications with Customers and Suppliers | 35 |

**9. TERMINATION** ............................................................................................ **35**
| 9.1 | Termination | 35 |
|  | 9.1.1 | By Either Party | 35 |
|  | 9.1.2 | By Purchaser | 36 |
|  | 9.1.3 | By Seller | 36 |
| 9.2 | Notice of Termination | 36 |
| 9.3 | Break-Up Fee; Expense Reimbursement | 36 |
|  | 9.3.1 | Break-Up Fee | 36 |

      9.3.2    Expense Reimbursement ............................................................. 36
  9.4    Procedure and Effect of Termination................................................. 37
**10. OTHER TAX MATTERS** ......................................................................... **38**
**11. BIDDING PROCEDURES** ....................................................................... **39**
  11.1    MobileAria Initial Bankruptcy Actions ........................................ 39
  11.2    Court Approval .............................................................................. 39
  11.3    Qualified Bidder............................................................................ 40
  11.4    Bidding Deadline .......................................................................... 40
  11.5    Due Diligence ............................................................................... 41
  11.6    Bid Requirements ......................................................................... 41
  11.7    Qualified Bids ............................................................................... 41
  11.8    Bid Protection ............................................................................... 42
  11.9    Auction, Bidding Increments and Bids Remaining Open............ 43
  11.10    Acceptance of Qualified Bids ..................................................... 44
  11.11    Sale Hearing................................................................................ 44
  11.12    Return of Good Faith Deposit..................................................... 44
  11.13    Reservation of Rights.................................................................. 44
**12. INDEMNIFICATION** ............................................................................... **45**
  12.1    Seller's Agreement to Indemnify ................................................ 45
  12.2    Purchaser's Agreement to Indemnify ......................................... 45
  12.3    Limitations on Agreements to Indemnify .................................... 45
  12.4    Third Party Indemnification Procedures ..................................... 46
**13. MISCELLANEOUS** ................................................................................ **47**
  13.1    Bulk Sales Laws .......................................................................... 47
  13.2    Notices .......................................................................................... 47
  13.3    Assignment.................................................................................... 48
  13.4    Entire Agreement ......................................................................... 48
  13.5    Waiver ........................................................................................... 48
  13.6    Severability ................................................................................... 48
  13.7    Amendment ................................................................................... 48
  13.8    Expenses....................................................................................... 48
  13.9    Third Parties ................................................................................. 48
  13.10    Headings ..................................................................................... 48
  13.11    Counterparts................................................................................ 48
  13.12    Governing Law ............................................................................ 49
  13.13    Public Announcements................................................................ 49
  13.14    Sales or Transfer Taxes ............................................................. 49
  13.15    Venue and Retention of Jurisdiction.......................................... 49
  13.16    Risk of Loss ................................................................................ 49
  13.17    Enforcement of Agreement ........................................................ 49
  13.18    Dispute Resolution ..................................................................... 49
  13.19    No Right of Setoff....................................................................... 50
  13.20    Limitation on Damages............................................................... 50

# LIST OF SCHEDULES

| Schedule Designation | Schedule Description |
|---|---|
| A | Seller's Knowledge |
| B | Reference Balance Sheet |
| 1.1.2.A | Third Party Bailed Assets |
| 1.1.2.D | Excluded Contracts |
| 1.1.2.G | Privileged Information and Materials |
| 1.1.2.J | Other Excluded Assets |
| 1.2.1 | Certain Licensed Intellectual Property |
| 2.1.1 | Transferred Contracts |
| 2.1.3 | Certain Assumed Liabilities |
| 4.2 | Allocation of Purchase Price |
| 5.1.1 | Organization and Good Standing |
| 5.1.3 | No Violations |
| 5.1.4 | Sufficiency of Acquired Assets |
| 5.1.5.A | Title to Personal Property |
| 5.1.5.C | Other Inventory Locations |
| 5.1.5.D | Machinery, Equipment and Capitalized Tools (Value Greater than $5,000 USD) |
| 5.1.6 | Litigation |
| 5.1.7.A.1 | Owned Intellectual Property |
| 5.1.7.A.2 | Licensed Intellectual Property |
| 5.1.7.A.3 | Software |
| 5.1.7.B | Intellectual Property Litigation Claims |
| 5.1.7.C | Rights Granted to Third Parties |
| 5.1.7.D | Free and Clear Owned Intellectual Property |
| 5.1.7.E | Excluded License |
| 5.1.8 | Insurance |
| 5.1.9 | Permits |
| 5.1.11 | Third Party Consents |
| 5.1.12(i) | December 31, 2003, 2004 and 2005 Unaudited Balance Sheets and Income Statements for the Business |
| 5.1.12(ii) | Unaudited Balance Sheet and Income Statement for Four Months Ended April 30, 2006. |
| 5.1.13 | Absence of Certain Changes |
| 5.1.14.A | Listed Contracts |
| 5.1.14.B | Listed Contracts – Exceptions |
| 5.1.15.A | Tax Returns |
| 5.1.15.D | Tax Matters |
| 5.1.16.A | Business Employees |
| 5.1.16.B | Funding |
| 6.2.5 | Third Party Approvals |
| 7.2.1 | Assignment of Lease |
| 7.2.2.A | Assignment of Patent Rights |
| 7.2.2.B | Assignment of Trademark Rights |
| 7.2.3 | Assignment and Assumption Agreement |
| 7.2.4 | Escrow Agreement |

7.2.5          Bill of Sale

7.2.6          License from Delphi Technologies, Inc. to WIRELESS MATRIX of
               Vehicle Bus Adapter firmware and Power Moding Profile software

## ASSET SALE AND PURCHASE AGREEMENT

**THIS ASSET SALE AND PURCHASE AGREEMENT** (this "**Agreement**") dated **June 6, 2006,** by and between **WIRELESS MATRIX USA, INC.**, a _____ corporation ("**WIRELESS MATRIX**") and **MOBILEARIA, INC.**, a Delaware corporation ("**MobileAria**" or "**Seller**").

## R E C I T A L S:

**WHEREAS**, MobileAria is engaged in the Business (as hereinafter defined).

**WHEREAS**, Delphi Automotive Systems LLC, a Delaware limited liability company ("**Delphi**") owns approximately 71% of MobileAria's issued and outstanding capital stock.

**WHEREAS**, on October 8, 2005, Delphi and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**WHEREAS**, on October 14, 2005 (the "**Petition Date**"), MobileAria filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court.  As of the Petition Date, the MobileAria bankruptcy case has been consolidated with the Delphi bankruptcy cases (collectively, MobileAria's bankruptcy case and the Delphi bankruptcy cases are referred to as the "**Bankruptcy Cases**").

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, MobileAria desires to sell to WIRELESS MATRIX all right, title and interest of MobileAria in and to the Acquired Assets (as hereinafter defined), and Purchaser (as hereinafter defined) desires to make such purchase, subject to Purchaser's assumption of the Assumed Liabilities and the conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

## DEFINITIONS

The following terms, as used in this Agreement, shall have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"**Accounts Receivable**" means all trade accounts receivable and other rights to payment from customers and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of Products delivered to customers, all other accounts or notes receivable and the full benefit of all security for such accounts or notes and any claim, remedy or other right related to any of the foregoing.

"**Acquired Assets**" means the assets referred to in Section 1.1.1.

1

"**Administrative Assets**" means books, records and other administrative assets used in or necessary for continuing the operations of MobileAria including but not limited to advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records, and sale order files; provided, however that Administrative Assets do not include Technical Documentation.

"**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity.  For purposes of this definition, control means ownership of more than fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar function.

"**Agreement**" means this Asset Sale and Purchase Agreement, including its Schedules.

"**Allocation**" means allocation of the Purchase Price, as described in Section 4.2.

"**Alternate Bid(s)**" shall have the meaning set forth in Section 11.11.

"**Alternate Bidder(s)**" shall have the meaning set forth in Section 11.11.

"**Alternative Transaction**" shall have the meaning set forth in Section 9.3.1.

"**Ancillary Agreements**" means the agreements referred to in Section 7.2.

"**Assumed Contracts**" means those Transferred Contracts entered into by Seller before the Petition Date.

"**Assumed Liabilities**" means the obligations assumed by Purchaser pursuant to Article  2, but only to the extent that an obligation: (a) arises on or after the Closing; and (b) with respect to obligations arising under Transferred Contracts: (i) does not arise from or relate to any breach by the Seller of any provision of any of the Transferred Contracts; (ii) does not arise from or relate to any event, circumstance or condition occurring or existing on or prior to the Closing that, with or without notice or lapse of time, would constitute or result in a breach of any of the Transferred Contracts; and (iii) is ascertainable by reference to the express terms of the Transferred Contracts.

"**Auction**" shall have the meaning set forth in Section 11.9.

"**Bankruptcy Cases**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**Bid Deadline**" shall have the meaning set forth in Section 11.4.

"**Bidding Procedures**" means the bidding procedures set forth in Section 11.1.

2

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures.

"**Bidding Process**" shall have the meaning set forth in Section 11.1.

"**Break-Up Fee**" shall have the meaning set forth in Section 9.3.1.

"**Business**" means providing location-based, data communication, productivity, and security services, as well as designing, marketing, and making available vehicle installed hardware units in the business-to-business market for remote and mobile platforms such as trucks, trailers, and service vehicles.  For avoidance of doubt, the Business does not include services or hardware for entertainment media distribution or playback or any services or hardware for the consumer or automotive markets.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by law or executive order to close.

"**Business Employees**" shall have the meaning set forth in Section 3.1.

"**Claims**" mean losses, liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" shall have the meaning set forth in Section 7.1.

"**Closing Date**" means the date of Closing.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Cases.

"**Competing HW**" shall have the meaning set forth in Section 8.5.1.A.

"**Competitive Business**" shall have the meaning set forth in Section 8.5.1.A.

"**Contracts**" mean all written or material oral purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, leases (for real property, personal property or otherwise), product warranty or service agreements and other commitments, agreements and undertakings of any nature, including quotations and bids outstanding on the Closing Date.

"**Copyrights**" mean: (i) copyrights existing anywhere (registered, statutory or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein, provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications for registration thereof; (v) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (vi) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (vii) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Cure Amounts**" means all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Purchaser of the Assumed Contracts under the Sale Approval Order that are Transferred Contracts.

"**Defending Party**" shall have the meaning set forth in Section 13.18.

"**Delphi**" shall have the meaning set forth in the Recitals.

"**Demanding Party**" shall have the meaning set forth in Section 13.18.

"**Deposit Amount**" shall have the meaning set forth in Section 4.1.1.

"**Disclosure Schedule**" means, collectively, the Schedules to Seller's Representations and Warranties contained in Section 5.1.

"**Escrow Agent**" means the escrow agent under the Escrow Agreement.

"**Escrow Agreement**" shall have the meaning set forth in Section 4.1.2.

"**Escrow Amount**" shall have the meaning set forth in Section 4.1.2.

"**Escrow Period**" shall have the meaning set forth in Section 4.1.2.

"**Excluded Assets**" means assets not included in the Acquired Assets, as set forth in Section 1.1.2.

"**Excluded Contracts**" shall have the meaning set forth in Section 1.1.2.D.

"**Excluded License**" shall have the meaning set forth in Section 5.1.7.E.

"**Expense Reimbursement**" shall have the meaning set forth in Section 9.3.2.

"**Expiration Date**" shall have the meaning set forth in Section 5.3.

"**Final Order**" means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending or (ii) if an appeal, writ of certiorari, re-argument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or re-argument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further re-argument or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"**Financial Statements**" shall have the meaning set forth in Section 5.1.12.

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time consistently applied.

4

"**Good Faith Deposit**" shall have the meaning set forth in Section 11.6.3.

"**Governmental Entity**" means any United States federal, state or local, tribunal, legislative, executive, governmental, quasi-governmental or regulatory authority, self-regulatory authority, agency, department, commission, instrumentality or body having governmental authority with respect to the transactions contemplated hereby, under applicable law.

"**Including**" means, whether or not initially capitalized, including without limitation.

"**Indemnification Claim**" shall have the meaning set forth in Section 12.4.

"**Intellectual Property**" means the Patent Rights, Trademark Rights, Copyrights, Software, Technical Documentation, Trade Secrets, Know-How and registered domain names and IP addresses.

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, supplies, and other inventory, wherever located.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Know-How**" means proprietary technical and business knowledge and information, including specifications, designs, methodologies, processes and production techniques resulting from research and development, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential.

"**Laws**" means laws, ordinances, codes, standards, administrative rulings or regulations of any applicable federal, state, local or foreign governmental authority.

"**Licensed Intellectual Property**" means Seller's rights with respect to all Intellectual Property licensed or sublicensed to Seller from an affiliated or unaffiliated third party.

"**Lien**" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"**Listed Contracts**" means the Seller's contracts and commitments listed on Schedule 5.1.14.A.

"**Marked Agreement**" shall have the meaning set forth in Section 11.6.2.

"**Material Adverse Effect**" means any change or event that has a material adverse effect on the business, assets, properties, financial condition or results of operations of the Business taken as a whole, except any change or event resulting from, relating to or arising out of: (a) any act or omission of a Seller taken with the prior written consent of the Purchaser; (b) any action taken by Seller or Purchaser or any of their respective representatives required by the terms of this Agreement; (c) general business or economic conditions; (d) conditions affecting the industry and markets in which the Business generally operates; (e) increases in energy, electricity, natural gas, raw materials or other operating costs; (f) changes resulting from the filing of the Bankruptcy

5

Cases or from any action required by the Bankruptcy Court; (g) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon such country, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of any of such countries; (h) acts of God; (i) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (j) changes in United States generally accepted accounting principles or generally accepted accounting principles of any foreign jurisdiction; (k) changes in any Law; (l) any existing event, occurrence or circumstance listed in the Disclosure Schedule as of the date hereof; (m) any adverse change in or effect on the Business that is entirely cured by Seller before the earlier of: (1) the Closing Date; and (2) the date on which this Agreement is terminated pursuant to Section 6.3 hereof; or (n) the regulatory status of the Purchaser.

"**MobileAria**" means MobileAria, Inc., a Delaware corporation.

"**Notice**" shall have the meaning set forth in Section 13.18.

"**OFAC**" shall have the meaning set forth in Section 5.2.10.

"**Ordinary Course of Business**" means, with respect to the Business, the ordinary course of business consistent with custom and practice of the Business from and after the Petition Date or to the extent consistent with orders issued in the Bankruptcy Cases.

"**Organizational Documents**" means: (a) the articles of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) the articles or certificate of organization and the operating agreement or other document intended to govern the structure and/or internal affairs of a limited liability company; (e) any charter, agreement, indenture, or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (f) any amendment to the foregoing.

"**Owned Intellectual Property**" means all Intellectual Property in and to which Seller holds, or has a right to hold, in whole or in part, right, title and interest.

"**Party**" or "**Parties**" means Purchaser and/or Seller.

"**Patent Rights**" means: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including, without limitation, any patent disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational statutory invention and design registrations, patents, and patent applications (including all provisionals, substitutions, reissues, divisions, continuations, continuations-in-part, extensions and reexaminations) and all rights therein provided by international treaties or conventions, and all patentable improvements to the inventions disclosed in each such registration, patent or application; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to Seller and that are currently used exclusively for the purpose of carrying on the Business or that relate exclusively to the Acquired Assets.

"**Permitted Lien**" means Liens of Seller's pre-Petition Date secured lenders and post-Petition Date secured lenders which Liens will be released on or prior to the Closing of the Sale.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

"**Personal Property**" means tangible personal property other than Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other IT assets other than Intellectual Property, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the Seller's premises, at the place of business of a vendor or elsewhere.

"**Petition Date**" shall mean October 14, 2005.

"**Post-Closing Portion**" shall have the meaning set forth in Section 10.3.

"**Post-Petition Contracts**" means the Contracts of MobileAria relating to the Business entered into in the Ordinary Course of Business or approved by the Bankruptcy Court, in either case on or after the Petition Date.

"**Potential Bidder**" shall have the meaning set forth in Section 11.3.

"**Pre-Closing Portion**" shall have the meaning set forth in Section 10.3.

"**Premises**" means the suite of offices leased by Seller for the Business at 800  West El Camino Real, Suite 240, Mountain View, California  94040.

"**Purchase Price**" means the payment referred to in Section 4.1.

"**Products**" means location-based, data communication, productivity, and security services for remote and mobile platforms in the commercial business-to-business market, including trucks, trailers, and service vehicles.  Products include back end server software, client software, and vehicle installed hardware units.  For avoidance of doubt, Products do not include services or hardware for entertainment media distribution or playback or any services or hardware for the consumer or automotive markets.

"**Purchased Intellectual Property**" means all Owned Intellectual Property and Licensed Intellectual Property.

"**Purchaser**" means **WIRELESS MATRIX USA, INC.**

"**Purchaser Damages**" shall have the meaning set forth in Section 12.1.

"**Qualified Bid**" shall have the meaning set forth in Section 11.7.7.

"**Qualified Bidder**" shall have the meaning set forth in Section 11.3.3.

"**Reference Balance Sheet**" means the balance sheet of the Business attached as Schedule B.

"**Required Bid Documents**" shall have the meaning set forth in Section 11.6.

"**Retained Liabilities**" shall have the meaning set forth in Section 2.3.

"**Retention Bonus**" shall have the meaning set forth in Section 3.1.4.

"**Return Date**" shall have the meaning set forth in Section 11.12.

"**Sale**" means the sale of the Business in accordance with the Bidding Procedures.

"**Sale Approval Order**" means an order or orders of the Bankruptcy Court approving the Sale issued pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to Purchaser, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets and Assumed Liabilities to the Purchaser in accordance with the terms and conditions of this Agreement, free and clear of all Liens other than, Permitted Liens and Liens encompassed within Assumed Liabilities assumed by Purchaser pursuant to Article 2, if any.

"**Sale Hearing**" shall have the meaning set forth in Section 11.10.

"**Sale Motion**" shall have the meaning set forth in Section 11.11.

"**SDN List**" shall have the meaning set forth in Section 5.2.10.

"**Seller**" means MobileAria, Inc, a Delaware corporation.

"**Seller Damages**" shall have the meaning set forth in Section 12.3.1.

"**Seller's Knowledge**" or "**Knowledge of Seller**" means the actual knowledge after reasonable investigation of the individuals listed on Schedule A, in each of their respective functional areas without imputation of the knowledge of any other Person.

"**Software**" means computer software and programs, including, without limitation, source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**Straddle Period**" means any taxable period that begins on or prior to the Closing Date and ends after the Closing Date.

"**Subsequent Bid**" shall have the meaning set forth in Section 11.7.7.

"**Successful Bid(s)**" shall have the meaning set forth in Section 11.9.6.

"**Successful Bidder(s)**" shall have the meaning set forth in Section 11.9.6.

"**Tax Return**" means any return, declaration, report, claim for refund or information return, or statement, or any other similar filings, related to Taxes, including any Schedule or attachment thereto.

"**Tax(es)**" means any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer taxes, use, gross receipts, value added, employment, excise, ad valorem, property, withholding, payroll, social contribution, customs duty, minimum or windfall profit taxes or transfer fees), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign government or subdivision or agency thereof.

"**Technical Documentation**" means all documented technical information currently in the files of the Business primarily used in the Business owned by Seller, in each case pertaining to the design or manufacture of the Products of the Business.

"**Termination Date**" shall have the meaning set forth in Section 9.1.1.E.

"**Third Party Bailed Assets**" shall have the meaning set forth in Section 1.1.2.A.

"**Third-Party Requirements**" shall have the meaning set forth in Section 5.1.3.

"**Trade Secrets**" means: (i) all forms and types financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations, specifications, tooling, program devices, formulas, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, customer and vendor lists, pricing and cost data, whether tangible or intangible, and whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public, and confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); (ii) all copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (iii) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (iv) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"**Trademark Rights**" means: (i) trademarks, trade names and service marks; (ii) the good will associated with trademarks, trade names and service marks; (iii) registrations and applications for registration of trademarks, trade names and service marks; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Transferred Contracts**" means the Contracts of Seller to be assigned to Purchaser at Closing as described in Section 2.1.1.

"**Transferred Employees**" shall have the meaning set forth in Section 3.1.3.

"**United States**" or "**U.S.**" means the fifty (50) states and the District of Columbia of the United States of America.

"**USA PATRIOT Act**" shall have the meaning set forth in Section 5.2.10.

"**Verizon Contract**" shall have the meaning set forth in Section 1.1.5.A.

"**Verizon Open Accounts Receivable**" means all Accounts Receivable from Verizon Services Corp. for subscriber services to be performed after the Closing Date.  All Accounts Receivable from Verizon Services Corp. for hardware and hardware installations is an Excluded Asset.

"**Warranties**" refers to the representations and warranties provided by Seller to Purchaser, or by Purchaser to Seller, as the case may be, in each case as referred to in Article 5 of this Agreement.

## 1.    CONVEYANCE OF THE ACQUIRED ASSETS:

**1.1.    Acquired Assets Transaction**.  Upon the terms and subject to the conditions set forth in this Agreement at Closing Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and Purchaser shall purchase, accept and acquire from the Seller, free and clear of all Liens except: (i) Permitted Liens; and (ii) Liens included in the Assumed Liabilities assumed by Purchaser pursuant to Article 2, if any, all of the assets and properties described in Section 1.1.1 below (collectively, the "**Acquired Assets**"), subject in each case to Section 1.1.2.

**1.1.1.    Acquired Assets**.  The Acquired Assets consist of all of Seller's right, title and interest in and to the rights and assets primarily used in, primarily arising from, primarily relating to, or necessary for the conduct of the Business (other than the Excluded Assets), including, without limitation: all Verizon Open Accounts Receivable (including any cash or cash equivalents received with respect to Verizon Open Accounts Receivable prior to the Closing Date), Personal Property, Permits, Inventory, rights under Transferred Contracts (including Seller's rights against third party manufacturers to the extent any liability is assumed by Purchaser pursuant to Section 2.1), Administrative Assets and Purchased Intellectual Property (including Trademark Rights including Trademark Rights in MobileAria and all Product names, but not including Delphi and related names), in each case if such assets are primarily used in, primarily arising from, primarily relating to, or necessary for the conduct of the Business, including all of Seller's rights in: (i) tangible Personal Property located at the Premises; and (ii) all Personal Property owned by or leased to the Seller in connection with the Business located at any outsource partner's location, including Qwest Communication; and (iii) all prepaid Inventory held by any Affiliate of Seller primarily for use in the Business, provided that such Affiliate has been paid in full or been assigned the corresponding receivable by Seller.

**1.1.2.    Excluded Assets**.  Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, the following properties and assets shall not be included in the Acquired Assets:

**A.    Bailed Assets**.  Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by any other third party listed in Schedule 1.1.2.A ("**Third Party Bailed Assets**").

**B.    Personnel and Medical Records**.  All work histories, personnel and medical records of employees and former employees of Seller who worked at

any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws: Purchaser will be provided the originals of all personnel and medical records of employees of Seller who have accepted employment with Purchaser in connection with the sale hereunder, with the prior written consent of such employee or after posted written notice or other appropriate notice to such employees if legally required.  If an employee objects to provision of personnel or medical records to Purchaser, the records will not be provided.

        **C.**     **Certain Financial Assets.**    Cash, cash equivalents, bank accounts and all accounts receivable (other than Verizon Open Accounts Receivable or cash or cash equivalents received in respect thereof).

        **D.**     **Certain Contracts.**  All Contracts of Seller that are not Transferred Contracts, including Contracts set forth on Schedule 1.1.2.D ("**Excluded Contracts**").

        **E.**     **Tax Refunds.**   Any refund of Taxes paid, or claim for refund of Taxes paid, of any kind relating to the Acquired Assets for any period prior to the Closing Date.

        **F.**     **Privileged Information and Materials.**  Information and materials protected by the attorney-client privilege or that, in the case of environmental-related documents, Seller considers to be proprietary information; and the lack of which excluded information and materials are not material to the operation of the Business, and provided that such materials are listed on Schedule 1.1.2.F hereto.

        **G.**     **Insurance.**   The benefit of any of Seller's or Seller's Affiliates' insurance policies relating to the operation of the Business (including any right to proceeds thereunder).

        **H.**     **Certain Rights.**   All of the rights and claims of the Seller available to Seller under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

        **I.**     **Other Excluded Assets.**  All computer hardware, equipment, or other assets listed on Schedule 1.1.2.I.

    **1.1.3.  Post-Closing Asset Deliveries.**   Should Seller or Purchaser, in its reasonable discretion, determine after the Closing that books, records or other similar materials constituting Acquired Assets are still in the possession of Seller, Seller shall promptly deliver them to Purchaser at no cost to Purchaser.  Should Seller or Purchaser, in its reasonable discretion, determine after the Closing that books, records or other materials constituting Excluded Assets were delivered to Purchaser, Purchaser shall promptly return them to Seller at no cost to Seller other than reimbursing Purchaser's reasonable out-of-pocket costs.

1.1.4.  **Prorations**:

     **A.**    To the extent that Seller has made any payment relating to the Business prior to the Closing Date with respect to any item listed in Subparagraph B below relating to periods on or following the Closing Date, Purchaser shall reimburse Seller on a per diem basis; and

     **B.**    To the extent Purchaser makes any payment relating to the Business following the Closing Date with respect to any item listed below relating to periods prior to the Closing Date, Seller shall reimburse Purchaser on a per diem basis, in each case for the following:

     (i)    Rent for the Premises and copier leases and other pre-paid amounts under Transferred Contracts (such other pre-paids to be mutually agreed by the parties before Closing);

     (ii)    Personal, real property and other ad valorem Taxes, allocated in accordance with local custom;

     (iii)    Water, wastewater treatment, sewer charges and other similar types of charges with respect to the Business;

     (iv)    Electric, fuel, gas, telephone and internet services and other utility charges; and

     **C.**    Verizon. If Seller receives payments from Verizon Services Corp. pursuant to the Verizon Contract that are for installations and subscriber services to be performed by Purchaser following the Closing Date, Seller shall transfer such payments to Purchaser.  If Purchaser receives payments from Verizon Services Corp. pursuant to the Verizon Contract attributable to installations and subscriber services previously performed by Seller relating to periods on or before the Closing Date, Purchaser shall transfer to Seller such funds allocable to each such installation performed by Seller and all such subscriber services rendered by Seller.

     **D.**    **Further Assurance.**  The parties will use commercially reasonable efforts to determine the amounts of the above prorations and settle such amounts at Closing.  To the extent that, within sixty (60) days after Closing, Seller, on the one hand, or Purchaser, on the other hand, receives any bill or other invoice for any of the items listed in this Section 1.1.4 or similar items, relating to both pre-Closing and post-Closing periods, the Seller or Purchaser shall, as soon as practicable but no later than ninety (90) days after Closing, send any such bill or invoice to the other Party.  If necessary to avoid incurring interest, penalties and/or late charges, Purchaser may pay all amounts shown to be due thereon, and may invoice Seller for all amounts owed by Seller thereunder, and in such case Seller shall reimburse such amounts.

Any payments due under this Section 1.1.4 that have not been settled at Closing shall be made within forty-five (45) days after the end of the month in which a bill or invoice is sent to a Party (or Affiliate thereof); provided, however, that the disputed portion of any such item shall be paid within forty-five (45) days after the final determination thereof on an

item-by-item basis.  When Purchaser makes a payment to a third party which is required to be reimbursed to Purchaser by Seller, the reimbursement payment shall be considered the repayment of an advance.

### 1.1.5.  **Non-Assignable Permits and Contracts**:

  **A.** **Non-Assignability.**  After giving effect to the Sale Approval Order, to the extent that any Permit included in the Acquired Assets or any Transferred Contract other than that Agreement No. C0505851 by and between the Seller and Verizon Services Corp. (the "**Verizon Contract**") is not capable of being assigned to Purchaser at the Closing without the consent or waiver of the issuer thereof or the other party thereto or any third party (including a Governmental Entity), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law, this Agreement shall not constitute an assignment thereof, or an attempted assignment, until any such consent or waiver is obtained.

  **B.** **Efforts to Obtain Consents and Waivers.**  At Purchaser's request, Seller shall, at its expense, use commercially reasonable efforts, and Purchaser shall, at Seller's expense, cooperate with Seller, to obtain the consents and waivers and to resolve the impracticalities of assignment referred to in Section 1.1.5.A after the Closing.

  **C.** **If Waivers or Consents Cannot be Obtained.**  To the extent that the consents and waivers referred to in Section 1.1.5.A are not obtained by Seller, or until the impracticalities of assignment referred to therein are resolved, Seller's sole responsibility with respect to such matters, notwithstanding Section 1.1, shall be to use, during the one hundred eighty (180) day period commencing with the Closing, all commercially reasonable efforts, at no cost to Purchaser (other than pursuant to Section1.1.5.D below), to: (i) provide to Purchaser the benefits of any such Permit or Transferred Contract, all as referred to in Section 1.1.5.A, included in the Acquired Assets; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Purchaser, without incurring any financial obligation to Purchaser; and (iii) at the request and direction of Purchaser, enforce for the account of Purchaser and at the cost of Purchaser any rights of Seller arising from the Permits included in the Acquired Assets or Transferred Contracts referred to in Section 1.1.5.A against such issuer thereof or other party or parties thereto.

  **D.** **Obligation of Purchaser to Perform.**  To the extent that Purchaser is provided the benefits pursuant to Section 1.1.5.C of any Permit included in the Acquired Assets or Transferred Contracts, Purchaser shall perform, on behalf of Seller, for the benefit of the issuer thereof or the other party or parties thereto the obligations of Seller thereunder or in connection therewith and if Purchaser shall fail to perform to the extent required herein, Seller, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under Section 1.1.5.C in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or, at Purchaser's request, Seller may perform at Purchaser's sole reasonable cost and expense, in which case Purchaser shall reimburse Seller's reasonable costs of such performance immediately upon receipt of an invoice

2.    **ASSUMPTION OF LIABILITIES:**

    **2.1.**    **Assumed Liabilities.**    At and as of the Closing, Purchaser shall assume and agree to pay, perform and discharge when due, and shall be liable with respect to, all obligations, liabilities and responsibilities specifically referred to in this Section 2.1 ("**Assumed Liabilities**"), other than the Retained Liabilities, as follows:

    **2.1.1.**    The obligations of Seller to be performed under the Contracts listed on Schedule 2.1.1 (the "**Transferred Contracts**") and the obligations of Seller to be performed under licenses and Permits included in the Acquired Assets that are assigned or otherwise transferred to Purchaser pursuant to this Agreement and listed on Schedule 2.1.1.

    **2.1.2.**    Obligations described in Article 3 of this Agreement with respect to Transferred Employees.

    **2.1.3.**    The obligation to pay for assets, goods or services ordered by Seller on or prior to the Closing and that are received by the Purchaser after Closing, provided that: (i) no single purchase or related group of purchases shall exceed $5,000 unless tied directly to a commitment purchase order from a customer and set forth on Schedule 2.1.3; and (ii) miscellaneous lesser amounts in the ordinary course of business consistent with amounts disclosed to Purchaser as "Expenses" in the income statements provided to Purchaser as part of the Financial Statements (other than Bank Service Charges).

    **2.1.4.**    Liabilities and obligations arising out of, resulting from, or relating to sales pursuant to Transferred Contracts of products or services by the Business, including all Product warranty, Product returns, Product liability (other than design defects) and Product recall liability related thereto.

    **2.1.5.**    All deferred revenue obligations arising under the Verizon Contract including all obligations to fulfill orders relating to products of the Business outstanding on the Closing Date set forth on Schedule 2.1.

    **2.2.**    **No Expansion of Third Party Rights**.    The assumption by Purchaser of the Assumed Liabilities shall in no way expand the rights or remedies of any third party against Purchaser or Seller as compared to the rights and remedies which such third party would have had against Seller absent the Bankruptcy Cases, had Purchaser not assumed such Assumed Liabilities. Without limiting the generality of the preceding sentence, the assumption by Purchaser of the Assumed Liabilities shall not create any third-party beneficiary rights other than with respect to the Person that is the obligee of such Assumed Liability.

    **2.3.**    **Retained Liabilities.**    Notwithstanding anything in this Agreement to the contrary, Purchaser shall not assume or be deemed to have assumed, and shall have no liability or obligation with respect thereto, any other liabilities of the Company (collectively, "**Retained Liabilities**") including without limitation the following: (i) liabilities in respect of employment or services performed on or prior to the Closing; (ii) product liability claims to the extent based on a defective design for Products designed by Seller and sold prior to the Closing Date except as expressly set forth in Section 2.1.4; (iii) existing litigation for which a claim has been made to or threatened in writing against Seller on or before the Closing Date; (iv) all Tax liabilities of Seller for all periods (but excluding any Tax liabilities allocated to Purchaser pursuant to Section 10.3 of this Agreement); (v) any liability or obligation of Seller for administrative fees and expenses, including,

without limitation, "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code; (vi) any liability or obligation of Seller for transaction fees and expenses and fees and expenses payable to lenders, brokers, financial advisors, legal counsel, accountants and other professionals in connection with this Agreement; (vii) all Debt owed by Seller to any party; (viii) all Claims, except for Assumed Liabilities; (ix) all liabilities to employees of Seller who are not Transferred Employees as defined in Section 3.1.3 or (x) any liability or obligation not expressly assumed pursuant to Section 2.1 hereof.

3.      **ACQUIRED ASSETS - PERSONNEL MATTERS – TRANSFERRED EMPLOYEES**:

   **3.1.    Business Employees.**  Listed on Schedule 5.1.16.A are all employees and consultants of Seller that perform services exclusively or primarily for the Business (each employee required to be so listed a "**Business Employee**"). With respect to each such employee and consultant (as limited in definition for purposes of this Article 3 only) included thereon, Schedule 5.1.16.A lists: (i) each such person's title or job/position; (ii) each such person's job designation (i.e., salaried or contract); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., authorized leave or absence, etc.)); (v) each such person's annual base rate of compensation; (vi) any additional compensation otherwise payable to such person or for which such person is expressly eligible; and, if applicable; (vii) any consideration, payment, or benefit to which such person may be entitled upon termination of services to the Seller or Purchaser; and (viii) any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, golden parachute, etc.) to the extent permitted to be disclosed under applicable Law (including local privacy laws).

   **3.1.1.**  Not later than fifteen (15) calendar days after signing this Agreement, Purchaser will confirm the names of the employees that it intends to offer employment to. Not later than ten (10) calendar days prior to the Closing Date, Purchaser will offer employment to substantially all Business Employees (other than as set forth on Schedule 5.1.16.A) with such new employment to commence (if accepted) with effect from the Closing and will confirm the list of such employees to Seller promptly thereafter.

   **3.1.2.**   Not later than fifteen (15) business days prior to the Closing Date, Seller will provide Purchaser with an updated Schedule 5.1.16.A, such updated schedule to include certain key employees as indicated on the initial schedule.

   **3.1.3.**  Purchaser's offer of employment to substantially all persons identified on Schedule 5.1.16.A, will be on Purchaser's standard terms and conditions as applied to similarly situated employees; provided, however, that Purchaser shall give each such employee credit for time previously employed by Seller for all purposes within Purchaser's direct control. Any Business Employee that accepts and commences employment with Purchaser pursuant to a written offer letter with Purchaser shall be referred to herein as a "**Transferred Employee**".

   **3.1.4.    Retention Bonus.**  Purchaser shall allocate an aggregate of $500,000 among certain of the Transferred Employees (the "**Retention Bonus**").  The method of allocation of the Retention Bonus among the Transferred Employees shall be as Purchaser may determine in its sole discretion.  On the Purchaser's first regular payroll date following the six (6) month anniversary of the Closing, Purchaser shall commence payment of the Retention Bonus in such amounts as determined by Purchaser to such Transferred Employees (subject to applicable deductions and withholding).

**3.2.** **Cooperation.**  Seller and Purchaser will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Article 3.

**3.3.** **No Third Party Rights.**  No provision of this Agreement confers rights or remedies upon any person, including Transferred Employees, other than the parties to this Agreement and Delphi.

**4.**    **PURCHASE PRICE:**

**4.1.** **Purchase Price; Deposit Amount.**  Subject to the terms and conditions of this Agreement, in consideration of the Sale, the aggregate purchase price for the Acquired Assets shall be the amount of: (i) Six Million five Hundred Thousand Dollars (US$6,500,000); plus (ii) assumption of the Assumed Liabilities.  The final aggregate purchase price, as so determined, is referred to herein as the "**Purchase Price**".

**4.1.1.** **Deposit Amount.**  Upon execution of this Agreement, Purchaser has delivered to the Escrow Agent pursuant to the terms of the Escrow Agreement $500,000 in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "**Deposit Amount**"), to be held by the Escrow Agent in an interest bearing account reasonably acceptable to Purchaser to serve as an earnest money deposit under this Agreement, and to be released in accordance with the following procedures:

**A.** **Deposit Instructions.**  On the Closing Date, Seller and Purchaser shall jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Seller in the Escrow Agreement (and such amount shall be applied towards the payment of the Purchase Price);

**B.** **Termination of Agreement.**  Upon any failure by Purchaser to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Section 7.1 hereof, the Escrow Agent shall deliver the Deposit Amount, in accordance with the terms of the Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Seller in the Escrow Agreement, to be retained by Seller.  Any such payment shall constitute Seller's sole recourse in connection with such failure to consummate the transactions contemplated hereby; and

**C.** **Other Reason.**  Upon termination of this Agreement for any other reason, or upon the failure by Seller to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Section 7.1 hereof, Seller and Purchaser shall jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Purchaser in the Escrow Agreement, to be retained by Purchaser.

**D.** **Temporary Escrow.**  Seller and Purchaser acknowledge that in order to execute this Agreement more expeditiously, Purchaser shall deliver to DLA Piper Rudnick Gray Cary US LLP, 2000 University Avenue, East Palo Alto, California 94303 ("DLA") the Deposit Amount no later than one (1) business day following the execution hereof (such deposit to be temporarily in lieu of the

provisions set forth above). Within one (1) business day following the execution of an Escrow Agreement substantially in the form attached hereto as Schedule 7.2.4 by each of the parties thereto, the Purchaser shall direct DLA to deliver the Deposit Amount to the Escrow Agent as set forth in Section 4.1.1 above as if such funds had been delivered by the Purchaser to the Escrow Agent as set forth therein. Such funds shall remain the property and under the control of Purchaser until such time as Purchaser directs DLA pursuant to the preceding sentence, at which time the other provisions of this Section 4.1.1 shall control.

      **4.1.2.**  **Delivery of Purchase Price.**  At Closing, Purchaser shall pay to Seller an aggregate amount equal to the Purchase Price less the Deposit Amount (apportioned pursuant to the allocation referred to in Section 4.2) and less $475,000 by wire transfer in U.S. Dollars in immediately available funds to the account of the appropriate Seller, pursuant to this Agreement and a notice delivered by Seller to Purchaser prior to Closing. At Closing, Purchaser shall pay to JPMorgan Chase Bank, NA as "**Escrow Agent**" hereunder $475,000 of the Purchase Price (which when added to the Deposit Amount (total is $975,000) is hereinafter referred to as the "**Escrow Amount**") to be held by the Escrow Agent as collateral to secure the rights of the Purchaser under Article 12 hereof. The Escrow Amount shall be held pursuant to the provisions of an escrow agreement substantially in the form of Schedule 7.2.4 (the "**Escrow Agreement**").  The Escrow Amount will be held by the Escrow Agent from the Closing Date until the one (1) year anniversary of the Closing Date (the "**Escrow Period**"); provided, however, that in the event Purchaser has made a claim under Article 12 prior to the end of the Escrow Period, then the Escrow Period shall continue (and the Escrow Agent will continue to hold in escrow that portion of the Escrow Amount which is equal to the amount which is necessary to satisfy such indemnity claim) until such claim is fully and finally resolved.  The costs and expenses of the Escrow Agent will be paid from and borne solely by the Escrow Amount.

      **4.2.**  **Allocation of Purchase Price.**  The Parties agree to allocate the Purchase Price among the Business and the agreements provided herein for transfer of the Business to Purchaser, for all purposes (including financial, accounting and tax) (the "**Allocation**") in a manner consistent with the Allocation Schedule set forth in Schedule 4.2 to be mutually agreed upon by Purchaser and Seller in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, based on the fair market value of the Acquired Assets.  Purchaser shall provide to Seller a draft Allocation within fifteen (15) days following the Closing Date.  This Allocation shall become final and binding on the parties, unless Seller notifies Purchaser within fifteen (15) days after receipt of such Allocation of Seller's disagreement with such Allocation.  In the event Seller timely notifies Purchaser of such disagreement, the parties shall resolve such disagreement in the manner described in Section 13.18 of this Agreement.  Purchaser and Seller shall each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue Code (or any successor form or successor provision of any future tax law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law.  Seller shall provide Purchaser and Purchaser shall provide Seller with a copy of any information required to be furnished to the Secretary of the Treasury under Internal Revenue Code Section 1060.

      **4.3.**  **Other Adjustments.**  To support working capital concerns at Seller, Delphi has entered into a letter of credit agreement with Prolificx to purchase products under a Delphi

purchase order on behalf of Seller. At Closing, should open volume orders exist between Delphi and Prolificx (ordered, but not shipped to Seller), Purchaser will purchase inventory from Delphi at cost as volume is shipped, and billed to Delphi to the extent that, and only to the extent that, such inventory is to be delivered to Purchaser after the Closing in connection with the service of an existing customer purchase order, and only if the payment for such inventory by Purchaser pursuant to this Section 4.3 is less than or equal to the amount such customer is obligated to pay to Purchaser for such inventory. Transitional planning and coordination between Delphi, Seller and Prolificx should support minimizing this amount of volume.

## 5.    REPRESENTATIONS AND WARRANTIES:

   **5.1.    Representations and Warranties of Seller.**  All information set forth in the Disclosure Schedules with respect to any clause of this Section 5.1 shall be deemed disclosed under and incorporated into any other clause of this Section 5.1 as to which such disclosure would clearly be appropriate based solely on the language in such disclosure and such other clause. Seller represents and warrants to Purchaser as follows:

      **5.1.1.    Organization and Good Standing.**  Except as otherwise set forth on Schedule 5.1.1, Seller is a legal entity duly organized, validly existing and in good standing under the laws of its the state of Delaware, and has all requisite corporate or other organizational power and, subject to any required Bankruptcy Court approval, authority to own, lease and operate its properties and assets and to carry on the Business as presently conducted, and is in good standing in all jurisdictions where it owns or leases real property, except where the failure so to qualify or to be so licensed would not have a Material Adverse Effect.

      **5.1.2.    Corporate Power; Due Authorization.**  Seller has the corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements, subject to Bankruptcy Court approval, to which Seller is a party, and to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated herein and therein. The execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller and the consummation of the contemplated transactions have been duly authorized by all necessary action on the part of Seller. Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, this Agreement, and the Ancillary Agreements, have been duly and validly executed and delivered by or on behalf of the Seller and (assuming this Agreement constitutes a valid and binding obligation of Purchaser) constitutes a legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

      **5.1.3.    No Violations.**  No consent, approval, authorization of, declaration, filing or registration with any domestic or foreign government or regulatory authority or any other third party is required to be made or obtained by the Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements (including the assignment of all Transferred Contracts and all Purchased Intellectual Property), except for: (i) consents, approvals, authorizations of, declarations or filings with, the Bankruptcy Court that have been made or obtained, or will be made or obtained prior to the Closing; and (ii) consents, approvals, authorizations, declarations,

filings and registrations set forth on Schedule 5.1.3, the lack of which would not have a Material Adverse Effect. The items referred to in clauses (i) through (ii) of this Section 5.1.3 are hereinafter referred to as the "**Third-Party Requirements**".

5.1.4.  **Sufficiency of Acquired Assets**.  The Acquired Assets comprise all of the assets reasonably necessary to carry on the Business in all material respects as it is now being conducted, except as identified on Schedule 5.1.4.

5.1.5.  **Personal Property; Condition of Personal Property**:

A.    **Title to Personal Property**.  Except for the Personal Property leases and other Personal Property referred to in Schedule 5.1.5.A, Seller has good, valid and marketable title to the Personal Property and Inventory included in the Acquired Assets.  Upon entry by the Bankruptcy Court of the Sale Approval Order, Seller shall transfer the Acquired Assets free and clear of any Lien, except as otherwise expressly indicated on Schedule 5.1.5.A.

B.    **Condition of Personal Property**.  To the Seller's Knowledge, the Personal Property included in the Acquired Assets are in such condition (considering age and purpose for which used) as to enable the Business to be conducted as currently conducted without material disruption.

C.    **Inventory**.  Except to the extent identified in Schedule 5.1.5.C, the Inventory included in the Acquired Assets will, as of the Closing, be located at Seller's Mountain View, CA site and such other locations as set forth on Schedule 5.1.5.C, be fit for the purpose for which it is ordinarily acquired, and, in the case of finished goods Inventory, merchantable in the Ordinary Course of Business in all material respects.

D.    **Machinery, Equipment and Tools**.  Regarding the Acquired Assets, Schedule 5.1.5.D sets forth a list of substantially all machinery, equipment and capitalized tools with an acquisition value greater than $5,000 USD, included in the Acquired Assets and primarily used in or related to the Business.

5.1.6.  **Litigation.**  Except for the pendency of the Bankruptcy Cases and any Claims referred to in Schedule 5.1.6, there is no suit, action, proceeding or, to Seller's Knowledge, investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to any of the Seller's Knowledge, threatened against or affecting Seller.

5.1.7.  **Intellectual Property Assets**:

A.    Schedule 5.1.7.A.1 sets forth a true and complete list, including a complete identification of each patent, trademark registration, copyright registration, domain name registration, and application therefor included in the Owned Intellectual Property; and Schedule 5.1.7.A.2 sets forth a true and complete list of all Licensed Intellectual Property.  Schedule 5.1.7.A.3 sets forth a true and complete list, in all material respects, of all Software used in, arising from, relating to, or necessary for the conduct of the Business.  To Seller's Knowledge there are no impediments to the ability of Seller under applicable Laws to maintain

19

in effect or renew their respective rights, in all material respects, in and to the Owned Intellectual Property. Except as set forth on Schedule 5.1.11, Schedule 5.1.14.B and/or Schedule 6.2.5, to Seller's Knowledge there are no impediments to the ability of Seller under applicable Law to grant to Purchaser by license or assignment the rights to the Licensed Intellectual Property as contemplated in this Agreement.

**B.**     To Seller's Knowledge, Seller is conducting the Business in a manner that does not violate the intellectual property right of another Person and no Claim has been made by any third party against Seller of Intellectual Property infringement or misappropriation resulting from the operation of the Business, except as set forth in Schedule 5.1.7.B.

**C.**     Seller has not granted any license, sublicense or other permission to use the Owned Intellectual Property included in the Acquired Assets to any third party, except as set forth on Schedule 5.1.7.C.

**D.**     Except as set forth on Schedule 5.1.7.D, all Owned Intellectual Property included in the Acquired Assets: (i) is owned solely and exclusively by Seller; and (ii) upon entry by the Bankruptcy Court of the Sale Approval Order, Seller shall transfer the Owned Intellectual Property free and clear of any encumbrances thereon.

**E.**     Except as set forth on Schedule 5.1.7.E, no Owned Intellectual Property or any Product that contains any is, in whole or in part, governed by an Excluded License.  For purposes of this Agreement, an "**Excluded License**" means any license that requires, as a condition of modification and/or distribution of software subject to the Excluded License, that: (i) such software and/or other software combined and/or distributed with such software be disclosed or distributed in source code form or (ii) such software and/or other software combined and/or distributed with such software and any associated intellectual property be licensed on a royalty free basis (including for the purpose of making additional copies or derivative works).

**F.**     Seller has taken commercially reasonable steps to protect rights in confidential information (both of the Seller and that of third parties that the Seller has received under an obligation of confidentiality), has required all current and former employees with whom the Seller has shared confidential information to execute legally binding written non-disclosure agreements, and has entered nondisclosure or other similar agreements with substantially all third parties to whom the Seller has shared confidential information, except where the failure to do so would not have a Material Adverse Effect.

**G.**     The Seller has secured from all parties who have created any material portion of, or otherwise have any rights in or to, the Owned Intellectual Property, valid and enforceable written assignments or licenses of any such work or other rights to the Seller and provided true, complete and correct copies of such assignments or licenses to Purchaser.

**H.**     The Seller does not export vehicle hardware units from the United States and has not determined whether it would require a license to do so.

20

**5.1.8.  Insurance.**  Schedule 5.1.8 contains a complete and correct list, in all material respects, of all material policies of insurance covering any of the assets primarily used in or relating to the Business, other than Excluded Assets, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder.  All such policies are outstanding and in full force and effect.

**5.1.9.  Compliance with Other Instruments and Laws; Permits.**  The Business is in compliance with all Laws applicable to the conduct of the Business and all Permits, except where the failure to be in compliance would not have a Material Adverse Effect.  All Permits that are necessary for the conduct of the Business and the ownership and operation of the Acquired Assets have been duly obtained, are in full force and effect, and, to Seller's Knowledge, are listed on Schedule 5.1.9, and there are no proceedings pending or, to Seller's Knowledge, threatened, which may result in the revocation, cancellation or suspension, or any materially adverse modification, of any such Permit, except in each case as would not, individually or in the aggregate, result in a Material Adverse Effect.  The execution, delivery and performance of, and compliance with, this Agreement and the Ancillary Agreements by Seller will not, with or without the passage of time or the giving of notice, result in any such violation or be in conflict with or constitute a default under any Permit.

**5.1.10. Brokers.**  Seller has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Purchaser would be liable.

**5.1.11. Consents and Approvals.**  Assuming that the Third-Party Requirements will be satisfied, made or obtained and will remain in full force and effect, and assuming receipt of the consents, approvals and authorizations listed in Schedule 5.1.11, neither the execution, delivery or performance of this Agreement and the Ancillary Agreements by the Seller, nor the consummation by Seller of the Sale, nor compliance by Seller with any of the provisions hereof and of the Ancillary Agreements, will, with or without the passage of time or the giving of notice: (i) result in any breach of any provisions of the articles of incorporation or bylaws or similar organizational documents of Seller; (ii) result in a violation, or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, amendment, vesting, payment, exercise, acceleration, suspension or revocation) under any of the terms, conditions or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, loan or credit agreement, license, permit, contract, lease, agreement, plan or other instrument, commitment or obligation to which Seller is a party or by which its properties or assets may be bound or affected; (iii) violate any order, writ, governmental authorization, injunction, decree, statute, rule or regulation applicable to Seller or to any of its properties or assets; or (iv) result in the creation or imposition of any Lien other than Permitted Encumbrances on any asset of Seller, except in the case of clauses (ii), (iii)  and (iv) above, for violations, breaches, defaults, terminations, cancellations, accelerations, creations, impositions, suspensions or revocations that: (a) would not individually or in the aggregate have a Material Adverse Effect; or (b) are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

**5.1.12. Financial Statements.**  (i) The unaudited balance sheets and statements of income, as of and for the fiscal years ended December 31, 2003, December 31, 2004

and December 31, 2005, for the Business are set forth in <u>Schedule 5.1.12(i)</u>; and (ii) the unaudited balance sheet and statement of income for the four (4) months ended April 30, 2006 for the Business are set forth in <u>Schedule 5.1.12(ii)</u> (such financial statements in clause (i) and (ii) are collectively referred to as the "**Financial Statements**").  Except as set forth on <u>Schedule 5.1.12(ii)</u>, the Financial Statements (including the notes thereto) were compiled from the books and records of the Business, are in accordance with such books and records, have been prepared in accordance with GAAP consistently applied (except as set forth therein) throughout the periods covered thereby and present fairly the assets, liabilities, financial position and results of operations of the Business as of the dates and for the periods indicated; provided, however, that the Financial Statements referred to in clause (ii) of the preceding sentence are subject to normal year-end adjustments (which, except as set forth on <u>Schedule 5.1.12(ii)</u> will not be material individually or in the aggregate) and lack footnotes required by GAAP.

5.1.13. <u>**Events Subsequent to Latest Financial Statements.**</u>  Except as referred to on <u>Schedule 5.1.13</u> or as otherwise contemplated by or referred to in this Agreement or the Ancillary Agreements, since April 30, 2006: (i) there has not been any Material Adverse Change; and (ii) the Business has been conducted and carried on only in the Ordinary Course of Business.

5.1.14. <u>**Contracts:**</u>

A.    <u>Schedule 5.1.14.A</u> lists all Contracts of Seller or its affiliates related to the Business that involve payment or performance obligations that individually exceed $25,000, and such Schedule includes all other Contracts to which Seller is a party or by which any of its properties are bound or that primarily relate to, are primarily used in, are primarily arising from, or are necessary for the conduct of the Business (including license and distribution agreements and arrangements among Seller, its Affiliates or third parties), other than Accounts Receivable (collectively, "**Listed Contracts**").  Seller has delivered or made available to Purchaser either: (i) true, correct and complete copies in all material respects; or (ii) accurate written descriptions in all material respects, of the Listed Contracts, except as set forth on <u>Schedule 5.1.14.A</u>.    <u>Schedule 5.1.14.A</u> identifies all Post-Petition Contracts included within the Listed Contracts other than immaterial Post-Petition Contracts and open purchase orders entered into in the Ordinary Course of Business. Except as set forth on <u>Schedule  5.1.14.A</u>, and except for Post-Petition Contracts that are immaterial to the Business, none of the Post-Petition Contracts included within the Listed Contracts contains any provisions restricting its assignment to Purchaser pursuant to the terms of this Agreement.

B.    Each of the Listed Contracts is valid, binding and, subject to payment of all Cure Amounts, if applicable (which Cure Amounts will be paid by Seller as set forth in the Sale Approval Order), enforceable against Seller, to the extent set forth therein, and, to Seller's Knowledge, the other parties thereto, in accordance with its terms, and is in full force and effect.  Except as set forth on <u>Schedule 5.1.14.B</u>, and other than with respect to monetary defaults by Seller under Listed Contracts that are curable by payment of all Cure Amounts, if applicable, Seller, and to Seller's Knowledge each of the other parties thereto, has performed all obligations required to be performed by it to date under, and is not in material default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Seller to assume and assign such Listed

Contracts to Purchaser, if applicable) in respect of, any of such Listed Contracts, and there is not a material default thereunder or material claim of default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Seller to assume and assign such Listed Contracts to Purchaser, if applicable) and there has not occurred any event which, with the passage of time or the giving of notice or both, would constitute a material default thereunder (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Seller to assume and assign such Listed Contracts to Purchaser, if applicable), on the part of Seller, or to Seller's Knowledge, on the part of any other party thereto.  Except as set forth in Schedule 5.1.14.B, and other than with respect to monetary defaults by Seller under Listed Contracts that are curable by payment of all Cure Amounts, if applicable, Seller has received no written claim or notice from any other party to any such Listed Contract that Seller has breached in any material respects any obligations to be performed by it thereunder, or is otherwise in material default or delinquent in any material respects in performance thereunder (except with respect to defaults, delinquencies or obligations that need not be cured or performed, as appropriate, under Section 365 of the Bankruptcy Code for Seller to assume and assign such Listed Contracts to Purchaser, if applicable).

**5.1.15. Tax Matters:**

**A.**    Seller has: (i) duly and timely filed with the appropriate federal, state, local and foreign authorities or governmental agencies, all Tax Returns required to be filed and such Tax Returns were true, correct and complete; and (ii) have paid all Taxes shown thereon as due and owing, except where the failure to file such Tax Returns or to pay such Taxes would not result in any liability to the Purchaser or any Lien on the Acquired Assets.

**B.**    Except as set forth on Schedule 5.1.15.A, Seller has properly and timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor or other third party (including federal income taxes, sales and use taxes, personal property taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes) and has properly and timely paid the same to the proper Tax receiving officers or authorized depositories, except in each case where such failure would not result in any liability to the Purchaser or any Lien on the Acquired Assets.

**C.**    Seller is not a party to any Tax allocation, Tax sharing agreement or Tax indemnity arrangement, except as provided in this Agreement, under which Purchaser could be subject to Tax or other liability after the Closing.

**D.**    Except as disclosed in Schedule 5.1.15.D, no claim has ever been made by an authority in a jurisdiction in which Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction or authority with respect to, in connection with, associated with or related to, Seller; no agreements or waivers are outstanding extending the statutory period of limitations applicable to any Tax Return of Seller with respect to a Tax assessment or deficiency; and Seller has not received any: (i) notice of underpayment of Taxes or other deficiency that has not been paid with respect to, in connection with, associated with or related to, Seller;

23

or (ii) any objection to any Tax Return, with respect to, in connection with, associated with or related to, Seller, except in each case where such matter would not result in any liability to the Purchaser or any Lien on the Acquired Assets. Except as disclosed in Schedule 5.1.15.D, all deficiencies asserted or assessments made as a result of any examinations with respect to, in connection with, associated with or related to, Seller have been fully paid or are fully reflected as a liability in the financial statements of the Seller.

**E.** Seller is not a party to any agreement, contract arrangement or plan that has resulted or would result, separately or in the aggregate, in the payment of any excess parachute payments within the meaning of IRC Code Section 280G.

**F.** There are no Tax liens on any of Seller's assets, except for liens for Taxes not yet due and payable.

**G.** Except for Transfer Taxes relating to the Sale, since April 30, 2006, Seller has not incurred any Taxes other than in the ordinary course of business and Seller has made adequate provisions on its books of account for all Taxes with respect to the Acquired Assets and the Business for such period, except for Taxes that would not result in any liability to the Purchaser or any Lien on the Acquired Assets.

**H.** Seller has no liability for the Taxes of any Person other than Seller or any of its subsidiaries (i) under Treasury Regulation 1.1502-6 (or any similar Treasury Regulations), (ii) as a transferee or successor, (iii) by contract, or (iv) otherwise, except in each case where such liability would not result in any liability to the Purchaser or any Lien on the Acquired Assets.

**5.1.16. Employee Issues:**

**A.** **Business Employees.** Schedule 5.1.16.A contains a list of all Business Employees, and the information thereon is true, complete and correct in all material respects.

**B.** **Seller Performance.** Seller has performed and discharged, or will perform and discharge on or before the Closing Date, its obligations with respect to all of the Business Employees, up to and including the Closing Date, including working time, payment of wages and salaries, benefits, employer's contributions to any relevant social security, health, welfare and occupational pension scheme, severance or any other payments, and payment of all other costs and expenses relating to their employment (including without limitation any taxation, accrued holiday and vacation pay, accrued bonus or other sums payable with respect to employment) up to and including the Closing Date, except as otherwise set forth on Schedule 5.1.16.B.

**5.1.17. Absence of Other Representations or Warranties.** Except for the Warranties expressly set forth in this Agreement and the Ancillary Agreements, Seller makes no representations or warranties, express or implied, with respect to the Acquired Assets, the Assumed Liabilities, the sale of the Business, and in particular but without limitation, Seller makes no representations with respect to any plan(s) of Purchaser for the future conduct of the Business. For the avoidance of doubt, no warranty or representation

is given on the contents of the documents provided in due diligence, on any other documents or other information   not contained in this Agreement or the Ancillary Agreements, or on any projected volumes of the Business, all which were produced only for information purposes.

**5.2.    Representations and Warranties of Purchaser.**   Purchaser warrants and represents to Seller as follows:

**5.2.1.   Corporate Data.**   Purchaser is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all requisite corporate or other organization power and authority to own, lease and operate its properties and assets.

**5.2.2.   Corporate Power; Due Authorization.**   Purchaser has the corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein.   The execution, delivery and performance of this Agreement and the Ancillary Agreements have been duly authorized by all necessary action on the part of Purchaser.   This Agreement is, and the Ancillary Agreements to which Purchaser is a party will be, when executed and delivered (assuming this Agreement constitutes a legal, valid and binding obligation of the Seller), valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or proceedings affecting the enforcement of creditors' rights generally and by the availability of equitable remedies and defenses.

**5.2.3.   No Violations.**   Neither the execution, delivery or performance of this Agreement by Purchaser, nor the consummation by Purchaser of the transactions contemplated herein, nor compliance by Purchaser with any of the provisions hereof, will: (i) except for the Third-Party Requirements, require Purchaser to obtain any consent, approval or action of, or make any filing with or give notice to, any domestic or foreign governmental or regulatory body or any other Person; (ii) conflict with or result in any breach of any provisions of the certificate of incorporation or bylaws of Purchaser; or (iii) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Purchaser or Purchaser's properties or assets.

**5.2.4.   Litigation.**   Except for the pendency of the Bankruptcy Cases, there is no suit, action, proceeding or investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to the knowledge of Purchaser, threatened against or affecting Purchaser which could reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

**5.2.5.   Brokers.**   Purchaser has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Seller would be liable.

**5.2.6.   Solvency.**   Upon the consummation of the transactions contemplated by this Agreement: (i) Purchaser will not be insolvent; (ii) Purchaser will not be left with

25

unreasonably small capital; (iii) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature; (iv) the capital of Purchaser will not be impaired; and (v) immediately following closing, Purchaser will have sufficient capital to continue the Business as a going concern (it being understood that Purchaser will have no obligation to continue all or any portion of the Business as a going concern).

5.2.7. **Availability of Funds.**   Purchaser has or will have available, at or prior to Closing, sufficient cash in immediately available funds to pay the Purchase Price and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

5.2.8. **Adequate Assurance of Future Performance.**   Purchaser has provided or will be able to provide, at or prior to Closing, adequate assurance of its future performance under each Assumed Contract to the parties thereto (other than Seller) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance shall be necessary thereunder with respect to any Assumed Contract.

5.2.9. **Compliance with Law.**   Purchaser is in compliance with all Laws applicable to it, except with respect to those violations that could not reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

5.2.10. **Anti-Money Laundering.**   Purchaser is in compliance with: (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA PATRIOT Act**") as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which Purchaser operates or does business. Neither the Purchaser nor any of its directors, officers or affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and Purchaser is not affiliated in any way with, or providing financial or material support to, any such persons or entities. Purchaser agrees that should it, or any of its directors, officers or affiliates be named at any time in the future on the SDN List, or any other similar list maintained by the U.S. Government, Purchaser shall inform the Seller in writing immediately.

5.3. **Survival of Representations, Warranties and Covenants of the Seller.**   The representations and warranties made by the Seller in Section 5.1 shall survive the Closing and shall expire on the first anniversary of the Closing Date (the "**Expiration Date**"); provided, however, that if, at any time prior to the first anniversary of the Closing Date, Purchaser delivers to Seller a written notice alleging the existence of an inaccuracy in or a breach of any of the representations and warranties made by the Seller and asserting a claim for recovery in accordance with Article 12 based on such alleged inaccuracy or breach, then the claim asserted in such notice shall survive the first anniversary of the Closing (and the Expiration Date with

respect thereto shall be extended) until such time as such claim is fully and finally resolved.  The covenants made by the Seller shall survive the Closing.

**5.4.    Survival of Representations, Warranties and Covenants of the Purchaser.**
The representations and warranties made by the Seller in Section 5.2 shall survive the Closing and shall expire on the Expiration Date; provided, however, that if, at any time prior to the first anniversary of the Closing Date, Seller delivers to Purchaser a written notice alleging the existence of an inaccuracy in or a breach of any of the representations and warranties made by the Purchaser and asserting a claim for recovery in accordance with Article 12 based on such alleged inaccuracy or breach, then the claim asserted in such notice shall survive the first anniversary of the Closing (and the Expiration Date with respect thereto shall be extended) until such time as such claim is fully and finally resolved.  The covenants made by the Purchaser shall survive the Closing.

**6.    CONDITIONS TO CLOSING:**

**6.1.    Conditions to Obligations of Seller and Purchaser.**  The respective obligations of each party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following conditions precedent:

**6.1.1.    Sale Approval Order.**  The Sale Approval Order, in form and substance reasonably satisfactory to Purchaser, shall be entered by the Bankruptcy Court and shall not be subject to a stay or injunction.

**6.1.2.    No Law, Judgments, etc.**  No provisions of any applicable Law and no judgment, injunction (preliminary or permanent), order or decree that prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement shall be in effect (each party taking any and all steps required by Section 8.2 of this Agreement).

**6.2.    Conditions to Obligations of Purchaser.**   The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Purchaser):

**6.2.1.    Accuracy of Representations and Warranties.**   Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Seller contained in this Agreement that are qualified by materiality shall be true and correct, and the other representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects, in each case as of the date hereof and as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time).  Subject to the preceding sentence, Seller may update or supplement the Disclosure Schedule prior to Closing by written notice to Purchaser, but any such update or supplement shall not be taken into account in determining whether the condition set forth in this Section 6.2.1 has been satisfied or whether there has been a breach of any representation, warranty or covenant has been breached for any purpose under this Agreement.  Any claim that Purchaser may have based on matters disclosed by Seller in such updated or supplemented Disclosure Schedule will be deemed waived by Purchaser if Purchaser nonetheless completes the transactions contemplated herein.

**6.2.2.  Performance of Covenants.**  Each of the Ancillary Agreements to which Seller is a party shall have been executed and delivered by Seller to Purchaser, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Seller on or before the Closing shall have been performed in all respects.

**6.2.3.  Payment of Cure Amounts.**  Seller shall have paid all Cure Amounts with respect to Assumed Contracts as set forth in Section 8.4 hereof.  Seller shall have cured any and all monetary defaults that arose under or otherwise became due and owing prior to the Closing Date under Transferred Contracts that are Post-Petition Contracts.

**6.2.4.  Certification.**  Seller shall furnish to Purchaser a certification in a form acceptable to Purchaser pursuant to Treasury Regulation Section 1.1445-2(b)(2) that Seller is not a foreign person.

**6.2.5.  Other Approvals.**  The third party consents set forth in Schedule 6.2.5 shall have been received and all consents, approvals and filings in connection with Third-Party Requirements shall have been obtained or made in form and substance reasonably satisfactory to the Purchaser.

**6.3.  Conditions to Obligations of Seller.**  Except as otherwise permitted by this Agreement, the obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Seller):

**6.3.1.  Accuracy of Representations and Warranties.**  The representations and warranties of Purchaser contained in this Agreement that are qualified by materiality shall be true and correct, and the other representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects, in each case as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

**6.3.2.  Performance of Covenants.**  Each of the Ancillary Agreements to which Purchaser is a party shall have been executed and delivered by Purchaser to Seller, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Purchaser on or before the Closing shall have been performed in all material respects.

**6.3.3.  Delivery of Purchase Price.**  Purchaser shall have delivered to Seller the Purchase Price by wire transfer, in immediately available funds, to such bank account or bank accounts as shall be specified by Seller to Purchaser on the Closing Date.

**7.  CLOSING:**

**7.1.  The Closing.**  Subject to the satisfaction of the conditions set forth in Article 6 of this Agreement, the closing (the "**Closing**") of the transactions contemplated hereby shall take place at the offices of DLA Piper, 2000 University Avenue, East Palo Alto, California 94303 at 10:00 a.m. on the second Business Day after the conditions set forth in Article 6 shall have been satisfied or waived (other than conditions which by their nature can be satisfied only at the

Closing) and in any case on a mutually agreeable date no later than the later of ten (10) days following the entry of the Sale Approval Order and July 31, 2006, or if such day is not a Business Day, then on the next immediately following Business Day, or on such other date or at such other time as the Parties may agree.   For tax and accounting purposes, the effective time of the transaction shall be 11:59 p.m. EDT on the Closing Date.

    **7.2.**   **Ancillary Agreements.**  At the Closing, the Parties shall execute and deliver each to the other the following agreements to which they are a party:

    **7.2.1.**   Assignment of Lease regarding 800 West El Camino Real, Mountain View, CA 94040 property substantially in the form of <u>Schedule 7.2.1</u>, including the landlord's consent thereto.

    **7.2.2.**   Intellectual Property Transfer Documents as follows:

    **A.**   An assignment from MobileAria to WIRELESS MATRIX of the Patent Rights set forth in <u>Schedule 5.1.7.A.1</u> substantially in the form attached hereto as <u>Schedule 7.2.2.A</u>.

    **B.**   An assignment from MobileAria to WIRELESS MATRIX of the Trademark Rights set forth in <u>Schedule 5.1.7.A.1</u> substantially in the form attached hereto as <u>Schedule 7.2.2.B</u>.

    **7.2.3.**   Assignment and Assumption Agreement relating to the Transferred Contracts, consistent with the Sale Approval Order substantially in the form attached hereto as <u>Schedule 7.2.3</u>.

    **7.2.4.**   Escrow Agreement between Seller, Purchaser and the Escrow Agent substantially in the form attached hereto as <u>Schedule 7.2.4</u>.

    **7.2.5.**   Bill of sale substantially in the form attached hereto as <u>Schedule 7.2.5</u>.

    **7.2.6.**   A non-exclusive, royalty-free license for vehicle adaptor bus technology on terms reasonably agreeable to  Delphi Technologies and Purchaser.

    **7.3.**   **Seller's Deliveries.**  At the Closing, Seller shall deliver to Purchaser the following, in proper form for recording where appropriate:

    **7.3.1.**   Executed assignments for the Permits and Contracts to be acquired by Purchaser pursuant to Article 1.

    **7.3.2.**   An officer's certificate, dated as of the Closing Date, executed on behalf of Seller, certifying that the conditions specified in Section 6.2 have been fulfilled.

    **7.3.3.**   A certificate, dated as of the Closing Date, executed on behalf of Seller by a Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Seller's Organizational Documents; and (ii) a true and correct copy of the resolutions of Seller's board authorizing the execution, delivery and performance of this Agreement and any Ancillary Agreement to which Seller is a party and the consummation of the transactions contemplated hereby and thereby.

**7.3.4.** Certified copies of all orders of the Bankruptcy Court pertaining to the contemplated transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order.

**7.3.5.** Duly executed bill of sale transferring the Acquired Assets to Purchaser.

**7.3.6.** Appropriate receipts.

**7.4.** **Purchaser's Deliveries**. At the Closing, Purchaser shall deliver to Seller, in proper form for recording where appropriate:

**7.4.1.** The Purchase Price less the Deposit Amount as required by, and in accordance with, Section 4.1.

**7.4.2.** An Assignment and Assumption Agreement pursuant to which the Purchaser assumes the Assumed Liabilities.

**7.4.3.** An officer's certificate, dated as of the Closing Date, executed on behalf of Purchaser, certifying that the conditions specified in Section 6.3 have been fulfilled.

**7.4.4.** A certificate, dated as of the Closing Date, executed on behalf of the Purchaser by its Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Purchaser's Organizational Documents; and (ii) a true and correct copy of the resolutions of the Purchaser's board authorizing the execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby.

**8.** **CERTAIN ADDITIONAL COVENANTS:**

**8.1.** **Bankruptcy Actions:**

**8.1.1.** The Bidding Procedures are set forth in Section 11.1. As further specified below, Seller shall file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking approval of the Bidding Procedures Order and the Sale Approval Order.

**8.1.2.** Seller shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Acquired Assets under the Agreement, including serving on all required Persons in the Bankruptcy Cases, notice of the Sale Approval Motion, the Sale Hearing (as hereinafter defined) and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure, the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

**8.2.** **Registrations, Filings and Consents; Further Actions.** Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement and the

Ancillary Agreements as promptly as practicable including, without limitation, using their reasonable best efforts to cause the satisfaction of all conditions to Closing.

**8.3.** **Operation of the Business Pending Closing**:

**8.3.1.**  Except: (i) as otherwise provided herein; (ii) as required by or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court; (iii) subject to any changes that may be required under applicable Laws; (iv) as set forth in the following sentence, until the Closing, Seller will (a) carry on the Business in substantially the same manner as heretofore; and (b) will perform in all material respects all of its obligations under all Listed Contracts and not amend, alter or modify in any significant respect that is adverse to the Business any provision of any Listed Contract; keep in full force and effect insurance comparable in amount and scope to coverage maintained by it on the date of this Agreement; use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees and others having business relations with the Business; endeavor to maintain the goodwill of the Business; and promptly advise Purchaser of any material and adverse change in the business condition (financial or other) of the Business or the Acquired Assets.

**8.3.2.**  Seller shall promptly notify Purchaser if Seller becomes aware of the occurrence of any event or circumstance that could reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2, 6.2.1 or 6.2.5 hereof to be satisfied including, without limitation, any event or circumstance that, upon the occurrence of such event or circumstance, causes any representation or warranty of the Seller to be untrue in any material (except for any representation or warranty qualified by materiality) respect at the time of the occurrence of such event or condition.

**8.3.3.**  Purchaser shall promptly notify Seller if Purchaser becomes aware of the occurrence of any event or circumstance that could reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2 or 6.3.1 hereof to be satisfied including, without limitation, any event or circumstance that, upon the occurrence of such event or circumstance, causes any representation or warranty of the Purchaser to be untrue in any material (except for any representation or warranty qualified by materiality) respect at the time of the occurrence of such event or condition.

**8.4.** **Assumed Contracts; Cure Amounts.**  As soon as practicable after the date hereof, Seller shall, pursuant to a motion in form and substance reasonably acceptable to Purchaser (which motion may be incorporated into the Sale Motion), move to assume and assign to Purchaser the Assumed Contracts and shall provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court.  Seller shall pay Cure Amounts as agreed to by the Seller and each party to an Assumed Contract or, absent such agreement, by order of Court in the time and manner specified by the Sale Approval Order. Notwithstanding anything in this Agreement to the contrary, at any time prior to the conclusion of the Sale Hearing, Purchaser may notify the Seller that it has elected not to take an assignment of one or more Assumed Contracts and Seller shall have no obligation to assume or make payment of the Cure Amount with respect to any such Assumed Contract.  Seller agrees to make such information available as Purchaser reasonably requests in order to make a determination with respect to such Assumed Contracts.

**8.5.** **Post-Closing Covenants.**  From and after the Closing, each of the Parties will perform its respective covenants and agreements set forth below:

### 8.5.1.  **Seller Post-Closing Covenants**:

**A.**      **Non-Competition.**   Seller has as at Closing, established the reputation of the Business. Seller undertakes and agrees with Purchaser that for a period of three (3) years after the Closing Date, except with the consent of Purchaser, Seller shall not either on its own account or in conjunction with or on behalf of any person, firm or company whether by sales, marketing, investing, management or other activities, carry on, license or be engaged, concerned or interested, directly or indirectly, whether as a shareholder, director, employee, partner, agent or otherwise in carrying on any business which is engaged in the design, development, manufacture or sale of Products (a "**Competitive Business**"); provided, however, that the restrictions contained in this Section 8.5.1 will not prohibit, in any way: (i) the acquisition of a controlling interest or merger with any person, or a division or business unit thereof, acquired by or merged, directly or indirectly, into Seller or any of its Affiliates after the Closing Date if the Competitive Business accounts for five (5%) percent or less of the sales or five (5%) percent or less of the value of the acquired business at the date of such acquisition (whichever is the greater) and the Competitive Business is not anticipated to become greater than fifteen (15%) percent of such acquired business's sales or value; (ii) the acquisition by Seller or any of its Affiliates, directly or indirectly, of a non-controlling ownership interest in any person or a division or business unit thereof, or any other entity engaged in a Competitive Business, if the Competitive Business accounts for fifteen (15%) percent or less of the sales or fifteen (15%) percent or less of the value of the acquired business at the date of such acquisition (whichever is the greater) and the Competitive Business is not anticipated to become greater than twenty percent (20%) of such acquired business's sales or value; (iii) the acquisition by Seller or any of its Affiliates, directly or indirectly, of less than five (5%) percent of the publicly traded stock of any person engaged in a Competitive Business; (iv) provision of consulting services to any Person for the purpose of designing or manufacturing on behalf of Seller or any Seller Affiliate or selling to Seller or any Seller Affiliate components and parts solely for automotive applications other than those that would constitute Products; (v) consistent with the generally applicable Seller or any Seller Affiliate troubled supplier practices, direct or indirect activities of Seller or any Seller Affiliate to advise, operate, manage or finance a troubled supplier of Seller or its Affiliates; and (vi) the design, development, manufacture or sale of telematic modems and other telematics hardware and the communication of digital data for the remote resource management market for any kind of vehicle, including commercial vehicles, and derivatives of such hardware (collectively, "**Competing HW**"); provided that Seller does not provide subscription services (other than repair or replacement of defective hardware) associated with the use of Competing HW; and, provided, further, that Competing HW may be sold only to original equipment manufacturers, any distributor or reseller, and commercial users requiring volumes exceeding 5,000 units.  For further clarification, Seller agrees not to market or sell products that combine all of the following features in one Competing HW unit: CDMA (EVDO), GPS, 802 technologies, Windows CE operating platform, USB/Serial/GPIO interfaces and 64MG internal memory capabilities.

**B.**      While the restrictions contained in this Section 8.5.1 are considered by the parties to be reasonable in all the circumstances, it is recognized that

restrictions of the nature in question may fail for technical reasons and, accordingly, it is hereby agreed and declared that if any of such restrictions shall be adjudged to be void as going beyond what is reasonable in all the circumstances for the protection of the interests of Purchaser and/or the Business but would be valid if part of the wording thereof were deleted or the periods thereof reduced or the range of activities or area dealt with thereby reduced in scope the said restriction shall apply with such modifications as may be necessary to make it valid and effective.

      **C.**      Seller will cooperate with Purchaser to transition the letter of credit arrangement set forth in Section 4.3 as of the Closing Date.

      **8.5.2.**  <u>**Technical Documentation.**</u>  Seller has delivered, or will deliver on or before the Closing, to the Purchaser, a copy of all Technical Documentation included in the Acquired Assets.  For a period of not less than one (1) year commencing at Closing, Purchaser and its Affiliates shall use reasonable efforts to maintain all Technical Documentation applicable to product design, test, release, validation and manufacture it acquires from Seller and its Affiliates in connection with the purchase of the Acquired Assets under Article 1 of this Agreement at a location at which they shall be reasonably accessible to Seller and its Affiliates upon reasonable request and with reasonable advance notice.  During such one (1) year period, Purchaser shall not intentionally destroy or give up possession of its final copy of such documentation without offering Seller the opportunity, at Seller's expense but without any payment to Purchaser, to obtain a copy of such documentation.

      **8.5.3.**  <u>**Books and Records and Litigation Assistance From and After Closing**</u>:

      **A.**      Purchaser and its Affiliates shall use reasonable efforts to preserve and keep all books, records, computer files, software programs and any data processing files delivered to Purchaser by Seller and its Affiliates pursuant to the provisions of this Agreement for a period of not less than one (1) year from the Closing Date, or for any longer period as may be required of the Business by any government agency, law, regulation, audit or appeal of Taxes, or Tax examination at Purchaser's sole cost and expense.  If and when Seller believes that such records are no longer legally required, it will notify Purchaser.  During such period, Purchaser shall: (i) provide Seller or its Affiliates with such documents and information as necessary, consistent with past practice, to complete the accounting books and records of  the Business as of December 31, 2006; and (ii) make such books and records available to Seller and its Affiliates as may be reasonably required by Seller and its Affiliates in connection with any legal proceedings against or governmental investigations of Seller and its Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Seller and its Affiliates, the Business or the Acquired Assets during such period.  Seller or its Affiliates shall reimburse Purchaser for the reasonable out-of-pocket expenses incurred in connection with any request by Seller to make available records pursuant to the foregoing sentence.  In the event Purchaser wishes to destroy or dispose of such books and records after one (1) year from the Closing Date, it shall first give not less than thirty (30) days' prior written notice to Seller or its Affiliates, and Seller or its Affiliates shall have the right, at its option, upon prior written notice given to Purchaser within twenty (20) days of receipt of Purchaser's notice, to take

possession of said records within thirty (30) days after the date of Purchaser's notice to Seller hereunder.

**B.**  Purchaser, for itself and on behalf of its Affiliates, agrees to: (i) retain all documents required to be maintained by federal, state, national or local legislation or regulations; (ii) make available documents and records delivered to it by Seller reasonably necessary in connection with any pursuit, contest or defense related to the Business, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Purchaser must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Purchaser must notify Seller of the existence of such privileged documents); and (b) Seller and its Affiliates will agree to keep confidential and not use for any other purpose documents and records that are confidential or are subject to trade secret protection); (iii) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to significantly interfere with Purchaser's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Seller and its Affiliates in connection with such claim.

8.5.4.  **Payment and Collections.**  Seller shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Purchaser after Closing, and Purchaser shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Seller after Closing, in order to ensure that the cost of the related liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement.  To the extent that any such collections are received after Closing in the form of checks or other negotiable instruments payable to the other Party, Seller or Purchaser, as appropriate, shall promptly take all necessary action to endorse such checks or instruments to permit the appropriate Party to collect the proceeds of such checks and instruments.  Seller shall promptly send Purchaser copies of all remittance advices and checks related to payments received by Seller with respect to such items.  Purchaser shall notify the Business' customers of the change in address of the owner of the Acquired Assets as may be required in order for such customers to properly remit any payments required under any applicable Acquired Asset and Seller shall cooperate with Purchaser as is reasonably necessary to so notify such customers, including providing appropriate contact information for each such customer.

8.5.5.  **Intellectual Property Transition Rights.**  Seller will have the right to continue to use the MobileAria corporate name and office materials of the Business in existence at the Closing and bearing any trademark, service mark, trade name or related corporate name of MobileAria, but only in connection with the Bankruptcy Cases and the dissolution and wind down of Seller.

8.6.  **Further Assurances.**  If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

**8.7.**   **[Reserved]**

**8.8.**   **Certain Transactions.**   Purchaser shall not acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any material delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Entity necessary to consummate the transactions contemplated by this Agreement or the Ancillary Agreements or the expiration or termination of any applicable waiting period; (ii) significantly increase the risk of any Governmental Entity entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements; (iii) significantly increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) materially delay or prevent the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements.

**8.9.**   **Communications with Customers and Suppliers.**   Prior to the Closing, Purchaser shall not, and shall cause its Subsidiaries and representatives not to, contact, engage in any discussions or otherwise communicate with any of the Business' customers, suppliers and others with whom it has material commercial dealings without obtaining the prior written consent of Seller (which may be conditioned on Seller having the right to participate in any meetings or discussion with any such customers, suppliers or others); provided, that Purchaser and Seller shall work together in good faith to arrange for an orderly transition of customer, supplier, and other third party relationships, including, without limitation, at the request of Purchaser, meetings and other correspondence with such customers, suppliers, and other third parties to ensure such orderly transition. Purchaser may contact Verizon Services Corp. to: (i) ensure orderly transition of the Verizon Contract to Purchaser; and (ii) reduce and assess the likelihood of termination of the Verizon Contract by Verizon Services Corp. or material reduction of the amount of business conducted pursuant to the Verizon Contract, provided that Purchaser provides at least twenty-four (24) hour prior notice to Seller and permits Seller to supervise such correspondence at Seller's election.

**9.**   **TERMINATION:**

**9.1.**   **Termination.** Anything contained herein to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

**9.1.1.**   **By Either Party:**

**A.**   By mutual written consent of Seller and Purchaser.

**B.**   Provided the terminating Party is not in default of its obligations under this Agreement, if consummation of the Sale would violate any non-appealable Final Order of any regulatory Governmental Entity, other than the Bankruptcy Court.

**C.**   If Seller consummates an Alternative Transaction.

**D.**    Provided the terminating Party is not in default of its obligations under this Agreement, by either Seller or Purchaser if the Closing shall not have occurred by July 31, 2006.

**E.**    If the Bankruptcy Court has not entered the Sale Approval Order, on or before July 26, 2006 (the "**Termination Date**") or such Sale Approval Order is subject to a stay or injunction; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1.1.E shall not be available to Purchaser if Purchaser shall have failed to perform, or caused any of its respective Affiliates to perform, any of its respective material obligations under this Agreement.

**9.1.2.  By Purchaser.**  By Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) (i) at any time prior to Closing, if a Material Adverse Effect shall have occurred, Purchaser may terminate within ten (10) Business Days after receiving written notice of such event, so long as such event is continuing at the time of any such termination; (ii) if Verizon Services Corp. has terminated, threatened to terminate, or Verizon otherwise evidences an intent to terminate the Verizon Contract or materially reduce the amount of business conducted pursuant to the Verizon Contract or (iii) on or after July 27, 2006, if Seller accepts a Qualified Bid or Qualified Bids at the Auction other than that of the Purchaser, solely if each of the following conditions precedent are met: (a) Purchaser does not submit a Subsequent Bid at the Auction; and (b) Seller does not provide notice on or before 5:00 p.m. (prevailing Eastern time) on July 26, 2006 that, notwithstanding Seller's acceptance of a Qualified Bid or Qualified Bids other than that of the Purchaser at the Auction, it intends to close the transactions contemplated hereby on or before July 31, 2006.  Should Purchaser submit a Subsequent Bid at the Auction, Purchaser shall not be entitled to terminate this Agreement under (iii) above and Purchaser's Subsequent Bid shall be irrevocable until the earlier of: (y) two (2) Business Days after the closing of the Sale of the Acquired Assets; or (z) August 31, 2006.

In addition, Purchaser may conduct a due diligence investigation (i) in connection with the matters described in Schedule 5.1.7.E. and (ii) in order to confirm the accuracy of Item 19 on Schedule 5.1.7.A.2 and the effect on the Business of such license. In the event that Purchaser notifies Seller in writing prior to 6:00 p.m. EDT on June 9, 2006 (or such later date as the parties may mutually agree) that the results of such further due diligence investigation are not reasonably acceptable to Purchaser and Seller and Purchaser are not able to agree upon a mutually acceptable resolution to such concerns, then Purchaser may, in such written notice, terminate this Agreement. In the event of such termination, Purchaser's sole remedy shall be the prompt return of the Deposit Amount, and Seller shall have no other liability to Purchaser whatsoever, whether a Break-Up Fee,  Expense Reimbursement or otherwise .

**9.1.3.  By Seller.**  If Seller accepts or is about to accept a Qualified Bid at the Auction other than that of Purchaser, provided that such termination shall be of no effect if Seller does not: (i) enter into an agreement with respect to such Qualified Bid within two (2) Business Days after termination hereunder; and (ii) subsequently complete the Sale pursuant to an Alternative Transaction.

**9.2.    Notice of Termination.**  In the event of any termination pursuant to this Article 9, written notice thereof setting forth the reasons therefor shall promptly be given to the other Party

and the transactions contemplated by this Agreement shall be terminated, without further action by any Party.

### 9.3.    **Break-Up Fee; Expense Reimbursement**:

9.3.1.   **Break-Up Fee.**  Subject to Section 9.3.4, in the event that: (i) Seller sells, transfers, leases or otherwise disposes, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, all or substantially all or a material portion of the Business or the Acquired Assets in a transaction or a series of transactions with one or more parties other than Purchaser (such event being an "**Alternative Transaction**"); or (ii) Purchaser rightfully terminates the Agreement pursuant to Section 9.1.2(iii) hereof, Seller shall, within two (2) Business Days after the consummation of an Alternative Transaction(s), pay to Purchaser an amount equal to three percent (3%) of the Purchase Price (the "**Break-Up Fee**"), unless the Agreement is then terminated under Sections 9.1.1.B; in which case no Break-Up Fee shall be payable.  The claim of Purchaser for a Break-up Fee shall be paid to Purchaser from the sale proceeds of an Alternative Transaction and, until paid in full, shall constitute a superpriority administrative expense claim under Section 364(c)(1) of the Bankruptcy Code.

9.3.2.   **Expense Reimbursement.**  In the event this Agreement is terminated pursuant to Sections 9.1.1.D or 9.1.1.E, and provided that Purchaser is not then in breach of this Agreement for which Seller had previously notified Purchaser, and, in the case of Section 9.1.1.D, the failure or occurrence of the event giving rise to any such termination results solely from the status of Seller or any action or conduct of Seller and not from the status of Purchaser or any intentional action or conduct of Purchaser, then Seller shall be obligated to pay Purchaser an amount equal to Purchaser's reasonable, actual out-of-pocket fees and expenses (including, without limitation, reasonable attorneys' fees, expenses of its financial advisors, and expenses of other consultants) incurred in connection with the transactions contemplated by this Agreement (the "**Expense Reimbursement**") up to a maximum of $120,000.  Any Expense Reimbursement payable upon termination of this Agreement shall be immediately earned upon such termination and payable by Seller to Purchaser promptly upon the delivery of an invoice related to such Expense Reimbursement to Seller by Purchaser to be delivered to Seller within ten (10) Business days of termination of this Agreement.   The claim of Purchaser for an Expense Reimbursement shall constitute a superpriority administrative expense under Section 364(c)(1) of the Bankruptcy Code.

9.3.3.   Payments to Purchaser pursuant to this Section 9.3 shall be by wire transfer of immediately available funds in U.S. Dollars, to such account or accounts as Purchaser shall designate in writing.

9.3.4.   Purchaser acknowledges and agrees that, in the event that it terminates this Agreement or Seller terminates this Agreement and Purchaser becomes entitled to receive or receives any Expense Reimbursement, Purchaser shall not be entitled to receive nor shall it receive the Break-Up Fee or any portion thereof, and, conversely, that in the event that Purchaser becomes entitled to receive or receives any Break-Up Fee, it shall not be entitled to receive nor shall it receive the Expense Reimbursement or any portion thereof. In the event that Purchaser would be entitled to receive both the Break-Up Fee and Expense Reimbursement but for the operation of this Section 9.3.4, Purchaser shall be entitled to receive the greater of such amounts.

37

**9.4.** **Procedure and Effect of Termination.** In the event of termination and abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof shall forthwith be given to the other Parties to this Agreement, and this Agreement shall terminate (subject to the provisions of this Article 9) and the transactions contemplated by this Agreement shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein no Party shall have any liability or further obligation to any other Party resulting from such termination except for the provisions of: (i)(a) Purchasers' obligations under that certain confidentiality agreement between the Parties dated April 10, 2006; (b) Article 9 (Termination); and (c) Sections 4.1.1 (Deposit Amount), 13.2 (Notice), 13.3 (Assignment), 13.4 (Entire Agreement), 13.5 (Waiver), 13.8 (Expenses), 13.12 (Governing Law), 13.13 (Public Announcements), 13.15 (Venue and Retention of Jurisdiction) and 13.18 (Dispute Resolution), all of which shall remain in full force and effect; and (ii) no party waives any claim or right against a breaching party in respect of any of its representations, warranties, covenants or agreements set forth in this Agreement occurring prior to such termination; provided, however, that in the event Purchaser is entitled to receive the Break-Up Fee, the right of Purchaser to receive such amount shall constitute Purchaser's sole remedy for (and such amount shall constitute liquidated damages in respect of) any breach by Seller of any of its representations, warranties, covenants or agreements set forth in this Agreement, and provided, further, that in the event Seller is entitled to receive the Deposit Amount, the right of Seller to receive such amount shall constitute Seller's sole remedy for (and such amount shall constitute liquidated damages in respect of) any breach by Purchaser of any of its representations, warranties, covenants or agreements set forth in this Agreement. In connection with any termination of this Agreement, all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the agency or Person to which made.

## 10.    **OTHER TAX MATTERS:**

**10.1.** Seller will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due prior to the Closing, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Purchaser shall make available to Seller (and to Seller's accountants and attorneys) any and all books and records and other documents and information in its possession or control reasonably requested by Seller to prepare these Tax Returns. Seller will make all payments required with respect to any such Tax Return.

**10.2.** Purchaser will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due after the Closing (other than for Taxes with respect to periods for which the consolidated, unitary and Tax Returns of Seller will include the operations of the Business). Purchaser shall be responsible for and shall pay when due all Taxes attributable, levied or imposed upon or incurred in connection with the Acquired Assets and the Business pertaining to: (a) any period ending after the Closing Date; and (b) the portion of any Taxes for which Purchaser is liable as determined in accordance with Section 10.3 below.

**10.3.** For purposes of this Article 10 and Section 2.3, whenever it is necessary to allocate the liability for Taxes for a Straddle Period, the determination of the Taxes of the Business for the portion of the Straddle Period ending at the end of the Closing Date (the "**Pre-Closing Portion**") and the portion of the Straddle Period beginning after the Closing Date (the "**Post-Closing Portion**") will be determined by assuming that the Straddle Period consisted of

two taxable years or periods, one of which ended at the close of business on the Closing Date and the other of which began at the beginning of the day after the Closing Date, and items of income, gain, deduction, loss or credit related to the Acquired Assets and the Business for the Straddle Period will be allocated between such two (2) taxable years or periods on a "closing of the books basis" by assuming that the books associated with the Business were closed at the end of the Closing Date; provided, however, that all real property taxes, personal property taxes, ad valorem obligations and similar taxes imposed on a periodic basis, in each case levied with respect to the Acquired Assets (other than Taxes resulting from the transactions described herein as provided for in Section 10.1) for a Straddle Period shall be apportioned between Seller and Purchaser as of the Closing Date based on the number of days of such taxable period up to and including the Closing Date and the number of days of such taxable period following the Closing Date. Seller shall be liable for the proportionate amount of such taxes that is attributable to the period up to and including the Closing Date; Purchaser shall be liable for the proportionate amount of such taxes that is attributable to the period following the Closing Date.

**10.4.** Seller and Purchaser will cooperate in connection with: (i) the preparation of filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets. Such cooperation includes a reasonable amount of direct access to accounting, engineering and contracting personnel, subject to availability, which shall not be unreasonably restricted, and advance notice to Purchaser's chief financial officer.

**10.5.** Seller shall not, and shall not cause the Business to make, revoke or amend any tax election, execute any waiver of restrictions or tax assessments or collections or extensions if there will be any impact on Purchaser as a result of doing so.

## 11.   <u>BIDDING PROCEDURES</u>:

**11.1.   <u>MobileAria Initial Bankruptcy Actions</u>.** This Article 11 sets forth the bidding procedures (the "**Bidding Procedures**") to be employed with respect to the Agreement and the sale (the "**Sale**") of the Acquired Assets. The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Sale Approval Order. The following overbid provisions and related bid protections are designed to compensate the Purchaser for its efforts and agreements to date and to facilitate a full and fair process (the "**Bidding Process**") designed to maximize the value of the Acquired Assets for the benefit of Seller and its Affiliates' creditors, shareholders and bankruptcy estate.

**11.2.   <u>Court Approval</u>.** Promptly after the execution of this Agreement, Seller shall file the Sale Motion with the Bankruptcy Court seeking: (i) entry of the Bidding Procedures Order approving the Bidding Procedures, the Break-Up Fee and the Expense Reimbursement; and (ii) subject to the competitive bidding process provided under the Bidding Procedures, entry of the Sale Approval Order approving this Agreement and the transaction specified herein. It is a material inducement to Purchaser to be able to acquire the Acquired Assets pursuant to the provisions of Sections 363 and 365 of the Bankruptcy Code, including in particular free and clear of Liens pursuant to Section 363(f) of the Bankruptcy Code. Therefore, notwithstanding anything in this Agreement to the contrary, any and all obligations of Purchaser under this Agreement are subject to the entry of the Sale Approval Order approving this Agreement and the transaction specified herein, and ordering, finding or concluding that, among other things: (a) notice of the Sale Motion and the transactions contemplated hereunder was proper and sufficient to all parties entitled to such notice; (b) the sale of the Acquired Assets to Purchaser is approved pursuant to

Section 363(b) of the Bankruptcy Code; (c) the assumption and assignment of the Assumed Contracts to the Purchaser is approved pursuant to Section 365 of the Bankruptcy Code and that the Cure Amounts to be paid by the Seller on the Closing Date to the non-debtor parties to the Assumed Contracts satisfy all monetary obligations and defaults of the Seller to those non-debtor third parties required to be cured pursuant to Section 365(b)(1) of the Bankruptcy Code; (d) the sale of the Acquired Assets to the Purchaser pursuant to this Agreement will be free and clear of all known and unknown Liens pursuant to Section 363(f) of the Bankruptcy Code; (e) Purchaser is not a continuation of Seller or its estate, there is no continuity of enterprise between Seller and Purchaser, Purchaser is not a successor to Seller or its estate and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or de facto merger of Purchaser and Seller or its estate; (f) Purchaser has acted in good faith within the context of and is entitled to the protections of Section 363(m) of the Bankruptcy Code; (g) the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code; (h) Purchaser is not assuming or acquiring any of Seller's liabilities except as specifically provided in this Agreement; and (i) the Sale Approval Order shall be effective immediately notwithstanding the provisions of Bankruptcy Rules 6004(g) and 6006(d).  Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted to the Purchaser as far prior to their filing with the Bankruptcy Court as reasonably practicable for the Purchaser's prior review and, solely with respect to the Bidding Procedures Order and the Sale Approval Order, approval, which shall not be unreasonably withheld or delayed.  Should Seller not have received Purchaser's approval of the Bidding Procedures Order and the Sale Approval Order prior to Seller's deadline for filing with the Bankruptcy Court, Seller may file such documents with the Bankruptcy Court and may submit a revised Bidding Procedures Order and/or Sale Approval Order reflecting agreed modifications thereto, if any, to the Bankruptcy Court prior to the hearing thereon.

**11.3.** **Qualified Bidder.**  Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Seller, in order to participate in the bidding process, each person (a "**Potential Bidder**"), other than the Purchaser, must deliver (unless previously delivered) to Seller:

**11.3.1.** An executed confidentiality agreement in form and substance satisfactory to Seller.

**11.3.2.** Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and the Business, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Seller and its financial advisors; and

**11.3.3.** A preliminary (non-binding) written proposal regarding: (i) the purchase price; (ii) any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the Purchase Price and the requisite Financial Assurance); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale, if selected as a successful bidder, and that the Seller determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by this Agreement shall be deemed a "**Qualified Bidder**".  As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Seller shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.   At the same time that Seller notifies the Potential Bidder that it is a Qualified Bidder, Seller shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired  Assets and the Business as provided in Section 11.5 below.   Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process.

**11.4.**   **Bid Deadline.**  A Qualified Bidder (other than Purchaser) that desires to make a bid shall deliver written copies of its bid to: MobileAria, Inc., 800 West El Camino Real, Suite 240, Mountain View, California 94040, Attention: Richard Lind with copies to: (i) Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan, 48098, Attention: Stephen H. Olsen; (ii) the Seller's restructuring counsel, Skadden, Arps, Slate, Meagher & Flom LLP, at 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention: John K. Lyons and Randall G. Reese; (iii) the Seller's financial advisor, Pagemill Partners, LLC, 2475 Hanover Street, Palo Alto, California 94304, Attention: Milledge A. Hart; (iv) the Seller's corporate counsel, DLA Piper Rudnick Gray Cary US LLP, 2000 University Avenue, East Palo Alto, California 94303, Attention: James M. Koshland; (v) counsel to the Creditors' Committee), Latham & Watkins LLP, at 885 Third Avenue, New York, New York 10022, Attention: Mark A. Broude; (vi) the Creditors' Committee's financial advisor, Mesirow Financial Consulting LLC, 666 Third Avenue, 21st Floor, New York, New York 10017, Attention: Ben Pickering; (vii) counsel to the debtors' prepetition lenders, Simpson Thacher & Bartlet LLP, 25 Lexington Avenue, New York, New York 10017, Attention: Kenneth S. Ziman; and (viii) the debtors' pre-petition lenders' financial advisor, Alvarez & Marsal, 600 Lexington Avenue, 6th Floor, New York, New York 10022, Attention: Andrew Hede so as to be received not later than 11:00 A.M. (New York Time), on June 29, 2006 (the "**Bid Deadline**").  As soon as reasonably practicable following receipt of each Qualified Bid, Seller shall deliver to Purchaser and its counsel complete copies of all items and information enumerated in Section 11.6 of this Agreement.

**11.5.**   **Due Diligence.**  Seller shall afford each Qualified Bidder due diligence access to the Acquired Assets and the Business.   Due diligence access may include management presentations as may be scheduled by Seller, access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Seller, in its sole discretion, may agree to.   Seller shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence shall not continue after the Bid Deadline. Seller may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.  Neither Seller nor any of its Affiliates (or any of their respective representatives) shall be obligated to furnish any information relating to Acquired Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

**11.6.**   **Bid Requirements.**  All bids must include the following documents (the "**Required Bid Documents**"):

**11.6.1.** A letter stating that the bidder's offer is irrevocable until the earlier of: (i) two (2) Business Days after the closing of the Sale of the Acquired Assets; or (ii) August 31, 2006.

**11.6.2.** An executed copy of the Agreement, together with all schedules a ("**Marked Agreement**") marked to show those amendments and modifications to such agreement and schedules that the Qualified Bidder proposes, including the Purchase Price.

**11.6.3.** A good faith deposit (the "**Good Faith Deposit**") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Seller in its sole discretion) payable to the order of Seller (or such other party as Seller may determine) in an amount equal to US$500,000.

**11.6.4.** Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Seller and its advisors.

**11.7.**   **Qualified Bids.**   A bid will be considered only if the bid:

**11.7.1.** Is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to Seller than, those contained in the Agreement.

**11.7.2.** Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**11.7.3.** Proposes a transaction that Seller determines, in its sole discretion, is not materially more burdensome or conditional than the terms of the Agreement and has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus (i) in the case of the initial Qualified Bid, $ 400,000; and (ii) $100,000 in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

**11.7.4.** Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

**11.7.5.** An acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

**11.7.6.** Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required governmental or regulatory approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving

such purchase, subject to the receipt of any governmental or regulatory approvals which must be obtained within twenty (20) days after entry of such order.

**11.7.7.** Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "**Qualified Bid**" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Seller shall have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided, further, however, that no bid shall be deemed by Seller to be a Qualified Bid unless such bid proposes a transaction that Seller determines, in its sole discretion, has a value, greater than or equal to the sum of the Purchase Price, plus the amount of the Break-Up Fee, plus $400,000, taking into account all material terms of any such bid.  Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale.  A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Purchaser is referred to as a "**Subsequent Bid**".

If Seller does not receive any Qualified Bids other than the Agreement received from the Purchaser, Seller will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement.

**11.8.**   **Bid Protection.  [Reserved]**

**11.9.**   **Auction, Bidding Increments and Bids Remaining Open.**  If Seller receives at least one (1) Qualified Bid in addition to the Agreement, Seller will conduct an auction (the "**Auction**") of the Acquired Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. EST on or before July 10, 2006, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, in accordance with the following procedures:

**11.9.1.** Only Seller, Delphi, Purchaser, any representative of the Committee, any representative of the secured lenders (and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only Purchaser and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

**11.9.2.**   At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Seller whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Seller shall provide copies of the Qualified Bid or combination of Qualified Bids which Seller believes is the highest or otherwise best offer to all Qualified Bidders who have informed Seller of their intent to participate in the Auction. Should an Auction take place, Purchaser shall have the right, but not the obligation, to participate in the Auction. Purchaser's election not to participate in an Auction shall in no way impair its entitlement to receive the Break-Up Fee or Expense Reimbursement, as applicable.

**11.9.3.** All bidders shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other

bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

**11.9.4.** Seller may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

**11.9.5.** Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $100,000 higher than the previous bid or bids. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), Seller shall give Purchaser a credit in an amount equal to the greater of any Break-Up Fee or Expense Reimbursement that may be payable to Purchaser under this Agreement and shall give effect to any assets and/or equity interests to be retained by Seller.

**11.9.6.** At the conclusion of the Auction, or as soon thereafter as practicable, Seller, in consultation with its financial advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets and the Business received at the Auction (the "**Successful Bid(s)**" and the bidder(s) making such bid, the "**Successful Bidder(s)**").

**11.10.** **Acceptance of Qualified Bids.**  Seller shall sell the Acquired Assets for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "**Sale Hearing**"). If, after an Auction in which the Purchaser: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less (b) the Break-Up Fee.

**11.11.** **Sale Hearing.**  The Sale Hearing will be held before the Honorable Robert Drain on July 19, 2006 at 10:00 a.m. (New York City time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing. If Seller does not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), Seller will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to the Purchaser following entry of the Sale Order.  If Seller does receive additional Qualified Bids, then, at the Sale Hearing, Seller shall seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "**Alternate Bid(s)**" and such bidder(s), the "**Alternate Bidder(s)**").  Seller's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute Seller's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing.  Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent

beyond the control of either Seller or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and Seller shall effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

**11.12.  Return of Good Faith Deposit.**  Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the closing of the Sale (the "**Return Date**").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s).  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, Seller will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of Seller.  On the Return Date, Seller shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

**11.13.  Reservation of Rights.**  Seller, after consultation with the agents for its secured lenders and the Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time, any bid (other than the Purchaser's bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of  the Sale; or (c) contrary to the best interests of Seller, its estate and creditors as determined by Seller in its sole discretion

**12.  INDEMNIFICATION:**

**12.1.  Seller's Agreement to Indemnify.**  If the Closing occurs and Purchaser makes a written claim for indemnification against Seller in accordance with the procedures set forth in this Article 12 prior to the Expiration Date, then Seller agrees to indemnify and hold harmless Purchaser subject to the terms of this Article 12, from and after the Closing, from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, the "**Purchaser Damages**") incurred by Purchaser as a result of or arising out of: (i) those Retained Liabilities and those Excluded Assets that are retained at Closing by Seller; (ii) a breach of any representation or warranty in this Agreement; (iii) any covenant to be performed on or before Closing; or (iv) a breach of any agreement or covenant of Seller in this Agreement to be performed after Closing; and the sole source to satisfy any remedy with respect to (i) and (ii) above shall be the Escrow Amount, and the limit of Seller's obligation with respect to clauses (i) and (ii) above, shall be $975,000.00.  Notwithstanding the foregoing, any claim based on clause (iii) must be made within one hundred eighty (180) days after the Closing Date.  As soon as possible after the Expiration Date, the Escrow Amount, including all cash, interest accrued thereon and other property retained by the Escrow Agent, will be delivered to Seller by the Escrow Agent, less an amount necessary to satisfy the amount of all then outstanding claims by Purchaser for Purchaser Damages in accordance with the terms of the Escrow Agreement.

**12.2.  Purchaser's Agreement to Indemnify.**  If the Closing occurs and Seller makes a written claim for indemnification against Purchaser in accordance with the procedures set forth in this Article 12, then, from and after the Closing, Purchaser shall indemnify and hold harmless Seller from and against all out-of-pocket liabilities, claims, assessments, losses, judgments,

45

settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, the "**Seller Damages**") incurred by Seller as a result of or arising out of: (i) the Assumed Liabilities; (ii) a breach of any representation or warranty of Purchaser contained herein; (iii) any covenant to be performed on or before Closing; (iv) a breach of any agreement or covenant of Purchaser contained herein to be performed after Closing; or (v) the use, operation or ownership of the Business or any of the Acquired Assets after the Closing unless such matters are of a nature also subject to indemnification pursuant to Section 12.1.  The maximum amount of Purchaser's obligations under clauses (i), (ii) and (v) above shall be $975,000.00.  Notwithstanding the foregoing, any claim based on clause (iii) must be made within one hundred eighty (180) days after the Closing Date.

      **12.3.**   <u>Limitations on Agreements to Indemnify</u>.   The obligations of either Party to indemnify the other pursuant to this Article 12 are subject to the following limitations:

      **12.3.1.** Each Party agrees that, from and after the Closing, the indemnification provided in this Article 12 is the exclusive remedy for a breach by the other Party of any representation, warranty, agreement or covenant contained in this Agreement, and that there shall be no other remedy for any breach by a party in respect of any claim for monetary damages arising out of or under this Agreement;

      **12.3.2.** In calculating amounts payable to an indemnified party, the amount of any indemnified Purchaser Damages or Seller Damages, as the case may be, shall be determined without duplication of any other damages for which a claim has been made or could be made under any other representation, warranty, covenant or agreement included herein;

      **12.3.3.** Any written notice delivered by an indemnified party to an indemnifying party seeking indemnification pursuant to this Agreement shall set forth, with as much specificity as is reasonably practicable, the basis of the claim, the sections of this Agreement which form the basis for the claim, and, to the extent reasonably practicable, a reasonable estimate of the amount of the Purchaser Damages or Seller Damages, as the case may be, that have been or may be sustained by such indemnified party; and

      **12.3.4.** Notwithstanding any other provision of this Agreement, in no event shall an indemnified party be entitled to indemnification pursuant to this Agreement to the extent any Purchaser Damages or Seller Damages, as the case may be, were attributable solely to the indemnified party's own gross negligence or willful misconduct.

      **12.3.5.** No indemnifying party shall be liable to an indemnified party until the amount of all indemnifiable damages of such indemnified party in the aggregate exceeds USD $20,000.00, after which point the indemnifying party will be obligated to the indemnified party for all damages (and not just the amount in excess of such amount).

To the extent an indemnifying party makes any indemnification payment pursuant this Article 12 for which the indemnified party has a right to recover against a third party (including an insurance company), the indemnifying party shall be subrogated to the right of the indemnified party to seek and obtain recovery from such third party.

      **12.4.**   <u>Third Party Indemnification Procedures</u>.   The obligations of any indemnifying party to indemnify any indemnified party under Sections 12.1 or 12.2 with respect to Purchaser Damages or Seller Damages, as the case may be, resulting from the assertion of liability by third

parties (including Governmental Entities) (an "**Indemnification Claim**"), shall be subject to the following terms and conditions:

**12.4.1.** Any party against whom any Indemnification Claim is asserted shall give the party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of Section 12.3.3), and, to the extent such matter involves a third party claim, the indemnifying party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified party.  Failure to give prompt written notice of a Indemnification Claim hereunder shall not affect the indemnifying party's obligations under this Article 12, except to the extent that the indemnifying party is actually prejudiced by such failure to give prompt written notice.  The indemnified party, at the indemnifying party's expense, shall, and shall cause its employees and representatives to, reasonably cooperate with the indemnifying party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying party with all available information and documents concerning such Indemnification Claim. If the indemnifying party, within thirty (30) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified party against whom such claim has been made shall (upon further written notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying party.

**12.4.2.** Anything in this Section 12.4 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne exclusively by the indemnifying party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

## 13.    <u>MISCELLANEOUS</u>:

**13.1.    <u>Bulk Sales Laws</u>.**  Seller and Purchaser hereby waive compliance by Seller with the provisions of the bulk sales Law of any state or foreign jurisdiction.

**13.2.    <u>Notices</u>.**  All notices, requests, consents or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first class mail (with receipt confirmed), to the following:

        **If to Seller:**        **MOBILEARIA, INC.**
                        800 West El Camino Real, Suite 240
                        Mountain View, California  94040
                        Attn:  President – Richard Lind
                        Fax No.:  650-937-1078

        **With a copy to:**    **DELPHI CORPORATION**
                        5725 Delphi Drive

                Troy, Michigan 48098
                Attn:  Assistant General Counsel - Commercial & Transactional
                Fax No.:  248-813-2491

**With a copy to:**  **DLA Piper**
                2000 University Avenue
                East Palo Alto, California  94303
                Attn:  Jim Koshland
                Fax No.:  650-833-2001

If to Purchaser:  **WIRELESS MATRIX USA, INC.**
                12369B Sunrise Valley Drive
                Reston, Virginia, 20190
                Attn:  Maria Izurieta
                Fax No.:  703-262-4013

With a copy to:  **COOLEY GODWARD LLP**
                11951 Freedom Drive
                Reston, VA 20190
                Attn:  Ryan E. Naftulin, Esq.
                Fax No.:  (703) 456-8100

provided, however, if either Party shall have designated a different addressee by notice, then to the last addressee so designated.

**13.3.**  **Assignment.**  This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the Parties and their Affiliates, but no rights, obligations, duties or liabilities of either Party may be assigned without the prior written consent of the other, which shall not be unreasonably withheld.

**13.4.**  **Entire Agreement.**  This Agreement, together with the Ancillary Agreements, represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein.  This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

**13.5.**  **Waiver.**  Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement: (i) shall be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.  At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

**13.6.**  **Severability.**  Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other

provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Law.

**13.7.   Amendment.**   This Agreement may only be amended only in writing by duly authorized representatives or officers of the Parties.

**13.8.   Expenses.**   Except as otherwise expressly provided in Section 9.3 of this Agreement or an Ancillary Agreement, each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

**13.9.   Third Parties.**   Nothing contained in this Agreement, express or implied, is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**13.10. Headings.**   The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

**13.11. Counterparts.**   More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart shall be deemed an original.

**13.12. Governing Law.**   This Agreement shall be construed and enforced in accordance with the laws of the State of New York and, to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**13.13. Public Announcements.**   Seller and Purchaser will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by Law and then only with such prior consultation.

**13.14. Sales or Transfer Taxes.**   All sales taxes, documentary and stamp taxes, transfer taxes, use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes or similar charges and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees) shall be paid by Purchaser.

**13.15. Venue and Retention of Jurisdiction.**   All actions brought, arising out of or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions.

**13.16. Risk of Loss.**   Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business shall be borne exclusively by the Seller.

**13.17. Enforcement of Agreement.**   The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties shall

49

be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

**13.18.  Dispute Resolution.**  Seller and Purchaser will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement or any Ancillary Agreement by good faith negotiations by senior management of each party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute.  Within fifteen (15) business days after receipt of the Notice, the receiving party (the "**Defending Party**") shall submit to the other a written response.  The Notice and the response shall include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties. Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored promptly.  All negotiations pursuant to this Section 13.18 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.  In any case, the Parties agree not to commence any litigation actions until the expiration of ninety (90) days after the date of the Notice, and all such actions are subject to Section 13.15 above.

**13.19.  No Right of Setoff.**  Neither party hereto nor any Affiliate thereof may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it hereunder or pursuant to any Ancillary Agreement against any amounts owed hereunder or pursuant to any Ancillary Agreement by such Persons to the other party hereto or any of such other party's Affiliates.

**13.20.  Limitation on Damages.**  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, INCLUDING ARTICLE 12, IN NO EVENT SHALL PURCHASER OR SELLER BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES.

**[Remainder of Page Intentionally Left Blank]**

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized officers.

**MOBILEARIA, INC.**

By: _[signature]_
Print Name: Richard C Lird
Title: President

**WIRELESS MATRIX USA, INC.**

By:
Print Name:
Title:

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized officers.

**MOBILEARIA, INC.**

By:
Print Name:
Title:

**WIRELESS MATRIX USA, INC.**

By:
Print Name: J. Richard Cerlon
Title: CEO + President

**EXHIBIT F**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
      In re                 :       Chapter 11
                                    :
DELPHI CORPORATION, et al.,         :       Case No. 05-44481 (RDD)
                                    :
                 Debtors.      :       (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002,
6004, 6006, AND 9014 AUTHORIZING AND APPROVING (I) SALE OF CERTAIN
OF DEBTORS' ASSETS COMPRISING SUBSTANTIALLY ALL OF ASSETS OF
MOBILEARIA, INC. FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES,
(II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES

("MOBILEARIA SALE ORDER")

          Upon the motion, dated June 6, 2006 (the "Motion"), of Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors"), for orders pursuant to 11 U.S.C. §§ 363 and

365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 approving (i) bidding procedures, (ii) the

granting of certain bid protections, (iii) the form and manner of sale notices, and (iv) the setting

of a sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale")

of certain of the Debtors' assets (the "Acquired Assets") comprising substantially all of the assets

of MobileAria, Inc. ("MobileAria") free and clear of liens, claims and encumbrances to Wireless

Matrix USA, Inc. (the "Purchaser") pursuant to the Asset Sale and Purchase Agreement dated

June __, 2006 by and between MobileAria and the Purchaser (the "Agreement"),[1] (ii) the

assumption and assignment of certain executory contracts and unexpired leases (the "Assumed

Contracts") to the Purchaser, and (iii) the assumption of certain liabilities (the "Assumed

Liabilities") by the Purchaser; and the Court having entered an order on June __, 2006 (the

"Bidding Procedures Order") approving (i) bidding procedures, (ii) the granting of certain bid

protections, (iii) the form and manner of sale notices, and (iv) the setting of the Sale Hearing;

and the Sale Hearing having been held on July __, 2006, at which time all interested parties were

offered an opportunity to be heard with respect to the Motion; and the Court having reviewed

and considered (i) the Motion, (ii) the objections thereto, if any, (iii) the arguments of counsel

made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that the relief

requested in the Motion is in the best interests of MobileAria, its estate, its creditors, and all

other parties in interest; and the Court having considered the arguments of counsel at the Sale

Hearing; and upon the record of the Sale Hearing; and after due deliberation thereon, and

sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The court has jurisdiction over the Motion and the transactions

contemplated by the Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion

in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Agreement.  A true and correct copy of the Agreement is attached hereto as Schedule 1.

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate.  See Fed. R. Bankr. P. 7052.

B.     The statutory predicates for the relief sought in the Motion are sections

363 and 365 of 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and Fed. R. Bankr.

P. 2002, 6004, 6006, and 9014.

C.     As evidenced by the affidavits of service previously filed with the Court,

and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate, and

sufficient notice of the Motion, the Sale Hearing, the Sale, the assumption and assignment of the

Assumed Contracts, and the Cure Amounts has been provided in accordance with 11 U.S.C. §§

102(l), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014, (ii) such notice was good

and sufficient, and appropriate under the particular circumstances, and (iii) no other or further

notice of the Motion, the Sale Hearing, or the Sale is or shall be required.

D.     As demonstrated by (i) the testimony and other evidence proffered or

adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale

Hearing, MobileAria has marketed the Acquired Assets and conducted the sale process in

compliance with the Bidding Procedures Order and the Auction was duly noticed and conducted

in a non-collusive, fair, and good faith manner.

E.     MobileAria (i) has full corporate power and authority to execute the

Agreement and all other documents contemplated thereby, and the transfer and conveyance of

the Acquired Assets by MobileAria has been duly and validly authorized by all necessary

corporate action of MobileAria, (ii) has all of the corporate power and authority necessary to

consummate the transactions contemplated by the Agreement, and (iii) has taken all corporate

action necessary to authorize and approve the Agreement and the consummation by MobileAria

of the transactions contemplated thereby, and no consents or approvals, other than those

3

expressly provided for in the Agreement, are required for MobileAria to consummate such

transactions.

        F.      MobileAria has demonstrated both (i) good, sufficient, and sound business

purpose and justification for the Sale because, among other things, MobileAria and its advisors

diligently and in good faith analyzed all other available options in connection with the

disposition of the Acquired Assets and determined that the terms and conditions set forth in the

Agreement, and the transfer to Purchaser of the Acquired Assets pursuant thereto, represent a fair

and reasonable purchase price and constitute the highest or otherwise best value obtainable for

the Acquired Assets and (ii) compelling circumstances for the Sale pursuant to 11 U.S.C. § 363(b)

prior to, and outside of, a plan of reorganization in that, among other things, absent the Sale the

value of the Acquired Assets will be harmed.

        G.      A reasonable opportunity to object or be heard with respect to the Motion

and the relief requested therein has been afforded to all interested persons and entities, including

without limitation: (i) the Office of the United States Trustee for the Southern District of New

York, (ii) counsel for the Purchaser, (iii) counsel for the Official Committee of Unsecured

Creditors appointed in these chapter 11 cases (the "Creditors' Committee"), (iv) counsel for the

Official Committee of Equity Security Holders appointed in these chapter 11 cases, (v) all

entities known to have expressed an interest in a transaction with respect to the Acquired Assets

during the past six months, (vi) all entities known to have asserted any Interests or Claims (as

defined below) in or upon the Acquired Assets, (vii) all federal, state, and local regulatory or

taxing authorities or recording offices, including but not limited to environmental regulatory

authorities, which have a reasonably known interest in the relief requested by the Motion, (viii)

all parties to Assumed Contracts, (ix) the United States Attorney's office, (x) the United States

4

Department of Justice, (xi) the Securities and Exchange Commission, (xii) the Internal Revenue

Service, (xiii) all entities on the Master Service List (as defined by the Supplemental Order

Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M), 9006, 9007, And 9014

Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And

Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management Order"))

and such other entities that are required to be served with notices under the Supplemental Case

Management Order.

H.      The Purchaser is not an "insider" of any of the Debtors, as that term is

defined in 11 U.S.C. § 101(31).

I.      The Agreement was negotiated, proposed, and entered into by MobileAria

and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

Neither MobileAria nor the Purchaser has engaged in any conduct that would cause or permit the

Sale to be avoidable under 11 U.S.C. § 363(n).

J.      The Purchaser is a good faith purchaser under 11 U.S.C. § 363(m) and, as

such, is entitled to all of the protections afforded thereby.  The Purchaser will be acting in good

faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the

Agreement at all times after the entry of this Sale Order.

K.      The consideration provided by the Purchaser for the Acquired Assets

pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for

the Acquired Assets, (iii) will provide a greater recovery for MobileAria's creditors than would

be provided by any other practical available alternative, and (iv) constitutes reasonably

equivalent value and fair consideration under the Bankruptcy Code and under the laws of the

United States, any state, territory, possession, or the District of Columbia.

5

L.        The Sale must be approved and consummated promptly to preserve the viability of MobileAria as a going concern.

M.        With the exception of the Assumed Liabilities, the transfer of the Acquired Assets to the Purchaser will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Purchaser with all right, title, and interest of MobileAria to the Acquired Assets free and clear of any and all liens, claims, interests, and encumbrances of any type whatsoever (whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), including, but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of MobileAria's or the Purchaser's interest in the Acquired Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of MobileAria's business prior to the transfer of the Acquired Assets to the Purchaser (collectively, the "Interests or Claims").

N.        If the Sale of the Acquired Assets were not free and clear of all Interests or Claims as set forth in the Agreement and this Sale Order, or if the Purchaser would, or in the future could, be liable for any of the Interests or Claims as set forth in the Agreement and this Sale Order, the Purchaser would not have entered into the Agreement and would not consummate the Sale or the transactions contemplated by the Agreement, thus adversely affecting MobileAria, its estate, and its creditors.

6

O.    MobileAria may sell its interests in the Acquired Assets free and clear of all Interests or Claims because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  All holders of Interests or Claims who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale, pursuant to 11 U.S.C. § 363(f)(2).  Those holders of Interests or Claims who did object fall within one or more of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their Interests or Claims, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim an Interest or Claim.

P.    The (i) transfer of the Acquired Assets to the Purchaser and (ii) assumption and assignment to the Purchaser of the Assumed Contracts and Assumed Liabilities will not subject the Purchaser to any liability whatsoever with respect to the operation of MobileAria's business prior to the Closing of the Sale or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

Q.    MobileAria has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Contracts is in the best interests of MobileAria, its estate, and its creditors.  The Assumed Contracts being assigned to, and the liabilities being assumed by, the Purchaser are an integral part of Acquired Assets being purchased by the Purchaser and, accordingly, such assumption and assignment of

7

Assumed Contracts and liabilities are reasonable, enhance the value of MobileAria's estate, and do not constitute unfair discrimination.

R.    MobileAria has (i) cured, or has provided adequate assurance of cure, of any default existing prior to the Closing of the Sale under any of the Assumed Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts provided on <u>Schedule 2</u> hereto and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts, with the meaning of 11 U.S.C. § 365(b)(1)(B), and the Purchaser has provided adequate assurance of their future performance of and under the Assumed Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).   The Court hereby finds that the Assumed Contracts to be assumed and assigned under the Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of Purchaser notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer, pursuant to 11 U.S.C. § 365(f).

S.    Approval of the Agreement and consummation of the Sale of the Acquired Assets at this time are in the best interests of MobileAria, its creditors, its estate, and other parties-in-interest.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

<u>General Provisions</u>

1.    The Motion is GRANTED.

8

<u>Approval Of The Agreement</u>

2.        Pursuant to 11 U.S.C. § 363(b), the Agreement and all of the terms and conditions thereof are hereby approved.

3.        Pursuant to 11 U.S.C. § 363(b), MobileAria is authorized to perform its obligations under the Agreement and comply with the terms thereof and consummate the Sale in accordance with and subject to the terms and conditions of the Agreement.

4.        Each of the signatories to the Agreement is directed to take all actions necessary or appropriate to effectuate the terms of this Sale Order.

5.        MobileAria is authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement, and to take all further actions as may be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Agreement.

6.        This Sale Order and the Agreement shall be binding in all respects upon all creditors (whether known or unknown) of MobileAria, the Purchaser, all successors and assigns of the Purchaser and MobileAria, all affiliates and subsidiaries of the Purchaser and MobileAria, and any subsequent trustees appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection.  To the extent any provision of this Sale Order is inconsistent with the terms of the Agreement, this Sale Order shall govern.

9

7.      The Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented by the parties thereto in accordance

with the terms thereof without further order of the Court; provided that any such modification,

amendment, or supplement is not material.

<u>Sale And Transfer Of The Acquired Assets</u>

8.      Except as expressly permitted or otherwise specifically provided for in the

Agreement or this Sale Order, pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the

consummation of the Agreement, the Acquired Assets shall be transferred to the Purchaser free

and clear of all Interests or Claims, with all such Interests or Claims to attach to the cash

proceeds of the Sale in the order of their priority, with the same validity, force, and effect which

they now have as against the Acquired Assets, subject to any claims and defenses MobileAria

may possess with respect thereto.

9.      The transfer of the Acquired Assets to the Purchaser pursuant to the

Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest

the Purchaser with all right, title, and interest of MobileAria in and to the Acquired Assets free

and clear of all Interests or Claims of any kind or nature whatsoever.

10.     If any person or entity which has filed financing statements, mortgages,

mechanic's liens, <u>lis pendens</u>, or other documents or agreements evidencing Interests or Claims

against or in the Acquired Assets shall not have delivered the foregoing to MobileAria prior to

the Closing of the Sale, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfactions, releases of all Interests or Claims that the

person or entity has with respect to the Acquired Assets, or otherwise, then (a) MobileAria is

hereby authorized to execute and file such statements, instruments, releases, and other

10

documents on behalf of the person or entity with respect to the Acquired Assets and (b) the

Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale

Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence

of the release of all Interests or Claims in the Acquired Assets of any kind or nature whatsoever.

11.    This Sale Order (a) shall be effective as a determination that, upon the

Closing of the Sale, all Interests or Claims of any kind or nature whatsoever existing as to

MobileAria or the Acquired Assets prior to the Closing of the Sale have been unconditionally

released, discharged, and terminated (other than any surviving obligations), and that the

conveyances described herein have been effected and (b) shall be binding upon and shall govern

the acts of all entities including, without limitation, all filing agents, filing officers, title agents,

title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state, and local officials, and all

other persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register, or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Acquired

Assets.

12.    Except as expressly permitted or otherwise specifically provided by the

Agreement or this Sale Order, all persons and entities, including, but not limited to, all debt

security holders, equity security holders, governmental, tax, and regulatory authorities, lenders,

trade, and other creditors, holding Interests or Claims of any kind or nature whatsoever against or

in MobileAria or the Acquired Assets (whether legal or equitable, secured or unsecured, matured

or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in

connection with, or in any way relating to, MobileAria, the Acquired Assets, the operation of

11

MobileAria's business prior to the Closing of the Sale, or the transfer of the Acquired Assets to

the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting

against the Purchaser, its successor or assign, its property, or the Acquired Assets, such persons'

or entities' Interests or Claims.

13.    Upon the completion of the transactions contemplated by the Agreement,

the Purchaser shall not be deemed to (a) be the successor of MobileAria, (b) have, de facto, or

otherwise, merged with or into MobileAria, (c) be a mere continuation or substantial

continuation of MobileAria or the enterprise(s) of MobileAria, or (d) be liable for any acts or

omissions of MobileAria in the conduct of MobileAria's business.

<u>Assumption And Assignment To The Purchaser Of The Assumed Contracts</u>

14.    Pursuant to 11 U.S.C. §§ 105(a) and 365, and subject to and conditioned

upon the Closing of the Sale, MobileAria's assumption and assignment to the Purchaser, and the

Purchaser's assumption on the terms set forth in the Agreement, of the Assumed Contracts is

hereby approved, and the requirements of 11 U.S.C. §§ 365(b)(1) and 365(f) with respect thereto

are hereby deemed satisfied.

15.    MobileAria is hereby authorized in accordance with 11 U.S.C. §§ 105(a)

and 365 to (a) assume and assign to the Purchaser, effective upon the Closing of the Sale, the

Assumed Contracts free and clear of all Interests or Claims of any kind or nature whatsoever and

(b) execute and deliver to the Purchaser such documents or other instruments as may be

necessary to assign and transfer the Assumed Contracts and Assumed Liabilities to the Purchaser.

The Post-Petition Contracts, effective upon the Closing of the Sale, shall be assigned to the

Purchaser clear of all Interests or Claims of any kind or nature whatsoever.

12

16.    The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), MobileAria shall be relieved from any further liability with respect to the Assumed Contracts after such assignment to and assumption by the Purchaser.

17.    All defaults or other obligations of MobileAria under the Assumed Contracts and the Post-Petition Contracts arising or accruing prior to the Closing of the Sale (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by MobileAria at the Closing of the Sale or as soon thereafter as practicable, and the Purchaser shall have no liability or obligation arising or accruing prior to the date of the Closing of the Sale, except as otherwise expressly provided in the Agreement.  Each non-debtor party to any Assumed Contracts is deemed to have consented to the assumption and assignment of the Assumed Contracts to Purchaser and is forever barred from asserting any default existing as of the date of the Closing or any purported written or oral modification to the Assumed Contracts.  The failure of the MobileAria, the Debtors or Purchaser to enforce prior to the Closing of the Sale one or more terms or conditions of any Assumed Contracts shall not be a waiver of such terms or conditions, or of MobileAria's, the Debtors' or Purchaser's rights to enforce every term and condition of any such Assumed Contracts.

18.    Each non-Debtor party to an Assumed Contract hereby is forever barred, estopped, and permanently enjoined from asserting against MobileAria or the Purchaser, or the property of either of them, any default existing, arising or accruing as of the Closing the Sale.

Additional Provisions

19.    The consideration provided by the Purchaser for the Acquired Assets under the Agreement is hereby deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, and any state, territory, possession, or the District of Columbia.

20.    Upon the Closing of the Sale, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Purchaser on pursuant to the terms of the Agreement.

21.    Except as otherwise provided in the Agreement, upon the Closing of the Sale, each of MobileAria's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release their respective Interests or Claims against the Acquired Assets, if any, as may have been recorded or may otherwise exist.

22.    This Sale Order (a) shall be effective as a determination that, upon the Closing of the Sale, all Interests or Claims of any kind or nature whatsoever existing as to MobileAria or the Acquired Assets prior to the Closing have been unconditionally released, discharged and terminated (other than any surviving obligations), and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of

14

all entities including without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state, and local officials, and all

other persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Acquired

Assets.

23.    Each and every federal, state, and governmental agency or department,

and any other person or entity, is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the

Agreement.

24.    All entities who are currently, or as of the Closing of the Sale may be, in

possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

the Agreement are hereby directed to surrender possession of the Acquired Assets to the

Purchaser upon the Closing of the Sale.

25.    The Purchaser shall have no liability or responsibility for any liability or

other obligation of MobileAria arising under or related to the Acquired Assets other than for the

Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise

specifically provided herein and in the Agreement, the Purchaser shall not be liable for any

claims against MobileAria or any of its predecessors or affiliates, and the Purchaser shall have no

successor or vicarious liabilities of any kind or character whether known or unknown as of the

Closing of the Sale, now existing or hereafter arising, whether fixed or contingent, with respect

to MobileAria or any obligations of MobileAria arising prior to the Closing of the Sale, including,

15

but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of MobileAria's business prior to the Closing of the Sale.

26.     Under no circumstances shall the Purchaser be deemed a successor of or to MobileAria for any Interest or Claim against or in MobileAria or the Acquired Assets of any kind or nature whatsoever.  The sale, transfer, assignment, and delivery of the Acquired Assets shall not be subject to any Interests or Claims, and Interests or Claims of any kind or nature whatsoever shall remain with, and continue to be obligations of, MobileAria.  All persons holding Interests or Claims against or in MobileAria or the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests or Claims of any kind or nature whatsoever against the Purchaser, its property, its successors and assigns, or the Acquired Assets with respect to any Interest or Claim of any kind or nature whatsoever such person or entity had, has, or may have against or in MobileAria, its estate, its officers, its directors, its shareholders, or the Acquired Assets.  Following the Closing of the Sale, no holder of an Interest or Claims in MobileAria shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to such Interest or Claim, or any actions that MobileAria may take in its chapter 11 case.

27.     The transactions contemplated by the Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of the Acquired Assets shall not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.  The Purchaser is a

16

purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded

by section 363(m) of the Bankruptcy Code.

28.    The consideration provided by the Purchaser for the Acquired Assets

under the Agreement is fair and reasonable and the Sale may not be avoided under section 363(n)

of the Bankruptcy Code.

29.    MobileAria, including, but not limited to, its officers, employees, and

agents, is hereby authorized to execute such documents and do such acts as are necessary or

desirable to carry out the transactions contemplated by the terms and conditions of the

Agreement and this Sale Order.  MobileAria shall be, and it hereby is, authorized to take all such

actions as may be necessary to effectuate the terms of this Sale Order.

30.    The terms and provisions of the Agreement and this Sale Order shall be

binding in all respects upon, and shall inure to the benefit of, MobileAria, its estates, and its

creditors, the Purchaser, and their respective affiliates, successors, and assigns, and any affected

third parties, including, but not limited to, all persons asserting an Interest or Claim in the

Acquired Assets to be sold to the Purchaser pursuant to the Agreement, notwithstanding any

subsequent appointment of any trustee, party, entity, or other fiduciary under any section of any

chapter of the Bankruptcy Code, as to which trustee, party, entity, or other fiduciary such terms

and provisions likewise shall be binding.

31.    Notwithstanding anything contained herein to the contrary, the term

"Acquired Assets" as defined herein does not include property that is not property of

MobileAria's estate, such as funds that are trust funds under any applicable state lien laws.

17

32.     To the extent permitted by section 525 of the Bankruptcy Code, no

governmental unit may revoke or suspend any permit or license relating to the operation of the

Acquired Assets sold, transferred, or conveyed to the Purchaser on account of the filing or

pendency of these chapter 11 cases or the consummation of the Sale.

33.     The failure specifically to include or to reference any particular provision

of the Agreement in this Sale Order shall not diminish or impair the effectiveness of such

provision, it being the intent of the Court that the Agreement be authorized and approved in its

entirety.

34.     The Agreement and any related agreements, documents, or other

instruments may be modified, amended, or supplemented by the parties thereto in accordance

with the terms thereof without further order of the Court; provided that any such modification,

amendment, or supplement does not have a material adverse effect on MobileAria's estate.

35.     The provisions of this Sale Order are nonseverable and mutually

dependent.

36.     Nothing in this Sale Order shall alter or amend the Agreement and the

obligations of MobileAria and the Purchaser thereunder.

37.     This Court retains jurisdiction to enforce and implement the terms and

provisions of the Agreement, all amendments thereto, any waivers and consents thereunder, and

of each of the agreements executed in connection therewith in all respects, including, but not

limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Purchaser,

(b) compel delivery of the purchase price or performance of other obligations owed to

MobileAria pursuant to the Agreement, (c) resolve any disputes arising under or related to the

18

Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce the

provisions of this Sale Order, and (e) protect the Purchaser against any Interests or Claims

against MobileAria or the Acquired Assets, of any kind or nature whatsoever, attaching to the

proceeds of the Sale.

        38.    Notwithstanding Rules 6004(g) and 6006(d) of the Federal Rules of

Bankruptcy Procedure or any other Bankruptcy Rule, this Sale Order shall take effect

immediately upon its entry.

        39.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
      July ___, 2006


_____
    UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT G**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. § 105(a) AND FED. R. BANKR. P. 2002
AND 9014 APPROVING (I) BIDDING PROCEDURES,
(II) CERTAIN BID PROTECTIONS, (III) FORM AND MANNER OF
<u>SALE NOTICES, AND (IV) SETTING OF A SALE HEARING</u>

("MOBILEARIA BIDDING PROCEDURES ORDER")

        Upon the motion, dated June 6, 2006 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-

in-possession in the above-captioned cases (collectively, the "Debtors"), for orders

pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014

approving (i) the bidding procedures set forth herein and attached hereto as <u>Exhibit 1</u> (the

"Bidding Procedures"), (ii) the granting of certain bid protections, (iii) the form and

manner of sale notices, and (iv) the setting of a sale hearing (the "Sale Hearing") and (b)

authorizing and approving (i) the sale (the "Sale") of certain of the Debtors' assets (the

"Acquired Assets") comprising substantially all of the assets of MobileAria, Inc.

("MobileAria") free and clear of liens, claims, and encumbrances to Wireless Matrix

USA, Inc. (the "Purchaser") pursuant to the Asset Sale and Purchase Agreement dated

June 6, 2006 by and between MobileAria and the Purchaser (the "Agreement")[1] or to the

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings
ascribed to them in the Agreement.

Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid, (ii) the assumption and assignment of certain prepetition executory contracts and unexpired leases (the "Assumed Contracts") and the assignment of certain postpetition executory contracts and unexpired leases (the "Postpetition Contracts," and collectively with the Assumed Contracts, the "Assigned Contracts") to the Purchaser or the Successful Bidder, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Purchaser or the Successful Bidder; and the Court having reviewed the Motion and the Limited Omnibus Objection Of The Official Committee Of Equity Security Holders In Opposition To Debtors' (i) Settlement Procedures Motion, (ii) Lift Stay Motion, and (iii) MobileAria Sale Motion (Docket No. 4215); and the Court having considered the arguments of counsel at the hearing held on June 19, 2006 (the "Hearing"); and upon the record of the Hearing; and after due deliberation thereon, and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction over this matter and over the property of the Debtors and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334.

B.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

C.    The relief requested in the Motion is in the best interests of MobileAria, its estate, its creditors, and other parties-in-interest.

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

D.    The notice given by the Debtors of the Motion and the Hearing constitutes due and sufficient notice thereof.

E.    The Debtors have articulated good and sufficient reasons for approving (i) the Bidding Procedures, (ii) the granting of certain bid protections as provided in the Agreement, (iii) the manner of notice of the Motion, the Sale Hearing, and the assumption and assignment of the Assumed Contracts, (iv) the form of notice of the Motion and the Sale Hearing to be distributed to creditors and other parties in interest, including prospective bidders, (v) the form of notice of the Cure Amounts and the assumption of the Assumed Contracts to be filed with the Court and served on parties to each Assumed Contract, and (vi) the setting of the Sale Hearing.

F.    MobileAria's payment to the Purchaser (as set forth in the Agreement), of the Break-Up Fee and the Expense Reimbursement (collectively, the "Bid Protections") (i) is an actual and necessary cost and expense of preserving MobileAria's estate, within the meaning of sections 503 and 507(b) of the Bankruptcy Code, (ii) is of substantial benefit to MobileAria's estate, (iii) is reasonable and appropriate, including in light of the size and nature of the Sale and the efforts that have been and will be expended by the Purchaser notwithstanding that the proposed Sale is subject to higher or better offers for the Acquired Assets, (iv) was negotiated by the parties at arms' length and in good faith, and (v) is necessary to ensure that the Purchaser will continue to pursue its proposed acquisition of the Acquired Assets.  The Bid Protections were a material inducement for, and condition of, the Purchaser's entry into the Agreement.  The Purchaser is unwilling to commit to hold open its offer to purchase the Acquired Assets under the terms of the Agreement unless it is assured of payment of the Bid Protections.

3

Thus, assurance to the Purchaser of payment of the Bid Protections has promoted more

competitive bidding by inducing the Purchaser's bid that otherwise would not have been

made, and without which bidding would have been limited.  Further, because the Bid

Protections induced the Purchaser to research the value of the Acquired Assets and

submit a bid that will serve as a minimum or floor bid on which other bidders can rely,

the Purchaser has provided a benefit to MobileAria's estate by increasing the likelihood

that the price at which the Acquired Assets are sold will reflect their true worth.  Finally,

absent authorization of the Bid Protections, MobileAria may lose the opportunity to

obtain the highest or otherwise best available offer for the Acquired Assets.

       G.      The Bidding Procedures are reasonable and appropriate and

represent the best method for maximizing the realizable value of the Acquired Assets.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:

Bidding Procedures

       1.      The Bidding Procedures, as set forth on Exhibit 1 attached hereto

and incorporated herein by reference as if fully set forth in this Order, are hereby

approved and shall govern all proceedings relating to the Agreement and any subsequent

bids for the Acquired Assets in these cases.

       2.      MobileAria may: (a) determine, in its business judgment, which

Qualified Bid is the highest or otherwise best offer, (b) consult with the representative of

any official committee or significant constituent in connection with the Bidding

Procedures, and (c) reject at any time before entry of an order of the Court approving a

Qualified Bid, any bid (other than the Purchaser's bid) which, in MobileAria's sole

discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of

4

the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii)

contrary to the best interests of MobileAria, its estate, and its creditors.  MobileAria is

authorized (i) to terminate the Bidding Process or the Auction at any time if it determines,

in its business judgment, that the Bidding Process will not maximize the value of the

Acquired Assets to be realized by MobileAria's estate and (ii) seek Bankruptcy Court

Approval of the Agreement with Purchaser.

<u>Sale Hearing</u>

3.      The Sale Hearing shall be held before the undersigned United

States Bankruptcy Judge on July 19, 2006 at 10:00 a.m. (Prevailing Eastern Time) in the

United States Bankruptcy Court for the Southern District of New York, One Bowling

Green, Room 610, New York, New York 10004, at which time the Court shall consider

the Motion, the Successful Bidder, and confirm the results of the Auction, if any.

Objections to the Motion shall be filed and served no later than 4:00 p.m. (Prevailing

Eastern Time) on July 14, 2006 (the "Objection Deadline").

4.      The failure of any objecting person or entity to timely file its

objection by the Objection Deadline shall be a bar to the assertion, at the Sale Hearing or

thereafter, of any objection to the Motion, the Sale, or MobileAria's consummation and

performance of the Agreement (including the transfer of the Acquired Assets and

Assigned Contracts free and clear of all Interests and Claims), if authorized by the Court.

5.      The Sale Hearing may be adjourned from time to time without

further notice to creditors or parties in interest other than by announcement of the

adjournment in open court or on the Court's calendar on the date scheduled for the Sale

Hearing or any adjourned date.

5

<u>Bid Protections</u>

6.      The Bid Protections, as more fully described in the Motion and the

Agreement, are hereby approved.  MobileAria's obligation to pay the Bid Protections, as

provided by the Agreement, shall survive termination of the Agreement and, until paid,

shall constitute a superpriority administrative expense pursuant to Bankruptcy Code

Section 507(b) and MobileAria shall be authorized to pay the Bid Protections to the

Purchaser in accordance with the terms of the Agreement without further order of this

Court.

<u>Notice</u>

7.      Notice of (a) the Motion, (b) the Sale Hearing, and (c) the

proposed assumption and/or assignment of the Assigned Contracts to the Purchaser

pursuant to the Agreement or to a Successful Bidder shall be good and sufficient, and no

other or further notice shall be required, if given as follows:

(a)     <u>Notice Of Sale Hearing</u>.  Within one days after entry of this
Order (the "Mailing Date"), MobileAria (or its agent) shall serve the Motion, the
Agreement, the proposed Sale Order, the Bidding Procedures, and a copy of the Bidding
Procedures Order by first-class mail, postage prepaid, upon (i) all entities known to have
expressed an interest in a transaction with respect to the Acquired Assets during the past
six months; (ii) all entities known to have asserted any lien, claim, interest, or
encumbrance in or upon the Acquired Assets; (iii) all federal, state, and local regulatory
or taxing authorities or recording offices which have a reasonably known interest in the
relief requested by the Motion; (iv) all parties to the Assumed Contracts; (v) all parties to
the Postpetition Contracts; (vi) the United States Attorney's office; (vii) the Securities and
Exchange Commission; (viii) the Internal Revenue Service; (ix) all entities on the 2002
List; and (x) counsel to the Creditors' Committee and the Equityholders' Committee.

(b)     <u>Sale Notice</u>.  On or before the Mailing Date, MobileAria (or
its agent) shall serve by first-class mail, postage prepaid, a notice of the Sale (the "Sale
Notice"), substantially in the form annexed hereto as <u>Exhibit 2</u>, upon all other known
creditors of MobileAria.

(c)    Cure Notice.  No later than ten days after the entry of this Order, MobileAria shall file with the Court and serve on all nondebtor parties to the Assumed Contracts a notice (the "Cure Notice"), substantially in the form annexed hereto as Exhibit 3, of the cure amount necessary to assume the Assumed Contract (the "Cure Amount").  MobileAria shall also file with the Court and serve on all nondebtor parties to the Postpetition Contracts a Cure Notice providing any Cure Amount necessary to assign the Postpetition Contract.  The nondebtor party to the Assumed Contract or Postpetition Contract shall have ten days from the service of the Cure Notice to object to the Cure Amount and must state in its objection with specificity what Cure is required (with appropriate documentation in support thereof).  If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Assumed Contract, Postpetition Contract, or any other document, and the nondebtor party to the Assumed Contract or Postpetition Contract shall be forever barred from asserting any other claims against the Debtors, the Purchaser, or the Successful Bidder (as appropriate), or the property of either of them, as to such Assumed Contract or Postpetition Contract, as relevant.

(d)    Assumption/Assignment Notice For Purchaser.  No later than ten days after the entry of this Order, MobileAria shall file with the Court and serve on all nondebtor parties to the Assumed Contracts a notice (the "Purchaser Assumption/Assignment Notice"), substantially in the form of the notice attached hereto as Exhibit 4, identifying the Purchaser as the party that will be assigned all of MobileAria's right, title, and interest in the Assumed Contracts, subject to completion of the bidding process provided under the Bidding Procedures.  MobileAria shall also file with the Court and serve on all nondebtor parties to the Postpetition Contracts a Purchaser Assumption/Assignment Notice identifying the Purchaser as the party that will be assigned all of Mobile Aria's right, title, and interest in the Postpetition Contracts, subject to completion of the bidding process provided under the Bidding Procedures. The nondebtor party to the Assumed Contract or Postpetition Contract shall have ten days from the service of the Purchaser Assumption/Assignment Notice to object to the proposed assumption and/or assignment to the Purchaser and must state in its objection, with specificity, the legal and factual basis of its objection.  If no objection is timely received, the nondebtor party to the Assumed Contract or Postpetition Contract shall be forever barred from asserting any objection with regard to the assumption and/or assignment.

(e)    Assumption/Assignment Notice For A Successful Buyer Other Than Purchaser.  In the event that following the Auction a party other than the Purchaser is the Successful Bidder, MobileAria shall, within one business day of the conclusion of the Auction, cause a notice (the "Other Successful Bidder Assumption/Assignment Notice"), substantially in the form of the notice attached hereto as Exhibit 5, to be sent to each nondebtor party to an Assumed Contract or Postpetition Contract identifying the Successful Bidder.  The nondebtor party to the Assumed Contract or Postpetition Contract shall have ten days from the service of the Other Successful Bidder Assumption/Assignment Notice to object to the proposed assumption and/or assignment to the Successful Bidder and must state in its objection, with specificity, the legal and factual basis of its objection.  If no objection is timely received,

7

the nondebtor party to the Assumed Contract or Postpetition Contract shall be forever barred from asserting any objection with regard to the assumption and/or assignment.

        8.      This Court shall retain jurisdiction to hear and determine all

matters arising from the implementation of this Order.

        9.      The requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York for

the service and filing of a separate memorandum of law is deemed satisfied by the

Motion.

Dated:   New York, New York
          June 22, 2006

                      /s/ Robert D. Drain
                      UNITED STATES BANKRUPTCY JUDGE

## MOBILEARIA, INC. BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of all or substantially all of the assets (the "Assets") comprising the entire business (the "Business") of MobileAria, Inc. (the "Seller"). On June 6, 2006, the Seller executed that certain Asset Sale and Purchase Agreement by and between Wireless Matrix USA, Inc. (the "Purchaser") and the Seller (the "Agreement"). The transaction contemplated by the Agreement is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined herein) pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

On June 6, 2006, the Seller filed a Motion For Orders Under 11 U.S.C. §§ 363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006 And 9014 (a) Approving (i) Bidding Procedures, (ii) Certain Bid Protections, (iii) Form And Manner Of Sale Notices, And (iv) Sale Hearing Date And (b) Authorizing And Approving (i) Sale Of Certain Of Debtors' Assets Comprising Substantially All Assets Of MobileAria, Inc. Free And Clear Of Liens, Claims, And Encumbrances, (ii) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (iii) Assumption Of Certain Liabilities (the "Sale Motion"). On June __, 2006, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an Order Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P. 2002 And 9014 Approving (i) Bidding Procedures, (ii) Certain Bid Protections, (iii) Form And Manner Of Sale Notices, And (iv) Sale Hearing Date (the "Bidding Procedures Order") approving the Bidding Procedures. The Bidding Procedures Order set 10:00 a.m. (Prevailing Eastern Time) on July 19, 2006 as the date the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to authorize the Seller to enter into the Agreement. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which bidders and bids become Qualified, the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined herein), the ultimate selection of the Successful Bidder(s) (as defined herein) and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process"). The Bidding Procedures were developed following consultation with, among others, the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Seller intends to continue to consult with such constituents throughout the Bidding Process. In the event that the Seller and any such constituent disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court shall have jurisdiction to hear and resolve such dispute.

### Assets To Be Sold

The Assets proposed to be sold include substantially all of the assets owned by the Seller.

## "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Seller, its agents, or estate, except, with respect to the Purchaser, to the extent set forth in the Agreement and, with respect to a Successful Bidder, to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court.

## Free Of Any And All Claims And Interests

Except, with respect to the Purchaser, to the extent otherwise set forth in the Agreement and, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder, all of the Seller's right, title, and interest in and to the Assets, or any portion thereof, to be acquired shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests"), such Claims and Interests to attach to the net proceeds of the sale of such Assets.

## Participation Requirements

Any person who wishes to participate in the Bidding Process (a "Potential Bidder") must become a Qualified Bidder. As a prerequisite to becoming a Qualified Bidder, a Potential Bidder, other than the Purchaser, must deliver (unless previously delivered) to the Seller:

(a) An executed confidentiality agreement substantially in the form attached hereto as Exhibit 1 (or in such other form acceptable to the Seller);

(b) Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Seller and its financial advisors; and

(c) A preliminary (non-binding) written proposal regarding (i) the purchase price range, (ii) any Assets expected to be excluded, (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing of the Purchase Price (as defined in the Agreement) and the requisite Good Faith Deposit), (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals, (v) any conditions to closing that it may wish to impose in addition to those set forth in the Agreement, and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder who delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Sale, if selected as a successful bidder, and who the Seller determines in its sole discretion is likely (based on

2

availability of financing, experience, and other considerations) to be able to consummate the Sale within the time frame provided by the Agreement shall be deemed a "Qualified Bidder."  As promptly as practicable, after a Potential Bidder delivers all of the materials required above, the Seller shall determine, and shall notify the Potential Bidder, whether such Potential Bidder is a Qualified Bidder.  At the same time that the Seller notifies the Potential Bidder that it is a Qualified Bidder, the Seller shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Assets and the Business as provided below.  Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process.

## Due Diligence

The Seller shall afford each Qualified Bidder due diligence access to the Assets and the Business.  Due diligence access may include management presentations as may be scheduled by the Seller, access to data rooms, on-site inspections, and such other matters which a Qualified Bidder may request and as to which the Seller, in its sole discretion, may agree.  The Seller shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  Any additional due diligence shall not continue after the Bid Deadline.  The Seller may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.  Neither the Seller nor any of its affiliates (or any of their respective representatives) shall be obligated to furnish any information relating to Assets and the Business to any person other than to Qualified Bidders who make an acceptable preliminary proposal.

Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets and the Business prior to making its offer, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets and the Business in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets or the Business, or the completeness of any information provided in connection therewith, the Bidding Process or the Auction (as defined herein), except, as to the Successful Bidder, as expressly stated in the definitive agreement with such Successful Bidder approved by the Bankruptcy Court.

## Bid Deadline

A Qualified Bidder (other than the Purchaser) who desires to make a bid shall deliver written copies of its bid to:  MobileAria, Inc., 800 West El Camino Real, Suite 240, Mountain View, California 94040, Attention: Richard Lind, with copies to:  (i) Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan 48098, Attention: Stephen H. Olsen, (ii) the Seller's restructuring counsel, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606, Attention: John K. Lyons and Randall G. Reese, (iii) the Seller's financial advisor, Pagemill Partners, LLC, 2475 Hanover Street, Palo Alto, California 94304, Attention: Milledge A. Hart, (iv) the Seller's corporate counsel, DLA Piper Rudnick Gray Cary US LLP, 2000 University Avenue, East Palo Alto, California 94303, Attention: James M.

Koshland, (v) counsel to the Creditors' Committee, Latham & Watkins LLP, at 885 Third Avenue, New York, New York 10022, Attention: Mark A. Broude, (vi) the Creditors' Committee's financial advisor, Mesirow Financial Consulting LLC, 666 Third Avenue, 21st Floor, New York, New York 10017, Attention: Ben Pickering, (vii) counsel to the debtors' prepetition lenders, Simpson Thacher & Bartlet LLP, 425 Lexington Avenue, New York, New York 10017, Attention: Kenneth S. Ziman, and (viii) the debtors' prepetition lenders' financial advisor, Alvarez & Marsal, 600 Lexington Avenue, 6th Floor, New York, New York 10022, Attention: Andrew Hede, so as to be received not later than 11:00 a.m. (Prevailing Eastern Time) on June 29, 2006 (the "Bid Deadline").  As soon as reasonably practicable following receipt of each Qualified Bid, Seller shall deliver complete copies of all items and information enumerated in the section below entitled "Bid Requirements" to (a) Purchaser and its counsel and (b) counsel for the Official Committee of Equity Security Holders (the "Equityholders' Committee").

## **Bid Requirements**

All bids must include the following documents (the "Required Bid Documents"):

(a) A letter stating that the bidder's offer is irrevocable until the earlier of (i) two Business Days after the closing of the Sale of the Assets or (ii) August 31, 2006.

(b) An executed copy of the Agreement, together with all schedules (a "Marked Agreement") marked to show those amendments and modifications to such agreement and schedules that the Qualified Bidder proposes, including the Purchase Price.

(c) A good faith deposit (the "Good Faith Deposit") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to the Seller in its sole discretion) payable to the order of the Seller (or such other party as the Seller may determine) in an amount equal to $500,000.00.

(d) Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to the Seller and its advisors.

## **Qualified Bids**

A bid will be considered only if the bid:

(a) is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Seller than, those contained in the Agreement;

(b) is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder;

(c) proposes a transaction that the Seller determines, in its sole discretion, is not materially more burdensome or conditional than the terms of the Agreement and has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus (i) in

the case of the initial Qualified Bid, $400,000.00, and (ii) in the case of any subsequent Qualified Bids, $100,000.00 over the immediately-preceding highest Qualified Bid;

(d) is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment;

(e) an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement;

(f) includes a commitment to consummate the purchase of the Assets (including the receipt of any required governmental or regulatory approvals) within not more than 15 days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any governmental or regulatory approvals which must be obtained within 20 days after entry of such order; and

(g) is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that the Seller shall have the right, in its sole and absolute discretion, to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided, further, however, that no bid shall be deemed by Seller to be a Qualified Bid unless such bid proposes a transaction that the Seller determines, in its sole discretion, has a value greater than or equal to the sum of the Purchase Price, plus the amount of the Break-Up Fee, plus $400,000.00, taking into account all material terms of any such bid. Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Purchaser is referred to as a "Subsequent Bid."

If the Seller does not receive any Qualified Bids other than the Agreement received from the Purchaser, the Seller will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement.

## Bid Protection

Recognizing the Purchaser's expenditure of time, energy, and resources, the Seller has agreed to provide certain bidding protections to the Purchaser. Specifically, the Seller has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor

which all other Qualified Bids must exceed and, therefore, is entitled to be selected as the
Purchaser.  As a result, the Seller has agreed that if the Seller sells the Assets to a Successful
Bidder other than the Purchaser, the Seller shall, in certain circumstances, pay to the Purchaser a
Break-Up Fee.  In the event the Agreement is terminated pursuant to certain other provisions
thereof, then the Seller shall, in certain circumstances, be obligated to pay the Purchasers'
Expense Reimbursement.  The payment of the Break-Up Fee or the Expense Reimbursement (as
applicable) shall be governed by the provisions of the Agreement and the Bidding Procedures
Order.

## Auction

If the Seller receives at least one Qualified Bid in addition to the Agreement, the Seller
will conduct an auction (the "Auction") of the Assets and the Business upon notice to all
Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. (Prevailing Eastern Time) on
July 6, 2006, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,
New York, New York 10036 in accordance with the following procedures:

(a) Only the Seller, the Purchaser, any representative of the Creditors' Committee and the
Equityholders' Committee, any representative of the secured lenders (and the legal and
financial advisers to each of the foregoing), and any Qualified Bidder who has timely
submitted a Qualified Bid shall be entitled to attend the Auction, and only the Purchaser
and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the
Auction.

(b) At least two Business Days prior to the Auction, each Qualified Bidder who has timely
submitted a Qualified Bid must inform the Seller whether it intends to participate in the
Auction and at least one Business Day prior to the Auction, the Seller shall provide
copies of the Qualified Bid or combination of Qualified Bids which the Seller believes is
the highest or otherwise best offer to all Qualified Bidders who have informed the Seller
of their intent to participate in the Auction.  Should an Auction take place, the Purchaser
shall have the right, but not the obligation, to participate in the Auction.  The Purchaser's
election not to participate in an Auction shall in no way impair its entitlement to receive
the Break-Up Fee or Expense Reimbursement, as applicable.

(c) All Qualified Bidders shall be entitled to be present for all Subsequent Bids with the
understanding that the true identity of each bidder shall be fully disclosed to all other
bidders and that all material terms of each Subsequent Bid shall be fully disclosed to all
other bidders throughout the entire Auction.

(d) The Seller may employ and announce at the Auction additional procedural rules that are
reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent
Bids) for conducting the Auction, provided that such rules are not inconsistent with these
Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered
in connection herewith.

(e) Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or
combination of Qualified Bids and continue in minimum increments of at least

6

$100,000.00 higher than the previous bid or bids. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Seller shall give the Purchaser a credit in an amount equal to the greater of any Break-Up Fee or Expense Reimbursement that may be payable to the Purchaser under the Agreement and shall give effect to any assets and/or equity interests to be retained by the Seller.

## Selection Of Successful Bid

At the conclusion of the Auction, or as soon thereafter as practicable, the Seller, in consultation with its financial advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (ii) identify the highest or otherwise best offer(s) for the Assets and the Business received at the Auction (the "Successful Bid" and the bidder(s) making such bid, the "Successful Bidder(s)").

Seller shall sell the Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "Sale Hearing"). If, after an Auction in which the Purchaser: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement, and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid, less (b) the Break-Up Fee.

## The Sale Hearing

The Sale Hearing is currently scheduled to take place before the Honorable Robert D. Drain, United States Bankruptcy Judge, on July 19, 2006 at 10:00 a.m. (Prevailing Eastern Time) in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Room 610, New York, New York 10004. The Sale Hearing may be adjourned or rescheduled by the Seller without notice other than by an announcement of the adjourned date at the Sale Hearing.

If the Seller does not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Seller will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Assets to the Purchaser following entry of the Sale Order. If Seller does receive additional Qualified Bids, then, at the Sale Hearing, Seller shall seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "Alternate Bid(s)" and such bidder(s), the "Alternate Bidder(s)"). The Seller's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute the Seller's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing. Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a

condition precedent beyond the control of either the Seller or the Successful Bidder, or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and the Seller shall effectuate a sale to the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such Alternate Bidder(s) without further order of the Bankruptcy Court.

## Return Of Good Faith Deposits

Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two Business Days following the closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s). If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Seller shall not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of the Seller.  On the Return Date, the Seller shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

## Reservation Of Rights

Seller, after consultation with the agent for the debtors' prepetition secured lenders and the Creditors' Committee:  (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may reject at any time, any bid (other than the Purchaser's bid) that is:  (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Seller, its estate, and creditors as determined by Seller in its sole discretion.

**EXHIBIT 1**

## NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement (this "**Agreement**") by and between _____, a _____ corporation (the "**Recipient**"), and MobileAria, Inc., a Delaware corporation (the "**Provider**") (each a "**Party**" and collectively, the "**Parties**"), is dated as of the latest date set forth on the signature page hereto.

1.    General.  In connection with the consideration of a possible negotiated transaction (a "**Possible Transaction**") between the Parties and/or their respective subsidiaries (each such Party being hereinafter referred to, collectively with its subsidiaries and affiliates, as a "**Company**"), Provider is prepared to make available to the Recipient certain "Evaluation Material" (as defined in Section 2 below) in accordance with the provisions of this Agreement, and both Parties agree to take or abstain from taking certain other actions as hereinafter set forth.

2.    Definitions.

(a)    The term "**Evaluation Material**" means information concerning the Provider which has been or is furnished to the Recipient or its Representatives in connection with the Recipient's evaluation of a Possible Transaction, including its business, financial condition, operations, assets and liabilities, and includes all notes, analyses, compilations, studies, interpretations or other documents prepared by the Recipient or its Representatives which contain or are based upon, in whole or in part, the information furnished by the Recipient hereunder.  The term Evaluation Material does not include information which (i) is or becomes generally available to the public other than as a result of a disclosure by the Recipient or its Representatives in breach of this Agreement, (ii) was within the Recipient's possession prior to its being furnished to the Recipient by or on behalf of the Provider, provided that the source of such information was not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Provider with respect to such information, or (iii) is or becomes available to the Recipient on a non-confidential basis from a source other than the Provider or its Representatives, provided that such source is not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Provider with respect to such information.

(b)    The term "**Representatives**" shall include the directors, officers, employees, agents, partners or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors) of the Recipient or the Provider, as applicable.

(c)    The term "**Person**" includes the media and any corporation, partnership, group, individual or other entity.

3.    Use of Evaluation Material.  The Recipient shall, and it shall cause its Representatives to, use the Evaluation Material solely for the purpose of evaluating a Possible Transaction, keep the Evaluation Material confidential, and, subject to Section 5, will not, and will cause its Representatives not to**,** disclose any of the Evaluation Material in any manner whatsoever; provided, however, that any of such information may be disclosed to the Recipient's Representatives who need to know such information for the sole purpose of helping the Recipient evaluate a Possible Transaction.  The Recipient agrees to be responsible for any breach

10

of this Agreement by any of the Recipient's Representatives.  This Agreement does not grant the Recipient or any of its Representatives any license to use the Provider's Evaluation Material except as provided herein.

4.    <u>Non-Disclosure of Discussions</u>.  Subject to Section 5, each Company agrees that, without the prior written consent of the other Company, such Company will not, and it will cause its Representatives not to, disclose to any other Person (i) that Evaluation Material has been provided by Provider to Recipient, (ii) that discussions or negotiations are taking place between the Companies concerning a Possible Transaction or (iii) any of the terms, conditions or other facts with respect thereto (including the status thereof).

5.    <u>Legally Required Disclosure</u>.  If the Recipient or its Representatives are requested or required (by oral questions, interrogatories, other requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the Evaluation Material or any of the facts disclosure of which is prohibited under Section 4 above, the Recipient shall provide the Provider with prompt written notice of any such request or requirement together with copies of the material proposed to be disclosed so that the Provider may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement.  If, in the absence of a protective order or other remedy or the receipt of a waiver by the Provider, the Recipient or its Representatives are nonetheless legally compelled to disclose Evaluation Material or any of the facts disclosure of which is prohibited under Section 4 or otherwise be liable for contempt or suffer other censure or penalty, the Recipient or its Representatives may, without liability hereunder, disclose to such requiring Person only that portion of such Evaluation Material or any such facts which the Recipient or its Representatives is legally required to disclose, <u>provided</u> that the Recipient and/or its Representatives cooperate with the Provider to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded such Evaluation Material or such facts by the Person receiving the material.

6.    <u>Return or Destruction of Evaluation Material</u>.  If either Company decides that it does not wish to proceed with a Possible Transaction, it will promptly inform the other Company of that decision.  In that case, or at any time upon the request of the Provider for any reason, the Recipient will, and will cause its Representatives to, within five business days of receipt of such notice, destroy or return all Evaluation Material in any way relating to the Provider or its products, services, employees or other assets or liabilities, and no copy or extract thereof (including electronic copies) shall be retained, except that Recipient's outside counsel may retain one copy to be kept confidential and used solely for archival purposes.  The Recipient shall provide to the Provider a certificate of compliance with the previous sentence signed by an executive officer of the Recipient.  Notwithstanding the return or destruction of the Evaluation Material, the Recipient and its Representatives will continue to be bound by the Recipient's obligations hereunder with respect to such Evaluation Material.

7.    <u>No Solicitation/Employment</u>.  The Recipient will not, within one year from the date of this Agreement, directly or indirectly solicit the employment or consulting services of or employ or engage as a consultant any of the officers or employees of the Provider, so long as they are employed by the Provider and for three months after they cease to be employed by

11

Provider.  The Recipient is not prohibited from soliciting by means of a general advertisement not directed at (i) any particular individual or (ii) the employees of the Provider generally.

8.    <u>Maintaining Privilege</u>.  If any Evaluation Material includes materials or information subject to the attorney-client privilege, work product doctrine or any other applicable privilege concerning pending or threatened legal proceedings or governmental investigations, each Company understands and agrees that the Companies have a commonality of interest with respect to such matters and it is the desire, intention and mutual understanding of the Companies that the sharing of such material by Recipient is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under the attorney-client privilege, work product doctrine or other applicable privilege.  All Evaluation Material provided by the Recipient that is entitled to protection under the attorney-client privilege, work product doctrine or other applicable privilege shall remain entitled to such protection under these privileges, this Agreement, and under the joint defense doctrine.

9.    <u>Not a Transaction Agreement</u>.  Each Company understands and agrees that no contract or agreement providing for a Possible Transaction exists between the Companies unless and until a final definitive agreement for a Possible Transaction has been executed and delivered, and each Company hereby waives, in advance, any claims (including, without limitation, breach of contract) relating to the existence of a Possible Transaction unless and until both Companies shall have entered into a final definitive agreement for a Possible Transaction.  Each Company also agrees that, unless and until a final definitive agreement regarding a Possible Transaction has been executed and delivered, neither Company will be under any legal obligation of any kind whatsoever with respect to such Possible Transaction by virtue of this Agreement except for the matters specifically agreed to herein.  Neither Company is under any obligation to accept any proposal regarding a Possible Transaction and either Company may terminate discussions and negotiations with the other Company at any time.

10.    <u>No Representations or Warranties; No Obligation to Disclose</u>.  The Recipient understands and acknowledges that neither the Provider nor its Representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material furnished by or on behalf of the Provider and shall have no liability to the Recipient, its Representatives or any other Person relating to or resulting from the use of the Evaluation Material furnished to the Recipient or its Representatives or any errors therein or omissions therefrom.  As to the information delivered to the Recipient, the Provider will only be liable for those representations or warranties which are made in a final definitive agreement regarding a Possible Transaction, when, as and if executed, and subject to such limitations and restrictions as may be specified therein.  Nothing in this Agreement shall be construed as obligating a the Provider to provide, or to continue to provide, any information to any Person.

11.    <u>Third Party Beneficiaries</u>.  Delphi Automotive Systems LLC and its affiliates are intended third party beneficiaries of this Agreement with same rights and powers as if they had executed this Agreement.

12.    <u>Modifications and Waiver</u>.  No provision of this Agreement can be waived or amended in favor of either Party except by written consent of the other Party, which consent shall specifically refer to such provision and explicitly make such waiver or amendment.  No

12

failure or delay by either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder.

13. <u>Remedies</u>. Each Company understands and agrees that money damages would not be a sufficient remedy for any breach of this Agreement by either Company or any of its Representatives and that the Company against which such breach is committed shall be entitled to equitable relief, including injunction and specific performance, as a remedy for any such breach or threat thereof. Such remedies shall not be deemed to be the exclusive remedies for a breach by either Company of this Agreement, but shall be in addition to all other remedies available at law or equity to the Company against which such breach is committed.

14. <u>Legal Fees</u>. In the event of litigation relating to this Agreement, if a court of competent jurisdiction determines that either Company or its Representatives has breached this Agreement, then the Company which is, or the Company whose Representatives are, determined to have so breached shall be liable and pay to the other Company the reasonable legal fees and costs incurred by the other Company in connection with such litigation, including any appeal therefrom.

15. <u>Governing Law</u>. This Agreement is for the benefit of each Company and shall be governed by and construed in accordance with the laws of the State of California applicable to agreements made and to be performed entirely within such State.

16. <u>Severability</u>. If any term, provision, covenant or restriction contained in this Agreement is held by any court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants or restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and if a covenant or provision is determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the Companies intend and hereby request that the court or other authority making that determination shall only modify such extent, duration, scope or other provision to the extent necessary to make it enforceable and enforce them in their modified form for all purposes of this Agreement.

17. <u>Construction</u>. The Companies have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Companies and no presumption or burden of proof shall arise favoring or disfavoring either Company by virtue of the authorship at any of the provisions of this Agreement.

18. <u>Term</u>. This Agreement shall terminate one year after the date of this Agreement.

19. <u>Entire Agreement</u>. This Agreement contains the entire agreement between the Companies regarding the subject matter hereof and supersedes all prior agreements, understandings, arrangements and discussions between the Companies regarding such subject matter.

20. <u>Counterparts</u>. This Agreement may be signed in counterparts, each of which shall be deemed an original but all of which shall be deemed to constitute a single instrument.

IN WITNESS WHEREOF, each of the undersigned entities has caused this Agreement to be signed by its duly authorized representatives as of the date written below.

Date: _____

**PROVIDER:**                                    **RECIPIENT:**

**MOBILEARIA, INC.**                             **[COMPANY NAME]**
800 West El Camino Real, Suite 240               ADDRESS FOR NOTICE:
Mountain View, California 94040

By: _____        By: _____
    Name:                                        Name:
    Title:                                       Title:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :
    In re                    :    Chapter 11
                          :
DELPHI CORPORATION, et al.,  :    Case No. 05-44481 (RDD)
                          :
            Debtor.    :    (Jointly Administered)
                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>NOTICE OF SALE OF CERTAIN ASSETS AT AUCTION</u>

PLEASE TAKE NOTICE OF THE FOLLOWING:

        1.      Pursuant to the Order Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P.

2002 And 9014 Approving (i) Bidding Procedures, (ii) Certain Bid Protections, (iii) Form

And Manner Of Sale Notices, And (iv) Setting Of A Sale Hearing (the "Bidding Procedures

Order") entered by the United States Bankruptcy Court for the Southern District of New York

(the "Bankruptcy Court") on June __, 2006, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") are offering for sale the assets (the "Assets") of MobileAria, Inc. ("MobileAria").  Capitalized terms used but not otherwise defined in this notice shall have the meanings ascribed to them in the Bidding Procedures.

2.      All interested parties are invited to make an offer to purchase the Assets in accordance with the terms and conditions approved by the Bankruptcy Court (the "Bidding Procedures").  Pursuant to the Bidding Procedures, the Debtors may conduct an auction for the Assets (the "Auction") beginning at 10:00 a.m. on July 6, 2006 at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York.

3.      Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order.  A copy of the Bidding Procedures is attached hereto as Exhibit 1.

4.      The Debtors have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.  Notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of a bid by a Qualified Bidder, the Good Faith Deposits of all bidders will be retained by the Debtors, and all bids will remain open, until the earlier of 48 hours after the closing of the sale of the Assets or August 31, 2006 (the "Return Date"); provided, however, that if the Debtors determine not to sell the Assets, the Good Faith Deposits of all Qualified Bidders will be returned by the Debtors within 48 hours of the Auction.  Upon failure to consummate the sale of the Assets because of a breach or failure on the part of the Successful Bidder, the Debtors may select in their business judgment the next highest or otherwise best Qualified Bid to be the Successful Bid without further order of the Court.  On the Return Date, the Seller will return the Good Faith Deposits of all Qualified Bidders, except the Successful Bidders, with accrued interest.

2

5.      The Debtors may: (a) determine, in their business judgment, which

Qualified Bid is the highest or otherwise best offer and (b) reject at any time before entry of

an order of the Bankruptcy Court approving a Qualified Bid any bid which, in the Debtors'

sole discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements

of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii)

contrary to the best interests of the Debtors, its estate, and its creditors.

6.      A hearing to approve the Sale of the Assets to the highest and best

bidder will be held on July 19, 2006 at 10:00 a.m. (Prevailing Eastern Time) at the United

States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room

610, New York, New York 10004, before the Honorable Robert D. Drain, United States

Bankruptcy Judge.  The hearing on the Sale my be adjourned without notice other than an

adjournment in open court.

7.      Objections, if any, to the proposed Sale must (a) be in writing, (b)

conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the

Southern District of New York, and the Seventh Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing

Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative

Procedures, entered by this Court on May 19, 2006 (Docket No. 3824), (c) be filed with the

Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users

of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-

interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format), (d) be submitted in

hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States

Bankruptcy Judge, and (e) be served in hard-copy form upon (i) MobileAria, Inc., 800 West

El Camino Real, Suite 240, Mountain View, California 94040 (Att'n: Richard Lind), (ii)

3

Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (iii)

counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker

Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iv) counsel for the

agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425

Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S. Ziman), (v) counsel for

the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington

Avenue, New York, New York 10017 (Att'n: Donald Bernstein and Brian Resnick), (vi)

counsel for the Official Committee of Unsecured Creditors, Latham & Watkins LLP, 885

Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg and Mark A.

Broude), (vii) counsel for the Official Committee of Equity Security Holders, Fried, Frank,

Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 (Att'n:

Bonnie Steingart), (viii) counsel for the Purchaser, Cooley Godward LLP, 101 California

Street, Fifth Floor, San Francisco, CA 94114 (Att'n: Gregg S. Kleiner), and (ix) the Office of

the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite

2100, New York, New York 10004 (Att'n:  Alicia M. Leonhard), in each case so that it is

**actually received** no later than **4:00 p.m. (Prevailing Eastern Time) on July 14, 2006**.

8.    This notice is qualified in its entirety by the Bidding Procedures Order.

Dated:  June __, 2006

                              BY ORDER OF THE COURT

                              John Wm. Butler, Jr. (JB 4711)
                              John K. Lyons (JL 4951)
                              Ron E. Meisler (RM 3026)
                              SKADDEN, ARPS, SLATE, MEAGHER
                                  & FLOM LLP
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois  60606
                              (312) 407-0700

                                - and -

                              Kayalyn A. Marafioti (KM 9632)
                              Thomas J. Matz (TM 5986)
                              SKADDEN, ARPS, SLATE, MEAGHER
                                  & FLOM LLP
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                  Debtors and Debtors-in-Possession

**<u>EXHIBIT 1</u>**

## MOBILEARIA, INC. BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of all or substantially all of the assets (the "Assets") comprising the entire business (the "Business") of MobileAria, Inc. (the "Seller"). On June 6, 2006, the Seller executed that certain Asset Sale and Purchase Agreement by and between Wireless Matrix USA, Inc. (the "Purchaser") and the Seller (the "Agreement"). The transaction contemplated by the Agreement is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined herein) pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

On June 6, 2006, the Seller filed a Motion For Orders Under 11 U.S.C. §§ 363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006 And 9014 (a) Approving (i) Bidding Procedures, (ii) Certain Bid Protections, (iii) Form And Manner Of Sale Notices, And (iv) Sale Hearing Date And (b) Authorizing And Approving (i) Sale Of Certain Of Debtors' Assets Comprising Substantially All Assets Of MobileAria, Inc. Free And Clear Of Liens, Claims, And Encumbrances, (ii) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (iii) Assumption Of Certain Liabilities (the "Sale Motion"). On June __, 2006, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an Order Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P. 2002 And 9014 Approving (i) Bidding Procedures, (ii) Certain Bid Protections, (iii) Form And Manner Of Sale Notices, And (iv) Sale Hearing Date (the "Bidding Procedures Order") approving the Bidding Procedures. The Bidding Procedures Order set 10:00 a.m. (Prevailing Eastern Time) on July 19, 2006 as the date the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to authorize the Seller to enter into the Agreement. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which bidders and bids become Qualified, the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined herein), the ultimate selection of the Successful Bidder(s) (as defined herein) and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process"). The Bidding Procedures were developed following consultation with, among others, the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Seller intends to continue to consult with such constituents throughout the Bidding Process. In the event that the Seller and any such constituent disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court shall have jurisdiction to hear and resolve such dispute.

### Assets To Be Sold

The Assets proposed to be sold include substantially all of the assets owned by the Seller.

7

### "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Seller, its agents, or estate, except, with respect to the Purchaser, to the extent set forth in the Agreement and, with respect to a Successful Bidder, to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court.

### Free Of Any And All Claims And Interests

Except, with respect to the Purchaser, to the extent otherwise set forth in the Agreement and, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder, all of the Seller's right, title, and interest in and to the Assets, or any portion thereof, to be acquired shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Claims and Interests"), such Claims and Interests to attach to the net proceeds of the sale of such Assets.

### Participation Requirements

Any person who wishes to participate in the Bidding Process (a "Potential Bidder") must become a Qualified Bidder.  As a prerequisite to becoming a Qualified Bidder, a Potential Bidder, other than the Purchaser, must deliver (unless previously delivered) to the Seller:

(a)  An executed confidentiality agreement substantially in the form attached hereto as Exhibit 1 (or in such other form acceptable to the Seller);

(b)  Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Seller and its financial advisors; and

(c)  A preliminary (non-binding) written proposal regarding (i) the purchase price range, (ii) any Assets expected to be excluded, (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing of the Purchase Price (as defined in the Agreement) and the requisite Good Faith Deposit), (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals, (v) any conditions to closing that it may wish to impose in addition to those set forth in the Agreement, and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder who delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Sale, if selected as a successful bidder, and who the Seller determines in its sole discretion is likely (based on availability of financing, experience, and other considerations) to be able to

consummate the Sale within the time frame provided by the Agreement shall be deemed a "Qualified Bidder." As promptly as practicable, after a Potential Bidder delivers all of the materials required above, the Seller shall determine, and shall notify the Potential Bidder, whether such Potential Bidder is a Qualified Bidder. At the same time that the Seller notifies the Potential Bidder that it is a Qualified Bidder, the Seller shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Assets and the Business as provided below. Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process.

## Due Diligence

The Seller shall afford each Qualified Bidder due diligence access to the Assets and the Business. Due diligence access may include management presentations as may be scheduled by the Seller, access to data rooms, on-site inspections, and such other matters which a Qualified Bidder may request and as to which the Seller, in its sole discretion, may agree. The Seller shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence shall not continue after the Bid Deadline. The Seller may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. Neither the Seller nor any of its affiliates (or any of their respective representatives) shall be obligated to furnish any information relating to Assets and the Business to any person other than to Qualified Bidders who make an acceptable preliminary proposal.

Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets and the Business prior to making its offer, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets and the Business in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets or the Business, or the completeness of any information provided in connection therewith, the Bidding Process or the Auction (as defined herein), except, as to the Successful Bidder, as expressly stated in the definitive agreement with such Successful Bidder approved by the Bankruptcy Court.

## Bid Deadline

A Qualified Bidder (other than the Purchaser) who desires to make a bid shall deliver written copies of its bid to: MobileAria, Inc., 800 West El Camino Real, Suite 240, Mountain View, California 94040, Attention: Richard Lind, with copies to: (i) Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan 48098, Attention: Stephen H. Olsen, (ii) the Seller's restructuring counsel, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606, Attention: John K. Lyons and Randall G. Reese, (iii) the Seller's financial advisor, Pagemill Partners, LLC, 2475 Hanover Street, Palo Alto, California 94304, Attention: Milledge A. Hart, (iv) the Seller's corporate counsel, DLA Piper Rudnick Gray Cary US LLP, 2000 University Avenue, East Palo Alto, California 94303, Attention: James M. Koshland, (v) counsel to the Creditors' Committee, Latham & Watkins LLP, at 885 Third Avenue, New York, New York 10022, Attention: Mark A. Broude, (vi) the Creditors' Committee's financial advisor, Mesirow Financial Consulting LLC, 666 Third

Avenue, 21st Floor, New York, New York 10017, Attention: Ben Pickering, (vii) counsel to the debtors' prepetition lenders, Simpson Thacher & Bartlet LLP, 425 Lexington Avenue, New York, New York 10017, Attention: Kenneth S. Ziman, and (viii) the debtors' prepetition lenders' financial advisor, Alvarez & Marsal, 600 Lexington Avenue, 6th Floor, New York, New York 10022, Attention: Andrew Hede, so as to be received not later than 11:00 a.m. (Prevailing Eastern Time) on June 29, 2006 (the "Bid Deadline").  As soon as reasonably practicable following receipt of each Qualified Bid, Seller shall deliver complete copies of all items and information enumerated in the section below entitled "Bid Requirements" to (a) Purchaser and its counsel and (b) counsel for the Official Committee of Equity Security Holders (the "Equityholders' Committee").

## Bid Requirements

All bids must include the following documents (the "Required Bid Documents"):

(a) A letter stating that the bidder's offer is irrevocable until the earlier of (i) two Business Days after the closing of the Sale of the Assets or (ii) August 31, 2006.

(b) An executed copy of the Agreement, together with all schedules (a "Marked Agreement") marked to show those amendments and modifications to such agreement and schedules that the Qualified Bidder proposes, including the Purchase Price.

(c) A good faith deposit (the "Good Faith Deposit") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to the Seller in its sole discretion) payable to the order of the Seller (or such other party as the Seller may determine) in an amount equal to $500,000.00.

(d) Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to the Seller and its advisors.

## Qualified Bids

A bid will be considered only if the bid:

(a) is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Seller than, those contained in the Agreement;

(b) is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder;

(c) proposes a transaction that the Seller determines, in its sole discretion, is not materially more burdensome or conditional than the terms of the Agreement and has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus (i) in the case of the initial Qualified Bid, $400,000.00, and (ii) in the case of any subsequent Qualified Bids, $100,000.00 over the immediately-preceding highest Qualified Bid;

10

(d) is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment;

(e) an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement;

(f) includes a commitment to consummate the purchase of the Assets (including the receipt of any required governmental or regulatory approvals) within not more than 15 days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any governmental or regulatory approvals which must be obtained within 20 days after entry of such order; and

(g) is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that the Seller shall have the right, in its sole and absolute discretion, to entertain bids for the Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; provided, further, however, that no bid shall be deemed by Seller to be a Qualified Bid unless such bid proposes a transaction that the Seller determines, in its sole discretion, has a value greater than or equal to the sum of the Purchase Price, plus the amount of the Break-Up Fee, plus $400,000.00, taking into account all material terms of any such bid. Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Purchaser is referred to as a "Subsequent Bid."

If the Seller does not receive any Qualified Bids other than the Agreement received from the Purchaser, the Seller will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement.

### Bid Protection

Recognizing the Purchaser's expenditure of time, energy, and resources, the Seller has agreed to provide certain bidding protections to the Purchaser. Specifically, the Seller has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor which all other Qualified Bids must exceed and, therefore, is entitled to be selected as the Purchaser. As a result, the Seller has agreed that if the Seller sells the Assets to a Successful Bidder other than the Purchaser, the Seller shall, in certain circumstances, pay to the Purchaser a Break-Up Fee. In the event the Agreement is terminated pursuant to certain other provisions thereof, then the Seller shall, in certain circumstances, be obligated to pay the Purchasers' Expense Reimbursement. The payment of the Break-Up Fee or the Expense

Reimbursement (as applicable) shall be governed by the provisions of the Agreement and the Bidding Procedures Order.

## Auction

If the Seller receives at least one Qualified Bid in addition to the Agreement, the Seller will conduct an auction (the "Auction") of the Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. (Prevailing Eastern Time) on July 6, 2006, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 in accordance with the following procedures:

(a) Only the Seller, the Purchaser, any representative of the Creditors' Committee and the Equityholders' Committee, any representative of the secured lenders (and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only the Purchaser and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

(b) At least two Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Seller whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Seller shall provide copies of the Qualified Bid or combination of Qualified Bids which the Seller believes is the highest or otherwise best offer to all Qualified Bidders who have informed the Seller of their intent to participate in the Auction.  Should an Auction take place, the Purchaser shall have the right, but not the obligation, to participate in the Auction.  The Purchaser's election not to participate in an Auction shall in no way impair its entitlement to receive the Break-Up Fee or Expense Reimbursement, as applicable.

(c) All Qualified Bidders shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid shall be fully disclosed to all other bidders throughout the entire Auction.

(d) The Seller may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith.

(e) Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $100,000.00 higher than the previous bid or bids.  The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Seller shall give the Purchaser a credit in an amount equal to the greater of any Break-Up Fee or Expense Reimbursement that may be payable to the Purchaser under the Agreement and shall give effect to any assets and/or equity interests to be retained by the Seller.

12

## Selection Of Successful Bid

At the conclusion of the Auction, or as soon thereafter as practicable, the Seller, in consultation with its financial advisors, shall:  (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (ii) identify the highest or otherwise best offer(s) for the Assets and the Business received at the Auction (the "Successful Bid" and the bidder(s) making such bid, the "Successful Bidder(s)").

Seller shall sell the Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "Sale Hearing").  If, after an Auction in which the Purchaser:  (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement, and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to:  (a) the amount of the Successful Bid, less (b) the Break-Up Fee.

## The Sale Hearing

The Sale Hearing is currently scheduled to take place before the Honorable Robert D. Drain, United States Bankruptcy Judge, on July 19, 2006 at 10:00 a.m. (Prevailing Eastern Time) in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Room 610, New York, New York 10004.  The Sale Hearing may be adjourned or rescheduled by the Seller without notice other than by an announcement of the adjourned date at the Sale Hearing.

If the Seller does not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Seller will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Assets to the Purchaser following entry of the Sale Order.  If Seller does receive additional Qualified Bids, then, at the Sale Hearing, Seller shall seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "Alternate Bid(s)" and such bidder(s), the "Alternate Bidder(s)").  The Seller's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute the Seller's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing.  Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of:  (i) failure of a condition precedent beyond the control of either the Seller or the Successful Bidder, or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and the Seller shall effectuate a sale to the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such Alternate Bidder(s) without further order of the Bankruptcy Court.

## Return Of Good Faith Deposits

Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two Business Days following the closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the Good Faith

13

Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s).  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Seller shall not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of the Seller.  On the Return Date, the Seller shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

## **Reservation Of Rights**

Seller, after consultation with the agent for the debtors' prepetition secured lenders and the Creditors' Committee:  (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may reject at any time, any bid (other than the Purchaser's bid) that is:  (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Seller, its estate, and creditors as determined by Seller in its sole discretion.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession


Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698


Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
        In re                                             :    Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :    Case No. 05-44481 (RDD)
                                                          :
                              Debtor.                     :    (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        NOTICE OF CURE AMOUNT WITH RESPECT TO EXECUTORY
        CONTRACT OR UNEXPIRED LEASE TO BE ASSUMED AND/OR ASSIGNED

PLEASE TAKE NOTICE THAT:

                1.      Pursuant to the Order Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P.

2002 And 9014 Approving (i) Bidding Procedures, (ii) Certain Bid Protections,  (iii) Form

And Manner Of Sale Notices, And (iv) Setting Of A Sale Hearing (the "Bidding Procedures

Order") entered by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on June __, 2006, MobileAria, Inc. ("MobileAria") hereby provides notice (the "Notice") of its intent to assume and/or assign the executory contract or unexpired lease (the "Assigned Contract") listed on Exhibit 1 hereto to the Successful Bidder with respect to MobileAria's assets.  Capitalized terms used but not otherwise defined in this notice shall have the meaning ascribed to them in the Bidding Procedures Order.

2.    On the Closing Date, or as soon thereafter as reasonably practicable, MobileAria will pay the amount MobileAria's records reflect is owing for prepetition arrearages, if any, as set forth on Exhibit 1 (the "Cure Amount").  MobileAria's records reflect that all postpetition amounts owing under the Assigned Contract have been paid and will continue to be paid until the assumption and/or assignment of the Assigned Contract and that, other than the Cure Amount, there are no other defaults under the Assigned Contract.

3.    Objections, if any, to the proposed Cure Amount must (a) be in writing, (b) state with specificity the cure asserted to be required, (c) include appropriate documentation thereof, (d) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824), (e) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (f) be submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York,

2

One Bowling Green, Room 610, New York, New York 10004, and (g) be served in hard-

copy form so that it is actually received within ten days of service of this Notice upon (i)

MobileAria, Inc., 800 West El Camino Real, Suite 240, Mountain View, California 94040

(Att'n: Richard Lind), (ii) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098

(Att'n: General Counsel), (iii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom

LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler,

Jr.), (iv) counsel for the agent under the Debtors' prepetition credit facility, Simpson Thacher

& Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S.

Ziman), (v) counsel for the agent under the postpetition credit facility, Davis Polk &

Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and

Brian Resnick), (vi) counsel for the Official Committee of Unsecured Creditors, Latham &

Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg

and Mark A. Broude), (vii) counsel for the Official Committee of Equity Security Holders,

Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York

10004 (Att'n: Bonnie Steingart), (viii) counsel for the Purchaser, Cooley Godward LLP, 101

California Street, Fifth Floor, San Francisco, California 94114 (Att'n: Gregg S. Kleiner), and

(ix) the Office of the United States Trustee for the Southern District of New York, 33

Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:  Alicia M. Leonhard).

        4.      If an objection to the Cure Amount is timely filed, a hearing with

respect to the objection will be held before the Honorable Robert D. Drain, United States

Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York,

One Bowling Green, Room 610, New York, New York 10004, at such date and time as the

Court may schedule.  A hearing regarding the Cure Amount, if any, may be continued at the

sole discretion of MobileAria until after the Closing Date.

5.        If no objection is timely received, the Cure Amount set forth in <u>Exhibit</u>
<u>1</u>, hereto, shall be controlling, notwithstanding anything to the contrary in any Assigned
Contract or any other document, and the nondebtor party to the Assigned Contract shall be
forever barred from asserting any other claims against the Debtors, the Purchaser, or the
Successful Bidder (as appropriate), or the property of either of them, as to such Assigned
Contract.  The failure of any objecting person or entity to timely file its objection shall be a
bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the
Sale, or MobileAria's consummation and performance of the Agreement (including the
transfer of the Assets and the Assigned Contracts free and clear of all Interests), if authorized
by the Court.

6.      Prior to the Closing Date, MobileAria may amend its decision with

respect to the assumption and/or assignment of the Assigned Contract and provide a new

notice amending the information provided in this Notice.

Dated:  New York, New York
        June __, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: _____
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: _____
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

5

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

　　　 - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
　　　　　　　　　　　　　　　　　　　 :
　　　In re　　　　　　　　　　　　　 :　　Chapter 11
　　　　　　　　　　　　　　　　　　　 :
DELPHI CORPORATION, et al.,　　　　 :　　Case No. 05-44481 (RDD)
　　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　　　Debtor.　　 :　　(Jointly Administered)
　　　　　　　　　　　　　　　　　　　 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF ASSUMPTION AND/OR ASSIGNMENT
OF EXECUTORY CONTRACT OR UNEXPIRED LEASE

PLEASE TAKE NOTICE THAT:

　　　　　　　1.　　　　Pursuant to the Order Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P.

2002 And 9014 Approving (i) Bidding Procedures, (ii) Certain Bid Protections, (iii) Form

And Manner Of Sale Notices, And (iv) Setting Of A Sale Hearing (the "Bidding Procedures

Order") entered by the United States Bankruptcy Court for the Southern District of New York

(the "Bankruptcy Court") on June __, 2006, MobileAria, Inc. ("MobileAria") has entered into

an Asset Sale and Purchase Agreement ("Agreement"), which Agreement is subject to an

overbid auction, with Wireless Matrix USA, Inc. (the "Purchaser") for the purchase of

substantially all of MobileAria's assets (the "Assets").  Capitalized terms used but not

otherwise defined in this notice (the "Notice") shall have the meaning ascribed to them in the

Bidding Procedures Order.

      2.      Pursuant to the terms of the Agreement and subject to completion of a

competitive bidding process described in the Bidding Procedures Order and the attachments

thereto, MobileAria will seek to assume and/or assign the contracts listed on Exhibit 1 hereto

(the "Assigned Contracts") at the hearing to be held at 10:00 a.m. (Prevailing Eastern Time)

on July 19, 2006 (the "Sale Hearing") before the Honorable Robert D. Drain, United States

Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York,

One Bowling Green, Room 610, New York, New York 10004.

      3.      Objections, if any, to the assumption and/or assignment of an Assigned

Contract must (a) be in writing, (b) state with specificity the reasons for such objection, (c)

conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the

Southern District of New York, and the Seventh Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing

Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative

Procedures, entered by this Court on May 19, 2006 (Docket No. 3824), (d) be filed with the

Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users

of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-

interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format), (e) be submitted in hard-

2

copy form directly to the chambers of the Honorable Robert D. Drain, United States

Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York,

One Bowling Green, Room 610, New York, New York 10004, and (f) be served in hard-copy

form <u>so it is actually received</u> within ten days after the date of this Notice upon (i)

MobileAria, Inc., 800 West El Camino Real, Suite 240, Mountain View, California 94040

(Att'n: Richard Lind), (ii) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098

(Att'n: General Counsel), (iii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom

LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler,

Jr.), (iv) counsel for the agent under the Debtors' prepetition credit facility, Simpson Thacher

& Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S.

Ziman), (v) counsel for the agent under the postpetition credit facility, Davis Polk &

Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and

Brian Resnick), (vi) counsel for the Official Committee of Unsecured Creditors, Latham &

Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg

and Mark A. Broude), (vii) counsel for the Official Committee of Equity Security Holders,

Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York

10004 (Att'n: Bonnie Steingart), (viii) counsel for the Purchaser, Cooley Godward LLP, 101

California Street, Fifth Floor, San Francisco, California 94114 (Att'n: Gregg S. Kleiner), and

(ix) the Office of the United States Trustee for the Southern District of New York, 33

Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:  Alicia M. Leonhard).

        4.      If an objection to the assumption and/or assignment of an Assigned

Contract is timely filed, a hearing with respect to the objection will be held before the

Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court

for the Southern District of New York, One Bowling Green, Room 610, New York, New

York 10004, at the Sale Hearing or such date and time as the Court may schedule.  If no

objection is timely received, the nondebtor party to the Assigned Contract shall be forever

barred from asserting any other claims, including, but not limited to, the propriety or

effectiveness of the assumption and assignment of the Assigned Contract, against the Debtors

or the Purchaser, or the property of either of them, as to such Assigned Contract.

      5.     Pursuant to 11 U.S.C. § 365, there is adequate assurance of future

performance that the Cure Amount set forth in the Cure Notice shall be paid in accordance

with the terms of the Sale Order.  Further, there is adequate assurance of the Purchaser's

future performance under the executory contract or unexpired lease to be assumed and

assigned because of the significant resources of the Purchaser.

      6.     Prior to the Closing Date, MobileAria may amend its decision with

respect to the assumption and/or assignment of any Assigned Contract and provide a new

notice amending the information provided in this Notice.

Dated:  New York, New York
      June __, 2006

             SKADDEN, ARPS, SLATE, MEAGHER
              & FLOM LLP

            By: _____
              John Wm. Butler, Jr. (JB 4711)
              John K. Lyons (JL 4951)
              Ron E. Meisler (RM 3026)
            333 West Wacker Drive, Suite 2100
            Chicago, Illinois  60606
            (312) 407-0700

                    - and -

            By: _____
              Kayalyn A. Marafioti (KM 9632)
              Thomas J. Matz (TM 5986)
             Four Times Square
            New York, New York 10036
             (212) 735-3000

            Attorneys for Delphi Corporation, et al.,
             Debtors and Debtors-in-Possession

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                      :

In re                :    Chapter 11
                      :

DELPHI CORPORATION, et al.,  :    Case No. 05-44481 (RDD)
                      :

            Debtor.    :    (Jointly Administered)
                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF ASSUMPTION AND/OR ASSIGNMENT
OF EXECUTORY CONTRACT OR UNEXPIRED LEASE

PLEASE TAKE NOTICE THAT:

        1.        Pursuant to the Order Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P.

2002 And 9014 Approving (i) Bidding Procedures, (ii) Certain Bid Protections,  (iii) Form

And Manner Of Sale Notices, And (iv) Setting Of A Sale Hearing (the "Bidding Procedures

Order") entered by the United States Bankruptcy Court for the Southern District of New York

(the "Bankruptcy Court") on June __, 2006, MobileAria, Inc. ("MobileAria") has accepted

the bid of [____] (the "Successful Bidder") for the purchase of substantially all of

MobileAria's assets (the "Assets").  The terms of the bid are set forth in the Asset Sale and

Purchase Agreement, dated as of June __, 2006 between MobileAria and the Successful

Bidder (the "Agreement").  Capitalized terms used but not otherwise defined in this notice

shall have the meaning ascribed to them in the Bidding Procedures Order.

2.      Pursuant to the terms of the Agreement, MobileAria will seek to

assume and/or assign the contracts listed on Exhibit 1 hereto (the "Assigned Contracts") at

the hearing to be held at 10:00 a.m. (Prevailing Eastern Time) on July 19, 2006 (the "Sale

Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Judge, United

States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room

610, New York, New York 10004.

3.      This notice shall amend and replace that certain Notice Of Assumption

And/Or Assignment Of Executory Contract Or Unexpired Lease dated June __, 2006

providing notice of MobileAria's intent to assume and/or assign the Assigned Contracts to

Wireless Matrix USA, Inc.

4.      Objections, if any, to the assumption and/or assignment of an Assigned

Contract must (a) be in writing, (b) state with specificity the reasons for such objection, (c)

conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the

Southern District of New York, and the Seventh Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing

Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative

Procedures, entered by this Court on May 19, 2006 (Docket No. 3824), (d) be filed with the

Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users

2

of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-

interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format), (e) be submitted in hard-

copy form directly to the chambers of the Honorable Robert D. Drain, United States

Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York,

One Bowling Green, Room 610, New York, New York 10004, and (f) be served in hard-copy

form so it is actually received within ten days after the date of this Notice upon (i)

MobileAria, Inc., 800 West El Camino Real, Suite 240, Mountain View, California 94040

(Att'n: Richard Lind), (ii) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098

(Att'n: General Counsel), (iii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom

LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler,

Jr.), (iv) counsel for the agent under the Debtors' prepetition credit facility, Simpson Thacher

& Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S.

Ziman), (v) counsel for the agent under the postpetition credit facility, Davis Polk &

Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and

Brian Resnick), (vi) counsel for the Official Committee of Unsecured Creditors, Latham &

Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg

and Mark A. Broude), (vii) counsel for the Official Committee of Equity Security Holders,

Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York

10004 (Att'n: Bonnie Steingart), (viii) counsel for the Successful Bidder, [_____] (Att'n:

[_____]), and (ix) the Office of the United States Trustee for the Southern District of New

York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:  Alicia M.

Leonhard).

        5.      If an objection to the assumption and/or assignment of an Assigned

Contract is timely filed, a hearing with respect to the objection will be held before the

3

Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court

for the Southern District of New York, One Bowling Green, Room 610, New York, New

York 10004, at the Sale Hearing or such date and time as the Court may schedule.  If no

objection is timely received, the nondebtor party to the Assigned Contract shall be forever

barred from asserting any other claims, including, but not limited to, the propriety or

effectiveness of the assumption and/or assignment of the Assigned Contract, against the

Debtors or the Successful Bidder, or the property of either of them as to such Assigned

Contract.

        6.      Pursuant to 11 U.S.C. § 365, there is adequate assurance of future

performance that the Cure Amount set forth in the Cure Notice shall be paid in accordance

with the terms of the Sale Order.  Further, there is adequate assurance of the Successful

Bidder's future performance under the executory contract or unexpired lease to be assumed

and assigned because of the significant resources of the Successful Bidder.

7.      Prior to the Closing Date, MobileAria may amend its decision with

respect to the assumption and/or assignment of any Assigned Contract and provide a new

notice amending the information provided in this Notice.

Dated:  New York, New York
        July __, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: _____
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By:_____
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

5