# **APPENDIX**

The New York Times

**Archive**

NYTimes | Go to a Section | Go

Welcome, 61oliver - Memb

SEARCH

NYT Since 1981 | Search

TimesSelect | ▶ NEWS TRACKER | ▶ TIMES FILE

Tip for TimesSelect subscribers: Want to easily save this page? Use Times File by simply clicking on the Save Article icon in the Article Tools box below.

NATIONAL DESK

# GILDED PAYCHECKS: Troubling Conflicts; Outside Advice on Boss's Pay May Not Be So Independent

By GRETCHEN MORGENSON (NYT) 3618 words
Published: April 10, 2006

**CORRECTION APPENDED**

For Ivan G. Seidenberg, chief executive of Verizon Communications, 2005 was a very good year. As head of the telecommunications giant, Mr. Seidenberg received $19.4 million in salary, bonus, restricted stock and other compensation, 48 percent more than in the previous year.

Others with a stake in Verizon did not fare so well. Shareholders watched their stock fall 26 percent, bondholders lost value as credit agencies downgraded the company's debt and pensions for 50,000 managers were frozen at year-end. When Verizon closed the books last year, it reported an earnings decline of 5.5 percent.

And yet, according to the committee of Verizon's board that determines his compensation, Mr. Seidenberg earned his pay last year as the company exceeded "challenging" performance benchmarks. Mr. Seidenberg's package was competitive with that of other companies in Verizon's industry, shareholders were told, and was devised with the help of an "outside consultant" who reports to the committee.

The independence of this "outside consultant" is open to question. Although neither Verizon officials nor its directors identify its compensation consultant, people briefed on the relationship say it is Hewitt Associates of Lincolnshire, Ill., a provider of employee benefits management and consulting services with $2.8 billion in revenue last year.

Hewitt does much more for Verizon than advise it on compensation matters. Verizon is one of Hewitt's biggest customers in the far more profitable businesses of running the company's employee benefit plans, providing actuarial services to its pension plans and advising it on human resources management. According to a former executive of the firm who declined to be identified out of concern about affecting his business, Hewitt has received more than half a billion dollars in revenue from Verizon and its predecessor companies since 1997.

In other words, the very firm that helps Verizon's directors decide what to pay its executives has a long and lucrative relationship with the company, maintained at the behest of the executives whose pay it recommends.

This is the secretive, prosperous and often conflicted world of compensation consultants, who are charged with helping corporate boards determine executive pay that is appropriate and fair, and who are often cited as the unbiased advisers whenever shareholders criticize a company's pay as excessive.

It is a world where consulting fees can reach $950 an hour, rivaling those of the nation's top lawyers. And it has grown into a substantial industry where there is little disclosure about how executive pay is determined.

Marc C. Reed, executive vice president for human resources at Verizon, declined to identify the company's compensation consultant, noting that the Securities and Exchange Commission did not require it. "We understand the potential perception issue," he said in an e-mail message, "but we think it's important to honor the confidentiality of our advisers, and we have always ensured there have been no conflicts of interest."

Suzanne Zagata-Meraz, a spokeswoman for Hewitt, said in a statement: "Hewitt Associates has strict policies in place to ensure the independence and objectivity of all our consultants, including executive compensation consultants. In addition, Hewitt adheres to strict confidentiality requirements and a strong Hewitt code of conduct."

Because much of what goes on in compensation consulting stays in the hushed confines of corporate boardrooms, the roles of these advisers in determining executive pay have been hidden from investors' view. Nevertheless, corporate governance experts say, the conflicts bedeviling some of the large consulting firms help explain why in good times or bad, executive pay in America reaches dizzying heights each year.

Warren E. Buffett, the chief executive of Berkshire Hathaway and an accomplished investor, has noted the troubling contributions that compensation consultants have made to executive pay in recent years.

"Too often, executive compensation in the U.S. is ridiculously out of line with performance," he wrote in his most recent annual report. "The upshot is that a mediocre-or-worse C.E.O. -- aided by his handpicked V.P. of human relations and a consultant from the ever-accommodating firm of Ratchet, Ratchet & Bingo -- all too often receives gobs of money from an ill-designed compensation arrangement."

How Much Is Too Much?

Executive pay has been a subject of criticism for decades. Even though last year's pay figures showed slower growth than in previous years, the fact that executive compensation often has little relationship to the performance of the company has contributed to a growing sense among investors that pay is diminishing shareholder returns. "Everybody should have an interest in controlling this explosion in executive pay," said Frederick E. Rowe Jr., chairman of the Texas Pension Review Board who is also chairman of Greenbrier Partners, a money management firm in Dallas. "The wealth of America has been built through the returns of our public corporations, and if those returns are being redirected to company managements, then the people who get the short end of the stick are the people who hope to retire someday."

The median compensation for chief executives at roughly 200 large companies rose modestly to $8.4 million last year, from $8.2 million in 2004, according to Equilar Inc., a compensation analysis firm in San Mateo, Calif. The median was $7.2 million in 2003.

There are those who defend the current levels of executive pay, saying that the packages are set by the market and reflect the rising value of executives in an increasingly complex and competitive arena.

In an interview with The Wall Street Journal on March 20, John W. Snow, secretary of the Treasury, characterized executive pay this way: "In an aggregate sense, it reflects the marginal productivity of C.E.O.'s." Mr. Snow added that he trusted the marketplace to reward executives. Mr. Snow was a member of the Verizon board from 2000 to 2002 and on its compensation committee in 2001.

But defenders of executive pay are increasingly being drowned out by investors and workers who see some packages not only as an unjustified cost but also as a potentially divisive social issue.

Any discussion of executive pay quickly leads to compensation consultants, because they are the experts relied upon by company directors trying to balance their fiduciary duties to shareholders and their desire to keep management happy. Directors look to consultants for their knowledge about prevailing pay practices as well as the tax and legal implications of different types of compensation. Yet the consultants' practices have received little scrutiny.

Consultants help select the companies to be used in peer groups for comparison purposes in judging an executive's performance. Picking a group of companies that will be easy to outperform is one way to ensure that executives can clear performance hurdles. Another is to structure an executive's pay so that it is always at or near the top of those in his industry regardless of his company's performance. This pushes up pay simply when others in the industry do well.

Consultant creativity is behind some of the pay practices that have generated huge windfalls for executives in recent years. Some of the most costly practices involving stock options, like mega-grants and automatic reloads of options when others are cashed in, have vanished under pressure as accounting rules have changed. But innovative practices continue to crop up and spread quickly because comparisons with what other executives receive is a central factor driving executive pay.

An increasingly common practice of consultants is to use the same performance benchmark to generate both short-term and long-term pay. This arrangement rewards executives twice for a single achievement, noted Paul Hodgson, senior research associate at the Corporate Library, a corporate governance research firm in Portland, Me.

A recent study by the Corporate Library, "Pay for Failure: The Compensation Committees Responsible," identified 11 major companies whose shareholder returns had been negative for five years, but whose chief executives' pay had exceeded $15 million during the last two years combined. "The disconnect between pay and performance is particularly stark" at these companies, the study noted. They include AT&T, BellSouth, Hewlett-Packard, Home Depot, Lucent Technologies, Merck, Pfizer, Safeway, Time Warner and Wal-Mart.

Directors Help Each Other

Verizon is the other company on the list. Mr. Seidenberg's $75 million total pay for five years looked especially high against a total shareholder loss of more than 26 percent in the period, the study said. Verizon's board received a grade of D in effectiveness from the Corporate Library.

Robert A. Varettoni, a Verizon spokesman, pointed out that Mr. Seidenberg had received the first increase in base salary last year since the company was formed in 2000. "During this particularly tumultuous time in the telecom industry," Mr. Varettoni said in an e-mail message, "Verizon has

maintained its financial health and infrastructure investments, increased its dividends, lowered its debt, transformed its revenue growth profile, and provided customers with a steady stream of product innovations, such as wireless broadband services and fiber-optic-based TV services."

Doreen A. Toben, chief financial officer of Verizon, sits on the board of The New York Times Company and on its audit committee. Hewitt Associates is the compensation consultant for The New York Times, said Catherine Mathis, a spokeswoman for the Times, but does not handle other business for the company.

Consultants are not alone in driving executive pay. Corporate boards are often composed of other chief executives with an interest in keeping executive pay high. Even though stock exchange regulations require compensation committee members to be independent of the executives whose remuneration they oversee, their connections with those people can run deep.

Verizon's compensation committee, for example, consists entirely of chief executives or former chief executives. Three of the four members sit on other boards with Mr. Seidenberg. When he was on Wyeth's board, Mr. Seidenberg helped set the pay of one member of Verizon's compensation committee, John L. Stafford, previously the chairman and chief executive of Wyeth.

Human resources officials often work closely with the compensation consultants and report directly to the chief executives. Then there are the executives themselves, who have been known to make quiet suggestions to their directors about their pay, according to board members and compensation experts who spoke about their experiences but said they feared retribution if they were identified.

Mutual fund and pension fund managers, too, regularly vote their shares in favor of large grants of stock options or restricted stock.

The potential for conflicts in consulting arrangements can be difficult for outsiders to spot. Even if the consultant is identified, the other work that a consultant's company performs for the compensation client is hard to plumb.

"I wish we could figure out how to flesh out the conflicts that pay consultants have in the same way we were successful in fleshing out the conflicts in Wall Street research," said Richard H. Moore, who as treasurer of North Carolina oversees $70 billion. "This is one of the last pieces that are pure unadulterated conflicts that neither the board nor the shareholder is well served by."

Room for Potential Conflicts

The only reference to Hewitt Associates in any Verizon filing, for instance, is a letter sent by the company to institutional shareholders and attached to a 2004 proxy filing. The letter, written by a Hewitt official, details the supplemental executive retirement plan in response to a shareholder proposal that would have required stockholder approval of any "extraordinary benefits for senior executives" at Verizon.

Last year, Verizon's directors described the compensation adviser as an "independent, outside consultant." In this year's proxy, the word "independent" is missing.

The Securities and Exchange Commission has proposed rules on compensation disclosure that would require compensation consultants to be identified. But the rules would not force companies to disclose details of other services provided by the consulting firm or its affiliates.

http://select.nytimes.com/search/restricted/article?res=F30E15FA35540C738DDDAD089...    7/12/2006

The potential for conflict is reminiscent of that among auditing firms that were performing lucrative consulting services related to information technology and tax issues for the same companies whose financial results they were certifying. When the S.E.C. required companies to disclose how much they were paying in consulting as well as audit fees, the industry was compelled to separate these businesses.

"Auditors' giving companies tax advice while acting as their independent auditors was clearly crossing the line into bad corporate governance in the cases of Enron and Hollinger," said Mr. Hodgson of the Corporate Library. Referring to pay consultants, he added: "The perception has been growing that it is better that there be a clear line of distinction between the people the board hires and the people hired by the corporation."

The Conference Board, a nonprofit organization that conducts research and conferences for business leaders, issued a report in January suggesting, among other practices, that boards hire their own compensation consultants, who have not done work for the company or its current management. The report quoted a former chief justice of Delaware, E. Norman Veasey: "Compensation committees should have their own advisers and lawyers. Directors who are supposed to be independent should have the guts to be a pain in the neck."

But according to consultants and directors, compensation committees typically employ a consultant who also works with a human resources executive, the company's chief executive and the chief financial officer. In many cases, a company's chief executive is present at meetings where the compensation consultant and the human resources executive hash out the terms of a package.

Some compensation committees have started hiring their own pay consultants who do no other work for their companies. James F. Reda & Associates, a small pay consultant in New York, founded in 2004, works with some of the nation's largest companies on executive compensation issues. But such independence is uncommon.

In a comment letter to the S.E.C. on its proposed disclosure rules, Mr. Reda noted that all but one of the nation's large compensation consultants offered other services. "Most diversified H.R. consulting firms earn more on selling other services than on performing compensation consulting services," he wrote.

Hewitt; Watson Wyatt; Towers Perrin; Pearl Meyer & Partners, a unit of Clark Consulting; and Mercer Human Resources Consulting, a unit of Marsh & McLennan, all provide a vast array of services to corporate clients.

Hewitt, for example, conducted mostly actuarial work when it was founded in 1940. Now, it is much more diversified, operating in 31 countries and providing things like investment services. Of the $2.8 billion in revenues at Hewitt in 2005, 71 percent came from its outsourcing business; 29 percent came from its human resources consulting unit.

Typically, only a fraction of a firm's sales come from compensation consulting. Mr. Reda estimates that compensation consulting generates less than 2 percent of a diversified firm's revenues.

Verizon is not the only Hewitt compensation client that uses the firm for actuarial, administrative, investment advice or other services. According to filings with the Labor Department, Hewitt has worn two hats in its work for Boeing, Maytag, Genuine Parts, Procter & Gamble, Toro, Morgan Stanley and Nortel Networks.

Because few companies identify their compensation consultant, this list is by no means comprehensive.

GILDED PAYCHECKS: Troubling Conflicts? Outside Advice on Boss's Pay May Not Be... Page 6 of 9
Case 1:05-cv-04556-1 Document 05-44484-hdd-K9 Filed 07/14/06 Entered 07/14/06 14:59:05 Appendix
Gilded Paychecks Article    Pg 7 of 10

At Verizon, Hewitt is ubiquitous. The company operates Verizon's employee benefits Web sites, where its workers get information about their pay, health and retirement benefits, college savings plans and the like. Labor Department filings show that Hewitt is actuary for three of Verizon's pension plans. Hewitt also performed extensive work for the two companies -- Bell Atlantic and GTE -- that merged to become Verizon in 2000. Immediately after the merger, Verizon employed Hewitt to help it assess overall human resources costs. Over the years, Hewitt's Web site has offered testimonials from Verizon officials about its services.

These multiple relationships are no accident. Hewitt calls its offerings "total human resources solutions" that help clients manage the costs of their work force efficiently.

Towers Perrin, Watson Wyatt and Mercer Human Resources make the same pitch. They contend, as Wall Street firms once did about stock analysts and investment bankers, that potential conflicts can be managed properly. In a working group report written by corporations and consultants last year for the Conference Board, they argued that companies and boards are best served by using a single compensation consultant -- less adversarial and lower cost -- and that the consultant should work closely with the company's management in devising executive pay. This argument was rejected in the Conference Board's subsequent report.

A 'One-Two Punch'

Brian Foley, an executive compensation expert who operates his own independent consulting firm in White Plains and who does not work for Verizon, analyzed Mr. Seidenberg's pay for this article. "If you were a shareholder looking at how Ivan did financially, in terms of new stuff, if you didn't know the facts, you would have sworn they had a really good year," Mr. Foley said. "Bonus up 23 percent and a 40 percent salary increase -- that's a one-two punch in a year when stockholders are down."

According to Verizon's proxy, Mr. Seidenberg received his raises last year in part because the company expanded "its customer base through innovative products in wireless, broadband, data, video and long-distance services," according to the company's proxy statement. In addition, Verizon made significant investments in its network and enlarged its market share. Verizon's annual consolidated operating revenue increased 6 percent, driven by 16.8 percent revenue growth at Verizon Wireless and 10.5 percent revenue growth in wireline data revenues.

Mr. Reed noted that last year Verizon's board canceled 209,660 restricted shares Mr. Seidenberg was to receive. "Ivan and the board have made a series of strategic business choices that are designed to create sustainable long-term shareholder value," he said in an e-mail message. "In 2006, these plans have begun to take root, and our shareholders have begun to benefit accordingly."

But Mr. Foley pointed to several aspects of Mr. Seidenberg's pay that seem out of sync. One is the low level of performance -- beginning at the 21st percentile of other companies -- that generates an incentive stock payout. "If you have 100 companies in the sample, as long as you beat 20 of them you start making money," Mr. Foley said. "That hurdle is so low it's almost embedded in the ground."

Another surprise, Mr. Foley said, was Verizon's contributions to Mr. Seidenberg's retirement plan in recent years. "They've put in almost $6 million in four years in new contributions -- that goes beyond holy cow," he said. "I look at this in the context of all the retrenchment Verizon has made in retiree benefits and medical for the rank-and-file guys." Verizon has frozen future benefits to be paid under Mr. Seidenberg's retirement plan, which had grown to $15.2 million by the end of last year.

Each year that Mr. Seidenberg has been Verizon's chief executive, a shareholder proposal has appeared on the company's proxy that is critical of its executive pay. At this year's meeting, scheduled for May 4, shareholders will vote on a proposal that would require that at least three-quarters of stock option and restricted share grants to executives be "truly performance-based, with the performance criteria disclosed to shareholders."

The company's directors say its incentive pay plans already "provide aggressive and competitive performance objectives that serve both to motivate and retain executives and to align their interests with those of the company's shareholders."

But the Corporate Library study concurred with Mr. Foley in questioning Verizon's practice of paying bonuses even when the company's performance lags well behind that of most companies in its comparison groups. "This is not even logical," the study asserted.

Mr. Reed of Verizon noted that the consultant used by the compensation committee did not certify board actions, "but its perspective -- which board members may or may not agree with -- is one of many inputs considered before the board reaches its independent decision."

On the matter of disclosing the consultant's identity, "We'll continue to look at this issue," he said, "even if the S.E.C. does not adopt new guidelines."

Gary Lutin, an investment banker at Lutin & Company in New York and an adviser in corporate control contests, said: "Paying some friendly consultant $100 million to help you justify the diversion of shareholder wealth to managers is just adding another $100 million to the diversion. If you're really trying to be a responsible director, you'd never rely on an expert who can't be considered objective."

Shareholders Speak Up

Verizon's compensation committee is led by Walter V. Shipley, former chief executive of the Chase Manhattan Corporation, and is made up of Richard L. Carrión, chief executive of Banco Popular de Puerto Rico; Robert W. Lane, chief executive of Deere & Company; and Mr. Stafford, formerly of Wyeth.

None of Verizon's directors agreed to be interviewed for this article.

Many of the Verizon directors who are on its compensation committee have also met Mr. Seidenberg at board meetings of other public companies. At Wyeth meetings, Mr. Seidenberg encounters Mr. Shipley, who is the chairman of Verizon's compensation committee and who is a member of Wyeth's committee, sitting with Mr. Carrión, at least until 2006.

Mr. Seidenberg sees Mr. Stafford when the board of Honeywell International meets. Mr. Stafford is chairman of Honeywell's compensation committee, which includes Mr. Seidenberg.

C. William Jones, the president and executive director of BellTel Retirees, a group of 111,500 people, has had many meetings with Verizon executives to discuss pay.

BellTel Retirees have placed four shareholder proposals relating to executive compensation on Verizon proxies in recent years; the organization has won significant concessions from the company after the proposals attracted shareholder support.

Mr. Jones said Verizon executives had always treated him with respect. But the dialogue stops on the subject of Verizon's consultant. "I spoke to a senior vice president of human resources and said, 'Who is it?'" recalled Mr. Jones, who retired in 1990 with 30 years' service. "He said, 'We have a policy that we do not disclose that information.' I don't know what the secret is."

**Correction:** April 11, 2006, Tuesday A bar graph yesterday in a grouping of charts with a front-page article about Verizon's relationship to the consultant who helped determine the compensation of its chief executive, Ivan G. Seidenberg, carried an incorrect label. The graph showed Mr. Seidenberg's direct annual compensation for the last five years -- consisting of salary, bonus, restricted stock and the cost of perquisites, known as "other pay." It did not show "total compensation," which would also have included stock option grants.

Chart/Photos: "The Compensation Loop"
The chief executive's pay package at Verizon is overseen by four men on the board's compensation committee with the assistance of an unnamed outside consultant. According to people briefed on the arrangement, that outside consultant is Hewitt Associates. As such, Hewitt both recommends Ivan Seidenberg's pay and reaps hundreds of millions of dollars in other consulting work from his management team.

Ivan G. Seidenberg
VERIZON -- Chief executive since 2000 Pay last year: $19.4 million
WYETH -- Current board member, and on compensation committee
HONEYWELL -- Current board member, and on compensation committee

Interlocking Board Members
The men on the compensation committee that is charged with determining fair pay for Verizon's chief executive often encounter each other and Mr. Seidenberg at other board meetings. In addition, all five men belong to an exclusive group: they are current and former chief executives of major companies.

Richard L. Carrión
VERIZON -- Director since '97, pay last year: $196,075*
BANCO POPULAR DE PUERTO RICO -- Current chief executive
WYETH -- Board member 2000-5, and on compensation committee

Robert W. Lane
VERIZON -- Director since '04, pay last year: $200,884*
DEERE & CO. -- Current chief executive

Walter V. Shipley
VERIZON -- Director since '97, pay last year: $206,254*
CHASE MANHATTAN -- Former chief executive 1994-'99
WYETH -- Current board member, and on compensation committee

John R. Stafford
VERIZON -- Director since '97, pay last year: $200,200*
WYETH -- Former chief executive 1986-2001
HONEYWELL -- Current board member, and on compensation committee

Verizon paid about $500 million . . . An estimated cumulative total since 1997

(Hewitt Associates)

... for pay advice and other consulting services.

Mr. Seidenberg's total annual compensation, in millions
2001: $13.4
2002: $9.5
2003: $13.1
2004: $12.8
2005: $19.4

Verizon's stock price

Graph tracks Verizon's stock price since 2001.

* Includes cash, stock, travel insurance premiums and telecommunications equipment.

(Ivan G. Seidenerg photograph by Earl Wilson/The New York Times)

(Sources by company reports; Bloomberg Financial Markets)(pg. A16)

Copyright 2006 The New York Times Company | Privacy Policy | Home | Search | Corrections | Help | Back to Top