**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY SU

July 9, 2006

# Is 'Total Pay' That Tough to Grasp?

### By GRETCHEN MORGENSON

THE Business Roundtable published an 11-year analysis of pay practices at 350 of the nation's largest companies last week, aiming, it said, to set the record straight on executive compensation. Care to guess what this lobbying organization representing 160 chief executives of top United States companies concluded? That pay dispensed to those in the corner office is entirely justified by growth in the shareholder returns at the companies they run.

Using the roundtable's figures, chief executives' compensation — up only 9.6 percent annually from 1995 to 2005 — has not even kept pace with total stockholder returns of 9.9 percent at the companies the executives stewarded during the same period.

"We wanted to try and promulgate a consistent set of facts because a lot of what we have seen in the media on executive pay we felt was misleading," said Thomas J. Lehner, the roundtable's director of public policy, in an interview last week.

It sure is a relief that we can cross off greedy executives from our list of what's ailing America.

But wait. A closer look at the roundtable's data shows that it omitted a tidy pile of pay from its calculation. The study's figure for "total" executive compensation is anything but that.

Brian Foley, an expert in executive compensation who runs his own independent firm in White Plains, examined the roundtable analysis. "It really is disingenuous," he said.

For starters, the total pay figures exclude dividends paid to executives on their restricted stockholdings — not an inconsequential figure, in many cases.

The total shareholder return to which the roundtable compares executive pay does, however, include dividends. Apples and oranges.

The roundtable study also excludes what executives have made by cashing in stock options and restricted stock over the 11 years — enormous numbers, in many cases. Instead, the study counts only the value of the options and restricted stock received by the 350 executives on the dates the awards were made. Hide and seek.

If the stocks underlying these options fell after they were granted, of course, the executives would not have received any value from them. But because the study covers 1995 through 2005, it's a fair guess that executives at these companies exercised boatloads of options and banked huge gains. Ditto for restricted shares.

That the roundtable doesn't consider options and restricted shares to be real money is reminiscent of Silicon Valley executives arguing that options shouldn't be accounted for as an employee cost because their precise value was hard to calculate. Cute, but not credible.

Pension benefits, deferred compensation and money received in severance packages — serious lucre all — are also missing from the roundtable's calculation. Finally, the study's total pay figure includes only the targeted value of all other performance-based cash or stock awards granted executives, in addition to the options and restricted stock already considered. These values, of course, can be much lower than what companies actually dispense. Shell game.

"I can understand why somebody might want to go with that pay-and-performance statistic because the way you control the debate is to control the statistic," Mr. Foley said. "But at a minimum don't you have to go side-by-side with actual numbers? The typical C.E.O., like the typical American worker — when you ask him how much money he earns, he is going to focus on what is either banked or bankable, not on some projection."

Frederic W. Cook, the founding director of a compensation consulting firm based in New York, who is considered to be an authority on executive pay, produced the roundtable's study. He used numbers provided by Mercer Human Resource Consulting, a unit of Marsh & McLennan.

Asked why he excluded dividends on restricted shares from his analysis, Mr. Cook conceded that it did make for an apples-and-oranges comparison. But they were excluded, he said, because not all companies pay them, and because those that do, don't disclose them. He offered a similar rationale about his exclusion of pension, severance and deferred compensation amounts from his analysis: such figures are not found in proxies, he said, so he couldn't include them.

As for using a target instead of an actual value on performance-based awards, Mr. Cook said: "We certainly weren't trying to make the number higher or lower because if the typical plan is three years, the target has a little bit of stretch in it, like a bonus: sometimes it earns more and sometimes less."

Why exclude the mountains of cash generated by executives' stock option exercises over the 11 years? "It's flawed to look at realized gains because they most often represent years of grants," Mr. Cook said. "We felt the critics of executive comp were falling into the trap of using the big gain numbers, which could represent grants earned over multiple years."

But given that the analysis is over 11 years, it seems odd to exclude gains for this reason. Wouldn't amounts earned

in big years even out with those earned in smaller ones?

Given all these omissions, how can Mr. Cook contend that total C.E.O. pay has lagged behind shareholder returns? "I felt it was a fair correlation, based upon the S.E.C. requirements as they now exist," he said.

This is not the first time that Mr. Cook has trotted out these numbers as evidence that executive pay today is both fair and fitting. They were also the basis for his testimony last May before a House Financial Services Committee hearing on executive compensation. "The media has been flooded with a multitude of distorted, misleading and oftentimes erroneous statistics to portray U.S. C.E.O.'s and board governance in a negative light," Mr. Cook said in his testimony. The roundtable recycled those exact, thunderous words in its study last week.

Roundtable members have quite a dog in this executive compensation hunt, of course. The organization's chairman is Hank McKinnell, the chief executive of Pfizer, who will receive an $83 million pension benefit from his company even though its shareholders have suffered losses since he took the helm.

Another knight of the roundtable is Robert L. Nardelli, the $245 million man atop Home Depot, a company whose stock has declined during his term as chief executive. Mr. Nardelli, who ran his company's annual meeting this year like a prison camp commandant, is also chairman of one of the roundtable's task forces: the Partnership for Disaster Response.

Mr. Lehner, who declined to say how much the roundtable paid Mr. Cook for his analysis, said the study was started three or four months ago. That was right around the time that Mr. McKinnell became the target of shareholder outrage over the munificent pay he has received as Pfizer's performance declined.

Despite its claims of setting the record straight on executive compensation, the roundtable's analysis does exactly what it has accused pay critics of doing: picking and choosing numbers to bolster their views. That's fine. Even expected. But will it be the last word?

Not a chance.

Copyright 2006 The New York Times Company

Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Site Map