SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

MOTION TO IMPLEMENT FINAL TRADING
ORDER IN RESPECT OF ACQUISITION OF STOCK BY
<u>HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.</u>

("HARBINGER TRADING MOTION")

    Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, the debtors and debtors-in-possession in the above captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order implementing this Court's Final Order Under 11 U.S.C. §§ 105, 362, and 541 and Fed. R. Bankr. P. 3001 (A) Establishing Notification Procedures Applicable to Substantial Holders of Claims and Equity Securities and (B) Establishing Notification and Hearing Procedures for Trading in Claims and Equity Securities (Docket No. 1780) (the "Final Trading Order") in respect of acquisition of Delphi common stock by Harbinger Capital Partners Master Fund I, Ltd ("Harbinger").  In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.  The Chapter 11 Filings

    1.  On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

    2.  On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in the Debtors' cases.  On April 28, 2006, the Office of the United States Trustee appointed an official committee of equity holders.

2

3.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.  The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure.

B.  Current Business Operations Of The Debtors

5.  Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of approximately $17.1 billion. At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were

3

transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.8 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.

4

Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.  The Debtors' Transformation Plan

11. On March 31, 2006, the Company outlined the key tenets of its transformation plan. The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007. To complete their restructuring process, the Debtors must focus on five key areas. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint. Finally, the Debtors must devise a workable solution to their current pension situation.

12. In connection with the first two elements of the Company's transformation plan, Delphi continues to participate in discussions with its unions and GM. Throughout those discussions, Delphi has consistently communicated a clear message to both its hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and intends to continue to discuss with its unions and

GM ways to become competitive in the Debtors' U.S. operations.  To that end, Delphi, GM and the UAW recently received this Court's approval of a tripartite agreement providing for a special hourly attrition program for Delphi's UAW-represented employees.  This special hourly attrition program could provide as many as 18,000 of Delphi's 23,000 existing UAW-represented long-term hourly employees with "soft landing" through retirement attrition programs and GM flowbacks.  Delphi also hopes to reach agreement on similar hourly attrition programs with its other unions, which could provide as many as 4,500 additional hourly employees with retirement programs or incentives.

    13. These hourly attrition programs constitute an important first step in implementing the Debtors' transformation plan, but will not resolve all of the issues related to Delphi's uncompetitive labor agreements.  Moreover, Delphi has not yet reached comprehensive agreements with its unions and GM.  Therefore, on March 31, 2006, Delphi moved under sections 1113 and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree benefits.  Contemporaneously therewith, the Debtors also moved to reject unprofitable supply contracts with GM.  Among the reasons for the GM contract rejection motion was the Debtors' belief that GM must cover a greater portion of the costs of manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This initial motion covers approximately half of the Debtors' North American annual purchase volume revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the filing of these motions was a necessary procedural step, the Debtors remain focused on reaching a consensual

resolution with all of Delphi's unions and GM before a hearing on the motions is necessary.

14. To implement the third element of the Debtors' transformation plan, the Company announced plans to focus its product portfolio on those core technologies for which the Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth. To that end, the Company will concentrate the organization around the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics, Power Products, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).

15. In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel Bearings. The Company will seek to sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines. The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

16. As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities. The Company believes that once its SG&A plan is fully implemented, the Company should realize savings of approximately $450 million per year in addition to savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.

17. As noted above, the final key tenet of the transformation plan is to devise a workable solution to the Debtors' current pension situation. The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce. To do so, however, it will be necessary to freeze the current hourly U.S. pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of January 1, 2007. Despite the freeze, because of the size of the funding deficit, it will also be necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor, and potentially Congress, to amortize funding contributions over a long-term period. The Company intends to replace the hourly plan (for certain employees) and the salaried plan with defined contribution plans.

18. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality

8

products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

E.  Background

19. On October 8, 2005, the Debtors filed the Motion For Order Under 11 U.S.C. §§ 105, 362, And 541 And Fed. R. Bankr. P. 3001 Establishing Notification Hearing Procedures For Trading In Claims And Equity Securities (Docket No. 29). On October 12, 2005, this Court entered the Interim Order Under 11 U.S.C. §§ 105, 362, And 541 And Bankruptcy Rule 3001 (A) Establishing Notification Procedures Applicable To Substantial Holders Of Claims And Equity Securities And (B) Establishing Notification And Hearing Procedures For Trading In Claims And Equity Securities (Docket No. 126).

20. On January 6, 2006, this Court entered the Final Trading Order. Paragraph 5 of the Final Trading Order requires an Entity[1] (i) that is not a Substantial Equityholder, (i.e., an Entity with Tax Ownership of Stock in excess of 26,499,999 shares) and wishes to purchase or otherwise acquire Tax Ownership of an amount of common stock of Delphi ("Stock") that would cause the Entity to become a Substantial Equityholder and (ii) that is a Substantial Equityholder and wishes to purchase or acquire Tax Ownership of any additional Stock, to file with this Court and serve on the Debtors, their counsel, and counsel for the Creditors' Committee, a Notice of Intent to Purchase, Acquire, or Otherwise Obtain Tax Ownership of Stock (attached as Exhibit 1B to the Final Trading Order) prior to consummation of the acquisition of such Stock. The Final

---

[1] All capitalized terms not defined herein have the meanings ascribed to them in the Final Trading Order.

9

Trading Order generally provides that the Debtors shall have 15 calendar days after receipt of a Notice of Intent to Purchase, Acquire, or Otherwise Obtain Tax Ownership of Stock to object to the proposed acquisition of Stock described in the Notice of Intent to Purchase, Acquire, or Otherwise Obtain Tax Ownership of Stock.

21. Paragraph 4 of the Final Trading Order provides that "[n]o entity may become a Substantial Equityholder without following the procedures set forth in paragraph 5 of [the] Final [Trading] Order." Paragraph 5 of the Final Trading Order sets forth specific restrictions and procedures for trading in Delphi's Stock.

22. Paragraph 9(a) of the Final Trading Order provides that any acquisition of Tax Ownership of Stock in violation of the restrictions and procedures set forth in paragraph 5 of the Final Trading Order shall be void ab initio, and the sanction for such violation shall be the reversal of the noncompliant transaction or such other (or additional) measures as the Court may consider appropriate.

23. Harbinger has represented to the Debtors that:

    (a) On June 1, 2006, Harbinger acquired Tax Ownership of Stock in excess of 26,499,999 shares;

    (b) On June 5, 2006, Harbinger acquired Tax Ownership of additional Stock resulting in a total Tax Ownership of Stock of 32,025,000 shares;

    (c) On June 12, 2006, Harbinger filed a Schedule 13D with the Securities and Exchange Commission disclosing its holdings of Stock; and

    (d) After the Debtors contacted Harbinger regarding the Schedule 13D and the terms of the Final Trading Order on June 14, 2006, Harbinger made no acquisitions or dispositions of Stock after such date.

24. Under the terms of the Final Trading Order, Harbinger's acquisition of Stock in excess of 26,499,999 shares constituted "Noncompliant Purchases." Among other things, Harbinger did not serve upon the Debtors a Notice of Intent to Purchase,

10

Acquire, or Otherwise Obtain Tax Ownership of Stock prior to such Noncompliant Purchases.

25.  Under paragraph 9(a) of the Final Trading Order, the Noncompliant Purchases were void <u>ab initio</u>.  As such, and consistent with paragraph 4 of the Final Trading Order, Harbinger never became a Substantial Equityholder under the Final Trading Order.

26.  Harbinger has represented to the Debtors that it did not receive actual notice of the Final Trading Order and that the Noncompliant Purchases were wholly inadvertent.  The Debtors assert that Harbinger did receive actual notice of the Final Trading Order and that, in any event, Harbinger also received constructive notice of the Final Trading Order.

27.  The Debtors believe that the relief requested in this Motion is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

<u>Relief Requested</u>

28.  By this Motion, the Debtors respectfully request that this Court enter an order, which, <u>inter alia</u>, requires Harbinger to:

(a)  Sell on the open market a sufficient number of shares of Stock it acquired in the Noncompliant Purchases (the "Stock Dispositions"), such that after the Stock Dispositions, Harbinger will hold fewer than 26.5 million shares of Stock. These open market transactions should be organized such that Harbinger has no actual knowledge of the identity of the persons or entity that is to become the beneficial owner of such Stock.  The Stock Dispositions should be completed within 20 days after the entry of this Order.  Harbinger would not be required to file:

(i)  A Notice of Status as a Substantial Equityholder as a result of any Stock Purchase;

(ii)  A Notice of Intent to Purchase, Acquire, or Otherwise Obtain Tax Ownership of Stock as a result of any Stock Purchase; and

11

        (iii)   A Notice of Intent to Sell, Exchange, or Otherwise Dispose of Tax Ownership of Stock as a result of the Stock Dispositions;

        (b)   Donate to one or more organizations described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, any profit Harbinger realizes from the disposition of such Stock; and

        (c)   Not later than 25 days after the entry of the order, file a certificate with this Court confirming its compliance with these procedures and specifically describing the details of each Stock Disposition.  Harbinger would be treated as never having owned the Stock acquired in the Noncompliant Purchases.

29.    Harbinger has represented to Debtors' counsel that these procedures are acceptable to them and that Harbinger will not object to the entry of an order granting the relief requested herein.

## Notice Of Motion

30.    Notice of this Motion has been provided in accordance with the Seventh Supplemental Order under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824).

## Memorandum Of Law

31.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter (a) an order granting this Motion and (b) granting such other further relief as is just.

Dated: New York, New York
July 17, 2006

          SKADDEN, ARPS, SLATE, MEAGHER
            & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr.
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession