Thomas M. Kennedy (TK-0993)
Susan Jennik (SJ-4607)
Larry Magarik (LM-3748)
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place
New York, NY 10003
(212) 358-1500

Omnibus Scheduled Return Date:
July 19, 2006, 10:00 am

**COURTESY COPY**

Attorneys for International Union of Electronic,
Electrical, Salaried, Machine and Furniture Workers,
Communications Workers of America (IUE-CWA)

RECEIVED
JUL 1 3 2006
CLAIMS PROCESSING
USBC, SDNY

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| In re DELPHI CORPORATION, *et al.*, | ) | |
| | ) | 05-44481 (RDD) |
| Debtors. | ) | (Jointly Administered) |

## OBJECTION BY IUE-CWA TO
## SUPPLEMENTAL KECP MOTION

The International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America ("IUE-CWA"), a labor union representing 8,500 hourly employees of Delphi Corporation, *et al.* ("Debtor" or "Delphi"), hereby objects to Debtor's Supplemental Key Employee Compensation Program Motion ("Second KECP Motion") to extend the Annual Incentive Plan ("AIP") program through the second half of 2006. Implementation of the proposed AIP for the second half of 2006 as it is currently proposed would be unnecessary, inappropriate, unsound business judgment, unreasonable and imprudent, and would certainly complicate the collective bargaining negotiations in which the Debtor is engaged with IUE-CWA and other unions, as well as the 11 U.S.C. §§ 1113 and 1114 processes.

Debtors have repeatedly described this proceeding as a labor transformation case. Debtors entered Chapter 11 for the primary purpose of securing the cooperation and agreement of its 34,000 represented workers and their unions to drastically cut these workers' wages and benefits. Two things have happened since the Court's approval of a revised form of the original proposed AIP. First, Delphi's actual performance in the first half of 2006 was far better than originally forecast. The Court asked at the original KCEP hearing if the proposed financial targets were a lay up or a reach. The answer is now obvious: those targets were a slam dunk. The steady state loss projections before the Court at the time of the original hearing were off by hundreds of millions of dollars. The first half of 2006 operating target of ($1,246,000,000) was essentially double the actual rate of loss in that period of approximately $650,000,000. Second, after the AIP was approved for the original group of 467 highly placed executives, Delphi unilaterally extended it to the other 14,000 North American salaried personnel. Without a single attempt to analyze who might need or warrant incentive pay, every salaried Delphi employee in North America was cut in on the deal in the amount of $60 million for 2006 without any apparent consideration as to what the impact might be on the union workers who, in many cases, work side by side with these salaried personnel.

The current motion again seeks approval of an AIP with easily achievable targets. The Second KECP Motion seeks approval to pay out bonuses if Delphi management can keep the operating income losses in the last six months of 2006 to "only" One Billion Five Hundred and Eighty Four Million Dollars ( $1,584,000,000) (See Motion paragraph 9), after having lost less than one half of that amount in the first half of 2006.

The limited factual support offered for this Motion suggests that in the last three years, Delphi has generated more of its annual operating income in the first six months of the calendar year.

But only in 2005 were the losses in the second half of the calendar year anything like what is being

used as the incentive target for the second half of 2006. Based on the performance in the first half

of 2006, the 2005 results are not fair as predictors of future performance.

This Motion also seeks authority to continue the AIP to 2007 after reaching agreement with

the Unsecured Creditors Committee. While the Committee professionals are well meaning, their

diligence in holding Delphi's feet to the fire on issues of professional compensation is informed by

interests that differ from the perspective of the unions. The IUE-CWA urges the Court to continue

to require Delphi to make its case for each six month period in which it chooses to extend its AIP.

The Motion should be denied or deferred until the conclusion of this Chapter 11 proceeding.

## Standard

The proposed Second KECP Motion should not be approved unless the Court finds that it

is "necessary or appropriate to carry out the provisions" of Chapter 11 under 11 U.S.C. § 105(a).

Additionally, since the proposed KECP expenditure, is admittedly outside the "ordinary course of

business," the Court may not approve it without an evidentiary hearing and findings of fact under

11 U.S.C. § 363(b)(1). The burden of proof is upon the Debtor to demonstrate "good business

justification" that the KECP is "necessary to aid the reorganization." **In re Lionel Corp.,** 722 F.2d

1063, 1070 (2d Cir. 1983); **In re Ionosphere Clubs, Inc.,** 100 BR 670, 675 (Bankr. SDNY 1989).

Additionally, Debtor must actually demonstrate good faith in the proposed transaction, **In re M**

**Capital Corp.,** 290 BR 743, 747 (9th Cir. BAP 2003), *cf.* **In re Adams Apple, Inc.,** 829 F.2d 1484

(9th Cir. 1987), particularly here where the proposed compensation package is directed toward

insiders and would amount to self-dealing, **The Official Committee of Subordinated Bondholders**

**v. Integrated Resources, Inc.,** 147 BR 650, 657 (Bankr. SDNY 1992), *appeal dismissed,* 3 F.3d 49

(2d Cir. 1993) (business judgment rule incorporates question of whether proposal is "tainted by self-dealing or manipulation").

Additionally, "Implicit in the grant of authority of 11 U.S.C. § 363(b)(1) . . . is the further requirement that the . . . debtor . . . justify the proposed transaction with sound business reasons in order to satisfy the estate representative's fiduciary duty to the debtor, creditor, and equity holders. Thus, . . . a bankruptcy judge must expressly find from the evidence presented at the hearing a sound business reason justifying the proposed transaction." Bassano, Joseph M., *et al.*, 9B **Am.Jur.2d Bankruptcy** § 1539 (August 2005) and cases cited therein. The Court of Appeals in **In re Lionel Corporation**, *supra* at 1071, rejected a proposed distribution and held that a bankruptcy judge must "expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." **Lionel** held that the critical factor is the impact on a plan of reorganization, and reiterated that the burden of proof is on the debtor in such an application. The District Court in **In re Integrated Resources**, 147 BR 650, 657 (Bankr. SDNY 1992), explained that a Court should itself assess the merits and fairness of a business transaction such as this one involving a management proposal in which the corporation's executives have direct financial interests. In the context of proposed payments to the top corporate insiders, "good faith" is a necessary element of inquiry, 2C **Bankr. Service L.Ed** (September 2005) § 20:119 and cases cited therein; **In re Gucci**, 126 F.3d 380, 390 (2d Cir. 1997).

Finally, "[i]t is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process." **In re Momentum Mfg. Corp.**, 25 F.3d 1132, 1135 (2d Cir. 1994); Norton, William L., 1 **Norton Bankr. L. & Prac. 2d** § 4:5 (July 2005); **In re Charles & Lillian Brown's Hotel Inc.**, 93 BR 49, 54 (Bankr. SDNY

1988); **In re Amarex Inc.**, 30 BR 763, 767 (Bankr. W.D. Okla. 1983) (Bankruptcy Court is a court of equity which may, in its discretion, deny even that relief which is within its power to grant based on equitable principles.)

The Second KECP Motion does not meet these standards and should be denied or deferred for the following reasons:

<u>Objections</u>

1.  **Approval of the Second KECP Motion Will Complicate Successful Collective Bargaining with Debtor's Workers' Unions and Hinder Creation of a Viable Reorganization Plan.**

Approval of an AIP which offers 467 top executives millions of dollars in bonus money for hitting easily obtainable operating income targets will anger, humiliate and alienate 34,000 Delphi represented workers and interfere with their unions having any reasonable chance to negotiate modifications in their collective bargaining agreements with Debtor. To this point the attrition programs that have been negotiated by the unions have not been subject to employee ratification votes because they were voluntary programs that did not amend existing collective bargaining contracts. In the current round of collective bargaining, Delphi seeks to modify existing contracts to drastically lower wages and benefits. Any agreement the Unions reach on those terms will be expressly subject to membership ratification. Granting the Motion will antagonize these workers, destroy their morale, turn them against any meaningful concessions, and thwart the very 11 U.S.C. §§ 1113 process on which Debtor focuses the Chapter 11 proceeding. The Motion will, therefore, not aid, but defeat the possibility of a reorganization plan.

For just this reason, the Court denied a similar motion in **In re Geneva Steel Company**, 236 BR 770 (Bankr. D. Utah 1999). In **Geneva**, as here, Debtor did not consult with any of its Unions

-5-

while formulating a retention program for a small group of top executives, *id.* at 773, n.4. In denying

the Motion, the Court stated in terms ringingly applicable here:

> While there is evidence that retention of the key employees is critical
> to Geneva's survival, there is also evidence that granting the Motion
> as prayed may jeopardize the continuing support of the Steelworkers
> in Geneva's reorganization process. Indeed, evidence was presented
> that some plumbers and electricians have already left Geneva's
> employment. The court views the support and participation of the
> Steelworkers as being equally critical to Geneva's successful
> reorganization as the support and participation of the key employees.
> The tension created by these opposing interests creates a significant
> dilemma for the court. To deny the Motion in full increases the risk
> that Geneva's management team may be lost or further reduced.
> However, to grant the Motion in full risks alienating the Steelworkers
> and their support of Geneva's efforts to reorganize. In an effort to
> fashion a compromise between these competing interests, the court
> will comment on the relative merits of the proposed retention
> program and invite Geneva to renew its Motion if it so desires.

*Id.* at 773.

Without a successful § 1113 process, there can be no effective reorganization plan, so the

Motion must be denied. The prerequisite for approving such a Motion is a finding that it would

"help develop a reorganization plan," **In re Bethlehem Steel Corp.**, ___ F.Supp.2d ___, 2003 WL

21738964 at *11 (SDNY 2003), which is impossible here. In **Bethlehem Steel**, the Court approved

financial professionals' fees so the unions could intelligently bargain and participate in discussions

concerning the restructuring of the debtor, including negotiations regarding possible modifications

to their existing labor and benefits agreements. Here, however, Debtor seeks approval for an act that

will not help develop a reorganization plan because the proposed expensive compensation increases

for its key executives will prejudice meaningful negotiations with the unions.

The Affidavit of Henry Reichard ("Reichard") submitted in response to the first AIP proposal detailed the ways in which implementation of an AIP will undermine the collective bargaining process. Reichard concluded:

> The process of negotiating a concessionary agreement is, under the best of circumstances, extremely difficult. What I have learned is that it takes cooperation, a feeling of shared sacrifice, and the perception that "everyone is in the same boat" to have a chance of success. The KECP Program will make this process impossible. Based on this, I urge the Court to reject the KECP Program. Unless rejected or seriously modified, it will be an insurmountable hurdle to the IUE reaching an agreement with Delphi to modify the collective bargaining agreement. It will make it impossible for the IUE to reach such an agreement, will make it impossible for the IUE to recommend that the members vote to accept such an agreement, it will make it impossible for such an agreement to be ratified, and will make it far more likely that the workers would strike if the current agreement is rejected.

Reichard Affidavit, ¶ 19.

## 2.    The Motion Should Be Deferred to the End of Chapter 11 Proceeding.

The Motion, which seeks to reward executives for carrying through a successful Chapter 11 reorganization, should be denied or deferred to the end of the Chapter 11 proceeding. Pegging these bonuses to easily reached targets turns this program into a simple KERP retention plan in which executives are rewarded for the mere act of breathing. A successful conclusion to the Chapter 11 process is the logical prerequisite for a bonus or reward. That is especially true now when the Debtor has stated it expects to exit the Chapter 11 proceeding in 2007. Bonuses under the proposed second half 2006 AIP would not be paid until early 2007 in any event. There is no need to further compensate these executives in 2007 when they plan to be out of Chapter 11 in 2007 and can set their own compensation programs in accord with their reasonable business judgment at that time.

The court in **In re US Airways Inc.**, 329 BR 793, 801 (Bankr. E.D. Va. 2005) refused to approve a program for key executives prior to confirmation of a merger plan, and only approved a bonus program for lower-level management employees <u>after</u> collective bargaining negotiations under § 1113 were successfully completed.

Moreover, the continuation of the AIP will become relevant in a Section 1113 or 1114 process, including the questions as to whether the Debtor's proposal assures that all parties are treated "fairly and equitably"; see 11 U.S.C. § 1113(b)(1)(A); **In re Jefly, Inc.**, 219 BR 88, 93-94 (Bankr. E.D. Pa. 1998). In this case, the reorganization plan may be dependent on the § 1113 process. The Court should certainly defer this Motion until after the §§ 1113 and 1114 proceedings are resolved or completed.

3.    **The Motion is Neither Necessary, Appropriate Nor Sound Business Judgment, But is Arbitrary and Unreasonable.**

The Motion is neither necessary, appropriate nor the exercise of sound business judgment. Rather, it is selfish, arbitrary and unreasonable. The shortsightedness of the original KECP Motion was given eloquent expression in a timely article, Morgenson, Gretchen, "Oohs and Ahs At Delphi's Circus," *New York Times Sunday Business*, November 13, 2005, Section 3, pp. 1 and 4, 2005 WLNR 18334017, which began as follows:

> It's not every day that investors can view the contortions performed by compensation consultants trying to justify the monster executive pay packages that they recommend to corporate clients. And when these exercises in absurdity are done for executives asking for great sacrifices from workers, retirees, creditors and former shareholders because they manage a company in Chapter 11 bankruptcy protection, the entertainment is unmatched.

-8-

The Motion is sparse and provides little support for its assertions. Among the inconsistencies in the Motion's premises and reasoning are the following:

– The Motion at Paragraph 2 assumes but does not establish that all of the Delphi executives (and by extension all of its salaried work force) are paid below market. Delphi has not met its burden of establishing this fact.

– The Motion at Paragraph 4 states that the incentive targets in the first half of 2006 were designed to provide Delphi executives with an appropriate incentive to perform at a high level. In fact, it is now clear that Delphi's financial performance <u>by the time the program was approved in March, 2006 by the Court was already demonstrating that the first half targets would be met</u>. Since the top executives must have known of this early satisfaction of these incentive goals, the program itself offered little additional incentive for high level performance once its easily obtainable goals were met.

– The Motion contends that Delphi is a moderately seasonal business in which its operating income is higher in the first half of the year. First, this fact suggests that the Debtor should have proposed a yearly plan in the first place. Second, the use of a foreshortened "x" axis on the graphs at paragraphs 7 and 8 of the Motion visually suggests that the difference in net sales and operating income in the first and second halves of the year is dramatic but the actual numbers (which are mysteriously absent from this account) shows only a modest difference in net sales (2003, $1.425 Billion vs $1.38 Billion; 2004, $1.5 Billion vs. $1.36 Billion; 2005 $1.38 Billion vs $1.31 Billion). Further, while there is a slightly larger difference in operating income in the years shown, the accompanying footnote reveals that those figures do not include adjustments for restructuring, asset impairment or other one time charges so they are essentially meaningless as future predictions. The

-9-

timing of a one time charge in those years could have (and probably did) heavily impact the second half results.

Any claim of "business necessity" for this disguised KERP is belied by the actual history of executive retention programs, as detailed by Keach, Robert J., "The Case Against KERPs," American Bankruptcy Institute 2003 Annual Spring Meeting, 041003 ABI-CLE 9 (2003). The empirical evidence establishes that there is no evidence that executive retention programs actually result in the retention of employees who would otherwise leave, while there is considerable evidence to the contrary. These programs do not work better than cheaper alternatives and are often unnecessary. They are upside down, because in fact the senior-most executives are the most replaceable. Executive retention programs have a negative impact on employee morale, and breed a lack of faith in and lack of respect for the bankruptcy system, the study found.

In short, the Second KECP Motion is unreasonable and aimed at feathering the nests of Debtor's key insiders. The bottom-line question is why Debtor's top executives should not face the same choice and same risks as are being posed to all of Debtor's other employees.

**Conclusion**

For the foregoing reasons, the Motion should be denied or deferred until the completion of the Chapter 11 proceeding.

Dated: New York, New York
     July 12, 2006

Respectfully submitted,

Thomas M. Kennedy (TK-0993)
Susan M. Jennik (SJ-4607)
Larry Magarik (LM-3748)
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place
New York, NY 10003
(212) 358-1500

-10-

## AFFIDAVIT OF SERVICE

State of New York     )
                         ) ss.:
County of New York    )

       Joan Esposito, being duly sworn, deposes and says that: I am not a party to the action, am

over 18 years of age, and reside in Kings County, New York. On July 12, 2006, I served the

within Objection by IUE-CWA to Supplemental KECP Motion by mailing a copy via overnight

mail to the following:

> Robert J. Rosenberg, Esq.
> Latham & Watkins LLP
> 885 Third Avenue, Suite 1000
> New York, New York 10022-4834
>
> Alicia Leonhard, Esq.
> U.S. Department of Justice
> Office of the United States Trustee
> 33 Whitehall Street, 21st Floor
> New York, New York 10004-2111
>
> Kayalan A. Marafioti, Esq.
> Thomas J. Matz, Esq.
> Skadden, Arps, Slate, Meagher & Flom, LLP
> 4 Times Square
> New York, New York 10036
>
> Delphi Corporation
> c/o Sean Corcoran and Karen Craft
> 5725 Delphi Drive
> Troy, MI 48098-2815
>
> John W. Butler, Jr.
> John K. Lyons
> Ron E. Meisler
> Nick D. Campanario
> Skadden, Arps, Slate, Meagher & Flom, LLP
> 333 West Wacker Drive, Suite 2100
> Chicago, Illinois 60606
>
> Jessica Kastin
> O'Melveny & Myers LLP
> Times Square Tower
> 7 Times Square
> New York, NY 10036

# KENNEDY, JENNIK & MURRAY, P.C.

### ATTORNEYS AT LAW

THOMAS M. KENNEDY
SUSAN M. JENNIK
THOMAS M. MURRAY
OF COUNSEL:
LARRY MAGARIK

113 UNIVERSITY PLACE
NEW YORK, NEW YORK 10003
(212) 358-1500
* * *
FACSIMILE (212) 358-0207

ELIZABETH M. PILECKI (NJ, MA)
RACHEL A. KIRTNER (OR)
RICHARD A. MAROKO
OMAR JOSEPH
(MA ONLY)

July 12, 2006

**BY UPS OVERNIGHT MAIL**
Honorable Robert Drain
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green
New York, NY 10004

Re:   Delphi Corporation, et.al.
      Case No 05-44481(RDD)

Dear Judge Drain:

Enclosed please find a courtesy copy of an Objection by IUE-CWA to Supplemental
KECP Motion in the above referenced matter, which was electronically filed today.

Very truly yours,

Thomas M. Kennedy

TMK:je
enc.