**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Email: robert.rosenberg@lw.com
       mitchell.seider@lw.com
       mark.broude@lw.com

**Hearing Date:**
August 17, 2006 at 10:00 a.m.

**Objection Deadline:**
August 10, 2006 at 4:00 p.m.

Counsel for The Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Delphi Corporation, et al., | Case No. 05-44481 (RDD) |
| Debtors. | Jointly Administered |

### MOTION FOR AN ORDER AUTHORIZING THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PROSECUTE THE DEBTORS' CLAIMS AND DEFENSES AGAINST GENERAL MOTORS CORPORATION AND CERTAIN FORMER OFFICERS OF THE DEBTORS

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Delphi Corporation ("Delphi") and certain of its affiliates (collectively, the "Debtors"), by and through its undersigned counsel, hereby moves this Court for entry of an order authorizing the Committee to prosecute the Debtors' claims and defenses against General Motors Corporation ("GM"), as well as certain former officers of the Debtors (collectively, the "Defendants"), as more fully described herein. In support of this motion (the "Motion"), the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.    Following its formation in these chapter 11 cases, the Committee began to
investigate GM's involvement in the Debtors' business affairs.  Based on information now
known to the Committee, it is evident that GM improperly used the spin-off of the Debtors in
1999 (the "Spin-Off") to divest itself of its underperforming automotive parts division and the
substantial labor, pension and benefits liabilities related to that division by causing the Debtors to
assume billions of dollars in GM obligations and to enter into transactions for the benefit of GM,
at the expense of the Debtors and their creditors.  Following the Spin-Off, GM, with the
assistance of certain former officers, continued to dominate and control the Debtors for GM's
benefit, at the expense of the Debtors and their creditors.

2.    The Committee strongly believes that the Defendants' conduct leading up to and
following the Spin-Off gives rise to significant affirmative claims of the Debtors against them, as
well as significant defenses and objections to any claims the Defendants may assert against the
Debtors (collectively, the "Claims and Defenses").  The Claims and Defenses are valuable assets
of the Debtors' estates because they may well support the recapture of billions of dollars in
payments and avoidance of obligations the Debtors were forced to undertake or incur for GM's
benefit.  The Claims and Defenses also may well reduce the amount or priority of, or otherwise
eliminate, certain of the Defendants' claims against the Debtors.  Successful prosecution of the
Claims and Defenses will increase dramatically the payout to unsecured creditors in these cases.
The Committee has prepared a draft complaint (the "Complaint") setting forth the Claims and
Defenses against the Defendants of which the Committee was aware at the time the draft was
provided to the Debtors.[1]  For the reasons set forth below, the Committee requests authority in its

---

[1] See footnote 4 below.

discretion to file, serve and prosecute on behalf of the Debtors' estates the Claims and Defenses

raised in the Complaint, as well as all other rights and remedies of the estates against the

Defendants arising from or related to the Claims and Defenses.

## JURISDICTION

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 1103(c)(5),

1107(a) and 1109(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the

"Bankruptcy Code").

## BACKGROUND

5.      On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this

Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On October 14,

2005, the three remaining Debtors also filed voluntary petitions.

6.      The Committee was appointed nine days after the Petition Date, on October 17,

2005.[2]  Shortly thereafter, the Committee selected Latham & Watkins LLP as its counsel,

Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. as its

investment banker.

7.      Following its formation in these chapter 11 cases, the Committee began to

investigate GM's involvement in the Debtors' business affairs.  Among other things, the

---

[2]   The following members originally were appointed to the Committee: (a) Capital Research and Management
Company; (b) Electronic Data Systems Corp.; (c) Flextronics International Asia-Pacific, Ltd.; (d) Freescale
Semiconductor, Inc.; (e) General Electric Company; (f) IUE-CWA and (g) Wilmington Trust Company, as
Indenture Trustee.  Flextronics International Asia-Pacific, Ltd., has resigned from the Committee, and Tyco
Electronics Corporation has since been appointed to the Committee.  The Pension Benefit Guaranty Corporation and
the UAW have been added as ex officio members of the Committee.

investigation has involved gathering and reviewing documents. On March 24, 2006, the

Committee filed a motion for an order compelling the production of documents by GM pursuant

to Rule 2004 of the Federal Rules of Bankruptcy Procedure. By Stipulation and Agreed Order

entered by the Court on April 11, 2006, the Committee and GM agreed that the Committee was

authorized to seek the production of documents from GM and that GM would produce

documents, subject to further negotiation and agreement between the Committee and GM (the

"2004 Order"). The Committee and GM agreed upon the terms of a protective order for GM's

production. On May 30, 2006, GM produced to the Committee a few thousand pages of

documents pursuant to the 2004 Order. However, many of these documents are redacted, are

publicly available or have been previously provided to the Committee. While some subsequent

production has been made, GM has not responded to most of the Committee's document

requests.

8.    On March 28, 2006, the Debtors filed a motion for approval of a Joint Interest

Agreement between the Debtors and the Committee to govern, among other things, the Debtors'

production of confidential or privileged information to the Committee regarding ongoing

investigations of the Debtors, including investigations by the Securities and Exchange

Commission. By order entered on April 18, 2006, the Court approved the Joint Interest

Agreement and related procedures (the "Joint Interest Order").

9.    Based on information in the public record and information produced by the

Debtors under the Joint Interest Order, the Committee determined that the Defendants' conduct

leading up to and following the Spin-Off gives rise to the Claims and Defenses. The Committee

further determined that the Claims and Defenses are very significant assets of the Debtors'

estates, and should be asserted against the Defendants by or on behalf of the Debtors. To this

end, on May 11, 2006, the Committee delivered to the Debtors' Board of Directors a letter (the

"Demand Letter") informing them of the existence of certain Claims and Defenses against GM

and requesting that the Debtors take prompt legal action to pursue them.  A copy of the Demand

Letter is attached hereto as Exhibit A.[3]  The Committee also requested the Debtors' consent to

the Committee's pursuit of these Claims and Defenses against GM on their behalf, in the event

the Board determined not to do so.

     10.     Subsequently, on May 17, 2006, the Committee delivered to the Debtors' Board

of Directors the draft Complaint asserting the Claims and Defenses against GM described in the

Demand Letter, as well as additional Claims and Defenses against certain individual defendants.[4]

A copy of the Complaint is attached hereto as Exhibit B.[5]  Following its delivery of the

Complaint, the Committee provided the Debtors with an annotated version of the Complaint

substantiating each factual assertion made therein by reference to the Debtors' documents, public

statements and sworn testimony of their officers.  Importantly, every single factual allegation in

the Complaint is based on either publicly available information or information that the Debtors

provided to the Committee.  Thus, all of the factual bases for the Claims and Defenses asserted

in the Complaint were known to the Debtors before they were known to the Committee.  On July

26, 2006, the Debtors formally communicated their denial of the Committee's request to pursue

the Claims and Defenses on behalf of the Debtors' estates.

---

[3]  The Demand Letter contains highly confidential information.  By order dated July 27, 2006 (the "Seal Order"), Judge Gerber, in this Court's absence, authorized the Committee's filing of the Demand Letter under seal.

[4]  The Claims and Defenses that are set forth in the Complaint that the Committee delivered to the Debtors on May 17, 2006 constitute only those Claims and Defenses of which the Committee was then aware.  Through further investigation and through discovery of the Defendants, the Committee may discover related Claims and Defenses against the Defendants.  The Committee hereby also is seeking authority to assert those Claims and Defenses of which the Committee is not yet aware.

[5]  The Complaint also contains highly confidential information and, pursuant to the Seal Order, Judge Gerber, in this Court's absence, authorized the Committee's filing of the Complaint under seal.

11.    The Committee anticipates that the Debtors might oppose the Committee's request for authority to prosecute the Claims and Defenses against GM, asserting that the Committee's action will jeopardize their ongoing negotiations with GM, their commercial relationship with GM, and GM's participation in the Debtors' restructuring. This argument should fail. The Committee, which represents the Debtors' principal financial stakeholders, is acutely aware of the importance of the relationship between the Debtors and GM, and of GM's essential role in the Debtors' reorganization. As a fiduciary for all unsecured creditors, however, the Committee has a unique responsibility to limit the amount of any claims that GM is able to impose upon the Debtors' estates to compensate it for its participation in addressing the Debtors' employee-related liabilities inherited from GM. The Committee is likewise obligated to maximize the recoveries the unsecured creditors may obtain from the Debtors by seeking to recoup from GM the massive sums that have already been paid by the Debtors since the Spin-Off on account of those same liabilities. The Committee is concerned that the Debtors will assert events in these chapter 11 cases as grounds to stymie prosecution of the Complaint. This would deprive unsecured creditors of the full value of the Claims and Defenses.

12.    The Debtors, by contrast, already have taken incremental steps to blunt the full impact of the Claims and Defenses on GM. In particular, the Debtors and GM have been negotiating the terms on which the Debtors will compensate GM for its participation in restructuring the Debtors' obligations to their unionized workforce.[6] The Debtors and GM consistently have excluded the Committee from their discussions and negotiations. As a result of these discussions, the Debtors have already begun limiting their rights against GM and seeking to have GM's claims against the Debtors allowed. To date, as more fully discussed below,

---

[6] As described and demonstrated in detail in the Complaint, GM created these obligations, engineered the Debtors' liability for them and is responsible and liable for the Debtors' inability to perform their obligations.

pursuant to attrition programs this Court approved with two unions, the Debtors have restricted

their rights to object to, or have permitted the allowance of, GM claims related to these programs

which could total billions of dollars. Current and subsequent discussions and negotiations

between GM and the Debtors, from which the Committee has been excluded, promise to have an

even more deleterious impact on unsecured creditors' recoveries. While the Debtors have

committed to consult with the Committee on any global deal with GM, consultation is simply

insufficient to allow the Committee to protect the interests of its constituency. A full seat at the

table is required.

13.    On March 22, 2006, the Debtors filed their Motion for Order under 11 U.S.C. §

363(b) and Fed. R. Bankr. P. 6004 Approving Debtors' Human Capital Hourly Attrition Program

("Attrition Program Motion No. 1"), pursuant to which they sought and ultimately obtained

approval of an attrition program with GM and the International Union, United Automobile,

Aerospace and Agricultural Implement Workers of America (the "UAW"), which provided in

part that (a) certain of the Debtors' UAW-represented employees would receive monetary

incentives to retire and (b) GM would accept 5,000 "flow back" active employees from the

Debtors. Employees who accepted the incentives to retire were given the opportunity to "check

the box" and transfer to GM for purposes of retirement, and GM would assume the OPEB

obligations for those retirees and the flowback employees. The Debtors agreed, on behalf of

themselves and all other parties in interest, that GM would be permitted to assert a claim against

the Debtors under the following three prepetition agreements in connection with the OPEB

obligations it assumed: (a) the U.S. Employee Matters Agreement between GM and Delphi, (b)

the Master Separation Agreement dated December 22, 1998 among GM, Delphi and certain of

Delphi's subsidiaries and (c) Delphi's agreement to indemnify GM for obligations it incurs under

a benefit guarantee between GM and the UAW.[7] The Debtors gave GM the right to assert claims

under these agreements, despite the fact that the Debtors acknowledged that these prepetition

agreements do not actually comprehend GM claims under the attrition program. Thus, the

Debtors waived for themselves and all other parties in interest the ability to assert a meritorious

defense to GM's claims.[8]

14.    On or about June 19, 2006, the Debtors filed the Motion for Order Under 11

U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 Approving (I) Supplement to UAW Special Attrition

Program, and (II) IUE-CWA Special Attrition Program ("Attrition Program Motion No. 2"),

pursuant to which they sought and ultimately obtained approval of an attrition program with GM

and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers–

Communications Workers of America (the "IUE"), as well as a supplemental attrition program

with GM and the UAW. Under both of these programs, the Debtors offered eligible UAW-

represented and IUE-represented employees buyout payments of $40,000, $70,000 or $140,000

in exchange for the employees' agreement to sever all ties with Delphi and GM except for vested

pension benefits. GM would fund one-half of the buyout payments. The Debtors agreed that

GM would receive an allowed claim in the aggregate amount of all buyout payments GM

actually pays under the programs. This means that no party, including the Committee, would be

---

[7] Under the attrition programs, the Debtors agreed to provide $35,000 to each of their retirement-eligible UAW-represented and IUE-represented employees who agree to leave the Debtors' employ. GM funded the Debtors' obligation to make these $35,000 payments. Though GM would not be able to assert a claim on account of those $35,000 payments under the terms of the attrition program, the Debtors acknowledged that GM would request, and probably would receive, *quid pro quo* consideration from the Debtors in the future.

[8] Pursuant to the U.S. Employee Matters Agreement, once it receives a flowback employee from the Debtors, GM would administer that employee's future post-employment health care and life insurance benefits. GM's OPEB obligation for each employee would consist of ongoing periodic payments for the employee's lifetime. Under the U.S. Employee Matters Agreement, however, GM's cost of these benefits for each flowback employee's lifetime is calculated using actuarial assumptions. The present value of that cost is then billed and is payable to GM in a lump sum. As such, the Debtors' payment obligation to GM under the U.S. Employee Matters Agreement with respect to OPEB obligations for the 5,000 flowback employees and the check the box retirees is accelerated and fixed, and could be in the billions of dollars.

permitted to challenge the allowance, amount or priority of GM's claim for such payments in the

future. In addition, IUE-represented employees who agree to retire under the attrition program

would be permitted to check the box and transfer to GM for purposes of retirement. The Debtors

agreed to waive their right to object to the allowance of any claim GM may assert for the OPEB

obligations they assumed for the IUE-represented retirees who check the box. Moreover, the

Debtors agreed to preclude any party in interest from objecting to GM's OPEB claim on the

ground that there is no contractual basis for such claim under the Master Separation Agreement,

even though the Debtors acknowledged that the Master Separation Agreement does not provide a

basis for such a claim.

15.    In its limited objection to the Debtors' Attrition Program Motion No. 2, the

Committee requested authority to prosecute the Claims and Defenses on behalf of the Debtors

for the limited purpose of reducing or eliminating claims of GM arising from the attrition

programs. Because the request was raised defensively, the Committee did not seek to pursue all

of the Claims and Defenses at that time. During the June 29, 2006 hearing on Attrition Program

Motion No. 2, this Court recognized the speed at which these cases are proceeding and that the

Debtors' defenses to GM's claims under the attrition programs should be examined and

disclosed in connection with the Debtors' settlement of labor issues. This Court stated that

"given the schedule that this case is under, [this is a matter that the Committee] . . . should just

discuss promptly with the debtor[s] ... and if something could not be resolved then, . . . [the

Committee] can make a motion [for authority to prosecute the Debtors' Claims and Defenses

relating to the attrition programs]." Transcript of June 29, 2006 Hearing at 76:9-77:1.

16.    However, the Committee has concluded that limiting its pursuit of the Claims and

Defenses to defending against GM's claims arising under the attrition programs is not sufficient

to protect the interests of unsecured creditors in maximizing recovery on the Claims and
Defenses. Accordingly, on July 12, 2006, the Committee sent to the Debtors a proposed
stipulation for broad authority to pursue not only the Claims and Defenses relating to GM's
claims arising under the attrition programs, but also all of the Debtors' Claims and Defenses
against the Defendants. The Debtors did not agree to execute the Stipulation.

17.    The Debtors have made it incumbent upon the Committee to seek authority at this
time to prosecute the Claims and Defenses against the Defendants. The Debtors received the
Complaint more than two months ago yet only two days ago informed the Committee that they
will neither pursue the Claims and Defenses at this time nor consent to the Committee's pursuit
of them on the Debtors' behalf. In the meantime, the Debtors have demonstrated that they will
not hesitate to diminish the value of the Claims and Defenses on a piecemeal basis.

18.    The Claims and Defenses against the Defendants are valuable estate assets that
must be preserved and fully realized. The active pursuit of the Claims and Defenses may allow
for the recovery of billions of dollars in payments the Debtors made to GM, and may permit the
Debtors' estates to avoid the obligations that they were forced to undertake or incur for GM's
benefit. The active pursuit now of the Claims and Defenses may also reduce the amount or
priority of, or otherwise eliminate, claims of the Defendants against the Debtors.

19.    The Committee has a fiduciary obligation to the Debtors' unsecured creditors to
examine and pursue the Claims and Defenses in a manner that maximizes their value if the
Debtors refuse to do so. In light of the amount of time that has passed and the Debtors' actions
and inaction since receiving the Demand Letter and the Complaint, the Committee should now
be authorized to file the Complaint and to prosecute the Claims and Defenses in its discretion.

20.    In this Motion, the Committee is not seeking to usurp or undermine the Debtors'

obligation to seek to mediate intercreditor disputes.  Rather, the Committee files this Motion to

obtain the authority the Committee has determined, in its judgment, it must have to protect the

interests of all unsecured creditors in maximizing the value of the Claims and Defenses.

Maintaining the value of the Claims and Defenses requires the full and forceful assertion of the

Claims and Defenses in negotiations with GM over an agreement or agreements with GM

regarding GM's participation in resolving the Debtors' obligations to their unionized workers.

The ongoing exclusion of the Committee from the Debtors' negotiations with GM of such

agreements degrades the value of the Claims and Defenses by allowing GM and the Debtors to

compromise or otherwise limit the Claims and Defenses without the Committee's participation.

Updates, briefings and reports from the Debtors on their discussions with GM, and even the

consultation to which the Debtors have committed without a seat at the table, are insufficient to

properly protect the interests of unsecured creditors in receiving full value from the Claims and

Defenses.  Obtaining the authority requested in this motion will protect the interests of unsecured

creditors in making sure the value of the Claims and Defenses is fully utilized as it will insert the

Committee in the negotiations with GM.

21.    Indeed, the purpose of the requested authority is not actually to file the Complaint at

this time.  Rather, the purpose of the requested authority is to ensure that the Committee, on

behalf of all of the Debtors' unsecured creditors, has a seat at the table in the negotiations that

are currently taking place between the Debtors and GM with respect to GM's contributions to,

and claims in respect of, the Debtors' "transformation."  Having this seat is essential to

accomplish what both the Committee and GM have stated to be their preferred outcome of those

negotiations – a global settlement among GM, the Debtors and the Committee.  This goal is

11

apparently not shared by the Debtors, who have to date been excluding the Committee from all

negotiations with GM, while reaching piecemeal agreements with GM under which the Debtors

have been agreeing to allow certain GM claims and to waive defenses to other GM claims. The

commitment to consult with the Committee - at best with descriptions of discussions, and at

worst after a deal is reached with GM - is not the same as a seat at the table; the Committee

would still have no meaningful input into the terms of that deal. The current path down which

the Debtors are taking the negotiations with GM will almost certainly lead to a protracted and

potentially damaging litigation with the Committee; on the other hand, if the Committee is

granted the relief requested in the Motion for Authority and is given a seat at the table, the

Committee firmly believes that the result will be accelerated negotiations with a substantially

greater opportunity for a mutually acceptable result.

## THE ESTATES' CLAIMS AND DEFENSES AGAINST THE DEFENDANTS

22.    The Claims and Defenses of which the Committee currently is aware, as well as

the factual allegations in support of them, are summarized in the Demand Letter and are

discussed in detail in the Complaint. See Exhibit B. The Claims and Defenses are more than

colorable and are not repeated herein. Moreover, through further investigation and through

discovery of the Defendants, the Committee may discover yet more Claims and Defenses against

the Defendants.

## RELIEF REQUESTED

23.    By this Motion, the Committee seeks entry of an order authorizing it in its

discretion to file, serve and prosecute on behalf of the Debtors' estates the Complaint, as it may

be amended, against the Defendants, and authorizing it in its discretion to file, serve and

prosecute all other actions, objections and rights against the Defendants arising from or related to

the Claims and Defenses that are property of the estates.[9]

## BASIS FOR RELIEF

### A.    Applicable Legal Standard

24.    Section 1107 of the Bankruptcy Code provides that a debtor in possession shall

perform all of the functions and duties of a trustee serving in a chapter 11 reorganization and

that, among these duties, are the duties to collect property of its estate, examine proofs of claim

and object to the allowance of any claim that is improper. See 11 U.S.C. § 1107(a).  Property of

the estate includes "all legal or equitable interests of the debtor," and these interests include all

causes of action belonging to the debtor at the time the case is commenced. See 11 U.S.C. §

541(a)(1); In re S.I. Acquisition, Inc., 817 F.2d 1142, 1149 (5th Cir. 1987).  Moreover, a debtor

is obligated to maximize the value of its estate for the benefit of its creditors. See, e.g.,

Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 352 (1985) ("The trustee is

'accountable for all property received,'. . . and has the duty to maximize the value of the estate").

Accordingly, a debtor is duty bound to pursue claims and defenses that will increase the value of

its estate. See, e.g., In re Commodore International Ltd., 262 F.3d 96, 99 (2d Cir. 2001) ("The

[debtor in possession] has an obligation to pursue all actions that are in the best interests of

creditors and the estate."), citing In re Spaulding Composites Co., 207 B.R. 899, 904 (B.A.P. 9th

---

[9] The Committee hopes the Claims and Defenses can be negotiated with GM and other parties without the
instigation of litigation.

Cir. 1997); Louisiana World Exposition v. Federal Insurance Co., 858 F.2d 233, 249 (5th Cir.

1988) ("If a valid and potentially profitable cause of action exists . . . which the debtor-in-

possession may assert on behalf of the corporation, *all* creditors are harmed when the debtor-in-

possession refuses to pursue it. The value of the estate is not maximized and the ultimate

recovery of all creditors is diminished.").

25.    "The primary purpose of [a] [creditors'] committee is to represent the interests of

all general unsecured creditors and to maximize distribution to them." In re Life Service

Systems, Inc., 279 B.R. 504, 510 (Bankr. W.D. Pa. 2002). In this regard, section 1103(c)(5) of

the Bankruptcy Code provides as follows:

> (c)  A committee appointed under section 1102 of this title may –
>
>> (2)  investigate the acts, conduct, assets, liabilities, and financial condition
>> of the debtor, the operation of the debtor's business and the desirability of
>> the continuance of such business, and any other matter relevant to the case
>> or to the formulation of a plan.
>>                                        * * *
>> (5)  perform such other services as are in the interest of those represented.

11 U.S.C. § 1103(c)(2), (5); see also In re Advisory Committee of Major Funding Corp., 109

F.3d 219, 224 (5th Cir. 1997) ("Section 1103 provides the tools with which . . . creditors'

committee[s] work."). Additionally, section 1109(b) of the Bankruptcy Code provides that "[a]

party in interest, including the debtor, the trustee, *a creditors' committee* . . . may raise and may

appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109 (emphasis

added).

26.    As noted by the Second Circuit in Unsecured Creditors Committee v. Noyes (In re

STN Enterprises), 779 F.2d 901, 904 (2d Cir. 1985), sections 1103 and 1109 of the Bankruptcy

Code imply a "qualified right for creditors' committees to initiate suit [on behalf of a debtor in

possession] with approval of the bankruptcy court." Moreover, where a debtor is unable or

unwilling to fulfill its statutory obligation to maximize the value of its estate, "[t]he practice of

authorizing the prosecution of actions on behalf of an estate by committees …, upon a showing

that such is in the interests of the estate, is one of long standing, and nearly universally

recognized." In re Adelphia Communications Corp., 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005)

(citations omitted).  This "provides creditors and other stakeholders with the comfort that

potentially valuable (and sometimes critical) claims on behalf of the estate will be prosecuted –

without requiring bankruptcy judges to . . . resort[] to much more draconian or ineffective

mechanisms to ensure the prosecution of those claims, with the destruction to going concern

value and creditor recoveries that would frequently be the result." Id.  In STN, 779 F.2d at 905,

the Second Circuit confirmed that a bankruptcy court's approval of a committee's prosecution of

litigation on behalf of a debtor that failed to pursue the litigation is appropriate when (a) the

committee presents a colorable claim for relief that, upon appropriate proof, would support

recovery and (b) the litigation is likely to benefit the debtor's estate.  See also Adelphia, 330

B.R. at 374, n.19; In re Sunbeam Corp., 284 B.R. 355, 374 (Bankr. S.D.N.Y. 2002).

27.    To establish a colorable claim, a committee need only provide minimal

evidentiary basis for its allegations, and the court need not conduct a mini-trial to determine

whether such a claim exists.  See, e.g., STN, 779 F.2d at 905.  In this context, a court's analysis

of the claims involved is similar to that applied in assessing a motion to dismiss a complaint for

failure to state a claim.  See, e.g., In re KDI Holdings, Inc., 277 B.R. 493, 508 (Bankr. S.D.N.Y.

1999); In re America's Hobby Center, Inc., 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998); In re

iPCS, Inc., 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003).  "[A] complaint should not be dismissed

for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41,

15

47 (1957). See also Halperin v. eBanker USA.com, Inc., 295 F.3d 353, 356 (2d Cir. 2002) (In

ruling on a motion to dismiss under F.R.C.P. 12(b)(6), a court must accept all factual allegations

in the complaint as true and draw all inferences in the plaintiff's favor. The court may dismiss

the complaint only if the plaintiff cannot prove any set of facts consistent with its allegations,

which would entitle plaintiff to the relief sought.); Todd v. Exxon Corp., 275 F.3d 191, 198 (2d

Cir. 2001) ("[On motion to dismiss for failure to state a claim,] the issue is not whether a plaintiff

will ultimately prevail but whether the claimant is entitled to offer evidence to support the

claims" (citation omitted)).

28.     If a debtor fails to pursue litigation that is likely to benefit its estate, such failure

is unjustifiable. See, e.g., STN, 779 F.2d at 905. An "'unjustifiable failure' of a debtor to bring

... suit does not require an improper motive for the failure. Rather, a debtor's failure to bring a

claim is deemed to be unjustifiable when the committee has presented a colorable claim that on

appropriate proof could support recovery, and the action is likely to benefit the reorganization

estate." Adelphia, 330 B.R. at 374, n.19 (citing STN, 779 F.2d at 905; Sunbeam, 284 B.R. at

374). In determining whether an action would be beneficial to the estate, courts perform a cost-

benefit analysis to determine whether the costs to the estate in pursuing the action would be

outweighed by the potential gain if the action is successful. See, e.g., STN, 779 F.2d at 905. As

with the determination of whether the claims are colorable, the court need not hold a mini-trial

on the likelihood of success of the claim. Id. Rather, the court need only find a sufficient

likelihood of success to justify any delay and expense to the bankruptcy estate that the initiation

and continuation of the litigation may produce. Id. at 906; America's Hobby Center, 223 B.R. at

282.

**B.**    **The Committee Has Alleged Colorable Claims That Support Recovery**

29.    The Claims and Defenses against the Defendants are more than colorable.  The

Committee has been investigating the Defendants' involvement in the Debtors' business affairs

since the Committee's formation, and the factual allegations gleaned from its investigation

currently comprise approximately 44 pages of the Complaint.  If the Court accepted all of the

Committee's factual allegations against the Defendants as true, and drew all inferences in the

Committee's favor, the Complaint would plainly survive a motion to dismiss for failure to state

claims under F.R.C.P. 12(b)(6).  Indeed, all of the factual allegations in the Complaint are taken

directly from either public filings, documents that the Debtors have produced to the Committee

or the sworn testimony of the Debtors' officers.  Moreover, appropriate discovery from GM in

connection with the 2004 Order undoubtedly will uncover additional facts in support, and may

uncover additional Claims and Defenses that are not currently set forth in the Complaint.  In

addition, the Claims and Defenses in the Complaint, on appropriate proof, support recovery

because they would enable the Debtors' estates and creditors to recover very significant amounts

from the Defendants.  Furthermore, the equitable subordination of the Defendants' claims against

the Debtors would prevent the needless dilution of the Debtors' unsecured creditors' recoveries

on their claims.

**C.**    **The Committee's Prosecution of the Complaint
Will Benefit the Debtors' Estates and Creditors**

30.    As mentioned above, the Debtors have statutory duties under section 1107 of the

Bankruptcy Code to maximize the value of their estates for their creditors by, among other

things, collecting the property of their estates and objecting to the allowance of improper claims.

More than two months ago the Committee, as the statutory representative of the Debtors'

unsecured creditors, formally requested that the Debtors either pursue the Complaint or consent

17

to the Committee's pursuit of the Complaint on their behalf. However, the Debtors, notwithstanding their statutory duties, have refused to take action to prosecute the Complaint or consent to the Committee's pursuit thereof. Under these circumstances, the Committee has met its burden to receive the Court's permission to prosecute the Complaint for the benefit of the Debtors' estates, and to prosecute other Claims and Defenses as may be appropriate. The Claims and Defenses set forth in the Complaint are colorable and the Debtors have declined to assert them. See, e.g., Louisiana World Exposition, 858 F.2d at 253 ("Where the interests of an estate and its creditors are impaired by the refusal of a trustee or a debtor in possession to initiate adversary proceedings to recover property of the estate, . . . [that] refusal [is] unjustified").

31.    In addition, the Debtors' failure to prosecute the Complaint is unjustifiable under STN because the Claims and Defenses therein and any other Claims and Defenses will benefit the Debtors' estates. Recovery on the Claims and Defenses set forth in the Complaint and other Claims and Defenses will increase distributions to the Debtors' estates and unsecured creditors, and equitable subordination of the Defendants' claims against the Debtors will prevent dilution of the claims of the Debtors' unsecured creditors. The magnitude of the benefit that the Committee's prosecution of the Complaint will provide the Debtors' estates and their creditors is such that any recovery from the Defendants or benefit from the equitable subordination of the Defendants' claims will vastly outweigh the expenses of litigation.

32.    Accordingly, based on the foregoing, the Committee has satisfied both prongs of the STN test for authority to prosecute the Complaint against the Defendants and to prosecute all other actions, objections and rights against the Defendants arising from or related to the Claims and Defenses that are property of the Debtors' estates.

18

## WAIVER OF MEMORANDUM OF LAW

33.     In accordance with Local Bankruptcy Rule 9013-1(b) for the Southern District of New York, no separate memorandum of law is necessary as all authorities relied on in support of this Motion are set forth herein.

## NOTICE

34.     Notice of this Motion has been provided in accordance with this Court's Case Management Order, as amended or supplemented, and the Committee submits that no other or further notice is necessary.  No previous motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Committee respectfully requests that this Court (a) enter an order, substantially in the form annexed hereto as Exhibit C, authorizing the Committee in its discretion to file, serve and prosecute on behalf of the Debtors' estates the Complaint, as it may be amended, against the Defendants, and authorizing the Committee in its discretion to file, serve and prosecute all other actions, objections and rights against the Defendants arising from or related to the Claims and Defenses that are property of the Debtors' estates and (b) grant such other relief as is just and proper.

Dated: July 28, 2006
      New York, New York

                            **LATHAM & WATKINS LLP**

                            By: /s/ Robert J. Rosenberg_____
                                 Robert J. Rosenberg (RR-9585)
                                 Mitchell A. Seider (MS-4321)
                                 Mark A. Broude (MB-1902)
                                 885 Third Avenue, Suite 1000
                                 New York, New York 10022
                                 Telephone:  (212) 906-1200

                            Counsel for the Official Committee
                            of Unsecured Creditors