**EXHIBIT 1**

ORIGINAL

# STANDARD SINGLE TENANT NNN LEASE
### W I T N E S S E T H

This lease ("Lease") is entered into by and between Limar Realty Corp. #19, a California corporation ("Landlord") and Packard-Hughes Interconnect, a Delaware corporation and General Motors Corporation, a Delaware corporation (collectively referred to as "Tenant"). For and in consideration of the payment of rents and the performance of the covenants herein set forth by Tenant, Landlord does lease to Tenant and Tenant accepts the Premises described below subject to the agreements herein contained.

1. **BASIC LEASE TERMS**

    a. **DATE OF LEASE:**    October 11, 1995

    b. **TENANT:**    Packard-Hughes Interconnect and General Motors Corporation

        Trade Name:    _____

        Address (of the Premises):    17150 Von Karman Avenue
                                        Irvine, CA ~~92715~~ 92714

        Address (for Notices):    x P. O. Box 19685

                                                Irvine, CA   92713-9685

    c. **LANDLORD:**    Limar Realty Corp. #19

        Address (for Notices):    One Bay Plaza
                                            1350 Bayshore Boulevard, Suite 850
                                            Burlingame, California 94010

    d. **TENANT'S USE OF PREMISES:** General office, research and development, light manufacturing and related storage.

    e. **PREMISES AREA:**    157,458 Rentable Square Feet

    f. **INSURING PARTY:**    Tenant is the "Insuring Party" unless otherwise stated herein.

    g. **TERM (inclusive):**    Commencement Date: _January 22, 1996_ ("Commencement Date")

                                     Expiration Date: _January 21, 2001_ ("Expiration Date")

                                     Number of Months: Sixty (60)

    h. **BASE RENT:** Eighty-Three Thousand Four Hundred Fifty-Three and no/100 Dollars ($83,453.00) per month.

    i. **BASE RENT ADJUSTMENT:**

        **Cost of Living.** The cost of living provisions (¶4.b.1) apply using the CPI Index for the CMSA of Los Angeles, Anaheim and Riverside and the annual floor limit ("Floor Limit") shall be an increase of three percent (3%) of Base Rent, and the annual ceiling limit ("Ceiling Limit") shall be an increase of seven percent (7%) of Base Rent.

    j. **TOTAL TERM BASE RENT** (exclusive of any adjustments due to ¶1.i.): $5,007,180.00

    k. **PREPAID BASE RENT:**    $83,453.00

    l. **SECURITY DEPOSIT:**    $ None

    m. **BROKER(S):**    None

    n. **GUARANTOR(S):**    None

    o! **ADDITIONAL SECTIONS:** Additional Sections of this Lease numbered _N/A_ through _N/A_ are attached hereto by addendum and made a part hereof. If none, so state in the following space: _None_.

    p. **EXHIBITS:** Exhibits lettered "A" through "F" are attached hereto and made a part hereof.

**EXHIBIT 1**

krutt\limar19\lease.2

2.  PREMISES

a.  **Premises.** Landlord leases to Tenant the premises described in ¶1. and in Exhibit A (the "Premises"). The term "Premises" includes all the land and improvements (including buildings, landscaping, parking lot, etc.) as described on Exhibit A. Subject to any additional work Landlord has agreed herein to do, Tenant hereby accepts the Premises in their condition existing as of the date of the execution hereof, subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Premises, and accepts this Lease subject thereto and to all matters disclosed thereby and by any exhibits attached hereto. Tenant acknowledges that neither Landlord nor Landlord's Broker has made any representation or warranty as to the suitability of the Premises for the conduct of Tenant's business. Tenant agrees with the square footage specified for the Premises in ¶1. and will not hereafter challenge such determination and agreement. The rental payable by Tenant pursuant to this Lease is not subject to revision in the event of any discrepancy in the rentable square footage for the Premises.

b.  **Acceptance.** Landlord represents that it is the fee simple owner of the Premises and has full right and authority to make this Lease. Landlord hereby leases the Premises to Tenant and Tenant hereby accepts the same from Landlord, in accordance with the provisions of this Lease. Landlord covenants that Tenant shall have peaceful and quiet enjoyment of the Premises during the Term (as defined below) of this Lease.

3.  TERM

a.  **Term.** The term ("Term") of this Lease is for the period that commences at 12:01 a.m. on the Commencement Date and expires at 11:59 p.m. on the Expiration Date subject to extension as provided in ¶28. If Landlord, for any reason, cannot deliver possession of the Premises to Tenant on or before the Commencement Date, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting from such delay. In that event, however, there shall be an abatement of Base Rent (as defined below) covering the period between the Commencement Date and the date when Landlord delivers possession to Tenant, all other terms and conditions of this Lease shall remain in full force and effect, provided, however, that if Landlord cannot deliver possession of the Premises to Tenant, this Lease shall be void. If a delay in possession is caused by Tenant's failure to perform any obligation in accordance with this Lease, the Term shall commence as of the Commencement Date, and there shall be no reduction of Base Rent between the Commencement Date and the time Tenant takes possession.

b.  **Possession.** It is acknowledged that Tenant is currently in possession of the entire Premises pursuant to a lease currently in force and executed by Tenant ("Prior Lease"). Landlord and Tenant acknowledge that the Prior Lease shall remain in full force and effect until the Commencement Date and shall thereupon terminate and be of no further force or effect.

4.  RENT

a.  **Base Rent.** Tenant shall pay Landlord in lawful money of the United States, without notice, demand, offset or deduction, rent in the amount(s) set forth in ¶1. which shall be payable in advance on the first day of each and every calendar month ("Base Rent") provided, however, the first month's Base Rent is due and payable upon execution of this Lease. The Base Rent set forth in ¶1.h. will sometimes be referred to as the "Initial Base Rent" and the Base Rent shall refer to the Initial Base Rent as from time to time adjusted pursuant to ¶4.b.1). Unless otherwise specified in writing by Landlord, all installments of Base Rent shall be payable at Limar Realty Corp. #19, One Bay Plaza, 1350 Bayshore Boulevard, Suite 850, Burlingame, CA 94010. Base Rent for any partial month at the beginning or end of this Lease will be prorated in accordance with the number of days in the subject month.

For purposes of Section 467 of the Internal Revenue Code, the parties to this Lease hereby agree to allocate the stated Base Rent provided herein to the periods which correspond to the actual Base Rent payments as provided under the terms and conditions of this Agreement.

b.  Rent Adjustment.

1)  **Cost of Living Adjustment.** The Base Rent shall be subject to a non-compounding increase on each annual anniversary of the Commencement Date. The base for computing the increase is the Consumer Price Index All Urban Consumers for the CMSA referenced in ¶1.i. (1982-84 base year = 100), published by the United States Department of Labor, Bureau of Labor Statistics ("Index"), which is in effect on the ninetieth (90th) day preceding the date of the Commencement Date ("Beginning Index"). The Index published and in effect on the ninetieth (90th) day preceding each annual anniversary ("Annual Anniversary") of the Commencement Date ("Adjustment Index") is to be used in determining the amount of the increase from one year to the next. Beginning with the first Annual Anniversary and continuing on each Annual Anniversary thereafter, the Base Rent shall be increased to equal the product achieved by multiplying the Initial Base Rent amount by a fraction, the numerator of which will be the Adjustment Index and the denominator of which will be the Beginning Index. If there is a decline from one Annual Anniversary to the next in the Adjustment Index, the Base Rent due during the subsequent lease year shall equal the Base Rent due during the then present lease year (i.e., there shall be no decrease in Base Rent). Notwithstanding the foregoing provisions of this ¶4.b.1), each Base Rent adjustment shall be subject to a minimum adjustment in accordance with the Floor Limit if specified in ¶1.i. and a maximum adjustment in accordance with the Ceiling Limit if specified in ¶1.i.

If the Index is changed so that the base year differs from 1982-84 = 100, the Index shall be converted

in accordance v     conversion factor published by the Unite   s Department of Labor, Bureau of Labor Statistic    the Index is discontinued or revised during the  erm, such other government index or computation with which it is replaced shall be used in order to obtain substantially the same result as, in Landlord's reasonable opinion, would be obtained if the Index had not been discontinued or revised.

2) Intentionally deleted.

c. Rent Without Offset. All Rent shall be paid without prior demand or notice and without any deduction of offset whatsoever. All Rent shall be paid in lawful currency of the United States of America. ~~Rent or other sums not paid within ten (10) days of its due date shall bear interest from the due date thereof at the lesser of ten percent (10%) per annum or the maximum legal interest rate permitted by law.~~ Acceptance of any payment by Landlord shall not be construed as a waiver by Landlord of any default by Tenant.

d. Rent. The term "Rent" as used in this Lease shall refer to Base Rent, prepaid rent, Real Property Taxes, Insurance Costs, Roof Replacement Amount, repairs and maintenance costs, utilities, late charges and other similar charges payable by Tenant pursuant to this Lease either directly to Landlord or otherwise. Generally, Tenant shall pay all operating expenses in connection with the Premises including, but not limited to, utilities, repairs and maintenance costs, insurance costs, real and personal property taxes, and all like costs, either directly to Landlord or otherwise as more particularly described in this Lease, save and except only for the cost of replacement of the Roof (as defined below) to be paid by Landlord in accordance with the provisions of ¶30.a.

5. Intentionally deleted.

6. USE OF PREMISES

a. Tenant's Use. Tenant shall use the Premises solely for the purposes stated in ¶1. and for no other purposes without obtaining the prior written consent of Landlord. Landlord and Tenant acknowledge that neither party nor the agent of either party has made any representation or warranty with respect to the Premises or with respect to the suitability of the Premises to the conduct of Tenant's business (other than the express warranties made by Tenant in this Lease), and that neither Landlord nor Tenant has agreed to undertake any modification, alteration or improvement to the Premises, except as provided in writing in this Lease. Tenant shall promptly comply with all existing and future laws, statutes, ordinances, orders and governmental regulations affecting the use, condition, alteration, improvement, access to and occupancy of the Premises. The cost of compliance with any future laws, statutes, ordinances, and governmental regulations shall be borne as provided in ¶30. Tenant shall not do or permit anything to be done in or about the Premises that will jeopardize Tenant's ability to maintain the insurance coverage with respect to the Premises as described in ¶16. Tenant shall not use the Premises for sleeping, washing clothes or the preparation, manufacture or mixing of anything that violates any existing or future applicable law, statute, ordinance, or governmental regulations affecting the Premises. Pets and/or animals of any type shall not be kept on the Premises.

b. CC&R's. Tenant agrees that this Lease is subject and subordinate to the Covenants, Conditions and Restrictions for the Irvine Industrial Complex, recorded May 21, 1965 in Book 7529 in the Official Records of Orange County, a copy of which is attached hereto as Exhibit B, as they may be amended from time to time ("CC&R's"), and further agrees that the CC&R's are an integral part of this Lease. Throughout the Term or any extension thereof, notwithstanding any other provision hereof, Tenant shall not violate the terms of the CC&R's and any modifications or amendments thereto, and shall be responsible for the payment of any periodic or special dues or assessments against the Premises. Tenant shall hold Landlord, its subsidiaries, directors, officers, agents and employees harmless and indemnify Landlord, its subsidiaries, directors, officers, agents and employees against any loss, expense and damage, including attorneys' fees and costs, arising out of the failure of Tenant to perform its obligations under this ¶6.b..

7. EMISSIONS; STORAGE, USE AND DISPOSAL OF WASTE

a. Emissions. Tenant shall not, except in compliance with applicable law and applicable permits, do any of the following:

1) Permit any vehicle on the Premises to emit exhaust which is in violation of any governmental law, rule, regulation or requirement;

2) Discharge, emit or permit to be discharged or emitted, any liquid, solid or gaseous matter, or any combination thereof, into the atmosphere or on, into or under the Premises, any building or other improvements of which the Premises are a part, or the ground or any body of water in violation of any existing or future federal, state or local law, statute, ordinance, rule or regulation including without limitation any such applicable law relating to Hazardous Materials (as defined below);

3) Produce, or permit to be produced, any intense glare, light or heat which will constitute a nuisance or violate any existing or future state or local law, statute, ordinance, rule or regulation or requirement;

4) Create, or permit to be created, any sound pressure level which will constitute a nuisance or violate any governmental law, rule, regulation or requirement; or

knutt\timar19\lease.2

    5)   Transmit, receiv   ermit to be transmitted or received, any e.   .magnetic, microwave or other radiation which wiii constitute a nuisance or violate any governmental law, rule, regulation or requirement.

b.   Storage and Use.

    1)   Storage. Subject to the uses permitted and prohibited to Tenant under this Lease, Tenant shall, in compliance with applicable laws, store in appropriate containers all solid, liquid or gaseous matter, or any combination thereof, which matter, if discharged or emitted into the atmosphere, the ground or any body of water, does or may (a) pollute or contaminate the same, or (b) adversely affect the (i) health or safety[1]of persons, whether on the Premises or anywhere else, (ii) condition, use or enjoyment of the Premises or any real or personal property, whether on the Premises or anywhere else, or (iii) Premises.

    2)   Use. In addition, except in compliance with applicable law and/or in connection with test equipment (e.g. calibration devices), Tenant shall not use, store or permit to remain on the Premises any solid, liquid or gaseous matter which is, or may become radioactive. Tenant shall store the materials in such a manner that no radioactivity will be detectable outside a designated storage area and Tenant shall use the materials in such a manner that (a) no real or personal property outside the designated storage area shall become contaminated thereby and (b) there are and shall be no adverse effects on the (i) health or safety of persons, whether on the Premises or anywhere else, (ii) condition, use or enjoyment of the Premises or any real or personal property thereon or therein, or (iii) Premises or any of the improvements thereto or thereon.

    3)   Hazardous Materials. Subject to the uses permitted and prohibited to Tenant under this Lease, Tenant shall store, use, employ, transport and otherwise deal with all Hazardous Materials (as defined below) employed on or about the Premises in accordance with all federal, state, or local law, ordinances, rules or regulations applicable to Hazardous Materials in connection with or respect to the Premises.

c.   Disposal of Waste.

    1)   Refuse Disposal. Tenant shall not keep any trash, garbage, waste or other refuse on the Premises except in sanitary containers and shall regularly remove same from the Premises in accordance with existing and future applicable law. Tenant shall keep all incinerators, containers or other equipment used for storage or disposal of such materials in a clean and sanitary condition.

    2)   Sewage Disposal. Tenant shall properly dispose of all sanitary sewage and shall not use the sewage disposal system (a) for the disposal of anything except sanitary sewage or (b) amounts in excess of the lesser of: (i) that reasonably contemplated by the uses permitted under this Lease or (ii) that permitted by any governmental entity. Tenant shall keep the sewage disposal system free of all obstructions and in good operating condition.

    3)   Disposal of Other Waste. Tenant shall properly dispose of all other waste or other matter delivered to, stored upon, located upon or within, used on, or removed from, the Premises in accordance with existing and future applicable law.

d.   Information. Upon written request, Tenant shall provide Landlord with any and all information regarding Hazardous Materials in the Premises, including copies of all filings and reports to governmental entities at the time they are originated, and any other information requested by Landlord, provided, however, Landlord shall keep all such information confidential and shall cause its agents, contractors and consultants to keep such information confidential unless otherwise agreed to by Tenant in writing. In the event of any accident, spill or other incident involving Hazardous Materials, Tenant shall immediately report the same to Landlord and supply Landlord with all information and reports with respect to the same. All information described herein shall be provided to Landlord regardless of any claim by Tenant that it is confidential. Notwithstanding the above provisions of this ¶7.d., Tenant shall not be required to provide Landlord with copies of purchase orders, invoices, shipping documentation and other like day-to-day documentation relating to the use of Hazardous Materials at the Premises by Tenant. Tenant shall provide to Landlord, from time to time, a written summary of the Hazardous Material employed by Tenant at the Premises. Notwithstanding the sentence immediately above, Tenant shall provide copies of all such documentation as is reasonably requested by Landlord in connection with any release or suspected release of Hazardous Materials at the Premises provided, however, Landlord shall keep all such information confidential and shall cause its agents, contractors and consultants to keep such information confidential unless otherwise agreed to by Tenant in writing.

e.   Compliance with Law. Notwithstanding any other provision in this Lease to the contrary, Tenant shall comply with all laws, statutes, ordinances, regulations, rules and other governmental requirements in complying with its obligations under this Lease, and in particular, relating to the storage, use, transportation, generation and disposal of Hazardous Materials. In addition, and not by way of limitation, Tenant shall maintain any asbestos containing material present at the Premises in accordance with applicable law and regulations existing now or in the future.

f.   Indemnity. Tenant hereby agrees to indemnify, defend and hold Landlord, its employees, lenders, directors, successors and assigns harmless from and against any and all actions, causes of action, losses, damages, costs, claims, expenses, penalties, obligations or liabilities of any kind whatsoever (including but not limited to reasonable attorneys' fees) to the extent arising out of claims by third parties relating to any Hazardous Materials Activity (as defined below) in connection with the Premises occurring at any time prior to or during

the Term of this Lea    withstanding any of the provisions of th        e, the indemnity obligation of Tenant pursuant to thi.    .f. shall survive for three years following the termination of this Lease. For purposes of this Lease, the term "Hazardous Materials" shall mean any hazardous, or toxic substance or pollutant or contaminant, as defined for purposes of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C Sections 9601 et seq.), as amended, or the Resource Conservation and Recovery Act (42 U.S.C. Sections 6901 et seq.), as amended, or any other federal, state, or local law, ordinance, rule or regulation now or at any time hereafter applicable (through the later of the date of termination of the Lease or the completion by Tenant of the Remedial Work pursuant to ¶7.g. below) to the Premises (collectively, "Hazardous Materials Laws") or any gasoline, diesel fuel or other similar petroleum hydrocarbons. For the purposes of this Lease, the term "Hazardous Materials Activity" shall mean any actual or claimed (in good faith) release, emission, discharge, generation, processing, abatement, removal, disposition, use, handling or transportation of any Hazardous Materials from, under, into, on or across the Premises. The indemnity obligation set forth in this ¶7.f. shall include, but not by way of limitation, liability for loss of use of the Premises but shall not include liability for diminution in value or consequential damages.

In connection with any circumstance in which the provisions of this ¶7.f. apply, Landlord shall notify Tenant of the existence of the claim, demand or other matter and Tenant shall defend the same at Tenant's expense and with counsel of Tenant's selection which counsel shall be satisfactory to Landlord in its reasonable discretion; provided, however, that Landlord shall at all times retain the right to participate in the defense at its own expense and with counsel of its selection so long as Landlord's participation does not interfere with Tenant's indemnity obligation hereunder. If Tenant shall, within a reasonable time after notice, fail to defend, Landlord shall have the right, but not the obligation, to undertake the defense of, and to compromise or settle, the claim or other matter on behalf, for the account, and at the risk of Tenant. Tenant shall not, without the prior written consent of Landlord which consent shall not be unreasonably withheld, (i) settle or compromise any law suit in any court of law or consent to the entry of any judgment in a court of law that does not include as an unconditional term the delivery by the plaintiff to Landlord of a dismissal with prejudice; (ii) settle or compromise any claim by a private party that does not include as an unconditional term a written unconditional release effective as to Landlord; or (iii) settle or compromise any enforcement action by a government entity without a document, or series of documents, which demonstrate that no further action is required in connection with the Premises, provided, however, that in no event shall any settlement or compromise of any action, suit, proceeding or claim require Landlord to pay costs in any amount, conduct remediation or perform corrective action. The provisions of the sentence immediately above shall not be construed to limit the right of Tenant to defend any claim, demand or other matter in a manner as reasonably determined by Tenant. The provisions of this ¶7.f. may be enforced by Landlord without regard to any other rights or remedies which Landlord may have pursuant to this Lease. Landlord agrees that Tenant in connection with any clean-up or remediation required pursuant to the indemnity obligation set forth in this ¶7.f. shall have the right to conduct the clean-up and/or remediation in a manner consistent with the definition of Remedial Work as set forth in ¶7.g. below.

g.    **Remediation on Termination.** In connection with any surrender of the Premises upon expiration or other termination of this Lease, Tenant shall engage the services of an environmental consultant reasonably acceptable to Landlord ("Consultant") to conduct a Phase I environmental review of the Premises and prepare a Phase I environmental report. The scope of the Phase I environmental report shall be consistent with the scope of inquiry and degree of investigation of the Phase I environmental reports for the Premises conducted by Mettlhauser in 1993 and Dudek & Associates in 1995, including (i) a physical inspection of the Premises, (ii) a check of public records relating to the environmental condition of the Premises and surrounding area, (iii) interviews of Tenant's management concerning the environmental condition of the Premises, (iv) investigation of any reported Hazardous Materials Activity during Tenant's tenancy and (v) additional areas of qualitative review consistent with the ASTM standards for a Phase I review then existing, provided such standards are widely accepted in the engineering community at the time of the Phase I review to be conducted pursuant to this ¶7.g. The scope of the Phase I environmental review shall be reasonably acceptable to Landlord and Tenant. The cost of any such Consultant shall be borne by Tenant. Following preparation of the Phase I environmental report, to the extent required as a result of the findings of the Consultant by reason of the Phase I environmental report, Tenant shall cause Consultant to conduct a Phase II environmental review of the Premises. The Phase I environmental report and the Phase II environmental report, if any, shall some times be collectively referred to as the "Environmental Report". The cost of such Phase II environmental review shall be borne by Tenant. Landlord shall at all times, at its cost, be entitled to reasonably participate, directly or indirectly through a consultant engaged by Landlord, in the Phase I environmental review and in the Phase II environmental review, if any, conducted by Tenant hereunder and review any Remedial Work conducted by Tenant so long as Landlord's participation does not interfere with Tenant's obligations hereunder. Landlord shall be entitled to copies of any and all environmental reports furnished by Consultant to Tenant.

Upon completion of any Phase I environmental report for the Premises and, if applicable, a Phase II report, Tenant shall give to Landlord written notice ("Environmental Notice") of any Remedial Work (as defined below), if any, required in connection with the Premises as disclosed by the Phase I report and/or Phase II report. Tenant shall, at its cost, and with contractors selected by Tenant (and reasonably acceptable to Landlord) perform any and all Remedial Work required to be performed pursuant to the findings of the environmental reports. Tenant shall at its cost, obtain any and all permits, licenses or governmental approvals required in connection with the Remedial Work and all Remedial Work shall be performed by Tenant in a workmanlike fashion and in accordance with all applicable laws now or in the future existing through the date of completion of such Remedial Work by Tenant. Such Remedial Work shall, to the extent practicable, be completed by Tenant within one hundred twenty (120) days following the termination of this Lease or within one hundred twenty (120) days following the date on which the Environmental Notice is given, whichever

is later. The Environn    jotice shall be given by Tenant not later than    (30) days following termination of this Lease.

For purposes of this ¶7.g. the term "Remedial Work" shall mean all investigation, monitoring, restoration, abatement, detoxification, containment, handling, treatment, removal, storage, decontamination, cleanup, transport, disposal or other ameliorative work or responsible action required by (i) any Hazardous Materials Laws applicable to the Premises now or in the future existing through the date of completion by Tenant of the Remedial Work; (ii) any order or reasonable request in accordance with applicable law of any federal, state or local governmental agency relating to the Premises; or (iii) as reasonably required or recommended by the Consultant in order to remediate any contamination of the Premises or a portion of the Premises as disclosed by the Phase I, and if applicable, the Phase II environmental report. In connection with such Remedial Work, Tenant (i) shall not be required to consider any future renovation, reconstruction or demolition by Landlord of the Premises, save and except that which could reasonably be anticipated in connection with continued industrial and/or commercial use of the Premises and further provided that in connection with any Hazardous Materials released on, in, under or about the Premises by Tenant (or any agent, employee or invitee of Tenant) encapsulation or other similar remediation which may result in future problems with respect to such Hazardous Materials shall not constitute an acceptable remediation by Tenant and (ii) will use the following factors in determining whether any action(s) should be taken and in developing the particular action(s) to be undertaken: (a) the specific requirements, if any, under applicable Hazardous Materials Laws in effect now or in the future (through the date of the date of the termination of this Lease or the date of completion of the Remedial Work by Tenant), and to the extent consideration (either directly or through use of a variance or other site-specific relief) of the following factors is not specifically precluded by such Hazardous Materials Laws: (b) the technical feasibility of the action(s): (c) the economic reasonableness of the action(s); and (d) the continued industrial and/or commercial use of the Premises.

h.    **Statutory Rights.** Notwithstanding any provision contained in this Lease to the contrary, the rights of Landlord as provided in ¶7.f. and ¶7.g. above shall be in addition to any other rights which Landlord may have with respect to the Tenant as provided by applicable law in connection with matters involving Hazardous Materials and the Premises and, in particular, but not by way of limitation, the provisions of ¶7.f. and ¶7.g.' shall not be construed to limit in any fashion the rights of Landlord against or with respect to Tenant as otherwise provided by applicable law in connection with any Hazardous Material contamination of the Premises. Notwithstanding the above provisions of this ¶7.h., upon completion of the Remedial Work as provided in ¶7.g., Landlord hereby agrees to waive any rights which Landlord may have against Tenant as provided by applicable law in connection only with the matters ("Waived Matter") disclosed by the Environmental Report for which Tenant has completed Remedial Work provided, however, that such waiver shall not restrict Landlord from filing an action against Tenant or otherwise making a claim against Tenant with respect to a Waived Matter in the event that a claim by a third party is made against Landlord with respect to a Waived Matter.

8.    **SIGNS.** Tenant shall not place any sign upon the Premises, except that Tenant may, with Landlord's prior written consent, install (but not on the roof) such signs as are reasonably required to advertise Tenant's own business provided such signs are in compliance with all applicable governmental requirements and the CC&R's. The installation of any sign on the Premises by or for Tenant shall be subject to the provisions of ¶12. (Repairs and Maintenance). Landlord hereby consents to and approves those signs located on the Premises as of the Commencement Date. Tenant shall have the right to replace such existing signs without Landlord's consent provided that the replacement signage is in substantially the same location as the original signage and that the size, design and content of the replacement signage is substantially similar to that of the original signage.

9.    **PERSONAL PROPERTY TAXES.** Tenant shall pay at least ten (10) days prior to delinquency all taxes assessed against and levied upon Tenant owned leasehold improvements, trade fixtures, furnishings, equipment and all personal property of Tenant contained in the Premises or elsewhere. When possible, Tenant shall cause its leasehold improvements, trade fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Landlord.

10.   **REAL PROPERTY TAXES**

a.    **Payment of Taxes.** Tenant shall pay the Real Property Taxes, as defined in ¶10.c., during the Term of this Lease. Subject to ¶10.b., all such payments shall be made at least ten (10) days prior to the delinquency date of the applicable installment. Tenant shall promptly furnish Landlord with satisfactory evidence that such Real Property Taxes have been paid. If any such Real Property Taxes to be paid by Tenant shall cover any period of time prior to the commencement of the Term or after the expiration or earlier termination of the Term hereof, Tenant' s share of such Real Property Taxes shall be equitably prorated to cover only the period of time this Lease is in effect, and Landlord shall reimburse Tenant for any overpayment after such proration. If Tenant shall fail to pay any Real Property Taxes required by this Lease to be paid by Tenant, Landlord shall have the right to pay the same upon ten (10) days written notice, and Tenant shall reimburse Landlord therefor including any interest and penalties upon demand.

b.    **Advance Payment.** In the event of a delinquency in the payment of Real Property Taxes, Landlord reserves the right, at Landlord's option, to thereafter estimate the current Real Property Taxes applicable to the Premises, and to require each installment of the Real Property Taxes to be paid in advance to Landlord by Tenant, in a lump sum amount, at least twenty (20) days prior to the applicable delinquency date.

c.    **Definition of "Real Property Taxes".** Λs used herein, the term "Real Property Taxes" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, and any license fee, commercial

rental tax, improvem      ... or bonds, levy of tax or other fee, charg      cise which may be imposed as a substitute for any o.      .oregoing (other than inheritance, personal in.. ..e or estate taxes) imposed upon the Premises by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, levied against any legal or equitable interest of Landlord in the Premises, Landlord's right to rent, and/or Landlord's business of leasing the Premises. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein, imposed by reason of events occurring, or changes in applicable law taking effect, during the Term of this Lease, including but not limited to a change in the ownership of the Premises or in the improvements thereon, the execution of this Lease, or any modification, amendment or transfer thereof, and whether or not contemplated by the parties hereto.

11. UTILITIES. Tenant shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered to Tenant, Tenant shall pay a reasonable proportion, to be determined by Landlord, of all charges jointly metered with other premises.

12. REPAIRS AND MAINTENANCE

    a. Tenant's Obligations.

       1) General. Tenant shall, at Tenant's sole cost and expense and at all times, keep the Premises and every part thereof in good order, condition and repair, ordinary wear and tear excepted, structural and non-structural (whether or not such portion of the Premises requiring repairs, or the means of repairing same, are reasonably or readily accessible to Tenant, and whether or not the need for such repairs occurs as a result of Tenant's use, any prior use, the elements or the age of such portion of the Premises), including, without limiting the generality of the foregoing, all equipment or facilities serving the Premises, such as plumbing, heating, air conditioning, ventilating, electrical, lighting facilities, boilers, fired or unfired pressure vessels, fire sprinkler and/or standpipe and hose or other automatic fire extinguishing system, including fire alarm and/or smoke detection systems and equipment, fire hydrants, fixtures, walls (interior and exterior), foundations, ceilings, roofs, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, on, about or adjacent to the Premises. Tenant shall not cause or permit any Hazardous Material to be spilled or released in, on, under or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Tenant's expense: take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises, the elements surrounding same, or neighboring properties, that was caused or materially contributed to by Tenant, or pertaining to or involving any Hazardous Materials and/or storage tank brought onto the Premises by or for Tenant or under its control. Tenant, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices. Subject to the terms hereof, Tenant's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. If, inclusive of Tenant's occupancy pursuant to earlier lease agreement(s) and amendments thereto, Tenant has occupied the Premises for seven (7) years or more, Landlord may require Tenant to repaint the exterior of the buildings on the Premises as reasonably required, but not more frequently than once every seven (7) years.

       2) Contracts. Unless otherwise expressly agreed in writing by Landlord and Tenant, Tenant shall, at Tenant's sole cost and expense, procure and maintain contracts, with copies to Landlord, in customary form and substance for, and with contractors specializing and experienced in, the inspection, maintenance and service of the following equipment and improvements, if any, located on the Premises: (i) heating, air conditioning and ventilation equipment, (ii) boiler, fired or unfired pressure vessels, (iii) fire sprinkler and/or standpipe and hose or other automatic fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drain maintenance and (vi) asphalt and parking lot maintenance. Tenant shall keep a detailed preventative maintenance schedule and log showing the frequency of maintenance
       on all HVAC, mechanical, electrical and other systems of the Premises and provide Landlord with a copy of same quarterly. Tenant shall not be relieved of its obligation to maintain and repair any of the items as described in this ¶12.a.2) in the event that Landlord agrees not to require Tenant to engage the services of third party contractors with respect to any such items.

       3) As-Is Condition. The parties affirm that Landlord, its subsidiaries, officers, directors, agents and/or employees have made no representations to Tenant respecting the condition of the Premises except as specifically stated herein. Tenant acknowledges and agrees that it is accepting the Premises AS-IS subject only to any work Landlord has agreed to perform as expressly set forth in this Lease and further that Tenant has occupied the Premises for a period of approximately twenty (20) years.

       4) Americans with Disabilities Act. Tenant acknowledges that as of the Commencement Date, the Premises may not comply with the Americans with Disabilities Act of 1990 ("ADA"), and that Landlord shall have no obligation with respect to any such failure of the Premises to so comply. Tenant shall, at its cost, at any time during the Term as required by any applicable governmental agency having jurisdiction over the Premises, make such modifications and alterations to the Premises as may be required in order to fully comply with the provisions of the ADA, as from time to time amended, and any and all regulations issued pursuant to or in connection with the ADA in such a manner as to satisfy the applicable governmental agency or agencies requiring remediation. Tenant shall at least thirty (30) days prior to

- 7 -

krutt/ümar10Vease.2

the commencem    .y construction in connection with satisf.    the ADA, give written notice
to Landlord of its    .ded commencement of construction toget.    .ith sufficient details so as to
reasonably disclose to Landlord the nature of the proposed construction, copies of any notices received
by Tenant from applicable governmental agencies in connection with the ADA and such other documents
or information as Landlord may reasonably request.

b.    **Landlord's Obligations.** It is intended by the Parties hereto that Landlord, during the Term of the Lease have
no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein,
whether structural or non structural, all of which obligations are intended to be that of the Tenant under
¶12.a. hereof. It is the intention of the Parties that the terms of this Lease govern the respective obligations
of the parties as to maintenance and repair of the Premises.

c.    **Compliance with Governmental Regulations.** Subject to the terms of ¶30. hereof, Tenant shall, at its own
cost and expense, promptly and properly observe and comply with all present and future orders, regulations,
directions, rules, laws, ordinances, and requirements of all governmental authorities (including but not limited
to state, municipal, county and federal governments and their departments, bureaus, boards and officials)
arising from the use or occupancy of, or applicable to, the Premises or privileges appurtenant to or in
connection with the enjoyment of the Premises.   Tenant shall also comply with all such rules, laws,
ordinances and requirements at the time Tenant makes any alteration, addition or change to the Premises.

d.    **Miscellaneous.**

1)    Landlord and Tenant shall each do all acts required to comply with all applicable laws, ordinances and
rules of any public authority relating to their respective maintenance obligations as set forth herein.

2)    Tenant expressly waives the benefits of any statute now or hereafter in effect which would otherwise
afford the Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of
Landlord's failure to keep the Premises in good order, condition and repair. Specifically, Tenant waives
the provisions of California Civil Code Sections 1941 and 1942 with respect to Landlord's obligations
for Tenant tenantability of the Premises and Tenant's right to make repairs and deduct the expenses of
such repairs from Rent.

3)    Tenant shall not place a load upon any floor of the Premises which exceeds the load per square foot
which such floor was designed to carry, as determined by Landlord or Landlord's structural engineer. The
cost of any such determination made by Landlord's structural engineer shall be paid for by Tenant upon
demand.

4)    Except as otherwise expressly provided in this Lease, Landlord shall have no liability to Tenant nor shall
Tenant's obligations under this Lease be reduced or abated in any manner whatsoever by reason of any
inconvenience, annoyance, interruption or injury to business arising from Landlord making any repairs or
changes which Landlord is required to make or is permitted to make by this Lease or by any tenant's
lease or is required by law to make in or to any portion of the Premises. Landlord shall nevertheless use
reasonable efforts to minimize any interference with Tenant's business in the Premises.

5)    Tenant shall give Landlord prompt notice of any damage to or defective condition in any part or
appurtenance of the Premises' mechanical, electrical, plumbing, HVAC or other systems serving, located
in or passing through the Premises.  Upon request by Landlord, Tenant shall provide Landlord with
evidence reasonably acceptable to Landlord of service contracts on such systems.

6)    Upon the expiration or early termination of this Lease, Tenant shall return the Premises to Landlord clean
and in the same condition as on the date Tenant took possession pursuant to the terms of this Lease,
except for normal and ordinary wear and tear and except as otherwise provided in this Lease. Any
damage to the Premises, including any structural damage, resulting from Tenant's use (except as caused
by normal and ordinary wear and tear) or from the removal of Tenant's fixtures, furnishings and
equipment shall be repaired by Tenant at Tenant's expense.

7)    Landlord may, at Landlord's option, choose to perform any of the Tenant's obligations in this ¶12.
("Tenant's Obligations") in the event that Tenant fails to perform any such obligation(s) within thirty (30)
days following written notice given by Landlord to Tenant (which notice shall specifically state the
obligation(s) which Tenant has failed to perform) provided, however, that in the event that such
obligation(s) cannot be reasonably performed within such 30-day period, Landlord shall not commence
performance of such Tenant's Obligation(s) so long as Tenant shall have commenced performance within
such 30-day period and thereafter diligently continues performance to completion. The cost of any such
Tenant's Obligations so performed by Landlord shall be at Tenant's sole cost and expense. Tenant shall
reimburse Landlord for any such costs incurred by Landlord in the performance of Tenant's Obligations
within ten (10) days of receipt of a billing from Landlord.

13.  **Intentionally deleted.**

14.  **ALTERATIONS.** At least twenty (20) days prior to the commencement of construction, Tenant shall give Landlord
written notice of all proposed alterations to the Premises requiring a permit pursuant to applicable law and shall
further provide to Landlord a copy of all permits and any and all construction drawings and specifications. Tenant
shall not be required to obtain the consent of Landlord with respect to any alterations to the Premises.  Landlord
may post notices in accordance with the laws of the state in which the Premises are located.  All alterations made

by Tenant shall be perform        ⎯nant and its contractors in a first class wₒ        ike manner and all permits and inspections shall be obtain⎯ ⎯m all required governmental entities. Tenant ⎯⎯l pay all costs for all alterations made by Tenant and shall keep the Premises free and clear of all mechanic's liens which may result from construction by Tenant. Any alterations, other than Tenant's trade fixtures which may be removed upon termination of this Lease, shall remain on and be surrendered with the Premises upon expiration or termination of this Lease, except that Landlord may, by giving written notice to Tenant within thirty (30) days before or thirty (30) days after expiration or other termination of the Term, elect to require Tenant to remove some or all of the alterations which Tenant may have made to the Premises subsequent to the Commencement Date provided that Landlord shall not be entitled to require Tenant to remove any alterations with respect to which Landlord has expressly waived such right. Any notice given by Tenant to Landlord of proposed alterations to the Premises may include a request that Landlord waive its right to require such alterations to be removed and upon receipt of such request (which must be in writing), Landlord shall advise Tenant whether Landlord will require Tenant to remove such alterations at the expiration or earlier termination of the Term. No waiver shall be effective, however, unless made expressly in writing by Landlord. If Landlord so elects, Tenant shall at its cost restore the Premises to the condition designated by Landlord in its election that alterations made by Tenant be removed, before the last day of the Term or within thirty (30) days after notice of its election is given by Landlord to Tenant whichever is later. Tenant shall not be required to remove any Tenant Improvements, alterations or other conditions in connection with the Premises existing as of the Commencement Date. The provisions of ¶14. shall be applicable only to alterations made by Tenant with respect to the Premises subsequent to the Commencement Date. A copy of any notice given by Tenant to Landlord pursuant to this ¶14 shall also be given by Tenant to Landlord's Lender (as defined below) as from time to time identified by Landlord as provided in ¶31.q. Initially, Landlord's Lender is MetLife Capital Financial Corporation and notices to such Lender shall be given as provided in ¶31.q.

15. **RELEASE AND INDEMNITY.** As material consideration to Landlord, Tenant agrees that Landlord shall not be liable to Tenant for any damage to Tenant or Tenant's property from any cause, except for damages resulting from Landlord's gross negligence or willful misconduct, and Tenant waives all claims against Landlord for damage to persons or property arising for any reason, except for damage resulting directly from Landlord's breach of its express obligations under this Lease which Landlord has not cured within a reasonable time after written notice of such breach from Tenant. Except as otherwise expressly provided (with respect to consequential damages) in ¶7.f. hereof, Tenant shall indemnify and hold Landlord harmless from all damages including attorneys' fees and costs arising out of any damage to any person or property occurring in, on or about the Premises or with respect to Tenant's use of the Premises or Tenant's breach of any term of this Lease.

16. **INSURANCE**

   a. **Payment For Insurance.** Regardless of whether the Landlord or Tenant is the Insuring Party, Tenant shall pay for all insurance for the Premises required under this ¶16. ("Insurance Costs"). Premiums for policy periods commencing prior to or extending beyond the Lease Term shall be prorated to correspond to the Lease Term. Payment shall be made by Tenant to Landlord within ten (10) days following receipt of an invoice for any amount due.

   b. **Liability Insurance.**

      1) **Carried by Tenant.** Whether or not Tenant is the Insuring Party, Tenant shall obtain and keep in force during the Term of this Lease a commercial general liability policy of insurance protecting Tenant and Landlord (as an additional insured) against claims for bodily injury, personal injury and property damage based upon, involving or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $2,000,000 per occurrence with an "Additional Insured-Managers or Landlords of Premises" endorsement and contain an "Amendment of the Pollution Exclusion" for damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease. The limits of said insurance required by this Lease or as carried by Tenant shall not, however, limit the liability of Tenant nor relieve Tenant of any obligation hereunder. All insurance to be carried by Tenant shall be primary to and not contributory with any similar insurance carried by Landlord, whose insurance shall be considered excess insurance only. All insurance coverage required pursuant to this ¶16. which is to name Landlord as a named insured shall also name Landlord's subsidiaries, directors, agents, officers and employees as named insureds.

      2) **Carried by Landlord.** In the event Landlord is the Insuring Party, Landlord shall also maintain liability insurance as described in ¶16.b.1), in addition to, and not in lieu of the insurance required to be maintained by Tenant. In the event Tenant is the Insuring Party, Landlord shall in addition carry Lessor's Risk Coverage and insure the Premises on Landlord's umbrella policy. Tenant shall not be named as an additional insured therein under any insurance obtained by Landlord in accordance with this ¶16.b.2).

   c. **Property Insurance – Building, Improvements and Rental Value.**

      1) **Building and Improvements.** The Insuring Party shall obtain and keep in force during the Term of this Lease a policy or policies in the name of Landlord and Tenant, with loss payable to Landlord and to the holders of any mortgages, deeds of trust or ground leases on the Premises ("Lender(s)"), insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full replacement cost of the Premises, exclusive of foundations, as the same shall exist from time to time, or the amount required by Lender(s), but in no event more than the commercially reasonable and available insurable

value thereof if, I ..on of the unique nature or age of the impro. s involved, such latter amount is less than full re,. .ement cost. If the coverage is available at a c....mercially reasonable cost, such policy or policies shall insure against all risks of direct physical loss or damage (including the perils of flood and earthquake), including coverage for any additional costs resulting from debris removal and reasonable amounts of coverage for the enforcement of any ordinance or law regulating the reconstruction or replacement of any undamaged sections of the Premises required to be demolished shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, then Tenant shall be liable for such deductible amount. Even if Landlord is the Insuring Party, Tenant's personal property shall be insured by Tenant under ¶16.d. rather than by Landlord.

2) **Rental Value.** The Insuring Party shall, in addition, obtain and keep in force during the term of this Lease a policy or policies in the name of Landlord and Lender, with loss payable to Landlord and Lender(s), insuring the loss of the full rental and other charges payable by Tenant to Landlord under this Lease for one (1) year (including all Real Property Taxes, Insurance Costs and any scheduled Rent increases). Said insurance shall provide that in the event the Lease is terminated by reason of an insured loss, the period of indemnity for such coverage shall be extended beyond the date of the completion of repairs or replacement of the Premises, to provide for one full year's loss of Rent from the date of any such loss. Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent, Real Property Taxes, Insurance Costs and other expenses, if any, otherwise payable by Tenant, for the next twelve (12) month period. Tenant shall be liable for any deductible amount in the event of such loss.

d.   **Tenant's Property Insurance.** Subject to the requirements of ¶16.e., Tenant at its cost shall either by separate policy, or at Landlord's option, by endorsement to a policy already carried, maintain insurance coverage on all of Tenant's personal property and Tenant owned leasehold improvements in, on or about the Premises similar in coverage to that carried by the Insuring Party under ¶16.c. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $10,000 per occurrence. The proceeds from any such insurance shall be used by Tenant for the replacement of personal property or the restoration of Tenant owned leasehold improvements. Tenant shall be the Insuring Party with respect to the insurance required by this ¶16.d. and shall provide Landlord with written evidence that such insurance is in force.

e.   **Insurance Policies.** Regarding Insurance required to be carried by Tenant per this ¶16. shall be with companies duly licensed to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least A− X, or such other minimal rating as may be required by Lender(s) as set forth in the most current issue of "Best's Insurance Guide." Tenant shall not do or permit to be done anything which shall invalidate the insurance policies referred to in this ¶16. Tenant shall cause to be delivered to Landlord certified copies of policies of such insurance or certificates evidencing the existence and amounts of such insurance with the insureds and loss payable clauses as required by this Lease. No such policy shall be cancelable or subject to modification except after thirty (30) days prior written notice to Landlord. Tenant shall at least thirty (30) days prior to the expiration of such policies, furnish Landlord with evidence of renewals or "insurance binders" evidencing renewal thereof, or Landlord may order such insurance and charge the cost thereof to Tenant, which amount shall be payable by Tenant to Landlord upon demand. If Tenant shall fail to procure and maintain the insurance required to be carried by Tenant under this ¶16., Landlord may, but shall not be required to, procure and maintain the same, but at Tenant's expense.

f.   **Mutual Waiver.** Notwithstanding anything to the contrary contained in this Lease, to the extent that this release and waiver does not invalidate or impair their respective insurance policies, the parties hereto release each other and their respective agents, employees, officers, directors, shareholders, successors, assignees and subtenants from all liability for injury to any person or damage to any property that is caused by or results from a risk which is actually insured against pursuant to the provisions of this Lease without regard to the negligence or willful misconduct of the parties so released. Each party shall use its best efforts to cause each insurance policy it obtains to provide that the insurer thereunder waives all right of recovery by way of subrogation as required herein in connection with any injury or damage covered by the policy. If such insurance policy cannot be obtained with such waiver of subrogation, or if such waiver of subrogation is only available at additional cost and the party for whose benefit the waiver is not obtained does not pay such additional costs after reasonable notice, then the party obtaining such insurance shall promptly notify the other party of the inability to obtain insurance coverage with the waiver of subrogation.

g.   Notwithstanding anything set forth herein to the contrary, Tenant may satisfy its obligations under this ¶16. with blanket policies of insurance coverage.

## 17. DAMAGE AND DESTRUC

a. **Damage - Insured.** In the event that the Premises is damaged by fire or other casualty which is covered under insurance pursuant to the provisions of ¶16. above, Landlord shall restore such damage provided that: (i) the destruction of the Premises does not exceed eighty percent (80%) of the then replacement value of the Premises; (ii) insurance proceeds are available (inclusive of any deductible amounts) to pay one hundred percent (100%) of the cost of restoration; and (iii) in the reasonable judgment of Landlord, the restoration can be completed within two hundred and seventy (270) days after the date of the damage or casualty under the laws and regulations of the state, federal, county and municipal authorities having jurisdiction. The deductible amount of any insurance coverage shall be paid by Tenant except in the case of flood or earthquake and in such case the deductible amount in excess of $10,000 per occurrence shall be paid by Landlord. If such conditions apply so as to require Landlord to restore such damage pursuant to this ¶17.a., this Lease shall continue in full force and effect, unless otherwise agreed to in writing by Landlord and Tenant. Tenant shall be entitled to a proportionate reduction of Rent at all times during which Tenant's use of the Premises is interrupted, such proportionate reduction to be based on the extent to which the damage and restoration efforts interfere with Tenant's business in the Premises. Tenant's right to a reduction of Rent hereunder shall be Tenant's sole and exclusive remedy in connection with any such damage.

b. **Damage - Uninsured.** In the event that the Premises is damaged by a fire or other casualty and Landlord is not required to restore such damage in accordance with the provisions of ¶17.a. immediately above, Landlord shall have the option to either (i) repair or restore such damage, with the Lease continuing in full force and effect, but Rent to be proportionately abated as provided in ¶17.a. above; or (ii) give notice to Tenant at any time within thirty (30) days after the occurrence of such damage terminating this Lease as of a date to be specified in such notice which date shall not be less than thirty (30) nor more than sixty (60) days after the date on which such notice of termination is given. In the event of the giving of such notice of termination, this Lease shall expire and all interest of Tenant in the Premises shall terminate on the date so specified in such notice and the Rent, reduced by any proportionate reduction in Rent as provided for in ¶17.a. above, shall be paid to the date of such termination. Notwithstanding the foregoing, if Tenant delivers to Landlord the funds necessary to make up the shortage (or absence) in insurance proceeds and the restoration can be completed in a two hundred seventy (270) day period, as reasonably determined by Landlord, and the destruction of the Premises does not exceed eighty percent (80%) of the then replacement value, Landlord shall restore the Premises as provided in ¶17.a. above.

c. **End of Term Casualty.** Notwithstanding the provisions of ¶17.a. and ¶17.b. above, either Landlord or Tenant may terminate this Lease if the Premises is damaged by fire or other casualty (and Landlord's reasonably estimated cost of restoration of the Premises exceeds ten percent (10%) of the then replacement value of the Premises) and such damage or casualty occurs during the last twelve (12) months of the Term of this Lease (or the Term of any renewal option, if applicable) by giving the other notice thereof at any time within thirty (30) days following the occurrence of such damage or casualty. Such notice shall specify the date of such termination which date shall not be less than thirty (30) nor more than sixty (60) days following the date on which such notice of termination is given. In the event of the giving of such notice of termination, this Lease shall expire and all interest of Tenant in the Premises shall terminate on the date so specified in such notice and the Rent shall be paid to the date of such termination. Notwithstanding the foregoing to the contrary, Landlord shall not have the right to terminate this Lease if damage or casualty occurs during the last twelve (12) months of the Term if Tenant timely exercises its option to extend the Term pursuant to ¶28. of this Lease within twenty (20) days after the date of such damage or casualty.

d. **Termination by Tenant.** In the event that the destruction to the Premises cannot be restored as required herein under applicable laws and regulations within two hundred seventy (270) days of the damage or casualty, notwithstanding the availability of insurance proceeds, Tenant shall have the right to terminate this Lease by giving the Landlord notice thereof within thirty (30) days of date of the occurrence of such casualty specifying the date of termination which shall not be less than thirty (30) days nor more than sixty (60) days following the date on which such notice of termination is given. In the event of the giving of such notice of termination, this Lease shall expire and all interest of Tenant in the Premises shall terminate on the date so specified in such notice and the Rent, reduced by any proportionate reduction in Rent as provided for in ¶17.a. above, shall be paid to the date of such termination.

e. **Restoration.** Landlord agrees that, in any case in which Landlord is required to, or otherwise agrees to restore the Premises, that Landlord shall proceed with due diligence to make all appropriate claims and applications for the proceeds of insurance and to apply for and obtain all permits necessary for the restoration of the Premises. Landlord shall restore the Premises to the condition existing prior to the date of the damage if permitted by applicable law. Landlord shall not be required to restore alterations made by Tenant, Tenant's improvements, Tenant's trade fixtures, and Tenant's personal property, such excluded items being the sole responsibility of Tenant to restore provided, however, that Landlord shall, to the extent of available insurance proceeds, restore Tenant Improvements to the Premises made by Tenant such as interior offices, lab and production improvements and other like improvements.

f. **Waiver.** Tenant waives the provisions of Civil Code §1932(2) and Civil Code §1933(4) with respect to any destruction of the Premises.

## 18. CONDEMNATION

a. **Definitions.** The following definitions shall apply: (1) "Condemnation" means (a) the exercise of any governmental power of eminent domain, whether by legal proceedings or otherwise by condemnor, or (b) the

knutt/timar19/lease.2

voluntary sale or trans    Landlord to any condemnor either under th    / condemnation or while legal proceedings for condemnation are proceeding; (2) "Date of Taking" means the date the condemnor has right to possession of the property being condemned; (3) "Award" means all compensation, sums or anything of value awarded, paid or received on a total or partial condemnation; and (4) "Condemnor" means any public or quasi-public authority, or private corporation or individual, having power of condemnation.

b.  Obligations to be Governed by Lease. If during the Term of the Lease there is any taking of all or any part of the Premises, the rights and obligations of the parties shall be determined strictly pursuant to this Lease. Each party waives the provisions of Code of Civil Procedure §1265.130 allowing either party to petition the Superior court to terminate this Lease in the event of a partial Condemnation of the Premises.

c.  Total or Partial Taking. If the Premises are totally taken by Condemnation, this Lease shall terminate on the Date of Taking. If any portion of the Premises is taken by Condemnation, this Lease shall remain in effect, except that Tenant can elect to terminate this Lease if the remaining portion of the Premises is rendered unsuitable for Tenant's continued use of the Premises. If Tenant elects to terminate this Lease, Tenant must exercise its right to terminate by giving notice to Landlord within thirty (30) days after the nature and extent of the Condemnation have been finally determined. If Tenant elects to terminate this Lease, Tenant shall also notify Landlord of the date of termination, which date shall not be earlier than thirty (30) days nor later than ninety (90) days after Tenant has notified Landlord of its election to terminate; except that this Lease shall terminate on the Date of Taking if the Date of Taking falls on a date before the date of termination as designated by Tenant. If any portion of the Premises is taken by Condemnation and this Lease remains in full force and effect, on the Date of Taking the Base Rent shall be reduced by an amount in the same ratio as the total number of square feet in the building(s) which are a part of the Premises taken bears to the total number of square feet in the building(s) which are a part of the Premises immediately before the Date of Taking. Any Award for the taking of all or any part of the Premises under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Landlord, whether such Award shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages; provided, however, that Tenant shall be entitled to any compensation separately awarded to Tenant for Tenant's relocation expenses and/or loss of Tenant's trade fixtures.

## 19. ASSIGNMENT OR SUBLEASE

a.  Tenant shall not assign or encumber its interest in this Lease or the Premises or sublease all or any part of the Premises or allow any other person or entity (except Tenant's authorized representatives, employees, invitees or guests) to occupy or use all or any part of the Premises without first obtaining Landlord's consent, which consent shall not be unreasonably withheld. Landlord shall give written notice of its consent or its determination not to consent within thirty (30) days following written request for such consent given by Tenant to Landlord. Any assignment, encumbrance or sublease without Landlord's prior written consent shall be voidable and at Landlord's election, shall constitute a default. If Tenant is a partnership, a withdrawal or change, voluntary, involuntary or by operation of law of any partner, or the dissolution of the partnership, shall be deemed a voluntary assignment. If Tenant consists of more than one person, a purported assignment, voluntary or involuntary or by operation of law from one person to the other shall be deemed a voluntary assignment. If Tenant is a corporation, any dissolution, merger, consolidation or other reorganization of Tenant, or sale or other transfer of a controlling percentage of the capital stock of Tenant, or the sale of at least fifty percent (50%) of the value of the assets of Tenant shall be deemed a voluntary assignment, provided, however, that no dissolution, merger, consolidation or other reorganization of Tenant that results in Tenant continuing as a subsidiary or division (either directly or indirectly) of General Motors Corporation or any such Corporation's subsidiary corporations shall be considered a voluntary assignment. Unless otherwise expressly agreed in writing by Landlord, no assignment shall relieve Tenant of any of its obligations pursuant to this Lease. All Rent received by Tenant from its subtenants in excess of the Rent payable by Tenant to Landlord under this Lease applicable to the portion of the Premises subleased shall be paid to Landlord, or any sums to be paid by an assignee to Tenant in consideration of the assignment of this Lease shall be paid to Landlord. If Tenant requests Landlord to consent to a proposed assignment or subletting, Tenant shall pay to Landlord, whether or not consent is ultimately given, an amount equal to Landlord's reasonable attorneys' fees and costs incurred in connection with such request not to exceed Two Thousand Dollars ($2,000.00). Tenant shall, upon completion of any assignment or subletting of all or any portion of the Premises, immediately and irrevocably assign to Landlord as security for Tenant's obligations under the Lease, all Rent from any such subletting or assignment. Landlord, as assignee and attorney in fact for Tenant, shall have the right to collect all rent and other revenues collectable pursuant to any such sublet or assignment and apply such rent and other revenues towards Tenant's obligations under the Lease provided, however, that Landlord shall have no right to collect such rent and other revenues until the occurrence of an act of default under this Lease.

b.  No interest of Tenant in this Lease shall be assignable by involuntary assignment through operation of law (including without limitation the transfer of this Lease by testacy or intestacy). Each of the following acts shall be considered an involuntary assignment: (a) if Tenant is or becomes bankrupt or insolvent, makes an assignment for the benefit of creditors, or institutes proceedings under the Bankruptcy Act in which Tenant is the bankrupt; or if Tenant is a partnership or consists of more than one person or entity, if any partner of the partnership or other person or entity is or becomes bankrupt or insolvent, or makes an assignment for the benefit of creditors; or (b) if a writ of attachment or execution is levied on this Lease; or (c) if in any proceeding or action to which Tenant is a party, a receiver is appointed with authority to take possession of the Premises. An involuntary assignment shall constitute a default by Tenant and Landlord shall have the right to elect to terminate this Lease, in which case this Lease shall not be treated as an asset of Tenant.

knutfilmar19lease.2

c.   Landlord may at its ( ... ) lect to terminate the Lease instead of a, ... ) the requested assignment or sublease. Should Lan... so elect to terminate this Lease, all of the ... ations of the parties thereunder shall terminate on the later of sixty (60) days following Landlord's notice to Tenant of its election hereunder, or the effective date of the proposed assignment or subletting sought by the Tenant, but in no event later than one hundred twenty (120) days following the date of Landlord's election under this ¶19.c. At the time of termination, all obligations of both parties hereunder shall terminate as to obligations thereafter accruing except as otherwise expressly provided in this Lease. Notwithstanding the above provisions of this ¶19.c. to the contrary, in the event that Landlord elects to terminate this Lease, Tenant shall have a period of thirty (30) days following Landlord's notice to Tenant of its election to so terminate in which to give Landlord notice of Tenant's election to withdraw its proposed assignment or subletting. In the event of any such timely withdrawal, Landlord's election to terminate this Lease shall be ineffective and this Lease shall continue in full force and effect.

20.  **DEFAULT.** The occurrence of any of the following shall constitute a default by Tenant: (a) a failure by Tenant to pay Rent within ten (10) days of its due date; or (b) the failure by Tenant to perform any other provision of this Lease within thirty (30) days following written notice of such failure given by Landlord to Tenant ("Default Notice") provided, however, that if such failure cannot reasonably be performed within thirty (30) days following the Default Notice then Tenant shall not be in default so long as Tenant commences to cure such failure within such 30-day period and thereafter diligently continues such cure to completion within one hundred eighty (180) days following the date on which the Default Notice is given.

21.  **LANDLORD'S REMEDIES.** Landlord shall have the following remedies if Tenant is in default. (These remedies are not exclusive; they are cumulative and in addition to any remedies now or later allowed by law):

a.   Landlord may continue this Lease in full force and effect, and this Lease will continue in effect so long as Landlord does not terminate Tenant's right to possession, and Landlord shall have the right to collect Rent when due. During the period Tenant is in default, Landlord can enter the Premises and relet the Premises, or any part of the Premises, to third parties for Tenant's account. Tenant shall be liable immediately to Landlord for all costs Landlord incurs in reletting the Premises, including without limitation, brokers' commissions, expenses of remodeling the Premises required by the reletting, and like costs. Reletting can be for a period shorter or longer than the remaining Term of this Lease. Tenant shall pay to Landlord the Rent due under this Lease on the dates the Rent is due, less the Rent Landlord receives from any reletting. No act by Landlord allowed by this ¶21.a. shall terminate this Lease unless Landlord notifies Tenant in writing that Landlord elects to terminate this Lease. After Tenant's default and for so long as Landlord does not terminate Tenant's right to possession of the Premises, if Tenant obtains Landlord's consent, Tenant shall have the right to assign or sublet its interest in this Lease, but Tenant shall not be released from liability. Landlord's consent to such a proposed assignment or subletting shall not be unreasonably withheld. If Landlord elects to relet the Premises as provided in this ¶21.a., Rent that Landlord receives from reletting shall be applied to the payment of: first, any indebtedness from Tenant to Landlord other than Rent due from Tenant; second, all costs, including for maintenance incurred by Landlord in reletting; and third, Rent due and unpaid under this Lease. After deducting the payments referred to in this ¶21.a., any sum remaining from the Rent Landlord receives from reletting shall be held by Landlord and applied in payment of future Rent as Rent becomes due under this Lease. In no event shall Tenant be entitled to any excess Rent received by Landlord. If, on the date Rent is due under this Lease, the Rent received from the reletting is less than the Rent due on that date, Tenant shall pay to Landlord, in addition to the remaining Rent due, all costs including for maintenance Landlord incurred in reletting that remain after applying the Rent received from the reletting as provided in this ¶21.a.; and

b.   Landlord may terminate Tenant's right to possession of the Premises at any time. No act by Landlord other than giving express written notice thereof to Tenant shall terminate this Lease. Acts of maintenance, efforts to relet the Premises, or the appointment of a receiver on Landlord's initiative to protect Landlord's interest under this Lease shall not constitute a termination of Tenant's right to possession. Upon termination of Tenant's right to possession, Landlord has the right to recover from Tenant: (1) the Worth of the unpaid Rent that had been earned at the time of termination of Tenant's right to possession; (2) the Worth of the amount by which the unpaid Rent that would have been earned after the date of termination until the time of award exceeds the amount of the loss of Rent that Tenant proves could have been reasonably avoided; (3) the Worth of the amount of the unpaid Rent that would have been earned after the award throughout the remaining Term of the Lease to the extent such unpaid Rent exceeds the amount of the loss of Rent that Tenant proves could have been reasonably avoided; and (4) any other amount, including but not limited to, expenses incurred to relet the Premises, court costs, attorneys' fees and collection costs necessary to compensate Landlord for all detriment caused by Tenant's default. The "Worth," as used above in (1) and (2) in this ¶21.b. is to be computed by allowing interest at the lesser of ten percent (10%) per annum or the maximum legal interest rate permitted by law. The "Worth," as used above in (3) in this ¶21.b. is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%).

22.  **ENTRY OF PREMISES.** Landlord and/or its authorized representatives shall have the right to enter the Premises at all reasonable times following twenty-four (24) hours written notice, except in the case of emergency, for any of the following purposes: (a) to determine whether the Premises are in good condition and whether Tenant is complying with its obligations under this Lease; (b) to do any necessary maintenance and to make any restoration to the Premises that Landlord has the right or obligation to perform; (c) to post "for sale" signs at any time during the Term, or to post "for rent" or "for lease" signs during the last ninety (90) days of the Term or during any period while Tenant is in default; (d) to show the Premises to prospective brokers, agents, buyers, tenants or persons interested in leasing or purchasing the Premises, at any time during the Term; or (e) to repair, maintain or improve the Premises and to erect scaffolding and protective barricades around and about the Premises but not so as to

- 13 -

prevent entry to the Prem       ⌐ to do any other act or thing necessary        ¡safety or preservation of the
Premises. Landlord shall no⌐  ⌐able in any manner for any inconvenience, dist⌐ ⌐nce, loss of business, nuisance or other damage arising out of Landlord's entry onto the Premises as provided in this ¶22, except as a result of Landlord's gross negligence or the gross negligence of its agents and/or contractors. Tenant shall not be entitled to an abatement or reduction of Rent if Landlord exercises any rights reserved in this ¶22. Landlord shall conduct its activities on the Premises as provided herein in a commercially reasonable manner that will lessen the inconvenience, annoyance or disturbance to Tenant. Landlord shall be obligated to comply with any and all security procedures mandated by Tenant in connection with any entry of Landlord upon the Premises.

23. **SUBORDINATION**

a.  Intentionally deleted.

b.  Additional Subordination. From time to time at the request of Landlord, Tenant covenants and agrees to execute and deliver within ten (10) days following the date of written request from Landlord, documents evidencing the priority or subordination of this Lease with respect to any ground lease or underlying lease or the lien of any mortgage or deed of trust in connection with the Premises. Any and all such documents shall be in such form as is reasonably acceptable to Tenant and Landlord as well as the Lender(s) and other applicable party. Any subordination agreement so requested by Landlord shall provide for Tenant to attorn to the successor in interest to Landlord and shall further provide that Tenant shall not be disturbed in its possession of the Premises or in the enjoyment of its rights pursuant to this Lease so long as Tenant is not in default with respect to its obligations pursuant to the Lease. Any such Subordination, Non-disturbance and Attornment Agreement shall be recorded in the official records of the office of the County Recorder in the County in which the Premises is located. Tenant hereby irrevocably appoints Landlord as attorney-in-fact of Tenant to execute, deliver and record any such document in the name of and on behalf of Tenant.

c.  Notice from Lender. Tenant shall be entitled to rely upon any notice given by Lender(s) in connection with the Premises requesting that Tenant make all future Rent payments to such Lender(s), and Tenant shall not be liable to Landlord for any payment made to such Lender(s) in accordance with such notice.

24. **ESTOPPEL CERTIFICATE/TENANT FINANCIAL STATEMENTS.** Tenant, at any time and from time to time, upon not less than ten (10) days written notice from Landlord, shall execute, acknowledge and deliver to Landlord and, at Landlord's request, to any existing or prospective purchaser, ground lessor or mortgagee of any part of the Premises, a certificate of Tenant stating: (a) that Tenant has accepted the Premises (or, if Tenant has not done so, Tenant has not accepted the Premises and specifying the reasons therefor); (b) the Commencement and Expiration Dates of this Lease; (c) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that same is in full force and effect as modified and stating the modifications); (d) whether or not to the best of Tenant's knowledge there are then existing any defenses against the enforcement of any of the obligations of Tenant under this Lease (and, if so, specifying same); (e) whether or not to the best of Tenant's knowledge there are then existing any defaults by Landlord in the performance of its obligations under this Lease (and, if so, specifying same); (f) the dates, if any, to which the Rent and other charges under this Lease have been paid; (g) whether or not there are Rent increases during the Lease Term and if so the amount of same; (h) whether or not the Lease contains any options or rights of first offer or first refusal; (i) the amount of any Security Deposit or other sums due Tenant; (j) the current notice address for Tenant; and (k) any other information that may reasonably be required by any of such persons. It is intended that any such certificate of Tenant delivered pursuant to this ¶24. may be relied upon by Landlord and any existing or prospective purchaser, ground lessor or mortgagee of the Premises. Landlord shall supply Tenant with a corresponding certificate within ten (10) days of Tenant's written request therefor.

25. **WAIVER.** No delay or omission in the exercise of any right or remedy by Landlord shall impair such right or remedy or be construed as a waiver. No act or conduct of Landlord, including without limitation, acceptance of the keys to the Premises, shall constitute an acceptance of the surrender of the Premises by Tenant before the expiration of the Term. Only written notice from Landlord to Tenant shall constitute acceptance of the surrender of the Premises and accomplish termination of the Lease. Landlord's consent to or approval of any act by Tenant requiring Landlord's consent or approval shall not be deemed to waive or render unnecessary Landlord's consent to or approval of any subsequent act by Tenant. Any waiver by Landlord of any Default must be in writing and shall not be a waiver of any other Default concerning the same or any other provision of the Lease.

26. **SURRENDER OF PREMISES; HOLDING OVER.** Upon expiration of the Term, Tenant shall surrender to Landlord the Premises and all tenant improvements and alterations in the same condition as existed at the Commencement Date, except for ordinary wear and tear and alterations which Tenant has the right or is obligated to remove under the provisions of ¶14. herein. Tenant shall remove all personal property including, without limitation, all wallpaper, paneling and other decorative improvements or fixtures and shall perform all restoration made necessary by the removal of any alterations or Tenant's personal property before the expiration of the Term, including, for example, restoring all wall surfaces to their condition as of the Commencement Date. Landlord can elect to retain or dispose of in any manner Tenant's personal property not removed from the Premises by Tenant prior to the expiration of the Term. Tenant waives all claims against Landlord for any damage to Tenant resulting from Landlord's retention or disposition of Tenant's personal property. Tenant shall be liable to Landlord for Landlord's cost for storage, removal and disposal of Tenant's personal property. Notwithstanding provisions of this ¶26. to the contrary, Tenant shall not be required to remove any alterations to the Premises with respect to which Landlord has waived its right to removal as provided in ¶14.

If Tenant with Landlord's consent remains in possession of the Premises after expiration of the Term or after the date in any notice given by Landlord to Tenant terminating this Lease, such possession by Tenant shall be deemed

krutt9mer19lease.2

to be a month to month ter        ncelable by either party on thirty (30) da         in notice given at any time by either party and all provisio.        this Lease, except those pertaining to Term, .        val options and Base Rent shall apply and Tenant shall pay monthly Base Rent in an amount equal to one hundred twenty-five percent (125%) of the Base Rent for the last full calendar month immediately preceding the expiration of the Term for the thirty (30) days immediately following such expiration and thereafter a monthly Base Rent in an amount equal to one hundred fifty percent (150%) of the Base Rent for the last full calendar month immediately preceding expiration of the Term.

Notwithstanding any provision of this Lease to the contrary, upon expiration or termination of the Lease, Tenant shall have the right to remove any and all phone systems, furniture, fixtures and other personal property purchased by Tenant which are not affixed to the Premises. Tenant shall in addition have a right to remove any and all mechanical equipment purchased by Tenant so long as such mechanical equipment is not affixed to the Premises and does not constitute a portion of a system which is affixed to the Premises. Tenant shall, at its sole cost and expense, repair any damage caused by removal of the above items.

27. NOTICES. All notices, demands, or other communications required or contemplated under this Lease shall be in writing and shall be deemed to have been duly given 48 hours from the time of mailing if mailed by registered or certified mail, return receipt requested, postage prepaid, or 24 hours from the time of shipping by overnight carrier, or the actual time of delivery if delivered by personal service to the parties at the addresses specified in ¶1. Either Tenant or Landlord may change the address to which notices are to be given to such party hereunder by giving written notice of such change of address to the other in accordance with the notice provisions hereof.

28. RENEWAL OPTIONS

   a.   Grant of Option. Provided that Tenant's right to possession of the Lease has not been terminated as a result of a default by Tenant under this Lease, Tenant shall have the right, at its option, to extend the Lease for one (1) period of five (5) years ("First Extended Term") commencing at the expiration of the initial Term of this Lease and at the expiration of the First Extended Term shall have the right to extend the Term for a second period of five (5) years ("Second Extended Term") commencing at the expiration of the First Extended Term.

   b.   Exercise of Option. If Tenant decides to extend the Lease for the First Extended Term, and provided that Landlord has timely provided to Tenant Landlord's proposed fair market rental value for the Premises, Tenant shall give written notice to Landlord of its election to extend not less than two hundred forty (240) days prior to the Expiration Date. If Tenant decides to extend the Lease for the Second Extended Term, Tenant shall give written notice to the Landlord of its election to extend not later than two hundred forty (240) days prior to expiration of the First Extended Term. Tenant's failure to give timely notice to Landlord of Tenant's election(s) to extend shall be deemed a waiver of Tenant's right(s) to extend. The terms and conditions applicable to the First Extended Term and the Second Extended Term shall be the same terms and conditions contained in this Lease except that after exercising the option to extend for the First Extended Term, Tenant shall be entitled to one (1) additional option to extend for the Second Extended Term and after the Second Extended Term, Tenant shall not be entitled to any further option to extend. The Base Rent for the First Extended Term and Second Extended Term shall be as determined in accordance with ¶28.c.

   c.   Determination of Base Rent During Each Extended Term.

      1)   Agreement on Base Rent. Landlord shall not be obligated to provide Tenant with the proposed fair market rental value until ten (10) months prior to the expiration of the then Term. Landlord and Tenant shall have thirty (30) days after Landlord provides the proposed fair market rental value in which to agree on the Base Rent during each Extended Term, which shall be ninety-five percent (95%) of the fair market rental value of the Premises during said Extended Term. The fair market rental value of the Premises during said Extended Term shall be based on the authorized zoning uses of the Premises, the quality, size, design and location of the Premises, and the rental value for lease renewals or extensions of comparable size, quality and location. If Landlord and Tenant agree on the Base Rent for each Extended Term during the thirty (30) day period, they shall immediately execute an amendment to this Lease stating the new Base Rent. During each Extended Term the Base Rent as applicable at the commencement of the Extended Term shall be adjusted annually pursuant to the provisions of ¶4.b.1) provided, however, that the Beginning Index shall be the Index which is in effect on the ninetieth (90th) day preceding the date of commencement of the Extended Term, the Initial Base Rent shall be the Base Rent effective as of the commencement of the Extended Term and the adjustment in Base Rent shall commence as of the first Annual Anniversary of the Commencement Date immediately following commencement of the Extended Term.

      2)   . Selection of Appraisers. If Landlord and Tenant are unable to agree on the Base Rent for each Extended Term within the thirty (30) day period, then within ten (10) days after the expiration of the thirty (30) day period and provided that Tenant has timely exercised the subject renewal option in accordance with ¶28.b., Landlord and Tenant each at its own cost and by giving notice to the other party, shall appoint a competent and disinterested real estate appraiser with at least five (5) years' full-time commercial appraisal experience in the Irvine, California area to appraise the fair market rental value of the Premises and set the Base Rent during said Extended Term. If either Landlord or Tenant does not appoint an appraiser within said ten (10) days, the single appraiser appointed shall be the sole appraiser and shall set the Base Rent during said Extended Term. If two (2) appraisers are appointed by Landlord and Tenant as stated in this ¶28.c.2), they shall meet promptly and attempt to set the Base Rent for said Extended Term. If the two (2) appraisers are unable to agree within thirty (30) days after the second appraiser has been appointed, they shall attempt to select a third appraiser meeting the qualifications stated in this

- 15 -

¶28.c.2) within ⸍        days after the last day the two (2) app       ⸍re given to set the Base Rent. ⸍
If they are unabl       ⸍ree on the third appraiser, either Landlord       ⸍ant, by giving ten (10) days'
notice to the other ⸍arty, can apply to the then president of the real estate board of Orange County or
to the Presiding Judge of the Superior Court of Orange County, for the selection of a third appraiser who
meets the qualifications stated in this ¶28.c.2). Landlord and Tenant each shall bear one-half (½) of the
cost of appointing the third appraiser and of paying the third appraiser's fee. The third appraiser,
however selected, shall be a person who has not previously acted in any capacity for either Landlord or
Tenant, or their affiliates.

3)   Value Determined by Three (3) Appraisers. Within thirty (30) days after the selection of the third
appraiser, a majority of the appraisers shall set the Base Rent for the Extended Term. If a majority of the
appraisers are unable to set the Base Rent within the stipulated period of time, Landlord's appraiser shall
arrange for simultaneous exchange of written appraisals from each of the appraisers and the three (3)
appraisals shall be added together and their total divided by three (3); the resulting quotient shall be the
Base Rent for the Premises during the Extended Term. If, however, the low appraisal and/or the high
appraisal are/is more than fifteen percent (15%) lower and/or higher than the middle appraisal, such low
appraisal and/or high appraisal shall be disregarded. If only one (1) appraisal is disregarded, the remaining
two (2) appraisals shall be added together and their total divided by two (2); the resulting quotient shall
be the Base Rent for the Premises during the Extended Term. If both the low appraisal and the high
appraisal are disregarded as stated in this ¶28.c.3), the middle appraisal shall be the Base Rent for the
Premises during the Extended Term.

4)   Notice to Landlord and Tenant. After the Base Rent for the Extension Term has been set, the appraisers
shall immediately notify Landlord and Tenant, and Landlord and Tenant shall immediately execute an
amendment to this Lease stating the new Base Rent.

5)   Minimum Base Rent Level. Notwithstanding any other provision of this Lease, in no event shall the Base
Rent for the First Extended Term be less than that Base Rent (as adjusted pursuant to ¶4.b.1)) prevailing
immediately prior to the Expiration Date nor in any event shall the Base Rent for the Second Extended
Term be less than that Base Rent (as adjusted pursuant to ¶4.b.1)) prevailing immediately prior to the
expiration of the First Extended Term.

29.  REPRESENTATIONS AND WARRANTIES. It is acknowledged that this Lease is being entered into in connection
with a purchase of the Premises by Landlord from a seller ("Seller") currently affiliated with Tenant and that Tenant
previously constituted a constituent part of such Seller. As material consideration for the purchase by Landlord
of the Premises from Seller and the entry by Landlord into this Lease, and given the affiliation of Tenant to Seller,
Tenant hereby represents and warrants to Landlord that:

a.   Pending Actions. Except as disclosed in writing by Tenant to Landlord, Tenant has not received written notice
that there are any pending actions, suits, arbitrations, claims or proceedings, at law or in equity, affecting the
Premises or in which Tenant is, or, to the best of Tenant's knowledge, will be, a party by reason of Tenant's
occupancy of the Premises.

b.   Governmental Regulations. Except as disclosed in writing prior to the date of execution of this Lease by
Tenant to Landlord, to the best of Tenant's knowledge, Tenant is not in violation of governmental regulations
relating to the Premises including, without limitation, the Americans with Disabilities Act, and Tenant has not
received written notice of any violations of governmental regulations relating to the Premises.

c.   Licenses. To Tenant's actual knowledge, without any independent inquiry, all licenses, approvals, permits
and certificates from governmental authorities or private parties currently necessary for the use and operation
of the Premises, as it is currently being used and operated, have been obtained.

d.   Utilities. The Premises are connected to and are served by water, solid waste and sewage disposal, drainage,
telephone, electricity and other utility equipment facilities and services which are adequate for the present use
and occupancy of the Premises and Tenant has received no written notice of any fact or condition which
would result in the termination or impairment in the furnishing of utility services to the Premises.

e.   Physical Defects. To Tenant's actual knowledge, without any independent inquiry, except as disclosed in
writing to Landlord prior to the execution of this Lease, there are no material, physical or mechanical defects
in the condition of the Premises, including, but not limited to, the roofs, exterior walls or structural
components of the Premises and the heating, air conditioning, plumbing, ventilating, elevator, utility, sprinkler
and other mechanical and electrical systems, apparatus and appliances located in the Premises.
Notwithstanding the foregoing provisions of this ¶29.e., Tenant hereby advises Landlord of the following: (i)
the condition of the roof of the Premises is unsatisfactory and Tenant is making no representation with
respect to the condition of the roof; (ii) the air conditioning systems within the Premises are old and require
frequent maintenance; (iii) the fire sprinkler system, although functional, may require earthquake bracing; and
(iv) the Premises has been occupied by Tenant for in excess of twenty (20) years and has been subject to the
normal wear and tear of occupancy by an industrial/manufacturing tenant.

f.   Insurance Notice. Tenant has not received any notice from any insurance company of any defects in the
Premises or in any portion of the Premises. ⸍

g.   Hazardous Materials. To the best of Tenant's knowledge and except as disclosed in the environmental reports
delivered to Landlord and listed on Exhibit C and/or as otherwise disclosed on Exhibit C, the Premises and all

knutt\timer18\lease_2

operations or activitie        or use or occupancy of the Premises, or        tion thereof, are in all material respects in compliance        all state, federal and local laws and regulati.        governing or in any way relating to the generation, handling, manufacturing, treatment, storage, use, transportation, spillage, leakage, dumping, discharge or disposal of Hazardous Materials. To the best of Tenant's knowledge, except for matters, if any, disclosed in the environmental reports delivered to Landlord and listed on Exhibit C attached hereto, and/or otherwise set forth on Exhibit C, no release of Hazardous Materials in violation of Hazardous Materials Laws has occurred on, above or beneath the Premises, and Tenant has not been required by any governmental agency to undertake any remediation activity with respect to any Hazardous Materials on the Premises. To Tenant's actual knowledge the environmental reports listed on Exhibit C constitute all of the environmental reports existing with respect to the Premises.

h.  Service Contracts. To the best of Tenant's knowledge, there are no service or maintenance contracts, commission agreements or equipment leases, (whether oral or written) which affect or will affect or which are or will be obligations of Landlord in connection with the Premises, other than the service contracts listed on Exhibit D. To the best of Tenant's knowledge, there are no current material defaults or breaches under any of the terms of provisions of such service contracts.

Tenant hereby agrees to indemnify Landlord against and to hold Landlord harmless from, all losses, damages, costs and expenses whatsoever including without limitation reasonable legal fees and disbursements incurred by Landlord relating to the Premises which arise, result from or relate to a breach of any of the representations or warranties of Tenant as set forth in this ¶29. The provisions of this ¶29. shall survive termination of the Lease and may be enforced by Landlord without regard to any other rights or remedies which Landlord may have pursuant to this Lease.

30. ROOF REPLACEMENT AND COMPLIANCE WITH FUTURE LAWS

a.  Roof Replacement. It has been determined by Landlord and Tenant that the entire roof of the Premises (the"Roof") requires replacement as of the Commencement Date of this Lease. Notwithstanding the provisions of ¶12.b. to the contrary, Landlord shall be responsible on a one time basis for the cost of replacement of the Roof in accordance with the provisions of this ¶30.a. Further, as additional Rent, Tenant shall pay the amounts as set forth in this ¶30.a. For purposes of this ¶30.a., portions of the Roof are sometimes referred to as the "low rear roof", "upper north roof" and "upper south roof", which portions of the Roof are more particularly described on Exhibit E attached hereto and incorporated herein by this reference. Notwithstanding any provisions in this ¶30.a. to the contrary, Landlord shall have no obligation to repair all or any portion of the Roof and the obligation of Landlord shall be limited to responsibility for the cost of replacement (rather than repair) of the entire Roof as more particularly described in this ¶30.a. Tenant's repair and maintenance obligation, as set forth in ¶12.a. shall, notwithstanding the provisions of ¶30.a., include repairs and maintenance of the Roof both prior to and following replacement of the Roof and/or various portions of the Roof. It is acknowledged that the low rear roof, upper north roof and upper south roof may be simultaneously replaced or may be replaced on a sequential basis. In any event, it is intended that the entire Roof be replaced prior to October 31, 1996.

1)  The cost for replacement of the Roof to be borne by Landlord shall be in the aggregate amount of $485,000.00 which cost is allocated $176,000.00 to the low rear roof, $136,000.00 to the upper north roof and $173,000.00 to the upper south roof. The aggregate cost of Roof replacement to be borne by Landlord shall be referred to as "Landlord's Roof Cost". In no event shall Landlord be responsible for any cost with respect to the replacement of the Roof in excess of the aggregate amount of Landlord's Roof Cost as described immediately above.

2)  In addition to any and all other Rent to be paid by Tenant pursuant to this Lease, Tenant shall pay to Landlord the Roof Replacement Amount (as defined immediately below), without notice, demand, offset or deduction, in advance on the first day of each and every calendar month of the Lease Term provided that the first month's Roof Replacement Amount shall be due and payable on the Commencement Date. The monthly Roof Replacement Amount for any partial calendar month at the beginning or end of this Lease will be prorated in accordance with the number of days in the subject month. The "Roof Replacement Amount" to be paid monthly by Tenant shall be equal to $4,634.91 which amount equates to the monthly amount required to fully pay and amortize the aggregate amount of Landlord's Roof Cost at a per annum interest rate of eight percent (8%) over a period of fifteen (15) years. Following completion of replacement of the entire Roof and determination of the aggregate actual cost of replacement, in the event that the actual Landlord's Roof Cost is less than $485,000.00, then the monthly Roof Replacement Amount shall be adjusted to equal the amount required to fully pay and amortize the lesser amount at a per annum interest rate of eight percent (8%) over a period of fifteen (15) years commencing as of the Commencement Date. The aggregate excess monthly Roof Replacement Amount then having been paid by Tenant shall be credited by Landlord against the immediately following monthly payments of Roof Replacement Amount until such excess amount is fully credited.

3)  The time for replacement of the Roof or sequential replacement of portions of the Roof shall, subject to the above completion date of October 31, 1996, be selected by Tenant. The roofing contractor to perform the work in connection with replacement of the Roof shall be selected by Tenant and shall be reasonably acceptable to Landlord. Tenant shall contract with its roofing contractor and prior to commencement of replacement of the Roof or any portion of the Roof, shall give Landlord at least fifteen (15) days prior written notice. The cost of replacement of the Roof may initially be paid by Tenant and thereafter reimbursed by Landlord pursuant to the provisions of this ¶30.a.3) or Tenant may request that

Landlord pay Te     roofing contractor directly and, in any e.     Landlord shall be obligated to reimburse or to pay directly the cost attributable to the Roof replacement work then having been completed by Tenant's roofing contractor. During the course of replacement of the Roof, the portion of the cost to be paid by Landlord shall be the amount billed by Tenant's roofing contractor for completed work so long as such amount is generally in accordance with the percentage of completion of the Roof and not in excess of that portion of Landlord's Roof Cost attributable to the low rear roof, upper north roof and upper south roof, respectively. Upon completion of replacement of the Roof, however, any excess costs attributable to any portion of the Roof which then remains unreimbursed or unpaid by Landlord, shall be paid by Landlord provided that the aggregate cost to be paid by Landlord shall not exceed the aggregate amount of Landlord's Roof Cost. In no event shall the last ten percent (10%) of Landlord's Roof Cost attributable to the portion of the Roof then being replaced be paid until Landlord is reasonably satisfied that completion of such portion of the Roof replacement has occurred. In no event shall Landlord be required to reimburse Tenant or directly pay Tenant's roof contractor more frequently than monthly. In connection with all requests for payment from Landlord, Tenant shall provide or cause to be provided to Landlord such documentation as Landlord may reasonably request which shall include, but not by way of limitation, copies of invoices or other billings, documentation relating to the percentage of completion of the work and appropriate mechanic's lien releases. In the event that Landlord is requested to reimburse Tenant, Landlord shall reimburse Tenant within ten (10) days following written request for such reimbursement from Tenant subject to receipt by Landlord of supporting documentation reasonably satisfactory to Landlord. Any amount reimbursable to Tenant not timely paid by Landlord shall bear interest at the rate of ten percent (10%) per annum. During any Roof replacement, Landlord or its representative shall be entitled to inspect the work as it is performed. In no event shall the specifications for replacement of the Roof be of a lesser quality than those specifications set forth on Exhibit F attached hereto and incorporated herein by this reference. The cost, if any, of replacement of the Roof in excess of Landlord's Roof Cost shall be borne by Tenant.

4) Tenant shall pay on a monthly basis the Roof Replacement Amount during the entire Term of the Lease (including the First Extended Term and Second Extended Term, if applicable).

5) Tenant and Landlord acknowledge and agree that an aggregate of One Hundred Thousand Dollars ($100,000) ("Excess Cost") of the total amount of Landlord's Roof Cost relates to atypical equipment located on the Roof of the Premises for the benefit of Tenant. Upon the expiration or termination of the Term of this Lease, Tenant shall pay to Landlord the unamortized portion as of the date of termination, if any, of such Excess Cost. It is acknowledged that the Roof Replacement Amount is computed on the basis of that amount required to fully pay and amortize the aggregate amount of Landlord's Roof Cost at a per annum interest rate of eight percent (8%) over a period of fifteen (15) years. The unamortized portion of the Excess Cost at any time shall be equal to twenty and sixty-two one-hundredths percent (20.62%) of the aggregate then unamortized amount of the Landlord's Roof Cost after giving credit for all amounts then having been paid by Tenant as Roof Replacement Amounts. The amount to be paid by Tenant pursuant to this ¶30.a.5) shall be paid as additional Rent and shall be paid within five (5) days following the expiration or other termination of the Term of this Lease.

6) Other than with respect to replacement of the Roof as provided in this ¶30.a., and consistent with the provisions of ¶12.b., Landlord shall have no other obligation with respect to the repair or maintenance of the Premises.

b. **Compliance with Future Laws.** The cost of compliance with orders, regulations, directions, rules, laws, ordinances and any and all other requirements of any and all governmental authorities enacted subsequent to the Commencement Date as required to be complied with by Tenant pursuant to the provisions of this Lease including, but not limited to, ¶12.c. shall be borne by Tenant to the extent that such compliance is required during the initial five year term of this Lease. To the extent that compliance is required during each of the First Extended Term and the Second Extended Term, if applicable, Tenant shall bear the first $250,000 of the cost of compliance and the balance of any such cost, if any, shall be borne fifty percent (50%) by Landlord and fifty percent (50%) by Tenant. In all events, the compliance shall be performed by Tenant and/or contractors or consultants engaged by Tenant. The first $250,000 of cost of compliance shall be an aggregate amount computed in connection with each of the First Extended Term and the Second Extended Term based upon compliance required during such periods regardless of whether performance of such compliance has been completed during such period. The Cost of Compliance shall include any and all third party costs incurred in connection with compliance including, but not limited to, the cost of third party consultants and contractors but shall not including any cost attributable to the personnel of Tenant or any like Tenant costs.

31. **MISCELLANEOUS PROVISIONS.**

a. **Time of Essence.** Time is of the essence of each provision of this Lease.

b.   Successor. This Lease        binding on and inure to the benefit of tl...        and their successors, except
     as provided in ¶19.

c.   Severability. The obligations of each Tenant executing this Lease shall be the joint and several responsibility
     of each entity named herein as Tenant.

d.   Landlord's Consent. Any consent required by Landlord under this Lease must be granted in writing and may
     not be unreasonably withheld by Landlord.

e.   Commissions. Each party represents that it has not had dealings with any real estate broker, finder or other
     person with respect to this Lease in any manner, except for the Broker(s) identified in ¶1., who shall be
     compensated by Landlord in accordance with the separate agreement between Landlord and the Broker(s).

f.   Other Charges; Legal Fees. If Landlord becomes a party to any litigation concerning this Lease or the Premises
     by reason of any act or omission of Tenant or Tenant's authorized representatives, Tenant shall be liable to
     Landlord for reasonable attorneys' fees and court costs incurred by Landlord in the litigation. Should the court
     render a decision which is thereafter appealed by any party thereto, Tenant shall be liable to Landlord for
     reasonable attorneys' fees and court costs incurred by Landlord in connection with such appeal.

     If either party commences any litigation against the other party or files an appeal of a decision arising out of
     or in connection with the Lease, the prevailing party shall be entitled to recover from the other party
     reasonable attorneys' fees and costs of suit. If Landlord employs a collection agency to recover delinquent
     charges, Tenant agrees to pay all collection agency and attorneys' fees charged to Landlord in addition to
     Rent, late charges, interest and other sums payable under this Lease.

g.   Landlord's Successors. In the event of a sale or conveyance by Landlord of the Premises, the same shall
     operate to release Landlord from any liability under this Lease, and In such event Landlord's successor in
     interest shall be solely responsible for all obligations of Landlord under this Lease.

h.   Interpretation. This Lease shall be construed and interpreted in accordance with the laws of the state in
     which the Premises are located. This Lease constitutes the entire agreement between the parties with respect
     to the Premises, except for such guarantees or modifications as may be executed in writing by the parties
     from time to time. When required by the context of this Lease, the singular shall include the plural, and the
     masculine shall include the feminine and/or neuter. "Party" shall mean Landlord or Tenant. If more than one
     person or entity constitutes Landlord or Tenant, the obligations imposed upon that party shall be joint and
     several. The enforceability, invalidity or illegality of any provision shall not render the other provisions
     unenforceable, invalid or illegal.

i.   Auctions. Tenant shall not conduct, nor permit to be conducted, either voluntarily or involuntarily, any auction
     upon the Premises without first having obtained Landlord's prior written consent. Notwithstanding anything
     to the contrary in this Lease, Landlord shall not be obligated to exercise any standard of reasonableness in
     determining whether to grant such consent.

j.   Quiet Possession. Upon payment by Tenant of the Rent for the Premises and the observance and
     performance of all of the covenants, conditions and provisions on Tenant's part to be observed and performed
     under this Lease, Tenant shall have quiet possession of the Premises for the entire Term hereof subject to all
     of the provisions of this Lease.

k.   Conflict. Any conflict between the printed provisions of this Lease and the typewritten or handwritten
     provisions shall be controlled by the typewritten or handwritten provisions.

l.   Offer. Preparation of this Lease by Landlord or Landlord's agent and submission of same to Tenant shall not
     be deemed an offer to lease to Tenant. This Lease is not intended to be binding until executed by all Parties
     hereto.

m.   Amendments. This Lease may be modified only in writing, signed by the Parties in interest at the time of the
     modification. The parties shall amend this Lease from time to time to reflect any adjustments that are made
     to the Base Rent or other Rent payable under this Lease.

n.   Construction. The Landlord and Tenant acknowledge that each has had its counsel review this Lease, and
     hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against
     the drafting party shall not be employed in the interpretation of this Lease or in any amendments or exhibits
     hereto.

o.   Captions. Article, section and paragraph captions are not a part hereof.

p.   Joint and Several. The obligations of Packard-Hughes Interconnect and General Motors Corporation as Tenant
     pursuant to this Lease are joint and several.

q.   Default by Landlord. In the event of the failure by Landlord to perform any matter required to be performed
     by Landlord pursuant to the provisions of this Lease, Tenant shall give Landlord written notice of such failure
     and Landlord shall not be in default pursuant to this Lease so long as such failure is cured within a reasonable
     period of time following the written notice given by Tenant. In connection with any such failure by Landlord,
     Tenant shall in addition give written notice of such failure to Landlord's Lender(s) with respect to the Premises

- 19 -

as from time to time d         ed by Landlord in a written notice given b         d to Tenant. The Lender shall
have an option to cure        ailure of Landlord within a reasonable perioo        ie following its receipt of such
notice and Tenant agrees that it shall not invoke any of its remedies pursuant to this Lease or any other
remedies available to Tenant at law or in equity as a result of the failure by Landlord during any period of time
that the Lender is proceeding to cure any such default with due diligence or is taking steps with due diligence
to obtain the legal right to enter the Premises and cure such failure. Initially, and until Landlord gives written
notice to Tenant to the contrary (which notice is acknowledged by Lender) Landlord's Lender is MetLife
Capital Financial Corporation and Tenant shall give notice pursuant to this ¶31.q. (in a manner described in
¶27) to MetLife Capital Financial Corporation, Real Estate Department, 10900 N.E. 4th St., Suite 500,
Bellevue, WA  98004.

r.    **Exhibits.** For reference purposes the Exhibits are listed below:

| | |
|---|---|
| Exhibit A: | The Premises |
| Exhibit B: | Covenants, Conditions And Restrictions |
| Exhibit C: | Environmental Reports |
| Exhibit D: | Service Contracts |
| Exhibit E: | Roof Plan |
| Exhibit F: | Roof Specifications |

**LANDLORD:**                                                     **TENANT:**

LIMAR REALTY CORP. #19, a California corporation      Packard-Hughes Interconnect, a Delaware corporation

By: _____                        By: _____
    Theodore H. Kruttschnitt                          Name: WAYNE J. GALLAGHER
    President
                                                      Title: CFO


                                                     General Motors Corporation, a Delaware corporation

                                                      By: _____

                                                      Name: M.P. CULLEN, DIRECTOR
                                                             Worldwide Real Estate

                                                      Title: _____

                                                      EXECUTION RECOMMENDED
                                                      WORLDWIDE REAL ESTATE
                                                      BY _____

krutt\limar19\lease.2

## EXHIBIT A

### The Premises

This Exhibit A is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

Land Legal Description

PARCELS 2 AND 3, IN THE CITY OF IRVINE, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A PARCEL MAP FILED IN BOOK 48 PAGE 39 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OIL, OIL RIGHTS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREINABOVE DESCRIBED, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED, AS RESERVED IN THE DEED FROM THE IRVINE COMPANY, RECORDED APRIL 29, 1970 IN BOOK 9277 PAGE 256, OFFICIAL RECORDS.

ALSO EXCEPT ALL OIL, OIL RIGHTS, MINERAL RIGHTS NATURAL GAS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREINABOVE DESCRIBED, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED AS RESERVED IN THE DEED FROM THE IRVINE INDUSTRIAL COMPLEX, A CALIFORNIA CORPORATION, RECORDED MAY 15, 1974 IN BOOK 11144 PAGE 664, OFFICIAL RECORDS.

## EXHIBIT A

**The Premises**
(continued)

Site Plan



Page 2 of 2

EXHIBIT B

## Covenants, Conditions And Restrictions

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



When recorded, mail to:

IRVINE INDUSTRIAL COMPLEX
P. O. BOX 100
IRVINE, CALIFORNIA

16662

BOOK 7529 PAGE 600

MAY 21  10 58 AM '65

J.W. SHUTTLE
COUNTY RECORDER

$14.00

DECLARATION OF RESTRICTIONS
Irvine Industrial Complex

THIS DECLARATION, made this 20th day of
_____, 1965, by IRVINE INDUSTRIAL COMPLEX, a
California corporation (hereinafter "Declarant"):

ARTICLE I
RECITALS

1.01  Declarant is the owner of certain real property in the County of Orange, State of California, described in Exhibit "A" which is attached hereto and by reference made a part hereof (hereinafter the "Property").

1.02  In order to establish a general plan for the improvement and development of the Property, Declarant desires to subject the Property to certain conditions, covenants and restrictions, upon and subject to which all of the Property shall be held, improved and conveyed.

ARTICLE II
GENERAL PROVISIONS

2.01  Establishment of Restrictions. Declarant, owner of the Property, hereby declares that the Property is now held, and shall hereafter be held, transferred, sold, leased, conveyed and occupied subject to the restrictions herein set forth, each and all of which is and are for, and shall inure to, the benefit of and pass with each and every parcel of the Property and shall apply to and bind the heirs, assignees and successors in interest of any owner thereof.

2.02  Purpose of Restrictions. The purpose of these restrictions is to insure proper development and use of the Property, to protect the owner of each parcel against such improper development and use of surrounding parcels as will depreciate the value of his parcel, to prevent the erection on the Property of structures built of improper design or materials, to encourage the erection of attractive improvements at appropriate locations, to prevent haphazard and inharmonious improvements, to secure and maintain proper setbacks from streets and adequate free spaces between structures, and in general to provide adequately for a high type and quality of improvement of the Property in accordance with a general plan.

2.03  Definitions.

(a)  Site.  "Site" shall mean all contiguous land under one ownership.

(b)  Improvements.  "Improvements" shall mean and include buildings, outbuildings, parking areas, loading areas, trackage, fences, walls, hedges, mass plantings, poles, signs

-1-

:\AC WPWIN60\WPFORMS\VAL-DOCS\LEASES\PACKARD\EXHBTHDR WPD

## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



BOOK 7529 PAGE 60

and any structures of any type or kind;

(c) Declarant. "Declarant" shall mean the undersigned, its successors and assigns.

ARTICLE III
REGULATION OF IMPROVEMENTS

3.01 Minimum Setback Lines

(a) General. No structure of any kind, and no part thereof, shall be placed on any site closer to a property line than herein provided. The following structures and improvements are specifically excluded from these setback provisions:

(1) Roof overhang, subject to the specific approval of Declarant in writing.

(2) Steps and walks.

(3) Paving and associated curbing, except that vehicle parking areas shall not be permitted within ten (10) feet of the street property line or lines.

(4) Fences, except that no fence shall be placed within the street setback area unless specific approval is given by Declarant in writing.

(5) Landscaping.

(6) Planters, not to exceed three (3) feet in height.

(7) Railroad spur tracks, switches and bumpers, provided that the location of such tracks, switches and bumpers is specifically approved by Declarant in writing.

(8) Gas and service stations including all pertinent uses, subject to the specific approval of Declarant in writing.

(9) Displays identifying the owner, lessee or occupant, subject to the specific approval of Declarant in writing.

(b) Setback from Interior Property Lines. The setback line is established as ten (10) feet from an interior property line.

(c) Setback from Street Property Lines. The setback line is established thirty (30) feet from a street property line.

-2-

:\vjnC:\WPWIN60\WPFORMS\WAL-DOCS\LEASES\PACKARD\EXHIBTHDR.WPD

## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

BOOK 7529 PAGE 602

3.02 Completion of Construction. After commencement of construction of any structure, the owner shall diligently prosecute the work thereon, to the end that the structure shall not remain in a partly finished condition any longer than reasonably necessary for completion thereof.

3.03 Excavation. No excavation shall be made except in connection with construction of an improvement, and upon completion thereof exposed openings shall be backfilled and disturbed ground shall be graded and leveled.

3.04 Landscaping.

(a) Every site on which a building shall have been placed shall be landscaped according to plans approved as specified herein and maintained thereafter in a sightly and well-kept condition.

(b) The property owner, lessee or occupant shall landscape and maintain unpaved areas between the property lines and the setback lines. The first ten (10) feet of the setback from street property lines shall be used exclusively for landscaping except for walks and driveways bisecting the required landscape area; provided, however, that gas and service stations are excepted from this requirement.

(c) The property owner, lessee or occupant shall provide hose bibs and maintenance facilities in the vicinity of the landscaped areas.

(d) Landscaping as approved by Declarant shall be installed within ninety (90) days of occupancy or completion of the building, whichever occurs first.

3.05 Signs.

(a) No billboard or advertising sign shall be permitted, other than the following:

(1) Those identifying the name, business and products of the person or firm occupying the premises; and

(2) Those offering the premises for sale or lease when specifically approved by Declarant in writing.

(b) Signs shall conform to setback lines unless specific approval to the contrary is granted by Declarant in writing.

(c) Signs and identifications on buildings or building sites shall only be of such size, design and color as is specifically approved by Declarant in writing.

-3-

# EXHIBIT B

## Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



BOOK 7529 PAGE 603

3.06 Parking Areas.

(a) General. Adequate off-street parking shall be provided to accommodate all parking needs for employee, visitor and company vehicles on the site. The intent of this provision is to eliminate the need for any on-street parking. If parking requirements increase as a result of a change in use or number of employees, additional off-street parking shall be provided to satisfy the intent of this section.

(b) Parking shall not be permitted:

(1) Between public street pavement and property line.

(2) Closer than ten (10) feet to a street property line.

(c) The parking requirements may be modified by Declarant as to any particular site.

3.07 Storage and Loading Areas.

(a) No materials, supplies or equipment, including company-owned or operated trucks, shall be stored in any area on a site except inside a closed building, or behind a visual barrier screening such areas from the view of adjoining properties and/or a public street.

(b) Loading areas shall not encroach into setback areas unless specifically approved by Declarant in writing.

(c) Loading docks shall be set back and screened to minimize the effect from the street. Docks shall not be closer than seventy (70) feet to the street property line, unless specifically approved by Declarant in writing. Loading will be permitted to the rear of the setback line from that portion of a structure not fronting a street.

3.08 Building Regulations. Any building erected on a site shall conform to the following construction practices:

(a) Exterior walls of sheet or corrugated iron, steel, aluminum or asbestos will be permitted only upon specific approval in writing by Declarant.

(b) Exterior walls shall be painted or suitably treated in a manner acceptable to Declarant.

ARTICLE IV
APPROVAL OF PLANS

4.01. No improvement, as that term is hereinabove defined, shall be erected, placed, altered, maintained or permitted to remain on any land subject to these restrictions until plans and specifications showing plot layout and all exterior elevations, with materials and colors, thereof and structural design, signs and landscaping, shall have been submitted to and approved in writing by Declarant. Such plans and specifications shall be submitted in writing over the signature of the owner or lessee of the site or his authorized agent.

4.02. Approval shall be based, among other things, on adequacy of site dimensions, adequacy of structural design, conformity and harmony of external design with neighboring structures; effect of location and use of improvements on neighboring sites, improvements,

-4-

## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



BOOK 7529 PAGE 604

of improvements on neighboring sites, improvements, operations and uses; relation of topography, grade and finished ground elevation of the site being improved to that of neighboring sites; proper facing of main elevation with respect to nearby streets; and conformity of the plans and specifications to the purpose and general plan and intent of these restrictions. Declarant shall not arbitrarily or unreasonably withhold its approval of such plans and specifications.

4.03  If Declarant fails either to approve or to disapprove such plans and specifications within thirty (30) days after the same have been submitted to it, it shall be conclusively presumed that Declarant has approved said plans and specifications, subject, however, to the restrictions contained in Article III hereof.

4.04  Neither Declarant nor its successors or assigns shall be liable in damages to anyone submitting plans to them for approval, or to any owner or lessee of land affected by this Declaration, by reason of mistake in judgment, negligence or nonfeasance arising out of or in connection with the approval or disapproval or failure to approve any such plans.  Every person who submits plans to Declarant for approval agrees, by submission of such plans, and every owner or lessee of any of said property agrees, by acquiring title thereto or interest therein, that he will not bring any action or suit against Declarant to recover any such damages.

4.05  Notwithstanding anything to the contrary herein contained, after the expiration of one year from the date of issuance of a building permit by municipal or other governmental authority for any improvement, said improvement shall, in favor of purchasers and encumbrancers in good faith and for value, be deemed to be in compliance with all provisions of this Article IV, unless actual notice of such noncompliance or noncompletion, executed by Declarant, shall appear of record in the office of the County Recorder of Orange County, California, or unless legal proceedings shall have been instituted to enforce compliance or completion.

4.06  Fee.  An architectural review fee shall be paid to Declarant at the time plans are submitted for approval based upon the following schedule:

(a).  When the plans submitted are prepared by an architect licensed to practice in the State of California, the architectural review fee shall be $100.

(b)  In all other cases the architectural review fee shall be $250.

### ARTICLE V
### ENFORCEMENT

5.01  Abatement and Suit.  Violation or breach of any restriction herein contained shall give to Declarant and every owner of property subject to these restrictions the right to enter upon the property upon or as to

-5-

## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



BOOK 7529 PAGE 605

which said violation or breach exists and to summarily abate and remove, at the expense of the owner or lessee thereof, any structure, thing or condition that may be or exist thereon contrary to the intent and meaning of the provisions hereof, or to prosecute a proceeding at law or in equity against the person or persons who have violated or are attempting to violate any of these restrictions to enjoin or prevent them from doing so, to cause said violation to be remedied or to recover damages for said violation.

5.02  Deemed to Constitute a Nuisance.  The result of every action or omission whereby any restriction herein contained is violated in whole or in part is hereby declared to be and to constitute a nuisance, and every remedy allowed by law or equity against an owner either public or private, shall be applicable against every such result and may be exercised by Declarant or by any owner of property subject to these restrictions.

5.03  Attorneys' Fees.  In any legal or equitable proceeding for the enforcement or to restrain the violation of this Declaration or any provision hereof, the losing party or parties shall pay the attorneys' fees of the prevailing party or parties, in such amount as may be fixed by the Court in such proceedings.  All remedies provided herein or at law or in equity shall be cumulative and not exclusive.

5.04  Inspection.  Declarant may, from time to time at any reasonable hour or hours, enter and inspect any property subject to these restrictions to ascertain compliance therewith.

5.05  Failure to Enforce Not a Waiver of Rights.  With the exception of the time limit for action by Declarant contained in Section 4.05 of Article IV hereof, the failure of Declarant or any property owner to enforce any restriction herein contained shall, in no event be, deemed to be a waiver of the right to do so thereafter nor of the right to enforce any other restriction.

### ARTICLE VI
### REGULATION OF OPERATIONS AND USES

6.01  Permitted Operations and Uses.

(a)  Unless otherwise specifically prohibited herein, any industrial operation and use will be permitted if it is performed or carried out entirely within a building that is so designed and constructed that the enclosed operations and uses do not cause or produce a nuisance to adjacent sites such as but not limited to vibration, sound, electro-mechanical disturbance and radiation, electro-magnetic disturbance, radiation, air or water pollution, dust, emission of odorous, toxic or non-toxic matter.  All lighting is to be shielded and confined within property lines.

(b)  An exception shall be made during

-6-

# EXHIBIT B

## Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

BOOK 7529 PAGE 606

periods when breakdown in equipment occurs in such a manner as to make it evident that the effect was not reasonably preventable.

6.02. Prohibited Operations and Uses. The following operations and uses shall not be permitted on any property subject to these restrictions:

(a) Residential.

(b) Trailer Courts.

(c) Labor camps.

(d) Junk yards.

(e) Drilling for and/or the removal of oil, gas or other hydrocarbon substances.

(f) Commercial excavation of building or construction materials.

(g) Distillation of bones.

(h) Dumping, disposal, incineration or reduction of garbage, sewage, offal, dead animals or refuse.

(i) Fat rendering.

(j) Stockyard or slaughter of animals.

(k) Refining of petroleum or of its products.

(l) Smelting of iron, tin, zinc or other ores.

(m) Hog raising.

6.03 Other Operations and Uses.

(a) Operations and uses which are neither specifically prohibited nor specifically authorized by these restrictions may be permitted in a specific case if operational plans and specifications are submitted to and approved in writing by Declarant. Approval or disapproval of such operational plans and specifications shall be based upon the effect of such operations or uses on other property subject to these restrictions or upon the occupants thereof. If Declarant fails either to approve or to disapprove such operational plans and specifications within thirty (30) days after the same have been submitted to it, it shall be conclusively presumed that Declarant has disapproved said plans and specifications.

(b) Neither Declarant nor its successors or assigns, shall be liable in damages to anyone submitting operational plans and specifications to them for approval, or to any

-7-

## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



BOOK 7529 PAGE 607

owner or lessee of land affected by this Dec-
laration, by reason of mistake in judgment,
negligence or nonfeasance arising out of or in
connection with the approval or disapproval or
failure to approve any such operational plans
and specifications. Every person who submits
operational plans and specifications to Dec-
larant for approval agrees, by submission of
such plans and specifications, and every owner
and lessee of any of said property agrees, by
acquiring title thereto or interest therein,
that he will not bring any action or suit
against Declarant to recover any such damages.

### ARTICLE VII
#### TERM, TERMINATION, MODIFICATION AND
#### ASSIGNMENTS OF DECLARANT'S RIGHTS AND DUTIES

7.01  Term.  This Declaration, every provision
hereof and every covenant, condition and restriction
contained herein shall continue in full force and effect
for a period of fifty (50) years from the date hereof.

7.02  Termination and Modification.  This Dec-
laration, or any provision hereof, or any covenant, con-
dition or restriction contained herein, may be terminated,
extended, modified or amended, as to the whole of said
property or any portion thereof, with the written consent
of the owners of sixty-five per cent (65%) of the pro-
perty subject to these restrictions, based on the number
of square feet owned as compared to the total number of
square feet subject to these restrictions, provided,
however, that so long as Declarant owns at least twenty
per cent (20%) of the property subject to these restric-
tions, no such termination, extension, modification or
amendment shall be effective without the written approval
of Declarant thereto.  No such termination, extension,
modification or amendment shall be effective until a
proper instrument in writing has been executed and ack-
nowledged and recorded in the office of the Recorder of
Orange County, California.

7.03  Assignments of Declarant's Rights and
Duties.  Any and all of the rights, powers and reserva-
tions of Declarant herein contained may be assigned to
any person, corporation or association which will assume
the duties of Declarant pertaining to the particular
rights, powers and reservations assigned, and upon any
such person, corporation or association's evidencing its
consent in writing to accept such assignment and assume
such duties, he or it shall, to the extent of such
assignment, have the same rights and powers and be sub-
ject to the same obligations and duties as are given to
and assumed by Declarant herein.  The term "Declarant",
as used herein, includes all such assignees and their
heirs, successors and assigns.  If, at any time Declarant
ceases to exist and has not made such an assignment, a
successor Declarant may be appointed in the same manner
as those restrictions may be terminated, extended, modi-
fied or amended under Section 7.02 of this Article VII.

-8-

:vja\C:\WPWIN60\WPFORMS\VAL-DOCS\LEASES\PACKARD\EXHBTHDR.WPD

## EXHIBIT B

## Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



BOOK 7529 PAGE 608

ARTICLE VIII
MISCELLANEOUS PROVISIONS

8.01  Constructive Notice and Acceptance. Every person who now or hereafter owns or acquires any right, title or interest in or to any portion of said property is and shall be conclusively deemed to have consented and agreed to every covenant, condition and restriction contained herein, whether or not any reference to this Declaration is contained in the instrument by which such person acquired an interest in said property.

8.02  Rights of Mortgagees. All restrictions and other provisions herein contained shall be deemed subject and subordinate to all mortgages and deeds of trust now or hereafter executed upon land subject to these restrictions, and none of said restrictions shall supersede or in any way reduce the security or affect the validity of any such mortgage or deed of trust; provided however, that if any portion of said property is sold under a foreclosure of any mortgage or under the provisions of any deed of trust, any purchaser of such sale, and his successors and assigns, shall hold any and all property so purchased subject to all of the restrictions and other provisions of this Declaration.

8.03  Mutuality, Reciprocity, Runs with Land. All restrictions, conditions, covenants and agreements contained herein are made for the direct, mutual and reciprocal benefit of each and every part and parcel of said property; shall create mutual, equitable servitudes upon each parcel in favor of every other parcel; shall create reciprocal rights and obligations between the respective owners of all parcels and privity of contract and estate between all grantees of said parcels, their heirs, successors and assigns; and shall, as to the owner of each parcel, his heirs, successors and assigns, operate as covenants running with the land, for the benefit of all other parcels.

8.04  Paragraph Headings. Paragraph headings, where used herein, are inserted for convenience only, and are not intended to be a part of this Declaration or in any way to define, limit or describe the scope and intent of the particular paragraphs to which they refer.

8.05  Effect of Invalidation. If any provision of this Declaration is held to be invalid by any court, the invalidity of such provision shall not affect the validity of the remaining provisions hereof.

8.06  Addition of Territory. Declarant may at any time or from time to time during the pendency of these restrictions add all or a portion of the land described in Exhibit "B", which is attached hereto and by reference made a part hereof, to the property which is covered by this Declaration, and upon the recording of a notice of addition to territory containing the provisions set forth in Section 8.07 of this Article VIII, the covenants contained in this Declaration shall apply to the added land in the same manner as if it were originally covered by this Declaration; and thereafter, the

-9-

:vja\C:\WPWIN60\WPFORMS\VAL-DOCS\LEASES\PACKARD\EXHBTHDR.WPD

## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



BOOK 7529 PAGE 609

rights, powers and responsibilities of the parties to this Declaration with respect to the added land shall be the same as with respect to the original land, and the rights, privileges, duties and liabilities of the owners, lessees and occupants of parcels within the added lands shall be the same as in the case of the original land.

8.07 The notice of addition to territory referred to in Section 8.06 of this Article VIII shall contain the following provisions:

(a) A reference to this Declaration, which reference shall state the date of recording hereof and the book or books of the records of Orange County, California, and page numbers where this Declaration is recorded.

(b) A statement that the provisions of this Declaration shall apply to the added territory in the manner set forth in Section 8.06 of this Article VIII; and

(c) An exact description of the added territory.

IN WITNESS WHEREOF, the undersigned has executed this Declaration on the date first hereinabove written.

IRVINE INDUSTRIAL COMPLEX

By _____
   John F. Porter, President

By _____
   Lansing E. Eberling, Secretary

STATE OF CALIFORNIA )
                     ) ss.
COUNTY OF ORANGE     )

On _____ 1965, before me, the undersigned, a Notary Public in and for said State, personally appeared JOHN F. PORTER, known to me to be the President, and LANSING E. EBERLING, known to me to be the Secretary, of the corporation that executed the within instrument, known to me to be the persons who executed the within instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

_____

JEANNE J. SANFORD
Notary Public
State of California
Principal Office In
Orange County

My Commission Expires February 9, 19__

-10-

## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



BOOK 7529 PAGE 610

PARCEL 1

Those portions of Blocks 8, 9 and 10 of Irvine's Subdivision, partly in the Cities of Santa Ana and Tustin, all in the County of Orange, State of California, as per map recorded in book 1, page 88 of Miscellaneous Record Maps, in the office of the County Recorder of said county, described as follows:

Commencing at the intersection of the northwesterly line of lot 126 of said Block 9 with the centerline of MacArthur Boulevard, 100 feet wide, and described in a deed to the County of Orange recorded January 10, 1963 in book 6339, page 441 of Official Records; thence South 49° 21' 56" East 609.30 feet along said centerline to a point on the north-westerly line of that certain land described as Parcel 1 in Revised Exhibit "A" attached to a Quitclaim deed to Irvine Industrial Complex recorded October 28, 1964 in book 7279, page 642 of Official Records; thence North 40° 33' 04" East 119.00 feet to the true point of beginning; thence North 31° 55' 35" West 533.52 feet; thence North 11° 56' 24" East 725.48; thence North 35° 32' 59" East 1189.86 feet; thence North 33° 11' 46" East 1759.67 feet; thence North 43° 39' 12" East 876.58 feet to a point on the southwesterly line of lot 116 of said Block 9; South 49° 20' 48" East 58.00 feet from the most westerly corner of said lot 116; thence South 40° 39' 43" East 1262.00 feet to the most southerly corner of said lot; thence North 49° 39' 12" East 1326.00 feet to the most easterly corner of said lot; thence North 67° 29' 42" West 977.05 feet to a point; South 49° 20' 48" East 346.95 feet from the most northerly corner of said lot; thence North 67° 41' 33" East 20.22 feet to the beginning of a curve concave northeasterly having a radius of 206.00 feet; thence northeasterly and northerly 329.79 feet along said curve through an angle of 65° 56' 54"; thence North 1° 44' 42" East 132.07 feet; thence North 22° 35' 31" East 44.59 feet; thence South 88° 13' 19" East 76.83 feet; thence North 81° 44' 42" East 159.00 feet; thence North 22° 35' 31" West 225.18 feet; thence North 86° 29' 22" East 841.86 feet; thence North 39° 06' 25" East 1356.38 feet to the most southerly corner of Parcel 2 of that certain land described in a deed to the State of California for the Newport Freeway recorded February 15, 1962 in book 6000, page 427 of Official Records; thence North 43° 39' 12" East 950.00 feet, along the southeasterly right of way line of said Parcel 2 to the most westerly corner of Parcel 1 of said State of California land; thence South 67° 36' 41" East 372.17 feet along the southwesterly right of way line of said Parcel 4; thence South 59° 06' 37" East 328.17 feet along said southwesterly line; thence North 40° 39' 12" East 50.00 feet to the most southerly corner of Parcel 1 of said land; thence North 43° 39' 12" East 50.00 feet along the southeasterly right of way line of said Parcel 3; thence North 02° 00' West 678.65 feet to the most northerly corner of said Parcel 3; thence North 40° 39' 12" East 1291.13 feet along the southeasterly line of Parcel 3 of said land to the most easterly corner thereof; thence South 55° 00' 00" East 1274.00 feet to the most southerly corner of lot 81 in said Block 10; thence North

"Exhibit A"

:vjaC:\WP\WIN60\WPFORMS\WAL-DOCS\LEASES\PACKARD\EXHBTHDR.WPD

## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



N:\A1C\WPWIN60\WPFORMS\VAL-DOCS\LEASES\PACKARD\EXHIBTHDR.WPD

## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



## EXHIBIT B

### Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



# EXHIBIT B

## Covenants, Conditions And Restrictions (continued)

This Exhibit B is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



RECORDED DOCUMENT

## EXHIBIT C

### Environmental Reports

This Exhibit C is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

Schedule of Environmental Reports

The following environmental reports have been forwarded to Buyer on May 4, 1995 via overnight mail:

1.   AHERA Style Bulk Asbestos Survey prepared by Health Science Associates, April 19, 1995.

2.   Summary Environmental Assessment, prepared by Dudek and Associates, April 1995.

3.   Report Environmental Sampling Program Drum Storage Facility Hughes Aircraft Irvine, CA, prepared by International Technologies, Corp., October, 1986.

4.   Preliminary Hazardous Waste and Petroleum Hydrocarbon Site Assessment of Hughes Aircraft Company Connecting Devices Division, 17150 Von Karman Ave., CA, prepared by ENSR, December, 1989.

5.   Site assessment Report Connecting Devices Division, 17150 Von Karman Ave., Irvine, CA., prepared ENSR, December 1991.

6.   Waste Storage Area Closure Report, prepared by Mittelhauser Corporation, July, 1993.

7.   Phase I Site Assessment Hughes Aircraft Company Connecting Devices Division, prepared by Mittelhauser Corporation, September, 1993.

8.   Summary Environmental Assessment, prepared by Dudek and Associates, July 26, 1995.

# EXHIBIT D

## Service Contracts

This Exhibit D is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

### Commission Agreements, Services Contracts and Equipment Leases

None

## EXHIBIT E

### Roof Plan

This Exhibit E is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.



DIAGRAM #1

PACKARD-HUGHES INTERCONNECT
17150 VON KARMEN AVENUE
IRVINE, CALIFORNIA
92713-9685
ROOF TOP VIEW

**EXHIBIT F**

**Roof Replacement Specifications**

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

Limar Realty

17150 Von Karman Avenue
Irvine, California
Pre-Bid Conference/Addendum #1

---

I.    Base Bid Scope of Work:

The Contractor shall supply all labor, transportation, materials, apparatus, and tools necessary for the roof replacement on the building's three independent roof sections.

A.    Approximate Roof Size:

| | |
|---|---|
| Lower roof section | 33,000 square feet |
| Upper north roof section | 39,700 square feet |
| Upper south roof section | 37,000 square feet |

(Contractor must verify dimensions)

B.    Existing Roof System: The roof covering each of these roof sections consists of a single built-up roofing membrane composed of a mineral surfaced cap sheet over two plies of felt, each set into hot asphalt over a base sheet. The base sheet was mechanically attached into the underlying plywood substrate.

C.    The specified roof replacement scope of work shall include:

1.    The removal and disposal of the existing roof system, including all flashings, equipment screen supports and sheet metal accessories, with the exception of the existing coping metal assembly which is to be reinstalled.

2.    The inspection of the existing substrate for any damage and replacement of any deteriorated areas of the plywood substrate to match existing on a unit cost basis.

3.    Installation of the new specified roof system, inclusive of all flashings and miscellaneous mechanical and electrical work. New roof system shall consist of a rosin sheet, mechanically fastened fiberglass base sheet, two (2) plies of Type VI fiberglass felt, and a mineral surfaced fiberglass cap sheet. Reference attached specification and detail drawings.

4.    Provide a five year contractors labor and materials guarantee with a manufacturers ten year warrantee on materials.

## EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

Limar Realty

17150 Von Karman Avenue
Irvine, California
Pre-Bid Conference/Addendum #1

D. Special project conditions to be included in Base Bid:

1. Demolition and removal of all non-used equipment penetrations, supports and mechanical units. The items to be removed have been marked on the units with orange spray paint.

2. Extend or reconstruct all existing platforms, ducts, pipes, vents, etc., to maintain a minimum 6 inch height clearance for platforms and 8 ' inch height clearance for all other penetrations.

3. The construction and installation of new platforms for all mechanical units currently resting on sleepers. New platforms to be constructed to maintain an 8 inch height clearance above the completed roof membrane. Work to include all miscellaneous plumbing, mechanical and electrical work in the extension and/or relocation of existing duct work, electrical lines and plumbing connections.

4. The demolition of the existing large mechanical platform on the lower roof section which is currently occupied by numerous individual pieces of mechanical equipment. Work to include restoration of the plywood substrate to match existing elevations in this area and the construction of new individual platforms for remaining mechanical equipment.

5. On the upper roof sections, the fabrication and installation of new equipment screen support flashings. Equipment screen is to be fitted with new "L" iron supports mounted on flashed sleepers with 22 gauge flashing pans, or the existing wood supports resized to permit the installation of cylindrical flashing posts which, in turn, are flashed with lead jacks.

6. On the upper south roof section, the removal of the existing expansion joint spanning the interior parapet wall and the installation of a new 20 gauge sheet metal expansion joint. Work to include all miscellaneous carpentry and mechanical work for the installation of new wood curb and sheet metal flashing and counterflashing. This work is also to include the fabrication and installation of an exterior mounted "S" lock expansion joint down the face of the adjacent stucco wall.

## EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

**Limar Realty**

17150 Von Karman Avenue
Irvine, California
Pre-Bid Conference/Addendum #1

---

7. Clean, prepare and reseal all mechanical unit duct joints using a Glenkote reinforced system. Replace all cracked or torn flex connectors with new Duro-Dyne MFD Durolon connectors.

8. The enlargement of the existing crickets or installation of new crickets as necessary to provide positive drainage behind all platforms and penetrations.

9. The fabrication and installation of new split lead or galvanized sheet metal flashings at all electrical and pipe penetrations. Metal flashings are to be fully soldered (no liquid solder) with galvanized flashings required to be riveted with top of galvanized flashing sealed with a double wrapping of Flashband tape.

10. The fabrication and installation of new 22 gauge galvanized iron sheet metal hooded enclosures for all multiple pipe penetration locations. All seams of enclosures to be riveted and fully soldered.

11. The installation of an additional reinforcing interply in all moderate ponding areas and the installation of an additional reinforcing layer of mineral surfaced cap sheet in front of each scupper location.

12. The fabrication and installation of new 22 gauge galvanized iron sheet metal pan covers with hems and drip edges on all existing and new platforms. All pan covers to be constructed with fully soldered or standing seams and are to be installed with EPDM waterproofing underlayments.

13. On the lower roof section, the removal of the existing equipment shed to permit the new roof installation with the subsequent reinstallation of the equipment shed on a new base of walkpad material installed over the completed roof membrane.

14. The construction and installation of new redwood blocking with walkpad bases under all plumbing, gas and electrical lines spanning the roof surface. Blocks to be attached to their respective line with "U" clamps screwed through blocking.

15. Walk pad material (a minimum of one section) is to be installed adjacent to the roof access, at each of the mechanical unit access panels and per the current walkpad configuration.

## EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

Limar Realty

17150 Von Karman Avenue
Irvine, California
Pre-Bid Conference/Addendum #1

---

16. The reconnection or installation, on a unit cost basis, of new copper condensation lines from each mechanical unit to the nearest roof drain location.

17. On the stucco walls transitioning from the lower roof section to the upper roof sections, the repair of the existing stucco walls and the application of a new elastomeric wall coating. Repair work to include replacement of all damaged or missing stucco and the treatment of all cracks as recommended by the material manufacturer prior to the installation of the new 20 mil elastomeric coating. Coating is to be installed on all parapet walls on the lower roof section.

II. Contractor shall also provide Alternate costs for the following :

A. **Alternate #1:**

Provide a total additive cost for a 15 year material manufacturer's unlimited penal sum guarantee.

B. **Alternate #2:**

Provide a total additive cost for the installation of a new 22 gauge standing seam coping metal assembly. Work to include removal and disposal of the existing coping metal and the painting of the new coping metal to match existing. Color of coping metal to be approved by Owner.

C. **Alternate #3:**

Provide a total additive cost, per roof section, for the installation of a new built-up roof membrane composed of a mineral surfaced cap sheet over three plies of Type VI fiberglass felt, each set into continuous applications of hot Type III asphalt over a mechanically fastened base sheet and rosin sheet, in lieu of the base bid roof membrane.

III. Contractor shall also provide Unit Prices for the following:

A. Provide on the Bid Proposal a separate cost, per 4' x 8' sheet, for the replacement of any deteriorated or otherwise damaged substrate to match existing.

## EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

**Limar Realty**

**17150 Von Karman Avenue**
**Irvine, California**
**Pre-Bid Conference/Addendum #1**

---

B.  Provide a separate cost, per roof drain, on the Bid Proposal for installation of new roof drains, such as a Josam, Series 21500. Remove decking as necessary to accomplish proper installation of the roof drain assembly. Drain installation shall include all necessary concrete coring and the fabrication and installation of a new 22 gauge leader box and downspout. Base of downspout to be provided with concrete splash block. Sheet metal downspout and collector box to be painted to match existing.

C.  Provide a separate cost, per lineal foot, on the Bid Proposal for installation of new roof drain lines.

D.  Provide a separate cost, per lineal foot, on the Bid Proposal for installation of new PVC condensate lines. New condensate lines shall be installed where none exist and to replace existing or as needed to accommodate proper drainage from HVAC units.

E.  Provide a price, per square foot, on the Bid Proposal for installation of new pre-tapered insulation crickets on the Bid Proposal. Crickets shall be installed where none exist and where necessary to remove ponding water.

Time for Completion:

A.  Contractor is to complete the project in the number of days submitted in his bid.

Reference Materials Attached:

A.  Governing Terms and Conditions of Bidder's Quotations

B.  Minimum Insurance Requirements

Submission of Bids:

A.  The enclosed worksheets are to be used for contractor's submission of bids. In addition, Contractor shall submit with his bid the following attachments:

- A  (Statement of Bidder's Qualifications)

- B  (Statement of Coordination)

- C  (Sample Certificates of Insurance)

## EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

Limar Realty

17150 Von Karman Avenue
Irvine, California
Pre-Bid Conference/Addendum #1

---

B. Bid Due Date: 2:00 p.m. on Wednesday, October 25, 1995.

C. No facsimile bids will be accepted. Bids not submitted on Quotation worksheets or submitted to others are subject to rejection.

D. ORIGINAL BIDS MUST BE SUBMITTED TO:

INDEPENDENT ROOFING CONSULTANTS
1761 E. Garry Ave.
Suite 100
Santa Ana, CA 92705
Attention: Jeff Starr

Should you have any comments or questions, please do not hesitate to contact me at your convenience.

Sincerely,

INDEPENDENT ROOFING CONSULTANTS

Jeff Starr
General Manager

JS/ch

cc: All Attendees

**EXHIBIT F**

**Roof Replacement Specifications** (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

### SECTION 07514 - BUILT-UP ROOFING

#### PART 1 - GENERAL

**1.01   Description of Work**

A.   Scope:

1.   The extent of the built-up. roofing system work is indicated on the drawings and by provisions of this section, and is defined to include roofing, composition flashing, stripping and roofing accessories integrally related to roofing installation.

B.   Related Work Specified Elsewhere:

1.   All Division 1 Specifications shall form a part of this and all other sections of these specifications.

2.   Roof Related Rough Carpentry:  Section 06100.

3.   Roof Related Metal Components:  Section 07600.

C.   System Description:

1.   The new roof system will consist of a fiberglass cap sheet surfacing membrane over two (2) plies of Type VI fiberglass felt, all of which shall be set into a continuous mopping of hot asphalt over a fiberglass base sheet. The fiberglass base sheet shall be mechanically fastened into the existing plywood deck over a rosin sheet.

#### PART 2 - PRODUCTS

**2.01   Acceptable Manufacturers**

A.   All membrane roofing materials shall be manufactured by the following approved manufacturers:

1.   Celotex

2.   Schuller

## EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

17150 VON KARMAN AVE., IRVINE, CA                    BUILT-UP ROOFING

**2.02    Sheet Materials**

A.   Asphalt Coated Fiberglass Base Sheet - ASTM D 4601.

B.   Glass Fiber Felt - ASTM D 2178-84, Type VI.

C.   Woven Glass Fabric - ASTM D 1668, Type I.

D.   Mineral Surfaced Fiberglass Cap Sheet - ASTM D 3909-86.

E.   Sheathing Paper - Rosin Sheet, not less than 4 lbs. per 100 square feet.

**2.03    Bituminous Materials**

A.   Asphalt Bitumen - ASTM D 312-84, Type III.

B.   Asphalt Primer - ASTM D 41-85.

C.   Elastomeric Roof Cement - ASTM D 4586-86, Type I.

D.   Flashing Cement - ASTM D 4586-86, Type II.

E.   Emulsified Aluminum Coating - Federal Specification No. TT-P-320D, Type II, Class 3.

**2.04    Cant Strips**

A.   At vertical junctures - nominal 4" x 4" preformed fiberboard cant strip - ASTM C 208-72.

**2.05    Fasteners**

A.   Base Flashing to Wood Members:  1.5" barbed roofing nails through 1" metal discs.

B.   Base Flashing to Concrete:  Specially threaded anchors, brand name "Tapcon", 3/16" minimum diameter, length to penetrate a minimum 1-1/2" into the concrete, manufactured by Buildex, a division of Illinois Tool Works, Inc., 2500 Brickvale Drive, Elk Grove Village, Illinois 60007, or approved equal, for securing base flashing to concrete surfaces.  The installed withdrawal resistance to be a minimum of 150 lbs. per anchor.  Fasteners shall be driven through 1" wide, 20 gauge metal termination bar.

### EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

---

17150 VON KARMAN AVE., IRVINE, CA                         BUILT-UP ROOFING

---

    C.  Base Sheet to Plywood Deck:  12 gauge nail with annular thread or serrated shank and integral 1" diameter metal disc of sufficient length to penetrate minimum 3/4" into wood deck.

    D.  Metal Flanges to Plywood Deck:  Annular threaded nail with 3/8" diameter head to penetrate wood 1-1/4" minimum.

**2.06  Miscellaneous**

    A.  Elastomeric sealant shall be a low modulus, high performance, one-part polyurethane conforming to Federal Specification No. TT-S-00230C, Type II, Class A, such as Mameco Vulkem 921 or Sikaflex-15LM.

    B.  Roof Protection Material - Siplast Trafbloc, or as manufactured or otherwise approved by the primary materials manufacturer.

    C.  Granules - No. 11 ceramic roofing granules as manufactured by 3M or approved equal.

    D.  Seal Tape - Self-adhesive cross-linked butyl rubber tape, 2" wide by 1/8" thick, such as GS/7500 as manufactured by General Sealants, Inc., P.O. Box 3855, City of Industry, California 91745, phone no. (818) 961-0211.  Surfaces must be clean and dry prior to application.

    E.  Elastomeric Pitch Pan Filler - Gaco-Western LM-60 liquid-applied urethane or approved equal.


### PART 3 - EXECUTION

### 3.01  Roof Preparation

    A.  Prior to commencement of roofing work, Contractor shall perform a thorough inspection of the building interior and exterior noting all existing damage, including past or current leakage.  Contractor shall also perform a thorough inspection of the building exterior, at reroof area only, noting all existing damage to walls, sidewalks, etc.  Documentation of this inspection shall be submitted to the Roofing Consultant prior to beginning work.  The Contractor shall be responsible for correction of any subsequent, undocumented damage or leakage.

    B.  Contractor is to check all roof drains <u>prior</u> to roof replacement in each drainage area to determine if the drain is plugged or if the drain bowl or any of its components are damaged.  Any of these items are to be brought to the

### EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

---

17150 VON KARMAN AVE., IRVINE, CA                              BUILT-UP ROOFING

---

attention of the Owner Representative prior to starting work, and will be the Owner's responsibility for correction. Any plugged or damaged drains brought to the attention of the Owner after work has begun will be the responsibility of the Contractor to correct.

C.   Contractor shall completely remove the entire existing built-up roofing, base flashing system, flanged metal, etc., down to the existing plywood deck. Dispose of all tear-off debris in accordance with local codes and ordinances.

D.   Contractor shall remove only as much roofing as can be safely replaced and completely watersealed at the end of each day.

E.   Prior to installation of new roofing, Contractor shall inspect the existing roof conditions and verify that the new roof system may be installed in strict accordance with original design, the manufacturer's current recommendations, and all other pertinent codes and regulations.

    1.   No new roofing will be applied until surfaces are reviewed jointly by the Quality Controller and the Roofing Contractor.

    2.   Any deteriorated or damaged decking shall be brought to the attention of the Owner. Replacement or repair shall be at the discretion of the Owner with any necessary replacement or repair costs to be borne by the Owner.

    3.   Commencement of roofing application over any section will denote acceptability by the Contractor of that section, and he will be responsible for any corrective work which may be occasioned by his having started over an unsatisfactory surface.

F.   Clean all surfaces of debris and of any moisture before proceeding with application of the new roof system.

G.   Disconnect, remove, and reconnect as necessary, any vents, electrical lines, etc., to allow for proper installation of new roofing and flashings.

**3.02**   **Base Sheet Installation**

A.   Contractor shall apply the rosin sheet directly over the cleared and swept plywood deck and over the rosin sheet. Mechanically fasten the fiberglass base sheet into the plywood deck in the following manner:

    1.   Over the entire surface, lay one (1) ply of rosin sheet, lapping each sheet at least two inches over the preceding sheet. Nail sufficiently to hold in place.

**EXHIBIT F**

Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

17150 VON KARMAN AVE., IRVINE, CA                          BUILT-UP ROOFING

---

2.  Starting at the low point of the roof, install a full ply of fiberglass base sheet with the following felts applied full width, lapping each felt two inches over the preceding ply. Fasten the laps with approved one inch head fasteners placed at nine inch centers and down the longitudinal centers of each sheet, fasten two rows spaced approximately 11 inches apart with fasteners staggered at approximately 18 inches on center. Wrinkles or ridges in the base sheet shall be cut and renailed to allow as smooth a surface as possible.

B.  Contractor shall install two (2) plies of the manufacturer's Type VI fiberglass roofing felt over the mechanically fastened base sheet in the following manner:

1.  Starting at the low point of the roof, apply one 18 inch wide strip, then over that ply, install a full 36 inch wide Type VI fiberglass roofing felt. Following plies are to applied full width, overlapping the preceding felt by 18 inches in such a manner that at least two (2) plies of felt cover the base sheet at any point.

2.  All layers of roofing shall be laid free of wrinkles, creases or fish-mouths. Plies shall be laid at right angles to the slope of the deck except where slopes exceed one inch per foot. Felts shall be laid directly behind asphalt applicator. Sufficient pressure shall be exerted on the roll during application to ensure prevention of air pockets.

C.  Contractor shall adhere to the following guidelines:

1.  Lightly broom each ply of felt in place, full width, while the bitumen is hot and fluid. Felts shall lay flat and fully bonded, in such a manner that in no area shall felt touch felt. Use only a squeegee or conduit type broom.

2.  Valleys and waterways shall receive an additional ply of fiberglass felt which shall be at least 36 inches wide. This ply shall be laid on top of the installed fiberglass base sheet and shall extend at least eight inches up inclines, out of the valleys.

3.  Roofing materials shall not be installed during inclement weather.

a.  Roofing materials shall not be applied when moisture in any form, such as dew, can be seen or felt on the surface to which those materials are to be applied.

b.  Materials shall not be applied when foaming, blistering, or bubbling of the hot bitumen occurs.

## EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

17150 VON KARMAN AVE., IRVINE, CA                     BUILT-UP ROOFING

---

    b.    Backnail felts at the leading edge on centers of 20 feet (1" - 2" slope); 10 foot (2" - 3" slope); 4 foot (3" - 6" slope).

    c.    Nail the cap sheet in the leading edge on the centers in (b) above and on staggered 6 inch centers at each end lap. All nails shall be mopped over with asphalt and lapped by the following cap sheet.

D.    Apply the Mineral Surfaced Fiberglass Cap Sheet in the following manner:

    1.    Starting at the low point, apply one (1) layer of cap sheet, being sure to maintain two inch side laps and six inch end laps over the preceding sheets. Cut 12 to 18 foot lengths of cap sheet and flop into a full width mopping of hot bitumen applied at a nominal rate of 30 pounds per 100 square feet. Temperature of the asphalt when applied must be such that, when the cap sheet is set into it, its temperature is approximately 20 degrees Fahrenheit above the EVT. The cap sheet must be firmly and uniformly set into the bitumen with all edges well sealed.

    2.    Loose granules are to be carried along throughout the cap sheet application to be broadcast over excess bitumen seepage, spillage, etc., in order to maintain the aesthetic quality of the cap sheet.

E.    Bitumen heating requirements shall be as follows:

    1.    Maximum asphalt temperature in heating equipment:

        a.    Asphalt shall not be heated to the minimum flashpoint.

        b.    The minimum finished blowing temperature shall not be exceeded for more than a total of four (4) hours, for any asphalt batch or portion thereof.

        c.    Remove from the project any asphalts heated above these limits.

    2.    Temperature at time and point of application:

        a.    All asphalts to be within 25 degrees Fahrenheit of their equiviscous temperature when applied in the roof system.

        b.    Asphalts not meeting this criteria are to be reheated or allowed to cool, as required.

## EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

---

17150 VON KARMAN AVE., IRVINE, CA                   BUILT-UP ROOFING

---

3. Rate of bitumen application:

    a. Interply moppings for membrane: 25 pounds (nominal) per 100 square feet for asphalt, with tolerances of -15 percent and + 25 percent.

    b. Mineral Surfaced Fiberglass Cap Sheet: 30 pounds (nominal) per 100 square feet.

**3.03** **Flashing Installation**

A. General flashing specifications:

    1. All flashing must be completed daily; however, base flashing may be delayed where a fiberglass felt flashing ply is required, so long as this ply is properly set into a solid mopping of asphalt as specified below, and the top, exposed edge is sealed using roof cement to create a temporary waterseal. Otherwise, no staged flashing application will be allowed.

    2. All other flashing not specifically detailed herein will be applied in accordance with manufacturer's specifications and approved by the Owner.

    3. All sheet metal that will come in contact with bituminous materials shall be primed with an asphaltic primer and allowed to dry before applying bitumen.

B. Contractor shall install flashings at vertical wall and curb surfaces which abut the built-up roof in the following manner:

    1. Prime concrete, masonry, and metal surfaces with asphaltic primer applied at a nominal rate of one gallon per 100 square feet, and allow to dry prior to applying bitumen.

    2. Install 4 inch cant strips at the juncture of all vertical surfaces and roof. Cants shall be nailed securely to horizontal and/or vertical wood surfaces.

    3. Embed not less than two (2) plies of fiberglass felt into solid moppings of hot steep asphalt over junctures, extending from the top of the vertical flashing surface and down to a point at least 2 and 4 inches past the toe of the cant strip, onto the roof. Over the preceding ply, install another ply of fiberglass felt into a solid mopping of hot steep asphalt

**EXHIBIT F**

**Roof Replacement Specifications** (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

17150 VON KARMAN AVE., IRVINE, CA                    BUILT-UP ROOFING

---

over junctures, extending from the top of the vertical flashing surface and down to a point at least 6 inches past the toe of the cant strip, onto the roof. If manufacturer requires more than three (3) plies, then his requirements shall govern.

4. Over the preceding ply install the cap sheet base flashing ply per the manufacturer's current recommendations. The flashing membrane shall be of sufficient width to extend from the top of the vertical flashing surface to a minimum of 6 inches past the toe of the cant strip, onto the roof, or 2 inches further onto the roof than the preceding ply.

5. At nailable surfaces, fasten the top edge of the base flashing approximately every 6 inches on center with appropriate fasteners through 1 inch diameter metal discs. At non-nailable surfaces, secure the top edge of the base flashing using a 20 gauge galvanized metal termination bar fastened to the wall using concrete screws turned into pre-drilled holes at 16 inches on center.

6. Completely bond all flashings to the underlying surface without any looseness, bubbles or voids. Remove and replace any loose flashing.

7. The top edge of all base flashings and inside/outside corners are to be terminated using a three-course application of woven glass fabric embedded into and covered over with flashing grade roof cement.

C. Contractor shall flash all flanged metal components in the following manner:

1. All flanges, including pipe flashings, flanged units, etc., will be primed and stripped-in with two (2) plies of fiberglass roofing felt embedded into hot asphalt. The first ply will extend a minimum of three inches beyond the flange onto the roof. The second ply will extend a minimum of three inches further onto the roof than the first ply. After the cap sheet application, seal the cut edge of the cap sheet with roof cement.

D. Upon completion of work, all exposed roof cement must be coated with an application of aluminum coating at a rate of 2 gallons per 100 square feet.

**3.04   Miscellaneous Work Items**

A. Refer to Section 06100 for roof related wood components and Section 07600 for roof related metal components.

**EXHIBIT F**

**Roof Replacement Specifications** (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

17150 VON KARMAN AVE., IRVINE, CA                    BUILT-UP ROOFING

---

B.  Extend pipes and supports if necessary, to a minimum height of eight inches above the roof surface.

C.  Extend, reroute, or otherwise manipulate ducts and/or pipes as needed to accommodate raising of equipment due to construction or extension of supports, etc.

D.  As applicable, remove existing metal counterflashing and coping to facilitate installation of new base flashing system. Clean joints thoroughly and reinstall, applying new sealant at overlaps and elsewhere, as needed.

E.  Install new roof protection material in front of roof access hatches and mechanical unit access doors, in a 4' x 4' wide area. The roof protection material shall be set into a solid coating of asphalt or roof cement with a one inch gap between sections, over the completed roof system.

F.  Remove all non-use equipment, supports etc. as indicated at the Pre-Bid Conference. If removal of existing equipment leaves holes through the plywood decking, repair decking with materials to match existing.

G.  Contractor shall be responsible for temporary displacement of existing units as necessary to accommodate construction of new or extension of existing supports.

H.  Surfaces to receive elastomeric sealant shall be thoroughly cleaned and primed per manufacturer's recommendations.

I.  Replace any severely rusted or otherwise damaged metal flashing, counterflashing and/or coping with new to match existing shape, gauge, size and dimensions.

J.  Where angling or equipment platforms for water diversion is not possible, and elsewhere where waterflow is obstructed, install crickets to eliminate the potential of ponding water. Crickets shall be formed from pre-tapered perlite roof insulation to be set into a solid mopping of hot Type III asphalt over the installed base sheet, to provide a minimum finished slope of 1/4 inch per foot. Asphalt moppings shall be applied at a nominal rate of 30 lbs. per 100 square feet.

## EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Limar Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

---

17150 VON KARMAN AVE., IRVINE, CA                    BUILT-UP ROOFING

---

4.  Interply moppings of hot (at EVT) asphalt shall be continuous and applied at a nominal rate of 25 pounds per square.  Application methods shall insure that all plies are completely embedded in asphalt. All interply bitumen shall be steep asphalt, Type III, 190 degrees Fahrenheit softening point.

5.  Temperatures at the kettle shall be controlled so that bitumen temperature shall not exceed the asphalt manufacturer's maximum finished blowing temperature.

6.  All exposed deck and fiberglass base sheet must be covered with the completed roof membrane system at the end of each day's work, with the exception of the surfacing sheet.  All roof terminations and openings shall be completed and watersealed on a daily basis.

7.  Staging of the roof membrane application or temporary membrane is not acceptable.  Membrane shall be installed in final form on a daily basis.

    a.  If phased roofing occurs as a result of emergency conditions, install additional plies over phased areas so that a continuous two-ply system is installed.

8.  Thermostatic controls and visible thermometer shall be provided on tanker and/or kettle, maintained in working order and calibrated.

9.  Foot and wheeled traffic shall be kept off the newly installed membrane until asphalt has sufficiently cured to prevent displacement voids.

10. All membrane deficiencies such as voids, bridging, fishmouths, cuts, tears, etc., shall be repaired in an acceptable manner.  Incorporate into such repairs as many plies as are affected by the deficiency.

11. Air void pockets, as determined by test samples, shall not exceed eight percent (8%) per interply mopping for individual sample and average of all samples shall be less than five percent (5%) per interply mopping. If corrective action is required, cut the roofing felts down to the void and cover with two (2) plies of fiberglass felt set into hot asphalt applied at a nominal rate of 25 pounds per 100 square feet.

12. For slopes greater than one inch per foot:

    a.  Run all felts parallel to the incline.

## EXHIBIT F

### Roof Replacement Specifications (continued)

This Exhibit F is attached to and made a part of that certain Lease dated October 11, 1995 by and between Lima Realty Corp. #19 as Landlord and Packard-Hughes Interconnect and General Motors Corporation as Tenant.

---

17150 VON KARMAN AVE., IRVINE, CA                           BUILT-UP ROOFING

---

K.   After proper installation of flashing at curbs, resecure existing unit to vertical curb surface using new screws through 5/8 inch steel/neoprene washers placed through existing fastener penetrations or maximum 12 inches on center.

L.   Any additional work shall be accomplished as indicated by the Roofing Consultant at the Pre-Bid Conference.

### END OF SECTION

### AMENDMENT NO. 1 TO LEASE

THIS AMENDMENT NO. 1 TO LEASE ("Amendment No. 1") is made effective as of the _3/st_ day of October, 2000, by and between **KILROY REALTY, L.P.**, a Delaware Limited Partnership, **KILROY REALTY CORPORATION**, a Maryland Corporation, General Partner ("Landlord"), and **PACKARD-HUGHES INTERCONNECT**, a Delaware Corporation, and **DELPHI AUTOMOTIVE SYSTEMS LLC**, a Delaware Limited Liability Company (collectively "Tenant"), with reference to the following facts and objectives:

### R E C I T A L S:

A.    **Limar Realty Corp.**, predecessor-in-interest to Landlord, acting in the capacity of and therein referred to as Landlord, entered into a Lease, dated October 11, 1995, with **Packard-Hughes Interconnect and General Motors Corporation**, predecessor-in-interest to Tenant, acting in the capacity of and therein referred to as Tenant (the "Lease"), for Landlord's building, the street address of which is 17150 Von Karman Avenue, Irvine, California 92614-0901 (the "Premises"), containing approximately 157,458 rentable square feet.

B.    The Lease and this Amendment No. 1 are hereinafter collectively referred to as the "Lease."

C.    The Term of the Lease commenced on January 22, 1996, and the current Term of the Lease is scheduled to expire at midnight on January 21, 2001.

D.    The current Monthly Base Rent is $93,927.09.

E.    Landlord and Tenant desire to extend the Term for an additional five (5) years, and to adjust Monthly Base Rent.

F.    Landlord and Tenant desire to acknowledge the foregoing and to amend the Lease as hereinafter provided.

**NOW, THEREFORE,** Landlord and Tenant agree as follows:

1.    **Term; Option to Extend**

1.1    Term
The Term of the Lease as set forth in paragraph 1(g) of the Lease is hereby extended by five (5) years, from January 22, 2001, until January 21, 2006 (the "Extended Lease Term").

1.2    Expiration of Option to Extend
The first option to extend the Term of the Lease, as set forth in paragraph 28(a) of the Lease, has been exercised by Tenant and shall have no further force or effect. Tenant has one (1) remaining option to extend the Term of the Lease for an additional five (5) years, exercisable in accordance with the provisions of paragraph 28(b) of the Lease.

2.    **Base Rent**
Monthly Base Rent for the Premises during the Extended Lease Term shall be the following amounts during the following periods:

| Period | Monthly Base Rent |
|--------|-------------------|
| January 22, 2001 through January 21, 2002 | $133,839.30 |

And thereafter, Base Rent shall be adjusted by annual CPI increases pursuant to paragraphs 28.c.1 and 4.b.1 of the Lease.

3.    **Condition of Premises**
Notwithstanding any other provision of the Lease, Tenant acknowledges that it now occupies the Premises and Tenant does and shall continue to accept the Premises in the present "as is" condition thereof at the commencement of the Extended Lease Term, exclusive of the provisions of paragraphs 17 (Damage and Destruction) and 18 (Condemnation) of the Lease, and subject to the conditions of paragraph 4, below.

- 1 -

4.    **Tenant Improvements**

Subject to mutually agreed upon plans and specifications between Landlord and Tenant (the "Plans"), Landlord shall provide Tenant with a tenant improvement allowance ("Allowance") for Tenant to complete desired improvements to the Premises ("Allowance Work") consisting of the following: (i) upgrade parking lot lighting in accordance with City of Irvine requirements; (ii) apply slurry coat and re-stripe parking lot; (iii) repair and/or replace irrigation systems as needed; and (iv) complete seismic upgrades pursuant to California Government Code. Landlord shall not unreasonably withhold its approval of the Plans provided the Plans relate to the Allowance Work. Landlord's failure to notify Tenant in writing of Landlord's desired changes to said Plans within fifteen (15) days of Landlord's receipt of same shall be deemed Landlord's approval of said Plans. The Allowance shall be advanced by Landlord subject to the following covenants and conditions:

4.1     Such Allowance shall be for the payment of costs to construct the Allowance Work and shall be in the amount of Seventy-Five Thousand Dollars ($75,000.00).

4.2     In the event that the total costs of the Allowance Work exceeds Seventy-Five Thousand Dollars ($75,000.00), Tenant shall be obligated to pay for all costs for Allowance Work which exceeds the Allowance.

4.3     The Allowance shall be disbursed by Landlord to Tenant when the Allowance Work has been substantially completed and a Certificate of Occupancy, or equivalent has been obtained.

4.4     All Allowance Work shall be made and performed by Tenant pursuant to the provisions of paragraph 14 of the Lease applicable to Alterations, with the following additional requirements:

4.4.1  Tenant's indemnity of Landlord as set forth in paragraph 15 of the Lease also shall apply with respect to any and all costs, losses, damages, injuries and liabilities related in any way to any act or omission of Tenant or Tenant's contractors, subcontractors, laborers, materialmen and suppliers (collectively "Tenant's Agents"), or anyone directly or indirectly employed by them in the performance of the Allowance Work, or in connection with Tenant's non-payment of any amount arising out of the Allowance Work. Such indemnity by Tenant, as set forth in paragraph 15 of the Lease, also shall apply with respect to any and all costs, losses, damages, injuries and liabilities related in any way to Landlord's performance of any ministerial acts reasonably necessary (i) to permit Tenant to complete the Allowance Work and (ii) to enable Tenant to obtain any building permit or certificate of occupancy for the Premises. Anything in this paragraph 4.4.1 to the contrary notwithstanding, Tenant shall not be required to indemnify Landlord with respect to any costs, losses, damages, injuries, or liabilities relating to or resulting from (i) Landlord's gross negligence or willful misconduct; (ii) Landlord's breach of its express obligations under the Lease which Landlord fails to cure within a reasonable time after written notice of breach from Tenant; or (iii) the failure of Landlord to pay the Allowance in accordance with the terms hereof.

4.4.2  All of Tenant's Agents shall carry worker's compensation insurance covering all of their respective employees, and shall also carry public liability insurance, including property damage, all with limits, in form and with companies as are required to be carried by Tenant as set forth in paragraph 16 of the Lease.

4.4.3  The Allowance Work shall comply in all respects with the following: (i) all state, federal, city or quasi-governmental laws, codes, ordinances and regulations, as each may apply according to the rulings of the controlling public official, agent or other person; (ii) applicable standards of the American Insurance Association (formerly, the National Board of Fire Underwriters) and the National Electrical Code; and (iii) building material manufacturer's specifications.

4.4.4  Landlord shall have the right to inspect the Allowance Work at all reasonable times until such time as the Allowance Work is substantially complete. Should Landlord in good faith disapprove any portion of the Allowance Work Landlord shall notify Tenant in writing of such disapproval prior to substantial completion of the Allowance Work, and shall specify the items disapproved. Any defects or deviations in, and/or good faith disapproval by Landlord of, the Allowance Work shall be rectified by Tenant (or the responsible contractor or subcontractor) at no expense to Landlord. Provided, however, that Landlord may not disapprove of Allowance Work which is in substantial compliance with the plans and specifications therefore and all Applicable Requirements.

C:\WINDOWS\TEMP\Packard Hughes.am1.cln3.doc11/13/00

4.4.5    With regard to items (i), (ii) and (iv) set forth in paragraph 4, above, within ten (10) days after completion of construction of the Allowance Work, Tenant shall cause a Notice of Completion to be recorded in the office of the Recorder of the County of Orange in accordance with Section 3093 of the Civil Code of the State of California, or any successor statute, and shall furnish a copy thereof to Landlord upon such recordation. If Tenant fails to do so, Landlord may execute and file the same on behalf of Tenant as Tenant's agent for such purpose, at Tenant's sole cost and expense. At the conclusion of the construction, (i) Tenant shall cause the Architect and/or Contractor for the Allowance Work: (A) to update the Plans and Specifications as necessary to reflect all changes made to the Plans and Specifications during the course of construction, (B) to certify to the best of their knowledge that the "record-set" of mylar as-built drawings are true and correct, which certification shall survive the expiration or termination of the Lease, and (C) to deliver to Landlord two (2) sets of copies of such record set of drawings within (90) days following issuance of a certificate of occupancy for the Premises, and (ii) Tenant shall deliver to Landlord a copy of all warranties, guaranties, operating manuals and appropriate information relating to the improvements, equipment and systems constituting a part of the Allowance Work.

4.4.6    Notwithstanding any provision to the contrary contained in this Lease, if an event of default as described in paragraph 20 of the Lease has occurred at any time on or before the substantial completion of the Allowance Work, and is not cured within the applicable period, then in addition to all other rights and remedies granted to Landlord pursuant to the Lease, Landlord shall have the right to withhold payment of all or any portion of the Allowance.

4.4.7    Notwithstanding the provisions of paragraph 14 of the Lease to the contrary Landlord hereby waives its right to require the Allowance Work to be removed at the expiration or earlier termination of the Extended Lease Term.

5.    **No Broker**

Landlord and Tenant each represents to the other that it has had no dealings with any real estate broker, agent or finder in connection with the negotiation of this Amendment No. 1, and that they know of no real estate broker, agent or finder, who is entitled to a commission or finder's fee in connection with this Amendment No. 1, except for Bryon Ward and John Martin at Grubb & Ellis ("Broker") who represented Tenant and shall be paid a fee by Landlord for a separate written agreement. Each party shall indemnify, protect, defend and hold harmless the other party against all claims, demands, losses, liabilities, lawsuits, judgments and costs and expenses (including reasonable attorneys' fees) for any leasing commission, finder's fee or equivalent compensation alleged to be owing on account of the indemnifying party's dealings with any real estate broker, agent or finder other than Broker. The provisions of this paragraph 5 will survive the expiration or earlier termination of the Lease.

6.    **Payments and Notices**

6.1    Landlord's address for purposes of payments and notices pursuant to paragraph 27 of the Lease is hereby confirmed to be as follows:

> Kilroy Realty, L.P.
> 2250 E. Imperial Highway, Suite 360
> El Segundo, CA  90245
> Tel. No. (310) 563-5500
> Fax No. (310) 416-9113

Copies of any notices to be given by Tenant to Landlord pursuant to paragraph 1(b) of the Lease also shall be given to the local office of Landlord within the county in which the Building is located and to Landlord's attorney, as follows:

> Kilroy Realty, L.P.
> 184 Technology Drive, Suite 200
> Irvine, CA  92618
> Tel. No. (949) 790-0840
> Fax No. (949) 790-0844
>
> Marshall L. McDaniel
> McDaniel & McDaniel
> 2250 E. Imperial Highway, Suite 1200
> El Segundo, CA  90245

- 3 -

Tel. No. (310) 640-1960
Fax No. (310) 322-8790

6.2    Tenant's address for purposes of notices pursuant to paragraph 27 of the
Lease is hereby confirmed to be as follows:

Packard-Hughes Interconnect and Delphi Automotive Systems, LLC
17150 Von Karman Avenue
Irvine, CA 92614-0901
Tel. No. (949) 660-5914
Fax No. (949) 660-6982

6.3    Copies of any notices to be given by Landlord to Tenant also shall be given as
follows:

Delphi Automotive Systems LLC
5725 Delphi Drive
Troy, MI 48098

Delphi Facilities Services Group
1450 W. Long Lake Road
Mail Code 480-414-250
Troy, MI 48098

## 7.    Miscellaneous

Words used herein which are defined in the Lease shall have the same meaning when used in
this Amendment No. 1. Except as herein amended the Lease is hereby ratified, affirmed and
approved. Landlord and Tenant both acknowledge and agree that to their best information and belief
no default exists under the Lease.

**IN WITNESS WHEREOF,** the parties hereto have executed this Amendment No. 1 as of
the date first herein above written.

**KILROY REALTY, L.P.,**
A Delaware Limited Partnership

By: **KILROY REALTY CORPORATION,**
A Maryland Corporation,
General Partner

By: _____
        JEFFREY C. HAWKEN
Title:    EXECUTIVE VICE PRESIDENT
        CHIEF OPERATING OFFICER

By: _____
        JOHN T. FUCCI
        SR. VICE PRESIDENT
Title: _____
        ASSET MANAGEMENT

**"LANDLORD"**

**PACKARD-HUGHES INTERCONNECT,**
A Delaware Corporation

By: _____

Title:    CFO

By: _____

Title:    President

Execution Recommended
Equis Corporation
By:
By:

**DELPHI AUTOMOTIVE SYSTEMS LLC,**
A Delaware Limited Liability Company

By: DELPHI AUTOMOTIVE SYSTEMS
CORPORATION, a Delaware corporation
Its: Managing Member

By: _____
                                11-30-00
Its:    Authorized Signatory

Execution Recommended
Equis Corporation
By:
By:

**"TENANT"**

**APPROVED / LEGAL
MIRO WEINER & KRAMER**

### AMENDMENT NO. 2 TO LEASE

THIS AMENDMENT NO. 2 TO LEASE ("Amendment No. 2") is made as of March 25, 2005, by and between **KILROY REALTY, L.P.**, a Delaware Limited Partnership, **KILROY REALTY CORPORATION**, a Maryland Corporation, General Partner ("Landlord"), and **PACKARD-HUGHES INTERCONNECT**, a Delaware Corporation, and **DELPHI AUTOMOTIVE SYSTEMS LLC**, a Delaware Limited Liability Company (collectively "Tenant"), with reference to the following facts and objectives:

### R E C I T A L S:

A.     **Limar Realty Corp.**, predecessor-in-interest to Landlord, acting in the capacity of and therein referred to as Landlord, entered into a Lease, dated October 11, 1995, with **Packard-Hughes Interconnect and General Motors Corporation,** predecessor-in-interest to Tenant, acting in the capacity of and therein referred to as Tenant (the "Lease"), for Landlord's building, the street address of which is 17150 Von Karman Avenue, Irvine, California 92714 (the "Premises"), containing approximately 157,458 rentable square feet.

B.     The Lease has heretofore been amended by an Amendment No. 1 to Lease, dated October 31, 2000 ("Amendment No. 1"). The Lease, Amendment No. 1 and this Amendment No. 2 are hereinafter collectively referred to as the "Lease."

C.     The Term of the Lease commenced on January 22, 1996, and the current Term of the Lease is scheduled to expire at midnight on January 21, 2006, subject to one remaining option to extend the Term for five (5) years set forth in paragraph 28a of the Lease.

D.     The current monthly Base Rent based upon the most recent CPI adjustment is $151,166.02.

E.     The form of the Lease is a NNN Lease with Tenant obligated for Real Property Taxes, Insurance Costs, utilities, repairs and maintenance. The foregoing language is not intended to nor shall it operate to change, modify, enlarge or diminish the covenants, conditions and express written provisions of the Lease.

F.     Pursuant to paragraph 30 of the Lease, Tenant is obligated for the reimbursement of Landlord's Roof Cost at the rate of $4,634.91 per month. Pursuant to paragraph 30a of the Lease, Tenant is obligated for the Excess Cost of the Roof Cost if the Roof Cost reimbursement is not fully paid over fifteen (15) years. The foregoing language is not intended to nor shall it operate to change, modify, enlarge or diminish the covenants, conditions and express written provisions of the Lease.

G.     Tenant has not paid and Landlord does not hold a security deposit pursuant to the Lease.

H.     Landlord and Tenant have agreed to extend the Term for an additional eleven (11) months and to adjust monthly Base Rent.

I.     Landlord and Tenant desire to acknowledge the foregoing and to further amend the Lease as hereinafter provided.

**NOW, THEREFORE,** Landlord and Tenant agree as follows:

1.     **Term; Option to Extend**
The Term of the Lease as set forth in paragraph 1 of Amendment No. 1 is hereby extended by eleven (11) months, from January 22, 2006, until December 21, 2006 (the "Second Extended Lease Term"). By reason of the extension of the Term provided for in this Amendment No. 2, there are no remaining options to extend the Term of the Lease.

2.    **Monthly Base Rent**
Monthly Base Rent for the Premises during the Second Extended Lease Term shall be the amount of $155,883.42, and shall not be subject to any CPI increases during the Second Extended Lease Term.

3.    **Roof Cost Reimbursement**
The Roof Cost Reimbursement of $4,634.91 set forth in paragraph 30 of the Lease shall continue to apply during the Second Extended Lease Term.

4.    **Condition of Premises**
Tenant acknowledges that it now occupies the Premises and Tenant does and shall continue to accept the Premises in the present "as is" condition thereof at the commencement of and during the Second Extended Lease Term, subject to the provisions of paragraphs 17 (Damage and Destruction) and 18 (Condemnation) of the Lease.

5.    **Payments and Notices**

5.1    Landlord's address for purposes of payments and notices pursuant to paragraph 27 of the Lease is hereby confirmed to be as follows:

> Kilroy Realty, L.P.
> 12200 W. Olympic Boulevard, Suite 200
> Los Angeles, CA  90064
> Tel. No. (310) 481-8400
> Fax No. (310) 481-6501

5.2    Copies of any notices to be given by Tenant to Landlord pursuant to paragraph 1(b) of the Lease also shall be given to the local office of Landlord within the county in which the Building is located and to Landlord's attorney, as follows:

> Kilroy Realty, L.P.
> 111 Pacifica, Suite 300
> Irvine, CA  92618
> Tel. No. (949) 790-0840
> Fax No. (949) 790-0844
>
> Marshall L. McDaniel
> McDaniel & McDaniel
> 12200 W. Olympic Boulevard, Suite 200
> Los Angeles, CA  90064
> Tel. No. (310) 481-8424
> Fax No. (310) 481-6530

6.    **Landlord's Broker**
Landlord and Tenant each represents to the other that it has had no dealings with any real estate broker, agent or finder in connection with the negotiation of this Amendment No. 2, and that they know of no real estate broker, agent or finder, who is entitled to a commission or finder's fee in connection with this Amendment No. 2, except for Equis Corporation, an Illinois Corporation ("Tenant's Broker") who represented Tenant and shall be paid a real estate lease brokerage fee by Landlord pursuant to a separate written agreement, with which Tenant shall not be concerned nor liable. Each party shall indemnify, protect, defend and hold harmless the other party against all claims, demands, losses, liabilities, lawsuits, judgments and costs and expenses (including reasonable attorneys' fees) for any leasing commission, finder's fee or equivalent compensation alleged to be owing on account of the indemnifying party's dealings with any real estate broker, agent or finder other than Tenant's Broker. The provisions of this paragraph 6 will survive the expiration or earlier termination of the Lease.

7.    **Entire Agreement**
This Amendment No. 2 embodies the entire understanding between Landlord and Tenant with respect to the subject matter hereof and can be changed only by an instrument in writing signed by both Landlord and Tenant. In the event of conflict between the terms of the Lease and the terms of this Amendment No. 2, the terms of this Amendment No. 2 shall prevail.

8.    **Counterparts**

This Amendment No. 2 may be executed in counterparts, including facsimile counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same Amendment No. 2.

9.    **Authority**

Each individual executing this Amendment No. 2 represents that he or she is duly authorized to execute and deliver this Amendment No. 2, and that this Amendment No. 2 is binding upon each of the respective parties in accordance with its terms.

10.    **Miscellaneous**

Words used herein which are defined in the Lease shall have the same meaning when used in this Amendment No. 2. Except as herein and previously amended the Lease is hereby ratified, affirmed and approved. Landlord and Tenant both acknowledge and agree that to their best information and belief no default exists under the Lease.

**IN WITNESS WHEREOF,** the parties hereto have executed this Amendment No. 2 as of the date first herein above written.

**KILROY REALTY, L.P.,**
A Delaware Limited Partnership

By: **KILROY REALTY CORPORATION**
A Maryland Corporation,
General Partner

By: _____
JEFFREY C. HAWKEN
Title: EXECUTIVE VICE PRESIDENT,
CHIEF OPERATING OFFICER

By: _____
JOHN T. FUCCI
Title: SR. VICE PRESIDENT
ASSET MANAGEMENT

**"LANDLORD"**

**PACKARD-HUGHES INTERCONNECT,**
A Delaware Corporation

By: _____  4/18/05
Kevin R. Heigel
Title: Chairman and President

By: _____  4/12
Nick Hotchkin - Vice President
Title: _____
Pamela M. Geller - Treasurer

**DELPHI AUTOMOTIVE SYSTEMS LLC,**
A Delaware Limited Liability Company

By: _____
Title: John A. Jaffurs
Executive Director
By: Delphi Facilities Services Group

Title: _____

**"TENANT"**