TOGUT, SEGAL & SEGAL LLP
Conflicts Counsel for
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, NY  10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)

HEARING DATE:        October 19, 2006
HEARING TIME:        10:00 a.m.
OBJECTION DEADLINE:  October 12, 2006 at 4:00 PM

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X
                                          :
In re                                     :        Chapter 11
                                          :
    DELPHI CORPORATION, et al.,           :        Case No. 05-44481 (RDD)
                                          :
                          Debtors.        :        (Jointly Administered)
                                          :
--------------------------------------------------------------X

**SECOND APPLICATION OF TOGUT, SEGAL & SEGAL LLP
FOR AN ALLOWANCE OF INTERIM COMPENSATION FOR
SERVICES RENDERED AS CONFLICTS COUNSEL FOR
THE DEBTORS FOR THE PERIOD FEBRUARY 1, 2006
THROUGH MAY 31, 2006 AND FOR REIMBURSEMENT OF EXPENSES**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Togut, Segal & Segal LLP ("TS&S"), as conflicts counsel for Delphi
Corporation ("Delphi") and the other above-captioned debtors and debtors in
possession (collectively, the "Debtors"), respectfully makes this application (the
"Second Application") for an allowance of interim compensation for professional
services rendered during the period of February 1, 2006 through and including May 31,
2006 (the "Second Interim Period"), and for reimbursement of expenses incurred in
connection with such services.  In support of this Application, TS&S states:

**PRELIMINARY STATEMENT**

During the Second Interim Period, TS&S continued to provide legal
services to assist the Debtors including, without limitation, the resolution of setoff

claims seeking an aggregate of approximately $63 million. In resolving these claims, the

Debtors collected more than $28 million of accounts receivable improperly retained by

vendors that asserted the setoff claims. In addition, and as more fully described below,

TS&S continued to assist the Debtors with the enforcement of pre-petition supply

agreements to ensure continued deliveries of product for the Debtors' "just in time"

inventory system. TS&S also assisted the Debtors in resolving disputes with certain

vendors which demanded post-petition payment on account of pre-petition obligations.

## I.    FEES AND EXPENSES FOR WHICH ALLOWANCE IS SOUGHT

1.    This Application is made pursuant to section 331 of title 11 of the

United States Code (the "Bankruptcy Code"), Rule 2016(a) of the Federal Rules of

Bankruptcy Procedure, and the November 4, 2005 Order of the Court establishing

procedures for compensation and reimbursement of professionals, as amended (the

"Administrative Fee Order"), for an allowance of interim compensation for services

rendered to the Debtors during the Second Interim Period in the amount of

$1,045,443.50, and for reimbursement of expenses in the amount of $13,940.08, which

were incurred during the Second Interim Period.

2.    TS&S attorneys and paraprofessionals expended a total of 2,330.5

hours representing the Debtors during the Second Interim Period for which the firm

requests compensation. A schedule setting forth the number of hours expended by the

firm's partners, counsel, associates and paraprofessionals during the Second Interim

Period, their respective hourly rates, and the year in which each attorney was admitted

to practice is attached as Exhibit "1". A schedule specifying the type of expenses for

which TS&S is seeking reimbursement during the Second Interim Period and the total

amount of each category is attached as Exhibit "2". To the extent that time or

disbursement charges for services rendered or disbursements incurred relate to the Second Interim Period, but are not processed until after the date of this Application, TS&S reserves the right to request additional compensation and reimbursement in a future application.

3.     TS&S maintains computerized records of the daily time slips completed by all attorneys and paraprofessionals.  Preceding the time entries is a chart listing the names, billing rates and time spent by each of the attorneys and paraprofessionals rendering services on behalf of the Debtors.  In support of this Application, copies of these computerized records, together with a computer generated detailed itemization of the expenses incurred, have been filed electronically with the Bankruptcy Court for the Southern District of New York (the "Court") as a supplement to this Application and furnished to the Debtors, the United States Trustee, the Debtors' secured lenders, and counsel for the official statutory committee of unsecured creditors appointed in these cases (the "Committee").

4.     On April 26, 2006, TS&S filed its first application (the "First Application") for an award of interim compensation in the amount of $789,874 and reimbursement of expenses of $14,531.15 for the period of October 8, 2005 through and including January 31, 2006 (the "First Interim Period").  Pursuant to an Order of the Court dated July 12, 2006, the hearing to consider first interim applications for compensation and reimbursement of expenses, including TS&S's First Application, was adjourned to October 19, 2006.

5.     Other than the payments made by the Debtors to TS&S for fees and expenses incurred during the First Interim Period pursuant to the Administrative Fee Order, as amended by the Court's July 12, 2006 Order, and disclosed in the First Application, and those payments described below made during the Second Interim

3

Period in accordance with the terms of Administrative Fee Order, TS&S has not received payment of any compensation or reimbursement of expenses in this Chapter 11 case.

6.      Pursuant to the Administrative Fee Order, TS&S submitted four monthly invoices during the Second Interim Period:  (i) for February 1, 2006 through February 28, 2006 in the amounts of $280,358.00 for fees and $3,625.90 for expenses; (ii) for March 1, 2006 through March 31, 2006 in the amounts of $328,794.50 for fees and $5,166.53 for expenses;  (iii) for April 1, 2006 through April 30, 2006 in the amounts of $217,441.50 for fees and $3,644.70 for expenses;  and (iv) for May 1, 2006 through May 31, 2006 in the amounts of $220,126.50 for fees and $1,502.95 for expenses.

7.      As of the date hereof and in accordance with the Administrative Fee Order, TS&S has received payment from the Debtors representing 80% of its fees and 100% of its expenses for the period February 1, 2006 through March 31, 2006.  TS&S has not yet received any payments from the Debtors for fees and expenses for services rendered during the period April 1, 2006 through May 31, 2006.

8.      As confirmed by the Certification of Neil Berger, a member of TS&S, attached as Exhibit "3", all of the services rendered by TS&S during the case for which interim compensation is sought herein were rendered for and on behalf of the Debtors in connection with their chapter 11 cases.

## II.    RETENTION OF TS&S[1]

9.      TS&S was retained by the Debtors just prior to the Initial Filing Date in October 2005 to serve as conflicts counsel and to work with the Debtors' lead

---

[1]      A description of the Debtors' business operations and the commencement of the Debtors' Chapter 11 cases is contained in the First Application and other pleadings filed in this Court.

bankruptcy counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  TS&S is

responsible for handling all bankruptcy-related matters where Skadden has an actual or

perceived conflict, and discrete tasks assigned by Skadden that can be more efficiently

handled by TS&S.  TS&S has not received a retainer.

10.     By Order dated November 4, 2005, the Debtors were authorized to

retain TS&S on a final basis (Docket No. 1034).

11.     Since its retention and through the Second Interim Period, TS&S

and Skadden have continued to carefully coordinate their efforts and their work is

complementary.[2]

12.     All of the work summarized in this Second Application and for

which TS&S seeks interim compensation was performed efficiently, at the lowest cost to

the Debtors' estates and with minimal duplication of services in an effort to keep the

administration expenses to a minimum.  TS&S also staffed its projects in a manner that

would permit it to bill fewer hours than would have otherwise been possible.

## III.    SERVICES RENDERED BY TS&S
##         DURING THE SECOND INTERIM PERIOD

13.     All of the professional services provided by TS&S are set forth in

TS&S' computerized time records, and the Court is respectfully referred to those

records for the details of all of the work performed.

14.     Prior to the filing of the Debtors' chapter 11 cases, the Debtors and

Skadden determined that a clear division of litigation-related duties was necessary to

avoid potential conflicts that might have arisen had Skadden had been responsible for

the resolution of all such matters.

---

[2]     A description of TS&S's qualifications to provide services to the Debtors is set forth at length in
the First Application, and that description is incorporated herein by reference.

15.     During the Second Interim Period, TS&S continued to take primary responsibility for representing the Debtors in the following matters, among others, that would not be addressed by Skadden:

(a)     motions and demands made by creditors asserting setoff and/or recoupment rights pursuant to section 553 of the Bankruptcy Code and Paragraph "18" of this Court's Final DIP Financing Order, dated October 28, 2005 (the "DIP Order");

(b)     motions by certain parties-in-interest for relief from the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Automatic Stay");

(c)     issues related to the Essential Supplier Motion (as defined below), including the resolution of Orders to Show Cause addressing payments made to non-conforming suppliers;  and

(d)     issues concerning potential injunction litigation with various suppliers to prevent cessation of shipment of products necessary for uninterrupted manufacturing activities of the Debtors.

## A.    Setoff Issues:

16.     As part of its negotiations regarding post-petition financing, the Debtors included a detailed mechanism in the DIP Order to enable the Debtors' suppliers to exercise setoff claims and/or recoupment rights regarding their pre-petition payables, subject to certain conditions.  Following the procedures contained in paragraph 18 of the DIP Order, a supplier may seek to exercise a setoff right that arose during the Debtors' ordinary course of business without such assertion being subject to section 362 of the Bankruptcy Code.[3]  Setoffs that are subject to paragraph 18 of the DIP Order may include claims arising out of, for example, pre-petition warranty and/or

---

[3]     Nothing contained herein is meant to modify the provisions of the DIP Order or any right or obligation of any party thereunder.

product recall, customer adjustments, customer rebates and allowances, overpricing, short shipments and credits for damaged goods.

17.    Any claimant that seeks to exercise setoff rights must submit a written request with supporting documentation to the Debtors and the Committee (with a copy to JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as Administrative Agent for the Debtors).  If within 10 business days after sending such request, unless the parties extend that time, the Debtors and any particular claimant have failed to agree on the allowed amount of a requested setoff, they may seek resolution of the matter through an agreed-upon mediator or the Court.  If the mediator cannot resolve the dispute within thirty days, the parties may submit the matter to binding arbitration, with the arbitrator having an additional 60 days to rule.

18.    At the end of the Second Interim Period, 76 non-General Motors claimants had asserted one or more setoff claims of approximately $145.5 million.  The Debtors received 33 setoff demands during the Second Interim Period,[4] and TS&S devoted substantial time assisting the Debtors with the continued resolution of setoff and/or recoupment requests.

19.    During the Second Interim Period, Applicant worked with the Debtors and FTI Consultants, Inc. ("FTI"), the Debtors financial advisors, and helped to resolve 17 setoff demands which sought to setoff an aggregate of approximately $63.2 million.

20.    Moreover, Applicant assisted the Debtors in the identification of setoff claimants who had been holding accounts receivable that were payable to the

---

[4]    To date, the Debtors have received 90 setoff requests, including 37 requests during the First Interim Period.

Debtors in amounts in excess of the amounts subject to the claimants' setoff demands.
Applicant obtained interim agreements with those setoff claimants and collected
approximately $28.1 million of accounts receivable, while preserving all of the Debtors
rights to challenge such claimants' setoff rights and to pursue the Debtors' additional
accounts receivable claims.

21.    To effectively resolve these setoff demands, TS&S continued to:
(i) regularly communicate with the Debtors' personnel to facilitate their ability to obtain
and analyze data needed to reconcile the amounts of the receivables owed to the
Debtors with amounts of the payables owed to the setoff claimants;  (ii) develop
strategies for responding to setoff motions and prepare for possible litigation if
settlement negotiations failed;  (iii) engage in negotiations with counsel for the setoff
claimants;  and (iv) conduct necessary legal and factual research regarding issues raised
in the motions and letter demands.

22.    TS&S also continued to work with the Debtors to ensure that
mutuality exists among the parties involved in the setoff demands.  In instances where
the amounts to be setoff have involved a pre-petition overpayment by the Debtors,
TS&S has conducted necessary forensic/factual and legal research.

23.    As a result of the number and size of setoff demands made by
vendors, it has been necessary for the Debtors, TS&S, Skadden and FTI to communicate
with each other regularly to know the status of the demands.  Consequently,
throughout the Second Interim Period, the Debtors, TS&S, Skadden and FTI
participated in weekly status calls to review pending setoff demands and to help
coordinate the participants' efforts.  During these calls, among other things, the parties:
(i) discussed new demands that the Debtors received (including an analysis of the
merits of each new demand);  (ii) discussed the status of the Debtors' and setoff

8

claimant's exchange of information to reconcile the accounts;  (iii) analyzed the factual

and legal issues implicated by the demands;  and (iv) developed uniform coordinated

strategies on behalf of the Debtors regarding each of the demands.  These calls have

proven essential in safeguarding the Debtors' interests because they have permitted

TS&S to efficiently address the setoff demands without duplicating the efforts of

Skadden or the Debtors.

24.    The services provided by TS&S to assist the Debtors in the

resolution of setoff claims has been highly beneficial and efficient:  at the end of the

Second Interim Period, claims seeking to setoff approximately $65 million have been

resolved and concluded, and the Debtors have collected more than $28 million of

accounts receivable that were improperly withheld by setoff claimants.  All of these

results were achieved with a minimum of litigation and court intervention.

25.    Setoff demands continue to be asserted against the Debtors, and

TS&S continues to assist the Debtors as they review, analyze and resolve demands.

**B.    Automatic Stay Issues:**

26.    During the Second Interim Period, TS&S continued to share

responsibility with Skadden in addressing contested motions filed by parties-in-interest

for relief from the Automatic Stay.  To resolve these requests, TS&S:  (i) had telephone

conferences with the Debtors' in-house attorneys and business representatives to

discuss strategy for settlement and/or potential responses to the motions;

(ii) communicated with counsel for the movants to discuss the legal issues that were

implicated by the motions and attempted to negotiate consensual resolutions;

(iii) reviewed documents provided by the Debtors and counsel to the movants (e.g.,

term sheets, contracts, related pleadings, etc.);  and (iv) performed legal research, when

necessary.  In particular, TS&S devoted substantial time in addressing issues arising out

9

of two automatic stay motions filed Bank of America, N.A. and BorgWarner Turbo
Systems, Inc.

27.    Bank of America N.A. ("BofA"):  The Debtors maintain
manufacturing and business facilities throughout the United States, and many of those
facilities are located in remote areas that are not serviced by major or regional air
carriers.  As part of their continuing efforts to achieve maximum profitability and to
eliminate unnecessary cost and delay, the Debtors have historically used two corporate
aircraft (the "Aircraft") to transport personnel.  The Aircraft are leased from BofA, as
successor to Fleet National Bank, which maintains title to the Aircraft and has asserted
first priority liens (the "BofA Liens") against the Aircraft, aircraft engines, parts
accessories, replacements and substitutions (the "Collateral"), and all charter revenue
(the "Aircraft Cash Collateral") that the Debtors derive from certain charter agreements
with third parties.

28.    Issues regarding BofA's Liens have engendered substantial motion
practice before the Court.  Early in the Debtors' cases, BofA objected to the DIP Order
but was overruled after the Debtor had modified the DIP Order to expressly provide
that the liens granted therein did not affect BofA's Collateral or Aircraft Cash Collateral.

29.    Almost immediately after that the DIP Order was entered, on
November 11, 2005, BofA filed a Motion for:  (i) adequate protection of its security
interests in the Collateral;  and (ii) termination of the automatic stay regarding the
Aircraft Cash Collateral, pursuant to which BofA again requested the same relief that it
had unsuccessfully sought in its objection to the DIP Order (the "BofA Motion").  TS&S
worked with the Debtors to respond to, and seek to resolve, the BofA Motion.  TS&S
reviewed and analyzed the BofA Motion and conferred with the client concerning the

10

factual representations made by BofA and the Debtors' positions regarding them. TS&S also conducted necessary factual and legal research.

30.    TS&S devoted significant time to prepare for a contested hearing on November 25, 2005 to consider the BofA Motion and the objection that TS&S prepared, served and filed on behalf of the Debtors. TS&S initiated and participated in extensive negotiations among the Debtors, BofA, the Committee and the Agents under the DIP Order and was able to reach a consensual resolution of the BofA Motion. TS&S negotiated a Consent Order and it was approved by the Court on January 12, 2006 (the "Consent Order").

31.    Notwithstanding entry of the Consent Order, on the very next day, January 13, 2006, BofA filed a complaint (the "BofA Complaint")[5] against Delphi Automotive Services Human Resources, LLC ("DASHR"), the Committee and JPMorgan Chase, for a declaration that:  (i) JPMorgan Chase, as the administrative agent for the pre-petition and post-petition secured lenders (the "Secured Lenders"), did not hold any security interest or liens in, among other things, the Collateral and the Aircraft Cash Collateral;  and (ii) BofA holds valid, perfected and first priority security liens in, among other things, the Collateral and Aircraft Cash Collateral.

32.    TS&S, on behalf of the Debtors, negotiated with BofA regarding the issues raised in the BofA Complaint. While the negotiations progressed, TS&S obtained extensions of the Debtors' time to answer the BofA Complaint. Those extensions avoided unnecessary expense for the Debtors and facilitated settlement negotiations.

---

[5]    _Bank of America, N.A. v. Delphi Automotive Systems Human Resources, LLC, et al._, Adv. Pro. #06-01121.

TS&S conferred with Skadden concerning the provisions of the DIP Order so that TS&S would not duplicate Skadden's prior efforts.

33.    A global resolution of all of the issues raised in the BofA Complaint was ultimately achieved.  The parties' agreement was memorialized in a Stipulation that the parties executed on April 6, 2006 (the "BofA Stipulation").  In the BofA Stipulation, among other things, JPMorgan Chase acknowledged that:  (i) as the agent for the Secured lenders, it does not hold any security interests or liens in DASHR's assets;  and (ii) as the agent for the DIP Lenders, the liens granted pursuant to the DIP Order did not include any assets encompassed by BofA's Liens.  Finally, the Debtors and the Committee agreed, and the Court found, that BofA's Liens were valid, perfected, first priority and unavoidable in bankruptcy, immediately as of the Initial Filing Date.  The Court approved the BofA Stipulation on April 26, 2006.

34.    <u>BorgWarner Turbo Systems, Inc. ("BorgWarner")</u>:  Prior to the commencement of the Debtors' cases, the Debtors sold and delivered certain components to BorgWarner for incorporation into turbo chargers and actuator kits that BorgWarner, in turn, sold to its customers.  These sales were made pursuant to a purchasing agreement between Delphi Automotive Systems LLC ("DASLLC") and BorgWarner (the "Purchasing Agreement").

35.    At some time after the Purchasing Agreement was signed, and prior to the Initial Filing Date, BorgWarner discovered that a certain percentage of the turbochargers that it had purchased from DASLLC were defective.  BorgWarner subsequently made a warranty claim against the Debtors and alleged that the defects were in the DASLLC components (the "Warranty Claim") rather than in components that BorgWarner bought from non-Debtor suppliers.  The parties were in the process of reconciling the Warranty Claim on the Initial Filing Date, and BorgWarner withheld

12

payment of approximately $2.6 million of outstanding pre-petition invoices due and owing to the Debtors (the "BorgWarner Invoices").

36.    On October 31, 2005, the Debtors made written demand upon BorgWarner for payment of the BorgWarner Invoices. Negotiations between the parties failed and on April 12, 2006, BorgWarner filed a Motion for relief from the Automatic Stay to commence a Michigan state court action to liquidate its Warranty Claim (the "BorgWarner Motion"). Moreover, BorgWarner sought to continue to withhold payment of the BorgWarner Invoices pending the resolution of its proposed state court action.

37.    TS&S worked with the Debtors' commercial representatives and in-house attorneys to prepare: (i) an objection to the BorgWarner Motion; and (ii) a complaint to commence an adversary proceeding to resolve these issues in the Bankruptcy Court rather than a Michigan state court. TS&S told BorgWarner of the Debtors' objection to the BorgWarner Motion and advised that the Debtors were prepared to commence an adversary proceeding against BorgWarner in the Bankruptcy Court. BorgWarner agreed to resume settlement negotiations with the Debtors.

38.    Renewed settlement negotiations between the Debtors and BorgWarner were successful. Under the terms of the parties' proposed settlement, the Warranty Claim would be resolved by: (i) the Debtors' payment of $2.35 million to BorgWarner to satisfy the Warranty Claim; and (2) BorgWarner's payment of not less than $3.2 million, representing pre-petition and post-petition accounts receivable owed to the Debtors. The parties' settlement was embodied in a settlement agreement that was signed on July 13, 2006, and BorgWarner has agreed to withdraw the BorgWarner Motion.

39.     The services provided by TS&S enabled the Debtors the avoid the cost, expense and delay of litigation concerning the BorgWarner Motion and litigation concerning the Warranty Claim.  Moreover, TS&S' efforts fostered a settlement agreement pursuant to which, among other things, the Debtors will obtain payment of more than $3 million of pre- and post-petition accounts receivable claims that BorgWarner had withheld.

**C.     Essential Supplier Issues/Orders to Show Cause**

40.     During the Second Interim Period, TS&S continued to resolve Orders to Show Cause against vendors which received post-petition payments on account of pre-petition obligations.

41.     The Debtors' manufacturing facilities use a "just-in-time" supply method for components.  Consequently, the Debtors do not maintain a significant inventory (and in many cases, less than 24 hours worth) of parts supplied by their most important suppliers (the "Essential Suppliers").  Moreover, the Debtors rely on the "sole source" supply method, i.e., they purchase all of their requirements for a particular (and necessary) part from one supplier.  Accordingly, the Debtors depend upon frequent and, in many cases, daily shipments of components from the Essential Suppliers to keep their manufacturing facilities operating.

42.     The Debtors were concerned that the Essential Suppliers would exploit the Debtors' need for shipments by, among other things, demanding post-petition payment of pre-petition invoices.  Consequently, on the Initial Filing Date, the Debtors filed their Motion for an Order Authorizing Continuation of Vendor Rescue Program and Payment of Pre-petition Claims of Financially-Distressed Sole Source Suppliers and Vendors Without Contracts (the "Essential Supplier Motion").  Pursuant

14

to the Essential Supplier Motion, the Debtors sought permission to conditionally pay[6] pre-petition claims (the "Essential Supplier Claims") owing to certain of its suppliers that were "essential" to the uninterrupted function of the Debtors' business operations.

43.     In the Essential Supplier Motion, the Debtors demonstrated that the relief sought was immediate and critically necessary because the failure to pay the Essential Supplier Claims would cause the Essential Suppliers to withhold goods and/or services from the Debtors.  Without "sole source" supplies, the Debtors would suffer substantial delays and disruptions and be unable to conduct business.  On October 13, 2005, the Court entered an Order approving the Essential Supplier Motion (the "Essential Supplier Order").

44.     Pursuant to the Essential Supplier Order, the Debtors were also authorized, but not directed, to waive (the "Waiver") the conditions outlined in the Essential Supplier Motion (e.g., the execution of a Trade Agreement) to conditionally pay the claim of a threatening supplier (the "Non-Conforming Supplier") subject to the following procedures[7]:

>    i.    in the event that the Debtors grant a Waiver to a
>          Non-Conforming Supplier, the Debtors file a
>          Notice of Waiver and a proposed Order to Show
>          Cause with the Court within three business days
>          of the payment pursuant to the Waiver, and serve
>          the Notice of Waiver and Order to Show Cause on:
>          (i) the Non-Conforming Supplier; (ii) the Office of
>          the United State Trustee;  (iii) counsel for the
>          Committee;  and (iv) counsel for the agent under
>          the Debtors' proposed post-petition credit facility
>          provided however, that the Debtors are not
>          required to file a Notice of Waiver and an Order to

---

[6]     The Debtors explain in the Essential Supplier Motion that they would cause parties to enter into letter agreements (the "Trade Agreements") as a condition for payment of an Essential Supplier Claim.

[7]     Nothing contained herein is meant to modify the provisions of the Essential Supplier Motion or Order or any right or obligation of any party thereunder.

Show Cause if, within three (3) business days following the grant of the Waiver, the Committee ratifies the Waiver in writing to the Debtors;

ii.  at the first regularly-scheduled hearing occurring at least five business days following entry of the Order to Show Cause by the Court, the Non-Conforming Supplier is required to appear before the Court to determine whether such Non-Conforming Supplier should not be held in violation of the Automatic Stay; and

iii.  if the Court determines that, by its conduct, the Non-Conforming Supplier has violated the Automatic Stay, the Non-Conforming Supplier may be required to disgorge the amount of the payment made by the Debtors pursuant to the Waiver, plus attorneys' fees and interest accrued on such amount at the rate specified under the relevant agreements governing the Debtors' DIP credit facility or such other higher rate as the Court specified, within three business days of entry of the order holding the Non-Conforming Supplier in violation of the Automatic Stay.

45.  During the Second Interim Period, TS&S continued its efforts to negotiate resolutions of four remaining Orders to Show Cause filed against Non-Conforming Suppliers for aggregate conditional payments of $2,250,166.98.[8]  To achieve settlements of these matters prior to the scheduled hearings for each of the corresponding Orders to Show Cause, TS&S: (i) conducted negotiations with counsel to the Non-Conforming Suppliers regarding the merits of the subject payments and the legal issues implicated by their demands for payment;  (ii) participated in numerous telephone conferences and meetings with the Debtors' personnel to discuss background and strategy pertaining to each Non-Conforming Supplier;  (iii) reviewed and analyzed

---

[8]  During the First Interim Period, TS&S filed eight Notices of Waiver and obtained corresponding Orders to Show Cause for the Debtors against Non-Conforming Suppliers for aggregate conditional payments of $3,512,006.76.  TS&S achieved settlements in four of those matters during the First Interim Period on terms favorable to the Debtors.

documents provided by the Debtors regarding each Non-Conforming Supplier's corporate structure and historical relationship with the Debtors;  (iv) performed legal and non-legal research to ensure that service of the Notices of Waiver and Orders to Show Cause upon foreign Non-Conforming Suppliers was in compliance with the Hague Convention, and whether those suppliers had the necessary "minimum contacts" with the United States to be subject to the jurisdiction of the Court;  and (v) deposed representatives (*e.g.,* financial directors) of the Non-Conforming Suppliers when necessary.

46.    As of the date of this Application, TS&S had resolved three of the four remaining Non-Conforming Suppliers matters during the Second Interim Period. Each of those settlements were memorialized by a Consent Order that was prepared by TS&S and entered by the Court.  In one of the matters, the Debtors' Non-Conforming Supplier agreed to apply the previously paid amounts ($117,000) to post-petition or cure obligations of the Debtors.  In another matter, a Non-Conforming Supplier returned the difference ($104,000) between the payment and the post-petition amount owed to it by the Debtors.

47.    TS&S reached a settlement for the Debtors involving the Order to Show Cause entered against Behr Industries Corporation ("Behr").  TS&S deposed Behr's representative, reviewed Behr's financial disclosures, and facilitated settlement negotiations.  The result was that Behr agreed to return $350,000 to the Debtors.  The Court entered an Order approving the Behr settlement on May 12, 2006.  TS&S' efforts helped prevent the cessation of shipping by Behr, an important supplier of the Debtors, and also enabled the Debtors to achieve a substantial benefit for their estates.

48.    To date, the Debtors have received approximately $3.3 million of cash and post-petition credit, including approximately $1.9 million during the Second Interim Period, in the non-conforming supplier matters handled by TS&S.

**D.    Injunction Issues:**

49.    During the Second Interim Period, TS&S continued to prepare pleadings at the request of the Debtors and Skadden to enjoin suppliers who threatened to stop shipping parts despite enforceable "sole source" contracts with the Debtors.

50.    Generally, the Debtors contracted with their suppliers to purchase parts at a specific time, which is often tied directly to the production run of a particular Original Equipment Manufacturer ("OEM") vehicle.  These requirements contracts generally take the form of purchase orders, which constitute the Debtors' requirements for a particular product over a specified period of time.  The Debtors' standard General Terms and Conditions (the "Terms and Conditions") are incorporated by reference into these contracts.  The Terms and Conditions provide that if a supplier "commences any of the work or services which are the subject of this Contract, [supplier] will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification."  The Terms and Conditions also contain the supplier's acknowledgment that in the event of an actual, anticipatory or threatened breach of the contract, the Debtors are entitled to specific performance and injunctive or other equitable relief.

51.    During the Second Interim Period, several suppliers threatened to stop shipping parts to the Debtors.  These suppliers asserted, among other things, that the price increases in raw materials made it unprofitable for them to continue to meet the Debtors' requirements.  The consequences of a supplier unilaterally stopping shipment of parts would have been catastrophic.  The Debtors' manufacturing facilities

18

would be forced to shut down within a matter of days after the missed shipment.
Within one to two days after a shutdown of one of the Debtors' facilities, the Debtors'
OEM customers would likely be forced to halt production of their products on one or
more of their assembly lines.  A shutdown of even one assembly line of an OEM could
cause the manufacturer millions of dollars of damages which would be asserted against
the Debtors.

   52. Consequently, when requested by the Debtors, TS&S immediately
prepared comprehensive pleadings against several suppliers that had threatened to
stop shipments.  These pleadings sought temporary, preliminary and permanent
injunctive relief to:  (i) enjoin the suppliers from breaching, terminating, or attempting
to terminate the pre-petition requirements contracts between the suppliers and the
Debtors;  and (ii) direct the suppliers to continue to perform under those contracts.  For
each supplier, TS&S drafted a complaint, motion for a temporary restraining order, a
memorandum of law, and a proposed Order.  TS&S was prepared to file each of those
documents with the Court in the event that the Debtors were not able to negotiate
acceptable business solutions with their suppliers and in that regard, litigation support
was unavoidable.

   53. To date, the Debtors' negotiations with suppliers who threatened to
stop shipments, with assistance from TS&S, have been successful and no injunction
pleadings have had to be filed, in part because the suppliers' knew that the Debtors and
TS&S were prepared to seek expedited relief from this Court.

**E.** **Committee's Application to Employ Jefferies & Company, Inc.:**

   54. During the Second Interim Fee Period, the Debtors and Skadden
requested that TS&S assist in resolving the Debtors' concerns regarding the
Committee's Application for an Order authorizing the retention of Jefferies &

Company, Inc. ("Jefferies") as the Committee's Investment Banker (the "Jefferies Application").

55.     The Jefferies Application (which amended the Committee's initial application) was filed on February 17, 2006, and it incorporated the Committee's engagement letter with Jefferies (the "Engagement Letter").  The Committee sought to retain Jefferies at a monthly fee of $175,000, plus expenses (the "Monthly Compensation"), and it provided for a transaction fee (the "Transaction Fee," together with the Monthly Compensation, the "Aggregate Compensation").  The Transaction Fee was to be measured on the ultimate distribution to the holders of allowed unsecured claims pursuant to the Debtors' plan of reorganization.  Although the proposed Transaction Fee payable to Jefferies was to be capped at $10 million (the "Transaction Fee Cap"), the Debtors believed that it was possible for the Engagement Letter to be read to permit Jefferies to request a higher amount.  As a separate issue, the Debtors were concerned that the Aggregate Compensation might not be competitively priced.

56.     To address these issues, TS&S conducted extensive legal and factual research to determine whether the Aggregate Compensation was appropriate, considering the services that Jefferies was to provide to the Committee, as well as the market compensation rates for similar services provided by comparable investment banking firms to committees in other large bankruptcy cases.  TS&S conferred with the Debtors' in-house counsel, business representatives and the Debtors' financial advisors to discuss strategy and research findings.  The Debtors ultimately determined that the Monthly Compensation and the Transaction Fee were within market rates.

57.     Extensive negotiations that were initiated by TS&S concerning the Transaction Fee resulted in an agreement by the Committee and Jeffries to amend the Engagement Letter and Jefferies Application to provide that in no event could Jeffries

20

be paid more than $12 million, although the Debtors continue to believe that Jeffries

maximum compensation should not be greater than $10 million.  On June 19, 2006, the

Court entered an Order approving the Jefferies Application consistent with the Debtors'

views.

58.     TS&S' efforts to obtain a negotiated resolution to the Debtors'

concerns regarding the Jefferies Application enabled the Debtors to avoid the time and

expense of litigating an objection to the Application,[9] reduce the risk of a potentially

increased Transaction Fee, and fostered the Debtors' continued relationship with the

Committee.

**G.     Resolution of Underwriters' Action for Preliminary and Permanent injunction
Staying Certain Securities Litigation:**

59.     The Debtors are co-defendants with various underwriters of certain

of the Debtors' pre-petition debt instruments the "Underwriters"), certain of the

Debtors' present and former officers and directors, and the Debtors' auditors, Deloitte &

Touche LLP, in the securities litigation entitled *In re Delphi Corp. Securities Litigation,*

which is pending before the Honorable Gerald E. Rosen in the United States District

Court for the Eastern District of Michigan (the "District Court"), and which is part of

the consolidated proceeding known as *In re Delphi Corporation Securities, Derivative and

ERISA Litigation* (the "Securities Litigation").  The District Court has taken a proactive

approach to the Securities Litigation and it entered a scheduling order and briefing

schedule that put the Securities Litigation on a fast track.

60.     On January 27, 2006, the Underwriters commenced adversary

proceeding number 06-01188 (the "Adversary Proceeding") in this Court against the

---

[9]     TS&S drafted an Objection to the Jefferies Application that was ultimately never filed with the
Court as a result of the consensual resolution.

plaintiffs in the Securities Litigation, and sought to extend the automatic stay to the

Underwriters, and to obtain a preliminary and permanent injunction of the Securities

Litigation (as defined below) pursuant to sections 105 and 362 of the Bankruptcy Code.

The Underwriters also filed a motion in the Adversary Proceeding requesting similar

relief (the "Injunction Motion").

   61. The Underwriters asserted that the continuation of the Securities

Litigation would have delayed and impeded the Debtors' reorganization efforts because

it would have distracted the Debtors' senior management.  The Underwriters also

asserted that they were entitled to indemnification and contribution from the Debtors

and their officers and directors, and that actions or claims against the Underwriters

were, in effect, actions or claims against the Debtors.

   62. The Debtors and Skadden asked TS&S to prepare an objection to

the Injunction Motion (the "Underwriters Objection").  TS&S worked with the Debtors'

in-house attorneys to finalize the Underwriters Objection, which was filed on March 2,

2006.  In the Underwriters Objection, it was explained that the Injunction Motion should

be denied because, among other reasons:  (i) the Underwriters lacked standing to seek

an extension of the Automatic Stay and the Debtors were the only parties with standing

to seek to enforce the Automatic Stay or extend its protections;  (ii) the relief sought by

the Underwriters advanced only the interests of the Underwriters and in no way

benefited the Debtors;  and (iii) the injunction would have impeded the expedited

process of the Securities Litigation that had been implemented by the District Court,

thereby interfering with the Debtors' plan confirmation goals.

   63. Promptly after TS&S filed the Underwriters Objection on behalf of

the Debtors, the Underwriters filed a motion to dismiss the Adversary Proceeding.

TS&S' efforts helped avoid the cost and distraction of litigation concerning the

Underwriters' injunction request, and saved the Debtors' resources which are need for their reorganization efforts.

**H.    Miscellaneous Matters Addressed by TS&S:**

64.    In addition to the matters discussed above, TS&S rendered services for, or on behalf of, the Debtors in connection with other miscellaneous matters during the Second Interim Period, such as:

(a)    reviewing various motions and other pleadings filed with the Court regarding case and project strategy;

(b)    analyzing and counseling the Debtors regarding the Committee's application to retain Buck Consultants, LLC as its pension and benefits actuary;

(c)    continuing to assist in the recovery of open accounts receivable that are due and payable to the Debtors;

(d)    preparing and filing TS&S's First Application (including corresponding exhibits) with the Court;

(e)    preparing for, and attending, the February 3, 2006 meeting pursuant to section 341 of the Bankruptcy Code;

(f)    participating in numerous (i) "task" and senior strategy calls;  and (ii) status and strategy meetings with the Debtors, the Debtors' professionals, and the Committee;

(g)    attending omnibus hearings and addressing various matters at such hearings;

(h)    preparing and regularly updating status charts for Debtors regarding assorted matters;

(i)    conferring with Skadden regarding the delegation of responsibilities of certain matters to TS&S to ensure no duplication of effort between the two firms;  and

(j)    frequently communicating with various third parties, including the Court, the United States Trustee, the Committee and individual creditors and other parties-in-interest concerning the status, conduct and administration of the Debtors' chapter 11 cases.

23

## V.    THE COMPENSATION REQUESTED

65.    There are numerous factors to be considered by the Court in determining allowances of compensation. *See, e.g.*, *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904 (1977); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991). *See also In re Nine Associates, Inc.*, 76 B.R. 943 (S.D.N.Y. 1987); *In re Cuisine Magazine, Inc.*, 61 B.R. 210 (Bankr. S.D.N.Y. 1986).

66.    The perspective from which an application for an allowance of compensation should be viewed in a reorganization case was aptly stated by Congressman Edwards on the floor of the House of Representatives on September 28, 1978, when he made the following statement in relation to section 330 of the Bankruptcy Code:

> [B]ankruptcy legal services are entitled to command the same competency of counsel as other cases. In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11. Contrary language in the Senate report accompanying S.2266 is rejected, and *Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir. 1968) is overruled. Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.

124 Cong. Rec. H11,092 (daily ed. Sept. 28, 1978) (emphasis added). *See also In re McCombs*, 751 F.2d 286 (8th Cir. 1984); *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991); *In re Carter*, 101 B.R. 170 (Bankr. D.S.D. 1989); *In re Public Service Co. of New Hampshire*, 93 B.R. 823, 830 (Bankr. D.N.H. 1988); *In re White Motor Credit Corp.*, 50 B.R. 885 (Bankr. N.D. Ohio 1985).

24

67.     In awarding compensation pursuant to section 330 of the

Bankruptcy Code to professional persons employed under section 327, the Court must

take into account, among other factors, the cost of comparable non-bankruptcy services.

Section 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

- reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional persons employed by such person; and

- reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

68.     As the court in *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13

(Bankr. S.D.N.Y. 1991), stated:

> With due recognition of the historical position of Bankruptcy Courts in compensation matters, we recognize that creditors have agreed to pay rates for retained counsel of their choice because of the needs of the particular case.  One could posit other situations or cases where a presumption of prior informed judgment might not be as strong.  Here, however, we have a multi-debtor, multi-committee case involving sophisticated creditors who have determined that the rates charged and tasks undertaken by attorneys are appropriate. We should not, and will not, second guess the determination of those parties, who are directed by Congress, under the Bankruptcy Code, to shape and resolve the case, and who are in fact bearing the cost.  To do so, of course, would be to continue what Congress specifically intended to stop in 1978: Courts, instead of markets, setting rates, with the inevitable consequence that all the legal specialists required by the debtor or official committees would demur to participate.

*Drexel*, 133 B.R. at 20-21.

69.     The professional services rendered by TS&S have required

expenditure of substantial time and effort.  During the Second Interim Period, TS&S

25

professionals and paraprofessionals recorded 2,330.5 hours in providing the required

professional services for which TS&S seeks compensation.[10]

70.    Time and labor devoted is only one of many factors to be

considered in awarding attorney compensation.  The number of hours expended must

be considered in light of (i) the amount involved and the results achieved to date,

(ii) the novelty and difficulty of the questions presented, (iii) the skill requisite to

perform properly the legal services, (iv) the preclusion of other employment on behalf

of other clients, (v) the customary fee charged to a private client for the services

rendered, (vi) awards in similar cases, (vii) time constraints required by the exigencies

of the case, including the frequency and amount of time required to be devoted other

than during regular business hours, (viii) the experience, reputation and ability of the

attorneys rendering services, and (ix) the nature and length of the professional

relationship with the client (the "Johnson Factors").  *See Johnson v. Georgia Highway*

*Express*, 488 F.2d at 717-19 (enumerating factors to be considered in awarding attorneys'

fees in equal employment opportunities cases under Title VII);  *In re First Colonial Corp.*

*of America*, 544 F.2d at 1294 (applying the Johnson Factors in bankruptcy cases).

71.    The majority of the Johnson Factors are codified in section 330(a) of

the Bankruptcy Code, and have been applied by various courts in making

determinations that requested attorneys' fees constitute reasonable compensation.  It is

---

[10]    In preparation of this Application, Applicant reviewed its prior monthly fee statements to Delphi and deemed it appropriate to:  (i) eliminate certain time entries;  (ii) include time entries that were inadvertently excluded from prior monthly fee statements;  and (iii) reassign certain time entries to appropriate billing matter codes. These corrections account for the slight variance in the total hours billed and fees sought in Applicant's monthly fee statements and this Application.  TS&S has eliminated time entries of 9.2 hours which represented time charges of $1,277.

well settled that the "lodestar method,"[11] as opposed to an application solely of the

Johnson Factors, is the best means of determining attorney fees in bankruptcy cases.[12]

The Supreme Court, however, has clearly articulated that the "lodestar method" is

presumed to subsume the Johnson Factors, as does section 330(a) of the Bankruptcy

Code.  *Delaware Valley I*, 478 U.S. at 563;  *Cena's Fine Furniture*, 109 B.R. at 581.

72.    TS&S respectfully submits that application of the foregoing criteria

more than justifies the compensation requested in this Application.  The professional

services rendered in these chapter 11 cases have been performed by attorneys with

broad expertise and high levels of skill in their practice areas or specialty.

73.    At all times throughout the Second Interim Period, TS&S

successfully avoided expensive litigation by brokering reasonable settlements among

the parties.  TS&S' efforts have therefore been of significant value to the Debtors and the

creditors of these estates.

74.    TS&S has not sought to burden this Court by setting forth all of the

services rendered to the Debtors and for the benefit of creditors.  TS&S has reviewed all

of its office files which indicate numerous legal situations and problems resolved over

and above those detailed in this Application, and which are more fully summarized in

---

[11]    Application of the "lodestar method" involves multiplying the number of hours reasonably
expended on the case by the reasonable hourly rate of compensation for each attorney.  *See Shaw v.
Travelers Indemnity Co. (In re Grant Assocs.)*, 154 B.R. 836, 843 (S.D.N.Y. 1993).  This method of calculating
attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which serves as a starting
point, permitting bankruptcy courts, in their own discretion, to consider other factors, such as the novelty
and difficulty of the issues, the special skills of counsel, and their results obtained.  *See In re Copeland*, 154
B.R. 693, 698 (Bankr. W.D. Mich. 1993).

[12]    *See, e.g., Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 483 U.S. 711 ("*Delaware
Valley II*"), on remand, 826 F.2d 238 (3rd Cir. 1987);  *Pennsylvania v. Delaware Valley Citizens Counsel for
Clean Air*, 478 U.S. 546 (1986) ("*Delaware Valley I*");  *United States Football League v. National Football League*,
887 F.2d 408, 413 (2nd Cir. 1989), *cert. denied*, 493 U.S. 1071  (1990);  *Lindy Bros. Builders Inc. v. American
Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973), *vacated on other grounds*, 540 F.2d 102 (3rd
Cir. 1976);  *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990);  *In re Drexel Burnham Lambert
Group Inc.*, 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

the time sheet entries annexed hereto and made a part hereof which were contemporaneously prepared when the services were rendered.

75.    TS&S has devoted 2,330.5 hours of actual recorded time during the Second Interim Period resulting in time charges of $1,045,443.50 as reflected in Exhibit "1," and remains unpaid as of the date of this Application.

76.    Throughout the Second Interim Period, TS&S sought to assign projects in this case to associates, law clerks, and paraprofessionals who could most efficiently and expeditiously handle them.  The blended hourly rate for the time charges that are subject to this Application is $448.59.  TS&S respectfully submits that the legal services reflected in the annexed time slip entries are fair and reasonable and are commensurate with the quality of services provided herein.

77.    In addition to the fees sought for legal services, TS&S has incurred $13,940.08 in out-of-pocket expenses during the Second Interim Period directly attributable to the representation of the Debtors.

78.    No part of the compensation to be received pursuant to this Application will be shared with any other person or firm, and no other agreements, either express or implied, to share any compensation received as attorneys for the Debtors has been, or will be, made by TS&S.

79.    Copies of this Application have been given to:  (i) the Debtors; (ii) counsel for the Debtors;  (iii) counsel for the Committee;  (iv) the United States Trustee;  (v) counsel for the agent under the Debtors' pre-petition credit facility; (vi) counsel for the agent under the Debtors' post-petition credit facility;  and (vii) the Joint Fee Review Committee.

28

VI.    **CONCLUSION**

       **WHEREFORE**, TS&S respectfully requests that this Application be

granted and that it be awarded an allowance of $1,045,443.50 for legal services rendered

to the Debtors during the Second Interim Period, and $13,940.08 for reimbursement of

expenses, and that the Debtors be authorized and directed to pay such amounts to the

as may be just and proper.

Dated:    New York, New York
         July 27, 2006

                        TOGUT, SEGAL & SEGAL LLP,
                        Conflicts Counsel for the Debtors
                        and Debtors in Possession

                        /s/ Albert Togut
                        ALBERT TOGUT (AT-9759)
                        NEIL BERGER (NB-3599)
                        Members of the Firm
                        One Penn Plaza, Suite 3335
                        New York, New York 10119
                        (212) 594-5000