**Hearing Date and Time:  October 19, 2006 at 10:00 a.m.**
**Objection Deadline :  October 12, 2006 at 4:00 p.m.**

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman (TJ 1129)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
        In re                               :        Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :        Case No. 05-44481 (RDD)
                                            :
                        Debtors.            :        (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### SECOND INTERIM APPLICATION OF O'MELVENY & MYERS LLP FOR ORDER AUTHORIZING AND APPROVING COMPENSATION AND REIMBURSEMENT OF EXPENSES

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

O'Melveny & Myers LLP ("O'Melveny"), special labor counsel for Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors, and debtors-in-possession in the

above-captioned case (collectively, the "Debtors"), hereby submits its second interim application

for the interim allowance of compensation and reimbursement of expenses (the "Second Interim

Application"), pursuant to sections 330(a)(1) and 331 of Chapter 11, Title 11 of the United States

Code (the "Bankruptcy Code"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the proposed form of which is attached hereto as Exhibit "A".

O'Melveny submits this Second Interim Application for (a) allowances of compensation for

professional services rendered by O'Melveny to the Debtors, and (b) reimbursement of actual

and necessary disbursements incurred by O'Melveny in rendition of required professional

services on behalf of the Debtors.  In support of the Second Interim Application, O'Melveny

respectfully represents as follows:

## I.
## PRELIMINARY STATEMENT

1.    As hereinafter set forth in detail, the activities performed by O'Melveny, in

conjunction with the Debtors and the Debtors' other retained professionals, were extensive

during the period from February 1, 2006 through May 31, 2006 (the "Second Interim Period"),

and yielded significant benefits to the estates and their creditors.

2.    O'Melveny requests that this Court authorize total compensation to

O'Melveny in the amount of $3,992,993.13, which includes reimbursement of fees in the amount

of $3,118,474.00, including the 20 percent holdback in the amount of $623,694.80, and expenses

in the amount of $874,459.13 for the Second Interim Period.[1]

---

[1]    The aggregate total sought for compensation during the Second Interim Period reflects O'Melveny's
voluntary write-off in the amount of $10,850.95 for certain fees and expenses that were charged to the Debtors.
Detail on the write-off amounts is provided below.

## II.
## BACKGROUND

A.    The Chapter 11 Filings

      3.    On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code.  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") also sought reorganization relief.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 8, 2005 and October 19, 2005, this Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Docket Nos. 28 and 404 respectively).

      4.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity security holders (the "Equity Committee").  No trustee or examiner has been appointed in the Debtors' cases.

      5.    The Debtors have not yet filed a plan of reorganization or disclosure statement.

      6.    This Court has jurisdiction over this Second Interim Application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

      7.    The statutory predicates for relief requested herein are §§ 330 and 331 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Local Rule 2014-1.

B.    Current Business Operations Of The Debtors

8.    Delphi had global 2005 net sales of approximately $26.9 billion and global

assets as of August 31, 2005 of approximately $17.1 billion.[2]  At the time of its chapter 11 filing,

Delphi ranked as the fifth largest public company business reorganization in terms of revenues,

and the thirteenth largest public company business reorganization in terms of assets.  Delphi's

non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without

supervision from the Bankruptcy Court.

9.    Delphi is a leading global technology innovator with significant engineering

resources and technical competencies in a variety of disciplines, and is one of the largest global

suppliers of vehicle electronics, transportation components, integrated systems and modules, and

other electronic technology.  Delphi supplies products to nearly every major global automotive

original equipment manufacturer.

10.    As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

ventures located in every major region of the world.  As of the Initial Filing Date, the Debtors

employed approximately 180,000 employees worldwide.  The Debtors' 50,600 U.S. employees

worked in approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy,

Michigan headquarters.  Approximately 34,750 of the Debtors' U.S. employees were hourly

employees as of the Initial Filing Date, and 96 percent of these were represented by

approximately 49 different international and local unions.  Outside the United States, Delphi's

foreign entities employed more than 134,000 people on the Initial Filing Date, supporting 120

manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

---

[2]    The aggregated financial data used in this Second Interim Application generally consists of consolidated
information from Delphi and its worldwide subsidiaries and affiliates.

11.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted Delphi's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still Delphi's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    <u>Events Leading to Chapter 11 Filing</u>

12.    In the first two years following Delphi's separation from GM, Delphi generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, Delphi has suffered losses.  In calendar year 2004, Delphi reported a net operating loss of $482 million on $28.6 billion in net sales.[3]  Reflective of a downturn in the marketplace, in 2005 Delphi incurred  net losses of approximately $2.8 billion on net sales of $26.9 billion.

13.    The Debtors believe that Delphi's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs; (b) a competitive U.S. vehicle production environment for domestic OEMs

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

resulting in the reduced number of motor vehicles that GM produces annually in the United

States and related pricing pressures; and (c) increasing commodity prices.

14.    In light of these factors, Delphi determined that it would be imprudent and

irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio,

operational issues, and forward looking revenue requirements.  Because discussions with its

unions and GM were not progressing sufficiently, Delphi commenced these chapter 11 cases for

its U.S. businesses to complete the Debtors' transformation plan and preserve value for its

stakeholders.

15.    Through the reorganization process, the Debtors intend to achieve

competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive

legacy liabilities and burdensome restrictions under current labor agreements and realigning

Delphi's global product portfolio and manufacturing footprint to preserve Delphi's core

businesses.  This requires negotiation with key stakeholders over their respective contributions to

the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process

to achieve the necessary cost savings and operational effectiveness.  The Debtors believe that a

substantial segment of Delphi's U.S. business operations must be divested, consolidated, or

wound-down during these cases.

16.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver value and high-quality products to its customers globally.

Additionally, Delphi will preserve and continue the strategic growth of its non-U.S. operations

and maintain its prominence as the world's premier auto supplier.

## III.
## RETENTION OF O'MELVENY

17.    The Debtors filed their application to employ O'Melveny with the Court on

October 8, 2005.   O'Melveny charges legal fees on an hourly basis at its attorneys' individual

hourly rates, which are based on the attorney's seniority and experience, and which are adjusted

from time to time.  O'Melveny also charges the Debtors for reasonable and actual out-of-pocket

expenses incurred, such as court services, computerized research, delivery services, photocopies,

long distance phone calls, fee associated with ongoing litigation, travel and other costs

necessarily incurred in connection with its representation of the Debtors.[4]  O'Melveny's fee

structure and reimbursement policies were disclosed in the Debtors' application to employ

O'Melveny, to which no party objected and this Court approved by order entered on November

4, 2005, a copy of which is attached hereto as Exhibit "B".

## IV.
## FEE PROCEDURES AND MONTHLY FEE STATEMENTS

18.    On November 4, 2005, this Court entered an Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

Professionals (Docket No. 869) (the "Initial Interim Compensation Order").   On March 8, 2006,

this Court entered a Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures for

Interim Compensation and Reimbursement of Expense of Professionals (Docket No. 2747) (the

"Supplemental Interim Compensation Order"), which, among other things, clarified the

deadlines for retained professionals to submit interim and final fee applications.  On March 28,

2006, this Court entered a Second Supplemental Order Under 11 U.S.C. § 331 Establishing

Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (Docket

---

[4]        As discussed more fully below, O'Melveny provides discounts to the Debtors, as regards certain expenses.
Specifically, O'Melveny does not charge the Debtors for outgoing facsimiles and charges the Debtors for only one-half of total travel time.

No. 2986) (the "Second Supplemental Interim Compensation Order") extending the deadline for

retained professionals to (a) file and serve their first interim fee applications and (b) serve

monthly fee statements.  On May 5, 2006, this Court entered its Third Supplemental Order Under

11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of

Expenses of Professionals (Docket No. 3630) (the "Third Supplemental Interim Compensation

Order"), which established a Fee Review Committee (as defined below), approved a protocol for

reviewing fees and reimbursement of expenses sought by retained professionals and further

extended the deadline (a) to file and serve the first interim fee application and (b) to serve

monthly fee statements.  On July 12, 2006, this Court entered its Fourth Supplemental Order

Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement

of Expenses of Professionals (Docket No. 3630) (the "Fourth Supplemental Interim

Compensation Order," together with the Initial Interim Compensation Order, Supplemental

Interim Compensation Order, Second Supplemental Interim Compensation order, and the Third

Supplemental Interim Compensation Order, the "Interim Compensation Order"), which

rescheduled the hearing on the First and Second Interim Fee Applications for October 19, 2006

and further authorized and directed the Debtors to release one-half of the holdback for all periods

ended on or before May 31, 2006.  Pursuant to the UST Guidelines, O'Melveny certifies that the

Debtors have received a copy of this Second Interim Application but have not yet completed this

review.  In addition, pursuant to paragraph 2(a) and 2(j) of the Interim Compensation Order, as

supplemented, as well as the Fee Review Protocol (as defined below), O'Melveny certifies that a

copy of this Second Interim Application is being served via overnight mail upon (i) the Debtors,

(ii) co-counsel for the Debtors, (iii) the United States Trustee for the Southern District of New

York, (iv) the Creditors' Committee, (v) counsel for the agent under the Debtors' prepetition

credit facility, (vi) counsel for the agent under the Debtors' postpetition credit facility, and (vii) the members of the Fee Review Committee (defined below).  O'Melveny is also serving, concurrently with this filing, notice of the filing of and the hearing on the Second Interim Application on parties as required by paragraph 8 of the Interim Compensation Order. O'Melveny submits that no other or further notice need be given.

19.    To minimize costs to the Debtors' estates and avoid duplicative efforts in the review of fee applications filed in these Reorganization Cases, the Debtors, the official committee of unsecured creditors (the "Creditors' Committee"), and the U.S. Trustee negotiated the formation of a joint fee review committee (the "Fee Review Committee") to review, comment on, and if necessary, object to the various fee applications filed in these Reorganization Cases.  As part of the Third Supplemental Interim Compensation Order, this Court authorized the establishment of the Fee Review Committee and approved a protocol regarding the Fee Review Committee, its composition, mandate, and procedures (the "Fee Review Protocol").  One aspect of the Fee Review Protocol institutes a series of procedures (the "Budget Procedures") with regard to the submission and review of budgets (each, a "Budget") for professionals working on these Reorganization Cases.  Pursuant to the Budget Procedures each professional must prepare and submit to the Fee Review Committee a Budget for professional fees for each application period.  The Fee Review Committee has, however, waived application of the Budget Procedures until further notice that appropriate task codes are available and, as of the date of the filing of this Application, has not yet required submission of a Budget for professional fees.  The Fee Review Committee held its initial meeting on May 17, 2006.

20.    In compliance with the Interim Compensation Order, on or before the last day of the month following each calendar month for which compensation was sought,

O'Melveny served by hand or overnight delivery to (i) the Debtors, (ii) co-counsel for the Debtors, (iii) the United States Trustee for the Southern District of New York, (iv) counsel for the official committee of unsecured creditors, (v) counsel for the agent under the Debtors' prepetition credit facility, (vi) counsel for the agent under the Debtors' postpetition credit facility, and (vii) the members of the Fee Review Committee (as applicable) a monthly statement of all professional fees and disbursements incurred during the preceding calendar month. The parties had at least 15 days after receipt to review any such statement. In the event any party had an objection to the compensation or reimbursement sought in a particular statement, such person was required to serve the objection no later than the 45th day following the month for which compensation was sought. If there were no objections, at the expiration of the 45 day period, the Debtors were ordered to promptly pay 80 percent of the fees and 100 percent of the expenses identified in each monthly statement. O'Melveny submitted monthly statements for each month during the Second Interim Period and no objections were received.

21.    O'Melveny received from Debtors a retainer of $300,000 prepetition, of which $190,886.56 was applied in the First Interim Period to satisfy expenses. Pursuant to the terms of its Engagement Letter, a copy of which is attached hereto as Exhibit "C," O'Melveny has applied an additional $21,588.19 of that retainer during the Second Interim Period to satisfy expenses.

22.    To the best of O'Melveny's knowledge, information and belief, the Debtors have paid all postpetition expenses in the ordinary course, and there are currently no unpaid, undisputed ordinary course, prepetition operating expenses in these cases.

23.     To the best of O'Melveny's knowledge, information and belief, the Debtors have sufficient funds on hand to pay the compensation and reimbursement of expenses requested herein.

24.     To the best of O'Melveny's knowledge, information and belief, the Debtors have filed with the United States Trustee all monthly operating reports presently due, and have paid all quarterly fees to the United States Trustee which are presently due.

25.     O'Melveny is providing in this Second Interim Application a general description of services rendered during the Second Interim Period.  Moreover, the actual time records of each professional are appended as Exhibit "D" to the Second Interim Application, thereby providing a detailed accounting of the services provided for consideration by the United States Trustee and this Court.

## V.
## SUMMARY OF COMPENSATION REQUESTED AND SERVICES RENDERED TO THE ESTATES DURING THIS PERIOD[5]

26.     O'Melveny seeks approval of professional fees in the amount of $3,118,474.00 and reimbursement of expenses in the amount of $874,459.13 for the Second Interim Period.  In accordance with the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (Appendix A to 28 C.F.R. § 58), dated May 17, 1996 (the "UST Guidelines"), O'Melveny has classified all services performed for which compensation is sought for this period.  Exhibit "E" is a table listing the names of all attorneys and paraprofessionals who have worked for the Debtors during the Second Interim Period, and their respective hourly rates and amounts billed, in addition to other summary information required by the UST Guidelines.  Exhibit "F" to this

---

[5]     O'Melveny has taken every effort to ensure that this Second Interim Application is prepared in accordance with the Guidelines for Reviewing Applications For Compensation & Reimbursement of Expenses filed under 11 U.S.C. § 330 (the "UST Guidelines") to the extent applicable.

Second Interim Application sets forth with particularity each category of expenses incurred by
O'Melveny on behalf of the Debtors.

27.    In staffing this case, in budgeting and incurring charges and disbursements,
and in preparing and submitting this Second Interim Application, O'Melveny has been mindful
of the need to be efficient while providing adequate and vigorous representation to the Debtors.
As described in detail herein, O'Melveny believes that the requests made in this Second Interim
Application comply with this Court's standards in the context of the unique circumstances
surrounding these unusually large and complex cases.

28.    During the Second Interim Period, O'Melveny had primary responsibility
for directing the Debtors' efforts to secure necessary relief from its collective bargaining
agreements and modifications to its hourly retiree benefits - arguably the most significant issue
to be addressed by the Debtors during this time frame.  Specifically, O'Melveny took the lead in
drafting and filing the Debtors' motion for relief from its collective bargaining agreements
pursuant to 11 U.S.C. § 1113(c) and for modification to hourly retiree benefits pursuant to 11
U.S.C. § 1114(g),[6] as well as supporting papers, and preparing for and participating in hearings
on the Section 1113 and 1114 Motion before this Court.  To meet the Debtors' needs,
O'Melveny attorneys have provided services on a daily basis, often working nights, weekends,
and holidays.  Throughout this process, certain of the principal O'Melveny attorneys working on
behalf of Delphi were required to devote the vast majority of their time to this matter.

29.    Because O'Melveny was retained as special labor counsel to the Debtors as
relates only to 11 U.S.C. §§ 1113 and 1114 ("Sections 1113 and 1114") advice, and related labor
law advice, the activities of O'Melveny are recorded under only one internal matter number,

---

[6]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements
And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits (Docket No. 3035) (the
"Section 1113 and 1114 Motion").

which therefore does not correspond to the UST Guidelines suggestions.  All O'Melveny

professionals keep a record of the time spent rendering such services in billing increments of

one-tenth of an hour.[7]  As noted above, Exhibit "D" contains O'Melveny's detailed invoices for

this matter number.

        30.    The tasks to which O'Melveny gave attention during the Second Interim

Period are summarized more fully below.  Although recitation of every item of professional

services that O'Melveny performed would unduly burden the Court, the following summary

highlights the major tasks to which O'Melveny devoted substantial time and attention during the

Second Interim Period.

        31.    <u>Section 1113/1114 Advice – Labor (-0001)</u>.  During the Second Interim

Period, O'Melveny researched and advised the Debtors regarding the legal requirements of

Sections 1113 and 1114 of the Bankruptcy Code, and related legal issues.  Specifically,

O'Melveny worked with the Debtors in all aspects of the Debtors' attempts to negotiate

significant labor cost and employee benefit savings with unions representing its hourly

employees.  As discussions with the unions and GM continued during the Second Interim Period,

O'Melveny worked closely with numerous financial, operational and labor relations personnel of

the client, as well as advisors to the client, to assist in negotiations strategy, information sharing,

and to develop a plan should it be necessary - as it ultimately was - to file for relief from the

various bargaining agreements under Sections 1113 and 1114.  O'Melveny, as a part of these

preparations, provided extensive advice and counseling on labor and benefit cost analyses,

strategic labor planning, and labor aspects of the Debtors' restructuring and transformation plans.

In addition, O'Melveny consulted with Delphi regarding proposed attrition programs and, at the

---

[7]      Although all professionals record time in increments of one-tenth of an hour, due to O'Melveny's voluntary write-off of one-half of travel time as discussed below, the total hours billed for certain professionals are expressed in one-hundredths of an hour.

Debtors' request, reviewed the UAW's special hourly attrition program, which was ultimately

approved by this Court in an order entered on May 8, 2006 (Docket No. 3648).  O'Melveny

attorneys also communicated regularly with the Debtors and their advisors regarding Debtors'

information sharing with the unions.

32.    At the request of the client, the bulk of O'Melveny's efforts in the first three

months of the Second Interim Period were geared toward drafting and filing the Section 1113

and 1114 Motion and supporting papers, including a memorandum of points and authorities in

support of the motion and multiple declarations and expert reports.  Prior to filing these

documents with the Court, they were significantly modified numerous times at the request of the

client to reflect, among other things, changes in the union negotiations, negotiations for financial

support from GM, and the Debtors' financial condition.  Prior to this Court's order extending the

Section 1113 and 1114 Motion's February 7, 2006 filing date to encourage ongoing tripartite

discussions,[8] O'Melveny attorneys devoted substantial efforts to finalizing the papers, in the

event the filing proceeded as scheduled.  Subsequent to that continuance, O'Melveny extensively

revised these papers to incorporate updated negotiations and changes in the Debtors' financial

circumstances and worked to finalize the papers, including numerous declarations to be used in

lieu of direct examinations at the hearing, for filing, which ultimately occurred on March 31,

2006.  Additionally, O'Melveny took the lead in drafting the Debtors' omnibus reply

memorandum of law in response to various objections by the unions and other entities,[9] as well

---

[8]    Second Amended Scheduling Order On Debtors' Motions To (1) Reject Collective Bargaining Agreements Under Section § 1113(c) and (II) Eliminate Retiree Medical And Life Insurance Benefits For Union-Represented Retirees Under Section 1114(g) (Docket No. 2425).

[9]    Omnibus Reply Memorandum Of Debtors In Support Of Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits (Docket No. 3551) (the "Section 1113/1114 Omnibus Reply Memorandum").

as supporting papers, including multiple supplemental declarations, which were served in May 2006.

33.    During the last month of the Second Interim Period, O'Melveny's efforts were concentrated on working with the Debtors to prepare for, take, and defend discovery and to prepare for and participate in the hearings on the Section 1113 and 1114 Motion.  In the immediate weeks preceding the hearings, the numerous objectors and parties asserting an interest substantially augmented the complexity of hearing preparation.  To accommodate the growing demands inherent in adequately responding to these entities and engaging in discovery within an extremely limited time frame, O'Melveny recruited the full-time assistance of two additional partners, both with extensive experience in handling complex litigation.  As a part of these hearing preparations, O'Melveny took the lead both in taking depositions of 18 union fact and expert witnesses, as well as in preparing and defending the Debtors' witnesses in several depositions.  In doing so, O'Melveny attorneys drafted deposition notices, deposition outlines, and cross-examinations all within the confines of extremely rigorous time and travel demands.  At the request of the Debtors, O'Melveny also drafted and prepared for filing additional procedural motion papers, in the eventuality that ongoing negotiations with the objectors and other parties asserting an interest on certain issues proved unsuccessful, necessitating motion practice.  Additionally, O'Melveny conferred with and prepared witnesses, including expert witnesses, for deposition and hearing.  O'Melveny also participated extensively in the hearings on Section 1113 and 1114 Motion, held on the 9th, 10th, 12th, 24th, and 26th of May 2006.

34.    During the Second Interim Period, attorneys and paraprofessionals at O'Melveny billed an aggregate of 6,464.45 hours[10] working on Section 1113 and 1114 matters.

---

[10]    The aggregate number of hours worked has been reduced to reflect a voluntary write-off of 5.2 hours billed by secretarial assistants and inadvertently charged to the Debtors.

As noted above, Exhibit "E" sets forth the name, hourly rate, hours billed, and total fees incurred by each O'Melveny attorney and paraprofessional during this time.

## VI.
## PREPARATION OF FEE APPLICATION

35.    During the Second Interim Period, O'Melveny expended 81.6 hours and $22,768.50 in fees in preparation of the First Interim Application.

## VII.
## LIST OF EXPENSES

36.    In connection with its representation of the Debtors during the Second Interim Period, O'Melveny advanced necessary expenses totaling $874,459.13.[11]  A detailed description of expenses incurred during the case is attached hereto as Exhibit "F".

37.    O'Melveny requests reimbursement for expenses including costs advanced for computerized research, delivery services, photocopies, long distance phone calls, fees associated with ongoing litigation, travel and other costs necessarily incurred in connection with its representation of the Debtors.  O'Melveny made every effort to limit expenditures and to use the most economical means available for accomplishing the tasks requiring such expenditures.

38.    Of the expenses, copying charges total $14,232.80.  O'Melveny's standard in-house charge for photocopying is $0.15 per page.  Delphi, however, is charged only $0.10 per page.[12]

---

[11]    The majority of these expenses are expert witnesses and consultant fees.  Total expenses sought in the Second Interim Period have been reduced to reflect a total voluntary write-off of $10,850.95 in copying and outgoing facsimile charges.

[12]    The Debtors were charged for regular internal copying at $0.15 per page, rather than $0.10 per page, during both the First and Second Interim Periods.  O'Melveny has therefore voluntarily written off $0.05 per page for all regular internal copying performed from October 9, 2005 through May 31, 2006, for a total reduction of $10,694.95 (representing a $7,116.40 write-off for the Second Interim Period and a $3,536.05 write-off for the First Interim Period).  The copying expenses for the Second Interim Period, as set forth above, already reflect the reduction for February 1, 2006 through May 31, 2006; in addition, O'Melveny has reduced the total expenses sought in this application to reflect the reduction for copying overcharges inadvertently billed from October 9, 2005 through January 31, 2006.

39.   O'Melveny also incurred costs for sending correspondence regarding the case.  O'Melveny charges $1.25 per page for outgoing facsimiles plus long distance phone charges, if applicable, but does not charge for incoming facsimiles.  Delphi, however, has not been charged for facsimiles other than for long distance charges associated with the transmissions.[13]  O'Melveny attempted to avoid overnight delivery expenses whenever possible.

40.   In addition to the above expenses, O'Melveny incurred expenses in connection with the travel of its attorneys to meetings and hearings before this Court in New York City, in connection with travel from its offices in Washington, D.C., New York City, and Los Angeles to Michigan for meetings with the client and others at the client's request, and in connection with travel to Michigan, Wisconsin, and New York for depositions of various union and Debtor witnesses.  These airfare and travel-related expenses totaled $85,063.95.[14]  In addition, O'Melveny's standard practice is to charge for 100 percent of travel time, which is also the charge for non-bankruptcy clients generally.  Delphi, however, is charged for only 50 percent of travel time.[15]

## VII.
## HOURLY RATES

41.   The hourly rates[16] of all professionals and legal assistants rendering services in this case for the Second Interim Period are set forth in Exhibit "E".  O'Melveny submits that these rates are reasonable and within the range of customary rates in the Southern District of

---

[13]   As noted above, the Debtors were inadvertently charged for outgoing facsimile expenses.  O'Melveny has therefore written-off the incorrect facsimile charges, totaling a reduction of $42.50.  This adjustment is reflected in the total expenses sought in the Second Interim Period.

[14]   As shown in Exhibit "F", this figure includes $33,793.67 for general travel expenses, $5,439.87 for meals while on travel, $10,402.86 in local travel costs, and $35,427.55 in direct bill airfare.

[15]   This 50 percent discount is taken into account up-front, with O'Melveny's invoices to the client reflecting only one-half of total travel time.

[16]   As disclosed in its Engagement Letter, the hourly rates of all O'Melveny professionals and legal assistants change from time to time based on, among other variables, changes in attorney seniority or status and changes in our rates generally.  These adjustments, where applicable, are noted in Exhibit "E".

New York for professionals of similar experience and expertise in cases other than those under title 11. Exhibit "E" also sets forth the year of admittance to each attorney's bar, the number of hours billed during the Second Interim Period, and the total fees attributable to each professional and paraprofessional, as well as other summary information required by the UST Guidelines.

42.    O'Melveny sought to control its fees by administering the case efficiently and coordinating the efficient prosecution of matters. Staffing of matters within the case was done with the intent to provide the optimal level of representation given the importance and complexity of a particular matter, and to avoid duplication of other professional efforts, including those of bankruptcy counsel Skadden, Arps, Slate, Meagher & Flom (Illinois).

## IX.
## LEGAL ARGUMENT

A.    The Legal Standard

43.    Section 331 of the Bankruptcy Code provides for interim compensation of professionals and incorporates the substantive standards of section 330, as applies to final allowances, to govern the Court's award of such compensation. 11 U.S.C. § 331. Section 330 provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual, necessary services rendered . . . and reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1). Section 330 also sets forth the criteria for the award of such compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded . . . the court should consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;

(C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; [and] . . .

(F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

44.    To grant a request for compensation, this Court must find that such request is reasonable.  The Second Circuit, in evaluating the reasonableness of a requested fee, has adopted the twelve-factor test of Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), which includes such factors as the time and labor involved; the novelty and difficulty of the questions; the skill requisite to perform the legal service properly; customary fee; the amount involved and the results obtained; experience, reputation, and ability of the attorneys; and awards in similar cases.  See United States Football League v. Nat'l Football League, 887 F.2d 408, 425 (2d Cir. 1989) (awarding plaintiffs-appellees attorney's fees against defendants-appellants for work done in connection with an antitrust suit).  The reasonableness of a compensation request is determined by taking into account the nature, extent and value of the services provided by the professional and the cost of comparable services.  See Colbert v. Furumoto Realty, Inc., 144 F. Supp. 2d 251, 260 (S.D.N.Y. 2001); see also Zolfo, Cooper & Co. v. Sunbeam-Oster Co., 50 F.3d 253 (3d Cir. 1995); In re Busy Beaver Bldg. Ctr., Inc., 19 F.3d 833, 849 (3d Cir. 1994).[17]

---

[17]    In the "market-driven approach" to compensation requests, the primary focus of the inquiry is the cost of comparable services in non-bankruptcy contexts.  See Zolfo, Cooper, & Co., v. Sunbean-Oster Co., 50 F.3d 253, 258; see also In re Busy Beaver Bldg. Ctr., Inc., 19 F.3d 833, 849-50; In re Fine Paper Antitrust Litig., 751 F.2d 562, 583 (3d Cir. 1984) ("[t]he value of an attorney's time generally is reflected in his normal billing rate").  This market-based approach permits flexibility in billing arrangements.  The "lodestar" method (hourly rate multiplied by

B.      O'Melveny's Fees Are Reasonable

45.    The professional services rendered by O'Melveny during the Second Interim Period required a high degree of professional competence and expertise.  The provision of such services, therefore, has required the expenditure of substantial time and effort.  O'Melveny submits that the services rendered were performed efficiently, effectively and economically and that the results obtained thus far have provided a significant benefit to the estates of Delphi and their creditors.

46.    In accordance with its practice in other matters, O'Melveny has utilized the lodestar method for calculating its compensation requested in this Second Interim Application. There is a strong presumption that the lodestar product is reasonable.  See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991).

47.    In awarding attorneys' fees, courts will also consider whether the services rendered were reasonably likely to benefit the debtor's estate.  See e.g., In re Ames Dep't Stores, Inc., 76 F.3d 66, 71 (2d Cir. 1996), rev'd on other grounds, Lamie v. United States Trustee, 540 U.S. 526 (2004);  In re Granite Partners, L.P., 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997);  In re Drexel Lambert Group, 133 B.R. at 22.  Thus, the Court should focus on what a reasonable lawyer would have done at the time and not invoke a hindsight analysis.

> [I]t is important for a court to maintain a sense of overall proportion and not become enmeshed in meticulous analysis of every detailed facet of the professional representation.  It is easy to speculate that the work could have been done in less time or with fewer attorneys or with an associate rather than a partner.  On the other hand, it is also possible that [the debtor] would not have enjoyed the success it did had its counsel managed matters differently.

---

hours worked) is currently the most widely utilized method for compensation arrangements, but regardless of the manner in which compensation is calculated, "[t]he baseline rule is for firms to receive their customary rates." Zolfo, Cooper, 50 F.3d at 259.

Boston & Maine Corp. v Moore, 776 F.2d 2, 10 (1st Cir. 1985) (citations omitted).

48.    O'Melveny's fees during the Second Interim Period were reasonable under the prevailing legal standard and should be allowed.  The amount of these fees is not unusual given the size of the Debtors' business and the capacity in which O'Melveny served as special counsel.  These fees are commensurate with fees that O'Melveny and other attorneys of comparable experience and expertise have charged for similar services.

C.    O'Melveny's Expenses Were Actual And Necessary

49.    Section 330(a)(1)(B) of the Bankruptcy Code permits reimbursement for actual, necessary expenses.  Moreover, reimbursement for actual, necessary expenses is permitted in the Second Circuit.  Accordingly, attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.  See United States Football League, 887 F.2d at 416; see also Kuzma v. IRS, 821 F.2d 930, 933-34 (2d Cir. 1987) see also Zolfo, Cooper, 50 F.3d at 258.  As noted above, O'Melveny has conducted a review to ensure compliance of expenses with the UST Guidelines.  Accordingly, those expenses for which reimbursement is sought in this Application satisfy the standards set forth in section 330(a)(1)(B) of the Bankruptcy Code as well as in United States Football League and Kuzma, and should therefore be allowed.

**X.**
**DESCRIPTION OF PROFESSIONAL EDUCATION AND EXPERIENCE**

50.    The biographies of the primary attorneys [18] employed by O'Melveny who rendered services in this case are attached as Exhibit "G".

---

[18]    As noted in Exhibit "G", biographies are provided for only those primary attorneys employed by O'Melveny who billed more than $10,000 in fees to the Debtors during the Second Interim Period.

## XI.
## NO SHARING OF COMPENSATION

51.    No agreement has been made, directly or indirectly, and no understanding

exists, for a division of compensation herein between O'Melveny and any other person or

persons, contrary to any applicable provisions of the Bankruptcy Code, the Bankruptcy Rules,

the local rules or state law.

## XII.
## COMPLIANCE WITH THE UNITED STATES TRUSTEE GUIDELINES, THE LOCAL GUIDELINES, AND THE INTERIM COMPENSATION ORDER

52.    As set forth in the Certification of Tom A. Jerman With Respect To The

Second Interim Application of O'Melveny & Myers LLP For Order Authorizing And Approving

Compensation And Reimbursement Of Expenses (attached hereto as Exhibit "H"), O'Melveny

has complied fully with the UST Guidelines, the Amended Guidelines for Fees and

Disbursements for Professionals in Southern District of New York Bankruptcy Cases adopted by

the Court on April 19, 1995 (the "Local Guidelines"), and the Interim Compensation Order, to

the extent applicable.

## XIII.
## NOTICE OF THIS SECOND INTERIM APPLICATION

53.    In compliance with the Interim Compensation Order, notice of the filing of

this Second Interim Application will be provided to all parties who have filed a notice of

appearance with the Clerk of this Court and requested notice of pleadings in these chapter 11

cases.  In addition, the Second Interim Application in its entirety will be served on the following

parties: (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: David Sherbin,

Esq.), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West

Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for

the agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425

Lexington Avenue, New York, New York 10017 (Att'n: Marissa Wesley, Esq.), (iv) counsel for

the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue,

New York, New York 10017 (Att'n:  Marlane Melican, Esq.), (v) counsel for the Official

Committee of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York,

New York 10022 (Att'n: Robert J. Rosenberg), (vi) the Office of the United States Trustee for

the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York

10004 (Att'n:  Alicia M. Leonhard), and (vii) the members of the Delphi Fee Review Committee.

In light of the nature of the relief requested, the Debtors submit that no other or further notice is

required.

## XIV.
## MEMORANDUM OF LAW

54.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

## XV.
## CONCLUSION

**WHEREFORE**, O'Melveny requests that this Court authorize and approve the

compensation in the amount of $3,118,474.00, including the 20 percent Holdback in the amount

of $623,726.00, and reimbursement of expenses in the amount of $874,459.13 for the Second

Interim Period.  O'Melveny also requests that this Court grant such further relief as may be

deemed just and proper.

DATED:  July 31, 2006

ROBERT A. SIEGEL (RS 0922)
TOM A. JERMAN (TJ 1129)
O'MELVENY & MYERS LLP


By     /s/ Tom A. Jerman           
       Tom A. Jerman
       Attorney for Delphi Corporation,
       et al., Debtors and Debtors-in-
           Possession