**Hearing Date: October 19, 2006**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                           :
       In re                   :     Chapter 11
                           :
DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                           :
                           :     (Jointly Administered)
           Debtors.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SECOND INTERIM APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP, COUNSEL TO THE DEBTORS-IN-POSSESSION, SEEKING ALLOWANCE AND
PAYMENT OF INTERIM COMPENSATION AND
REIMBURSEMENT OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("SECOND SKADDEN INTERIM FEE APPLICATION")

| | |
|---|---|
| Name of Applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to Provide Professional Services to: | Delphi Corporation and the Affiliate Debtors |
| Date of Retention Order: | November 4, 2005 |
| Period for Which Compensation and Reimbursement are Sought: | February 1, 2006 through May 31, 2006 |
| Amount of Compensation Sought as Actual, Reasonable, and Necessary: | **$11,310,231** |
| Amount of Expense Reimbursement Sought as Actual, Reasonable, and Necessary: | **$825,854** |
| Voluntary Reductions: | |
|    Monthly Fee Statements: | **$941,043** |
|    Second Fee Application: | **$179,049** |
|    Total Voluntary Reductions: | **$1,120,092** |
| Additional Fee Correction | **$18,524** |
| Total Voluntary Reductions and Fee Correction | **$1,138,616** |

This is an/(a):    _____X_____Interim    _____Final Application.

Aggregate Amounts Paid to Date:  **$20,121,687**

## PRIOR FEE APPLICATIONS

| Prior Fee Application | Date Filed | Period Covered | Interim Fees Requested (Awarded) | Interim Expense Reimbursement Requested (Awarded) |
|---|---|---|---|---|
| First | 05/31/06 | 10/08/05 – 01/31/06 | $9,200,920 (Pending) | $622,420 (Pending) |

TIME SUMMARY TO SECOND INTERIM FEE APPLICATION OF
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FEBRUARY 1, 2006 – MAY 31, 2006

| Name | Year Of Admission | Rate[1] | Hours | Amount |
|------|------|------|------|------|
| **PARTNERS** | | | | |
| Butler, Jr., John Wm. | 1980 | $756 | 1,147.8 | $867,582 |
| Marafioti, Kayalyn A | 1980 | $795 | 738.1 | $586,804 |
| Lyons, John K. | 1989 | $633 | 729.9 | $461,764 |
| Springer, David E. | 1977 | $723 | 546.7 | $395,021 |
| Furfaro, John P. | 1981 | $757 | 416.1 | $315,085 |
| Cochran, Eric L. | 1987 | $759 | 294.5 | $223,597 |
| Panagakis, George N. | 1990 | $706 | 235.5 | $166,290 |
| Berke, Jay S. | 1972 | $755 | 189.7 | $143,224 |
| Wexler, Marian P. | 1977 | $752 | 167.5 | $125,934 |
| Hogan, III, Albert L. | 1997 | $620 | 144.3 | $89,466 |
| Hiestand, N. Lynn | 1981 | $835 | 101.9 | $85,088 |
| Berlin, Kenneth | 1974 | $746 | 94.5 | $70,494 |
| Frishman, Lawrence D. | 1989 | $755 | 26.2 | $19,783 |
| Atkins, Peter A. | 1969 | $696 | 16.2 | $11,273 |
| Leff, Neil M. | 1981 | $785 | 14.1 | $11,069 |
| Gross, Cliff | 1989 | $770 | 13.4 | $10,318 |
| Gibson, Marie L.* | 1997 | $585 | 14.8 | $8,658 |
| **Partner Total** | | | **4,891.2** | **$3,591,450** |
| **COUNSEL** | | | | |
| Matz, Thomas J. | 1976 | $560 | 932.8 | $522,368 |
| Shivakumar, Dhananjai | 1998 | $538 | 884.7 | $475,664 |
| Amodeo, John A. | 1977 | $580 | 55.2 | $32,016 |
| Jackson, Jerry L. | 1977 | $580 | 28.8 | $16,704 |
| Sensenbrenner, Eric B. | 1996 | $560 | 21.1 | $11,816 |
| **Counsel Total** | | | **1,922.6** | **$1,058,568** |
| **ASSOCIATES** | | | | |
| Meisler, Ron E. | 1999 | $508 | 1,116.2 | $566,784 |
| Ziegler, Venera E. | 2003 | $510 | 980.2 | $499,902 |
| Stuart, Nathan L. | 2002 | $433 | 1,124.5 | $487,366 |
| Fern, Brian M. | 1996 | $471 | 1,001.1 | $471,355 |
| MacDonald, F. Neil | 1997 | $527 | 884.6 | $466,155 |
| Toussi, Sina | 1995 | $540 | 852.8 | $460,512 |
| Reese, Randall G. | 2001 | $434 | 991.2 | $429,736 |
| Wilson, Louis D. | 2000 | $510 | 607.8 | $309,978 |
| Guzzardo, John | 2004 | $365 | 811.2 | $296,478 |
| Herriott, Allison Verderber | 2004 | $357 | 815.2 | $290,937 |
| Micheli, Matthew J. | 2002 | $409 | 563.5 | $230,384 |
| Zaltzman, Haim | 2006 | $331 | 604.3 | $200,307 |

---

[1]    The blended rates set forth for certain professionals reflect the average billing rate for the entire Application Period and incorporate a reduced billing rate for nonworking travel time.

| Name | Year Of Admission | Rate[1] | Hours | Amount |
|---|---|---|---|---|
| De Elizalde, Dolores | 2003 | $440 | 432.2 | $190,168 |
| Campanario, Nick D. | 2002 | $446 | 402.0 | $179,223 |
| Wharton, Joseph N. | 1998 | $460 | 354.8 | $163,109 |
| Diaz, Lisa B.** | | $295 | 505.6 | $149,153 |
| VanLonkhuyzen, Courtney E. | 2004 | $371 | 388.0 | $144,076 |
| Danz, Catherine E. | 2001 | $465 | 180.6 | $83,982 |
| Pilkington, Christian | Foreign (1999) | $540 | 112.6 | $60,804 |
| Jjingo, M. Janine | 2006 | $295 | 199.6 | $58,885 |
| Phillips, Daniel P. | 1998 | $540 | 90.3 | $48,762 |
| Kahn, Melissa T. | 2003 | $395 | 89.2 | $35,240 |
| Tsiros, Dionysios V. ** | | $295 | 73.8 | $21,773 |
| Kohut, Ronald D. | 2004 | $410 | 51.8 | $21,238 |
| Gibson, Marie L.* | 1997 | $540 | 27.1 | $14,634 |
| Ogunsanya, Gregory O. | 2004 | $440 | 30.1 | $13,244 |
| Olasky, Peter | 2005 | $375 | 33.0 | $12,375 |
| Perl, Michael W. | 2004 | $375 | 28.9 | $10,838 |
| Silverberg, Bennett S. | 2001 | $485 | 21.5 | $10,428 |
| **Associate Total** | | | **13,373.7** | **$5,927,826** |
| **PARAPROFESSIONALS** | | | | |
| Demma, Jeffrey | N/A | $230 | 552.8 | $127,144 |
| Salazar, Adriana | N/A | $175 | 633.1 | $110,797 |
| Zsoldos, Andrew F. | N/A | $145 | 716.3 | $103,869 |
| Rosen, Ruth | N/A | $220 | 250.5 | $55,166 |
| Klimek, Marsha V. | N/A | $230 | 223.3 | $51,359 |
| Yoeli, Matthew E. | N/A | $145 | 303.1 | $43,950 |
| Chow, Pauline | N/A | $230 | 174.5 | $40,135 |
| Donnelly, Neal P. | N/A | $175 | 227.1 | $39,743 |
| Nowicki, John A. | N/A | $230 | 127.3 | $29,279 |
| Buckman, Katherine | N/A | $162 | 129.4 | $20,948 |
| Jacobson, Susan J. | N/A | $230 | 84.9 | $19,527 |
| Gilchrist, Julie M. | N/A | $230 | 78.8 | $18,124 |
| Jin, David | N/A | $161 | 103.5 | $16,678 |
| Hendrick, Daniel | N/A | $145 | 110.5 | $16,023 |
| Rosi, Domino A. | N/A | $145 | 97.9 | $14,196 |
| DiBella, Joseph B. | N/A | $210 | 65.6 | $13,776 |
| Scher, Shimrit | N/A | $145 | 80.5 | $11,673 |
| **Paraprofessional Total** | | | **3,959.1** | **$732,387** |
| **TOTAL ALL PROFESSIONALS** | | | **24,146.6** | **$11,310,213** |
| This summary excludes voluntary fee reductions of $1,014,966, of which $862,928 was reduced on the monthly statements and $179,038 is an additional accommodation on this interim application. | | | | |

\* On April 1, 2006, Marie L. Gibson became a partner of Skadden. Because Ms. Gibson became a partner during the Application Period, for statistical purposes, her time billed as a partner is included in the partner category, while her time billed as an associate is included in the associate category.

\*\* These timekeepers are "Law Clerks." Law Clerks are law school graduates who have not yet been admitted to practice. For purposes of billing statistics, law clerks are included with associates.

SUMMARY OF SERVICES RENDERED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
FEBRUARY 1, 2006 – MAY 31, 2006

| Activities | Hours | Fees |
|---|---|---|
| Employee Matters (Labor Unions) | 4,993.7 | $2,590,790 (22.9%) |
| Customer Matters (GM) | 4,178.2 | $1,789,803 (15.8%) |
| Creditor Meetings / Statutory Committees | 3,068.6 | $1,527,032 (13.5%) |
| Case Administration | 1,828.3 | $603,278 (5.3%) |
| Supplier Matters | 1,014.1 | $539,862 (4.8%) |
| Retention / Fee Matters / Objections (Others) | 1,119.5 | $431,545 (3.8%) |
| Nonworking Travel Time | 1,312.3 | $376,303 (3.3%) |
| Asset Dispositions (General) | 701.7 | $375,042 (3.3%) |
| Employee Matters (General) | 679.4 | $359,097 (3.2%) |
| Leases (Real Property) | 565.4 | $290,834 (2.6%) |
| Secured Claims | 567.6 | $266,437 (2.4%) |
| General Corporate Advice | 373.9 | $249,312 (2.2%) |
| Global Subsidiaries (Non-U.S.) | 337.4 | $205,234 (1.8%) |
| Business Operations / Strategic Planning | 264.7 | $192,132 (1.7%) |
| Utilities | 379.3 | $192,060 (1.7%) |
| Retention / Fee Matters (SASM&F) | 465.2 | $191,088 (1.7%) |
| Claims Administration (General) | 338.3 | $151,245 (1.3%) |
| Claims Administration (Reclamation/Trust Funds) | 351.6 | $142,265 (1.3%) |
| Automatic Stay (Relief Actions) | 304.0 | $140,233 (1.2%) |
| Environmental Matters | 201.2 | $140,142 (1.2%) |
| Litigation (Insurance Recovery) | 208.1 | $105,009 (0.9%) |
| Tax Matters | 145.7 | $82,775 (0.7%) |
| Intellectual Property | 126.6 | $65,656 (0.6%) |
| Employee Matters (Pension) | 98.7 | $58,190 (0.5%) |
| Real Estate (Owned) | 73.7 | $44,502 (0.4%) |

| Activities | Hours | Fees |
|---|---|---|
| Executory Contracts (Personalty) | 84.4 | $38,078 (0.3%) |
| Litigation (General) | 80.6 | $33,598 (0.3%) |
| Employee Matters (Retirees/OPEB) | 83.0 | $32,138 (0.3%) |
| Reports and Schedules | 54.5 | $22,844 (0.2%) |
| Financing (DIP and Emergence) | 28.7 | $20,973 (0.2%) |
| Reorganization Plan / Plan Sponsors | 65.8 | $20,728 (0.2%) |
| Asset Dispositions (Real Property) | 24.1 | $14,196 (0.1%) |
| Customer Matters (General) | 17.8 | $9,186 (0.1%) |
| Regulatory and SEC Matters | 10.5 | $8,624 (0.1%) |
| **Total** | **24,146.6** | **$11,310,231** |

**Hearing Date: October 19, 2006**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

　　　- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
　　Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                           :
　　　　In re                           :    Chapter 11
                                                           :
DELPHI CORPORATION, et al.,          :    Case No. 05-44481 (RDD)
                                                           :
                                                           :    (Jointly Administered)
　　　　　　　Debtors.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SECOND INTERIM APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP, COUNSEL TO THE DEBTORS-IN-POSSESSION, SEEKING ALLOWANCE AND
PAYMENT OF INTERIM COMPENSATION AND
REIMBURSEMENT OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("SECOND SKADDEN INTERIM FEE APPLICATION")

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), counsel for Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),

debtors and debtors-in-possession in the above-captioned cases (the "Reorganization Cases"),

submit this second interim application (the "Interim Application") seeking interim allowance and

payment of compensation and reimbursement of expenses under 11 U.S.C. §§ 330 and 331 for the

period from February 1, 2006 through May 31, 2006 (the "Application Period").  Skadden submits

this Interim Application for (a) allowance of compensation for professional services rendered by

Skadden to the Debtors, and (b) reimbursement of actual and necessary charges and disbursements

incurred by Skadden in the rendition of required professional services on behalf of the Debtors.  In

support of this Interim Application, Skadden represents as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and

affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11

of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").  The

Debtors continue to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders

directing the joint administration of the Debtors' chapter 11 cases.

2.    On October 17, 2005, the Office of the United States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (the "Equity Committee").  No trustee or

examiner has been appointed in the Debtors' cases.

3.    On May 5, 5006, this Court authorized the establishment of a joint fee

review committee ("Fee Review Committee") and approved a protocol regarding the committee,

2

its composition, mandate, and procedures (Docket No. 3630).  The Fee Review Committee is

comprised of a representative of: (a) the Office of the United States Trustee for this District; (b) the

Debtors; and (c) the Official Committee of Unsecured Creditors.

4.       This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

5.       The statutory predicates for the relief requested herein are sections 330 and

331 of the Bankruptcy Code, Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Local

Rule 2016-1.  This Interim Application has been prepared in accordance with the Amended

Guidelines for Fees and Disbursements for Professionals in Southern District of New York

Bankruptcy Cases, adopted by the Court on April 19, 1995 (the "Local Guidelines"), and the

United States Trustee Guidelines for Reviewing Applications for Compensation and

Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (Appendix A to 28 C.F.R. § 58), dated

May 17, 1996 (the "UST Guidelines" and, together with the Local Guidelines, the "Guidelines").

Pursuant to the Local Guidelines, a certification regarding compliance with the Guidelines is

attached hereto as Exhibit A.

Retention Of Skadden

6.       Upon the commencement of the Reorganization Cases, the Debtors applied

to this Court for an order approving the retention of Skadden as their principal restructuring and

bankruptcy counsel (the "Retention Application") to perform legal services under a general

retainer that was necessary to enable the Debtors to faithfully execute their duties as

3

debtors-in-possession.  On November 4, 2005, this Court entered an order (the "Retention Order")[2] authorizing the Debtors to employ Skadden as their counsel under the terms set forth in the Retention Application.[3]

7.    In the Retention Application, the Debtors disclosed that Skadden's fees for professional services are based on its guideline hourly rates, which are periodically adjusted.  The Debtors also disclosed in the Retention Application that Skadden's charges and disbursements are invoiced pursuant to Skadden's Policy Statement Concerning Charges and Disbursements, a copy of which is attached to the Engagement Agreement.  Certain charges and disbursements are not charged separately under the bundled rate structure as described in the Retention Application. Other than an arrangement between Skadden and its members, there is no agreement or understanding between Skadden and any person for the sharing of compensation to be received for services rendered in this case.

Fee Procedures And Monthly Fee Statements

8.    On November 4, 2005, this Court entered the Order Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (Docket No. 869) (the "Initial Interim Compensation Order").  This order was subsequently amended on March 8, 2006 (Docket No. 2747), March 28, 2006 (Docket No. 2986) and May 5, 2006 (Docket No. 3630).  The latest amendment, dated July 13, 2006, was the Fourth Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (Docket No. 4545) (the "Fourth Supplemental

---

[2]    A copy of the Retention Application, the supporting declaration, and the Retention Order are attached hereto as Exhibit B.  These materials include factual information regarding the experience and standing at the bar of certain of Skadden's senior attorneys.

[3]    The Retention Order incorporates the terms of an engagement agreement dated as of July 12, 2005 (the "Engagement Agreement"), between Skadden and the Debtors, a copy of which is attached as Exhibit A to the declaration supporting the Retention Application.

Interim Compensation Order," together with the Initial Interim Compensation Order, and previous amendments, collectively, the "Interim Compensation Order"), whereby the Court adjourned the hearing date for professionals' first interim fee applications from July 19, 2006 to October 19, 2006, established October 12, 2006 as the objection deadline for the first and second interim fee applications (in accordance with the supplemental case management order), and authorized and directed the Debtors to release one-half of each retained professional's 20% holdback for all billing periods through May 31, 2006.

9.      To monitor costs to the Debtors' estates and avoid duplicative efforts in the review of fee applications filed in these Reorganization Cases, the Debtors, the Creditors' Committee, and the U.S. Trustee negotiated the formation of the Fee Review Committee to review, comment on, and, if necessary, object to the various fee applications filed in these Reorganization Cases.  On May 5, 2006, this Court authorized the establishment of the Fee Review Committee and approved a protocol regarding the Fee Review Committee, its composition, mandate, and procedures (the "Fee Review Protocol") (Docket No. 3630).  The Fee Review Committee has retained Legal Cost Control, Inc. as fee analyst, subject to court approval, to assist the Fee Review Committee.

10.      Pursuant to paragraph 2(a) and 2(j) of the Interim Compensation Order, as supplemented, as well as the Fee Review Protocol (defined below), Skadden is submitting this Interim Application to the Debtors, the U.S. Trustee, counsel to the Creditors' Committee, counsel for the agent under the Debtors' prepetition credit facility, counsel for the agent under the Debtors' postpetition credit facility, and the members of the Fee Review Committee and its advisors.

<u>Overview Of Delphi Corporation</u>

11.    Delphi and its subsidiaries and affiliates (collectively, the "Company"), as of December 31, 2005 had global 2005 net sales of $26.947 billion, and global assets as of December 31, 2005 of approximately $17.023 billion.[4]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

12.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

13.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[4]    The aggregated financial data used in this Interim Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

<u>Events Leading To Chapter 11 Filing</u>

14.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of $4.753 billion on $28.622 billion in net sales.[5]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of $2.357 billion on net sales of $26.947 billion.

15.    The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

16.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

---

[5]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

<u>The Debtors' Transformation Plan</u>

17.    On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the

first half of 2007.  To complete their restructuring process, the Debtors must focus on five key

areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to

conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's

financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a

workable solution to their current pension situation.

18.    In connection with the first two elements of the Company's transformation

plan, Delphi continues to participate in discussions with its unions and GM.  However, because

Delphi was not able to achieve comprehensive agreements with its unions and GM during the first

nine months of these chapter 11 cases, on March 31, 2006, Delphi moved under sections 1113 and

1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify retiree

benefits.[6]  On May 9, 2006, the hearing under sections 1113 and 1114 of the Bankruptcy Code

commenced.  Contemporaneously with the filing of the 1113/1114 Motion, the Debtors also

---

[6]    Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And
Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035) (the
"1113/1114 Motion").

8

moved to reject unprofitable supply contracts with GM.[7]  Among the reasons for the GM Contract

Rejection Motion was the Debtors' belief that GM must cover a greater portion of the costs of

manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This

initial motion covers approximately half of the Debtors' North American annual purchase volume

revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the filing of

these motions was a necessary procedural step, the Debtors continue to pursue a consensual

resolution with all of Delphi's unions and GM before the merits of the motion are determined by

the Bankruptcy Court.

         19.     Throughout these cases and notwithstanding the 1113/1114 Motion and the

GM Contract Rejection Motion, Delphi has consistently communicated a clear message to both its

hourly workforce and GM: Delphi is committed to finding a consensual resolution to its issues and

intends to continue to discuss with its unions and GM ways to become competitive in the Debtors'

U.S. operations.  To that end, during the Application Period, Delphi, GM, and the United

Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") received

this Court's approval of a tripartite agreement providing for a special hourly attrition program for

Delphi's UAW-represented employees.[8]  In addition, after the Application Period, on July 7,

2006, this Court entered an order[9] approving a similar special attrition program with the

---

[7]    Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033) (the "GM Contract Rejection
Motion").

[8]    On May 8, 2006, the Court entered an order approving the agreement relating to the UAW's special hourly
attrition program (Docket No. 3648), and such order was amended by this Court on May 12, 2006 (Docket No.
3754).  On May 18, 2006, Wilmington Trust Company, as indenture trustee, filed a notice of appeal related to both
the May 8, 2006 order and the May 12, 2006 amended order approving the agreement related to the UAW's
special hourly attrition program (Docket No. 3813).

[9]    On July 17, 2006, Wilmington Trust Company, as indenture trustee, filed a notice of appeal related to the July 7,
2006 order approving a special attrition program with the IUE-CWA and a Supplement to the UAW special
attrition program (Docket No. 4572).

International Union of Electronic, Electrical, Salaried, Machine and Furniture

Workers-Communications Workers of America, (the "IUE-CWA") and a Supplement to the UAW

special attrition program (Docket No. 4461).[10]  While these special hourly attrition programs could

provide more than 18,000 of Delphi's 29,000 existing UAW and IUE-CWA-represented long-term

hourly employees with "soft landings" through retirement, attrition programs, and GM flowbacks,

the attrition programs do not resolve the issues related to Delphi's uncompetitive labor agreements.

20.     To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which the

Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.  To that end, the Company will focus the organization around

the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics,

Power Products, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic

Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment &

Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel and Gas Engine

Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal

(Climate Control & Powertrain Cooling).[11]

21.     In contrast, the Company similarly identified certain non-core product lines

that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts,

Cockpits and Instrument Panels, Door Modules and Latches, Ride Dynamics, Steering, and Wheel

Bearings.  The Company will sell or wind down these non-core product lines (which will include

---

[10]   Furthermore, Delphi is currently negotiating the terms of similar programs with the United Steelworkers of
America and Delphi's other unions, which, if agreed upon, would provide those hourly employees with
comparable retirement programs and incentives.

[11]   The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or
consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial
vehicles, or other adjacent-market businesses and product lines.

approximately one-third of its global manufacturing sites) and will consult with its customers,

unions, and other stakeholders to carefully manage the transition of such affected product lines.

The Company intends to sell or wind down the non-core product lines and manufacturing sites by

January 1, 2008.

22.    As part of its organizational restructuring, the fourth element of the Debtors'

transformation plan, the Company expects to reduce its global salaried workforce by as many as

8,500 employees as a result of portfolio and product rationalizations and initiatives adopted

following an analysis of the Company's selling, general, and administration ("SG&A") cost saving

opportunities.  The Company believes that once its SG&A plan is fully implemented, the

Company should realize savings of approximately $450 million per year in addition to savings

realized from competitive measures planned for its core businesses and the disposition of non-core

assets.

23.    As noted above, the final element of the transformation plan is to devise a

workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the

benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly

and salaried workforce.  To do so, however, it will be necessary to freeze the current hourly U.S.

pension plan as of October 1, 2006 and to freeze the current salaried U.S. pension plan as of

January 1, 2007.  Despite the freeze, because of the size of the funding deficit, it will also be

necessary for the Debtors to obtain relief from the Pension Benefit Guaranty Corporation (the

"PBGC"), the Internal Revenue Service, the Department of Labor, and potentially Congress, to

amortize funding contributions over a long-term period.  The Company intends to replace the

hourly plan (for certain employees) and the salaried plan with defined contribution plans.

11

24.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will continue to marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Significant Events During The Application Period</u>

25.     The most significant events during the Application Period were in connection with the development, announcement, and partial implementation of the Debtors' transformation plan.  Nearly 40% of the professional fees for which approval is sought in this Interim Application relates to the first two elements of the transformation plan involving resolution of labor and GM issues including preparation and prosecution of the 1113/1114 Motion and the GM Contract Rejection Motion.

A.     <u>Negotiations With Unions And GM</u>

26.     From the inception of these cases, the Debtors have publicly expressed their need to transform their labor agreements to provide a competitive labor cost structure and to address non-profitable and non-strategic U.S. operations.  In particular, the Debtors' existing labor agreements must be modified in three principal respects.  First, the Debtors must obtain hourly wage and benefit cost levels that are competitive with other U.S. auto parts suppliers.  Second, the Debtors must address those provisions that limit the Debtors' ability to respond to market forces by selling or winding-down non-core product lines and manufacturing sites by January 1, 2008, or by reducing their global workforce.  Third, the Debtors must address their substantial liabilities for retirement benefits for hourly employees and their uncompetitive retiree health care plans.  The

12

Debtors are currently pursuing parallel paths: prosecuting the 1113/1114 Motion in an effort to gain judicial authorization to impose necessary modifications to the Debtors' labor agreements while simultaneously negotiating with their unions in an attempt to reach a consensual agreement regarding modifications to certain terms of their collective bargaining agreements.  To restructure the Debtors' businesses and design a feasible plan of reorganization, the Debtors must address and resolve these issues.

27.    During the Application Period, Skadden worked closely with the Debtors and other professionals regarding the Debtors' negotiations with their unions.  As this Court is aware, the Debtors postponed the filing of their 1113/1114 Motion numerous times to allow for continued dialogue in an effort to reach a consensual resolution.  For example, during this Application Period, the Debtors on February 17, 2006 announced that based upon progress in discussions with its major unions and GM the Debtors obtained judicial approval to adjourn their February 17, 2006 1113/1114 Motion filing deadline to facilitate continued talks in an effort to achieve a comprehensive agreement.  Absent agreement with all parties, Delphi announced it would file no later than March 31, 2006 its motions under sections 1113 and 1114 of the Bankruptcy Code to initiate the process of seeking court authorization to reject the collective bargaining agreements and terminate hourly post-retirement health care plans and life insurance.

28.    In an effort to facilitate a "soft landing" for its hourly employees (with or without a comprehensive and consensual agreement), Delphi began negotiating with its major unions to develop attrition programs.  On March 22, 2006, a tripartite agreement was reached by and between the UAW, Delphi, and GM that set forth the terms of an attrition program.[12]  Because

---

[12]    On May 8 and May 12, 2006, respectively, this Court entered an order and an amended order approving the UAW-GM-Delphi Special Attrition Program (Docket Nos. 3754 and 3648, respectively).  The orders have since been appealed by Wilmington Trust Corporation, as indenture trustee.  As this Court is aware, on June 19, 2006,

no comprehensive agreement was reached, on March 31, 2006, the Debtors filed their 1113/1114

Motion, concurrent with (a) their announcement regarding the Debtors' transformation plan and

(b) their filing of the GM Contract Rejection Motion seeking authorization to reject certain

executory contracts with GM.  Following the March 31, 2006 filings, the Debtors responded to an

intensive discovery process for both motions and prepared for, took, and defended numerous

depositions of various witnesses, including experts.  Beginning on May 9, 2006, the Court held a

contested hearing relating to the 1113/1114 Motion.  So far the hearing on this matter has been

conducted over seven days, two of which took place after the Application Period.[13]

29.    Contemporaneously with the filing of the 1113/1114 Motion, the Debtors

also moved to reject unprofitable supply contracts with GM.  Among the reasons for the GM

Contract Rejection Motion was the Debtors' belief that GM must cover a greater portion of the

costs of manufacturing products for GM at the Debtors' plants that primarily produce parts for GM

vehicles.  In the GM Contract Rejection Motion, the Debtors identified 21 operational sites that

currently generate significant operating losses and primarily produce parts for GM vehicles.  In the

GM Contract Rejection Motion, the Debtors requested authority to reject over 5,000 GM supply

contracts related to the 21 operational sites.  The Debtors' initial motion covers approximately half

of the Debtors' North American annual purchase volume revenue from GM but only 10% of the

Debtors' total contracts with GM.  Together, the GM Contract Rejection Motion and the

1113/1114 Motion were designed to address losses incurred by the Debtors' manufacturing

---

the Debtors sought approval of an agreement to implement a similar special attrition program with the IUE-CWA
and a Supplement to the UAW special attrition program.  One June 29, this Court held a contested, evidentiary
hearing regarding the relief requested and on July 7, 2006, this Court entered an order approving the motion
(Docket No. 4461). This order was also appealed by Wilmington Trust Company, as indenture trustee (Docket No.
4572).  Delphi is still in negotiations with its other unions regarding similar programs, as well as comprehensive
labor modifications consistent with the Debtors' transformation requirements.

[13]    On June 13, 2006, this Court entered an order adjourning the 1113/1114 hearings until August 11, 2006 (Docket
No. 4170).  In addition, in its order, this Court scheduled certain status conferences, set forth discovery and
deposition guidelines, and laid out meet and confer obligations for the parties.

operations due to operational obligations and restrictions inherited from GM.  Although the filing

of these motions was a necessary procedural step, the Debtors continue to pursue a consensual

resolution with all of Delphi's unions and GM before the merits of the motions are determined by

the Bankruptcy Court.[14]

B.      Statutory Committees

        30.    Equity Committee.  During the Application Period, on March 21 and 22,

2006, this Court held a contested evidentiary hearing regarding a motion filed by Appaloosa

Management L.P.'s ("Appaloosa") requesting the Court direct the U.S. Trustee to appoint an

official committee of equity security holders in these Reorganization Cases (Docket No. 1604).

On March 31, 2006, this Court entered its order directing the formation of such a committee for

specific limited purposes and on April 30, 2006, after soliciting approximately 300,000

shareholders, the U.S. Trustee appointed the Equity Committee (Docket No. 3503).[15]  Since the

formation of the Equity Committee, the Debtors have sought to foster a productive working

relationship with the Equity Committee and to apprise it, within the boundaries of the limited

scope for which the Equity Committee was formed, of historical and current events.

        31.    Creditors' Committee.  From the outset of these cases, the Debtors have

sought to establish and maintain a transparent and productive working relationship with the

Creditors' Committee.  The Debtors have met with the Creditors' Committee numerous times

during the Application Period, including five formal meetings that included presentations and

other materials which formed the basis of discussion and review.  As a result of these efforts, the

---

[14]    On June 13, 2006, this Court entered an order (a) adjourning the GM Contract Rejection Motion to the later of
        August 15, 2006 or a court date directly following the conclusion of the hearings on the 1113/1114 Motion and (b)
        setting forth discovery, objection, response, and deposition deadlines (Docket No. 4169).

[15]    The membership of the Equity Committee was subsequently amended, as announced by the U.S. Trustee on May
        11, 2006 (Docket No. 3726).

Debtors and the Creditors' Committee, including their respective professionals, have been able to achieve a productive working relationship in these cases and reduce the number of contested matters before the Court.

C.    Case Administration

32.    Upon commencing the Reorganization Cases, the Debtors became one of the largest companies, on a consolidated basis, ever to file chapter 11 petitions and the largest industrial company ever to seek chapter 11 relief.  During the Application Period, nearly 1,950 items were docketed, and nearly 4,200 items have been docketed in the Reorganization Cases through the end of this Application Period.  There are approximately 451 parties on the core service lists in these Reorganization Cases.  There were more than 70 orders entered during the Application Period in which 4 omnibus and 7 off-omnibus hearings were conducted.  Skadden has logged and responded to more than 700 letters, e-mails, and telephone messages recorded on its dedicated Delphi voice-mail box.

33.    As stated, during the Application Period, the Debtors focused their efforts on formulating their transformation plan and beginning to take actions in furtherance thereof.  In undertaking these efforts, the Debtors and their advisors, including Skadden,[16] have worked diligently with the Debtors' senior management and continued negotiations with key constituencies to enable a successful reorganization and to provide a platform for future growth.

---

[16]    Skadden is one of a team of skilled professionals retained by the Debtors to assist in their reorganization efforts. Skadden's assistance to the Debtors during the Application Period generally was part of a collaborative effort with the Debtors' other retained professions, including Rothschild Inc. as financial advisors and investment bankers, FTI Consulting, Inc. as restructuring and financial advisors, Groom Law Group Chartered as special employee benefits counsel, Jones Lang LaSalle Americas, Inc. as real estate transaction and services providers, O'Melveny & Myers LLP as special labor counsel, Shearman & Sterling LLP as special counsel, and Togut, Segal & Segal LLP as conflicts counsel.

<u>Requested Fees And Reimbursement Of Expenses</u>

34.     Skadden has played an important role in advising the Debtors with respect
to the initial stages of implementing their restructuring strategy.  As a result of its efforts during the
Application Period, Skadden now seeks interim allowance of $11,310,231 in fees calculated at the
applicable guideline hourly billing rates of the firm's personnel who have worked on the
Reorganization Cases, and $825,854 in charges and disbursements actually and necessarily
incurred by Skadden while providing services to the Debtors during the Application Period.

35.     This Interim Application reflects (a) a voluntary reduction by Skadden in
connection with each monthly statement in the aggregate amount of $862,928 (with respect to
fees, generally including the elimination from any matter of any timekeeper who recorded less
than one hour and the elimination of any timekeeper who recorded less than $2,500 in the
aggregate across matters) and $78,115 (with respect to charges and disbursements), (b) an
additional voluntary reduction in the amount of $179,049 in connection with this Interim
Application to reflect, among other things, the elimination of all fees related to (i) any timekeeper
who billed less than $10,000 during the Application Period,[17] (ii) any instance in which a
timekeeper billed less than $1,000 to a particular matter during the Application Period, and (iii) the
elimination of any matter to which fewer than ten hours were billed during the Application Period,
and (c) an adjustment to reduce the proposed fees sought by $18,524 to correct two discrete billing
errors related to two timekeepers.  Accordingly, including the voluntary client accommodations in

---

[17]     Skadden's general criteria for measuring transitory timekeepers in these cases as adopted in the First Fee
Application would be to extend a voluntary fee reduction to reflect, among other things, (i) any timekeeper who
billed less than ten total hours during the Application Period and (ii) any timekeeper who billed less than $1,000
during the Application Period.  For this particular Application Period, Skadden determined instead to extend a
voluntary fee accommodation to reflect any timekeeper who billed less than $10,000 during the Application
Period.  This increased threshold for the measurement of transitory timekeepers is intended as a financial
accommodation extended based on the particular events in the Application Period and Skadden's review of the
totality of the circumstances relating to the Interim Application.

connection with each monthly statement (excluding the adjustments), Skadden is voluntarily

reducing its fees by $1,041,966, or approximately 8.4%, and its charges and disbursements by

approximately $78,126, or approximately 8.6%, for a total reduction of $1,120,092 for items

Skadden normally would bill its clients.[18]

36.    In staffing this case, in budgeting and incurring charges and disbursements,

and in preparing and submitting this Interim Application, Skadden has been mindful of the need to

be efficient while providing appropriate and vigorous representation to the Debtors. As described

in detail herein, Skadden believes that the requests made in this Interim Application comply with

this Court's standards in the context of the unique circumstances surrounding these unusually large

and complex cases.

Summary Of Services Rendered By
Skadden During The Application Period

37.    Throughout the Application Period, Skadden has worked closely with the

Debtors and their advisors to administer these estates and maximize the return for parties in

interest. These services have been directed towards a myriad of tasks necessary to achieve this

result. To meet the Debtors' needs, Skadden has provided multi-disciplinary services on a daily

basis, often working nights, weekends, and holidays. Throughout this process, certain of the

principal Skadden attorneys working on the Reorganization Cases were required to devote the vast

majority of their time to this matter, often to the exclusion of other clients. As a result of the efforts

of the Debtors and their professionals, the Debtors have made substantial progress in evaluating

---

[18]    Skadden believes that the amounts requested in this Interim Application are reasonable in relation to the services
rendered. The amounts requested are already reduced to reflect the client accommodations described herein. To
the extent that a party objects to this Interim Application, Skadden reserves the right to recapture such client
accommodations and seek up to the full amount of fees and expenses actually incurred in connection with this
engagement.

and stabilizing their businesses, preparing and pursuing a transformation plan in order to emerge

from chapter 11 in the first half of 2007.

38.    At the commencement of the Reorganization Cases, Skadden created 45

different matter numbers or subject-matter categories (the "Matter Categories") to which its

professionals assigned the time billed by them, all of which are related to the tasks performed by

Skadden on behalf of the Debtors.[19]  Skadden has kept a contemporaneous record of the time spent

rendering such services and, consistent with the Guidelines, separated tasks in billing increments

of one-tenth of an hour.  All of the services performed by Skadden have been legal in nature and

necessary for the proper administration of the Reorganization Cases.

39.    Skadden devoted approximately <u>67.1%</u> of its time to the following six

matters, each of which was responsible for fees <u>in excess of $400,000</u> during the Application

Period: Employee Matters (Labor Unions), Customer Matters (GM), Creditor Meetings / Statutory

Committees, Case Administration, Supplier Matters, and Retention/Fee Matters/Objections

(Others).

40.    Skadden devoted approximately <u>29.2%</u> of its time in the aggregate to the

following 15 matters, billings for each of which were <u>between $100,000 and $400,000</u> in fees

during the Application Period: Nonworking Travel Time, Asset Dispositions (General), Employee

Matters (General), Leases (Real Property), Secured Claims, General Corporate Advice, Global

Subsidiaries (Non-U.S.), Business Operations / Strategic Planning, Utilities, Retention / Fee

Matters (SASM&F), Claims Administration (General), Claims Administration

(Reclamation/Trust Funds), Automatic Stay (Relief Actions), Environmental Matters, and

Litigation (Insurance Recovery).

---

[19]    <u>Exhibit C</u> contains a table of all matter numbers used by Skadden in these Reorganization Cases, as well as a
description of certain business statistics of Skadden in these Reorganization Cases.

41.    The remainder of time (approximately 3.7%) billed by Skadden was devoted to the following 13 matters, each of which was responsible for less than $100,000 during the Application Period: Tax Matters, Intellectual Property, Employee Matters (Pension), Real Estate (Owned), Executory Contracts (Personalty), Litigation (General), Employee Matters (Retirees/OPEB), Reports and Schedules, Financing (DIP and Emergence), Reorganization Plan / Plan Sponsors, Asset Dispositions (Real Property), Customer Matters (General), and Regulatory and SEC Matters.

Matters Exceeding $400,000

A.    Employee Matters (Labor Unions)

42.    As of the Petition Dates, nearly all of the Debtors' approximately 34,750 hourly employees in the United States were (and still are) represented by three principal unions – the UAW, which represents approximately 70% of the Debtors' hourly workforce, the IUE-CWA, which represents approximately 25% of the hourly workforce, and the United Steelworkers of America, Local 87 (the "USWA"), which represents nearly 3% of the hourly workforce.  The Debtors have master collective bargaining agreements with each of these three unions as well as "local agreements" with affiliated local unions covering primarily local issues that are worksite or business specific.  The Debtors also have collective bargaining agreements with three other unions representing a smaller segment of the U.S. hourly workforce – the International Association of Machinists and Aerospace Workers (the "IAM"), the International Brotherhood of Electrical Workers (the "IBEW"), and the International Union of Operating Engineers (the "IUOE") (the six foregoing unions (the UAW, IUE-CWA, USWA, IAM, IBEW, and IUOE) being referred to herein collectively as the "Unions").

20

43.    During the Application Period, Skadden worked closely with the Debtors and other professionals to further the negotiations between the Debtors and their Unions. Throughout the Application Period, Skadden worked closely (being mindful not to duplicate efforts) with O'Melveny & Myers, LLP ("O'Melveny") and Groom Law Group, special labor counsel and special employee benefits counsel, respectively, retained by the Debtors to advise with respect to the filing of the Debtors' 1113/1114 Motion.  Although the Debtors were prepared to file their 1113/1114 Motion on numerous occasions, Delphi announced on February 17, 2006 that based upon progress in discussions with its major unions and GM the talks would continue in an effort to achieve a comprehensive agreement.  Therefore, to facilitate dialogue between the parties, the deadline to file the 1113/1114 Motions was further extended to March 31, 2006.

44.    In addition, during the Application Period, Delphi also negotiated with its major unions to develop an attrition program for hourly employees (with or without a consensual comprehensive agreement) to facilitate a "soft landing" for current employees on an individual and voluntary basis.  During the Application Period, Delphi, with the assistance of Skadden, successfully negotiated an agreement with GM and the UAW to establish an attrition program to provide certain incentives and benefits for employees to sever their employment.  Skadden drafted a motion seeking approval of this attrition program, which motion was finalized and filed on March 22, 2006 (Docket No. 2933) – the same day the agreement memorializing the attrition program was signed.  Skadden responded to objections and discovery requests and prosecuted the motion on behalf of the Debtors at the April 7, 2006 omnibus hearing.  On May 8, 2006, this Court entered the order approving the motion with certain modifications (Docket No. 3648), which was

subsequently amended on May 12, 2006 (Docket No. 3754).  This order was appealed by

Wilmington Trust Co., as indenture trustee (Docket No. 3813).[20]

45.    On March 31, 2006, the Debtors filed their 1113/1114 Motion.  Following

the filing of their 1113/1114 Motion, the Debtors responded to an intensive discovery process and

prepared for, took, and defended numerous depositions of various witnesses, including experts.

Further assistance by Skadden and O'Melveny (which was closely coordinated by Delphi and the

firms) was provided in preparations for the contested hearing on the motion which was held thus

far over seven days, five of which were during the Application Period.  Among other things,

Skadden participated in analyzing and discussing potential litigation strategies with the Debtors

and their special counsel, prepared thirteen witnesses called by the Debtors, identified and

reviewed more than 300 hearing exhibits designated by the Debtors and other parties in interest,

and assembled hearing materials, including 17 volumes of hearing exhibits.

46.    In connection with the foregoing services, Skadden expended 4,993.7 hours

during the Application Period for which Skadden seeks compensation of $2,590,790.[21]  Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

D-1.  A summary of the hours incurred and value of the services performed by each professional is

provided in the following table:

---

[20]    In addition, after the Application Period, on June 19, 2006, the Debtors sought approval of an agreement to
implement a similar special attrition program with the IUE-CWA and a Supplement to the UAW special attrition
program (Docket No. 4269).  On June 29, Skadden represented the Debtors in a contested, evidentiary hearing
regarding the relief requested and on July 7, 2006, this Court entered an order approving the motion (Docket No.
4461). This order was also appealed by Wilmington Trust Company, as indenture trustee.  Furthermore, Delphi
with the assistance of Skadden, is continuing to negotiate with the steelworkers, as well as its other unions,
regarding similar programs.

[21]    Skadden's first interim fee application requested fees in the amount of $414,991, or 4.5% of the total amount
requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| John P. Furfaro | $770 | 402.3 | $309,771 |
| Louis D. Wilson | $510 | 595.7 | $303,807 |
| John (Jack) Wm. Butler, Jr. | $835 | 315.2 | $263,193 |
| Thomas J. Matz | $560 | 432.2 | $242,032 |
| Kayalyn A. Marafioti | $795 | 260.6 | $207,178 |
| Brian M. Fern | $485 | 319.1 | $154,764 |
| Neil MacDonald | $540 | 279.6 | $150,984 |
| Jay S. Berke | $755 | 189.7 | $143,224 |
| George N. Panagakis | $755 | 180.8 | $136,505 |
| Nick D. Campanario | $465 | 238.0 | $110,671 |
| Randall G. Reese | $465 | 167.9 | $78,074 |
| Ron E. Meisler | $540 | 140.9 | $76,086 |
| David E. Springer | $755 | 89.6 | $67,649 |
| Allison V. Herriott | $375 | 114.8 | $43,051 |
| Nathan L. Stuart | $440 | 76.2 | $33,528 |
| Dhananjai Shivakumar | $560 | 53.6 | $30,016 |
| John Guzzardo | $375 | 71.9 | $26,963 |
| Sina Toussi | $540 | 47.5 | $25,650 |
| Haim Zaltzman | $335 | 29.0 | $9,715 |
| Ronald D. Kohut | $410 | 22.3 | $9,143 |
| Eric L. Cochran | $795 | 6.3 | $5,009 |
| M. Janine Jjingo | $295 | 15.5 | $4,573 |
| Courtney E. VanLonkhuyzen | $375 | 9.8 | $3,676 |
| Albert L. Hogan III | $620 | 5.7 | $3,534 |
| Lisa B. Diaz | $295 | 6.3 | $1,858 |
| Paraprofessional Total | | 923.2 | $150,136 |
| **Total** | | **4,993.7** | **$2,590,790 (22.9%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$68,991** |

B.    Customer Matters (GM)

47.    During the Application Period, Skadden assisted the Debtors in negotiating various matters with GM, the Debtors' largest customer and former parent. As of December 31,

23

2005, GM accounted for $12.86 billion of the Debtors' total net sales and was party to many material agreements with the Debtors.

48.    During the Application Period, Skadden met with Delphi's Board of Directors and advised senior management on strategic short- and long-term matters concerning GM, including, without limitation, (a) discussions regarding the Debtors' transformation plan and their efforts to realign the Company's global product portfolio and manufacturing footprint, (b) negotiating with GM for financial support to effectuate a comprehensive restructuring of the Debtors' businesses while minimizing the impact upon the Debtors' employees, (c) GM contract matters, including the GM Contract Rejection Motion, and (d) resolving setoff requests made by GM.

49.    Skadden devoted considerable amounts of time throughout the Application Period addressing each of the GM items discussed above.  Of particular note, Skadden spent significant time reviewing certain of the Debtors' contracts with GM in preparation for the GM Contract Rejection Motion.  Primarily, Skadden, working with FTI and the Debtors, reviewed contracts where the Debtors were providing parts to GM at a financial loss to the Debtors.  To facilitate this process, during the Application Period, Skadden devoted significant time to conducting legal research regarding the rejection of executory contracts, reviewing contracts covered by the GM Contract Rejection Motion, and drafting the GM Contract Rejection Motion in the event that a consensual resolution cannot be reached.  In addition, Skadden assisted the Debtors in reviewing expired contracts between the Debtors and GM and conducted research regarding the Debtors' legal options with regards to performance under the expired contracts while negotiating terms for new supply contracts with GM.

24

50.     Ultimately, on March 31, 2006, with the assistance of Skadden, the Debtors filed the GM Contract Rejection Motion.  On the same date, the Debtors delivered to GM a letter regarding commercial agreements that expired between October 1, 2005 and March 31, 2006, the terms of which the Debtors wished to reset if GM were to renew the contracts.  In their March 31, 2006 press release, the Debtors stated that they would not unilaterally revise the terms and conditions on which the Debtors were providing interim supply of parts to GM in connection with the expired contracts or file additional contract rejection motions prior to May 12, 2006 so long as GM did not initiate re-sourcing or other hostile commercial initiative against the Debtors.

51.     The GM Contract Rejection Motion was initially scheduled to be heard on May 12, 2006.  In early April 2006, the Debtors were served with discovery requests related to the motion by GM and other constituents.  In light of the originally scheduled hearing date, Skadden and FTI assisted the Debtors in responding on an expedited basis to GM's discovery requests.  Skadden devoted a substantial amount of time reviewing documents produced by both the Debtors and GM in response to various discovery requests.  The Debtors ultimately produced over 50,000 pages of documents in response to GM's discovery requests.  In connection with GM's discovery requests, the Debtors also spent a significant amount of time during the Application Period preparing for the depositions of certain Delphi and GM witnesses.  Although the hearing date of the motion was twice adjourned, during the Application Period, the Debtors, FTI, and Skadden diligently prepared for a hearing on the motion.  Ultimately, shortly after the end of the Application Period, on June 13, 2006, this Court agreed to adjourn the hearing on the motion until the later of August 15, 2006 and the conclusion of the 1113/1114 hearing to permit negotiations between the Debtors and GM to continue.

25

52.     In addition, the Debtors and their advisors negotiated extensively with GM, the Debtors' largest customer, and potentially the largest creditor, with respect to the application of various first-day orders in the period both before and after the Petition Dates.  This included addressing GM's concerns with respect to setoff rights under the order granting the Debtors' motion for approval of their debtor-in-possession financing (the "DIP Financing Order"), and customer and vendor matters.  Skadden also met with and discussed with GM comprehensive solutions with regard to human capital matters relating to collective bargaining agreements, pension plans, and OPEB liabilities.  To guide these discussions, Skadden assisted the Debtors in strategizing and otherwise drafting documentation in an attempt to engender GM's support.  The Debtors, with the assistance of Skadden, also participated in weekly and bi-weekly meetings with GM executive management and its financial advisors throughout the Application Period.  In light of the importance of such meetings, Skadden also devoted significant efforts to assisting the Debtors in preparing for such meetings through, among other things, participation in advance working group meetings.

53.     In connection with the foregoing services, Skadden expended 4,178.2 hours during the Application Period for which Skadden seeks compensation of $1,789,803.[22]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-2.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

---

[22]    Skadden's first interim fee application requested fees in the amount of $458,182, or 5.0% of the total amount requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Nathan L. Stuart | $440 | 787.1 | $346,324 |
| Dhananjai Shivakumar | $560 | 604.5 | $338,520 |
| Courtney E. VanLonkhuyzen | $375 | 370.6 | $138,975 |
| John (Jack) Wm. Butler, Jr. | $835 | 135.3 | $112,976 |
| John Guzzardo | $375 | 292.4 | $109,651 |
| Eric L. Cochran | $795 | 122.3 | $97,229 |
| Kayalyn A. Marafioti | $795 | 111.7 | $88,803 |
| Albert L. Hogan III | $620 | 138.6 | $85,932 |
| Sina Toussi | $540 | 128.9 | $69,606 |
| David E. Springer | $755 | 52.7 | $39,790 |
| Lisa B. Diaz | $295 | 113.9 | $33,601 |
| Ron E. Meisler | $540 | 37.5 | $20,250 |
| George N. Panagakis | $755 | 21.8 | $16,459 |
| Melissa T. Kahn | $410 | 32.1 | $13,161 |
| Haim Zaltzman | $335 | 35.3 | $11,826 |
| Thomas J. Matz | $560 | 20.1 | $11,256 |
| Bennett S. Silverberg | $485 | 21.5 | $10,428 |
| Peter Olasky | $375 | 20.6 | $7,725 |
| Ronald D. Kohut | $410 | 17.5 | $7,175 |
| John K. Lyons | $695 | 8.9 | $6,186 |
| Venera E. Ziegler | $510 | 5.3 | $2,703 |
| Allison V. Herriott | $375 | 6.3 | $2,363 |
| Brian M. Fern | $485 | 4.8 | $2,329 |
| Louis D. Wilson | $510 | 3.1 | $1,581 |
| Nick D. Campanario | $465 | 2.6 | $1,209 |
| Randall G. Reese | $465 | 2.4 | $1,116 |
| Paraprofessional Total | | 1,080.4 | $212,629 |
| **Total** | | **4,178.2** | **$1,789,803 (15.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$57,928** |

C.    Creditor Meetings/Statutory Committees

54.    This category of time relates to meetings with various creditor and equity

constituencies, and, in particular, with the Creditors' Committee and its legal and financial

advisors, the Equity Committee, and the Ad Hoc Equity Committee (principally through

Appaloosa).  Throughout the Application Period, Skadden communicated with the Creditors'

Committee, the Equity Committee, the Ad Hoc Equity Committee, and their respective advisors

regarding the progress and status of the Reorganization Cases.

55.    In addition to day-to-day communication, during the Application Period,

Skadden represented the Debtors at five formal meetings with the Creditors' Committee and its

professional advisors – including three meetings in February alone, a critical time in these

Reorganization Cases.  In addition to the formal meetings with the full Creditors' Committee,

during the Application Period, the Debtors also held meetings between the professionals for the

Creditors' Committee and the professionals for the Debtors.  These meetings have allowed the

Debtors to keep the Creditors' Committee members and professionals informed as to upcoming

issues, such as motions to be heard at the monthly omnibus hearings, the status of the Debtors'

transformation plan, and actions to be undertaken in furtherance of that plan.  In addition, monthly

meetings have provided a forum in which to address general and specific concerns that the

Creditors' Committee may have.  The Debtors believe that these efforts have likely eliminated

potential objections that the Creditors' Committee might have lodged to some of the Debtors'

motions by communicating with the Creditors' Committee in advance of filings and anticipated

transactions, thus avoiding some unnecessary litigation expenses.  Skadden assisted the Debtors in

preparing for these meetings, including the coordination of financial information and status reports

regarding implementation of various orders and other relevant matters.

56.    Skadden also continued to respond to informal information requests by the

Creditors' Committee professionals, pursuant to which the Debtors provided additional

information about the exercise of the authority granted under first-day orders, their financial

28

situation, and background on various motions contemplated by the Debtors.  Moreover, with

Skadden's assistance, the Debtors and Creditors' Committee negotiated an information sharing

protocol designed, among other things, to protect privilege, which was presented to this Court for

its approval.  These efforts by the Debtors and Skadden have continued to foster a productive

working relationship between the Debtors and the Creditors' Committee.

57.    Furthermore, as the Court is aware, during the Application Period, the

Debtors continued to respond to creditors' requests for appointment to the Creditors' Committee.

On February 17, 2006, GM filed a motion seeking appointment by this Court to the Creditors'

Committee (Docket No. 2443).  Skadden worked closely with the Debtors to evaluate this request

and communicate their views on this request to the appropriate parties, including filing a statement

in response on March 2, 2006 (Docket No. 2642).  Ultimately, in the face of several objections

from the U.S. Trustee, the Creditors' Committee, and others, on March 8, 2006, GM withdrew its

motion (Docket No. 2746).

58.    In addition, during the Application Period, Law Debenture Trust Company

of New York ("Law Debenture") sought to be appointed to the Creditors' Committee.  The Court

denied this request (Docket No. 1607).  In response to this Court's February 8, 2006 denial of Law

Debenture's motion, on February 17, 2006 (Docket No. 2199), Law Debenture filed a motion for

leave to appeal pursuant to 28 U.S.C. §§ 158(a)(3) and 1292(b) and the collateral order doctrine

(Docket No. 2429).  On March 1, 2006, the Debtors, with the assistance of Skadden, filed a

response opposing this motion.  On April 13, 2006, Skadden represented the Debtors on this matter

in a status conference before the District Court for the Southern District of New York.  During the

status conference, the United States District Court noted that the Debtors' chapter 11 cases will

29

continue to proceed while Law Debenture's motion is pending and gave no indication that it would

rule on Law Debenture's motion in the near future.[23]

59.    In addition, one of the key issues that arose during the Application Period

related to Appaloosa efforts to establish an official committee of equity security holders.

Specifically, during the Application Period, Skadden assisted the Debtors in opposing the Motion

of Appaloosa Management L.P. Pursuant To 11 U.S.C. §1102(a)(2) For An Order Directing The

United States Trustee To Appoint An Equity Committee In These Chapter 11 Cases (Docket No.

1604).

60.    Skadden spent substantial time during the Application Period assisting the

Debtors in preparing for this litigation.  During the Application Period, Skadden responded to

substantial discovery requests from Appaloosa, including gathering responsive documents and

reviewing the documents for relevance, privilege, and confidentiality, prepared declarations in

support of the Debtors' opposition, prepared and defended witnesses for three depositions,

responded to motions to quash and motions to compel, and prepared and reviewed expert reports.

Ultimately, the Debtors reviewed and produced 17,244 pages of documents in connection with the

discovery process.  In addition, the Debtors, with Skadden's assistance, issued discovery requests

to Appaloosa, pursuant to which Skadden received and reviewed over 3,500 pages of documents.

Skadden also deposed three expert witnesses offered by Appaloosa.  As the hearing drew nearer,

the Debtors, with Skadden's assistance, prepared exhibits for trial and negotiated the entry of

exhibits with the other parties involved in the litigation.  In total, there were 246 exhibits entered

into evidence for the summary proceeding.  This Court conducted a two-day evidentiary hearing

on this matter on March 21 and 22, 2006, following which, on March 22, 2006, the Court granted

---

[23]    On July 5, 2006, in the United States District Court for the Southern District of New York, Judge Cote denied Law
Debenture's motion for leave to appeal.

the motion to appoint the Equity Committee to represent the interests of the Delphi's stockholders in these Reorganization Cases. On March 30, 2006, this Court issued an order directing the appointment of an Equity Committee with a substantially more limited role in these Reorganization Cases than the Creditors' Committee or that role sought by Appaloosa. On April 30, 2006, the U.S. Trustee appointed the Equity Committee.

61.    Following the appointment of the Equity Committee, the Debtors began meeting with the Equity Committee and responding to various requests for information issued by the Equity Committee. As with the Creditors' Committee, the Debtors have commenced monthly meetings with the Equity Committee, including one such meeting during the Application Period on May 3, 2006 lasting more than three hours at which the Debtors presented a 241-page presentation (with additional exhibits) that was designed to "level up" the Equity Committee with other stakeholders regarding major issues in the Reorganization Cases. In addition, numerous working group meetings have been conducted following the May 3, 2006 meeting, including a professionals' meeting on May 11, 2006. Skadden has assisted the Debtors in preparation for these meetings and has been in regular communication with counsel for the Equity Committee. Moreover, the Debtors, with the assistance of Skadden, have been providing the Equity Committee, as well as Appaloosa, with substantial amounts of information, including information filed with respect to the 1113/1114 Motion and materials related to the GM Contract Rejection Motion.

62.    During the Application Period, Skadden also advised the Debtors with respect to, and represented the Debtors at the meeting of creditors held pursuant to section 341 of the Bankruptcy Code (the "341 Meeting"), which was held on February 3, 2006. At the 341 Meeting, the Debtors, assisted by Skadden, provided those in attendance a short presentation of the

31

background of the Company and the status of the Reorganization Cases prior to answering questions of the U.S. Trustee and participating creditors.

       63.     In connection with the foregoing services, Skadden expended 3,068.6 hours during the Application Period for which Skadden seeks compensation of $1,527,032.[24] Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-3. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Neil MacDonald | $540 | 410.7 | $221,778 |
| David E. Springer | $755 | 225.0 | $169,876 |
| Sina Toussi | $540 | 292.7 | $158,058 |
| John Guzzardo | $375 | 395.8 | $148,426 |
| John (Jack) Wm. Butler, Jr. | $835 | 159.0 | $132,766 |
| Brian M. Fern | $485 | 245.5 | $119,069 |
| Kayalyn Marafioti | $795 | 117.1 | $93,096 |
| Dhananjai Shivakumar | $560 | 156.0 | $87,360 |
| Ron E. Meisler | $540 | 156.6 | $84,564 |
| Thomas J. Matz | $560 | 136.2 | $76,272 |
| Allison V. Herriott | $375 | 203.0 | $76,126 |
| Haim Zaltzman | $335 | 117.8 | $39,463 |
| Venera K. Ziegler | $510 | 26.8 | $13,668 |
| Nathan L. Stuart | $440 | 30.2 | $13,288 |
| M. Janine Jjingo | $295 | 44.9 | $13,246 |
| Gregory O. Ogunsanya | $440 | 16.0 | $7,040 |
| Randall G. Reese | $465 | 8.5 | $3,953 |
| Dolores De Elizalde | $440 | 5.8 | $2,552 |
| John K. Lyons | $695 | 3.5 | $2,433 |
| George N. Panagakis | $755 | 2.4 | $1,812 |

---

[24]   Skadden's first interim fee application requested fees in the amount of $415,954, or 4.5% of the total amount requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Joseph N. Wharton | $485 | 2.5 | $1,213 |
| Marie L. Gibson | $540 | 2.0 | $1,080 |
| Paraprofessional Total | | 310.6 | $59,893 |
| **Total** | | **3,068.6** | **$1,527,032 (13.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$23,375** |

D.    Case Administration

64.    This category of time is comprised of matters relating to, among other things, (a) general communications with creditors and other parties in interest, (b) general case administration, including duties pertaining to service of process and pleading and file maintenance, (c) general preparation for, and attendance at, court hearings, (d) general advice with respect to the prosecution of the Reorganization Cases, and (e) general advice with respect to the rights and duties of debtors-in-possession in the administration of the Reorganization Cases.

65.    Given the size and complexity of these Reorganization Cases – the Debtors comprise the largest industrial company to ever seek chapter 11 relief – the Debtors and Skadden were presented with a unique set of challenges in administering the cases, tracking motions filed by others, responding to inquiries from parties-in-interest, and maintaining organization and control over a case that could quickly have become disorganized if attention were not provided to case administration matters on a continual basis.

66.    Thus, for instance, Skadden worked closely with the Debtors, this Court's Clerk's Office, representatives of this Court's Chambers, the U.S. Trustee's Office, the Debtors' notice and claims agent (Kurtzman Carson Consultants LLC ("KCC")), the Debtors' public relations advisors, and the Debtors' other advisors in coordinating the various procedures and processes to aid in the administration of the Reorganization Cases, including a dedicated website, telephone hotlines, and e-mail information sites to assist in responding to the numerous inquiries

that this case has generated.  At the commencement of the Reorganization Cases, the Debtors and Skadden established a telephone hotline that provides basic information to callers and allows them to leave messages that Skadden can return.  During the Application Period, nearly 180 messages were submitted to the hotline.  In addition, numerous parties contacted Skadden directly with their inquires.  Where necessary, Skadden researched responses to more complicated voicemail messages and otherwise responded to inquiries tendered through the hotline.  A considerable amount of time was devoted to these efforts.

67.    Skadden also estimates that it received approximately 450 pieces of written correspondence during the Application Period, all of which were routed to appropriate professionals within Skadden and responded to either orally or in writing.  Skadden necessarily devoted significant resources responding to these matters.  These efforts assured responsive answers to parties, ensured that the Debtors continued to conduct their affairs in accordance with the Bankruptcy Code and applicable nonbankruptcy law, and also assisted the Debtors and their estates by resolving numerous matters that otherwise may have resulted in pleadings filed with this Court.

68.    In addition to communications matters, Skadden maintained various files critical to enable Skadden and others to address promptly issues that arose during the Application Period.  Skadden reviewed all pleadings and orders filed in the Reorganization Cases and worked with KCC to ensure that entities entitled to notice were kept informed of significant events in the Reorganization Cases.  The efficient management of administrative matters in a paper-intensive case of this size is a significant task.  Each week, the Debtors and Skadden are inundated with correspondence, documents, requests, pleadings, and other papers.  During the Application Period, nearly 1,950 items have been docketed.  On average, then, at least 16 pleadings were filed and

34

docketed each day (including weekends and holidays) during the 120 days covered by the

Application Period.  As of May 31, 2006, nearly 4,200 items had been docketed since the Petition

Dates.

69.    Given this volume of activity, Skadden maintained various procedures to

create efficiencies in the management of the Reorganization Cases and to avoid unnecessary

duplication of effort between its own professionals and its advisors.  For instance, during the

Application Period, Skadden kept detailed calendars of future events in the Reorganization Cases

and maintained other planning tools to ensure that critical deadlines were met in this large and

highly complicated case.

70.    Despite the streamlined notice procedures authorized by this Court,

Skadden is required to devote substantial attention and resources to service and related matters in

these cases.  As of the end of the Application Period, there were approximately 390 parties who

had filed a notice of appearance or request for notice in these cases (the "2002 List Parties") and

approximately 60 parties are listed on the Master Service List[25] in these cases.  Skadden devotes a

great deal of time updating and maintaining these lists to ensure proper notice: they review each

pleading filed and update the entities that firms represent as well as record relevant addresses, they

review all electronic and written correspondence to ensure all lists are accurate, and they review all

notices of appearance to ensure that no party in interest is inadvertently excluded from a mailing.

71.    Obviously the great number of parties who have appeared in these

proceedings and the time-sensitive nature of many of the pleadings and replies that must be filed

---

[25]    The Master Service List is comprised of (a) the Debtors and their counsel, (b) the Office of the United States
Trustee, (c) the members of and counsel for each Committee, (d) counsel for the agent under the Debtors'
prepetition credit facility, (e) counsel for the agent under the Debtors' postpetition credit facility, and (f) those
parties which may be added to the Master Service List by the Debtors upon written request to the Debtors or as
may be otherwise ordered by the Court for good and sufficient cause pursuant to the Local Rules and as required
in the Debtors' case management order.

require a great deal of coordinated effort among Skadden.  There are many matters that require

special notices of particular items that significantly expand these duties.  Thus, Skadden maintains

and continually updates separate notice lists for various parties including the DIP lenders,

landlords, and unions and their respective advisors.

72.    In addition to communications and service matters, Skadden devoted

significant time preparing for and attending the omnibus and off-omnibus hearings that this Court

has established.  The omnibus hearings have streamlined the administration of these

Reorganization Cases by establishing a schedule known to all parties in interest for Court hearings,

thus eliminating unnecessary time and expenses spent appearing before the Court on numerous

occasions each month.  The internal coordination of motions, responses, objections, witnesses, and

other related matters, however, requires close and careful attention by the entire Skadden team.

Indeed, the monthly omnibus hearing agendas that Skadden prepares require significant attention

by numerous Skadden professionals beginning weeks before each hearing.  In most instances, a

carefully coordinated team of a limited number of Skadden attorneys attend the hearings to meet

with numerous parties in interest who appear and to resolve as many issues as possible.  Moreover,

following the hearings, Skadden must, on some occasions, modify proposed orders to comply with

the Court's rulings and subsequently submit those orders to this Court for signature and docketing.

73.    During the Application Period, there have been four omnibus and seven

significant off-omnibus hearings.  Approximately 53 discrete matters have been heard at these

hearings.  As this Court is aware, the Debtors, with the assistance of Skadden and the Debtors'

other professionals, have succeeded in presenting the great majority of these matters as

uncontested or resolved.  There have been relatively few contested matters in these cases, and even

fewer matters that actually required contested evidentiary hearings.  But for the coordinated efforts

of Skadden (as well as the Debtors' other retained professionals) in connection with these hearings, this simply would not be possible.

74.     Moreover, on almost a daily basis, Skadden advises the Debtors' management of the Debtors' rights and duties as debtors-in-possession, noting proscribed, permitted, and required conduct.  Skadden frequently advises the Debtors' management with respect to specific business questions posed by management and by events occurring in the Reorganization Cases.  Part of Skadden's advice in this regard involves the participation of Skadden in periodic planning and strategy conferences with the Debtors' senior management team.

75.     To assist the Debtors in continuing to perform their fiduciary duties, Skadden works with the Debtors in implementing procedures for the Debtors to operate their businesses in accordance with the requirements of the Bankruptcy Code.  Skadden reviews certain of the Debtors' proposed expenditures, contractual relationships, dispositions of property and other transactions to aid the Debtors in evaluating whether the contemplated transactions are within the ordinary course of business or are outside the ordinary course of business and require Court approval.

76.     In connection with the foregoing services, Skadden expended 1,828.3 hours during the Application Period for which Skadden seeks compensation of $603,278.[26]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-4.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

---

[26]    Skadden's first interim fee application requested fees in the amount of $1,136,809, or 12.4% of the total amount requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Ron E. Meisler | $540 | 151.0 | $81,540 |
| Thomas J. Matz | $560 | 129.7 | $72,632 |
| Kayalyn Marafioti | $795 | 84.4 | $67,098 |
| Allison V. Herriott | $375 | 93.2 | $34,951 |
| John (Jack) Wm. Butler, Jr. | $835 | 25.9 | $21,627 |
| John K. Lyons | $695 | 30.8 | $21,406 |
| Brian M. Fern | $485 | 30.0 | $14,551 |
| Lisa B. Diaz | $295 | 47.0 | $13,865 |
| Venera E. Ziegler | $510 | 26.7 | $13,617 |
| Matthew J. Micheli | $440 | 21.7 | $9,548 |
| Sina Toussi | $540 | 15.2 | $8,208 |
| Haim Zaltzman | $335 | 22.4 | $7,505 |
| Randall G. Reese | $465 | 12.7 | $5,907 |
| Nathan L. Stuart | $440 | 12.0 | $5,280 |
| Dolores De Elizalde | $440 | 10.5 | $4,620 |
| Joseph N. Wharton | $485 | 6.7 | $3,250 |
| Dionysios V. Tsiros | $295 | 10.5 | $3,098 |
| M. Janine Jjingo | $295 | 7.5 | $2,213 |
| Paraprofessional Total | | 1,090.4 | $212,362 |
| **Total** | | **1,828.3** | **$603,278 (5.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$79,344** |

E.      Supplier Matters

        77.     As stated above, Delphi is the largest industrial company ever to seek

chapter 11 relief.  The Debtors' manufacturing operations depend upon the timely delivery of

goods and services from thousands of separate suppliers that are party to more than 96,000 distinct

supply agreements.  Management of the Debtors' supply chain issues was further complicated by

the Debtors' reliance, consistent with normal automotive industry practice, on "just-in-time"

inventory management systems and "sole source" supply methods.  As discussed in detail in

38

motions filed earlier in these cases,[27] use of the just-in-time supply method means that the Debtors

do not maintain a significant inventory of the components supplied by many of their suppliers.

Pursuant to the sole source supply method, the Debtors frequently purchase all their requirements

for a particular part from one supplier, each of which must meet demanding specifications imposed

by both the Debtors and their original equipment manufacturer ("OEM") customers before they

can be used in manufacturing the Debtors' products.

78.    The Debtors' use of just-in-time inventory management and sole source

supply methods results in, among others, the following unique risks to the Debtors' businesses:

(a) a failure by a supplier to timely ship goods may force the Debtors' manufacturing facilities

using those parts to shut down less than 24 hours after the missed shipment and the Debtors' OEM

customer's manufacturing facilities to shut down less than 48 hours after the missed shipment, and

(b) the Debtors are unable to re-source parts to another supplier in the short term.  The Debtors'

postfiling supply chain management has been further complicated by the fact that many of the

Debtors' suppliers are facing similar financial pressures to those faced by the Debtors and are in a

tenuous financial position as well.  The financial instability of some such suppliers was

significantly exacerbated by the Debtors' chapter 11 filings and the large prepetition amounts owed

to suppliers at the time of the Debtors' filings.

79.    In the prior application period, this Court entered an order, dated December

12, 2005 (Docket No. 1494) (the "SAAP Order") granting the Debtors authority to assume

agreements covering the supply of goods that the Debtors determine are critical to their on-going

---

[27]    See, e.g., Motion for Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, and 1108 and Fed. R. Bankr. P. 6004 and
9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of
Financially-Distressed Sole Source Suppliers and Vendors Without Contracts, dated October 13, 2005 (Docket
No. 17); Motion for Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving
Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements, dated November 18,
2005 (Docket No. 1098).

business operations.  The Debtors sought entry of the SAAP Order to develop and implement procedures to effectively and rapidly address issues relating to expiring supply agreements and implementation of the relief granted by the Court pursuant to the SAAP Order.  During the Application Period, Skadden assisted the Debtors with regard to implementation of the SAAP Order, and the Debtors have assumed numerous agreements pursuant to the Order.  This required the Debtors, with the assistance of Skadden, to negotiate a significant number of assumption agreements with multiple suppliers.  During the Application Period, Skadden also spent time negotiating with suppliers regarding the extension or replacement of expiring supply agreements, including pursuant to the procedures approved by the Court in the SAAP Order.

80.    During the Application Period, the Debtors also worked with suppliers which had filed adversarial motions to consensually resolve the disputes raised by those motions, including, for example, the Motion To Compel Assumption/Rejection Of Supplier Contracts With LBQ Foundry S.A. De C.V. and Aramark Services, Inc.'s Motion For Relief From Automatic Stay To Proceed With Termination Of Catering Agreement.  In addition, on behalf of the Debtors, Skadden obtained from this Court entry of an order authorizing the Debtors' rejection of certain license and supply agreements with Inovise Medical, Inc.  Rejection of the Invoise agreement freed Delphi Medical Systems Corporation from the burdensome financial commitments required under the agreement and allowed Delphi Medical Systems Corporation to use preferred alternative technology.

81.    In connection with the foregoing services, Skadden expended 1,014.1 hours during the Application Period for which Skadden seeks compensation of $539,862.[28]  Detailed

---

[28]    Skadden's first interim fee application requested fees in the amount of $1,032,388, or 11.2% of the total amount requested in the first interim fee application for this matter.

time entries of each Skadden professional related to these services are attached hereto as Exhibit
D-5. A summary of the hours incurred and value of the services performed by each professional is
provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Randall G. Reese | $465 | 503.9 | $234,315 |
| John K. Lyons | $695 | 315.1 | $218,995 |
| Allison V. Herriott | $375 | 56.9 | $21,338 |
| Sina Toussi | $540 | 38.8 | $20,952 |
| Matthew J. Micheli | $440 | 24.6 | $10,824 |
| Ron E. Meisler | $540 | 18.6 | $10,044 |
| Nathan L. Stuart | $440 | 19.5 | $8,580 |
| Thomas J. Matz | $560 | 9.8 | $5,488 |
| Haim Zaltzman | $335 | 16.0 | $5,360 |
| Lisa B. Diaz | $295 | 9.4 | $2,773 |
| Kayalyn A. Marafioti | $795 | 1.5 | $1,193 |
| **Total** | | **1,014.1** | **$539,862 (4.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$13,388** |

F.    Retention/Fee Matters/Objections (Others)

82.    Reorganization cases as large and complex as these require the coordinated
efforts of a number of restructuring advisors and professionals. To this end, during the Application
Period, Skadden worked with the Debtors and their other professionals in retaining approximately
13 such professionals in these cases. Where necessary, Skadden conferred with the Debtors and
the professionals and provided assistance with evaluating discrete issues affecting the Debtors'
retention of these professionals.

83.    In addition, during the Application Period, Skadden advised the Debtors in
retaining, pursuant to the Order Under 11 U.S.C. §§ 327, 330, and 331 Authorizing Retention Of
Professionals Utilized By Debtors In Ordinary Course Of Business (the "Ordinary Course
Professionals Order"), approximately 40 ordinary course professionals who provide the Debtors

41

with a host of non-restructuring legal, accounting, and other professional services. Because the

Ordinary Course Professional Order requires any ordinary course professional to file an affidavit

prior to being retained and compensated by the Debtors, Skadden assisted the Debtors in tracking

which professionals had filed such affidavits and when the expiration of the individual objection

periods had occurred, permitting the Debtors then to pay such ordinary course professionals.

84.    In accordance with the requests of the U.S. Trustee, the Ordinary Course

Professionals Order requires that any ordinary course professional whose fees exceed $50,000 per

month or $500,000 in the aggregate during the pendency of these Reorganization Cases must be

retained pursuant to a formal retention application to receive future compensation from the

Debtors. Accordingly, during the Application Period, Skadden assisted approximately seven of

the Debtors' ordinary course professionals in preparing and filing their formal retention

applications. In addition, during this period, Skadden began the process of preparing additional

retention applications, which were subsequently filed after this Application Period.

85.    In connection with the foregoing services, Skadden expended 1,119.5 hours

during the Application Period for which Skadden seeks compensation of $431,545.[29] Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

D-6. A summary of the hours incurred and value of the services performed by each professional is

provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Dolores De Elizalde | $440 | 319.1 | $140,404 |
| Venera E. Ziegler | $510 | 160.8 | $82,008 |
| Haim Zaltzman | $335 | 151.0 | $50,586 |

---

[29]    Skadden's first interim fee application requested fees in the amount of $377,176, or 4.1% of the total amount
requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|---|---|---|---|
| Thomas J. Matz | $560 | 75.7 | $42,392 |
| M. Janine Jjingo | $295 | 73.0 | $21,535 |
| Ron E. Meisler | $540 | 30.2 | $16,308 |
| Dionysios V. Tsiros | $295 | 41.4 | $12,214 |
| John K. Lyons | $695 | 13.3 | $9,244 |
| Kayalyn A. Marafioti | $795 | 10.6 | $8,428 |
| Lisa B. Diaz | $295 | 19.4 | $5,723 |
| John (Jack) Wm. Butler, Jr. | $835 | 6.0 | $5,011 |
| Catherine E. Danz | $465 | 4.1 | $1,907 |
| Nathan L. Stuart | $440 | 3.9 | $1,716 |
| Gregory O. Ogunsanya | $440 | 3.5 | $1,540 |
| Paraprofessional Total | | 207.5 | $32,529 |
| **Total** | | **1,119.5** | **$431,545 (3.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$19,963** |

### Matters Between $100,000 And $400,000

G.    Nonworking Travel Time

86.    Because of the extensive breadth of services that Skadden is providing the Debtors in these Reorganization Cases, Skadden draws upon the experience and talent of a number professionals from its worldwide organization including offices located in Chicago, New York, Washington, D.C., Los Angeles, and London, England.  As this Court is aware, the Debtors are headquartered in Troy, Michigan, members of the Creditors' Committee are based in several states across the U.S., the Debtors' postpetition lenders are based in New York, and many of the Debtors' other primary constituencies, including its unions and GM, are based in Michigan.  As a consequence of these disparate locations and the Debtors' expectation and determined need that Skadden partners, associates, paraprofessionals be on site in Michigan on a weekly basis as well as in other locations including New York and Washington D.C.  Skadden frequently must travel among these and other locations as necessary to meet with the Debtors' Board of Directors and

43

senior management, creditor constituencies, and to attend Court hearings.  Skadden's professionals

who spend time traveling, but not otherwise working, allocate their time to this billing category.

        87.      Skadden expended 1,312.3 hours during the Application Period devoted to

non-working travel time for which Skadden seeks compensation of $376,303.[30]  This amount

reflects a fifty percent (50%) reduction from Skadden's guideline hourly rates.  Detailed time

entries of each Skadden professional are attached hereto as <u>Exhibit D-7</u>.  A summary of the hours

incurred and value of the travel time for each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| John (Jack) Wm. Butler, Jr. | $418 | 217.6 | $90,854 |
| John K. Lyons | $348 | 131.0 | $45,523 |
| Ron E. Meisler | $270 | 133.2 | $35,964 |
| Randall G. Reese | $232 | 134.1 | $31,178 |
| Dhananjai Shivakumar | $280 | 70.6 | $19,768 |
| David E. Springer | $377 | 47.0 | $17,742 |
| Matthew J. Micheli | $220 | 79.8 | $17,556 |
| Allison V. Herriott | $188 | 78.8 | $14,776 |
| Brian M. Fern | $243 | 58.5 | $14,187 |
| Neil MacDonald | $270 | 42.7 | $11,529 |
| George N. Panagakis | $378 | 30.5 | $11,514 |
| Eric L. Cochran | $398 | 26.5 | $10,534 |
| Joseph N. Wharton | $243 | 37.0 | $8,973 |
| John Guzzardo | $188 | 41.2 | $7,725 |
| Nick D. Campanario | $233 | 33.1 | $7,697 |
| Nathan L. Stuart | $220 | 33.7 | $7,414 |
| John P. Furfano | $385 | 13.8 | $5,314 |
| Marian P. Wexler | $385 | 7.9 | $3,042 |
| Kenneth Berlin | $385 | 5.9 | $2,272 |
| Peter A. Atkins | $418 | 5.4 | $2,255 |

---

[30]    Skadden's first interim fee application requested fees in the amount of $290,270, or 3.2% of the total amount
requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Haim Zaltzman | $168 | 12.8 | $2,145 |
| Courtney E. VanLonkhuyzen | $188 | 7.6 | $1,425 |
| Melissa T. Kahn | $205 | 6.5 | $1,333 |
| Paraprofessional Total | | 57.1 | $5,583 |
| **Total** | | **1,312.3** | **$376,303 (3.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$445,322**[31] |

## H.    Asset Dispositions (General)

88.    The Debtors have stated that to achieve the necessary cost savings and operational effectiveness envisioned in their transformation plans, a substantial segment of Delphi's U.S. business operations will need to be divested, consolidated, or wound-down through the chapter 11 process. During the Application Period, Skadden allocated significant resources advising the Debtors with respect to various contemplated divestitures of significant assets.

89.    Of particular note, during the Application Period, Skadden advised the Debtors with respect to the resolution of post-closing matters in relation to the Company's 2005 prepetition sale of its global battery business to Johnson Controls, Inc. ("JCI"). Specifically, Skadden assisted the Debtors with the disposition of the Company's money-losing battery manufacturing facility in New Brunswick, New Jersey and the planned transition to JCI of battery production out of the Fitzgerald, Georgia facility. The Company was unable to sell the New Brunswick facility in 2005 because of a "no-sale" clause in the collective bargaining agreement between the Company and the IUE-CWA, the union representing the hourly employees at the New Brunswick facility, requiring the IUE-CWA's consent to sell that facility. Because JCI could not fill existing customer needs with its own manufacturing facilities, the Company agreed to keep operating the Fitzgerald and New Brunswick facilities to sell batteries exclusively to JCI. At the

---

[31]    Prior to taking a 50% reduction to the guideline hourly rates, Skadden eliminated approximately 110.1 hours of billable time during the Application Period as an additional accommodation to the Debtors.

45

time of the Application Period, the New Brunswick facility was losing approximately $3 million per month and the Fitzgerald facility was losing approximately $2 million per month.

90.     Accordingly, the Debtors sought, with Skadden's assistance, the expeditious disposition of these facilities to stem these losses.  In particular, Skadden worked with the Debtors to negotiate a transfer agreement with JCI and to file a motion to obtain this Court's approval of such agreement, which provided for (a) the sale of the New Brunswick facility to JCI, (b) the continued supply of batteries as well as the orderly transition of production to JCI from the Fitzgerald facility, (c) the implementation of an attrition plan with the IUE-CWA providing for a reduction to encourage the consensual separation of approximately 200 of the facility's 300 hourly employees, (d) the payment of $12.5 million from JCI to mitigate a majority of the costs of that attrition plan, and (e) the IUE-CWA's waiver of the no-sale clause and certain neutrality obligations with respect to the New Brunswick facility.

91.     In addition to stemming losses from two money-losing facilities, this postpetition transfer agreement also allocated risks and obligations from those two plants in a manner that benefits the Debtors, provided for a "soft landing" for the hourly employees at the New Brunswick facility, and telegraphed the Debtors' intent to manage environmental liabilities at the New Brunswick facility.  Finally, this transfer agreement facilitated the payment of economic support from GM to Delphi pursuant to a separate agreement between the parties executed in connection with the 2005 sale of the global battery business, under the terms of which GM agreed, upon the sale of the New Brunswick facility to JCI, to provide financial support for the Company to transform its U.S. battery plant operations to be more efficient and competitive.

92.     In addition, during the Application Period, Skadden assisted the Debtors in preparing for their first sale of assets in chapter 11 through an auction process.  In connection with

46

the sale of the assets of MobileAria, Inc.("MobileAria"), an Affiliate Debtor, during the

Application Period, Skadden worked closely with DLA Piper Rudnick Gray Cary US LLP,

MobileAria's outside corporate counsel, and Pagemill Partners, LLC, MobileAria's investment

banker, to advise MobileAria with respect to the various bankruptcy considerations at issue in

connection with the sale.  Specifically, Skadden analyzed various bidding procedures used in

different cases, began drafting pleadings requesting authority to facilitate the sale and other

documents in furtherance of this transaction, including proposed bidding procedures and notices of

assumption and/or assignment and cure, analyzed the bids submitted by interested parties,

reviewed and revised the proposed form of asset sale agreement distributed to bidders, and advised

the client with respect to the sale process and reaching an agreement with a stalking horse bidder.[32]

Finally, with the assistance of its advisors, the Debtors have begun the process of identifying

additional assets that may be subject to divestiture, consolidation, or wind-down.

93.    In connection with the foregoing services, Skadden expended 701.7 hours

during the Application Period for which Skadden seeks compensation of $375,042.[33]  Detailed

time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit</u>

---

[32]  On May 6, 2006, MobileAria filed a Motion For Orders Under 11 U.S.C. Sections 363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014 (A) Approving (I) Bidding Procedures, (II) Certain Bid Protections, (III) Form And Manner Of Sale Notices, And (IV) Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of Certain Of The Debtors' Assets Comprising Substantially All Assets Of MobileAria, Inc. Free And Clear Of Liens, Claims, And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (III) Assumption Of Certain Liabilities (Docket No. 4040).  On June 22, 2006 , this Court entered Order Under 11 U.S.C. § 105(a) and Fed.R.Bankr.P. 2002 and 9014 Approving (I) Bidding Procedures, (II) Certain Bid Protections, (III) Form and Manner of Sale Notices, and (IV) Setting of a Sale Hearing  (Docket No. 4328).  The auction for the assets of MobileAria, Inc. was held on July 6, 2006 and the sale hearing was held on July 19, 2006.

[33]  Skadden's first interim fee application requested fees in the amount of $117,199, or 1.3% of the total amount requested in the first interim fee application for this matter.

D-8.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| John K. Lyons | $695 | 166.7 | $115,857 |
| Joseph N. Wharton | $485 | 182.9 | $88,707 |
| Ron E. Meisler | $540 | 128.2 | $69,228 |
| Venera E. Ziegler | $510 | 63.3 | $32,283 |
| Randall G. Reese | $465 | 34.6 | $16,089 |
| Nathan L. Stuart | $440 | 36.4 | $16,016 |
| Marian P. Wexler | $770 | 6.8 | $5,236 |
| Dionysios V. Tsiros | $295 | 15.8 | $4,661 |
| Allison V. Herriott | $375 | 10.7 | $4,013 |
| Lisa B. Diaz | $295 | 12.7 | $3,747 |
| Thomas J. Matz | $560 | 5.8 | $3,248 |
| Kayalyn A. Marafioti | $795 | 3.7 | $2,942 |
| Melissa T. Kahn | $410 | 6.5 | $2,665 |
| Haim Zaltzman | $335 | 5.6 | $1,876 |
| John (Jack) Wm. Butler, Jr. | $835 | 2.2 | $1,838 |
| Sina Toussi | $540 | 3.2 | $1,728 |
| M. Janine Jjingo | $295 | 4.6 | $1,357 |
| Eric L. Cochran | $795 | 1.4 | $1,113 |
| Paraprofessional Total | | 10.6 | $2,438 |
| **Total** | | **701.7** | **$375,042 (3.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$18,137** |

I.    Employee Matters (General)

94.    As of the Petition Dates, the Company employed approximately 180,000 employees worldwide, of which 50,600 were employees in the United States at approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters. Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Petition Dates, and 96% of these are union-represented.  Outside the United States, as of the same date, the

Company's foreign entities employed more than 134,000 people on the Petition Dates, supporting

120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

95.     During these Reorganization Cases, the Debtors anticipate restructuring the

compensation programs of all of their employees to market-competitive levels.  Among other

human capital programs, Skadden, along with other advisors to the Debtors, advised the Debtors in

connection with the Debtors' reassessment of the employment proposition that the Company could

offer its executive workforce in light of current U.S. and marketplace economic realities.  The

result of this evaluation led to Skadden's drafting, prior to the Application Period, of a motion (the

"KECP Motion") to implement a key employee compensation program ("KECP") based on

recommendations made by the Debtors' outside compensation consultant as adopted by the

Compensation Committee of Delphi's Board of Directors.  The KECP Motion was objected to by

11 parties: the Creditors' Committee, the U.S. Trustee, five unions, the PBGC, the agent under the

Debtors' prepetition credit facility, the indenture trustee to Delphi's senior unsecured securities,

and "the Court-appointed Lead Plaintiffs" in the consolidated securities class action entitled In re

Delphi Corp. Securities Litigation, Master File No. 1:05-CV-2637 (NRB) (S.D.N.Y. 2005) (the

"Lead Plaintiffs") (collectively, the "KECP Objectors").  Prior to the Application Period, Skadden

served discovery on many of the KECP Objectors, and some KECP Objectors served discovery of

their own on the Debtors.  In response to the parties' various pre-hearing discovery requests, both

prior and during the Application Period Skadden reviewed and produced more than 5,000 pages of

documents related to the KECP.  In addition, during the Application Period, Skadden took the

depositions of witnesses from various union objectors.  On February 10, 2006, the Bankruptcy

Court conducted an evidentiary hearing on the Debtors' request to restore a limited portion of the

at-risk compensation opportunities available to the Debtors' executives prepetition by

implementing a short-term annual incentive program ("AIP") for the first six months of 2006.  On February 17, 2006 the Court approved the AIP proposed by the Debtors (Docket No. 2441).[34]

96.    In addition, as part of the Debtors' organizational restructuring, the fourth element of its transformation plan, the Debtors expect to reduce their global salaried workforce by as many as 8,500 employees as a result of portfolio and product realizations and initiatives adopted following an analysis of the Debtors' SG&A cost savings opportunities.  On May 30, 2006 the Debtors, with the assistance of Skadden, obtained Court approval to enter into two agreements with Booz Allen Hamilton Inc. to provide ongoing support for the Debtors' SG&A expenses and organizational transformation (Docket No. 3952).

97.    In connection with the foregoing services, Skadden expended 679.4 hours during the Application Period for which Skadden seeks compensation of $359,097.[35]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-9.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Neil MacDonald | $540 | 139.6 | $75,384 |
| David E. Springer | $755 | 93.1 | $70,291 |
| Brian M. Fern | $485 | 136.7 | $66,300 |
| Nick D. Campanario | $465 | 106.5 | $49,523 |
| John (Jack) Wm. Butler, Jr. | $835 | 40.6 | $33,902 |
| Kayalyn A. Marafioti | $795 | 18.5 | $14,708 |
| Allison V. Herriott | $375 | 34.6 | $12,976 |
| Thomas J. Matz | $560 | 15.9 | $8,904 |

---

[34]    Subsequent to the Application Period, at the July 19, 2006 Omnibus Hearing, the Court approved the Debtors' request to (a) continue the AIP and fix second half 2006 AIP targets and (b) further adjourn the KECP emergence incentive program hearing to October 19, 2006.

[35]    Skadden's first interim fee application requested fees in the amount of $879,786, or 9.6% of the total amount requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Ronald D. Kohut | $410 | 12.0 | $4,920 |
| Ron E. Meisler | $540 | 8.1 | $4,374 |
| John Guzzardo | $375 | 9.9 | $3,713 |
| Nathan L. Stuart | $440 | 7.1 | $3,124 |
| Neil M. Leff | $785 | 3.0 | $2,355 |
| Paraprofessional Total | | 53.8 | $8,623 |
| **Total** | | **679.4** | **$359,097 (3.2%)** |
| **Voluntary fee accommodation  excluded from total:** | | | **$12,860** |

J.    Leases (Real Property)

98.    The Debtors are lessors or lessees with respect to approximately 90 leases

of real property.  Skadden worked closely with the Debtors on matters related to such real property

leases including (a) reviewing the Debtors' existing leases, (b) reviewing proposed new leases, (c)

preserving the Debtors' right to assume, assume and assign, or reject such leases through an

extension of the period within which the Debtors must assume or reject such leases under the

Bankruptcy Code, and (d) conducting negotiations, drafting pleadings, and appearing for the

Debtors at hearings relating to the rejection or renewal of leases (or entry into new leases) and

other matters concerning the disposition of the Debtors' nonresidential real property leases.

99.    In addition, during the Application Period, Skadden prepared notices to

implement the Debtors' business decisions relating to the disposition of certain leases pursuant to

the order entered by this Court approving procedures for the rejection of leases.  In particular, the

Debtors rejected one lease and entered into or renewed five leases.  In addition, the Debtors

successfully settled an objection by a landlord, Universal Tool & Engineering Co., Inc., ("UTE")

which objected to the Debtors' rejection of an Indianapolis, Indiana lease (Docket No. 3462).

Specifically, UTE expressed concerns regarding (a) possible unremediated environmental issues

at the leased site and (b) the abandonment of hazardous and/or burdensome property at the leased premises by the Debtors after April 30, 2006, the proposed effective date of lease rejection. Although the Debtors prepared to litigate the matter, the Debtors, with Skadden's assistance, were able to consensually resolve the issue without the need for a contested hearing.

100.    Finally, the Debtors, with Skadden's assistance, successfully objected to a motion by Cherokee North Kansas City LLC ("Cherokee"), which sought commence the 365(d)(4) deadline with respect to the Missouri lease with Cherokee.  Skadden conducted discovery regarding Cherokee's motion during this period, which involved reviewing and producing hundreds of pages of documents in response to Cherokee's document requests, reviewing documents produced by Cherokee, taking the depositions of Cherokee's two witnesses in Kansas City, Missouri and Denver, Colorado, and preparing for and defending the deposition of John D. Sheehan, Delphi's Chief Restructuring Officer, in Troy, Michigan.  In preparing for the hearing on the motion, Skadden reviewed potential hearing exhibits, developed lines of questioning for cross-examination of Cherokee's witnesses, and prepared Mr. Sheehan to provide testimony for the Debtors.  As a result of these efforts, on April 11, 2006, this Court denied Cherokee's motion (Docket No. 3199).

101.    In connection with the foregoing services, Skadden expended 565.4 hours during the Application Period for which Skadden seeks compensation of $290,834.[36]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-10.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

---

[36]  Skadden's first interim fee application requested fees in the amount of $143,190, or 1.6% of the total amount requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Matthew J. Micheli | $440 | 177.1 | $77,924 |
| Catherine E. Danz | $465 | 137.0 | $63,706 |
| Marian P. Wexler | $770 | 66.1 | $50,897 |
| Ron E. Meisler | $540 | 39.7 | $21,438 |
| David E. Springer | $755 | 25.4 | $19,178 |
| Sina Toussi | $540 | 24.9 | $13,446 |
| Melissa T. Kahn | $410 | 29.0 | $11,890 |
| John A. Amodeo | $580 | 20.0 | $11,600 |
| Nick D. Campanario | $464 | 21.8 | $10,123 |
| Kayalyn A. Marafioti | $795 | 4.6 | $3,658 |
| Randall G. Reese | $465 | 4.8 | $2,232 |
| M. Janine Jjingo | $295 | 5.9 | $1,741 |
| John (Jack) Wm. Butler, Jr. | $835 | 1.5 | $1,253 |
| Paraprofessional Total | | 7.6 | $1,748 |
| **Total** | | **565.4** | **$290,834 (2.6%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$8,393** |

K.       Secured Claims

102.     Throughout the Application Period, the Debtors, with the assistance of Skadden, continued to work and meet with their prepetition lenders to keep them reasonably informed with respect to these Reorganization Cases.

103.     Skadden also devoted time to reconciling requests for setoff under the DIP Financing Order.  Paragraph 18 of the DIP Financing Order sets forth comprehensive procedures by which customers and suppliers of the Debtors can exercise and resolve their setoff rights without having to file motions to lift the automatic stay.  Accordingly, during the Application Period, the Debtors and their advisors devoted time to analyzing and resolving approximately 75 requests by customers and suppliers who sought to exercise setoff rights under the DIP Financing

53

Order.  In seeking to resolve these setoff claims, Skadden devoted considerable effort to tracking

the setoff claims, researching their validity, and ultimately negotiating resolutions of the claims.

104.    Skadden also dealt with a number of issues regarding assertion of liens

against the Debtors.  In particular, on January 16, 2006, four complaints were filed to establish the

validity, extent, and priority of liens, three of which were resolved consensually.  With regard to

the fourth complaint filed by L&W Engineering, Co. and Southtec, LLC, during the Application

Period, the Debtors, with the assistance of Skadden, reviewed the allegations, researched the legal

issues raised by the complaint, and began drafting an answer.  The answer was filed on June 2,

2006, just two days after the end of the Application Period.

105.    In connection with the foregoing services, Skadden expended 567.6 hours

during the Application Period for which Skadden seeks compensation of $266,437.[37]  Detailed

time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit

D-11</u>.  A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Sina Toussi | $540 | 183.8 | $99,252 |
| Venera E. Ziegler | $510 | 149.8 | $76,398 |
| Dolores De Elizalde | $440 | 67.5 | $29,700 |
| Ron E. Meisler | $540 | 21.9 | $11,826 |
| M. Janine Jjingo | $295 | 39.7 | $11,712 |
| Haim Zaltzman | $335 | 32.4 | $10,856 |
| Lisa B. Diaz | $295 | 22.5 | $6,637 |
| Allison V. Herriott | $375 | 15.3 | $5,738 |
| Thomas J. Matz | $560 | 7.7 | $4,312 |

---

[37]    Skadden's first interim fee application requested fees in the amount of $236,983, or 2.6% of the total amount
requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| John (Jack) Wm. Butler, Jr. | $835 | 5.0 | $4,175 |
| Dionysios V. Tsiros | $295 | 6.1 | $1,800 |
| John K. Lyons | $695 | 2.1 | $1,460 |
| Paraprofessional Total | | 13.8 | $2,571 |
| **Total** | | **567.6** | **$266,437 (2.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$9,305** |

L.    <u>General Corporate Advice</u>

106.    During the Application Period, Skadden attended meetings of the Delphi's

Board of Directors which required, among other things, working with the Debtors' various

professionals and the Debtors' senior management to prepare detailed materials for distribution

and discussion.  In connection with these meetings and in the course of the Debtors' daily

operations, in addition to general restructuring advice, Skadden devoted a significant amount of

time advising the Debtors' management and Board of Directors on other general corporate

governance matters as it relates to the reorganization.

107.    Also during the Application Period, Skadden advised the Debtors in

connection with the preparation of the Debtors' regulatory filings with the Securities and Exchange

Commission ("SEC"), including the Debtors' Form 8-Ks, which are issued in connection with

disclosure issues on matters such as material agreements, financial matters, and the Debtors'

monthly operating reports, as well as in connection with internal and external communication

matters.  In addition, during the Application Period, Skadden assisted the Debtors in reviewing and

revising the Form 10-K for the year ended December 31, 2005, which was filed on July 11, 2006.

108.    In connection with the foregoing services, Skadden expended 373.9 hours during the Application Period for which Skadden seeks compensation of $249,312.[38]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-12.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Eric L. Cochran | $795 | 90.7 | $72,108 |
| John (Jack) Wm. Butler, Jr. | $835 | 80.6 | $67,302 |
| Sina Toussi | $540 | 39.5 | $21,330 |
| Marie L. Gibson | $555 | 37.1 | $20,574 |
| Ron E. Meisler | $540 | 26.2 | $14,148 |
| Kayalyn A. Marafioti | $795 | 14.7 | $11,687 |
| Peter A. Atkins | $835 | 10.8 | $9,018 |
| Gregory O. Ogunsanya | $440 | 10.6 | $4,664 |
| Peter Olasky | $375 | 12.4 | $4,650 |
| Randall G. Reese | $465 | 8.7 | $4,046 |
| Neil M. Leff | $785 | 4.3 | $3,376 |
| Lawrence D. Frishman | $755 | 4.3 | $3,247 |
| Louis D. Wilson | $510 | 5.2 | $2,652 |
| Brian M. Fern | $485 | 5.2 | $2,522 |
| Nathan L. Stuart | $440 | 4.2 | $1,848 |
| Marian P. Wexler | $770 | 2.3 | $1,771 |
| Allison V. Herriott | $375 | 3.0 | $1,126 |
| Paraprofessional Total | | 14.1 | $3,243 |
| **Total** | | **373.9** | **$249,312 (2.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$18,759** |

---

[38]    Skadden's first interim fee application requested fees in the amount of $340,687, or 3.7% of the total amount requested in the first interim fee application for this matter.

M.    <u>Global Subsidiaries (Non-U.S.)</u>

109.    During the Application Period, Skadden devoted time advising the Company on matters relating to its non-U.S. global subsidiaries including divestitures, commercial and corporate transactions, and cash management matters that have arisen in the Company's overseas operations.

110.    For example, Skadden gave detailed advice regarding the sale of Shanghai Delco Electronics & Instrumentation Company Ltd. ("SDE"), a Chinese joint venture, to the joint venture partner, which was approved by the Court on March 17, 2006 (Docket No. 2859). Further, Skadden advised on the sale by Delphi Deutschland GmbH of certain of its operations in Germany. This included detailed advice in relation to various intellectual property issues surrounding the sale and assignment by Delphi Technologies, Inc. of certain patents and intellectual property rights to the purchaser. The Debtors, with Skadden's assistance, obtained approval of this sale through the use of the notice procedures set forth in the Order Under 11 U.S.C. § 363 Approving Procedures To Sell Certain <u>De</u> <u>Minimis</u> Assets Free And Clear Of Liens, Claims, And Encumbrances And To Pay Market Rate Broker Commissions In Connection With Such Sales Without Further Court Approval entered by this Court on October 27, 2005 (Docket No. 766). Finally, during the Application Period, Skadden advised the Debtors in relation to proposed strategic arrangements aimed at increasing and streamlining the Debtors' market share in certain of its global businesses.

111.    Furthermore, during the Application Period, Skadden and the Debtors engaged in analyses regarding many discrete issues involving their global subsidiaries. For example, Skadden and the Debtors analyzed setoff global issues including setoffs between non-U.S. global subsidiaries and international suppliers. Finally, Skadden advised the Debtors regarding ongoing U.K. pension issues related to a branch office owned by an Affiliate Debtor.

112.    In connection with the foregoing services, Skadden expended 337.4 hours during the Application Period for which Skadden seeks compensation of $205,234.[39] Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-13. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| N. Lynn Hiestand | $835 | 97.6 | $81,497 |
| Christian Pilkington | $540 | 112.6 | $60,804 |
| Venera E. Ziegler | $510 | 40.8 | $20,808 |
| Sina Toussi | $540 | 27.8 | $15,012 |
| Allison V. Herriott | $375 | 31.0 | $11,625 |
| Ron E. Meisler | $540 | 14.0 | $7,560 |
| Kayalyn A. Marafioti | $795 | 4.8 | $3,816 |
| Nathan L. Stuart | $440 | 6.8 | $2,992 |
| Thomas J. Matz | $560 | 2.0 | $1,120 |
| **Total** | | **337.4** | **$205,234 (1.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$15,441** |

N.    Business Operations/Strategic Planning

113.    This particular matter is comprised of time incurred by Skadden in working with the Debtors' senior management, investment bankers, financial advisors, and other business and legal advisors in considering restructuring strategies and initiatives. Among other matters, senior Skadden lawyers, including Mr. Butler, are expected to participate in weekly meetings at the company including Delphi Transformation Committee meetings. Skadden also participated in numerous strategy sessions, meetings, and calls to consider such major case issues as the Debtors' development of (a) their transformation plan, which they announced publicly on a March 31, 2006,

---

[39]    Skadden's first interim fee application requested fees in the amount of $330,534, or 3.6% of the total amount requested in the first interim fee application for this matter.

(b) a comprehensive, go-forward and a 2006-10 restructuring business plan, and (c) various scenarios, considerations, and ramifications regarding the Reorganization Cases.  Furthermore, Skadden assisted the Debtors with respect to operational issues as they related to these Reorganization Cases, including, without limitation, conducting negotiations with the Creditors' Committee, as well as analyzing certain proposed strategic intercompany transactions.  Skadden also worked with the Debtors' in-house attorneys and key business personnel to explain certain common issues that arise in many chapter 11 cases.

114.    During the Application Period, Skadden also assisted the Debtors in drafting a motion to allow Delphi Automotive Systems LLC ("DAS LLC") to make outstanding, current, and future equity investments in its joint venture (and Affiliate Debtor) Delphi Furukawa Wiring Systems LLC ("DFWS") and to approve notice procedures by which DAS LLC may contribute additional capital to DFWS without further court approval.  These capital contributions will allow the Debtors to maintain an important customer relationship that is expected to result in positive benefits to the estate over the next decade.  This Court approved the motion on March 17, 2006 (Docket No. 2858).

115.    In connection with the foregoing services, Skadden expended 264.7 hours during the Application Period for which Skadden seeks compensation of $192,132.[40]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-14</u>.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

---

[40]    Skadden's first interim fee application requested fees in the amount of $258,753, or 2.8% of the total amount requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| John (Jack) Wm. Butler, Jr. | $835 | 105.9 | $88,427 |
| Eric L. Cochran | $795 | 45.9 | $36,491 |
| Kayalyn A. Marafioti | $795 | 29.9 | $23,772 |
| Ron E. Meisler | $540 | 26.3 | $14,202 |
| Thomas J. Matz | $560 | 17.5 | $9,800 |
| John K. Lyons | $695 | 6.7 | $4,657 |
| Allison V. Herriott | $375 | 10.4 | $3,900 |
| David E. Springer | $755 | 4.5 | $3,398 |
| Nathan L. Stuart | $440 | 4.1 | $1,804 |
| Marie L. Gibson | $585 | 2.8 | $1,638 |
| Randall G. Reese | $465 | 3.3 | $1,535 |
| Sina Toussi | $540 | 2.6 | $1,404 |
| Paraprofessional Total | | 4.8 | $1,104 |
| **Total** | | **264.7** | **$192,132 (1.7%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$6,795** |

O.    Utilities

116.    As of the Petition Dates, the Debtors obtained utility service from approximately 162 utilities nationwide.  Together, the utilities provide service to the Debtors under approximately 850 separate billing accounts.  Prior to this Application Period, Skadden obtained from this Court, on behalf of the Debtors, entry of an interim order and a final order (the "Final Utilities Order") prohibiting the utilities from disconnecting service and establishing global procedures for addressing adequate assurance demands which, among other things, allowed the Debtors a reasonable period of time to respond to such demands without the threat that service would be terminated prematurely.

117.    During the Application Period, Skadden have advised the Debtors as to the proration of bills to distinguish between prepetition claims and the Debtors' postpetition payment obligations.  Skadden has also fielded and responded to telephone calls, e-mail messages, notices,

60

and other written correspondence from utilities and landlords in relation to alleged postpetition delinquencies.  Skadden has responded to a myriad of shut-off notices, service discontinuations, notices of lien, and other enforcement mechanisms in contravention of the Final Utilities Order and successfully prevented utility service from being interrupted.

118.    During the Application Period, Skadden also spent time drafting and successfully prosecuting the Debtors' Motion for Order under 11 U.S.C. §§ 362, 363, and 365 Authorizing Debtors To (I) Obtain Significant Improvement In Energy Costs By Modifying Agreements With Lockport Energy Associates L.P. ("Lockport") And New York State Electric And Gas Corporation, (II) Assume Modified Agreement With Lockport Energy Associates L.P., And (III) Consent To Relief From Automatic Stay For Limited Purpose Of Allowing Lockport Energy Associates L.P. To Record Modified Easements, which the Debtors believe will result in significant ongoing cost savings at the affected locations (Docket No. 2444).[41]  Indeed, as a result of these efforts, the Debtors anticipate approximately $13.5 million in cost savings for the Debtors and Lockport has agreed to share certain profits with the Debtors, which is estimated to be $6 million.

119.    In connection with the foregoing services, Skadden expended 379.3 hours during the Application Period for which Skadden seeks compensation of $192,060.[42]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-15.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

---

[41]    The Court entered the order on March 17, 2006 (Docket No. 2856).

[42]    Skadden's first interim fee application requested fees in the amount of $295,549, or 3.2% of the total amount requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Venera E. Ziegler | $510 | 349.1 | $178,041 |
| Haim Zaltzman | $335 | 18.5 | $6,198 |
| Kayalyn A. Marafioti | $795 | 5.4 | $4,293 |
| Thomas J. Matz | $560 | 6.3 | $3,528 |
| **Total** | | **379.3** | **$192,060 (1.7%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$2,838** |

P.    Retention/Fee Matters (SASM&F)

120.    Skadden is one of the largest law firms in the world, with more than 1,700
attorneys located in 22 offices in 11 countries.  Because of the number of the Debtors' business
relationships and the number of Skadden's business clients, Skadden has been required to spend
significant time after the commencement of the Reorganization Cases with respect to retention and
fee issues.  In particular, Skadden conducted an extensive relationship and disclosure search in
connection with being retained as Debtors' counsel.  After such retention and during the
Application Period, Skadden supplemented its search results through distribution of a
questionnaire to the firm's professionals worldwide.  In addition, as new parties have become
involved in aspects of these cases, Skadden has conducted supplementary disclosure searches.
Finally, pursuant to the requirements of the Interim Compensation Order, Skadden has prepared
detailed monthly compensation packages for distribution in accordance with the established
procedures.

121.    In connection with the foregoing services, Skadden expended 465.2 hours
during the Application Period for which Skadden seeks compensation of $191,088.[43]  Detailed
time entries of each Skadden professional related to these services are attached hereto as Exhibit

---

[43]    Skadden's first interim fee application requested fees in the amount of $58,023, or 0.6% of the total amount
requested in the first interim fee application for this matter.

D-16.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| Allison V. Herriott | $375 | 94.0 | $35,252 |
| Lisa B. Diaz | $295 | 87.8 | $25,901 |
| Ron E. Meisler | $540 | 41.6 | $22,464 |
| John (Jack) Wm. Butler, Jr. | $835 | 25.9 | $21,627 |
| Haim Zaltzman | $335 | 55.8 | $18,694 |
| Joseph N. Wharton | $485 | 31.1 | $15,084 |
| Dolores De Elizalde | $440 | 25.7 | $11,308 |
| Michael W. Perl | $375 | 28.9 | $10,838 |
| Sina Toussi | $540 | 9.3 | $5,022 |
| Daniel P. Phillips | $540 | 6.2 | $3,348 |
| Kayalyn A. Marafioti | $795 | 4.2 | $3,339 |
| Thomas J. Matz | $560 | 4.9 | $2,744 |
| Randall G. Reese | $465 | 5.6 | $2,604 |
| Louis D. Wilson | $510 | 3.8 | $1,938 |
| Brian M. Fern | $485 | 3.5 | $1,698 |
| Matthew J. Micheli | $440 | 3.6 | $1,584 |
| Eric B. Sensenbrenner | $560 | 2.6 | $1,456 |
| Nathan L. Stuart | $440 | 3.2 | $1,408 |
| Paraprofessional Total | | 27.5 | $4,779 |
| **Total** | | **465.2** | **$191,088 (1.7%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$39,923** |

Q.    Claims Administration (General)

122.    Given the number of lenders, vendors, employees, litigation claimants, stockholders, and other parties in interest in these cases, matters pertaining to claims filing, review, and administration the Debtors, Skadden, and a number of other professionals throughout these Reorganization Cases, have allocated resources to prepare for the review and reconciliation of

63

these claims.  Throughout the Application Period, Skadden has responded to various inquiries from potential claimants.

123.    During the Application Period, Skadden prepared a motion for entry of an order setting the claims bar date, and also oversaw preparation of the notices and customized proof of claim forms to be used in these cases.  Skadden also advised the Debtors on the scope of mail and publication notice and responded to inquiries regarding claims and proofs of claim processes on the Delphi legal hotline.  As a result of these efforts, on April 12, 2006, this Court entered an order setting the bar date for July 31, 2006 (Docket No. 3206).  Skadden worked closely with the Debtors and their claims and notice agent in overseeing the dissemination of proof of claim forms and bar date notices to over 580,000 parties.

124.    In connection with the foregoing services, Skadden expended 338.3 hours during the Application Period for which Skadden seeks compensation of $151,245.[44]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-17.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
| --- | --- | --- | --- |
| Randall G. Reese | $465 | 86.2 | $40,084 |
| John K. Lyons | $695 | 40.7 | $28,288 |
| Allison V. Herriott | $375 | 43.8 | $16,426 |
| Haim Zaltzman | $335 | 48.9 | $16,382 |
| Thomas J. Matz | $560 | 17.9 | $10,024 |
| Kayalyn A. Marafioti | $795 | 10.8 | $8,587 |
| Ron E. Meisler | $540 | 13.3 | $7,182 |
| Brian M. Fern | $485 | 14.8 | $7,178 |
| Lisa B. Diaz | $295 | 15.5 | $4,573 |

---

[44]    Skadden's first interim fee application requested fees in the amount of $31,974, or 0.3% of the total amount requested in the first interim fee application for this matter.

64

| Name | Rate | Time | Value |
|------|------|------|-------|
| John (Jack) Wm. Butler, Jr. | $835 | 4.1 | $3,424 |
| Paraprofessional Total | | 42.3 | $9,097 |
| **Total** | | **338.3** | **$151,245 (1.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$6,656** |

R.    Claims Administration (Reclamation/Trust Funds)

125.    Given the exceptionally large number of suppliers and shipments that the
Debtors receive on a continuous basis, it was inevitable that the Debtors would receive a
substantial number of reclamation demands in the very early stages of these Reorganization Cases.
Due to the tremendous volume of reclamation demands received by the Debtors since the
commencement of these cases, on January 6, 2006, the Court granted the Debtors, through the
assistance of Skadden, a 45-day extension of the deadline for the Debtors to reconcile all
reclamation claims to and including February 21, 2006 (Docket No. 1747).[45]

126.    To facilitate the review process of these 855 reclamation demands, which
required the Debtors to respond to all reclamation demands within 135 days, Skadden worked with
the Debtors and their business advisors to develop a comprehensive process for responding to all
such reclamation demands, evaluating any disagreements, and reaching agreed reclamation claim
amounts.  In implementing this process, Skadden reviewed hundreds of reclamation claims and
drafted a significant amount of correspondence, including reclamation response statements and
settlement letters.

127.    These efforts required substantial assistance from Skadden in advising the
Debtors regarding their legal obligations under the reclamation procedures, including, for instance,

---

[45]    Indeed, the Debtors received thousands of reclamation demands, including duplicate demands.  Skadden worked
closely with the Debtors and their business advisors in reviewing many of these demands and eliminating scores
of duplicate claims.  As a result, the Debtors, with the assistance of Skadden, identified roughly 855 non-duplicate
reclamation demands containing nearly 100,000 lines of data, with a total face amount of more than $285 million.

evaluating foreign supplier claims and analyzing demands covering various types of inventory.  In addition, Skadden corresponded with numerous claimants and worked with the Debtors and their financial advisors to design training materials and process protocols for on-going negotiations with suppliers.

128.    Reclamation response statements were sent to all 855 claimants on February 21, 2006.  These statements, representing the results of many hours of review of invoices and billing records, identified total reclamation claims of approximately $17.5 million.  As a result of almost continual negotiations with reclamation claimants since the Petition Date, over 685 of the original 855 non-duplicate claims are now resolved, subject to reservations of further defenses.

129.    In connection with the foregoing services, Skadden expended 351.6 hours during the Application Period for which Skadden seeks compensation of $142,265.[46]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-18.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| Matthew J. Micheli | $440 | 196.0 | $86,240 |
| Joseph N. Wharton | $485 | 56.2 | $27,257 |
| John K. Lyons | $695 | 11.1 | $7,715 |
| Ron E. Meisler | $540 | 2.4 | $1,296 |
| Paraprofessional Total | | 85.9 | $19,757 |
| **Total** | | **351.6** | **$142,265 (1.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$16,319** |

---

[46]    Skadden's first interim fee application requested fees in the amount of $134,926, or 1.5% of the total amount requested in the first interim fee application for this matter.

S.    Automatic Stay (Relief Actions)

130.    As of the Petition Dates, the Debtors were parties to more than two hundred active and threatened lawsuits.  Although the automatic stay set forth in section 362 of the Bankruptcy Code prohibits parties from pursuing these types of claims during the Reorganization Cases, the Debtors have received numerous requests, including 43 motions, since the Petition Dates seeking modification of the stay to allow the claimants to proceed against the Debtors in non-bankruptcy fora.  During the Application Period, fourteen motions requesting modification of the automatic stay were filed.  Skadden worked with the Debtors' legal department and other of the Debtors' employees to reach a consensual resolution in response to many of the modification or relief requests.  In certain cases, however, the Debtors and the movant were unable to resolve their differences and on those occasions, Skadden (and in certain instances Togut, Segal & Segal LLP in lieu of Skadden) drafted objections to these lift stay motions.  In addition, during the Application Period Skadden worked closely with the Debtors to begin developing procedures for modifying the automatic stay.

131.    In connection with the foregoing services, Skadden expended 304.0 hours during the Application Period for which Skadden seeks compensation of $140,233.[47]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-19.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Brian M. Fern | $485 | 144.9 | $70,277 |
| Matthew J. Micheli | $440 | 53.0 | $23,320 |
| Ron E. Meisler | $540 | 37.4 | $20,196 |

---

[47]    Skadden's first interim fee application requested fees in the amount of $64,079, or 0.7% of the total amount requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Lisa B. Diaz | $295 | 37.8 | $11,151 |
| Kayalyn A. Marafioti | $795 | 10.1 | $8,030 |
| Thomas J. Matz | $560 | 7.5 | $4,200 |
| Paraprofessional Total | | 13.3 | $3,059 |
| **Total** | | **304.0** | **$140,233 (1.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$8,424** |

T.    <u>Environmental Matters</u>

      132.    Skadden assisted the Debtors in their efforts to comply with environmental law while also complying with the requirements of the Bankruptcy Code.  Analysis of Debtors' potential environmental liabilities raises particularly complex factual issues because, among other reasons, a large portion of those liabilities arise from actions or operations that took place before the Debtors' separation from GM.  As a result, research of many legal issues was required.

      133.    In addition, Skadden assisted the Debtors with analysis of contractor claims and the imposition of mechanics' liens with respect to potential environmental liabilities, review of notices of violations and orders received from regulatory agencies, review of environmental conditions associated with Debtors' properties in certain states, and developing provisions for resolving potential environmental liabilities in connection with potential property sales and lease rejections.  Finally, Skadden advised the Debtors in connection with a proposed settlement with the state of New Jersey's environmental agency for environmental remediation at the Debtors' battery manufacturing facility in New Brunswick, New Jersey, which the Debtors sold to JCI pursuant to a Transfer Agreement dated May 26, 2006.

134.    In connection with the foregoing services, Skadden expended 201.2 hours during the Application Period for which Skadden seeks compensation of $140,142.[48]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-20.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Kenneth Berlin | $770 | 88.6 | $68,222 |
| Marian P. Wexler | $770 | 37.2 | $28,644 |
| John A. Amodeo | $580 | 35.2 | $20,416 |
| Jerry L. Jackson | $580 | 28.8 | $16,704 |
| Sina Toussi | $540 | 7.1 | $3,834 |
| Ron E. Meisler | $540 | 4.3 | $2,322 |
| **Total** | | **201.2** | **$140,142 (1.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$5,849** |

U.    Litigation (Insurance Recovery)

135.    During the Application Period, Skadden was required to devote resources to various litigation matters.  In particular, on April 18, 2006, Skadden assisted the Debtors in obtaining Court approval of the Debtors' Motion For Approval Of Joint Interest Agreement Between Debtors And Official Committee of Unsecured Creditors, Implementation Of Protective Order, And Approval Of Procedures To Protect Information In Fee Statements related to certain investigations by the Debtors and third parties (Docket No. 3279).  The Joint Interest Agreement between the Debtors and the Creditors' Committee allows the Debtors to share certain confidential, and sometimes privileged, information with the Creditors' Committee regarding investigations, including (a) the internal review conducted by the Audit Committee of Delphi's Board of

---

[48]    Skadden's first interim fee application requested fees in the amount of $163,396, or 1.8% of the total amount requested in the first interim fee application for this matter.

Directors, (b) the formal ongoing investigations by several governmental agencies, (c) the

Company's restatement of earnings for fiscal years 2001 through 2003, (d) the subject matter

related to the commencement of certain class actions, including, without limitation, actions

brought under the Employee Retirement Income Security Act ("ERISA") and various securities

actions, and (e) the review by a special committee of Delphi's Board of Directors of certain

shareholder derivative demands and related actions (collectively, the "Investigations").  With

Skadden's assistance, pursuant to the Motion, the Debtors also received approval for fee

procedures to protect the confidential time detail that discloses work conducted by the

professionals working on matters related to the Investigations.

      136.    In addition, the Debtors with the assistance of Skadden entered into a

stipulation and order regarding a motion filed for class certification related to a ERISA litigation

pending against Delphi Corporation and others.

      137.    In connection with the foregoing services, Skadden expended 208.1 hours

during the Application Period for which Skadden seeks compensation of $105,009.[49]  Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

D-21.  A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Nathan L. Stuart | $440 | 77.0 | $33,880 |
| Ron E. Meisler | $540 | 36.6 | $19,764 |
| John (Jack) Wm. Butler, Jr. | $835 | 12.0 | $10,021 |
| Brian M. Fern | $485 | 16.4 | $7,955 |
| David E. Springer | $755 | 9.4 | $7,097 |
| Venera E. Ziegler | $510 | 13.5 | $6,885 |

---

[49]    Skadden's first interim fee application requested fees in the amount of $103,530, or 1.1% of the total amount
requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Neil MacDonald | $540 | 12.0 | $6,480 |
| Lisa B. Diaz | $295 | 19.6 | $5,782 |
| Kayalyn A. Marafioti | $795 | 4.8 | $3,817 |
| Matthew J. Micheli | $440 | 4.0 | $1,760 |
| Thomas J. Matz | $560 | 2.8 | $1,568 |
| **Total** | | **208.1** | **$105,009 (0.9%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$1,707** |

### Matters Under $100,000

V.    Tax Matters

138.    In January 2006, this Court entered an order that established certain restrictions on the trading of equity in Delphi or claims against the Debtors to preserve substantial tax attributes of the Debtors that could provide potential future tax savings for the Debtors well in excess of $1 billion (the "Final Trading Order").  A significant portion of Skadden's work on tax matters during the Application Period related to analyzing filings with the Court and the SEC by equity holders and claim holders to ensure compliance with the Final Trading Order as well as assisting the company in connection with its evaluation of its tax attributes and their preservation pursuant to the Final Trading Order.

139.    On March 7, 2006 the PBGC filed liens in excess of $250 million on non-U.S. affiliates of the Debtors pursuant to section 412(n) of the Internal Revenue Code because the Debtors failed to make the minimum funding payments for its defined pension plans.  Skadden researched the PBGC's ability to file such liens and the likely affect of such filings.  Additionally, throughout the Application Period, Skadden devoted substantial time to assisting the Debtors in handling the various tax issues that arose as part of the Reorganization Cases, including analysis

71

regarding the application of the Bankruptcy Code and this Court's orders to federal, state, and local tax laws and employment tax issues.

140.     In connection with the foregoing services, Skadden expended 145.7 hours during the Application Period for which Skadden seeks compensation of $82,775.[50]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-22</u>. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Daniel P. Phillips | $540 | 84.1 | $45,414 |
| Eric B. Sensenbrenner | $560 | 18.5 | $10,360 |
| Cliff Gross | $770 | 13.4 | $10,318 |
| Venera E. Ziegler | $510 | 16.0 | $8,160 |
| Kayalyn A. Marafioti | $795 | 5.9 | $4,691 |
| Thomas J. Matz | $560 | 4.9 | $2,744 |
| Allison V. Herriott | $375 | 2.9 | $1,088 |
| **Total** | | **145.7** | **$82,775 (0.7%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$19,044** |

W.     <u>Intellectual Property</u>

141.     Throughout the Application Period, Skadden provided legal advice regarding bankruptcy-related issues affecting the Debtors' intellectual property – particularly patents and licenses.  In particular, Skadden spent time analyzing the potential sale of certain of the Debtors' intellectual property.  Also, on May 30, 2006, this Court entered an order authorizing and approving certain licensing agreements between certain of the Debtors and Denso Corporation, which settled a patent infringement lawsuit between the parties (Docket No. 3950).

---

[50]     Skadden's first interim fee application requested fees in the amount of $932,086, or 10.1% of the total amount requested in the first interim fee application for this matter.

142.    In connection with the foregoing services, Skadden expended 126.6 hours during the Application Period for which Skadden seeks compensation of $65,656.[51]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-23. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Venera E. Ziegler | $510 | 66.6 | $33,966 |
| Sina Toussi | $540 | 17.5 | $9,450 |
| Joseph N. Wharton | $485 | 12.2 | $5,917 |
| Ron E. Meisler | $540 | 9.4 | $5,076 |
| Thomas J. Matz | $560 | 8.6 | $4,816 |
| Kayalyn A. Marafioti | $795 | 4.2 | $3,339 |
| Dolores De Elizalde | $440 | 3.6 | $1,584 |
| Haim Zaltzman | $335 | 4.5 | $1,508 |
| **Total** | | **126.6** | **$65,656 (0.6%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$23,441** |

## X.    Employee Matters (Pension)

143.    Skadden assisted the Debtors during the Application Period in connection with bankruptcy and restructuring matters related to the Debtors' seven defined benefit pension plans covered by termination insurance programs administered by the PBGC.  Among other things, during the Application Period, Skadden communicated with the PBGC regarding pension matters and analyzed the impact of the Debtors' chapter 11 filings on the pension plans.

144.    In connection with the foregoing services, Skadden expended 98.7 hours during the Application Period for which Skadden seeks compensation of $58,190.[52]  Detailed time

---

[51]    Skadden's first interim fee application requested fees in the amount of $22,186, or 0.2% of the total amount requested in the first interim fee application for this matter.

[52]    Skadden's first interim fee application did not request any compensation for this matter.

entries of each Skadden professional related to these services are attached hereto as Exhibit D-24.

A summary of the hours incurred and value of the services performed by each professional is

provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Venera E. Ziegler | $510 | 61.5 | $31,365 |
| Kayalyn A. Marafioti | $795 | 21.4 | $17,014 |
| Thomas J. Matz | $560 | 9.2 | $5,152 |
| N. Lynn Hiestand | $835 | 2.5 | $2,088 |
| Ron E. Meisler | $540 | 2.7 | $1,458 |
| Eric L. Cochran | $795 | 1.4 | $1,113 |
| **Total** | | **98.7** | **$58,190 (0.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$11,781** |

Y.    Real Estate (Owned)

145.    Skadden assisted the Debtors in undertaking a comprehensive review of the

Debtors' owned real estate.  Indeed, Skadden worked closely with employees of the Debtors in

coordinating matters related to Debtors' owned real estate, including (a) resolving claims related to

real property issues including mechanic's liens, (b) advising the Debtors on selling de minimis real

estate parcels and the disposition of real estate assets generally, and (c) analyzing tax issues.  These

issues required numerous meetings with the Debtors' real estate and facilities personnel.

146.    In connection with the foregoing services, Skadden expended 73.7 hours

during the Application Period for which Skadden seeks compensation of $44,502.[53]  Detailed time

entries of each Skadden professional related to these services are attached hereto as Exhibit D-25.

A summary of the hours incurred and value of the services performed by each professional is

provided in the following table:

---

[53]    Skadden's first interim fee application requested fees in the amount of $63,413, or 0.7% of the total amount
requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Marian P. Wexler | $770 | 37.4 | $28,798 |
| Catherine E. Danz | $465 | 25.2 | $11,719 |
| Lisa B. Diaz | $295 | 8.2 | $2,419 |
| Ron E. Meisler | $540 | 2.9 | $1,566 |
| **Total** | | **73.7** | **$44,502 (0.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$765** |

Z.    Executory Contracts (Personalty)

147.    The Debtors estimate that, as of the Petition Dates, they were parties to 347,000 scheduled executory contracts and unexpired leases which collectively involve billions of dollars of liabilities.  During the Application Period, Skadden worked closely with dozens of internal and external representatives and employees of the Debtors to coordinate the review of various executory contracts and, together with the Debtors' senior management and business advisors, to evaluate contracts and leases for assumption or rejection.  To conduct the analysis, Skadden participated in meetings with the Debtors' business personnel regarding appropriate proration of invoices and postpetition payment obligations.  Moreover, Skadden participated in numerous meetings and teleconferences with contract counterparties regarding contractual matters, termination notices, and other issues.  Also, the Debtors, with the assistance of Skadden, responded to numerous requests from counterparties to compel the assumption or rejection of their contracts.

148.    In connection with the foregoing services, Skadden expended 84.4 hours during the Application Period for which Skadden seeks compensation of $38,078.[54]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-26.

---

[54]    Skadden's first interim fee application requested fees in the amount of $153,055, or 1.7% of the total amount requested in the first interim fee application for this matter.

A summary of the hours incurred and value of the services performed by each professional is
provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| Nathan L. Stuart | $440 | 23.1 | $10,164 |
| Joseph N. Wharton | $485 | 17.7 | $8,585 |
| Ron E. Meisler | $540 | 9.7 | $5,238 |
| Haim Zaltzman | $335 | 11.0 | $3,686 |
| Kayalyn A. Marafioti | $795 | 3.8 | $3,022 |
| M. Janine Jjingo | $295 | 8.5 | $2,508 |
| Allison V. Herriott | $375 | 4.4 | $1,650 |
| Thomas J. Matz | $560 | 2.9 | $1,624 |
| Brian M. Fern | $485 | 3.3 | $1,601 |
| **Total** | | **84.4** | **$38,078 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$43,203** |

AA.    Litigation (General)

149.    During the Application Period, Skadden was required to devote resources to
various litigation matters not within the purview of other billing categories.  Much of the activity
in this billing category relates to efforts by Skadden to ensure that actions arising out of the
everyday operations of the Debtors do not distract the Debtors from their chief goal of successful
emergence from chapter 11.  These efforts included, among other things, an extension of the
Debtors' deadline to remove certain state court actions to this Court (Docket No. 2857), resolution
of litigation against the Debtors, and advising the Debtors on the implications of the chapter 11
proceedings on litigation pending in other, non-bankruptcy fora.  The Debtors, with Skadden's
assistance also successfully obtained Court approval of the Debtors' Motion Authorizing And
Approving Stipulations And Settlement Agreements With Certain Defendants in In re Electrical

76

Carbon Products Antitrust Litigation.[55]    Delphi and thirteen other similarly situated companies (collectively, the "Plaintiffs") entered into a stipulation and settlement agreement with certain of the defendants on February 11, 2006 (the "Settlement").  In general, the Settlement provides that the Plaintiffs will: (a) dismiss the action against the settling defendants and the individual defendants with prejudice and without costs and (b) release and discharge the settling defendants from non-foreign claims arising from the Electrical Carbon Products price-fixing conspiracy.  The Debtors' anticipated recovery from the Settlement will likely exceed $1.1 million, which is nearly three times their last settlement demand.

150.    In connection with the foregoing services, Skadden expended 80.6 hours during the Application Period for which Skadden seeks compensation of $33,598.[56]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-27.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Haim Zaltzman | $335 | 43.3 | $14,507 |
| Sina Toussi | $540 | 14.0 | $7,560 |
| Joseph N. Wharton | $485 | 8.5 | $4,123 |
| Brian M. Fern | $485 | 4.8 | $2,328 |
| Ron E. Meisler | $540 | 3.8 | $2,052 |
| Matthew J. Micheli | $440 | 3.7 | $1,628 |
| Thomas J. Matz | $560 | 2.5 | $1,400 |
| **Total** | | **80.6** | **$33,598 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$21,454** |

---

[55]    The Court entered the order on May 30, 2006 (Docket No. 3948).

[56]    Skadden's first interim fee application requested fees in the amount of $21,112, or 0.2% of the total amount requested in the first interim fee application for this matter.

BB.    Employee Matters (Retirees/OPEB)

151.    Skadden assisted the Debtors during the Application Period in connection with matters related to retiree benefits including preliminary advice regarding potential claims that may be asserted against the Debtors if they are permitted to modify retiree benefits under section 1114 of the Bankruptcy Code.

152.    In connection with the foregoing services, Skadden expended 83.0 hours during the Application Period for which Skadden seeks compensation of $32,138.[57]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-28. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Lisa B. Diaz | $295 | 47.5 | $14,013 |
| Brian M. Fern | $485 | 13.6 | $6,596 |
| Melissa T. Kahn | $410 | 15.1 | $6,191 |
| Neil M. Leff | $785 | 6.8 | $5,338 |
| **Total** | | **83.0** | **$32,138 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$3,486** |

CC.    Reports And Schedules

153.    The Debtors are required to submit Monthly Operating Reports, which provide detailed information regarding the Debtors' assets, liabilities, and operations on a monthly basis.  During the Application Period, Skadden worked with the Debtors' finance and accounting personnel, as well as the Debtors' financial advisors and the U.S. Trustee, to review and file Monthly Operating Reports for the months of January, February, March, and April.  Skadden also

---

[57]    Skadden's first interim fee application requested fees in the amount of $21,019, or 0.2% of the total amount requested in the first interim fee application for this matter.

worked closely with the Debtors and their financial advisors following the filing of the Debtors

Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs

("Statements") to resolve certain discrete issues which resulted in the Debtors' filing of certain

amendments to the Schedules and Statements on February 1, 2006 and April 18, 2006.  On

February 1, 2006, the Debtors filed amendments to Schedule F for certain Debtors to reflect

aggregate debits reflected in the Debtors' cross-charge accounts and to identify certain claims

related to cross-charge accounts as unliquidated.  On April 18, 2006, the Debtors filed further

amendments to the Schedules and Statements to update the Schedules to reflect current prepetition

balances and to make certain modifications to the Schedules and Statements based upon the

Debtors' further review and verification of the information contained therein.

      154.    In connection with the foregoing services, Skadden expended 54.5 hours

during the Application Period for which Skadden seeks compensation of $22,844.[58]  Detailed time

entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-29</u>.

A summary of the hours incurred and value of the services performed by each professional is

provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Randall G. Reese | $465 | 18.5 | $8,603 |
| Thomas J. Matz | $560 | 12.7 | $7,112 |
| Ron E. Meisler | $540 | 5.3 | $2,862 |
| Kayalyn A. Marafioti | $795 | 1.8 | $1,431 |
| Paraprofessional Total | | 16.2 | $2,836 |
| **Total** | | **54.5** | **$22,844 (0.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$6,509** |

---

[58]    Skadden's first interim fee application requested fees in the amount of $187,152, or 2.0% of the total amount
requested in the first interim fee application for this matter.

DD.    Financing (DIP And Emergence)

155.    Subsequently, during this Application Period, the Debtors entered into the

Third Amendment to the Amended and Restated Credit Agreement, dated May 26, 2006, which

provides Delphi with additional time to deliver both the audited financial statements for the year

ended December 31, 2005 and the quarterly financial statements for the periods ended March 31,

2006 and June 30, 2006.[59]  Although Shearman & Sterling LLP had primary responsibility for

documenting the amendments, Skadden provided assistance to the Debtors with respect to

reviewing and drafting related documents.  During the Application Period, Skadden also

periodically advised the Debtors with respect to whether, and in what manner, various issues

arising in the Reorganization Cases might be affected by the terms of the DIP facility.

156.    In connection with the foregoing services, Skadden expended 28.7 hours

during the Application Period for which Skadden seeks compensation of $20,973.[60]  Detailed time

entries of each Skadden professional related to these services are attached hereto as Exhibit D-30.

A summary of the hours incurred and value of the services performed by each professional is

provided in the following table:

---

[59]    On October 28, 2005, the Court granted, on a final basis, the DIP Financing Order (Docket No. 0797), which approved the first amendment to the DIP credit facility, providing the Debtors' access to $2 billion in DIP financing subject to the terms and conditions set forth in the DIP financing documents, as amended, and an adequate protection package for the lenders to the prepetition credit facilities as well as to those parties asserting rights of setoff against the Debtors.  On April 13, 2006 and in accordance with the DIP Financing Order, the Debtors further amended their DIP credit facility by entering into that certain Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated November 21, 2005 (the "Second Amended DIP Facility").  The Second Amended DIP Facility, among other things, adds new lenders to the DIP credit facility, increases the interest rate that was provided under the DIP credit facility, and alters the provisions regarding future amendments.

[60]    Skadden's first interim fee application requested fees in the amount of $296,608, or 3.2% of the total amount requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Lawrence D. Frishman | $755 | 21.9 | $16,536 |
| John (Jack) Wm. Butler, Jr. | $835 | 4.1 | $3,424 |
| Allison V. Herriott | $375 | 2.7 | $1,013 |
| **Total** | | **28.7** | **$20,973 (0.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$9,366** |

EE.    <u>Reorganization Plan/Plan Sponsors</u>

      157.    During the Application Period, the Debtors, with the assistance of Skadden, began preparing to file a motion to extend the Debtors' exclusive periods for filing a plan of reorganization and soliciting acceptances thereof.[61]   The Debtors requested that the Court extend (a) the exclusive right to file a plan of reorganization from through and including August 5, 2006 to through and including February 1, 2007 and (b) the solicitation period from through and including October 4, 2006 to through and including April 2, 2007.  The Debtors, through Skadden, consulted with the major constituents, including the Creditors' Committee, regarding this motion, which resulted in this matter being uncontested.

      158.    In connection with the foregoing services, Skadden expended 65.8 hours during the Application Period for which Skadden seeks compensation of $20,728.[62]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-31</u>. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Lisa B. Diaz | $295 | 58.0 | $17,110 |
| Ron E. Meisler | $540 | 4.2 | $2,268 |

---

[61]    On June 19, 2006, the Court granted the Debtors' motion to extend the exclusivity period (Docket No. 4266).

[62]    Skadden's first interim fee application requested fees in the amount of $14,195, or 0.2% of the total amount requested in the first interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Allison V. Herriott | $375 | 3.6 | $1,350 |
| **Total** | | **65.8** | **$20,728 (0.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$6,460** |

## FF.    Asset Dispositions (Real Property)

159.    During the Application Period, Skadden advised the Debtors regarding the sale or potential sale of certain assets including excess real property assets.  In particular, Skadden advised the Debtors with regard to the sale of some real property assets resulting from the sale of one of the Debtors' facilities.

160.    In connection with the foregoing services, Skadden expended 24.1 hours during the Application Period for which Skadden seeks compensation of $14,196.[63]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-32. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Marian P. Wexler | $770 | 9.8 | $7,546 |
| Catherine E. Danz | $465 | 14.3 | $6,650 |
| **Total** | | **24.1** | **$14,196 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$1,415** |

## GG.    Customer Matters (General)

161.    During the Application Period, Skadden assisted the Debtors by, among other things, responding to questions and working with the Company to draft and periodically revise presentations for customers explaining the authority the Debtors had received from this Court to continue operations during these Reorganization Cases.  By facilitating negotiations with

---

[63]    Skadden's first interim fee application requested fees in the amount of $36,866, or 0.4% of the total amount requested in the first interim fee application for this matter.

the customers and working with the Debtors as they reconcile their books and records, Skadden has assisted the Debtors in resolving these matters to date.

162.    In connection with the foregoing services, Skadden expended 17.8 hours during the Application Period for which Skadden seeks compensation of $9,186.[64] Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-33. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Ron E. Meisler | $540 | 10.2 | $5,508 |
| Allison V. Herriott | $375 | 5.8 | $2,175 |
| N. Lynn Hiestand | $835 | 1.8 | $1,503 |
| **Total** | | **17.8** | **$9,186 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$3,533** |

HH.    Regulatory And SEC Matters

163.    During the Application Period, Skadden reviewed various materials and prepared for and represented the Debtors in meetings with the Creditors' Committee to discuss matters relating to formal ongoing investigations by several governmental agencies and various securities actions.

164.    In connection with the foregoing services, Skadden professionals expended 10.5 hours during the Application Period for which Skadden seeks compensation of $8,624.[65] Detailed time entries of each Skadden professional related to these services are attached hereto as

---

[64]    Skadden's first interim fee application requested fees in the amount of $72,901, or 0.8% of the total amount requested in the first interim fee application for this matter.

[65]    Skadden's first interim fee application requested fees in the amount of $12,425, or 0.1% of the total amount requested in the first interim fee application for this matter.

Exhibit D-34.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| John (Jack) Wm. Butler, Jr. | $835 | 6.9 | $5,762 |
| Kayalyn A. Marafioti | $795 | 3.6 | $2,862 |
| **Total** | | **10.5** | **$8,624 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$968** |

## Relief Requested

165.    In accordance with the Interim Compensation Order, Skadden has submitted monthly fee statements for the period from February 1, 2006 through May 31, 2006, and now submits this Interim Application covering the Application Period.  Based on the firm's customary billing practices, the Debtors ordinarily would be billed a total of $12,352,197[66] for fees and $903,980 for charges and disbursements.  In keeping with Skadden's commitment to self-policing its fees, charges, and disbursements, and based on various accommodations to the Debtors, Skadden voluntarily reduced, as part of its monthly fee statements, its fees by $862,928, or approximately 7.0 percent, and its charges and disbursements by $78,115, or approximately 8.6%.  As a result, the actual amount billed to the Debtors was $11,507,793 for fees and $825,865 for charges and disbursements.

166.    Moreover, as an additional accommodation, Skadden has voluntarily reduced the amount sought in this Interim Application by $179,049 to reflect, among other accommodations, the elimination of (i) fees related to any timekeeper who billed less than $10,000 during the Application Period, (ii) fees related to any instance in which a timekeeper billed less

---

[66]    This interim fee application reflects a deduction of $18,524 to remedy certain billing errors related to two timekeepers.

than $1,000 to a particular matter during the Application Period, and (iii) any matter to which

fewer than ten hours were billed during the Application Period.  As a result, the actual amount

sought herein is $11,310,231 for fees.  This represents a total reduction with respect to fees,

charges, and disbursements of $1,120,092, or approximately 8.4%, from those amounts that would

customarily be charged.

167.    The Interim Compensation Order provides that when seeking interim

compensation, professionals must submit monthly fee statements to the Debtors, counsel to the

Debtors, the U.S. Trustee, counsel for the Creditors' Committee, counsel for the agent under the

Debtors' prepetition credit facility, counsel for the agent under the Debtors' postpetition credit

facility, and members of the Fee Review Committee.  Each person receiving a statement has at

least 15 days after its receipt to review it.  If no objection to a monthly fee statement is made within

45 days after the end of the applicable billing period, the Debtors are authorized to pay 80% of the

fees requested (with the remaining 20% of the fees requested referred to herein as the "Holdback")

and 100% of the charges and disbursements requested.  In accordance with the Interim

Compensation Order, Skadden has submitted monthly fee statements for each of the months

covered by the Application Period.

168.    No party has filed an objection to Skadden's monthly fee statements.

Accordingly, with respect to the monthly fee statements covering the Application Period and the

release of half the Holdback accrued through May 31, 2006, Skadden has received $10,357,014 on

account of billed fees and $825,865 on account of billed charges and disbursements.  For the

period ending May 31, 2006, Skadden accrued a Holdback in the amount of $4,149,646.  After

payment of half of the Holdback due to Skadden for the first interim application period and this

Application Period, the Holdback amount will have been reduced to $2,074,823.

A.    <u>Allowance Of Professional Fees</u>

169.    During the Application Period, professionals at Skadden billed an aggregate of 24,146.6 hours reflected in this Interim Application working on matters concerning the Debtors' Reorganization Cases.[67]  Of such time spent, 4,891.2 hours were spent by partners, 1,922.6 hours were spent by counsel, 13,373.7 hours were spent by associates, and 3,959.1 hours were spent by legal assistants.  A summary showing the name and position of each such partner, counsel, associate, and legal assistant, together with that person's date of admission to the bar (as applicable), net hours during the Application Period, and hourly billing rate, is provided in the Summary of Services found at the beginning of this Interim Application.[68]

B.    <u>Reimbursement Of Charges And Disbursements</u>

170.    As disclosed in the Retention Application that this Court approved, it is Skadden's standard policy to charge its clients in all areas of practice for certain charges and disbursements incurred in connection with such clients' cases. The charges and disbursements charged to clients include, among others, charges for messenger services, photocopying, court fees, travel expenses, postage, long distance telephone, computerized legal research, investigative searches, and other charges customarily billed by law firms.  Certain charges and disbursements are not separately charged for under the bundled rate structure as described in the Engagement Agreement.

171.    Skadden has attempted to minimize the charges and disbursements associated with the Debtors' Reorganization Cases, particularly for items such as reproduction and delivery, which have been lowered as a result of the restricted service list and the ability to serve

---

[67]    Skadden maintains records of the time it expended in the rendition of all professional services, which time records are made concurrently with the rendition of professional services.

[68]    In addition to the matter list, <u>Exhibit C</u> also sets forth the blended hourly rate and certain other business statistics associated with the Reorganization Cases.

the 2002 List Parties electronically, which Skadden proposed and this Court approved.  During the

Application Period, Skadden disbursed the following sums for actual and necessary charges and

disbursements in the rendition of professional services in the Reorganization Cases, and requests

that it be reimbursed therefor:

Charges And Disbursements Incurred[69]

| | |
|---|---|
| Travel Expenses | $331,803 |
| Reproduction And Document Preparation | $277,790 |
| Computer Legal Research | $117,662 |
| Court Reporting | $37,069 |
| Electronic Document Management | $22,658 |
| Courier, Express Delivery, And Postage | $18,022 |
| Outside Research | $10,012 |
| Telecommunications | $8,587 |
| Professional Fees | $1,890 |
| UCC Research/Opinion | $296 |
| Filing/Court Fees | $65 |
| **TOTAL** | **$825,854** |

172.    The above charges and disbursements are reasonable and are consistent

with those incurred by other bankruptcy practitioners in other large, complex chapter 11

reorganization cases in this and other districts.  Moreover, Skadden believes that the unique size

and complexity of these cases, including the terms of this Court's case management order, as

amended, which require, among other things, overnight delivery of most pleadings, warrant

reimbursement of the foregoing charges and disbursements.

Reasonableness Of Fees, Charges, And Disbursements

173.    Under section 330 of the Bankruptcy Code, a Bankruptcy Court may award

to a professional employed by the estates "reasonable compensation for actual, necessary services"

rendered by the professional, plus "reimbursement for actual, necessary expenses."  See 11 U.S.C.

---

[69]    The details relating to the charges and disbursements can be found in Exhibits D-1 through D-35 on a matter by matter basis.

§ 330(a)(1).  See generally In re Cenargo Int'l, 294 B.R. 571 (Bankr. S.D.N.Y. 2003); In re Childworld, Inc., 185 B.R. 14 (Bankr. S.D.N.Y. 1995).

174.    In determining the amount of "reasonable compensation," the Court must consider the nature, extent, and value of the services, taking into account all the relevant factors, including the time spent on such services, the rates charged for such services, whether the services were necessary and beneficial, whether the services were performed in a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed, and whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code. See 11 U.S.C. § 330(a)(3).

175.    In assessing attorneys' fees, courts use several different approaches.  The Second Circuit and bankruptcy courts in this district frequently utilize the "lodestar" method, which is a determination as to the number of hours of service reasonably devoted to the case multiplied by the attorney's reasonable rates.  See Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999) (applying the lodestar approach to a non-bankruptcy case); In re Masterwear Corp., 233 B.R. 266, 277 (Bankr. S.D.N.Y. 1999).  When applying the lodestar approach, courts in this district incorporate the familiar factors set forth in Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir. 1974).[70]  See, e.g., Betancourt v. Giuliani, 325 F. Supp. 2d 330, 332 (S.D.N.Y. 2004) ("In adjusting the lodestar, courts generally consider the . . . factors set forth in Johnson v. Georgia Highway Express, Inc."); In re Sucre, 226 B.R. 340, 351-52 (Bankr. S.D.N.Y. 1998) ("To

---

[70]    The twelve Johnson factors are (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) the time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.  Johnson, 488 F.2d at 717-19.

determine the 'lodestar fee' the Court must make an initial objective determination as to the number of hours reasonably expended and the reasonable hourly rate . . . . After multiplying the two, the Court may adjust the product by a consideration of [the <u>Johnson</u>] factors.")

176.    In awarding attorneys' fees, courts will also consider whether the services rendered were reasonably likely to benefit the debtor's estate.  <u>See</u>, <u>e.g.</u>, <u>In re Ames Dep't Stores, Inc.</u>, 76 F.3d 66, 71 (2d Cir. 1996), <u>rev'd on other grounds</u>, <u>Lamie v. United States Trustee</u>, 540 U.S. 526 (2004); <u>In re Granite Partners, L.P.</u>, 213 B.R. 440, 447 (Bankr. S.D.N.Y.  1997); <u>In re Drexel Lambert Group, Inc.</u>, 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991).  Thus, the Court should focus on what a reasonable lawyer would have done at the time and not invoke a hindsight analysis.

> [I]t is important for a court to maintain a sense of overall proportion and not become enmeshed in meticulous analysis of every detailed facet of the professional representation.  It is easy to speculate that the work could have been done in less time or with fewer attorneys or with an associate rather than a partner.  On the other hand, it is also possible that [the debtor] would not have enjoyed the success it did had its counsel managed matters differently.

<u>In re Boston & Maine Corp.</u>, 776 F.2d 2, 10 (1st Cir. 1985) (citations omitted).

177.    In accordance with the factors enumerated in 11 U.S.C. § 330 and applicable case law, the amount requested herein by Skadden is fair and reasonable, given:  (a) the nature of the Reorganization Cases, (b) the novelty and complexity of the Reorganization Cases, (c) the time and labor required to represent the Debtors effectively, (d) the time limitations imposed by the Reorganization Cases, (e) the nature and extent of the services rendered, (f) Skadden's experience, reputation, and ability, (g) the value of Skadden's services, and (h) the cost of comparable services other than in a case under the Bankruptcy Code.

89

C.    Nature, Complexity, And Duration Of Cases

178.    As should be evident from the summary of Skadden's services as described above in this Interim Application, the Debtors' chapter 11 reorganization presents a particularly unique set of circumstances, and unquestionably is a large and complex case.  The nature and complexity of the Reorganization Cases has required Skadden to develop case management and staffing solutions at every stage of the proceedings.  These tasks have been particularly daunting in light of the Debtors' widespread operations and the relative sophistication of other parties-in-interest in these Reorganization Cases.  Skadden nonetheless has assisted the Debtors by employing a streamlined case management structure that generally consists of relatively small, core teams, and has assigned various attorneys to other discrete tasks to avoid the performance of duplicative or unnecessary work.

179.    Given the size of these Reorganization Cases and the number of matters that continually need to be addressed, there have been occasions when a number of Skadden attorneys must be present and participate in the discussions and negotiations.  This is particularly true of meetings with the Creditors' Committee, and the Equity Committee, and also with respect to the monthly omnibus hearings.  Skadden believes that, as evident by the summaries contained in this Interim Application and the time entries attached hereto, it has articulated specific reasons for attendance by multiple attorneys on such occasions.

D.    Experience Of Skadden

180.    The experience of Skadden also has benefited the estates.  Skadden is among the largest firms and has one of the largest restructuring groups in the world.  As more fully set forth in the Retention Application, Skadden's restructuring attorneys and attorneys from other practice areas have extensive knowledge and experience in dealing with the multitude and

90

fast-paced issues that arise in similar chapter 11 cases. Accordingly, Skadden's depth of experience

in chapter 11 matters has ensured that a number of pressing matters could be addressed promptly.

In addition, Skadden's commitment to monitoring the administrative expenses of the estates,

including its own legal fees, has been a constant element of its representation of the Debtors.

Indeed, this emphasis has been manifested in Skadden careful review of its fees, charges, and

disbursements and a voluntary client accommodation of $1,120,092, including a voluntary

aggregate accommodation of $941,043 on Skadden's monthly fee statements and an additional

$179,049 voluntary reduction on this Interim Application.

E.    Comparable Services

181.    An award of compensation also must be based on the cost of comparable

services other than in a bankruptcy case.  Skadden's rates are consistent with rate structures

charged to other clients in non-bankruptcy matters.  Moreover, its rate structure was disclosed

clearly in its Retention Application, which this Court approved and as to which none of the major

constituents objected.  The amounts sought by Skadden are consistent with the fees, charges, and

disbursements incurred by other chapter 11 debtors in cases of similar size, complexity, and

duration.  Accordingly, the cost of comparable services supports the Interim Application, and the

services performed during the Application Period more than warrant the allowance of

compensation, particularly in view of the results achieved.

F.    Compliance With Guidelines

182.    Skadden believes that this Interim Application, together with the

attachments hereto, substantially complies in all material respects with the Guidelines.  To the

extent this Application does not comply in every respect with the requirements of such guidelines,

Skadden respectfully requests a waiver for any such technical non-compliance.

Notice

183.     In compliance with the Fourth Supplemental Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

Professionals, entered by this Court on July 13, 2006 (Docket No. 4545), notice of the filing of this

Interim Application will be provided to all parties who have filed a notice of appearance with the

Clerk of this Court and requested notice of pleadings in these chapter 11 cases.  In addition, the

Interim Application in its entirety will be served on the following parties: (i) Delphi Corporation,

5725 Delphi Drive, Troy, Michigan 48098, Att'n: David Sherbin, Esq., (ii) the Office of the United

States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York,

New York 10004, Att'n: Alicia M. Leonhard, Esq., (iii) counsel for the Creditors' Committee,

Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4802, Att'n: Robert J.

Rosenberg, Esq., (iv) counsel for the Equity Committee, Fried, Frank, Harris, Shriver & Jacobson,

LLP, One New York Plaza, New York, NY 10004, Att'n Bonnie Steingart, Esq., (v) counsel for the

agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425

Lexington Avenue, New York, New York 10017, Att'n: Kenneth S. Ziman, Esq. and Robert H.

Trust, Esq., (vi) counsel for the agent under the Debtors' postpetition credit facility, Davis Polk &

Wardell, 450 Lexington Avenue, New York, New York 10017, Att'n: Donald Bernstein, Esq. and

Brian Resnick, Esq., and (vii) the members of the Fee Review Committee and its advisor, Legal

Cost Control, Inc., 255 Kings Highway East, Haddonfield, New Jersey 08033, Att'n: John J.

Marquess.  In light of the nature of the relief requested, the Debtors submit that no other or further

notice is necessary.

<u>Memorandum Of Law</u>

184.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, Skadden respectfully requests that the Court (a) enter an order allowing interim compensation of $11,310,231 to Skadden for professional services rendered as attorneys for the Debtors during the Application Period, plus reimbursement of actual and necessary charges and disbursements incurred in the sum of $825,854 and (b) grant it such other and further relief as is just.

Dated: New York, New York
      July 31, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP


By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

      - and -


By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

94