SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

      In re                     :    Chapter 11
                                 :

DELPHI CORPORATION, et al.,    :    Case No. 05-_____ (___)
                               :

                  Debtors.   :    (Jointly Administered)
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 329 AND FED. R. BANKR. P. 2014 AND 2016 (I) AUTHORIZING EMPLOYMENT AND RETENTION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES AS ATTORNEYS FOR DEBTORS-IN-POSSESSION AND (II) SCHEDULING A FINAL HEARING THEREON

("SKADDEN RETENTION APPLICATION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby apply (the "Application") to this Court for interim and

final orders under 11 U.S.C. §§ 327(a) and 329 and Fed. R. Bankr. P. 2014 and 2016

(a) authorizing the employment and retention of Skadden, Arps, Slate, Meagher & Flom LLP

and affiliates (collectively, "Skadden" or the "Firm") as counsel for the Debtors as of the

Petition Date (as hereinafter defined) and (b) scheduling a final hearing thereon.  In support of

this Application, the Debtors submit the Declaration of John Wm. Butler, Jr. (the "Butler

Declaration") and the Affidavit of Robert S. Miller, Jr. in Support of Chapter 11 Petitions and

First Day Orders, sworn to October 8, 2005.  In further support of this Application, the

Debtors respectfully represent as follows:

---

[1] In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

.

<u>Background</u>

A.     <u>The Chapter 11 Filings</u>

1.     On October 8, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have moved this Court for an order for joint administration of these chapter 11 cases.

2.     No trustee, examiner, or creditors' committee has been appointed in the Debtors' cases.

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.     The statutory predicate for the relief requested herein are sections 327(a) and 329 of the Bankruptcy Code and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure.

B.     <u>Current Business Operations Of The Debtors</u>

5.     With more than 180,000 employees worldwide, global 2004 revenues of approximately $28.6 billion and global assets as of August 31, 2005 of approximately $17.1 billion,[2] Delphi ranks as the fifth largest public company business reorganization in terms of

---

[2]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors, will continue their business operations without supervision from the Bankruptcy Court, and will not be subject to the chapter 11 requirements of the U.S. Bankruptcy Code.

6.    Over the past century, the operations which are now owned by Delphi have become a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Today, the Company is arguably the single largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company's technologies and products are present in more than 75 million vehicles on the road worldwide.  The Company supplies products to nearly every major global automotive original equipment manufacturer with 2004 sales to its former parent, General Motors Corporation, equaling approximately $15.4 billion and sales to each of Ford Motor Company, DaimlerChrysler Corporation, Renault/Nissan Motor Company, Ltd., and Volkswagen Group exceeding $850 million.

7.    As part of its growth strategy, Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in every major region of the world.  In the U.S., the Debtors employ approximately 50,600 people.  Those employees work in approximately 44 manufacturing sites and 13 technical centers across the country, and in Delphi's worldwide headquarters and customer center located in Troy, Michigan.  Approximately 34,750 of these individuals are hourly employees, 96% of whom are represented by approximately 49 different international and local unions.  Outside the United States, the Company's foreign entities employ more than

4

134,000 people, supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide.

8.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi and its subsidiaries and affiliates in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

9.    Due to the significant planning that goes into each vehicle model, Delphi's efforts to generate new business do not immediately affect its financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle.  When awarding new business, which is the foundation for the Company's forward revenue base, customers are increasingly concerned with the financial stability of their supply base.  The Debtors believe that they will maximize stakeholder value and the Company's future prospects if they stabilize their businesses and continue to diversify their customer base.  The Debtors also believe that this must be accomplished in advance of the expiration of certain benefit guarantees between GM and certain of Delphi's unions

representing most of its U.S. hourly employees which coincides with the expiration of the

Company's U.S. collective bargaining agreements in the fall of 2007.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the

Company generated more than $2 billion in net income.  Every year thereafter, however, with

the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company

reported a net operating loss of $482 million on $28.6 billion in net sales.  Reflective of a

downturn in the marketplace, Delphi's financial condition has deteriorated further in the first

six months of 2005.  The Company experienced net operating losses of $608 million for the

first six months of calendar year 2005 on six-month net sales of $13.9 billion, which is

approximately $1 billion less in sales than during the same time period in calendar year

2004.[3]

11.    The Debtors believe that three significant issues have largely contributed

to the deterioration of the Company's financial performance: (a) increasingly unsustainable

U.S. legacy liabilities and operational restrictions driven by collectively bargained

agreements, including restrictions preventing the Debtors from exiting non-strategic, non-

profitable operations, all of which have the effect of creating largely fixed labor costs, (b) a

competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion
tax charge, primarily related to the recording of a valuation allowance on the U.S.
deferred tax assets as of December 31, 2004.

number of motor vehicles that GM produces annually in the United States and related pricing
pressures, and (c) increasing commodity prices.

12.   In light of these factors, the Company determined that it would be
imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,
product portfolio, operational issues and forward looking revenue requirements.  Having
concluded that pre-filing discussions with its Unions and GM were not leading to the
implementation of a plan sufficient to address the Debtors' issues on a timely basis, the
Company determined to commence these chapter 11 cases for its U.S. businesses to complete
the Debtors' transformation plan and preserve value.

13.   Through the reorganization process, the Debtors intend to achieve
competitiveness for Delphi's core U.S. operations by modifying or eliminating non-
competitive legacy liabilities and burdensome restrictions under current labor agreements and
realigning Delphi's global product portfolio and manufacturing footprint to preserve the
Company's core businesses.  This will require negotiation with key stakeholders over their
respective contributions to the restructuring plan or, absent consensual participation, the
utilization of the chapter 11 process to achieve the necessary cost savings and operational
effectiveness envisioned in the Company's transformation plan.  The Debtors believe that a
substantial segment of Delphi's U.S. business operations must be divested, consolidated, or
wound-down through the chapter 11 process.

14.   Upon the conclusion of this process, the Debtors expect to emerge from
chapter 11 as a stronger, more financially sound business with viable U.S. operations that are
well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal

7

all of its resources to continue to deliver value and high-quality products to its customers

globally. Additionally, the Company will preserve and continue the strategic growth of its

non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.    By this Application, the Debtors seek to employ and retain the firm of

Skadden, as of the Petition Date, to represent the Debtors as their principal restructuring and

bankruptcy counsel in connection with the filing of their chapter 11 petitions and prosecution

of their chapter 11 cases. Accordingly, the Debtors respectfully request entry of interim and

final orders under sections 327(a) and 329 of the Bankruptcy Code and Rules 2014 and 2016

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) authorizing each

of them to employ and retain Skadden as their attorneys under a general retainer to perform

the legal services that will be necessary during their chapter 11 cases and (b) scheduling a

hearing to determine whether the relief should be granted on a final basis.

16.    Since July 12, 2005, Skadden has performed extensive legal work for the

Debtors in connection with their ongoing restructuring efforts designed to complete their

transformation plan and to preserve the value of the company.

17.    Prior to commencement of these chapter 11 cases, the Debtors sought the

services of Skadden with respect to, among other things, advice regarding restructuring

matters in general and, if required, preparation for the potential commencement and

prosecution of chapter 11 cases for the Debtors pursuant to an engagement agreement with

Skadden dated as of July 12, 2005 (the "Engagement Agreement").

8

<u>Basis For Relief</u>

18.    The Debtors believe that continued representation by their prepetition restructuring counsel, Skadden, is critical to the Debtors' efforts to restructure their businesses because Skadden has become familiar with the Debtors' business and financial and legal affairs and, accordingly, is well-suited to guide the Debtors through the chapter 11 process.

19.    Since the commencement of this engagement, Skadden has assisted the Debtors and their affiliates in connection with, among other things, acting as special corporate counsel to the Debtors and providing advice regarding, without limitation, their efforts to effectuate a consensual resolution with General Motors Corporation and the Debtors' major unions, attending board of directors meetings (and various committees thereof) and internal company meetings from time to time, and the preparations for the filing of these cases.

20.    The Debtors have selected Skadden as their attorneys because of its experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  Indeed, Skadden believes it has assembled a highly qualified team of attorneys to service the Debtors during their reorganization efforts.  John Wm. Butler, Jr., co-leader of Skadden worldwide corporate restructuring practice will coordinate the overall representation of the Debtors along with Peter Allan Atkins.  Mr. Butler has served as counsel in transactional work with debtors, sellers, purchasers and creditors of financially troubled companies, in nonjudicial restructurings, and in chapter 11 reorganization cases in several hundred transactions across North America and in international transactions located in Asia, Australia, Europe, South America and the Middle East.  Mr. Butler has also represented creditors' and equity

9

committees, secured lenders and chapter 7 trustees in numerous cases in this and other

jurisdictions. Attached hereto as Exhibit A is the professional biography of Mr. Butler

detailing his specific experience. In addition, other members of Skadden who have been

actively involved in representing the Debtors prior to the commencement of these cases will

continue to perform services for the Debtors postpetition.

      21.  Each of the Debtors desire to employ Skadden under a general retainer

because of the extensive legal services that will be required in connection with their

respective chapter 11 cases and the firm's familiarity with the business, financial and legal

affairs of the Debtors and their affiliates.

Services To Be Rendered

      22.  The services of attorneys are necessary to enable the Debtors to execute

faithfully their duties as debtors-in-possession. Subject to further order of this Court, the firm

of Skadden will be required to render, among others, the following services to the Debtors as

requested by the Debtors:

    (a)  advise the Debtors with respect to their powers and duties as debtors and debtors-in-possession in the continued management and operation of their business and properties;

    (b)  attend meetings and negotiate with representatives of creditors and other parties in interest;

    (c)  advise and consult on the conduct of the case, including all of the legal and administrative requirements of operating in chapter 11;

    (d)  advise the Debtors in connection with any contemplated sales of assets or business combinations, including the negotiation of asset, stock purchase, merger or joint venture agreements, formulate and implement bidding procedures, evaluate competing offers, draft appropriate corporate

10

documents with respect to the proposed sales, and counsel the Debtors in connection with the closing of such sales;

(e)   advise the Debtors on matters relating to the evaluation of the assumption, rejection or assignment of unexpired leases and executory contracts;

(f)   provide advice to the Debtors with respect to legal issues arising in or relating to the Debtors' ordinary course of business including attendance at senior management meetings, meetings with the Debtors' financial advisors and meetings of the board of directors, and advice on employee, workers' compensation, employee benefits, executive compensation, tax, environmental, banking, insurance, securities, corporate, business operation, contracts, joint ventures, real property, press/public affairs and regulatory matters and advise the Debtors with respect to continuing disclosure and reporting obligations, if any, under securities laws;

(g)   take all necessary action to protect and preserve the Debtors' estates, including the prosecution of actions on their behalf, the defense of any actions commenced against those estates, negotiations concerning all litigation in which the Debtors may be involved and objections to claims filed against the estates;

(h)   negotiate and prepare on the Debtors' behalf plan(s) of reorganization, disclosure statement(s) and all related agreements and/or documents and take any necessary action on behalf of the Debtors to obtain confirmation of such plan(s);

(i)   prepare on the Debtors' behalf all petitions, motions, applications, answers, orders, reports, and papers necessary to the administration of the estates;

(j)   attend meetings with third parties and participate in negotiations with respect to the above matters;

(k)   appear before this Court, any appellate courts, and the U.S. Trustee, and protect the interests of the Debtors' estates before such courts and the U.S. Trustee; and

(l)   perform all other necessary legal services and provide all other necessary legal advice to the Debtors in connection with these chapter 11 cases and bring the Debtors' chapter 11 cases to a conclusion.

23.    Skadden has indicated a willingness to act on behalf of, and render such services to, the Debtors.[4]

<u>Disinterestedness Of Professionals</u>

24.    Except as set forth in the Butler Declaration, to the best of the Debtors' knowledge, the members, counsel and associates of the firm of Skadden (a) do not have any connection with any of the Debtors, their affiliates, their creditors, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any other party-in-interest, or their respective attorneys and accountants, (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, and (c) do not hold or represent any interest adverse to the Debtors' estates.

25.    More specifically, as set forth in the Butler Declaration:

(a)    Neither Skadden nor any attorney at the Firm holds or represents an interest adverse to the estates.

(b)    Except as set forth herein and in the Butler Declaration, neither Skadden nor any attorney at the Firm is or was a creditor, an equity holder, or an insider of the Debtors, except that Skadden previously rendered legal services to the Debtors for which it was compensated. Certain Skadden attorneys may own Delphi common stock, either directly or indirectly. Also, partners of the Firm may hold Delphi common stock in managed accounts over which they have no control over investment decisions pertaining to holdings in such accounts. Pursuant to the internal policy of Skadden, the Debtors have been placed on the firm's "restricted list" and no sale or purchase of securities or claims relating to the Debtors will be

---

[4]    Concurrently herein, the Debtors have filed an application under 11 U.S.C. § 327(a) to retain Togut Segal & Segal as conflicts counsel and an application under 11 U.S.C. § 327(e) to retain Shearman & Sterling LLP as their special counsel. The Debtors will take the appropriate steps to ensure that there is no unnecessary and wasteful duplication of efforts by and between Togut Segal & Segal, Shearman & Sterling LLP and Skadden.

12

authorized or permitted during the pendency of our retention as the
Debtors' counsel in the chapter 11 cases.

(c) Neither Skadden nor any attorney at the Firm is or was an investment
banker for any outstanding security of the Debtors.

(d) Neither Skadden nor any attorney at the Firm is or was, within three years
before the filing of the Debtors' chapter 11 cases, an investment banker
for any security of the Debtors, or an attorney for an investment banker in
connection with the offer, sale or issuance of any security of the Debtors.

(e) Neither Skadden nor any attorney at the Firm is or was, within two years
before the Petition Date, a director, officer or employee of the Debtors or
of an investment banker of the Debtors.

(f) Skadden does not have an interest materially adverse to the interests of the
estates or of any class of creditors or equity security holders by reason of
any direct or indirect relationship to, connection with, or interest in the
Debtors or an investment banker specified in the foregoing paragraphs, or
for any other reason.

26.    In view of the foregoing, the Debtors believe that Skadden is a

"disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as

modified by section 1107(b) of the Bankruptcy Code, except as set forth in the Butler

Declaration.

27.    In addition, the Debtors are informed by Skadden that no other attorney

at Skadden is related to any United States Bankruptcy Judge for the Southern District of New

York or to the United States Trustee for such district or to any employee in the office thereof,

except that Adlai S. Hardin III, a Corporate Restructuring associate employed by Skadden in

its New York office, is the son of Judge Adlai Hardin.

Professional Compensation

28.    The Engagement Agreement provided for the implementation of a

retainer program pursuant to which the Debtors paid an initial retainer of $500,000 for

13

professional services rendered and to be rendered and charges and disbursements incurred to Skadden on behalf of the Debtors in connection with those services described in the Engagement Agreement (the "Initial Retainer").  Thereafter, Skadden periodically invoiced the Debtors and drew down the Initial Retainer in payment of such invoices and was paid certain supplemental amounts in order to replenish the Initial Retainer (collectively, the "Supplemental Retainer") in the following amounts and on the following dates: $1,600,000 on August 19, 2005, $2,000,000 on September 8, 2005, and $1,750,000 on September 27, 2005.

29.     Pursuant to the Engagement Agreement, Skadden received a filing retainer of $4,000,000 to be utilized in accordance with the Engagement Agreement to cover a portion of the projected fees, charges and disbursements to be incurred during the reorganization cases (the "Filing Retainer," and, together with the Initial Retainer and the Supplemental Retainer, the "Retainer").

30.     Pursuant to the Engagement Agreement, Skadden will apply the Retainer to pay any fees, charges and disbursements which remain unpaid as of the Petition Date and will retain the remainder of the Retainer to be applied to any fees, charges and disbursements which remain unpaid at the end of the reorganization cases.  As of October 7, 2005 (the last date on which the firm's books and records were reviewed in connection with the preparation of this application), after application of all prepetition fees, charges and disbursements incurred and posted as of that date (including estimated fees, charges and disbursements billed as of October 8, 2005 prior to the commencement of these cases), the amount of the Retainer was $4,033,019.

14

31.    According to Skadden's books and records, for the period July 12, 2005,

through October 8, 2005, the total amount of services billed to the Debtors in connection with

contingency planning was $2,845,087 with an additional $227,668 for charges and

disbursements.  During the same period, the total aggregate amount of all services billed was

$5,500,654 plus charges and disbursements in the amount of $315,327.  Skadden's books and

records further reflect that for the period July 12, 2005 through October 8, 2005, Skadden

received an aggregate of $9,850,000 from the Debtors, including payments received for

services rendered prior to the filing on October 8, 2005, and is inclusive of the Retainer

balance of $4,033,019.  The aggregate amount applied to fees, charges and disbursements for

the same period was $5,816,981, exclusive of the Retainer balance of $4,033,019.  Any

portion of the prepetition amounts received by Skadden that has not yet been applied to

prepetition fees and expenses will be applied when such amounts are identified.  Should any

balance remain after such application, the remainder will be held as a retainer for and applied

against postpetition fees and expenses that are allowed by the Court.

32.    Pursuant to the Engagement Agreement, Skadden provides the Debtors

with periodic (no less frequently than monthly) statements for services rendered and charges

and disbursements incurred.  During the course of the reorganization cases, the issuance of

periodic statements shall constitute a request for an interim payment against the reasonable

fees to be determined at the conclusion of the representation.  For professional services,

Skadden's fees are based in part on its guideline hourly rates which are periodically adjusted.

Skadden will be providing professional services to the Debtors under its standard bundled rate

schedule and, therefore, Skadden will not be seeking to be separately compensated for certain

15

staff, clerical and resource charges. As of September 1, 2005, the hourly rates under the

bundled rate structure range from $585 to $835 for partners and of counsel, $560 to $640 for

counsel and special counsel, $295 to $540 for associates, and $90 to $230 for legal assistants

and support staff. The hourly rates set forth above are subject to periodic increases in the

normal course of the firm's business, often due to the increased experience of a particular

professional.

33.    Skadden intends to apply to the Court for allowance of compensation for

professional services rendered and reimbursement of charges and disbursements incurred in

these chapter 11 cases in accordance with applicable provisions of the Bankruptcy Code, the

Bankruptcy Rules, the Local Rules for the Southern District of New York (the "Local Rules")

and the United States Trustee Guidelines. Skadden will seek compensation for the services of

each attorney and paraprofessional acting on behalf of the Debtors in these cases at the then-

current bundled rate charged for such services on a non-bankruptcy matter.

34.    The hourly rates set forth above are the Firm's standard bundled hourly

rates for work of this nature. These rates are set at a level designed to compensate Skadden

fairly for the work of its attorneys and legal assistants and to cover fixed and routine overhead

expenses including those items billed separately to other clients under the Firm's standard

unbundled rate structure. Consistent with the Firm's policy with respect to other clients,

Skadden will continue to charge the Debtors for all other services provided and for other

charges and disbursements incurred in the rendition of services. These charges and

disbursements include, among other things, costs for telephone charges, photocopying (at a

reduced rate of $0.10 per page for black and white copies and higher commensurate charges

16

for color copies), travel, business meals, computerized research, messengers, couriers, postage, witness fees and other fees related to trials and hearings. Charges and disbursements are invoiced pursuant to Skadden's Policy Statement Concerning Charges and Disbursements. (The "Policy Statement Concerning Charges and Disbursements" is attached as Exhibit B to the Engagement Agreement.) Certain charges and disbursements are not separately charged for under the bundled rate structure as described in the Engagement Agreement.

35.    Skadden has agreed to accept as compensation such sums as may be allowed by this Court on the basis of the professional time spent, the rates charged for such services, the necessity of such services to the administration of the estate, the reasonableness of the time within which the services were performed in relation to the results achieved, and the complexity, importance, and nature of the problems, issues or tasks addressed in these cases.

36.    Other than as set forth above and in the Butler Declaration, no arrangement is proposed between the Debtors and Skadden for compensation to be paid in these cases, and no agreement or understanding exists between Skadden and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case.

<u>Notice</u>

37.    Notice of this Application has been provided by facsimile, electronic transmission, overnight delivery or hand delivery to (i) the office of the United States Trustee, (ii) the Debtors' fifty (50) largest unsecured creditors, (iii) counsel for the agent to the Debtors' pre-petition credit facility, and (iv) counsel for the agent to the Debtors' proposed

post-petition credit facility.  In light of the nature of the relief requested, the Debtors submit

that no other or further notice is necessary.

<u>Memorandum Of Law</u>

38.    Because the legal points and authorities upon which this Motion relies

are incorporated herein, the Debtors respectfully request that the requirement of the service

and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter
interim and final and orders (i) authorizing the Debtors' retention of Skadden upon
the terms outlined in this Application, (ii) scheduling a final hearing thereon, and
(iii) granting such other and further relief as is just and proper.

Dated:   New York, New York
         October 8, 2005

                            Delphi Corporation, et al.,
                            Debtors and Debtors-In-Possession


                            By:  _s/ John D. Sheehan_____
                            Title: John D. Sheehan
                            Name: Vice President and Chief
                                     Restructuring Officer

Exhibit A
Professional Biography of John Wm. Butler, Jr.

# Biography



## John Wm. Butler Jr.

*Partner*
*Skadden, Arps, Slate, Meagher & Flom LLP*
*Corporate Restructuring*

Jack Butler is co-leader of Skadden's worldwide corporate restructuring practice, which serves corporations and their principal creditors and investors by providing value-added legal solutions in troubled company M&A, financing and restructuring situations. He has acted as lead counsel for sellers, purchasers and creditors in hundreds of transactions across the Americas as well as cross-border transactions in Asia, Australia, Europe and the Middle East. Mr. Butler also advises officers and directors of public companies involved in debt restructuring on matters related to corporate governance and fiduciary duty.

Mr. Butler's representative company matters include the restructuring of Delphi Corporation, Friedman's Inc., Haynes International, Inc., Kmart Corporation, Per-Se Technologies, Inc. (formerly Medaphis Corporation), Rite Aid Corporation, Singer N.V., Venator Group, Inc., Wickes Furniture Co., Inc. and Xerox Corporation, and special counsel representations of 360/networks, inc., Enron Corporation and The Warnaco Group, Inc. He also represented US Airways Group, Inc. in its 2002 restructuring, which provided the company with $1.24 billion in liquidity. Mr. Butler has substantial experience in representing companies in transactions that provided for the disposition of their assets and operating businesses to third parties as part of Chapter 11 cases, including: Air Transport International LLC, Comdisco, Inc., Eagle Food Centers, Inc., FPA Medical Management, Inc., Peter J. Schmitt Co., Inc., Service Merchandise Company, Inc. and USN Communications, Inc.

Mr. Butler's cross-border experience includes representing numerous companies such as AM International, Inc., Comdisco, Singer, Warnaco and Xerox with the restructuring of their subsidiaries located outside the United States, international financing transactions, and divestiture of various business lines and entities. He has also advised on cross-border matters on behalf of Faurecia N.A., a French automotive equipment supplier, in connection with distressed acquisitions and other matters; and Lightel, S.A. and Tess, S.A., Brazilian telecommunications companies, in connection with the financing and structuring of various privatization transactions in Brazil.

Representative creditor matters include advice to Bankers Trust Company, as agent for the senior lenders in the reorganization cases of Bradlees, Inc. and The Grand Union Company; Credit Suisse First Boston, in connection with the restructuring and sale of Long John Silver's restaurants; and Verizon Capital Corporation and its special purpose affiliates in the reorganization cases of PG&E National Energy Group, Inc. and USGen New England, Inc.

Chicago Office
T: 312.407.0730
F: 312.407.8501

New York Office
T: 212.735.3114

E: jbutler@skadden.com

### Education

J.D., University of Michigan Law
School, 1980

A.B., Princeton University, 1977
*(magna cum laude)*

### Admissions

Illinois
Michigan
U.S. Supreme Court

### Associations/Affiliations

Chairman (1996-1997) and Director (1991-1999, 2001-2004), Turnaround Management Association

Fellow, American College of Bankruptcy (Elected 1997)

Fellow, International Insolvency Institute (Elected 2002)

Director, American Bankruptcy Institute (1992-1998)

Chairman (1997) and Director (1993-2003), American Board of Certification

Chairman (1997), Governing Board, Commercial Finance Association Education Foundation

(continued on reverse side)

# Biography

## John Wm. Butler Jr.

Mr. Butler was the recipient of the first-ever Chairman's Award from the Turnaround Management Association in 2001 for his contributions to and standing in the corporate renewal industry. He has been listed in all editions of the *K&A Restructuring Register*, the peer group listing of the top restructuring attorneys and financial advisors in the United States; has been named by *Turnarounds & Workouts* to its list of the top dozen restructuring lawyers in America for the last seven consecutive years; is listed as a leader in the corporate restructuring and insolvency field in *Chambers USA: America's Leading Lawyers for Business 2005* and in the 10th edition (2005) of *Global Counsel (PLC Which Lawyer?)*; and was named as one of the top 25 most highly regarded global restructuring lawyers in the 2005 edition of *The International Who's Who of Business Lawyers* and as one of the top 10 worldwide restructuring lawyers in 2002 by *Global Counsel* magazine.

In addition, Mr. Butler was profiled as one of the "Dealmakers of the Year" by *The American Lawyer* in its 2004 Corporate Scorecard issue (April 2004); was named to the BTI Consulting Group's Client Service All-Star Team for 2004 based on interviews with more than 200 corporate counsel at *Fortune* 1000 companies; and was selected as one of the top 100 lawyers in Illinois in 2005 by *Law & Politics* and *Chicago* magazine.

Associate General Counsel, Commercial Finance Association (1998-2002)

Group of Thirty Six INSOL International (1995-present)

Co-Chair, 2005 INSOL World Congress

Chairman (1998 and 2003), Turnaround Management Association Tenth and Fifteenth Anniversary Conventions

Co-Chair, *The American Lawyer* and Zeughauser Group Best in the Business: Annual Practice Leaders Conference (2004-present)

Co-Chair, Renaissance American/BeardGroup Corporate Reorganizations Conference (1999-present) and Healthcare Transactions Conference (2000-present)

Executive Advisory Council, Children Affected by AIDS Foundation (2003-present)

Board of Governors, Hugh O'Brian Youth Leadership (1998-present)

Day School Advisory Board, St. Chrysostom's Day School (2005-present)

Second Century Campaign Steering Committee, Francis W. Parker School (2005-present)

John Maclean Society, Princeton University (1985-present)

8/05

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|                          |   |                          |
|--------------------------|:--|--------------------------|
| In re                    | : | Chapter 11               |
|                          | : |                          |
| DELPHI CORPORATION, et al., | : | Case No. 05-_____ (___) |
|                          | : |                          |
| Debtors.                 | : | (Jointly Administered)   |
|                          | : |                          |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF JOHN WM. BUTLER, JR. IN SUPPORT OF APPLICATION
FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 329 AND FED.R. BANKR. P. 2014
AND 2016 AUTHORIZING EMPLOYMENT AND RETENTION OF SKADDEN,
ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES
AS ATTORNEYS FOR DEBTORS-IN-POSSESSION

I, JOHN WM. BUTLER, JR., declare that:

STATE OF NEW YORK       )
                               ) ss:
COUNTY OF NEW YORK   )

      1.     I am a member of the firm of Skadden, Arps, Slate, Meagher &
Flom LLP, which maintains an office for the practice of law at 333 West Wacker Drive,
Chicago, Illinois 60606-1225. I am a member in good standing of the bars of, and am
admitted to practice in, the States of Illinois and Michigan, the United States District
Courts for the Northern District of Illinois and the Eastern and Western Districts of
Michigan, the United States Court of Appeals for the Sixth and Seventh Circuits, and the
United States Supreme Court. I submit this declaration pursuant to 11 U.S.C. §§ 327 and
329 and Fed. R. Bank. P. 2014 and 2016 in support of the Application for Order Pursuant
to 11 U.S.C. §§ 327(a) and 329 Authorizing the Employment and Retention of Skadden,
Arps, Slate, Meagher & Flom LLP and Affiliates as Attorneys for the Debt-
ors-in-Possession (the "Application"), filed contemporaneously herewith by the Debtors.
Except as otherwise indicated, I have personal knowledge of the matters set forth herein
and if called as a witness, would testify competently thereto.[1]

## QUALIFICATION OF PROFESSIONALS

      2.     As of July 12, 2005, Skadden, Arps, Slate, Meagher & Flom LLP
and its affiliates (collectively, "Skadden" or the "Firm") began representing Delphi
Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate

---

[1]    Certain of the disclosures herein relate to matters within the knowledge of other attorneys at
Skadden (as defined below) and are based on information provided by them.

Debtors,")[2] , debtors and debtors in possession in the above-captioned cases, (collectively, the "Debtors") in their present efforts to restructure their businesses pursuant to an engagement agreement with Skadden dated as of July 12, 2005 (the "Engagement Agreement"), a copy of which is attached hereto as Exhibit A.

3.      Skadden believes it has assembled a highly qualified, dedicated team of attorneys that have committed, and will continue to commit, a concentrated effort to the Engagement to represent the Debtors during their reorganization efforts. I am the co-leader of Skadden's worldwide corporate restructuring practice and have served as counsel in transactional work with debtors, sellers, purchasers, and creditors of finan-cially troubled companies, in nonjudicial restructurings and in chapter 11 reorganization cases in several hundred transactions across North America, and in international transac-tions located in Asia, Australia, Europe, South America, and the Middle East. I am a Fellow of the American College of Bankruptcy and the International Insolvency Institute, served as Chairman of the Turnaround Management Association in 1996 and 1997 and as director from 1991-99 and again from 2001-04, was President and Chairman of the

---

[2]      In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufactur-ing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connec-tion Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corpora-tion, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmen-tal Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

American Board of Certification from 1995-97, was a director of the American Bank-

ruptcy Institute from 1991-98, was Chairman of the Governing Board of the Commercial

Finance Association Education Foundation from 1994-96, and was Associate General

Counsel of the Commercial Finance Association from 1996-2000.

        4.      Peter Allan Atkins and I will coordinate Skadden's overall repre-

sentation of the Debtors.  Other Skadden partners with principal responsibilities in the

Engagement matters are Eric L. Cochran, N. Lynn Hiestand, John K. Lyons and Kayalyn

A. Marafioti.  Mr. Atkins, a corporate partner resident in the New York office, concen-

trates on corporate, securities, and financial practice areas, including extensive involve-

ment in the mergers and acquisitions field.  Mr. Cochran, a corporate partner resident in

the New York office, has extensive experience in international transactions, mergers and

acquisitions, and corporate governance matters.  Ms. Hiestand, a corporate restructuring

partner resident in the London office, represents buyers, sellers, borrowers and lenders,

debtors, creditors, and financial advisors in a variety of international transactions,

primarily those involving financially troubled companies and will lead the legal efforts in

connection with international initiatives and issues.  Mr. Lyons, a corporate restructuring

partner resident in the Chicago office, represents debtors, creditors, sellers, purchasers,

and other financial advisors in all stages of complex restructuring transactions from

chapter 11 reorganizations to out of court negotiations, workouts and divestitures, and

will be primarily responsible advising the Debtors at their worldwide headquarters on

general aspects of the reorganization.  Ms. Marafioti, a corporate restructuring partner

resident in the New York office, who represents creditors, debtors, committees, equity

security holders, and foreign liquidators in a wide range of restructuring transactions and

bankruptcy litigation, will be responsible for general aspects of the reorganization
including coordination of the chapter 11 cases in this Court.

   5.  Other Skadden partners presently with engagement responsibilities
include Lawrence D. Frishman (finance), John P. Furfaro (labor), Cliff Gross (tax), Neil
M. Leff (executive compensation), Marian P. Wexler (real estate) and George
Zimmerman (litigation).  Additional lawyers will be added to Skadden's representation of
the Debtors in these chapter 11 cases on an as needed basis.

   6.  As a result of its representation of the Debtors, Skadden has
become informed about the Debtors and their businesses, and is generally familiar with
the Debtors' capital structure and those material agreements relating to Skadden's
engagement as disclosed to us by the Debtors.

SERVICES TO BE RENDERED

   7.  The Debtors have requested that Skadden render the following
services in connection with these cases:

   (a)  advise the Debtors with respect to their powers and duties as
debtors and debtors-in-possession in the continued management
and operation of their businesses and properties;

   (b)  attend meetings and negotiate with representatives of creditors and
other parties-in-interest;

   (c)  advise and consult on the conduct of the case, including all of the
legal and administrative requirements of operating in chapter 11;

   (d)  advise the Debtors in connection with any contemplated sales of
assets or business combinations, including the negotiation of asset,
stock purchase, merger or joint venture agreements, formulate and
implement bidding procedures, evaluate competing offers, draft
appropriate corporate documents with respect to the proposed
sales, and counsel the Debtors in connection with the closing of
such sales;

5

(e)    advise the Debtors on matters relating to the evaluation of the
       assumption, rejection or assignment of unexpired leases and execu-
       tory contracts;

(f)    provide advice to the Debtors with respect to legal issues arising in
       or relating to the Debtors' ordinary course of businesses, including
       attendance at senior management meetings, meetings with the
       Debtors' financial advisors, meetings of the board of directors, and
       advice on employee, workers' compensation, employee benefits,
       executive compensation, tax, environmental, banking, insurance,
       securities, corporate, business operation, contracts, joint ventures,
       real property, press/public affairs, and regulatory matters, and
       advise the Debtors with respect to continuing disclosure and re-
       porting obligations, if any, under securities laws;

(g)    take all necessary action to protect and preserve the Debtors' es-
       tates, including the prosecution of actions on their behalf, the
       defense of any actions commenced against those estates, negotia-
       tions concerning all litigation in which the Debtors may be in-
       volved and objections to claims filed against the estates;

(h)    negotiate and prepare on the Debtors' behalf plan(s) of reorganiza-
       tion, disclosure statement(s) and all related agreements and/or
       documents and take any necessary action on behalf of the Debtors
       to obtain confirmation of such plan(s);

(i)    prepare on the Debtors' behalf all petitions, motions, applications,
       answers, orders, reports, and papers necessary to the administration
       of the estates;

(j)    attend meetings with third parties and participate in negotiations
       with respect to the above matters;

(k)    appear before this Court, any appellate courts, and the U.S.
       Trustee, and protect the interests of the Debtors' estates before such
       courts and the U.S. Trustee; and

(l)    perform all other necessary legal services and provide all other
       necessary legal advice to the Debtors in connection with these
       chapter 11 cases and bring the Debtors' chapter 11 cases to a
       conclusion.

8.      Subject to this Court's approval of the Application, Skadden is willing to serve as the Debtors' counsel and to perform the services described above.

DISINTERESTEDNESS OF SKADDEN

9.      Except as otherwise set forth herein, the partners, counsel, and associates of Skadden (a) do not have any connection with the Debtors or their affiliates, their creditors, the U.S. Trustee, or any person employed in the office of the U.S. Trustee, or any other party in interest, or their respective attorneys and accountants, (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, and (c) do not hold or represent any interest adverse to the estates.

10.      Skadden represented, represents, and in the future likely will represent, certain creditors of the Debtors and other parties-in-interest in matters unrelated to the Debtors, the Debtors' reorganization cases, or such entities' claims against or interests in the Debtors.  Of the Debtors' (a) affiliates, (b) officers and directors, (c) joint owners of Debtors' affiliates, (d) fifty largest unsecured creditors (on a consolidated basis as of September 2005 as determined by the Debtors), (e) counterparties to major contracts, (f) major lenders, (g) shareholders who own over 5% of the Debtors' shares, (h) professionals, (i) counterparties to major leases, (j) insurance providers, (k) major vendors, (l) major customers, (m) non-Debtor parties to collective bargaining agreements with the Debtors, (n) indenture trustees, (o) underwriters of securities, (p) major litigation parties, (r) state and governmental agencies, and (s) Judges and United States Trustees for the United States Bankruptcy Court for the Southern District of New York, Skadden currently represents or has represented the following entities (or in some cases their affiliates as indicated):

7

11.    <u>Officers and Directors</u>:  The current and former directors and officers of the Debtors include Jose Maria Alapont, J.T. Battenberg III, R. H. Brust, Alan S. Dawes, Richard Erwin, Robert Katz, Jeffrey Krause, Robert Steve Miller Jr., Rodney O'Neal, Brian O'Neill, John D. Opie, Roger S. Penske, John D. Sheehan, John Short and Robert Sparks.  In addition, John D. Opie is an outside director of NBC, Inc., an affiliate of GE; R. H. Brust is an executive director of Eastman Kodak Co., Robert S. Miller Jr. is a current outside director of Symantec Corporation and UAL Corp. and a former outside director of Federal-Mogul Corp. and DaimlerChrysler Motors Corp.; Rodney O'Neal is an outside director of Goodyear Tire & Rubber Co.; Roger S. Penske is on the board of directors of Penske Corp. and GE Co.; Alan S. Dawes is an outside director of Autonation, Inc.; Brian O'Neill is director of Prudential International Assurance Public Ltd. Co.; J. T. Battenberg III is outside director of Sara Lee Corporation; Jeffrey Krause is executive of First Interstate Insurance Agency of Oregon; Jose Maria Alapont is Executive of Federal-Mogul Corporation; Richard Erwin is a Managing Director of Roche OY; Robert Katz is President of Liberty Supply, Inc.  Skadden currently represents or has represented NBC, Inc., Eastman Kodak Co, Federal-Mogul Corp., Symantec Corporation, DaimlerChrysler Motors Corp., Waste Management, Inc., UAL Corp., Goodyear Tire & Rubber Co., Penske Corp., GE Co., Autonation, Inc., The Williams Companies Inc., Prudential International Assurance Public Ltd. Co., Sara Lee Corporation, First Interstate Insurance Agency of Oregon, Atlas Processing Company, Roche OY, and Liberty Supply, Inc. or their affiliates in matters unrelated to the Debtors.

12.    Skadden represents Robert S. "Steve" Miller, Jr., Delphi's Chairman and Chief Executive Officer, on a matter unrelated to the Company involving Mr.

8

Miller's directorship of Waste Management, Inc.  In addition, prior to the Petition Date

and with the prior knowledge and consent of the Company, Skadden provided advice to

John D. Sheehan, the Company's Vice President and Chief Restructuring Officer, in

connection with meetings, interviews, testimony, and submissions relating to the investi-

gation of the Company by the Securities and Exchange Commission as well as the

internal investigation completed prior to July 2005 on a basis that was not adverse to the

Company.

      13.    <u>Joint Owners of Debtors' affiliates</u>:  Skadden currently represents

RS Investment Management in matters unrelated to the Debtors and their chapter 11

cases.  In addition, Skadden currently represents or in the past has represented Palm, Inc.

and Royce & Assocs, believed to be affiliates of some of the Debtors' joint owners of

their affiliates in matters unrelated to the Debtors and their chapter 11 cases.

      14.    <u>Fifty Largest Unsecured Creditors</u>:  Skadden currently represents

or has represented the following fifty largest unsecured creditors or their affiliates in

matters unrelated to the Debtors and their chapter 11 cases: AK Steel Corporation;

affiliates of American Axle and Manufacturing Holdings Inc.; and an affiliate of Autocam

Corp; the parent company of Autoliv Asp Inc.; Engelhard Corporation and some affili-

ates; affiliates of Freescale Semiconductor Inc.; General Motors Corp. and affiliates[3];

affiliates of HSBC Bank USA, N.A.; affiliates of Infineon Technologies AG; Ispat Inland,

---

[3]    As of the date of this Affidavit, Skadden does not represent GM and will not represent GM in the
future prior to the termination of the Engagement except on unrelated matters in accordance with
the terms of Skadden's Engagement Agreement and after disclosure to the Debtors, the United
States Trustee and the Court of the fact of any such engagement.  Skadden currently represents a
subsidiary of and certain financial advisors to GM on certain limited matters unrelated to the
Debtors, but is free to represent the Debtors on a basis adverse to GM in the chapter 11 cases
without any notice to or further consent from GM.

Inc.; Johnson Electric Holdings Ltd.; affiliates of Molex Inc.; affiliates of NEC Electron-

ics Inc.; Olin Corp. and an affiliate; an affiliate of Panasonic Automotive; an affiliate of

Pechiney Rolled Products LLC.; an affiliate of Robert Bosch Corporation; SGS

Thomson; affiliates of Siemens Automotive Ltd.; affiliates of TRW Automotive; Tyco

International Ltd. and affiliates; an affiliate of Waupaca Foundry Inc.

15.    Counterparties to Major Contracts:  Skadden currently represents

or has represented the following counterparties to major contracts or their affiliates in

matters unrelated to the Debtors and their chapter 11 cases: Alltel Corporation and an

affiliate; affiliates of American Electric Power (AEP); affiliates of Ameritech Information

Systems, Inc.; AT&T Corporation and an affiliate; AT&T Wireless and affiliates;

affiliates of Cardinal Health, Inc.; Cellco Partnership (d/b/a Verizon Wireless) and

affiliates; the parent company of Cinergy PSI IN; Consumers Energy Company and

affiliates; Consumers Power Company and affiliates; an affiliate of the Deparment of

Commerce/National Institute of Standards and Technology (DOC/NIST); an affiliate of

the Department of Defense/Tank-Automotive and Armaments Command

(DOD/TACOM); an affiliate of the Department of Energy/National Energy Technology

Laboratory (DOE/NETL); an affiliate of the Department of Transportation; an affiliate of

DPL Energy Resources, Inc.; affiliates of DTE Energy Co.; Entergy (MS Power & Light)

USA and affiliates; affiliates of El Paso Electric Co.; an affiliate of Georgia Power

Company; Honeywell International; an affiliate of Indiana Michigan Power Company;

affiliates of Indiana-American Water Company; affiliates of Indianapolis Power & Light

Company; an affiliate of Kokomo Gas & Fuel Co.; KPL (Western Resourses); affiliates

of Mississippi Power Company; an affiliate of National Aeronautics and Space Adminis-

10

tration (NASA); Nextel Communications, Inc.; OneOK Energy Marketing and affiliates; affiliates of Pepco Energy Services; affiliates of PSE&G; affiliates of SBC Ameritech; affiliates of SBC Global Services, Inc.; affiliates of SkyTel; an affiliate of Southern California Edison; affiliates of Sprint United; an affiliate of Tennessee Valley Authority; affiliates of Time Warner, Inc.; affiliates of Verizon; and an affiliate of Wisconsin Electric Power Co.

16.    Major Lenders:[4]  Skadden currently represents or has represented the following major lenders or their affiliates in matters unrelated to the Debtors and their chapter 11 cases: several affiliates of ABN Amro Bank N.V.; Amaranth Partners LLC; affiliates of Banc One Capital Markets, Inc.; Bank of China Luxembourg S.A.; Bank of New York; Bank of Nova Scotia and affiliates; The Bank of Tokyo-Mitsubishi, Ltd. and affiliates; Barclays Bank plc. and affiliates; affiliates of Bear Stearns Investment Products; BNP Paribas and affiliates; Calyon NY Branch (f/k/a Credit Lyonnais) and affiliates; affiliates of Cargill Financial Services International, Inc.; an affiliate of Cede & Co.; Citibank N.A. and affiliates; affiliates of Citicorp Securities, Inc.; affiliates of Citicorp Vendor Finance, Inc.; Citigroup Financial Products Inc. and affiliates; affiliates of Comerica Bank; Commerzbank A.G. and affiliates; and affiliates of Compaq Financial Services Corp.; an affiliate of Dai-Ichi Kangyo Trust Co. of New York; Deutsche Bank A.G. and affiliates; Deutsche Bank Trust Company; Fifth Third Bank; several affiliates of First Chicago Capital Markets, Inc.; Goldman Sachs Credit Partners L.P.; an affiliate of

---

[4]    Each of the lenders included in this category is limited to a $10 million commitment. Skadden may have represented or may represent certain of the lenders below the $10 million threshold in matters unrelated to the Debtors and their chapter 11 cases. Skadden is in the process of conducting disclosure research with respect to the voluminous number of lenders who have extended credit to the Debtors in an amount below this threshold and will include these results in a supplemental declaration after completion.

HBK Master Fund L.P.; J.P. Morgan Chase Bank, N.A. and several of its affiliates[5];

affiliates of KeyBank National Association; affiliates of Lehman Commercial Paper, Inc.;

Mizhuo Corporate Bank Ltd. (f/k/a DKB); affiliates of Morgan Stanley Senior Fundings,

Inc.; the parent company and affiliates of Regions Bank; Societe Generale S.A. and

affiliates; Sumitomo Mitsui Banking Corporation and an affiliate; UBS AG and several of

its affiliates; an affiliate of UFJ Bank Limited; Wachovia Bank, N.A. and affiliates; an

affiliate of Whitney National Bank.

17.   Major Shareholders:  Skadden currently represents or has repre-

sented the following major shareholders or affiliates of such major shareholders in

matters unrelated to the Debtors and their chapter 11 cases: affiliates of Capital Group

International, Inc.; Capital Research & Management Co.; affiliates of Dodge & Cox; and

State Street Bank and Trust Co.

18.   Professionals:  Skadden currently represents or has represented the

following professionals or affiliates of such professionals in matters unrelated to the

Debtors and their chapter 11 cases: BBK Ltd.; an affiliate of Corporate Executive Board

Co.; Ernst & Young LLP and an affiliate; affiliates of Fidelity Employer Services

Company LLC; FTI Consulting, Inc.; KPMG LLP and affiliates; Salomon Smith Barney

---

[5]   Skadden also represented JP Morgan Chase Bank, N.A. in connection with a Receivables Purchase Agreement, dated as of March 31, 2003, as amended from time to time, among Delphi Receivables LLC as Seller, Delphi Corporation as Servicer, JP Morgan, Falcon Asset Securitization Corporation, ABN AMRO Bank N.V., Amsterdam Funding Corporation, The Bank of Tokyo-Mitsubishi, Ltd., and Gotham Funding Corporation. On October 6, 2005, the Debtors gave notice of their election to terminate the U.S. Facility Program pursuant to the terms of the relevant agreements upon the earlier of October 11, 2005 and the occurrence of an amortization event. The commencement of these chapter 11 cases has constituted such an amortization event and the U.S. Facility Program has terminated.   As of the Petition Date, there were no borrowings under the U.S. Facility Program.

Inc. (a/k/a Citigroup) and several affiliates; affiliates of Sedgwick Claims Management

Services, Inc.; and Sitrick & Company, Inc.

19.    Counterparties to Major Leases:  Skadden represents or has

represented the following counterparties to major leases or affiliates of such

counterparties to major leases in matters unrelated to the Debtors and their chapter 11

cases: affiliates of Ford Motor Land Development Corporation; an affiliate of Kilroy

Relaty, L.P. (b/k/a Limar Realty Corp.); and LaSalle National Bank.

20.    Insurance Providers:  Skadden represents or has represented the

following insurance providers or affiliates of such insurance providers in matters

unrelated to the Debtors and their chapter 11 cases: an affiliate of ACE American

Insurance Company; ACE USA and an affiliate of ACE USA; affiliates of AIG Excess

Casualty North America; affiliates of AIU, Inc.; Allianz of America Corp. and affiliates;

affiliates of American Home Assurance Co.; affiliates of American International Group,

Inc. (AIG); the parent company of AON (Bermuda) Limited; the ultimate company of

AON UK; an affiliate of Arch Insurance Group Inc. (U.S.); Blue Cross Blue Shield of

Michigan; affiliates of Canawill, Inc.; the parent company and an affiliate of CIGNA

Behavioral Health; CIGNA Corp.; Continental Casualty Co. (C.N.A.); an affiliate of

Delta Dental Plans Association; affiliates of Great American Insurance Co.; affiliates of

Gulf Underwriters Insurance Company; affiliates of Hewitt Associates; affiliates of Ins.

Co. of the State of Pennsylvania (AIG); Liberty Mutual Insurance Company; affiliates of

Marsh USA, Inc.; an affiliate of Medco Health Solutions, Inc.; the parent company of The

Medstat Group Inc.; Metropolitan Life Insurance Co. (MetLife) and some of its affiliates;

National Union Fire Ins. Co. (AIG) and affiliates; affiliates of Pacific Employers Insur-

13

ance Co. (ACE USA); PriceWaterhouseCoopers International Ltd.; affiliates of St. Paul

Fire & Marine Insurance Company; affiliates of Steadfast Insurance Company (Zurich);

Swiss Re Company and affiliates; affiliates of Twin City Fire Insurance (Hartford);

United Health Group; affiliates of United State Aviation Insurance Group (USAIG); an

affiliate of Watson Wyatt & Co.; XL Global Reinsurance Company, Ltd.; and the parent

company of Zurich American Insurance Company.

   21. <u>Major Vendors</u>: Skadden represents or has represented the

following major vendors or affiliates of such vendors in matters unrelated to the Debtors

and their chapter 11 cases: 3M Company; affiliates of Advanced Micro Devices, Inc.;

affiliates of Advanced Polymer Systems, Inc. (n/k/a AP Pharma Inc.); Alcoa Inc. and an

affiliate; affiliates of Analog Devices Inc.; Basell USA Inc.; an affiliate of Bayer AG;

Best Buy Co.; affiliates of Carpenter Technology Corporation; Circuit City Stores Inc.

and affiliates; Dana Corporation; Deloitte & Touche USA LLP and some of its affiliates;

affiliates of Dura Automotive Systems Inc; an affiliate of ECO-BAT America LLC;

Electronic Data Systems Corporation (EDS); Exxon Mobil Corp. and an affiliate; an

affiliate of Federal Environmental Protection Agency; affiliate of The Furukawa Electric

Co.; General Electric Capital Co. and several of its affiliates; General Electric Co. and

several of its affiliates; affiliates of Georgia Gulf Corp.; Hayes Lemmerz International

Inc.; affiliates of Henkel KGAA; affiliates of Hitachi Ltd.; Hub Group Inc.; an affiliate of

Hyatt Legal Plans Inc.; an affiliate of Illinois Tool Works Inc.; an affiliate of International

Wire Group, Inc.; affiliates of Internet Corp.; an affiliate of Kyocera Corp.; Mahle

GMBH; Martinrea International Inc.; affiliates of Microchip Technology Inc.; an affiliate

of Mittal Steel (b/k/a ISPAT International Ltd.); affiliates of Motorola Automotive;

14

Motorola Inc. and an affiliate; affiliates of National Semiconductor Corp.; NEC Corp.

and affiliates; an affiliate of Plymouth Rubber Company; PricewaterhouseCoopers LLP;

an affiliate of RLI Surety; an affiliate of Robert Stiftung Bosch GMBH;  RSR Corpora-

tion; Safeco Insurance Co. and affiliates; affiliates of Seiko Epson Corporation; an

affiliate of Sequa Corp.; affiliates of Shell Oil; an affiliate of Spartech Corp.; SPX Corp;

affiliates of Standard Motor Products Inc.; an affiliate of Steel Technologies Inc.; Texas

Pacific Group Ltd.; Textron Inc. and an affiliate; an affiliate of Thyssenkrupp AG;

affiliates of Tower Automotive Inc.; the parent company of Trico Products Corporation;

affiliates of Tyco Electronics Corp; Unigraphics Solutions Inc.; US Steel Corporation and

an affiliate; and Visteon Automotive Systems, Inc.

      22.   Major Customers:  Skadden represents or has represented the

following customers or affiliates of such customers in matters unrelated to the Debtors

and their chapter 11 cases: affiliates of Aftermarket Technology Corp.; affiliates of

Agilent Technologies Inc.; affiliates of Arvinmeritor Inc.; affiliate of AZ Automotive

Corp.; an affiliate of Michael Baker, Corp.; Benteler Industries, Inc.; Brite Smile and

affiliates; an affiliate of Cambrex Bio Science Inc.; affiliates of Cardinal Health Inc.;

affiliates of Caterpillar Inc.; affiliates of Coinstar, Inc.; affiliates of Cummins, Inc.;

DaimlerChrysler AG; Fiat Group and affiliates; Ford Motor Company; an affiliate of

Harley Davidson, Inc.; Hewlett-Packard Co. and affiliates; affiliates of HP Financial

Services; Hyundai Motor America; INO Therapeutics LLC; an affiliate of International

Truck & Engine Corporation; an affiliate of Intier Automotive Inc.; Johnson Controls

Inc.; the parent company of Kautex Textron;  affiliates of KLA Tencor Corp.; an affiliate

of L-3 Communications Holdings Inc.; affiliates of Lear Corporation Automotive

Systems; and affiliates of Magna International Inc.; affiliates of Matco Tools; affiliates of

Medrad Inc.; Medtronic Inc.; Mitsubishi Motors of America Credit Co.; Navistar

International Corporation; affiliates of NuVasive, Inc.; affiliates of StorageTek (a/k/a

Starage Technology Corp.); Sunrise Medical Ltd. and an affiliate; an affiliate of Verilink

Corporation; and an affiliate of Volvo Parts North America, Inc.

23.    <u>Non-Debtor Parties to Collective Bargaining Agreements</u>:

Skadden has not previously represented any of the non-Debtor parties to collective

bargaining agreements.

24.    <u>Indenture Trustees</u>:  Skadden represents or has represented the

following indenture trustees or affiliates of such indenture trustees in matters unrelated to

the Debtors and their chapter 11 cases:  Bank One Trust Company N.A. and affiliates;

First National Bank of Chicago (a/k/a Bank One, N.A.) and several of its affiliates.; J.P.

Morgan Chase; and J.P. Morgan Trust Company, N.A. and affiliates.

25.    <u>Underwriters of Securities</u>:  Skadden represents or has represented

the following underwriters of securities or affiliates of such underwriters in matters

unrelated to the Debtors and their chapter 11 cases:  A.G. Edwards & Sons, Inc.; ABN

AMRO Incorporated and affiliates; Advest, Inc. and affiliates; Banc of America Securi-

ties LLC and affiliates; Barclays Capital Inc. and affiliates; BNP Paribas Securities Corp.

and affiliates; Citigroup Global Markets Inc. and affiliates; an affiliate of Comerica

Securities Inc.; Credit Suisse First Boston LLC and affiliates, Deutsche Bank Securities

Inc. and affiliates; HSBC Securities (USA) Inc. and affiliates; J.P. Morgan Securities Inc.

and affiliates; an affiliate of Janney Montgomery Scott LLC; McDonald Ivestments Inc.,

affiliates of Merrill Lynch, Pierce, Fenner & Smith Inc.; Morgan Stanley & Co. Incorpo-

16

rated and affiliates; Oppenheimer & Co. Inc. and affiliates; affiliates of Quick & Reilly,

Inc.; RBC Dain Rauscher Inc. and affiliates; The Royal Bank of Scotland plc. and

affiliates; Scotia Capital (USA) Inc. and affiliates; SG Cowen Securities Corp. and

affiliates; Stifel, Nicolaus & Co., Inc.; UBS Securities LLC and affiliates; US Bancorp

Piper Jaffray Inc. and an affiliate; Utendahl Capital Partners, L.P. and an affiliate; and

Wachovia Capital Markets, LLC and affiliates.

26.    <u>Major Litigation Parties</u>:  Skadden represents or has represented

the following major litigation parties or affiliates of such parties in matters unrelated to

the Debtors and their chapter 11 cases:  an affiliate of Altria Corporate Services, a client

of the firm; James Arnold Jr., who is Secretary of a company whose affiliates are clients

of the firm; affiliates of Building Materials Holding Corp (d/b/a BMC West Corp.);

James Burdette, who is president of Lockwood Financial Services Inc., affiliates of which

company are clients of the firm, and President of Bank of New York, a client of the firm;

an affiliate of The Chamberlain Group, Inc.; an affiliate of DSL Net Inc.; Eaton Corpora-

tion and affiliates; William P. Edwards, who is the President of Vendome, and an affiliate

of which company is a client; affiliates of Elco textro Fastening Systems; affiliates of

Elco Textron, Inc.; Terrence Evans, who is VP of Newark Road Realty Co., affiliates of

which company are clients of the firm; Faurecia Exhaust Systems, Inc.; Greystone & Co.;

John Harden, who is Vice President of Macquarie Aviation North America 2 Inc., an

affiliate of Honeywell ACS Sensing & Control; Robert Hillman, who is President of a

company, affiliates of which company are clients of the firm; Linda Hudson, who is

President of General Dynamics Armament and Technical Products, Inc., affiliate of

General Dynamics Corporation, a client of the firm; an affiliate of IMSS (Instituto

Mexicano del Seguro Social); an affiliate of INFONAVIT (Instituto del Fondo Nacional

de la Vivienda para los Trabajadores); William Jensen is the President of Fidelity

National Home Warranty, affiliates of which company are clients; Steven Kramer, who

serves as executive to Thermo Vision Colorado, an affiliate of which company is a client

of the firm; affiliates of Land Rover; Lockheed Martin Corp.; an affiliate of Mahle

Sistemas de Filtracion de Mexico; MCI Telecommunications Corporation; an affiliate of

Mercedes Benz US International (MBUSI); an affiliate of Open Hungaru (GMPT); Jerry

Peter, who is President of A&M Cleaning Products, Inc, an affiliate to a Great Lakes

Chemical Corporation, a client of the firm; Republic Waste Industries, Inc. (a/k/a

Autonation); affiliates of Siemens VDO Automotive AG (SVDO); affiliates of

SouthTrust Bank; affiliates of State of New York; affiliates of Strattec Security Corpora-

tion; Kenneth Taylor is Treasurer of Navigan International Southeast Inc., an affiliate to

Navigant International, Inc., a former client of the firm; an affiliate of Tenneco Automo-

tive Inc.; an affiliate of Gorg Warner Inc.; Anthony Whitehead, who is the Marketing

Executive of Gray Texas L.P., an affiliate of which company is a client; Chris Wong, who

is managing director of GT Management, affiliates of which company are clients of the

firm; and Karl L. Young, who is an executive of Altria Group.

27.    <u>State and Governmental Agencies</u>:  Skadden represents or has

represented the following state and governmental agencies or affiliates of such state and

governmental agencies in matters unrelated to the Debtors and their chapter 11 cases: an

affiliate of California Environmental Protection Agency (Cal EPA); an affiliate of

Integrated Waste Management Board (IWMB) (California); affiliates of New York State

Department of Environmental Conservation (NYSDEC); an entity related to the Occupa-

tional Safety and Health Administration (OSHA); and an affiliate of U.S. Department of Transportation.

28.    <u>Judges and United States Trustees for the United States Bankruptcy Court for the Southern District of New York</u>:  I am not related, and to the best of my knowledge, no attorney at the Firm is related, to any United States District Judge or United States Bankruptcy Judge in the Southern District of New York or to the United States Trustee for such district or any employee in the office thereof, except that Adlai S. Hardin III, a Corporate Restructuring associate employed by Skadden in its New York office, is the son of Judge Adlai Hardin.

29.    Many of the firm's representations of the above clients consist of representations in episodic transactional matters.  Skadden's representation of the above entities will not affect the firm's representation of the Debtors in these cases.  Skadden does not presently represent the above entities in any matters adverse and/or related to the Debtors.

30.    Skadden is one of the largest law firms in the world and has a diverse client base.  Indeed, for the period beginning September 1, 2004, and ending August 31, 2005, no single client accounted for more than 3.655% of Skadden's total value of time billed to client matters for that period.  With the exception of Citigroup, Inc., Credit Suisse First Boston Corporation, Daimler Chrysler AG, Deloitte Touche Tohmatsu, Deutsche Bank AG, and JP Morgan Chase, no single client referenced in this Declaration accounted for more than 1% of Skadden's total value of time billed during that same period and, of the above group, only Citigroup, Inc. and JP Morgan Chase accounted for more than 1.8% of Skadden's total value of time billed.

19

31.     Neither Skadden nor any attorney at the firm holds or represents an interest adverse to the estates.

32.     Except as set forth herein, neither Skadden nor any attorney at Firm is or was a creditor, an equity holder, or an insider of the Debtors, except that Skadden rendered legal services to the Debtors for which it was compensated.  Certain Skadden partners may own Delphi common stock, either directly or indirectly.  Also, partners of the firm may hold Delphi common stock in managed accounts over which they have no control over investment decisions pertaining to holdings in such accounts.  Pursuant to the internal policy of Skadden, the Debtors have been placed on the firm's "restricted list" and no sale or purchase of securities or claims relating to the Debtors will be authorized or permitted during the pendency of our retention as the Debtors' counsel in the chapter 11 cases.[6]

33.     Neither Skadden nor any attorney at the Firm is or was an invest-ment banker for any outstanding security of the Debtors.

34.     Neither Skadden nor any attorney at the Firm is or was, within three years before the filing of the Debtors' chapter 11 cases, an investment banker for any

---

[6]     It is Skadden's written Firm policy that (i) Firm personnel are not permitted to purchase any debt or equity securities of, or claims against, any company which is a debtor in a case under the U.S. Bankruptcy Code or similar proceeding under state law or the laws of foreign jurisdictions or has publicly announced that it is contemplating such action; and (ii) if Firm personnel have acquired a debt or equity security of or a claim against a company prior to a company's filing or contempla-tion of a chapter 11 case and the Firm subsequently concludes that the individual's ownership of such a security or claim may interfere with the Firm's retention or compensation in connection with the case, the Firm may require the individual to divest the claim or security.  If the claim or security to be divested cannot be sold in the market (e.g., because the Firm is in possession of material inside information), Firm personnel may be required to divest the claim or security without receiving any consideration therefor.

20

security of the Debtors, or an attorney for an investment banker in connection with the offer, sale or issuance of any security of the Debtors.

35.     Neither Skadden nor any attorney at the Firm is or was, within two years before the Petition Date, a director, officer or employee of the Debtors or of an investment banker of the Debtors.

36.     Skadden does not have an interest materially adverse to the interests of the estates or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Debtors or an investment banker specified in the foregoing paragraphs, or for any other reason.

37.     Pursuant to the Engagement Agreement, the Debtors waived certain non-disqualifying conflicts and agreed that Skadden may represent other present and future clients of the Firm on a basis adverse to the Debtors, including litigation, legal or other proceedings, so long as Skadden was not then and had not previously been engaged by the Debtors in the matter.  However, during the pendency of the chapter 11 cases, Skadden will not represent present or future clients of the firm on matters adverse to the Debtors in these chapter 11 cases.

38.     In view of the foregoing, Skadden is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

PROFESSIONAL COMPENSATION

39.     The Engagement Agreement provided for the implementation of a retainer program pursuant to which the Debtors paid an initial retainer of $500,000 for professional services rendered and to be rendered and charges and disbursements incurred to Skadden on behalf of the Debtors in connection with those services described in the

21

Engagement Agreement (the "Initial Retainer").  Thereafter, Skadden periodically invoiced the Debtors and drew down the Initial Retainer in payment of such invoices and was paid certain supplemental amounts in order to replenish the Initial Retainer (collectively, the "Supplemental Retainer") in the following amounts and on the following dates: $1,600,000 on August 19, 2005, $2,000,000 on September 8, 2005, and $1,750,000 on September 27, 2005.

40.    Pursuant to the Engagement Agreement, Skadden received a filing retainer of $4,000,000 to be utilized in accordance with the Engagement Agreement to cover a portion of the projected fees, charges and disbursements to be incurred during the reorganization cases (the "Filing Retainer," and, together with the Initial Retainer and the Supplemental Retainer, the "Retainer").

41.    Pursuant to the Engagement Agreement, Skadden will apply the Retainer to pay any fees, charges and disbursements which remain unpaid as of the Petition Date and will retain the remainder of the Retainer to be applied to any fees, charges and disbursements which remain unpaid at the end of the reorganization cases. As of October 7, 2005 (the last date on which the firm's books and records were reviewed in connection with the preparation of this declaration), after application of all prepetition fees, charges and disbursements incurred and posted as of that date (including estimated fees, charges and disbursements billed as of October 8, 2005 prior to the commencement of these cases), the amount of the Retainer was $4,033,019.

42.    According to Skadden's books and records, for the period July 12, 2005 through October 8, 2005, the total amount of services billed to the Debtors in connection with contingency planning was $2,845,087 with an additional $227,668 in

charges and disbursements.  During the same period, the total aggregate amount of all

services billed was $5,500,654 plus charges and disbursements in the amount of

$315,327.  Skadden's books and records further reflect that for the period July 12, 2005

through October 8, 2005, Skadden received an aggregate of $9,850,000 from the Debtors,

including payments received for services rendered prior to the filing on October 8, 2005,

and is inclusive of the Retainer balance of $4,033,019.  The aggregate amount applied to

fees, charges and disbursements for the same period was $5,816,981, exclusive of the

Retainer balance of $4,033,019.  Any portion of the prepetition amounts received by

Skadden that has not yet been applied to prepetition fees and expenses will be applied

when such amounts are identified.  Should any balance remain after such application, the

remainder will be held as a retainer for and be applied against postpetition fees and

expenses that are allowed by this Court.

      43.      Pursuant to the Engagement Agreement, Skadden provides the

Debtors with periodic (no less frequently than monthly) statements for services rendered

and charges and disbursements incurred.  During the course of the reorganization cases,

the issuance of periodic statements shall constitute a request for an interim payment

against the reasonable fees to be determined at the conclusion of the representation.  For

professional services, Skadden's fees are based in part on its guideline hourly rates which

are periodically adjusted.  Skadden will be providing professional services to the Debtors

under its standard bundled rate schedule and, therefore, Skadden will not be seeking to be

separately compensated for certain staff, clerical and resource charges.  Presently, as set

forth on Exhibit B, the hourly rates under the bundled rate structure range from $585 to

$835 for partners and of counsel, $560 to $640 for counsel and special counsel, $295 to

$540 for associates, and $90 to $230 for legal assistants and support staff. The hourly rates set forth above are subject to periodic increases in the normal course of the Firm's business, often due to the increased experience of a particular professional.

44.    Skadden intends to apply to this Court for allowance of compensation for professional services rendered and reimbursement of charges and disbursements incurred in these chapter 11 cases in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules for the Southern District of New York, and the United States Trustee Guidelines. Skadden will seek compensation for the services of each attorney and paraprofessional acting on behalf of the Debtors in these cases at the then-current bundled rate charged for such services on a non-bankruptcy matter.

45.    The hourly rates set forth above are the Firm's standard bundled hourly rates for work of this nature. These rates are set at a level designed to compensate Skadden fairly for the work of its attorneys and legal assistants and to cover fixed and routine overhead expenses including those items billed separately to other clients under the Firm's standard unbundled rate structure. Consistent with the Firm's policy with respect to other clients, Skadden will continue to charge the Debtors for all other services provided and for other charges and disbursements incurred in the rendition of services. These charges and disbursements include, among other things, costs for telephone charges, photocopying (at a reduced rate of $0.10 per page for black and white copies and higher commensurate charges for color copies), travel, business meals, computerized research, messengers, couriers, postage, witness fees, and other fees related to trials and hearings. Charges and disbursements are invoiced pursuant to Skadden's Policy State-

24

ment Concerning Charges and Disbursements. (The "Policy Statement Concerning Charges and Disbursements" is attached as Exhibit B to the Engagement Agreement.) Certain charges and disbursements are not separately charged for under the bundled rate structure as described in the Engagement Agreement.

46.    Skadden has agreed to accept as compensation such sums as may be allowed by this Court on the basis of the professional time spent, the rates charged for such services, the necessity of such services to the administration of the estate, the reasonableness of the time within which the services were performed in relation to the results achieved, and the complexity, importance, and nature of the problems, issues, or tasks addressed in these cases.

47.    Other than as set forth above, no arrangement is proposed between the Debtors and Skadden for compensation to be paid in these cases.

48.    Except for such sharing arrangements among Skadden, Arps, Slate, Meagher & Flom LLP, its affiliates, and their respective members, Skadden has no agreement with any other entity to share any compensation received, nor will any be made, except as permitted under section 504(b)(1) of the Bankruptcy Code.

49.    Skadden has instituted and is carrying on further inquiries of its partners and associates with respect to the matters contained herein, including the approximately 1,600 attorneys in the firm's 23 domestic and international offices. Skadden will file supplemental declarations regarding this retention if any additional relevant information comes to its attention. Additionally, as a matter of retention and disclosure policy, Skadden will periodically review its past and present connections with entities materially participating in these cases from time to time and will file supplemen-

25

tal disclosure declarations, if warranted, contemporaneously with the filing of its professional interim fee applications.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on October 8, 2005, at New York, New York.

s/ John Wm. Butler, Jr.
John Wm. Butler, Jr.

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE
NEW YORK 10036-6522
———
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-3700
GENERAL FAX
917-777-3700
EMAIL ADDRESS
PATKINS@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

As of July 12, 2005

**PRIVILEGED AND CONFIDENTIAL**

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

        Attention:  Mr. Robert S. Miller, Jr.
                   Chairman and CEO
                   and
                   Logan G. Robinson, Esq.
                   Vice President and General Counsel

        Re:     Engagement Agreement with Skadden

Ladies and Gentlemen:

        We are pleased that Delphi Corporation, for itself and each of its subsidiaries for which there is no disqualifying conflict and which Skadden, Arps, Slate, Meagher & Flom LLP and its affiliated law practices ("Skadden" or the "Firm") has agreed to represent (collectively, the "Company"), has decided to engage Skadden as special counsel in connection with the matters described below in the "Scope of Engagement" section of this Engagement Agreement and such other matters as are assigned to us in the future and that we agree to undertake (the "Engagement"). Accordingly, the Engagement is limited to those specific matters enumerated in and/or contemplated by this Engagement Agreement.

        This letter sets forth the terms of our engagement arrangements for all matters (whether pending or prospective), including staffing, fees and waivers, the scope of our engagement, the basis on which the Firm will present its bills for fees, related charges and disbursements, and certain limitations on the Firm's services arising from

Delphi Corporation
As of July 12, 2005
Page 2

potential conflicts of interest. As usual, our Engagement is to represent the Company
and not its individual directors, officers, employees or shareholders. However, we
anticipate that in the course of that Engagement, we may provide information or advice
to directors, officers or employees in their corporate capacities or as otherwise consented
to by the Company including as described below.

### Scope of Engagement

We have agreed to represent the Company as special counsel in the
Company's efforts to work out its present financial circumstances, which may include
restructuring its financial affairs and capital structure and providing legal advice to the
Company with respect to proposals from one or more third-party investors, in addition to
future representation of the Company on matters for which the Firm may be engaged by
the Company not related to the Company's efforts to work out its present financial
circumstances. The services to be provided by the Firm in connection with the Engage-
ment will encompass all services normally and reasonably associated with this type of
engagement which the Firm is requested and is able to provide and which are consistent
with its ethical obligations. As legal counsel, we are not in a position to, and the
Company has not retained us to, provide financial advice. With respect to all matters of
our Engagement, we will coordinate closely with the Company as to the nature of the
services to be rendered by us and the scope of our engagement.

The Engagement may involve advice as to corporate transactions and
corporate governance, negotiations, out-of-court agreements with creditors, equity
holders, prospective acquirers and investors, review of documents, preparation of
agreements, review and preparation of pleadings, court appearances and such other
actions as both of us deem necessary and desirable. While the Company has advised us
that it is actively pursuing a transformation strategy under the leadership of the Board of
Directors and executive management of the Company (including through the Delphi
Strategy Board) to address growth objectives, resolve certain financial issues and
maximize the enterprise value of the Company for its stakeholders, we agree that the
Engagement also will include advice to, and representation of the Company, as debtors
and debtors-in-possession, should the Company seek relief pursuant to the provisions of
the Bankruptcy Code subject to confirmation of our retention by the Board of Directors
in the enabling resolutions adopted by the Board of Directors authorizing the commence-
ment of chapter 11 cases and the approval of our retention by the Bankruptcy Court.

Delphi Corporation
As of July 12, 2005
Page 3

      If the Company determines that reorganization cases under chapter 11 of the Bankruptcy Code are appropriate, we will prepare for the filing of the chapter 11 petitions, including review of documents and preparation of the petitions with supporting schedules and statements. During the cases and subject to our ethical obligations discussed above, we will advise and consult on the conduct of the cases, including all of the legal and administrative requirements of operating in chapter 11; prepare such administrative and procedural applications and motions as may be required for the sound conduct of the cases; prosecute and defend litigation that may arise during the course of the cases; consult with you concerning and participate in the formulation, negotiation, preparation and filing of a plan or plans of reorganization and disclosure statement(s) to accompany the plan(s); review and object to claims; analyze, recommend, prepare, and bring any causes of action created under the Bankruptcy Code; take all steps necessary and appropriate to bring the cases to a conclusion; and perform the full range of services normally associated with matters such as this which the Firm is in a position to provide.

      In the event that chapter 11 cases are commenced and our retention is authorized, our representation will include, as noted above, serving as principal bankruptcy counsel to the debtors-in-possession under a general retainer, subject to court approval. Such representation also will encompass all out-of-court planning and negotiations attendant to these tasks. Although it is hoped that litigation can be avoided, subject to ethical constraints regarding conflicts of interest, we also will be available to serve the Company in any litigation capacities that become necessary to the extent that any required court approval is obtained.

### Case Management and Coordination of Outside Counsel

      The Company is presently using more than one law firm for representation of its interests on substantive matters including, particularly, the law firm of Shearman & Sterling LLP. It is likely that more than one law firm may be needed for such representation, particularly to represent the Company in connection with the numerous labor-intensive day-to-day tasks associated with the Company's present restructuring efforts and other matters including pending litigation, government investigations and related actions and proceedings.

      Other than the general representation of the Company by Skadden as restructuring counsel and in the cases, if filed (subject to confirmation of our retention by the Board of Directors in the enabling resolutions adopted by the Board of Directors authorizing the commencement of any chapter 11 cases), the Company will continue to

Delphi Corporation
As of July 12, 2005
Page 4

have discretion to assign specific tasks to co-counsel, adjunct counsel, or special counsel (collectively, "Other Counsel"), as the case may be. If, as outlined below, we are unable to obtain court approval for all matters in potential chapter 11 cases that you wish us (and we agree) to undertake, our representation would include as many of those matters as are approved.

We are committed to working with the Company and in full cooperation with Other Counsel to manage the Engagement on a cost-efficient and productive basis. To the extent possible, given the nature and magnitude of the Engagement, steps have been taken and should continue to be taken by the Company to coordinate tasks and, when practical, to divide these tasks to avoid unnecessary duplication of effort between us and Other Counsel. As of part of this case management protocol, we agree to provide periodic information to the Company and consult with the Company's executive management team regarding work plans, professional staffing, and professional fee accruals and forecasts (as discussed below) in order to assist the Company in coordinating the Engagement on a cost-efficient and productive basis.

## Engagement Personnel

Jack Butler and I will coordinate all Engagement matters on behalf of Skadden. Additional lawyers, including those in other practice areas, will be added to the Engagement on an as needed basis. We have agreed to the Company's request that, to the extent practicable under the circumstances and exigencies facing the Company, we staff the Engagement with a working group of professionals that are prepared to commit a concentrated effort to the Engagement as the Company believes that there are efficiencies of identification with, and dedication to the Engagement. We have also agreed to provide the Company with an organizational chart of lawyers assigned to the Engagement and to promptly update the organizational chart as to any changes in staffing as to which we agree to consult with and obtain the concurrence of the Company.

## Fees, Charges and Disbursements

Our fees will be based primarily on the time involved in the Engagement and our bundled hourly time charges. A list of our current bundled hourly time charges using the Firm's bundled rate structure as of January 1, 2005 is attached as Exhibit A. As part of the Firm's ordinary business practices, hourly time charges are periodically reviewed and revised, and we presently plan to do so effective as of September 1, 2005.

Delphi Corporation
As of July 12, 2005
Page 5

      If the Engagement results in one or more transactions or a direct economic benefit to the Company, with your concurrence as provided below, our fee would reflect a variety of factors. These factors include bundled hourly time charges, the overall benefit to the Company of the transaction, the Company's subjective appraisal of our contribution to the transaction, the cost-control and efficiency exercised in our execution of the Engagement in connection with the transaction, the personal contribution of the Skadden partners coordinating and managing the Engagement, our success in collaboration with the Company's management and integration with the Company's legal staff, and the views of our client. As to each of these factors, we consider it very important and would not submit a final statement for services rendered in excess of our bundled hourly time charges without having discussed our fee in advance with the Company based on the factors mentioned above and obtaining your concurrence.

      As to billing, we will submit a client level on-account statement for all Engagement matters approximating bundled hourly time charges for payment on not less than a monthly basis, and at each matter's conclusion, we will submit a final statement for services rendered which will be based upon our bundled hourly time charges and, if appropriate, the factors outlined above, and which would credit all prior payments. Each statement submitted would be accompanied by a summary of attorney time showing the time worked by each lawyer working on an Engagement matter and the guideline hourly rate for each lawyer. In addition, our billing statements will include charges and disbursements incurred by us in the course of performing legal services in accordance with our standard practice as described in the summary attached as <u>Exhibit B</u>, which may be periodically updated.

      From time to time, the Company may request a fee range estimate for a particular Engagement matter. Any such estimate would be premised upon certain assumptions, including, but not limited to, completion of the matter by a particular target date, no unusual issues or problems arising, no litigation, counsel for the other parties sufficiently experienced and competent to perform such counsel's normal functions in this type of matter and so forth. In such situations, we will respond promptly to the Company's request in writing although it is agreed that such estimates shall not constitute a fee cap or amendment of this Engagement Agreement and all such discussions and written estimates would be handled through Jack Butler or the undersigned in respect of the overall Engagement on behalf of the Firm.

Delphi Corporation
As of July 12, 2005
Page 6

## Fee Structure and Retainers

It is customary in matters of this nature for us to receive a reasonable retainer / on account payment and to be paid promptly for services rendered and charges and disbursements incurred on behalf of the Company, including payment for the services rendered and charges and disbursements incurred prior to the date hereof. Given the size and complexity of the Company's affairs, we have requested a payment in the amount of $500,000, representing a retainer / on account payment for professional services rendered and to be rendered and charges and disbursements incurred by us to the Company's account in connection with our representation of the Company including with respect to any consensual non-judicial restructuring as well as any initial preparation that you authorize for cases under chapter 11 of the Bankruptcy Code that may be filed by or against the Company (the "Initial Retainer"). The Company agrees to supplement the Initial Retainer from time to time during the course of the Engagement in such amounts as we mutually shall agree are reasonably necessary to maintain the Initial Retainer at a level that will be sufficient to fund Engagement fees, charges and disbursements to be incurred for time periods to be covered by the Initial Retainer.

Should the Company subsequently decide to seek chapter 11 relief, we will also require an additional retainer / on account payment to supplement the Initial Retainer in order to cover Engagement fees, charges and disbursements to be incurred during the initial phase of the reorganization cases (the "Filing Retainer"). We will determine and discuss the amount of the Filing Retainer with you prior to the initiation of any chapter 11 case or at such earlier time as either we or the Company deems appropriate or desirable. Of course, the reasonableness of the Filing Retainer remains subject to review by the court in any ensuing cases.

In the future, we will send the Company periodic invoices (not less frequently than monthly) for services rendered and charges and disbursements incurred on the basis discussed above. Each invoice constitutes a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation. Upon transmittal of the invoice, unless the Company elects to promptly pay the presented statement by wire transfer, the Firm shall draw upon the Initial Retainer (as may be supplemented from time to time by supplemental retainers) in the amount of the invoice. The Company agrees upon submission of each such invoice, if so requested by the Firm, to wire the invoice amount to us as replenishment of the Initial Retainer (together with any supplemental amount to which the Firm reasonably requests), without prejudice to the Company's right to advise us of any differences it may have with respect to such

Delphi Corporation
As of July 12, 2005
Page 7

invoice. We have the right to apply to any outstanding invoice (including amounts billed
prior to the date hereof), up to the remaining balance, if any, of the Initial Retainer (as
may be supplemented from time to time by supplemental retainers) at any time subject to
(and without prejudice to) the Company's opportunity to review our statements.

   In the event that the Company subsequently determines to seek bank-
ruptcy court protection and subject to the terms of any professional compensation order
entered in the Company's chapter 11 cases, the issuance of our periodic invoice shall
constitute a request for an interim payment against the reasonable fee to be determined at
the conclusion of the representation. Although the Company may pay us from time to
time for services rendered in our capacity as special counsel for various matters, some
fees, charges, and disbursements incurred before the filing of bankruptcy petitions
(voluntary or involuntary) may remain unpaid as of the date of the bankruptcy filings.
Any portion of the Initial Retainer (as may be supplemented from time to time by
supplemental retainers or the Filing Retainer) not otherwise properly applied will be held
by us for the payment of any such unpaid fees, charges and disbursements (whether or
not billed).

   If orders for relief relating to the Company are entered, the unused
portion, if any, of the Initial Retainer (as may be supplemented from time to time by
supplemental retainers or the Filing Retainer) will be applied to any unpaid prepetition
invoices and unbilled fees, charges and disbursements, although any requisite court
permission will be obtained in advance. Postpetition fees, charges and disbursements
will be due and payable immediately upon entry of an order containing such court
approval or at such time thereafter as instructed by the court, it being agreed and
understood that the unused portion, if any, of the Initial Retainer (as may be supple-
mented from time to time by supplemental retainers or the Filing Retainer) shall be held
by us and applied against the final fee application filed and approved by the court. The
Company understands that while the arrangement in this paragraph may be altered in
whole or in part by the bankruptcy court, the Company shall nonetheless remain liable
for payment of court approved postpetition fees and expenses. Such items are afforded
administrative priority under 11 U.S.C. § 503 (b)(1). The Bankruptcy Code provides in
pertinent part, at 11 U.S.C. § 1129(a)(9)(A), that a plan of reorganization cannot be
confirmed unless these priority expenses are paid in full (unless such claimants agree to
different treatment) in cash on the effective date of any reorganization plan.

   If a dispute develops about our fees, you may be entitled under Part 137
of the Rules of the Chief Administrator of the New York Courts to arbitration of that

Delphi Corporation
As of July 12, 2005
Page 8

dispute if it involves more than one thousand and less than fifty thousand dollars. We acknowledge that following the substantial completion of the restructuring activities currently being pursued by the Company and in the circumstance that the scope of our Engagement is materially reduced, the retainer program described in this letter shall be superceded by an arrangement where the Firm is paid monthly in arrears for services rendered and charges and disbursements advanced.

## Confidentiality and Related Matters

Confidential communications between a client and counsel are ordinarily privileged, but the commencement of a bankruptcy case may severely limit this attorney-client privilege. Specifically, if a trustee is appointed in any case concerning a corporate debtor or partnership, the trustee will be able to obtain from us or other counsel and disclose to others information communicated by the Company to counsel. Some courts also have held that an examiner may invade the attorney-client privilege.

Because of the nature of the Firm's practice (involving more than 1,600 lawyers throughout the United States and in various international offices), from time to time we concurrently may represent one client in a particular matter and the adversary of that client in an unrelated matter. Thus, for example, while representing the Company, we may represent a third party who is adverse to the Company in a matter unrelated to the matters covered by this Engagement Agreement. In addition, while representing the Company, we may represent an account debtor of the Company as a debtor in a reorganization case or in connection with out-of-court negotiations with such entity's creditors concerning that entity's ability to pay its debts generally.

Despite any such concurrent representation, we strictly preserve all client confidences and zealously pursue the interests of each of our clients. The mutual understanding reflected in this Engagement Agreement, including the waivers set forth below, are, of course, premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit.

With respect to third parties and based on our initial discussions concerning the Company's capital structure and given the Company's business relationships, we have identified certain entities involved with the Company (or are competitors of the Company) as our clients on matters unrelated to the Company including, but not limited to Autoliv, Inc., Citicorp USA, Inc., Credit Suisse, Deutsche Bank AG New York Branch, Hayes Lemmerz International, Inc., HSBC Bank USA, National Association and

Delphi Corporation
As of July 12, 2005
Page 9

JPMorgan Chase Bank, N.A., as well as other entities that are providing financial
accommodations and services to the Company or have other material relationships.  We
also represented JP Morgan Chase Bank, N.A. in connection with a Receivables Pur-
chase Agreement, dated as of March 31, 2003, as amended from time to time, among
Delphi Receivables LLC as Seller, Delphi Corporation as Servicer, JP Morgan, Falcon
Asset Securitization Corporation, ABN AMRO Bank N.V., Amsterdam Funding
Corporation, The Bank of Tokyo-Mitsubishi, Ltd., and Gotham Funding Corporation.

         While we represent certain of the Company's customers, including
DaimlerChrysler Corporation and Ford Motor Company on matters unrelated to the
Company, we confirm that, as of the date of this agreement, the Firm does not represent
General Motors Corporation ("GM") and will not represent GM in the future prior to the
termination of this agreement except on unrelated matters in accordance with the terms of
this agreement and after disclosure to you of the fact of any such engagement.  As
previously noted to you, the Firm currently represents a subsidiary of and certain
financial advisors to GM on certain limited matters unrelated to the Company, but is free
to represent the Company in the Engagement on a basis adverse to GM, other than in
certain non-bankruptcy litigation or proceedings, without any notice to or further consent
from GM.  As to the Company's directors and officers, we are representing an officer of
the Company on a matter unrelated to the Company involving the officer's directorship of
another company and, with the prior knowledge and consent of the Company, we are
providing advice to an officer of the Company in connection with meetings, interviews,
testimony, and submissions relating to the investigation of the Company by the Securities
and Exchange Commission as well as the internal investigation completed prior to the
date of this letter on a basis that is not adverse to the Company.

         Accordingly, while for purposes of this Engagement Agreement, the
Company should assume that we represent a substantial number of the Company's
creditors, customers and stakeholders on matters unrelated to the Company, we will, at
the Company's  request, furnish you with a list of relevant clients when we receive
updated information from the Company from time to time regarding its creditors and
other stakeholders.  In the event that chapter 11 cases are commenced, we will prepare a
disclosure summary which will be publicly disclosed and will be updated periodically
thereafter in connection with the filing of interim fee applications and as otherwise
required.              We do not provide certain kinds of opinion letters in connection
with restructuring and bankruptcy reorganization cases to clients or to others who may
wish to rely upon such letters.  We do not alter this policy except under very unusual
circumstances and then only upon further written agreement.

Delphi Corporation
As of July 12, 2005
Page 10

## Waivers and Related Matters

The Firm represents a broad base of clients on a variety of legal matters. Accordingly, absent an effective conflicts waiver, conflicts of interest may arise that could adversely affect your ability and the ability of other clients of the Firm to choose the Firm as its counsel and preclude the Firm from representing you or other clients of our Firm in pending or future matters. Given that possibility, we wish to be fair not only to you, but to our other clients as well. Accordingly, this letter will confirm our mutual agreement that the Firm may represent other present or future parties on matters other than those for which it had been or then is engaged by the Company, whether or not on a basis adverse to the Company or any of its affiliates, including in litigation, legal or other proceedings or matters, which are referred to as "Permitted Other Representation." In furtherance of this mutual agreement, the Company agrees that it will not for itself or any other party assert the Firm's representation of the Company, either previously, in its then existing representation in the Engagement, or in any other matter in which the Company retains the Firm, as a basis for disqualifying the Firm from representing another party in any Permitted Other Representation and agrees that any Permitted Other Representation does not constitute a breach of duty. Permitted Other Representation would include, without limitation, representing a client over which the Company might be seeking to acquire influence or control, or from which the Company may wish to buy assets, or representing a client regarding its interest at the time in acquiring influence or control over an entity in which the Company then has a similar interest. Notwithstanding the foregoing waivers, the Firm agrees that, during the pendency of any chapter 11 reorganization cases involving the Company in which the Firm is acting as bankruptcy and restructuring counsel pursuant to a general retainer pursuant to 11 U.S.C. § 327 (a), the Firm will not represent present or future clients of the Firm on matters adverse to the Company in such chapter 11 reorganization cases.

Our representation of the Company is premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit without the Company's consent. Provided that the Firm acts in the manner set forth in this paragraph, the Company would not for itself or any other party assert that the Firm's possession of such information, even though it may relate to a matter for which the Firm is representing another client or may be known to someone at the Firm working on the matter, (a) is a basis for disqualifying the Firm from representing another of its clients in any matter in which the Company or any other party has an interest; or (b) constitutes a breach of any duty owed by the Firm.

Delphi Corporation
As of July 12, 2005
Page 11


       With respect to parties affiliated with the Company generally, including parties owned by the Company and parties that hold direct or indirect interests in the Company, it is our understanding that the Firm is not being asked to provide, and will not be providing, legal advice to, or establishing an attorney-client relationship with, any such affiliated party or person in their individual capacity and will not be expected to do so unless the Firm has been asked and has specifically agreed to do so. Finally, it is our understanding that if the Firm acts as counsel for any other party as to which the Company then owns completely, directly or indirectly, all of the common stock or similar voting interest (other than directors' qualifying shares, if any), the mutual agreement reflected in this letter, including the waivers, would apply to that party as well.

*     *     *

       The provisions of this letter will continue in effect, including if the Firm's representation of the Company was ended at your election (which, of course, the Company would be free to do at any time) or by the Firm for Good Cause (which would be subject to ethical requirements). Good Cause includes the Company's breach of this agreement (including any material change in our engagement responsibilities (which would include the commencement of chapter 11 cases in which we were not retained as primary Section 327(a) counsel) without our consent or the failure to pay any payment when due under this Engagement Agreement), the Company's refusal or failure to cooperate with us or provide us with continuing access to the Board of Directors and senior management officers of the Company as appropriate, any fact or circumstance that would render our continuing representation unlawful or unethical, or, in our reasonable judgment, resignation of the engagement becomes necessary or appropriate. Any unused portion of the retainers we have received will be applied to our outstanding fees, charges and disbursements and the Company will promptly pay to us the remaining balance owed to us, if any. To the extent that the remaining amount of the retainers exceeds the amount of such fees, charges and disbursements, we will pay such amount to the Company. In addition, the provisions of this Engagement Letter will apply to future engagements of the Firm by the Company unless we mutually agree otherwise.

       The Company agrees to make appropriate employees available to us to assist in factual inquiries and factual determinations, court hearings and appearances, transactions and dealings in relation to the subject matter with regard to which we have been retained.

Delphi Corporation
As of July 12, 2005
Page 12


   This agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to its conflicts of laws principles.  For purposes of this letter, references to Skadden or the Firm include our affiliated law practice entities.  There are no representations or promises other than as expressly set forth herein.


   If the foregoing terms of our representation meet with your approval and accurately represent your understanding of the Company's retention agreement with us, we would appreciate your signing one copy of this Engagement Agreement and returning it to us.

Delphi Corporation
As of July 12, 2005
Page 13


Again, we very much appreciate the opportunity to work with Delphi
Corporation and look forward to doing so.

With best regards,

Sincerely yours,



Peter Allan Atkins

Attachments

cc:  John Wm. Butler, Jr., Esq.

AGREED AND ACKNOWLEDGED:

Delphi Corporation., for itself
and its subsidiaries


By: _____

    Its: _____

Dated:  As of July 12, 2005

CONFID    IIAL

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP & AFFILIATES

### STANDARD BUNDLED HOURLY TIME CHARGE SCHEDULE[*]

#### January 1, 2005

|  | Rate |
|---|---|
| **PARTNERS and OF COUNSEL**: | $540 - $825 |
| **COUNSEL/SPECIAL COUNSEL**: | $535 - $640 |
| **ASSOCIATES**: | |
| Level | |
| 9 | $495 |
| 8 | 495 |
| 7 | 480 |
| 6 | 460 |
| 5 | 430 |
| 4 | 395 |
| 3 | 375 |
| 2 | 335 |
| 1 | 265[**] |
| **LEGAL ASSISTANTS**: | $ 90 - $195 |

---

[*]    These are the Firm's standard hourly fee rates for most attorneys and legal assistants in the Firm's "bundled rate" structure for clients who are not billed separately for certain charges (e.g., secretarial and word processing time preparing legal documents, proofreading, facsimile services, overtime meals and overtime travel allowances). In-house reproduction under the bundled rate structure is charged at $0.10 per page. Please note that in a limited number of cases or for specific types of work (e.g., M&A transactions, certain types of tax matters, etc.), individual rates may be higher or lower than those stated.

[**]    First year associates will move to $295/hr. at the later of April 1st, 2005 or the date of passing bar exam.

### SKADDEN ARPS, SLATE, MEAGHER& FLOM LLP AND AFFILIATES
#### Policy Statement Concerning Charges and Disbursements
#### Under Standard Bundled Rate Structure
#### Effective 9/1/03

*Skadden Arps bills for reasonable charges and disbursements incurred in connection with an engagement. Clients are billed for external charges at the actual cost billed by the vendor except in a few cases noted below; charges for internal support services are billed at rates derived from internal cost analyses or at rates set at or below comparable outside vendor charges.*

**I.  Research Services.**  Charges for on-line computerized research (LexisNexis, Westlaw and financial services) and use of outside research services and materials are billed at the actual amounts charged by vendors, which have been reduced by discounts the Firm receives from vendors.

SEC filings retrieved using the Disclosure system in our library are charged based on standard vendor rates derived from an internal cost analysis.

The State of Delaware Database provides computer access to a corporations database in Dover, Delaware.  The charge for this service is $50 per transaction, which is the average amount charged by outside services.

**II.  Travel-Related Expenses.**  Out-of-town travel expenses are billed at actual cost and include air or rail travel, lodging, car rental, taxi or car service, tips and other reasonable miscellaneous items associated with travel. Corporate and/or negotiated discounted rates are passed on to the client.  Specific Firm policies for expenditures relating to out-of-town travel include:

- *Air Travel.*  Coach travel is used for all U.S. domestic flights unless upgrades are available at little additional cost or prior client approval is obtained for a different class. For international flights from the United States, business class is used.  Travel by attorneys based outside the United States is consistent with these policies.

- *Lodging.*  Overnight accommodations are generally booked with hotels with which the Firm has a corporate rate or, when this is not possible, with hotels suggested by the client.

Local travel charges include commercial transportation and, when a private car is used, mileage, tolls and parking. Specific policies govern how and when a client is charged for these expenses; these include:

- *Fares for commercial transportation (e.g., car service, taxi or rail) are charged at the actual vendor invoice amount.  The charge for private car usage is the IRS rate allowance per mile (or the equivalent outside the United States) plus the actual cost of tolls and parking.*

- *Round-trip transportation to the office is not charged separately for attorneys who work weekends or holidays, nor is transportation home on business days when an attorney works past a certain hour (typically 8:30 p.m.).*

- *Local travel for support staff is not charged when a staff member works after 8:00 p.m. specifically for the client.*

**III.  Word Processing and Secretarial and other Special Task-Related Services.**  Routine secretarial tasks (correspondence, filing, travel and/or meeting arrangements, etc.) are not charged to clients. There is no separate charge for word processing and secretarial services associated with preparing legal documents.

Multi-function personnel, such as qualified secretaries and word processors, may also perform other specialized tasks (such as EDGAR filings or legal assistant services).  Such work is recorded in the appropriate billing category (for example, legal assistant services are recorded as fee in "Legal Assistant Support" on bills).

**IV.  Reproduction and Electronic Document Management.**  Photocopying services (including copying, collating, tabbing and velo binding) performed in-house is charged at 10 cents per page, which represents the average internal cost per page. Color photocopies are charged at 50 cents per page (based on outside vendor rates).  Photocopying projects performed by outside vendors are billed at the actual invoice amount. Special arrangements can be made for unusually large projects.

Electronic Data Management services (e.g., scanning, OCR processing, printing from scanned files, and conversions) performed by outside vendors are billed at the actual invoice amount and those performed in-house are billed at rates comparable to those charged by outside vendors.

**V.  Electronic Communications:**  Clients are charged for communications services as follows:

- *Telephone Charges.*  There is no charge for local telephone calls or facsimile services. Long distance telephone calls made from the Firm are charged based on applicable rates in tariff tables and are allocated

within a client based on the hours worked by attorneys on various matters for that client. Collect, credit card and third party calls are charged at the vendor rate plus applicable taxes and are assigned to the specific matter for which such charges were incurred.

- *Facsimile Charges.* There is no charge for outgoing or incoming facsimiles.

**VI. *Postage and Courier Services.*** Outside messenger and express carrier services are charged at the actual vendor invoice amount which frequently involves discounts negotiated by the Firm. Postage is charged at actual mail rates. On certain occasions, internal staff may be required to act as messengers; a standard rate is charged for their time.

**VII . *UCC Filing and Searches.*** Charges for filings and searches, in most instances, are based on standard amounts determined by the vendor. Unusual filings and searches will be charged based on vendor invoice.

**VIII. *Meals.*** Business meals with a client are charged at actual cost. Luncheon and dinner meetings with the client at the Firm are charged based on the costs developed by our food service vendor. Breakfast, beverage and snack services at the Firm's offices are not charged, except in unusual circumstances. Overtime meals are not charged separately to clients.

**IX. *Direct Payment by Clients of Other Disbursements.*** Other major disbursements incurred in connection with an engagement will be paid directly by the client. (Those which are incurred and paid by the Firm will be charged to the client at the actual vendor's invoice amount.) Examples of such major disbursements that clients will pay directly include:

- *Professional Fees* (including disbursements for outside professional services such as local counsel, accountants, witness and other professional fees).

- *Filing/Court Fees* (including disbursements for agency fees for filing documents, standard witness fees, juror fees).

- *Transcription Fees* (including disbursements for outside transcribing agencies and courtroom stenographer transcripts).

- *Other Disbursements* (including any other required out-of-pocket expenses incurred for the successful completion of a matter).

\* \* \* \* \*

2

**CONFIDENTIAL**

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP & AFFILIATES

## STANDARD BUNDLED HOURLY TIME CHARGE SCHEDULE[*]

### September 1, 2005

|  | Rate |
|---|---|
| **PARTNERS and OF COUNSEL:** | $585 - $835 |
| **COUNSEL/SPECIAL COUNSEL:** | $560 - $640 |
| **ASSOCIATES:** |  |
| Level |  |
| 8 | $540 |
| 7 | 510 |
| 6 | 485 |
| 5 | 465 |
| 4 | 440 |
| 3 | 410 |
| 2 | 375 |
| 1 | 295[**] |
| **LEGAL ASSISTANTS:** | $ 90 - $230 |

---

[*]     These are the Firm's standard hourly fee rates for most attorneys and legal assistants in the Firm's "bundled rate" structure for clients who are not billed separately for certain charges (e.g., secretarial and word processing time preparing legal documents, proofreading, facsimile services, overtime meals and overtime travel allowances).  In-house reproduction under the bundled rate structure is charged at $0.10 per page.  Please note that in a limited number of cases or for specific types of work (e.g., M&A transactions, certain types of tax matters, etc.), individual rates may be higher or lower than those stated.

[**]     First year associates will move to $335/hr. after being admitted to the Bar.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                          :
     In re                        :       Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :       Case No. 05-44481 (RDD)
                                                          :
              Debtors.    :       (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

FINAL ORDER UNDER 11 U.S.C. §§ 327(a) AND 329
AND FED. R. BANKR. P. 2014 AND 2016 AUTHORIZING EMPLOYMENT
AND RETENTION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
AND AFFILIATES AS ATTORNEYS TO DEBTORS

("SKADDEN RETENTION FINAL ORDER")

Upon the application, dated October 8, 2005 (the "Application"), of

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for a

final order (the "Final Order") under 11 U.S.C. §§ 327(a) and 329 and Fed. R. Bankr. P.

2014 and 2016, authorizing each of the Debtors to employ and retain the law firm of

Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates ("Skadden") under a general

retainer as their attorneys; and upon the Affidavit Of Robert S. Miller, Jr. In Support Of

Chapter 11 Petitions and First Day Orders, sworn to October 8, 2005, and the

Declaration of John Wm. Butler, Jr., a member of the Firm, dated October 8, 2005, in

support of the Application (the "Butler Declaration"); and this Court being satisfied with

the representations made in the Application and the Butler Declaration that such

attorneys represent no interest adverse to any of the Debtors' estates, that they are

disinterested persons as that term is defined under section 101(14) of the Bankruptcy

Code, as modified by section 1107(b) of the Bankruptcy Code, and that their

employment is necessary and would be in the best interests of each of the Debtors, their

estates, their creditors, and other parties-in-interest; and it appearing that proper and

adequate notice of the Application has been given and that no other or further notice is

necessary; and upon the record herein; and after due deliberation thereon; and good and

sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Application is GRANTED on a final basis.

2.      Subject to the terms of this Final Order, the Debtors' employment

of Skadden as their attorneys, effective as of the Application date, to perform the

services set forth in the Application and in the engagement letter attached to the Butler

Declaration as Exhibit A, is approved under sections 327(a) and 329 of the Bankruptcy

Code, and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

3.      Skadden shall be compensated in accordance with the procedures

set forth in sections 330 and 331 of the Bankruptcy Code and such Bankruptcy Rules,

Local Rules for the United States Bankruptcy Court for the Southern District of New

York (the "Local Rules"), and United States Trustee Guidelines as may then be

2

applicable, from time to time, and such procedures as may be fixed by order of this

Court.

        4.     Any party-in-interest shall have the right to raise the issue of the

application of Skadden's prepetition retainer to postpetition fees and expenses incurred

at any time.

        5.     This Court shall retain jurisdiction to hear and determine all

matters arising from the implementation of this Final Order.

6.      The requirement under Local Rule 9013-1(b) for the service and

filing of a separate memorandum of law is deemed satisfied by the Application.

Dated:  November 4, 2005
           New York, New York

/s/  Robert D. Drain
UNITED STATES BANKRUPTCY JUDGE