**Hearing Date and Time: To Be Set By The Court**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman (TJ 1129)
Rachel S. Janger
Jessica Kastin (JK 2288)

GROOM LAW GROUP, CHTD
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620
Lonie A. Hassel (LH 8805)

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :
      In re                 :    Chapter 11
                           :
DELPHI CORPORATION, et al.,   :    Case No. 05-44481 (RDD)
                           :
               Debtors.   :    (Jointly Administered)
                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' RESPONSE TO INTERNATIONAL ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, DISTRICT 10 AND  INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, LOCAL 663
MOTION FOR JUDGMENT ON PARTIAL FINDINGS**

**("RESPONSE TO MOTION FOR JUDGMENT")**

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, the

Debtors and the Debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this response ("Response") to the Motion For Judgment On Partial Findings

Dismissing The IBEW And IAM Pursuant To Rule 7052(c) ("Motion for Judgment") (Docket

No. 4890).

<u>Preliminary Statement</u>

1.      The IAM and the IBEW seek dismissal from the Debtors' motion for relief

under sections 1113 and 1114 of the Bankruptcy Code (the "1113/1114 Motion").[1]  Together, the

IAM and IBEW represent slightly more than 100 of Delphi's thousands of U.S.-based

employees.  The Motion for Judgment alleges that the Debtors have not complied with the

procedural requirements of sections 1113 and 1114 of the Bankruptcy Code.  The evidence

presented to the Court by the Debtors and summarized below clearly proves to the contrary.

Notably, only the IAM and IBEW have brought a motion for judgment even though (a) they each

received from Delphi proposals and information comparable to those provided to Delphi's other

unions, and (b) they have been negotiating with Delphi over the 1113/1114 proposals since at

least April 20, 2006.

2.      As directed by this Court, to prevail on their Motion for Judgment, the IAM

and IBEW must show that the Debtors failed to make a <u>prima facie</u> showing that under

controlling law they complied with the procedural requirements of sections 1113 and 1114.[2]

---

[1] Any capitalized terms not expressly defined herein are intended to have the meanings ascribed to them in the
1113/1114 Motion and accompanying memorandum of law, and references to Delphi include the Debtors, as
appropriate.
[2] The Court has limited any Rule 7052 motion in this proceeding to the procedural requirements of sections 1113
and 1114 as identified by the United States Bankruptcy Court for the District of Minnesota in <u>In re Mesaba
Aviation, Inc.</u>, 341 B.R. 693 (Bankr. D. Minn. 2006).  Transcript from the 1113/1114 hearing ("Hearing Tr.") (June
2) 88:16-89:3 (Docket No. 4262); (June 5) 4:17-5:19 (Docket No. 4261).

3.    In making this determination, this Court must assess the Debtors' case and evidence with respect to each of the following procedural requirements of sections 1113 and 1114:

- Whether the Debtors made a proposal to each of the IAM and IBEW for modification of their respective collective bargaining agreements;

- Whether the Debtors have based their proposals on the most complete and reliable information available at the time;

- Whether the Debtors have provided the IAM and IBEW with relevant information necessary for them to evaluate the proposals; and

- Whether the Debtors have met and conferred in good faith with the IAM and IBEW in an attempt to reach mutually satisfactory modifications to the IAM and IBEW collective bargaining agreements.

4.    The Motion for Judgment must fail because, as detailed below, the Debtors have complied with these procedural requirements.

5.    Proposals.  The Debtors have made several specific and definite proposals to the IAM and IBEW, first on October 21, 2005 and continuing to date.  The Debtors' proposals consisted of comprehensive term sheets outlining specific modifications to each of the IAM and IBEW collective bargaining agreements, including modified wage rates and benefits.  In fact, in response to these proposals the IAM and IBEW made joint counter-proposals to the Debtors on April 20, 2006 and have since exchanged additional proposals and engaged in negotiations with the Debtors.

6.    The IAM and IBEW's arguments that the Debtors' proposals were defective because they were contingent upon GM financial support, and because they "did not contain specific proposals for modification of the collective bargaining agreement[s] or of retiree benefits," are baseless.  The Debtors' Competitive Benchmark Proposals, which were made to the IAM and IBEW on November 15, 2005, were not contingent on GM financial support, and the

unions were plainly able to bargain over such proposals if they had chosen to do so.  The fact

that the IAM and IBEW did not engage Delphi in discussions until six months after the Debtors

made their first proposals is not a basis for complaint.

       7.     Similarly, the unions' argument that the Debtors' proposals are "too vague"

to meet the requirements of sections 1113 and 1114 because they include references to "pattern

treatment" is similarly not compelling.  The IAM and IBEW are well aware of the history of

pattern bargaining at Delphi discussed below, and, indeed, the IAM and IBEW <u>proposed</u> that

their agreements be patterned after those agreed to with the UAW.

       8.     <u>Complete And Reliable Information</u>.  The IAM and IBEW make the

unfounded assertion that the Debtors' proposals are not based on the most complete and reliable

information because in assessing competitive wage and benefit rates, the Debtors compared

<u>economy-wide</u> groups of similarly-skilled workers as well as wages and benefits of Delphi's

<u>direct competitors</u> instead of conducting a <u>local</u> comparability study.  The IAM and IBEW have

offered no evidence that a local comparability study would have been more reliable or complete

than the analysis undertaken by Delphi.

       9.     <u>Relevant Information To Evaluate Proposals.</u>  Contrary to the IAM and

IBEW's assertion that the "Debtors have presented no evidence that they provided information to

the IAM or IBEW necessary to evaluate their proposals," the Debtors provided the IAM and

IBEW with a massive amount of relevant information.  Motion for Judgment ¶ 18.  The

declaration of Darrel Kidd discussed Delphi's extensive information response procedure as well

as the establishment and maintenance of a virtual data room containing all information given by

Delphi to all of its unions and their financial advisors in connection with the section 1113 and

1114 proceedings.  The IAM and IBEW were given the ability to access the data room as early

3

as January 3, 2006 when the data room was first established, yet chose not to do so until April

2006.  The uncontroverted testimony of Rob Gerling established that Delphi had responded to <u>all</u>

of the IAM and IBEW's information requests as of May 26, 2006.  Moreover, the IAM and

IBEW had enough information to formulate counter-proposals in April 2006 and to continue

negotiating and exchanging proposals with Delphi to date.

10.    Given that the Debtors have shown that they have produced relevant

information necessary to evaluate their proposals, the burden shifts to the IAM and IBEW to

show that the information provided was not relevant information necessary to their evaluation of

the Debtors' proposals.  The IAM and IBEW have made no such showing.

11.    <u>Meet And Confer In Good Faith</u>.  The Debtors made themselves available

to meet at reasonable times and, the evidence shows that Delphi met with representatives of the

IAM and IBEW on several occasions and continues to do so.  Further, despite the acknowledged

history of pattern bargaining by the IAM and IBEW, both unions understood that they could

pursue negotiations with Delphi prior to Delphi reaching agreements with its larger unions.  And

the IAM and IBEW did so by making joint counter-proposals on April 20, 2006, one day before

filing their opposition to the 1113/1114 Motion.

12.    The Debtors have made a <u>prima</u> <u>facie</u> showing of compliance with all of

the procedural requirements of sections 1113 and 1114.  As such, the Motion for Judgment must

be denied in its entirety.

Relevant Facts

A.    <u>Delphi's Collective Bargaining Agreements With The IAM And IBEW</u>

13.    In addition to the national collective bargaining agreements that Delphi has

with the UAW, the IUE-CWA, and the USW covering thousands of Delphi employees, Delphi

also has local agreements with the IAM and IBEW.  The IAM represents approximately 45

4

Delphi employees.  Hearing Exhibit ("Ex.") 20,[3] Declaration of Robert Gerling ("Gerling Dec.")

(Docket No. 3557), ¶ 2;[4] Deposition Testimony of Donald L. Griffin ("Griffin Dep."), 9:23.[5]

These 45 employees are skilled Toolmakers and Machine Repairmen in Delphi's Milwaukee,

Wisconsin Electronics and Safety ("E&S") operation.  See Ex. 9, Declaration of Darrell Kidd

("Kidd Dec.") (Docket No. 3039), ¶ 9.

14.    Delphi and the IAM entered into a collective bargaining agreement (the

"IAM Agreement") on December 22, 2003 that remains in effect through December 7, 2007.  Id.

15.    The IBEW represents approximately 60 Delphi employees (40 employees in

the Energy and Chassis division and 20 employees in the Electronics and Safety ("E&S")

division) in Milwaukee, Wisconsin.  See Ex. 20, Gerling Dec., ¶ 2;  Ex. 221, Deposition

Testimony of Randal A. Middleton[6]  ("Middleton Dep."), 13:13-15.

16.    Delphi has two collective bargaining agreements with the IBEW (the

"IBEW Agreements," and together with the IAM Agreement, the "IAM/IBEW Agreements").

One agreement, which became effective on March 31, 2004 and will expire on December 7,

2007, covers IBEW-represented employees in Delphi's E&C division.  Ex. 9, Kidd Dec., ¶ 10.

The second IBEW agreement became effective on March 11, 2004 and is set to expire on

December 7, 2007.  It covers the IBEW-represented employees in Delphi's E&S division.  Id.

---

[3] The hearing exhibits cited herein are those exhibits submitted to the Court throughout the course of the hearing of the Debtors' 1113/1114 Motion that began on May 9, 2006.

[4] For the convenience of the Court all cites to hearing exhibits will be accompanied by the name of the document (e.g., Ex. 20, Gerling Dec., ¶ 2.)

[5] The Debtors' designations of the relevant portions of the deposition testimony of Donald L. Griffin, Business Representative for IAM District 10, are contained in Exhibit 220 (Confidential).

[6] The Debtors' designations of the relevant portions of the deposition testimony of Randal A. Middleton, President and Business Manager for IBEW Local 663, are contained in Exhibit 221 (Confidential).

B.    Proposals, Information, And Meetings With IAM/IBEW Prior To The Filing Of
The 1113/1114 Motion

(i)    October 2005

17.    Delphi sent its initial proposals for contract modifications pursuant to

sections 1113 and 1114 to each of the IAM and IBEW on October 21, 2005 (the "October

Proposals") -- within the same two-day period when Delphi presented October 2005 proposals to

each of its other unions.  See Ex. 7, Declaration of Kevin M. Butler ("Butler Dec.") (Docket No.

3038), ¶ 48; Ex. 80, Letter from Kevin Butler to Edwin Hill, IBEW, dated October 21, 2005

("October IBEW Letter").  It is undisputed that the IAM and IBEW received Delphi's proposals

on or about October 21, 2005.  Ex. 220, Griffin Dep. 12:2-23; Ex. 221, Middleton Dep. 18:11-

25; 19:2-23.  Mr. Middleton, President of IBEW Local 663, testified that he "understood the

proposals.  The Company was modifying seeking concessions."  Ex. 221, Middleton Dep.,

20:17-25 (emphasis added).

18.    The October Proposals set forth specific modifications to the IAM/IBEW

Agreements, including, but not limited to, specific base wage rates and benefit levels.  See Exs.

80, 81.

19.    In the four-page cover letters accompanying the October Proposals from

Kevin Butler, Delphi's Vice President, Human Resources, to the IAM and IBEW, Delphi noted

that it had provided the unions with information necessary for them to evaluate Delphi's

proposals.  This information included Delphi's business plan, a summary of changes in financial

projections since the business plan was developed, Delphi's valuation of its proposed

modifications, and Delphi's valuation model.  See Ex. 80, October IAM Letter, 3; Ex. 81,

October IBEW Letter, 3;  Ex. 221, Middleton Dep., 30-33.

6

20.    Mr. Butler's October letters also referred to the information and assumptions upon which Delphi based its October Proposals, which was the most complete and reliable information available at the time. <u>See</u> Ex. 80, October IAM Letter at 2; Ex. 81, October IBEW Letter, 2.

21.    On October 24, 2005, Robert Gerling, Delphi's Labor Director assigned to negotiate Delphi's section 1113 and 1114 proposals with the IAM and IBEW, had two separate meetings with each of the IAM and IBEW to discuss and explain the October Proposals. Ex. 20, Gerling Dec. ¶¶ 2, 18. During these meetings, Mr. Gerling presented Delphi's proposals and made himself available to answer questions and begin negotiating modifications to the IAM/IBEW Agreements. <u>Id</u>. at ¶¶ 18, 19.

22.    Despite Mr. Butler's clear invitation in his October letters to the IAM and IBEW to "[p]lease contact [him] at [their] earliest convenience so that [they] may immediately begin to meet and confer regarding the Section 1113 and 1114 Proposal contained in the attached Term Sheet," neither the IAM nor the IBEW responded to the October Proposals or requested negotiations based on these proposals. <u>See</u> Ex. 7, Butler Dec., ¶ 51; Ex. 80, October IAM Letter at 2; Ex. 81, October IBEW Letter at 2.

(ii)    <u>November 2005</u>

23.    By cover letters dated November 16 and November 17, 2005, Mr. Butler provided each of the IAM and the IBEW with modified section 1113/1114 proposals (the "Competitive Benchmark Proposals") that increased the base wages and benefits from those proposed in the October Proposals. <u>See</u> Ex. 86, Letter from Kevin Butler to Robert Thayer, IAM, dated November 17, 2005 (the "November IAM Letter"); Exs. 87, 304, Letter from Kevin Butler to Edwin Hill, dated November 16, 2005 ("November IBEW Letter").

24.    As with the October Proposals, the Competitive Benchmark Proposals set forth specific modifications to the IAM/IBEW Agreements. <u>See</u> Exs. 86, 87.  Delphi included additional financial information with the Competitive Benchmark Proposals, including a cost per hour "pennysheet," regional wage benchmarking by classification (DPH comparators), summary of benchmark results, and other estimated benchmark comparisons.  <u>See, e.g.,</u> Ex. 304.

25.    It is undisputed that neither the IAM nor the IBEW offered a counter-proposal to the Competitive Benchmark Proposals or requested negotiations regarding Delphi's proposed changes to their collective bargaining agreements until April 2006.  Ex. 7, Butler Dec., ¶ 54;  Ex. 221, Middleton Dep., 85:22-25, 86:2.  They failed to do so despite Mr. Butler's letters which informed the IAM and IBEW that Delphi's increasing losses demonstrated "an urgent need for constructive dialogue and positive resolution" and that Delphi was "ready to discuss these issues at [the unions'] earliest convenience."  Ex. 86, IAM November Letter; Ex. 87, November IBEW Letter.

26.    Indeed, during a November 2005 meeting between Mr. Gerling and Mr. Middleton of the IBEW, Mr. Middleton commented that the IBEW was going to "watch the UAW" before responding to Delphi's proposals.  Ex. 20, Gerling Dec., ¶ 21.  During his deposition, Mr. Middleton explained the concept of "pattern bargaining" as it traditionally related to Delphi as "the larger unions set the boundaries of what the contract is going to look like financially, structure of the contract, and we follow suit in accordance with our -- our size."  Ex. 221, Middleton Dep. 14:14-24.  Although Mr. Gerling informed the IAM and the IBEW that Delphi planned to meet with the UAW and the IUE-CWA, he always held himself open to meet with the IAM and the IBEW for negotiations.  <u>See</u> Ex. 20, Gerling Dec., ¶ 22.

8

(iii)    December 2005

27.    By letters dated December 13, 2005, Delphi sent to each of the IBEW and

the IAM its preliminary 2006-2010 business plan information.  See, e.g., Ex. 305 (Confidential),

Letter from Kevin Butler to Edwin Hill, dated December 13, 2005.  Subsequently, on December

19, 2005, Delphi withdrew the Competitive Benchmark Proposals in an attempt to reach a

consensual resolution with its unions.   Delphi was clear, however, that if no resolution was

reached, it would be forced to reinstate the Competitive Benchmark Proposals.  See Ex. 7, Butler

Dec., ¶ 55.  Mr. Gerling notified the IAM and IBEW of Delphi's press release regarding the

withdrawal.  Ex. 20, Gerling Dec., ¶ 23.

(iv)    January 2006-March 2006

28.     Between November 2005 and March 2006, neither the IAM nor the

IBEW contacted Delphi with a counter-proposal or a request to begin negotiations.  Id. ¶ 24.

29.    Delphi and the UAW reached agreement on the UAW Special Attrition

Program on March 22, 2006.   Ex. 7, Butler Dec., ¶ 57.  Mr. Gerling sent the IAM and the

IBEW the UAW Special Attrition Program shortly after it was finalized.  Ex. 20, Gerling Dec., ¶

24.

30.    On March 25, 2006, Mr. Butler sent the IAM and IBEW new labor

modification proposals pursuant to sections 1113 and 1114 (the "GM Consensual Proposals").

See Ex. 92, Letter from Kevin Butler to Robert Thayer, IAM dated March 25, 2006 ("March

IAM Letter"); Exs. 93, 306, Letter from Kevin Butler to Edwin Hill, IBEW dated March 25,

2006 ("March IBEW Letter").[7]  Delphi also provided to all of its unions subject to the 1113/1114

---

[7] Again, these proposals were sent to the IAM and IBEW during the two-day period during which the Debtors
provided all affected unions with the GM Consensual Proposals.  Ex. 7, Butler Dec., ¶ 58.

9

Motion a presentation of Delphi's financial back-up materials for the GM Consensual Proposals.
See, e.g., Ex. 306 (Confidential); Ex. 92, March IAM Letter.

31.     As clearly stated in Mr. Butler's March cover letter, the GM Consensual
Proposals set forth "two different approaches for achieving the cost savings and operational
flexibility that Delphi needs to restructure."  Ex. 92, March IAM Letter; Ex. 93, March IBEW
Letter.  The first alternative assumes that GM would provide financial support for "soft landings"
for IAM and IBEW-represented employees in making the transition from their current terms and
conditions of employment to the Debtors' proposed terms and conditions.  Id.

32.     Mr. Butler also explained that "[t]he second alternative is based on the
assumption that Delphi must restructure without any financial support from GM.  These terms
are largely the same terms that were included in our proposal on or about November 15, 2005
and remain consistent with the discussion in our transmittal letter to you on that date."  Id.

33.     Mr. Butler's letter made it very clear that if GM did not provide adequate
financial support, the Debtors' sections 1113 and 1114 proposals would remain the Competitive
Benchmark Proposals that were made to the unions in November 2005, as slightly revised.  Id.
Similarly, the GM Consensual Proposals state "In the event that GM does not agree to provide
financial support, the non-contingent terms set forth in or appended to this Term Sheet shall
govern."  Ex. 92, March IAM Letter, GM Consensual Proposals p. 2; Ex. 93, March IBEW
Letter, GM Consensual Proposals p. 2.

(v)     Proposed Modifications To The IAM/IBEW Agreements In
The Competitive Benchmark Proposals

34.     The Competitive Benchmark Proposals consist of approximately 20 pages
of specific and definite proposed modifications to the IAM/IBEW Agreements.  The following is
a summary of some of the principal modifications Delphi outlined in the Competitive

Benchmark Proposals to (i) wages and benefits, (ii) job security, (iii) retirement, and (iv) other non-competitive provisions. The terms of Delphi's agreements with the IAM and IBEW, as well as all of the proposed modifications thereto are set forth in greater detail in the declarations of Kevin Butler, Steven Gebbia, Robert Gerling, and Darrell Kidd (Exs. 7, 13, 9, 20, respectively).

35.    <u>Wage Rates</u>.  Under the Competitive Benchmark Proposals, Delphi proposes an average base wage of $12.50 per hour for production employees (compared to the $10.00 proposed in October) and a base wage of $21.50 for skilled trades (compared to the $19.00 proposed in October).  <u>See</u> Ex. 7, Butler Dec., ¶ 52.  Delphi also proposes to eliminate COLA payments for all employees.  <u>See</u> <u>id</u>. ¶ 65.

36.    <u>Overtime And Shift Premiums</u>.  Delphi proposes to modify its non-competitive overtime and shift premium provisions by paying all overtime at time-and-a-half only.  Overtime would be payable only after working 40 hours in a pay period, which 40 hours would include other contractual paid time such as vacation and holidays.  In addition, the amount and nature of overtime worked would be determined at Delphi's sole discretion, and voluntary overtime provisions would be eliminated.  Shift premiums also would be reduced to five percent of the applicable base hourly rate.  <u>See</u> <u>id</u>. ¶ 67.

37.    <u>Health Care, Dental, Vision, And Prescription Drug Coverage</u>.  Delphi seeks to provide an industry-standard employee cost-sharing program with monthly employee contributions and increased out-of-pocket maximums, co-payments, and deductibles.  Delphi also proposes to eliminate any dental and vision coverage from the plans, and would cap the length of continuation of company-paid health care coverage at seven months following the month the employee was last in active service.  <u>See</u> Ex. 13, Declaration of Steven Gebbia ("Gebbia Dec.") (Docket No. 3042), ¶¶ 5, 9-10; Ex. 7, Butler Dec., ¶ 53 Ex. G.

11

38.    <u>Job Security</u>.  Delphi seeks the elimination of provisions that inhibit its ability to close, or partially or wholly sell, spin-off, split-off, consolidate, or otherwise dispose in any form any manufacturing site, asset, or business unit.  In the event Delphi sells a facility, Delphi would use its best efforts to obtain the purchaser's agreement to hire existing Delphi employees.  Any collective bargaining agreement provisions that would require a purchaser of Delphi's facilities to assume the existing collective bargaining agreements, however, would be eliminated.  <u>See</u> Ex. 7, Butler Dec., ¶ 70.

39.    <u>Protected Status/JOBS Bank</u>.  The Competitive Benchmark Proposals would eliminate Protected Status and the JOBS Bank.  <u>See</u> <u>id</u>. ¶ 71.

40.    <u>Pension Benefits</u>.  Delphi proposes freezing the existing Delphi Hourly-Rate Employees Pension Plan ("HRP"), including the Individual Retirement Plan benefit, effective October 1, 2006.  Delphi also proposes that new-hire employees would participate in a defined contribution plan to which Delphi would contribute three percent of each employee's base wages up to 40 hours per week.  Delphi reserved the right, however, to seek termination of the HRP at a later date if necessary to achieve a viable restructuring plan.  <u>See</u> Ex. 13, Gebbia Dec., ¶ 48.

41.    <u>OPEB</u>.  Pursuant to section 1113 for active hourly employees, and section 1114 for hourly retirees, Delphi proposes to eliminate its obligation to provide health care and employer-paid life insurance coverage during retirement.  Under Delphi's proposals, active hourly employees would also no longer receive basic life insurance, survivor income benefit insurance, and extra accident insurance during retirement from Delphi.  <u>See</u> <u>id</u>. ¶ 45.

(vi)    Proposed Modifications To The IAM/IBEW Agreements In
        The GM Consensual Proposals

42.     With minor exceptions, Delphi's Competitive Benchmark Proposals are incorporated into the GM Consensual Proposals with the modifications outlined below.

43.     The GM Consensual Proposals set forth clearly under the heading "Transformation Proposals - GM Financial Support" those portions of the GM Consensual Proposals that were conditioned on GM financial support adequate to pay for the cost of the proposal: wage rates above those proposed in the Competitive Benchmark Proposals; a modified dental plan; buyout and buydown payments; retiree medical accounts; and defined contribution plan.  Ex. 92, IAM March Letter, GM Consensual Proposals p. 2; Ex. p3, IBEW March Letter, GM Consensual Proposals p. 2.

44.     In the event of adequate GM financial support, the GM Consensual Proposals offer definite proposed modifications to the IAM/IBEW Agreements as detailed in the declarations of Kevin Butler, Steven Gebbia, Rob Gerling, and Darrell Kidd (Exs. 7, 9, 13, 20 respectively).   Delphi presented the GM Consensual Proposals to the unions in redline format so that the differences between the Competitive Benchmark and GM Consensual Proposals would be evident.  See Ex. 92, IAM March Letter, GM Consensual Proposals; Ex. 93, IBEW March Letter, GM Consensual Proposals.

45.     On March 24, 2006, Mr. Gerling scheduled a conference call, which took place on March 30, 2006, with Messrs. Griffin (IAM) and Middleton (IBEW) and Delphi's local negotiating team to discuss and answer questions regarding the UAW Special Attrition Program and Delphi's GM Consensual Proposals.  Prior to that time, neither the IAM nor the IBEW had requested negotiations with Delphi to discuss Delphi's proposals or provided Delphi with a

13

counter-proposal.  Mr. Gerling also told Messrs. Griffin and Middleton that Delphi intended to

negotiate a similar attrition program with the IAM and IBEW.  See Ex. 20, Gerling Dec., ¶ 24.

      C.      Proposals, Information, And Meetings After The Filing Of The 1113/1114 Motion

      46.      On or about April 13, 2006, Mr. Gerling contacted Messrs. Griffin and

Middleton to schedule negotiations.  Ex. 20, Gerling Dec., ¶ 25.   On April 20 and 21, 2006, Mr.

Gerling and other Delphi representatives held two bargaining sessions with the IAM and IBEW.

Id.  On April, 20, 2006, just one day before the deadline for the IAM and the IBEW to file their

objections to the Debtors' 1113/1114 Motion, the IAM and IBEW gave Delphi joint counter-

proposals (the "Joint Counter-Proposals").[8]  Id.; Ex. 198, Exhibits to the Declaration of Randal

A. Middleton ("Middleton Dec.") (Docket No. 3350), Ex. G.

      47.      The Joint Counter-Proposals reflect some movement on the part of the

IAM and IBEW regarding base wage rates, COLA, shift premiums, holidays, and profit sharing.

Ex. 198, Exhibits to the Middleton Dec., Ex. G.  The Joint Counter-Proposals, however, reject

the rest of the Debtors' proposals including, but not limited to, those regarding vacation accrual,

Delphi's right to sell, close, or consolidate facilities, successorship, hiring requirements,

guaranteed income stream benefits, health care, pension, and OPEB.  Id.

      48.      Although the unions responded to approximately 40 of the Debtors'

specific proposals, they noted in their Joint Counter-Proposals that they needed additional

information to respond to approximately 6 proposed modifications to the IAM/IBEW

Agreements.  See id. at 2 (profit sharing, health care, life and disability), 6 (health care, retiree

life insurance), 8 (health care).  Further, the Joint Counter-Proposals contain a "most favored

---

[8] The IAM and IBEW amended the Joint Counter-proposals with negligible changes on April 24, 2006.  See Ex.
271, Amended Joint Counter-proposals.

nations" provision that would give the IAM and IBEW the benefit of any more favorable terms

negotiated by another one of Delphi's unions.

49.    In response to and consistent with the Joint Counter-Proposals, on May 6,

2006, Delphi authorized Mr. Jerman of O'Melveny & Myers LLP, to propose an alternative to

the IAM and IBEW (and the IUOE) that Delphi would offer these unions the same terms and

conditions of employment ultimately accepted by the UAW.  Ex. 280 (Confidential),

Supplemental Declaration of Robert Gerling ("Supp. Gerling Dec."), ¶ 3; Ex. 277, May 6, 2006,

e-mail from Tom A. Jerman to IAM and IBEW.  In response, the IAM and IBEW's counsel

expressed a desire to let the bargaining representatives from Delphi, the IAM, and IBEW

negotiate without participation of the attorneys.

50.    In compliance with the unions' request, on May 11, 2006, during a break

in the hearing in this matter, Mr. Gerling met with representatives of the IAM and IBEW in New

York City and provided them with a  written proposal to establish an attrition program for the

IAM and IBEW with terms substantially similar to the UAW Special Attrition Program.  Ex.

280 (Confidential), Supp. Gerling Dec., ¶ 4.  The IAM and IBEW representatives informed Mr.

Gerling that they were not in a position to discuss Delphi's attrition proposals on that date.

Accordingly, Mr. Gerling scheduled meetings for the following week in Troy, Michigan.  Id. ¶ 4.

51.    During the week of May 15, 2006, Mr. Gerling and members of his staff

met with the bargaining committees for the IAM and IBEW on four different days, for a total of

approximately 35 hours.  During these meetings, Delphi explained to these unions that Delphi's

attrition proposal was an addendum to the GM Consensual Proposals and that if the IAM and

IBEW agreed to the terms of the GM Consensual Proposals, Delphi would remove the GM

financial support contingency aspect of those proposals for the IAM and IBEW.  Id. ¶¶ 5, 6 and

Exhibit A attached thereto.  By doing so, Delphi offered to pay for the improved terms of the

GM Consensual Proposal for its IAM and IBEW represented employees without GM financial

support.  Id. ¶ 7.  There is no evidence that the IAM and IBEW failed to understand Delphi's

proposals, or needed additional information to evaluate them.

52.     Delphi also offered the approach first raised by Mr. Jerman of having the

IAM and IBEW agree to accept whatever terms and conditions of employment were ultimately

agreed upon by the UAW.  Id. ¶ 8.  Contrary to the Motion for Judgment and consistent with the

Joint Counter-Proposals, the IAM and IBEW representatives indicated that this approach was

acceptable in principle, but they expressed a concern regarding the fact that IAM and IBEW

represented Delphi employees are not covered by a GM Benefit Guarantee.  Id. ¶ 9.  Delphi also

spent time during these May meetings addressing the IAM and IBEW's concerns regarding

healthcare plans.  Delphi made its benefits experts available to discuss plan designs and answer

questions regarding the Debtors' proposals.  Id.

53.     On May 20 and 21, 2006, Delphi provided the IAM and IBEW with full

counter-proposals.  See id. at ¶ 6 and Exhibits B, C, and D attached thereto.  The principal

modifications to the Debtors' proposals are discussed in detail in the Supplemental Declaration of

Robert Gerling.  See Ex. 280 (Confidential), Supp. Gerling Dec., ¶ 6.

54.     Since Mr. Gerling's testimony on May 26, 2006, there have been further

negotiations and exchanges of information between Delphi and the IAM and IBEW.[9]  On June 1,

2006, Mr. Gerling met with Messrs. Griffin (IAM) and Middleton (IBEW) in New York.

During this meeting, Mr. Middleton offered two different proposals: (i) Delphi removing the

IAM and IBEW from the section 1113 and section 1114 process and letting their collective

---

[9] The Debtors will offer evidence of these negotiations and information exchanges as part of their rebuttal case.

bargaining agreements expire in 2007 or (ii) continuing to discuss Delphi's proposals and Delphi

assisting the IAM and IBEW with obtaining a benefit guarantee from GM.  Mr. Middleton

indicated that the unions would prefer to pursue the second option, including a desire to finalize

an attrition program and a buyout program, but that the IAM and IBEW would not be available

to meet again until June 19, 2006.

55.    Since the start of the 60-day adjournment of the 1113/1114 hearing on

June 5, 2006, Delphi has continued to meet with the IAM and IBEW and the parties continue to

exchange counter-proposals in an attempt to reach a consensual resolution.  Delphi's latest

section 1113/1114 proposal to the IAM and IBEW was made on August 3, 2006.[10]

D.    The Debtors Provided Relevant Information Necessary To Evaluate Their
       Proposals

(i)    Information Requested By The IAM And IBEW

56.    Between October 3, 2005 and the close of the presentation of the Debtors'

direct case (and, as the Debtors' rebuttal evidence will confirm, to date) the IAM and IBEW

together have submitted over 100 requests for information to Delphi.  As of August 4, 2006,

Delphi had responded to all but six of these requests.[11]  As testified to by Mr. Middleton

(IBEW), at least a third of these requests were modeled after "cookie cutter" requests used in

other section 1113 proceedings in which the IAM and IBEW were parties, such as the Tower

Automotive chapter 11 cases.  Ex. 221, Middleton Dep., 60:15-61:20.

---

[10] These latest proposals have been added as hearing exhibits 374-78 (Confidential) pursuant to the Court's request at
the August 9, 2006 status conference for copies of the latest proposals and counter-proposals exchanged by the
parties.
[11] All six of the IAM and IBEW's outstanding information requests were submitted to Delphi between June 1 and
July 28, 2006.  The IAM and IBEW have also recently submitted additional requests for information.   As of the
date of Mr. Gerling's May 26, 2006 hearing testimony, however, Delphi had responded to all of the IAM and
IBEW's information requests.  Hearing Tr. (May 26 a.m.) 100:22-24 (Docket No. 4346).

57.    As Mr. Gerling explained to Messrs. Griffin and Middleton early on in the information sharing process in October 2005, Delphi set up a system whereby requests for labor-related information were passed through a central team led by Chuck McWee, a Delphi Labor Director.  See Ex. 20, Gerling Dec. ¶¶ 5, 20, 24; Ex. 9 Kidd Dec. ¶¶ 50, 51.

58.    The IAM and IBEW's requests often duplicated the multitude of requests that Delphi received from its other unions and their financial advisors.  Mr. McWee worked in conjunction with Delphi's finance, benefits, and other relevant teams to provide as much information and as soon as possible in response to all the unions' requests.  Id.

59.    On March 28, 2006, Mr. Butler sent a letter to all of Delphi's unions subject to the 1113/1114 Motion to the effect that Delphi had provided all of the relevant information requested regarding the Debtors' proposals and invited the unions and their financial advisors to inform Delphi of any outstanding information requests.  See Ex. 9, Kidd Dec, ¶ 2; Ex. H Letter from Kevin Butler to unions dated March 28, 2006.

60.    In response, on April 5, 2006, counsel for the IAM and IBEW contacted the Debtors' counsel regarding the information sharing process and made a number of inquiries.  See Ex. 10, Supplemental Declaration of Darrell Kidd ("Supp. Kidd Dec."), ¶ 14.  On April 12, 2006, Delphi's counsel responded to all issues raised by the IAM and IBEW in their correspondence. Id.  ¶ 15.

61.    The information provided to the IAM and IBEW in the past nine months has been distributed by a variety of means including in-person meetings, and electronic and regular mail.  Delphi also set up a virtual data room as a central repository for the massive volume of information produced by Delphi to its unions and their financial advisors.  The IAM

and IBEW have received, or at a minimum have access to, <u>all</u> of the information provided by the

Debtors to all its unions subject to the 1113/1114 Motion.

        (ii)   <u>Virtual Data Room</u>

62.    As noted above, in January 2006, Delphi established a virtual data room to

assist the unions with receiving information in response to their numerous information requests.

Ex. 9, Kidd Dec., ¶ 55.  On December 20, 2005, Delphi informed the unions, including the IAM

and IBEW, that it was setting up the data room and gave the unions a data access request form.

<u>Id</u>. ¶ 56.  Delphi instructed the unions that once they filled out and returned the data access

request form they would receive a password allowing them entry into the data room, which

would contain Delphi's responses to all union and financial advisor requests for information.  <u>Id</u>.

The virtual data room went live on January 3, 2006.  <u>Id</u>. ¶ 55.

63.    The index to the virtual data room reflects that as of August 4, 2006, 11

data files were posted between February and May 2006 in response to IAM and IBEW requests

for information.  In addition to these 11 files, the data room contains over 700 documents that

were provided to either one of Delphi's unions or their financial advisors.  All of this information

is and has been available to the IAM and IBEW.  <u>See</u> Ex. 349, Virtual Data Room Index (entries

240 (posted February 2006), 260, 264, 267, 268, 277, 345, 346, 492, 606, and 672 (posted May

31, 2006)).

64.    Neither Mr. Griffin nor Mr. Middleton made any substantive attempt,

however, to use the virtual data room until April 2006.   Ex. 220, Griffin Dep., 59: 2-7,

Middleton Dep., 79:6-80:12.   Mr. Middleton waited until April to access the data room even

though by e-mail dated February 10, 2006, Mr. McWee informed Mr. Middleton that responses

to some of the IBEW's information requests were posted on the virtual data room.   Ex. 221,

Middleton Dep., 80:14-84:9.

<u>Argument</u>

<u>Debtors Have Complied With The Procedural
Requirement Of Sections 1113 And 1114</u>

65.    Federal Rule of Civil Procedure 52(c) is made applicable to chapter 11

proceedings through Federal Rule of Bankruptcy Procedure 7052.   Rule 52(c) states that:

> If during a trial without a jury a party has been fully heard on an issue and
> the court finds against the party on that issue, the court may enter
> judgment as a matter of law against that party with respect to a claim or
> defense that <u>cannot under the controlling law be maintained</u> or defeated
> without a favorable finding on that issue, or the court may decline to
> render any judgment until the close of all the evidence.  Such a judgment
> shall be supported by findings of fact and conclusions of law as required
> by subdivision (a) of this rule.  (Emphasis added.)

66.    The Court has limited the application of Rule 52(c) in this matter to the

issue of whether the Debtors have complied with the procedural requirements of sections 1113

and 1114.  Hearing Tr. (June 2) 88:16-89:3 (Docket No. 4262); (June 5) 4:17-5:19 (Docket No.

4261).  Therefore, to satisfy their burden under Rule 52(c) in this case, the IAM and IBEW must

show that the Debtors' have not (i) made a proposal to modify the IAM/IBEW Agreements, (ii)

based their proposals on the most complete and reliable information available at the time of the

proposals, (iii) provided the unions with relevant information necessary to evaluate the Debtors'

proposals, and (iv) met and conferred with the unions at reasonable times in a good faith attempt

to reach mutually satisfactory modifications to the IAM/IBEW Agreements.  <u>See</u> 11 U.S.C. §§

1113(b), 1114(f); <u>In re Mesaba Aviation, Inc.</u>, 341 B.R. 693, 743 (Bankr. D. Minn. 2006);

Hearing Tr. (June 2) 88:16-89:3; (June 5) 4:17-5:19.

67.     The Debtors' prima facie evidence that it satisfied the procedural requirements under sections 1113 and 1114 is enough to defeat the Motion for Judgment. See In re Regency Holdings (Cayman), Inc., 216 B.R. 371, 374 (Bankr. S.D.N.Y. 1998) (setting forth standard for 7052 motions as whether "plaintiff fails to make out a prima facie case, or despite a prima facie case, the court determines that the preponderance of evidence goes against the plaintiff's claim"); see also In re Teligent, Inc., 315 B.R. 308, 313 (Bankr. S.D.N.Y. 2004) (noting that Rule 7052  motion was denied based on prima facie evidence); In re Chateaugay Corp., 154 B.R. 29, 32 (Bankr. S.D.N.Y. 1993) (denying Rule 52(c) based on prima facie evidence).

68.     The record clearly demonstrates that the Debtors have fully satisfied the procedural requirements of sections 1113 and 1114.   There is no evidence that the IAM and IBEW failed to understand Delphi's proposals, needed additional information to evaluate those proposals, or that Delphi failed to meet and confer with the unions in an attempt to reach a mtual agreement regarding the Debtors' proposed modifications to the IAM/IBEW Agreements.[12]

A.     The Debtors Made Specific Proposals

69.     Delphi has made several proposals to the IAM and IBEW beginning in October 2005, with the most recent proposal dated August 3, 2006.  As detailed above, each of these proposals contains specific modifications to the IAM/IBEW Agreements.

70.     The IAM and IBEW contend that the GM Consensual Proposals were not specific because the proposals were "'contingent upon a commitment by General Motors to

---

[12] The unions' argument that the Debtors have not made definite and specific proposals for modifications to the IAM/IBEW Agreements is belied by the documentary evidence and the fact that there is no evidence in the record that the unions did not understand the Debtors' proposals.  To the contrary, Mr. Middleton testified in his deposition that he understood the concessions the Debtors were seeking.  Middleton Dep., 20:17-25.

provide Delphi with financial support sufficient to fund the difference between the cost of these programs and the cost of Delphi's proposal of November 15, 2005.'"  Motion for Judgment ¶ 6. The IAM and IBEW's April 2006 Joint Counter-Proposals seriously belie any argument that the Debtors did not provide the IAM and IBEW with definite proposals for modification of their collective bargaining agreements.

71.    Further, Mr. Butler's March letters accompanying the GM Consensual Proposals explain that the Debtors were setting forth "two different approaches for achieving the cost savings and operational flexibility that Delphi needs to restructure."  Ex. 92, March IAM Letter; Ex. 93, March IBEW Letter.  The first alternative assumed that GM would provide financial support for soft landings for IAM and IBEW-represented employees in making the transition from their current terms and conditions of employment to the Debtors' proposed terms and conditions.  Whereas "[t]he second alternative is based on the assumption that Delphi must restructure without any financial support from GM.  These terms are largely the same terms that were included in our proposal on or about November 15, 2005 and remain consistent with the discussion in our transmittal letter to you on that date."  Id.

72.    Delphi made it very clear that if GM did not provide adequate financial support, the Debtors' sections 1113 and 1114 proposals would remain the Competitive Benchmark Proposals that were distributed to the unions in November 2005, with slight revisions.  Id.

73.    Moreover, in commenting on the GM Consensual Proposals, this Court observed that those portions of the proposals that were contingent on adequate GM financial support are analogous to a wage snap-back proposal.  See Hearing Tr. (May 9 a.m.) 148-50. Courts have typically endrosed these types of "contingent" proposals, finding that snap-back or

profit-sharing proposals may be an important element of a Section 1113 or 1114 proposal.  See,
e.g., In re Indiana Grocery Co., 136 B.R. 182, 193 (Bankr. S.D. Ind. 1990) ("Snap-back
provisions in modification [of collective bargaining agreement] proposals are favored because
they ensure that once a company is profitable enough for successful reorganization, further
profits not 'necessary' for reorganization are returned to the employees who made the
concessions"); see also In re Mesaba Aviation, Inc., 341 B.R. at 743 (noting in response to the
unions' argument that the debtors must include a snap-back provision that "such provisions
clearly lessen the unpalatability of employee concessions").  Notably, this issue is now moot
because the Debtors have since removed the GM financial support contingency from their
proposals to the IAM and IBEW and have offered the IAM and IBEW a Delphi-funded attrition
program.

74.    The unions' allegations that the Debtors' May 25, 2006 proposals are too
vague and indefinite to satisfy the requirements of sections 1113 and 1114 because the Debtors
offered the IAM and IBEW "pattern treatment" must fail.  Motion for Judgment ¶¶ 8, 9, 13.  The
"pattern treatment" offer would allow the IAM and IBEW to accept, subject to ratification, the
same contract and pension modifications ultimately accepted by the UAW in connection with the
1113/1114 Motion -- a proposal first suggested by the IAM and IBEW in April 2006.  Exs. 312-
14, May 25, 2006 Proposals to the IAM and IBEW, at 2; Hearing Tr. (May 26 a.m.) 160:4-
162:13 (Docket No. 4346).

75.    Furthermore, the IAM and IBEW's Joint Counter-Proposals included a
"most favored nations" provision that states as follows: "If more favorable terms are negotiated
with other unions they will apply to [the IAM and IBEW]."  Ex. 198, Middleton Dec., Ex. G at 8;

see also Hearing Tr. (May 26 a.m.) 160:4-162:13.[13]  The IAM and IBEW's stated rationale for

the most favored nations proposal was that "since no other unions have reached agreements any

agreement should provide that [the IAM and IBEW] will not be disadvantaged."  Id.

    76.    Delphi's pattern treatment proposal is akin to the IAM and IBEW's request

for a most favored nations provision, because under either proposal, the IAM and IBEW's

contract modifications would be based on the agreement the UAW ultimately reaches with

Delphi.

   B.    The Debtors' Proposals Were Based On The Most Complete And Reliable
         Information Available At The Time The Proposals Were Made

    77.    As explained by both Kevin Butler and John Sheehan, Delphi's Vice

President, Chief Restructuring Officer, Chief Accounting Officer, and Controller, the October

Proposals were based on the most complete and reliable information available to Delphi at that

time, including Delphi's most recent revenue and cost projections.  See Ex. 7, Butler Dec., ¶ 77;

Ex. 5, Declaration of John D. Sheehan ("Sheehan Dec."), ¶¶ 44-53, 65-89.

    78.    On November 15-17, 2005, Delphi updated its business plan and financial

forecasts, and served the IAM and IBEW with revised proposals.  See Ex. 7, Butler Dec., ¶ 52.

Delphi also provided the IAM and IBEW with updated financial information in December 2005.

Ex. 305.

    79.    In March 2006, following GM's agreement to the UAW Special Attrition

Program, Delphi continued to update its forecasts, and provided the IAM and IBEW with the

GM Consensual Proposals, which includes certain proposals premised on financial support from

---

[13] The most favored nations provision remained in the unions' April 24, 2006 Amended Joint Counter-proposals.
Ex. 271, Amended Joint Counter-proposals, at 8.

GM.   In all cases, when Delphi made proposals, or, when projections became available, the

basic financial projections underlying the proposals were provided to all of the unions, including

the IAM and IBEW.  <u>See</u> Ex. 7, Butler Dec., ¶ 80.

80.    Delphi's continued reliance on its most recent business plan and financial

forecasts satisfies its obligation to base its proposal on the most complete and reliable

information available.  <u>See</u> <u>In re Amherst Sparkle Mkt.</u>, 75 B.R. 847, 850-51 (Bankr. N.D. Ohio

1987) (finding that proposal met standard when debtor relied on profit and loss reports, balance

sheets for prior fiscal year, cash disbursement data, general ledger and payroll registers, and

projections of performance).

81.    In establishing the rule that the proposal must be based on the most

complete and reliable information available, "Congress must have intended that the court make

its finding based on the best, albeit fragmentary information available at the time of the hearing

on rejection."  Collier, <u>Bankruptcy</u> at ¶ 1113.6[1][b].  Any other construction of the statute would

make it impossible to obtain Section 1113 relief until the company had completed a plan of

reorganization -- and the debtor could not do so without knowing the status of its collective

bargaining agreements.

82.    The unions' argument that Delphi failed to base its proposals on the most

complete and reliable information available at the time because the Debtors "have made no study

of competitive wage rates in the Milwaukee area for skilled trades" is baseless.  Motion for

Judgment ¶ 15.   As testified to by Professor Michael Wachter and Kevin Butler, Delphi based its

proposals on a comparison of <u>economy-wide</u> groups of similarly-skilled workers as well as

wages and benefits of Delphi's <u>direct</u> <u>competitors</u>.  <u>See</u> Ex. 7, Butler Dec., ¶¶ 81-96; Ex.16,

Declaration And Expert Report of Michael L. Wachter, ¶ 7.  As described in detail in Kevin

Butler's declaration, Delphi performed a <u>supplier-based</u> <u>competitor</u> analysis to determine a "competitive" wage and benefit package.  Ex. 7, Butler Dec., ¶ 82.  Mr. Butler identifies at least eight sources of information relied upon by Delphi in performing its analysis.  <u>Id</u>. ¶¶ 81-96.  The IAM and IBEW have offered no evidence that a local comparability study would have been more reliable or complete than the analyses undertaken by Delphi and Professor Wachter.[14]

      C.     <u>The Debtors Provided The IAM And IBEW With Relevant Information Necessary To Evaluate The 1113/1114 Proposals</u>

     83.     Sections 1113(b)(1)(B) and 1114(f)(1)(B) require the Debtors to provide the IAM and IBEW with relevant information necessary to evaluate the Debtors' proposals.

     84.     The unions' assertion that "the Debtors have presented no evidence that they have provided information to the IAM or IBEW necessary to evaluate their proposals" is patently wrong.   Motion for Judgment ¶ 18.

     85.     The uncontroverted evidence is clear:

- In October 2005, Delphi sent the IAM and IBEW the Debtors' business plan, a summary of changes in Delphi's financial projections since the business plan was adopted, a valuation of the Debtors' proposed modifications, and Delphi's valuation model.  Exs. 80, 302 (Confidential)

- In November 2005, Delphi sent the IAM and IBEW additional financial information.  Exs. 86, 304 (Confidential)

- In December 2005, Delphi sent the IAM and IBEW its preliminary 2006-2010 business plan information.  Ex. 305 (Confidential)

- In January 2006, Delphi set up the virtual data room and the IAM and IBEW had the means to access this data room.  Ex. 9

- In March 2006, Delphi provided the unions with a presentation of Delphi's financial back-up materials for the GM Consensual Proposals.  Ex. 306 (Confidential).

---

[14] The unions also argue that Delphi's alleged failure to consider the closing of the Milwaukee plants in formulating its proposals makes the proposals procedurally defective.  Motion for Judgment ¶ 16.  Delphi did not base its proposals on a plant-by-plant analysis, nor is it required to do so.

- In April 2006, the IAM and IBEW submitted Joint Counter-Proposals to Delphi, which indicated the few areas in which additional information was requested. Ex. 198, Middleton Dec., Ex. G; Ex. 271.

- As of May 26, 2006, Delphi had responded to all of the IAM and IBEW's nearly 100 information requests.  Hearing Tr. (May 26 a.m.) 100:22-24.

- The IAM, IBEW, and Delphi continue to negotiate and exchange proposals today.  Exs. 374-378.

86.    The Debtors have satisfied their initial burden of demonstrating that they provided relevant information necessary for the IAM and IBEW to evaluate the Debtors' proposals.  See, e.g., In re Appletree Mkts, 155 B.R. 431, 437-38 (S.D. Tex. 1993) (debtor provided union with access to financial books and current financial statements); In re Valley Steel Prods. Co., Inc., 142 B.R. 337, 337 (Bankr. E.D. Mo. 1992) (debtor provided yearly operating statements and monthly bankruptcy operating report); In re Amherst Sparkle Mkt, Inc., 75 B.R. 847, 850, 852 (Bankr. N.D. Ohio 1987) (information sufficient even though original provision consisted solely of unaudited financial data which contained errors); In re Royal Composing Room, Inc., 62 B.R. 403, 412-13 (Bankr. S.D.N.Y. 1986), aff'd, 78 B.R. 671 (2d Cir. 1988) (single sheet of paper which listed union costs was "reliable and relevant information and complete enough to form a basis for reasoned consideration of [the debtor's] proposal").

87.    Again, Delphi provided the IAM and IBEW with access to all of the information provided to the UAW, IUE-CWA, USW, and IUOE.   Yet, the IAM and IBEW are the only unions bringing a motion for judgment.  The Mesaba court noted that once the debtors met the initial burden of proving what information they provided, the burden "shifts to the unions 'to provide evidence that the information provided was not the relevant information' which was necessary for [them] to evaluate the proposal[s]'."  In re Mesaba Aviation, Inc., 341 B.R. at 713

(citations omitted - emphasis in original).  While the Debtors have clearly met their initial

burden, the IAM and IBEW have provided no evidence that the volume of information provided

to them was not the relevant information necessary for them to evaluate the Debtors' proposals.

The IAM and IBEW make only conclusory allegations that Debtors provided them with no

information.  Contrary to this unsupported argument, the IAM and IBEW had enough

information to enable them to make Joint Counter-Proposals in April and to continue negotiating

and exchanging proposals.   The Joint Counter-Proposals indicate clearly the topics on which the

IAM and IBEW were waiting to receive information before responding with a counter-proposal.

Other than that information, which the Debtors have subsequently provided to the IAM and

IBEW, there is no evidence that the IAM and IBEW were unable to evaluate Debtors' proposals.

> D.    The Debtors Have Met And Conferred In Good Faith With The IAM And IBEW
>        At Reasonable Times In An Attempt To Reach Mutually Satisfactory
>        Modifications To The IAM/IBEW Agreements

88.    Sections 1113(b)(2) and 1114(f)(2) require that the Debtors meet at

reasonable times with the unions in an attempt to reach mutually satisfactory modifications to the

IAM/IBEW Agreements.  Delphi has made itself available to negotiate with the IAM and IBEW

since October 2005.   In fact, Mr. Gerling and other Delphi representatives meet with IAM and

IBEW representatives several times to explain the Debtors' proposals and each of Mr. Butler's

letters to the unions invited them to contact Delphi to begin negotiations.  See generally Ex. 20,

Gerling Dec., ¶¶ 4-26; Exs. 80, 81, 86, 87, 92, 93, Kevin Butler's letters to the unions.

89.    Courts have held that debtors whose efforts fell far short of those that

Delphi has made nonetheless negotiated in good faith.  See In re Alabama Symphony Ass'n, 155

B.R. 556, 576 (Bankr. N.D. Ala. 1993) (holding that the debtor met good faith standard because

it was not responsible for union's refusal to meet); In re Sierra Steel Corp., 88 B.R. 337,

341 (Bankr. D. Colo. 1988) (despite lack of negotiations, debtor met good faith standard when it supplied all relevant financial data at its disposal, offered to provide union with any additional financial data necessary for evaluation of its proposal, and repeatedly requested to meet with union).

90.    The IAM and IBEW's decision to wait until April 2006 to engage in bargaining does not translate into a failure on Delphi's part to meet or confer with the IAM and IBEW.  Further, the IAM and IBEW have offered no excuse for their failure to engage Delphi in negotiations prior to that time.

91.    Finally, the IAM and IBEW contend that "the Debtors are not ready to bargain with the IAM and IBEW."  Motion for Judgment ¶ 26.  The IAM and IBEW know full well that they have been bargaining with Delphi since April and continue to do so.

<u>Notice</u>

92.    Notice of this Response has been provided in accordance with the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered May 19, 2006 (Docket No. 3824).  The Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

93.    Because the legal points and authorities upon which this Response relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

<u>Conclusion</u>

94.    The Debtors have more than satisfied their <u>prima</u> <u>facie</u> burden of showing

that they complied with the procedural requirements of sections 1113 and 1114.  Accordingly,

the Motion for Judgment pursuant to Rule 7052 dismissing the IAM and IBEW as parties to the

section 1113/1114 proceedings should be denied in its entirety.

Dated:  New York, New York
      August 16, 2006

          SKADDEN, ARPS, SLATE, MEAGHER &
            FLOM LLP

          By:<u>/s/ John Wm. Butler, Jr.</u>
            John Wm. Butler, Jr. (JB 4711)
            John K. Lyons (JL 4951)
            Ron E. Meisler (RM 3026)
          333 West Wacker Drive, Suite 2100
          Chicago, Illinois  60606
          (312) 407-0700

          By:<u>./s/ Kayalyn A. Marafioti</u>
            Kayalyn A. Marafioti (KM 9632)
            Thomas J. Matz (TM 5986)
          Four Times Square
          New York, New York 10036
          (212) 735-3000

          O'MELVENY & MYERS LLP

          By:<u>/s/ Tom A. Jerman</u>
            Robert A. Siegel (RS 0922)
            Tom A. Jerman (TJ 1192)
            Rachel S. Janger
            Jessica Kastin (JK 2288)
          1625 Eye Street, NW
          Washington, DC  20006
          (202) 383-5300

          GROOM LAW GROUP, CHARTERED

          By:<u>/s/ Lonie A. Hassel</u>
            Lonie A. Hassel (LH 8805)

30

1701 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 857-0620

Attorneys for Delphi Corporation, <u>et al.</u>,
Debtors and Debtors-in-Possession