- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DELPHI CORPORATION,

9

10          Debtor.

11

12    - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                July 19, 2006

19                10:08 AM

20

21    B E F O R E:

22    HON. ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25

- 2 -

1

2    HEARING re Motion for Relief from Automatic Stay Filed by

3    Petitioners, Mary P. O'Neill and Liam P. O'Neill

4

5    HEARING re Motion of the Offshore Group Pursuant to Bankruptcy

6    Code Sections 362(d)(1) and 553 for Order Lifting the Automatic

7    Stay to Permit the Offshore Group to Exercise Right of Setoff

8

9    HEARING re Motion of BorgWarner Turbo Systems Inc. for Relief

10   from Automatic Stay to Liquidate Setoff and Recoupment Claims

11   Against the Debtors

12

13   HEARING re Motion of Ericka S. Parker, Chapter 7 Trustee,

14   Seeking Relief from the Automatic Stay to Allow Her to Continue

15   Asserting Counterclaims in Pending Litigation Being Prosecuted

16   by the Debtor

17

18   HEARING re First Interim Fee Application of Howard & Howard

19   Attorneys, P.C., Intellectual Property Counsel to Debtors, for

20   Interim Allowance of Compensation and Reimbursement of Expenses

21   for the Period October 8, 2005 Through January 31, 2006

22

23

24

25

- 3 -

1

2    HEARING re First and Final Application of Ernst & Young, LLP,

3    as Sarbanes-Oxley, Valuation and Tax Services Providers for the

4    Debtors, for Allowance and Payment of Compensation for

5    Professional Services and Reimbursement of Actual and Necessary

6    Expenses

7

8    HEARING re First Interim Application of Quinn Emanuel Urquhart

9    Oliver & Hedges, LLP, Special Litigation Counsel to the

10   Debtors-in-Possession for Compensation and Reimbursement of

11   Expenses

12

13    HEARING re First Application of Cadwalader, Wickersham and Taft

14    LLP as Attorneys for the Debtors for Interim Allowance of

15    Compensation for Professional Services Rendered and for

16    Reimbursement of Actual and Necessary Expenses Incurred From

17    October 10, 2005 Through January 31, 2006

18

19    HEARING re First Application of Togut, Segal & Segal LLP for an

20    Allowance of Interim Compensation for Services Rendered as

21    Conflicts Counsel for the Debtors for the Period October 8,

22    2005 Through January 31, 2006

23

24

25

- 4 -


1

2    HEARING re First Interim Application of Dickinson Wright PLLC

3    for Order Authorizing and Approving Compensation for Services

4    Rendered From January 13, 2006 Through January 31, 2006

5

6    HEARING re First Interim Application for Allowance of

7    Compensation and Reimbursement of Expense Incurred by FTI

8    Consulting, Inc. as Restructuring and Financial Advisor to the

9    Debtors for the Period October 8, 2005 Through January 31, 2006

10

11    HEARING re First Interim Application of Groom Law Group,

12    Chartered, As Special Employee Benefits Counsel for the

13    Debtors, Seeking Allowance of Compensation for Professional

14    Services Rendered and for Reimbursement of Actual and Necessary

15    Expenses Incurred From October 8, 2005 Through January 31, 2006

16

17    HEARING re First Application of Shearman & Sterling LLP, as

18    Special Counsel to the Debtors, for Allowance of Interim

19    Compensation for Professional Services Rendered and for

20    Reimbursement of Actual and Necessary Expenses Incurred From

21    October 8, 2005 Through January 31, 2006

22

23

24

25

                                                              - 5 -


 1

 2    HEARING re First Interim Application of Thompson Hine LLP as

 3    Special Counsel for Debtors for Interim Court Approval,

 4    Allowance and Payment of Compensation for Services Rendered and

 5    Expenses Advanced From October 8, 2005 Through January 31, 2006

 6

 7    HEARING re First Interim Application of O'Melveny & Myers LLP

 8    for Order Authorizing and Approving Compensation and

 9    Reimbursement of Expenses

10

11    HEARING re First Interim Application for Compensation and

12    Reimbursement of Expenses of Warner Stevens, L.L.P., as

13    Conflicts Counsel to the Official Committee of Unsecured

14    Creditors for the Period of November 10, 2005 Through January

15    31, 2006

16

17    HEARING re First Interim Application for Allowance of Fees and

18    Expenses of Deloitte & Touche LLP as Independent Auditors and

19    Accountants to the Debtors for the Period From October 8, 2005

20    Through January 31, 2006

21

22

23

24

25

- 6 -

1

2    HEARING re First Interim Application of Butzel Long, P.C.,

3    Commercial and Litigation Counsel to Debtors and Debtors-in-

4    Possession, for Allowance and Payment of Compensation and

5    Reimbursement of Expenses for the Period From October 8, 2005

6    Through January 31, 2006 under U.S.C. Sections 330 and 331

7

8    HEARING re First Interim Application for Approval of

9    Compensation and Reimbursement of Expenses of Price, Heneveld,

10   Cooper, DeWitt & Litton, LLP, Intellectual Property Counsel to

11   the Debtors, for Services Rendered From October 9, 2005 Through

12   January 31, 2006

13

14   HEARING re First Interim Fee Application of Jaeckle Fleischmann

15   & Mugel, LLP for Allowance of Compensation for Services

16   Rendered and Reimbursement of Expenses

17

18   HEARING re First Interim Application of Banner & Witcoff, Ltd.,

19   Intellectual Property Counsel to Delphi Corporation, Seeking

20   Allowance and Payment of Interim Compensation and Reimbursement

21   of Expenses Under 11 U.S.C. Sections 330 and 331

22

23

24

25

- 7 -

1

2    HEARING re First Application of KPMG LLP, as Tax and

3    Transaction Services Advisors for the Debtors, for Interim

4    Allowance of Compensation for Professional Services Rendered

5    and Reimbursement of Actual and Necessary Expenses Incurred

6    From October 8, 2005 Through January 31, 2006

7

8    HEARING re Revised First Interim Application of Covington &

9    Burling, Foreign Trade and Special Corporate Committee Legal

10   Counsel to the Debtors and Debtors-in-Possession, for Allowance

11   of Compensation for Services Rendered and Reimbursement of

12   Expenses Incurred for the Period From October 8, 2005 Through

13   January 31, 2006

14

15   HEARING re First Interim Application for Cantor Colburn LLP for

16   Allowance of Compensation for Services Rendered and

17   Reimbursement of Expenses Pursuant to 11 U.S.C. Sections 330,

18   331

19

20   HEARING re First Interim Application for Allowance and Payment

21   of Compensation and Reimbursement of Expenses Pursuant to 11

22   U.S.C. 328, 330 and 331

23

24

25

                                                        - 8 -


1

2    HEARING re First Interim Application of Wilmer Cutler Pickering

3    Hale and Dorr LLP, Special Regulatory Counsel for the Audit

4    Committee of the Board of Directors of Delphi Corporation, for

5    Allowance of Compensation for Services Rendered and Expenses

6    Incurred From October 8, 2005 Through January 31, 2006-07-20

7

8

9    HEARING re first Interim Application of Rothschild Inc. for

10   Compensation and Reimbursement of Expenses

11

12    HEARING re First Interim Application for Approval of

13    Compensation and Reimbursement of Expenses of Rader, Fishman &

14    Grauer PLLC, Intellectual Property Counsel to Debtors, for

15    Services Rendered From October 8, 2005 Through January 31, 2006

16

17    HEARING re First Interim Application of Jefferies & Company,

18    Inc., as Investment Banker to the Official Committee of

19    Unsecured Creditors for Interim Allowance of Compensation for

20    Professional Services Rendered and Reimbursement of Actual and

21    Necessary Expenses Incurred for the Period October 18, 2005

22    Through January  31, 2006.

23

24

25

                                                      - 9 -


1

2    HEARING re First Fee and Expense Application of Latham &

3    Watkins LLP as Counsel to the Official Committee of Unsecured

4    Creditors

5

6    HEARING re Firast Interim Application of Mesirow Financial

7    Consulting, LLC for Allowance of Compensation and Reimbursement

8    of Expenses as Financial Advisor to the Official Committee of

9    Unsecured Creditor for the Period From October 19, 2005 Through

10    January 31

11

12    HEARING re First Fee and Expense Application of Steven Hall &

13    Partners, LLC as Compensation and Employment Agreement Advisor

14    for the Official Committee of Unsecured Creditors

15

16    HEARING re First Interim Application of Skadden, Arps, Slate,

17    Meagher & Flom LLP and Affiliates, Counsel to the Debtors-in-

18    Possession, Seeking Allowance and Payment of Interim

19    Compensation and Reimbursement of Expenses Under 11 U.S.C.

20    Sections 330 and 331

21

22    HEARING re First Interim Fee Application of Blake, Cassels &

23    Graydon LLP as Canadian Counsel for Debtors for Allowance and

24    Payment of Interim Compensation and Reimbursement of Expenses

25    Under 11 U.S.C. Sections 330 and 331

                                                          - 10 -


1

2    HEARING re Fee Committee's Application for an Order Authorizing

3    Retention of Legal Cost Control as Fee and Expense Analyst,

4    Nunc Pro Tunc to June 1, 2006, Pursuant to Sections 327(A) and

5    328 of the Bankruptcy Code

6

7    HEARING re Motion for Order Under 11 U.S.C. Section 363(b) and

8    Federal Rules of Bankruptcy Procedures 6004 Authorizing the

9    Debtors to Enter Into an Agreement with A.T. Kearney, Inc.

10

11    HEARING re Motion to Implement Final Trading Order in Respect

12    of Acquisition of Stock by Harbinger Capital Partners Master

13    Fund I, Ltd.

14

15    HEARING re Motion of H.E. Services Company and Robert Backie,

16    Majority Shareholder for Relief from the Automatic Stay Under

17    Section 362 of the Bankruptcy Code

18

19

20

21

22

23

24

25

- 11 -

1

2  HEARING re Motion for Orders Under 11 U.S.C. Sections 363 and

3  365 and Federal Rules of Bankruptcy Procedure 2002, 6004, 6006

4  and 9014 (A) Approving (i) Bidding Procedures; (ii) Certain Bid

5  Protections; (iii) Form and Manner of Sale Notices; and (iv)

6  Sale Hearing Date and (B) Authorizing and Approving (i) Sale of

7  Certain of Debtors' Assets Comprising Substantially All Assets

8  of MobileAria, Inc. Free and Clear of Liens, Claims and

9  Encumbrances; (ii) Assumption and Assignment of Certain

10 Executory Contracts and Unexpired Leases; and (iii) Assumption

11 of Certain Liabilities

12

13 HEARING re Supplement to KECP Motion Seeking Authority to: (A)

14 Fix Second Half 2006 AIP Targets and Continue AIP Program and

15 (B) Further Adjourn KECP Emergence Incentive Program Hearing

16

17 HEARING re Motion of NuTech Plastics Engineering, Inc. for

18 Relief from the Automatic Stay in Order to Continue Pre-

19 petition Breach-of-Contract Case Against Delphi Automotive

20 Systems USA, L.L.C. and General Motors

21

22 HEARING re Summons and Notice of Pretrial Conference in an

23 Adversary Proceeding

24

25

- 12 -

1

2  A P P E A R A N C E S :

```
 3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

 4        Attorneys for Debtor and

 5        Debtors-in-Possession

 6        333 West Wacker Drive

 7        Chicago, IL 60606

 8

 9   BY:   JOHN WM. BUTLER, JR., ESQ.

10

11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

12        Attorneys for Debtor and

13        Debtors-in-Possession

14        Four Times Square

15        New York, NY 10036

16

17   BY:   KAYALYN A. MARAFIOTI, ESQ..

18        ALBERT L. HOGAN, ESQ.

19

20   TOGUT, SEGAL & SEGAL, LLP

21        Attorneys for Debtors

22        One Penn Plaza

23        New York, NY 10118

24

25   BY:   NEIL BERGER, ESQ.
```

                                                    - 13 -

```
 1

 2   KRONISH, LIEB WEINER & HELLMAN, LLP

 3        Attorneys for Debtors

 4        1114 Avenue of the Americas

 5        New York, NY 10036

 6

 7   BY:   ADAM C. ROGOFF, ESQ.

 8

 9   O'MELVENY & MYERS, LLP
```

```
10        Attorneys for Debtors

11        7 Times Square

12        New York, NY 10036

13

14   BY:   JEFFREY I. KOHN, ESQ.

15

16   SHERMAN & STERLING, LLP

17        Attorneys for Debtors

18        599 Lexington Avenue

19        New York, NY 10022

20

21   BY:   DOUGLAS P. BARTNER, ESQ.

22

23

24

25
```

                                                            - 14 -

```
1

2    QUINN EMANUEL URQUHARDT OLIVER & HEDGES

3        Attorneys for Debtors

4        865 S. Figueroa Street

5        10th Floor

6        Los Angeles, CA 90017

7

8    BY:   MATEO FOWLER, ESQ.

9

10   MAYER, BROWN, ROWE & MAW, LLP

11        Attorneys for Debtors

12        71 S. Wacker Drive

13        Chicago, IL 60606

14

15   BY:   PAUL J.N. ROY, ESQ.
```

16

17    COOLEY GODWARD, LLP

18        101 California Street

19        5th Floor

20        San Francisco, CA 94111

21

22    BY:   GREGG S. KLEINER, ESQ.

23

24

25

                                                    - 15 -


1

2    LATHAM & WATKINS, LLP

3        Attorneys for the Official Committee of

4        Unsecured Creditors

5        885 Third Avenue

6        New York, NY 10022

7

8    BY:   MARK A. BROUDE, ESQ.

9        ROBERT J. ROSENBERG, ESQ.

10

11    WARNER STEVENS, LLP

12        Attorneys for the Official Committee of

13        Unsecured Creditors

14        301 Commerce Street

15        Suite 1700

16        Fort Worth, TX 76102

17

18    BY:   MICHAEL D. WARNER, ESQ.

19

20    COHEN, WEISS AND SIMON, LLP

21        Attorneys for UAW

22        330 West 42nd Street

https://vip21.veritextllc.com/myfiles/710373/122356.TXT

23        New York, NY 10036

24

25    BY:    BABETTE CECCOTTI, ESQ.

                                                            - 16 -


1

2    PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C.

3          Attorneys for IBEW and IAM

4          1555 North River Center Drive

5          Suite 202

6          Milwaukee, WI 53212

7

8    BY:    MARIANNE GOLDSTEIN ROBBINS, ESQ.

9          (TELEPHONICALLY)

10

11    GORLICK, KRAVITZ & LISTHAUS, P.C.

12          Attorneys for Operating Engineers

13          Locals 18-S, 101-S, 832-S

14          17 State Street

15          4th Floor

16          New York, NY 10004

17

18    BY:    BARBARA S. MEHLSACK, ESQ.

19

20

21

22

23

24

25

                                                            - 17 -


1

2   WHITE & CASE, LLP

3       Attorneys for Ad Hoc Equity Committee

4       200 South Biscayne Boulevard

5       Suite 4900

6       Miami, FL 33131

7

8   BY:   FRANK L. EATON, ESQ.

9

10  MENAKER & HERMANN, LLP

11      Attorneys for Mary P. and Liam P. O'Neill

12      10 East 40th Street

13      New York, NY 10016

14

15  BY:   RICHARD MENAKER, ESQ.

16      ALEXIS L. HALL, ESQ.

17

18  TISDALE & ASSOCIATES, LLC

19      Attorneys for

20      1600 Broadway

21      Suite 2600

22      Denver, CO 80202

23

24  BY:   DOUGLAS M. TISDALE, ESQ.

25

                                                    - 18 -


1   SCHAFER & WEINER, PLLC

2       Attorneys for

3       40950 Woodward Avenue

4       Suite 100

5       Bloomfield Hills, MI 48304

6

7   BY:   RYAN HEILMAN, ESQ.

8

```
 9   MASTROMARCO & JAHN, P.C.

10        Attorneys for H.E. Services Co. and Robert Backie

11        and Cindy Palmer, Personal Representative

12        of the Michael Palmer Estate

13        1024 North Michigan

14        Saginaw, MI 48805

15

16   BY:  VICTOR J. MASTROMARCO, JR., ESQ.

17

18   HELLER EHRMAN, LLP

19        Attorneys for At Road, Inc.

20        7 Times Square

21        New York, NY 10036

22

23   BY:  CARREN B. SHULMAN, ESQ.

24

25
```

                                                            - 19 -

```
 1

 2   ARNALL GOLDEN GREGORY, LLP

 3        Attorneys for Verizon Services Corp.

 4        171 17th Street, NW

 5        Suite 1200

 6        Atlanta, GA 30363

 7

 8   BY:  DARRYL S. LADDIN, ESQ.

 9

10   LOWENSTEIN SANDLER, P.C.

11        Attorneys for Lead Plaintiffs

12        65 Livingston Avenue

13        Roseland, NJ 07068

14
```

15    BY:   MICHAEL S. ETKIN, ESQ.

16

17    OFFICE OF THE UNITED STATES TRUSTEE

18          33 Whitehall Street

19          21st Floor

20          New York, NY 10004

21

22    BY:   ALICIA M. LEONHARD, ESQ.

23          TRACY HOPE DAVIS, ESQ.

24

25

                                              - 20 -

                        DELPHI CORPORATION (DRAFT)

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.  Okay.  Delphi?

3              MR. BUTLER:  Your Honor, good morning.  Jack Butler

4    from Skadden, Arps, Slate, Meagher & Flom, LLP along with my

5    partners, Al Hogan and Kayalyn Marafioti, here for the debtors'

6    ninth omnibus hearing for July 2006.

7              Your Honor, we have filed an agenda for today's

8    hearing.  It has 42 matters on it, the substantial number of

9    which have been adjourned to later dates, which I'll cover in a

10   few minutes.  With Your Honor's permission, we would follow the

11   order of the agenda.

12             THE COURT:  Okay.  That's fine.

13             MR. BUTLER:  And, Your Honor, the first matter on the

14   agenda is the O'Neill lift-stay motion at Docket No. 2748 in

15   which we understood from chambers that there's a bench ruling.

16             THE COURT:  Right.  I reviewed the insurance

17   materials as well as the record of the oral argument at the

18   last hearing on this matter which was at the last omnibus day.

19   And I had some concerns based on what I thought I heard at the

20   oral argument that perhaps the O'Neills were changing their

21   request for relief in seeking relief beyond the insurance

22    policies themselves.  It appears to me from reviewing the

23    transcript that that's not the case.  I don't know.  Is their

24    counsel here?

25          MS. HALL:  Yes.

                                                    - 21 -

                    DELPHI CORPORATION (DRAFT)

1          THE COURT:  I just want to confirm that.  You're

2    looking just to the insurance, correct?

3          MS. HALL:  (No audible response)

4          THE COURT:  All right.  And then, of course, we went

5    through the issue as to what that means, given that the debtors

6    have a self-insured retention supported by their own financial

7    planning as set forth on the record of that hearing and also in

8    connection with the Court's prior order approving the

9    assumption of the insurance agreements.  And it was clear to me

10   that there would be if the O'Neills established liability, in

11   effect, on the debtors' estate resulting from that given the

12   SAR, although the affect would be indirect, it would still be

13   real.  I've also considered the fact that the debtors are still

14   reviewing proofs of claim but that they have not, to date,

15   informed me of any similar lawsuits to this one personal injury

16   lawsuit, where the matter is, although not ready for trial,

17   well developed.

18          In light of all of that, and in applying the relevant

19   factors to this matter laid out by the Second Circuit in the

20   Sonnax case, at 907 F.2d 1280, 1286 (2d Cir. 1990), which

21   include whether relief would result in a partial or complete

22   resolution of the issue, lack of any connection with or

23   interference with the bankruptcy case, whether a specialized

24   tribunal with necessary expertise has been established to hear

25   the cause of action, where the debtors' insurer has assumed

                                                    - 22 -

                    DELPHI CORPORATION (DRAFT)

1   full responsibility for a defense, in the interest of judicial

2   economy and the expeditious and economical resolution of

3   litigation, including whether the parties are ready for trial,

4   and, finally, the impact of the stay and the balance of forums

5   here, I concluded that the stay should be lifted to permit the

6   conclusion of the litigation and again, on the condition that

7   the recovery on the claim be limited to insurance proceeds.

8          The Court does not have jurisdiction to decide this

9   personal injury action and, again, as I said before, the record

10  doesn't reflect that there are any other actions of a similar

11  nature.  Certainly it doesn't reflect that there are a plethora

12  of such actions that may require more collective dispute

13  resolution mechanisms.

14         Secondly, again, the recovery is limited to insurance

15  here and I, in these circumstances, weigh that more heavily

16  than the indirect effect of a recovery upon the debtors' estate

17  through the funding of the SAR.

18         Finally, I recognize that the plaintiff here is an

19  individual that has suffered a personal injury.  I don't know

20  whether that will result in any ultimate judgment against the

21  debtors, but balancing the harm to that person in proceeding to

22  some form of recovery as against the debtors, particularly

23  given the time that has elapsed since the filing date, I think

24  the balance of harms, in this instance, weighs in favor of the

25  O'Neills.

                                                    - 23 -

                        DELPHI CORPORATION (DRAFT)

1          So, I will grant that relief and you should submit an

2   order after running it by Mr. Butler to make sure it's

3   consistent with my ruling and the representation that any

4   recovery on the claim be limited to the insurance.

5          MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

6   next matters on the agenda, matters 2 and 3, one is the

7   Offshore Group's lift-stay motion at Docket No. 2811 and number

8    3 is BorgWarner Turbo Systems, Inc. lift-stay motion at Docket

9    No. 3218 and Mr. Berger is handling that on behalf of the

10    debtors.

11         MR. BERGER:  Good morning, Judge.  Neil Berger,

12    Togut, Segal and Segal.  Number 2 is the Offshore Group motion

13    for relief from the automatic stay to affect a setoff.

14    Negotiations have been ongoing.  For the last couple of weeks

15    the delta between the bid and ask is efficiently small that I

16    can say with confidence that I hope that in the next week or

17    two to have to Mr. Rosenberg's office and the committee a

18    proposed resolution.  The principal at Offshore who is

19    primarily responsible for making the business decision was out

20    last week and this week and we'll hope to pick that up next

21    week and, hopefully, when we come back on the August calendar,

22    we'll be handing up a settlement agreement.

23         THE COURT:  Okay.

24         MR. BERGER:  We'll mark that one, rather, for

25    adjournment.

- 24 -

DELPHI CORPORATION (DRAFT)

1         THE COURT:  Okay.

2         MR. BERGER:  BorgWarner -- I'm pleased to report that

3    the business representatives at Delphi and BorgWarner were able

4    to negotiate a business resolution of this matter.  This was

5    BorgWarner seeking to liquidate its pre-petition warranty claim

6    they have.  It's a resolution of Your Honor's October 13, '05

7    first day order, final first day order, authorizing the debtors

8    to honor the pre-petition customer programs.  The warranty

9    claim was liquidated in the approximate sum of 2.3 million

10    dollars.  As part of that negotiation, Your Honor, we were able

11    to free up approximately 3.2 million dollars of account

12    receivables coming in the debtors' way, so it was a double win

13    for the debtors in this instance.  While I was waiting for the

14    hearing to begin, I got an e-mail from Detroit confirming that

15    the settlement agreement has been signed, fully negotiated, and

16    we expect that within the week BorgWarner will withdraw this

17    motion.

18          THE COURT:  Okay.

19          MR. BERGER:  Thank you, Judge.

20          THE COURT:  Thank you.

21          MR. BUTLER:  Your Honor, matter number 4 on the

22    agenda is the Erica Parker lift-stay motion at Docket No. 3705.

23    This is a request from a Chapter 7 trustee to seek relief from

24    the automatic stay to allow her to continue asserting

25    counterclaims in pending litigation being prosecuted by the

                                              - 25 -

                    DELPHI CORPORATION (DRAFT)

1     debtors and also to collect proceeds from Delphi if she's

2     successful in her counterclaims.

3          We have been in continuing discussions with the

4     Chapter 7 trustee, with Ms. Parker.  We believe -- this is in,

5     by the way, in connection with the Toledo Professional Temps,

6     Inc. or Flex Techs Professionals Services, Inc., a filing in

7     the United States Bankruptcy   Court -- or, rather, district

8     court now, for this particular matter, in the northern district

9     of Ohio.  We've been able to reach a resolution -- we hope will

10    be a resolution with Ms. Parker.  We're very close and we've

11    not filed an objection formally at this point in time.  We'd

12    ask that this be put off to the next omnibus hearing on August

13    17th.  We hope to have it resolved by that time.  If not, we'll

14    file an objection.

15          THE COURT:  Okay.

16          MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

17    next group of matters, which are matters 5 through 34 represent

18    the first fee application periods of the retained professionals

19    in this case that are required by the courts interim

20    compensation procedures order to file periodic fee

21    applications.  The fee applications render a review by the

22    joint fee review committee established by this Court and Your

23    Honor may recall that the Court has entered a fourth

24    supplemental interim procedures order at Docket No. 4545 that

25    the request of the fee committee -- that accomplished a number

- 26 -

DELPHI CORPORATION (DRAFT)

1    of matters.  One, it put these applications off and

2    consolidated them with the fee applications for the second fee

3    application period for those to be considered at a combined

4    hearing at the October 19th, 2006 omnibus hearing and also

5    following a review by the fee committee -- it was the fee

6    committee's recommendation that in the interim for the first

7    two fee application periods that have the holdback that have

8    been previously by the debtors.  And Your Honor granted that

9    relief in connection with the four supplement order.

10          So these matters would then be adjourned by the order

11    to October 19th combined with the second fee application

12    periods and subject to the review committee and their

13    recommendations at that time.

14          THE COURT:  Okay.  Very well.

15          MR. BUTLER:  Matter no. 36 on the agenda, Your Honor,

16    is also a fee committee business.  The fee committee has

17    retained legal cost control as a fee and expense and filed an

18    application nunc pro tunc for their retention to June 1st,

19    2006.  This is at Docket No. 4117.

20          The fee committee has retained legal cost control to

21    aid the committee in performing certain of its duties.  There

22    have been some discussions and the fee committee has obtained

23    input from professionals regarding the scope of legal cost

24    control, whether they're a full blown fee examiner or they're

25    an analyst supporting the fee committee's work.  That's being

- 27 -

DELPHI CORPORATION (DRAFT)

1  reviewed by the fee committee and the fee committee asked to

2  adjourn this application to the August 17th omnibus hearing

3  while that matter is resolved.

4           THE COURT:  Okay.  Although it should be very clear.

5  I did not contemplate a full blown fee examiner here and I view

6  these types of services as being useful really only because of

7  the software.

8           MR. BUTLER:  Your Honor, I think the fee committee is

9  trying to sort out given the volume of these applications, and

10  Your Honor has some sense of the number of applications filed

11  and their length and their complexity.  I don't think anyone

12  doubts the fact the fee committee needs support.

13          THE COURT:  Oh, they definitely need support but I

14  just -- I -- it should be tech support essentially.  I mean,

15  tech will have to know what they're reviewing but I don't

16  want -- I want business people making the decisions, not some

17  hired guy.

18          MR. BUTLER:  Thank you, Your Honor.

19          THE COURT:  By the way, I don't know if anyone from

20  the U.S. Trustee is here, but it struck me that if the

21  government is going to spend any money on the U.S. Trustee

22  program, the best money it could spend would be a few hundred

23  thousand dollars to develop its own software so that, for

24  instance like this, who -- I don't particularly want to put out

25  of business but they don't have to be doing what they're doing

                                                        - 28 -

DELPHI CORPORATION (DRAFT)

1  if the government would develop its own software so that the

2  U.S. Trustee would have those resources.

3           MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

4  next matter on the agenda is matter number 36.  This is the

5  debtors' motion authorizing the debtors under 363 to enter into

6  an agreement with A.T. Kearney, Inc. essentially to examine --

```
 7   help us analyze and negotiate and restructure various costs

 8   including, without limitation, the review and analysis of

 9   certain executory contracts.

10         A company of this size, a company with 28 billion

11   dollars in annual revenue has lots of executory contracts.  A

12   fair portion of those are captured within the debtor entities

13   as opposed to being in the non-debtor entities.  And we had the

14   opportunity to, in connection with the review of assumption or

15   rejection of executory contracts, to systemically review all of

16   those contracts, or at least those from which the company

17   thinks they can generate cost savings.  As the debtors reached

18   out to A.T. Kearney to have them do this, they have helped in

19   other cases which Mr. Shearman and general counsel and others

20   have been involved.  They have helped generate significant

21   savings.  The debtors believe that through the assistance that

22   A.T. Kearney can provide here that we can generate perhaps 30

23   to 60 million worth of annual savings in this first round.

24         We have -- we believe that we could have retained

25   these folks in the ordinary course of business but given the
```

                                                      - 29 -

                        DELPHI CORPORATION (DRAFT)

```
 1   size of the payment which is a fixed fee of 3.9 million dollars

 2   and a contingent fee of up to another 500,000 dollars in

 3   consultation with the creditors' committee and at the request

 4   of A.T. Kearney, we have sought to confirm our ability to use

 5   the state property under 363 for this purpose.

 6         We've reviewed this retention application in detail

 7   with the creditors' committee.  They support entry of the

 8   revised order which gives a level of review to the creditors'

 9   committee in connection with evaluating whether the contingent

10   fee should or should not be paid and establishes mechanics for

11   the committee's review of those matters.  And if the committee

12   is not satisfied, there is an alternative dispute resolution
```

13    mechanic and then ultimately the opportunity for the committee

14    to object to the payment of the contingent fee here before the

15    Court in a subsequent hearing.

16           Your Honor, I think that there is a -- this is one of

17    those applications where I think from the debtors' perspective,

18    there's nothing hopefully but upside here for the estates.  We

19    believe the savings will significantly exceed the expenditures

20    in connection with this project that we wish to undertake.

21    There are no objections to the relief requested.  Unless Your

22    Honor has any other questions, we'd ask that Your Honor enter

23    the revised order.

24           THE COURT:  Okay.  Does anyone have anything to say

25    on this motion?  All right.  I reviewed the revised order and

                                                          - 30 -

                        DELPHI CORPORATION (DRAFT)

1     that appears fine to me.  So, based on the vermins in the

2     motion, as well as there being no objection, I'll approve it.

3            MR. BUTLER:  Thank you, Your Honor.  Your Honor,

4     matter number 37 on today's agenda is the Harbinger Trading

5     Motion at Docket No. 4576 which arises from a violation of the

6     final trading order.  My partner, Ms. Marafioti, has been

7     handling this matter and will report to the Court on what we

8     believe is a noncontested hearing.

9            MS. MARAFIOTI:  Good morning, Your Honor.

10           THE COURT:  Good morning.  Kayalyn Marafioti for

11    Delphi Corporation.  This motion that was brought on by order

12    to show cause, Your Honor, is to implement this Court's earlier

13    order of January of this year that set forth certain

14    notification procedures for substantial equity holders to

15    either sell down or acquire new shares of stock of Delphi.  We

16    did serve the order to show cause in accordance with its terms,

17    Your Honor.

18           You no doubt recall that the -- what I call the final

19    NOL trading order entered in January does contain a fairly

20    intricate set of terms that requires advanced notice to the

21    debtors and the Court in the event that a substantial equity

22    holder either sells down or acquires new shares.  And what

23    happened in this instance is that by its own representation to

24    us, Harbinger Capital Partners, Master Fund I, Ltd. did not

25    comply with those pre-advanced notification terms of that order

- 31 -

DELPHI CORPORATION (DRAFT)

1    before acquiring shares of stock in June of this year that took

2    it over the threshold set by that NOL trading order.  So, by

3    June 5 of this year, Harbinger had acquired, I think, some

4    32,025,000 shares of stock of Delphi.  And when Harbinger filed

5    a Schedule 13D on June 12th, that's when the debtors first

6    became aware of this and immediately contacted Harbinger to

7    find out what was going on.

8         So since that time, we've tried to devise a means of

9    enabling Harbinger to sell down the shares below the threshold

10   that might impair Delphi's tax attributes and we've come up

11   with a system that we think works.  It's actually based on a

12   private letter ruling of the Internal Revenue Service so we

13   think it should be effective.

14        But, in essence, what this order would do if entered

15   would be to require Harbinger to sell on the open market shares

16   of stock such that it would fall below the threshold.  To the

17   extent that Harbinger made a profit on that, it would have to

18   donate the profit to a charity that's qualified by the Internal

19   Revenue Code and would have to afterwards give notice to us and

20   to the Court that all of this has been accomplished.  The order

21   would reaffirm, in essence, what the January order already

22   says, which is that these shares were acquired or essentially

23   void avenicio -- the shares -- the acquisition was void

24   avenicio.

25        THE COURT:  The acquisition not the shares.

- 32 -

DELPHI CORPORATION (DRAFT)

1      MS. MARAFIOTI:  Yeah, the acquisition.  No, we'd like

2  to think the shares are still outstanding, Your Honor.  But the

3  acquisition was void avenicio.  It would further provide that

4  Harbinger is not to engage in this type of activity obviously

5  in the future.  And we think that it would, in essence,

6  preserve the integrity of the original order and also preserve

7  a valuable asset of the debtors' estate.

8      So, with Harbinger's consent and not seeing any other

9  objections by any party in interest, we would ask that the

10 Court enter the order.

11     THE COURT:  And I'm not -- have I seen the final

12 version of that?

13     MS. MARAFIOTI:  I believe you have, Your Honor.  It's

14 part of the package that came down with the order to show

15 cause.

16     THE COURT:  Oh, okay.  So it hasn't been changed

17 since then?

18     MS. MARAFIOTI:  No, it has not.

19     THE COURT:  All right.  Very well.  I will approve --

20 oh, I'm sorry.

21     MR. EATON:  Just a point of clarification, Your

22 Honor.

23     THE COURT:  Okay.

24     MR. EATON:  Your Honor, Frank Eaton on behalf of

25 Harbinger.  We agree with just about everything that Ms.

- 33 -

DELPHI CORPORATION (DRAFT)

1  Marafioti has stated.  Certainly it's an agreed order.

2  However, our client does not acknowledge that it was a

3  violation of the trading order.  We contend that we did not

4  receive actual notice of the trading order.

5          THE COURT:  Okay.

6          MR. EATON:  Thank you.

7          THE COURT:  That's fine.

8          MS. MARAFIOTI:  For the record, Your Honor, our

9   claims agent believes that notice was given but in any event

10  constructive notice was had.  So now that we've agreed upon

11  it --

12          THE COURT:  But this is all a dead issue so it

13  doesn't need to be decided.

14          MS. MARAFIOTI:  -- we can resolve it.  That's right.

15  Thank you.

16          THE COURT:  Okay.

17          MR. BUTLER:  Your Honor, that takes us to the

18  contested docket.  Before the contested docket, I do have --

19  even though I suggested to Your Honor that we would follow the

20  order of the agenda, is counsel for L&W Engineering present in

21  the courtroom?  I was trying to save them some time because of

22  the adversary proceeding status conference.

23          THE COURT:  But my clerk is telling me that L&W's

24  counsel had arranged to be participating telephonically and she

25  just told me that there was some problem with court call, so

                                                      - 34 -

DELPHI CORPORATION (DRAFT)

1   they may not either be able to hear you or speak to us, so we

2   should --

3          MR. BUTLER:  Not a problem.  I was just trying to see

4   if they were in the courtroom to save them some time.  But they

5   would come later in the agenda anyway at some point, Your

6   Honor.

7          THE COURT:  Okay.  Very well.

8          MR. BUTLER:  Continuing then with the contested

9   docket, the first matter is Docket No. -- or matter number 38

10  on the agenda, which is the H.E. Services Company lift-stay

11  motion at Docket No. 2705.  Your Honor will recall that this

12    was dealt with at the last omnibus hearing on a preliminary

13    hearing basis but that the Court adjourned the motion for final

14    hearing at today's omnibus hearing because H.E. Services argued

15    for the first time at the prior hearing that the discrimination

16    aspect of its commercial litigation suit amounted to a personal

17    injury tort claim under 28 U.S.C. 157(b)(5) and thus they

18    argued the bankruptcy court did not have jurisdiction to

19    adjudicate this claim.

20         The Court also, because this had been raised for the

21    first time, granted leave to the debtors if the debtors chose

22    to -- didn't direct us to but gave us leave to file a

23    supplemental objection on that limited issue, which we did.  We

24    did file the supplemental objection at Docket No. 4532.  And

25    I'm not going to argue that, Your Honor, here.  I think the

                                                     - 35 -

                        DELPHI CORPORATION (DRAFT)

1    objection is clear on its face.  We've pointed to the cases in

2    the Second Circuit which make it clear that this does not fall

3    within 137(b)(5) here in the Second Circuit and also we

4    distinguished the case is cited by the movant.  So we have

5    nothing further, Your Honor, on this matter.

6         THE COURT:  Okay.

7         MR. MASTROMARCO:  Thank you, Your Honor.  Victor

8    Mastromarco on behalf of Mr. Backie and H.E. Services.  And I'd

9    like to indicate in response to their position set forth in

10   their brief that there's no mention of the fact either here

11   today or in their brief that Mr. Backie is an individual

12   plaintiff in the case.  H.E. Services is also seeking that same

13   protection under the U.S. Constitution Section 1981.  And,

14   again, H.E. Services is an individual as defined under Section

15   1981 in the case law.

16        The cases that are cited by the debtor in their brief

17   to the Court invite the Court to determine -- well,

18    essentially, there's a narrow issue for the Court, as I see it.

19    And that is, whether or not 157(b)(5) is to be given a narrow

20    construction or a broad construction or somewhere in between.

21    The defendants have been taking the position, essentially

22    citing two very old cases, that the Court should narrowly

23    construe 157(b)(5) and to do so, the Court would have to strain

24    and change the plain language of 157(b)(5).  The defendants

25    want this Court to include the words bodily injury into the

- 36 -

DELPHI CORPORATION (DRAFT)

1    statute.  And it's not included.  And I'm reading the

2    157(b)(5).  In pertinent part it reads, "the district court

3    shall order that personal injury tort and wrongful death claims

4    shall be tried in the district in which the bankruptcy case is

5    pending or in the district court in the district where the

6    claim arose as determined by the district court where the

7    bankruptcy case is pending."

8         The narrow approach, as I indicated, would require

9    this Court to construe that statute as putting words in there

10   that, strictly construed, it doesn't have.  And, certainly,

11   Congress, Your Honor, knew how to say the words personal bodily

12   injury when it wanted to.  As an example, see 11 U.S.C. Section

13   522(d)(1).

14        This also -- this type of approach invites the Court

15   to interpret pleadings that were drafted, and certainly in this

16   case, before this proceeding was filed.  Again, the case is

17   cited by the defendants.  There's only two of them that are

18   cited in their brief.  This Vinci case, V-I-N-C-I, versus Town

19   of Carmel and there was another case, too.  It was the Cohen

20   case.  These cases are seventeen years old and have been

21   heavily criticized by the Circuit.

22        As an example, in the case that I cited to the Court

23   during the last omnibus hearing was the In Re Ice Cream

24   Liquidation, Inc. case and in that particular case, which, by

25    the way, is the only case that's been cited to the Court where

- 37 -

DELPHI CORPORATION (DRAFT)

1    Section 1981 is being discussed, in that particular case,

2    certainly the Court took a middle ground in reviewing these

3    things.  And, basically, the Court talked about how some of the

4    Circuits have taken this position of a broad construction.  The

5    Court didn't think that that was necessarily the way to go but

6    also the Court looked at the narrow construction and rejected

7    that out of hand.  I would note that what's important in the In

8    re Ice Cream Liquidation case is if 157(b)(5) is applicable,

9    then this Court does not have jurisdiction to make any

10    decisions as to the discrimination portion of the complaint.

11    Certainly, and I would just read from that case just briefly

12    here, if I could, Your Honor, "here it is not necessary for

13    this Court to determine whether it has any jurisdiction" -- and

14    italicized "any" -- "under Section 157(b)(5) over that portion

15    of the claim objection dealing with the sexual harassment

16    successor liability claim or whether such jurisdiction would be

17    core or noncore under Section 157(b)(2).  That is because

18    plaintiff's arguments for relief from stay and abstention only

19    grow stronger as the Court's jurisdiction in respect of the

20    sexual harassment successor liability claim is diminished.  As

21    will be apparent from discussion below, the key consideration

22    here is that this Court has no" -- and italicized -- "no

23    jurisdiction to try that portion of the claim objection which

24    relates to the sexual harassment successor liability claim."

25    And, Your Honor, that's a 2002 opinion.  And that's how the

- 38 -

DELPHI CORPORATION (DRAFT)

1    Courts have interpreted 157(b)(5), not based on some eighteen

2    year old case on a bankruptcy that was filed in 1981.

3            THE COURT:  What was the section you quoted to me?

4    Didn't you say 1122?  I just didn't hear it.

5          MR. MASTROMARCO:  Just a moment.  If I wrote it down

6    wrong, I apologize.  I believe it was 11 U.S.C. 522 --

7          THE COURT:  522.

8          MR. MASTROMARCO:  --(d)(1).

9          THE COURT:  Okay.

10          MR. MASTROMARCO:  And those words appear in that

11    particular section.  I mean, certainly, again --

12          THE COURT:  No, no.  I just wanted to make sure I

13    heard it.  I thought I heard you incorrectly.

14          MR. MASTROMARCO:  We ask for strict construction of

15    the statute, Your Honor.

16          THE COURT:  All right.  I have in front of me a

17    motion by H.E. Services and Robert Backie for relief from the

18    automatic stay to pursue in the Eastern District of Michigan

19    their pending pre-petition litigation alleging among other

20    things breach of contract, promissory estoppel on this

21    representation and civil rights violations.

22          As with every request to obtain relief from the

23    automatic stay in respect of an unsecured claim, including this

24    here, to pursue pre-petition litigation, the Court considers

25    those factors laid out by the Second Circuit.  In its Sonnax

                                                        - 39 -

                    DELPHI CORPORATION (DRAFT)

1    case, 907 F.2d 1280 at 1286 (2d. Cir. 1990) that are relevant

2    to determine whether there is a basis even with respect to an

3    unsecured claim to permit the liquidation of that claim

4    notwithstanding the automatic stay.  Based on my review of the

5    papers and the factors, I conclude that the stay should not be

6    lifted.  The relevant factors here are whether relief would

7    result in a partial or complete resolution of the issues, lack

8    of any connection with or interference with the bankruptcy case

9    whether a specialized tribunal with necessary expertise has

10    been established to hear the cause of action, whether the

11    debtors' insurer has assumed full responsibility for the

12    defense, whether the action primarily involves third parties,

13    the interest of judicial economy and the expeditious and

14    economical resolution of litigation, whether the parties are

15    ready for trial in the other proceeding and the impact of the

16    stay on the parties and the balance of harms.  And, by the

17    parties, I include not only the debtors but their other

18    unsecured creditors.

19         The litigation is not, based on my understanding,

20    particularly well developed in the Michigan court.  Litigation,

21    importantly, does not appear to be covered by insurance so

22    recovery would be -- you know, if there's a ruling favorable to

23    the plaintiffs against the debtors' estate, and I believe that

24    at this stage is the case, it is not therefore appropriate to

25    force the debtors to engage in such litigation to liquidate a

- 40 -

DELPHI CORPORATION (DRAFT)

1    claim well in advance of a general claim liquidation procedures

2    in the case.  As noted by Mr. Butler this morning, for the

3    first time at oral argument at the preliminary hearing on this

4    matter, counsel for the movants raised the issue that the

5    Court, if the litigation were ultimately to be tried in an

6    adversary proceeding, would not have jurisdiction under 28

7    U.S.C. 157(b)(2)(O) which provides that personal injury, tort

8    or wrongful death claim are solely from the district court's

9    determination.  As I noted at that hearing, if that fact or if

10    that assertion were true as a matter of law, that would be an

11    additional factor, although not dispositive, in the Sonnax

12    analysis.  It would not be dispositive because the Courts have

13    recognized that notwithstanding Section 157(b)(2)(O) the

14    bankruptcy court may generally deal in the preliminary stages

15    with personal injury claims.  However, it would be a

16    significant factor in that this Court could not ultimately

17   determine the matter if it were to be litigated in an adversary

18   proceeding.

19        However, based on the supplemental briefs filed on

20   the matter as well as the Court's own research, I conclude that

21   the law in the Southern District of New York in respect of this

22   type of claim is contrary to the movants' contention.  While

23   this is not a dispositive ruling on the Section 157(b)(2)(O)

24   issue, it appears to me that the law in the Southern District,

25   including at the district court level, as well as a proper

                                                        - 41 -

                        DELPHI CORPORATION (DRAFT)

1    reading of the statute, would limit the statute so that it

2    would modify to this type of commercial dispute.  See, in

3    addition to the cases cited by the debtors in their

4    supplemental memorandum, In re Finley, 194 B.R. 728, 734

5    (S.D.N.Y. 1995) and In re Cohen 107 B.R. 453, 455 (S.D.N.Y.

6    1989).

7         So I'll deny the motion at this time and you can

8    submit an order to that effect, Mr. Butler, after running it by

9    counsel.

10        MR. BUTLER:  Thank you, Your Honor.

11        THE COURT:  Okay.

12        MR. BUTLER:  Your Honor, the next matter on the

13   agenda is matter number 39.  This is the MobileAria Sale motion

14   at Docket No. 4040.

15        Your Honor, we are here today to deal with the

16   Court's approval on that request, the Court's approval for the

17   sale of substantially all the assets of MobileAria, Inc., one

18   of the debtors in these Chapter 11 cases, to Wireless Matrix

19   U.S.A., Inc.

20        As Your Honor may recall, we were here at a prior

21   hearing in getting approval of bid procedures.  We got approval

22   of bid procedures with respect to an asset sale and purchase

23   agreement with Wireless Matrix U.S.A., Inc. which was the

24    stalking horse in connection with this transaction.  And there

25    were procedures that were established by the Court at the prior

- 42 -

DELPHI CORPORATION (DRAFT)

1    omnibus hearing to set forth a competitive bidding process that

2    would move forward to determine the highest or otherwise best

3    bid for this particular group of assets and then we would come

4    back to the Court today for a final sale hearing.

5           Your Honor, the bidding procedures order was entered

6    by the Court on June 22nd, 2006.  It set the stage for the

7    competitive bidding process and for the auction of

8    substantially all of MobileAria's assets.  That order has been

9    docketed at Docket No. 4328.  There was an element of that

10   order that required the debtors to provide parties in interest

11   with notice of the sale, notice of cure amounts, notice of

12   MobileAria's intent to assume and assign contracts and

13   establish certain procedures and deadlines with respect to each

14   of those subjects.  And the debtors complied with the terms of

15   that order, provided all the required notices in connection

16   with that and also served notice on all known creditors of

17   MobileAria.

18           Well, I've got some information to report to the

19   Court regarding the competitive bidding process and the

20   selection of Wireless Matrix as the ultimate successful bidder

21   here.  I do want to advise the Court at the outset of this

22   hearing that we have been able to resolve all of the objections

23   that have been filed.

24           THE COURT:  Okay.

25           MR. BUTLER:  So there is a resolution to each of the

- 43 -

DELPHI CORPORATION (DRAFT)

1    objections.  I'll walk through them in a few minutes.

2           THE COURT:  Okay.

3          MR. BUTLER:  But those all have been resolved in one

4    manner or another.  Now, Your Honor, initially, pursuant to the

5    bidding procedures order, we served on all non-debtor parties

6    to the assumed contracts a notice that identified Wireless

7    Matrix as the party that would be assigned, mobilized right

8    title and interest on the assumed contracts.  And that was

9    subject to the completion of the auction that was to occur.

10          We also -- so we provided that notice at that time

11   and so we dealt both with that and with cure procedures and a

12   variety of other issues relating to the contracts that were the

13   subject of the assets of the auction and of the sale.  And we

14   then proceeded to conduct the auction.

15          The auction was conducted and in connection with the

16   bidding process, there were competing bids that were sought.

17   There were competing bids received.  At Road, Inc. was the

18   other bidder that submitted a competitive bid on June 28th and

19   in evaluating that bid, MobileAria's board of directors met on

20   June 30th and determined that that bid was a qualified bid

21   under the bidding procedures order Your Honor had entered and

22   that set the stage, Your Honor, for an auction.  And,

23   therefore, there was an auction held on July 6th in our New

24   York offices here.  We had representatives of At Road and

25   Wireless Matrix, the two bidders, the creditors' committee and

- 44 -

DELPHI CORPORATION (DRAFT)

1    the agent for the pre-petition secured lenders.  Counsel for

2    the equity committee was also invited to participate but

3    elected not to participate in this particular auction.

4          MobileAria was represented at the auction by its

5    president, Mr. Lind.  Individuals from the debtors' -- from

6    Delphi's MNA department in Troy, Page Mill Partners, which was

7    the investment banker, and MobileAria's corporate counsel, DLA,

8    Piper, Rudnick, Gray and Cary, as well as Skadden.

9          Your Honor, the resulting bid process which began at

10   10 a.m. and lasted until about 8:30 in the evening, we have

11   actually as exhibits for this hearing the transcript of that

12   auction, resulted in the bid being increased from approximately

13   six million dollars to 11.2 million dollars -- actually, it was

14   11.4 million dollars, with respect to Crossroads (sic), and

15   Wireless Matrix' final bid was 11.2 million dollars.  The

16   remaining terms were substantially similar and in the debtors'

17   judgment provided substantially equivalent economic value and

18   therefore, at the conclusion of the auction there was a

19   difference between the two bids of 200,000 dollars.

20         Following the auction, MobileAria's board of

21   directors met telephonically with its financial advisors and

22   after reviewing the bids, chose At Road as the successful

23   bidder and selected unanimously Wireless Matrix last bid as the

24   alternative bid.  And so, after the auction process, we then

25   sent out notices with respect to At Road being the successful

- 45 -

DELPHI CORPORATION (DRAFT)

1   bidder and went through the whole assumption process,

2   notification and so forth.

3         That led to, among other things, the filing of an

4   objection this week from Verizon Services Corporation, which

5   objected on a number of grounds to the sale, including raising

6   issues of adequate assurance and future performance by the

7   successful bidder.  And there were a series of negotiations

8   which I won't go into detail about in connection with those

9   matters which we think were resolved to Verizon's satisfaction,

10   but at the end of the day -- last evening, and it really was at

11   the end of the day, about 10:00 last evening, we received a

12   termination of At Roadscontract to purchase the agreement from

13   At Road who indicated that pursuant to their agreement, they

14   believed they had the ability to terminate on account of the

15   Verizon objection.  And while the debtors are reserving all

16     their rights and remedies with respect to that termination,

17     we're not agreeing it was proper, the debtors nevertheless

18     moved immediately to deal with the alternative bidder, with

19     Wireless Matrix, which was original stalking horse, and

20     achieved a resolution of matters between Verizon and Wireless

21     Matrix about 2:30 this morning so that we are prepared to go

22     forward today with the sale to Wireless Matrix.  That sale is

23     acceptable to Verizon.  There is a revised form of order that

24     we have provided to the Court in connection with the sale.  We

25     are in the process of revising the purchase agreement with

- 46 -

DELPHI CORPORATION (DRAFT)

1     respect to Wireless Matrix to, simply, from a mechanical

2     perspective, change the stalking horse agreement to include the

3     terms and conditions that were included in the auction

4     transcript that both parties agreed to with respect to the

5     contract.  It requires some revision to the contract but it is,

6     in my view, a ministerial action to simply take the agreements

7     and insert them in.  But the parties didn't get that done

8     between 2:30 this morning and the time of this hearing.

9             So, assuming Your Honor is prepared to go forward

10     with this transaction and approve it, counsel to the debtor and

11     to Wireless Matrix would like to be able to finalize that

12     agreement and finalize the order.  Verizon wants to take one

13     more look at the form of order and we'd submit it to Your Honor

14     tomorrow or Friday.

15             THE COURT:  Okay.  So the Wireless Matrix agreement

16     is for the 11.2 million?

17             MR. BUTLER:  It's for 11.2 and they will get a credit

18     for the breakup fee under the bidding procedures order because

19     there was a breakup fee that they were entitled to.  We picked

20     somebody else so they're going to get from the 11.2 million

21     purchase price a credit of something just shy of 200,000

22     dollars as an additional credit for the breakup fee.

23          THE COURT:  Because the 11.4 million figure for At

24   Road would have had to have had the breakup fee deducted from

25   it?

- 47 -

DELPHI CORPORATION (DRAFT)

1           MR. BUTLER:  Correct.

2           THE COURT:  Okay.

3           MR. BUTLER:  And they're entitled to the breakup fee

4    because they were not chosen as the successful bidder.  And so

5    they'll get that credit in connection with it.  So, it will be

6    11.2 minus the breakup fee.  That still is a very substantial

7    enhancement over the agreement originally agreed to with the

8    debtors.

9           THE COURT:  Well, it's not because they were not

10   chosen as the successful bidder.  It's because that was how the

11   bidding actually played out.

12          MR. BUTLER:  Yes, Your Honor.

13          THE COURT:  It wasn't really an 11.4 million net to

14   the estate.  It was 11.2 million.

15          MR. BUTLER:  Correct, Your Honor.

16          THE COURT:  Okay.  All right.

17          MR. BUTLER:  Your Honor, with respect to the

18   resolution with Verizon, unless counsel for Verizon wants me to

19   go through in detail on the record, I'm going to rely on

20   paragraph 43 of the revised order which provides the

21   understandings that have been reached with respect to Verizon.

22          Verizon had a number of concerns and, without going

23   through all the details, briefly summarize them because I think

24   they can be summarized briefly.  First, there are some issues

25   associated with alleged errors in billing that have occurred

- 48 -

DELPHI CORPORATION (DRAFT)

1    with respect to historical billing.  Those group of claims have

2   been limited to 270,000 dollars, the claims that they can make

3   with respect to that.  That's for the debtors' account and

4   we'll have to deal with that issue and there's a mechanism for

5   us to resolve those matters.

6           THE COURT:  So there's a cap on what the cure claim

7   would be?

8           MR. BUTLER:  For that bucket of claims.

9           THE COURT:  Okay.

10          MR. BUTLER:  And that would be 700,000 dollars and

11  that would be an administrative claim that we would deal with.

12          The second set of claims deals with certain repairs

13  and other work due under the Verizon contract that Verizon

14  argues MobileAria has not completed.  And Wireless Matrix has

15  agreed that if MobileAria doesn't complete that work, then

16  Wireless Matrix would be obligated to complete it and Wireless

17  Matrix would be entitled to its reasonable out-of-pocket costs

18  and expenses attributable to the performance of that work as

19  outlined in the order.

20          We've agreed and MobileAria has agreed to escrow

21  100,000 dollars to pay those administrative -- those estimated

22  costs and Wireless Matrix would be entitled to submit invoices

23  subject to our ability to dispute them.  But those are the

24  administrative expenses as well.

25          THE COURT:  Okay.

                                                          - 49 -

                        DELPHI CORPORATION (DRAFT)

1           MR. BUTLER:  The third piece of this is that there

2   may be other defaults that Verizon has asserted that are not

3   completely liquidated at this point with respect to other

4   matters under the agreement with Verizon.  And there is an

5   agreement that Verizon can assert those claims as

6   administrative claims up to a maximum of one million dollars

7   within one year from the date of closing.  So, there's a one

8   year period for them to be comfortable that there are no other

9    defaults under the contract that's being assumed and there's a

10    cap of one million dollars of our administrative exposure.

11        THE COURT:  And this contract with Verizon was a

12    post-petition contract, right?

13        MR. BUTLER:  No.  It was, Your Honor, a pre-petition

14    that was being assumed as part of this.  And they're alleging,

15    among other things, that there are defaults and other matters

16    that are subject to curing.

17        THE COURT:  Okay.

18        MR. BUTLER:  The other thing I think is very

19    important here which also guided the debtors in negotiating

20    this is that Verizon has in this contract the ability to

21    terminate for convenience with 180-day notice.  It is

22    undisputed between the parties that Verizon contracts are a

23    very important assets of the group of assets being sold and

24    both purchasers had the ability to terminate their purchase

25    agreement if in fact Verizon -- they had -- there's some

- 50 -

DELPHI CORPORATION (DRAFT)

1    standards I won't go into, but, basically, the basic position

2    would be that they had knowledge that Verizon had an intent to

3    terminate as of the time of closing.  And that's, by the way,

4    the assertion that At Road made the connection with terminating

5    its agreement.  They believed that notwithstanding Verizon's

6    settlement and Verizon's agreement to go forward that there was

7    still that intention.  And because of the importance of the

8    Verizon contract of the MobileAria assets and the sale and

9    because we don't believe the sale could be completed without

10    Verizon going forward and because of their right to actually

11    give a notice to terminate on 180-day notice, we thought there

12    was a commercial resolution of all this that was necessary.

13        THE COURT:  So Verizon has represented that it does

14    not intend to terminate this contract?

15          MR. BUTLER:  Yeah.  I believe that's correct based on

16   these matters.  In fact, they've agreed to withdraw their

17   objection with prejudice and there's also an agreement that

18   should Verizon ever seek to terminate the Verizon contract for

19   convenience pursuant to the terms of the contract, that both

20   the purchaser and MobileAria will be relieved from all of their

21   obligations to Verizon under paragraph 43 of the order.  So

22   there's a remedy back to both the estate and to Wireless Matrix

23   if Verizon for some reason were to change its mind.  We think

24   this has been resolved on the commercial matter.  Our

25   impression is the debtors -- from the debtors' perspective is

                                                          - 51 -

                      DELPHI CORPORATION (DRAFT)

1    that Verizon is supportive of Wireless Matrix' acquisition of

2    these assets and as Wireless Matrix as the go forward

3    purchaser.  That some of the issues they had with respect to

4    adequate assurance and future performance were related solely

5    to At Road and not to Wireless Matrix and that this ought to go

6    forward on a commercial basis beyond this day.  And in any

7    event, even with all of these various buckets of what I've

8    described to you from the company's perspective, the net amount

9    realized by the estates for the sale of the MobileAria assets

10   will still substantially exceed that which had been the

11   original purchase agreement.

12          THE COURT:  Okay.

13          MR. BUTLER:  So, unless -- there are a number of

14   lawyers in the room today -- that are in court today that are

15   here listening to this presentation.  Unless someone thinks I

16   need to say something else about this, I'm going to simply rely

17   on that presentation and on the revised order with the

18   understanding, Your Honor, that we will submit the actual order

19   and the agreement for entry in the next day or two.

20          THE COURT:  Okay.

21          MS. SHULMAN:  Good morning, Your Honor.  Carren

22    Shulman from Heller Ehrman for At Road, Inc.  The only reason

23    I'm speaking today is because there's been a number of

24    statements made that were inaccurate about At Road, Inc.'s

25    offer in this case and what happened.  And I just briefly

- 52 -

DELPHI CORPORATION (DRAFT)

1    wanted to state since this is on the record that we did not

2    give notice at 10:00 last night.  We gave notice substantially

3    earlier.  This has been going on for several weeks and we've

4    acted in good faith throughout this process.  And what's quite

5    disappointing to us is that up till the last minute we were

6    negotiating in good faith and it appears based on what's

7    happened today that that may not have been the case on the

8    other side, not necessarily with Delphi.  So, that's what I

9    wanted to state here today.  We'll deal with any allegations

10   made that we consider to be defamatory outside of this

11   courtroom.  And I have a copy of our termination letter, Your

12   Honor, if you'd like to see it.  We were debating whether to

13   file it with the Court and we need to look at the nondisclosure

14   agreement to see whether we have a basis for doing so.  Thank

15   you.

16        THE COURT:  No.  I don't need to see it.  I'm sure if

17   they're not settled, all the issues pertaining to the

18   termination will be dealt with in an appropriate proceeding,

19   including the issue of damages, which may go beyond the 200,000

20   and reflect whatever the debtors had to agree to to lock in the

21   only remaining deal.

22        MR. BUTLER:  Yes, Your Honor.  And, by the way, just

23   so the record is clear, we received the notice of termination

24   by e-mail approximately 8:00 last night.  I apologize.  It

25   wasn't 10:00.

- 53 -

DELPHI CORPORATION (DRAFT)

1    THE COURT:  Okay.  All right.  That's fine.  I was

2    going to ask what the footnote in Verizon's objection meant

3    when it said it announces its intention that it may terminate

4    the agreement.  But I guess that may come up some time in the

5    future, ie., the 180-day termination.  But -- okay.

6    MR. LADDIN:  Good morning, Your Honor.  Darryl Laddin

7    on behalf of Verizon Services Corporation.  Your Honor, I will

8    be brief.  I'm not going to go into the At Road discussions.

9    That's not for the Court today and so I don't need to do that.

10   And Your Honor has obviously read the objection.

11   Mr. Butler correctly stated that we have reached an

12   agreement with the debtors as well as with Wireless Matrix with

13   respect to the assumption and assignment of the Verizon

14   contract.  That agreement is set forth in paragraph 43 of the

15   agreement which is a detailed paragraph that covers the terms

16   of the agreement in Schedule 3 to the proposed order.  We have

17   reached agreement on all terms of that and as a result of that

18   agreement, we do withdraw our objection.

19   THE COURT:  Okay.  So Verizon does not intend to

20   exercise the 180-day termination right as of today?

21   MR. LADDIN:  As of today, that's correct.  And that

22   issue is dealt with specifically in paragraph (e) -- 43(e),

23   which, as Mr. Butler explained, states that if Verizon does

24   exercise the 180-day termination right then each of the

25   purchaser and MobileAria should be relieved from all of their

- 54 -

DELPHI CORPORATION (DRAFT)

1    obligations under paragraph 43.

2    THE COURT:  Okay.

3    MR. LADDIN:  Thank you, Your Honor.  Any other

4    objections or withdrawn also even before this?

5    MR. BUTLER:  They've been resolved, Your Honor.  The

6    objections have been resolved.  And I think certainly the

7    notices of withdrawal are actually on the docket.

8          THE COURT:  Okay.

9          MR. BUTLER:  The only thing I didn't mention in the

10   record, Your Honor, is that Mr. Robert Shumaker, who is a

11   member of the MobileAria board of directors and a founding

12   director of the company is present in the courtroom today if

13   the Court had any questions about the board's exercise of the

14   business judgment in accepting this offer.

15          THE COURT:  All right.  No, I don't given the lack of

16   objections and the notice.  I also don't believe that I need to

17   hear anything about adequate assurance and future performance

18   given that the stalking horse has turned out to be the buyer,

19   although I was prepared that in connection with At Road.  All

20   of the contract parties got notice of Wireless Matrix as a

21   potential assignee and no one is pursuing an objection with

22   regard to assumption or assignment so I'm prepared to approve

23   the transaction and enter the order consistent with statements

24   on the record and the draft that I've seen.

25          MR. BUTLER:  Thank you, Your Honor.  We'll submit the

                                                            - 55 -

                          DELPHI CORPORATION (DRAFT)

1    final form of order and the final form of agreement before the

2    end of the week.

3          THE COURT:  Okay.  Let's take a moment now 'cause we

4    have to dial in Ms. Robbins and the other people on the phone.

5    I'll take a two minute break while we do this.

6          MR. BUTLER:  Thank you, Your Honor.

7          THE COURT:  Five minute break.

8          (Brief recess from 11:06 to 11:14 a.m.)

9          THE COURT:  Please be seated.  All right.  We're back

10   on the record in Delphi.

11          MR. BUTLER:  Your Honor, the next matter on the

12   agenda is matter number 40, the supplement to the KECP motion

13   at Docket No. 4419.  By filing of the supplement, Your Honor,

14     the debtors adjourned until the October omnibus hearing all

15     matters relating to the KECP other than the continuation of the

16     AIP program.  The continuation -- what's before the Court today

17     is the continuation of the annual incentive program for this

18     period and for the second half of 2006 and for future periods.

19          One matter, Your Honor, I wanted to note just for the

20     Court's attention, there are seven objectors to this motion,

21     six unions and the lead plaintiffs.  I've been able to consult

22     this morning with each of the counsel to those parties other

23     than Mr. Kennedy on behalf of the IUE.  There's no one in court

24     today on behalf of the IUE which was unanticipated by the

25     debtors and I think by the other objectors.  And I wanted to

- 56 -

DELPHI CORPORATION (DRAFT)

1      bring that to Your Honor's attention at the commencement of the

2      hearing.

3           THE COURT:  Okay.  Have we heard anything from him?

4      No?  All right.  Okay.  Well, I read their objection obviously.

5           MR. BUTLER:  Your Honor, what I'd like to do is with

6      the Court's permission, is get the evidentiary record and then

7      deal with the argument.  I'm not going to make an opening

8      statement here.

9           THE COURT:  Okay.

10          MR. BUTLER:  With respect to the evidentiary record,

11     Your Honor, there have been identified and in the joint trial

12     exhibit book, there are 24 exhibits, although there's a larger

13     number of exhibits because Exhibit #1 is a incorporation of

14     reference.  All the exhibits are from the February 10th, 2006

15     hearing.  There are no objections to any of the 24 exhibits

16     from any parties save the debtors' objection to Exhibit #15

17     which was designated by the IAM, IBEW and IUOE which was the

18     expert report of Michael L. Wachter from the 1113/1114 matters.

19     But other than with respect to Exhibit 15 which we can deal

20     with either now or later, I'd move the admission of all 24

21    exhibits into the record.

22         (24 exhibits which had been marked for identification

23    at the 2/10/06 hearing were hereby received into the record as

24    Debtors' Exhibits 1-24, as of this date.)

25         THE COURT:  Okay.  And that's unopposed, I gather?

- 57 -

DELPHI CORPORATION (DRAFT)

1    All right.  They'll be admitted.

2         MR. BUTLER:  And then we can deal at whatever point

3    it's appropriate to deal with Exhibit 15.

4         THE COURT:  Okay.

5         MR. BUTLER:  Your Honor, with respect to the debtors'

6    witnesses, the evidentiary record in this case as it relates to

7    witness testimony, we have five witnesses present in the

8    courtroom available for cross-examination and redirect

9    examination in connection with their declarations which have

10   been provided to the objectors and we would present them in the

11   following order:  first, the declaration of Mr. Sheehan, John

12   D. Sheehan, which is Exhibit #11; second, the declaration of

13   Nick Bubnovich, the company's expert, which is Exhibit #10;

14   third, the declaration of Deborah Alexander, which is Exhibit

15   12; fourth, the declaration of Virgis W. Colbert, which is

16   Exhibit 13.  Mr. Colbert is chairman of the compensation

17   committee of Delphi's board of directors.  And, finally, the

18   declaration of Rodney O'Neil which is Exhibit #14.  Mr. O'Neil

19   is the president of Delphi Corporation.

20        Your Honor, I've conferred with the objectors -- or

21   counsel to the objectors and unless I have this wrong and

22   they'll tell me if I do, but I believe that there is no cross-

23   examination proposed by any of the objectors other than Ms.

24   Robbins who has some questions of Mr. Sheehan and of Mr.

25   Bubnovich.

- 58 -

DELPHI CORPORATION (DRAFT)

1          MS. ROBBINS (telephonically):  I don't believe I have

2    any questions for Mr. Sheehan.  I'm sorry, I misunderstood Mr.

3    Butler.  I thought he was going to be testifying beyond his

4    declaration.

5          MR. BUTLER:  So --

6          THE COURT:  Okay.  Is that correct, though, that

7    other than Ms. Robbins with respect to Mr. Bubnovich, no one

8    wishes to cross-examine any of the witnesses on their

9    declarations?

10          MS. MEHLSACK:  As far as we know, as was noted, Mr.

11    Kennedy has not arrived --

12          THE COURT:  Right.

13          MS. MEHLSACK:  -- and we don't know what his position

14    would be.

15          THE COURT:  Okay.  All right.  Then, Mr. Butler, he

16    should take the stand, please.

17          (Witness duly sworn by the Court.)

18          THE COURT:  And just for the record, could you spell

19    your name?

20          THE WITNESS:  Sure.  B-U-B-N-O-V-I-C-H.

21          THE COURT:  Okay.  And just if you can, if you can

22    try to speak near the microphone, particularly since Ms.

23    Robbins is on the phone and it's the microphone that picks up

24    her connection.

25          THE WITNESS:  Yes, Your Honor.

                                                      - 59 -

DELPHI CORPORATION (DRAFT)

1          THE COURT:  Okay.  You can go ahead, Ms. Robbins.

2          MS. ROBBINS:  Thank you, Your Honor.

3    CROSS-EXAMINATION BY

4    MS. ROBBINS:

5    Q.  Just a few questions, Mr. Bubnovich.  You make reference

6    to the number of executives who have left during 2006.  Is it

7    accurate that you did not know the specifics concerning those

8    executives, for example, where they were each assigned?

9    A.    That's correct.

10   Q.    And in terms of how the incentive plan works, I just want

11   to confirm something.  Let's say that the performance for the

12   corporation is twenty-five percent above your target that will

13   free up a certain amount of funds for AIP bonuses.  And then I

14   want to compare that to a situation in which you're fifty

15   percent above target.  Am I accurate that that would increase

16   the amount of funds available for bonuses?

17   A.    Yes, to the extent the financial performance is fifty

18   percent above the target, as opposed to twenty-five above, a

19   larger bonus pool would be funded.

20         MS. ROBBINS:  Those are my only questions, Your

21   Honor.

22         THE COURT:  Okay.  I actually had a couple of

23   questions.  So I'll ask them now.  In your declaration, Mr.

24   Bubnovich, you say that -- these aren't the exact words but

25   that the AIP supplement is comparable or competitive to

                                                   - 60 -

                    DELPHI CORPORATION (DRAFT)

1    compensation programs of Delphi's peers?

2          THE WITNESS:  Yes.

3          THE COURT:  When you use the term "peers", what do

4    you mean?  What types of companies?

5          THE WITNESS:  When I use the term "peers", I'm

6    referring to companies of similar size as well as companies

7    that are in the same industry including automobile supplies as

8    well as just the general automobile industry.

9          THE COURT:  Okay.  So that would include companies

10   like Visteon?

11         THE WITNESS:  Yes.  I don't know the exact details,

12   for example, of Visteon's plan.  What the decla -- what I mean

13   in that section of the declaration is the overall design of the

14   program with financial targets as well as a maximum adjustments

15   for individual performance, the financial measure that is tied

16   to the internal planning or financial or budgeting process is

17   consistent with the design of the company's peers.

18           THE COURT:  In looking at the design of the programs

19   employed by the company's peers, did you determine whether they

20   have taken into account for setting their targets seasonality?

21           THE WITNESS:  I didn't look at seasonality with

22   respect to any particular bonus plan but it is, I think, true

23   that companies take into account seasonality in determining the

24   performance targets under a plan.

25           THE COURT:  While most of the plans of the company's

                                                          - 61 -

                          DELPHI CORPORATION (DRAFT)

1   peers, or all of them, are they annual plans?

2           THE WITNESS:  Yes.

3           THE COURT:  And would the bonus be paid at the end of

4   the year then or at the end of the fiscal year?

5           THE WITNESS:  Yes.  It would be paid shortly

6   following the end of the fiscal year.

7           THE COURT:  Okay.  Is Watson Wyatt doing other work

8   for the debtors other than reviewing compensation plans and the

9   like?

10           THE WITNESS:  Yes.

11           THE COURT:  What sort of work?

12           THE WITNESS:  Watson Wyatt is the actuary under the

13   company's various pension plans.  From time to time, we have

14   also done other consulting work including health care

15   consulting as well as sales compensation consulting.

16           THE COURT:  Is any of that ongoing now?

17           THE WITNESS:  We are not doing any sales compensation

18   work.  I don't believe we're doing any health care consulting,

19   but we are the company's ongoing pension actuaries.

20          THE COURT:  In connection with your work regarding

21   the AIP, are there any agreements or understandings about other

22   work that Watson Wyatt might be doing?

23          THE WITNESS:  Absolutely not, Your Honor.

24          THE COURT:  Okay.  I have no further questions.

25          MR. BUTLER:  No recross, Your Honor.

                                                    - 62 -

                       DELPHI CORPORATION (DRAFT)

1           THE COURT:  All right.  You can step down, sir.

2           MR. BUTLER:  Did Your Honor have any questions of any

3    other witnesses?

4           THE COURT:  Well, you may know this since you're ever

5    involved in the 1113/1114 process as well.  I understand from

6    the motion that the targets upon which the second round AIP is

7    based, you are essentially not only vetted with the committee

8    but are the committee's targets is what they viewed as being

9    appropriate, is that right?

10          MR. BUTLER:  Certainly Mr. Rosenberg could answer

11   that.  I don't know that the committee would say that they're

12   their targets.  They're the company's targets.  They were

13   developed based on the business planning process described in

14   Mr. Sheehan's declaration and they were vetted with the

15   compensation committee and with the full board of directors and

16   with the creditors' committee.  There was an extensive amount

17   of due diligence about the targets by the creditors' committee

18   and their financial advisors and their compensation advisors.

19   The proposed payment curves that are attached to the order are

20   in fact the curves recommended by the compensation consultant

21   to the creditors' committee which we adopted.  And the actual

22   targets became the subject of discussion including a meeting

23   that was held last Friday here in New York, in West Chester,

24   involving the KECP subcommittee of the creditors' committee and

25   the debtors' management team and financial advisors.  The

- 63 -

DELPHI CORPORATION (DRAFT)

1   result of all that, Your Honor, was paragraph 3 of the revised

2   order.

3           THE COURT:  With the hundred million dollars

4   (inaudible)?

5           MR. BUTLER:  Where there is -- the question, I think,

6   that the committee had unresolved in its discussions with us

7   was whether or not there were all of the benefits from things

8   being planned for it from transformation that should be

9   excluded from under EBIT DA UG from targets.  Because we're not

10  taking adjustments with respect to subsidies or benefits

11  provided by General Motors or from the union concessions or the

12  union modifications being made with respect to any kind of

13  transformation agreements.  That whether or not those were

14  completely captured.  And their other transformation issues.

15  So it's not just limited to those but other transformation

16  issues that should be, on reflection, appropriately excluded

17  from the target on a reasonable basis.  And the committee

18  wanted the opportunity to be able to sort that out.  We

19  negotiated with them, concluded that the best way for them to

20  make a reasonable judgment -- and we agreed -- and some of this

21  you have to work on faith here.  The company agreed that while

22  we think our targets are reasonable that we were prepared to

23  have the committee make its own unilateral assessment of that

24  up to this hundred million dollar cap based on the discussions

25  between the parties, the KECP subcommittee and the company,

- 64 -

DELPHI CORPORATION (DRAFT)

1   after the fact when all the information is in.

2           THE COURT:  The hundred million dollar cap is on the

3   corporate --

4           MR. BUTLER:  It's on the corporate.  Correct, Your

5   Honor.  So, for example, if, to use the example, if our actual

 6    performance came in at negative 350 as opposed to negative 411

 7    and the creditors' committee thought there should be a 50 or 60

 8    or 70 million dollar adjustment to the target, that could mean

 9    that the EBIT DA UG target would be taken out of the

10    performance payment and there would be no payment 'cause Your

11    Honor previously ruled that at least at the moment you want

12    there to be a cliff at the target level and we've stuck with

13    that.  We haven't come back and tried to propose anything other

14    than that.  So there's a cliff at target.  Then that would

15    impact all of the corporate employees and depending on the

16    percentages that had been negotiated with the compensation

17    experts of the creditors' committee, varying percentages of

18    divisional compensation would be affected because the mix by

19    division changes between corporate performance and divisional

20    performance.

21          THE COURT:  Okay.  So the percentages or curves were

22    worked out largely based on the suggestions of the committee's

23    consultants that targets were heavily vetted by the committee

24    and the committee has built in this hundred million dollar

25    adjustment mechanism?

                                                     - 65 -

                    DELPHI CORPORATION (DRAFT)

 1          MR. BUTLER:  Correct.  I mean, I think it's fair to

 2    say, if you asked -- the payment curves are in fact the

 3    committee's compensation consultants' payment curves.  The

 4    targets are the company's curves -- or the company's targets

 5    having been vetted by the committee to which the committee is

 6    now supportive based on the version of the order that's been

 7    submitted to Your Honor.

 8          THE COURT:  And the targets then are derived from the

 9    ongoing business plan review?

10          MR. BUTLER:  Yes, Your Honor.  As Your Honor may

11    recall from testimony you've heard in this courtroom, the

12    company does forecast about quarterly for the -- looking

13    forward and this was based on the three plus nine forecast that

14    was completed in the March/April time frame as we move forward

15    looking forward to the second half of the year.

16           THE COURT:  So are these targets consistent with the

17    business plan underpinnings of the 1113/1114 proposal?

18           MR. BUTLER:  They're consistent, Your Honor, with the

19    steady state aspects of it as it's been updated because we

20    don't get the benefit of either the U or G.  EBIT DA UG.  That

21    doesn't translate into earnings that can influence these

22    payments.

23           THE COURT:  And you say the "steady state" as it has

24    been updated?

25           MR. BUTLER:  Right.  By the three plus nine forecast,

                                                      - 66 -

                    DELPHI CORPORATION (DRAFT)

1    Your Honor.

2           THE COURT:  Okay.

3           MR. BUTLER:  And that's been not only submitted into

4    evidence but it's been widely vetted.

5           MS. ROBBINS:  Hello?

6           THE COURT:  No, I'm just thinking.  You can't see me

7    thinking.  Maybe that's a good thing.  All right.  I guess I

8    don't have any more questions then of any of the objectors.

9           MR. BUTLER:  Your Honor, before we go through the

10    objections, we probably ought to resolve the evidentiary

11    record.  There was a remaining issue as to Exhibit #15.  The

12    debtors objected to the introduction of that evidence because

13    it was -- Ms. Robbins had designated that, I believe --

14    actually, I guess, counsel for both the IAM-IBW and the IUE had

15    designated that and Mr. Wachter's testimony from the 1113/1114

16    insofar it was dealing with quit rates for the hourly workers

17    in that area.  We don't think it's relevant.  We don't think it

18    has any foundation for purposes of trying to tie it to

19    executive compensation and so we object to it both on a

20    foundation basis and on relevance.

21          MS. ROBBINS:  If I may be heard, Your Honor?

22          THE COURT:  Yes, sure.

23          MS. ROBBINS:  First of all, Dr. Wachter's statement

24    involves quit rates on an economy-wide basis.  There is no

25    reference that then it's limited to hourly employees.  It

                                                        - 67 -

                        DELPHI CORPORATION (DRAFT)

1     instead focuses economy-wide and industry-wide.  So we would

2     understand that by the terms used to have included everyone

3     including executives and management personnel.

4           I would also point out that the Wachter declaration

5     provides a summary of both the employer's proposals, both the

6     current salary rates for skilled and unskilled employees and

7     the employer's proposals with respect to skilled and unskilled

8     employees.  And so it provides a backdrop for understanding the

9     impact of the employer's proposal here for a bonus program in

10    the context of 1113 and 1114, which is, in their reference, by

11    virtually all the unions.  Mr. Wachter identifies each of the

12    wage rates and the employer's proposed reduction in those wage

13    rates.

14          THE COURT:  For the hourly employees?

15          MS. ROBBINS:  For the hourly employees.  But I think

16    that that is relevant in terms of understanding our concern

17    that it would impact the 1113/1114 hearing.  The quit rates, as

18    I said, we understand to apply to management as well as hourly.

19          MS. MEHLSACK:  Your Honor, if I may amplify?

20          THE COURT:  You may.  I'm sorry.  This is Exhibit 15?

21          MR. BUTLER:  Yes.

22          MS. MEHLSACK:  Just by way of clarification, Barbara

23    Mehlsack for the Operating Engineers.  And the IBW, the IAM and

24    the Operating Engineers Locals filed their joint objections and

25    we filed the exhibits jointly, Your Honor.  And the Wachter

- 68 -

DELPHI CORPORATION (DRAFT)

1    exhibit we believe is relevant because Mr. Wachter makes the

2    point that quit rates are further evidence of whether

3    compensation is competitive or not competitive and he compares

4    the hourly quit rates to a number that -- to statistics that

5    DLS produces that are not limited.  They are economy-wide

6    manufacturing sector-wide without regard to whether they are

7    hourly employees, salaried employees, executive employees.  And

8    our point is that there has been no comparison of quit rates

9    and this program is being justified on a number of different

10   grounds but one of the grounds is a retention ground.  And we

11   are concerned about the lack of the sufficiency of the evidence

12   going to the retention issues and to the fact that the debtors

13   offered no evidence to compare quit rates of the executives

14   either to the peer group that Mr. Bubnovich discussed in

15   talking about comparing the overall structure of the plan nor

16   even to the economy-wide or manufacturing-wide rates that Mr.

17   Wachter used.  If quit rates are evidence of competitiveness

18   val none of compensation, then we think that that's an issue

19   that ought to have been addressed in more detail and it goes to

20   our objection that the evidence in support of this plan at this

21   stage is not sufficiently particularized on a number of

22   different grounds.  And that's why we believe that the

23   declaration is relevant, Your Honor.

24           MR. BUTLER:  Your Honor, with respect to Dr.

25   Wachter's declaration, the union counsel led, in this case, by

- 69 -

DELPHI CORPORATION (DRAFT)

1    Mr. Kennedy, cross-examined Dr. Wachter at the hearing on his

2    declaration.  And on page 37 of that, I can just read a couple

3    of questions and answers.  Mr. Kennedy asked with reference to

4    paragraph 14 of the declaration which is part of Exhibit 15

5    that the unions seek to get admitted here.  At line 14 of the

6    transcript, Mr. Kennedy says "Is that just a blue collar quick

7    rate or is that for everyone involved in a plant or

8    manufacturing facility?

9        "Answer:  Those are collected as average plant on numbers.

10       "Question:  So, would that apply for instance to salary,

11   to management at manufacturing plants?

12       "Answer:  Actually, that I'm not entirely sure of without

13   checking the sources more specifically, but I think they are

14   but I would need to check the reference.

15       "Question:  Okay.  Sitting here today, do you have any

16   information on what the salaried or managerial quick rate is

17   economy-wide?

18       "Answer:  No."

19           THE COURT:  All right.

20           MR. BUTLER:  And I just don't know what the relevance

21   or foundation is, Your Honor, with respect to Dr. Wachter's

22   testimony of 11/13 in the context of this hearing, which is why

23   we objected.

24           THE COURT:  All right.  It's just a relevance

25   objection and as far as I'm concerned and I think as far as my

                                                        - 70 -

                            DELPHI CORPORATION (DRAFT)

1    opinion or the Court's concern, they can deal with that by

2    looking at the objection and looking at the other facts as

3    well, including his testimony.  So, I'll admit it for what it's

4    worth.

5            Okay.  So do I have anything from the objectors?

6            MS. MEHLSACK:  We have not created an order, Your

7    Honor, but I guess we'll be UAW Steelworkers and then Ms.

8    Robbins for IBEW, IAM and IUOE and then I will follow Ms.

9    Robbins.

10           THE COURT:  Okay.

11        MS. CECOTTI:  Good morning, Your Honor.  Babette

12   Cecotti for the UAW.  Excuse the slight disorganization.  We

13   were, as I say, anticipating Mr. Kennedy's arrival.  In terms

14   of the objection of the UAW, and I have read Mr. -- the Skadden

15   response to the objections that have been filed and I'll

16   attempt to take that into account in my remarks.

17        We are certainly not here to be repetitive of the

18   hearing that took so long before Your Honor in February.

19   However, all of the unions, and including the UAW, have raised

20   the issue of the appropriateness of further proceedings to set

21   bonus opportunities for executives right in the middle of the

22   1113/1114 proceedings that of course Your Honor is presiding

23   over and supervising.

24        We certainly do remember and acknowledge the Court's

25   ruling and the comments that Your Honor made with respect to

- 71 -

DELPHI CORPORATION (DRAFT)

1   the similar issue we made at the time.  Of course then we were

2   anticipating the proceedings and now we're right in the middle

3   of them.  But I would not want the Court to think that we have

4   short memories or short attention spans.  We certainly took

5   that very much into consideration but as the UAW has said in

6   its objection that the reality is that the issues that are on

7   the table now between the debtor and the unions, including the

8   UAW, present issues that are simply -- they are very difficult

9   to deal with this, as the Court has heard before, but simply

10   make it even more difficult and complicated for the unions to

11   do what the unions need to do in this case, which is to see if

12   there can be a consensual resolution of all of this.  And in

13   order to do that, we need -- eventually, we will need the

14   support of the membership that will need to vote on an

15   agreement if there is an agreement to be brought forward.  And,

16   as the Court heard last time, I think once one is in the

17   reality of the situation, including making choices about

18    whether to take attrition opportunities or stay with the

19    company dealing with information that may be circulating about

20    the company's proposals and the unions' reaction to the

21    proposals, it seems to me that the focus right now should be

22    bringing everybody focused on the same goal, which is to see if

23    there can be a consensual resolution here.  And notwithstanding

24    the Court's comments, which again we acknowledge and I think we

25    may have a respectful disagreement with in terms of what it

- 72 -

DELPHI CORPORATION (DRAFT)

1    would take to actually talk to the membership and try to get

2    them to see that perhaps the two exercises are not

3    inconsistent.  In the unions' mind they very much are and they

4    very much do present a complicating factor.  And I think with

5    that said and as we've laid that out in our objection, I'll

6    just move on to the UAW's other objections.

7            With respect to the program itself, I think the

8    colloquy that we've just heard with Mr. Bubnovich and the

9    Court's comments with respect to the targets and so forth

10    demonstrate another key problem for the UAW which is the design

11    of the program itself.  Even if we could say, and as I think

12    the consultant testified, the features that the consultant used

13    were comparative design features with respect to the pier

14    group.  They may well be very laudable features for an

15    incentive program.  But I think that, as the consultant also

16    said, the programs are by and large annual programs.  And some

17    of the issues that have come up in terms of trying to set

18    targets and hearing now the debtors are trying to lower

19    targets, has to do with the fact that the debtor has determined

20    to make this sort of a two bites at the apple type program.  We

21    have two -- we have six month increments for which there will

22    be bonus opportunities provided.  Budgeting is certainly not a

23    science.  Not being an accountant myself, I can only imagine

24    the complications that ensue when you try to do something like

25    this, taking a year and trying to split it in half.  What costs

                                                         - 73 -

                        DELPHI CORPORATION (DRAFT)

1    and savings and projections are attributable to what -- first

2    of all, which periods of the year, I think the efforts of the

3    committee the first time around to try to figure out what

4    aspects of the company's reorganization restructuring efforts

5    should be excluded took into account the fact that we have here

6    a case that's trying to do a lot at once.  So when we have the

7    dash UG, that was the committee's effort to recognize that we

8    have a case here where there's a lot going on where a lot of

9    things could result and find their way rippling through the

10   budgetary process for any number of reasons.  I think that if

11   you -- once you then try to parse this into two six month

12   periods, you are simply compounding the problem.  And the

13   committee's efforts notwithstanding and the efforts that they

14   have said they will undertake with respect to the hundred

15   million dollars, while laudable and while certainly a step in

16   the right direction in terms of oversight, are simply not

17   enough, at least from the standpoint of the UAW.

18           So, that we have first of all the six month, six

19   month feature of the program, which we think makes it different

20   than the pier group to begin with; the fact that it must

21   necessarily compound the difficulties of trying to figure out

22   what exactly the incentive measures are going to be in a case

23   where at the same time the debtor is trying to undergo massive

24   labor restructuring changes; it has to deal with GM and other

25   customer issues.  There will be a lot going on in this case and

                                                         - 74 -

                        DELPHI CORPORATION (DRAFT)

1    I for one would find it to be a near miracle if at the end of

2    the day one could actually line up what the incentive features

3    of this that actual executives could actually work on and

4    actually show to be a demonstrable result of their efforts, if

5    that could actually be demonstrated.  We think that the process

6    and the type of a case it is and the way the program has been

7    designed simply makes all of that impossible for the Court to

8    be able to have demonstrated with any assurance that the

9    considerable amount of money that's at stake will actually work

10    towards the goal that it's intended to, again, assuming, in a

11    perfect world, that an incentive feature that meets -- the

12    design features that have been set out could actually work as

13    designed.

14         In addition, we have raised an objection to the

15    debtors' request that this process now simply be allowed,

16    assuming the Court approves it today, to continue without

17    further Court authority.  Again, taking nothing away from the

18    efforts of the committee or its professionals, it is simply not

19    enough oversight.  The Court ruled in February that the six

20    month AIP at that time was a transaction out of the ordinary

21    course of the debtors' business and we believe that there is

22    really nothing that's been demonstrated that would take it

23    outside of that ruling here today or -- and there's -- simply

24    having the oversight of the committee and the budgetary process

25    does not substitute for the Court's review an oversight.  And

- 75 -

DELPHI CORPORATION (DRAFT)

1    we think that to the extent today's program is approved, and we

2    think for all the reasons that I've said it shouldn't be, but

3    to the extent it is, there should not be an effective blank

4    check issued to the debtor even with the committee

5    participation to simply roll this program forward without any

6    further Court oversight.  Thank you.

7         THE COURT:  Okay.  Thank you.

8         MR. MORANAVIC:  Good morning, Your Honor.  Robert

9    Moranavic on behalf of the Steelworkers.  I'll be brief.  We

10    echo the comments of my colleague.  Noting, in particular, that

11    where we have the membership's requirement to ratify any

12    agreement that would be negotiated between the debtors and the

13    Steelworkers.  It becomes particularly difficult to persuade

14    members that it is in their interests at the same time to cut

15    their own wages and cut their own benefits and eliminate jobs

16    while they are seeing executives increase their compensation.

17            THE COURT:  You have to speak a little bit more into

18    the microphone so Ms. Robbins can hear.

19            MR. MORANAVIC:  I'm sorry.  So, with that I will

20    conclude my comments.

21            THE COURT:  Okay.

22            MR. MORANAVIC:  Thank you very much.

23            THE COURT:  Thank you.

24            MS. ROBBINS:  Your Honor, if Mr. Kennedy is not

25    there, is there anyone from the IUE there now or should I enter

                                                           - 76 -

                        DELPHI CORPORATION (DRAFT)

1    my appearance.

2            THE COURT:  You should go ahead.

3            MS. ROBBINS:  Appearing on behalf of the IAM and

4    IBEW, Marianne Goldstein Robbins, the law firm of Previanat,

5    Goldberg, Uelmen.  And I'm speaking also, to some extent, for

6    the IUOE.  Ms. Mehlsack and I did work together on addressing

7    this issue and she will speak for me.  I would like to start by

8    pointing out there is a new commitment which deals with

9    transfers to insiders, which, in our view would include

10    executives.  The Section 503(c).  We think that that's

11    important because it demonstrates that the way in which

12    bankruptcy law is progressing there is a desire established by

13    the statute that if there are transfers to people who are

14    involved in the company in a very high level, there should be a

15    very particularized showing before there are transfers to them.

16    For example, on the issue of retention which has been raised by

17    the debtors, there is to be a particularized showing that, for

18    example, there is a bonafide offer.  And just for a moment, I'm

19    going to point out that in my few questions of the debtor's

20    expert, we do not know, in this case, anything about the

21    reasons for the quit rate for the few executives that have left

22    in 2006, the reason for that.  The debtor, for example, has

23    announced the closure of certain facilities.  It would not be

24    at all surprising or inopportune if some of those facilities,

25    some of the executives assigned to those facilities sought

- 77 -

DELPHI CORPORATION (DRAFT)

1    other employment.  Just as the hourly employees at those

2    facilities are going through attrition and its been noted that

3    their quit rate has increased also.  Because those plants are

4    closing.  And we have a shrinking foot print that we would

5    expect to see to shrink at all levels.  But I think I want to

6    focus about some of our concerns about the change in the

7    target.  As we read the Court's prior order, the target, had

8    been a negative operating income of eighty million and now

9    we're holding to 411 million negative as a target.  So we have

10    a huge increase in a negative number as being the target for

11    incentives.  And I want direct the Court's attention back to

12    Mr. Sheehan's declaration in the 1113/1114 hearing which is at

13    tab 16 in the exhibit book for this hearing.  And in that

14    declaration Mr. Sheehan addresses the fact that the performance

15    for the beginning of 2006 was better than expected.  And he

16    identifies a number of reasons for that.  And attaches very

17    significant numbers to those reasons.  He mentions material

18    cost reductions, which were projected at ninety-nine million

19    for the year but fifty-three million just, I believe, in the

20    first quarter.  He mentions the fact that there is additional

21    attrition which has saved the company money in its job stake

22    and this was voluntary attrition, at that point people who had

23    quit.  And then he mentions that in terms of the expenses for

24    retirement, they projected -- the company projected for the

25    year 116 million dollars less than an expense.  He mentions

- 78 -

DELPHI CORPORATION (DRAFT)

1    attrition of salaried employees.  And at this point, he does

2    not mention it from a point of view that this is a negative,

3    but that these are individuals that would not have to be

4    replaced because the company's reduction in foot print.  And

5    that's another fifty-five million.  And here he is talking

6    about, basically, the first quarter of 2006.  And so what we

7    see is that the company's estimates have been unrealistic.  And

8    that, in fact, for reasons not related to management's

9    productivity, there had been reductions in costs.  And, given

10   that, we would expect even if there is a volume difference,

11   that this would have been taken into consideration in realizing

12   the target did not have to be adjusted to the extent that

13   adjustment is sought.  And there was absolutely no

14   consideration given to this.  So it really does appear that

15   this is a very unrealistic -- it's essentially reducing what

16   was already an unrealistically low estimate of performance.

17   And one of the points that we made, that I think was questioned

18   in the response to our objection, was that how this would end

19   up involving more money for the bonus program.

20          THE COURT:  Before you get into that, do you dispute

21   that these targets were based on the updated city/state

22   projections which would have taken into account the information

23   that you just went through, the lower costs of various

24   components of the city/state projections.  I mean, I understand

25   your argument that you're making that they were wrong once, so

- 79 -

DELPHI CORPORATION (DRAFT)

1    they could be wrong again.  But, I didn't quite follow the

2    second point which is that -- I thought I heard you saying that

3    they haven't really adjusted except for (indiscernible)

4    adjustment dollars.

5          MR. ROBBINS:  Well, Your Honor, and I have to say

6    that I just -- I don't see how they have taken these things

7    into account.  And the way that I get to that point, Your

8    Honor, is by looking at what the target was for the first half.

9    In other words, you know, if we saw that the target -- the

10   target for the first half was a much longer negative number, so

11   what we see is that even though we have all these positive

12   things going on, we now have a request for a far greater

13   negative number.  A greater loss, if you will.  And that makes

14   no sense when you see how the basic statement where 600 million

15   for the first half, we've made a 600 million improvement.  And

16   the only adjustment that is specifically referenced in the

17   order, of course, is restructuring.  And the items that I

18   mentioned from Mr. Sheehan's earlier declaration, are not

19   involved in restructuring.  They are essentially items which

20   occurred unrelated to restructuring as far as I can tell.  Mr.

21   Sheehan's declaration certainly doesn't reference any of them

22   as being related to restructuring.  And what I look at is the

23   gross numbers, Your Honor.  In fact, they're saying everything

24   positive is going on and yet, we need this hugely larger

25   negative number.  And I -- you expect that if this had really

                                                        - 80 -

                      DELPHI CORPORATION (DRAFT)

1    been taken into consideration the new number, even with the

2    adjustment for volume, would be similar, it would not be more

3    than 300 million lower.  So I guess I do question it.  It may

4    be a little bit of black box magic here, but the fact is the

5    target is being reduced.  Notwithstanding all the positive

6    things that have been going on which have not been related to

7    management's performance so much as the fact that material

8    costs is going down and it's other expenses have not

9   materialized the way that they would be expected to.  To move

10  on, want to say that this has an impact on the cost of the

11  plan.  Because if the target is too low, what would have been a

12  twenty-five percent increase over target becomes a fifty

13  percent increase in target.  And that means that more resources

14  are used to fund the incentive plan that really is not acting

15  as an incentive plan but really is a foregone conclusion from

16  what we see previously.  I did want to also touch on the impact

17  this has on the 1113 and 1114 proceedings.  We realize that the

18  debtor has reached attrition packages with some of the unions

19  that has not happened with the IAM, IBEW or IUOE.  The debtor

20  has not been available for those discussions yet.  And I think

21  that the other thing that has to be remembered what has not

22  been addressed.  And we'd like to believe it's because,

23  perhaps, it will not need to be addressed.  But that certainly

24  has not been debtor's position up to this point.  Debtor says

25  that they still intend to seek huge reductions in pay.  If you

                                                      - 81 -

                     DELPHI CORPORATION (DRAFT)

1   look at -- you know, just as a refresher, in Dr. Walker's

2   declaration, for Steelworkers it's basically a thirty-three

3   percent reduction in pay that is being sought.  And it's not

4   just in pay and fringe benefits, the reductions are even

5   larger, particularly, in the area of retirement benefits.  And

6   this, of course, is in the context where -- for the IAM-IBEW

7   and a number of the IUOE employees -- all of the IAM and IBEW

8   and many of the IUOE employees, their locations will no longer

9   exist.  So, basically, what they have to look forward to is

10  retirement if they're old enough.  And those very retirement

11  benefits we're told to continue to be in jeopardy.  That the

12  employer's seeking the ability to terminate those retention

13  plans.  And that will cause the loss of supplemental benefits.

14  And this in a situation where the employer takes the position

15  that there is no benefit guaranty for these groups.  So what we

16    have here is a situation where you're trying to reach a

17    consensual agreement, which cuts pay, and cuts retirement

18    benefits.  And you want to do this in a context where you're

19    saying you know, let's lower the goals for management and

20    increase their pay, at the time that you're asking people to,

21    basically, forsake their retirement and live on a third less

22    pay.  That is not the way to get a voluntary agreement, in our

23    view.  And if that is the goal, this seems very ill conceived.

24    In straight monetary issues, what we have is a situation where,

25    according to the debtor's, thirty-seven million will go to this

                                                            - 82 -

                            DELPHI CORPORATION (DRAFT)

1    plan.  It could be more if the goals are askewed as we believe

2    they are.  There's no reference, but last time around the AIP

3    program wants -- the Court ordered it for executives, was

4    extended to other salaried individuals, which presumably would

5    mean even more money would go into bonuses.  And, again, part

6    of the problem is will that mean there's not enough money to

7    fund the pension for hourly employees or salaried employees,

8    for that matter.  If we're really in these dire straights do we

9    have, or doesn't the debtor have millions of dollars to throw

10   into this kind of program.  Isn't the time to address this

11   farther down the road as the rest of the KESP motion, when we

12   will have a better idea on how all of this will sort out.  And

13   I wanted to point out one other thing.  While the debtor has

14   put into evidence the minutes from the committee's

15   consideration of this supplemental KESP program.  There is no

16   reference in that consideration as to the impact this will have

17   on the 1113/1114 proceedings, or on the balance sheet, for that

18   matter.  I think that just understates the fact, that this is

19   not the right time to be talking about this.  This should be

20   deferred with all other portions of the KESP motion to a later

21   point in time.  And finally, we don't see the reason for

22    approving this program into future six-months periods without

23    the input of other constituencies.  This time around, we see a

24    huge change from a goal of minus eighty million to a goal of

25    minus 411 million notwithstanding a 600 million dollar

                                                              - 83 -

                    DELPHI CORPORATION (DRAFT)

1    improvement.  In that kind of context, before we see huge

2    variables of this kind, we think this needs the oversight of

3    the Court and the Court's ability to get input from other

4    constituencies.

5            THE COURT:  Okay.

6            MS. ROBBINS:  And I have to thank the Court for

7    allowing me to participate by phone.  I know it's not ideal and

8    I really appreciate it.

9            THE COURT:  Okay.  That's fine.

10           MS. ROBBINS:  Thank you.  Nothing further.

11           THE COURT:  All right.  Ms. Mehlsack.

12           MS. MEHLSACK:  Your Honor, we just got a note that

13    Mr. Kennedy, apparently, misunderstood, I guess, the afternoon

14    scheduling of the status of negotiations to be a change in the

15    time of this hearing.  And is apparently on his way.  I don't

16    know --

17           THE COURT:  I read his objection.  It was very clear.

18    I know he's eloquent, but I'm not sure how much he would have

19    added in person.

20           MS. MEHLSACK:  I will try not to be redundant.  We

21    thought we had divided up the issues, but I guess we were not

22    so clear with each other.  Let me -- this program is being

23    justified, Your Honor, on two basis.  One is as an actual

24    incentive program.  And the other is as a retention program.

25    And we think that the particularized evidence of need that the

                                                              - 84 -

                    DELPHI CORPORATION (DRAFT)

1    Congress has now put into the code through 503(c), though

2    clearly not directly applicable, ought to be a guiding

3    principal.  And we think that there are severe deficiencies --

4         THE COURT:  I've already got that one.

5         MS. MEHLSACK:  I understand that you -- 503(c),

6    itself, does not apply.  Let me just -- Mr. O'Neil has said

7    that this program is a valid incentive program because the

8    performance levels of the debtor and the 600 million dollar

9    achievement over and above projections, are due to substantial

10   productivity achievements.  And substantial achievements in

11   both, quality and delivery -- record quality and delivery

12   rates.  And Mr. O'Neil says, that they're better than the 2005

13   record perfor -- and that they are evidence of a record

14   performance since the 1999 formation of the company.

15   Notwithstanding that, Your Honor, the debtor's using, as we

16   understand it, the difference in the 2005 first half versus

17   second half seasonal results to justify the significant

18   declines in negative performance.  Quite apart from the fact

19   that the math, Your Honor, just does not compute.  That there

20   are multiples of reductions in the negative levels that exceed

21   the difference in the 2005.  We don't understand how there can

22   be a use of the 2005 record can be a justification for those

23   significantly reduced targets, when the debtor's saying look,

24   we've achieved through -- and this is an issue we will address

25   in a little more detail -- through management's efforts, we've

- 85 -

DELPHI CORPORATION (DRAFT)

1    achieved 600 million dollars over our operating income

2    projections for 2006.  And so -- and that goes, also, Your

3    Honor, to the issue of how this is going to impact on the

4    unionized employees.  Because those records, on target

5    deliveries of quality performance, are now being justified as

6    the efforts of management and therefore, the basis for

7    rewarding management for achieving targets significantly lower

8    than the target that were achieved in years in which

9    productivity, quality, delivery rates were far lower.  In fact,

10   as Your Honor knows, from 2001 through 2004, while these

11   incentive programs were in place, the only year that an

12   incentive was paid was 2002.  We think there's a huge

13   disconnect, Your Honor, and that hourly employees -- to explain

14   to hourly employees, you've done a terrific job, guys, but you

15   know what, we're giving the executives the credit for the

16   terrific job you've done.  And notwithstanding that, we're

17   cutting your pay.  That, Your Honor, all other -- your praise

18   for the lawyers and the union leaders ability to explain things

19   to the membership, that's something, your Honor, I really do

20   not believe that any of us can stand up in front of the

21   membership and sufficiently explain to that membership.  The

22   second, Your Honor, goes to -- I'd like to address this motion

23   of this being automatic in the future.  Because it's related to

24   both the impact and to sound business judgment.  Mr. Butler

25   said, the last time around, that he hoped that the union

                                                    - 86 -

                    DELPHI CORPORATION (DRAFT)

1    leadership could explain to their members that this -- that the

2    KESP was carefully debated and that it's a dynamic case that's

3    going to go for six months only.  Nobody will be able to tell

4    the union members that the next KESP is carefully debated,

5    because we will have no idea, Your Honor, of what is going to

6    go on.  And that's with all do respect for the creditors'

7    committee as fiduciaries.  We will not have the information

8    that we need.  It will not be aired in public.  The second

9    thing is, Your Honor, Your Honor noted at that hearing that,

10   again, that though the six-months experience from January to

11   June 30th might have, and you said small pea presidential

12   value, the fact is that it would be reopened for negotiation

13   and further development.  That's not going to happen in the

14   next time around, Your Honor, if this is automatic.  Finally,

15   the debtor said, we exercised sound business judgment about

16   this issue of the impact on 1113 and 1114 and the union

17   members.  Because, look, it was debated by the board of

18   directors and you can see it in the minutes.  The only minutes

19   that have been put into this proceeding are the compensation

20   committee minutes and there's no reference, Your Honor, in

21   those minutes to any consideration of the impact on the

22   1113/1114 proceeding and on union members.  So for precisely

23   the reasons that were put into the record as evidencing the

24   sound business judgment of the debtor in the first proceeding,

25   we think that Your Honor has to deny the right to have this

- 87 -

DELPHI CORPORATION (DRAFT)

1   program automatically continue.  Thank you, Your Honor.

2          THE COURT:  Okay.  Thank you.  Mr. Etkin.

3          MR. ETKIN:  Good afternoon, Your Honor.  Michael

4   Etkin on behalf of the lead plaintiffs in the consolidated

5   securities litigation.  We did put in our response, Your Honor,

6   raising two issues.  The first had to do with just seeking

7   assurance that the prophylactic measures contained in the

8   original orders would carry forward.  And we have received that

9   assurance so that no longer is an issue for us.  And very

10  briefly, Your Honor, the second issue relates to something

11  you've heard about and that's the automatic continuation.

12  These types of proceedings, obviously, still remain a

13  lightening rod -- somewhat of a lightening rod in this case.

14  And under those circumstances to not have this fully vetted

15  with parties having an opportunity to be heard and subject to

16  further order of this Court, we just believe, would be

17  inappropriate.

18         THE COURT:  Okay.

19         MR. BUTLER:  Your Honor, I'd like to spend a few

20  minutes talking about the evidence that's before the Court.

21    Because I believe the evidence is uncontroverted in support of

22    the debtor's limited relief that we're seeking today.  I want

23    to start with Exhibit Number 4.  And I do want to point out, on

24    this record, Your Honor, all this is uncontroverted.  I

25    appreciate and I respect the comments that counsel to the

- 88 -

DELPHI CORPORATION (DRAFT)

1    unions made about their concerns with respect to the program,

2    but they did not introduce a single piece of evidence in

3    support of any of those views.  And I think the Court does

4    appreciate but needs to look at, for example, Exhibit 4.

5    Exhibit 4 represents -- and I think it's telling, I won't go

6    through every piece of all the pies, but it does examine that

7    when you're talking about competitive pay, and that's what this

8    case is about, in everything we do, it's about being

9    competitive.  Being competitive with hourly workers, being

10   competitive with salaried workers, being competitive with

11   executives, being competitive in our procurement practices.

12   Everything we're trying to do, Your Honor, just approved a

13   motion earlier that we can go back and make sure that the way

14   in which we're dealing with executory contracts.  We got the

15   best market rate deals we can get.  It's about being

16   competitive.  That's what this reorganization is about.  And it

17   is uncontroverted and undisputed that, for example, if one

18   looks at the last couple of pages of Exhibit 4.  Let's just

19   look at the senior executives for which a lot of these

20   objections are focused.  As we sit here today, these executives

21   have seventy-four percent of their competitive -- their

22   competitive pay is unavailable to them.  That's the competitive

23   shortfall, that's what the testimony says.  And they have --

24   they're receiving only salary and benefits which represents

25   twenty-six percent of their competitive pay.  Assuming Your

- 89 -

DELPHI CORPORATION (DRAFT)

1    Honor approves this, they'll still be missing fifty-three

2    percent of their competitive pay, because the annual incentive

3    opportunity only represents an initial twenty-one percent.

4    More than half of their competitive pay is tied up in the long-

5    term incentive program which is represented in the KESP by the

6    emergence awards program -- emergence incentive program, and

7    the debtors, have again, put that off for another three months.

8    By the time we come to the Court, the earliest time we can now

9    come to the Court on that program, will be October, the first

10   anniversary of our Chapter 11 case.  So for our executives,

11   they will be the only people working at Delphi that have had

12   more than half of the available -- of their -- what's supposed

13   to from a competitive perspective, of their payment structure,

14   not available to them for over a year.  We understand that.  We

15   concluded it's in the best interest of the estate to put that

16   off, and we're putting it off.  But this annual incentive

17   opportunities is clearly a competitive and critical element --

18   essential element of their compensation package.  And, I think,

19   that the information that's concluded in Exhibit 4 is

20   important.  I also think its important to note here what the

21   testimony was, and we do this to be efficient, and we don't

22   necessarily have witnesses on live, direct testimony

23   speaking -- you mean, be testifying for hours about these

24   things, but I know Your Honor's read the declarations.  But I

25   do think it's important to note here, in the record, of the

                                                        - 90 -

                    DELPHI CORPORATION (DRAFT)

1    testimony of Mr. Colbert on behalf of the compensation

2    committee and Ms. Alexander who's the executive director of

3    compensation at the company, who describe the procedures that

4    are going to be put into place about how this program, not only

5    the continuation of the program, but the existing program is

6    going to be administered in determination who actually gets the

7  opportunities.  Yes, the company exceeded its targets in the

8  first half of the year.  Yes, there are opportunities

9  available.  They're not all 200 percent opportunities, in some

10  divisions its going to be less than 100 percent of the

11  opportunity available to them because they didn't make some of

12  the targets they should have made.  Not everybody -- the

13  maximum opportunity is widely divergent for the first half

14  program.  But -- those are still opportunities.  That doesn't

15  translate, and everyone's going to get that.  And, in fact,

16  that's not going to happen.  And the testimony, again,

17  uncontroverted, is further demonstration of the reasonable

18  nature of the design of this program.  There is an individual

19  by individual assessment, including the compensation committee

20  of the board reviewing all the executive matters of officers of

21  the company's performance to determine whether they should get

22  that opportunity or not.  It's available, but will it be

23  awarded?  That's a separate business judgment determination

24  that's being made on a case-by-case basis.  And, I think, as

25  Mr. Colbert testified, in the evidence, to the fact it is

                                                        - 91 -

                    DELPHI CORPORATION (DRAFT)

1  highly unlikely that the maximum opportunities available under

2  the program you authorized in the first half, Your Honor, are

3  in fact, going to be actually awarded across the program.

4          THE COURT:  The way I read this motion, the maximum

5  amount that will be awarded here is 36.3 million.  Is that

6  right?  So, if, for example, a particular division exceeds

7  expectation by fifty percent, their share of the 36.3 doesn't

8  go up so that the number exceeds 36.3.

9          MR. BUTLER:  Your Honor, at target it's one level.

10  And then there's a cap of the maximum level and you can't

11  exceed that cap.  And, in fact, the way the program is

12  designed, after those opportunities are determined by division

13  and by corporate, for any individual executive that simply

14    says, this is your opportunity.  Then there's an assessment

15    made, should they get that full opportunity?  Should they get

16    nothing?  Should they get something between zero and the full

17    opportunity?  And that is an individual judgment made by the

18    company as to every executive.  And what the testimony you have

19    before you here is, for Mr. Colbert on behalf of the

20    compensation committee and Ms. Alexander on behalf of the

21    executive management team is that it is highly unlikely the

22    company's going to use the full amount that has been achieved,

23    because there will be deductions for people who, individually,

24    have not met their individual performance objectives.

25            THE COURT:  Okay.

                                                        - 92 -

                        DELPHI CORPORATION (DRAFT)

1            MR. BUTLER:  And I think that's an important point.

2    The fact that because the discussion here is okay, they made

3    thirty-six million, so it's all going to go out the door.

4    That's not going to happen here.  All right.  And how much will

5    actually be awarded will be dependent upon the company's actual

6    judgment going forward.  I think that's an important piece of

7    the evidence.  I also think Mr. Sheehan's declaration at

8    Exhibit 11 is important, as well.  Because it does explain, I

9    think Your Honor was correct, that the -- that the

10    understanding that these -- this program, second half program,

11    and the targets were developed based on the updated three plus

12    nine forecast, which comprehended the performance in the first

13    half of the year, the actual first quarter.  And carry that

14    through, Your Honor's heard a lot of testimony about that in

15    another setting, as it relates to how that analysis went

16    through.  And that went into evaluating the target, the

17    negative 411 million dollar target.  And one only needs to look

18    at chart 2 at Exhibit 11, Mr. Sheehan's testimony, to

19    understand the seasonality which is dramatic between first half

20    and second half.

21            THE COURT:  I want to make sure I understand that.

22    The adjustments for the second half of 2006, were they just

23    based on the same proportion as to the proportions for 2005's

24    first half and second half.  Or did they take into account the

25    fact that things changed in the first half of 2006 and we

- 93 -

DELPHI CORPORATION (DRAFT)

1    should probably have proportions a little more updated for

2    this.

3            MR. BUTLER:  Your Honor, the three plus nine forecast

4    wasn't adopted and wasn't developed in any (indiscernible), as

5    a compensation forecast.  The three plus nine forecast is a

6    regular routine forecast that's put together every year --

7            THE COURT:  I'm just talking about the seasonality

8    adjustment.  Does that reflect the 3.9 -- I'm sorry the three

9    plus nine forecast?  Or does it just reflect just performance

10    in 2005?

11            MR. BUTLER:  No.  The three plus nine.  What happens

12    is -- the fact that there's a difference in -- the fact --

13    there was no special seasonality adjustment made for purpose of

14    the KESP targets.  The fact is, that the negative four-eleven

15    falls out of the three plus nine forecast.  Because the second

16    half, the company loses more money than it does in the first

17    half.  And that's a result -- and Your Honor only has to look

18    at that empirically, you know we just finished a summer shut

19    down in the second half of the year, Your Honor.  And the

20    testimony that's in the record, describes the automotive change

21    over, the launch of new models, the productivity issues that

22    Mr. O'Neil goes into.  But it's important to understand that

23    targets were not selected for compensation.  I think that's an

24    important element here.  The KESP targets are derived from the

25    three plus nine forecast which was developed after looking at

- 94 -

DELPHI CORPORATION (DRAFT)

1    the actual performance in the first quarter of 2006 and looking

2    at what changes ought to be made for the balance of the year in

3    light of each of the elements of that performance.  And then,

4    ultimately, when we got to the KESP for the second half of the

5    year, the target was then derived from that number.  There were

6    some adjustments made as to North American GM volume and then

7    it was reviewed with the creditors' committee.  And I think,

8    it's undisputed in the record, that this company will perform,

9    what will generate less operating income in the second half of

10   the year, than it does in the first half of the year.  And

11   that's what Mr. Sheehan's testimony is, that's what history

12   tells us is the case.  And there's no reason to believe that

13   that will be any different this year than last year.  But it's

14   not as though, once we got the KESP targets, we said oh, gee,

15   let's make another seasonality adjustment.  No such adjustment

16   was made.  It was derived strictly from the three plus nine.

17   The other, I think, important point to testimony, in addition

18   to Mr. Bovnovitch's testimony about the competitiveness of

19   this.  And I do take issue that this is presented to Your Honor

20   as a retention program.  I think, Your Honor, in your opinion,

21   previously acknowledged that there are retentive aspects of

22   this, in your own assessment of this program.  But this program

23   has been presented -- has been developed as an incentive

24   program.  There's no stay to pay element, there's no guaranteed

25   compensation here.  This is an incentive program which is an

- 95 -

DELPHI CORPORATION (DRAFT)

1    interval element of one of the four key elements of competitive

2    executive compensation.  But I do think it's also important,

3    Your Honor, to take note of the first half of the year and of

4    Mr. O'Neil's testimony in Exhibit 14.  And this is not Mr.

5    O'Neil saying -- I do need to respond to what one of the

6    counsels suggest, this is not Mr. O'Neil saying, oh gee, 411

7    executives out of a 185 thousand people are the only people

8    that made a difference in the company.  Nobody's suggested

9    that, nobody's said that.  There's nothing in this record that

10   would support that conclusion.  But it's also true, that these

11   411 executives, together with some of their other colleagues

12   around the globe, managed a twenty-five, twenty-eight billion

13   dollar enterprise, with somewhere around 180 thousand

14   employees.  And it is, frankly to me, as a practitioner in this

15   restructuring business, it is noteworthy, if not remarkable

16   that in the largest manufacturing restructuring case in

17   history, this company, all of the people in this company,

18   everybody associated with this company has been able to operate

19   in the first period of this case without any material

20   disruption.  And there's a lot of stakeholders to be

21   congratulated for that.  There's a lot of employees to be

22   congratulated.   But at the end of the day, is that a factor

23   that should be taken into consideration in the compensation of

24   the executive team?  There absolutely should be, without

25   apologies.  The fact of the matter is, this company has over-

- 96 -

DELPHI CORPORATION (DRAFT)

1    performed in the first half of the year.  It has created more

2    value than existed before, or lost less in this case because

3    we're still going to lose two billion dollars this year.  But

4    it has created more value and certainly shored up the company's

5    liquidity in a way that is different than what had originally

6    been anticipated.  I'm not going to address the 1113/1114

7    arguments here.  I know we'll be dealing with all of this at

8    that time.  But this does not -- the performance in the first

9    half of this year, does not change the requirement to transform

10   Delphi to a competitive enterprise.  And the measure is

11   competitiveness and we'll be able to address that in all

12   aspects of our business in each of the contested hearings we

13    need to deal with in this case.  And we will carry the burden

14    and demonstrate to the Court why the need to be competitive

15    requires us take various actions.  But in this hearing, which

16    deals with executives and with the uncontroverted evidence

17    here, Your Honor, we need to at least address part of the gap

18    in competitive pay as the evidence indicates by at least

19    continuing the annual incentive program.  I do think its

20    noteworthy here, and without, in any way, taking away from the

21    comments made and the objections raised and the concern raised

22    by the unions, that aside from the limited objection of the

23    lead plaintiffs, no other creditor in this case -- no other

24    stakeholder in this case is taking issue with the continuation

25    of this program, including the creditors' committee or the

- 97 -

DELPHI CORPORATION (DRAFT)

1    equity committee.  Either the official committees or the ad hoc

2    committees or anybody else.  That is different than last time.

3    And I think its important that the Court take that into

4    consideration, as well.  In terms of any other specific

5    comments, I think, Your Honor, most everything else that was

6    raised in this -- in the objections of the oral argument from

7    the objectors, Your Honor, I think has been addressed either by

8    the uncontroverted evidentiary record, or by our omnibus reply.

9            THE COURT:  Okay.  I have in front of me the debtor's

10    motion for approval of a supplementary or separate to their

11    annual incentive program for their executive workforce, that's

12    sometimes referred to the supplemental AIP.  The debtors

13    determined, I think appropriately, in consultation with various

14    parties of interest, originally in the early spring to seek

15    approval of only the first six months of an AIP.  Which was

16    granted in February of this year, after a lengthy evidentiary

17    hearing.  There were no promises or understandings with respect

18    to whether the AIP would continue for the next six months of

19    2006.  And that's why we're here today.  At the hearing on

20    February 16th, I set forth what I believe to be that proper

21    standard for reviewing the motion of this kind and I continue

22    to believe that's the proper way to consider such a request.  I

23    note here, that unlike with regard to the first application,

24    the only objectors are the debtor's six unions.  They have

25    raised some of the same objections that they've raised before,

                                                              - 98 -

                        DELPHI CORPORATION (DRAFT)

1    although, obviously within the context of this revised or

2    supplemental program.  The remaining objection, which is by the

3    lead plaintiffs in the securities litigation with the debtors,

4    I believe, has been addressed inclusively by the debtor's

5    response and commitment.  Except as expressly modified in the

6    proposed order.  The original order approving the first half of

7    the AIP would continue to govern including February 10 of that

8    order which has the protective language that the lead

9    plaintiffs are particularly concerned about although others

10   were as well.  The remaining piece of the lead plaintiff's

11   objection is sitting as one of the objections raised by each of

12   the unions.  Which is an objection to the debtor's request that

13   for an OSI that goes under the official creditors' committee,

14   that it not be required to seek court approval with respect to

15   future rolling forwards of their annual incentive -- incentives

16   for 2007.  I'll address that at the end of my ruling.  The

17   objections raised a number of issues which I'll address a lot

18   them, although, not necessarily in the order of importance.

19   The first issue raised by the unions, however, I believe, is

20   the most important issue with respect to this motion.  And one

21   that I've considered carefully, in light of the fact, a lot of

22   business judgment as well as proper to a Dallas judgment and

23   also the judgment of the various union and constituency such as

24   the two official committees.  That objection is that approval

25   of this supplement to the AIP will be extremely

https://vip21.veritextllc.com/myfiles/710373/122356.TXT

- 99 -

DELPHI CORPORATION (DRAFT)

1   counterproductive given the present existence of the ongoing

2   negotiation between the debtors' and the unions with regard to

3   very serious proposed modifications of their collective

4   bargaining agreements as well as under Section 1114 of the

5   bankruptcy code to benefits, retiree benefits.  Those

6   modifications clearly were prepared for various significant

7   reductions in compensation and benefits for the union workers.

8   It's argued with some force that the simultaneous approval of

9   an annual incentive compensation program for the second half of

10  2006 is inflammatory to the union workers who are not only not

11  getting the opportunity for a bonus but also are being asked to

12  make very significant sacrifices on a consensual basis.  But in

13  addition there's an obvious backdrop of litigation under

14  Section 1113 and Section 1114 here, whether the Court must

15  evaluate other things the relevant measure of sacrifice or gain

16  or whatever other opportunity to use of other constituents in

17  the case including, of course, salary workers.  I think that

18  argument must be viewed in the particular context of this

19  motion, however.  Which is one that seeks approval of an annual

20  incentive program, which as Mr. Butler points out, is one of

21  the four elements of executive compensation.  The debtors'

22  executives for the second half of 2006 would have only, if I

23  approve this motion, the first two elements of executive

24  compensation, salary and benefits.  The debtors have not

25  (indiscernible), appropriately so, to prove settlement, which

- 100 -

DELPHI CORPORATION (DRAFT)

1   potentially is meaningful.  But also it's very clearly tied to

2   the overall restructuring of the debtors obligations as well as

3   business.  That is long term (indiscernible).  That leaves this

4   third element which I view, if the facts support it, that's

5    more akin to maintaining the business and the growing it in

6    normal course as opposed to having relayed without all of the

7    constituencies and businesses restructuring.  And if it is

8    properly tied to reasonable projections of the ordinary course

9    of maintenance and growth of the business.  So that it is tied

10   to reasonable performance.  I do not believe that it should be

11   viewed as inflammatory, but rather as a reasonable incentive

12   program and be providing that it's consistent with such

13   programs for the debtor's competitors.  The evidence supports

14   that conclusion and as importantly has not been rebutted with

15   the contrary evidence.  That this is not a competitive program

16   tied to reasonable projections that the debtor's using in all

17   of their business building purposes and not solely, if at all,

18   prepared for anything other than that.  The facts here,

19   therefore, distinguish this motion from the motion that was put

20   forth the Court in the U.S. Airways case at 329 BR793 Eastern

21   District of Virginia Bankruptcy Court, 2005, in a number of

22   important ways.  There the court was asked in the context of

23   ongoing waiver negotiations to improve key employee retention

24   and severance program that raised in my mind, and I think in

25   the Virginia Bankruptcy Court's mind very different issues.

                                                    - 101 -

                        DELPHI CORPORATION (DRAFT)

1    Not to the operation of the business but to the outcome of the

2    case.  Moreover, the targets here, their performance and

3    opportunities -- the performance targets tied to opportunities

4    (indiscernible) with the creditors' committee and do appear to

5    be reasonable in light of how they were prepared.  They're tied

6    to the steady state operation of the business.  And, in fact,

7    (indiscernible) daughter who makes it clear, if it was that

8    excluded from the financial measurements upon which the

9    executives have the opportunity and forbodeness are the

10   informational results regarding the union, GM and up measures

11   that the debtors were taking that are a little separate part

12    program of the business in that way.  So it seems to me that on

13    the side of whether this is fair the offer of management, I

14    conclude based on the record, including my own questions to Mr.

15    Marcovich that it's six-month AIP, how it was prepared, with

16    reasonable measures to avoid conflicts of interest.  And based

17    on effective third-party betting including by the committee.

18    And as far as whether it is fair as to the hourly workers, of

19    course, the issue of an 1113, if and that for another day.  And

20    I'm sure that I will be asked to consider, and will consider

21    whether in the context of what was being asked of the unions,

22    if will get to relitigation under 1113 is fair in light of what

23    fashion its received.  However, in the interim, I don't.  And I

24    think this was aptly stated the (indiscernible) off this motion

25    (indiscernible) in his programming.  And important and

- 102 -

DELPHI CORPORATION (DRAFT)

1    consistent with the ability of the debtors to be competitive.

2    I believe with that ultimately is brunt of the focus for what

3    the union negotiations as opposed to the 1113/1114 litigation.

4    Again, and I find that this is the case with the motion in

5    front of me.  This is not a detention of severance program

6    which raises for me more troubling issues and then you got the

7    middle stages of a bankruptcy case.  It's also a blueprint that

8    very clearly provides for individual by individual view.

9    (Indiscernible) opportunity to obtain incentive payment if the

10    targets are there.  In addition, unlike the U.S. Airways case,

11    it does not come in the context of whether the Court has

12    already imposed, as the Court did in U.S. Airways a very

13    substantial interim modification of the collective bargaining

14    agreements, which is obviously not the case here.  So I

15    understand that in the context of a union vote on a potential

16    settlement with all of the concessions that the debtors are

17    seeking.  Therefore, in negotiation of those concessions, one

18    could (indiscernible) exploit the notion of (indiscernible) but

19    I continue to believe that when it must work, or can't work at

20    the actual issue at stake.  (Indiscernible) here in the context

21    that is treatment of the managerial constituency and the

22    (indiscernible) of the constituency.  The other attritions, I

23    guess, are (indiscernible) to my conclusion that this would

24    based upon objective and these are the criteria of attrition.

25    I don't believe that the debtors should now be penalized for

- 103 -

DELPHI CORPORATION (DRAFT)

1    having signed it to the last (indiscernible).  Approval of an

2    AIP in two steps, it seems to me that the EBITDA and OBATDA

3    measurements are the measurements that can be made accurately.

4    They clearly will be some discretion in terms of the backing

5    out of this (indiscernible) savings.  But given the equitable

6    committee and ultimately the role of the Court, it seems to me

7    that the executives are taking the risk here as opposed to the

8    estate.  Also, in a provisional (indiscernible) are not viewing

9    this as a retention package approach.  I have essentially

10   discounted the evidence submitted by the company with to

11   (indiscernible).  Because I think that ultimately this will

12   have evolved, it is intended to keep people working.  I'm sure

13   if you can do it again in terms of what it takes to insure that

14   his vendors are competitive against their pears.  I have always

15   had a problem accepting situations where people who are legally

16   working themselves out of a job in measuring retention programs

17   and (indiscernible).  And I believe that there are so few

18   factors as to why something can be a advised to stay or not and

19   whether they should be.  Then I'm generally much more

20   comfortable with doing it through incentive programs than

21   retention programs.  And this is not accepting.  It seems to me

22   that if, in fact, a debtor has a separate bonus structure, it's

23   senior executives that leave unless they're working themselves

24   out of a job.  They should understand the issues of staying or

25    not is one that they have to decide on their own in light of

- 104 -

DELPHI CORPORATION (DRAFT)

1    their sense of fair with their families, but to all the

2    creditor shareholders and other constituencies of the company

3    that leave.  So again, in light of whether it's competitive and

4    supported by record, that indicates that it is and represents

5    used in the business (indiscernible) and somehow

6    (indiscernible).  The last issue is whether, subject of course,

7    to the creditors' committee review that commitment.  The future

8    of an AIP program should be one that's subject to Court with

9    you after notice to parties-in-interest.  I could pass on these

10    two lines on this point.  As I noted at the earlier hearing,

11    when a Court is reviewing whether I'm close to being a normal

12    personnel and salary decision.  I think it's a foot print to --

13    I give quite a bit of deference to debtor in possession.

14    Particularly where its official committee is pulling it's

15    proper

16    oversight (indiscernible).  On the other hand, we are in the

17    context of extremely sensitive and extremely important

18    negotiations with the (indiscernible) litigation.  Which mean,

19    the debtors and their unions.  Moreover, notwithstanding my

20    earlier and the active and responsible role of the creditors'

21    committee, I also observe that, of course, the debtors far

22    exceeded their targets for the first six month of the year.

23    And while I am satisfied the targets for the next six months

24    are reasonable, in the track of another instance of gladly

25    exceeding those targets.  I respect the other parties of

- 105 -

DELPHI CORPORATION (DRAFT)

1    interest with (indiscernible) with the future.  So, while I

2    recognize that having another hearing like this provides some

3    disruption in our (indiscernible) for the company, it seems to

4    me that at least while negotiations and relegation regarding

5    the unions are let go, it's better to try for a continued

6    review to the parties of interest.  My hope is that that the

7    picture will turn clear and the debtors can -- they have with

8    their present operations move on to a more normal steady state.

9    Also if you're going with regard to personnel qualifications as

10   well.  But that isn't the case today.  To the contrary, this

11   motion up it's again, that even though it appears that the

12   debtors (indiscernible) employees, union and non-union are

13   operating at a higher level.  Particularly, for

14   (indiscernible).  If that is the case, they're still projecting

15   losses of approximately two trillion dollars.  That to me

16   indicates that debtors have a lot more to do to apply to their

17   business.  And until that picture is clearer I (indiscernible)

18   very significant (indiscernible) to unions.  And I think that

19   it is appropriate for the debtors to continue to have to go

20   through this process with regard to future problems like this.

21   So, I'll approve the motion with the exception of the provision

22   that states that no further members would be given.

23          MR. BUTLER:  Thank you, Your Honor.  Based on the

24   order that's been agreed with the committee, will the Court

25   simply make that change and enter the order we submitted.  Or

                                                        - 106 -

                    DELPHI CORPORATION (DRAFT)

1    do you want us to submit another order?

2          THE COURT:  Well --

3          MR. BUTLER:  I just don't want to delay the process.

4          THE COURT:  Since you -- the committee worked on it,

5    I think it's probably worthwhile for you all to do it, don't

6    leave it up to me.

7          MR. BUTLER:  We're meeting again tomorrow, so we'll

8    get something over to the Court tomorrow.

9          THE COURT:  Okay.  Thank you.

10         MR. BUTLER:  Your Honor, the next matter on the

11    agenda is matter number 41.  This is NuTech Plastic Engineering

12    Inc.'s lift stay motion.  It's filed at docket number 4436.

13    It's been contested by the debtors.  We filed an objection

14    docket number 4559.  And counsel for NuTech is here to present

15    their motion.

16        MR. TISDALE:  May it please the Court.  Good

17    afternoon, Your Honor.  My name is Douglas M. Tisdale, T-I-S-D-

18    A-L-E, of the law firm of Tisdale & Associates, LLC.  With me

19    in Court today is Steven A. Klenda, K-L-E-N-D-A, of our office.

20    We represent NuTech Plastics Engineering.  We're here today,

21    Your Honor, for the preliminary hearing on NuTech's motion for

22    relief from stay, that's docket number 4436.  For the purposes

23    of this hearing, Your Honor, we would incorporate here is our

24    proffer of evidence, the evidence in the argument in our motion

25    papers.  Including our memorandum of law and the affidavit that

                                                        - 107 -

                        DELPHI CORPORATION (DRAFT)

1    we had of J.A. Schwartz, Esquire, the trial counsel for NuTech

2    in their state court case, and the attachments thereto.  Your

3    Honor, I noted on the agenda that our reply that we filed

4    yesterday, was not indicated on the agenda.  But I am informed

5    by your court staff that our reply was received by the Court.

6        THE COURT:  That's right.

7        MR. TISDALE:  Then, Your Honor, I won't tender a

8    bench copy that I had just in case the Court did not have one.

9    Your Honor, in 2002 NuTech filed a lawsuit in the Genesee

10   County Circuit Court --

11       THE COURT:  I don't think you have to go through the

12   facts.  I have a couple of basic questions.

13       MR. TISDALE:  I'll be happy to answer them.

14       THE COURT:  What I didn't really understand here,

15   whether Delphi's liabi -- claim liability is derivative of GM's

16   liability to your clients.  Is it derivative or is it separate.

17    It's just not clear to me.

18         MR. TISDALE:  It's a breach of contract case, Your

19    Honor, as to both parties.  They are, in fact, related.

20    Delphi's is not one of a fiduciary or, as one who would stand

21    in the place of.  However, GM, we are informed by debtor in its

22    responsive papers, would intend to assert an indemnification

23    claim against Delphi.  But each of the parties separately

24    contracted with NuTech Plastics.

25         THE COURT:  I noted that trial court that invited the

                                                          - 108 -

                        DELPHI CORPORATION (DRAFT)

1    filing although not necessarily in light of the stay.  The

2    Judge gave you opportunity to proceed just the against GM, but

3    not against -- not to keep alive a claim against Delphi.  If I

4    feel approve a RICO on that which is that I would make it clear

5    that the -- is this in Michigan?-

6         MR. TISDALE:  Yes, Your Honor.

7         THE COURT:  The Michigan Court would not try the case

8    twice.  And if it wasn't resolved consensually by Delphi, I

9    would try the matter vis a vis Delphi.  Do you think it's worth

10    taking a stab at that -- because the debtors are prepared to

11    let it go forward as against GM.

12         MR. TISDALE:  I understand that, Your Honor.

13         THE COURT:  It would seem to me that the trial court

14    would understand if it didn't want to conduct two different

15    trials.  But I don't think it would have to.  In fact, it seems

16    to me, particularly -- and this might be the case given the

17    indemnification claim that's asserted, Delphi's liability is

18    largely a derivative of GM's.  That GM would defend

19    aggressively, Delphi can watch that from the sidelines.  And

20    then as debtors often do, decide what to do as a result of a

21    trial.

22         MR. TISDALE:  Your Honor, I understand the Court's

23    thinking on that.  And I appreciate that.  Because, among other

24    things, we have specifically requested that the alternative

25    relief, or at least, if you will, the minimal relief to be

- 109 -

DELPHI CORPORATION (DRAFT)

1    accorded is that we have a clarification for the benefit of the

2    Michigan State Court which does not typically deal with

3    bankruptcy issues to the extent that this Court does.  That

4    said, Your Honor, I don't want to be seen as abandoning an

5    important point here, which is in a case where discovery was

6    completed.  In fact, two years before the trial was set.  And

7    seven months after the dispositive motions had been determined

8    finally.  And unfortunately for us, the only thing that

9    intervened was six weeks before trial, this case was filed.

10   That, Your Honor, we believe, is a telling fact under the Sonix

11   analysis.  And we believe, that as a practical matter, when the

12   Court looks at the totality of the circumstances under Sonix

13   is -- and we've outlined the factor, and I won't repeat them

14   all here.  But certainly in the totality of the circumstances,

15   Judge, we would respectfully assert that not just a compromise

16   solution, i.e., of allowing us clearly to go ahead against

17   General Motors and making it clear to the Michigan Court

18   wouldn't have to do a retrial for purposes of Delphi's

19   liability at some future point.  That may be a nice compromise

20   the debtor would propose, but Your Honor, we don't think that

21   its justified under Sonix.

22          THE COURT:  Well --

23          MR. TISDALE:  We think that relief is required.

24          THE COURT:  Let me change direction your direction a

25   little bit.  What about the pre -- the debtor's response that

- 110 -

DELPHI CORPORATION (DRAFT)

1    GM has indicated that if the trial is going to go forward

2    parties for both Delphi and GM they're going to have to get new

3    counsel.  Because right now, this is the same counsel defending

4    both entities.  Is that going to slow things up?

5        MR. TISDALE:  Well, Your Honor, to the extent that

6    one can say discovery was completed, dispositive motions were

7    filed, argued and lost by the defendants, that new trial

8    counsel coming in would have essentially a pre-packaged case.

9    Every lawyer who approaches litigation, when they have to step

10   in before trial, and it happens to all of us from time to time,

11   knows that there is some catch up work we have to do.  But the

12   case has been prepared for trial, it was ready for trial, it

13   was on the eve of trial.  And therefore, any new counsel that

14   would come in would, of course, ask for an appropriate period

15   of time.  But, Your Honor, not the kind of delay that we would

16   otherwise experience here in these proceedings.  There is,

17   under the rules of judicial economy and an expeditious and

18   economical resolution of all of the issues.  A forum sitting

19   there, ready, willing and able to hear the entirety of the

20   case.

21        THE COURT:  It really would be in a month and half,

22   would it.

23        MR. TISDALE:  At that point, Your Honor, I would

24   assume that it wouldn't be September, which is the trial date

25   that we have heard from our trial counsel and is submitted into

- 111 -

DELPHI CORPORATION (DRAFT)

1    evidence in before this Court pursuant to the affidavit of Jay

2    Schwartz.  That said, Your Honor, the case has the longest

3    history in the Genesee County circuit court in terms of not

4    having to go to trial, having been filed back in 2002.  And so,

5    clearly, Your Honor, at this point a speedy trial would be

6    available and new counsel, I think, would appropriately be

7    expected to come up to speed.  And, I think, General Motors can

8    find a lawyer in Detroit.

9        THE COURT:  Okay.  Let me ask you.  Given that

10    discovery is complete, is there really an issue with the

11    gentleman, the CO.  I mean, he's been deposed.

12              MR. TISDALE:  Yes, Your Honor.  The difficulty is

13    though, now we have to have a trial.  And we appreciate the

14    offer that was made by debtors.  That, in fact, just do a

15    preservation deposition.  Your Honor, a preservation deposition

16    is no substitute for the crucible of trial.  The circumstances

17    and developments that occur at trial are such as to require

18    that the jury, the fact finder who will hear this matter, see

19    that witness and judge the credibility and the weight of that

20    witness.

21              THE COURT:  Well, I'm sure we can videotape.

22              MR. TISDALE:  Your Honor, I know we can video tape,

23    that's not the same as judging in person the credibility and

24    the weight to be accorded the witness.  And we submit that it's

25    a prejudicial impact on us.  And when balancing the harms, as

                                                    - 112 -

                    DELPHI CORPORATION (DRAFT)

1    the last factor Sonax would require, we think that that

2    particular balance harms us and is not fair.

3              THE COURT:  Okay.

4              MR. TISDALE:  Your Honor, if I can, just in summary.

5    Very briefly, as to one thing.  We know the Court's been very

6    patient today with a number of matters and I apologize.  But it

7    is an important matter to NuTech.  And we do want to make

8    certain that the Court understands that the relief that we have

9    sought, because there was comment made by debtor's counsel in

10    their response, the relief that we seek is, of course, limited.

11    I believe the form of order that was submitted to the Court was

12    perhaps a little broader than might ordinarily have been the

13    circumstances.

14              THE COURT:  It's not for enforcement but for solely

15    for purposes of liquidating the claim.

16          MR. TISDALE:  Exactly, Your Honor.  The Court

17     understands that and we assumed the debtors understood that as

18     well.  But it's clear to all of us, that in fact, it's solely

19     for purposes of liquidation.  And, Your Honor, very simply put,

20     the most central factor, under Sonax, which after all began

21     with Curtis, Judge Allen's opinion out of the District of Utah.

22     Which as to the point about being ready for trial began with

23     Judge Brumbah's decision in Feedler in Colorado.  When Judge

24     Brumbah indicated that if the case is ready for trial, that's a

25     central factor.  And, Your Honor, that's the one that Congress

                                                        - 113 -

                    DELPHI CORPORATION (DRAFT)

1      chose to comment on in the legislative history, which we

2      pointed out to the Court in our reply as well.  That factor,

3      Your Honor, is a heavy factor.  Distraction is always the claim

4      of every debtor.  When I was debtor's counsel in the Gillette

5      Holdings, Your Honor, getting up in the morning was a

6      distraction, going to bed at night was a distraction, anything

7      is a distraction.  But that doesn't interfere with the

8      administration of the case.  They've got separate trial

9      counsel, they can proceed with this case without being

10     prejudice and without being unduly distracted from the other

11     significant matters that they have before them.  Under those

12     circumstances, Your Honor, we suggest that the breathing room

13     that they ask for is fine.  We gave them that.  But we don't

14     have to give them an iron lung.

15          THE COURT:  Okay.

16          MR. TISDALE:  Thank you, Your Honor.

17          THE COURT:  All right.

18          MR. BUTLER:  Your Honor, our point in this, I think,

19     is simple.  We are -- I don't think this case, ultimately, is

20     going to be tried in Genesee County.  Because if Your Honor

21     lifts the stay, it's not clear to me that we won't exercise our

22     removal rights, which have been preserved with respect to this

23    particular litigation.  There is new trial counsel that's going

24    to have to be obtained for General Motors.  I don't think this

25    meets the Sonix factors, although discovery has been completed.

- 114 -

DELPHI CORPORATION (DRAFT)

1    We do think that the stay should be modified for the limited

2    purpose of preserving Mr. Mailey's deposition through a video

3    deposition.  And there are lots of cases in which videotaped

4    deposition is admitted in trial when the declarant's

5    unavailable -- a witness is unavailable.  And seeing as they've

6    made the point, we do think the stay should be modified to

7    permit that to go forward on an expeditious matter so that the

8    testimony is not lost.  If that relieves the concern, then that

9    ought to be taken care of.  But aside from that, Your Honor,

10    this is a garden variety breach of contract claim.  All right.

11    And, you know, our claims bar date is at the end of this month.

12    We're going to begin to assess what we should be doing in

13    connection with claims administration.  Your Honor's already

14    pointed out, that this Court, unlike some of the other lift

15    stay matters have been before the Court, this Court is

16    competent jurisdictionally and otherwise to try this matter, if

17    it ever has to come up in a disputed proof of claim.  And this

18    issue can be dealt with.

19        THE COURT:  Well, your response said that

20    alternatively be okay to lift the stay to the extent it

21    applies, in we will not or doesn't apply, to let them go

22    against GM.

23        MR. BUTLER:  Your Honor, I never thought it applied

24    to GM to begin with.

25        THE COURT:  Well, there's no indemnification claim.

- 115 -

DELPHI CORPORATION (DRAFT)

1    So maybe they're being character -- but I don't think it does

2    either.

3            MR. BUTLER:  No issue of that, Your Honor.

4            THE COURT:  I mean, it's not uncommon for the debtors

5    to look at the results of litigation even though their not

6    specifically binding and then make decisions about how to

7    settle in the light.  Particularly if there is joint liability

8    in the debtor as everyone knows has all sorts of issues that

9    it's negotiating with GM.  This could lead to another one.

10           MR. BUTLER:  There's no question about that either,

11   Your  Honor.

12           THE COURT:  I understand that this is -- if

13   everything goes further would be set for trial some time in

14   September.  Given my statement about GM getting new counsel, I

15   think it probably wouldn't be set for then.  Counsel I'd like

16   the parties to work together on -- at least considering an

17   order that would make it clear to trial court that you really

18   have to make one trial and that would be as between the

19   plaintiff and GM.  And the claim that the plaintiff has

20   against Delphi would be dealt with in the bankruptcy case and

21   if the Court still has a problem with that, and I don't think

22   it would, I'll certainly retain this again.

23           MR. BUTLER:  We'll work on that order.  In the

24   interim, assuming we work it out with counsel, I would propose

25   that we submit an interim order that would modify the stay

                                                      - 116 -

                        DELPHI CORPORATION (DRAFT)

1    immediately with respect to the declarant who's ill.

2            THE COURT:  Well, I don't know how ill he is.  If

3    he's well enough to at least, be testifying sometime in

4    September, so rather than brining him up to a deposition right

5    now, maybe you can consider that, in the interim.  If he's

6    going to testify, if this works out the day of the trial in

7    September because GM would not need to hire new counsel, he'll

8    testify to that and you'll have that the benefit of that

9    testimony.  That's something to consider if this is delayed.

10          MR. BUTLER:  So should we set this -- continue this

11   to the next omnibus hearing, Your Honor?

12          THE COURT:  Yes.

13          MR. BUTLER:  And we'll work on that order and

14   resubmit.

15          THE COURT:  Right.  Okay.

16          MR. BUTLER:  Thank you, Your Honor.

17          THE COURT:  Okay.

18          MR. BUTLER:  Your Honor, matter number 42, the last

19   number on the omnibus docket is the status conference in the

20   adversary proceeding for L&W Engineering Company.  And my

21   colleague, Mr. Hogan, is responsible for handling that

22   adversary and will handle this conference.

23          THE COURT:  Okay.  I think their counsel is on the

24   phone?  Is that correct?

25          MR. HEILMAN:  Ryan Heilman of Schaeffer & Weiner,

                                                    - 117 -

                       DELPHI CORPORATION (DRAFT)

1    PLLC on behalf of the plaintiff L&W Engineering and Telsac.

2          THE COURT:  Okay.

3          MR. HOGAN:  Good afternoon, Your Honor.  Al Hogan, on

4    behalf of the debtors.  Your Honor, this agenda item relates to

5    an adversary proceeding against the debtors.  That is

6    proceeding number 06-01136.  The plaintiffs in the case, as

7    counsel indicated, is L&W Engineering a subsidiary of Southtech

8    LLC.  To this point, what has happened -- and this is a pre-

9    trial conference.  To this point, Judge, what has happened is

10   that plaintiffs have filed their complaints, the debtors have

11   filed their answer, affirmative defenses and counterclaims.

12   The plaintiffs have responded.  Your Honor, at this point we

13   believe we have dispositive motion under Rule 12(c).  I

14   discussed this with counsel for the plaintiffs.  The plaintiffs

15    also believe that they have a dispositive motion of some sort.

16    And what we're asking for today is the entry of an agreed

17    scheduling order setting a briefing schedule and hearing at the

18    September omnibus hearing.

19         THE COURT:  Okay.  And the underlying issue whether

20    it counts as a claim or counterclaim is whether they set a lien

21    on certain property.

22         MR. HOGAN:  That's correct.  The nature of the

23    complaint is to determine the validity, extended prior to the

24    liens under certain Michigan statutes that the plaintiffs have

25    identified.

                                                      - 118 -

                    DELPHI CORPORATION (DRAFT)

1          THE COURT:  Okay.  So you agreed on a briefing

2     schedule?

3          MR. HOGAN:  We have, Your Honor.  It's contained in

4     the proposed scheduling order.

5          THE COURT:  All right.  And so when would these be

6     heard by me.

7          MR. HOGAN:  Our proposal is at the September 14

8     omnibus hearing would involve briefing -- response and then

9     reply briefing, on August 9th, August 23rd and September 6th,

10    for hearing at the September omnibus hearing.

11         THE COURT:  All right.  And again, it's a motion to

12    dismiss, it's not an evidentiary hearing?

13         MR. HOGAN:  Our hearing's a 12(c) motion based on the

14    pleading and I don't understand plaintiff's counsel to be

15    offering evidence in connection with their dispositive motion

16    but claim to --

17         THE COURT:  It's not a summary judgment motion?

18         MR. HEILMAN:  Ryan Heilman, again.  I expect that

19    motion will include other documents outside of the pleadings it

20    will be summary judgment motion.

21         THE COURT:  Well, if it's a summary judgment motion,

https://vip21.veritextllc.com/myfiles/710373/122356.TXT

    22    then you're going to have to file your statements under Rule

    23    7056 and the like.  I'll have your respective statements on

    24    that.  That should be put into your scheduling order if you

    25    haven't done that yet.

                                                        - 119 -

                        DELPHI CORPORATION (DRAFT)

    1              MR. HOGAN:  We will, Your Honor.

    2              THE COURT:  Okay.  So, I'll enter that once I get it.

    3              MR. HOGAN:  Okay.  Thank you, Judge.

    4              MR. HEILMAN:  Thank you, Your Honor.

    5              THE COURT:  Okay.

    6              MR. BUTLER:  Your Honor, that completes the agenda

    7    for the July omnibus hearing.

    8              THE COURT:  All right.  So I'll see you all at 2.

    9              MR. BUTLER:  Yes.  Well, chambers conference at 2

    10    o'clock.

    11              THE COURT:  Okay.  Thank you.

    12              MR. BUTLER:  Thank you very much.

    13              (Whereupon this hearing was concluded at 1:13 PM)

    14

    15

    16

    17

    18

    19

    20

    21

    22

    23

    24

    25

                                                        - 120 -

```
 1
 2                    I N D E X
 3
 4              T E S T I M O N Y
 5   WITNESS            EXAMINATION BY        PAGE
 6   Nick Bubnovich    Ms. Robbins           59
 7
 8              E X H I B I T S
 9   DEBTOR'S          DESCRIPTION           PAGE
10   1-24              24 exhibits which     56
11                     had been marked at
12                     the 2/10/06
13                     hearing
14
15              R U L I N G S
16   DESCRIPTION           PAGE              LINE
17   O'Neill Lift-Stay     23                1
18   Motion granted
19   Motion authorizing    29                2
20   debtors to enter into
21   agreement with A.T.
22   Kearney approved
23
24
25
```

                                            - 121 -

```
 1
 2              R U L I N G S, cont'd
 3   DESCRIPTION           PAGE              LINE
 4   Motion of H.E.        41                7
 5   Services Company and
 6   Robert Backie for relief
 7   from the automatic
```

```
  8    stay denied

  9    MobileAria's            54              22

 10    sale motion approved

 11    Supplement to KECP      105             21

 12    motion approved

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

                                                  - 122 -

```
  1

  2                   C E R T I F I C A T I O N

  3

  4    I, court approved transcriber, certify that the foregoing is a

  5    correct transcript from the official electronic sound recording

  6    of the proceedings in the above-entitled matter.

  7

  8    _____ July 21, 2006

  9    Signature of Transcriber            Date

 10

 11        Lisa Bar-Leib

 12    typed or printed name

 13
```

14

15

16

17

18

19

20

21

22

23

24

25