1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44481

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DELPHI CORPORATION,

9

10            Debtor.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14                    U.S. Bankruptcy Court

15                    One Bowling Green

16                    New York, New York

17

18                    June 29, 2006

19                    10:16 a.m.

20

21   B E F O R E:

22   HON. ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25

2

1    MOTION to Approve Motion For Order Under 11 U.S.C. Section

2    363(b) And Fed. R. Bankr. P. 6004 Approving (I) Supplement To

3    UAW Special Attrition Program, And (II) IUE-CWA Special

4     Attrition Program filed by John Wm. Butler Jr. on behalf of

5     Delphi Corporation.

6

7     AGREED Protective Order signed on 1/12/2006 Governing

8     Production and Use of Confidential and Highly Confidential

9     Information in Connection with the Within Chapter 11 Cases,

10    Including Contested Matters and Adversary Proceeding.

11

12    MOTION to Approve Motion For Order Under 11 U.S.C. Section

13    363(b) And Fed. R. Bankr. P. 6004 Approving (I) Supplement To

14    UAW Special Attrition Program, And (II) IUE-CWA Special

15    Attrition Program filed by John Wm. Butler Jr. on behalf of

16    Delphi Corporation.

17

18    OBJECTION to Motion Preliminary Objection of The Ad Hoc Equity

19    Committee to the Debtors' Motion for Order Under U.S.C. Section

20    363(b) and Fed. R. Bankr. P. 6004 Approving (i) Supplement UAW

21    Special Attrition Program and (ii) IUE-CWA Special Attrition

22    Program (related document(s)[4269]) filed by Frank L. Eaton on

23    behalf of Appaloosa Management L.P., Wexford Capital LLC, Lampe

24    Conway & Co., LLC, Harbinger Capital Partners, LLC and Marathon

25    Asset Management LLC.


                                                    3


1     RESPONSE Debtors' Omnibus Reply To Objections To Motion For

2     Order Under 11 U.S.C. Section 363(b) And Fed. R. Bankr. P. 6004

3     Approving (I) Supplement To UAW Special Attrition Program And

4     (II) IUE-CWA Special Attrition Program (related

5     document(s)[4343], [4378], [4379], [4369], [4390], [4381],

6     [4292]) filed by John Wm. Butler Jr. on behalf of Delphi

7     Corporation.

8

```
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24    Transcribed By:  Esther Accardi
25
```

4

```
 1    A P P E A R A N C E S :

 2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

 3         Attorneys for Delphi Corporation

 4         Four Times Square

 5         New York, New York 10036

 6

 7    BY:  JOHN WM. BUTLER, JR., ESQ.

 8         KAYALYN A. MARAFIOTI, ESQ.

 9

10    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

11         Attorneys for Delphi Corporation

12         333 West Wacker Drive

13         Chicago, Illinois 60606
```

```
14

15    BY:  ALBERT L. HOGAN, ESQ.

16

17    O'MELVENY & MYERS, LLP

18         Attorneys for Debtors

19         7 Times Square

20         New York, New York 10036

21

22    BY:  JEFFREY I. KOHN, ESQ.

23

24

25
```

5

```
 1    KENNEDY, JENNIK & MURRAY, P.C.

 2         Attorneys for IUE

 3         113 University Place

 4         New York, New York 10003

 5

 6    BY:  THOMAS KENNEDY, ESQ.

 7

 8    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

 9         Attorneys for Steelworkers Union

10         1350 Broadway

11         Suite 501

12         New York, New York 10018

13

14    BY:  LOWELL PETERSON, ESQ.

15

16    PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C.

17         Attorneys for IBEW and IAM

18         1555 North River Center Drive
```

```
19        Suite 202

20        Milwaukee, Wisconsin 53212

21

22   BY:  MARIANNE GOLDSTEIN ROBBINS, ESQ.

23        (Telephonically)

24

25
```

6

```
1    COHEN, WEISS AND SIMON, LLP

2         Attorneys for UAW

3         330 West 42nd Street

4         New York, New York 10036

5

6    BY:  BABETTE CECCOTTI, ESQ.

7         BRUCE H. SIMON, ESQ.

8

9    LATHAM & WATKINS, LLP

10        Attorneys for Statutory Creditors'

11        Committee

12        885 Third Avenue

13        New York, New York 10022

14

15   BY:  MITCHELL E. SEIDER, ESQ.

16

17   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

18        Attorneys for the Equity Committee

19        One New York Plaza

20        New York, New York 10004

21

22   BY:  BONNIE STEINGART, ESQ.

23
```

24

25

7

1   KIRKPATRICK & LOCKHART NICHOLSON GRAHAM, LLP

2        Attorneys for Wilmington Trust Company

3        599 Lexington Avenue

4        New York, New York 10022

5

6   BY:  EDWARD M. FOX, ESQ.

7

8   WEIL, GOTSHAL & MANGES, LLP

9        Attorneys for General Motors

10       767 Fifth Avenue

11       New York, New York 10153

12

13  BY:  MICHAEL P. KESSLER, ESQ.

14

15  GORLICK, KRAVITZ & LISTHAUS, P.C.

16       Attorneys for Operating Engineers

17       Locals 18-S, 101-S, 832-S

18       17 State Street, 4th Floor

19       New York, New York 10004

20

21  BY:  BARBARA S. MEHLSACK, ESQ.

22

23

24

25

8

```
 1   WHITE & CASE, LLP

 2        Attorneys for Appaloosa Management

 3        1155 Avenue of the Americas

 4        New York, New York 10036

 5

 6   BY:  GLENN M. KURTZ, ESQ.

 7

 8   SILVERMAN PERLSTEIN & ACAMPORA LLP

 9        Attorneys for Chapter 7 Trustee

10        100 Jericho Quadrangle

11        Jericho, New York 11753

12

13   BY:  ROBERT D. NOSEK, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25
```

                                              9

```
 1

 2                    P R O C E E D I N G S

 3        THE COURT:  Delphi Corporation.

 4        MR. BUTLER:  Your Honor, good morning.  Jack Butler from

 5   Skadden Arps Slater Meagher & Flom, LLP.  I'm here with my
```

6    colleagues Kayalyn A. Marafioti and Al Hogan, for the matter

7    especially set for today's agenda.  The first, Your Honor, is a

8    chambers conference under the fourth amended scheduling order,

9    docket number 4170.  This is the first of three chambers

10   conferences that have been directed under that scheduling order

11   and those are to be held in-camera.  So --

12       THE COURT:  Well, is there -- I know you have Ms. Robbins

13   on the phone, too.  Is there -- does everyone who is going to

14   participate at the conference also want to listen to the

15   attrition program matter.  Because given the in-camera nature

16   of it, it might make sense to have that conference after the

17   hearing so that those who are in the audience, as they wouldn't

18   be involved in that in-camera conference, would leave and I

19   wouldn't have to squeeze you into a small conference room and

20   kick two-thirds of the people out of the courtroom.  Does

21   anyone mind waiting to the conclusion of this hearing?  I'm

22   assuming you all want to see what's going to happen at the

23   hearing.

24       MS. ROBBINS:  Your Honor, this is Marianne Robbins.  I

25   wonder if we have any idea how long the hearing will be?


                                              10


1        THE COURT:  We could dial you back or give you a time.

2        MS. ROBBINS:  Be present for it, but I have another

3    commitment late in the morning, so I just wondered if anyone

4    had any idea if this is likely to be two hours or three hours

5    or its going to be relatively short?

6        THE COURT:  I don't think its going to be relatively

7    short.  I guess there's a couple of hours.

8        MS. ROBBINS:  Then, Your Honor, I would like the ability

9    to dial back in.

10       THE COURT:  Okay.  All right, so, should we then contact

11    your office when we're done?

12        MS. ROBBINS:  That would be terrific if somebody could do

13    that.

14        THE COURT:  Do we have your number?

15        MS. ROBBINS:  414-271-4500.  If someone calls that number

16    and leaves a message for me, a receptionist will find me.

17        THE COURT:  Okay.  That's 271, you said?

18        MS. ROBBINS:  414-271-4500.

19        THE COURT:  Okay.  Very well, thank you.

20        MS. ROBBINS:  Thank you very much, Your Honor.

21        THE COURT:  Okay.  All right.  So, why don't we proceed

22    then with the UAW supplement and the IUE Attrition Program

23    motion?

24        MR. BUTLER:  Your Honor, the only matter on the agenda

25    other than the chamber's conference is the debtors' motion for


11


1    an order under Section 363(b) and under our Rule 6004, to

2    prove, as Your Honor pointed out, the supplement to the UAW

3    Special Attrition Program and the IUE-CWA Special Attrition

4    Program which has now been collectively bargained, that motion

5    is at docket number 4269.

6        Your Honor, the objections that have been filed are set

7    forth in the agenda circulated.  There are objections all

8    styled, as limited.  But there are objections that have been

9    filed by each of the statutory committees as well as by the

10    Appaloosa led self-styled ad hoc equity committee and the

11    Wilmington Trust.  Your Honor, the papers in this matter are

12    pretty comprehensive, including both the objections, and are on

13    this reply.  And I would propose, unless Your Honor wants to

14    hear from people, to simply move forward with the evidence.

15        THE COURT:  No, that's fine.

16        MR. BUTLER:  Your Honor, we have filed -- in terms of the

17    exhibit binders, there is a three set of exhibits.  My

18    understanding, and counsel can correct me if I have this

19    incorrect, there are no objections to the admission of exhibits

20    1 through 13.  Exhibits 14 through 27 are to be admitted not

21    for the truth of the matter asserted.  Exhibits 28 through 32

22    are not objected.  Exhibits 39 through 43 are not objected to.

23    And Exhibits 45 through 55 are not objected to.  In lieu of the

24    admission of Exhibit Number 56, my understanding is we're

25    stipulating to the fact -- the debtors' are, that the high


                                              12


1     yield weekly report for the period June 22nd, reports that the

2     bid price for -- 2006 notes, the notes 6.55 percent notes,

3     through 2006, the bid price on that June 22nd, as reported in

4     that publication, was 82.750.  Is that correct?  Do I have it

5     right?

6         MR. FOX:  Yes, you did.

7         MR. BUTLER:  So that stipulation into the evidentiary

8     record is in lieu of Exhibit 56.  With respect to Exhibit 44,

9     my understanding is the parties are trying to work on

10    clarifying some designations under -- about Mr. Sheehan's

11    transcript.  So I should be able to report on that prior to the

12    conclusion of the evidentiary record.  Which leaves, I believe,

13    the only outstanding objections by any party, to be that of

14    Wilmington Trust's two documents, 33 through 38?  33, they

15    raise an authentication question.  And with respect to all of

16    the exhibits, 33 through 38, they raise a relevance objection.

17        MR. FOX:  Excuse me.  We also object to 42.  And with

18    respect to the designations on 43 which we received as of 3:15

19    this morning, we did not have a chance to review them.  So

20    until we determine that it is relevant, I just ask that the

21    entire transcript be put in the record.

22         MR. BUTLER:  We have no objection to the entire transcript

23    going in, Your Honor.  So those are -- as I understand, Your

24    Honor, the only objections.  So I don't even want to hear the

25    argument on the particular objections and just move the

13

1    admissions of ones that are not objected to and leave the

2    others for later.

3         THE COURT:  Well, are you going to raise them later, or do

4    you just want them in the record to have them in the record?

5         MR. BUTLER:  Well, I think we want -- we want all of this

6    to go into the record, Your Honor.  The --

7         THE COURT:  No, but what I'm saying is are you going to

8    refer to them later.  In which case, I could deal with the

9    objections in context or are they just basically, sort of,

10   supplemental to your main --

11        MR. BUTLER:  Well, they're supplemental, Your Honor.  I

12   don't intend to -- when we get into closing arguments, I mean,

13   I'll have something to say about those exhibits.  I don't

14   intend, and depending upon how you deal with the motion to

15   quash, we may have something to say with respect to the

16   Wilmington witness, with respect to these matters.  As Your

17   Honor knows, the Wilmington Trust has also filed the motion to

18   quash the trial subpoena last evening with respect to the

19   witness who had been subpoenaed to appear today.  And we have

20   filed our reply to that which is another matter we should

21   probably deal with.  And that would certainly bear -- although,

22   not entirely, that would bear in somewhat on the use of

23   Exhibit's 31 through 38 and Exhibit 42.  Although, we think

24   they would be relevant even if the testimony was not deemed

25   necessary for this hearing.  And we're prepared to argue that

14

1    issue as well, Your Honor, as a pre-trial matter if you want us

2    to do so.

3    (Debtor's Exhibit 1 through 13 was hereby received into

4    evidence, as of this date.)

5    (Debtor's Exhibit 14 through 27 was hereby received into

6    evidence, as of this date.)

7    (Debtor's Exhibit 28 through 32 was hereby received into

8    evidence, as of this date.)

9    (Debtor's Exhibit 39 through 43 was hereby received into

10   evidence, as of this date.)

11       THE COURT:  Well, all right.  Why don't we do that?

12       MR. BUTLER:  So, Mr. Fox's motion, so --

13       MR. FOX:  Thank you, Your Honor.  Edward Fox with

14   Kirkpartrick & Lockhart Nicholson Graham, on behalf of

15   Wilmington Trust Company's indentured trustee.  Your Honor, we

16   did file the motion yesterday because we -- Your Honor was not

17   in a position to give us a hearing -- to hear this until this

18   morning.  I had really felt no choice but to ask Mr. Similari

19   to come back from Wilmington to New York.  And he is her in the

20   courtroom today, so I think that obviates a lot of it.  But

21   I -- the debtors succeeded in wasting Mr. Similari's time.  I

22   think the question now is whether and how much of the Court's

23   time gets wasted over this exercise.  The debtor indicates in

24   footnote 8, on page 11 of its reply, referring to the

25   deposition of Mr. Similari of Wilmington Trust that was taken

15

1    yesterday, that "he could not offer a single factual basis in

2    support of its objection, relying instead solely upon the legal

3    argument constructed by Wilmington Trust counsel."  If that's

4    the case, for the life of me, I don't understand --

5        THE COURT:  Well, do you agree with that?

6        MR. FOX:  We're not offering -- our view is that the

7    debtors have not proven their case.

8        THE COURT:  No, but I'm just asking.  I mean, you don't

9    intend to offer his testimony, in any way, for any factual

10   support for the benefit or detriment to Delphi Corporation of

11   this matter.

12       MR. FOX:  No.  All of our knowledge is from what the

13   debtors have said either in discovery or in the papers.

14       THE COURT:  Okay.  I think based on that, I don't really

15   see why he needs to testify.  It's stipulated.

16       MR. BUTLER:  Your Honor, if we can stipulate to the

17   transcript, going in -- here's the issue.  Wilmington Trust

18   has, and Your Honor called it out, we addressed it in

19   paragraph's 11 of our reply as well as 64 through 66 of our

20   reply.  Wilmington Trust has consistently, in these cases,

21   filed objections with a common theme that Delphi Corporation

22   should not bear the costs of the debtors' labor force

23   restructuring.  That's been their position.  And when they lose

24   on those objections, as they did with respect to the first

25   attrition motion, they appeal this Court's decision to a higher

16

1    court.

2        What the debtors' want, because we presume that if Your

3    Honor rules for the debtors today, Wilmington Trust will again

4    take this to the district court.  We want to have a complete

5    record.  And that record includes the fact that Wilmington

6    Trust is not acting at the direction of any bond holder.  And

7     that Wilmington Trust, in fashioning these arguments, about the

8     fact that Delphi Corporation has no liability.  The person

9     responsible at Wilmington Trust for managing this indenture,

10    hasn't even examined the basic documents in Wilmington Trust

11    possession that would belie that position.  And the fact is,

12    this is an argument where, you know, Delphi Corporation is the

13    employer, Delphi Corporation signed all the documents.

14    Wilmington Trust wants to come in here every hearing and say

15    Delphi Corporation has no liability here.  And so -- there's

16    got to be a client here, Your Honor.  Mr. Fox has to have a

17    client.  And that client, when put to the test, that client

18    hasn't even examined, by his own admission, the offering

19    memoranda and other documents in their possession as to what

20    the circumstances were, when Wilmington -- you know, when

21    Wilmington's represented bond holders invested in this company.

22         And, Your Honor, if Mr. Fox is intent on taking you up to

23    the district court, we want to have the record to be complete.

24    That's our issue.  I mean, I was perfectly content with what we

25    did -- what Your Honor ordered at the last hearing, in what we

17

1     described on pages 64 to 66, in what Your Honor suggested the

2     parties do with the New Brunswick hearing.  Which was put the

3     language in the proposed order, which is in here, which says, I

4     quote it at page 66 "nothing in this motion" -- paragraph 66,

5     "nothing in this motion, the supplement, the IUE-CWA Special

6     Attrition Program" --

7          THE COURT:  No, but that's a separate point.  I understand

8     you have the reservation of rights.  Well -- so, in addition,

9     in trying to establish that there's no factual underpinning as

10    to the economic effects of this request of relief on Delphi

11    Corporation, you want to establish what?    The -- I'm not

12   sympathetic about the ôdirection of the client.ö  The client is

13   Wilmington Trust, so obviously they authorized this.  As far as

14   familiarity with underlying documents, you're saying that the

15   indentures, themselves, are relevant on that?

16       MR. BUTLER:  The indentures, the offering   memoranda --

17   I mean, the point we're trying to simply make is that

18   Wilmington Trust is coming here attacking our business

19   judgment.  Saying we couldn't possibly have exercised

20   reasonable business judgment because there's no benefit to

21   Delphi Corporation.  And yet, they have undertaken no analysis

22   of that at all on their perspectives to have a contrary point

23   of view.  Usually when you come in and you have a perspective,

24   there's a counter perspective.  And all I'm saying, Your Honor,

25   is they have no factual counter perspective at all with respect

18

1    to their issues.  Not even an admission that these bonds

2    invested, subject to the liabilities.  Which happens to be the

3    fact?

4        THE COURT:  Well, they take issue with what the

5    liabilities are.  But, I -- look as far as the relevance

6    objection, I don't really have a problem with the documents.

7    And I'm not sure that they're particularly persuasive to me, in

8    any event.  But I looked at the documents just to see what they

9    were and they go to the -- they're the indentures and the

10   offering memorandum, I don't have a problem with admitting

11   those.  As far as his deposition is concerned, I don't know

12   what else is in the deposition besides what Mr. Fox has already

13   stipulated to.  And -- so do you have a problem with the

14   deposition?

15       MR. FOX:  Well, I think, Your Honor, if you can review the

16   deposition for what its worth, I don't think it's going to add

17    anything.

18        THE COURT:  All right.  So I'll admit it.

19        MR. FOX:  And that's it's in lieu of Mr. Similari's

20    testifying.

21        THE COURT:  Okay.

22        MR. FOX:  That's fine, Your Honor.  With respect to the

23    other documents we just argued about, what if any --

24        THE COURT:  Right.  You can argue as to the weight of

25    them.


                                                    19


1         MR. FOX:  Right is what is divulged.

2         THE COURT:  Okay.

3         MR. BUTLER:  Thank you, Your Honor.

4         MR. FOX:  Thank you.

5         THE COURT:  Okay.

6         MR. BUTLER:  Your Honor, I believe that means all the

7     documents are now in, other than Exhibit 56, which we have the

8     stipulation for in lieu of the exhibit and Exhibit 44, which

9     we're working with the committee counsel on, which we'll report

10    back to Your Honor by the end of the hearing.

11        THE COURT:  Okay.

12        MR. FOX:  Your Honor, just so the record's clear with the

13    entire Similari --

14        THE COURT:  Yes.

15        MR. FOX:  -- transcript will be in the record.

16        THE COURT:  Not just those designations but the whole

17    thing.

18        MR. FOX:  Thank you.

19        THE COURT:  Okay.

20        MR. BUTLER:  Your Honor, as has been our custom, we have,

21    and they have now been admitted into evidence, declarations in

22    support of the motion.  The first declaration, at Exhibit 28,

23    which has been admitted, the declaration of Kevin Butler, we

24    would call Mr. Butler for any cross examination in connection

25    with that declaration.


                                                    20


1     THE COURT:  Okay.  Does anyone want to cross examine Mr.

2     Butler?  I don't have any questions for him either.  I think

3     the issues really go to -- the issues raised in the objections,

4     I think, to the extent they were addressed, were addressed by

5     the evidence.

6     MR. BUTLER:  Then the next witness we would offer Your

7     Honor is the declaration of Mr. Sheehan, in connection with his

8     declaration which has been admitted at Exhibit Number 30.

9     THE COURT:  Okay.  Does anyone want to cross examine Mr.

10    Sheehan?

11    MR. SEIDER:  Yes, Your Honor, if I might?

12    THE COURT:  Okay.

13    (The Witness is Sworn)

14    THE COURT:  Just for the record, can you just spell your

15    name?

16    THE WITNESS:  John, J-O-H-N, Sheehan, S-H-E-E-H-A-N.

17    MR. SEIDER:  And for the record, Mitchell Seider of Latham

18    & Watkins for the official committee of unsecured creditors.

19    CROSS EXAMINATION BY

20    MR. SEIDER:

21    Q.  Good morning, Mr. Sheehan.

22    A.   Mr. Seider.

23    Q.  Mr. Sheehan, you're familiar with the programs that are

24    before Judge Drain, today?

25    A.   Yes, I am.

1    Q.    Under those programs, if they are approved, Mr. Sheehan,

2    will Delphi receive a release on its OPEB liability to those

3    employees who check the box?

4    A.    It will not be.  I don't believe that's the case in

5    that -- as the employees check the box, they will retire as

6    General Motor's employees.  And, I believe, that we will be

7    released from the primary obligation to pay for the OPEB -- to

8    pay for the medical costs of those individuals post their

9    retirement.  I believe that there may be other avenues in which

10   General Motors would seek recovery.  But, yes, Delphi is

11   relieved of the obligation for the OPEB.

12   Q.    Relieved because General Motors will pay it, but not

13   released because it's being formally excuse from the obligation

14   under all circumstances?

15   A.    I think that's correct.

16        MR. SEIDER:  Pass the witness, Your Honor.

17        THE COURT:  Okay.  Does anyone else have any questions for

18   Mr. Sheehan?  I have one.  This was raised in the unsecured

19   creditors' committee's limited objection.  And I think it's

20   clear, but I just want to make sure it's clear.  You recall

21   that the debtors have previously entered into, and the Court

22   has previously approved, a special attrition program with the

23   UAW and GM?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  To the extent there are any inconsistencies,


22

1    and I'm not sure there will be, but to the extent there are any

2    inconsistencies between the relief you're seeking today, in

3    this motion, regarding the UAW and that last motion, the relief

4      you're seeking today, has no bearing on the last motion,

5      correct?  You're not modifying the last motion, or the last

6      order?

7           THE WITNESS:  No, I don't believe that's the case, sir.

8           THE COURT:  Okay.  You can step down.

9           MR. BUTLER:  Can I have a moment, Your Honor?

10          MR. SEIDER:  Your Honor, I see Mr. Sheehan talking with

11     his counsel --

12          THE COURT:  Well, he's not going to testify again.

13          MR. SEIDER:  Okay.  My apologies, Your Honor.  I wasn't

14     sure that you were done.  You were, thank you.

15          MR. BUTLER:  Your Honor, our final witness here that we

16     have with respect to the declarations is that of Mr. Resnick

17     which is Exhibit Number 29, which has been admitted.  We

18     present Mr. Resnick for any cross examination.

19          THE COURT:  Okay.  Does anyone wish to cross examine Mr.

20     Resnick?  Well, the objections raise an issue with regard to,

21     at least in my mind, problematically, how the debtors went

22     about evaluating the provisions of the agreement that provide

23     that GM will have an allowed claim for the 50 percent of the

24     buy-out that it's funding.  And also the debtors' evaluation of

25     the provision that permits GM to assert, under the Master


23


1      Separation Agreement, the claim for taking on the IUE

2      liabilities in light of the apparent absence of a formal

3      indemnification agreement specifically addressing those

4      liabilities.  Are you reserving Mr. Resnick or someone else in

5      rebuttal to that point.

6           MR. BUTLER:  Your Honor, we actually believe that Mr.

7      Resnick's testimony addresses that question.

8           THE COURT:  Okay.

9        MR. BUTLER:  If Your Honor has questions, we can put Mr.

10   Resnick on the stand and walk through that.  I mean, our papers

11   can walk through the --

12        THE COURT:  Well, no -- I mean it's just -- it's just that

13   there's -- I may want to hear from him depending on what I hear

14   from the others, from the objectors about that analysis.  So

15   you can reserve him for rebuttal and that may be worthwhile.

16   Because I have just some questions about how the parties

17   actually interpret, at least, one provision of this agreement.

18        MR. BUTLER:  We'll be happy to do that, Your Honor.

19        THE COURT:  Okay.

20        MR. BUTLER:  So subject to the rebuttal case, Your Honor,

21   that would constitute the debtors' evidentiary record.

22        THE COURT:  Okay.

23        MR. BUTLER:  Does any of the other parties have any

24   evidence they want to offer?

25        MR. KESSLER:  Your Honor, the committee does not have any


                                    24


1   direct evidence to offer.

2        THE COURT:  Okay.  All right.

3        MR. BUTLER:  Does any of the objectors have anything to

4   offer to the record?

5        MR. KENNEDY:  Other than the documents that have already

6   been put into evidence in the exhibit binders, no.

7        THE COURT:  All right.

8        MR. KURTZ:  The ad hoc committee of equity holders have no

9   evidence to offer.

10        THE COURT:  Okay.

11        MR. BUTLER:  Your Honor, in support of our case, I'm going

12   to rely principally on the omnibus reply that we filed.  I'm

13   not going to -- I know, Your Honor, reads these things.  I'm

14   not going to repeat all the arguments in there.  We're here

15   today on the IUE program, at this point in the case.  Because

16   there were a series of events that led us not to be able to get

17   this done at the time that the UAW program was or a meeting

18   with them, thereafter.  And when we were lined up to complete

19   it at the time we were finishing up for the summaries of the

20   1113 and 1114 cases, as you know, Mr. Reichert passed

21   tragically and that delayed everything.  We are now in a

22   position to move forward on this.  It involves somewhere in the

23   neighborhood of our hourly workers.

24       With respect to the debtors' transformation plans, it's

25   extremely important that we are able to get this second program

25

1   approved and implemented.  The vast majority, the super

2   majority of our hourly workers are represented either by the

3   UAW or the IUE-CWA.  And as I believe has been publicly

4   reported, the IUE attrition program to date, has a take rate

5   subject to people being able to revoke their elections of some

6   12,699 individuals having voluntarily elected an option under

7   that program to take away somewhere north of around 87 percent,

8   involves a total population of 21,737 members of the UAW who

9   work at Delphi.  Leaving about 8,600 employees to be addressed

10   in, at least, one element of our labor transformation.

11       As Your Honor recalls, there are really three things that

12   we need to be able to do in our labor transformation.  We need

13   to account for the work force that's here and determine whether

14   they will, as an individual, be transformed.  Or whether they

15   will elect options to leave the systems and be replaced by

16   other workers to the extent we need additional workers.

17   Whether we need to replace those workers at a different

18   economic level, in terms of the economic compensation paid to

19    them.  We have, also, the need to bring the economics,

20    generally, in line with competitive realities faced by Delphi

21    Corporation out in the global economy inherent in the United

22    States.  And third, we need to be able to resolve our -- the

23    other provisions of our collective bargaining agreements that

24    are also non-competitive, but are not necessarily relating to

25    the base wage or to the number workers that we have.  But we


26


1    also have to address, and that includes, making sure those

2    agreements are competitive in the new reality of our footprint

3    going forward.

4        The UAW program, to date, clearly has addressed in an

5    important measure, but certainly not in a complete measure, how

6    to deal with the first element of those three items.  And the

7    additional program here today, for the UAW, the expansion of

8    the pre-retirement program to include the 26th year as an

9    additional option, we were very mindful, this is not an

10    amendment to the prior program.  It does not change anything in

11    the prior order.  This is an additional option that would be

12    approved under this program.  And also, the buyout

13    arrangements, which would allow us to have people take a buyout

14    and waive their claims with respect any other invested pension,

15    is an important element addressing the remainder of the 8,600

16    or so employees of the UAW that we believe need an expanded

17    menu of options to make as many of individual judgments as are

18    possible, before we get involved in the issue of mandatory

19    transformation, which is an issue we're going to need to

20    address at some point in this reorganization.  And, in

21    addition, obviously, flow backs in dealing with sales and wind

22    down and the residual population are important elements.  But

23    the debtors' believe that it's extremely important as a labor

24    matter to be able to address these buyout issues and continue

25    to create opportunities for the residual population of the

27

1    21,737, those remaining here, to be able to elect a

2    voluntarily -- options that would be appropriate to them.

3        That motivation, the motivation number 1, of moving

4    forward with the UAW, and we'll address that more in chamber's

5    conference later.  And second, of dealing with our second

6    largest union, the IUE-CWA, and allowing them to, sort of,

7    catch up.  Because they are now a month or two behind where we

8    thought they should be, in parallel with the UAW, is extremely

9    important to the reorganization towards the timetable that has

10    been laid out towards trying to make substantial progress prior

11    to coming back here on August 11th to resume, if necessary, the

12    Section 1113, 1114 case.  And there is a significant amount of

13    concern in our employee population about the unavailability of

14    these options.  And we'll address what the implications are for

15    the USW and for the splinter unions in the chambers conference

16    and what the progress is in those areas.

17        And so looking first at the UAW supplement, and these two

18    additional options.  I don't think that at the end of the day,

19    that anyone is disputing the pre-retirement option for the 26th

20    year, we fund it.  GM is not involved in that.  I don't think

21    that's a particular issue to anybody.

22        The other option is the buyout option.  And, again, Mr.

23    Resnick is available to the Court to answer any questions the

24    Court has on this.  But, the debtors concluded, that it was in

25    the debtors' business judgment to make these payments, either

28

1    140 thousand or seventy thousand or forty thousand depending

2    upon classification and seniority of years of credit and

3    service.   In order for people to give waivers to the estate and

4    walk away with everything other than divested pension, we think

5    that's important.   There's a price tag with that.

6         How do the debtors finance that, was the question.   The

7    debtors have, really, several options.   The debtors could

8    borrow again their DIP to finance it.   The debtors can use

9    liquidity they have in their post-petition estates to do it.

10   Or the debtors could try to find a more economic manner in

11   addressing those issues, than they otherwise would.   And just

12   to make the point, had the debtors chosen to simply fund all

13   this, essentially as a post-petition claim or a post-petition

14   set of payments, these objections, obviously, fall away in that

15   circumstance.   But it doesn't make particularly good business

16   judgment for the debtors to do that.   That means using 125,

17   150, 200 million dollars, depending on your estimation of tape

18   rate of incremental liquidity of the estate.   Now, both from a

19   cash perspective, and ultimately from an overall value

20   perspective and a funded thing entirely just as we did the pre-

21   retirement program.   And what we're able to -- and by the way,

22   had we chosen to do that, all of the things that the objectors

23   are concerned about in terms of, so called, incidental benefits

24   to General Motors, because someone who retires and waives OPEB,

25   walks away with his OPEB, obviously, if the benefit guaranty's


                                   29


1    triggered some time in the future, those people won't be there

2    claiming against that guaranty.   So there's some incidental

3    benefit that General Motor's doesn't mind.   If we funded it all

4    entirely ourselves, same thing is true.

5        That makes the program no more objectionable, no less

6    objectionable from their perspective than it now, expect they

7    wouldn't object under those circumstances.  What they object to

8    is that the debtors, in trying to approach this from the most

9    economic perspective, were able to get another entity to pay

10   half of this obligation.  And not take, as Your Honor pointed

11   out in the earlier hearing, an administrative claim for that.

12   Most people who pay money to the estate, post-petition, get an

13   administrative claim.  They chose not to.  We were able to

14   negotiate with them an allowed pre-petition claim for that at

15   the Delphi Corporation level, for all the reasons we described.

16   The debtors believe that's the appropriate level for it to be

17   at, in connection with that.  And, ultimately, that means they

18   take whatever the payment  back -- they take in whatever

19   currency and whatever terms all the unsecured creditors do.

20   Which essentially means, from a  stand point on an unsecured

21   creditor, we've been successful in taking a claim that what to

22   be senior and therefore dilutive of whatever the recovery is to

23   unsecured creditors.  And we have made it pari passu with all

24   unsecured creditors.

25       Now, that doesn't help, I guess the equity holders.


                                            30


1    Because it comes, in every respect, ahead of the equity

2    holders.  But, you know, the equity holders position in this

3    case has been, they're in the money.  It's yet to be chosen.

4    But, if they're in the money, than the hundreds of dollars,

5    whether its paid as the unsecured creditors' payment or paid as

6    a DIP loan, really should be immaterial to them.  What's

7    happened, instead, here, and that's the essence of this

8    evaluation, how should -- with respect to the UAW program, how

9    should the debtors most economically fund this program in the

10    best interest of the estate.  And from a business judgment

11    perspective, the debtors believe -- and I think believe quite

12    strongly, that it has to be right from an economic analysis,

13    that a pre-petition unsecured claim is better than a post-

14    petition administrative claim.  If you presume that you're

15    going to do the program under either circumstance.  And

16    nobody's objecting to the program.  The oddity of this is, that

17    everybody wants this transformation process to occur.

18    Everybody wants this to be transformed voluntarily, if its

19    possible.  And everyone seems to recognize, no matter what

20    they're priority on the pre-petition capital structure, that

21    labor transformation is incremental to value here.  That's

22    there's value that is going to either be maintained or created

23    by a successful labor transformation in this case.  So, on that

24    level, I don't think the analysis is much more detailed than

25    that.  Your Honor, could always deny the relief with respect to


                                    31


1    General Motors, on that particular issue.  In which case, the

2    program gets implemented by us funding the entire amount from

3    the estate as a post-petition matter.  That simply, to us, is

4    bad business.  And we think that ought not be something that we

5    are required to do.  And that claim, which is being created

6    from an entirely new accommodation, in our view, does not

7    effect, in any way, any of the other claims issues in this case

8    which have been preserved.  This is a simple trade.  What

9    compensation or consideration do you give for someone giving

10    you new money to pay a new program that makes imminent business

11    sense to implement and implement now.

12         With respect to the second issue, which is the check-the-

13    box issue.  And the debtors recognize there's not a specific

14    indemnity agreement here.  If Your Honor remembers, under the

15   last program there were three channels.  The three channels

16   were the Master Separation Agreement, the separate -- so

17   called, Covenant Agreement, which was the indemnity related to

18   the benefit guaranty.  And there was the Employee Matters

19   Agreement which deals with the fact that there was flow backs

20   to General Motors.  There are no flow backs with the IUE, so

21   there's no employee matters agreement.  There is no separate

22   indemnity agreement.  There is the Master Separation Agreement.

23   That channel, one of the three channels, still exist here.  The

24   words that surround the check-the-box arrangement here, with

25   one exception I'll talk about in a minute.  The basic words and

32

1    the preservation of rights are identical to what was approved

2    in the last program.  The words are identical, the relief is

3    identical.  Again, the arrangement is that General Motors can

4    assert a claim.  When they assert the claim, everybody is free

5    to object to it.  Not to be able to assert the claim, because

6    the check-the-box  program, just like the last program, is a

7    new program.  So it would be very difficult to argue, if you

8    didn't say, well, gee, you can't argue the check-the-box isn't

9    assertable under the program, you know, then everyone would

10   have it -- you know, it would be an out-of-box objection, just

11   like it was last time.  We've created this check-the-box

12   arrangement, it wasn't contemplated by any of the pre-petition

13   documents, we acknowledge that, that was true in the last

14   program.  The check-the-box is a new opportunity.  We know, by

15   the way, it was an important opportunity.  Well, Judge, all but

16   five, of the nearly 13,000 employees, who elected under the

17   attrition program with the UAW, checked the box.  All but five

18   decided they would rather retire on GM's balance sheet than on

19   ours.  And so the importance of that check-the-box program,

20    particularly to the IUE and CWA, which has no flow-backs, a no

21    flow-back rights or any other right to be able to move to GM,

22    the opportunity to retire on the GM balance sheet was extremely

23    important in order to be able to collectively bargain this

24    attrition program.

25        And so, what mechanics do we put in place.  We told

33

1    General Motors that we were not going to give them a new claim

2    for it.  We told General Motors we were weren't going to let

3    them sign -- we set up a new document.  General Motors, by the

4    way, without going into settlement discussions, in great

5    detail, General Motors wanted us to sign a separate financing

6    agreement for that obligation and create a new set of documents

7    under which they would be able to assert a claim.  We said no.

8    We were not going to create a new conduit or new channel for

9    them to assert the claim.  What we were prepared to do was look

10    to the only agreement, the pre-petition agreement, that was

11    arguable applicable to this type of arrangement, which was the

12    Master Separation Agreement.  And they would need to run the

13    same obstacle course.  For this, they're running under the

14    prior programs.  And, Your Honor, all of the rights to claim

15    all the things that the committees and others may want to claim

16    at some point in time have been preserved.  And the -- if

17    there's a claim down the line for any of those issues, without

18    trying to go through a laundry list of what they might be, the

19    fact is those claims have been specifically preserved.  As to

20    the debtors, and this was the one exception, and this is

21    different from the UAW program.

22        The debtors agree that when it came time for that

23    objection process to occur, the debtors would limit their

24    objection to what the debtors view is the central issue in the

25    case surrounding OPEB.  Which is what the economic value of

34

1    what that claim is.  So the debtors have said, we would limit

2    our objection to the economic valuation issue.  We were not

3    prepared to accept -- and Your Honor's heard this in the equity

4    committee litigation, in the prior litigation on attrition

5    programs, in the 1113, 1114 litigation and elsewhere, the

6    principal issues raised by the stake holders, is that the value

7    in a claims allowance basis, the value of an OPEB claim in

8    claims administration, is different than the value of an OPEB

9    claim on a balance sheet in accordance with accounting

10    standards.  That issue, the debtors have reserved fully for the

11    debtors to litigate.  While anyone else wants to file an

12    objection, but we have reserved that right to ourselves to

13    continue to litigate.  And we don't believe anyone else --

14    there needs to be a delegation of authority to others to

15    litigate.  That's all, we think premature, as our papers say.

16    But we reserve that right.  And, Your Honor, we believe that

17    that option, the option to assert a claim, not get a claim,

18    there's no allowance here, there's no agreement about OPEB

19    here, just the right to assert a claim subject to everybody's

20    ability to argue it, we believe preserves the same kind of

21    benefits as occurred previously.

22         THE COURT:  Okay.  Let me explore that for a second.

23    First of all, there's no flow back agreement between the IUE

24    and GM?

25         MR. BUTLER:  Correct.

35

1         THE COURT:  There is a benefit guaranty?

2          MR. BUTLER:  Correct.

3          THE COURT:  What does GM's agreement in this aspect of the

4    IUE-CWA attrition program add, in the nature of a flow back, to

5    the benefit guaranty?

6          MR. BUTLER:  I don't know that it adds -- the flow back

7    and the benefit guaranty are sort of two different concepts.

8    What this agreement does is allow people to now, if they want

9    to leave the system now, it allows them to retire now on the

10   balance sheet of General Motors.  And it requires them, by the

11   way, to take, subject to whatever General Motors is paying

12   their retirees.

13         THE COURT:  But my question -- I acknowledge it was

14   somewhat difficult to answer, because it was not well-phrased

15   is in the benefitsguaranty, the IUE employees would not be

16   able, simply to say, you have to pay my benefits now to GM,

17   right?

18         MR. BUTLER:  Well neither can anybody -- let me go with

19   that.  Let me walk through that, I think I understand the crux

20   of your question.  Right now, as we sit here today, no employee

21   at Delphi can look to GM and say pay my benefits.  The only way

22   that will ever happen is that either GM agrees voluntarily to

23   permit it to happen, which is what the check-the-box programs

24   are, all new.  All new programs that have been created post-

25   petition.  Or the benefit guaranty would have to be triggered


                                36


1    under its terms.  And that would occur, with respect to

2    presumably the 1113, 1114 process.  Because General Motors has

3    taken the position, which is a colorable argument, that the

4    unions are estopped from voluntarily modifying anything that

5    Delphi that is subject to the guaranty because that would

6    viciate the guaranty.  So, to the extent that the unions would

7    try to say, let's -- you and we, Delphi and unions, we agree to

8    collectively bargain something that would arguably cause there

9    to be a shortfall under some benefit, that could flow back

10   through the guaranty.  General Motor's position is, not so fast

11   that would viciate the guaranty it won't be available.

12        THE COURT:  Okay.  Now those arguments in respect of the

13   benefit guaranty apply to the extent they're correct, they're

14   by equally to the UAW and the IUE, because they both have a

15   benefit guaranty.

16        MR. BUTLER:  Correct.  And the USW.

17        THE COURT:  And the USW.  Now, however, the UAW also has a

18   flow back agreement and the IUE doesn't.

19        MR. BUTLER:  Correct.

20        THE COURT:  Does the agreement of GM under this program,

21   involving the IUE, give the IUE the benefits of a -- and

22   consequently the debtors too--benefits of a flow back, separate

23   and apart from the benefit guaranty?

24        MR. BUTLER:  No, Your Honor, not in my opinion.  Flow

25   back, actually allows a -- would allow, for example, the UAW --

37

1    a flow back from Delphi to General Motors from a supplier to a

2    OEM, actually would allow somebody to flow back and not have

3    their wages transformed.  Right.  They actually flow back and

4    they work.

5        THE COURT:  This doesn't apply to that.

6        MR. BUTLER:  No.  Not at all.

7        THE COURT:  So the absence of a flow back agreement is

8    really, is kind of irrelevant to this particular motion then?

9        MR. BUTLER:  Other than -- I don't think it's irrelevant,

10   Your Honor.  The absence of the ability to be able to address

11   the labor issues here, for the IUE not being able to flow their

12    -- some of their union members back to General Motors, which is

13    an option the UAW had.

14          THE COURT:  Right.

15          MR. BUTLER:  Okay.  The lack of that optionality, if you

16    will, makes the issue of labor transformation to the IUE say

17    that, in their view, much more difficult.

18          THE COURT:  Well, I agree with that.  I'm focusing on the

19    GM issue, since that's where the objections, basically,  with

20    the exception of the issue of, you know, which debtor should be

21    paying for this, the objections focus on the GM claim issues.

22    And in that respect, I think, flow back is irrelevant.

23    Although, obviously, it's really important--its absence is a

24    very important factor for the IUE.  Okay.  Now turning to the

25    provision which, as I read it, is in the same language, or

                              38

1    formulation as the prior order, it says, that -- of the

2    proposed order it says that GM will have a claim that may be

3    asserted or assertable under the Master Separation Agreement.

4    This is kind of de ja vu all over again, but I just want to

5    explore for a moment what that means, the word ôassertable,ö or

6    ômay assert.ö  Particularly given all of the reservations of

7    rights that the various committees and  other parties in

8    interest, other than the debtor, have to object on any basis.

9    I think you mentioned before, in your remarks, that arguably

10    the provision -- the indemnification provision in Article 5 of

11    the MSA, could cover this, and clearly the creditors' committee

12    and the other objectors want to argue that it wouldn't cover

13    it, that this wouldn't fall under the definition of ôDelphi

14    Liabilities,ö which is the defined term that's covered by the

15    MSA indemnity.  And you used the phrase, as you did in the last

16    hearing, that what this agreement does is ôchannel GM's claim,ö

17    in connection with this check-the-box program to this

18    particular indemnification agreement.  If, under this

19    agreement, the creditors' committee wants to contend that it's

20    nevertheless, in the terms of its agreement, not ôa liability

21    that relates to, or arises out of, or in connection with the

22    Delphi Assetsö or fits any of the other provisions of ôDelphi

23    Liabilities,ö are they still free to do so?

24        MR. BUTLER:  Your Honor, as we I think we -- my view of

25    that is, they have a limitation there.  And the limitation that

39

1    they have, in that circumstance, is they can't make the sort of

2    the -- what I would consider the circular argument, that

3    because we did this post-petition under this program, it

4    clearly couldn't have been asserted.  They would have to take

5    it as a claim assertable -- as -- and assert it at the time of

6    that agreement.  So they would have to be able -- General

7    Motors has the right to say, look, you can't nail me because I

8    agreed to do this voluntarily.  I agreed to do this check-the-

9    box voluntarily, post-petition.  You can't, by virtue of that

10    alone, say that I can't claim under this agreement.  So its

11    assertable there, but all of the defenses that would exist with

12    respect to that claim coming into that channel, the obstacle

13    course, so to speak, would remain.  So for example, most of the

14    things, I don't want to discus them here because they've been

15    discussed with us in confidence.  But most of the claims that I

16    have heard analyzed by the statutory committees and by the

17    creditors' committee go to much more significant issues

18    relating to conduct and other kinds of theories under the

19    bankruptcy code.  But they would not be able to -- just like

20    the UAW program, you've already approved, they would not be

21    able to say that this is not allowable, because the mere

22    assertion of it as a post-petition matter is barred.  It's

23    identical to the last program.

24          THE COURT:  Okay.

25          MR. BUTLER:  Mr. Kessler apparently wants to help me, from


40


1    General Motors.

2          THE COURT:  All right.

3          MR. KESSLER:  Your Honor, I don't disagree with anything

4    Mr. Butler's saying.  I think I would articulate it a little

5    differently.  General Motor's understanding, and our agreement

6    is, that no one can object that our claim falls under the scope

7    of the indemnity provision of the Master Separation Agreement.

8    It is assertable under, comprehended by, deemed to exist under,

9    and they can't say that the language of the indemnity versus

10   what GM is doing don't fit.  They're free to attack the Master

11   Separation Agreements and say it was a fraudulent -- it's

12   avoidable as a fraudulent conveyance.  They're free to attempt

13   to subordinate the claim under subordination theories, but they

14   are not allowed to object to the claim as a claim that falls

15   under the language, comprehended by the indemnity.

16         MR. BUTLER:  Just to be clear, they're free to use any

17   provision of the bankruptcy code they want to assert that

18   General Motors should not receive a claim, correct?

19         MR. KESSLER:  Other than that it --

20         MR. BUTLER:  That's not the bankruptcy claim.  I'm asking

21   --

22         MR. KESSLER:  Yes.  Yes.  I'm in agreement with what

23   you're saying.

24         THE COURT:  Okay.  In other words, if for some reason this

25   claim wouldn't be in respect of a payment on account of a

41

1    ôDelphi Liability,ö which is the defined term that triggers the

2    indemnity, then, nevertheless, it'll be deemed to be a ôDelphi

3    Liability.ö

4        MR. BUTLER:  Yes.  Just like the prior program, the same

5    arrangement.

6        THE COURT:  Okay.

7        MR. KESSLER:  To say it more simply, I would say no one's

8    objection should be allowed on the grounds that Delphi did not

9    indemnify for this.  I'm not arguing that Delphi had an

10    agreement that allows us to make a claim as Delphi indemnified

11    the release.

12        THE COURT:  Okay.  All right, now, of course, the

13    committee says the difference is that with the UAW program

14    there were specific agreements that covered it and here they

15    take the view that -- notwithstanding the benefit guaranty--GM

16    would not have a right to claim over, either on a common law

17    basis or under the basis of any agreement.

18        MR. BUTLER:  Let's explore that.  The committee's

19    position, as I understand it, is that the covenant -- remember

20    there were three channels the last time.  One of those channels

21    was the MSA, same agreement.  The flow back agreement which you

22    said was not relevant to the IUE.  And then there was the

23    indemnity agreement, the covenant agreement, which was specific

24    to the benefit guaranty.  I think it's fair to say that the

25    creditors' committee view was that, is now and will ever be,


42

1    that the indemnity agreement that was related to the benefit

2    guaranty is a absolute fraudulent transfer.  That it was

3    entered into -- and that this bankruptcy case was filed five

4    years and ten months following the execution of that, and

5    that's it's a fraudulent transfer.  And they believe that.

6    Whether that's true or not, whether you only determine that, it

7    would be the case.  But if that were true, just follow the

8    logic train, if that was true than the only -- and it's not --

9    this is not really a flow back matter, although, GM is free to

10   try and wiggle into the flow back channel if they choose to,

11   under the UAW one, and they can make that claim.  And we can

12   all have -- including the debtors, can have our issues with

13   that, than the only avenue, if you follow the logic of the

14   committee, the creditors' committee, as they thought about the

15   UAW program, the only channel was the MS.  The same place we

16   are today.  So that the fact that the last hearing had a

17   channel that -- an additional channel that the creditors'

18   committee thought was a fraudulent transfer and not a channel

19   at all, ought not change the logic about why the MSR is

20   available this time as it was last year.  You know, Your

21   Honor -- and I'll tell you, this is an example and we're going

22   to have many others, I think, during this case, as we try to

23   move towards reorganization, in which the debtor is trying to

24   get all sides to come to a common place on something that's

25   good for the estate, good for business enterprise value, good


                                    43


1    for the reorganization.  And the problem is just as

2    vociferously as, you know, you mentioned the word claim and GM

3    in the same sentence.  Everybody on the left-hand side of the

4    room, you know, goes almost, I think you said in our papers

5    fanatical, they would say not fanatical, just being

6    responsible, would be their view.  On the other side of the

7    table, we have General Motors telling us, you mean, you want us

 8    to do the same check-the-box arrangement.  We had three claims

 9    channels before in the optionality of that, you want us to

10    stick us into the master separation agreement alone with no

11    other way of getting there, under the same rules and conditions

12    as you did in the UAW.  Because as Your Honor points out, the

13    words are the same.  You know, and he wants to have -- it's all

14    or nothing.  We either get through that channel, obstacle

15    course or we don't.  And they said -- General Motors said to

16    us, that's not acceptable to us, we want you to crate a new

17    channel and they gave us the documentation for it, and we said

18    no, we won't do that.  And so, Your Honor, we're trying to stay

19    faithful to the construct that we brought to this Court in

20    connection with the UAW program, the construct that you

21    approved, and the construct that is intended to allow us to

22    move forward in a manner which, on the merits of the actual

23    motion, nobody contests is in the best interest of the estate

24    as it relates to labor transformation acts.

25         THE COURT:  Okay.  Let's go back to the buyout for a


44


 1    moment.  Which, I would say, applies to both the UAW and the

 2    IUE.  As I take it, the -- other than suggesting that the

 3    debtors should have done a better job in negotiating with GM--

 4    the objectors are saying that its not a binary choice, it's not

 5    either buyout, on the one hand, or nothing.  That there's some

 6    way that the debtors, in essence, could force GM to -- in order

 7    to channel GM, into honoring its benefits guaranty.  At which

 8    point, they would have all their objections to the

 9    indemnification claim, because ultimately the argument is --

10    what their opposing is the allowed claim for the buyout when

11    what they're putting up against that is an indemnification

12    claim.  Of course, that assumes that you have channeled this

13    process through the benefit guaranty as opposed to doing it as

14    part of the buyout.  So, I guess, the issue is, did the debtors

15    consider some sort of alternative to doing the buyout that

16    would have gotten approximately the same results but had a

17    claim over that would not be allowed and would be subject,

18    fully, to objections.

19        MR. BUTLER:  Your Honor, we explored a lot of

20    alternatives.  The first one was just to have General Motors

21    fund it as it did the thirty-five thousand dollar incentive

22    payment for attrition, and not get anything.  And General

23    Motors agreed to do that, by the way, in the IUE-CWA program.

24    You notice this program has yet another very extensive set of

25    payments by General Motors, thirty-five thousand times upped


45


1    it, plus, their shares are being worked out of taxes and other

2    things, up to times eight, potentially, eight thousand people.

3    That number which can be in the hundreds of millions of

4    dollars, if you figure the total number out, I'm not sure of

5    how the exact math works.  But that number they're already

6    putting out.  And remember, as I said last time, with respect

7    to that number, they're reserving that to a comprehensive

8    settlement saying we're going to come back and try to get that

9    back from you, Delphi.  But if we never reach another deal with

10    them, they have no claim against the estate with respect to

11    those numbers.

12        THE COURT:  Right.  No one's objecting to that.

13        MR. BUTLER:  I -- of course they aren't, Your Honor.  Nor

14    does anyone want to say, gee, that's a valuable part of the

15    program.  And, you know, it's -- and that certainly, you know,

16    I can understand that, you know -- and I understand the basis

17    argument of the stake holders is gee, General Motors is

18  responsible for everything that ever went wrong at Delphi and,

19  therefore, they should pay everything and not get a claim back.

20  I understand that argument, that's their home run win which

21  puts equity back in the money, they're not currently there.

22  The problem, of course, is that doesn't give any realistic

23  assessment of the value that General Motor's adds to this case.

24  And the answer, as I have said from the first day, the answer

25  to this conundrum, will at the end of the day, be consensually

46

1  negotiated.  And the answer will be in the middle somewhere.

2  Somewhere between that line.  And we did negotiate that, Your

3  Honor, with respect to General Motors.  And what we were able

4  to achieve, was with respect to us wanting to lay off some of

5  this liability, in terms of having it funded now which is good

6  for cash flow, which I think is undisputable.  And, which we

7  believe, ultimately, depending upon the currency and dividends

8  with respect to unsecured creditors provides a real additional

9  benefit to the estate such from a business judgment

10  perspective, I said before, and I think this still holds.  A

11  claim that's been effectively subordinated from administrative

12  to unsecured, has to be better unless to your question, there's

13  another way of doing it.  Now, in the objections, not one of

14  them proposes what that way is.  Nor under the case law, do

15  people get to sort of say, okay, let's just remove from the

16  negotiations a single provision of a comprehensive agreement

17  because that's not how they get negotiated, ultimately.  But

18  they don't offer that.  And the fact is, you had a specific

19  question.  Can the benefit guaranty be triggered by the debtors

20  unilaterally to create this channel over to the -- over to

21  the -- to General Motor's balance sheet.  And I will tell Your

22  Honor, I think the most affective way of doing that is exactly

23    what the debtors are doing in the 1113, 1114 process.  Should

24    we prevail on that then we will have channeled things over to

25    General Motors.  And they will have all the claims against the


47


1    estate that they may get and all the people could fight about

2    claims and we'll be right back here in the same discussion,

3    frankly, down the line if we're not able to consensually

4    resolve it at the bargaining table.  But ultimately -- because

5    I don't believe, and I may be wrong, but I don't believe that

6    the unions will voluntarily do anything to cause that

7    particular guaranty to be triggered -- attempt to be triggered

8    without General Motors participation.  Because of General

9    Motor's view, which I don't think -- whether they're right or

10    their wrong, whether there's a 1 percent risk or a 90 percent

11    risk, I don't believe the unions, at the end of the day -- our

12    experience has been that they're not going to take that risk

13    on.  And so there is -- you know, the only way to go -- to the

14    entire benefit guaranty.  But the way it gets triggered is

15    through having financial distress and through certain events

16    that occur.  All right, including us not paying on our benefit

17    obligations.  Your Honor and I both know under 1114 we have an

18    absolute obligation to pay these obligations unless and

19    until -- post-petition unless and until Your Honor modifies

20    them.  Right, we can't get out of Chapter 11 under 1129, unless

21    we are able to prove that we did that.  So from a retirement

22    benefits perspective how one is able to channel over to the

23    benefit guaranty without it being collectively bargained with

24    the unions and without an event occurring where we are

25    permissibly allowed under the law to stop paying, which


48

1   triggers the guaranty.  The only other way to do that, I think,

2   is through the 1113, 14 process which three of the four

3   objectors over here are opposed to, right?  We get -- that's

4   the Alice in Wonderland world I live in.  When I go to that tea

5   party these folks over there are saying don't do that either.

6   And ultimately, you know, we believe in the exercise of our

7   business judgment in trying to sort this out.  That when you

8   look at the buyouts -- buyouts are important, nobody in this

9   room is disputing that.  Buyouts are valuable to labor

10  transformation, nobody's disputing it.  Should we pay it all

11  for ourselves, fund it entirely from the post-petition estate,

12  which is economically worse to every stake holder if we do

13  that, or should we try to get GM to step in and fund part of it

14  and subordinate what would otherwise be an administrative

15  claim.  I would submit, Your Honor, the debtors' business

16  judgment here, you know, far surpasses any 363 standard we

17  would have to deal with.

18      THE COURT:  Okay.  Thank you.

19      MR. KENNEDY:  Your Honor, Tom Kennedy, for the IUE.  Since

20  the IUE's name was mentioned.  I thought I would stand to

21  answer any questions the Court might have.  I think, though it

22  surprises me to say this, Mr. Butler pretty accurately

23  represented the circumstances.

24      THE COURT:  For now we're not at the tea party.

25      MR. KENNEDY:  I'm not at the tea party.  We all shift our


49


1   sides in this particular scrum, Your Honor.  But there's a

2   couple of things that I did want to emphasize.  The check-the-

3   box opportunity for IUE-CWA employees was an incredibly

4   important part of reaching a consensual agreement that we

5    anticipate that our membership will be supportive of.

6    Remembering that, as opposed to other issues in a bankruptcy

7    proceeding, this is not simply a dollars and cents issue.  It

8    is health care for retirees.  And the prospect of any

9    significance that that health care could be interrupted is one

10   of such a daunting nature to the unions that Mr. Butler is

11   certainly correct, that we much prefer and would not accept an

12   alternative to a certain transition of health care from Delphi,

13   in this case to those who check the box, to General Motors.  It

14   is true there's a General Motor's claim and a guaranty that we

15   fully intend to enforce, if and when, the prospect presents

16   itself.  But there are many possible slips between an assertion

17   of the guaranty and the actual provision of health care.  And

18   the check-the-box opportunity is a certain procedurally simple,

19   administratively definite opportunity for our members to

20   achieve a continuation of the healthcare and benefits that, I

21   hope I don't need to emphasize to the Court, as being

22   important.  It is necessary for General Motors to be a

23   participant in any negotiations that are going to be successful

24   in reorganizing this company.  In our negotiations, which were

25   unfortunately delayed, we participated fully with both General

50

1    Motors at times, with Delphi at times and with them together,

2    at times.  They made demands as to the form of the agreement

3    that included the language for the most part that had

4    previously been in the UAW order.  The agreement we have is

5    conditioned at paragraph 3(a), as attached to the moving

6    documents, is conditioned to finding the order acceptable to

7    IUE-CWA, Delphi and General Motors.  And given the

8    circumstances in which we are now in, in which this buyout

9    programs is being ruled out to the factories that IUE-CWA

10    represents, and the membership is in the process of signing up.

11    If, in fact, there's uncertainty about the approval of that

12    order or its implementation it will retard the effective

13    implementation of this program and, I believe, be a detriment

14    to the reorganization of this company.  The negotiations going

15    forward will be even more difficult than ones we just finished.

16    As we discussed the terms and conditions of employment that are

17    going to be applicable.

18        THE COURT:  You mean if this weren't approved, or if it

19    were delayed.

20        MR. KENNEDY:  If this weren't approved, Your Honor, it

21    would be a classic attempt to repair an omelet.  There's just

22    no way the parties could meet again and convince our

23    membership, in many different factors in many different states,

24    8,500 of them, that they should be confident that any program

25    we reach will be approved by this Court.  It would be difficult


51


1    and retard, I think, significantly and for a long time our

2    ability to reach a meaningful agreement.

3        THE COURT:  I guess implicit in that is, I guess -- well

4    you tell me--is the flip side of that also, implicit in what

5    you said -- would you confirm what Mr. Butler said that if this

6    is approved it would facilitate remaining negotiations under

7    1113 and 1114 because you'll arguably have had a smaller work

8    force and --

9        MR. KENNEDY:  Exactly, Your Honor.  I think I would even

10   go further than Mr. Butler.  The nature of those discussions

11   are going to be dramatically impacted by the take rate for the

12   program that we have established.  We know the take rate in the

13   UAW factories.  We anticipate that it will be at least, as

14   good, if not better -- higher -- I don't know if the word

15    better is appropriate.   Higher, in any event, because of the

16    lack of flow back opportunities of IUE-CWE members into GM

17    plants.  So that we anticipate there will be a high take rate

18    which will give us a profile of our workforce that would make

19    much easier the opportunity to negotiate a going forward labor

20    agreement.  If we are uncertain as to those numbers, because

21    this program is delayed due to actions in this Court, but will

22    impede our ability reach a full agreement.

23        THE COURT:  Okay.

24        MR. KENNEDY:  The GM position needs to be present in a big

25    way in our subsequent discussions as well.  I think if the


52


1    repeated objections to these claim figures which -- or claim

2    processes, I guess I should say, which we don't believe are

3    well grounded, are entertained or accepted by the Court, I

4    think its going to be more difficult to bring General Motors to

5    the table in our subsequent negotiations as well.  And we fear

6    that in the course of the discussions over the claims, it

7    really should be put off to a different part of this

8    proceeding.  It will have an impact on General Motor's ability

9    or willingness to come forward and present funds if they're not

10    obligated to present.  And that, we would suggest to you, is a

11    reason to act, and act swiftly, with respect to these

12    objections.  That as I've said, we believe, are not well

13    grounded.  And I'll summarize it to a single point.  We could

14    have insisted rather than leave uncertain this order.  That

15    Delphi agreed to fund every aspect of this separation program.

16    We didn't, first, because we were happy to have General Motors

17    as part of the process because if goes well for their being

18    part of a continuing process that we need them there for.  And

19    secondly, because we understood, even as labor union people,

20    that if the less cash the debtor used to put this program into

21    operation the greater the likelihood that it will continue as a

22    functioning company, it will successfully reorganize and will

23    save as many jobs as possible.  So since this could have been

24    done by cash, for the objectors to contend that they've

25    materially been harmed by doing it in the manner in which it


53


1    has been done, simply doesn't pass our view of the common sense

2    test.  So, if the Court has no other questions, I'll end at

3    that point.

4          THE COURT:  No, that's okay.  Thank you.

5          MR. KENNEDY:  Sure.

6          MS. CECCOTTI:  Good morning, Your Honor.  Babette

7    Ceccotti, for the UAW.  We did file a short statement in

8    support of the motion in its entirety today.  And, other than

9    to make just a couple of points now, I'd like to just reserve

10   an opportunity to perhaps augment Mr. Butler's rebuttal once

11   the objector's arguments are finished.  Depending, again, on

12   the Court's questions.  The UAW views the supplement to the

13   program is critical and believes, in terms of the expanded

14   opportunities that it would provide, we think that the Court's

15   observations in reproving the last -- the initial program are

16   equally pertinent for the reasons that the Court observed in

17   April.  It's important to have the expanded incentive

18   opportunities and the supplement represents in the UAW's view,

19   a very important and constructive step forward in the framework

20   that the parties established and that the Court heard very much

21   about in the context of the 1113 process.  So we certainly rise

22   in support of the motion today.  And unless the Court has any

23   questions, we'll just simply wait and see if the objector's

24   comments cause me to rise again.

25          THE COURT:  Okay.  Thank you.  Anyone else in support of

54

1    the motion?  Okay.  I'll hear from the objectors then.

2          MR. SEIDER:  Your Honor, Mitchell Seider, Latham & Watkins

3    on behalf of the unsecured creditors' committee.  Your Honor,

4    because we understand this to be in the nature of final

5    argument, we would like to have an opportunity to hear Mr.

6    Resnick's testimony which Mr. Butler alluded to before making

7    final argument, if that will be acceptable to Your Honor.

8          THE COURT:  Well, it's up to him whether he wants to put

9    in any testimony.

10          MR. BUTLER:  I think, the Court said it may have

11    questions.  I thought what the record said was the Court said

12    he may have further questions of Mr. Resnick after he hears the

13    positions that the objections were taking.  Now I certainly --

14    I'll do whatever you want, Your Honor.  If the Court wants to

15    ask questions now --

16          THE COURT:  I mean, this is ultimately -- it seems to me

17    largely a legal analysis.  And he said it before, and usually I

18    confirm this.  Mr. Butler, you were involved in these

19    negotiations yourself, right?

20          MR. BUTLER:  Yes I was, Your Honor.  But, Your Honor, the

21    one thing I would ask when you say is, there certainly is a

22    legal analysis to be applied to the facts, but business

23    judgments factual based.

24          THE COURT:  I understand.

25          MR. BUTLER:  Your Honor, I know you do.  I just want to --

55

1          THE COURT:  I just -- I leave it up to you, but I gather -

2     - I don't think I need his testimony.

3          MR. BUTLER:  Okay.  Thank you, Your Honor.

4          MR. SEIDER:  Thank you, Your Honor.  Your Honor, the

5     debtors tell us that the approval of these programs will have a

6     number of beneficial effects on the estate.  We're told that

7     cash flow will improve, that head count will be reduced at a

8     number of the debtors' facilities, which the debtors have

9     deemed to be non-core facility.  That there will be a positive

10    impact on the debtors' ongoing labor negotiations.  And that

11    the programs will lead to a reduction in operating losses.

12    The committee certainly supports the debtor in its effort to

13    achieve all of these goals and the committee, Your Honor,

14    accepts the debtors' conclusion that the implementation of

15    these programs on the benefit side to the IUE and the UAW will

16    foster and assist the debtors in reaching those goals.  Where

17    the committee, Your Honor and the debtors have apart company,

18    is whether the debtors have in the words of Mr. Butler, chosen

19    the most rational and appropriately economic path for arriving

20    at that place.  Your Honor, there is a large record before you

21    that bears upon that question.  The debtors have not discussed

22    it in any detail with you.  We would like an opportunity to do

23    so.  I'd like to start, Your Honor, by talking about what GM

24    gives here and then turn to what GM takes in return.  As we see

25    it, Your Honor, there are three principal things that GM is


56


1     putting into this process.  First, it's putting in

2     approximately fifty-six million dollars on account of the

3     thirty-five thousand dollar payments to the eligible IUE

4     retirees who the debtors project will accept the early

5     retirement program.  Contrary to what Mr. Butler has said, we

6    will say that that is a valuable part of the program.  Your

7    Honor, the second piece is the allowed claim that arises from

8    GM's fifty cent on the dollar contribution to the buyout

9    program for those members of the IUE and the UAW who are not

10   eligible for the early retirement portion of the program.

11   Based again, Your Honor, on the debtors' testimony, I believe

12   it's Mr. Sheehan's declaration, that approximately 20 percent

13   of those eligible for this program are expected to participate.

14   That will provide GM with an allowed claim -- excuse me, Your

15   Honor, that will require a contribution of a 135 million

16   dollars which the debtors will treat as an allowed claim.  And

17   lastly --

18          THE COURT:  That covers both --

19          MR. SEIDER:  That's correct.

20          THE COURT:  -- UAW and IUE.

21          MR. SEIDER:  Yes, Your Honor.

22          THE COURT:  Right.

23          MR. SEIDER:  And then lastly, Your Honor, the third part

24   is GM's agreement to take on direct OPEB liability with respect

25   to those who check the box under the early retirement portion


                                   57


1    of the program.  Now, what does GM take in return for these

2    contributions?  It will of course, as Mr. Butler told us at the

3    hearings held in April, put on its plate for the final score

4    card at a final settlement what it is contributing towards the

5    thirty-five thousand dollar payment to the early retirees, the

6    fifty-six million dollars I mentioned a moment ago.  Your

7    Honor, GM will also get the allowed unsecured senior claim of a

8    135 million dollars.  I would like to stop there for a moment

9    before -- and not just brush by that the way in which, I think,

10   the debtors did.  That 135 million dollar claim, Your Honor,

11    has real value and it has real value today.  As the debtors'

12    stipulation indicated, Your Honor, or supports, Your Honor, an

13    allowed senior claim at Delphi Corp. now, in the form of the

14    notes, is bid at about eighty-two cents on the dollar --

15        THE COURT:  When you say "senior claim" you don't -- what

16    do you mean?

17        MR. SEIDER:  Senior are unsecured, Your Honor.

18        THE COURT:  But it's not, it's not senior to any other

19    unsecured claim?

20        MR. SEIDER:  No, it would be pari passu, as we understand

21    it, Your Honor, with those 6.55 percent notes that we had the

22    stipulation on that were bid at eighty-two and three quarter

23    cents as of the beginning of this week.

24        THE COURT:  Okay.

25        MR. SEIDER:  At eighty cents --

58

1        THE COURT:  Well -- no one has subordinated their claim to

2    it, right?

3        MR. SEIDER:  That is correct, Your Honor.

4        THE COURT:  Okay.

5        MR. SEIDER:  Right.  Now, at eighty cents, that 135

6    million dollar claim could be liquidated for about 108 million

7    dollars.  That comes back to GM on its claim and has to be

8    netted in the equation here.

9        Now, what else does GM get, Your Honor?  GM gets

10    insulation from very significant OPEB liabilities, albeit

11    contingent ones, on behalf of those who are projected to accept

12    the buyout.  Based upon the debtors' numbers that were provided

13    to us -- and that, Your Honor, is set forth at Exhibit 39, I

14    believe -- the pool for OPEB, or, excuse me, the OPEB liability

15    for those eligible for the buyouts totals approximately 900

16    million dollars.

17        Again, Your Honor, using the debtors' projected acceptance

18    rate in that pool of people of 20 percent, that's 180 million

19    dollars.  Because those employees, by virtue of taking the

20    buyout, will be walking away from all future OPEB claims, that

21    is a liability -- a contingent liability, but nevertheless a

22    180 million dollar liability that GM is relieved from

23        Your Honor, GM will also receive the ability to assert,

24    under the Master Separation Agreement, a claim for the OPEB of

25    those employees who check the box and choose retirement at GM,

59

1     by virtue of checking the box.  And there are two portions to

2     that, if you will, Your Honor.  One for the IUE, one for the

3     UAW.

4         With respect to the IUE, based upon the debtors'

5     projection -- and this is in the Rothschild numbers as well --

6     based on the debtors' projection that 75 percent of the six

7     hundred eligi -- excuse me, 75 percent of the eligible IUE

8     employees will check the box, that means that of the 600

9     million dollars in OPEB liability associated with that pool,

10    approximately 450 million of it will be available to GM in the

11    form of a claim under the Master Separation Agreement.

12        With respect to the UAW side of the check-the-box, now the

13    twenty-six year group, according to Mr. Sheehan's testimony in

14    deposition on Monday that -- there are 400 eligible UAW workers

15    in that twenty-six year group.  Again using the debtors'

16    projection that 75 percent of the pool will check the box, that

17    leaves 300 UAW workers electing that option.  Again using the

18    debtors' number -- and this is Mr. Sheehan's testimony -- of

19    approximately 200 thousand dollars in OPEB liability per

20    employee, that creates another sixty million dollars in claim

21   for GM under the Master Separation Agreement, leaving a total

22   claim, Your Honor, of approximately 510 million dollars under

23   the Master Separation Agreement.

24        Now, we are told, Your Honor, by the debtors that there is

25   no alternative that makes economic sense other than the

60

1   alternative which the debtors have chosen.  Your Honor we

2   think, however that there is an alternative, and we think that

3   it's a more economic one.

4        To go back to the amount of money that GM is putting into

5   this program, the 135 million for buyouts and the fifty-six

6   million for the thirty-five thousand dollar payments.  That

7   totals a contribution from GM of 191 million dollars.  Now, the

8   debtors have the ability, they have the liquidity and they have

9   the room on the DIP to borrow 191 million dollars, Your Honor.

10  There are enormous benefits that would flow to the estate by

11  avoiding GM's participation in this program and by -- through

12  the debtors instead, electing to borrow on the DIP or use

13  liquidity which they already have.

14        Among other things, Your Honor, we avoid transferring to

15  GM a certain value of approximately 108 million dollars through

16  the allowed claim for the buyout contribution.  We would

17  preclude GM from asserting a claim for up to 510 million

18  dollars on the basis of the OPEB liability for those who check

19  the box.

20        THE COURT:  Right, I'm sorry -- let me back -- I

21  understood your first point, I guess, but I didn't understand

22  your math.

23        MR. SEIDER:  On the OPEB?

24        THE COURT:  No, on the buyout.

25        MR. SEIDER:  On the 108?

61

1        THE COURT:  Yeah.

2        MR. SEIDER:  Yes, Your Honor.  Eighty percent of 135

3    million dollars is approximately 108 million dollars.

4        THE COURT:  Oh, okay.

5        MR. SEIDER:  Those claims that are now bid -- those claims

6    are now pari passu with the claim GM would have, are bid as of

7    Monday at eighty-two and three quarter cents.  Your Honor, the

8    final --

9        THE COURT:  But just let me explore that for a moment.

10   The debtors are out 135 million dollars more, right?

11       MR. SEIDER:  That's correct.

12       THE COURT:  And by doing the buyout, GM is still insulated

13   from the benefit guaranty, isn't it?

14       MR. SEIDER:  With respect to those that take the buyout it

15   is, that's correct.

16       THE COURT:  So why isn't it just a comparison of 135

17   million verses some percentage of 180?

18       MR. SEIDER:  Because, Your Honor, GM also can receive and

19   will receive a recovery on the OPEB claim that goes along as

20   part of this program.  And when you put that --

21       THE COURT:  No, but isn't that the 180?

22       MR. SEIDER:  Excuse me?

23       THE COURT:  Isn't that the 180?  Oh no, I'm sorry, you're

24   switching to OPEB, you're switching to OPEB?

25       MR. SEIDER:  Yes.  But it all goes together.

62

1        THE COURT:  All right, but okay, then turning to OPEB, how

2    do you borrow on the DIP to pay the OPEB?

3      MR. SEIDER:  Well let me address that, Your Honor.

4      THE COURT:  Okay.

5      MS. SEIDER:  You don't borrow on the DIP to pay the OPEB.

6      THE COURT:  Okay.

7      MR. SEIDER:  Because, as the OPEB exists on the debtors'

8  balance sheet today, the OPEB that would be transferred -- it

9  is an accounting obligation.  It is not a cash expense.  It

10  gets paid out over time.

11      Once the OPEB liability under this program transfers to GM

12  -- and I shouldn't say transfers, because there is no release

13  for the debtors.  Once GM undertakes, directly, the liability

14  for that OPEB, it can come back immediately and assert a claim.

15  And that claim, again, based on the value of Delphi Corp

16  general, unsecured claims, has real, current value, okay?  And,

17  again that's 510 million dollars of claim that can be

18  monetized.

19      THE COURT:  But -- you're kind of gliding over the

20  introductory clause to what you just said, which is "once GM

21  takes on the OPEB."  When are they going to do that?

22      MR. SEIDER:  I'm sorry?  I didn't hear you --

23      THE COURT:  Your logic assumes that GM has taken on the

24  OPEB.  When are they going to do that?

25      MR. SEIDER:  They are going to do that under this program.


63


1  Absent their participation in this program, they won't.  Once

2  they do, they have the claim.  If they don't, they don't

3  necessarily have the claim.

4      THE COURT:  So, in essence, you're asking me to play

5  chicken with them.

6      MR. SEIDER:  No, Your Honor.  We're not asking you to play

7  chicken.  We would be asking you to play chicken if the debtors

8    did not have more than enough room under the DIP to borrow the

9    additional 191 million dollars.  These programs can self-fund.

10    THE COURT:  Well, but unless you're saying that you're

11    going to take out the check-the-box aspect of this attrition

12    program, how can I assume that if the debtor is funding the

13    buyout that everything else in the program will flow along,

14    without GM getting some sort of right to some sort of claim?

15    MR. SEIDER:  Yes.  I understand your point, Your Honor.

16    Your Honor, first, as Mr. Sheehan testified, regardless of

17    whether this program is approved or not, Delphi still has

18    liability for the OPEB.  Under the benefit guaranty GM has

19    liability for the OPEB.  It's a current liability of GM.  The

20    benefit guaranty is there, and if the guaranty gets triggered,

21    it's liable.  So, Delphi's not getting released and GM's not

22    getting released regardless of whether the program is approved

23    or not.  It remains the same.

24    THE COURT:  Well, so you dispute Mr. Butler's assertion

25    that you can't put the OPEB to GM today?  You can't get the


64


1    equivalent or the near equivalent of the check-the-box option

2    today?

3    MR. SEIDER:  You can't -- I don't know that GM would agree

4    to the equivalent of the check-the-box option.  But what we're

5    saying, Your Honor, is Delphi is currently is paying OPEB.  The

6    benefit guaranty has not been triggered.  If the programs are

7    not approved, Delphi will continue to pay that OPEB, and if it

8    stops, the guarantee is still there.  And I do want to make

9    another point on that score, Your Honor.

10    THE COURT:  Well, is it -- well, let me understand this.

11    Isn't the difference -- you're saying there's no material

12    difference between the check-the-box aspect of this attrition

13    program and what Delphi's doing already?

14         MR. SEIDER:  From whose perspective, Your Honor?

15         THE COURT:  From either Delphi's or the unions?

16         MR. SEIDER:  Well, the employees, Your Honor, should

17    seamlessly continue to receive the OPEB benefits that they're

18    entitled to.  And if that's interrupted, the rights again will

19    be the same pre-program and post-program.  GM is there with the

20    program or without, and Delphi is there with the program or

21    without.

22         THE COURT:  But I want to go back to when I introduced

23    this, which is that the committee supports what the debtor is

24    doing in this program vis-a-vis the two unions, because of all

25    the reasons that Mr. Butler and you detailed.  The union, in


                                        65


1     this case it's just the union because -- I'm sorry -- the

2     twenty-six year group also has to check the box, so it's both

3     of the unions -- have said that that's a very critical element

4     of this program.  Are you saying it could be carved out of the

5     program and Delphi can achieve the same results?

6          MR. SEIDER:  Your Honor, I don't think that it can be

7     carved out of the program by you, but what we are saying is

8     that from an economic perspective, as I said a moment ago, the

9     liability remains.  It's there.  The protection of the guaranty

10    doesn't go away if this program is not approved as it's

11    currently constructed.  So from the perspective of the

12    employees, they have the same balance sheet to look to

13    regardless of whether the program is approved or not.

14         THE COURT:  Well, is there a benefit to the debtors, vis-

15    a-vis the unions, of having it in the agreement or not?

16         MR. SEIDER:  I don't know the answer to that, Your Honor.

17    We haven't heard it from -- I haven't heard it from the

18    debtors' witnesses.

19        THE COURT:  Okay.

20        MR. SEIDER:  Your Honor, the 510 million dollar claim that

21    goes from being an accounting liability on the debtors' books

22    to a cash liability in the form of a claim to GM, again has

23    significant cash value.  Eighty percent of 510 million dollars,

24    Your Honor, is about 408 million dollars.  If the program is

25    not approved, Your Honor, that 510 million dollars of

66

1    accounting expense on Delphi's books will not become

2    convertible into a claim with a value of 408 million dollars

3    and a claim of 510 million dollars which must be answered for

4    in a plan of reorganization.

5        Additionally,  Your Honor, by doing the attrition programs

6    without GM, Delphi would also avoid having to settle-up, if you

7    will, for the fifty-six million dollars represented by the

8    payments on the thirty-five thousand dollars at some future

9    point when a final deal is done between Delphi and GM, if one

10    is ever done.

11        Also, Your Honor, by not doing the programs as they've

12    been currently structured -- by doing them without GM, Your

13    honor, the estates would not be giving up any rights at all

14    vis-a-vis GM.

15        THE COURT:  But, again I come back to this. I could see

16    how you could do the buyouts without GM, although frankly, I

17    don't understand the math on that point.  But I don't see how

18    you could do the OPEB check-the-box program without GM?  That's

19    not what you really mean, is it?

20        MR. SEIDER:  No, it's not, Your Honor.

21        THE COURT:  Okay.

22        MR. SEIDER:  What we do mean is that OPEB benefits can

23    continue to flow seamlessly, and if there is an interruption

24    without doing the check-the-box program, the balance sheet to

25    which the employees can look are the exact same balance sheets

67

1    they can look to if we do the programs.

2         Now, with respect to the math on the buyouts, Your Honor,

3    yes, it's eight cents on the dollar, but this program, I think

4    as we've been told by the debtor or these programs rise and

5    fall as a whole.  And so, that math has to be factored into the

6    OPEB math as well.  And when we put it all together, and I'll

7    get there in a moment, Your Honor, from our perspective the

8    economics of doing the programs -- the buyout program -- and

9    not doing it the way that it's been structured with GM's

10   participation make good economic sense to the committee.

11        Your Honor, if these programs -- if the buyouts were done

12   without GM, it would require about another 191 million dollars

13   either in liquidity or DIP borrowing.  If it were done in that

14   way, however, the estates would be able to keep approximately

15   516 million dollars in current value, and would also retain

16   that 510 million dollars in accounting obligation for the OPEB

17   --

18        THE COURT:  But that's just an accounting basis, right?

19        MR. SEIDER:  No, it's not, Your Honor --

20        THE COURT:  I mean, they would still have the liability

21        MR. SEIDER:  Your Honor, it's not an accounting basis.

22   And here's why:  the 510 million dollars, Your Honor, gets paid

23   out over time, it is subject to being discounted back to a

24   present value because it's a future expense and, Your Honor,

25   the contract that gives rise to that claim is up for -- or

1    expires on its terms in September '07.  Now will the next

2    contract have OPEB at a dramatically lower rate?  I don't know.

3    Will it be a somewhat lower rate?  I don't know.  But based

4    upon what Your Honor has heard in this case, and it's not

5    unreasonable to presume that it's not going to be higher.  And

6    so, by the time we're done taking that 510 in current

7    accounting expense and converting into a cash equivalent so

8    that apples can be compared to apples, we've discounted it back

9    and we've also factored in something for the change that will

10   happen in future OPEB obligations, Your Honor, that resulting

11   number from that exercise is going to be a whole lot less then

12   the difference between the 516 million in value that goes to GM

13   through the program, less the 191 million dollars you have to

14   borrow additionally to get there.  Or, said another way, Your

15   Honor, that 510 in future OPEB expense on a current value basis

16   is going to be significantly less than the 325 million dollar

17   delta between the 516 and the 191.

18        THE COURT:  Well, let me explore that.  First of all, I

19   guess what you're saying, it seems, is that there would be no

20   further pursuit of the 1113, 1114 motion.  You just let the

21   contracts expire at the end of the year, right?

22        MR. SEIDER:  No, no, Your Honor, I was simply using that

23   as a --

24        THE COURT:  The year 2007.

25        MR. SEIDER:  -- fallback.  So if, for some reason the

69

1    process doesn't need a negotiated resolution or if, for some

2    reason, there's not a judicial decision by the time of

3    expiration, at a bare minimum we are left with the

4    renegotiation of the contract in '07.

5        Yes, there are likely to be intervening events between now

6    and then, either in the form of a settlement or in the form of

7    judicial action, but we think it is certainly more likely than

8    not that those intervening events will lead to not greater OPEB

9    packages in the future, but reduced OPEB packages in the

10   future, which, in turn, drives that 510 and retained accounting

11   expense down.

12       THE COURT:  Well wouldn't, in real dollars, the OPEB

13   guaranty still be called upon?

14       MR. SEIDER:  Yes, it would be.  And then the claim --

15   you're talking about the GM benefit guarantee, Your Honor?

16   Yes.  And then it comes back through the indemnity guaranty

17   subject to all the defenses and all of the infirmities that may

18   exist with respect to the indemnity guaranty.

19       THE COURT:  And, you believe there's no common-law right

20   of subrogation or contribution?

21       MR. SEIDER:  Your Honor, there may be.  And we're happy to

22   defend it.  We feel good about that one, Your Honor.

23       THE COURT:  Well I guess when you actually try to quantify

24   it, the claim itself, that is an accounting matter too.

25   Because the fact that it's trading at eighty-two cents on the


70


1    dollar today means nothing, right?  In terms of the actual

2    dollars that the debtor will spend?

3        MR. SEIDER:  It means more than nothing, Your Honor.

4        THE COURT:  No, no, in terms of the dollars out.  You're

5    comparing future dollars out under one scenario where this

6    arrangement's not approved and the debtor basically goes back

7    to the drawing board and pays 100 percent of the buyout plus

8    the thirty-five thousand dollar per person payments,  and then

9    just pays OPEB in the ordinary course, until something happens,

10    upon which -- when it will all be accelerated anyway, when that

11    thing happens, sometime between now and 2007.

12         MR. SEIDER:  Crystallized, if something happens, yes.

13         THE COURT:  All right.  Well. At the same time the

14    debtor's not paying out dollars today in respect of declaring

15    that GM is allowed to assert for OPEB.

16         MR. SEIDER:  That is true, Your Honor, but if the claim

17    can be liquidated, that is value that flows to GM, and it's

18    GM's --

19         THE COURT:  But as far as the debtors are concerned, that

20    doesn't mean anything.

21         MR. SEIDER:  It doesn't mean anything yet. But when the

22    purchaser or purchasers of the claim come back for treatment of

23    their allowed claim it will.  And yes, there will be --

24         THE COURT:  Listen.  Don't mix apples and oranges.  If

25    you're talking about present quantifiable benefits under two


                                      71


1    different scenarios, you should -- I'm looking at the debtors'

2    perspective, not GM's perspective.  It's -- either way it's pay

3    in the future, right?

4         MR. SEIDER:  It's paid through a plan, that's correct.

5         THE COURT:  Okay, so --

6         MR. SEIDER:  And how far in the future that is, we shall

7    see.

8         THE COURT:  Right.

9         MR. SEIDER:  But it's not five years or the life, for

10    instance, of a forty-five year old on a current mortality

11    table.

12         THE COURT:  But it -- but don't you think it's fair to

13    assume that there will be some crystallization of OPEB, which

https://vip21.veritextllc.com/myfiles/620041/120882.TXT

14    includes an invocation of the GM benefit guaranty at some point

15    in the relatively near future in this case, under either

16    scenario?

17         MR. SEIDER:  Yes, Your Honor.

18         THE COURT:  And, so therefore the only real difference is

19    the preservation of extra arguments to object to that claim,

20    right?

21         MR. SEIDER:  From the perspective of the debtors?

22         THE COURT:  Yes.

23         MR. SEIDER:  And the estates?

24         THE COURT:  Yes.

25         MR. SEIDER:  Yes, Your Honor.


                                        72


1          THE COURT:  Okay.  So what I'm really supposed to weigh

2     here is those arguments verses the benefits of having this

3     program, the whole program, today?

4          MR. SEIDER:  From the perspective of the debtors alone?

5          THE COURT:  And their estates, of course.

6          MR. SEIDER:  Well, we have a different perspective on

7     that, Your Honor, because we do factor in that OPEB liability

8     which will have to be dealt with at plan time.  We would much

9     prefer, from our perspective as creditors, to have 510 million

10    dollars of future OPEB expense, than having a 408 million

11    dollar senior -- excuse me, 510 million dollar general

12    unsecured claim at the Delphi Corp level.  Because the OPEB

13    future expense in current value is much less than the 510 in

14    current general unsecured claim.

15         THE COURT:  Either way it's a liability.

16         MR. SEIDER:  Sure it's a liability, Your Honor, but

17    liabilities are associated with value.  And I, on the other

18    side of the coin, would much rather collect on my 510 million

19    dollars at eighty cents on the dollar six months, a year from

20    now, than wait over the life of an OPEB payout for 510 which is

21    coming down anyway.

22        THE COURT:  And how long do you think the life of that

23    payout is going to be here?

24        MR. SEIDER:  Well, Your Honor, that depends on the

25    mortality tables.  The pool of people who create that have

73

1    twenty-six to thirty years in.  I don't know the --

2        THE COURT:  So you think this is going to be a twenty-six

3    or thirty year case?

4        MR. SEIDER:  No, no, no, Your Honor.  No, no, no, Your

5    Honor.

6        THE COURT:  No, I'm saying -- I'm being somewhat

7    facetious, but don't you think that the OPEB, including GM's

8    guaranty is going to be crystallized in this case, one way or

9    another?

10        MR. SEIDER:  Yes.

11        THE COURT:  So won't that give rise to a claim at that

12    point?

13        MR. SEIDER:  It will give rise to a claim, Your Honor,

14    that is subject to --

15        THE COURT:  And at that point people can value it at

16    eighty-two cents on the dollar, or fifteen cents on the dollar

17    if you --

18        MR. SEIDER:  Yes.

19        THE COURT:   -- believe that the union negotiations are

20    falling apart, contrary to the reports in the press that people

21    are reacting to right now, which is why they're willing to

22    spend eighty-two cents on the dollar?

23        MR. SEIDER:  Yes, Your Honor.  But let's compare the 510

24    on the one hand as a claim under the program and the 510 as a

25    crystallized liability under the GM benefit guaranty.

74

1         THE COURT:  Right.

2         MR. SEIDER:  Okay? Under the GM benefit guaranty, that

3    claim is subject to a number of defenses which are very

4    valuable and viable defenses from a legal standpoint, and is

5    subject to reduction to some extent -- as I think as Mr. Butler

6    alluded to in his argument on other grounds as well -- verses a

7    claim that is not subject to the same defenses and reductions.

8    And we think that those defenses, I think Your Honor alluded to

9    this a little while ago.  Those defenses have real value to us,

10   Your Honor.

11        THE COURT:  Well, there's the -- I understand two points,

12   maybe there's more that I'm not focusing on here.  The first

13   point is, of course that there's no direct benefit guaranty

14   indemnity for the IUE --

15        MR. SEIDER:  That's correct.

16        THE COURT:  -- obligation that GM has.

17        MR. SEIDER:  And no -- yes, no direct indemnity, that's

18   correct.

19        THE COURT:  The second point is that even with respect to

20   the UAW the 1999 direct indemnity may be more subject, although

21   not necessarily exclusively subject, than the MSA indemnity to

22   avoidance.

23        MR. SEIDER:  Yes, Your Honor.

24        THE COURT:  Although, you obviously are going to

25   preserving your rights on avoiding the MSA too.

75

1        MR. SEIDER:  Yes, Your Honor.  One additional difference,

2    if I might just interrupt for a second.  The MSA also, is with

3    multiple debtors.  The indemnity is just with Delphi Corp.

4        THE COURT:  I understand.  But Mr. Fox may like that fact.

5    So, is there something else?  I mean, are all the   other --

6    this is a genuine question, it's not a rhetorical question--how

7    else does making the claim ôassertableö again through the MSA

8    adversely affect the estates and conversely improve GM's

9    position?

10       MR. SEIDER:  GM has the liability under the benefit

11   guaranty.  If it came in, or tried to come in through the MSA

12   without the order that you've been asked to enter today, I

13   don't think that there would be more than a -- even a scintilla

14   of a chance that it would succeed on the face of the terms of

15   the MSA.  But that obviously doesn't conflict --

16       THE COURT:  But we covered that point, okay.

17       MR. SEIDER:  Yes.

18       THE COURT:  All right.  Okay.

19       MR. SEIDER:  All right, if I might just recap this very

20   quickly for Your Honor.  From our perspective, Your Honor, the

21   325 million dollars in cash that would be saved or value that

22   would be saved substantially outweighs the ongoing OPEB

23   liability that would be kept by these estates and still

24   shouldered by GM in the event the motion today were denied.  If

25   the Court is inclined to grant the motion it would like, Your


76


1    Honor, authority from the Court for the committee to assert the

2    defenses and other claims that the estates may have with

3    respect to any claims that come back through these programs, at

4    least to the extent that the debtors have agreed that they will

5    not, themselves, assert those defenses.  We are not asking for

6    authority any broader than that.  We simply want to be able to

7    play defense, Your Honor, with both hands, not with one tied

8    behind our backs.

9        THE COURT:  Well on that score I think that, ultimately

10   your request, as you've just limited it, may make sense and it

11   may be something you can negotiate consensually with the

12   debtors.  I think procedurally, particularly give some of the

13   pressure in some of the other circuits that STN and Commodore,

14   you know other circuits at least don't necessarily follow along

15   the lines of the Second Circuit law--it's better to do that by

16   separate motion or, preferably by a stipulation.

17       MR. SEIDER:  We certainly understand that, Your Honor.  We

18   merely raised it now because we thought that this was an

19   opportunity or, I should say, a point in time when we really

20   did need to be raised.

21       THE COURT:  Right, well, I think that given the schedule

22   that this case is under, it's something that you should just

23   discuss promptly with the debtor --

24       MR. SEIDER:  We will, Your Honor.

25       THE COURT:  -- and if something can't be resolved then,


77


1    you know, you can make a motion.

2        MR. SEIDER:  Thank you, Your Honor.

3        THE COURT:  Okay.

4        MS. STEINGART:  Good afternoon, Your Honor.  Bonnie

5    Steingart from Fried, Frank on behalf of the Official Committee

6    of Equity Holders.  I think that Your Honor appreciates what

7    the issues are.  The debtors' request and form of order now

8    relies on two assumptions.  One is that claims that have been

9    given to GM in connection with the program are assertable under

10   the Master Separation Agreement.  I think as the Creditors'

11    Committee has made clear, there are serious questions about

12    that.  There has been no evidence presented about what that

13    agreement is, what the terms of it were, what the other --

14         THE COURT:  I'm sorry, which agreement?

15         MS. STEINGART:  The Master Separation Agreement.

16         THE COURT:  It in the -- I mean, I have it.  It's in the

17    record of the Chapter 11 case, I've read it.  For purposes of

18    this hearing, I'll accept what you people say, which is that

19    there's a substantial issue as to whether, butfor the

20    provisions of this order the check-the-box payments would be

21    covered.  It may be something that GM would be able to convince

22    me otherwise about, but for purposes of this hearing I'll

23    accept that fact.

24         MS. STEINGART:  But in terms of that fact, Your Honor, you

25    know, you said that the debtor asked for expedited

78

1    consideration of these kinds of issues.  And to the extent that

2    the Court is being asked to construe agreements and hold that

3    substantial claims are covered by those agreements, it seems to

4    me that there should be a better evidentiary record on that.

5    And indeed, on that issue, the burden would clearly be on the

6    debtors, Your Honor.  And that's a burden that they're seeking

7    to sidestep by having the Court deem that these claims can be

8    under Master Separation Agreement.  The collateral --

9         THE COURT:  But I don't think that anyone's asserted that

10    it's just ice in winter.  I think they're up front about saying

11    that, in fact, there's a very strong likelihood that it

12    wouldn't be covered.

13         MS. STEINGART:  Right and indeed, that that is a fiction,

14    Your Honor.  And, to the extent that it's a fiction that

15    creates a mechanism for a pre-petition claim that can't be

16    attacked on a very substantial ground it should not exist, Your

17    Honor, especially because of the second assumption.

18        And the second assumption that pervades the papers of the

19    debtors in that the colloquy that Your Honor had with the

20    committee just makes clear as a fiction that somehow GM is

21    putting in new money.  I think that the Court understands, just

22    as all of us understand, and I'll quote from part of the

23    conversation that took place before, that "the crystallization

24    of GM's liability under the GM guaranty will occur in the near

25    term."


                                                            79


1        And indeed, this agreement today is being made so that GM

2    can reduce and can manage that liability, which, now that

3    Delphi is in bankruptcy, is certainly a substantial liability

4    and is no longer -- is almost no longer contingent because, as

5    this Court is aware, part of that discussion will be definitely

6    embedded in the 1113, 1114 process.

7        So the two fictions, really, that the claim is based on is

8    one, that somehow it arises under the Master Separation

9    Agreement, which we all agree is a fiction.  Okay, it's being

10   deemed, we're pretending.  And the other thing we're pretending

11   is that somehow there's new money here and if it wasn't on this

12   fiction, there would be an administrative claim.  I think that

13   there would have to be substantial proof, Your Honor, before

14   this Court can make a holding, before this Court could find as

15   a matter of fact and as a matter of law that what GM is putting

16   in, is new money.  There's certainly been no proof with respect

17   to that and there's been no proof that the real liability here

18   that GM is dealing with is its own.

19       And the only issue this raises, Your Honor, is the claim.

20   The only issue that we care about is being able to question the

21    claim.  Now there are two things that Mr. Butler says about
22    that:  well, this is a consensual process and when I have these
23    folks on one side of the table then these folks sneak out and
24    oh my gosh, oh my gosh -- what a parade of horrors this is.
25    But, Your Honor, it's not a parade of horrors.  If Mr. Butler

80

1    says it's premature to delegate claims pursuit to the
2    committees -- to the committee or the committees because
3    certainly we will be asking for standing to pursue claims on
4    behalf of the debtor against GM -- it's premature to delegate,
5    it's premature to investigate, it's premature to bring claims
6    on behalf of the debtor against GM.  Indeed, this has to be
7    part of the consensual process; it has to be part of the
8    discussion.  Then you can't take a piece of the discussion
9    away.  And the fact that this program is dealing with part of
10   GM's liabilities and GM's actions in connection with the spin-
11   off and thereafter; you can't remove this piece and then say,
12   well, the rest of it has to be consensual.  The only issue
13   here --
14       THE COURT:  Well, they're not saying that the rest of it
15   has to be consensual -- I mean they're doing something that the
16   unions, you know, said I shouldn't even start on, which is
17   totally unconsensual, which is the 1113 motion.  I mean,
18   there's always been a backdrop here of a nonconsensual
19   alternative.
20       MS. STEINGART:  But Your Honor, we all want it to be
21   consensual.  Don't get me wrong.  What we're saying here is
22   that GM should not be given a kind of claim as a result of
23   resolving this piece that is not open to being questioned on
24   all grounds that should otherwise be available.  And that it
25   should not be shielded by deeming it to occur under the Master

81

1    Separation Agreement.  That really puts all parties in the
2    optimal position to create the consensual arrangement.  And you
3    don't have pieces of it leeching out piecemeal in a manner that
4    doesn't take into consideration all of the constituents.
5        THE COURT:  Well, but timing is everything, right?
6        MS. STEINGART:  Timing is everything.  But timing is in
7    control of the people who come here and say it's an emergency,
8    Your Honor.  I think that as the Creditors' Committee has made
9    clear, there's no emergency here.  The debtor has liquidity to
10   take care of these claims if they want to offer a program.  The
11   question is how it gets paid for and who gets the claims and
12   how do those get resolved.
13       THE COURT:  I'm sorry, how does it have the liquidity to
14   offer a program dealing with OPEB?
15       MS. STEINGART:  Well, because the OPEB liabilities, until
16   the resolution of 1113, 1114, are not immediately accelerated.
17   So it's not as if the OPEB liabilities that exist today make
18   the balance sheet unworkable.  That's what the entire process
19   here is about.
20       THE COURT:  No, but you see that's why I go back to the
21   point about timing.  Ultimately, it seems to me as I listen to
22   you, and having read your papers, is that as a practical matter
23   there's a substantial likelihood that there will be some form
24   of large claim of GM against these estates because of their
25   guaranties.

82

1        And there are two issues that are raised by this motion.

2    The first is whether the -- whether there are new benefits to a

3    ôprogram,ö as opposed to what the objectors are proposing, not

4    only with respect to immediate cash savings, but also from the

5    effect that that program has on the remaining negotiations, as

6    opposed to not having a program, an attrition program.

7        And then, secondly whether the prospect of leaving open

8    certain aspects of GM's claim -- really one, which is its

9    ability to assert the claim under the MSA -- outweighs the

10   other benefits.  All that I think the objectors are saying to

11   me is postpone it and we'll work it out later, either by

12   litigation or negotiation and we'll do better later vis-a-vis

13   GM than today.

14       But if you look at it in isolation, GM is getting clearly

15   something directly today under this motion, but the debtors are

16   also getting a program that seems to have other benefits.

17       MS. STEINGART:  Well, I think, Your Honor, what we're

18   saying is that the benefits that GM is receiving are

19   unjustified -- that they're unjustified because the claims

20   cannot arise under the Master Separation Agreement.  They're

21   unjustified because it's not new money.  And the other reason

22   that Mr. Butler raised was, somehow the unions can never allow

23   the benefit guaranties to be triggered because somehow the

24   benefit guaranties preclude the unions from negotiating in good

25   faith to -- from bargaining in good faith.  Because, you know

83

1    if the unions trigger the benefit guaranty -- and I'm just

2    trying to understand the argument that Mr. Butler was making to

3    the Court, Your Honor -- that somehow, if the unions trigger

4    the benefit guaranty by their conduct they don't get to enjoy

5    the fruits of the benefit guaranty.

6        I don't understand the benefit guaranty myself, having

7    looked at it to say that.  But, Your Honor, I would say to the

8    extent that the benefit guaranties purport to limit the union's

9    ability to bargain in good faith, that those would be contrary

10   to public policy.

11        The obligation to bargain in good faith is statutory under

12   the National Labor Relations Act and certainly could not be

13   bargained away in some guaranty with GM.  So I think that --

14   and that's certainly in none of the papers that Mr. Butler has

15   submitted, it's in none of the affidavits that I've seen.  I

16   don't think that anyone would put that in an affidavit that

17   somehow, there is a limitation on the union's ability to

18   bargain because if their bargaining triggers the guaranty that

19   GM wouldn't have to pay on the guaranty.  I just -- I thought

20   that that was unexpected and I thought that that needed to be

21   responded to, Your Honor.

22        So, our view, essentially is that the benefit to GM, Your

23   Honor, is unjustified.  And while GM should be given a claim --

24   and we have no objection to GM getting a claim -- the ability

25   to object to that claim on all grounds that would be available

84

1    to the debtor or otherwise, should be preserved.  And modifying

2    the structure of this arrangement to the extent that GM

3    doesn't' have a carte blanche to assert claims under the Master

4    Separation Agreement from anyone other than the debtor is not a

5    significant change.

6         THE COURT:  I guess what I'm saying is, aren't these same

7    types of issues going to arise, vis-a-vis GM, in any event,

8    down the road?

9         MS. STEINGART:  I think that the Creditors' Committee

10   having looked at the record -- we weren't appointed at that

11   time, Your Honor.  And having looked at the record that was

12   made during the argument and order in connection with the last

13   attrition motion, it's my understanding that the Creditors'

14   Committee has preserved the rights of all parties to object on

15   all grounds to claims that have been given.  To the extent that

16   these three other agreements:  the Master Separation, Employee

17   Benefit and Indemnity, remain issues there, you know, there are

18   grounds to challenge those.

19       But I think that in each of these situations, Your Honor,

20   there is -- the calculus has to be made about what GM's

21   exposure is, what benefit GM is gaining, and whether what

22   they're getting from Delphi or from the constituents in this

23   case by limiting their ability to challenge the claims is

24   justified.  And here, Your Honor, that balance -- it's a

25   different question each time.  It can't always be resolved by

85

1   the behemoth moving forward.  I think this time that that

2   balance, in terms of the benefit that GM is receiving, that

3   benefit is unjustified, and modifying --

4       THE COURT:  Well, that's my question.  Why?  In light of

5   the fact that, I think, all that you are looking to preserve is

6   the flexibility to raise these same points when you have a

7   negotiation two or three months from now.

8       MS. STEINGART:  Because the Master Separation Agreement,

9   Your Honor, in no way provides a conduit for this claim.

10       THE COURT:  I guess I'm not being clear.  When you have

11   the negotiation two or three months from now and everybody is

12   trying to tap the asset of the benefit guaranty and at the same

13   time trying to limit what GM gets from the estate in return for

14   it, aren't you, in essence, having the same type of negotiation

15   with GM then?  Because they have something and you want

16   something at the same -- the same time, I mean --

17      MS. STEINGART:  Well, it is the same type of negotiation.

18    But to the extent that the ability to have that negotiation is

19    curtailed by taking away the ability of this side of the table

20    to attack the assertion of those claims under the Master

21    Separation Agreement, then that conversation or that

22    negotiation is changed in a way that isn't warranted at this

23    point.

24      THE COURT:  Because?

25      MS. STEINGART:  Because there's no evidence at this point

86

1    that if you take that aspect of this agreement out of the

2    agreement, that GM won't do it.  And the other thing is --

3      THE COURT:  And so I think you are, like the Creditors'

4    Committee, asking me to play chicken with GM.

5      MS. STEINGART:  Right.  Well, and the other aspect of it

6    is that, as the Creditors' Committee said, this program can be

7    pursued and this program can be offered without GM.  So    GM -

8    -

9      THE COURT:  That means that you have a pretty broad

10    definition of the word "program," right?

11      MS. STEINGART:  Well, I think that they --

12      THE COURT:  There's no "check-the-box."

13      MS. STEINGART:  But Your Honor, the check-the-box exists

14    by virtue of the guaranty.  That check-the-box is there anyway.

15    It's not something additional that's being provided by virtue

16    of this program.  The benefit guaranty is the check-the-box.

17    The unions got the benefit of the guaranty years ago and

18    they've always had the check-the-box.  So there's nothing new,

19    from that aspect of it, at this point.

20      THE COURT:  Okay.

21      MS. STEINGART:  Thank you, Your Honor.

22      MR. KURTZ:  Good morning, Your Honor, Glenn Kurtz from

23  White & Case on behalf of the Ad Hoc Committee of Equity

24  Holders.  I would like to start by specifically adopting all

25  the positions that you've heard about.  There's a lot of paper.

87

1  There's been lengthy argument and I don't want to repeat that

2  so I'm going to expressly adopt it, and try to make points that

3  are different, either entirely or at least, slightly.

4       The first point I want to raise, Your Honor, is the

5  standard of review, which is not business judgment or total

6  deference under a business judgment.  The debtors have

7  repeatedly relied on the prior order with respect to the

8  attrition program from their preliminary statement through

9  their papers and here in court today.  What the debtors have

10  utterly ignored of course is Your Honor's determination with

11  respect to your review of the attrition program and offered no

12  reason why your prior determination doesn't apply here.

13       Page 216 of the transcript from the April 7th hearing,

14  you've identified the review as follows:  "It is my practice to

15  give less deference to the debtor's business judgment in those

16  situations and to exercise more of my own in light of the

17  arguments raised by the objectors."  And that was, I believe,

18  in response to the presentation we made with respect to the

19  strict scrutiny.  We relied then and we rely now on New

20  Hampshire Electric and on CGE, which both specifically said as

21  you get closer to matters that impact the reorganization and

22  have significance that you get heightened scrutiny.  I also

23  rely on GM's role in all this.  Which I think is as close to

24  being an insider.  I think Your Honor rejected that, but I'll

25  raise it for preservation purposes and also our sub rosa plain

88

1    issue, which I know you have strong feelings against.  But in

2    either case, you've already ruled that it should be closer to

3    your judgment and not simply your acceptance of the judgment of

4    the debtors.  And it's the same motion, it applies to several

5    issues according to the debtor and so I assume that will be the

6    appropriate standard of review here too.

7        On the first significant piece of the program that we are

8    talking about, which is the buyout component, Your Honor asked,

9    you know, what other options were there?  Why was this a good

10   idea?  And I did want to offer that.  The option is not to

11   provide the buyout payments at all.  The debtors -- and I'll

12   get to, I think they're just a benefit to GM, not to the

13   estate -- the debtors proudly announced today, that in

14   connection with the attrition program they had participation

15   rates including some thirteen thousand people.  And of those

16   thirteen thousand people only five did not check the box.  So,

17   we have a very wholesome record that checking the box is an

18   adequate opportunity.

19       We had Mr. Kennedy stand up and tout the fact that his

20   union will participate to the same extent, perhaps more, in

21   light of their pre-existing contractual arrangement.  So why is

22   it, in light of the fact that everybody is checking the box and

23   participating in connection with the first attrition program,

24   do we have to offer some new program, some new component to the

25   program in a supplement?


89


1        And it seems clear to me that it was for the benefit of

2    GM.  And that it is GM that benefits from that and they benefit

3    from it in two ways.  The first way they benefit from it is,

4    instead of just paying the OPEB benefits subject to all

5    defenses and the like, they now get 50 percent of that financed

6    by the estate today, because to accept the buyout payments made

7    you give up your rights to OPEB.  Those payments are a

8    reasonable approximation of the potential OPEB liabilities

9    going forward, and now 50 percent are assumed by the estate.

10   And the second 50 percent is GM and it's allowed.  You're no

11   longer in a position where GM makes a claim subject to all

12   defenses, but is, in fact allowed.  So the only real benefit

13   that we can see, with respect to the buyout portion of this is

14   in favor of GM.

15        Having said that we also think, Your Honor there should be

16   a series of clarifications to protect everybody's rights, in

17   the even that any portion of that program, that part of that

18   program is permitted.  And they are as follows:  first, we

19   would like to be comfortable that all interested parties,

20   including members of the Ad Hoc Committee, preserve all claims

21   against GM.  That the allowance of the claim doesn't have any

22   impact on claims that affirmatively can be brought by anybody

23   else.

24        And that, on a related point, nothing in allowing a claim

25   impacts that claim, even if the affirmative claim against GM


90


1    would have constituted in whole or in part some defense to the

2    claim that's being allowed, potentially, or at least is being

3    requested to being allowed in this motion.

4        So, by analogy, Your Honor, a compulsory counterclaim of

5    some kind -- if GM's claim is allowed it certainly should not

6    imply that any relevant defenses have been adjudicated in any

7    fashion and are limited in any way in connection with any

8    claims that interested parties, including members of the Ad Hoc

9    Committee, would choose to bring later.

10    THE COURT:  I'm trying to think how that comes up, other

11    than -- other than 502(d).  My view is that 502(d) is implicit

12    in this since 502(d) talks about ödisallowingö a claim, which

13    includes claims which are already allowed.  But I don't

14    understand the other points you're making.

15    MR. KURTZ:  My only concern, and it may not be something

16    that I need to be concerned about, but if GM has an allowed

17    claim that relates to an OPEB liability which all relates to

18    fraudulent conveyance actions and the like, I don't want to

19    have to litigate with GM the notion that, in allowing this

20    claim you would necessarily have had to raise certain defenses.

21    And that those defenses --

22    THE COURT:  Ordinarily, this wouldn't be res judicata or

23    collateral estoppel in some way.

24    MR. KURTZ:  Yeah, collateral estoppel --

25    THE COURT:  I don't think that's contemplated by the


91


1    parties.

2    MR. KURTZ:  Okay.

3    MR. BUTLER:  I think that GM, for the record that it's not

4    and I think GM would say it's not.  Mr. Kessler?

5    MR. KESSLER:  If you're talking about, as Mr. Butler

6    referred before bankruptcy claims, it's not.

7    THE COURT:  Well but, I mean but this is a --on the

8    funding the 50 percent, the argument that's been made to me is

9    that this is new money and so I don't see how a önew moneyö

10    allowed claim could somehow be res judicata or collateral

11    estoppel in respect of an öold moneyö claim.

12    MR. BUTLER:  Your Honor, the debtors absolutely concur

13    with that.

14          THE COURT:  Okay.

15          MR. BUTLER:  The only thing we don't concur with is Mr.

16   Kurtz's statement that it's his litigation or his clients'

17   should advance against General Motors, that's an estate claim,

18   not his client's claim.

19          THE COURT:  All right, but everyone's rights are

20   preserved.  It seemed to be that the language in the proposed

21   order was consistent with the prior order which says that all,

22   you know, everyone's rights and claims are --

23          MR. BUTLER:  Right.  Your Honor the -- an appropriate STN

24   or Commodore motion will be made by appropriate parties --

25          THE COURT:  Right.


                                                92


1          MR. BUTLER:  --at the appropriate time.  Nobody's

2    suggesting that we are going single handedly to pursue a claim.

3          THE COURT:  Okay.

4          MR. BUTLER:  On a related matter, Your Honor, I want to

5    also clarify that, if there is an allowance of a claim that

6    that doesn't mean that there's a determination that GM in fact

7    gets a distribution with respect to that claim.  But that all

8    rights under 502(d) and 502(j) are preserved --

9          THE COURT:  Right.

10         MR. BUTLER:  -- so that, and all common law setoffs and

11   the like that, there shouldn't just be a timing matter that

12   when the time comes down the road -- I mean, we're not trying

13   to litigate it today -- the distributions are here, that

14   there's an availability to stop that distribution in light of

15   what might be substantial claims that are being litigated at GM

16   at that time.

17         THE COURT:  As I said, I think that 502(d) is not

18   implicated by this because 502(d) talks about the disallowance

19    of a claim.  I.e., it presumes that even if you can have an

20    allowed claim, if you don't pay it back (the preference -- or

21    whatever, you know) -- that claim is disallowed.  You know

22    502(j) is kind of an amorphous right so, if the basis for

23    reconsideration is that it shouldn't have been allowed then I

24    think you're wrong.  But if -- I don't know what else there

25    would be, but --


                                                            93


1        MR. KURTZ:  Well, 502(d) which I understand, Your Honor

2    says is preserved is on -- goes to one issue.  502(j) is a

3    statutory right to seek reconsideration.  And I suppose it's

4    either preserved or it's not preserved by reason of this order.

5    We're trying to get some clarification as to whether --

6        THE COURT:  Well, what I don't think the parties have

7    agreed upon, and I'll leave it this way, is that somehow, if

8    things don't go the way someone wants in the case, that they

9    can revisit this agreement.  I don't think that's contemplated.

10   So, you know, in that sense, it wouldn't be reconsidered.  But,

11   but I think now that's - so,

12       MR. KURTZ:  There's be no right -- I view it as a --

13       THE COURT:  The whole regimen of the Bankruptcy Code,

14   starting with the fact that you don't normally pay unsecured

15   claims except pursuant to a plan, is not somehow vitiated by

16   this, by this motion.  On the other hand there shouldn't be an

17   implication that that means that 502(j) can be viewed to get,

18   you know, a whole new look at this and we'd be arguing the same

19   point down the road in light of, you know -- other negotiations

20   with GM.

21       MR. KURTZ:  I understand.  I suppose your position is that

22   there's a procedural right to seek to have something

23   reconsidered and it may be that Your Honor would not be

24    inclined to reconsider on particular bases, but we would

25    nonetheless have the right to make the statutory request and it


94


1    would either be granted or denied based on the facts presented

2    in connection with the request.

3         THE COURT:  Okay.

4         MR. KURTZ:  On the OPEB piece, I'm going to rely on the

5    arguments of others as to whether GM can, and we think, cannot

6    create some new claim and effect a waiver of everyone's rights.

7    It was in the papers but I do want to highlight for Your Honor

8    the FCX decision which permitted the debtors to waive their

9    rights but did not allow them to waive the rights of the other

10   interested parties, including creditors.  We think it's a

11   better course to preserve those rights as they're contemplated

12   at law.

13        I wasn't planning to make a comment, but in light of the

14   Creditors' Committee's comments about what that OPEB liability

15   could look like.  I do want to comment that our view is, that

16   whatever claim that could be brought, either by contract,

17   common law or otherwise would only be to the extent that valued

18   the estate.  It was estate's value.  And that we believe that

19   the -- to the extent that we're ever in a position where GM is

20   paying OPEB benefits that we have an obligation to make those

21   payments or provide those benefits subject to rejection of the

22   CBAs, I suppose, up until expiration of the CBAs in October of

23   2007.

24        And so the value of the benefits that are being provided

25   between the trigger date and/or the agreement date.  And


95

1    October 2007 may or may not constitute a claim by GM but

2    certainly GM is not bringing any new value to the estate for

3    which it could seek a claim based on the present value of the

4    actuarially determined claims, perhaps in perpetuity.

5         So I'll want to be certain that nobody's going to claim

6    that we have not preserved that position.  We do not think that

7    GM has a claim beyond what the benefits are in actual economic

8    terms from the time they provide them until the expiration of

9    the CBAs, and not as an actuarial determined present valuation

10   of its OPEB benefits into perpetuity or any other future-

11   looking period.

12        THE COURT:  Okay.

13        MR. KURTZ:  And on that front, I did want to note that the

14   idea that GM is adding some sort of new value because they have

15   no obligation existing to provide a check-the-box, I think is,

16   you know, maybe hyper-technically accurate, but I think it's

17   substantively inaccurate.

18        There is an existing obligation to pay those OPEB benefits

19   subject to a trigger.  And the debtors have filed the motion

20   for that trigger.  That's actually sort of the Alice-in-

21   Wonderland tea party that I've been invited to.  The one where

22   GM has no obligation to pay OPEBs but that happens during the

23   course of a motion that is being prosecuted under 1113 to

24   trigger GM's OPEB obligation.

25        So I would suggest that if the debtors that don't have it

96

1    both ways then they can seek to trigger the OPEB liabilities

2    and then come here on the attrition motion and say, well,

3    there's never going to be a trigger of the OPEB liability so

4    GM's actually giving us something new and different.

5       THE COURT:  Well, I, well --if there's some -- what I was

6   suggesting that, it seemed to me, was new was simply the

7   timing, as opposed to the trigger.

8       MR. KURTZ:  The timing is new but then I think Your Honor

9   has to evaluate the value of having a trigger maybe thirty or

10  sixty or ninety days from now compared to what the trigger

11  would be at the completion of the 1113 motion, depending upon

12  how it gets disposed of by Your Honor.

13      The final point I want to raise is, there was a footnote,

14  I think footnote 9 in the reply and I thought I heard it

15  repeated again today about the notion that GM will try to take

16  credit in some global resolution, which, hopefully all parties

17  will be involved in and it won't be just sort of forced in a

18  motion down our throats here, that they will seek credit for

19  the thirty-five thousand.

20      Now, the attrition program is clear as can be, and we have

21  the testimony and there is an order.  And we got all

22  clarifications, including from GM, that that thirty-five

23  thousand dollars would be provided without any right of claim

24  and we're a little troubled.

25      And, Your Honor, by the way asked the question of Mr.


97


1   Sheehan, is there anyway that this program modifies the old

2   program and the answer was no.  And I'm a little troubled by

3   the notion that, although they don't have a claim for the

4   thirty-five thousand per employee that they are going to seek

5   credit in some global settlement.

6       And it's troublesome, one because I think it runs contrary

7   to the way that the program was described and so ordered, and

8   two, I also find it a little unusual that it is the debtors

9   that put in their papers that GM may seek credit for something

10    that GM has no legal right to seek credit for and that that's

11    going to constitute some form of consideration.

12        It's all part of our problem with who is leading the

13    charge against GM and will ultimately be relevant to an STM

14    Commodore motion or at least a new issue about at least

15    defensively being able to prosecute issues with respect to GM.

16        THE COURT:  Okay.

17        MR. KURTZ:  Thank you, Your Honor.

18        MR. FOX:  Good afternoon, Your Honor, Edward Fox from

19    Kirkpatrick & Lockhart, Nicholson, Graham, LLP on behalf of

20    Wilmington Trust Company as indentured trustee.  Your Honor at

21    the outset I'd also like to join in the objections of the

22    previous objectors -- the Committee, Equity Committee and, dare

23    I say it Appaloosa as well.  And I also want to make sure, as

24    we specified in our papers, that we incorporate our arguments

25    from the previous attrition hearing on April 7th, because I


                                    98


1    think they're applicable here as well.

2        The only point I make in terms of concurring with the

3    Creditors' Committee objection is that we have a difference of

4    view with respect to a point made in footnote 11 of the

5    Creditors' Committee objection, so I'll leave that aside.

6        THE COURT:  What is that?

7        MR. FOX:  It goes to the issue of who's the party to the

8    collective bargaining agreement and where the claims lie.

9        THE COURT:  Okay.

10        MR. FOX:  We've been through the structure issues before,

11    so I don't want to belabor that and the issues of Delphi

12    Corporation being the party against whom the claims are being

13    asserted by General Motors and, in this case, being the party

14    that's actually laying out the debtor's share of the cost of

15    funding the current attrition program.

16        Whereas Delphi Automotive Systems LLC, the operating

17    subsidiary, which is also a debtor, is the party which -- on a

18    daily basis is employing the unionized employees, is paying

19    their wages, is paying for the jobs bank if they're not

20    actively working and will be the beneficiary of the reduced

21    wage rates and reduced payments to jobs bank employees, which

22    will presumably result, if these attrition programs are

23    successful.  The --

24        THE COURT:  Who's the sponsor of the various benefit

25    plans?

99

1        MR. FOX:  I don't know that I've seen that documentation.

2    And I -- but I believe that the funding, at least initially. is

3    coming from DAS, LLC, unless there's something in the record

4    that suggests otherwise, that I haven't seen.

5        THE COURT:  Uh-huh.

6        MR. FOX:  The, you know, debtors assert and particularly

7    Mr. Sheehan's motion and in Mr. Sheehan's declaration that the

8    attrition program will result in lower operating costs.  Those

9    are lower operating costs for DAS, LLC.  While he concedes that

10    it will result in higher pension funding contributions which,

11    if not paid are presumably jointly and severally liable under

12    ERISA.

13        The -- part of the problem we have with this is that the

14    debtors have not analyzed the effect of this motion on an

15    entity-by-entity basis.  And we continue to believe that the

16    Court's obligation is to do exactly that. Now, we've designated

17    portions of Mr. David Resnick's testimony on exactly this point

18    and specifically asked him in his deposition yesterday, this

19    question:  "Have you made any attempt to evaluate the cost and

20    benefits of these programs on a debtor-by-debtor basis?"

21        And the answer was "no."  And asked if he was aware if

22    anybody else at Delphi had undertaken such an analysis and

23    again, his answer was he was not aware.  And he further

24    indicated that, in his analysis, they're looking at these

25    programs on a consolidated basis rather on an entity-by-entity


100


1    basis.

2        And he was asked a question:  "Do you assume that Delphi

3    Corporation's interests -- Delphi Corporation the legal

4    entity's interests are identical to those of Delphi Automotive

5    Systems, LLC with respect to these attrition programs?"  His

6    answer was:  "the way we, at Rothschild, have been looking at

7    these programs are really regarding Delphi broadly, generically

8    speaking and not by any specific legal entity."  And he goes on

9    with more of the same.  And I'll just finish it up.  The

10    question was, "so in other words, you're just -- I don't mean

11    to belabor the point but you're regarding all forty entities as

12    if they were a common pot, is that correct?"  The Answer:

13    "yes."  Question:  "So any benefits go into the common pot and

14    any detriments come out of the pot, but you haven't focused any

15    attention on how they're allocated among the legal entities

16    that comprise the collective group we're calling the debtors?"

17    Answer:  "Correct."

18        And that's problematic.  Because if the debtors haven't

19    done that, then I don't know how they satisfy their business

20    judgment and I don't know how the Court can then make a

21    determination as to whether they've properly followed their

22    business -- exercised their business judgment in analyzing this

23    on an entity-by-entity basis.  I want to address a couple of

24    points.

25          THE COURT:  Well, can I, can I stop you there for a

101

1   second?

2          MR. FOX:  Sure.

3          THE COURT:  Given the express reservation of each debtor's

4   rights against the other debtors, and I guess the further fact

5   that at least in respect of the OPEB check-the-box portion of

6   this program, the agreement that GM can assert its claim under,

7   even though it's only asserting it against Delphi Corp, is one

8   where there is joint-and-several liability?

9          MR. FOX:  Well, let me address that specific point first,

10  and then I'll answer your question more broadly.  Because I

11  know you made a comment when Mr. Seider was speaking.  The

12  Master Separation Agreement does have four Delphi entities, but

13  the order -- and it's paragraph 8, I believe, of the proposed

14  form of order -- specifically provides that that claim that GM

15  is going to assert pursuant to the Master Separation Agreement

16  is only against Delphi Corporation.

17         THE COURT:  No, I understand that.  But given that the

18  agreement provides for joint-and-several liability, wouldn't

19  that further bolster Delphi Corp's claim for contribution over

20  against DAS or any other debtor?

21         MR. FOX:  You mean pursuant to the terms of the Master

22  Separation Agreement?

23         THE COURT:  Yeah.

24         MR. FOX:  Well, --

25         THE COURT:  I agree that it's clear under this motion, if

102

1   it were granted, that GM would only have a claim against Delphi

2    Corp.  But given the terms of that agreement, it would seem to

3    bolster, if you needed to bolster it at all, the argument,

4    which is already preserved, based on the rights of each debtor

5    to go against the other debtors, that Delphi Corporation would

6    have a contribution claim against the other entities.

7        MR. FOX:  Well, I think the problem with that is that,

8    using the Master Separation Agreement as a basis, all of the

9    objectors, Wilmington Trust included, do not believe that GM

10   would be authorized but for Your Honor's approval, that  the -

11   -.

12       THE COURT:  I know.  But I'm just talking about the inter-

13   debtor issue.

14       MR. FOX:  Well, but it relates to that.  Because if I were

15   representing one of the other debtors and Delphi corporation

16   came along and said, well, I made this payment under the Master

17   Separation Agreement and therefore, I can now seek contribution

18   from you as another party to the Master Separation Agreement,

19   my response would be, you didn't have a right or an obligation

20   under this agreement to make that payment.  It was only because

21   a court order said that you can pretend, or deem it to be an

22   obligation under that as a way, as Mr. Butler says, to channel

23   the claim or to create a claim that otherwise doesn't exist,

24   that they could make that argument.  So I think that --

25       THE COURT:  Well, I don't know.  I imagine you would be

103

1    taking the opposite side down the road on that one.  But in any

2    event, my question really went to this point:  given that all

3    of those issues are preserved by the express language of the

4    proposed order, it seems to me that your point, you know, only

5    arises if two things are the case.  One is that Delphi

6    Corporation has a reasonable expectation that it will, as a

7    practical matter, not be able to get the value back that is

8    properly attributable to other entities.  And two, that -- and

9    I guess this is related to the first one -- that in essence it

10   should decide to just simply jettison the North American

11   business.  Both of which seem to be pretty momentous decisions

12   to make.

13        MR. FOX:  Well, there are a couple of issues there.  In

14   terms of recovering the value of the claim if the rights are

15   preserved, at a minimum there's certainly no assurance that any

16   claim over by Delphi Corp against DAS, LLC or any of the other

17   debtor entities, is necessarily going to be money good.  I

18   mean, we don't know what the recovery rates are going to be at

19   the various creditors at various levels.

20        If it turns out that claims against Delphi Corporation are

21   paying eighty-two cents on the dollar and claims at DAS, LLC

22   are paying thirty-two cents on the dollar, I mean, unless we

23   have an administrative claim or some assurance of that or a

24   priority of some kind, or super priority, that certainly on an

25   unsecured basis there would be no assurance that that claim


104


1    would be recovered in full.  So there needs to be some way to

2    address that if the order's going to properly address that.

3        Secondly, and I have to concede that I don't have the

4    indenture for the subordinated bonds with me, and I haven't

5    looked at it in a long time, so I don't remember the terms of

6    it.  But it may be that GM, by having this claim is going to

7    have a right to share in those subordination rights.

8        THE COURT:  That's not what was said earlier, at least, as

9    far as I -- the record reflected.

10        MR. FOX:  I don't recall, Your Honor.  That would be

11   another concern.  And then, in terms of asserting the claim,

12    although the right to assert it is preserved, I have to say

13    that I'm very uncomfortable that that is sufficient.  Because

14    the debtor has certainly gone out of its way to, you know,

15    state that Delphi Corporation is certainly responsible for all

16    those obligations but has also gone completely the other way to

17    refuse to concede that DAS, LLC has any liability here.  And,

18    at a minimum that they're going to be deemed a joint employer.

19        THE COURT:  All right, but that's why you're here, right?

20        MR. FOX:  Well --

21        THE COURT:  I mean there are other ways to -- if you agree

22    that the debtor is not acting appropriately in respect to those

23    claims there are other avenues to take on that.

24        MR. FOX:  Well, and I appreciate that comment, and we'll

25    take that to heart, but --

105

1        THE COURT:  The entity is not just a claim payor.  The

2    entity is a subsidiary, and generally speaking, for example,

3    with investments by a parent in a subsidiary, unless the

4    subsidiary is woefully insolvent and should literally go out of

5    business they are not -- you know, they're viewed as for fair

6    consideration.  So I guess, ultimately when you balance those

7    two factors, unless there's, you know, on this record it seems

8    to me that it's hard for me to say that the reservation of

9    rights isn't sufficient.

10        MR. FOX:  But it's only fair consideration if it's a

11    solvent subsidiary.  If they're putting --

12        THE COURT:  Well, I don't think that's right.  I think it

13    has to be really sick for it not to be solvent -- not to be

14    fair consideration.

15        MR. FOX:  What?

16        THE COURT:  No, we're talking about fraudulent transfer

17    law.  But, generally speaking, to have an operating subsidiary

18    is viewed as a good thing.  And even if it -- at the very

19    moment you're talking about it, it may be somewhat insolvent,

20    the fact that it's there and is continuing to operate and you

21    believe, as a parent, that it has liabilities, you know, that's

22    value.

23        MR. FOX:  Look, if at the end of the day as part of a

24    plan, I mean, I believe -- I assume that the debtors are going

25    to one of two things to hang on to the subsidiaries.  One is


106


1    going to be that they're going to do some sort of substantive

2    consolidation so that the creditors of the subsidiaries become

3    creditors of the parent, so that the parent can keep the subs.

4    Alternatively they would have the creditors of the subsidiaries

5    contribute back to the parent their interest in the subs, in

6    return for claims against the parent or stock in the parent, so

7    that the parent can keep the sub.

8        But otherwise, if you didn't do one of those two things,

9    the subsidiaries, unless they're solvent, are going to become

10    the property of the creditors of those subsidiaries and they

11    would not remain the property of the parent.  So to invest

12    money in a subsidiary on this basis, to try to -- not to keep

13    it going today or tomorrow, because tomorrow, if this attrition

14    program is not approved, DAS, LLC will still -- at least

15    tomorrow and for the foreseeable future -- be paying the wages

16    of these employees that show up everyday.  But there's no value

17    for Delphi Corporation in that subsidiary.  So I can't

18    necessarily subscribe to that point.

19        THE COURT:  Well it seems to me -- unless you're saying--

20    and I certainly don't see in Wilmington Trust's papers, or in

21    what's been represented as a factual matter, that Delphi should

22    be shutting down the North American business,  it seems to me

23    that the reservation of rights is sufficient.

24         MR. FOX:  Well, I'm not sure.  And I think we indicated at

25    the last hearing in April on this point, that there was some

                                                    107

1    question about whether the --

2         THE COURT:  Well, I understand that ôsome question about

3    not being sure,ö and the like doesn't on this type of motion

4    really doesn't carry the day.  That's the only point I'm

5    making.

6         MR. FOX:  Well, at some point, though, if you properly add

7    up the costs and the benefits of the particular entities, which

8    hasn't been done here, then at some point you'd say, gee, are

9    we really going to wind up with subsidiaries that are worth

10   what it is we're putting into them?  And particularly when

11   you're paring down the subsidiaries, as Mr. Sheehan testified

12   at the 1113 hearing, I believe it was, so at the end of the

13   transformation, if they go through with it as they indicated in

14   their -- I think it's their March 31 press release, they'll be

15   left with seven plants with four billion dollars worth of

16   revenues and, you know, with a 5 or 6 percent profit margin

17   they'll have about a quarter of a million dollars worth of

18   operating income.  It's not clear that, you know, that all the

19   money that's being expended to preserve that necessarily -- and

20   all the risk that's being incurred, particularly in the 1113

21   process, necessarily makes it worthwhile not to just do a

22   phased shutdown and get to September of 2007.

23        THE COURT:  Well, I understand that.  And that's a live

24   issue.  But based on this record I'm just not -- it just

25   doesn't seem to me that that is established.

108

1        MR. FOX:  Well, I understand that.  But I guess I just

2    point out it becomes the debtors' burden to -- certainly in the

3    first instance -- and without the debtor-by-debtor analysis,

4    I'm not sure that they can establish that.

5        THE COURT:  Okay.

6        MR. FOX:  If I could, I'd just like to address a couple of

7    points that the debtors raised in their reply, although I think

8    Your Honor basically disposed of them previously.  Just for

9    purposes of the record, if you'd indulge me a moment.  The

10   debtor did make the argument that Wilmington Trust is, you

11   know, objecting without being at the direction of the bond

12   holders.  Clearly, I think as you understand under 1109, the

13   Wilmington Trust is a statutory party-in-interest and, quite

14   frankly, it would gut the protections afforded bond holders by

15   the Trust Indenture Act of 1939 if the Court was only willing

16   to hear indentured trustees if they're acting at the direction

17   of bond holders under the terms of an indenture.  That's just -

18   -

19       THE COURT:  I mean, I don't know what the debenture says.

20   So maybe the bond owners have a beef with Wilmington Trust, but

21   that's a separate issue, and I don't -- that's not in front of

22   me --

23       MR. FOX:  Thank you, Your Honor.  And the other point that

24   Mr. Butler has made in terms of reliance, or that bond holders

25   knew or should have known of the existence of the collective

109

1    bargaining agreements based on the information in the

2    prospectuses.  If you look at those prospectuses, although they

3    do reflect the fact that the Delphi Corporation is a party to a

4    collective bargaining agreement, there's certainly no

5    discussion in there about the legal ramifications of that issue

6    here.   There's certainly nothing in there that says you can

7    never assert claims with respect to DAS, LLC or that they

8    wouldn't be, at a minimum, a joint employer.

9         And when you look at those agreements, too, you have to be

10   very careful because they switch back and forth between talking

11   about Delphi Corporation on an individual basis, and Delphi, or

12   Delphi Corporation, in effect, on a consolidated basis, because

13   the financials were on a consolidated basis.  So any notion of

14   reliance really isn't relevant in this situation, we don't

15   believe as a matter of law anyway.  But I don't think you can

16   really prove reliance there.

17        And finally, Your Honor, I just make a point.  The UAW

18   supplement, the agreement itself, affirms the prior program,

19   which would be the program approved on April 7th.  And I just

20   want to be clear that the order should not be viewed as

21   confirming the Court's prior order or the prior program but

22   only this program.  So that there's not an effort here to have

23   this order go back and --

24        THE COURT:  That's correct.

25        MR. FOX:  -- and sort of retroactively --


                                    110


1         THE COURT:  I would never -- there's no such creature.

2         MR. FOX:  No, I believe that's right, but --

3         THE COURT:  Okay.

4         MR. FOX:  -- I want there to be an interpretation to that

5    effect.

6         THE COURT:  Okay.

7         MR. FOX:  Thank you, Your Honor.

8      THE COURT:  Okay.  Do you know who the sponsor of the

9   benefits plan is?

10      MR. BUTLER:  I do, Your Honor.  It's Delphi Corporation.

11   Mr. Fox, if he remembers all of the exhibits he has from the

12   1113, 1114 proceedings in which he's the principal objector --

13   one of the principal objectors, Wilmington's   Trust --

14      THE COURT:  Well I wouldn't say he's the principal

15   objector, but he's an objector, yes.

16      MR. BUTLER:  And those would go, Your Honor -- those would

17   include the 2003 UAW, IUE, USW National Agreements and Master

18   Agreements and the Supplemental Agreements on the hourly-rated

19   employee pension plan, hourly health care plan, which is OPEB,

20   supplemental unemployment benefit plan, hourly life insurance

21   plan, hourly sickness account and accident plan, the guaranteed

22   income stream plan and so on and so forth.  All of those are

23   exhibits in the record on that disk.  The disks that were

24   submitted in 1113 and 1114 are in evidence there.  We didn't

25   feel we needed to put all that in evidence here, but given Mr.


111


1   Fox's statements we'd ask Your Honor to incorporate those

2   exhibits by reference into this hearing record.  They've

3   already been admitted in the 1113, 1114, if we could, Your

4   Honor.

5      THE COURT:  They've been admitted?

6      MR. BUTLER:  Yes.

7      THE COURT:  That's fine.

8      MR. BUTLER:  I believe they've been submit-- Mr. Fox, do

9   you have an objection to that?

10      MR. FOX:  No.

11      THE COURT:  Could I go then, to one of the points Mr.

12   Kurtz made, which is, because there really wasn't much

13    discussion about this until he made the point, which is:  why

14    even do the buyout?  What are the specific benefits of the

15    buyout -- I guess more particularly there is the concern that,

16    I guess is implicit in his statement, that the folks who have

17    already signed up will switch to do the buyout, as opposed to

18    what they've already agreed to.

19         MR. BUTLER:  Right.  I did have in my notes, Your Honor,

20    Mr. Kurtz was the only one of the -- representing the only

21    objector who actually said we shouldn't do something as it

22    relates to the benefit program.  And the buyout program, let's

23    just take it from the UAW supplement.  I think I indicated to

24    the Court in my opening statements or certainly in the response

25    after the opposed evidentiary record.  I represented to the


112


1    Court; there are approximately, 86,000 UAW workers who have not

2    participated in the attrition program to date.  And, I believe,

3    both Ms. Ceccotti and I talked about the fact that those

4    employees need to have options to determine their fate.  That

5    represents about a little more than a third of the total

6    employees -- UAW represented employees at the company.  And we

7    believe that some of the -- you know, we believe that some of

8    those will be addressed, ultimately, in the flow back

9    arrangements and that a significant number of them can be

10    addressed in the buyout.

11         THE COURT:  Well, do the -- do the estimates for the

12    buyout for both the UAW and the -- seventy-five million for the

13    debtors on the UAW and sixty million for the IUE -- do those

14    estimates include people who would otherwise be doing the

15    check-the-box approach, or is it really separate?

16         MR. KESSLER:  They are different people -- well, there's

17    only a slight overlap of people, Your Honor.

18          THE COURT:  That's --

19          MR. KESSLER:  The buyout attracts people, for the most

20    part, who don't qualify for the other options.  There is some

21    overlap, but not much.

22          THE COURT:  Okay.

23          MR. BUTLER:  Mr. Kennedy wants to take a shot at that.

24          THE COURT:  Okay.

25          MR. KENNEDY:  For the IUE-CWA lacking the opportunity to

113

1    flow back to GM plants has more than 60 percent of its

2    membership that would not be entitled to any other option,

3    other than the buyouts.  There is no overlap between people who

4    will be able to or intelligently wouldn't take a buyout because

5    the retirement opportunities are limited to those with thirty

6    years or more, who get the 35,000, or have twenty-six years or

7    more who get a subsidized payment for four years up until

8    they've achieved thirty years of service.  Or, have fifty years

9    of age and more than ten years of service.  Because, in the IUE

10   plants we have permitted other buyout opportunities and early

11   retirement opportunities to go on, the profile of our

12   membership is one in which we have a substantially younger

13   membership and membership with fewer years of service.  So that

14   to enable any significant reduction in headcount, at least in

15   the IUE-CWA plants, there has to be a buyout opportunity and

16   for it to be an intelligent choice for our membership it has to

17   be at the economic range that it has currently established.  So

18   I understand Mr. Kurtz raises the question, but to the extent

19   he was anticipating that this was some extra or additional

20   benefit giving -- being given to people, he is wrong.  We would

21   not have a deal today were it not for the existence of those

22   buyout opportunities.

https://vip21.veritextllc.com/myfiles/620041/120882.TXT

23          THE COURT:  Okay.

24          MR. BUTLER:  The other point I'll make, Your Honor, I

25    mean, and this would have come into the record had Mr. Kurtz

114

1    chosen to cross examine Mr. Butler on these issues, and one of

2    the elements we have of today's hearing is that, I think, it's

3    more noticed, that the evidence in here, which is in the form

4    of declarations largely, is uncontroverted.  Nobody else put

5    any evidence in, nobody essentially cross examined any of our

6    witnesses and the evidence is uncontroverted.  And then you get

7    up and argue it and say well, gee, maybe this program isn't

8    needed for the following reasons.  Had that been asked of Mr.

9    Butler, and he's here, he would have pointed out that the

10   experience that labor bargainers have in this, is at a very

11   small percentage of people.  Something under 1 percent, ever

12   implicated in -- to the extent they could change their minds --

13   and changing their minds.  And that when -- and that our

14   experience at Delphi has been, that once these buyouts were

15   actually announced it accelerated people accepting the other

16   aspects in the attrition program.  So we don't -- we don't

17   think, Your Honor, it's going to have the view, and Mr. Butler

18   can provide any answer -- answer those questions directly if

19   you want him to.

20          THE COURT:  Okay.

21          MR. BUTLER:  Your Honor, with respect to the -- I just

22   want to cover a couple of points that each of the objectors

23   made and I'm going to -- if it's all right with Your Honor, I'm

24   going to start with -- and go backwards.  Note to start with

25   Mr. Fox first and Wilmington Trust, and work backwards.  One

1    thing I noted in the evidentiary record, and we'll submit the

2    corrected exhibits to make this, Your Honor, apparently the

3    copying effort in preparing for this hearing the offering

4    memoranda are -- you have the even pages but not the odd pages,

5    and we'd like you to have all the pages for the record, here

6    particularly in the event there's an appeal taken.  So, Your

7    Honor, we'll submit corrected exhibits if we may.

8         THE COURT:  Okay.

9         MR. BUTLER:  The only issue that, I think, I wanted to --

10    I believe Your Honor dealt with the reservation of rights here.

11    And clearly, I think, the Court has it exactly right that, from

12    the perspective of the debtors, which is that, you know, we

13    have put in the preservation of rights to preserve claims over

14    against the subsidiaries.  Where Wilmington Trust and the

15    debtors' part company has been the continued position of

16    Wilmington trust modified, a little bit, in their supplemental

17    objection for the first time.  The Delphi Corporation itself

18    has no liability whatsoever.  And there seems to have at least

19    some concession, reading the first few paragraphs of their

20    supplemental objection, that Wilmington Trust now, apparently,

21    begins to concede that Delphi Corporation itself may, in fact,

22    have liability here.  We agree that the issue is open and we

23    preserved it with respect to whether there are any claims over

24    or not.  But the factual record here is, all of these programs,

25    be it health care or pension, or collective bargaining

116

1    agreements, all of these programs are with Delphi Corporation.

2    The prospectus is that we're out there in which the bondholders

3    bought, simply from the standpoint of disclosure purposes, made

4    it very clear that, as risk factors, you read to the risk

5    factors they come back in capital letters that investment in

6    Delphi Corporation is; beware of, be concerned about,

7    understand that it's -- your investment is subject to all these

8    labor issues, from work stoppages to the terms of a collective

9    bargaining agreement to OPEB, is discussed, all these things

10   are in the risk factors.  And we just simply, you know, we

11   respect and understand the claims reservation issue.  We are

12   simply, from our perspective, the reason we've reacted so

13   strongly on the point to say Delphi Corporation itself has no

14   primary responsibility here, we think is plainly not supported

15   by anything.  That's been our point with respect to Wilmington

16   Trust.

17        With respect to both of the comments made by both the

18   equity committee and by the Appaloosa led ad hoc group, let me

19   just briefly first deal with the equity committees' statements.

20   They say there are two fictions, one that the MSA is the

21   appropriate claims channel.  And two, that there is any new

22   money being contributed from General Motors in this.  And Your

23   Honor responded with exactly what the debtors -- the Court said

24   it was concerned or what it would weigh is exactly what the

25   debtor's weighed.  It's the precise point, which is, the Court

117

1    needed to weigh the scope waiver under the MSA, arguing that's

2    the scope waiver given the uncertainty surrounding that,

3    against the benefits of this entire program.  That's precisely

4    one of the calculations the debtors came up to.  And we believe

5    that the scope waiver issue, particularly requiring General

6    Motors to otherwise navigate through the MSA, was much better

7    than simply giving them their own separate claims channel.  We

8    could have signed the agreement General Motors wanted.  We

9    could have come here with check-the-box and said, here's a new

10    check-the-box agreement.  The equity committee, Ms. Steinberg

11    said, you know, she said, "we have no objection to them having

12    a claim," we just don't want it under the MSA.  Well, we could

13    have done that.  We could have come to the Court and said here,

14    they -- General Motor -- in fact, that's what they wanted.

15    Here, you could have a claim for this, of check-the-box, and,

16    you know, the only issue will be how people want to litigate

17    the issue associated with that claim.  And then there wouldn't

18    be any scope waiver, they would have the claim -- a separate

19    claims channel.  We wanted them, for a whole host of strategic

20    reasons, we wanted them to be required because we think it's in

21    the best interest of the estate, to have to navigate through

22    the MSA obstacles in order to be able to assert that.  We

23    think, at the end of the day that is more likely to result in a

24    compromise acceptable to the estate.  And we think, ultimately,

25    to all of the -- to the Court, if not to every single


118


1    stakeholder, then if we simply had given them a separate new

2    claims channel for that purpose.  And so, as to the other

3    issue, as to the fiction of them putting new money in, I think,

4    with respect to the monies putting in, I think Your Honor

5    understands, under the attrition payments -- incentives, they

6    are putting in this additional fifty-six million dollars.  To

7    Mr. Kurtz's point about whether or not we should be disclosing

8    in our papers the fact that General Motors has told us that

9    they're going to want to, somehow, take account of that in an

10    ultimate consensual settlement, we actually think disclosure is

11    a good thing.  We wanted the Court and everyone else to know

12    that that's what they'd said.  Doesn't mean they are going to

13    get it.  But it's hard to, you know, change someone's view.

14    Unless someone comes to a table to negotiate, it's hard for

15    them to argue that they are going say, I'm going to comprehend

16    all the value against all of the responsibilities in coming to

17    an ultimate comprehensive settlement.  And the 120 million

18    dollars number on buyouts that they would participate in, pay

19    half of, that's real money.  That is new money.  And we think

20    Your Honor got the analysis exactly right again, which is,

21    should the estate go out and borrow it under the DIP or should

22    the estate be able to put some of that off on a claim that

23    later may not have a full one hundred cent payout on it.  And

24    so the number was -- the question is, the delta between the

25    two, is that better than paying the absolute dollar value.  We


119


1    really did view it as an economic assessment.  Earlier, when we

2    started this hearing, Your Honor indicated that the Court

3    wanted to delve into an exam on the thought process of the

4    debtors.  And that's exactly what we looked at.  Ballots were

5    important, how do you fund them?  We thought, if you will, the

6    arbitrage on the claims issue was a much better approach for

7    the debtors than simply using up all liquidity.  The issue that

8    kind of confused me with Mr. Kurtz's comments, even Mr.

9    Seider's comments on behalf of the creditors' committee is that

10    they all -- they want us to do the labor transformation but it

11    seems to me that each of them doesn't want us to do check-the-

12    box.  I mean, they sort of said it both ways.  But they said

13    don't do check-the-box.  And ultimately, and I think Mr.

14    Kennedy's indicated it for the IUE -- I think our declarations

15    made it clear but the check-the-box, having that ability to do

16    that is extremely important to our labor transformation

17    process.  And just to be clear, check-the-box and the

18    ramifications of that in terms of what happens to employee, is

19    different than whether the employee -- whether the benefit

20    guaranty ever, ultimately, is triggered.  I agree with Your

21    Honor, at some point either consensually or not consensually,

22    the debtors absolutely believe that that issue will be

23    crystallized prior to a plan of reorganization being confirmed

24    in this case.  That has been our operating assumption.  So

25    the -- and the only other point I think I wanted to make, Your


120


1    Honor, with respect to the creditors committee's comments was

2    simply -- their argument, I think, takes the claims argument,

3    sort of, in isolation and it doesn't balance it against the

4    benefits in the entire program.  And it assumed, from an

5    operation perspective, that all of the claims were allowed.  I

6    mean, ultimately, they talked in terms of these half a billion

7    dollar claims as if they were really allowed and real claims

8    and would be -- and then they were talking about, well they

9    sold them off to a claims purchaser, what the value of that

10    would be and so forth.  And I had to tell you, from the

11    debtor's perspective, we think there is a significant set of

12    obstacles that General Motors is going to have to navigate,

13    including with the debtor's, just to clear, before they're

14    going to get OPEB claims allowed at anywhere near the kinds of

15    values that, I think, General Motors believes they ought to be

16    allowed at.  I think they will assert an actuarial balance

17    sheet type of value and that's why we reserved the issue to

18    ourselves and for everybody else on what the real economic

19    value of the claim is.  Unless Your Honor has any other

20    questions, I don't have any other comments.

21        THE COURT:  Okay.  Thank you.

22        MR. KURTZ:  Can we have one minute?  Your Honor, just a

23    couple of quick responses.  Obviously we have no evidentiary

24    factual burden.  This is debtor's motion and debtor's burden.

25    The buyout provision is not limited to people who can't

                                                        121

1    otherwise check-the-box.  It would be nice if it was so

2    limited.  It extends to everybody, to GM's benefit.  Moreover,

3    it's an extra contractual obligation that could have been

4    resolved, and I'm sure, to the utter satisfaction of the unions

5    if they had allowed flow backs, and then, kept GM with an OPEB

6    claim subject to defenses or if they had allowed early

7    retirements in which GM would have taken the OPEB liabilities

8    and accepted the defendants.  But instead what they did is they

9    created a program where they would saddle the debtor's with 50

10    percent of the financial obligation associated with the soft

11    landing and allow the other 50 percent in an allowed claim

12    without any defenses.  So GM clearly won that point and it

13    benefits GM.  It doesn't benefit the debtors or the estate.

14    And the last point, Your Honor, is it just misstates our

15    position to say, we don't like check-the-box or objecting to

16    check-the-box.  They can check the box.  What we're saying is,

17    that the debtor's cannot waive our existing defenses by

18    creating a fictitious contract claim that we can't defend

19    against.

20    (The Judge's Final Ruling is Attached to the Order at Docket

21    Number 4461)

22        THE COURT:  Well, I have a motion in front of me by the

23    debtors in this case for approval of a supplemental special

24    attrition program agreement between themselves, the UAW and GM,

25    as well as an agreement for a special attrition program between

                                                        122

https://vip21.veritextllc.com/myfiles/620041/120882.TXT

1    themselves, their second largest union the IUE-CWA and GM.  The

2    Court had a lengthy hearing regarding the first agreement

3    between Delphi, the UAW and GM a couple of months ago and

4    approved that agreement.  The current supplement is an add-on

5    to that agreement and it doesn't change any of the prior terms

6    of that agreement or the Court's order approving it.  But, that

7    prior -- previously approved program is important to understand

8    in the sense that it provides some context for this motion.

9    The other contextual point that is important is to note that

10   between the date that I approved the main special attrition

11   program between the UAW, GM and Delphi and today; the debtor's

12   filed a motion to reject their collective bargaining agreements

13   with, not only the UAW and the IUE-CWA but their three other

14   unions.  The Court held several days of trial on that motion

15   and then at the parties request, adjourned the trial to permit

16   further negotiations among the unions and Delphi and GM.  In

17   that trial of the 1113, 1114 issues the unions, in particular

18   the UAW strongly asserted that they had been on a path with

19   both Delphi and GM to deal with the union issues prior to

20   (indiscernible due to equipment) 1113 and 1114 motion.  Which

21   included, as a critical step, the reduction of the debtor's

22   hourly workforce pursuant to attrition programs.  Both that had

23   been negotiated, and further programs with other unions that

24   were under consideration.  And that statement was brought out

25   to large measure by the subsequent negotiations of the


123


1    supplemental health program with the UAW as well as the program

2    with the IUE and both of which are conforming.  The motion has

3    been objected to by the former active non-union parties of

4    interest in this case.  The official creditors committee and

5    official equities committee, the indentured trustee have

6      approximately two million dollars of unsecured debt, and the ad

7      hoc had to be equity to fee.  Those objections, however in

8      large part, if not exclusively, go to one aspect of the

9      proposed agreements and not to the merits of Delphi's entering

10      into an attrition program with the IUE and supplementing its

11      current attrition program with the UAW. Consequently the

12      evidentiary hearing -- the evidentiary portion of this hearing

13      was much briefer than the earlier hearing.

14          Before I -- well, let me say this first, the     object --

15      the primary basis for each of the four objections is, the

16      objectors' view that the proposed agreements unduly benefit GM

17      to the detriment of Delphi.  Specifically, each objector

18      contends that in two respects, GM is improperly obtaining

19      preferred different treatment pursuant to the agreements.

20          The first respect is that under the agreement, GM has

21      agreed both with respect to the UAW and the IUE, to pay one

22      half of the proposed actual buyout of those employees who

23      choose to take a buyout.  And will, under the agreement,

24      receive an allowed claim, an unsecured claim, against Delphi

25      Corporation with monies actually spent by GM.


124


1          Secondly, of each objector points to the provision of the

2      agreement (indiscernible due to equipment) which would deem

3      GM's claim in respect of its assuming liability for OPEB

4      obligations, for those employees who check the box to transfer

5      those obligations to GM.  To deem that claim, one that is

6      assertable under the master separation agreement between Delphi

7      and GM entered into in 1998, whether or not, in an actual

8      pattern, such a claim would be asserted under the master

9      separation agreement.

10          Before discussing the merits of those objections as well

11    as the remaining objections by Wilmington Trust and the ad hoc

12    equity committee, I should hope the standard, under which I am

13    reviewing this motion, the motion discounts as a request under

14    section 363(b) of the Bankruptcy Code, which requires that if

15    the debtor uses, sells or leases assets of its estate out of

16    the ordinary course it needs to provide an opportunity for a

17    hearing on notice to the parties in interest.  And I believe

18    that this is properly, a motion for sections 363(b) of the

19    Code.  In that, among other things, the debtor would be

20    expending approximately 135 million dollars, if its projections

21    are accurate, in respect of the buyout aspect of the program.

22        In addition, I have reviewed the motion under the standard

23    for review of settlements in bankruptcy cases as laid out by

24    the courts, starting with protective committee for independent

25    stockholders of TNT Trailer and Ferrying v. Anderson 390 US


125


1    414424, 1968, I do that because there are elements of this

2    proposal which do change the treatment of GM.  Which

3    (indiscernible due to equipment) and GM argues to the

4    contrarily affect new undertakings by GM.  But not entirely

5    accepting that analysis for the purposes of this hearing, I'm

6    going to apply the settlement standard for those aspects of the

7    settlement.  Which happen to be the aspects that the -- those

8    aspects of the agreements -- excuse me, which happen to be

9    those aspects that the objectors primarily oppose.  As set

10    forth in TNT Trailer Ferrying and many cases after that,

11    including Bionosphere and Refsom Partners, in considering the

12    settlement in bankruptcy the Court needs to consider the

13    probability of success in litigation, the difficulty in

14    collection, the complexity of the litigation involved, with the

15    underlying issues involved, and the expense and convenience of

16    delay necessarily attending to them.  In the interests of

17    creditors and stockholders and the drop or debt.  Settlements

18    in  bankruptcy are favored, perhaps even more so than in

19    general litigation given the limited resources of most debtors.

20    And it's clear from the case law, as best set out in WT Grant

21    case, that the Court need not conduct any trial or lengthy

22    evidentiary hearing when considering a proposed settlement.

23    And that it should evaluate, I have record and the forwarding

24    factors like that -- and approve it in its discretion under

25    (indiscernible due to equipment)of reasonableness in light of


                                         126


1    those factors.  With respect to motions under section 363(b)

2    the courts in this circuit require the bankruptcy court to

3    evaluate such motions in the light of its own business

4    judgment, although heavily informed by -- under proper

5    circumstances -- proper exercise of business judgment by the

6    debtor.  And by proper exercise I mean the Court's determine,

7    when applying the business judgment rule, whether the debtor

8    has followed proper procedures in evaluating the proposal and

9    whether the proposal is one involving an insider as opposed to

10   arms-length negotiations.  And if its arms-length negotiations

11   may include recognition of the fact that one party may all or

12   less leverage than another.  As well as, again, the views of

13   third parties, such as an official committee that may have

14   access to nearly as much, if not as much, information as the

15   debtor's decision makers.  Particularly if those third parties

16   object to the it being sought.  And I've -- as I've said,

17   reviewed this motion in the light of both of the standards.

18   Turning to the objections, it is clear to me from the

19   statements of the objectors with one exception -- the exception

20   I'll deal with later -- that the objectors agree with the

21   debtor.  That a (indiscernible) such as that covered by this

22   motion providing for attrition of the debtors' union employees.

23   It is beneficial to the debtor's generally.  The record is

24   clear on this point.  And I don't want to elaborate on it at

25   length, but I should note that as these debtors have clearly

127

1   set forth, and I think its undisputed, the necessity to them of

2   substantially reducing their operations in the United States.

3   Which would involve, in the normal course, a substantial

4   reduction, of course, in hourly and salaried workforce engaged

5   in United States operations.  The attrition program already

6   been substantially implemented with GM, has proven to be

7   successful in leading to substantial reductions in debtor's

8   hourly workforce.  Wherever those reductions occurred, by and

9   large, at the level of the most highly paid hourly workers

10  thereby, not only reducing the numbers of the debtor's

11  workforce but also disproportionately by worker costs that the

12  debtors face.  The reductions also helped the debtors in

13  another respect which is that they have shifted from their

14  books as a principal pattern onto the books of GM a substantial

15  liability for retiree and other OPEB benefits.  As it was made

16  clear to me in Mr. Sheehan's testimony, the attrition program

17  does not actually provide for a release of the debtor in

18  respect of OPEB.  On the other hand, the OPEB check-the-box

19  mechanism in GM and IUE programs, essentially, transfer

20  seamlessly an employee to GM's benefits package without raising

21  the uncertainties as to when that might otherwise occur in

22  respect of GM's guaranty of benefits to those two unions

23  entered in 1999.  Further, the testimony on the record is clear

24  and I include as part of the record, the representations by

25  counsel directly involved in the negotiations such as Mr.

128

1    Kennedy and Mr. Butler and GM's counsel, that the existence of

2    an attrition program for the UAW as well as the implementation

3    of an attrition program for the IUE is of very little

4    importance to the debtor's resolving their other issues with

5    the unions in respect of the prevailing wage rates, plant

6    shutdowns, and the like.  In that it clarifies the parameters,

7    or size, of the debtor's workforce going forward and means that

8    the parties would be negotiating issues with the proper factual

9    context as opposed to a hypothetical one.  As Mr. Kennedy said,

10   there is also a substantial timing element in this last point.

11   The 1113, 1114 hearing was adjourned only till August 11th for

12   various reasons, some of which are quite unfortunate, i.e., the

13   death of the chief negotiator for the IUE.  The IUE is a couple

14   of months behind the UAW in having an actual track record of

15   participation in an attrition program.  The record is clear,

16   and I think undisputed, that it is very important for the

17   ongoing labor negotiations that actual experience under

18   attrition program for the IUE has promptly, and well before our

19   August 11th, so that the parties can meaningfully negotiate the

20   rest of their labor issues.  The contrary is the disapproval of

21   this program, as Mr. Kennedy also represented it and is, as I

22   believe, fully understandable, would be a serious disrupt in

23   the debtor's attempt to resolve its labor issue.  So as I

24   noted, the reasons for approving an attrition program like this

25   one, I believe, are clear and largely acknowledged by the

129

1    objectors.

2         As I noted, the primary objection raised by the objectors

3     is as to the two aspects of GM's claims resulting from this

4     program.  Let me address the buyback point first.  Although I

5     should note that these points, to my mind, are not discreet in

6     that this is a comprehensive attrition program.  If I were to

7     find fault with one aspect of the program, whether it's the

8     buyback claim or the right of GM to assert a claim under the

9     MSA, I don't have the power to amend the agreement.  At best,

10    what would occur would be, a return by the three parties to the

11    bargaining table to renegotiate the agreement.

12         As regards to the buyback point, the agreement provides

13    that GM will have an allowed claim for the actual dollars it

14    spent, in respect of the buyback which would be 50 percent of

15    the buyback amount.  It was suggested, somehow, that this claim

16    allowance would violate section 502(e) of the Bankruptcy Code.

17    Mr. Kennedy, at oral argument, raised that point that did the

18    debtors papers adequately address the issue.  They claim is

19    only allowed to the extent that GM actually pays out-of-pocket

20    in respect of the buyback.

21         Moreover, the record has made it clear that GM's rights in

22    respect of the amount claimed is different than the creditor.

23    In that they would still be subject to the requirements of

24    confirmation of a plan and payout pursuant to a plan.  The

25    disallowance of such a claim on 502(d) of the bankruptcy code,

130

1     were GM to be found to have received in full the transfer and

2     not returned that transfer and other provisions of the

3     Bankruptcy Code that apply too, hope to allow claims.  And that

4     means the record is clear on the extent of the fourth line.

5         The debtors contend that this is new money and that they

6     would either have to go out-of-pocket themselves with the 50

7     percent that GM is paying.  Or along the lines of a third party

8    who would have a, in all likelihood, secured and post-petition

9    priority claim for the amount.  And based on that logic, GM's

10   agreement up front, in return for an allowed unsecured claim,

11   is of benefit to the estate.  And that is so because the record

12   suggests that, at least as of today, there's no assurance that

13   unsecured creditors, as GM would be under this agreement, would

14   receive a hundred cents on the dollar on their claims.  And

15   therefore, the debtor is paying half of the buyout with -- to

16   approve an otherwise small bankruptcy dollars, as opposed to a

17   hundred cent dollars.

18       It is argued, nonetheless, that GM is obtaining for itself

19   an undue benefit through this approach.  That is because GM

20   has, as I mentioned earlier, previously guarantied OPEB

21   benefits to the IUE and GM.  Pursuant to the buyback

22   consequence of the employees election of the buyback would be

23   elimination of that contingent liability on GM's part.  It's --

24   I'm sure this applies to anyone, that GM is not in radiant of

25   this agreement so as to make a gift to Delphi, rather it's


               131


1    doing it in its own best interest.  And I'm sure that the

2    consequence that it considered with this agreement is that it

3    would be relieved of its contingent benefit guaranty liability,

4    in respect of those parties whose buyout is being fund on a

5    fifty-two week basis.

6       But the issue before me is not the benefit that GM

7    receives, whether the debtor is obtaining a reasonable benefit

8    in light of the alternatives available to it.  I've spent a

9    considerable amount of this hearing trying to evaluate the

10   alternatives available to the debtor, to the buyout proposal.

11   It seems to me the first one, which is set for the reasons I

12   stated earlier, is not a valid alternative in that its paying

13   with hundred cent dollars -- clearly hundred cent dollars in

14   that instance.  As far as I could tell, although the objectors

15   are not particularly clear about this, and in fact, didn't

16   address it at all in their papers, did not just take the view

17   that the debtor's alternative simply not to have a check-the-

18   box section of the program, but rather to offer only the

19   portion of the program that provides for the buyout and the

20   35,000 dollars of payments per person.  It's suggested by the

21   objectors that the unions would be as comfortable -- or should

22   be as comfortable with that approach as with the current

23   proposed program.  And that the debtors would ultimately

24   obtain, not only the same benefits that is the current program

25   but, in fact, better benefits by applying these agreements.


132


 1   Certainly the representations by the unions are to the

 2   contrary, and I accept those representations based on my review

 3   of the GM IUE and GM UAW benefit guaranty.  As well as my

 4   belief that a clear check-the-box provision is something

 5   definitely understandable but inherently more lawful to an

 6   hourly employee then reliance upon the benefit guaranty.  And

 7   therefore, a lot more likely to induce an employee to accept

 8   attrition promptly.  The objectors contend that Delphi could

 9   simply continue to perform its own obligations under the -- its

10   own benefit plans with the unions having the comfort of the

11   backdrop of GM guaranty.

12        I have two issues with that logic.  The first is that, as

13   I said before, I don't believe that leads employees to accept

14   attrition now.  (Indiscernible) conform to the contrary creates

15   greater uncertainty for them.

16        Secondly, and I believe that ultimately the issues of how

17   and when GMs benefit guaranties would be triggered, will arise

18    in any event, in this case, and lead to some form of liquidated

19    or non-contingent claim by GM.  Consequently, I don't believe

20    that one should generally -- what one could generally -- simply

21    put the union problem onto GM now, without some form of

22    inducement to GM in a tangible form.

23         Given that GM is, in fact, going to be going out-of-pocket

24    for up to 50 percent of the buyout clause, it seems to me that

25    the inducement that the debtors have provided for them is


133


1    appropriate, which is an unsecured, pre-petition claim subject

2    to the ministrations that I have told you earlier.  And that

3    there is no meaningful alternative in them to that process that

4    gets the debtor's the same type of benefit.  Clearly, this

5    falls within the range of reasonableness of the settlement, to

6    the extent is a settlement with GM.  And also, in my mind, is

7    supported by good business reasons.  As with any settlement or

8    any deal, one can imagine different ways that it might be

9    negotiated, but that's not the order of the Court for either of

10   the settlement or business judgment statements.

11        I've already addressed, in some measure, the second issue

12   which is that under the agreements GM is deemed to have an

13   assertive claim under the MSA.  This does, clearly, give GM a

14   benefit in return for its acceptance of the check-the-box OPEB

15   transfer.  That is because it is further from clear and

16   probably unlikely that without it being deemed to be asserted

17   upon the MSA, GM would have certain claim under the MSA.

18   Moreover, with regard to the  UAW -- I'm sorry -- the IUE in

19   contrast to the UAW, there is no separate indemnity agreement

20   whereby Delphi indemnified GM for OPEB performance to the IUE

21   under the GM benefit guaranty.

22        So, absent the deeming of the claim to be assertable under

23    the MSA, that it appears that GM will have to fall back on its

24    rights under common law, separation and retribution, which

25    might be different than under the MSA.  That being said, the


                                    134


1     benefit to GM is limited in the following respects; first the

2     debtors expressly reserve the right to object to the

3     quantification of such a claim under the MSA, which is a future

4     issue given the different ways that one may quantify the OPEB

5     liabilities.  Secondly, except for the right to have the claim

6     be deemed assertable onto the MSA, also parties other than the

7     debtor have the right to object on a basis to such a claim of

8     GM under the MSA.  Including, for example, insubordination and

9     brought the transcript objections set up and alike.

10        The question at the end that I have to address, really,

11    and I am going to discuss it in the context of the other issue,

12    is whether this gives debt to GM, it is reasonable and an

13    exercise of good business judgment and an appropriate

14    settlement of potential down the road.  Again, I noted earlier

15    the benefits of this type of thing.  I failed to mention that

16    one of the benefits is payment or offer to pay up to 35,000

17    dollars per individual by GM, you know, without any agreement

18    by the determined in respect of whether GM has a claim there or

19    not.

20        Secondly, as I said before, today GM has no obligation to

21    accept check-the-box liability for OPEB.  It merely has its

22    obligation under the OPEB guaranties.  It's argued by the

23    objectors that those are the same -- or tantamount to being the

24    same thing.  As I said before, I disagree with that.  I believe

25    that the form -- the check-the-box division and concession by

1    GM is substantially more likely to induce hourly workers to

2    accept the attrition program then simply reliance on the

3    benefit guaranty, which does not run into any individual

4    worker.  And is, furthermore, tied up in the unpredictable

5    outcome of the pending section 1113 and 1114 litigation.

6        Further, I'm aware that the agreement in respect of the

7    OPEB claim does give GM certain rights, I believe, in

8    protecting either litigation or negotiations following more and

9    extensive of the 1113 litigation.  That those issues would not,

10   necessarily, all be decided in the estate's favor and contrary

11   to GM, and that there's a substantial likelihood that the

12   parties in why to disapprove these agreements on this basis,

13   would simply be postponing a negotiation for several months.

14   Not obtaining an ultimate result of dramatically more

15   beneficial to the estate.  And of course by postponing the

16   negotiation for more months the result will be, I believe,

17   severely detrimental to the ongoing negotiations specifically

18   between GM, the union and the debtors and essentially deprive

19   the debtors the benefit of the attrition program that's been

20   proposed.  So consequently, I'm not prepared to disapprove the

21   agreement on this basis or to play a game of chicken with GM or

22   to suggest that it only made this change I would

23   (indiscernible), in other words, again, while one could posit

24   different ways that this might have been negotiated.  The

25   agreement that has resulted is within their business judgment

136

1    and also within the bounds of reasonableness that have been

2    placed upon them, partial settlement of how GM's OPEB claim

3    with respect to these employees will be treated.

4        If we turn to the other objections briefly, first I'm

5    going to a point actually raised in this objection.  This is

6    counsel at oral argument suggested that Appaloosa was

7    nevertheless suggesting that these two agreements constitute

8    (indiscernible) plan reorganization and consequently could not

9    be approved without prior approval of disclosure statement

10   aborting by all parties of interest and confirmation of a plan.

11   I disagree with that analysis and I do not believe that these

12   agreements effect the Chapter 11 plan, in that they do not

13   determine the treatment of creditors but rather deal with a

14   settlement of claim to the extent that it is being settled and

15   the intention of new money of the debtors to buyout their

16   employees.  This is not the type of matter that creditors would

17   be expected to vote on.  Obviously, as with any action and of

18   the ordinary course, there are consequences that flair from the

19   agreements that affect the debtor's business and particularly,

20   therefore, their chances to reorganize.

21       But as the second circuit has made clear and Lionel has

22   brought to me, the existence of those consequences does not

23   constitute a sup-plan.  Simply, Appaloosa argued, again I

24   believe only in oral argument, that it questioned whether the

25   proposed buyout was even necessary.  In that the debtors had


137


1    already obtained very significant and beneficial results from

2    the UAW attrition program.  The assertion, again, came as

3    somewhat of a surprise to me and I believe also the debtors.

4    And I believe it's been sufficiently rebutted by the counsel

5    involved in the negotiations in the following two respects,

6    first, with regard to the UAW employees, it appears that there

7    may be some overlap between the existing program and buyout --

8    but that the existing program in that they apply to more senior

9   workers, would logically continue to be chosen by those workers

10  and that the buyout would buy two other -- two others.

11      Secondly, Mr. Kennedy represented and based on my

12  understanding of record in 1113 and 1114 hearing his

13  representation is correct, in that they ought to believe that t

14  would be the buyout in order to have optimal attrition given

15  the age of its workforce, which is substantially younger than

16  the threshold traders for the other aspects of the program.

17  Again, Delphi has opposed the basic idea that attrition here is

18  good.  I believe that is the only issue that I needed to

19  consider in connection with this objection, i.e., whether a

20  date would encourage attrition on its own as opposed to being

21  simply redundant with the other aspects of the program.

22      And finally, in the equity committee, the ad hoc committee

23  and Wilmington Trust has objected to the settlement in the

24  motion on the basis that Delphi Corporation -- the parent

25  corporation, is the (indiscernible) under the settlement up to


138


1   GM who will be paying out to the extent buyout payments are

2   paid by the debtor -- the backup payments.  It was contended by

3   each of those three objectors that other entities, in

4   particular the North American subsidiaries actually employ the

5   hourly workers affected by this agreement, should be

6   responsible for making the payments and having a claim asserted

7   against them by GM.

8       The agreement in the proposed order is similar to the

9   existing UAW attrition program, provide that all rights of

10  every debtor, as it does to every other debtor, are fully

11  preserved so that for example, Delphi Automotive Systems

12  behinds it's either supervised or have a claim asserted against

13  it by Delphi Corporation under way of its bigger share,

14    (indiscernible) that Delphi Corporation has to pay out, either

15    to GM or to the EUA workers.  There is no determination

16    anywhere in the order as to what level of priority that claim

17    would have, in the hopes the payment out occurs post-petition

18    by Delphi Corporation.

19        As I noted in oral argument, it seems to be, that perhaps

20    with one exception, that certain preservation of rights

21    sufficiently addresses the -- that's particularly the case

22    since Delphi Corporation is not simply a volunteer of a

23    potentially innocent bystander here.  In addition to being a

24    party to a corporate investment group because they may or may

25    not have independent legal significance as far as claims


139


1    asserted against it.  But it is also responsive of the various

2    benefit plans that come with retiree health and OPEB benefits

3    and consequently would be benefited by a reduction of such

4    OPEB.

5        But leaving that aside, it is also the parent of DAS, and

6    potentially that the objectors believe should probably be

7    resolved of the obligation.

8        As far as the record of this hearing is concerned and

9    based on my knowledge of the debtors reorganization planning,

10    including as set forth in the 1113, 1114 trial, it is clear to

11    me that the debtors presently do not intend to jettison their

12    North American operations and that they see tangible benefit

13    them in those operations.  Moreover, it does not appear to me,

14    on this record, that those North American subsidiaries are so

15    hopelessly insolvent that they could not satisfy a -- all or a

16    material portion of a claim over for each of -- for their fair

17    share of my ability in respect of its payments on these

18    agreements.  Or as to the extent that they could not on

19    absolute majority rule, take the corporation, when at a

20    minimum, would become an equity holder through plan for those

21    North American entities.

22        Consequently, it seems to me that these, in one way or

23    another, be able to any of the (indiscernible).  And

24    consequently, I think the reservation does sufficiently protect

25    Delphi Corporation from having to pay more than its fair share


140


1    under this agreement.  So consequently, I'll approve the motion

2    and authorize the debtors to enter into the two agreements.

3        There's a remaining aspect totally aside, which was

4    address briefly, which is the debtor's request that the ten day

5    stay, under Bankruptcy Rule, 6004(g) not apply.  There was an

6    attempt to rebut the assertion, which I accept, and I guess

7    it's implicit in my earlier remarks, that the prompt

8    implementation of this attrition program is of the greatest

9    importance to the debtor's ability to continue to resolve the

10    bigger earning ratios which, of course, are of fundamental

11    importance to this Chapter 11 case.  I believe that the need

12    for the speed is sufficiently important to establish cause

13    under Rule 6004(g), notwithstanding the fact that there were

14    four objections to the motion.  Again, with the limited

15    exceptions that I discussed, those are motions -- I'm sorry --

16    those objections were not based on the merits of the attrition

17    program itself.  There are a lot of issues involving GM and as

18    I previously said, I believe that treatment of GM in these

19    agreements is both essential to the agreements and cannot be

20    changed without losing the agreements.  And reasonable and

21    support the debtor's business reasons.  So I believe that the

22    attrition programs need to be implemented promptly and that the

23    existence of a ten day stay, which would take us into,

24    basically, mid-July would simplify the implementation of

25    attrition programs as to materially impair the ongoing

141

1    negotiations of the remaining collective bargaining issues.  So

2    I've granted this motion as well.

3    (The Judge's Final Ruling is Attached to the Order at Docket

4    Number 4461)

5        MR. BUTLER:  Thank you, Your Honor.  Your Honor, we

6    submitted an order to the court for the Court's consideration

7    and I didn't hear anything and the ruling didn't direct us to

8    change aspects of that and would ask the Court to consider

9    entering it.

10        THE COURT:  I think that's fair.  There were some

11    clarifications on the record.  But I believe that they are

12    consistent with the document and what they were.  I don't think

13    you had any language, for example, on 502(b) and the like.  Has

14    everyone had a chance to review that order?  It wasn't I.

15    Okay.  So it will be entered.

16        MR. BUTLER:  Thank you, Your Honor.  Your Honor, what do

17    you want to do with the chambers conference at this point?

18        THE COURT:  Well, can everyone -- would everyone like

19    about -- I can either break for about fifteen minutes or five

20    minutes or I could break for an hour.

21        MR. KENNEDY:  I'd say five minutes, Your Honor.

22        THE COURT:  Okay.

23        MR. BUTLER:  All right.  So 2:30 Your Honor, for the

24    chamber's conference?

25        THE COURT:  Yes.

142

https://vip21.veritextllc.com/myfiles/620041/120882.TXT

1        MR. BUTLER:  And -- okay.  And that would involve just

2   people who are actually --

3        THE COURT:  Yes, let me be clear.  That conference is just

4   going to involve the parties who are actively participating in

5   the 1113, 1114 litigation.  So if you are looking to press, or

6   just a general comment or equity voter or employee, I'd just

7   exclude you anyway so you ought to leave now.  Otherwise, I'll

8   be back at 2:30, excuse me.

9        MR. BUTLER:  Thank you, Your Honor.

10       (Proceedings Concluded at 2:16 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    143


1                        I N D E X

2

3   WITNESS          EXAMINATION BY PAGE

4   John Sheehan   Mr. Seider      20

5

https://vip21.veritextllc.com/myfiles/620041/120882.TXT

```
 6                    E X H I B I T S

 7    DEBTOR'S  DESCRIPTION     PAGE

 8    1 through 13              14

 9    14 through 27             14

10    28 through 32             14

11    39 through 43             14

12

13                        R U L I N G

14    Judge's Ruling       123-143

15

16

17

18

19

20

21

22

23

24

25
```

                                              144

```
 1               C E R T I F I C A T I O N

 2

 3    I, Esther Accardi, court approved transcriber(s), certify that

 4    the foregoing is a correct transcript from the official

 5    electronic sound recording of the proceedings in the above-

 6    entitled matter.

 7

 8    _____ June 30, 2006_____

 9    Signature of Transcriber                Date

10
```

11    Esther Accardi    _____

12    typed or printed name

13

14

15

16

17

18

19

20

21

22

23

24

25