IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

In re                         :     Chapter 11
                                 :

DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                               :

               Debtors.     :     (Jointly Administered)
                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On August 23, 2006, I caused to be served the document listed below (i) upon the parties listed on Exhibit A hereto via overnight delivery and (ii) upon the parties listed on Exhibit B via facsimile:

      Notice of Proposed Deminimis Sale of Assets Located in Flint, Michigan Free and Clear of Liens, Claims and Encumbrances.  [a copy of which is attached hereto as Exhibit C]

Dated: August 24, 2006

                                */s/ Evan Gershbein*
                                Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 24th day of August, 2006, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature :        */s/ Amy Lee Huh*

Commission Expires:    *3/15/09*

# EXHIBIT A

Delphi Corporation
Special Parties

| CreditorName | CreditorNoticeName | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Alicia M. Leonhard, Esq. | Office of the United States Trustee for the Southern District of New York | 33 Whitehall Street | Suite 2100 | New York | NY | 10004 | |
| Bonnie Steingart, Esq. | Fried, Frank, Harris, Shriver & Jacobson LLP | One New York Plaza | | New York | NY | 10004 | |
| Brian Resnick, Esq. | Davis Polk & Wardwell | 450 Lexington Avenue | | New York | NY | 10017 | |
| Donald S. Bernstein, Esq. | Davis Polk & Wardwell | 450 Lexington Avenue | | New York | NY | 10017 | |
| Dove Bid | John Miller | 16042 Meadow Oak Dr | | Chesterfield | MO | 63017 | |
| Galaxy International Machinery Inc | John Marshall | 1685 Maroon Bells Lane | | Bolingbrook | IL | 60490-6530 | |
| Genesee County Treasurer | Office of Daniel T. Kildee | 1101 Beach Street | | Flint | MI | 48502-1475 | |
| Honeywell | Tim Bensette | 16671 Old Bedford | | Northville | MI | 48167 | |
| Kenneth S. Ziman, Esq. | Simpson Thacher & Bartlett LLP | 425 Lexington Avenue | | New York | NY | 10017 | |
| Mark A. Broude, Esq. | Latham & Watkins LLP | 885 Third Avenue | | New York | NY | 10022 | |
| NGK Spark Plugs USA | Rick Sullivan | 46929 Magellan Dr | | Wixom | MI | 48393 | |
| Payson Plating | Tony Payson | 6889 Orchard Lake Rd #301 | | West Bloomfield | MI | 48332 | |
| Robert J. Rosenberg, Esq. | Latham & Watkins LLP | 885 Third Avenue | | New York | NY | 10022 | |
| Torch Spark Plug Co., LTD. | Chen Guangyun, General Manager | 3N Hongqi Road | | Zhuzhou | Hunan | 412002 | China |
| Treasurer, City of Flint | Office of Doug Bingaman | 1101 S. Saginaw St. | | Flint | MI | 48502 | |

# EXHIBIT B

Delphi Corporation
Special Parties

| CreditorName | CreditorNoticeName | Address1 | Address2 | City | State | Zip | Country | Fax |
|---|---|---|---|---|---|---|---|---|
| Alicia M. Leonhard, Esq. | Office of the United States Trustee for the Southern District of New York | 33 Whitehall Street | Suite 2100 | New York | NY | 10004 | | 212-668-2255 |
| Bonnie Steingart, Esq. | Fried, Frank, Harris, Shriver & Jacobson LLP | One New York Plaza | | New York | NY | 10004 | | 212-859-8585 |
| Brian Resnick, Esq. | Davis Polk & Wardwell | 450 Lexington Avenue | | New York | NY | 10017 | | 212-450-3213 |
| Donald S. Bernstein, Esq. | Davis Polk & Wardwell | 450 Lexington Avenue | | New York | NY | 10017 | | 212-450-3092 |
| Dove Bid | John Miller | 16042 Meadow Oak Dr | | Chesterfield | MO | 63017 | | 636-537-5449 |
| Genesee County Treasurer | Office of Daniel T. Kildee | 1101 Beach Street | | Flint | MI | 48502-1475 | | 810-257-3885 |
| Honeywell | Tim Bensette | 16671 Old Bedford | | Northville | MI | 48167 | | 419-436-5624 |
| Kenneth S. Ziman, Esq. | Simpson Thacher & Bartlett LLP | 425 Lexington Avenue | | New York | NY | 10017 | | 212-455-2502 |
| Mark A. Broude, Esq. | Latham & Watkins LLP | 885 Third Avenue | | New York | NY | 10022 | | 212-751-4864 |
| NGK Spark Plugs USA | Rick Sullivan | 46929 Magellan Dr | | Wixom | MI | 48393 | | 248-926-6910 |
| Payson Plating | Tony Payson | 6889 Orchard Lake Rd #301 | | West Bloomfield | MI | 48332 | | 248-626-4199 |
| Robert J. Rosenberg, Esq. | Latham & Watkins LLP | 885 Third Avenue | | New York | NY | 10022 | | 212-751-4864 |
| Torch Spark Plug Co., LTD. | Chen Guangyun, General Manager | 3N Hongqi Road | | Zhuzhou | Hunan | 412002 | China | 011-86-733-845-0227 |
| Treasurer, City of Flint | Office of Doug Bingaman | 1101 S. Saginaw St. | | Flint | MI | 48502 | | 810-238-8481 |

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
        In re                             :        Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :        Case No. 05-44481 (RDD)
                                          :
                            Debtors.      :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF PROPOSED DE MINIMIS SALE OF ASSETS
LOCATED IN FLINT, MICHIGAN FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES

PLEASE TAKE NOTICE THAT in accordance with the Order Under 11

U.S.C. § 363 Approving Procedures To Sell Certain De Minimis Assets Free And Clear Of

Liens, Claims, And Encumbrances And To Pay Market Rate Broker Commissions In

Connection With Such Sales Without Further Court Approval, entered on October 28, 2005

(Docket No. 766) (the "De Minimis Asset Sale Order"), Delphi Automotive Systems LLC, a

Delaware limited liability company (the "Seller"), hereby gives notice of its intention to sell

certain assets and equipment located at its facility at 1300 North Dort Highway, Flint,

Michigan to Great American Group, LLC, located at 9 Parkway North, Suite 300, Deerfield,

Illinois (the "Purchaser"), pursuant to the Asset Sale Agreement (the "Agreement").  A copy

of the Agreement is attached hereto as Exhibit A.  The assets and equipment subject to the

Agreement include, but are not limited to, machinery, equipment, spare parts, and tooling

(collectively, the "Assets").

PLEASE TAKE FURTHER NOTICE THAT in consideration of the

foregoing, the Purchaser shall pay the Seller $1,000,000.

PLEASE TAKE FURTHER NOTICE THAT the Purchaser is not an insider of the Seller as such term is defined in section 101(31) of the Bankruptcy Code and has no other connections to the Seller.

PLEASE TAKE FURTHER NOTICE THAT no broker was used in the sale of the Assets.

PLEASE TAKE FURTHER NOTICE THAT pursuant to the <u>De Minimis</u> Asset Sale Order, the Seller will consummate the sale of the Assets free and clear of liens, claims, and encumbrances, and take such actions as are necessary to close the transaction, including but not limited to collection of proceeds of the sale of the Assets, <u>provided</u> <u>that</u> counsel to the Seller does not receive from a party which receives this notice (a "Notice Party"), within five business days after the date following the Notice Party's initial receipt of this notice, a written objection or written request for additional time to evaluate the proposed sale.

Dated: New York, New York
      August 23, 2006

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons
    Ron E. Meisler
  333 West Wacker Drive, Suite 2100
  Chicago, Illinois  60606
  (312) 407-0700

    - and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, <u>et</u> <u>al.</u>,
  Debtors and Debtors-in-Possession

3

**Exhibit A**
**<u>Asset Sale Agreement</u>**

Final 6-29-06

## ASSET SALE AGREEMENT

**THIS ASSET SALE AGREEMENT** is made by and between Great American Group, LLC ("Buyer") and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company (the "SELLER"), each individually referred to as a "Party", and collectively referred to as the "Parties" to this Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in Article 1.

**WHEREAS,** on October 8, 2005, the SELLER, along with certain of its affiliated companies, filed voluntary petitions (the "Petitions") for relief commencing a case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS,** the SELLER, along with certain of its affiliated companies, continue to operate their businesses and manage their assets and properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS,** the Buyer desires to purchase from the SELLER, and the SELLER desires to sell to Buyer, on an "as is, where is" basis, the Acquired Assets, all in the manner and subject to the terms and conditions set forth herein and in the De Minimis Sale Order;

**NOW, THEREFORE,** in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

**Section 1.01** "Acquired Assets" means the M&E and Other Equipment. The Acquired Assets do not include any items that are associated with, or used by, the SELLER in its other products.

**Section 1.02** "De Minimis Sale Order" means the Order under 11 U.S.C. § 363 Approving Procedures to Sell Certain De Minimis Assets Free and Clear of Liens, Claims, and Encumbrances and to Pay Market Rate Broker Commissions in Connection with Such Sales Without Further Court Approval, entered by the Bankruptcy Court on October 27, 2005, in the Chapter 11 Case and attached hereto as Exhibit 1.02.

**Section 1.03** "Facility" means Seller's Flint, Michigan facility, which is located at 1300 N. Dort Hwy, Flint, Michigan

**Section 1.04** "Encumbrance" shall mean any claim, judgment, license, lease, sublease, lien, pledge, option, charge, easement, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, title retention arrangement which is intended as security, capitalized lease under generally accepted accounting principles, encumbrance or other right of third parties, whether voluntarily incurred or arising by operation of law, and includes, without limitation, any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof, and any "claim", "lien", or "security interest" as those terms are defined in the United States Bankruptcy Code.

Final 6-29-06

**Section 1.05    [Reserved]**

**Section 1.06** "Liquidation" shall mean the orderly liquidation by the Buyer of all or a portion of the Acquired Assets, which will include an offsite auction of certain of the Acquired Assets by Buyer.

**Section 1.07** "M&E" means the machinery and equipment listed on Exhibit 1.07 hereto.

**Section 1.08** "Other Equipment" means substantially all inspection equipment, tooling, spares, tool bins, and general support equipment used exclusively by Seller to manufacture spark plugs, which are not being sold to other purchasers of Seller's spark plug machinery and equipment.

**Section 1.09** Other Defined Terms.  In addition to the terms defined above, the following terms shall have the meanings set forth in the Sections indicated:

| <u>Term</u> | <u>Section</u> |
|---|---|
| "Buyer" | Introductory Paragraph |
| "Buyer's Invitees" | 10.01 |
| "Closing" | 2.03 |
| "Closing Date" | 2.03 |
| "Purchase Price" | 2.02 |
| "Removal Date" | 5.02 |
| "Seller" | Introductory Paragraph |

## ARTICLE 2

### SALE OF ACQUIRED ASSETS

**Section 2.01  <u>Assets Transferred.</u>**    On the terms and subject to the conditions set forth in this Agreement and in the De Minimis Sale Order, SELLER shall sell, transfer and convey to Buyer and Buyer shall purchase and acquire, on an "as is where is" basis, good title to the Acquired Assets, free and clear of any and all Encumbrances.

**Section 2.02  <u>Purchase Price of Acquired Assets.</u>**

A.    On the Closing Date (as defined in Section 2.03 below), and prior to the date of delivery of any of the Acquired Assets, Buyer will pay to SELLER, in payment for the Acquired Assets, the non-refundable amount of $1,000,000 (the "Purchase Price"), by wire transfer to the SELLER's bank account.

B.    All payments by Buyer to SELLER under this Agreement shall be accomplished by a wire transfer to the following account or such other account as may be designated by SELLER:

Bank One
Detroit, Michigan
Account of: Delphi Automotive Systems, LLC
Account #: 361388594
ABA #:072000326
Swift Code: FNBCUS44

Final 6-29-06

C.     Buyer agrees to furnish to Seller, a properly completed and executed, Michigan Resale Exemption Certificate for the Acquired Assets being purchased from Seller under this Agreement

**Section 2.03  Closing.**  The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place 30 days following the execution of this Agreement by all of the Parties, provided that all of the conditions set forth in Article 8 shall have been satisfied or waived (the date of the Closing being herein referred to as the "Closing Date").   For financial, accounting and tax purposes, the Closing shall be deemed conclusively to have occurred at 11:59 p.m. Eastern Time on the Closing Date.

**Section 2.04  Transfer Documents.**  Upon full payment for, and completion of delivery of the Acquired Assets, SELLER will deliver to Buyer a bill of sale, invoice, or such other similar document to vest Buyer with full and complete title to the Acquired Assets. Concurrently with the execution of this Agreement, Buyer will deliver to the Seller a certified copy of resolutions of Buyer's board of directors authorizing and approving the transactions contemplated by this Agreement.

**Section 2.05  Post-Closing Asset Deliveries.**  Should the SELLER in its reasonable discretion determine after the Closing that books, records, or other materials constituting Acquired Assets are still in the possession of SELLER or any of its affiliated companies, the SELLER shall or shall cause such affiliates to promptly deliver them to Buyer at no cost to Buyer, other than as contemplated in this Agreement.  Should SELLER or Buyer in its reasonable discretion determine after the Closing that books, records, or other materials not constituting Acquired Assets were delivered to Buyer, Buyer shall promptly return them to the SELLER at no cost to SELLER.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLER

The SELLER represents and warrants to Buyer as follows:

**Section 3.01  Corporate Authority.**  Subject to the De Minimis Sale Order, the SELLER has full corporate authority to execute and perform in accordance with this Agreement, and, upon full satisfaction of the terms and conditions of the De Minimis Sale Order, this Agreement shall constitute a valid and binding obligation of the SELLER.  This Agreement and all transactions contemplated hereby have been duly authorized by all requisite corporate authority, and will not result in a violation of any of the terms and provisions of SELLER's certificate of incorporation, articles of association, by-laws or other organizational documents, as applicable, or of any other agreement to which the SELLER is a party or by which it is bound, except for those violations that are excused by or are unenforceable as a result of the filing of the Petitions or the entry of the De Minimis Sale Order.

**Section 3.02  Title to Acquired Assets.**  SELLER warrants that, as of the date of delivery of the Acquired Assets, SELLER will have good and marketable title to the Acquired Assets free and clear of any Encumbrance.

**Section 3.03  Litigation.**  There is no litigation - equitable or legal, administrative, arbitrative or other proceedings - pending against SELLER with respect to the Acquired Assets, and SELLER is unaware of any investigation regarding any charge of violation of any applicable law, rule or regulation with respect to the Acquired Assets.

**Section 3.04  Disclaimer  of  Warranties.**   THE  ACQUIRED  ASSETS  AND  ANY  OTHER PROPERTY, RIGHTS AND SERVICES FURNISHED OR TO BE FURNISHED UNDER OR IN

Final 6-29-06

CONNECTION WITH THIS AGREEMENT BY SELLER TO BUYER ARE BEING FURNISHED ON AN "AS IS, WHERE IS" BASIS, WITH ALL FAULTS, AND THE SELLER MAKES NO WARRANTIES (EXCEPT TITLE) OR REPRESENTATIONS WHATSOEVER, EXPRESS OR IMPLIED, CONCERNING ANY OF THE ACQUIRED ASSETS, OR THE CONDITION, ACCURACY, QUALITY, UTILITY OR COMPLETENESS THEREOF, AND HEREBY EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY OF NONINFRINGEMENT OF THE PROPRIETARY RIGHTS OF THIRD PARTIES.

**Section 3.05  Location of the Assets.**  The Acquired Assets will be physically located at the Facility on the Closing Date.

**Section 3.06  Survival of Representations and Warranties.**  No representations and warranties made by the SELLER in this Article 3 shall survive beyond the Closing Date, except for the representation in Section 3.02 which shall survive for a period of two (2) years after the Closing Date.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents, warrants and covenants to the SELLER as follows:

**Section 4.01  Corporate Authority.**  Buyer has full corporate authority to execute and perform in accordance with this Agreement, and this Agreement constitutes a valid and binding obligation of Buyer; this Agreement and all transactions contemplated hereby have been duly authorized by all requisite corporate authority, and will not result in a violation of any of the terms and provisions of Buyer's certificate of incorporation, articles of association, by-laws or other organizational documents, as applicable, or of any other agreement to which Buyer is a party or by which it is bound.

**Section 4.02  Permits, Licenses and Approvals.**  Buyer has obtained all permits, licenses and approvals from any foreign, federal, state or local authority or administrative agency necessary to consummate the transactions contemplated hereby and engage in business utilizing the Acquired Assets.

**Section 4.03  Consents and Approvals.**  No consent, approval, or authorization of any non-governmental third party and no consent, approval, authorization or declaration of or filing or registration with any foreign, federal, state or local governmental or regulatory authority is required to be made or obtained by Buyer in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

**Section 4.04  No Assumption of Liabilities.**  Except as specifically provided in this Agreement, Buyer does not assume or agree to pay, perform or discharge any debts, obligations, contracts or liabilities of the SELLER, wherever or however incurred.

**Section 4.05  Survival of Representations and Warranties.**  All representations and warranties made by Buyer in this Article 4 shall survive for a period of two (2) years after the Closing Date.

## ARTICLE 5

## INSPECTION AND DELIVERY OF ACQUIRED ASSETS

**Section 5.01  Inspection.** Buyer acknowledges that it has inspected the Acquired Assets, and is satisfied with the condition thereof as referred to in Section 5.04.  SELLER agrees to maintain the

Final 6-29-06

Acquired Assets in their present condition, ordinary wear and tear excepted, until such time as title and risk of loss shall pass to Buyer.

**Section 5.02** <u>**Preparation For Shipment**</u>. The Acquired Assets are being delivered ex-works, SELLER's facility, Flint, Michigan, USA; Buyer shall be responsible for, and at its own cost and expense shall effect, the disconnecting, dismantling, packaging, preparation for shipment, and loading, shipment (including without limitation, skidding, movement to, and removal from SELLER's facility), and transportation of the Acquired Assets from SELLER's facility to its ultimate destination. Buyer shall cause such Acquired Assets to be completely dismantled and removed from SELLER's facility no later than one hundred twenty days (120) after Closing (the "Removal Date") unless Removal Date is extended by SELLER for reasons of Force Majeure under section 9.01. Such activities of Buyer's agents and employees shall be performed in a careful and workmanlike manner without damage to SELLER's facility and at such times and in such manner reasonably approved by SELLER so as to not interfere with or disrupt production or other operations at SELLER's facility. Buyer will have the right to have its employees at SELLER's facility during the time the Acquired Assets are being disconnected, dismantled and loaded onto trucks. Buyer, its employees, agents, representatives and contractors, shall comply with all applicable federal, state, and local laws, ordinances, regulations and standards and all applicable SELLER safety rules and regulations while on SELLER's premises. If Buyer does not completely remove the Acquired Assets on or before the date set forth above, SELLER may dispose of any remaining Acquired Assets in accordance with Section 10.01 hereof. SELLER shall not have any obligations or duties with respect to disconnecting, dismantling, packaging, preparation for shipment, loading, and/or delivery of the Acquired Assets.

**Section 5.03** <u>**Delivery**</u>. Delivery of the Acquired Assets shall take place, and title and risk of loss to such Assets shall pass from SELLER to Buyer, at the Closing.

**Section 5.04** <u>**Acknowledgment**</u>. BUYER IS ACQUIRING THE ACQUIRED ASSETS AND ANY OTHER PROPERTY, RIGHTS AND SERVICES FURNISHED OR TO BE FURNISHED UNDER OR IN CONNECTION WITH THIS AGREEMENT FROM THE SELLER TO BUYER "AS IS," WITH ALL FAULTS AND WITHOUT WARRANTIES OF ANY KIND (EXCEPT TITLE), EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY WARRANTY OF NONINFRINGEMENT OF THE PROPRIETARY RIGHTS OF THIRD PARTIES.

Without limiting the generality of the foregoing waiver or SELLER's disclaimer in Section 3.04, Buyer agrees that: (i) the SELLER neither represents nor warrants that any of the Acquired Assets will operate satisfactorily or that any of the Acquired Assets comply with any applicable foreign, federal, state, or local laws, ordinances, regulations, or standards, including, but not limited to, regulations and standards promulgated under federal and state environmental or occupational safety and health laws; (ii) Buyer accepts the entire risk and responsibility of taking any necessary action (including performing inspections and undertaking physical modifications) to make the Acquired Assets operate safely and satisfactorily in Buyer's plant and comply with any applicable foreign, federal, state, or local laws, ordinances, regulations, or standards, including regulations and standards promulgated under federal and state environmental, occupational safety and health laws, or import and export laws; (iii) the SELLER shall have no liability or responsibility for the condition, yield and/or operation of the Acquired Assets after the Closing; and (iii) Buyer is purchasing the Acquired Assets based solely upon its own inspection, evaluation, review and analysis, and Buyer assumes the entire risk associated with such inspection, evaluation, review and analysis being incomplete or inaccurate.

<u>**ARTICLE 6**</u>

<u>**INSURANCE**</u>

Final 6-29-06

### Section 6.01  Buyer's Insurance

Buyer and its agents, representatives, contractors and/or the Buyer's Invitees (as defined in Section 10.01 below) shall, during the performance of activities under Articles 5, 7 and 10 of this Agreement, maintain the following insurance coverage:

| Kind of Insurance | Minimum Limits |
| --- | --- |
| Workers Compensation | Statutory per applicable state law, including Employer's Liability with limits of not less than $1,000,000 |
| Comprehensive General Liability (including contractual liability) | $5,000,000 per occurrence combined single limit for personal injury and property damage |
| Comprehensive Automobile Liability (covering owned, non-owned and hired vehicles) | $1,000,000 per occurrence combined single limit for personal injury and property damage |

Before any of the activities referred to in Articles 5, 7 or 10 are started, Buyer shall furnish the SELLER with a certificate evidencing compliance with the limits, insurance requirements and waiver of subrogation set forth above and below.    Delphi shall be an Additional Insured under Buyer's insurance policy (except Workers' Compensation and Employers' Liability).    Such certificate shall be in a form acceptable to, and underwritten by an insurance company reasonably satisfactory to Delphi and with an A.M. Best Company rating of A- or above.  All policies of insurance procured by Buyer herein shall be written as primary policies; not contributing with or in excess of coverage that Delphi may carry.  By requiring insurance herein, Delphi does not represent that coverage and limits will necessarily be adequate to protect the Buyer.  The purchase of appropriate insurance coverage by Buyer or the furnishing of certificate of insurance shall not release Buyer from its respective obligations or liabilities under this Agreement. If Buyer's policies do not contain the standard separation of insured's provision, or a substantially similar clause, they shall be endorsed to provide cross-liability coverage.   Buyer shall agree to waive their insurer's right of subrogation under its policies.   The Certificate of Insurance should also provide at least 30 days' prior written notice to the SELLER of cancellation, modification or material change to the policy.

**Section 6.02  Seller's Insurance.**  Seller will maintain its existing property damage, liability, fire, theft and any other insurance with respect to the Facility and the Acquired Assets through the Removal Date.

### ARTICLE 7

### INTELLECTUAL PROPERTY

**Section 7.01**  Buyer agrees to abide by the United States Government Export Administration Regulations.

Final 6-29-06

**Section 7.02**  Nothing in this Agreement shall be construed to require the SELLER to furnish any intellectual property or technical information owned by SELLER or its affiliated companies.

**Section 7.03**  Buyer acknowledges that it is not acquiring any rights in or to any trade names or trademarks of the SELLER under this Agreement, and agrees not to use any trade name or trademark of the SELLER with respect to any Acquired Asset or products produced by Buyer after execution of this Agreement.  In addition, Buyer shall conspicuously mark and identify any products produced by it utilizing any of the Acquired Assets as being products of Buyer.

## ARTICLE 8

## CONDITIONS PRECEDENT

**Section 8.01**  <u>Conditions Precedent to Obligation of the SELLER and the Buyer</u>.  The respective obligations of each party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction of the following conditions:

    A. no action, suit or proceeding (including any proceeding over which the Bankruptcy Court has jurisdiction under 28 U.S.C. § 157(b) and (c)) brought by any governmental entity shall be pending to enjoin, restrain or prohibit the transactions contemplated by this Agreement, or that would be reasonably likely to prevent or make illegal the consummation of the transactions contemplated by this Agreement;

    B. no governmental entity shall have issued any order, decree or ruling, and there shall not be any statute, rule or regulation, restraining, enjoining or prohibiting the consummation of the transactions contemplated by this Agreement; and

    C. the full satisfaction of the terms and conditions of the De Minimis Sale Order.

**Section 8.02**  <u>Conditions Precedent to Obligation of the SELLER</u>.  The obligation of the SELLER to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following additional conditions:

    A.   The Buyer shall have performed in all material respects its obligations under this Agreement required to be performed by the Buyer at or prior to the Closing Date; and

    B. Each of the representations and warranties of the Buyer contained in this Agreement shall be true and correct as of the Closing Date as if made at and as of such date.

**Section 8.03**  <u>Conditions Precedent to Obligation of the Buyer</u>.  The obligation of the Buyer to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following additional conditions:

    A.   The SELLER shall have performed in all material respects its obligations under this Agreement required to be performed by the SELLER at or prior to the Closing Date; and

    B.  Each of the representations and warranties of the SELLER contained in this Agreement shall be true and correct, in all material respects, as of the Closing Date as if made at and as of such date.

Final 6-29-06

## ARTICLE 9

## GENERAL PROVISIONS

**Section 9.01  Force Majeure.**  Each party shall be temporarily excused from performing its obligations under this Agreement for so long as such performance is prevented or delayed by any event of Force Majeure.  The term "Force Majeure" shall, for purposes of this Agreement, include:  (i) any strike, lockout or labor dispute at the plant of a party or its suppliers, (ii) any shortage or curtailment of utilities, materials or transportation, (iii) any act or omission of any government authority, or (iv) any other cause beyond the reasonable control of a party.  A party affected by an event of Force Majeure shall promptly notify the other party and shall use its best efforts to overcome and mitigate such event of Force Majeure.

**Section 9.02  Indemnification by Buyer.  Buyer shall defend, indemnify, and hold harmless the SELLER and its affiliated companies, and each of their respective officers, agents, and employees, from and against any and all claims, suits, causes of action, liabilities, losses (including death, personal injury, and property damage), judgments, obligations, fines, damages, penalties, costs of defending or settling, and expenses (including consequential damages and attorneys' fees) of any kind or character (whether based on breach of contract, breach of warranty, tort (including negligence), strict liability, environmental laws, intellectual property rights, or otherwise) arising out of, or in any manner, relating or attributable to:  (a) the breach or performance by Buyer of any of its obligations under this Agreement; (b) arising after the Closing, related to the transportation, manufacture, operation, use, handling, storage, maintenance, sale, transfer or disposal of (i) any of the Acquired Assets, or (ii) any products, components, parts or subassemblies produced from or with the Acquired Assets; or (c) the acts or omissions of Buyer's Invitees or their employees or agents.**

**Section 9.03  Limitation of Liability.**  SELLER SHALL NOT BE LIABLE TO BUYER FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES ARISING OUT OF ANY ACT OR OMISSION REFERRED TO IN OR RELATED TO THE PERFORMANCE OF THIS AGREEMENT, OR TO THE USE, OPERATION, OR MAINTENANCE OF ANY ACQUIRED ASSET BY ANY PERSON, WHETHER OCCASIONED BY BREACH OF CONTRACT, BREACH OF WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, ENVIRONMENTAL LAWS, INTELLECTUAL PROPERTY INFRINGEMENT OR OTHERWISE.

**Section 9.04  PCB Items.**  The SELLER hereby informs Buyer that the Acquired Assets may contain polychlorinated biphenyls ("PCBs") and therefore may be a regulated PCB item as defined under Title 40, US Code of Federal Regulations, Part 761 (40 CFR 761), the use, disposal, import, export or other distribution of which may be subject to specific requirements under federal regulations pursuant to the federal Toxic Substances Control Act ("TSCA"), as well as state and local additional regulatory requirements.  Once title to the Acquired Assets is transferred to Buyer under this Agreement:  (i) the SELLER shall be relieved of any further obligation with regard to any claim first made after the Closing related to the design, transportation, manufacture, operation, use, handling, storage, maintenance, sale, transfer or disposal of these items; and (ii) Buyer agrees to transport, operate, use, handle, store, mark, and/or properly dispose of PCB items in an environmentally safe manner and in compliance with applicable federal, state and local laws, ordinances, regulations, standards, etc., including the TSCA.

**Section 9.05  Termination.**  If, after the date of this Agreement and prior to the passage of title and risk of loss to any Acquired Asset, an item of M&E is lost, damaged or destroyed by any cause whatsoever (excluding ordinary wear and tear and damage caused by the acts or omissions of Buyer

or its agents or employees), this Agreement shall terminate with respect to the affected M&E, and an appropriate adjustment will be made to the Purchase Price by SELLER.

**Section 9.06    Independent Contractors, Expenses.**  This Agreement does not constitute any party the agent or legal representative of any another party. Each party is an independent contractor, responsible for its own expenses, including attorneys' and other professional fees incurred in connection with the transactions contemplated by this Agreement. No party is authorized to create any obligation on behalf of another party.

**Section 9.07    Bulk Sales.**  The Buyer hereby waives compliance with any bulk sales or other similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement.

**Section 9.08    Entire Agreement, Waiver.**  This Agreement constitutes the entire agreement of the parties, and supersedes all prior and contemporaneous agreements and negotiations between the parties, concerning the subject matter herein. No amendment to this Agreement shall be binding upon either party unless it is in writing and is signed by authorized representatives of all parties. Failure by any party to enforce any term or condition of this Agreement, or to exercise any right hereunder, shall not be construed as thereafter waiving such term, condition or right; and in no event shall any course of dealing, custom or usage of trade modify, alter or supplement any term of this Agreement.

**Section 9.9    Assignment.**  Neither party may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other party, except that the SELLER may freely assign their rights and delegate any of their duties to a subsidiary or affiliated company, or any successor in interest by operation of law. Buyer's obligations under this Agreement shall be binding upon any transferee of the Acquired Assets, to the extent such obligations may relate to the Acquired Assets so transferred, and Buyer shall obtain and deliver to the SELLER a copy of such transferee's agreement to be so bound.

**Section 9.10    Notices.**    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been given when delivered personally or by expedited courier service, or when mailed by certified mail (return receipt requested) with postage prepaid, or upon receipt of the facsimile transmission report in the case of a telefax, addressed to a party at its address set forth below, or to such other address as may be designated by notice given to the other party:

|       |           |                                        |
|-------|-----------|----------------------------------------|
| (i)   | To SELLER:| Delphi Automotive Systems              |
|       |           | World Headquarters & Customer Center   |
|       |           | 5725 Delphi Drive                      |
|       |           | Troy, MI  48098-2815                   |
|       |           | Attention:  President, AHG             |
|       |           |                                        |
|       | And       | DELPHI CORPORATION                     |
|       |           | 5725 Delphi Drive                      |
|       |           | Troy, MI  48098-2815                   |
|       |           | Facsimile:  248-813-2491               |
|       |           | Attention:  Assistant General Counsel- |
|       |           |             Commercial and Transactional |
|       |           |                                        |
| (ii)  | To Buyer: | Great American Group                   |
|       |           | 9 Parkway North, Suite 300             |
|       |           | Deerfield, IL 60015                    |

Final 6-29-06

Facsimile: 847-444-1401
Attention: Mark Naughton

**Section 9.11  Law and Jurisdiction; Severability.**  If there is any dispute or difference of opinion between the parties regarding the construction or interpretation of this Agreement or the rights and liabilities of the parties, the parties shall strive to settle the same amicably.  This Agreement shall be governed by, and construed and enforced in accordance with the laws of the state of Michigan and, to the extent applicable the Bankruptcy Code, excluding any such laws which direct the application of laws of any other jurisdiction.  If any provision of this Agreement contravenes any applicable law, then such provision shall be deemed reformed or severed, but only to the extent necessary to comply with such law, and the remaining provisions shall remain in full force and effect.  The Buyer and the Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated thereby (and agree not to commence any litigation relating thereto except in the Bankruptcy Court).

**Section 9.12  Captions.**   The captions shall not be deemed a part of this Agreement, but are inserted merely for the convenience of the parties.

**Section 9.13  Public Announcements.**  The SELLER and Buyer will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except (a) as may be required by law and then only with such prior consultation and (b) as the Seller deems necessary, in its sole discretion, to satisfy the requirements of the De Minimis Sale Order.

## ARTICLE 10

## THE LIQUIDATION

**Section 10.01 The Liquidation; Access to Facility.**   Seller acknowledges that Buyer will be conducting the Liquidation following the Closing Date and will require that the Acquired Assets remain at the Facility through the Removal Date in order to: (i) prepare and lot the Acquired Assets, (ii) allow potential buyers to preview the Acquired Assets and (iii) allow the removal of the Acquired Assets after the Liquidation (the "Permitted Purposes").  From the Closing Date and through the Removal Date, the Buyer shall have the right to access to the Facility at reasonable times and during normal business hours (Monday through Friday 8:00 a.m. – 4:00 p.m.), or such other times as may be agreed between the parties, free of any rent, utilities (including heat, air conditioning, electric, and water) or other payment for occupancy, for the Permitted Purposes. From the Closing Date and through the Removal Date, the Seller shall provide to the Buyer two active and working phone lines and any T1 or DSL service currently provided to the Facility.  The Buyer shall pay all expenses related to the Liquidation other than rent or occupancy expense as provided above. The Buyer shall have the right to collect and keep the proceeds of the Liquidation.  After the Closing Date, and subject to the restrictions set forth above, the Buyer shall have the right to invite potential purchasers and bidders (as applicable) (collectively, the "Buyer's Invitees") onto the premises of the Facility for purposes of inspecting the Acquired Assets prior to the Liquidation and removing (by successful purchasers and/or bidders, as applicable) purchased Acquired Assets from the Facility following the Liquidation.

**Section 10.02 Buyer Covenants.**  The Buyer and its employees, subcontractors and agents, shall conduct all activities contemplated by this Article 10, and all other aspects of the Liquidation (including, without limitation, any offsite auction): (a) in a safe manner, using all commercially reasonable precautions to protect against accident or injury, (b) in a manner that does not damage or

Final 6-29-06

negatively reflect on the reputation of and/or goodwill associated with the Seller, its affiliated companies, or any of their businesses, (c) in a manner that does not cause damage to the Facility, its premises, any other asset(s) of Seller, or any adjoining property, (4) in compliance with applicable federal, state and local laws and regulations, including any license and bonding requirements, and (5) in compliance with all of Seller's rules, regulations and requirements pertaining to access to and activities upon Seller's property and facilities. The Buyer shall return the Facility to the Seller, in "broom swept" condition and with all of the Acquired Assets removed from the Facility's premises, as soon as reasonably practicable after completion of the Liquidation, but in no event later than the Removal Date.

**Section 10.03 Abandoned Assets.** Any Acquired Assets remaining at the Facility after the Removal Date shall be deemed to have been abandoned by Buyer and Seller may remove, discard or otherwise dispose of such items, with no responsibility or liability to Buyer or Buyer's Invitees.

**Section 10.04 Use of Name.** The Buyer shall be authorized to use the name "Delphi" in its advertising of the sale of the Acquired Assets pursuant to the Liquidation, provided, however, that the Seller shall have the right to approve in advance any advertising using such name in its sole and absolute discretion.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be signed in duplicate by their duly authorized representatives.

DELPHI AUTOMOTIVE SYSTEMS LLC

By: _____

Name: Ronald M. Pogue

Title: Business Line Executive

Date: 7-20-06

GREAT AMERICAN GROUP, LLC

By: _____

Name: Mark P. Naughton

Title: Vice President/General Counsel

Date: July 14, 2006

Final 6-29-06

**EXHIBIT 1.02:**        **De Minimis Sale Order**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

|                                          |                              |
|------------------------------------------|------------------------------|
| In re                                    | :                            |
|                                          | :                            |
|                                          | : Chapter 11                 |
| DELPHI CORPORATION, et al.,              | :                            |
|                                          | : Case No. 05 – 44481 (RDD)  |
| Debtors.                                 | :                            |
|                                          | : (Jointly Administered)     |
|                                          | :                            |

-------------------------------------------------------------x

ORDER UNDER 11 U.S.C. § 363

APPROVING PROCEDURES TO SELL CERTAIN DE MINIMIS ASSETS

FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES AND

TO PAY MARKET RATE BROKER COMMISSIONS IN CONNECTION

WITH SUCH SALES WITHOUT FURTHER COURT APPROVAL

("DE MINIMIS ASSET SALE ORDER")

Upon the motion, dated October 17, 2005 (the "Motion"), of Delphi Corporation and certain of its

subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), for an order under section 363 of title 11 of the United States Code, 11

U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), authorizing the Debtors to sell certain de

minimis assets outside the ordinary course of business free and clear of liens, claims, and

encumbrances and to pay market rate broker commissions in connection with such dispositions

without further Court approval; and upon the record of the hearing held on the Motion; and this Court

having determined that the relief requested in the Motion is in the best interests of the Debtors, their

estates, their creditors, and other parties-in-interest; and it appearing that proper and adequate notice

Final 6-29-06

of the Motion has been given and that no other or further notice is necessary; and after due

deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

## ORDERED, ADJUDGED, AND DECREED THAT:

1. The Motion is GRANTED.

2. The Debtors are authorized to consummate, without further Court approval, arms-

length sales of real and personal property outside of the ordinary course of business when the

purchase price is $10 million or less for each transaction or in the aggregate for a related series of

transactions (the "de minimis Assets"), free and clear of all liens, claims, and encumbrances, with any

such liens, claims, and encumbrances attaching to the sale proceeds with same force, validity,

priority, perfection and effect as such liens had on the property immediately prior to the sale, subject

to the notice procedures and other terms of this Order set forth below.

3. The Debtors hereby are authorized to pay, without further Court approval, market

rate broker commissions (the "Broker Commissions") for brokers utilized in the ordinary course of the

Debtors' business in connection with any sales of de minimis Assets upon satisfaction of the

disclosure requirements provided for herein.

4. Sales of de minimis Assets are subject to the following notice procedures (the

"Notice Procedures"):

(a) The Debtors shall give notice of each proposed sale (the "Sale Notice") to (i) the

Office of the United States Trustee, (ii) counsel to any official committees appointed in these

cases (the "Committee(s)"), (iii) counsel for the agent under the Debtor's debtor-in-possession

lenders (the "DIP Lenders"), (iv) counsel for the agent under the Debtors' prepetition credit

facility; (v) any other known holder of a lien, claim, or encumbrance against the specific

property to be sold, and (vi) any known interested party in the subject de minimis Assets

(collectively, the "Notice Parties"). The Sale Notice shall be served by facsimile, if possible, so

as to be received by 5:00 p.m. (Eastern Time) on the date of service and by overnight mail.

The Sale Notice shall specify (i) the assets to be sold, (ii) the identity of the proposed

Final 6-29-06

purchaser (including a statement that the proposed purchaser is not an "insider" as defined in

section 101(31) of the Bankruptcy Code ), (iii) the proposed sale price, (iv) a copy of any

documentation executed in contemplation of the

transaction, and (v) an affidavit of the broker, if any, pursuant to rule 2014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), that identifies the broker, the

amount of the Broker Commission, affirms based on such broker's reasonable knowledge and

belief, that the commission is at or lower than the market commission for similar sales and

contains the disclosures required by Bankruptcy Rule 2014.

     (b) The Notice Parties shall have five business days following initial receipt of the Sale

Notice to object to or request additional time to evaluate the proposed transaction and the

Broker Commission. If counsel to the Debtors receives no written objection or written request

for additional time prior to the expiration of such five business day period, the Debtors shall be

authorized to consummate the proposed sale transaction and to take such actions as are

necessary to close the transaction and collect the proceeds of such sale, including, without

limitation, payment of the Broker Commission.

     (c) If a Notice Party objects to the proposed transaction and/or the Broker

Commission within five business days after the Sale Notice is received, the Debtors and such

objecting Notice Party shall use good faith efforts to consensually resolve the objection. If the

Debtors and the objecting Notice Party are unable to achieve a consensual resolution, the

Debtors shall not take any further steps to consummate the proposed transaction without first

obtaining Bankruptcy Court approval of the proposed transaction, including retention of any

broker, *nunc pro tunc*, upon notice and a hearing.

     (d) To the extent that a competing bid is received for the purchase of the de minimis

Assets, which in the Debtor's sole discretion, in the exercise of their business judgment and in

consultation with their processionals, materially exceeds the value of the purchase price

contained in the Sale Notice, the Debtors shall re-notice the proposed sale to the subsequent

bidder pursuant to the Notice Procedures; *provided* that the proposed purchase price is still

Final 6-29-06

less than or equal to $10 million, and to the extent the proposed purchase price is greater than

$10 million, the Debtors shall file a motion with this Court

in accordance with the Case Management Order (Docket No. 164) to obtain approval for the

proposed transaction.

(e) Any valid and enforceable liens shall attach to the net proceeds of the sale with

same force, validity, priority, perfection and effect as such liens had on the property

immediately prior to the sale, subject to any claims and defenses the Debtors may possess

with respect thereto, and any amounts in excess of such liens shall be utilized by the Debtors

in accordance with the terms of the debtor-in-possession financing agreements (collectively,

the "DIP Agreement") (if approved by this Court) or any order entered by this Court.

5. Nothing in the foregoing procedures shall prevent the Debtors, in their sole and

absolute discretion, from seeking Bankruptcy Court approval at any time of any proposed transaction

upon notice and a hearing, or if necessary, to comfort a purchaser, to submit a separate order to this

Court along with a certificate of no objection to be entered without need for a hearing on the matter.

6. The Notice Procedures set forth herein shall not apply to sales of assets that involve

an "insider," as defined in section 101(31) of the Bankruptcy Code or any sale that, because of the

integral nature of the asset, would require the Debtors subsequently to sell additional assets for an

aggregate sum in excess of $10 million. Any such sale shall continue to require an individual hearing

as prescribed by section 363(b) of the Bankruptcy Code.

7. Sales of de minimis Assets shall be arm's-length transactions entitled to the

protections of section 363(m) of the Bankruptcy Code.

8. The Debtors and their respective officers, employees, and agents are authorized to

perform all of their obligations, take whatever actions necessary, and issue, execute, and deliver

whatever documents may be necessary or appropriate to implement and effectuate any dispositions

of de minimis Assets.

9. Each and every federal State and local government agency or department is hereby

directed to accept any and all documents and instruments necessary or appropriate to consummate

Final 6-29-06

the dispositions of de minimis Assets. The register or recorder of deeds (or other similar recording

agency) is hereby directed to accept and include a certified copy of this Order along with any other

appropriate conveyance documents used to record and index the transfer of any de minimis Assets in

the appropriate public records.

10. Pursuant to the terms of the DIP Agreement and the interim order approving such

DIP Agreement on an interim basis, entered on October 12, 2005, and subject to the final approval of

the DIP Agreement, the DIP Lenders hold valid, duly perfected security interests in and liens upon the

de minimis Assets. Subject to the final approval of the DIP Agreement, any and all proceeds obtained

by the Debtors from any sales of such de minimis Assets will be applied as required by the DIP

Agreement or any order entered by this Court. Nothing contained herein shall be deemed a waiver by

the DIP Lenders of any required approval or disapproval of any sale, whether pursuant to this Order

or otherwise.

11. All other holders of valid and perfected liens shall be treated in accordance with

section 363(f) of the Bankruptcy Code.

12. Nothing in this Order alters or modifies the Debtors' obligation to file a motion

pursuant to section 365 of the Bankruptcy Code to assume and/or assign any lease.

13. No further orders of this Court are necessary to effectuate the terms set forth

herein for transactions or related series of transactions completed in good faith.

14. This Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this Order.

15. The requirement under Local Rule 9013-1(b) for the service and filing of a

separate memorandum of law is deemed satisfied by the Motion.


Dated:        New York, New York

              October 27, 2005


                            /s/ Robert D. Drain

                            UNITED STATES BANKRUPTCY JUDGE

Final 6-29-06

EXHIBIT 1.04:        MACHINERY & EQUIPMENT

| Property Tag # | Description |
|---|---|
| 134624 | SPARK PLUG INSULATOR ASSEMBLY MACHINE |
| 135183 | COOLER F/INSULATOR ASSY.GLASS SEAL FURNACE LINES |
| 135299 | INSULATOR ASSEMBLY GLASS SEAL FURNACE |
| 135304 | HIGH VOLUME 100% RESISTANCE CHECK MACHINE |
| 135336 | INSULATOR ASSEMBLY TO FURNACE TRANSFER CONVEYOR |
| 135337 | INSULATOR ASSEMBLY TO FURNACE TRANSFER CONVEYOR |
| 135499 | SPARK PLUG TRAY STACKER |
| 135500 | SPARK PLUG TRAY STACKER |
| 89789 | KODAK CONTOUR PROJECTOR |
| 104505 | ELECTRIC WALKIE TYPE STRADDLESTACKER TRUCK (#774) |
| 113521 | CLARK ELECTRIC WALKIE TYPE FORK STACKER (#1061) |
| 117996 | SWECO SEPERATOR-30 INCH |
| 127546 | BARRY BLOWER PROCESSING FAN |
| 127547 | BARRY BLOWER PROCESSING FAN |
| 127622 | DC VOKES DUST COLLECTING SYSTEM-SIZE 4/8/10 |
| 128793 | CONVEYOR W/MERGE SECTION & ACCUMULATOR |
| 129135 | DENSOMATIC DRY PRESSING & FORM GRINDING MACHINE |
| 129978 | MERGE CONVEYOR F/TRANSPORTING GREEN INSULATORS |
| 130016 | CARDBOARD DUNNAGE CRUSHER |
| 130527 | DYNAMIC AIR PNEUMATIC CONVEYING SYSTEM |
| 130609 | COMBINATION INSULATOR MOLD & GRIND MACHINE |
| 130611 | COMBINATION INSULATOR MOLD & GRIND MACHINE |
| 130612 | COMBINATION INSULATOR MOLD & GRIND MACHINE |
| 130613 | COMBINATION INSULATOR MOLD & GRIND MACHINE |
| 130618 | COMBINATION INSULATOR MOLD & GRIND MACHINE |
| 131636 | BAG HOUSE F/SMITH MOLD & GRIND MACHINES |
| 131637 | BAG HOUSE F/SMITH MOLD & GRIND MACHINES |
| 131638 | BAG HOUSE F/SMITH MOLD & GRIND MACHINES, DCE Volkes |
| 131669 | PNEUMATIC TUBE TRANSPORT SYSTEM |
| 131670 | PNEUMATIC TUBE TRANSPORT SYSTEM |
| 134117 | PENTRONIX AUTOMATIC TRAY LOADER-MAT'L HAND.SYSTEM |
| 134149 | STEELCASE SUPERVISIOR'S CUBICLE |
| 139622 | INSULATOR FAB GUAGES |
| 139623A | FIRED INSULATOR INSPECTION MACHINE, Retina Systems |
| 139625 | FIRED INSULATOR INSPECTION MACHINE |
| 139626 | INSULATOR GLAZE & FIRE MACHINE |
| 139627 | INSULATOR GLAZE & FIRE MACHINE |
| 139628 | INSULATOR GLAZE & FIRE MACHINE |
| 139729 | DUST COLLECTOR |
| 139758 | FURNACE FOR INSPECT AND GLAZE, 1746 |
| 139759 | FURNACE FOR INSPECT AND GLAZE, 1746 |
| 139760 | FURNACE FOR INSPECT AND GLAZE, 1746 |
| 140572 | CHILLED WATER PUMP TANK |
| 238092 | AIR SLIDE DISTRIBUTION SYSTEM |
| 244453 | DRAG CHAIN CONVEYOR-UNDERGROUND |

Final 6-29-06

| | |
|---|---|
| 244454 | DRAG CHAIN CONVEYOR-UNDERGROUND |
| 113339 | Clark Electric Walkie type Fork Stacker (#1080) |
| 122957 | PENTRONIX COMPACTING PRESS-6 TON |
| 131253 | STEELCASE SUPERVISOR'S CUBICLE |
| 136479 | COMPACTING PRESS FOR CERAMIC RESISTOR SUBSTRATES |
| 136480 | MULTI-LOADER |
| 137788 | CERAMIC COMPACTING PRESS |
| 138851 | PTX PENTRONIX COMPACTING PRESS |
| 138862 | PTX PENTRONIX COMPACTING PRESS |
| 140742 | AUTO-LOADER FOR EOS BUTTONS |
| 140743 | AUTO-LOADER FOR EOS BUTTONS |
| 140744 | AUTO-LOADER FOR EOS BUTTONS |
| 140745 | AUTO-LOADER FOR EOS BUTTONS |
| 113242 | WYSSMONT TURBO DRYER |
| 117571 | STAINLESS STEEL OSCILLATING GRANULATOR |
| 121972 | WYSSMONT TURBO DRYER-STAINLESS STEEL |
| 122108 | SWECO SEPARATOR VIBRATING SCREEN |
| 127990 | EXIDE POWER SOLID STATE BATTERY CHARGER (marked 725483, BC 1055185, no brass tag) |
| 129160 | BLUE M DRYING OVEN-6KW |
| 137022 | DUST COLLECTOR FOR GLASS SEAL POWDER AREA |
| 137600 | MATERIAL DRYER FOR GLASS SEAL POWDER PREP AREA |
| 137601 | MATERIAL DRYER FOR GLASS SEAL POWDER PREP AREA |
| 137602 | CONVEYOR FOR GLASS SEAL POWDER MATERIAL PREP AREA |
| 137603 | CONVEYOR FOR GLASS SEAL POWDER MATERIAL PREP AREA |
| 138470 | TECHNETICS BULK BAG UNLOADING SYSTEM, Sterling Scale |
| 139647 | POWDER MIXING SYSTEM |
| 139648 | POWDER MIXING SYSTEM |
| 139649 | POWDER MIXING SYSTEM, Vat |
| 139653 | DRYER CERAMIC GRANULE, Wyssmott |
| 139712 | CAMBELT CONVEYOR |
| 139714 | DUST COLLECTOR |
| 139717 | FLUID PUMP, labeled -B5A, B5B,B5C,B5D |
| 139719 | 15 CU FT MIXER (Vat labeled 139719A) |
| 139720 | IMPELLER MIXER AND STAND B-8 Yamato mixer |
| 139722 | CHAMBER DRYER - 32 CU.FT. Blue M Oven |
| 139723 | PACK OUT EQUIPMENT |
| 140129 | ONE 20 CU. FT. PROCESS MODULE; READCO, Vat |
| 140130 | ONE IMPELLER ASSY; READCO BILL VOLDRICH, mixer truck |
| 140246 | SCREENER, 22 |
| 140438 | VIBRATORY FEEDER |
| 81741 | RUBBER MOLD PRESS |
| 84637 | BLDG #4106-DIRECT FIRED TUNNEL CERAMIC KILN |
| 87043 | POROX LINED BALL MILL PULVERIZING MACHINE-6X8, Steveco |
| 88723 | METAL BIN TO STORE/FEED TALC/KAOLIN TO PRESSES |
| 89102 | SWINDELL DRESSLER CERAMIC KILN |
| 91937 | RUBBER MOLD MAKER |
| 91969 | PULVERIZING MACHINE |
| 102782 | MIKRO PULSAIR DRY DUST COLLECTION SYSTEM |
| 103440 | BLDG #4081-CERAMIC TUNNEL KILN-142 FT. |
| 104525 | MIKRO PULSARIE DRY DUST COLLECTION SYSTEM |

Final 6-29-06

| | |
|---|---|
| 106341 | MIKRO PULSAIRE DRY DUST COLLECTOR-5000 TO 6000CFM |
| 107285 | PATTERSON ARLCITE LINED PEBBLE MILL-TYPE D (6X8), Steveco |
| 107470 | COOLING CHAMBERS FOR KILN #1 (TAG #084637) |
| 107471 | COOLING CHAMBER F/KILN #2 (TAG #089102) |
| 109466 | WALKIE TYPE FORK STACKER-3000# CAPACITY (AC#927) |
| 111660 | BLDG #4081-RECUPERATIVE MULTI BURNER KILN |
| 112634 | ELECTRIC GENERATOR-350 KVA-DELCO |
| 113191 | COOLING CHAMBER F/DRESSLER MULTIBURNER TUNNEL KILN |
| 115618 | MICRO-PULSAIRE DUST COLLECTOR SYSTEM |
| 115758 | MICRO PULSAIRE DUST COLLECTOR SYSTEM |
| 115770 | MICRO PULSAIRE DUST COLLECTOR SYSTEM |
| 116622 | MIKRO PULSAIRE HIGH VACUUM FILTER DUST SEPARATOR |
| 116954 | MASTERFLOW FEEDER W/WATER METER & CONTROL PANEL bldg 4094, bay F-14 alumina load sta |
| 116975 | WEIGH SYSTEM W/10000# SCALE/MIXER/WATER |
| 117995 | SWECO SEPERATOR-30 INCH |
| 118060 | ARLCITE LINED PEBBLE MILL PUVERIZING MACHINE, Steveco |
| 118979 | ROTEX VIBRATING SCREEN |
| 118980 | ROTEX VIBRATING SCREEN |
| 120327 | SEALED ROLLER BEARING MOUNTED PEBBLE MILL, Steveco |
| 123503 | BLENDER-3 CU.FT. |
| 126369 | PNEUMATIC CERAMIC HANDLING SYSTEM |
| 126550 | FLEX-KLEEN DUST COLLECTOR |
| 130015 | CARDBOARD DUNNAGE CRUSHER |
| 133061 | TRANSFER CAR MATERIAL HANDLING SYSTEM |
| 133062 | TRANSFER CAR MATERIAL HANDLING SYSTEM, Kiln |
| 133481 | LOAD TRAY TO SAGGER SYSTEM |
| 133549 | INSULATOR TRAY & SAGGER ACCUMULATING CONVEYOR SYS. |
| 134346 | LIQUID POLYFON ADDITION SYSTEM |
| 136617 | DENSE PHASE PNEUMATIC SYS TO UNLOAD PEBBLE MILLS |
| 136674 | PULVERIZING MACHINE, Steveco Powder Ball Mill |
| 89788 | KODAK CONTOUR PROJECTOR |
| 102722 | J & L COMPARATOR W/ELECTRONIC POWER ELEVATING UNIT |
| 133613 | DYE DIP SYSTEM-MECHANICAL WASHER |
| 138677 | TURNTABLE TO ROTATE KILN CARS |
| 138678 | TURNTABLE TO ROTATE KILN CARS |
| 138831 | CONVEYOR SYSTEM F/INSULATOR INSPECTION |
| 139730 | INSPECT & GLAZE MACHINE #1 |
| 139731 | INSPECT AND GLAZE MACHINE #2 |
| 139732 | INSPECT AND GLAZE MACHINE #3 |
| 116939 | WALKIE TYPE REACH TRUCK-3,000# CAPACITY (#1254) |
| 134623 | SPARK PLUG INSULATOR ASSY MACHINE (located in 801) |
| 136198 | SPOT COOLING SYSTEM |
| 138226 | GASKET FEED STATION F/LOW VOLUME SYSTEM |
| 112003 | CLARK ELECTRIC WALKIE TYPE FORK STACKER (AC #1019) |
| 112834 | LINDBERG MESH BELT ATMOSPHERE ANNEALING FURNACE |
| 113538 | CLARK ELECTRIC WALKIE TYPPE PALLET TRUCK (AC#1103) |
| 114494 | SPANMASTER 2 TON MOTOR DRIVEN BRIDGE CRANE |
| 119083 | 5 TON ELECTRIC HOIST F/ROTOFORGER |
| 119294 | DOUBLE DRUM TYPE WASH,RINSE & BLOW-OFF MACHINE |

| | |
|---|---|
| 119299 | PROGRAMMED HOIST SYS.F/ZINC PHOSPHATE (SEE FMAC6) |
| 119816 | LINDBERG WIRE MESH ROLLER HEARTH ANNEALING FURNACE |
| 119817 | LINDBERG GENERATOR W/REFRIGERATION UNIT, tore down |
| 119829 | HEADING MACHINES (National slug header, draw 119970) |
| 119928 | REVERE RAM LOADER F/SPARK PLUG EXTRUSION SLUGS |
| 119942 | RANSOHOFF DOUBLE DRUM 3 STAGE STEAM HEAT WASHER |
| 119970 | IN LINE WIRE DRAWING MACHINE |
| 120278 | STOCK REEL |
| 120455 | STEEL BELT CONVEYOR F/SLUG WASHER & ANNEALING OVEN |
| 120456 | STEEL BELT CONVEYOR F/SLUG WASHER & ANNEALING OVEN |
| 120694 | CABLE HOIST-5 TON CAPACITY |
| 120795 | CONVEYOR SYSTEM TO TRANSFER SLUGS |
| 122128 | BRIDGE CRANE FOR 4TH ROTAFORGE MACHINE-5 TON CAP. |
| 122284 | WELDER-BUTT-FLASH-AUTO |
| 122541 | WELDER-BUTT & FLASH-MAN |
| 129184 | NATIONAL SLUG HEADER-CAPACITY .525 IN. (draw 131004) |
| 129299 | STOCK REEL-DECOILER & REWINDER |
| 130019 | CARDBOARD DUNNAGE CRUSHER |
| 130707 | STOCK REEL DECOILER & REWINDER |
| 131004 | WIRE DRAWING MACHINE |
| 131275 | CLARK WALKING STACKER (AC #1654) |
| 108151 | FEEDALL ELEVATING HOPPER FEEDER |
| 108739 | WARCO PRESS |
| 109034 | WARCO PRESS |
| 109035 | WARCO PRESS |
| 109038 | WARCO STRAIGHT SIDE PRESS |
| 111643 | MINSTER PRESS-200 TON, torn down, bushings |
| 122843 | VERSON ALLSTEEL SINGLE DRIVE PRESS |
| 126213 | SPECIAL BULK FEEDING SYSTEM TO FEED SLUGS |
| 127212 | SLUG FEEDING SYSTEM |
| 127756 | VERSON SINGLE ACTION PRESS-200 TON, torn down, flywheel |
| 127757 | VERSON SINGLE ACTION PRESS-200 TON |
| 131984 | ELECTRONIC SCALE-MINIMUM CAPACITY #5000 LB. |
| 108226 | 6 SPINDLE EXTRUDED SPARK PLUG SHELL TURNING MACH. |
| 109782 | ACME GRIDLEY 6 SPINDLE CHUCKING MACHINE, torn down |
| 117187 | ACME GRIDLEY AUTOMATIC CHUCKING MACHINE-6 SPINDLE, different style |
| 117188 | ACME GRIDLEY AUTOMATIC CHUCKING MACHINE-6 SPINDLE, different style |
| 117425 | UNDERHUNG ELECTRIFIED BRIDGE CRANE-4,000# CAPACIT |
| 121246 | RANSOHOFF DRUM TYPE WASH,RINSE & DRY MACHINE |
| 123298 | CHIP SEPARATOR, part of washer |
| 123299 | SKIP HOIST, part of washer |
| 135382 | TROLLEY TYPE CONVEYOR |
| 89548 | STRAIGHT LINE SHELL AND WIRE MACHINE |
| 92148 | STRAIGHT LINE SHELL & WIRE MACHINE - Disassembled |
| 97010 | SHELL & WIRE MACHINE, Stripped, no feeder |
| 109723 | SHELL & SIDE WIRE MACHINE, Helfrecht |
| 109996 | SHELL & WIRE ASSEMBLY MACHINE |
| 112062 | CLARK ELECTRIC WALKIE TYPE FORK STACKER (AC #1007) |
| 113083 | HELFRECHT SHELL & SIDE WIRE ASSEMBLY MACHINE |

Final 6-29-06

| | |
|---|---|
| 116185 | SHELL & WIRE ASSEMBLY MACHINE, Helfrecht |
| 117156 | SPARK PLUG SHELL BLACKENING SYSTEM-Udylite |
| 117323 | ONE TON UNDERHUNG ELECTRIFIED BRIDGE CRANE W/HOIST |
| 117324 | ONE TON UNDERHUNG ELECTRIFIED BRIDGE CRANE W/HOIST |
| 117371 | LOAD/UNLOAD SYSTEM F/BEFORE & AFTER BLACKENING |
| 117803 | DUALL WET FUME SEPERATOR-38700 CFM |
| 117804 | DUALL WET FUME SEPARATOR-33400 CFM |
| 127270 | PRUTTON PLANETARY THREAD ROLLER-MAX.3/4IN. (feeder removed) |
| 138008 | MANNOR WASHER |
| 139643 | GRIDLEY & SOUND ENCLOSURE |
| 118325 | ACME GRIDLEY AUTOMATIC CHUCKING MACHINE-6 SPINDLE |
| 135326 | SIDE WIRE WELDING MACHINE |
| 138188 | CHIP COMPACTOR SYS.F/SYNCHRON.PLATINUM SPARKPLUG |
| 138267 | WASHER SYSTEM F/PLATINUM SPARK PLUG CELL also PW-2, Thread Washer, Continental BT# 138254 |
| 139467 | PLATINUM WELDER F/SHELL ASSEMBLY, Sonic, #725436, 725554, BC 1057190 |
| 139635 | ASSEMBLY WASHERS SPARK PLUG SHELL |
| 139636 | ASSEMBLY WASHERS SPARK PLUG SHELL |
| 139639 | FLOOR FEEDER FOR SHELL FAB |
| 139640 | FLOOR FEEDER FOR SHELL FAB |
| 139641 | SPARK PLUG SHELL WASHER |
| 139642 | SPARK PLUG SHELL WASHER |
| 139657 | GRIDLEY |
| 140109 | SOUND ENCLOSURE for Gridley |
| 140110 | SOUND ENCLOSURE for Gridley |
| 140234 | COPPER CORE SIDEWIRE WELDER- MANUAL |
| 140235 | COPPER CORE SIDEWIRE WELDER- MANUAL |
| 140369 | SHELL ASSEMBLY MACHINE - COPPER CORED (BC#1056885) |
| 140979 | COPPER CORE SIDEWIRE MACHINE |
| 140984 | COPPER CORE WELDER - partially salvaged. |
| 141062 | WAVINESS GAGE, Precision Devices Inc. |
| 109338 | 20 INCH CONTOUR MEASURING PROJECTOR, Bausch & Lomb |
| 115924 | PACKAGING MACHINE CASE OPENER,LOADER & SIDE GLUER |
| 116922 | PACKOMATIC AUTO.CASE OPENER,LOADER,GLUER & SEALER |
| 116930 | SPARK PLUG ASSEMBLY MACHINE 117057 conv at test |
| 116931 | SPARK PLUG ASSEMBLY MACHINE |
| 116932 | SPARK PLUG ASSEMBLY MACHINE |
| 116933 | SPARK PLUG ASSEMBLY MACHINE |
| 117044 | HEAT SHOCK FIXTURE TO TEST LEAKAGE OF SPARK PLUGS |
| 117052 | TWO LANE WASHER F/ASSEMBLED SPARK PLUGS |
| 117054 | TWO LANE WASHER FOR ASSEMBLED SPARK PLUGS |
| 117714 | REDINGTON AUTO.CARTON FORMING & PACKAGING MACHINE |
| 117716 | REDIINGTON AUTOMATIC MULTIPACKER F/SPARK PLUGS |
| 121805 | REDINGTON HIGHSPEED MULTIPACK CARTONER W/COUNTER |
| 121806 | REDINGTON HIGH SPEED MULTIPACK CARTONER W/COUNTER |
| 121918 | REDINGTON TYPE PACKAGING MACHINE |
| 122787 | REDINGTON CARTON EXPANDING,LOADING & CLOSING MACH part of system, 2-6, used for packout, after 122789 |
| 122789 | DOUGLAS AUTOMATIC CASE PACKER & SEALER |

Final 6-29-06

| | |
|---|---|
| 126975 | REDINGTON SPARK PLUG SINGLE PACKER |
| 128821 | SPARK PLUG CARTONER F/4,6 OR 8 PACK CARTONS |
| 130011 | CARDBOARD DUNNAGE CRUSHER |
| 135221 | FUNCTIONAL TEST FOR SPARK PLUGS |
| 135392 | FUNCTIONAL TEST F/SPARK PLUGS |
| 135998 | ACUGAGE OPTICAL INSPECTION SYSTEM |
| 139611 | INSULATOR ASM GLASS SEAL FURNACE |
| 139592 | FINAL ASM LOAD TRAY PICK/PLACES |
| 139596 | FINAL ASSEMBLY MACHINE, Bodine |
| 139599 | FINAL ASM WASHER W/LUBE PROTECTANT |
| 139605 | INSULATOR PRINT/FLASH DRY/INSPECT |
| 139608 | INSULATOR ASM MACHINE W/TRAY LOAD |
| 139614 | TRAY CONVEYOR/FURNACE UNLOAD/F-POST |
| 140015 | PROFILING TUNNEL KILN - DATA PAQ |
| 140470 | SILICONE COATING MACHINE - INSULATOR TIP |
| 128463 | MOTORIZED BRIDGE CRANE-2,000# CAPACITY |
| 140008 | COPPER CORE WELDER |
| 140106 | WASHER, center wire |
| 140958 | COPPER CORE SHELL WELDING MACHINE |
| 105347 | HEADING MACHINE |
| 108034 | J & L OPTICAL COMPARATOR (5 X 16 TABLE) |
| 109770 | NATIONAL 1/2 INCH FIVE STATION FOUR DIE BOLTMAKER |
| 111902 | HARPER CONVEYOR TYPE FURNACE-TEMP.1250-2050 DEGREE |
| 114640 | U.S.BAIRD POLIACTION HYDRA-TILT TUMBLER<br>also 723184 B-14 tumbler |
| 114896 | NATIONAL 5 STATION 4 DIE BOLTMAKER W/ROLL THREAD. |
| 116063 | INDUSTRIAL POWER SPRAY WASHER |
| 116655 | NATIONAL 5 STATION,4 DIE BOLTMAKER W/ROLL THREAD. |
| 116901 | WIRE DRAWING MACHINE |
| 116903 | WIRE DRAWING MACHINE for A-29 |
| 117254 | SELF CONTAINED WIRE DRAWING MACHINE |
| 119102 | 5 STATION 4 DIE BOLTMAKER F/SPARK PLUG TERM.POST |
| 120353 | WIRE DRAWING MACHINE |
| 120617 | NATIONAL 5 STATION HEADING MACHINE |
| 120974 | IN LINE WIRE DRAWING MACHINE |
| 120976 | IN LINE WIRE DRAWING MACHINE |
| 121123 | EXIDE BATTERY CHARGER |
| 121248 | NATIONAL 1/4 INCH,5 STATION,4 DIE BOLTMAKER |
| 122589 | 16 FT.SPAN MOTOR DRIVEN CRANE SYSTEM-4000# CAP. |
| 122606 | 2 TON BRIDGE CRANE SYSTEM-20 FT.SPAN-4000# CAP. |
| 137574 | X-RAY MACHINE F/INSPECTING SPARK PLUG INSULATORS |
| 139779 | RECTIFIER 2 PIECES |
| 139780 | RECTIFIER 2 PIECES |
| 83607 | POROX-LINED PEBBLE MILL PULVERIZING MACHINE |
| 91997 | PULVERIZING MACHINE |
| 95911 | PULVERIZING MACHINE |
| 110584 | 368 GAL.HIGH DENSITY BALL MILL-PULVERIZING MACHINE |
| 111704 | PATTERSON AGITATED MIXER |
| 111705 | PATTERSON AGITATED MIXING BOWL |
| 111706 | PATTERSON AGITATED MIXING BOWL |

Final 6-29-06

| 111707 | PATTERSON AGITATED MIXING BOWL |
|---|---|
| 111708 | PATTERSON AGITATED MIXING BOWL |
| 117295 | WHEELABRATOR MULTI-TABLE W/AUXILIARY TABLES for tray repair 714186 E-9 Dust collector for wheelabrator 725828 Wilton belt Grinder with dust collector |
| 118063 | GLASS SEAL FURNACE LOADER |
| 120017 | GLASS SEAL FURNACE-4000# HOUR-1450 DEGREE Globar furnace, fire brick removed |
| 122312 | TOLEDO DOUBLE RATIO SCALE |
| 136928 | VACUUM SYS LV 5 |
| 83126 | B & S UNIVERSAL GRINDER |
| 91897 | UNIVERSAL GRINDER W/WET GRINDING ATTACHMENT |
| 95682 | BENCH LATHE |
| 100377 | PRECISION TOOL ROOM LATHE |
| 106990 | LINK HYDRAULIC PRESS-500 TON |
| 114512 | GORTON VERTICAL HEAD POWER FEED MILLING MACHINE |
| 115040 | JONES & LAMSON COMPARATOR & MEASURING MACHINE |
| 116906 | PARKER-MAJESTIC INTERNAL GRINDER |
| 117643 | BRIDGEPORT MILLING MACHINE |
| 120655 | BROWN & SHARPE MICROMASTER SURFACE GRINDING MACH. |
| 121333 | BROWN & SHARPE VALUE MASTER UNIVERSAL GRINDER |
| 123179 | SURFACE ALLOYING UNIT W/APPLICATOR-110 VOLT |
| 133273 | BROWN & SHARPE TECH-MASTER SURFACE GRINDER |
| 95683 | BENCH LATHE |
| 98352 | SINGLE SPINDLE DRILL PRESS |
| 103905 | BARBER-COLMAN 36 SPEED GEARED HEAD TOOL ROOM LATHE |
| 111144 | BROWN & SHARPE MICROMASTER SURFACE GRINDER |
| 113231 | HARDINGE HIGH SPEED LATHE |
| 114576 | WET ABRASIVE BELT GRINDER |
| 115348 | CLARK ELECTRIC WALKIE TYPE FORK STACKER (#1165) |
| 117220 | WALKIE TYPE FORK TRUCK (#1279) |
| 123542 | STERLING SELF CONTAINED AUTO.PARTS COUNTING SCALE |
| 121768 | PAPER SHREDDER W/FEED IN CONVEYOR |
| 123519 | BROWN & SHARPE MICROMASTER SERIES II GRINDER |
| 93768 | UNIVERSAL GRINDING MACHINE |
| 117681 | GORTON VERTICAL SWIVEL HEAD HAND FEED MILL |
| 122232 | HORIZONTAL COLD WALL VACUUM FURNACE-1CU.FT.CAP. |
| 139021 | JET CABINET WASHER F/TOOL ROOM HEAT TREAT |
| 81229 | INSULATOR GRINDER |
| 83191 | INSULATOR GRINDER FOR RUBBER MOLDED INSULATORS |
| 133599 | AUTOMATIC ISOSTATIC PRESS |
| 114563 | VERTICAL MILLING MACHINE-TABLE SIZE 46IN.X 9IN. |
| 111669 | JONES & LAMSON PEDESTAL COMPARATOR |
| 108124 | CLARK WALKIE TYPE FORK TRUCK-3000# CAP.(#866) |
| 130023 | CARDBOARD DUNNAGE CRUSHER |
| 134343 | AUTOMATIC CASE LOADING CARTONING MACHINE |
| 134344 | AUTOMATIC CASE LOADING CARTONING MACHINE |
| 121121 | EXIDE BATTERY CHARGER |
| 122924 | JONES & SHIPMAN GRINDING MACHINE |
| 130515 | HURCO MILLING MACHINE TABLE-(6O X 15 1/4) |
| 139602 | BODINE TESTER FOR FINAL ASSEMBLY MACHINE FA1-1 |

Final 6-29-06

| | |
|---|---|
| 105345 | NATIONAL 3/16" HEADING MACHINE, S/N# 31426 |
| 119103 | NATIONAL BOLT MAKER, S/N #27332 |
| 120973 | INLINE WIRE DRAW MACHINE FOR HEADER A-22 |
| 122745 | P&H OVERHEAD HOIST |
| 136927 | PORTABLE VACUUM SYSTEM, LINE 4,FIM-9 |
| 137023 | PORTABLE VACUUM SYSTEM, FIM-6 |
| 138254 | THREAD WASHER, CONTINENTAL BT |
| 130017 | CARDBOARD DUNNAGE CRUSHER |

1-National Model 141 Ball Header w/ Straightener & Reel
1- Greenlee Roto-Forge Slug Former
8- 2-3/8 Gridley Chuckers
1- Tolhurst Oil Extraction System
7- Helfreght Ground Electrode Trim Machines w load/unload
1-Prutton Thread Roller
2-NI Platting Lines w/ load/unload
7-National ¼ Bolt Header Machines
2-National 3/16 Double Stroke Header Machines
2-Manor Drum Wshers
1-Ferro-Fab Washer
2-Hobart Wshers
1-Retina Vision Sorting System
3-Ball Mills
3-Mixers
2-Rotex Screeners
2-Spray Dryers
3-Insulator Glaze and Inspection Lines
2-Wismont Dryers & Screeners-IP Powder Technology
1-Weighing System
1-Heavy Duty Mixer
2- Simac Insulator Assembly Lines
Large Assortment of Simac Tray Loaders
1-Research Element Style Furnace
1-Simac Resistance Checker
1- Capital Automated Insulator Assembly Line
1- Bodine Automated Insulator Assembly/Die Electric Test Line
4-Helfreght Final Assembly Machines
2-Misc. Washers
2-Redington Carton Packers
1-Simac Final Assembly Machine
1-Miller Die Electric Test Machine
1-Die Electric Machine (Blank Insulator)
1-Puck Master Metal Compactor
1-Wheelabrator Shot-Peen
16-Optical Comparators
Chatillion Shear Testers