Bonnie Steingart (BS-8004)
Debra M. Torres (DT-9093)
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone:  212.859.8000
Facsimile:  212.859.4000

*Counsel for the Official Committee of Equity Security Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                          :
In re:                                                    :    Chapter 11
                                                          :
  Delphi Corporation, et al.,                             :    Case No.  05-44481 (RDD)
                                                          :    (Jointly Administered)
                                       Debtors.           :
                                                          :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**OBJECTION OF THE OFFICIAL COMMITTEE OF
EQUITY SECURITY HOLDERS TO THE MOTION FOR
AN ORDER AUTHORIZING THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO
PROSECUTE THE DEBTORS' CLAIMS AND DEFENSES
AGAINST GENERAL MOTORS CORPORATION
<u>AND CERTAIN FORMER OFFICERS OF THE DEBTORS</u>**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

        The Official Committee of Equity Security Holders (the "Equity Committee") appointed

in the chapter 11 cases (the "Chapter 11 Cases") of Delphi Corporation ("Delphi") and certain of

its affiliates (collectively, the "Debtors") files this objection (the "Objection") to the motion (the

"Motion") of the Official Committee of Unsecured Creditors (the "Creditors' Committee") for

an order authorizing the Creditors' Committee to prosecute the Debtors' claims, causes of action

and defenses against General Motors Corporation ("GM") and certain former officers of the

Debtors, which was filed with this Court on July 28, 2006.  In support of the Objection, the

Equity Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors' claims, causes of action and defenses against and relating to GM are

of paramount import, interest and concern to the Equity Committee and are at the heart of the

Debtors' restructuring and the value of the Debtors' estates.  Like the Creditors' Committee,

based on information and belief, the Equity Committee has reason and basis to conclude that GM

improperly used the spin-off of the Debtors in 1999 (the "Spin-Off") and GM's continued

domination and control of the Debtors to divest GM of significant liabilities and

underperforming assets in an effort to substantially improve its own balance sheet and financial

performance.[1]

2.      Although the Debtors were purportedly spun-off from GM, the Debtors have

never had an existence independent from GM.  From the time of and at all times since the Spin-

---

[1]      The Equity Committee has reviewed and considered the draft complaint against GM and others prepared
by the Creditors' Committee (the "UCC Complaint").  The Equity Committee understands that certain
highly confidential non-public information received by the Creditors' Committee under its joint interest
agreement with the Debtors was integral to the Creditors' Committee's formulation of the UCC Complaint.
The Debtors and the Equity Committee recently entered into a similar joint interest agreement, which was
approved by this Court on August 17, 2006.  The Equity Committee has received three installments of
information from the Debtors pursuant to their joint interest agreement.  To the extent the Equity
Committee deems necessary and appropriate, the Equity Committee will file a supplement to this Objection
under seal.  In addition, pursuant to Local Rule 9013-1(b), the Equity Committee respectfully submits that
no separate memorandum of law in support of the Objection is necessary, as all authorities relied on for the
Objection are set forth herein.  However, after its review of the non-public information and to the extent
the Equity Committee deems necessary and appropriate, the Equity Committee will supplement this
Objection with a separate memorandum of law.

Off, GM has dominated and controlled the Debtors and caused the Debtors to incur substantial

undue and unfair burdens for the sole and exclusive benefit of GM and at the expense of the

Debtors and the Delphi shareholders.  In addition, based on information and belief, certain

present and former officers and directors of the Debtors facilitated GM's actions and were

complicit in the fraud on the Debtors and the Delphi shareholders.

      3.      The Equity Committee agrees with the conclusions of the Creditors' Committee,

as set forth in its Motion, that GM's conduct leading up to and following the Spin-Off gives rise

to significant affirmative claims and causes of action of the Debtors against GM and certain

former officers of the Debtors, as well as significant defenses and objections to any claims GM

may assert against the Debtors.  There are also claims, causes of action and defenses against

GM, certain current and former officers and directors of GM and certain current and former

officers and directors of the Debtors that are substantial and meritorious that are not included in

the UCC Complaint.[2]

      4.      The relationship and fraudulent pattern of conduct of GM in connection with the

Debtors prior to and since the Spin-Off caused devastating harm and damage to the Debtors,

their estates and, most especially, Delphi shareholders.  This wrongful conduct gives rise to

numerous and substantial affirmative claims against GM worth, based on the Equity

---

[2]     While the UCC Complaint sets forth facts in support of, and a number of, the substantial and valuable
claims against GM, the UCC Complaint fails to assert and provide a complete accounting of the panoply of
claims against GM and others.  The UCC Complaint sets forth an incomplete view of the universe of
claims against GM and the resulting harm to the Debtors' estates.  Consistent with its role as representative
of unsecured creditors, the Creditors' Committee's interest and function are limited to ensuring that
unsecured creditors are paid in full.

Committee's preliminary analysis, approximately $26 billion.  This amount does *not* include (i)

the trebling of damages provided for by certain of the applicable statutes, (ii) prejudgment

interest and (iii) potential punitive damages.  In addition to the numerous affirmative claims

against GM, there are myriad meritorious defenses to the claims against the Debtors asserted by

GM.  All of these claims, causes of action and defenses are of extraordinary value and import

and, when fully prosecuted, will provide significant recoveries to all of the Debtors'

stakeholders.

5.      There is no reason, basis, merit or support for granting control of the claims,

causes of action and defenses to the Creditors' Committee, and granting such control will not

lead to the maximization of value for the benefit of all of the Debtors' constituencies and the

Debtors' estates as a whole.  Rather, granting the Creditors' Committee control will artificially

cap the value of these significant assets solely to the detriment of Delphi's shareholders, the

constituency most aggrieved by the GM conduct that gives rise to the claims, causes of action

and defenses.

6.      Based on information and belief, at the time of the Spin-Off and every day since,

GM has used its actual and *de facto* control over the Debtors' businesses to engage in a wide-

ranging and continuing fraud on the Debtors and Delphi's shareholders.  From inception, GM

undercapitalized the Debtors, defrauded the Debtors and Delphi's shareholders, precluded the

Debtors from achieving the only business plan that might have permitted the Debtors to meet the

overwhelming obligations imposed on them by GM, extracted additional transfers in value as the

price of re-assuming liabilities that GM had shifted to the Debtors for inadequate value, forced

the Debtors into an untenable labor situation and extorted unreasonable commercial concessions

4

over a period of many years.  All of this was perpetrated for the sole and exclusive benefit of

GM.  As result of GM's overall course of conduct, the Debtors have been injured, harmed,

damaged and defrauded, which ultimately forced the Debtors into bankruptcy.[3]

7.    On information and belief, the successful prosecution of the claims, causes of

action and defenses arising from GM's wrongful conduct would result in the increase of the

Debtors' estates by billions of dollars.  Because any value in the Debtors' estates that exceeds

the amounts necessary to pay creditors in full belongs to holders of the Debtors' equity, the

---

[3]    The Debtors have acknowledged in various pleadings that GM's conduct ultimately lead to the filing of the Chapter 11 Cases.  See e.g., Affidavit of Robert S. Miller, Jr. Under Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and Various First Day Applications and Motions, dated October 8, 2005, at ¶¶ 15-18 (noting that one of the key issues that contributed to the deterioration of the Debtors' financial performance that lead to the chapter 11 filing was the Debtors' increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements that were negotiated by GM and the unions, which the Debtors were required to assume in connection with the Spin-Off); Declaration of Mark R. Weber In Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g), dated March 31, 2006, at ¶ 15 (noting that at time of the Spin-Off the Debtors were required to assume existing labor agreements between GM and its unions, despite the fact that GM and the Debtors recognized that those labor agreements were too costly for an independent parts supplier and doing so contravened one of the stated assumptions of the Spin-Off, which was that the Debtors would be able to negotiate labor agreements independent of GM and consistent with those of other independent parts suppliers) and ¶ 17 (noting that while the Debtors were still majority owned and controlled by GM, GM obligated the Debtors to mirror GM's labor agreements in 1999 and 2003, even though GM recognized such terms might be untenable for the Debtors); Declaration of Kevin M. Butler In Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g), dated March 31, 2006, at ¶¶ 21-25 (noting that though one of the Debtors' business objectives at the time of the Spin-Off was to fix, sell, or close a number of unprofitable operations that GM transferred to the Debtors, the Debtors were prohibited from doing so due to restrictions in GM's agreements with its unions that GM required the Debtors to mirror and that as a result of the restrictions, the Debtors have been left with a product portfolio that differs from its strategic vision); Declaration of John D. Sheehan In Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g), dated March 31, 2006, at ¶¶ 42-43 (noting that GM has been particularly aggressive in seeking price-downs and year-over-year price reductions and that, as a result, GM has received greater price-downs and year-over-year price reductions than the Debtors' other customers).

recoveries from the claims, causes of action and defenses belong, in whole or in part, to Delphi

shareholders.  As such, any compromise of the claims, causes of action and defenses requires

that the interests of *all* stakeholders, including Delphi shareholders, must be considered, and that

any such compromise must be endorsed by all constituencies, including Delphi shareholders.

8.      Control of the claims, causes of action and defenses must lie with those who owe

equity holders fiduciary duties.  The Debtors, their officers, directors and various professionals

owe fiduciary duties directly to equity holders and have a clear and definitive burden, duty and

obligation to achieve the maximum recovery possible on the claims for the benefit of the

Debtors' estates and all stakeholders.

9.      Because the claims, causes of action and defenses, when vigorously pursued, will

result in GM being a net obligor to the Debtors' estates in the billions of dollars, any conflicts of

interest that the Debtors have in pursuing the maximum value of the claims, causes of action and

defenses must be subject to heightened and detailed scrutiny by the Court.  The Debtors cannot

ignore the impact on the claims, causes of action and defenses of their negotiations regarding

ongoing or future agreements with GM and labor.  Any compromise of the claims, causes of

action and defenses (i) in exchange for future business arrangements or (ii) that provides for a

recovery to GM before Delphi shareholders is inappropriate and unjust.  Through any such

arrangement, the Debtors would be transferring value out of the Debtors' estates to GM instead

of enhancing the value of the Debtors' estates for the benefit of all stakeholders.  In satisfying

their fiduciary duties to the Debtors' estates, the Debtors cannot permit the transfer of value to

GM merely for the sake of improving their customer/supplier relationship with GM, to

accommodate the claims of creditors (especially creditors who hold large equity interests in GM)

6

or to expedite the Debtors' emergence from chapter 11, no matter how well characterized.

10.     The Creditors' Committee lacks the incentive or obligation to realize the full value of the claims, causes of action and defenses.[4]  The Equity Committee recognizes and applauds the Creditors' Committee's substantial efforts to investigate, analyze and pursue certain of the claims, causes of action and defenses against GM.  However, despite its efforts, the Creditors' Committee does not have the responsibility and accountability to all stakeholders to realize maximum value for the claims, causes of action and defenses.  Rather, as stated by the Creditors' Committee throughout its Motion, the Creditors' Committee has duties only to *unsecured creditors* and its obligation to maximize the value of the claims, causes of action and defenses ends when unsecured creditors are paid in full.

11.     The Creditors' Committee is not an advocate for the Debtors' estates as a whole or for stakeholders other than those represented by it, and its only concern and function (and arguably authority) are to obtain a recovery that would pay its constituency the full amount it is owed on their claims.  The Creditors' Committee cannot be expected to zealously pursue any

---

[4]      It must be emphasized that certain members (Electronic Data Systems Corp. ("EDS"), Capital Research and Management Company and General Electric Corporation) of the Creditors' Committee have substantial pecuniary interests in GM, and although they do not have the same conflicts as the Debtors, such relationships have tempered and will temper the Creditors' Committee's willingness to vigorously pursue and prosecute the claims, causes of action and defenses.  Based on disclosures made in publicly available documents, the largest client of EDS is GM, which accounts for 9.7% of EDS's revenue.  EDS was a wholly owned subsidiary of GM until 1996 and, in February 2006, GM awarded EDS information technology service contracts worth $3.8 billion over five years.  Combined with other contracts between GM and EDS, EDS will receive between $1.2 and $1.4 billion from GM annually.  Additionally, EDS will receive hundreds of millions of dollars for ongoing services, such as business process outsourcing, that were not part of the new agreement.  Based on information and belief, Capital Research and Management Company, a member of the Creditors' Committee, owns approximately 11% of GM's common stock.  GM is an important trading partner of General Electric Corporation.

settlement in an amount greater than the value of unsecured claims.  In fact, it would be

obligated to agree to any arrangement that pays creditors in full regardless of the value that is

truly due and owing the Debtors' estates.  Given the scope of the claims, causes of action and

defenses asserted in the UCC Complaint, however, it cannot be seriously disputed that the value

of the claims, causes of action and defenses is substantial and far exceeds the claims of

unsecured creditors.  As such, the Creditors' Committee cannot be vested with authority to

monetize the claims, causes of action and defenses in a manner that maximizes their value.

Indeed, vesting control of the claims, causes of action and defenses in the Creditors' Committee

will all but ensure that value belonging to Delphi shareholders will not be obtained.  The

recovery on the claims, causes of action and defenses will be artificially capped at the amount

necessary to make the creditors whole.

12.    In addition, the Creditors' Committee acknowledges that it is not seeking to fully

prosecute the claims, causes of action and defenses with respect to GM.  Specifically, the

Creditors' Committee asserts in its Motion that the purpose of the Motion is not to prosecute the

claims, causes of action and defenses, but rather to ensure that *unsecured creditors* have a seat at

the table in negotiations among the Debtors and GM.  Just the filing of the Motion has achieved

this result for the Creditors' Committee, which now enjoys a front row seat and has moved

center stage in the negotiations among GM and the Debtors.  As a result, and as evidence of the

Creditors' Committee's intention not to pursue or prosecute the affirmative claims and causes of

action, the Creditors' Committee has adjourned the Motion.

13.    As noted above, it is critical that the claims, causes of action and defenses be fully

pursued and maximum value be realized for the benefit of *all* stakeholders, including Delphi

8

shareholders, who were the most aggrieved by GM's conduct.  It is clear from the Motion that

there is no basis to transfer pursuit of the claims, causes of action and defenses to the Creditors'

Committee.  The claims, causes of action and defenses must reside with a party that has

obligations to the Debtors' estates and *all* stakeholders, whether it be the Debtors, or, to the

extent the Debtors fail to satisfy their duties to *all* stakeholders, the Equity Committee.

14.    Therefore, the Motion should be denied.

## BACKGROUND

15.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and

affiliates filed voluntary petitions in this Court for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").  This Court entered orders directing the joint

administration of the Debtors' Chapter 11 Cases.  The Debtors continue to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

16.    On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee")

appointed the Creditors' Committee.  No trustee or examiner has been appointed in the Debtors'

Chapter 11 Cases.

17.    On March 30, 2006, the Court entered an order (the "Equity Committee Order")

directing the U.S. Trustee to appoint a committee of equity security holders pursuant to section

1102 of the Bankruptcy Code.

18.    On April 28, 2006, the U.S. Trustee appointed the Equity Committee.

19.    Since its formation and consistent with the Equity Committee Order, the Equity

Committee has been investigating GM's relationship with the Debtors, including their business

arrangements and conduct in connection with and following the Spin-Off.  The majority of the information reviewed by the Equity Committee in connection with these efforts has been publicly available.

20.     On July 27, 2006, an order (the "Order to Seal") was entered by this Court granting the Creditors' Committee's motion for authorization to file under seal a demand letter and the draft UCC Complaint attached as exhibits to the Motion.  The Motion was filed on the following day with the related exhibits filed under seal.

21.     On August 3, 2006, this Court approved a stipulation and agreed order amending the Order to Seal to provide that the Creditors' Committee may provide the Equity Committee with a copy of the UCC Complaint that had redacted all confidential information subject to a certain joint interest agreement between the Debtors and the Creditors' Committee.  As a result, the Equity Committee received a redacted copy of the UCC Complaint on August 3, 2006.[5]

22.     On August 4, 2006, the Debtors filed a preliminary objection to the Motion.

23.     On August 17, 2006, professionals for the Equity Committee received an unredacted copy of the UCC Complaint.

## OBJECTION

24.     The Debtors' current circumstances are the direct result of a scheme perpetrated

---

[5]     In the Motion, the Creditors' Committee states that the UCC Complaint contains highly confidential information.  It is the Equity Committee's understanding, based on conversations with the Creditors' Committee, that much of this highly confidential information was provided to the Creditors' Committee by the Debtors pursuant to the joint interest agreement among the parties referenced in the Motion.  As noted previously, the Equity Committee and the Debtors received Court approval of a similar joint interest agreement and the Equity Committee has recently received three installments of highly confidential information upon which part of the UCC Complaint is based.

by GM pursuant to which GM used the Debtors to improperly prop up GM's balance sheet and

operating performance at the expense of the Debtors' estates and Delphi shareholders.  The

Debtors have been harmed and damaged since their inception and every day thereafter by GM's

domination and control.  GM's improper actions—commencing prior to the Spin-Off, which was

fraudulent and a sham, and continuing with its domination and control of the Debtors—give rise

to claims and causes of action against GM and others and defenses to GM's claims that make

GM a net obligor to the Debtors for billions of dollars.

   25.  GM's wrongful and fraudulent actions give the Debtors' estates claims and causes

of action for, among other things, actual and constructive fraudulent conveyances, preferences

under the Bankruptcy Code and applicable state laws, and federal statutory and state common

law violations premised upon, *inter alia*, intentional fraud; conspiracy; breach of fiduciary

duties; commercial fraud; fraudulent concealment; fraudulent misrepresentation; inducing and

aiding and abetting breaches of fiduciary duty by Delphi officers and directors; interference with

prospective economic advantages; interference with contracts; interference with the lawful

business of Delphi; misappropriation; unjust enrichment, quasi-contract and restitution;

rescission and contract avoidance based on duress, unconscionability or as contracts of adhesion;

alter ego; and implied or equitable indemnity.  These claims are in addition to the myriad

defenses the Debtors possess against claims GM has asserted.  The defenses include, *inter alia*,

the doctrine of unclean hands; equitable disallowance; fraud in the inducement; duress;

unconscionability; contracts of adhesion; and recharacterization and equitable subordination to

existing shareholder interests.  The affirmative claims and all of the defenses implicate all of the

protections and conditions provided in section 502 of the Bankruptcy Code.  All affirmative

claims along with numerous defenses will reduce or eliminate entirely GM's allowable claims against the Debtors' estates.

26.    By its Motion, the Creditors' Committee is seeking authorization to file, serve and prosecute on behalf of the Debtors' estates certain of these claims, causes of action and defenses against GM and certain former officers of the Debtors, and any other actions relating thereto, which should and must be pursued for maximum value.  According to the standard set forth in Second Circuit cases, the Creditors' Committee may be given standing to prosecute the claims, causes of action and defenses if it presents colorable claims for relief that the Debtors have unjustifiably failed to prosecute or abused their discretion in not prosecuting, and the prosecution of the claims, causes of action and defenses by the Creditors' Committee would be in the best interests of the Debtors' estates.  See In re STN Enterprises, 779 F.2d 901 (2d Cir 1985); In re Adelphia Communications Corp., 330 B.R. 364, 374 (Bankr. S.D.N.Y. 2005).

27.    Consistent with case law, there is no doubt that the Creditors' Committee has presented colorable claims for relief.  However, the Creditors' Committee has not shown that transferring the claims, causes of action and defenses with respect to GM to the Creditors' Committee will maximize the value of such claims, causes of action and defenses to the Debtors' estates and provide any benefit to the Debtors' estates or stakeholders.  See Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.), 284 B.R. 355, 374 (Bankr. S.D.N.Y. 2002) ("a finding that allowing a committee to pursue a debtor's claim would be necessary and beneficial to the resolution of the bankruptcy proceeding is required in all instances.").

28.    In light of the discussions in the Creditors' Committee's Motion and the

12

additional facts highlighted below, it is apparent that the value of the claims, causes of action and defenses against GM far exceeds the value of the recovery that would be necessary to permit unsecured creditors a full recovery on their prepetition claims.  As such, the claims, causes of action and defenses must be held by parties who will seek to maximize the claims and defenses for the benefit of all constituencies, including shareholders.  As fiduciaries to all stakeholders, the Debtors and their professionals have the duty and burden to preserve and protect shareholder value and are obligated to realize the full value of the claims, causes of action and defenses.  On the other hand, because the Creditors' Committee owes fiduciary duties only to unsecured creditors—who have no incentive to obtain recoveries beyond those necessary to satisfy creditors' claims—its control of the claims, causes of action and defenses will cause a forfeiture, as opposed to a maximization, of value.

I.      **The claims and defenses are far reaching and have substantial value for Delphi's shareholders**

29.     As the Creditors' Committee in the UCC Complaint has made clear and as the Equity Committee, based on information to date and a review of publicly available information (see footnotes 1 and 5 supra), agrees, the Debtors have numerous and extremely valuable affirmative claims and causes of action for damages against GM, and myriad defenses to the claims that GM has included in its recently filed proof of claim.  These claims, causes of action and defenses, when fully pursued (whether by litigation or negotiation), will preserve value for the Delphi shareholders—which necessarily means that the Debtors' unsecured creditors will achieve full recovery of their prepetition claims.

A.      **Summary of the scheme**

13

30.      The history of GM's dealings with the Debtors can be viewed through the lens of many different legal and equitable theories.  The financial difficulties that led the Debtors to file for bankruptcy protection have their roots in the terms of the Spin-Off, which was a sham transaction designed by GM to:

- remove underperforming Delphi facilities and business lines from GM's balance sheet;

- free GM to purchase automotive parts from suppliers other than the Debtors, which as a GM division and subsidiary was saddled with uncompetitive labor costs under the collective bargaining agreements between GM and its unions;

- shift underfunded pension liabilities to the Debtors without transferring equivalent value in assets, thus improving the net position of the remaining GM pension funds;

- shift completely unfunded liabilities relating to other post-employment benefits ("OPEB") to the Debtors without transferring *any* value to the Debtors to compensate for the Debtors' assumption of these liabilities, thus increasing GM's net worth and its borrowing capacity;

- reduce GM's workforce and labor costs;

- reduce GM's vulnerability to work stoppages and strikes by unionized Delphi employees; and

- maintain control over the operation of the Debtors' businesses and financial affairs after the Spin-Off, in order to protect the flow of parts that GM continued to purchase from the Debtors.

On information and belief, a fully developed evidentiary record will show that GM designed and implemented the Spin-Off as a means to improve its own balance sheet and financial statements, prop up the value of its own securities, and subsidize its own operations—all at the expense of the Debtors and Delphi shareholders.  GM's efforts in this regard did not end, however, when the Spin-Off was complete.  Instead, every day since the Spin-Off, GM has continued to shift

14

liabilities to the Debtors, extract value from the Debtors for GM's sole benefit and dominate and
control the Debtors in all aspects, including in connection with its business decisions, operations
and labor relations, as if it were still a GM subsidiary rather than a publicly held, independent
company.

31.    GM achieved these goals through many different actions.  First, the Debtors were
knowingly and intentionally undercapitalized by GM, receiving insufficient assets to cover the
GM pension liabilities it was forced by GM to assume, and receiving no consideration
whatsoever from GM or any other party in respect of the OPEB obligations it was forced to
assume.  The extent of the Debtors' undercapitalization was concealed by, among other things,
the inclusion on the Debtors' balance sheet and financial statements of certain assets carried at
their historical book value rather than at their true economic and financial market value.

32.    Simultaneously with concealing the Debtors' vast undercapitalization, GM was
doing all that it could to transfer liabilities off its own balance sheet and onto the Debtors, and to
extort and coerce additional value out of the Debtors.  GM transferred to the Debtors
responsibility for all accrued OPEB liabilities relating to the active GM employees being
transferred to the Debtors—then totaling more than $4.6 billion—even though these obligations
had accrued during the employees' years of employment by GM.  No consideration whatsoever
was transferred to the Debtors in exchange for the Debtors' assumption of these accrued OPEB
liabilities, although on information and belief GM was aware that failing to do so would
seriously imperil the Debtors' financial viability.   In particular, GM chose to retain $1.6 billion
in a VEBA trust previously established by GM and funded by the Debtors for the express
purpose of partially funding the Debtors' accrued OPEB costs, even though the Spin-Off

15

removed those liabilities from GM's balance sheet.

33.    While the accrued pension liabilities transferred to the Debtors were *underfunded* by close to $2 billion, the funding levels for the accrued pension liabilities retained by GM improved significantly.  Adding insult to injury, in connection with the initial public offering and distribution of shares that effected the Spin-Off, GM caused the Debtors to commit to contributing an additional $1.8 billion to GM's pension plans by early 2000—thus sparing GM from having to "top up" the underfunded pension funds itself.  This again was an instance where GM siphoned funds from the Debtors to benefit GM without *any* corresponding business purpose or benefit to the Debtors.

34.    The inequitable impact of the Spin-Off on the Debtors' balance sheet was compounded by the fact that GM caused the Debtors to assume pension and OPEB liabilities for salaried employees retiring after January 1, 1999, even though GM remained the Debtors' sole or controlling shareholder for another five months.  GM thus continued to benefit financially from the services of these employees as the Debtors' ultimate parent company for five months after it transferred responsibility for its benefit to the Debtors.

35.    In addition, while GM agreed that all of the Debtors' hourly workers who retired from the Debtors before October 1, 1999 (a deadline that was subsequently extended to December 31, 1999) would be treated as GM retirees, GM did not necessarily assume the full cost of paying retiree benefits to these employees.   GM caused the Debtors to "agree" to make an additional "true-up" payment to GM if a "higher than anticipated" number of hourly workers retired from the Debtors prior to the deadline; the "anticipated" retirement rate, of course, was based on historical retirement figures rather than the unique circumstances of the Spin-Off.  Not

16

surprisingly, the actual retirement figures for Delphi hourly workers during 1999 (11,000) were much higher than the estimate based on historical retirement rates (7,000). As a result, the Debtors were required to pay GM (which had already improved its net pension fund position and its balance sheet) for the cost of re-assuming pension liabilities and OPEB liabilities for the 4,000 "unanticipated" retirees. Thus, the Debtors were forced to "reimburse" GM the full value of (a) pension liabilities for these workers, even though GM had not transferred adequate assets to compensate for the Debtors' assumption of these liabilities; and (b) OPEB liabilities for which GM had never paid the Debtors *any* consideration.

36.    Upon the completion of the Spin-Off, GM was the source of more than 70% of the Debtors' revenues. The Debtors were in-name-only independent as GM was able to continue its effective control of the Debtors' businesses through a series of agreements ancillary to the Spin-Off, including, without limitation, the Component Supply Agreement, which restricted the Debtors' ability to close or sell unprofitable operations or business lines. GM used this actual and effective control to siphon additional value from the Debtors by causing the Debtors to enter into further agreements and transactions that benefited GM at the Debtors' sole expense and provided no benefit to the Debtors. The sham nature of the Spin-Off was thus perpetuated on a daily basis in the years following the Spin-Off.

37.    For example, GM and the Debtors had told the public that a key benefit of the Spin-Off to the Debtors would be "labor independence," permitting the Debtors over time to negotiate more competitive labor agreements with their unions, putting the Debtors in a position to compete effectively against independent suppliers for new, non-GM business. Predictably, the Debtors' and GM's unions were not happy about the prospect of a Delphi free to negotiate

17

labor agreements that were in line with other parts suppliers rather than those of the major automobile companies.  While GM was still Delphi's majority shareholder, GM had caused the Debtors to agree to "mirror" the labor agreements for 1999-2003 that were to be negotiated a few months after the Spin-Off became effective—thus eliminating Delphi's ability to even attempt to achieve "labor independence" during the first four years of its existence.  Thereafter, GM caused the Debtors to agree to "mirror" GM's labor agreements that would be in effect for the period 2003-2007.  In short, GM eliminated the Debtors' ability to achieve "labor independence" for the first *eight* years of their existence as an "independent" company.  GM caused the Debtors to enter into these agreements, to which no "independent" company would have agreed, to buy *GM* peace from the unions.  Each day that the Debtors had to bear these additional above market labor costs are part of the claims against GM.

38.    These "mirror" agreements did not benefit the Debtors in any way; to the contrary, they caused the Debtors to incur additional costs without business purpose and because they locked the Debtors into an uncompetitive cost structure that would severely undercut their efforts to win new, non-GM business, left the Debtors *more* dependent on GM for future business, rather than less.  Thereafter, the Debtors were forced to agree to an ever-increasing series of "pricedowns" on GM supply contracts—pricedowns that far exceed the discounts that the Debtors had to offer to other customers—in order to retain a significant portion of GM's business.   In stark contrast, the supply contracts that GM caused the Debtors to assume granted GM increased freedom over time to purchase parts from other suppliers offering more competitive prices than the Debtors could.

39.    In order to buy peace with the unions, in September 1999, GM also agreed to

18

guarantee that the Debtors would provide pension and OPEB benefits to the Debtors' unionized

workers comparable to those provided by GM to its own employees during the eight-year

"mirror" period.  However, unwilling to bear the full consequences of these benefit guarantees,

GM caused the Debtors in December 1999 to execute an indemnity agreement obligating the

Debtors to reimburse GM for any payments it made to the United Auto Workers Union

("UAW") workers pursuant to the UAW benefit guarantee.  The Debtors received no benefit or

consideration for this agreement, much less reasonably equivalent value.  There was no

consideration provided by GM for the indemnity and it served no business purpose for the

Debtors.  In fact, the indemnity agreement made it so that the Debtors could "owe" GM more

than the Debtors would have owed directly to the UAW workers absent the benefit guarantee.

      40.    The foregoing is but a partial description of the facts underlying the ongoing

massive fraud that began prior to the Spin-Off and continued unabated thereafter.[6]

**B.**    **Claims and causes of action against GM**

      41.    Although the Debtors were purportedly spun-off from GM, the Debtors never left

GM's control and dominance nor did the Debtors ever have an existence independent from GM.

Prior to the Spin-Off, from the day of the Spin-Off and every day thereafter, GM has used the

Debtors as an instrument to fraudulently prop up GM's balance sheet and operating performance

at the expense of the Debtors' estates and Delphi's shareholders.  The relationship and fraudulent

---

[6]    The Equity Committee has developed and continues to develop a more fulsome set of facts.  To the extent
the Equity Committee deems necessary and appropriate, the Equity Committee intends to provide the Court
with more detailed facts in a supplemental pleading that the Equity Committee will file under seal if the
Court so advises.

pattern of conduct of GM in connection with the Debtors prior to the Spin-Off, since the Spin-

Off and at all times thereafter give rise to numerous and substantial affirmative claims against

GM worth, based on the Equity Committee's preliminary analysis, approximately $26 billion.

As stated earlier, this amount does not include (i) the trebling of damages provided for by certain

applicable statutes, (ii) prejudgment interest and (iii) potential punitive damages.  The following

highlights certain of the myriad claims that can and must be asserted against GM to obtain

recovery of the billions of dollars to which the Debtors are entitled based on GM's unlawful and

fraudulent conduct.  All affirmative claims along with numerous defenses should and will

eliminate entirely GM's allowable claims against the Debtors' estates and make GM a net

obligor of the Debtors.

42.    GM's wrongful and fraudulent actions give the Debtors' estates claims and causes

of action for, among other things, (i) actual and constructive fraudulent conveyances and

fraudulent obligations, (ii) preferences under the Bankruptcy Code and applicable state laws, (iii)

intentional fraud, (iv) conspiracy, (v) breach of fiduciary duties, (vi) commercial fraud, (vii)

fraudulent concealment, (viii) fraudulent misrepresentation, (ix) inducing and aiding and abetting

breaches of fiduciary duty by present and former Delphi officers and directors, (x) interference

with prospective economic advantages, (xi) interference with contracts, (xii) interference with

the lawful business of Delphi, (xiii) misappropriation, (xiv) unjust enrichment, quasi-contract

and restitution, (xv) rescission and contract avoidance based on duress, unconscionability or as

contracts of adhesion, (xvi) alter ego, and (xvii) implied or equitable indemnity.

43.    Prior to the Spin-Off, every day since the Spin-Off, and leading up to the filing of

petitions for relief, GM has engaged in a pattern of using the Debtors to benefit GM at the

Debtors' expense.  To that end, GM has extracted value from, and imposed obligations on, the

Debtors each day without providing any consideration to the Debtors.  As a result, GM is liable

to the Debtors under section 548(a) of the Bankruptcy Code and under the Uniform Fraudulent

Transfer Act, which has been adopted by both Michigan and Delaware.  The fraudulent transfers

and obligations that GM imposed on the Debtors include, without limitation, the following: (i)

the initial transfer of underfunded pension obligations to the Debtors for their active hourly and

salaried workers; (ii) the initial transfer of completely unfunded OPEB obligations to the Debtors

for their active hourly and salaried workers; (iii) the Debtors' $1.6 billion VEBA payments

retained by GM at the time of the Spin-Off; (iv) GM's imposition on the Debtors of "true-up"

obligations with respect to (a) OPEB benefits for Delphi hourly workers who retired between

January 1, 1999 and December 31, 1999, which required the Debtors to "reimburse" GM for re-

assuming unfunded liabilities that GM had imposed on the Debtors without any consideration

whatsoever, and (b) pension obligations that had been underfunded when transferred to the

Debtors; (v) GM's imposition of OPEB and pension benefit payments to retirees for the years

such retirees worked at GM; (vi) GM's imposition on the Debtors of the "mirror" agreements

and the resulting collective bargaining agreements, which among other things, (a) obligated the

Debtors to make wage, benefit, OPEB and pension benefit payments the Debtors made to their

hourly workers after October 8, 1999 in excess of competitive market rates and (b) caused the

Debtors to incur additional expenses as a result of labor restrictions that precluded the Debtors

from laying off employees; (vii) additional costs and expenses as a result of GM's imposition of

restrictions on the Debtors' ability to close unprofitable plants and product lines; (viii) excessive

price-downs extorted from the Debtors by GM; (ix) any and all obligations arising out of the

Spin-Off agreements; and (x) any and all obligations arising out of the UAW indemnity agreement.

44.    As each and every one of these payments or other transactions occurred, the already substantial gap between the Debtors' assets and their liabilities widened.  Further, GM is liable to the Debtors for any payments or transfers made by the Debtors either to GM or to third parties for the benefit of GM on account of obligations owed to GM in the year prior to the filing of the Debtors' chapter 11 petitions as preferences pursuant to section 547 of the Bankruptcy Code.[7]

45.    In addition to these transfers being constructively fraudulent, they are also avoidable and subject to attack as actual fraudulent transfers.  Even the limited record the Equity Committee has seen to date is replete with examples of GM's fraud on the Debtors and their constituencies, from the basic premise of ensuring Delphi that it would have labor independence as part of the Spin-Off to the various fraudulent transfers, to GM's apparent involvement in the misdescriptions of certain payments to and from the Debtors and other accounting fraud.  As a result, GM has liability for intentional fraud, commercial fraud, fraudulent concealment and fraudulent misrepresentations.

46.    The record demonstrates that GM exercised its control and dominance to cause the Debtors to (i) enter into crippling labor agreements for GM's benefit, (ii) provide GM with well-below-market pricing, (iii) extract extraordinary price-downs and (iv) take actions that were

---

[7]    Any resulting unsecured claim would be subject to disallowance as a result of the defenses to GM's claims set forth below.

economically unfeasible and would not have been undertaken by any independent company.

GM's conduct gives rise to liability for misappropriation, as well as numerous business torts,

including interference with prospective economic advantages, interference with the lawful

business of the Debtors, and interference with contract.  As a result of GM's wrongful conduct,

GM was enriched at the Debtors' expense, resulting in additional claims for unjust enrichment,

quasi-contract and restitution.  In addition, as a result of the fraudulent conduct by GM, all

contracts with GM that were predicated on fraud are subject to rescission by the Debtors,[8] and

the Debtors have affirmative claims to recover the value provided to GM pursuant to such

contracts.

47.    GM's total control and dominance of the Debtors, together with the Debtors'

complete lack of independence, also caused the Debtors to be nothing more than the alter ego of

GM.  The purported Spin-Off and grossly and fraudulently misrepresented independence were

nothing more than a charade.  In addition to being liable for each and every obligation and debt

that was pre-Spin-Off an obligation or debt of GM, GM is also liable as the Debtors' alter ego

and is liable for all of the Debtors' claims and obligations.  Further, as discussed above, many of

the liabilities that GM imposed on the Debtors (for example the legacy liabilities) were actually

liabilities of GM.  Nonetheless, GM used its control and domination of the Debtors to cause the

Debtors to assume such obligations in violation of GM's duties.  The Debtors are entitled to an

---

[8]    In addition to rescission based on GM's fraud, the contracts with GM are also subject to rescission or
avoidance based on, among others, duress, unconscionability and as contracts of adhesion.  These grounds
for avoiding or rescinding the contracts, may be asserted as affirmative claims as well as defenses against
GM.

implied indemnity in contract or in tort on the basis that GM is responsible in large part for the

conduct giving rise to the legacy liabilities, while the Debtors' liability is derivative because of

GM's improper control and domination.

48.    Because the various agreements and obligations imposed on the Debtors by GM

prior to the Spin-Off (and unless and until Delphi is made whole by GM) caused Delphi to be

insolvent and in the "zone of insolvency," GM was not free to consider only its own self-interest

in forcing Delphi to assume GM's own underfunded or unfunded liabilities, or in capitalizing

Delphi.[9]  GM is liable for injuries it inflicted on Delphi for its own benefit even prior to

February 5, 1999, *i.e.*, the date on which GM began offering shares of Delphi to the public.

There can be no dispute, of course, that during the time that GM was a controlling shareholder of

Delphi, *i.e.,* between February 5, 1999 and May 29, 1999, GM owed a fiduciary duty of loyalty

and care directly to Delphi, and to Delphi's minority shareholders.  Further, as noted above, once

---

[9]    GM could not disregard the interests of Delphi and cause Delphi to act solely in GM's interests even though GM was its 100% shareholder prior to February 5, 1999.   While GM may seek to take comfort regarding its liability for injuries inflicted on Delphi while Delphi was a wholly-owned subsidiary based on *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171 (Del. 1988), GM should be aware that *Anadarko* does not immunize 100% shareholders where the subsidiary is insolvent or in the "zone of insolvency," as Delphi has been (unless and until Delphi is made whole by GM) since the end of 1998. Earlier this year, in *Scott Acquisition Corp. v. Morris (In re Scott Acquisition Corp.)*, 344 B.R. 283 (Bankr. D. Del. 2006), the court expressly held *Anadarko* inapplicable in a zone-of-insolvency situation and permitted the bankruptcy trustee of a corporation, which at the relevant time had been a 100% subsidiary, to pursue claims against the subsidiary's former directors for breach of fiduciary duty.  *See also RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall)*, 2003 WL 22989669, at *12-13 (Bankr. S.D.N.Y. Dec. 11, 2003) (finding "no basis for the principle . . . that the directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent corporation" and permitting claims by the debtor-in-possession and the creditors' committee to proceed against former directors of the subsidiary); *Roselink Investors, L.L.C., v. Shenkman*, 386 F. Supp. 2d 209, 215 (S.D.N.Y. 2004) (recognizing right of creditors of wholly-owned subsidiary in zone of insolvency to pursue fiduciary duty claims).  The rationale of these cases is directly applicable here.

24

the Spin-Off was complete, GM's control and domination over Delphi continued as GM caused

Delphi's officers and directors—who now owed fiduciary duties solely to Delphi and its

shareholders—to approve or acquiesce in additional acts of corporate waste.  Because the duties

owed by GM, and Delphi's officers and directors, were owed directly to Delphi and also to its

public shareholders, Delphi is entitled to recover to the full extent to which Delphi's assets were

wasted—that is, to the full extent to which the liabilities transferred to Delphi exceeded the value

of the assets transferred—and are not limited by the amount necessary to permit unsecured

creditors to recover par plus interest.  GM breached duties to Delphi and induced and aided and

abetted breaches by Delphi's officers and directors.  GM's wrongful and unlawful actions in

concert with certain of Delphi's officers and directors give rise to claims of conspiracy against

GM.

       49.    GM's fraudulent conduct with respect to the Debtors gives rise to both affirmative

claims against GM for the billions of dollars in damages the Debtors suffered as a result of GM's

domination and to avoidance actions with respect to the related transfers and obligations GM

forced the Debtors to incur.  As a result, as further discussed below, pursuant to section 502(d) of

the Bankruptcy Code, GM's conduct relating to these fraudulent transfers and obligations creates

grounds to disallow all claims asserted by GM against the Debtors' estates.  Section 502(d)

provides that the court shall *disallow* any claim of any entity that is a transferee of a transfer

avoidable under section 548 of the Bankruptcy Code, unless such entity or transferee has paid

the amount, or turned over any such property, for which such entity or transferee is liable.  See

11 U.S.C. 502(d).  Thus, "the Bankruptcy Code explicitly bans [the] allowance [of a claim of a

transferee] until [the transferee] has repaid the estate for the fraudulently transferred property."

25

Glinka v. Federal Plastics Mfg. (In re Housecraft Indus. USA, Inc.), 310 F.3d 64, 72 n.8 (2d Cir.

2002).

      50.      In sum, there are numerous and significant claims and causes of action against

GM.  This is not surprising in light of the simple fact that GM has acted wrongly and taken

actions that have significantly harmed the Debtors and Delphi's shareholders.  The Debtors

should not and cannot seek to release GM from these liabilities without providing a full and

complete assessment of each and every claim and cause of action and without providing for a

mechanism for each of the Debtors' stakeholders to participate in the value of each and every

claim and cause of action.  These claims and causes of action are viable and significant assets of

the Debtors' estates that must be fully realized.

      51.      The Equity Committee is still receiving information from the Debtors, reviewing

the facts and developing the record that it expects will form the basis for numerous additional

affirmative claims and causes of action against GM.  As indicated above, as necessary and

appropriate, the Equity Committee intends to file a supplement to this Objection under seal

providing additional evidence with respect to the claims and causes of action set forth above and

identifying additional claims and causes of action.

**C.**      **Defenses to claims asserted by GM against the Debtors**

      52.      As indicated above, GM's domination and control of the Debtors prior to the

Spin-Off and at all times thereafter caused the Debtors billions of dollars in harm and damages

and effectively forced the Debtors into bankruptcy.  Yet despite its wrongful and fraudulent

conduct, and adding insult to injury, GM has submitted a proof of claim against the Debtors'

estates amounting in the billions of dollars in order to capture whatever value is left in the

26

Debtors' estates that GM has not yet extracted and plundered over the past seven years.  Because of GM's continuous fraudulent conduct and the resulting injuries to the Debtors, the Debtors have meritorious defenses against GM's claims that, when fully pursued, will result in the disallowance of GM's claims in their entirety.  These defenses include, among others, (i) the doctrine of unclean hands, (ii) equitable disallowance, (iii) fraud in the inducement, (iv) duress, (v) unconscionability, (vi) contracts of adhesion and (vii) recharacterization and equitable subordination to existing shareholder interests.  All of the above-delineated affirmative claims and all of the defenses implicate all of the protections and conditions provided in section 502 of the Bankruptcy Code.[10]  As such, as a matter of law, GM cannot receive any distribution unless and until all of GM's claims and all disputes with respect to such claims have been resolved by final court order.

53.    By taking the position that it can recover on claims arising from its own malfeasance, GM runs afoul of the long-standing equitable principle that it must have "clean hands" in order to obtain relief from the Bankruptcy Court.  Principles of justice and fairness mandate rejection of GM's efforts to recover on the claims it has asserted.[11]

---

[10]    Obviously there are numerous defenses as to the calculation and accuracy of the claims asserted by GM. For example, there are numerous objections that could be raised to the method by which GM calculates OPEB liability.  The defenses discussed above are over and above any defenses and objections that arise from the documents or the calculation of the claims.  As discussed above, the obligations on which GM's claims are based may also be avoided under fraudulent conveyance laws, which will result in the disallowance of GM's claims.

[11]    "[I]t is axiomatic that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process."  Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.), 352 F.3d 671, 680 (2d Cir. 2003) (internal citation omitted); Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 244 (1933) ("It is one of the fundamental principles upon

54.    The unclean hands doctrine exists to bar the perverse result of GM being able to fraudulently undercapitalize the Debtors and force them to enter into and assume costly and burdensome agreements from the moment of their existence as an allegedly independent corporate entity and still be able to recover billions of dollars under those very agreements.  As a court of equity, the Bankruptcy Court is authorized to disallow GM's claims due to its unclean hands, and such a result is necessary to ensure that GM does not profit from its unconscionable acts that began prior to the Spin-Off and have continued to this day.  Similarly, GM's claims are subject to the doctrine of equitable disallowance, equitable estoppel and unjust enrichment and should be disallowed in their entirety.  Any other result would be inequitable and a violation of fundamental principles of the Bankruptcy Code.

55.    In addition, the agreements that give rise to certain of GM's claims (*e.g.*, the indemnity agreements and undertakings) were part of an ongoing fraudulent scheme by GM to loot the Debtors for its own ends, at the sole expense and to the great detriment of the Debtors and Delphi shareholders.  As a matter of basic contract law, agreements induced by fraud are unenforceable against the defrauded party.

56.    The Equity Committee is currently developing its analyses with respect to the Debtors' contract-based defenses to GM's claims.  Set forth below is brief description of certain of the defenses the Equity Committee has so far identified.  Of course, under section 502(b)(1) of

---

which equity jurisprudence is founded, that before a complainant can have a standing in court he must first show that not only has he a good and meritorious cause of action, but he must come into court with clean hands.").

28

the Bankruptcy Code, to the extent that GM's claims are unenforceable under non-bankruptcy

law, so too are those claims unenforceable under bankruptcy law.  As a result of GM's

misconduct and these defenses, the burdensome contracts between GM and Delphi are void *ab*

*initio*.  GM's fraudulent conduct is such that its claims should be disallowed outright in these

chapter 11 cases.

57.    The Spin-Off-related agreements and other contracts relied on by GM for its

claims against the estates are voidable based on a number of contract-related defenses.  All of the

initial Spin-Off-related agreements were premised on GM's misrepresentations as to the benefits

that would flow to the Debtors from supposed "labor independence" —independence GM then

withheld for its own benefit—thus rendering the contracts voidable at Delphi's option.[12]

58.    Similarly, a wide range of contracts relied on by GM for its claims against the

estates are voidable because the Debtors' consent was induced by duress – improper threats of

damaging the Debtors' business that overcame the Debtors' free will and left the Debtors no

reasonable alternative.  Moreover, the lack of any realistic alternatives on the Debtors' part,

combined with GM's total domination and control of the Debtors both prior to and subsequent to

the Spin-Off, will enable the Debtors to avoid those terms of the agreements that are

substantively unreasonable (*i.e.*, unreasonably favorable to GM) under the doctrine of

---

[12]    See, e.g., Samuel D. Begola Services, Inc. v. Wild Bros., 534 N.W.2d 217, 219 (Mich. Ct. App. 1995)
("Fraud in the inducement occurs where a party materially misrepresents future conduct under
circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon.
Fraud in the inducement to enter a contract renders the contract voidable at the option of the defrauded
party.").

unconscionability.  Not only did the Spin-Off agreements and various subsequent agreements,

like the "mirror" agreements and the UAW indemnity agreement, not arise from arm's-length

bargaining as a factual matter, no party bargaining at arm's-length would conceivably have

agreed to the terms GM imposed on the Debtors.

59.    In addition to all of the bases for disallowance, GM's claims are also subject to

recharacterization due to GM's intentional undercapitalization of the Debtors.  The initial

capitalization of the Debtors at the time of the Spin-Off was grossly inadequate, and GM was

responsible for the undercapitalization at the time Delphi entered into certain indemnity

agreements.  The benefit guarantees and related indemnity agreements were mechanisms for GM

to provide conditional future investments of capital for the Debtors' business and for the Debtors

to meet their minimum funding obligations relating to their legacy liabilities.  Because the true

nature of the indemnity obligations of Delphi pursuant to the Spin-Off agreements is equity as

opposed to debt, GM's claims relating to the indemnity undertakings should be recharacterized

and treated as equity interests rather than debt claims.  Such equity interests would then be

equitably subordinated to all other equity interests pursuant to section 510(c) of the Bankruptcy

Code.

60.    Moreover, as set forth above, GM imposed numerous fraudulent transfers and

obligations on the Debtors that can be avoided under the Bankruptcy Code and applicable non-

bankruptcy law.  Therefore, under section 502(d) of the Bankruptcy Code, GM's claims must be

disallowed in their entirety and GM must not recover any value from the Debtors' estates unless

and until GM repays to the Debtors' estates the billions of dollars it received as a fraudulent

transfer or as a result of fraudulent obligations incurred by the Debtors.[13]

## II.    **The Debtors have fiduciary duties to all stakeholders and are obligated to maximize the value of the claims and defenses for the benefit of their current stakeholders**

61.    As described above, the value of the claims, causes of action and defenses is

enormous and belongs to the Debtors' estates and all constituencies, including shareholders.  To

ensure that maximum value is realized, at this point, a party that is duty bound to maximize the

value of the Debtors' estates for all stakeholders must control the prosecution of the claims,

causes of action and defenses.

62.    The Debtors and their officers and directors owe duties of loyalty and care to all

parties in interest in the Chapter 11 Cases, not just the Debtors' creditors.  See Commodity

Futures Trading Com. v. Weintraub, 471 U.S. 343, 355 (U.S. 1985); Mims v. Kennedy Capital

Mgmt., Inc. (In re Performance Nutrition, Inc.), 239 B.R. 93, 111 (Bankr. N.D. Tex. 1999) ("A

trustee in bankruptcy owes a duty of care and a duty of loyalty to the corporation and its

---

[13]    In addition, the proof of claim filed by GM against the Debtors asserts a number of claims based on theories of contribution, reimbursement and indemnification.  For example, certain of GM's asserted claims relate to GM's obligations to provide OPEB and other benefits to former Delphi employees pursuant to prepetition labor arrangements relating to the Spin-Off and thereafter, including arrangements set forth in the Employee Matters Agreement and the UAW indemnity agreement and the Debtors' postpetition attrition programs.  Even assuming that such claims would not be disallowed on a variety of other grounds by reason of the fraudulent nature of the transfers, obligations and conduct that give rise to such claims, such claims should be disallowed under section 502(e)(1)(B) of the Bankruptcy Code.  Under section 502(e)(1)(B) of the Bankruptcy Code, the Bankruptcy Court shall disallow a claim for indemnity, reimbursement or contribution to the extent that it is contingent as of the time of allowance or disallowance.  For many of GM's asserted claims, GM's obligation to pay on the underlying claim (such as obligations to provide OPEB benefits to employees well into the future) will be contingent and not enforceable until GM actually expends the funds relating to such underlying claims (*i.e.*, until GM actually makes the OPEB or other payments).  As such, the relating claims against the Debtors for contingent obligations of GM must be disallowed pursuant to section 502(e)(1)(B).

shareholders, similar to a director's fiduciary duties, but also owes those same duties to the

creditors of the bankrupt corporation.").  It is precisely because of these broad fiduciary duties

that the Bankruptcy Code permits a debtor to continue in the operation of its business as a debtor

in possession.  See Commodity Futures Trading Com, 471 U.S. at 355, citing Wolf v. Weinstein,

372 U.S. 633, 651 (1963) ("Indeed, the willingness of courts to leave debtors in possession 'is

premised upon an assurance that the officers and managing employees can be depended upon to

carry out the fiduciary responsibilities of a trustee.'").  Those fiduciary responsibilities of the

trustee "run[] to shareholders as well as to creditors."  Id.

63.    Recognizing the broad fiduciary duties that the Debtors owe to their estates, their

creditors, and their equity holders, the Bankruptcy Code "not only authorizes the chapter 11

debtor to manage the estate's legal claims, but in fact requires the debtor to do so in a way that

maximizes the estate's value."  Smart World Techs., LLC v. Juno Online Servs. (In re Smart

World Techs., LLC), 423 F.3d 166, 175 (2d Cir. 2005); see also In re Commodore Int'l Ltd., 262

F.3d 96, 99 (2d Cir. 2001) (a debtor "has an obligation to pursue all actions that are in the best

interests of creditors and the estate.").

64.    Given their fiduciary duties to all stakeholders, including shareholders, the

Debtors and their professionals have accountability to all constituencies, including shareholders,

with respect to the claims, causes of action and defenses.  The Debtors, the Delphi board and

Delphi management are duty bound to seek from GM and others the full value of the claims,

causes of action and defenses for the benefit of their current stakeholders.

65.    In that regard, the Equity Committee is sensitive to and focused on the conflict

that confronts the Debtors because GM is and will be a major customer of the Debtors and GM

32

plays, and going forward will play, a major role in the Debtors' business.  Despite the enormous

value of the claims, causes of action and defenses, the Debtors view the claims, causes of action

and defenses more as an obstacle to the Debtors' ongoing role as a principal GM supplier than as

a critical asset of the estates.  The Debtors therefore have demonstrated their desire to

compromise the claims, causes of action and defenses in return for forward-looking business

opportunities, rather than as a source of recovery for injured stakeholders.  It is for this reason

that any compromise of the claims, causes of action and defenses must be carefully scrutinized

by the Court and all parties.

66.     Given the importance, gravity and value of the claims against GM, it is wrong and

inconsistent with the duties and obligations of the board and management of Delphi to all

stakeholders for the Debtors to consider any compromise and settlement with GM without

having fully vetted and pursued each and every one of the Debtors' claims, causes of action and

defenses against GM.  The Debtors cannot be in a position to choose not to prosecute claims or

to settle claims without the support of Delphi shareholders unless they have fully explored each

of the claims and have definitively determined the value and merit (or lack thereof) of each

claim.  Business judgment and the standard required of any settlement under Bankruptcy Rule

9019 require a full, complete and detailed analysis by the Debtors' board and management and

by the Debtors' professionals.

67.     The Debtors cannot use parochial and short-term business reasons to discount or

forfeit the full value of the claims, causes of action and defenses.  The claims, causes of action

and defenses have *net* value in the billions of dollars reflecting the years of damage inflicted on

the Debtors' estates by GM.  The claims, causes of action and defenses far exceed the value of

33

any favorable business arrangements the Debtors may reach with GM as part of their global

"transformation" deal.  Therefore, the compromise of the claims, causes of action and defenses

by the Debtors in exchange for favorable go-forward business arrangements with GM or an

expeditious emergence from chapter 11 would be insufficient compensation for the Debtors'

stakeholders and thus a breach of duties.  The Debtors must insist upon a full accounting for the

value owed to Delphi shareholders.  As fiduciaries, if the Debtors determine and seek to

compromise any of the claims, causes of action and defenses, the Debtors must ensure that the

beneficiaries of such compromise are the Debtors' current stakeholders, most especially Delphi's

shareholders, who are the parties most aggrieved by GM's wrongful conduct.  The Debtors must

be guided by these duties in their efforts to pursue and realize value for the Debtors' estates for

the claims, causes of action and defenses that is proportionate to, and sufficient to compensate

for, the losses and harm incurred by all of the Debtors' stakeholders.

68.    It is for this reason that the Equity Committee opposes any attempt by the Debtors

to release affirmative claims and causes of action against GM in exchange for GM contributions

to its transformation issues or for potential future business opportunities, which would relegate

the Debtors' creditors and Delphi's shareholders to objecting to the allowability of some (but not

all) of GM's proof of claim.  While such an approach would benefit GM, it would not permit the

Debtors to marshal their assets in a manner that takes into account the interests of all

stakeholders.  The Debtors' affirmative claims against GM far exceed the value of any

commercial arrangement to be reached with GM; as such, the release of these affirmative claims

and causes of action for future business arrangements permits GM to take value from the

Debtors' estates at the expense of the Debtors' stakeholders.

34

69.     To that end, any settlement and compromise cannot provide, by way of subordination or otherwise, the value of the claims, causes of action and defenses against GM only to arm's-length creditors and to the exclusion of Delphi's shareholders.  GM's wrongful conduct defrauded and harmed the Debtors, the Debtors' creditors and, most significantly, Delphi's shareholders, who suffered the greatest damage.  As such, any settlement that does not recognize the harm GM has caused to Delphi's shareholders and allows GM to obtain any value from the Debtors' estates ahead of Delphi's shareholders is inappropriate.  Any compromise of the claims, causes of action and defenses must be structured in a way so that the value of the Debtors' estates is realized by the Debtors' stakeholders, including Delphi shareholders; anything less would be a breach of the Debtors' fiduciary duties.

III.     **The Creditors' Committee's control of the claims and defenses will lead to a forfeiture of the value of the claims and defenses to the detriment of the Debtors' estates and shareholders**

70.     The Creditors' Committee has been a staunch advocate for its constituency throughout the Chapter 11 Cases and the Equity Committee does not doubt the Creditors' Committee's ability to prosecute the claims it chose to include in the UCC Complaint.  However, despite sharing the Creditors' Committee's concerns about the conflicts of interest faced by the Debtors, the Equity Committee believes the Creditors' Committee is not the appropriate party to prosecute the claims, causes of action and defenses because of its limited role and responsibilities in the Chapter 11 Cases: to fight for its constituency and its constituency alone.

71.     The Creditors' Committee is a fiduciary for unsecured creditors.  The Creditors' Committee is not, and does not pretend to be, a fiduciary "to the debtor, other classes of creditors, or the estate."  See In re Smart World Techs., LLC, 423 F.3d at 175 n.12.  The

35

Creditors' Committee acknowledges its focus in the Motion, stating that the "primary purpose of [a] [creditors'] committee is to represent the interests of all general unsecured creditors and to maximize distribution to them."  Motion at ¶25, quoting In re Life Service Systems, Inc., 279 B.R. 504, 510 (Bankr. W.D. Pa. 2002).  As such, while the Creditors' Committee does have an interest in limiting the claims GM may have and in pursuing affirmative actions against GM, those interests only go so far as to secure a full recovery for unsecured creditors.  In this case, such an interest will lead to a significant and inappropriate forfeiture of value.

72.    As described above, the claims, causes of action and defenses with respect to GM have substantial monetary value over and above the amounts necessary for unsecured creditors to receive a full recovery, with such excess value belonging to Delphi shareholders.  The Creditors' Committee is not an advocate for the Debtors' estates as a whole or for stakeholders other than those represented by the Creditors' Committee, and its only concern and function (and arguably authority) are to obtain a recovery that would pay its constituency the full amount it is owed on its claims.  The Creditors' Committee cannot be expected to zealously pursue any settlement in an amount greater than the value of unsecured claims.  In fact, it would be obligated to agree to any arrangement that pays creditors in full regardless of the value that is truly due and owing the Debtors' estates.  To charge the Creditors' Committee with pursuing the claims, causes of action and defenses would have the effect of setting an artificially low ceiling on the potential recovery that the estates could recognize from the claims, causes of action and defenses.

73.    Therefore, transferring the claims, causes of action and defenses from the Debtors to the Creditors' Committee, a party that is not duty bound to maximize the value of such claims,

causes of action and defenses, is not in the best interests of the Debtors' estates.

74.     The Equity Committee notes, however, that if, for any reason, it appears that the

Debtors' management, board of directors or professionals do not intend to fully pursue the

claims, causes of action and defenses or intend to compromise them in a manner that deprives

their estates of full value, control of the claims, causes of action and defenses should not

continue to reside with the Debtors.  In such event, the remedy must be to transfer control to the

Equity Committee to ensure maximum value is realized for the Debtors' estates.

75.     Therefore, while the Equity Committee objects to the relief requested, if the Court

determines that the Debtors' claims, causes of action and defenses against GM should not

continue to reside with the Debtors, for the reasons set forth above, those claims, causes of

action and defenses cannot be transferred to the Creditors' Committee.  Instead, those claims,

causes of action and defenses must either be transferred to the Equity Committee, which, as the

statutory representative of all Delphi shareholders (the constituency most harmed by GM's

wrongful conduct), has both the duty and the incentive to seek maximum value for the Debtors'

claims and defenses against GM.

## CONCLUSION

76.     The claims, causes of action and defenses with respect to GM have enormous

value to the Debtors' estates, with such value ultimately belonging to Delphi's shareholders.

The substantial affirmative claims against GM alone are worth, based on the Equity Committee's

preliminary analysis, approximately $26 billion.  As such, there is no reason, basis, merit or

support for transferring the claims, causes of action and defenses to the Creditors' Committee,

which does not have fiduciary duties to all of the Debtors' constituencies to maximize the value

of the claims, causes of action and defenses.  No benefit would result to the estates if the claims,

causes of action and defenses are transferred exclusively to the Creditors' Committee, which

lacks the interest to realize the full value of the claims, causes of action and defenses; instead,

such transfer will ultimately lead to a forfeiture of value for the benefit of GM and to the

detriment of Delphi shareholders.  Therefore, and for the foregoing reasons, the Equity

Committee respectfully requests that the Motion be denied.  In the alternative, if this Court

determines that the Debtors should no longer control and have the authority to prosecute the

claims, causes of action and defenses, the Equity Committee respectfully requests such authority

to file, serve and prosecute on behalf of the Debtors' estates the claims, causes of action and

defenses against GM and certain former officers of the Debtors, and any other actions.

Dated:  September 5, 2006
      New York, New York

            OFFICIAL COMMITTEE OF EQUITY
              SECURITY HOLDERS OF
              DELPHI CORPORATION, ET AL.


By:   /s/  Douglas L. Dethy
      Douglas L. Dethy
      Chairman of Equity Committee


FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP

By:   /s/  Bonnie Steingart
      Bonnie Steingart (BS-8004)
      Debra M. Torres (DT-9093)

One New York Plaza
New York, New York 10004
Telephone:  212.859.8000
Facsimile:  212.859.4000

*Counsel for the Official Committee of Equity
Security Holders*

562387