UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

H.E. SERVICES COMPANY, and
ROBERT BACKIE, Majority
Shareholder

        Plaintiffs,

vs.

DELPHI AUTOMOTIVE
SYSTEMS, LLC, a foreign corporation.

        Defendant.

File No. 05-10053

Hon. David M. Lawson
Magistrate Judge Charles E. Binder

---

VICTOR J. MASTROMARCO, JR.  (P34564)
MANDA L. WESTERVELT (P62597)
MASTROMARCO & JAHN, P.C.
Attorneys for Plaintiffs
1024 North Michigan Avenue, P.O. Box 3197
Saginaw, Michigan 48605-3197
(989) 752-1414

ARTHUR T. LIPPERT, JR. (P16714)
LIPPERT, HUMPHREYS, CAMPBELL,
DUST & HUMPHREYS, P.C.
Attorneys for Defendant
4800 Fashion Square Boulevard
Plaza North, Suite 410
Saginaw, Michigan 48604-2604
(989) 792-2552

DONALD R. PARSHALL, JR. (P30267)
Attorney for Defendant
Delphi World Headquarters
 M/C:  480-410-254
5825 Delphi Drive
Troy, Michigan 48098-2815
(248) 813-3445

---

There is no other pending or resolve civil action arising out of the transaction
or occurrence alleged in the complaint.

## AMENDED COMPLAINT, RELIANCE UPON EARLIER DEMAND FOR JURY TRIAL AND PRE-TRIAL CONFERENCE



PLAINTIFF'S
EXHIBIT
3
tabbies

NOW COMES the Plaintiff, H.E. Services Company, and Robert Backie, by and through their attorneys, MASTROMARCO & JAHN, P.C., and hereby Complains against the Defendant stating more fully as follows:

## Common Allegations

### 1.

That at all times material hereto, the Plaintiff, H.E. Services Company (hereinafter HES), is a certified minority-owned business and the race of its primary majority shareholders is that of Native American Chippewa Indian.

### 2.

That Plaintiff, Robert Backie, is at all times material hereto, a 51% shareholder and is a natural born Native American Chippewa Indian.

### 3.

That this action is brought pursuant to 42 U.S.C § 1981 and as such, this Court has federal question jurisdiction over this cause pursuant to 28 U.S.C. 1331.

### 4.

That this jurisdiction is also based on the diversity standing of Delphi Automotive Systems, LLC, said corporation being a citizen of a different state and a foreign corporation from Michigan pursuant to 28 U.S.C § 1332.

### 5.

That at all times material hereto, the Plaintiffs, HES and Robert Backie, are within the "zone of interest" protected by 42 U.S.C § 1981.

2

6.

That furthermore, HES and Robert Backie, have the "racial identity" to also sufficiently fall within the "zone of interest" to have prudential standing to bring this action under Section 42 U.S.C. § 1981.

7.

That Plaintiff also brings claims of promissory estoppel, breach of contract, breach of contract (UCC), as well as violations of Michigan Public Policy, fraud and misrepresentation premised on Michigan Law and this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367.

8.

That furthermore, Plaintiffs' sale of goods to the Defendant is also governed by the Uniform Commercial Code.

9.

That furthermore, the amount in controversy exceeds the sum of 20 million dollars, exclusive of costs, interest and attorney fees.

**Factual Background**

10.

That indicated above, both Plaintiffs are a member of a certified minority group protected by 42 USC § 1981.

11.

That the Plaintiff, HES, was incorporated in 1986.

3

12.

That Plaintiffs were encouraged by the Defendant to obtain minority status and if said status was obtained, Plaintiffs would be given favored status by Defendant, pursuant to their internal policies.

13.

That Plaintiffs did in fact obtain minority status based upon the specific urging of GM/Saginaw Steering Gear (later Delphi) personnel. (See **Exhibit 1**).

14.

That Plaintiffs were also told that GM/Saginaw Steering Gear and later Delphi, did have a policy and procedure and had certain "buyer responsibilities" and that once minority status was achieved that the following would be initiated by Delphi:

a.    Refer promising minority suppliers to local minority supplier coordinators as possible candidates for the Mentorship Program;

b.    Refer competitive minority suppliers to other organizations to expand their opportunities;

c.    They would ensure minority suppliers purchasing goals were included in the buyers (Delphi is the buyer) annual business plan;

d.    They would ensure mentees (minorities) were included on all appropriate bidding lists;

e.    They would ensure tier 1 suppliers (non-minorities) are actively supporting the Mentorship Program through their tier 2 (minority) sourcing;

f.    Employ the "Bridge Solution" when a mainstream (mentee)(minority) company is competitive or a defending minority source is involved;

4

g.    Actively promote through their Vice-President of Global Purchasing of Delphi Automotive Systems, LLC so as to "build a network of business relationships and rapidly increase [purchases] from the minority supplier";

15.

That the Plaintiff, HES, did obtain minority status and continued their business with Delphi Automotive Systems LLC.

16.

That Defendant does not have a minority status; however, upon information and belief the Defendant bids on government contracts with the State of Michigan as well as the federal government.

17.

That furthermore and as will be set forth below in further detail, Delphi Automotive Systems LLC used the minority status of the Plaintiff, HES, to the Plaintiff, HES' detriment and, to the detriment of Plaintiff, Robert Backie, majority shareholder of HES.

18.

That as will be set forth in further detail, the Defendant, Delphi Automotive Systems LLC, did discriminate against the Plaintiffs herein, by using their minority status to drive down the cost of other third-party suppliers, and then, after successfully using Plaintiffs' minority status to drive down prices they then discriminated further by awarding contracts to the third-party suppliers to the detriment of the Plaintiffs because Plaintiffs were a minority.

19.

That the Defendant did discriminate against the Plaintiffs by using the policies of Delphi as it would relate to Plaintiffs' minority status and by misrepresenting its business need for

5

services and parts (a statement of existing fact) so as to induce the Plaintiff to expend resources on the guarantee (or in the alternative, a bad-faith promise) of business contracts so that Defendant could drive down prices with the present intention of awarding the contracts to non-minority business suppliers or to drive down the prices of existing non-minority suppliers who have existing contracts to gain a competitive advantage to the Plaintiffs' detriment.

### Juarez, Mexico

20.

That Plaintiff, Robert Backie, became acquainted with Mr. Gregg A. Novak, with Worldwide Purchasing Delphi Energy and Management Systems, in approximately January of 1995.

21.

That Plaintiff, Robert Backie's, relationship with Mr. Novak continued when he was transferred from Flint, Michigan, to Delphi's new Technical Center in Juarez, Mexico later in 1995/1996.

22.

That apparently Delphi began experiencing problems with prototype machining availabilities in the Juarez, Mexico, area sometime in 1996.

23.

And as such, and in approximately April of 1996, Mr. Novak introduced Plaintiffs to representatives from Delphi including Tony Kayyod, Jerry Heller, Roberto Martinez and Enrique Chavez along with several of Defendant's Project Engineers, who sought from Plaintiffs a capability profile and an engineering prototype support center proposal to support Defendant's Delphi-Juarez operations.

6

24.

The Plaintiffs were informed that the support proposal was to be modeled after Plaintiffs'
Ancon Prototype Facility which was an approved minority source for Defendant.

25.

That specifically the Prototype Support Center was to supply Delphi with prototype
machines, parts, assembly, inspection and related services for Defendants' Juarez facility.

26.

That in August of 1996, at the urging of Delphi, HES did organize a team of corporate
executives to concentrate their efforts on the Delphi-Juarez program, including the request and
requirement of sending sales representatives to live in neighboring El Paso, Texas, for purposes
of meeting Delphi-Juarez's demands (Defendant's present need for services and parts).

27.

That specifically Plaintiffs were requested to attend a series of meetings in Juarez,
Mexico, put on by Defendant Delphi in the summer and fall of 1996.

28.

That in July, 1996, Plaintiffs participated in a meeting with Delphi where Mr. Richard
Bolt, a Senior Vice President for Republic Bank, was in attendance whereby Delphi
misrepresented facts concerning the exclusive nature of Plaintiff's proposed facility along with
its existing need for services and parts in Juarez, Mexico, with the knowledge that Plaintiff and
the bank were relying on this information for financing and for their business plan, and
Defendant specifically knew that this information would be utilized by the Plaintiff and the bank
in their business plan for purposes of financing.

7

29.

That furthermore HES was assured by Delphi representatives that if in fact they made the financial commitment, and established a manufacturing facility in El Paso, Texas, that they would be given the exclusive contract to serve the present needs (as Defendant misrepresented said need for services and parts to be) of Defendant.

30.

That furthermore specific information was given in the form of a description of the type of parts that they had an on-going need for and the equipment which was needed to perform the services pertaining to those parts including but not limited to CNC machining centers, CNC lathes, Wire & Solid EDM machines, co-ordinate measuring machines for inspection, hydraulic presses, surface grinders, assorted work stations, stock/saw support tooling, and also assorted computer and information technology equipment required for the office, etc., which further confirmed the bad-faith promises made by Delphi concerning the Delphi-Juarez relationship with HES.

31.

That in point of fact, and as a result of these false representations of existing fact, confirmation, assurances and promises (bad-faith), Republic Bank did give the go ahead to HES for purposes of financing the project at issue.

32.

That Defendants agents, at the aforesaid meetings referred to above, further informed Plaintiffs that if Plaintiffs' proposal was accepted by Defendant, the Plaintiffs would be the exclusive Prototype Support Center for Defendants' Juarez facility for the fling of the programs

8

and that the facility had an on-going need for a Prototype Support Center and the services which it would supply.

### 33.

That as such, and at Defendants request, Plaintiff did provide a written Proposal/Agreement which is attached as **Exhibit 1A**.

### 34.

That furthermore, and at Defendants request, and as discussed in Paragraph 23 above, Plaintiff provided an "Engineering Prototype Support Center Proposal" (See **Exhibit 1A**) and a "Capability Profile." (See **Exhibit 2**).

### 35.

Further, at Delphi's request, HES personnel made multiple trips to El Paso, Texas, including the President of HES, Vice-President of Manufacturing, Vice-President of Sales, Director of Quality Control, Director of Manufacturing and Facilities and the Manager of the Ancon Division of HES.

### 36.

That following the above-mentioned meetings the Defendant accepted Plaintiffs' proposal in October of 1996.

### 37.

That following the series of meetings referred to above and following Defendant's acceptance of the proposal, the Plaintiffs did, as a result of Delphi's misrepresentation of its present need for services and parts (a statement of existing fact) along with its representations that Defendant would exclusively utilize Plaintiffs' facility, install a "state of the art" machine shop and inspection facility in a leased site in El Paso, Texas in reliance on Defendant's

9

misrepresentation of its present need for services and parts and also based on bad-faith promises made by the Defendant as set forth above for the purposes of meeting the Defendant's present need for services and parts at the Delphi-Juarez facility as it was represented by the Defendant.

38.

That Plaintiffs' Plant opened as set forth in their Proposal on or about February 1, 1997, and the opening was attended by Delphi personnel amid fanfare with local dignitaries.

39.

That all in all, and with the knowledge of Delphi, HES had an initial investment of over $1.35 million dollars in the El Paso operation.

40.

That the Defendant breached its Agreement by not honoring its agreement to have Plaintiffs serve as the exclusive source for prototype services and mislead Plaintiffs as to their true intentions.

41.

That despite the fact that Defendants' facility continued to operate, the Plaintiffs did not receive the promised business.

42.

That the above investment was all lost as were the profits when the Plaintiffs were forced to close down their Texas Facility in approximately October of 2000, as a result of Defendant's misrepresentations as to Plaintiffs' exclusive contract along with its misrepresentations as to its present need for services and parts as well as its bad-faith promise to provide business to the Plaintiffs.

10

43.

That the Plaintiffs' damages include the expense of an A2 LA Laboratory Certification and Inspection equipment which was never used, or if used, to a minimal extent. All such certification was <u>required</u> by Delphi for the El Paso site.

44.

That as a result of Defendant's misrepresentation of the exclusive nature of Plaintiffs' contract, along with its misrepresentations as to its present need for services and parts and as a result of the bad-faith promises made to the Plaintiffs, Plaintiffs were forced to lay off personnel beginning in approximately July of 2000.

45.

That Delphi did refuse to pay the delinquent invoices for the site.

46.

That as such Plaintiffs have been severely damaged, including breach of contract, revenues and expenditures.

## **HES Flint Manufacturing Division**

47.

That in approximately October, 1999, Delphi, through its agents, Duane Bollinger, Director of Purchasing, Walter R. Jennings, Manager of Minority Supplier Development, Jodi Wood, Purchasing Department, Steven Dawe, Purchasing Manager Contract Manufacturing, and Dale Kowaleski, Purchasing Department, approached Plaintiffs for purposes of providing four multiple additional projects with high volume production.

11

48.

That in subsequent meetings Defendant Delphi did provide yearly volumes (based on statements of present need for services and parts) of what projects and programs would be supplied to HES (a bad-faith promise), and Delphi also agreed to supply all the necessary and suitable machinery and tooling for the jobs.

49.

The Defendant entered into a contract with Plaintiff that upon the opening of Plaintiff's facility, the Plaintiff would receive 7,586,999 parts in year one of its operation, with a probable increase of 360,878 parts above and beyond the 7,586,999 parts within year one, and a follow-up increase of 2,713,840 parts in year one to two above and beyond the above mentioned quantities for the life of the programs. (See **Exhibit 3** and Plaintiff HES' Manufacturing Program Log - Volume Per Year)

50.

That at the end of year one, the Plaintiff had only received thirty-three percent of the parts ordered.

51.

That Delphi also enticed HES to establish a Plant in the "Flint area" with its above-mentioned misrepresentations of its present need for services and parts and bad-faith promises.

52.

That the Plaintiffs were further enticed to establish the Plant in the Flint Area by Defendant's on-going representations, from the above-mentioned representatives, as to the preferential treatment which was to provided to minority corporations along with Defendant's repeated acknowledgment as to Plaintiffs' minority status.

12

53.

That Defendant Delphi also required that the Plaintiff lease a building, provide a Plant layout, and receive approval from Delphi Saginaw Management for the lease which then intended to enter.

54.

That in reliance on Defendant's representations of its present need for services and parts and in further reliance on Defendant's bad-faith promises, HES did contract with Cooper Real Estate in Flint, Michigan for purposes of finding a suitable accommodation which would satisfy Delphi's Saginaw Purchasing and Manufacturing.

55.

That Delphi's Supervisors and Representatives specifically chose the location for the HES Plant, and had in fact turned down several other locations because "we don't want this facility being too close to any union activity."

56.

That in point of fact, the Plaintiff did maintain and enter into contractual relations based upon Delphi's representation of its present need for services and parts and in reliance on its bad-faith promises of future business, and based upon Plaintiffs' reliance upon Defendant's representations of preferential treatment towards Plaintiffs as a minority business, after locating a building at 5117 South Dort Highway, Flint, Michigan.

57.

That said building, both office and distribution facilities, consisted of over 47,000 square feet of office and warehouse space, including parking and two easements for driveways. (See **Exhibit 4**).

13

58.

That as such, HES entered into a lease term for the building for five years with an annual base rent of $227,950.00, said lease also requiring a security deposit of $25,000 triple net.

59.

That Plaintiff, HES, did take possession of said building on March 27, 2000.

60.

That in fact, the machines that Delphi supplied for purposes of the HES Plant, were inferior, old, antiquated and not suitable for the jobs.

61.

That furthermore, Defendants did not provide the contracts, to the level of production that they agreed to supply (based on representations of its present need for services and parts) to the Plaintiff once the Plaintiffs set up the Flint operation.

62.

That specifically, Plaintiffs did meet with the Defendants to explain the losses that they had been incurring on September 28, 2001, and specifically discussed with Delphi their failure to meet the promised obligations and contractual agreement. Please see **Exhibit 5** which is the Organizational Financial Overview, which was provided to Ray Campbell, Vice President of Worldwide Purchasing for Delphi Automotive.

63.

That specifically, Plaintiffs did meet with the Defendants to explain the losses that they had been incurring on September 28, 2001, and specifically discussed with Delphi their failure to meet the promised obligations and contractual agreement. Please see **Exhibit 5** which is the

14

Organizational Financial Overview, which was provided to Ray Campbell, Vice President of Worldwide Purchasing for Delphi Automotive.

64.

That when this was brought to the Defendant Delphi's attention, Defendants immediately began to threaten HES' operations in Saginaw and Flint.

65.

That specifically Defendants did state that notwithstanding the quotes which were based on Delphi's misrepresented present need for services and parts (a statement of existing fact) by Delphi, that Delphi was intending to hold HES to the bidding contract price based on the high volume of units that Delphi had promised (in bad-faith) but not supplied.

66.

That furthermore, at that point Delphi threatened to pull all contracts and breach all existing multi-year contracts with the Plaintiff, HES.

67.

That furthermore, Defendants did not provide the contracted for and projected business, and in fact, did provide bogus representations of what they intended to provide to the Plaintiffs, so they could utilize the bids so as to specifically drive down the bid prices of other non-minority third party bidders and those who had existing contracts for those same parts.

68.

That instead of providing the orders as agreed upon, the Defendant eventually provided those orders to non-minority businesses.

15

69.

That Defendant in fact did make good on its bad-faith threat and did pull all contracts and

equipment, in breach of said contracts from the Plaintiff in all their Saginaw and Flint Plants and

provided the equipment and contracts to non-minority companies contributing to the demise of

HE Services Flint facility in July of 2003.

70.

That because of the Defendant Delphi's actions herein, Plaintiff has suffered losses in the

Flint location alone that exceed $10.6 million dollars and losses in setup of over $1.85 million

dollars.

71.

That Defendant Delphi's decision to move equipment from a key minority supplier of 17

years did proximately contribute to the demise of HE Services as a whole in April 2004.


**EX-CELL-O Grinding Machine XJ 690**

72.

That in early 1999 HES was approached by Mr. Bruce Waslusky and Dave McGregor

who were both with Delphi purchasing in Saginaw, Michigan.

73.

That on November 1, 1999, Defendant in its purchase order # S3B00028, to reimburse

Plaintiff $621,696 for the purchase of the Ex-Cell-O Grinding Machine XJ 690 over three years,

and further agreed to purchase a minimum of 7000 pieces of twelve specific parts on an annual

basis for three years at $130.70 for each piece.

16

74.

That pursuant to the purchase order the machine was to be designed per Defendants' specifications and built by the manufacturer of Defendants' choosing, and that the machine as designed by Defendant would be capable of making the twelve specific parts in the quantity as set forth above.

75.

That the Plaintiffs accepted Defendant's offer on December 14, 1999, and purchased the machine (PO 53510057).

76.

That Delphi orchestrated, with their engineers, the design of the machine, and required it to be equipped with "fanuc" controls as opposed to "seimen" controls that were normally provided with the machine by EX-CELL-O.

77.

That in fact, Defendant Delphi did interfere and exercise control over its manufacturer of choice EX-CELL-O on the actual design of the machine, which as noted herein and which precipitated the problems which later occurred with the machine.

78.

That the machine as designed by the Defendant was delivered by the manufacturer of Defendant's choosing to the Plaintiffs in March of 2002.

79.

That Plaintiffs immediately learned upon the delivery and installation of the machine, that the machine was incapable of making the 7000 parts annually for two of the twelve parts and was wholly incapable of producing of any quantity of ten of the twelve different part designs.

17

80.

Further, the Defendant submitted orders for less than five percent of the 7000 pieces which the Defendant had agreed to order on an annual basis.

81.

That instead of submitting orders for the above-mentioned parts to the Plaintiffs, the Defendant instead submitted orders for those parts to a non-minority corporation "Ranger Tool & Die Corporation", and paid the non-minority corporation more money per piece then Defendant was paying the Plaintiffs for the same piece, and the Defendant refused to pay the Plaintiffs the same price.

82.

That in point of fact, Defendants conduct in giving the above-mentioned business to a non-minority corporation was contrary to Defendant's earlier promise (in bad-faith) to the Plaintiffs that if Plaintiffs purchased said machine, that the Defendant Delphi would purchase spindle shafts (based on representations of its present need for spindle shafts, i.e., a statement of existing fact) over a period of many years, and that a portion of the purchases would be delegated or designated toward the purchase of the machine.

83.

That as such, Plaintiff has been damaged in projected profits, downtime and lost labor due to Defendant Delphi's actions herein.

84.

That all of Defendants actions were motivated in part, because of the Defendants minority status, to the Plaintiffs' detriment, and in violation of the anti-discrimination laws.

18

## COUNT I - 42 U.S.C. § 1981

### 85.

That the Plaintiffs hereby incorporate paragraphs 1 through 84 of the factual allegations word for word and paragraph by paragraph as if restated herein.

### 86.

That Plaintiff's have standing to commence this action brought pursuant to 42 U.S.C. § 1981 because a harm has been suffered which is cognizable under section 1981 and has acquired an imputed racial identity.

### 87.

That Plaintiffs are within the statutory zone of interest to have prudential standing to bring an action under section 1981.

### 88.

That Plaintiff HES is a minority-owned technology services contractor certified by the United States Small Business Administration (SBA) as a firm owned and operated by socially and economically disadvantaged individuals, eligible to receive federal contracts under the SBA's business development program. 42 U.S.C. 637.

### 89.

That HES' majority shareholder, Robert Backie, is a Native American Chippewa Indian.

### 90.

That Plaintiffs suffered a violation of section 1981 which states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens,

19

and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

91.

That 42 U.S.C. § 1981(b) defines "make and enforce contracts" as follows: "For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

92.

That Defendant violated section 1981 when it breached existing contractual agreements, made false promises and misrepresentations regarding contractual negotiations and when they gave non-minority companies preferential treatment, to the detriment of Plaintiffs, as set forth more fully in Plaintiffs' statement of facts.

93.

That as a result of Defendant's violations of section 1981, Plaintiffs have suffered economic damages in excess of 20 Million dollars, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.

94.

That Plaintiffs have also suffered non-economic loss including emotional distress, anguish, mortification, humiliation, and loss of pleasures of life.

WHEREFORE, Plaintiff requests that this Honorable Court enter Judgment in favor of the Plaintiffs and award damages in an amount to compensate the Plaintiffs for the damages as set forth herein.

20

## COUNT II - INNOCENT/NEGLIGENT MISREPRESENTATIONS

95.

That Plaintiffs hereby incorporate Paragraphs 1 through 84 of the factual allegations and paragraphs 85 through 94 of Count I word for word and paragraph by paragraph as if restated herein.

96.

That Plaintiffs claim that Defendant made innocent or negligent misrepresentations of a material fact (as set forth more fully in the factual allegations).

97.

That the misrepresentation was made in connection with the making of a contract between Plaintiffs and Defendant.

98.

That the misrepresentation was false when made, and/or were made negligently.

99.

That Plaintiffs would not have entered into the contract if Defendant had not made the representations.

100.

That Plaintiffs suffered economic and non-economic damages as a result of entering into the contract.

101.

That Plaintiffs loss benefited the Defendant.

21

102.

That as a result of Defendant's misrepresentation, Plaintiffs have suffered economic damages in excess of 20 Million dollars, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.

103.

That Plaintiffs have also suffered non-economic loss including emotional distress, anguish, mortification, humiliation, and loss of pleasures of life.

WHEREFORE, Plaintiff requests that this Honorable Court enter Judgment in favor of the Plaintiffs and award damages in an amount to compensate the Plaintiffs for the damages as set forth herein.

## COUNT III - FRAUDULENT MISREPRESENTATION

104.

That Plaintiffs hereby incorporate Paragraphs 1 through 84 of the factual allegations, paragraphs 85 through 94 of Count I, paragraphs 95 through 103 of Count II, word for word and paragraph by paragraph as if restated herein.

105.

That Defendant made material representations as set forth more fully above in the statement of facts.

106.

That said material representations were false.

22

107.

That at the time Defendant made the material representations, the Defendant knew that the representations were false, or made the representations recklessly, without knowledge of its truth as a positive assertion.

108.

That the Defendant made the representations with the intention that the Plaintiffs would act upon said representations.

109.

That the Plaintiffs acted in reliance on the representations as set forth more fully in the statement of facts.

110.

That the Plaintiffs suffered damage as a result.

111.

That as a result of Defendant's misrepresentation, Plaintiffs have suffered economic damages in excess of 20 Million dollars, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.

112.

That Plaintiffs have also suffered non-economic loss including emotional distress, anguish, mortification, humiliation, and loss of pleasures of life.

WHEREFORE, Plaintiff requests that this Honorable Court enter Judgment in favor of the Plaintiffs and award damages in an amount to compensate the Plaintiffs for the damages as set forth herein.

MASTROMARCO & JAHN, P.C., 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197 (989) 752-1414
Website: Mastromarco-Jahn.com

## COUNT IV - SILENT FRAUD

113.

That Plaintiffs hereby incorporate Paragraphs 1 through 84 of the factual allegations, paragraphs 85 through 94 of Count I, paragraphs 95 through 103 of Count II, paragraphs 104 through 112 of Count III, word for word and paragraph by paragraph as if restated herein.

114.

That Defendant made material false representations to the Plaintiffs as set forth more fully in the statement of facts.

115.

That the material representations were known by the Defendant to be false or were made recklessly without knowledge of its truth or falsity.

116.

That Defendant intended that the Plaintiffs rely on the representations.

117.

That Plaintiffs in fact acted upon the representations made by the Defendant.

118.

That Plaintiffs thereby suffered injury.

119.

That Defendant had a legal or equitable duty of disclosure thus the suppression of information constitutes silent fraud.

24

120.

That as a result of Defendant's misrepresentation and suppression of information, Plaintiffs have suffered economic damages in excess of 20 Million dollars, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.

121.

That Plaintiffs have also suffered non-economic loss including emotional distress, anguish, mortification, humiliation, and loss of pleasures of life.

WHEREFORE, Plaintiff requests that this Honorable Court enter Judgment in favor of the Plaintiffs and award damages in an amount to compensate the Plaintiffs for the damages as set forth herein.

## COUNT V - FRAUD BASED ON BAD-FAITH PROMISE

122.

That Plaintiffs hereby incorporate Paragraphs 1 through 84 of the factual allegations, paragraphs 85 through 94 of Count I, paragraphs 95 through 103 of Count II, paragraphs 104 through 112 of Count III, paragraphs 113 through 121 of Count IV, word for word and paragraph by paragraph as if restated herein.

123.

That Plaintiffs claim that Defendant defrauded it by making bad-faith promises (as set forth more fully in Plaintiffs' factual allegations).

124.

That Defendant made bad-faith promises of future conduct to Plaintiffs as set forth more fully in the statement of facts.

MASTROMARCO & JAHN, P.C., 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197 (989) 752-1414
Website: Mastromarco-Jahn.com

125.

That at the time Defendant made these promises it did not intend to keep the promises.

126.

That Defendants made these promises with the intent that Plaintiff rely on said promises.

127.

That the Plaintiffs relied on said promises to their detriment.

128.

That as a result of Defendant's fraud based on a bad-faith promise, Plaintiffs have suffered economic damages in excess of 20 Million dollars, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.

129.

That Plaintiffs have also suffered non-economic loss including emotional distress, anguish, mortification, humiliation, and loss of pleasures of life.

WHEREFORE, Plaintiff requests that this Honorable Court enter Judgment in favor of the Plaintiffs and award damages in an amount to compensate the Plaintiffs for the damages as set forth herein.

## COUNT VI - PROMISSORY ESTOPPEL

130.

That Plaintiffs hereby incorporate Paragraphs 1 through 84 of the factual allegations, paragraphs 85 through 94 of Count I, paragraphs 95 through 103 of Count II, paragraphs 104 through 112 of Count III, paragraphs 113 through 121 of Count IV, paragraphs 122 through 129 of Count V, word for word and paragraph by paragraph as if restated herein.

26

131.

That Defendant made promises, as set forth in the preceding and subsequent paragraphs, to the Plaintiff that were clear and definite as set forth more fully in the statement of facts.

132.

That when said promises were made, the Defendant knew or should reasonably have expected that these promises would induce the Plaintiffs to take certain action.

133.

That the Plaintiffs did take action in reliance on the promises made by Defendant.

134.

That Plaintiffs were damaged as a result of their reliance on the promises made by the Defendant.

135.

That as a result of Defendant's conduct, Plaintiffs have suffered economic damages in excess of 20 Million dollars, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.

136.

That Plaintiffs have also suffered non-economic loss including emotional distress, anguish, mortification, humiliation, and loss of pleasures of life.

WHEREFORE, Plaintiff requests that this Honorable Court enter Judgment in favor of the Plaintiffs and award damages in an amount to compensate the Plaintiffs for the damages as set forth herein.

MASTROMARCO & JAHN, P.C., 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197 (989) 752-1414
Website: Mastromarco-Jahn.com

## COUNT VII - CONTRACT ACTION-UCC

### 137.

That Plaintiffs hereby incorporate Paragraphs 1 through 84 of the factual allegations, paragraphs 85 through 94 of Count I, paragraphs 95 through 103 of Count II, paragraphs 104 through 112 of Count III, paragraphs 113 through 121 of Count IV, paragraphs 122 through 129 of Count V, paragraphs 130 through 136 of Count VI, word for word and paragraph by paragraph as if restated herein.

### 138.

That Plaintiffs bring this claim as a seller against Defendant, a buyer, for the sale of goods.

### 139.

That Defendant entered into an agreement with Plaintiffs by its words and conduct which manifested its intent to make a contract.

### 140.

That a contract existed between Plaintiffs and the Defendant.  MCL 440.2206; 440.2207.

### 141.

That the Defendant submitted purchase orders to the Plaintiff which were in turn accepted by the Plaintiff who provided the requested goods along with an invoice.

### 142.

That Defendant, the buyer, breached the contract by failing to pay on invoices in excess of $400,000, along with failing to comply and fulfill its contractual obligations towards Plaintiffs

MASTROMARCO & JAHN, P.C., 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197  (989) 752-1414
Website: Mastromarco-Jahn.com

facility in Flint, Michigan, and with regards to the Ex-Cell-O machine as set forth earlier in this Complaint.

143.

That the amount which remains unpaid includes as an example those set forth in Plaintiff's Delphi Accounts Receivable Reconciliation. (See **Exhibit 6**).

144.

That Plaintiffs were damaged by the breach of contract.

145.

That this action is brought pursuant to MCL 440.2709 as a result of Defendant's breach by nonpayment after acceptance of the goods.

146.

That Plaintiffs are entitled to the price due under the contract together with any commercially reasonable charges, expenses the Plaintiffs incurred as a result of Defendant's breach.

147.

That as a result of Defendant's breach of contract, Plaintiffs have suffered economic damages in excess of $400,000, exclusive of attorney fees, costs, and interest.

**COUNT VIII - CONTRACT ACTION**

148.

That Plaintiffs hereby incorporate Paragraphs 1 through 84 of the factual allegations, paragraphs 85 through 94 of Count I, paragraphs 95 through 103 of Count II, paragraphs 104 through 112 of Count III, paragraphs 113 through 121 of Count IV, paragraphs 122 through 129

29

of Count V, paragraphs 130 through 136 of Count VI, paragraphs 137 through 147 of Count VII,

word for word and paragraph by paragraph as if restated herein.

149.

That Plaintiffs bring this claim as a seller and provider of services against Defendant, a

buyer, for those services.

150.

That Defendant entered into an agreement with Plaintiffs by its words and conduct which

manifested its intent to make a contract.

151.

That a contract existed between Plaintiffs and the Defendant.

152.

That the Defendant submitted purchase orders to the Plaintiff which were in turn

accepted by the Plaintiff who provided the requested services along with an invoice.

153.

That Defendant, the buyer, breached the contract by failing to pay on invoices in excess

of $400,000, along with failing to comply and fulfill its contractual obligations towards Plaintiffs

facility in Texas, in Flint, Michigan, and with regards to the Ex-Cell-O machine as set forth

earlier in this Complaint.

154.

That the amount which remains unpaid includes as an example those set forth in

Plaintiff's Delphi Accounts Receivable Reconciliation. (See **Exhibit 6**).

155.

That Plaintiffs were damaged by the breach of contract.

30

156.

That this action is brought as a result of Defendant's breach by nonpayment after acceptance of the services.

157.

That Plaintiffs are entitled to the price due under the contract together with any commercially reasonable charges, expenses the Plaintiffs incurred as a result of Defendant's breach.

158.

That as a result of Defendant's breach of contract, Plaintiffs have suffered economic damages in excess of $400,000, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.

WHEREFORE, Plaintiff requests that this Honorable Court enter Judgment in favor of the Plaintiffs and award damages in an amount in excess of 20 Million Dollars to compensate the Plaintiffs for the damages as set forth herein.

PREPARED BY:

MASTROMARCO & JAHN, P.C.

DATED: __6/9____, 2005          __/s/Russell C. Babcock_____
                                RUSSELL C. BABCOCK (P57662)
                                Attorneys for Plaintiff
                                1024 N. Michigan Ave., P.O. Box 3197
                                Saginaw, MI  48605-3197
                                (989) 752-1414

31

## RELIANCE UPON DEMAND FOR TRIAL BY JURY

*NOW COMES*, the above-entitled Plaintiffs, by and through their attorneys,

MASTROMARCO & JAHN, P.C., and hereby relies upon their earlier demand for a trial by jury

of all issues in this cause of action unless expressly waived.

PREPARED BY:

MASTROMARCO & JAHN, P.C.

DATED: __6/9____, 2005          ___/s/Russell C. Babcock_____
                                RUSSELL C. BABCOCK (P57662
                                Attorneys for Plaintiff
                                1024 N. Michigan Ave., P.O. Box 3197
                                Saginaw, MI  48605-3197
                                (989) 752-1414

MASTROMARCO & JAHN, P.C., 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI  48605-3197  (989) 752-1414
Website:  Mastromarco-Jahn.com

## RELIANCE UPON EARLIER DEMAND FOR PRE-TRIAL CONFERENCE

*NOW COMES*, the above-entitled Plaintiffs, by and through their attorneys,

MASTROMARCO & JAHN, P.C., and hereby relies upon their earlier demand for a Pre-Trial

Conference.

PREPARED BY:

MASTROMARCO & JAHN, P.C.

DATED: ___6/9_____, 2005         ____/s/Russell C. Babcock_____
                                 RUSSELL C. BABCOCK (P57662.
                                 Attorneys for Plaintiff
                                 1024 N. Michigan Ave., P.O. Box 3197
                                 Saginaw, MI  48605-3197
                                 (989) 752-1414

MASTROMARCO & JAHN, P.C., 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI  48605-3197   (989) 752-1414
Website:  Mastromarco-Jahn.com

## PROOF OF SERVICE

I hereby certify that on __**June 9, 2005**___ I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system which will send notification of such filing to the following: **Mr. Donald R. Parshall, Jr.** and I hereby certify that I have mailed by United States Postal Service the document to the following non ECF participants: **Mr. Arthur T. Lippert, Jr.**.

/s/Russell C. Babcock_____
RUSSELL C.BABCOCK (P57662)

**Business Address:**
1024 North Michigan Avenue
P.O. Box 3197
Saginaw, Michigan 48605-3197
(989) 752-1414 Telephone
(989) 752-6202 Fax
Russellbabcock@aol.com

MASTROMARCO & JAHN, P.C., 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197  (989) 752-1414
Website: Mastromarco-Jahn.com