**Hearing Date and Time: October 19, 2006 at 10:00 a.m.**
                                         **Objection Deadline: October 12, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
         In re                                     :        Chapter 11
                                                      :
DELPHI CORPORATION, et al.,            :        Case No. 05-44481 (RDD)
                                                      :
                                                      :        (Jointly Administered)
         Debtors.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        **MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004
AUTHORIZING DEBTORS TO ENTER INTO INFORMATION TECHNOLOGY
<u>INFRASTRUCTURE OUTSOURCING AGREEMENTS</u>**

                            ("IT INFRASTRUCTURE OUTSOURCING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 authorizing, but not directing, the Debtors to enter into various information technology ("IT") infrastructure outsourcing agreements. In support of this Motion, the Debtors respectfully represent as follows:

Background

A.   The Chapter 11 Filings

1. On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2. No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    4.  The statutory predicates for the relief requested herein are section 363(b) of the Bankruptcy Code and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.  <u>Current Business Operations Of The Debtors</u>

    5.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2005 had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

    6.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

    7.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.     Events Leading To The Chapter 11 Filing

8.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

9.     The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions

---

[2] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

13. By this Motion, the Debtors seek entry of an order under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 authorizing, but not directing, the Debtors to enter into and perform under (a) an agreement with Electronic Data Systems Corporation and EDS Information Services, LLC (together, "EDS"), which provides for the outsourcing of global desktops, service desk, and mainframe systems hosting (the "EDS Agreement"), and (b) an agreement with Hewlett Packard Company ("HP"), which provides for the outsourcing of server systems hosting (the "HP Agreement," and, together with the EDS Agreement, the "IT Infrastructure Outsourcing Agreements").

Basis For Relief

14. The Debtors' decision to enter into the IT Infrastructure Outsourcing Agreements is one step in the implementation of their transformation plan. Specifically, under the Debtors' transformation plan, the Debtors intend to transform their salaried workforce to ensure a competitive structure aligned with their product portfolio and manufacturing footprint, which would in turn, lower the Debtors' selling, general, and administrative ("SG&A") expenses. To achieve this goal, the Debtors are designing and implementing a shared service delivery model that will contribute to the reduction of their global SG&A expense by $450 million annually. One aspect of this effort is Delphi's accelerated consolidation and outsourcing of IT functions and the transition to common processes and systems. Benchmarking analysis conducted with independent consultants examining the detailed cost of IT services of Delphi and its key IT competitors concluded that Delphi's 2005 IT operating budget of $588 million could be reduced by $256 million (included in the $450 million objective) through three transformation actions: outsourcing IT services, reducing the number and type of unique, non-common systems,

6

moving to common operating platforms, and running a streamlined IT shared service organization.

15. Outsourcing of IT services, which is expected to achieve a portion of the $256 million in savings, will be completed in three phases. The Debtors' shared service model calls for the outsourcing of the following IT services: (a) global infrastructure services, including desktops, service desk, and mainframe and server systems hosting (which is the subject matter of this Motion); (b) system development, maintenance, and support; and (c) network services such as data networks and voice services. Subject to this Court's approval of the Motion, the Debtors will be able to complete the first phase of the planned outsourcing. The other two phases, (i) outsourcing of systems development, maintenance, and support and (ii) outsourcing of network services, are contemplated for the first half of 2007.

16. Currently, the Debtors purchase IT services from more than 100 regional-based suppliers. The completion of all three outsourcing phases would enable rationalization of the supplier-provider base to fewer than ten direct suppliers. Because many of the Debtors' major existing IT contracts are due to expire by the end of 2007, it is appropriate for the Debtors to take this initiative at this time. Alternatively, the Debtors could begin negotiations to extend their existing agreements. Doing so, however, would not only hinder the Debtors' long-term efforts to transition to a more efficient delivery model through outsourcing, but could also restrict the Debtors in completing other transformation objectives due to ongoing minimum revenue commitments in existing contracts.

17. Outsourcing IT services to a few strategic suppliers will enable the Debtors to significantly reduce the number of internal employees providing such services. The first phase, outsourcing of global infrastructure services, will result in significant operating

7

savings over current operating costs. After one-time transition costs of approximately $80 million, net operating savings are expected to approximate $155 million over the seven-year term of the IT Infrastructure Outsourcing Agreements.

18. As part of the competitive bidding process for the outsourcing of IT infrastructure services, the Debtors used external industry experts in global outsourcing and contract negotiations to objectively and competitively select service providers that have proven technical capability and global breadth. The Debtors followed a structured bidding process methodology to ensure that an objective and comprehensive assessment was conducted according to established standards. The Debtors established a selection steering committee (the "Selection Steering Committee"), chaired by Bette M. Walker, Delphi's chief information officer. The Selection Steering Committee assessed the market for qualified service providers and identified four such providers. Subsequently, the Selection Steering Committee conducted a formal review of each service provider's standard market offering, and ultimately the Debtors sought requests for proposals from two service providers, EDS and HP. The Debtors provided a detailed service requirement document to EDS and HP and also conducted due diligence on the global service delivery capabilities of EDS and HP. EDS and HP both submitted formal proposals to the Debtors. Subsequently, the parties negotiated master service agreements, statements of work, service levels, pricing, and supporting schedules.

19. Based on arms-length negotiations between the Debtors and EDS and HP, the Debtors have recommended to Delphi's Board of Directors that Delphi award aspects of the project to each of EDS and HP.[3] Splitting the scope of the project between EDS and HP allowed

---

[3] The Debtors are also in the process of competitively bidding two additional outsourcing contracts for system development, maintenance and support, and network services. The Debtors expect to award those contracts in late 2006 and early 2007, respectively.

8

05-44481-rdd    Doc 5237    Filed 09/29/06    Entered 09/29/06 15:35:41    Main Document
Pg 9 of 20

the Debtors to select the most competitive terms offered by each of EDS and HP. Moreover, by moving to a model that provides for the outsourcing of IT infrastructure services to two vendors, the Debtors believe that they will (a) achieve and sustain a competitive environment in which their service providers will provide service at competitive prices throughout the term of the agreement, (b) be able to develop stronger relationships with their fewer service providers, (c) reduce their costs through common process, common systems, and economies of scale, and (d) find providers with innovation and progressive technology. The key terms of each proposal are described below.

A.   The Outsourcing Proposal

20.   The Debtors have entered into agreements with EDS and HP, the IT Infrastructure Outsourcing Agreements, the effectiveness of which is conditioned on this Court's approval. The Debtors are filing the IT Infrastructure Outsourcing Agreements under seal as Exhibit A and Exhibit B attached hereto, respectively.[4] The EDS Agreement and HP Agreement are being filed under seal because they contain competitively sensitive business information which, if publicly disclosed, could detrimentally affect the Debtors' (and EDS and HP's) ability to negotiate the terms of future agreements with other parties. Generally, each agreement is a global services contract under which Delphi will contract for global infrastructure services on behalf of itself and each of its subsidiaries and affiliates for a seven-year term.[5] The aggregate cost of both contracts is between $700 and $800 million over the seven-year term. Monthly operating expenses and one-time transition costs will be charged directly or allocated to the

---

[4] The Debtors filed the IT Infrastructure Outsourcing Agreements under seal in accordance with the Order Under 11 U.S.C. § 107(b) And Fed. R. Bankr. P. 9018 Authorizing Debtors To File The Information Technology Infrastructure Outsourcing Agreements Under Seal (Docket No. 5231).

[5] In the event of any inconsistency between the Motion and the IT Infrastructure Outsourcing Agreements, the IT Infrastructure Outsourcing Agreements shall govern.

9

Delphi affiliates which use the services, with approximately 35% of operating and transition costs being borne by the Debtors and the remaining costs by non-Debtor affiliates of Delphi.[6]

B. The IT Infrastructure Outsourcing Agreements

21. The scope of services to be provided under the IT Infrastructure Outsourcing Agreements includes transition services both at inception and at termination to ensure a smooth transition from existing service providers to EDS and HP and also to ensure that there is no disruption to Delphi's business at the end of the term. In addition, each service provider would be required to submit a detailed transformation plan which identifies principal changes in technology and deliverables to allow Delphi to work toward implementing common systems and a more efficient IT services delivery model and achieve year-over-year price reductions over the life of the contracts. Pricing bands would allow for significant adjustments in service volumes (up and down) without triggering repricing, thereby providing Delphi with substantially more flexibility and scalability than it has under its existing IT infrastructure contracts. As explained in more detail below, this provision will be particularly helpful when Delphi seeks to sell or wind-down non-core product lines and manufacturing sites as part of its transformation plan. The IT Infrastructure Outsourcing Agreements also include benchmarking clauses to ensure that the contracts continue to be competitive as to service, price, and technology over their respective terms.

22. <u>Termination Rights</u>. Delphi may terminate either of the IT Infrastructure Outsourcing Agreements (a) for cause, (b) for convenience, (c) upon change in control of applicable service provider or Delphi, or (d) for insolvency of the applicable service provider.

---

[6] As previously disclosed in other filings before this Court, the Intercompany Agreement, dated May 17, 1999, is an intercompany cash pooling agreement allowing for Delphi and its subsidiaries to engage in intercompany transactions, track intercompany transfer of funds, and obtain reimbursement for services provided to each other. The Intercompany Agreement covers the flow of expenses and liabilities arising from the EDS Agreement and the HP Agreement.

No termination charges apply in the case of a termination for cause or upon insolvency of the applicable service provider.  The amount of any termination charges under a termination for convenience or upon change in control are calculated in accordance with the schedule attached to the terminated agreement and, in each case, reflect the service provider's investment to provide the services.  There are no termination charges payable after five years under either of the IT Infrastructure Outsourcing Agreements.

          23.    EDS and HP each have the right to terminate their respective Agreements (a) after the expiration of the applicable notice period in the event that Delphi has failed to pay undisputed fees above a specified amount or (b) in the event that Delphi becomes insolvent after emergence from these chapter 11 cases.  If either EDS or HP becomes entitled to terminate its respective agreement, each must nonetheless provide termination assistance services at previously negotiated prices and payment terms for an additional period of time.

          24.    <u>Divestitures</u>.  As part of its transformation plan, Delphi identified non-core product lines and manufacturing sites that do not fit into its future strategic framework, which it is seeking to sell or wind-down.  Delphi also continually evaluates its product portfolio and could retain or exit certain businesses depending on market forces or cost structure changes.  Delphi intends to sell or wind-down non-core product lines and manufacturing sites during the term of the IT Infrastructure Outsourcing Agreements.  Thus, Delphi required that the IT Infrastructure Outsourcing Agreements provide Delphi flexibility with respect to the effect that a divestiture would have upon its rights and obligations under these agreements.  The following table summarizes Delphi's options under the IT Infrastructure Outsourcing Agreements subsequent to a divestiture:

11

|  | **Partial Termination For Convenience** | **Reduce Service Consumption (Reduced Resource Credit Mechanism)** | **Requirement Of Divested Entity To Enter Into Separate Agreement With Service Provider By Cleaving IT Infrastructure Outsourcing Agreement** |
|---|---|---|---|
| **Termination Charges** | • Termination charges would apply | • Termination charges would not apply | • Termination charges would not apply |
| **Rights** | • Right to hire people, buy equipment, and assign contracts | • No right to hire people, buy assets, or assign contracts | • No need to hire people, buy assets, or transfer contracts |
| **Base Charges** | • Apportioned to scale for remaining services | • No proportionate adjustment unless reduced service consumption falls below a regional resource unit volume band, in which case pricing for affected resource unit is renegotiated | • Apportioned, based on services to be provided to divested entity<br>• Per unit pricing based on aggregate service consumption |
| **Other** | • Most likely incur separate project costs for services related to due diligence | • "Extraordinary Events" clause (which may result in more favorable pricing for Delphi) may be invoked if reduction is significant | • Base charges may be increased to reflect higher fixed costs (service provider would be required to prove that cleaving caused higher fixed costs)<br>• May incur separate project costs for services related to due diligence, except for previously disclosed divestitures |

25. <u>Treatment Of Prepetition Agreements And Claims Of HP And EDS</u>. Prior to the Petition Date, Delphi had existing agreements with both HP (the "HP Prepetition Agreement") and EDS (the "EDS Prepetition Agreement"), under which both HP and EDS provided to Delphi certain IT infrastructure services. Under the HP Agreement, HP and Delphi agree to terminate the HP Prepetition Agreement, under which HP has been providing certain applications hosting services, and HP agrees to release all claims against Delphi and its affiliates for termination charges or other obligations that arise as a result of the termination of that agreement.[7] Delphi remains obligated to make all postpetition payments under the HP

---

[7] A prepetition lease for equipment between Delphi and HP embedded in the HP Prepetition Agreement, however, remains in effect as to all of its terms and conditions to enable HP to provide services in accordance with the terms of the HP Agreement, and HP has not waived any claims related to that prepetition equipment

12

Prepetition Agreement for services rendered and equipment leased prior to the later of the effective date of the HP Agreement and January 1, 2007. Under the EDS Agreement, EDS and Delphi agree that, with respect to all services being provided thereunder, the terms and conditions (including charges and service requirements) under the EDS Agreement would amend and supersede the terms and conditions (including charges and service requirements) under the EDS Prepetition Agreement for infrastructure and other IT services. As a result, certain prepetition services provided by EDS will be terminated under the EDS Agreement while other prepetition services, which are beyond the scope of the EDS Agreement, will continue to be provided under the Debtors' existing agreements with EDS. In addition, under the EDS Agreement, EDS is also agreeing to release all claims against Delphi and its affiliates for termination charges or other obligations that arise as a result of the reduction in scope and services to be provided under that agreement.[8]

26.   <u>Companion Agreements</u>.  To minimize Delphi's tax exposure and to enable Delphi to comply with local laws, HP and EDS have entered or will enter into companion agreements with certain of Delphi's affiliates (the "Companion Agreements") to provide such affiliates the services contemplated under the IT Infrastructure Outsourcing Agreements. Pursuant to the Companion Agreements and the IT Infrastructure Outsourcing Agreements, Delphi's affiliates will be directly invoiced for the services they receive from HP or EDS under the IT Infrastructure Outsourcing Agreements and will be obligated to pay those invoices. To induce HP and EDS' performance to Delphi's affiliates, Delphi has agreed to be secondarily liable for the obligations of the applicable affiliates under the IT Infrastructure Outsourcing

---

lease. The specific terms of this release are included as an exhibit to the HP Agreement which forms a part of Exhibit B and which was filed under seal.

[8] The specific terms of this release are included as an exhibit to the EDS Agreement which forms a part of Exhibit A and which was filed under seal.

Agreements. In the event that Delphi is required to make payment under the IT Infrastructure Outsourcing Agreements on behalf of an affiliate Debtor, the proposed order approving the Motion contemplates that Delphi would have an allowed claim under section 503 of the Bankruptcy Code against the affiliate Debtor for the amount of such payment.[9]

27. The Debtors and EDS have bargained in good faith to arrive at the terms and conditions of the EDS Agreement, as is evidenced by the fact that the Debtors were able to achieve the terms summarized above. Moreover, EDS has significant and proven experience with delivering the services as described herein. Thus, the Debtors submit that EDS has the expertise, skills, and tools to help Delphi efficiently transform its IT infrastructure services.

28. The Debtors and HP have also bargained in good faith to arrive at the terms and conditions of the HP Proposal, as is evidenced by the fact that the Debtors were able to achieve the terms summarized above. Moreover, HP has significant experience with delivering the services as described herein. Thus, the Debtors submit that HP has the expertise, skills, and tools to help Delphi efficiently transform its IT infrastructure services.

29. In the exercise of their business judgment, the Debtors believe that the savings and organizational efficiency to be achieved through the work of EDS, HP, and Delphi will maximize the recovery for all stakeholders and that therefore the proposed agreements with EDS and HP are in the best interests of the Debtors' estates and the relief sought herein should be approved.

---

[9] Contemporaneously with entering into the Companion Agreements, Delphi will enter into indemnity agreements with its foreign, non-Debtor affiliates receiving services under the IT Infrastructure Outsourcing Agreements. Under these indemnity agreements, in consideration for Delphi's directing HP and EDS to provide the services contemplated under the IT Infrastructure Outsourcing Agreements to the foreign affiliates, the foreign affiliates will indemnify Delphi for any payments made by Delphi on their behalf under the IT Infrastructure Outsourcing Agreements.

14

Applicable Authority

30.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

31.     The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Orion Pictures, 4 F.3d at 1098-99.

32.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  Id.   To satisfy its burden, it is not enough for an objector

simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

33.    As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

34.    The Debtors submit that entering into IT Infrastructure Outsourcing Agreements in accordance with the terms described above reflects a sound use of the Debtors' business judgment. By entering into the IT Infrastructure Outsourcing Agreements, the Debtors estimate total net operating savings as compared to current spending for global infrastructure services of approximately $155 million over the seven-year term of the agreements. The IT Infrastructure Outsourcing Agreements allow for significant changes in the Debtors' organizational size and scope commensurate with business portfolio divestitures, wind-downs, or acquisitions (a significant benefit to Delphi) without triggering a repricing of the Agreements. Also, by reducing the number of service providers, the Debtors should reduce their IT costs through common processes, common systems, and economies of scale.

## Notice Of Motion

35.    Notice of this Motion has been provided in accordance with the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824). In

light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

36.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

17

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing, but not directing, the Debtors to enter into and perform under the IT Infrastructure Outsourcing Agreements with EDS and HP and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
September 29, 2006

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

**Exhibit A**
**EDS Agreement**

(Filed Under Seal)

**Exhibit B**
**HP Agreement**

(Filed Under Seal)