**Hearing Date and Time: October 19, 2006 at 10:00 a.m.**
**Objection Deadline: October 12, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
    In re                                :       Chapter 11
                                        :
DELPHI CORPORATION, et al.,      :       Case No. 05-44481 (RDD)
                                        :
                                        :       (Jointly Administered)
           Debtors.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER FED. R. BANKR. P. 3003(c)(3) AND 9006(b)(1)
DEEMING CERTAIN PROOFS OF CLAIM TIMELY FILED

("CLAIM TIMELINESS MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to Fed. R. Bankr. P. 3003(c)(3) and 9006(b)(1) deeming certain proofs of claim dated by the claimant thereunder on or prior to July 31, 2006 (the "Bar Date") and stamped by The DRS Group ("DRS") as having been received on or prior to August 9, 2006 to be timely filed. In support of this Motion, the Debtors respectfully represent as follows:

## Background

A. <u>The Chapter 11 Filings</u>

1. On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

2. On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors. On April 28, 2006, the Office of the United States Trustee appointed an official committee of equity security holders. No trustee or examiner has been appointed in the Debtors' cases.

3. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    4. The statutory predicates for the relief requested herein are rules 3003(c)(3) and 9006(b)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B. <u>Current Business Operations Of The Debtors</u>

    5. Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of December 31, 2005 of approximately $17.0 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

    6. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

    7. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.  Events Leading To The Chapter 11 Filing

8.  In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

9.  The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.  In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of

---

[2]  Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

13.     By this Motion, the Debtors seek an order under Bankruptcy Rules 3003(c)(3) and 9006(b)(1) deeming certain proofs of claim dated by the claimant thereunder on or prior to the Bar Date and stamped by DRS as having been received on or prior to August 9, 2006 to be timely filed.  A list of the proofs of claim covered by this Motion, including the claimants thereunder and the liquidated claims asserted therein, is attached hereto as Exhibit A (the "Proofs of Claim").

Basis For Relief

14.     On April 12, 2006, this Court entered an Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No. 3206) (the "Bar Date Order").  Among other things, the Bar Date Order set 5:00 p.m. (Eastern Standard Time) on the Bar Date as the deadline by which proofs of claim had to be actually received by the clerk of this Court in order for such proofs of claim to be timely filed. Under paragraph 11 of the Bar Date Order, a creditor of the Debtors whose proof of claim was not received by the clerk by 5:00 p.m. on the Bar Date was to be forever barred, estopped, and enjoined from (a) asserting any claim against the Debtors that such creditor has that (i) exceeds the amount, if any, that is set forth in the Debtors' Schedules of Liabilities (the "Schedules") as undisputed, non-contingent, and liquidated or (ii) is of a different nature or in a different classification than as set forth in the Schedules (any such claim, an "Unscheduled Claim") and (b) voting upon, or receiving distributions under, any plan or plans of reorganization in these chapter 11 cases in respect of an Unscheduled Claim, and the Debtors and their property are forever discharged from any and all indebtedness or liability with respect to such Unscheduled Claim.

15. In accordance with paragraph 12 of the Bar Date Order, on or prior to April 20, 2006, Kurtzman Carson Consultants, LLC, the claims and noticing agent in these cases (the "Claims Agent"), provided notice of the Bar Date by mailing a notice of bar date approved by this Court (the "Bar Date Notice"), together with a proof of claim form, to more than 500,000 potential parties-in-interest. The Debtors also published the Bar Date Notice in nearly 40 newspapers and other publications and posted the Bar Date Notice on the Delphi Legal Information Website, www.delphidocket.com. Consistent with the Bar Date Order, the Bar Date Notice advised each recipient that proofs of claim had to be actually received by the clerk of this Court no later than 5:00 p.m. (Eastern Standard Time) on the Bar Date in order for such proofs of claim to be timely filed.

16. Consistent with this Court's General Order M-279 dated January 15, 2003, all parties were directed to mail their proofs of claim to a post office box (the "Post Office Box") at the Bowling Green Station of the United States Post Office, to the extent not delivered to the Court by messenger or overnight courier. In accordance with its general practice in cases filed in this District, the Claims Agent engaged DRS to physically retrieve all proofs of claim from the Post Office Box, as well as to receive from the clerk of the Court proofs of claim delivered to the Court by messenger or overnight courier. Pursuant to the protocol provided by the clerk of the Court, DRS was to stamp each proof of claim with the date upon which such proof of claim was received by DRS, as the agent for the clerk of this Court, and with a unique proof of claim number identifying such proof of claim. Thereafter, the first page of each proof of claim was to be scanned into computer files and provided to the Court and the original proofs of claim were to be forwarded to the Claims Agent for entry onto the claims register, which is maintained by the Claims Agent.

7

17. After the Bar Date, the Debtors noticed certain abnormalities in the entry onto the claims register of proofs of claim that appeared to have been received by DRS after the Bar Date. Specifically, the claims register reflected a disproportionate number of proofs of claim as having been received on August 9, 2006. The chart below summarizes the number of claims entered on the claims register between August 1, 2006 and August 25, 2006.



18. After noticing this abnormality, the Debtors immediately undertook an extensive investigation of the procedures of both the Claims Agent and DRS for the recording of proofs of claim both prior to the Bar Date and in the days immediately thereafter. This investigation revealed that DRS's general practice was to retrieve mail from the Post Office Box twice daily. The first mail retrieval occurred in the morning, generally around 9:00 a.m., and the second mail retrieval occurred in the early afternoon, generally between noon and 2:30 p.m. On the Bar Date, DRS did not alter its general practice and last retrieved mail from the Post Office

8

Box in the early afternoon on the Bar Date.  Therefore, some proofs of claim that may have been timely received into the Post Office Box in accordance with the Bar Date Order may not have been collected by DRS from the Post Office Box until the morning of August 1, 2006.

19.   On August 1, 2006, DRS again collected mail from the Post Office Box on two occasions – first in the early morning and last in the early afternoon.  DRS continued to collect mail from the Post Office Box at least once daily on each day following the Bar Date.  Beginning with the proofs of claim collected by DRS from the Post Office Box on the morning of August 1, 2006 and continuing through August 9, 2006, DRS did not segregate proofs of claim by the date received, but rather commingled all such proofs of claim.[3]  On August 9, 2006, DRS stamped all proofs of claim collected from the Post Office Box between August 1, 2006 and August 9, 2006 with an August 9, 2006 receipt date.  Such proofs of claim, however, could have been received into the Post Office Box at any point in time from mid-afternoon on the Bar Date through mid-afternoon on August 9, 2006.  DRS apparently discarded all envelopes in which such proofs of claim had been received.

20.   As a result of the Debtors' investigation, the Debtors believe that some or all of the Proofs of Claim listed on <u>Exhibit A</u> attached hereto may have been timely filed under the Bar Date Order.  Because the proofs of claim that were collected from the Post Office Box between August 1, 2006 and August 9, 2006 were not necessarily stamped with the accurate date of receipt and because the envelopes for such proofs of claim (which potentially could have aided the Debtors in determining when each such proof of claim had actually been received) are

---

[3]   It is the Debtors' current understanding, based upon representations made by senior personnel of DRS, that all proofs of claim collected by DRS from the Post Office Box on or prior to early afternoon on the Bar Date were properly segregated by day and date-stamped with the proper date that the claim was received.  Claims received in the Post Office Box on the Bar Date after DRS's early afternoon claims retrieval were commingled with all claims received between August 1, 2006 through August 9, 2006 and subsequently stamped as received on August 9, 2006.

9

not available, the Debtors cannot determine with any certainty which of the Proofs of Claim were timely filed and which were not.[4]

21.  In total, the 396 Proofs of Claim assert liquidated claims in the amount of approximately $21.3 million, as well as additional undetermined unliquidated claims.[5]  The Debtors have not yet reconciled any of the Proofs of Claim, however, and therefore make no representation as to the possible amount of such claims that is likely ultimately to be allowed against the Debtors.  Finally, certain of the Proofs of Claim were filed by employees of the Debtors, some of whom may constitute "insiders" of one or more of the Debtors pursuant to section 101(31) of the Bankruptcy Code.  All such Proofs of Claim are included on Exhibit A.

22.  In the interests of fairness to all creditors of the Debtors, the Debtors hereby request that this Court deem each of the Proofs of Claim to be timely filed under the Bar Date Order.  The Debtors expressly reserve all of their rights to further object to any or all of the Proofs of Claim at a later date on any basis whatsoever other than that such Proofs of Claim were not timely filed pursuant to the Bar Date Order.

Applicable Authority

23.  Bankruptcy Rule 3003 permits the court to extend the time within proofs of claim may be filed for cause shown:

> The court shall fix and for cause shown may extend the
> time within which proofs of claim or interest may be filed.
> Notwithstanding the expiration of such time, a proof of

---

[4] The Debtors have excluded from the Proofs of Claim that are the subject of this Motion any proof of claim which was dated by the claimant on or after August 1, 2006, except to the extent that the date is clearly in error (e.g., a date in the future).  The Debtors respectfully assert that a claimant's dating of its proof of claim form with a date after the Bar Date is an admission that such proof of claim was not timely filed under the Bar Date Order.

[5] Certain of the Proofs of Claim purport to amend or replace earlier-filed proofs of claim and thus the potential impact on the total amount of asserted claims of deeming the Proofs of Claim timely filed may be less than the total asserted amount of the Proofs of Claim.

10

> claim may be filed to the extent and under the conditions stated in Rule 3002(c)(2) [filing by an infant or incompetent person], (c)(3) [filing of claims arising with respect to certain judgments], and (c)(4) [filings of rejection damages claims].

Fed. R. Bankr. P. 3003(c)(3). Additionally, Bankruptcy Rule 9006(b)(1) permits the court to deem proofs of claim timely filed when the failure to timely file the proof of claim was the result of excusable neglect:

> Except as provided in paragraphs (2) [enlargement of time not permitted] and (3) [enlargement of time limited] of this subdivision, when an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

Fed. R. Bankr. P. 9006(b)(1).

24. The Supreme Court has identified the following factors relevant to the determination of the existence of excusable neglect that would be sufficient to permit the late filing of a proof of claim:

(a) the danger of prejudice to the debtor;

(b) the length of the delay and its potential impact on judicial proceedings;

(c) the reason for the delay, including whether it was within the reasonable control of the creditor; and

(d) whether the creditor acted in good faith.

Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P., 507 U.S. 380, 395 (1993).

25. The Second Circuit has noted that it has taken a "hard line" in applying the Pioneer test and, further, that its primary focus is on the third Pioneer factor – the reason for the delay – including whether the delay was within the reasonable control of the creditor. See Midland Cogeneration Venture Ltd. P'Ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 122 (2d Cir. 2005) (stating that "[w]e have 'taken a hard line' in applying the Pioneer test" and that "'we and other circuits have focused on the third factor: "the reason for the delay, including whether it was within the reasonable control of the movant."'" (internal citation omitted)); Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 368 (2d Cir. 2003) (same).[6]

26. The Debtors respectfully assert that the facts described above present one of the unique and rare instances in which relief is appropriate under the Pioneer test. Although the claimants who filed the Proofs of Claim could have, and should have, avoided the arguably late receipt of their Proofs of Claim by filing such claims earlier, the Debtors are unable to conclusively determine which, if any, of the Proofs of Claim were in fact received by DRS after the Bar Date as a result of the failure to segregate the Proofs of Claim received after noon but before 5:00 p.m. on the Bar Date from those Proofs of Claim that were received after 5:00 p.m. on the Bar Date through August 9, 2006. Such failure was outside the reasonable control of the claimants filing the Proofs of Claim and thus meets the third prong of the Pioneer test. Deeming the Proofs of Claim to be timely filed also comports with fundamental principles of fairness to all creditors and other parties-in-interest in these cases. Therefore, the Debtors hereby request that this Court deem each of the Proofs of Claim to be timely filed pursuant to the Bar Date Order.

---

[6] In Silivanch, the Second Circuit cautioned "that the equities will rarely if ever favor a party who fail[s] to follow the clear dictates of a court rule, and that where the rule is entirely clear, we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the Pioneer test." 333 F.3d at 366-67.

12

27. Finally, the Debtors expressly reserve all of their rights to further object to any or all of the Proofs of Claim at a later date on any basis whatsoever other than that such Proofs of Claim were not timely filed pursuant to the Bar Date Order and request that any order entered with respect to this Motion expressly provide that such order will neither constitute, nor be deemed to constitute, the allowance of any of the Proofs of Claim.

## Notice Of Motion

28. Notice of this Motion has been provided in accordance with the Seventh Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on May 19, 2006 (Docket No. 3824). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

29. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) deeming each Proof of Claim to be timely filed pursuant to the Bar Date Order, and (b) granting them such other and further relief as is just.

Dated: New York, New York
September 29, 2006

                SKADDEN, ARPS, SLATE, MEAGHER
                  & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession