**Exhibit B**

**Fiduciary and Employee Benefit Liability Insurance Policy**

# **AIG** American International Companies®

### Employee Benefit Plan Fiduciary Liability Insurance

POLICY NUMBER:
*931-88-61*
REPLACEMENT OF
POLICY NUMBER:
*216-79-67*

☐ AIU Insurance Company
☐ American Home Assurance Company
☐ American International Pacific Insurance Company
☐ American International South Insurance Company
☐ Birmingham Fire Insurance Company of Pennsylvania

☐ Granite State Insurance Company
☐ Illinois National Insurance Company
☐ National Union Fire Insurance Company of Louisiana
☒ National Union Fire Insurance Co. of Pittsburgh, Pa.
☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE: EXCEPT AS SET FORTH IN ITEM 3(b) OF THE DECLARATIONS, THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

NOTICE: THE INSURER HAS THE DUTY TO DEFEND; HOWEVER, THE INSURED MAY ELECT TO ASSUME THE DUTY TO DEFEND. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

NOTICE: TERMS APPEARING IN BOLD FACE TYPE HAVE SPECIAL MEANING. SEE CLAUSE 3 OF THE POLICY.

## DECLARATIONS

| ITEMS | | |
|---|---|---|
| | | (herein  **Named Sponsor**") |
| 1 | NAMED SPONSOR: *DELPHI CORPORATION* | |
| 1(a) | MAILING ADDRESS: *5725 DELPHI DR.* *TROY, MI 48098-2815* | |
| 1(b) | SUBSIDIARY COVERAGE: | Any past, present or future **Subsidiary** of the **Named Sponsor** |
| 1(c) | PLAN COVERAGE: | Any past, present or future **Plan** |
| 2 | POLICY PERIOD:   From: *February 5, 2004*   To: *February 5, 2005* 12:01 A.M. standard time at the address stated in Item 1(a) of the Declarations. | |
| 3(a) | POLICY AGGREGATE LIMIT OF LIABILITY (herein "**Limit of Liability**") For all **Loss**, in the aggregate, under this policy including **Defense Costs** (other than **Defense Costs** (if any) set forth in Item 3(b) of the Declarations): *$25,000,000* | |

*7231975*

77893 (3/01)

1

MDL-000077

| ITEMS (Continued) | |
|---|---|
| 3(b) | **ADDITIONAL LIMIT OF LIABILITY FOR DEFENSE COSTS:** *$0* |
| 3(c) | **SUBLIMIT OF LIABILITY FOR VOLUNTARY COMPLIANCE LOSS**<br>For all **Voluntary Compliance Loss**, in the aggregate, ☐ See endorsement #<br>under this policy including **Defense Expenses**  ☒ None<br><br>This Sublimit of Liability shall be part of and not in addition to the **Policy Aggregate Limit of Liability** set forth in Item 3(a) of the Declarations. |
| 4 | **RETENTION:**   Not applicable to: (i) non-**Indemnifiable Loss** of a **Natural Person Insured** (ii) judgments and settlements (all Coverages); and (iii) **Voluntary Compliance Loss** |
| 4(a) | **Defense Costs:** *$5,000,000*<br>☐ None |
| 5 | **CONTINUITY DATE:** *February 5, 1999* |
| 6 | **PREMIUM:**              *$250,000*<br><br>    *Premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act 2002: Not applicable, coverage rejected by insured. Any coverage provided for losses caused by an act of terrorism as defined by TRIA (TRIA Losses) may be partially reimbursed by the United States under a formula established by TRIA as follows:  90% of TRIA Losses in excess of the insurer deductible mandated by TRIA, the deductible to be based on a percentage of the insurer's direct earned premiums for the year preceding the act of terrorism.*<br>    *A copy of the TRIA disclosure sent with the original quote is attached hereto.* |
| 7 | **NAME AND ADDRESS OF INSURER** (herein "**Insurer**"):<br>*National Union Fire Insurance Company of Pittsburgh, Pa.*<br>*175 Water Street*<br>*New York, NY 10038*<br><br>This policy is issued only by the insurance company indicated in this Item 7. |

*7231975*

77893 (3/01)                2

**MDL-000078**

POLICYHOLDER DISCLOSURE STATEMENT
UNDER
TERRORISM RISK INSURANCE ACT OF 2002

You are hereby notified that under the federal Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, you now have a right to purchase insurance coverage for losses arising out of an Act of Terrorism, which is defined in the Act as an act certified by the Secretary of the Treasury (i) to be an act of terrorism, (ii) to be a violent act or an act that is dangerous to (A) human life; (B) property or (C) infrastructure, (iii) to have resulted in damage within the United States, or outside of the United States in case of an air carrier or vessel or the premises of a U.S. mission and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. You should read the Act for a complete description of its coverage. The Secretary's decision to certify or not to certify an event as an Act of Terrorism and thus covered by this law is final and not subject to review. There is a $100 billion dollar annual cap on all losses resulting from Acts of Terrorism above which no coverage will be provided under this policy and under the Act unless Congress makes some other determination.

For your information, coverage provided by this policy for losses caused by an Act of Terrorism may be partially reimbursed by the United States under a formula established by the Act. Under this formula the United States pays 90% of terrorism losses covered by this law exceeding a statutorily established deductible that must be met by the insurer, and which deductible is based on a percentage of the insurer's direct earned premiums for the year preceding the Act of Terrorism.

Unless you sign this form and return it to us rejecting Terrorism Coverage under the Federal Act, you will be covered for Terrorism as defined in the Act and your premium for that coverage is *$2,500*_____ .


_____   I hereby reject coverage in accordance with the Act.


_____
Signature of Insured


_____
Print Name/Title


_____
Date

**COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE**

Insured Name: *DELPHI CORPORATION*


Policy Number: *931-88-61*
Policy Period Effective Date From: *February 5, 2004*     To: *February 5, 2005*

81285 (1/03)

MDL-000079

**IN WITNESS WHEREOF,** the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

_____
SECRETARY

_____
PRESIDENT

_____
AUTHORIZED REPRESENTATIVE

_____
COUNTERSIGNATURE DATE

_____
COUNTERSIGNED AT

*AON RISK SERVICES, INC. OF ILLINOIS*
*200 E. RANDOLPH ST., 14TH FL.*
*AON CENTER*
*CHICAGO, IL 60601-6060*

*7231975*

77893 (3/01)

**MDL-000080**

American International Companies

**Employee Benefit Plan Fiduciary Liability Insurance**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including any attachments and any materials incorporated therein which form a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

   (a)  Solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the **Loss** of each and every **Insured** arising from a **Claim** against an **Insured** for any actual or alleged **Wrongful Act** by any such **Insured** (or by any employee for whom such **Insured** is legally responsible).

   (b)  Solely with respect to **CAP Penalties** and **Delinquent Filer Penalties** assessed against an **Insured**, and **Voluntary Fiduciary Correction Loss** incurred by an **Insured**, during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** during the **Policy Period** or the **Discovery Period** (if applicable) or within thirty (30) days after the end of the **Policy Period** or the **Discovery Period** (if applicable), and subject to the other terms, conditions and limitations of this policy, this policy shall:

   (i)   pay the **CAP Penalties** and **Delinquent Filer Penalties**; and
   (ii)  reimburse the **Voluntary Fiduciary Correction Loss**,

   of each and every **Insured**, collectively not to exceed the amount of the **Sublimit of Liability** set forth in Item 3(c) of the Declarations; provided that the **Insured** shall select a **Panel Counsel Firm** as provided in Clause 9 of the policy.

   The payment of any **Voluntary Compliance Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that a **Voluntary Compliance Loss** results in a **Claim**.

2. **DEFENSE AGREEMENT**

   (a)  **INSURER'S DUTY TO DEFEND**

   Except as hereinafter stated, the **Insurer** shall have both the right and duty to defend any **Claim** against an **Insured** alleging a **Wrongful Act**, even if such **Claim** is groundless, false or fraudulent.

   The **Insured** shall have the right to effectively associate with the **Insurer** in the defense of any **Claim**, including, but not limited to, negotiating a settlement, subject to the provisions of this Clause 2. The **Insurer** shall not, however, be obligated to defend any **Claim** after either: (1) the **Limit of Liability** and any additional **Defense Costs** (if any) indicated in Item 3(b) of the Declarations have been exhausted; or (2) after the rejection of a settlement offer, pursuant to the terms of subparagraph (c) of this Clause 2.

   (b)  **INSURED'S OPTION TO ASSUME DEFENSE**

   Notwithstanding the above, the **Insureds** shall have the right to assume the defense of any **Claim** made against them. This right shall be exercised in writing by the **Named Sponsor** on the behalf of all **Insureds** within sixty (60) days of the reporting of the **Claim** to the **Insurer** pursuant to Clause 8 of the policy. Upon receipt of such

77892 (3/01)                                         1

MDL-000081

written request, the **Insurer** shall tender the defense of the **Claim** to the **Insureds**. Once the defense has been so tendered, the **Insurer** cannot re-assume the defense of the **Claim**. The **Insurer** shall have the right to effectively associate with the **Insureds** in the defense of any **Claim**, including but not limited to negotiating a settlement. Provided that the **Insurer** shall be permitted to effectively associate with the **Insureds** in the defense of any **Claim**, including but not limited to negotiating a settlement of any **Claim**, the **Insurer's** consent to settlements, stipulated judgments and **Defense Costs** shall not be unreasonably withheld.

(c)   **GENERAL PROVISIONS (applicable to both (a) and (b) above)**

The Insurer shall advance **Defense Costs** prior to the final disposition of a **Claim**, subject to the other provisions of this policy. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests, in the event and to the extent that the **Insureds** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.

The **Insured(s)** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to in writing by the **Insurer** shall be recoverable as **Loss** under the terms of this policy.

The **Insured(s)** shall give the **Insurer** full cooperation and such information as the **Insurer** may reasonably require. The **Insurer** may make any settlement of any **Claim** it deems expedient with respect to any **Insured**, subject to such **Insured's** written consent. If any **Insured** withholds consent to such settlement, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed the amount for which the **Insurer** could have settled such **Claim**, plus **Defense Costs** incurred as of the date such settlement was proposed in writing by the **Insurer**. Further, in the event the **Insurer** is defending the **Claim** pursuant to Clause 2(a) above, then the **Insurer** shall tender the **Claim** to the **Insureds** who shall thereafter at their own expense and on their own behalf negotiate and defend such **Claim** independently of the **Insurer**.

Selection of counsel to defend the **Claim** made against the **Insureds** shall be governed by Clause 9 of the policy (if applicable).

3.   **DEFINITIONS**

"**Administrator**" means an **Insured** with respect to any **Wrongful Act** described in subparagraph (2) of the Definition of **Wrongful Act**.

"**Benefits**" means any obligation under a **Plan** to a participant or beneficiary under a **Plan** which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

"**Breach of Fiduciary Duty**" means a violation of the responsibilities, obligations or duties imposed upon **Insureds** by **ERISA**.

"**Cafeteria Plan**" means a plan as defined in Section 125 of the Internal Revenue Code of 1986, as amended or a plan from which the participants may choose among two or more benefits consisting of cash and qualified benefits.

"**CAP Penalties**" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the Internal Revenue Service (IRS) pursuant to a written agreement to correct an inadvertent **Plan** defect under an Employee Plans Compliance Resolution System, provided that such agreement to

MDL-000082

correct such **Plan** defect was entered into in writing by the **Insured** with the IRS du ring the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

"**Claim**" means:

(1) a written demand for monetary, non-monetary or injunctive relief; or
(2) a civil, criminal or arbitration proceeding for monetary, non-monetary or injunc tive relief which is commenced by:
   (i) service of a complaint or similar pleading; or
   (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or
   (iii) receipt or filing of a notice of charges; or
(3) a formal agency or regulatory adjudicative proceeding to which an **Insured** is subject; or
(4) any fact-finding investigation by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation, or similar governmental agency which is located outside of the United States.

"**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

"**Consulting Fees**" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs or expenses associated with: (i) a **Plan** audit; or (ii) identifying, finding or assessing such **Breach of Fiduciary Duty**.

"**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to in writing by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**, whether incurred under Clause 2(a), (b) or (c) of this policy, but excluding any compensation of **Natural Person Insureds** or employees of an **Insured**.

"**Defense Expenses**" means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the **Insurer** resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs and expenses associated with finding or assessing such **Breach of Fiduciary Duty** and any compensation of **Natural Person Insureds** or employees of an **Insured**.

"**Delinquent Filer Penalties**" means penalties assessed by the U.S. Department of Labor or the IRS under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

"**Dependent Care Assistance Program**" means a dependent care assistance program as defined in Section 129 of the Internal Revenue Code of 1986, as amended.

"**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Named Sponsor** or any **Subsidiary**.

"**Employee Benefit Law**" means ERISA or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a **Plan** is subject. Except to the extent set forth in subparagraph (2) of the Definition of **Wrongful Act**, **Employee Benefit Law** shall not include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

MDL-000083

"ERISA" means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, the Newborns' and Mothers Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), and including any amendment or revision thereto.

"ESOP" means any employee stock ownership plan as defined in **ERISA**, or any other **Plan** under which investments are made primarily in securities of the **Sponsor Organization** or whose assets at any time within twelve months prior to the inception date of this policy were comprised of 20% or more of securities of the **Sponsor Organization**.

"Fiduciary" means a fiduciary as defined in an **Employee Benefit Law** (if applicable), with respect to a **Plan**, or a person or entity who exercises discretionary control as respects the management of a **Plan** or the disposition of its assets.

"Foreign Jurisdiction" means any jurisdiction, other than the United States or any of its territories or possessions.

"Foreign Policy" means the **Insured's** or any other member company of American International Group, Inc.'s (AIG) standard fiduciary or pension trust liability policy (including all mandatory endorsements, if any) approved by AIG to be sold within a **Foreign Jurisdiction**, that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then **Foreign Policy** means the standard policy most recently registered in the local language of the **Foreign Jurisdiction**, or if no such policy has been registered, then the policy most recently registered in that **Foreign Jurisdiction**. The term **Foreign Policy** shall not include any directors and officers, partnership, managerial, comprehensive general liability, employment practices liability or professional liability coverage.

"Fringe Benefit" means any plan or benefit described in Section 132 of the Internal Revenue Code of 1986, as amended.

"Indemnifiable Loss" means **Loss** for which the **Sponsor Organization** has indemnified or is permitted or required to indemnify any natural person **Insured**.

"Insured(s)" means:

(1) any **Natural Person Insured**;
(2) any **Plan(s)**;
(3) the **Sponsor Organization**; and
(4) any other person or entity in his, her or its capacity as a **Fiduciary**, **Administrator** or trustee of a **Plan** and included in the Definition of **Insured** by specific written endorsement attached to this policy.

"Loss" means damages, judgments (including pre/post-judgment interest on a covered judgment), settlements and **Defense Costs**; however, **Loss** shall not include: (1) civil or criminal fines or penalties imposed by law, except (i) to the extent set forth in Item 3(c) of the Declarations page for **Voluntary Compliance Loss**, (ii) **UK Fines and Penalties**, (iii) the five percent or less civil penalty imposed upon an **Insured** under Section 502(i) of ERISA, and (iv) the 20 percent or less penalty imposed upon an **Insured** under Section 502(l) of ERISA, with respect to covered settlements or judgments; (2) the multiplied portion of multiplied damages; (3) taxes or tax penalties; (4) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (5) **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of a **Natural Person Insured**; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

MDL-000084

Where permitted by law, **Loss** shall include punitive or exemplary damages imposed u pon any **Insured** (subject to the policy s other terms, conditions and exclusions, including but not limited to exclusions relating to profit, deliberate fraud or criminal acts and knowing or willful violation of any statute, rule or law, including but not limited to **Employee Ben efit Law**).

**Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (1)–(6) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall include **Voluntary Compliance Loss**.

"**Management Control**" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; the general partners of a limited partnership; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the **Named Sponsor**, to elect, appoint or designate a majority of the Board of Directors of a corporation, the management committee of a joint venture, the general partners of a limited partnership, or the management board of a limited liability company.

"**Natural Person Insured**" means any:

(1) past, present or future natural person director, officer, governor, general partner, management committee member, member of the board of managers or employee of a **Sponsor Organization** or if applicable, of a **Plan**, and as to all of the above in his or her capacity as a **Fiduciary**, **Administrator** or trustee of a **Plan**; or
(2) past, present or future natural person in a position equivalent to a position listed in subparagraph (1) of this Definition in the event that the **Sponsor Organization** is operating in a **Foreign Jurisdiction**.

"**Non-qualified Plan**" means any of the following plans for a select group of management or highly compensated directors, officers and/or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan, or excess benefit plan.
"**Pension Plan**" means a pension plan as defined in any **Employee Benefit Law**.

"**Plan**" means automatically, any qualified plan, fund, trust or program (including, but not limited to, any **Pension Plan**, **Welfare Plan**, **Cafeteria Plan**, **Dependent Care Assistance Program**, **Fringe Benefit**, and **VEBA**) or **Non-qualified Plan**, established anywhere in the world, which was, is or shall be sponsored solely by the **Sponsor Organization**, or sponsored jointly by the **Sponsor Organization** and a labor organization, solely for the benefit of the employees and/or the directors, officers, governors, management committee members, members of the board of managers or natural person general partners of the **Sponsor Organization**, subject to the following provisions:

(1) if such **Plan** is a **Pension Plan(s)**, other than an ESOP, stock option plan or **Pension Plan** described in subparagraphs (5)(a) and 5(b) below, then the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** prior to the inception date of this policy, unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal;
(2) if such **Plan** was sold, spun-off or terminated prior to the inception date of this policy the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the inception date of this policy, unless such sale, spin-off or termination had already been reported to the **Insurer** under a policy issued by the **Insurer** of which this policy is a continuous renewal;

MDL-000085

(3)  if such **Plan** is sold, spun-off or terminated during the **Policy Period**, the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the end of the **Policy Period**;

(4)  if such **Plan** is an **ESOP** or stock option plan, the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** unless such **Plan** was already covered under a policy issued by the **Insurer** of which this policy is a continuous renewal and such **Plan** is added to the Definition of **Plan** by specific written endorsement attached to this policy; or

(5)  if such **Plan** is a **Pension Plan** (other than an **ESOP**, or stock option plan) and:

    (a)  is acquired during the **Policy Period** as a result of the **Sponsor Organization's** acquisition of a **Subsidiary** whose assets total more than 25% of the total consolidated assets of the **Sponsor Organization** as of the inception date of this policy; or

    (b)  is acquired during the **Policy Period** and such **Plan's** assets total more than 25% of the total consolidated assets of all covered **Pension Plans** as of the inception date of this policy,

then, this policy shall apply to such **Plan** (but solely with respect to a **Wrongful Act(s)** occurring after the date of such acquisition), but only upon the condition that within 90 days of its acquisition, the **Named Sponsor** shall have provided the **Insurer** with a completed application for such new **Plan** and agreed to any additional premium or amendment of the provisions of the policy required by the **Insurer** relating to such new **Plan**. The 90 day reporting condition shall not apply if such new **Plan** does not constitute one of the five largest **Pension Plans** of the **Sponsor Organization** and the failure to report such **Plan** within the 90 day reporting period was due to inadvertent omission by the **Named Sponsor** and upon discovery of such **Plan**, the **Named Sponsor** shall notify the **Insurer** as soon as practicable, provide any information required by the **Insurer** relating to such **Plan** and pay any premium required by the **Insurer** relating to such **Plan**.

The Definition of **Plan** shall also include: (i) the following government-mandated programs: unemployment insurance, Social Security, or disability benefits, but solely with respect to a **Wrongful Act** defined in subparagraph (2) of the Definition of **Wrongful Act** in this policy; (ii) any **Pension Plan** (other than an **ESOP** or stock option plan) considered or created by the **Sponsor Organization** during the **Policy Period**; or (iii) any other plan, fund or program, which is included in the Definition of **Plan** by specific written endorsement attached to this policy.

In no event, however, shall the Definition of **Plan** include any multiemployer plan as defined in **Employee Benefit Law**.

"**Policy Period**" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

"**Pollutants**" include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed.

"**Sponsor Organization**" means the **Named Sponsor** designated in Item 1 of the Declarations and any **Subsidiary** thereof; and, in the event any bankruptcy proceeding shall be instituted by or against the **Named Sponsor** or any **Subsidiary** thereof, the resulting debtor in possession (or equivalent status outside the United States), if any.

"**Subsidiary**" means any past, present or future: (1) for-profit entity of which the **Named Sponsor** has **Management Control** either directly or indirectly through one or more other **Subsidiaries**; and (2) not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by the **Named Sponsor**. The term **Subsidiary** shall automatically apply to any new **Subsidiary** acquired or created during the **Policy Period**.

MDL-000086

A for-profit entity ceases to be a **Subsidiary** when the **Named Sponsor** no longer maintains **Management Control** of such **Subsidiary**. A not-for-profit entity ceases to be a **Subsidiary** when the **Named Sponsor** no longer exclusively sponsors such **Subsidiary**.

"**UK Fines and Penalties**" means civil fines and penalties assessed against an **Insured** by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom or by the Occupational Pensions Regulatory Authority in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of the policy.

"**VEBA**" means a voluntary employees beneficiary association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended and the regulations thereunder, the purpose of which is to provide for life, sickness, accident or other benefits and that is funded solely by the **Sponsor Organization**, and provides benefits for voluntary members who are employees or former employees of the **Sponsor Organization** and/or their beneficiaries.

"**Voluntary Compliance Loss**" means **CAP Penalties**, **Delinquent Filer Penalties** and **Voluntary Fiduciary Correction Loss**.

"**Voluntary Fiduciary Correction Loss**" means damages, **Defense Expenses** and **Consulting Fees** incurred in connection with the U.S. Department of Labor's ("DOL") Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent **Breach of Fiduciary Duty** occurring during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal), provided that such compliance with the DOL'S Voluntary Fiduciary Correction Program results in the **Insured** obtaining a "No Action" letter from the DOL; however, **Voluntary Fiduciary Correction Loss** shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (6) **Benefits**, or that portion of damages equal to such **Benefits**; (7) matters of which the **Insured** had knowledge prior to the inception date of this policy or the first policy issued by the **Insurer** to the **Named Sponsor** of which this policy is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

"**Welfare Plan**" means a welfare plan as defined in **Employee Benefit Law**.

"**Wrongful Act**" means:

    (1)  as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, the **Plan** or the **Sponsor Organization**, but only with respect to a **Plan**; and

    (2)  as respects an **Administrator**, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:

        (i)  counseling employees, participants and beneficiaries; or

        (ii)  providing interpretations; or

        (iii)  handling of records; or

        (iv)  activities affecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**,

      or any matter claimed against an **Insured** solely by reason of his, her or its status as an **Administrator**, the **Plan** or the **Sponsor Organization**, but only with respect to a **Plan**;

    (3)  as respects a **Natural Person Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any

MDL-000087

multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Sponsor Organization** and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a **Natural Person Insured**.

4.   **WORLDWIDE EXTENSION**

Where legally permissible, this policy shall apply to a **Claim** made against any **Insured** anywhere in the world.

With regard to a **Claim(s)** brought and maintained solely in a **Foreign Jurisdiction** against an **Insured** formed and operating in such **Foreign Jurisdiction**, the **Insurer** shall apply to such **Claim(s)** those terms and conditions (and related provisions) of the **Foreign Policy** registered with the appropriate regulatory body in such **Foreign Jurisdiction** that are more favorable to such **Insured** than the terms and conditions of this policy. However, this paragraph shall apply only to Clauses 1, 3-5, 9-13, and 16-19 of this policy and the comparable provisions of the **Foreign Policy**. In addition, this paragraph shall not apply to the non-renewal or claims made and reported provisions of any policy.

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Sponsor**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal).

5.   **EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with a **Claim** made against an **Insured(s)**:

(a)   arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an **Insured** was not legally entitled;

(b)   arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act, or any knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law**;

[The **Wrongful Act** of any **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the foregoing exclusions 5(a) and 5(b).]

(c)   for discrimination in violation of any law, except that this exclusion shall not apply to discrimination in violation of **Employee Benefit Law**;

(d)   alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Act** alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)   alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** has notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

MDL-000088

(f) for failure to fund a **Plan** in accordance with **Employee Benefit Law** or the **Plan** instrument, or the failure to collect contributions owed to the **Plan**; except that this exclusion shall not apply to **Defense Costs**;

(g) alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a Fiduciary or Administrator of any plan, fund or program, other than a **Plan** as defined in this policy, or by reason of his, her or its status as a Fiduciary or Administrator of such other plan, fund or program;

(h) for bodily injury, sickness, disease, or death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof; except that this exclusion shall not apply to **Defense Costs** incurred in the defense of a **Claim** for **Breach of Fiduciary Duty**;

(i) alleging, arising out of, based upon or attributable to any **Wrongful Act** as respects the **Plan** taking place at any time when the **Sponsor Organization** did not sponsor such **Plan** or when the **Natural Person Insured** was not a **Fiduciary**, **Administrator**, trustee, director, officer, governor, management committee member, member of the board of managers, general partner or employee of the **Sponsor Organization** or if applicable, a **Plan**;

(j) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly: (1) the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, that this exclusion shall not apply to non–**Indemnifiable Loss** arising from a **Claim** alleging damage to a **Plan**, other than non–**Indemnifiable Loss** constituting **Cleanup Costs**;

6. **LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING DEFENSE COSTS)**

The **Limit of Liability** stated in Item 3(a) of the Declarations is the limit of the **Insurer's** liability for all **Loss**, including **Defense Costs**, under this policy arising out of all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** stated in Item 3(b) of the Declarations, if any, shall be an additional **Limit of Liability** for that part of **Loss** constituting **Defense Costs** incurred in connection with all **Claims** first made against the **Insured** during the **Policy Period** or the **Discovery Period** (if applicable). The **Limit of Liability** for Defense Costs stated in Item 3(b) shall be in addition to and not part of the **Limit of Liability** stated in Item 3(a) of the Declarations. **Loss** constituting **Defense Costs** shall first reduce the additional **Limit of Liability** stated in Item 3(b). Should the **Limit of Liability** stated in Item 3(b) of the Declarations become exhausted, or should the **Limit of Liability** stated in Item 3(b) of the Declarations be stated as "none", then subsequent **Defense Costs** will reduce the **Limit of Liability** stated in Item 3(a).

The **Sublimit of Liability** set forth in Item 3(c) of the Declarations shall be part of and not in addition to the **Limit of Liability** set forth in Item 3(a).

The **Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Limit of Liability** for the **Policy Period**. Further, any **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable), which pursuant to Clause 8(b) or 8(c) is considered made during the **Policy Period** or **Discovery Period** shall also be subject to the aggregate **Limit(s) of Liability** stated in Item 3 of the Declarations.

**Defense Costs, whether incurred under Clause 2(a), (b) or (c) of this policy, are not payable by the Insurer in addition to the Limit of Liability; except that the separate limit, if any, listed in Item 3(b) of the Declarations shall be in addition to the aggregate Limit of Liability stated in Item 3(a) of the Declarations. Defense Costs are part of Loss and as such are subject to the Limit of Liability for Loss.**

77892 (3/01)                9

MDL-000089

7.  **RETENTION CLAUSE**

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the Retention amount stated in Item 4 of the Declarations, such Retention amount to be borne by the **Insured** and shall remain uninsured, with regard to all **Defense Costs** other than: (1) non–**Indemnifiable Loss** of a **Natural Person Insured**; and (2) **Voluntary Compliance Loss**. A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

8.  **NOTICE/CLAIM REPORTING PROVISIONS**

**Notice hereunder shall be given in writing to the Insurer named in Item 7 of the Declarations at the address indicated in Item 7 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.**

(a) The **Insured(s)** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of a **Claim** made against an **Insured** as soon as practicable after the **Named Sponsor's** risk manager or general counsel (or if no such position exists, then such equivalent position) first becomes aware of the **Claim**, but in all events no later than either:

  (1) the end of the **Policy Period** or during the **Discovery Period** (if applicable); or

  (2) within thirty (30) days after the end of the **Policy Period** or the **Discovery Period** (if applicable), as long as such **Claim** was first made against an **Insured** within the final thirty (30) days of the **Policy Period** or the **Discovery Period** (if applicable).

(b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 8(a) above, then a **Claim** which is subsequently made against an **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, shall be considered related to the first **Claim** and made at the time such notice was given.

(c) If during the **Policy Period** or during the **Discovery Period** (if applicable) the **Sponsor Organization** or an **Insured(s)** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against an **Insured** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then a **Claim** which is subsequently made against such **Insured** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

9.  **PRE–AUTHORIZED DEFENSE ATTORNEYS**

This Clause 9 applies only to: (1) a **Claim** brought by any government entity; (2) a request for coverage for a **Voluntary Compliance Loss**; or (3) a **Claim** brought in the form of a class or representative action.

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("**Panel Counsel Firm(s)**") from which a selection of legal counsel shall be made to conduct the defense of any **Claim** against an **Insured** to which this Clause 9 applies and pursuant to the terms set forth below:

MDL-000090

In the event the **Insurer** is operating under a duty to defend pursuant to Clause 2(a) of this policy, then the **Insurer** shall select a **Panel Counsel Firm** to defend the **Insureds**. Upon the written request of the **Named Sponsor**, the **Insurer** may consent to a different **Panel Counsel Firm** selected by the **Named Sponsor** to defend the **Insureds**, which consent shall not be unreasonably withheld.

In the event the **Insureds** have assumed the defense of the **Claim** pursuant to Clause 2(b) of the policy, then the **Insureds** shall select a **Panel Counsel Firm** to defend the **Insured**. In addition, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, the **Insured** may select a **Panel Counsel Firm** different from that selected by other **Insureds** if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The selection of a **Panel Counsel Firm** from the attached list to defend the **Claim** against the **Insureds** shall not be restricted to the jurisdiction in which the **Claim** is brought.

The list of **Panel Counsel Firms** may be amended from time to time by the **Insurer**. However, no change shall be made to the specific list attached to this policy during the **Policy Period** without the consent of the **Named Sponsor**. At the request of the **Named Sponsor**, the **Insurer** may in its discretion add one or more law firms to the attached list of **Panel Counsel Firms** for the purposes of defending the **Claim** made against the **Insureds**. The list of **Panel Counsel Firms** may also be amended to add, at the sole discretion of the **Insurer**, a non-**Panel Counsel Firm** for the purpose of acting as "local counsel" to assist an existing **Panel Counsel Firm**, which **Panel Counsel Firm** will act as "lead counsel" in conducting the defense of the **Claim**, for **Claims** brought in a jurisdiction in which the chosen **Panel Counsel Firm** does not maintain an office.

10. **DISCOVERY CLAUSE**

Except as indicated below, if the **Named Sponsor** shall cancel or the **Named Sponsor** or the **Insurer** shall refuse to renew this policy, the **Named Sponsor** shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal ("**Discovery Period**"), upon payment of the respective "**Additional Premium Amount**" described below, in which to give to the **Insurer** written notice pursuant to Clauses 8(a) and 8(c) of the policy of: (i) **Claims** first made against an **Insured**; and (ii) circumstances of which the **Natural Person Insured** or an **Insured** shall become aware, in either case during said **Discovery Period** and solely with respect to a **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.

The **Additional Premium Amount** for: (1) one year shall be no more than 75% of the **Full Annual Premium**; (2) two years shall be no more than 150% of the **Full Annual Premium**; and (3) three years shall be no more than 225% of the **Full Annual Premium**. As used herein, "**Full Annual Premium**" means the premium level in effect immediately prior to the end of the **Policy Period**.

Notwithstanding the first paragraph of Clause 6, if the **Named Sponsor** shall cancel or the **Insurer** or the **Named Sponsor** shall refuse to renew this policy, then the **Named Sponsor** shall also have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the end of the **Policy Period**) with an aggregate limit of liability applicable to **Claims** made against the **Insured** during such **Discovery Period** which is in addition to, and not part of, the applicable **Limit of Liability** set forth in Item 3 of the Declarations. The **Insurer** shall quote such a **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as it deems appropriate in its sole and absolute discretion.

77892 (3/01)                                    11

MDL-000091

In the event of a **Transaction**, as defined in Clause 12(a), the **Named Sponsor** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 10 shall terminate unless written notice of election of a **Discovery Period,** together with any additional premium due, is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

11. **CANCELLATION CLAUSE**

This policy may be canceled by the **Named Sponsor** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent. This policy may only be canceled by or on behalf of the **Insurer** in the event of non-payment of premium by the **Named Sponsor**. In the event of non-payment of premium by the **Named Sponsor**, the **Insurer** may cancel this policy by delivering to the **Named Sponsor** or by mailing to the **Named Sponsor**, by registered, certified, or other first class mail, at the **Named Sponsor's** address as shown in Item 1 of the Declarations, written notice stating when, not less than 15 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy shall be canceled by the **Named Sponsor**, the **Insurer** shall retain the customary short rate proportion of the premium herein. If the period of limitation relating to the giving of notice as set forth in this Clause 11 is also set forth in any law controlling the construction thereof, then such period shall be deemed to be amended so as to be equal to the minimum period of limitation set forth in the controlling law.

12. **ORGANIZATIONAL CHANGES**

(a) If during the **Policy Period**:

    (1) the **Named Sponsor** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

    (2) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Sponsor**;

(any of such events being a "**Transaction**"), then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the **Transaction**. This policy may not be canceled after the effective time of the **Transaction** and the entire premium for this policy shall be deemed earned as of such time. The **Named Sponsor** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 10 of this policy.

77892 (3/01)                                       12

MDL-000092

(b) *Other Organizational Changes:* In all events, coverage as is afforded under this policy with respect to a **Claim** made against any **Sponsor Organization** and/or any **Insured** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time such **Sponsor Organization** became a **Sponsor Organization** and such **Insured** became an **Insured**, and prior to the effective time that such **Sponsor Organization** ceases to be a **Sponsor Organization** or such **Insured** ceases to be an **Insured**.

With regard to any **Plan** that was sold, spun-off or terminated either prior to the inception date of this policy or during the **Policy Period**, this policy shall apply but solely with respect to a **Wrongful Act(s)** that occurred prior to the date of such sale or spin-off, or prior to the date that the **Sponsor Organization** or **Natural Person Insured** ceases to be a **Fiduciary** or **Administrator** of, a sold or spun-off **Plan**, or in the case of a terminated **Plan**, prior to the final date of asset distribution of such **Plan**, provided that notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**.

13. **SUBROGATION AND WAIVER OF RECOURSE**

In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery thereof, and the **Insureds** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of the **Insureds**. In no event shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless such **Insured** has been convicted of a criminal act, or been determined to have in fact committed a deliberate fraudulent act or knowingly or willingly violated any statute, rule or law (including but not limited to **Employee Benefit Law**), or been determined to have in fact obtained any profit or advantage to which such **Insured** was not legally entitled.

In the event this policy has been purchased by an **Insured** other than a **Plan**, the **Insurer** shall have no right of recourse against an **Insured**. Notwithstanding the foregoing, the **Insurer** shall have a right of recourse against an **Insured** arising out of a **Claim** by an **Insured** against another **Insured** unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, assistance of or active participation by the **Insured** claimed against.

It is further provided that in the event of any recovery under this Clause 13, the **Limit of Liability** of this policy shall be restored to the extent of such recovery after subtracting any costs, expenses or reimbursements incurred by the **Insurer** in connection therewith.

14. **OTHER INSURANCE**

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written only as specific excess insurance over the **Limit of Liability** provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

15. **NOTICE AND AUTHORITY**

It is agreed that the **Named Sponsor** shall act on behalf of its **Subsidiaries** and each and every **Insured** with respect to the giving of notice of **Claim**, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right under Clause 2(b) or Clause 10 of this policy.

MDL-000093

16. **ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

17. **ACTION AGAINST INSURER**

No action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial or by written agreement of the **Insureds**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against any **Insured** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by any **Insured** or his or her spouse or **Domestic Partner** or his, her or its legal representatives. Bankruptcy or insolvency of any **Insured** or of his, her or its estate shall not relieve the **Insurer** of any of its obligations hereunder.

18. **SPOUSAL, DOMESTIC PARTNER AND LEGAL REPRESENTATIVE EXTENSION**

If a **Claim** against a **Natural Person Insured** includes a **Claim** against: (i) the lawful spouse **or Domestic Partner** of such **Natural Person Insured**; or (ii) a property interest of such spouse or **Domestic Partner**, and such **Claim** arises from any actual or alleged **Wrongful Act** of such **Natural Person Insured**, this policy shall cover **Loss** arising from the **Claim** made against that spouse or **Domestic Partner** or the property of that spouse or **Domestic Partner** to the extent that such **Loss** does not arise from a **Claim** for any actual or alleged act, error or omission of such spouse or **Domestic Partner**. This policy shall cover **Loss** arising from a **Claim** made against the estate, heirs, or legal representatives of any deceased **Natural Person Insured**, and the legal representatives of any **Natural Person Insured**, in the event of incompetency, insolvency or bankruptcy, who was a **Natural Person Insured** at the time the **Wrongful Act(s)** upon which the **Claim** is based was committed.

19. **HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

MDL-000094

# APPENDIX A

## PANEL COUNSEL
## EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY

- 1 -

**ARIZONA**

Snell & Wilmer
One Arizona Center
Phoenix, AZ 85004-0001
Primary Contact:
Katherine M. Harmeyer (602) 382-6357

**CALIFORNIA**

Lillick & Charles, L.L.P.
Two Embarcadero Center, Suite 2700
San Francisco, CA 94111
Primary Contact:
D. Ward Kallstrom (415) 984-8282

Pillsbury Madison & Sutro, L.L.P.
235 Montgomery Street
P.O. Box 7880
San Francisco, CA 94120
Primary Contact:
Robert A. Gordon (415) 983-1782

Sedgwick, Detert, Moran & Arnold
One Embarcadero Center, 16th Floor
San Francisco, CA 94111-3765
Primary Contact:
Julia A. Molander (415) 627-1424

**DISTRICT OF COLUMBIA**

Arent, Fox, Kintner, Plotkin & Kahn
1050 Connecticut Avenue, NW
Washington, DC 20036-5339
Primary Contact:
Carol Connor Flowe (202) 857-6054

Arnold & Porter
555 12th Street, NW
Washington, DC 20004-1206
Primary Contact:
Scott B. Schreiber (202) 942-5000

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
Primary Contact:
William J. Kilberg, P.C. (202) 955-8573

Groom and Nordberg
1701 Pennsylvania Avenue, NW, Suite 1200
Washington, DC 20006
Primary Contact:
Robert Gallagher (202) 857-0620

Kilpatrick Stockton L.L.P.
700 13th Street, NW, Suite 800
Washington, DC 20005-5923
Primary Contact:
Steven J. Sacher (202) 508-5840

O'Melveny & Myers LLP
555 13th Street, NW, Suite 500 West
Washington, DC 20004-1109
Primary Contact:
Robert N. Eccles (202) 383-5300

Patton Boggs, L.L.P.
2550 M Street, N.W.
Washington, DC 20037
Primary Contact:
Michael A. Curto (202) 457-5611

Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Primary Contact:
Paul J. Ondrasik, Jr. (202) 429-8088

Verner, Liipfert, Bernhard, McPherson & Hand
901 15th Street, NW, Suite 700
Washington, DC 20005
Primary Contact:
Ronald B. Natalie (202) 371-6028

**GEORGIA**

Alston & Bird
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309-3424
Primary Contact:
Gregory C. Braden (404) 881-7497

King & Spalding
191 Peachtree Street
Atlanta, GA 30303-1763
Primary Contact:
Lara B. Robinson (404) 572-3567

**ENDORSEMENT# _1_**

This endorsement, effective _12:01 am      February 5, 2004_      forms a part of
policy number   _931-88-61_
issued to _DELPHI CORPORATION_

by    _National Union Fire Insurance Company of Pittsburgh, Pa._

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMENDATORY ENDORSEMENT**

**MICHIGAN**

This endorsement modifies insurance provided under the following:

EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY INSURANCE POLICY

This policy is hereby amended as follows:

I.    The following is added to Clause **8.**, **NOTICE/CLAIM REPORTING PROVISIONS**:

Failure to give any notice required to be given by this policy within the time
specified herein shall not invalidate any **Claim** if it can be shown not to have been
reasonably possible to give such notice within the prescribed time and that notice
was given as soon as was reasonably possible.

With respect to all notice/claim reporting requirements of this Clause, notice to any
authorized agent of the **Insurer** within this state, with particulars sufficient to
identify the **Insured**, shall be deemed notice to the **Insurer**.

II.    Clause   **14. OTHER INSURANCE**, is deleted in its entirety and replaced with the
following:

**14.   OTHER INSURANCE**

If other valid and collectible insurance is available to any **Insured** for a loss to
which this policy also applies, then the **Insurer** shall share with all that other
insurance by the following method:

If all of the other insurance permits contribution by equal shares, the
**Insurer** shall follow this method also.  Under this approach, each insurer
contributes equal amounts until it has paid its applicable limit of
insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal
shares, the **Insurer** will contribute by limits.  Under this method, each
insurer's share is based upon the ratio of its applicable limit of insurance
to the total applicable limits of insurance of all insurers.

The **Insurer** shall not be liable under this policy for a greater proportion for a
loss than the applicable **Limit of Liability** stated in the Declarations to the
total applicable limit of liability of all valid and collectible insurance against
such loss.

*END 001*

79191 (1/02)                                             1

MDL-000096

<u>ENDORSEMENT# *1*</u>    (continued)

III.   The following clause is added to the policy:

–   **INSOLVENCY/BANKRUPTCY OF THE INSURED**

The insolvency or bankruptcy of the **Insured** shall not relieve the **Insurer** of its obligations under this policy as long as all policy requirements are met by the **Insured**, its trustee or receiver in bankruptcy.  Should a covered judgment be rendered against an insolvent or bankrupt **Insured**, the **Insurer** shall be liable for the amount of such judgment, (subject to the policy terms, conditions and exclusions) not be exceed the applicable **Limit of Liability** stated in the Declarations.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS SHALL REMAIN UNCHANGED.**

_____
AUTHORIZED REPRESENTATIVE

*END 001*

MDL-000097

### ENDORSEMENT# 2

This endorsement, effective *12:01 am*      *February 5, 2004*      forms a part of
policy number  *931-88-61*
issued to *DELPHI CORPORATION*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### MICHIGAN
### AMENDATORY ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" shall mean the insurance company which issued this policy; and 2) "First Named Insured" shall mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page.

It is hereby agreed and understood that the cancellation condition is deleted and replaced by the following:

1. This policy may be cancelled at any time at the request of the First Named Insured, in which case the Insurer shall, refund the excess of paid premium or assessment above the pro rata rates for the expired time.

2. This policy may be cancelled at any time by the Insurer by mailing to the First Named Insured at the First Named Insured's address last known of the Insurer or an authorized agent of the Insurer, with postage fully prepaid, a not less than ten (10) days' written notice of cancellation with or without tender of the excess of paid premium or assessment above the pro rata premium for the expired time. The excess, if not tendered, shall be refunded on demand.

3. The minimum earned premium on any policy cancelled hereunder shall not be less than the pro rata premium for the expired time or $25.00, whichever is greater.

All other terms and conditions remain unchanged.

_____
AUTHORIZED REPRESENTATIVE

**END 002**

52149 (3/93)

MDL-000098

<u>ENDORSEMENT# *3*</u>

This endorsement, effective *12:01 am     February 5, 2004*      forms a part of
policy number  *931-88-61*
issued to *DELPHI CORPORATION*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### 3/01 EMPLOYEE BENEFIT PLAN FIDUCIARY LIABILITY AMENDATORY

In consideration of the premium charged, it is hereby understood and agreed that the
policy (and any endorsement amending the policy) is hereby amended as follows:

Clause 3. DEFINITIONS

1.    The definition of **"Employee Benefit Law"** is deleted in its entirety and
replaced with the following:

   **"Employee Benefit Law"** means:

   (1)   **ERISA** or any similar common or statutory law of the United States,
   Canada or any state or other jurisdiction anywhere in the world to which
   a **Plan** is subject.

   (2)   Solely with respect to paragraph (2) of the definition of **Wrongful Act**,
   **Employee Benefit Law** shall also include Part 164 of the regulations
   under the Health Insurance Portability and Accountability Act of 1996
   (hereinafter **"HIPAA Privacy Regulations"**), unemployment insurance,
   Social Security, government-mandated disability benefits or similar law.

   (3)   In no event shall **Employee Benefit Law**, other than as set forth in
   paragraph (2) of this definition of **Employee Benefit Law**, include any law
   concerning worker's compensation, unemployment insurance, Social
   Security, government-mandated disability benefits or similar law.

2.    The definition of **"ERISA"** is deleted in its entirety and replaced with the
following:

   **"ERISA"** means the Employee Retirement Income Security Act of 1974
   (including, but not limited to, amendments relating to the Consolidated
   Omnibus Budget Reconciliation Act of 1985, Health Insurance Portability and
   Accountability Act of 1996 as it relates to Sections 102(b) and 104(b)(1) of
   **ERISA**, the Newborns' and Mothers' Health Protection Act of 1996, the Mental
   Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of
   1998), and including any amendment or revision thereto.

3.    The definition of **"ESOP"** is deleted in its entirety and replaced with the
following:

   **"ESOP"** means any employee stock ownership plan as defined in **ERISA**, or any
   other **Plan** under which investments are made primarily in securities of or
   issued by (i) the **Sponsor Organization**, (ii) the parent of the **Sponsor
   Organization**, (iii) any acquired **Subsidiary**, or (iv) any parent of any acquired
   **Subsidiary**, or whose assets at any time within twelve months prior to the
   inception date of this policy were comprised of 10% or more of securities of
   the **Sponsor Organization**, the parent of the **Sponsor Organization**, any
   acquired **Subsidiary**, or any parent of any acquired **Subsidiary**.

*END 003*

MDL-000099

ENDORSEMENT# *3*    (continued)

4.  The definition of "**Plan**" is amended by deleting paragraphs (2) and (4) in their entirety and replacing *them* with the following:

    (2)  if such **Plan** was sold, spun-off or terminated prior to the inception date of this policy the **Named Sponsor** shall provide written notice of such sale, spin-off or termination to the **Insurer** prior to the inception date of this policy and pay any required premium relating to such Plan, unless such sale, spin-off or termination had already been reported to the **Insurer** under a policy issued by the **Insurer** of which this policy is a continuous renewal;

    (4)  if such **Plan** is an **ESOP** or stock option plan, the **Named Sponsor** shall provide written notice of such **Plan** to the **Insurer** and such **Plan** is added to the Definition of **Plan** by specific written endorsement attached to this policy; or

5.  The definition of "**Wrongful Act**" is deleted in its entirety and replaced with the following:

    (1)  as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, but only with respect to a **Plan**; and

    (2)  as respects an **Administrator**, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:
         (i)   counseling employees, participants and beneficiaries; or
         (ii)  providing interpretations; or
         (iii) handling of records; or
         (iv)  activities effecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**,
         or any matter claimed against an **Insured** solely by reason of his, her or its status as an **Administrator**, but only with respect to a **Plan**;

    (3)  as respects a **Natural Person Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Sponsor Organization** and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than a **Natural Person Insured**.

Clause 12. ORGANIZATIONAL CHANGES is amended by deleting paragraph (b) in its entirety and replacing it with the following:

    (b)  *Other Organizational Changes:* In all events, coverage as is afforded under this policy with respect to a **Claim** made against any **Sponsor Organization** and/or any **Insured** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time such **Sponsor Organization** became a **Sponsor Organization** and such **Insured** became an **Insured**, and

*END 003*

MDL-000100

ENDORSEMENT# *3*    (continued)

prior to the effective time that such **Sponsor Organization** ceases to be a **Sponsor Organization** or such **Insured** ceases to be an **Insured**.

With regard to any **Plan** that was sold, spun-off or terminated either prior to the inception date of this policy or during the **Policy Period**, this policy shall apply but solely with respect to a **Wrongful Act(s)** that occurred prior to the date of such sale or spin-off, or prior to the date that the **Sponsor Organization** or **Natural Person Insured** ceases to be a **Fiduciary** or **Administrator** of, a sold or spun-off **Plan**, or in the case of a terminated **Plan**, prior to the final date of asset distribution of such **Plan**, provided that in the event of a sale, spin-off or termination prior to the inception of this **Policy Period**, notice of such sale, spin-off or termination is provided to the Insurer *prior to the inception of this Policy Period* and any required premium is paid, or, in the event of a sale, spin-off termination during the Policy Period, notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**.

The following clause shall be added to the policy:

20.   **ORDER OF PAYMENTS**

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this policy, then the **Insurer** shall in all events:

(a)   first, pay **Loss** for which coverage is provided under this policy for any **Natural Person Insured** and any covered **Plan** under this policy; and

(b)   then, only after payment of **Loss** has been made pursuant to Clause 20(a) above, with respect to whatever remaining amount of the **Limit of Liability** is available after such payment, shall payment for the **Sponsor Organization** be made for such other **Loss** for which coverage is provided under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 003*

MDL-000101

### ENDORSEMENT# 4

This endorsement, effective *12:01 am*      *February 5, 2004*      forms a part of
policy number *931-88-61*
issued to    *DELPHI CORPORATION*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### RETENTIONS APPLY TO ALL LOSS
### OTHER THAN NON-INDEMNIFIABLE AND VOLUNTARY COMPLIANCE

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

1.    Item 4 of the Declarations is deleted in its entirety and replaced with the following:

| 4 | RETENTION: | (a) | |
|---|---|---|---|
| | | (i)  non- **Indemnifiable Loss**<br>of a **Natural Person Insured:** | None |
| | | (ii) **Voluntary Compliance Loss:** | None |
| | | (iii) Judgments, Settlements and<br>**Defense Costs** for **Sponsor**<br>**Organization**, **Plan** or **Natural**<br>**Person Insured** for **Indemnifiable**<br>**Loss** (other than **Indemnifiable Loss**<br>described in Item **4(b)** below: | $ 2,500,000<br>(for all **Loss** arising<br>from **Claims** alleging<br>the same **Wrongful**<br>**Act**   or   related<br>**Wrongful Acts**) |
| | | (b) **Sponsor Organization**, **Plan**, or<br>**Natural Person Insured** for **Indemnifiable Loss:** $5,000,000<br>For all **Loss** in connection with any **Claim(s)** made against any<br>**Insured**, including but not limited to any derivative or<br>representative class action, arising out of, based upon,<br>attributable to or in any way related to any securities of the<br>**Sponsor Organization** or any affiliate thereof. | |

2.    The Clause of the policy entitled RETENTION CLAUSE is deleted in its entirety and
replaced with the following:

### RETENTION CLAUSE

The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is
in excess of the Retention amount stated in Item 4 of the Declarations, such
Retention amount to be borne by the **Insured** and shall remain uninsured, with
regard to all **Loss** other than: (1) non- **Indemnifiable Loss** of a **Natural Person Insured**;
and (2) **Voluntary Compliance Loss**.  A single Retention amount shall apply to **Loss**

*END 4*

MDL-000102

<u>**ENDORSEMENT# *4***</u>    **(Continued)**

This endorsement, effective *12:01 am*    *February 5, 2004*    forms a part of
policy number *931-88-61*
issued to  *DELPHI CORPORATION*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

Subject to the above paragraph, the Retention amounts stated in Item 4 of the
Declarations as amended by this endorsement shall apply. In the event a Claim
triggers more than one amount stated in Item 4 of the Declarations as amended by
this endorsement, only the highest such amount shall apply, which amount shall
apply to all Loss under such Claim.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 4*

**MDL-000103**

**ENDORSEMENT# 5**

This endorsement, effective *12:01 am     February 5, 2004*     forms a part of
policy number  *931-88-61*
issued to   *DELPHI CORPORATION*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

**DEFINITION OF PLAN AMENDED**

In consideration of the premium charged, it is hereby understood and agreed that
notwithstanding any other provision of this policy (including any endorsement attached
hereto whether such endorsement precedes or follows this endorsement in time or
sequence), Clause 3 DEFINITION of "Plan", paragraph 5 is deleted in its entirety and
replaced with the following:

(5)     if such **Plan** is a **Pension Plan** (other than an **ESOP**, or stock option plan) and:

(a)     is acquired during the **Policy Period** as a result of the **Sponsor
Organization's** acquisition of a **Subsidiary** whose assets total more
than 10% of the total consolidated assets of the **Sponsor
Organization** as of the inception date of this policy; or

(b)     is acquired during the **Policy Period** and such **Plan's** assets total more
than 10% of the total consolidated assets of all covered **Pension
Plans** as of the inception date of this policy,

then, this policy shall apply to such **Plan** (but solely with respect to a
**Wrongful Act(s)** occurring after the date of such acquisition), but only upon
the condition that within 90 days of its acquisition, the **Named Sponsor** shall
have provided the **Insurer** with a completed application for such new **Plan**
and agreed to any additional premium or amendment of the provisions of the
policy required by the **Insurer** relating to such new **Plan**. The 90 day
reporting condition shall not apply if such new **Plan** does not constitute one
of the five largest **Pension Plans** of the **Sponsor Organization** and the failure
to report such **Plan** within the 90 day reporting period was due to
inadvertent omission by the **Named Sponsor** and upon discovery of such
**Plan**, the **Named Sponsor** shall notify the **Insurer** as soon as practicable,
provide any information required by the **Insurer** relating to such **Plan** and pay
any premium required by the **Insurer** relating to such **Plan**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

<u>AUTHORIZED REPRESENTATIVE</u>

END 5

**MDL-000104**

## ENDORSEMENT# 6

This endorsement, effective *12:01 am*      *February 5, 2004*      forms a part of
policy number  *931-88-61*
issued to  *DELPHI CORPORATION*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### TIE-IN OF LIMITS ENDORSEMENTS

In consideration of the premium charged, it is hereby understood and agreed that the combined **Limit of Liability** of the **Insurer** for all **Claims** both under this **policy's Limit of Liability**, as set forth in the Declarations of this policy, and also under policy No. **931-88-56** issued to Delphi Corporation, by _National Union (or any renewal or replacement of such policy or which succeeds such policy in time) (" **Other AIG Policy**"), shall be $25,000,000.

Accordingly, the **Limit of Liability** for **Loss** under this policy shall be reduced by **Loss** incurred under the **Other AIG Policy** because the **Limit of Liability** under the **Other AIG Policy** is now part of and not in addition to the **Limit of Liability** of this policy as set forth in the Declarations of this policy.

Finally, nothing in this endorsement shall be construed to increase the **Insurer's Limit of Liability** set forth in the Declarations page of such **Other AIG Policy** which shall remain the maximum liability of the **Insurer** for all **Claims** under such **Other AIG Policy**, or the **Insurer's Limit of Liability** under this policy as set forth in the Declarations of this policy which shall remain the maximum liability of the **Insurer** for all **Claims** combined under this policy.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

*END 6*

_____
AUTHORIZED REPRESENTATIVE

**MDL-000105**

**ENDORSEMENT# 7**

This endorsement, effective *12:01 am*     *February 5, 2004*     forms a part of
policy number   *931-88-61*
issued to *DELPHI CORPORATION*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SUBLIMIT OF LIABILITY FOR VOLUNTARY COMPLIANCE LOSS

In consideration of the premium charged, it is hereby understood and agreed that the **Sublimit of Liability** for all **Voluntary Compliance Loss** in the aggregate, including **Defense Expenses**, is *$150,000*     .

This **Sublimit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** set forth in Item 3(a) of the Declarations and in no way shall serve to increase such **Policy Aggregate Limit of Liability**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 007*

78642 (8/01)

**MDL-000106**

<u>ENDORSEMENT# 8</u>

**This endorsement, effective 12:01 AM** *February 5, 2004*   **forms a part of
policy number** *931-88-61*
**issued to** **DELPHI CORPORATION**

by       *National Union Fire Insurance Company of Pittsburgh, PA*

**CANCELLATION PROVISIONS CLARIFIED**

In consideration of the premium charged, it is hereby understood and agreed that
Clause **11. CANCELLATION CLAUSE** is deleted in its entirety and is replaced by the
following:

**11. CANCELLATION CLAUSE**

This policy may be canceled by the **Named Entity** at any time only by mailing
written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or
its authorized agent. This policy may only be canceled by or on behalf of the
**Insurer** in the event of non-payment of premium by the **Named Entity**. In the
event of non-payment of premium by the **Named Entity**, the **Insurer** may cancel
this policy by delivering to the **Named Entity** or by mailing to the **Named Entity**,
by registered, certified, or other first class mail, at the **Named Entity's** address
as shown in Item 1(a) of the Declarations, written notice stating when, not less
than 15 days thereafter, the cancellation shall be effective.  The mailing of
such notice as aforesaid shall be sufficient proof of notice. The **Policy Period**
terminates at the date and hour specified in such notice, or at the date and
time of surrender. The **Insurer** shall have the right to the premium amount for
the portion of the **Policy Period** during which the policy was in effect.

If this policy shall be canceled by the **Named Entity**, the **Insurer** shall retain the
customary short rate proportion of the premium herein. If the period of
limitation relating to the giving of notice as set forth in this Clause 11 is also
set forth in any law controlling the construction thereof, then such period shall
be deemed to be amended so as to be equal to the minimum period of
limitation set forth in the controlling law.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

**MDL-000107**

**ENDORSEMENT# *9***

This endorsement, effective *12:01 am    February 5, 2004*    forms a part of
policy number *931-88-61*
issued to  *DELPHI CORPORATION*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## ADDITION TO THE TERM EXECUTIVE

In consideration of the premium charged, it is hereby understood and agreed that the term
" **Executive**" is amended to include the individual(s) listed below, but solely for **Wrongful
Acts** committed in his or her respective capacity(ies) described below.

CAPACITY

EXECUTIVE DIRECTOR OF EMPLOYEE BENEFITS
EXECUTIVE DIRECTOR OF INDUSTRIAL RELATIONS

Furthermore, provided that for the purpose of the applicability of the coverage provided by
this endorsement, the **Sponsor Organization** will be conclusively deemed to have
indemnified the individuals afforded coverage by this endorsement to the extent that the
**Sponsor Organization** is permitted or required to indemnify such persons pursuant to law
(common or statutory) or contract or the charter, bylaws, operating agreement or similar
documents of an **Sponsor Organization** (which are hereby deemed to adopt the broadest
provision of the law which determines, or defines such rights of indemnity). The **Sponsor
Organization** hereby agrees to indemnify such persons to the fullest extent permitted by
law, including the making in good faith of any required application for court approval and
the passing of any required corporate resolution or the execution of any contract.

It is further understood and agreed that only as respects any additional coverage granted
by virtue of this endorsement, the **Insurer** shall not be liable for any **Loss** in connection
with any **Claim** made against an **Insured** alleging any **Wrongful Act** occurring prior to each
individual's respective **Continuity Date** if an **Insured** knew or could have reasonably
foreseen that such **Wrongful Act** could lead to a **Claim** under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

END 9

**MDL-000108**

## ENDORSEMENT #10

This endorsement, effective   *12:01 am   February 5, 2004*        forms a part of
policy number:   *931-88-61*
issued to:   *DELPHI CORPORATION*

by:     National Union Fire Insurance Company of Pittsburgh, Pa.

### CLAUSE 2(c) (DEFENSE AGREEMENT, GENERAL PROVISIONS) AMENDED
### (Disposal of Claims Within Retention)

In consideration of the premium charged, it is hereby understood and agreed that
Clause 2(c), Defense Agreement, General Provisions, shall be amended by adding
the following paragraph after the second paragraph therein:


Notwithstanding any of the foregoing, if all **Insured** defendants are able to
dispose of all **Claims** which are subject to one retention amount (inclusive of
**Defense Costs**) for an amount not exceeding any applicable retention amount,
then the **Insurer's** consent shall not be required for such disposition.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

### END 10

MDL-000109

### ENDORSEMENT# *11*

This endorsement, effective *12:01 am      February 5, 2004*      forms a part of
policy number  *931-88-61*
issued to   *DELPHI CORPORATION*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SEVERABILITY OF THE APPLICATION ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that the
following Clause is added to the policy at the end thereof:

**SEVERABILITY**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon
the statements, warranties and representations contained in the application for this
policy (including materials submitted thereto and, if this is a renewal application, all
such previous policy applications for which this policy is a renewal) as being
accurate and complete. All such statements, warranties and representations are
the basis for this policy and are material to the risk assumed by the **Insurer**, and are
to be considered as incorporated into this policy.

The **Insureds** agree that in the event that the particulars and statements contained
in the application are not accurate and complete, then this Policy shall be void as to
any **Insured** who knew as of the inception date of the **Policy Period** of the facts that
were not accurately and completely disclosed in the application (whether or not
such **Insured** knew that such facts were not accurately and completely disclosed in
the application) and as to any **Insured** to whom such knowledge is imputed.

For purposes of determining whether knowledge shall be imputed to an **Insured**,
knowledge possessed by the person or persons who executed the application shall
be imputed to all **Insureds**.

Notwithstanding the foregoing, this policy shall provide coverage, subject to the
policy's terms, conditions and exclusions, for any non- **Indemnifiable Loss** of any
**Natural Person Insured** to whom knowledge is imputed pursuant to the preceeding
subparagraph above, provided that such **Natural Person Insured** did not have
knowledge of the facts that were not accurately and completely disclosed.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

END 11

**MDL-000110**

### ENDORSEMENT# *12*

This endorsement, effective *12:01 am*    *February 5, 2004*    forms a part of
policy number  *931-88-61*
issued to  *DELPHI CORPORATION*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### FINAL DETERMINATION WORDING

In consideration of the premium charged, it is hereby understood and agreed that Clause 5.
EXCLUSIONS, is amended by deleting Exclusions (a) and (b) in their entirety and replacing
them with the following:

(a)    arising out of, based upon or attributable to the gaining of any profit or
advantage if a judgment or final adjudication or an alternative dispute
resolution proceeding adverse to the **Insured(s)** establishes that the
**Insured(s)** was not legally entitled to such profit or advantage;

(b)    arising out of, based upon or attributable to the committing of any criminal or
deliberate fraudulent act, or any knowing or willful violation of any statute,
rule or law, including, but not limited to **Employee Benefit Law**, if a judgment
or final adjudication or an alternative dispute resolution proceeding adverse
to the **Insured(s)** establishes such criminal or deliberate fraudulent act, or any
knowing or willful violation of any statute, rule or law, including, but not
limited to **Employee Benefit Law**;


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

END 12

**MDL-000111**

ENDORSEMENT# *13*

This endorsement, effective *12:01 am*      *February 5, 2004*      forms a part of
policy number   *931-88-61*
issued to   *DELPHI CORPORATION*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PUNITIVE, EXEMPLARY OR MULTIPLE DAMAGES
### LAW MOST FAVORABLE

In consideration of the premium charged, it is hereby understood and agreed that the
second paragraph of the Definition of "**Loss**" is deleted in its entirety and replaced with the
following:

> **Loss** shall include punitive, exemplary or multiple damages imposed upon any
> **Insured** (subject to the policy's other terms, conditions and exclusions, including but
> not limited to exclusions relating to profit, deliberate fraud or criminal acts and
> knowing or willful violation of any statute, rule or law, including but not limited to
> **Employee Benefit Law**).
>
> It is further understood and agreed that the enforceability of this endorsement shall
> be governed by such applicable law which most favors coverage for punitive
> damages.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

END 13

**MDL-000112**

**ENDORSEMENT# *14***

This endorsement, effective *12:01 am*        *February 5, 2004*        forms a part of
policy number    *931-88-61*
issued to *DELPHI CORPORATION*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**TERRORISM EXCLUSION ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that this insurance does not apply to any loss, injury, damage, claim or suit, arising directly or indirectly as a result of a certified "act of terrorism" defined by Section 102. Definitions., of the Terrorism Risk Insurance Act of 2002 and any revisions or amendments.

Wherever used in this endorsement: 1) **"Insurer"** means the insurance company which issued this policy; and 2) **"Insured"** means the Named Employer, Named Corporation, Named Sponsor, Named Organization, Named Entity, Named Insured or Insured stated in Item 1. of the Declarations.

For purposes of this endorsement and in compliance with the Terrorism Risk Insurance Act of 2002, an "act of terrorism" shall mean:

(1)    Act of Terrorism –

    (A)    Certification. – The term "act of terrorism" means any act that is certified by the Secretary of the Treasury of the United States of America, in concurrence with the Secretary of State, and the Attorney General of the United States of America --

        (i)    to be an act of terrorism;

        (ii)    to be a violent act or an act that is dangerous to --

            (I)    human life;

            (II)    property; or

            (III)    infrastructure;

        (iii)    to have resulted in damage within the United States of America, or outside of the United States of America in the case of --

            (I)    an air carrier or vessel described in paragraph (5)(B); [for the convenience of this endorsement, paragraph (5)(B) reads: occurs to an air carrier (as defined in Section 40102 of title 49, United States Code) to a United States flag vessel (or a vessel based principally in the United States of America, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States of America), regardless of where the loss occurs, or at the premises of any United States of America mission]; or

            (II)    the premises of a United States of America mission; and

        (iv)    to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States of America or to influence the policy or affect the conduct of the United States Government by coercion.

*END 014*

**MDL-000113**

## ENDORSEMENT# *14*   (continued)

(B)   Limitation. -- No act shall be certified by the Secretary as an act of terrorism if --
    (i)    the act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
    (ii)   property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000.

(C)   Determinations Final. – Any certification of, or determination not to certify, an act as an act of terrorism under this paragraph shall be final, and shall not be subject to judicial review.

(D)   Nondelegation. – The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred.

For the purposes of this endorsement, the Insured: 1) acknowledges that it has received a Policyholder Disclosure Statement Under Terrorism Risk Insurance Act of 2002; 2) has elected not to purchase insurance coverage for losses arising out of an Act of Terrorism; 3) has not paid any premium for such coverage; and 4) has affirmatively authorized the Insurer to attach this exclusion.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 014*

MDL-000114

## ENDORSEMENT# *15*

This endorsement, effective *12:01 am*      *February 5, 2004*        forms a part of
policy number   *931-88-61*
issued to    *DELPHI CORPORATION*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DISCOVERY CLAUSE AMENDED

In consideration of the premium charged, it is hereby understood and agreed that the first paragraph of Clause 10, DISCOVERY, is deleted in its entirety and replaced by the following:

(1)     Except as indicated below, if the Insurer or the Named Sponsor shall cancel or refuse to renew this policy, the Named Sponsor shall have the right to one year following the effective date of such nonrenewal (the " **Discovery Period**"), upon payment of an additional premium of <u>200%</u> of the "full annual premium", or in the event the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, the **Named Entity** shall have the right to a **Discovery Period** of two or three years following the effective date of such cancellation or nonrenewal, upon payment of an additional premium amount as shall be determined by the **Insurer** in its sole and absolute discretion, in which to give to the Insurer written notice of Claims first made against the Insureds during said <u>one year</u> period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

END 15

**MDL-000115**

## NOTICE TO MICHIGAN INSUREDS

**MICHIGAN DISCLAIMER**
**Michigan Senate Bill 1213**
**Exempt Commercial Policyholder**

This following notice is being provided in compliance with Michigan Law:

**This policy is exempt from the filing requirements of section 2236 of the insurance code of 1956, 1956 PA 218, MCL 500.2236.**