UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
   In re                                :      Chapter 11
: 
DELPHI CORPORATION, et al.,      :      Case No. 05-44481 (RDD)
: 
                     Debtors.  :      (Jointly Administered)
: 
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328
AUTHORIZING EMPLOYMENT AND RETENTION OF
W.Y. CAMPBELL & COMPANY AS FINANCIAL ADVISOR AND
INVESTMENT BANKER TO DEBTORS NUNC PRO TUNC TO SEPTEMBER 1, 2006

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or the "Company"), hereby submit this application (the "Application") for entry of an order under 11 U.S.C. §§ 327(a) and 328 (a) authorizing the employment and retention of W.Y. Campbell & Company ("Campbell") as financial advisor and investment banker to the Debtors, effective as of September 1, 2006. In support of this Application, the Debtors submit the Declaration And Statement Of Andre A. Augier, a Managing Director at

---

[1] In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

Campbell (the "Augier Declaration"), sworn to on October 31, 2006. In further support of this Application, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 327(a) and 328 of the Bankruptcy Code.

B.    Current Business Operations Of The Debtors

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2005 had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion. At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest

2

public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

   6.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

   7.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.  Events Leading To The Chapter 11 Filing

   8.  In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.

3

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

9. The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D. The Debtors' Transformation Plan

11. On March 31, 2006, the Company outlined the key tenets of its transformation plan. The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007. To complete their restructuring process, the Debtors must focus on five key areas. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

4

commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint. Finally, the Debtors must devise a workable solution to their current pension situation.

12. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

13. By this Application, the Debtors seek to employ and retain Campbell as financial advisor and investment banker with regard to the particular matters as further described herein, effective as of September 1, 2006. Accordingly, the Debtors respectfully request the entry of an order under sections 327(a) and 328 of the Bankruptcy Code authorizing the employment and retention of Campbell as financial advisor and investment banker pursuant to that certain letter agreement (the "Engagement Letter")[2] attached to the Augier Declaration as Exhibit 1.

---

[2] Capitalized terms used but not defined herein have the meanings assigned to them in the Engagement Letter.

5

Qualifications Of Campbell

14.     Campbell is one of North America's premier specialty investment banking firms. Its activities include helping corporations and individuals sell and acquire businesses, private capital raising, restructuring, and financial advisory services.

15.     Since commencing operations in 1988, Campbell has completed assignments in virtually every business segment including manufacturing, distribution, services, retail, and technology, and has provided financial advisory services on almost every type of transaction including large public company divestitures, the sale of public and private companies, joint ventures, the structuring and financing of management buyouts, complicated restructurings and recapitalizations, and private placements. Since its inception, Campbell has completed numerous transactions in a host of industry segments, with particular experience in automotive related transactions. Campbell has concluded transactions across North America, Europe, and Asia.

16.     Campbell is aware that the Debtors have submitted applications relating to the proposed retention and employment of additional investment banking and financial advisory professionals in connection with these chapter 11 cases. The services to be provided by Campbell under the Engagement Letter are limited to the matters set forth therein and the Debtors and Campbell will make every effort to avoid duplicating the work performed by such other professionals retained by the Debtors.

Services To Be Rendered

17.     As set forth in the Engagement Letter, the Debtors have engaged Campbell to provide the following services in connection with the formulation, analysis, negotiation, and implementation of the divestiture or other strategic alternatives relating to the

6

Debtors' Mount Business, whether pursuant to an M&A Transaction, any series or combination of transactions, or otherwise:

    (a)    to the extent deemed desirable by the Debtors, identify, review, evaluate and initiate potential M&A Transactions or other transactions;

    (b)    to the extent Campbell deems necessary, appropriate, and feasible, or as the Debtors may request, review and analyze the assets and the operating and financial strategies of the Mount Business;

    (c)    assist in the definition of objectives related to value and terms of divestiture;

    (d)    assist in identification of the Mount Business' proprietary attributes;

    (e)    assist in the identification and solicitation of appropriate transaction parties;

    (f)    prepare and distribute confidentiality agreements and appropriate descriptive selling materials (to include Offering Memorandums, Management Presentations, and other documentation as may be required or appropriate);

    (g)    the initiation of discussions and negotiations with prospective transaction parties;

    (h)    assist the Debtors and their other professionals in reviewing and evaluating the terms of any proposed M&A Transaction or other transaction, in responding thereto and, if directed, in developing and evaluating alternative proposals for an M&A Transaction or other transaction, whether in connection with a Plan or otherwise;

    (i)    review and analyze any proposals the Debtors receive from third parties in connection with an M&A Transaction or other transaction;

    (j)    assist or participate in negotiations with the parties-in-interest in connection with an M&A Transaction or other transaction;

    (k)    advise and attend meetings of the Debtors' Board of Directors, creditor groups, official constituencies, and other interested parties, as the Debtors determine to be necessary or desirable;

    (l)    if requested, participate in hearings before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") or such district or other bankruptcy courts as

        the Debtors may request and provide relevant testimony with respect to the matters described herein and issues arising with respect thereto in connection with any proposed Plan;

(m)    assist the Debtors' internal and external counsel to enable such counsel to provide legal advice to the Debtors, as contemplated under the Engagement Letter; and

(n)    render such other financial advisory and investment banking services as may be reasonably requested by the Debtors in connection with any of the foregoing.

Disinterestedness Of Professionals

18.    To the best of the Debtors' knowledge, information, and belief, Campbell has no connection with, and holds no interests adverse to, the Debtors, their creditors, or any other party-in-interest, or their respective attorneys or accountants, in the matters for which Campbell is proposed to be retained, except as disclosed in the Augier Declaration.

19.    To the best of the Debtors' knowledge, Campbell is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code, and as required under section 327(a) of the Bankruptcy Code.  The Augier Declaration, executed on behalf of Campbell in accordance with section 327(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), is filed contemporaneously herewith and incorporated herein by reference.  The Debtors' knowledge, information, and belief regarding the matters set forth in this Application are based on, and made in reliance upon, the Augier Declaration.

20.    The Debtors submit that the employment of Campbell on the terms and conditions set forth herein is in the best interest of the Debtors, their creditors, and all parties-in-interest.

8

Professional Compensation

21.     The Debtors respectfully refer interested parties to the Engagement Letter for a full recitation of the proposed terms of Campbell's compensation.  In summary, if this Application is approved, as compensation for the services rendered under the Engagement Letter, Campbell will be entitled to receive the following fees in cash:

(a)     Commencing as of the effective date of the Engagement Letter, and whether or not an M&A Transaction is proposed or consummated, a cash advisory fee (the "Monthly Fee") of $50,000 per month payable by the Company in advance on the date of the Engagement Letter and on the first day of each subsequent month, which in the aggregate shall not under any circumstance be less than $600,000.

(b)     A fee (the "M&A Fee") equal to the greater of (i) product of (A) the Aggregate Consideration as defined in the Engagement Letter, times (B) 1.75%, or (ii) $1,250,000, which shall be due and payable in cash upon the closing of such M&A Transaction.

(c)     To the extent that services of the type described in Paragraph 17(l) hereof are requested, representatives of Campbell shall be paid $750 per hour for all time spent preparing for, attending, or testifying at such hearings.

(d)     To the extent the Debtors request Campbell to perform additional services not contemplated by the Engagement Letter, such additional fees as shall be mutually agreed upon by Campbell and the Debtors, in writing, in advance.

(e)     Campbell shall credit against the M & A Fee 100% of the aggregate Monthly Fees (the "Monthly Fee Credit").

(f)     Without in any way reducing or affecting the Monthly Fees, the M&A Fee, or any provisions of Exhibit B to the Engagement Letter, the Debtors shall reimburse Campbell for its reasonable expenses incurred in connection with the performance of its engagement, and the enforcement of the Engagement Letter, including without limitation, the reasonable fees, disbursements, and other charges of Campbell's counsel.  Reasonable expenses shall also include, but not be limited to, expenses incurred in connection with travel and lodging, data processing and communication charges, data base, research, postage, and courier services. Consistent with and subject to final approval by the

9

        Bankruptcy Court, the Debtors shall promptly reimburse Campbell for such expenses upon presentation of an invoice or other similar documentation with reasonable detail. Expense reimbursement shall be made in accordance with the Debtors' expense reimbursement guidelines, as set forth in the Engagement Letter.

22.    The Debtors and Campbell acknowledge and agree that (a) the hours worked, (b) the results achieved, and (c) the ultimate benefit to the Debtors of the work performed, in each case, in connection with Campbell's engagement, may be variable, and the Debtors and Campbell have taken such factors into account in setting the fees under the Engagement Letter; provided, however, that with respect to the hours worked, Campbell shall devote whatever resources as are required to fulfill the purposes of its engagement on a timely basis.

23.    In the event that this Court approves the retention of Campbell by the Debtors, (a) Campbell's fees and expenses shall be subject to (i) the jurisdiction and approval of this Court under section 328(a) of the Bankruptcy Code and any order entered by this Court with regard to Campbell's retention, (ii) any applicable fee and expense guideline orders, and (iii) any requirements governing interim and final fee applications, and (b) the Debtors shall pay all fees and expenses of Campbell under the Engagement Letter as promptly as practicable in accordance with the terms thereof and the orders of this Court governing interim and final fee applications, and after obtaining all necessary further approvals from this Court, if any.

Basis For Relief

A.    Campbell Meets Bankruptcy Code Requirements For Retention

24.    Section 327(a) of the Bankruptcy Code provides that a debtor-in-possession may, with the court's approval, employ professionals that do not hold or represent an interest adverse to the estate and that are "disinterested persons," as defined by section 101(14) of the Bankruptcy Code, to represent or assist the debtor-in-possession in carrying out its duties

10

under the Bankruptcy Code. <u>See</u> 11 U.S.C. §§ 101(14) & 327(a); <u>see also</u> <u>In re Granite Partners, L.P.</u>, 219 B.R. 22, 32 (Bankr. S.D.N.Y. 1998). Further, section 1107(b) of the Bankruptcy Code provides that a person is not disqualified for employment by a chapter 11 debtor-in-possession under section 327(a) of the Bankruptcy Code solely because of such person's employment by or representation of the debtor before the commencement of the case. <u>See</u> 11 U.S.C. § 1107(b).

25. As stated above, the Debtors believe that Campbell does not hold or represent an interest adverse to the Debtors' estates and is a "disinterested person" under the Bankruptcy Code. The Debtors submit that Campbell, therefore, is eligible to be employed by the Debtors in connection with these chapter 11 cases.

B.   <u>The Proposed Terms Of Retention Are Reasonable</u>

26. Section 328(a) of the Bankruptcy Code provides, in relevant part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis." 11 U.S.C. § 328(a).

27. Congress intended section 328(a) to enable debtors to retain professionals pursuant to specific fee arrangements to be determined at the time of the court's approval of the retention, subject to reversal only if the terms are found to be improvident in light of "developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a). <u>See also</u> <u>Donaldson, Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co.</u>, 123 F.3d 861, 862-63 (5th Cir. 1997) ("[I]f the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment.").

28. The Debtors believe that the fee structure and other terms and conditions in the Engagement Letter, including the indemnification provision, are reasonable terms and

11

conditions of employment and should be approved under section 328(a) of the Bankruptcy Code. The fee structure appropriately reflects the nature of the services to be provided by Campbell and the fee structures typically utilized by Campbell and other leading financial advisory and investment banking firms. In particular, the Debtors believe that the proposed fee structure creates a proper balance between fixed monthly fees and contingency fees based on a successful restructuring.

29.  The Debtors submit that the terms and conditions of Campbell's employment in these chapter 11 cases are reasonable in light of (a) industry practice, (b) market rates charged for comparable services both in and out of the chapter 11 context, and (c) Campbell's substantial investment banking and financial advisory experience. The Debtors believe that Campbell is qualified to act as financial advisor and investment banker for the Debtors, that the terms and conditions of Campbell's retention and employment are reasonable and, therefore, should be authorized and approved by this Court.

30.  As set forth in the Augier Declaration, Campbell intends to apply to this Court for allowance of compensation and reimbursement of expenses in accordance with the procedures set forth in the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), as those procedures may be modified or supplemented by order of this Court. Consistent with its ordinary practice and the practice of financial advisors in other chapter 11 cases whose fee arrangements are typically not hours-based, Campbell does not ordinarily maintain contemporaneous time records in one-tenth hour increments or provide or conform to a schedule of hourly rates for its professionals. The Debtors

therefore request that Campbell be excused from compliance with such requirements and that it be required only to maintain such time records in one-half-hour increments.

Indemnification

31.     As more fully described in the Engagement Letter, and pursuant to the terms of the proposed Order approving Campbell's retention, if the Application is granted, the Debtors will indemnify and hold Campbell harmless against liabilities arising out of or in connection with its retention by the Debtors except for any such liability for losses, claims, damages, or liabilities incurred by the Debtors that are finally judicially determined by a court of competent jurisdiction to have resulted primarily from the gross negligence, willful misconduct or fraud of Campbell, or because of a material breach of a term or condition of the Engagement Letter by Campbell.

32.     The Debtors request that the indemnification provisions contained in the Engagement Letter, including in Exhibit B thereto (the "Indemnification Provisions"), be approved. The Indemnification Provisions may be summarized as follows:

(a)     The Debtors agree to indemnify and hold harmless Campbell and its affiliates, counsel, and other professional advisors, and the respective directors, officers, controlling persons, agents, and employees (collectively, the "Indemnified Parties"), from and against any losses, claims, or proceedings, including without limitation stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards, and any other liabilities, reasonable costs, reasonable fees, and reasonable expenses (collectively, "Losses") (a) directly or indirectly related to or arising out of (i) oral or written information provided by the Debtors, the Debtors' employees or other agents, which either the Debtors or an Indemnified Party provide to any person or entity or (ii) any other action or failure to act by the Debtors, the Debtors' employees or other agents or any Indemnified Party at the Debtors' request or with the Debtors' consent, in each case in connection with, arising out of, based upon, or in any way related to the Engagement Letter, the retention of and services provided by Campbell under the Engagement Letter, or any M&A Transaction or other transaction described in the

13

Engagement Letter; or (b) otherwise directly or indirectly in connection with, arising out of, based upon, or in any way related to the engagement of Campbell under the Engagement Letter or any transaction or conduct in connection therewith, provided that the Debtors shall not be required to indemnify an Indemnified Party for such Losses if and only to the extent that it is finally judicially determined by a court of competent jurisdiction that such Losses arose (x) because of the gross negligence, willful misconduct, or fraud of such Indemnified Party or (y) because of a material breach of a term or condition of the Agreement by such Indemnified Party.

(b) The Debtors shall further reimburse any Indemnified Party promptly after obtaining the necessary approval of the Bankruptcy Court, if any, for any reasonable legal or other fees, disbursements, or expenses as they are incurred (a) in investigating, preparing, or pursuing any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any Indemnified Party is a party, in each case to the extent relating to Losses for which indemnification is available hereunder (each, an "Action") and (b) in connection with enforcing such Indemnified Party's rights under the Agreement; provided, however, that in the event and only to the extent that it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose (x) because of the gross negligence, willful misconduct, or fraud of such Indemnified Party or (y) because of a material breach of a term or condition of the Agreement by such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed under this paragraph.

(c) The Debtors shall have the right to assume the defense of any Action including the employment of counsel reasonably satisfactory to Campbell and will not, without the prior written consent of Campbell (which shall not be unreasonably withheld or delayed), settle, compromise, consent, or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Party is a party thereto) unless such settlement, compromise, consent, or termination (a) contains an express, unconditional release of each Indemnified Party which is a party to the Action from all liability relating to such Action and (b) does not include an admission of fault, culpability, or a failure to act by or on behalf of any Indemnified Party. Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which the Agreement relates, but, subject to certain limitations

14

     contained in the Engagement Letter, the fees and expenses of such counsel shall be at the expense of such Indemnified Party.

(d) The Debtors also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Debtors for or in connection with advice or services rendered or to be rendered by any Indemnified Party pursuant to the Engagement Letter, the transactions contemplated hereby or any Indemnified Party's actions or inactions in connection with any such advice, services, or transactions except for and only to the extent that such Losses of the Debtors are finally judicially determined by a court of competent jurisdiction to have arisen (x) because of the gross negligence, willful misconduct, or fraud of, or (y) because of a material breach of a term or condition of the Engagement Letter by such Indemnified Party in connection with any such advice, actions, inactions, or services.

(e) If any right of any Indemnified Party is finally judicially determined to be unavailable (except by reason of the gross negligence, willful misconduct, or fraud of such Indemnified Party, or because of a material breach of a term or condition of the Engagement Letter by such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated by the Engagement Letter, then the Company shall contribute to such Losses (a) in such proportion as is appropriate to reflect the relative benefits received by the Company and its creditors and stockholders, on the one hand, and such Indemnified Party, on the other hand, and (b) if (and only if) the allocation provided in clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault of the Company and such Indemnified Party. In no event shall the aggregate contribution of all such Indemnified Parties exceed the amount of fees received by Campbell under the Engagement Letter.

    33. The Debtors and Campbell believe that the Indemnification Provisions are customary and reasonable for financial advisory and investment banking engagements, both out-of-court and in chapter 11 cases. See United Artists Theater Co. v. Walton, 315 F.3d 217 (3d Cir. 2003); In re Acterna Corp., Case No. 03-12837 (BRL) (Bankr. S.D.N.Y. June 24, 2003); In re Joan & David Halpern, Inc., 248 B.R. 43 (Bankr. S.D.N.Y. 2000), aff'd, 2000 WL 1800690

15

(S.D.N.Y. 2000); and <u>Bodenstein v. Comdisco, Inc.</u>, 2002 U.S. Dist. LEXIS 17994 (N.D. Ill. 2002).

Notice

34.     With the approval of the Office of the United States Trustee, the Debtors have served notice of the filing of this Application upon requisite parties-in-interest and have provided parties-in-interest with 10 days within which to object to the Application. In the event no such objection is filed and served upon the Debtors within such 10-day period, the Debtors shall thereafter submit to the Court an order granting the relief requested in this Application <u>nunc pro tunc</u> to September 1, 2006, without necessity of a hearing. If an objection is timely filed and served within such 10-day period, a hearing to consider approval of the Application will be held on November 30, 2006 at 10:00 a.m. (Prevailing Eastern Time) before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York, 10004. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

35.     Because the legal points and authorities upon which this Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (i) approving the employment of Campbell as the Debtors' financial advisor and investment banker nunc pro tunc to September 1, 2006 and (ii) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         November 6, 2006

                                            DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-Possession

                                            By:   /s/ John D. Sheehan_____
                                                  Name: John D. Sheehan
                                                  Title:   Vice President and Chief Restructuring Officer