**Hearing Date and Time: November 30, 2006 at 10:00 a.m.**
**Objection Deadline: November 24, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |
|---|---|
| In re | : Chapter 11 |
| DELPHI CORPORATION, et al., | : Case No. 05-44481 (RDD) |
|  | : (Jointly Administered) |
| Debtors. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR. P. 6004
AUTHORIZING DELPHI MEDICAL SYSTEMS TEXAS CORPORATION TO ENTER INTO
AMENDMENT TO MANUFACTURING AGREEMENT TERMINATING
SUPPLY OPERATIONS TO ITS SOLE CUSTOMER

("DELPHI MEDICAL SYSTEMS TEXAS CORPORATION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 authorizing, but not directing, Delphi Medical Systems Texas Corporation ("Delphi Medical Texas") to (a) enter into an Amendment to the Contract Manufacturing Agreement with Applera Corporation ("Applera"), pursuant to which Delphi Medical Texas will cease manufacturing products for Applera, its sole customer, and (b) close its facility located in Stafford, Texas (the "Houston Facility").  In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    No trustee or examiner has been appointed in the Debtors' cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are section 363(b) of the Bankruptcy Code and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2005 had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.    Events Leading To The Chapter 11 Filing

        8.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.

        9.    The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (c) increasing commodity prices.

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
       valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
       loss in calendar year 2004 was $482 million.

4

10.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally. Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

Relief Requested

13.    By this Motion, the Debtors seek entry of an order under section 363(b) of

the Bankruptcy Code and Bankruptcy Rule 6004 authorizing, but not directing, Delphi Medical

Texas to (a) enter into an Amendment to the Contract Manufacturing Agreement with Applera,

pursuant to which Delphi Medical Texas will cease manufacturing products for Applera, its sole

customer, and (b) close its Houston Facility. Applera, acting through its subsidiary Applied

Biosystems Group, develops and markets advanced medical research instruments, and is

currently the sole customer of Delphi Medical Texas.

Basis For Relief

14.    Prior to the Petition Date, in connection with the purchase of Applera's

operations at the Houston Facility, Delphi Medical Texas entered into the Contract

Manufacturing Agreement (the "Agreement") with Applera for the manufacture and sale of

certain medical, analytical, and testing devices (the "Products") to Applera. A copy of the

Agreement is attached hereto as Exhibit A.[3]

15.    Under the terms of the Agreement, Delphi Medical Texas agreed to use

the operations at the Houston Facility to manufacture and sell the Products to Applera and

Applera agreed to purchase the Products exclusively from Delphi Medical Texas on a three-year

basis. Moreover, as part of the transaction, Applera assigned to Delphi its interest in the lease for

---

[3]    The Agreement contains several exhibits which are not attached hereto. These exhibits contain pricing
information, financial information, and personal employee information that are sensitive to both Applera and
Delphi Medical Texas, and the information is not germane to the present Motion. Parties-in-interest that do not
compete with the Debtors may request the exhibits to the Agreement, provided that such parties first execute a
non-disclosure agreement acceptable to the Debtors.

the Houston Facility and Applera's work force at the Houston Facility was transitioned to Delphi

Medical Texas.  Delphi Medical Texas entered into the transaction because the Agreement

provided a steady revenue stream and management believed that it could utilize profitably the

excess capacity of the Houston Facility to sell products to additional customers.

16.     Unfortunately, the manufacture of the Products for Applera proved

unprofitable at the agreed prices, and alternative uses for the excess capacity at the facility did

not develop as planned.  As a result, the Delphi Medical Texas entity, which was created to

operate the Houston Facility and whose sole function to date was to perform pursuant to the

Agreement, has suffered losses at the rate of approximately $2.5 million per year.  The current

term of the Agreement extends to June 6, 2008.  Due to ongoing losses and the anticipation that

those losses might increase through the term of the Agreement, Delphi Medical Texas has

determined that it is necessary to seek an earlier termination of the Agreement and wind down

operations at the Houston Facility.

17.     To facilitate the closure of the Houston Facility, Delphi Medical Texas

proposes to enter into the Amendment to the Agreement with Applera (the "Amendment").  A

copy of the Amendment is attached hereto as Exhibit B.[4]  Under the terms of the Amendment,

Delphi Medical Texas would agree to continue to manufacture and sell a set quantity of Products

to Applera for a finite period of time at the Houston Facility, preventing interruption of the

supply of Products while Applera procures new sources for the Products. Delphi Medical Texas

expects that this wind-down period will be completed and the Houston Facility will be closed in

---

[4]     The Amendment contains several exhibits which are not attached hereto.  These exhibits contain pricing
information, financial information, and personal employee information that are sensitive to both Applera and
Delphi Medical Texas, and the information is not germane to the present Motion.  Parties-in-interest that do not
compete with the Debtors may request the exhibits to the Amendment, provided that such parties first execute a
non-disclosure agreement acceptable to the Debtors.

the first quarter of 2007.  Once Delphi Medical Texas satisfies its obligations under the

Amendment, Delphi Medical Texas will have no further obligations under the Agreement.

18.    In consideration for the assistance of Delphi Medical Texas in the

transition period, Applera has agreed to enter into the Amendment to the Agreement.  The

Amendment and closure of the Houston Facility provide several benefits to Delphi Medical

Texas, with relatively minor attendant costs, as summarized below:

| Benefit Value | | Costs | |
|---|---|---|---|
| Price Increases | $1.3 million | Net Severance Expense | $100,000 |
| Inventory Liquidation | up to $5 million | Lease Expense | $250,000 |
| Success Fee | $547,000 | | |
| Reduction in Operating Loss | $2.5 million annually | | |
| **Estimated Total:** | **$9.7 million** | | **$350,000** |

19.    Specifically, the Amendment includes price increases that will result in

reduced losses of approximately $1.3 million through 2007.  With these price increases, Delphi

Medical Texas believes that it can operate on a break-even basis during the wind-down period.

The Amendment also provides that Applera will purchase remaining inventory upon the  closure

of the Houston Facility, thus saving Delphi Medical Texas the necessity of liquidating

approximately $5 million worth of otherwise excess inventory.

20.    Finally, the Amendment provides that Applera will pay Delphi Medical

Texas $547,000 as a success fee for closing the Houston Facility and relocating manufacturing

operations.  Of this amount, $250,000 will be allocated to defray the expense of employee

severances and $297,000 will be allocated as retroactive price increases.

21.    To close the Houston Facility, Delphi Medical Texas will be required to

terminate or relocate all 35 of its employees.  After applying the $250,000 provided by Applera

for this expense, the net cost to Delphi Medical Texas for severance expenses will be

approximately $100,000.  This expense is well within the terms of the ordinary course severance

policy of Delphi Medical Texas, which this Court previously authorized the Debtors to

continue.[5]  Delphi Medical Texas will also be required to expend approximately $250,000 to

satisfy its remaining obligations under the lease for the Houston Facility.  The total cost to

Delphi Medical Texas in closing its operations at the Houston Facility is thus $350,000.

22.    Following the closure of the Houston Facility, Delphi Medical Texas will

be left with no assets and no further business purpose.  The Amendment provides that, at the

closure of the Houston Facility, Applera will purchase any remaining equipment for $50,000.

Delphi Medical Texas believes that this equipment has limited market value, and the cost of any

marketing efforts would exceed amounts recovered, if any.

23.    Based on arms-length negotiations between Delphi Medical Texas and

Applera, Delphi Medical Texas has elected to close its operations at the Houston Facility and

enter into the Amendment to the Agreement.  Doing so will provide the benefits to Delphi

Medical Texas described above, including: (a) price increases of $1.3 million; (b) avoidance of

inventory risk of up to $5 million; (c) defrayal of the costs of closing the Houston Facility,

including payment of $547,000 by Applera; and (d) reduction of annual operating losses of

approximately $2.5 million. These substantial benefits are offset by a mere $350,000 in one-time

costs to close the Houston Facility.

24.    In summary, entering into the Amendment and closing the Houston

Facility with Applera's cooperation will reduce future losses under the Agreement, and Delphi

Medical Texas believes that this course of action represents the best possible outcome.  The

---

[5]    See Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, And 1108 (I) Authorizing Debtors To Pay Prepetition
Wages And Salaries To Employees And Independent Contractors, (II) Authorizing Debtors To Pay Prepetition
Benefits And Continue Maintenance Of Human Capital Benefit Programs In The Ordinary Course, And (III)
Directing Banks To Honor Prepetition Checks For Payment Of Prepetition Human Capital Obligations, dated
October 13, 2005 (Docket No. 0198).

Amendment follows extensive arms-length negotiations and Delphi Medical Texas' decision to

enter into the Amendment represents sound business judgment.  Delphi Medical Texas believes

that the savings and organizational efficiency to be achieved through the closure of the Houston

Facility and entry into the Amendment to the Agreement will maximize the recovery for all

stakeholders and that therefore the relief sought herein should be approved.

<u>Applicable Authority</u>

25.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  <u>See</u> <u>In re Lionel</u>

<u>Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); <u>In re Delaware Hudson</u>

<u>Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

26.    The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  <u>In re Orion Pictures Corp.</u>, 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's

consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a

means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift

administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a

lengthy trial with disputed issues."  <u>Orion Pictures</u>, 4 F.3d at 1098-99.

27.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter,

"[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of

rebutting the presumption of validity." Id.   To satisfy its burden, it is not enough for an objector

simply to raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections." Lionel, 722 F.2d at 1071.

       28.     As a rule, the debtor's business judgment "should be approved by the court

unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo.

1991)).

       29.     Delphi Medical Texas submits that entering into the Amendment to the

Agreement and closing the Houston Facility in accordance with the terms described above

reflects a sound use of Delphi Medical Texas' business judgment.  The Amendment will provide

significant benefits, possibly amounting to $9.7 million, to Delphi Medical Texas.  These

benefits are substantial when juxtaposed against the $350,000 cost of the consolidation.

Accordingly, this Court should grant the relief requested in the Motion.

Notice Of Motion

       30.     Notice of this Motion has been provided in accordance with the Amended

Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered by this Court on October 26, 2006

(Docket No. 5418).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

31.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing, but not directing, Delphi Medical Texas to (1) enter into an Amendment to the Contract Manufacturing Agreement with Applera, pursuant to which Delphi Medical Texas will cease manufacturing products for Applera, its sole customer, and (2) close its Houston Facility and (b) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
November 9, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:    /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:    /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession