# **Exhibit B**

05-44481-rdd    Doc 5517-2    Filed 11/09/06    Entered 11/09/06 21:02:09    Exhibit B
Pg 1 of 10

# AMENDMENT TO CONTRACT MANUFACTURING AND SUPPLY AGREEMENT AND TRANSITION AGREEMENT

This Amendment is entered into as of November 10, 2006 by and between Applera Corporation, a Delaware corporation, acting through its Applied Biosystems Group ("**AB**" or "**Customer**") and DELPHI MEDICAL SYSTEMS TEXAS CORPORATION, a Texas corporation("**Delphi**"), (collectively the "**Parties**," and each individually a "**Party**").

## BACKGROUND

Customer and Delphi (the "parties") entered into a Contract Manufacturing Agreement (the "Manufacturing Agreement") dated as of June 6, 2005 under which Delphi has been manufacturing products (the "Products") for Customer. On October 8, 2005, Delphi filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Delphi has advised Customer that it intends to close the Houston, Texas facility at which the Products are being manufactured on or soon after March 31, 2007. The Parties by this Amendment wish to amend the Manufacturing Agreement and set forth the terms and conditions under which the final production work at the Houston, Texas facility will be completed and the transition of manufacturing of certain of the Products to Customer will be accomplished.

**Now, therefore,** for good and valuable consideration, the sufficiency of which is acknowledged by both, the Parties hereby enter into this Amendment as of the Effective Date as follows:

1. **CONDITION PRECEDENT; AMENDMENT OF EXHIBITS.**

    1.1  As a condition precedent to the parties' obligations to perform under this Amendment, the approval of the Bankruptcy Court is required. Accordingly, the effective date" of this Amendment shall be the date on which an order of the Bankruptcy Court approving this Amendment is entered (the "Effective Date"); provided, however, that if the Bankruptcy Court shall enter an order declining to approve this Amendment, then this Amendment shall be null and void ab initio and the Manufacturing Agreement, unamended by this Amendment, will remain in full force and effect in accordance with its terms.

    1.2  Exhibit 1 of the Manufacturing Agreement is hereby restated to read as <u>Exhibit 3.1</u> attached to this Amendment. References in the Manufacturing Agreement to Exhibit 1 shall be deemed references to Exhibit 3.1 attached to this Amendment. Exhibit 3 of the Manufacturing Agreement is hereby deleted in its entirety.

2. **ARTICLE 2 MODIFICATIONS (PURCHASE AND SUPPLY, FORECASTS AND PURCHASE ORDERS).**

    2.1  All but the last sentence of Section 2.1 of the Manufacturing Agreement is hereby deleted in its entirety.

    2.2  Sections 2.2.1 and 2.2.2 of the Manufacturing Agreement are hereby deleted in their entirety.

    2.3  Section 2.2.3 of the Manufacturing Agreement is hereby modified by deleting the language in its entirety and substituting the following language therefor:

"Customer shall order Products by submitting purchase orders to Delphi. Delphi shall manufacture and deliver to Customer all Products ordered by Customer under this Agreement, on the terms and conditions set forth herein. Delphi shall use reasonable efforts to deliver all Products ordered by Customer on the delivery dates specified in Customer's orders and in any event before March 31, 2007, but if Delphi cannot reasonably do so, Delphi shall deliver all Products not delivered to Customer prior to March 31, 2007 as soon as reasonably feasible after March 31, 2007. Delphi shall accept purchase orders from Customer submitted in accordance with this Agreement. Customer will order from Delphi under this Agreement at least the number of Products listed in Exhibit 3.1 attached hereto and will submit purchase orders to Delphi for such Products on or before November 15, 2006. Purchase orders may be issued by mail, facsimile or (upon mutual agreement of the Parties) electronic data interchange, provided that, as set forth in Section 6.3, Delphi shall not be required to deliver any Product sooner than fifteen (15) calendar days after delivery of Customer's purchase order to Delphi. Delphi shall fill all purchase orders by no later than the delivery dates set forth in Customer's orders, subject to the lead time provisions of this Agreement. Delphi shall not be required to accept any purchase order for a Product with respect to which the last day of any applicable lead time period falls after March 31, 2007. If Customer delivers to Delphi a purchase order for a Product that Delphi is not required to accept under the terms of the immediately preceding sentence, Delphi shall promptly inform Customer in writing whether or not Delphi accepts such purchase order. If Delphi does accept such purchase order, Delphi shall be required to manufacture and deliver the Product or Products subject to such accepted purchase order pursuant to the terms of this Agreement."

2.4. Section 2.2.4 (inclusive) of the Manufacturing Agreement is hereby deleted in its entirety.

2.5 Section 2.4 of the Manufacturing Agreement is hereby deleted in its entirety.

2.6 Section 2.7 of the Manufacturing Agreement is hereby deleted in its entirety (as the provisions of such Section have already been implemented).

3. **ARTICLE 3 AMENDMENT (PRICES AND PAYMENTS)**

3.1 Section 3.1 of the Manufacturing Agreement is hereby amended by deleting the first sentence thereof and substituting the following sentence therefor: "The prices for all Products delivered by Delphi to Customer on or after November 1, 2006 shall be the prices set forth in Exhibit 3.1 to this Agreement." Section 3.1 of the Manufacturing Agreement is further amended by deleting the reference to "Exhibit 1" in the second sentence thereof and substituting therefor the words "Exhibit 3.1".

3.2 Sections 3.1(b) and 3.1(c) of the Manufacturing Agreement are hereby deleted in their entirety. In consideration of the other promises contained herein, Delphi hereby forgoes and releases Customer from any and all obligations to make any payments under such sections, regardless of when any such obligation arose.

4. **ARTICLE 4 AMENDMENTS (POST CLOSING ACCESS TO SPECIFICATIONS)**

4.1 Section 4.1 of the Manufacturing Agreement is hereby deleted in its entirety and the following language is substituted therefor:

2

"Upon the termination of this Agreement, Delphi shall promptly deliver to Customer all copies, whether in paper, electronic or other form, of the Specifications and associated documentation, and such other drawings, schematics, manuals, instructions or other documentation regarding Products as Customer may request. Delphi agrees to not erase or delete its electronically stored records relating to Products, including records in Delphi's AGILE or MAX systems, for a least one year after the final Product is delivered to Customer under this Agreement. At any time during the term of this Agreement and for a period of one (1) year thereafter, Delphi shall afford Customer reasonable access to such information and any written records related to Products that Delphi may have retained, or will furnish such information or copies of such records as had not been delivered to Customer, as Customer may request., excluding any such information that is proprietary or confidential information of Delphi that is materially different than any technical, process, manufacturing method or other such information that was in effect or practiced by Customer at the Houston Facility immediately prior to the Start of Production."

4.2   Section 4.2 of the Manufacturing Agreement is hereby deleted in its entirety.

4.3   Section 4.3 of the Manufacturing Agreement is hereby amended by adding the following at the beginning of Section 4.3: "To the extent Delphi has available or reasonable access to personnel or other resources that would permit Delphi to comply with the provisions of this Section 4.3:".

5.   [This Section is intentionally left blank].

6.   **ARTICLE 8 AMENDMENTS (PRODUCT DEVELOPMENT AND INTELLECTUAL PROPERTY)**

6.1   Article 8 is of the Manufacturing Agreement is hereby modified by adding the following to the end of Section 8.3:

"The foregoing grant of rights by Customer to Delphi shall terminate on the later of March 31, 2007 or the date that Delphi delivers the last Product to Customer under this Agreement. Delphi hereby grants Customer a non-exclusive, perpetual, royalty-free, worldwide license to use the Specifications and Delphi's other Intellectual Property created or developed by Delphi during the Term of this Agreement or the Manufacturing Agreement and employed by Delphi in connection with fulfilling its obligations under this Agreement through and including March 31, 2007 that is required or useful for the manufacture, distribution or sale of the Products."

6.2   Section 8.5 of the Manufacturing Agreement is hereby amended by deleting the words "provided that no such discontinuance shall reduce the Minimum Aggregate Purchase Value of Product set forth on Exhibit 1 with respect to any period" following the word "notification" in the 17th line thereof.

7.   **ARTICLE 9 AMENDMENTS (VIOLATIONS, COMPLAINTS AND NOTIFICATION; PRODUCTION RECORDS)**

Section 9.2 of the Manufacturing Agreement is hereby modified to add the following words to the end of the last sentence thereof: "; provided, however, that Delphi need not provide access to its facility after the Lease of the Houston Facility is terminated and Delphi no longer has rights to access the Houston Facility."

3

8. **ARTICLE 10 AMENDMENTS (WARRANTY)**

Section 10.3 of the Manufacturing Agreement is hereby modified to add the following sentences to the end thereof:

"Notwithstanding the foregoing, Delphi will be relieved of its obligations set forth in this Section 10.3 on and after April 1, 2007, provided that Delphi will reimburse Customer for Customer's reasonable costs and expenses, including time of Customer employees, incurred by Customer in performing obligations that Delphi would have been required to perform under this Agreement had Section 10.3 remained in full force and effect in accordance with its terms."

9. **ARTICLE 13 AMENDMENTS (SUPPLY OF SERVICE PARTS)**

Section 13 of the Manufacturing Agreement is hereby modified by deleting the reference to Exhibit 1 in the fourth line thereof and replacing it with "Exhibit 3.1" and deleting the sentence beginning with "Pricing for the labor..." and by substituting the following sentence in place thereof:

"Notwithstanding the foregoing, Delphi shall not be required to manufacture and deliver any Service Parts that are not ordered by Customer prior to the date where the order date plus customary lead time provided for in this Agreement would result in a delivery date after March 31, 2007."

Section 13 of the Manufacturing Agreement is hereby further modified by deleting the last sentence thereof.

10. **ARTICLE 17 AMENDMENTS (TERM AND TERMINATION)**

10.1 Section 17.1 of the Manufacturing Agreement is hereby deleted in its entirety and the following language is substituted therefor:

"This Agreement shall become effective on the Effective Date and shall remain in effect until Delphi has fully performed its obligations under this Agreement."

10.2 Section 17.4(a) of the Manufacturing Agreement is modified to add the following language to the end thereof: "; provided, however, that Customer acknowledges that Delphi filed for protection under Chapter 11 of the United States Bankruptcy Code on October 8, 2005, and that such filing shall not implicate the provisions of this Section 17.4(a)."

10.3 Section 17.7 of the Manufacturing Agreement is hereby deleted.

11. **ARTICLE 19 AMENDMENTS (GENERAL PROVISIONS)**

11.1 Section 19.12 of the Manufacturing Agreement is hereby deleted in its entirety.

11.2 Article 19 of the Amendment is hereby modified by adding the following provisions:

4

"19.14  Facilities Lease Costs. On or before December 20, 2006 Delphi will provide the Landlord of the Lease (as the terms "Landlord" and "Lease" are defined in the Assignment of Lease dated June 6, 2005 between Delphi Corporation ("Parent") and Customer), or will cause Parent to provide, nine (9) months advance notice of Parent's intent to terminate the Lease, and will take all actions necessary, including without limitation the payment of any early termination fee due, so that the Lease will terminate in accordance with its terms by no later than September 20, 2007 with no further liability or responsibility on the part of Parent as tenant Delphi or Customer except as otherwise expressly provided in the Lease. Delphi shall be solely responsible for taking all actions or ensuring all actions are taken necessary for terminating the lease and for paying, and shall pay, all costs and expenses associated with the termination of the lease, including without limitation, payment of the early termination amount, the vacating of the leased premises and delivery of the leased premises back to the Landlord in the condition required by the Lease. Delphi agrees that it shall not reject the Lease, and will prevent rejection of the Lease, in the bankruptcy proceedings to which it is a party as of the Effective Date, and Delphi will fully comply with its and Parent's obligations and covenants under the Lease and will in all cases takes such actions as are necessary to assure that all obligations and covenants of the tenant under such lease are fully complied with and performed.."

"19.15  Tooling and Fixtures. Customer agrees to purchase, and Delphi agrees to sell and deliver to Customer, the tooling, fixtures and equipment at the Houston manufacturing facility, including the items listed on <u>Exhibit 12.2</u> for a price of US fifty thousand dollars (US$50,000), to be paid by Customer within 30 days of the later of (a) receipt of an invoice from Delphi or (b) receipt of such tooling, fixtures and equipment by Customer in good order and condition, and, with respect to any such items obtained by Delphi from Customer, in substantially the same condition as when received by Delphi, reasonable wear and tear accepted. Delphi hereby warrants and agrees that such tooling fixtures, and equipment shall be sold and transferred to Customer free from any and all liens, charges, mortgages, pledges and encumbrances of every nature and description, and that Delphi has full power and authority to sell, assign and transfer the same as herein provided. Delphi shall arrange for shipment of the items listed on Exhibit 12.2 to Customer FOB Delphi's dock. Risk of loss with respect to such items shall pass to Customer upon delivery to the carrier. If requested by Customer, Delphi shall deliver a bill of sale to Customer in such form as Customer may reasonably request. Customer may determine which tooling, fixtures and equipment that it has purchased of which it wishes to take delivery, and will identify the same to Delphi no later than March 31, 2007, or as soon thereafter as is practical."

"19.16  Transition of 310, 8200, Procise and 433 Instrument and 140 Pumps Manufacturing to AB Singapore or other Manufacturing Facilities. Delphi shall take such actions as Customer reasonably requests to transition manufacturing of the 310, 8200, Procise and 433 instruments and 140 pumps to Customer's Singapore Plant, or one or more other facilities designed by Customer to Delphi in writing, by March 31, 2007 or such later date as shall reasonably allow Delphi to fulfill its manufacturing obligations under this Agreement. Customer has delivered to Delphi a template for a Transition Plan entitled: Procedure, Product Transfer, Document No. 4322589. Promptly after execution of this Amendment, the parties will meet and utilize such template to jointly determine the actions to be included to complete transition of the Products (the "Transition Plan"). Customer will pay or, upon within forty five (45) days from receipt of invoice, reimburse Delphi for the reasonable costs of transporting all parts, tooling or other materials

5

Customer requests in writing be shipped to Singapore or such other designated location(s). Delphi will comply with Customer's reasonable instructions regarding carriers and shipment. Delphi will use carriers designated by Customer. If Delphi personnel travel at Customer's request outside Texas or Colorado to facilitate such transfer, Customer will reimburse Delphi for the reasonable out of pocket travel, lodging and meal expenses of such employees approved by Customer in advance in writing in accordance with Customer's normal travel and expense policies, reasonably promptly after submission by Delphi of Customer's normal expense report forms."

"19.17 Remaining Raw Materials at Delphi. To the extent not utilized in manufacturing the Products hereunder, Customer will purchase from Delphi such inventory of raw materials and components (i) as were purchased by Delphi from Customer pursuant to the Bill of Sale, Inventory, WIP and Assumption Agreement dated June 6, 2005, (ii) as were the subject of open purchase orders between AB and third parties and that were assumed by Delphi and that were purchased and paid for by Delphi, (iii) as were purchased by Delphi and necessary to manufacture Products ordered by Customer, without regard to any subsequent reduction by Customer of any such order, and there was insufficient inventory owned by Customer at the Houston Facility available to fulfill such orders, or (iv) as to which Delphi received or receives from Customer a material authorization coverage form authorizing the purchase of quantities greater than MRP demand (that is, greater than the amount necessary to manufacture Products ordered from Customer), and (v), to the extent not included with the categories set forth in subsections (i), (ii), (iii) and (iv) above in this Section 19.17, inventory purchased and designated to manufacture the 310, 8200, Procise and 433 instruments, the 140 pump and the 4700/autoloader. The amount payable by Customer for such raw materials and components identified in subsections (i) through (v), inclusive, above shall be the amount actually paid by Delphi to its suppliers for such raw materials and components. Delphi shall make the inventory to be purchased by Customer available for pick up by Customer at the location at which such inventory is normally stored, reasonably organized for pick up, at a time or times reasonably designated by Customer that will not be later than March 31, 2007, or as soon thereafter as is practical. Delphi warrants and agrees that all inventory sold to Customer shall be in new and good condition and usable for its intended purposes. Customer shall not be required to purchase any inventory that does not meet the foregoing conditions. Customer may determine which inventory that it has purchased that it wishes to take delivery of, and will identify same to Delphi, by no later than March 31, 2007, or as soon thereafter as is practical. Customer will be responsible at its cost for picking up and removing such items as Customer selects to a location or locations designated by Customer. Delphi shall be responsible at its cost for disposing of any items that Customer does not wish to take and that are so identified to Delphi within forty five (45) days after the last delivery of Products to Customer. Title and risk of loss with respect to inventory, tools, fixtures and other goods to be delivered to or picked up and removed by Customer will pass to Customer upon delivery to the carrier."

"19.18 Successful Completion Fee. Within sixty (60) days after the completion by Delphi of all of its obligations identified below in this Section 19.18, , Customer will pay Delphi a "successful completion" fee equal to the sum of $546,751 ($250,00 of which is designated to finance an enhanced Delphi severance plan for employees of Delphi's facility to be instituted by Delphi). Delphi shall inform AB in writing when Delphi believes it has earned the successful completion fee. If AB disagrees with Delphi, it shall so state to Delphi in writing and set forth the reasons for AB's conclusions. Upon Delphi curing its failure to meet any such obligation as set forth below, AB shall promptly pay

6

the successful completion fee to Delphi. The obligations to be performed by Delphi to obtain the successful completion fee are:

(i) Delphi's delivery of the Products required to be delivered pursuant to purchase orders accepted or required to be accepted by Delphi (including without limitation, for the avoidance of doubt, under any such purchase orders delivered to Delphi prior to the Effective Date of this Amendment);

(ii) Delphi's obligations to deliver the Specifications and other documents as set forth in the first sentence of Section 4.1 of this Amendment;

(iii) Delphi's obligations under Section 19.14 above to implement or cause to be implemented early termination of the Lease and observe or have observed, and to not breach or permit to be breached, all of its or Parent's material obligations under the Lease through May 30, 2007;

(iv) Delphi's obligations under Section 19.15 above to sell and deliver the identified tooling, fixtures and equipment, as more fully set forth in Section 19.15.

(v) Delphi's obligations under the Transition Plan;

(vi) Delphi's obligations under Section 19.17 above to deliver or make available for pick up remaining raw materials and components, as set forth in Section 19.17 above.

(vii) Delphi's obligation to deliver a Bill of Sale to Customer, as set forth in Section 19.21 below.

Payment by Customer to Delphi of the successful completion fee shall not be deemed an acknowledgment by Customer that Delphi has performed its obligations set forth above in this Section 19.18 or any other obligation or covenant of Delphi, and shall not be deemed a release or waiver of any rights, causes of action or remedies Customer may have for breach of this Amendment or the Manufacturing Agreement.

"19.19 Costs and Expenses. Each Party will bear its own costs and expenses of implementing this Agreement, and make all payments due to third parties engaged by a Party in connection therewith, except to the extent expressly set forth in this Agreement."

"19.20 Audits and Inspections. Upon reasonable advance notice to Delphi and an opportunity for Delphi to participate therein, Customer may take its own inventory count and inspect the inventory, and may also inspect Delphi's Houston, Texas manufacturing facility and associated facilities while Delphi remain the tenant or otherwise has the right to grant Customer access to the House Facility."

"19.21 Condition of Goods to be Sold to Customer, Bill of Sale. All goods to be sold by Delphi to AB pursuant to this Agreement will be sold under a Bill of Sale or Bill of Sales in form and substance reasonably satisfactory to AB, which shall include Delphi's representation and warranty that it is transferring good and marketable title to such goods free and clear of all liens, charges, mortgages, pledges and encumbrances and that Delphi has full power and authority to sell, assign and transfer the same as provided in the bill of sale. Inventory sold and transferred by Delphi to Customer shall be in new and good condition

7

and usable for its intended purposes, and tools and fixtures and other goods sold that is not inventory will be in substantially the same condition as received by Delphi, reasonable wear and tear excepted. Customer shall not be required to purchase any inventory or other goods that do not meet the conditions set forth in this Section 19.21 or applicable conditions set forth elsewhere in this Agreement."

"19.22 Offset Rights. Customer may offset against and recoup from any amounts owed to Delphi under this Agreement as Amended any damages suffered by Customer arising out of any breach by Delphi of this Agreement that is not capable of being cured by Delphi, or, if a breach is capable of being cured, that is not cured by Delphi within thirty (30) days after delivery by Customer to Delphi of notice of the breach."

"19.23 No Third Party Rights. This Agreement is made solely for the benefit of the Parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement unless otherwise agreed to by all the Parties hereto."

## 12. OTHER AGREEMENTS, RELEASE

12.1 No Assumption. Customer acknowledges and agrees that this Amendment is not intended, nor shall it be construed, as an assumption, adoption or rejection under Section 365 of the U.S. Bankruptcy Code of the Manufacturing Agreement or any purchase order or any other executory contract or other agreement between Delphi and Customer, nor a release or waiver by Customer of any of its rights, causes of action or remedies, except to the extent expressly set forth in Section 12.3 below.

12.2 Proof of Claim. Customer acknowledges that all the matters alleged in its Proof of Claim filed with the Bankruptcy Court on July 28, 2006 (Case Number 05-44511) have been finally settled and that it has withdrawn or will promptly withdraw such proof of claim.

12.3 Release. In consideration of the mutual undertakings, covenants and agreements set forth herein, Customer agrees that all claims, suits, liabilities, causes of action, demands, debts and controversies arising out of Delphi's failure to supply Products for the term contemplated by the Manufacturing Agreement as originally executed are hereby settled. Customer releases absolutely and forever discharges Delphi, its parent companies, subsidiaries and affiliates, and their respective representatives, agents, attorneys, past and present employees, officers, directors and shareholders, administrators, predecessors, successors, assigns and affiliated corporations from any and all claims, charges, demands, damages, debts, liabilities, accounts, obligations, costs, expenses, actions and causes of action of every kind and nature whatsoever, whether now known or unknown, suspected or unsuspected, which they may now have, own or hold, or at any time heretofore ever had, owned or held, or hereafter can, shall or may have or allege based upon, related to or by reason of the early termination of the production of Products by Delphi, provided that, for the avoidance of doubt, the settlement and release set forth above in this Section 12.3 shall not apply to the modified obligations of Delphi set forth in this Amendment.

12.4 For the avoidance of doubt, purchase orders submitted by Customer to Delphi under this Agreement shall be binding even if the Bankruptcy Court does not approve this amendment.

8

12.5 <u>Survival.</u> Except as expressly set forth in this Amendment, the Manufacturing Agreement shall remain in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed and delivered by their representatives thereunto duly authorized as of the day and year first shown above.

| **APPLERA CORPORATION,** <br> **acting through its Applied Biosystems Group** | **DELPHI MEDICAL SYSTEMS** <br> **TEXAS CORPORATION** |
|---|---|
| By | By |
| Title | Title |
| Date Signed: _____ | Date Signed: _____ |

9