Hearing Date and Time: November 30, 2006 at 10:00 a.m.
Response Date and Time: November 24, 2006 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) |
| Debtors. | (Jointly Administered) |

### MOTION FOR ORDER AUTHORIZING ENTRY INTO SETTLEMENT WITH THE SECURITIES AND EXCHANGE COMMISSION

("SEC SETTLEMENT MOTION")

       Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submit this Motion For Order Authorizing Entry Into Settlement With The Securities And Exchange Commission (the "Motion"). In support of this Motion, the Debtors respectfully represent as follows:

Background

A.   The Chapter 11 Filings

1.   On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.   No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.   This Court has jurisdiction over this objection pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.   The statutory predicate for the relief requested herein is section 105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.   Current Business Operations Of The Debtors

5.   As of December 31, 2005, Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion and

2

global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

    6.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

    7.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[1] The aggregated financial data used in this objection generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

C.    Events Leading To The Chapter 11 Filing

        8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

        9.    The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

        10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

D.   The Debtors' Transformation Plan

11.   On March 31, 2006, the Company outlined the key tenets of its transformation plan. The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007. To complete their restructuring process, the Debtors must focus on five key areas. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint. Finally, the Debtors must devise a workable solution to their current pension situation.

12.   Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

E.   Securities And Exchange Commission Investigation

13.   On October 30, 2006, the Securities and Exchange Commission (the "Commission") commenced and simultaneously settled with Delphi a lawsuit alleging violations of federal securities laws. The lawsuit and settlement relate to transactions that were the subject

of a June 2005 financial restatement. Specifically, Delphi completed a financial restatement in June 2005, the effects of which reduced retained earnings as of December 31, 2001 by $265 million, reduced 2002 net income by $24 million, and improved 2003 net loss by $46 million. The nature of the restatement adjustments have been described on Form 8-K filings with the Commission.[3] Delphi fully cooperated with the Commission throughout its investigation.[4]

        14.     Under the agreement approved by the Commission, and as more fully described below, Delphi agreed, without admitting or denying any wrongdoing, to be enjoined from future violations of the securities laws. Also under the agreement, the Commission did not seek civil monetary penalties against Delphi. Delphi is pleased that the Commission's investigation has been completed and settled, and considers the settlement an important step in its transformation process.

---

[3] Subsequent to and unrelated to the settlement, on November 8, 2006, Delphi filed a current report on Form 8-K in which it disclosed that it had determined it will require more time to complete its financial statements and file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2006. In connection with the audit of Delphi's 2006 consolidated financial statements and performing related interim procedures for the third quarter, the Company's independent auditors identified and informed Delphi of a potential issue with the designation of hedges related to foreign currency. Specifically, Delphi became aware that the hedge designation for foreign currency forward contracts it had entered into to hedge exposure to foreign currency fluctuations may not have satisfied the technical accounting rules under Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended ("FAS 133") to qualify for exemption from the more strict effectiveness testing requirements. Delphi together with its current and former independent public accounting firms is reviewing the accounting treatment accorded to these contacts. Delphi had historically designated its foreign currency forward contracts as hedges and recorded changes in value during each period prior to settlement as other comprehensive income or loss. Delphi is reviewing its designation documentation to determine if it has complied with the requirements of FAS 133 applicable to hedge accounting. These types of foreign currency forward contracts are routinely entered into as part of Delphi's currency exchange rate risk management strategy. Delphi believes that these foreign currency forward contracts were effective economic hedges for its exposure to foreign currency fluctuations. The potential change to the accounting for these contracts does not affect cash flows. However, it may change the timing of recognizing the previously deferred gains or losses on the foreign currency forward contracts in earnings for the periods impacted.

[4] Separately, and as previously disclosed in public filings, the Debtors are cooperating with the Department of Justice in a parallel investigation.

Relief Requested

15.     By this Motion, the Debtors seek entry of the proposed order authorizing the Debtors' entry into a settlement with the Commission resolving investigations by the Commission into various prepetition acts of the Debtors.  Delphi's settlement with the Commission permanently restrains and enjoins Delphi from violating certain securities laws, but does not impose any monetary fine on Delphi.  Delphi's settlement with the Commission is subject to this Court's approval.  This Court's approval of the settlement will remove another major hurdle to the Debtors' transformation process.

16.     The proposed settlement is, in the Debtors' view, in the best interests of all creditors and other stakeholders.  The Debtors therefore request that the settlement be approved and that the proposed order be entered.

Basis For Relief

A.     Internal And Commission Investigations

17.     In late July 2004, Delphi received its first subpoena from the Commission requesting information regarding Delphi's agreements with a long time supplier of information technology services to Delphi.  In August 2004, Delphi received a copy of the formal order of investigation from the Commission indicating that the staff of the Commission (the "Staff") had commenced a non-public, fact-finding inquiry regarding transactions between Delphi and the information technology supplier, including the accounting treatment of payments made and credits given by the information technology supplier to Delphi during 2000 and 2001, and certain payments made by Delphi to the information technology supplier for system implementation services in 2002 and in early 2003.  Delphi formally retained the outside firm of Wilmer Cutler

Pickering Hale and Dorr, LLP ("WilmerHale") in August 2004 to assist in its internal review of this matter.

18.     In October 2004, the Audit Committee of the Board of Directors (the "Audit Committee") assumed oversight responsibility for the internal review and directed Delphi's response to the Staff's investigation. To assist with the internal review, WilmerHale retained a forensic accounting consultant. As a result of Delphi's internal review, in addition to the payments, credits, and other matters identified by the Commission, certain other transactions were identified and investigated. Delphi shared this information with the Staff on an ongoing basis.

19.     In connection with Delphi's remedial measures, on March 1, 2005 and thereafter, the chairman of the Audit Committee, and at times one or more of the other independent directors serving on the Audit Committee (collectively, the "Audit Committee Members"), met with certain members of management who were involved in the transactions under review. The meetings before the Audit Committee Members were conducted in a methodical and fair manner. This process enabled the Audit Committee Members to evaluate the conduct and knowledge of the employees under review, and to consider carefully what personnel changes or other steps, if any, should be taken to strengthen Delphi's internal controls and procedures over financial reporting and disclosure controls and procedures so that the occurrence of similar errors could be prevented.

20.     As a result of this process, in March 2005, Delphi took the following remedial actions, among others: (i) accepted the resignation, effective March 4, 2005, of Delphi's Vice Chairman and Chief Financial Officer, who also resigned from Delphi's Board of Directors; (ii) accepted the resignation of Delphi's former Chief Accounting Officer and

8

Controller and business line executive in charge of certain product lines; and (iii) reassigned the Vice President of Treasury, Mergers & Acquisitions and New Markets to a non-officer position with a commensurate reduction in responsibilities and compensation.  Each of these individuals had supervisory authority for others involved in or was directly involved in certain of the principal transactions under investigation.  Moreover, on March 4, 2005, Delphi filed a Form 8-K stating that, although the Company's internal investigation was not yet complete, based on its preliminary conclusions reached to date with respect to the transactions under review, the audited financial statements and related independent auditor's reports for 2001 and subsequent periods should no longer be relied upon and that a restatement would be required.

21.     On April 1, 2005 and thereafter, the Audit Committee Members met with additional members of management who were involved in the transactions under review.  Following these meetings, Delphi took additional remedial actions by accepting the resignations of, or otherwise separating, employees serving in the following positions:  (i) Director of Financial Accounting and Reporting, from 2001 to 2004; (ii) Director of Financial Accounting and Reporting, from August 1998 to January 2000, and Director of Capital Planning and Pension Analysis, from January 2000 to August 2001; (iii) Treasurer and Vice President of Treasury, Mergers and Acquisitions, from 1998 to 2005; (iv) Director of Financial Accounting and Reporting, from March 2000 to April 2001; and (v) Assistant Treasurer, from 1998 to September 19, 2000.  Delphi subsequently made further personnel changes resulting in the resignation or separation of additional employees.

22.     On June 8, 2005, the Audit Committee met with the Company's independent auditors to discuss the results of its investigation, and on June 30, 2005, Delphi announced the completion of its financial restatement.  In conjunction with the restatement, the

9

Audit Committee concluded its internal investigation of certain accounting transactions that dated back to 2000.

B.      Resolution Of The Commission Investigation

23.     On October 30, 2006, the Commission filed and settled financial fraud charges against Delphi in the United States District Court for the Eastern District of Michigan. In its complaint (the "Complaint"), a copy of which is attached hereto as Exhibit A, the Commission charged Delphi with engaging in a pattern of fraudulent conduct between 2000 and 2004. At the same time, Delphi agreed to resolve the charges with the Commission, without admitting or denying any wrongdoing, and to be enjoined from future violations of the securities laws. The Commission also charged thirteen individuals (nine of whom were former Delphi employees) for their alleged roles in the fraudulent conduct and/or in related reporting and books-and-records violations by Delphi, none of whom are currently employed by or are insiders of the Debtors.

24.     Delphi has fully cooperated with the Commission's investigation and requests for information. This cooperation entailed long hours of discussion and negotiation with the Staff, on the one hand, and representatives of the Debtors, on the other hand, including the Audit Committee's counsel, WilmerHale. In addition, during the course of the Commission's investigation, the Company twice entered into tolling agreements with the Commission to extend the applicable statute of limitations, first until April 6, 2006, and subsequently until October 31, 2006. As a result of the efforts of the Debtors, their representatives, and representatives of the Commission, the Debtors now seek approval of Delphi's settlement with the Commission, which resolves the Commission's claims against Delphi on terms that are favorable to the Debtors' estates, with no monetary fines being imposed.

25. The Commission's Complaint alleges that, between 2000 and 2004, Delphi engaged in multiple schemes that resulted in Delphi materially misstating its financial condition and operating results in filings with the Commission, offering documents, press releases, and other documents and statements. The allegations contained in the Complaint include the following:

- In 2000, Delphi engaged in two fraudulent accounting and disclosure schemes, which had the purpose of and ultimately resulted in Delphi hiding a $237 million warranty claim asserted by its former parent company and inflating its net income by $202 million.

- In the fourth quarter of 2000, Delphi entered into two improper inventory schemes, through which it agreed to sell approximately $270 million of metals, automotive batteries and generator cores to two third parties at year end, while simultaneously agreeing to repurchase the inventory in the following quarter for the original sales price, plus interest charges and structuring fees. The purpose and result of the schemes was for Delphi to inflate its cash flow from operations by $200 million, engineer $270 million in inventory reductions and improperly report $80 million in net income.

- In the fourth quarter of 2001, Delphi solicited a $20 million lump sum payment from an IT company in return for Delphi providing new business to the IT company. Delphi agreed to repay the $20 million over five years, with interest, which made the payment, in substance a loan to the IT company. However, in order to meet earnings forecasts for the quarter, Delphi improperly accounted for the $20 million payment as if it was a nonrefundable rebate on past business, rather than a liability.

- From 2003 to 2004, Delphi hid up to $325 million in factoring, or sales of accounts receivable, in order to improperly boost non-GAAP pro forma measures of Delphi's financial performance that were relied upon by investors, analysts, and rating agencies. Hiding this factoring allowed Delphi to overstate materially its "Street Net Liquidity," a pro forma measure, during that two-year period. In addition, in one quarter, Delphi also manipulated the hidden factoring to create a false $30 million boost in its "Street Operating Cash Flow," another pro forma measure.

26. On October 20, 2006, Delphi, without admitting or denying the allegations of the Commission, consented, under the terms of the consent (the "Consent") attached hereto as

11

Exhibit B, to the entry of the final judgment (the "Final Judgment"), the form of which is attached as an exhibit to the Consent. The Final Judgment, among other things, permanently restrains and enjoins Delphi from the violation of certain securities law-Section 17(a) of the Securities Act of 1933; Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Securities Exchange Act of 1934 (the "Exchange Act"); and Rules 10b-5, 12b-20, 13a-1, 13a-13 and 13b2-1 promulgated under the Exchange Act. Consistent with the principles announced in the Commission's January 2006 Statement Concerning Financial Penalties, the Commission considered Delphi's significant remediation and extensive cooperation, among other things, in deciding not to impose a monetary penalty.

27. There are collateral implications resulting from consenting to the entry of the Final Judgment.[5] Nevertheless, the Debtors believe that entering into this settlement is in their best interests. Indeed, absent prevailing in full on the merits at trial, the Debtors believe that this settlement is as positive a resolution as could be reasonably expected. In light of the risks and costs inherent in litigation, together with the importance to the Debtors' transformation plan of resolving the Commission's investigation and potential claims against the Debtors, the Debtors have concluded that entering into this settlement is in the best interest of their estates and stakeholders.

---

[5] For example, Delphi is subject to contempt should it violate the terms of the injunction. Absent relief from the Commission, entry of the Final Judgment also renders inapplicable, for a three year period, the protections of the "safe harbor" for forward looking statements under the federal securities laws. (The judicially created "bespeaks caution" doctrine may nevertheless provide protection in defending against any private securities actions premised upon forward looking statements that are accompanied by meaningful cautionary language. See, e.g., In re WorldCom, Inc. Securities Litigation, 294 F.Supp.2d 392, 410-11 (S.D.N.Y. 2003).) The Final Judgment may also have the effect of requiring Delphi to meet more stringent disclosure and/or reporting obligations in connection with future issuances of securities.

C.    Remedial Steps And Implementation Of Controls

28.    As previously disclosed in filings with the Commission, as a result of its investigation the Audit Committee identified several material weaknesses involving lack of knowledge of generally accepted accounting principles and appropriate staffing; certain ineffective or inadequate accounting policies; certain ineffective or inadequate controls over the administration and related accounting treatment for contracts; and an ineffective "tone" within the organization related to the discouragement, prevention, or detection of "management override" as well as an inadequate emphasis on analysis of accounts and financial transactions. Delphi has made and will continue to make improvements to its policies and procedures, as well as to the staffing of positions that play a significant role in internal controls to address these matters, all of which have been more fully described in Delphi's filings with the Commission.

29.    Moreover, subsequent to the restatement, but before reaching a settlement with the Commission, Delphi made several high level personnel changes. These include the following: (i) Robert S. Miller, Jr. was named as Delphi's Chief Executive Officer on July 1, 2005; (ii) John Arle was named Vice President and Treasurer, as of June 8, 2005; (iii) David M. Sherbin was named Vice President and General Counsel on October 3, 2005, and Delphi's Board of Directors assigned Mr. Sherbin the additional duties of Chief Compliance Officer, reporting in this capacity to both the CEO and the Audit Committee; and (iv) the Board of Directors named Robert J. Dellinger as Executive Vice President and Chief Financial Officer on October 8, 2005. In addition, none of the employees and officers named in the Commission's Complaint remains in Delphi's employ.

Applicable Authority

30. Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a). Settlements and compromises are "a normal part of the process of reorganization," Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Comm'ns Corp., 327 B.R. 143, 159 (decision to accept or reject a settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

31. Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of a debtor's estate. See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Comm'ns, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained. Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it."). In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

32. The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate: (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant

14

expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

33. Courts in this district have further elaborated on these factors to consider: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the proportion of the class members who do not object or who affirmatively support the proposed settlement, (d) the competency and experience of counsel who support the settlement, (e) the relative benefits to be received by individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the directors and officers as a result of the settlement, and (g) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion. Adelphia Comm'ns, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

34. The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances. See Adelphia Comm'ns, 327 B.R. at 159-60; see also Penn Centr., 596 F.2d at 1114. Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'" In re Telesphere Comm'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citation omitted). To that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above

"'the lowest point in the range of reasonableness.'" Adelphia Comm'ns, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994).

35. The Debtors believe that the settlement described herein and in the Final Judgment, attached as an exhibit to the Consent, clearly falls within a reasonable range of litigation possibilities, is in the best interests of the estate, and should be approved.  As is the case with any litigation, the outcome of any potential litigation in connection with the Commission investigation is uncertain, and a trial on the merits would involve significant time and expense, as well as an administrative burden.  Thus, the Debtors believe that resolving the Commission investigation in the manner described above is a fair resolution of this matter, and in the best interests of the Debtors and their creditors.  Moreover, the settlement described above and in the Final Judgment involves no monetary fines or penalties.  In addition, the Debtors' settlement with the Commission allows the Debtors to clear another hurdle on the way to exiting chapter 11.

36. In the exercise of their business judgment, the Debtors therefore believe that the terms of the settlement are reasonable.  Based on the benefits to be realized from entering into the settlement agreement with the Commission, together with the potential harm to the estates if the relief requested herein is not granted, the Debtors respectfully request that the settlement be approved.

Notice

37. Notice of this Motion has been provided in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. Sections 102(1) and 105 and Fed. R. Bankr. P.

2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures (Docket No. 5418).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

38.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) granting the relief requested herein and (b) granting the Debtors such other further relief as is just.

Dated:     New York, New York
           November 10, 2006

                              SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP

                              By:  /s/ John Wm. Butler, Jr.
                                   John Wm. Butler, Jr. (JB 4711)
                                   John K. Lyons (JL 9331)
                                   Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606

                                   - and -

                              By:  /s/ Kayalyn A. Marafioti
                                   Kayalyn A. Marafioti (KM 9632)
                                   Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036

                              Attorneys for Delphi Corporation, et al.,
                                 Debtors and Debtors-in-Possession