# EXHIBIT D

**Hearing Date and Time: November 30, 2006 at 10:00 a.m.**
**Response Date and Time: November 24, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
       In re                              :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                       Debtors.           :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF MOTION FOR ORDER AUTHORIZING ENTRY INTO SETTLEMENT WITH THE SECURITIES AND EXCHANGE COMMISSION

PLEASE TAKE NOTICE that on November 10, 2006, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed a Motion For Order Authorizing Entry Into Settlement With The Securities And Exchange Commission (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the Motion will be held on November 30, 2006, at 10:00 a.m. (Prevailing Eastern Time) (the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418) (the "Eighth Supplemental Case Management Order"), (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (d) be submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for the agent under the

Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S. Ziman), (iv) counsel for the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald S. Bernstein and Brian Resnick), (v) counsel for the Official Committee of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg and Mark A. Broude), and (vi) counsel for the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 (Att'n: Bonnie Steingart), and (vii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:  Alicia M. Leonhard), in each case so as to be **received** no later than **4:00 p.m. (Prevailing Eastern Time)** on **November 24, 2006** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth herein and in accordance with the Eighth Supplemental Case Management Order will be considered by the Bankruptcy Court at the Hearing.  If no objections to the Motion are timely filed and served in accordance with the procedures set forth herein and in the Eighth Supplemental Case Management Order, the Bankruptcy Court may enter a final order granting the Motion without further notice

Dated: New York, New York
　　　　 November 10, 2006

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:/s/ John Wm. Butler, Jr.                                 
　　 John Wm. Butler, Jr. (JB 4711)
　　 John K. Lyons (JL 4951)
　　 Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700


By:/s/ Kayalyn A. Marafioti                               
　　 Kayalyn A. Marafioti (KM 9632)
　　 Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
　 Debtors and Debtors-in-Possession

**Hearing Date and Time: November 30, 2006 at 10:00 a.m.**
**Response Date and Time: November 24, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                     :

     In re                            :     Chapter 11

                                       :

DELPHI CORPORATION, et al.,        :     Case No. 05-44481 (RDD)

                                       :

                                     :     (Jointly Administered)

               Debtors.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## MOTION FOR ORDER AUTHORIZING ENTRY INTO SETTLEMENT WITH THE SECURITIES AND EXCHANGE COMMISSION

### ("SEC SETTLEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the

"Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submit this Motion For Order Authorizing Entry Into

Settlement With The Securities And Exchange Commission (the "Motion").  In support of this

Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and

affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title

11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

The Debtors continue to operate their businesses and manage their properties as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered

orders directing the joint administration of the Debtor's chapter 11 cases.

2.    No trustee or examiner has been appointed in the Debtors' cases.  On

October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an

official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an

official committee of equity holders.

3.    This Court has jurisdiction over this objection pursuant to 28 U.S.C. §§

157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicate for the relief requested herein is section 105(a) of

the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

5.    As of December 31, 2005, Delphi and its subsidiaries and affiliates

(collectively, the "Company") had global 2005 net sales of approximately $26.9 billion and

2

global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked

as the fifth largest public company business reorganization in terms of revenues, and the

thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S.

subsidiaries are not chapter 11 debtors and continue their business operations without

supervision from the Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

---

[1]    The aggregated financial data used in this objection generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates.

3

C.    Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

9.      The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

4

D.     The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

E.     Securities And Exchange Commission Investigation

13.     On October 30, 2006, the Securities and Exchange Commission (the "Commission") commenced and simultaneously settled with Delphi a lawsuit alleging violations of federal securities laws.  The lawsuit and settlement relate to transactions that were the subject

of a June 2005 financial restatement. Specifically, Delphi completed a financial restatement in

June 2005, the effects of which reduced retained earnings as of December 31, 2001 by $265

million, reduced 2002 net income by $24 million, and improved 2003 net loss by $46 million.

The nature of the restatement adjustments have been described on Form 8-K filings with the

Commission.[3] Delphi fully cooperated with the Commission throughout its investigation.[4]

14.    Under the agreement approved by the Commission, and as more fully

described below, Delphi agreed, without admitting or denying any wrongdoing, to be enjoined

from future violations of the securities laws. Also under the agreement, the Commission did not

seek civil monetary penalties against Delphi. Delphi is pleased that the Commission's

investigation has been completed and settled, and considers the settlement an important step in

its transformation process.

---

[3]    Subsequent to and unrelated to the settlement, on November 8, 2006, Delphi filed a current report on Form 8-K
in which it disclosed that it had determined it will require more time to complete its financial statements and
file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2006. In connection with the audit
of Delphi's 2006 consolidated financial statements and performing related interim procedures for the third
quarter, the Company's independent auditors identified and informed Delphi of a potential issue with the
designation of hedges related to foreign currency. Specifically, Delphi became aware that the hedge
designation for foreign currency forward contracts it had entered into to hedge exposure to foreign currency
fluctuations may not have satisfied the technical accounting rules under Statement of Financial Accounting
Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended ("FAS 133") to
qualify for exemption from the more strict effectiveness testing requirements. Delphi together with its current
and former independent public accounting firms is reviewing the accounting treatment accorded to these
contacts. Delphi had historically designated its foreign currency forward contracts as hedges and recorded
changes in value during each period prior to settlement as other comprehensive income or loss. Delphi is
reviewing its designation documentation to determine if it has complied with the requirements of FAS 133
applicable to hedge accounting. These types of foreign currency forward contracts are routinely entered into as
part of Delphi's currency exchange rate risk management strategy. Delphi believes that these foreign currency
forward contracts were effective economic hedges for its exposure to foreign currency fluctuations. The
potential change to the accounting for these contracts does not affect cash flows. However, it may change the
timing of recognizing the previously deferred gains or losses on the foreign currency forward contracts in
earnings for the periods impacted.

[4]    Separately, and as previously disclosed in public filings, the Debtors are cooperating with the Department of
Justice in a parallel investigation.

<u>Relief Requested</u>

15.      By this Motion, the Debtors seek entry of the proposed order authorizing

the Debtors' entry into a settlement with the Commission resolving investigations by the

Commission into various prepetition acts of the Debtors.  Delphi's settlement with the

Commission permanently restrains and enjoins Delphi from violating certain securities laws, but

does not impose any monetary fine on Delphi.  Delphi's settlement with the Commission is

subject to this Court's approval.  This Court's approval of the settlement will remove another

major hurdle to the Debtors' transformation process.

16.      The proposed settlement is, in the Debtors' view, in the best interests of all

creditors and other stakeholders.  The Debtors therefore request that the settlement be approved

and that the proposed order be entered.

<u>Basis For Relief</u>

A.      <u>Internal And Commission Investigations</u>

17.      In late July 2004, Delphi received its first subpoena from the Commission

requesting information regarding Delphi's agreements with a long time supplier of information

technology services to Delphi.  In August 2004, Delphi received a copy of the formal order of

investigation from the Commission indicating that the staff of the Commission (the "Staff") had

commenced a non-public, fact-finding inquiry regarding transactions between Delphi and the

information technology supplier, including the accounting treatment of payments made and

credits given by the information technology supplier to Delphi during 2000 and 2001, and certain

payments made by Delphi to the information technology supplier for system implementation

services in 2002 and in early 2003.  Delphi formally retained the outside firm of Wilmer Cutler

7

Pickering Hale and Dorr, LLP ("WilmerHale") in August 2004 to assist in its internal review of this matter.

18.    In October 2004, the Audit Committee of the Board of Directors (the "Audit Committee") assumed oversight responsibility for the internal review and directed Delphi's response to the Staff's investigation.  To assist with the internal review, WilmerHale retained a forensic accounting consultant.  As a result of Delphi's internal review, in addition to the payments, credits, and other matters identified by the Commission, certain other transactions were identified and investigated.  Delphi shared this information with the Staff on an ongoing basis.

19.    In connection with Delphi's remedial measures, on March 1, 2005 and thereafter, the chairman of the Audit Committee, and at times one or more of the other independent directors serving on the Audit Committee (collectively, the "Audit Committee Members"), met with certain members of management who were involved in the transactions under review.  The meetings before the Audit Committee Members were conducted in a methodical and fair manner.  This process enabled the Audit Committee Members to evaluate the conduct and knowledge of the employees under review, and to consider carefully what personnel changes or other steps, if any, should be taken to strengthen Delphi's internal controls and procedures over financial reporting and disclosure controls and procedures so that the occurrence of similar errors could be prevented.

20.    As a result of this process, in March 2005, Delphi took the following remedial actions, among others:  (i) accepted the resignation, effective March 4, 2005, of Delphi's Vice Chairman and Chief Financial Officer, who also resigned from Delphi's Board of Directors; (ii) accepted the resignation of Delphi's former Chief Accounting Officer and

Controller and business line executive in charge of certain product lines; and (iii) reassigned the

Vice President of Treasury, Mergers & Acquisitions and New Markets to a non-officer position

with a commensurate reduction in responsibilities and compensation.  Each of these individuals

had supervisory authority for others involved in or was directly involved in certain of the

principal transactions under investigation.  Moreover, on March 4, 2005, Delphi filed a Form 8-

K stating that, although the Company's internal investigation was not yet complete, based on its

preliminary conclusions reached to date with respect to the transactions under review, the audited

financial statements and related independent auditor's reports for 2001 and subsequent periods

should no longer be relied upon and that a restatement would be required.

         21.      On April 1, 2005 and thereafter, the Audit Committee Members met with

additional members of management who were involved in the transactions under review.

Following these meetings, Delphi took additional remedial actions by accepting the resignations

of, or otherwise separating, employees serving in the following positions:  (i) Director of

Financial Accounting and Reporting, from 2001 to 2004; (ii) Director of Financial Accounting

and Reporting, from August 1998 to January 2000, and Director of Capital Planning and Pension

Analysis, from January 2000 to August 2001; (iii) Treasurer and Vice President of Treasury,

Mergers and Acquisitions, from 1998 to 2005; (iv) Director of Financial Accounting and

Reporting, from March 2000 to April 2001; and (v) Assistant Treasurer, from 1998 to September

19, 2000.  Delphi subsequently made further personnel changes resulting in the resignation or

separation of additional employees.

         22.      On June 8, 2005, the Audit Committee met with the Company's

independent auditors to discuss the results of its investigation, and on June 30, 2005, Delphi

announced the completion of its financial restatement.  In conjunction with the restatement, the

Audit Committee concluded its internal investigation of certain accounting transactions that

dated back to 2000.

B.    Resolution Of The Commission Investigation

23.    On October 30, 2006, the Commission filed and settled financial fraud

charges against Delphi in the United States District Court for the Eastern District of Michigan.

In its complaint (the "Complaint"), a copy of which is attached hereto as Exhibit A, the

Commission charged Delphi with engaging in a pattern of fraudulent conduct between 2000 and

2004.  At the same time, Delphi agreed to resolve the charges with the Commission, without

admitting or denying any wrongdoing, and to be enjoined from future violations of the securities

laws.  The Commission also charged thirteen individuals (nine of whom were former Delphi

employees) for their alleged roles in the fraudulent conduct and/or in related reporting and

books-and-records violations by Delphi, none of whom are currently employed by or are insiders

of the Debtors.

24.    Delphi has fully cooperated with the Commission's investigation and

requests for information.  This cooperation entailed long hours of discussion and negotiation

with the Staff, on the one hand, and representatives of the Debtors, on the other hand, including

the Audit Committee's counsel, WilmerHale.  In addition, during the course of the Commission's

investigation, the Company twice entered into tolling agreements with the Commission to extend

the applicable statute of limitations, first until April 6, 2006, and subsequently until October 31,

2006.  As a result of the efforts of the Debtors, their representatives, and representatives of the

Commission, the Debtors now seek approval of Delphi's settlement with the Commission, which

resolves the Commission's claims against Delphi on terms that are favorable to the Debtors'

estates, with no monetary fines being imposed.

25.     The Commission's Complaint alleges that, between 2000 and 2004, Delphi engaged in multiple schemes that resulted in Delphi materially misstating its financial condition and operating results in filings with the Commission, offering documents, press releases, and other documents and statements.   The allegations contained in the Complaint include the following:

- In 2000, Delphi engaged in two fraudulent accounting and disclosure schemes, which had the purpose of and ultimately resulted in Delphi hiding a $237 million warranty claim asserted by its former parent company and inflating its net income by $202 million.

- In the fourth quarter of 2000, Delphi entered into two improper inventory schemes, through which it agreed to sell approximately $270 million of metals, automotive batteries and generator cores to two third parties at year end, while simultaneously agreeing to repurchase the inventory in the following quarter for the original sales price, plus interest charges and structuring fees.   The purpose and result of the schemes was for Delphi to inflate its cash flow from operations by $200 million, engineer $270 million in inventory reductions and improperly report $80 million in net income.

- In the fourth quarter of 2001, Delphi solicited a $20 million lump sum payment from an IT company in return for Delphi providing new business to the IT company.   Delphi agreed to repay the $20 million over five years, with interest, which made the payment, in substance a loan to the IT company.   However, in order to meet earnings forecasts for the quarter, Delphi improperly accounted for the $20 million payment as if it was a nonrefundable rebate on past business, rather than a liability.

- From 2003 to 2004, Delphi hid up to $325 million in factoring, or sales of accounts receivable, in order to improperly boost non-GAAP pro forma measures of Delphi's financial performance that were relied upon by investors, analysts, and rating agencies.   Hiding this factoring allowed Delphi to overstate materially its "Street Net Liquidity," a pro forma measure, during that two-year period.   In addition, in one quarter, Delphi also manipulated the hidden factoring to create a false $30 million boost in its "Street Operating Cash Flow," another pro forma measure.

26.     On October 20, 2006, Delphi, without admitting or denying the allegations of the Commission, consented, under the terms of the consent (the "Consent") attached hereto as

Exhibit B, to the entry of the final judgment (the "Final Judgment"), the form of which is

attached as an exhibit to the Consent.  The Final Judgment, among other things, permanently

restrains and enjoins Delphi from the violation of certain securities law-Section 17(a) of the

Securities Act of 1933; Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the

Securities Exchange Act of 1934 (the "Exchange Act"); and Rules 10b-5, 12b-20, 13a-1, 13a-13

and 13b2-1 promulgated under the Exchange Act.  Consistent with the principles announced in

the Commission's January 2006 Statement Concerning Financial Penalties, the Commission

considered Delphi's significant remediation and extensive cooperation, among other things, in

deciding not to impose a monetary penalty.

27.    There are collateral implications resulting from consenting to the entry of

the Final Judgment.[5]  Nevertheless, the Debtors believe that entering into this settlement is in

their best interests.  Indeed, absent prevailing in full on the merits at trial, the Debtors believe

that this settlement is as positive a resolution as could be reasonably expected.  In light of the

risks and costs inherent in litigation, together with the importance to the Debtors' transformation

plan of resolving the Commission's investigation and potential claims against the Debtors, the

Debtors have concluded that entering into this settlement is in the best interest of their estates

and stakeholders.

---

[5]    For example, Delphi is subject to contempt should it violate the terms of the injunction.  Absent relief from the
Commission, entry of the Final Judgment also renders inapplicable, for a three year period, the protections of
the "safe harbor" for forward looking statements under the federal securities laws.  (The judicially created
"bespeaks caution" doctrine may  nevertheless provide protection in defending against any private securities
actions premised upon forward looking statements that are accompanied by meaningful cautionary language.
See, e.g., In re WorldCom, Inc. Securities Litigation, 294 F.Supp.2d 392, 410-11 (S.D.N.Y. 2003).)   The Final
Judgment may also have the effect of requiring Delphi to meet more stringent disclosure and/or reporting
obligations in connection with future issuances of securities.

C.    Remedial Steps And Implementation Of Controls

28.    As previously disclosed in filings with the Commission, as a result of its investigation the Audit Committee identified several material weaknesses involving lack of knowledge of generally accepted accounting principles and appropriate staffing; certain ineffective or inadequate accounting policies; certain ineffective or inadequate controls over the administration and related accounting treatment for contracts; and an ineffective "tone" within the organization related to the discouragement, prevention, or detection of "management override" as well as an inadequate emphasis on analysis of accounts and financial transactions. Delphi has made and will continue to make improvements to its policies and procedures, as well as to the staffing of positions that play a significant role in internal controls to address these matters, all of which have been more fully described in Delphi's filings with the Commission.

29.    Moreover, subsequent to the restatement, but before reaching a settlement with the Commission, Delphi made several high level personnel changes.  These include the following:  (i) Robert S. Miller, Jr. was named as Delphi's Chief Executive Officer on July 1, 2005; (ii) John Arle was named Vice President and Treasurer, as of June 8, 2005; (iii) David M. Sherbin was named Vice President and General Counsel on October 3, 2005, and Delphi's Board of Directors assigned Mr. Sherbin the additional duties of Chief Compliance Officer, reporting in this capacity to both the CEO and the Audit Committee; and (iv) the Board of Directors named Robert J. Dellinger as Executive Vice President and Chief Financial Officer on October 8, 2005. In addition, none of the employees and officers named in the Commission's Complaint remains in Delphi's employ.

Applicable Authority

30.     Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the

trustee and after notice and a hearing, the court may approve a compromise or settlement."

Bankruptcy Rule 9019(a).  Settlements and compromises are "a normal part of the process of

reorganization," Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106,

130 (1939)); see also In re Adelphia Comm'ns Corp., 327 B.R. 143, 159 (decision to accept or

reject a settlement lies within sound discretion of bankruptcy court), adhered to on

reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

31.     Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate

when the compromise is fair and equitable and is in the best interests of a debtor's estate.  See,

e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Comm'ns, 327 B.R. at 159 ("The settlement

need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within

the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr.

Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y.

1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best

interest of an estate before approving it.").  In general, compromises in the bankruptcy context

should be approved unless they "'fall below the lowest point in the range of reasonableness.'"

Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

32.     The Supreme Court in TMT Trailer Ferry set forth the following factors

that courts should consider in determining whether a proposed settlement or compromise is in the

best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b)

the difficulties associated with collection, (c) the complexity of the litigation, and the attendant

14

expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors.

TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v.

Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

33.     Courts in this district have further elaborated on these factors to consider:

(a) the balance between the likelihood of plaintiff's or defendants' success should the case go to

trial vis-à-vis the concrete present and future benefits held forth by the settlement without the

expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex

and protracted litigation if the settlement is not approved, (c) the proportion of the class members

who do not object or who affirmatively support the proposed settlement, (d) the competency and

experience of counsel who support the settlement, (e) the relative benefits to be received by

individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the

directors and officers as a result of the settlement, and (g) the extent to which the settlement is

truly the product of arms-length bargaining, and not of fraud or collusion.  Adelphia Comm'ns,

327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

34.     The bankruptcy court need not determine that all of the foregoing criteria

favor approval of a compromise, and the proposed compromise need not be the best agreement

that the debtor could have achieved under the circumstances.  See Adelphia Comm'ns, 327 B.R.

at 159-60; see also Penn Centr., 596 F.2d at 1114.  Instead, the court's proper "role is to

determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co.,

120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation

possibilities.'"  In re Telesphere Comm'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994)

(citation omitted).  To that end, courts should not substitute their own judgment for that of the

debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above

"'the lowest point in the range of reasonableness.'"  <u>Adelphia Comm'ns</u>, 327 B.R. at 159 (quoting

<u>W.T. Grant Co.</u>, 699 F.2d at 608); <u>accord</u> <u>Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co.</u>

(In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), <u>aff'd sub nom</u>. <u>Sobchack v.</u>

<u>Am. Nat'l Bank & Trust Co.</u>, 17 F.3d 600 (2d Cir. 1994).

35.     The Debtors believe that the settlement described herein and in the Final

Judgment, attached as an exhibit to the Consent, clearly falls within a reasonable range of

litigation possibilities, is in the best interests of the estate, and should be approved.  As is the

case with any litigation, the outcome of any potential litigation in connection with the

Commission investigation is uncertain, and a trial on the merits would involve significant time

and expense, as well as an administrative burden.  Thus, the Debtors believe that resolving the

Commission investigation in the manner described above is a fair resolution of this matter, and in

the best interests of the Debtors and their creditors.  Moreover, the settlement described above

and in the Final Judgment involves no monetary fines or penalties.  In addition, the Debtors'

settlement with the Commission allows the Debtors to clear another hurdle on the way to exiting

chapter 11.

36.     In the exercise of their business judgment, the Debtors therefore believe

that the terms of the settlement are reasonable.  Based on the benefits to be realized from

entering into the settlement agreement with the Commission, together with the potential harm to

the estates if the relief requested herein is not granted, the Debtors respectfully request that the

settlement be approved.

<u>Notice</u>

37.     Notice of this Motion has been provided in accordance with the Amended

Eighth Supplemental Order Under 11 U.S.C. Sections 102(1) and 105 and Fed. R. Bankr. P.

2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case

Management, and Administrative Procedures (Docket No. 5418).  In light of the nature of the

relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

38.     Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) granting the relief requested herein and (b) granting the Debtors such other further relief as is just.

Dated:        New York, New York
              November 10, 2006

                              SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP

                              By:   /s/ John Wm. Butler, Jr.
                                  John Wm. Butler, Jr. (JB 4711)
                                  John K. Lyons (JL 9331)
                                  Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606

                                  - and -

                              By:   /s/ Kayalyn A. Marafioti
                                  Kayalyn A. Marafioti (KM 9632)
                                  Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036

                              Attorneys for Delphi Corporation, et al.,
                                  Debtors and Debtors-in-Possession

# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

U.S. SECURITIES AND EXCHANGE
COMMISSION,

        **Plaintiff,**

    **v.**

DELPHI CORPORATION,
J.T. BATTENBERG, III,
ALAN DAWES,
PAUL FREE,
JOHN BLAHNIK,
MILAN BELANS,
CATHERINE ROZANSKI,
JUDITH KUDLA,
SCOT MCDONALD,
B.N. BAHADUR,
ATUL PASRICHA,
LAURA MARION,
STUART DOYLE and
KEVIN CURRY,

        **Defendants.**

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges for its Complaint:

# SUMMARY OF ALLEGATIONS

1.    This case involves a pattern of federal securities laws violations by defendant Delphi Corporation ("Delphi") and certain of its senior officers, accounting staff and treasury staff, from 2000 through 2004.  During this time, Delphi's former Chief Executive Officer J.T. Battenberg, III, former Chief Financial Officer Alan Dawes, former Controller and Chief Accounting Officer Paul Free, former Treasurer and Vice President John Blahnik, former Director of Capital Planning and Pension Analysis Milan Belans, former Director of Financial Accounting and Reporting Catherine Rozanski and Judith Kudla, a former Delphi finance director, each engaged in one or more fraudulent accounting or disclosure schemes.  As a result of these schemes, Delphi materially misstated its financial condition and operating results in filings with the Commission, in offering documents, and in other statements to investors.

2.    Scot McDonald, a senior accountant with a Texas information technology ("IT") company (the "IT Company") and B.N. Bahadur, the principal and owner of a Michigan consulting company (the "Consulting Company"), each aided and abetted Delphi in separate fraudulent schemes.  The other individual defendants aided and abetted Delphi in books and records and reporting violations associated with certain of the schemes.

2

3.    First, in the second quarter and full year 2000, Delphi improperly

accounted for and disclosed an increase in warranty reserves related to warranty

claims made by its former parent company.  Delphi recorded the reserve increase

as a direct adjustment to retained earnings rather than as an expense.  It also

disclosed the adjustment in an intentionally and materially misleading way that

suggested, falsely, that the second quarter adjustment primarily related to certain

pension and other post-employment ("OPEB") matters and failed to disclose

highly material information concerning the reserve increase and the former parent

company's warranty claim.  Moreover, in the third quarter and full year 2000,

Delphi improperly accounted for and disclosed a payment that it made to its former

parent company pursuant to a settlement agreement.  Delphi treated the payment as

if it related primarily to certain pension and OPEB matters, even though Delphi

knew that the settlement in fact related exclusively to the warranty claims made by

its former parent company.  As a result of these deliberate mischaracterizations,

Delphi materially overstated its originally reported earnings per share ("EPS") and

net income for the second and third quarters of and full year 2000.  The

misstatements were reflected in Delphi's Form 10-Q for the period ended June 30,

2000, as filed with the Commission on or about July 17, 2000, its Form 10-Q for

the period ended September 30, 2000, as filed with the Commission on or about

October 11, 2000, and its Form 10-K for the period ended December 31, 2000, as

filed with the Commission on or about February 8, 2001. Defendants Battenberg, Dawes, Free and Belans were responsible for some or all of this fraudulent conduct. Defendant Atul Pasricha aided and abetted in the Delphi books and records, and reporting violations associated with Delphi's improper accounting for the warranty settlement.

4.       Also, in the fourth quarter of 2000, Delphi sold approximately $270 million of inventory to two third parties while simultaneously agreeing to repurchase the inventory in the following quarter for the original sales price, plus interest charges and structuring fees. By improperly accounting for the transactions as true sales, rather than as financing transactions, Delphi improperly recognized a material amount in cash flow from operations and materially overstated its reported EPS and net income for the fourth quarter of 2000 and, combined with the warranty misstatements, further materially overstated its net income for the year 2000. The misstatements were reflected in Delphi's Form 10-K for the period ended December 31, 2000, as filed with the Commission on or about February 8, 2001. Defendants Dawes, Free, Blahnik and Belans were responsible for some or all of this fraudulent conduct. Delphi was aided and abetted in one of the transactions by Defendant Bahadur. Defendant Laura Marion aided and abetted in the Delphi books and records, and reporting violations associated with Delphi's accounting for and reporting of these transactions.

4

5.    Additionally, in the fourth quarter of 2001, Delphi solicited a lump sum payment from the IT Company, in return for Delphi providing new business to the IT Company and agreeing to repay the $20 million, with interest, over a five-year period.  Despite knowing that this payment should have been accounted for by Delphi as Delphi's liability to the IT Company, Delphi documented the transaction in a way that misrepresented the nature of the payment and accounted for the payment as an immediate reduction of IT expense in the fourth quarter.  This resulted in Delphi materially overstating its originally reported EPS and net income in 2001 for the fourth quarter and for the full year (based on the company's pro forma reported earnings, which excluded certain restructuring charges).  The misstatements were reflected in Delphi's Form 10-K for the period ended December 31, 2001, as filed with the Commission on or about February 12, 2002. Defendants Dawes, Free, Rozanski and Kudla were responsible for some or all of this fraudulent conduct.  Delphi was aided and abetted in the fraudulent scheme by Defendant McDonald.  Defendants Stuart Doyle and Kevin Curry, client executives at the IT Company, aided and abetted the Delphi books and records, and reporting violations associated with the scheme.

6.    Moreover, from 2003 to 2004, Delphi intentionally failed to disclose material sales of accounts receivable ("factoring").  In its earnings reports filed with the Commission on Forms 8-K in 2003 and in related presentations to

investors and analysts in 2003 and 2004, Delphi used pro forma measures of

liquidity and operating cash flow, known as Street Liquidity and Street Operating

Cash Flow.   Under these measures, consistent with rating agency practices, cash

flow from factoring is supposed to be treated as borrowing proceeds rather than as

cash flow from operations.   By failing to disclose a material portion of its total

factoring, Delphi materially overstated its Street Liquidity and Street Operating

Cash Flow.   Defendants Dawes and Blahnik participated in some or all of this

fraudulent conduct.

      7.     By virtue of the foregoing conduct:

      a.     Delphi, directly or indirectly, engaged in and, unless enjoined, will

will continue to engage in transactions, acts, practices or courses of business which

constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities

Act") [15 U.S.C. §77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B)

of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78j(b),

78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, 13a-11

and 13a-13 [17 C.F.R. §§240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11 and

240.13a-13], promulgated thereunder;

      b.     Battenberg, directly or indirectly, engaged in and, unless

enjoined, will continue to engage in transactions, acts, practices or courses of

business which constitute violations of Section 17(a) of the Securities Act [15

U.S.C. §77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C.

§§78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R.

§§240.10b-5, 240.13b2-1 and 240.13b2-2], promulgated thereunder, and aided and

abetted violations by Delphi of Sections 13(a) and 13(b)(2)(A) of the Exchange

Act [15 U.S.C. §§78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13

[17 C.F.R. §§240.12b-20, 240.13a-1 and 240.13a-13], promulgated thereunder;

      c.     Dawes, directly or indirectly, engaged in and, unless enjoined,

will continue to engage in transactions, acts, practices or courses of business which

constitute violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)],

Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and

78m(b)(5)], and Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R. §§240.10b-5,

240.13b2-1 and 240.13b2-2], promulgated thereunder, and aided and abetted

violations by Delphi of Sections 13(a), 13(b)(2)(A) and Section 13(b)(2)(B) of the

Exchange Act [15 U.S.C. §§78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules

12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-

11 and 240.13a-13], promulgated thereunder;

      d.     Free, directly or indirectly, engaged in and, unless enjoined,

will continue to engage in transactions, acts, practices or courses of business which

constitute violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)],

Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and

78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R. §§240.10b-5,

240.13b2-1 and 240.13b2-2], promulgated thereunder, and aided and abetted

violations by Delphi of Sections 13(a), 13(b)(2)(A) and Section 13(b)(2)(B) of the

Exchange Act [15 U.S.C. §§78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules

12b-20, 13a-1 and 13a-13 [17 C.F.R. §§240.12b-20, 240.13a-1 and 240.13a-13],

promulgated thereunder;

       e.    Blahnik, directly or indirectly, engaged in and, unless enjoined,

will continue to engage in transactions, acts, practices or courses of business which

constitute violations of violated Section 17(a) of the Securities Act [15 U.S.C.

§77q(a)], Section 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)] of the

Exchange Act and Rules 10b-5 and 13b2-1 [17 C.F.R. §§240.10b-5 and 240.13b2-

1], promulgated thereunder, and aided and abetted violations by Delphi of Sections

13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§78m(a) and

78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-11 [17 C.F.R. §§240.12b-20,

240.13a-1 and 240.13a-11], promulgated thereunder;

       f.    Belans, directly or indirectly, engaged in and, unless enjoined,

will continue to engage in transactions, acts, practices or courses of business which

constitute violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)],

Section 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and

78m(b)(5)] and Rules 10b-5 and 13b2-1 [17 C.F.R. §§240.10b-5 and 240.13b2-1],

promulgated thereunder, and aided and abetted violations by Delphi of Sections

13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§78m(a) and

78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§240.12b-20,

240.13a-1 and 240.13a-13], promulgated thereunder;

    g.  Rozanski, directly or indirectly, engaged in and, unless

enjoined, will continue to engage in transactions, acts, practices or courses of

business which constitute violations of Section 17(a) of the Securities Act [15

U.S.C. §77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§

78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 [17 C.F.R. §§240.10b-5 and

240.13b2-1], promulgated thereunder, and aided and abetted violations by Delphi

of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C.

§§78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20 and 13a-1 [17

C.F.R. §§240.12b-20 and 240.13a-1], promulgated thereunder;

    h.  Kudla, directly or indirectly, engaged in and, unless enjoined,

will continue to engage in transactions, acts, practices or courses of business which

constitute violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)],

Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and

78m(b)(5)] and Rules 10b-5 and 13b2-1 [17 C.F.R. §§240.10b-5 and 240.13b2-1],

promulgated thereunder, and aided and abetted Delphi's violations of Sections

10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C.

§§78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10(b)(5), 12b-20 and

13a-1 [17 C.F.R. §§240.10b-5, 240.12b-20 and 240.13a-1], promulgated

thereunder;

       i.      Bahadur aided and abetted violations by Delphi of Sections

10(b), 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§78j(b), 78m(a) and

78m(b)(2)(A)] and Rules 10b-5, 12b-20 and 13a-1 [17 C.F.R. §§240.10b-5,

240.12b-20 and 240.13a-1], promulgated thereunder;

       j.      McDonald aided and abetted violations by Delphi of Sections

10(b), 13(a) and 13(b)(2)(A) of the Exchange Act  [15 U.S.C. §§78j(b), 78m(a)

and 78m(b)(2)(A)] and Rules 10b-5, 12b-20 and 13a-1 [17 C.F.R. §§240.10b-5,

240.12b-20 and 240.13a-1], promulgated thereunder;

       k.      Pasricha aided and abetted and, unless enjoined, will continue

to aid and abet violations by Delphi of Sections 13(a) and 13(b)(2)(A) of the

Exchange Act [15 U.S.C. §§78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1

and 13a-13 [17 C.F.R. §§240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13],

promulgated thereunder;

       l.      Marion aided and abetted violations by Delphi of Sections 13(a)

and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§78m(a) and 78m(b)(2)(A)] and

Rules 12b-20 and 13a-1 [17 C.F.R. §§240.10b-5, 240.12b-20 and 240.13a-1],

promulgated thereunder;

m.      Doyle aided and abetted violations by Delphi of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§78m(a) and 78m(b)(2)(A)] and Rules 12b-20 and 13a-1 [17 C.F.R. §§240.10b-5, 240.12b-20 and 240.13a-1], promulgated thereunder; and

n.      Curry aided and abetted violations by Delphi of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§78m(a) and 78m(b)(2)(A)] and Rules 12b-20 and 13a-1 [17 C.F.R. §§240.10b-5, 240.12b-20 and 240.13a-1], promulgated thereunder.

8.      The Commission requests that the Court enjoin defendants Delphi, Battenberg, Dawes, Free, Blahnik, Pasricha, Belans, Rozanski, Kudla and McDonald from further violations of the federal securities laws as alleged herein.

9.      The Commission further requests that the Court order defendants Battenberg, Dawes, Free, Blahnik, Belans, Rozanski, Kudla, Bahadur and McDonald to disgorge all ill-gotten gains, with prejudgment interest thereon pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

10.     The Commission further requests that the Court order defendants Battenberg, Dawes, Free, Blahnik, Belans, Rozanski, Kudla, and McDonald to pay civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

11.     The Commission further requests that the Court order defendants

Pasricha, Bahadur, Marion, Doyle and Curry to pay civil penalties pursuant to

Section 21(d)(3) of the Exchange Act.

12.     The Commission further requests that, pursuant to Section 21(d)(2) of

the Exchange Act, the Court permanently bar defendants Battenberg, Dawes and

Blahnik from serving as an officer or director of any issuer that has a class of

securities registered under Section 12 of the Exchange Act or that is required to file

reports pursuant to Section 15(d) of the Exchange Act.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this action pursuant to Section 22(a)

of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(e) and 27 of the

Exchange Act [15 U.S.C. §§78u(e), 78aa] and 28 U.S.C. §1331.

14.     Venue is proper in this Court pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C.

§78aa].

15.     In connection with the transactions, acts, practices and courses of

business alleged in this Complaint, Delphi, Battenberg, Dawes, Free, Blahnik,

Pasricha, Belans, Rozanski, Kudla, Marion, Bahadur, McDonald, Doyle and Curry

(collectively, the "Defendants") directly or indirectly, made use of the means or

instrumentalities of interstate commerce or of the mails.  Some of these

transactions, acts, practices and courses of business occurred within the Eastern District of Michigan.

## DEFENDANTS

16.    Delphi is an auto parts supplier that, at all relevant times, has been headquartered in Troy, Michigan. It was incorporated in Delaware in 1998. At all relevant times, Delphi's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the New York Stock Exchange ("NYSE") under the symbol "DPH." In 2001 and 2003, Delphi made certain registered offerings of notes and preferred stock. On October 8, 2005, Delphi filed for bankruptcy in the Southern District of New York. On November 11, 2005, Delphi was delisted from the NYSE. Delphi's common stock is now registered with the Commission pursuant to Section 12(g) of the Exchange Act and trades in the over the counter market and is quoted in the pink sheets under the symbol "DPHIQ." During all relevant times, Delphi disseminated financial statements to the public that the Company represented were presented in accordance with generally accepted accounting principles ("GAAP").

17.    J.T. Battenberg, III, age 63, resides in Bloomfield Hills, Michigan and Naples, Florida. He served as Chief Executive Officer and Chairman of Delphi from February 1999 until June 2005, when he retired from the company. As Chief Executive Officer, Battenberg reviewed Delphi's Forms 10-Q, and reviewed and

signed Delphi's Forms 10-K, prior to their filing with the Commission. Battenberg also reviewed Delphi's earnings releases and participated in presentations to investors and financial analysts.

18.    Alan Dawes, age 51, resides in Palm Beach Gardens, Florida. He served as Chief Financial Officer of Delphi from August 1998 to March 2005, when he was separated by Delphi. At all relevant times, Dawes reported to Battenberg. Dawes is not an accountant or a lawyer, but at all relevant times supervised Delphi's accounting and financial disclosure functions. As Delphi's Chief Financial Officer, Dawes prepared or oversaw the preparation of materials concerning Delphi's earnings forecasts and financial performance. He also reviewed or oversaw the preparation of Delphi's Forms 10-Q, and reviewed or oversaw the preparation of, and signed, Delphi's Forms 10-K, prior to their filing with the Commission. Dawes also reviewed and participated in the preparation of Delphi's earnings releases and participated in, and in the preparation of, presentations to investors and financial analysts.

19.    Paul Free, age 50, resides in Oakland, Michigan. He served as Controller and Chief Accounting Officer of Delphi from 1998 to April 2002, reporting to Dawes. He was separated by Delphi in March 2005. Free has been licensed as a certified public accountant ("CPA") in the State of Missouri since 1981. As Controller and Chief Accounting Officer of Delphi, Free prepared or

oversaw the preparation of materials concerning Delphi's earnings forecasts and financial performance. He also prepared, reviewed or oversaw the preparation of, and signed, Delphi's Forms 10-Q and 10-K, prior to their filing with the Commission. Free also reviewed and participated in the preparation of Delphi's earnings releases and participated in, and in the preparation of, presentations to investors and financial analysts.

20.    John Blahnik, age 52, resides in Bloomfield Hills, Michigan. He served first as Treasurer and then as Vice President of Treasury, Mergers and Acquisitions of Delphi from 1998 to 2005, reporting to Dawes. In June 2005, he was separated by Delphi. As Delphi's Treasurer and Vice President of Treasury, Mergers and Acquisitions, Blahnik oversaw the preparation of earnings releases and analyst and rating agency presentations that incorporated information concerning GAAP and non-GAAP measures of Delphi's cash flow and liquidity.

21.    Milan Belans, age 39, resides in Farmington Hills, Michigan. He served in various positions at Delphi, from 1998 until August 2005, when he was separated by the company. Belans served in Delphi's controller's office, as Director of Financial Accounting and Reporting, from August 1998 to January 2000, reporting to Free. He also served in Delphi's treasury department, as Director of Capital Planning and Pension Analysis, from January 2000 to August

15

2001, reporting to Dawes, Blahnik and Pasricha. Belans has been licensed as a CPA in the state of Michigan since 1992.

22.    Judith Kudla, age 48, resides in Bloomfield Hills, Michigan. She served in various positions at Delphi from 1998 to April 2002, when she was separated by the company. Kudla served as Director of Finance in Delphi's IT department from June 1999 to April 2002. In that position, Kudla was responsible for providing GAAP accounting advice concerning IT department transactions. Kudla has been licensed as a CPA in the State of Michigan since approximately 1984.

23.    Catherine Rozanski, age 38, resides in Troy, Michigan. She served in various positions at the company, from 1999 to 2005, when she was separated by the company. Rozanski served as Delphi's Director of Financial Accounting and Reporting from April 2001 to March 2004. Rozanski has been licensed as a CPA in the State of Michigan since 1992. As Director of Financial Accounting and Reporting, Rozanski prepared, reviewed or oversaw the preparation of Delphi's Forms 10-Q and 10-K, prior to their filing with the Commission.

24.    Scot McDonald, age 41, is a resident of Carrollton, Texas. He has served in various accounting positions at the IT Company from 1996 to the present. Between 1996 and 2002, McDonald served as the IT Company's Manager of U.S. GAAP Consulting and Reporting. Subsequently, he served, at various

16

times, as Director of U.S. GAAP, Controller and Chief Accounting Officer of the IT Company. McDonald has been licensed as a CPA in the State of Texas since 1989.

25.    B.N. Bahadur, age 61, resides in West Bloomfield, Michigan. At all material times, he was the founder, sole owner and principal of the Consulting Company, a private management consulting company based in Southfield, Michigan.

26.    Atul Pasricha, age 49, resides in Bloomfield Hills, Michigan. He served in various positions at Delphi from 1998 until 2006, when he resigned from the company. From 1998 to September 19, 2000, he was an assistant treasurer at Delphi.

27.    Laura Marion, age 34, resides in Rochester Hills, Michigan. She served in various positions at Delphi from 1999 to 2006, when she resigned from the company. Marion served as Delphi's Director of Financial Accounting and Reporting, reporting to Free, from March 2000 to April 2001. As Director of Financial Accounting and Reporting, Marion prepared, reviewed or oversaw the preparation of Delphi's Form 10-K for 2000, prior to its filing with the Commission.

28.    Stuart Doyle, age 49, resides in Rochester Hills, Michigan. He served in various positions at the IT Company, from 1985 to 2004. From approximately

June 2000 to February 2002, he served as the lead client executive supporting the IT Company's relationship with Delphi.

29.    Kevin Curry, age 58, resides in Hilton Head, South Carolina. He served in various positions at the IT Company, from 1976 until 2004. In 2001 and early 2002, he was a client executive, reporting to Doyle and supporting the IT Company's relationship with Delphi. Through the rest of 2002, he was the lead client executive supporting the IT Company's relationship with Delphi.

## Delphi's Warranty Reserve Increase and Warranty Payment to its Former Parent Company

30.    In May 2000, Delphi's former parent company asserted that Delphi owed it more than $350 million, and possibly as much as $800 million, to cover alleged warranty claims for purportedly defective parts Delphi sold to the former parent company prior to Delphi's separation from the former parent company in 1999 (the "Separation"). Because Delphi's existing reserves were not nearly sufficient to cover these claims, Battenberg and Dawes knew or were reckless in not knowing that making such a payment would result in a significant reduction to Delphi's operating income.

31.    Battenberg, Dawes and other Delphi executives believed the former parent company should have been estopped from making warranty claims related to parts sold before the Separation in excess of the reserves the former parent

18

company had put in place at Delphi at the time of the Separation. Despite their belief that the warranty claim was unfair, however, Battenberg and Dawes believed Delphi could not afford to be in a major dispute with its former parent company, which was Delphi's largest customer, and therefore believed Delphi had no choice but to settle with the former parent company.

### Second Quarter 2000 Warranty Reserve

32.    As of July 2000, Battenberg and Dawes hoped that they could convince the former parent company to reduce its warranty claims to no more than $100 million. Accordingly, in the second quarter of 2000, Delphi increased its warranty reserves by $112 million. However, Delphi misclassified this increase to the warranty liability as a direct charge, after tax, to retained earnings, rather than to current expenses, under the incorrect notion that the liability should have been recorded in Delphi's initial spin-off balance sheet at Separation. There was no basis for Delphi to record the reserve adjustment as an adjustment related to the spin-off. In particular, Battenberg and Dawes knew that Delphi remained liable for warranties on parts sold to the former parent prior to the spin-off, and that, in continuing to assert its full $275 million warranty claim, the former parent company had firmly rejected Delphi's contention that the warranty liability should have been recorded in Delphi's balance sheet before the spin-off. The misclassification of the reserve increase as a direct adjustment to equity, rather

than as an expense item, resulted in Delphi materially overstating its net income

for the second quarter, as reported in Delphi's Form 10-Q for the period ended

June 30, 2000, by $69 million.

33.    After Delphi and the former parent company settled the warranty

claims without agreement that the liability should have been accrued before the

separation, Delphi executives familiar with the warranty negotiations, including

Dawes and Free, knew or were reckless in not knowing that no basis existed for

Delphi's characterization of the second quarter warranty accrual as a direct charge

to equity.  Nevertheless, Delphi's Form 10-K for the period ended December 31,

2000 reflected the continued mischaracterization of the warranty reserve

adjustment, resulting in Delphi materially overstating its net income for the year by

$69 million.  Delphi's Form 10-K for the period ended December 31, 2000 was

reviewed and signed by Dawes and Free, both of whom knew or were reckless in

not knowing that Delphi's accounting for the warranty reserve, as reflected in the

financial statements incorporated in the Form 10-K, was materially and

intentionally false and misleading.

34.    In its Form 10-Q for the period ended June 30, 2000, Delphi

intentionally failed to disclose material information concerning its warranty dispute

with its former parent company.  Delphi made no mention of the warranty reserve

increase, and instead referred vaguely and misleadingly to a "separation related"

charge, suggesting the charge related to one of "several separation related transactions, such as the separation of our hourly pension and [OPEB] plans" from the former parent company.  Delphi's only disclosure relating to the former parent's warranty claim was a statement, elsewhere in the filing, that it was "engaged in ongoing discussions" with the former parent company "regarding potential warranty claims which may be material" but that it "believe[d] that [its] established reserves [would] be adequate to cover these claims."  Under the direction of, or with the approval of, Battenberg, Dawes and Free, Delphi intentionally failed to disclose in the filing or elsewhere: (i) that the former parent company was making a warranty claim of more than $350 million that far exceeded either Delphi's existing warranty reserves or the former parent company's historical warranty claims against Delphi; (ii) that the largest item in the so-called separation related charge did not relate to pension and OPEB, but to a highly material $112 million ($69 million after tax) increase in Delphi's warranty reserve; (iii) that the direct charge to retained earnings associated with the warranty claims related not to a previously agreed true-up of warranty claims, but to new claims asserted by the former parent company long after Separation; or (iv) the possible significance of these events to Delphi's current and future operating results and liquidity.  Delphi's Form 10-Q for the period ended June 30, 2000 was signed by Free and reviewed by Battenberg and Dawes, all of whom knew or were

reckless in not knowing that, as a result of the disclosures and omissions, the filing was materially and intentionally false and misleading.

## September 2000 Warranty Settlement

35.    By September 2000, Delphi and its former parent company had reached an agreement concerning 27 warranty claims, their likely cost, and the proportion representing Delphi's responsibility.  Delphi executives, including Battenberg and Dawes, continued to believe that the former parent company should be estopped from making the claims.  They also continued to be concerned about the impact of a large warranty payment on Delphi's net income for 2000. And they were concerned that, if Delphi made such a large warranty payment to its former parent company, investors, analysts and customers would raise serious questions about the quality of Delphi automotive parts.  However, Battenberg, and Dawes, as well as Pasricha and Belans, treasury executives who were reporting to Dawes and directly involved in the warranty negotiations, knew that the former parent company would not accept any amount less than $237 million from Delphi to satisfy the warranty claims, and would not agree that the liability should have been recorded in Delphi's initial spin-off balance sheet.

36.    Accordingly, in a September 5, 2000 meeting attended by Battenberg, Dawes and senior officers of the former parent company, the possibility of "asymmetrical" accounting was discussed.  Battenberg and Dawes took this to be a

suggestion that Delphi and the former parent company each account for the $237 million payment differently. According to Battenberg, the former parent company suggested that Delphi could use the "true up" process to accomplish its goals. The true-up process was a process by which Delphi made payments to the former parent company to compensate it for ongoing pension and OPEB liabilities associated with certain Delphi employees who had been employed by the former parent company.

37.    Battenberg and Dawes took the suggestion that Delphi use asymmetrical accounting and the true up process to resolve the warranty dispute as a suggestion that Delphi mischaracterize the warranty payment to meet its accounting and disclosure purposes, even though they knew the former parent company would be accounting for the whole payment as a warranty payment. They also understood, however, that Delphi could potentially limit the payment's impact on its own income statement if Delphi could relate the payment to something that would not directly and immediately lower Delphi's income and would not have to be publicly disclosed as relating to warranty expense.

38.    Immediately following the September 5 meeting, a scheme was developed to minimize the impact of the $237 million payment on Delphi's income statement by mischaracterizing it as a deferrable pension/OPEB expense. To carry out this scheme, Belans, at Pasricha's direction and with Dawes' approval, added a

provision to the warranty settlement agreement that released the former parent

company from a pension/OPEB claim that the former parent company had never

asserted against Delphi, and had no basis to assert; specifically, a claim that, in

calculating the pension/OPEB true-up payments, the companies should have used

certain 1999 actuarial assumptions, rather than 1998 assumptions. To support

Delphi's false and misleading accounting for the pension/OPEB release, Belans,

also at the direction of Pasricha, had Delphi's actuarial consultant conduct a rough

calculation of what Delphi's pension/OPEB true up payments would be if the

companies had used the 1999 assumptions. While Delphi's actuaries did not

perform any type of formal analysis, they did send Delphi a one-page fax that

suggested that Delphi's pension and OPEB payments to the former parent

company could have been about $202 million higher.

39.    On or about September 22, 2000, Delphi and the former parent

company executed the settlement agreement. The agreement was signed by Dawes

for Delphi, with the approval of Battenberg. It provided that, in exchange for

Delphi paying the former parent company $237 million in the third quarter of

2000, the former parent company would release Delphi from claims relating to 27

warranty campaigns and would release Delphi from any claim that the companies

should have used the 1999 actuarial assumptions, instead of 1998 assumptions, in

connection with the pension/OPEB true up payments. The agreement did not

allocate the payment between the 27 warranty items and the release of the

pension/OPEB liability, and thus facilitated the plan to account for the payment

asymmetrically. Although not reflected in the written agreement, the former parent

company also agreed to engage in a mediation or arbitration with Delphi, pursuant

to which Delphi could present its argument that the former parent company was

estopped from making the warranty claims and could attempt to recover a portion

of the $237 million.

40.    Consistent with the negotiations between the companies that had

valued the 27 items at $237 million, in connection with its quarter ended

September 30, 2000, the former parent company recorded the entire payment as a

warranty payment. The former parent company allotted no value to the

pension/OPEB provisions because it knew the claim was worthless. In contrast, in

the same period, Delphi improperly recorded $202 million of the total amount as a

pension/OPEB payment to the former parent company, and only $35 million as a

warranty charge. The $202 million portion of the payment had no impact on

Delphi's income statement because Delphi treated the $202 million payment as an

actuarial loss in its pension plan. This treatment enabled Delphi to amortize the

payment as an adjustment of pension expense over several years. Had Delphi

properly recorded the $202 million as a warranty-related expense, Delphi's net

income would have been less than $15 million for the third quarter of 2000, rather

than the $148 million it reported in its Form 10-Q for the third quarter of 2000 and its Form 10-K for 2000.

41.     Delphi has now conceded that the provision in the settlement agreement relating to pension/OPEB costs had no economic value and that it should have accounted for the entire $237 million payment to the former parent company as a warranty payment.  It filed a restated Form 10-K on June 30, 2005, recording the entire payment as a warranty charge.

42.     Battenberg, Dawes, Free and Belans each knew or were reckless in not knowing that engineers and financial analysts from Delphi and the former parent company had valued the 27 warranty items at $237 million and that the former parent company would not back down from its claim for $237 million. They also knew or were reckless in not knowing that, to the extent Delphi believed it had any basis to argue that the former parent company was estopped from making the claims, the former parent company had agreed to the arbitration or mediation process through which Delphi could present its claims to a neutral third party, and that those claims would not be limited to $35 million, but to the full $237 million.  (Battenberg, Dawes and Free subsequently became aware that, as a result of the mediation, Delphi ultimately recovered $55 million in warranty expense from the former parent company, even though Delphi had only recorded $35 million of the payment to the former parent company as a warranty expense).

Finally, Battenberg, Dawes, Free and Belans knew or were reckless in not knowing that at no time during any of the negotiations leading to the September 2000 settlement did anyone at the former parent company make any claim relating to pension/OPEB actuarial assumptions. Rather they included, or allowed the inclusion of, the reference to increases in pension/OPEB costs in the warranty settlement solely to allow Delphi to falsely account for $202 million of the payment as a pension/OPEB payment to the former parent company.

43.     Based on their participation in the scheme, Battenberg, Dawes, Free and Belans knew or were reckless in not knowing that Delphi's accounting for the $202 million of the $237 million payment to the former parent company, as reflected in its Form 10-K for the period ended December 31, 2000, was materially and intentionally false and misleading.

44.     Delphi's disclosure of the warranty settlement was also intentionally and materially misleading. In its third quarter Form 10-Q, Delphi disclosed the $237 million payment to the former parent company as a "separation related obligation to [the former parent company] . . . related primarily to changes in assumptions for pension and other post-retirement benefits as well as to certain pre-separation warranty claims." In its Form 10-K for 2000, Delphi similarly stated that the September 2000 settlement "related primarily to changes in assumptions for employee benefit obligations, as well as certain pre-Separation

warranty claims." Battenberg, Dawes and Free prepared, signed and/or reviewed both filings and knew or were reckless in not knowing that, as a result of the disclosures and omissions, the filings were materially and intentionally false and misleading.

## Inventory Transactions

45.    Near year end 2000, Delphi entered into two transactions through which Delphi purported to sell approximately $200 million of metals inventory to a bank (the "Bank") and approximately $70 million of automotive generator cores and batteries to the Consulting Company, while simultaneously agreeing that it would repurchase the same inventory from the same parties in the first quarter of 2001. Delphi accounted for the transactions as sales. It should have accounted for them as financing transactions. By accounting for the transactions as sales, Delphi artificially and materially lowered its reported inventory levels and inflated cash flow from operations. Additionally, because Delphi used the Last-In-First-Out ("LIFO") inventory accounting method, the sham inventory reduction also enabled the company to report LIFO gains in earnings of more than $80 million for the year 2000.

### December 2000 Precious Metals Transaction with the Bank

46.    In the last few days of 2000, Delphi entered into an agreement with the Bank, purporting to sell it approximately $200 million of precious metals. As

agreed at the time of the sale, Delphi repurchased the identical metals from the

Bank before the end of January 2001. Under the terms of its agreement, the Bank

purported to own the metals for the one-month period, and Delphi agreed to pay

the Bank approximately $3.5 million. The purpose of the transaction was to permit

Delphi to accelerate recognition of inventory liquidation gains, feign greater

liquidity, and otherwise appear to achieve analyst targets and other financial goals.

As a result of the transaction, Delphi improperly recognized $54 million in net

income. Delphi also improperly boosted its cash flow from operations by

approximately $200 million.

47.    From the time of its separation from its former parent company,

Delphi had purchased from its former parent company, and maintained, high value

inventories of precious metals. The metals, known collectively as either "Platinum

Grade" or "Precious Group" metals, or simply as "PGMs," were used in the

production of auto parts, including, primarily, catalytic converters. An agreement

reached with its former parent company in 1998 gave Delphi ownership of an

existing PGM inventory that Delphi would use to manufacture parts sold to its

former parent company. The agreement expired at the end of 2000. There was an

expectation between the parties that shortly after year-end 2000, the former parent

company would purchase Delphi's PGM inventory, which would result in removal

of the metals from Delphi's balance sheet.

48.    Although the 1998 agreement did not expire until December 31, 2000, Delphi incorrectly presumed that its former parent company would repurchase the metals at or before the end of 2000.  As a result, Delphi's financial forecasts and guidance to investors and analysts for the year and fourth quarter 2000 contemplated material reductions in inventory levels and increases in cash flow from operations and net income, consistent with a sale of approximately $200 million of PGMs to its former parent company.  Realizing, however, that its former parent company may not agree to purchase the metals before year end 2000, Delphi's then treasurer Blahnik directed Belans to conceive an alternative structured finance plan.  This initiative was described to Dawes in a November 2000 memorandum from treasury as "Off-balance sheet financing of PGM inventory."  Free was also aware of the initiative and relied on it as part of an effort to feign year-end reductions in inventory.  Under the plan, Delphi would temporarily sell the metals to a third party before year end and then buy them back in early 2001 in time to sell the metals to its former parent company.

49.    In November 2000, Belans discussed with Delphi's outside auditor, proposed structures that would allow Delphi to temporarily move the PGM inventory off balance sheet and account for the transaction as a true sale, rather than as a financing transaction.  The auditor approved of three alternative structures for the transaction.  One such structure called for Delphi to sell the

metals to a third party at the end of 2000 and simultaneously entering a forward contract to repurchase the metals. However, the auditor advised Belans that, under GAAP, in order for the transaction to be accounted for as a true sale and repurchase, the sales price and the forward price must be "market" prices. Based on the auditor's guidance and his prior experience as a CPA, Belans knew or was reckless in not knowing that, if the forward price was generated by taking the purchase price and adding the purchaser's carrying and interest costs, the transaction would have to be accounted for as a financing rather than as a sale.

50.    In late December, it became clear to Delphi that its former parent company would not purchase the PGM inventory from Delphi before early 2001. Blahnik knew Delphi would have to pay the Bank a significant fee to achieve an equivalent financial statement result through a structured financing transaction. Nevertheless, with Dawes' and Blahnik's approval, Delphi went forward with the initiative it had discussed with its auditor, ultimately negotiating a transaction with the Bank.

51.    The transaction with the Bank had two components: a purchase agreement, pursuant to which the Bank agreed to purchase the PGM inventory from Delphi in December 2000, and a forward agreement, pursuant to which Delphi agreed to repurchase the identical metals from the Bank in January 2001, at specified prices. Neither contract states how the parties arrived at these prices.

52.    Delphi and the Bank executed the agreements on December 28, 2000. Blahnik signed on behalf of Delphi.  On the same day, the Bank wired $199,256,785.65 to Delphi.  Delphi treated approximately $193 million of this amount as a reduction in inventory and approximately $6 million as a credit to cost of sales, resulting in an equivalent increase to income.  On January 29, 2001, Delphi wired $202,514,626.18 back to the Bank.  Between December 28 and January 29, the metals remained under Delphi's control and, in fact, continued to be used by Delphi in its production process.  The contrived inventory reduction enabled Delphi to report a $54 million LIFO gain at the end of 2000.

53.    The price at which Delphi sold the metals to the Bank, and the higher price at which it repurchased the metals, were both well below market price for the metals.  In a misleading effort to demonstrate it was following its auditor's advice that the price at which Delphi sold the metals should be market prices, however, Belans created a memorandum that falsely justified the prices as being appropriately discounted from market, based on the very large volume of metals involved in the transaction.  While acknowledging that there was huge volatility in the price of PGMs, the memorandum also justified the forward price as an appropriate approximation of the one-month future price of the metals.  However, the memorandum's analysis was contrived.  In fact, the purchase price was obtained not by looking at the metals' market value, but by taking the approximate

32

price at which Delphi held the metals on its books. The forward price was calculated by taking the $199,256,785.65 purchase price and adding $3,257,840.52 in the Bank's fees and costs.

54.    Although the agreements Delphi entered with the Bank omitted any reference to the true basis for the pricing, internal documents at Delphi make clear that, at a minimum, Blahnik, Belans and Free knew or were reckless in not knowing, and Marion came to know before Delphi filed its Form 10-K for 2000, how the parties actually arrived at the purchase and forward amounts. For example, on the day before Blahnik was to sign the agreements with the Bank, Belans sent Blahnik a memo stating that "the forward price is the price received under [the Purchase Agreement], plus the $2 million transaction fee, plus the interest carry cost." After the transaction, but before Delphi issued its Form 10-K for the period ended December 31, 2000, Marion received from the treasury department and shared with Free a document that provided a "cost breakdown" for the "4th Qtr 2000 Structured Finance Initiatives" and showed the "Structuring Fee[s]," "Interest Carry" costs and "Other Fees" associated with the metals inventory transaction. Similarly, Delphi told the Bank it wanted an "accounting transaction" that would allow Delphi to move the metals off of its books, yet satisfy its auditor that the transaction could be accounted for as a sale.

## December 2000 Cores and Batteries Transaction with a Consulting Company

55.     Also in December 2000, following negotiations with Bahadur, Delphi
entered into an agreement with the Consulting Company.  Under the agreement,
Delphi purported to sell automotive batteries and generator cores to the Consulting
Company.  Pursuant to an oral repurchase arrangement with Bahadur, however,
Delphi agreed it would repurchase the identical inventory from the Consulting
Company in the first quarter of 2001, at its original price, plus a transaction fee.
Delphi's purpose in entering into the transaction was to accelerate recognition of
$27 million in inventory LIFO liquidation gains and achieve net income targets.

56.     The transaction that was ultimately to become the December 2000
cores and batteries transaction was also listed on Treasury's November 2000
memorandum to Dawes, described as "off-balance sheet financing of generator
cores" and was listed on spreadsheets maintained by Free in connection with his
year-end inventory reduction effort.  As with the transaction with the Bank,
Belans' goal was to structure the transaction in a way that would assure Delphi
would obtain the auditor's approval for true sale accounting treatment.  On the face
of the agreement with the Consulting Company, such accounting treatment seemed
appropriate.  However, Belans deliberately omitted material terms of the actual
agreement from the written documents.  In fact, Delphi and Bahadur had orally

agreed that the Consulting Company would sell the inventory back to Delphi in early 2001 at the purchase price plus a fee.

57.    Although the Consulting Company had been engaged by Delphi on multiple occasions to provide consulting services, prior to the cores and batteries transaction, the Consulting Company had never purchased inventory from an automotive or automotive supply company.  Moreover, the Consulting Company had no need nor use for the batteries or cores.  Nevertheless, after consulting outside counsel and participating in telephone conference calls with counsel and Belans, Bahadur agreed to enter into the transaction with Delphi.  Bahadur's counsel, who drafted the contract, proposed to Belans and recommended to Bahadur that Delphi's repurchase obligation be put in writing.  Because Delphi wanted to mislead its auditor into believing there was no repurchase agreement, however, Belans refused to put the repurchase obligation in writing.  Bahadur agreed to go forward with the transaction without a written repurchase agreement.

58.    Before consummating the transaction, Belans and Bahadur negotiated the specific price for the repurchase:  Delphi would sell the inventory to the Consulting Company for $70,000,000, the approximate book value of the inventory, and repurchase it from the Consulting Company for $70,000,000 plus a 0.5% fee.  On December 27, 2000, Delphi and the Consulting Company entered into an "Inventory Purchase Agreement," pursuant to which the Consulting

Company agreed to purchase cores and batteries from Delphi. The agreement made no mention of Delphi's repurchase obligation or its agreement to pay a fee to the Consulting Company.

59.     Delphi originally contemplated that the Consulting Company transaction would help Delphi meet both inventory and cash flow targets. However, in late December 2000, Delphi learned from Bahadur that the Consulting Company would be unable to obtain financing before year end and thus would be unable to immediately pay for the inventory. In a conference call, Free, Blahnik and Belans discussed the fact that, without receiving payment from the Consulting Company in 2000, Delphi would be unable to use the scheme as part of its plan to meet operating cash flow targets. Nevertheless, because the transaction was also important to Delphi's inventory reduction scheme, Free and Blahnik directed Belans to go forward with the transaction.

60.     After the new year, while the Consulting Company was still working on securing financing, Belans, with the knowledge and approval of Blahnik and Free, came up with an alternative plan that essentially resulted in Delphi financing the transaction itself. Belans enrolled the Consulting Company in a third party entity's supplier financing program. In the normal course, Delphi enrolled its suppliers in the third party supplier financing program so that suppliers could receive early, but reduced, payment on invoices issued for material purchased by

Delphi. Under the program, as soon as the supplier's invoice was received and approved by Delphi, the third party supplier financer would pay the supplier at a discount. Delphi would then pay the third party supplier financer the full amount of the invoice on its actual due date.

61.   In connection with the batteries and cores transaction, however, Delphi used the third party supplier finance program for a different and improper purpose. At Belans' direction, Delphi first arranged with Bahadur for the Consulting Company to be enrolled in the supplier financer program. Then, again at Belans' direction, Delphi arranged with Bahadur to have the Consulting Company issue an invoice to Delphi for $70,840,214.28. This amount was calculated by Delphi so that, after the third party supplier financer took its fee, the Consulting Company would receive the net proceeds of $70,350,000. Upon receipt of the invoice, Blahnik and Free both approved it on behalf of Delphi and Delphi submitted it to the third party supplier financer. Blahnik and Free both knew or were reckless in not knowing that Delphi was repurchasing inventory it had purported to sell to the Consulting Company just days before and that the purpose of using the third-party supplier financer was to give the false appearance that the sale and repurchase were separate transactions.

62.   The Consulting Company received the $70,350,000 from the third-party supplier financer on or about January 12, 2001 and immediately paid $70

million to Delphi as payment for its purchase of the inventory. The Consulting Company retained $350,000 as its fee. A month later, Delphi paid $70,840,214.28 to the third party supplier financer. When the transaction was complete, Delphi had paid the Consulting Company $350,000, and had paid the third party supplier financer $538,385.63, to move inventory off of Delphi's books for approximately two weeks. At a cost of almost $900,000, Delphi manufactured an inventory LIFO gain of $27 million. No inventory ever left Delphi's premises.

63.    As with the Bank transaction, Dawes, Blahnik and Free knew or were reckless in not knowing, and Marion came to know before Delphi filed its Form 10-K for 2000, that the Consulting Company transaction was a financing transaction and not a true sale. In addition, Free and Belans hid material facts concerning the transaction from Delphi's auditor. In 2001, when the auditor learned of the January repurchase, the auditor questioned whether there had been any pre-existing agreement with the Consulting Company to repurchase the inventory. Free and Belans assured the auditor there was none.

**Misstatements of Accounting for the Inventory Transactions**

64.    GAAP requires that an arrangement be treated as a product financing and not a sale where the sponsor (in this case Delphi) "sells the [inventory] to another entity . . . and in a related transaction agrees to repurchase the product," and where the repurchase price is not subject to change except, as necessary, to

recover substantially all fluctuations due to finance and holding costs. *FAS 49: Accounting for Product Financing Arrangements* (June 1981).

65.    Delphi has restated the metals and cores and batteries inventory transactions, admitting that they should have been accounted for as financing transactions. As a result of the transactions, Delphi materially overstated its cash flow from operations by $200 million and materially overstated its originally reported earnings per share by approximately 13 cents or 36% for the quarter and 7% for the full year. Combined with Delphi's improper accounting for its second quarter warranty reserve and third quarter warranty settlement, Delphi materially overstated its originally reported EPS for the full year 2000 by 49 cents or 26%. These misstatements were reflected in Delphi's Form 10-K for 2000.

66.    Delphi, Dawes, Free, Blahnik and Belans improperly accounted for and reported the metals and cores and batteries transactions as sales rather than as financings, with the intent of creating, and resulting in, material misrepresentations of the company's net income, cash flow from operations and LIFO inventory levels for the quarter and fiscal year ended December 31, 2000. Dawes, Free, Blahnik and Belans each were active participants in the inventory schemes. Dawes and Blahnik oversaw and approved the scheme. Belans had day-to-day responsibility for negotiating with the counterparties. On the cores and batteries transaction, Belans negotiated the Consulting Company's fee with Bahadur and provided

Bahadur with an oral repurchase agreement. Belans also organized for the

transaction to be financed using the supplier financing program. On the metals

transaction, Belans negotiated contracts that omitted any reference to bank's

structuring fee and interest carry cost and then drafted a memo to Delphi's auditor

that falsely suggested that the pricing was obtained based on an analysis of the

future price of the metals. Free and Blahnik both signed the Consulting Company

invoice that allowed Delphi to repurchase the cores and batteries inventory. In

addition, Blahnik signed the bank contracts in connection with the metals

transaction. Free approved Delphi's accounting for both transactions. Finally,

Dawes and Free, prepared, reviewed and/or signed Delphi's Form 10-K for 2000.

        67.     At the time they participated in the scheme, Dawes, Blahnik, Free and

Belans knew or were reckless in not knowing that the metals and cores and

batteries transactions each involved sales of inventory with related agreements to

repurchase. In addition, each knew or was reckless in not knowing that, in each

transaction, the repurchase price was not subject to change and was calculated to

cover the bank's and Consulting Company's costs, as well as to provide them with

a significant profit on the transactions. They also each knew or were reckless in

not knowing that the purpose of the inventory transactions was to improperly

accelerate the recognition of LIFO liquidation gains, achieve net income targets,

feign material improvements in liquidity, and otherwise appear to achieve analyst

targets and other financial goals.  As such, each knew or was reckless in not

knowing that Delphi's original accounting for the transactions as sales, including

the resultant reductions of inventory and increases to income and operating cash

flow, was materially and intentionally false and misleading.

### Delphi's Disclosures Concerning the Bank and Consulting Company Transactions

68.    Delphi's 2001 disclosures concerning its fourth quarter and full year

net income, Operating Cash Flow and inventory management were calculated to

lead investors and analysts to believe that Delphi was generating cost-saving

reductions in inventory levels and legitimate increases in operating cash flow and

net income without giving insight into the contrived nature of the Bank and

Consulting Company transactions.  As a part of Delphi's January 17, 2001

announcement of its results for the fourth quarter and full year 2000, Delphi falsely

reported in the company's press release that "[d]ue to a sharp and unexpected drop

in fourth quarter vehicle volumes, we took immediate actions to reduce costs in

line with resulting revenue declines," including the use of "aggressive inventory

management, workforce adjustments and other cost reduction initiatives."

Similarly, in a call with analysts the same day, Dawes explained that:

> [w]e also were able to in the quarter take advantage – and
> frankly one of the reasons why we were at the high end of the
> earnings range, we did benefit from inventory reductions . . . .
> We did always anticipate that we would see a slight [LIFO]
> benefit at the end of this year.  It was about [$]10 million more

than we expected as a result of strong inventory reduction
programs we had.

In Delphi's Form 10-K for the period ended December 31, 2000, Delphi also

falsely attributed improvements to gross margin and net income as being the result

of "aggressive inventory management." Dawes, Free and Marion were each

involved in drafting or reviewing one or more of these disclosures.

69.     At no time prior to the Commission investigation that led to the filing

of this Complaint (the "Commission Investigation"), did Delphi disclose publicly

that a significant portion of the so-called "aggressive inventory management" was

in fact attributable to financing transactions that would not allow for the removal of

inventory from Delphi's balance sheet.  In fact, by the time of the January 17

earnings announcement, Delphi had already repurchased the Consulting Company

inventory and would be repurchasing the Bank inventory within 12 days.  Delphi

also failed to disclose that approximately 66% of its fourth quarter cash flow

improvement attributable to "inventory management" was the result of the Bank

transaction.  Finally, Delphi did not disclose that its year-end inventory

transactions did not in fact result in "reduc[ing] costs"; rather, through the various

fees it paid to the Bank, the Consulting Company and the third-party supplier

financer, Delphi incurred approximately $4 million in additional and unnecessary

costs.  Dawes, Free, Blahnik and Belans knew or were reckless in not knowing

that, as a result of these disclosures and omissions, Delphi's Form 10-K for 2000 was materially and intentionally false and misleading.

## 2001 Notes Offering

70.    On or about May 31, 2001, in connection with an offering of notes registered under a Shelf Registration Statement filed with the Commission on Form S-3, Delphi issued an offering document that incorporated by reference Delphi's 2000 Form 10-K, including Delphi's fiscal year 2000 financial statements and disclosures.

## IT Service Provider Lump Sum Payment

71.    In the fourth quarter of 2001, Delphi improperly recorded a $20 million payment from the IT Company as income, even though it knew the payment was in substance a loan, because Delphi was required to repay the $20 million to the IT Company, with interest. On December 21, 2001, Delphi and the IT Company entered into a new IT contract (the "New IT Contract"), pursuant to which the IT Company agreed to provide Delphi with certain services and manpower, and to facilitate certain third party payments, associated with the implementation of enterprise application software at Delphi. At the same time, the IT Company agreed to pay Delphi a $20 million upfront payment.

72.    At the time they signed the contract, Delphi and the IT Company agreed that Delphi would repay the $20 million to the IT Company over 5 years in

monthly payments of $333,333.33. They also agreed that Delphi would pay interest on the $20 million, through an intentionally opaque scheme involving accelerated payments on other IT Company service invoices, and utilizing the same supplier finance program Delphi had improperly used in connection with the Consulting Company transaction.

73.    Under the structure agreed between the parties, the IT Company paid Delphi $20 million and Delphi simultaneously entered into the New IT Contract, under which it would pay the IT Company approximately $207 million over the course of five years, purportedly for software implementation services. However, the true value of the contract was approximately $187 million, with the additional $20 million included simply as a mechanism for Delphi to repay the upfront payment.

74.    To compensate the IT Company for its interest costs on the $20 million, Delphi agreed to pay certain invoices on another contract (unrelated to the New IT Contract) one month early. Delphi had the supplier finance company pay the IT Company early on invoices or portions of invoices with a total dollar value equal to Delphi's outstanding principal balance on the $20 million. Delphi then reimbursed the IT Company for the supplier finance company's discount. Only internal Delphi and IT Company documents reflect the fact that the purpose of this

this early payment arrangement was to compensate the IT Company for Delphi's use of the $20 million.

75.    It was widely known at Delphi, including by Dawes, Free, Rozanski and Kudla, that the $20 million would be paid to the IT Company. Dawes, Free, Director of Financial Accounting and Reporting Rozanski and IT Finance Director Kudla also knew or were reckless in not knowing that, because the $20 million was refundable, it would contravene GAAP to record the $20 million as an immediate reduction of IT expense instead of as a Delphi liability to the IT Company. Nevertheless, contemporaneous charts prepared and/or presented by Dawes showed that the $20 million in income was key to Delphi meeting its external analyst targets and that Delphi intended to take the $20 million as income.

76.    The IT Company had the opposite accounting goal, and one that was consistent with the true terms of the agreement between the parties: to defer the $20 million over the term of the New IT Contract. However, both Doyle, the IT Company executive with primary responsibility for delivering the New IT Contract, and Curry, an IT Company executive who reported to Doyle and had day-to-day responsibility for negotiating with Delphi, knew that Delphi's goal was to draft "vague" documents that would allow it to achieve its accounting goals.

77.    IT Company accounting personnel, the most senior of whom was U.S. GAAP Manager McDonald, were also involved in reviewing and approving the

45

New IT Contract and the terms of the $20 million payment. In November 2001,

McDonald was warned by another accountant at the IT Company that Delphi had

"questionable accounting objectives," including an intention to "record the $20

million as revenue."

78.     Delphi's auditor had advised Rozanski that, in order for Delphi to

treat the $20 million as income, there would need to be a written agreement among

the parties that made clear that the $20 million was not refundable and not tied to

the New IT Contract. Accordingly, Rozanski directed personnel at Delphi to draft

a side letter that was consistent with this guidance, even though she knew the

guidance was based on the false premise that the $20 million payment and New IT

Contract were unrelated. The side letter was drafted by Delphi and used

intentionally vague, false and misleading language. Before the letter was executed

by the IT Company, McDonald approved the intentionally vague, false and

misleading language.

79.     On December 19, 2001, two days before the New IT Contract was

signed, Delphi provided the IT Company with multiple different drafts of the side

letter, suggesting different variations on language that Delphi believed would allow

it to account for the $20 million as income. All of the drafts misrepresented the

transaction. The key factors in determining the correct accounting for the $20

million was, first, whether the payment was made in connection with new or past

business and, second, whether or not the payment was refundable. Even though all parties to the negotiations, including Dawes, Free, Rozanski, Kudla, Doyle and Curry, knew that the payment was tied specifically to a new contract, Delphi proposed that the letters indicate that the payment was in connection with "ongoing and past business service relationships" or, at the very least, in connection with "ongoing business relationships." Moreover, even though all parties knew that Delphi was required to repay the $20 million to the IT Company, some of the draft letters characterized the payment as "nonrefundable." Finally, even though all parties knew that the payment was specifically tied to the New IT Contract, in all drafts of the letter, Delphi omitted any reference whatsoever to the New IT Contract.

80.   McDonald was asked by other personnel at the IT Company to consider the various versions of the side letter proposed by Delphi, including Delphi's suggestion that the payment be characterized as "nonrefundable" and Delphi's request that, if possible, the letter refer to the companies' "ongoing and past" relationships. Both of these characterizations were completely inconsistent with McDonald's understanding of the true terms of the transaction, based on his discussions with other IT Company personnel and his review of various documentation. They were consistent, however, with what the other IT Company accountant had told him earlier: that Delphi was looking for a way to record the

$20 million as income. Despite this knowledge, McDonald only revised the draft documents to the extent necessary to obtain the approval of the IT Company's auditor on the IT Company's desired accounting for the $20 million payment.

81.    In a December 19 e-mail, McDonald explained to other IT Company personnel that he had discussed the $20 million payment with the IT Company's outside auditor and, based on that discussion, determined that the IT Company could defer the $20 million "provided it is signed and dated and payment is made at the same time that the [New IT Contract] is signed." He further instructed that the letter "cannot refer to past services" but indicated that the term "on-going relationship" was "alright" (even though he knew the payment related not to an ongoing relationship, but to new services to be performed by the IT Company). McDonald also recommended that the IT Company remove from the draft letter an explicit reference to the payment being "nonrefundable," but did not suggest that the companies make clear in the letter that the payment was in fact refundable. Finally, he did not suggest that any language be added to indicate that the payment was connected in any way to the New IT Contract.

82.    On December 21, 2001, Doyle signed the final side letter on behalf of the IT Company. Although the letter was not identical to the letter McDonald approved, it contained the same material misleading statements and omissions. As a result of these misstatements and omissions, each company felt able to apply

48

opposite accounting treatments to the $20 million payment. The IT Company chose to read the term "ongoing relationship" to be a reference to the New IT Contract and thus deferred the $20 million expense over time. Meanwhile, Rozanski falsely claimed that the term "ongoing relationship" was a reference to pre-existing business. Because of Rozanski's misstatements and because the side letter made no mention of the fact the payment was to be repaid or that the payment related to the New IT Contract, Delphi's auditor was persuaded that it was appropriate for Delphi to account for the $20 million as income.

83.    Despite McDonald's success in removing the term "nonrefundable" from the letter, in the weeks after the letter was signed, the IT Company became concerned that, in part because the letter was deliberately vague and misleading, Delphi had not entered into any clear written obligation to repay the $20 million. In early 2001, after discussion among the companies, Kudla approved a solution that was once again vague and misleading, but gave the IT Company the assurances it believed it needed. The solution was to enter into false "work orders."

84.    In the normal course of business, under the terms of the New IT Contract, Delphi would instruct the IT Company to perform work by negotiating so-called "work orders." These work orders would describe the nature of the work to be performed and the amount Delphi would pay the IT Company to perform the

work. In connection with the $20 million, Delphi and the IT Company agreed to enter into "work orders" that purported to be for $20 million of "administrative services" that the IT Company would provide Delphi under the New IT Contract. In return for these purported administrative services, Delphi agreed to pay the IT Company $20 million over five years at a rate of $333,333.33 per month. In fact, the IT Company provided no administrative services under the work orders. Rather, the work orders were simply a mechanism for Delphi to pay $20 million to the IT Company without making it obvious that it was repaying the December 2001 payment. One or more of the work orders was authorized by Curry for the IT Company and by a number of Delphi employees, including Free and Kudla. Curry knew, and Free and Kudla knew or were reckless in not knowing, that the true purpose of the work order was to facilitate monthly repayments of the $20 million.

85.    Delphi's original accounting for the $20 million payment as an immediate reduction in expense, rather than as Delphi's liability to the IT Company, violated GAAP. The $20 million of income Delphi reported as a result of its improper accounting for the payment was material, representing approximately 24% of Delphi's fourth quarter pro forma EPS (Delphi had recorded certain restructuring charges in the fourth quarter of 2001 and reported pro forma net income to exclude the impact of these charges) and 6% of its full year pro forma EPS. In connection with its June 30, 2005 restatement, Delphi has now

accounted for the $20 million as a liability to the IT Company, rather than as a reduction in expense.

86.    Dawes, Free, Rozanski and Kudla each were active participants in the scheme to mischaracterize the $20 million lump sum payment as fourth quarter 2001 income to Delphi.  Dawes approved Delphi's entry into the $20 million payment transaction.  Free approved Delphi's accounting for the transaction and also signed false work orders through which Delphi repaid the $20 million to the IT Company.  Rozanski also approved Delphi's accounting for the transaction and suggested ways to draft the transaction documents in a way that would obscure the true substance of the transaction and allow Delphi to obtain the desired accounting. She also provided the December 21 side letter to Delphi's auditor knowing that it misrepresented the true terms and circumstances of the $20 million payment. Kudla actively participated in meetings and discussions leading to the signing of the New IT Contract and false $20 million payment side letter and then took a lead role in drafting and approving the false work orders.  Finally, Dawes, Free and Rozanski reviewed, prepared and/or signed Delphi's Form 10-K for 2001.  At the time they each participated in the scheme, Dawes, Free, Rozanski and Kudla knew, or were reckless in not knowing, that the agreements and side letters between Delphi and the IT Company were intentionally drafted so that they did not reflect the true terms of the payment, for the purpose of and resulting in Delphi

improperly accounting for and reporting the payment. These misstatements were reflected in Delphi's Form 10-K for 2001 and also incorporated by reference into offering documents filed by Delphi in connection with its 2003 notes and preferred securities offerings.

87.    Based on his conduct, as described above, McDonald knew or was reckless in his failure to know that his activity in connection with the $20 million lump sum payment scheme was part of an overall activity that was improper. McDonald, who is an expert in GAAP accounting, knew of Delphi's fraudulent intentions based on (i) his discussions with another accountant at the IT Company who informed McDonald of Delphi's "questionable accounting motives," including its plan to record the $20 million payment as income; (ii) his receipt of information from other IT Company personnel and his review of drafts of the side letter between the companies, that demonstrated that Delphi was proposing language for the side letter that falsely stated the terms of the transaction, in order to support Delphi's desire to account for the $20 million as income;  and (iii) based on other documents that were provided to him by IT Company personnel that reflected the IT Company's understanding that Delphi desired $20 million that it could record as income in the fourth quarter of 2001. He substantially assisted in Delphi's fraud by approving language of an intentionally false and misleading side letter that was used to misrepresent the true nature of the $20 million payment to

52

Delphi's auditor. In particular, while he removed language that he considered
detrimental to the IT Company's accounting goals, he permitted the use of
deliberately vague, false and misleading language that permitted Delphi to achieve
its goal of accounting for the $20 million payment as income and also was used by
Delphi to mislead its auditor about the true terms of the $20 million payment.

## 2003 Notes and Preferred Share Offerings

88.   On or about July 22, 2003, October 21, 2003 and November 14, 2003,
in connection with offerings of notes and preferred shares registered under Shelf
Registration Statements filed with the Commission on Form S-3, Delphi issued
offering documents that incorporated by reference Delphi's Form 2002 10-K,
including Delphi's financial statements for fiscal years 2000, 2001 and 2002.

## Undisclosed Accounts Receivable Factoring

89.   From at least 2003 to 2004, Delphi knowingly failed to disclose the
full extent of its European Accounts Receivable Factoring program. By hiding a
material portion of its European factoring, Delphi was able to materially
misrepresent its Street Net Liquidity by up to $330 million. In addition, in at least
one period, Delphi further manipulated its disclosure of the factoring in order to
materially overstate its Street Operating Cash Flow by an additional $30 million.

90.   Factoring is a common source of financing where a company agrees
to sell some or all of its accounts receivable, at a discount, to a financial institution

or other entity with the goal of obtaining the cash more quickly. Analysts view these off-balance sheet facilities like debt because they serve a financing function and often involve substantial recourse and indirect guarantees.

91.    During all relevant periods, Delphi's investors, analysts and rating agencies relied upon Delphi's reported Street Net Liquidity and Street Operating Cash Flow as important measures of Delphi's financial condition and performance. Delphi reported that Street Net Liquidity was a non-GAAP measure of Delphi's liquidity, calculated as total cash less the sum of total on-balance-sheet debt plus certain off-balance-sheet obligations, such as factoring and securitization programs that are not treated as debt for purposes of GAAP but are considered debt by rating agencies. Delphi reported that Street Operating Cash Flow was a non-GAAP measure of Delphi's operating cash flow, calculated as cash provided by operations, from the statement of cash flows, plus pension contributions and restructuring payments, less capital expenditures, and further reduced by increases in off-balance-sheet obligations, such as factoring and securitization programs.

92.    To some employees at Delphi, the undisclosed factoring became known simply as the "secret" or "base level" factoring. Under the direction of Dawes and Blahnik, during the period 1999 through 2002, only factoring exceeding the base level was disclosed by Delphi. By late 2002 or early 2003, however, Dawes and Blahnik were advised that it was improper for Delphi to

exclude the secret factoring from its disclosures. However, Dawes and Blahnik took no immediate steps to correct the issue. In fact, in the first quarter of 2003, at Blahnik's suggestion and with Dawes' knowledge, Delphi briefly and intentionally increased the hidden factoring, and decreased disclosed factoring, by $30 million. By doing so, Delphi was able to understate its incremental period-to-period change in accounts receivable factoring and thus cause an automatic $30 million or approximately 20% overstatement of reported Street Operating Cash Flow in the quarter. The overstatement was included in Delphi's earnings release, which was furnished to the Commission on Form 8-K.

93.    Discussions of whether and how to disclose the factoring continued at Delphi throughout 2003. Dawes ultimately decided that the factoring should be disclosed. However, after discussion with Blahnik and others, he decided the disclosure should be done in a way that would not be obvious to rating agencies. In particular, had Delphi disclosed all of the secret factoring immediately, it would have had the immediate result of decreasing Delphi's Street Net Liquidity by $300 million. Accordingly, Dawes approved a plan where the factoring would be "bled in" over time. Dawes and Blahnik concluded that by disclosing only $35 million of factoring per quarter, the discrepancy would go unnoticed by the ratings agencies. Delphi finally started to bleed in the $35 million per quarter in the first

55

quarter of 2004, more than a year after Dawes and Blahnik had been informed that it was improper for Delphi not to disclose the secret factoring.

94.    By October 2004, using its piecemeal disclosure scheme, Delphi had incrementally moved $105 million of the secret factoring into disclosed factoring, with $195 million of the factoring remaining undisclosed. By that time Delphi was in the midst of the Commission Investigation. Dawes, recognizing that Delphi's failure to fully disclose the factoring was inappropriate and, if discovered, would draw additional scrutiny to his conduct, directed that Delphi discreetly disclose the rest of the factoring in Delphi's next earnings release. The amount was described in the Net Liquidity section of Delphi's analyst presentation as part of a line item called "Other." In a January 20, 2005 earnings call with analysts, Dawes described the "Other" line as relating to "some small capital structure items." He did not tell analysts that the "Other" line included the newly disclosed factoring.

95.    Delphi, Dawes and Blahnik failed to disclose the full extent of Delphi's Accounts Receivable Factoring Program with the intent and effect of overstating Delphi's Street Net Liquidity. From the fourth quarter of 2002 to the fourth quarter of 2004, Delphi materially overstated its Street Net Liquidity in amounts ranging from $195 million to $330 million and by percentages ranging from 7% to 11%. The misstatements of Delphi's Street Net Liquidity were reflected in Delphi's earnings release for the period ending December 31, 2002, as

furnished to the Commission on a Form 8-K filed January 17, 2003 and in

presentations made to Delphi investors and financial analysts in connection with

Delphi's earnings releases for the periods ending December 31, 2002, March 31,

2003, June 30, 2003, September 30, 2003, December 31, 2003, March 31, 2004,

September 30, 2004 and December 31, 2004.

96.    Delphi, Dawes and Blahnik also materially overstated Delphi's Street

Operating Cash Flow by $30 million or approximately 20% for the period ended

March 31, 2003.  This overstatement was reflected in Delphi's earnings release for

the period ending March 31, 2003, as furnished to the Commission on a Form 8-K

filed April 16, 2003, and in related presentations to Delphi investors and financial

analysts

97.    On June 9, 2005, Delphi issued a Form 8-K in which it acknowledged

that it did not accurately disclose to credit rating agencies or analysts "the amount

of sales of accounts receivable or factoring arrangements from the date of its

separation from [its former parent company] until year-end 2004."

98.    Dawes and Blahnik knew, or were reckless in not knowing, that for a

number of years, Delphi intentionally hid material amounts of factoring from

rating agencies, analysts and investors.  They also knew or were reckless in not

knowing that Delphi's eventual decision to disclose the factoring in small

increments was made with the intention of hiding the prior existence of the secret

factoring from rating agencies and of avoiding an immediate and material $300 million decrease in Street Net Liquidity. They also knew or were reckless in not knowing that, in the first quarter of 2003, even after being told that the factoring must be disclosed, Delphi materially *increased* the undisclosed factoring to meet a quarterly Street Operating Cash Flow target. Finally, Dawes knew or was reckless in not knowing that Delphi's disclosure of the remaining factoring in 2005, in connection with Delphi's reporting of its 2004 financial results, was accomplished in a way that was intended to continue to hide the prior existence of the factoring from investors, analysts and rating agencies. Dawes and Blahnik also knew of and substantially assisted in the scheme to manipulate Delphi's reported factoring, Street Net Liquidity and Street Operating Cash Flow and, as a result, Delphi filed Forms 8-K on January 17, 2003 and April 16, 2003 that were materially and intentionally false and misleading.

### Delphi's Internal Control Failures

99.    As evidenced by the misconduct described in paragraphs 1 through 98 above, at least for the periods 2000 and 2001, Delphi had a system of internal controls that was not sufficient to detect violations of GAAP. Dawes, as chief financial officer, Free and Rozanski as members of the controllers' staff, and Kudla, as finance director for Delphi's IT department, each had direct responsibility for overseeing some or all aspects of Delphi's internal controls.

Based on their conduct, as described in paragraphs 1 through 98 above, they each

knowingly circumvented those internal controls.

## False Statements to Delphi's Auditor

100.   Battenberg, Dawes and Free each signed representation letters to

Delphi's auditor dated October 11, 2000, January 16, 2001 and January 16, 2002,

and Battenberg and Dawes each signed a representation letter to Delphi's auditor

dated January 16, 2003, that falsely stated that Delphi's 2000 and/or 2001 financial

statements were fairly presented in conformity with GAAP.  Moreover,

Battenberg, Dawes and Free signed the October 11, 2000 and January 16, 2001

representation letters, and Battenberg and Dawes signed the January 16, 2003

representation letter, knowing the letters omitted material facts concerning the

September 2000 warranty agreement.  In addition, Dawes and Free signed the

January 16, 2001 and January 16, 2002 representation letters, and Dawes signed

the January 16, 2003 representation letter, knowing that the letters omitted material

facts concerning the December 2000 Consulting Company inventory transaction.

Finally, Dawes and Free signed the January 16, 2002 representation letter, and

Dawes signed the January 16, 2003 representation letter, knowing that it omitted

material facts concerning the December 2001 IT Company transaction.

101.    In addition, in communications with Delphi's auditor, Battenberg,

Dawes and Free made materially and intentionally false and misleading statements

and omissions concerning these schemes, as follows:

a.    In connection with the September 2000 warranty settlement,

Battenberg, Dawes and Free failed to inform Delphi's auditor that: (i) the former

parent company suggested that Delphi explore a basis for asymmetrical

accounting; (ii) that the $237 million amount in the warranty settlement agreement

was arrived at by a joint team of engineers and financial analysts from Delphi and

the former parent company who had analyzed the causes and costs of each of 27

warranty claims; or (iii) that the former parent company's early 2000 comments on

the effect of 1998 healthcare assumptions were not requests or claims for

reimbursement, but only intended to counter Delphi's claims that it should be

reimbursed for the effects of other terms in the agreement that had turned out to be

less favorable for Delphi;

b.    In connection with the December 2000 Consulting Company

transaction, Free falsely denied to Delphi's auditor or, at least, failed to inform

Delphi's auditor, that Delphi had entered an oral arrangement to repurchase the

cores and batteries inventory or that Delphi had agreed to pay the Consulting

Company a structuring fee.  Free also failed to inform the auditor that Delphi self-

financed the repurchase of the Consulting Company inventory using the third-party

supplier finance program; and

      c.    In connection with the December 2001 IT Company

transaction, Dawes and Free failed to inform Delphi's auditor that the IT Company

paid Delphi $20 million in return for Delphi signing the New IT Contract or that

Delphi agreed to repay the $20 million to the IT Company over five years.

## FIRST CLAIM

### Violations of Section 17(a) of the Securities Act
### [15 U.S.C. §77q(a)]

102.   Paragraphs 1 through 101 are realleged and incorporated by reference

as if set forth fully herein.

103.   From at least 2001 through 2003, Delphi, Battenberg, Dawes, Free,

Blahnik and Belans, in the offer or sale of securities, by the use of the means or

instruments of transportation and communication in interstate commerce or by use

of the mails, directly or indirectly: employed devices, schemes or artifices to

defraud; obtained money by means of an untrue statement of a material fact or an

omission to state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading; or

engaged in transactions, practices or courses of business which operated as a fraud

or deceit upon the purchasers of such securities, as described above in paragraphs 1

through 102.

104.   In at least 2003, Rozanski and Kudla in the offer or sale of securities, by the use of the means or instruments of transportation and communication in interstate commerce or by use of the mails, directly or indirectly: employed devices, schemes or artifices to defraud; obtained money by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engaged in transactions, practices or courses of business which operated as a fraud or deceit upon the purchasers of such securities, as described above in paragraphs 1 through 103.

105.   Delphi, Battenberg, Dawes, Free, Blahnik, Belans, Rozanski, and Kudla knew or were reckless in not knowing of the facts and circumstances described in paragraphs 1 through 104 above.

106.   By reason of the activities described in paragraphs 1 through 105, above, Delphi, Battenberg, Dawes, Free, Blahnik, Belans, Rozanski, and Kudla violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## SECOND CLAIM

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 Promulgated Thereunder [17 C.F.R. §240.10b-5]

107.   Paragraphs 1 through 106 are realleged and incorporated by reference as if set forth fully herein.

108.   From at least 2000 through 2004, as a result of the activities described in paragraphs 1 through 107, above, Delphi, Dawes and Blahnik, in connection with the purchase or sale of securities, by the use of the means and instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, directly or indirectly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon purchasers and sellers of securities in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5], promulgated thereunder.

109.   From at least 2000 through 2002, as a result of the activities described in paragraphs 1 through 108, above, Battenberg, Free and Belans in connection with the purchase or sale of securities, by the use of the means and instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, directly or indirectly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts,

practices or courses of business which operated as a fraud or deceit upon purchasers and sellers of securities in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5], promulgated thereunder.

110.    From at least 2001 through 2002, as a result of the activities described in paragraphs 1 through 109, above, Rozanski and Kudla in connection with the purchase or sale of securities, by the use of the means and instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange, directly or indirectly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon purchasers and sellers of securities in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5], promulgated thereunder.

111.    Delphi, Battenberg, Dawes, Free, Blahnik, Belans, Rozanski and Kudla knew or were reckless in not knowing of the facts and circumstances described in paragraphs 1 through 110 above.

112.    By reason of the activities described in paragraphs 1 through 111, above, Delphi, Battenberg, Dawes, Free, Blahnik, Belans, Rozanski and Kudla

violated Sections 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5

thereunder [17 C.F.R. §240.10b-5].

## THIRD CLAIM

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 Promulgated Thereunder [17 C.F.R. §240.10b-5]

113.    Paragraphs 1 through 112 are realleged and incorporated by reference

as if set forth fully herein.

114.    From at least 2000 through 2002, as a result of the activities described

in paragraphs 1 through 113, above, Delphi in connection with the purchase or sale

of securities, by the use of the means and instrumentalities of interstate commerce,

the mails, or the facilities of a national securities exchange, directly or indirectly:

(a) employed devices, schemes or artifices to defraud; (b) made untrue statements

of material fact or omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not

misleading; or (c) engaged in acts, practices or courses of business which operated

as a fraud or deceit upon purchasers and sellers of securities in violation of Section

10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R.

§240.10b-5], promulgated thereunder.

115.   Kudla, Bahadur and McDonald each knew, or were reckless in his or her failure to know, that his or her activities, as described in paragraphs 1 through 114 above, was part of an overall activity by Delphi that was improper.

116.   Kudla, Bahadur and McDonald each knowingly provided substantial assistance to Delphi in the commission of these violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5], promulgated thereunder, as described in paragraphs 1 through 115 above.

117.   By reason of the activities described in paragraphs 1 through 116, above, Kudla, Bahadur and McDonald, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], aided and abetted Delphi's violations of Sections 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## FOURTH CLAIM

**Violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13]**

118.   Paragraphs 1 through 117 above are realleged and incorporated by reference herein.

119.   As alleged more fully above, Delphi filed with the Commission materially and intentionally false and misleading financial statements and disclosure on its Forms 10-K for its fiscal years ended December 31, 2000 and

December 31, 2001, and on its Forms 10-Q for the fiscal quarters ended June 30, 2000 and September 30, 2000. In addition, Delphi filed intentionally false and misleading disclosures in earnings releases furnished to the Commission on Forms 8-K on January 17, 2003 and April 16, 2003.

120. Delphi also failed to make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflected the transactions and disposition of its assets. In addition, Delphi failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles, or any other applicable criteria and to maintain accountability for assets. As a result of the foregoing, Delphi violated Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

## FIFTH CLAIM

**Aiding and Abetting Violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13]**

121. Paragraphs 1 through 120 above are realleged and incorporated by reference herein.

122.   As alleged more fully above, Delphi violated Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

123.   Battenberg, Dawes, Free, Blahnik, Pasricha, Belans, Rozanski, Kudla, Bahadur, McDonald, Doyle, Curry and Marion each knew or was reckless in his or her failure to know, that his or her activity, as described in paragraphs 1 through 122 above, was part of an overall activity by Delphi that was improper.

124.   Battenberg, Dawes, Free, Blahnik, Pasricha, Belans, Rozanski, Kudla, Bahadur, McDonald, Doyle, Curry and Marion each knowingly provided substantial assistance to Delphi in the commission of some or all of the violations by Delphi of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], promulgated thereunder, as described in paragraphs 1 through 123 above.

125.   By reason of the activities described in paragraphs 1 through 124, above, Battenberg, Dawes, Free, Blahnik, Pasricha, Belans, Rozanski, Kudla, Bahadur, McDonald, Doyle, Curry and Marion, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], aided and abetted Delphi's violations of

Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

126.   By reason of the activities described in paragraphs 1 through 125, above, Dawes, Free, Rozanski and Kudla, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], aided and abetted Delphi's violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

127.   By reason of the activities described in paragraphs 1 through 126, above, Battenberg, Dawes, Free and Belans, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], aided and abetted Delphi's violations of Rule 13a-13 [17 C.F.R. § 240.13a-13], promulgated under Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)].

128.   By reason of the activities described in paragraphs 1 through 127, above, Dawes and Blahnik, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], aided and abetted Delphi's violations of Rule 13a-11 [17 C.F.R. § 240.13a-13], promulgated under Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)].

## SIXTH CLAIM

### Violations of Section 13(b)(5) of the
### Exchange Act [15 U.S.C. §78m(b)(5)]

129.  Paragraphs 1 through 128 above are realleged and incorporated by reference herein.

130.  Battenberg, Dawes, Free, Blahnik, Belans, Rozanski and Kudla knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified, directly or indirectly, or caused to be falsified books, records and accounts of Delphi that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

131.  By reason of the foregoing, Battenberg, Dawes, Free, Blahnik, Belans, Rozanski and Kudla violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## SEVENTH CLAIM

### Violations of Rule 13b2-1 promulgated under the Exchange Act [17 C.F.R. §240.13b2-1]

132.  Paragraphs 1 through 131 above are realleged and incorporated by reference herein.

133.  Battenberg, Dawes, Free, Blahnik, Belans, Rozanski and Kudla, directly or indirectly, falsified or caused to be falsified, books, records, or accounts described in Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

70

134.    By reason of the foregoing, Battenberg, Dawes, Free, Blahnik, Belans, Rozanski and Kudla violated Rule 13b2-1, promulgated under the Exchange Act [17 C.F.R. §240.13b2-1].

## EIGHTH CLAIM

### Violations of Rule 13b2-2 promulgated under the Exchange Act [17 C.F.R. §240.13b2-2]

135.    Paragraphs 1 through 134 above are realleged and incorporated by reference herein.

136.    Battenberg, Dawes and Free, directly or indirectly: (a) made or caused to be made a materially false or misleading statement to an accountant in connection with; or (b) omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstance under which such statements were made, not misleading, to an accountant in connection with: (1) any audit, review or examination of the financial statements of Delphi required to be made pursuant to Section 13(b) of the Exchange Act [15 U.S.C. § 78m(b)]; or (2) the preparation or filing of any document or report required to be filed with the Commission pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] or otherwise.

137.    By reason of the foregoing, Battenberg, Dawes and Free violated Rule 13b2-2, promulgated under the Exchange Act [17 C.F.R. §240.13b2-2].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

### **I.**

Permanently restraining and enjoining:

(a)    defendant Delphi, its officers, agents, servants, employees, attorneys, assigns and all those persons in active concert or participation with them who receive actual notice of the Final Judgment by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices and courses of business alleged above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], promulgated thereunder.

(b)    defendant Battenberg, his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the Final Judgment by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices and courses

of business alleged above, or in conduct of similar purport and object, in violation

of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Sections 10(b) and

13(b)(5) of the Exchange Act [15 U.S.C. §§78j(b) and 78m(b)(5)] and Rules 10b-

5, 13b2-1 and 13b2-2 [17 C.F.R. §§240.10b-5, 240.13b2-1 and 240.13b2-2],

promulgated thereunder, and from aiding and abetting violations of Sections 13(a)

and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and

Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-

13] promulgated thereunder;

      (c)     defendant Dawes, his agents, servants, employees and attorneys and

all persons in active concert or participation with him who receive actual notice of

the Final Judgment by personal service or otherwise, and each of them from,

directly or indirectly, engaging in the transactions, acts, practices and courses of

business alleged above, or in conduct of similar purport and object, in violation of

Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Sections 10(b) and

13(b)(5) of the Exchange Act [15 U.S.C. §§78j(b), 78m(b)(5)] and Rules 10b-5,

13b2-1 and 13b2-2 [17 C.F.R. §§240.10b-5, 240.13b2-1 and 240.13b2-2],

promulgated thereunder, and from aiding and abetting violations of Sections 13(a),

13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a),

78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17

C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], promulgated

thereunder;

(d)     defendant Free, his agents, servants, employees and attorneys and all

persons in active concert or participation with him who receive actual notice of the

Final Judgment by personal service or otherwise, and each of them from, directly

or indirectly, engaging in the transactions, acts, practices and courses of business

alleged above, or in conduct of similar purport and object, in violation of Section

17(a) of the Securities Act [15 U.S.C. §77q(a)] and Sections 10(b) and 13(b)(5) of

the Exchange Act [15 U.S.C. §§78j(b), 78m(b)(5)] and Rules 10b-5, 13b2-1 and

13b2-2 [17 C.F.R. §§240.10b-5, 240.13b2-1 and 240.13b2-2], promulgated

thereunder, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A)

and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a) 78m(b)(2)(A) and

78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20,

240.13a-1 and 240.13a-13], promulgated thereunder;

(e)     defendant Blahnik, his agents, servants, employees and attorneys and

all persons in active concert or participation with him who receive actual notice of

the Final Judgment by personal service or otherwise, and each of them from,

directly or indirectly, engaging in the transactions, acts, practices and courses of

business alleged above, or in conduct of similar purport and object, in violation of

Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Sections 10(b) and

13(b)(5) of the Exchange Act [15 U.S.C. §§78j(b), 78m(b)(5)] and Rules 10b-5

and 13b2-1 [17 C.F.R. §§240.10b-5 and 240.13b2-1], promulgated thereunder, and

from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the

Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1

and 13a-11 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13], promulgated

thereunder;

(f)    defendant Belans, his agents, servants, employees and attorneys and

all persons in active concert or participation with him who receive actual notice of

the Final Judgment by personal service or otherwise, and each of them from,

directly or indirectly, engaging in the transactions, acts, practices and courses of

business alleged above, or in conduct of similar purport and object, in violation of

Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Sections 10(b) and

13(b)(5) of the Exchange Act [15 U.S.C. §§78j(b), 78m(b)(5)] and Rules 10b-5

and 13b2-1 and 132-2 [17 C.F.R. §§240.10b-5 and 240.13b2-1], promulgated

thereunder, and from aiding and abetting violations of Sections 13(a), and

13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and

Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-

13], promulgated thereunder;

(g)    defendant Rozanski, her agents, servants, employees and attorneys

and all persons in active concert or participation with him who receive actual

75

notice of the Final Judgment by personal service or otherwise, and each of them

from, directly or indirectly, engaging in the transactions, acts, practices and courses

of business alleged above, or in conduct of similar purport and object, in violation

of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Sections 10(b) and

13(b)(5) of the Exchange Act [15 U.S.C. §§78j(b), 78m(b)(5)] and Rules 10b-5

and 13b2-1 [17 C.F.R. §§240.10b-5 and 240.13b2-1], promulgated thereunder, and

from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B)

of the Exchange Act [15 U.S.C. §§ 78m(a) 78m(b)(2)(A) and 78m(b)(2)(B)] and

Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20 and 240.13a-1], promulgated

thereunder;

(h)    defendant Kudla, her agents, servants, employees and attorneys and

all persons in active concert or participation with him who receive actual notice of

the Final Judgment by personal service or otherwise, and each of them from,

directly or indirectly, engaging in the transactions, acts, practices and courses of

business alleged above, or in conduct of similar purport and object, in violation of

Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Sections 10(b) and

13(b)(5) of the Exchange Act [15 U.S.C. §§78j(b), 78m(b)(5)] and Rules 10b-5

and 13b2-1 [17 C.F.R. §§240.10b-5 and 240.13b2-1], promulgated thereunder, and

from aiding and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A) and

13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) 78m(b)(2)(A) and

76

78m(b)(2)(B)] and Rules 10b-5, 12b-20 and 13a-1 [17 C.F.R. §§ 240.10b-5,

240.12b-20 and 240.13a-1], promulgated thereunder;

(i)    defendant McDonald, his agents, servants, employees and attorneys

and all persons in active concert or participation with him who receive actual

notice of the Final Judgment by personal service or otherwise, and each of them

from, directly or indirectly, engaging in the transactions, acts, practices and courses

of business alleged above, or in conduct of similar purport and object, from aiding

and abetting violations of Sections 10(b), 13(a) and 13(b)(2)(A) of the Exchange

Act [15 U.S.C. §§78j(b), 78m(a) and 78m(b)(2)(A)] and Rules 10b-5, 12b-20 and

13a-1 [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-1], promulgated

thereunder;

(j)    defendant Pasricha, his agents, servants, employees and attorneys and

all persons in active concert or participation with him who receive actual notice of

the Final Judgment by personal service or otherwise, and each of them from,

directly or indirectly, engaging in the transactions, acts, practices and courses of

business alleged above, or in conduct of similar purport and object, from aiding

and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15

U.S.C. §§78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13 [17

C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13], promulgated thereunder;

## II.

Ordering the Defendants Battenberg, Dawes, Free, Blahnik, Belans, Rozanski, Kudla, and Bahadur to disgorge ill-gotten gains from the conduct alleged herein and to pay prejudgment interest thereon.

## III.

Ordering the Defendants Battenberg, Dawes, Free, Blahnik, Belans, Rozanski, Kudla, and McDonald to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## IV.

Ordering the Defendants Pasricha, Bahadur, Marion, Doyle and Curry to pay civil penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## V.

Permanently barring defendants Battenberg, Dawes and Blahnik, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from serving as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the

terms of all orders and decrees that may be entered or to entertain any suitable

application or motion for additional relief within the jurisdiction of this Court.

## VII.

Granting such other and further relief as the Court may deem appropriate.

Respectfully submitted,

Dated:  October 30, 2006
      Washington, D.C.

Gregory N. Miller
U.S. Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549-4030
Tel:  202-551-4469
Fax: 202-772-9245

Of counsel:
Fredric Firestone
Kenneth R. Lench
Andrew B. Sporkin
Jonathan P. Scott
U.S. Securities and Exchange
Commission

Attorney for Plaintiff

Local counsel:
Ellen Christensen
Assistant United States Attorney
U.S. Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226-3211
Tel:  313-226-9112
Fax: 313-226-3800

# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SECURITIES AND EXCHANGE COMMISSION,

                                        Plaintiff,

                        v.

DELPHI CORPORATION, et al.

                                        Defendants.

Case: 2:06-cv-14891
Assigned To: Cohn, Avern
Referral Judge: Pepe, Steven D
Filed: 10-30-2006 At 10:06 AM
CMP US SEC V. DELPHI CORP, ET AL (T
AM)

# CONSENT OF DEFENDANT DELPHI CORPORATION

1.      Defendant Delphi Corporation ("Defendant") waives service of a summons and
the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over
Defendant and over the subject matter of this action.

2.      Without admitting or denying the allegations of the complaint (except as to
personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to
the entry of the final Judgment in the form attached hereto (the "Final Judgment") and
incorporated by reference herein, which, among other things, permanently restrains and enjoins
Defendant from violation of Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the
Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5, 12b-20, 13a-1, 13a-13 and
13b2-1 thereunder.

3.      Defendant waives the entry of findings of fact and conclusions of law pursuant to
Rule 52 of the Federal Rules of Civil Procedure.

4.      Defendant waives the right, if any, to a jury trial and to appeal from the entry of
the Final Judgment.

1

5.     Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

6.     Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

7.     Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

8.     Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions. Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

9.     Consistent with 17 C.F.R. 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and

2

other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that it shall not be permitted to contest the factual allegations of the complaint in this action.

10.    Defendant understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegation in the complaint or order for proceedings." 17 C.F.R. § 202.5. In compliance with this policy, Defendant agrees: (i) not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; and (ii) that upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint. If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

11.    Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees,

expenses, or costs expended by Defendant to defend against this action. For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

12.     In connection with this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party, Defendant (i) to the extent it discovers any additional documents that are responsive to subpoenas issued to it in SEC investigation HO-10011 that have not been produced to the Commission staff, will immediately produce such documents to the Commission staff, unless the Commission staff has previously agreed that such documents need not be produced; (ii) will accept service by mail or facsimile transmission of notices or subpoenas issued by the Commission for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by Commission staff; (iii) appoints Defendant's undersigned attorney as agent to receive service of such notices and subpoenas; (iv) with respect to such notices and subpoenas, waives the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the testimony reimburses Defendant's travel, lodging, and subsistence expenses at the then-prevailing U.S. Government per diem rates; and (iv) consents to personal jurisdiction over Defendant in any United States District Court for purposes of enforcing any such subpoena.

13.     Defendant agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

14.    Defendant agrees that this Court shall retain jurisdiction over this matter for the

purpose of enforcing the terms of the Final Judgment.

DELPHI CORPORATION

By: _____

David M. Sherbin
Vice President, General Counsel & Chief
Compliance Officer
5725 Delphi Drive
MC: 483-400-603
Troy, MI 48098

On October 20, 2006, David M. Sherbin, a person known to me, personally appeared
before me and acknowledged executing the foregoing Consent with full authority to do so on
behalf of Delphi Corporation as its Vice President, General Counsel & Chief Compliance
Officer.

_____

Notary Public
Commission expires:

MICHELLE A. MCGANN
NOTARY PUBLIC MACOMB CO., MI
MY COMMISSION EXPIRES Apr 8, 2007
ACTING IN OAKLAND COUNTY, MI

Approved as to form:

_____

Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000
Attorney for Defendant

5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                             Plaintiff,<br><br>             v.<br><br>DELPHI CORPORATION, et al.<br><br>                             Defendants. | C.A. No. __-____ (___) |

**FINAL JUDGMENT AS TO DEFENDANT DELPHI CORPORATION**

The Securities and Exchange Commission having filed a Complaint and Defendant Delphi Corporation; having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction) ; waived findings of fact and conclusions of law; waived any right to appeal from this Final Judgment; and filed a Chapter 11 bankruptcy petition on October 8, 2005 in the matter captioned *In re Delphi Corporation, et al.*, Case No. 05-44481 (S.D.N.Y.) (RDD):

**I.**

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails,

directly or indirectly:

    (a)      to employ any device, scheme, or artifice to defraud;

    (b)      to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)      to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

## II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)      to employ any device, scheme, or artifice to defraud;

    (b)      to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

2

(c)    to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person.

**III.**

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant, its agents,

servants, employees, attorneys and those persons in active concert or participation with it who

receive actual notice of this Final Judgment, by personal service or otherwise, and each of them,

is permanently restrained and enjoined from violating Section 13(a) of the Exchange Act [15

U.S.C. §§ 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§

240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] by, directly or indirectly, filing or causing to

be filed with the SEC any registration statement pursuant to Section 12(g) of the Exchange Act

[15 U.S.C. § 78l], or any annual report, current report, quarterly report, or other report pursuant

to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and the rules and regulations

promulgated thereunder that: (a) contains any untrue statement of material fact or omits to state

any material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading: (b) fails to contain information required to be

contained therein; or (c) fails to comply in any material respect with the requirements of Section

12(g) or Section 13(a) of the Exchange Act [15 U.S.C. §§ 78l and 78m(a)] or Exchange Act Rules

12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and

240.13a-13].

## IV.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant, its agents, servants, employees, attorneys and those persons in active concert or participation with it who receive actual notice of this Final Judgment, by personal service or otherwise, and each of them, is permanently restrained and enjoined from violating Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78 m (b)(2)(A)] by, directly or indirectly, failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

## V.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant, its agents, servants, employees, attorneys and those persons in active concert or participation with it who receive actual notice of this Final Judgment, by personal service or otherwise, and each of them, is permanently restrained and enjoined from violating Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by, directly or indirectly, failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that :(a) transactions are executed in accordance with management's general or specific authorization; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets: (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any

4

differences.

## VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is

incorporated herein with the same force and effect as if fully set forth herein, and that Defendant

shall comply with all of the undertakings and agreements set forth therein.

## VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent and this

Final Judgment are subject to approval of the Bankruptcy Court in Delphi's Chapter 11 case

captioned *In re Delphi Corporation, et al.*, Case No. 05-44481 (S.D.N.Y.) (RDD).

## VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.


Dated: _____, _____


_____

UNITED STATES DISTRICT JUDGE

5

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
        In re                             :        Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :        Case No. 05-44481 (RDD)
                                          :
                        Debtors.          :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x


ORDER AUTHORIZING ENTRY INTO SETTLEMENT WITH
THE SECURITIES AND EXCHANGE COMMISSION

("SEC SETTLEMENT ORDER")

        Upon the motion, dated November 10, 2006 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-

possession in the above-captioned cases (collectively, the "Debtors"), for an order (the "Order")

under 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 9019 authorizing the Debtors to enter into a

settlement with the Securities and Exchange Commission (the "Commission"); and upon the

record of the hearing held on the Motion; and this Court having determined that the relief

requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and

other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been

given and that no other or further notice is necessary; and after due deliberation thereon, and

sufficient cause appearing therefor, it is hereby

        ORDERED, ADJUDGED, AND DECREED THAT:

        1.      The Motion is GRANTED.

2.      The Debtors' decision to resolve all proceedings and investigations of the Commission, raised in its Complaint filed in the United States District Court for the Eastern District of Michigan on October 30, 2006, upon the terms contained in Final Judgment, attached as Exhibit 1 to this Order, is reasonable under the circumstances and is approved.

3.      The Debtors' settlement with the Commission, as memorialized in the Final Judgment, is hereby approved.

4.      The Debtors are authorized and directed to take all steps necessary and appropriate to implement the settlement as specified in the Final Judgment.

5.      The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the First Omnibus Claims Objection.

Dated: New York, New York
        November ___, 2006


_____
    UNITED STATES BANKRUPTCY JUDGE

2

# **Exhibit 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

DELPHI CORPORATION, et al.

Defendants.

C.A. No. __-____ (___)

**FINAL JUDGMENT AS TO DEFENDANT DELPHI CORPORATION**

The Securities and Exchange Commission having filed a Complaint and Defendant

Delphi Corporation; having entered a general appearance; consented to the Court's jurisdiction

over Defendant and the subject matter of this action; consented to entry of this Final Judgment

without admitting or denying the allegations of the Complaint (except as to jurisdiction) ; waived

findings of fact and conclusions of law; waived any right to appeal from this Final Judgment; and

filed a Chapter 11 bankruptcy petition on October 8, 2005 in the matter captioned *In re Delphi*

*Corporation, et al.*, Case No. 05-44481 (S.D.N.Y.) (RDD):

**I.**

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and

Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating Section 17(a) of the Securities

Act of 1933 [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or

instruments of transportation or communication in interstate commerce or by use of the mails,

directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

## II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)      to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

**III.**

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant, its agents, servants, employees, attorneys and those persons in active concert or participation with it who receive actual notice of this Final Judgment, by personal service or otherwise, and each of them, is permanently restrained and enjoined from violating Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] by, directly or indirectly, filing or causing to be filed with the SEC any registration statement pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78l], or any annual report, current report, quarterly report, or other report pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and the rules and regulations promulgated thereunder that: (a) contains any untrue statement of material fact or omits to state any material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading: (b) fails to contain information required to be contained therein; or (c) fails to comply in any material respect with the requirements of Section 12(g) or Section 13(a) of the Exchange Act [15 U.S.C. §§ 78l and 78m(a)] or Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13].

## IV.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant, its agents, servants, employees, attorneys and those persons in active concert or participation with it who receive actual notice of this Final Judgment, by personal service or otherwise, and each of them, is permanently restrained and enjoined from violating Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78 m (b)(2)(A)] by, directly or indirectly, failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

## V.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant, its agents, servants, employees, attorneys and those persons in active concert or participation with it who receive actual notice of this Final Judgment, by personal service or otherwise, and each of them, is permanently restrained and enjoined from violating Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by, directly or indirectly, failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that :(a) transactions are executed in accordance with management's general or specific authorization; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets: (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any

4

differences.

## VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is

incorporated herein with the same force and effect as if fully set forth herein, and that Defendant

shall comply with all of the undertakings and agreements set forth therein.

## VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent and this

Final Judgment are subject to approval of the Bankruptcy Court in Delphi's Chapter 11 case

captioned *In re Delphi Corporation, et al.*, Case No. 05-44481 (S.D.N.Y.) (RDD).

## VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

Dated: _____, _____

_____
UNITED STATES DISTRICT JUDGE

5