# EXHIBIT E

**Presentment Date and Time: November 20, 2006 at 4:00 p.m.**
**Objection Deadline: November 20, 2006 at 2:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
            In re                                         :    Chapter 11
                                                          :
            DELPHI CORPORATION, et al.,                   :    Case No. 05- 44481 (RDD)
                                                          :
                              Debtors.                    :    (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF PRESENTMENT OF ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), 1107(b) AND  FED. R. BANKR.
P. 2014 AUTHORIZING EMPLOYMENT AND RETENTION OF KPMG LLP TO ASSIST DEBTORS IN (I)
CERTAIN IMPROVEMENTS TO THE INTERNATIONAL TAX REPORTING PACKAGE AND PROCESSES
EFFECTIVE NUNC PRO  TUNC TO AUGUST 1, 2006, (II) CERTAIN INTERNAL REPORTING INITIATIVES
EFFECTIVE NUNC PRO TUNC TO MAY 9, 2006, (III) A SPECIAL INVESTIGATION EFFECTIVE NUNC PRO
TUNC TO JULY 10, 2006, AND (IV) CERTAIN TRANSFER PRICING SERVICES EFFECTIVE NUNC PRO TUNC
MAY 19, 2006, (V) CERTAIN IMPROVEMENTS TO THE FINANCIAL CLOSE, CONSOLIDATION AND
MANAGEMENT REPORTING PROCESSES, AND (VI) CERTAIN ADDITIONAL SERVICES

PLEASE TAKE NOTICE that on November 10, 2006, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases, filed the Second Supplemental Application For An Order Under 11 U.S.C. §§ 327(a), 328(a) And 1107(b) And Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of KPMG LLP To Assist Debtors In (I) Certain Improvements To The International Tax Reporting Package and Processes Effective Nunc Pro Tunc To August 1, 2006, (II) Certain Internal Reporting Initiatives Effective Nunc Pro Tunc To May 9, 2006, (III) A Special Investigation Effective Nunc Pro Tunc To July 10, 2006, And (IV) Certain Transfer Pricing Services Effective Nunc Pro Tunc To May 19, 2006, (V) Certain Improvements To The Financial Close, Consolidation and Management Reporting Processes, And (VI) Certain Additional Services (the "Second Supplemental Application," attached to this notice as Exhibit A).

PLEASE TAKE FURTHER NOTICE that if timely written objections are filed, served, and received in accordance with this notice, a hearing to consider approval of the Second Supplemental Application will be held on November 30, 2006, at 10:00 a.m. (Prevailing Eastern Time) (the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York, 10004.

PLEASE TAKE FURTHER NOTICE that if no written objections to the Second Supplemental Application are timely filed, served, and received, the order filed with the Second Supplemental Application and attached to this notice as Exhibit B will be submitted for signature to the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004 on November 20, 2006 at 4:00 p.m. (Prevailing Eastern Time).

2

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Second

Supplemental Application must (a) be in writing, (b) conform to the Federal Rules of

Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York,

and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And

Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates

And Certain Notice, Case Management, And Administrative Procedures, entered by this

Court on October 26, 2006, as amended (the "Amended Eighth Supplemental Case

Management Order") (Docket No. 5418), (c) be filed with the Bankruptcy Court in

accordance with General Order M-242 (as amended) registered users of the Bankruptcy

Court's case filing system must file electronically, and all other parties-in-interest must file

on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any

other Windows-based word processing format), (d) be submitted in hard-copy form directly

to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, and (e)

be served upon (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098

(Att'n: General Counsel), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher &

Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm.

Butler, Jr.), (iii) counsel for the agent under the Debtors' prepetition credit facility, Simpson

Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017

(Att'n: Kenneth S. Ziman), (iv) counsel for the agent under the postpetition credit facility,

Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Brian

Resnick), (v) counsel for the Official Committee Of Unsecured Creditors,

Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J.

Rosenberg and Mark A. Broude), (vi) counsel for KPMG LLP, King & Spalding LLP, 1185

Avenue of the Americas, New York, New York 10036  (Att'n: H. Slayton Dabney, Jr.), (vii)

3

counsel for the Official Committee Of Equity Security Holders, Fried Frank, Harris, Shriver

& Jacobson LLP, One New York Plaza, New York, New York 10004 (Att'n: Bonnie

Steingart), and (viii) the Office of the United States Trustee for the Southern District of

New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n: Alicia M.

Leonhard), in each case so as to be **received** no later than **2:00 p.m. (Prevailing Eastern

Time) on November 20, 2006** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth herein and in accordance with the Amended Eighth Supplemental Case Management Order will be considered by the Bankruptcy Court at the Hearing.  If no objections to the Second Supplemental Application are timely filed and served in accordance with the procedures set forth herein and in the Amended Eighth Supplemental Case Management Order, the Bankruptcy Court may enter an order granting the Second Supplemental Application **without further notice**.

Dated: New York, New York
      November 10, 2006

              SKADDEN, ARPS, SLATE, MEAGHER
                & FLOM LLP

              By: /s/ John Wm. Butler, Jr.
                John Wm. Butler, Jr. (JB 4711)
                John K. Lyons (JL 4951)
                Ron E. Meisler (RM 3026)
              333 West Wacker Drive, Suite 2100
              Chicago, Illinois  60606
              (312) 407-0700

                    - and -

              By: /s/ Kayalyn A. Marafioti
                Kayalyn A. Marafioti (KM 9632)
                Thomas J. Matz (TM 5986)
               Four Times Square
              New York, New York  10036
              (212) 735-3000

              Attorneys for Delphi Corporation, et al.,
                Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :
      In re                        :      Chapter 11
                             :
DELPHI CORPORATION, et al.,    :      Case No. 05-44481 (RDD)
                             :
                Debtors.   :      (Jointly Administered)
                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECOND SUPPLEMENTAL APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a),
328(a), 1107(b) AND FED. R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT
AND RETENTION OF KPMG LLP TO ASSIST DEBTORS IN (I) CERTAIN
IMPROVEMENTS TO INTERNATIONAL TAX REPORTING PACKAGE
AND PROCESSES EFFECTIVE <u>NUNC</u> <u>PRO</u> <u>TUNC</u> TO AUGUST 1, 2006,
(II) CERTAIN INTERNAL REPORTING INITIATIVES EFFECTIVE
<u>NUNC</u> <u>PRO</u> <u>TUNC</u> TO MAY 9, 2006, (III) A SPECIAL INVESTIGATION
EFFECTIVE <u>NUNC</u> <u>PRO</u> <u>TUNC</u> TO JULY 10, 2006, (IV) CERTAIN
TRANSFER PRICING SERVICES EFFECTIVE <u>NUNC</u> <u>PRO</u> <u>TUNC</u>
TO MAY 19, 2006, (V) CERTAIN IMPROVEMENTS TO FINANCIAL
CLOSE, CONSOLIDATION AND MANAGEMENT REPORTING
<u>PROCESSES, AND (VI) CERTAIN ADDITIONAL SERVICES</u>

      Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this application (the "Second Supplemental Application") for entry of an order

pursuant to sections 327(a), 328(a), and 1107(b) of title 11 of the United States Code, as

amended (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") authorizing the employment and retention of KPMG LLP ("KPMG")

to assist the Debtors in (i) certain improvements to the international tax reporting package and

processes effective <u>nunc</u> <u>pro</u> <u>tunc</u> to August 1, 2006 (representing phase II of the services under

the previously approved International Project Engagement Letter dated May 24, 2005, and the

Revised International Project Engagement Letter dated September 12, 2005, both of which were

previously approved by the Court), (ii) certain internal reporting initiatives effective <u>nunc</u> <u>pro</u>

<u>tunc</u> to May 9, 2006, (iii) a special investigation effective <u>nunc</u> <u>pro</u> <u>tunc</u> to July 10, 2006, (iv)

certain transfer pricing services effective <u>nunc</u> <u>pro</u> <u>tunc</u> to May 19, 2006 (representing services

of the type contemplated in paragraph 16(a)(ii) of the Original Application, as defined herein),

(v) certain improvements to the financial close, consolidation and management reporting

processes, and (vi) certain additional services (including the renewal and extension of existing

services and additional phase services under existing engagements by and between the Debtors

and KPMG) of a nature consistent with the services covered in retention applications previously

approved by the Court ("Additional Services").    In support of this Second Supplemental

Application, the Debtors submit a Declaration of Gary A. Silberg, sworn to November 10, 2006

(the "Declaration"), annexed hereto as <u>Exhibit A</u>.    This Second Supplemental Application

supplements (a) that certain application dated February 14, 2006, pursuant to §§ 327(a), 328(a)

and 1107(b) of the Bankruptcy Code and Rule 2014 of the Bankruptcy Rules for authorization to

retain KPMG as tax and transaction services advisors to the Debtors, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to

October 8, 2005 (the "Original Application") and (b) that certain supplemental application, dated

April 20, 2006, pursuant to sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and

Rule 2014 of the Bankruptcy Rules authorizing (i) the employment and retention of KPMG as

advisory and valuation services advisors to the Debtors, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to February 16,

2006, (ii) the continued retention of KPMG as tax advisors to the Debtors, effective <u>nunc</u> <u>pro</u>

<u>tunc</u> to January 1, 2006, and (iii) additional international executive tax services to be rendered by

KPMG to the Debtors, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to January 18, 2006 (the "First Supplemental Application"). In further support of this Second Supplemental Application, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014.

B.    <u>Current Business Operations of the Debtors</u>

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2005 had global 2005 net sales of approximately $26.9 billion and global assets of

approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues, and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from the

Bankruptcy Court.

6.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's

business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and

liabilities of these divisions and subsidiaries were transferred to the Company in accordance with

the terms of a Master Separation Agreement between Delphi and GM.  In connection with these

transactions, Delphi accelerated its evolution from a North American-based, captive automotive

supplier to a global supplier of components, integrated systems, and modules for a wide range of

customers and applications.  Although GM is still the Company's single largest customer, today

more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company

generated approximately $2 billion in net income.  Every year thereafter, however, with the

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

4

exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its transformation plan. The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

the first half of 2007. To complete their restructuring process, the Debtors must focus on five key areas. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint. Finally, the Debtors must devise a workable solution to their current pension situation.

12.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

13.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements. Having concluded that pre-filing discussions with its unions and GM were not leading to the implementation of a plan sufficient to address the Debtors' issues on a timely basis, the Company determined to commence these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value.

6

<u>The Original And Supplemental Applications</u>

14.    On February 15, 2006, the Debtors filed the Original Application pursuant to the terms of certain engagement letters, by and between the Debtors and KPMG, each as described and defined therein (the "Original Engagement Letters").

15.    On March 3, 2006, this Court entered an order approving the Original Application, pursuant to the terms of the Original Engagement Letters, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to October 8, 2005 (the "Original Retention Order").

16.    On April 20, 2006, the Debtors filed the First Supplemental Application pursuant to the terms of certain engagement letters, by and between the Debtors and KPMG, each as described and defined therein (the "First Supplemental Engagement Letters").

17.    On May 2, 2006, this Court entered an order approving the First Supplemental Application, pursuant to the terms of the First Supplemental Engagement Letters, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to (i) February 16, 2006 for the employment and retention of KPMG as advisory and valuation advisors to the Debtors, (ii) January 1, 2006 for the continued retention of KPMG as tax advisors to the Debtors, and (iii) January 18, 2006 for the additional international executive tax services to be rendered by KPMG to the Debtors (the "First Supplemental Retention Order").

<u>Relief Requested</u>

18.    By this Second Supplemental Application, the Debtors respectfully request entry of an order under §§ 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014, authorizing the employment and retention of KPMG to assist the Debtors in (i) certain improvements to the international tax reporting package and processes effective <u>nunc</u> <u>pro</u> <u>tunc</u> to August 1, 2006 (representing phase II of the services under the previously approved

International Project Engagement Letter dated May 24, 2005, and the Revised International Project Engagement Letter dated September 12, 2005, both of which were previously approved by the Court), pursuant to the terms and conditions set forth in that certain letter agreement dated July 10, 2006, annexed to the Declaration as Exhibit A (the "International Tax Package Improvement Project Engagement Letter"), (ii) certain internal reporting initiatives effective nunc pro tunc to May 9, 2006, pursuant to the terms and conditions set forth in that certain letter agreement dated May 17, 2006, annexed to the Declaration as Exhibit B (the "Internal Reporting Engagement Letter"), (iii) a special investigation effective nunc pro tunc to July 10, 2006, pursuant to the terms and conditions set forth in that certain letter agreement dated July 3, 2006, annexed to the Declaration as Exhibit C (the "Special Investigation Engagement Letter"), (iv) certain transfer pricing services effective nunc pro tunc to May 19, 2006 (representing services of the type contemplated in paragraph 16(a)(ii) of the Original Application), pursuant to the terms and conditions set forth in that certain letter agreement dated May 22, 2006, annexed to the Declaration as Exhibit D (the "Transfer Pricing Services Engagement Letter"), (v) certain improvements to the financial close, consolidation and management reporting processes, pursuant to the terms and conditions set forth in that letter agreement dated October 30, 2006, annexed to the Declaration as Exhibit E (the "Financial Close, Consolidation And Management Reporting Project Engagement Letter," and together with the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, and the Transfer Pricing Services Engagement Letter, the "Second Supplemental Engagement Letters"), and (vi) certain Additional Services.

19.    The Debtors believe that they will continue to require the services provided by KPMG and request for KPMG to render Additional Services to the Debtors which will

include activities relating to subsequent phases of work for which KPMG has already been retained under certain engagements and other work of a nature consistent with the services covered in this and the other previously approved retention applications, as documented from time to time by engagement confirmations ("Engagement Confirmations").  Accordingly, the Debtors are hereby seeking authority to retain KPMG to complete the projects described in certain engagement letters and to execute additional engagements containing indemnity and limitations on liability provisions on terms that are no less favorable to the Debtors than those set forth in the Master Services Engagement Letter (as defined in the Original Application) without seeking further Court approval.  Delphi submits that this arrangement is far more beneficial to and conservative of estate resources than would be the case if each engagement between the Debtors and KPMG required a lengthy and expensive retention application.  Moreover, no bankruptcy policies should be offended because such arrangement does nothing to effect the administration of these chapter 11 cases.

<u>Scope Of Services</u>

20.    In accordance with the International Tax Package Improvement Project Engagement Letter, KPMG will provide such international tax package improvement project services to the Debtors as KPMG and the Debtors deem appropriate and feasible, including but not limited to:

|     |     |
| --- | --- |
| i. | Collaborating with the Debtors to identify improvements to the international tax reporting package and processes; |
| ii. | Assisting with the development, implementation, and testing of improvements to the international tax reporting package and processes; |
| iii. | Assisting with the development of training materials for the improved international tax reporting package and processes; |
| iv. | Assisting with training personnel of the Debtors on the new international tax reporting package and processes; |

v.    Assisting the Debtors with reviewing the implementation of the international tax reporting package and processes; and

vi.    Providing other services related to the development and implementation of the improved international tax reporting package and processes as appropriate.

21.    In accordance with the Internal Reporting Engagement Letter, KPMG will assist the Debtors in certain internal reporting initiatives and provide such services to the Debtors as KPMG and the Debtors deem appropriate and feasible, including but not limited to:

i.    Assisting with the realignment of the reporting units within the Electronic & Safety division headquartered in Kokomo, Indiana; and

ii.    Migrating trial balance codes from other Delphi reporting sites, which are currently being integrated into the Electronics & Safety division reporting structure.

22.    In accordance with the Special Investigation Engagement Letter, KPMG will provide staff assistance in connection with a special investigation at the Debtors' HD Flint Facility.

23.    In accordance with the Transfer Pricing Services Engagement Letter, KPMG will assist the Debtors in developing transfer prices on certain transactions between the Debtors' related party affiliates in the U.S. and Canada and provide such services to the Debtors as KPMG and the Debtors deem appropriate and feasible, including but not limited to:

i.    Interviewing knowledgeable personnel in Dayton and Toronto regarding the nature of intercompany transactions, including the assignment of functions and risk;

ii.    Reviewing Delphi's comparable company benchmarking analysis for reasonableness;

iii.    Reviewing the "cost-competitive adjustments" applied to Delphi's tested-party results for comparability with third-party benchmarks;

iv.    Assessing the appropriateness of any "comparable uncontrolled prices" identified by management;

v.    Selecting the most appropriate method (or "best method" for U.S. purposes) with which to test arm's length pricing for tangible-product transactions;

10

vi.    Reviewing the existing R&D cost sharing agreement and considering its appropriateness in light of each affiliate's actual contribution and the applicable transfer pricing regulations; and

vii.    Analyzing administrative services expenses charged from the U.S. affiliate to the Canadian affiliate, documenting an understanding of the cost base included in the charges, and assessing the appropriateness of the allocation keys.

24.   In accordance with the Financial Close, Consolidation And Management Reporting Project Engagement Letter, KPMG will assist the Debtors with improving the financial close, consolidation and management reporting processes, and provide such services to the Debtors as KPMG and the Debtors deem appropriate and feasible, including but not limited to:

i.    Finance Restructuring:

- Confirming project logistics and schedules (<u>e. g.</u> site visits, interviews, workshops and stakeholder presentations);

- Developing a vision and a draft of the guiding principles of the finance organization, addressing its roles and current processes (<u>e. g.</u> standardization, technology and controls);

- Interviewing finance management staff to gain an understanding of their goals;

- Comparing current finance organization alignment, structure and process standardization to industry leading practices and management goals;

- Interviewing the leads in the budgeting and forecasting group to gain an understanding of their goals;

- Confirming and re-validating the vision and guiding principles of the controller's organization;

- Assessing the change management needs and developing a "go forward" plan;

- Obtaining an understanding of the current finance/IT technology structure including common systems, management reporting, outsourcing support, etc.;

- Obtaining an understanding of the current roles & responsibilities for the individuals in the finance restructuring program office;

ii.    Corporate Accounting Follow-up Review:

11

- Following up interviews and meetings with corporate consolidation and reporting group to expand on initial workshop interviews;

- Meeting with IT accounting group to discuss allocations;

- Performing data mining and analysis of the trail balance resubmissions, corporate journal vouchers (CJVs) and journal vouchers (JVs);

- Drafting detailed process maps of the corporate close, consolidation and internal and external reporting (refer to "High Level Close Process Map" documented during initial workshop);

- Gaining an understanding of the legal entity and management reporting processes (e. g. Hyperion utilization);

- Assessing the current multiple charts of accounts (e. g. Hyperion, SAP, DGL and others);

iii.  Division Reviews - Electronic & Safety and Packard:

- Interviewing key finance professionals to obtain an understanding of their goals;

- Developing an understanding of the global plan for SAP implementation; documenting existing process flows (processes and data);

- Obtaining an understanding of the division management reporting process;

- Identifying potential improvements to address control deficiencies already identified by management;

- Developing observations and recommendations focused on an integrated approach considering people, process, technology and controls;

- Performing GAP analysis comparing divisional processes to industry leading practices as observed by KPMG;

- Reviewing the roles and responsibilities of the division controller's function;

- Confirming corporate level observations with management;

iv.  Corporate Accounting Re-Visit and Validation:

- Validating and integrating of business unit reviews back to the corporate accounting group;

12

- Comparing entity trial balance submissions to the corporate consolidation process;

- Assisting management to build an action plan to remediate potential gaps identified in the assessment;

- Performing GAP analysis of corporate processes to industry leading practices as observed by KPMG;

- Validating the guiding principles with management developed during weeks 1-6;

- Performing a high level benchmark of the corporate controllers organization;

- Identifying potential improvements to address control deficiencies already identified by management;

v.    Report Preparation and Project Stakeholders Reviews:

- Documenting findings and recommendations;

- Preparing a roadmap to move forward;

- Assisting in drafting a business case for the finance restructuring program;

- Developing "next step" plan and proposal;

- Presenting report to stakeholders;

vi.    Deliverables:

- Providing draft deliverables to the project sponsor for review and comment, prior to final delivery; and

- Providing weekly status update report that will be distributed to the project stakeholders.

25.    The services to be provided by KPMG to the Debtors will not be unnecessarily duplicative of those provided by any other of the Debtors' professionals and KPMG will coordinate any services performed at the Debtors' request with the Debtors' other professionals, including financial advisors, accountants, and counsel, as appropriate, to avoid duplication of efforts.

26.    Subject to this Court's approval of the Second Supplemental Application, KPMG is willing to assist the Debtors in (i) certain improvements to the international tax reporting package and processes, as described in the International Tax Package Improvement

13

Project Engagement Letter on the terms set forth therein, (ii) certain internal reporting initiatives, as described in the Internal Reporting Engagement Letter on the terms set forth therein, (iii) a special investigation, as described in the Special Investigation Engagement Letter on the terms set forth therein, (iv) certain transfer pricing services, as described in the Transfer Pricing Services Engagement Letter on the terms set forth therein, (v) certain improvements to the financial close, consolidation and management reporting processes, as described in the Financial Close, Consolidation And Management Reporting Project Engagement Letter on the terms set forth therein, and (vi) certain Additional Services.

<u>Qualifications Of Professionals</u>

27.    The Debtors have selected KPMG to assist the Debtors in certain improvements to the international tax reporting package and processes, certain internal reporting initiatives, a special investigation, certain transfer pricing services, certain improvements to the financial close, consolidation and management reporting processes, and certain Additional Services because of KPMG's diverse experience and extensive knowledge in the fields of accounting and taxation.

28.    The Debtors have employed KPMG as financial and tax advisors since 1999.  By virtue of its prior engagements, KPMG has developed a significant amount of institutional knowledge regarding the Debtors' books, records, financial information, and other data maintained by the Debtors.  Such experience and knowledge will be valuable to the Debtors in their efforts to reorganize.  Accordingly, the Debtors wish to retain KPMG to provide assistance during these chapter 11 cases.

29.    The services of KPMG are deemed necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully.    Further, KPMG is well-qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

Disinterestedness Of Professionals

30.    The Affidavit of Patrick N. Karpen, sworn to February 9, 2006 (the "Original Affidavit") filed in support of the Original Application, the Affidavit of Gary A. Silberg, sworn to April 20, 2006 (the "First Supplemental Affidavit") filed in support of the Supplemental Application, and the Affidavit of Ann Marie Goddard, sworn to July 10, 2006 (the "Goddard Affidavit," and together with the Original Affidavit and the First Supplemental Affidavit, the "Prior Affidavits"), contain information available as of the date hereof with respect to KPMG's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a). Based on the information set forth in the Prior Affidavits, the Debtors submit that KPMG and the professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

Professional Compensation

31.    Subject to this Court's approval and pursuant to the terms and conditions of the Second Supplemental Engagement Letters, KPMG's requested compensation for professional services rendered to the Debtors will be based upon the hours actually expended by each assigned staff member at each staff member's hourly billing rate, subject to the discounts and other terms set forth herein.

32.    The rates included in this Second Supplemental Application (exclusive of discounts) are KPMG's normal and customary rates for matters of this sort.  In the normal course

15

of business, KPMG revises its hourly rates on October 1st of each year.  Subject to this Court's

approval, KPMG requests that the rates listed below be revised to the hourly rates that will be in

effect at such time.

33.    KPMG has agreed to apply a voluntary discount (of 25%) as set forth in the

International Tax Package Improvement Project Engagement Letter.  The discounted hourly rates

for such services to be rendered by KPMG are as follows:

| Professional Level: | Net Hourly Rate After Application Of 25% Discount: |
| --- | --- |
| Partner | $470 |
| Senior Manager | $375 |
| Manager | $265 |
| Senior Associate | $210 |
| Associate | $170 |

34.    KPMG has agreed to apply a voluntary discount (of 40%) as set forth in the

Internal Reporting Engagement Letter.  The discounted hourly rates for such services to be

rendered by KPMG are as follows:

| Professional Level: | Net Hourly Rate After Application Of 40% Discount: |
| --- | --- |
| Partner | $465 |
| Director | $450 |
| Manager | $432 |
| Senior | $315 |
| Staff | $231 |

35.   KPMG has agreed to apply a voluntary discount (of 62.6%) as set forth in the Special Investigation Engagement Letter.  The discounted hourly rate for such services to be rendered by KPMG are as follows:

| Professional Level: | Net Hourly Rate After Application Of 62.6% Discount: |
|---|---|
| Senior Associate | $140 |

36.   As set forth in the Transfer Pricing Services Engagement Letter, KPMG's fee for this engagement will be the lesser of (i) actual time incurred to complete the project at KPMG's standard hourly rates, or (ii) $45,000.

37.   KPMG has agreed to apply a voluntary discount (of 40%) as set forth in the Financial Close, Consolidation And Management Reporting Project Engagement Letter.  The discounted hourly rate for such services to be rendered by KPMG are as follows[3]:

| Professional Level: | Net Hourly Rate After Application Of 40% Discount: |
|---|---|
| Partner | $480 |
| Managing Director/Director | $465 |
| Senior Manager | $450 |
| Manager | $435 |
| Senior Associate | $300 |
| Associate | $195 |

---

[3]   The difference between the 40% discounted rates of the Internal Reporting Engagement Letter dated May 17, 2006 and the Financial Close, Consolidation And Management Reporting Project Engagement Letter dated October 30, 2006 is due to an increase of the KPMG standard rate as of October 2006.

38.    KPMG also will seek reimbursement of incurred necessary expenses such as travel, lodging, meals, telephone, videoconferencing, word-processing, graphics, administrative support, and other out-of-pocket expenses incurred in providing professional services.  KPMG will seek such reimbursements in accordance with the terms and conditions of the Travel and Per Diem Reimbursement policy made part of the engagement letters, and in accordance with guidelines established by the U.S. Trustee.

39.    KPMG intends to apply to this Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, corresponding Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), orders of this Court, and guidelines established by the U.S. Trustee (the "U.S. Trustee Guidelines").  KPMG acknowledges that all compensation will be subject to this Court's review and approval after notice and hearing.  KPMG has agreed to accept as compensation such sums as may be allowed by this Court.

40.    The Debtors believe that KPMG's fees are fair and reasonable in light of industry practice, market rates both in and out of chapter 11 proceedings, KPMG's experience in reorganizations, and KPMG's importance in these cases.

Other Terms And Conditions Of The International Tax Package
Improvement Project Engagement Letter, The Internal Reporting Engagement
Letter, The Special Investigation Engagement Letter, The Financial Close, Consolidation
And Management Reporting Project Engagement Letter, And Any Additional Services

41.    The KPMG global network encompasses independent professional services practices conducted by separate legal entities throughout the world.  KPMG International, a Swiss cooperative, serves as a coordinating entity for a network of member firms operating under the KPMG name.  KPMG International is a member-based entity with no shareholders and no permanent capital.  Each of the member firms of KPMG International ("KPMG Member

Firms") is separate and legally distinct.  KPMG is the United States member firm of KPMG International.

       42.   Without the Debtors' prior written approval, KPMG may subcontract with certain other KPMG Member Firms to provide services to the Debtors under the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, the Financial Close, Consolidation And Management Reporting Project Engagement Letter, and any Engagement Confirmation of Additional Services, <u>provided</u>, <u>however</u>, that KPMG will remain fully and solely responsible for all of its liabilities and obligations under the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, the Financial Close, Consolidation And Management Reporting Project Engagement Letter, and any Engagement Confirmation of Additional Services whether or not performed, in whole or in part, by KPMG, any affiliate of KPMG, any KPMG Member Firm, or any of their respective affiliates.  The Debtors will have no recourse, and will bring no claim, against any KPMG Member Firm other than KPMG, or against any subcontractors, members, shareholders, directors, officers, managers, partners, agents, representatives, or employees of any KPMG Member Firm (or any of their respective successors or permitted assigns), or any of their respective assets, with respect to the services or otherwise under the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, the Financial Close, Consolidation And Management Reporting Project Engagement Letter, and any Engagement Confirmation of Additional Services.

       43.   KPMG will pay such Engagement Member Firms directly for their services, and will apply to the Court for reimbursement by the Debtors of any such payments made by

KPMG to the Engagement Member Firms.  The KPMG Member Firms (other than KPMG) providing services to the Debtors under the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services will use category codes to describe the services rendered, rather than more detailed descriptions usually required for fee applications.

44.    With respect to dispute resolution, KPMG acknowledges that any dispute or claim relating to their engagement under the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, the Financial Close, Consolidation And Management Reporting Project Engagement Letter, and any Engagement Confirmation of Additional Services may also be brought before this Court.

45.    With respect to indemnification and  limitation on liability, KPMG acknowledges that under the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, the Financial Close, Consolidation And Management Reporting Project Engagement Letter,  and any Engagement Confirmation of Additional Services, KPMG will not be indemnified and KPMG's limitation of liability will not apply to claims arising out of KPMG's own bad-faith, self-dealing, breach of fiduciary duty, gross negligence, or willful misconduct, if any.

46.    With respect to termination, KPMG acknowledges that under the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, the Financial Close, Consolidation And Management Reporting Project Engagement Letter, and any Engagement Confirmation of Additional Services that the terminating party will provide the Court, the U.S. Trustee, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and the

Joint Fee Review Committee (the "Fee Committee") with ten business days' notice of termination. The provisions of the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, the Financial Close, Consolidation And Management Reporting Project Engagement Letter, and any Engagement Confirmation of Additional Services relating to indemnification, limitation of liability, fees and expenses, and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of the agreement and will survive completion of the Debtors' bankruptcy, whether through a confirmed plan of reorganization, liquidation of the Debtors' assets under chapter 11 or 7 of the Bankruptcy Code, or otherwise.

<div align="center">

Other Terms And Conditions Of The
<u>Transfer Pricing Services Engagement Lette**r**</u>

</div>

47.    The Transfer Pricing Services Engagement Letter, as modified and amended to contain the following additional terms and conditions as set forth below, is substantially similar to the Original Engagement Letters and the First Supplemental Engagement Letters and provides for compliance with the U.S. Trustee's standard terms and conditions and procedures mandated by this Court. KPMG's provision of services to the Debtors is contingent upon the Court's approval of each term and condition of the Transfer Pricing Services Engagement Letter, as modified by the terms and conditions set forth below.

<u>Subcontracting Services To KPMG Member Firms</u>

48.    Without the Debtors' prior written approval, KPMG may subcontract with certain other KPMG Member Firms to provide services to the Debtors under the Transfer Pricing Services Engagement Letter, <u>provided</u>, <u>however</u>, that KPMG will remain fully and solely responsible for all of its liabilities and obligations under the Transfer Pricing Services Engagement Letter, whether or not performed, in whole or in part, by KPMG, any affiliate of

<div align="center">21</div>

KPMG, any KPMG Member Firm, or any of their respective affiliates. The Debtors will have no recourse, and will bring no claim, against any KPMG Member Firm other than KPMG, or against any subcontractors, members, shareholders, directors, officers, managers, partners, agents, representatives or employees of any KPMG Member Firm (or any of their respective successors or permitted assigns), or any of their respective assets, with respect to the services or otherwise under the Transfer Pricing Services Engagement Letter.

49.     KPMG will pay such Engagement Member Firms directly for their services and will apply to the Court for reimbursement by the Debtors of any such payments made by KPMG to the Engagement Member Firms. The KPMG Member Firms (other than KPMG) providing services to the Debtors under the Second Supplemental Engagement Letters will use category codes to describe the services rendered, rather than more detailed descriptions usually required for fee applications.

Dispute Resolution

50.     Any dispute or claim between KPMG and the Debtors arising out of or relating to the Transfer Pricing Services Engagement Letter or any other services provided by or on behalf of KPMG to the Debtors or at the Debtors' request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) will be resolved in accordance with the dispute resolution procedures as set forth in the Transfer Pricing Services Engagement Letter (the "Dispute Resolution Procedures"). Notwithstanding the Dispute Resolution Procedures provided for in the Transfer Pricing Services Engagement Letter, KPMG acknowledges that any dispute or claim relating to their engagement also may be brought before this Court.

Indemnification

51.   In no event will KPMG be indemnified for a claim that a court determines by a final order to have arisen out of KPMG's own bad-faith, self-dealing, breach of fiduciary duty, gross negligence, or willful misconduct, if any.

Limitation On Liability

52.   KPMG's limitation of liability will not apply to claims arising out of KPMG's own bad-faith, self-dealing, breach of fiduciary duty, gross negligence, or willful misconduct, if any.

Termination

53.   The Debtors or KPMG may terminate the Transfer Pricing Services Engagement Letter in the event of breach by the other party, which breach is not cured within thirty days after notice by the non-breaching party, provided, however, that the terminating party will notify the other.  In addition, the terminating party will provide the Court, the U.S. Trustee, the Creditors' Committee and the Fee Committee with ten business days' notice of termination. The provisions of the Transfer Pricing Services Engagement Letter relating to indemnification, limitation of liability, fees and expenses, and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of the agreement and will survive completion of the Debtors' bankruptcy, whether through a confirmed plan of reorganization, liquidation of the Debtors' assets under chapter 11 or 7 of the Bankruptcy Code, or otherwise.

Certain Additional Services

54.   From time to time and as the Debtors and KPMG deem necessary and appropriate, Delphi may elect to retain KPMG to perform Additional Services.  The Debtors will provide written notice to KPMG and the Debtors and KPMG will execute an Engagement

23

Confirmation of Additional Services, which will summarize engagement details (to the extent applicable), such as the following:

- Names of the engagement partner and lead engagement manager;
- Target name;
- Dates and location(s) where fieldwork is expected to be performed;
- Specific services requested by the Debtors;
- Known potential conflicts of interest;
- Reporting requirements; and
- Fee arrangements.

55.    Upon execution of any Engagement Confirmation of Additional Services by the Debtors and KPMG, KPMG will have been engaged to perform the services in accordance with such Engagement Confirmation of Additional Services under terms no less favorable to the Debtors than the Standard Terms and Conditions dated February 16, 2006, as attached to the Internal Reporting Engagement Letter (the "Standard Terms and Conditions"), and the Order approving this Application.  Each Engagement Confirmation of Additional Services will become effective as of the date of the commencement of the services or, if earlier, the date of execution of such Engagement Confirmation of Additional Services without further application or order by the Court.

## Conclusion

56.    For the foregoing reasons, the Debtors submit that the relief requested herein is in the best interests of the Debtors and their estates and creditors and should be approved.

## Notice

57.    Notice of this Second Supplemental Application has been provided in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105

And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

58.    Because the legal points and authorities upon which this Second Supplemental Application relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (I) authorizing the employment and retention of KPMG to assist the Debtors in (i) certain improvements to the international tax reporting package and processes, consistent with the terms and conditions of the International Tax Package Improvement Project Engagement Letter effective <u>nunc</u> <u>pro</u> <u>tunc</u> to August 1, 2006 (representing phase II of the services under the previously approved International Project Engagement Letter dated May 24, 2005, and the Revised International Project Engagement Letter dated September 12, 2005, both of which were previously approved by the Court), (ii) certain internal reporting initiatives, consistent with the terms and conditions of the Internal Reporting Engagement Letter effective <u>nunc</u> <u>pro</u> <u>tunc</u> to May 9, 2006, (iii) a special investigation, consistent with the terms and conditions of the Special Investigation Engagement Letter effective <u>nunc</u> <u>pro</u> <u>tunc</u> to July 10, 2006, (iv) certain transfer pricing services, consistent with the terms and conditions of the Transfer Pricing Services Engagement Letter effective <u>nunc</u> <u>pro</u> <u>tunc</u> to May 19, 2006 (representing services of the type

contemplated in paragraph 16(a)(ii) of the Original Application), (v) certain improvements to the financial close, consolidation and management reporting processes, consistent with the terms and conditions of the Financial Close, Consolidation And Management Reporting Project Engagement Letter, (vi) certain Additional Services, and (II) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          November 10, 2006

<div style="margin-left:40%">

DELPHI CORPORATION, on behalf of itself and certain of its subsidiaries and affiliates, as Debtors and Debtors-in-Possession

By:  /s/ John D. Sheehan
     Name: John D. Sheehan
     Title:   Vice President and Chief Restructuring
              Officer

</div>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), 1107(b) AND FED. R. BANKR.
P. 2014 AUTHORIZING EMPLOYMENT AND RETENTION OF KPMG LLP TO
ASSIST DEBTORS IN (I) CERTAIN IMPROVEMENTS TO INTERNATIONAL
TAX REPORTING PACKAGE AND PROCESSES EFFECTIVE NUNC PRO
TUNC TO AUGUST 1, 2006, (II) CERTAIN INTERNAL REPORTING
INITIATIVES EFFECTIVE NUNC PRO TUNC TO MAY 9, 2006, (III) A
SPECIAL INVESTIGATION EFFECTIVE NUNC PRO TUNC TO JULY 10,
2006, (IV) CERTAIN TRANSFER PRICING SERVICES EFFECTIVE NUNC
PRO TUNC TO MAY 19, 2006, (V) CERTAIN IMPROVEMENTS TO FINANCIAL
CLOSE, CONSOLIDATION AND MANAGEMENT REPORTING
PROCESSES, AND (VI) CERTAIN ADDITIONAL SERVICES

Upon the Second Supplemental Application dated November 10, 2006 (the

"Second Supplemental Application")[1] of Delphi Corporation and certain of its domestic

subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), for an order (the "Second Supplemental Retention Order") pursuant

to sections 327(a), 328(a), and 1107(b) of title 11 of the United States Code, as amended (the

"Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") authorizing the employment and retention of KPMG LLP ("KPMG") to

assist the Debtors in (i) certain improvements to the international tax reporting package and

processes effective nunc pro tunc to August 1, 2006 (representing phase II of the services under

---

[1]      Capitalized terms used herein but not otherwise defined shall have those meanings set forth in the Second
Supplemental Application.

the previously approved International Project Engagement Letter dated May 24, 2005, and the

Revised International Project Engagement Letter dated September 12, 2005, both of which were

previously approved by the Court), (ii) certain internal reporting initiatives effective <u>nunc</u> <u>pro</u>

<u>tunc</u> to May 9, 2006, (iii) a special investigation effective <u>nunc</u> <u>pro</u> <u>tunc</u> to July 10, 2006, (iv)

certain transfer pricing services effective <u>nunc</u> <u>pro</u> <u>tunc</u> to May 19, 2006 (representing services

of the type contemplated in paragraph 16(a)(ii) of the Original Application), (v) certain

improvements to the financial close, consolidation and management reporting processes, and (vi)

certain additional services (including the renewal and extension of existing services and

additional phase services under existing engagements by and between the Debtors and KPMG)

of a nature consistent with the services covered in retention applications previously approved by

the Court ("Additional Services"); and this Court having determined that the relief requested in

the Second Supplemental Application is in the best interests of the Debtors, their estates, their

creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the

Second Supplemental Application has been given and that no other or further notice is necessary;

and after due deliberation thereon; and good and sufficient cause appearing therefor, it hereby is

ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Second Supplemental Application is GRANTED on a final basis.

2.    Subject to the terms of this Second Supplemental Retention Order, the

Debtors' employment and retention of KPMG to assist the Debtors in certain improvements to

the international tax reporting package and processes pursuant to the terms and conditions of the

Second Supplemental Application and the International Tax Package Improvement Project

Engagement Letter is approved pursuant to sections 327(a), 328(a), and 1107(b) of the

Bankruptcy Code and Bankruptcy Rule 2014, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to August 1, 2006.

3.    Subject to the terms of this Second Supplemental Order, the Debtors' employment and retention of KPMG to assist the Debtors in certain internal reporting initiatives pursuant to the terms and conditions of the Second Supplemental Application and the Internal Reporting Engagement Letter is approved pursuant to sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to May 9, 2006.

4.    Subject to the terms of this Second Supplemental Order, the Debtors' employment and retention of KPMG to assist the Debtors in a special investigation pursuant to the terms and conditions of the Second Supplemental Application and the Special Investigation Engagement Letter is approved pursuant to sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to July 10, 2006.

5.    Subject to the terms of this Second Supplemental Order, the Debtors' employment and retention of KPMG to assist the Debtors in certain transfer pricing services pursuant to the terms and conditions of the Second Supplemental Application and the Transfer Pricing Services Engagement Letter is approved pursuant to sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to May 19, 2006.

6.    Subject to the terms of this Second Supplemental Order, the Debtors' employment and retention of KPMG to assist the Debtors in certain improvements to the financial close, consolidation and management reporting processes pursuant to the terms and conditions of the Second Supplemental Application and the Financial Close, Consolidation And Management Reporting Project Engagement Letter is approved pursuant to sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014.

7.    Subject to the terms of this Second Supplemental Order, the Debtors' employment and retention of KPMG to assist the Debtors in certain Additional Services is approved pursuant to the terms and conditions of the Second Supplemental Application and

3

sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014.

8.     KPMG shall be compensated for fees and expenses in accordance with the standards and procedures set forth in sections 330 and 331 of the Bankruptcy Code and all applicable Bankruptcy Rules, Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), guidelines established by the Office of the United States Trustee (the "U.S. Trustee"), and further orders of this Court.

9.     KPMG shall take reasonable steps to ensure that it does not charge the Debtors' estates for duplicative services.

10.     Notwithstanding anything to the contrary set forth in the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services, without the Debtors' prior written approval, KPMG may subcontract a portion of its responsibilities under the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services with certain other member firms of KPMG International (the "KPMG Member Firms"); provided, however, that KPMG shall remain fully and solely responsible for all of KPMG's liabilities and obligations under the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services.

11.     Notwithstanding anything to the contrary set forth in the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services, KPMG shall be solely responsible for all of KPMG's liabilities and obligations under the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services, whether performed, in whole or in part, by KPMG, any affiliate of KPMG, any KPMG Member Firm, or any of their respective affiliates.  The Debtors shall have no recourse, and shall bring no claim, against any KPMG Member Firm other than KPMG, or against any subcontractors, members, shareholders, directors, officers, managers, partners, agents, representatives, or

4

employees of any KPMG Member Firm (or any of their respective successors or permitted assigns), or any of their respective assets, with respect to the services, or otherwise under the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services.

12.    All requests of KPMG for payment of indemnity pursuant to the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services shall be made by means of an application (interim or final as the case may be) and shall be subject to review by this Court to ensure that payment of such indemnity conforms to the terms of the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought; provided, however, that in no event shall KPMG be indemnified for a claim that a court determines by a final order to have risen out of KPMG's own bad-faith, self-dealing, breach of fiduciary duty, gross negligence, or willful misconduct, if any.

13.    In the event that KPMG seeks reimbursement for attorney's fees from the Debtors pursuant to the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services, the invoices and supporting time records from such attorneys shall be included in KPMG's own applications (both interim and final) and such invoices and time records shall be subject to the U.S. Trustee's guidelines for compensation and reimbursement of expenses and the approval of this Court under the standard of sections 330 and 331 of the Bankruptcy Code, without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy section 330(a)(3)(C) of the Bankruptcy Code.

14.    KPMG's limitation of liability, as set forth in the Second Supplemental

5

Engagement Letters and any Engagement Confirmation Additional Services, shall not apply to claims arising out of KPMG's own bad-faith, self-dealing, breach of fiduciary duty, gross negligence, or willful misconduct, if any.

15.    Any dispute or claim between KPMG and the Debtors arising out of or relating to the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services or any other services provided by or on behalf of KPMG to the Debtors or at the Debtors' request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) will be resolved in accordance with the dispute resolution procedures as set forth in the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services, provided, however, that any dispute or claim relating to their engagement also may be brought before this Court.

16.    Notwithstanding anything to the contrary set forth in the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services, the Debtors or KPMG may terminate any of the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services in the event of breach by the other party, which breach is not cured within thirty days after notice by the non-breaching party, provided, however, that the terminating party shall notify the other.  In addition, the terminating party shall provide the Court, the U.S. Trustee, the Creditors' Committee, and the Fee Committee with ten business days' notice of termination.  The provisions of the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services relating to indemnification, limitation of liability, fees and expenses, and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of the agreements and shall survive completion of the Debtors' bankruptcy, whether through a confirmed plan of reorganization, liquidation of the Debtors' assets under chapter 11 or 7 of the Bankruptcy Code,

or otherwise.

17.    Any party-in-interest shall have the right to raise the issue of the application of KPMG's prepetition retainer to postpetition fees and expenses.

18.    To the extent that this Second Supplemental Retention Order is inconsistent with the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services, this Second Supplemental Retention Order shall govern.

19.    With the exception of KPMG, the KPMG Member Firms providing services under the Second Supplemental Engagement Letters and any Engagement Confirmation of Additional Services shall be permitted to use category codes to describe the time spent on services rendered, rather than the more detailed descriptions usually required for fee applications.

20.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Second Supplemental Retention Order.

21.    The requirement under Local Rule 9013-1(b) for the service and filing of a separate memorandum of law is deemed satisfied by the Second Supplemental Application.

Dated:    New York, New York
           November __, 2006



_____
UNITED STATES BANKRUPTCY JUDGE

7

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :
       In re                     :     Chapter 11
                            :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                            :
             Debtors.    :     (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DECLARATION OF GARY A. SILBERG IN SUPPORT OF SECOND SUPPLEMENTAL
APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), 1107(b) AND
FED. R. BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND RETENTION
OF KPMG LLP TO ASSIST DEBTORS IN (I) CERTAIN IMPROVEMENTS TO
INTERNATIONAL TAX REPORTINGPACKAGE AND PROCESSES EFFECTIVE
NUNC PRO TUNC TO AUGUST 1, 2006, (II) CERTAIN INTERNAL REPORTING
INITIATIVES EFFECTIVE NUNC PRO TUNC TO MAY 9, 2006, (III) A
SPECIAL INVESTIGATION EFFECTIVE NUNC PRO TUNC TO JULY 10, 2006,
(IV) CERTAIN TRANSFER PRICING SERVICES EFFECTIVE NUNC PRO TUNC
TO MAY 19, 2006, (V) CERTAIN IMPROVEMENTS TO
FINANCIAL CLOSE, CONSOLIDATION AND MANAGEMENT
REPORTING PROCESSES, AND (VI) CERTAIN ADDITIONAL SERVICES

State of Illinois      )
                     ) ss:
City of Chicago     )

Gary A. Silberg, hereby declares as follows:

          1.       I am a Certified Public Accountant and a partner of KPMG LLP ("KPMG"),

a professional services firm.  I submit this declaration (the "Declaration") on behalf of KPMG in

support of the second supplemental application (the "Second Supplemental Application")[1] of

Delphi Corporation, and certain of its subsidiaries and affiliates, debtors and debtors-in-possession

in the above-captioned chapter 11 cases (collectively, the "Debtors"), for entry of an order,

pursuant to §§ 327(a), 328(a), and 1107(b) of title 11 of the United States Code, as amended (the

"Bankruptcy Code"), and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the employment and retention of KPMG to assist the Debtors in (i) certain improvements to the international tax reporting package and processes effective <u>nunc pro tunc</u> to August 1, 2006 (representing phase II of the services under the previously approved International Project Engagement Letter dated May 24, 2005, and the Revised International Project Engagement Letter dated September 12, 2005, both of which were previously approved by the Court*)*, pursuant to the terms and conditions set forth in that certain engagement letter dated July 12, 2006, annexed hereto as <u>Exhibit A</u> (the "International Tax Package Improvement Project Engagement Letter"), (ii) certain internal reporting initiatives effective <u>nunc pro tunc</u> to May 9, 2006, pursuant to the terms and conditions set forth in that certain engagement letter dated May 17, 2006, annexed hereto as <u>Exhibit B</u> (the "Internal Reporting Engagement Letter"), (iii) a special investigation effective <u>nunc pro tunc</u> to July 10, 2006, pursuant to the terms and conditions set forth in that certain engagement letter dated July 3, 2006, annexed hereto as <u>Exhibit C</u> (the "Special Investigation Engagement Letter"), (iv) certain transfer pricing services effective <u>nunc pro tunc</u> to May 19, 2006 (representing services of the type contemplated in paragraph 16(a)(ii) of the Original Application), pursuant to the terms and conditions set forth in that certain engagement letter dated May 22, 2006, annexed hereto as <u>Exhibit D</u> (the "Transfer Pricing Services Engagement Letter"), (v) certain improvements to the financial close, consolidation and management reporting processes, pursuant to the terms and conditions set forth in that certain engagement letter dated October 30, 2006, annexed hereto as <u>Exhibit E</u> (the "Financial Close, Consolidation And Management Reporting Project Engagement Letter," and together with the International Tax Package Improvement Project Engagement Letter, the Internal Reporting

---

[1]    Capitalized terms used herein but not otherwise defined will have those meanings set forth in the Second Supplemental Application, Original Affidavit or the First Supplemental Affidavit (each as defined below).

Engagement Letter, the Special Investigation Engagement Letter, and the Transfer Pricing

Services Engagement Letter, the "Second Supplemental Engagement Letters"), and (vi) certain

additional services (including the renewal and extension of existing services and additional phase

services under existing engagements by and between the Debtors and KPMG) of a nature

consistent with the services covered in retention applications previously approved by the Court

("Additional Services").  This Declaration hereby incorporates by reference (a) the Affidavit of

Patrick N. Karpen, sworn to on February 9, 2006 (the "Original Affidavit"), filed in support of the

application dated February 14, 2006, pursuant to sections 327(a), 328(a), and 1107(b) of the

Bankruptcy Code and Rule 2014 of the Bankruptcy Rules for authorization to retain KPMG as tax

and transaction services advisors to the Debtors, effective nunc pro tunc to October 8, 2005 (the

"Original Application"), pursuant to the terms of the engagement letters as described and defined

therein (the "Original Engagement Letters"), (b) the Affidavit of Gary A. Silberg, sworn to on

April 20, 2006 (the "First Supplemental Affidavit"), filed in support of the first supplemental

application dated April 20, 2006 (the "First Supplemental Application"), pursuant to sections

327(a), 328(a), and 1107(b) of the Bankruptcy Code and Rule 2014 of the Bankruptcy Rules

authorizing (i) the employment and retention of KPMG as advisory and valuation services

advisors to the Debtors effective nunc pro tunc to February 16, 2006, (ii) the continued retention of

KPMG as tax advisors to the Debtors effective nunc pro tunc to January 1, 2006, and (iii)

additional international executive tax services to be rendered by KPMG to the Debtors effective

nunc pro tunc to January 18, 2006 (the "First Supplemental Engagement Letters"), and (c) the

Affidavit of Ann Marie Goddard, sworn to on July 10, 2006, (the "Goddard Affidavit," and

together with the Original Affidavit and the First Supplemental Affidavit, the "Prior Affidavits").

On March 3, 2006, this Court entered an order approving the Original Application effective nunc

pro tunc to October 8, 2005 (the "Original Retention Order") and on May 2, 2006, this Court

entered an order approving the First Supplemental Application (the "First Supplemental Retention

Order").

2.      The Second Supplemental Application requests approval for the Debtors to

employ KPMG for Additional Services.  Accordingly, KPMG will complete the projects described

in certain engagement letters and execute additional engagements containing indemnity and

limitations on liability provisions on terms that are no less favorable to the Debtors than those set

forth in the Master Services Engagement Letter (as defined in the Original Application) without

seeking further Court approval.  This arrangement is far more beneficial to and conservative of

estate resources than would be the case if each engagement between the Debtors and KPMG

required a lengthy and expensive retention application.  I have personal knowledge of the matters

set forth herein, and, if called as a witness, would testify competently thereto.[2]

<div align="center">Services To Be Rendered</div>

3.      In accordance with the International Tax Package Improvement Project

Engagement Letter, KPMG will provide certain international tax package improvement project

services to the Debtors as KPMG and the Debtors deem appropriate and feasible, including, but

not limited to:

    i.      Collaborating with Debtors to identify improvements to the international tax reporting package and processes;

    ii.     Assisting with the development, implementation, and testing of improvements to the international tax reporting package and processes;

    iii.    Assisting with the development of training materials for the improved international tax reporting package and processes;

    iv.    Assisting with training personnel of the Debtors on the new international tax reporting package and processes;

---

[2]      Certain of the disclosures herein relate to matters within the knowledge of other professionals at KPMG.

     v.       Assisting the Debtors with reviewing the implementation of the international tax reporting package and processes; and

     vi.      Providing other services related to the development and implementation of the improved international tax reporting package and processes as appropriate.

4.      In accordance with the Internal Reporting Engagement Letter, KPMG will assist the Debtors in certain internal reporting initiatives and provide such services as KPMG and the Debtors deem appropriate and feasible, including but not limited to:

     i.       Assisting with the realignment of the reporting units within the Electronic & Safety division headquartered in Kokomo, Indiana; and

     ii.      Migrating trial balance codes from other Delphi reporting sites which are currently being integrated into the Electronics & Safety division reporting structure.

5.      In accordance with the Special Investigation Engagement Letter, KPMG will provide staff assistance in connection with a special investigation at the Debtors' HD Flint Facility.

6.      In accordance with the Transfer Pricing Services Engagement Letter, KPMG will assist the Debtors in developing transfer prices on certain transactions between the Debtors' related party affiliates in the U.S. and Canada and provide such services to the Debtors as KPMG and the Debtors deem appropriate and feasible, including but not limited to:

     i.       Interviewing knowledgeable personnel in Dayton and Toronto regarding the nature of intercompany transactions, including the assignment of functions and risk;

     ii.      Reviewing Delphi's comparable company benchmarking analysis for reasonableness;

     iii.     Reviewing the "cost-competitive adjustments" applied to Delphi's tested-party results for comparability with third-party benchmarks;

     iv.     Assessing the appropriateness of any "comparable uncontrolled prices" identified by management;

     v.      Selecting the most appropriate method (or "best method" for U.S. purposes) with which to test arm's length pricing for tangible-product transactions;

     vi.    Reviewing the existing R&D cost sharing agreement and considering its appropriateness in light of each affiliate's actual contribution and the applicable transfer pricing regulations; and

     vii.   Analyzing administrative services expenses charged from the U.S. affiliate to the Canadian affiliate, documenting an understanding of the cost base included in the charges, and assessing the appropriateness of the allocation keys.

7.      In accordance with the Financial Close, Consolidation And Management Reporting Project Engagement Letter, KPMG will assist the Debtors with the improvement of the Debtors' financial close, consolidation and management reporting processes, and provide such services to the Debtors as KPMG and the Debtors deem appropriate and feasible, including but not limited to:

     i.      Finance Restructuring:

- Confirming project logistics and schedules (e. g. sites visits, interviews, workshops and stakeholder presentations);

- Developing a vision and a draft of the guiding principles of the finance organization, addressing its roles and current processes (e. g. standardization, technology and controls);

- Interviewing finance management staff to gain an understanding of their goals;

- Comparing current finance organization alignment, structure and process standardization to industry leading practices and management goals;

- Interviewing the leads in the budgeting and forecasting group to gain an understanding of their goals;

- Confirming and re-validating the vision and guiding principles of the controller's organization;

- Assessing the change management needs and developing a "go forward" plan;

- Obtaining an understanding of the current finance/IT technology structure including common systems, management reporting, outsourcing support, etc.;

- Obtaining an understanding of the current roles & responsibilities for the individuals in the finance restructuring program office;

ii.     Corporate Accounting Follow-up Review:

- Following up interviews and meetings with corporate consolidation and reporting group to expand on initial workshop interviews;

- Meeting with IT accounting group to discuss allocations;

- Performing data mining and analysis of the trail balance resubmissions, corporate journal vouchers (CJVs) and journal vouchers (JVs);

- Drafting detailed process maps of the corporate close, consolidation and internal and external reporting (refer to "High Level Close Process Map" documented during r initial workshop);

- Gaining an understanding of the legal entity and management reporting processes (e. g. Hyperion utilization);

- Assessing the current multiple charts of accounts (e. g. Hyperion, SAP, DGL and others);

iii.    Division Reviews - Electronic & Safety and Packard;

- Interviewing key finance professionals to obtain an understanding of their goals;

- Developing an understanding of the global plan for  SAP implementation; documenting existing process flows (processes and data);

- Obtaining an understanding of the division management reporting process comparing internal to corporate;

- Identifying potential improvements to address control deficiencies already identified by management;

- Developing observations and recommendations focused on an integrated approach considering people, process, technology and controls;

- Performing GAP analysis comparing divisional processes to industry leading practices as observed by KPMG;

- Reviewing the roles and responsibilities of the division controller's function;

- Confirming corporate level observations with management;

iv.     Corporate Accounting Re-Visit and Validation

- Validating and integrating of business unit reviews back to the corporate accounting group;

- Comparing entity trial balance submissions to the corporate consolidation process;

- Assisting management to build an action plan to remediate potential gaps identified in the assessment;

- Performing GAP analysis of corporate processes to industry leading practices as observed by KPMG;

- Validating the guiding principles with management developed during Weeks 1-6;

- Performing a high level benchmark of the corporate controllers organization;

- Identifying potential improvements to address control deficiencies all ready identified by management;

v.   Report Preparation and Project Stakeholders Reviews:
- Documenting findings and recommendations;

- Preparing a roadmap to move forward;

- Assisting in drafting a business case for the finance restructuring program;

- Developing "next step" plan and proposal;

- Presenting report to stakeholders;

vi.   Deliverables:
- Providing draft deliverables to the project sponsor for review and comment, prior to final delivery;  and

- Providing weekly status update report that will be distributed to the project stakeholders.

8.    The services to be provided by KPMG to the Debtors will not be unnecessarily duplicative of those provided by any of the Debtors' other professionals and KPMG will coordinate any services performed at the Debtors' request with the Debtors' other professionals, including financial advisors, accountants, and counsel, as appropriate, to avoid duplication of efforts.

9.    Subject to this Court's approval of the Second Supplemental Application, KPMG is willing to assist the Debtors in (i) certain improvements to the international tax reporting

package and processes, as described in the International Tax Package Improvement Project Engagement Letter on the terms set forth therein, (ii) certain internal reporting initiatives, as described in the Internal Reporting Engagement Letter on the terms set forth therein, (iii) a special investigation as described in the Special Investigation Engagement Letter on the terms set forth therein, (iv) certain transfer pricing services, as described in the Transfer Pricing Services Engagement Letter on the terms set forth therein, (v) certain improvements to the financial close, consolidation and management reporting processes, as described in the Financial Close, Consolidation And Management Reporting Project Engagement Letter on the terms set forth therein, and (vi) certain Additional.

<p style="text-align:center;">Professional Compensation</p>

10.    Subject to this Court's approval and pursuant to the terms and conditions of the Second Supplemental Engagement Letters, KPMG's requested compensation for professional services rendered to the Debtors will be based upon the hours actually expended by each assigned staff member at each staff member's hourly billing rate, subject to the discounts and other terms set forth herein.

11.    The rates included in this Declaration (exclusive of discounts) are KPMG's normal and customary rates for matters of this sort.  In the normal course of business, KPMG revises its hourly rates on October 1st of each year.  Subject to this Court's approval, KPMG requests that the rates listed below be revised to the hourly rates that will be in effect at such time.

12.    KPMG has agreed to apply a voluntary discount (of 25%) as set forth in the International Tax Package Project Engagement Letter.  The discounted hourly rates for such services to be rendered by KPMG are as follows:

Professional Level:                                            Net Hourly Rate After
                                                               Application Of 25% Discount:

| | |
|---|---|
| Partner | $470 |
| Senior Manager | $375 |
| Manager | $265 |
| Senior Associate | $210 |
| Associate | $170 |

12.    KPMG has agreed to apply a voluntary discount (of 40%) as set forth in the Internal Reporting Engagement Letter.    The discounted hourly rates for such services to be rendered by KPMG are as follows:

| Professional Level: | Net Hourly Rate After Application Of 40% Discount: |
|---|---|
| Partner | $465 |
| Director | $450 |
| Manager | $432 |
| Senior | $315 |
| Staff | $231 |

13.    KPMG has agreed to apply a voluntary discount (of 62.6%) as set forth in the Special Investigation Engagement Letter.    The discounted hourly rate for such services to be rendered by KPMG are as follows:

| Professional Level: | Net Hourly Rate after Application Of 62.6% Discount: |
|---|---|
| Senior Associate | $140 |

13.    As set forth in the Transfer Pricing Services Engagement Letter, KPMG's fee for this engagement will be the lesser of (i) actual time incurred to complete the project at KPMG's standard hourly rates, or (ii) $45,000.

14.    KPMG has agreed to apply a voluntary discount (of 40%) as set forth in the

Financial Close, Consolidation And Management Reporting Project Engagement Letter.    The

discounted hourly rates for such services to be rendered by KPMG are as follows[3]:

| Professional Level: | Net Hourly Rate After Application Of 40% Discount: |
|---|---|
| Partner | $480 |
| Managing Director/Director | $465 |
| Senior Manager | $450 |
| Manager | $435 |
| Senior Associate | $300 |
| Associate | $195 |

15.    KPMG also will seek reimbursement of incurred necessary expenses such

as travel, lodging, meals, telephone, videoconferencing, word-processing, graphics, administrative

support, and other out-of-pocket expenses incurred in providing professional services.    KPMG

will seek such reimbursements in accordance with the terms and conditions of the Travel and Per

Diem Reimbursement policy made as part of the engagement letters, and in accordance with

guidelines established by the U.S. Trustee.

Other Terms And Conditions Of The International Tax Package Improvement
Project Engagement Letter, The Internal Reporting Engagement Letter,
The Special Investigation Engagement Letter, The Financial Close, Consolidation
And Management Reporting Project Engagement Letter, And Additional Services

16.    KPMG's provision of services to the Debtors is contingent upon the Court's

approval of each term and condition set forth in the Second Supplemental Engagement Letters and

any Engagement Confirmation of Additional Services, as modified by the proposed order

approving the Second Supplemental Application.

---

[3]    The difference between the 40% discounted rates of the Internal Reporting Engagement Letter dated May 17, 2006 and the Financial Close, Consolidation And Management Reporting Project Engagement Letter dated October 30, 2006 is due to an increase of the KPMG standard rate as of October 2006.

17.    KPMG International, a Swiss cooperative, serves as a coordinating entity for a network of member firms operating under the KPMG name.  KPMG International is a member-based entity with no shareholders and no permanent capital.  Each of the member firms of KPMG International ("KPMG Member Firms") is separate and legally distinct.

18.    KPMG is the United States member firm of KPMG International.  The KPMG global network encompasses independent professional services practices conducted by separate legal entities throughout the world.  Without the Debtors' prior written approval, KPMG may subcontract with certain other KPMG Member Firms to provide services to the Debtors under the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, the Financial Close, Consolidation And Management Reporting Project Engagement Letter, and any Engagement Confirmation of Additional Services, provided, however, that KPMG will remain fully and solely responsible for all of its liabilities and obligations under the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, the Financial Close, Consolidation And Management Reporting Project Engagement Letter, and any Engagement Confirmation of Additional Services whether or not performed, in whole or in part, by KPMG, any affiliate of KPMG, any KPMG Member Firm or any of their respective affiliates.  The Debtors will have no recourse, and will bring no claim, against any KPMG Member Firm other than KPMG, or against any subcontractors, members, shareholders, directors, officers, managers, partners, agents, representatives or employees of any KPMG Member Firm (or any of their respective successors or permitted assigns), or any of their respective assets, with respect to the services or otherwise under the International Tax Package Improvement Project Engagement Letter, the Internal Reporting Engagement Letter, the Special

Investigation Engagement Letter, the Financial Close, Consolidation And Management Reporting

Project Engagement Letter, and any Engagement Confirmation of Additional Services.

19.     The KPMG Member Firms (other than KPMG) providing services to the

Debtors under the Second Supplemental Engagement Letters and any Engagement Confirmation

of Additional Services will use category codes to describe the services rendered, rather than more

detailed descriptions usually required for fee applications.

20.     With respect to dispute resolution, KPMG acknowledges that any dispute or

claim relating to their engagement under the International Tax Package Improvement Project

Engagement Letter, the Internal Reporting Engagement Letter, the Special Investigation

Engagement Letter, the Financial Close, Consolidation And Management Reporting Project

Engagement Letter, and any Engagement Confirmation of Additional Services may also be

brought before this Court.

21.     With respect to indemnification and  limitation on liability provisions,

KPMG acknowledges that under the International Tax Package Improvement Project Engagement

Letter, the Internal Reporting Engagement Letter, the Special Investigation Engagement Letter,

the Financial Close, Consolidation And Management Reporting Project Engagement Letter,  and

any Engagement Confirmation of Additional Services, KPMG will not be indemnified and

KPMG's limitation of liability will not apply to claims arising out of KPMG's own bad-faith,

self-dealing, breach of fiduciary duty, gross negligence, or willful misconduct, if any.

22.     With respect to termination, KPMG acknowledges that under the

International Tax Package Improvement Project Engagement Letter, the Internal Reporting

Engagement Letter, the Special Investigation Engagement Letter, the Financial Close,

Consolidation And Management Reporting Engagement Letter, and any Engagement

Confirmation of Additional Services that the terminating party will provide the Court, the U.S.

Trustee, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and the

Joint Fee Review Committee (the "Fee Committee") with ten business days' notice of termination.

The provisions of the International Tax Package Improvement Project Engagement Letter, the

Internal Reporting Engagement Letter, the Special Investigation Engagement Letter, the Financial

Close, Consolidation And Management Reporting Engagement Letter, and any Engagement

Confirmation of Additional Services relating to indemnification, limitation of liability, fees and

expenses, and alternative dispute resolution will remain operative and in full force and effect

regardless of any termination or expiration of the agreement and will survive completion of the

Debtors' bankruptcy, whether through a confirmed plan of reorganization, liquidation of the

Debtors' assets under chapter 11 or 7 of the Bankruptcy Code, or otherwise.

<div align="center">

Other Terms And Conditions Of The
Transfer Pricing Services Engagement Letter

</div>

23.    The Transfer Pricing Services Engagement Letter, as modified and

amended to contain the following additional terms and conditions as set forth below is

substantially similar to the Original Engagement Letters and the First Supplemental Engagement

Letters and provides for compliance with the U.S. Trustee's standard terms and conditions and

procedures mandated by this Court.  KPMG's provision of services to the Debtors is contingent

upon the Court's approval of each term and condition of the Transfer Pricing Services Engagement

Letter, as modified by the terms and conditions set forth below.

Subcontracting Services To KPMG Member Firms

24.    As set forth in the Transfer Pricing Services Engagement Letter, KPMG is

the United States member firm of KPMG International.  Without the Debtors' prior written

approval, KPMG may subcontract with certain other KPMG Member Firms to provide services to

the Debtors under the Transfer Pricing Services Engagement Letter, <u>provided</u>, <u>however</u>, that

KPMG will remain fully and solely responsible for all of its liabilities and obligations under the

Transfer Pricing Services Engagement Letter, whether or not performed, in whole or in part, by

KPMG, any affiliate of KPMG, any KPMG Member Firm, or any of their respective affiliates.

The Debtors will have no recourse, and will bring no claim, against any KPMG Member Firm

other than KPMG, or against any subcontractors, members, shareholders, directors, officers,

managers, partners, agents, representatives or employees of any KPMG Member Firm (or any of

their respective successors or permitted assigns), or any of their respective assets with respect to

the services or otherwise under the Transfer Pricing Services Engagement Letter.

        25.    The KPMG Member Firms (other than KPMG) providing services to the Debtors

under the Second Supplemental Engagement Letters will use category codes to describe the

services rendered, rather than more detailed descriptions usually required for fee applications.

<u>Dispute Resolution</u>

        26.       Any dispute or claim between KPMG and the Debtors arising out of or

relating to the Transfer Pricing Services Engagement Letter or any other services provided by, or

on behalf of, KPMG to the Debtors or at the Debtors' request (including any dispute or claim

involving any person or entity for whose benefit the services in question are or were provided) will

be resolved in accordance with the dispute resolution procedures as set forth in the Transfer

Pricing Services Engagement Letter (the "Dispute Resolution Procedures").  Notwithstanding the

Dispute Resolution Procedures provided for in the Transfer Pricing Services Engagement Letter,

any dispute or claim relating to this engagement also may be brought before this Court.

<u>Indemnification</u>

27.        In no event will KPMG be indemnified for a claim that a court determines by a final order to have arisen out of KPMG's own bad-faith, self-dealing, breach of fiduciary duty, gross negligence, or willful misconduct, if any.

Limitation On Liability

28.        KPMG's limitation of liability will not apply to claims arising out of KPMG's own bad-faith, self-dealing, breach of fiduciary duty, gross negligence, or willful misconduct, if any.

Termination

29.        The Debtors or KPMG may terminate the Transfer Pricing Services Engagement Letter in the event of breach by the other party, which breach is not cured within thirty days after notice by the non-breaching party, provided, however, that the terminating party will notify the other.  In addition, the terminating party will provide the Court, the U.S. Trustee, the Creditors' Committee, and the Fee Committee with ten business days' notice of termination.  The provisions of the Transfer Pricing Services Engagement Letter relating to indemnification, limitation of liability, fees and expenses, and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of the agreement and will survive completion of the Debtors' bankruptcy, whether through a confirmed plan of reorganization, liquidation of the Debtors' assets under chapter 11 or 7 of the Bankruptcy Code, or otherwise.

Certain Additional Services

30.        From time to time and as the Debtors and KPMG deem necessary and appropriate, Delphi may elect to retain KPMG to perform Additional Services.  The Debtors will provide written notice to KPMG and the Debtors and KPMG will execute an Engagement

Confirmation of Additional Services, which will summarize engagement details (to the extent applicable), such as the following:

- Names of the engagement partner and lead engagement manager;

- Target name;

- Dates and location(s) where fieldwork is expected to be performed;

- Specific services requested by the Debtors;

- Known potential conflicts of interest;

- Reporting requirements; and

- Fee arrangements.

31.     Upon execution of any Engagement Confirmation of Additional Services by the Debtors and KPMG, KPMG will have been engaged to perform the services in accordance with such Engagement Confirmation of Additional Services under terms no less favorable to the Debtors than the Standard Terms and Conditions dated February 16, 2006, as attached to the Internal Reporting Engagement Letter (the "Standard Terms and Conditions"), and the Order approving this Application.  Each Engagement Confirmation of Additional Services will become effective as of the date of the commencement of the services or, if earlier, the date of execution of such Engagement Confirmation of Additional Services without further application or order by the Court.

<u>Disinterestedness Of Professionals</u>

32.     The Prior Affidavits and this Declaration contain information on KPMG's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).   KPMG maintains procedures on an ongoing basis to evaluate its connections with parties-in-interest in the Debtors' chapter 11 cases (the "Conflicts Procedures").   Based on the information in the Prior

Affidavits, this Declaration and the Conflicts Procedures, KPMG and the professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

33.     KPMG's identification of material relationships is ongoing.  If and when additional information becomes available with respect to any other relationships which may exist between KPMG, KPMG Member Firms (as defined in the Original Affidavit), or their partners and professionals and the Debtors, creditors, or any other parties-in-interest which may affect these chapter 11 cases, supplemental affidavits describing such information will be filed with this Court.

34.     In accordance with section 504 of the Bankruptcy Code, I hereby state that there is no agreement or understanding between KPMG and any other entity, other than a member, partner, or regular associate of KPMG for the sharing of compensation received or to be received for services rendered under the Second Supplemental Engagement Letters.

35.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on November 10, 2006, at Chicago, Illinois

Gary A. Silberg
Partner

EXHIBIT A



303 East Wacker Drive
Chicago, IL 60601-5212

Telephone 312 665 1000
Fax 312 665 6000

July 10, 2006

**PRIVATE**
Ms. Suzanne Kihn
Director, Corporate Accounting
Delphi Corporation
M/C 483.400.141
5725 Delphi Drive
Troy, MI  48098

**Re:  International Tax Package Improvement Project**

Dear Suzanne:

We are pleased you have engaged KPMG LLP ("KPMG") to assist Delphi Corporation ("Delphi") with the International Tax Package Improvement Project.  This letter confirms the scope and related terms of your engagement of KPMG.

KPMG will assist Delphi by:

- Collaborating with Delphi to identify improvements to the international tax reporting package and processes;

- Assisting with the development, implementation, and testing of improvements to the international tax reporting package and processes;

- Assisting with the development of training materials for the improved international tax reporting package and processes;

- Assisting with training Delphi personnel on the new international tax reporting package and processes;

- Assisting Delphi with reviewing the implementation of the international tax reporting package and processes; and

- Providing other services related to the development and implementation of the improved international tax reporting package and processes as appropriate.

**Limitation of Engagement Services**

KPMG's services are intended to assist Delphi in modifying Delphi's tools and processes for collecting data from Delphi's foreign operations in support of the computation of an income tax provision.  Delphi management is ultimately responsible for ensuring the necessary financial and tax information are collected from its foreign operations.



KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative



KPMG's services do not include assisting directly Delphi's management in establishing and supporting its current and deferred income taxes and financial statement disclosures. KPMG is not assuming responsibility for management analysis or decision-making with respect to the application of any accounting principle to the income tax provision, related financial statement disclosures and balance sheet accounts, such as determining the necessity or amount of a valuation allowance or tax contingency reserve. Delphi is to consult with their independent auditor on the application of accounting principles.

This engagement does not contemplate the provision or oral advice or the issuance of a written report on the application of accounting principles pursuant to AU section 625 of the AICPA's Professional Standards, Reports on the Application of Accounting Principles. Accordingly, KPMG's services will not be directed toward consultation on the application of accounting principles to Delphi's particular facts and circumstances.

Unless separately engaged to do so, KPMG will not express an opinion on the possible outcome of a tax contingency.

In this engagement, KPMG assumes no responsibility for auditing information provided by Delphi management or Delphi foreign operations. KPMG also assumes no responsibility for expressing an opinion on any part of Delphi's financial statements. Those are the sole responsibility of Delphi's independent auditor. If necessary and appropriate, KPMG will meet with Delphi's independent auditor during the course of the engagement to discuss our services and any preliminary findings.

**Coordination with KPMG International Member Firms**
Our services covered by this engagement letter may also necessitate the assistance of a member firm of KPMG International. To the extent that our services under this engagement letter require such assistance, the services will be provided under the direction of KPMG LLP, the U.S. member firm of KPMG International, and will include the participation of other member firms of KPMG International ("KPMG member firms"). KPMG LLP is a separate legal entity from other member firms of KPMG International. Advice relative to tax matters outside the United States will be based on tax advice provided by the KPMG member firm in the particular country and on the relevant tax authorities in that country. In rendering such advice, we may also consider U.S. tax treaties, their technical explanations, and judicial and administrative interpretations thereof.
In certain countries, a KPMG member firm is authorized to provide legal services within its jurisdiction. This engagement letter encompasses only tax services provided by KPMG member firms and does not encompass any legal services a KPMG member firm may be authorized to provide. Should the provision of such services not be proscribed by applicable independence rules and should Delphi choose to retain a KPMG member firm to provide legal services, including drafting of documents, in a particular country, Delphi and



the KPMG member firm will enter into a separate fee arrangement and engagement letter for the provision of such legal services.

We do not anticipate that the written tax advice provided under this engagement letter will rise to the level of a Covered Opinion as defined in §10.35 of Circular 230 ("Covered Opinion"). Therefore, all the written tax advice provided under this engagement letter will contain the following legend:

> ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

However, if our services will rise to the level of a Covered Opinion, we will issue a separate engagement letter.

**Tax Advice Standards**

KPMG applies elevated standards in providing tax advice. Under these standards, we must be able to determine that any return position on which we advise has a "realistic possibility" of being sustained on its merits (i.e., approximately a one-in-three or greater likelihood of success if challenged by the IRS) if the position does not involve a transaction designated by the IRS as a "listed transaction" within the meaning of Treas. Reg. §1.6011-4, or a transaction with the principal purpose of avoiding or evading any tax imposed by the Internal Revenue Code (a "principal purpose transaction"). If the advice relates to a "principal purpose transaction", we must arrive at a "should" confidence level (i.e., approximately a 70 percent or greater likelihood of success if challenged by the IRS) with respect to the position. We will not render any advice with respect to a "listed transaction" or any transaction that is substantially similar to a "listed transaction." In determining whether a position satisfies the "realistic possibility" and "should" standards, we will not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be settled. We will inform you as soon as possible if, during our analysis, we determine circumstances exist that prevent us from advising you under these standards.



**Fees**

Our fee for this engagement will be based on the actual time incurred to complete the project, whether such services are provided by KPMG LLP or by KPMG member firms. KPMG LLP will act as a clearinghouse for invoices submitted by the KPMG member firms which will enable a single invoice that settles budgeting and foreign currency issues. KPMG LLP will pay such KPMG member firms directly for their services and will apply to the Court for reimbursement of any payments made by KPMG LLP to the KPMG member firms.

In the normal course of business, KPMG LLP revises its hourly rates on October 1 of each year. The customary hourly rates for tax advisory and consulting services rendered by KPMG as of today's date, together with the discounted hourly rate that KPMG LLP has agreed to for this engagement, are:

| Professional Level | Standard Rate | Billing Rate |
|---|---|---|
| Partner | $625 | $470 |
| Senior Manager | $500 | $375 |
| Manager | $350 | $265 |
| Senior Associate | $275 | $210 |
| Associate | $225 | $170 |

In addition, in accordance with the Exhibits to this engagement letter, we will bill for out-of-pocket expenses, which should not exceed 20 percent of total estimated fees. These expenses may include such items as travel, lodging, meals, telephone, videoconferencing, word-processing, graphics, and administrative support.

We will render progress billings to Delphi monthly per the terms of the Delphi bankruptcy documents.



*Ms. Suzanne Kihn*
*Delphi Corporation*
*July 10, 2006*
*Page 5*

The estimated budget for this project is:

| | Partner Hours $470 | Manager Hours $375 | Staff Hours $210 | Total Estimated Hours | Other Costs | Estimated Fees and Other Expenses |
|---|---|---|---|---|---|---|
| **Software Development** | | | | | | |
| A. Requirements Development | 16 | 48 | | $ 25,520 | $ 4,000 | $ 29,520 |
| B. Application Development | 16 | 150 | | $ 63,770 | $ 4,000 | $ 67,770 |
| C. Test plan development | - | 16 | | $ 6,000 | | $ 6,000 |
| D. Software Testing | 16 | 120 | | $ 52,520 | | $ 52,520 |
| E. Report Development (4), Installation and Testing | | 80 | 80 | $ 46,800 | | $ 46,800 |
| F. Automate Help Screens | | 8 | 40 | $ 11,400 | | $ 11,400 |
| F. Training Development | 8 | 60 | | $ 26,260 | $ 2,000 | $ 28,260 |
| G. Training Delivery | 32 | 96 | | $ 51,040 | $20,000 | $ 71,040 |
| | | | | | | |
| **Tax Basis Balance Sheets** | | | | | | |
| 36 trial balances in 23 countries estimated at 15 hours per country | 23 | 92 | 230 | $ 93,610 | | $ 93,610 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Total** | ~~95~~ 111 | ~~672~~ 670 | | $ 376,920 | $30,000 | $ 406,920 |

*       *       *

The attached Exhibit A, Terms and Conditions, and Exhibit B, Travel and Per Diem Reimbursement policy, are made a part of this engagement letter. You acknowledge and agree that all KPMG member firms and their personnel who provide services covered by this engagement letter shall be bound by, and entitled to the benefits of, the terms of this engagement letter and the attached Standard Terms and Conditions. To the extent Delphi personnel are permitted to travel business class on overseas airline trips, it is hereby agreed that KPMG personnel will be allowed to utilize business class as well.





If you would like to further discuss the engagement scope, please do not hesitate to call me at 312-665-5124. If you agree with the terms of this engagement letter, please sign the enclosed copy of this letter to confirm our understanding of the scope and return it to my attention.

Very truly yours,

KPMG LLP

Duncan M. Forsythe
*Partner*

Enclosures:  Exhibit A:  General Terms and Conditions
             Exhibit B:  Travel and Per Diem Reimbursement
             Exhibit C:  Dispute Resolution Procedures


cc:   Gary Silberg - KPMG Chicago
      Catherine Reid - KPMG Chicago
      Jay M. Frucci - KPMG Detroit

*KPMG*

*Ms. Suzanne Kihn*
*Delphi Corporation*
*July 10, 2006*
*Page 7*

ACCEPTED:

**Delphi Corporation**

Authorized Signature

VP CRO & CAO
Title

7/24/06
Date



## EXHIBIT A

## GENERAL TERMS AND CONDITIONS

1.    Agreement.  It is agreed that KPMG LLP ("Consultant") will provide to Delphi Corporation ("Delphi") the services (the "Services") described in the accompanying engagement letter (the "Engagement Letter") to which this Exhibit A is attached (the Engagement Letter, this Exhibit A and Exhibit B are collectively referred to as this "Agreement").  For purposes of this Agreement, the terms "Consultant" include any affiliates of Consultant identified in the Engagement Letter as performing any of the Services, and the term "Delphi" includes any subsidiaries and affiliates of Delphi for which the Services are performed.  This Agreement constitutes the entire and sole agreement between Delphi and Consultant, and merges all prior and contemporaneous communications with respect to the subject matter of this Agreement.

2.    Independent Contractor.  Consultant will provide the Services as an independent contractor.   Nothing contained in this Agreement shall be construed to create an employment or principal-agent relationship or joint venture between Consultant and Delphi, and neither party shall have the right, power or authority to obligate or bind the other in any manner whatsoever.

3.    Personnel.  All of Consultant's agents, employees, subcontractors and/or independent contractors furnished by Consultant to perform the Services (collectively, "Personnel") are and will remain Consultant's employees and/or independent contractors and, under no circumstances, will any Personnel furnished by Consultant be deemed to be Delphi's employees or agents.  Consultant is solely responsible, at Consultant's sole cost and expense, for (i) the fulfillment of all obligations to Personnel and (ii) the compliance by Consultant and Personnel with this Agreement and all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

4.    Conduct of Consultant's Personnel.  Consultant will assure that all Personnel who are performing Services on behalf of Consultant are competent to perform the Services.  Consultant will require all Personnel who are performing any work on Delphi's premises to comply with all of Delphi's regulations and policies.  Delphi, in its sole discretion, has the right to: (a) bar any of Personnel from Delphi's premises for failure to observe Delphi's regulations or policies, (b) require that Consultant promptly remove from Delphi's premises any Personnel who violate any of Delphi's regulations or policies, and (c) require that Consultant cease using any Personnel to perform the services who are reasonably unacceptable to Delphi.  Delphi will confer with Consultant to discuss Delphi's concerns prior to requiring removal of any Personnel.  Consultant will replace any barred or removed Personnel with Personnel reasonably acceptable to Delphi.



5.    Non-Solicitation of Employees.

A.    Delphi agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Consultant if listed in the engagement letter attached hereto, who have been assigned to or have performed any of the Services contemplated herein.

B.    Consultant agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Delphi's Tax staff who have participated in the furtherance of this Agreement.

C.    Notwithstanding the provisions of Sections 5A and 5B, neither party shall be prohibited from employing any employee, former employee or personnel of the other who contacts such party (i) on his or her own initiative or (ii) in response to a general solicitation for employment contained in a newspaper or any other publication.

6.    Professional Fees.  Delphi will compensate Consultant for actual Services performed in accordance with the fee schedule set forth in this Agreement (the "Fee Schedule"). Consultant will invoice Delphi no more frequently than monthly.  Consultant will submit, with each invoice for payment, a report specifying the actual Services performed and the calculation of the invoiced payment in accordance with the Fee Schedule.  Invoices will be due and payable by Delphi within forty-five (45) days of Delphi's receipt of the invoice and corresponding report in the required form.

7.    Expenses.  Delphi will reimburse Consultant for all reasonable costs and expenses Consultant incurs in connection with the Services, including, without limitation, all travel expenses, provided, however, that Consultant must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $1,000 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $2,500 during any calendar month. Consultant will not charge any markup, overhead, profit or other fees on the reimbursable expenses.  Delphi's reimbursement obligations will be governed by the provisions of Exhibit B.

8.    Taxes.    Unless otherwise agreed in the Engagement Letter, any applicable taxes imposed on Consultant in connection with the performance of the Services (except for taxes imposed on Consultant's income) will be invoiced to, and paid by, Delphi in addition to fees and expenses.

9.    Indemnification.



a.  Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from third party claims against Consultant based on any of Consultant's written or verbal work product prepared pursuant to this Agreement and furnished by Consultant to Delphi for internal use (such as reports, analyses, projections, advice, recommendations and other data ) (collectively, "Internal Work Product Claims"). In addition, Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses (other than Internal Work Product Claims), to the extent arising out of or resulting from third party claims against Consultant based on any activities of Consultant in connection with the performance of Services under this Agreement (collectively, "Non-Work Product Claims"). Notwithstanding the foregoing, Consultant will not be indemnified for claims arising out of Consultant's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct.

B.  Consultant shall indemnify, defend and hold harmless Delphi, including its directors, officers, employees, agents and representatives, from any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from the negligence, illegal acts or willful misconduct of Consultant and/or its directors, officers, employees, agents or representatives in connection with the performance of Services under this Agreement, provided, however, that Consultant will have no obligation to indemnify Delphi to the extent that any such claims or damages arise out of or result from Internal Work Product Claims.

C.  In each case, the indemnifying party shall also pay to the indemnified party any and all costs and expenses incurred in connection with the enforcement of these indemnification provisions.

D.  The indemnification obligations set forth in this Section 9 and the general terms and conditions of this Agreement shall not apply to any tax or other governmental filings prepared by Consultant. The rights and obligations of the parties with respect to such services shall be governed by a separate agreement.

10.  <u>Limitation of Liability</u>.  Consultant's liability under this Agreement will be limited to three (3) times the professional fees paid; provided however that this limitation shall not apply (i) in the event of any breach of Section 16 below relating to Delphi Proprietary Information or (ii) if Consultant is found to be grossly negligent or to



have acted willfully or fraudulently. Consultant's limitation of liability will not apply to claims arising out of Consultant's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct. In no event will Consultant or Delphi be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including loss of profits, data, business or goodwill) regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

11. <u>Standard of Performance</u>. Consultant will use its best skills, resources and judgment to perform the Services in an efficient and economical manner and in accordance with the highest professional standards. If any Services are not completed to Delphi's reasonable satisfaction, Consultant will, at no additional cost to Delphi, take reasonable steps to correct any deficiencies. The express warranties in this Paragraph and in this Agreement shall be in lieu of all other warranties, express or implied, including the implied warranty of merchantability and fitness for a particular purpose.

12. <u>Reliance on Information/Authorities</u>. Consultant will base its conclusions on the facts and assumptions that Delphi submits and will not independently verify this information. Inaccuracy or incompleteness of the information Delphi provides could have a material effect on Consultant's conclusions. In rendering its advice, Consultant may consider, for example, the applicable provisions of the Internal Revenue Code of 1986, and ERISA as amended, and the relevant state statutes, the regulations thereunder, and judicial and administrative interpretations thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of Consultant's advice. Consultant will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Delphi separately engages Consultant to do so after such changes or modifications.

13. <u>Legal Counsel</u>. Delphi should consult with and/or engage legal counsel for the purpose of advising on non-tax legal aspects of matters on which Consultant provides tax advice and drafting any legal documents and/or agreements that may be required in connection therewith. Consultant will provide Delphi's legal counsel with tax-related advice that is deemed necessary by Delphi's legal counsel to draft such documents and/or agreements. To the extent Services of legal counsel or other professional service providers are required, Delphi is responsible for engaging and paying such service providers.

14. <u>Federal Confidential Communications Privilege</u>. A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between Consultant personnel and Delphi regarding federal tax advice provided pursuant to



this engagement.  By retaining Consultant, Delphi agrees that Consultant is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing.  As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, Delphi should notify Consultant if the Internal Revenue Service or other third party requests information about any tax advice or tax advice documents provided by Consultant.

Delphi understands that Consultant makes no representation, warranty, or promise, and offers no opinion with respect to the applicability of such confidentiality privilege to any communication. Delphi agrees to indemnify Consultant for any attorney's fees and other costs and expenses incurred by Consultant in defending the confidentiality privilege on Delphi's behalf. Consultant agrees to promptly notify Delphi of any claim for which Consultant seeks indemnification and Delphi shall have the right to conduct the defense or settlement of any such claim at Delphi's sole expense, and Consultant shall cooperate with Delphi. Consultant shall nonetheless have the right to participate in such defense at its own expense and to approve the settlement of any claim hereunder that imposes liability or obligation.

15.   <u>Disclosure and Restriction on Use</u>.   If this engagement relates to a strategy offered by Consultant to Delphi that is designed to reduce or defer federal income tax for a direct or indirect corporate participant, pursuant to Treasury Regulation section 301.6111-2(c), Delphi (and each employee, representative, or other agent of Delphi) is expressly authorized to disclose the structure and tax aspects of the strategy with any and all persons, without limitation of any kind.

Written advice provided by Consultant to Delphi is for the information and use of Delphi only and may not be relied upon by any third party without the express written permission of Consultant.

16.   <u>Non-Disclosure of Delphi Proprietary Information.</u>
"Delphi Proprietary Information" means any information concerning the business and affairs of Delphi which is not publicly available at the time disclosed to, or learned by, Consultant or any Personnel. Delphi Proprietary Information includes, without limitation, this Agreement and any written or verbal work product prepared pursuant to this Agreement (such as reports, analyses, projections, advice, recommendations and other data); trade secrets; product specifications; data; know-how; formulae; compositions; processes; designs; sketches; photographs; samples; inventions; concepts; ideas; past, current and planned research and development; past, current and planned manufacturing or distribution methods and processes; price lists; marketing and business plans, methods and processes; financial results and information; reports; computer software and programs (including object code



and source code); databases; notes; analyses; compilations; studies; and other materials or intangibles. Delphi Proprietary Information also includes any materials or information that contain or are based on any other Delphi Proprietary Information, whether prepared by Delphi, Consultant, Personnel or any other person. Information will be conclusively deemed Delphi Proprietary Information if it is marked "Proprietary" or "Confidential" or with an equivalent legend at the time it is disclosed. Any information transmitted orally will be conclusively deemed Delphi Proprietary Information if Delphi notifies Consultant that it is proprietary within a reasonable time following oral disclosure. The failure, however, to mark information as "Proprietary" or "Confidential" or to notify Consultant that oral information is proprietary will not affect the information's proprietary nature. Delphi Proprietary Information does not include any trade secrets; data; know-how; formulae; compositions; processes; designs; sketches; inventions; concepts; ideas; methodologies, and techniques; models; templates; general purpose consulting and software tools previously created, acquired, owned or developed or independently developed by Consultant in the performance of the Services without reference to Delphi's Proprietary Information.

A.    In connection with Consultant's performance of Services, Delphi may disclose Delphi Proprietary Information to Consultant and Personnel. All Delphi Proprietary Information disclosed, furnished or made available to Consultant and/or Personnel and all Delphi Proprietary Information generated or developed by Consultant and/or Personnel will be treated and maintained as confidential by Consultant and Personnel, will not be disclosed to any third parties, either in whole or in part, except upon Delphi's prior written authorization, and will be used by Consultant and Personnel only for the purpose of performing the Services in accordance with this Agreement, in all cases using the same degree of care and discretion to avoid disclosure, publication or dissemination of such Delphi Proprietary Information that Consultant uses with respect to its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable degree of care and discretion). Before Consultant or Personnel discloses any information that could, under any circumstances, constitute Delphi Proprietary Information, Consultant will obtain Delphi's written consent. Neither Consultant nor Personnel will remove any Delphi Proprietary Information from Delphi's premises unless Delphi authorizes the removal in writing. Consultant will be responsible and liable to Delphi for the violation by any of Personnel of these confidentiality obligations.



B.   The foregoing obligations under this Section 16B of this Exhibit A shall not apply to the extent that any Delphi Proprietary Information (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than Consultant and Personnel, (ii) is subsequently learned by Consultant or Personnel from a third party that has a legal right to make such disclosure and does not impose an obligation of confidentiality on the receiving party, (iii) was known to Consultant or Personnel at the time of disclosure by Delphi, (iv) was generated independently by Consultant or Personnel before disclosure by Delphi, or (v) is required to be disclosed by Consultant or Personnel by law, subpoena or other process.

17.   <u>Assignment and Subcontracting</u>.   Consultant will not assign or subcontract any portion of its responsibilities under this Agreement without Delphi's prior written approval.

18.   <u>Changes and Delays</u>.
A.   In the event that (i) Delphi requires a change in the scope of the Services, (ii) any change of applicable law or regulation affects the timing or performance of the Services or (iii) any action by Delphi or a third party (other than Personnel) affects the timing or performance of the Services, subject to the mutual agreement of Delphi and Consultant, the fees and/or schedule for performance for the Services will be equitably adjusted by the parties.

B.   To the extent that the Engagement Letter provides that Consultant's performance under this Agreement is contingent upon specific action or cooperation of Delphi, including the supply to Consultant of specific resources, approvals, and information, any delays in Consultant's performance which occur as a result of the failure or untimely performance by Delphi shall be excused to the extent of any such delay or untimely performance by Delphi and Consultant shall not incur any liability to Delphi as a result of any such delay or untimely performance by Delphi.

19.   <u>Term and Termination</u>. This Agreement will terminate when the Services have been completed. In addition, either party may terminate this Agreement in the event of the breach by the other party of this Agreement, which breach is not cured within thirty (30) days after notice by the non-breaching party. In addition, the terminating party shall provide the United States Bankruptcy Court for the Southern District of New York, the Office of the United States Trustee, the Creditors' Committee and the Fee Review Committee (if



any) with ten (10) days' notice of termination. Delphi shall pay Consultant for Services performed prior to the effective date of termination as well as expenses incurred prior to the effective date of termination and approved by Delphi in accordance with Section 7 of this <u>Exhibit A</u>.

20. <u>Conflict</u>. In the event of any conflict, ambiguity or inconsistency between this Agreement and any other agreement relating to the Services, including any preprinted terms and conditions on Delphi's purchase orders, the terms and conditions of this Agreement shall govern.

21. <u>Survival</u>. The provisions of this Agreement which give the parties rights beyond termination of this Agreement will survive any termination of this Agreement.

22. <u>Severability</u>. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect.

23. <u>Amendment</u>. This Agreement shall not be modified except by a later written agreement signed by both parties.

24. <u>Alternative Dispute Resolution</u>.

 A. Any dispute or claim arising out of or relating to the Engagement Letter between the parties, the services provided thereunder, or any other services provided by or on behalf of Consultant or any of its subcontractors or agents to Delphi or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit C attached hereto, which constitute the sole methodologies for the resolution of all such disputes. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction. Mediation, if selected, may take place at a location to be designated by the parties. Arbitration shall take place in Detroit, Michigan. Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.



*Page 16*
*Ms. Suzanne Kihn*
*Delphi Corporation*
*July 10, 2006*

B.        Notwithstanding the agreement to such procedures, KPMG LLP acknowledges that any dispute or claim relating to their engagement also may be brought before the United States Bankruptcy Court for the Southern District of New York. Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks or logos, solely in the courts of the State of Michigan or in the courts of the United States located in the State of Michigan. The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes.



## EXHIBIT B

**Travel and Per Diem Reimbursement**

A.   If Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel and per diem expenses, subject to prior written approval of Delphi, will be reimbursable as follows:

| | |
|---|---|
| 1. Air Travel | Economy/Coach class only.  Business class is permitted only upon prior written consent by Delphi. |
| 2. Hotel | Consultant will exercise good, sound business judgment and discretion in choosing hotels, such as moderately priced chain hotels or hotels that offer discounted corporate rates.  Where extended travel is involved, reduced rates may be available and should be requested. |
| 3. Rental cars | Compact or intermediate class only.  The cost of collision damage waiver and personal accident insurance is the responsibility of Consultant. |
| 4.         Mileage Allowance | Reimbursement will be at the then current IRS rate (currently $0.325 per mile) for the miles which are in excess of his or her normal commute from home to work and back.   When permanently assigned to another location, even if the new location is temporary, Consultant will not be reimbursed for excess miles, additional driving time, etc. |
| 5. Expense Reports | If requested, Consultant will provide receipts for all reimbursable expenses, including meals and other expenditures, in excess of $25.00 or more. |
| 6. Meals | Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours.  Reimbursement for meals will be the actual and reasonable expenses paid by Consultant. |
| 7. Extended Travel | Consultant should review the home visit policy prior to a trip. Generally, the following provisions apply: |
| | If the travel expense is less than the living expense in the temporary location, Consultant will be reimbursed for travel to |



the permanent location every week.

If the travel expense is more than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent location every two weeks.

Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8. Miscellaneous          When Consultant chooses an alternative method of transportation, *e.g.,* to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

Consultant is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Consultant will make all travel arrangements through Total Travel Management, using a special account set up for such purposes.

Any cash advance by Consultant to its employee is the responsibility of Consultant.

9. Per Diem          In certain instances, a per diem will be paid to Consultant in accordance with Delphi's standard per diem policy.

B.     All travel and per diem for which Consultant seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.



## EXHIBIT C

### Dispute Resolution Procedures

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

### *Mediation*

Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Mediation Procedures (Effective April 1, 1998), with the exception of paragraph 2 which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

### *Arbitration*

Arbitration shall be used to settle the following disputes: (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the engagement letter or contract between the parties, or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the



Arbitration Rosters maintained by any JAMS Office in the United States. If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

EXHIBIT B

EXHIBIT B



| | |
|---|---|
| **KPMG LLP**<br>303 East Wacker Drive<br>Chicago, IL 60601-5212 | Telephone  312 665 1000<br>Fax        312 665 6000<br>Internet   www.us.kpmg.com |

May 17, 2006

Mr. John D. Sheehan
Chief Restructuring Officer
Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098-2815

Dear John:

We appreciate the opportunity for KPMG LLP ("KPMG" or "we") to assist Delphi Corporation ("Delphi", the "Company", or "you") related to your realignment of reporting units within the Electronics & Safety division ("E&S") headquartered in Kokomo, Indiana. This letter outlines the background, scope, timeline and professional fees for this project.

## BACKGROUND

The process to realign the business units will include migrating trial balance codes from other Delphi reporting sites, which are currently being integrated into the E&S reporting structure. These sites are categorized as "clean" (i.e. entire trial balance code will migrate in full) or "dirty" (i.e. only a portion of the trial balance code will migrate).

## SCOPE

*KPMG's Assistance & Approach*

E&S has requested assistance with their following endeavors, expected to consist of no more than 20 "clean" and 10 "dirty" reporting sites:

1) Strategic Enterprise Management (SEM) and Schedule B Desk

   a. Modification of spreadsheets (e.g. Tie Sheet and FX Footprint files); and
   b. Realignment of Tie Sheets for previous 2 reporting years, which are tied to Hyperion

2) Income Statement and Forecast Reporting

   a. Modification of spreadsheets (e.g. Master File); and
   b. Realignment of Master File for previous 2 reporting years, which are tied to Hyperion.

3) Product Line Profit & Loss (P&L) Reporting—Realign into appropriate product business unit for previous 2 reporting years

E&S has targeted the following completion dates:

- 2006 Quarter 1, Quarter 2 and July (month) due August 31st
- 2006 5 month (actual) +7 month (forecast) due August 31st
- 2005 Quarter 1, Quarter 2 and Quarter 3 due September 18th
- 2005 Quarter 4 and 2004 (annual) due November 30th

JUN 28 2006 11:39 FR DELPHI CORP          248 813 2612 TO 913122757918          P.02



Mr. John D. Sheehan
Delphi
May 17, 2006
Page 2

KPMG will execute a step approach to assist in this initiative:

*Step 1: Diagnose & Assess*
Assessment of the current state processes and tools to further specify the extent of assistance required and resourcing needs  In addition, this requires that E&S familiarize KPMG with the use of data and tools for the current reporting requirements related to the areas of focus discussed above.

*Step 2: Develop & Design*
Modify the current tools (i.e. Excel or Access) to realign the financial information based on the new reporting requirements.  KPMG will document a high-level flow diagram for the areas listed above and provide a design to accommodate the new reporting requirements for realignment.  In addition, this will include testing the data within the redesigned tools.

If tools other than the current tools (i.e. Excel or Access) are required, KPMG is not responsible for its design within the scope of this engagement letter.

*Step 3: Execute*
Assistance with your realignment of the (1) SEM and Schedule B Desk, (2) Income Statement and Forecast Reporting of impacted quarters and (3) Product Line P&L Reporting. This will be based on the design work discussed above.

We will meet with your on-site Project Manager weekly to review the overall project status, key issues, and upcoming tasks.

*Management's Role and Responsibilities*

Delphi is responsible for providing the necessary financial information to KPMG.  Moreover, Delphi is responsible for establishing and supporting its income statement and balance sheet accounts and financial statement disclosures and maintaining adequate internal controls and procedures necessary to prepare such information.  In addition, Delphi will:

a) Provide KPMG, on a timely basis, all information, documentation and materials relating to Delphi's operations necessary for KPMG to perform the services described in this letter;

b) Establish that all information provided to KPMG is materially accurate and complete, and is updated on a timely basis.  KPMG will not be held responsible for Delphi information that has not been rendered in accordance with the provisions of paragraphs (a) and (b); and

c) Provide KPMG with reasonable access to all employees and personnel affected by the services described in this letter and cooperate with KPMG in arranging meetings as appropriate.

d) Provide KPMG with adequate work space and workstations with appropriate system access relating to the services described in this letter.



Mr. John D. Sheehan
Delphi
May 17, 2006
Page 3

## OTHER TERMS AND CONDITIONS

All services performed under this master letter with respect to each Engagement will be subject
to the Delphi Standard Terms and Conditions for Transaction Services Engagements dated
February 16, 2006 (the "Standard Terms and Conditions") attached as Appendix A and
incorporated by reference herein, subject to the following modifications:

1) Paragraph 10:  Term

   - The Debtors or KPMG LLP may terminate the Master Services Engagement
     Letter at any time by giving written notice to the other party not less than
     thirty (30) calendar days before the effective date of termination.  In
     addition, the terminating party shall provide the United States Bankruptcy
     Court for the Southern District of New York, the Office of the United States
     Trustee, the Creditors' Committee and the Fee Review Committee (if any)
     with ten (10) days' notice of termination.

2) Paragraph 13:  Limitations on Damages

   - KPMG LLP's limitation of liability will not apply to claims arising out of
     KPMG LLP's own bad-faith, self-dealing, breach of fiduciary duty (if any),
     gross negligence, or willful misconduct.

3) Paragraph 15:  Indemnification

   - KPMG LLP will not be indemnified for claims arising out of KPMG LLP's
     own bad-faith, self-dealing, breach of fiduciary duty (if any), gross
     negligence, or willful misconduct.

4) Paragraph 27:  Alternative Dispute Resolution

   - Notwithstanding the Dispute Resolution Procedures provided for in the
     Engagement Letters, KPMG LLP acknowledges that any dispute or claim
     relating to their engagement also may be brought before the United States
     Bankruptcy Court for the Southern District of New York.

KPMG will perform their services under the Statements on Standards for Consulting Services
issued by the American Institute of Certified Public Accountants.  The sufficiency of the
procedures is solely the responsibility of the specified users of our advice and/or discussion
documents.  Consequently, KPMG makes no representation regarding the sufficiency of the
procedures either for the purpose for which our advice and/or discussion documents is being
prepared or for any other purpose.

To the extent that KPMG provides accounting advisory services to Delphi, we will base our
conclusions on the facts and assumptions that Delphi submits; we will not independently verify
such information but will inform Delphi's management of any such information that may appear
questionable to KPMG.  Inaccuracy or incompleteness of the information provided to us could
have a material effect on our advice and services provided.  In rendering accounting advice,
whether written or oral, we will consider the applicable technical literature, laws and regulations.
Financial reporting authoritative guidance is subject to change or modification, retroactively or
prospectively, by varying interpretation and by subsequently issued pronouncements, legislation,
and regulatory, administrative, or judicial decisions.  Any such change or modification could



Mr. John D. Sheehan
Delphi
May 17, 2006
Page 4

affect the validity of our advice. Following the termination of this engagement, we will not update our advice for subsequent changes or modifications.

In this engagement, KPMG assumes no responsibility for auditing information provided by Delphi or for expressing an opinion on any part of Delphi's financial statements. Those responsibilities belong to Delphi and their independent auditor.

Accounting advice provided by KPMG to Delphi may not be provided to any third party without the express written permission of KPMG. Additionally, Delphi agrees that we have no obligation to update any information provided to you for events and circumstances occurring after termination of this engagement, unless a request is agreed to in writing.

Because of the requirements of Statement of Auditing Standards No. 50 *Reports on the Application of Accounting Principles* (SAS 50) as amended by Statement of Auditing Standards No. 97, *Amendment to SAS 50, 'Reports on the Application of Accounting Principles'* (SAS 97), and KPMG internal policies, on those occasions when we provide such accounting advice to the principal of proposed accounting policies who is not a KPMG audit client, such professional requirements include communicating with the independent auditors' of the Company to discuss such matters as:

- the economic substance of the transactions in scope versus the form of the transaction;
- whether there is a dispute between the Company and the continuing accountants; or
- whether the continuing accountants have reached a conclusion that differs from ours.

If necessary and appropriate, KPMG will meet with Delphi's independent auditor during the course of the engagement to discuss our services and any preliminary findings. If you request oral or written advice on the application of Generally Accepted Accounting Procedures that we consider to be under the requirements of SAS 50, we will conduct our customary engagement procedures for the individual topics requested and, if accepted, we will issue an addendum to this engagement letter defining the scope of such procedures.

KPMG is not assuming responsibility for management analysis or decision-making with respect to the Delphi's positions taken on tax returns, the application of any accounting principles, related financial statement disclosures and balance sheet accounts. Delphi is to consult with their independent auditor on the application of accounting principles.

Delphi has the right to share the results of their work with their auditors (Deloitte & Touche and Ernst & Young) and legal counsel. If you would like to share our Reports (defined below) with other parties, we would consider the specific request and, if accepted, we would require that such parties execute an approved reader letter prior to your release of our work. An example of such letter is included at Appendix B.

Except as otherwise set forth in the Engagement Letter, in accepting this engagement, Delphi acknowledges that completion of this engagement or acceptance of Reports (defined below) resulting from this engagement will not constitute a basis for Delphi's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). This engagement shall not be construed to support Delphi's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.



Mr. John D. Sheehan
Delphi
May 17, 2006
Page 5

All oral and written communications by KPMG to you with respect to the Engagement, including drafts and those communications occurring prior to the execution of the Engagement Letter (collectively, "Reports") will be subject to the terms and conditions of the Engagement Letter and the Delphi Standard Terms and Conditions dated February 16, 2006. We have no obligation to update Reports or to revise information presented to you to reflect events and transactions occurring subsequent to the date of the final Report we issue to you. You agree to review Reports promptly and to advise us on a timely basis of any additional procedures you would like us to perform or areas to address. You authorize us to send Reports electronically for your convenience. However, you may only rely upon the final copy of our report as our work product.

## TIMING

KPMG is available to begin providing these services beginning the week of May 22, 2006, or sooner once this engagement letter has been executed by you. We will seek proper authorization for service and fee payment from the Bankruptcy Court and/or US Trustee as appropriate. Should we learn that our application for provision of these services or fee reimbursement is not accepted by the Bankruptcy Court or US Trustee, our engagement will terminate immediately upon such notice and we will have no obligation to complete the services engaged herein.

## PROFESSIONAL FEES

We will charge our actual hours incurred using a discount of 40% from our standard hourly rates by level listed below.

| Level | Standard Rate | 40% Discount | Net Rate |
|---|---|---|---|
| Partner | $775 | $ 310 | $ 465 |
| Director | $750 | $ 300 | $ 450 |
| Manager | $720 | $ 288 | $ 432 |
| Senior | $525 | $ 210 | $ 315 |
| Staff | $385 | $ 154 | $ 231 |

We have attached as Appendix C a preliminary estimate of resources and potential hours incurred over the period from May 22nd to July 31st as an indicative illustration of the potential size and fees on this engagement. This preliminary illustration will be revised to an on-going engagement fee projection based on our detailed planning and experience as we conduct the engagement. We will keep you updated of our progress, and provide you with the hours that are expected to be incurred on a bi-weekly basis in advance. We will highlight any changes in scope and additional fees for your approval prior to incurring such fees. We will accumulate actual hours incurred extended by our agreed rates, along with out-of-pocket expenses on a bi-weekly basis, will explain any significant variances from our initial estimates, and will submit invoices monthly.

In addition to our professional fees, you agree to reimburse KPMG for our approved out-of-pocket expenses incurred in connection with each engagement. Neither the amount of our fees nor the payment of our fees and expenses will depend upon the findings of our work. We will bill expenses that we consider normal and necessary, and will exclude perks such as first class travel.



Mr. John D. Sheehan
Delphi
May 17, 2006
Page 6

## OTHER MATTERS

The Reports provided under this engagement letter are not intended to be used, nor should be used, in connection with any tax matter. In the event Delphi uses Reports for or in relation to any tax matter, such Reports are not intended or written by KPMG to be used, and cannot be used by a client or any other person or entity for the purpose of (i) avoiding penalties that may be imposed on any taxpayer or (ii) promoting, marketing or recommending to any other party any matters addressed herein.

We do not anticipate providing any tax advice under this engagement letter and therefore our Reports will contain the following legend:

> *This report is not intended to be used, nor should be used, in connection with any tax matter. In the event Client uses this report for or in relation to any tax matter, the report is not intended or written by KPMG to be used, and cannot be used, by a client or any other person or entity for the purpose of (i) avoiding penalties that may be imposed on any taxpayer or (ii) promoting, marketing or recommending to any other party any matters addressed herein.*

## DEBRIEFING

As part of our commitment to quality service, we would welcome the opportunity to receive your comments at any time on our work and the service that we deliver.

## CONFIRMATION

Please indicate your acceptance of these arrangements by signing both copies of this letter in the space provided below and returning one signed copy of the letter. We look forward to working with you.

If you have any questions, please call Brian Heckler at (312) 665-2693.


Very truly yours,

KPMG LLP


Enclosures

cc:    G. Silberg
       S. Carlin

JUN 28 2006 11:41 FR DELPHI CORP          248 813 2612 TO 913122757918          P.07

**KPMG**

Mr. John D. Sheehan
Delphi
May 17, 2006
Page 7

**ACCEPTED by Delphi:**

_____     6/28/06
Signature                           Date

VP, Chief Restructuring Officer
Title
   & CAO



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

**Appendix A**
**Page 1**

These Standard Terms and Conditions are an integral part of the accompanying letter from KPMG that identifies the engagement (the "Engagement") to which they relate (the "Engagement Letter" or "Engagement Confirmation" in the case of a Master Engagement Letter, collectively referred to herein as the "Engagement Letter"). In the event of conflict between the Engagement Letter and these Standard Terms and Conditions, the provisions of the Engagement Letter shall prevail.

1. **Certain Definitions.**

   (a) **Client.** Client herein refers to the addressee(s) of the Engagement Letter.
   (b) **DDA.** Due diligence assistance ("DDA") is a service in which KPMG assists a client with a financial, tax, or operational investigation of a target business.
   (c) **Acquisition DDA Engagement.** DDA provided to a client considering an investment in, or acquisition of, another business or part thereof, or that may accept securities from another business as consideration in a transaction.
   (d) **Pre-Sale DDA Engagement.** DDA that is provided to a client considering the sale or other disposition of the client itself or a division, subsidiary, or other business component of the client. In a Pre-Sale DDA Engagement, any reporting by KPMG is generally limited to the client, and no reporting is provided to prospective acquirers.
   (e) **Vendor-Initiated DDA Engagement.** DDA that is provided to a client considering the sale or other disposition of the client itself or a division, subsidiary, or other business component of the client. As distinguished from a Pre-Sale DDA Engagement, in a Vendor-Initiated DDA Engagement the objective of the engagement is to prepare a report that will be provided to prospective acquirers.
   (f) **Target.** Target herein refers to the entity(ies) or division(s) representing the subject of the procedures described in the Engagement Letter.
   (g) **Bidder.** Bidder herein refers to a potential acquirer of Target.
   (h) **Other capitalized terms.** Other capitalized terms in these Standard Terms and Conditions not defined elsewhere herein shall have the meanings given to them in the Engagement Letter.

2. **Procedures.** The procedures KPMG will perform are limited to those referred to in the Engagement Letter and its exhibits and addenda. The procedures KPMG will perform are limited in nature and extent to those that Client has determined meets its needs and, as such, will not necessarily disclose all significant matters about Target or reveal errors in the underlying information, instances of fraud, or illegal acts, if any. KPMG will provide no assurance and make no representation regarding the sufficiency of the procedures either for the purpose for which KPMG has been engaged or for any other purpose.

In performing KPMG's procedures and reporting its findings, KPMG will rely upon information provided to KPMG by Client's and Target's personnel and advisors, and any publicly available information KPMG uses, and KPMG will not independently verify the accuracy or completeness of such information. KPMG's procedures with respect to Target's financial information will be substantially less in scope than an audit conducted in accordance with U.S. generally accepted auditing standards, and any procedures with respect to Target's internal control over financial reporting will be substantially less in scope than an examination of internal control conducted in accordance with Standards for Attestation Services established by the American Institute of Certified Public Accountants. Consequently, KPMG will express no opinion and will provide no other form of assurance on Target's financial statements or Target's internal control over financial reporting.

3. **Timing.** Client acknowledges that KPMG's ability to gather the information Client requires and to complete KPMG's work in a timely manner and within KPMG's estimates of fees and expenses depends upon a variety of factors outside KPMG's control, including but not limited to, the availability of information, the degree of cooperation KPMG receives from Client's and Target's personnel and advisors, and the timeliness and completeness of the responses by Client's and Target's personnel and advisors to KPMG's requests for information. KPMG intends to complete KPMG's procedures expeditiously under the circumstances, subject to those factors that are beyond KPMG's control.

4. **Other Relationships.**

   (a) In an Acquisition DDA Engagement, KPMG may potentially be engaged by more than one potential bidder in connection with an acquisition of Target. In a Pre-Sale DDA Engagement or a Vendor-Initiated DDA Engagement, KPMG may be engaged by potential bidders in connection with an acquisition of Target. If the KPMG engagement team providing services to Client becomes aware that a separate KPMG team has been engaged by a potential bidder, KPMG will notify Client that KPMG has been so engaged (subject to any confidentiality restrictions) and will take all reasonable steps to prevent the disclosure, without appropriate prior approvals, of information between the KPMG team serving Client and the engagement team serving any other party. Unless Client elects to exercise Client's right to terminate the Engagement, Client agrees that KPMG may represent other parties and Client waives any potential conflict.

   (b) In an Acquisition DDA Engagement, KPMG may serve as independent auditors of Target, or provide other services to Target. In a Pre-Sale DDA Engagement or a Vendor-Initiated DDA Engagement, KPMG may serve as independent auditors of, or provide other services to, a potential bidder or bidders. In such cases, KPMG will take all reasonable steps to prevent the disclosure, without appropriate prior approvals, of confidential information between the KPMG engagement team serving Client and the KPMG engagement team serving any other party. However, Client hereby acknowledges and agrees that KPMG may be in possession of confidential information concerning Target or a potential bidder that may be relevant to Client and that such information will not be disclosed to Client unless Target or the potential bidder provides written

**February 16, 2006**



**Delphi Standard Terms and Conditions**          **Appendix A**
**For Transaction Services Engagements**          **Page 2**

consent to such disclosure in advance.

If KPMG serves as independent auditors of Target or such potential bidder, KPMG's professional responsibilities may require that KPMG inform the engagement team serving Target or the bidder about information coming to KPMG's attention that affects KPMG's engagement to audit Target's or such bidder's consolidated financial statements. In a Vendor-Initiated DDA Engagement, if information comes to our attention that affects KPMG's engagement to audit such bidder's consolidated financial statements and any such information is not reflected in KPMG's report, KPMG reserves the right to disclose that information to KPMG's audit client.

Client acknowledges that KPMG's relationship with Target or a potential bidder may represent an actual or potential conflict of interest for KPMG in light of the services KPMG has agreed to provide to Client hereunder. Client hereby agrees that KPMG's relationship shall not constitute a conflict of interest for purposes of KPMG's Engagement hereunder and Client expressly waives its right to assert any such conflict against KPMG. Client hereby acknowledges that KPMG's agreement to provide the services hereunder is based upon and subject to the foregoing waiver and, in the event that Client revokes such waiver, KPMG's Engagement hereunder will automatically terminate.

5. **Projections.** In the event the procedures KPMG performs relate to prospective information, KPMG will not compile, examine, or apply other procedures to such information in accordance with Statements on Standards for Attestation Engagements issued by the American Institute of Certified Public Accountants and, accordingly, will express no opinion or any other form of assurance or representations concerning the accuracy, completeness or presentation format of the prospective information.    There will usually be differences between projected and actual results, because events and circumstances frequently do not occur as expected or predicted, and those differences may be material.

6. **Reporting.**    All oral and written communications by KPMG to Client with respect to the Engagement, including drafts and those communications occurring prior to the execution of the Engagement Letter (collectively, "Reports"), will be subject to the terms and conditions of the Engagement Letter and these Standard Terms and Conditions.    KPMG has no obligation to update Reports or to revise information presented to Client to reflect events and transactions occurring subsequent to the date of the final Report KPMG issues to Client.    Client agrees to review Reports promptly and to advise KPMG on a timely basis of any additional procedures Client would like KPMG to perform or areas to address.

In an Acquisition DDA Engagement or Pre-Sale DDA Engagement, unless specifically requested by Client, KPMG is not obligated to provide copies of Reports to Target for the purpose of confirming Target's representations concerning the accuracy of the factual information presented in Reports.    If Client would like

Target to review KPMG's report, KPMG may require Client and Target to indemnify KPMG for any claims arising out of or relating to such release.    In a Vendor-Initiated DDA Engagement, KPMG will provide Client and Target copies of Reports and will require Client and Target to confirm the factual accuracy of the Reports.

KPMG's findings will not constitute recommendations to Client as to whether or not Client should proceed with any proposed transaction.

7. **Limitation on the Use and Distribution of Reports.** Because of the special nature of the Engagement, KPMG's Reports are not suited for any purpose other than to assist the intended recipient in evaluating the potential transaction, and Client agrees Reports will be used for that purpose only.    Reports will be provided by KPMG for the intended recipient's information only, and Client agrees that the Reports may not be copied, quoted or referred to, in whole or in part, by Client without KPMG's prior written consent, except in the manner provided for in the Engagement Letter or these Standard Terms and Conditions.    Client also agrees that Reports, and any of the information contained therein, will be disclosed only to Client's board of directors, management and other employees, Client's independent audit firm, and to attorneys acting as Client's counsel in the contemplated transaction, provided that each of the foregoing is subject to a binding obligation (through a written agreement or professional obligation) to maintain the confidentiality of the Reports.

In certain instances, Client may request that a copy of a Report be distributed to a third party for informational purposes.    KPMG will consider consenting to distribution based on such factors as the identity of the third party and the third party's intended use of the Report.    If KPMG agrees to the distribution of the Report to a third party, Client agrees to execute, and agrees to require the third party to execute, an "Agreement to Release Information." If an acceptable "Agreement to Release Information" cannot be obtained, KPMG will consider meeting with the third party to discuss in general terms the procedures outlined in the Engagement Letter. In addition, KPMG will consider performing, under the terms of a separate engagement letter with the third party, additional procedures, if any, that the third party considers appropriate.

8. **Services.**    It is understood and agreed that KPMG's services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client.

9. **Payment of Invoices.**    Client agrees to pay properly submitted invoices within thirty (30) days of the invoice date, or such other due date as may be indicated in the Engagement Letter. KPMG shall have the right to halt or terminate entirely its services under the Engagement Letter until payment is received on past due invoices. All fees, charges and other amounts payable to KPMG under the Engagement Letter do not include any sales, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be Client's sole responsibility, excluding any applicable taxes based on KPMG's net income or taxes arising from the

**February 16, 2006**



**Delphi Standard Terms and Conditions**          **Appendix A**
**For Transaction Services Engagements**              **Page 3**

employment or independent contractor relationship between KPMG and its personnel.

10. **Term.** Unless terminated sooner in accordance with its terms, the Engagement shall terminate upon the completion of KPMG's services under the Engagement Letter. In addition, either party may terminate the Engagement Letter at any time by giving written notice to the other party not less than 30 calendar days before the effective date of termination.

11. **Ownership.**

(a) **KPMG Property.** KPMG has created, acquired, owns or otherwise has rights in, and may, in connection with the performance of services under the Engagement Letter, employ, provide, modify, create, acquire or otherwise obtain rights in, various concepts, ideas, methods, methodologies, procedures, processes, know-how, and techniques, models, templates; software, user interfaces and screen designs; general purpose consulting and software tools, utilities and routines; and logic, coherence and methods of operation of systems (collectively, the "KPMG Property"). KPMG retains all ownership rights in the KPMG Property. Client shall acquire no right or interest in such property, except for the license expressly granted in the next paragraph. In addition, KPMG shall be free to provide services of any kind to any other party as KPMG deems appropriate, and may use the KPMG Property to do so. KPMG acknowledges that KPMG Property shall not include any of Client's confidential information or tangible or intangible property, and KPMG shall have no ownership rights in such property.

(b) **Ownership of Deliverables.** Except for KPMG Property, and upon full and final payment to KPMG under the Engagement Letter, the tangible items specified as deliverables or work product in the Engagement Letter including any intellectual property rights appurtenant thereto (the "Deliverables") will become the property of Client. If any KPMG Property is contained in any of the Deliverables, KPMG hereby grants Client a royalty-free, paid-up, non-exclusive, perpetual license to use such KPMG Property in connection with Client's use of the Deliverables.

12. **Limitation on Warranties. THIS IS A SERVICES ENGAGEMENT. KPMG WARRANTS THAT IT WILL PERFORM SERVICES UNDER THE ENGAGEMENT LETTER IN GOOD FAITH, WITH QUALIFIED PERSONNEL IN A COMPETENT AND WORKMANLIKE MANNER IN ACCORDANCE WITH APPLICABLE INDUSTRY STANDARDS. KPMG DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

13. **Limitation on Damages.** Except for your and our respective indemnification obligations as described in these Standard Terms and Conditions, or cases of bad faith or willful misconduct, neither you nor we shall be

liable to the other for any actions, damages, claims, liabilities, costs, expenses or losses arising out of the services performed hereunder for a total amount in excess of two times the fees paid or owing to us for services rendered by us under this engagement. Except with respect to a breach of Paragraph 20 below, in no event shall either you or we be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs). The provisions of this Paragraph shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss, whether in contract, statute, tort or otherwise.

14. **Infringement.**

(a) KPMG hereby agrees to indemnify, hold harmless and defend Client from and against all claims, liabilities, losses, expenses (including reasonable attorneys' fees), fines, penalties, taxes or damages (collectively "Liabilities") asserted by any third party against Client to the extent such Liabilities result from the infringement by the Deliverables of any third party's patents issued as of the date of the Engagement Letter, trade secrets, trademarks or copyrights. The preceding indemnification provision shall not apply to any infringement arising out of the following:

(i) use of the Deliverables other than in accordance with applicable documentation or instructions supplied by KPMG or other than in accordance with Paragraph 15(b);

(ii) any alteration, modification or revision of the Deliverables not expressly agreed to in writing by KPMG; or

(iii) the combination of the Deliverables with materials not supplied or approved by KPMG.

(b) In case any of the Deliverables or any portion thereof is held, or in KPMG's reasonable opinion is likely to be held, in any such suit to constitute infringement, KPMG may, within a reasonable time, at its option, either:

(i) secure for Client the right to continue the use of such infringing item; or

(ii) replace, at KPMG's sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing.

In the event KPMG is, in its reasonable discretion, unable to perform either of the options described in (i) or (ii) above, Client shall return the Deliverable to KPMG, and KPMG's sole liability shall be to refund to Client the amount paid to KPMG for such item; provided that the foregoing shall not be construed to limit KPMG's indemnification obligation set forth in Paragraph 14(a) above.

(c) The provisions of this Paragraph 14 state KPMG's entire liability and Client's sole and exclusive

**February 16, 2006**



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

**Appendix A**
**Page 4**

remedy with respect to any infringement or claim of infringement.

15. **Indemnification.**

(a) Each party agrees to indemnify, hold harmless and defend the other party from and against any and all Liabilities for physical injury to, or illness or death of, any person or persons regardless of status, and damage to or destruction of any tangible property, which the other party may sustain or incur, to the extent such Liabilities result from the negligence or willful misconduct of the indemnifying party.

(b) Except as otherwise required by law, as permitted by the Engagement Letter, or as provided in paragraph 20(e) below with respect to any proposed or completed transaction, Client acknowledges and agrees that any advice, recommendations, information or work product provided to Client by KPMG in connection with this Engagement is for the confidential use of Client, may not be relied upon by any third party, and Client will not disclose or permit access to such advice, recommendations, information or work product to any third party or summarize or refer to such advice, recommendations, information or work product or to KPMG's engagement under the Engagement Letter without, in each case, KPMG's prior written consent. In furtherance of the foregoing, Client will indemnify, defend and hold harmless KPMG from and against any and all Liabilities suffered by or asserted against KPMG in connection with a third party claim to the extent resulting from such party's use or possession of or reliance upon KPMG's advice, recommendations, information or work product as a result of Client's use or disclosure of such advice, recommendations, information or work product.

(c) The party entitled to indemnification (the "Indemnified Party") shall promptly notify the party obligated to provide such indemnification (the "Indemnifying Party") of any claim for which the Indemnified Party seeks indemnification. The Indemnifying Party shall have the right to conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense, and the Indemnified Party shall cooperate with the Indemnifying Party. The party not conducting the defense shall nonetheless have the right to participate in such defense at its own expense. The Indemnified Party shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages.

(d) Our standard terms and conditions relating to indemnification are modified and amended to the extent that neither party will be indemnified, and its limitation of liability will not apply, to bad faith, self-dealing or a breach of fiduciary duty (if any), gross negligence or willful misconduct.

16. **Cooperation; Use of Information.**

(a) Client agrees to cooperate with KPMG in the performance of the services under the Engagement Letter and shall provide KPMG with timely access to and use of Client's and Target's personnel, facilities, equipment, data and information to the extent necessary for KPMG to perform the services under the Engagement Letter. The Engagement Letter may set forth additional obligations of Client in connection with this Engagement. Client acknowledges that Client's failure to assign Client personnel having skills commensurate with their role with respect to this Engagement could adversely affect KPMG's ability to provide the services under the Engagement Letter.

(b) KPMG will base its conclusions on the facts and assumptions that Client's and Target's personnel and advisors submit and will not independently verify this information. Inaccuracy or incompleteness of the information submitted to KPMG could have a material effect on KPMG's conclusions. In rendering its advice, KPMG may consider, for example, the applicable provisions of the Internal Revenue Code of 1986 and ERISA as amended, and the relevant state and foreign statutes, the regulations thereunder, income tax treaties, and judicial and administrative interpretations thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of KPMG's advice. KPMG will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Client separately engages KPMG to do so in writing after such changes or modifications.

(c) Treasury regulations under IRC section 6011 require taxpayers to disclose to the IRS their participation in reportable transactions. Client agrees to use its best efforts to promptly inform KPMG of any transaction covered by this Engagement that is required to be disclosed as a reportable transaction to the IRS or to any state or other jurisdiction adopting similar or analogous provisions. Treasury regulations under IRC section 6112 provide that KPMG must retain lists of investors in reportable and registerable transactions if we are a material advisor with respect to the transactions, and states or other jurisdictions may adopt similar or analogous provisions. Therefore, if KPMG determines that Client has participated in a reportable or registerable transaction, KPMG may place Client's name and information on a list. This list may later be requested by the IRS or other tax authority and KPMG ultimately may be required to provide it; however, KPMG will advise Client if KPMG provides Client's information to the IRS or other tax authority.

(d) Information relating to advice KPMG provides to Client, including communications between KPMG and Client and material KPMG creates in the course of providing advice, may be privileged and protected from disclosure to the IRS or other governmental authority. Should such an authority seek disclosure from KPMG of written or oral communications relating to such advice, KPMG will discuss with Client opportunities for asserting

**February 16, 2006**



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

the privilege. As KPMG is not able to assert the privilege on Client's behalf with respect to any communications for which privilege has been waived, Client agrees to notify KPMG of any such waivers, whether resulting from communications with KPMG or third parties in the same or a related matter. Client also understands that privilege may not be available for communications with an audit client and that KPMG personnel providing audit and non-audit services will discuss matters that may affect the audit to the extent required by applicable professional standards.

17. **Force Majeure.** Neither Client nor KPMG shall be liable for any delays resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

18. **Limitation on Actions.** No action, regardless of form, arising out of or relating to this Engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for non-payment may be brought by a party not later than one year following the date of the last payment due to such party under the Engagement Letter.

19. **Independent Contractor.** It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is or shall be considered an agent, distributor or representative of the other. Neither party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

20. **Confidentiality.**

(a) "Confidential Information" means all documents, software, reports, data, records, forms and other materials obtained by one party (the "Receiving Party") from the other party (the "Disclosing Party") in the course of performing the services under the Engagement Letter: (i) that have been marked as confidential; (ii) whose confidential nature has been made known by the Disclosing Party to the Receiving Party; or (iii) that due to their character and nature, a reasonable person under like circumstances would treat as confidential. Notwithstanding the foregoing, Confidential Information does not include information which: (i) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (iv) relates to the tax treatment or tax structure of any transaction as further described in Paragraph 20(e) below; (v) KPMG determines is required to be maintained by KPMG under section 6112 of the Internal Revenue Code and the regulations thereunder or similar or analogous provisions of a state or other jurisdiction; or (vi) is received by the Receiving Party from a third party without

restriction and without a breach of an obligation of confidentiality.

(b) The Receiving Party will deliver to the Disclosing Party all Confidential Information of the Disclosing Party and all copies thereof when the Disclosing Party requests the same, except for one copy thereof that the Receiving Party may retain for its records. The Receiving Party shall not use or disclose to any person, firm or entity any Confidential Information of the Disclosing Party without the Disclosing Party's prior written permission; provided, however, that notwithstanding the foregoing, the Receiving Party may disclose Confidential Information to the extent that it is required to be disclosed pursuant to a statutory or regulatory provision or court order or to fulfill professional obligations and standards.

(c) Each party shall be deemed to have met its nondisclosure obligations under this Paragraph 20 as long as it exercises the same level of care to protect the other's information as it exercises to protect its own confidential information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

(d) If the Receiving Party receives a subpoena or other validly issued administrative or judicial demand requiring it to disclose the Disclosing Party's Confidential Information, the Receiving Party shall provide prompt written notice to the Disclosing Party of such demand in order to permit it to seek a protective order. So long as the Receiving Party gives notice as provided herein, the Receiving Party shall be entitled to comply with such demand to the extent permitted by law, subject to any protective order or the like that may have been entered in the matter.

(e) Notwithstanding anything to the contrary set forth herein, no provision in the Engagement Letter or these Standard Terms and Conditions is or is intended to be construed as a condition of confidentiality within the meaning of Internal Revenue Code sections 6011, 6111, 6112 or the regulations thereunder, or under any similar or analogous provisions of the laws of a state or other jurisdiction. Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction within the scope of this Engagement that reduces or defers federal tax and all materials of any kind (including opinions and other tax analyses) that are provided to Client relating to such tax treatment and tax structure. If a state or other jurisdiction adopts provisions that are similar or analogous to those in IRC sections 6011, 6111, or 6112 or the regulations thereunder, the authorization to disclose in the preceding sentence also shall apply to any transaction within the scope of this Engagement that is subject to such provisions of that state or other jurisdiction.

21. **Survival.** The provisions of Paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24,

**February 16, 2006**

 **Delphi Standard Terms and Conditions**          **Appendix A**
**For Transaction Services Engagements**          **Page 6**

25(a), and 27 hereof shall survive the expiration or termination of this Engagement.

22. **Assignment.** Neither party may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other party, such consent not to be unreasonably withheld. Notwithstanding the foregoing, to the extent any of the services under the Engagement Letter will be performed in or relate to a jurisdiction outside of the United States, Client acknowledges and agrees that such services, including any applicable tax advice, may be performed by the member firm of KPMG International practicing in such jurisdiction. Accordingly, Client agrees that KPMG may share data and information received from Client with such member firm as may be required to complete this Engagement.

23. **Severability.** In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this Agreement shall not be affected, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

24. **Governing Law.** The Engagement Letter and these Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws provisions thereof.

25. **Miscellaneous.**

    (a) Except as otherwise set forth in the Engagement Letter, in accepting this Engagement, Client acknowledges that completion of this Engagement or acceptance of Deliverables resulting from this Engagement will not constitute a basis for Client's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). This Engagement shall not be construed to support Client's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

    (b) KPMG may communicate with Client by electronic mail or otherwise transmit documents in electronic form during the course of this Engagement. Client accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices) and agrees that it may rely only upon a final hardcopy version of a document or other communication that KPMG transmits to Client.

    (c) For engagements performed in California or where the services provided by KPMG fall under the jurisdiction of California law, rule or regulation, Client acknowledges that certain of KPMG's personnel that have an ownership interest in the partnership and who may provide services in

connection with this Engagement may not be licensed as certified public accountants under the laws of any of the various states.

26. **Entire Agreement.** These terms, and the Engagement Letter including Exhibits, constitute the entire agreement between KPMG and Client with respect to this Engagement and supersede all other oral and written representations, understandings or agreements relating to this Engagement.

27. **Alternative Dispute Resolution.**

    (a) Any dispute or claim arising out of or relating to the Engagement Letter, the services provided hereunder, or any other services provided by or on behalf of KPMG or any of its subcontractors or agents to Client or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit A attached hereto, which constitute the sole methodologies for the resolution of all such disputes. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction. Mediation, if selected, may take place at a location to be designated by the parties. Arbitration shall take place in New York, New York. Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

    (b) Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks or logos, solely in the courts of the State of New York or in the courts of the United States located in the State of New York. The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes.

    (c) Our standard terms and conditions relating to the Dispute Resolution procedures are modified by providing that any dispute or claim also may be resolved before the United States Bankruptcy Court for the Southern District of New York.

**February 16, 2006**



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

**Appendix A**
**Page 7**

## Exhibit A

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(i) **Mediation.** Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Institute for Dispute Resolution Mediation Procedures (effective April 1, 1998), with the exception of paragraph 2 which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

(ii) **Arbitration.** Arbitration shall be used to settle the following disputes: (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the Engagement Letter, or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the Arbitration Rosters maintained by any JAMS office in the United States. If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

**February 16, 2006**

Appendix E

Date

PRIVATE & CONFIDENTIAL

Ms. Laura J. Marion
Assistant Controller
Delphi
5725 Delphi Drive
Troy, Michigan 48098-2815

Approved Reader Name
Title
Company
Address

Pursuant to this letter, Delphi authorizes us to release one copy of our report to [Approved Reader]. Our report is related to our assistance to Delphi in its valuation of certain assets and reporting units in connection with its review for impairment under Statement of Financial Accounting Standards Nos. 142 and 144. Our assistance is provided to Delphi in conjunction with our engagement letter dated February 16, 2006. The report is being provided at Client's request to [Approved Reader] for informational purposes only. It is understood and agreed that the report is not suited for any purpose other than the aforementioned valuation exercise, and as such, is restricted for the internal distribution only of [Approved Reader]. [Approved Reader] should complete its own assessments of value to the extent it considers necessary. It is understood that the reading of our report does not substitute for [Approved Reader's] own undertakings in this regard.

Upon Delphi agreeing to the terms of this letter, we will release one copy of our report to [Approved Reader], who is subject to the terms of this agreement.

[Approved Reader] agrees that KPMG LLP (KPMG) shall not be liable for any act done or step taken or omitted by it in good faith, except in all cases for its own willful misconduct and hereby agrees to indemnify, defend and hold harmless KPMG from any third party claim asserted against KPMG to the extent resulting from KPMG having released its report to [Approved Reader].

Please indicate your acceptance of these arrangements by signing this letter.


Very truly yours,

KPMG LLP



Name
*Partner*

**Accepted and Agreed to by:**

Delphi                                    [Approved Reader]


_____        _____
[Name]                                    [Name]
[Title]                                     [Title]


_____        _____
Date                                      Date

| | 80% of Standard Rates | Week Beg 22-May | 29-May | 5-Jun | 12-Jun | 19-Jun | 26-Jun | 3-Jul | 10-Jul | 17-Jul | 24-Jul | Total Hours | Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Accounting Support and Project Coordination/Oversight* | | | | | | | | | | | | | |
| Brian Heckler | 620 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 20 | $12,400 |
| Dan Gary | 600 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 20 | $12,000 |
| Michael Ricafort | 575 | 40 | 32 | 24 | 0 | 24 | 24 | 24 | 24 | 24 | 24 | 240 | $138,000 |
| Marc Augier | 575 | 40 | 32 | 40 | 0 | 40 | 32 | 24 | 40 | 40 | 40 | 328 | $188,600 |
| Bill Wilson | 420 | 40 | 32 | 0 | 40 | 40 | 32 | 24 | 40 | 40 | 0 | 288 | $120,960 |
| Sr. Associate | 420 | 0 | 0 | 0 | 0 | 40 | 24 | 0 | 40 | 40 | 40 | 184 | $77,280 |
| Total | | 124 | 100 | 68 | 44 | 148 | 116 | 76 | 148 | 148 | 108 | 1,060 | $549,240 |

The above estimates are preliminary in nature based on a preliminary understanding of the work scope (locations and time period). Actual amounts will vary depending on the level of detail of the work, access to records, etc. Accordingly, this estimate is subject to revision upon conduct of detailed planning.

<u>EXHIBIT C</u>



**KPMG LLP**
Suite 1200
150 West Jefferson
Detroit, MI 48226-4429

Telephone    313 230 3000
Fax              313 230 3001
Internet       www.us.kpmg.com

July 3, 2006

Mr. Brian D. Thelen
Vice President Corporate Audit Services
Delphi Corporation
World Headquarters & Customer Center
M/C 483.400.272
5725 Delphi Drive
Troy, MI 48098

Dear Mr. Thelen:

We are pleased you have engaged KPMG LLP ("KPMG") to provide staff assistance in connection with Delphi Corporation's (Delphi) special investigation at your HD Flint facility. This letter is intended to confirm the scope and related terms of our engagement.

KPMG personnel will assist Delphi's personnel in supporting the above special investigation. Our assistance will be under the direction and supervision of Ms. Linda Gabbard, Manager Corporate Audit Services, who will be responsible for communicating the tasks and requirements of the project to personnel we supply and for reviewing their work. KPMG will not be considered the preparer/developer of Dephi's special investigation at HD Flint and will not sign any deliverable(s).

In connection with this engagement, we will not:

- provide any management oversight of our personnel in connection with the project;

- participate in the determination of the scope and objectives of the project;

- assist in the development of the project plan;

- provide any manager or partner review of the deliverable(s); or

- function in a management or employee role or make decisions that could have an effect on Delphi's business.

We will begin work at a mutually convenient time after receiving a signed copy of this engagement letter.

KPMG LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.



Page 2
Mr. Brian Thelen
Delphi Corporation
July 3, 2006

We will calculate our professional fees for services rendered using the following hourly rate at a discount of 62.6% from our standard hourly rates for the level of personnel as indicated below:

| Level | Standard Rate | 62.6% Discount | Net Hourly Rate |
|---|---|---|---|
| Senior Associate | $375 | $235 | $140 |

Based upon the level of the professional and the estimated amount of time devoted to the engagement, we anticipate that our professional fees for assisting Delphi for approximately three weeks to be between $17,000 to $18,000 excluding all out-of-pocket expenses.

Throughout the engagement, I will be responsible for the administration of this agreement and will submit, upon completion of the engagement, an invoice for fees and expenses incurred, with payment due upon receipt.

Should Delphi require additional hours, more professionals or a change in the current anticipated staff for this engagement, fees for such additional professionals or hours will be commensurate with the experience levels requested and utilized. We will require that you sign an addendum to this letter in the event that the duration of the engagement or the scope of services is modified.

OTHER TERMS AND CONDITIONS OF THE ENGAGEMENT LETTER

All services performed under this Engagement Letter will be subject to the Standard Terms and Conditions for Transaction Services Engagements dated February 16, 2006 (the "TS Standard Terms and Conditions") attached as Appendix A and incorporated by reference herein, except as modified as follows:

Services: Client Responsibilities

It is understood and agreed that KPMG's services may include advice and recommendations; but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made be, Client. KPMG will not perform management functions or make management decisions for Client. References herein to Client shall refer to the addressee of this Engagement Letter to which these Standard Terms and Conditions are attached (the "Engagement Letter").

In connection with KPMG's provision of services under the Engagement Letter, Client agrees that Client, and not KPMG, shall perform the following functions:

-   make all management decisions and perform all management functions;

-   designate an individual who possesses suitable skill, knowledge and experience, preferably within senior management, to oversee such services, and to evaluate the adequacy and results of such services;



Page 3
Mr. Brian Thelen
Delphi Corporation
July 3, 2006

- accept responsibility for the results of services; and

- establish and maintain internal controls over the processes with which such services are concerned, including monitoring on-going activities.

Please sign the enclosed copy of this letter to confirm our agreement and return it to us. If you should have any questions or would like to discuss this letter in more detail, please call me at (586) 243-8107.

Very truly yours,

KPMG LLP

*Noreta J. Davis*

Noreta J. Davis
Partner

*Enclosure*

Accepted and agreed: Delphi Corporation:

By: *Kevin Smith*

Title: *Director, GSM*

Date: *June 28, 2006.*



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

**Appendix A**
**Page 1**

These Standard Terms and Conditions are an integral part of the accompanying letter from KPMG that identifies the engagement (the "Engagement") to which they relate (the "Engagement Letter" or "Engagement Confirmation" in the case of a Master Engagement Letter, collectively referred to herein as the "Engagement Letter"). In the event of conflict between the Engagement Letter and these Standard Terms and Conditions, the provisions of the Engagement Letter shall prevail.

1. **Certain Definitions.**

   (a) **Client.** Client herein refers to the addressee(s) of the Engagement Letter.

   (b) **DDA.** Due diligence assistance ("DDA") is a service in which KPMG assists a client with a financial, tax, or operational investigation of a target business.

   (c) **Acquisition DDA Engagement.** DDA provided to a client considering an investment in, or acquisition of, another business or part thereof, or that may accept securities from another business as consideration in a transaction.

   (d) **Pre-Sale DDA Engagement.** DDA that is provided to a client considering the sale or other disposition of the client itself or a division, subsidiary, or other business component of the client. In a Pre-Sale DDA Engagement, any reporting by KPMG is generally limited to the client, and no reporting is provided to prospective acquirers.

   (e) **Vendor-Initiated DDA Engagement.** DDA that is provided to a client considering the sale or other disposition of the client itself or a division, subsidiary, or other business component of the client. As distinguished from a Pre-Sale DDA Engagement, in a Vendor-Initiated DDA Engagement the objective of the engagement is to prepare a report that will be provided to prospective acquirers.

   (f) **Target.** Target herein refers to the entity(ies) or division(s) representing the subject of the procedures described in the Engagement Letter.

   (g) **Bidder.** Bidder herein refers to a potential acquirer of Target.

   (h) **Other capitalized terms.** Other capitalized terms in these Standard Terms and Conditions not defined elsewhere herein shall have the meanings given to them in the Engagement Letter.

2. **Procedures.** The procedures KPMG will perform are limited to those referred to in the Engagement Letter and its exhibits and addenda. The procedures KPMG will perform are limited in nature and extent to those that Client has determined meets its needs and, as such, will not necessarily disclose all significant matters about Target or reveal errors in the underlying information, instances of fraud, or illegal acts, if any. KPMG will provide no assurance and make no representation regarding the sufficiency of the procedures either for the purpose for which KPMG has been engaged or for any other purpose.

In performing KPMG's procedures and reporting its findings, KPMG will rely upon information provided to KPMG by Client's and Target's personnel and advisors, and any publicly available information KPMG uses, and KPMG will not independently verify the accuracy or completeness of such information. KPMG's procedures with respect to Target's financial information will be substantially less in scope than an audit conducted in accordance with U.S. generally accepted auditing standards, and any procedures with respect to Target's internal control over financial reporting will be substantially less in scope than an examination of internal control conducted in accordance with Standards for Attestation Services established by the American Institute of Certified Public Accountants. Consequently, KPMG will express no opinion and will provide no other form of assurance on Target's financial statements or Target's internal control over financial reporting.

3. **Timing.** Client acknowledges that KPMG's ability to gather the information Client requires and to complete KPMG's work in a timely manner and within KPMG's estimates of fees and expenses depends upon a variety of factors outside KPMG's control, including but not limited to, the availability of information, the degree of cooperation KPMG receives from Client's and Target's personnel and advisors, and the timeliness and completeness of the responses by Client's and Target's personnel and advisors to KPMG's requests for information. KPMG intends to complete KPMG's procedures expeditiously under the circumstances, subject to those factors that are beyond KPMG's control.

4. **Other Relationships.**

   (a) In an Acquisition DDA Engagement, KPMG may potentially be engaged by more than one potential bidder in connection with an acquisition of Target. In a Pre-Sale DDA Engagement or a Vendor-Initiated DDA Engagement, KPMG may be engaged by potential bidders in connection with an acquisition of Target. If the KPMG engagement team providing services to Client becomes aware that a separate KPMG team has been engaged by a potential bidder, KPMG will notify Client that KPMG has been so engaged (subject to any confidentiality restrictions) and will take all reasonable steps to prevent the disclosure, without appropriate prior approvals, of information between the KPMG team serving Client and the engagement team serving any other party. Unless Client elects to exercise Client's right to terminate the Engagement, Client agrees that KPMG may represent other parties and Client waives any potential conflict.

   (b) In an Acquisition DDA Engagement, KPMG may serve as independent auditors of Target, or provide other services to Target. In a Pre-Sale DDA Engagement or a Vendor-Initiated DDA Engagement, KPMG may serve as independent auditors of, or provide other services to, a potential bidder or bidders. In such cases, KPMG will take all reasonable steps to prevent the disclosure, without appropriate prior approvals, of confidential information between the KPMG engagement team serving Client and the KPMG engagement team serving any other party. However, Client hereby acknowledges and agrees that KPMG may be in possession of confidential information concerning Target or a potential bidder that may be relevant to Client and that such information will not be disclosed to Client unless Target or the potential bidder provides written

**February 16, 2006**



**Delphi Standard Terms and Conditions
For Transaction Services Engagements**

**Appendix A
Page 2**

consent to such disclosure in advance.

If KPMG serves as independent auditors of Target or such potential bidder, KPMG's professional responsibilities may require that KPMG inform the engagement team serving Target or the bidder about information coming to KPMG's attention that affects KPMG's engagement to audit Target's or such bidder's consolidated financial statements. In a Vendor-Initiated DDA Engagement, if information comes to our attention that affects KPMG's engagement to audit such bidder's consolidated financial statements and any such information is not reflected in KPMG's report, KPMG reserves the right to disclose that information to KPMG's audit client.

Client acknowledges that KPMG's relationship with Target or a potential bidder may represent an actual or potential conflict of interest for KPMG in light of the services KPMG has agreed to provide to Client hereunder. Client hereby agrees that KPMG's relationship shall not constitute a conflict of interest for purposes of KPMG's Engagement hereunder and Client expressly waives its right to assert any such conflict against KPMG. Client hereby acknowledges that KPMG's agreement to provide the services hereunder is based upon and subject to the foregoing waiver and, in the event that Client revokes such waiver, KPMG's Engagement hereunder will automatically terminate.

5. **Projections.** In the event the procedures KPMG performs relate to prospective information, KPMG will not compile, examine, or apply other procedures to such information in accordance with Statements on Standards for Attestation Engagements issued by the American Institute of Certified Public Accountants and, accordingly, will express no opinion or any other form of assurance or representations concerning the accuracy, completeness or presentation format of the prospective information. There will usually be differences between projected and actual results, because events and circumstances frequently do not occur as expected or predicted, and those differences may be material.

6. **Reporting.** All oral and written communications by KPMG to Client with respect to the Engagement, including drafts and those communications occurring prior to the execution of the Engagement Letter (collectively, "Reports"), will be subject to the terms and conditions of the Engagement Letter and these Standard Terms and Conditions. KPMG has no obligation to update Reports or to revise information presented to Client to reflect events and transactions occurring subsequent to the date of the final Report KPMG issues to Client. Client agrees to review Reports promptly and to advise KPMG on a timely basis of any additional procedures Client would like KPMG to perform or areas to address.

In an Acquisition DDA Engagement or Pre-Sale DDA Engagement, unless specifically requested by Client, KPMG is not obligated to provide copies of Reports to Target for the purpose of confirming Target's representations concerning the accuracy of the factual information presented in Reports. If Client would like

Target to review KPMG's report, KPMG may require Client and Target to indemnify KPMG for any claims arising out of or relating to such release. In a Vendor-Initiated DDA Engagement, KPMG will provide Client and Target copies of Reports and will require Client and Target to confirm the factual accuracy of the Reports.

KPMG's findings will not constitute recommendations to Client as to whether or not Client should proceed with any proposed transaction.

7. **Limitation on the Use and Distribution of Reports.** Because of the special nature of the Engagement, KPMG's Reports are not suited for any purpose other than to assist the intended recipient in evaluating the potential transaction, and Client agrees Reports will be used for that purpose only. Reports will be provided by KPMG for the intended recipient's information only, and Client agrees that the Reports may not be copied, quoted or referred to, in whole or in part, by Client without KPMG's prior written consent, except in the manner provided for in the Engagement Letter or these Standard Terms and Conditions. Client also agrees that Reports, and any of the information contained therein, will be disclosed only to Client's board of directors, management and other employees, Client's independent audit firm, and to attorneys acting as Client's counsel in the contemplated transaction, provided that each of the foregoing is subject to a binding obligation (through a written agreement or professional obligation) to maintain the confidentiality of the Reports.

In certain instances, Client may request that a copy of a Report be distributed to a third party for informational purposes. KPMG will consider consenting to distribution based on such factors as the identity of the third party and the third party's intended use of the Report. If KPMG agrees to the distribution of the Report to a third party, Client agrees to execute, and agrees to require the third party to execute, an "Agreement to Release Information." If an acceptable "Agreement to Release Information" cannot be obtained, KPMG will consider meeting with the third party to discuss in general terms the procedures outlined in the Engagement Letter. In addition, KPMG will consider performing, under the terms of a separate engagement letter with the third party, additional procedures, if any, that the third party considers appropriate.

8. **Services.** It is understood and agreed that KPMG's services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client.

9. **Payment of Invoices.** Client agrees to pay properly submitted invoices within thirty (30) days of the invoice date, or such other due date as may be indicated in the Engagement Letter. KPMG shall have the right to halt or terminate entirely its services under the Engagement Letter until payment is received on past due invoices. All fees, charges and other amounts payable to KPMG under the Engagement Letter do not include any sales, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be Client's sole responsibility, excluding any applicable taxes based on KPMG's net income or taxes arising from the

**February 16, 2006**



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

**Appendix A**
**Page 3**

employment or independent contractor relationship between KPMG and its personnel.

10. **Term.** Unless terminated sooner in accordance with its terms, the Engagement shall terminate upon the completion of KPMG's services under the Engagement Letter. In addition, either party may terminate the Engagement Letter at any time by giving written notice to the other party not less than 30 calendar days before the effective date of termination.

11. **Ownership.**

(a) **KPMG Property.** KPMG has created, acquired, owns or otherwise has rights in, and may, in connection with the performance of services under the Engagement Letter, employ, provide, modify, create, acquire or otherwise obtain rights in, various concepts, ideas, methods, methodologies, procedures, processes, know-how, and techniques, models, templates; software, user interfaces and screen designs; general purpose consulting and software tools, utilities and routines; and logic, coherence and methods of operation of systems (collectively, the "KPMG Property"). KPMG retains all ownership rights in the KPMG Property. Client shall acquire no right or interest in such property, except for the license expressly granted in the next paragraph. In addition, KPMG shall be free to provide services of any kind to any other party as KPMG deems appropriate, and may use the KPMG Property to do so. KPMG acknowledges that KPMG Property shall not include any of Client's confidential information or tangible or intangible property, and KPMG shall have no ownership rights in such property.

(b) **Ownership of Deliverables.** Except for KPMG Property, and upon full and final payment to KPMG under the Engagement Letter, the tangible items specified as deliverables or work product in the Engagement Letter including any intellectual property rights appurtenant thereto (the "Deliverables") will become the property of Client. If any KPMG Property is contained in any of the Deliverables, KPMG hereby grants Client a royalty-free, paid-up, non-exclusive, perpetual license to use such KPMG Property in connection with Client's use of the Deliverables.

12. **Limitation on Warranties. THIS IS A SERVICES ENGAGEMENT. KPMG WARRANTS THAT IT WILL PERFORM SERVICES UNDER THE ENGAGEMENT LETTER IN GOOD FAITH, WITH QUALIFIED PERSONNEL IN A COMPETENT AND WORKMANLIKE MANNER IN ACCORDANCE WITH APPLICABLE INDUSTRY STANDARDS. KPMG DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

13. **Limitation on Damages.** Except for your and our respective indemnification obligations as described in these Standard Terms and Conditions, or cases of bad faith or willful misconduct, neither you nor we shall be

liable to the other for any actions, damages, claims, liabilities, costs, expenses or losses arising out of the services performed hereunder for a total amount in excess of two times the fees paid or owing to us for services rendered by us under this engagement. Except with respect to a breach of Paragraph 20 below, in no event shall either you or we be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs). The provisions of this Paragraph shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss, whether in contract, statute, tort or otherwise.

14. **Infringement.**

(a) KPMG hereby agrees to indemnify, hold harmless and defend Client from and against all claims, liabilities, losses, expenses (including reasonable attorneys' fees), fines, penalties, taxes or damages (collectively "Liabilities") asserted by any third party against Client to the extent such Liabilities result from the infringement by the Deliverables of any third party's patents issued as of the date of the Engagement Letter, trade secrets, trademarks or copyrights. The preceding indemnification provision shall not apply to any infringement arising out of the following:

(i) use of the Deliverables other than in accordance with applicable documentation or instructions supplied by KPMG or other than in accordance with Paragraph 15(b);

(ii) any alteration, modification or revision of the Deliverables not expressly agreed to in writing by KPMG; or

(iii) the combination of the Deliverables with materials not supplied or approved by KPMG.

(b) In case any of the Deliverables or any portion thereof is held, or in KPMG's reasonable opinion is likely to be held, in any such suit to constitute infringement, KPMG may, within a reasonable time, at its option, either:

(i) secure for Client the right to continue the use of such infringing item; or

(ii) replace, at KPMG's sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing.

In the event KPMG is, in its reasonable discretion, unable to perform either of the options described in (i) or (ii) above, Client shall return the Deliverable to KPMG, and KPMG's sole liability shall be to refund to Client the amount paid to KPMG for such item; provided that the foregoing shall not be construed to limit KPMG's indemnification obligation set forth in Paragraph 14(a) above.

(c) The provisions of this Paragraph 14 state KPMG's entire liability and Client's sole and exclusive

**February 16, 2006**



**Delphi Standard Terms and Conditions**    **Appendix A**
**For Transaction Services Engagements**    **Page 4**

remedy with respect to any infringement or claim of infringement.

15. **Indemnification.**

(a) Each party agrees to indemnify, hold harmless and defend the other party from and against any and all Liabilities for physical injury to, or illness or death of, any person or persons regardless of status, and damage to or destruction of any tangible property, which the other party may sustain or incur, to the extent such Liabilities result from the negligence or willful misconduct of the indemnifying party.

(b) Except as otherwise required by law, as permitted by the Engagement Letter, or as provided in paragraph 20(e) below with respect to any proposed or completed transaction, Client acknowledges and agrees that any advice, recommendations, information or work product provided to Client by KPMG in connection with this Engagement is for the confidential use of Client, may not be relied upon by any third party, and Client will not disclose or permit access to such advice, recommendations, information or work product to any third party or summarize or refer to such advice, recommendations, information or work product or to KPMG's engagement under the Engagement Letter without, in each case, KPMG's prior written consent. In furtherance of the foregoing, Client will indemnify, defend and hold harmless KPMG from and against any and all Liabilities suffered by or asserted against KPMG in connection with a third party claim to the extent resulting from such party's use or possession of or reliance upon KPMG's advice, recommendations, information or work product as a result of Client's use or disclosure of such advice, recommendations, information or work product.

(c) The party entitled to indemnification (the "Indemnified Party") shall promptly notify the party obligated to provide such indemnification (the "Indemnifying Party") of any claim for which the Indemnified Party seeks indemnification. The Indemnifying Party shall have the right to conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense, and the Indemnified Party shall cooperate with the Indemnifying Party. The party not conducting the defense shall nonetheless have the right to participate in such defense at its own expense. The Indemnified Party shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages.

(d) Our standard terms and conditions relating to indemnification are modified and amended to the extent that neither party will be indemnified, and its limitation of liability will not apply, to bad faith, self-dealing or a breach of fiduciary duty (if any), gross negligence or willful misconduct.

16. **Cooperation; Use of Information.**

(a) Client agrees to cooperate with KPMG in the

performance of the services under the Engagement Letter and shall provide KPMG with timely access to and use of Client's and Target's personnel, facilities, equipment, data and information to the extent necessary for KPMG to perform the services under the Engagement Letter. The Engagement Letter may set forth additional obligations of Client in connection with this Engagement. Client acknowledges that Client's failure to assign Client personnel having skills commensurate with their role with respect to this Engagement could adversely affect KPMG's ability to provide the services under the Engagement Letter.

(b) KPMG will base its conclusions on the facts and assumptions that Client's and Target's personnel and advisors submit and will not independently verify this information. Inaccuracy or incompleteness of the information submitted to KPMG could have a material effect on KPMG's conclusions. In rendering its advice, KPMG may consider, for example, the applicable provisions of the Internal Revenue Code of 1986 and ERISA as amended, and the relevant state and foreign statutes, the regulations thereunder, income tax treaties, and judicial and administrative interpretations thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of KPMG's advice. KPMG will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Client separately engages KPMG to do so in writing after such changes or modifications.

(c) Treasury regulations under IRC section 6011 require taxpayers to disclose to the IRS their participation in reportable transactions. Client agrees to use its best efforts to promptly inform KPMG of any transaction covered by this Engagement that is required to be disclosed as a reportable transaction to the IRS or to any state or other jurisdiction adopting similar or analogous provisions. Treasury regulations under IRC section 6112 provide that KPMG must retain lists of investors in reportable and registerable transactions if we are a material advisor with respect to the transactions, and states or other jurisdictions may adopt similar or analogous provisions. Therefore, if KPMG determines that Client has participated in a reportable or registerable transaction, KPMG may place Client's name and information on a list. This list may later be requested by the IRS or other tax authority and KPMG ultimately may be required to provide it; however, KPMG will advise Client if KPMG provides Client's information to the IRS or other tax authority.

(d) Information relating to advice KPMG provides to Client, including communications between KPMG and Client and material KPMG creates in the course of providing advice, may be privileged and protected from disclosure to the IRS or other governmental authority. Should such an authority seek disclosure from KPMG of written or oral communications relating to such advice, KPMG will discuss with Client opportunities for asserting

**February 16, 2006**



**Delphi Standard Terms and Conditions**          **Appendix A**
**For Transaction Services Engagements**             **Page 5**

the privilege. As KPMG is not able to assert the privilege on Client's behalf with respect to any communications for which privilege has been waived, Client agrees to notify KPMG of any such waivers, whether resulting from communications with KPMG or third parties in the same or a related matter. Client also understands that privilege may not be available for communications with an audit client and that KPMG personnel providing audit and non-audit services will discuss matters that may affect the audit to the extent required by applicable professional standards.

17. **Force Majeure.** Neither Client nor KPMG shall be liable for any delays resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

18. **Limitation on Actions.** No action, regardless of form, arising out of or relating to this Engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for non-payment may be brought by a party not later than one year following the date of the last payment due to such party under the Engagement Letter.

19. **Independent Contractor.** It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is or shall be considered an agent, distributor or representative of the other. Neither party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

20. **Confidentiality.**

(a) "Confidential Information" means all documents, software, reports, data, records, forms and other materials obtained by one party (the "Receiving Party") from the other party (the "Disclosing Party") in the course of performing the services under the Engagement Letter: (i) that have been marked as confidential; (ii) whose confidential nature has been made known by the Disclosing Party to the Receiving Party; or (iii) that due to their character and nature, a reasonable person under like circumstances would treat as confidential. Notwithstanding the foregoing, Confidential Information does not include information which: (i) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (iv) relates to the tax treatment or tax structure of any transaction as further described in Paragraph 20(e) below; (v) KPMG determines is required to be maintained by KPMG under section 6112 of the Internal Revenue Code and the regulations thereunder or similar or analogous provisions of a state or other jurisdiction; or (vi) is received by the Receiving Party from a third party without

restriction and without a breach of an obligation of confidentiality.

(b) The Receiving Party will deliver to the Disclosing Party all Confidential Information of the Disclosing Party and all copies thereof when the Disclosing Party requests the same, except for one copy thereof that the Receiving Party may retain for its records. The Receiving Party shall not use or disclose to any person, firm or entity any Confidential Information of the Disclosing Party without the Disclosing Party's express, prior written permission; provided, however, that notwithstanding the foregoing, the Receiving Party may disclose Confidential Information to the extent that it is required to be disclosed pursuant to a statutory or regulatory provision or court order or to fulfill professional obligations and standards.

(c) Each party shall be deemed to have met its nondisclosure obligations under this Paragraph 20 as long as it exercises the same level of care to protect the other's information as it exercises to protect its own confidential information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

(d) If the Receiving Party receives a subpoena or other validly issued administrative or judicial demand requiring it to disclose the Disclosing Party's Confidential Information, the Receiving Party shall provide prompt written notice to the Disclosing Party of such demand in order to permit it to seek a protective order. So long as the Receiving Party gives notice as provided herein, the Receiving Party shall be entitled to comply with such demand to the extent permitted by law, subject to any protective order or the like that may have been entered in the matter.

(e) Notwithstanding anything to the contrary set forth herein, no provision in the Engagement Letter or these Standard Terms and Conditions is or is intended to be construed as a condition of confidentiality within the meaning of Internal Revenue Code sections 6011, 6111, 6112 or the regulations thereunder, or under any similar or analogous provisions of the laws of a state or other jurisdiction. Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction within the scope of this Engagement that reduces or defers federal tax and all materials of any kind (including opinions and other tax analyses) that are provided to Client relating to such tax treatment and tax structure. If a state or other jurisdiction adopts provisions that are similar or analogous to those in IRC sections 6011, 6111, or 6112 or the regulations thereunder, the authorization to disclose in the preceding sentence also shall apply to any transaction within the scope of this Engagement that is subject to such provisions of that state or other jurisdiction.

21. **Survival.** The provisions of Paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24,

**February 16, 2006**



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

**Appendix A**
**Page 6**

25(a), and 27 hereof shall survive the expiration or termination of this Engagement.

22. **Assignment.** Neither party may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other party, such consent not to be unreasonably withheld. Notwithstanding the foregoing, to the extent any of the services under the Engagement Letter will be performed in or relate to a jurisdiction outside of the United States, Client acknowledges and agrees that such services, including any applicable tax advice, may be performed by the member firm of KPMG International practicing in such jurisdiction. Accordingly, Client agrees that KPMG may share data and information received from Client with such member firm as may be required to complete this Engagement.

23. **Severability.** In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this Agreement shall not be affected, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

24. **Governing Law.** The Engagement Letter and these Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws provisions thereof.

25. **Miscellaneous.**

    (a) Except as otherwise set forth in the Engagement Letter, in accepting this Engagement, Client acknowledges that completion of this Engagement or acceptance of Deliverables resulting from this Engagement will not constitute a basis for Client's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). This Engagement shall not be construed to support Client's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

    (b) KPMG may communicate with Client by electronic mail or otherwise transmit documents in electronic form during the course of this Engagement. Client accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices) and agrees that it may rely only upon a final hardcopy version of a document or other communication that KPMG transmits to Client.

    (c) For engagements performed in California or where the services provided by KPMG fall under the jurisdiction of California law, rule or regulation, Client acknowledges that certain of KPMG's personnel that have an ownership interest in the partnership and who may provide services in

connection with this Engagement may not be licensed as certified public accountants under the laws of any of the various states.

26. **Entire Agreement.** These terms, and the Engagement Letter including Exhibits, constitute the entire agreement between KPMG and Client with respect to this Engagement and supersede all other oral and written representations, understandings or agreements relating to this Engagement.

27. **Alternative Dispute Resolution.**

    (a) Any dispute or claim arising out of or relating to the Engagement Letter, the services provided hereunder, or any other services provided by or on behalf of KPMG or any of its subcontractors or agents to Client or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit A attached hereto, which constitute the sole methodologies for the resolution of all such disputes. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction. Mediation, if selected, may take place at a location to be designated by the parties. Arbitration shall take place in New York, New York. Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

    (b) Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks or logos, solely in the courts of the State of New York or in the courts of the United States located in the State of New York. The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes.

    (c) Our standard terms and conditions relating to the Dispute Resolution procedures are modified by providing that any dispute or claim also may be resolved before the United States Bankruptcy Court for the Southern District of New York.

**February 16, 2006**



**Delphi Standard Terms and Conditions**          Appendix A
**For Transaction Services Engagements**          Page 7

### Exhibit A

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(i) **Mediation.** Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Institute for Dispute Resolution Mediation Procedures (effective April 1, 1998), with the exception of paragraph 2 which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

(ii) **Arbitration.** Arbitration shall be used to settle the following disputes: (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the Engagement Letter, or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the

CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the Arbitration Rosters maintained by any JAMS office in the United States. If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

**February 16, 2006**

EXHIBIT D

May 22, 2006

**PRIVATE**

Mr. Robert Sparks
General Tax Counsel – International
Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

**Re: Transfer pricing services involving certain transactions between U.S. and Canadian affiliates**

Dear Bob:

KPMG LLP ("KPMG") is pleased to help Delphi Corporation ("Delphi" or "Company") develop transfer prices on certain transactions between its related party affiliates in the U.S. and Canada.[1] This letter confirms the scope and related terms of KPMG's transfer pricing work for Delphi.

**PROJECT SCOPE**

This engagement is limited to KPMG's review of the transfer pricing methods applied to the following intercompany transactions between Delphi's U.S. and Canadian affiliates:

1) Tangible product sales from the U.S. affiliate to the Canadian affiliate;

2) Sharing of research and development costs among U.S. and Canadian affiliates; and

3) Administrative services provided by the U.S. affiliate to the Canadian affiliate.

With regard to these transactions, KPMG will review Company documents and interview Company personnel to establish an understanding of key facts and circumstances. Based on such information gathering, as well as consideration of relevant transfer pricing regulations[2], KPMG will prepare a formal report documenting our recommendations regarding the structure of the transactions and the establishment of transfer prices that are designed to satisfy the arm's length standard. More specifically, KPMG will conduct the following activities during the course of this engagement:

*Tangible-Product Transactions*

- Interview knowledgeable personnel in Dayton and Toronto regarding the nature of intercompany transactions, including the assignment of functions and risks;

- Review Delphi's comparable company benchmarking analysis for reasonableness;

- Review the "cost-competitive adjustments" applied to Delphi's tested-party results for comparability with third-party benchmarks;

- Assess the appropriateness of any "comparable uncontrolled prices" identified by management;

---

[1] This engagement is not intended to provide transfer pricing documentation under Internal Revenue Code section 6662(e) and the associated regulations for U.S. compliance purposes or those of any other jurisdiction relevant to Delphi.

[2] Internal Revenue Code §482 and related Treasury Regulations, as well as the Canadian transfer pricing guidelines.

- Select the most appropriate method (or "best method" for US purposes) with which to test arm's length pricing for tangible-product transactions;

*Services Transactions*

- Review the existing R&D cost sharing agreement, and consider its appropriateness in light of each affiliate's actual contributions and the applicable transfer pricing regulations;

- Analyze administrative services expenses charged from the U.S. affiliate to the Canadian affiliate; document an understanding of the cost base included in the charges, and assess the appropriateness of the allocation keys;

At the conclusion of the information gathering and analysis phases, KPMG will prepare a formal report which will summarize all pertinent facts and circumstances, and present our recommendations and related rationale. We understand that KPMG's report will be used to support your internal management discussions, and might be included as a supporting analysis in Delphi's overall transfer pricing documentation.

During this analysis, KPMG may learn facts or identify data that would necessitate changes to the approaches proposed or expand the scope of our analyses. If such changes occur that materially impact the scope of the project and the fees associated with our work, KPMG would notify Delphi and would not conduct any work without your approval.

## PROJECT TIMING

We are prepared to commence work on this engagement immediately upon receiving an original signed copy of this letter from you authorizing us to proceed. We will be prepared to discuss our preliminary findings within 2 to 3 weeks of beginning work on the project. Our draft report will be completed thereafter, and will be provided to you for your review. After receiving your comments, we will prepare and issue a final version of the report.

## PROJECT TEAM

I will have overall responsibility for the quality and timeliness of project deliverables. In addition, I will be directly responsible for reviewing the R&D cost sharing and administrative services agreements, and outlining KPMG's related positions.

Jerry Klopfer, a Managing Director in the Chicago office, will be responsible for the day-to-day conduct of the project. As part of these responsibilities, Jerry will interview Delphi's U.S.-based management team, coordinate the efforts of KPMG's Canadian member firm, and draft the report. Jerry will be supported by experienced associates from our Chicago office, as necessary to complete the work.

Francois Vincent, Partner in-charge of the Canadian transfer pricing practice, will lead the Canadian transfer pricing team working on this project. Francois will also play an integral role in assessing the appropriateness of the R&D cost sharing and administrative services agreements from a Canadian perspective.

Joe Devitt, an economist with KPMG's Canadian member firm, will be responsible for visiting the Canadian location, and interviewing personnel regarding functions and risks. Both Francois and Joe will be involved in the decision-making process regarding best method selection, and will otherwise review and influence all substantive outputs of the project. Joe will be supported by experienced associates from KPMG's Toronto office, as necessary, to complete the work.

Team member resumes are available at your request.

## PROFESSIONAL ARRANGEMENTS

KPMG's professional fees are based on the amount of time we spend and are not dependent on the outcome of our analysis. Our fee for this engagement will be the <u>lesser</u> of actual time incurred to complete the project at our standard hourly rates, or $45,000. Based on our experience with similar projects, we expect that our fees for this engagement will range between approximately $35,000 and $45,000.

In addition, we will bill you for administrative costs (e.g., document reproduction, database usage, administrative support, etc.) and out-of-pocket expenses (e.g., travel, lodging, meals, etc.).

Our ability to meet the proposed schedule and fee estimate depends on our receiving timely factual and financial information from Delphi as requested. Circumstances encountered during the performance of these services that warrant additional time or expense could cause us to be unable to deliver them within the above estimates. We will endeavor to notify you of any such circumstances as they are assessed. If such matters exceed the scope of this engagement letter, we will issue separate engagement letters to confirm the scope and related terms of any additional engagements.

This fee quote is valid for 60 days from the date of this letter. If Delphi wishes to engage KPMG to perform this study later than 60 days from the date of this letter, we would need to issue a revised letter and fee quote.

Our fees for this engagement will be progress billed monthly, in accordance with the standards and procedures as set forth in the Bankruptcy Code.

## STANDARD TERMS AND CONDITIONS

The terms and conditions, travel and per diem reimbursement, and dispute resolution procedures which shall apply to this engagement are attached as Exhibits A, B, and C, respectively. These are the same Exhibits previously attached to the "KPMG Retention Application" submitted to the Bankruptcy Court on or about February 16, 2006. To the terms and conditions (Exhibit A), we also incorporate the following modifications to these terms and conditions

> **Item 10. Limitation of Liability** – The first sentence is changed to read as follows: *Consultant's liability under this Agreement will be limited to the following amounts:*
>
> - *For projects up to $25,000 in fees paid – limitation on damages will be 20 times the fees paid or owing to KPMG for services rendered by KPMG under the Engagement Letter;*
>
> - *For projects between $25,001 and $100,000 in fees paid – limitation on damages will be $500,000;*
>
> - *For projects between $100,001 and $200,000 in fees paid – limitation on damages will be $1,000,000;*
>
> - *For projects greater than $200,000 in fees paid – limitation on damages will be 5 times the fees paid or owing to KPMG for services rendered by KPMG under the Engagement Letter;*
>
> *provided however that this limitation shall not apply (i) in the event of any breach of Section 16 below relating to Delphi Proprietary Information, or (ii) if Consultant is found to be grossly negligent or to have acted willfully or fraudulently.*

We do not anticipate that the written tax advice provided under this engagement letter will rise to the level of a Covered Opinion as defined in §10.35 of Circular 230 ("Covered Opinion") or be

used by Delphi for purposes of avoiding penalties. Therefore, all the written tax advice provided under this engagement letter will contain the following legend:

> ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

However, if our services will rise to the level of a Covered Opinion or will be used by Delphi for purposes of avoiding penalties, we will issue a separate engagement letter.

KPMG applies elevated standards in preparing tax opinions. Under these standards, we must be able to determine that each position on which the opinion provides a conclusion is "more likely than not" to be upheld (i.e., has a greater than 50 percent likelihood of success if challenged by the IRS) if the position does not involve a transaction designated by the IRS as a "listed transaction" within the meaning of Treas. Reg. §1.6011-4, or a transaction with the principal purpose of avoiding or evading any tax imposed by the Internal Revenue Code (a "principal purpose transaction"). If a position relates to a "principal purpose transaction", we must arrive at a "should" confidence level (i.e., approximately a 70 percent or greater likelihood of success if challenged by the IRS) with respect to the position. We will not issue an opinion on any "listed transaction" or any transaction that is substantially similar to a "listed transaction." In determining whether the "more likely than not" and "should" standards are satisfied, we will not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be settled. We will inform you as soon as possible if, during our analysis, we determine circumstances exist that prevent us from issuing the tax opinion under these standards.


## COORDINATION WITH KPMG MEMBER FIRMS

Our services covered by this engagement letter may also necessitate the assistance of a member firm of KPMG International. To the extent that our services under this engagement letter require such assistance, the services will be provided under the direction of KPMG LLP, the U.S. member firm of KPMG International, and will include the participation of one or more other member firms of KPMG International ("KPMG member firms"). KPMG LLP is a separate legal entity from other member firms of KPMG International. Advice relative to tax matters outside the United States will be based on tax advice provided by the KPMG member firm in the particular country and on the relevant tax authorities in that country. In rendering such advice, we may also consider U.S. tax treaties, their technical explanations, and judicial and administrative interpretations thereof.

In certain countries, a KPMG member firm is authorized to provide legal services within its jurisdiction. This engagement letter encompasses only tax services provided by KPMG member firms and does not encompass any legal services a KPMG member firm may be authorized to provide. Should the provision of such legal services not be proscribed by applicable independence rules and should you choose to retain a KPMG member firm to provide legal services, including drafting of documents, in a particular country, you and the KPMG member firm will enter into a separate fee arrangement and engagement letter for the provision of such legal services.

**ACCEPTANCE**

Kindly indicate your acceptance of this proposal by signing and dating below, and returning an original signed copy to our office. This proposal, when signed by you, together with the attached terms and conditions will become the engagement letter. Should you have any questions, please call me at (312) 665-8387 or Jerry Klopfer at (312) 665-2096.

We look forward to providing the transfer pricing services requested, and to working with you and your colleagues.

Sincerely,

Tom Zollo
Principal

Accepted by:

*Delphi Corporation*

Date: 5/25/06

Robert Sparks, General Tax Counsel – International

Enclosure: Standard terms and conditions

cc:      Phil Stoffregen

Jerry Klopfer

Francois Vincent

Joe Devitt



## EXHIBIT A

### GENERAL TERMS AND CONDITIONS

1.    __Agreement.__  It is agreed that KPMG LLP ("Consultant") will provide to Delphi Corporation ("Delphi") the services (the "Services") described in the accompanying engagement letter (the "Engagement Letter") to which this Exhibit A is attached (the Engagement Letter, this Exhibit A and Exhibit B are collectively referred to as this "Agreement"). For purposes of this Agreement, the terms "Consultant" include any affiliates of Consultant identified in the Engagement Letter as performing any of the Services, and the term "Delphi" includes any subsidiaries and affiliates of Delphi for which the Services are performed. This Agreement constitutes the entire and sole agreement between Delphi and Consultant, and merges all prior and contemporaneous communications with respect to the subject matter of this Agreement.

2.    __Independent Contractor.__  Consultant will provide the Services as an independent contractor.  Nothing contained in this Agreement shall be construed to create an employment or principal-agent relationship or joint venture between Consultant and Delphi, and neither party shall have the right, power or authority to obligate or bind the other in any manner whatsoever.

3.    __Personnel.__  All of Consultant's agents, employees, subcontractors and/or independent contractors furnished by Consultant to perform the Services (collectively, "Personnel") are and will remain Consultant's employees and/or independent contractors and, under no circumstances, will any Personnel furnished by Consultant be deemed to be Delphi's employees or agents.  Consultant is solely responsible, at Consultant's sole cost and expense, for (i) the fulfillment of all obligations to Personnel and (ii) the compliance by Consultant and Personnel with this Agreement and all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

4.    __Conduct of Consultant's Personnel.__  Consultant will assure that all Personnel who are performing Services on behalf of Consultant are competent to perform the Services.  Consultant will require all Personnel who are performing any work on Delphi's premises to comply with all of Delphi's regulations and policies.  Delphi, in its sole discretion, has the right to: (a) bar any of Personnel from Delphi's premises for failure to observe Delphi's regulations or policies, (b) require that Consultant promptly remove from Delphi's premises any Personnel who violate any of Delphi's regulations or policies, and (c) require that Consultant cease using any Personnel to perform the services who are reasonably unacceptable to Delphi.  Delphi will confer with Consultant to discuss Delphi's concerns prior to requiring removal of any Personnel. Consultant will replace any barred or removed Personnel with Personnel reasonably acceptable to Delphi.

5.    Non-Solicitation of Employees

A.    Delphi agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Consultant if listed in the engagement letter attached hereto, who have been assigned to or have performed any of the Services contemplated herein.

B.    Consultant agrees that during the term of this Agreement and for a period of one (1) year after the termination of this Agreement, it will not hire or attempt to hire any employees or former employees of Delphi's Tax staff who have participated in the furtherance of this Agreement.

C.    Notwithstanding the provisions of Sections 5A and 5B, neither party shall be prohibited from employing any employee, former employee or personnel of the other who contacts such party (i) on his or her own initiative or (ii) in response to a general solicitation for employment contained in a newspaper or any other publication.

6.    Professional Fees.  Delphi will compensate Consultant for actual Services performed in accordance with the fee schedule set forth in this Agreement (the "Fee Schedule"). Consultant will invoice Delphi no more frequently than monthly. Consultant will submit, with each invoice for payment, a report specifying the actual Services performed and the calculation of the invoiced payment in accordance with the Fee Schedule. Invoices will be due and payable by Delphi within forty-five (45) days of Delphi's receipt of the invoice and corresponding report in the required form.

7.    Expenses.  Delphi will reimburse Consultant for all reasonable costs and expenses Consultant incurs in connection with the Services, including, without limitation, all travel expenses, provided, however, that Consultant must obtain prior approval of Delphi for any individual reimbursable expenses in excess of $1,000 or for reimbursable expenses which exceed or are anticipated to exceed an aggregate of $2,500 during any calendar month. Consultant will not charge any markup, overhead, profit or other fees on the reimbursable expenses. Delphi's reimbursement obligations will be governed by the provisions of Exhibit B.

8.    Taxes.  Unless otherwise agreed in the Engagement Letter, any applicable taxes imposed on Consultant in connection with the performance of the Services (except for taxes imposed on Consultant's income) will be invoiced to, and paid by, Delphi in addition to fees and expenses.

9.    Indemnification.

A.    Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims,

2



demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from third party claims against Consultant based on any of Consultant's written or verbal work product prepared pursuant to this Agreement and furnished by Consultant to Delphi for internal use (such as reports, analyses, projections, advice, recommendations and other data ) (collectively, "Internal Work Product Claims"). In addition, Delphi shall indemnify, defend and hold harmless Consultant, including its directors, officers, employees, agents and representatives, from and against any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses (other than Internal Work Product Claims), to the extent arising out of or resulting from third party claims against Consultant based on any activities of Consultant in connection with the performance of Services under this Agreement (collectively, "Non-Work Product Claims"), **provided, however,** that Delphi will have no obligation to indemnify Consultant to the extent that any Non-Work Product Claims arise out of or result from the negligence, illegal acts or willful misconduct of Consultant and/or its directors, officers, employees, agents or representatives.

B.    Consultant shall indemnify, defend and hold harmless Delphi, including its directors, officers, employees, agents and representatives, from any and all claims, demands, actions, damages, liabilities, costs and expenses, including reasonable attorney fees and expenses, to the extent arising out of or resulting from the negligence, illegal acts or willful misconduct of Consultant and/or its directors, officers, employees, agents or representatives in connection with the performance of Services under this Agreement, **provided, however,** that Consultant will have no obligation to indemnify Delphi to the extent that any such claims or damages arise out of or result from Internal Work Product Claims.

C.    In each case, the indemnifying party shall also pay to the indemnified party any and all costs and expenses incurred in connection with the enforcement of these indemnification provisions.

D.    The indemnification obligations set forth in this Section 9 and the general terms and conditions of this Agreement shall not apply to any tax or other governmental filings prepared by Consultant. The rights and obligations of the parties with respect to such services shall be governed by a separate agreement.

10.    **Limitation of Liability.** Consultant's liability under this Agreement will be limited to twenty (20) times the professional fees paid; provided however that this limitation shall not apply (i) in the event of any breach of Section 16 below relating to Delphi Proprietary Information or (ii) if Consultant is found to be grossly negligent or to have acted willfully or fraudulently. In no event will Consultant or Delphi be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including loss of profits, data, business or goodwill) regardless of whether such liability is based on breach of contract,

3



tort, strict liability, breach of warranties, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

11.    Standard of Performance.  Consultant will use its best skills, resources and judgment to perform the Services in an efficient and economical manner and in accordance with the highest professional standards.  If any Services are not completed to Delphi's reasonable satisfaction, Consultant will, at no additional cost to Delphi, take reasonable steps to correct any deficiencies.  The express warranties in this Paragraph and in this Agreement shall be in lieu of all other warranties, express or implied, including the implied warranty of merchantability and fitness for a particular purpose.

12.    Reliance on Information/Authorities.  Consultant will base its conclusions on the facts and assumptions that Delphi submits and will not independently verify this information.  Inaccuracy or incompleteness of the information Delphi provides could have a material effect on Consultant's conclusions.  In rendering its advice, Consultant may consider, for example, the applicable provisions of the Internal Revenue Code of 1986, and ERISA as amended, and the relevant state statutes, the regulations thereunder, and judicial and administrative interpretations thereof.  These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of Consultant's advice.  Consultant will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Delphi separately engages Consultant to do so after such changes or modifications.

13.    Legal Counsel.  Delphi should consult with and/or engage legal counsel for the purpose of advising on non-tax legal aspects of matters on which Consultant provides tax advice and drafting any legal documents and/or agreements that may be required in connection therewith.  Consultant will provide Delphi's legal counsel with tax-related advice that is deemed necessary by Delphi's legal counsel to draft such documents and/or agreements.  To the extent Services of legal counsel or other professional service providers are required, Delphi is responsible for engaging and paying such service providers.

14.    Federal Confidential Communications Privilege.  A confidentiality privilege under Internal Revenue Code Section 7525 may pertain to certain communications between Consultant personnel and Delphi regarding federal tax advice provided pursuant to this engagement.  By retaining Consultant, Delphi agrees that Consultant is instructed to claim the privilege on Delphi's behalf, with respect to any applicable communications, up to and until such time as Delphi may waive any such privilege in writing.  As disclosure of any such confidential communications to the Internal Revenue Service or other third party may cause any confidentiality privilege to be waived, Delphi should notify Consultant if the Internal Revenue Service or other third party requests information about any tax advice or tax advice documents provided by Consultant.

4



Delphi understands that Consultant makes no representation, warranty, or promise, and offers no opinion with respect to the applicability of such confidentiality privilege to any communication. Delphi agrees to indemnify Consultant for any attorney's fees and other costs and expenses incurred by Consultant in defending the confidentiality privilege on Delphi's behalf. Consultant agrees to promptly notify Delphi of any claim for which Consultant seeks indemnification and Delphi shall have the right to conduct the defense or settlement of any such claim at Delphi's sole expense, and Consultant shall cooperate with Delphi. Consultant shall nonetheless have the right to participate in such defense at its own expense and to approve the settlement of any claim hereunder that imposes liability or obligation.

15.    **Disclosure and Restriction on Use.**    If this engagement relates to a strategy offered by Consultant to Delphi that is designed to reduce or defer federal income tax for a direct or indirect corporate participant, pursuant to Treasury Regulation section 301.6111-2(c), Delphi (and each employee, representative, or other agent of Delphi) is expressly authorized to disclose the structure and tax aspects of the strategy with any and all persons, without limitation of any kind.

Written advice provided by Consultant to Delphi is for the information and use of Delphi only and may not be relied upon by any third party without the express written permission of Consultant.

16.    **Non-Disclosure of Delphi Proprietary Information.**

A.    "Delphi Proprietary Information" means any information concerning the business and affairs of Delphi, which is not publicly available at the time disclosed to, or learned by, Consultant or any Personnel. Delphi Proprietary Information includes, without limitation, this Agreement and any written or verbal work product prepared pursuant to this Agreement (such as reports, analyses, projections, advice, recommendations and other data); trade secrets; product specifications; data; know-how; formulae; compositions; processes; designs; sketches; photographs; samples; inventions; concepts; ideas; past, current and planned research and development; past, current and planned manufacturing or distribution methods and processes; price lists; marketing and business plans, methods and processes; financial results and information; reports; computer software and programs (including object code and source code); databases; notes; analyses; compilations; studies; and other materials or intangibles. Delphi Proprietary Information also includes any materials or information that contain or are based on any other Delphi Proprietary Information, whether prepared by Delphi, Consultant, Personnel or any other person. Information will be conclusively deemed Delphi Proprietary Information if it is marked "Proprietary" or "Confidential" or with an equivalent legend at the time it is disclosed. Any information transmitted orally will be conclusively deemed Delphi Proprietary Information if Delphi notifies Consultant that it is proprietary within a reasonable time following oral disclosure. The failure, however, to mark information as "Proprietary" or "Confidential" or to notify Consultant that oral information is proprietary will not affect the

5



information's proprietary nature. Delphi Proprietary Information does not include any trade secrets; data; know-how; formulae; compositions; processes; designs; sketches; inventions; concepts; ideas; methodologies, and techniques; models; templates; general purpose consulting and software tools previously created, acquired, owned or developed or independently developed by Consultant in the performance of the Services without reference to Delphi's Proprietary Information.

B.    In connection with Consultant's performance of Services, Delphi may disclose Delphi Proprietary Information to Consultant and Personnel. All Delphi Proprietary Information disclosed, furnished or made available to Consultant and/or Personnel and all Delphi Proprietary Information generated or developed by Consultant and/or Personnel will be treated and maintained as confidential by Consultant and Personnel, will not be disclosed to any third parties, either in whole or in part, except upon Delphi's prior written authorization, and will be used by Consultant and Personnel only for the purpose of performing the Services in accordance with this Agreement, in all cases using the same degree of care and discretion to avoid disclosure, publication or dissemination of such Delphi Proprietary Information that Consultant uses with respect to its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable degree of care and discretion). Before Consultant or Personnel discloses any information that could, under any circumstances, constitute Delphi Proprietary Information, Consultant will obtain Delphi's written consent. Neither Consultant nor Personnel will remove any Delphi Proprietary Information from Delphi's premises unless Delphi authorizes the removal in writing. Consultant will be responsible and liable to Delphi for the violation by any of Personnel of these confidentiality obligations.

C.    The foregoing obligations under this Section 16B of this Exhibit A shall not apply to the extent that any Delphi Proprietary Information (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than Consultant and Personnel, (ii) is subsequently learned by Consultant or Personnel from a third party that has a legal right to make such disclosure and does not impose an obligation of confidentiality on the receiving party, (iii) was known to Consultant or Personnel at the time of disclosure by Delphi, (iv) was generated independently by Consultant or Personnel before disclosure by Delphi, or (v) is required to be disclosed by Consultant or Personnel by law, subpoena or other process.

17.    Assignment and Subcontracting.  Consultant will not assign or subcontract any portion of its responsibilities under this Agreement without Delphi's prior written approval.  To the extent any of the services under the Engagement Letter will be performed in or relate to a jurisdiction outside of the United States, Client acknowledges and agrees that such services may be performed by the member firm of KPMG International practicing in such jurisdiction. Accordingly, Client consents to KPMG's disclosure to a member firm and such member firm's use of information received from Client for the purpose of providing services under the Engagement Letter.

Oct-12-06    23:38aa    From-KPMG LLP - NYPFS                    212 903 5800              T-820    P 314/318    F-451



18.    Changes and Delays.

    A.    In the event that (i) Delphi requires a change in the scope of the Services, (ii) any change of applicable law or regulation affects the timing or performance of the Services or (iii) any action by Delphi or a third party (other than Personnel) affects the timing or performance of the Services, subject to the mutual agreement of Delphi and Consultant, the fees and/or schedule for performance for the Services will be equitably adjusted by the parties.

    B.    To the extent that the Engagement Letter provides that Consultant's performance under this Agreement is contingent upon specific action or cooperation of Delphi, including the supply to Consultant of specific resources, approvals, and information, any delays in Consultant's performance which occur as a result of the failure or untimely performance by Delphi shall be excused to the extent of any such delay or untimely performance by Delphi and Consultant shall not incur any liability to Delphi as a result of any such delay or untimely performance by Delphi.

19.    Term and Termination. This Agreement will terminate when the Services have been completed. In addition, either party may terminate this Agreement in the event of the breach by the other party of this Agreement, which breach is not cured within thirty (30) days after notice by the non-breaching party. Delphi shall pay Consultant for Services performed prior to the effective date of termination as well as expenses incurred prior to the effective date of termination and approved by Delphi in accordance with Section 7 of this Exhibit A.

20.    Conflict. In the event of any conflict, ambiguity or inconsistency between this Agreement and any other agreement relating to the Services, including any preprinted terms and conditions on Delphi's purchase orders, the terms and conditions of this Agreement shall govern.

21.    Survival. The provisions of this Agreement, which give the parties rights beyond termination of this Agreement, will survive any termination of this Agreement.

22.    Severability. If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or part, the remaining portions of this Agreement shall remain in effect.

23.    Amendment. This Agreement shall not be modified except by a later written agreement signed by both parties.

24.    Alternative Dispute Resolution.

    A.    Any dispute or claim arising out of or relating to the Engagement Letter between the parties, the services provided thereunder, or any other services provided by or on

7

behalf of Consultant or any of its subcontractors or agents to Delphi or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit C attached hereto, which constitute the sole methodologies for the resolution of all such disputes. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction. Mediation, if selected, may take place at a location to be designated by the parties. Arbitration shall take place in Detroit, Michigan. Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

B.    Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks or logos, solely in the courts of the State of Michigan or in the courts of the United States located in the State of Michigan. The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes.

25.    Miscellaneous.

A.    For engagements where services will be provided by KPMG through offices located in California, Client acknowledges that certain of KPMG's personnel who may be considered "owners" under the California Accountancy Act and implementing regulations (California Business and Professions Code section 5079(a); 16 Cal. Code Regs. sections 51 and 51.1) and who may provide services in connection with this engagement, may not be licensed as certified public accountants under the laws of any of the various states.

B.    Where KPMG is reimbursed for expenses, it is KPMG's policy to bill clients the amount incurred at the time the good or service is purchased. If KPMG subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, KPMG does not credit such payment to Client. Instead, KPMG applies such payments to reduce its overhead costs, which costs are taken into account in determining KPMG's standard billing rates and certain transaction charges that may be charged to clients.

8

Oct-12-05    03:35am    From-KPMG LLP - NCPPS                    013 003 0500        T-020  P.012/015  F-481



## EXHIBIT E

### Travel and Per Diem Reimbursement

A.    If Personnel are required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel and per diem expenses, subject to prior written approval of Delphi, will be reimbursable as follows:

1.  Air Travel          Economy/Coach class only. Business class is permitted only upon prior written consent by Delphi.

2.  Hotel              Consultant will exercise good, sound business judgment and discretion in choosing hotels, such as moderately priced chain hotels or hotels that offer discounted corporate rates. Where extended travel is involved, reduced rates may be available and should be requested.

3.  Rental cars        Compact or intermediate class only. The cost of collision damage waiver and personal accident insurance is the responsibility of Consultant.

4.  Mileage Allowance   Reimbursement will be at the then current IRS rate (currently $0.405 per mile) for the miles which are in excess of his or her normal commute from home to work and back. When permanently assigned to another location, even if the new location is temporary, Consultant will not be reimbursed for excess miles, additional driving time, etc.

5.  Expense Reports     If requested, Consultant will provide receipts for all reimbursable expenses, including meals and other expenditures, in excess of $25.00 or more.

6.  Meals              Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours. Reimbursements for meals will be the actual and reasonable expenses paid by Consultant.

7.  Extended Travel     Consultant should review the home visit policy prior to a trip. Generally, the following provisions apply:

                       If the travel expense is less than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent location every week.

                       If the travel expense is more than the living expense in the temporary location, Consultant will be reimbursed for travel to the permanent location every two

9

**KPMG**

weeks.

Except expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

**8.  Miscellaneous**

When Consultant chooses an alternative method of transportation, e.g., to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report forms.

Consultant is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Consultant will make all travel arrangements through Global Experts in Travel (GET), or other designated supplier, using a special account set up for such purposes.

Any cash advance by Consultant to its employee is the responsibility of Consultant.

**9.  Per Diem**

In certain instances, a per diem will be paid to Consultant in accordance with Delphi's standard per diem policy.

B.      All travel and per diem for which Consultant seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

10

Oct-11-05    02:37pm    From-KPMG LLP - HOPPS                313 853 8500              T-926  P.014/215  F-497

## EXHIBIT C

### Dispute Resolution Procedures

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

### Mediation

Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Mediation Procedures (Effective April 1, 1998), with the exception of paragraph 2 which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

### Arbitration

Arbitration shall be used to settle the following disputes:  (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or  (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the engagement letter or contract between the parties, or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the Arbitration Rosters maintained by any JAMS Office in the United States. If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened

11

selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

12

<u>EXHIBIT E</u>



**KPMG LLP**
99 High Street
Boston, MA 02110-2371

| | |
|---|---|
| Telephone | 617 988 1000 |
| Fax | 617 988 0800 |
| Internet | www.us.kpmg.com |



October 30, 2006

Thomas S. Timko
Chief Accounting Officer & Controller
Jim Enzor
Finance Director, Finance Restructuring Initiative
Delphi Corporation
5725 Delphi Drive
Troy, MI 48098-2815

On behalf of KPMG LLP ("KPMG"), we appreciate the opportunity to provide Delphi Corporation with professional services to assist management with an assessment of the financial close, consolidation and management reporting. This letter, which serves as our engagement letter, and the attached standard terms and conditions, set forth the terms of our engagement.

**Objectives**

The objective of this engagement is to help Delphi Corporation with improving the financial close, consolidation and management reporting process. KPMG has broken down the engagement into a weekly approach.

KPMG's personnel will work with Delphi Corporation's personnel in conducting this engagement.

**Scope**

The scope of our work will focus in two primary areas Delphi's monthly close, consolidation and management reporting process and the Future State of the Finance Function:
We have been requested to visit the following locations in order to develop a broader understanding during this review phase.

- Corporate

- Two divisional accounting locations (Electronic & Safety and Packard)

- One plant location for each division

- One international location for each division (e.g. France & Germany). This will include the division's European Headquarters, Accounting Service Center and a plant



Page 2
Thomas S. Timko
Delphi Corporation
October 30, 2006

The above locations will be finalized by Delphi Corporation prior to the engagement start date in order to facilitate planning by the engagement team.

**Project Approach, Activities and Timing**

In light of the project objectives and scope described above, a summary of the activities that KPMG may conduct are as follows:

KPMG's Quality Close & Reporting Methodology provides a flexible approach to support improvement of the financial close and reporting process. The timing is elapsed time and it takes in to consideration the number of holidays in November. We have broken down our engagement activity and timing as follows:

## Week 0: Project Planning

- Finalize project plan to include strategy for site visits, interview and workshop schedules and multiple Stakeholder reviews and updates

## Weeks 1-6: Finance Restructuring

- Confirm project logistics and schedules (i.e. sites visits, interviews, workshops and stakeholder presentations)
- Develop a vision and a draft of the guiding principles of the Finance organization, addressing its roles and current processes (e.g. standardization, technology and controls)
- Interview Finance Management staff to gain an understanding of their goals
- Compare current finance organization alignment, structure and process standardization to industry leading practices and management goals
- Interview the leads in the Budgeting and Forecasting group to gain an understanding of their goals
- Confirm and re-validate the vision and guiding principles of the Controller's Organization
- Assess the Change Management needs and develop a "go forward" plan
- Obtain an understanding of the current Finance / IT technology structure including common systems, management reporting, outsourcing support, etc.
- Obtain an understanding of the current roles & responsibilities for the individuals in the Finance Restructuring Program Office

## Week 1: Corporate Accounting Follow-up Review

- Follow up interviews and meetings with Corporate Consolidation and Reporting group to expand on our initial workshop interviews
- Meet with IT Accounting group to discuss allocations
- Perform data mining and analysis of the trail balance resubmissions, Corporate Journal Vouchers



Page 3
Thomas S. Timko
Delphi Corporation
October 30, 2006

- Draft detailed process maps of the Corporate Close, Consolidation and Internal and External Reporting (refer to High Level Close Process Map documented during our initial workshop)
- Gain an understanding of the legal entity and management reporting processes (e.g. Hyperion utilization)
- Assess the current multiple Charts of Accounts (i.e. Hyperion, SAP, DGL and others)

## Weeks 2-6: Division Reviews - Electronic & Safety and Packard):

- Interview key finance professionals to obtain an understanding of their goals
- Develop an understanding of the global plan for SAP implementation
- Document existing process flows (processes and data)
- Obtain an understanding of the division management reporting process comparing internal to corporate
- Identify potential improvements to address control deficiencies all ready identified by management
- Develop observations and recommendations focused on an integrated approach considering people, process, technology and controls
- Perform GAP analysis comparing divisional processes to industry leading practices as observed by KPMG
- Review the roles and responsibilities of the division controller's function
- Confirm corporate level observations with Management

## Week 7: Corporate Accounting Re-visit and Validation:

- Validation and Integration of Business Unit reviews back to the Corporate accounting Group
- Compare entity trial balance submissions to the corporate consolidation process
- Assist management to build an action plan to remediate potential gaps identified in the assessment
- Perform GAP analysis of corporate processes to industry leading practices as observed by KPMG
- Validate the guiding principles with management that were developed during Weeks 1-6
- Perform a high level benchmark of the Corporate Controllers Organization
- Identify potential improvements to address control deficiencies all ready identified by management

## Weeks 7-9 Report Preparation and Project Stakeholders Reviews:

- Document findings and recommendations
- Prepare a roadmap to move forward
- Assist in drafting a Business Case for the Finance Restructuring Program
- Develop next steps plan and proposal



Page 4
Thomas S. Timko
Delphi Corporation
October 30, 2006

- Present report to stakeholders

## Deliverables

Draft deliverables will be provided to the project sponsor for review and comment, prior to final delivery. We will also provide weekly status update report that will be distributed to the project Stakeholders. The final deliverables for this engagement will generally consist of the following Delphi Corporation approved documents:

### Week 1:

- Project plan and strategy for site visits
- Draft  vision and guiding principles
- Initial Status Report to confirm the format and content of the weekly status reports
- Process maps for the corporate consolidation process

### Week 6: Division Deliverables

- Existing  "As Is" process flows (processes and data)
- Documented management reporting process internal versus corporate
- Listing of bottlenecks, issues, obstacles to the process
- List of potential improvements to address control deficiencies all ready identified by management
- Observations and recommendations focused on people, process, technology and controls
- Draft gap analysis of current divisional close and reporting processes to industry leading practices
- Mid-project status report

### Week 7: Corporate Deliverables

- A draft action plan to remediate potential gaps identified in the assessment
- Gap analysis comparing current corporate processes to industry leading practices
- Guiding principles for financial close process
- A list of potential improvements to address control deficiencies
- Conduct meeting to review draft report with Corporate team and project Stakeholders

### Weeks 7: Finance Restructuring Deliverables

- Financial Vision/Architecture for the finance organization to include
  - ➢ Guiding principles and industry leading practices
  - ➢ Organization alignment and structure
  - ➢ Process standardization opportunities



Page 5
Thomas S. Timko
Delphi Corporation
October 30, 2006

> ➤ Joint Finance / IT technology vision to include common systems, management reporting, outsourcing support, etc.
> ➤ Draft of roles & responsibilities for the individuals in the Finance Restructuring Program Office
> ➤ Draft Business Case for the Finance Restructuring Program
- • Conduct meeting to review draft results with project Stakeholders

## Weeks 8 and 9: Final Phase 1 Deliverables and Stakeholder Reviews

- • Findings and recommendations
- • Finance Restructuring Business Case
- • Roadmap to move forward
- • Next steps plan and proposal
- • Present report to team and stakeholders
- • Finalize Phase 1 report and Business Case to include a "go forward" plan

The draft deliverables will be provided to the project sponsor for review, comment and approval prior to final delivery. KPMG may send final reports/deliverables electronically for Delphi Corporation's convenience. However, only the final hard-copy report should be viewed as our work product.

The deliverables presented as part of this engagement are for the internal use of Delphi Corporation's management, the Audit Committee, and Board of Directors and are not to be distributed externally to third parties, in whole or in part, without prior written consent from KPMG in each instance, or used for any other purpose. We disclaim any intention or obligation to update or revise the observations whether as a result of new information, future events or otherwise. Should additional documentation or other information become available which impacts upon the observations reached in our deliverables, we reserve the right to amend our observations and summary documents accordingly.

## OTHER TERMS AND CONDITIONS

Standard terms & conditions
All services performed under this master letter will be subject to the Standard Terms and Conditions for Transaction Services Engagements dated February 16, 2006 (the "Standard Terms and Conditions") attached as Appendix A and incorporated by reference herein. We mutually agree to apply these Standard Terms and Conditions to this engagement notwithstanding that this engagement contemplates a multi-disciplinary team beyond the Transaction Services personnel assigned, and does not relate to the defined engagements described in paragraph 1, (b), (c), (d), and (e). Therefore, we agree that the following paragraphs provided in the attached Appendix A are not applicable to this engagement: 1(b-g), 4(a) and (b), and the second paragraph of 6, as well as the substitution of Client for any references to Target throughout the Appendix A provisions.



Page 6
Thomas S. Timko
Delphi Corporation
October 30, 2006

In addition, KPMG and Delphi mutually agree to modify the following paragraphs in Appendix A as stated below:

Paragraph 10 is modified and amended to provide that in addition, the terminating party may terminate this engagement letter in the event of breach by the other party, which breach is not cured within thirty (30) days after notice by the non-breaching party, provided, however, that the terminating party shall notify the other. Delphi or KPMG LLP may terminate this engagement letter at any time by giving written notice to the other party not less than thirty (30) calendar days before the effective date of termination. In addition, the terminating party shall provide the Bankruptcy Court ("Court"), the Office of the United States Trustee (the" U.S. Trustee"), the Creditors' Committee and the Fee Review Committee (if any) with ten (10) business days' notice of termination. The provisions of this engagement letter relating to indemnification, limitation of liability, fees and expenses, and alternative dispute resolution will remain operative and in full force and effect regardless of any termination or expiration of the engagement letter and shall survive completion of the Company's bankruptcy, whether through a confirmed plan of reorganization, liquidation of the Company's assets under Chapter 11 or 7 of the Bankruptcy Code, or otherwise.

Paragraph 13 is modified and amended to the extent that KPMG LLP's limitation of liability will not apply to claims arising out of KPMG LLP's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.

Paragraph 15 is modified and amended to the extent that KPMG will not be indemnified for claims arising our of KPMG LLP's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.

**Other Matters**

Our services covered by this engagement letter may also necessitate the assistance of a member firm of KPMG International. To the extent that our services under this engagement letter require such assistance, the services will be provided under the direction of KPMG LLP, the U.S. member firm of KPMG International, and will include the participation of other member firms of KPMG International ("KPMG member firms"). KPMG LLP is a separate legal entity from other member firms of KPMG International. KPMG LLP, without the Company's prior written approval, may subcontract a portion of its responsibilities under this engagement letter to any of the KPMG member firms, provided, however, that KPMG LLP shall remain fully and solely responsible for all of KPMG's liabilities and obligations under the engagement letter.

All oral and written communications by KPMG to you with respect to this engagement, including drafts and those communications occurring prior to the execution of this engagement letter (collectively,



Page 7
Thomas S. Timko
Delphi Corporation
October 30, 2006

"Reports"), will be subject to the terms and conditions of this engagement letter and the Standard Terms and Conditions.

KPMG will provide our services in accordance with the terms and conditions of this letter. Such services are not intended to be an audit, examination, attestation, special report or agreed-upon procedures engagement as those services are defined in American Institute of Certified Public Accountants (AICPA) literature applicable to such engagements conducted by independent auditors. Accordingly, these services will not result in the issuance of a written communication to third parties by KPMG directly reporting on financial data or internal control or expressing a conclusion or any other form of assurance.

## Project Management and Staffing
### KPMG Core Team
**Joseph Orlando.** I will be responsible for the overall engagement quality of service Delphi Corporation receives during the conduct of this engagement.

**Engagement Manager.** Thomas Gorski will be the primary resource for coordinating our services including all client work and deliverables.

**Engagement Staff.** Other memebers of the project team include:

- Bill Dailey, Managing Director
- TBD, Senior Manager
- Michael Ricafort, Manager
- Mark McStravick, Manager
- TBD, Associate

## Client Participation and Responsibilities
During the development of this engagement letter, we have been guided by certain assumptions about the project scope, and level of Delphi Corporation's involvement and support.

**Delphi Corporation Support.** We will require the support of Delphi Corporation's personnel in order to achieve timely completion of the project. Support includes, but is not limited to, the collection of all relevant documents (paper or electronic) and the scheduling of interviews and coordination of meetings.

**Project Management.**



Page 8
Thomas S. Timko
Delphi Corporation
October 30, 2006

Delphi Corporation will designate a management level individual to oversee the conduct of this project, including coordination of Delphi Corporation resources needed and review of draft deliverables. Delphi Corporation personnel assigned to the project will review draft deliverables on a timely basis.

## Timing

KPMG is available to begin providing these services beginning once this engagement letter has been executed by you and a mutually acceptable start date has been identified. We will seek proper authorization for service and fee payment from the Bankruptcy Court and/or US Trustee as appropriate. Should we learn that our application for provision of these services or fee reimbursement is not accepted by the Bankruptcy Court or US Trustee, our engagement will terminate immediately upon such notice and we will have no obligation to complete the services engaged herein.

## Professional Fees

We will charge our actual hours incurred using a discount of 40% from our standard hourly rates by level listed below. We anticipate this engagement will take approximately 8 to 9 weeks elapsed time to complete and the professional fees will be approximately $587,000.

Our professional fees are based upon the specified skill level of the professionals providing the services and the amount of time and materials required to complete the engagement. The following table represents the resources required, the estimated time and the estimated cost to complete the engagement.

| Resource Level | Standard Rate/Hour | % Discount | Net Rate |
|---|---|---|---|
| Partner | $800 | 40 | $480 |
| Managing Director/Director | $775 | 40 | $465 |
| Senior Manager | $750 | 40 | $450 |
| Manager | $675 | 40 | $435 |
| Senior Associate | $500 | 40 | $300 |
| Associate | $325 | 40 | $195 |

We have attached as Appendix B an estimate of resources and projected hours to be incurred over the course of this engagement. We will accumulate actual hours incurred extended by our agreed rates, along with out-of-pocket expenses, and will submit invoices monthly.

In addition to our professional fees, you agree to reimburse KPMG for our approved out-of-pocket expenses incurred in connection with this engagement. Neither the amount of our fees nor the payment of our fees and expenses will depend upon the findings of our work. We will bill expenses that we consider normal and necessary and will exclude perks such as first class travel (unless such first class travel



Page 9
Thomas S. Timko
Delphi Corporation
October 30, 2006

represents a free upgrade or otherwise is obtained at no additional cost over a comparable coach class ticket).

Circumstances encountered during the engagement or scope changes may warrant additional time and expense. We will notify you of such circumstances as they arise and we will obtain your approval before proceeding.

\* \* \* \* \*

If the terms of this engagement letter as set forth above are acceptable to you, please indicate your acceptance and authorization for KPMG to proceed with the related work by signing both copies of this letter in the appropriate space and returning one of the originals to me.

We look forward to working with Delphi Corporation. If we can provide you with any additional information, please feel free to contact me at (617) 817-2736 (jorlando@kpmg.com) or Tom Gorski (tgorski@kpmg.com) at (603) 421-6250.

Joseph Orlando, Partner

KPMG LLP

Enclosures:

Attachment A – KPMG Standard Terms and Conditions
Attachment B – Projected Hours for Engagement Team

ACCEPTED:

Company     Delphi Corp.

By          _____

Date        Nov 6, 2006



# Delphi Standard Terms and Conditions
# For Transaction Services Engagements

**Attachment A**
**Page 1**

These Standard Terms and Conditions are an integral part of the accompanying letter from KPMG that identifies the engagement (the "Engagement") to which they relate (the "Engagement Letter" or "Engagement Confirmation" in the case of a Master Engagement Letter, collectively referred to herein as the "Engagement Letter"). In the event of conflict between the Engagement Letter and these Standard Terms and Conditions, the provisions of the Engagement Letter shall prevail.

## 1. Certain Definitions.

    (a) **Client.** Client herein refers to the addressee(s) of the Engagement Letter.

    (b) **DDA.** Due diligence assistance ("DDA") is a service in which KPMG assists a client with a financial, tax, or operational investigation of a target business.

    (c) **Acquisition DDA Engagement.** DDA provided to a client considering an investment in, or acquisition of, another business or part thereof, or that may accept securities from another business as consideration in a transaction.

    (d) **Pre-Sale DDA Engagement.** DDA that is provided to a client considering the sale or other disposition of the client itself or a division, subsidiary, or other business component of the client. In a Pre-Sale DDA Engagement, any reporting by KPMG is generally limited to the client, and no reporting is provided to prospective acquirers.

    (e) **Vendor-Initiated DDA Engagement.** DDA that is provided to a client considering the sale or other disposition of the client itself or a division, subsidiary, or other business component of the client. As distinguished from a Pre-Sale DDA Engagement, in a Vendor-Initiated DDA Engagement the objective of the engagement is to prepare a report that will be provided to prospective acquirers.

    (f) **Target.** Target herein refers to the entity(ies) or division(s) representing the subject of the procedures described in the Engagement Letter.

    (g) **Bidder.** Bidder herein refers to a potential acquirer of Target.

    (h) **Other capitalized terms.** Other capitalized terms in these Standard Terms and Conditions not defined elsewhere herein shall have the meanings given to them in the Engagement Letter.

## 2. Procedures.

The procedures KPMG will perform are limited to those referred to in the Engagement Letter and its exhibits and addenda. The procedures KPMG will perform are limited in nature and extent to those that Client has determined meets its needs and, as such, will not necessarily disclose all significant matters about Target or reveal errors in the underlying information, instances of fraud, or illegal acts, if any. KPMG will provide no assurance and make no representation regarding the sufficiency of the procedures either for the purpose for which KPMG has been engaged or for any other purpose.

In performing KPMG's procedures and reporting its findings, KPMG will rely upon information provided to KPMG by Client's and Target's personnel and advisors

information will be substantially less in scope than an audit conducted in accordance with U.S. generally accepted auditing standards, and any procedures with respect to Target's internal control over financial reporting will be substantially less in scope than an examination of internal control conducted in accordance with Standards for Attestation Services established by the American Institute of Certified Public Accountants. Consequently, KPMG will express no opinion and provide no other form of assurance on Target's financial statements or Target's internal control over financial reporting.

## 3. Timing.

Client acknowledges that KPMG's ability to gather the information Client requires and to complete KPMG's work in a timely manner and within KPMG's estimates of fees and expenses depends upon a variety of factors outside KPMG's control, including but not limited to, the availability of information, the degree of cooperation KPMG receives from Client's and Target's personnel and advisors, and the timeliness and completeness of the responses by Client's and Target's personnel and advisors to KPMG's requests for information. KPMG intends to complete KPMG's procedures expeditiously under the circumstances, subject to those factors that are beyond KPMG's control.

## 4. Other Relationships.

    (a) In an Acquisition DDA Engagement, KPMG may potentially be engaged by more than one potential bidder in connection with an acquisition of Target. In a Pre-Sale DDA Engagement or a Vendor-Initiated DDA Engagement, KPMG may be engaged by potential bidders in connection with an acquisition of Target. If the KPMG engagement team providing services to Client becomes aware that a separate KPMG team has been engaged by a potential bidder, KPMG will notify Client that KPMG has been so engaged (subject to any confidentiality restrictions) and will take all reasonable steps to prevent the disclosure, without appropriate prior approvals, of information between the KPMG team serving Client and the engagement team serving any other party. Unless Client elects to exercise Client's right to terminate the Engagement, Client agrees that KPMG may represent other parties and Client waives any potential conflict.

    (b) In an Acquisition DDA Engagement, KPMG may serve as independent auditors of Target, or provide other services to Target. In a Pre-Sale DDA Engagement or a Vendor-Initiated DDA Engagement, KPMG may serve as independent auditors of, or provide other services to, a potential bidder or bidders. In such cases, KPMG will take all reasonable steps to prevent the disclosure, without appropriate prior approvals, of confidential information between the KPMG engagement team serving Client and the KPMG engagement team serving any other party. However, Client hereby acknowledges and agrees



**Delphi Standard Terms and Conditions
For Transaction Services Engagements**

**Attachment A
Page 2**

consent to such disclosure in advance.

If KPMG serves as independent auditors of Target or such potential bidder, KPMG's professional responsibilities may require that KPMG inform the engagement team serving Target or the bidder about information coming to KPMG's attention that affects KPMG's engagement to audit Target's or such bidder's consolidated financial statements. In a Vendor-Initiated DDA Engagement, if information comes to our attention that affects KPMG's engagement to audit such bidder's consolidated financial statements and any such information is not reflected in KPMG's report, KPMG reserves the right to disclose that information to KPMG's audit client.

Client acknowledges that KPMG's relationship with Target or a potential bidder may represent an actual or potential conflict of interest for KPMG in light of the services KPMG has agreed to provide to Client hereunder. Client hereby agrees that KPMG's relationship shall not constitute a conflict of interest for purposes of KPMG's Engagement hereunder and Client expressly waives its right to assert any such conflict against KPMG. Client hereby acknowledges that KPMG's agreement to provide the services hereunder is based upon and subject to the foregoing waiver and, in the event that Client revokes such waiver, KPMG's Engagement hereunder will automatically terminate.

5. **Projections.** In the event the procedures KPMG performs relate to prospective information, KPMG will not compile, examine, or apply other procedures to such information in accordance with Statements on Standards for Attestation Engagements issued by the American Institute of Certified Public Accountants and, accordingly, will express no opinion or any other form of assurance or representations concerning the accuracy, completeness or presentation format of the prospective information. There will usually be differences between projected and actual results, because events and circumstances frequently do not occur as expected or predicted, and those differences may be material.

6. **Reporting.** All oral and written communications by KPMG to Client with respect to the Engagement, including drafts and those communications occurring prior to the execution of the Engagement Letter (collectively, "Reports"), will be subject to the terms and conditions of the Engagement Letter and these Standard Terms and Conditions. KPMG has no obligation to update Reports or to revise information presented to Client to reflect events and transactions occurring subsequent to the date of the final Report KPMG issues to Client. Client agrees to review Reports promptly and to advise KPMG on a timely basis of any additional procedures Client would like KPMG to perform or areas to address.

In an Acquisition DDA Engagement or Pre-Sale DDA Engagement, unless specifically requested by Client, KPMG is not obligated to provide copies of Reports to Target for the purpose of confirming Target's representations concerning the accuracy of the factual information presented in Reports. If Client would like

Target to review KPMG's report, KPMG may require Client and Target to indemnify KPMG for any claims arising out of or relating to such release. In a Vendor-Initiated DDA Engagement, KPMG will provide Client and Target copies of Reports and will require Client and Target to confirm the factual accuracy of the Reports.

KPMG's findings will not constitute recommendations to Client as to whether or not Client should proceed with any proposed transaction.

7. **Limitation on the Use and Distribution of Reports.** Because of the special nature of the Engagement, KPMG's Reports are not suited for any purpose other than to assist the intended recipient in evaluating the potential transaction, and Client agrees Reports will be used for that purpose only. Reports will be provided by KPMG for the intended recipient's information only, and Client agrees that the Reports may not be copied, quoted or referred to, in whole or in part, by Client without KPMG's prior written consent, except in the manner provided for in the Engagement Letter or these Standard Terms and Conditions. Client also agrees that Reports, and any of the information contained therein, will be disclosed only to Client's board of directors, management and other employees, Client's independent audit firm, and to attorneys acting as Client's counsel in the contemplated transaction, provided that each of the foregoing is subject to a binding obligation (through a written agreement or professional obligation) to maintain the confidentiality of the Reports.

In certain instances, Client may request that a copy of a Report be distributed to a third party for informational purposes. KPMG will consider consenting to distribution based on such factors as the identity of the third party and the third party's intended use of the Report. If KPMG agrees to the distribution of the Report to a third party, Client agrees to execute, and agrees to require the third party to execute, an "Agreement to Release Information." If an acceptable "Agreement to Release Information" cannot be obtained, KPMG will consider meeting with the third party to discuss in general terms the procedures outlined in the Engagement Letter. In addition, KPMG will consider performing, under the terms of a separate engagement letter with the third party, additional procedures, if any, that the third party considers appropriate.

8. **Services.** It is understood and agreed that KPMG's services may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Client.

9. **Payment of Invoices.** Client agrees to pay properly submitted invoices within thirty (30) days of the invoice date, or such other due date as may be indicated in the Engagement Letter. KPMG shall have the right to halt or terminate entirely its services under the Engagement Letter until payment is received on past due invoices. All fees, charges and other amounts payable to KPMG under the Engagement Letter do not include any sales, use, excise, value added or other applicable taxes, tariffs or duties, payment of which shall be Client's sole responsibility, excluding any applicable taxes based on KPMG's net income or taxes arising from the

**February 16, 2006**



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

**Attachment A**
**Page 3**

employment or independent contractor relationship between KPMG and its personnel.

10. **Term.** Unless terminated sooner in accordance with its terms, the Engagement shall terminate upon the completion of KPMG's services under the Engagement Letter. In addition, either party may terminate the Engagement Letter at any time by giving written notice to the other party not less than 30 calendar days before the effective date of termination.

11. **Ownership.**

(a) **KPMG Property.** KPMG has created, acquired, owns or otherwise has rights in, and may, in connection with the performance of services under the Engagement Letter, employ, provide, modify, create, acquire or otherwise obtain rights in, various concepts, ideas, methods, methodologies, procedures, processes, know-how, and techniques, models, templates; software, user interfaces and screen designs; general purpose consulting and software tools, utilities and routines; and logic, coherence and methods of operation of systems (collectively, the "KPMG Property"). KPMG retains all ownership rights in the KPMG Property. Client shall acquire no right or interest in such property, except for the license expressly granted in the next paragraph. In addition, KPMG shall be free to provide services of any kind to any other party as KPMG deems appropriate, and may use the KPMG Property to do so. KPMG acknowledges that KPMG Property shall not include any of Client's confidential information or tangible or intangible property, and KPMG shall have no ownership rights in such property.

(b) **Ownership of Deliverables.** Except for KPMG Property, and upon full and final payment to KPMG under the Engagement Letter, the tangible items specified as deliverables or work product in the Engagement Letter including any intellectual property rights appurtenant thereto (the "Deliverables") will become the property of Client. If any KPMG Property is contained in any of the Deliverables, KPMG hereby grants Client a royalty-free, paid-up, non-exclusive, perpetual license to use such KPMG Property in connection with Client's use of the Deliverables.

12. **Limitation on Warranties. THIS IS A SERVICES ENGAGEMENT. KPMG WARRANTS THAT IT WILL PERFORM SERVICES UNDER THE ENGAGEMENT LETTER IN GOOD FAITH, WITH QUALIFIED PERSONNEL IN A COMPETENT AND WORKMANLIKE MANNER IN ACCORDANCE WITH APPLICABLE INDUSTRY STANDARDS. KPMG DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

13. **Limitation on Damages.** Except for your and our respective indemnification obligations as described in these Standard Terms and Conditions, or cases of bad faith or willful misconduct, neither you nor we shall be

liable to the other for any actions, damages, claims, liabilities, costs, expenses or losses arising out of the services performed hereunder for a total amount in excess of two times the fees paid or owing to us for services rendered by us under this engagement. Except with respect to a breach of Paragraph 20 below, in no event shall either you or we be liable for consequential, special, indirect, incidental, punitive or exemplary damages, costs, expenses, or losses (including, without limitation, lost profits and opportunity costs). The provisions of this Paragraph shall apply regardless of the form of action, damage, claim, liability, cost, expense, or loss, whether in contract, statute, tort or otherwise.

14. **Infringement.**

(a) KPMG hereby agrees to indemnify, hold harmless and defend Client from and against all claims, liabilities, losses, expenses (including reasonable attorneys' fees), fines, penalties, taxes or damages (collectively "Liabilities") asserted by any third party against Client to the extent such Liabilities result from the infringement by the Deliverables of any third party's patents issued as of the date of the Engagement Letter, trade secrets, trademarks or copyrights. The preceding indemnification provision shall not apply to any infringement arising out of the following:

(i) use of the Deliverables other than in accordance with applicable documentation or instructions supplied by KPMG or other than in accordance with Paragraph 15(b);

(ii) any alteration, modification or revision of the Deliverables not expressly agreed to in writing by KPMG; or

(iii) the combination of the Deliverables with materials not supplied or approved by KPMG.

(b) In case any of the Deliverables or any portion thereof is held, or in KPMG's reasonable opinion is likely to be held, in any such suit to constitute infringement, KPMG may, within a reasonable time, at its option, either:

(i) secure for Client the right to continue the use of such infringing item; or

(ii) replace, at KPMG's sole expense, such item with a substantially equivalent non-infringing item or modify such item so that it becomes non-infringing.

In the event KPMG is, in its reasonable discretion, unable to perform either of the options described in (i) or (ii) above, Client shall return the Deliverable to KPMG, and KPMG's sole liability shall be to refund to Client the amount paid to KPMG for such item; provided that the foregoing shall not be construed to limit KPMG's indemnification obligation set forth in Paragraph 14(a) above.

(c) The provisions of this Paragraph 14 state KPMG's entire liability and Client's sole and exclusive

**February 16, 2006**



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

**Attachment A**
**Page 4**

remedy with respect to any infringement or claim of infringement.

**15. Indemnification.**

(a) Each party agrees to indemnify, hold harmless and defend the other party from and against any and all Liabilities for physical injury to, or illness or death of, any person or persons regardless of status, and damage to or destruction of any tangible property, which the other party may sustain or incur, to the extent such Liabilities result from the negligence or willful misconduct of the indemnifying party.

(b) Except as otherwise required by law, as permitted by the Engagement Letter, or as provided in paragraph 20(e) below with respect to any proposed or completed transaction, Client acknowledges and agrees that any advice, recommendations, information or work product provided to Client by KPMG in connection with this Engagement is for the confidential use of Client, may not be relied upon by any third party, and Client will not disclose or permit access to such advice, recommendations, information or work product to any third party or summarize or refer to such advice, recommendations, information or work product or to KPMG's engagement under the Engagement Letter without, in each case, KPMG's prior written consent. In furtherance of the foregoing, Client will indemnify, defend and hold harmless KPMG from and against any and all Liabilities suffered by or asserted against KPMG in connection with a third party claim to the extent resulting from such party's use or possession of or reliance upon KPMG's advice, recommendations, information or work product as a result of Client's use or disclosure of such advice, recommendations, information or work product.

(c) The party entitled to indemnification (the "Indemnified Party") shall promptly notify the party obligated to provide such indemnification (the "Indemnifying Party") of any claim for which the Indemnified Party seeks indemnification. The Indemnifying Party shall have the right to conduct the defense or settlement of any such claim at the Indemnifying Party's sole expense, and the Indemnified Party shall cooperate with the Indemnifying Party. The party not conducting the defense shall nonetheless have the right to participate in such defense at its own expense. The Indemnified Party shall have the right to approve the settlement of any claim that imposes any liability or obligation other than the payment of money damages.

(d) Our standard terms and conditions relating to indemnification are modified and amended to the extent that neither party will be indemnified, and its limitation of liability will not apply, to bad faith, self-dealing or a breach of fiduciary duty (if any), gross negligence or willful misconduct.

**16. Cooperation; Use of Information.**

(a) Client agrees to cooperate with KPMG in the performance of the services under the Engagement Letter and shall provide KPMG with timely access to and use of Client's and Target's personnel, facilities, equipment, data and information to the extent necessary for KPMG to perform the services under the Engagement Letter. The Engagement Letter may set forth additional obligations of Client in connection with this Engagement. Client acknowledges that Client's failure to assign Client personnel having skills commensurate with their role with respect to this Engagement could adversely affect KPMG's ability to provide the services under the Engagement Letter.

(b) KPMG will base its conclusions on the facts and assumptions that Client's and Target's personnel and advisors submit and will not independently verify this information. Inaccuracy or incompleteness of the information submitted to KPMG could have a material effect on KPMG's conclusions. In rendering its advice, KPMG may consider, for example, the applicable provisions of the Internal Revenue Code of 1986 and ERISA as amended, and the relevant state and foreign statutes, the regulations thereunder, income tax treaties, and judicial and administrative interpretations thereof. These authorities are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of KPMG's advice. KPMG will not update its advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof, unless Client separately engages KPMG to do so in writing after such changes or modifications.

(c) Treasury regulations under IRC section 6011 require taxpayers to disclose to the IRS their participation in reportable transactions. Client agrees to use its best efforts to promptly inform KPMG of any transaction covered by this Engagement that is required to be disclosed as a reportable transaction to the IRS or to any state or other jurisdiction adopting similar or analogous provisions. Treasury regulations under IRC section 6112 provide that KPMG must retain lists of investors in reportable and registerable transactions if we are a material advisor with respect to the transactions, and states or other jurisdictions may adopt similar or analogous provisions. Therefore, if KPMG determines that Client has participated in a reportable or registerable transaction, KPMG may place Client's name and information on a list. This list may later be requested by the IRS or other tax authority and KPMG ultimately may be required to provide it; however, KPMG will advise Client if KPMG provides Client's information to the IRS or other tax authority.

(d) Information relating to advice KPMG provides to Client, including communications between KPMG and Client and material KPMG creates in the course of providing advice, may be privileged and protected from disclosure to the IRS or other governmental authority. Should such an authority seek disclosure from KPMG of written or oral communications relating to such advice, KPMG will discuss with Client opportunities for asserting

**February 16, 2006**



the privilege. As KPMG is not able to assert the privilege on Client's behalf with respect to any communications for which privilege has been waived, Client agrees to notify KPMG of any such waivers, whether resulting from communications with KPMG or third parties in the same or a related matter. Client also understands that privilege may not be available for communications with an audit client and that KPMG personnel providing audit and non-audit services will discuss matters that may affect the audit to the extent required by applicable professional standards.

17. **Force Majeure.** Neither Client nor KPMG shall be liable for any delays resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

18. **Limitation on Actions.** No action, regardless of form, arising out of or relating to this Engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for non-payment may be brought by a party not later than one year following the date of the last payment due to such party under the Engagement Letter.

19. **Independent Contractor.** It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is or shall be considered an agent, distributor or representative of the other. Neither party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

20. **Confidentiality**.

(a) "Confidential Information" means all documents, software, reports, data, records, forms and other materials obtained by one party (the "Receiving Party") from the other party (the "Disclosing Party") in the course of performing the services under the Engagement Letter: (i) that have been marked as confidential; (ii) whose confidential nature has been made known by the Disclosing Party to the Receiving Party; or (iii) that due to their character and nature, a reasonable person under like circumstances would treat as confidential. Notwithstanding the foregoing, Confidential Information does not include information which: (i) is already known to the Receiving Party at the time of disclosure by the Disclosing Party; (ii) is or becomes publicly known through no wrongful act of the Receiving Party; (iii) is independently developed by the Receiving Party without benefit of the Disclosing Party's Confidential Information; (iv) relates to the tax treatment or tax structure of any transaction as further described in Paragraph 20(e) below; (v) KPMG determines is required to be maintained by KPMG under section 6112 of the Internal Revenue Code and the regulations thereunder or similar or analogous provisions of a state or other jurisdiction; or (vi) is received by the Receiving Party from a third party without

restriction and without a breach of an obligation of confidentiality.

(b) The Receiving Party will deliver to the Disclosing Party all Confidential Information of the Disclosing Party and all copies thereof when the Disclosing Party requests the same, except for one copy thereof that the Receiving Party may retain for its records. The Receiving Party shall not use or disclose to any person, firm or entity any Confidential Information of the Disclosing Party without the Disclosing Party's express, prior written permission; provided, however, that notwithstanding the foregoing, the Receiving Party may disclose Confidential Information to the extent that it is required to be disclosed pursuant to a statutory or regulatory provision or court order or to fulfill professional obligations and standards.

(c) Each party shall be deemed to have met its nondisclosure obligations under this Paragraph 20 as long as it exercises the same level of care to protect the other's information as it exercises to protect its own confidential information but in no event less than reasonable care, except to the extent that applicable law or professional standards impose a higher requirement.

(d) If the Receiving Party receives a subpoena or other validly issued administrative or judicial demand requiring it to disclose the Disclosing Party's Confidential Information, the Receiving Party shall provide prompt written notice to the Disclosing Party of such demand in order to permit it to seek a protective order. So long as the Receiving Party gives notice as provided herein, the Receiving Party shall be entitled to comply with such demand to the extent permitted by law, subject to any protective order or the like that may have been entered in the matter.

(e) Notwithstanding anything to the contrary set forth herein, no provision in the Engagement Letter or these Standard Terms and Conditions is or is intended to be construed as a condition of confidentiality within the meaning of Internal Revenue Code sections 6011, 6111, 6112 or the regulations thereunder, or under any similar or analogous provisions of the laws of a state or other jurisdiction. Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction within the scope of this Engagement that reduces or defers federal tax and all materials of any kind (including opinions and other tax analyses) that are provided to Client relating to such tax treatment and tax structure. If a state or other jurisdiction adopts provisions that are similar or analogous to those in IRC sections 6011, 6111, or 6112 or the regulations thereunder, the authorization to disclose in the preceding sentence also shall apply to any transaction within the scope of this Engagement that is subject to such provisions of that state or other jurisdiction.

21. **Survival.** The provisions of Paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24,

**February 16, 2006**



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

25(a), and 27 hereof shall survive the expiration or termination of this Engagement.

22. **Assignment.** Neither party may assign, transfer or delegate any of its rights or obligations without the prior written consent of the other party, such consent not to be unreasonably withheld. Notwithstanding the foregoing, to the extent any of the services under the Engagement Letter will be performed in or relate to a jurisdiction outside of the United States, Client acknowledges and agrees that such services, including any applicable tax advice, may be performed by the member firm of KPMG International practicing in such jurisdiction. Accordingly, Client agrees that KPMG may share data and information received from Client with such member firm as may be required to complete this Engagement.

23. **Severability.** In the event that any term or provision of this Agreement shall be held to be invalid, void or unenforceable, then the remainder of this Agreement shall not be affected, and each such term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

24. **Governing Law.** The Engagement Letter and these Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws provisions thereof.

25. **Miscellaneous.**

    (a) Except as otherwise set forth in the Engagement Letter, in accepting this Engagement, Client acknowledges that completion of this Engagement or acceptance of Deliverables resulting from this Engagement will not constitute a basis for Client's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). This Engagement shall not be construed to support Client's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

    (b) KPMG may communicate with Client by electronic mail or otherwise transmit documents in electronic form during the course of this Engagement. Client accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices) and agrees that it may rely only upon a final hardcopy version of a document or other communication that KPMG transmits to Client.

    (c) For engagements performed in California or where the services provided by KPMG fall under the jurisdiction of California law, rule or regulation, Client acknowledges that certain of KPMG's personnel that have an ownership interest in the partnership and who may provide services in

connection with this Engagement may not be licensed as certified public accountants under the laws of any of the various states.

26. **Entire Agreement.** These terms, and the Engagement Letter including Exhibits, constitute the entire agreement between KPMG and Client with respect to this Engagement and supersede all other oral and written representations, understandings or agreements relating to this Engagement.

27. **Alternative Dispute Resolution.**

    (a) Any dispute or claim arising out of or relating to the Engagement Letter, the services provided hereunder, or any other services provided by or on behalf of KPMG or any of its subcontractors or agents to Client or at its request (including any dispute or claim involving any person or entity for whose benefit the services in question are or were provided) shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit A attached hereto, which constitute the sole methodologies for the resolution of all such disputes. By operation of this provision, the parties agree to forego litigation over such disputes in any court of competent jurisdiction. Mediation, if selected, may take place at a location to be designated by the parties. Arbitration shall take place in New York, New York. Either party may seek to enforce any written agreement reached by the parties during mediation, or to confirm and enforce any final award entered in arbitration, in any court of competent jurisdiction.

    (b) Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material or (ii) its names, trademarks, service marks or logos, solely in the courts of the State of New York or in the courts of the United States located in the State of New York. The parties consent to the personal jurisdiction thereof and to sole venue therein only for such purposes.

    (c) Our standard terms and conditions relating to the Dispute Resolution procedures are modified by providing that any dispute or claim also may be resolved before the United States Bankruptcy Court for the Southern District of New York.

**February 16, 2006**



**Delphi Standard Terms and Conditions**
**For Transaction Services Engagements**

**Attachment A**
**Page 7**

## Exhibit A

The following procedures are the sole methodologies to be used to resolve any controversy or claim ("dispute"). If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(i) **Mediation.** Any party may request mediation of a dispute by providing a written Request for Mediation to the other party or parties. The mediator, as well as the time and place of the mediation, shall be selected by agreement of the parties. Absent any other agreement to the contrary, the parties agree to proceed in mediation using the CPR Institute for Dispute Resolution Mediation Procedures (effective April 1, 1998), with the exception of paragraph 2 which shall not apply to any mediation conducted pursuant to this agreement. As provided in the CPR Mediation Procedures, the mediation shall be conducted as specified by the mediator and as agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with facilitation by the mediator, to reach a consensual resolution of the dispute. The mediation shall be treated as a settlement discussion and shall be confidential. The mediator may not testify for any party in any later proceeding related to the dispute. No recording or transcript shall be made of the mediation proceeding. Each party shall bear its own costs in the mediation. Absent an agreement to the contrary, the fees and expenses of the mediator shall be shared equally by the parties.

(ii) **Arbitration.** Arbitration shall be used to settle the following disputes: (1) any dispute not resolved by mediation 90 days after the issuance by one of the parties of a written Request for Mediation (or, if the parties have agreed to enter or extend the mediation, for such longer period as the parties may agree) or (2) any dispute in which a party declares, more than 30 days after receipt of a written Request for Mediation, mediation to be inappropriate to resolve that dispute and initiates a Request for Arbitration. Once commenced, the arbitration will be conducted either (1) in accordance with the procedures in this document and the Rules for Non-Administered Arbitration of the CPR Institute for Dispute Resolution ("CPR Arbitration Rules") as in effect on the date of the Engagement Letter, or (2) in accordance with other rules and procedures as the parties may designate by mutual agreement. In the event of a conflict, the provisions of this document and the

CPR Arbitration Rules will control.

The arbitration will be conducted before a panel of three arbitrators, two of whom may be designated by the parties using either the CPR Panels of Distinguished Neutrals or the Arbitration Rosters maintained by any JAMS office in the United States. If the parties are unable to agree on the composition of the arbitration panel, the parties shall follow the screened selection process provided in Section B, Rules 5, 6, 7, and 8 of the CPR Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or any dispute concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator shall be appointed unless he or she has agreed in writing to abide and be bound by these procedures.

The arbitration panel shall issue its final award in writing. The panel shall have no power to award non-monetary or equitable relief of any sort. Damages that are inconsistent with any applicable agreement between the parties, that are punitive in nature, or that are not measured by the prevailing party's actual damages, shall be unavailable in arbitration or any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitration panel have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only as provided in the CPR Arbitration Rules. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The award reached as a result of the arbitration will be binding on the parties, and confirmation of the arbitration award may be sought in any court having jurisdiction.

**February 16, 2006**