# EXHIBIT D

# DELPHI

August 11, 2004

Rex H. Elliott, Esq.        *via fax and U.S. mail*
Cooper & Elliott LLC
2175 Riverside Drive
Columbus, Ohio 43221

RE:     Threatened Litigation by Audrey Huston & Family;
        10591 Engle Rd., Butler Township, OH

Dear Mr. Elliott:

This letter responds to your July 27th and 30th letters advising that you have been retained to represent the Huston family to file suit against Delphi Corporation unless the company purchases the Huston home for $300,000. You wrote: "Audrey Huston has been forced from her property and is unable to sell the property…" and that "Audrey and Kay (Schaeffer) have … vacated the house due to their fears regarding the contamination." Delphi remains willing to try to resolve all outstanding issues with the Hustons. However since the family has chosen to engage counsel, cut off all communication other than through their attorneys, and threatened litigation, Delphi is forced to reconsider its options. This letter begins that process by 1) responding to the claims alleged in your letter, and 2) setting forth Delphi's position.

## Response to Your Letters of July 27th and 30th

Delphi is disappointed that Mrs. Huston and her family have repudiated the agreement reached between the parties last spring. Your characterization that Delphi had made an "*offer* to purchase the Huston property at a value reflecting a <u>*contaminated*</u> residential use of the property" (emphasis added) is both erroneous and incomplete. Erroneous because Delphi's initial offer to arrange for a third party to purchase the property for $102,000 was based on an appraisal by an independent, licensed appraiser who was not aware of any contamination of the property. A careful reading of Ms. Gail Wagner's appraisal, a copy of which was previously provided to Mr. and Mrs. Huston, will disclose that it does not mention any contamination or reduce the appraised value due to such considerations. To the contrary, Paragraph 4 on page 2 of her appraisal states:

> "Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any … adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions (sic.) … "

Delphi did not disclose the groundwater sampling to Ms. Wagner when retaining her services in order to avoid the argument that the groundwater quality affected her valuation of the property.

Delphi's intent was to offer the Hustons a price reflecting the fair market value of the property assuming there was no contamination.

Your reference of Delphi's *offer* is also incomplete and mischaracterizes the facts. As I indicated in my July 1st letter to Mr. Chapin, Delphi and the Huston family reached an oral *agreement* last March 19th for the property to be sold for $130,000 plus $20,000 for moving and closing expenses. A letter memorializing that agreement was mailed to Mrs. Huston and Mrs. Schaeffer on April 2nd.

Your July 27th letter states: "I am also aware of John (sic) Dane's appraisal of *$300,000 for a commercial use* of the land and that the property *zoning permits a commercial buyer*" (emphasis added). The letter further states that you "have personally visited the property and there is little question that commercial use would be the highest and best use . . .". James Dane and your opinions get to the heart of the issue: what is the fair market value of the property and what is its highest and best use?

Mr. Dane's October 1, 2003 commercial appraisal declares: "The highest and best use of the property is Commercial/Industrial Zoning." Mr. Dane further states: "It is my opinion, as of Sept 18, 2003, that the value of this property as zoned Commercial/Industrial and adjusting for negative amenities is ........ $250,000 to $300,000."

Delphi strongly disagrees with Mr. Dane and your assessments. First, the property is not zoned, nor likely to be rezoned, for commercial use. Joseph Flanagan of the Butler Township Zoning Office recently confirmed that 10591 Engle Road is zoned Residential based on the current township zoning map. While the long-term land use plan for Engle Road is Industrial, Mr. Flanagan stated: "Retail commercial would most likely not be considered appropriate use in this area based on the land use plan." (See attached copy of Mr. Flanagan's August 2, 2004 letter.)

Second, Mr. Dane is not a general licensed appraiser, but rather a residential appraiser. His commercial/industrial appraisal is outside of the scope of his residential appraisal license.

Third, Delphi recently retained a general licensed appraiser who states that the highest and best use of the property is residential. Leland Coe estimates the property to value at $110,000 for residential use but only $89,400 if the site were zoned and sold for commercial reuse. This commercial valuation does not subtract the necessary demolition cost to prepare the property for rebuilding. An industrial use would cause the property to be worth even less. As you know, Delphi owns property directly behind the Huston property. Unlike the Huston property, this vacant land is within the borders of the City of Vandalia, is already zoned industrial and has access to city water and sewage. The property is actively being marketed for sale ranging from $31,900 an acre for land that fronts on Northwoods Blvd. to $15,900 an acre for interior property, including the property that abuts the Huston parcel. According to your clients' position, as supported by Mr. Dane's appraisal, that "Commercial/Industrial zoned property" in the area is worth $8.25 per square foot or $395,370/acre ($8.25/sq. ft. x 43,560 sq. ft./acre = $359,370/acre), Delphi is foolishly trying to sell its property 11 to 22 times below fair market value. Why would

2

any rational business person purchase your clients' residentially zoned property for $250,000 to $300,000 when adjacent, industrial zoned property is selling between $15,900 to $31,900 per acre?

There are several problems with Mr. Dane's $250,000 to $300,000 valuation. First, his comparable properties are several miles away in a very desirable commercial area, with crucial utilities such as city water and sewage being available. Although Mr. Dane noted that his comparable sales were "serviced by city utilities, curbs, gutters and walks," he did not adequately downward adjust the sales price. Mr. Dane wrote that "Installation of city utilities on the subject property could well exceed $10,000 to $20,000". Based on conversations with city officials, Delphi estimates that it would exceed $200,000 to bring city water and sewage to Engle Road. Regardless of cost however, there is no city water or sewage service available at Engle Road today and no foreseeable plans for the City of Vandalia to provide it. Indeed, the City does not provide such services to areas outside of its municipal boundaries. Thus, an additional hurdle that a prospective commercial purchaser would need to overcome would be to have the property annexed by the City of Vandalia.

In his October 1st Addenda to his Residential Appraisal, Mr. Dane claims:
> "There are numerous businesses which do not have to rely on drinking water to establish their businesses in Commercial or Industrial areas. Warehousing, storage yards, automobile storage yards, rental storage buildings, building material sales yards, etc., to name a few."

The properties on Miller Lane and Shady Knoll that Mr. Dane uses as comparisons in his commercial appraisal were not purchased for such commercial use and thus should not be used in the appraisal. However, some of the properties across the street from the Huston residence fit Mr. Dane's description. Although these properties are located in the City of Vandalia, they are not connected to city water or sewage. Mr. Dane's appraisal does not refer to these adjacent properties at all. These Engle Road business properties are valued at considerably less than $8.25/square foot--$359,000/acre baseline price used in Mr. Dane's appraisal. Yet even these types of businesses are not suitable uses for the Huston property because they are, and by the nature of their business need to be, larger buildings and acreage than the Huston property would support. Even were space not a problem, the Huston's residential neighbors may not appreciate these types of businesses abutting their homes. Consequently, such commercial uses may not be allowed by Butler Township. Likewise, the type of businesses being constructed on Miller Lane and Shady Knoll which Mr. Dane uses as comparable sales would not find an irregularly shaped 0.902 acre parcel sandwiched between two residences and facing businesses such as Sandy's Towing, Vandalia Rental, A to Z Self Storage, and Hester Masonry to fit in their business image.

Second, for the Engle Road property to be used commercially, the existing structure would either have to be razed or brought up to code. (See Mr. Flanagan's August 2nd letter: "To use an existing structure, current-building code requirements must be met. . .".) Depending upon the type of commercial use, plumbing, electrical, ventilation, parking, and access for the disabled would have to be provided. Other amenities, such as lighting, computer wiring, and general

3

updating would also have to budgeted. The cost of converting old homes to offices ranges from 150 % to 300% of new construction. (See attached July 22nd Detroit News article, "Converting old homes to offices is costly".) Conversely, if the Huston home were to be razed, as happened with the homes on Miller Lane and Shady Knoll, that cost would need to be subtracted from any assessment.

Third, the site is not zoned for commercial use. Rezoning permitting a commercial use is speculative at best, and according to Mr. Flanagan, rezoning for retail/commercial uses is unlikely. Your July 27th letter states "the property zoning permits a commercial buyer". What is the basis of this claim?

Finally, your letter states that "Audrey Huston has been forced from her property and is unable to sell the property ... because ... she would clearly need to disclose the many years of contamination". You later elaborated in the July 30th letter that "Audrey and Kay have, in fact, vacated the house due to their fears regarding the contamination". Delphi rejects the premise that the property is not saleable. My client is unaware that any attempt to market the house, either commercially or residentially, has been made. Please provide support for your claim. Has the property been listed with a real estate broker? As Delphi has previously pointed out to the Hustons, houses on either side of their property have sold in the last few years. Delphi was prepared to back up its beliefs with action by arranging to buy the property, install a new well and then resell the property for residential use after making full disclosures. Unfortunately, the Hustons' recent actions have foreclosed such an outcome.

Nor was Mrs. Huston "forced from her property" due to any contamination attributable to Delphi. The well water consistently met drinking water standards every time it was tested. Delphi is unaware of any health care professional advice which the Hustons were given advising them to move. The Hustons refused to consult with the County Health Department. A simple water filter, use of bottled water or allowing Delphi to install a new well would have eliminated any concerns the Hustons may have had about using their well. Delphi finds the allegation that Mrs. Huston was forced from her property in 2004 to lack credibility when she has known of the contamination since 2001. Mrs. Huston moved because a two-story house no longer suited her needs at this stage of her life.

Your letter implies that there is other contamination, apart from the groundwater concern. ("... years of contaminating their property, *including*, most significantly, their groundwater supply" [emphasis added]). Delphi is not aware of any other sources of contamination emanating from Delphi's property. What are you referring to and what evidence do you have to support such a claim? The property likely has other contamination that would need to be disclosed to potential buyers, such as lead paint. A thorough environmental inspection of the property may reveal asbestos, oil contamination from the fuel storage tank, and other environmental concerns such as chemicals from past site uses by Mr. and Mrs. Huston, particularly Mrs. Huston's hair salon business.

4

## Delphi's Theory of the Case & Proposal

In the hope of resolving this matter, below is a summary of Delphi's theory of this case. Based on your and Mr. Chapin's letters and reviewing the available records I understand the following.

Delphi has tested the Huston groundwater well on five occasions, from July 16, 2001 through November 20, 2003 with results of TCE ranging from non-detect up to 1.8 ppb and DCE from non-detect up to 17.6 ppb. The federal drinking water limit for TCE is 5 ppb and for DCE is 70 ppb. The results of the well sampling have been provided to federal, state and local agencies as well as the Hustons. Mr. and Mrs. Huston were initially pleased with the test results and expressed no concern about drinking the water. Neither they nor their children ever requested that the water be treated or an alternate water source be supplied. Indeed, they have rejected Delphi's offers to install a new well in a different aquifer. While Mrs. Huston mentioned a dislike for the taste and/or odor from the groundwater, the two chemicals do not present a taste or odor at these extremely low concentrations. Rather, as Delphi pointed out to the Hustons, groundwater often has taste and/or odor associated with it that are attributable to naturally occurring minerals. Delphi attempted to facilitate the County Health Department meeting with the Hustons to discuss their aesthetic concerns but the Hustons refused.

Beginning in 2003 Mr. and Mrs. Huston began suggesting that they wanted to move and requested that Delphi purchase their home. That request was formalized in an October 9, 2003 letter from the couple to John Ridd. Unknown to Delphi at the time, Mr. and Mrs. Huston had already transferred the property to their two children through a Quit Claim Deed executed on September 23, 2003. The deed was not recorded until December 29th, 2003.

Following receipt of their October 9th letter, Delphi entered into good faith discussions with Mr. and Mrs. Huston to buy a property which, it now turns out, neither one owned. Mrs. Schaeffer was present at all the meetings and her brother, John T. (aka Terry) Huston, was present at the November 14th meeting. No one disclosed the unrecorded deed. Discussions broke down over the fair market value of the property. Delphi summarized its position to the putative owners in a letter dated November 25th but renewed its offer to install a new well irrespective of whether an agreement could be reached on the sales price.

> "Delphi remains willing to install a shallow well on your property and permanently close your deep well at no expense to you. This offer is not contingent on the sale of your property. As we have done at Cassel Road, Delphi would require a deed restriction prohibiting future use of the lower aquifer. If you are interested, we will supply for your review a sample agreement similar to those signed by your neighbors on Cassel Road."

The Hustons never replied to this letter. Delphi learned of the unfortunate death of Mr. Huston when its consultant hand delivered the results of the November 20th well samples shortly before Christmas. Out of respect for the family, Delphi did not contact the Hustons until February. At

5

Delphi's request, a meeting was held on February 26th with Mrs. Huston in a final attempt to resolve the matter.

The meeting was cordial but Delphi was never informed that Mrs. Huston did not own the property. While Mrs. Schaeffer was present, her brother, who co-owns the property, was not. Mrs. Huston rejected Delphi's offer to split the difference between Mr. Dane's residential appraisal and Delphi's appraisal. Mrs. Huston stated that she believed the property was worth $175,000. In response to Delphi's suggestion of hiring a third, and mutually agreed upon, appraiser, Mrs. Huston stated that she would not take less than $150,000 for the property. The meeting ended with the agreement that Mrs. Schaeffer would e-mail *Mrs. Huston's final position* so that it could be considered by Delphi management.

Mrs. Schaeffer sent Mr. Weflen the e-mail on March 8th and stated that "...*mother has made the decision* to remain at $150,000 asking price" (emphasis added). On March 19th, Mr. Weflen telephoned Mrs. Schaeffer and an oral agreement was reached where Delphi would arrange to have a third party pay Mrs. Huston $130,000 for the property plus $20,000 for moving and closing costs. A confidentiality agreement and a property damage release would be required. Delphi agreed to work with Mrs. Huston and her daughter to provide them with time to purchase a new residence and move but Delphi was hoping to get the property on the market in time for the upcoming selling season. Since the sale was without a realtor, Mrs. Huston would not incur any commission cost. On April 2nd Mr. Weflen sent Mrs. Huston and Mrs. Schaeffer a confirmation letter. Thus, Delphi was led to believe that it had a deal and was moving forward in ordering a title policy (the cover page of which I previously sent you), and preparing the various documents.

The charade of the deal continued when Mr. Chapin, who it turns out drafted the September 23rd Quit Claim Deed, contacted Delphi personnel last April to inform, and later confirmed to me in writing, that "...this office has been retained to *represent Mrs. Audrey Huston* in all matters regarding *her real property* located in Vandalia, OH." Likewise, your July 27th letter begins with the subject line: "Re: Audrey Huston, 10591 Engle Road, Vandalia . . . ." and noted "Audrey Huston has been forced from *her* property and is unable to sell the property at 10591 Engle Road . . . ."). Mrs. Huston cannot sell 10591 Engle Road because she does not own it. The only property interest concerning 10591 Engle Road that Mrs. Huston may legally sell is her life estate, which certainly is not valued at $150,000 let alone $300,000.

If Mrs. Huston needed to move it was due to factors unrelated to the groundwater quality, such as her health and age. She was not "forced out". Delphi attempted to work first with Mr. and Mrs. Huston, and then with Mrs. Huston and her daughter in good faith. Lately, however, Delphi's efforts have been met with delay and duplicity. The demands of your July 27th letter are unfounded and unreasonable. Delphi rejects your clients' "offer to permit Delphi to purchase the property for the amount of $300,000." As an accommodation to Mr. and Mrs. Huston and in response to their October 9th letter, Delphi was prepared to purchase the Engle Road home for a fair and generous price. However, with the Huston family repudiation of the March 19th

6

agreement, as memorialized in the April 2nd letter, the arrangement concerning the purchase of the property has been terminated.

Delphi remains willing to install a new well to be located in the upper aquifer and to close the existing well which your clients claim makes the house unsellable. As before, Delphi would require a deed restriction prohibiting future use of the lower aquifer. However, given the recent threat of litigation and to avoid piecemeal settlements, Delphi will require that your clients and the Estate of Mr. Huston release Delphi and General Motors of all claims relating to or arising from any contamination of the property from the Vandalia plant.

It is unfortunate that our clients have not been able to resolve their differences. I am prepared to discuss this letter and the underlying dispute with you and Mr. Chapin. If there are facts that have been inadvertently misstated or omitted which you believe are relevant, please bring them to my attention. Otherwise, Delphi is prepared to defend itself in court should your clients choose to file suit.

Sincerely,

*James P. Walle*

James P. Walle
Attorney
Delphi Legal Staff

cc:   Donald H. Chapin, Esq.

7

Trustees
Joseph Ellis
Doug Orange
Julie Lewis

Administrator
Joseph Flanagan, Jr

Clerk
Gregory Brush

Board of Zoning Appeals
Jackie Blakesly
Jack Moorman
John Brann
Curtis Slaton
Earl Moyer

Zoning Commission
Jim Coughlin
Curtis Flora
Mike Leo
Bruce Routson
Gary Spoltman



## Butler Township Government Center

August 2, 2004

James Walle
5825 Delphi Drive
M/C 480-410-166
Troy, Michigan 48098

RECEIVED
DELPHI
AUG 0 5 2004
LEGAL STAFF

Dear Mr. Walle:

On 29 July 2004, I spoke with Christine Horch regarding the current zoning of several parcels on Engle Road in Butler Township, Montgomery County, Ohio.

Based on the map enclosed with this letter, the parcels on Engle Road, situated west of Interstate 75 and north of Northwoods Blvd. in Butler Township, are designated by one of the following zones (the district are in order from south to north): "B-2" Business District; "R-2" Single Family Residential District; "PD-3" Planned Business District; "PD-4" Planned Industrial District; and "B-3" Business District.

Traveling north on the west side of Engle Road ending at Strobridge Road, parcel zoning varies from business to residential to business and then industrial. In reviewing the zoning map it would appear that the first address 10569 Engle Road is zoned Business; followed by 10591, 10655 and 10681 Engle Road zoned as Residential; cell tower parcel 10711 Engle and the unnamed parcel just north of 10711 Engle Road are zoned as Business; and parcels 10787, 10855, 10871 and 10881 Engle Road are Industrial.

The parcels located on the east side of Engle Road and those located on Northwoods Blvd are located in the City of Vandalia; thus zoning information can be obtained from the City.

Also, as we discussed, the process to change parcels currently zoned as residential to industrial and that such change would conform the to the township "Proposed Land Use Plan" for this area (copy enclosed). To

8524 North Dixie Drive • Dayton, Ohio 45414 • (937) 898-6735 • FAX (937) 898-5308

JPW
Aug. 5, 2004

rezone the property in question, the petitioner would submit a rezoning application and supporting documentation, along with a $200 processing fee to Butler Township. The rezoning process generally takes approximately 90 days. Retail commercial would most likely not be considered appropriate use in this area based on the land use plan.

To use an existing structure, current-building codes requirements must be met; however, those requirements are administered through the Montgomery County Building Regulations Department.

If you require additional information, please feel free to contact me.

Sincerely,

Joseph E. Flanagan, Jr.
Township Administrator

jflanagan@ButlerTownship.com

cc: Christine Horch



**BUTLER TOWNSHIP**
MONTGOMERY COUNTY OHIO
PROPOSED LAND USE

- Residential – Low to Medium Density
- Residential – Medium Density
- Residential – Medium to High Density
- Residential – Within Incorporated Area
- Institutional
- Office
- Business
- Industrial
- Extraction
- Airports
- Agricultural or Vacant
- Alluvial Soils

Engle Road Site

REAL ESTATE

Thursday, July 22, 2004 | The Detroit News  3C

# Converting old homes to offices is costly

**Firms invest additional money to lure customers with aesthetic appeal.**

By Maureen McDonald
*Special to The Detroit News*

SOUTHFIELD — If a person dropped a handful of marbles on the wide plank floors in the McGovern Building Group's 1890s farmhouse-turned-new office, the marbles would spread out six different directions on a very wavy surface.

The building's remodeling costs spiraled to $50,000 more than budgeted, and the move has taken several months longer than anticipated. Terry McGovern, owner of the six-member remodeling and historic preservation company, tackles endless amounts of paperwork generated by historic commissions and ancient infrastructure that consumes cash by the payload.

"Right now, I'm bleeding red ink," said McGovern, who expects to move into the former McDonnell house in Southfield this month. "When we get into our building, it will be a real showpiece."

Several Metro Detroit firms have invested thousands of dollars and endless hours into turning historic houses into modern offices and retail establishments. Owners said the love of architecture outweighs the excess costs, pegged at 150 percent of new construction.

"It will take me 10 years to break even from all the expenses I've encountered with this house, and I keep spending," said Gina Virgona-Rewold, owner of the new La Dolce Vita Spa in downtown Rochester.

Virgona-Rewold occupies the 8,000-square-foot Slumberfeld Mansion, now decked in seven different colors of exterior paint. She spent $1 million for the property and invested more than $300,000 in remodeling.

"Sterile spas are a dime a dozen. This house lends itself to a very charming romantic atmosphere," she said. "Women want to be here to relax, be pampered."

Occupying a historic house puts one's business on the map, helping to draw employees and clients, said Douglas Peters, an attorney with Charfoos and Christensen, whose firm owns the 22,500-square-foot Hecker-Smiley mansion on Woodward and Ferry near the Detroit Institute of Arts. It paid $600,000 in 1992 for the 1892-built home and spent $2 million restoring it.

The firm recently bought the Stephens house on the same block of Ferry Street. Out-of-town clients stay at the nearby Inn on Ferry Street, a row of newly restored mansions.

"The place (Hecker-Smiley) was a real dump. We had to replace the roof, the wiring, the plumbing and nearly everything else. Then we added cabling for high-speed data transmission, rebuilt the stained glass window, and added central air," said Peters, the former managing partner who engineered the restoration project.

Nevertheless, Peters said it was all worthwhile. "This is a wonderful work environment. We have working fireplaces, which are especially nice in the winter. We can put on parties for up to 100 people on the main floor, and we converted the carriage house to a moot courtroom." The law firm won awards from the Secretary of the Interior and the American Bar Association for its rehab work.

In Southfield, McGovern is still up to his eyeballs in last-minute repair tasks. He refused to conduct a full inspection on the McDonnell house property when he bought it for $600,000 in February. Instead, he filled three, full 30-yard trash containers with refuse from the over-stuffed home.

"I wouldn't have bought it if I knew all that I was getting into. But I loved the property. It is a work of art," McGovern said.

He added a 100-year-old door he found at an antique auction 30 years ago and restored the paint to period colors. He hopes to put a proper gable roof above the 2 1/2 car garage the previous owner erected. The parlor will become a conference room and the 400-square-foot living room a production and architectural office. The entire house will serve as a showpiece for remodeling clients.

Peters said new construction would cost $100 a foot, while restoration costs $150 to $300 a square foot.



Charfoos and Christensen is one of several Metro Detroit firms to convert historic houses into modern offices. It spent $2 million to restore the Hecker-Smiley mansion.



Peters

*Maureen McDonald is a Metro Detroit free-lance writer.*

```
TRANSFER
10:55am    DECEMBER 29, 2003
KARL L. KEITH, COUNTY AUDITOR
Conv/Tran #: 26455
```

# Quit-Claim Deed
(Per O.R.C. 5302.11)
with a Reserved Life Estate

AO1-2-9-47

Clarence E. Huston and Audrey L. Huston, married, of Montgomery County, Ohio, for valuable consideration paid, grants equally to John T. Huston and Kay Huston Schaeffer, excepting and reserving unto the Grantor a non-assignable and inalienable estate in the property, for the life of the Grantor, whose tax-mailing address is:

10591 Engle Road
Vandalia, Ohio 45377

the following REAL PROPERTY:   Situated in the Township of Butler, the County of Montgomery, and in the State of Ohio, and being more particularly bounded and described as follows:

ADDENDUM "A"

Subject however to all easements, covenants and restrictions of record.

Parcel No:

Commonly Known As:    10591 Engle Road

Prior Instrument Reference: Vol. 1347 Page 4 of the Official Records of Montgomery County, Ohio.

Witness his/her hand this 23rd day of September 2003.

_Clarence E. Huston_ (signature)
Clarence E. Huston

_Audrey L. Huston_ (signature)
Audrey L. Huston

State of Ohio        )
                     )ss.
County of Montgomery )

BE IT REMEMBERED, that on this 23rd day of September 2003, before me, the subscriber, a notary public in and for said state, personally came, Clarence E. Huston and Audrey L. Huston, the Grantors in the foregoing deed, and acknowledged the signing thereof to be their voluntary act and deed.

IN TESTIMONY THEREOF, I have hereunto subscribed my name and affixed my seal on this day and year aforesaid.

ANDREA L. WEST
NOTARY PUBLIC - STATE OF OHIO
My Commission Expires March 29, 2005

_Andrea L. West_ (signature)
Notary Public, State of Ohio

This instrument was prepared by:    Don H. Chapin
                                    Elder Law Attorney
                                    Chapin Law Offices
                                    3148 Broadway, Suite 300
                                    Grove City, Ohio 43123

## ADDENDUM "A"

### Legal Description

Situated in the Township of Butler, in the County of Montgomery and State of Ohio, being in the northwest quarter of Section 10, Town 3, Range 6, east, etc., being part of the same premises described in the conveyance from Otto Wegner and Vera Wegner to Russell E. Macy and Bertha J. Macy, by deed dated May 27, 1947 and recorded in Deed Book 1224, page 83, of the deed records of Montgomery County, Ohio, being bounded and more particularly described as follows:

Beginning at an iron pin in the east line of said quarter section, said beginning point is north 2 degrees west with the east line of said quarter section and Engle Road a distance of 430 feet from an iron pin at the southeast corner of above said quarter section thereof; thence from the above said beginning point south 88 degrees west a distance of 228.83 feet to an iron pin; thence north 1 degree 07 minutes west a distance of 100 feet to an iron pin; thence north 55 degrees 27 minutes east a distance of 269.6 feet to an iron pin in the east line of said quarter section and Engle Road; thence south 2 degrees east with the east line of said quarter section and Engle Road a distance of 245 feet to the place of beginning, containing 0.902 acre, subject, however, to all legal highways.

Grantors acquired title to the above described real estate by deed recorded in Deed Book 1224, Page 83, of the deed records of Montgomery County, Ohio.

```
KARL KEITH
COUNTY AUDITOR
MONTGOMERY COUNTY DAYTON, OHIO
DESCRIPTION APPROVED FOR
STRAIGHT TRANSFER CLOSURE
NOT CHECKED.
BY_____ DATE 12-29-03
MAP DEPARTMENT
```