# EXHIBIT A

KAYE SCHOLER LLP
Richard G. Smolev (RS 2222)
425 Park Avenue
New York, New York 10022-3598
(212) 836-8000 (telephone)
(212) 836-8689 (facsimile)

*Counsel for InPlay Technologies, Inc.,*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No.: 05-44481 (RDD) |
| Debtors. | Jointly Administered |

## AFFIDAVIT OF ROBERT J. BRILON IN SUPPORT OF
## INPLAY TECHNOLOGIES, INC.'S OBJECTION TO CLAIM NUMBER 2558

State of Arizona

County of Maricopa

I, Robert J. Brilon, declare:

1.    I am the President, Chief Executive Officer and Chief Financial Officer of InPlay Technologies, Inc. (NASDAQ: NPLA) ("InPlay"). I am submitting this Affidavit in support of the Response of InPlay Technologies, Inc. to Objection to Claim Number 2558 (the "Response"). I have first hand knowledge of all of the facts contained herein and can competently testify to the matters described herein.

2.    Pursuant to a License Agreement dated April 20, 2000 (the "License Agreement"), InPlay (f/k/a DuraSwitch Industries, Inc.) licensed certain proprietary technology identified as the DuraSwitch Patents and DuraSwitch Technology to Delphi Automotive Systems LLC ("Delphi") as more particularly described in the License Agreement, a true and correct copy of which is attached hereto as Exhibit A. Capitalized terms not otherwise defined in this

31361132.DOC

Affidavit have the meanings ascribed to them in the License Agreement. Relevant pages from the Delphi web site generally describing the proprietary technology that was the subject of the License Agreement are attached hereto as Group Exhibit B.

3.  In consideration of the License of the DuraSwitch Patents and DuraSwitch Technology, Delphi agreed to pay minimum royalties of $12 million, as detailed in Section 3.2 of the License Agreement.

4.  Delphi paid InPlay the minimum royalty payment due for the period July 1, 2003 through June 30, 2004 in the amount of $1 million and for the period July 1, 2004 through June 30, 2005 in the amount of $2 million[1]. Delphi made no other royalty payments under the License Agreement.

5.  The License Agreement has not been modified and there was no agreement between InPlay and Delphi relieving Delphi of any of its obligations under the License Agreement.

6.  Following the rejection of the License Agreement, InPlay undertook an extensive effort to license the DuraSwitch Patents and DuraSwitch Technology in the Exclusive Licensed Field or to cause its existing licensees to enter the Exclusive Licensed Field. Due to the condition of the automobile industry and to the long product development lead time in that industry, InPlay has been unable to license the DuraSwitch Patents and DuraSwitch Technology in the Exclusive Licensed Field or to find others willing to exploit the DuraSwitch Patents and DuraSwitch Technology in that field.

---

[1]    This amount includes both cash paid by Delphi and credits to which Delphi was entitled under the License Agreement.

7.   Pursuant to agreements attached hereto as Exhibits C, D and E Delphi purchased and continues to own 1,651,846 shares of InPlay common stock, representing approximately 15% of InPlay's common stock.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correction.

Dated:  November 16, 2006

 /s/ Robert J. Brilon_<br>Robert J. Brilon

Subscribed and sworn to
before me this 16th day of
November, 2006

   /s/ David Swirbul

David Swirbul
Notary Public, State of Arizona

Maricopa County

Commission # 250186

Expires April 9, 2009

EXHIBIT A

## LICENSE AGREEMENT

This Agreement is made on April 20, 2000 ("Effective Date"), between Delphi Automotive Systems LLC ("Delphi"), with offices at 408 Dana Street, Warren, Ohio 44486, and DuraSwitch Industries, Inc., ("DuraSwitch"), having a principal place of business at 234 South Extension, Section 103, Mesa, Arizona 85210.

## BACKGROUND

A. DuraSwitch represents that it has developed unique switch technology.
B. DuraSwitch represents that it has developed and possesses valuable information pertaining to magnetically coupled armature switch technology.
C. DuraSwitch represents that it has applied for patent coverage which relates to the magnetically coupled armature switch technology and owns patent applications and patents which are listed in Schedule 1 and corresponding patent applications and patents in other countries.
D. Delphi wishes to obtain from DuraSwitch, and DuraSwitch is willing to provide to Delphi, a license in accordance with and subject to the terms and conditions contained in this Agreement.
E. By way of separate agreement, DuraSwitch wishes to grant an option to purchase common stock in DuraSwitch Industries, Inc., and Delphi is willing to agree to such an option.

The parties agree as follows:

## 1. DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below:

1.1 "DuraSwitch Patents" shall mean:
   (a) the patents listed in Schedule 1,
   (b) any patents granted on the patent applications listed in Schedule 1 and any continuations and divisions of such applications,
   (c) any patents in other countries corresponding to such patents, and
   (d) any other patents granted on inventions conceived by DuraSwitch prior to the end of the License Period, or under which DuraSwitch has the right to grant a license to Delphi at any time during the License Period, and which relate to DuraSwitch Technology. However, DuraSwitch has no performance requirements nor efforts required to continue to develop new technology nor share future technology developments beyond DuraSwitch Technology.

1.2 "DuraSwitch Technology" shall mean all information possessed by DuraSwitch, now or at any time during the License Period, needed to produce magnetically coupled armature switches.

1.3 "License Period" shall mean the period extending from the Effective Date until April 21, 2020 or until this Agreement is terminated under clause 11.

1.4 "Licensed Products" shall mean any and all products the manufacture, use, sale, offer for sale or import of which, in the absence of this Agreement, would infringe or contribute to the infringement of at least one claim of DuraSwitch Patents.

1.5 "Exclusive Licensed Field" shall mean the original equipment, service parts and aftermarket passenger automobile, light truck and heavy truck industries.

1.6 "Non-exclusive Licensed Field" shall mean all fields of industry except passenger automobile, light truck, heavy truck, appliance, avionic, beverage dispenser, and consumer electronics (except to the extent consumer electronics relates to the Exclusive Licensed Field).

1.7 "Pushbutton Armature" shall mean a movable conductive element actuated by at least partially separating it from a magnet. By way of example and not limitation, such armatures are shown in Figs. 11 and 12 of Patent 5,523,730 and in Figs. 1-2 of Patent 5,990,772 and in Fig. 17 of Patent 5,666,096 and in products currently sold by DuraSwitch under the trademark Pushgate™.

1.8 "Translating Armature" shall mean a movable conductive element actuated by moving a Magnet Set that is in coupling relation with the conductive element, whether the movement is rotary, linear or otherwise. By way of example and not limitation, such armatures are shown in Figs. 1-2, 4-5 and 8-10 of Patent 5,523,730 and in Figs. 13-15 of Patent 5,666,096 and in products currently sold by DuraSwitch under the trademarks Rotor™ and Slider™.

1.9 "Directionally Sensitive Armature" shall mean a movable conductive element actuated by at least partially separating it from a magnet and whose output is dependent upon the location on the element where a separating force is applied. By way of example and not limitation, such an armature is shown in Figs. 1-2 of U.S. Patent Application Serial No. 09/324,567 and in products currently sold by DuraSwitch under the trademark MagnaMouse™.

1.10 "Actuating Control Mechanism" shall mean a device for movably mounting one or more Magnet Sets. By way of example and not limitation, an Actuating Control Mechanism with one Magnet Set is shown in Fig. 1 of Patent 6,023,213 and an Actuating Control Mechanism with two Magnet Sets is shown in Fig. 5 of that patent.

2

1.11 "Magnet Set" shall mean one or more individual magnets grouped together in coupling relation with a moveable conductive element.

1.12 "Delphi Affilitates" shall mean any company directly or indirectly controlled by Delphi, or under common control with Delphi. A company is controlled by ownership of more than fifty percent (50%) of the stock entitled to vote for directors of the company or persons performing a function similar to that of directors.

## 2. LICENSE

2.1 DuraSwitch hereby grants to Delphi to the extent of the Exclusive Licensed Field an exclusive license with the right to grant sublicenses under the DuraSwitch Patents and DuraSwitch Technology during the License Period to make, use, sell, offer for sale and import Licensed Products throughout the world.

    (a) Delphi shall have the exclusive right under the DuraSwitch Patents and DuraSwitch Technology to grant sublicenses, to the extent of the Exclusive Licensed Field, to others at royalty rates not less than those required to be paid in clause 3 of this Agreement.

    (b) In respect to sublicenses granted by Delphi under this Agreement, Delphi shall pay over to DuraSwitch that proportion of royalties received from its sublicensees necessary to yield DuraSwitch returns on Licensed Products sold by such sublicenses equal to the amounts which it would have received from Delphi on equivalent Licensed Products sold by Delphi. Sublicense royalties received by Delphi in excess of the amounts otherwise due to DuraSwitch under clause 3 shall be divided sixty five (65) percent to Delphi and thirty five (35) percent to DuraSwitch except if such sublicense royalties are received from a sublicensee for which Delphi holds a twenty (20) percent or greater equity interest. Sublicense royalties received by Delphi in excess of the amounts otherwise due to DuraSwitch under clause 3 from sublicensees for which Delphi holds a twenty (20) percent or greater equity interest will not be payable to DuraSwitch.

    (c) Termination of this Agreement shall terminate all sublicenses which may have been granted by Delphi, provided that any sublicensee may elect to continue to sublicense by advising DuraSwitch in writing, within sixty (60) days of the sublicensee's receipt of written notice of such termination, of its election, and of its agreement to assume in respect to DuraSwitch all of the obligations contained in its sublicensing agreement with Delphi. Any sublicense granted by Delphi shall contain provisions corresponding to those of this paragraph respecting termination and the conditions of continuance of sublicenses.

    (d) The granting by Delphi of sublicenses under the DuraSwitch Patents and DuraSwitch Technology shall be in the sole discretion of Delphi, and Delphi shall have the sole power to determine whether or not to grant sublicenses, the identity of the sublicensees, and subject to sub-paragraphs (a) and (c) of this clause 2.1, the royalty rates and terms and conditions of such sublicenses.

2.2 The exclusive license granted in clause 2.1 of this Agreement is not subject to any reserved license in DuraSwitch to make, use, sell, offer for sale and import Licensed Products.

2.3 Delphi shall have the sole right to convert the exclusive license granted in clause 2.1 into a non-exclusive license in the Exclusive License Field under DuraSwitch Patents and DuraSwitch Technology for the balance of the License Period to make, use, sell, offer for sale and import Licensed Products throughout the world. This right to convert shall be effective on July 1, 2007 provided DuraSwitch receives notice at least six (6) months before July 1, 2007. For the balance of the License Period, Delphi shall pay DuraSwitch the royalties in clauses 3.3-3.6 but shall not be subject to minimum and maximum royalties in clause 3.2.

2.4 After July 1, 2012 and with twelve (12) months notice, either Delphi or DuraSwitch shall have the right to convert the exclusive license granted in clause 2.1 into a non-exclusive license in the Exclusive License Field under DuraSwitch Patents and DuraSwitch Technology for the balance of the License Period to make, use, sell, offer for sale and import Licensed Products throughout the world. For the balance of the License Period, Delphi shall pay DuraSwitch the royalties in clauses 3.3-3.6 but shall not be subject to minimum and maximum royalties in clause 3.2.

2.5 DuraSwitch hereby grants to Delphi to the extent of the Non-exclusive Licensed Field a non-exclusive license with no right to grant sublicenses, except to Delphi Affiliates, under the DuraSwitch Patents and DuraSwitch Technology during the License Period to make, use, sell, offer for sale and import Licensed Products throughout the world except in Australia and in New Zealand.

4

2.6 DuraSwitch will execute the attached License Confirmations and any other proper documents required to record Delphi's rights under this Agreement in the United States Patent and Trademark Office.

2.7 DuraSwitch will promptly inform Delphi of the grant of each patent licensed under clause 2.1 and 2.5, and of the filing of each application for such a patent, and will promptly furnish copies of such patents to Delphi.

2.8 DuraSwitch will promptly disclose, deliver and otherwise make fully available to Delphi in the form of duplicates of drawings, designs, data, reports, written specifications, instructions and consultations, or in such other suitable manner and form as may be convenient to the parties, all DuraSwitch Technology listed in Schedule 2 within 15 days of the effective date of this Agreement, provided that this clause does not apply to any DuraSwitch Technology which has been communicated to DuraSwitch on terms which preclude DuraSwitch from disclosing it to Delphi.

2.9 DuraSwitch, during the License Period, will continue to promptly disclose, deliver and otherwise make fully available to Delphi in the form of duplicates of drawings, designs, data, reports, written specifications, instructions and consultations, or in such other suitable manner and form as may be convenient to the parties, all DuraSwitch Technology now possessed or hereafter discovered or developed by DuraSwitch or otherwise coming into DuraSwitch's possession that is requested by Delphi or that DuraSwitch believes would be helpful to Delphi in the manufacture, sale and importation of magnetically coupled armature switch technology, provided that this clause does not apply to any DuraSwitch Technology which is communicated to DuraSwitch on terms which preclude DuraSwitch from disclosing it to Delphi. However, DuraSwitch has no performance requirements nor efforts required to continue to develop new technology nor share future technology developments beyond DuraSwitch Technology.

## 3. EXCLUSIVE LICENSE FEE / ROYALTIES

3.1 Delphi shall pay to DuraSwitch as an exclusive license fee, within thirty (30) days of the Effective Date of this Agreement, four million dollars U.S. (U.S. $4,000,000.00) which shall be nonrefundable and not creditable against royalties.

3.2 Delphi shall pay to DuraSwitch royalties as stated in clause 3.3 through 3.6 for the license in clause 2.1 during the License Period, but in no event shall royalties for a one (1) year period starting on July 1, 2000 be less than the following minimum royalties and more than the following maximum royalties during each of the years indicated:

| Year | Minimum per Year | Maximum per Year |
|------|------------------|------------------|
| July 1, 2000 – June 30, 2001 | None | None |
| July 1, 2001 – June 30, 2002 | None | None |
| July 1, 2002 – June 30, 2003 | None | None |
| July 1, 2003 – June 30, 2004 | U.S. $1,000,000.00 | None |
| July 1, 2004 – June 30, 2005 | U.S. $2,000,000.00 | None |
| July 1, 2005 – June 30, 2006 | U.S. $3,000.000.00 | None |
| July 1, 2006 – June 30, 2007 | U.S. $6,000,000.00 | None |
| July 1, 2007 – June 30, 2008 | U.S. $7,000,000.00 | U.S. $10,000,000 |
| July 1, 2008 – June 30, 2009 | U.S. $8,000,000.00 | U.S. $10,000,000 |
| July 1, 2009 – June 30, 2010 | U.S. $9,000,000.00 | U.S. $10,000,000 |
| July 1, 2010 – June 30, 2011 | U.S. $10,000,000.00 | U.S. $10,000,000 |
| July 1, 2011 – June 30, 2012 | U.S. $10,000,000.00 | U.S. $10,000,000 |
| July 1, 2012 – April 21, 2020 | None | None |

3.3 For every Pushbutton Armature sold by Delphi, Delphi shall pay to DuraSwitch a royalty of U.S. ten (10) cents ($0.10) for the first three (3) years starting on July 1, 2000 and U.S. three (3) cents ($0.03) starting from July 1, 2003 for the License Period.

3.4 For every Translating Armature sold by Delphi, Delphi shall pay to DuraSwitch a royalty of U.S. ten (10) cents ($0.10) starting on July 1, 2000 for the License Period. For Actuating Control Mechanisms having more than one Magnet Set, the royalty for the second (or more) Magnet Set shall be U.S. two (2) cents ($0.02) starting on July 1, 2000 for the License Period.

3.5 For every Directionally Sensitive Armature sold by Delphi, Delphi shall pay to DuraSwitch a royalty of U.S. ten cents ($0.10) starting on July 1, 2000 for License Period.

3.6 Delphi shall pay no royalty to DuraSwitch for any Licensed Products sold to DuraSwitch. Royalties for any DuraSwitch Patents conceived by DuraSwitch prior to the end of the License Period, or under which DuraSwitch has the right to grant a license to Delphi at any time during the License Period shall be negotiated in good faith not to exceed U.S. ten (10) cents ($0.10) . DuraSwitch agrees that with respect to any DuraSwitch Patent which may later issue covering any apparatus made or sold by Delphi under the licenses granted in this Agreement and upon which royalties have been paid, Delphi shall not pay any additional royalties. However, DuraSwitch has no performance requirements nor efforts required to continue to develop new technology nor to share future technology developments beyond DuraSwitch Technology.

6

3.7 Royalties in clauses 3.3-3.6 for the License Period starting from July 1, 2012 shall be reduced by one third (1/3) upon the exercise by Delphi of an option to purchase common stock in DuraSwitch, pursuant to a separate agreement between DuraSwitch and Delphi.

3.8 Delphi shall pay to DuraSwitch royalties, for the license granted in clause 2.5, to be negotiated in good faith and not to exceed the lowest non-exclusive license royalty rate received by DuraSwitch at any time during the License Period.

3.9 Within thirty (30) days after the end of each month starting on July 1, 2000, Delphi shall furnish DuraSwitch with written statements showing Delphi's sales of Licensed Products during the preceding month, any deductions taken, and the computation of royalties, and shall pay the royalties due under this clause 3. A similar statement shall be rendered and payment made within thirty (30) days after and as of the date of termination of this Agreement covering the period from the end of that covered by the preceding statement to the date of termination. Delphi shall keep for two (2) years after the date of submission of each statement, true and accurate records, files and books of account containing all the data reasonably required for the full computation and verification of Delphi's sales of Licensed Product, royalties and deductions taken. Delphi agrees to permit DuraSwitch to examine, these records to the extent necessary to verify the reports. The examination by DuraSwitch shall be conducted by an auditor appointed by DuraSwitch and paid for by DuraSwitch.

## 4. ASSIGNABILITY

4.1 The licenses granted in this agreement shall be binding upon any successor of DuraSwitch in ownership or control of the DuraSwitch Patents and DuraSwitch Technology.

4.2 The license is personal to Delphi, and Delphi may not assign the license to any person unless DuraSwitch has given approval to the assignment, which DuraSwitch may give or refuse at its absolute discretion, provided that Delphi may assign the license, without DuraSwitch approval to (i) the successor to that portion of its business to which the license relates or (ii) any company directly or indirectly controlled by Delphi, or under common control with Delphi. A company is controlled by ownership of more than fifty percent (50%) of the stock entitled to vote for directors of the company or persons performing a function similar to that of directors.

## 5. MARKING

5.1 Delphi shall place in a conspicuous location on any Licensed Product a distinguishing mark agreeable to both parties and the number or numbers of the DuraSwitch Patents applicable thereto.

5.2 The marking of Licensed Product in clause 5.1 shall not be required if the product performance is compromised thereby, the marking can not reasonably be placed on any Licensed Product due to the product size, or in all instances where Delphi's customers request in writing that any Licensed Products do not include any markings.

7

5.3 Delphi shall notify DuraSwitch in writing when any Licensed Products are not marked pursuant to clause 5.2.

## 6. PUBLICITY

6.1 Delphi shall use the DURASWITCH trademark in all publications relating to the Licensed Products. Usage of any DuraSwitch trademarks and trade names shall be in accordance with DuraSwitch's then current published specifications relating to the use thereof. DuraSwitch reserves the right to periodically review and monitor Delphi's use of DuraSwitch's trademark and trade names in order to preserve DuraSwitch's rights, good will and value in its trademarks and trade names.

6.2 Except as required in clauses 5.1 and 6.1, Delphi is not required to use any DuraSwitch trademarks or trade names.

6.3 Within three (3) days of the Effective Date of this Agreement, Delphi and DuraSwitch shall issue a press release as shown in Schedule 4.

6.4 DuraSwitch shall not use any Delphi trademarks, trade names or service marks without the prior written consent of Delphi.

## 7. CONFIDENTIALITY

7.1 All of the terms of this Agreement except clause 3.1 and a combined total of the minimum royalties in clause 3.2 for the first seven years equaling twelve million dollars (U.S. $12,000,000), but not the existence of the Agreement, are confidential, and neither party shall disclose such terms and conditions to anyone else without first obtaining the prior written consent from the other party, provided that either party may disclose the terms and conditions of this Agreement in response to the legal requirement of a governmental agency or a court of compentent jurisdiction if such disclosure is first submitted to the other party.

7.2 Delphi will protect materials received from DuraSwitch under this Agreement and containing DuraSwitch Technology against disclosure to others with the same degree of care Delphi protects its own materials of a similar nature and will endeavor to instruct Delphi employees most likely to have access to such materials that such materials are to be so protected. DuraSwitch acknowledges that Delphi often discloses its own materials for its own commercial purposes to customers, vendors and consultants, and accordingly will not assert any claim with respect to disclosure or use of any materials, or any DuraSwitch Technology, disclosed to Delphi. The foregoing expresses Delphi's entire obligation with respect to DuraSwitch Technology, and supersedes any obligation that might otherwise be implied by or inferred from any legends placed on materials containing DuraSwitch Technology.

7.3 DuraSwitch will protect materials received from Delphi under this Agreement against disclosure to others with the same degree of care DuraSwitch protects its own materials of a similar nature and will endeavor to instruct DuraSwitch employees most likely to have access to such materials that such materials are to be so protected. Delphi acknowledges that DuraSwitch often discloses its own materials for its own commercial purposes to customers, vendors and consultants, and accordingly will not assert any claim with respect to disclosure or use of any materials disclosed to Delphi. The foregoing expresses DuraSwitch's entire obligation with respect to such materials, and supersedes any obligation that might otherwise be implied by or inferred from any legends placed on materials.

## 8. INFRINGEMENT BY THIRD PARTIES

8.1 Each party shall notify the other party in writing of any suspected infringement(s) of the DuraSwitch Patents and shall inform the other party of any evidence of such infringement(s).

8.2 Delphi shall have the first right to institute suit for infringement(s) in the Exclusive License Field. DuraSwitch agrees to join as a party plaintiff in any such lawsuit initiated by Delphi, if requested by Delphi or required by law, with all costs, attorney fees, and expenses to be paid by Delphi. However, if Delphi does not institute suit for infringement(s) within ninety (90) days of receipt of written notice from DuraSwitch of DuraSwitch's desire to bring suit for infringement in its own name and on its own behalf, then DuraSwitch may at its own expense, bring suit or take any other appropriate action.

8.3 If, within six (6) months of receipt of notice of infringement by another of any patent owned or controlled by DuraSwitch arising out of sale of devices identical or similar to Licensed Products, DuraSwitch and/or Delphi does not halt such infringement or bring suit against such other person, Delphi shall be permitted to defer payment of any royalties, until such infringement is halted, under this Agreement on Licensed Products for which royalties are based solely on Delphi's use of the patent infringed by such third party. Reports showing the amount of deferred royalties shall be submitted during any period of deferral of payments pursuant to this paragraph.

8.4 DuraSwitch shall have the sole right to institute suit for infringement(s) in the Non-exclusive License Field.

8.5 Neither party may settle with an infringer without the prior approval of the other party if such settlement would affect any rights of the other party under the DuraSwitch Patents and DuraSwitch Technology.

9

## 9. WARRANTY

9.1  DuraSwitch warrants it has the right to convey the licenses granted by this Agreement. DuraSwitch agrees to hold Delphi harmless from any and all costs, expenses, and damages (including attorneys' fees) incurred or sustained by Delphi as the result of any third party legally instituted suit relating to DuraSwitch's right to license the DuraSwitch Patents and DuraSwitch Technology.  In case of any such suit, DuraSwitch agrees that Delphi may defer payment of fifty (50) percent of the royalties due under this Agreement for sales of Licensed Products covered by the DuraSwitch Patent or Technology under dispute from six (6) months after the date of the suit until it is satisfactorily ended, at which time all deferred royalties on all sales of Licensed Products shall be immediately forwarded to DuraSwitch.  If the suit is not satisfactorily ended, DuraSwitch will return the fifty (50) percent non-deferred royalties due under this Agreement for sales of Licensed Products covered by the DuraSwitch Patents or Technology under dispute within thirty (30) days of receipt of written notice from Delphi. Reports showing the amount of deferred royalties shall be submitted during any period of deferral of payments pursuant to this paragraph.

9.2  DuraSwitch warrants that, as of the Effective Date of this Agreement, it has received no claim from a third party charging infringement of a patent by any activity of DuraSwitch.

9.3  If at any time during the term of this Agreement Delphi receives written notice that the Licensed Products manufactured or sold by Delphi under this Agreement are covered by any patent which is owned or controlled by a person, firm, or corporation other than DuraSwitch, Delphi may negotiate with such person, firm, or corporation for a license on such terms as Delphi deems appropriate.  Should the settlement with such person, firm, or corporation require the payment of a royalty on a Licensed Product made, used, sold, offered for sale, or imported by Delphi hereunder, the royalties otherwise payable by Delphi under clause 3 hereof shall be reduced by the same amount that royalties are paid by Delphi to such other person, firm, or corporation, but such reduction shall not exceed one-half (1/2) of the royalties otherwise payable under clause 3.

9.4  DuraSwitch agrees to defend at its expense and hold harmless Delphi from all loss or damage by reason of any and all actions or proceedings charging infringement, whether rightfully or wrongfully brought, of any patent by reason of manufacture, use, sale, offer for sale, or import of any Licensed Products by Delphi under this Agreement.  Delphi agrees to notify DuraSwitch in writing of all such actions or proceedings and, at the expense of DuraSwitch, to assist DuraSwitch in the defense of the action or proceeding.  If the manufacture, use, offer for sale, sale or import of such Licensed Products is enjoined as a result of such action or proceeding, DuraSwitch will indemnify Delphi for any and all losses or damages sustained by reason of obeying such injunction.

10

9.5    If a claim or claims of any patent licensed hereunder shall be held invalid, unenforceable, or cancelled  by a court or administrative agency from whose decision no appeal is taken or no appeal or other proceeding for review can be taken (hereinafter a "final judgment"), then such claim or claims shall, subsequent to the date of the final judgment, be treated as invalid, unenforceable, or cancelled and no royalties shall be due under clause 3 of this Agreement for sales thereafter of Licensed Products covered solely by such claims.

9.7    If a claim or claims of any patent licensed hereunder shall be held noninfringed by a third party's switch related products in a final judgment of a court or administrative agency, then subsequent to the date of the final judgment, Delphi shall have no obligation to pay royalties hereunder to DuraSwitch on switch related products manufactured, used, sold, offered for sale or imported by Delphi which do not infringe such patent.

9.8    DuraSwitch warrants that, as of the Effective Date of this Agreement, it has received no claim from a third party for ownership or misappropriation of any DuraSwitch Patent and/or DuraSwitch Technology.

9.9    DuraSwitch does not warrant or represent that any DuraSwitch Technology is or will be patentable or that any DuraSwitch Patent is or will be valid.

9.10   DuraSwitch warrants that, as of the Effective Date of this Agreement, to the extent of the Exclusive Licensed Field, it and its licensees have not granted any rights under DuraSwitch Technology and/or DuraSwitch Patents.  In addition, DuraSwitch warrants that, as of the Effective Date of this Agreement, DuraSwitch is under no obligation with any third party prohibiting the disclosure of DuraSwitch Technology to Delphi.

9.11   DuraSwitch agrees that with respect to any patent which may later issue, it will not assert against Delphi, or its vendees, any claims for infringement based on the manufacture, use, sale, offer for sale or import of any apparatus made or sold by Delphi under the license granted in this Agreement and upon which royalty has been paid in accordance with the provisions of clause 3.

9.12   DuraSwitch warrants that, during the License Period all DuraSwitch Patents will not be allowed to lapse.

## 10. LIABILITY

10.1   Delphi shall indemnify, defend and hold DuraSwitch harmless against all claims and expenses, including legal expenses and reasonable attorney's fees, arising out of the death of or injury to any person or persons or out of damage to property resulting from Delphi's production, assembly, sale or use of the Licensed Products.

11

10.2 Delphi's indemnification under clause 10.1 shall not apply to any claims or expenses due to: (i) the negligence of DuraSwitch; or (ii) the intentional wrongdoing or intentional misconduct of DuraSwitch.

10.3 Delphi's indemnification under clause 10.1 shall not apply to any claims or expenses due to: (i) the negligence of DuraSwitch; or (ii) the intentional wrongdoing or intentional misconduct of DuraSwitch.

## 11. TERM

11.1 This Agreement shall continue in force for the License Period unless terminated by either party under clause 11.2.

11.2 If either party shall at any time default in the payment of any monies due in accordance with this Agreement or in fulfilling any of the other obligations or conditions hereof, prior to terminating this Agreement, the other party shall give notice of such default specifying the reasons thereof. If such default is not cured by the noticed party within ninety (90) days of such notice, the other party shall then have the right in its own discretion to terminate this Agreement by giving written notice of termination. This Agreement shall terminate on the 30th day after each notice of termination is given. The noticed party shall have the right to cure any such default up to, but not after, the giving of such notice of termination.

## 12. LICENSED PRODUCT QUALITY

12.1    The DuraSwitch Quality Standards, attached as Schedule 3, shall be used as a minimum acceptable level of quality for all Licensed Products.

12.2 DuraSwitch shall be permitted to inspect Licensed Products in order to ensure minimum compliance with the DuraSwitch Quality Standards. Such inspection will be permitted by Delphi not more than four times per year during reasonable working hours and only after a written request has been received by Delphi one (1) week in advance of such inspection.

## 13. NOTICE

13.1  All notices given under this Agreement shall be in writing and shall be deemed to have been properly given when delivered personally or sent by prepaid registered or certified mail, or electronic transmission, and all payments and statements shall be sent by first class mail, postage prepaid, to the following addresses:

| If given to Delphi: | If given to DuraSwitch: |
|---|---|
| President<br>Delphi Packard Electric Systems<br>408 Dana Street<br>P.O. Box 431<br>Warren, Ohio 44486 | President<br>DuraSwitch Industries, Inc.<br>234 South Extension, Section 103<br>Mesa, Arizona, 85210 |
| with courtesy copies to: | with courtesy copies to: |
| Attention: Legal Staff – M/C 480-414-420<br>P.O. Box 5052<br>Troy, Michigan 48007-5052<br>Fax: (248) 267-5559 | _____<br>_____<br>_____<br>_____ |

The date of service shall be deemed to be the date on which such notice, payment, or statement was personally delivered, posted, or sent by telex or electronic transmission. Either party may give written notice of a change of address and, after notice of such change has been received, any notice, payment, or statement thereafter shall be given to such party as above provided at such changed address.

## 14. COVENANT

14.1  DuraSwitch, for the License Period, agrees to refrain from disclosing any DuraSwitch Technology to any company, partnership or other entity which is engaged in the manufacture, use or sale of products in the Exclusive Licensed Field.

## 15. CONSTRUCTION

15.1  This Agreement will be governed by and construed in accordance with the laws of the state of Illinois, without regard to its law of conflicts. The headings of Articles and Sections in this Agreement are intended solely for convenience of reference and shall not be considered in construing this Agreement.

## 16. EXTRANEOUS WRITINGS

16.1 This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof; all prior agreements, drafts, representations, statements, negotiations, and undertakings are superseded hereby. No amendment to this Agreement shall be effective unless it is in writing and signed by duly authorized representatives of both parties.

## 17. ARBITRATION

17.1 Both parties shall use their best efforts to resolve by mutual agreement any disputes, controversies, or differences which may arise from, under, out of, or in connection with this Agreement. If such disputes, controversies, or differences cannot be settled between the parties within sixty (60) days of the first written notice relative thereto, it shall be resolved by arbitration before three arbitrators acting under the Expedited Arbitration Rules in accordance with the most recent Rules of the American Arbitration Association. Such arbitration shall be held in Michigan and the award rendered in the arbitration shall be final and binding upon both parties.

IN WITNESS THEREOF, the parties have made this Agreement the day and year written above.

Delphi Automotive Systems LLC

By: _____

Name: _____D.R. Heilman_____

Title: _____President_____

Date: _____4/20/00_____

DuraSwitch Industries, Inc.

By: _____

Name: _R. TERREN DUNLAP_

Title: _CEO/CHAIRMAN_

Date: _4/21/00_____

## LICENSE CONFIRMATION

This document confirms that Duraswitch Industries Inc., incorporated under the laws of Nevada and having a principal place of business at 234 South Extension, Section 103, Mesa, Arizona, ("Duraswitch"), has granted DELPHI AUTOMOTIVE SYSTEMS LLC, incorporated under the laws of Delaware and having a place of business at Warren, Ohio ("DELPHI"), to the extent of the original equipment, service parts and aftermarket passenger automobile, light truck and heavy truck industries, an exclusive license with the right to grant sublicenses to make, use, sell, offer for sale and import throughout the world magnetically coupled armature switches covered by one or more of the patents listed in the attached Schedule 1,any patents granted on the patent applications listed in the attached Schedule 1 and any continuations and divisions of such applications, any patents in other countries corresponding to such patents, any other patents granted on certain inventions conceived by Duraswitch, and certain other patents under which Duraswitch has the right to grant a license to Delphi, upon and subject to the terms of an Agreement between Duraswitch and Delphi made the 20th day of April, 2000.

DURASWITCH INDUSTRIES, INC.

By _Steven Dunlap_

Title _CEO / CHAIRMAN_

Date _4/21/00_

The foregoing instrument was acknowledged before me this _21_ day of _April_, 2000 by _K. Terren Dunlap_ of Duraswitch Industries, Inc., a Nevada company on behalf of the company.



(Seal)

_____
Notary Public

## LICENSE CONFIRMATION

This document confirms that Duraswitch Industries Inc., incorporated under the laws of Nevada and having a principal place of business at 234 South Extension, Section 103, Mesa, Arizona, ("Duraswitch"), has granted DELPHI AUTOMOTIVE SYSTEMS LLC, incorporated under the laws of Delaware and having a place of business at Warren, Ohio ("DELPHI"), to the extent of all fields of industry except passenger automobile, light and heavy truck original equipment, service parts and aftermarket industries, appliance, avionic, beverage dispenser, consumer electronics (except to the extent consumer electronics relates to the Exclusive Licensed Field)  a non-exclusive license with no right to grant sublicenses to make, use, sell, offer for sale and import throughout the world except Australia and New Zealand magnetically coupled armature switches covered by one or more of the patents listed in the attached Schedule 1,any patents granted on the patent applications listed in the attached Schedule 1 and any continuations and divisions of such applications, any patents in other countries corresponding to such patents, any other patents granted on certain inventions conceived by Duraswitch, and certain other patents under which Duraswitch has the right to grant a license to Delphi, upon and subject to the terms of an Agreement between Duraswitch and Delphi made the 20th day of April, 2000.

DURASWITCH INDUSTRIES, INC.

By _R. Terren Dunlap_

Title _CEO/CHAIRMAN_

Date _4/21/00_

The foregoing instrument was acknowledged before me this 21 day of April, 2000 by R. Terren Dunlap of Duraswitch Industries, Inc., a Nevada company on behalf of the company.

(Seal)

OFFICIAL SEAL
LIN ASHLEY
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Comm. Expires 10/1/01

_Lin Ashley_
Notary Public

16

## Schedule 1

*Applications*

Magnetically Actuated Pushbutton Switch - Filed January 8, 1999

Directionally Sensitive Switch - Filed June 2, 1999

Switch Panel Having a Magnetically-Retained Overlay - Filed September 14, 1999

Island Switch - Filed October 18, 1999

Magnetically Actuated Switch with Debris Isolation - Filed December 17, 1999

Magnetically-Retained Armature Retainer for Electrical Switches - Filed January 10, 2000

Method and Kit for Converting a Flat Panel Switch - Filed March 30, 2000

*Letters Patent*

| U.S. | Patent No. |
|------|-----------|
| | 5,523,730 |
| | 5,666,096 |
| | 5,867,082 |
| | 5,990,772 |
| | 6,023,213 |

## Schedule 2

The following list includes DuraSwitch Technology to be transferred to Delphi within fifteen (15) days of the Effective Date pursuant to clause 2.6 of this Agreement.

1. All Manufacturing Specifications including, but not limited to, quality control plans
2. All Engineering Design Specifications
3. All Part Prints
4. All formulations required to manufacture the Licensed Products
5. All Quality data for the past two months
6. All production test data for the past two months
7. All tooling, jig and fixture blueprints, design manuals, and training manuals

Schedule 3



## PushGate<sup>TM</sup> Product Specification – Number DPS-0600

- ASTM-F1597 – Determining The Actuation Force and Contact Force of a Membrane Switch

- ASTM-F1661 – Determining Contact Bounce Time of Membrane Switch

- ASTM-F1662 – Verifying The Specific Dielectric Withstand Voltage of A Membrane Switch

- ASTM-F1663 – Determining The Capacitance of A Membrane Switch

- ASTM-F1681 – Determining the Current Carrying Capacity of A Conductor as Part of A Membrane Switch

- ASTM-F1683 – Creasing or Bending A Membrane Switch Tail Assembly

- ASTM-F1689 – Determining The Insulation Resistance of A Membrane Switch

- ASTM-F1762 – Effects of Variation of Atmospheric Pressure on Membrane Switches

- ASTM-F1812 – Membrane Switch ESD Shielding Test Method

- ASTM-F1842 – Determining Ink or Coating Adhesion on Plastic Substrates for Membrane Switches

- ASTM-F1895 – Submersion of Membrane Switch

- ASTM-F1896 – Determining the Circuit Resistance of A Membrane Switch

- Mil-Std 202 – Test Methods for Electronic & Electrical Component Parts

- Mil-Std-810E – Environmental Test Methods and Engineering Guidelines

- UDI-R-20459 – Quality Assurance Environmental Test Plan
.

*Note:* The aforementioned ASTM test specifications were written specifically for membrane switch technology. *DuraSwitch*® PushGate™ technology, although similar in many aspects does not have an applicable industry standard at this time that can be referenced. In all cases, the PushGate™ technology meets and in critical areas exceeds the Membrane specifications. In those cases where PushGate™ technology exceeds those design and test standards, our Document will note such differences.

© DuraSwitch Industries, Inc. 2000                                      Page 3 of 56



## PushGate™ Product Specification – Number DPS-0600

- **Format For Reporting**
- General description of test to be performed and results expected
    - Customer
    - Product type
    - Serial number
    - Model number
    - Drawing number
    - Brief description of features, functions, etc.

- Hardware identification (switch unit to component level assembly)
- Functional description of the affected parts of the switch unit
- Test Measurements
    - Description of test and particular referenced documents
    - Test results (charting, graphing, test datum)
- Root Cause of failure
- Corrective actions
- **Attachments**
- Incremental test log (showing time of test starts, interruptions, failures and restarts)
- Failure Mode and Effect Analysis (physics of failures)
- **Reference Documents for Testing**
- ASTM Membrane Switch
- ASTM-1596 – Exposure of Membrane Switches to Temperature and Humidity
- ASTM-F1570 – Determining the Tactile Ratio of a Membrane Switch
- ASTM-F1578 – Contact Closure Cycling of a Membrane Switch
- ASTM-F1595 – Viewing Conditions for visual Inspection Standards of Membrane Switches

© DuraSwitch Industries, Inc. 2000    Page 2 of 56



## PushGate™ Product Specification – Number DPS-0600

### 9. Quality Considerations

I.    PURPOSE:
The purpose of this procedure will be to outline the test requirements to validate, qualify, and determine product performance, capability, and worthiness to specification on a random sample and test basis. To ensure that all product on an ongoing basis complies the company's basic assembly, environmental, mechanical and electrical specifications.

• SCOPE:

The following test(s) are to determine whether *DuraSwitch*® products meet specified performance parameters, i.e.; Electrical, Mechanical, Environmental and Human Factors Engineering. Environmental requirements will include: temperature, humidity, shock, and vibration areas that could normally be experienced in and through the use when exposed in our daily surroundings. In addition, product will be subjected to a total functional test based upon all aspects of product design as defined within the *DuraSwitch*® performance specifications as noted at the time of customer acceptance of quote.

This procedure, **Performance, Life Cycle and Environmental Profiling** will output the necessary data, in narrative and statistical format required, outlining the environmental and stress conditions to which the product under test will be subjected to during its various life phases. The data may be form of calculations, laboratory tests and/or operational measurements. Each profile will show the number of measurements from which the average value of these stresses and design achievements are determined as well as their characteristic variability which will be expressed in terms of standard deviation.

Reporting shall include: test specifications, method used, test parameters, duration, descriptions of how the test will be performed, test set-up (block diagram), test equipment to be utilized, location of voltage and current sensors, resistance measurements, accelerometers, thermocouples, etc., relative to test items, and data reduction techniques.

The Product Assurance team working under the supervision of Quality Engineering will perform the test, record test data and anomalies in written format. The report will include an analysis of the causes of the anomalies and corrective action taken to prevent recurrence. A test anomaly caused by an equipment failure (this includes failures caused by external sources) shall be reported in the same manner.

© DuraSwitch Industries, Inc. 2000
56

**Schedule 4**


**DELPHI**
Automotive Systems
Driving Tomorrow's Technology

**news release**

**FOR RELEASE:** Tuesday, April 25, 2000

**CONTACTS:**  Ann Cornell
330.759.6141
DuraSwitch:  Heather Beshears
480.586.3357

# DELPHI PARTNERS WITH DURASWITCH® TO BRING NEW SWITCH TECHNOLOGY INTO AUTOMOTIVE MARKET

WARREN, Ohio — Delphi Automotive Systems (NYSE:DPH) signed a licensing agreement today with DuraSwitch Industries Inc. (AMEX:DRA) for exclusive rights to utilize and manufacture DuraSwitch's revolutionary magnetically coupled switch technology for the automotive industry, announced David R. Heilman, president, Delphi Packard Electric Systems and vice president, Delphi.

Delphi's Packard Electric Division will utilize its knowledge of switches and switch packaging to adapt the DuraSwitch technology to the automotive industry, as well as the non-automotive switch markets. Along with the licensing and manufacturing agreement, Delphi has an option to acquire slightly under 20 percent of DuraSwitch.

"This is a significant win for Delphi and for DuraSwitch," said Heilman. "I'm confident that the marketplace acceptance of this innovative technology will be great, yielding substantial sales that will benefit both Delphi and DuraSwitch. Our potential for an equity position in DuraSwitch will not only cement our relationship, but will allow us to participate in their value growth."

Delphi's diversified customer base and solid manufacturing footprint will help take DuraSwitch global. The automotive switch market is valued at $4 billion, with a 6.8 percent compounded average annual growth rate.

Heilman said, "This is exactly the switch technology that is needed to provide the multitude of switching and electronic features that today's automotive customers demand. We consider DuraSwitch to be a next generation switch technology, which has a straightforward design that fits perfectly with our manufacturing capabilities."

DuraSwitch utilizes a patented, revolutionary magnetic-based design that provides previously unheard of levels of reliability and durability, with a consistent tactile feedback or "click." This specialized technology enables the switches to be used in applications where either membrane or electro-mechanical switches are currently used. It easily incorporates into flat

- more -

page 2, Delphi and DuraSwitch partner

panel, electronically integrated switch packaging, currently required in advanced electrical/ electronic architectures and in demand by vehicle manufacturers.

"We are excited to be part of the Delphi Team, combining our switch technology with their state-of-the-art manufacturing capabilities," said Terry Dunlap, chief executive officer and chairman, DuraSwitch. "I'm confident that by working together the opportunities to apply this technology will quickly extend well beyond the automotive market."

"We see Delphi as the perfect partner," said Bob Brilon, president and chief financial officer, DuraSwitch. "Their strong global presence and solid customer base will help us achieve our vision of leadership in human-machine interface technology."

This partnership with DuraSwitch will enable Delphi to maintain and grow its current switch business. The intent is to begin moving away from some of the electro-mechanical switches typically used in vehicles and replace them with DuraSwitch technology, which has fewer parts, Heilman said. By doing so, switch degradation and failure rates can be minimized leading directly to more satisfied vehicle buyers.

"Our exclusive licensing agreement with DuraSwitch will help Delphi become a leader in automotive switch technology," said Carl Rausch, director of marketing, planning and business development, Delphi Packard Electric. "We see this switch technology fitting nicely with Delphi's infotainment systems and devices, as well as other automotive communication applications. It also lends itself well to the custom styling, differentiation and higher quality that our customers are requesting."

DuraSwitch, incorporated in 1997, and headquartered in Mesa, Ariz., designs and licenses an innovative switch technology that is used to operate products in a variety of commercial and consumer applications. DuraSwitch became listed on the American Stock Exchange in August 1999. Some key customers include Disney World, Rain Bird, Johnson Outdoors, Raytheon Marine, U.S. Filter and Frymaster. DuraSwitch can be found on the Internet at www.duraswitch.com

Delphi Automotive Systems, headquartered in Troy, Mich., USA, is a world leader in transportation and mobile electronics components and systems technology. Delphi's three business sectors – Dynamics & Propulsion; Safety, Thermal & Electrical Architecture; and Electronics & Mobile Communication – provide comprehensive product solutions to complex customer needs. Delphi has approximately 214,200 employees, and operates 178 wholly owned manufacturing sites, 41 joint ventures, 53 customer centers and sales offices and 27 technical centers in 39 countries.  Regional headquarters are located in Paris, Tokyo and São Paulo, Brazil.  Delphi can be found on the Internet at www.delphiauto.com.

#     #     #

GROUP
EXHIBIT B

Home / Manufacturer Products / Tech Transfer Licensing / Delphi
Technology Licensing / Duraswitch

# Technology Inventory Search

**TECHNOLOGY NAME:**
**Duraswitch**

A switch technology that combines the best features of both electro-mechanical and flat panel membrane devices into cost effective, thin design solutions for next-generation products. Duraswitch?s technology utilizes magnets, eliminating parts that wear out. The thin profile design functions without the scraping, flexing, grinding, or material stress associated with traditional switches providing superior durability and performance, a unique tactile feel. A reduction of switch failure can result in lower associated warranty costs.

| | |
|---|---|
| **CLASSIFICATION:** | Electronics & MEMS: Switch Products |
| **PATENT #:** | |
| **PRODUCT PROFILE:** | duraswitch.pdf [PDF] |
| **INVENTOR NAME(S):** | |
| **CONTACT INFO:** | Diane Cunningham
248.813.8061
diane.cunningham@delphi.com |

**Back to Search Results** ⚲

DTI Technology Group:
Switches

# D u r a s w i t c h   T e c h n o l o g y

**Description** – Duraswitch is an electronic switch technology that combines the best features of both electromechanical and flat panel membrane switches into cost-effective, thin designs that provide excellent solutions for next-generation products. Duraswitch technology utilizes magnets, eliminating parts that inevitably wear out in other technologies. The designs function without the scraping, flexing, grinding, or material stress associated with traditional switches. Duraswitch technology provides outstanding features like superior durability and performance, a unique tactile feel, a thin profile design, and exceptional robustness. The switch designs are easy and cost-effective to manufacture. In addition, another benefit of the Duraswitch design is the drastic reduction of switch failure and the associated repair and warranty costs.

Possible automotive applications for the Duraswitch technology include HVAC systems, lights, mirrors, and entertainment system controls. The Duraswitch design can be used in any flat panel, electronically integrated switch packaging, replacing membrane or electromechanical switches.





## Technology Data

| Category | Status |
|---|---|
| Commercial viability | – Proven |
| Patent protection | – Issued |
| Know-how | – Available |

## Potential Applications

| Industry | Description |
|---|---|
| Automotive | – Robust and user-friendly switches for automotive systems such as HVAC and entertainment controls |
| Appliances | – User-friendly and dependable human-machine interfaces |
| Electronics | – Reliable and durable flat panel and rotary electric switches |



DELPH

Delphi Technologies, Inc.
M/C 483-400-404
5725 Delphi Drive
Troy, Michigan 48098-2815 U.S.A.
Tel: [1] 248.813.8061 Fax: [1] 248.813.5008

©2004 Delphi Corporation. All rights reserved.

DT-P&M-0201-0-July04

EXHIBIT C

## OPTION PURCHASE AGREEMENT

THIS OPTION PURCHASE AGREEMENT ("Agreement") is dated **April 20, 2000,** by and between **DELPHI AUTOMOTIVE SYSTEMS CORPORATION,** a Delaware corporation ("**Holder**") and **DURASWITCH INDUSTRIES, INC.,** a Nevada corporation ("**Company**").

In consideration of the premises and the mutual representations, warranties, covenants and agreements contained in this Agreement, the parties, intending to be legally bound, agree as follows:

1.     In consideration of Holder entering into a License Agreement with Company dated as of the date of this Agreement, and other good and valuable consideration, receipt of which is hereby acknowledged by Company, Company hereby issues to Holder an irrevocable option to purchase 1,651,846 shares of its $.001 par value common stock (the "**Common Stock**"), subject to adjustment as provided in the Option to Purchase Common Stock (the "**Option**").

2.     Company represents and warrants to Holder that:

(a)     Company will at all times have authorized, and reserved sufficient shares of Common Stock for issuance pursuant to the Option and/or this Agreement; it will take all actions necessary to ensure that all such shares are issued in full compliance with all applicable laws and regulations, and with any requirement of any securities exchange upon which any capital stock of Company may be listed; and the issuance of the Option is, and of such shares will be, exempt from registration under any federal or state securities laws; and

(b)     Company's authorized capitalization consists solely of 40,000,000 shares of Common Stock par value $.001 per share and 10,000,000 shares of Series A, no par value preferred stock; with respect to each class of shares, Company's most recent SEC filing, Form 10-KSB describes outstanding shares and shares issuable based on all existing options, warrants and other rights to acquire Company's Common Stock or Preferred Stock (as the case may be), with no changes since that filing, except as previously otherwise disclosed in writing to Holder.

(c)     Company has full power and authority to enter into this Agreement and to consummate the transactions contemplated herein, and this Agreement has been duly executed and delivered by Company and is a valid and legally binding obligation of Company in accordance with its terms under Nevada law.

3.     Holder represents and warrants to Company that it is acquiring the Option (and will acquire the Common Stock issuable upon exercise of the Option) for its own account for investment and not with a view towards distribution, except in compliance with all applicable laws.

4.     Holder shall not sell or otherwise transfer the Option or any Common Stock acquired upon the exercise of the Option except pursuant to an effective registration under the Securities Act of 1933 (the "**Securities Act**") or in a transaction which, in the opinion of counsel (which may be in-house counsel to Holder), qualifies as an exempt transaction under the Securities Act and the rules and regulations promulgated thereunder and any applicable state securities laws. The certificates evidencing the Option and the Common Stock issuable upon exercise of the Option may bear an appropriate legend reflecting the foregoing restrictions on the transfer of such securities.

5.     The provisions of Exhibit A hereto, pursuant to which Company has granted certain registration rights to Holder, are incorporated herein by reference as if stated in full in this Agreement.

6.     This Agreement (including the Exhibits), together with the Option (and Exhibits to the Option), constitutes the complete and entire agreement between Holder and Company regarding the sale of the Option to Holder by Company.

7.    The interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of Nevada without resort to that state's conflict-of-laws principles.

8.    This Agreement (including the registration rights set forth in Exhibit A) shall inure to the benefit of and be binding upon the successors, assigns and transferees of each of the parties, including, without limitation and without the need for an express assignment, subsequent transferees of the Option or any shares of Common Stock acquired upon the exercise of the Option; but nothing herein shall be deemed to permit any assignment, transfer or other disposition of the Option or any shares of Common Stock acquired upon the exercise of the Option issued pursuant to this Agreement in violation of applicable law.

9.    At the date of this Agreement, Holder has not had an opportunity to investigate or analyze the business, assets, commitments (licenses, other contracts, etc.), liabilities, properties and affairs of Company.   Company agrees to provide Holder with reasonable access to its facilities and personnel to enable Holder to complete such investigation and analysis, and to provide Holder with copies of documents relating thereto during the Exercise Period.  In addition, Company will keep Holder informed of its affairs, and will advise Holder of any and all events or conditions that exist or occur and that have had or might have a material adverse effect on the assets, properties, business, liabilities, prospects or financial condition of Company, other than such events or conditions previously disclosed to Holder in writing.

10.    Upon exercise of the Option for [1,651,846] Option Shares, Holder and Messrs. Dunlap, Van Zeeland (Tony) and Brilon (the "**Primary Shareholders**") will enter a shareholders' agreement ("**Shareholders' Agreement**") that provides that all shares owned by them will be voted in such manner, and Company, Holder and the Primary Stockholders will take such other action as may be necessary to:

(a)    Cause the By-laws of Company to be amended to include the terms set forth in subparagraph (e) below (to the extent such By-laws are not already in effect);

(b)    Prevent, without the written consent of Holder, any amendment to the articles of Incorporation or By-laws of Company except as referred to in clause (a) above;

(c)    Cause the Board of Directors of Company to consist of six members and to cause one designee of Holder (increased to two designees if Holder's ownership interest increases to 20% or greater and Board of Directors increases to greater than six members) and the three Designees of the Primary stockholders to be elected as directors of Company;

(d)    Prevent Company from taking any action inconsistent with the Stockholders' Agreement or the Articles of Incorporation or By-laws described therein; and

(e)    Prevent any subsidiary or affiliate of Company from taking, without the consent of Holder, any of the following actions which, if taken by Company, will require the prior unanimous consent of the Directors of Company.  Approval of the following matters must include the unanimous affirmative vote of the Directors of Company:

(i)    changing the nature of Company's business or expanding or reducing the scope of Company's operations;

(ii)    amending the Certificate of Incorporation or By-laws of Company;

(iii)    the creation of debt or debt obligations exceeding a two to one ratio of debt to equity;

(iv)    dividends or other distributions absent positive retained earnings;

(f)    Company currently has comprehensive employee benefit plans.  The parties will consider in good faith whether any voting provisions are appropriate relating to significant changes in employee compensation arrangements.

11.    Company and Holder and the Primary Shareholders agree to negotiate in good faith to finalize the Shareholders' Agreement prior to expiration of the Exercise Period.

**IN WITNESS WHEREOF,** each of the parties has duly executed this Agreement as of this 20th day of April, 2000.

Signed:

**DELPHI AUTOMOTIVE SYSTEMS**
**CORPORATION**

D. R. Heilman
President

**DURASWITCH INDUSTRIES, INC.**

by

R. TERREN DUNLAP
CEO/CHAIRMAN

**EXHIBIT A**

**REGISTRATION RIGHTS**

1.    **Piggy-Back Rights.**

(a)    If Company decides, at any time prior to the second year anniversary of the expiration of the Exercise Period (as defined in the Option), to prepare and file a registration statement under the Securities Act of 1933 (the "**Securities Act**") with respect to the public offering for cash of any shares of its Common Stock (or of other securities convertible into or exchangeable for Common Stock) (**"Registration Statement"**), and which is not a registration solely to implement an employee benefit plan or a transaction to which Rule 145 under the Securities Act is applicable, Company shall give 30 days' prior written notice of such decision to Holder and shall, upon the written request of Holder and subject to Paragraph 3 below, include in the Registration Statement such number of Option Shares (as defined in the Option) as Holder may request, together with any other shares of Common Stock then beneficially owned by Holder or Holder's affiliates (collectively "**Holder's Shares"**). If Company has not received a request from Holder to include Option Shares within such 30-day period, then Company shall have no obligation to include any such shares in the offering. The registration rights granted in this section shall expire if not exercised before the second year anniversary of the expiration of the Exercise Period.

(b)    Company shall keep such Registration Statement(s) and other filings relating thereto effective and current under the Securities Act permitting the sale of Holder's Shares included therein for the same period that the registration is maintained effective in respect of shares of other persons (including Company). In any underwritten offering of Common Stock, any Holder's Shares which are included will be sold at the same time and the same per-share price as Company's shares. In connection with any Registration Statement or subsequent amendment or similar document filed with respect thereto, Company shall make Holder's Shares covered thereby eligible for public offering and sale under the securities and Blue Sky laws of such jurisdictions as may be specified by Holder before the effective date of such Registration Statement; provided that Company shall not be obligated to qualify to do business in any jurisdiction where it is not so qualified as of such effectiveness, or to take any action which would subject it to unlimited service of process in any jurisdiction where it is not so subject at such time. Company shall keep such Blue Sky filings current for the length of time it must keep effective any Registration Statement, post-effective amendment, prospectus or offering circular pursuant hereto.

(c)    Upon receipt of any notice from Company that the Registration Statement or any prospectus included therein must be supplemented or amended, Holder will forthwith discontinue disposition of any shares pursuant to such Registration Statement until Holder's receipt of copies of a supplemented or amended prospectus covering such shares, and, if so directed by Company, Holder will deliver to Company (at Company's expense and as soon as possible) all copies, other than permanent file copies then in Holder's possession, of the prospectus covering such shares current at the time of its receipt of such notice. Company shall use its best efforts to deliver and, if necessary, cause to be made effective under the Securities Act, and any applicable state securities laws, any such amended or supplemented prospectus as soon as possible.

2.    **Expenses; Consent.** In connection with any Registration Statement or other filing described herein (including without limitation keeping such filings effective as provided herein), Company shall bear all the expenses and professional fees related to the registration including, but not limited to, printing, filing, legal, accounting and registration fees (provided that Holder shall be responsible for any legal expenses incurred by Holder relating to registration of Holder's Shares). Company shall also provide Holder with such number of printed copies of the prospectus, offering circulars and/or supplemental or amended prospectuses in final and preliminary form as Holder may reasonably request. Company consents to the use of each such prospectus or offering circular in connection with the sale of the Holder's Shares.

3.    **Underwritten Offerings.**

(a)    If any registration in which Holder proposes to participate pursuant to Paragraph 1 involves the distribution of any securities through one or more underwriters, Company will, if requested by Holder, arrange for such underwriters to include all of the Company shares to be offered and sold by Holder among the securities of Company to be distributed by such underwriters.   The underwriters' obligation to include such Shares shall be conditioned upon Holder's agreement to enter into an agreement with the managing or lead underwriter, as is customary for selling shareholders which are not affiliates of the issuer, provided that Holder shall not be required to make any representations or warranties to or agreements with Company or the underwriters other than representations, warranties or agreements regarding Holder, its shares and its intended method of distribution or any other representations or warranties required by law or customarily given by selling shareholders which are not affiliates of the Issuer in an underwritten public offering.

(b)    If any registration under Paragraph 1 involves an underwritten offering and the managing underwriter of such offering shall advise Company that, in its view, the number of securities requested to be included in such registration exceeds the largest number (the "**Maximum Amount**") that can be sold in an orderly manner in such offerings, within a price range acceptable to Company, Company shall include in such registration shares in the following priority: first, all shares of Common Stock that the Company proposes to register for its own account; and second, Holder's Shares requested by Holder to be included in the Registration Statement, pro rata with the aggregate of all shares of all other persons exercising similar registration rights granted before the date hereof.

4.    **Indemnification; Contribution.**

(a)    **Indemnification by Company.** Company shall indemnify, to the fullest extent permitted by law, Holder, its directors, stockholders, officers, affiliates, employees, agents and each person who controls any of the foregoing within the meaning of the Securities Act against all losses, claims, damages, liabilities and expenses (including reasonable attorneys' fees) caused by, resulting from, arising out of or related to any untrue or alleged untrue statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements made therein not misleading, except insofar as the same are caused by or contained in any information with respect to Holder furnished in writing to Company by Holder specifically for use therein or caused by Holder's failure to deliver a copy of the Registration Statement or prospectus or any amendments or supplements thereto in accordance with the requirements of the Securities Act after Company has furnished such Holder with a copy of the same. Company shall also indemnify any underwriter of Company's Common Stock, its officers, employees and directors and each person who controls such underwriter (within the meaning of the Securities Act) to the same extent as provided above with respect to the indemnification of Holder.

**(b)**    <u>**Indemnification by Holder.**</u>   In connection with any Registration Statement in which Holder is participating, such Holder will furnish to Company in writing such information and affidavits as Company reasonably requests in connection with preparation of the Registration Statement, prospectus or preliminary prospectus and shall indemnify, to the full extent permitted by law, Company, its directors, each of its officers who have signed the Registration Statement and each person who controls Company (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses (including reasonable attorneys' fees) caused by, resulting from, arising out of or related to any untrue statement of a material fact or any omission of a material fact required to be stated in the Registration Statement or prospectus or any amendment thereof or supplement thereto, or necessary to make the statements therein (in the case of a prospectus, in the light of the circumstances under which they were made) not misleading, to the extent, but only to the extent, that such untrue statement or omission is caused by or contained in any information or affidavit furnished in writing by such Holder expressly for use in such Registration Statement, prospectus, preliminary prospectus or any amendment thereof.   In no event shall the liability of Holder hereunder exceed the amount of net proceeds received by it upon the sale of securities pursuant to such offering.

**(c)**    <u>**Conduct of Indemnification Proceedings.**</u>    Any person entitled to indemnification hereunder shall give prompt written notice to the indemnifying party after the receipt by such person of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which such person may claim indemnification or contribution pursuant to this Agreement and, unless in the reasonable judgment of such indemnified party a conflict of interest may exist between such indemnified party and the indemnifying party with respect to such claim, permit the indemnifying party to assume the defense of such claim with counsel satisfactory to such indemnified party.   If the indemnifying party is not entitled to, or elects not to, assume the defense of a claim, it will not be obligated to pay the fees and expenses of more than one counsel with respect to such claim, unless in the reasonable judgment of counsel for such indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim, in which event the indemnifying party shall be obligated to pay the reasonable fees and expenses of such additional counsel or counsels.   The indemnifying party will not be subject to any liability for any settlement made without its consent.

**(d)**    <u>**Contribution.**</u>

(i)    If the indemnification provided for in this Paragraph 4 from the indemnifying party is unavailable to an indemnified party in respect of any losses, claims, damages, liabilities or expenses referred to herein, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and indemnified parties in connection with the actions which resulted in such losses, claims, damages, liabilities or expenses, as well as any other relevant equitable considerations.   The relative fault of such indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such indemnifying party or indemnified parties, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action.   The amount paid or payable by a party as a result of the losses, claims, damages, liabilities and expenses referred to above shall be deemed to include, subject to the limitations set forth in Subparagraph 4(c) hereof, any legal or other fees or expenses reasonably incurred by such party in connection with any investigation or proceeding.

(ii)    The parties agree that it would not be just and equitable if contribution pursuant to this Subparagraph 4(d) were determined by pro rata allocation or by any

other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph.

(iii)    If indemnification is available under this Paragraph 4, the indemnifying parties shall indemnify each indemnified party to the full extent provided in Subparagraphs 4(a) and 4(b) hereof without regard to the relative fault of said indemnifying party or indemnified party or any other equitable consideration provided for in this Paragraph 4(d).

EXHIBIT D

**This Option has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or under applicable state securities laws. Except as provided herein, this Option may not be sold, offered for sale, pledged or hypothecated except in compliance with applicable laws and the other restrictions on transfer set forth herein.**

## DURASWITCH INDUSTRIES, INC.

---

## OPTION TO PURCHASE COMMON STOCK

### April 20, 2000

1.     **Grant.** DuraSwitch Industries, Inc, a Nevada corporation (hereinafter, "**Company**"), for value received hereby grants to Delphi Automotive Systems Corporation, a Delaware corporation ("**Holder**") an irrevocable option ("**Option**") to purchase 1,651,846 shares of Company's authorized but unissued $.001 par value common stock (the "**Common Stock**"), subject to adjustment as provided below. (The shares of Common Stock issuable under this Option are referred to as the "**Option Shares**".)

2.     **Term.** This Option may be exercised at any time before 11:59 p.m. on June 30, 2000 (the "**Exercise Period**"), subject to subparagraph 8(d) below.

3.     **Exercise Price.** The exercise price for each Option Share described in paragraph 1 (the "**Original Exercise Price**") is $7.00 per share, subject to adjustment as provided below.

4.     **Reservation and Authorization of Common Stock.** Company agrees (a) that all Option Shares will, upon issuance, be validly issued, fully paid and non-assessable and free of all transfer taxes, liens and charges, (b) that during the Exercise Period, Company will at all times have authorized and reserved for the purpose of issue or transfer upon exercise of this Option, sufficient shares of Common Stock to provide for the exercise of this Option and (c) that Company will take all such actions as may be necessary to ensure that the Option Shares may be issued without violation of any applicable law or regulation, or any requirement of any securities exchange upon which any capital stock of Company may be listed.

5.     **Exercise Procedure.** Holder may exercise this Option, in whole but not in part, by presenting it and tendering the aggregate Exercise Price for the Option Shares in legal tender or by certified check or wire transfer to Company, at Company's principal executive offices, along with a duly exercised written subscription substantially in the form of Exhibit 5. (The date on which this Option is thus surrendered is referred to as the "**Exercise Date**".) Company shall promptly, but in no event later than ten (10) days after the Exercise Date, at its expense (including the payment of issuance taxes), issue and deliver to Holder certificate(s) representing the number of shares of Common Stock so purchased. Such shares of Common Stock shall be deemed issued to Holder for all purposes as of the opening of business on the Exercise Date notwithstanding any delay in the actual issuance.

6.     **Resale of Option or Shares.** Neither this Option nor the Option Shares have been registered under the Securities Act or under the securities laws of any state. Neither this Option nor such shares when issued may be sold or transferred, in the absence of (i) an effective registration statement for this Option or such shares, as the case may be, under the Securities Act and such registration or qualification as may be necessary under the securities laws of any state, or (ii) if requested by Company, an opinion of counsel reasonably satisfactory to Company (who may be inside counsel to Holder) that such registration or qualification is not required. Company shall cause any certificate evidencing securities issued upon exercise of this Option before said registration and qualification of such securities to bear an appropriate legend describing the foregoing transfer restrictions. Notwithstanding any other provision of this Option, Holder may transfer this Option (in whole but not in part) and any

1

securities issuable upon exercise of this Option to any person or entity which is an affiliate or subsidiary of Holder.

7. **Transfer.** This Option shall be registered on the books of Company which shall be kept at its principal office for that purpose, and, subject to paragraph 6, shall be transferable in whole but not in part but only on such books by Holder in person or by duly authorized attorney with written notice substantially in the form of Exhibit 7 hereof. Company will at no time close its transfer books against the transfer of this Option or of any shares of Common Stock or other securities issuable upon the exercise of this Option in any manner which interferes with the timely exercise of this Option.

8. **Adjustments upon Certain Events.**

(a) **Stock Split or Dividend; Adjustment to Exercise Price and Number of Option Shares.** If the shares of Common Stock at any time outstanding shall be subdivided into a greater or combined into a lesser number of shares of Common Stock, by stock-split, reverse split or otherwise, or if shares of Common Stock shall be issued as a stock dividend, the Exercise Price shall be increased or decreased, as applicable, to an amount which shall bear the same relation to the Exercise Price in effect immediately before such subdivision, combination or stock dividend as the total number of shares of Common Stock outstanding immediately after such subdivision, combination or stock dividend shall bear to the total number of shares of Common Stock outstanding immediately before such subdivision, combination or stock dividend; likewise, in case of any such subdivision, combination or stock dividend, the number of Option Shares shall be increased or decreased as applicable, to the number which shall bear the same relation to the number of Option Shares obtainable hereunder immediately before such event, as the total number of shares of Common Stock outstanding immediately after such event shall bear to the total number of shares of Common Stock outstanding immediately before such event. An adjustment made pursuant to this subparagraph 8(a) shall become effective immediately upon the effective date of such subdivision, combination or stock dividend retroactive to the record date, if any, for such subdivision, combination or stock dividend.

(b) **Merger, Reclassification, etc.** In case of any capital reorganization, or any reclassification of the Common Stock, or in case of any consolidation of Company with or the merger of Company into any other corporation or other entity (other than a consolidation or merger in which Company is the continuing corporation) or in case of the sale of all or substantially all of the property and assets of Company to any other corporation or other entity, this Option shall, effective upon such reorganization, reclassification, consolidation, merger or sale be exercisable upon the terms and conditions specified herein, for the number of shares of stock or other securities or property of Company, or of the corporation, person or other entity resulting from such consolidation or surviving such merger or to which such sale shall be made, as the case may be, which Holder of this Option would have been entitled to receive had this Option been exercised immediately before such reorganization, reclassification, consolidation, merger or sale or any record date with respect thereto. In any such case, if necessary, the provision set forth in this Option with respect to the rights and interests thereafter of Holder shall be appropriately adjusted in good faith by the Board of Directors of Company so as to be applicable, as nearly as may reasonably be possible, to any shares of stock or other securities or property thereafter deliverable on the exercise of this Option. The subdivision or combination of shares of Common Stock at any time outstanding into a greater or lesser number of shares of Common Stock which results in adjustment pursuant to subparagraph 8(a) above shall not be deemed to be a reclassification of the Common Stock of Company for the purposes of this subparagraph 8(b). Company shall not effect any such consolidation, merger, or sale, unless before or upon the consummation thereof the successor corporation (if other than Company) resulting from such consolidation or merger or the corporation purchasing such assets shall assume, by written instrument executed and delivered to Company and Holder, the obligation to deliver to Holder such shares of stock, securities or assets to which in accordance with the foregoing provisions, such Holder may be entitled, as well as any other obligations arising under this Option. If any such transaction occurs, but does not expressly incorporate a price per share

2

of Common Stock of Company, Company's Board of Directors shall nonetheless reduce the Exercise Price if, in good faith, it concludes that such transaction values Company at a per share price of less than the Exercise Price.

(c)    **Liquidating Dividends, Etc.**  If Company makes a distribution of its assets to the holders of its Common Stock as a dividend in liquidation or by way of return of capital or other than as a dividend payable out of earnings or surplus legally available for dividends under applicable law or any distribution to such holders made in respect of the sale of all or substantially all of Company's assets (other than as provided in Sections 8(a) or 8(b), Holder shall be entitled to receive upon the exercise hereof, in addition to the shares of Common Stock receivable upon such exercise, and without payment of any consideration other than the Exercise Price, an amount in cash equal to the fair market value of such distribution per share of Common Stock multiplied by the number of shares of Common Stock which, on the record date for such distribution, are issuable upon exercise of this Option, or if no such record is taken, as of the date of such distribution (with no further adjustment being made following any event which causes a subsequent adjustment in the number of shares of Common Stock issuable upon the exercise hereof), and an appropriate provision therefor shall be made a part of any such distribution.

(d)    **Additional Agreements Relating to Option Shares.**  Company agrees that the 1,651,846 Option Shares referred to in paragraph 1 plus the 225,000 shares of Common Stock issueable under the Warrant are intended to represent a 19.9 % equity interest in Company.  If Holder acquires the 1,651,846 Option Shares referred to in paragraph 1 above, Company agrees:

(i)  Company may from time to time issue (an "**Issuance**") shares of Common Stock upon exercise of options, warrants, convertible instruments and other rights to acquire Company's Common Stock.  In such event, the Option shall be increased to allow Holder to purchase such number of shares of Common Stock as is necessary to maintain Holder's 19.9 % ownership interest in Company, at an exercise price equal to the average closing price of the Common Stock over the 90 day period immediately preceding the date of such Issuance.  Such Option may be exercised at any time within [90 days] after Company notifies Holder of such Issuance.

(ii)  Conversely, Company may from time to time redeem or otherwise acquire or retire shares of Common Stock (a "**Redemption Event**").  In such event, Holder will have a right to require Company to purchase ("**Put Right**") such number of shares of Common Stock as is necessary to maintain a 19.9 % interest in Company.  The price at which Company will buy such shares shall be the same price paid by Company in the Redemption Event.  The Put Right may be exercised by Holder within [90 days] after Company notifies Holder of the occurrence of a Redemption Event.

(e)    **Notice of Adjustment.**  Whenever the number of Option Shares or the Exercise Price is adjusted, as herein provided, Company shall promptly notify Holder in writing of such adjustment(s) and shall deliver to such Holder a statement setting forth the number of Option Shares and the Exercise Price after such adjustment(s), setting forth a brief statement of the facts requiring such adjustment(s) and setting forth the computation by which such adjustment(s) was made.

(f)    **Statement of Option.**  The form of this Option need not be changed because of any change in the Exercise Price or in the number of Option Shares.

9.    **Notice.**  When any notice is required by this Option to be given to a person, such notice shall be provided by first class mail, postage prepaid or by facsimile transmission or any other means of physical delivery reasonably calculated to reach such person at least as quickly as first class mail, to the principal executive offices of such person, attention:  Corporate Secretary.

3

10. **Replacement of Option.** At the request of Holder and on production of evidence reasonably satisfactory to Company of the loss, theft, destruction or mutilation of this Option (and in the case of loss, theft, or destruction, if required by Company, upon delivery of an indemnity agreement reasonably requested by Company), Company at its expense will issue in lieu thereof a new Option of like tenor, representing the right to subscribe for and purchase the number of shares of Common Stock which may be subscribed for and purchased hereunder.

11. **Representations.**

(a) Holder, by its acceptance hereof represents that it is an accredited investor within the meaning of Rule 501 of the Securities Act and covenants that this Option is, and any stock issued hereunder will be, acquired for investment purposes, and that Holder will not distribute the same in violation of any state or federal law or regulation.

(b) Company represents that it is duly incorporated under the laws of the State of Nevada; that Company has been duly authorized by all necessary corporate action to issue this Option to Holder; and that this Option, when executed on Company's behalf by the person named below will be binding upon Company in accordance with its terms.

**IN WITNESS WHEREOF,** Company has caused this Option to be signed on its behalf by its undersigned officer, and its corporate seal to be hereunto affixed, as of the date first above written.

Attest:

**DURASWITCH INDUSTRIES, INC.**

By: _____

By: _____

Title: President, CFO, Treas. + Secretary

Title: CEO / CHAIRMAN

4

**EXHIBIT 5**

**FORM OF ELECTION TO PURCHASE**

**To: DuraSwitch Industries, Inc.**

Ladies and Gentlemen:

The undersigned hereby elects to exercise its right under the attached Option by purchasing _____ shares of the Common Stock of Company, and herewith tenders in payment for such shares the aggregate exercise price of $_____ all in accordance with the terms of the attached Option.

The undersigned requests that the certificate(s) for such shares be issued in the name of _____ whose taxpayer number is _____ and whose address is _____ and that such certificates (and any cash delivered   therewith)   be   delivered   to   _____   whose   address   is _____ _____.

Date:_____

Signed:_____
(Signature must conform in all respects to name of Holder
as specified on face of the Option.)

Name of Holder:_____
(please print)

Address of Holder:_____

**EXHIBIT 7**

**ASSIGNMENT**

FOR VALUE RECEIVED, _____
(Name)

whose address is _____

**assigns and transfers** the attached Option together with all right, title and interest therein, and does

hereby irrevocably appoint _____

attorney to transfer said Option on the books of Company with full power of

substitution in the premises.


Done this ___ day of _____, _____.



Signed:_____
By:_____
Its:_____

6

EXHIBIT E

## SHAREHOLDERS' AGREEMENT

**SHAREHOLDERS' AGREEMENT** dated as of **June 19, 2000,** among **DURASWITCH INDUSTRIES, INC.,** a Nevada corporation ("**Company**"), **DELPHI AUTOMOTIVE SYSTEMS CORPORATION,** a Delaware corporation ("**Delphi**"), and R. TERREN DUNLAP, ANTHONY J. VAN ZEELAND and ROBERT J. BRILON (collectively, the "**Primary Shareholders**").

**WHEREAS,** the Primary Shareholders are the record owners of over 37% of the outstanding shares of capital stock of Company (the shares of Company capital stock presently outstanding or issued from time to time pursuant to securities exchangeable for such capital stock are referred to as the "**Shares**");

**WHEREAS,** Company and Delphi have executed an Option Purchase Agreement dated April 20, 2000 (the "**Option Agreement**") granting to Delphi an option to purchase 1,651,846 shares of capital stock of Company ("**Option Shares**");

**WHEREAS,** the Option Agreement requires that this Shareholders' Agreement be executed if Delphi acquires the Option Shares; and

**WHEREAS,** concurrently with the execution of this Shareholders' Agreement, Delphi has purchased the Option Shares.

**NOW, THEREFORE,** each of the Primary Shareholders and Company covenant and agree with Delphi as follows:

1.      **Designees.**  The Board of Directors of Company shall, at all times during the term of this Shareholders' Agreement, consist of six members.  At the date of this Agreement, the Board consists of William E. Peelle, John W. Hail, Michael Van Zeeland, Anthony J. Van Zeeland, and R. Terren Dunlap. As soon as possible after Delphi designates in writing to the other parties one individual to be elected as director of Company, the other parties will use their best efforts to cause such individual to be elected to fill the sixth position.  The Primary Shareholders will use their best efforts to cause all of the Directors to waive any Share ownership requirements as to any individual designated as the Delphi Designee.  Thereafter, Delphi will designate in writing to the other parties one individual to be elected as director of Company, and the Primary Shareholders (by the majority vote of the Primary Shareholders) will similarly designate in writing to Delphi and Company three individuals to be elected as directors of Company.  Each such individual is hereinafter referred to as a "**Designee**".

2.      **Voting of Shares.**  Delphi and each Primary Shareholder will vote all Shares owned by them in such manner, and Company, Delphi and the Primary Shareholders will take such other action as may be necessary:

A.      To cause the By-laws of Company to be amended to include the terms set forth in Schedule I hereto (to the extent such By-laws are not already in effect);

B.      To prevent, without the written consent of Delphi, any amendment to the Articles of Incorporation or By-laws of Company except as referred to in clause A above or in Section 8 of this Shareholders' Agreement;

C.      Cause the Board of Directors of Company to consist of six members and to cause one Designee of Delphi (increased to two Designees if Delphi's ownership interest increases to 20% or greater <u>and</u> Board of Directors increases to greater than six members) and the three Designees of the Primary Shareholders to be elected as directors of Company;

D.      To prevent Company from taking any action inconsistent with this Shareholders' Agreement or the Articles of Incorporation or By-laws described herein;

6/19/00

E.    To prevent any subsidiary or affiliate of Company from taking, without the consent of Delphi, any action which, if taken by Company, would require the prior unanimous consent of the Directors of Company; and

F.    Company currently has comprehensive employee benefit plans. The parties will consider, in good faith, whether any voting provisions are appropriate relating to significant changes in employee compensation arrangements.

If, during the period of this Shareholders' Agreement, any Designee ceases to act as a director for reasons of death, disability, resignation, failure or refusal to so act or for any other reason, or Delphi or the Primary Shareholders determine that another person should be named in substitution for one of their respective Designees theretofore selected, then a successor shall promptly be designated by the party or parties originally designating the director and the other parties shall take all available steps necessary to effect such Designee's prompt election as a director of Company.

3.    <u>Transfer of Shares</u>.    No Primary Shareholder shall transfer, assign, pledge, hypothecate, or in any way alienate any Shares (collectively, a "Transfer"), in any transaction or series of related transactions, representing 4% or more of Company's securities (including as outstanding for purposes of calculating said 4% all convertible securities, stock options and other securities that are exchangeable for Shares of Company), whether voluntarily or by operation of law, or gift or otherwise, to any person or such person's Associates (as defined in SEC regulations) without first obtaining from the transferee of such Shares a written agreement ("Transferee Agreement") to be bound by the obligations of this Shareholders' Agreement to the same extent as the Primary Shareholder from whom such transferee is acquiring Shares, except that thereafter this Shareholders' Agreement will apply to any and all Transfers of such Shares. Company will cause its transfer agent to issue a certificate to a permitted transferee representing the Shares so Transferred only upon receipt of a signed original copy of the Transferee Agreement. Any purported Transfer in violation of this Agreement shall be void and ineffectual, and shall not operate to transfer any interest or title to the purported transferee.

4.    **Remedies.**    The parties agree that damages at law would not be an adequate remedy for any violation or threatened violation of this Shareholders' Agreement and that each party will accordingly be entitled to obtain and hereby consents to injunctive relief, in any court having jurisdiction, restraining the other party from any such violation or threatened violation and mandating any affirmative act necessary to permit the consummation of any transaction contemplated in this Shareholders' Agreement; and each party waives the claim or defense therein that the other party has an adequate remedy at law, and shall not urge in any action or proceeding the claim or defense that a remedy at law exists.  Injunctive relief shall not be exclusive of any other remedies, at law or equity, available to the party seeking such relief upon any violation or threatened violation of this Shareholders' Agreement.

5.    **Successors and Assigns.** This Shareholders' Agreement shall be binding upon and shall operate for the benefit of the Primary Shareholders, Company and Delphi and their respective heirs, executors, administrators, successors and assigns.  Except as otherwise consented to in writing by Delphi, each transferee of any interest in the Shares owned by the Primary Shareholders (including securities exchangeable for such Shares) shall be bound by all of the terms of this Shareholders' Agreement as though specifically named as a Primary Shareholder herein and as though such transferee were a signatory hereto.

6.    **Severability.** The invalidity or unenforceability of any particular provision of this Shareholders' Agreement or with respect to any particular party shall not affect the other provisions hereof or the validity or enforceability with respect to the other parties, and this Shareholders' Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted or such party was not a signatory.

2

6/19/00

7. **Counterparts.** This Shareholders' Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. A copy of this Shareholders' Agreement shall at all times be kept at the principal office of Company.

8. **Termination.** This Shareholders' Agreement shall continue in full force and effect until the 15th anniversary of this Shareholders' Agreement, unless earlier terminated pursuant to the next sentence of this Section 8, or hereafter extended by written agreement of the parties. This Shareholders' Agreement shall automatically terminate upon the earliest of the following events: (i) the date on which Delphi ceases to hold any Shares or securities exchangeable for Shares; or (ii) the date on which Delphi acquires at least a 51% ownership interest in Company. If this Shareholders' Agreement is terminated pursuant to clause (ii) above, the Primary Shareholders shall take such action as may be necessary to cause: (a) Company's Articles and By-laws to be amended to require a mere majority director vote for all matters; and (b) the resignation of an appropriate number of Primary Shareholders Designees and their replacement by Delphi Designees.

9. **Governing Law.** The interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of Nevada without resort to that state's conflict-of-laws principles.

10. **Notice.** When any notice is required by this Shareholders' Agreement to be given to a person, such notice shall be provided by first class mail, postage prepaid, or by facsimile transmission or any other means of physical delivery reasonably calculated to reach such person at least as quickly as first class mail, to the principal executive offices of such person, attention: Corporate Secretary; or, in the case of the Primary Shareholders, to their addresses set forth below.

**THIS AGREEMENT** was executed of the date first set forth above.

DURASWITCH INDUSTRIES, INC.                    DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _____                   By: _____
                                                   David R. Heilman

Its: _____C E O_____                Its:  Vice President

                                               _____
                                               **R. TERREN DUNLAP**
                                               15617 N. Audubon Place, Fountain Hills, Arizona 85268

                                               _____
                                               **ANTHONY J. VAN ZEELAND**
                                               2140 S. Rogers Circle, Mesa, Arizona 85202

                                               _____
                                               **ROBERT J. BRILON**
                                               3944 E. Juniper Circle, Mesa, Arizona 85205

3

6/19/00

**Schedule I**

**AMENDED AND RESTATED BY-LAWS OF**

**DURASWITCH INDUSTRIES, INC.**

In addition to other matters, in form and substance satisfactory to Delphi, the By-laws will require that the Board of Directors consist of 6 directors (who need not be residents of the State of Nevada or shareholders of Company) and will require the unanimous approval of the directors of Company for the following matters:

(i)     Changing the nature of Company's business or expanding or reducing the scope of Company's operations;

(ii)    Amending the Certificate of Incorporation or By-laws of Company;

(iii)   The creation of debt or debt obligations exceeding a two to one ratio of debt to equity;

(iv)   Dividends or other distributions absent cumulative, positive retained earnings.

4