EXHIBIT A

## MASTER LEASE AGREEMENT

THIS MASTER LEASE AGREEMENT, dated as of June **29**, 2001 ("Agreement"), is between Delphi Automotive Systems Corporation, a Delaware corporation, with an office at 5725 Delphi Drive, Troy, Michigan 48098 ("Lessee") on its behalf and on behalf of any subsidiary, affiliate, division or operating unit (collectively, an "Affiliate") which is or becomes a party to this Agreement by execution of a Schedule (as defined below), and Pacific Rim Capital, Inc. a California corporation, with an office at 1 Jenner, Suite 170, Irvine, California 92618 ("Lessor"). In the event an Affiliate enters into a Schedule, as lessee, with Lessor, such Affiliate and Lessee shall be jointly and severally liable for all obligations of Lessee thereunder and under this Agreement as it relates thereto.

In consideration of the mutual covenants contained in this Agreement, Lessor and Lessee agree as follows:

I.    **LEASING:**

(a)    Subject to the terms and conditions set forth below, Lessor will lease to Lessee, and Lessee will lease from Lessor, the machinery, equipment and any other items ("Equipment") described in any Annex A to an Equipment Schedule ("Schedule") executed by Lessor and Lessee that incorporates by reference the terms and conditions of this Agreement. Terms defined in a Schedule and not defined herein have the meanings contained in such Schedule. Each Schedule shall constitute a separate and enforceable lease.

(b)    In the event a Schedule referencing and incorporating the terms and conditions of this Agreement is entered into and executed by an Affiliate as "Lessee", each such Schedule and all documents related thereto, including, without limitation, this Agreement, will constitute valid, legal and binding agreements, enforceable against both Lessee (Delphi Automotive Systems Corporation) and such Affiliate jointly and severally as Lessee thereunder in accordance with their respective terms, except to the extent that the enforcement of Lessor's remedies may be limited under applicable bankruptcy and insolvency laws and other laws related to or affecting the enforcement of creditor's rights from time to time.

(c)    Before Lessor purchases Equipment from the manufacturer or supplier thereof ("Supplier") and leases the Equipment to Lessee under a Schedule, Lessor must receive each of the following documents with respect to the Equipment duly executed, in form and substance satisfactory to Lessor:  (i) a Schedule relating to the Equipment, (ii) a Purchase Order Assignment and Consent in the form of Annex B to the Schedule (unless Lessor issued the purchase order for the Equipment), and (iii) any other documents Lessor reasonably requests.  Upon delivery of the Equipment and acceptance of the Equipment by Lessee, Lessee will execute and deliver to Lessor a Delivery Certificate (in the form of Annex C to the Schedule) covering the Equipment, and deliver or cause to be delivered to Lessor a bill of sale (unless Lessor issued the purchase order for the Equipment) for the Equipment (in form and substance satisfactory to Lessor).  Lessor appoints Lessee as its agent to inspect and accept the Equipment from the Supplier.  When Lessee executes a Delivery Certificate, Lessee will be deemed to have received and accepted the Equipment described in the Delivery Certificate under the Schedule, but the execution of a Delivery Certificate will not limit any rights Lessee or Lessor may have against the Supplier.

II.    **TERM, RENT, AND PAYMENT:**

(a)    The rent payable for the Equipment and Lessee's right to use the Equipment will commence on the date the Lessee executes the Delivery Certificate for the Equipment ("Lease Commencement Date"). The term of the lease of the Equipment will be the period specified in the applicable Schedule. If any term is extended, the word "term" shall be deemed to refer to the extended term.

(b)    Lessee will pay rent in accordance with the provisions of the applicable Schedule to Lessor at its address stated above, or as Lessor otherwise directs. If Advance Rentals are payable under the applicable Schedule, (i) Lessee will pay them when Lessor accepts the Schedule and (ii) Lessor will apply them to the first rent payments under the Schedule. In no event shall any Advance Rental or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee will pay a late charge of one cent ($.01) per dollar on, and in addition to, the amount of such rent.

III.    **TAXES:**

Lessee will report (to the extent that it is legally permissible) and pay promptly all taxes, fees, and assessments due, imposed, assessed, or levied against the Equipment, or the purchase, ownership, delivery, leasing, possession, use or operation of the Equipment, or upon the rentals or receipts with respect to this Agreement or any Schedule, including all license and registration fees and all sales, use, personal property, excise, gross receipts, stamp, or other similar taxes, imposts, duties, and charges, and any penalties, fines, or interest on any such taxes, imposts, duties or charges, which any taxing authority imposes against this Agreement or any Schedules or supplemental documents, or against Lessor, Lessee or the Equipment to the extent they relate to the term of this Agreement (collectively, "Taxes"). Notwithstanding the preceding sentence, Lessor will be responsible for filing all personal property tax returns for the Equipment (to the extent that it is legally permissible). However, Lessee will not be liable for any taxes which are levied on or measured by the total gross income, net income, total gross receipts, capital, capital stock, or net worth of Lessor, including any single business type taxes such as the current Lessor's Michigan Single Business Tax. Lessee is also not liable for any penalties, fines, or interest resulting from any acts or omissions of Lessor, unless they arise from Lessor's acts or omissions which are based on a request from Lessee or are in reliance on Lessee's representations or duties under this Agreement. When Lessor requests, Lessee will submit to Lessor written evidence of Lessee's payment of Taxes and send Lessor copies of any tax reports or returns submitted by Lessee with respect to Taxes assessed against the Equipment. Lessee will also (i) reimburse Lessor when Lessee receives written request for reimbursement for any Taxes charged to or assessed against Lessor or the Equipment, unless such Taxes have previously been paid by, or simultaneously billed to Lessee (in this regard Lessor and Lessee agree to mutually cooperate in the resolution of such matters with the appropriate taxing authorities) and (ii) show ownership of the Equipment by Lessor on all tax reports.

IV.    **REPORTS:**

(a)    Within ten (10) days after any tax or other lien attaches to any Equipment, Lessee will notify Lessor in writing of all material information Lessee possesses with respect to the lien and the location of the Equipment to which the lien has attached (unless the lien has been fully discharged.)

(b)     Lessee will permit Lessor to inspect any Equipment during normal business hours, if the exercise of such inspection right does not interfere with the normal operation of the Equipment or the business of Lessee.  Lessee will not be required to demonstrate the operation of the Equipment to Lessor.

(c)     Lessee will keep the Equipment at the location specified in the applicable Schedule and will promptly notify Lessor, in writing, if Lessee relocates any Equipment in which case Lessee will indemnify and protect Lessor against and from from any loss, cost or expense incurred as a result of such relocation.  If Lessor requests, Lessee will notify Lessor promptly in writing of the location of any Equipment.

(d)     If any Equipment is lost or damaged and the estimated repair cost would exceed ten percent (10%) of the Equipment's then fair market value, or if any Equipment is otherwise involved in an accident causing significant personal injury or significant property damage, then Lessee will promptly notify Lessor, in writing, of such event.

## V.     DELIVERY, USE, AND OPERATION:

(a)     All Equipment will be shipped directly from the Supplier to Lessee at the address designated by Lessee.

(b)     Lessee will use the Equipment solely in the conduct of its business and in a manner that complies with all applicable laws and regulations.

(c)     LESSEE WILL NOT REMOVE ANY EQUIPMENT FROM THE CONTINENTAL UNITED STATES, WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR, WHICH LESSOR WILL NOT UNREASONABLY WITHHOLD.

(d)     Lessee will keep the Equipment free and clear of all liens and encumbrances other than the following: (1) liens arising from claims attributable to Lessor, (2) liens for taxes of Lessee either not yet due or being contested in good faith by appropriate proceedings,  and (3) materialmen's, mechanics', workmen's, repairmen's, or other like liens arising in the ordinary course of Lessee's  business (including those arising under maintenance agreements entered into in the ordinary course of business) securing obligations that are not overdue or are being contested in good faith by appropriate proceedings, so long as such proceedings do not involve any material danger of the sale, forfeiture, or loss of the Equipment.

## VI.     SERVICE:

(a)     Lessee will cause the Equipment to be maintained in good operating order, repair, condition, and appearance in accordance with normal industry standards, normal wear and tear excepted.  At any time Lessor requests, Lessee will affix in a prominent position on each unit of Equipment plates, tags, or other identifying labels showing that Lessor owns the Equipment. Unless an Event of Default is continuing, Lessee may deliver possession of any Equipment to the Supplier or to any other provider for testing, service, repair, maintenance, or overhaul work.

(b)     Unless Lessor consents, Lessee will not affix or install any accessory, equipment, or device on any Equipment that impairs the originally intended function, fair market value or use of such Equipment.  All additions, repairs, parts, supplies, accessories, equipment, and devices furnished, attached, or affixed to any Equipment, which are not readily removable, will be made only in compliance with applicable law, and will belong to Lessor and be subject to the terms of

this Agreement. Unless Lessor consents, Lessee will not affix or install any Equipment to or in any real property if such installation is likely to cause the Equipment to be a fixture.

## VII.    STIPULATED LOSS VALUE:

An "Event of Loss" means:  (i) the loss of any Equipment or its use due to the destruction of or damage to the Equipment which renders repair uneconomical or which renders such Equipment permanently unfit for normal use by Lessee; (ii) the theft, disappearance, confiscation, condemnation, or seizure of title to any Equipment which results in the loss of possession or use of the Equipment by Lessee for a period in excess of sixty (60) consecutive days; or (iii) the imposition of environmental or other legal restrictions that make continued use of the Equipment illegal or, in Lessee's commercially reasonable opinion, uneconomical.  Lessee will promptly and fully notify Lessor in writing upon the occurrence of any Event of Loss.  On the next rental payment date after an Event of Loss (the "Payment Date"), Lessee will pay Lessor, without duplication, the sum of (x) the Stipulated Loss Value (as defined in Annex D) of the Equipment which has suffered an Event of Loss calculated as of the rental period immediately preceding such Event of Loss ("Calculation Date") plus (y) all rental and other amounts which are due with respect to the applicable Equipment through the Payment Date.  Upon payment of all sums due hereunder, the term of this Agreement and the liability of Lessee with respect to the applicable Equipment will terminate, and Lessee will  retain possession of the Equipment.

## VIII.    RISK OF LOSS:

Lessee hereby assumes and bears the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is received by a carrier for shipment to Lessee until the Equipment is received by Lessor in accordance with the shipping provisions in Section X.

## IX.    INSURANCE:

Lessee will keep all Equipment insured with "ALL-RISKS" property insurance to a limit of the Stipulated Loss Value, including, but not limited to, insurance for damage to or loss of such Equipment and maintain liability coverage for personal injuries, death, or property damage that may result from the use or operation of the Equipment, with Lessor named as additional insured and with a loss payable clause in favor of Lessor and it's assigns, as their interests may appear. All policies will be issued by companies that are qualified to issue insurance in the State in which the Equipment is or will be located.  Lessee will deliver to Lessor, upon written request by Lessor, certificate(s) of insurance that state that the insurance is primary to any other insurance that may be available to Lessor and provide at least thirty (30) days' written notice to Lessor of cancellation, modification, or material change to any policy.  Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement.

## X.    RETURN OF EQUIPMENT:

(a)    Upon any expiration or termination of this Agreement or any Schedule, Lessee will promptly, subject to Lessee's rights in connection with an Event of Loss under Section VII, perform any repairs required to place the affected Equipment in good condition and repair and in working order for its originally intended purpose, normal wear and tear excepted.  The Equipment will be deemed in good condition and repair and in working order if the Equipment meets normal

industry standards for similar used equipment.    If deinstallation, disassembly, or crating is required, Lessee will deinstall, disassemble, and crate the Equipment in accordance with normal industry standards.  Lessee will then tender the affected Equipment to Lessor at the Equipment Location specified in the applicable Schedule or, at the option of Lessor, at any location designated by Lessor within two hundred fifty (250) miles of the Equipment Location.   After Lessee delivers the Equipment to Lessor at the Equipment Location or such other location as Lessor directs, Lessee will have no new responsibilities for the Equipment but will not be relieved of any obligations arising before delivery.

(b)    Until Lessee complies with the requirements of Section X(a) above, Lessee's rent payment and other obligations under this Agreement will continue from month to month notwithstanding any expiration or termination of the lease term.   Lessor may terminate such continued leasehold interest upon ten (10) days' written notice to Lessee.

## XI.    EVENTS OF DEFAULT:

Lessor may declare this Agreement in default upon the occurrence of any one of the following events ("Events of Default"):

(a)    Lessee breaches its obligation to pay rent under any Schedule or any other sum when due thereunder or under this Agreement and fails to cure the breach within ten (10) days after Lessee receives written notice of the breach;

(b)    Lessee breaches any of its insurance obligations under Section IX and fails to cure the breach within ten (10) days after Lessee receives written notice of the breach;

(c)    Lessee breaches any of its other obligations, representations, or warranties under this Agreement and fails to cure the breach within thirty (30) business days after Lessee receives written notice of the breach; or

(d)    Lessee becomes insolvent or ceases to do business as a going concern or bankruptcy, reorganization or dissolution or other similar proceedings are instituted by or against Lessee or all or a substantial part of its property under the Federal Bankruptcy Act or any dissolution, liquidation or other law of the United States or of any state or other competent jurisdiction and, if against Lessee, it consents thereto or fails to cause the same to be dismissed within 30 days.

## XII.    REMEDIES:

(a)    At any time an Event of Default is continuing, Lessor may, at its option, do one or more of the following with respect to all or any part of the Equipment, to the extent permitted by, and subject to compliance with applicable law then in effect:

(1)    proceed by appropriate court action or actions to enforce performance by Lessee of the applicable covenants and terms of the Schedule and this Agreement or to recover damages for the breach thereof;

(2)    require Lessee to return promptly all or any part of the Equipment in accordance with Section X(a) hereof, as if the Equipment were being returned at the end of the term;

(3)      enter the premises, with or without legal process, where all or any part of the Equipment is located and take immediate possession of the Equipment;

(4)      sell the Equipment, upon fifteen (15) days' written notice to Lessee, at public or private sale, as Lessor determines, or otherwise dispose of, hold, use, operate, lease to others, or keep idle the Equipment as Lessor determines in its sole discretion, all free and clear of any rights of Lessee, except as hereinafter set forth in this Section XII.  Lessor may sell the Equipment without having the Equipment present at place of sale, and Lessor may make reasonable use of Lessee's premises for the purpose of displaying and selling the Equipment at no expense to Lessor;

(5)      whether or not Lessor has exercised any of its rights under subpara-graphs (1), (2), and (3) of this Section XII, demand that Lessee pay to Lessor on a payment date specified in a written notice from Lessor, as damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rental period immediately preceding the declaration of default), all rent due for the Equipment prior to the payment date Lessor specifies, any late charges provided for in Section II hereof, any interest provided for in Section XXIII(i) below, any accrued and then-due taxes, and all reasonable costs and expenses, including reasonable legal fees incurred by Lessor in connection with the enforcement of, but not the administration of, the Agreement; and

(6)      by notice to Lessee, declare this Lease (for any or all Equipment) canceled.

If Lessor, pursuant to subparagraph (4) of this Section XII, sells, re-leases, or otherwise disposes of the Equipment, the proceeds of sale, lease, or other disposition, if any, will be applied in the following order of priorities:  (i) to pay all of Lessor's reasonable costs, charges, and expenses incurred in taking, removing, holding, repairing, selling, leasing, or otherwise disposing of the Equipment; then (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee hereunder; then (iii) to reimburse Lessee for any sums previously paid by Lessee as liquidated damages or expenses of the sale; and then (iv) any surplus shall be retained by Lessor. Lessee will immediately pay any deficiency arising under clauses (i) or (ii) of this Section XII(a).

(b)      The foregoing remedies are cumulative and not exclusive of other remedies, and any or all of these remedies may be exercised in lieu of or in addition to each other or any other remedies available at law or in equity.  The waiver of any default will not be a waiver of any other or subsequent default.

## XIII.   ASSIGNMENT:

(a)      LESSEE WILL NOT, WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR WHICH LESSOR WILL NOT UNREASONABLY WITHHOLD, ASSIGN, CONVEY, SUBLEASE, MORTGAGE OR HYPOTHECATE ANY EQUIPMENT OR ITS RIGHTS OR INTEREST IN THIS AGREEMENT EXCEPT THAT LESSEE MAY ASSIGN, TRANSFER OR SUBLET ITS RIGHTS WITH RESPECT TO EQUIPMENT UNDER THIS AGREEMENT TO ANY ENTITY WHICH LESSEE, DIRECTLY OR INDIRECTLY, CONTROLS, IS CONTROLLED BY OR IS UNDER COMMON CONTROL WITH.  IF LESSEE ASSIGNS OR OTHERWISE TRANSFERS ANY RIGHTS WITH RESPECT TO ANY EQUIPMENT, LESSEE WILL REMAIN FULLY AND PRIMARILY LIABLE UNDER THIS AGREEMENT.

(b)      Lessor may, without the consent of Lessee, sell, assign or otherwise transfer it's rights, interests and title in and to this Agreement, a Schedule and/or the related Equipment and

the proceeds thereof to a third party.  If Lessee receives written notice of any such sale, assignment, or other transfer from Lessor, Lessee will pay all rent and all other amounts payable and perform all obligations under any assigned Equipment Schedule to and for the benefit of the assignee or as instructed by Lessor in the written notice.  Lessee will also confirm, in writing, receipt of the notice of the sale, assignment or other transfer by executing a Notice and Acknowledgment of Assignment substantially in the form set forth in Annex E.

(c)    The terms and provisions of this Agreement shall be binding upon and inure to the benefit of Lessor and Lessee and their successors and permitted assigns.

## XIV.    NET LEASE; ETC.:

This Agreement is a net lease.  Lessee's obligation to pay rent and other amounts due under this Agreement is absolute and unconditional.  Lessee will not be entitled to any abatement or reductions of, or set-offs against, the rent or other amounts Lessee owes Lessor under this Agreement, including, without limitation, any abatements, reductions or set-offs arising or allegedly arising out of claims (present or future, alleged or actual, and including claims arising out of the negligence of Lessor or Supplier or their strict liability in tort) of Lessee against Lessor or Supplier under this Agreement or otherwise.  This Agreement will not terminate nor will the obligations of Lessee to Lessor be affected by reason of any defect in or damage to, or loss of possession, use or destruction of, any Equipment from any cause whatsoever.  Rents and other amounts due under this Agreement will continue to be paid in all events in the manner and at the times set forth in this Agreement unless the obligation is terminated pursuant to the express terms of this Agreement.

## XV.    INDEMNIFICATION:

Lessee and Lessor will indemnify, save and hold harmless the other party, and the other party's agents, employees, successors, and assigns from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including reasonable legal expenses, of any kind or nature, in contract or tort, arising out of the breach by Lessor or Lessee, respectively, of any part of this Agreement.  However, neither party will be entitled to indemnification to the extent that any losses, damages, penalties, injuries, claims, actions and suits, including reasonable legal expenses, of any kind and nature, in contract or tort, are caused by the negligence or malfeasance of the party that would otherwise be entitled to indemnification.  Lessee will also indemnify, save and hold harmless Lessor, its agents, employees, successors, and assigns from and against any and all losses, damages, penalties, injuries, claims, actions, and suits, including reasonable legal expenses, of any kind or nature, in contract or tort (including Lessor's strict liability in tort), arising during the term of this Agreement, out of the selection, manufacture, acceptance, or rejection of the Equipment by Lessee, and the delivery to Lessee, possession, maintenance, use, condition, return, or operation of the Equipment by Lessee (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark, or copyright infringement or environmental damage).  Lessor or Lessee, respectively, will, upon request by the other party, defend any actions based on, or arising out of, any claims that give rise to any such indemnification rights.

## XVI.    TAX BENEFITS:

(a)    Lessee will take any reasonable actions Lessor requests to assure that (i) as long as modified cost recovery or depreciation deductions ("Tax Benefits"), as defined by the Internal Revenue Code of 1986, as amended, (the "Code"), are available with respect to the purchase and

ownership of the Equipment, Lessor will be the party entitled to claim the Tax Benefits relating to the Equipment, and (ii) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all Tax Benefits specified in Section C of the applicable Schedule. At no time during the term of this Agreement will Lessee take any action or omit to take any action Lessor reasonably requests, or permit any sublessee or assignee to take any action Lessor reasonably requests, which results in the disqualification of any Equipment for, reduction of (which is not the result of Lessor having alternative minimum tax status), or recapture of, all or any portion of any Tax Benefits. All references to Lessor in this Section XVI include Lessor and the consolidated taxpayer group of which Lessor is a member.

(b)     If as a result of a breach of any representation, warranty, or covenant of Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor reasonably determines that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any such Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any such Tax Benefit is recomputed or recaptured (any such determination, disallowance, adjustment, recomputation, or recapture being hereinafter called a "Loss"), then to the extent of any such breach Lessee will pay to Lessor, as additional rental payments, an amount that causes Lessor's net after-tax return on investment to equal the net after-tax return on investment (assuming an effective tax rate equal to the applicable corporate tax rate under the Code) that would have been realized by Lessor if the Loss had not occurred, computed in all cases using the same assumptions utilized in originally establishing the terms upon which the Equipment giving rise to the Loss was leased to Lessee. This amount will be payable within thirty (30) days after Lessor notifies Lessee in writing that a Loss has occurred, including a written statement describing in reasonable detail the Loss and of the manner in which Lessor calculates its amount.

## XVII.  SURVIVAL:

All of Lessor's and Lessee's rights, privileges, and indemnities contained in Sections XV and XVI survive the expiration or other termination of this Agreement. The rights, privileges, and indemnities contained in this Agreement are expressly made for the benefit of, and will be enforceable by Lessor and Lessee and their successors and assigns.

## XVIII.  DISCLAIMER:

LESSEE HAS SELECTED AND WILL SELECT ALL EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR DOES NOT MAKE, HAS NOT MADE, WILL NOT MAKE, AND WILL NOT BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO ANY EQUIPMENT OR ANY COMPONENT OF ANY EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. Without limiting the foregoing, Lessor has no responsibility or liability to Lessee or any other person with respect to any of the following, regardless of any negligence of Lessor: (i) any liability, loss, or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy of any Equipment, any deficiency or defect (latent or otherwise) in any Equipment, or any other circumstance in connection with any Equipment; (ii) the use, operation, or performance of any Equipment or any risks relating to any Equipment; (iii) any interruption of service, loss of business or anticipated profits, or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement, or

replacement of any Equipment. If no Event of Default exists under this Lease, Lessee may assert and enforce, at Lessee's sole cost and expense, from time to time, in the name of and for the account of Lessor and Lessee (or both), as their interests may appear, whatever claims and rights Lessor and Lessee (or both) have against any Supplier of the Equipment.

## XIX. REPRESENTATIONS AND WARRANTIES OF LESSEE:

Lessee represents and warrants to Lessor that:

(a)  Lessee has the power and capacity to enter into and perform this Agreement and all related documents Lessee executes in connection with this Agreement (together, the "Documents"). Lessee is qualified to do business wherever necessary to carry on its present business operations, including the jurisdiction(s) where the Equipment is or will be located.

(b)  The Documents have been duly authorized, executed, and delivered by Lessee and constitute valid, legal, and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of Lessor's remedies may be limited under applicable bankruptcy and insolvency laws and other laws related to or affecting the enforcement of creditors' rights from time to time in effect.

(c)  No approval, consent, or withholding of objections is required from any governmental authority or instrumentality with respect to the entry into or performance by Lessee of the Documents except as have already been obtained.

(d)  The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law, or regulation applicable to Lessee or any provision of Lessee's organizational documents or (ii) result in any breach of, constitute a default under, or result in the creation of any lien, charge, security interest, or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan, or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e)  There are no suits or proceedings pending or threatened in court or before any commission, board, or other administrative agency against or affecting Lessee, which will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f)  The Equipment is and will remain tangible personal property.

(g)  Lessee is and will remain validly existing and in good standing under the laws of the State of its organization.

(h)  The Equipment will only be used for commercial or business purposes.

## XX. COVENANTS OF LESSOR:

(a)  Lessor will not directly or indirectly create, incur, assume, or permit the existence of any lien attributable to Lessor on any Equipment that adversely affects or has priority over Lessee's rights under this Agreement.

(b)  Lessor will not, through its own actions or inactions, interfere with Lessee's quiet enjoyment of the Equipment during the applicable lease term so long as an Event of Default does not exist.

9

## XXI.   EARLY TERMINATION:

(a)   At any time on or after the First Termination Date (specified in the applicable Schedule), Lessee may terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date") that is at least ninety (90) days after Lessee delivers written notice of termination to Lessor.

(b)   After Lessee elects to terminate this Lease as to the Equipment listed on a Schedule, Lessee will, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS").

(c)   Prior to the Termination Date, Lessee will (i) certify to Lessor any bids Lessee receives and (ii) pay Lessor (A) the Termination Value set forth on Annex D to the applicable Schedule (calculated as of the Termination Date) for the Equipment, and (B) all rent and other sums due under this Agreement with respect to the applicable Equipment as of the Termination Date.

(d)   On of before the Termination Date, Lessor will sell the Equipment on an AS IS BASIS for cash to the highest bidder under acceptable terms and conditions and refund to Lessee the proceeds of such sale (net of any expenses of the sale) up to the amount of the Termination Value.  If no sale occurs, the lease of the applicable Equipment will not terminate and Lessor promptly will refund the Termination Value (less any expenses incurred by Lessor) to Lessee.

## XXII.   PURCHASE OPTION:

(a)   If Lessee notifies Lessor at least ninety (90) days before the expiration of the lease term of any Equipment, then Lessee may purchase all (but not less than all) of the Equipment in any Schedule on an AS IS WHERE IS BASIS for  an amount equal to the Equipment's "Fair Market Value" (plus all applicable sales taxes) at lease expiration.

(b)   "Fair Market Value" means the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell.  For the purpose of determining Fair Market Value, (i) the Equipment will be assumed to be in the condition in which it is required to be maintained and returned under this Agreement; (ii) any installed Equipment will be valued on an uninstalled basis; and (iii) costs of removal will not be deducted.

## XXIII.   MISCELLANEOUS:

(a)   LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION, DIRECTLY OR INDIRECTLY, BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR ANY RELATED DOCMENTS, AND THE RELATIONSHIP BETWEEN LESSEE AND LESSOR UNDER THIS AGREEMENT AND THE RELATED DOCUMENTS.  THIS WAIVER ENCOMPASSES ALL DISPUTES THAT MAY BE FILED IN ANY COURT (INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS).  NOTWITHSTANDING ANY STATE OR FEDERAL LAW TO THE CONTRARY, THIS WAIVER IS NOT UNILATERALLY REVOCABLE.  THIS WAIVER ALSO APPLIES TO ANY SUBSEQUENT AMENDMENTS,

RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT, OR ANY RELATED DOCUMENTS. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b)    Unless and until Lessee exercises its rights under Section XXI above, nothing contained in this Agreement gives or conveys to Lessee any right, title, or interest in and to any Equipment except as a lessee. No cancellation or termination by Lessor, pursuant to the provisions of this Agreement or any Schedule hereto, will release Lessee from any then outstanding obligations to Lessor.

(c)    Time is of the essence of this Agreement.

(d)    Lessor's or Lessee's failure at any time to require strict performance by the other party of any of the provisions of this Agreement will not waive or diminish Lessor's or Lessee's right to subsequently demand strict compliance with the terms of this Agreement.

(e)    Upon Lessor's request, Lessee will execute any instrument reasonably necessary for filing, recording, or perfecting the interest of Lessor or otherwise needed in order fully to effect the purposes of the Lease, and any assignment hereof.

(f)    All notices under this Agreement will be deemed adequately given if sent by registered or certified mail or by nationally recognized overnight delivery service to the addressee at its address stated in this Agreement, or at such other place as the addressee designates in writing. All notices will be effective upon receipt or failure or refusal to accept receipt.

(g)    This Agreement and any Schedule and Annexes to this Agreement constitute the entire agreement of the parties with respect to the subject matter hereof. NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY RELATED DOCUMENT OR ANY WAIVER OF ANY OF THE PROVISIONS OR CONDITIONS OF THIS AGREEMENT OR ANY RELATED DOCUMENTS WILL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES TO THIS AGREEMENT.

(h)    If Lessee fails to comply with any provision of this Agreement, Lessor will have the right, but will not be obligated to, effect compliance, in whole or in part following reasonable advance written notice to Lessee. All monies spent and expenses and obligations incurred or assumed by Lessor in effecting such compliance will be additional rent due to Lessor within five (5) working days after the date Lessor requests payment. Lessor's effecting such compliance will not waive Lessee's default.

(i)    In addition to the one cent ($.01) per dollar per month late charge in Section 2b, after an Event of Default, any rent or other amount not paid to Lessor will bear interest, both before and after any judgment or termination of this Agreement, at the lesser of the Prime Rate (as shown in the "Money Rates" column of *The Wall Street Journal* as of the date of Event of Default) or the maximum rate allowed by law.

(j)    Any provisions in this Agreement and any Schedule or any Related Document which are in conflict with any statute, law, or applicable rule will be deemed omitted, modified, or altered to the extent necessary to remedy the conflict.

(k)    This Agreement is governed by and is to be construed and enforced according to the internal laws of the State of Michigan, excluding any laws which direct the application of laws of any other jurisdiction.

Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:

PACIFIC RIM CAPITAL, INC.

LESSEE:

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By _____

Title _____

By _John Blahnik_____

Title _Vice President And Treasurer_

ANNEX B
TO
SCHEDULE NO. ___*1*_____
TO MASTER LEASE AGREEMENT
DATED AS OF *JUNE 29, 2001*

PURCHASE ORDER ASSIGNMENT AND CONSENT

THIS ASSIGNMENT AGREEMENT, dated as of *JUNE 29, 2001* ("Assignment") is entered into between *PACIFIC RIM CAPITAL* ("Lessor"), and *DELPHI AUTOMOTIVE SYSTEMS* ("Lessee"), based upon the following:

A.     Lessee desires to lease certain equipment ("Equipment") from Lessor pursuant to the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease").

B.     Lessee desires to assign, and Lessor is willing to acquire, certain of Lessee's rights and interests under the purchase order(s), agreement(s), and/or document(s) (the "Purchase Orders") Lessee has issued to the Supplier(s) of such Equipment.

NOW, THEREFORE, in consideration of their mutual covenants under this Assignment and the Lease, Lessor and Lessee agree as follows:

SECTION 1.    DEFINED TERMS.

All terms used in this Assignment have the meaning ascribed to them in the Lease unless otherwise defined in this Assignment.

SECTION 2.    ASSIGNMENT.

(a)    Lessee hereby assigns and sets over to Lessor all of Lessee's rights and interests in and to the Equipment and, to the extent they relate to the Equipment, the Purchase Orders, including, without limitation, (i) the rights to purchase, to take title, and to be named the purchaser in the bill of sale for the Equipment, (ii) all claims for damages in respect of the Equipment (including, without limitation, all warranty and indemnity claims), and (iii) any and all rights of Lessee to compel performance by the Supplier.

(b)    Even though Lessee has assigned its rights and interests in and to the Equipment and Purchase Orders to Lessor, unless an Event of Default exists under the Lease, Lessee is authorized during the term of the Lease to assert and enforce, at Lessee's sole cost and expense, from time to time in the name of and for the account of Lessor or Lessee (or both), as their interests may appear, whatever claims and rights Lessor may have against any Supplier of the Equipment

SECTION 3.    CONTINUING LIABILITY OF LESSEE.

Even though Lessee has assigned its rights and interests in and to the Equipment and Purchase Orders to Lessor:   (a) Lessee will remain liable to the Supplier to perform any duties and obligations of the purchaser under the Purchase Orders, except respecting payment provided for in the Lease so long as Lessee has complied with its obligations under Section I(b) of the Lease, to the same extent as if this Agreement had not been executed; (b) the execution of this Agreement will not modify any contractual rights of the Supplier under the Purchase Orders,

except respecting payment provided for in the Lease, and the liabilities of the Supplier under the Purchase Orders will continue as if this Agreement had not been executed; (c) the exercise by Lessor of any of its rights under this Assignment or the Lease will not release Lessee from any of its duties or obligations to the Supplier, except payment provided for in the Lease, under the Purchase Orders; and (d) Lessor will not have any obligation or liability under the Purchase Orders by reason of, or arising out of, this Assignment or be obligated to perform any of the obligations or duties of Lessee under the Purchase Orders or to make any payment (except to pay for the Equipment, subject to the terms in the Lease) or to make any inquiry of the sufficiency of or authorization for any payment received by any Supplier or to present or file any claim or to take any other action to collect or enforce any claim assigned under this Assignment.

The parties hereto have caused this Assignment to be duly executed as of the date first above written.

LESSOR:                                    LESSEE:

                                           By _Delphi Automotive Corp_
By_____                  Name _John Blahnik_
Name_____                  Title _Vice President and Treasurer_
Title_____

## CONSENT AND AGREEMENT

Supplier consents to this Assignment and agrees not to assert any claims or defenses against Lessor or Lessee that are inconsistent with this Assignment.  Supplier further agrees that the Purchase Orders are amended as necessary to provide as follows:

(a)    Title to and risk of loss of the Equipment will pass to Lessor upon Lessee's execution of the Delivery Certificate for such Equipment; and

(b)    Supplier waives and discharges any security interest, lien, or other encumbrance in or upon the Equipment and agrees to execute such documents as Lessor requests evidencing the release of any such encumbrance and the conveyance to Lessor of title to the Equipment.

(c)    On and after the date this Consent is executed, Supplier will not make any addition to or delete any items from the Equipment referred to in the Assignment without the prior written consent of both Lessor and Lessee.

The undersigned has caused this Consent to be executed this _____ day of _____, 20_____.

SUPPLIER:

By_____
Name_____
Title_____

ANNEX C
TO
SCHEDULE NO. _____
TO MASTER LEASE AGREEMENT
DATED AS OF _____

<u>DELIVERY CERTIFICATE</u>

To:    _____ ("Lessor")

      Pursuant to the provisions of the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease"), Lessee certifies and warrants that (a) all Equipment listed below has been delivered and installed (if applicable) and (b) Lessee has received the Equipment for all purposes of the Lease.

      Lessee further certifies that (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee under the Lease are true and correct on the date hereof; and (iii) Lessee has reviewed and approves the purchase documents for the Equipment, if any.

<u>DESCRIPTION OF EQUIPMENT</u>

| <u>Manufacturer</u> | <u>Serial Numbers</u> | <u>Type and Model of Equipment</u> |
|---|---|---|
| | | |

_____
Authorized Representative

Dated: _____

**ANNEX D**
**TO**
**SCHEDULE NO. _____1_____**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF _JUNE 29, 2001_**

STIPULATED LOSS AND TERMINATION VALUE TABLE[*]

| RENTAL | STIPULATED LOSS VALUE | TERMINATION VALUE |
|---|---|---|
| Interim Rent | % | % |
| Basic Term Rent | % | % |

Initials: _____          (M) ___ _John Blubit_ ___
Lessor                                                    Lessee

---

[*] The Stipulated Loss Value or Termination Value for any unit of Equipment equal the Capitalized Lessor's Cost of the unit multiplied by the appropriate percentage derived from the above tables. If the lease term is extended for any reason, then the last percentage figure shown above controls throughout the extended term.

ANNEX E

## NOTICE OF ACKNOWLEDGMENT AND ASSIGNMENT

[Date]

[Delphi Division Address]

Attention:  [John W. Jarrett]

Re:  Equipment Schedule No. _____ (the "Lease") to Master Lease Agreement dated
_____ (the "Agreement") between _____ as lessor ("Lessor") and
Delphi Automotive Systems Corporation, acting through its _____ Division as lessee
(the "Lessee"),

Ladies and Gentlemen:

**NOTICE**

Lessor hereby notifies and directs Lessee that:

By collateral assignment, Lessor has assigned or will promptly assign to
_____ ("Lender") all of Lessor's rights under the Lease, including all
rights to receive rent payments and other sums due under the Lease (collectively, the
"Payments").  Notwithstanding this assignment, Lessor will continue to perform Lessor's
obligations under the Lease.

Until Lessee receives written notice to the contrary from Lender, Lessee will make all
Payments directly to Lender at the following address:
_____.

**ACKNOWLEDGEMENT**

Lessee acknowledges to Lender that:

1.      True and complete copies of the Lease and the Agreement are attached hereto
as Exhibit A, and they represent the sole agreements between Lessor and Lessee with respect
to the Equipment and the Payments due and to become due under the Lease.

2.      If Lessee has executed a Delivery Certificate for the equipment described in the
Lease (the "Equipment"),  then Lessee's obligation to make the Payments is absolute and
unconditional, and Lessee will not assert against Lender, any claim, defense, counterclaim,
recoupment, setoff or right to cancel the Lease.  If Lessee has not executed a Delivery
Certificate, then upon Lessee's execution thereof, Lessee's obligation to make the Payments
will be absolute and unconditional, and Lessee will not assert against Lender, any claim,
defense, counterclaim, recoupment, setoff or right to cancel the Lease.

3.    If Lessee has executed a Delivery Certificate for the Equipment, then the Equipment has been fully and finally accepted by Lessee and is in Lessee's possession at the location specified in the Lease.  If Lessee has not executed a Delivery Certificate, then upon Lessee's execution thereof, the Equipment will have been fully and finally accepted by Lessee and will be in Lessee's possession at the location specified in the Lease.

4.    The Lease and the Agreement are in full force and effect, and Lessee will not modify or consent to any material modification of the Lease or the Agreement, without the prior written consent of Lender, and such modification will be ineffective without Lender's prior written consent, which consent will not be unreasonably withheld.

5.    Neither Lessee nor, to Lessee's knowledge, Lessor, is in default under the Lease or the Agreement.

6.    No sublease, assignment or transfer by Lessee will in any manner impair, diminish or relieve the Lessee of its primary obligations under the Lease or the Agreement, including its obligation to make all Payments.

7.    With respect to the Lease and the Agreement, Lessee and Lessor waive all of their rights and remedies under Article 2A of the Uniform Commercial Code, except to the extent that they are expressly set forth in the Lease or the Agreement.

8.    Lessee has not received any notice of a prior sale, transfer, assignment, hypothecation or pledge of the Lease, the Payments or the Equipment.

The undersigned Lessee and Lessor acknowledge and confirm that the above statements are true and correct.

**LESSOR:**                                              **LESSEE:**

_____      Delphi Automotive Systems Corporation

By: _____      By: _____

Its: _____      Its: _____

**EQUIPMENT SCHEDULE
SCHEDULE NO. 1
DATED AS OF June 29, 2001
TO MASTER LEASE AGREEMENT
DATED AS OF June 29, 2001**

Lessor and its Mailing Address:

Pacific Rim Capital, Inc.
One Jenner, Suite 170
Irvine, CA 92618

Lessee and its Mailing Address:

Delphi Automotive Systems Corporation
5725 Delphi Drive
Troy, MI 48098

Capitalized terms not defined in this Schedule have the meanings assigned to them in the Master Lease Agreement identified above (the "Agreement").   (The Agreement and this Schedule are collectively referred to as the "Lease.")

A.      EQUIPMENT

Pursuant to the terms of the Lease, Lessor will acquire and lease to Lessee, and Lessee will lease from Lessor, the Equipment listed on Annex A attached to this Schedule and made a part of this Schedule.

B.      FINANCIAL TERMS

1.      Advance Rent (if any):  $ N/A

2.      Capitalized Lessor's Cost:  $3,108,161.60

3.      Basic Term Lease Rate Factor:  1.735%

4.      Daily Lease Rate Factor:  0.058%

5.      Term:  For each item of Equipment, begins on the Lease Commencement Date of such Item and continues for 60 Months after the Basic Term Commencement Date and until Lessee (i) delivers Lessor 30 days prior written notice of its intent to terminate this Schedule (provided any such termination shall not be before the expiration of said 60 Month period), and (ii) returns the Equipment to Lessor in the condition required hereunder and under the Schedule.   If any term is extended, the word "term" shall be deemed to refer to the extended term.

6.      Basic Term Commencement Date:  The first day of the calendar month which immediately follows the Lease Commencement Date of the last (final) item of Equipment delivered to and accepted hereunder by Lessee.

7.      Equipment Location:  Packard Hughes-Interconnect, 17195 Hwy 98 W., Foley, AL 36532

8.      Lessee's Federal Tax ID Number:  38-0572515

9. <u>Suppliers</u>:  Simplimatic Automation; DEK USA; FUJI America Corp.; BTU International; TDK Corp of America; Speedline Technologies; PMJ Automec USA Inc.; IPTE; Teradyne, Inc.; Dionex Corporation; and Brock Electronics LTD

10. <u>Last Delivery Date</u>:  August 31, 2001

11. <u>First Termination Date</u>:  Not Applicable to this Schedule.

C.      TERM AND RENT

1.      <u>Interim Rent</u>.  For the period from and including the Lease Commencement Date to the Basic Term Commencement Date ("Interim Period"), Lessee will pay rent ("Interim Rent") for each unit of Equipment equal to the product of (x) the Daily Lease Rate Factor, (y) the Capitalized Lessor's Cost of such unit and (z) the number of days in the Interim Period.  Interim Rent is due on the last day of each month during the Interim Period.

2.      <u>Basic Term Rent</u>.  Commencing on the last day of that certain month in which the Basic Term Commencement Date occurs, and on the same day of each following month (each, a "Rent Payment Date") during the Basic Term, Lessee will pay ("Basic Term Rent") equal to the product of (x) the Basic Term Lease Rate Factor and (y) the Capitalized Lessor's Cost of all Equipment covered by this Schedule.

3.      <u>Adjustment to Capitalized Lessor's Cost</u>.  If Lessee authorizes Lessor to adjust the Capitalized Lessor's Cost to account for equipment change orders, equipment returns, invoicing errors, and similar matters and Lessor agrees to such adjustment, Interim Rent and Basic Term Rent will be adjusted (pursuant to Paragraphs 1 and 2 above) and Lessor will promptly send Lessee a written notice stating the final Capitalized Lessor's Cost which Lessee agrees to acknowledge in writing.

D.      EQUIPMENT RETURN

Upon the expiration or permitted termination of this Schedule, Lessee will promptly, subject to Lessee's rights in connection with an Event of Loss under Section VII, perform any repairs required to place the affected Equipment in condition stated below.  If deinstallation, disassembly, or crating is required, Lessee will deinstall, disassemble, and crate the Equipment in accordance with the Suppliers specifications.

Upon expiration or permitted termination of this Schedule, Lessee, at its own risk and expense, will return the Equipment then subject to this Lease to the Lessor pursuant to the Lessor's instructions to a location designated by Lessor.  Such Equipment, upon redelivery shall be free and clear of all mortgages, liens, security interest charges, encumbrances and claims.

Upon return of such Equipment, Lessor or its agent shall inspect the equipment; if in the Lessor's opinion the Equipment is not in compliance with the condition s hereinafter described, a mutually acceptable independent appraiser (or if no such appraiser has been selected within 15 days prior to the expiration or earlier termination of the Schedule, the independent Equipment Company) shall be appointed by the Lessor to inspect the Equipment for the purpose of determining the repairs, additions or replacements, if any which are necessary to place the Equipment in the condition hereinafter described.

At the time of return, the Equipment shall:

1. Be in compliance with all applicable federal, state and local laws;

2. Be in good operating order, repair and condition, free of excess dirt, corrosion, with no missing or damaged parts, free of any hazardous waste material;

3. Be mechanically and structurally sound, able to perform the same function for which it was intended as when originally delivered in accordance with manufacturer's recommended specifications;

4. Equipment to be deinstalled according to the manufacturer's specifications.

5. During notice period, the lessee shall demonstrate the Equipment under power to prospective buyers.

6. Lessee shall enter a maintenance agreement with the manufacturer or other such party acceptable to Lessor. Upon equipment return, the equipment will be relicensed and recertified for manufacturer maintenance at Lessee expense.

Lessee agrees to pay all fees, charges, costs and expenses related to such inspection and Lessee shall pay for all repairs and replacement, which shall be effectuated immediately.

In the event any necessary repairs or replacements are not completed within seven days from the expiration or permitted termination date, Lessee shall pay to Lessor, interim rent equal to the daily rent equivalent of the periodic monthly rent for each day in excess of the Term until such repairs and replacements are completed and the units of Equipment involved are returned to Lessor. Said payment shall be made on the date the units of Equipment are returned to Lessor, (but not less frequently than monthly).

E.        UCC Financing Statements

> Lessee hereby authorizes Lessor to file UCC financing statements against Lessee as deemed reasonably necessary by Lessor to establish and protect the rights and remedies of Lessor hereunder and in the Equipment without Lessee's signature to the extent permitted by applicable law.

Lessee hereby agrees that Lessor's obligations hereunder to purchase the Equipment and lease same to Lessee are subject to credit approval (of Lessee given the details of this Lease).

Except as expressly modified by this Schedule, all terms and provisions of the Agreement remain in full force and effect.  The terms and conditions of this Schedule shall govern in the event of any conflict between the terms and conditions hereof and of the Agreement.  This Schedule is not binding or effective with respect to the Agreement or Equipment until executed by authorized representatives of Lessor and Lessee.

Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:                                              LESSEE:

Pacific Rim Capital, Inc.                            Delphi Automotive Systems Corporation

By _____            By _____

Name Marc C. Mills _____     Name John G. Blahnik _____

Title President _____      Title Vice President and Treasurer _____

**ANNEX A**
**TO**
**SCHEDULE NO. 1**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF June 29, 2001**
<u>DESCRIPTION OF EQUIPMENT</u>

| Equipment Type / Supplier | Cost Per Type |
|---|---|
| 1. Conveyors for line<br>Supplier: Simplimatic | $344,551.00 |
| 2. Ink Jet Machine<br>Supplier: Simplimatic | $65,000.00 |
| 3. 265 Infinity Screen Printer<br>Supplier: DEK | $184,875.00 |
| 4. FUJI Chip Shooter, Feeder Storage Rack,<br>Feeder Paper, Feeder Emboss, Flex Placer,<br>Keyboard, Motor Feeder, Main Module,<br>Machine Interface, Operator Module, Interface<br>Board, Cable, Training and Installation.<br>Supplier: FUJI | $776,805.50 |
| 5. VIP-98 Air Reflow Oven<br>Supplier: BTU International | $78,500.00 |
| 6. Radial Lead Insertion Machine,<br>Axial Insertion Machine, Conversion Software,<br>Spares Parts Kit, Calibration Tool<br>Supplier: TDK Corp of America | $367,660.00 |
| 7. Vectra Base Wave Solder Machine<br>Supplier: Speedline Technologies | $170,389.10 |
| 8. Odd Form Cells, Custom Reel Feeder for<br>AMPS tabs,<br>Supplier: PMJ Automec USA | $592,947.00 |
| 9. Speedrouter, Board Grippers,<br>Supplier: IPTE | $159,921.00 |
| 10. ICT Test Handling machine, Test Fixture<br>for GE Maine Domestic Panel, Test Fixture<br>for GE Maine International PCB.<br>Supplier: IPTE | $150,048.00 |
| 11. ICT Tester<br>Supplier: Teradyne Inc | $171,340.00 |
| 12. ION Chromatograph<br>Supplier: Dionex Corporation | $26,700.00 |
| 13. Bartector CP742E<br>Monitor Module for Fuji unit<br>Supplier: Brock Electronics | $19,425.00 |

**ANNEX C
TO
SCHEDULE NO. 1
TO MASTER LEASE AGREEMENT
DATED AS OF JUNE 29, 2001**

<u>DELIVERY CERTIFICATE NO. *x*</u>

To:    Pacific Rim Capital, Inc. ("Lessor")

Pursuant to the provisions of the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease"), Lessee certifies and warrants that (a) all Equipment listed below has been delivered and installed (if applicable) and (b) Lessee has received the Equipment for all purposes of the Lease.

Lessee further certifies that (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee under the Lease are true and correct on the date hereof; and (iii) Lessee has reviewed and approves the purchase documents for the Equipment, if any.

Equipment Description:          As set forth in attached Description of Equipment.

Capitalized Lessor's Cost:      $_____.

Lease Commencement Date:        _____.

Basic Term Commencement Date:   _____.

Equipment Location:             _____

Basic Term Rent:                $          per calendar month, in advance.


_____John Belshul_____
                              Authorized Representative

_____08/17/01_____    Dated:

6 of 7

**ANNEX D TO**
**SCHEDULE NO. 1**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF JUNE 29, 2001**

<u>STIPULATED LOSS VALUE TABLE</u>[*]

| Rent Payment Date No. | Percentage of Lessor's Cost | | Rent Payment Date No. | Percentage of Lessor's Cost | |
|---|---|---|---|---|---|
| 1 | 100.000 | % | 31 | 68.256 | % |
| 2 | 99.058 | % | 32 | 67.062 | % |
| 3 | 98.108 | % | 33 | 65.858 | % |
| 4 | 97.151 | % | 34 | 64.645 | % |
| 5 | 96.186 | % | 35 | 63.423 | % |
| 6 | 95.213 | % | 36 | 62.191 | % |
| 7 | 94.233 | % | 37 | 60.949 | % |
| 8 | 93.245 | % | 38 | 59.697 | % |
| 9 | 92.249 | % | 39 | 58.435 | % |
| 10 | 91.245 | % | 40 | 57.163 | % |
| 11 | 90.234 | % | 41 | 55.881 | % |
| 12 | 89.214 | % | 42 | 54.589 | % |
| 13 | 88.186 | % | 43 | 53.287 | % |
| 14 | 87.150 | % | 44 | 51.974 | % |
| 15 | 86.106 | % | 45 | 50.651 | % |
| 16 | 85.054 | % | 46 | 49.318 | % |
| 17 | 83.993 | % | 47 | 47.974 | % |
| 18 | 82.924 | % | 48 | 46.619 | % |
| 19 | 81.846 | % | 49 | 45.254 | % |
| 20 | 80.760 | % | 50 | 43.877 | % |
| 21 | 79.665 | % | 51 | 42.490 | % |
| 22 | 78.561 | % | 52 | 41.092 | % |
| 23 | 77.449 | % | 53 | 39.683 | % |
| 24 | 76.328 | % | 54 | 38.262 | % |
| 25 | 75.198 | % | 55 | 36.831 | % |
| 26 | 74.059 | % | 56 | 35.388 | % |
| 27 | 72.911 | % | 57 | 33.933 | % |
| 28 | 71.754 | % | 58 | 32.467 | % |
| 29 | 70.588 | % | 59 | 30.989 | % |
| 30 | 69.413 | % | 60 and thereafter | 29.500 | % |

---

[*] The Stipulated Loss Value or Termination Value for any unit of Equipment equal the Capitalized Lessor's Cost of the unit multiplied by the appropriate percentage derived from the above tables. If the lease term is extended for any reason, then the last percentage figure shown above controls throughout the extended term.

**DELIVERY CERTIFICATE NO. 1**
**TO**
**SCHEDULE NO. 1**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF JUNE 29, 2001**

To:     Pacific Rim Capital, Inc. ("Lessor")

Pursuant to the provisions of the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease"), Lessee certifies and warrants that (a) all equipment listed below ("Equipment") has been delivered and installed (if applicable) and (b) Lessee has received the Equipment for all purposes of the Lease.

Lessee further certifies that (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee under the Lease are true and correct on the date hereof; and (iii) Lessee has reviewed and approves the purchase documents for the Equipment, if any.

| | |
|---|---|
| Equipment Description: | As set forth in attached Description of Equipment. |
| Capitalized Lessor's Cost | $171,340.00. |
| Lease Commencement Date: | June 25, 2001. |
| Basic Term Commencement Date: | The Basic Term Commencement Date is the later of (i) August 1, 2001 or (ii) the first day of the calendar month which immediately follows the Lease Commencement Date of the last (final) Item of Equipment delivered to and accepted under the Lease by Lessee. |
| Equipment Location: | 17195 Hwy. 98 West, Foley, AL  36532. |
| Basic Term Rent: | $2,972.75 per calendar month, in advance. |

_John Blake_
Authorized Representative

Dated:  08/17/01

1

**DESCRIPTION OF EQUIPMENT**
**TO DELIVERY CERTIFICATE NO. 1**

Equipment Location: 17195 Highway 98 West, Foley, AL  36532

| QTY. | PART/MODEL NUMBER | DESCRIPTION | SERIAL NO. |
|------|-------------------|-------------|------------|
| 1 | 049-408-02 | TERADYNE MANUFACTURING PROCESS TEST BASE SYSTEM, Z1888-2 W/O PRISM | 1888-2-208 |
| 1 | | OPT, Z18 PC W/STD MONITOR | |
| 1 | | OPT, DIAGNOSTIC PRINTER | |
| 1 | | UPGRADE, THC TO VP | |
| 3 | | DRVR/RCVR II-D BDS, BOX OF 8 | |
| 2 | | DRVR/RCVR II-D BDS, BOX OF 4 | |
| 1 | | OPT, DUAL PRGM PWR SPLY Z1803/1805/1808/1888 | |
| 1 | | OPT, HIGH VOLT 100V STIM FOR ATB2/EAO SYSTEMS | |
| 1 | | OPT, DUAL VACUUM Z1803PLUS-2, Z1888-2 | |
| 1 | | TRAINING, 18XX PRGM-VP | |
| 1 | | PCA, DRVR/RCVR II-D | |
| 1 | | OPT, Z18XX PHILIPS INTFC SFTWR | |
| 2 | | 1 DAY APPLICATIONS ASSITANCE AGREEMENT FOR Z1800-SERIES | |

## DELIVERY CERTIFICATE NO. 2
## TO
## SCHEDULE NO. 1
## TO MASTER LEASE AGREEMENT
## DATED AS OF JUNE 29, 2001

To:     Pacific Rim Capital, Inc. ("Lessor")

Pursuant to the provisions of the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease"), Lessee certifies and warrants that (a) all equipment listed below ("Equipment") has been delivered and installed (if applicable) and (b) Lessee has received the Equipment for all purposes of the Lease.

Lessee further certifies that (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee under the Lease are true and correct on the date hereof; and (iii) Lessee has reviewed and approves the purchase documents for the Equipment, if any.

| | |
|---|---|
| Equipment Description: | As set forth in attached Description of Equipment. |
| Capitalized Lessor's Cost: | $364,551.00. |
| Lease Commencement Date: | As set forth in attached Description of Equipment. |
| Basic Term Commencement Date: | The Basic Term Commencement Date is the later of (i) September 1, 2001 or (ii) the first day of the calendar month which immediately follows the Lease Commencement Date of the last (final) Item of Equipment delivered to and accepted under the Lease by Lessee. |
| Equipment Location: | 17195 Hwy. 98 West, Foley, AL  36532. |
| Basic Term Rent: | $6,324.96 per calendar month, in advance. |

_John Blahnik_
Authorized Representative

Dated: _08/23/01_

1

## DESCRIPTION OF EQUIPMENT
## TO DELIVERY CERTIFICATE NO. 2

**Equipment Location: 17195 Highway 98 West, Foley, AL  36532**

| QTY. | PART/MODEL NUMBER | DESCRIPTION | SERIAL NO. | LEASE COMMENCEMENT DATE |
|---|---|---|---|---|
| 1 | 10000589 | SIMPLIMATIC AUTOMATION CONVEYOR PACKAGE TO INCLUDE THE FOLLOWING:  2050, 24", ZW, HC | M108850 | 6/29/01 |
| 4 | 10000834 | 2010, 48", 2D, INSPECT | | 6/29/01 |
| 1 | 10000838 | 2010, 24", 32-34.5" ELEVATION | M109290 | 6/29/01 |
| 1 | 10000839 | 2010, 24", 52-54.5" INCLINE | M109300 | 6/29/01 |
| 1 | 10000840 | 2010, 24", 54.5" HEIGHT | M109310 | 6/29/01 |
| 1 | 10000842 | 2170, 16FT, EC, FS, INDEX, ALARM | M109320 | 6/29/01 |
| 2 | 10000844 | 2180, FIFO, CIMTRACK | | 6/29/01 |
| 1 | 10000853 | 2010, 837MM, Z, SLIDE, I | M109340 | 6/29/01 |
| 1 | 10000854 | 2010, 1.5 METER, Z, SLIDE, I | M109350 | 6/29/01 |
| 1 | 10000837 | 2090, 37"-32" WAVE INFEED | M109490 | 6/29/01 |
| 1 | 10000841 | 2090, 54"-37" LOWERATOR | M109500 | 6/29/01 |
| 1 | 10000851 | 2160, 13FT, P&F, Z, HC | M109580 | 6/29/01 |
| 1 | 10000678 | 2010 DUAL LANE 24", Z, 2D, .125 | | 6/29/01 |
| 1 | 10000440 | 8010, 93.5", AB, HC, I | | 6/29/01 |
| 3 | 10000695 | 2010, 24", Z, PWC, I | | 6/29/01 |
| 8 | 10000574 | 2010, 24", 1D, ZW, SLIDE, I | | 6/29/01 |
| 1 | 10000697 | 2230, 24", PWC, DESTACKER | M108830 | 6/29/01 |
| 1 | 10000687 | 2010, 80", Z, 2D, PWC, WORK | M109180 | 6/29/01 |
| 1 | 10000835 | 2010, 48" WORKSTATION | M109270 | 6/29/01 |
| 1 | 10000700 | 2260, 78", SERVO, PWC | | 6/29/01 |
| 1 | 10000468 | 2050 CIMTRACK INVERTER | | 6/29/01 |
| 1 | 11000003 | INSTALLATION | | 6/29/01 |
| 1 | 3600 | IMS MODEL 3600 INKJET MARKING SYSTEM | | 6/22/01 |

**DELIVERY CERTIFICATE NO. 3**
**TO**
**SCHEDULE NO. 1**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF JUNE 29, 2001**

To:    Pacific Rim Capital, Inc. ("Lessor")

Pursuant to the provisions of the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease"), Lessee certifies and warrants that (a) all equipment listed below ("Equipment") has been delivered and installed (if applicable) and (b) Lessee has received the Equipment for all purposes of the Lease.

Lessee further certifies that (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee under the Lease are true and correct on the date hereof; and (iii) Lessee has reviewed and approves the purchase documents for the Equipment, if any.

| | |
|---|---|
| Equipment Description: | As set forth in attached Description of Equipment. |
| Capitalized Lessor's Cost: | $1,979,323.60 |
| Lease Commencement Date: | As set forth in attached Description of Equipment. |
| Basic Term Commencement Date: | The Basic Term Commencement Date is the later of (i) October 1, 2001 or (ii) the first day of the calendar month which immediately follows the Lease Commencement Date of the last (final) Item of Equipment delivered to and accepted under the Lease by Lessee. |
| Equipment Location: | 17195 Hwy. 98 West, Foley, AL  36532. |
| Basic Term Rent: | $34,341.26 per calendar month, in advance. |

_John Blnln_
Authorized Representative

Dated:  _Oct 15, 2001_

## DESCRIPTION OF EQUIPMENT
## TO DELIVERY CERTIFICATE NO. 3

**Installation Site:** 17195 Highway 98 West, Foley, AL  36532

| QTY. | PART/MODEL NUMBER | DESCRIPTION | SERIAL NO. | LEASE COMMENCEMENT DATE |
|------|-------------------|-------------|------------|--------------------------|
| 1 | 10000467 | 2120 CIMTRACK FLIGHTED BUFFER | | 7/12/01 |
| 1 | 156562 | SMEMA UPLINE INTERFACE | 276153 | 6/6/01 |
| 1 | 156563 | SMEMA DOWNLINE INTERFACE | | 6/6/01 |
| 1 | 160067 | TYPHOON E.STOP BLAMKING PLUG BOM | | 6/6/01 |
| 1 | 133944 | DO NOT FIT PASTE DISPENSER | | 6/6/01 |
| 1 | 152031 | BASIC BOARD INSPECTION | | 6/6/01 |
| 1 | 110V-INF | INF 110V M/C VOLTAGE SETTING | | 6/6/01 |
| 1 | 137977 | PROFLOW SCAR OPTION FOR INF | | 6/6/01 |
| 2 | 137471 | TRANSFER HEAD 300MM CASSETTE TYPE | | 6/6/01 |
| 1 | PAINT.D | DEK/UIC WHITE DSF 2.4.1 | | 6/6/01 |
| 1 | 158067 | INFINITY OPERATOR MANUAL (ENGLISH) | | 6/6/01 |
| 1 | 152035 | NETWORKED FILES, TCP/IP | | 6/6/01 |
| 1 | 157045 | QC-CALC V.2.0 32BIT, WIN 95/98 WIN NT 4.0 W/CABLE | | 6/6/01 |
| 1 | 157275 | BLUE UNDERSCREEN CLEANER 520MM | | 6/6/01 |
| 1 | 115975 | VACUUM/FILTRATION UNIT SP08 EL/CB 100-120V 60HZ | | 6/6/01 |
| 1 | 156915 | INTERNATIONAL PACKING | | 6/6/01 |
| 1 | SQA353 | SQY ASSY (45DEG X 300M) METAL | | 6/6/01 |
| 1 | INST.USA | INSTALLATION BY DEK USA | | 6/6/01 |
| 1 | WARRANTY.1 | WARRANTY 1 YEAR | | 6/6/01 |
| 1 | TRAINING | TRAINING | | 6/6/01 |
| 1 | | HIGH SPEED CHIP PLACER | CP742E-529 | 6/29/01 |
| 1 | DOAHO-0002 | CP742E SPARE PARTS KIT | | 6/29/01 |
| 1 | | QUICK CHIP PLACER | QP341E-992 | 6/29/01 |
| 1 | K2049M | KB-595EAP KEY BOARD | | 6/29/01 |
| 1 | 59320 | MULTI TRAY UNIT, MTU-9E QP341 (STACKABLE) | | 6/29/01 |
| 1 | UEEK-0100 | UCW01 PROG. KIT/MAIN MOD | | 6/19/01 |
| 1 | UEEK-4330 | CP7 FUJICAM PROGRAMMING INTERFACE | | 6/19/01 |
| 1 | UEEK-4300 | QP341 FUJICAM PROGRAMMING INTERFACE | | 6/19/01 |
| 1 | UEEK-0200 | UEEK-01 OPERATORS KIT WITH C/C SOFTWARE | | 6/19/01 |
| 1 | 39217 | SPARE FEEDER STORAGE RACK (CP6) | | 6/1/01 |
| 40 | AKJAA-2100 | KJD-0804-1.0-330 8MMX4MM CP 7 FEEDER PAPER | | 6/1/01 |
| 30 | AKJAA-2400 | KJE-0804-1.0-330 8MMX4MM CP 7 FEEDER EMBOSSED | | 6/1/01 |
| 20 | AKJAA-2200 | KJD-0804-1.3-330 8MMX4MM CP 7 FEEDER PAPER | | 6/1/01 |
| 10 | AKJAA-2500 | KJE-0804-1.3-330 8MMX4MM CP7 FEEDER EMBOSSED | | 6/1/01 |
| 3 | A2835-AKJBA-0100 | KJE-1204 2.5-330 CP-VII FEEDER 12X4MM EMBOSSED | | 6/1/01 |
| 5 | A2835-AKJBA-0200 | KJE-1208 2.5-330 CP-VII FEEDER 12X8MM EMBOSSED | | 6/1/01 |
| 6 | A2835-AKJCA-0300 | KJE-1612-3.7-330 CP7 FEEDER | | 6/1/01 |
| 3 | AKDCA-6100 | FMB-16E-380 IP/QP MOTOR FEEDER | | 6/1/01 |
| 2 | AKDCA-6100 | FMB-16E-380 IP/QP MOTOR FEEDER | | 7/7/01 |
| 5 | AKDDA-6100 | FMB-24E-380 IP/QP MOTOR FEEDER | | 7/7/01 |
| 1 | UEEK-6010 | IMG01 GERBCAM INTERFACE GERBER TO CAD | | 7/17/01 |

**DESCRIPTION OF EQUIPMENT**
**TO DELIVERY CERTIFICATE NO. 3**

Installation Site: 17195 Highway 98 West, Foley, AL  36532

| QTY. | PART/MODEL NUMBER | DESCRIPTION | SERIAL NO. | LEASE COMMENCEMENT DATE |
|---|---|---|---|---|
| 1 | PHFA-4 | VIP 98 AIR TWENTY-TWO INCH BELT TYPE RECIRCULATION IMPINGEMENT CONVECTION REFLOW SOLDER FURNACE | | 6/20/01 |
| 1 | A0801010 | VC-21S MAIN UNIT RADIAL LEAD INSERTION MACHINE | | 7/30/01 |
| 1 | A4050110 | AC-7 AXIAL VCD MAIN UNIT | | 7/30/01 |
| 1 | VC-1112056-01 | VECTRA WAVESOLDERING SYSTEM | VC-1112056-01 | 7/10/01 |
| 1 | OP-BASE-VC | VECTRA BASE MACHINE | | 7/10/01 |
| 1 | OP-RGDV-VC | RIGID V FINGERS | | 7/10/01 |
| 1 | OP-FCLR-VC | FINGER CLEANER | | 7/10/01 |
| 1 | OP-CBS-VC | CENTER BOARD SUPPORT | | 7/10/01 |
| 1 | OP-MWTH-VC | MOTORIZED WIDTH ADJUST | | 7/10/01 |
| 1 | OP-VEC-VC | VECTA HEATER | | 7/10/01 |
| 1 | OP-TOPIR-VC | TOP INFRARED HEATER | | 7/10/01 |
| 1 | OP-ACCSPRAY-VC | ACCUSPRAY FLUXER | | 7/10/01 |
| 1 | OP-EXTFLX-WS | EXTERNAL FLUXER CABINET | | 7/10/01 |
| 1 | OP-N2PLS-VC | CONTOUR PLUS SYSTEM | | 7/10/01 |
| 1 | OP-N2ROT-VC | NITROGEN ROTARY CHIP NOZZLE | | 7/10/01 |
| 1 | OP-MROLL-VC | MOTORIZED ROLLOUT/JACK | | 7/10/01 |
| 1 | OP-HGTSNR-EC | WAVE HEIGHT SENSOR | | 7/10/01 |
| 1 | OP-SMEMA-WS | SMEMA INTERFACE | | 7/10/01 |
| 1 | OP-MNLS-WS | ENGLISH MANUALS | | 7/10/01 |
| 1 | ALP.000086.2 | PACKARD HUGHES DOMESTIC 4-UP PANEL | | 7/31/01 |
| 1 | ALP.DEMO14.0 | SPEEDROUTER DEMO SYSTEM, SAW, CONSUMABLE PACKAGE, EDGE BELT | | 7/18/01 |
| 1 | ALP.000086.1 | PACKARD HUGHES DOMESTIC 2-UP PANEL | | 7/18/01 |
| 2 | 960708 | CBL, 3COND, LINE CORD, US | | 7/13/01 |
| 1 | 56829 | PROD, D6, AS40, .50ML VIAL KIT | | 7/13/01 |
| 1 | 50803 | SERVICE, INSTALL, DX-120 | | 7/13/01 |
| 1 | SP5635 | SP SYS, DUAL COLUMN DX-120 AUTO | | 7/13/01 |
| 1 | | BARTECTOR MONITOR MODULE | | 7/16/01 |
| 1 | | SCANNER, HAND HELD FOR PS2, HS100 | | 7/16/01 |
| 1 | | CONTROLLER, C/W ALL STANDARD FEATURES INCLUDING 2 AVAILABLE, DB9, SERIAL PORTS | | 7/16/01 |
| 1 | | FIXTURE, PACKARD, DISPENSE | | 8/27/01 |
| 2 | ALP.000132.1 | TRAVERSER UNIT, 1500MM STROKE | | 7/13/01 |
| 1 | ALP.000133.1 | INSPECTION CONVEYOR, 2400MM, 4-ZONE | | 7/13/01 |
| 1 | ALP/000134.1 | LINKING CONVEYOR, 500MM, 1-ZONE | | 7/13/01 |
| 1 | ALP.000088.1 | FIXTURE, PACKARD, DOMESTIC | | 8/27/01 |
| 1 | ALP.000089.1 | FIXTURE, PACKARD, INTERNATIONAL | | 8/27/01 |

## DESCRIPTION OF EQUIPMENT
### TO DELIVERY CERTIFICATE NO. 3

Installation Site: 17195 Highway 98 West, Foley, AL  36532

| QTY. | PART/MODEL NUMBER | DESCRIPTION | SERIAL NO. | LEASE COMMENCEMENT DATE |
|------|-------------------|-------------|------------|-------------------------|
| 1 | ALP.000084.1 | ADD-ON HANDLER NTH 5260/4 | | 8/27/01 |
| 1 | ALP.000085.1 | GRS GRAPHICAL REPAIR STATION | | 8/27/01 |

**DELIVERY CERTIFICATE NO. 4**
**TO**
**SCHEDULE NO. 1**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF JUNE 29, 2001**

To:    Pacific Rim Capital, Inc. ("Lessor")

Pursuant to the provisions of the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease"), Lessee certifies and warrants that (a) all equipment listed below ("Equipment") has been delivered and installed (if applicable) and (b) Lessee has received the Equipment for all purposes of the Lease.

Lessee further certifies that (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee under the Lease are true and correct on the date hereof; and (iii) Lessee has reviewed and approves the purchase documents for the Equipment, if any.

| | |
|---|---|
| Equipment Description: | As set forth in attached Description of Equipment. |
| Capitalized Lessor's Cost: | $617,014.34 |
| Lease Commencement Date: | As set forth in attached Description of Equipment. |
| Basic Term Commencement Date: | November 1, 2001 |
| Equipment Location: | 17195 Hwy. 98 West, Foley, AL  36532. |
| Basic Term Rent: | $10,705.20 per calendar month, in arrears. |
| Final Capitalized Lessor's Cost For Equipment Schedule No. 1 Dated June 29, 2001: | $3,132,228.94 |
| Total Final Basic Term Rent For Equipment Schedule No. 1 Dated June 29, 2001: | $54,344.17 per calendar month, in arrears. |

Lessee acknowledges that Delivery Certificate Nos. 1, 2 and 3 incorrectly state that Basic Term Rent is due monthly in advance and that such Basic Term Rent for each is due monthly in arrears.

_____
Authorized Representative

Dated: ___10/17/01_____

**ANNEX C
TO SCHEDULE NO. 1
TO MASTER LEASE AGREEMENT
DATED AS OF JUNE 29, 2001**

Installation Site:  17195 Highway 98 West, Foley, AL  36532

| QTY. | PART/MODEL NUMBER | DESCRIPTION | SERIAL NO. | LEASE COMMENCEMENT DATE |
|---|---|---|---|---|
| 2 | HISAC 1500 | HISAC 1500 ODD-FORM ASSEMBLY CELL | 20001112, 20001170 | 9/6/2001 |
| 2 | | FINGER SETS | | 9/6/2001 |
| 3 | | PROGRAMMABLE CLINCHING UNIT AND BOARD SUPPORT | | 9/6/2001 |
| 4 | | VISION PLUS PACKAGE, LEADSCAN - LASER LEAD INSPECTION SYSTEM | | 9/6/2001 |
| 5 | | FRONT FEEDER INTERFACE - ADDITIONAL 300MM OF FEEDER SPACE, 5 SLOTS | | 9/6/2001 |
| 7 | | SINGLE LANE TUBE FEEDER WITH AUTOMATIC TUBE CHANGE | 1515, 1516, 1518, 1521, 1522, 1523, 1524 | 9/6/2001 |
| 2 | | RADIAL FEEDER | 3607, 3608 | 9/6/2001 |
| 10 | | GPAX FEEDER | 36073608 | 9/6/2001 |
| 1 | M11125-4-0 | PUNCHING TOOL | | 9/6/2001 |
| 1 | M11144-4-0 | CUSHION | | 9/6/2001 |
| 1 | M11187-4-0 | GUIDE PLATE | | 9/6/2001 |
| 2 | V0688 | CUSTOM REEL FEEDER | 0139, 0140 | 10/5/2001 |

## CERTIFICATE OF INCUMBENCY

I, Diane Kaye, do hereby certify that I am the duly qualified and acting Secretary of Delphi Automotive Systems Corporation (the "Company"), a Delaware corporation, and I do further certify that (i) the person whose name, title and signature appear below hold with the Company the position set opposite his name, and the signature appearing opposite his name is his genuine signature; and (ii) such person is duly authorized to act on behalf of and to bind the Company, for and with respect to obligations under Equipment Schedule(s) referencing and incorporating the terms and conditions of the Master Lease Agreement between the Company and Pacific Rim Capital, Inc., dated as of June 29, 2001 (the "Lease") and that upon execution and delivery by said person of the Lease and / or any documents related to the Lease (including, without limitation, Equipment Schedules, Certificates of Delivery and Acceptance, and Notices and Acknowledgments of Assignment), each will constitute a legally binding and enforceable obligation of the Company.

| Position | Name | Signature |
|---|---|---|
| Vice President and Treasurer | John G. Blahnik | *John Blahnik* |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of this Company this 29 day of June, 2001.



By _____
           Secretary